PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*Authenticom, Inc. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | MDL No. 2817<br>Case No. 18-cv-00864<br><br>Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |

**RESPONSE OF DEFENDANTS CDK GLOBAL, LLC
AND THE REYNOLDS AND REYNOLDS COMPANY
TO PLAINTIFF AUTHENTICOM, INC.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
ON DEFENDANTS' COUNTERCLAIMS**

**PUBLIC VERSION**

## RECORD CITATION FORMAT

| Abbr. | Reference | Docket Number |
|---|---|---|
| Auth. Ex. | Exhibits to the Declaration of Daniel V. Dorris, May 20, 2020 | Dkt. 977-1 |
| Defs. Add'l Ex. | Exhibits to the Declaration of Daniel T. Fenske, July 28, 2020 | Filed concurrently |
| Defs. JSOAF | Defendants CDK Global, LLC's and The Reynolds & Reynolds Company's Statement of Additional Material Facts In Opposition to MDL Plaintiffs' Motions for Summary Judgment on Defendants' Counterclaims, July 28, 2020 | Filed concurrently |
| Defs. JSUF | Defendants CDK Global, LLC and The Reynolds & Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of their Motion for Summary Judgment Exhibits, May 20, 2020 | Dkt. 974 |
| Defs. JSUF Ex. | Exhibits to the Declaration of Daniel T. Fenske, May 20, 2020 | Dkt. 975 |
| RSUF | The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of Its Motion to Partial Summary Judgment, October 15, 2019 | Dkt. 779 *et seq.* |
| RSUF Ex. | Exhibits to the Declaration of Brice Wilkinson, October 15, 2019 | Dkt. 779-1 |

## DEFENDANTS' RESPONSE TO
## AUTHENTICOM'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1(b), Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") hereby submit this joint response to Plaintiff Authenticom, Inc.'s Statement of Undisputed Material Facts In Support Of Its Motion For Summary Judgment On Defendants' Counterclaims (Dk. 977). CDK and Reynolds incorporate by reference Defendants' Joint Statement of Common Undisputed Material Facts In Support of Their Motions for Summary Judgment (Dkt. 974); their Joint Statement of Additional Material Facts, filed simultaneously herewith, and the previously filed Reynolds's October 15, 2019 Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment (Dkt. 779, 780, 782, 783).

To the extent that CDK and Reynolds indicate that any fact asserted by Authenticom is undisputed, it is solely for purposes of Authenticom's motion for summary judgment on Defendants' counterclaims and not for any other purpose in this MDL. *See, e.g., Brown v. Navarro*, 2012 WL 3987427, at *3 (N.D. Ill. Sept. 11, 2012).

1.      Dealer Management System ("DMS") software is enterprise software that franchised automobile dealerships rely on to manage their operations. Ex. 150, Expert Report of Allan Stejskal ("Stejskal Rep.") ¶ 24; Ex. 90, PX 1383 at REYMDL00016579 ¶ 2; Ex. 4, Declaration of Brian Maas, President of the California New Car Dealers Association ("Maas Decl.") ¶ 4, *Authenticom* Dkt. 56 (DMS "software is mission-critical software that every dealership relies on to manage and direct its operation" and store its data); Ex. 57, DX 230, FTC Auto/Mate Complaint (March 19, 2018) ("FTC Auto/Mate Complaint") ¶ 24 ("The DMS is a mission-critical business software that serves as the backbone of the dealer's information technology systems.").

**RESPONSE:** Undisputed.

2.      The DMS includes a database that stores data central to dealership operations, such as information related to customers, service appointments, and car and parts inventory. Ex. 150, Stejskal Rep. ¶ 30 ("At the heart of the DMS is a database that stores dealer data, which supports all of the various functions performed at a dealership."); ███████████████████████████ ███████████████████████████████████████████████████████████ Ex. 3, Declaration of Chris Longpre, Owner and Vice President of Lexus of Westminster car dealership ("Longpre Decl.") ¶ 4, *Authenticom* Dkt. 55 ("The DMS contract is a significant expense for . . .

dealers[]. As part of the contract, we pay CDK to store our dealership data. That data includes vehicle, inventory, customer, sales, and other of our most important information. CDK does not own that data. We do.");  ████████████████████████████████████████
████████████████████████████████████████

**RESPONSE:** It is undisputed that the DMS includes a database where data about dealership operations is stored, including related to customers, service appointments, and car and parts inventory.

3.     Dealers input data they generate in their day-to-day operations into the DMS database. ████████████████████████████████████████████████████ Ex. 6, Declaration of Leigh Ann Conver ("Conver Decl.") ¶ 10, *Authenticom* Dkt. 90 ("CDK's DMSs hold, among other information, the dealer's operational and business data."); Ex. 1, Declaration of Wayne Fitkin, IT Director for Walter's Automotive Group ("Fitkin Decl.") ¶ 4, *Authenticom* Dkt. 53 ("As part of the contract, we pay CDK to store data owned by Walter's Automotive Group. Walter's Automotive Group owns the data that is on its DMS system.").

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that the DMS stores certain data that dealers generate in their day-to-day operations. This Fact is unsupported and disputed to the extent it implies that the DMS stores *only* data dealers generate in the course of their day-to-day operations, as no cited source supports that proposition. To the contrary, the DMS contains data "generated" and owned by third parties other than the dealers, including the DMS provider, OEMs, consumers, credit bureaus, and others. Defs. JSUF 52, 54 (explaining that CDK and Reynolds DMSs "store consumer and dealership employee Personally Identifiable Information ("PII") and Sensitive Personal Information ("SPI") such as social security numbers, driver's license numbers, and financial information" and that they include "intellectual property and proprietary data that belongs to the DMS provider, OEMs, and other third parties.").

4.     CDK has long stated that dealers "own" – that is, control – the data they store on the DMS database. Ex. 95, PX 1726 at CDK-3122863 (CDK CEO Mr. Anenen stating: "[A] dealership fundamentally owns the data in its DMS, and dealers should control who accesses their data and how it's used."); Ex. 66, PX 228 at CDK-0804051 (Kevin Henahan, ADP's Senior Vice

President for Marketing, stated: "First, it's the dealer's data. . . . We do a lot of things to provide security for the dealer systems and their data."); Ex. 130, CDK-3122449 (2008 CDK "NewsFlash" stating "[o]ur view is that it is the dealers data to share with other companies as they see fit, as long as they acknowledge the risks"); *id.* at 450 ("ADP has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others.");

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████ █████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Ex. 150, Stejskal Rep. ¶¶ 59-60.

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that the relevant CDK personnel made the statements attributed to them.

But it is unsupported and disputed that dealers in fact own—or that CDK has ever taken the

position that dealers own—all the data in the DMS. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

Consistent with the MSA, CDK has made clear that dealers own *some* of the data on the

DMS, namely, certain of the "transactional" data that dealers generate in the course of their

business regarding their sales of cars and service. *See, e.g.,* ████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ As Authenticom has acknowledged,

dealers do not own all such data, however. For example, consumers own the data relating to

themselves, such as their social security numbers, home address, and similar information. Defs.

Add'l Ex. 368, AUTH_00045359 ("Your dealership DMS contains inventory, sales and service

data but also contains your customers' private information including customer birth dates, social

security information and contact information."). Moreover, the DMS houses data created and

owned by the DMS provider, car manufacturers ("OEMs"), and other third parties. *See* Response

to Fact 3 above; Defs. JSUF 52, 54.

Moreover, the exhibits this Fact cites do not state that dealers own all data in the DMS.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ This Fact is further unsupported by

certain cited materials, such as Authenticom Exhibit 66 (2007), Authenticom Exhibit 95 (2007),

and Authenticom Exhibit 130 (2008) because they reflect statements made in 2007 and 2008, and

thus do not even purport to reflect CDK's position today.

