**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Authenticom, Inc. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00868 (N.D. Ill) | Magistrate Judge Jeffrey T. Gilbert |

**CDK GLOBAL, LLC'S OPPOSITION TO
AUTHENTICOM, INC.'S MOTION FOR SUMMARY JUDGMENT
ON CDK'S COUNTERCLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION & BACKGROUND ...................................................................1

LEGAL STANDARD...........................................................................................3

ARGUMENT .......................................................................................................4

I. Authenticom Was Not Authorized To Access CDK's DMS..............................5

   A. CDK's Contracts With Its Dealers Prohibit Access By Third-Party Software Like Authenticom's. ...............................................................................7

   B. Authenticom Is Not The Dealers' "Agent."...........................................11

      1. Authenticom Disclaimed An Agency Relationship. ......................11

      2. Authenticom Did Not Have An Agency Relationship With Dealers. ............13

         a. Authenticom, not dealers, controlled the method of performance. ..............13

         b. The "course of performance" is irrelevant and disputed.............................17

         c. Authenticom's principal authority is inapposite...........................................18

   C. Regardless Of Agency, Authenticom Lacked CDK's Authorization. .....................20

   D. Authenticom Did Not Have An Implied License To Use CDK's DMS Under Copyright Law. ........................................................................23

II. Authenticom Is Not Entitled To Summary Judgment On CDK's DMCA Counterclaim..25

   A. CDK Launched A Host Of Security Measures. .......................................26

   B. CDK's Technological Measures Effectively Controlled Access To Its System............................................................................................29

   C. Authenticom Repeatedly Circumvented CDK's Access Controls...........................32

   D. CDK's Access Controls Protect Copyrighted Works. .............................................37

      1. CDK's Software And Data Compilations Are Copyrighted.............................38

      2. Expert Testimony On Copyrightability Is Not Required, And Authenticom Failed to Plead The Relevant Affirmative Defenses In Any Event. ...............40

      3. CDK's Security Measures Control Access To Its Copyrighted Works...........41

   E. There Is No Independent Copyright "Nexus" Requirement And, Regardless, CDK Satisfies It. ..........................................................43

   F. Authenticom Was Not Authorized To Circumvent CDK's Access Controls...........45

III. Authenticom Fails To Show A Lack Of Disputed Material Fact Justifying Summary Judgment On Any Of CDK's Remaining Counterclaims. .........................45

   A. Authenticom Has Violated The CFAA....................................................46

   B. CDK Has Actionable Counterclaims Under The Trade Secrets Acts.....................47

      1. CDK Has Protectable Trade Secrets. ....................................47

**TABLE OF CONTENTS (continued)**

**Page(s)**

      2.      Authenticom's Counterarguments Are Unavailing. .........................................48

C.    CDK May Seek Injunctive Relief Under The UCL....................................................50

D.    CDK Has A Viable Trespass-To-Chattels Counterclaim. .........................................50

E.    CDK Can Pursue An Unjust Enrichment Remedy Against Authenticom. ...............53

F.    CDK Has A Viable Action For Fraud.......................................................................53

G.    There Is No Statute-Of-Limitations Problem With Any Counterclaim....................55

CONCLUSION……………………………………………………………………………56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actuate Corp. v. Int'l Bus. Machs. Corp.*,
  2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ................................................. 30

*Advanced Computer Servs. of Mich., Inc. v. MAI Sys. Corp.*,
  845 F. Supp. 356 (E.D. Va. 1994) .......................................................... 41, 45

*Alliance of Auto. Mfrs., Inc. v. Jones*,
  2014 WL 12848659 (N.D. Fla. Jan. 7, 2014) ................................................. 7

*Allstate Ins. Co v. Countrywide Fin. Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ....................................................... 7

*Am. Family Mut. Ins. Co. v. Roth*,
  485 F.3d 930 (7th Cir. 2007) ......................................................... 47, 48, 49

*In re Am. Online, Inc.*,
  168 F. Supp. 2d 1359 (S.D. Fla. 2001) ...................................................... 21

*America Online, Inc. v. IMS*,
  24 F. Supp. 2d 548 (E.D. Va. 1998) ........................................................ 51

*American Dental Association v. Delta Dental Plans Ass'n*,
  126 F.3d 977 (7th Cir. 1997) .............................................................. 40

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) ....................................................................... 4

*In re Application of Olmstead*,
  646 N.E.2d 1275 (Ill. App. 1995) .......................................................... 22

*Automation by Design, Inc. v. Raybestos Products Co.*,
  463 F.3d 749 (7th Cir. 2006) ....................................................... 12, 24, 25

*Avaya Inc. v. Telecom Labs, Inc.*,
  2014 WL 97335 (D.N.J. Jan. 7, 2014) ...................................................... 24

*Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*,
  15 F.3d 489 (5th Cir. 1994) ............................................................... 9

*Ballard v. Jewel Food Stores, Inc.*,
  2020 WL 616468 (N.D. Ill. Feb. 10, 2020) .................................................. 4

*Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*,
  2018 WL 1394033 (N.D. Ill. Mar. 20, 2018) ................................................ 47

*Bay State Milling Co. v. Martin*,
  916 F.2d 1221 (7th Cir. 1990) ............................................................. 54

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Beal Bank Nev. v. Northshore Ctr. THC, LLC,*
    64 N.E.3d 201 (Ill. App. 2016) ............................................................................... 17

*Beer Capitol Distributing, Inc. v. Guinness Bass Import Co.,*
    290 F.3d 877 (7th Cir. 2002) ................................................................................. 53

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.,*
    331 F. Supp. 977 (N.D. Cal. 2018) ........................................................................ 50

*Canario's, Inc. v. City of Austin,*
    2015 WL 5096650 (Tex. App. Aug. 26, 2015) ......................................................... 9

*Carter v. United States,*
    530 U.S. 255 (2000) .............................................................................................. 21

*CDK Global, LLC v. Brnovich,*
    No. 2:19-cv-4849, Dkt. 127 (D. Ariz. July 24, 2020) ................................... 2, 42

*Cent. Ill. Light Co. v. Home Ins. Co.,*
    821 N.E.2d 206 (Ill. 2004) ...................................................................................... 9

*Chamberlain Group., Inc. v. Skylink Technologies., Inc.,*
    381 F.3d 1178 (Fed. Cir. 2004) ............................................................................ 43

*Cisco Sys. Inc. v. Arista Networks, Inc.,*
    2017 WL 4771009 (N.D. Cal. May 10, 2017) ........................................................ 41

*Coe v. Milwaukee Cnty.,*
    2008 WL 5071717 (E.D. Wis. 2008) ....................................................................... 6

*CompuServe Inc. v. Cyber Promotions, Inc.,*
    962 F. Supp. 1015 (S.D. Ohio 1997) .............................................................. 51, 52

*Conrad v. Bendewald,*
    500 F. App'x 526 (7th Cir. 2013) ............................................................................ 6

*Craigslist Inc. v. 3Taps Inc.,*
    964 F. Supp. 2d 1178 (N.D. Cal. 2013) ..........................................................*passim*

*Craigslist, Inc. v. Kerbel,*
    2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) .................................................. 28, 32

*Daniels v. Corrigan,*
    886 N.E.2d 1193 (Ill. App. 2008) ......................................................................... 14

*ECT Int'l, Inc. v. Zwerlein,*
    597 N.W.2d 479 (Wis. Ct. App. 1999) ................................................................. 48

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Erickson v. Trinity Theatre, Inc.*,
 13 F.3d 1061 (7th Cir. 1994) ........................................................................ 19

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
 893 F.3d 1176 (9th Cir. 2018) ................................................................ 39, 40

*Facebook, Inc. v. Power Ventures, Inc.*,
 844 F.3d 1058 (9th Cir. 2016) ..................................................................... 20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
 499 U.S. 340 (1991) ..................................................................................... 38

*Fisher v. Alarm.com Holdings, Inc.*,
 2018 WL 5717579 (N.D. Ill. Nov. 1, 2018) ................................................... 9

*FM Indus., Inc. v. Citicorp Credit Servs., Inc.*,
 2008 WL 717792 (N.D. Ill. Mar. 17, 2008) .................................................. 42

*Fourth Estate Public Benefit Corp. v. Wall-Street.com*,
 139 S. Ct. 881 (2019) ................................................................................... 38

*Gallo v. Moen, Inc.*,
 813 F.3d 265 (6th Cir. 2016) ....................................................................... 10

*Gamerberg v. 3000 E. 11th St.*,
 44 Cal. App. 4th 424 (Cal. App. 2020) ........................................................ 23

*Greenpoint Mortg. Funding, Inc. v. Family First Mortg., Inc.*,
 2007 WL 2608554 (N.D. Ill. Sept. 4, 2007) ................................... 4, 30, 34, 53

*Grevas v. U.S. Fid. & Guar. Co.*,
 604 N.E.2d 942 (Ill. 1992) ............................................................................. 8

*Griswold v. Antoniak*,
 2013 WL 627242 (Wis. Ct. App. Feb. 21, 2013) .......................................... 53

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
 497 F. Supp. 2d 627 (E.D. Pa. 2007) .......................................................... 34

*Henson v. Santander Consumer USA Inc.*,
 137 S. Ct. 1718 (2017) ................................................................................... 9

*Estate of Hevia v. Portrio Corp.*,
 602 F.3d 34 (1st Cir. 2010) .......................................................................... 24

*Hotmail Corp. v. Van$ Money Pie Inc.*,
 1998 WL 388389 (N.D. Cal. Apr. 16, 1998) ................................................ 51

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Howland v. BG Prods., Inc.*,
    2000 WL 1848356 (Wis. Ct. App. Dec. 19, 2000) ............................................. 14

*I.M.S. Inquiry Mgmt. Sys. Ltd. v. Berkshire Info. Sys. Inc.*,
    307 F.Supp.2d 521 (S.D.N.Y.2004) ..................................................................... 30

*ICONICS, Inc. v. Massaro*,
    192 F. Supp. 3d 254 (D. Mass. 2016) ................................................................ 41

*IMAPizza, LLC v. At Pizza Ltd.*,
    334 F. Supp. 3d 95 (D.D.C. 2018) ..................................................................... 22

*Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd.*,
    36 F. Supp. 2d 1051 (N.D. Ill. 1999) ................................................................... 8

*Johnson Bank v. Tiziani*,
    2011 WL 4835728 (Wis. App. Oct. 13, 2011) ................................................... 55

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
    33 F.Supp.2d 820 (W.D. Mo. 1998) ................................................................... 12

*Kapadia v. Chi. Transit Auth.*,
    1987 WL 11383 (N.D. Ill. May 15, 1987) ......................................................... 23

*Knapp v. Hill*,
    657 N.E.2d 1068 (Ill. App. 1995) ................................................... 11, 14, 16, 17

*Korea Supply Co. v. Lockheed Martin Corp.*,
    63 P.3d 937 (Cal. 2003) .................................................................................... 50

*Kuryakyn Holdings, LLC v. Ciro, LLC*,
    242 F. Supp. 3d 789 (W.D. Wis. 2017) ............................................................. 47

*Kwikset Corp. v. Super. Ct.*,
    246 P.3d 877 (Cal. 2011) .................................................................................. 50

*Lang v. Lions Club of Cudahy Wisconsin, Inc.*,
    939 N.W.2d 582 (Wis. 2020) ................................................................. 18, 19, 20

*Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*,
    569 F.2d 286 (5th Cir. 1978) ............................................................................ 47

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
    342 F.3d 714 (7th Cir. 2003) ............................................................................ 47

*Lundin v. Shimanski*,
    368 N.W.2d 676 (Wis. 1985) ............................................................................ 54

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) .................................................................................... 41, 42

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010) .................................................................................... *passim*

*Metalex Corp. v. Uniden Corp. of Am.*,
863 F.2d 1331 (7th Cir. 1988) ...................................................................................... 18

*Metavante Corp. v. Emigrant Sav. Bank*,
2008 WL 5099619 (E.D. Wis. Nov. 26, 2008) ............................................................. 55

*Montgomery v. Noga*,
168 F.3d 1282 (11th Cir. 1999) .................................................................................... 38

*Monumental Life Ins. Co. v. Ill. Mut. Life Ins. Co.*,
2012 WL 5845631 (N.D. Ill. Nov. 19, 2012) ................................................................. 6

*Morich v. Lobermeier*,
905 N.W.2d 807 (Wis. 2018) ........................................................................................ 22

*Musacchio v. United States*,
136 S. Ct. 709 (2016) .................................................................................................... 46

*Navistar, Inc. v. New Baltimore Garage, Inc.*,
2012 WL 4338816 (N.D. Ill. Sept. 20, 2012) .......................................................... 30, 35

*Nexon Am., Inc. v. Game Anarchy*,
2013 WL 12121539 (C.D. Cal. Apr. 3, 2013) ............................................................... 35

*NLFC, Inc. v. Devcom Mid-Am., Inc.*,
45 F.3d 231 (7th Cir. 1995) .......................................................................................... 42

*Norton v. Am. Home Mortg. Servicing, Inc.*,
2011 WL 5828122 (E.D. Wis. Nov. 18, 2011) ............................................................. 11

*Ollerman v. O'Rourke Co., Inc.*,
288 N.W. 2d 95 (Wis. 1980) .......................................................................................... 55

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014) ..................................................................................... 38

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
2012 WL 3306600 (E.D.N.Y. June 13, 2012) ............................................................... 33

*RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*,
2010 WL 3307084 (N.D. Ill. Aug. 18, 2010) ................................................................ 53

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Restoration Specialists, LLC v. Hartford Fire Ins. Co.*,
    2009 WL 3147481 (N.D. Ill. Sept. 29, 2009) .................................................. 11

*Scheurer v. Fromm Family Foods LLC*,
    863 F.3d 748 (7th Cir. 2017) ......................................................................... 11

*Sears Mortg. Corp. v. Rose*,
    634 A.2d 74 (N.J. 1993) ................................................................................ 11

*Snap-On Bus. Sols. Inc. v. O'Neil & Assocs.*,
    708 F. Supp. 2d 669 (N.D. Ohio 2010) ................................................... 39, 52

*Steinbeck v. Steinbeck Heritage Found.*,
    400 F. App'x 572 (2d Cir. 2010) ................................................................... 14

*Stenograph L.L.C. v. Bossard Assocs.*,
    144 F.3d 96 (D.C. Cir. 1998) ........................................................................ 41

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
    401 F. Supp. 3d 1068 (S.D. Cal. 2019) ........................................................ 38

