# EXHIBIT 532



[*Home*] [*Databases*] [*World Law*] [*Multidatabase Search*] [*Help*] [*Feedback*]

# England and Wales High Court (Technology and Construction Court) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Technology and Construction Court) Decisions >> SAP UK Ltd v Diageo Great Britain Ltd [2017] EWHC 189 (TCC) (16 February 2017)
URL: *http://www.bailii.org/ew/cases/EWHC/TCC/2017/189.html*
Cite as: [2017] EWHC 189 (TCC)

[*New search*] [*Printable RTF version*] [*Help*]

Neutral Citation Number: **[2017] EWHC 189 (TCC)**
Case No: HT-2015-000340

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**TECHNOLOGY AND CONSTRUCTION COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL
16/02/2017

B e f o r e :

**MRS JUSTICE O'FARRELL DBE**

_____

Between:

| | |
|---|---|
| **SAP UK LIMITED** | **Claimant** |
| - and – | |
| **DIAGEO GREAT BRITAIN LIMITED** | **Defendant** |

_____

**Lawrence Akka QC and Henry Byam-Cook** (instructed by **Bird & Bird LLP**) for the **Claimant**
**Vernon Flynn QC and Jonathan Hill** (instructed by **Addleshaw Goddard LLP**) for the **Defendant**

Hearing dates: 28th November 2016, 29th November 2016, 30th November 2016, 1st December 2016

_____

**HTML VERSION OF JUDGMENT APPROVED**
_____

Crown Copyright ©

**Mrs Justice O'Farrell:**

1. On 28 May 2004 the claimant ("SAP") and Diageo plc entered into a Software Licence and Maintenance Agreement ("the Agreement") whereby SAP granted Diageo plc a licence to use its software in return for the payment of licence and maintenance fees.

2. The Agreement has been subject to a number of amendments and on 20 November 2012 it was novated by Diageo plc to the defendant ("Diageo").

3. The software licensed under the Agreement is the mySAP Business Suite, incorporating the following components:

    i) mySAP Enterprise Resource Planning (mySAP ERP);

    ii) mySAP Customer Relationship Management (mySAP CRM);

    iii) mySAP Supply Chain Management (mySAP SCM);

    iv) mySAP Supplier Relationship Management (mySAP SRM);

    v) mySAP Product Lifecycle Management (mySAP PLM).

4. This case is concerned with the mySAP ERP software. The mySAP ERP software comprises a centralised database, together with an application layer which runs on a customer's server, providing functionality for the operation, financial management and human capital management of a business. In addition, the mySAP ERP software provides a master data store, which is updated and internally co-ordinated to reflect new data entries, and which is capable of interacting with and being re-used across multiple business processes.

5. Diageo is a global drinks company. It uses the mySAP ERP software for management of its manufacturing, stock and supply chain, financial reporting and control, and human resources requirements in its business. The licence fee payable for the mySAP ERP software is calculated by reference to the number of "Named Users" of various categories identified in the Agreement. The maintenance fee for the mySAP ERP software is payable annually and calculated as a percentage of the licence fee.

6. SAP also grants to Diageo under the Agreement a licence to use software engines, including the SAP Exchange Infrastructure ("SAP PI"), which distributes messages between the systems it is connecting, maps one format to another and checks the integrity of the messages transferred. An additional fee is payable by Diageo for the use of SAP PI based on the monthly volume of messages processed.

7. From about 2011/2012, Diageo developed and introduced to its business two new software systems, "Gen2" and "Connect", using a platform provided by Salesforce.com, a competitor of SAP. Gen2 is an application which manages the operations of Diageo sales and service representatives, enabling them to manage their customer visits and calls, and to record information obtained during those visits and calls. Connect enables customers to manage their business accounts with Diageo, and to place and review orders directly, rather than through call centres.

8. SAP's case is that the Gen2 and Connect systems use and/or access the mySAP ERP software directly or indirectly. As a result, SAP is entitled to additional licence and maintenance fees in the sum of £54,503,578 under the Agreement or as damages. Further, SAP seeks a mandatory injunction requiring Diageo to permit SAP reasonable access to the mySAP ERP software so as to verify usage by Diageo and for an account of any additional licence and maintenance fees payable.

9. Diageo acknowledges that the Gen2 and Connect systems interact with the mySAP ERP software via the SAP PI engine, for which payment is made based on processed message volumes, but disputes that such interaction constitutes use and/or access directly or indirectly to the mySAP ERP software so as to give rise to the payment of additional licence and maintenance fees. Diageo seeks a declaration from the court that there has been no infringement by Diageo, or the users of Gen2 and Connect, of any copyright or other intellectual property rights owned by SAP in the mySAP ERP software.

10. This hearing has been fixed to deal with issues of liability only and not quantum.

    *The Issues*

11. The parties have helpfully agreed a list of issues to be determined by the court in this part of the claim. Those issues can be summarised as follows:

    i) On the proper interpretation of the Agreement, is authorised use or access to the mySAP ERP software limited to Named Users?

    ii) What functionality is provided by Diageo Connect and Diageo Gen2 to users of those systems?

iii) Do users of the Diageo Connect system use or access the mySAP ERP software and, if so, in what Named User category should they be categorised?

iv) Do users of the Diageo Gen2 system use or access the mySAP ERP software and, if so, in what Named User category should they be categorised?

v) What remedy is the claimant entitled to under the Agreement or as compensation for breach?

vi) Is the defendant entitled to the declarations or publicity order sought?

*The Agreement*

12. The Agreement was executed on 28 May 2004 and has been supplemented, amended and novated by the following documents:

   i) Addendum dated 28 May 2004;

   ii) Oracle Database Licence dated 28 May 2004;

   iii) Addendum No.3 dated 4 March 2009;

   iv) Exhibit No.9 dated 22 December 2009;

   v) 3rd Replacement to Exhibit No.1 dated 22 December 2009;

   vi) Novation Agreement between Diageo plc, SAP and Diageo dated 20 November 2012;

   vii) 4th Replacement to Exhibit No.1 dated 23 July 2013;

   viii) Exhibit No.27 dated 9 July 2015.

13. The introduction in the Agreement provides:

   "A. SAP wishes to grant to the Customer, and the Customer wishes to accept, a licence to use certain software on the terms set out in this Agreement. The usage authorised by this Agreement is set out in the Exhibit; this may increase over time by means of further Exhibits being signed.

   B This licence will enable the Customer to permit both use of the software by Group Companies and Outsource Providers and access to it by Supply Chain Third Parties on certain conditions.

