# EXHIBIT 538

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN
_____

AUTHENTICOM, INC.,

        Plaintiff,

 -vs-                           Case No.  17-CV-318-JDP

CDK GLOBAL, LLC and             Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,   June 27, 2017
                                  8:04 a.m.

        Defendants.
_____

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF EVIDENTIARY HEARING
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Godfrey & Kahn S.C.
       BY: JENNIFER L. GREGOR
       One East Main Street, Suite 500
       Madison, Wisconsin 53701

       Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
       BY: MICHAEL N. NEMELKA
           AARON M. PANNER
           DAVID L. SCHWARZ
           DEREK T. HO
           JOANNA T. ZHANG
           JOSHUA HAFENBRACK
           KEVIN J. MILLER
       1615 M Street, N.W.
       Suite 400
       Washington, D.C.  20036

        Jennifer L. Dobbratz, RMR, CRR, CRC
       U.S. District Court Federal Reporter
         United States District Court
       120 North Henry Street, Rm. 410
        Madison, Wisconsin  53703
           (608) 261-5709

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 3 of 185 PageID #:73198
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 2 of 184

2-A-2

APPEARANCES CONTINUED:

Also appearing:    STEPHEN COTTRELL, Authenticom
                   STEVE ROBB, IT Support

For the Defendant CDK Global, LLC:

                   Foley & Lardner
                   BY:   JEFFREY A. SIMMONS
                   150 East Gilman Street
                   Madison, Wisconsin  53701

                   Mayer Brown LLP
                   BY:   BRITT M. MILLER
                         MATTHEW D. PROVANCE
                   71 South Wacker Drive
                   Chicago, Illinois  60606

                   Mayer Brown LLP
                   BY:   MARK W. RYAN
                   1999 K Street, N.W.
                   Washington, D.C.  20006

Also appearing:    LEE BRUNZ, General Counsel, CDK Global, LLC
                   NICK HEY, IT Support

For the Defendant The Reynolds and Reynolds Company:

                   Perkins Coie LLP
                   BY:   CHARLES G. CURTIS, JR.
                   1 East Main Street, Suite 201
                   Madison, Wisconsin  53703

                   Sheppard Mullin Richter & Hampton, LLP
                   BY:   MICHAEL P. A. COHEN
                   2099 Pennsylvania Avenue, N.W.
                   Suite 100
                   Washington, D.C.  20006

                   Gibbs & Bruns LLP
                   BY:   AUNDREA K. GULLEY
                         BRIAN T. ROSS
                         BRICE A. WILKINSON
                   1100 Louisiana Street, Suite 5300
                   Houston, Texas  77002

Also appearing:    ROBERT SCHAEFER and KELLY HALL,
                   The Reynolds and Reynolds Company

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 4 of 185 PageID #:73199
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 3 of 184

2-A-3

### INDEX OF WITNESSES

| PLAINTIFF'S WITNESSES | EXAMINATION | PAGE |
|---|---|---|
| WAYNE FITKIN | Direct Examination by Ms. Gregor | 5 |
| | Cross-Examination by Mr. Ryan | 19 |
| | Cross-Examination by Mr. Ross | 23 |
| ALAN ANDREU | Direct Examination by Mr. Miller | 27 |
| | Cross-Examination by Mr. Ryan | 46 |
| | Cross-Examination by Mr. Ross | 52 |
| MATTHEW RODEGHERO | Direct Examination by Mr. Miller | 55 |
| | Cross-Examination by Mr. Ross | 69 |
| HAL SINGER | Direct Examination by Mr. Panner | 76 |
| | Cross-Examination by Mr. Cohen | 109 |
| GORDON KLEIN | Direct Examination by Mr. Ho | 134 |
| | Cross-Examination by Mr. Curtis | 151 |
| | Cross-Examination by Mr. Simmons | 170 |
| | Redirect Examination by Mr. Ho | 171 |

### INDEX OF EXHIBITS

| PLAINTIFF'S EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 60 | Email - W. Fitkin, 11/29/16 | 19 | 26 |
| 119 | Reliance Worksheet | 155 | |
| 152 | CDK Interface | 10 | 11 |

| DEFENDANTS' EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 1 | Data Exchange Agreement | 98 | 98 |
| 175 | Email - T. Petruzzelli | 72 | |
| 176 | Email - J. Bennick | 70 | |

\*\*\*

20        (Proceedings called to order at 8:04 a.m.)

21            THE CLERK:  Case No. 17-CV-318-JDP, *Authenticom,*

22    *Incorporated v. CDK Global, et al.*  Court is called for second

23    day of evidentiary hearing.  May we have the appearances,

24    please.

25            THE COURT:  Good morning.  Let's do appearances.  It's

1    useful to have on the record who is here.

2          MS. GREGOR:  Good morning.  Jennifer Gregor, Godfrey &

3    Kahn, for the plaintiffs.  Seated on my left, Kevin Miller from

4    Kellogg Hansen.  On the right, Mike Nemelka, Derek Ho.  Behind

5    me, Steve Cottrell of Authenticom, Aaron Panner, and David

6    Schwarz.

7          THE COURT:  Very good.  Thank you.  And for the

8    defense?

9          MS. GULLEY:  Good morning, Your Honor.  This is Andi

10    Gulley, Gibbs & Bruns, for Reynolds and Reynolds Company.  I'm

11    here with Mr. Bob Schaefer and Mr. Kelly Hall from the company

12    with my colleague Brian Ross.  I think I see Michael Cohen --

13    there he is -- and Chuck Curtis will make an appearance in a

14    little bit.

15          THE COURT:  All right.  Very good.  Thank you.

16          MR. RYAN:  Good morning, Your Honor.  Mark Ryan for CDK

17    with Britt Miller and Jeff Simmons.

18          THE COURT:  Very good.  Good morning to all of you.

19    All right.  So I believe we're ready to take the next witness

20    for plaintiffs.  Is that where we're at?

21          MS. GREGOR:  Yes.

22          THE COURT:  Let me tell you, I tried last night to

23    review the declarations of the experts so that I would have at

24    least a basic familiarity with their positions just to

25    facilitate your presentation of the evidence, so I can't claim

1    to have exhaustively mastered every subtlety, but at least I

2    tried to get a perspective so that we can go fairly quickly, and

3    I think everybody picked up on the idea that as for

4    qualifications, you can just give me the elevator pitch

5    highlighting the most salient qualifications that are pertinent

6    to this matter.  So with that, plaintiff should call its next

7    witness.

8         MS. GREGOR:  Thank you.  Plaintiffs call Wayne Fitkin.

9              **WAYNE FITKIN, PLAINTIFF'S WITNESS, SWORN,**

10                  <u>DIRECT EXAMINATION</u>

11   BY MS. GREGOR:

12   Q    Good morning.  Can you please state your name for the

13   record.

14   A    Wayne Fitkin.

15   Q    Where do you live?

16   A    Yorba Linda, California.

17   Q    Can you give us an overview of your experience in the

18   automotive IT industry?

19   A    I've been working in the automotive IT industry for the

20   past 29 years.

21   Q    Where do you currently work?

22   A    I currently work at Walter's Automotive Group in Riverside,

23   California, and Ontario, California.

24   Q    Have you worked in any other dealerships?

25   A    Yeah.  Prior to February of last year, I worked 28 years

─────WAYNE FITKIN - DIRECT─────

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 7 of 185 PageID #:73202
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 6 of 184

2-A-6

```
 1    for the Fletcher Jones Automotive Group managing 20 dealerships

 2    from Honolulu to Chicago.

 3    Q    What is your role currently?

 4    A    IT director.

 5    Q    Are you familiar with DMS software integrators and vendors

 6    then?

 7    A    Very much so, intimately.

 8    Q    And which DMS provider has supplied the dealerships that

 9    you've worked for?

10    A    Currently it's CDK.

11    Q    Have you used Authenticom's DealerVault product?

12    A    I have.

13    Q    And are you satisfied with DealerVault?

14    A    I think it's an incredibly exceptional product when it was

15    first offered to me when I worked for Fletcher.  I signed all 20

16    of our franchises up for it.  It's the best thing I have ever

17    seen because for once I had a single pane of glass to see every

18    third-party vendor that was receiving data.  I could turn them

19    on and off at will.  I could add new feeds.  I could see the

20    fields that they were getting.  It was complete control, and at,

21    you know, $35 a rooftop, it was an incredible deal.  In fact, I

22    was never charged once by a third-party vendor for the fees for

23    the service.  They were so nominal that it was just considered a

24    cost of doing business for them.

25            THE COURT:  How many dealers are in the Walter's
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 8 of 185 PageID #:73203
Case: 3:18-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 7 of 184

2-A-7

```
 1    Automotive Group?

 2              THE WITNESS:  Currently four.

 3              THE COURT:  Four?  Okay.  Okay.  Very good.

 4    BY MS. GREGOR:

 5    Q    How many dealers were at the Fletcher Jones -- in the

 6    Fletcher Jones --

 7    A    20.

 8    Q    How does DealerVault compare to CDK's product for

 9    integration?

10    A    Well, I've not seen a product that does any of those things

11    that I've mentioned that CDK offers.  There is a place where you

12    can go look where they're telling you how many bad guys are

13    connecting to your computer systems and how many processes that

14    are running on the system that shouldn't be there, but I have

15    yet to even find a place to turn the 3PA feed off.

16    Q    Did you hear testimony -- did you attend most of the

17    proceedings yesterday?

18    A    The whole day I was here.

19    Q    Did you hear testimony about user IDs and passwords?

20    A    I did.

21    Q    Can you explain how you create a user ID for Authenticom in

22    your role as the IT director for the dealership?

23    A    Well, I heard a lot about them asking people, "Did you give

24    your user ID out?"  I would never give my user ID out.  My user

25    ID has access to 100% of every single function that there is on
```

───── WAYNE FITKIN - DIRECT ─────

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 9 of 185 PageID #:73204
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 9 of 184

2-A-8

1     the system.  What I have done for Authenticom is create a user

2     ID just for Authenticom that has access to a single function,

3     ENG, which is basically -- it's an English statement processor

4     where you type your query in a language they don't call SQL.

5     They call it English.  You type an English statement, and the

6     results of your question is spilled to the screen that they then

7     scrape.

8              THE COURT:  What is English?  You mean like --

9              THE WITNESS:  English is CDK or ADP's flavor or name

10    for SQL, Structured Query.

11             THE COURT:  Okay.  So you still have to know how to

12    write a SQL query.

13             THE WITNESS:  Right.  It's close, you know, like list,

14    and then you say the file name you want to list the data from,

15    and then you put your parameters.  Maybe you only want a day's

16    worth of data.  You don't want to spill all the data.  You just

17    want updates and then the fields you want, and that's how

18    they're written.

19             THE COURT:  Okay.  So there's a common-sense dimension

20    to it, but you can't -- you need some training on how to present

21    what they call an English query.

22             THE WITNESS:  Right.  And I've been to their system

23    administrator classes in Clackamas, Oregon.

24             THE COURT:  So it's not like just doing a Google

25    search that you --

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 10 of 185 PageID #:73205
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/03/19 Page 9 of 184

2-A-9

```
1              THE WITNESS:  No, no, no, no.  It's a flavor originally
2      designed for a fossil of an operating system called Pick that is
3      still running on their systems today.
4              THE COURT:  Okay.
5              THE WITNESS:  And that's the query language.
6              THE COURT:  Okay.  I get it.
7              THE WITNESS:  It's called English.
8              THE COURT:  I got it.
9      BY MS. GREGOR:
10     Q    How does the level of access that Authenticom has compare
11     to your access as the IT administrator for the dealership?
12     A    I have the keys to the kingdom.  There's not a feature that
13     I can't run, full access to every single thing on every single
14     account.  Authenticom has access to limited accounts and to a
15     single function, ENG, for the purpose of retrieving the data
16     that I need them to retrieve so that they can -- I like to call
17     it feeding the children.  All the third-party vendors that need
18     the data, I call that feeding the children.  So they gather the
19     data, normalize the data, check the addresses against the NCOA
20     database, and then send the feeds to a couple dozen third-party
21     vendors that I use.
22     Q    Did you hear testimony yesterday about manual reporting?
23     A    I did hear that.  I heard that quite a bit, and I have to
24     say I understand that CDK and Reynolds offer a way for me to do
25     that manually.  Here is the thing about manual:  Manual doesn't
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 11 of 185 PageID #:73206
Case: 3:17-cv-00018-jdp Document #: 165 Filed: 07/05/17 Page 10 of 184

2-A-10

```
 1    work.  Take the case of the open recall vendor that was here
 2    yesterday.  It's 50 stores.  He's got to find 50 people, one in
 3    each store, to manually run a report, grab the data, and then
 4    transmit it to Authenticom.  These people can't have a day off.
 5    They can't make a mistake, can't have a vacation.  It doesn't
 6    work unless you can automate the process.  You have to be able
 7    to automate the process.
 8         In the example of -- I'll give you an example.  If I want
 9    to get every repair order created every single day and I want
10    the data of all the repair orders that were opened on that day,
11    I have to get that data after the service department closes so
12    they're not creating any more repair orders but before the job
13    stack runs and rolls all the closed ones into the history file.
14    That has to be done between 8:00 and 10:00.  You're not going to
15    have an employee there between 8:00 and 10:00 to do that
16    manually every single day, so manual has no value.  If you're
17    going to do data extractions, it has to be automated.  The
18    minute that CDK takes away the ability to automate these data
19    extractions, they've taken away a valuable tool that I've had
20    for almost 30 years.
21    Q    Can we have Plaintiff's Exhibit 152 on the screen, please?
22    While we're pulling it up, Mr. Fitkin, did you submit a couple
23    of declarations in this proceeding?
24    A    I did.
25    Q    And when was the last time you reviewed those?
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 12 of 185 PageID #:73207
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/17 Page 12 of 184

2-A-11

```
 1      A    Repeat the question.

 2      Q    When was the last time you read your declarations?

 3      A    Yesterday.

 4      Q    Do you stand by that testimony today?

 5      A    I do.

 6      Q    So on the screen you should have Plaintiff's Hearing

 7   Exhibit 52.

 8           THE COURT:  152, I think.

 9           MS. GREGOR:  Sorry.

10           THE COURT:  Is this one in?

11           MS. GREGOR:  No, not yet.

12   BY MS. GREGOR:

13      Q    Mr. Fitkin, can you explain what's showing on your screen?

14      A    This is the interface provided by CDK to add, remove, or

15   alter or disable user IDs on the system.

16           THE COURT:  Okay.  Is there any objection to this

17   exhibit?

18           MR. RYAN:  No, Your Honor.

19           THE COURT:  Okay.  Good.  This one is in.  All right.

20   Very good.

21   BY MS. GREGOR:

22      Q    You took this screen shot?

23      A    I did.

24      Q    Why did you take a screen shot of this?

25      A    I took this screen shot because five days after you guys
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 13 of 185 PageID #:73208
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/13 Page 12 of 184

2-A-12

```
 1    entered your preliminary injunction or --

 2              THE COURT:  After they asked -- after they filed --

 3              THE WITNESS:  Right.  CDK in retaliation five days

 4    later, at least I didn't notice it for five days, destroyed any

 5    user ID on my system that I created to where I could no longer

 6    enable them.  I had been enabling them using the tools that CDK

 7    provided for me as they would automatically disable them every

 8    single hour on the hour the ones that I wanted to stay enabled.

 9    I wrote a script using the tools CDK provided me to re-enable

10    them automatically so that the vendors I needed to get my data

11    to would still get them.

12    BY MS. GREGOR:

13    Q    Which user ID was affected?

14    A    This is dvault1, which is the one that was created for

15    Authenticom.

16    Q    It looks like there's a message on the screen in a black

17    box.  Can you see that and read that for the Court?

18    A    It says, "User ID has been used in a manner that violates

19    the terms of your CDK Master Services Agreement and cannot be

20    enabled or copied."

21    Q    Do you think that working with DealerVault violates the

22    dealership contract with CDK?

23    A    I do not.  In fact, this has been going on for more than 25

24    years that I know of, and I've worked with all three of the

25    original integrators, Authenticom, DMI, and IntegraLink,
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 14 of 185 PageID #:73209
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 13 of 184

2-A-13

1    providing them user IDs and passwords for more than 25 years to

2    extract data on my behalf to send to our manufacturers and

3    third-party vendors that I've entered into business arrangements

4    with to help my customer experience, for example, sending a

5    thank-you letter for coming in for service or for buying a car,

6    for anything like that.  So when they disable these IDs, they

7    affect my customer experience, lower my CSI score, and cause all

8    kinds of disruptions.

9            THE COURT:  What's the CSI score?

10           THE WITNESS:  It's something that is so valuable in the

11   automotive industry.  There's a company that does surveys to

12   grade you on how well you've treated the customer, and the

13   manufacturers live and breathe on them in grading their

14   dealerships so -- there's even money involved.  If your score

15   would go too low, it could cost you, I'm not exaggerating,

16   millions in incentive money.  So you have to keep the score up

17   there, so it's imperative that we keep these feeds going.

18           THE COURT:  And the incentive money comes from the

19   carmakers?

20           THE WITNESS:  Yes, from the carmakers.

21   BY MS. GREGOR:

22   Q    And is CSI the Customer Satisfaction Index?

23   A    It is.  It's been going on for a long time that they've

24   been surveying the customers after a purchase or a service

25   experience.

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 15 of 185 PageID #:73210
Case: 3:17-cv-00513-jdp Document #: 165 Filed: 07/05/19 Page 14 of 184

2-A-14

```
 1     Q    How about from a cost perspective?  How has CDK's blocking
 2     affected Walter's Automotive Group?
 3     A    Well, I'll give you an example.  At the beginning of the
 4     year, we were looking at a service appointment software program,
 5     and we chose not to go with it -- the company was XTime --
 6     because of the huge data access fees that were added on because
 7     we were a CDK store, those additional charges.  Now, I had
 8     mentioned that I understand that Authenticom charges $35 a month
 9     for a fee.  Since then and now, the manufacturers have insisted
10     that we go with a program that has an online ability to create a
11     service appointment, so we had to go with XTime.  We were forced
12     into it by Porsche and by Audi, and because of that we had to
13     sign a contract with XTime.  Just one rooftop, over $400 in data
14     access fees imposed by CDK on XTime passed directly back to me
15     for one rooftop for something that used to cost $35.  That's why
16     the dealerships are up in arms.  They're being not only charged
17     for a system to run their business, tens of thousands of dollars
18     a month, but are now faced with thousands upon thousands of
19     dollars in data access charges imposed by CDK to get their own
20     data to do business.
21     Q    Is it important to you, somebody who works for dealerships,
22     to have choice in the vendors and integrators that you work
23     with?
24     A    It is because without competition, they're going to get
25     away with charging that kind of money, and with competition it
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 16 of 185 PageID #:73211
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/18 Page 16 of 184

2-A-15

1    would have to fairly charge for the service.  Now, I understand

2    the desire to guard the gate and guard the data.  I do get it.

3    It does make sense, but I trust Authenticom a hundred percent.

4         CDK and Reynolds -- Reynolds has always been like this -- I

5    know that from past -- but CDK had never treated the customers

6    in this manner.  This is new as of recent, and I'm very

7    surprised by it.  I'm not surprised by Brockman treating his

8    customers that way because he always has.  He's always treated

9    the data like it was his data.  I converted three UCS stores in

10   Las Vegas to CDK without a drop of data coming over because I

11   couldn't get it out.  That was the most --

12              THE COURT:  What are UCS stores?

13              THE WITNESS:  In Las Vegas it was Mercedes-Benz of

14   Henderson, Fletcher Jones Imports on Sahara, and Fletcher Jones

15   Toyota on Sahara.

16              THE COURT:  So USC was the dealer group?

17              THE WITNESS:  USC was owned by Bob Brockman.  Reynolds

18   was its own company, which was a great company.  I had seven

19   stores on Reynolds that we bought in an acquisition that I later

20   converted to CDK so all the stores were on one.  We got all the

21   data.  They were a great company, Reynolds and Reynolds, until

22   the day Brockman bought them and selectively kicked off the

23   customers they didn't want anymore that they didn't see value in

24   and kept the ones that they wanted and imposed all these rules

25   that treated the data like it was their data.  They've always

────── WAYNE FITKIN - DIRECT ──────

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 17 of 185 PageID #:73212
Case: 3:07-cv-00818-jdp Document #: 165 Filed: 07/05/17 Page 16 of 184

2-A-16

1    been a company that did not allow you to get at your data.

2         MS. GREGOR:  We pass the witness.  No further

3    questions.

4         THE COURT:  Let me ask you one question before we go

5    over for your cross-examination.  Why wouldn't you make the

6    choice, if you're unhappy with CDK because they are grabby about

7    the data like Reynolds was, why wouldn't you go to a DMS

8    provider that had a more open attitude and allowed --

9         THE WITNESS:  Real story?

10        THE COURT:  Yeah.

11        THE WITNESS:  If you want to run a car dealership in

12   today's world, there's really only two viable choices, Reynolds

13   and Reynolds and CDK.  Until somebody really builds something

14   that will do it, those are your only choices.

15        THE COURT:  There's testimony that 28% of the market is

16   non-Reynolds/CDK.

17        THE WITNESS:  I understand that.

18        THE COURT:  So more than a quarter of dealers are using

19   somebody else.

20        THE WITNESS:  I understand that but --

21        THE COURT:  So what's wrong with those people?

22        THE WITNESS:  There's a lot of bad press where people

23   that have gone to that -- other companies, a lot of them come

24   back to either CDK or Reynolds because CDK and Reynolds has been

25   doing this for 30, 40 years, and these companies are trying to

————WAYNE FITKIN - DIRECT————

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 18 of 185 PageID #:73213
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/18 Page 17 of 184

2-A-17

1      do something that is so monumental.

2              THE COURT:  You're talking about the --

3              THE WITNESS:  To build something that would run a car

4      dealership is a monumental task.  There's so many moving parts.

5      You have your parts inventory, you have your manufacturers, you

6      have your data -- there is -- it is so complex that people have

7      gone to the 28%, it's not really worked out for them, and a lot

8      of them come back.  CDK and Reynolds can attest to that.  In

9      fact, I think they put something up on the board about how many

10     of them come back.  It's not viable.  There's not really a

11     viable choice to truly handle the accounting, the entire service

12     department, the entire parts department, and sales.  In the case

13     of CDK, their offering for sales is so poor that we use another

14     DMS just for sales called Advent Resources.  They've never been

15     able to bring something to fulfill that need to my past employer

16     or my current employer, both on Advent, because the product is

17     so poor.

18             THE COURT:  That's CDK you're talking about.

19             THE WITNESS:  Yeah.  I went to all 20 of the Fletcher

20     dealerships and put them on CDK's front end and went back to all

21     20 of them, put them back on Advent because the people in the

22     sales department screamed how bad it was.

23             THE COURT:  And so with the 28%, the minority of the

24     market that's non-Reynolds/non-CDK, they're even worse is what

25     you're saying.

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 19 of 185 PageID #:73214
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/19 Page 19 of 184

2-A-18

```
1              THE WITNESS:  Yes.  They do not have a product that
2    will successfully run a car dealership, in my opinion.  It's
3    either CDK or Reynolds are your only choices.  They own the
4    market.
5              THE COURT:  Now, one last clarification before I turn
6    you over for cross-examination.  I may misuse terms here.  So I
7    asked you with Walter's Automotive Group how many dealerships it
8    had, and you said there were four.
9              THE WITNESS:  Correct.
10             THE COURT:  How many stores?  And when people say
11   "rooftops," does that mean like one location so you've got --
12   explain that to me.
13             THE WITNESS:  I'll give you an example.  On Adams
14   Street we had one rooftop, so it's one account, one contract,
15   but there was a Porsche and an Audi dealership under the
16   rooftop.
17             THE COURT:  Okay.
18             THE WITNESS:  Now that rooftop has moved on to Indiana,
19   the Porsche dealership in a brand new store, so they're not
20   under one rooftop, but they still have one CMF, which is, you
21   know, an account.  So rooftop generally means one franchise, but
22   it could mean more.
23             THE COURT:  Okay.
24             THE WITNESS:  You could have four franchises under a
25   rooftop.
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 20 of 185 PageID #:73215
Case: 3:07-cv-00618-jdp Document #: 165 Filed: 07/05/12 Page 19 of 184

2-A-19

```
 1              THE COURT:  All right.  That clarifies.

 2              THE WITNESS:  It actually means a logon, like a common

 3      service logon, a common parts logon.

 4              THE COURT:  Okay.  And when you said Walter's

 5      Automotive Group had four dealerships, what does that mean?  How

 6      many rooftops?  How many brands?

 7              THE WITNESS:  It's currently four.  It's a

 8      Mercedes-Benz dealership on Adams, an Audi dealership across the

 9      street on Adams, a Porsche dealership around the corner on

10      Indiana, and then in a city 30 miles away is a brand new Audi

11      dealership that we opened January of this year.

12              THE COURT:  All right.  Good.  Thanks for clarifying

13      that.  Very helpful.  Okay.  Cross-examination.

14                          CROSS-EXAMINATION

15      BY MR. RYAN:

16      Q    Good morning.

17      A    Good morning.

18      Q    Good morning, Mr. Fitkin.  Could we have Plaintiff's

19      Exhibit 60 up on the screen, please?  And the next page, please.

20      The next page.  Go back one.

21              Can you read that or would you like a hard copy,

22      Mr. Fitkin?

23      A    I can see it.

24      Q    Okay.  And is the top of Plaintiff's Exhibit 60, is that an

25      email?
```

WAYNE FITKIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 21 of 185 PageID #:73216
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/21 Page 20 of 184

2-A-20

```
 1      A    It is.

 2      Q    From -- and it's from you to some people at -- to where?

 3      A    Some people at CDK.

 4      Q    Okay.  And it's dated November 29th, 2016?

 5      A    Correct.

 6      Q    That's before this litigation started, right?

 7      A    Correct.

 8      Q    And it's before you submitted your declarations in the

 9      case.

10      A    It is.

11      Q    Okay.  And in your email you're complaining about CDK

12      blocking user profiles and -- correct?

13      A    I'm complaining about stripping the value from "Enabled On"

14      from the user ID so that they no longer work to where I had to

15      go back in and put the C number back in the "Enabled On" field

16      so that my third-party vendor could access the data again.

17      Q    And then you go on to say, "Currently you are even

18      disabling my profile," correct?

19      A    Right.  I had one that had my name, first and last name,

20      and CDK disabled my own user ID.

21      Q    So I just want to go to your point about retaliation.  Even

22      before you filed any declarations in this case, you were in a,

23      I'll use the word, a "battle" with CDK because they were

24      disabling --

25      A    Yeah, but it wasn't every hour on the hour.  That's what it
```

WAYNE FITKIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 22 of 185 PageID #:73217
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 22 of 184

2-A-21

```
 1    turned into.  This was on occasion.

 2    Q    Now --

 3    A    It got worse and worse over time.

 4    Q    You say to CDK in your email, "This underhanded attempt to

 5    monetize the data owned by Walter's Automotive Group at our

 6    expense will only cost you market share."  Do you see that?

 7    A    I do see that.  I did say that.

 8    Q    And by "market share" you meant share of the DMS market,

 9    correct?

10    A    Right.

11    Q    So you're saying here, "If you keep this up, we're going

12    somewhere else."

13    A    I'm saying, "If you keep this up, eventually something will

14    present itself that's viable, and then we will go somewhere

15    else."

16    Q    Right.  And in the next sentence you say, "I have heard

17    that the McKenna Group is leaving CDK and going to a full Advent

18    solution in January," right?  You have to say yes or no.

19    A    Yes.

20    Q    Thank you.

21    A    Sorry.

22    Q    No, no, no.  No problem.  And McKenna Group was a car

23    dealer?

24    A    They are.

25    Q    And so they were leaving CDK and going to the competition,
```

WAYNE FITKIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 23 of 185 PageID #:73218
Case: 3:17-cv-00518-jdp Document #: 165 Filed: 07/05/17 Page 22 of 184

2-A-22

```
1    right?

2    A     They were.  Kind of leading edge though, I mean Advent

3    running a whole dealership.  That's me saying I'm going to take

4    a wait and see how that goes.  Now, my son works there so --

5           THE COURT:  Let's just focus on the questions from

6    counsel on this one.

7           THE WITNESS:  Okay.

8    BY MR. RYAN:

9    Q     You say in your declaration that you wrote a script that

10   launched every five minutes to re-enable user IDs that were

11   disabled by CDK; is that right?

12   A     I did say that.  I used the tools provided by CDK to put

13   the C number back in the field of the user IDs that they were

14   disabling with their script every hour on the hour.

15   Q     And this was, in part, to allow Authenticom to continue to

16   have access to the system?

17   A     Correct.

18   Q     And did you -- well, you're a pretty experienced IT guy.

19   That's why you were able to write the script, right?

20   A     That's pretty basic script.

21   Q     Okay.  And did you share this script with anyone?  Did you

22   share it with Authenticom or anyone else?

