**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817<br>Case No. 18-cv-00864 |
| **This Document Relates To:** | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| **THE DEALERSHIP CLASS ACTION** | **Public Version** |

**DEALERSHIP CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

GLOSSARY OF TERMS AND REFERENCES ......................................................... xi

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................. 1

I.  THE RECORD EVIDENCE IS MORE THAN SUFFICIENT TO ESTABLISH THE
    EXISTENCE OF A HORIZONTAL CONSPIRACY ........................................... 1

    A.  Defendants' Actual DIS Prices Exceed "But-For" Prices ..........................4

    B.  Communications and Information Exchanges Between Defendants .............5

    C.  The February 2015 Agreements .........................................................6

    D.  Defendants' Pretextual Explanations for Their Anticompetitive Conduct .....9

    E.  The DMS and DIS Markets Are Conducive to Cartel Behavior ................13

II. DEALERS' DAMAGES CLAIMS ARE NOT DEFICIENT ............................... 14

    A.  Dealers' Direct Damages Claims Are Not Barred By *Illinois Brick*...........14

        1.  Dr. Williams Measured Damages to Dealers as Direct Purchasers ...........14

        2.  CDK's Policy Arguments are Unavailing ........................................... 17

    B.  Dr. Williams's Damages Model Accounts Exclusively For Harm From Alleged
    Unlawful Conduct ..........................................................................20

        1.  Dealers Seek Damages Caused by Defendants' Collusive Conduct Which is Not
        Based Upon an Already-Dismissed Exclusive Dealing Claim...................22

        2.  Dr. Williams's Damages Model Accounts For Lawful Price Increases .......23

    C.  Plaintiffs Offer Sufficient Evidence of Individual and Classwide Damages ....25

III. CDK'S ARGUMENTS CONCERNING STATE LAW CLAIMS ARE MERITLESS ... 29

    A.  Dismissal of Federal Claims Would Not Warrant Dismissal of State Claims ...29

    B.  Dealers' Claims Satisfy the Nexus to Massachusetts, New Hampshire, Mississippi, New
    Hampshire, New York, South Dakota, and West Virginia ........................29

    C.  The Consumer Protection Laws of Colorado, Minnesota, North Dakota, New Mexico,
    and South Dakota Allow Claims for Potential Antitrust Violations ..............39

    D.  Dealers are Proper Nevada and West Virginia Plaintiffs ........................41

    E.  Plaintiffs' Class Action Claims are Proper under Illinois, South Carolina, and Colorado
    Law ............................................................................................43

F.   Dealers Satisfy the Arizona, Hawaii, New Jersey, Utah, and West Virginia Statutory Notice Requirements ............................................................................................46

1.   Notice was Provided to all State Attorneys General in October 2018 ...................... 47

2.   The Notice Requirements are Not Enforceable Under Shady Grove ......................... 48

3.   Alternatively, Lack of Notice Compliance Is Not a Basis for Dismissal ................... 49

CONCLUSION ...................................................................................................................... 50

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*600 LB Gorillas, Inc. v. Fieldbrook Foods Corp.*,
   2018 WL 3475495 (D. Mass. Jun. 19, 2018) .................................................... 30, 31

*A & R Fugleberg Farms, Inc. v. Triangle Ag, LLC*,
   2010 WL 1418870 (D.N.D. Apr. 7, 2010) ........................................................... 40

*In re Aftermarket Filters Antitrust Litig.*,
   2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ........................................................ 49

*In re Aggrenox Antitrust Litig.*,
   2016 WL 4204478 (D. Conn. Aug. 9, 2016) ................................................... 44, 45

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) .................................................................. 49

*Alakayak v. British Columbia Packers, Ltd.*,
   48 P.3d 432 (Alaska 2002) ................................................................................ 29

*Allergease Inc. v. Walgreen Co.*,
   2017 WL 66819 (N.D. Ill. Jan. 6, 2017) ......................................................... 27, 28

*Andren v. Alere, Inc.*,
   2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ..................................................... 46

*Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) ......................................................................... 14, 17, 20

*Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*,
   943 F.3d 42 (1st Cir. 2019) ............................................................................... 32

*In re Asacol Antitrust Litig.*,
   2016 WL 4083333 (D. Mass. July 20, 2016) ...................................................... 48

*Authenticom, Inc. v. CDK Global, LLC*,
   2017 WL 3017048 (W.D. Wisc. July 14, 2017) .................................................... 7

*Authenticom, Inc. v. CDK Global, LLC*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) .................................................................. 7

*In re Auto. Parts Antitrust Litig.*,
   2013 WL 2456612 (E.D. Mich. June 6, 2013) ............................................... 36, 45

*In re Auto. Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ............................................................... 38

*In re Auto. Parts Antitrust Litig.*,
  50 F. Supp. 3d 836 (E.D. Mich. 2014) ................................................................. 37

*In re Automobile Antitrust Cases I & II*,
  204 Cal. Rptr. 3d 330 (Cal. Ct. App. 2016) ........................................................ 29

*Bigelow v. RKO Pictures, Inc.*,
  327 U.S. 251 (1946) ............................................................................................. 19

*In re Blood Reagents Antitrust Litig.*,
  266 F. Supp. 3d 750 (E.D. Pa. 2017) .................................................................... 4

*Blue Cross & Blue Shield of Mass. V. AstraZeneca Pharms. LP*
  *(In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156 (1st Cir. 2009) ........... 30

*Blue Cross & Blue Shield United of WI v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ................................................................................ 25

*Blue Shield of Va. v. McCready*,
  457 U.S.465 (1982) .............................................................................................. 18

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  186 F.3d 781 (7th Cir. 1999) ................................................................................ 25

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) (Mem. at 31) .................................. 44, 45, 47

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ................................................................................ 27

*In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*,
  2015 WL 5166014 (E.D. Tenn. June 24, 2015) .................................................... 45

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Pa. 2010) ................................................................... 33

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) ........................................................... 37

*Citizens for Appropriate Rural Rds. v. Foxx*,
  815 F.3d 1068 (7th Cir. 2016) .............................................................................. 28

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) ................................................................... 44

*In re ConAgra Foods, Inc.*,
  908 F. Supp. 2d 1090 (C.D. Cal. 2012) ................................................................ 49

*Conway v. Licata*,
  104 F. Supp. 3d 104 (D. Mass. 2015) ................................................................... 31

*Davidson v. Apple Inc.*
   2018 WL 2325426 (N.D. Cal. May 8, 2018) ........................................................ 46

*In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms. Inc.*,
   903 F. Supp. 2d 198 (S.D.N.Y 2012) .............................................................. *passim*

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019) .............................................................. *passim*

*DJ Coleman, Inc. v. Nufarm Ams., Inc.*,
   693 F. Supp. 2d 1055 (D.N.D. 2010) ................................................................ 40

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
   2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002) ................................................ 17

*In re Dynamic Random Access Memory ("DRAM I") Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................... 37

*Dynegy Mktg. and Trade v. Multiut Corp.*,
   2008 WL 2410425 (N.D. Ill/ June 11, 2008) .................................................... 27

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
   273 U.S. 359 (1927) ........................................................................................ 19

*In re Effexor Antitrust Litig.*,
   357 F. Supp. 3d 363 (D.N.J. 2018) ................................................................. 47

*Fishman Transducers, Inc. v. Paul*,
   684 F.3d 187 (1st Cir. 2012) ........................................................................... 32

*In re Generic Pharms. Pricing Antitrust Litig.*,
   368 F. Supp. 3d 814 (E.D. Pa. 2019) ........................................................ 47, 49

*In re Graphics Processing Units Antitrust Litig.*,
   540 F. Supp. 2d 1085 (N.D. Cal. 2007) ........................................................... 35

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................... 39

*Gutmann v. Campbell*,
   1998 WL 36030923 (D.N.M. Jan. 30, 1998) ................................................... 27

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
   2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) ................................................ 35, 36

*Hatchett v. Henry Schein, Inc.*,
   2020 WL 733834 (S.D. Ill. Feb. 13, 2020) ................................................ 44, 46

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ................................................................... 4, 9, 13

*HipSaver Co. v. J.T. Posey Co.*,
490 F. Supp. 2d 55 (D. Mass. 2007) ...................................... 31

*Hood ex rel. State v. BASF Corp.*,
2006 WL 308378 (Miss. Ch. Ct. Jan. 17, 2006) ...................................... 35

*In re Hydroxycut Mktg. and Sales Practices Litig.*,
299 F.R.D. 648 (S.D. Cal. 2014) ...................................... 45

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ...................................... *passim*

*Inguran, LLC v. ABS Global, Inc.*,
2019 WL 1900345 (W.D. Wis. Apr. 29, 2019) ...................................... 29

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...................................... 36

*In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*,
2020 WL 2110931 (E.D. Va. May 4, 2020) ...................................... 42

*Kleen Prods. LLC v. Int'l Paper*,
2017 WL 2362567 (N.D. Ill. May 31, 2017) ...................................... 13

*Kleen Prods., LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) ...................................... 5

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
781 N.E.2d 787 (2003) ...................................... 30

*Lamb's Patio Theatre, Inc. v. Universal Film Exchs., Inc.*,
582 F.2d 1068 (7th Cir. 1978) ...................................... 13

*In re Lipitor Antitrust Litig.*,
336 F. Supp. 3d 395 (D.N.J. 2018) ...................................... 48

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
2017 WL 3131977 (D.N.J. Jul. 20, 2017) ...................................... 36

*In re Lithium Ion Batteries Antitrust Litig.*,
2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ...................................... 45

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2001) ...................................... 18

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) ...................................... 48

*Malik v. Falcon Holdings, LLC*,
675 F.3d 646 (7th Cir. 2012) ...................................... 27

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ................................................. 17

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ............................................ 23, 24, 25

*McNeely v. Wells Fargo Bank, N.A.*,
115 F. Supp. 3d 779 (S.D.W. Va. 2015 (cited by CDK at 27) ............. 42

*In re Microsoft Corp. Antitrust Litig.*,
2003 WL 22070561 (D. Md. Aug. 22, 2003) ......................... 34

*Midwestern Midget Football Club, Inc. v. Riddell, Inc.*,
2015 WL 4727438 (S.D.W. Va. Aug. 10, 2015) .................... 42

*Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*,
476 F.3d 442 (7th Cir. 2007) ................................................. 9

*Mulvania v. Sheriff of Rock Island Cnty.*,
850 F.3d 849 (7th Cir. 2017) ............................................. 27

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
846 F. Supp. 2d 828 (S.D. Ohio 2012) ............................ 30

*Nev. Power Co. v. Eighth Judicial Dist. Court of Nev.*,
102 P.3d 578 (Nev. 2004) ............................................ 41

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F.Supp.2d 160 (D. Me. 2004) .................................. *passim*

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ............................ 33

*Oak Indus., Inc. v. Zenith Elecs. Corp.*,
726 F. Supp. 1525 (N.D. Ill. 1989) ............................. 26, 27

*In re Optical Disk Drive Antitrust Litig.*,
2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) .................... 45

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) ........................ 36

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ..................... 33, 39, 41

*Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*,
496 F. Supp. 2d 404 (D. Del. 2007) ............................ 37, 38

*Pecover v. Elec. Arts Inc.*,
2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .................... 28

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) .................................................. 13

*In re Propranolol Antitrust Litig.*,
   249 F. Supp. 3d 712 (S.D.N.Y. 2017) ....................................... *passim*

*P&G Co. v. Stone Container Corp. (In re Linerboard Antitrust Litig.)*,
   504 F. Supp. 2d 38 (E.D. Pa. 2007) ..................................................... 9

*Ransom v. Marrese*,
   122 Ill. 2d 518 (1988) ....................................................................... 45

*In re Refrigerant Compressors Antitrust Litig.*,
   2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ..................................... 33

*In re Remicade Antitrust Litig.*,
   345 F. Supp. 3d 566 (E.D. Pa. 2018) ............................................ 39, 50

*In re Restatis* (*Cyclosporine Opthalmic Emulsion*) *Antitrust Litig.*,
   355 F. Supp. 3d 145 (E.D.N.Y. 2018) ................................................ 48

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*,
   642 F.3d 560 (7th Cir. 2011) ............................................................. 44

*SCVNGR, Inc. v. Echarge Licensing, LLC*,
   2014 WL 4804738 (Sept. 25, 2014) ................................................... 30

