# EXHIBITS 1-3
# Filed under Seal

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

AUTHENTICOM, INC.,

              Plaintiff,

 -vs-                           Case No.  17-CV-318-JDP

CDK GLOBAL, LLC and             Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,  June 26, 2017
                                     9:03 a.m.

              Defendants.

_____

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF EVIDENTIARY HEARING
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Godfrey & Kahn S.C.
        BY:  JENNIFER L. GREGOR
        One East Main Street, Suite 500
        Madison, Wisconsin  53701

        Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
        BY:  MICHAEL N. NEMELKA
            AARON M. PANNER
            DAVID L. SCHWARZ
            DEREK T. HO
            JOANNA T. ZHANG
            JOSHUA HAFENBRACK
            KEVIN J. MILLER
        1615 M Street, N.W.
        Suite 400
        Washington, D.C.  20036

        Jennifer L. Dobbratz, RMR, CRR, CRC
        U.S. District Court Federal Reporter
        United States District Court
        120 North Henry Street, Rm. 410
        Madison, Wisconsin  53703
        (608) 261-5709

Case 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 4 of 38 PageID #:75812
Case 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 101 of 60

1-A-111

```
 1      A    Never once.

 2      Q    Does the user emulation software that Authenticom uses in

 3      any way alter or copy the DMS software itself?

 4      A    It does not.

 5      Q    Ms. Miller talked about software being on the box, hostile

 6      software being on the box.  Do you install any software on the

 7      DMS system?

 8      A    Never have and never would.

 9      Q    What is the advantage for dealers to automated approach of

10      data extraction instead of having to do it manually?

11      A    Dealers like to focus on selling and servicing cars.

12      That's their core competency.  Automating the process is just

13      like, you know, robotics on an assembly line.  Essentially we do

14      what humans could do only much faster and more efficiently, and

15      we eliminate errors.

16      Q    After you've -- so what do you do after Authenticom pulls

17      the data?  What does it do next?

18      A    So again we akin that to the United Nations, and we've got

19      all these different formats and business rules from the

20      dealership, so what we do is we normalize it.  We then put it

21      into our database and we create -- we run -- actually before it

22      goes into the database, we normalize components of it.  For

23      example, we validate that a dollar amount is actually a dollar

24      amount, a phone number is a phone number, VIN numbers are VIN

25      numbers, et cetera.
```

STEPHEN COTTRELL - DIRECT

Case 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 5 of 38 PageID #:75813
Case 3:17-cv-00318-jdp Document #: 154 Filed: 07/05/17 Page 104 of 160

1-A-134

```
1     A    That's correct.

2     Q    You mentioned there are instances where dealers pay you.

3     What is that?

4     A    Most notably would be the Lithia group.

5     Q    What is the Lithia group?

6     A    Third or fourth largest publicly traded dealership group in

7     North America.

8     Q    And they pay you to use DealerVault?

9     A    They do.

10         THE COURT:  How do you spell Lithia?

11         THE WITNESS:  L-I-T-H-I-A.  I'm the world's worst

12    speller, so that's not guaranteed.

13    BY MR. NEMELKA:

14    Q    Real quick, why does Lithia pay you for DealerVault?

15    A    They're ecstatic about the control, transparency, reporting

16    and audit capabilities that it gives them over the movement of

17    their data.

18    Q    Okay.  Now let's go to Authenticom pricing.  What does

19    Authenticom charge for data polling?

20    A    So for a single file type, $25 per month.  For two or more

21    up to the seven file types that we provide, $50.

22    Q    Does Authenticom provide bidirectional access?

23    A    We do.

24         THE COURT:  What does that mean?

25    BY MR. NEMELKA:
```

STEPHEN COTTRELL - DIRECT

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

———————————————————————————————————————

AUTHENTICOM, INC.,

              Plaintiff,

 -vs-                              Case No.  17-CV-318-JDP

CDK GLOBAL, LLC and              Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,  June 27, 2017
                                    8:04 a.m.

              Defendants.

