# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| *Motor Vehicle Software Corp. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00865 (N.D. Ill.) | **PUBLIC-REDACTED** |

## PLAINTIFF MOTOR VEHICLE SOFTWARE CORPORATION'S OPPOSITION TO DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

GLOSSARY ............................................................................................................................... v

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

    I.       ELECTRONIC VEHICLE REGISTRATION AND TITLING SERVICES ............... 2

        A.  EVR Markets Are State-Specific Markets ................................................................. 2

        B.  EVR Providers Compete in Certain State Markets ..................................................... 3

        C.  CDK and Reynolds Conspired to Deny MVSC Access to Data .................................. 4

            1.  MVSC Posed a Competitive Threat to CVR ......................................................... 4

            2.  CDK and Reynolds Agreed To Deny MVSC Access to 3PA and RCI ................. 5

            3.  CDK and Reynolds Have Acted On Their Agreement ........................................... 8

               a.  CDK Repeatedly Excluded MVSC From the 3PA Program ........................... 9

               b.  Reynolds Repeatedly Excluded MVSC From the RCI Program ................... 11

               c.  CDK and Reynolds Have Exploited MVSC's Lack of Data Access to CVR's Advantage ......................................................................................... 13

            4.  CDK and Reynolds Also Conspired to Exclude Data Integrators ....................... 13

        D.  The Conspiracy Has Harmed MVSC in Four State Markets ..................................... 15

LEGAL STANDARD ............................................................................................................... 16

ARGUMENT ............................................................................................................................ 16

    I.       THERE IS AMPLE EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT REYNOLDS AND CDK CONSPIRED TO IMPEDE MVSC'S ACCESS TO DEALER DATA .................................................. 16

        A.  Communications Between the Alleged Co-Conspirators Would Allow a Reasonable Jury to Find Liability .......................................................................... 17

        B.  Reynolds's Contrary Position Ignores the Direct Evidence of Conspiracy, Conflates Group Boycotts With Unilateral Refusals to Deal, and Conflicts with the Record ......................................................................................................... 20

i

1. Whether Reynolds's Conduct Constitutes a Unilateral Refusal to Deal Is Immaterial ................................................................................................ 20

2. The Alleged Conspiracy Makes Economic Sense ................................. 22

II. THERE IS AMPLE EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT REYNOLDS'S AND CDK'S CONSPIRACY CAUSED MVSC HARM ........................................................................... 24

A. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in California.... 25

B. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Illinois ........ 27

C. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Virginia ...... 29

D. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Wisconsin... 30

E. It Is Undisputed that MVSC Incurred Costs to Develop and Maintain Manual Workarounds for Data Access ................................................................... 31

III. MVSC HAS AMPLE EVIDENCE OF ANTITRUST INJURY ............................... 32

A. A Reasonable Jury Could Conclude that MVSC Suffered Antitrust Injury .............. 32

B. A Reasonable Jury Could Find That There Has Been Harm to Competition............. 33

C. MVSC's Use of Independent Data Integrators Does Not Negate Antitrust Injury..... 34

IV. MVSC HAS PROFFERED PROOF OF DAMAGES ................................................. 35

V. MVSC'S STATE LAW CLAIMS CAN PROCEED TO TRIAL .............................. 35

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**CASES**                                                **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ........................................................................... 33

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998)............................................................................... 29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).......................................................................................... 32

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) ........................................................................ 20

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ..................................................................................... 35

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ...................................................................... 27, 34

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990).......................................................................... 21, 22

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ............................................................................ 23

*In re DMS Antitrust Litg.*,
    2018 WL 6629250 (N.D. Ill. Oct. 22, 2018)................................................ 16, 17

*In re DMS Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018) ............................................................... 17

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990).......................................................................................... 31

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ...................................................................... 17, 23

*King v. Idaho Funeral Ass'n*,
    862 F.2d 744 (9th Cir. 1988) ............................................................................ 27

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959).................................................................................... 17, 33

*Mailand v. Burckle*,
    20 Cal. 3d 367 (1978) ...................................................................................... 35

*Matsushita Electric Industrial Co. v. Zenith Radio Corporation*,
475 U.S. 574 (1986) ............................................................................................. 23

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ............................................................................................. 33

*Peerless Heater Co. v. Mestek, Inc.*,
2000 WL 637082 (E.D. Pa. May 11, 2000) ........................................................ 27

*People ex rel. Scott v. Coll. Hills Corp.*,
91 Ill. 2d 138 (1982) ........................................................................................... 35

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) .................................................................................. 25

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ........................................................................ 18, 21

*Safeway, Inc. v. Abbott Labs.*,
761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................................ 21

*Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
830 F.2d 1374 (7th Cir. 1987) ............................................................................ 32

*In re Sulfuric Acid Antitrust Litig.*,
743 F. Supp. 2d 827 (N.D. Ill. 2010) .................................................................. 18

*Tunica Web Advertising v. Tunica Casino Operators Association, Inc.*,
496 F.3d 403 (5th Cir. 2007) ........................................................................ 19, 20

*United States v. Beaver*,
515 F.3d 730 (7th Cir. 2008) .............................................................................. 21

*United States v. Misle Bus & Equip. Co.*,
967 F.2d 1227 (8th Cir. 1992) ............................................................................ 21

*In re Uranium Antitrust Litig.*,
552 F. Supp. 518 (N.D. Ill. 1982) ...................................................................... 20


**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*
(3d ed. 2017) ....................................................................................................... 31

# GLOSSARY

## ABBREVIATIONS

| Abbreviation | Full Citation |
|---|---|
| ACOM SUF | Authenticom, Inc.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 977) |
| AL SUF | AutoLoop's Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on CDK Global LLC's Counterclaim (Dkt. 950) |
| CC Br. | Authenticom, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 978) |
| Dealer SUF | Dealership Counter-Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on CDK Global, LLC's Counterclaims (Dkt. 968) |
| DJ SUF | Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment (Dkt. 974) |
| MSUF | The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (Dkt. 956) |
| PJ RSUF | MDL Plaintiffs' Joint Response to Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment (filed concurrently) |
| PJ SAF | MDL Plaintiffs' Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment (filed concurrently) |
| Resp. to MSUF | MVSC's Responses to The Reynolds and Reynolds Company's Statement of Undisputed Material Facts (filed concurrently) |
| Caseria Ex. | Exhibits to the Declaration of Leo D. Caseria in Support of The Reynolds and Reynolds Company's Motion for Summary Judgment and its Local Rule 56.1(a)(3) Statement of Undisputed Facts (Dkts. 957, 958, and 959) |
| Dorris Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff Authenticom, Inc.'s Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 977-1) |
| Dorris AL Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff AutoLoop's Motion for Summary Judgment on CDK Global, LLC's Counterclaim (Dkt. 950-1) |

| Abbreviation | Full Citation |
|---|---|
| Emmanual Ex. | Exhibits to the Declaration of Jonathan Emmanual in Support of The Reynolds and Reynolds Company's Motion for Partial Summary Judgment (Dkt. 779-2) |
| Fenske Ex. | Exhibits to the Declaration of Daniel Fenske in Support of Defendants CDK Global, LLC's And The Reynolds And Reynolds Company's Motion For Summary Judgment (Dkt. 975) |
| Ho Ex. | Exhibits to the Declaration of Derek T. Ho in Support of MDL Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment (filed concurrently) |
| Wedgworth Ex. | Exhibits to the Declaration of Peggy J. Wedgworth in Support of Dealership Counter-Defendants' Motion for Summary Judgment on CDK Global, LLC's Counterclaims (Dkt. 968-1) |
| Wilkinson Ex. | Exhibits to the Declaration of Brice Wilkinson in Support of Reynolds's Motion for Partial Summary Judgment (Dkt. 779-1) |

