**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE: DEALER MANAGEMENT
SYSTEMS ANTITRUST LITIGATION

This Document Relates To:

*Loop, LLC v. CDK Global, LLC*,
Case No. 1:18-cv-002521 (N.D. Ill.)

MDL No. 2817
Case No. 18-cv-00864

Hon. Robert M. Dow, Jr.
Magistrate Judge Jeffrey T. Gilbert

**PUBLIC-REDACTED**

**PLAINTIFF AUTOLOOP'S OPPOSITION TO
DEFENDANT CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

GLOSSARY ................................................................................................................. iv

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................ 6

    I.    CDK Is Not Entitled To Summary Judgment On AutoLoop's Damages Claim.............. 6

        A.    AutoLoop's Damages Evidence Reasonably Accounts For Alternative Causes ...... 6

            1.    Dr. Israel's Model Isolates The Effects Of The Unlawful Conduct ................. 6

            2.    Dr. Israel Accounts For Defendants' Unilateral Market Power....................... 10

        B.    CDK's Other Criticisms Of AutoLoop's Damages Evidence Must Be Resolved By The Jury ......................................................................................... 11

            1.    Dr. Israel Reliably Measured RCI Prices........................................................ 11

            2.    Dr. Israel's Quality Assumption In His Forced Switching Analysis Was Proper, And At Best, Presents A Fact Dispute ................................................. 13

            3.    AutoLoop Does Not Seek To Recover For Harm To Cox Automotive........... 15

    II.    There Are Triable Issues On Liability........................................................................ 15

CONCLUSION............................................................................................................. 15

# TABLE OF AUTHORITIES

## CASES

*Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ................................7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................6

*Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048 (W.D. Wisc. July 14, 2017) .............1

*Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019 (7th Cir. 2017) .........................................1

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
       152 F.3d 588 (7th Cir. 1998) ..........................................................................7, 11, 13, 15

*DMS Antitrust Litig., In re*, 362 F. Supp. 3d 477 (N.D. Ill. 2019) .............................................3, 4

*Flonase Antitrust Litig., In re*, 284 F.R.D. 207 (E.D. Pa. 2012) ....................................................8

*Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ...........................13

*Hyland v. HomeServices of Am., Inc.*, 2012 WL 12995647 (W.D. Ky. July 3, 2012) ...................8

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ............................................6

*MCI Comm'cns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983) .............................................6

*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015) ..........................................8

*Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346 (E.D.N.Y. 2011) .........................................14

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) .................................................13

*Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006) .........................................................14

*Senne v. Village of Palatine*, 6 F. Supp. 3d 786 (N.D. Ill 2013),
       *aff'd*, 784 F.3d 444 (7th Cir. 2015) .....................................................................................4

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ..............................................................10

*SourceOne Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667 (E.D.N.Y. May 10, 2018) ............8

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013) ......................................................10

*Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019), *appeal pending*, No. 19-3640
    (3d Cir. filed Nov. 15, 2019).....................................................................7

*Sulfuric Acid Antitrust Litig.*, *In re*, 446 F. Supp. 2d 910 (N.D. Ill. 2006).....................................6

*Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122
    (N.D. Ohio Sept. 30, 2015).....................................................................8

## OTHER MATERIAL

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*
    (3d ed. 2017).....................................................................................5

Daniel L. Rubinfeld, *Antitrust Damages* (Nov. 21, 2009)..............................................7

## GLOSSARY

| Abbreviation | Full Citation |
|---|---|
| ACOM SUF | Authenticom, Inc.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 977) |
| AL SUF | AutoLoop's Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on CDK Global LLC's Counterclaim (Dkt. 950) |
| Dealer SUF | Dealership Counter-Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on CDK Global, LLC's Counterclaims (Dkt. 968) |
| PJ RSUF | MDL Plaintiffs' Joint Response to Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment |
| PJ SAF | MDL Plaintiffs' Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment |
| Caseria Ex. | Exhibits to the Declaration of Leo D. Caseria in Support of The Reynolds and Reynolds Company's Motion for Summary Judgment and its Local Rule 56.1(a)(3) Statement of Undisputed Facts (Dkts. 957, 958, and 959) |
| Dorris AL Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff AutoLoop's Motion for Summary Judgment on CDK Global, LLC's Counterclaim (Dkt. 950-1) |
| Fenske Ex. | Exhibits to the Declaration of Daniel Fenske in Support of Defendants CDK Global, LLC's And The Reynolds And Reynolds Company's Motion For Summary Judgment (Dkt. 975) |

## INTRODUCTION

Plaintiff Loop, LLC ("AutoLoop") has ample evidence for a jury to conclude that the conspiracy between Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") harmed the putative class of software application ("app") vendors by massively increasing the data integration fees those vendors pay. Chief Judge Peterson and the Seventh Circuit credited evidence of "whopping" price increases even at the preliminary injunction stage. *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017); *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *4, 7 (W.D. Wisc. July 14, 2017).