It is undisputed that dealers "control" the data in the DMS to the extent that they have the

right pursuant to a licensing agreement with their DMS provider to use the DMS and the data in it

**PUBLIC VERSION**

as authorized by the MSA. *See* Defs. JSUF 65. But dealers do not have the unfettered right to

"control" DMS data. Dealers' DMS licenses prohibit them from granting third-party access to the

DMS. *See* Defs. JSUF 66-67. Federal law, including but not limited to the Graham-Leach-Bliley

Act, imposes limitations on how dealers can use certain DMS data relating to consumers. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

        To the extent that this Fact conflates "ownership" of data with "control" over it, this Fact

is unsupported because none of the cited material supports the proposition that "control" over data

yields "ownership" of that data.

        5.      Reynolds has repeatedly acknowledged that dealers own the data they store on the
DMS database. Ex. 73, PX 636 (Reynolds advertisement stating: "You own your data and choose

████████████████████████████████████████████████████████

████████        Ex. 150, Stejskal Rep. ¶¶ 59-60.

**RESPONSE:** Disputed and unsupported in part.

        It is undisputed that Reynolds has acknowledged that dealers own certain of the data stored

on the DMS (i.e., "their data"). None of the exhibits this Fact cites even purport to state that dealers

own all DMS data, and it is undisputed that they do not. Both CDK's DMS and Reynolds's DMS

include intellectual property and proprietary data that belongs to the DMS provider, OEMs, and

other third parties. *See* Defs. JSUF 52, 54-55, (explaining that CDK and Reynolds DMSs "store

Personally Identifiable Information ("PII") and Sensitive Personal Information ("SPI") such as

social security numbers, driver's license numbers, and financial information"; that they include

"intellectual property and proprietary data that belongs to the DMS provider, OEMs, and other

third parties"; ██████████████████████████████████████████

███████████████████████.

      6.    In 2018, there were 16,794 franchised new car dealership locations – called "rooftops" – in the United States. Ex. 151, Expert Report of Mark Israel ("Israel Rep."), ¶ 15 (citing National Automobile Dealers Association figures).

**RESPONSE:** Undisputed.

      7.    CDK and Reynolds have a combined market share of ████████████ in the market for DMS services with respect to franchised, new-car dealerships in the United States, when market share is measured by dealership rooftop (i.e., franchised stores). ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████.

**RESPONSE:** Unsupported and disputed in part.

    It is undisputed that CDK and Reynolds had a combined market share of ████████████

based on dealership rooftops for the time periods stated. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.

      8.    ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████ Ex. 150, Stejskal Rep. ¶ 39
("Large dealership groups (those with multiple rooftops) in particular work almost exclusively with CDK and Reynolds.").

**RESPONSE:** Unsupported and disputed.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ The result of these

flawed assumptions is that Dr. Israel "double counts" many dealership groups, and implies a total

available "market share" of ████████████

9.    In addition to the DMS, dealers use other software applications to help them sell and service cars. *See* Ex. 163, CDK Global, *Is the Cheaper DMS Really Better?* (May 3, 2017) ("A DMS can't stand alone. It needs to work seamlessly with F&I, Parts & Service, Sales, Accounting and even OEM integrations."), https://www.cdkglobal.com/us/insights/cheaper-dms-really-better; Ex. 58, DX 405 at COX_0020334 ¶ 7 (there are "various third party application tools that dealers will use to supplement the functionality of their franchise dealer DMS"); Ex. 6, Conver Decl. ¶ 11, *Authenticom* Dkt. 90 ("Many dealers contract with third-party providers ('vendors') that offer software applications that perform operational functions for dealerships.").

**RESPONSE:** Undisputed.

10.    Commonly used applications include vehicle inventory management, customer relationship management ("CRM"), electronic vehicle registration and titling ("EVR"), service

and repair appointment scheduling, and lead generation and marketing. Ex. 150, Stejskal Rep. ¶ 49 (describing popular application types); Ex. 7, Declaration of Howard Gardner ("Gardner Decl.") ¶ 3, *Authenticom* Dkt. 93 (same).

**RESPONSE:** Undisputed.

11.    To function, third-party applications often depend on access to the dealer's data stored on the DMS database. Ex. 6, Conver Decl. ¶ 11, *Authenticom* Dkt. 90 ("As a general matter, in order to provide these services, the vendors must have access to a dealer's data."); ██████ ██████████████████ Ex. 150, Stejskal Rep. ¶ 55 ("Each of these applications is reliant on a core set of data that powers the application.").

**RESPONSE:** Disputed in part.

It is undisputed that third-party applications are often designed to leverage data, including but not limited to a dealership's operational data, that may be stored on the DMS rather than having dealership employees re-key such data into the application directly.

It is disputed that third-party applications require such data access "to function," as applications can "function" without direct access to data stored on the DMS. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Indeed, Defendants provide a number of tools allowing dealers to download, export and "push" DMS data to third parties, including software vendors, showing that vendors do not need direct access to data "stored on the DMS database" to obtain access to any data that the vendor may wish to leverage. Defs. JSUF 5, 9, 22.

Further, the extent of "access" that an application is designed to rely upon varies from application to application. ████████████████████████████████

████████████████████████████████████████████████████████

**PUBLIC VERSION**

████████████████████████████████████████████████████ ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

It is further disputed that the data so used by third-party applications is exclusively the "dealer's data." While data used by a third-party application may include a dealership's operational data, it may also include personally identifiable information belonging to consumers or data licensed from third parties such as original equipment manufacturers. *See* Defs. JSUF 52-56; *see also* ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████.

12.     Historically, companies called data integrators have provided services that facilitate third-party application access to data stored on a dealer's DMS. Ex. 5, Declaration of Steve Cottrell ("Cottrell Decl.") ¶ 7, *Authenticom* Dkt. 62 ("[S]eparate companies – called 'data integrators' – specialize in extracting dealers' data from their DMS databases, organizing it, and delivering to vendors the specific data required for their applications."). Ex. 150, Stejskal Rep. ¶ 61 ("There is a long history of companies that have provided data integration services to dealers and to software vendors seeking the use of dealer data in order provide services to the dealers.").

**RESPONSE:** Disputed in part.

PUBLIC VERSION

It is undisputed that for a number of years there have been companies in the automotive software space that have sold the service of pulling or screen-scraping data from DMSs to provide that data to third-party application vendors for a fee, and that Authenticom is one of those companies. Defs. JSUF 30-31, 77-78, 94; RSUF 21.

It is disputed that these companies are "data integrators" or provide "data integration." *See* Auth. Compl. [Auth. Dkt. 1] ¶ 54, n. 4 ("While data access providers are commonly referred to as 'integrators,' there is no actual 'integration' between data integrators and the DMS database in the traditional sense of the two fusing or combining. Instead, in this context, 'integration' is simply a synonym for data access."); ████████████████████████████████████
████████████████████████████████████████████████████

It is further disputed that such companies are authorized to access the Reynolds or CDK DMSs. Defs. JSUF 65-67, 70, 80-88, 138-165; RSUF 49-56.

13.    Data integrators provide a variety of services that convert the dealer's data into a format that is easy for dealers and vendors to use. Ex. 5, Cottrell Decl. ¶ 9, *Authenticom* Dkt. 62 (data integrators provide "automated, seamless [data integration] without the need for manual intervention by dealers"; convert data "from a raw, unorganized state into a standardized format that is easy for vendors to use"; "correct data-entry errors or anomalies"; and standardize data from various DMS databases into a single format); Ex. 150, Stejskal Rep. ¶¶ 62-65 (describing range of services provided by data integrators).