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
    566 U.S. 560 (2012) ...................................................................................... 32

*Thompson v. Gordon*,
    948 N.E.2d 39 (Ill. 2011) ................................................................................ 7

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*,
    306 F. Supp. 3d 1164 (C.D. Cal. 2018) .................................................. 32, 33

*Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*,
    315 F. Supp. 3d 1147 (C.D. Cal. 2018) ....................................................... 32

*Ticketmaster L.L.C. v. RMG Techs.*,
    507 F. Supp. 2d 1096 (C.D. Cal. 2007) ....................................................... 29

*Tietsworth v. Harley-Davidson, Inc.*,
    677 N.W.2d 233 (Wis. 2004) ....................................................................... 53

*Trident Prods. & Servs. LLC v. Canadian Soiless Wholesale, Ltd.*,
    859 F. Supp. 2d 771 (E.D. Va. 2012) ..................................................... 49, 50

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
    292 F.3d 512 (7th Cir. 2002) ....................................................................... 44

*United States v. Crippen*,
    2010 WL 7198205 (C.D. Cal. Nov. 23, 2010) ............................................. 44

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*United States v. Green*,
    904 F.2d 654 (11th Cir. 1990) ...................................................................................... 23

*United States v. Neal*,
    46 F.3d 1405 (7th Cir. 1995) ........................................................................................ 23

*United States v. Nosal*
    930 F. Supp. 2d 1051 (N.D. Cal. 2013) ....................................................................... 21

*United States v. Ranum*,
    96 F.3d 1020 (7th Cir. 1996) ........................................................................................ 23

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015) ......................................................................................... 23

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ......................................................................................... 44

*Universal City Studios v. Reimerdes*,
    111 F.Supp.2d 294 (S.D.N.Y. 2000) ..................................................................... 32, 44

*Vitrano v. N.A.R., Inc.*,
    2020 WL 1493620 (E.D.N.Y. Mar. 27, 2020) ............................................................. 7

*Westmas v. Creekside Tree Services, Inc.*,
    907 N.W. 2d 68 (Wis. 2018) .................................................................................. 19, 20

*Wilmington Tr. Co. v. AEP Generating Co.*,
    859 F.3d 365 (6th Cir. 2017) ....................................................................................... 10

*Wis. Tel. Co. v. Reynolds*,
    87 N.W.2d 285 (Wis. 1958) .................................................................................... 51, 52

*Ziehlsdorf v. Am. Family Ins. Grp.*,
    1990 WL 149183 (Wis. Ct. App. 1990) ...................................................................... 12

**Statutes**

17 U.S.C. § 101 ................................................................................................................ 39, 41

17 U.S.C. § 1201(a)(1)(A) .......................................................................................... *passim*

17 U.S.C. § 1201(a)(2) ........................................................................................................ 38

17 U.S.C. § 1201(a)(3)(A) ............................................................................................ 32, 45

17 U.S.C. § 1201(a)(3)(B) ............................................................................................ 29, 31

17 U.S.C. § 1201(b) ...................................................................................................... 36, 38

## TABLE OF AUTHORITIES (continued)

**Page(s)**

18 U.S.C. § 1030(a)(2)(C) ................................................................................ 23, 46

18 U.S.C. § 1030(c)(4)(A)(I) ................................................................................ 46

18 U.S.C. § 1839(3) ................................................................................ 48

28 U.S.C. 1292(a)(1) ................................................................................ 42

**Other Authorities**

Restatement (Second) of Torts § 540 (1977) ........................................................ 55

Restatement (First) of Torts § 218 (1934) ........................................................... 51

Restatement (Third) of Agency § 1.01 (2006) ...................................................... 11

### RECORD CITATION FORMAT

| Abbr. | Reference | Docket Number |
|---|---|---|
| Auth. Ex. | Exhibits to the Declaration of Daniel V. Dorris, May 20, 2020 | Dkt. 977-1 |
| CDK Opp. to Dealer SJ | CDK Global, LLC's Opposition to the Dealership Counter-Defendants' Motion for Summary Judgment, July 28, 2020 | Filed concurrently |
| Defs. JSOAF | Defendants CDK Global, LLC's and The Reynolds & Reynolds Company's Statement of Additional Material Facts In Opposition to MDL Plaintiffs' Motions for Summary Judgment on Defendants' Counterclaims, July 28, 2020 | Filed concurrently |
| Defs. JSUF | Defendants CDK Global, LLC and The Reynolds & Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of their Motion for Summary Judgment Exhibits, May 20, 2020 | Dkt. 974 |
| Defs. JSUF Ex. | Exhibits to the Declaration of Daniel T. Fenske, May 20, 2020 | Dkt. 975 |
| Mot. | Plaintiff Authenticom, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment on Defendants' Counterclaims, May 20, 2020 | Dkt. 978 |
| Resp. Auth. SOF | Response of Defendants CDK Global, LLC and The Reynolds and Reynolds Company to Plaintiff Authenticom, Inc.'s Statemetn of Undisputed Material Facts in Support of its Motion for Summary Judgment on Defendants' Counterclaims, July 28, 2020 | Filed concurrently |
| Reynolds SJ Opp. | Counterplaintiff The Reynolds and Reynold Company's Opposition to Counterdefendant Authenticom, Inc.'s Motion for Summary Judgment, July 28, 2020 | Filed concurrently |

## INTRODUCTION & BACKGROUND

Counter-Plaintiff CDK Global, LLC ("CDK") develops and maintains complex dealer management systems ("DMSs") for auto dealerships. Counter-Defendant Authenticom, Inc. ("Authenticom") is a "hostile" data extractor—a third party that uses dealer-issued credentials to access the DMS, copy vast amounts of data, and sell it to app vendors or other entities. Authenticom has no contractual or indemnification relationship with CDK, does not seek CDK's permission to access the DMS, and does not tell CDK how it is extracting data or where the data is going. Authenticom has repeatedly accessed the DMS—often by circumventing CDK's security measures—knowing that CDK did not authorize it to do so.

Authenticom contends that CDK's contracts with dealers (known as Master Services Agreements or "MSAs") permit the dealers to authorize Authenticom to access the DMS on the dealer's behalf. But Authenticom's reading of the MSAs is wrong as a matter of law. CDK retains sole ownership of the DMS and licenses its use to dealers while explicitly prohibiting the dealers from causing ████████████████████████████████████ ██████" except under narrow exceptions not applicable here. Authenticom seeks refuge ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████

Indeed, Authenticom's argument is irreconcilable with the position the dealer plaintiffs have taken in their own summary judgment motion. CDK has countersued a number of dealers for breach of contract for facilitating Authenticom's automated access in violation of their MSAs. *See* Dkt. 522. These dealers are Authenticom's supposed principals and (unlike Authenticom) are the counterparties to the very MSAs that Authenticom relies upon. In their summary judgment motion, the dealers do not claim that the record unambiguously shows that Authenticom was their "agent" or that there is no genuine dispute regarding the meaning of the

PUBLIC VERSION

MSAs. Dkt. 965 (Dealer SJ Br.). In fact, certain dealers ask this Court to grant *them* summary judgment on the ground that no reasonable jury could conclude that the dealers had the right and ability to supervise Authenticom, *id.* at 70-71—one of the issues central to the agency analysis. There is thus more than enough evidence to survive summary judgment on the question whether the MSA permits Authenticom's access.

Agency questions aside, Authenticom's contorted reading of the MSA fails for a more basic reason. Regardless of what the MSA says about dealers' ability to grant "agents" access to the DMS, *CDK* did not give Authenticom authorization (as the dealer's agent or otherwise). To the contrary, CDK made it clear to Authenticom that it was not welcome on the DMS. As the Court has recognized, CDK's authorization is the legally significant requirement: "Although dealers might have a breach of contract claim against CDK if CDK's denial of authority [to Authenticom] violated its contract with the dealers, that does not change the fact that CDK denied Authenticom authority." Dkt. 506 at 15.

A jury could easily find that Authenticom knew that it did not have CDK's authorization to access the DMS. Authenticom's CEO Steve Cottrell acknowledged in a 2014 letter, for example, ████████████████████████████████████████████" Resp. Auth. SOF 28, and Cottrell later claimed that a CDK employee cornered him at an industry trade show in April 2016 and told him "[o]ur contract with dealers does not allow them to give you a user name and password to continue to export data," and said that CDK would "enforce our contract with dealers and sue them if needed to keep you out of our systems," Defs. JSUF 189. The record contains many more similarly damning admissions by Authenticom executives and others. Indeed, Cottrell has flatly admitted in this litigation that ██████████████████████████ ██████████████████ but that Authenticom continued to do so. Resp. Auth. SOF 28.

"Clear" is an understatement. In mid-2016, CDK deployed a variety of technological measures designed to bolster its policy against unauthorized third-party access and to impede

Authenticom and other hostile integrators from using automated means to access the DMS. Authenticom responded by developing scripts and other tools to defeat those controls. Common sense says that security measures designed to stop automated third-party access reflect the system operator's *denial* of authorization to those entities, not an invitation for hostile integrators to find another way in.

Authenticom circumvented CDK's security controls with countermeasures that falsely represented that Authenticom was a "dealer employee" (it was not); used scripts to answer CAPTCHA and other prompts specifically designed to defeat automated access; and continuously scanned the DMS to detect and re-activate user accounts that CDK associated with non-authorized access and had accordingly disabled. Engaging in these sophisticated work-arounds would have been absurd if Authenticom had CDK's permission to access the DMS all along. Notwithstanding Authenticom's talk about the MSA and licensing principles, then, the relevant fact is clear—faced with overwhelming evidence that Authenticom lacked CDK's authorization to access its computer systems, Authenticom did so anyhow, justifying its conduct based on an invented dealer-given right (which CDK purportedly could not revoke) to access the CDK DMS.

As explained below, federal and state law prohibit Authenticom from hacking into CDK's DMS over CDK's objections, whether Authenticom claimed to be hacking on behalf of dealers, vendors, or itself. Authenticom has identified no ground for summary judgment on these claims. A jury must decide whether Authenticom's conduct violated the law.

## LEGAL STANDARD

The Court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet that standard, Authenticom must show that no "reasonable jury could return a verdict for" CDK, even when viewing the record in the light most favorable to CDK and drawing all

reasonable inferences in its favor. *Ballard v. Jewel Food Stores, Inc.*, 2020 WL 616468, at \*4 (N.D. Ill. Feb. 10, 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

### ARGUMENT

CDK's Counterclaims allege that Authenticom violated the Computer Fraud & Abuse Act ("CFAA") (Count I); the Digital Millennium Copyright Act ("DMCA") (Count II); the Defend Trade Secrets Act (Count III); the Wisconsin Computer Crimes Act ("WCCA") (Count IV); the Wisconsin Uniform Trade Secrets Act (Count V); the California Comprehensive Computer Data Access and Fraud Act ("CCCDAF") (Count VI); and the California Unfair Competition Law ("UCL") (Count VII). CDK also claims that Authenticom's conduct gives rise to common-law claims for tortious interference with contract (Count VIII); trespass to chattels (Count IX); unjust enrichment (Count XI); and fraud (Count XII). Authenticom moves for summary judgment on all of these claims. But settled law and the record in this case show, at the very least, that there are disputed material facts on each of CDK's counterclaims, such that Authenticom's motion should be denied.

*First*, Authenticom had no authorization, express or implied, to use CDK's DMS. ███████████████████████████████████████████████—precisely the type of access that Authenticom employs. Authenticom argues that it qualifies as the dealer's "agent" and is therefore permitted to access the DMS under the MSA, but that is triply wrong: (1) ████████████████████████████████████████████ ███████████████████; (2) Authenticom is not the dealer's agent—its own contracts with dealers disclaim any agency relationship, and record evidence shows that dealers had no control over the methods and means of Authenticom's conduct; and (3) even if the MSA allowed dealers to authorize automated access by their agents, this Court has already held that CDK was entitled to revoke any such authorization, which CDK unquestionably did (or so a reasonable jury could find). *See infra* Part I.

4

*Second*, Authenticom is not entitled to summary judgment on CDK's DMCA counterclaim. In an effort to keep Authenticom and others out of its system, CDK implemented a series of technological measures to impede automated third-party access to the DMS. Authenticom repeatedly circumvented these measures by using computer scripts to gain access to the DMS. This conduct is a classic violation of the DMCA. Straining to avoid liability, Authenticom twists the language of the statute in ways courts have uniformly rejected and asks this Court to read the factual record in Authenticom's favor rather than in the light most favorable to CDK. *See infra* Part II.

*Third*, Authenticom includes a grab-bag of arguments on several other counterclaims, none of which warrants summary judgment in Authenticom's favor. *See infra* Part III.

*         *         *

Authenticom's arguments for summary judgment are in many ways materially indistinguishable as between the two counter-plaintiffs, CDK and the Reynolds & Reynolds Company ("Reynolds"). In the interest of avoiding undue length, CDK discusses only briefly legal arguments addressed more comprehensively by Reynolds. Instead, wherever possible, CDK joins Reynolds's opposition in full and incorporates its arguments by reference herein.

## I. Authenticom Was Not Authorized To Access CDK's DMS.

Authenticom's principal argument is that CDK's MSAs with dealers allowed the dealers to authorize Authenticom to access CDK's DMS. Mot. 24-41. Authenticom claims that this authorization defeats all of CDK's counterclaims. *Id.* But any such authorization would not defeat CDK's DMCA claim for the reasons discussion in Section II.G below. Regardless, as further explained below, a reasonable jury could find that Authenticom had no authorization to access the CDK DMS. Thus, all of CDK's counterclaims survive.

Authenticom's claim that CDK's dealer MSAs authorized Authenticom to access the CDK DMS has no basis in law or fact. Indeed, Authenticom has repeatedly alleged in this

litigation that it was *not* an authorized user of the DMS under CDK's dealer contracts.[1] Those allegations are binding on Authenticom, as this Court squarely held in denying Authenticom's prior efforts to walk away from them. *See* Dkt. 506 at 12 ("Authenticom alleges that CDK's contracts prohibit dealers from granting Authenticom access to their data, which is a factual allegation."). As this Court explained, "the Court expects that Authenticom would not have alleged that CDK's contracts prohibit dealers from granting Authenticom access to their data unless it had a good faith basis for doing so," Dkt. 506 at 12 n.3—especially since Authenticom had access to CDK's dealer contract when it made all of those admissions. *See, e.g.*, Compl. ¶ 151 (quoting CDK's MSA). Alone, Authenticom's admissions about the CDK MSA foreclose summary judgment on this issue. *Conrad v. Bendewald*, 500 F. App'x 526, 528 (7th Cir. 2013) (observing that on summary judgment a party "is bound by what she said in her pleadings"); *Monumental Life Ins. Co. v. Ill. Mut. Life Ins. Co.*, 2012 WL 5845631, at *2 (N.D. Ill. Nov. 19, 2012) (holding party to its pleadings when it attempted to change its allegations about definition of contract term); *Coe v. Milwaukee Cnty.*, 2008 WL 5071717, at *4 (E.D. Wis. 2008) (same where party attempted to change allegations about the existence of contract).