   C The licence fees are calculated on the basis of: user fees; fees for supplementary software products and database fees…"

14. "Agreement" is defined in clause 1.1 as:

   "this Software Licence and Maintenance Agreement together with the Exhibit, the Schedule and any licence applying to database software licensed from SAP …"

15. "Exhibit" is defined in clause 1.1 as:

   "the Exhibit issued with this Agreement plus any further Exhibits which reference this Agreement."

16. Clause 3.1 provides:

   "Subject to clause 14, SAP grants to the Customer a non-exclusive and perpetual licence to use the Software and Documentation."

17. "Software" is defined in clause 1.1 as:

   "the software set out in the Exhibit together with any software provided as part of warranty and maintenance service."

18. "Documentation" is defined in clause 1.1 as:

> "the descriptions accompanying the Software in machine-readable form and all updates thereto supplied as part of the warranties and maintenance services."

19. Clause 3.2 provides:

> "The authorised usage of the Software is set out in the Exhibit. The Customer shall inform SAP promptly if its usage is beyond that set out in the Exhibit, in which case additional licence and maintenance fees will become payable in accordance with clause 6.2."

20. Clause 3.18 provides:

> "The Customer may authorise Supply Chain Third Parties to access the Software within the following bounds:
>
> 3.18.1 usage by Supply Chain Third Parties shall be classified in the same manner as usage by the Customer and Group Companies (e.g. numbers and categories of Named Users and supplementary software product usage);
>
> 3.18.2 Supply Chain Third Parties shall have no access to the source or object code of the Software;
>
> 3.18.3 Supply Chain Third Parties may only use the Software for the internal business transactions of the Customer …
>
> 3.18.4 the Customer shall be responsible for the acts and omissions of Supply Chain Third Parties as if they were the Customer's acts and omissions;
>
> 3.18.5 Where unknown third party consumers (i.e. the general public) place orders in the Software to purchase the goods or services of Customer then the only charge for this is via the sales order engine. In the event such unknown third parties do not place orders for goods or services or they have no access either directly or indirectly to the Software then no other licensing charges apply.

21. "Supply Chain Third Party" is defined in clause 1.1 as:

> "a third party that requires access to the Software in connection with the operation of the business of the Customer and/or its Group Companies (e.g. business customers, companies with whom Customer has alliances or business arrangements, distributors and suppliers)."

22. Clause 3.19 provides:

> "Once in any 12 month period, unless otherwise requested by SAP and in any event no more than three times in any 24 month period, the Customer shall, using the tools provided by SAP, generate from each instance of the Software and deliver to SAP the information necessary to check that usage of the Software corresponds with the Exhibit. If Customer fails to do so then the Customer shall permit SAP reasonable direct and/or remote access to the Software and the equipment on which it is installed to verify usage. In so doing, SAP shall comply with the Customer's reasonable security requirements. If usage is discovered which does not correspond to the Exhibit, additional licence and maintenance fees will become payable as referred to in clause 6.2. For the avoidance of doubt each party shall bear its own costs incurred in the performance of its obligations of this clause."

23. Clause 6.2 provides:

> "Without prejudice to any other rights and remedies of or available to SAP, if usage of the Software does not correspond to the Exhibit
>
> save where such usage:
>
> i) is accidental; or
>
> ii) is unintentional; or

    iii) is undertaken by an individual exceeding his authority and does not result in any business benefit to Diageo

    in which circumstance the Customer shall immediately cease such usage and the parties shall in good faith and taking into consideration the business benefit derived seek to agree a fair and reasonable amount of compensation to be paid to SAP. In the event of repeated recurrence of such usage the parties will meet in good faith to discuss the circumstances that gave rise to the recurrence and in the event such recurrence cannot be prevented or subsequently happens again then the Customer will pay for the necessary licences,

    additional licence and maintenance fees calculated in accordance with Customers then current corporate pricing levels, or in the absence of the same SAP's then current price list shall be due from the date on which the unauthorised usage was first identified. The Customer shall promptly sign and return to SAP a further Exhibit that SAP shall prepare detailing the relevant usage and fees but SAP's right to receive payment of those fees shall not be dependent upon signature of this Exhibit."

24. Clause 6.3 provides:

    "… SAP may charge interest on any undisputed overdue amount at a rate of 2 per cent per annum over the base Lending Rate of HSBC Bank plc current from time to time, but only for the period of the delay and on the amount of the delayed payment."

25. Clause 10 obliges SAP to provide maintenance services and for Diageo to pay maintenance fees based on a percentage of the licence fees as set out in clause 10.19:

    "The maintenance fees shall be calculated from the date of the Exhibit as a percentage of the net licence fees for the permitted usage of the Software as set out in the Exhibit (fees for part years being apportioned on a pro rata basis) as follows:

    10.19.1 for the first 24 months from the date of this Agreement the relevant percentage shall be 17%. Following expiry of this period the relevant percentage will not increase by more than one additional percentage point per twelve month period for the next twenty four months;

    10.19.2 after that, the relevant percentage shall be that which is stated in SAP's then current price list."

26. Clause 15.1 provides that the Agreement constitutes the entire agreement and understanding of the parties relating to the supply, licensing, use, possession and maintenance of the Software and Documentation.

27. The 4th Replacement Exhibit No.1 ("the Exhibit") sets out the authorised usage of the mySAP ERP software under the Agreement from 19 December 2011 (commercially sensitive items have been added into a separate confidential annex):

**"1. Grant of Rights**

    Subject to the terms and conditions of the Agreement, as supplemented by this Exhibit, Customer is hereby granted a Licence of the Software specified herein.

**2. The Software and Pricing**

**a) mySAP Business Suite**

    Customer is licensed to use the following software components which form the mySAP Business Suite … mySAP Enterprise Resource Planning (mySAP ERP) …

    Basis of Pricing

    Named User pricing: Usage of the mySAP Business Suite is subject to Named User pricing…

**b) SAP NetWeaver**

    Customer is licensed to use the following software components which form SAP NetWeaver …

    Basis of Pricing

Named User pricing: Usage of SAP NetWeaver in an application specific runtime basis for the purposes of enhancing and integrating SAP solutions is subject to Named User pricing.[1]

[Note 1: Named Users licensed to use the mySAP Business Suite are also licensed to use SAP NetWeaver at no additional cost.]

SAP Exchange Infrastructure[2]…

[Note 2: SAP Exchange Infrastructure is licensed at no additional cost in the context of application specific runtime SAP-to-SAP integration.]