23   A     I shared that I did that to keep their ID enabled.

24   Q     Did you give it to any other dealers, the script?

25   A     No.
```

WAYNE FITKIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 24 of 185 PageID #:73219
Case: 3:17-cv-00518-jdp Document #: 165 Filed: 07/05/17 Page 23 of 184

2-A-23

```
 1      Q    Okay.  And I think you said at the outset of your testimony
 2      that you have the keys to the kingdom?
 3      A    I have access to everything being the IT director.
 4      Q    Right.
 5      A    I have the SA logon as no restrictions whatsoever.
 6      Q    And there's sensitive information that you do not allow
 7      Authenticom access to, correct?
 8      A    I only allow them the access that is required to pull the
 9      data that I need them to pull.
10           MR. RYAN:  Thank you.
11           THE COURT:  Cross-examination for Reynolds.
12           MR. ROSS:  Just a few questions, Your Honor.
13                        CROSS-EXAMINATION
14      BY MR. ROSS:
15      Q    Mr. Fitkin, my name is Brian Ross.  I'm here for Reynolds.
16      You said earlier that you would never give your username and
17      password out.
18      A    No.
19      Q    Do you recall that testimony?
20      A    Right.
21      Q    And why would you not ever give your password out?
22      A    Because I have too much access.
23      Q    Okay.
24      A    I wouldn't give out any of my employees' usernames and
25      passwords.
```

WAYNE FITKIN - CROSS

1    Q    That would be a dangerous practice, right?

2    A    Well, it's more access than Authenticom would need to pull

3    the data.  That's why they get their own, and it's created with

4    limited access to do the single function that they need to do.

5    Q    And you only have knowledge of what usernames your own

6    dealerships give out, correct?

7    A    Correct.

8    Q    Okay.  I'm just going to bounce around to a couple

9    different topics to move through this quickly.  You mentioned

10   that you feel that there's only two viable DMS options in the

11   market, CDK and Reynolds?

12   A    It's my opinion.

13   Q    Are you familiar with DealerTrack?

14   A    I am.

15   Q    And DealerTrack is owned by Cox Automotive --

16   A    I am familiar with DealerTrack, and we have looked at them,

17   and the consensus is that they're really not ready.

18   Q    Okay.  They just don't work well enough, right?

19   A    Well, they're probably the strongest one of the 28%.  If

20   you were going to leave CDK or Reynolds, that probably would be

21   your best choice.

22   Q    But not good enough at this point?

23   A    Not good enough at this point.

24   Q    Okay.  Last question --

25   A    But that's my opinion.

WAYNE FITKIN - CROSS

1    Q    Fair enough.

2    A    Based on what I hear in the industry.

3    Q    Okay.  You said earlier that manual reporting access does

4    not work.

5    A    Does not work.  It's not reliable.

6    Q    Have you ever used or tried or seen Reynolds' Dynamic

7    Reporting function?

8    A    You have to understand that I haven't been on a Reynolds

9    store in ten years.  I'm guessing the years, but I had two

10   franchises in northern California, four franchises in Chicago

11   that I converted before Bob Brockman bought Reynolds.

12   Q    Were you aware that Mr. Brockman's company merged with

13   Reynolds in 2006, if that helps?

14   A    Bob Brockman bought it.  To quote him, "Why did I do that?

15   Because I could."

16   Q    Okay.  Well, I'm not going to debate with you about that.

17   A    I was there in LA when he called us all to meet with him

18   and announce it.

19   Q    Okay.

20   A    Compared himself to Bill Gates.  In fact, the president of

21   Fletcher Jones said, "I've heard enough of this" -- four letter

22   word -- stood up and walked out of the room.

23   Q    Did you recall my question, sir?

24   A    I'm sorry.  I just thought --

25              THE COURT:  Have you used the Dynamic Reporting?

WAYNE FITKIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 27 of 185 PageID #:73222
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 26 of 84

2-A-26

```
 1              THE WITNESS:  I have not seen it with my own eyes.

 2              THE COURT:  I think the answer is no.

 3              THE WITNESS:  I understand it's --

 4              THE COURT:  The answer was highly informative but not

 5     really --

 6     BY MR. ROSS:

 7     Q    Since you haven't been on a Reynolds system in at least ten

 8     years, you have no familiarity with any functions, manual or

 9     otherwise, that have been released by Reynolds anytime in the

10     last ten years if not longer, right?

11     A    That's right.

12              MR. ROSS:  No further questions, Your Honor.

13              THE COURT:  Any redirect?

14              MS. GREGOR:  No.

15              THE COURT:  All right.  Thank you.

16              MR. RYAN:  Your Honor, I'd like to offer Plaintiff's

17     Exhibit 60.

18              THE COURT:  Any objection?

19              MS. GREGOR:  No objection.

20              THE COURT:  60 is in.  Thank you.

21          Thank you very much, Mr. Fitkin.

22              THE WITNESS:  Am I done?

23              THE COURT:  You are.

24              THE WITNESS:  All right.

25          (Witness excused at 8:39 a.m.)
```

WAYNE FITKIN - CROSS

```
 1              THE COURT:  All right.  Next witness.

 2              MR. MILLER:  Your Honor, the plaintiff calls Alan

 3    Andreu.

 4              ALAN ANDREU, PLAINTIFF'S WITNESS, SWORN,

 5                        DIRECT EXAMINATION

 6    BY MR. MILLER:

 7    Q    Good morning, Mr. Andreu.  Could you state your name for

 8    the record.

 9    A    Good morning.  Alan Andreu.

10    Q    Who is your employer?

11    A    Dominion Dealer Solutions.

12    Q    How long have you worked at Dominion?

13    A    I began working for them in 2011 when they purchased the

14    company that I had founded.

15    Q    What's your position at Dominion?

16    A    I'm considered a product general manager of equity.

17    Q    What types of products do you manage?

18    A    So directly I manage our equity product, the one I founded,

19    but as it relates to DMSs and data extraction, I'm the go-to guy

20    for all of our products, which would include Sales Center, our

21    CRM; Dealer Specialties, our inventory product.  We also have a

22    web product, Reputation Management, dealer marketing product.

23    Q    Taking Sales Center as an example, can you describe what

24    generally it does for a dealership?

25    A    Sure.  We talked about that a little bit yesterday, but, in
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 29 of 185 PageID #:73224
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 29 of 184

2-A-28

```
 1    short, it manages the relationship between customers, so it's
 2    the one that sends letters, manages follow-up, schedules
 3    incoming customers, pretty much the whole relationship between
 4    the dealership and the customer.
 5    Q    What kinds of data does Sales Center need from the
 6    dealership?
 7    A    So we talked a lot about data sets yesterday.  Sales Center
 8    utilizes the sales data which comes in current and historic
 9    service data, current and historic open ROs, service
10    appointments.
11    Q    Does Dominion generally use an integrator to obtain dealer
12    data from the DMS?
13    A    Yes, they do.
14    Q    Does Dominion itself offer a data integration service?
15    A    Actually we do.  It's called SelectQu.
16    Q    Prior to the last four or five years, which data
17    integrators has Dominion typically used?
18    A    So we have several products, and we're not -- we don't
19    require product owners to use the same one, so some of the
20    product owners would use Authenticom, and some of the product
21    owners would use SelectQu.
22    Q    As an application vendor, were you satisfied with the
23    services offered by Authenticom and SelectQu?
24    A    Absolutely.
25    Q    Does Dominion care about whether the data integrators it
```

ALAN ANDREU - DIRECT

```
 1    uses offer a secure service?
 2    A    Oh, absolutely.  It's brutally important to us.  We know
 3    it's important to the dealer.  It's important to our reputation.
 4    Q    To the best of your knowledge, did either Authenticom or
 5    SelectQu ever suffer a security data breach?
 6    A    Not to my knowledge.
 7    Q    Are you aware of any dealer ever expressing concern over
 8    the data security offered by either Authenticom or SelectQu?
 9    A    No.
10    Q    Which DMS providers are most commonly used by your dealer
11    customers?
12    A    Overwhelmingly it's Reynolds and Reynolds and CDK.  I would
13    say our customer base is roughly that 70%/30% split.
14    Q    Did there come a time when Dominion stopped using
15    Authenticom or SelectQu for dealers using the Reynolds DMS?
16    A    Yes.  We had a few products under our Autobase umbrella
17    that were forced to go to RCI back in 2011.
18    Q    Why?
19    A    They were the products that, because of what was then the
20    beginning of the blocking that we've heard so much about, really
21    couldn't survive without closer to realtime -- it didn't need to
22    be exactly realtime, but they couldn't live on daily feeds, and
23    they needed to write back.  We had our CRM product, Autobase,
24    the one you asked about earlier, and we also had a Service
25    Scheduler product that would have competed in the space with
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 31 of 185 PageID #:73226
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 30 of 184

2-A-30

 1   XTime mentioned in the testimony before me.

 2   Q    Did the blocking you testified about lead Dominion to

 3   change its data integration provider for certain applications?

 4   A    For those two we had to go to RCI.  The others we left with

 5   either Authenticom or SelectQu.

 6   Q    And if you already testified about this, I apologize.

 7   About what time frame was this?

 8   A    It was in 2011 that we actually signed.

 9   Q    In 2011 about how much was Dominion paying to Authenticom

10   on a per-dealer/per-rooftop basis for the Sales Center data?

11   A    So Authenticom wasn't the primary source for Sales Center,

12   but they did use them.  Authenticom at the time charged us $45

13   for the first 500 dealers and then $22.50 for everything over,

14   so the volume we were at then, the average would have been

15   around $35, maybe a little less than $35.

16   Q    During that same time period, about how much did Dominion

17   pay to SelectQu on a per-dealer/per-rooftop basis?

18   A    That was $30 flat.

19   Q    And how much did Reynolds charge Dominion for Sales

20   Center's integration on a per-dealer basis when Sales Center

21   first started using RCI?

22   A    When they first started using RCI, the charge was -- well,

23   they offered three data packages, but the data package most

24   often used, almost always used, was $247 compared to the $30 we

25   were paying SelectQu.

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 32 of 185 PageID #:73227
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 32 of 184

2-A-31

1    Q    Now, after Reynolds began blocking Authenticom and

2    SelectQu, was there ever a time you were able to serve

3    dealerships using a Reynolds DMS with an integration provider

4    other than RCI?

5    A    Yes.  So that would have been true of everything except

6    Autobase, so we were on Autobase for RCI, but all of our other

7    products continued to use Authenticom and SelectQu, and then

8    about four years later, in 2015, when the blocking had just

9    grown to a point of pain, we switched to DMI to have -- so it's

10   confusing to people.  We switched to DMI, owned by CDK, to pull

11   Reynolds and Reynolds data.

12   Q    How did that come about?

13   A    I got a call from Kevin Distelhorst at CDK in early 2015,

14   probably March or so, and he said that they had an agreement

15   with Reynolds that would allow him to pull Reynolds and Reynolds

16   data.  It would protect me -- and the word he used I'll never

17   forget -- from the "attack" Reynolds was giving us with data

18   lockouts, and lockouts defined as what you've heard the last two

19   days.

20   Q    So did you switch from using Authenticom or SelectQu to

21   using DMI?

22   A    We did.  We switched all of the products that were at

23   Authenticom to DMI and most of the products that were at

24   SelectQu to DMI during that time.

25   Q    Did you have to pay fees to CDK to use DMI to provide the

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 33 of 185 PageID #:73228
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 32 of 184

2-A-32

1    data integration on Reynolds' DMS?

2    A    Absolutely.  We moved -- we were there for 15 months, and

3    in that 15-month period we paid CDK for that data almost a

4    million dollars.

5    Q    What happened after the 15-month period was up?

6    A    Well, that would have been the time during that 15-month

7    period we were negotiating with Reynolds and Reynolds.

8    Remember, we knew that CDK's grace period or safe haven or wind

9    down, whatever you would want to call it, was going to end, and

10   we knew the date.  It was July of 2016.  So we spent that time

11   during that safe haven negotiating with Reynolds and Reynolds to

12   move our data over -- or to move our dealers over so that we

13   would be prepared once DMI stopped.  So by the time it stopped,

14   we had just given up on reaching a fair agreement with Reynolds

15   and Reynolds.

16   Q    How much does Reynolds charge for Sales Center RCI

17   integration today?

18   A    Well, that was actually one of the two main reasons we

19   didn't sign RCI.  They -- the charge that was 247 that you asked

20   about a moment ago in 2011, six years later that same exact data

21   package that was $247 was going to cost us $893 over a six-year

22   period, and among other -- a lot of other reasons that we didn't

23   like the contract, Mr. Schaefer himself called me personally on

24   my mobile and said, "What can we do to make this go forward?"

25        And I said, "Well, there's a lot missing, but the one

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 34 of 185 PageID #:73229
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 33 of 184

2-A-33

1    that's absolutely a deal-breaker is we need some sort of price

2    inflation index that we could follow," and I threw out numbers

3    like, you know, 5% a year, 10% a year.  "You got to pick a

4    number, but we can't sign a contract that has no protection."

5    We had just experienced over a six-year period, what is that,

6    four times, 247 to 893.  We couldn't sign our name on something

7    with absolutely no index.

8         And his answer was, "That's an absolute deal-breaker," and

9    it was.

10        And let me be clear, had he agreed to that, there were

11   plenty of other things wrong with the contract, but that was one

12   of them.

13   Q    Switch gears a little bit.  For Dominion dealer customers

14   who use a DMS provider other than CDK or Reynolds, what data

15   integrators does Sales Center currently use?

16   A    So all of those are pretty easy to work with, but we still

17   use a data integrator for those.  We use -- some products use

18   Authenticom.  Some products use SelectQu.

19   Q    And about how much do you pay today per rooftop to

20   Authenticom or SelectQu for those dealers that don't use either

21   CDK or Reynolds for their DMS?

22   A    Still that $30, a little less in some cases, but around 30.

23   Q    Okay.  I'm going to talk about CDK now.  Did CDK ever

24   restrict the ability of Dominion's integrators to access CDK's

25   DMS --

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 35 of 185 PageID #:73230
Case: 3:07-cv-00618-jdp Document #: 165 Filed: 07/05/13 Page 34 of 184

2-A-34

```
 1          THE COURT:  Before you move on, the question was, "For
 2    Dominion dealer customers who use a DMS provider other than CDK
 3    or Reynolds, what data integrators does Sales Center currently
 4    use?"
 5        And you said, "So all of those are pretty easy to work
 6    with," but I'm not sure what you mean by "all of those" that are
 7    easy to work with.
 8          THE WITNESS:  So I thought the question -- let me clear
 9    that up.  I thought the question was Dominion's products in
10    general.  I missed the Sales Center reference.  So Dominion's
11    products in general, let me run through them so that we're
12    clear.  Sales Center still uses RCI, Reynolds and Reynolds RCI,
13    dating back to that 2011 contract.  The other products use a
14    variety of integrators.  The DMS providers, those other than
15    Reynolds and CDK, are easy to work with and would actually send
16    us the data directly if we asked.  We have agreements with them.
17    They're cheap.  $25, for example, with Auto/Mate is a pretty
18    common one.
19        But even then, even though we could get it directly, we
20    still choose to go through an integrator, and we go through an
21    integrator for some of the reasons mentioned in the testimony
22    before.  They standardize it, so by the time I get it, I
23    don't -- it's sort of DMS agnostic.  I don't care about the
24    nuances of the differences, and so they standardize it in
25    format.  They standardize the data itself so that all addresses
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864-Document #: 1080-15 Filed: 07/28/20 Page 36 of 185 PageID #:73231
Case: 3:17-cv-00513-jdp  Document #: 165  Filed: 07/05/19  Page 35 of 184

2-A-35

1    spell "boulevard" the same way, for example.  They run it

2    through NCOA, which is the National Change of Address.  They

3    enhance it often with email appends, meaning they find current

4    and emails that are missing.  They enhance it with phone

5    appends.  They do phone tagging so I know what's a cell phone,

6    what's a home phone, what's a business phone.  So there's a lot

7    of data enhancement that happens through the integrators.  So,

8    to be clear, for those DMSs that aren't ADP -- sorry, CDK or

9    Reynolds and Reynolds, we still choose to use an integrator even

10   though we don't have to.

11          THE COURT:  Okay.  So if I'm keeping track here, really

12   it's Sales Center is on RCI, but that's pretty much the only one

13   that you use RCI for?

14          THE WITNESS:  Well, as a matter of fact, it's the only

15   one left.  The other product that we put on RCI was a product

16   called Service Scheduler.  I mentioned it briefly.  It competes

17   with XTime.  It completely had to fold.  Our RCI feed was more

18   than our retail selling price, and our share of the market was

19   pretty low compared to XTime anyway, and it completely put that

20   entire product out of business, RCI did.

21          THE COURT:  Okay.  All right.  Thanks for that

22   clarification.

23   BY MR. MILLER:

24   Q    So we were going to talk about CDK next.  Did CDK ever

25   restrict the ability of Dominion's integrators to access the CDK

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 37 of 185 PageID #:73232
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 36 of 184

2-A-36

```
 1    DMS?

 2    A    So I'm well aware of stories where CDK blocked vendors.

 3    It's been testified here.  I know that happened, heard it plenty

 4    of places, but for us mostly no because I was told at breakfast

 5    at NADA in 2015, make sure I get my years right, I had breakfast

 6    with Kevin Distelhorst and some other CDK folks, and they told

 7    me the blocking was coming.  They said that that was coming fast

 8    and furious and it would be like Reynolds.

 9         I had lived through that pain and suffering, and I don't

10    say that with any hyperbole.  It was brutally difficult on the

11    vendors and the dealers, and so I had no desire to go through

12    that again, so we pursued CDK certification pretty aggressively.

13    As a matter of fact, at one point we were pushing them, and they

14    were trying to redesign the program, and they had us on hold,

15    and that's another story, probably not pertinent, but we went

16    from pushing them to suddenly we were the bad guys for not being

17    done with it already, but the -- so they mostly honored not

18    cutting us off.  They tried, I would say, fairly not to block

19    our logons.  Happened occasionally but not really.  Our driver

20    was what was said, not what they did.

21    Q    Prior to 2015, when was the last time that CDK said

22    anything to you about whether they would restrict access to

23    their DMS?

24    A    So, interestingly, you've probably gotten a theme.  All of

25    these vendors get together at NADA, so all these meetings happen
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 38 of 185 PageID #:73233
Case: 3:17-cv-00518-jdp Document #: 165 Filed: 07/05/19 Page 37 of 184

2-A-37

```
 1    at NADA, and two NADAs prior I had lunch with Kevin, and we

 2    bad-mouthed Reynolds together, what evil people they were for

 3    blocking everyone.  I certainly had plenty to say and so did he,

 4    and then two short years later in 2015 he was one and they were

 5    the blockers.  The irony wasn't lost on me.

 6    Q    So the conversation you just testified about with

 7    Mr. Distelhorst was in 2013?

 8    A    '13.

 9    Q    Thank you.  Today for dealers using CDK's DMS, what

10    integration provider does Dominion use?

11    A    I'm sorry.  Repeat that again?

12    Q    Sure.  Today for dealers using CDK's DMS, what integrator

13    provider does Dominion use?

14    A    So we're in the final stages of 3PA certification.  So for

15    each product this answer will be slightly different, but broadly

16    speaking we use DMI, which was requested -- actually required

17    sort of by CDK for the last three or four months while we were

18    doing our certification, and so most of our products are in the

19    process today actually of transitioning from DMI to actual CDK's

20    3PA program, and then a couple of our products never were able

21    to comply to that move to DMI phase, so they still are SelectQu,

22    but they too will be transitioning to 3PA in the next week or

23    so.

24    Q    Would you have preferred for some applications to use

25    SelectQu or Authenticom?
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 39 of 185 PageID #:73234
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 39 of 184

2-A-38

1    A    I would have preferred for all of the applications to have

2    remained at SelectQu or Authenticom.

3    Q    Why?

4    A    Their service was, in my opinion, better.  It was

5    absolutely at least as good by any definition, but I think

6    better, and probably for us the most significant thing is if I

7    get data through a certified means, whether it's CDK or Reynolds

8    and Reynolds, I still -- arguably it's harder for me, but even

9    if it were the same, I still have to send that data to somebody

10   to enhance it, so when I used Authenticom or SelectQu, the data

11   came from the DMS.  It was clean, standardized, enhanced, and

12   then sent to me, and when I got it, I was done.

13        Now I have to write routines that bring in the data from

14   CDK or Reynolds and Reynolds, both more complicated than getting

15   it from Authenticom to begin with, then package that data up,

16   send it out to be enhanced.  I happen to use Authenticom.

17   There's about a million choices out there to enhance it, but

18   then they enhance it, and then they send it back.  So from a

19   data flow point of view, I have to touch that data twice and

20   keep it all separate, and it's difficult.  It's technically

21   difficult.  It's technically challenging.  It would be much

22   simpler for me just to use an Authenticom or any of the other

23   integrators that used to be out there or our very own SelectQu.

24   Q    We talked about pricing earlier.  How much does CDK charge

25   Dominion for Sales Center's 3PA integration?

---

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 40 of 185 PageID #:73235
Case: 3:17-cv-00518-jdp Document #: 165 Filed: 07/05/19 Page 39 of 184

2-A-39

```
 1    A    I have to smile when you ask me that question.  So compared
 2    to Reynolds' 893, it's cheap -- it's only $457 -- until you
 3    compare it to that $30 that I could have paid Authenticom.
 4    Q    Do you acquire all dealer data on the CDK DMS through 3PA?
 5    A    So our contract said that we had to get 100% of our dealers
 6    that were on CDK through the 3PA program, but as we went through
 7    the process of both negotiating and certifying, CDK made a few
 8    exceptions to where we got data on a few dealer groups.
 9    Q    For those exceptions, how does Dominion acquire data for
10    those dealerships?
11    A    So they made an exception for at least three dealer groups
12    that I can think of, two were Group 1 and Lithia, both fairly
13    large groups that most people would know of, and then they made
14    a third exception, which was the most ironic to me, for the
15    Leith Group.  CDK said that we could get the data directly from
16    those dealer groups, and, to be clear, we still had to pay for
17    that data.  We had to pay CDK to register them in the 3PA
18    program, so we paid that $457, but we were allowed to get the
19    data directly from the dealership, which has a twist of irony
20    with the Leith Group.
21         The dealership group, Leith, is able to send us the data
22    that they send us because they pay SelectQu, our company, to
23    extract it, so as you heard testimony earlier, extracting data
24    from an -- from someone at the dealer is no easy task.  So
25    Leith, a pretty high-tech company, fairly large, probably
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 41 of 185 PageID #:73236
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 40 of 184

2-A-40

1    employs a dozen IT people, choose to pay SelectQu to get data

2    out of CDK because it's that hard.  They pay SelectQu, happens

3    to be our company.  SelectQu pulls it, sends it to Leith.  Leith

4    then sends it to me.  Incidentally, then I send it to Steve to

5    enhance, and then he sends it back, and I post it to the dealer

6    on my website.  You should be shaking your head now.

7    Q    I don't have a diagram.  In your experience are there any

8    significant differences between the functionality or security of

9    RCI and 3PA on the one hand and Authenticom or SelectQu on the

10   other?

11   A    Other than I don't have to send it to all those places, no.

12   The data extraction, in very large terms -- you guys heard

13   yesterday about APIs and File Transfer Protocols.  In very large

14   terms, every data extraction I get, whether it's from RCI or CDK

15   or Steve or SelectQu, in very large, broad strokes, somebody

16   collects the data and posts it on some connection, whether it's

17   a predefined point like an API or a pre-established address like

18   a file transfer -- an FTP folder -- we use SFPT; S stands for

19   secure -- the data is dropped there or sent there or connected

20   there.  We get it pretty much the same way.

21        Now, because of the blocking, I'll have to confess that I

22   get data more often through CDK's 3PA program, and I get data

23   more often than with RCI for Autobase or Sales Center, but to be

24   clear, that improvement on the frequency is not a technical

25   restriction other than it's hard for an integrator to hit the

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 42 of 185 PageID #:73237
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 42 of 184

2-A-41

```
 1    system that often because of the blocking.
 2    Q    Were you here yesterday for the opening when Reynolds said
 3    that vendors receive better functionality on RCI than on
 4    Authenticom?
 5    A    I was.
 6    Q    Do you agree?
 7    A    I disagree.
 8    Q    Now, one of CDK's witnesses provided a declaration
 9    claiming, among other things, that the 3PA program includes
10    enhancements that significantly improve the ability of
11    third-party vendors to obtain information from the DMS.  As
12    compared to Authenticom's and SelectQu's services, is your
13    experience that 3PA improves Dominion's ability to obtain
14    information from the DMS?
15    A    Absolutely not.
16    Q    If RCI, 3PA, and Authenticom were the same price but
17    defendants did not engage in blocking, which integrator would
18    you choose?
19    A    I would absolutely choose, and honestly maybe not even
20    Authenticom, I would absolutely chose a third-party integrator,
21    either SelectQu or Authenticom.
22    Q    Then why does Dominion pay so much more for Reynolds and
23    CDK's data integration than you would pay for Authenticom and
24    SelectQu?
25    A    We have no choice.  I was flatly told by a couple of folks,
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 43 of 185 PageID #:73238
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 42 of 184

2-A-42

 1    Jeff Nosic (ph.), Kevin Distelhorst, that if I wanted CDK data,

 2    I had to go through 3PA.  In fact, he said that they weren't

 3    going to endorse even a dealer-initiated download process.

 4    Remember, I have all of our products except for Sales Center

 5    using dealer-initiated downloads -- we'll talk about that later,

 6    I hope -- but we have our products.  We're familiar, very

 7    familiar, with the dealer-initiated download process with

 8    Reynolds, so that was a subject that Kevin Distelhorst and Jeff

 9    Nosic and I had a lot.  It was a viable option for us, and they

10    said they weren't going to endorse it, and I remember the words

11    exactly.

12         I said, "So you're saying that if I don't go to 3PA, I

13    won't be able to do business with CDK dealers?"

14         And he says, "Well, I wouldn't put it that way."

15         And I said, "Well, I think you just did."

16         If I didn't go to 3PA, I was not going to get 3PA -- or CDK

17    data, period.  It was very clear.

18    Q    Thank you.  And so let's move then to the dealer-initiated

19    downloads or have you heard the term "Dynamic Reporting"?

20    A    Sure.

21    Q    When providing applications to dealers using Reynolds DMS,

22    does Dominion use RCI for all of its applications?

23    A    No, just the Sales Center one.

24    Q    Is -- does Dominion use the dealer-initiated downloads for

25    any applications?

ALAN ANDREU - DIRECT

```
 1      A    Yes.  For all of the products except for Sales Center, we
 2      use dealer-initiated downloads where the dealer sends us daily
 3      files.  So the first limitation, even if all of the other things
 4      work magically, is it's once a day at best, but yes.
 5      Q    Is a dealer-initiated download more secure than using
 6      SelectQu or Authenticom?
 7      A    It's comically not as secure.  It downloads the file in
 8      plain text, usually done by an employee at God-knows-what
 9      computer.  He stores it locally in plain text, and then he's
10      supposed to upload it to a secure FTP site, which we've guided
11      them carefully on how to do, but more often than not it shows up
12      unencrypted, often in an email, sometimes, God forbid, copied
13      and pasted into the body of the email itself.  It is horribly
14      insecure.
15      Q    In your experience do dealer-initiated downloads through
16      Dynamic Reporting work as well for Dominion as Authenticom and
17      SelectQu did?
18      A    I mentioned earlier I personally manage the DealActivator
19      product.  We have a whole team of folks whose sole job it is to
20      call dealers and remind them they didn't do what they promised
21      that they would do, and last week alone, last week alone out of
22      the 230 or so Reynolds and Reynolds dealers we have, 189 of
23      those failed to send us the data we needed last week.
24      Q    Are there any other shortcomings with the Dynamic Reporting
25      that you've experienced?
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 45 of 185 PageID #:73240
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 44 of 184

2-A-44

```
 1      A    Well, not getting data for 189 of my 230 stores is a start,

 2      but the dealers hate it.  The dealers complain about it.  The

 3      testimony you heard about the pain and suffering is no joke,

 4      and, by the way, it hasn't always been as hard as it is now.  It

 5      used to be a little easier.  Dealers could at least select

 6      multiple files, and I couldn't tell you because I personally am

 7      not clicking the buttons on Reynolds and Reynolds about exactly

 8      the work flow, but dealers tell me all the time that it's harder

 9      to use now than it's ever been, so for Reynolds to imply that

10      they're helping dealers do that is not true.  And incidentally,

11      I can't have -- remember my Sales Center people?  I can't have

12      any of them -- not a single dealer in the Sales Center world can

13      send me data through dealer-initiated downloads.  We're not

14      allowed to mix those two.

15      Q    Shift gears again.  Has Dominion been impacted by the use

16      of RCI and 3PA?

17      A    Absolutely.  So costs have skyrocketed.  We haven't been

18      successful in passing it through to the dealerships, so our

19      earnings are way down.  They completely destroyed the Scheduler

20      product that was our competitor to XTime.  SelectQu has been

21      stripped of most of its profitability or all of its

22      profitability and most of its revenue.  The sales cycle has been

23      damaged because of the challenges that salespeople have in the

24      street because of the propaganda by Reynolds and CDK when we say

25      we're not certified with RCI.  Dealers have left us over either
```

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 46 of 185 PageID #:73241
Case: 3:17-cv-00513-jdp Document #: 165 Filed: 07/05/19 Page 45 of 184

2-A-45

```
 1    their frustration of dealer-initiated downloads or, in CDK's

 2    case, the price increase that we told them we were about to pass

 3    through.  So, yes, it's hurt us a lot.

 4    Q     Final topic, Mr. Andreu.  Can we talk about your RCI

 5    agreement with Reynolds?  What limitations, if any, does

 6    Reynolds place on Dominion's ability to tell dealers how much it

 7    pays for integration?

 8    A     It gags us completely.  We can't tell them anything, so I'm

 9    expected to somehow pass through an $893 charge on an $1,152

10    product without telling them why.

11    Q     Was Dominion ever accused of violating the price secrecy

12    provisions in its contract?

13    A     We were.

14    Q     What did Reynolds say?

15    A     We put a line item on an invoice that said "integration

16    fee," and at the time, by the way, that fee was $195 is what we

17    passed through.  I don't recall what the offsetting Reynolds

18    charge was, but since it started at $247, you can bet $195

19    wasn't all of it.

20    Q     What was Reynolds' response to your passing through --

21    communicating the pass-through?

22    A     They sent a nasty letter to the then-product manager of

23    Sales Center, told us that we had -- defamation I think was on

24    there.  They said that we violated the secrecy requirement.