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
   2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ................................ 41, 49

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) ............................................ 36, 40

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
   38 P.3d 47 (Colo. 2001) .................................................................... 46

*Smith-Brown v. Ulta Beauty, Inc.*,
   2019 WL 932022 (N.D. Ill. Feb. 26, 2019) ....................................... 45

*Spray-Rite Service Serv. Corp. v. Monsanto Co.*,
   684 F.2d 1226 (7th Cir.1982) ............................................................ 25

*Staley v. Gilead Scis., Inc.*,
   2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) ..................................... 50

*State by Humphrey v. Philip Morris, Inc.*,
   551 N.W.2d 490 (Minn. 1996) .......................................................... 40

*State ex rel. Palumbo v. Graley's Body Ship, Inc.*,
   425 S.E.2d 177 (W. Va. 1992) .......................................................... 38

*State ex rel. Spaeth v. Eddy Furniture Co.*,
386 N.W.2d 901 (N.D. 1986) ............................................................................ 40

*State Farm Life Ins. Co. v. Jonas*,
775 F.3d 867 (7th Cir. 2014) ............................................................................ 44

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) .............................................................. 38

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) .............................................................................. 18, 19, 20

*Suchanek v. Sturm Foods, Inc.*,
311 F.R.D. 239 (S.D. Ill. 2015) ........................................................................ 45

*Technical Learning Collective, Inc. v. Daimler-Benz AG*,
1980 WL 1943 (D. Md. Aug. 28, 1980) ............................................................ 17

*Terry v. Atlas Van Lines, Inc.*
1988 WL 128639 (N.D. Ill. Nov. 15, 1988) ...................................................... 43

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ............................................................................ 13

*Tichy v. Hyatt Hotels Corp.*,
376 F. Supp. 3d 821 (N.D. Ill. 2019) .................................................................. 3

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013) .................................................................... 6

*U.S. v. Feldman*,
825 F.2d 124 (7th Cir. 1987) ............................................................................ 43

*U.S. v. South*,
28 F.3d 619 (7th Cir. 1994) .............................................................................. 29

*Uncle Henry's Inc. v. Plaut Consulting Co.*,
399 F.3d 33 (1st Cir. 2005) .............................................................................. 32

*Valspar Corp. v. E.I. DuPont De Nemours & Co.*,
873 F.3d 185 & n.9 (3d Cir. 2017) ................................................................... 13

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ............................................................................ 25

*Weidman v. Ford Motor Co.*,
2020 WL 674348 (E.D. Mich. Feb. 11, 2020) .................................................. 50

*In re Wellbutrin XL Antitrust Litig.*,
260 F.R.D. 143 (E.D. Pa. 2009) ....................................................................... 41

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   752 F.3d 728 (8th Cir. 2014) ................................................... 8

*Wilson v. MRO Corp.*,
   2017 WL 2608541 (S.D.W. Va. June 15, 2017) ................................. 42

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2019 WL 1397728 (E.D. Va. Feb. 6, 2019) ................................... 47

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   400 F. Supp. 3d 418 (E.D. Va. 2019) ......................................... 50

**Statutes**

28 U.S.C. § 1715 ............................................................... 47

740 ILCS 10/7 ............................................................ 43, 45

Colo. Rev. Stat. § 6-1-105 ................................................... 39

Colo. Rev. Stat. § 6-1-113 ........................................... 43, 45, 46

District of Columbia Code § 28-4501, *et seq.* ............................... 29

Haw. Rev. Stat. § 480-13.3 ................................................... 49

Mass. Gen. Laws Ch. 93A ................................................ 30, 31

Minn. Stat. §325F.68, *et seq.* ............................................... 40

Miss. Code Ann. § 75-21-1 ................................................... 34

Nev. Deceptive Trade Practices Act § 41.600 ................................. 41

Nev. Rev. Stat. § 598.077 ................................................... 41

N.H. Rev. Stat. Ann. § 358-A:2 ............................................. 33

N.M. Stat. Ann. § 57-12-3 ................................................... 39

N.Y. Civ. Prac. Law & Rules § 901 .......................................... 45

N.Y. Gen. Bus. Laws § 340, *et seq.* .......................................... 36

S.C. Code Ann. § 39-5-140 ................................................... 43

S.D. Codified Laws § 37-1-3.1, *et seq.* ....................................... 37

S.D. Codified Laws § 37-24-6 ............................................... 39

W. Va. Code § 46A-6-104 ................................................... 42

W. Va. Code § 47-18-1, *et seq.* .............................................. 38

## GLOSSARY OF TERMS AND REFERENCES

The following is a list of defined terms and references used herein:

| TERM | DEFINITION |
|---|---|
| 3PA | CDK's Third Party Access program |
| ACOM SUF | Plaintiff Authenticom, Inc.'s Statement of Undisputed Material Facts in Support of Its Motion For Summary Judgment On Defendants' Counterclaims (ECF No. 977) |
| *Authenticom* Opp. | Plaintiff Authenticom, Inc.'s Opposition to Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Motion for Summary Judgment, filed concurrently herewith |
| *Authenticom* SJ Br. | Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Memorandum in Support of Motion for Summary Judgment [against Authenticom, Inc.] (ECF No. 966) |
| *AutoLoop* SJ Br. | Memorandum in Support of CDK Global, LLC's Motion for Summary Judgment [against Loop, LLC d/b/a AutoLoop] (ECF No. 969) |
| CDK | CDK Global, LLC (including CDK's corporate predecessor, the ADP Dealer Services division, prior to being spun-off as an independent corporation in late 2014) |
| Complaint | Dealership Plaintiffs' Consolidated Class Action Complaint (ECF No. 184) |
| DiD | Difference-in-differences regression methodology |
| DIS | Data integration services |
| DJ SUF | Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions For Summary Judgment (ECF No. 974) |
| DMI | Digital Motorworks, Inc. |
| DMS | Dealer Management System |
| February 2015 Agreements | The following three written agreements between CDK and Reynolds, dated Feb. 18, 2015: (i) Data Exchange Agreement (FEX 49); (ii) 3PA Agreement (FEX 50), and (iii) Reynolds Interface Agreement (FEX 51) |
| FEX | Exhibit to the Declaration of Daniel T. Fenske, dated May 20, 2020 (ECF No. 975) |

| TERM | DEFINITION |
|---|---|
| Motion | CDK Global, LLC's Motion for Summary Judgment (against Dealership Plaintiffs) (ECF No. 970) |
| Murphy Report | Corrected Expert Report of Dr. Kevin Murphy, Nov. 15, 2019 (FEX 76) |
| Nielson Report | Expert Rebuttal Report of Seth D. Nielson, Ph.D., Nov. 15, 2019 (FEX 77) |
| OEM | Original equipment manufacturer (*i.e.*, auto manufacturer) |
| PJ RUSF | MDL Plaintiffs' Responses to Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment, filed concurrently herewith |
| PJ SAF | MDL Plaintiffs' Statement of Additional Material Facts in Opposition to Defendants' Motions for Summary Judgment, filed concurrently herewith |
| RCI | Reynolds Certified Interface program |
| Reynolds (or R&R) | The Reynolds and Reynolds Company |
| SIS | Superior Integrated Solutions, Inc. |
| Tr. | Deposition transcript |
| WEX | Exhibit to the Declaration of Peggy J. Wedgworth, filed concurrently herewith |
| Whinston Report | Expert Report of Michael D. Whinston, Ph.D., Aug. 26, 2019 (FEX 78) |
| Williams Reply | Expert Reply Report of Michael A. Williams, Ph.D., Dec. 19, 2019 (FEX 80) |
| Williams Report | Expert Report of Michael A. Williams, Ph.D., Aug. 26, 2019 (FEX 79) |

Dealership Class Plaintiffs ("Dealerships" or "Dealers") respectfully submit this memorandum in opposition to CDK's Motion for Summary Judgment (ECF No. 970) ("Motion").

## INTRODUCTION

Dealers have developed compelling evidence showing that CDK and Reynolds engaged in a conspiracy that caused extensive damages. Dealers easily satisfy the summary judgment standard. Their conspiracy claim is entirely plausible, and is amply supported by *direct evidence* of Defendants' anticompetitive agreement, as well as numerous "plus factors." As direct purchasers of Defendants' DMSs, Dealers are entitled to damages under federal law, reflecting the DMS's reduced value and functionality. The damages caused by Defendants' conspiracy were properly measured by Dealers' expert Dr. Michael Williams. The damages model further accounts for the fact that CDK and Reynolds, as profit-maximizing entities, would have exercised any unilateral market power in the pre-conspiracy period. In addition, the model demonstrates that Defendants' challenged conduct caused damages to Dealers in the form of higher DIS fees, which are recoverable under state law.

CDK's arguments fail as a matter of law as it has not carried its burden to show that no reasonable jury could find in Dealers' favor. At best, CDK's arguments raise factual questions for trial. When viewing the facts in the light most favorable to and drawing all reasonable inferences in favor of the Dealers, CDK's summary judgment motion should be denied in its entirety.[1]

## ARGUMENT

### I. THE RECORD EVIDENCE IS MORE THAN SUFFICIENT TO ESTABLISH THE EXISTENCE OF A HORIZONTAL CONSPIRACY

Plaintiffs satisfy the summary judgment standard, as Plaintiffs' theory of conspiracy is entirely plausible, Defendants' conduct is not inherently procompetitive, there is both direct and

---

[1] Dealers hereby incorporate by reference the "Background" section of the *Authenticom* Opp.

strong circumstantial evidence of an anticompetitive agreement between Defendants, and other "plus factors" further support the inference of conspiracy. Dealership Plaintiffs incorporate here by reference Section I of the *Authenticom* Opp. concerning the overwhelming evidence of Defendants' unlawful horizontal conspiracy. The arguments below specifically address the arguments raised by CDK in its brief against Dealers (at 17-22) on this topic.

Based on his thorough analysis of the case record, ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ FEX 80, Williams Reply ¶ 7.

Contrary to CDK's assertion (at 18), Dr. Williams analyzed evidence of Defendants' incentives to conspire. Dr. Williams discussed evidence that ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ Dr. Williams also cited evidence showing that █████████████████████████████████████████

████████████████████████████████████████.[3] And Dr. Williams

---

[2] ████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

[3] ████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████ ██ ███████████
████████████████████████████████████████

discussed that ████████████████████████████████████████

████████████████████████████████████████████ █ ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ FEX 80, Williams Reply ¶ 7.

Dr. Williams also analyzed data on DMS dealer switching patterns.[5] He concluded ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* ¶ 28.

Dr. Williams's analysis of "plus factors" (*i.e.*, "additional factual circumstances . . . indicating an agreement", *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019)), supports the inference of a conspiracy between Defendants. *See* ABA Section of Antitrust Law (2d Ed. 2018), Proof of Conspiracy Under Federal Antitrust Laws, at 26 ("It is sometimes said that a plaintiff seeking to prove a conspiracy through evidence of conscious parallelism must also prove sufficient 'plus factors' to make an inference of agreement compelling. Courts have considered both economic analysis of the structure and operation of the market and noneconomic evidence as plus factors."). As Dealers addressed in *Daubert* briefing, CDK is incorrect that "[t]he utility of a 'plus factors' framework is questionable in the Seventh Circuit." *See* ECF No. 992 at 14-15.

---

[4] ████████████████████████████████████████████████████
████████████████████████████████

[5] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

### A.    **Defendants' Actual DIS Prices Exceed "But-For" Prices**

Dr. Williams's regression analysis showed that ████████████████████████

██████████████████████████████    ████    █████████████████████████████

████████████████████████. *See* FEX 79, Williams Report ¶ 163 and Table 3.

"Economic evidence showing that prices are above but-for benchmark prices constitutes a plus

factor" towards an inference of conspiracy, as it is evidence of "action[s or conduct that could

occur in the presence of a collusive agreement but that are highly unlikely to occur in its absence."