———————————————————————————————————————

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF EVIDENTIARY HEARING
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Godfrey & Kahn S.C.
       BY: JENNIFER L. GREGOR
       One East Main Street, Suite 500
       Madison, Wisconsin  53701

       Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
       BY: MICHAEL N. NEMELKA
           AARON M. PANNER
           DAVID L. SCHWARZ
           DEREK T. HO
           JOANNA T. ZHANG
           JOSHUA HAFENBRACK
           KEVIN J. MILLER
       1615 M Street, N.W.
       Suite 400
       Washington, D.C.  20036

        Jennifer L. Dobbratz, RMR, CRR, CRC
       U.S. District Court Federal Reporter
        United States District Court
       120 North Henry Street, Rm. 410
        Madison, Wisconsin  53703
           (608) 261-5709

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 7 of 38 PageID #:75815
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 9 of 184

2-A-9

1          THE WITNESS:  No, no, no, no.  It's a flavor originally

2     designed for a fossil of an operating system called Pick that is

3     still running on their systems today.

4          THE COURT:  Okay.

5          THE WITNESS:  And that's the query language.

6          THE COURT:  Okay.  I get it.

7          THE WITNESS:  It's called English.

8          THE COURT:  I got it.

9     BY MS. GREGOR:

10    Q    How does the level of access that Authenticom has compare

11    to your access as the IT administrator for the dealership?

12    A    I have the keys to the kingdom.  There's not a feature that

13    I can't run, full access to every single thing on every single

14    account.  Authenticom has access to limited accounts and to a

15    single function, ENG, for the purpose of retrieving the data

16    that I need them to retrieve so that they can -- I like to call

17    it feeding the children.  All the third-party vendors that need

18    the data, I call that feeding the children.  So they gather the

19    data, normalize the data, check the addresses against the NCOA

20    database, and then send the feeds to a couple dozen third-party

21    vendors that I use.

22    Q    Did you hear testimony yesterday about manual reporting?

23    A    I did hear that.  I heard that quite a bit, and I have to

24    say I understand that CDK and Reynolds offer a way for me to do

25    that manually.  Here is the thing about manual:  Manual doesn't

────WAYNE FITKIN - DIRECT────

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page: 8 of 38 PageID #:75816
Case: 3:17-cv-00318-jdp Document #: 165-7 Filed: 07/05/17 Page 10 of 184

2-A-10

1    work.  Take the case of the open recall vendor that was here

2    yesterday.  It's 50 stores.  He's got to find 50 people, one in

3    each store, to manually run a report, grab the data, and then

4    transmit it to Authenticom.  These people can't have a day off.

5    They can't make a mistake, can't have a vacation.  It doesn't

6    work unless you can automate the process.  You have to be able

7    to automate the process.

8         In the example of -- I'll give you an example.  If I want

9    to get every repair order created every single day and I want

10   the data of all the repair orders that were opened on that day,

11   I have to get that data after the service department closes so

12   they're not creating any more repair orders but before the job

13   stack runs and rolls all the closed ones into the history file.

14   That has to be done between 8:00 and 10:00.  You're not going to

15   have an employee there between 8:00 and 10:00 to do that

16   manually every single day, so manual has no value.  If you're

17   going to do data extractions, it has to be automated.  The

18   minute that CDK takes away the ability to automate these data

19   extractions, they've taken away a valuable tool that I've had

20   for almost 30 years.

21   Q    Can we have Plaintiff's Exhibit 152 on the screen, please?

22   While we're pulling it up, Mr. Fitkin, did you submit a couple

23   of declarations in this proceeding?

24   A    I did.

25   Q    And when was the last time you reviewed those?

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 9 of 38 PageID #:75817
Case: 3:19-cv-00313-jdp Document #: 265-7 Filed: 07/09/19 Page 49 of 184

2-A-45

1    their frustration of dealer-initiated downloads or, in CDK's

2    case, the price increase that we told them we were about to pass

3    through.  So, yes, it's hurt us a lot.

4    Q    Final topic, Mr. Andreu.  Can we talk about your RCI

5    agreement with Reynolds?  What limitations, if any, does

6    Reynolds place on Dominion's ability to tell dealers how much it

7    pays for integration?

8    A    It gags us completely.  We can't tell them anything, so I'm

9    expected to somehow pass through an $893 charge on an $1,152

10   product without telling them why.

11   Q    Was Dominion ever accused of violating the price secrecy

12   provisions in its contract?