**KEY PEOPLE**

| NAME | COMPANY | TITLE |
|---|---|---|
| Don Armstrong | Motor Vehicle Software Corp. | CEO and co-founder |
| Bob Brockman | The Reynolds and Reynolds Company | Founder, Owner, Chairman, and CEO |
| Napa Bulusu | Motor Vehicle Software Corp. | Senior Manager, Operations |
| Leigh Ann Conver | CDK Global, LLC | Senior Director of Strategy |
| Steve Cottrell | Authenticom, Inc. | Authenticom, Inc. Owner and CEO |
| Howard Gardner | CDK Global, LLC | Vice President and Manager of Data Strategy |
| Scott Herbers | CDK Global, LLC | CDK Vice President of Sales, North America; CVR General Manager and ▮▮▮▮▮▮▮▮▮ |
| Keith Hill | The Reynolds and Reynolds Company | Vice President of Sales |
| Mike Joza | CDK Global, LLC | Senior Director of Business Development |
| Robert N. Karp | CDK Global, LLC | President of CDK Global, LLC North America |
| Mark Kithcart | Computerized Vehicle Registration | Vice President of Marketing |

| NAME | COMPANY | TITLE |
|---|---|---|
| Dan McCray | CDK Global, LLC | Vice President of 3PA Product Management |
| Christopher Morris | CDK Global, LLC | Account Director; former CVR ███████████████ |
| Joseph Nemelka | Motor Vehicle Software Corp. | President & Chief Operating Officer |
| John Roeder | Computerized Vehicle Registration | Senior Director of Sales |
| Mark Roman | CDK Global, LLC | Director of Sales |
| Robert Schaefer | The Reynolds and Reynolds Company | Vice President of OEM Relations and Data Services |
| Jonathan Strawsburg | The Reynolds and Reynolds Company | Vice President of The Reynolds and Reynolds Company; ████████ |
| Ron Workman | CDK Global, LLC | Senior Vice President, Global Corporate Development |

## INTRODUCTION

Defendant the Reynolds and Reynolds Company ("Reynolds") does not dispute, for purposes of its summary judgment motion, that if CDK Global, LLC ("CDK") and Reynolds either (1) agreed to block data integrators' access to their DMS or (2) agreed to deny MVSC "certified" integration on their respective DMS, that agreement would violate Sections 1 and 2 of the Sherman Act. Plaintiff Authenticom, Inc. ("Authenticom") has explained in its summary judgment opposition why a reasonable jury could readily conclude that CDK and Reynolds agreed to block independent data integrators; MVSC explains below why there is likewise ample evidence that MVSC suffered injury and damages from that agreement. That alone defeats Reynolds's motion.

The evidence would likewise allow a jury to conclude that Reynolds and CDK – which jointly operated Computerized Vehicle Registration ("CVR"), one of MVSC's main rivals – agreed to deny MVSC access to their "certified" integration services.



Ho Ex. 221, PX 1105 at CVR-0018040; Ho Ex. 130, PX 498 at REYMDL00118362. A reasonable jury could readily conclude that

. Although there is much more evidence, no more would be required to support a verdict that Reynolds violated the Sherman Act.

Reynolds's other arguments fare no better. MVSC has proffered evidence that Defendants' joint denial of data access imposed costs MVSC would not otherwise have incurred; slowed its growth in California; delayed its entry in Illinois and Virginia; and barred it from entering

Wisconsin – all costing it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That is classic antitrust injury. Defendants' argument that MVSC has been successful in its home state of California hardly defeats MVSC's claim: the evidence shows that MVSC would have done better in the absence of the anticompetitive conduct, which is the relevant point for causation and damages. And the harm to MVSC's expansion in Illinois, Virginia, and Wisconsin also constitutes damages caused by Defendants' conspiracy. Reynolds's motion should therefore be denied.

## BACKGROUND

## I.     ELECTRONIC VEHICLE REGISTRATION AND TITLING SERVICES

Electronic vehicle registration and titling ("EVR") allows dealerships to register and title vehicles pursuant to state department of motor vehicle ("DMV") regulations. EVR applications require access to certain data on dealers' respective DMS: (1) car buyer identification, (2) vehicle identification, and (3) financing information. *See* MSUF 9.

### A.     EVR Markets Are State-Specific Markets

Typically, EVR providers partner with state DMVs to issue registration, license plates, and titles for vehicles sold at new car dealerships. *Id.* 5. In general, only state-approved firms may operate as EVR providers. As a result, EVR providers vary by state, and an EVR provider in one state does not compete with EVR providers operating only in other states. *Id.* 8. State EVR regulations also vary by state. *See id.* Some states, for example, cap or limit the fees that EVR providers can charge. In California, EVR providers generally collect, at most, $25 per transaction. PJ SAF 92. In Illinois, the prices EVR providers can charge are even lower, with EVR providers collecting only up to $10 per transaction. *Id.*

Some states, like Illinois and Virginia, require dealers to provide a car's registration and license plate at the time of sale. MSUF 6. EVR providers in those states must have near-instantaneous access to data on a dealer's DMS. PJ SAF 93. For many years, only automated

integration through data integrators or DMS providers' data integration services (such as CDK's Third Party Access ("3PA") or the Reynolds Certified Interface ("RCI")) could provide such access, and those remain the most effective method. *Id.*[1]

### B. EVR Providers Compete in Certain State Markets

**MVSC**. Founded in 2005, MVSC provides EVR services in California, Oregon, Virginia, and Illinois. MSUF 1. Its products are called "DMVdesk" and "Vitu." *Id.* 2. MVSC has operated in California since its founding. *Id.* 1. It began its efforts to expand into Illinois in 2013 and Virginia in 2014. PJ SAF 113, 115. MVSC does not currently provide EVR services in Wisconsin, but it has attempted to enter the state since at least early 2014. *Id.* 117.