To quantify damages, AutoLoop's expert Dr. Mark Israel uses a well-accepted "difference-in-differences" model that compares price increases for the Reynolds Certified Interface ("RCI") and CDK's Third Party Access ("3PA") to price increases for a benchmark of data integrators and does so for periods before and during the conspiracy. There is no dispute that such a model is reliable; indeed, CDK's own damages expert Dr. Kevin Murphy also uses a "difference-in-differences" model to provide an alternative calculation of damages. CDK's criticisms of Dr. Israel's model lack merit and, at most, point to disputed factual issues for resolution by the jury.

*First*, contrary to CDK's assertion, Dr. Israel's model does take reasonable steps to limit damages to the price increases caused by Defendants' conduct. His "difference-in-differences" model is designed to do that, by comparing 3PA and RCI prices, which were affected by the conspiracy, to other benchmarks that were not. Further, the reasons CDK offers for why CDK and Reynolds *might* have raised their prices even without an unlawful agreement are unsupported by any evidence, and a jury would not be required to credit CDK's speculation.

*Second*, CDK rehashes its *Daubert* argument that Dr. Israel failed to consider the possibility that CDK's and Reynolds's price increases resulted from their unilateral market power. But that argument makes no economic sense, as Dr. Israel explained. As profit-maximizing

enterprises, CDK and Reynolds would already have exercised any unilateral market power to set pre-conspiracy 3PA and RCI prices. Moreover, there is no evidence that their DMS market power increased after the conspiracy; to the contrary, the evidence shows a *reversal* in CDK's market-share gains after it agreed to stop competing with Reynolds on openness. A reasonable jury could readily reject CDK's claim that post-conspiracy price increases reflect unilateral market power.

*Third*, CDK repeats another argument from its *Daubert* motion in claiming that it was inappropriate for Dr. Israel to calculate RCI prices using average revenue per unit ("ARPU"). But Dr. Israel reasonably opined that ARPU is the appropriate measure of price because it reflects the actual amount app vendors are spending for data integration. And Dr. Israel performed a robustness check that disproves CDK's speculation that increases in ARPU could be due to vendors shifting to higher-priced integration packages rather than increases in the prices for those packages. This argument at best provides a basis for cross-examination before the jury.

*Fourth*, Dr. Israel's testimony will enable the jury to determine damages caused by "forced switching," that is, damages suffered by app vendors forced to switch from lower-priced data integrators to 3PA and RCI. Dr. Israel makes the reasonable (and conservative) assumption that vendors that used lower-priced data integrators, on average, were indifferent to any quality difference of Authenticom or SIS versus 3PA or RCI. There is ample evidence to support this assumption: many vendors including AutoLoop preferred the quality of data integrators. It is for the jury to decide whether to credit Dr. Israel's opinions based on the evidence at trial.

## BACKGROUND

**A.** AutoLoop provides apps that dealerships use to manage their retail operations. *See* AL SUF 2. Those apps need access to data stored on dealers' DMS, and AutoLoop relies on data integration services for that access. *See id.* at 7-8. Data integration services may be purchased directly from the DMS provider – for example, from CDK through its 3PA service or from

Reynolds through its RCI service – or from data integrators, companies that specialize in offering data integration services. *See* ACOM SUF 12-13, 68. 3PA and RCI are direct competitors of data integrators who provide the same or similar services. *See* PJ SAF 17.