**RESPONSE:** Disputed in part.

It is undisputed that data extractors can perform services that include standardizing or converting data into a format that a particular vendor or dealer may prefer.

It is disputed that the data so used is exclusively the "dealer's data." *See* Resp. Auth. SOF 11; Defs. JSUF 52-56 (describing data owned by entities other than the dealer on the DMS).

It is also disputed that this is a service primarily used by dealers as opposed to vendors. The customers of data extractors are typically third-party application vendors, not dealerships. Defs. JSUF 30. ████████████████████████████████████████

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

14.     CDK acquired two data integrators – Digital Motorworks ("DMI") in 2002 and IntegraLink in 2010 – through which CDK provides data integration services on several different DMS types, including CDK and Reynolds. Ex. 7, Gardner Decl. ¶¶ 75-77, *Authenticom* Dkt. 93; Ex. 150, Stejskal Rep. ¶ 66 ("CDK saw sufficient value in the services provided by third-party integrators to acquire both DMI (in 2002) and IntegraLink (in 2010) in order to provide these integration services across all DMS providers.").

**RESPONSE:** Disputed and unsupported in part.

It is undisputed that CDK acquired Digital Motorworks, Inc. ("DMI") in 2002 and later

acquired IntegraLink through its acquisition of the Cobalt Group in 2010. *See* Defs. JSUF 27. ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████



15.    Dealers authorize data integrators to access their data stored on the DMS. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1, Fitkin Decl. ¶ 9, *Authenticom* Dkt. 53 ("Walter's Automotive Group specifically authorizes Authenticom to pull our data from the DMS."); E▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**RESPONSE:** Disputed in part.

It is undisputed that some dealers purport to allow data extractors to access the DMS, though others do not. It is also undisputed that dealers have the right to download and push data residing in the DMS to third parties, including data integrators, so long as the dealer does not enable the third-party access to the DMS itself. *See* Defs. JSUF 5, 9, 22.

It is disputed that dealers have the legal right to "authorize" data extractors to access the DMS because (a) dealers are not the DMS system owner, and this Court has already held that

authorization must come from the system owner, Dkt. 506 at 14-15; (b) CDK and Reynolds's standard dealer contracts prohibit dealers from allowing third-party data extractors like Authenticom to access the DMS, *see* RSUF 49-56; Defs. JSUF 65-67; and (c) regardless of CDK's and Reynolds's dealer contracts, both DMS providers have repeatedly made clear to dealers and Authenticom that they do not authorize third-party access by data extractors like Authenticom to access their respective DMSs, *see* Defs. JSUF 66-67; *see also* Dkt. 506 at 15 ("Although dealers might have a breach of contract claim against CDK if CDK's denial of authority violated its contract with the dealers, that does not change the fact that CDK denied Authenticom authority.").

16.    Dealers may create separate login credentials unique to data integrators to access the DMS database.



Ex. 6, Conver Decl. ¶ 11, *Authenticom* Dkt. 90 ("Dealers often provide or create login credentials for third party intermediaries, like Authenticom, who access the DMS on behalf of vendors without the DMS provider's authorization."); Ex. 7, Gardner Decl. ¶ 30, *Authenticom* Dkt. 93 ("Dealers have facilitated data access . . . by providing or creating login credentials for them to access the DMS");

Ex. 150, Stejskal Rep. ¶ 68 (describing "[u]ser emulation" method of access in which "the dealer provides a User ID and password with the appropriate security privileges to a third-party data integrator or application provider," which can "then execute functions that might run a report or create or update particular data in the DMS.").

**RESPONSE:** Disputed and unsupported in part.

It is undisputed that dealers using the Reynolds or CDK DMS have the technical ability to create new login credentials unique to any given user and provide those credentials to third parties, including data integrators. It is unsupported and disputed that dealers have the legal right to do so for the reasons stated in response to Fact 15 above. Indeed, as the materials this Fact cites make clear, dealers routinely set up login credentials and provide them to third parties "without the DMS provider's authorization." Auth. Ex. 6, Conver Decl. ¶ 11, *Authenticom* Dkt. 90; *see also* Auth.

13

**PUBLIC VERSION**

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

17. [REDACTED]

[REDACTED]

**RESPONSE:** Disputed and unsupported in part.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] It is unsupported and disputed that dealers have the legal right to create such user accounts and provide them to third parties for the reasons stated in the response to Fact 15 above.

18. [REDACTED]

[REDACTED]

**RESPONSE:** Unsupported and disputed in part.

[REDACTED]

[REDACTED]

[REDACTED] It is unsupported and disputed that dealers have the legal right to create such user accounts and provide them to anyone and with any system access

14

PUBLIC VERSION

levels they wish. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

19.     Authenticom was founded in 2002 by the entrepreneur Steve Cottrell, who at first ran the business out of a room in his son's apartment. Ex. 5, Cottrell Decl. ¶ 1, *Authenticom* Dkt. 62; Ex. 13, PI Hearing Tr. 1-A-88 to 1-A-89 (Q: "How many employees did it start with?" A: "One." Q: "So from those beginnings, could you please describe the growth of your business? A: "Essentially started in my son's bedroom, as the President stated.").

**RESPONSE:** Undisputed.

20.     By 2015, Authenticom grew to 120 employees based in La Crosse, Wisconsin. Ex. 5, Cottrell Decl. ¶ 2, *Authenticom* Dkt. 62.

**RESPONSE:** Undisputed.

21.     In a July 2, 2015 speech in La Crosse, Wisconsin, President Barack Obama heralded Authenticom as "one of America's fastest growing private companies" and noted Authenticom provides its employees with well-paying jobs and an equity stake in the company's success. President Obama's speech is available at www.youtube.com/watch?v=Bfzu9kd5HU8. Ex. 5, Cottrell Decl. ¶ 74, *Authenticom* Dkt. 62.

**RESPONSE:** Undisputed in part.

It is undisputed that President Obama stated the words attributed to him here. To the extent

this fact is offered to show the truth of what President Obama said, the fact is unsupported because

PUBLIC VERSION

President Obama's statement is hearsay not subject to any exception and lacks foundation. *See* Fed. R. Evid. 602, 802.

22.     At its height in early 2015, Authenticom provided data integration services to nearly 500 software vendors at 15,000 dealer rooftop locations. Ex. 5, Cottrell Decl. ¶ 34, *Authenticom* Dkt. 62.

**RESPONSE:** Disputed in part.

It is undisputed that in early 2015 Authenticom provided data polling services to roughly 15,000 dealer rooftop locations in the United States and Canada, including both franchise and non-franchise dealerships and both automobile and non-automobile dealerships.

It is disputed that Authenticom provided these services on behalf of 500 software vendors. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████

It is further disputed that 2015 represented Authenticom's height. ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████

It is further disputed that Authenticom provides "data integration" services. *See* Resp. Auth. SOF 12.

23.     Authenticom only accesses dealer data with the dealer's express, written authorization. Ex. 5, Cottrell Decl. ¶ 24, *Authenticom* Dkt. 62 ("Before Authenticom pulls data from a dealership, it gets specific authorization from the dealer."); Ex. 2, Declaration of Michael Korp ("Korp. Decl.") ¶ 25, *Authenticom* Dkt. 54 ("Several of our vendors use Authenticom to pull the dealerships data. I have expressly and specifically authorized Authenticom to perform this

service."); Ex. 1, Fitkin Decl. ¶ 9, *Authenticom* Dkt. 53 ("Walter's Automotive Group specifically authorizes Authenticom to pull our data from the DMS."); ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**RESPONSE:** Unsupported and disputed.

This Fact is unsupported and disputed to the extent it assumes that dealers have the legal authority to "authorize" access to a DMS over the objections of their DMS provider and/or any restrictions placed in the license agreement between the DMS provider and the dealership, for the reasons described in Defendants' response to Fact 15 above. *See* Resp. Auth. SOF 15.