Even without Authenticom's own binding allegations, however, its argument that it was authorized to access the DMS still would fail, for three reasons: (1) ███████████████████ █████████████████████████████████████████████████████████████ ███████████ (2) Authenticom is not an "agent" of the dealer, *see infra* § B; and (3) regardless of what the dealers' MSA said, CDK made clear to Authenticom that Authenticom did not have

---

[1] *See, e.g.*, Dkt. 1, Compl. ¶ 150 ("In their DMS contracts with dealers, both CDK and Reynolds require dealers to agree that they will not provide anyone other than the DMS provider access to their data for purposes of data integration and syndication to vendors. The contractual terms thus *prohibit dealers from granting* access to their data to anyone else, *including data integrators such as Authenticom*."); No. 18-868, Dkt. 146, at ¶ 148 (Authenticom's PI Reply to Def.'s Statement of Facts) ("It is undisputed that CDK and Reynolds' DMS contracts forbid dealers from allowing Authenticom or other parties from accessing the dealers' own data stored in the DMS."); No. 17-2540 (7th Cir.), Dkt. 52/58, at 21-22 (Authenticom Cons. Br. for Appellee) ("CDK and Reynolds have exclusive dealing provisions in their dealer contracts (dealers cannot provide automated access to their data to anyone else).").

6

CDK's authorization to access CDK's DMS, *see infra* § C. Authenticom also argues that, as to

the DMCA, it had an "implied license" to access the DMS under copyright principles. That

argument fails under long-settled copyright law. *See infra* § D.

**A.    CDK's Contracts With Its Dealers Prohibit Access By Third-Party Software Like Authenticom's.**



Authenticom does not claim that

its access was permitted under those procedures—and it was not. Thus, under the plain meaning

of these provisions,

To begin, Authenticom is a "third party."

it receives its "plain, ordinary and popular meaning." *Thompson v. Gordon,* 948 N.E.2d 39, 47

(Ill. 2011). And a "third party" to a contract is anyone who is not a party to the contract.[3] That

includes Authenticom.

---

[2] All citations to the "MSA" in this brief are to Defs. JSUF Ex. 64 unless otherwise noted.

[3] *See, e.g.*, Black's Law Dictionary (11th ed. 2019) ("third party" means "[a] person who is not a party to a lawsuit, agreement, or other transaction but who is usu[ally] somehow implicated in it; someone other than the principal parties."); *cf. also Vitrano v. N.A.R., Inc.*, 2020 WL 1493620, at *7 (E.D.N.Y. Mar. 27, 2020) (same); *Allstate Ins. Co v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1173 (C.D. Cal. 2011) (same); *Alliance of Auto. Mfrs., Inc. v. Jones*, 2014 WL 12848659, at *7 n.9 (N.D. Fla. Jan. 7, 2014) (similar).

Authenticom does not dispute that it is a "third party" within the ordinary meaning of that term. Rather, it contends that ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ As this Court has already observed, however, that reading of the MSA raises a host of problems.

First, "the provision allowing dealers to disclose or otherwise make available CDK's products" to agents "does not specifically address third party software." Dkt. 506 at 13. "[W]hen a contract contains both general and specific provisions relating to the same subject, the specific provision controls." *Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd.*, 36 F. Supp. 2d 1051, 1055 (N.D. Ill. 1999) (quoting *Grevas v. U.S. Fid. & Guar. Co.*, 604 N.E.2d 942, 944 (Ill. 1992)). ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Second, Authenticom argues that because the contract uses the terms "█████" and "█████," anyone who is an "█████" is not a "█████████" and vice versa. Mot. 25. But that makes no sense in this context or as a matter of general contract interpretation. The more sensible reading is that the ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

PUBLIC VERSION

████████████████████████ The mere fact that a contract uses two different terms (one general and one more specific) does not mean that the terms are mutually exclusive. *Cf. Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 493-94 (5th Cir. 1994) (whether or not entity "could be considered an independent contractor" is irrelevant to whether entity "was a subcontractor for purposes of the indemnity clause of the contract"). Indeed, it is commonplace to describe "agents" as "third parties." *See, e.g.*, *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017) ("third party collection agents"); *Fisher v. Alarm.com Holdings, Inc.*, 2018 WL 5717579, at *2 (N.D. Ill. Nov. 1, 2018) ("third-party agents"); *Canario's, Inc. v. City of Austin*, 2015 WL 5096650, at *4 (Tex. App. Aug. 26, 2015) ("an escrow agent" is "traditionally a private third-party that holds the escrow funds").

Thus, reading the term "third parties" to include "agents" does not render any portion of the MSA "surplusage or nugatory." Mot. 25. It gives full effect to every provision in the MSA while giving "third party" its plain meaning—a meaning Authenticom ignores. Mot. 25.

By contrast, Authenticom's reading of the contract gives no independent meaning to

§ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. ████████████████████████████████

████████████████████████████████████████████████████████

Otherwise, it would add nothing to the more general bar on third-party access. *See, e.g.*, *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004) (rejecting interpretation that "simply cannot be the case" because it would render other language "mere surplusage").

Third, ███████████████████████████

███████████████████████████████████████

███████████████. Under Authenticom's reading of the contract, all that would be for

naught. Dealers could avoid the need to follow those procedures simply by designating a third

party as their "agent." But contracting parties do not hide "elephants in mouseholes."

*Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 373 (6th Cir. 2017) (quoting *Gallo*

*v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016)). The MSA would not contain such an obvious

end-run around its careful scheme for third-party software.[4]

Finally, the record shows that CDK negotiated ███████████████████

███████████████████████████████████████

███████████████████████████████ If Authenticom's reading

of the MSA were correct, these individually negotiated provisions would have been pointless—

whether phrased as an "acknowledgment" or not. Mot. 15. ███████████████

███████████████████████████████████████

██████████████████████████████ ███████████████

███████████████████████████████████████

███████████████████ That is all the more true because several dealers—whom CDK

has sued for breach of the MSA—do not claim that they are entitled to summary judgment on

the question of whether the MSAs permitted them to share credentials with Authenticom. *See*

Dkt. 965 (Dealer SJ Br.); CDK Opp. to Dealer SJ § I.B.1.

---

[4] Authenticom mentions that CDK began to modify some of the terms in its MSA beginning in 2017. Mot. 30. But that is irrelevant to what the terms in CDK's *pre*-2017 MSA require. In any event, for any dealers subject to the new MSA, that change makes even more clear that Authenticom was not authorized to poll the DMS after 2017.

### B. Authenticom Is Not The Dealers' "Agent."

██████████████████████████████████████████████████████

████████████, Authenticom was not the dealers' agent. The Restatement (Third) of Agency

§ 1.01 (2006) defines agency as the "fiduciary relationship" that results when one party (the

principal) assents to another party (the agent) acting on the principal's behalf and subject to the

principal's control. Under Illinois law, the "test of agency is whether the purported principal

has the right to control the manner and method in which the work is carried out by the agent

and whether the agent is capable of subjecting the principal to personal liability." *Knapp v.*

*Hill*, 657 N.E.2d 1068, 1071 (Ill. App. 1995).[5]

The existence of an agency relationship is a quintessential question of fact. *See* Dkt. 506

at 13 (citing *Restoration Specialists, LLC v. Hartford Fire Ins. Co.*, 2009 WL 3147481, at *3

(N.D. Ill. Sept. 29, 2009) ("[T]he question of agency typically presents an issue of fact that

seldom can be resolved at the summary judgment stage . . . .")). Especially here, where the

facts must be construed in the light most favorable to CDK, Authenticom cannot show that it

is entitled to summary judgment on this ground.

#### 1. Authenticom Disclaimed An Agency Relationship.

Reams of evidence show that Authenticom and the dealers subject to CDK's MSA did

not have an agency relationship. To start, Authenticom did not have *any* defined relationship

with dealers for much of the relevant period. ████████████████████████████████

██████████████████████████████████████████████████████

████████ Defs. JSOAF 30; Resp. Auth. SOF 29. ██████████████████████████

---

[5] The analysis is essentially the same under New Jersey or Wisconsin law. Under New Jersey law, "an agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993). Wisconsin "requires 'an agreement of two parties, embodying three factual elements: (1) the manifestation of the principal that the agent is to act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking.'" *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 755 n.4 (7th Cir. 2017) (quoting *Norton v. Am. Home Mortg. Servicing, Inc.*, 2011 WL 5828122, at *2 (E.D. Wis. Nov. 18, 2011)).

11

███████████████████████████████████████████████

█████████████████████████████████████████████ Resp. Auth.

SOF 23; Defs. JSOAF 7-9.

Indeed, the evidence shows that *vendors*, not dealers, are Authenticom's principal

clients. ███████████████████████████████████████████████

Defs. JSOAF 3, 5. ████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Defs. JSOAF 6. ████████████████████

███████████████████████████████████████████████

███████████████████████████ Defs JSOAF 4.

Even after Authenticom began to contract directly with dealers as to DealerVault in

2014, Resp. Auth. SOF 29, its standard contract *expressly disclaimed* an agency relationship.

That contract provides that "[t]he Parties expressly agree that they are independent contractors

and do not intend for these Terms and Conditions to be interpreted as an employment[,] *agency*,

joint venture, or partnership relationship." Resp. Auth. SOF 42 (emphasis added). Now that its

efforts to escape liability hinge on its ability to portray itself as the dealers' agent, however,

Authenticom attempts to brush aside its disclaimer of an agency relationship as irrelevant. Mot.

33.

But this Court has already rejected Authenticom's argument—distinguishing the same

case Authenticom points to as the crux of its argument on summary judgment. *See* Dkt. 506 at

9-10 (discussing why *Automation by Design, Inc. v. Raybestos Products Co.*, 463 F.3d 749 (7th

Cir. 2006), cited at Mot. 33, is inapplicable). As the Court held, it is "certainly" relevant that

Authenticom's contract with dealers "expressly disclaims . . . an agency relationship." *Id.* at

10; *see also K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 33 F.Supp.2d 820, 828 (W.D. Mo. 1998)*;

Ziehlsdorf v. Am. Family Ins. Grp.,* 1990 WL 149183, at *1 (Wis. Ct. App. 1990).

2.      **Authenticom Did Not Have An Agency Relationship With Dealers.**

The substance of Authenticom's relationship with dealers lacks the hallmarks of a principal-agent relationship. Authenticom retained the right to control the method of its performance. Authenticom tries to obfuscate that clear contractual right with "course of performance" arguments, which are irrelevant and in any event are inconsistent with other record evidence. In the end, Authenticom seeks refuge in a single Wisconsin case that provides no support for its broad conception of agency.

a.      **Authenticom, not dealers, controlled the method of performance.**

What Authenticom calls the "substance" of its relationship with dealers, Mot. 33, is no more suggestive of an agency relationship than its express disclaimer. According to Authenticom, "the undisputed evidence shows that dealers had the right to control all aspects of Authenticom's provision of data integration services" (*i.e.*, data extraction from the CDK DMS). Mot. 31. But there are numerous material factual disputes that preclude summary judgment on that issue.

Authenticom's standard DealerVault contract states that *Authenticom* controls the manner in which it extracts data from the DMS. ███████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████



Defs. JSOAF 13-14.

That is the antithesis of an agency relationship, in which the *principal* has the right to control the agent's performance. *Knapp*, 657 N.E.2d at 1071 (principal must control the "manner and method in which the work is carried out by the agent"). Most fundamentally, any "rights" dealers may enjoy exist at Authenticom's grace, as Authenticom has the sole right to change the contract terms at will. Courts routinely hold that one-sided agreements like Authenticom's standard DealerVault contract do not create a principal-agent relationship. *See*, *e.g.*, *Daniels v. Corrigan*, 886 N.E.2d 1193, 1203-04 (Ill. App. 2008) (holding that there was no agency relationship where the written agreement expressly disclaimed a principal-agent relationship and reserved in the alleged agent significant control over the manner and method of his work—including setting his own hours of operation, exercising day-to-day discretion over how to go about his duties, and not having to report extensively to the alleged principal); *Howland v. BG Prods., Inc.*, 2000 WL 1848356, at *5 (Wis. Ct. App. Dec. 19, 2000) (holding that no agency relationship existed where the parties' contract "explicitly declared that it was not [the parties'] intent . . . to create an agency relationship" and the contract terms left the alleged agent discretion such that it, not the alleged principal, "controlled the details" of its work, which did not need to be performed "in any specific manner" other than to achieve "the objectives of the contract"); *see also Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010) (holding that contract terms giving alleged agent "complete power and authority to negotiate, authorize, and take action . . . forecloses any argument that the parties

[contemplated the level of control] necessary to create an agency relationship") (discussing similar New York agency principles).

Authenticom does not dispute that its dealer contracts give it complete control over the process. Rather, it focuses on cherry-picked statements from its own employees and certain dealers as to how much "control" the dealers supposedly had over Authenticom's actions. Mot. 32. But none of these statements concern the dealer's *right* to control Authenticom's actions, which the DealerVault contract makes clear dealers do not have.

Further, none of the types of "control" Authenticom identifies concerns the manner and method of the work itself. Each is focused on Authenticom's outputs—things like the type of data tabulated and the form in which it is provided. *See* Mot. 31. Authenticom's argument thus would create principal-agent relationships from nearly every conceivable commercial transaction. For example, a restaurant customer has "control" over the type of hamburger she wishes to order, including whether to include cheese, lettuce, tomatoes, or what temperature to cook the burger. Although the customer has the right to define the end product it purchases, it has no right to control the *manner* in which the restaurant creates that product. The customer cannot, for instance, walk into the kitchen and dictate which chef should make her meal or the steps the chef should take in doing so. But control merely over the type of hamburger—the kind of "control" Authenticom asserts exists here—cannot possibly make the restaurant the customer's "agent," with all the fiduciary duties that entails.