Basis of Pricing

SAP NetWeaver Software Engine pricing: Usage of one or more of these software engines is not included as part of the standard mySAP Business Suite Named User licence and is subject to an additional charge in each case…

### c) Licence and Pricing of mySAP Business Suite

The Customer has selected only those Named Users for the mySAP Business Suite listed below, and the prices for those Named Users are as follows:

| User Categories | Price per User in GBP |
| --- | --- |
| Developer Users | … |
| Professional Users | … |
| Limited Professional Users | … |
| Employee Users | … |
| Diageo HR Manager Self Service | … |
| Light User | … |
| Light ESS User | … |

### d) Licence and Pricing of Software Engines

The Customer has selected only those Software Engines listed below, and the prices for such Software Engines are as follows: …

**SAP Exchange Infrastructure (SAP XI)**

| GB/month | Price per 50 GB/month | Max cumulated Price |
| --- | --- | --- |
| 0 to 50 | … | … |
| 50 to 250 | … | … |
| 250 to 500 | … | … |
| 500 to 1,000 | … | … |
| 1,000 to 2,000 | … | … |
| 2,000 to 3,000 | … | … |
| Above | … | … |

[Note 10: SAP XI pricing consists of two elements: SAP XI Base Engine and Adapters. If SAP XI is used to integrate 3rd party applications, then the SAP XI Base Engine is priced based on the overall processed message volume expressed in GigaByte (GB) per month. A single message originating from customers' SAP application and being send [sic] to customers' SAP application is not counted.]

3. Calculation of the Licence Fees (excl. VAT)

a) Existing Licences

| Total No. | Named Users | Prices in GBP |
|---|---|---|
| … | … | … |

STANDARD NET LICENCE FEES…

4. Maintenance

Notwithstanding clause 10.19 of the Agreement, the maintenance fees for the licences of the Software granted under this Exhibit shall be calculated as a percentage of the Standard Net Licence Fees specified above and shall be payable in accordance with clause 6.1 of the Agreement.

For the avoidance of doubt, the relevant percentage shall be as follows:

2012 – 19.5%

2013 – 20.1%

2014 – 20.8%

2015 – 21.4%

2016 – 22%

Thereafter the maintenance fees shall be calculated in accordance with clause 10.19.2 of the Agreement."

28. "Named User" is defined in clause 1.1 as:

"an individual representative (e.g. employee, agent, consultant, contractor) of the Customer, a Group Company, an Outsource Provider or a Supply Chain Third Party who is authorised to access the Software directly or indirectly (e.g. via the Internet or by means of a hand-held or third party device or system). The extent to which a Named User is authorised to use the Software depends upon his user category as set out in the schedule."

29. The Schedule to the Agreement describes the Named User Categories as follows:

"Developer User:

An individual who is entitled to use the development and administration tools contained in the Software…

Professional User:

An individual who is entitled to perform operational related roles supported by the Software. The Professional User Licence includes the rights granted under a Limited Professional User licence.

Limited Professional User:

An individual who is entitled to perform limited operational related roles supported by the Software. Representatives of Supply Chain Third Parties should be licensed as Limited Professional Users unless they are performing functions or roles normally performed by the Customer's / Group

Company's personnel (e.g. independent contractors, consultants, temporary workers), in which case they will need to be licensed as Professional Users. Individuals who access the Software solely by means of a hand-held device and never by any other means should be licensed as Limited Professional Users. The Limited Professional User licence includes the rights granted under an Employee User Licence.

**Employee User:**

**An individual who is entitled to perform employee self-service related (non-job specific) roles supported by the Software. Each Employee User may access the Software solely for his own purposes and not for or on behalf of other individuals.**

…

**Light User**

**Is a Named User who is a Diageo employee who uses the Software on a limited or infrequent basis for an average of approximately one hour per two week period. By way of illustration this would include users raising or approving requisitions, a cost centre manager checking an invoice, supply manager reviewing spend information and a line manager checking on staff details or any such similar activity.**

**Mobile User**

**Is a Named User who uses SAP-developed solutions and/or SAP Software that give access to business process functionality via hand-held or other mobile devices only. These devices may be operated in on-line or off-line modes depending on the business process needs and availability of network connectivity. All categories of mobile user license cover provision by SAP of software components on hand-held or other mobile devices only, communications middleware and server-based components allowing interaction with business processes supported by the mySAP solutions suite.**

**Light ESS User**

**Is typically a shop floor/factory floor employee of Customer who only uses ESS HR related functionality within the Software on an infrequent basis (i.e. less than one hour per month). Typically an HR Portal User does not have a dedicated PC but uses a self-service kiosk to access SAP."**

*Witnesses*

30. The following witnesses gave evidence:

    i) Andrew Lack, an account director at SAP, who explained the basis on which the mySAP ERP software is priced by reference to the number of named users;

    ii) Adrian Faust, a pre-sales customer solutions principal at SAP, who provided a description of the mySAP ERP and SAP PI systems and the interaction with the Salesforce system based on the Process and Product Description ("PPD") provided by Diageo;

    iii) Gary Gallagher, core commercial assets manager at Diageo, who verified that the PPD is a true and complete description of the Diageo Connect and Diageo Gen2 systems, and their interactions with mySAP ERP software;

    iv) Gurli Donohoe, commercial effectiveness director for Diageo, Ireland, who explained the operation of the Customer Contact Centre;

    v) Kieran Forde, lead for platform architecture for Global Diageo Business Services, who explained how the Diageo professional users access and use mySAP ERP.

*The mySAP ERP software*

31. The mySAP ERP software is installed on hardware owned by Diageo, using an Oracle database. The basic package provides industry-specific functionality for:

    i) Operations – sales and distribution, materials management, production planning, logistics execution and quality management;

    ii) Financials – financial accounting, management accounting, financial supply chain management and treasury issues;

    iii) Human Capital Management – service delivery, recruitment and payroll management.

    Diageo has added a number of software engines to enhance the features of the basic package and has developed code and configuration data to enable its applications to run with mySAP ERP.

32. The mySAP ERP software stores, updates and co-ordinates the centralised, relational database (a complex network of tables) for Diageo's business.

33. The application layer of the software contains and executes the business logic, enabling users of mySAP ERP to carry out business processes, such as ordering products. The separate stages of each transaction are linked together by the software; it leads the user through each stage and produces a single transaction record.