25    They submitted -- they made us submit to an intimidating audit,
```

```
 1    and ultimately we wrote them a check for $100,000 or they were
 2    going to cut the RCI program off from our Sales Center product.
 3              MR. MILLER:  No further questions.  Thank you.
 4              THE COURT:  Cross-examination.
 5              MR. RYAN:  Thank you, Your Honor.
 6                        CROSS-EXAMINATION
 7    BY MR. RYAN:
 8    Q    Good morning, Mr. Andreu.
 9    A    Good morning.
10    Q    I just want to clear a few things up.  So your company is a
11    DMS provider?
12    A    Our company is an application provider, an integrator
13    provider through SelectQu, and, yes, we do have a DMS, a small
14    one, called ACCESS that services smaller dealers.  About 400 is
15    their customer account.
16    Q    So you have 400 DMS clients?
17    A    Yes, sir.
18    Q    Okay.  And on the applications, how many applications do
19    you offer?
20    A    It's hard to separate them exactly, but, let's see, we have
21    CRM Sales Center.  We have the equity product we market as
22    DealActivator, Dealer Specialties inventory.  We have a web
23    product.  We have a dealer marketing product we call Auto
24    Revenue.  We have a reputation management product called Prime,
25    and then we have various forms of all of those.  So I'd say six
```

```
 1    general categories.
 2    Q    Is the app market in which you compete a marketplace with
 3    lots of competitors?
 4    A    Highly competitive.
 5    Q    And this may not be fair, but how many firms are out there
 6    providing different kinds of apps?
 7    A    I truly don't know.
 8    Q    You believe it's a highly competitive market as we sit here
 9    today?
10    A    Yes.
11    Q    Okay.  You mentioned the fact that there are some two
12    hundred and -- if I got the number right, there were 189 dealers
13    who didn't get it right last week with respect to the download
14    program out of 280 --
15    A    230.
16    Q    230, thank you.  And so that means that you have -- you're
17    working with 230 dealers who are using this download process?
18    A    Correct.
19    Q    Okay.  Thank you.  And you also mentioned that the dealers
20    sometimes don't follow good data security practices?
21    A    I think I said often don't follow good data practices with
22    regard to the dealer-initiated downloads.
23    Q    And you were pretty shocked by some of those practices, I
24    took from your testimony?
25    A    I was.  To be frank, I was shocked that the process was to
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 49 of 185 PageID #:73244
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 49 of 184

2-A-48

1    download a plain text file to your local computer, which is the

2    dealer-initiated download process.

3    Q    And as a -- does SelectQu, does it compete with

4    Authenticom?

5    A    It does.

6    Q    Does it compete with DMI?

7    A    It does.

8    Q    Does it compete with IntegraLink?

9    A    It does.

10   Q    And just -- who else is out there?

11   A    Well, nowadays there's RCI competes with DMI and SelectQu

12   and Authenticom.  There's a few small, probably-manage-a-few-

13   hundred-store integrators, but all of the big ones are out of

14   the market.  SIS comes to mind.  It's been put out of business.

15   There used to be -- I myself was in that space in the '90s.

16   From '91 until really I developed DealActivator, I was in that

17   space, did consulting, but they're mostly gone now.

18   Q    And I thought I heard you use a term "Group 1 dealers."

19   A    Yes, Group 1 is a name of a -- like comparable to Penske.

20   Group 1 has -- I don't know their numbers -- 170 or 80 stores or

21   so.

22   Q    And are you familiar with the term "tier one dealers"?

23   A    Well, I'm familiar with the term "tier one."

24   Q    Tier one.  What is that?

25   A    Well, it means a little different in the OEM space than it

ALAN ANDREU - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 50 of 185 PageID #:73245
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 49 of 184

2-A-49

```
 1    does in the marketing space, but, generally speaking, it's the

 2    OEM level of the chain.  So most people would use tier one

 3    talking about OEM initiatives, tier two talking about regional

 4    initiatives, and then tier three talking about dealer

 5    initiatives.  I'm not sure the context you're using it.

 6    Q    Okay.  That's fine.  I just wanted to see if I understood

 7    it.  I don't, but I don't think that it matters.

 8         How many car -- about how many car dealers in the United

 9    States are there, your best estimate, sir, that use DSMs?

10    A    DMSs?

11    Q    DMSs.  Thank you.

12    A    15,000 or so.

13    Q    15,000, and those are all new car --

14    A    I don't know the numbers exactly, but my universe, when

15    I've designed my marketing and sales team, 15,000 is the number

16    I would use.  It's a little hard to count.  You heard some

17    testimony earlier about rooftops and franchises, and you could

18    count it about a thousand ways, but 15,000 or so is pretty

19    close.

20              THE COURT:  A question was qualified about how many

21    dealers use DMSs.  Are there dealers that don't?

22              THE WITNESS:  All of them use some sort of DMS.  The

23    testimony about the only viable choice is Reynolds and CDK, a

24    lot of dealers would share that opinion.  We have 400 that

25    don't, clearly.  They bought them from us.  There's a pretty
```

ALAN ANDREU - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 51 of 185 PageID #:73246
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/11 Page 50 of 184

2-A-50

1    good chunk who have bought DealerTrack, but it is a fairly

2    popular decision, and it really has to do with the scaleability.

3    It has to do with those DMSs' relationships with the OEMs.  So

4    getting permission to communicate back and forth from the OEMs

5    is difficult.

6             THE COURT:  Like parts information, stuff like that.

7             THE WITNESS:  Yeah, and financial reporting.

8    There's -- the barrier to entry to get in the DMS space is

9    difficult.  Dominion, for example, purchased the company ACCESS,

10   and it had about 400 dealers.  It still has about 400 dealers,

11   and we purchased it for the -- we would call it the domain

12   knowledge.  We wanted to buy people who knew how to do this, and

13   we spent about $50 million trying to build another one and ended

14   up flushing it.

15        So building one is hard.  It's expensive.  And I would say

16   that CDK and Reynolds pretty much owns the market.  The 28%,

17   even in the past four or five years, is probably doubled.

18   Somebody probably has that number, I don't know, but -- and

19   what's driving them there is exactly this subject.  It's hard.

20            THE COURT:  I just want to make sure I understand.

21   There's no -- now, there's a little used car lot that I pass on

22   the way to work.  They don't look very sophisticated.  They

23   don't -- it's not a new car dealer, so they might not --

24            THE WITNESS:  No, actually they probably do.  Most of

25   the auctions offer some cheap little DMS.  Ironically, that's

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 52 of 185 PageID #:73247
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 52 of 184

2-A-51

```
 1    how I got in the business in 1983.  I wrote a little package for
 2    what was then called Florida Motors, little dirt lots, me and a
 3    couple guys.  It was horrible but -- in retrospect, but it
 4    worked.  So, no, every dealer at every size probably has
 5    something that runs their dealership.
 6            THE COURT:  Okay.  And so then -- but a new car dealer,
 7    if you got a franchise to sell new cars, then --
 8            THE WITNESS:  You're getting a DMS.
 9            THE COURT:  All right.  And then there's a lot fewer
10    new car dealerships than there were, do the math, ten years ago.
11            THE WITNESS:  There's fewer for sure.
12            THE COURT:  Yeah.
13            THE WITNESS:  I don't know the numbers exactly.
14            THE COURT:  Okay.  All right.  Okay.  Thanks.
15    BY MR. RYAN:
16    Q    Are you familiar with a company by the name of SIS?
17    A    I am.
18    Q    And what do they do?
19    A    Well, nothing now, but they used to be integrators.  They
20    also did forms programming.  I competed with them in that space
21    in the '90s.  Phil Battista owned it, and he, I believe, has
22    closed it completely.  If he does something still today, I
23    certainly didn't know that.  I thought he retired completely.
24            MR. RYAN:  Thank you.
25            THE COURT:  Cross for Reynolds.
```

ALAN ANDREU - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 53 of 185 PageID #:73248
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/13 Page 52 of 184

2-A-52

```
 1            MR. ROSS:  Yes, Your Honor.  Just a few.

 2                      CROSS-EXAMINATION

 3    BY MR. ROSS:

 4    Q    Mr. Andreu, I thought I heard a reference a few minutes ago

 5    to RCI competing in the data integration market?

 6    A    Sure.

 7    Q    Just to make sure there's no misunderstanding, RCI is not a

 8    product that is offered or works or competes in the space of

 9    other DMS integration, that is other than Reynolds, is it?

10    A    So what you said is correct.  It competes, though the --

11    other people compete with RCI, and RCI, in my opinion, competes

12    with them for that percentage of dealers that I have that use

13    Reynolds and Reynolds' DMS.  So it used to be about a third.

14    It's less than that now, but about a third of my dealers used

15    Reynolds and Reynolds, and I had many choices.  RCI was one of

16    them.

17    Q    RCI is a part of the Reynolds DMS, right?

18    A    I would say it's an integrator.  I'm not sure where you're

19    drawing that line.

20    Q    You're contending that RCI is some sort of a separate

21    entity?

22    A    RCI takes DMS data from the Reynolds machine and sends it

23    to me, the vendor.  I would call that an integrator.

24    Q    What is RCI?

25    A    Reynolds Certified Interface.
```

ALAN ANDREU - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 54 of 185 PageID #:73249
Case: 3:17-cv-00318 jdp Document #: 165 Filed: 07/05/17 Page 53 of 184

2-A-53

1    Q    Is it a company?

2    A    I couldn't tell you its corporate structure.

3    Q    Okay.  You had mentioned a letter that was sent to Dominion

4    regarding a breach of Reynolds' price confidentiality

5    provisions --

6    A    Yes, sir.

7    Q    -- earlier.  That was in 2012, correct?

8    A    It was post-2011 probably.  I don't recall the date.

9    Q    And your memory was there was a demand for $100,000?

10   A    The settlement was $100,000 is absolutely my memory.

11   Q    Okay.  Well, if the letter requests a lesser amount than

12   that, you'll defer to whatever the documents say, I assume?

13   A    (No response.)

14   Q    The document says what it says, right?

15   A    The document says what it says, right.

16   Q    Thank you.  You talked about Reynolds' price increases for

17   RCI interfaces?

18   A    Yes.

19   Q    I think you said that the top package, as we sit here

20   today, is $893?

21   A    Well, as we sit here right this minute, it's $811.  In

22   September of 2017, which for all practical purposes is right

23   around the corner, the sixth anniversary of the contract, it's

24   going to $893.

25   Q    Okay.  So you got a pretty specific, down-to-the-dollar

ALAN ANDREU - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 55 of 185 PageID #:73250
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 54 of 184

2-A-54

1    understanding and memory of these amounts?

2    A    Down to the dollar.

3    Q    Was the -- was the largest, by far, increase in that fee

4    back in 2013?

5    A    The first two increases were nauseatingly large, and the

6    increase for 2017 was 10% from 811 to 893.

7    Q    Every increase since 2013 has been either 5% or this year

8    10%, right?

9    A    That is actually correct, yes.

10   Q    Okay.  So you're not contending that the -- Reynolds has

11   raised its prices in some gigantic way since 2015?

12   A    Well, let's review.  The first increase was 30%.  The

13   second increase was about 100%.  We had three 5% increases, and

14   now we have a 10.  I'm contending that they're all absurd.

15   Q    Okay.  I understand your opinion.  The $811, that's your

16   top deluxe package that Reynolds offers, right?

17   A    The soon-to-be $893 package is the package required to run

18   my $1,152-a-month CRM.

19   Q    And you have lesser-priced packages available from

20   Reynolds?

21   A    I have lesser-priced packages available to run

22   lesser-priced products, yes, sir.

23   Q    And Reynolds has offered in the past to work with Autobase

24   to try to cut down on the interfaces to lower your prices,

25   right?

ALAN ANDREU - CROSS

```
 1        A    So if you're asking me has Reynolds ever said, "Do less
 2        integration, less innovation, less services to the dealer, and
 3        we'll charge you less money," I'm sure they have.
 4                 MR. ROSS:  I have no further questions.
 5                 THE COURT:  Any redirect?
 6                 MR. MILLER:  No, Your Honor.
 7                 THE COURT:  Thank you very much, Mr. Andreu.
 8                 THE WITNESS:  Thank you.
 9            (Witness excused at 9:23 a.m.)
10                 THE COURT:  Next witness.
11                 MR. MILLER:  Your Honor, the plaintiffs call Matt
12        Rodeghero.
13                 THE COURT:  Very good.
14            MATTHEW RODEGHERO, PLAINTIFF'S WITNESS, SWORN,
15                 MR. MILLER:  Your Honor, we don't have a fancy binder,
16        but I have two loose exhibits.  Would you like us to hand
17        those --
18                 THE COURT:  Yes, by all means.
19                 MR. MILLER:  Copies for the opposing counsel and one
20        for the witness too, please, Jennifer.
21                          DIRECT EXAMINATION
22        BY MR. MILLER:
23        Q    Good morning or -- yes, it is still morning.  Good morning,
24        Mr. Rodeghero.  Can you please state your name for the record.
25        A    Yeah.  My name is Matthew Rodeghero.
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 57 of 185 PageID #:73252
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 56 of 184

2-A-56

1    Q    Where do you work?

2    A    I work at AutoLoop.

3    Q    How long have you been an employee of AutoLoop?

4    A    Nine years.

5    Q    What is your position?

6    A    I'm the chief product officer of AutoLoop.

7    Q    Can you briefly describe AutoLoop's business and products?

8    A    Absolutely.  We are one of the leading customer attention

9    marketing service and sales retention products in the

10   marketplace.  We also provide a CRM, scheduling tools, service

11   drive check-in process, work flow management for dealerships.

12   Q    What kind of dealer data does the full suite of AutoLoop

13   applications need to function?

14   A    We use quite a bit of data.  We have some very high data

15   demands.  We use -- we pull all the ROs, open and closed.  We

16   pull deals, appointments, parts inventory -- well, that's a

17   request that we have outstanding -- parts orders, special order

18   parts, also customer information.

19   Q    And can you remind the Court what ROs stands for?

20   A    Yes.  Repair orders.  It's a service ticket.

21   Q    How does AutoLoop typically get the data -- dealer data it

22   needs?

23   A    We use a third-party integrator where we can.  Where we

24   can't, we use RCI and CDK's interfaces.

25   Q    Why do you use third-party integrators?

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 58 of 185 PageID #:73253
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 57 of 184

2-A-57

 1     A     We use third-party integrator -- we actually use SIS

 2     currently.  They still do have some business through non-RCI and

 3     non-CDK dealerships.  We use them because they provide a

 4     one-stop where we can come in and extract data for all of the

 5     different DMS types.

 6     Q     Historically when you purchase data integration services

 7     from SIS, how much did you pay for the full suite of AutoLoop's

 8     products?

 9     A     $39.

10     Q     Were you satisfied with SIS's service?

11     A     Yeah, absolutely.

12     Q     Did you consider SIS's services to be secure?

13     A     Yeah, we did.

14           THE COURT:  How would you know?

15           THE WITNESS:  We didn't get into the details with them.

16     We asked them what they do.  They said they had some standard

17     practices they do, and they carried insurance policies for it,

18     and so we took them at face value on that.

19           THE COURT:  Okay.  Good.  Thank you.

20     BY MR. MILLER:

21     Q     I want to move quickly through this.  So was there a time

22     when you stopped using SIS for integration with Reynolds

23     dealers?

24     A     With Reynolds dealers, yes.  We stopped in 2015.

25     Q     Why?

―――――MATTHEW RODEGHERO - DIRECT―――――

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 59 of 185 PageID #:73254
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 59 of 184

2-A-58

1    A   Because we got notice from SIS that they would no longer be

2    continuing to support integration for RCI.  Leading up to that

3    point, we had been undergoing some stress with their ability to

4    support the integration.  They were being blocked by Reynolds

5    and Reynolds, and they were not being allowed to extract the

6    data on a day-to-day basis.

7    Q   Could you briefly describe how Reynolds' blocking impacted

8    AutoLoop's business?

9    A   Absolutely.  It was kind of a day-to-day struggle for us.

10   We would routinely come in in the morning and have anywhere

11   between a hundred to 500 stores that would be shut off and not

12   able to run our software tools, so we would have support tickets

13   from every one of our dealerships with very colorful language

14   telling us why they're upset with us and that they needed to get

15   the system back up and running.  Our engineering team was

16   incredibly taxed during that time trying to come up with

17   solutions and work with SIS to get the data feeds back up in

18   place.  It took all of our development resources away from

19   developing products and focused them on trying to sustain

20   running our dealerships' integration.

21   Q   Did AutoLoop eventually become RCI certified?

22   A   Yes, we did.

23   Q   Approximately when?

24   A   That was 2015 we signed the contract with them, and then it

25   took a bit of time to finish the integration and certify and

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 60 of 185 PageID #:73255
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 59 of 184

2-A-59

```
 1    officially transition all of our dealerships over.

 2    Q     In 2015 how much did Reynolds charge AutoLoop for RCI

 3    integration for a dealer using, say, the full suite of

 4    AutoLoop's products?

 5    A     We were somewhere in the $700 range, in the mid-700s.

 6    Q     And today how much does Reynolds charge AutoLoop for

 7    integration for that suite of products?

 8    A     Our most recent price increase took us to $835 for that

 9    full package.

10    Q     In addition to the package cost, are there any additional

11    fees that Reynolds charges?

12    A     Yes, there are.  As of recently, Reynolds has added an

13    additional cost to the RCI package which relates to anytime we

14    push a transaction back to the DMS, there's an additional 5 cent

15    charge that is added to it.  For an example, when we need to

16    write an appointment to the DMS, if we have to update the

17    customer information, that's a transaction, and then if we have

18    to push the appointment into the DMS, that's a transaction as

19    well.  So for a customer to go online to schedule an appointment

20    for a dealership, that costs an extra 10 cents.  On average that

21    costs us about $70 a dealership extra on top of the normal

22    integration costs.  That's an average.  I have dealerships that

23    run over $1,000 a month in transactional charges just -- that's

24    just the transactions, so that would be in addition to the $835

25    cost for the flat integration fee.
```

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 61 of 185 PageID #:73256
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/21 Page 60 of 184

2-A-60

```
 1     Q    For dealers using a DMS other than CDK and Reynolds, how
 2     much do you pay for integration for that full suite of products
 3     today?
 4     A    For the full suite for all transactions, reading, writing,
 5     and posting information back to the DMS, I pay $79 right now.
 6     Q    So we talked about Reynolds blocking.  If we could switch
 7     to CDK.  Did CDK block SIS as well?
 8     A    CDK to my experience did not block --
 9          THE COURT:  I'm not sure I understand that answer.
10          THE WITNESS:  Sorry.
11          THE COURT:  Okay.  So this is non-CDK and Reynolds.
12     You pay $79 a dealer from -- and that's the remaining business
13     with SIS?
14          THE WITNESS:  Yes, that's the remaining business with
15     SIS.
16          THE COURT:  That's $79 from the vestigial SIS
17     operation, right?
18          THE WITNESS:  Yes, exactly.
19          THE COURT:  All right.  I got it.  Thank you.
20     BY MR. MILLER:
21     Q    So I'd asked did CDK block SIS as well?
22     A    No, they didn't.  We heard rumors in the street, as you
23     heard from Dominion, that there was -- the word was it was
24     coming, and so at that point we were also -- we were also
25     receiving a push from one of our manufacturer customers that
```

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 62 of 185 PageID #:73257
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 62 of 184

2-A-61

```
 1    they wanted us to be certified through CDK, a certified program,

 2    so we opted to not go through the pain again, and we went with

 3    the direct integration.

 4    Q    Have you fully transitioned to 3PA yet?

 5    A    We have not.  We're still in the middle of finishing the

 6    certification.  We're about 40% through the transition right

 7    now.

 8    Q    Under your current contract with CDK, will you be able to

 9    keep using SIS on all your dealerships?

10    A    We can only use SIS for non-CDK and Reynolds business.  We

11    have to transition all of our accounts for all products over to

12    CDK interface.

13    Q    How much did CDK charge AutoLoop for 3PA integration when

14    you first joined?

15    A    We were around $690, $694, something like that.

16    Q    Did you have any prior agreements with CDK that permitted

17    any of your products to access the CDK DMS?

18    A    Yeah, we did.  We actually -- we acquired a company in 2014

19    called CAR-Research or CAR-Interactive.  They're a CRM company.

20    They were previously certified under the ADP certification

21    program, and they were paying about $160 a month for that

22    integration.

23    Q    And so for -- the price for your access to the CDK database

24    went from approximately $160 in 2014 to $694 in 2016; is that

25    correct?
```

MATTHEW RODEGHERO - DIRECT

```
 1     A     Yeah, that's correct.  So when we acquired that company, we
 2     transitioned into the Certified Integration for our AutoLoop
 3     business as well.  They required us to go -- re-go through the
 4     integration process, and they transitioned us onto a 3PA
 5     contract, and with that contract came the new pricing structure.
 6     So I had to go back to my existing CRM business and move them
 7     from the $160 integration fee to the more expensive integration
 8     fee, and during that transition I -- you know, we went through
 9     the documentation, and the documentation for the API
10     implementation that we did from the CAR-Research integration to
11     the current integration was the same documentation, so I asked
12     them, you know, "Is this any new or improved integration?"
13         And they said, "Well, it's just our new 3PA program that
14     we're rolling out," but all the implementation was still the
15     same for my team.
16     Q     Were there any noticeable product improvements?
17     A     No, there were none.
18     Q     Today how much does AutoLoop pay CDK for integration for
19     its full suite of products?
20     A     We have a price increase coming at the end of this month.
21     July 1st we'll be paying $735.
22     Q     Do you pass on the RCI and 3PA fees to dealers?
23     A     Yes, we do.  We pass them straight through.
24     Q     Does AutoLoop add a markup or margin on top of the
25     integration fees?
```

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 64 of 185 PageID #:73259
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 63 of 184

2-A-63

```
 1    A    No.  We've not been in the business of trying to get money

 2    off of the transactions.  We're just trying to sell software.

 3    Q    In your experience are 3PA and RCI significantly better

 4    integration services than SIS?

 5    A    No, not particularly.  I haven't found anything about them

 6    that's any better or improved on the transactions that I would

 7    get from SIS.

 8    Q    Are there any ways in which RCI and 3PA are more limited

 9    than SIS?

10    A    Yeah.  I did lose some functionality when I made the

11    transition to both of the different systems in different ways.

12    With the RCI system I lost the ability to make some of the

13    notifications that I do around parts, special order parts

14    orders.  I can no longer get the information indicating when I

15    can make those notifications through the RCI program.  I also

16    lost the ability to do some pushback information, and with CDK

17    there was some things I lost the ability to do as well.

18    Q    So why does AutoLoop pay these higher integration fees from

19    Reynolds and CDK?

20    A    It was a decision where we had to look at the things that

21    we were dealing with on the support basis and the constant loss

22    of business and upset dealerships saying, "Hey, you guys, you

23    got to keep your system up.  We can't keep running our business

24    with your software if your software doesn't work."

25         So at that point it was a decision.  We're like, "Okay.  We
```

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 65 of 185 PageID #:73260
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 64 of 184

2-A-64

```
 1    have to keep the software running so we have to pay this cost."

 2    Q    If there wasn't the threat of blocking from the defendants,

 3    would you rather use SIS?

 4    A    We would be glad to go back to SIS.

 5    Q    I want to move to --

 6              THE COURT:  Just -- I mean, the cost is so clear.  Why

 7    wouldn't you rather pay $79 instead of $735.

 8              THE WITNESS:  Yeah, that's exactly --

 9              THE COURT:  That's the primary thing --

10              THE WITNESS:  That's the primary thing.  The other

11    thing we've run into from time to time with them is -- an

12    example would be is when we go back to -- when I worked with

13    SIS, if I needed additional information or I needed to develop a

14    new product that I wanted to give to the dealerships because

15    they've asked for a new functionality, I would go to them and

16    say, "Hey, can you get this additional data?"  They would work

17    it out.  They would come back and provide that data to me.

18         I make those requests with CDK and Reynolds, and if it can

19    be done, the time lines are between six months to a year with

20    additional recertification fees and paying for recertifying and

21    retesting.  With SIS it was not difficult at all.  So the

22    business relationship has changed drastically.

23              THE COURT:  Thank you.

24              MR. MILLER:  Thank you, Your Honor.

25    BY MR. MILLER:
```

—— MATTHEW RODEGHERO - DIRECT ——

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 66 of 185 PageID #:73261
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 66 of 184

2-A-65

 1    Q    Changing topics.  Do your contracts with Reynolds and CDK

 2    include restrictions on what information you can share with

 3    dealers about integration prices?

 4    A    Yeah, they do.  The Reynolds' contract specifically states

 5    that I'm not allowed to tell the dealerships that I'm receiving

 6    a fee from Reynolds for the integration that I get from them.

 7    Q    I handed out --

 8         THE COURT:  Just to be clear, you said that you're not

 9    allowed to tell the dealerships that you're receiving a fee from

10    Reynolds.

11         THE WITNESS:  Yeah.

12         THE COURT:  You're paying a fee to Reynolds.

13         THE WITNESS:  Yes.  I'm -- I get charged --

14         THE COURT:  You're being charged a fee.

15         THE WITNESS:  Yeah.  I'm being charged a fee from

16    Reynolds.  Sorry.

17         MR. MILLER:  Thank you for that.  I handed out some

18    documents, but in the interest of time, I think I'm going to

19    move on.

20         THE COURT:  Before you move on, does CDK impose that

21    same restriction about communicating the fee to the CDK dealers?

22         THE WITNESS:  Their restriction is a little different.

23    They -- I'm allowed to say that I have a cost from them to get

24    the data from them, but I'm not allowed to tell the dealerships

25    what that cost is.  That kind of creates a little bit of a

────────── MATTHEW RODEGHERO - DIRECT ──────────

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 67 of 185 PageID #:73262
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 66 of 184

2-A-66

1    sticky situation for me because I charge them a DMS -- I charge

2    them an integration fee, and if that -- and then CDK has

3    published fees that don't align with the fees that they charge

4    me, so dealerships go onto their website and look up fees for

5    what they think that I should be getting, and it doesn't align

6    with what I'm charging even though I'm passing the fees straight

7    through, and I'm not allowed to show them my contract or the

8    terms or the costs in my contract so they don't -- my

9    dealerships get upset with me, and they feel like I'm misleading

10   them in what I charge them.

11          THE COURT:  So what is CDK publishing?

12          THE WITNESS:  They're publishing -- I have been told

13   it's their standard rack rates for integration -- they call them

14   pips.  They're integration points, but our package, because of

15   the data that we need, is combinations of those, and so it

16   doesn't align with what they've published as their pricing, but

17   I'm not allowed to show anything to support my cost.

18          THE COURT:  All right.  Thank you.  Go ahead.

19   BY MR. MILLER:

20   Q    Last topic, Mr. Rodeghero.  How has AutoLoop's switch from

21   SIS to 3PA and RCI for integration affected its business?

22   A    A couple big things.  I mean, as you heard from Dominion,

23   they have products that the product itself costs less than the

24   integration, and I have that as well.  I have scheduling

25   products and other products that cost well under the integration

─────────── MATTHEW RODEGHERO - DIRECT ───────────

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 68 of 185 PageID #:73263
Case: 3:07-cv-00813-jdp Document #: 165 Filed: 07/05/13 Page 67 of 184

2-A-67

1    fees, and so from the standpoint of trying to sell a product to

2    a dealership and you have to tell them, "I have a $500 product,

3    and the integration is $600 or $700," they look at you and

4    they're like, "Well, why am I going to buy that product from

5    you?  That's crazy."

6         So I lose business from that standpoint.  I'm not able to

7    sell new business from that standpoint.  I'm hurt in the aspect

8    of the ability to constantly innovate because my attention is

9    kind of spread on -- to supporting that integration, and I'm

10   hindered in the fact that I can't go back and ask for new

11   information easily.

12        There's also restrictions in the contract that if I am to

13   use their data for anything specifically not named as a product,

14   I have to come back to them to launch a new product.  So if I

15   want to do any new functionality, I'm not allowed to do that new

16   functionality using their integration information unless I come

17   back to them and recertify that product or add a product to my

18   certification, at which point then I have to recontract.

19   Q    Has AutoLoop considered using an integration provider other

20   than 3PA --

21   A    Yes.

22   Q    -- or RCI?  What other integration providers have you

23   considered using?

24   A    We've considered Authenticom.  We actually do have some

25   dealers using the DealerVault application.  We considered going

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 69 of 185 PageID #:73264
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 69 of 184

2-A-68

```
1    back to SIS.  We would love to use one of those guys for all of
2    our integration.
3    Q    Did you go back to -- or choose Authenticom?
4    A    We -- I actually recall we do have a few of the stores
5    running through the DealerVault program through other smaller
6    DMSs, and we would love to go back to using one or both of them
7    for all of our integration.
8    Q    And why do you not?
9    A    Because of that constant struggle to go through this
10   blocking and dancing task of keeping the integration up all the
11   time.
12             MR. MILLER:  No further questions.
13             THE COURT:  Before you go to your cross-examination,
14   I'm just anticipating the defendants' position here is that the
15   recertification process that kind of slows you down if you want
16   to make a product change, get more data --
17             THE WITNESS:  Uh-huh.
18             THE COURT:  -- I mean the obvious answer is that they
19   want to have a reliable connection and transmission of data, so
20   they want to test the data that you're asking for and to make
21   sure that it works.  So why isn't that a reasonable response to
22   a question that you want to change the kind and amount of data
23   that you're getting from Reynolds?
24             THE WITNESS:  Sure, and I would agree often -- if I'm
25   requesting new data, that would be -- definitely be the case.
```

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 70 of 185 PageID #:73265
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 69 of 184

2-A-69

```
 1    There are a lot of times when you can develop a new function or

 2    feature or product that doesn't change the demands of the data

 3    or doesn't require to push or pull any different data.  It's

 4    just a new functionality using that same data, and in that case

 5    there would be no change to my integration with their system

 6    whatsoever.  I would not be changing or processing how I'm using

 7    that data.  I would just be changing some interaction on the

 8    dealership side facing that information.  So, yes, it could be

 9    an easy process where I'm not changing that demand.  It could be

10    quick.