*Id.* ¶¶ 114-15 (citing William E. Kovacic *et al.*, *Plus Factors and Agreement in Antitrust Law*, 110

Mich. L. Rev. 393-436, at 420, 428 (2011)).[7]

CDK argues (at 18-19) that Dr. Williams's regression analysis does not support an

inference of conspiracy because "[the fact] that prices were supposedly elevated . . . says nothing

about whether Defendants *conspired* to raise prices." But Dr. Williams did not merely find that

"prices were . . . elevated"; his regression analysis shows that ██████████████████████

██████████████████████████████████████████████████████████████. As

explained in Section II.B., *infra*, Dr. Williams's damages model appropriately accounts for supply

and demand factors, Defendants' unilateral market power to affect DIS prices, and any price

impact of the exclusive dealing provisions in Defendants' contracts with vendors. Based on his

analysis of the record, Dr. Williams concluded that ████████████████████████████

████████████████████████████████████████████████

---

[6] Although Dr. Williams's damages analysis stopped at July 2019, Dealers' damages are ongoing.

[7] *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) (expert's "regression analysis that found, after correcting for other factors likely to influence prices of HFCS, that those prices were higher during the period of the alleged conspiracy than they were before or after[,]" was "admissible evidence that higher prices during the period of the alleged conspiracy cannot be fully explained by causes consistent with active competition . . . ."); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 773-74 (E.D. Pa. 2017) (expert testimony that defendants' price increases could not be explained by ordinary market forces supported inference of a price-fixing conspiracy).

CDK (at 19) cites *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935-36 (7th Cir. 2018), for the proposition that "'it is not a violation of antitrust law for a firm to raise its price' so long as the firm acts unilaterally." CDK's 3PA price increases during the damages period were *not* unilateral, but were entirely dependent on the conspiracy with Reynolds. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Further, as shown in Section I of the *Authenticom* Opp., CDK's decision to close its DMS to independent integration was *not* unilateral but was the result of its unlawful agreement with Reynolds to stop competing on DMS "openness". Thus, in the absence of an agreement with Reynolds, CDK would *not* have closed its DMS, and could *not* have successfully raised 3PA prices. *See* FEX 80, Williams Reply ¶¶ 12-35 ████████████████

████████████████████████

B.     **Communications and Information Exchanges Between Defendants**

CDK argues (at 19) that communications between Defendants do not establish the existence of an "unwritten conspiracy" because they "relate merely to the negotiation and implementation of the 2015 Agreements." That argument falsely assumes that the February 2015 Agreements were not a key component of Defendants' larger conspiracy. As discussed below, and in Section I of the *Authenticom* Opp., however, the February 2015 Agreements (standing alone or combined with other evidence) support the inference of a conspiracy to restrain competition.

Further, Dr. Williams did not opine that the mere *existence* of communications between CDK and Reynolds supports the inference of conspiracy; instead, he found tha ██████████████

███████████████████████████████████████████████████

████████████████████████████████ FEX 79, Williams Report ¶ 118. For example, in

5

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ FEX 80, Williams Reply ¶ 68 (citing WEX 95, CDK-0787969 to 970 (PX 889)).

Here, "Plaintiffs have presented evidence, not only of the large number of contacts [between defendants], but also of the content of these communications, that suggests cartel behavior. This is exactly the kind of circumstantial evidence that, when viewed in conjunction with the massive record in this case, could lead a jury to reasonably infer a conspiracy in restraint of trade." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 830 (D. Md. 2013).

### C. The February 2015 Agreements

CDK (at 20) criticizes Dr. Williams's opinion that █████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ FEX 79, Williams Report ¶ 121.

Dr. Williams testified that ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████."[8] As Dr. Williams explained,

---

[8] *See* WEX 185, ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ FEX 80, Williams Reply ¶¶ 120-121.[9] Dr. Williams's conclusions are consistent with Judge St. Eve's ruling that, while the February 2015 Agreements do not expressly require Defendants to block *all* independent integration, "they do effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit Defendants from assisting in the hostile access of one another's DMSs[,]" which would "make sense if—as [Defendants'] executives allegedly admitted—Defendants sought to 'support' one another's integration services to the exclusion of third-party integrators from the competition." *Authenticom, Inc. v. CDK Global, LLC*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018); *see also Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *6 (W.D. Wis. July 14, 2017) ("Although the agreements do not explicitly state that defendants will work together to eliminate

---

[9] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

third-party data integrators, the agreements have that effect. . . . After the agreements, there is little room in the market for third-party integrators.").[10]

Even if the Court views the February 2015 Agreements as not violative of antitrust law by themselves, they still have probative value towards an inference of conspiracy. "[T]his is not a contracts case in which the scope of the alleged anticompetitive agreement is cabined by the four corners of the written document. Not confined by the parol evidence rule, [plaintiff] could use all manner of extrinsic evidence to persuade a jury that what the wholesalers *actually agreed to do* [violated the law]." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014). The court in *Wholesale Grocery Prods.* found it "[t]elling[]" that while defendants' written agreement "permitted [them] to compete in each other's regions for new and existing customers, *neither one actually did so*." *Id.* The court also found emails concerning defendants' intentions behind the agreement to be "revealing"; the court reversed the district court's grant of summary judgment to defendants, finding that "a reasonable jury could conclude that the wholesalers' real agreement involved dividing territory and customers along geographic lines." *Id.*

The facts the court found "revealing" in *Wholesale Grocery Products* are also present here.



. PJ SAF 37-39, 54-56; DJ SUF 126-27.

_____

[10]

.

[11] For example, one key piece of evidence cited in *Wholesale Grocery Products* was an email in which defendant C&S's executive wrote that C&S "was not interested in a transaction that leaves [co-defendant]

D.    <u>**Defendants' Pretextual Explanations for Their Anticompetitive Conduct**</u>

"[E]vidence of pretextual explanations for [anti-competitive actions], if believed by a jury, would disprove the likelihood of independent action by an alleged conspirator." *P&G Co. v. Stone Container Corp. (In re Linerboard Antitrust Litig.)*, 504 F. Supp. 2d 38, 53 (E.D. Pa. 2007) (citation and internal quotation marks omitted); *see also Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 452 (7th Cir. 2007) ("pretextual reasons have some probative value" when combined with other evidence of a conspiracy).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

SuperValu in New England." 752 F.3d at 734 (internal quotation marks omitted). ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ classic non-economic evidence of conspiracy. *High Fructose Corn Syrup*, 295 F.3d at 661.

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████  Defendants' disregard of purported security concerns over independent integration when it was profitable to do so shows their "concerns" were pretextual.

The opinions of Plaintiffs' cybersecurity expert, Dr. Seth Nielson, further show that CDK's explanations for closing its DMS were pretextual. █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. ¶ 267; *see also id.* ¶¶

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

CDK argues (at *Authenticom* SJ Br. p. 11) that ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



### E. The DMS and DIS Markets Are Conducive to Cartel Behavior

Evidence of market characteristics that are "conducive to cartel behavior" (FEX 79, Williams Report ¶ 11) further bolsters the inference of conspiracy. As Dr. Williams discusses,

CDK does not contest the existence of these market characteristics, but only challenges their probative value towards an inference of conspiracy.[15] Such market characteristics can contribute to the inference of conspiracy when combined with other evidence of collusion. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010) ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion.").[16]

*See also High Fructose Corn Syrup*, 295

---

[14] Unlike in *Lamb's Patio Theatre, Inc. v. Universal Film Exchs., Inc.*, 582 F.2d 1068, 1070 (7th Cir. 1978) (cited by CDK at 21), Dealers do not rely *solely* on evidence of Defendants' pretextual explanations to support the inference of conspiracy.

[15] CDK (at 22) cites *Valspar Corp. v. E.I. DuPont De Nemours & Co.*, 873 F.3d 185, 196-97 & n.9 (3d Cir. 2017) for the proposition that expert testimony on market characteristics can be rejected where "[t]here is no dispute that the market was primed for anticompetitive interdependence and that it operated in that manner". Thus, CDK concedes that the DMS and DIS markets were conducive to cartel behavior.

[16] *See also Kleen Prods. LLC v. Int'l Paper*, 2017 WL 2362567, at *14 (N.D. Ill. May 31, 2017) (denying motion to exclude expert's testimony about industry structure, finding it relevant to the existence of a conspiracy even if not dispositive "by itself"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) ("[T]he structure of an industry can suggest whether observed parallel behavior is likely to be the result of agreement or mere interdependence.").

F.3d at 656-67 (evidence from plaintiffs' economic expert that the structure of the market was "favorable" to "secret price fixing", including high market concentration, contributed to inference of conspiracy); ABA Section of Antitrust Law (2d Ed. 2018), Proof of Conspiracy Under Federal Antitrust Laws, at 120.

## II. DEALERS' DAMAGES CLAIMS ARE NOT DEFICIENT

### A. Dealers' Direct Damages Claims Are Not Barred By *Illinois Brick*

#### 1. Dr. Williams Measured Damages to Dealers as Direct Purchasers

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) creates a "bright-line rule" permitting suits by direct purchasers. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524 (2019). As direct purchasers of Defendants' DMSs (*see* DJ SUF 4, 18, 177), Dealers are entitled to damages reflecting the DMS's reduced value and functionality proximately caused by the alleged conspiracy.[17]

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ Dr. Williams's methodology is aligned with *Illinois Brick* and the factual record because ████████████████████████████████

---

[17] *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 531 (N.D. Ill. 2019) ("*In re DMS*") ("Plaintiffs allege that CDK and Reynolds, competitors in the DMS market, agreed not to compete with each other in certain respects (*i.e.*, permitting third-party DMS access) resulting in DMSs with less value and inferior functionality. Plaintiffs therefore allege anticompetitive conduct in the DMS market.").

███████████████████████████████████████████.

CDK's own evidence confirms this approach. ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

       ████████████████████████████████████████████ ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[18] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

[19] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████



---

[20] *See* Section I.D., *supra*, concerning evidence that ███████████████████████ .

[21] ████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

[22] ████████████████████████████████████████████
████████████████████████████████████████████

2.     CDK's Policy Arguments are Unavailing

CDK mistakenly argues (at 7) that Dealers' methodology to measure direct damages is barred because it would "*create*" "'the problems identified in' *Illinois Brick*".[23] As the Supreme Court recently explained in *Apple*, *Illinois Brick* establishes a "bright-line" rule that permits direct purchasers to recover damages (139 S. Ct. at 1522) and "there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Id*. at 1524 (citation omitted).[24] The Seventh Circuit has instructed:

> *Apple* confirms that *Illinois Brick* is a bright-line rule allocating the right to sue to direct purchasers alone, not a rule that requires analysis of competing policy justifications in each case. The relationship between the buyer and the seller, rather than the nature of the alleged anticompetitive conduct, governs whether the buyer may sue under the antitrust laws.

*Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020). *See id*. ("The relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser, *not the difficulty of assessing the overcharge*.") (emphasis added).[25] Under the "bright-line rule," Dealers, as direct purchasers from Defendants, are entitled to damages. Even assuming, *arguendo*, that CDK's policy arguments were relevant (they are not), they have no merit here, as shown below.

---

[23] All emphasis in this memorandum was present in the original cited documents unless otherwise noted.

[24] *See also id*. at 1529 (Gorsuch, J., dissenting) ("Instead of focusing on the traditional proximate cause question where the alleged overcharge is first (and thus surely) felt, the Court's test turns on who happens to be in privity of contract with whom.").

[25] CDK (at 8) quotes *Marion Healthcare*, 952 F.3d at 840, to argue that "'one and only one entity in the market' can recover". But here, Dealers *are* direct purchasers in the DMS market, and are the *only* claimants seeking recovery with respect to that market. Also inapposite are *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp*., 2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002), and *Technical Learning Collective, Inc. v. Daimler-Benz AG*, 1980 WL 1943 (D. Md. Aug. 28, 1980); in those cases, the plaintiffs were not direct purchasers. *See* 2002 WL 31528625, at *1; 1980 WL 1943, at *6-7.

a. **Potential for Multiple Liability**. CDK argues (at 7) that it faces a "potential for multiple liability" because both Dealers and vendors seek direct damages measured by increased DIS fees. That prospect, however, implicates none of *Illinois Brick*'s concerns. That case addressed the risk of multiple liability for a conspiracy involving *one* product (concrete) purchased by *one* group (contractors), who used the product to build structures that were incorporated into buildings purchased by governmental authorities. Critically, those authorities purchased *nothing* directly from the defendants. *See* 431 U.S. at 426. By contrast, in this case, *two* different classes of purchasers directly purchased *two* different products from Defendants: Dealers directly purchased DMSs, and vendors directly purchased DIS. "[D]ifferent injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus . . . differently situated plaintiffs might be able to raise claims." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-82 (7th Cir. 2001) (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)). Thus, *Illinois Brick* is no bar where "the evidence viewed favorably to the plaintiffs shows that damage from the defendants' conduct was felt in two separate markets" -- here, the DMS and DIS markets. *Loeb Indus.*, 306 F.3d at 483.

b. **Similar Damage Measure**. CDK also complains (at 6) that Dr. Williams used the same methodology to measure Dealers' direct damages as DMS purchasers, and their indirect damages as DIS purchasers. *Illinois Brick*, however, does not address (much less restrict) the methodology to calculate damages, and it certainly does not preclude a plaintiff from using a single methodology to calculate damages for different claims.