13   A    We were.

14   Q    What did Reynolds say?

15   A    We put a line item on an invoice that said "integration

16   fee," and at the time, by the way, that fee was $195 is what we

17   passed through.  I don't recall what the offsetting Reynolds

18   charge was, but since it started at $247, you can bet $195

19   wasn't all of it.

20   Q    What was Reynolds' response to your passing through --

21   communicating the pass-through?

22   A    They sent a nasty letter to the then-product manager of

23   Sales Center, told us that we had -- defamation I think was on

24   there.  They said that we violated the secrecy requirement.

25   They submitted -- they made us submit to an intimidating audit,

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 10 of 38 PageID #:75818
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/19 Page 69 of 184

2-A-63

1    A    No.  We've not been in the business of trying to get money

2    off of the transactions.  We're just trying to sell software.

3    Q    In your experience are 3PA and RCI significantly better

4    integration services than SIS?

5    A    No, not particularly.  I haven't found anything about them

6    that's any better or improved on the transactions that I would

7    get from SIS.

8    Q    Are there any ways in which RCI and 3PA are more limited

9    than SIS?

10   A    Yeah.  I did lose some functionality when I made the

11   transition to both of the different systems in different ways.

12   With the RCI system I lost the ability to make some of the

13   notifications that I do around parts, special order parts

14   orders.  I can no longer get the information indicating when I

15   can make those notifications through the RCI program.  I also

16   lost the ability to do some pushback information, and with CDK

17   there was some things I lost the ability to do as well.

18   Q    So why does AutoLoop pay these higher integration fees from

19   Reynolds and CDK?

20   A    It was a decision where we had to look at the things that

21   we were dealing with on the support basis and the constant loss

22   of business and upset dealerships saying, "Hey, you guys, you

23   got to keep your system up.  We can't keep running our business

24   with your software if your software doesn't work."

25        So at that point it was a decision.  We're like, "Okay.  We

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 11 of 38 PageID #:75819
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/17 Page 64 of 184

2-A-64

```
 1    have to keep the software running so we have to pay this cost."

 2    Q    If there wasn't the threat of blocking from the defendants,

 3    would you rather use SIS?

 4    A    We would be glad to go back to SIS.

 5    Q    I want to move to --

 6              THE COURT:  Just -- I mean, the cost is so clear.  Why

 7    wouldn't you rather pay $79 instead of $735.

 8              THE WITNESS:  Yeah, that's exactly --

 9              THE COURT:  That's the primary thing --

10              THE WITNESS:  That's the primary thing.  The other

11    thing we've run into from time to time with them is -- an

12    example would be is when we go back to -- when I worked with

13    SIS, if I needed additional information or I needed to develop a

14    new product that I wanted to give to the dealerships because

15    they've asked for a new functionality, I would go to them and

16    say, "Hey, can you get this additional data?"  They would work

17    it out.  They would come back and provide that data to me.

18         I make those requests with CDK and Reynolds, and if it can

19    be done, the time lines are between six months to a year with

20    additional recertification fees and paying for recertifying and

21    retesting.  With SIS it was not difficult at all.  So the

22    business relationship has changed drastically.

23              THE COURT:  Thank you.

24              MR. MILLER:  Thank you, Your Honor.

25    BY MR. MILLER:
```

MATTHEW RODEGHERO - DIRECT

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

       Plaintiff,

-vs-                          Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC       Madison, Wisconsin
and THE REYNOLDS and        June 27, 2017
REYNOLDS COMPANY,          1:50 p.m.

       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT–SECOND DAY OF EVIDENTIARY HEARING
**AFTERNOON SESSION**
    HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
            AARON PANNER
            DAVID SCHWARZ
            DEREK HO
            JOSHUA HAFENBRACK
            KEVIN MILLER
            JOHANNA ZHANG
       1615 M Street, NW, Ste. 400
        Washington, DC  20036

Also present:  Stephen Cottrell – Authenticom president
              Steve Robb – IT technician

       Lynette Swenson   RMR, CRR, CRC
      U.S. District Court Federal Reporter
       120 North Henry Street, Rm. 520
        Madison, Wisconsin  53703

Case: 1:18-cv-00864 Document #: 1085-1 Filed: 07/29/20 Page 13 of 38 PageID #:75821
Case: 3:17-cv-00918-jdp Document #: 163 Filed: 07/05/17 Page 77 of 265

2-P-77

1  Q    Okay.  Now, go down, and then it says "only if," and

2  then it lists three conditions.  So CDK can pull the data

3  from the Reynolds DMS only if.  Do you see the *only if*?