**CVR**. Founded in 1992, CVR is a joint venture owned by CDK (80 percent) and Reynolds (20 percent). Resp. to MSUF 3.



*Id.* CDK exercises management and control over CVR's day-to-day operations. *Id.* *Id.* . *Id.* 3, 22. *Id.* 3.

In April 2015, CVR bought another California EVR provider, AVRS; they now operate as a single business in 18 states, including California (since 1997), Illinois (since 2005), Virginia (since 1993), and Wisconsin (since 1997). MSUF 4; Resp. to MSUF 46.

---

[1]

C.     **CDK and Reynolds Conspired to Deny MVSC Access to Data**

   1.   **MVSC Posed a Competitive Threat to CVR**

CVR was the first EVR provider in most states, operating with little to no competition for

years.  PJ SAF 96; Ho Ex. 125, PX 477 at REYMDL00117713. ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ PJ SAF 97.  MVSC was one of those competitors.

   MVSC entered California – ███████████████████████████ PJ SAF 95 – in 2005

with a user-friendly, web-based product and extensive customer support, *see* MSUF 1, 2; PJ SAF

98. ██████████████████████████████████████████████████████████████████████

█████████████████████████.  PJ SAF 99; Ho Ex. 219, PX 1100 at CDK-

1725891.002-.003 (█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████



Ho Ex. 216, PX 1096 at CVR-0023113.002 (█████████████████████████████).

   By 2013, MVSC began to expand into Illinois, ██████████████████████████

█████████████████████████████████████.  PJ SAF 113. ███████████████████████

████████████████████ *Id.* 95. ██████████████████████████████████████████

███████████████████████████████████████████████ *Id.*████████████████████

███████████████████████████████████████. *Id.* 100.  But to compete in Illinois,

MVSC needed near real-time access to data on the DMS, which could only be obtained through

data integrators or 3PA or RCI.  *Id.* 93.  ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████" *Id.* 100; Ho Ex. 218, PX 1098 at CVR-0017627; *see also* Ho Ex. 256, PX 1540 at CVR-0017625 (██████████████████████████████████████████████████████████████

████████████████████████████

**2.   CDK and Reynolds Agreed To Deny MVSC Access to 3PA and RCI**

To dampen the threat that MVSC posed to CVR's dominance in critical markets, CDK and Reynolds agreed to exclude MVSC from their respective data integration services.  *See, e.g.*; Ho Ex. 237, PX 1259 at CVR-0068171-72 (████████████████████████████████████

████████████████████████████████████████████████ (emphasis added).

The agreement was likely formed as early as 2011.  ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

PJ SAF 101; Ho Ex. 4, Nemelka Tr. 377:2-379:17.  ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

At the latest, the agreement was in place by early 2014, as MVSC began its efforts to expand outside California, including to Illinois.  Meetings between the three entities during the year provided ample opportunities to conspire.  ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



PJ SAF 102; Ho Ex. 213, PX 1093 at CVR-0296001-02 (emphasis added).[2]

PJ SAF 103; Ho Ex. 217, PX 1097 at CDK-0235604.

*Id.*

PJ SAF 103; Ho Ex. 125, PX 477 at REYMDL00117714.

*Id.* at -7712.

In subsequent communications among CDK, Reynolds, and CVR, the three confirmed that they had agreed to deny MVSC access to data.

_____

[2] Ho Ex. 213, PX 1093 at CVR-0296000. *Id.* *Id.*



PJ SAF 104; Ho Ex. 221, PX 1105 at CVR-0018040.

*Id.* (highlighting added).

PJ SAF 104; Ho Ex. 130, PX 498 at REYMDL00118363.

*Id.* at -8362.

*Id.* (highlighting added). ███████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ PJ SAF 104; Ho Ex. 131, PX 499 at

REYMDL00117615. ███████████████████████████

█████████████████████████████ *Id.* █████████████

████████████████████████████████████████

████████████████ *Id.* at -7617. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████



*Id.* at -7619 (highlighting added). ████████████████████

████████████████████████████████████ *Id.*

### 3. CDK and Reynolds Have Acted On Their Agreement

Consistent with their agreement, every time MVSC applied to participate in the 3PA and

RCI programs, Defendants rejected it or offered terms Defendants knew it could not accept.

### a. CDK Repeatedly Excluded MVSC From the 3PA Program

█████████████████████████████████████████████████████ PJ SAF 105.

████████████████████████████████████████████████████████████

███████████████████████████████ *Id.*; Ho Ex. 205, PX 971 at CDK-0177998-99. █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *Id.* ██████████████



*Id*; *see also* Ho Ex. 133, PX 550 at CDK-2884310, -4313 █████████████████

█████████████████████████████████████████████████ PJ SAF

105; Ho Ex. 26, McCray Tr. 154:20-23 ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ PJ SAF 105; Ho Ex. 4, Nemelka Tr.

287:3-288:15. ████████████████████████████████████

██████████████████████████████████████. PJ SAF 35, 41, 44-45.

████████████████████████████████████████████████████████████

████████████████ PJ SAF 105. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



*Id.*; Caseria Ex. 89 (Dkt. 958-38), MVSC_MDL_0021478 at -1478.

. PJ SAF 106; Caseria Ex. 90

(Dkt. 958-39), MVSC_MDL_0005263 at -5263.

PJ SAF 106; Ho Ex. 395,

MVSC_MDL_0007415 at -7415.

PJ SAF 106; Ho Ex. 349, CDK-1769206.[3]

PJ SAF 107.

*Id.*; Ho Ex. 401,

MVSC_MDL_0041226 at -1227.

. *Id.*

Ho Ex. 337, CDK-1298856 at -8857.

*Id.* at -8856.

PJ SAF 107.

---

[3] ” PJ SAF 106; Ho Ex. 142, PX 602 at CDK-3015148.

- 10 -



*Id.*; Ho Ex. 4, Nemelka Tr. 333:4-334:8

. PJ SAF 107; Caseria Ex. 37 (Dkt. 957-37), DX 108.

*Id.*

PJ SAF 107; Ho Ex. 4, Nemelka Tr. 333:4-334:8.

Resp. to MSUF 51.

PJ SAF 107; Ho Ex. 94, PX 151 at 1; Ho Ex. 4, Nemelka Tr. 403:21-406:2.

**b. Reynolds Repeatedly Excluded MVSC From the RCI Program**

Caseria Ex. 39 (Dkt. 957-39), DX 87 at MVSC_MDL_0055338-39. *Id.*

. MSUF 28, 29.

. PJ SAF 108.



███████████████████████████████████ Resp. to MSUF 35. ██████████████████

████████████████████████████████████████████████████████████

██████ MSUF 29; Caseria Ex. 30 (Dkt. 957-30), DX 91 at MVSC_MDL_0000608; *see also*

Caseria Ex. 31 (Dkt. 957-31, DX 92 at MVSC_MDL_0000780. ████████████████

████████████████ *See* MSUF 31; Caseria Ex. 31 (Dkt. 957-31), DX 92.