AutoLoop historically purchased data integration services from a data integrator – Superior Integrated Solutions ("SIS") – for between $39 and $69 per month per dealer. *See* AL SUF 8; Dorris AL Ex. 1 [Dkt. 950-2] at 57:6-9. SIS provided "real-time" service (that is, SIS provided updates to apps when data was changed in the DMS) and "writeback" service (that is, SIS allowed apps to write new data into the DMS). *See* PJ SAF 29. AutoLoop was satisfied with SIS's data integration service and had no need or desire to switch to 3PA or RCI, which AutoLoop did not believe to be higher quality than SIS. *See* AL SUF 9, 13. In 2015, AutoLoop was forced to switch from SIS to RCI and 3PA because Reynolds blocked SIS's ability to provide data integration services on Reynolds's DMS and because CDK threatened to do the same with respect to its DMS. *See id.* ¶¶ 9, 14. AutoLoop's data integration fees jumped from $39 to $69 per dealer per month to approximately $700 per dealer per month for both 3PA and RCI. *See id.* ¶¶ 11, 15.

**B.** AutoLoop brought antitrust claims in this Court against CDK but not against Reynolds (with which it has an arbitration agreement). AutoLoop claims that CDK colluded with Reynolds beginning in September 2013 to stop competing based on the "openness" of their DMSs to data integrators, and, ultimately, to eliminate data integrators that competed with their respective 3PA and RCI data integration services. AutoLoop relies on the same evidence of conspiracy that is set forth in Authenticom's opposition to Defendants' summary judgment motion. *See also* Dkt. 820, at 5, 10, 13 (providing evidence of September 2013 conspiracy start date); *In re DMS Antitrust Litig.*, 362 F. Supp. 3d 477, 491-93 (N.D. Ill. 2019) (denying motion to dismiss horizontal conspiracy claim). AutoLoop also brings claims based on unlawful unilateral conduct, asserting

that CDK has unlawfully monopolized the DMS-specific market for data integration services on CDK's DMS and that CDK has imposed unlawful exclusive-dealing provisions that require app vendors to purchase all of their data integration services for CDK's DMS from CDK. *See DMS*, 362 F. Supp. 3d at 493-97 (denying motion to dismiss unilateral conduct claims).[1]

AutoLoop claims this unlawful conduct has harmed AutoLoop and other app vendors by forcing them to pay increased prices for data integration services. AutoLoop seeks to recover damages on behalf of itself and a class of software vendors who also purchased data integration services from CDK and Reynolds through 3PA and RCI.

**C.** Dr. Mark Israel – AutoLoop's expert on liability, antitrust injury, and damages – is a renowned economist, former professor at Northwestern University's Kellogg School of Management, and current head of Compass Lexecon's North American Antitrust Practice. *See* Caseria Ex. 1 [Dkt. 957-1] at Ex. A. As to liability, Dr. Israel opines that the economic and noneconomic evidence show that Defendants agreed no later than September 2013 not to compete on openness in the DMS market and to block data integrators such as Authenticom from the market. *See id.* ¶¶ 110-60, 166-71. Dr. Israel also opines that the conspiracy caused antitrust injury to app vendors in the form of higher data integration prices. *See id.* ¶¶ 173-92.

---

[1] CDK erroneously contends in a footnote (at 3 n.2) that AutoLoop has "abandoned" its argument that CDK's exclusive-dealing provisions were part of the conspiracy. AutoLoop alleged that CDK's exclusive-dealing provisions were unlawful regardless of whether they were implemented pursuant to the conspiracy. *See* Dkt. 194, Am. Compl. ¶ 186. In opposing CDK's motion to dismiss, AutoLoop argued this Court previously held the exclusive-dealing claim was plausible even if the provision was imposed unilaterally. *See* Dkt. 360, at 19. AutoLoop's assertion of one meritorious argument does not mean AutoLoop "abandoned" or "forfeited" other arguments. *See Senne v. Village of Palatine*, 6 F. Supp. 3d 786, 790 (N.D. Ill. 2013), *aff'd*, 784 F.3d 444 (7th Cir. 2015). Finally, contrary to CDK's assertion, the challenged exclusive-dealing provision is different from provisions that existed prior to the conspiracy. Before the conspiracy, the provision restricted a single application of a vendor from using a data integration service other than 3PA for that application, but after the conspiracy, the provision applied to every application of a vendor. *See* PJ RSUF 24. In any event, CDK's erroneous assertion is immaterial because, even if true, it would not affect the viability of the conspiracy claim.