Defendants also dispute that Authenticom obtains written "authorization" from dealerships in all cases. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

        ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**PUBLIC VERSION**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

Defendants further dispute that Authenticom only accesses data for which it had any supposed "authorization." Authenticom in the past has accessed more data than that it is authorized to extract and/or than the software vendors actually require. Defs. JSUF Ex. 245,

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**PUBLIC VERSION**

The Fact is further unsupported by Authenticom Exhibits 1 and 2 because the fact that certain dealerships purported to provide written authorization for Authenticom to access data does not indicate that Authenticom "only" accesses a DMS with written authorization.

Defendants dispute that Authenticom only accesses "dealer data." *See* Resp. Auth SOF 11 (citing Defs. JSUF 53-56).

24.   Dealers create login credentials for Authenticom to access the DMS database. Ex. 5, Cottrell Decl. ¶ 24, *Authenticom* Dkt. 62 ("Dealers set up separate login credentials for Authenticom so that Authenticom can access the DMS database.");

**RESPONSE:** Disputed in part.

25.  After the dealer creates login credentials for Authenticom, the dealer can revoke those credentials at any time. Ex. 164, Declaration of Steve Cottrell (May 19, 2020) ("Cottrell 5/19/20 Decl.") ¶ 4 (After dealers set up login credentials for Authenticom to access the DMS database, "[d]ealers can revoke the login credentials . . . at any time." Once a dealer de-activates Authenticom's login credentials, "Authenticom's access to the dealer's DMS database is shut off and Authenticom has no ability to access the DMS.").

**RESPONSE:** Undisputed.

26.  Dealers control the data to which Authenticom has access through their ability to control the permissions associated with the credentials given to Authenticom. Ex. 164, Cottrell 5/19/20 Decl. ¶ 5 ("Dealers control the permissions associated with Authenticom's login credentials."); Ex. 14, PI Hearing Tr. 2-A-8:1-9:21 (Fitkin Testimony) ("What I have done for

Authenticom is create a user ID just for Autenticom that has access to a single function" to perform user emulation . . . "Authenticom has access to limited accounts and to a single function . . . for the purpose of retrieving the data that I need them to retrieve so that they can – I like to call it feeding the children. All the third-party vendors that need the data, I call that feeding the children. So they gather the data, normalize the data, check the addresses against the NCOA database, and then send the feeds to a couple dozen third-party vendors that I use.").

**RESPONSE:** Disputed in part.

It is undisputed that the "permission associated with the credentials given to Authenticom" inherently limits the data Authenticom can access to the data those credentials have the ability to access. It is unsupported and disputed that account credentialing inherently limits Authenticom's access to only the data that the dealers has given Authenticom permission to access. ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

27.     Authenticom accesses the DMS in the same way that a dealer employee would; Authenticom's software "emulates" a dealer employee's use of the DMS, allowing for automated extraction of or writing of data to the DMS. Ex. 5, Cottrell Decl. ¶ 25, *Authenticom* Dkt. 62 ("Once dealers set up login credentials for Authenticom, Authenticom automates the pulling of data

through user emulation software, which uses the DMS application software to run and capture reports in the same way a user at a dealership would. The difference is that integrators like Authenticom automate the process, whereas a user at the dealership would retrieve the data manually."); Ex. 13, PI Hearing Tr. 1-A-108:15-19 ("Essentially what we do is through terminal emulation or keyboard emulation, we utilize the application layer of the DMS system just like an employee would. Essentially we're an employee at the dealership typing in the data request only we have very fast fingers."); ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

**RESPONSE:** Disputed.

As Mr. Cottrell's own declaration states, there is a key "difference" between the way Authenticom and dealer employees access the DMS and the data on it: "The difference is that integrators like Authenticom automate the process, whereas a user at the dealership would retrieve the data manually." Auth. Ex. 5, Cottrell Decl. ¶ 25. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**PUBLIC VERSION**



28.     Authenticom employees *did not believe* their access of Reynolds's and CDK's DMS was unauthorized or prohibited by contract. Ex. 44, Cottrell Tr. 10:17-11:2 (Q: "Did there come a time when you understood that CDK objected to your polling data from the CDK system?" A: "Actually, no. Because our position was that we were polling data for the dealers at the dealers' authorization acting as their agent."); *id.* at 22:13-17 ("Our authorization came from our relationship with the dealers. The dealers paid, you know, lots and lots of money for access to that system. And we were authorized by the dealers, you know, to pull that data."); Ex. 24, Clements Tr. 260:11-13 ("We were dealer agents based on your dealer authorization, which allowed us to collect the data on their behalf."); Ex. 45, Brown Tr. 244:4-6 ("Additionally, we had authorization from the dealers to act as their agent to pull the dealers' data."); Ex. 37, Noth Tr. 69:22-70:4 ("[W]e get authorization from the dealers . . . to access the systems as their agent.").

**RESPONSE:** Unsupported and disputed.

This Fact is unsupported because no cited material supports the proposition that Authenticom employees believed that CDK or Reynolds authorized Authenticom's access, and this Court has already held that authorization must come from the DMS provider, not dealers. Dkt. 506 at 14-15.

This Fact is also disputed. Multiple pieces of evidence make clear that Authenticom employees understood that Reynolds and CDK did not authorize Authenticom to access the DMS and/or that such access was prohibited by contract. Authenticom's CEO Steve Cottrell ███████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

   █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

**PUBLIC VERSION**

████████████████████████████████████████████████████████████

██████

      There are numerous additional examples of other Authenticom employees demonstrating

their awareness that Authenticom's access to CDK's DMSs was unauthorized. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

**PUBLIC VERSION**

Authenticom personnel were similarly aware that their access to Reynolds's DMS was unauthorized and prohibited by contract. *See* RSUF 50-56. Reynolds repeatedly publicly announced its opposition to automated access by third parties. RSUF Ex. 82 (February 19, 2007 Automotive News Article); RSUF Ex. 107, REYMDL00012341 (February 4, 2007 Automotive News Article ("Reynolds, with about 11,000 dealership customers in the United States, has warned dealers that they are violating their contracts when they provide log-ins and passwords to third-party vendors.")); RSUF Ex. 97, REYMDL00015601 (April 2007 Automotive News Article) (reporting that in 2006 "Reynolds and Reynolds Co. began informing dealers they would be violating their contract if they allowed third parties to access directly the Reynolds dealer management system"); RSUF Ex. 98, REYMDL01075600 (March 2012 Automotive News Article) ("What we're [Reynolds] trying to do is block unmonitored automated access to the DMS."); RSUF Ex. 18, REYMDL00022899 (Fuel Article January 1, 2010: "It remains our policy to not allow 'hostile interfaces' or unauthorized code on your systems to protect both Reynolds and your dealership from security breaches and potential data corruption issues.").

26

PUBLIC VERSION



29.     In the fall of 2013, Authenticom released its DealerVault data integration platform. Ex. 97, AUTH_00148142 (September 5, 2013) (press release announces the launch of DealerVault, "the first ever cloud-based system that allows dealerships to control the distribution of their data."); Ex. 96, AUTH_00123382 (November 5, 2013) (DealerVault "getting [its] first dealers on-boarded."); Ex. 37, Noth Tr. 184:22-185:3 (discussing pricing for DealerVault in October 2013).

**RESPONSE:** Disputed in part.

It is undisputed that Authenticom released DealerVault in the fall of 2013, although Authenticom did not sign up any dealerships for DealerVault until early 2014. Defs. JSOAF 30. It is unsupported and disputed that Authenticom, whether through its DealerVault product or otherwise, "integrates" with the DMS for the reasons stated in response to Fact 12 above.