Evidence from dealers drives home the dealer's *lack* of control over how Authenticom went about extracting data. For instance, the Continental Counter-Defendants have argued in this litigation that they are not liable for violations of the DMCA because there is no evidence they had "the right or ability to supervise Authenticom's alleged circumvention" of CDK's DMS access controls or "any knowledge of Authenticom's alleged circumvention." Dkt. 965 (Dealer SJ Br.) at 68-69. Indeed, Continental's corporate representative stated that all

15

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████; *contra* Mot. 33 n.13 (stating that "key dealer groups" touted agency-like control). ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ Thus, Authenticom's claim (at 30) that dealers saw Authenticom as their "agent"—based solely on the made-for-this litigation statements of dealer employees and a dealer consultant represented by counsel for the dealer plaintiffs in this MDL—is belied by the dealers' own contracts with Authenticom and dealer witnesses' testimony on the substance of the Authenticom-dealer relationship.

Authenticom also dramatically overstates the amount of "control" the evidence shows it has granted dealers. Authenticom uses its proprietary software to automate the extraction of data from CDK's DMS. Defs. JSOAF 17-18, 22. ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████" Defs. JSOAF 20. ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

 . Authenticom controlled many other aspects of the data-extraction process as well. *See* Defs. JSOAF 19-27.[6]

Further, the record shows

"). Dealers controlled *none* of those practices.

### b. The "course of performance" is irrelevant and disputed.

Authenticom's argument that CDK's "course of performance" is evidence of authorization (Mot. 28) likewise misses the point. The Court has already held that the term "agent" in the MSA is unambiguous—the only question is whether Authenticom meets the definition. *See* Dkt. 506 at 9 n.2. That renders extrinsic evidence like course of performance irrelevant as a matter of law. *See, e.g.*, *Beal Bank Nev. v. Northshore Ctr. THC, LLC*, 64 N.E.3d 201, 205 (Ill. App. 2016) ("Although extrinsic evidence may be used to aid in the interpretation of an ambiguous contract, such evidence may not be used to interpret a contract that is

---

[6] Further, it is irrelevant for purposes of agency that Authenticom's DealerVault system purported to provide dealers with control over data already extracted by Authenticom from the DMS and placed into DealerVault, and then sent to vendors. Resp. Auth. SOF 33-34. That system gave individual dealers no visibility or control over DealerVault's access to data in the DMS itself. *Id.* And it is the manner in which Authenticom *accesses the DMS and extracts data* that constitutes "the manner and method" (*Knapp*, 657 N.E.2d at 1071) relevant to agency status.

unambiguous on its face."). And to the extent it were relevant, any ambiguity as to who the contract covers counsels against summary judgment. *See, e.g.*, *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988) ("[I]f the court finds that the contract is ambiguous, the contract's meaning becomes a fact question for the trier-of-fact."). *Contra* Mot. 28.

The course of performance to which Authenticom refers is also, at best, ambiguous: Although at one time CDK stated publicly that dealers could use third-party data extractors to access the DMS, it removed that option from its marketing materials in 2012, and beginning in 2013 began advising dealers expressly that third parties like Authenticom who were not certified in the 3PA program were not approved for access to the DMS. Resp. Auth. SOF 72. CDK's damages counterclaims are limited to August 2014 and beyond, Auth. Ex. 147 (Rubinfeld Rpt.) ¶ 23, long after CDK changed its position and after Authenticom acknowledged that CDK did not authorize its access.

### c.       Authenticom's principal authority is inapposite.

Authenticom bases its agency argument almost entirely on the Wisconsin Supreme Court's decision in *Lang v. Lions Club of Cudahy Wisconsin, Inc.*, 939 N.W.2d 582 (Wis. 2020). *See* Mot. 31-34. This Court has already held that Illinois law applies to the agency issue. Dkt. 506 at 13 n.4. ("[The issue of] whether Authenticom is an agent of the dealers under the MSA . . . is governed by Illinois law."). But in any case, Wisconsin is not an outlier on agency principles. *Lang* is not close to being on "all fours" (Mot. 32) with the situation here.

For one thing, the *Lang* court's discussion of agency law arose in an entirely different context, where Wisconsin's strong public policy favoring immunity for property owners that allow the public to use their land for recreational activities created a powerful incentive to find that an agency relationship existed. 939 N.W.2d at 590-91. The situation here could not be more different. The CFAA, the DMCA, and the Copyright Act reflect Congress's "strong public policy" in protecting owners' rights to control access to their computer systems and

copyrighted materials. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1066 (7th Cir. 1994) (Copyright Act); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 946 (9th Cir. 2010) (DMCA); *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1187 (N.D. Cal. 2013) (CFAA).

Nor is the *Lang* court's actual analysis of the agency issue of any help to Authenticom. The contract in *Lang* expressly provided that the tortfeasor was the "agent" of the property owner (the claimed principal). *Lang*, 939 N.W.2d at 587. That agreement also specifically required the agent to "carry out instructions as to . . . manner of performance." *Id.* at 593. Authenticom's contract with its dealership clients does the opposite. It states that Authenticom was *not* the dealers' agent, does not provide dealers with control over the manner of performance, and gives Authenticom the right to change the dealer's rights under the contract at will. *See supra* pp. 11-14; *see also* Defs. JSOAF 10-14.

*Lang* also emphasizes that agency depends on the purported principal's right to control the details of the work. The plaintiff there tripped on an electric cord at a festival by the Lions Club, which had hired the contractor who placed the cord. 939 N.W.2d at 596-97. The Lions Club walked through the property to scrutinize its contractors' work beforehand and actually exercised control over the placement of the cord both before and after the accident. *Id*. at 596-98. Here, by contrast, there is no evidence that the dealers routinely supervised Authenticom's performance of its work when it accessed the DMS or had any effective control over how Authenticom extracted data. ███████████████████████████████████ ██████████████████████████ Defs. JSOAF 12. That makes it impossible for a dealer to "control" the manner in which Authenticom does so.

Authenticom's relationship with dealers more closely resembles another Wisconsin Supreme Court case, *Westmas v. Creekside Tree Services, Inc.*, 907 N.W. 2d 68 (Wis. 2018), that the *Lang* court distinguished. In *Westmas*, the court held that no agency relationship existed between a property owner and a tree-trimming service because the agreement between the two

19

included no specific directions about the "methods" of tree trimming and the property owner had no expertise in the subject. *Id.* at 72; *see also Lang*, 939 N.W.2d at 592-93 (discussing *Westmas*). The *Westmas* court concluded that the property owner enjoyed the right to expect a particular result (trimmed trees) but not to control the method of trimming. *Westmas*, 907 N.W.2d at 79; *see also Lang*, 939 N.W.2d at 592-93. Likewise, here, Authenticom points to no evidence that the dealers enjoyed the right to control the *method* of data extraction—for example, which software Authenticom would use to access the DMS, or whether Authenticom would use automated means to evade CDK's security controls. Authenticom focuses instead on the product expected by the dealer (the dataset to be extracted and sent to vendors). Also as in *Westmas*, the dealers lack expertise in using automated hostile access to pull data from the DMS or in circumventing DMS security controls. Authenticom is not the dealer's agent because Authenticom retains control over its manner of performance.

### C. Regardless Of Agency, Authenticom Lacked CDK's Authorization.

Even if the MSA allowed dealers to give "agents" automated access to the DMS and even if Authenticom qualified as an "agent," that still would not give Authenticom the authorization that federal data-privacy law requires to access CDK's proprietary DMS. This Court has already rejected the argument (as it pertains to Authenticom) that the MSAs divested CDK of its authority to decide who could and could not access its DMS. As the Court held in the context of the CFAA counterclaim, "[a]lthough dealers might have a breach of contract claim against CDK if CDK's denial of authority violated its contract with the dealers, that does not change the fact that CDK *denied Authenticom authority*." Dkt. 506 at 15 (emphasis added); *see also, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016) (holding that defendant lacks authorization "when the employer has rescinded permission to access the computer and the defendant uses the computer anyway"). It is indisputable that CDK denied Authenticom authority no later than August 2014. *See* Dkt. 966 (Defs. SJ Br.) at 62.

20

Nor does the common law of trespass somehow undercut CDK's right to revoke any prior consent it may have given. *See* Mot. 36-37. "[A] 'cluster of ideas' from the common law should be imported into statutory text only when Congress employs a common-law term, and not when, as here, Congress simply describes an offense analogous to a common-law crime without using common-law terms." *Carter v. United States*, 530 U.S. 255, 265 (2000). Congress did not use common law terms like "trespass" in the CFAA or the DMCA, so it is inappropriate to incorporate common law concepts into those statutes. *See In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1371 n.8 (S.D. Fla. 2001) (refusing to "[b]orrow[] from the common law definition of trespass" to construe the CFAA).

Nor is it appropriate to incorporate common law concepts where doing so would frustrate the purpose of the CFAA. In *United States v. Nosal*, the defendant argued that she was not liable under the CFAA for accessing her former employer's confidential database because she had obtained the login credentials from her former assistant, who was authorized to use the system. 930 F. Supp. 2d 1051, 1054, 1061-62 (N.D. Cal. 2013). The defendant argued that "the CFAA does not cover situations where an employee voluntarily provides her password" because, "[j]ust as consensual use of an employee's key to gain physical access is not trespass, consensual use of an employee's computer password is not hacking." *Id.* at 1061-62. The court rejected that argument, holding that "nothing in the wording of the CFAA or interpretive case law" supports that construction. *Id.* at 1062. The court added that incorporating this concept from trespass law would gut the CFAA. *Id.* ("If the CFAA were not to apply where an authorized employee gave or even sold his or her password to another unauthorized individual, the CFAA could be rendered toothless.").

The same is true here. It would be especially improper to bar a system owner from revoking any authorization previously given by contract because doing so would frustrate the purpose of the CFAA and run headlong into other federal data privacy laws that may *require* a

system owner to revoke prior consent. If a dealer decided, for example, to use a data integrator with a known track record of causing data breaches, CDK would be powerless to bar that integrator's access to *CDK's own computer systems*. That makes no sense, especially in light of other federal laws or regulations that may require entities that are custodians over systems containing sensitive consumer data to take reasonable steps to protect that data, particularly in the face of known risks from hostile third parties.[7]

In any case, CDK's right to revoke prior consent is entirely consistent with the common law. *See* 75 Am. Jur. 2d Trespass § 80 ("Although consent to entry is generally a defense to an action for trespass, consent may later be revoked."); *see also, e.g.*, *Morich v. Lobermeier*, 905 N.W.2d 807, 813 (Wis. 2018) (same); *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 128 (D.D.C. 2018) ("Of course, the restaurant could revoke its consent, and it would have a claim for trespass if the competitor refused to leave.").

Authenticom analogizes its supposed right to access the DMS to a property lease, claiming that at common law a landlord could not revoke contractual consent given to a tenant to invite guests onto his property. Mot. 37. But Authenticom ignores a key, dispositive distinction: a lease gives the tenant a *property interest* in the land. *See, e.g.*, *In re Application of Olmstead*, 646 N.E.2d 1275, 1277 (Ill. App. 1995) ("a lease . . . is an encumbrance" that, *inter alia*, "conveys a lesser interest" in the property). In contrast to a lease, a license conveys no property interest. At common law, a licensee had no right under a license to authorize third-party access to the land. *Application of Rosewell*, 387 N.E.2d 866, 870 (Ill. App. 1979) (license is "a mere personal privilege" that "can only be enjoyed by the licensee himself, and is not

---

[7] This is not a hypothetical concern. The FTC sued the DMS provider DealerBuilt after a data breach for failing to adequately protect dealer data under its Safeguards Rule, which requires certain institutions to "develop[], implement[], and maintain[] reasonable administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information" they maintain. 16 C.F.R. Part 314.1(a); Complaint, *In re: Lightyear Dealer Technologies, LLC, d/b/a Dealerbuilt*, FTC Dkt. No. C-4687 (F.T.C. Sept. 6, 2019); Defs. JSOAF 69. Under Authenticom's interpretation of the CFAA, however, CDK would be *prohibited* from withdrawing any access to third parties who access CDK's DMS with dealer consent, even if necessary to ensure compliance with the Safeguards Rule.

therefore assignable so that an under tenant can claim privileges conceded to a lessee.") (quotation omitted). "In keeping with a license's permissive nature," a licensor "generally can revoke a license at any time without excuse or without consideration to the licensee." *Gamerberg v. 3000 E. 11th St.*, 44 Cal. App. 4th 424, 429 (Cal. App. 2020); *Kapadia v. Chi. Transit Auth.*, 1987 WL 11383, at *2 (N.D. Ill. May 15, 1987) ("A license by definition is not a permanent entitlement and does not operate to create an estate in land in the licensee. . . . The licensor ordinarily can revoke it at any time, with or without a reason.").

The MSAs here provide dealers nothing like a common law lease.