34. Diageo Named Users hold individual login details and passwords to access the mySAP ERP database and operate the business processes.

35. SAP provides an infrastructure exchange engine, originally known as SAP Exchange Infrastructure ("SAP XI") and now called SAP Process Integration ("SAP PI"), installed on hardware owned by Diageo. SAP PI provides adapters to facilitate communication between different SAP systems or between a SAP system and a non-SAP system. The adapters translate messages from one application to another, map the messages (ensuring communication with the relevant business objects that may be defined by different parameters in different systems) and check integrity to ensure that no corruption has occurred during the transmission of the messages.

    *Interpretation of the Agreement - Issue (i)*

    *On a proper interpretation of the Agreement:*

    > a) *Are only Named Users authorised to "use" or "access" the mySAP ERP software "directly" or "indirectly"?*

    > b) *Was and is Named User pricing the only basis upon which the mySAP ERP software was and is licenced to the Defendant?*

    > c) *May individuals "use" or "access" the mySAP ERP software "directly" via SAP PI with the authorisation of the Claimant under the licence granted in respect of SAP PI irrespective of whether they are Named Users?*

36. SAP's case is that:

    i) A Named User is an individual representative of Diageo or a Group Company, or a Supply Chain Third Party, who is authorised to use or access the software directly or indirectly.

    ii) On a plain reading of the Agreement, it does not entitle anyone who is not a Named User, licensed as such, to use or access mySAP ERP.

    iii) Use or access to the software via SAP PI is not an alternative to authorisation as a Named User. Although SAP PI acts as a conduit for messages between systems, it does not and cannot perform the roles of the systems between which it provides connectivity. In particular, it cannot replicate the functionality which resides in mySAP ERP. If use or access to the software via SAP PI were an exception to the requirement for a Named User licence, it would require an express carve out in the Agreement to that effect but there is none.

37. Diageo's case is that:

    i) The licence granted in respect of SAP PI is a "gatekeeper" licence for gaining access to the SAP suite of applications and database. It covers such operations as occur within mySAP ERP's applications as a result of data and instructions passed through the SAP PI interface from third party software systems.

    ii) That interpretation is supported by:

        a) an explicit statement in the Agreement that while a charge is made for data passing from SAP applications to third party applications via the SAP PI interface, no such charge is made for data passing from one SAP application to another; and

        b) the absence from the Agreement of any statement that users of third party software which interacts with SAP applications via SAP PI require individual licensing as users of the SAP applications.

    iii) SAP's interpretation would result in all users of the third party software systems being required to be Named Users i.e. most people in the organisation, which would not make commercial sense. In this case, it is common ground that up to 3 November 2015 Diageo has paid between £50 million and £61 million by way of licence and maintenance fees.

*Discussion and Finding*

38. When interpreting a written contract, the court is concerned to ascertain the intention of the parties by reference to what a reasonable person, having all the background knowledge which would have been available to the parties, would have understood them to be using the language in the contract. It does so by focussing on the meaning of the relevant words in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the contract, (iii) the overall purpose of the clause and the contract, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions: *Arnold v Britton* [2015] UKSC 36 per Lord Neuberger Paras.15-23; *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50 per Lord Clarke Paras.21-30; *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38 per Lord Hoffmann Paras.14-15, 20-25.

39. The starting point is the express words used by the parties in the Agreement. Introductory paragraph A and clause 3.1 provide that SAP grants to Diageo a licence to use the Software. The Software is defined by clause 1.1 as the software set out in the Exhibit. Paragraph 1 of the Exhibit confirms that the licence is granted in respect of the Software specified in the Exhibit. The Software set out in paragraph 2 of the Exhibit comprises the software components forming the mySAP Business Suite (which include mySAP ERP software), the SAP NetWeaver software components and various software engines (which include SAP PI).

40. The extent of the licence is defined by Introductory paragraph A and clause 3.2 which state that the usage authorised by the Agreement is set out in the Exhibit.

41. The table in paragraph 2a) of the Exhibit provides that: *"Usage of the mySAP Business Suite is subject to Named User pricing."* Paragraph 2c) of the Exhibit describes the categories of Named Users selected by Diageo for the mySAP Business Suite and the licence fee for each Named User within those categories. The table in paragraph 3 of the Exhibit identifies the number of licences for each category of Named User so as to calculate the licence fees payable. Therefore, there is an agreed number of each category of Named User in respect of which a licence fee is payable.

42. A Named User is defined in clause 1.1 of the Agreement as an individual representative of Diageo or a Group Company, or a Supply Chain Third Party: *"who is authorised to use or access the software directly or indirectly."* The definition expressly states: *"The extent to which a Named User is authorised to use the Software depends upon his user category as set out in the Schedule"*. The Schedule describes in general terms the characteristics of each category of Named User.

43. The plain and obvious meaning of the above provisions is that only Named Users are authorised to use or access the mySAP ERP software.

44. There is no other pricing basis set out in the Exhibit on which the mySAP ERP software is licensed to Diageo.

45. I reject Diageo's submission that SAP PI is a "gatekeeper" licence for gaining access to the SAP suite of applications and database. The Exhibit contains a separate basis of pricing for the SAP PI software engine and adapters, which applies even where there is a Named User licence for mySAP ERP: *"Usage of one or more of these software engines is not included as part of the standard mySAP Business Suite Named User licence and is subject to an additional charge in each case"* (paragraph 2b) of the Exhibit). Therefore, it is clear that it is an addition, rather than an alternative, to authorisation under a Named User licence.

46. The express licence for use of SAP PI in respect of SAP-to-SAP integration at no additional charge (Footnote 2 in the Exhibit) does not indicate that the use of SAP PI is already included as part of the mySAP Business Suite. Paragraph 2b) of the Exhibit expressly states otherwise. It simply indicates that the licence fees for mySAP Business Suite include any SAP PI costs for internal SAP-to-SAP connectivity.

47. Diageo correctly notes that the Agreement does not contain any express statement that users of third party software which interacts with SAP applications via SAP PI require individual licensing as users of the SAP applications. However, that does not detract from the clear wording in the Agreement that usage of the mySAP Business Suite is subject to Named User pricing. There are no words in the Agreement that make an exception to the general limit of the licence for usage of the mySAP ERP software when it is effected via SAP PI.

48. There is no room for arguments based on commercial value or contra proferentem where the objective meaning of the words used in the Agreement is clear and free from ambiguity.