11         Where I need new data and I have to go through that, it

12    would require a little additional testing if I'm asking for more

13    information, and I agree with that.  I don't have a point of

14    contention with that.  We've had problems in the past where

15    recently we've asked for additional data, and they told us, "You

16    can't have it for six months, if then," and so we can't move

17    forward with any product development, whereas it's never been a

18    problem in the past.

19              THE COURT:  Okay.  I think I understand.

20    Cross-examination.

21              MR. ROSS:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23    BY MR. ROSS:

24    Q    Sir, could you please pronounce your last name for me?  I

25    just want to make sure I don't mispronounce it.
```

MATTHEW RODEGHERO - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 71 of 185 PageID #:73266
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 70 of 184

2-A-70

1    A    Rodeghero.

2    Q    Rodeghero.  Thank you.  Mr. Rodeghero, AutoLoop has been

3    well aware of Reynolds' third-party system access policies since

4    at least 2010.  Are you aware of that?

5    A    Yes.

6    Q    And, in fact, beginning in 2010 AutoLoop made -- began

7    making multiple complaints to the U.S. Federal Trade Commission

8    about the very same policies that we've been talking about in

9    this hearing, right?

10   A    I would suppose that's the case.  I'm on the business and

11   product side.  I'm not the one that deals with legal things like

12   that.

13   Q    Okay.  Nick, could you put up Defendants' 176, please.

14        Just briefly, Mr. Rodeghero, I've put before you an email

15   from Jason Bennick to a Lisa Kopchik at the FTC.  Who is Jason

16   Bennick.

17   A    Jason Bennick was a former employee of the company.

18   Q    Okay.  And he was a chief operating officer?

19   A    Yeah.

20   Q    And this -- as you see here in this email, it begins,

21   "Lisa, it was both a pleasure and an honor to have the

22   opportunity to speak with you recently regarding our ongoing

23   concerns with Reynolds market practices."  Do you see that?

24   A    Yeah.

25   Q    And then, Nick, if you could go to the following page,

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 72 of 185 PageID #:73267
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 72 of 184

2-A-71

 1    SIS3469 -- I'm sorry, previous page.

 2         Here at the bottom -- I'm just going to hit a couple of

 3    quick highlights -- "As a result, this enables Reynolds to" --

 4    and this is all bold -- "to block out any third-party vendor who

 5    cannot afford their RCI licensing process," and that's what

 6    you've testified about earlier here today, correct.

 7    A    Yes.

 8    Q    And then one more on the following page.  Here Mr. Bennick

 9    talks about how, "An outline of this general strategy is covered

10    in the aforementioned article," and it refers to a 2007 article

11    wherein Brockman, that's Mr. Brockman, our chairman, "continues

12    to maintain a strict policy of not allowing other companies with

13    competing applications access to the Reynolds DMS."  Do you see

14    that?

15    A    I do.

16    Q    So the third-party system access strategy, at least as

17    alleged here, was widely known in the public no later than 2007

18    according to Mr. Bennick's email, right --

19         MR. NEMELKA:  I object, Your Honor.  That's misleading.

20    That's just Reynolds, not after CDK and Reynolds worked jointly.

21         MR. ROSS:  And I'll clarify.  I'm just talking about --

22         THE COURT:  Hold on here.  Let's see where we're going

23    with this witness.  So complaints were made in 2010, references

24    something that happened in 2011.  Okay.  So the stage is set.

25    Let's ask a question.

―――――――― MATTHEW RODEGHERO - CROSS ――――――――

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 73 of 185 PageID #:73268
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 72 of 184

2-A-72

```
 1    BY MR. ROSS:

 2    Q    Correct.  I'm setting the stage just that you're generally

 3    aware these complaints were made in 2010.

 4    A    I'm not on that email, so I'm not familiar with it, but I'm

 5    seeing it, so, yes, I can say that, yes, I can see that that was

 6    made.

 7    Q    Were you shown this email before your testimony today?

 8    A    No.

 9    Q    Okay.  So let's go to page -- could we pull up Defendants'

10    175, Nick?

11         Who is Tony Petruzzelli?

12    A    Tony is one of the co-owners of the company and over sales.

13    Q    Okay.  And he's still at AutoLoop as we sit here today?

14    A    Yes, he is.

15    Q    Was Mr. Petruzzelli originally going to come and testify

16    today, but you were designated to take his place?

17    A    I'm not familiar with that.

18    Q    Okay.  Fair enough.  If you go to the bottom email -- so on

19    the second page, Nick -- on this chain this is a note from

20    Tony --

21         THE COURT:  Why don't you blow that up so I can see it.

22    BY MR. ROSS:

23    Q    This appears to be a note from Mr. Petruzzelli in August of

24    2013 to a Melanie Sabo, and I'll represent to you that Melanie

25    Sabo was an attorney at the Federal Trade Commission, and
```

MATTHEW RODEGHERO - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 74 of 185 PageID #:73269
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 73 of 184

2-A-73

1    Mr. Petruzzelli says that -- he's writing to Ms. Sabo at the FTC

2    and reiterating complaints about Reynolds and Reynolds.  Can you

3    see that?

4    A    Yes, I do.

5    Q    Okay.  And then if you go up above -- Nick, could we blow

6    up that email above? -- Mr. Petruzzelli gets a response from

7    Mr. Green at the FTC, the assistant acting director, where

8    Mr. Green acknowledges receipt of the email and states two

9    things.  One, that the FTC will evaluate --

10        THE COURT:  Okay.  Let's not do this with this witness.

11   If all you're trying to do is making the point that they

12   complained to the FTC and the FTC didn't do anything, I don't

13   think this witness is really going to have anything to add to

14   that, and so we don't need to take time to do this if that's

15   where you're going.  So if you got something you want to ask

16   this witness, let's get there.

17        MR. NEMELKA:  Your Honor, I'd like to object as well

18   because that's misleading.  If they're going to open up what the

19   FTC is currently doing, they can open up that door, but I don't

20   think they want to.  This is from 2013 before they entered into

21   the agreement.

22        MR. ROSS:  And, Your Honor, I'm simply --

23        THE COURT:  I'm not sure where you're going.  I get the

24   point.  If what you're talking about here is they complained,

25   the FTC didn't do anything, I get it.  So what do you want to

MATTHEW RODEGHERO - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 75 of 185 PageID #:73270
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 74 of 184

2-A-74

1    get from this witness?

2              MR. ROSS:  I will move on, Your Honor.

3              THE COURT:  Okay.

4    BY MR. ROSS:

5    Q    After Mr. Petruzzelli complained to the FTC and complained

6    that the FTC had not taken the action that he'd requested,

7    AutoLoop joined the RCI program, correct?

8    A    Yes, that's correct.

9    Q    In 2015?

10   A    Uh-huh.

11   Q    Has AutoLoop's Reynolds business gone up or down since that

12   time in terms of dealerships?

13   A    I don't have the exact dealer count.  I do know we lost

14   quite a few stores when we made the transition.  We have been

15   lucky enough to sign some additional business through OEM

16   relationships and large dealer groups, but I don't have the

17   exact numbers.

18   Q    AutoLoop's Reynolds dealership count has almost doubled

19   since the time that it joined the RCI program; isn't that right?

20   A    I would actually -- I don't believe that's the case.  I

21   would say that there had -- a lot of those stores that were --

22   had a separate relationship where at -- Reynolds made an

23   agreement with another integrator, actually SIS, to allow Subaru

24   to continue to use that data through SIS as opposed to going

25   through the RCI program, and a lot of those stores as of now

MATTHEW RODEGHERO - CROSS

```
 1     Subaru has asked that we move those stores over to RCI, so there

 2     were no -- it was not a doubling of our business at all.

 3     Q    Auto --

 4     A    It was all existing business.

 5     Q    AutoLoop is flourishing as we sit here today.

 6     A    We've had a struggle with Reynolds specifically.  We've

 7     been faced with the decision of having to keep that business up

 8     and running, and it's hard to sell our products and hard to

 9     compete with -- where we have to contend with those high prices.

10     Q    Nevertheless, AutoLoop is flourishing and has just recently

11     received a very important contract from Hyundai, correct?

12     A    Yes, that's true.

13               MR. ROSS:  No further questions.

14               THE COURT:  All right.  Cross?

15               MR. RYAN:  No questions, Your Honor.

16               THE COURT:  Redirect?

17               MR. MILLER:  No, Your Honor.

18               THE COURT:  Very good.  Thank you, Mr. -- and I have

19     forgotten how you pronounce it.  Rodeghero?

20               THE WITNESS:  Rodeghero.

21               THE COURT:  Rodeghero.  Thank you very much.

22          (Witness excused at 9:50 a.m.)

23               THE COURT:  Okay.  Let's do one more witness before we

24     take our morning break.

25               MR. PANNER:  Your Honor --
```

MATTHEW RODEGHERO - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 77 of 185 PageID #:73272
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 76 of 184

2-A-76

```
 1              THE COURT:  Yes.

 2              MR. PANNER:  Aaron Panner.  This is an expert so --

 3              THE COURT:  Okay.  He's going to be up there a while.

 4              MR. PANNER:  We'll have about a half hour of direct

 5      probably, so I don't know if you want to take --

 6              THE COURT:  All right.  Let's take a short morning

 7      break.  With this many people it's always hard to get back here

 8      in less than 15 minutes so five after 10:00.  Okay?

 9              MR. PANNER:  Thank you, Your Honor.

10         (Recess taken from 9:51 a.m.-10:19 a.m.)

11              THE COURT:  All right.  Let's have your next witness.

12              MR. PANNER:  Thank you, Your Honor.  Plaintiff calls

13      Dr. Hal Singer.

14          HAL SINGER, PLAINTIFF'S WITNESS, SWORN,

15              THE COURT:  Whenever you're ready.

16                   DIRECT EXAMINATION

17      BY MR. PANNER:

18      Q    Good morning.  Please state your name for the record.

19      A    Hal Singer.

20      Q    Can you briefly describe your qualifications to testify in

21      this matter?

22      A    I have a Ph.D. in economics from the Johns Hopkins

23      University.  I specialize in the area of industrial

24      organization, pricing, and antitrust economics.  I teach pricing

25      to MBA students at the Georgetown McDonough School of Business.
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 78 of 185 PageID #:73273
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/18 Page 77 of 184

2-A-77

1    I'm a senior fellow at a think tank called the George Washington

2    Institute of Public Policy.  I'm a principal at a consulting

3    firm called Economists Incorporated.

4    Q    Have you ever testified in court before?

5    A    Several times.

6    Q    Okay.  And what is your particular specialty as an

7    economist?

8    A    Industrial organization, antitrust economics, regulation.

9    I've done financial litigation as well.

10   Q    Did you have an opportunity to review the declaration that

11   you filed in this matter?

12   A    I did.

13   Q    Did you have an opportunity to review the reply declaration

14   that you filed in this matter?

15   A    I did.

16   Q    Do you stand by the testimony that's contained in those two

17   declarations?

18   A    I do.

19   Q    Now, as an economist, was there any aspect of the

20   performance of the markets that are at issue in this case that

21   you found particularly significant?

22   A    Yes.  The most significant aspect of this case, in my

23   opinion, is the prices -- are the prices and the price increases

24   imposed by defendants that were supported by the restraints at

25   issue.  I think the prices and the price increases speak to --

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 79 of 185 PageID #:73274
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 79 of 184

2-A-78

```
 1            THE COURT:  You can push the mic just a little bit.
 2    About one foot from the mic is good.
 3            THE WITNESS:  Sorry.
 4            THE COURT:  That's all right.  Happens all the time.
 5    Go ahead.
 6            THE WITNESS:  I think the price increases speak to the
 7    anticompetitive harms in this case.  I think the price increases
 8    also speak to the motivation behind the restraints at issue in
 9    the case.
10    BY MR. PANNER:
11    Q    Okay.  Can -- Steve, could we bring up the first
12    demonstrative slide?
13         Now, we heard testimony this morning from two vendors about
14    price increases.  Do you recall some of that testimony?
15    A    I do.
16    Q    You prepared this slide before you heard that testimony; is
17    that right?
18    A    Yes.
19    Q    Okay.  Can you describe what this slide is intended to --
20            THE COURT:  You can be brief.  I think I get this.
21            THE WITNESS:  I will be brief, Your Honor.  There are a
22    few benchmarks that aren't obvious, and I would like the
23    opportunity just to explain them to you in the way that I think
24    about them.  But, very simply, on the left-hand side of the
25    graph or of the figure are the pre-agreement, and I'm speaking
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 80 of 185 PageID #:73275
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 79 of 184

2-A-79

1    of the February 2015 agreement, the pre-agreement prices charged

2    by CDK, and on the right side of the figure are the post-prices

3    charged by CDK.

4    BY MR. PANNER:

5    Q    Okay.  And are there -- there are three different, I guess,

6    benchmark prices there.  Can you describe what they are showing?

7    A    Sure, and I'll be very brief.  The first benchmark I like

8    to refer to is the before/after benchmark.  As an economist,

9    it's a very common metric that's used to evaluate whether prices

10   have been elevated and can be attributable to the challenged

11   conduct.  Here CPA has raised its own price to vendors they're

12   serving, dealers on the CDK platform --

13   Q    I think the first time you said CPA, but you meant CDK.

14   A    CDK, I apologize.  CDK.  So I'm going to compare the short

15   blue line to the tall blue line.  CDK prior to this agreement

16   was charging, based on the best publicly available sources, $70

17   per rooftop per month, and after the agreement they were

18   charging on the order of $250 to 300, and that's a very

19   conservative estimate.  We've heard a lot of testimony that

20   suggests it was a lot higher than that.  This is something on

21   the order of a four times or five times increase -- sorry, three

22   times increase, going from 70 to 250.  That's the first

23   benchmark, the before/after benchmark.

24   Q    Okay.  And there's a couple other benchmarks?  Just briefly

25   describe what you're showing.

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 81 of 185 PageID #:73276
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/21 Page 80 of 184

2-A-80

```
 1    A      The second benchmark I would call the contemporaneous

 2    benchmark compared to independence.  So now I'm going to compare

 3    the 250 to 300 price point for CDK post-agreement to the 30 to

 4    $50 price point charged by independents, independent integrators

 5    post-agreement.  So we're looking at a contemporaneous period of

 6    time, sorry, and we're saying what could possibly justify such a

 7    higher price?

 8         So to the extent that we can rely on the independents as a

 9    proxy for competitive rates, which I think we can, this is

10    evidence in my mind of what we would call super competitive

11    prices, so that's the second benchmark, the contemporaneous

12    benchmark.

13    Q     What's the third bar on the bar graph?

14    A     The third bar, this one --

15            THE COURT:  Again, I can read the chart.  It really

16    seems to me you're just describing the chart to me.  I can see

17    it.  I have heard all this testimony, so let's get to really

18    what's underneath this.  I get the chart.  I get the idea.

19            MR. PANNER:  Thank you, Your Honor.

20    BY MR. PANNER:

21    Q     And we heard something about Reynolds' price increase as

22    well, and that was something that you relied on in your

23    opinions?

24    A     Yes.

25    Q     Okay.  Are you aware of any offsetting -- well, first, let
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 82 of 185 PageID #:73277
Case: 3:07-cv-00618-jdp Document #: 165 Filed: 07/05/17 Page 82 of 184

2-A-81

1    me ask you, as an economist, what harms do you see from the

2    price increase that has been observed for integration services?

3    A    The immediate harm is it's higher prices paid by vendors

4    who are seeking access to dealers' data on their respective

5    defendant's systems, but we've also heard that those vendors in

6    turn pass along those prices to their dealer clients.  So it's

7    not only the vendors who are harmed here but also dealers.

8         And these numbers, it's hard to think about an abstract

9    going from 70 to 250, but a very simple example is if you just

10   use the before/after benchmark and say it's on the order of a

11   $200 price increase, for a dealer that has ten applications and

12   five rooftops, you're talking on the order of $10,000 extra per

13   month that can be attributed to these price increases.

14   Q    Now, did you observe any offsetting benefits from the

15   change -- from the change in the way the integration services

16   were provided at this time?

17   A    I did not, and I've read the defendants' submissions, and I

18   still have not.  As an economist, I'm looking for an offset,

19   something that would keep customers whole.  So the first place

20   that I thought to look would be on the dealer side, on the DMS

21   prices to dealers.  I thought maybe this is part of a

22   rebalancing in such a way that we're going to shift some of the

23   costs burden over to vendors and we're going to relax the burden

24   on dealers, but that didn't happen.  My observation of DMS

25   prices is they've actually gone up over this period.  And, in

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 83 of 185 PageID #:73278
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 82 of 184

2-A-82

 1    fact, I think it was Mr. Schaefer who said it would just be

 2    infeasible to lower prices on the DMS side.  So no efficiency

 3    justification there.

 4         The second place that I would want to go looking for a

 5    possible efficiency justification for the restraints would be in

 6    the form of a higher quality integration offering.  You could

 7    say something like, "Maybe I'm charging this much more than what

 8    independents are, but I'm giving you a higher quality

 9    integration service," but defendants are not even arguing that.

10    So I haven't seen an offset that would compensate vendors and

11    dealers for the harm that I believe they've suffered.

12         THE COURT:  But you're overlooking the main argument

13    that the defendants are making.  And, again, this may or may not

14    be an economic question.  So what I'm really interested in from

15    you is how would an economist approach this subject because, as

16    in a lot of cases, you get the damages experts, the economists,

17    whatever, they're really not technical experts in the field, so

18    you have to deal with what you can observe in the marketplace.

19    And here, it seems to me, the defendants are making what's

20    ultimately really a technological argument that I'm not sure I

21    see how it would show up in the marketplace, and the argument is

22    pretty simple:

23         "It's really expensive to provide a secure, high quality,

24    reliable database, and what you're getting from us now with the

25    benefits of our closed system is you get an absolutely reliable,

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 84 of 185 PageID #:73279
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 83 of 184

2-A-83

1    secure data.  There are some features that Authenticom has

2    that -- you know, bells and whistles on it, but the core of what

3    you want is reliable, secure data, and that's what we're getting

4    now, and it's really expensive, and we're providing that."

5         THE WITNESS:  I got it.

6         THE COURT:  And so --

7         THE WITNESS:  Can I tell you an economist --

8         THE COURT:  Now I want to know what an economist says

9    about that.  So how do you know whether it's really secure or

10   not?

11        THE WITNESS:  So economists aren't security experts,

12   right?  So I can't speak to that benefit, but what I can do is

13   observe what I think is a very nice, natural experiment in the

14   marketplace, and that is for several years, up until the

15   agreement, we had an open platform in CDK competing against a

16   closed platform.  If you believe the defendants' claim that

17   closed is superior from a quality perspective, what you should

18   see is that customers walking with their feet, dealer customers,

19   ought to be migrating over to the closed system.  In fact, we

20   see the opposite, Your Honor.

21    We see massive substitution away from R and R's closed

22   system towards the CDK system over this period.  We're going to

23   get into this in the slide presentation.  As an economist, I

24   attach a lot of significance to that because it's telling me

25   that customers see the closed system.  They hear the pitch, you

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 85 of 185 PageID #:73280
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 84 of 184

2-A-84

1    know, supposedly a higher security, it's a whiz-bang product

2    that's superior, and yet they're moving to the open system, so

3    it's very hard for me to square that fact with defendants'

4    efficiency justification.

5            THE COURT:  Okay.  So to do this you're looking at

6    CDK's attractiveness in the market when prior to 2015 --

7            THE WITNESS:  CDK was committed to open this.  They

8    used this in their marketing literature.  They went to the

9    market and they said, "We're going to need to be superior

10   because of openness.  Because of openness, think about all the

11   things that come: low-priced integration, low-priced apps, the

12   proliferation of apps.  This is just going to be a better

13   platform than what our closed rival is doing," and they won.  We

14   see a massive, a massive share shift going from R and R during

15   this experiment to CDK on the order of 10 percentage points of

16   share shift, 40% market share down to -- even higher than 40 I

17   understand, down to 30% over this period.

18       In fact, I think it is a legitimate inquiry to contemplate

19   whether Reynolds could have sustained their closed system much

20   longer in the absence of the agreement among defendants.  That

21   is, market forces may have compelled Reynolds to adopt an open

22   system like CDK.

23            THE COURT:  Okay.  All right.

24            MR. PANNER:  Thank you, Your Honor.  Actually, I'm

25   going to indicate briefly what Dr. Singer is planning to talk

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 86 of 185 PageID #:73281
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 85 of 184

2-A-85

1    about.  If there are aspects of it that are adequately

2    covered --

3              THE COURT:  I will feel free to direct him to my

4    concerns.

5              MR. PANNER:  I would be grateful because time is short.

6        If you can put up the second slide, Steve.

7    BY MR. PANNER:

8    Q    So what are -- if you can, briefly describe the four areas

9    that you were planning to cover this morning.

10   A    Right.  The first topic is going to be product market

11   definition.  I don't want to get into the technicals that have

12   already been described about DMS and integration.  I want to

13   talk about it from an antitrust economics perspective.  What are

14   the relevant product markets in this case.

15   Q    Okay.  And then what's the next topic?

16   A    I'm going to talk a bit about the defendants' restraints,

17   and I'm going to divide those between horizontal restraints as

18   opposed to vertical restraints.  We're going to talk about the

19   two and how they reinforced each other.

20   Q    And, briefly, horizontal is between competitors?

21   A    That's right.  And vertical, to distinguish, is a

22   restriction that you place on your customers, so in this case it

23   would be either with the dealer customer or with the vendor

24   customer.

25   Q    And the anticompetitive effects of these restraints, we

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 87 of 185 PageID #:73282
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 86 of 184

2-A-86

```
 1     actually sort of started there, I guess.
 2     A    We started there.  I'd say we might come back there with
 3     time permitting as well.
 4     Q    It's one of your favorite topics, isn't it?
 5     A    I think that's what the economists are here for.
 6     Q    Okay.  And then very briefly are you going to talk about
 7     the harm to Authenticom?
 8     A    Yes.
 9     Q    Okay.  Now, who are the -- from an economic point of view,
10     who are the customers in the DMS market?
11     A    Dealers.
12     Q    Okay.  And we've heard testimony about the dominant
13     position of Reynolds and CDK in that market.  Did you in your
14     investigation and in the testimony that you heard today hear
15     anything about barriers to entry that helped the defendants to
16     maintain their market position?
17     A    I did, and this is a really important point too which -- as
18     an economist, not to hit you with too much jargon, but we think
19     about natural barriers to entry and artificial barriers to
20     entry.  The artificial would be those of the defendants' making,
21     but there are natural barriers here, and they're really
22     important.  We heard one today about the investment that it
23     would take to try to go after defendants and the DMS base.  It
24     would be a massive investment, and the know-how and the
25     technology that would have to be brought to bear is fairly
```

1    daunting.  But even if you could get over that, you have this

2    problem that we refer to as lock-in or switching costs, and what

3    that means is that the dealers have invested on their own a lot

4    of resources in training their employees to learn how to operate

5    a particular DMS system.  I think in the record making a switch

6    has been analogized to heart transplant surgery.

7              THE COURT:  I get it.  That's why the Court still uses

8    WordPerfect.

9              THE WITNESS:  Or data management systems for a law firm

10    I think would be, trying to get a law firm to switch over to a

11    data management system.  It's intimidating.  It's daunting.  And

12    so the jargon that economists use is lock-in.  But this is

13    important because it means that an entrant, even if it could get

14    over the first barrier, the technological barrier that I

15    mentioned, the up-front cost investment, you would also have to

16    convince dealers to make the switch, and that isn't easy.

17         Now, I also mentioned artificial restraints, and I think in

18    this case the length of the contracts that the defendants have

19    entered into with their dealer customers -- I understand it's on

20    the order of five years -- I'd consider that to be a barrier to

21    entry as well because if you approach a dealer and it's in year

22    two of a five --

23              THE COURT:  I get that point.

24              THE WITNESS:  Okay.

25    BY MR. PANNER:

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 89 of 185 PageID #:73284
Case: 3:07-cv-00618-jdp Document #: 165 Filed: 07/05/17 Page 89 of 184

2-A-88

```
 1    Q    Now, we also talked -- there's also been -- I'm sorry.  In

 2   your report you also talk about the market for integration

 3   services.  Who are the customers in that market?

 4   A    I would say that there are really two customers here, the

 5   dealers and the vendors.

 6    Q    Can you explain that?

 7   A    Yes.  The dealer ultimately has to grant authority as to

 8   who is going to get access to its data, so I think that the

 9   dealer --

10         THE COURT:  I think I understand the basic idea here,

11   but I guess my question is, when you define a market, you don't

12   look strictly at who pays the price for the service.  You look

13   at who makes the decision about who gets into the market?  Am I

14   conceiving of this the right way?

15         THE WITNESS:  I think so.

16         THE COURT:  Let me give you an example.

17         THE WITNESS:  This is a special case.

18         THE COURT:  Okay.  So college textbooks.  The professor

19   chooses the textbook, the students pay for it, and so that has

20   certain effects on the market and so --

21         THE WITNESS:  Health care.  You could think of health

22   care --

23         THE COURT:  That's another one where the decisionmaker

24   and the person who pays for it separates, and that has an

25   inflationary kind of --
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 90 of 185 PageID #:73285
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/11 Page 89 of 184

2-A-89

```
 1              THE WITNESS:  Right.

 2              THE COURT:  So help me explain, if I look at this

 3      integration services market, what are the peculiarities of this

 4      market that should matter most to me?

 5              THE WITNESS:  I think that this aspect -- the question

 6      was who is the customer.  I mean, who is making the decision?

 7      The vendor is not entirely making the decision here.  It's a

 8      decision that's made jointly with the dealer customer.  So I do

 9      think that's a salient aspect of this market.  We'll talk about

10      others too but --

11              THE COURT:  Okay.

12      BY MR. PANNER:

13      Q    Now, as an economist --

14              THE COURT:  The fundamental question here is, is there

15      even such a market?  Now it's just built into the DMS product.

16      If I take the defendants' view, it's just a thing that DMS

17      software does.  So is it still a market?

18              THE WITNESS:  It's still a market.  We come across this

19      issue in lots of cases.  I do a lot of work in the area of

20      vertical integration, and there's always the question of when an

21      ancillary product or service -- when the defendant vertically

22      integrates into some ancillary product or service with an aim of

23      hopefully, in their opinion, trying to serve that service, does

24      the ancillary market go away?  Right?

25              So as an example, I was involved in the Comcast/NBC merger,
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 91 of 185 PageID #:73286
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/21 Page 90 of 184

2-A-90

1    so Comcast vertically integrates into broadcast television by

2    buying NBC.  Does broadcast television go away as a relevant

3    antitrust product market?  No, it does not.  Now, it's true that

4    Comcast's vertical integration may impair competition in that

5    market, slant the playing field in favor of Comcast's affiliate,

6    but it doesn't negate the existence of the ancillary market.

7    Your Honor, the defendants still offer integration services --

8              THE COURT:  Help me understand this.

9              THE WITNESS:  Okay.

10             THE COURT:  At some point it could, right?  So I don't

11   really think that there's a separate market for spell-checkers

12   right now because it's just integrated into your word processing

13   software.  Now, if you look back in the olden days, maybe there

14   was -- I'd buy a word processor.  Then I'd also have to shop for

15   the spell-checker.  Now it's so thoroughly integrated it just

16   doesn't make sense to talk about the market for spell-checkers.

17   Okay?  So help me understand if that's what's going on here.

18             THE WITNESS:  If I could use another example, it's a

19   famous antitrust case, one that I actually cut my teeth on, was

20   the *Microsoft* case.  So there Microsoft incorporated the browser

21   into its operating system, right?  And did that negate the

22   existence of a browser market?  No.  Microsoft still competed,

23   albeit now at an extreme advantage vis-a-vis Netscape.

24        So here I would look to the question of whether or not

25   there exists a demand separate and apart for -- this is what the

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 92 of 185 PageID #:73287
Case: 3:17-cv-00513-jdp Document #: 165 Filed: 07/05/17 Page 92 of 184

2-A-91

```
 1    Court suggests was the test -- for the ancillary market, in this
 2    case integration service, that is distinct and separate from the
 3    primary service, which is DMS, and I think if you go into that,
 4    there is a separate demand.
 5            THE COURT:  Do I judge that now or do I judge it prior
 6    to the restraining conduct?
 7            THE WITNESS:  I don't think it changes.  I don't think
 8    it changes.  I still think there's a separate demand for
 9    integration.  When the defendants offer the service, they offer
10    it through a separate unit.  Defendants still --
11            THE COURT:  Does that matter?
12            THE WITNESS:  It does matter.  It does.  Because it's
13    perception is the marketplace.  CDK still offers integration
14    separately, as we've heard, to vendors who are trying to access
15    non-CDK dealer systems, right?  So that's still a standalone
16    service.  Independent operators are still offering integration
17    service to this day, albeit in an impaired state.  So the notion
18    that integration has been negated, I mean, you wouldn't be able
19    to understand the case if you looked away at that product
20    market.
21            THE COURT:  Okay.  All right.  So for you the thing is
22    that there's still a demand for independent integration
23    services.
24            THE WITNESS:  Correct.  And we have other evidence too.
25    If I could?
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 93 of 185 PageID #:73288
Case: 3:17-cv-00518-jdp Document #: 165 Filed: 07/05/19 Page 92 of 184

2-A-92

```
1              THE COURT:  Uh-huh.

2              THE WITNESS:  So we always ask this question about a

3      hypothetical monopolist test, right?  Could a hypothetical

4      monopolist of integration service raise prices above competitive

5      levels and not lose so many customers as to render the price

6      increase unprofitable?  This is straight out of the merger

7      guidelines, right?  But if it couldn't, that would suggest that

8      maybe integration doesn't represent its own product market.