Under established law, a methodology need only provide a "reasonable" inference of the damage amount. *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 563 (1931) ("[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although

18

the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."). *See also Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264 (1946); *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927).

Thus, damages may properly be measured by a plaintiff's payments to third parties (as was done here). *See Blue Shield*, 457 U.S. at 470, 479-80 (where insurers conspired to block psychologists from receiving payment, employee, whose employer purchased insurance, could recover fees she paid psychologist). Indeed, Dealers need not pay *anyone* to prove antitrust damages. It suffices that Dealers' property (their directly purchased DMSs) lost value and functionality due to the conspiracy. *See Story Parchment*, 282 U.S. at 567 (permitting recovery of property's reduced value);[26] ECF No. 1043 at 1 (CDK's acknowledgement that "antitrust plaintiffs can recover for diminution in property value or lost business.").[27]

Given the record here, including ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

c.    **The 12(b)(6) Ruling.** Dealers' methodology does not contravene the Court's prior ruling. The ruling with respect to DIS fees addressed damages under Dealers' "exclusive dealing claim . . . based on their status as indirect purchasers in the DIS market." *In re DMS*, 362 F. Supp.

---

[26] This case is stronger than *Story Parchment*, where the property at issue was not purchased from the defendants, yet its value dropped because of defendants' conspiracy. Here, Dealers purchased DMSs directly from Defendants, whose conspiracy reduced the DMSs' value and functionality.

[27] *See also Bigelow*, 327 U.S. at 262-63 (where defendants conspired to block theaters' exhibition of first-run movies, "loss of . . . admission receipts" was a "fair measure of the damage"); *Eastman Kodak*, 273 U.S. at 379 (affirming judgment for recovery of lost profits due to defendant's refusal to deal; "plaintiff's evidence as to the amount of damages, while mainly circumstantial, was competent . . . .").

3d at 531. Here, however, Dealers' methodology provides a "reasonable" measure of damages sustained by Dealers *qua* direct purchasers of DMSs, *see Story Parchment*, 282 U.S. at 563, irrespective of any exclusive dealing. The Court held that Dealers, as direct purchasers of Defendants' DMSs, can pursue claims for federal antitrust damages resulting from the reduced value and functionality of the DMSs, 362 F. Supp. 3d at 531, and as shown above, the increase in DIS fees provides a fair measurement of the DMSs' loss of value and functionality. It thus is perfectly appropriate under the Court's ruling, and *Illinois Brick* (as construed in *Apple*).[28]

**B.** **Dr. Williams's Damages Model Accounts Exclusively For Harm From Alleged Unlawful Conduct**

Dr. Williams's liability analysis and damages calculation quantifies *only* the effects of conspiratorial conduct as alleged in the Complaint, and concludes that the record of evidence in this case is consistent with a conspiracy. ███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[29]

████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[28] CDK's argument (at 9) for dismissal of various state claims based on its *Illinois Brick* analysis fails for the reasons set forth above.

[29] ████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████

---



CDK also inaccurately argues (at 9-12) that Dealers' claims are deficient because Dr. Williams's analysis purportedly (1) ignores that this Court has dismissed Dealers' exclusive dealing claim, and (2) attributes all price increases to the conspiracy. Both arguments fail.

       1.       <u>Dealers Seek Damages Caused by Defendants' Collusive Conduct Which is Not Based Upon an Already-Dismissed Exclusive Dealing Claim</u>

CDK argues (at 10, as well as in their *Daubert* motion at 9-11) that "Dr. Williams's model includes harm purportedly arising from exclusive dealing." CDK is incorrect. As explained in Dealers' *Daubert* opposition (ECF No. 992 at 7), simply because a claim in a conspiracy has initially been dismissed on procedural grounds does not convert defendants' conduct into lawful

---

[31] *See AutoLoop* SJ Br. at 6 ("[A]n antitrust damages model must assume that the defendant would have engaged in lawful profit-maximizing competition."). To the extent CDK argues it would have caused the same harm through unilateral conduct in a "but for" world, that is foreclosed as a matter of law. *See* ECF No. 875 at 9-14 (motion to exclude testimony of Kevin Murphy).

action. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161-63 (7th Cir. 1983) (where jury found that some but not all of defendant's pricing policies were lawful, the Seventh Circuit remanded for new trial for damages only). Further, CDK represents (at 22) that █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

    2.    <u>Dr. Williams's Damages Model Accounts For Lawful Price Increases</u>

CDK argues (at 11-12) that █████████████████████████████████████████

██████████████████████████████████. Expert analysis and evidence do not support that argument. As Dr. Williams testified, ██████████████████████████████

████████████████████████████████. *See* WEX 185, Williams Tr. 216:25-217:8.[32]

CDK (at 11-12) additionally attacks Dr. Williams's analysis by claiming that he failed to account for █████████████████████████████████████████████

---

[32] Dr. Williams's testimony at 258-59 (cited by CDK at 11-12) also fails to support CDK's argument. █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████. Though CDK is incorrect, this argument demonstrates that the September 2013 conspiracy start date is conservative. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. ¶¶ 67-68.[33]

████████████████████████████. ¶¶ 67-68.

Finally, CDK states (at 12) that Dealers' claims must fail as they must separate the price effects of alleged collusion from the price effects of the Defendants' lawful market power. As demonstrated above, this argument ignores Dr. Williams's analysis, and misstates Seventh Circuit law which has not supported disaggregation of damages in antitrust cases and has frowned upon such in *reviewing jury verdicts*. Instead, *courts await a jury determination of whether alleged conduct is lawful,* and only then consider how best (if at all) to address any potential concerns. As Judge Posner stated:

> Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another.. . . .

> There is nothing inconsistent between requiring *proof that damages were caused by illegal acts* and the rule that a plaintiff need not disaggregate damages among those acts found to be unlawful.

*MCI Commc'ns Corp.,* 708 F.2d at 1161-63 (internal citations omitted).[34] Here, no alleged conduct has been determined to be lawful, and therefore no adjustment to the analysis is needed. In fact,

---

[33] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

[34] "MCI assumed in the preparation of its damage study that all twenty-two of AT&T's acts charged were illegal. In fact, liability has now been established with respect to only seven of the twenty-two counts of

an antitrust plaintiff may recover damages for the same general course of conduct that can support two separate claims (*e.g.*, refusal-to-deal and tying). *See Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 483 (7th Cir. 2020) (overruling district court ruling that Viamedia could not establish antitrust injury for tying claim because the injuries were the same as those alleged from Comcast's refusal to deal, and noting "[b]ecause the same general course of conduct supports both the refusal-to-deal and tying claims, the two theories necessarily allege similar injuries and damages"); *Spray-Rite Serv. Corp. v. Monsanto Co*., 684 F.2d 1226, 1243 (7th Cir.1982) ("We will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."), *aff'd on other grounds*, 465 U.S. 752 (1984).[35]

Dr. Williams's damages model and his analysis of the case record permits the jury to make a reasonable and principled estimate of damages caused by the alleged horizontal conspiracy; therefore, CDK's motion on all damages claims should be denied.

### C. Plaintiffs Offer Sufficient Evidence of Individual and Classwide Damages

CDK argues (at 13) that Dealers' damage model "fails to answer the only relevant question at this stage", *i.e.*, whether the named Plaintiffs "can proffer sufficient evidence to withstand summary judgment." CDK is wrong.

---

alleged monopolization. MCI's lost profits study does not establish any variation in the outcome depending on which acts of AT&T were held to be legal and which illegal. On the contrary, the study was prepared well in advance of trial on the assumption that all of AT&T's actions constituted the willful maintenance of a monopoly." *Id.* at 1163.

[35] CDK's reliance on other cases is misplaced. In *Blue Cross & Blue Shield United of WI v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998), the expert's analysis included alleged anticompetitive practices throughout both before-and-after periods; and the only illegal action found by the jury (the division of markets) "added nothing to the price effects of the legal practices," and "was among the least important of the many antitrust violations charged in this suit[.]" *Id.* at 592-94. In *In re Brand Name Prescription Drugs Antitrust Litig*., 186 F.3d 781 (7th Cir. 1999), the expert opined on market power "after working on the case for only 40 hours" but failed to opine on collusive conduct. *Id.* at 786.

As explained in Section II.A., *supra,* 

.[36] Thus, the record establishes that the named Plaintiffs purchased apps for which Defendants charged inflated, passed-on DIS fees. Whether an individual Plaintiff's damages are $10, $100, or some other "allocate[d] … portion" of the $339 million amount (Mem. at 13) is immaterial at the summary judgment stage, as there can be no dispute that each Plaintiff sustained damages. *See Oak Indus., Inc. v. Zenith Elecs. Corp*., 726 F. Supp. 1525, 1539 (N.D. Ill. 1989) ("While plaintiffs may require more evidence . . . to quantify damages if awarded, we believe plaintiffs have come forward with sufficient evidence to withstand a motion for summary judgment.").

The Case Management Order ("CMO") does not require Plaintiffs to provide expert testimony concerning individual damages prior to summary judgment. *See* ECF No. 166. If further evidence of individual damages is warranted, it can be provided at (or after) class certification. Under the CMO, class certification procedures (including Plaintiffs' designation of experts and exchange of expert reports) are due "21 days after conclusion" of the *Authenticom* trial. *Id.* at 3. That trial will not occur until sometime after the Court decides the pending *Daubert* and summary judgment motions. *Id*. The Court has ample authority to manage the case schedule, including scheduling the submission of named plaintiff damages evidence, if appropriate, at the class

---

[36] *See* WEX 188, Dealership Plaintiffs' Amended Objections and Responses to CDK's First Interrogatories (Responses 2 and 3), at Exhibits A-Y. CDK failed to include these exhibits with FEX 112.

certification stage. Even assuming, *arguendo*, that Dealers were required to provide individual damages calculations *prior* to class certification (they were not),[37] the appropriate remedy is not summary dismissal. *See Gutmann v. Campbell*, 1998 WL 36030923, at *15 n.28 (D.N.M. Jan. 30, 1998) (denying summary judgment: "The mere failure to quantify damages surely cannot preclude a plaintiff from presenting evidence to a jury regarding the injuries suffered and the amount of damage caused by those injuries."); *Oak Indus.*, 726 F. Supp. at 1539.

Moreover, CDK has failed to show prejudice from any (*supposed*) shortage of additional calculations. *See Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 649 (7th Cir. 2012) (summary judgment not appropriate for plaintiffs' alleged failure to timely quantify damages in violation of discovery rules, where "Defendants have not explained how the plaintiffs' delay injured them"); *compare with Dynegy Mktg. and Trade v. Multuit Corp.*, 2008 WL 2410425, at *5 (N.D. Ill. June 11, 2008) (prejudice was significant factor in court's refusal to permit late-submitted evidence (not calculation) of damages). On the other hand, summary judgment for CDK on this ground would unduly prejudice Plaintiffs and the putative class. *See Malik*, 675 F.3d at 649-50 ("[T]he remedy for procedural missteps in litigation must be proportionate to the injury."). Given that individual damages calculations can be provided at class certification, at trial, or such other time as the Court should require, CDK's arguments should be rejected.

CDK's cases (at 16) do not support a contrary view.[38] Neither *Dynegy*, *Allergease*, nor CDK's other cases hold that, at summary judgment, class action plaintiffs must proffer

---

[37] Even at the class certification stage, individualized damage calculations are not required. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) (district court "erred when it ruled that class certification was precluded based on the need for damages to be assessed individually"). *See also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (courts can "'appoint[] a magistrate judge or special master to preside over individual damages proceedings.'") (citation omitted).