4  A    Yes.

5  Q    Let's go to the third.  "CDK's access to the

6  Reynolds DMS does not materially degrade or otherwise

7  materially adversely affect the operation of the

8  applicable Reynolds DMS or place Reynolds and/or a

9  Reynolds dealer at a material operational or security

10 risk – provided, however, that any such material adverse

11 risk -- effect or risk covered by this Section 4.6 must

12 be demonstrated to CDK by Reynolds with clear and direct

13 evidence and that CDK shall be given a reasonable

14 opportunity to cure any such material adverse effect or

15 risk."  Do you see that?

16 A    Yes.

17 Q    Did Reynolds ever invoke this clause?

18 A    Not that I can remember.

19 Q    Reynolds never even invoked this clause that the

20 thousands of usernames that CDK was using put any

21 material effect or risk on Reynolds' system; isn't that

22 right?

23 A    During this period of time, because we had to

24 protect it, we didn't know what they were doing, so it

25 did not put a material impact on the system.

ROBERT SCHAEFER – CROSS

# EXHIBITS 5-17
# Filed under Seal

# EXHIBIT 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

CDK Global, LLC, et al.,          )
                                  )
              Plaintiffs,         )          2:19-cv-4849-GMS
                                  )
        vs.                       )          Phoenix, Arizona
                                  )            June 2, 2020
Mark Brnovich, et al.,            )
                                  )
              Defendants.         )
_____)


BEFORE:  THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

VOLUME A

(Pages 1 - 79)


Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2:09:59PM 1    with the CDK DMS, approximately?

2    A.  I don't know exactly how many integrate, but we have over

3    66,000 integration applications in our portfolio today.

4    Q.  And did CDK write the software code for its DMS?

2:10:16PM 5    A.  Yes, they did.  It started around 1975.

6    Q.  And approximately how many lines of code are we talking

7    about?

8    A.  Millions of lines of codes.  There's between -- depending

9    on the implementation, between 40,000 and 450,000 tables in a

2:10:32PM10    single DMS instance.

11    Q.  And by "a single DMS instance," you mean a single dealer's

12    licensed DMS, correct?

13    A.  That's correct.

14    Q.  And what kind of investment was required by CDK to create

2:10:46PM15    the DMS software?

16    A.  For a product of this complexity, it would be usually

17    between 10 and 15 million dollars a year.  So over the 45-year

18    period, it has been 450 to probably 700 million dollars' worth

19    of investment in the product.

2:11:03PM20    Q.  And based on your answer, was this a one-time investment or

21    is it an ongoing investment?

22    A.  It is an ongoing investment.  We continue to invest in the

23    product today.

24    Q.  And does CDK have any registered copyrights on its DMS?

2:11:19PM25    A.  We have a registered copyright on our DASH DMS.

133

2:11:22PM 1    Q.  Do you have one for the Drive DMS?

2          A.  No.  Our chief technology officer, chief product officer

3          has decided not to do that based on the number of iterations of

4          the product that are continuing three, four, to five times a

2:11:39PM 5    year we have major releases of the product.  And it would

6          require that we share some of our source code, which is

7          something that we don't want to do.

8          Q.  Can you give me an example of copyrighted material in the

9          DMS?

2:11:52PM10    A.  The data dictionary would certainly be copyrighted material

11         in the DMS.  This describes and provides context to what the

12         attributes in the fields are in the DMS.  Again, there's up to

13         450,000 tables, millions potentially of data elements in the

14         DMS, so that data dictionary is very critical to the

2:12:13PM15    functioning of the DMS.

16              We also have a business application layer that does

17         interpretations and does other functions on the data.  And

18         there's lots of algorithms inside of the DMS to calculate

19         things like tax, and other, you know, elements that are

2:12:27PM20    required to sell, service, and inventory and do other functions

21         in the DMS.