Eventually, MVSC realized that it "wouldn't be able to do business in Illinois" without

automated access to data on the Reynolds DMS.  PJ SAF 93; Ho Ex. 4, Nemelka Tr. 201:16-19.

███████████████████████████████████████████████. MSUF 32. ██████

████████████████████████████████████████████████████████████

█████████████████████████████████████ MSUF 33. ██████████

█████████████████████████████████████ Resp. to MSUF 35; Caseria Ex. 33

(Dkt. 957-33), DX 94 at MVSC_MDL_0021971. ████████████████████████

██████████████████████████████████████████████████████ *Id.*

at -1969. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ *Id.*  In early November, MVSC concluded it could not move forward with RCI

certification because it would be economically prohibitive.  MSUF 36; Caseria Ex. 75 (Dkt. 958-

24), MVSC_MDL_0003940 at -3940 (MVSC: ████████████████████████████

█████████████████████████████ PJ SAF 108; Ho Ex. 4, Nemelka Tr. 210:13-211:6

████████████████████████████████████████████████████████████

██████████); Ho Ex. 31, Armstrong (Individual) Tr. 151:3-12.

### c. CDK and Reynolds Have Exploited MVSC's Lack of Data Access to CVR's Advantage

Throughout the period, CDK and Reynolds worked together to advantage CVR in the market by exploiting MVSC's lack of access to "certified integration" via 3PA or RCI. PJ SAF 109. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.*; Ho Ex. 254, PX 1524 at REYMDL00479400. ████████████████████████ *Id.* ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ PJ SAF 109; Ho Ex. 449, REYMDL00537499 at -7500.003, .005.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ SAF 109; Ho Ex. 126, PX 488 at REYMDL00238184. ████████████

████████████████████████████████████████████████████

████████ *Id.* ████████████████████████████████████

██████████████████████████████████████████████████████.[4]

### 4. CDK and Reynolds Also Conspired to Exclude Data Integrators

During the same period, CDK and Reynolds also conspired to block independent data integrators from their respective DMS, as explained in Authenticom's Opposition to Defendants' Motion for Summary Judgment ("Authenticom Opp. Br."). This conspiracy directly impacted MVSC, because, without access through either 3PA or RCI, MVSC relied on independent data

---

[4] █████████████████████████████████████████████████████ PJ SAF 109; Ho Ex. 127, PX 489 at REYMDL00333373. ███████████████████████████ PJ SAF 109.

integrators as its only alternative for automated data access to the Reynolds or CDK DMS. *See* PJ

SAF 93. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████. Resp. to

MSUF 56; Caseria Ex. 98 (Dkt. 958-47), MVSC_MDL_0013203 at -3203 (███████████████

███████████████ Caseria Ex. 40 (Dkt. 957-40), MVSC_MDL_0002456 at -2456

███████████████████████████████████████

██████████████████████

███████████████████████████. PJ SAF 110. ███████████

███████████████████████████████████████

███████████████████████ Ho Ex. 379, CVR-0024146 at -4148. ███████

███████████████████████████████████████

███████████████████ PJ SAF 110. ███████████████████

███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████

Ho Ex. 282, CDK-0053940 at -3940. ██████████████████

███████████████████████ PJ SAF 110.

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████ PJ SAF 110; Ho Ex. 210, PX 1008 at CDK-

2194528.001-.002. ████████████████████████████

█████████████████████████████████████████████████

█████ . PJ SAF 110. ████████████████████████████

█████████ *E.g.*; Ho Ex. 407, MVSC_MDL_0050807 at -0807.

### D. The Conspiracy Has Harmed MVSC in Four State Markets

Because CDK and Reynolds have blocked its access to automated data integration, MVSC has had to resort to costly manual workarounds, which are inferior to automated integration for several reasons. PJ SAF 111. First, the tools are slower, requiring dealerships to expend time and effort performing manual tasks and learning workaround procedures. *Id.* Second, the workarounds' "manual" component increases the risk and occurrence of transaction errors. *Id.*

MVSC's first manual workarounds did not deliver near real-time access to data. But MVSC was able to continue to provide EVR services in California because that state historically did not require dealers to register cars and provide temporary plates at the point of sale. MSUF 7; PJ SAF 112. ████████████████████████████████████████

████████████████████████████████████████████

████ PJ SAF 112; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶ 13-15 ████████████████

Defendants' conduct also impeded MVSC's expansion beyond California. ████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ PJ SAF 113-14; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 21. ████████████████████████████

████████████ PJ SAF 115. ████████████████████████

█████████████████████████████ . PJ SAF 116; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 21.

Ultimately, MVSC could not begin operations in Illinois or Virginia ██████████

████████████████████████████ PJ SAF 94, 114, 116. ████████



. *Id.* 94.

MSUF 6; Resp. to MSUF 19.

PJ SAF 111.

In at least one instance, MVSC's lack of data access has more than just delayed MVSC's entry into a new state:  it has prevented it entirely.  In 2014, MVSC began operations to expand into Wisconsin.  PJ SAF 117.

*Id.* 118.                                                                                                  .

*Id.*                                                                          *Id.*

## LEGAL STANDARD

MVSC incorporates the legal standard set forth in Authenticom's Opposition Brief.

## ARGUMENT

**I.     THERE IS AMPLE EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT REYNOLDS AND CDK CONSPIRED TO IMPEDE MVSC'S ACCESS TO DEALER DATA**

Viewing the facts in the light most favorable to MVSC and drawing all reasonable inferences in its favor, a reasonable jury could return a verdict for MVSC on its claims that Reynolds conspired with CDK to deprive MVSC of access to dealer data, in violation of the Sherman Act and related state laws.  First, Reynolds agreed with CDK to block independent data integrators (like Authenticom) from accessing their DMS – the same unlawful agreement that is at issue in every case in this MDL.  See Order, *MVSC v. CDK Global, Inc.*, No. 17-896, Dkt. 73, at 1-2 (C.D. Cal. Oct. 2, 2017) ("*MVSC I*"); *In re DMS Antitrust Litig.*, 2018 WL 6629250, at *2 (N.D. Ill. Oct. 22, 2018) ("*MVSC II*").  Second, Reynolds agreed with CDK to refuse to allow

MVSC to participate in CDK's and Reynolds's data integration programs, 3PA and RCI. *See MVSC I* at 3; *MVSC II* at *2-3. Reynolds does not contest, for purposes of its motion, that the agreements MVSC alleges violate the Sherman Act.[5]

The evidence supporting the allegation that Reynolds and CDK conspired to block independent data integrators is set forth in Authenticom's Opposition Brief, which MVSC incorporates by reference. As discussed in Parts II-IV below, MVSC has ample evidence that this aspect of the Defendants' unlawful conspiracy harmed MVSC; accordingly, denial of summary judgment in Authenticom's case would require denial of Reynolds's motion in this case. Furthermore, as discussed in the remainder of this Part, the evidence supports a jury finding that Reynolds conspired to deny MVSC access to dealer data through the RCI and 3PA programs; its motion should be denied for this reason as well.