Dr. Israel then uses a "difference-in-differences" model to quantify the damages suffered by AutoLoop and other app vendors. A "difference-in-differences" model examines prices for "different" products – those affected by the conspiracy and those unaffected by the conspiracy (the benchmark) – before and during the conspiracy; it is a well-recognized economic method for estimating damages. *See id.* ¶¶ 194-99; *see generally* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 123-208 (3d ed. 2017). Dr. Israel's model isolates the increase in prices due to the conspiracy as opposed to other factors that affect all products. *See* Caseria Ex. 1 [Dkt. 957-1] ¶ 194.

To calculate "overcharge" damages, Dr. Israel used SIS and Authenticom prices as the benchmark. *See id.* ¶ 198.[2] Dr. Israel's "difference-in-differences" regression was statistically significant to a high degree and resulted in an estimated $343 million in damages through 2019. *See id.* ¶¶ 200-01, 216 & tbl. 7. Dr. Israel also conducted robustness checks using "before-and-after" models that compared 3PA and RCI prices to pre-conspiracy 3PA and RCI prices and added industry control variables (software price index and auto sales). *See id.* ¶¶ 203-05. Those checks also showed high statistical significance and resulted in almost the same total damages: $364 million. *See id.* tbls. 5, 9. Dr. Israel also estimated damages for app vendors forced to switch from lower-priced data integrators to Defendants' higher-priced 3PA and RCI services, estimating class-wide "forced switching" damages of $22 million through 2019. *See id.* ¶¶ 217-20.

---

[2] Due to concerns Defendants' experts raised regarding the SIS pricing data, Dr. Israel also ran his model using only Authenticom as the benchmark. The results were nearly identical, with overcharge damages being lowered from $343 million to $336 million, and forced-switching damages being lowered from $22 million to $14 million. *See* Caseria Ex. 2 [Dkt. 957-2] ¶¶ 190-91 & tbls. 4-6.

**LEGAL STANDARD**

CDK bears the burden to show that – viewing the facts in the light most favorable to AutoLoop and drawing all reasonable inferences in AutoLoop's favor – no reasonable jury could find damages. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under settled antitrust law, "the *amount* of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work." *MCI Comm'cns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983); *see In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 924 (N.D. Ill. 2006) (standard is "reasonable degree of certainty."). That rule stems from the reality that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation" and from "the principle . . . that it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (internal quotation marks omitted).

**ARGUMENT**

**I.     CDK Is Not Entitled To Summary Judgment On AutoLoop's Damages Claim**

**A.     AutoLoop's Damages Evidence Reasonably Accounts For Alternative Causes**

CDK argues that AutoLoop's damages improperly include price increases that CDK and Reynolds would have imposed in a "but for" world. Dr. Israel has responded to that argument at length, and CDK's contrary position raises at best a credibility issue for the jury to resolve. CDK's arguments are also unpersuasive in light of the record evidence.

**1.     Dr. Israel's Model Isolates The Effects Of The Unlawful Conduct**

Dr. Israel's "difference-in-differences" model isolates price increases due to the Defendants' unlawful conduct by comparing 3PA and RCI prices to benchmark prices of SIS and Authenticom. *See* Caseria Ex. 1 [Dkt. 957-1] ¶ 194 (model "controls for factors influencing all

products and measures the impact of the factor of interest [the conspiracy] on the affected product [3PA and RCI]").  The model counts as damages only price increases for 3PA and RCI that exceed price increases for the benchmark (which would have been subject to the same market forces as 3PA and RCI).  *See id.* ¶ 196.  Thus, by design, Dr. Israel's model *does* isolate the damages caused by Defendants' unlawful conduct, contrary to CDK's claim (at 6-7).  In addition, Dr. Israel conducted robustness checks using pre-conspiracy 3PA and RCI prices as the benchmark to isolate the conspiracy's effect and calculated almost the same damages.[3]

CDK hypothesizes (at 7) that CDK and Reynolds might have had distinctive reasons (not shared by other data integrators) to raise 3PA and RCI prices even apart from the conspiracy. Given the latitude afforded to plaintiffs to prove antitrust damages, that argument does not warrant summary judgment; a perfect benchmark is not required.  *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 42-43 (E.D. Pa. 2019), *appeal pending*, No. 19-3640 (3d Cir. filed Nov. 15, 2019); *Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013); *cf. Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (alternative factors "likely to have" affected prices must "be taken into account"; need "to correct for salient factors").[4]  Dr. Israel used a comparable benchmark of direct competitors (SIS and Authenticom) *and* performed robustness checks with