30.     DealerVault offered a dealer-controlled data integration product. Ex. 11, PI Hearing Tr. 1-P-183:14-184:7 (California New Car Dealers Association President Brian Maas testifying regarding DealerVault: "I think it's the best product in its market space. There's no user interface that's easier to use. The fact that it limits by field, et cetera, as we saw in the demonstration this

PUBLIC VERSION

morning, all the feedback that we've heard from our dealer members it's a quality product."); Ex. 13, PI Hearing Tr. 1-A-90:21-25 (Mr. Cottrell testifying: "There's a tremendous need in the marketplace for dealers to be able to take control, have visibility, transparency, and control of their data. Not only did we see an opportunity in the market, but we saw a tremendous need and really felt that this was something we could do for the industry.").

**RESPONSE:** Unsupported and disputed.

This Fact is disputed because dealers do not control many aspects of DealerVault's services, as described in Defendants' Statement of Additional Facts. *See* Defs. JSOAF 10-14 (DealerVault-dealer contract provisions give DealerVault, not dealer, control over the manner in which it performs under the contract and gives DealerVault the right to alter dealer rights at will), 15 (dealers stating that Authenticom/DealerVault does not give the dealer sufficient control), 35 (dealers do not have complete control over the time of day extraction happens), 24 (Authenticom polled a standard set of dealer data at standard times across dealers), 39 (Authenticom has turned on vendor feeds without dealer permission), 40-42 (Authenticom has extracted more data than the dealer approved), 32-33 (Authenticom entered into contracts with third parties to sell them DMS data, and actually sold that DMS data without dealers' or consumers' consent).

This Fact is also unsupported because it does not define what it means by a "dealer-controlled data integration product." None of the cited materials, moreover, support the proposition that dealers "control" the manner in which DealerVault "integrates" with the DMS.

31.     Authenticom's enters into contracts with dealers who use DealerVault called the DealerVault Terms & Conditions. *See* Ex. 104, CDK-0012573.

**RESPONSE:** Undisputed.

32.     The DealerVault Terms & Conditions provide that "DealerVault shall only extract the Dealership Data that the Dealership permits DealerVault to extract." Ex. 104, CDK-0012573 § 3.4.

**RESPONSE:** Disputed in part.

It is undisputed that Authenticom's Terms and Conditions governing DealerVault (Auth. Ex. 28) state that "DealerVault shall only extract the Dealership Data that the Dealership permits DealerVault to extract." Auth. Ex. 104 § 3.4. To the extent this Fact implies that Authenticom/DealerVault abided by that limitation, this Fact is disputed for the reasons stated in response to Facts 23, 26 and 30.

33.     DealerVault gives dealers "complete and total control" over how their data is distributed to the dealer's software vendors. Ex. 10, Reply Declaration of Steve Cottrell ("Cottrell Reply Decl.") ¶ 14, *Authenticom* Dkt. 143; Ex. 44, Cottrell Tr. 30:19-31:2 ("DealerVault provides a platform for dealers to syndicate their data with complete transparency and control to vendors of their choice.").

**RESPONSE:** Unsupported and disputed.

This Fact is unsupported to the extent it states that DealerVault gives dealers "'complete and total control' over *how* their data is distributed" because none of the cited materials supports the proposition that dealers have control over "how" their data is distributed.

Moreover, that assertion is disputed for the reasons stated response to Facts 23, 26 and 30 above and in Defendants' Statement of Additional Facts. *S



34.     DealerVault provides an interface where dealers can add, remove, or change the specific data fields that Authenticom sends to specific vendors on the dealer's behalf. Ex. 5, Cottrell Decl. ¶ 29, *Authenticom* Dkt. 62 ("DealerVault provides a unified user interface where

dealers are able to add, remove, or change the data sets that Authenticom sends to the vendors on the dealer's behalf."); Ex. 13, PI Hearing Tr. 1-A-90:14-18 (Mr. Cottrell testifying: "DealerVault is a front-end web-based application that allows dealers complete control over their data. It allows them to see with full transparency and deliver data to their vendors of their choosing and control the access to that data to a granular level."); Ex. 45, Brown Tr. 219:14-18 ("But we only work with vendors that have specific authorization from a dealer. So if a dealer was to, you know, shut down their business with a vendor, we would then shut down the vendor."); Ex. 164, Cottrell 5/19/20 Decl. ¶ 8.

**RESPONSE:** Disputed in part.

It is undisputed that DealerVault provides an interface that purports to allow dealers to add, remove, or change the specific data fields that Authenticom sends to specific vendors on the dealer's behalf. To the extent this Fact implies that DealerVault ensures that Authenticom never accesses more data than the dealer purported to authorized it to access, this Fact is disputed for the reasons stated in response to Facts 23 and 26. To the extent this Fact implies that DealerVault gives dealers, rather than Authenticom, "control" over what data DealerVault accesses, how it does so, or to which third parties it sends DMS data, this Fact is disputed for the reasons stated in response to Facts 23, 26 and 30.

35.    When dealers use Authenticom's services, they control the categories of data which Authenticom accesses. Ex. 164, Cottrell 5/19/20 Decl. ¶ 7 ("Dealers control the categories of data in the DMS database that Authenticom accesses. For example, dealers can choose to have Authenticom access to inventory data but not sales data"); Ex. 45, Brown Tr. 179:6-8 ("We only pull the fields – well, we only pull the fields and the elements that the dealer authorizes us to pull."); Ex. 10, Cottrell Reply Decl. ¶ 13, *Authenticom* Dkt. 143 ("As a matter of practice, Authenticom requests access from the dealers to retrieve data from the five aforementioned directories. Authenticom does not access any data beyond those five directories unless specifically directed to do so by a dealer Authenticom is thus limited to accessing data in the DMS that is controlled by the dealers.").

**RESPONSE:** Disputed.

This Fact is disputed for the reasons stated in response to Facts 23, 26, and 30 above.

36.    Through the DealerVault user interface, dealers control the frequency with which their data is distributed to their vendors. Ex. 164, Cottrell 5/19/20 Decl. ¶ 9 ("Through the DealerVault online portal, dealers control the frequency with which Authenticom distributes the dealer's data to vendors. For example, dealers can choose to have Authenticom provide data integration services at multiple intervals during the day, once at night, once a week, or even once

a month depending on the dealer's needs for a particular vendor. Dealers can set the frequency of data integration on a vendor-by-vendor basis, so that some vendors receive data more frequently and others less frequently"); Ex. 45, Brown Tr. 134:16-135:4 ("Now, the data is – once we have it in DealerVault, and if a dealer has chosen a specific vendor, then the frequency by which we send the data is up to the program or the necessity of the vendor . . . ." Q: "Does the dealer have the ability to determine or change that frequency?" A: "Yes, of course.").

**RESPONSE:** Disputed.

37.     DealerVault allows dealers to review records of the data sent to or received from software vendors. Ex. 13, PI Hearing Tr. 1-A-90:18-19 (Mr. Cottrell testifying that DealerVault provides "audit and reporting capabilities for the data that's been transmitted");

**RESPONSE:** Unsupported and disputed in part.

This Fact is unsupported other than for the fact that Dealer Vault has undescribed "audit and reporting capabilities for the data that's been transmitted." Auth. Ex. 13, PI Hearing Tr. 1-A-90:18-19. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

This Fact is further disputed because DealerVault also provides no ability for dealers to review and understand which data Authenticom sells to third parties, as Authenticom does not seek dealers' permission to sell that data or even warn them in advance that it will do so. *See* Defs. JSOAF 32 (Authenticom sells data to third parties without advance dealer or consumer permission). Finally, it is disputed that dealers have a *right* "to review records of the data sent to or received from software vendors," ████████████████████████████████████████████

████████████████████████████████████████████████████████

38.    DealerVault gives dealers transparency about the software vendors that receive the dealer's data through the DealerVault service. Ex. 11, PI Hearing Tr. 1-P-134:23-135:1 (Defendants' security expert, Eric Rosenbach testifying: "[W]hen we talk about transparency, DealerVault itself, I think, is good. That's an impressive piece of technology. It does give the dealer transparency on data that's there and where it's going."); Ex. 12, PI Hearing Tr. 2-P-168:20-169:2 (CDK executive Howard Gardner testifying that it is "implausible" that dealers using "Authenticom's DealerVault" do not "know where [their] data is going").