Thus, even if common law concepts like trespass applied to the federal statutes in question, those concepts support CDK, not Authenticom.[8]

### D. Authenticom Did Not Have An Implied License To Use CDK's DMS Under Copyright Law.

Authenticom did not enjoy an "implied license" (Mot. 26) under copyright principles to access the DMS. Its own authority (cited at 26) emphasizes that an implied license is "rare"

---

[8] Authenticom also invokes the rule of lenity to argue that the CFAA should be read to preclude copyright holders from revoking authorization. Mot. 37. But the one case it cites says nothing about revocation, and involved a "judgment of conviction" with the rule of lenity in play only to ensure "fair warning of what constitutes criminal conduct." *United States v. Valle*, 807 F.3d 508, 512, 523 (2d Cir. 2015). In any event, Authenticom's reading is at odds with the unambiguous statutory text. The statute says "without authorization" (18 U.S.C. § 1030(a)(2)(C), *id.* (a)(5)(C)), not "never had authorization." *See, e.g.*, *United States v. Green*, 904 F.2d 654, 655 (11th Cir. 1990) (declining to apply the rule of lenity to add defendant-friendly temporal restrictions when "the statute is silent as to any temporal restrictions . . . [and] is thus unambiguous on its face"). The Seventh Circuit has repeatedly recognized that the rule of lenity is "inapplicable" when, as here, the statutory text plainly favors one reading over another. *United States v. Neal*, 46 F.3d 1405, 1410 (7th Cir. 1995) ("[T]he rule of lenity is inapplicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized everything from which aid can be derived, it is left with an ambiguous statute.") (internal quotation marks and brackets omitted); *accord United States v. Ranum*, 96 F.3d 1020, 1030 (7th Cir. 1996) (describing the showing of ambiguity necessary to resort to the rule of lenity as a "difficult standard," and rejecting the rule's application even where the defendant offered a plausible, "nuanced interpretation" of the statutory text ultimately adopted by the dissent).

and applies only in "narrow circumstances." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41, 47 (1st Cir. 2010). This is not one of them. An implied license only arguably exists if there is "no indication that a license-granting copyright owner has restricted the licensee's ability to use third parties in implementing the license." *Id.* at 45. ████████████████████████████ ██████████████████████████████████████

Authenticom's remaining implied-license authorities are even further afield. *See* Mot. 26. It cites a district court case that, while granting judgment to the defendant in a DMCA action, made the passing observation that "the prevailing construction of licensing agreements [is to] allow third-party use for the licensee's benefit." *Avaya Inc. v. Telecom Labs, Inc.*, 2014 WL 97335, at *6 n.26 (D.N.J. Jan. 7, 2014). But that court recognized that there is no implied license if (as here) the evidence shows that the primary license restricts the ability to enable third-party access. *See id.*

Authenticom also cites *Automation by Design,* which turned on intricacies of the specific contract—*i.e.*, whether the licensee's actions fit within a narrow prohibition on "transferring" the license to third-parties. 463 F.3d at 751-54. Here, transferring is not at issue, and there can be no quibbling over whether Authenticom's use of the DMS is encompassed by contracts that discuss dealers' duties "█████████████████████████████████████ ████████████████████████████████████████ Moreover, the license in *Automation by Design* expressly permitted duplication of the drawings for manufacturing parts for Raybestos's own use, which is what the defendant did. 463 F.3d at 754. The court's holding that Raybestos did not "transfer" the license by hiring a third party to manufacture parts from the drawings, *id.* at 758, has no relevance here, ████████████

███████████████████████████████████████████████████

██████████████████████████████████

Finally, not a single case Authenticom cites for its implied-license theory involved express statements from the copyright holder to the implied licensee that its access was unauthorized. Here, the facts show Authenticom was aware no later than August 2014 that it did not have permission to access the DMS. *See* Resp. Auth. SOF 28.

*     *     *

For the reasons discussed above, a reasonable jury could conclude that Authenticom's access to the DMS was not authorized because (1) the dealer MSAs ██████████████████ ████████████████████████████████████████ (2) Authenticom is not the dealer's agent; and (3) regardless, CDK independently revoked (no later than August 2014) any supposed authorization the MSAs may have provided. Moreover, the dealer MSAs foreclose Authenticom's "implied license" theory under copyright law. Authenticom therefore is not entitled to summary judgment on the question of whether it had authority to access the DMS or on the many CDK counterclaims to which that question is relevant.

## II. Authenticom Is Not Entitled To Summary Judgment On CDK's DMCA Counterclaim.

The DMCA makes it illegal to "circumvent a technological measure that effectively controls access" to a copyrighted work, including software and related material. 17 U.S.C. § 1201(a)(1)(A). Authenticom makes several scattershot arguments for summary judgment on CDK's DMCA claim. Mot. 41-60. But none is availing. As with its authorization arguments, Authenticom's discussion of the DMCA largely rehashes legal arguments this Court considered and rejected at the motion-to-dismiss stage. As then, Authenticom's artificially cramped

---

[9] The holding in *Automation by Design* also turned on the fact that Raybestos "lacked the tools or skills" to manufacture the parts itself. *Id.* at 757. There is no similar issue here: CDK provides dealers with the tools and contractual rights to use the DMS's reporting features and to send data to Authenticom or whatever third party it chooses. *See* Defs. JSUF 22.

reading of the DMCA departs sharply from the statutory text and the case law. It would effectively foreclose liability under the DMCA for all but the most egregious violations.

Reynolds's brief explains Authenticom's legal failings in detail, and CDK incorporates that discussion by reference here. Reynolds SJ Opp. § II. Below, CDK shows that Authenticom's automated circumvention of CDK's multi-tiered system of controlling access to its DMS satisfies each element of the DMCA: (1) CDK's relevant security measures were "technological measures that effectively control[] access to" the DMS; (2) Authenticom repeatedly "circumvented" those controls; and (3) CDK's security measures controlled access to copyrighted works. *See infra* §§ A-D. Authenticom also argues that CDK's DMCA claims lacks a sufficient "nexus" to copyright infringement. But the DMCA has no "nexus" requirement and, even if it did, CDK has satisfied the requirement that Authenticom hypothesizes. *See infra* § E.

### A. CDK Launched A Host Of Security Measures.

CDK announced its SecurityFirst initiative in June 2015. Defs. JSUF 158. It then began researching and implementing an escalating series of security measures to block unauthorized, hostile third-party access to its DMS. Defs. JSUF 159, 161. These included the following:

**Yes/No Prompt**. CDK implemented a "Yes/No" prompt on a test basis in March 2016, deploying that prompt more broadly against accounts it suspected of being used by Authenticom in June 2016. Resp. Auth. SOF 99. That prompt appeared when a user signed into the DMS, and it stated:

> The CDK Global DMS is for authorized Dealer personnel only. Use or access by unauthorized third parties is prohibited. . . . Enter 'YES' to confirm you are an authorized dealer employee in order to continue. Enter 'NO' to exit this program.

Resp. Auth. SOF 99. This was just the first of an escalating series of security measures CDK implemented for the purpose of preventing unauthorized, automated access to the DMS by third-parties. Resp. Auth. SOF 100.

Around June 15, 2016, Authenticom updated its polling script to respond "YES" to the Yes/No Prompt. Resp. Auth. SOF 102. That response was false: Authenticom is not and does not purport to be an "authorized dealer employee." Authenticom has admitted that every time it responded "Yes" to this prompt, it did so using automated software scripts. Mot. 21. CDK stopped deploying the prompt for Authenticom users on approximately July 18, 2016. Defs. JSOAF 52.

**Disabling Hostile Accounts.** A few weeks later, in August 2016, CDK shifted course and began to disable user accounts used by suspected third parties. Resp. Auth. SOF 87. In response, Authenticom took steps to hide the fact that it was using certain login credentials, going so far as to instruct dealer employees to provide user names that would make it appear that an authorized dealer employee was using the account. For example, in one email about the deactivations, an Authenticom employee wrote, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Defs. JSOAF 81.

Authenticom then developed a software program, called Profile Manager, to automatically reactivate disabled accounts. Defs. JSOAF 49-50. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Resp. Auth. SOF 107. ████████

██████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

**CAPTCHA**. In October 2017, CDK began implementing CAPTCHA prompts on accounts that it suspected hostile integrators like Authenticom were using.[10] Resp. Auth. SOF 90. *See* Mot. 52 (reproducing prompt). The prompt made clear that "machine/automated access" to the DMS was unauthorized and required the user to confirm that "you are an authorized dealer employee" by entering the obscured letters the prompt presented:

> Only dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services. Machine/automated access, access via the use of non CDK software or issuing of user names and passwords for third party use is considered non-authorized access. Those using this system without authorization will be denied access and may be subject to legal action. Enter the following text to confirm you are an authorized dealer employee.

Defs. JSOAF 48. Yet again, Authenticom created automated means to bypass this latest control, in this case by developing software to read and respond to CDK's CAPTCHA prompt and gain access to the DMS. Resp. to Auth. SOF 91-92. ███████████████████████████████████

██████████████████████████████████████████████ *ee* Resp. Auth. 91 (citing Auth. Ex. 148 (Stroz Rpt.) App. C ¶ 24).

---

[10] CAPTCHA stands for "Completely Automated Public Turing Test to tell Computers and Humans Apart." *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798, at *1 n.2 (N.D. Cal. Aug. 2, 2012).

**B.      CDK's Technological Measures Effectively Controlled Access To Its System.**

The escalating series of security controls discussed above qualify as "technological measures that effectively control[] access" under the DMCA. 17 U.S.C. § 1201(a)(1)(A). The statute provides that a "technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). For the reasons discussed in Reynolds's brief, which CDK incorporates here, CDK's access controls easily meet the test. Reynolds SJ Opp. § II.B. In summary:

**1.** Both the CAPTCHA prompt and the Yes/No prompt require the application of information (either "YES" or the series of characters shown in the prompt) through the use of a "process" (reading and entering the relevant text), to gain access to the CDK DMS. *See Ticketmaster L.L.C. v. RMG Techs.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) ("[B]ecause CAPTCHA 'in the ordinary course of its operation, requires the application of information . . . to gain access to the work,' it is a technological measure that regulates access to a copyrighted work."). The access controls were put in place by CDK, satisfying the requirement that they be imposed "with the authority of the copyright owner." *See, e.g.*, *MDY Indus.*, 629 F.3d at 954 ("Warden's provisions were put into place by Blizzard [the copyright owner], and thus, function 'with the authority of the copyright owner.'"); *see* Reynolds SJ Opp. § II.B.1.

**2.** CDK's use of login prompts and its related practice of disabling hostile user accounts similarly qualify as technological measures under the DMCA. To gain access to the DMS, the user must supply "information" (a valid user account and password) through a process (manual entry). Furthermore, although Authenticom's Profile Manager tool circumvented that process, it still "appli[ed] information" to gain access to the DMS. 17 U.S.C. § 1201(a)(3)(B). Upon launching, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Resp. Auth. SOF 104, 107. On this point, Authenticom *agrees* that a login prompt requiring active login credentials constitutes a "technological measure" that "effectively controls access" under the DMCA. *See* Mot. 50; *Navistar, Inc. v. New Baltimore Garage, Inc.*, 2012 WL 4338816, at *4 (N.D. Ill. Sept. 20, 2012) (describing with approval the holding of *I.M.S. Inquiry Mgmt. Sys. Ltd. v. Berkshire Info. Sys. Inc.*, 307 F.Supp.2d 521, 531-32 (S.D.N.Y.2004), that "the plaintiff's password system was within the definition of 'technological measure' as the term is defined in the DMCA"); *Actuate Corp. v. Int'l Bus. Machs. Corp.*, 2010 WL 1340519, at *9 (N.D. Cal. Apr. 5, 2010).[11] The login prompt is part of a broader access-control system, including CDK's process for identifying and disabling unauthorized user accounts, which functions to allow only users who are authorized to access the system to gain entry. *See* Reynolds SJ Opp. § II.B.2 (discussing Reynolds's analogous "Suspicious User ID" security measures).

**3.** Authenticom's arguments as to why three of CDK's security measures—its CAPTCHA prompts, "Yes/No" prompt, and disabling hostile accounts—do not "effectively control access" to the DMS are wrong, as detailed in Reynolds's brief and summarized here.[12]

*First*, Authenticom's argument that CDK's access controls do not qualify because they "must be capable of distinguishing between those who have 'authority' from the copyright owner and those who do not," Mot. 49, is made up. The statute does not even hint that an access control must *itself* distinguish between authorized and unauthorized users to "effectively

---

[11] Authenticom says (at 51-55) that only three technological measures are at issue: CDK's CAPTCHA and Yes/No prompts, and its system to identify and disable hostile user accounts. That is wrong: CDK also pleaded that Authenticom circumvented CDK's *login prompts* requiring a valid user name and password. *See* Dkt. 229, Counterclaims ¶ 107 ("CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include, for instance, requiring dealer employees to log on with passwords . . . ."), ¶ 108 ("Authenticom has repeatedly circumvented CDK's access control measures in order to access the CDK DMS, extract data from it, and push data back into it. Authenticom has wrongfully obtained login credentials, in violation of contractual requirements that such credentials be given to authorized dealer employees only.").

[12] As noted above, Authenticom *agrees* that CDK's login prompts requiring valid user names and passwords qualify under the statute.

control access" to a copyrighted work. *See* Reynolds SJ Opp. § II.B. The language Authenticom relies on for this argument says only that the technological measure must have been *put in place* by the copyright owner. *MDY*, 629 F.3d at 954. No court has ever adopted Authenticom's proposed interpretation. To the contrary, multiple decisions apply the DMCA to technological measures that do not distinguish authorized from unauthorized users. Regardless, CAPTCHA and similar "challenge" prompts help distinguish authorized from unauthorized users because they are designed to keep out a class of users—computers—that are not permitted to access the CDK DMS. *See* Reynolds SJ Opp. § II.B.1.

*Second*, Authenticom argues that CDK's disabling of hostile user accounts—a measure that Authenticom circumvented through its Profile Manager tool—is not an access control because CDK only disabled those accounts after Authenticom had already used them to access the DMS. That is also a made-up requirement with no support in the DMCA. Authenticom gained "access to the work" (*i.e.*, the DMS and the data on it) every time it signed into the DMS using login credentials that CDK had previously disabled. That Authenticom had previously accessed the DMS on other occasions is irrelevant, for the reasons Reynolds's brief explains. *See* Reynolds SJ Opp. § II.B.2.

*Third*, Authenticom argues that CDK's Yes/No prompt—but not other access controls—does not "effectively control access" to the DMS because Authenticom supposedly developed with ease computer scripts to circumvent that prompt. Mot. 51. This argument also finds no support in the statutory text, which states only that the control must require the application of "information" or a "process" to access the work to effectively control access. 17 U.S.C. § 1201(a)(3)(B). Thus, as Authenticom recognizes at one point—but then immediately ignores—an effective control need not be "circumvention-proof" or even "strong." Mot. 54. The control need only "provide some degree of control over access to a copyrighted work." *MDY Indus.*, 629 F.3d at 954 n.17.

31

Every court to have considered a CAPTCHA, for example, has found it to be an access control for purposes of the DMCA—regardless of whether sophisticated programmers can develop ways to answer CAPTCHAs programmatically and gain access to the system (as Authenticom did here). *See, e.g.*, *Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147, 1167 (C.D. Cal. 2018); *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018); *Craigslist*, 2012 WL 3166798, at *9. Indeed, it cannot be the law that an access control falls outside § 1201(a)(3)(B) because hackers consistently have found ways to evade it. As one court put it, "if the word 'effectively' were read to mean that the statute protects 'only successful or efficacious technological means of controlling access,'" it would "gut" the DMCA by "limit[ing] the application of the statute to access control measures that thwart circumvention" while "'withhold[ing] protection for those measures that can be circumvented.'" *MDY*, 629 F.3d at 954 n.17 (quoting *Universal City Studios v. Reimerdes*, 111 F.Supp.2d 294, 318 (S.D.N.Y. 2000)). That would "offer protection where none is needed" and "withhold protection precisely where protection is essential." *Reimerdes*, 111 F. Supp. 2d at 318. Authenticom has identified no case adopting its upside-down interpretation.