49. In conclusion, in answer to the questions posed in Issue (i):

    i) Only Named Users are authorised to use or access the mySAP ERP software directly or indirectly.

    ii) Named User pricing is the only basis on which the mySAP ERP software was and is licensed to Diageo.

    iii) Individuals may not use or access the mySAP ERP software directly via SAP PI with the authorisation of SAP under the licence granted in respect of SAP PI irrespective of whether they are Named Users.

    *Functionality provided by Diageo Gen2 & Diageo Connect - Issue (ii)*

    *Insofar as is relevant to the issues raised by the case, what functionality is provided by Diageo Connect and Diageo Gen2 to users of those systems?*

50. In about 2011 Diageo procured the development of the Gen2 system by Deloittes using a software platform supplied by Salesforce.com ("Salesforce"). Gen2 was designed to allow Diageo sales representatives to collate relevant data to assist with the management and tracking of sales, primarily at outlets for sales of drinks to consumers, such as pubs and clubs.

51. Subsequently, Diageo procured the development of the Connect system, again using the Salesforce software platform. Connect was designed to enable Diageo's customers and distributors to place orders for products directly using an online portal, rather than through Diageo employees in a call centre. Customers are permitted to place orders, check stock availability and prices, see invoices and choose delivery dates 24 hours a day, seven days a week.

52. Salesforce is a cloud based application. The standard Salesforce business objects, as configured and customised by Diageo, are stored in a cloud-based relational database.

53. The Gen2 and Connect systems were deployed by Diageo from about April 2012.

54. Users access the functionality of Salesforce (Gen2 or Connect) through a web browser on any computer, laptop or mobile device that is connected to the internet. The web browser connects to the Salesforce website. The web browser runs client-side code and displays screens loaded from the Salesforce website.

55. When the Gen2 or Connect applications interact with mySAP ERP, they do so via SAP PI.

56. A summary of the key interactions between Salesforce and mySAP ERP is set out below.

57. Logging on to the Salesforce interface by a user triggers retrieval of the configured log in details in mySAP ERP and communication of a username and password details through SAP PI to Salesforce, which validates the login and returns a session ID to mySAP ERP (Interface ID I00237).

58. **Changes in the following records stored in the mySAP ERP database (limited to 'the delta') are extracted from mySAP ERP and sent in regular batches (or on manual request) to Salesforce so as to ensure that the data in mySAP ERP and Salesforce are aligned:**

    i) Customer master details - general data such as address (Interface ID I00236), sales organisation details (Interface ID I00241) and financial data (Interface ID I00252);

    ii) Product master details – product materials (Interface ID I00238), sales area specific product data (Interface ID I00243), product portfolio (Interface ID I00244), product hierarchy (Interface ID I00245) and details of volume and configuration of products (Interface ID I00248);

    iii) Sales area logistics – sales area specific details, such as minimum and maximum weights for orders (Interface ID I00240), order split rules, lead in and delivery times (Interface ID I00251) and container information (Interface ID I00438);

    iv) Customer mapping – where a customer in Salesforce is detected and mapped to a customer master record in mySAP ERP (Interface ID I00239);

    v) Return beer codes categorising the reason for product return (Interface ID I00337); and

    vi) Product portfolio notifications, such as change to a product (Interface ID I00441).

59. **Sales order simulation and creation requires tasks that are initiated in a Salesforce application to be transferred with all relevant information, via SAP PI, to mySAP ERP, where the information is used to update the central database and the task is processed and completed.**

60. **Having logged on and selected products, the customer's order details are mapped to mySAP ERP where a simulated order is triggered and a response sent to Salesforce with any errors, prices and stock availability (Interface ID I00247).**

61. **Salesforce creates a purchase order number and the PO number is sent to mySAP ERP where checks for duplication are made (Interface ID I00262).**

62. **If the customer elects to place an order, a new order workflow item is created, which triggers notification of the order to SAP PI (Interface ID I00260).**

63. **Interface ID I000260 triggers a web service call to Saleforce to retrieve and transfer the Salesforce order ID to a table in mySAP ERP with a SAP order number (Interface ID I00261).**

64. **The mySAP ERP system sends to Salesforce a status update on any orders (Interface ID I00246).**

65. **Functionality is available to enable a sales representative to send a message from Salesforce to mySAP ERP to create a free issue order i.e. sample products, although this functionality is not in use (Interface ID I00440).**

66. **If it is necessary to return beer kegs, a service representative assigns a unique tag number to any keg that is returned and enters the return details in Salesforce where it is placed in a return queue and sent to mySAP ERP in an overnight batch and entered into the SAP records (Interface ID I00337).**

67. **Where a user on Salesforce requires information held in the mySAP ERP database, a request is sent to mySAP ERP via SAP PI and a reply is sent via SAP PI to Salesforce:**

    i) Sales order history:

        a) the customer selects the 'view order history' tab in Salesforce which triggers a request to mySAP ERP via SAP PI for the relevant data which is then sent to Salesforce (Interface ID I00250);

        b) a Salesforce user selects the 'order history' tab in Salesforce, the request is mapped by SAP PI to mySAP ERP and a response is sent to Salesforce (Interface ID I00439); and

        c) the customer requests an order acknowledgement in Salesforce, the request is mapped by SAP PI to mySAP ERP and the data sent to Salesforce where it is displayed as a pdf (Interface ID I00424).

ii) Invoice and financial document retrieval:

a) the Salesforce user requests an invoice in Salesforce, the request is mapped by SAP PI to mySAP ERP and a response is sent to Salesforce (Interface ID I00254);

b) the Salesforce user requests a list of financial documents in Salesforce, the request is mapped by SAP PI to mySAP ERP where the data is retrieved and sent to Salesforce (Interface ID I00363);

c) the Salesforce user requests a copy of a financial document in Salesforce, the request is mapped by SAP PI to mySAP ERP where the document is retrieved and sent to Salesforce (Interface ID I00364).

*Diageo Connect - Issues (iii) & (iv)*

iii) *As regards the Diageo Connect system:*

a) *What actual and possible interactions are and have there been at all material times between the Diageo Connect system, as implemented, and the mySAP ERP software?*

b) *What actual and possible interactions are and have there been at all material times between the Diageo Connect system, as implemented, and the mySAP ERP software (differentiated by category of user)?*

iv) *Do or did any of the interactions referred to in paragraph 3 above constitute "use" or "access" "directly" or "indirectly" of or to the mySAP ERP software by the users of the Diageo Connect system, given the proper interpretation of those terms in the Agreement, and, if so, in what Named User category should the users of Diageo Connect be categorised?*

68. The users of Connect are categorised by Diageo as follows:

i) Connect Customer – the customers who carry out self-service transactions on the Connect system. These are the relevant users for the purpose of the issues in dispute.

ii) Connect MDM (Master Data Manager) – business administrators, some of whom are Named Users, who create the data and settings within Salesforce so that customers can access and use Connect.

iii) SAP MDM – Named Users who are responsible for the management of the transactions on mySAP ERP in support of data to be sent to Salesforce as part of Connect.