9              Here we have two nice experiments, again, that directly

10     answer the question.  We've got CDK's very large price increase

11     that we heard testimony today about, right?  And I have traced

12     the profitability of that price increase, right?  It was

13     profitable, right?  And that tells me that not only is

14     integration a relevant product market, but it also suggests that

15     there's a specific aftermarket, a CDK-specific integration

16     market, that is its own antitrust product market.

17             R and R, even though it wasn't as profitable for its price

18     increase, the reason why it wasn't as profitable, of course, is

19     that they were competing against an open system when they raised

20     their prices.  There was more defection.  R and R suffered more

21     defection, it is true, than CDK, but they didn't suffer so much

22     defection as to render the integration price increase

23     unprofitable.

24             THE COURT:  Let me ask you a question about your

25     natural experiment.  I think this is one of the ways it's
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 94 of 185 PageID #:73289
Case: 3:17-cv-00018-jdp Document #: 165 Filed: 07/05/17 Page 93 of 184

2-A-93

1    criticized.  I think your analysis of the critical loss really

2    was an analysis that was based on essentially gross revenues,

3    and I think you're criticized for not really examining the

4    profitability of it.

5         THE WITNESS:  I actually use margins for both.  I had

6    margin estimates.  There was an Elliott Management study or

7    letter that conveyed not only what Reynolds' margins were but

8    also what CDK's margins were.  Elliott was complaining that

9    CDK's margins were smaller, so I actually made use of those

10   margins.  It is one of the key inputs, Your Honor, in the

11   critical share calculation, and it told me exactly how much

12   defection either defendant would have to suffer in order to

13   render the price increase unprofitable, and I found that the

14   amount of defection, even for R and R, which was more severe

15   than the defection encountered by CDK which was covered at the

16   time when it went closed, was not enough to render the price

17   increases unprofitable.

18        THE COURT:  And on the product-specific market, and

19   here I'm thinking about the *Kodak* case --

20        THE WITNESS:  I am too.

21        THE COURT:  -- as the prototype --

22        THE WITNESS:  I am too.

23        THE COURT:  -- if I kind of look at the way it looks

24   like now, thinking of just the 3PA integration function that CDK

25   has and the RCI that R and R has, it's not quite analogous to

1     the Kodak situation because there was still some independent

2     service people who could service Kodak copiers, but here it's --

3     I get it that in a sense it's product specific because it

4     relates only to CDK dealers, but there's no real market there.

5     You either are in the 3PA or you're not, and so I'm wondering if

6     it makes sense to think of it as a product-specific market in

7     that way.

8          THE WITNESS:  I think so.  This is the way we get to

9     the question from an economic perspective is if a hypothetical

10    monopolist only controlled the CDK-specific integration market,

11    would it be able to raise prices significantly over competitive

12    levels without suffering enough loss to render the price

13    increase unprofitable?  I don't think that CDK needs the R and R

14    to control -- this hypothetical monopolist, which isn't so

15    hypothetical.  Would they need to also control other integration

16    markets in order to raise the price?  The answer is no, and it

17    is because, quite simply -- we go back to the lock-in story --

18    the vendor doesn't like this price increase.  We've heard

19    testimony that it's painful.  In fact, it's so painful that it's

20    causing some, you know, apps to go out.  The vendor, to dodge

21    this price increase, you know, by CDK to pick one example, would

22    have to go start convincing dealers that they should defect over

23    to a different DMS, right?  "Help me, help me, because I don't

24    want to suffer this harm."  That's a very tough pitch to a

25    dealer, and so as a result, the vendors are extremely vulnerable

1    to these price increases, and they basically have to take it.

2         THE COURT:  And so your answer to the defendants'

3    position, which is that we acknowledge it's got a unified system

4    here -- it's a DMS system, and it includes data integration as

5    one of our components -- the answer is that, yeah, dealers don't

6    like it, but there's robust competition in the DMS market, so

7    dealers can choose the DMS that they like, and if this

8    independent integration is something they like, they can go to a

9    DMS provider that offers it.  Your answer is that, no, there's

10   just this very pronounced stickiness in the DMS market that

11   prevents dealers from actually making a market decision about

12   what they like in a DMS system.  It's not impossible to switch,

13   but there's so much stickiness in there that it makes too much

14   of a difference.

15        THE WITNESS:  Correct, and we've heard a lot of

16   testimony about the 28% and why can't you just make a go on the

17   28.  I just want to note that the 72% that we hear actually

18   understates, in my opinion, the market share.  Go to the merger

19   guidelines, and you'll see there's all different ways to

20   denominate shares.  The 72% is denominated in terms of dealers,

21   but we know the defendants are charging more for DMS.  They're

22   earning more revenue per dealer than the fringe supplier.  So on

23   a revenue basis, Your Honor, the market share is much higher

24   than 72%.  We'll get it eventually when we get into the

25   discovery.

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 97 of 185 PageID #:73292
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 96 of 184

2-A-96

```
1          And, second, I would note that the scraps are being divvied

2     up by not one or two firms but, according to defendants, by five

3     firms, right?  So you have five firms having to divvy up the

4     residual, and I don't think that any one of those are

5     sufficiently potent so as to discipline --

6          THE COURT:  I want to make sure I understand the point

7     of that.  So if there were one of these little players that had

8     a really great product and it had the additional benefit of

9     having an open system so you could pick your own data

10    integrator, they could gain market share because it's -- the

11    market demands it.

12         THE WITNESS:  It's possible they could.  I understand

13    the defendants are -- at least one of the defendants are in the

14    process of acquiring one of those upstarts that now represents

15    on the order of 8%, so it's conceivable that one could represent

16    a threat, but if they get taken out, of course, they won't --

17         THE COURT:  Well, I think I get the point here though,

18    which is that I think there are two phenomenon.  One is that

19    there's such high natural barriers to entry that one of these

20    small players, whose products -- I think there's some testimony

21    that the products are deficient and not really effective

22    competitors anyway, but the high barriers to entry really

23    prevent them from becoming effective alternatives, and even if

24    there were an effective alternative, there's such high switching

25    costs that the market is reluctant to make the move at all, and
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 98 of 185 PageID #:73293
Case: 3:07-cv-00518-jdp Document #: 165 Filed: 07/05/13 Page 97 of 184

2-A-97

```
 1    so as a result of that then, the defendants are able to

 2    extract --

 3            THE WITNESS:  Right.  One thing that we're going to get

 4    to see, Your Honor, is we're going to get into the switching

 5    data in more detail, and you'll see that as a result of the

 6    agreement, there's been a sharp drop-off in defections from

 7    Reynolds.  Reynolds used to be losing -- when they were the only

 8    closed and they were competing against open and then a fringe

 9    that was open, they were losing a lot of dealer customers year

10    after year after year.  That defection has largely dropped off.

11    We'll get into an exhibit that shows that.

12            THE COURT:  Okay.  All right.  I think I get the basic

13    lay of the land here.  Again, I don't mean to totally monopolize

14    your examination, but I'm turning it back to you.  Take me to

15    the next chapter.

16            MR. PANNER:  I appreciate it.

17    BY MR. PANNER:

18    Q    Let's try to move on to talking about the economic analysis

19    of the restraints that are at issue here, and you've referred to

20    an agreement between CDK and Reynolds that they entered into I

21    believe it was February of 2015.  Are you familiar with that?

22    A    Yes.

23    Q    Okay.  What was the nature of that agreement?

24    A    Well, to understand the nature, you have to understand that

25    these defendants are vertically integrated up and down the
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 99 of 185 PageID #:73294
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 99 of 184

2-A-98

```
 1    supply chain not only in DMS but also in integration and also in
 2    the app space, and I think the agreements, when you consider
 3    them collectively, speak to how the defendants are going to act
 4    or not act vis-a-vis independent integrators up and down that
 5    chain.
 6    Q    Okay.  Now, what in particular was the nature -- I have
 7    heard this referred to as a wind-down agreement.  What
 8    specifically was the focus of that first agreement?  I think
 9    it's -- we can pick it up just so that the Court has it,
10    Defendants' Exhibit 1.  Let me just make sure.  I don't know if
11    it's been introduced.  Is there any objection?
12              MR. RYAN:  No objection.
13              THE COURT:  It's in.
14    BY MR. PANNER:
15    Q    Just for reference, what was the focus of this Defendants'
16    Exhibit 1?
17    A    As an economist, my takeaway from this agreement is that,
18    as the name suggests, they are winding down competition in the
19    market for integration, and so prior to the agreement, CDK was
20    competing against R and R with CDK's own integration product.
21    This is for vendors who are trying to access data on dealers who
22    are R and R customers.  Prior to the agreement, you have
23    competition.  After the agreement, that competition is
24    extinguished.  So in my mind, I mean, they were horizontal
25    competitors.  They're competing in the same product market.  The
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/29/20 Page 100 of 185 PageID #:73295
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 99 of 184

2-A-99

```
1    agreement extinguishes that competition.  It is, therefore, a

2    horizontal agreement.

3               THE COURT:  And this is the competition from DMI.

4               THE WITNESS:  Correct, Your Honor.

5    BY MR. PANNER:

6    Q    And how does that harm Reynolds' customers?

7    A    Well, that harm is fairly obvious in the sense that

8    Reynolds' customers used to have a choice in which integration

9    provider they would go with.  CDK's price was lower at the time,

10   and that choice has been removed.

11   Q    Does anything about that affect competition in the DMS

12   market?

13   A    It does, and this one -- you'll have to allow me a little

14   bit longer to get this one out because it's not as obvious.

15               THE COURT:  You're scaring me.

16               THE WITNESS:  Does that mean my answers have been too

17   long already?

18               THE COURT:  No.  It's just that you're now winding up

19   for a long explanation for something I think I understand.

20               THE WITNESS:  I just want you to take a breath because

21   this one --

22               THE COURT:  I really don't want to miss anything, but I

23   took the time to read your declaration, so I think I get the

24   gist of it, but I want to make sure that what we can do here is

25   get to the nuances and to concerns that I have.
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 101 of 185 PageID #:73296
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 100 of 184

2-A-100

1          THE WITNESS:  This one is hard, and I just want to take

2    a breath, and then I'll go in.  So here we go.  Prior to the

3    agreement CDK used to have a relationship with R and R's dealer

4    customers, all right?  That relationship was that CDK was

5    providing integration service to them.  It's true they weren't

6    providing DMS yet, but I see that as having a toehold.  Not to

7    hit you with too much economic jargon, but the notion is that

8    once I have a foot in the door with the dealer customer, it

9    becomes that much easier to convert that customer into a CDK

10   dealer customer for DMS service, Your Honor.

11         And now what we're doing with this wind-down agreement is

12   that CDK is throwing away those relationships.  It's

13   extinguishing a foot in the door of a dealer customer and

14   saying, "You take them.  You take them back."  This has

15   ramifications beyond the integration market, Your Honor.  This

16   is now directly impairing competition in DMS.

17         There's one other aspect, if I could, and that's why I said

18   take a breath, there's a second way in which it impairs

19   competition in DMS, and that is the horizontal agreements of

20   February 2015, in my opinion, supported and reassured CDK in its

21   choice of reversing what had been a decade-long practice of

22   openness towards a closed system.  That is, we see in CDK's

23   planning documents, they're talking about reciprocal

24   arrangements as part of moving from their open to the closed

25   system.  They needed the assurance.  They needed reciprocity.

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 102 of 185 PageID #:73297
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 101 of 184

2-A-101

```
 1      "Will you help us attack and stop independent integrators?"

 2           And so now what's happening is that whereas the market,

 3      dealers used to enjoy this competition between an open platform

 4      and a closed platform, the horizontal agreement of February 2015

 5      tips the market now in the direction of closed versus closed.

 6      This is inferior from the perspective of dealers.  Clearly they

 7      would like at least the opportunity to have some openness in the

 8      marketplace, and so the agreement in that sense assists in

 9      the --

10           THE COURT:  Help me understand exactly what CDK gets

11      out of this then.  This gets into some of the finer points of

12      the agreement, which I want to make sure I have a handle on.

13           THE WITNESS:  Your Honor, I have been trying to

14      understand exactly that as well because what's much more obvious

15      to an outsider is all the goodies that Reynolds gets out of the

16      agreement, right?  CDK is agreeing to wind down this integration

17      offering that they used to, and they're not -- they're no longer

18      going to be doing that.  They're turning back these

19      relationships.  CDK is also offering to charge a free service

20      for integration to R and R in its capacity as a vendor, right?

21      R and R used to use Authenticom in its capacity as a vendor, and

22      now they're going to get free service from CDK, which I can

23      explain at least why I think they're doing that.

24           So there are obvious benefits that are going to arrival

25      from this agreement, and no firm would ever willingly give away
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 103 of 185 PageID #:73298
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 102 of 184

2-A-102

1    benefits unless it was getting something back in return, and CDK

2    was -- this is not an economic phrase -- eating R and R's lunch

3    in my opinion.  They were stealing share.  We're going to see

4    that in the churn data.  They were stealing massive amounts of

5    customers year after year when we had this regime of open versus

6    closed.  They're giving that away too.

7         I mean, so what is it?  What is it that they're getting

8    back?  And you put your finger on the mystery, and,

9    unfortunately, because we haven't had discovery yet, I don't

10   have a concrete answer.  There are surmises that I've been -- in

11   conversations I've had with Mr. Cottrell and others about what

12   we think is going on, and I'm happy to offer them to you, but I

13   don't have any documents or evidence that would answer the

14   question precisely as to what CDK is getting out of it.

15             THE COURT:  Okay.  Good.  All right.

16   BY MR. PANNER:

17   Q    Can we go to -- this will help to illustrate a little bit

18   about what I think you were talking about, Dr. Singer.  Can we

19   go to slide 4?  Yeah.  Now, can you quickly describe what this

20   shows?

21   A    Right.  This shows Reynolds switching data, and so there's

22   an important caveat that you should know, that 2017 is a partial

23   year, so I don't want to create the impression that the

24   defections away from Reynolds dropped from 411 to 91.  That is

25   not the impression, okay?  But if you just stopped the

Case: 1:18-cv-00864 Document #:1080-15 Filed: 07/28/20 Page 104 of 185 PageID #:73299
Case: 3:17-cv-00318-jdp Document #:165 Filed: 07/05/19 Page 103 of 184

2-A-103

1    experiment in 2016, you'll see that losing 411, 389, right?

2    These numbers are halved by the time you get to 2016, a year

3    after the agreement has been hatched.  You could extrapolate

4    what's going to happen in 2017 by multiplying it by three, I

5    think, but you're still well south of the 400 number of

6    defections.

7         But here's what's more important I think, Your Honor, is

8    look at the -- of the 411, look how many went to CDK prior to

9    the horizontal arrangement in place, right?  235 dealers

10   switched of the 411.  That accounts for 57% of all defectors

11   from Reynolds.  Even though 2017 is partial data, you still can

12   take the ratio, one-third of the way or one-fourth of the way

13   through the year, and the agreement has ensured now that the

14   defections from -- as a percentage, the defections that are

15   going from Reynolds, fewer and fewer are heading towards CDK,

16   and this is -- this is a clear benefit to Reynolds.

17        Certainly when you're going closed and your rival is going

18   open, it's painful.  You're going to lose a lot of customers

19   that way, and the agreement appears to have been successful, at

20   least from Reynolds' perspective, in shutting down significantly

21   that sort of substitution.

22   Q    Okay.  I want to switch quickly, because we don't want to

23   take too much time, to the question of vertical restraints.  Can

24   you tell me what are the -- what's the basic vertical restraint

25   from the point of view of integration services between the DMS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 105 of 185 PageID #:73300
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 104 of 184

2-A-104

```
 1    providers and the dealers?

 2    A     So the defendants put restrictions in their agreements with

 3    their dealer customers as to the nature of the dealings that a

 4    dealer could have with third-party integrators.

 5    Q     With respect to the vendors, were there vertical restraints

 6    that were imposed?

 7    A     Yes.  It operated very similarly and, one, it was as part

 8    of a certification program, that it was a condition of

 9    certification that you would -- you as the vendor would agree

10    not to deal with third-party integrators.

11    Q     Okay.  And --

12          THE COURT:  Let me just make sure I know where this --

13    and this is in the wind-down agreement?

14          THE WITNESS:  No, Your Honor.  These are agreements

15    that defendants strike with their dealer customers and with

16    their vendor customers separate and apart from the horizontal

17    agreement with the -- among themselves.

18          THE COURT:  And one of the questions I have is, is this

19    independent action by the two defendants or is this in some way

20    an outgrowth or required in the wind-down agreement?

21          THE WITNESS:  It's a great question.  I mean, to me

22    that's kind of at the heart of the case, Your Honor.

23          THE COURT:  That's why you're here to help me get

24    there.

25          THE WITNESS:  And we're at a preliminary phase, so I
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 106 of 185 PageID #:73301
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 105 of 184

2-A-105

1    want to be careful, but this is what I can say as an economist:

2    What I observe is that CDK faced this decision every year.

3    Every year it went up against a closed system starting in 2007.

4    It seems like they didn't -- Reynolds didn't really start

5    imposing blocking I think in a serious way until 2011 time

6    frame, but CDK keeps evaluating this decision over and over

7    every year.  "Should I follow or should I stay open?"  And every

8    year they tell us with their feet what they think is the most

9    profitable solution.  They choose open.  They not only choose

10   open, they put it in their marketing, and they go right after

11   dealer customers, and they say, "This is why we're a better

12   system.  We're open.  We'll never go closed."

13        So all of a sudden the calculus somehow changes in February

14   '15, 2015, right, in the early part of 2015.  And we have two

15   dueling hypotheses as to what changed that calculus, and

16   defendants say, and I'm going to try to put this, you know, in

17   the most respectful and credible way possible, is that they were

18   learning of attacks in the news on Target and -- there's another

19   one besides Target they thought was important; I can't remember

20   what it was -- and this changed their calculus.  That's behind

21   door number A.

22        Behind door number B is that we have at the same time a

23   horizontal agreement between the two in which they agree to join

24   forces up this stacked vertically integrated structure to make

25   life very difficult for independent integrators.  I mean, those

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 107 of 185 PageID #:73302
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 106 of 184

2-A-106

 1    are your dueling hypotheses.  Did we get here naturally?  Did we

 2    get here with a unilateral decision or did we get here because

 3    CDK needed assurances, right, that they got back in the form of

 4    this February agreement to close their system down.

 5         THE COURT:  Tell me what -- here is the thing that I'm

 6    struggling with here in terms of the analysis of the agreement:

 7    What are the assurances that CDK got back and why do you

 8    characterize it as joining forces?  The defendants are going to

 9    tell you that it was just because there was a pattern of

10    unauthorized access by DMI to the Reynolds DMS dealer data, and

11    so basically it was an agreement to stop unlawful activity.

12         THE WITNESS:  Let's start with that October 2014

13    planning document where CDK is thinking about closing its

14    system.  One of the bullet points in that document, and I'm

15    paraphrasing now but I'm sure we can get it up, is reciprocal

16    agreements from rival DMS providers.  I think that the notion of

17    reciprocity, that is that if we can unite and join forces in

18    snuffing out independent integrators, we will be much more

19    effective than if we try to do it alone.

20         Then you turn next to the agreement, and you get those

21    assurances from Reynolds.  Reynolds assures CDK that it's not

22    going to support third-party integrators.

23         Now, there's a wonderful question out there is why did CDK

24    need these assurances in light of the pattern that Reynolds had

25    displayed for year after year of being closed, being hostile, if

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 108 of 185 PageID #:73303
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 107 of 184

2-A-107

```
 1      you will, to third-party integrators?  And to that I would

 2      respond that Reynolds is losing a lot of market share,

 3      potentially over 10 percentage points of market share, and

 4      what's not clear to me is whether Reynolds could have sustained

 5      those losses year after year after year.  What assurance do we

 6      have that Reynolds isn't going to go open?  What assurance do we

 7      have that Reynolds isn't going to launch its integration product

 8      and go after our customers, right?  What assurances?

 9              THE COURT:  Okay.  So Reynolds assures CDK that it will

10      continue to stay on a closed system.

11              THE WITNESS:  Exactly.

12              THE COURT:  Okay.  All right.

13      BY MR. PANNER:

14      Q    Your Honor -- sorry, Dr. Singer, there has been --

15      A    Call me Hal.

16      Q    There has been -- you've heard some testimony this morning

17      about the provisions in contracts between Reynolds and vendors

18      and in contracts between CDK and vendors about passing on

19      information about integration service costs.  Did you hear that

20      testimony this morning?

21      A    I did.  It's been referred to as the price secrecy

22      provisions.

23      Q    And why are those significant from an economic point of

24      view?

25      A    From an economic point of view, they tell me that the
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 109 of 185 PageID #:73304
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 103 of 184

2-A-108

```
1   defendants didn't want their dealer customers to know of the

2   source of the price increases on the vendor side.  If these

3   price increases were small, if they thought that vendors weren't

4   going to try to pass them along, then if they didn't -- if they

5   didn't worry about what it was going to do to their relations,

6   their customer relations with dealers, these provisions likely

7   wouldn't be in the agreements, but what -- as an economist what

8   I'm reading is that, "This is going to be big.  This could cause

9   trouble, and we want to impair the ability of the vendors to

10  communicate the source and the magnitude of the price increases

11  that we're imposing on that side of the market."

12          THE COURT:  And, again, do you have any information

13  about whether the price secrecy provisions were a matter of

14  agreement between the defendants?

15          THE WITNESS:  I do not.

16          THE COURT:  Okay.

17          MR. PANNER:  Dr. Singer -- no further questions.

18          THE COURT:  Okay.  Cross-examination.

19          MR. COHEN:  Thank you, Your Honor.  Your Honor, may I

20  approach?  I have a notebook.

21          THE COURT:  Yes.

22          MR. COHEN:  I don't think I'll use most of this given

23  your questions, Judge Peterson.

24          THE WITNESS:  Thank you.

25          MR. COHEN:  Sorry to throw the courtroom off.
```

HAL SINGER - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 110 of 185 PageID #:73305
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 109 of 184

2-A-109

```
 1              THE COURT:  That's quite all right.

 2              MR. COHEN:  I'm 52.  I'm old, and it's --

 3              THE COURT:  That's fine.  Let her rip right from there.

 4                        CROSS-EXAMINATION

 5      BY MR. COHEN:

 6      Q    So I think I wrote down CDK, when it was an open system,

 7      was stealing massive amounts of customers, so much so that

 8      Reynolds was going to lose its shirt and maybe not even stay in

 9      business, but switching is so hard that we're a single brand

10      market?  How is that consistent?

11      A    I don't think that characterizes my testimony.

12      Q    I think that's exactly what you said.  Dr. Singer, did you

13      just say up here in response to the direct testimony that CDK,

14      when it was an open system was, quote/unquote, "stealing massive

15      amounts of customers from Reynolds"?

16      A    I did.  What I was quibbling with was that they were on the

17      verge -- I think you said on the verge of going out of business.

18      I didn't testify to that.

19      Q    You said it was uncertain, did you not, whether or not

20      Reynolds could survive?

21      A    No.  It was uncertain whether or not Reynolds could sustain

22      a closed policy while they were competing against a viable

23      competitor with an open policy.

24      Q    But Reynolds had always been one, always been a closed

25      system.
```

HAL SINGER - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 111 of 185 PageID #:73306
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 110 of 184

2-A-110

 1    A    Absolutely.

 2    Q    Always blocked access, always restricted access to only

 3    authorized users, correct?

 4    A    I just want to be careful --

 5    Q    I think that's a good idea generally.

 6    A    Yes, but --

 7              MR. PANNER:  I object.

 8              THE COURT:  Sustained.  This is getting very

 9    argumentative, and it seems like we're getting off to kind of an

10    unproductive start.  You have a point here about the fact that

11    there was a lot of switching apparently with R and R -- from R

12    and R to CDK, but you're saying that switching costs are high,

13    so reconciling those seems to be -- you know, they're tendencies

14    that are pointing in opposite directions.

15              THE WITNESS:  They are.

16              THE COURT:  So you've acknowledged that.

17              THE WITNESS:  I have acknowledged that.

18              THE COURT:  Which I think is the point of the question.

19    Okay?  Next question.

20    BY MR. COHEN:

21    Q    Could -- would you mind putting the switching demonstrative

22    on that you all used?

23         I'd like you to look at your switching demonstrative,

24    please, for a moment, Dr. Singer.  Thank you.

25         So this chart shows dealers switching from Reynolds in the

---

HAL SINGER - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 112 of 185 PageID #:73307
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 112 of 184

2-A-111

```
1    first column, correct?  This is business that Reynolds lost in a

2    particular year; is that right, Dr. Singer?

3    A    Yes.

4    Q    And the second column shows how many went to CDK, correct?

5    A    Of those, how many went to CDK.

6    Q    And then the last is your, in essence, calculation of that

7    percentage, correct?

8    A    Yes.

9    Q    And I'm not going to quibble with the math.  I'm accepting

10   it all.

11   A    Okay.

12   Q    Before the alleged horizontal restraint in 2014, 361

13   dealers switched from Reynolds, correct?

14   A    I just want to make sure, I think you said the horizontal

15   restraint in 2014.  It was in 2015.

16   Q    Before the horizontal restraints.

17   A    Right.  So 2014 definitely predates the horizontal.  You

18   had 361 leaving Reynolds, correct.

19   Q    And if you take 2017 and you have 91 through April --

20   correct?

21   A    Correct.

22   Q    -- and if you were to stretch that out to the end of the

23   year, I calculate that out to be 273.

24   A    Yes.

25   Q    So 361 in 2014 and 273 in 2017.  Not a huge difference, is
```

Case: 1:18-cv-00864-Document #: 1080-15 Filed: 07/28/20 Page 113 of 185 PageID #:73308
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 112 of 184

2-A-112

1    it?

2    A    When you compare those two years, no, but I'm looking at a

3    longer trend that begins in something in the range of 400.

4    Q    So let's look at the trend a little bit.  From 2016 to

5    2017, the switching trend is going up more -- they're losing

6    more.  Post-alleged restraint, that trend is increasing again.

7    2015 it's 209.  2016 it's going up again.  2017 it's going to go

8    up even higher, correct?

9    A    Correct.

10   Q    So let's also look at where they're going.  In 2015, 54%

11   are going to someone other than CDK, right?

12   A    Yes.

13   Q    And in 2016, 59% are going to someone other than CDK.

14   A    Right.  The agreement is having the effect of causing less

15   defection towards CDK.  That's my thesis, right?

16   Q    But they're going somewhere.

17   A    Yes.

18   Q    And they're going to an open system.

19   A    Yes.

20   Q    Yeah.  And in 2017 the number, which is not notably

21   different than pre-restraint, 78% are going to another DMS

22   supplier other than CDK in some open system.

23   A    I would respectfully disagree.  When you look -- if you're

24   asking me, 22% is a -- I'm not talking about statistical

25   significance; I'm talking about economic significance -- is a

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 114 of 185 PageID #:73309
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 113 of 184

2-A-113

1   much smaller percent than the 57% at the beginning of the time

2   series.

3   Q    And it's actually -- but even there until 2017, it is a

4   smaller percentage going to CDK, but 78% of those people are

5   finding a home.  They're going somewhere.

6   A    Right.  What you've done is you've managed, through the

7   horizontal agreement, you've managed --

8          THE COURT:  Let's let him ask the question.

9   BY MR. COHEN:

10  Q    Do you agree with that?

11  A    I agree that 1 minus 22 is 78.  I'm with you.

12  Q    You agree that in 2014, the year before the alleged

13  restraint, and I'd prefer to call it an "alleged restraint," the

14  numbers are not notably different between the years 2014 and

15  2017 if you play that out.  What is notably different is simply

16  the percentage who were finding a different home; is that

17  correct, Dr. Singer?

18  A    If I could put it in my words, the purpose of this

19  demonstrative was to show that the percentage of the defectors

20  who are going to CDK is falling over time, and I attribute that,

21  at least in part, to the alleged horizontal agreement.

22  Q    It could also be attributed to CDK's unilateral change in

23  policy, could it not?

24  A    For whatever reason -- for whatever reason we see fewer

25  defections going to CDK, and it happens to coincide with this

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 115 of 185 PageID #:73310
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 114 of 184

2-A-114

1    agreement that was entered -- a horizontal arrangement between

2    CDK and R and R.  CDK was also embracing a closed system at the

3    same time.  So I grant you that there are a lot of factors that

4    are undermining competitive options for dealers.

5    Q    The nub of your interest in this subject matter is CDK's

6    switch from an open system to a closed system, correct?

7    A    I'm not sure "nub of my interest."  It is a very compelling

8    economic question as to what caused them to make that switch.

9    Q    I think what I'm trying to get at in plain speak is that

10   this is -- this would not be -- this would be of interest --

11   this is of interest to you because you feel the consequence of

12   the 2015 agreement was for CDK to go to a closed system; is that

13   right?

14   A    I think it helped that transition, yes.

15   Q    And if CDK went to a closed system purely unilaterally,

16   purely on its own in 2015 and there was no agreement between

17   Reynolds and CDK that CDK needed or that caused them to change

18   to that closed system, then that's just a unilateral marketplace

19   decision, and that's not a restraint, is it?

20   A    Well, first, it is, but, second, it sounds like what you

21   want me to do -- and we can do hypotheticals because that's what

22   we do, right?  We could assume away the existence of the

23   horizontal agreement and say if all we had in '15 was a movement

24   from closed to open -- open to closed, could that be causing the

25   result?  And I grant you, yes, if that's all we had, but that's

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 116 of 185 PageID #:73311
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 116 of 184

2-A-115

1    not what we have.  We have two things that are happening

2    concurrent, which is the horizontal agreement and CDK's decision

3    to become closed after decades of being open.

4    Q    Right.

5    A    Sorry, decade-plus of being open.

6    Q    And the horizontal agreement is for CDK's DMI system to no

7    longer compete with the functionality that Reynolds provides in

8    its own computer system with respect to access; is that correct?

9    A    That is -- that's one component of a larger set of

10   agreements.  There's three agreements that are signed, of

11   course, at the time, but if I could put it in my words, yes,

12   that CDK is agreeing to give up these relationships that it had

13   developed, valuable relationships in my opinion, with dealers

14   who are using a rival for their DMS and basically turn those

15   customers back over to Reynolds.  I haven't seen -- I haven't

16   seen anything like that, you know, in my antitrust experience.

17   I thought it was a pretty significant event.

18   Q    And how many times in your antitrust experience has a

19   computer system operator been compelled to grant access to

20   anybody who wanted it?

21   A    I can't think of examples off the top of my head right now.

22   Q    It's kind of hard, right?  We've been talking -- and I

23   don't know if you were in the courtroom for my opening at all.

24   A    I was.

25   Q    I talked about a case called *Facebook*.  Do you recall that?

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 117 of 185 PageID #:73312
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 116 of 184

2-A-116

```
 1     A    I don't recall the Facebook case.