[38] In *Dynegy*, the claimant failed to provide "any evidence of damages," or even "a way to calculate damages." 2008 WL 2410425, at *5. Just the opposite is the case here -- Dr. Williams presented a methodology for determining total damages, and calculations showing total damages of $339 million

*individualized* damage calculations. Moreover, CDK cites no decision where an expert submitted a class-wide damages calculation well in *advance* of the class certification phase, yet summary judgment was granted due to the plaintiff's failure to quantify individual damages.

CDK also improperly attacks Plaintiffs' class-wide damage calculation. CDK claims (at 15-16) that Dr. Williams did not calculate "state-by-state damages," but as Dr. Williams explained, his methodologies and models plainly permit such calculations to be made. *See* FEX 79, Williams Report ¶ 171. And, if the Court certifies a nationwide class under Illinois law (where CDK is headquartered, *see* DJ SUF 16),[39] then damages under that law would equal the ███████████ █████████████████████████ In any event, state-by-state calculations can be made, if necessary, in connection with the class certification motion or at trial.

CDK also argues (at 15) that Dr. Williams's damage analysis is barred by *Illinois Brick*. To the contrary, Dr. Williams's calculation properly measures damages sustained by dealers -- as *direct purchasers* of Defendants' DMSs -- for the lost DMS value and functionality caused by the conspiracy, and is not barred by *Illinois Brick*. *See* Section II.A., *supra*.

Finally, CDK asserts (at 15) that "the Dealers' settlement with Reynolds prohibits them from certifying a class period that starts before 2015." That is incorrect. The settlement agreement does *not* restrict the start date for a litigation class period. *See* ECF No. 427-2, ¶ 29. In any event,

---

(before trebling), and each individual Plaintiff has submitted evidence including invoices from and payments to app providers which shows entitlement to damages and can be used to calculate individual damages at the appropriate time. Also inapposite is *Allergease Inc. v. Walgreen Co.*, 2017 WL 66819 (N.D. Ill. Jan. 6, 2017). There, the court found plaintiff's damage theory was "improperly based on *unadulterated speculation* and . . . *barred by the new business rule*." *Id.* at \*6 (emphasis added). Here, Dealers' damages methodology is not speculative, but reflects the straightforward concept that Dealers sustained damages (measured by higher DIS fees) due to the reduced value and functionality of Defendants' DMSs. CDK also improperly relies on *Citizens for Appropriate Rural Rds. v. Foxx*, 815 F.3d 1068 (7th Cir. 2016). Unlike that case, Dealers do not "seek additional discovery" to oppose summary judgment. *See id.* at 1082.

[39] *See generally Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at \*18-19 (N.D. Cal. Dec. 21, 2010) (certifying nationwide class against California-based entity under California state antitrust law).

CDK is not a party to the agreement, and thus has no right to enforce it.

## III. CDK'S ARGUMENTS CONCERNING STATE LAW CLAIMS ARE MERITLESS

### A. Dismissal of Federal Claims Would Not Warrant Dismissal of State Claims

CDK urges (at 23) that, because the federal claims (supposedly) should be dismissed, the state claims should be dismissed as well. CDK's two-paragraph argument is superficial and should be rejected. *See In re DMS*, 362 F. Supp. 3d at 554 (declining to rule on state law issue absent fuller briefing), *id*. at 551-52. *See also U.S. v. South*, 28 F.3d 619, 629 (7th Cir. 1994); *Inguran, LLC v. ABS Global, Inc.*, 2019 WL 1900345, at *17 (W.D. Wis. Apr. 29, 2019) (rejecting defendants' "superficial, one paragraph argument that summary judgment is warranted").

Moreover, there are many reasons why a state claim could be maintained, even if a federal claim is dismissed. For example, CDK argues that "plus factors" do not suffice to show a conspiracy under federal law. *See* ECF No. 882 (*Daubert* motion) at 13. But even if CDK is correct (it is not), it ignores whether those factors suffice under state law.[40]

### B. Dealers' Claims Satisfy the Nexus to Massachusetts, New Hampshire, Mississippi, New Hampshire, New York, South Dakota, and West Virginia

CDK's argument (at 24-26) that Dealers fail to show a nexus to Massachusetts, New Hampshire, Mississippi, New York, South Dakota, and West Virginia[41] is entirely misplaced. As discussed below, there is ample evidence that Defendants' conspiratorial conduct had a nexus with, and impact in, each of the states for which Dealers have asserted state law claims. That evidence is identified in the chart attached hereto as Table A, and is broken down by state, and further broken down by types of conduct and other intrastate contacts relevant to those state law claims. The

---

[40] *See Alakayak v. British Col. Packers, Ltd*., 48 P.3d 432, 452 (Alaska 2002) ("plus factors" warrant denial of summary judgment); *In re Automobile Antitrust Cases I & II*, 204 Cal. Rptr. 3d 330, 367 (Ct. App. 2016).

[41] CDK has also raised a nexus argument as to the District of Columbia Code § 28-4501, *et seq.* (Count IX). Dealership Plaintiffs concede this argument and withdraw this claim.

factual assertions set forth below (included in Table A) in support of Dealers' nexus argument are listed at PJ SAF 136-150; to avoid unnecessary repetition, citations to the PJ SAF will not be repeated below.

**Massachusetts:** CDK (at 24) relies upon *SCVNGR, Inc. v. Echarge Licensing,* LLC, 2014 WL 4804738, at *6 (Sept. 25, 2014) for the proposition from the seminal case, *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (2003), that pursuant to Mass. Gen. Laws Ch. 93A (Count XXXIX), intrastate analysis requires the court to consider the facts "in the context of the entire § 11 claim," in "determin[ing] whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth[.]" However, CDK omits that the court disavowed the use of any specific set of factors to determine whether the alleged wrongful conduct met this standard: "the analysis required under MCPA § 11 should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus away from the purpose and scope of c. 93A."[42] 2014 WL 4804738, at *6 (citing *Kuwaiti*, 781 N.E.2d at 473). "This analysis is not based on a fixed set of factors, but upon the particular facts the court finds relevant after examining the entire context of the claim." *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 846 F. Supp. 2d 828, 891 (S.D. Ohio 2012) ("'the source' of the wrongful conduct, where the misconduct was received, and where it was 'acted on' are all permissible considerations in the 'center of gravity' determination") (citing *RGJ Assocs., Inc. v. Stainsafe, Inc.*, 338 F. Supp. 2d 215, 233-34 (D. Mass. 2004)).[43]

---

[42] *See also Blue Cross & Blue Shield of Mass. v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 194 (1st Cir. 2009) ("'fact intensive' inquiry" that varies from case to case, and "the focus of the inquiry should be on 'the purpose and scope' of ch. 93A[,]" which is to "'encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair business practices.'").

[43] "Plaintiff is correct that, when a party receives deceptive statements and relies upon those statements within a particular state, courts have concluded that the state in which the reliance has occurred can be said

*In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009).[44] is instructive to this case. In finding appellant manufacturer liable (affirming court below) for violations of Massachusetts' unfair and deceptive business practices statute, the First Circuit concluded that defendants' conduct which "directly, and by design, affected physicians in Massachusetts and caused financial injury to payors in Massachusetts" established a sufficient nexus for the statute, even though the defendant's principal place of business was in Delaware and its "conduct was directed nationwide". *See also Conway v. Licata*, 104 F. Supp. 3d 104, 119-20 (D. Mass. 2015) (denying summary judgment on center of gravity issue because plaintiff resided in, received and relied upon many communications alleged to be fraudulent in, and experienced losses in, Massachusetts); *600 LB Gorillas, Inc.*, 2018 WL 3475495, at *5-6 (denying summary judgment because plaintiff could show center of gravity occurred in Massachusetts since plaintiff received and made decisions based upon misrepresentations made there).

In evaluating the facts of this case, CDK fails to satisfy its burden of proving the absence of a genuine issue of a material fact, even conceding (at 24) that Dealers have alleged ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

to be the 'center of gravity' for purposes of a Chapter 93A claim." *600 LB Gorillas, Inc. v. Fieldbrook Foods Corp.*, 2018 WL 3475495, at *4 (D. Mass. Jun. 19, 2018).

[44] Similarly, in *HipSaver Co. v. J.T. Posey Co.*, 490 F. Supp. 2d 55, 71 (D. Mass. 2007), defendant argued its conduct did not primarily and substantially occur in Massachusetts because it launched a *nationwide* advertising campaign making allegedly false representations about plaintiff's product. The court denied summary judgment on the Mass. Gen. Laws Ch. 93A claim stating, "[h]ere, [plaintiff] claims injury under the statute as a result of [defendant's] distribution of allegedly false advertising materials to 98 health care facilities in Massachusetts" . . . . "[b]ecause the distribution of these materials occurred in-state, [plaintiff] has produced sufficient evidence that the 'center of gravity' of the claim occurred 'primarily and substantially' inside of the Commonwealth." *Id.* at 72.

██████ The evidence, as discussed below and in Table A, presents genuine disputed issues of material fact as to CDK's nexus argument.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ – hardly a "few" Massachusetts customers, so as to be distinguishable from *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012) relied upon for alleged support by CDK (at 24).[45] Nor was this an "incidental effect" on Massachusetts as per the cases cited by CDK (at 25).[46]

A key element of the conspiracy was ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

─────────────────────

[45] *Uncle Henry's Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005) (at 24) is also distinguishable, because the deceptive statements were acted upon outside of Massachusetts. *Id.* at 39. Here, key elements of the conspiracy **took place in Massachusetts**, and Dealers received and acted upon Defendants' wrongful acts in Massachusetts.

[46] *Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*, 943 F.3d 42, 48 (1st Cir. 2019) (at 25) is also distinguishable (deceptions occurred almost entirely outside of Massachusetts).

██████ ██ ██ ████ ███ █████ ██████ █████ ██ ████ ████████████████████.

**New Hampshire:** As CDK notes (at 25), in its decision on CDK's motion to dismiss, the Court declined to decide whether the nexus requirement was satisfied pursuant to New Hampshire's consumer protection statute, N.H. Rev. Stat. Ann. § 358-A:2 (Count XLIII) ("NHCPA"). *See In re DMS*, 362 F. Supp. 3d at 550. The NHCPA prohibits the "use [of] any unfair method of competition or any unfair or deceptive act or practice in the conduct of *any trade or commerce within this state*." N.H. Rev. Stat. Ann. § 358-A:2 (emphasis added). Caselaw is "admittedly mixed"[47] as to whether or not a nationwide scheme in which plaintiffs pay higher prices in the state is sufficient to satisfy the statute's requirement, and there are a plethora of cases supporting Dealers' position.[48] The few cases CDK relies on (at 25) are clearly distinguishable.[49] CDK misconstrues the ruling in *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224 (M.D. Pa. 2010), arguing that the court claimed to focus its analysis on "the 'offending conduct' itself", but then essentially did not, concluding that it was sufficient "that defendants

---

[47] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 761 (E.D. Pa. 2014).

[48] "[A] broad construction of the statute is consistent with the New Hampshire legislature's intent that 'the CPA . . . be construed broadly.'" *Niaspan*, 42 F. Supp. 3d at 761 (citation omitted). *See also In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1081-82 (S.D. Cal. 2017) (sale of allegedly price-fixed products in New Hampshire meets statutory requirement because includes trade or commerce which indirectly affects people in the state); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010) (defendant's injection of price-fixed chocolate into New Hampshire market satisfied statutory requirement); *In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms. Inc.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y 2012) ("*DDAVP*") (New Hampshire commerce and citizens affected by defendants' allegedly deceptive conduct).

[49] CDK (at 25) primarily relies upon *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *17 (E.D. Mich. Apr. 9, 2013) for the proposition that "alleged conspirators taking action in New Hampshire" is necessary, not just "increased prices paid in [the state]." *Refrigerant*, however, was decided on a motion to dismiss, thus the fact that there were no allegations in the complaint that "any unfair or deceptive act or practice took place in New Hampshire" (*id.* at *18) was controlling, but is of no moment here. The remaining cases relied upon by CDK from two federal courts (at 25 n.6) are also inapposite as they are motion to dismiss decisions addressing the sufficiency of the complaint – none involve class actions alleging a nationwide conspiracy with intrastate conduct or effects.

colluded to fix the price of chocolate products that were then introduced into the New Hampshire market." In fact, in the sentence following CDK's excerpt, the court clarifies that "this purported behavior encompasses conduct that was part of trade or commerce that, at the very least, had indirect effects on the New Hampshire market and its residents" *Id.* at 235.