22         Q.  Is that data structure and that data dictionary unique to

23         CDK, or do other DMS providers use the same data structure?

24         A.  It is unique to CDK.

2:12:42PM25    Q.  And how do you know that?

# EXHIBITS 19-61
# Filed under Seal

# EXHIBIT 62

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

AUTHENTICOM, INC.

          Plaintiff,

    vs.

CDK GLOBAL, LLC; and THE REYNOLDS
AND REYNOLDS COMPANY

          Defendants.

Case No. 17-cv-318

---

**SUPPLEMENTAL DECLARATION OF WAYNE FITKIN**

---

I, Wayne Fitkin, declare as follows:

1.      I make this declaration based on my personal knowledge in support of Authenticom's reply brief in support of its motion for a preliminary injunction.

2.      As I explained in my March 22, 2017 declaration, I am currently the IT director for Walter's Automotive Group. Before my position with Walter's Automotive Group, I worked as the IT director for the Fletcher Jones Automotive Group.

3.      I have been working with CDK software for more than 25 years. Both Walter's Automotive Group and the Fletcher Jones Automotive Group have used CDK DMS software for many years.

4.      In my March 22, 2017 declaration, I explained how I grant access to Authenticom to pull data from Walter's Automotive Group's DMS by providing a user ID and password to Authenticom. This grants Authenticom access to my dealer data stored on the DMS. The process was similar for the DMS at the Fletcher Jones Automotive Group.

5.      The process I use to create this user ID and password is essentially the same way I grant access to new employees of the dealership. I note that CDK does not require me to provide

the identity of or background information about the employees who will be granted access to the dealer's DMS. I am allowed to make those decisions myself, just as I should be allowed to choose which agents of the dealership are allowed to pull dealer data.

6. As the dealer, I expressly give Authenticom (or other integrators, such as when I worked with Digital Motorworks and IntegraLink) access to my dealer data stored on the DMS. I allow the integrator to pull the exact same data that I could myself (or one of my employees could) pull.

7. One major benefit of using Authenticom's DealerVault product is that it allows me to select, and thus limit, the particular types of data that I can send to a given vendor. If I were to allow a vendor direct access to the DMS, the vendor would have access to all data associated with the particular log-on, which is more data than the vendor generally needs. Using DealerVault, however, I can select what data fields are made available to our vendors, and I can track exactly what reports are generated for the vendors. Thus, it is attractive to me, from a security perspective, to have a product like DealerVault, which allows me to send to a vendor only the data it needs to perform its service and to have transparency into the transmission of dealership data to third parties. CDK does not have an equivalent product; I have never found a way to turn off a 3PA feed, let alone control what data is accessible via 3PA.

8. Dealerships contract with Authenticom to provide integration services for the dealers, and dealerships expressly authorize Authenticom to act as an agent on their behalf to provide data integration services that I could also provide in-house. But Authenticom's DealerVault product allows me to perform data integration services more efficiently, and it better allows me to limit data that is sent to the dealer's vendors. I do not consider Authenticom's

access into my DMS system to be "unauthorized;" indeed, it is expressly authorized. And I do not consider Authenticom's access to be "hostile."

9.      Neither I, nor anyone for whom I create a user ID and password, have access to the source code for the DMS system or any proprietary information of CDK. The access that I have to our DMS system only allows me to view or extract the data that Walter's Automotive Group itself stores on the DMS system; I do not have access to any CDK software and cannot copy or alter CDK source code or proprietary materials. Authenticom has the same type of access.

10.     To my knowledge, neither Walter's Automotive Group or the Fletcher Jones Automotive Group have experienced a degradation of the DMS data as the result of Authenticom's or other integrators' access to the data. Dealers value data security tremendously, and have every reason to protect the integrity of their data, including customer data. I am comfortable permitting Authenticom to continue to access the DMS system, just as I would allow Walter's own employees to do so.

11.     Dealerships also take additional security measures, beyond restrictions placed on them by DMS and other software and IT system providers. Only a select few employees are allowed to access the full data stored in the DMS system. Furthermore, some of the most sensitive personally identifiable information, such as drivers' license numbers, social security numbers, and dates of birth are not stored in the CDK DMS at Walter's Automotive Group. Authenticom does not have access to this information. This information is stored in a separate program called Advent, and it is purged after 30 days. Credit card information is not stored in any program at Walter's Automotive Group.