### A. Communications Between the Alleged Co-Conspirators Would Allow a Reasonable Jury to Find Liability

1. A reasonable jury could conclude that Reynolds and CDK conspired to deny MVSC access to their respective "certified" integration programs because there is direct evidence that they reached that agreement. That evidence "is all the proof [MVSC] needs." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] Contrary to Reynolds's contention (at 9-10 n.10), MVSC's Section 1 conspiracy claims assert a group boycott subject to *per se* condemnation, not evaluation under the rule of reason. *See In re DMS Antitrust Litig.*, 313 F. Supp. 3d 931, 951-52 (N.D. Ill. 2018) (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals . . . to deal with other traders, have long been held to be in the [Sherman Act's] forbidden category.")). In any event, nothing in Reynolds's motion turns on this question.

PJ SAF 104; Ho Ex. 221, PX 1105 at CVR-0018040 (█████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████; PJ SAF 104; Ho Ex. 130, PX

498 at REYMDL00118362 ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████ PJ

SAF 104; Ho Ex. 131, PX 499 at REYMDL00117619 (█████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

A reasonable jury could easily conclude that the Defendants would not have voiced these shared

beliefs to each other – and on multiple occasions – unless Reynolds and CDK had agreed to deny

MVSC access to data on their DMS.[6]

Other evidence, discussed *supra*, bolsters the conclusion that Defendants agreed, no later

than 2012, to deny MVSC participation in RCI and 3PA. ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ PJ SAF 101; Ho Ex. 4,

Nemelka Tr. 377:21-378:21. █████████████████████████████████████████████

████████████████████████████████ PJ SAF 95.  A reasonable jury could infer from this

---

[6] *See also In re Sulfuric Acid Antitrust Litig.* 743 F. Supp. 2d 827, 858-59 (N.D. Ill. 2010) ("damaging" statements by defendants alluding to "strategy" to reduce market supply of product and other documents "pointing to compliance with this plan" constituted "circumstantial evidence tending to show" that defendants agreed to "cleverly disguised conspiracy" to reduce output); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009-10 (6th Cir. 1999) (statement by witness that defendant admitted to entering into an agreement with codefendant combined with other circumstantial evidence of conspiracy would entitle a reasonable jury to find the existence of a conspiracy).

testimony that, ████████████████████, Defendants agreed not to allow MVSC into their respective certified access programs because of the competitive threat MVSC posed to CVR.

    2.    Given this evidence of an agreement to deny MVSC access to data – and of CDK's and Reynolds's broad collusion discussed in the Authenticom brief – a reasonable jury could infer that MVSC's failure to gain access to 3PA and RCI, despite its efforts to do so, was a product of Defendants' agreement.  For example, in *Tunica Web Advertising v. Tunica Casino Operators Association, Inc.*, 496 F.3d 403 (5th Cir. 2007), an internet advertising company and its owner alleged that several casinos had conspired not to deal with it on any terms.  In support of these allegations, there was direct evidence that the casinos had reached a "'gentlemen's agreement' to not do business with" the advertising company, as well as evidence that the casinos declined the company's offers to advertise on its website.  *Id.* at 407.  The casinos argued that their refusals were insufficient to create a triable issue on the group boycott claim because there were "a number of valid, independent reasons" why each would have declined the advertising offer – they argued, in other words, that the plaintiff had failed to point to sufficient evidence that their refusals were concerted, rather than unilateral.  *Id.* at 410-11 & n.11.  The court rejected that argument, reasoning that, given the evidence that a "gentlemen's agreement" was formed, a reasonable jury could infer that the casinos acted on their agreement, notwithstanding any ambiguity of the circumstances surrounding the refusals themselves.  *Id.* at 410.

    Here, as in *Tunica*, given the evidence of an agreement between CDK and Reynolds to deny MVSC access to data, a reasonable jury could conclude that Defendants' refusal to allow MVSC to participate in 3PA and RCI was the product of that unlawful agreement.  CDK refused to deal with MVSC ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ PJ SAF 105-07. Reynolds, for its part, effectively refused to deal with MVSC in 2014, extending economically prohibitive terms despite knowing that MVSC could not afford to operate in California and Illinois at those prices. *Id.* 108. Reynolds will be free to contend at trial that it and CDK acted independently and not pursuant to an agreement; but the evidence of an agreement to deny MVSC access to data integration service creates a triable issue that their refusals were the product of concerted conduct. *See Tunica*, 496 F.3d at 410-11 & n.11.

**B. Reynolds's Contrary Position Ignores the Direct Evidence of Conspiracy, Conflates Group Boycotts With Unilateral Refusals to Deal, and Conflicts with the Record**

**1. Whether Reynolds's Conduct Constitutes a Unilateral Refusal to Deal Is Immaterial**

a. Reynolds's claim (at 10-13) that its 2014 price proposals to MVSC did not constitute an unlawful unilateral refusal-to-deal, is legally beside the point because MVSC's claim is that CDK and Reynolds engaged in an unlawful group boycott. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017) (unilateral refusal to deal doctrine "simply does not speak to claims . . . alleging concerted refusals to deal"). Under hornbook conspiracy law, evidence that Reynolds and CDK agreed to boycott MVSC and that MVSC was denied participation in Reynolds's RCI program *and/or* CDK's 3PA program pursuant to that agreement is all the evidence that MVSC needs. Reynolds's concession (at 13-14) that CDK refused to deal with MVSC is thus fatal to its motion; that conduct – which, as explained *supra* (at 19-20), a reasonable jury could conclude was pursuant to an agreement with Reynolds – is attributable to Reynolds as co-conspirator. *See, e.g.*, *In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 522 (N.D. Ill. 1982) ("[I]t has long been the law that an antitrust defendant is jointly and

severally liable for the acts of its co-conspirators.").  Even if Reynolds would have been willing to defect from the conspiracy and give MVSC RCI access at a high enough price, that would not absolve Reynolds of liability.  *See United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) (citing cases) ("It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself," disprove the conspiracy.); *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1231 (8th Cir. 1992) (defendant's cheating did not absolve him of liability for agreeing to price-fixing conspiracy).