---

[3] CDK notes (at 6-7) that nearly all RCI and 3PA price increases are counted as "overcharge" damages.  That is because the benchmark prices did not materially change before-and-after the conspiracy, *see* Caseria Ex. 1 [Dkt. 957-1] ¶ 179, which indicates that there were no market factors (other than the conspiracy) that caused the increase in RCI and 3PA prices.  Using pre-conspiracy RCI and 3PA prices as the benchmark leads to the same result.  It is also of no import that pre-conspiracy 3PA prices were lower than RCI prices.  The prices differed because the market for data integration services was more competitive on CDK's DMS at that time.  *See id.* ¶ 126.

[4] As one of CDK's damages experts has explained, a benchmark need only be "*reasonably* comparable to the market at issue."  Daniel L. Rubinfeld, *Antitrust Damages* at 3-4 (Nov. 21, 2009), *at* https://ec.europa.eu/competition/antitrust/actionsdamages/rubinfeld.pdf (emphasis added).

- 7 -

pre-conspiracy 3PA and RCI prices. *See* Caseria Ex. 1 [Dkt. 957-1] ¶¶ 198, 200-01 & Tech. App'x at 146-59; PJ SAF 17. The rigor of Dr. Israel's analysis far exceeds the use of more imperfect benchmarks that courts routinely hold to be sufficient. *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851-52 (5th Cir. 2015) (allowing new entrant to use an established company's performance over a different period as a benchmark).[5]

Moreover, Dr. Israel gave ample reasons for rejecting CDK's hypothesis – made (at 7-8) without any evidentiary citation – that the post-conspiracy price increases were the result of "growing demand for certified integration; the increased costs of building-out certified integration programs or responding to growing cyber-security threats; and a growing need for improved or sophisticated integration services." *First*, as Dr. Israel shows, RCI and 3PA prices sharply increased around the key points of the conspiracy – around September 2013, when the conspiracy began;[6] in mid-2015, after the parties solidified the conspiracy through written agreements; and after March 2016,[7] when CDK implemented its blocking measures. CDK has presented no evidence of any increases in product quality coincident with those price increases.

---

[5] *See also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 223-24 (E.D. Pa. 2012) (benchmark from a different time period); *SourceOne Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667, at *4 (E.D.N.Y. May 10, 2018) (benchmark from a different region); *Hyland v. HomeServices of Am., Inc.*, 2012 WL 12995647, at *8-9 (W.D. Ky. July 3, 2012) (same); *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6082122, at *26 (N.D. Ohio Sept. 30, 2015).

[6] As Dr. Israel explains, it does not matter whether the price increases in the fall of 2013 were discussed in August 2013 because Reynolds could have reasonably anticipated its efforts to cooperate with CDK to more fully "close" its DMS. *See* Caseria Ex. 2 [Dkt. 957-2] ¶ 183.

[7] CDK decided to "close" its DMS by 2014, when the February 2015 agreements were being negotiated. *See* Caseria Ex. 2 [Dkt. 957-2] ¶ 144. Immediately after signing those agreements, CDK began developing the technological measures to "block" access by data integrators. *See* PJ SAF 60. CDK deployed those measures once they were ready. *See* Caseria Ex. 2 [Dkt. 957-2] ¶ 144.



Caseria Ex. 1 [Dkt. 957-1] fig. 7, at 105.

*Second*, Dr. Israel also opined that had product improvements enhanced the value of 3PA and RCI (as CDK speculates), there would have been no need for CDK and Reynolds to block data integrators to raise their prices. *See* Caseria Ex. 2 [Dkt. 957-2] ¶¶ 146-49, 176 & tbl. 3. *Third*, as Dr. Israel notes, a jury could reasonably conclude from the evidence that these supposed quality improvements either did not exist or were not valued by app vendors, and thus, had no effect on 3PA and RCI prices. *See id.* ¶¶ 150-54, 159-68. AutoLoop and other vendors, for example, did not believe that RCI or 3PA provided any quality or security improvements; nor did "certification" add additional value. *See* PJ SAF 18, 47, 75, 78, 82, 122-26; AL SUF 13.[8]

---

[8] SIS and Authenticom provided additional security features and more sophisticated integration yet did not raise prices. *See* ACOM SUF 23, 25-26, 30, 33-41 (dealer control and transparency); PJ SAF 18 (same); *id.* at 29 (cyber liability insurance); *id.* (near real-time and writeback service). Further, contrary to CDK's claim (at 7), if there was demand for "certified integration" – vetting of application vendors using the data – independent data integrators also could have offered that service; CDK presents no evidence to the contrary.