**RESPONSE:** Disputed in part.

It is undisputed that DealerVault purports to provide dealers information about which software vendors receive DMS data from DealerVault associated with that dealer. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[REDACTED]

[REDACTED] Finally, it is disputed that dealers have a *right* to any "transparency" over where DMS data is sent, since Authenticom's DealerVault contract gives Authenticom the right to alter that contract at will. Defs. JSUF Ex. 46, PX 165 (AUTH_00200265) § 10.13.

39.     Dealership principals and executives have lauded the control that DealerVault provides them over their data. Ex. 14, PI Hearing Tr. 2-A-6:11-7:15 ("I think it's an incredibly exceptional product when it was first offered to me when I worked for Fletcher [a dealership group]. I signed all 20 of our franchises up for it. It's the best thing I have ever seen because for once I had a single pane of glass to see every third-party vendor that was receiving data."); Ex. 1, Fitkin Decl. ¶ 6, *Authenticom* Dkt. 53 ("Walter's Automotive Group has been using Authenticom's DealerVault product for the past year. I am extremely satisfied with this product, as it allows me to view and control exactly what data is being transmitted to third-party application providers."); Ex. 9, Fitkin Reply Decl. ¶ 7, *Authenticom* Dkt. 141 ("One major benefit of using Authenticom's DealerVault product is that it allows me to select, and thus limit, the particular types of data that I can send to a given vendor."); Ex. 3, Longpre Decl. ¶ 10, *Authenticom* Dkt. 55 ("If I had my choice, I would use Authenticom's DealerVault service for all of my vendors. DealerVault is more cost effective and provides dealers with a secure system and substantial control over their data, which CDK does not offer."); [REDACTED]

[REDACTED]

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that the five dealer principals or employees cited in this Fact made the statements attributed to them. This Fact is unsupported to the extent it implies that any individuals beyond those five had positive views of DealerVault.

This Fact is otherwise disputed. A number of dealership principals and employees have negative views of Authenticom/DealerVault, including as to the level of control Authenticom/DealerVault provides to dealers over DMS data and the level of transparency

**PUBLIC VERSION**

Authenticom/DealerVault provides as to which data it accesses or sends, and to which third parties.

40.

**RESPONSE:** Unsupported and disputed in part.

PUBLIC VERSION

It is undisputed Mr. Johnson made the quoted statement at his deposition. ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

41.     Brian Maas, the President of the California New Car Dealers Association, stated in a sworn declaration: "For those dealers that use or wish to use Authenticom's DealerVault product it is important that it gives them complete control and visibility over how their data is extracted and distributed to application providers." Ex. 4, Maas Decl. ¶ 15, *Authenticom* Dkt. 56.

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that the quoted statement appears in Brian Mass's declaration (Auth. Ex. 4). This Fact is unsupported to the extent it purports to imply that others hold Mr. Maas's views. It is disputed that DealerVault gives dealers "complete control and visibility over how their data is extracted and distributed" for the reasons stated in response to Facts 26 and 30 above. *See also* Defs. JSOAF 32-44.

42.     Dealers consider Authenticom to be their agent when Authenticom provides data integration services on the dealer's behalf. ████████████████████████

████     Ex. 11, PI Hearing Tr. 1-P-196:24-197:1 (Michael Korp, Ghaben Auto Group) (Q: "When Authenticom pulls your data, do they act as your agent?" A: "Yes."); Ex. 9, Fitkin Reply Decl. ¶ 8, *Authenticom* Dkt. 141 ("Dealerships contract with Authenticom to provide integration services for the dealers, and dealerships expressly authorize Authenticom to act as an agent on their behalf to provide data integration services that I could also provide in-house.").

**RESPONSE:** Disputed.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

PUBLIC VERSION

43.

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that CDK employees made the statements attributed to them in this Fact. The Fact is unsupported by the cited materials to the extent it implies that CDK employees *generally* viewed DealerVault as described in this Fact. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

44.    ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**RESPONSE:** Unsupported and disputed.

45.

**RESPONSE:** Unsupported and disputed in part.

**PUBLIC VERSION**

46.

**RESPONSE:** Unsupported in part.

41

**PUBLIC VERSION**

47.

**RESPONSE:** Unsupported in part.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

48.   ████████████████████████████████████████
█████████████████████████████

**RESPONSE:** Unsupported.

This Fact is unsupported by admissible evidence because the cited exhibit (Authenticom

Exhibit 132) is from CDK, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

49.   ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████

**RESPONSE:** Unsupported and disputed in part.

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████

50.   ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

51.

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that the CDK personnel cited in this Fact made the statements attributed to them.

PUBLIC VERSION

52. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

53. CDK uses standard form contracts called the Master Services Agreement ("MSA") for providing its DMS to dealers. ████████████████████████████████████████████
████

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that CDK's standard DMS license agreement is called the Master Services Agreement ("MSA"), and that Authenticom Exhibit 18 is an example of CDK's MSA that was effective in 2015. This Fact's characterization of the MSA as a "form" contract is unsupported.

54.     Since at least 2008, CDK's standard MSA has granted the "Client" – the dealer – a license to use the DMS. ███████████████████████████

**RESPONSE:** Disputed in part.

It is undisputed that CDK's MSA grants the dealer a license to use the DMS with certain restrictions and that it has done so since at least 2008. To the extent this Fact implies that such a "license" gave the dealer the unfettered right to use the DMS however it wished, or to authorize any third-party to access the DMS, this Fact is disputed for the reasons stated in response to Fact 15 above.

55.     ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

47

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

    56.   ███████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

**RESPONSE:** Unsupported and disputed in part.

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

**PUBLIC VERSION**

57.

**RESPONSE:** Unsupported and disputed in part.

**PUBLIC VERSION**

58. ███████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

59. ███████████████████████████████████████████
██████████████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

60. ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

**RESPONSE:** Disputed in part.

61.    Reynolds enters into standard contracts with dealers called the Reynolds Master Agreement, the Reynolds Defined Terms, and the Reynolds Customer Guide. ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████).

**RESPONSE:** Undisputed.

62. ██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

**RESPONSE:** Disputed in part.

PUBLIC VERSION

-

- ███████████████████████████████████████
  ██████████████

▪ ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ████████████████████████████

▪ ███████████████████████████████████████
  ███████████████████████████████████████
  ██████████████████████████████

▪ ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

63.  ███████████████████████████████████
███████████████████████████████████████

**RESPONSE:** Disputed in part.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

    64. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

**RESPONSE:** Undisputed.

    65. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

**RESPONSE:** Unsupported and disputed in part.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**PUBLIC VERSION**

66.

**RESPONSE:** Disputed in part.

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

67.    Since approximately 2006, Reynolds has publicly criticized the use of third-party data integrators. Ex. 5, Cottrell Decl. ¶¶ 35-36, *Authenticom* Dkt. 62.

**RESPONSE:** Undisputed.

68.    Reynolds provides a data integration service – called the Reynolds Certified Interface ("RCI") program – for vendors to use to access data stored on Reynolds's DMS. ████████
███████████████

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that Reynolds provides a program called the Reynolds Certified Interface

("RCI") program, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

69.