**C.     Authenticom Repeatedly Circumvented CDK's Access Controls.**

The DMCA defines "circumvent a technological measure" broadly to mean "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). The DMCA does not define those terms, so the Court gives them their ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

One common definition of "bypass" is to "circumvent," meaning "to manage to get around especially by ingenuity or stratagem." https://www.merriam-webster.com/dictionary/ bypass; https://www.merriam-webster.com/dictionary/circumvent. "[I]impair" means "to diminish in function, ability, or quality: to weaken or make worse," https://www.merriam-

webster.com/dictionary/impair, while one meaning of "avoid" is "to prevent the occurrence or effectiveness of," https://www.merriam-webster.com/dictionary/avoid. The statutory terms thus broadly apply to any actions that substantially reduce the effectiveness of technological access measures protecting copyrighted works. *See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2012 WL 3306600, at *12 (E.D.N.Y. June 13, 2012) ("By including terms such as 'avoid' and 'bypass,' Congress plainly intended section 1201(a)(1) to cover a wide array of acts.").

Authenticom's use of automated means to evade CDK's security measures qualifies as "bypassing," "impairing," and "avoiding" those measures. By developing software to maintain its access to the CDK DMS, Authenticom engaged in a sustained effort to "circumvent" CDK's measures by "get[ting] around" CDK's controls through "ingenuity or stratagem"—that is, by "bypassing them." Further, Authenticom "diminished" the "ability" (that is, "impaired") and "prevented" the "effectiveness" of (that is, "avoided") CDK's security efforts, which were designed to stop the very automated access in which Authenticom repeatedly engaged after circumventing CDK's efforts. *See, e.g.*, *Ticketmaster*, 306 F. Supp. 3d at 1174 ("By using bots or CAPTCHA farms, Defendants are '*avoiding*' CAPTCHA without the authority of Ticketmaster.") (emphasis added).

Indeed, Authenticom, its lawyers, and its own expert have described its efforts to evade Defendants' security measures using the same concepts reflected in the DMCA's text. *See, e.g.*, Defs. JSOAF 51 (citing January 2017 Authenticom talking points stating that CDK "███████ ███████████████████████████████████████████████████████ ███████████████████████████████"); Mot. for P.I. at 8 [Auth. Dkt. 61] (stating that Authenticom "develop[ed] *workaround* solutions that circumvented Reynolds's efforts to block access"); Auth. 7th Cir. Resp. Br. at 12 ("Reynolds' efforts, however, were not entirely successful; Authenticom, CDK, and other integrators worked with

dealers to develop *workarounds*."); Defs. JSOAF 45 (testimony by former Authenticom CFO that ""); Resp. Auth. SOF 91 (testimony by Authenticom's expert that Authenticom "

) (emphases added). So have market participants. Defs. JSOAF 50.

In short, Authenticom's efforts to "trick" CDK's system into believing Authenticom was actually an authorized human employee through the use of computer scripts violated the DMCA. *See* Reynolds SJ Opp. § II.D. That Authenticom did not *disable* or *void* the controls, Mot. 41, or that it claims its computer scripts only responded to CDK's prompts by inputting the required text, Mot. 43-44, is irrelevant for the reasons explained in Reynolds's brief. *See* Reynolds SJ Opp. 38-39.

CDK offers four additional arguments to show that Authenticom committed "circumvention" under the DMCA.

*First,* Authenticom's principal authority, *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 644 (E.D. Pa. 2007) (cited at 42), is irrelevant both factually and legally. There, the defendants only gained access to copyrighted materials because the copyright holder's security measures malfunctioned. As a result, the defendants "could not avoid or bypass any protective measure, because nothing stood in the way of them viewing these screenshots." *Id.* The Court stated that a defendant must "disable or void" a measure to "bypass" or "avoid" it, *id.* but that was plainly *dicta* in light of the Court's finding that the security measure malfunctioned and thus did not operate to control access anyway. The cramped interpretation of "bypass" and "avoid" in *Healthcare Advocates* is inconsistent with the plain meaning of those words, better reasoned case law, and the purpose of the DMCA. And in any event, the *Healthcare Advocates* court declined to interpret what "impair" means under the DMCA, *id.*, an independent basis for finding circumvention, as discussed above.

**PUBLIC VERSION**

*Second*, this Court has already rejected Authenticom's reliance on *Navistar*, *supra*, which held that an unauthorized third-party's use of active login credentials to access a computer system is not "circumvention" under the DMCA. The key distinction between *Navistar* and this case is that the login prompt in *Navistar* was used precisely as the system owner intended, whereas here Authenticom got through CDK's prompts and re-enabled disabled user accounts through automated methods that CDK did *not* authorize and expressly sought to prevent. Dkt. 506 at 16-17 ("[CDK's] DMS was *not* designed to allow third-parties such as Authenticom to re-enable passwords that CDK intentionally disabled."); Resp. Auth. SOF 100, 106.

For example, the steps Authenticom had to take to achieve access—



—shows that CDK's system was not designed to allow users *automatically* to re-enable disabled passwords. Defs. JSUF 162. Accordingly, Authenticom's contention that it is not "a violation to request that their dealer customers re-enable login credentials or . . . provide new credentials to Authenticom" is a red herring. Mot. 44. Authenticom developed its Profile Manager software to do what the DMS was not designed for—

" Resp. Auth. SOF 106. Indeed, in the midst of its efforts to develop Profile Manager, Authenticom circulated a "talk track" that stated that CDK

" Defs. JSOAF 51. It comes as no surprise that multiple courts—including this one—have held that efforts to evade a system owner's measures to identify and shut down unauthorized user accounts constitutes circumvention under the DMCA. Dkt. 506 at 17; *MDY Indus.*, 629 F.3d at 942 (system designed to monitor patterns looking for bot activity and disable

suspected culprits); *Nexon Am., Inc. v. Game Anarchy*, 2013 WL 12121539, at *2 (C.D. Cal. Apr. 3, 2013) (system designed to detect and disable automated processes).[13]

*Third*, the Court should reject Authenticom's argument (at 45-46) that each time its Profile Manager scripted "launched"—that is, each time it ran to determine if a user account had been disabled and needed to be re-enabled—is not a violation of the DMCA. Every time Profile Manager launched, it "avoided" or "impaired" CDK's access control measures, namely, CDK's system to identify and block hostile user accounts and only allow those with valid login credentials to access the DMS. *See supra* p. 33.



T███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ Profile Manager weakened CDK's account deactivation measures and made them less effective every time it ran. Each instance thus qualifies as an "act of circumvention" that "impaired" or "avoided" CDK's security measures under the DMCA.[14]

---

[13] Indeed, Authenticom's sharing of Profile Manager is itself a violation of the DMCA under the Act's plain terms. *See* 17 U.S.C. § 1201(b)(1)(A) ("No person shall . . . provide . . . any technology, product, service, device, [or] component . . . primarily designed or produced for the purpose of circumventing a protection afforded by a technological measure . . .").

[14] CDK does not seek to impose liability for "attempted" violations of the DMCA, as Authenticom implies. Mot. 44. Rather, Authenticom *actually* circumvented CDK's security controls each time Profile Manager ran by impairing the controls' effectiveness, even if the script did not take the further step of re-enabling a disabled account in any given instance.

Finally, for the reasons Reynolds explains, Authenticom's use of unauthorized user accounts to access the DMS *by itself* constitutes "circumvention" under the DMCA. *See* Reynolds SJ Opp. § II.D.3. Thus, each time Authenticom circumvented CDK's CAPTCHA prompts or its Yes/No prompt, and each time it used a previously disabled user account that Profile Manager re-enabled, it violated the DMCA.

*      *      *

Even if any individual instances of Authenticom's evasion of CDK's security measures do not qualify as "circumvention," the whole is greater than the sum of its parts. CDK has engaged in a years' long effort to identify and prevent hostile access, through an escalating series of security measures. Meanwhile, Authenticom has engaged in a sustained campaign to circumvent every one of those efforts, and to continue to access a computer system over the system owner's strident objection. Authenticom points to no authority suggesting that every access control in a suite of such controls must be considered piecemeal in applying federal law. For the reasons explained in Reynolds's brief, the Court should conclude that Authenticom committed unlawful "circumvention" under the DMCA when it repeatedly evaded CDK's many security measures, which unquestionably use technological means to prevent unauthorized system access. *See* Reynolds SJ Opp. § II.B.

**D.      CDK's Access Controls Protect Copyrighted Works.**

The final element of CDK's DMCA claim is that its technological measures protect access to copyrighted works. 17 U.S.C. § 1201(a)(1)(A). CDK's DMS software and the unique manner in which CDK has organized the data it houses are copyrighted, and CDK's many security measures described above control access to that copyrighted material. Authenticom's arguments to the contrary ignore the fundamentals of copyright law and the evidentiary record.

### 1. CDK's Software And Data Compilations Are Copyrighted.

The DMCA applies to "works protected under" the copyright laws of the United States. 17 U.S.C. §§ 1201(a)(1), (a)(2), (b)(1). CDK has two relevant copyrights here: (1) in the DMS software and its underlying code and visual elements, and (2) in the data compilations housed on the DMS. CDK has not registered its copyrights, but that does not matter: "[C]opyright automatically inheres in the work at the moment it is created without regard to whether it is ever registered." *Montgomery v. Noga*, 168 F.3d 1282, 1288 (11th Cir. 1999); *see also Fourth Estate Public Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881 (2019) ("An author gains 'exclusive rights' in her work immediately upon the work's creation, including rights of reproduction, distribution, and display.").

**a.** CDK has a copyright interest in its proprietary DMS software and its related code and screen displays. Copyright laws protect original works of authorship, including software. A work is original if it was "independently created by the author (as opposed to copied from other works), and . . . possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "[A]lmost all novel software code constitutes a creative, original work of authorship that is automatically protected under the Copyright Act." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1073 (S.D. Cal. 2019); *see also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1355 (Fed. Cir. 2014). CDK's DMS software easily meets that standard. The software is proprietary to CDK, which has developed—and continued to update—that software. Defs. JSOAF 53. CDK personnel wrote much of the code underlying that software, including—as discussed below—the code that Authenticom unlawfully copies when it evades CDK's security measures and queries the DMS. *See* Reynolds SJ Opp. § II.C.1 (similar for Reynolds). Similarly, CDK's screen displays are unique to CDK and thus sufficiently creative in their own right. *See* Defs. JSOAF 54.

**b.** Copyright law also protects the manner in which a copyright holder organizes, arranges, and displays information. 17 U.S.C. § 101 (defining a protected "compilation" as a "collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"). To be protected, a compilation of data or factual information merely needs to exhibit some "creativity in the selection, arrangement, or coordination of the facts," which is "not an exacting standard." *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1181, 1184-85 (9th Cir. 2018).[15] CDK's data compilation easily meets this standard.

CDK's employs creativity to create, compile, organize, and display data in the DMS in ways that are useful and valuable to CDK's dealer customers. *See, e.g.*, *Snap-On Bus. Sols. Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 685 (N.D. Ohio 2010) (plaintiff organized data "in an original data tree and create[d] relationships between the levels of the tree that would not otherwise exist"). CDK's DMS "organizes and maintains data provided by dealers, customers, software providers, banks, credit reporting bureaus, car manufacturers, and many other entities" along with "data that is proprietary to CDK itself." Defs. JSUF Ex. 108 (Rodrigues Decl. ¶ 2). ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ In other words, CDK's proprietary software converts the underlying raw data into an original, creative work.

---

[15] Authenticom states that the only two copyrightable aspects of CDK's DMS are the underlying code and its "visual elements." Mot. 46. But CDK also alleges that the CDK DMS is "an original and independent work" consisting of "original and distinct elements," such as the "arrangement, organization, and display of information," on the DMS, which Authenticom copies when querying the system. Dkt. 230, Counterclaims ¶ 21; *see also id.* ¶ 45 (same). For this reason alone, the Court should deny Authenticom summary judgment on this issue, for Authenticom's motion does not even address a core aspect of CDK's copyrighted works. Regardless, the arguments Authenticom makes as to other aspects of CDK's copyrighted material (like CDK's data compilations) also fail.

As CDK explained in its own motion for summary judgment (*see* Dkt. 966 at 59-60), this manipulation and organization of the data is at the center of CDK's business and is sufficiently creative to meet the low bar for copyright protection. Take, for instance, the taxonomy in *American Dental Association v. Delta Dental Plans Association*, 126 F.3d 977 (7th Cir. 1997). Steps as simple as assigning each procedure a number, a short description, and a long description constituted "copyrightable subject matter." *Id.* at 978. The particular way the data was shaped could have been done in different ways, with "any of these choices . . . original to the author," while "another author could do things differently." *Id.* at 979.

So too here: ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████. Indeed, Authenticom's business model *presupposes* that CDK's DMS maintains data in a sufficiently unique, valuable way. That is why Authenticom seeks to access the DMS in an automated fashion—to use the CDK system's built-in query functions to extract data in the useful way that CDK has chosen to maintain it. This easily meets the low threshold for copyrightability of a data compilation. *Experian*, 893 F.3d at 1181.

>    2.  **Expert Testimony On Copyrightability Is Not Required, And Authenticom Failed to Plead The Relevant Affirmative Defenses In Any Event.**

For the reasons explained in Reynolds's brief, Authenticom is wrong that CDK needed to present "expert testimony" on copyrightability, particularly regarding the creativity of "visual elements" in its DMS. Mot. 48. First, expert testimony on copyrightability is not only not required in the Seventh Circuit; it is *prohibited.* Reynolds SJ Opp. 32-33. Second, Authenticom's argument that CDK's visual displays are commonplace and functional, and thus do not warrant copyright protection (a) is an affirmative defense that it did not plead and thus has waived; and (b) ignores that the defense would not apply to literal copying of copyrighted

works, which happens every time Authenticom accesses and queries the DMS. *See id.* at 32-33; Defs. JSOAF 53-54.[16] Regardless, CDK has submitted adequate evidence of the copyrightability of its DMS data compilations and screen displays. *See supra* p. 39; Defs. JSOAF 54.