69. The use of Connect by customers includes interaction between the Salesforce application and mySAP ERP.

70. Firstly, the customer master data in mySAP ERP is required to enable a customer to create an order through Connect. Customer master general data, sales area data and financial data is extracted from mySAP ERP to Salesforce, usually on a batch schedule three times per day, to ensure alignment of the records in the two systems.

71. Secondly, the product master data in mySAP ERP is required to enable a customer to create an order through Connect. Product hierarchy, product volumes/sizes and configuration, any customer specific portfolio and product catalogues are extracted from mySAP ERP to Salesforce, usually on a batch schedule three times per day. This interaction makes available a list of products in Connect from which the customer can place an order.

72. Thirdly, the sales area logistics rules in mySAP ERP are required to enable a customer to create an order through Connect. Details of the minimum/maximum weights, pallets, cases and line items permitted per order in each sales area, the delivery times and container types are extracted from mySAP ERP to Salesforce, usually on a batch schedule three times per day.

73. Fourthly, when a customer logs in to the Connect portal, selects products, reviews and approves an order, the data is mapped to mySAP ERP, where a simulated order is generated and checks against availability and pricing are carried out, following which a response is sent to Connect for the customer to place the order. When a customer places an order in Connect, it is saved in a queue for transfer to mySAP ERP where a SAP order number is generated.

74. Finally, a customer can view historical sales and accounting data by selecting the 'view order history' or 'view sales order' option in Connect. This triggers a web service call to SAP PI, which in turn maps the data into a call into mySAP ERP. The historical data is retrieved by mySAP ERP, sent via SAP PI and displayed as a pdf document in the Connect portal.

75. SAP's case is that the Connect system is entirely dependent on mySAP ERP. The above interactions constitute use or access to mySAP ERP directly or indirectly. The users of Connect should be licensed as Named Users. The relevant Named User Category as set out in the Schedule is Professional User.

76. Diageo's case is that the interactions that occur indirectly between users of the Connect system and mySAP ERP do not amount to use of, or access to, the mySAP ERP software, as Professional Users or any Named Users. The interactions between the customers in Connect and mySAP ERP are in essence the same as they were when those same users obtained their account information and placed orders through the call centres.

*Discussion and Finding*

77. It is common ground that the test is whether the Connect customers "use" or "access" the mySAP ERP software "directly" or "indirectly". The Agreement does not contain a definition of these terms. The plain and obvious meaning of "use" in the context of the Agreement is application or manipulation of the mySAP ERP software. The plain and obvious meaning of "access" in the context of the Agreement is acquiring visibility of, or connection to, the mySAP ERP software.

78. There is some assistance in the Agreement as to the meaning of "directly" or "indirectly". The definition of "Named User" refers to use or access directly or indirectly *"(eg via the Internet or by means of a hand-held or third party device or system)"*.

79. In my judgment, the interactions identified above between the Connect customer and mySAP ERP constitute use of, or access to, the mySAP ERP software. As set out in Issue (ii) above, the log in process triggers a connection with mySAP ERP via SAP PI. Each stage of the order process requires the customer to initiate the transmission of a message from Connect to mySAP ERP and a corresponding response to be received from mySAP ERP. A customer's order can't be completed in Connect; submission of the order initiates transmission of the same to mySAP ERP where the final processing and completion is carried out. At each stage of the order process, the customer is accessing or using mySAP ERP indirectly through SAP PI. The example in the Named User definition in clause 1.1 of the Agreement includes use or access *"via … a … third party … system"*. This would include use or access via SAP PI (a software engine and adaptors that could be provided by SAP or another provider).

80. Diageo relies on the fact that, prior to the introduction of Connect, customers were required to place orders through call centres. SAP has never contended that such customers should be Named Users. The Connect portal simply allows the customers to place orders directly into the system, rather than through an intermediary. However, that argument does not assist Diageo. When an order is placed through a call centre, there is no interaction between the customer and the mySAP ERP software. The individual submitting the order to the mySAP ERP system is the call centre operative. The call centre operatives are Named Users. It follows that if the individual submitting the order to the mySAP ERP system is the customer, that customer should be a Named User.

81. Diageo relies on the fact that some of the interaction between the Connect customers and mySAP ERP is asynchronous but the timing of the interaction doesn't have any bearing on whether it amounts to use or access of the software.

82. Clause 6.2 of the Agreement provides that if usage of the software does not correspond to the Exhibit, additional licence and maintenance fees are payable. The clause provides that any such additional fees shall be calculated in accordance with Diageo's then current corporate pricing levels or, in the absence of the same, SAP's then current price list.

83. Diageo's pricing levels are set out in the Exhibit against various categories of Named User. The categories of Named User are described in the Schedule to the Agreement.

84. There is difficulty in allocating Connect customers to any particular Named User category. In 2004 such usage through cloud-based portals was not generally available and therefore, unsurprisingly, it is not explicitly identified in the Schedule. In any event, as Diageo has submitted, the descriptions of the Named User categories

in the Schedule are very general and high level. They provide little guidance on the level of access or use envisaged for each group.

85. A Professional User is described as *"an individual who is entitled to perform operational related roles supported by the Software."* On first reading, this would appear to cover all users because the purpose of mySAP ERP software is to support the operational roles of the business. However, it must be read against the descriptions of the other user categories in order to give effect to the intentions of the parties. A Limited Professional User is described as *"an individual who is entitled to perform limited operational related roles supported by the Software."* This is stated to include Supply Chain Third Parties (unless they perform a Diageo role). Clause 3.18 of the Agreement provides that Supply Chain Third Parties are not authorised to have access to the source or object code of the software. From this, it can be deduced that a Professional User is authorised to have access to the source or object code of the mySAP ERP software. Connect customers do not have such access to the mySAP ERP software. Therefore, they should not be categorised as Professional Users.