 2     Q    Facebook -- you understand Facebook is a social network

 3     that is an attractive place where data aggregators at one point

 4     in time tried to scrape the screens and form services around

 5     that.  Do you know that?

 6     A    I'm not all that familiar with that case.  I'm sorry.

 7     Q    So let me -- here is where I'm going with it, and I don't

 8     have time to debate with you, and I'm limited in my

 9     cross-examination just from the constraints of the courtroom

10     today, but let me ask you the question a different way.

11          If Reynolds has been a closed system its entire life and

12     the vertical restraint is saying to all of the people who

13     license its system, "You can't let anyone else in" -- that's the

14     vertical restraint -- "we restrict access to our closed

15     system --

16     A    Yes.

17     Q    -- and access to that closed system in violation of that

18     restriction is illegal," is there a product market for an

19     illegal access to Reynolds' computer system?

20     A    Of course, a private actor can't deem something to be

21     illegal.  In Reynolds' position, what CDK was doing prior to the

22     agreement was in violation of its agreements with dealer

23     customers, but it wasn't illegal as a matter of law, right?  But

24     here is what's important from an economic perspective.  I'm not

25     in a position to say it's legal, illegal, in violation, not in
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 118 of 185 PageID #:73313
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/18 Page 117 of 184

2-A-117

 1    violation.  What I can tell you as an economist is that prior to

 2    the February 2015 agreement, CDK was offering a lower-priced

 3    alternative for integration to R and R's dealer customers.  And

 4    to me that is an economic substitute, right?  And it was taken

 5    away, right?  Reynolds can call it anything, purple, right?  But

 6    that doesn't negate the competitive offering that was removed

 7    from customers.

 8    Q    How effective was CDK at gaining access to the Reynolds

 9    system in 2014?

10    A    It's a great question.  I think it was sufficiently -- it

11    was sufficiently good at penetrating this wall such that an

12    agreement needed to be hatched to wind it down.  I think that,

13    you know, it begs the question why an agreement?  Why do we need

14    an agreement?  If Reynolds was so good at policing this wall and

15    had shut down CDK so as to completely cripple its offering,

16    right, why the agreement, right?  Just do it by yourself.

17    Q    Doesn't that explain why CDK might need the agreement?  If

18    Reynolds had become so darned good at blocking because it got

19    better and better and better and better at figuring out how to

20    protect its closed system to the point where it had completely

21    shut down outside integration, doesn't that explain to you why

22    CDK needed this agreement?  Isn't that just capitulation?

23    A    No, no, it doesn't.

24    Q    Okay.  Let's talk a little bit about your critical-loss

25    analysis.  You shared with the Court how you plugged in margins

HAL SINGER - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 119 of 185 PageID #:73314
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 113 of 184

2-A-118

```
 1    for Reynolds.  Do you recall that testimony?

 2    A    Yes.

 3    Q    Let's look at where you got those margins with me, if you

 4    will, and I put a notebook in front of you.  Take me to the

 5    source for your margin data.  I think it starts -- you start by

 6    saying that in 2006 there was a pre-price hike margin of 20%,

 7    correct?

 8    A    Right.  I believe I got the margin data -- I remember this.

 9    We don't have to go in the book, but I got the margin data from

10    two sources.  One is this Elliott letter, Elliott Management

11    letter, and then I also got it from an analyst on the internet.

12    Q    Got it.  So let's look -- and the Elliott letter is the

13    post-price hike margin, correct?

14    A    Yes.

15    Q    And what was that margin?

16    A    Something on the order of 50%.  We can go in --

17    Q    It's all right there.  I'd like to be pretty specific about

18    it.  It's a really important point.

19              THE COURT:  Well, it's your notebook.  Tell him what

20    page to look at.

21              MR. COHEN:  Sure.  Look at paragraph 36 to 38 of your

22    declaration.

23              THE WITNESS:  So first tab?  I'm sorry.

24              MR. COHEN:  Yes.

25              THE WITNESS:  Paragraph 38?
```

HAL SINGER - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 120 of 185 PageID #:73315
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 119 of 184

2-A-119

```
 1              MR. COHEN:  Correct.
 2              THE COURT:  Okay.  What's the question?
 3    BY MR. COHEN:
 4    Q    So if you look at paragraph 38, Dr. Singer, you were going
 5    through this exercise of comparing prices and margins
 6    pre-restraint and post-restraint; is that correct?
 7    A    Correct.
 8    Q    And this is what you call the critical-loss analysis; is
 9    that right?
10    A    Right.  This is one of two ways that I offered to try to
11    figure out how much defection would be needed.  You're aware the
12    second way doesn't require margin data.
13    Q    This is the way you chose.
14    A    This is one of two ways.
15    Q    And what you're trying to show is that both prices and
16    margins increased, correct?
17    A    I'm trying to figure out how much defection would Reynolds,
18    if we're doing Reynolds here, have to suffer in order to render
19    an integration price increase unprofitable.
20    Q    Right.  And you actually did a calculation, and you have
21    numbers, and I'd like to just spend some time walking through
22    those numbers, if I could.
23    A    Let's do it.
24    Q    This is an important part of your report, is it not?
25    A    Yes.
```

HAL SINGER – CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 121 of 185 PageID #:73316
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 120 of 184

2-A-120

1    Q    Yeah.  Okay.  So let's, first, go to the pre-agreement

2    margin number, all right?  That comes from tab 7, I believe, tab

3    7.  You cite this Value Investors Club report.  It's a report on

4    CDK.  Do you see that?

5    A    Right, but I think it also gave me some insight as to

6    Reynolds --

7    Q    Absolutely.  And the data in this report -- what you're

8    trying to do is calculate the pre-restraint margin, correct?

9    And the date of this report is January 29th, 2015, and who is

10   u0422811?

11   A    I don't understand the question.

12   Q    Who wrote this report?  It says it's by u042281 [verbatim].

13   So right on the first page there, Dr. Singer, right under the

14   title of the report.  I'm just wondering -- you know, this is a

15   pretty important -- Reynolds is not a public company.  Nobody

16   knows its margins.  You're going in to do this analysis, so I'm

17   trying to understand how you arrived at this source and its

18   value and its credibility and how --

19            THE COURT:  I think we get that.  Who wrote the report?

20            THE WITNESS:  Well, sitting here I can't tell you who

21   u04 was.  I cited it as Value Investors Club as the source.  I

22   had another estimate, as you saw, from Elliott, but the Elliott

23   margin was the post-price increase margin.

24   BY MR. COHEN:

25   Q    Post.

————— HAL SINGER – CROSS —————

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 122 of 185 PageID #:73317
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 121 of 184

2-A-121

1    A    So I figured that -- and I don't have access, of course, to

2    Reynolds' data because we're in preliminary -- this is going to

3    eventually come out, so I need something, and I say very clearly

4    in my report this is for illustrative purposes.  I'm trying to

5    figure out what we would need.  I can tell you that we could

6    play with all sorts of values within the range, and given the

7    magnitude of the price increase, right -- it was very large --

8    you're just not going to get the defection needed for any

9    plausible parameter of the margin.

10   Q    Sure.  I'd like to talk about what you did do though.

11   A    Yeah.

12   Q    Not all the things that you might want to have done because

13   you have offered an opinion, correct, based on this critical --

14          THE COURT:  He has.  Let's drill down more efficiently

15   here.

16          MR. COHEN:  Very good.

17   BY MR. COHEN:

18   Q    So if you will turn to page 2 of 7, and I think you

19   hopefully will have a little highlighted phrase, all of us, that

20   shows where I think you got the margin; is that right?

21   A    Correct.

22   Q    So it says, "Reynolds clearly laid out the playbook when

23   they increased margins from 20% to 51%."  Do you see that?

24   A    Yes.

25   Q    "Shortly after their LBO."  Do you see that?

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 123 of 185 PageID #:73318
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 122 of 184

2-A-122

1    A    Yes.

2    Q    When was the LBO?

3    A    Oh, I don't have the exact year in my mind.

4    Q    What if I were to tell you it was 2006?  Do you have any

5    disagreement with that?

6    A    No, that sounds about right.

7    Q    Okay.  So in 2006, nine years before the alleged restraint,

8    the margin calculation is 51%.  Would you agree with that?

9    A    Yes.

10    Q    Now, I'd like you to flip back to tab 6.

11    A    Okay.

12    Q    What we did, and I don't know if this is any more or less

13    accurate, but we searched the exact language that you found in

14    the Value Investors report, and we think that it appears here on

15    page 35, which is two pages in, in the highlighted text.  Do you

16    see that?

17    A    Yes.

18    Q    Okay.  So -- and the language there -- by the way, this is

19    cited to an author.  Do you see that, Dr. Singer?

20    A    Yes.

21    Q    And that author is a second-year MBA student at the

22    Columbia Business School.  Do you see that?

23    A    Yes.

24    Q    And that second-year Columbia student says that Reynolds

25    was taken private in 2006, so I think we can at least -- maybe

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 124 of 185 PageID #:73319
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 123 of 184

2-A-123

1    give you more comfort there on the LBO, correct?

2    A    Okay.

3    Q    At which time it had similar margin structure to CDK, and

4    then here's a -- talking about it's increasing its margins at

5    that time to 50% by turning over an expensive workforce and

6    cutting other costs.  Do you see that?

7    A    Yes.

8    Q    So Reynolds increased its margins -- Reynolds'

9    pre-restraint margin wasn't really 20%, was it?  It was 50% in

10   2006, and it got there not by a price hike, but by cutting

11   costs.

12   A    That's fair.

13   Q    The post-margin analysis is 50% also, correct, 55% in your

14   report?

15   A    I think you're referring back to the Elliott --

16   Q    Yeah, the Elliott report, post post-restraint?

17   A    I think that's Elliott's estimate, yes.

18   Q    So in nine years through all of Reynolds' price increases

19   and all of Reynolds' conducts excluding others from the market,

20   blocking everybody it possibly could, it increased its margin

21   through this alleged restraint by 3%?

22   A    If you compare across those two and you use that as your

23   estimate -- we'll get better estimates, of course -- that's how

24   the margins changed.

25   Q    That's not the analysis you did though in your

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 125 of 185 PageID #:73320
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 124 of 184

2-A-124

```
1    critical-loss analysis, is it?  You compared 20% to 55%, didn't

2    you?

3    A    I did use 20.  I'm fairly confident -- I can't do the

4    calculation in my head, but if you were to use 50 instead, you

5    would still show that they didn't suffer sufficient defection.

6    Finally, I offered another way to do the analysis without any

7    reference to margins.  I don't even think it's a close call.

8    Q    Okay.  I'm just going to talk about what you did do.

9    A    Okay.

10   Q    And what -- I think we are in agreement that based on the

11   sources you looked at, the proper analysis was not 20% to 55%

12   but 51% to 55% over nine years of price hikes.

13   A    Well, remember, you don't need a change in margin to do the

14   critical share loss.  You just need the pre-price hike margin.

15   Q    Okay.

16   A    And what I'll grant you is that upon looking at this, I

17   think you could convince me that I could have used 50 as opposed

18   to 20.

19   Q    Okay.  Very good.

20              THE COURT:  Just to be clear about this, that's --

21   under the heading of the 50%, that's the variant view.  Now, I

22   don't know whether the Value Investors Club is of any value at

23   all as far as a source of information, but it sets out an

24   alternative that the margin was 51%.  Am I missing something

25   here?
```

Case: 1-18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 126 of 185 PageID #:73321
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 125 of 184

2-A-125

```
1           THE WITNESS:  I can go back to value investment but --

2           THE COURT:  I think we've reached really a point of

3    diminishing returns, but I think there's a debate about what the

4    pre-conduct margin was, and I think you've admitted you don't

5    really have good information about it.

6           THE WITNESS:  Not yet.

7           THE COURT:  Might be 50%.  Might be 20%.

8           MR. COHEN:  That's where we are, Judge.

9           THE COURT:  Okay.  I take your point.  All right.

10          MR. COHEN:  That's all I was trying to get at.  Really

11   nothing more than that.

12          THE COURT:  I think I get that.  All right.  Very good.

13   BY MR. COHEN:

14   Q    So now the other part, of course, is the price component,

15   correct?

16   A    Correct.

17   Q    What were the prices for Reynolds pre-alleged restraint?

18   A    We'd have to go into the write-up.  I didn't have great

19   insight as to what the prices were, but I was going by what I

20   could get in the public domain again.

21   Q    So maybe we can cut through an exercise if you will indulge

22   me to just simply say you didn't know what the prices were pre

23   and post-restraint for Reynolds?

24   A    I did the best I could using publicly available

25   information.  We can go to the citation.  My recollection is
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 127 of 185 PageID #:73322
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 126 of 184

2-A-126

 1    that it was from news reports that was trying to estimate the

 2    magnitude of the Reynolds price increase.

 3    Q    So let's do it then.  Let's go to the first one.  It's on

 4    tab 4.

 5    A    Okay.

 6    Q    And you say pre-restraint the prices were about $100 or

 7    something.  You can come up with this analysis.  And this is

 8    from an article about StoneEagle, Q&A with StoneEagle and this

 9    gentleman named Brent Allen.  Do you know what StoneEagle is?

10    A    It's a -- it appears to be an analyst group that's tracking

11    the DMS market.

12    Q    Do you know who Brent Allen is?

13    A    Sitting here, I do not know who he is, no.

14    Q    And I guess the heart of all of this is that Mr. Allen in

15    this Q&A provides a, quote/unquote, "example," right, about if a

16    vendor is charged to pay $100 for each rooftop, then this is

17    what he'd be paying, $500, right?

18    A    Correct.

19    Q    This doesn't say anything about these fees being Reynolds

20    and Reynolds, does it?

21    A    Well, it's an analyst report that seems to be tracking

22    Reynolds and Reynolds, but I'd have to go back and look at the

23    entire document.

24    Q    Look, I think it's pretty plain here, don't you, if you

25    read the highlighted language that this gentleman is just

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 128 of 185 PageID #:73323
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 127 of 184

2-A-127

```
1    offering an example for mathematical purposes picking the number

2    a hundred because it's round and multiplying it by five.

3    A    He's speaking about a certified-only model, and Reynolds

4    and Reynolds is along the top of the companies that he's

5    following, and I'll leave it at that.

6    Q    Okay.  I think we can look at this source, and you do agree

7    that this example of $100 expressly says in the document itself

8    that it's for example purposes.

9    A    Yes.  It's his best estimate.  He's trying to give

10   presumably a representative example, but, again, I'll stress

11   that my analysis -- it says right at the top, "This is for

12   illustrative purposes."  I don't have data -- I don't have

13   insight yet as to what Reynolds is charging in each year to each

14   customer.

15   Q    Excellent.  And this is in 2012, correct?

16   A    Yes.

17   Q    And so your post-restraint citation is the next page, tab

18   5.  Do you see that?

19   A    Yes.

20   Q    And this is a *DrivingSales News* article, correct?

21   A    Yes.

22   Q    And the figures that you draw in your loss calculation

23   analysis are highlighted towards the bottom.  Do you see that?

24   A    Right.  It's coming back to me.  This came out of a

25   complaint, I believe.
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 129 of 185 PageID #:73324
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 129 of 184

2-A-128

1    Q     Right, a complaint.  And you don't know if those

2    allegations are true, correct?

3    A     No.  I'm having to accept those numbers on their face for

4    the purpose of the illustrative calculation.

5    Q     Because you don't have the numbers, and you haven't -- you

6    don't have the information to do the analysis.

7    A     Not yet.  Not yet.

8    Q     And --

9          THE COURT:  I'm confused by that because now we've

10   actually heard testimony at the hearing about what the prices

11   are now.  So the post-price for Reynolds doesn't seem to be a

12   mystery anymore to the Court.  This witness might not have had

13   it at the time he did his declaration.  Am I missing something

14   on that?

15         MR. COHEN:  Judge, I think we heard testimony by 2 of

16   147 vendors about what their particular price is for what they

17   may need, but I think you're going to hear testimony from

18   Reynolds that pricing is a little more complicated than you may

19   think.

20         THE COURT:  All right.  But we're probably not going to

21   get it from this witness.

22         MR. COHEN:  I just want to -- I want to -- I hear your

23   point, Your Honor, and I could have skipped all of this if I can

24   just get the witness to tell me that he does not have the --

25         THE COURT:  I think he's answering your questions quite

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 130 of 185 PageID #:73325
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/13 Page 129 of 184

2-A-129

1   honestly, so if you just ask the questions, he'll probably tell

2   you, I think.

3   BY MR. COHEN:

4   Q    Is this report post-restraint or pre-restraint?

5   A    This is -- it's a difficult question.  The restraints are

6   in place potentially as early as 2007, but my best information

7   is that Reynolds didn't start policing and enforcing the

8   restrictions with earnest until a later period, something on the

9   order of 2011, 2013.

10  Q    You're talking about the vertical restraints, Dr. Singer;

11  is that right?

12  A    Oh, yeah.  Yes.

13  Q    But your critical-loss analysis is really about this

14  horizontal agreement between -- in substantial part, right,

15  between Reynolds and CDK?

16  A    It was a lot more than that.  I was trying to evaluate -- I

17  was trying to do a comparison of the profitability of closing

18  down the system and raising your integration prices when you're

19  closed and your rival is open.  That's one experiment.  And then

20  I wanted to redo the analysis when you are closed and your rival

21  is closed, cemented allegedly with a horizontal agreement.

22  Q    And that occurred in 2015?

23  A    Correct.

24  Q    Correct.  So the part of your critical-loss analysis that

25  relates to the profitability of a price hike post-2015 agreement

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 131 of 185 PageID #:73326
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 180 of 184

2-A-130

1    was conducted without having actual margin information or actual

2    price information for Reynolds' 147 vendors; is that correct?

3    A    I just want to make sure I understand, for Reynolds' 147

4    vendors.  Do you mean did I have the price data that Reynolds

5    charges for each of its 147 vendors?

6    Q    I'll ask the question very specifically again.  The part of

7    your critical-loss analysis that relates to the impact of the

8    alleged horizontal restraint in 2015 was conducted without

9    margin data and without price information for Reynolds' 147

10   vendors.

11   A    It was calculated with the best available information in

12   the public domain, and there were estimates for the prices that

13   Reynolds was charging in the marketplace according to industry

14   trade magazines and analysts.  I did not have the price point

15   that Reynolds was charging to each of the 147 vendors, and I

16   expect that that sort of information would become available with

17   discovery.

18        MR. COHEN:  Okay.  I'm done with that line of

19   questioning, Judge, in case the patience has worn that thin.

20        THE COURT:  Yeah.  Go ahead.  Let's keep moving then.

21        MR. COHEN:  Okay.

22   BY MR. COHEN:

23   Q    Now, you talked about efficiencies, countervailing

24   efficiencies, for conduct, Dr. Singer.  Do you recall that?

25   A    Yes.

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 132 of 185 PageID #:73327
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 131 of 184

2-A-131

1    Q    Do you have any reason to disagree with Reynolds'

2    conclusion that its closed system that it's always pursued and

3    always maintained is what's necessary for it to bring its

4    product to market?

5    A    I don't think that it's necessary to bring its product to

6    market by looking at the success of CDK with an open system.

7    Q    Well, CDK has a different computer system.  My client has

8    designed a closed computer system, as you mentioned earlier,

9    correct?

10   A    Your client has pursued a closed system, correct.

11   Q    And you're not a computer scientist, correct?  And you have

12   no reason to disagree with -- you do have to kind of say --

13   A    Oh, I'm not a computer scientist.

14   Q    You have no reason to disagree with Dr. Schneck, correct?

15   A    I don't know if I've heard the testimony of Dr. Schneck.

16   Q    Let me just say Dr. Schneck is a computer scientist, and if

17   he's explained why Reynolds has a closed architecture, you have

18   no reason to disagree with that, correct?

19   A    I have no reason to disagree with that.

20   Q    So you really can't opine on the efficiencies to the extent

21   that there is a scientific, mathematical, computer science

22   reason for Reynolds to have a closed system?

23   A    I respectfully disagree with that.  If the question is can

24   I opine on the efficiencies, I'm looking for some sort of offset

25   or something that would compensate dealers for suffering through

1    a price increase of this magnitude, and I think I can look from

2    an economic perspective as to whether or not I feel the dealers

3    have been made whole by virtue of an alleged enhancement in

4    security, and I explained that I didn't think that the market

5    data that I've observed is consistent with that hypothesis.

6    Q    If Reynolds was the only person in the market and it

7    designed a closed system --

8    A    Sorry.  I missed the beginning.

9    Q    If Reynolds was the only major DMS provider in the market

10   and it developed a closed system and it concluded that closed

11   system was the only way it could provide its service in a stable

12   and secure way and that cost $2 billion over three decades,

13   they'd be entitled to charge in some way for that?  What price

14   would be okay for that?

15   A    I don't take a position on what price would be okay for

16   that.

17   Q    Okay.  No further questions on that.  My last question is I

18   have to ask you this because your counsel asked you if you've

19   testified in court before.  You have testified in court before,

20   correct?

21   A    Yes.

22   Q    And your testimony has been excluded six times by federal

23   courts, has it not?

24   A    If you're counting, like, when a paragraph -- I'm in a

25   current case right now, pay-for-delay case, where I submitted

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 134 of 185 PageID #:73329
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 133 of 184
2-A-133

```
1    five reports and I think totalling hundreds of pages in which
2    case a paragraph relating to the activist standard was excluded.
3    So I will grant you that that happened, and I think there's one
4    occasion which a report in its entirety was excluded on the
5    grounds of relevancy, but I have written over a hundred reports
6    in cases.  I've testified in well over 50 matters.
7    Q    But you don't dispute that in at least six of those
8    occasions, portions of your testimony have been excluded by
9    federal courts.
10   A    I don't think that that's quite right, but I will grant you
11   one of them that's -- I'm actually going to be in a court very
12   soon on pay for delay.  I wrote five reports, five-odd reports,
13   hundreds and hundreds of pages, and a few paragraphs are
14   excluded because the judge believed that I was opining on what
15   the Supreme Court had advocated -- or articulated was the
16   standard in a pay-for-delay case.
17        MR. COHEN:  Thank you.  Your Honor, I think I'm done,
18   but I'd just like one moment to confer with my colleague.
19        THE COURT:  Go ahead.  Confer quickly.
20        MR. RYAN:  No further questions, Your Honor.
21        THE COURT:  Okay.  Very good.  CDK is covered then too?
22        MR. RYAN:  CDK has no questions on cross.
23        THE COURT:  Okay.  Very good.  Let's find if there's
24   any redirect?
25        MR. PANNER:  No, Your Honor.
```

HAL SINGER - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 135 of 185 PageID #:73330
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 134 of 184

2-A-134

```
 1              THE COURT:  All right.  Very good.  Thank you very

 2     much, Mr. Singer, Dr. Singer.

 3              THE WITNESS:  It was a pleasure.  Thank you.

 4          (Witness excused at 11:44 a.m.)

 5              THE COURT:  All right.  Let's have the next witness.

 6              MR. HO:  Your Honor, Derek Ho for the plaintiff.  We

 7     call Gordon Klein.

 8              THE COURT:  Very good.

 9              GORDON KLEIN, PLAINTIFF'S WITNESS, SWORN,

10              MR. HO:  Your Honor, may we approach the witness with

11     the binder?

12              THE COURT:  Yes.  Thank you.

13              THE WITNESS:  Thank you.

14                        DIRECT EXAMINATION

15     BY MR. HO:

16     Q    Would you state your full name for the record, please.

17     A    Yes.  It is Gordon Klein.

18              THE COURT:  And you can move about a foot away from the

19     microphone.

20              THE WITNESS:  I picked up on that as well.

21     BY MR. HO:

22     Q    What is your current position, Mr. Klein?

23     A    I'm a faculty member and have been for the last 35 years,

24     faculty both at UCLA's law school and UCLA's Anderson School of

25     Management.
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 136 of 185 PageID #:73331
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 135 of 184

2-A-135

1    Q    Could you give us your educational background?

2    A    I'm a J.D. as well as a CPA as well as a bachelor's in

3    business administration.  Both with respect to law and

4    accounting, I'm not practicing.

5    Q    Fair to say that you've been qualified as an expert in

6    accounting, finance, valuation, and similar matters on a number

7    of occasions in the past?

8    A    Yes, I have.

9    Q    Is there anything specifically relevant to this case about

10   your experience that you'd like to highlight?

11   A    Ever so briefly.  I have taught bankruptcy law, small

12   business management, business plan forecasting.  I recently

13   testified, about a month ago, in the General Motors bankruptcy

14   as the trustee's expert.  I have also testified in a case that

15   recently yielded for an automobile dealership chain a quarter of

16   a billion dollars, so I think I've got significant experience in

17   dealerships as well as bankruptcy.  I've also been a consultant

18   to many of the major banks in the world from Societe Generale to

19   Credit Suisse, HSBC in Hong Kong to Chase, Bank of America,

20   Citi, JPMorgan, Goldman Sachs, and others.

21   Q    I believe you've prepared some slides to assist in your

22   testimony today?

23   A    I have.

24   Q    Could we put up slide No. 1, please?  I believe slide No. 1

25   summarizes your opinions in this case.  Let's just wait for the

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 137 of 185 PageID #:73332
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 136 of 184

2-A-136

1    slide to come up.  Could you please explain your opinions in

2    this case for the Court?

3    A    Yes.  Broadly, I kind of played it two scenarios.  One is

4    the absence of an injunction being granted.  The other is the

5    presence of an injunction being granted and the economic

6    consequences that would likely flow under either of those two

7    scenarios.

8    Q    Could you summarize your opinions with respect to scenario

9    A, the no injunction scenario?

10   A    Yes, if no injunction is granted, there will be serious and

11   irreversible harm suffered by Authenticom that will involve both

12   a loss of a substantial number of customers, a negative cash

13   flow over the forthcoming 12 months of approximating $1 million,

14   about 40 employees will necessarily be laid off, and were I to

15   be advising the bank, I would recommend to them they do, indeed,

16   foreclose absent the granting of an injunction.

17   Q    And what about your opinions with respect to scenario B,

18   with the injunction?

19   A    In contrast, if a preliminary injunction is granted, it

20   appears that the company can survive from a financial

21   standpoint, continue as a going concern making interest payments

22   and significant, if not full, principal payments to the bank

23   along the way, and, as a consequence, I would anticipate the

24   bank would continue to forbear.  It's unlikely to foreclose.

25   Q    I want to start by having you explain how you get to the

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 138 of 185 PageID #:73333
Case: 3:17-cv-00318-jdp Document #: 165   Filed: 07/05/17   Page 137 of 184

2-A-137

1    negative net cash flow of about a million dollars over the next

2    12 months, and let's turn to slide 4 just to start off.  Could

3    you explain what slide 4 represents?

4    A    Yes.  I looked at the company's recent 12-month financial

5    statements, and they indicated that the company, Authenticom,

6    has had net cash flow from operations over the most recent

7    12-month segment of about $3.2 million.

8    Q    And then how did your analysis proceed from there?

9    A    My analysis proceeded from there to look at what the impact

10   would be in the event that, indeed, the defendants here

11   successfully cut off or materially succeeded cutting off access

12   by Authenticom to dealerships.

13   Q    Let's turn to slide 5, please.  What does this slide

14   represent?

15   A    I broke out the revenues being generated from the principal

16   service, which is polling.  There's a secondary service called

17   data hygiene, but looking at the principal service, I

18   contemplated how much of it is what I refer to as defendants'

19   source, that's to say associated with CDK and Reynolds, and,

20   conversely, that which is associated with all others.  I refer

21   to them as defendants' source and, quote, "other source," and I

22   assign dollar amounts to that based on the books and records.

23   Q    And then if you turn to slide 6, please.  What did you do

24   from there?

25   A    What I did was I made the assumption that all defendants'

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/29/20 Page 139 of 185 PageID #:73334
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 183 of 184

2-A-138

1    sourced revenues would disappear with respect to polling

2    services and, to the extent that would happen, what the

3    implications would be for the company's roughly 3.2 million net

4    cash flow.  My conclusion was of that 3.2 million net cash flow,

5    that all of the defendants' source polling revenues would

6    disappear.  The associated cost of generating it would be a cost

7    saving that correlatively would disappear, and, as a

8    consequence, the net impact would be 2.6 million of net cash

9    flow would disappear causing the previous 3.2 million to drop to

10   approximately 600,000 of net cash flow.

11   Q    Now, in the top right-hand corner you have a line that

12   says, "42% cost savings," and the cost savings are about $1.9

13   million.  What does that $1.9 million represent?

14   A    It principally, because this is a service business,

15   represents labor costs, that is to say people.

16   Q    I think we've got that represented in the next slide.  So

17   approximately how many layoffs does that represent?

18   A    That represents, given that the personnel make an average

19   compensation level of about $50,000 per year, that represents in

20   ballpark terms just short of 40 employees being laid off.

21   Q    Would there be other revenues apart from the defendants'

22   source polling revenues that would also be lost?

23   A    I believe so, yes.

24   Q    And could you explain -- let's turn to slide B.  Could you

25   explain your analysis with respect to those additional revenues?

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 140 of 185 PageID #:73335
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/14 Page 139 of 184

2-A-139