More importantly, however, after development of a full factual record in this case, there exist at least disputed issues of fact as to whether anticompetitive conduct took place within New Hampshire, which are sufficient to defeat CDK's Motion. *See* Table A at 5-6. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

The remainder of the states challenged by CDK are relegated to a sole footnote (at 26 n.7), containing citations to one case per state for generic – and essentially meaningless – propositions in light of the evidence in this case establishing a sufficient nexus with those states.

**Mississippi:** In reference to Mississippi's antitrust statute, Miss. Code Ann. § 75-21-1 (Count XVII), CDK relies upon *In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561, at *2 (D. Md. Aug. 22, 2003) (at 26 n.7) for the proposition that "*at least some* conduct" by the offending

party has to be performed wholly intrastate (emphasis added).[50] As the *Microsoft* decision was issued at the pleading stage, the court's decision was not premised on a full factual record. Here, there is ample record evidence that the conduct at issue was accomplished by "at least some conduct" by Defendants performed wholly within Mississippi pursuant to Miss. Code Ann. § 75-21-1.[51] Defendants implemented significant elements of the conspiracy in Mississippi in reference to their 150 Mississippi dealer customers. *See* Table A at 7-8. ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

---

[50] "[E]ven after having been alerted to . . . the issue [plaintiffs failed to allege that Microsoft's monopoly was to be accomplished by any transactions "lying wholly within the state"], plaintiffs make only the entirely conclusory averment that Defendant Microsoft obviously created a monopoly in both interstate and intrastate commerce.'" *Id.* at 2. Table A demonstrates that a sufficient nexus with Mississippi has been established.

[51] *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.* ("*NMV*"), 350 F.Supp.2d 160, 171 (D. Me. 2004) (the Mississippi Supreme Court has characterized sales and distribution within Mississippi as "intrastate" in character when made "after the . . . products [have] been received . . . in this state and . . . incorporated into the general mass of property therein", thus where car companies conspired to prevent less expensive Canadian cars from entering American market, the fact that cars entered Mississippi and were sold there at higher price due to lack of competition satisfied Mississippi statute); *In re DDAVP Indirect Purchaser Antitrust Litig v. Ferring Pharms. Inc.*, 903 F. Supp. 2d 198, 230 (S.D.N.Y. 2012) (drug purchases in Mississippi plausibly satisfied statutory requirement that "some conduct" occur in that state); *Hood ex rel. State v. BASF Corp.*, 2006 WL 308378, at *5 (Miss. Ch. Ct. Jan. 17, 2006) (once defendant brought its vitamins into final destination Mississippi, the vitamins were subject to its jurisdiction); *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 540 F. Supp. 2d 1085, 1099 (N.D. Cal. 2007) (permitting claim under Mississippi law where plaintiffs alleged defendants' conspiracy substantially affected commerce in state, injured Mississippi residents, and defendants promoted products in state and harmed competition in state).

**New York:** Unlike the allegations in *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005) (at 26 n.7), the evidence here clearly demonstrates Dealers' claims have a nexus with New York pursuant to its antitrust statute, Donnelly Act, N.Y. Gen. Bus. Laws § 340, *et seq.* (Count XXI). *See In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *20-21 (E.D. Mich. June. 6, 2013) (distinguishing *H-Quotient* on the same basis; state law claims (including New York) not dismissed for an insufficient nexus to intrastate commerce because purchasers purchased systems transported into these states).[52]

The evidence in this case shows a sufficient New York nexus because Defendants' conspiracy was implemented through actions taken in New York. *See* Table A at 9-11. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[52] *See also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 499 (S.D.N.Y. 2017) (claim stands because complaint alleged both interstate and intrastate conduct); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 664 (E.D. Mich. 2011) (intrastate effects requirement met by claiming anticompetitive conduct caused supracompetitive price effects nationwide); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 399 n.7 (E.D. Pa. 2010) (sale of goods at artificially high monopolistic prices in New York exposes defendant to liability); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *24-25 (D.N.J. Jul. 20, 2017) (sufficient New York nexus based on a nationwide conspiracy affecting New York commerce); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *19 (E.D. Mich. June 6, 2013) (although anticompetitive conduct directed at all states, claims dismissal unwarranted because plaintiffs were injured in New York).

███████████████████████████████. CDK also has a corporate office located in New York.

**South Dakota:** As to South Dakota's antitrust statute, S.D. Codified Laws § 37-1-3.1, *et seq.* (Count XXVI), CDK improperly relies upon *In re Dynamic Random Access Memory ("DRAM I") Antitrust Litig.*, 516 F. Supp. 2d 1072, 1099 (N.D. Cal. 2007) (at 26 n.7), for the proposition that it is "insufficient to allege [a] national conspiracy with substantial effects on interstate commerce," but CDK's statement is taken completely out of context. The court was analyzing a complaint that failed to allege *any conduct or conspiratorial effect within South Dakota*. *Id.* at 1099. Pursuant to the language of the statute, the court noted that plaintiffs would be "able to state a claim under the statute as long as they allege an unlawful conspiracy to restrain trade or commerce, *any part of which* is within the state of South Dakota." *Id.* (emphasis added). Thus, in *DRAM I* the complaint **only** alleged a national conspiracy, with no allegations as to any conduct or conspiracy that took place or had any effect in South Dakota.[53]

The South Dakota antitrust statute states that "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful." S.D. Codified Laws § 37-1-3.1. Though the language is ambiguous as to whether part of the conspiracy or part of the trade or commerce must be within the state, courts have resolved such ambiguity by adopting the latter statutory interpretation. *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) (citing *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 414 (D. Del. 2007); *NMV*, 350 F. Supp. 2d at 172). Thus, a plaintiff must allege only that defendant's conduct produced

---

[53] *See Chocolate*, 602 F. Supp. 2d at 581 n.53 (distinguishing *DRAM I* on the same basis and concluding, in contrast, *Chocolate* plaintiffs alleged that defendants sold products in, suppressed competition in, and maintained prices at noncompetitive levels in, South Dakota).

anticompetitive effects within South Dakota. *NMV*, 350 F. Supp. 2d at 172.[54] There is sufficient record evidence that *both* part of the conspiracy *and* part of the trade or commerce take place in South Dakota. *See* Table A at 12-13. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ Finally, at least as of late 2013, one of CDK's major data centers was located in Sioux Falls.

**West Virginia:** CDK references *State ex rel. Palumbo v. Graley's Body Ship, Inc.*, 425 S.E.2d 177, 183 n.11 (W. Va. 1992) (at 26 n.7) for the unremarkable statement that "West Virginia's antitrust law is directed towards *intrastate* commerce". The West Virginia Antitrust Act, codified at W. Va. Code § 47-18-1, *et seq*., provides that: "the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, *any part of which* is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." W.Va. Code § 47-18-4. (emphasis added).[55] Defendants carried

---

[54] *See In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 857-58 (E.D. Mich. 2014) (South Dakota purchases and sales of products affected by conspiracy sufficient to state claim); *Chocolate*, 602 F. Supp. 2d at 581 (national conspiracy that produced increased prices in South Dakota sufficient to state claim); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 906-07 (N.D. Cal. 2008) (production, promotion sales, marketing, and/or distribution of SRAM in South Dakota that substantially affected commerce therein sufficient to state claim); *NMV*, 350 F. Supp. 2d at 172 (plaintiffs need only allege that a part of the trade or commerce occurred within South Dakota).

[55] *See In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1007 (E.D. Mich. 2014) (allegations sufficient where plaintiffs alleged that competition was harmed in West Virginia by being forced to pay supracompetitive prices at artificially high levels in the state due to a conspiracy); *In re Intel*, 496 F. Supp. 2d at 414 (denying motion to dismiss where plaintiffs alleged sale of products in West Virginia, whose prices were affected by anticompetitive behavior -- that this constituted establishment or maintenance of a conspiracy "*any part of which is within*" West Virginia); *NMV*, 350 F. Supp. 2d at 175 (only part of the trade or commerce need to have occurred in West Virginia and sale of vehicles in West Virginia met this requirement at pleading stage) (citing *Buscher v. Abbott Labs.*, No. 94-C-755, at 2 (W. Va. Cir. Ct. Jan. 27, 1994) ("Thus, the Antitrust Act prohibits a conspiracy that restrains West Virginia trade or commerce, regardless of the locus of the conspiracy.")).

out *at least part* of their anticompetitive and conspiratorial actions in West Virginia. *See* Table A at 14-15. 

### C. The Consumer Protection Laws of Colorado, Minnesota, North Dakota, New Mexico, and South Dakota Allow Claims for Potential Antitrust Violations

CDK argues (at 26) that the consumer protection statutes of Colorado, Minnesota, North Dakota, New Mexico, and South Dakota do not reach Defendants' anticompetitive behavior. In *DDAVP*, the court addressed the same issue as to the consumer protection statutes of Colorado,[56] New Mexico,[57] and South Dakota,[58] and held that where plaintiffs had alleged that Defendant misrepresented its products through manufacturing, *marketing*, and selling, and thus forced

---

[56] As to Colorado, CDK cites (at 26) *NMV*, 350 F. Supp. 2d at 179-80, for the proposition that an alleged conspiracy did not constitute prohibited conduct under the Colorado's consumer protection statute; however, this case says nothing about whether colluding and conspiring would constitute "unfair" business practices which is also prohibited by the statute. *See* Colo. Rev. Stat. § 6-1-105 and subsection (kkk) states that a person engages in behavior proscribed by the statute who "[e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice."

[57] In reference to New Mexico, CDK cites (at 27) *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007). *GPU* is distinguishable because the court opined about price-fixing only, and did not discuss the consumer protection statute for any other type of anticompetitive conduct. Here, Dealers' claims encompass anticompetitive behavior which caused dealers to pay supracompetitive prices, recognized forms of unconscionable or unfair conduct which may be brought under the consumer protection statute of New Mexico. *See* N.M. Stat. Ann. § 57-12-3; *see also In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 589 (E.D. Pa. 2018) (claims of alleged conspiracy, including agreements between competitors, sufficient regarding "unconscionable" or "unfair" acts under New Mexico's consumer protection statute); *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1082 ( "'significant artificial increases' to product price" and purchasers paying supracompetitive prices satisfied New Mexico standard).

[58] As to South Dakota, CDK cites (at 27) *NMV*, 350 F. Supp. 2d at 202-03 which is distinguishable because the court found that neither fraud nor deception was alleged. *NMV* did not decide that anticompetitive conduct was inactionable under South Dakota's consumer protection law. Here, not only did Dealers allege fraudulent and deceptive practices, but also the disputed conduct here is within the ambit of other proscribed activities under the South Dakota law, including unlawful activity as described in SDCL 37-24-6(1).

consumers to pay *supracompetitive prices*, this was sufficient to state claims under each state's respective statute. 903 F. Supp. 2d at 221-24, 227-29. As for Minnesota, in *Sheet Metal Workers Local 441 Health & Welfare Plan*, 737 F. Supp. 2d at 414, the court broadly construed Minn. Stat. §325F.68, *et seq*., and held that defendant's actions "to maintain its monopoly on the market" would be a sustainable claim based on the Minnesota Supreme Court's broad interpretation of the consumer protection statute.[59] It is similarly well-established in North Dakota[60] that its consumer protection statute must be liberally construed in favor of the consumer. *See DJ Coleman, Inc. v. Nufarm Ams., Inc.*, 693 F. Supp. 2d 1055, 1074 (D.N.D. 2010); *A & R Fugleberg Farms, Inc. v. Triangle Ag, LLC*, 2010 WL 1418870, at *3-4 (D.N.D. Apr. 7, 2010).

CDK also argues (at 26) that granting summary judgment would be consistent with the Court's decision on CDK's Motion to Dismiss dealers' Arkansas Deceptive Trade Practice Act ("ADTPA") claim. However, CDK fails to mention that the Court dismissed the ADTPA claim because that statute only proscribed "'unconscionable, false, or deceptive' business practices *without reference to* 'unfair' business practices." *In re DMS*, 362 F. Supp. 3d at 556 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *11 (N.D. Ill. June 29, 2015) ("*DFA*")) (emphasis added).[61] The Colorado and New Mexico statutes explicitly mention "unfair" business practices. *See supra* at n.56, 57. Minnesota, South Dakota, and North Dakota

---

[59] *See State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) ("These [consumer protection] statutes are generally very broadly construed to enhance consumer protection").