12.      It appears that CDK is stating that their contracts for the DMS contain language that disallows dealers from granting access to the data in the DMS to third parties.  I have been working with CDK for decades and have negotiated contracts for the CDK DMS system.  Yet, I have never understood the CDK contracts to restrict dealers in this way.

13.      For years, CDK took the position that the dealer owns that data and has the right to share that data with whomever it chooses.  For years, CDK did not take any action to prevent data integrators (like Authenticom) from accessing or pulling the data.  In my view, CDK changed its position in around 2015, and began blocking access by integrators like Authenticom from accessing the DMS, which was a change in position that I did not foresee and I believe is inconsistent with the position CDK had always taken prior to then.

14.      I recently reviewed Walter's Automotive Group's current contract with CDK.  In the 2015 Master Services Agreement from CDK, (which was signed before I began working at Walter's) the agreement acknowledged that: "During the initial term of the Schedule, CDK acknowledges that Client may provide a third party vendor with a user id and password into the Client's CDK DMS System to allow routine screen scrape of the DMS."  That CDK would put that in the contract – specifically allowing me to provide login credentials to a third-party integrator to access data on the CDK DMS – just shows that CDK's "security" concern is a pretext.  In my view, if CDK had true security concerns about independent data integrators, CDK would not have put that in the contract.

15.      I do not need CDK or other DMS providers to tell me how to protect my own data.  I am a sophisticated business person, with access to resources to help me evaluate and determine how to best protect my own data, and I should have the option to choose to work with whatever service providers I prefer to best help manage and utilize my data.

16.     The dealers I've worked for pay CDK significant fees for use of the DMS itself.  I do not believe we should also have to pay an excessive toll on the data stored on the DMS just to be able to utilize the dealer's own data.

17.     In my March 22, 2017 declaration, I explained that it is highly disruptive to switch DMS providers. I have personally transitioned dealer locations from one DMS to another, for example, when the Fletcher Jones Automotive Group acquired additional dealers. When we did so, we transitioned those locations from the DMS they were using to the DMS used by the rest of the dealerships in the group. We transitioned these dealers for efficiency of administration and for integration of new dealers into the group, but the costs and time investment for transitioning to new DMS systems are otherwise prohibitive and would not be justified in the ordinary course of business, without a significant event such as acquisition of new dealers.

18.     Since my prior declaration, I believe that CDK has increased its blocking efforts toward Walter's Automotive Group in retaliation for my having submitted a declaration in this matter.

19.     I understand that my prior declaration was filed with the court on May 18, 2017. On May 23, 2017, less than a week later, CDK blocked my ability to re-enable log-ins and passwords for Authenticom.  This blocking is reflected in the below screenshot I took on May 23, 2017, in which a message from CDK appeared on my screen, stating: "User ID [dvault1] has been used in a manner that violates the terms of your CDK Master Services Agreement and cannot be enabled or copied."

20. I cannot easily create a workaround to this, as this is a level of blocking I have not encountered before by CDK. Prior to this blocking incident, Authenticom has never had its dvault1 user ID permanently disabled.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 22, 2017 in Riverside, California.

_Wayne_

Wayne Fitkin

# EXHIBITS 63-81
# Filed under Seal

# EXHIBIT 82

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| AUTHENTICOM, INC., | |
| *Plaintiffs.* | Case No. 17-cv-318 |
| v. | |
| CDK GLOBAL, INC. and THE REYNOLDS AND REYNOLDS COMPANY. | |
| *Defendants.* | |

**DECLARATION OF WAYNE FITKIN**

I, Wayne Fitkin, declare as follows:

1.      I am the Information Technology director for Walter's Automotive Group, which owns four car dealerships in Riverside and Ontario, California.  I am responsible for overseeing all technological aspects of the business.  I have worked at Walter's Automotive Group for one year, and prior to that, I worked for 29 years as the Information Technology director at Fletcher Jones Automotive Group.