**b.**      In any event, a reasonable jury could find that Reynolds's proposals constituted constructive refusals to allow MVSC to participate in RCI.  A refusal to deal need not be outright – a party may refuse to deal with another party by extending terms that are so unreasonable that the offer amounts to an effective refusal.  *See Re/Max Int'l*, 173 F.3d at 1014 (imposition of "additional costs" on "boycotted entit[ies]" that were allegedly "economically unsustainable" constituted refusal to deal); *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179-80 (2d Cir. 1990) ("[T]here need not be an outright refusal to deal . . . It is sufficient if the terms of the offer to deal are unreasonable."); *Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874 (N.D. Cal. 2011) ("unreasonable terms and conditions" can amount to a "practical refusal to deal").  MVSC's executives testified that Reynolds's unreasonable price terms would make it unprofitable for MVSC to operate in the California and Illinois markets.[7]  PJ SAF 108.  Reynolds, moreover, was well aware that its terms were economically prohibitive:  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.  Resp. to MSUF 35.  *See Consol. Rail*

---

        [7] Contrary to Reynolds's argument (at 12) this testimony is hardly "speculative":  MVSC's Chief Operating Officer, Nemelka, its Chief Executive Officer, Don Armstrong, had ample foundation to testify about whether the proposed terms would have been economically feasible; MVSC did not need an expert to do so.  *See Consol. Rail Corp.*, 902 F.2d at 179-80.

*Corp.*, 902 F.2d at 178-79 (statements by plaintiffs' executives that terms would mean "its profits 'would be almost ludicrously low'" yielded "triable issue" on denial of essential facility claim).



*See* Resp. to MSUF ¶ 35; Ho Ex. 436, REYMDL00037507 ▮▮▮ Ho Ex. 452, REYMDL01076538 (▮▮▮). ▮▮▮ ▮▮▮ [8] MSUF 37, 38; Resp. to MSUF 35; PJ SAF 108. ▮▮▮ ▮▮▮ . PJ SAF 108; Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 26:7-27:17, 32:15-33:7, 38:22-39:7. ▮▮▮ ▮▮▮

### 2. The Alleged Conspiracy Makes Economic Sense

**a.** Reynolds's argument that the alleged conspiracy makes no economic sense fails first of all because Reynolds misstates the law. As explained in Authenticom's Opposition Brief (at 40-45), where there is direct evidence of agreement, a plaintiff does not need to resort to economic inference to defeat summary judgment. There is direct evidence with regard to both

---

[8] ▮▮▮ PJ SAF 95, 100. ▮▮▮ *See* MSUF 23, 37-41 (▮▮▮ .

aspects of the conspiracy at issue here. *See* Authenticom Opp. Br. at 40-45; *supra* at 17-18.

In any event, Reynolds's argument that the alleged conspiracy makes no economic sense is incorrect because both CDK and Reynolds benefited from the concerted exclusion of MVSC from RCI and 3PA in a way that unilateral action could not achieve. Without an agreement, either Reynolds or CDK could have been tempted to capture data integration revenue from MVSC, even at the price of undermining CVR profits. *See* Resp. to MSUF 3, 22. By agreeing not to provide data access, Reynolds and CDK ensured that neither one would undercut CVR's advantage in the market vis-à-vis MVSC.[9] The conspiracy paid off: MVSC lost dealers to CVR in California; its entry into Illinois and Virginia was delayed; and it could not compete in Wisconsin.

This case is thus nothing like *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 577-78 (1986), where the alleged conspiracy was to drive firms out of the U.S. market by maintaining artificially low prices over a 20-year period. The conspiracy there made no economic sense because the defendants would have had to agree to suffer substantial immediate losses for highly speculative future gains – gains that still had not been realized over a 20-year period. *Id.* at 589-93. Here, there is nothing far-fetched about a conspiracy that would immediately benefit both CDK and Reynolds by virtue of higher profits for CVR.

**b.** Reynolds points (at 20-21) to MVSC's market share growth in California relative to CVR's, but that argument falls into the "trap" of eliding the distinction "between the existence of a conspiracy and its efficacy." *High Fructose*, 295 F.3d at 656. The evidence shows that the conspiracy put the brakes on MVSC's growth despite its superior product. PJ SAF 112-19.

---

[9] Reynolds's suggestion (at 23-24) that it had no incentive to engage in a conspiracy in which CDK may have stood to gain more is unfounded. There is no requirement that co-conspirators must stand to achieve equivalent gains to make their participation in an unlawful scheme rational or plausible. *Cf. Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) ("[C]o-conspirators need not share the same motive or goal; it is sufficient . . . [if they] 'acquiesc[ed] in an illegal scheme.'") (citation omitted).

MVSC's ability to mitigate some of the effects of the conspiracy does not mean that Reynolds lacked an economic incentive to participate in it.

Reynolds's argument that other EVR providers' membership in RCI makes MVSC's alleged conspiracy implausible is misguided " ███████████████ PJ SAF 108; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Report ¶ 241.[10] ████████████████████████████



*Id*. And evidence establishes that MVSC posed a particularly significant competitive threat, especially because it competed with CVR in ██████████████████. PJ SAF 100. There is nothing implausible about an agreement between Defendants to target MVSC.[11]

## II. THERE IS AMPLE EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT REYNOLDS'S AND CDK'S CONSPIRACY CAUSED MVSC HARM

A reasonable jury could conclude that the conspiracy between Reynolds and CDK to deny

---

[10] Reynolds's related contention (at 20) that it did not favor CVR over other EVR providers distorts the record. ████████████████████████████████████ Resp. to MSUF 27; Ho Ex. 446, REYMDL00207183 at -7183-84. ████████████ Resp. to MSUF 27; Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 42:13-43:23. In any event, substantial evidence supports the conclusion that Reynolds's conduct favored CVR over *MVSC* in the relevant markets. ██████████████████████ Resp. to MSUF 21; Ho Ex. 129, PX 497 at REYMDL002655067; Fenske Ex. 71 (Dkt. 975-71), Bresnahan Report ¶ 361. ████████████████████████ Resp. to MSUF 45; Ho Ex. 442, REYMDL00117700 at -7702 ██████████ (emphasis added).

[11] Reynolds also similarly argues (at 23) that a conspiracy to monopolize cannot succeed if it only targets a single competitor. But the facts in this case, where only a small number of EVR providers compete in the relevant markets, make it clearly distinguishable from those upon which Reynolds relies.

MVSC access to data harmed MVSC. In particular, there is evidence that, as a result of the conspiracy: 1) MVSC's market share growth in California slowed as MVSC lost dealership customers who declined to use its application because MVSC lacked access to automated integration through certified integration programs or independent data integrators; 2) MVSC's entry into Illinois was delayed because it did not have a viable point-of-sale integration solution ███████████████; 3) MVSC's entry into Virginia was also delayed because it did not have a viable point-of-sale integration solution ██████████████; 4) MVSC's entry into Wisconsin was blocked because it lacked viable data access; and 5) MVSC incurred substantial costs to develop and maintain workaround solutions to mitigate the lack of data access.