Ultimately, "[t]he soundness of the factual underpinnings" of Dr. Israel's analysis – here, that the price increases cannot be explained by unilateral behavior – "are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). They cannot justify summary judgment. *See also*, *e.g.*, *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766-67 (7th Cir. 2013) (disputed assumptions for the jury to resolve).

### 2. Dr. Israel Accounts For Defendants' Unilateral Market Power

**a.** For the reasons given in Plaintiffs' opposition to Defendant's *Daubert* motion to exclude Dr. Israel's testimony, *see* Dkt. 1001, at 20-23, which are incorporated by reference here, CDK's argument that Defendants' price increases can be explained by their unilateral market power makes no economic sense. In brief, as CDK concedes (at 6), CDK and Reynolds were profit-maximizing entities that would have already exercised their unilateral market power to set their 3PA and RCI prices before the conspiracy began. There is no evidence – and certainly no undisputed evidence – that CDK and Reynolds achieved greater market power (unrelated to the unlawful agreement) during the damages period. There is thus no economic basis to conclude that any price increases during that period were the product of unilateral market power.

Dr. Israel's model confirms this. His "difference-in-differences" model compares prices for 3PA and RCI against various benchmarks *before and after* the conspiracy. *See* Caseria Ex. 1 [Dkt. 957-1] ¶¶ 190-91. The model thus isolates price increases for RCI and 3PA that cannot be explained by the pre-existing RCI and 3PA prices. *See id.* ¶¶ 194-96. Because those pre-existing 3PA and RCI prices were set when CDK and Reynolds had market power, the model already accounts for CDK's and Reynolds's unilateral market power.

CDK's argument (at 8) that Dr. Israel is "hav[ing] it both ways" mischaracterizes his opinion, as Plaintiffs have addressed elsewhere. *See* Dkt. 1035, at 5-6 (Plaintiffs' *Daubert* reply brief). Dr. Israel did not opine that Defendants had the unilateral power to achieve the same price

increases as the conspiracy achieved. To the contrary, he opined that Defendants' collusive conduct caused substantial price increases to vendors. His point about unilateral conduct was that *even if* CDK's and Reynolds's conduct after September 2013 was found to be unlawful *unilateral* action rather than unlawful *collusive* action, his damages opinion would remain the same because the effects of the unlawful conduct would be the same regardless of the legal basis for liability. *See* Caseria Ex. 2 [Dkt. 957-2] ¶¶ 133-36; Fenske Ex. 322 [Dkt. 979-122] Israel Tr. 272:5-274:4.

This case is nothing like CDK's principal authority, *Marshfield Clinic*. There, the Seventh Circuit explained that the "usual way to measure damages" is "to compare prices that [the defendant] charged [the plaintiff] before and during the conspiracy," 152 F.3d at 592, which is what Dr. Israel did. But in *Marshfield Clinic*, the plaintiff's expert could not perform a before-and-after analysis because the alleged anticompetitive practices "embraced the entire period . . . in which the necessary data are obtainable." *Id.* Thus, unlike Dr. Israel, the expert in *Marshfield Clinic* was unable to account for the possibility that the defendant's prices were higher because of unilateral market power. *See id.* at 593-94.[9]

### B. CDK's Other Criticisms Of AutoLoop's Damages Evidence Must Be Resolved By The Jury

#### 1. Dr. Israel Reliably Measured RCI Prices

As in Defendants' *Daubert* motion, CDK claims that Dr. Israel has improperly used ARPU as a measure for RCI prices. For the reasons given in opposition to that motion, *see* Dkt. 1001, at 18-19, and for the reasons below, this argument at most creates a credibility issue for trial. Dr. Israel explained that ARPU – the total monthly integration fees paid by an app divided by the number of integration packages used by that app – is the appropriate measure for his damages