**RESPONSE:** Disputed.

70.

**RESPONSE:** Disputed.

71. ██████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████

**RESPONSE:** Unsupported and disputed.

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

72.     For many years, CDK supported the dealer's right to use data integrators. █████
█████████████████████████████████████████
███████████████████████████████████████ Ex. 131,
CDK-3122862 at 863 (former CDK CEO Steve Anenen stating in a Q&A interview with *Dealer Magazine*: "There are a number of ways that third-parties have accessed data in the past with a dealer's permission, by doing a screen scrape or some other kind of access in order to get data. We won't prohibit that and we think dealers should be able to govern how they want that to happen."); Ex. 88, PX 1037 at CDK-00122549 (Dec. 2006) (CDK's Senior Vice President for Marketing telling *Automotive News*: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path."); ████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████

**RESPONSE:** Unsupported and disputed in part.

PUBLIC VERSION





73.     A

Ex. 84, PX 933 at CDK-0804066 (Feb. 19, 2007) (former CDK CEO Steve Anenen describing, in an interview with *Automotive News*, the "clear difference in philosophy" between CDK and Reynolds: "I don't know how you can ever

**PUBLIC VERSION**

make the opinion that the data is yours to govern and to preclude others from having access to it when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish? I don't understand that."); ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

64

74. 

**RESPONSE:** Unsupported and disputed in part.

75.     In mid-2006, an industry coalition called Open Secure Access was formed to promote the principle that dealers should control who accessed their data, including through the use of dealer-authorized independent data integrators. Ex. 150, Stejskal Rep. ¶¶ 75-76 (describing the formation of the Open Secure Access coalition, including that "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company.")); Ex. 86, PX 1035 (press release announcing the formation of the Open Secure Access coalition on May 17, 2006).

**RESPONSE:** Disputed in part.

It is undisputed that an industry coalition called Open Secure Access was founded in 2006.

[REDACTED]

76.     In early 2007, CDK joined Open Secure Access. Ex. 131, CDK-3122862 at 863 (Mr. Anenen in *Dealer Magazine* interview: "As you know, ADP has joined the OSA (Open Secure Access) coalition. You can see our name now on its letterhead. We joined OSA for a couple of reasons. First and foremost, the principles that it has endorsed are exactly the same principles that we hold near and dear to our own business philosophy: that dealership fundamentally owns the data in its DMS, and dealers should control who accesses their data and how it's used."); [REDACTED] Ex. 150, Stejskal Rep. ¶ 77 ("To more formally cement its position in the marketplace, CDK joined OSA just before an open letter to the industry was published in *Automotive News* in early 2007."); *see* Ex. 87, PX 1036.

**RESPONSE:** [REDACTED]

77.     Open Secure Access's guiding principles included (with "You" referring to dealers): "It's your data. *You* know best what to do with it." Ex. 87, PX 1036 ("We believe **DMS companies that support openness have the most to offer dealers**. Rather than use their leverage to reduce competition and increase dealer costs, these progressive DMS companies are actively contributing to facilitating innovation and increasing dealer profitability. Restrictive data policies have just the opposite effect *and* they hurt dealers."); *see* Ex. 150, Stejskal Rep. ¶ 77.

**RESPONSE:** Unsupported and disputed.

Although the quoted statement appears in the cited Open Secure Access promotional flyer, it is not listed as one of the "five key principles." Auth Ex. 87. The actual "five key principles" include that the preferred method for data access would be that DMS companies provide "technologically advanced means to interact (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database" rather than having data extractors using usernames and passwords screen scrape data from a DMS. Auth Ex. 87. Both Reynolds and CDK in fact provide such technologically advanced direct integration to their DMSs through the Reynolds Certified Interface and Third Party Access ("3PA") Programs, respectively. *See* Defs. JSUF 6-8, 11, 25-26.

78. ████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████ █████████████████████████████
██████████████████████████

**RESPONSE:** Disputed in part.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

79. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

**RESPONSE:** Disputed.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

80. ██████████████████████████████████████████████ Mr. Witt was
Vice President for Software Engineering and Development at DMI from 2006 to 2013.

**RESPONSE:** Disputed.

81.

**RESPONSE:** Disputed in part.

**PUBLIC VERSION**

████████████████████████████████████████

████████████████████████████████████████

███████████████████

82.    ███████████████████████████████████
████████████████████████████████████████
███████████████

**RESPONSE:** Disputed in part.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

83.    In 2012, Reynolds began taking steps to disable login credentials that it suspected were being used by data integrators. ████████████████████████
████████████████████████████████████████
███████████████████

**RESPONSE:** Disputed in part.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

84.     CDK and Reynolds disabled Authenticom's login credentials only after Authenticom used those credentials to access the DMS. Ex. 165, Declaration of Brian Clements (May 19, 2020) ("Clements 5/19/20 Decl.") ¶ 9.

**RESPONSE:** Undisputed.

85.     The only successful method for responding to Reynolds's disabling of user credentials was for a dealer to re-enable existing credentials or to create new login credentials for Authenticom and other data integrators like DMI. Ex. 5, Cottrell Decl. ¶ 40, *Authenticom* Dkt. 62 ("After CDK and Reynolds disabled Authenticom's credentials, dealers worked cooperatively with Authenticom to set up new credentials and re-establish access. Given the sheer scale of the mass blocking, Authenticom was forced to redirect a majority of its 120-person workforce to the effort – including at one point hiring 50 temporary employees solely to help dealers navigate around the shutdowns.");

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████

**RESPONSE:** Disputed in part.

Defendants dispute that re-enabling a disabled credential or creating new credentials to circumvent Reynolds's DMS access controls, violate Reynolds's DMS license agreements, and run unauthorized copies of Reynolds's software constitutes a "successful method."

To the extent this Fact suggests this was the only "successful method" to extract data from the Reynolds DMS, that is disputed. Dealerships could alternatively push vehicle inventory data out of the DMS to an FTP site using Reynolds's built-in AVID reporting tool, or export other DMS data for transmittal using Dynamic Reporting. RSUF 6-9; Defs. JSUF 5. Dealerships whose credentials had been disabled could also have encouraged their software vendors to join the RCI Program. Defs. JSUF 6-11. Both of these would have allowed for "successful"—and non-illegal— access to data stored on the Reynolds DMS to continue.

To the extent this Fact simply suggests that when Reynolds disabled a login credential being used by Authenticom, Authenticom could no longer use that credential to hostilely access the Reynolds DMS, that is undisputed.

86. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

**RESPONSE:** Unsupported and disputed.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

87. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

**RESPONSE:** Undisputed.

*See* Defs. JSUF 159.

88. ████████████████████████████████████████
████████████████████████████████████████████
██████████████████

**PUBLIC VERSION**

**RESPONSE:** Unsupported and disputed.

**PUBLIC VERSION**

89.

**RESPONSE:** Unsupported and disputed.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

90. ███████████████████████████████████████
████

**RESPONSE:** Undisputed.

91. ███████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████.

**RESPONSE:** Disputed.

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

PUBLIC VERSION

92.

**RESPONSE:** Unsupported and disputed in part.

93.

**RESPONSE:** Disputed in part.

**PUBLIC VERSION**

94. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

95. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████

**RESPONSE:** Disputed and unsupported.

96. ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████

**RESPONSE:** ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

97. ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████████

**RESPONSE:** Undisputed.

98. ██████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████

**RESPONSE:** Disputed and unsupported in part.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

99. ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████

**RESPONSE:** Disputed in part.

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**PUBLIC VERSION**

100.

**RESPONSE:** Disputed.

**PUBLIC VERSION**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

101.  ████████████████████████████████████████

**RESPONSE:** Unsupported and disputed in part.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



**RESPONSE:** Undisputed.

102.