### 3. CDK's Security Measures Control Access To Its Copyrighted Works.

CDK's access controls also protect access to its copyrighted works. 17 U.S.C. § 1201(a)(1)(A). Each time that Authenticom circumvents those controls and accesses the DMS to extract data, it creates unauthorized copies of the software code underlying the DMS. In particular, when Authenticom launches the DMS software, it creates a copy of proprietary code on CDK's servers. Defs. JSOAF 53. After it bypasses CAPTCHA or similar login "prompts," and moves on to access the DMS's English query function, it creates a copy of yet more code. *Id.* This process—Authenticom accessing a DMS function and automatically creating a copy of CDK's original, proprietary code in the computer's memory—continues with each function Authenticom accesses until it logs off the system. *Id.*

Courts have recognized that copying software code violates the copyright holder's exclusive rights. For purposes of copyright law, a "copying" occurs "when a computer program is transferred from a permanent storage device to a computer's RAM." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993) (affirming district court's holding on this issue); *see also Stenograph L.L.C. v. Bossard Assocs.*, 144 F.3d 96, 100 (D.C. Cir. 1998) (same); *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 265-66 (D. Mass. 2016) ("[E]ach time a software program is run, it is transferred to the computer's memory, creating a new copy."); *Advanced Computer Servs. of Mich., Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 363 (E.D. Va.

---

[16] This argument also encompasses any argument that CDK's DMS is not a protected data "compilation" under 17 U.S.C. § 101. That still would be an affirmative defense that Authenticom never raised. *See Cisco Sys. Inc. v. Arista Networks, Inc.*, 2017 WL 4771009, at *4 (N.D. Cal. May 10, 2017) (instructing jury on *scenes a faire* defense as to a compilation).

1994) ("[W]here, as here, a copyrighted program is loaded into RAM and maintained there for minutes or longer, the RAM representation of the program is sufficiently 'fixed' to constitute a 'copy' under the Act."). Courts in this Circuit agree. *FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 2008 WL 717792, at *5 (N.D. Ill. Mar. 17, 2008) ("[A] user reproduces a program stored in his computer's hard drive merely by launching that program, thereby causing the computer to copy it to Random Access Memory.") (citing *MAI*, 991 F.2d at 518); *see also NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 235 (7th Cir. 1995) (citing *MAI* favorably).

Authenticom does not dispute that any copying of CDK's software code after Authenticom circumvented CDK's access controls would show that CDK's security measures control "access to a work protected under" the copyright laws. 17 U.S.C. § 1201(a)(1)(A). Instead, it asserts that all relevant CDK code is copied into RAM *before* Authenticom gets through CDK's CAPTCHA and Yes/No prompts. Mot. 46-47. That is just wrong. ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Resp. Auth. SOF 108. Thus, Authenticom circumvented security measures that "control access" to copyright works. As Reynolds's brief explains, this conclusion is amply supported by the statutory text and case law, and Authenticom's supposed contrary authority is both distinguishable and wrong. Reynolds SJ Opp. § II.C.2.[17]

---

[17] Recently, a district court concluded on a preliminary injunction motion that it was possible that a state law requiring DMS providers to give dealer-authorized third-parties access to dealer data through an Application Programming Interface ("API") could be harmonized with the protections afforded to DMS providers under the Copyright Act. *See* Order, *CDK Global, LLC v. Brnovich*, No. 2:19-cv-4849, Dkt. 127 at 7-8 (D. Ariz. July 24, 2020) (reasoning that the law did not necessarily implicate copyright because "APIs users" will not be "'able to obtain a copy of any [the API provider's] source code or executable code"). That order squarely conflicts with the Ninth Circuit's opinion in *MAI Systems Corp.* and CDK intends to appeal it under 28 U.S.C. § 1292(a)(1). In any event, the Arizona court's decision is not relevant to the copyright issues in this case. Authenticom does not access the data housed in

---

### E. There Is No Independent Copyright "Nexus" Requirement And, Regardless, CDK Satisfies It.

Authenticom claims that CDK must show a "nexus" between the access resulting in the circumvention and actual copyright infringement. Mot. 55-58. For the reasons explained more fully by Reynolds, the Court should reject Authenticom's attempt to graft onto the DMCA a "nexus" requirement because (1) there is no "nexus" requirement in the text of Section 1201(a)(1); (2) better reasoned cases have rejected the requirement; (3) it is inconsistent with the DMCA as a whole; and (4) by its own terms the "nexus" requirement as espoused by the case that created it, *Chamberlain Group., Inc. v. Skylink Technologies., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004), does not apply where, as here, the copyright holder has by contract limited the right of licensees (here, dealers) to share the copyrighted work with third parties. *See* Reynolds SJ Opp. § II.F; CDK Opp. to Dealer SJ § II.C.

Regardless, there is a sufficient "nexus" here because, as explained above, each time Authenticom accesses the CDK DMS it copies CDK's copyrighted works, including its code, screen displays, and proprietary data compilations. Indeed, Authenticom does not dispute that it copies CDK's copyrighted material. Rather, Authenticom's sole argument that there is an insufficient "nexus" here is that its infringement constituted "fair use." Mot. 58.

But again, Reynolds's brief explains why this argument fails. Authenticom does not even attempt to address the statutory factors for fair use. And numerous courts have recognized that fair use is not a defense to violations of no-circumvention provisions in the DMCA. Further, the defense does not apply where, as here, the party copied copyrighted material for commercial purposes and to compete against the copyright holder. Reynolds SJ Opp. § II.G.

---

CDK's DMS through an API or equivalent interface. Rather, as explained above, Authenticom uses dealer credentials to log in to the DMS directly. It then runs CDK code to query and copy data, and scrapes the data as it is as it is organized, maintained, and presented by CDK.

First, the DMCA's anti-circumvention provision does not allow for the defense of fair use. That defense is referenced in the Act's copyright-infringement provision (Section 1201(c)) but is notably absent from the anti-circumvention provision at issue here (Section 1201(a)). As many courts have held, Congress's decision not to include a fair use defense for acts of circumvention was deliberate and sensible. The reference to fair use in Section 1201(c) "merely illuminates the DMCA's impact on copyright infringement claims" and adding the "fair use arrow to a defendant's § 1201(a) quiver" would "contradict[] the plain meaning of the statute." *United States v. Crippen*, 2010 WL 7198205, at *2 (C.D. Cal. Nov. 23, 2010); *see also, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001) ("[T]he DMCA targets the circumvention of digital walls guarding copyrighted material . . . but does not concern itself with the use of those materials after circumvention."); *Reimerdes*, 111 F. Supp. 2d at 303 ("[T]he decision not to make fair use a defense to a claim under Section 1201(a) was quite deliberate."). And it is hardly unusual for some copyright defenses to be inapplicable to particular statutes. As the leading copyright treatise observes, "fair use" and "other aspects of copyright law developed over the centuries do not automatically bear upon the new forms of entitlement created" by the DMCA. 1 *Nimmer on Copyright* §§ 12A.17[B], 12A.19[B] (2006).

Second, even if a fair use defense to a DMCA circumvention claim existed, it would not apply where, as here, the unauthorized user gains access to further its own commercial endeavors in competition with the copyright owner, as Reynolds shows. *See* Reynolds SJ Opp. pp. 55-56. Authenticom used CDK's copyrighted software and data from its copyrighted database for the express purposes of *reselling* access to DMS data to vendors in competition with CDK. Under those circumstances, the fair use defense does not apply—or so a reasonable jury could find. *See, e.g.*, *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) ("Fair use is a mixed question of law and fact, which means that it may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion—but not otherwise.")

44

(internal quotations omitted); *Advanced Computer Servs.*, 845 F. Supp. at 365-66 (holding that there is no fair use for plaintiffs' unauthorized use of MAI's copyrighted software where software was creative in nature, licensees were on notice that third parties were not allowed to use it, and plaintiffs' use was commercial and likely deprived MAI of business).

### F. Authenticom Was Not Authorized To Circumvent CDK's Access Controls.

Authenticom claims, with barely any analysis, that if it had authorization to access the DMS, CDK's DMCA claim necessarily fails. Mot. 38. But as Reynolds explains, whether Authenticom had authorization to access the DMS is insufficient under the DMCA. *See* Reynolds SJ Opp. § II.A. The DMCA provides that a person circumvents a technological measure under the DMCA when he avoids or bypasses that "technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). The "authority" clause modifies the phrase "technological measure." Thus, according to the DMCA's plain language, the Act only "exempts from § 1201(a) liability those whom a copyright owner authorizes *to circumvent an access control measure*, not those whom a copyright owner authorizes to access the work." *MDY Indus.*, 629 F.3d at 953 n.16 (emphasis added). Even if Authenticom had authorization to access the *DMS* (and it does not), that would not answer the question whether Authenticom had authority to *circumvent CDK's access controls*. It plainly has no such authority, as CDK's prompts expressly stated that only authorized "dealer employee[s]" had permission to respond to them and gain access to the DMS. Resp. Auth. SOF 99.

### III. Authenticom Fails To Show A Lack Of Disputed Material Fact Justifying Summary Judgment On Any Of CDK's Remaining Counterclaims.

Authenticom spends the rest of its brief making perfunctory arguments about various aspects of CDK's other counterclaims. None provides a basis for summary judgment.[18]

---

[18] Authenticom also includes a single paragraph (at 78-79) arguing that CDK is limited to nominal damages because the opinions of its damages expert (Rubinfeld) and security expert (Stroz) should be excluded for the reasons discussed in its *Daubert* motions. For the reasons discussed in CDK's responses to those motions, both experts easily satisfy *Daubert*.

### A. Authenticom Has Violated The CFAA.

The CFAA imposes criminal and civil penalties on anyone who "intentionally accesses a protected computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C), *id.* (a)(5)(C); *see also Musacchio v. United States*, 136 S. Ct. 709, 713 (2016). Authenticom does not dispute that the record supports most elements of a CFAA claim: that Authenticom "intentionally accesses" the DMS; that the DMS constitutes a "protected computer"; or that Authenticom "obtains information" from the DMS. *See, e.g.*, Dkt. 966 at 61.

Authenticom takes issues only with two aspects of CDK's counterclaim under the CFAA: (1) whether Authenticom was authorized to access the CDK DMS; and (2) whether CDK can show the "loss" necessary for a private right of action under the CFAA. Mot. 65-68. Neither argument has merit.

**1. Authorization.** As discussed at length above, *see supra* § I, Authenticom is not entitled to summary judgment on the question of whether it had authorization to access the DMS, and that analysis applies fully here.

**2. Loss.** Authenticom also claims that CDK cannot recover under the CFAA because it has not shown a loss of $5,000 from a single instance of impermissible access. *See* Mot. 65-68. For the reasons offered in Reynolds's brief, however, the CFAA does not require that the loss be attributable to a single instance of unauthorized access. Rather, the statute allows for recovery based of a single loss caused by multiple breaches and, regardless, it also expressly permits "aggregat[ion]." 18 U.S.C. § 1030(c)(4)(A)(I). Authenticom ignores the statutory text, the better-reasoned case law, and the absurd results that would flow from its interpretation of the statute. *See* Reynolds SJ Opp. § IV. CDK incurred at least ████ to investigate, respond to, and take steps to prohibit Authenticom's unauthorized access over a period of three years. *See* Mot. 68; Defs. JSOAF 76-77. That loss is recoverable under the CFAA's plain terms.

### B.  CDK Has Actionable Counterclaims Under The Trade Secrets Acts.

CDK brings claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1836 *et. seq.*, and the Wisconsin Uniform Trade Secrets Act ("WUTSA"), Wis. Stat. § 134.90. The DTSA and WUTSA are interpreted identically. *E.g., Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*, 2018 WL 1394033, at *3 n.1 (N.D. Ill. Mar. 20, 2018); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797-98 (W.D. Wis. 2017).

Authenticom's only argument for summary judgment on the trade secrets claim—aside from authorization, Mot. 39-40, already addressed above—is that CDK has not identified a protectable trade secret. Mot. 5-6, 69-71. Authenticom is wrong. Whether a given feature constitutes a trade secret is "ordinarily a question of fact" requiring the factfinder to make "an ad hoc evaluation of all the surrounding circumstances." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) ("the question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder'") (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978)). And there is plenty of evidence from which a reasonable jury could conclude that Authenticom has misappropriated CDK's trade secrets here.

#### 1.  CDK Has Protectable Trade Secrets.

Under both the DTSA and the WUTSA, information qualifies as a trade secret if it satisfies two criteria. First*, it must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." *Am. Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933 (7th Cir. 2007) (quoting Wis. Stat. § 134.90(1)(c)). The vast amount of data stored on CDK's DMS—which includes proprietary information from dealers, dealers' customers, third parties, and CDK itself, Defs. JSUF Ex. 108 (Rodrigues Decl. ¶ 4)— meet this standard. That data is part of the value that CDK offers dealers and vendors who use

its DMS and 3PA program. Indeed, there is considerable irony in Authenticom claiming that the DMS itself is not, and does not contain, trade secrets. The significant improper, clandestine efforts Authenticom used to access CDK's DMS alone puts the lie to Authenticom's litigation position that the system houses nothing whose "economic value" derives from not being "generally known" or "ascertainable."

Second, information constituting a trade secret must be "the subject of efforts to maintain its secrecy that are reasonable under the circumstances." *Roth,* 485 F.3d at 933 (quoting Wis. Stat. § 134.90(1)(c)); 18 U.S.C. § 1839(3). But there is no question that CDK took reasonable efforts to maintain the secrecy of the data on its DMS. It spends millions of dollars on cybersecurity efforts annually, including deploying technical measures (like the access controls discussed above, *see supra* Part II.A.) to prevent Authenticom and other third parties from accessing the data without authorization. Defs. JSOAF 76-77. Authenticom does not argue otherwise.

### 2. Authenticom's Counterarguments Are Unavailing.

Authenticom contends that because the underlying data in the DMS belongs to multiple parties, including dealers, OEMs, credit bureaus, other third parties, and the DMS provider itself, CDK has no trade-secret right to the compilation of that data. *See* Mot. 70-71. But it is well established that data compilations from multiple sources can be protected trade secrets even if isolated segments of the underlying data are not. For instance, in *Duggan v. American Family Mutual Insurance Co.*, the court recognized that an insurance company database containing customer data like "policyholder name, address, date of birth, various telephone numbers, email addresses, VIN numbers, all policy types, [and] premium information on all policies" qualified for trade-secret protection. 2010 WL 1268175, at *15 (E.D. Wis. Mar. 30, 2010) (internal quotation marks and brackets omitted); *see also ECT Int'l, Inc. v. Zwerlein*, 597 N.W.2d 479, 482-83 (Wis. Ct. App. 1999) (customer lists can be protected trade secrets).