86. SAP submits that Connect customers fall within the definition of Supply Chain Third Parties because they are Diageo's business customers. The definition of Supply Chain Third Party is: *"a third party that requires access to the Software in connection with the operation of the business of [Diageo]… (eg business customers)…"* The Connect customers are Diageo business customers. However, the Connect customers primarily use or access mySAP ERP for business process functionality, rather than the internal operational functions of Diageo, such as production planning, management accounting or recruitment and payroll management.

87. A Mobile User is described in the Schedule as: *"a Named User who uses SAP-developed solutions and/or SAP Software that give access to business process functionality via hand held or other mobile devices only".* Although Connect customers have the ability to gain indirect access to mySAP ERP via any device that is connected to the internet (a facility that was not in widespread business use in 2004), their use is much closer to that of a Mobile User than a Limited Professional User.

88. The Employee User, Light User, Light ESS User and other categories are not applicable because Connect customers are not Diageo employees. Connect customers are not unknown third party consumers for the purposes of clause 3.18.5 because they are identified Diageo business customers who have been given access to Connect by Diageo Connect MDMs.

89. In my judgment, there is no applicable Named User category for the Connect customers in the current version of the Schedule. They do not have access to source or object code. They do not have access to the functionality provided by mySAP ERP in support of the wider operation of Diageo's business. They access business process functions and information from the database for the purpose of ordering products and managing their own personal accounts only.

90. However, I do not accept Diageo's case that this is an "all or nothing" case that must fail if SAP is unable to establish that the additional users are Professional Users. The pleadings and the agreed list of issues identify the category of Named User as a dispute that the court has been asked to determine. Clause 6.2 is in sufficiently wide terms to entitle SAP to additional fees based on its own price list if there is no relevant price for the category of additional usage identified.

91. In summary, usage by Connect customers is not authorised usage under the Agreement. SAP is entitled to additional licence and maintenance fees, the level of such fees to be assessed in the quantum phase of the trial, if not agreed, by reference to the nature and extent of the usage and SAP's price list.

*Diageo Gen2 - Issues (v) & (vi)*

v) *As regards the Diageo Gen2 system:*

    a) *What actual and possible interactions are and have there been at all material times between the Diageo Gen2 system, as implemented, and the mySAP ERP software?*

    b) *What actual and possible interactions are and have there been at all material times between the Diageo Gen2 system, as implemented, and the mySAP ERP software (differentiated by category of user)?*

vi) *Do or did any of the interactions referred to in paragraph 5 above constitute "use" or "access" "directly" or "indirectly" of or to the mySAP ERP software by the users of the Diageo Gen2 system, given the proper*

*interpretation of those terms in the Agreement, and, if so, in what Named User category should the users of Diageo Gen2 be categorised?*

92. The users of Gen2 are categorised by Diageo as follows:

    i) Master Data Manager ("MDM") – business administrators who create and maintain master data, including the users, customers, products, territories and business roles.

    ii) Transactional Data Manager ("TDM") – business administrators who create and maintain transactional data, including products or activities that are specific to certain customer or user groups, tasks and surveys that are executed by the sales representatives when visiting customers.

    iii) Sales Representatives - the field sales users that plan and undertake visits to outlets (proactively or reactively) to capture and update data related to the category and classification of the outlet and the actions that are carried out within a visit or call to that outlet.

    iv) Customer Contact Representative ("CCR") - users that work in a call centre and take inbound calls from customers related, mainly, to queries or quality issues that the customers need resolving, but also to identify sales opportunities to be followed up. The Salesforce web interface is used.

    v) Service Manager - the managers of the technical service reps in Ireland.

    vi) Gen2 System - a "system" role that manages the integration between Salesforce and other tools, such as mass loading of data, or extracting data from Salesforce to external reporting tools.

    vii) Gen2 Support - users that provide technical support for the system.

93. There is interaction between the Gen2 system and the master data and application functions in mySAP ERP, as follows.

94. Customer records are created and maintained in Salesforce by the MDM but data is extracted from mySAP ERP to Salesforce in respect of certain customers to which Diageo sells products directly to avoid the need for duplication of record maintenance and potential discrepancies between the systems.

95. Product data is selected from the mySAP ERP hierarchy and sent to Salesforce to be shown in the Gen2 application, together with product data collected by the sales representatives from outlets and entered directly in Salesforce.

96. Customer master general data, customer master sales area data and customer financial data is extracted from mySAP ERP to Salesforce, usually on a batch schedule three times per day, to ensure alignment of the records in the two systems.

97. A sales representative can assign a unique tag to a keg of beer that is required to be returned from an outlet for a refund where it is defective. Details of the defective beer are recorded by the sales representative in the Gen2 application using a mobile device. The beer tags are read in batches of 100 and sent to SAP PI where they are translated and sent to mySAP ERP for validation and subsequent processing. A 'success' response is sent by mySAP ERP through SAP PI back to Salesforce.

98. In my judgment, the interactions identified above between the Gen2 users and mySAP ERP constitute use of, or access to, the mySAP ERP software. As set out in Issue (ii) above, the log in process triggers a connection with mySAP ERP via SAP PI. The MDMs access and use mySAP ERP when creating and maintaining customer and product data which is extracted from mySAP ERP for Gen2. The sales representatives do not access or use mySAP ERP when they retrieve data for the purpose of their calls or visits to outlets, such as product data. Ms Donohoe's evidence was that they use commercial reports prepared by other Diageo employees for information on outlets and do not have access to business customer pricing or order history. However, the sales representatives access and use mySAP ERP when they log in to Gen2 for the purpose of entering beer tags for returned kegs. At each stage of these interactions, the Gen2 user is accessing or using mySAP ERP indirectly through SAP PI.

99. There is no evidence that the TDMs, CCRs or Gen2 support staff use or access the mySAP ERP software.

100. The Gen2 MDMs fall within the category of Professional User in the Schedule as they are individuals who are entitled to perform operational related roles supported by the Software.

101. The Gen2 sales representatives do not fall within any identified category of Named User in the Exhibit. Their interaction with the software is limited and specific to their role. The category that most closely resembles the use or access for the sales representatives is the Mobile User identified in the Schedule, as they are individuals who use or access the business process functionality of my SAP ERP using mobile applications on tablet devices like iPads (iOS) or Samsung Tabs (Android). There is no relevant pricing level in the Exhibit for a Mobile User and therefore it would be necessary to calculate the additional fee by reference to SAP's price list.

102. In summary, usage by Gen2 sales representatives is not authorised usage under the Agreement. SAP is entitled to additional licence and maintenance fees, the level of such fees to be assessed in the quantum phase of the trial, if not agreed, by reference to the nature and extent of the usage and SAP's price list.