```
 1     A     Yes.  I understand Mr. Cottrell testified, and I was here,
 2     that he would lose all or essentially all of his other business
 3     given what we might loosely call colloquially the one-stop
 4     shopping effect.  I took a less dramatic assumption to be a bit
 5     conservative, and I assumed that 75% of such revenues would
 6     dissipate, and if, indeed, 75% dissipate but 25% remained --
 7              THE COURT:  This is the data hygiene work that would be
 8     lost if you lost the data polling?
 9              THE WITNESS:  Not quite, Your Honor, but there will be
10     a secondary spillover effect with data hygiene.  That's
11     upcoming.  For the moment I'm simply speaking about the core
12     data polling.  Hygiene is around the corner.
13              THE COURT:  Okay.  All right.
14     BY MR. HO:
15     Q     This is data polling associated with dealers that do not
16     use CDK or Reynolds as their DMS providers?
17     A     That's right.  What I call "other."
18     Q     And if you turn to slide 9, did you perform basically the
19     same analysis as you did for the defendants' source data
20     polling?
21     A     Yes.  I assume the same mathematical relationships in terms
22     of the cost savings and the dollar amount, and as the color red
23     rather obviously indicates, the firm would go into the red.  It
24     would no longer have positive net cash flows from operations,
25     but, rather, it would now be negative cash flow of approximately
```

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 141 of 185 PageID #:73336
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 140 of 184

2-A-140

1    $600,000 from its operational activities, again, for

2    clarification, focusing only on operations, not cap

3    expenditures, and not yet focusing on the data hygiene as posed

4    by the Court.

5    Q    Let's turn to the data hygiene now.  If we could turn to

6    slide 11, please.

7    A    With respect to data hygiene, I spoke with company

8    management, and we segregated the data hygiene customers into

9    what could be referred to as standalone or independents, which

10   is to say they would likely continue irrespective of any alleged

11   misconduct being enjoined or not enjoined in this matter, and

12   separately a much smaller segment would be the segment that

13   would, indeed, be influenced, which it's not the greatest

14   phrase, but would be called the nonstandalone or that which

15   would be potentially subject to a spillover secondary

16   consequential effect.

17   Q    And after making that distinction, how did you proceed from

18   there?

19   A    I performed, in a nutshell, the exact same analysis but

20   with the implications if all of the defendant affiliator --

21   defendant source data hygiene were to dissipate.

22   Q    And that's slide 12; is that correct?

23   A    That is correct.  Once again, same mathematics, same cost

24   saving.  The dollar amounts, of course, are much more modest,

25   but that would further put the firm under water by an additional

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 142 of 185 PageID #:73337
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 142 of 184

2-A-141

1    $180,000 or it would take it to roughly $780,000 negative.

2    Q    And what about other source hygiene?

3    A    And once again I made a similar assumption.  As opposed to

4    a full dissipation of the other, I assumed a 75% deterioration

5    in that business with 25% remaining, and I then factor that in

6    with the incremental impact, and, of course, you go even more

7    deeply into the red, which when we'll see I think on the slide

8    that has now presented itself, an incremental $85,000 would now

9    be further diminution in net cash flow taking you to negative

10   $866,000 from operations.

11   Q    Does your analysis thus far consider capital expenditures?

12   A    It has not.

13   Q    What would happen if you did consider capital expenditures?

14   A    Of course, now we move from the operation section of the

15   financial reporting to the investing or investing in yourself,

16   if you will, capital expenditures.  If one takes into account

17   capital expenditures, which are obviously essential in a

18   technology business, not all businesses but particularly one

19   that needs to remain on the cusp of technological advancement,

20   you're going to go even more deeply into the hole.

21        I think I made a relatively conservative assumption.  It's

22   my understanding that Authenticom has assured its bank that it

23   will spend no more than $107,000 over the upcoming 12-month

24   period on capital expenditures.  I benchmarked that for

25   reasonableness, and I looked at the books and records of the

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 143 of 185 PageID #:73338
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 142 of 184

2-A-142

1    company.  In the last year alone from an accounting standpoint,

2    depreciation and amortization, which roughly approximate the

3    consumption or deterioration in your infrastructure or

4    longer-lived assets, was 13 times that size.  I spoke with also

5    Mr. Cottrell and looked at some documents.  In any event, it

6    appears that 107,000 is a really bare bones try to get by, but

7    accepting that, because they did provide that assurance to the

8    bank, I assumed that they'd get by with only about 107,000 of

9    capital expenditure, arguably treading water for the next 12

10   months from a technological standpoint --

11        THE COURT:  Just give me an idea, what are they going

12   to spend the $107,000 on?  Is that, like, new computers or

13   something like that?

14        THE WITNESS:  Well, that's a fair question.  They do

15   have servers.  They do have significant computer hardware.  And,

16   although I didn't explore it in any meaningful detail, one would

17   imagine you have to constantly upgrade your software and improve

18   it.

19        THE COURT:  All right.

20   BY MR. HO:

21   Q    Mr. Klein, did you also consider a scenario in which

22   Authenticom lost less than all of the defendants' source polling

23   revenues?

24   A    I did.  Now that I've, I think, established that at least

25   under the model I've presented thus far they would, plus or

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 144 of 185 PageID #:73339
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 143 of 184

2-A-143

```
1    minus, be $1 million in the hole over the upcoming 12 months, I

2    then contemplated perhaps a more relaxed set of constraints.  I

3    think that's what you're about to ask me about.

4    Q    Right.  And when you consider a more relaxed set of

5    constraints, what conclusions do you draw?

6    A    I further made the assumption because I've heard over the

7    course of the last number of hours some conversation about

8    so-called Dynamic Reporting and the fact that there might not be

9    an immediate loss of all Reynolds-related business with regard

10   to Dynamic Reporting, I said let's assume, much like with the

11   other, you'd have both a one-stop shopping effect, which again

12   ought to cannibalize that by at least the 75% at least over the

13   near-to-intermediate term, coupled with the fact that there are

14   some real technological or functionality aspects of the Dynamic

15   Reporting, but, in any event, to the extent that that type of

16   revenue stream would continue, at least in the nearest term, I

17   assumed it would fall off only by 75%, not by the full

18   assumption I previously made of defendants' source, all 100%.

19   Q    You also opined that if there's no injunction, the bank

20   would be likely to foreclose --

21   A    If I may just complete my answer in that respect.  To the

22   extent I were to go ahead and assume that the Dynamic Reporting

23   to some extent would survive and the Reynolds business would to

24   some extent survive by a one-quarter survival factor in the near

25   term, that would cause the net cash flow to not be quite so
```

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 145 of 185 PageID #:73340
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 144 of 184

2-A-144

1    negative.  It wouldn't be down to roughly negative million.  It

2    would be down to roughly negative 700,000, but, of course, it

3    would still be deeply challenging for this company to survive.

4    Indeed, it could not with that level of negative cash flow.

5    Q    And in scenario A, why, in your opinion, would the bank be

6    likely to foreclose, and if we could bring up slide 16?

7    A    In scenario A the bank faces a situation.  Should we seize

8    assets now recognizing, by way of just a quick foundation, the

9    bank has a very broad global perfected security interest in all

10   assets, cash, tangible, intangible, as well as prospective

11   proceeds down the road, which most notably have the potential to

12   encompass litigation proceeds.  So the bank can grab everything,

13   and if it does grab current existing assets, it doesn't waive

14   its right to participate downstream.  It simply grabs what it

15   can now, and it preserves all options, as I understand the

16   security agreement, to proceed subsequently.

17           THE COURT:  Remind me the balance on the loan.  11

18   million?

19           THE WITNESS:  The balance on the loan currently is 11.8

20   million.  I know they recently made a principal payment, so I

21   may be a touch off on that.

22           THE COURT:  Ballpark.

23           THE WITNESS:  It's north of 11 million from an original

24   18.

25   BY MR. HO:

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 146 of 185 PageID #:73341
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 145 of 184

2-A-145

1    Q    So could you continue and explain why you believe the bank

2    would foreclose?

3    A    You bet.  If the bank were to ask me what their best course

4    of action would be, I would encourage them to proceed to

5    foreclose, at least subject to the pendency of the immediate

6    hearing, and I would give them that advice for the following

7    reason:

8         Number one, the company currently has cash of 270,000 and

9    accounts receivable, which, of course, are near cash -- they

10   become cash in the next month or two -- of a million eight.  So

11   right there you could grab 2.1 million approximately in purely

12   liquid assets.

13        Secondly, the company has on the books and records, and I

14   spoke with Mr. Cottrell at some length what the likely net

15   realizable value would be, and those assets would yield

16   approximately another 2 million.  That's property, that's other

17   tangibles, and that is customer lists.  And so at that point in

18   round terms, you're up to 4 million of value, and, of course,

19   all this is pre-litigation and collection costs, but that would

20   be something they're going to have to encounter one way or the

21   other if --

22             THE COURT:  How did you come up with the 1.8 million on

23   the property?

24             THE WITNESS:  I'm sorry, sir?

25             THE COURT:  How did you come up with the 1.8 million

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 147 of 185 PageID #:73342
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 146 of 184

2-A-146

1    value for the property and equipment?

2            THE WITNESS:  I did two things.  Number one, looked at

3    what's on the books and records, recognized that accounting

4    numbers are not always market value numbers.  Secondly, I had

5    some lengthy conversation with Mr. Cottrell.

6            THE COURT:  Okay.  So is the 1.8 million something

7    close to what you think a bank would realize if they foreclosed

8    and tried to sell it?

9            THE WITNESS:  That's correct.

10           THE COURT:  Okay.

11   BY MR. HO:

12   Q    Please go on, Mr. Klein.

13   A    And continuing onward, this situation uniquely -- it was a

14   closely held or private firm, of course.  As a result, Mr.

15   Cottrell is a personal co-obligor on the bank obligation, and

16   any analysis really has to take into account not typical large,

17   publicly traded analysis but delve into his personal resources.

18   The company -- the company in this case being BMO, the bank --

19   has the right to pursue his personal assets.  Those personal

20   assets presently include approximately 300,000 in cash, and he

21   owns multiple real estate properties and other tangible assets

22   that on a net of mortgage basis would yield approximately a

23   million eight, and so if one added it up, you'd be at about 5.9

24   million, plus or minus, of immediate collectability, coupled

25   with the fact, of course -- I have a tax background -- the

GORDON KLEIN - DIRECT

1   company, BMO Bank, would get an immediate tax write-off, and to

2   the extent that they're going to lose about $6 million on the

3   loan, they would also be foregoing, at a one-third corporate tax

4   rate, they'd be foregoing 2 million of immediate tax savings,

5   and analytically we consider that to be a cash inflow with, say,

6   a saved outflow.

7        So its net cash position, plus or minus -- there's some

8   uncertainty to be sure -- but, plus or minus, the bank would

9   walk away with 5.9 and an immediate tax saving of about another

10  2 million, which falls a touch short but approximates $8

11  million.

12  Q    And why in your view is that preferable to delaying

13  foreclosure?

14  A    Because it's 8 million in the hand once one factors in tax

15  considerations, and it would be immediate, and, of course, banks

16  are very sensitive to time value money, and they would continue

17  to have a claim -- they'd continue to be perfected in any monies

18  that have to come in thereafter, most notably prospective

19  litigation benefits.  So if you're owed about 11.8 or 11 and a

20  half or whatever it stands today, they would get a very

21  significant portion of it now and in no way prejudice themselves

22  against collecting the remainder of it when and if the remainder

23  comes in, which would be most notably and practically

24  exclusively attributable to a prospective litigation recovery if

25  one does so ensue.

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 149 of 185 PageID #:73344
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 143 of 184

2-A-148

1    Q    Mr. Klein, just a couple questions about scenario B.  This

2    is the scenario with the injunction.  With an injunction, in

3    your opinion would Authenticom be able to maintain a positive

4    net cash flow over the next 12 months?  If you turn to slide 17.

5    A    Moving to slide 17 -- just for absolute completion on the

6    slide we just looked at, if the bank were to defer, all those

7    assets would at least for the moment be there, but there's going

8    to be a degradation of those assets, number one.  Computer

9    hardware is going to become more technologically obsolete.  The

10   software might, likewise, do the same.  The customer list might,

11   likewise, do the same.  And Mr. Cottrell is not subject to any

12   impediments, as I have read the security agreement, on the

13   potential use of his personal wealth to meet personal needs in

14   the interim.

15        In short, the bank faces a situation of getting the bulk of

16   their recovery now and some later if they act to foreclose after

17   the forbearance agreement expires or, in the alternative, they

18   can wait.  If they wait, they have great uncertainty about what

19   will be there, and, secondly, it wouldn't be there until the

20   completion of litigation on the merits which might be a year,

21   perhaps two down the road, and they would effectively be waiving

22   an immediacy and accepting significant risk, and, therefore,

23   they would apply a present value factor that's a very high-risk

24   factor, and on balance when one compares the present value

25   acting now versus acting later running the risk of the

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 150 of 185 PageID #:73345
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 149 of 184

2-A-149

```
 1    deterioration dissipation of the assets as well as time value, I
 2    would suggest the bank, to complete the analysis, would most
 3    likely want to act at or about now when the forbearance
 4    agreement expires.
 5            THE COURT:  How much of the property is real estate,
 6    and not talking about Mr. Cottrell's but the -- Authenticom's.
 7            THE WITNESS:  To my knowledge, none.  Just personal
 8    real estate.
 9            THE COURT:  Okay.  All right.  Good.
10    BY MR. HO:
11    Q    Okay.  So now let's turn to a couple questions about
12    scenario B, the scenario with the injunction.  If we could now
13    turn to slide 17.  What does this slide represent?
14    A    This represents the state of affairs for Authenticom as it
15    has existed recently.  Specifically, I took the net cash flow
16    that we spoke about over the last 12 months and just broke it
17    down on a monthly basis.  Monthly net cash flow is around
18    $267,000.  And then I looked at what they could do if, indeed,
19    the injunction is issued.  I know the Court had posed this
20    question relatively early on in the proceedings.
21            If the injunction is, indeed, granted and if, indeed,
22    Authenticom continues on average as its done in the last 12
23    months absent improvement, if it simply did status quo outcome,
24    if you will, it would bring in 267,000.  The company could not
25    make the historical full principal payment, but, by my
```

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 151 of 185 PageID #:73346
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 150 of 184

2-A-150

1  mathematical calculations, it could make about three-quarters of

2  the principal payment.  The principal historically has been

3  200,000 a month.  It could do about 150.  It could also keep

4  perfectly current on interest.  My phrase "net cash flow" has

5  the interest already taken out of it.  In short, they could pay

6  the bank interest in full.  They could make three out of four

7  principal payments to the bank.  They could make that more

8  modest level of cap expenditures, which has been assured to the

9  bank -- that's the 107,000 divided by the 12 months -- and it

10  could satisfy its explicit or implicit tax burden as an S

11  corporation to pay taxes.  That takes you to a bottom line

12  that's essentially a break even.

13  Q    Under that scenario in your opinion is the bank likely to

14  foreclose?

15  A    Under that scenario I believe the bank would not be likely

16  to foreclose.  I think that under that scenario, which I believe

17  is a conservative one because it assumes that if the injunction

18  were, indeed, to be granted there would be no improvement

19  whatsoever, that past would be prologue -- that's to say recent

20  past would be prologue -- the company would be in this

21  circumstance where the bank would be made whole from a time

22  value standpoint.  They'd be getting their interest.  They'd be

23  getting three out of four principal payments.  They would

24  continue to have the ability to participate in any prospective

25  litigation recoveries.  The bank would almost surely from an

GORDON KLEIN - DIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 152 of 185 PageID #:73347
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 151 of 184

2-A-151

1    intangible standpoint have an incredibly loyal customer and

2    perhaps reputational benefits in the community, prospectively as

3    well.  They would have no costs of execution, litigation

4    headaches, adverse publicity, and all of that, again, assumes

5    status quo.

6         If one were to return to the situation the company enjoyed

7    as recently as a year or two ago, the opposing expert professor,

8    and I hope I pronounce it correctly, Zmijewski, has asserted

9    that the company historically not going that far back had over

10   $3 million of free cash flow, and so the company would be

11   somewhere between most recent state of events and perhaps a more

12   or a -- yeah, a more benign environment of a year to two ago.

13   In any event, this is kind of a worst case, that they stay right

14   where they are and that the injunction and related publicity and

15   marketing efforts don't improve things.

16             MR. HO:  Thank you, Your Honor.  We'd pass the witness.

17             THE COURT:  All right.  Cross-examination.

18                        CROSS-EXAMINATION

19   BY MR. CURTIS:

20   Q    Good afternoon, Mr. Klein.  My name is Charles Curtis.

21   A    Mr. Curtis, a good day.

22   Q    Good day.  And may I ask plaintiffs if they could put back

23   on the screen slide 1 from your examination.  And while that's

24   coming up -- there we go -- I wanted to ask you first a question

25   from your -- a question regarding your first expert declaration.

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 153 of 185 PageID #:73348
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 152 of 184

2-A-152

```
1    In paragraph 6 of your first declaration, you state that,

2    "Authenticom has been unable to obtain or renew debt financing

3    on a long-term basis due to lenders' concerns about the

4    company's viability."  Did I quote that correctly?

5    A    I'm certain you did.

6    Q    Okay.  But that's not the issue, is it?  We're not worried

7    about whether or not Authenticom can get long-term debt

8    financing.  I thought you stated it quite well under scenario B.

9    "Can Authenticom remain operational until resolution of

10   litigation on the merits."

11   A    That's correct.

12   Q    That really is the issue, isn't it?

13   A    I think that is fair, but I'm happy to amend that.  I don't

14   think they can get long term, intermediate term, or near term.

15   Q    And you don't say that anywhere in your opening report or

16   your rebuttal report as far as midterm or short term?

17   A    I may not have, but I stand by my assertion that they would

18   not get it, period, for one day, one week, one month, or

19   decades.

20   Q    Now, rather than, you know, hypothesizing, did anyone ask

21   the bank about short term or midterm financing?

22   A    I understand that Mr. Cottrell -- it's a combination of two

23   things.  One, I know he has spoken to a couple of prospective

24   lenders.  Secondly, I'm exercising my professional judgment.

25   Who in the world would step in front of this train, if you will,
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 154 of 185 PageID #:73349
Case: 3:17-cv-00310-jdp Document #: 165 Filed: 07/05/17 Page 153 of 184

2-A-153

1    as it's speeding towards you until you know if a preliminary

2    injunction is going to be granted given the projections I shared

3    which state prospectively the company is on the cusp of running

4    a negative deficit of a million a year.  I wouldn't lend for a

5    day, and I wouldn't lend anything longer than a day.

6    Q    Okay.  Well, we'll get to those projections in just a

7    moment, but my question was did anyone ask the bank about short

8    term or midterm financing?

9    A    I don't know that that specific inquiry was made.  I think

10   it's de facto that's happened.  The forbearance is a form of the

11   economic continuation of financing on a short-term basis.

12   Q    But I thought you just said a bit ago that come July 15th

13   if the Court has not granted a preliminary injunction, it's

14   going to make economic sense for the bank to foreclose then,

15   right?

16   A    That would be my recommendation if the bank were to so ask

17   me.

18   Q    So why did the bank not do that on April 15th when the loan

19   was due?  Why did it give a forbear -- a 90-day forbearance

20   then?

21   A    Well, I, again, would be speculating, but I would certainly

22   offer the natural statement that if you believe that this

23   preliminary injunction does, indeed, have a reasonable

24   likelihood, you might as a courtesy, as well as a financial

25   matter, go ahead and await the Court's determination.  But if

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 155 of 185 PageID #:73350
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 154 of 184

2-A-154

 1    that determination is adverse to Authenticom, then you have

 2    arguably this parade of horribles that no one is at that point

 3    going to lend nor would one lend with a risk factor pending

 4    that, indeed, the threatened cutoff would destroy their revenue

 5    stream.

 6    Q    We'll get to the revenue stream in a moment.  One question

 7    about -- let me back up.  Authenticom has already breached

 8    several loan covenants, hasn't it, since 2016?

 9    A    That's correct.

10    Q    Okay.  And I believe in the booklet here there's one of the

11    letters from the bank.  I just -- I don't want to waste the

12    Court's time going through all of these, but I would refer the

13    Court to Defendants' Exhibits 108, 109, 110, and 111, four of

14    them.  And Authenticom breached various covenants during this

15    time, right, going back to 2016?

16    A    That's correct.

17    Q    But yet --

18    A    One covenant in particular.

19    Q    Okay.  And yet the bank has either waived those breaches or

20    at least not moved to accelerate the loan or foreclose on the

21    loan, right?

22    A    That's correct, keeping in mind at that juncture they were

23    still getting interest and principal payments.

24    Q    Now, the forbearance agreement, which you've included in

25    this booklet, nowhere says that BMO Harris will foreclosure on

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 156 of 185 PageID #:73351
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 155 of 184

2-A-155

1   July 15th, right?

2   A    Yes.  Of course, I didn't include it, but the statement

3   stands.  The forbearance agreement doesn't mandate it.  It,

4   however, is very much discretionary, and they, I think it's a

5   reasonable inference, picked that date awaiting the outcome,

6   positive or negative, of this proceeding.

7   Q    Okay.  And, indeed, under section 2.2D of the forbearance

8   agreement, that specifically says that come July 15th, the bank

9   may pursue or fail to pursue various remedies at its discretion.

10  A    And if I were advising the bank, I'd say keep all your

11  options open, sure.

12  Q    Okay.  And yet no one has talked to the bank.  I mean, you

13  haven't talked to the bank.

14  A    No.  I myself have not spoken with the bank.

15  Q    Okay.  And we don't know about short term or midterm

16  financing.

17  A    Your question is vague --

18          THE COURT:  Now you're repeating yourself, Mr. Curtis.

19          MR. CURTIS:  Okay.

20  BY MR. CURTIS:

21  Q    May I refer you to Exhibit 119 in your booklet and in

22  particular page 7 of Exhibit 119.

23          THE COURT:  This is Plaintiff's Exhibit 119; is that

24  right?

25          MR. CURTIS:  Correct, Your Honor.

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 157 of 185 PageID #:73352
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 156 of 184

2-A-156

1          THE WITNESS:  And that's one with, I believe, the

2     yellow highlighting on it.

3          MR. CURTIS:  Yes, it is.  Yellow highlighting.

4     BY MR. CURTIS:

5     Q    This is one of your reliance worksheets that was produced

6     in support of your opinions, correct?

7     A    That's correct.

8     Q    Okay.  And are these notes in the right-hand margin your

9     notes or did they come from someone else?

10    A    They didn't come from me.

11    Q    Who did they come from?

12    A    I don't know.

13    Q    Okay.  Reading the notes, am I correct that these notes

14    describe various blocking actions that Reynolds and Reynolds has

15    taken through the years?

16    A    I'm not -- as I stated, I'm not the author of them.  I see

17    one or more notes.  I don't know that they speak entirely to

18    that.  Like I see purchase of a particular investment in another

19    affiliate, so I think some of them may speak to blocking, but I

20    don't know that they all do.  In fact, it appears quite clear a

21    couple of them involve company acquisitions.

22    Q    Okay.  We can leave that to the Court to read the

23    specifics.  Let me ask you to go to quarter three for 2013, and,

24    Judge, I promise I'm not going to spend much time on this but --

25         THE COURT:  Okay.  What page are we talking about?

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 158 of 185 PageID #:73353
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 157 of 184

2-A-157

```
 1              MR. CURTIS:  Quarter three of 2013.  And I just wanted
 2      to note --
 3              THE COURT:  I'm not sure what page we're on.
 4              MR. CURTIS:  Oh, I'm sorry.  Page 7.
 5              THE COURT:  Okay.
 6              THE WITNESS:  Same page.
 7      BY MR. CURTIS:
 8      Q    And there's a reference to Reynolds and Reynolds disabling
 9      report generators, and there's a term "Apocalypse 1."  Have you
10      heard the term "Apocalypse 1" before?
11      A    Well, I've heard the term "apocalypse."  I don't think I
12      have ever seen an enumeration of how many apocalyi (ph.) there
13      are but --
14      Q    Okay.  Okay.  Well, let's just focus on how many apocalyi
15      there are in here.
16      A    All right.
17      Q    But you haven't heard that term in connection with
18      Authenticom?
19      A    I have.
20      Q    You have?
21      A    Well, apocalypse.
22      Q    Okay.
23      A    Not with the number 1.
24      Q    Okay.  Okay.  So you're familiar with what they're
25      referring to as far as apocalypse in 2013?
```

GORDON KLEIN - CROSS

```
 1     A    Actually not.  It was in a very early conversation, perhaps

 2     the first conversation --

 3     Q    Okay.

 4     A    -- I heard somebody on the phone from Authenticom mention

 5     apocalypse which, of course, was an evocative phrase, but at

 6     that juncture and, indeed, at this juncture, I don't know what

 7     date or what event they had in mind.  Still don't.

 8     Q    Okay.  Regardless of that, I believe your report and

 9     perhaps your testimony indicated that 2014 was a good year for

10     Authenticom; is that right?

11     A    Well, good is all, of course, relative.  It was not as

12     good, arguably, as in the absence of the blocking activities and

13     the alleged merger market division agreement.

14     Q    Uh-huh.  Uh-huh.  Can I ask you to -- now, this is turning

15     to page 8 of this, and I'd ask you to look at the entry for

16     quarter three in 2015.  There's a reference to Apocalypse 2?

17     A    Apparently the sequel, yes.

18     Q    Okay.  Oh, the sequel, right.  Apocalypti (ph.).  And are

19     you familiar with generally what they're referring to there?

20     A    Not -- I already indicated I don't know what apocalypse is

21     in this context or 1 from 2 from 19.

22     Q    Okay.  Regardless of what they meant by that, if we look at

23     the entry for quarter three in 2016, I see the entry, "Polling

24     revenue starts to recover from Reynolds and Reynolds

25     interference in 2015"?
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 160 of 185 PageID #:73355
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 159 of 184

2-A-159

 1    A    I read that, and I agree; that's what it says.

 2    Q    Okay.  Are you aware of any reason why Authenticom could

 3   not have sued Reynolds after the events of 2013?

 4    A    I have no familiarity with what their resources was, their

 5   propensity to engage in litigation that could be very costly.  I

 6   have no basis for an opinion.

 7    Q    Same answer with respect to after Apocalypse 2 in 2015?

 8    A    Agreed.

 9    Q    Okay.

10    A    No, same answer.

11    Q    Okay.  And with respect to the loan covenants, was there

12   any reason once the loan covenants began to be violated why

13   Authenticom, knowing that the balloon payment was going to be

14   due, couldn't have sued a year ago?

15    A    I'm not sure I followed your question, but if I get to what

16   I think is the nub of it, I have no basis for knowing why they

17   acted or failed to act from a litigation standpoint at any point

18   in their history.  I assume that answers your question.

19         THE COURT:  Just so I'm clear about the covenants,

20   there are certain kind of ratio requirements in the loan.  Those

21   are the ones that were breached, and then BMO noticed them of

22   their breach of the ratio to have income above --

23         THE WITNESS:  And it was even less prominent than that.

24   The company disclosed the breach.  It prepared a schedule.  It

25   said, "We missed this one.  Here is the math."  And to my

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 161 of 185 PageID #:73356
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 160 of 184

2-A-160

1    knowledge, no actions were taken.  Again, the company kept

2    paying full interest and principal.

3              THE COURT:  But that was the nature of the breach --

4              THE WITNESS:  There were two mathematical covenants,

5    and one was tripped, but there was no economic default.

6              THE COURT:  Okay.

7    BY MR. CURTIS:

8    Q    Okay.  Could we forward to slide 5, please, from your deck.

9    Thank you.  And just so you can be ready, I'm going to also be

10   asking for slide 8 in a moment.

11        Now, as I understand this slide, you assumed for purposes

12   of this analysis that all of the money from polling revenues

13   associated with the Reynolds and the CDK DMSs would just go away

14   if the Court denies preliminary injunction.

15   A    That's the underlying assumption.  That's correct.  Of

16   course, I then relaxed that assumption, but, yes, that's what

17   this slide narrowly depicts.

18   Q    Now, in that connection --

19              THE COURT:  How --

20              MR. CURTIS:  -- that was -- I'm sorry, Judge.

21              THE COURT:  How do you relax that assumption?  I

22   thought you relaxed the assumption about the nondefendant source

23   income.

24              THE WITNESS:  I also relaxed the assumption about -- at

25   the very end of the questioning about the Dynamic Reporting and

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 162 of 185 PageID #:73357
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 161 of 184

2-A-161

1      the notion that CDK might fall off by 75%, not 25% -- not 100%.

2                THE COURT:  All right.  I didn't see a slide on the --

3                THE WITNESS:  There wasn't.  It was, frankly, in

4      response to testimony I heard yesterday.

5                THE COURT:  Got you.  So that's the one that takes us

6      back to three quarters of a million under water.

7                THE WITNESS:  As opposed to a full million under water;

8      that's right.

9                THE COURT:  Okay.

10     BY MR. CURTIS:

11     Q    Now, with respect to this 60% of the pie, how much of that

12     60% of the pie is associated with revenues derived by

13     Authenticom from the Dynamic Reporting that we were just talking

14     about?

15     A    I don't know that I have that answer off the top of my

16     head.  In fact, I know I don't have that answer off the top of

17     my head.

18     Q    Okay.  So -- and you understand that that portion of the

19     pie, the Dynamic Reporting, Reynolds has no problem with what

20     Authenticom is doing.  Did you understand that?  We have no

21     objection to the use of Dynamic Reporting done properly where

22     the dealer pushes the data over to Authenticom and Authenticom

23     can do its magic.  Do you understand that?

24     A    I do understand that.  I also understand that there's the

25     one-stop shopping issue, that to the extent you're not accessing

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 163 of 185 PageID #:73358
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 162 of 184

2-A-162

```
 1    all DMS, that there's going to be a cannibalization.  Again --
 2              THE COURT:  But the important point here really is that
 3    you don't know how much of the defendant source revenue would be
 4    spared by the use of the Dynamic Reporting.
 5              THE WITNESS:  That's correct, I don't.
 6    BY MR. CURTIS:
 7    Q    Okay.  And it could be half of that 60% of the pie for all
 8    you know.
 9    A    You could say for all I know.  My understanding is the
10    Reynolds business is somewhat different than the CDK business,
11    but without the numbers at my fingertips, I'll adopt that.  I
12    don't know.
13    Q    Now, moving on, there's another component of that 60% of
14    the pie which relates to what I'll call hostile integration.
15    You've heard that term?
16    A    Well, I've heard that term, but I'm not sure I know what
17    you're -- I've heard the term, if that's your question.
18    Q    Okay.  Money that Authenticom is making by entering
19    Reynolds' DMS over Reynolds' objections.  So there's a portion
20    of the pie of revenue that Reynolds objects to, okay?
21    A    Yes.
22    Q    Okay.  And you are assuming that if the Court denies a
23    preliminary injunction, that's going to go away, right?
24    A    Yes.
25    Q    Okay.  Now, do you understand that my client is not asking
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 164 of 185 PageID #:73359
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 163 of 184

2-A-163

1    the Court to enjoin Authenticom from what it's doing pending

2    trial?