[60] For North Dakota, CDK cites (at 27) *NMV* again for the same proposition. Once again, the *NMV* court decided this issue on the motion to dismiss and ruled against plaintiffs finding that they had failed to allege fraud or deceit. The *NMV* court noted that few North Dakota courts had addressed the issue and relied on dicta from *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 903 (N.D. 1986) in concluding that the North Dakota consumer protection statute did not apply to anticompetitive conduct.

[61] The Court also stated that "the Arkansas legislature has . . . reserve[d] the ADTPA for fraudulent and unconscionable acts" and went on to hold that where a consumer protection statute proscribed not only deceptive, fraudulent, and unconscionable business practices, but *also* proscribed unfair business practices, those claims would stand. *See id*. at *35 (allowing California, Florida, and North Carolina consumer protection statute claims to stand without needing to plead deceptive or unconscionable conduct).

statutes have been broadly interpreted to cover the kind of anticompetitive activity evidenced in this case. At a minimum, there is a genuine factual dispute as to whether Defendants engaged in conduct covered by these statutes, when they conspired with each other. *See* PJ RSUF ¶ 118.

### D. Dealers are Proper Nevada and West Virginia Plaintiffs

CDK alleges (at 27) that Dealers are not proper plaintiffs in Nevada or West Virginia. CDK is incorrect and summary judgment should be denied on these claims.

**Nevada:** CDK contends that under the Nevada Deceptive Trade Practices Act ("NDTPA"), a cause of action for consumer fraud may only be brought by an elderly person or a person with a disability pursuant to NDTPA § 598.077. Courts have squarely rejected this argument.[62] In fact, in *DDAVP*, the court disagreed with the analysis in *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 163 (E.D. Pa. 2009) – the only case CDK cites for alleged support (at 27) – applying the language of the statute, as do other cases, to businesses. *See DDAVP*, 903 F. Supp. 2d at 227 n.14.[63] Section § 598.077 of the NDPTA, cited by CDK (at 27), does nothing more than set forth additional *remedies* available to an elderly or disabled person if found to be victims of deceptive trade practices;[64] it does not preclude other victims of consumer fraud from bringing an action pursuant to the statute. *See DDAVP,* 903 F. Supp. 2d at 227.

---

[62] NDTPA § 41.600 explicitly provides a cause of action for any "person who is a victim of . . . [a] deceptive trade practice as defined in [the statute]."

[63] *See also Nev. Power Co. v. Eighth Judicial Dist. Court of Nev.*, 102 P.3d 578, 583 n.7 (Nev. 2004) (commercial customers of a public utility had a viable NDTPA claim: "N[DTPA §] 41.600 . . . provides for a private cause of action by a person who is a victim of consumer fraud and defines 'consumer fraud; to include "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.'"); *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1081 ("'any victim of consumer fraud can bring a civil action' under the NDTPA" and rejecting defendants' argument that only elderly or disabled may bring such claims); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2018 WL 7197233, at *47 (S.D.N.Y. Dec. 26, 2018) ("private relief in the [NDTPA] is not so limited [to the elderly or disabled] . . . . Nev. Rev. Stat. § 41.600 operates to provide a right of action to 'any person who is a victim of consumer fraud.'").

[64] Section 598.077 of the NDTPA (cited by CDK at 27), refers to another section of the NDTPA that merely states "if the court finds that a person has engaged in a deceptive trade practice directed toward an elderly person or a person with a disability, the court may, *in addition to any other civil or criminal penalty,*

**West Virginia:** CDK alleges (at 27) that a plaintiff must be a "consumer" to maintain a cause of action under the West Virginia Consumer Credit and Protection Act ("WVCCPA") (Count XLIX). CDK's reliance on cases addressing the term "consumers" is misplaced.[65] *Wilson v. MRO Corp.*, 2017 WL 2608541 (S.D. W. Va. June 15, 2017), clarifies that the statute is applicable to "organizations" bringing a claim. *Id.* at *7 ("Nowhere in these provisions does it state that only consumers may bring such claims or that they must involve consumer transactions.").[66]

Accordingly, Dealers may bring a cause of action under the WVCCPA as they fit the statutory definition of a "person." *See also In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, 2020 WL 2110931, at *4 (E.D. Va. May 4, 2020) ("Because plaintiffs need not qualify as 'consumers' or plead a 'consumer transaction' to state a claim under the WVCCP, the corporate named plaintiff . . . asserts a valid claim."); *Midwestern Midget Football Club, Inc. v. Riddell, Inc.*, 2015 WL 4727438, at *2 (S.D.W. Va. Aug. 10, 2015) (corporation qualified as a "person" under the WVCCPA).

---

impose a civil penalty of not more than $12,500 for each violation," NDTPA § 598.0973(1) (emphasis added). *DDAVP*, 903 F. Supp. 2d at 227.

[65] As stated in *McNeely v. Wells Fargo Bank, N.A.*, 115 F. Supp. 3d 779, 785 (S.D.W. Va. 2015 (cited by CDK at 27), "[t]he WVCCPA sets forth multiple definitions of the terms 'consumer.'" Factually inapplicable to this case, *McNeely* applies the Article 2 definition, of "consumer," § 46A-2-122, which addresses paying a debt obligation and concludes that the plaintiffs failed to demonstrate a genuine issue of material fact as to whether a plaintiff was obligated to defendant for the loans at issue. In *Any Occasion, LLC v. Florists' Transworld Delivery, Inc.*, 2010 WL 3584411, at *2 (N.D.W. Va. Sept. 15, 2010) (Br. at 27) – in contrast to this case -- the plaintiff specifically plead it was "a consumer, pursuant to W.Va. Code §46-A-6-102." *Any Occasion, LLC et al. v. Florists' Transworld Delivery, Inc.*, No. 5:10-cv-44 (N.D. W. Va.) (ECF No. 3-2 at ¶ 48) (filed Apr. 8, 2010). Lastly, *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *11 (D.N.J. Feb. 20, 2020) is designated "not for publication" and merely references *Any Occasion*.

[66] *See* W. Va. Code § 46A-1-102(20): "'Organization' means a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative or association."

### E.    Plaintiffs' Class Action Claims are Proper under Illinois, South Carolina, and Colorado Law

CDK seeks dismissal of three claims under Illinois, South Carolina, and Colorado law, arguing that they are barred by state law class action prohibitions.[67] CDK's arguments are procedurally improper. Under the CMO, class certification procedures are deferred pending completion of the *Authenticom* trial. *See* ECF No. 166 at 3. These arguments, which have nothing to do with the factual record in this case, may be raised at that time.

If the Court addresses those arguments now, it should dismiss them outright. The Court already rejected CDK's arguments concerning Illinois and South Carolina law.[68] *See In re DMS*, 362 F. Supp. 3d at 553 (citing, *inter alia*, *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)),[69] and that ruling governs under the "law of the case" doctrine. *See U.S. v. Feldman*, 825 F.2d 124, 130 (7th Cir. 1987); *Terry v. Atlas Van Lines, Inc*., 1988 WL 128639, at *6 (N.D. Ill. Nov. 15, 1988) (applying doctrine where defendant's "previous motion to dismiss and current motion for summary judgment raise the identical question").

The Court's ruling was also correct under *Shady Grove* and Seventh Circuit caselaw. In *Shady Grove*, five justices (in a four-Justice plurality opinion by Justice Scalia and a concurring opinion by Justice Stevens) found that New York's statutory prohibition against class actions for statutory penalties did not apply to class actions in federal court and that, instead, Rule 23 governed the case. The four Justices concluded that federal procedural rules apply in federal court, even if they affect a party's substantive rights. 559 U.S. at 407. Justice Stevens concluded that the New

---

[67] Specifically, CDK asserts (at 27 and n.9) that class action claims in Counts XI, XXXV, and XLVII are barred by 740 ILCS 10/7, Colo. Rev. Stat. § 6-1-113(2), and S.C. Code Ann. § 39-5-140(a), respectively.

[68] If the Court does rule now and rejects CDK's arguments, CDK should not be allowed to reargue these points at class certification for what would be a third bite at the apple.

[69] The Court declined to rule, without further briefing, whether a class action for money damages under the Colorado law "is barred under *Shady Grove*." *In re DMS*, 362 F. Supp. 3d at 554.

York statute was procedural, but opined that Rule 23 would not govern if the state statute "is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id*. at 423. The Seventh Circuit has embraced the plurality opinion.[70]

CDK urges (at 29) that Justice Stevens' opinion should control because, in CDK's view, it is the narrower of the two opinions. The concurrence, however, "is not logically narrower." *In re Aggrenox Antitrust Litig*., 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016). In any event, as shown below, the outcome here is the same under *both* opinions. *See In re DMS*, 362 F. Supp. 3d at 553 n.23 ("Because the Court would reach the same conclusion under the standard set forth in the plurality and in the concurrence, the Court need not address which standard applies.").

**Illinois:** Courts in this District have routinely rejected application of Illinois's class action bar. "[D]istrict courts in the Northern District of Illinois recently have . . . concluded that even if Justice Stevens's concurrence was persuasive dicta, the Illinois Antitrust Act did not alter the scope of any substantive right or remedy 'because any indirect purchaser procedurally blocked from participation in a class action *would still have the same remedy in an individual action*.'" *Hatchett v. Henry Schein, Inc.*, 2020 WL 733834, at *3 (S.D. Ill. Feb. 13, 2020) (emphasis added, citation omitted). *See In re DMS*, 362 F. Supp. 3d at 553 ("Defendant has not identified any authority for concluding that the class action bars at issue are so intertwined with a state-created right or remedy as to justify finding that it trumps Rule 23 . . . .").[71]

---

[70] *See Sawyer v. Atlas Heating & Sheet Metal Works, Inc*., 642 F.3d 560, 564 (7th Cir. 2011) (*Shady Grove* "holds that Rule 23 applies to *all* federal civil suits, even if that prevents achieving some other objective that a court thinks valuable."); *State Farm Life Ins. Co. v. Jonas*, 775 F.3d 867, 869 (7th Cir. 2014) ("[F]ederal procedures govern in federal litigation[.]"). *See also In re DMS*, 362 F. Supp. 3d at 553 ("Although the Seventh Circuit has not squarely addressed which opinion controls, it otherwise has indicated that Justice Scalia's plurality sets forth the controlling legal standard.").

[71] *See also City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 764 (N.D. Ill. 2019); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017) ("The availability of the class action procedure does not change the substantive rights or remedies available to [indirect purchasers] under Illinois law.") (note that *In re Opana ER Antitrust Litig*., 162 F. Supp. 3d 704 (N.D. Ill. 2016) (Mem. at 31)

This result also follows from the Illinois statute's plain language. The statute prohibits a claimant from "maintain[ing] a class action *in any court of this State* . . . ." 740 ILCS 10/7(2) (emphasis added). Accordingly, the prohibition applies only to cases *in the state court*. *In re Aggrenox*, 2016 WL 4204478, at *5 ("It is not obvious that the formulaic expression 'in any court of this State' appearing in an Illinois statute applies to a federal court in Connecticut . . . ."); *In re Propranolol,* 249 F. Supp. 3d 712 at 728. *See generally Ransom v. Marrese*, 122 Ill. 2d 518, 525 (1988) (Indiana statutory requirement that claimant obtain opinion from medical panel before filing malpractice suit "in any court of this State" did not govern suit filed in Illinois). Indeed, given the fact that the New York statute addressed in *Shady Grove* contains no such restriction, *see* N.Y. Civ. Prac. Law & Rules § 901(b), this is an even more compelling case for non-enforcement of a state class action restriction than *Shady Grove* itself.[72]

**South Carolina:** The South Carolina Unfair Trade Practices Act's restriction is "procedural, not substantive." *Smith-Brown*, 2019 WL 932022, at *13. Courts thus have properly found the restriction inapplicable in federal court. *See id.* at *13-14; *In re Broiler Chicken*, 290 F. Supp. 3d at 821; *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 264 (S.D. Ill. 2015).[73]

**Colorado:** The Colorado Consumer Protection Act ("CCPA") is similar to the New York statute addressed in *Shady Grove*. Remedies under the CCPA include "[t]he greater of: (I) The

---

reached a contrary result); *see also Aggrenox*, 2016 WL 4204478, at *6; *In re Propranolol Antitrust Litig*., 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017); *In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014).