2.      Dealer Management System ("DMS") software is vital to the functioning of Walter's Automotive Group dealerships.  Without DMS software, no transactions can take place.  CDK has provided the DMS for Walter's Automotive Group dealerships for more than 20 years.

3.      It is highly disruptive to switch DMS providers.  Walter's Automotive Group entered into a five-year contract with CDK and is unlikely to switch DMS providers given the difficulty and cost involved in switching DMS providers.

1

4.      The DMS contract is a very significant expense for the Walter's Automotive Group.  As part of the contract, we pay CDK to store data owned by Walter's Automotive Group.  Walter's Automotive Group owns the data that is on its DMS system.  This is Walter's Automotive Group's data, and Walter's Automotive Group has the right to share this data with whomever it wishes.

5.      Walter's Automotive Group works with approximately fifty third-party application providers who provide a variety of important services, including marketing and lead generation.  These application providers cannot function and provide the services they were paid to perform without access to Walter's Automotive Group's data on the DMS.

6.      Walter's Automotive Group has been using Authenticom's DealerVault product for the past year.  I am extremely satisfied with this product, as it allows me to view and control exactly what data is being transmitted to third-party application providers.  DealerVault also requires these application providers to sign confidentiality agreements.

7.      Walter's Automotive Group's application providers also use Authenticom's data pulling services.  Authenticom pulls Walter's Automotive Group's data from the DMS and modifies it into a format specifically requested by the third-party application provider.

8.      The security of Walter's Automotive Group's data is paramount.  I am satisfied with the security protections Authenticom has in place to extract the data, aggregate it, and send it to third party vendors who have signed confidentiality agreements.

9.      Walter's Automotive Group specifically authorizes Authenticom to pull our data from the DMS.  Authenticom extracts data using user credentials (a user ID and password) I have specifically created for Authenticom.  Under this user ID, Walter's Automotive Group granted Authenticom permission to access and pull data for the dealerships in Walter's

Automotive Group. Authenticom pulls the data in the same manner as the dealer itself would. Walter's Automotive Group has authorized other data aggregators, including Digital Motorworks and IntegraLink (both owned by CDK), to pull data in this exact same way – i.e., we provided a username and password to CDK's subsidiaries so they could pull the data just as Authenticom does.

10.    CDK has repeatedly blocked Authenticom from pulling Walter's Automotive Group's data from the DMS by disabling the log-in credentials that I created for Authenticom. They have created a routine that disables Authenticom's user ID ("acom") every hour on the hour.

11.    Given my technical expertise, I was able to write a script that launches every five minutes and re-enables Authenticom to gain access to the DMS. In my opinion, most dealers lack the technical ability to create work-arounds, however. Without the work-around I created, Authenticom would not be able to access any data from the DMS; in turn, Authenticom would not be able to transmit this data to application providers that rely on this data to provide necessary services for Walter's Automotive Group. This would cause severe disruption to Walter's Automotive Group's operations.

12.    CDK sent Walter's Automotive Group a letter threatening to turn off Telnet by January 1, 2017, which would prevent my work-around from functioning and result in Authenticom being unable to pull our data from the DMS. Telnet is a text-based communication protocol for transferring data between the user and the DMS. It is, however, an unencrypted transmission protocol. CDK's purported reason for turning off Telnet is to improve security, but this is a pretext; CDK's intends to force all third-party application providers to enroll in their 3PA program. Disabling Telnet would paralyze the many applications that Walter's Automotive

3

Group utilizes and that rely on Authenticom's data aggregation service. Turning off Telnet would also cut off my ability to automate the process of pulling data from Walter's Automotive Group's own database in order to carry out important functions.

13.     Though CDK has not yet turned off Telnet, CDK has stated it will. When that happens, it will cause severe harm to Walter's Automotive Group and disrupt our business.

14.     CDK has taken the position that Walter's Automotive Group cannot allow Authenticom to pull data. This position is contrary to the ownership rights that Walter's Automotive Group has over its own data. CDK's position is also clearly designed to give CDK exclusive access to pull and aggregate our data from the DMS, to the exclusion of other data aggregators like Authenticom.

15.     CDK's blocking tactics have had the intended effect of causing application providers to sign up for CDK's own data aggregation service – the 3PA program. It is my understanding that third-party application providers needed the certainty that the data would not be interrupted, and so felt compelled to join CDK's program.

16.     In my opinion, if CDK chose to protect and control data access, and were to fairly charge for this service without blocking competitors, I would not object.

17.     CDK charges third-party application providers much more to obtain our data through the 3PA program than Authenticom charged them for the same data. If the third-party application provider has a product that competes with any CDK product, then the charge becomes astronomical.

18.     The application providers that participate in CDK's 3PA program pass on the "data access fees" that CDK charges to Walter's Automotive Group. As a result, Walter's Automotive Group must pay much more for third-party application services than it did when the

application providers obtained the data from Authenticom. Walter's Automotive Group does not receive a corresponding reduction in price for its DMS services from CDK to offset the higher data access fees.

19. Before CDK started its blocking tactics, Walter's Automotive Group had many more application providers to choose from. Now, many of these application providers have either gone out of business or enrolled in CDK's 3PA program, which has made their products prohibitively expensive as a result of having to pass on the higher data access fees to dealer customers such as Walter's Automotive Group.

20. CDK also charges exorbitantly high fees to application providers who have competing products to CDK in an effort to drive up CDK's profits. For example, Walter's Automotive Group was interested in using a third-party application provider called XTime to manage service appointments. XTime directly competes with an application that CDK offers. CDK's data access charges added over $400 a month to the cost of XTime, prohibiting our ability to justify the expense for XTime's product. This cost XTime our business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed in Riverside, CA, this 22nd day of March, 2017.


By: _Wayne Fitkin_____
Wayne Fitkin

# EXHIBIT 83

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

AUTHENTICOM, INC.,

*Plaintiffs.*

Case No. -cv-

v.

CDK GLOBAL, INC. and THE REYNOLDS
AND REYNOLDS COMPANY.

*Defendants.*

## DECLARATION OF CHRIS LONGPRE

I, Chris Longpre, declare as follows:

1.     I am an owner and vice president of the Lexus of Westminster car dealership in Orange County, California. I have been an executive at Lexus of Westminster since 2002. Prior to that, I was a software developer.

2.     Lexus of Westminster is a family-owned and family-run franchised car dealership. We sell roughly 2,500 cars per year, making us a medium-sized dealership.

3.     Since 2003, Lexus of Westminster has used a Dealer Management System ("DMS") provided by CDK Global, LLC ("CDK"). My current contract with CDK expires in late 2018.

4.     The DMS contract is a significant expense for our car dealership. As part of the contract, we pay CDK to store our dealership data. That data includes vehicle, inventory, customer, sales, and other of our most important information. CDK does not own that data. We do.

1

5. Over the last couple of years, I have become concerned about CDK's treatment of my dealership's data stored on the DMS system. CDK gives us little control over or visibility into how our data is used. Meanwhile, CDK is charging third-party application providers excessive fees – often between $200 and $800 a month – so that they can access my own data.

6. I use roughly 20 third-party application providers at my dealerships. These applications provide critical services to our dealership including online advertising, inventory management, direct mail pieces, customer follow-up, excess inventory wholesales, and many other services. These services are essential to our day-to-day operations. These application providers perform many functions that the DMS cannot or does not perform.

7. One example of a third-party application provider is my Customer Retail Management provider, DealerSocket. As a result of CDK's integration fees, DealerSocket has informed me they are raising the prices it charges my dealership by $500 a month.

8. In short, I am indirectly footing the bill for a large fee increase so that one of my key application providers can access my own data. Based on conversations with my other vendors, similar price increases, relating to CDK's integration fees, are likely in the near future.

9. I also use a company called AVRS to provide electronic titling and vehicle registration services. AVRS uses Authenticom to pull my data off the DMS system.

10. If I had my choice, I would use Authenticom's DealerVault service for all of my vendors. DealerVault is more cost effective and provides dealers with a secure system and substantial control over their data, which CDK does not offer.

11. I pay CDK nearly $13,000 a month for DMS services. Price increases happen every year, and they are never lower than 5 percent. I negotiated a 12-month price protection guarantee in my current contract, but that is now expiring.

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Westminster, California, this 4th day of April, 2017.

By: _____

# EXHIBITS 84-189
# Filed under Seal