### A. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in California

A reasonable jury could find that Defendants' conspiracy has caused MVSC to lose customers and profits in California. Although MVSC has been able to continue to provide EVR services to CDK and Reynolds dealers in California using manual workarounds, these workarounds, as noted, are inferior to automated integration because they require more steps and effort and pose a greater risk of error. PJ SAF 111. And there is evidence that MVSC's lack of automated integration was a material factor in the loss of California customers. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (causation requires that the conduct was a substantial or materially contributing factor in producing that injury).



. PJ SAF 112; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶ 12-16 ████████████ *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 30-38 █████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ PJ SAF 112; Ho Ex. 79, Email from

J. Nemelka to S. Jackley and T. Fricker, ████████████████████████ (12/11/18). ████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████ Ho Ex. 410, MVSC_MDL_0052582.

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████, *see* PJ SAF 56-57, 60:



███████████████████████████████████████████

██████ PJ SAF 112; Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 89-91 & Ex. D.9.

Reynolds's argument (at 25-26) that MVSC suffered no harm in California based on

MVSC's relative success there fails because a reasonable jury could conclude from the evidence,

including Mr. Klein's expert opinion, that MVSC would have fared substantially better in the absence of the conspiracy. Indeed, the relevant inquiry is not whether MVSC has grown in market share in absolute terms, but what its growth would have been but for the anticompetitive conduct.[12] *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 788-90 (6th Cir. 2002) (rejecting argument that plaintiff failed to show harm when its market share increased over the period because the relevant inquiry is what its growth would have been but for the unlawful conduct).

### B. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Illinois

A reasonable jury could also infer that, in addition to stifling its growth in California, the conspiracy was a material factor hampering MVSC's ability to expand into point-of-sale states for several years because MVSC lacked the technological capacity to do so. Illinois was one of those states. ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████ PJ SAF 113. ████████████████████████

████████████████████ *Id.* ████████████████████████████

████████████████████████████████████████████

████████████████████████. *Id.* 114; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 21 Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 41. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ PJ SAF 114. ████████

---

[12] The two cases upon which Reynolds relies are inapt. *See King v. Idaho Funeral Ass'n*, 862 F.2d 744, 746 (9th Cir. 1988); *Peerless Heater Co. v. Mestek, Inc.*, 2000 WL 637082, at *8 (E.D. Pa. May 11, 2000). In neither case did the plaintiffs argue or present evidence showing that their market share or sales would have grown more but for the anticompetitive conduct.



███████████████████████████████████████████████████████. *Id.*

PJ SAF 114; Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶ 80. ███████████

███████████████████████ *Id.*

███████████████████████████████████████████████. PJ SAF 114; Caseria Ex. 5 (Dkt. 957-5), Klein Reply

Report ¶ 76. ████████████████████████████████

████████████████████████████████ PJ SAF 114; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 20.[13]

_____

[13] ████████████████████████████████████████

████████████████████████████████████ Resp. to MSUF 75.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

### C. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Virginia

A reasonable jury could conclude that the harm that MVSC suffered in Virginia, another point-of-sale state, was similar to the harm it suffered in Illinois: MVSC was harmed because it lacked the technological capacity to expand operations in the state sooner. ████████████████

████████████████████████████████████████ PJ SAF 115.

███████████████████████████████████████████████████

██████████████████████ PJ SAF 116; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 21. ████

███████████████████████████████████████████████████

████████████████████████████████████████████████[14]

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ PJ SAF 116;[15] ████████████████████████████████

███████████████████████████████████████████████████

---

[14] ████████████████████████████████████████████████

███████████ Resp. to MSUF 64. ████████████████████

*E.g.*, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir. 1998) ("Since *Jefferson Parish* no court has inferred substantial market power from a market share below 30 percent."). ████████████████████████████████████████ Resp. to MSUF 64; ████ Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 26. █████████████████████████████████████

██████████████ Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 117-19.

but-for the illegality. It thus cannot rebut MVSC's showing that Defendants' actions did cause these harms, let alone eliminate the need for a trial on this question.

### D. A Reasonable Jury Could Find that the Conspiracy Harmed MVSC in Wisconsin

Finally, a reasonable jury could infer that Defendants' conspiracy was a substantial factor in preventing MVSC from entering Wisconsin. ████████████████████████████████ ████████████████████████████████████████████████████████. PJ SAF 117. But the evidence shows that, despite these efforts, Defendants' conspiracy impeded MVSC's ability to enter the state for two primary reasons. ████████████████████████ ██████████████████████████████ PJ SAF 118; Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 29, 49. ████████████████████████

████████████████████████████████████████

██████████████████ PJ SAF 118; Ho Ex. 134, PX 555 at CDK-0236501.003 ████████ ████████████████████████████████████████ Ho Ex. 380, CVR-0313979 at -3980 ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 19.

Reynolds's argument that a 2017 Wisconsin DMV letter establishes that other factors were the sole cause of MVSC's inability to compete reads far too much into the document at issue. The comment by one state official three years after MVSC's initial application that "the department was not accepting new vendors" refers to the fact that MVSC (and other applicants) were denied entrance – a fact that no party disputes in this case. The letter does not say (as Reynolds contends)

*why* the state denied MVSC's entry.  Nor does it indicate that the state had a blanket policy in 2014 and 2015 barring any new EVR providers from entering.  ████████████████

████████████████████████████████████

████████████████  PJ SAF 117; *e.g.*, Ho Ex. 393, MVSC_MDL_0001908 at -1936.  █

████████████████████████████████████

████████████████████████████████████

Reynolds's other attempt (at 17-19) to defeat causation by arguing that any marketing or lobbying by Defendants was lawful under the *Noerr-Pennington* doctrine is also misguided.  Here, the problem is not whatever lobbying efforts Defendants undertook, but their unlawful marketplace conduct.  Evidence that CVR relied on its exclusive access to data in its marketing efforts, including through lobbying, demonstrates that such access was critical and that Defendants' denial of that access affected MVSC's ability to obtain regulatory approval.  PJ SAF 118.  *Noerr-Pennington* does not immunize engaging in unlawful conduct – such as boycotting a competitor's access to a crucial input – as a means to achieve a desired legislative or regulatory end.  *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424-25 (1990).

### E.    It Is Undisputed that MVSC Incurred Costs to Develop and Maintain Manual Workarounds for Data Access

Beyond the harm to MVSC in the relevant state markets, it is undisputed that MVSC incurred costs to develop manual workarounds as a result of its lack of access to certified integration or data integrators.  And whether or not "MVSC's [mitigation] efforts are successful, [its] reasonable expenditures in pursuing them are recoverable."  ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 101 (3d ed. 2017) (citing cases).

████████████████████████████████████

████████████████████  *See* PJ SAF 94, 111, 119; Ho Ex.

461, 8/26/19 Nemelka Decl. ¶ 7. 

███████████████████████████████████████████████████

████████ MSUF 18; *see also* PJ SAF 119; Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 10. ████

███████████████████████████████████████████████████

█████████████████████████████████ PJ SAF 119. ████████████████

███████████████████████████████████████████████████

█████████ *Id.* ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ *Id.*; Caseria Ex. 4 (Dkt. 957-4), Klein

Report ¶¶ 132-135 (█████████████████████████████████████

████████████ At minimum, it is undisputed that MVSC suffered harm in the form of

mitigation costs as a result of the conspiracy – the only triable issue concerns its extent.

## III.    MVSC HAS AMPLE EVIDENCE OF ANTITRUST INJURY

### A.    A Reasonable Jury Could Conclude that MVSC Suffered Antitrust Injury

A reasonable jury could conclude that MVSC's harm constituted antitrust injury because

its injuries flowed directly from the unlawful aspects of CDK's and Reynolds's agreement.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Defendants' conspiracy

was designed to preserve their market power by denying potential competitors a necessary input

to the provision of EVR service.  MVSC was a target of the conspiracy and suffered harm because

it was unable to compete as effectively as a result of Defendants' conduct.  No more is required to

establish antitrust injury.  *See Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning

Ass'n*, 830 F.2d 1374, 1382 (7th Cir. 1987).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████. Reynolds's other contention (at 34)

that there was no antitrust injury because Reynolds had no obligation to deal with MVSC on

favorable terms confuses unilateral refusals to deal with concerted refusals to deal.[16]  Whether or

not Reynolds has an independent obligation to provide MVSC access to data through RCI, it still

may not agree with CDK not to do so.  *See Klor's*, 359 U.S. at 209-11.

### B.    A Reasonable Jury Could Find That There Has Been Harm to Competition

A reasonable jury could also find harm to competition due to reduction in consumer choice,

reduction in product quality, and stifling of innovation in the relevant EVR markets.  There is

ample evidence that Defendants' conspiracy has reduced consumer choice. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████  PJ SAF 114, Dorris Ex. 151 (Dkt. 977-153), Israel Report ¶¶ 188, 191.  In California,

moreover, there is evidence that MVSC has lost customers it would have otherwise had but for its

lack of certified or automated access to data.  PJ SAF 112.  By depriving MVSC of access to data,

Defendants have deprived many dealers of their preferred choice of EVR provider.  *Id.*, Dorris Ex.

151 (Dkt. 977-153), Israel Report ¶ 192 ████████████████████████████████████

█████████████████████████████████████████

There is also sufficient evidence that CDK and Reynolds have used denial of data access

as a means of propping up CVR's inferior product – ████████████████████████████████

---

[16] Both of the cases upon which Reynolds relies for this argument – *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009) and *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) – addressed claims of unilateral refusals to deal.

████████████████████████████████████████████████. PJ SAF 104.

MVSC has had to expend significant resources responding to Defendants' anticompetitive

conduct, particularly with respect to developing workarounds for data access. *Id.* 119. That, in

turn, has dampened innovation in the relevant markets because these are resources MVSC would

have spent improving its own product offering. *Id.*; Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶

28, 36; Ho Ex. 461, 8/29/19 Nemelka Decl. ¶¶ 10, 20. █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

PJ SAF 119; Ho Ex. 59, Israel Tr. 592:6-16; *see also id.* 599:20-600:1.

Reynolds nevertheless relies again (at 33-34) on MVSC's market share in California to try

to defeat any claim of harm. But, as noted, growth in market share is not dispositive: harm to

competition may still occur if consumer choice or product quality has been reduced. *Conwood

Co.*, 290 F.3d at 789. Reynolds's arguments about MVSC's growth in California thus, at most,

create a material dispute of fact with respect to harm to competition in that market.[17]

### C. MVSC's Use of Independent Data Integrators Does Not Negate Antitrust Injury

Reynolds's final attempt to undermine antitrust injury by pointing to MVSC's use of data

integrators does not advance its cause. To start, the premise of the argument assumes too much.

MVSC does not simply allege antitrust injury based on its inability to use data integrators for data

access; MVSC also alleges that it was harmed by a group boycott conspiracy to deny it membership

in CDK's and Reynolds's respective certified access programs. *E.g.*, SAC ¶¶ 68, 164. Reynolds,

---

[17] Reynolds also suggests vaguely (at 33) that there has been increased competition in a few different EVR markets nationally. As a preliminary matter, the state of competition in EVR markets outside of California, Illinois, Wisconsin, and Virginia is irrelevant. And in any event, the evidence upon which Reynolds relies for its vague assertion of increased EVR competition does not establish that proposition and is based largely upon inadmissible hearsay. *See* Resp. to MSUF 39, 62, 79.

of course, does not argue that access through its own, authorized RCI program or through CDK's 3PA program would violate any law. In any event, Reynolds has not come close to showing that access by all independent data integrators, at all times, was unlawful. And there is a material factual dispute about whether the denial of access was an aspect of Defendants' anticompetitive conduct; Defendants can hardly turn that antitrust violation into a defense.

## IV.   MVSC HAS PROFFERED PROOF OF DAMAGES

As noted, MVSC has proffered the expert testimony of Gordon Klein on the issue of damages. Mr. Klein measured MVSC's lost profits due to the interference with MVSC's business from the conspiracy between Reynolds and CDK to deny MVSC access to data, and excluded other factors that might have explained MVSC's damages. *See* PJ SAF 112-19; Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 12-17, 136-140. Mr. Klein's opinions measuring MVSC's damages in California, Illinois, Virginia, and Wisconsin are reliable and admissible for the reasons explained in MVSC's Opposition to Reynolds's Motion to Exclude Gordon Klein's Testimony, Dkt. 1009. Reynolds's arguments to the contrary (at 36-37) merely repeat meritless arguments in its *Daubert* motion and should be rejected as explained in MVSC's opposition to that motion.

## V.   MVSC'S STATE LAW CLAIMS CAN PROCEED TO TRIAL

In addition to its Sherman Act claims, MVSC alleges that Reynolds violated the California Cartwright Act, the California Unfair Competition Law, and the Illinois Antitrust Act. SAC ¶¶ 245-263. Because MVSC's California and Illinois state law claims rest on the same theories as its federal antitrust claims, MVSC's state law claims must be tried to a jury as well. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999); *People ex rel. Scott v. Coll. Hills Corp.*, 91 Ill. 2d 138, 150 (1982); *Mailand v. Burckle*, 20 Cal. 3d 367, 376 (1978).

## CONCLUSION

For the foregoing reasons, Reynolds's motion for summary judgment should be denied.

Dated:  July 28, 2020

Respectfully submitted,

*/s/ Derek T. Ho* __

Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiff Motor Vehicle*
*Software Corporation*

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on July 28, 2020 I caused a true and correct copy of the foregoing **PLAINTIFF MOTOR VEHICLE SOFTWARE CORPORATION'S OPPOSITION TO DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com