---

[9] To the extent CDK argues it would have caused the same harm through unilateral conduct in a "but for" world, that is foreclosed as a matter of law. *See* Dkt. 875, at 9-14 (motion to exclude testimony of Kevin Murphy).

analysis. *See* Caseria Ex. 2 [Dkt. 957-2] ¶¶ 185-86. ARPU measures the "actual marketplace prices" – the amount of data integration fees paid – and thus is the correct measure for an overcharge analysis. CDK suggests (at 13) that Dr. Israel should have analyzed Reynolds's prices for integration packages without regard to the quantity of each package purchased. As Dr. Israel explains, that makes "no sense" because the prices by themselves say nothing about how much app vendors are paying for data integration.[10]

CDK argues that the increase in ARPU may be explained by "composition effects" – a shift by apps toward more expensive integration packages rather than an increase in the prices for those packages. But because Dr. Israel calculated RCI prices *per app*,[11] composition effects would be relevant only if an app changed the mix of integration packages that it used over time. *See* Caseria Ex. 2 [Dkt. 957-2] ¶ 193. Dr. Israel hypothesized that it was unlikely that the integration needs of an app would change over time. He tested that hypothesis by using a "standard approach in economics": a "fixed weight price index" that eliminates "changes in product mix over time." *Id.* ¶ 194. He ran a correlation analysis comparing the "fixed price index" and ARPU and found that the two measures of RCI prices were nearly perfectly correlated (coefficient of 0.99). *See id.* That test disproves that composition effects accounted for the observed price increases.

CDK has noted in *Daubert* briefing (Dkt. 1028, at 7) that the high correlation coefficient means that the results of Dr. Israel's "difference-in-differences" model using ARPU and a fixed-price index are correlated but not that those two models result in the same magnitude of damages.

---

[10] Using prices as CDK suggests would undercount damages in this case. Vendors have complained that they are forced to purchase more expensive integration packages than are needed by their applications. *See* PJ SAF 76. This increases the amount that application vendors pay for data integration even though the prices remain the same.

[11] The data determined the granularity with which Dr. Israel could attribute integration fees to applications. For some application vendors like Cox Automotive, the data identified the fees for separate applications offered by that vendor. For other vendors, the data identified the fees for the vendor. *See* Caseria Ex. 1 [Dkt. 957-1] ¶ 247.

This misses the point. The purpose of that robustness check is to determine whether – as CDK speculates – there are material composition effects in the data. The robustness check excludes that possibility; accordingly, Dr. Israel did not need to take additional steps to determine how those non-existent composition effects altered damages. Nor does CDK present any economic analysis to suggest that composition effects influenced RCI prices. CDK's damages expert Dr. Murphy does not claim that Dr. Israel needed to account for composition effects. Rather, Dr. Murphy calculated an alternative damages figure using a "difference-in-differences" model *based on ARPU*, just as Dr. Israel did. *See* Fenske Ex. [Dkt. 975-76] ¶ 104. Further, the expert that raised the possibility that Dr. Israel needed to account for composition effects – Dr. Timothy Bresnahan – is not CDK's expert and has not been disclosed as an expert in the *AutoLoop* action at all.

In sum, CDK's speculation that composition effects may explain the increase in RCI prices – backed by no expert analysis and disproven by Dr. Israel – does not, as a matter of law, prevent a jury from ascertaining damages to a reasonable degree of certainty. *See supra* p. 10 (jury resolves disputes regarding the "factual underpinnings" and "assumptions" of expert testimony).[12]

### 2. Dr. Israel's Quality Assumption In His Forced Switching Analysis Was Proper, And At Best, Presents A Fact Dispute

Dr. Israel calculated "forced switching" damages for vendors who demonstrated a preference for lower-priced integrators SIS and Authenticom. In his analysis, he assumed that

---

[12] The cases on which CDK relies (at 13-14) are inapposite. Each involves a situation in which an expert performed "averaging" where (unlike here) there was reason to believe the "averaging" would affect the results and where (unlike here) the expert performed no robustness check on the appropriateness of "averaging." *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493-95 (N.D. Cal. 2008) (expert performed no robustness check and opposing expert demonstrated that, without "averaging," the results "evaporate[d]"); *Marshfield Clinic*, 152 F.3d at 594 (expert used "average price per patient" without a robustness check and despite evidence suggesting that "average price per patient" could be misleading due to defendant treating "patients who [were] sicker than average and so require[d] longer treatment"); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591-92 (N.D. Ill. 2009) (no robustness check plus evidence that "use of averages, when applied to these facts, unacceptably masks the significant variation in" the data).

these app vendors were indifferent to the quality between the SIS or Authenticom and 3PA or RCI. *See* Caseria Ex. 1 [Dkt. 957-1] ¶ 219.  For vendors that are indifferent to quality, the proper measure of "forced switching" damages is the difference in pre-conspiracy prices between SIS or Authenticom and 3PA or RCI (which is the measure Dr. Israel used).  *See id.*  For vendors that are not indifferent to quality, the damages would be higher (if the vendor preferred the quality of SIS or Authenticom) or lower (if the vendor preferred the quality of 3PA or RCI).  *See id.*

Dr. Israel's assumption was conservative.  There is abundant evidence that app vendors preferred the quality of SIS or Authenticom to 3PA or RCI.  *See* Caseria Ex. 2 [Dkt. 957-2] ¶¶ 150-54 (citing evidence).  Among other things, vendors believed SIS and Authenticom were at least as secure and that Authenticom provided them greater control over their data and visibility into who was allowed to access that data.  *See* PJ SAF 18, 47, 75; AL SUF 13.  Further, because Dr. Israel calculated "forced switching" damages only for app providers who were already predominately using SIS and Authenticom, these vendors were even more likely to either be indifferent to quality or to prefer SIS or Authenticom.  AutoLoop, for example, preferred SIS's data integration service but was nonetheless forced to switch.  *See supra* p. 3.  There is thus sufficient evidence for a reasonable jury to conclude that app vendors that were already using SIS or Authenticom – on average – preferred the quality of SIS or Authenticom to RCI or 3PA, and hence, that Dr. Israel's assumption was well-founded and even conservative.  *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("manifestly" proper for expert to "giv[e] an opinion based on factual assumptions, the validity of which are for the jury to determine"); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 376 (E.D.N.Y. 2011) (use of "conservative assumptions" are not grounds to exclude a damages analysis) (citing cases).

### 3. AutoLoop Does Not Seek To Recover For Harm To Cox Automotive

AutoLoop as putative class representative will not seek damages based on harm suffered by Cox Automotive. Dr. Israel calculates damages for each app, *see* Caseria Ex. 1 [Dkt. 957-1] tbl. 8, at 129-36, making it a simple exercise to remove damages attributable to Cox Automotive (which are nevertheless relevant to establishing competitive harm).

## II. There Are Triable Issues On Liability

CDK does not assert any unique arguments for granting summary judgment on liability as to AutoLoop. CDK acknowledges (at 16-17) that AutoLoop's antitrust claims share the same foundation as Authenticom's claims and repeats arguments that CDK and Reynolds have made for summary judgment against Authenticom. Those arguments fail for the reasons given by Authenticom. The parties also agree that, if AutoLoop's federal claims survive (which they do), so too do AutoLoop's state law claims. *See* Dkt. 969, CDK Br. 18.

Summary judgment should also be denied as to AutoLoop's market-division claim. Defendants' documents show that (1) CDK and Reynolds agreed not to compete to provide data integration services on each other's DMSs, and (2) Reynolds agreed not to compete against CDK to provide data integration services on other DMSs. *See* PJ SAF 54. That is a *per se* unlawful market division. *See Marshfield Clinic*, 152 F.3d at 591. Although this Court dismissed Cox Automotive's market-division allegations at the pleading stage, *see* Dkt. 505, at 12-13, it declined to do so as to AutoLoop, *see* Dkt. 504, at 18-19. The summary judgment evidence – in particular, of Reynolds's agreement to cede the data integration market on other DMSs to CDK – goes beyond Cox Automotive's allegations and supports a triable market-division claim.

## CONCLUSION

CDK's motion for summary judgment should be denied.

Dated:  July 28, 2020

Respectfully submitted,

/s/ Derek T. Ho
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Interim Class Counsel for the Putative*
*Vendor Class*

**CERTIFICATE OF SERVICE**

I, Derek T. Ho, an attorney, hereby certify that on July 28, 2020 I caused a true and correct copy of the foregoing **PLAINTIFF AUTOLOOP'S OPPOSITION TO DEFENDANT CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Derek T. Ho*

Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com