103.

**RESPONSE**: Unsupported and disputed in part.

104.    Authenticom developed a script called Profile Manager that dealers that use the CDK DMS could run to automate the process of re-enabling Authenticom's login credentials. Ex. 165, Clements 5/19/20 Decl. ¶¶ 4-6; Ex. 45, Brown Tr. 362:14-363:13 (Profile Manger is a "tool that was constructed to keep connections open" and works to "re-enable profiles that had been locked out."); Ex. 61, DX 817 at AUTH_00140426 (May 8, 2017) ("The sole purpose of the application is to repair usernames and passwords that you have previously setup and provided to your chosen service providers. These are the very same profiles that CDK has continually disabled, impacting the flow of your data to your vendors.").

**RESPONSE:** Unsupported and disputed in part.

PUBLIC VERSION

**PUBLIC VERSION**

[black redaction bars]

105.    The dealer runs Profile Manager from the dealer's computer system. Ex. 165, Clements 5/19/20 Decl. ¶ 7; Ex. 61, DX 817 at AUTH_00140426 (April 28, 2017) (Authenticom message to dealers regarding Profile Manager: "the Profile Manager tool provides you with BlueZone scripts to manage your vendor profiles," which allows "you to connect and run automated scripts on your DMS. The script initiated by the tool is not installed on the DMS; rather, it is run from a dealership PC and uses the DMS protocols in the same fashion a real user would use the system.").

**RESPONSE**: Disputed in part.

It is undisputed that Profile Manager runs on the dealer's computer system. This Fact is disputed to the extent it implies that only the dealer "runs" Profile Manager in light of the evidence, described in Fact 104 above, that Authenticom developed the Profile Manager tool and installed it on many dealer systems. [black redaction bar]

[black redaction bars]

106.    Profile Manager uses tools built in to the CDK DMS that CDK makes available to the dealer to manage login credentials. Ex. 165, Clements 5/19/20 Decl. ¶ 5; Ex. 61, DX 817 at AUTH_00140426 (May 8, 2017) (with Profile Manager, the dealer runs a script from the dealer's PC and "uses the DMS protocols in the same fashion a real user would use the system.").

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that Profile Manager "uses tools built in to the CDK DMS that CDK makes available to the dealer to manage login credentials," but this fact is unsupported to the extent it implies that Profile Manager uses *only* such "tools." Profile Manager is software that is *not* built into the CDK DMS and is designed to automate a process that CDK designed for dealers to use in manual fashion. █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

107.    Dealers can run the Profile Manager program without enabling Authenticom's credentials. Ex. 165, Clements 5/19/20 Decl. ¶ 6.

**RESPONSE:** Unsupported and disputed in part.

It is undisputed that Profile Manager will not re-enable credentials that are already enabled at the time that Profile Manager runs. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████  This Fact is unsupported and disputed to the extent it implies that dealers "run" Profile Manager for the reasons stated in response to Fact 104 above.

108.  █████████████████████████████████████████████

███████████████████████████████████████████████

**RESPONSE:** Unsupported and disputed.

[REDACTED]

109. [REDACTED]

**RESPONSE:** This Fact is undisputed, [REDACTED]

[REDACTED]

110. In the computer security field, access controls determine what members of the organization or outside parties have permission to access certain data and to ensure that the data is made available only to those with sufficient authorization. [REDACTED]

**RESPONSE:** Disputed.

[REDACTED]



111.    The DMS industry is a subset of the enterprise resource planning ("ERP") software industry. Ex. 157, Expert Rebuttal Report of Eric Kimberling ¶ 36 ("Dealerships predominantly use industry-specific ERP software known as Dealer Management Systems ('DMS').") (citing documents from CDK and Reynolds describing the DMS as a type of ERP system).

**RESPONSE:** Disputed.

It is undisputed that Dealer Management Systems are enterprise software solutions that provide a variety of functions to automobile dealerships including accounting, finance and insurance, inventory, and service management.

It is disputed that DMSs are a "subset" of an "enterprise resource planning" industry that includes Microsoft, SAP, Oracle, or others. Microsoft, SAP, and Oracle's enterprise software solutions do not compete in the DMS space, do not offer the same or similar functionality as DMS providers, and do not offer the same or similar integrations as DMS providers. *See* Defs Add'l Ex. 531, Mottern Rpt. § 2. ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

112.    ERP providers (such as Microsoft, Oracle, or SAP) do not prohibit their customers from hiring a software company to build a software interface for data integration. ██████████████████████████████████

**RESPONSE:** Disputed in part.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

113.    Authenticom has never had a data breach. Ex. 5, Cottrell Decl. ¶ 30, *Authenticom* Dkt. 62 ("Authenticom's security protections and protocol are state of the art. Authenticom has never had a data breach and its firewall has never been compromised."); Ex. 13, PI Hearing Tr. 1-A-114:12-14 (Q: "Has Authenticom ever had a data breach?" A: "Never once.").

**RESPONSE:** Disputed and unsupported.

PUBLIC VERSION

114. ███████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████

**RESPONSE:** Disputed in part.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████

115. ███████████████████████████████████████
█████████████████████████████████████████████

**RESPONSE:** Unsupported in part.

**PUBLIC VERSION**

**PUBLIC VERSION**

116.

**RESPONSE:** Unsupported in part.

117. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

**RESPONSE:** Unsupported.

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████

118. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

**RESPONSE:** Disputed.

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

**PUBLIC VERSION**

**RESPONSE:** Disputed in part.

PUBLIC VERSION

120.    Mere access to a computer system – no matter how frequent – does not impair the performance of that computer system if there is unutilized computing power. Ex. 154, Expert Rebuttal Report of Adam Shostack ¶¶ 143-151.

**RESPONSE:** Disputed and unsupported.

This statement is unsupported because none of the cited paragraphs in Mr. Shostack's report contain or establish the stated proposition.

PUBLIC VERSION

PUBLIC VERSION

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

Dated: July 28, 2020                           Respectfully submitted,


/s/ *Aundrea K. Gulley*                          /s/ *Britt M. Miller*
Aundrea K. Gulley                                Britt M. Miller
Brian T. Ross                                    Michael A. Scodro
Brice A. Wilkinson                               Daniel T. Fenske
Ross M. MacDonald                                Matthew D. Provance
GIBBS & BRUNS LLP                                Jed Glickstein
1100 Louisiana Street                            MAYER BROWN LLP
Suite 5300                                       71 South Wacker Drive
Houston, TX 77002                                Chicago, IL 60606
(713) 751-5258                                   (312) 782-0600
agulley@gibbsbruns.com                           bmiller@mayerbrown.com
bross@gibbsbruns.com                             mscodro@mayerbrown.com
bwilkinson@gibbsbruns.com                        dfenske@mayerbrown.com
rmacdonald@gibbsbruns.com                        mprovance@mayerbrown.com
                                                 jglickstein@mayerbrown.com

Michael P.A. Cohen                               Mark W. Ryan
Leo D. Caseria                                   MAYER BROWN LLP
SHEPPARD MULLIN RICHTER & HAMPTON, LLP           1999 K Street NW
2099 Pennsylvania Avenue NW, Suite 100           Washington, DC 20006
Washington, DC 20006                             (202) 263-3000
(202) 747-1900                                   mryan@mayerbrown.com
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

                                                 *Counsel for Defendant*
*Counsel for Defendant*                          *CDK Global, LLC*
*The Reynolds and Reynolds Company*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on July 28, 2020, I caused a true and correct copy of the foregoing **RESPONSE OF DEFENDANTS CDK GLOBAL LLC AND THE REYNOLDS AND REYNOLDS COMPANY TO PLAINTIFF AUTHENTICOM, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

<div style="margin-left: 40%;">

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com

</div>