Nor is the DMS simply a collection of data. CDK's DMS organizes that data in ways useful to its dealership customers, and the suite of tools on the DMS allows the dealerships to access, download, and export that data. Defs. JSUF 20-21. As the Seventh Circuit recognized, databases consisting of data compilations that provide such useful tools easily meet the test for trade secrets. *See Roth*, 485 F.3d at 933 ("The customer information in the plaintiff's database is a trade secret" because that data—there, for use in the insurance industry—"are filtered for their suitability to buy insurance, resulting, . . . in 'a defined, manageable and economically viable universe of uniquely receptive potential customers.'") (internal quotations omitted).

Authenticom quibbles with one of CDK's expert's statements that the " ███████████ ████████████████" claiming that CDK never pleaded that. Mot. 69. But for all intents and purposes the CDK-created "forms, accounting rules, tax tables, and proprietary tools and data compilations" that CDK pointed to in its counterclaims (CDK Answer ¶ 127 (Dkt. 229)) *are* the DMS. CDK's business model hinges on providing data from multiple sources, organized and query-able in ways that are economically useful to dealers. And Authenticom's business model hinges on misappropriating that data, as CDK organizes and enhances it.

As it does elsewhere in its motion, Authenticom repeatedly tries to downplay its hostile access to data stored on the DMS, claiming there is no evidence that it "accessed data on the DMS that was CDK's secret information" because Authenticom only "accessed a subset of the data." Mot. 70. But even the subset that Authenticom routinely accessed—the sales, service, inventory, financing and insurance, and similar information—relies on CDK's proprietary material to organize and display the data in ways useful to dealers. Defs. JSUF 20-21.

Finally, Authenticom implies that an expert must testify to the existence of CDK's trade secrets. *See* Mot. 69. But the one decision it cites for that proposition is far afield. The trade secret claim in that case hinged on whether two "formulate soil-amendment[s]" had similar chemical structures. *See Trident Prods. & Servs. LLC v. Canadian Soiless Wholesale, Ltd.*, 859

F. Supp. 2d 771, 779, 781 (E.D. Va. 2012) (cited at Mot. 70). It is not difficult to see why the court would think expert testimony was needed there, given the highly "technical and scientific matters" at issue. *Id.* at 781. *Trident* does not suggest, much less hold, that an expert is needed where, as here, jurors easily could grasp the economic value of maintaining secrecy over a data compilation and related tools. *See, e.g.*, *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 977, 980-81 (N.D. Cal. 2018) (rejecting defendant's contention that plaintiff "failed to prove a cause of action for misappropriation of trade secrets because it needed to present expert testimony to prove the claim," for there is "no expert requirement" for trade-secret claims, and the issue was not "so far beyond the common knowledge of a layperson that the jury required the assistance of expert testimony").

### C.    CDK May Seek Injunctive Relief Under The UCL.

Authenticom's argument regarding the California UCL is narrow. Authenticom contends that CDK is seeking "impermissible" (at 71) remedies under the UCL because damages are unavailable and there is nothing to disgorge here. As with Reynolds, *see* Reynolds SJ Opp. § V, this argument ignores CDK's request for injunctive relief, Dkt. 229, Counterclaims ¶ 50, which is "the primary form of relief available under the UCL," *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 895 (Cal. 2011); *accord Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 946-47 (Cal. 2003). Authenticom never argues that CDK cannot meet the standards for injunctive relief. Mot. 71-72.

### D.    CDK Has A Viable Trespass-To-Chattels Counterclaim.

Authenticom argues that CDK has not shown actionable impairment on its trespass-to-chattels counterclaim. *See* Mot. 72-74. For the reasons Reynolds offers, this argument is impossible to square with the law. *See* Reynolds SJ Opp. § VI. As with Reynolds's system, the facts show that Authenticom impaired CDK's DMS.

A trespass to chattel occurs when "[o]ne who without a consensual or other privilege to do so uses or interferes with the chattel in possession of another," causing either (1) the chattel to be "impaired as to its condition, quality or value," (2) the chattel's possessor to be "deprived of the use of the chattel for a substantial time," or (3) injury to some "thing in which the possessor has a legally protected interest." *Wis. Tel. Co. v. Reynolds*, 87 N.W.2d 285, 288 (Wis. 1958) (quoting Restatement (First) of Torts § 218) (1934)); *see also* Dkt. 506 at 23(citing *Reynolds* for applicable standard). A reasonable jury could find that Authenticom's conduct meets those standards.

A jury could find for CDK on "impairment." ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

That is unquestionably "impairment." Courts have long recognized that increased use of computing resources constitutes an impairment sufficient to succeed on a trespass-to-chattels claim. *E.g.*, *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550-51 (E.D. Va. 1998); *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 WL 388389, at *7 (N.D. Cal. Apr. 16, 1998); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1018-19 (S.D. Ohio 1997). Thus, Authenticom is incorrect (at 74) that CDK's damages expert, Dr. Rubinfeld, only measured system access, not impairment. ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[19] Authenticom's other criticisms of Dr. Rubinfeld (at 73) regarding impairment rehash arguments from its *Daubert* motion—all of which go to weight, not admissibility, and should be rejected for the reasons discussed in Defendants' opposition to that motion. Dkt. 994.

For the same reasons, the jury could find that Authenticom deprived CDK of its chattel (the computer capacity on its DMS servers) for "a substantial time" and impaired CDK's "legally protected interests." *Reynolds*, 87 N.W.2d at 288. As noted, Authenticom's repeated unauthorized DMS access occupied substantial DMS server capacity, slowing it down. That alone is sufficient to survive summary judgment in a trespass-to-chattels case. For example, the court in *Snap-on Business Solutions* held that there was a genuine dispute of material fact under either an impairment theory or for deprivation for a substantial time where there was evidence of a spike in web traffic on the plaintiff's servers. 708 F. Supp. 2d at 675. In another case, the plaintiff showed only that the volume of the defendant's spam email slowed the plaintiff's servers sufficiently to bother its customer base. *CompuServe*, 962 F. Supp. at 1018-19. The effect on customers, however slight, was enough to show harm to the plaintiff's "legally protected interest" in its customers' unobstructed ability to access its servers. *Id.* at 1023. Here, again, CDK has put forward evidence showing that dealer customers were impacted by Authenticom's repeated tie-ups of the DMS. *See* Defs. JSUF 50.

None of Authenticom's authority supports its argument. Instead, these cases stand for the unremarkable proposition that a plaintiff must prove some effect on the chattel or its interests in the chattel. In *Intel Corp. v. Hamidi* (cited at Mot. 74), a former Intel employee sent half a dozen emails to an internal company mailing list criticizing Intel's employment practices. 71 P.3d 296, 299 (Cal. 2003). Intel neither claimed nor showed any evidence that the handful of emails ever burdened its servers. *See id.* at 306. Similarly, in *Fischkoff v. Iovance Biotherapeutics, Inc.* (cited at Mot. 74), a trade secrets case, a former employee copied sensitive information before leaving to work for a competitor. 339 F. Supp. 3d 408, 412 (S.D.N.Y. 2018). The trespass-to-chattels claim failed because copying information to a flash drive never affected the plaintiff's chattel (the server storing information). *Id.* at 416. At bottom, the plaintiff's complaint was about the breach of confidentiality, not a burden on the server. *Id.*

### E.    CDK Can Pursue An Unjust Enrichment Remedy Against Authenticom.

Authenticom argues (at 74-75) that an unjust-enrichment remedy is unavailable because a contract exists between CDK and its dealer customers. For the reasons discussed in further detail in Reynolds's opposition brief, however, that is wrong. Reynolds SJ Opp. § VII. Put simply, a contract with a third party does not foreclose an unjust enrichment claim against a defendant with whom the plaintiff has no contractual relationship. *See, e.g.*, *Griswold v. Antoniak*, 2013 WL 627242, at *4 (Wis. Ct. App. Feb. 21, 2013) (holding that Wisconsin law does not support "the proposition that the existence of a contract necessarily bars an unjust enrichment claim against someone who is *not* a party" to the contract). Illinois unjust-enrichment law, which is "similar" to Wisconsin's, *Beer Capitol Distributing, Inc. v. Guinness Bass Import Co.*, 290 F.3d 877, 881 (7th Cir. 2002), confirms the point. *See, e.g.*, *RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, 2010 WL 3307084, at *3 (N.D. Ill. Aug. 18, 2010) (rejecting argument that "unjust enrichment is barred because there was a contract" where defendant "was not a party" to that contract); *Greenpoint Mortg. Funding, Inc. v. Family First Mortg., Inc.*, 2007 WL 2608554, at *3 (N.D. Ill. Sept. 4, 2007) (same).

### F.    CDK Has A Viable Action For Fraud.

The elements of fraud are "(1) the defendant made a misrepresentation of fact; (2) the representation was untrue; (3) the defendant knew the representation was untrue or made it recklessly; (4) the representation was made with intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage; and (5) the plaintiff believed the representation to be true and relied on it." *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 252 n.38 (Wis. 2004). Authenticom challenges only the first and fifth elements. Mot. 76-77. A jury could conclude that CDK satisfies them both.

Authenticom repeatedly misrepresented its authority to access the CDK DMS. As part of its multi-faceted efforts to keep unauthorized users out of its DMS (while still permitting

authorized users to access it), CDK added a textual prompt at the system login screen asking the user to confirm that he or she was a dealership "employee," which was intended to ensure that a user really was an authorized, human dealer employee. Resp. Auth. SOF 100. This YES/NO prompt required users to "enter YES to confirm that you are an authorized dealer employee" or to "[e]nter 'NO' to exit th[e] program." Resp. Auth SOF 99. By Authenticom's own admission, it developed software to give a false answer to that prompt. *See, e.g.*, Mot. 54. Similarly, CDK's CAPTCHA prompt required the user to "[e]nter the following text to confirm you are an authorized dealer employee." *See supra* p. 28; Defs. JSOAF 48. Authenticom developed software to enter that text automatically, thus falsely representing that it was an "authorized dealer employee." And even if Authenticom had not made such express misrepresentations, its *conduct* still falsely represented its status, which is also actionable under Wisconsin fraud law. *See* Reynolds SJ Opp. § VIII.

Authenticom protests that it did not answer these prompts falsely because it was the dealer's "agent." Mot. 76. But even setting aside the sharp factual disputes on that score, *see supra* § I.B., CDK's prompts required Authenticom to assert it was a dealer *employee*, not the dealer's *agent*. Authenticom does not and cannot contend that it was a dealer employee, which is more than sufficient to show an actionable misrepresentation. *See, e.g.*, *Bay State Milling Co. v. Martin*, 916 F.2d 1221, 1227 (7th Cir. 1990) (observing that Wisconsin law "liberally construes" what constitutes misrepresentation); *Lundin v. Shimanski*, 368 N.W.2d 676, 681 & n.5 (Wis. 1985) ("Any conduct capable of being turned into a statement of fact is a representation.") (quotation omitted).

CDK also relied on Authenticom's misrepresentations. By definition, CDK relied on Authenticom's false representations because the CDK system would not have permitted Authenticom to access the DMS had Authenticom truthfully represented that it was not an "authorized dealer employee." Resp. Auth. SOF 991-100. In arguing to the contrary,

Authenticom makes the absurd claim that CDK did not need to rely on the responses because it only placed the prompts in question on suspected hostile accounts. Mot. 77. But *suspected* is a key qualifier. The point of using a CAPTCHA or similar prompt, rather than disabling a user entirely, is that the system owner does not necessarily *know* in advance whether the user in question is an authorized human or an unauthorized machine. *See, e.g.*, *Johnson Bank v. Tiziani*, 2011 WL 4835728, at *7 (Wis. App. Oct. 13, 2011) (holding that a party could show justifiable reliance even when he "did not read the contract" whose "clear contract terms . . . are contrary to the position taken by the party"); Restatement (Second) of Torts § 540 (1977) (observing that "[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth" even when "he might have ascertained the falsity of the representation had he made an investigation"); *cf. Ollerman v. O'Rourke Co., Inc.*, 288 N.W. 2d 95, 108 (Wis. 1980) (citing Restatement § 540 with approval).

Those basic facts are more than enough to show sufficient reliance, which is a question of fact for the jury to decide. *See, e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 2008 WL 5099619, at *11 (E.D. Wis. Nov. 26, 2008).

### G.     There Is No Statute-Of-Limitations Problem With Any Counterclaim.

Finally, Authenticom contends that for limitations purposes the state-law counterclaims run backward from the date the complaint was filed (May 1, 2017) and the federal law counterclaims run backward from the date the counterclaims were filed (June 29, 2018). *See* Mot. 60-65. Authenticom is correct as to the state-law claims but wrong as to the federal claims.

First, for the reasons Reynolds gives in its opposition brief, CDK's counterclaims against Authenticom were compulsory, and thus "relate back" to the filing of Authenticom's complaint in May 2017. *See* Reynolds SJ Opp. § III. It is true that the Court held that CDK's CFAA counterclaim against the *dealers* was not compulsory. Dkt. 749 at 12-16. But it did so in the context of that particular claim, recognizing that the appropriate test—whether the

counterclaim "arise[s] out of the [same] transaction or occurrence" as the complaint—is "flexible" and case-specific. *Id*. at 13. Authenticom's claims are based directly on allegations of blocking and interference, which overlap with CDK's counterclaims and which Authenticom's complaint discusses to a much greater degree than the dealers ever did. Indeed, several issues central to CDK's counterclaims—such as allegations regarding CDK's DMS contracts—are discussed at length in Authenticom's complaint but were mostly or entirely absent from the dealers' complaint. Compl. § III.B.1.

Second, if the federal claims run backward from June 2018, Authenticom still accessed the DMS without CDK's authorization throughout the applicable limitations periods. The statute of limitations for CDK's claims ranges from 2 years (under, *e.g.*, the CFAA) to 4 years (under, *e.g.*, the UCL). CDK's damages expert calculated damages on a monthly basis from August 2014 to March 2019, so there are no problems of proof. Auth. Ex. 147 (Rubinfeld Rpt.) ¶ 23 & Attachment 4. Thus, even if accepted, Authenticom's arguments would not bar any of CDK's counterclaims; these arguments would only limit potential damages.

## CONCLUSION

The Court should deny Authenticom's motion for summary judgment.

Dated: July 28, 2020

Respectfully submitted,

*/s/ Britt M. Miller*

Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@ mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

### CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on July 28, 2020, I caused a true and correct copy of the foregoing **CDK GLOBAL, LLC'S OPPOSITION TO AUTHENTICOM, INC.'S MOTION FOR SUMMARY JUDGMENT ON CDK'S COUNTERCLAIMS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com