*Verification of Usage - Issues (vii), (viii) & (xi)*

vii) *Has the Defendant supplied the Claimant with all information regarding usage of the mySAP ERP software which it is required to supply under clause 3.2 or clause 3.19 of the Agreement, as properly construed?*

viii) *Was the Defendant required to permit the Claimant reasonable access to the mySAP software held by the Defendant and the equipment on which it is installed to verify usage of that software?*

xi) *Is the Claimant entitled to a mandatory injunction or specific performance requiring the Defendant to permit reasonable access to the mySAP ERP software and the equipment on which it is installed to verify usage of the mySAP ERP software?*

103. I accept Diageo's case that it has not hidden the fact that it integrated mySAP ERP with the Salesforce systems. Mr Faust's evidence was that he became aware of Gen2 and Connect in November 2015 but he was unable to say when others at SAP first knew of Diageo's use of those applications. The availability of the Diageo video on Youtube indicates that there was no attempt to conceal information from SAP.

104. Diageo has provided SAP with software usage reports generated by SAP's monitoring tools as required by clause 3.19. The dispute between the parties as to the application of the software licence has required Diageo to provide additional information on usage but that does not automatically place it in breach of clause 3.19.

105. In the light of the court's determination that usage by Connect and Gen2 users gives rise to additional licence and maintenance fees, there will need to be an accounting exercise in order to identify the additional Named Users, the numbers in each category, and calculation of the additional licence and maintenance fees payable.

106. The PPD produced in these proceedings provides details of the numbers of Connect and Gen2 users in each category and the nature of their interaction with mySAP ERP software. If, and to the extent that, SAP requires additional information in order to verify the usage of its software, that should be the subject of a further request for information.

107. SAP has not established breach of clause 3.19 and therefore is not entitled to have access to the Salesforce system so as to verify the usage.

*Damages – Issue (ix)*

ix) *Under the Claimant's alternative case, is the Defendant obliged to pay any damages to the Claimant for breach of the Agreement?*

108. Clause 3.2 of the Agreement provides that authorised usage of the mySAP ERP software is as set out in the Exhibit. Diageo's Connect and Gen2 users are not Named Users and therefore such usage is unauthorised. Unauthorised usage amounts to a breach of the Agreement. The opening words of clause 6.2 make clear that SAP's right to additional licence and maintenance fees for unauthorised usage is without prejudice to any other rights or remedies available. Therefore, in principle, SAP would be entitled to damages for breach of the Agreement as an alternative to the fees claimed under the Agreement, subject to proof of loss and any contractual exclusions or limitations of liability.

*Interest – Issue (x)*

x) *If the Defendant is obliged to pay any monetary sums to the Claimant, is it obliged to pay interest on those sums, whether under clause 6.3 of the Agreement or otherwise?*

109. Clause 6.3 of the Agreement provides for Diageo to pay contractual interest on any undisputed overdue amount. The additional licence and maintenance fees claimed in these proceedings were disputed by Diageo. Therefore, clause 6.3 is not engaged. The clause could have provided for interest to be payable on any sums found to be due, in addition to disputed sums, but it does not. However, the court has power to award interest on any sums awarded pursuant to section 35A of the Senior Courts Act 1981.

    *Account – Issue (xii)*

    xii) *Is the Claimant entitled to an account of the additional licence and maintenance fees due from the Defendant in respect of the Defendant's usage of the mySAP ERP software beyond that set out in the Agreement and an order for payment of the sums found to be due on such account?*

110. SAP is entitled to an account of the additional licence and maintenance fees due from Diageo and an order for payment of the sums found to be due on such account.

    *Counterclaim – Issues (xiii) & (xiv)*

    xiii) *Is the Defendant entitled to the declarations of non-infringement sought in the Counterclaim?*

    xiv) *Is the Defendant entitled to a publicity order in respect of any judgment in its favour?*

111. Diageo seeks declaratory relief as follows:

    i) A declaration that by integrating Connect and Gen2 with the mySAP ERP software and using those two systems, the Defendant has not infringed the Claimant's copyright or (if any subsist) other intellectual property rights in the mySAP ERP software.

    ii) A declaration that none of the users of Connect or Gen2 have infringed the Claimant's copyright or (if any subsist) other intellectual property rights in the mySAP ERP software.

112. By letter dated 20 May 2015, SAP alleged that Diageo had infringed SAP's intellectual property rights. Following correspondence from Diageo, by letter dated 13 July 2015 SAP's solicitors, Bird & Bird, reserved SAP's rights to advance such claims should their ongoing analysis of the factual position reveal that such an infringement had taken place. The allegation has not been formally withdrawn but it has not been raised in these proceedings and there is no indication that SAP intends to pursue it.

113. Diageo submits that the court should grant the declarations sought. SAP has not pleaded any positive case on infringement and therefore has no defence to the substance of the counterclaim.

114. SAP's position is that SAP has not formulated any claim against Diageo on infringement and the declarations would serve no useful purpose. If SAP sought to bring such a claim in subsequent proceedings it could be dealt with by estoppel/abuse of process arguments on the part of Diageo.

115. The court has power to grant negative declaratory relief where necessary to achieve the aims of justice: *Messier-Dowty Ltd v Sabena SA* [2000] 1 WLR 2040. However, usually it will decline to grant a declaration in favour of a party against whom no claim has been formulated as it would serve no useful purpose: *Nokia Corp v Interdigital Technology Corp* [2006] EWCA Civ 1618 per Jacob LJ at Para.15.

116. It is not necessary or useful for the declarations sought by Diageo to be granted. SAP has not formulated or advanced any allegation of infringement against Diageo. As a result, the court has heard no evidence or submissions on any substantive issue going to infringement. There is no current threat on the part of SAP to commence a claim for infringement, which might justify the relief sought. Any such claim regarding use or access by users of Gen2 or Connect to mySAP ERP could and should have been brought by SAP in these proceedings. Therefore, it is likely that any subsequent claim would amount to an abuse of process. No useful purpose would be served by the declarations sought by Diageo. Therefore, the court declines to grant such relief.

117. The court will consider the question of any publicity order following further submissions from the parties.

**BAILII:** [Copyright Policy](...) | [Disclaimers](...) | [Privacy Policy](...) | [Feedback](...) | [Donate to BAILII](...)
URL: *http://www.bailii.org/ew/cases/EWHC/TCC/2017/189.html*