3    A    I'm sorry.  I missed the word.  You're not asking the

4    Court --

5    Q    Asking the Court to enjoin.  We're not asking the Court to

6    block Authenticom in a preliminary injunction.

7    A    Of course.  I understand that.

8    Q    Okay.  So isn't the status quo -- if the Court denies

9    relief and just leaves us with the status quo, isn't the status

10   quo that the two defendants object to what Authenticom is doing,

11   and Authenticom just keeps doing it and making money month after

12   month after month from these objectionable activities?  Why is

13   there any reason to think that that's going to stop?  If the

14   Court denies preliminary injunction on Friday, why is there any

15   reason to think that Authenticom is going to stop on Monday?

16   A    Well, I think that the reason is in part I've read your

17   papers on this matter which indicates there's zero chance, zero

18   odds or chance, of the plaintiffs prevailing.  Furthermore,

19   although I am less expert than probably everybody in this room

20   because I didn't sit through the data security issues, to the

21   extent you suggest that there are these severe demonstratively

22   harmful potential cybersecurity or data security issues and that

23   needs to be stopped, the notion that you would go halfway and

24   allow some intrusion, some hostility, some invasion, some threat

25   to the national economy I think is a rather tepid response.  I

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 165 of 185 PageID #:73360
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 164 of 184

2-A-164

1   think that your contentions, as I interpret them, are binary.

2   This has got to be shut down for the integrity.  You're going to

3   the core.  You're going to the nut.  You're going to the inside.

4   And so, therefore, I think it is quite reasonable to assume it's

5   a binary outcome if this court does not grant the injunction.

6          THE COURT:  I think Mr. Curtis' question though is that

7   at least during the term -- until we decide the case on the

8   merits ultimately, Authenticom has been pretty good about

9   getting around whatever barriers Reynolds throws up, and so

10  they're going to continue to be able to do that even if I deny

11  the injunction.

12         THE WITNESS:  Well, that's a technology question that I

13  can't answer, and I'd perhaps simply leave it there, but I've

14  got to believe that these multibillion dollar corporations if

15  they truly want to enforce data security could accomplish it.

16  At least that's my nontechnician supposition.

17  BY MR. CURTIS:

18  Q    Okay.  Could we go to slide 8 now, please.  Thank you.  And

19  now, again, with slide 8, this is focusing on income that

20  Authenticom derives from other DMSs.

21  A    That's correct.

22  Q    Okay.  And I believe you testified that you were being

23  conservative in assuming that Authenticom was going to lose 75%

24  of that?

25  A    Well, it is conservative relative to what I heard Mr.

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 166 of 185 PageID #:73361
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 165 of 184

2-A-165

```
 1    Cottrell testify to, and I've not heard anyone testify to the
 2    contrary, so the evidence before me, it is more conservative
 3    than that which I have previously heard.
 4    Q    Okay.  Now, looking now at your rebuttal report, Mr. Klein,
 5    from last Thursday, and looking in particular at Exhibit A to
 6    your report, there's a worksheet; is that correct?
 7    A    Yes.
 8    Q    That takes the Court through your various assumptions; is
 9    that correct?
10    A    Yes.
11    Q    Okay.  Now, in your worksheet last Thursday, you assumed
12    that Authenticom -- if Authenticom were to lose, approximately
13    40% of its other source revenues.  That was your assumption on
14    Thursday.
15    A    Well, let's be very clear, sir.  In a different analysis I
16    did a break-even analysis, and I believe you're conflating two
17    completely different concepts.  I did not assume as a factual
18    matter that 75% loss or a hundred percent would be lost, but I
19    recognize that's an unknown.  There's testimony from Mr.
20    Cottrell, perhaps there will be other testimony to the contrary.
21    So I was trying to simply illustrate that even if I am wrong
22    about a hundred percent or Mr. Cottrell is wrong about a hundred
23    percent or I'm wrong about 75%, if it went to as little as 40%
24    loss, you would be negative, and that's before even taking into
25    account capital expenditures.  So, no, sir, I never assumed as a
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 167 of 185 PageID #:73362
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 166 of 184

2-A-166

 1    reasonableness measure.  I did sort of a stress testing.

 2    Q    Okay.  And what led you today to assume a 75% loss of other

 3    DMS-related revenue?  Why not 50%?  Why not 25%?

 4    A    Well, again, I could have certainly adopted the only

 5    evidence before me, which was Mr. Cottrell's testimony, all or

 6    essentially all.  Again, I was showing some level, I think, of

 7    conservatism.  There's no right number if the conservatism is

 8    75%, but I thought that that would be informative to the Court.

 9    It was something more cautious, more hesitant, than 100%.  In

10    the event that Mr. Cottrell's testimony was not fully adopted by

11    the Court, I gave a reasonable alternative.  One could, of

12    course, have presented many, many pages, but we are under some

13    time constraints.  I picked what I thought was a reasonable

14    illustrative example.

15    Q    Let's look at the actual data.  Could you put the slide up?

16    And this is, I believe, a slide that was initially displayed for

17    the Court in Mr. Nemelka's opening argument.  Are you familiar

18    with this slide, sir?

19    A    Well, there's several that look similar.

20         THE COURT:  Mr. Curtis, before we do this, can you just

21    try to identify it enough so that if I read this record, I'll be

22    able to figure out what it is we're looking at right now because

23    I don't have a number on it or anything here so --

24         MR. CURTIS:  Okay.  Absolutely.  And maybe someone

25    could give me the exhibit number.  I see a Klein number.

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 168 of 185 PageID #:73363
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/18 Page 167 of 184

2-A-167

```
 1              MS. MILLER:  It's source AUTH, A-U-T-H, underscore

 2    KLEIN underscore EXP underscore 0000496.

 3              THE COURT:  Okay.  That ought to be enough.

 4              MR. CURTIS:  I know we marked the Excel spreadsheet as

 5    an exhibit, Your Honor, and it's entitled "Authenticom DMS

 6    Connections," and just to speed things along, this takes us

 7    from, what, from 2010 through -- up through April of this year;

 8    is that right?

 9              THE WITNESS:  That's correct.

10    BY MR. CURTIS:

11    Q    Okay.  Now, the orange line in this graph shows Reynolds

12    and Reynolds related income.  So let me rephrase that.  Shows

13    Authenticom's connections with the Reynolds DMS; is that right?

14    A    That's correct.

15    Q    Okay.  And that number is going up, not down; is that

16    right?

17    A    I'm sorry.  In what time frame, sir?

18    Q    Well, how about beginning in June of -- January of 2016 and

19    going forward.  The trend seems to be going up, not down.  Do I

20    read that right?

21    A    Looking at the last handful of months, it is modestly going

22    up.

23    Q    Okay.  Well, the last handful of months being the last,

24    what, 15, 16 months, the line has been going up?

25    A    That's correct.
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 169 of 185 PageID #:73364
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 168 of 184

2-A-168

```
 1     Q     Okay.

 2     A     A little bit.

 3     Q     And the gray line relates to connections with other DMSs;

 4     is that right?

 5     A     Yes.

 6     Q     And that line is shooting up as well over the last several

 7     months, isn't it?

 8     A     It's moving up; that's correct.

 9     Q     Okay.  And the Reynolds and CDK lines certainly are not

10     running parallel at this point, are they?

11     A     Absolutely agreed.

12     Q     Okay.  One final question.  Could we go back to the

13     worksheet slide?  Oh, I'm sorry.  I'm sorry.  Excuse me.  Going

14     back to the binder, the Excel sheet we were looking at,

15     Plaintiff's Exhibit 119.

16     A     If I may stop you, I only -- my binder goes through 118, I

17     think.

18     Q     It was the one we were just looking at with the yellow

19     lines.

20     A     Which just for identification for the Court's benefit --

21     oh, I see.  They're not in sequential order.  There was a 119

22     that precedes a 118.  Fair enough.

23     Q     Sure.  And I'm looking at page 8 and in particular the

24     second quarter of 2017.  What is EBITDA, E-B-I-T-D-A?

25     A     Or, as some of us call it, EBITDA.  Earnings before --
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 170 of 185 PageID #:73365
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 169 of 184

2-A-169

1      Q    I was a history major so --

2           THE COURT:  You can be brief.

3           THE WITNESS:  Earnings before interest --

4           THE COURT:  I know what it is.

5    BY MR. CURTIS:

6      Q    Okay.  And this says that EBITDA in the most recent

7    quarter, quarter two of 2017, was up by 55%.  Am I correct?

8      A    It does.

9      Q    Okay.  And if you just look in that column going up to

10   previous quarters, 55% is the strongest performance in terms of

11   growth in EBITDA since 2013.  Is that not right?

12     A    Well, if you're taking three-month segment over three-month

13   segment, you get massive statistical potential for fluctuations,

14   but that is the greatest increase in percentage terms.  Per this

15   page I agree, nearly focused the answer would be correct.

16          MR. CURTIS:  I have no further questions.

17          THE COURT:  Okay.  Anything for CDK?

18          MR. SIMMONS:  Just a few quick ones.  Could we put

19   slide 17 of his demonstratives up?  While we wait, I believe

20   this is going to be -- I'm looking for the slide with the

21   foreclosure comparison.

22          THE COURT:  I think that's 16.

23          MR. SIMMONS:  Is that 16?  Okay.

24

25

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 171 of 185 PageID #:73366
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 170 of 184

2-A-170

```
 1                          CROSS-EXAMINATION

 2   BY MR. SIMMONS:

 3   Q    You prepared slide 16, this one.  This is effectively a

 4   response to an opinion that defendants' expert, Professor

 5   Zmijewski, issued, correct?

 6   A    That's correct.

 7   Q    His opinion was that BMO Harris Bank would find it

 8   uneconomical to foreclose on the loan, correct?

 9   A    Well, he didn't quantify anything.  He spoke as a broad

10   notion, so I think he may have overstated his opinion.

11   Q    But the point of this slide is to respond to that opinion,

12   correct?

13   A    The point was to respond to his broad, amorphous statement

14   with a quantification.

15   Q    Okay.  And you produced a rebuttal report last Thursday,

16   right?

17   A    Yes.

18   Q    And this slide doesn't appear in any form in your rebuttal

19   report, correct?

20   A    This slide does not; that's correct.

21   Q    And these numbers, the dollar amounts that are in column

22   one, don't appear anywhere in that report either, do they?

23   A    I think that's probably correct.

24   Q    Okay.  And then you also in your testimony you added on to

25   this.  You talked about some tax benefits as well, like a $2
```

GORDON KLEIN - CROSS

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 172 of 185 PageID #:73367
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 171 of 184

2-A-171

```
 1    million tax benefit, correct?

 2    A    Yes.

 3    Q    That's not mentioned in your report anywhere either, is it,

 4    right?

 5    A    In terms of the reply of a couple days ago, that's correct.

 6    Q    Right.  And it's nowhere in these demonstrative exhibits

 7    either, is it?  What we've got on the screen right now or any of

 8    the slides that you prepared for your testimony here, that $2

 9    million isn't reflected there, correct?

10    A    It's not physically on the slide, but I testified to it.

11              MR. SIMMONS:  Okay.  No further questions.

12              THE COURT:  Okay.  Any redirect?

13              MR. HO:  Your Honor, just briefly.

14                          REDIRECT EXAMINATION

15    BY MR. HO:

16    Q    Mr. Klein, in your opinion is the possibility that

17    Authenticom could avoid defendants' blocking in the absence of

18    an injunction likely to be sufficient to avoid bank foreclosure?

19    A    Can I hear that question again, please?

20    Q    Is the possibility that Authenticom could avoid defendants'

21    blocking in the absence of an injunction likely to be sufficient

22    to avoid bank foreclosure?

23    A    Again, I don't know what action the bank would take.  The

24    bank has seen both its own review of the financials of the

25    company; the bank, as I understand, has had significant
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 173 of 185 PageID #:73368
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 172 of 184

2-A-172

1    conversations with Mr. Cottrell.  The bank has seen that the

2    auditors of the company have expressed, quote -- contrary to

3    their general desire to favor their client or placate their

4    client, the auditor themselves have expressed, quote,

5    "substantial doubt about this company's surviving as a going

6    concern," and they expressed that before this litigation.  They

7    expressed this several months ago, as I understand.  If this

8    injunction were to not be granted, the auditor would have an

9    even more intense feeling, certainly not a less intense feeling.

10   So, no, I don't believe the bank would be disinclined on some

11   remote possibility as is reflected, I think, underlying your

12   question.

13            MR. HO:  Thank you.  No further questions.

14            THE COURT:  Okay.  All right.  Thank you, Mr. Klein.

15            THE WITNESS:  Thank you.

16       (Witness excused at 12:38 p.m.)

17            THE COURT:  Okay.  Let's find out where we are in terms

18   of witnesses on the plaintiff's case.  Anybody else?

19            MS. GREGOR:  We have no more witnesses, but we have one

20   housekeeping motion before we close up our case.

21            THE COURT:  Okay.

22            MS. GREGOR:  Are you ready for it now?

23            THE COURT:  Yeah.  Let's do it now.

24            MS. GREGOR:  Authenticom would move the Court asking

25   for the Court to admit into evidence all of the exhibits

GORDON KLEIN - REDIRECT

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 174 of 185 PageID #:73369
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 173 of 184

2-A-173

1    identified on plaintiff's exhibit list that we filed yesterday.

2    It's largely the documents that were submitted in connection

3    with our motion for a preliminary injunction and reply papers,

4    and it's our view that all that should come in for the Court's

5    consideration for the purpose of the preliminary injunction, and

6    if the defendants have a symmetrical motion, we're fine with

7    that too.  We would -- you know, we think it's all fair game for

8    the Court's consideration of the preliminary injunction motion

9    but recognize that maybe all parties would want to reserve

10   objections for evidentiary issues for later in the case, such as

11   summary judgment or trial when we get there, but for purposes of

12   this preliminary stage that it all comes in.

13          THE COURT:  Let's find out what the defendants think.

14   I'm inclined to think that that's probably a reasonable approach

15   to take, but I know you had earlier reserved the right to raise

16   particularly pointed objections to some of the declaration

17   content that was presented, but let's find out what you think

18   should be the playing field of evidence that I can look at.

19          MS. GULLEY:  Yeah, I think that's right, Your Honor.  I

20   think like, as Mr. Ryan mentioned yesterday, it would be useful

21   to give us an opportunity to lodge, you know, very targeted,

22   specific objections to preserve the record for appeal or for

23   whatever.  You know, there's more than -- there's like 160-some

24   of them.  And, you know, to the extent they weren't introduced

25   into evidence and we haven't heard, you know, kind of the

```
 1    background and history of the document, we may need to preserve
 2    specific objections, but we could do that by -- you know, we
 3    could trade those things and keep it narrow.
 4              THE COURT:  And it wouldn't be unusual in a preliminary
 5    injunction matter for me to say, "I'll receive everything you
 6    put in by declaration."  You don't have to reiterate everything.
 7    It's not like a trial where you have to reiterate everything
 8    live in the courtroom for the jury, so I have a lot of evidence
 9    that I think is properly a matter that I can consider if I think
10    it's worthwhile.
11              MS. GULLEY:  Right.  We'd just ask for the right to
12    preserve objections, you know, as long as it's reciprocal and
13    that sort of thing.
14              THE COURT:  So I have at least the rudimentary
15    foundations of kind of an agreed-on approach here.  But let me
16    ask another question just particularly of interest to me about
17    how do you think I'm going to deal with all of this stuff?
18    Mr. Curtis seemed to think that I can decide this on Friday.  I
19    think that was just for illustrative purposes.  The bank has
20    extraordinary confidence in my ability to turn this around
21    quickly, by July 15th so it can decide whether to foreclose or
22    not or do something else.  What are the parties' expectations?
23    I gathered you have a preliminary injunction because you want a
24    fast answer, but you've kind of hit me with a fire hose of
25    exhibits and documents and evidence and --
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 176 of 185 PageID #:73371
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 175 of 184

2-A-175

 1          MS. GREGOR:  I'm well aware of the Court's workload,

 2     and I'm very sympathetic --

 3          THE COURT:  It isn't the work -- you know, I do have

 4     other cases.  Thank you for acknowledging that.  But even if I

 5     had this as my sole reason for living, you've given me a ton of

 6     stuff to deal with.  So what do the parties expect or want me to

 7     do?

 8          MS. GREGOR:  Understood.  It's very important to

 9     Authenticom obviously, and, you know, we've filed briefs and

10     submitted what we think are, you know, robust papers.  We've

11     presented what we think are the most important witnesses and

12     evidence, but, you know, frankly, I think that sometimes courts

13     hear preliminary injunctions without hearings, and so we also

14     want to understand with respect to the exhibits just where we

15     stand on the housekeeping there but --

16          THE COURT:  And I appreciate that.  I think having good

17     exhibit hygiene, I'll use that term, is a very good idea for me,

18     but it suggests that I will have, you know, really microscopic

19     evaluation of all of the evidence and whether particular

20     paragraphs in a declaration is presented.

21          So I can honestly say I'm not sure how or when I could or

22     should rule on this.  I get the urgency for Authenticom, and so

23     sometimes I like to rule from the bench, if I can.  I think that

24     it's a better work of legal scholarship if I have the luxury of

25     a long time to write a very considered opinion on it, but I

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page: 177 of 185 PageID #:73372
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 176 of 184

2-A-176

1    don't know if that's really going to work for the parties here.

2            MR. PANNER:  Well, Your Honor, as you can appreciate,

3    the urgency for Authenticom is quite pressing, and the

4    presentation of evidence has been, obviously Your Honor will

5    judge, but it has given, I think, Your Honor a good opportunity

6    to judge the lay of the land with respect to both the question

7    of the -- whether there's a more than negligible chance of

8    success on the merits and whether there is a significant risk of

9    irreparable harm and where the balance of the harms lies in the

10   public interest, and obviously we'll have the opportunity, as

11   Your Honor has extended, to have an opportunity to address the

12   Court after the close of evidence.

13        We haven't heard the defendants' case, but I do -- I would

14   be hopeful in light of the urgency of the situation that the

15   Court could evaluate the presentations, the law, and the

16   evidence as promptly as possible in order to forestall the harm

17   that is threatened here.  And, of course, a ruling from the

18   bench, my partner reminds me, would be very welcome, and I do

19   understand that there's the opportunity for appeal for that, but

20   I do think that it would be reasonable for the Court to rule and

21   then issue an opinion subsequently that would set out in further

22   detail the Court's reasons, for example.

23            THE COURT:  Uh-huh.  The only -- here are two

24   considerations, and I want to hear the defendants' input on

25   this.  If I'm going to rule from the bench, I don't think I'm

1    that inclined to give you then an elaborated long written

2    opinion.  If I'm going to rule from the bench, I'll give you the

3    ruling, and, you know, again, it won't be as thorough as a long

4    written opinion, but it will give you what you need, and then,

5    you know, you can move on from here with appeal or whatever you

6    want.  But the ruling from the bench will be the ruling.  I

7    would follow it up with a written order to make sure that the

8    conclusions and whatever directives I provide are in writing so

9    you have those, of course, but I wouldn't give you the long

10   analysis if I rule from the bench.

11       The other factor is I doubt highly that I'd be prepared to

12   rule from the bench at the end of today.  So I'd probably look

13   at at the end of the day making an assessment of how long I

14   think I need to digest the material, tell you -- if I decide to

15   rule from the bench, and I see the utility of that, I'd probably

16   schedule a hearing for me to deliver my ruling to you.  I'm not

17   sure exactly when that would be, but obviously it -- BMO, again,

18   thinks July 15 th is the deadline that they've imposed on me,

19   and who am I to question that?

20       So that's kind of my perspective.  Also, if I wait longer,

21   all kidding aside, the idea of waiting longer than July 15th to

22   deliver a ruling from the bench seems really counterproductive.

23   I'll forget half of what I heard already, and so that's kind of

24   my perspective right now, but let me hear what the defendants

25   want.  Defendants probably want the decision as long out into

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 179 of 185 PageID #:73374
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 179 of 184

2-A-178

1      the future as I can possibly deliver it.

2              MS. GULLEY:  No, no.  Thank you, Your Honor.  For all

3      of the opposite reasons that the plaintiff said, I'm sure you

4      know we'd welcome an opinion from the bench as well, but, you

5      know, I think one thing to think about -- and, first of all,

6      your suggestion of, you know, coming back and talking about

7      that, although it does mean we will be very tired, is -- that

8      makes sense.

9              But in terms of what we have to do, I mean, assuming that

10     there's some chance of success on the merits, which, of course,

11     we think there is not, and assuming there's some imminent harm,

12     which we think there's not, and so on and so forth down the

13     elements, say you are going to issue an injunction, you know, in

14     that case, you know, under Rule 65 you're going to have to --

15     you've heard kind of the testimony about, well, this is the

16     status quo, so at least in the case of my client, you have to

17     tell them to do something, and you got to do it in reasonable

18     detail.  And, you know, you'll read in the declarations, you'll

19     hear from the witnesses that that's impossible for them, and so

20     there's some question there about, you know -- we've got a

21     couple hours left today; our case hasn't started -- just to get

22     through kind of answering the plaintiff's case much less that.

23     Okay?  If we get there, I don't think -- I think you need to

24     hear more.  That's all I would suggest.

25              THE COURT:  All right.

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 180 of 185 PageID #:73375
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 179 of 184

2-A-179

```
 1              MS. MILLER:  For our part, Your Honor, we agree.  I

 2     think you'll have a much more full picture of the facts that you

 3     need to evaluate.  It's not just about the exhibits, as

 4     Ms. Gulley just said.  You're going to hear from our witnesses,

 5     and we believe that once you evaluate those, you'll reach your

 6     decision, but, yes, there's more to it than simply just that

 7     evaluation, and we would have to -- if Your Honor is inclined to

 8     issue an injunction, there would have to be, I think, some

 9     discussion of what that injunction would look like because there

10     are practical problems.

11              MS. GULLEY:  With witnesses.

12              THE COURT:  Yeah, go ahead.

13              MR. PANNER:  Thank you, Your Honor.  I do think that

14     the nature of an injunction is not as complicated as the

15     defendants are suggesting.

16              THE COURT:  So just to be clear, you're suggesting that

17     if at the end of the day I think an injunction is warranted, you

18     think I have to have another hearing then and take witness

19     testimony about what the injunction should be.

20              MS. GULLEY:  I think you will hear more evidence on

21     this today like what that would mean to Reynolds if you

22     literally -- if you look at the proposed order that the

23     plaintiffs suggest, which is basically eviscerate all their

24     contracts with third-parties, eviscerate all their contracts

25     with dealers, and order them to, quote/unquote, "stop blocking,"
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 181 of 185 PageID #:73376
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 180 of 184

2-A-180

1   something they have been doing for a decade, yeah, I think you

2   would need to understand the -- I know you've heard a lot of

3   information about the technology but literally the guts and

4   bolts of what it means to do whatever -- I honestly don't know

5   exactly what they're asking for but -- short of stop blocking,

6   but to understand that, I mean, I think we'd have to know or

7   else we'd be down here every day, right, saying, "Oh, they

8   violated the injunction," when we're just doing normal business.

9          THE COURT:  Well, just as a practical matter, I take

10  your point.  We have to have an injunction that's reasonably

11  clear and that articulates what has to happen, but I really

12  hadn't anticipated that I'd have to have another hearing and

13  hear more witnesses to figure out what the injunction would be

14  if I were to grant it.

15         MS. GULLEY:  I don't want to borrow trouble.  Hopefully

16  we don't.

17         THE COURT:  That's not usually how we roll on these

18  things, so, you know, I get the lay of the land from what people

19  tell me.  It highlights to me the difficulties that would be

20  imposed in granting the injunction, and, frankly, it's probably

21  more common than not that I'm not persuaded by some simplistic

22  sweeping injunction that plaintiffs propose.  I mean, usually

23  they don't get exactly what they want.

24         MS. GULLEY:  Sure.

25         THE COURT:  That's even in the case where I grant them.

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 182 of 185 PageID #:73377
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 182 of 184

2-A-181

```
 1   I mean, if I deny it, then it's a simpler matter, but even if I
 2   were to grant it, I don't usually just think that, say, stop
 3   blocking is an adequate injunction.
 4        MS. GULLEY:  Right.  So just to clarify what I mean
 5   more specifically, you know, if you're trying to enjoin and
 6   preserve the status quo, that seems like the kind of thing that
 7   is simpler to do, but when you're literally telling someone to
 8   do -- you know, do an affirmative action that is different from
 9   something they've been doing for ten years, especially in a
10   space that is technologically this complex -- I don't think
11   there's dispute about there has to be a box and there has to be
12   controls on the doors.  You know, does stop blocking mean throw
13   open the doors?  Of course not, right?  But there really does
14   have to be some discussion in addressing what that is, and,
15   honestly, I don't want to borrow trouble on it or assume which
16   way you're going to rule, but I wanted to plant the seed that to
17   the extent that you may have questions about that, it would be
18   useful for us to know that, and we could deal with it.
19        THE COURT:  I certainly don't want to judge before I
20   hear --
21        MS. GULLEY:  Right.  You haven't heard our case.
22        THE COURT:  -- defendants' case.  So far I've heard one
23   of your witnesses in the plaintiff's case.  I get that.  A lot
24   of times what I will do is I will say here is the -- my sense of
25   what needs to happen.  There's a detail to be worked out here.
```

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 183 of 185 PageID #:73378
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 182 of 184

2-A-182

 1    It's really -- you know, I'm not a computer security expert, so

 2    I'll rely on the parties to marshal their expert knowledge and

 3    try to agree on something set within the broad parameters of

 4    what the Court provides.  So, you know, I might say I'm going to

 5    enjoin -- I'm going to tell you to stop blocking.  You guys

 6    figure out how it happens and how soon and all those sorts of

 7    things.

 8        Now, I'd give you much more specific direction than that if

 9    I were inclined to go that way, but sometimes the actual nuts

10    and bolts really requires more expertise than the Court has.  So

11    I can set a -- sort of a I'll put you in a box, and you can

12    figure out exactly how to solve the problem.  So that seems to

13    me to be not an unlikely scenario here.

14        MS. MILLER:  I think, Your Honor, at least from our

15    perspective, again, we think that once we've been able to put

16    our case in, Your Honor will have a more fulsome picture --

17        THE COURT:  Oh, yeah.  I don't mean to suggest that

18    it's a likely scenario that I'm going to issue the injunction

19    and tell you to work out the details.

20        MS. MILLER:  Fair enough.

21        THE COURT:  If I were to issue an injunction in a

22    complex case like this, it would involve working out details.

23        MS. MILLER:  The point at least from our perspective is

24    we would like to be heard on -- in the event the Court were to

25    be inclined to go that direction, we would like to be heard on

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 184 of 185 PageID #:73379
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 183 of 184

2-A-183

1    what the possible implications of that would be and what

2    possible alternatives or options might be available to us in

3    order to make it potentially workable to preserve the status

4    quo.

5           MS. GULLEY:  I think the issue, you know, is to do the

6    balance of harms, we really do in our business need to

7    understand what we're being ordered to do, and so, you know, I

8    agree with Britt.

9           THE COURT:  I don't see any of that as unreasonable.

10   So all right.  I'm tempted to just call for the next witness,

11   but I'm going to take a lunch break now.  So let's reconvene

12   at -- I don't know.  Time is at a premium, so why don't we --

13   instead of going all the way until 2:00, why don't we just take

14   a lunch break until quarter to 2:00.  So not quite an hour.  15

15   minutes.  So quarter to 2:00 we'll reconvene.

16          (Recess taken at 12:54 p.m.)

17                           * * *

18

19

20

21

22

23

24

25

Case: 1:18-cv-00864 Document #: 1080-15 Filed: 07/28/20 Page 185 of 185 PageID #:73380
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 184 of 184

2-A-184

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 27th day of June, 2017, before the Honorable James D.

5     Peterson, Chief U.S. District Judge for the Western District of

6     Wisconsin, in my presence and reduced to writing in accordance

7     with my stenographic notes made at said time and place.

8          Dated this 5th day of July, 2017.

9

10

11

12

13

14                                    /s/ Jennifer L. Dobbratz

15                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                Federal Court Reporter

16

17

18

19

20

21

22

23

24     The foregoing certification of this transcript does not apply to
       any reproduction of the same by any means unless under the
25     direct control and/or direction of the certifying reporter.