[72] CDK's effort (at 31) to distinguish New York's statutory provision based on its *placement* relative to other provisions is unavailing. *See Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 932022, at *14 (N.D. Ill. Feb. 26, 2019) ("[T]he fact that a class action bar is included within a consumer protection statute does not make it any more substantive than if it were found instead among the state's rules of procedure.").

[73] *See also In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, 2015 WL 5166014, at *32 (E.D. Tenn. June 24, 2015); *In re Hydroxycut Mktg. and Sales Practices Litig*., 299 F.R.D. 648, 654 (S.D. Cal. 2014); *In re Lithium Ion Batteries*, 2014 WL 4955377, at *2; *In re Auto. Parts Antitrust Litig*., 2013 WL 2456612, at *30; *In re Optical Disk Drive Antitrust Litig*., 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012).

amount of actual damages sustained; or (II) Five hundred dollars; or (III) Three times the amount of actual damages sustained . . . ." Colo. Rev. Stat. § 6-1-113(2)(a).

"The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public," and its "purpose is achieved through injunctions and civil penalties such as treble damages . . . ." *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 50-51 (Colo. 2001) (citing, *inter alia*, § 6-1-113(2)). Given *Shady Grove*'s ruling that New York's prohibition of class actions for statutory penalties did *not* affect substantive rights, the same result should apply to the CCPA.

As in the case of the Illinois class action prohibition, a dealer "'blocked from participation in a class action would still have the same remedy in an individual action.'" *See Hatchett v. Henry Schein*, 2020 WL 733834, at *3 (addressing Illinois class action bar, citation omitted). Thus, under *Shady Grove*'s plurality opinion and Justice Stevens's concurring opinion, CDK's argument must be rejected. *See Andren v. Alere, Inc.*, 2017 WL 6509550, at *21-22 (S.D. Cal. Dec. 20, 2017) (holding CCPA's class action prohibition inapplicable in federal court).[74]

### F. Dealers Satisfy the Arizona, Hawaii, New Jersey, Utah, and West Virginia Statutory Notice Requirements

Summary judgment should be denied as to CDK's argument (at 32-34) that Dealership Plaintiffs did not provide notice pursuant to Arizona, Hawaii, Utah, New Jersey, and West Virginia antitrust and consumer protection statutes. Contrary to CDK's assertion (at 32), it did *not* include Arizona in its notice argument on the motion to dismiss. In fact, Dealers served notice to the Arizona Attorney General on June 14, 2018 (*see* WEX 189); accordingly, this issue is moot. As to the remaining states, notice has been satisfied.

---

[74] CDK's reliance on *Davidson v. Apple Inc.,* 2018 WL 2325426 (N.D. Cal. May 8, 2018) (Mem. at 31), is unavailing. *See In re DMS*, 362 F. Supp. 3d at 554 (*Davidson* "lacks persuasive force").

1. <u>Notice was Provided to all State Attorneys General in October 2018</u>

In compliance with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA"), on October 24, 2018 – only a few months after Dealers filed their Complaint – Reynolds provided notice of the then-proposed class action settlement with Dealership Plaintiffs to the Attorneys General of each of the 50 states. *See* ECF No. 477. The CAFA notice package included Dealers' Complaint. *Id.*; ECF No. 184. Significantly, after receiving this notice, *none* of the State Attorneys General (the actual parties affected by the notice issue) chose to intervene in this case or otherwise communicate about the litigation with Dealership counsel. Thus, notice was given to the State Attorneys General, there is no prejudice to the parties (or the State Attorneys AGs), and the remedial purpose of the notice provisions at issue has been satisfied. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 1397728, at *25 (E.D. Va. Feb. 6, 2019) (where State Attorneys General, including Utah and Hawaii AGs, were given late notice of the lawsuit and did not object or indicate any intent to intervene, dismissal of the claims was unwarranted and an "inefficient and heavy-handed remedy for a relatively minor delay, as no one claims prejudice."); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 n.85 (E.D. Pa. 2019) ("The relevant question is not whether Defendants have been prejudiced by any failure to follow the statutorily required notice procedures . . . . the purpose of the statutory rules is not to give notice to Defendants, but to inform the relevant state attorney general so they may decide whether to intervene or otherwise proceed with the claim.").[75] Apart from the sufficiency of the notice, CDK's arguments regarding notice pursuant to *Shady Grove* are unavailing.

---

[75] *Broiler Chicken*, 290 F. Supp. 3d at 772 (cited by CDK at 33) actually supports Dealers' position since State Attorneys General received notice of the litigation. Courts have permitted service of a complaint to Attorneys General following a decision on the motion to dismiss. *See, e.g.*, *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 400 (D.N.J. 2018) (granting defendants' motion to dismiss without prejudice, allowing plaintiffs leave to comply with notice provisions, including Utah, Arizona, and West Virginia). In this case, notice was provided in October 2018, a few months after the filing of the Complaint and three months

2.    The Notice Requirements are Not Enforceable Under Shady Grove

As discussed in Section III.E, *supra*, the Seventh Circuit has embraced Justice Scalia's plurality opinion in *Shady Grove.* However, analysis under either the plurality or Justice Stevens's concurrence renders the same outcome. State notice requirements are procedural and thus inapplicable to cases brought in federal court.

CDK relies upon *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 415-16 (D.N.J. 2018), *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019), and *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) (at 34) for the proposition that no conflict exists between Rule 23 and state notice requirements because Rule 23 does not attempt to answer the same question or subject. CDK mistakenly concludes (at 33) the absence of a specific notice provision in Rule 23 equates to an absence of conflict between the state notice requirements and Rule 23. This is incorrect as per *In re Restatis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 156 (E.D.N.Y. 2018), which disagreed with the analysis in *Lipitor* and *Asacol*, stating:

> The [notice] situation here is ***identical*** [to *Shady Grove*]. Hawaii's law includes a limitation on the types of claims eligible for class treatment and this limitation is *absent* from Rule 23. Therefore, I find that Hawaii's law conflicts with Rule 23, and I agree with the district courts that have concluded that Hawaii's requirement applies in federal court only if it is substantive, rather than procedural. *See In re Propranolol*, 249 F. Supp. 3d at 728; *In re Aggrenox*, 94 F. Supp. 3d at 253-54.

*Id.* at 156 (emphasis added). The question turned on whether the notice provision of the Hawaii Antitrust statute was procedural. The court concluded Hawaii's law "does not alter the substantive elements of plaintiff's claims" and thus Rule 23's procedural requirements should govern in

---

before the Court rendered its decision on CDK's motion to dismiss. Although State AGs have received notice of the Complaint (and Reynolds settlement), should the Court deem it necessary, Dealers can serve the AGs at issue with the Complaint again.

federal court. *Id.* at 156-57. Other courts have held similarly for Hawaii.[76] CDK additionally makes a nonsensical argument (at 34), erroneously equating Illinois's *Illinois Brick* repealer statute – which creates substantive rights for an entire class of purchasers and has nothing to do with notice to the Hawaii Attorney General – with the Hawaii notice provision, which does not create such rights and is purely procedural.[77]

        3.       <u>Alternatively, Lack of Notice Compliance Is Not a Basis for Dismissal</u>

        Regardless of the *Shady Grove* analysis, many courts have concluded that the state notice provisions at issue are not a basis for dismissal of Hawaii[78] and Utah[79] antitrust claims, and New Jersey's consumer protection statute.[80] As to West Virginia, some courts have not strictly

---

[76] The notice provision of Hawaii's Antitrust Act (Haw. Rev. Stat. § 480-13.3) has been interpreted by courts as procedural, and inapplicable in federal actions. *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 254 (D. Conn. 2015) (Hawaii's notice provisions are "procedural prerequisites" not sufficiently a "'part of a State's framework of substantive rights or remedies' to be controlling in federal court"); *In re Propranolol*, 249 F. Supp. 3d at 728 (Hawaii's antitrust notice provisions are "procedural rules" that do not apply in federal court); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2018 WL 7197233, at *25 (motion to dismiss Hawaii claim denied, finding Act's notice provision "conflicts with the federal rule" and thus "yield[s] to Rule 23.")*.

[77] The cases cited by CDK in its concluding statement (at 34) are similarly unavailing. CDK draws a questionable analogy between the Ohio Consumer Protection statute (at issue in both *Phillips* and *Wilson* cases cited at 34) and the challenged notice provisions here.

[78] *See, e.g.*, *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009) (remedial purposes of Hawaii antitrust statute does not require dismissal for failure to comply and "nothing in the statutory scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anti-competitive behavior."); *In re Cast Iron*, 2015 WL 5166014, at *23 (plaintiff's failure to comply with notice requirement would not bar claim).

[79] *See, e.g.*, *Generic Pharms. Pricing*, 368 F. Supp. 3d at 834-35 ("Regardless of whether the relevant notice provisions [Arizona, Nevada, Rhode Island and Utah] are substantive or procedural, they do not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement for the Complaints. Therefore, this argument is not a basis for dismissal of . . . state antitrust claims.").

[80] *See, e.g.*, *In re ConAgra Foods, Inc.*, 908 F. Supp. 2d 1090, 1110 (C.D. Cal. 2012) (directing plaintiff to provide notice at motion to dismiss because several state statutes, including New Jersey, are clear notice need not be given before suit commenced and failure to do so is not basis for dismissing claims) (citing *Morgan v. Air Brook Limousine, Inc.*, 510 A.D.2d 1197, 1198 (1986) ("Since plaintiff's attorney failed to notify the Attorney General of this action, in accordance with N.J.S.A. 56:8-20, the court directed the attorney to do so to determine if he wanted to intervene or appear")).

construed the notice provision to defendants, allowing the intent of the statute to control.[81] There

is also no conceivable prejudice here. Defendants are certainly aware of the West Virginia

consumer protection claim. Dealers have settled with Reynolds and CDK has made no indication

in its motion that it would have made a cure offer. However, Dealers can make post-filing notice

to CDK should the Court deem it necessary.

## CONCLUSION

For the foregoing reasons, CDK's Motion should be denied in its entirety.

DATED: July 28, 2020                                Respectfully submitted,


                                                    */s/ Peggy J. Wedgworth*
                                                    Peggy J. Wedgworth (*pro hac vice*)
                                                    Elizabeth McKenna (*pro hac vice*)
                                                    **MILBERG PHILLIPS GROSSMAN LLP**
                                                    One Pennsylvania Plaza, Suite 1920
                                                    New York, New York 10119-0165
                                                    Tel: (212) 594-5300
                                                    Fax: (212) 868-1229
                                                    pwedgworth@milberg.com
                                                    emckenna@milberg.com

                                                    ***Interim Lead Counsel for the Dealership Class***

                                                    Leonard A. Bellavia (*pro hac vice*)
                                                    **BELLAVIA BLATT, PC**
                                                    200 Old Country Road, Suite 400
                                                    Mineola, New York 11501
                                                    Tel: (516) 873-3000
                                                    Fax: (516) 873-9032
                                                    lbellavia@dealerlaw.com

                                                    ***Dealership Class Plaintiffs' Steering Committee***

---

[81] *See In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 440 (E.D. Va. 2019) (statute permits sending notice after complaint filed); *Weidman v. Ford Motor Co.*, 2020 WL 674348, at *5-6 (E.D. Mich. Feb. 11, 2020) (post-filing notice to defendant accepted by court); *Staley v. Gilead Scis., Inc.*, 2020 WL 1032320, at *34-35 (N.D. Cal. Mar. 3, 2020) (same); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 589 (E.D. Pa. 2018) (plaintiffs fulfilled notice obligation where defendant was sent notice three months after filing amended complaint).

Daniel C. Hedlund (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Dealership Class Plaintiffs' Steering Committee*

James E. Barz
Frank Richter
**ROBBINS GELLER RUDMAN & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, Illinois 60606
Tel: (312) 674-4674
Fax: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

*Dealership Class Plaintiffs' Steering Committee*

Robert A. Clifford
**CLFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Tel: (312) 899-9090
Fax: (312) 251-1160
RAC@cliffordlaw.com

*MDL Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Peggy J. Wedgworth, an attorney, hereby certify that on July 28, 2020, I caused a true and correct copy of the foregoing **DEALERSHIP CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth