**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr. Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | **PUBLIC-REDACTED** |

**PLAINTIFF AUTHENTICOM, INC.'S OPPOSITION TO DEFENDANTS
CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY ............................................................................................................. iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.      THE RELEVANT AUTOMOTIVE SOFTWARE MARKETS ........................... 3

          A.     Defendants' Dominance in the Market for Dealer Management Systems ....... 3

          B.     Software Apps Markets ..................................................................................... 5

          C.     The Data Integration Markets .......................................................................... 6

          D.     Authenticom's Data Integration Services ....................................................... 7

    II.     EVIDENCE OF DEFENDANTS' CONSPIRACY .............................................. 8

          A.     CDK and Reynolds Compete Vigorously on DMS Openness (2006-2013)..... 8

          B.     CDK and Reynolds Agree Not To Compete (September 2013).................... 13

          C.     CDK and Reynolds Implement Their Agreement (2013-2014) .................... 17

          D.     Defendants' February 2015 Contracts ........................................................... 24

          E.     Defendants Admit the Existence of the Conspiracy (2015 and 2016)........... 29

          F.     Defendants' Exclusive Dealing and Price Secrecy Provisions Facilitate the Conspiracy .................................................................................................... 31

    III.    DEFENDANTS' CONSPIRACY HAS HARMED COMPETITION IN MULTIPLE MARKETS .................................................................................. 33

    IV.    DEFENDANTS' CONDUCT HAS HARMED AUTHENTICOM ..................... 38

LEGAL STANDARD................................................................................................ 39

ARGUMENT ........................................................................................................... 40

    I.      A REASONABLE JURY COULD FIND THAT CDK AND REYNOLDS ENTERED INTO A *PER SE* UNLAWFUL HORIZONTAL CONSPIRACY.... 40

     A.     Defendants' Admissions That They Conspired To Block Independent Data Integrators from Their DMSs Are Alone Enough To Defeat Summary Judgment ........................................................................................ 40

     B.     The Summary Judgment Record Contains Ample Additional Direct Evidence That Defendants Conspired............................................................. 45

     C.     Ample Evidence Would Allow a Reasonable Jury To Conclude That the Alleged Conspiracy Makes Economic Sense ................................... 51

     D.     Defendants' Agreement To Stop Competing on Openness "Merit[s] *Per Se* Treatment" ........................................................................................ 60

II.     ANTITRUST INJURY ........................................................................ 65

     A.     Defendants' Counterclaims Do Not Defeat Authenticom's Conspiracy Claim ........................................................................................................ 65

     B.     Authenticom Can Establish Antitrust Injury for Its Unilateral Claims........... 66

III.     AUTHENTICOM IS ENTITLED TO TRIAL ON ITS EXCLUSIVE DEALING AND MONOPOLIZATION CLAIMS.................................................. 67

     A.     Authenticom Has Stated an Exclusive Dealing Claim ................................... 67

         1.     A Reasonable Jury Could Find That Reynolds Has Market Power.......... 67

         2.     The Evidence Supports a Relevant Market for Data Integration Services 69

         3.     Defendants' Remaining Arguments Lack Merit....................................... 71

     B.     Authenticom Has a Triable Case on Section 2 Monopolization.................... 72

IV.     AUTHENTICOM IS ENTITLED TO TRIAL ON ITS STATE LAW CLAIMS 77

     A.     Authenticom Has Alleged a Valid Tortious Interference Claim ................... 77

         1.     Authenticom's Contracts Were (and Are) Valid ..................................... 78

         2.     Whether Defendants' Interference Was Justified Raises Questions for Trial........................................................................................................ 78

         3.     Authenticom Has Established Causation and Damages .......................... 79

V.     AUTHENTICOM HAS SUFFICIENT EVIDENCE OF DAMAGES................ 79

CONCLUSION...................................................................................... 80

# TABLE OF AUTHORITIES

**Page**

## CASES

*Air Passenger Computer Reservations Sys. Antitrust Litig.*, *In re*, 694 F. Supp. 1443 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991)................................................................76

*Am. Needle, Inc. v. New Orleans Louisiana Saints*, 385 F. Supp. 2d 687 (N.D. Ill. 2005)................................................................................................69

*Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87 (2d Cir. 2018).......................47

*Authenticom, Inc. v. CDK Global, LLC*:

    2017 WL 3017048 (W.D. Wis. July 14, 2017) ("*Authenticom I*"), *vacated*, 874 F.3d 1019 (7th Cir. 2017) ..............................................3-4, 8, 25, 26, 30, 31, 37, 38, 45, 66, 71

    874 F.3d 1019 (7th Cir. 2017) ("*Authenticom II*").............................................33

*Behnke v. Hertz Corp.*, 235 N.W.2d 690 (Wis. 1975) ................................................78

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227 (C.D. Cal. 2013)................................................................................................75

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998)................................................................................................80

*Brand Name Prescription Drugs Antitrust Litig.*, *In re*, 186 F.3d 781 (7th Cir. 1999)................................................................................................43

*Briggs & Stratton Corp. v. Kohler Co.*, 405 F. Supp. 2d 986 (W.D. Wis. 2005)........................72

*Broiler Chicken Antitrust Litig.*, *In re*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................57, 58

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................................64

*Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781 (Wis. 2006)............................77, 79

*CDK Global LLC v. Brnovich*, No. 2:19-cv-04849-GMS, Dkt. 127 (D. Ariz. July 24, 2020)................................................................................................37

*Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001)..............................80

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516553 (S.D. Ohio Mar. 21, 2014), *aff'd*, 781 F.3d 264 (6th Cir. 2015) ........................................76

*Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969) ................................................71

*Datel Holdins Ltd. v. Microsoft Corp.*:

    712 F. Supp. 2d 974 (N.D. Cal. 2010) ................................................................75

    2010 WL 3910344 (N.D. Cal. Oct. 4, 2010)......................................................65

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir. 1996)....................68, 75

*DMS Antitrust Litig.*, *In re*, 313 F. Supp. 3d 931 (N.D. Ill. 2018)............40, 42, 43, 49, 50, 51, 59, 60, 64, 65, 66, 69, 71, 74, 75, 76

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ..........72, 73, 74, 75, 76, 77

*Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986)............................................................78

*Fishman v. Wirtz*, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981) ........................................................66

*FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392 (1953)..................................................68

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990)..............................................62

*High Fructose Corn Syrup Antitrust Litig.*, *In re*, 295 F.3d 651 (7th Cir. 2002) .............39, 40, 41, 43, 45, 50, 51

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987) .............................77

*Interstate Circuit v. United States*, 306 U.S. 208 (1939)..............................................................58

*InterVest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp.*, 206 F. Supp. 2d 702 (E.D. Pa. 2002), *aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P.*, 740 F.3d 144 (3d Cir. 2003)..................................................................................44

*Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987) ......................................................80

*Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018)..................................39, 57

*Lee-Moore Oil Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299 (4th Cir. 1979) ..............................72

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................39, 41, 42, 54

*MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983) ............................................80

*McLaughlin Equip. Co. v. Servaas*, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004)......................71

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017)..........................................67

*Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, 2010 WL 55845 (E.D. Wis. Jan. 5, 2010).......................................................................................78

*Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345 (S.D. Fla. 1998) ............................ 74

*Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*:

    1988 WL 5038 (N.D. Ill. Jan. 19, 1988), *vacated in part*, 1988 WL 23830
    (N.D. Ill. Mar. 8, 1988) ................................................................................................ 65

    1988 WL 23830 (N.D. Ill. Mar. 8, 1988) ...................................................................... 65

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ......................................... 39, 41, 42

*Moore v. Boating Indus. Ass'ns*, 819 F.2d 693 (7th Cir. 1987) ...................................................... 64

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ......................................... 62, 63

*Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*, 2008 WL 11408997
    (C.D. Cal. Oct. 10, 2008) ............................................................................................. 75

*Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009) .................................................. 42

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) .............................................. 65, 66

*Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697 (7th Cir. 2011) ............................. 45, 47

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) ............................... 68

*Paradyne Corp. v. Wolaver*, 1986 WL 8502 (N.D. July 30, Ill. 1986) .......................................... 69

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ...................................................... 71

*Publ'n Paper Antitrust Litig.*, *In re*, 690 F.3d 51 (2d Cir. 2012) ................................................... 42

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218 (E.D. Cal. 1999) ................... 76

*Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698 (7th Cir. 2014) ......................... 79

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) ............................... 66

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ................................ 67, 72

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998) .............................................. 42, 44, 45

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) ..................... 77

*Southeastern Milk Antitrust Litigation*, *In re*, 739 F.3d 262 (6th Cir. 2014) ............................... 63

*Stamatiou v. U.S. Gypsum Co.*, 400 F. Supp. 431 (N.D. Ill. 1975) ............................................... 78

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949) .................................................. 68

*Sulfuric Acid Antitrust Litig.*, *In re*, 446 F. Supp. 2d 910 (N.D. Ill. 2006) ................................... 80

*Text Messaging Antitrust Litig.*, *In re*, 782 F.3d 867 (7th Cir. 2015) ........................................... 55

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ........................................... 57, 60, 67, 73

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291
(9th Cir. 1982) ................................................................................................... 68

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) .................................................. 64

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) .............................................. 64

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................... 68, 70

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) .................................. 61, 62

*United States v. The Mathworks, Inc.*, No. 02-888-A (E.D. Va. Mar. 17, 2003) ................ 64

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398
(2004) .................................................................................................................. 61

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) .................................... 66

*Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, *In re*, 868 F.3d 132
(3d Cir. 2017) ..................................................................................................... 65

*Wholesale Grocery Prods. Antitrust Litig.*, *In re*, 752 F.3d 728 (8th Cir. 2014) ............ 50

*Wilk v. Am. Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990) ................................................... 67

## STATUTES

Sherman Act, 15 U.S.C. § 1 *et seq.* ........................................................................ 2, 63

§ 1, 15 U.S.C. § 1 .................................................................................... 2, 50, 51, 66

§ 2, 15 U.S.C. § 2 ................................................................................................ 72, 76

## OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

Vol. VI (4th ed. 2017) .................................................................................. 41, 42

Vol. XII (3d ed. 2012) ........................................................................................ 48

2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation*
(2d ed. 2020) ................................................................................................61

Restatement (Second) of Torts (1979) ......................................................................78, 79

## GLOSSARY

**ABBREVIATIONS**

| Abbreviation | Full Citation |
|---|---|
| ACOM SUF | Authenticom, Inc.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 977) |
| AL SUF | AutoLoop's Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on CDK Global LLC's Counterclaim (Dkt. 950) |
| CC Br. | Authenticom, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 978) |
| Dealer SUF | Dealership Counter-Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on CDK Global, LLC's Counterclaims (Dkt. 968) |
| DJ SUF | Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment (Dkt. 974) |
| MSUF | The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (Dkt. 956) |
| PJ RSUF | MDL Plaintiffs' Joint Response to Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment (filed concurrently) |
| PJ SAF | MDL Plaintiffs' Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment (filed concurrently) |
| Resp. to MSUF | MVSC's Responses to The Reynolds and Reynolds Company's Statement of Undisputed Material Facts (filed concurrently) |
| Caseria Ex. | Exhibits to the Declaration of Leo D. Caseria in Support of The Reynolds and Reynolds Company's Motion for Summary Judgment and its Local Rule 56.1(a)(3) Statement of Undisputed Facts (Dkts. 957, 958, and 959) |
| Dorris Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff Authenticom, Inc.'s Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 977-1) |
| Dorris AL Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff AutoLoop's Motion for Summary Judgment on CDK Global, LLC's Counterclaim (Dkt. 950-1) |
| Emmanual Ex. | Exhibits to the Declaration of Jonathan Emmanual in Support of The Reynolds and Reynolds Company's Motion for Partial Summary Judgment (Dkt. 779-2) |

| Fenske Ex. | Exhibits to the Declaration of Daniel Fenske in Support of Defendants CDK Global, LLC's And The Reynolds And Reynolds Company's Motion For Summary Judgment (Dkt. 975) |
|---|---|
| Ho Ex. | Exhibits to the Declaration of Derek T. Ho in Support of MDL Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment (filed concurrently) |
| Wedgworth Ex. | Exhibits to the Declaration of Peggy J. Wedgworth in Support of Dealership Counter-Defendants' Motion for Summary Judgment on CDK Global, LLC's Counterclaims (Dkt. 968-1) |
| Wilkinson Ex. | Exhibits to the Declaration of Brice Wilkinson in Support of Reynolds's Motion for Partial Summary Judgment (Dkt. 779-1) |

## KEY PEOPLE

| NAME | COMPANY | TITLE |
|---|---|---|
| Don Armstrong | Motor Vehicle Software Corp. | CEO and co-founder |
| Beth Ayotte | CDK Global, LLC | Director of Marketing/3rd Party Access |
| Bob Brockman | The Reynolds and Reynolds Company | Founder, Owner, Chairman, and CEO |
| Napa Bulusu | Motor Vehicle Software Corp. | Senior Manager, Operations |
| Brian Clements | Authenticom, Inc. | Chief Operations Officer |
| Leigh Ann Conver | CDK Global, LLC | Senior Director of Strategy |
| Steve Cottrell | Authenticom, Inc. | Authenticom, Inc. Owner and CEO |
| Kevin Distelhorst | CDK Global, LLC | VP & Chief Customer Officer |
| Steve French | CDK Global, LLC | Senior Director of Client & Data Services |
| Howard Gardner | CDK Global, LLC | Vice President and Manager of Data Strategy |
| Chris Hellyer | The Reynolds and Reynolds Company | Manager, Data Services and Security |
| Scott Herbers | CDK Global, LLC | CDK Vice President of Sales, North America; CVR General Manager and CVR Board Member |
| Keith Hill | The Reynolds and Reynolds Company | Vice President of Sales |

| NAME | COMPANY | TITLE |
| --- | --- | --- |
| Mike Joza | CDK Global, LLC | Senior Director of Business Development |
| Robert N. Karp | CDK Global, LLC | President of CDK Global, LLC North America |
| Mark Kithcart | Computerized Vehicle Registration | Vice President of Marketing |
| Ronald Lamb | The Reynolds and Reynolds Company | President and former Senior Vice President of Sales |
| Jon Martin | The Reynolds and Reynolds Company | Director RCI Operations and RCI Security |
| Dan McCray | CDK Global, LLC | Vice President of 3PA Product Management |
| Christopher Morris | CDK Global, LLC | Account Director; former CVR Board Member on behalf of Reynolds |
| Joseph Nemelka | Motor Vehicle Software Corp. | President & Chief Operating Officer |
| John Roeder | Computerized Vehicle Registration | Senior Director of Sales |
| Mark Roman | CDK Global, LLC | Director of Sales |
| Robert Schaefer | The Reynolds and Reynolds Company | Vice President of OEM Relations and Data Services |
| Jonathan Strawsburg | The Reynolds and Reynolds Company | Vice President of The Reynolds and Reynolds Company; CVR Board Member |
| Malcolm Thorne | CDK Global, LLC | Executive Vice President & Chief Global Strategy Officer |
| Kevin Witt | CDK Global, LLC | Vice President of Software Engineering & Development |
| Ron Workman | CDK Global, LLC | Senior Vice President, Global Corporate Development |

## INTRODUCTION

The central factual issue in this case – and this MDL – is whether The Reynolds and Reynolds Company ("Reynolds") and CDK Global, LLC ("CDK") conspired to refrain from competing in the Dealer Management Software ("DMS") market and to block rivals from the related data integration market. As set forth in detail herein, there is overwhelming evidence that Defendants did exactly that. The jury will see dozens of documents and hear testimony from Defendants' own witnesses (and Authenticom's experts) that, prior to September 2013, CDK and Reynolds were fierce competitors. CDK was taking DMS market share from Reynolds by aggressively marketing its DMS as "open" to dealer-authorized data integrators – a feature dealers preferred. That competitive pressure forced Reynolds to preserve access by data integrators despite its preference to close its system.

But, by 2013, Reynolds found CDK's vulnerability: its lucrative data integration businesses, DMI and IntegraLink. Reynolds showed its teeth by demonstrating its technical ability to exclude DMI and IntegraLink from its DMS. That brought CDK to the table, and CDK and Reynolds quickly decided that they could do better through a ███████████████████████ than continued competition. The jury will hear evidence of the flurry of calls between ████████ ███████████████████, and the ensuing meeting between ███████████████████████ ███████████████████; Reynolds's documented demands for DMS market concessions in exchange for reopening the data spigot for DMI; CDK's agreement to back off its criticism of Reynolds's exploitative data policies at Reynolds's insistence; Reynolds's preservation of favored access for DMI while other independent integrators remained blocked on Reynolds's DMS; and a shared commitment to blocking independent integrators and Authenticom in particular. Reynolds took advantage of the agreement to escalate the fees it charged for its RCI data integration service (as competitive losses to CDK dwindled); and, after Defendants formalized their agreement in

February 2015, CDK's 3PA integration fees skyrocketed and quickly matched Reynolds's. Applications vendors – who pay integration fees – lost hundreds of millions of dollars in overcharges. And Authenticom was driven to the brink.

CDK and Reynolds ask for summary judgment on the ground that they never conspired; the conclusive proof, they say, is that neither needed the other to block independent data integrators from its own DMS. But that is a disputed proposition. Pre-conspiracy, Reynolds could not close because of CDK's competitive pressure, and CDK could not close its DMS without risking its own customer defections and jeopardizing millions in profits that its affiliated integrators (and apps) were earning by accessing Reynolds's DMS. Each company was facilitating Authenticom by using its services on the other's DMS; the two needed to cooperate to eliminate Authenticom from their respective DMS's. As CDK's Howard Gardner recognized, for both Reynolds and CDK, the alternative to cooperation was to ██████████████████ But the "fight" that Reynolds and CDK agreed to avoid was the competitive rivalry – in particular, competition on data access policies or "openness" – that the Sherman Act relies on to promote consumer welfare and that horizontal competitors may not agree to forgo without violating Section 1.

The jury will also hear that Reynolds and CDK executives (Robert Schaefer and Dan McCray) admitted to Authenticom's founder, Steve Cottrell, that Reynolds and CDK had agreed to drive Authenticom from the market. Chief Judge Peterson heard Cottrell's testimony as well as Schaefer's, and he considered Cottrell's testimony both credible and sufficient to establish Defendants' liability. So could a jury. No more is required to defeat Defendants' motion; their only response is to ask this Court to look the other way.

Defendants' remaining arguments likewise fail: Authenticom, as a competitor nearly driven from the market by a group boycott, suffered classic antitrust injury. The claim that

Authenticom's conduct violated certain statutes is both legally insufficient and incorrect; at best, these are issues for trial. And Authenticom's exclusive dealing and data-integration-service market monopolization claims are likewise supported by the evidence and expert opinion.

With no claim that their alleged conduct was lawful, Defendants' sole basis for summary judgment is that they did not do what they told Cottrell they did: *agree* to drive independent data integrators from the market by cooperating to shut down access to the dealer data stored on their DMSs. But a jury, crediting not only Defendants' own boasts but also the detailed documentary evidence of unlawful collusion, must be free to disagree. Summary judgment should be denied.

## BACKGROUND

### I.  THE RELEVANT AUTOMOTIVE SOFTWARE MARKETS

#### A.  Defendants' Dominance in the Market for Dealer Management Systems

**1.**  A Dealer Management System ("DMS") is "mission-critical" software that automates many of an automobile dealership's operations, including payroll, inventory, customer relationship management, and service. *See* ACOM SUF 1. Each of the approximately 17,000 franchised dealerships in the U.S. relies on a DMS. ACOM SUF 1, 6. For decades, CDK (known before a 2014 spin-off as ADP) and Reynolds have been the dominant providers of DMS software. They control more than 70% of the market when measured by dealership locations (known as "rooftops") and more than 90% when measured by car sales. ACOM SUF 7. Among the largest and most lucrative dealership groups – those with 10 or more rooftops – CDK and Reynolds have a ▮▮▮▮ market share. ACOM SUF 8; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 44.

The DMS includes a database, where dealers store information such as customer name and contact information, completed and pending sales, and more. ACOM SUF 3. Defendants have long publicly recognized that the dealer – not CDK or Reynolds – "owns" (that is, controls) that data. *Id.* ¶¶ 3-5; *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *1 (W.D. Wis.

July 14, 2017) ("*Authenticom I*") ("The data . . . belongs to the dealer."). Defendants' contracts likewise so provide.[1]

    2.    Defendants' dominant DMS market position is protected by high barriers to entry. New entrants must invest heavily in up-front software development costs. PJ SAF 1. They must obtain certifications and meet interoperability requirements for more than a dozen car manufacturers such as General Motors and Toyota (known as "Original Equipment Manufacturers" or "OEMs"). *Id.*; Ho Ex. 143, PX 638 at 2 ████████████

████████████████████████████████████████████████

███████████████████████████████████████

Even if they overcome those obstacles, competing DMS providers can only vie for a small percentage of dealerships because of the high switching costs. CDK and Reynolds lock up dealerships through long-term contracts (typically five years), hair-trigger extension provisions, and hefty fees for early termination. PJ RSUF 2. Even when dealerships are contractually free to switch, the practical cost is enormous: industry participants have testified that switching DMSs is akin to a "knee replacement," a "brain lobotomy," a "heart transplant," or learning a new language. PJ SAF 3-5 (switching DMS providers creates risk of data loss, requires purchasing costly new hardware, and involves many hours of employee training). Reynolds warns dealers that switching DMSs ██████████████████████████████████████████████

████ *Id.* ¶ 6.[2] As a result, the average dealer stays with CDK or Reynolds for approximately 20

---

[1] *See* Dorris Ex. 137 (Dkt. 977-139), at REYMDL00012254 (Reynolds Customer Guide) ███████████████████████████████████ Dorris Ex. 137 (Dkt. 977-19), at CDK-0000181 (CDK Master Services Agreement § 7.A) ████████████████████
████████████████████████████████████████████████

[2] In just one example, Hendrick Automotive – the sixth-largest dealership group – abandoned its effort to switch from Reynolds to CDK when the costs of conversion proved too great. *See* PJ SAF 7; Ho Ex. 295, at CDK-0728580 ████████████████████████████████████

years, and annually, █████ of dealers stay with their current DMS provider.  *Id.* ¶ 8.  New entry into the DMS market has been virtually non-existent.  Even Microsoft "gave up" due to these obstacles.  PJ SAF 9-10; Ho Ex. 8, Jezek Tr. 362:19-363:3.[3]

### B. Software Apps Markets

There are also relevant antitrust markets for software applications that dealerships use in addition to the DMS.  Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 56; *see id.* ¶ 22, tbl. 2 (listing main categories of dealer apps).  Popular applications include vehicle inventory management, customer relationship management ("CRM"), electronic vehicle registration and titling ("EVR"), scheduling service and repair appointments, lead generation and marketing, and many more.  Dorris Ex. 150 (Dkt. 977-152), Stejskal Rep. ¶ 49 (describing popular application types).  On average, dealers use 15 to 20 (or more) apps.  *Id.* (describing popular app types).

CDK and Reynolds sell their own apps – sometimes called "layered applications."  Unlike in the DMS market, Defendants do not have a dominant market position in apps, and have struggled to compete.  PJ SAF 12 (Defendants "traditionally were not first-to-market with innovative solutions").  CDK in particular has made a major push to expand its portfolio of applications.  PJ SAF 19 (CDK's 2010 acquisition of digital marketing application, Cobalt, for $400 million and 2018 acquisition of customer relationship management application, ELEADS,

---

██████████████████████████████████████████████████
███████████████████████ Ho Ex. 163, CDK-0117339 ████
██████████████████  Dorris Ex. 150 (Dkt. 977-152), Stejskal Rep. ¶ 36 (Asbury Auto Group – the nation's seventh-largest dealership group – abandoned attempt to switch from Reynolds to Dealertrack).

[3] The third largest DMS – Cox Automotive's Dealertrack – ████████████████████████████████████████████████ *See* PJ SAF 10; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶¶ 48-50.  Other DMS companies have jettisoned attempts to displace Defendants.  Ho Ex. 65, PI Hearing Tr. 2-A-50:7-14 (Alan Andreu, of Dominion Enterprises, testifying:  "[T]he barrier to entry to get in the DMS space is difficult. . . .  [W]e spent about $50 million trying to build another one and ended up flushing it.").

for $550 million).  As CDK's former CEO Brian MacDonald explained, "  PJ SAF 19; Ho Ex. 162, CDK-1190297.

### C.     The Data Integration Markets

For all these apps, dealer data stored on the DMS is a critical input.  ACOM SUF 11.  App providers (known in the industry as "vendors") historically have turned to data integrators for access to data stored on the DMS.  Acting as dealer's agent, data integrators automate the process of extracting and "writing back" dealer data stored on the DMS, giving vendors efficient access to data without the need for manual intervention by dealership employees.  ACOM SUF 13.  Data integrators also convert data from a "from a raw, unorganized state into a format that is easy for vendors to use" and perform data-enhancement services such as correcting data-entry errors, updating and verifying information (i.e., email addresses), and standardizing data from various DMS databases into a single format.  *Id.*; Dorris Ex. 5 (Dkt. 977-6), Cottrell Decl. ¶¶ 9, 25.

Until relatively recently, there was robust competition in the market for data integration services.  Beginning in the early 2000s, many independent providers – including Authenticom, Digital Motorworks ("DMI"), IntegraLink, Superior Integrated Solutions ("SIS"), Stone Eagle, Freedom Data Resources, SelectQu, ProQuotes, and InDesign, among others – competed to provide data integration services.  PJ SAF 13.  And because of that competition, prices were low: Authenticom, for example, charges $50 or less on a per-month, per-rooftop basis.  *Id.* ¶ 14.

Those low prices fostered innovation and new entry in the app market.  PJ SAF 15; Ho Ex. 19, Rubino Tr. 93:9-20

████████████ CDK acquired two of the largest data integrators – DMI (in 2002) and Integralink (in 2010) – and continues to operate them today, providing data integration services across all DMS types. ACOM SUF 14. Over two decades, no independent integrator has ever caused a security breach at any automotive dealership. PJ SAF 16.[4]

CDK and Reynolds also sell their own data integration services. In addition to DMI and Integralink, CDK provides data integration services to dealers using the CDK DMS through its "Third Party Access" ("3PA") program. PJ RSUF 23. Reynolds has an integration product – called the "Reynolds Certified Interface" ("RCI") program – for data on the Reynolds DMS. ACOM SUF 68. Defendants have long recognized that independent integrators including Authenticom are direct competitors to their own data integration services. ACOM SUF 45 (Defendants recognizing competitive threat from Authenticom's DealerVault service); PJ SAF 17; Ho Ex. 338, CDK-1313249 (████████████████████████████████████████████ ██████████████████████████ Ho Ex. 371, at CDK-2931056.005 (██████████████████████ ██████.

### D. Authenticom's Data Integration Services

Authenticom, based in La Crosse, Wisconsin, was founded in 2002 by the entrepreneur Steve Cottrell. ACOM SUF 19. From modest beginnings, Authenticom grew to 120 employees, *id.* ¶ 20, and at one time served nearly 500 software vendors and was a trusted business partner of 15,000 dealerships (some 90% of dealerships in the United States), *id.* ¶ 22. On July 2, 2015, President Obama visited La Crosse and, with Mr. Cottrell seated a few feet away in the gallery, hailed Authenticom as "one of America's fastest growing private companies." *Id.* ¶ 21 (speech available at www.youtube.com/watch?v=Bfzu9kd5HU8). President Obama said:

---

[4] ACOM SUF 113 (Authenticom has never had a data breach); PJ SAF 17 (same for SIS, DMI and Integralink, Stone Eagle, SelectQu, and InDesign).

So Steve Cottrell lives right here in La Crosse. . . . In 2002 he started a small business out of his house, to help manage data for car companies and dealerships. By 2007, he employed a handful of people. Then he was hit with a double whammy: the recession came and the auto industry almost went belly up. . . . During the worst years of the recession, Steve invested in new people, new technology, decided to double down, was absolutely confident his business model was right. As the auto industry came roaring back, things began booming. Since 2007, Steve's revenue is up 1,000 percent. His company Authenticom has gone from 18 employees to more than 120. So, this business that began in Steve's son's old bedroom is now one of America's fastest growing private companies based in a restored historic building right in downtown La Crosse.

Authenticom's primary product is DealerVault, a cloud-based platform that "allows dealers to monitor and control the data provided from its DMS to the vendors that it uses." *Authenticom*, 2017 WL 3017048 at *2. DealerVault was the first dealer-operated data integration platform in the industry, lauded by dealers as the "best product in its market space." ACOM SUF 30, 39. Through DealerVault, dealers can control the exact data that Authenticom provides to specific vendors on the dealer's behalf. ACOM SUF 32-44. As Chief Judge Peterson found after the *Authenticom* preliminary injunction hearing, DealerVault "has already won acceptance in the market" and "is popular with dealers, who generally feel strongly that because they own their data, they should be able to control and monitor its use." *Authenticom I*, 2017 WL 3017048 at *2, *10.[5]

## II.     EVIDENCE OF DEFENDANTS′ CONSPIRACY

### A.     CDK and Reynolds Compete Vigorously on DMS Openness (2006-2013)

For many years, CDK and Reynolds permitted dealerships to use data integrators to obtain dealer data on their DMSs. Beginning in 2006, Reynolds – but not CDK – started restricting dealerships' ability to use third parties to obtain dealer data. PJ RSUF 81. Reynolds's change

---

[5] Unlike DealerVault, Defendants' integration services do not give dealers transparency and control over the flow of their data. PJ SAF 18. Nor do Defendants offer the data standardization and cleansing services that Authenticom provides as a matter of course. *Id.* Indeed, some vendors pay (at greatly inflated rates) to receive the data from CDK and Reynolds in a raw and unorganized state and then have to send it to Authenticom for data enhancement services to put the data into a useable format. *Id.*

began when it was acquired by Bob Brockman, who owned another DMS provider, UCS, which had historically restricted third-party access.  PJ SAF 22; Ho Ex. 22, Whitworth Tr. 299:17-21.  After the acquisition, Reynolds – at the time, the largest DMS provider – began publicly to criticize the use of data integrators.  ACOM SUF 67.

Reynolds's change triggered a period of competition between CDK and Reynolds regarding "openness" – dealers' ability to use data integrators – that began in 2006 and ended when CDK and Reynolds agreed to stop competing in late 2013.  ACOM SUF 72-77; PJ SAF 22-26; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶¶ 11-12, 119-131 (describing "competition in openness" between CDK and Reynolds).  In response to Reynolds's new policy against access by dealer-authorized data integrators, CDK aggressively marketed its DMS as superior to Reynolds because it was open.  ACOM SUF 72; PJ SAF 23.

Reynolds quickly tried to get CDK to back off that competitive threat, but its initial attempt failed.  ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████  But CDK refused, and instead touted its open DMS to dealerships.  ACOM SUF 73; Dorris Ex. 84 (Dkt. 977-86), PX 933 (Anenen describing CDK's "clear difference in philosophy with Reynolds": "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it when in fact it's really the data belonging to the dealer.").  CDK also criticized Reynolds's justification for its closed policy – the supposed security risks posed by data integrators – ██████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████  ACOM SUF 74.

In early 2007, to enhance its competitive position vis-à-vis Reynolds, CDK joined Open Secure Access, a coalition of "DMS companies that support openness."  ACOM SUF 74-76; Dorris Ex. 131 (Dkt. 977-133), at CDK-3122863 (Anenen telling Dealer Magazine that "the principles that is has endorsed are exactly the same principles that we hold near and dear to our own business philosophy:  that the dealership fundamentally owns the data in the DMS and should control who access their data and how it's used.").  Reynolds was not a member of the coalition.  ACOM SUF 76; *see* Dorris Ex. 87 (Dkt. 977-89)  Internally, CDK noted that joining Open Secure Access was

██████████████████████████████████████████████████████████████████████████

████████████████████████████████  *Id.*; Dorris Ex. 127 (Dkt. 977-129), at CDK-3120854.

From 2006 through June 2013, CDK vigorously marketed the superiority of its open DMS as compared to Reynolds's more restrictive system.  CDK's executives publicly touted the openness of its DMS, ACOM SUF 73, repeatedly highlighting the openness of its DMS at the annual National Automobile Dealers Association ("NADA") conference.  Ahead of the 2012 NADA conference, CDK noted its open stance ██████████████████████ and vowed not to disrupt independent integrators █████████████████████████████████

████████  PJ SAF 22; Ho Ex. 353, at CDK-1867793.021.  At the 2013 NADA convention, CDK reiterated that ████████████████████████████████████████████████████████████████████

██████████████████████████████  *Id.*; Ho Ex. 175, PX 875 at CDK-0974989.  Alan Andreu, of the software vendor Dominion Enterprises, testified that he had a conversation at the 2013 NADA convention with CDK executive Kevin Distelhorst, where the two of them "threw stones" at Reynolds over their closed stance and increasing data integration charges.  *Id.*; Ho Ex. 66, *CDK*

- 10 -

*v. Brnovich* PI Hearing Tr. 359-360.  CDK maintained this open policy until at least June 2013.

*Id.*; Ho Ex. 318, at CDK-0847065.002) ███████████████████████████

██████████████████████████████████ Ho Ex. 177, PX 878, at CDK-1524404.006 (August

5, 2013) ███████████████████████████████████████████████████████████

███████████████████████████████████

    CDK's aggressive marketing of its open DMS was successful:  between 2006 and 2013,

CDK overtook Reynolds as the nation's largest DMS provider.  PJ SAF 23; Dorris Ex. 70 (Dkt.

977-72), at CDK-0244310.002 (showing CDK's rise and Reynolds's fall in DMS share). ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ PJ SAF 23; Dorris Ex. 153 (Dkt. 977-155), Whinston Rep. ¶ 307.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.*; Ho Ex. 25, Witt Tr. 179:8-12.

████████████████████████████████████████████ acknowledged  (and

lamented) the competitive pressure brought to bear by CDK, ███████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ PJ SAF 25.

████████████████████████████████████████████████████████████████

█████████████ *Id.*

████████████████████████████████████████████████████████████████

████████████████ PJ SAF 26; Ho Ex. 121, PX 446, at CDK-2053727.

To stem the losses caused by competition from CDK, Reynolds was forced to ease off its attempts to restrict dealerships' use of data integrators. In 2009, for example, Reynolds began implementing technological measures intended to make access by data integrators more difficult. ACOM SUF 78-79.[6] But, as noted above, CDK was taking significant market share from Reynolds, ACOM SUF 80, and CDK repeatedly used its relationships with OEMs and Reynolds's dealership customers to apply pressure on Reynolds, PJ SAF 24; Ho Ex. 25, Witt Tr. 231:3-7

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  *Id.*; Dkt. 968-4, PX 885 at CDK-2673485.

In response to CDK's competitive threat, Reynolds engaged in widespread "whitelisting" of login credentials used by independent integrators – that is, protecting those credentials from blocking measures. ACOM SUF 69-70: PJ SAF 27. Over several years, Reynolds allowed data integrators, including Authenticom and CDK's data integration companies (DMI and IntegraLink), to use more than ████ login credentials to access the Reynolds DMS on behalf of large dealership customers ██████████████████████████████ OEMs, and important vendors ████████████. ACOM SUF 70; PJ SAF 27. ████████████████████

---

[6] Reynolds's early technological blocking measures from 2009 to 2013 were ████████████ *id.* ¶ 80, and ineffective at preventing independent integrators from accessing Reynolds's dealers' data on the dealers' behalf, *id.* ¶ 79; *see also* PJ SAF 26.

███████████████████████████████████████████████████████████
███████████████████████████████████████████. PJ SAF 28.

CDK and Reynolds's competition on openness in the DMS market led to vibrant competition in the data integration market. Numerous data integrators, including Authenticom, CDK's data integration subsidiaries (DMI and IntegraLink), SIS, SelectQu, and others, competed to provide data integration for CDK and Reynolds dealership customers. Authenticom unveiled its DealerVault platform in 2013 to position itself as the most dealer-friendly data integrator in the industry. ACOM SUF 30. Other integrators touted their real-time and write-back functionality, among other service features. PJ SAF 29; Ho Ex. 244, PX 1284 at SIS DMS 0002391 (██████

██████████████████████████████████████████████████████████

██████████

CDK's open stance on data access in the DMS market also aided its own data integration businesses. CDK's revenues and profits from DMI ████████████ from 2010 to 2012, from ████

████ to ████████, with profit margins reaching ████. PJ SAF 31, CDK calculated that DMI provided ████ of all independent data integration on the Reynolds system, ACOM SUF 48, and all ████████████████████████ used DMI for data integration services, PJ SAF 31. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████. *Id.*; Ho Ex. 176, PX 877 at CDK-0771481 ████

██████████████████████████████████████████████████████████

████████████████████████████████████████

**B.** **CDK and Reynolds Agree Not To Compete (September 2013)**

**1.** By 2013, CDK and Reynolds were in the sixth year of their competitive struggle regarding DMS openness. Reynolds wanted to close its system further but could not do so as long as CDK was marketing the benefits of openness and sowing dissatisfaction with Reynolds's closed

DMS policy among dealership customers.  PJ SAF 26; Ho Ex. 119, PX 444 at CDK-2462264

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

CDK's competitive stance helped it gain market share in the DMS market, but left its lucrative data integration businesses – DMI and IntegraLink – and growing portfolio of applications vulnerable to Reynolds's unpredictable blocking efforts.

The events of August 2013 illustrate the state of competition between the two DMS companies prior to their conspiracy.  Several months after it targeted Authenticom and SIS with a "major lock out initiative," Reynolds began blocking DMI's access to the Reynolds DMS.  PJ RSUF 85.  CDK responded to the August 2013 blocking with competitive counter-punches: ████

████████████████████████████████████████████████████████████

████████████████████████████████  In conversations with Reynolds dealers, CDK's sales staff attacked Reynolds for their blocking efforts.  *Id.*; Ho Ex. 267, AUTH_00169148 (CDK sales rep telling a dealer that Reynolds has "been telling dealerships that this is a security measure," "but I honestly think they just want to be able to charge you (and us, and our clients, even the OEMs) for something we'd given you at no cost; the potential to turn your data into improved revenue and/or service").  And CDK used Reynolds's blocking in DMS sales efforts.  *Id.*; Ho Ex. 323, at CDK-0873420 ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

Reynolds was under increasing fire from dealers.  ████████████████████████████

████████████████████████████████████████████████████████ PJ

SAF 33; Ho Ex. 109, PX 374 ████████████████████████████████ Ho Ex. 444,

REYMDL00200844 ██████████████████████████████████████

██████████████ Ho Ex. 445, REYMDL00200976 ███████████████

██████████████████████████████████████████████████████

███████████████████████████ ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.*; Ho Ex.

448, at REYMDL00247621.



PJ SAF 34; Ho Ex. 180, PX 883, at CDK-0872981.

**2.** In September 2013, CDK and Reynolds reached an agreement to end their six-year arms race. CDK agreed to stop differentiating its DMS on the basis of its openness, thus giving Reynolds relief from the competitive pressure that cost it dearly in terms of dealership customers and DMS revenue, and that impeded it from fully closing its DMS. In return, Reynolds agreed to whitelist DMI and IntegraLink, CDK's data integration affiliates, so they could continue to provide data integration services on Reynolds's system – with a commitment by CDK to transition its data integration customers to RCI.

In August 2013 and September 2013, there were ████████████████████████

█████████████████s. PJ SAF 35. Although Defendants' witnesses professed a lack of memory as to what was discussed at those calls, *id.,* ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ A reasonable jury could readily infer that the two companies discussed these business points during their telephone discussions in August and September 2013. Defendants' executives gave no other explanation – much less a legitimate explanation – for those communications.

**Point One**: ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

As noted above, CDK was taking Reynolds DMS customers based on its open DMS, and was aggressively disparaging Reynolds's security rationale for its DMS closure as "████████████." Eliminating CDK's competing "voice" in the DMS market and getting CDK to embrace Reynolds's closed system (*i.e.*, Reynolds's "security perspective") was, as Mr. Schaefer put it, ██████████████████████ *Id.* ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ PJ SAF 25; Ho Ex. 145, PX 642 at REYMDL00260942 ████████████████████

████████████████████████████████ (emphasis added).

**Point Two**: ████████████████████████████████████████████████

████████████████████████████████████ PJ SAF 36; Fenske Ex. 61 (Dkt. 975-61), PX 948 at CDK-0802600. This would help Reynolds ██████ its behavior by transitioning away

from reliance on Authenticom so that Reynolds's actions were consistent with its ███████ ████████████████████████ *Id.*[7]  It would also help CDK ensure that its apps – which were an increasingly significant part of CDK's business, *see* PJ SAF 20 – had access to dealerships that used the Reynolds DMS.

**Point Three**: ████████████████████████████████████████████



████████████████████████████████████████████████
████████████████████████████████████████ PJ SAF 36. ████
████████████████████████████████████████████████ *See supra* p.13 (noting the ██████ in DMI's revenue between 2010 and 2012 and that DMI accounted for more than ██████ of independent data integration on the Reynolds DMS).

In sum, the September 2013 accord was a classic *quid pro quo*.  CDK agreed to abandon its competitive advantage in the DMS market by refraining from marketing its open DMS (and, as set forth below, would eventually join Reynolds in closing the DMS altogether).  In return, Reynolds would give CDK's data integration businesses guaranteed access to the Reynolds DMS, exempting them from its blocking measures against other data integrators.  And the parties would cooperate by giving each others' apps reciprocal access to their respective systems.  As Mr. Gardner later put it, CDK and Reynolds decided that cooperation was preferable to ████████ ████████████████████████ PJ SAF 52; Fenske Ex. 62 (Dkt. 975-62), PX 950.

## C.    CDK and Reynolds Implement Their Agreement (2013-2014)

After Schaefer and Gardner reached an agreement on these three points at the September 27, 2013 meeting, the two companies set out to put it into effect.  Certain aspects of the agreement

---

[7] Reynolds had begun selling DMS-agnostic apps like Naked Lime.  These applications relied on the same data integrators that Reynolds criticized, including Authenticom.  *See* ACOM SUF 114.

were implemented immediately, as explained in this section; as explained in the next section, others required the negotiation of a formal contract that was finalized in February 2015.

1. With respect to Point One, right after the September 27 meeting, ▮▮▮▮▮



PJ SAF 37. Specifically:

- ▮▮▮▮▮▮ Ho Ex. 341, at CDK-1404710 (Oct. 2, 2013) (emphasis added).

- ▮▮▮▮▮▮ Ho Ex. 306, at CDK-0803767-768. *Id.*

- ▮▮▮▮▮▮ *See* Ho Ex. 359, at CDK-2243804 ▮▮▮▮▮▮

- ▮▮▮▮▮▮ Ho Ex. 363, at CDK-2682708 (Oct. 25, 2013). ▮▮▮▮▮▮ *Id.*



- ██████████████████████████████████████████████████
████████████████████████████████████████ Dkt. 975-56, at CDK-0926512 (Nov. 4, 2013)
(emphasis added). ███████████████████████████████████████
████████████████████████████████████ *See id.*
████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ PJ SAF 37; Ho Ex. 90, PX 63 at CDK-0802387. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ PJ

SAF 37; Ho Ex. 302, at CDK-0802567-568. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████ *Id.*; Ho Ex. 364, at CDK-

2682988.

Defendants' DMS switching data confirm that CDK pulled its competitive punches against

Reynolds in the DMS market beginning in October 2013. As noted, beginning in 2006, CDK

began to take substantial market share from Reynolds by marketing its open DMS.  *See supra* p. 11.  But after 2013, that trend reversed:  ███████████████████████████████████

███████████████  PJ SAF 39; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 148.  That reversal is especially notable because Reynolds's intensification of its efforts to block dealer-authorized data integrators had caused ███████████████████████████████  *See supra* pp. 19-20; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 148; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶ 103.  ████████████████████████████████████████████████

███████████████████████████████  *See* Dorris Ex. 153 (Dkt. 977-155), Whinston Rep. ¶ 448 (Figure 28).  ████████████████████████████████████████████████

██████████████████████████████████████████████████████████  PJ SAF 39; Ho Ex. 263, PX 1708.[8]

CDK also began to support Reynolds's closed DMS policy – ████████████████████████

█████████████████████████████████.  PJ SAF 36.  At the January 2014 NADA conference, CDK presented a "Data Security Workshop" – marketed to "the entire [CDK] email database" – concerning the risks of "giv[ing] people access to your DMS" and the benefits of CDK's data integration service 3PA, which offered "secured, monitored access."  PJ SAF 40; Ho Ex. 327, at CDK-0925519.  CDK also sent letters to OEMs and dealers to "combat" independent data integrators like Authenticom.  *Id.*  CDK coordinated with Reynolds on at least one such letter, which a CDK employee described as "████████████████████████████."  *Id.*; Ho Ex. 368, at CDK-2856996.  In August 2014, CDK sent a letter to Volkswagen dealers stating that Authenticom was "not an approved vendor" and casting further doubt on Authenticom:  "We do

---

[8] When CDK "closed" its system and began disabling dealer login accounts in 2016, it too started to lose DMS customers.  *See* PJ SAF 39; Dorris Ex. 153 (Dkt. 977-155), Whinston Rep. ¶ 450 (Figure 32) ████████████████████████████████████████████████████████████

not have information about the methods being used by Authenticom to access your DMS data, nor do we have knowledge of what data is extracted by Authenticom, the third parties to whom Authenticom may deliver your data, or the intended use of your data by those third parties." *Id.*; Ho Ex. 361, at CDK-2401122.001. ███████████████████

████████████████████████████████████████████████████

*Id.*; Ho Ex. 372 at CDK-2933245. ███████████████████

████████████████████████████████████████████████████

████████████████████████████ *Id.*

2. With respect to Point Three, right after the September 2013 meeting between Schaefer and Gardner, Reynolds largely stopped blocking DMI and "whitelisted" numerous DMS user credentials used by DMI. *See* PJ SAF 38 ███████████████████

████████████████████████████████████████████████████

██████████████████████████ " *Id.*; Ho Ex. 57, Whinston Tr. 214:16-215:8; *see also* Ho Ex. 98, PX 252 at CDK-0801743 (Dec. 7, 2013) ███████████████████

███████████████████████████ Ho Ex. 100, PX 255 at CDK-2286512.003 ██

████████████████████████████████████████████████████

████████████████████████ Later, in 2014, Reynolds held off on releasing "security changes" to block independent integrators, including DMI and IntegraLink, while the parties formalized the mechanics of the ████████ agreed to in September 2013. PJ SAF 41; Ho Ex. 197, PX 951 at CDK-2238112 (Apr. 14, 2014) ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



██████████████████████████████. *Id.*; Ho Ex. 198, PX 953 at CDK-0223000 ████████████████████████████████████

CDK and Reynolds also cooperated to switch app vendors from competing data integrators to DMI as part of the "████████ On ████████████████████████████████

████████████████████████████████████████████████

████████████████████████ PJ SAF 42; Ho Ex. 298, at CDK-0800659 (Schaefer telling Mr. Gardner, "You work the deal with VG . . . and we will support it"). ████████████

████████████████████████████████████ *Id.*; Ho Ex. 358, CDK-2239477 ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ PJ SAF 43.

**3.** It was in the course of CDK's "collaborative relationship" with Reynolds that it decided to close its DMS to independent data integrators and to require dealerships to use CDK's in-house data integration service – cementing the agreement not to compete with Reynolds on openness. Although CDK officials have given contradictory testimony about exactly when CDK decided to fully close its DMS, a reasonable jury could readily infer – based on the facts set forth below – that the decision was made in early 2014, as part of the continued implementation of the September 2013 agreement with Reynolds to promote a joint position on DMS security.

CDK began investigating the possibility of blocking data integrators in the second half of 2013 – ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ PJ



SAF 44; Dorris Ex. 150 (Dkt. 975-150), at CDK-0872875; Dorris Ex. 82 (Dkt. 977-84), PX 884 at CDK-1105564 ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *Id.*; Ho Ex. 187, PX 907 at CDK-0950678; Ho Ex. 462, CDK-0767624.

By early December 2013, ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████.[9] *See* PJ SAF 44; Ho Ex. 300, at CDK-0801867; Ho Ex. 325, CDK-0912660 ████████████████████████████

████████ ████████████████████████████████████

████████████████████████████████████████████████.

PJ SAF 48; Ho Ex. 158, PX 736, Thorne Decl. ¶ 48. By August 2014 – ██████████████████

---

[9] Later, CDK officials acknowledged that its SecurityFirst program did not actually improve security and was rather ██████████████████████████ PJ SAF 47; Ho Ex. 236, PX 1247 at CDK-2666064; Ho Ex. 207, PX 988 at CDK-2667336 ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *d.*; Ho Ex. 172, PX 865 at CDK-0759288.

[10] ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████  *see supra* p. 20

███████████████████████████████████████████████████

███████  PJ SAF 44; Ho Ex. 182, at CDK-2879756.  ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

PJ SAF 49; Ho Ex. 249, PX 1394 at REYMDL00243035.

### D. Defendants' February 2015 Contracts

1.      Full implementation of the agreement required the consummation of a formal contract to give each others' apps reciprocal access to their DMSs (Point Two) and to implement the formal "soft landing" that Reynolds had promised to CDK (Point Three).  Documents indicate negotiation of that set of formal agreements began shortly after their September 27, 2013 accord.  PJ SAF 50; Dorris Ex. 152 (Dkt. 975-152) at CDK-0901363 (████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████  *Id.*; Ho Ex. 144, PX 641, at CDK-0903802

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████

Both CDK and Reynolds characterized their formal agreements as implementing the closure of their systems to data integrators, including Authenticom.  ████████████████████

██████████████████████████████████████████████████

████████████████████████  PJ SAF 51; Ho Ex. 358, at CDK-2239477 ██████████

██████████████████████████████████████████████████

- 24 -

For its part, CDK viewed "reciprocal agreements with DMS providers" as a way to "Secure the CDK DMS through eliminating opportunities for key enablers of hostile integration (R&R – Authenticom, Dominion, SelectQu)." *Id.*; Ho Ex. 272, at CDK-0001062.



PJ SAF 53; Ho Ex. 100, PX 255 at CDK-2286512.005.

*Id.*; *see also* Ho Ex. 185, PX 902 at CDK-0061312.001 (

PJ SAF 55; Ho Ex. 200, PX 960 at CDK-0189717-18.

    **2.**       On February 18, 2015, CDK and Reynolds executed three written agreements. The centerpiece was a so-called "Data Exchange Agreement," pursuant to which "CDK agreed to wind down" its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during a five-year "wind-down period." PJ RSUF 127; Dkt. 795-49, § 1.4.

In Section 4.5 of the agreement, CDK and Reynolds also "agreed that they would not assist any person that attempts to access or integrate with the other party's DMS." *Authenticom I*, 2017 WL 3017048, at *35. That meant not only that CDK and Reynolds would not provide data integration services on each other's DMSs, but also that the two companies would jointly boycott other independent integrators such as Authenticom. PJ SAF 56; Ho Ex. 154, PX 711 at CDK-0189652 ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ The agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." PJ RSUF 123. That "restriction of access" lasts forever. *Authenticom I*, 2017 WL 3017048, at *3 ("Section 4.5's terms do not expire."); PJ RSUF 123; Dkt. 795-49, § 6.1. Finally, the agreement required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds dealers." PJ RSUF 120; Dkt. 795-49, §§ 4.4, 4.1.

Two other written agreements between CDK and Reynolds granted reciprocal access for their respective layered applications into the 3PA and RCI programs. PJ RSUF 128, 131. As part of the deal, Reynolds – which had been paying low competitive prices to Authenticom for integration service – received five years of free 3PA access from CDK, thus shielding it from relatively high (and soon-to-escalate) 3PA prices. PJ RSUF 129; Dkt. 975-50, § 3(a).

███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ PJ SAF 57; Ho Ex. 186, PX 906 at CDK-2117316; Ho Ex. 92, PX 139 at CDK-1424529-530 ████████████████████████ ███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ *Id.*; Ho Ex. 203, PX 965 at CDK-14255111.008; *id.* at 511.002 ████████████████

████████████████████ Ho Ex. 154, PX 711 at CDK-0189652 ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

Both CDK and Reynolds described the February 2015 agreements as part of their overarching strategies to "secure" their DMSs by closing their systems to independent integrators.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ PJ SAF 51; Ho Ex. 10, Workman Tr. 98. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ *d.*; Ho Ex. 114, PX 391 at REYMDL00574720.

**3.** Once the agreements were signed, Defendants took immediate steps to block independent integrators. On March 16, 2015, Reynolds "locked down" its system by blocking

---

[11] On the same day as Mr. Gardner's presentation, CDK sent a letter to DMI's vendor clients with the headline: "New Agreement Between CDK Global, Reynolds and Reynolds Will Benefit You and Your Reynolds Dealers." PJ SAF 57; Ho Ex. 370, CDK-2919185. In the letter – ████████████████ *see id.* – CDK touted that "the RCI program has proven to be a successful approach to consistent, reliable exchange of data from a R&R DMS," *id.* Thereafter, CDK and Reynolds continued to closely coordinate their market messaging. *Id.*; Ho Ex. 155, PX 714 ██████████████ Ho Ex. 156, PX 717 ████████████████████████████████████ Ho Ex. 95, PX 186 ██████████████ ████████████████████████

access to non-DMI integrators, including Authenticom.  PJ SAF 58; Ho Ex. 250, PX 1402; Ho Ex.

194, PX 939 at CDK-2401731 ███████████████████████████████████████████████

████ ████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Reynolds then sent a cease-and-desist

letter – for the first time – to Authenticom and several other independent integrators.  *Id.*[12]

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████ PJ SAF 60; Ho Ex. 103, PX 268 at CDK-0395057.  On June 22,

2015, CDK announced its SecurityFirst initiative to block data integrators and substantially raise

3PA prices.  *Id.*  As CDK's economic expert noted, CDK's announcement of the SecurityFirst

initiative signaled that it "intended to secure its DMS" against independent integrators.  *Id.*; Dorris

Ex. 153 (Dkt. 977-155), Whinston Rep. ¶ 130.

Defendants actively coordinated implementation of the February 2015 agreements.  ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ PJ SAF

61; Ho Ex. 96, PX 187 at REYMDL00109651.  ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████ " *Id.*  CDK readily agreed.  *Id.* ███████████████████████████████

---

[12] ████████████████████████████████████████████████████████████
███████ PJ SAF 58; Ho Ex. 107, PX 302, ███████████████████████████████████
██████████████████████████████ *d.*; Ho Ex. 472, CDK-0911715.



*Id.*; Martin Tr. 110:6-115:20.[13]

*Id.*

Well into 2016, CDK and Reynolds continued to police compliance with their agreement.

PJ SAF 45; Ho Ex. 193, PX 938 at CDK-0817806.

*Id.*

PJ SAF 46; Ho Ex. 168, PX 819 at AUTH 00144031.

*Id.*; Ho Ex. 91, PX 125 at REYMDL00233147 (

*Id.* (emphasis added).

. PJ SAF 45, Ho Ex. 253, PX 1504 at CDK-2270358

### E. Defendants Admit the Existence of the Conspiracy (2015 and 2016)

---

[13] , PJ SAF 61; Ho Ex. 97, PX 188 at REYMDL00270151, , *id.*; Ho Ex. 3, Martin Tr. 110:6-115:20.

Employees from CDK and Reynolds have admitted to the conspiracy in two conversations with Steve Cottrell, Authenticom's CEO, who has testified to both calls multiple times under oath.

*First*, in a May 2015 phone conversation, shortly after Reynolds sent Authenticom the cease-and-desist letter, Reynolds's Bob Schaefer told Cottrell that CDK and Reynolds "had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data." PJ SAF 59; Dorris Ex. 5 (Dkt. 977-6), Cottrell Decl. ¶ 52. Schaefer said that Brockman was adamant about cutting off all data integrators. *Id.* Cottrell testified to Schaefer's call under cross-examination in the preliminary injunction hearing before Chief Judge Peterson. *Id.*; Ho Ex. 64, PI Hearing Tr. 1-A-138-139. After hearing Cottrell and Schaefer give conflicting accounts of the conversation,[14] Chief Judge Peterson found Cottrell's testimony to be more credible. *See Authenticom I*, 2017 WL 3017048, at *6.

*Second*, at the NADA convention on April 3, 2016, CDK's Dan McCray approached Cottrell at Authenticom's booth, but Cottrell was unavailable. PJ SAF 62. Cottrell later approached CDK's booth, where McCray suggested they "take a walk." *Id.* McCray led Cottrell to a secluded area down a service ramp. *Id.*[15] Once they were alone, McCray said that the "major DMS companies" – *i.e.*, CDK and Reynolds – were "working collaboratively to remove all hostile integrators from our DMS system." *Id.* To end the conversation, "Dan looked [Cottrell] in the eye and he said, 'I admire you. I admire your company.' He said, 'I'd really like to see you get something for it before I fucking destroy it.'" *Id.*

---

[14] ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████ PJ RSUF 59; Dorris Ex. 90 (Dkt. 977-92), Schaefer Decl. ¶¶ 97-98.

[15] Consistent with Mr. Cottrell's testimony, the NADA floor plan of the exhibit space for the 2016 convention shows a service ramp near CDK's booth. PJ SAF 62; Ho Ex. 165, PX 779 (NADA-2002484).

The next morning, after a restless night, Cottrell recorded detailed notes of his conversation with McCray.  PJ SAF 63; Dkt. 975-32, DX 744 at AUTH_00167028.  These notes are the only contemporaneous record of the conversation, and a former FBI computer forensics analyst has analyzed them to confirm they were created on April 4, 2016 and have not been modified since that date.  *See id.*; Ho Ex. 86, DX 1237, Halpin Rep.  Cottrell also relayed Mr. McCray's statement regarding CDK's agreement with Reynolds to multiple executives at Authenticom.  PJ SAF 64.

After observing Cottrell's live testimony about this conversation at the *Authenticom* preliminary injunction hearing, Chief Judge Peterson found Cottrell's testimony "persuasive" and "credited" it as true.  *Authenticom I*, 2017 WL 3017048, at *6.  McCray had submitted a declaration denying parts of the conversation (which had been part of an earlier declaration by Cottrell) but did not appear at the hearing to contest Cottrell's account.  *See* PJ SAF 66.

Discovery has further bolstered Cottrell's account of his conversation with McCray. Immediately after the 2016 NADA convention, CDK employees recounted



PJ SAF 65; Ho Ex. 189, PX 910 at CDK-0161698.

*Id.*; Ho Ex. 30, Battista Tr. 59:19-60:4 (

## F.  Defendants' Exclusive Dealing and Price Secrecy Provisions Facilitate the Conspiracy

Both CDK and Reynolds have imposed exclusive dealing requirement on vendors that participate in the 3PA and RCI programs.  Those provisions are both anticompetitive in their own right and have facilitated Defendants' conspiracy.

**Exclusive Dealing**:  Both CDK and Reynolds prohibit vendors that join the 3PA and RCI programs, respectively, from using any independent data integrator.  PJ SAF 67.  CDK's exclusive dealing provision never expires.  *Id.*; Ho Ex. 37, ███████████████████ ████████████████████████████████████████  When questioned on this point by Chief Judge Peterson at the *Authenticom* preliminary injunction hearing, CDK's Gardner could not offer any justification for a permanent exclusive dealing term.  *Id.*; Ho Ex. 63, PI Hearing Tr. 2-P-179:17-20 (The Court: "Do you know if there's any justification for doing that?"  Mr. Gardner: "No, and I'm not – I'm puzzled by that.").

**Price Secrecy**:  CDK and Reynolds also prohibit vendor customers from disclosing to dealers the 3PA and RCI data integration fees they pay.  PJ SAF 68; Ho Ex. 224, PX 1123 (3PA Agreement) § 8 █████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████  Defendants' price secrecy has frustrated dealers' efforts to calculate the full cost of using Defendants' DMSs, including added integration fees.  *Id.*; Ho Ex. 88, PX 24, at CDK-0569059 ██████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ████████████████████  *Id.*; Ho Ex. 271, at CDK-0000786 ██████████ ███████████████████████████████████

As with CDK, Reynolds's Schaefer acknowledged that the price secrecy provision is designed to prevent dealers from negotiating over data integration fees.  PJ SAF 68; Ho Ex. 63, PI Hearing Tr. 2-P-51:7-15 ("███████████████████████████████████

████████████████████ Reynolds has enforced its price secrecy requirement by imposing *$100,000*

penalties on at least two vendors that disclosed Reynolds's RCI pricing to dealers.  PJ SAF 69.

## III.  DEFENDANTS′ CONSPIRACY HAS HARMED COMPETITION IN MULTIPLE MARKETS

Defendants' conduct has severely harmed competition and consumers in multiple markets.

**1.       Price Increases for Data Integration**:  The two companies' agreement directly resulted in supra-competitive prices for data integration.  PJ SAF 72-73.  Vendors that need access to dealer data on the CDK and Reynolds DMSs now have no choice but to purchase data integration services at the price and terms set by CDK and Reynolds.  PJ SAF 77; Ho Ex. 106, PX 300, at CDK-0194969 (███████████████████████████████████████████ ████████████████████).  Exploiting that lack of alternatives, Defendants have massively raised 3PA and RCI prices.  Pre-conspiracy, independent integrators charged roughly $50 per-month, per-rooftop.  PJ SAF 72.  Post-conspiracy, Defendants charge upwards of *$700 or more* for the same services.  *Id.*; Ho Ex. 65, PI Hearing Tr. 2-A-57:6-9, 59:2-9, 61:13-62:21 (service lane app AutoLoop went from paying $39 to the independent integrator SIS to paying $735 to CDK and $835 to Reynolds for the same service); Ho Ex. 65, PI Hearing Tr. 2-A-30:9-15, 32:16-24, 38:24-39:3 (app vendor Dominion went from paying $30 to $35 a month to Authenticom to paying $893 to Reynolds and $457 to CDK for the same services); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017) ("*Authenticom II*") (noting evidence at the preliminary-injunction phase of "whopping" and "bloated fees" CDK and Reynolds charge vendors).

To take one example, ██████████████████████████████████████

██████████████████████████████████████████████████████████████

PJ SAF 72.  Similarly, from 2013 to 2014, ██████████████████████████████

████████████  Despite these price increases, there was no change in the quality of Defendants'

services; on the contrary, CDK has *removed* important functionality (the ability to create and

update repair orders in the service lane).  PJ SAF 81-82.  These apps are not outliers: as Workman

said, CDK raised 3PA prices ████████████████████" in conjunction with the "SecurityFirst"

initiative.  PJ SAF 72; Ho Ex. 123, PX 465 at CDK-0175731.  In his report, Plaintiffs' economist

Dr. Mark Israel demonstrated that CDK and Reynolds imposed overcharges exceeding $300

million between 2013 and 2019.  *Id.*; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 214, tbl. 6.

In contrast to CDK's and Reynolds's exorbitant fees, other DMS providers offer "certified"

integration programs for a fraction of the cost – i.e., $25 to $75 a month.  PJ SAF 78.  The quality

of these certified integration programs is equal to or better than 3PA and RCI, offering the same

bi-directional, real-time data access without artificial restrictions on data access.  *Id.*  None of these

other DMS providers blocks dealers from using independent integrators.  PJ SAF 79.

2.     **Elimination of Product Differentiation in the DMS Market**:  By agreeing not to

compete on openness, Defendants also harmed competition in the DMS market by eliminating

product differentiation that benefited consumers.  As explained above, many dealership customers

preferred CDK's open system, and CDK overtook Reynolds as the nation's leading DMS on the

basis of its open DMS.  Defendants' conspiracy deprived consumers of that choice.

3.     **Harm to Competition in Software Apps**:  CDK's and Reynolds's conduct has

also harmed competition in the market for software applications in several ways.  First, by raising

the price of data integration – a necessary input – Defendants' conspiracy drove out apps (and

prevented entry by new apps) that could not afford inflated 3PA and RCI fees.  PJ SAF 80; Dorris

Ex. 2 (Dkt. 977-3), Korp Decl. ¶¶ 4-9 (detailing harm to small vendor Open Recalls, which helps

dealerships track down car owners with unresolved safety recalls); Ho Ex. 55, Andreu Tr. 38:9-22

(Dominion Enterprises canceled its service scheduler app "because the integration fee with

Reynolds was quite literally more than the selling price of our service scheduler product").

Compounding the problem, Defendants refuse to certify smaller apps until they have a large

established client base – depriving startup apps of the data they need to innovate and expand.  PJ

SAF 85.  Second, Defendants have used their control over data integration to give superior service

and functionality to their own apps – a strategy CDK referred to as "tilting the table":



PJ SAF 81; Ho Ex. 140, PX 578, at slide 37.  CDK has stated in internal documents that its control

over dealer data is its ████████████████████████████████████████████████

████████████████████████████  PJ SAF 84; Ho Ex. 362, at CDK-2452933.002.

Defendants' "tilt the table" strategy has severely impeded vendors' ability to compete. For example, neither CDK nor Reynolds has allowed applications to automatically create and update service appointments (except for their own applications). PJ SAF 81. As a result, dealerships using competing applications are forced to manually re-key information into the DMS, resulting in a less efficient and lower quality experience. In short, apps commonly *lose* functionality when they are forced to switch from independent integrators to 3PA and RCI, despite paying astronomically higher prices. PJ SAF 82. And Defendants' inflated 3PA and RCI fees deprive vendors of resources for innovation and expansion. PJ SAF 83. MVSC's summary judgment opposition provides another example of an app harmed by Defendants' conduct.

Defendants' suppression of competition in apps helps preserve their dominance of the DMS market. As apps provide greater functionality, they reduce dealerships' dependence on the DMS – a threat CDK referred to as "disintermediation."[16] Defendants' conspiracy thus harms competition – and preserves Defendants' market dominance – across all three related markets in the automotive software ecosystem: (1) it eliminates consumer choice and preserves Defendants' monopoly power in the DMS market; (2) forecloses competition and permits Defendants to charge supracompetitive prices in the data integration market and (3) impedes competition from app providers that threaten Defendants' DMS monopoly.

*                *                *

---

[16] PJ SAF 84; Ho Ex. 328, at CDK-0948270.011 ███████████████████████

███████████████████████████████████████ Ho Ex. 137, PX 565 at CDK-1126091

███████████████████████████████ Ho

Ex. 313, at CDK-0834924 (█████████████████████████

███████████████████████████████

Ultimately, the effects of Defendants' conduct are felt every time a car buyer walks into a showroom.  As Brad Miller of NADA put it:

> [T]he biggest thing I hear from dealers [is] a frustration that they can't provide the customer experience that they want because they can't get the information back and forth, right? . . . [F]olks have to enter data nine and 10 times in the course of selling a car.  And that's crazy.
>
> I was on a panel with a gentleman in fact last year at a large dealer group who made the following point.  He said look, I go get a $4 chicken sandwich and the way I buy that is different today.  I can do it online.  I get there.  They've got an iPad. They swipe my card and my chicken sandwich is ready when I go.  They may even know what my normal order is and provide it to me.  At the same time, the way that we run customers through the service line hasn't changed in 25, 30 years and so there's an increasing frustration.  This [is] all tied to the information you have and how it gets back and forth with third parties, how it is shared, how it is stored, how do systems talk to each other.

PJ SAF 86; Ho Ex. 164, PX 778 at 2.

In response to this market failure, a number of States – including Arizona, North Carolina, Oregon, and Montana – have passed laws to prevent CDK and Reynolds from seizing control over and monopolizing access to dealer data.  Recently, following a two-day evidentiary hearing, the federal court in Arizona rejected Defendants' attempt to enjoin the Arizona Dealer Law based on a laundry list of constitutional and preemption claims (seven of which the district court dismissed outright before the hearing).  *See* Order, *CDK Global LLC v. Brnovich*, No. 2:19-cv-04849-GMS, Dkt. 127 (D. Ariz. July 24, 2020).  In so doing, Judge Snow rejected as unsupported by any evidence – just as Chief Judge Peterson had before him following the *Authenticom* evidentiary hearing – Defendants' arguments that data integrators pose security risks and cause data corruption and system performance problems.  *See id.* at 14 ("The 'history of data corruption and performance degradation caused by third-party access' that [CDK and Reynolds] describe [] is not substantiated by Plaintiffs' evidence); *id.* at 16-17 ("Plaintiffs have not pointed to a single instance of a data

breach by a third-party integrator."); *accord Authenticom I*, 2017 WL 3017048, at *2, *9 (same findings after *Authenticom* hearing).

## IV.   DEFENDANTS' CONDUCT HAS HARMED AUTHENTICOM

Defendants' conspiracy has caused severe harm to Authenticom, the conspiracy's principal target.   *See supra* pp. 24-25, 29-31.   At one point, CDK considered buying Authenticom to eliminate it as a competitor (████████████████████) and to avoid dealer anger that would result from CDK blocking Authenticom ("████████████").  PJ SAF 17; Ho Ex. 188, PX 908 at CDK-1442845.   Ultimately, CDK worked jointly with Reynolds to eliminate Authenticom. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████ PJ SAF 87; Ho Ex. 192, PX 926; Ho Ex. 122, PX 459 at CDK-0021983 ████████████████████████

████████████████████████ In another colorful exchange that indicates Defendants' targeting of Authenticom, after Cottrell gave an industry presentation on "data taxes" and "technological blockages" in January 2016, CDK officials derided him as an "old cry baby."  PJ SAF 88; Ho Ex. 105, PX 298. ████████████████

████████████████████████████████

████████████████████ *Id.*; Ho Ex. 105, PX 298 at CDK-2741409.

Defendants' joint and aggressive blocking of Authenticom's access caused "a dramatic drop-off in revenue" that put Authenticom "on the brink of going under." *Authenticom I*, 2017 WL 3017048, at *4.  After the preliminary injunction proceedings, Authenticom has survived as a shell

of its former self after laying off more than 60% of its staff effective February 2018 (bringing its 120-person workforce down to 35 employees). PJ SAF 90. Authenticom's damages expert, Catherine M. Lawton, concluded that Authenticom suffered between $115.8 million and $144.4 million in lost profits as a result of Defendants' unlawful conduct. *Id.*; Fenske Ex. 74, (Dkt. 975-74), Lawton Rep. ¶ 13(c). She showed that Authenticom saw consistent and rapid growth from its founding 2002 until 2013, *id.* ¶¶ 307-313, before "Authenticom's financial performance began to experience a marked decline in 2013 – when both its connections and revenues began to decline." *Id.* ¶ 321. In 2015, following Defendants' written agreements and aggressive actions to target Authenticom, Authenticom's revenues and connections plummeted. PJ SAF 89-90. Authenticom's revenue also fell substantially, going from $17.2 million in 2015 to $11.6 million in 2018. PJ SAF 90; Fenske Ex. 74, (Dkt. 975-74), Lawton Rep. ¶ 326.

## LEGAL STANDARD

"Antitrust plaintiffs do not face a heightened burden to defeat summary judgment." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018). Authenticom "must establish that there is a genuine issue of material fact as to whether [Defendants] entered into an illegal conspiracy that caused [it] to suffer a cognizable injury." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, if, drawing every reasonable inference in Authenticom's favor, a reasonable jury could conclude based on the evidence that Defendants reached "a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted) – here, a coordinated end to competition with respect to openness and cooperation to exclude independent integrators – the question whether Defendants in fact did so is for trial. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002).

## ARGUMENT

**I. A REASONABLE JURY COULD FIND THAT CDK AND REYNOLDS ENTERED INTO A *PER SE* UNLAWFUL HORIZONTAL CONSPIRACY**

There is more than enough evidence for a reasonable jury to conclude that Defendants conspired starting in September 2013 to end competition with respect to openness in the DMS market and to exclude independent integrators from their respective systems. The evidence supporting the existence of that conspiracy, which is a *per se* violation of the antitrust laws, includes both direct evidence (including admissions of Defendants' own executives and contemporaneous documents reflecting Defendants' agreement) and circumstantial evidence (including expert testimony regarding Defendants' motive to conspire and the evidence of hundreds of millions of dollars of consumer harm). "Maybe the defendants could convince a jury that the spin that their brief puts on the evidence is the correct one," but "there is sufficient admissible evidence in support of the hypothesis of a . . . conspiracy to prevent the grant of summary judgment to the defendants." *High Fructose*, 295 F.3d at 666.

**A. Defendants' Admissions That They Conspired To Block Independent Data Integrators from Their DMSs Are Alone Enough To Defeat Summary Judgment**

**1.** In denying Defendants' motions to dismiss, this Court held that the testimony by Authenticom's CEO, Steve Cottrell, that Defendants' own executives (Bob Schaefer of Reynolds and Dan McCray of CDK) admitted to a conspiracy to block independent data integrators would, if credited, constitute "direct evidence" of an unlawful conspiracy. *See In re DMS Antitrust Litig.*, 313 F. Supp. 3d 931, 950-51 (N.D. Ill. 2018). As the Court stated:

> These allegations straightforwardly suffice. They are, for one, direct-evidence allegations of the agreement: Taken as true, the fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement. No further inference is required. Indeed, such "admission[s] by [ ] employee[s] . . . of the conspirators" are textbook examples of adequate direct-evidence allegations.

*Id.* (alterations in original; citation omitted).  Moreover, the Court held, the conspiracy to which Cottrell testified is *per se* unlawful:

> That broader agreement is, moreover, anticompetitive.  Under established law, "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" merit per se treatment.

*Id.* at 951 (citation omitted).

Cottrell has testified under oath consistent with the allegations in the Complaint regarding his conversations with Schaefer and McCray.  *See supra* pp. 29-31.  That testimony – which must be accepted as true on a summary judgment motion – is alone enough to entitle Authenticom to a trial.  Indeed, first-hand testimony that defendants acknowledged an unlawful conspiracy is "all the proof a plaintiff needs."  *High Fructose*, 295 F.3d at 654; *see also* VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1418a, at 134 (4th ed. 2017) ("Areeda") (noting as "straightforward" evidence of an agreement "a third person['s testimony] that the alleged conspirator or one of her employees told him of the existence of such an agreement").

**2.**     Invoking *Matsushita*, Defendants spill much ink (at 17-50) on the argument that the conspiracy Defendants' executives admitted to Cottrell is implausible because Defendants had incentives to pursue the same conduct unilaterally.  But Defendants' argument fails at the threshold because *Matsushita* does not suggest that a factfinder may discount traditional evidence of conspiracy.  On the contrary, direct evidence that Defendants *did* collude necessarily "tends to exclude the possibility" they acted independently, *Monsanto*, 465 U.S. at 764 – hence the Seventh Circuit's holding in *High Fructose* that a defendant's admission is enough by itself.  Where such evidence would support a reasonable jury finding that the agreement existed, the argument that Defendants had incentives to act unilaterally cannot justify summary judgment.  *See High Fructose*, 295 F.3d at 654 ("[*i*]*n the absence of such an admission, the plaintiff must present*

- 41 -

evidence from which the existence of such an agreement can be inferred") (emphasis added).  The agreement is unlawful even if it was unnecessary, or even irrational.  *See id.* at 655 ("price-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price").

*Monsanto*, the progenitor of the tends-to-exclude principle, makes this clear.  *See Monsanto*, 465 U.S. at 765 (finding tends-to-exclude standard satisfied in light of "substantial *direct* evidence of agreements to maintain prices").  In *Matsushita*, conversely, it was only because there was no direct evidence of the alleged agreement to set predatory prices that the Court concluded that the economic implausibility of such an agreement was relevant to whether a reasonable jury could infer the conspiracy's existence.  *See* 475 U.S. at 595-96 ("The 'direct evidence' on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. . . . *That being the case*, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e).") (second emphasis added).[17]  Other Circuits have joined the Seventh Circuit in holding that the *Matsushita* framework applies only in the absence of direct evidence of a conspiracy, which exists here.[18]  *See also* VI Areeda ¶ 1413a, at 92 ("[I]n the presence of explicit evidence of an agreement the presence of an independent reason [for acting] is irrelevant.").

_____

[17] As explained below, moreover, the conspiracy alleged in *Matsushita* – an agreement to set predatorily *low* prices for television products in the U.S. while setting supracompetitive prices in Japan – is worlds away from the conspiracy alleged here, which is a classic group boycott designed to allow Defendants to "charge more for their integration services."  *DMS*, 313 F. Supp. 3d at 952.

[18] *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998) ("[T]he *Matsushita* standard only applies when the plaintiff has failed to put forth direct evidence of conspiracy."); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (collecting other cases).  The contrary statement in *Nitro Distributing, Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009), is dictum, and the "purported 'direct evidence'" there was highly tenuous.  *Id.* at 426 (vertically related firm attended a meeting at which pricing was, at most, discussed).

Defendants' contrary argument is the same one that the Court rightly rejected at the motion-to-dismiss stage. *See DMS*, 313 F. Supp. 3d at 952 (rejecting argument that "the Court should disregard the Complaint's direct-evidence (or at a minimum, highly probative) allegations of the agreement's existence"). At summary judgment, no less than at the pleading stage, Defendants' admissions are "all the proof [Authenticom] needs." *High Fructose*, 295 F.3d at 694. The question whether to credit Cottrell's testimony can only be resolved at trial.

**3.** Defendants argue (at 46) that their statements are "ambiguous" because they require the jury to make "inferences." The Court also correctly rejected that argument in denying Defendants' motion to dismiss. *See DMS*, 313 F. Supp. 3d at 951 (concluding that Defendants' admissions constitute direct evidence); *see also id.* ("Even if[,] . . . as Defendants assert, there was some ambiguity in the admissions, they are at a minimum 'highly suggestive of the existence' [of an] agreement to block Authenticom from accessing dealer data and thus out of the market."). Moreover, Defendants' arguments – which are for the jury to resolve, *see In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 788 (7th Cir. 1999) ("the interpretation of" even "ambiguous documentary evidence of collusion is for the jury") – mischaracterize Cottrell's testimony.

*First*, contrary to Defendants' representation (at 46-47), Cottrell never "concede[d]" that he did not understand there to be an agreement based on his conversation with Schaefer – rather, he confirmed that the conversation concerned "an agreement . . . between Reynolds and CDK to keep Authenticom off their respective systems." *See* PJ RSUF ¶¶ 186-187. That he did not immediately conclude that the agreement was "criminal" does not mean he thought it did not exist.

- 43 -

*See id.* Defendants may cross-examine on this basis at trial, but they cannot obtain summary judgment based on a self-serving and inaccurate portrayal of Cottrell's testimony.[19]

*Second*, the assertion that McCray did not acknowledge a conspiracy with Reynolds because Cottrell's written summary of McCray's statements does not identify Reynolds by name is a jury argument, and a weak one at that. Cottrell's notes refer to an "agree[ment]" by "[m]ost of the major DMS companies" to "effectively '[l]ock [Authenticom] and the other third parties out." That reference clearly includes Reynolds. Indeed, Cottrell testified that that was his understanding and what his notes mean. *See* PJ RSUF ¶ 190; Ho Ex. 62, PI Hearing Tr. 1-P-40:5-11 (Cottrell understood McCray's reference to the "major" DMS providers "to be Reynolds and Reynolds because there are only two. . . . His intention was clear. His statement was clear, yes."). Moreover, at the time of his conversation with McCray, Schaefer of Reynolds had already acknowledged the same agreement.

*Third*, that neither of these statements specified the date on which their conspiracy began or use the "openness" shorthand MDL Plaintiffs have adopted does not render these statements too vague to overcome summary judgment. To the contrary, even less specific threats have been held to be direct evidence. *See*, *e.g.*, *Rossi*, 156 F.3d at 468 (finding direct evidence from threat "that if I went into business that [two rivals] would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to keep me out of business"). And the rest of the direct evidence of Defendants' collusion, *see infra* Point I.B, puts any ambiguity to rest.[20]

---

[19] Nor do any supposed "inconsistencies" in Mr. Cottrell's testimony justify summary judgment. *See High Fructose*, 295 F.3d at 655 ("In deciding whether there is enough evidence of price fixing to create a jury issue, a court asked to dismiss a price-fixing suit on summary judgment must be careful to avoid three traps that the defendants in this case have cleverly laid in their brief. The first is to weigh conflicting evidence (the job of the jury) . . . .").

[20] Mr. Cottrell's account of these statements is hardly as vague as the putative "smoking gun" at issue in *InterVest Financial Services, Inc. v. S.G. Cowen Securities Corp.*, 206 F. Supp. 2d 702 (E.D. Pa.

*Fourth*, that Authenticom (mistakenly) predicted at the time that CDK's blocking efforts would fail to disrupt its business (*see* Mem. at 49) has nothing to do with whether Cottrell's testimony, if credited, is direct evidence of that conspiracy. It is, as this Court properly recognized.

*Fifth*, Defendants' attempt (at 49) to undermine Cottrell's credibility disregards black-letter summary judgment law. *See Rossi*, 156 F.3d at 468 (viewing direct evidence of conspiracy in the light most favorable to the non-movant); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("district courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations") (citation omitted). And the argument is particularly misplaced here, when Chief Judge Peterson, who heard both Cottrell and Schaefer testify live – subject to cross-examination – found that Cottrell was credible and Schaefer was not. *See Authenticom I*, 2017 WL 3017048, at *6.

### B. The Summary Judgment Record Contains Ample Additional Direct Evidence That Defendants Conspired

On top of Defendants' admissions, the record contains a mountain of additional direct evidence that Defendants expressly agreed not to compete on openness and to block independent data integrators. As detailed above, CDK and Reynolds documents show that, starting no later than September 2013, CDK agreed to stop competing in the DMS market on the basis of its open DMS and to pursue a joint strategy with Reynolds to block independent data integrators like Authenticom. In exchange, Reynolds agreed to give CDK's data integration business a "soft landing" on its DMS, giving CDK a competitive advantage over rival data integrators. And the two companies agreed to guarantee ██████████ apps access to their respective DMSs, while denying it to other rival app vendors (like MVSC). As in *High Fructose*, the record contains more

---

2002), *aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P.*, 740 F.3d 144 (3d Cir. 2003) – a memorandum merely stating that a firm took actions because of "pressure from Wall Street." *Id.* at 713.

than enough evidence for a reasonable jury to conclude by the civil preponderance standard "that there was an explicit agreement" not to compete and to exclude competitors.  *See* 295 F.3d at 661.

Defendants ignore much of the evidence set out above.  And where they address it at all, they give it their own spin, contrary to the Court's obligation to view the evidence in the light most favorable to Authenticom.  *See id.* at 655 ("combin[ing] a recital of the facts favorable to the defendants with an interpretation favorable to them of the remaining evidence," "is the character of a trial brief" rather than of a brief seeking summary judgment).

1.    **The September 2013 Agreement.**  Defendants' assertion (at 35) that "there is *no* evidence that the parties reached *any* agreement in September 2013" and that the "framework" discussed at the September 27, 2013 meeting was merely a "conversation to begin exploring negotiations over what ultimately became the 2015 Agreements" is a self-serving characterization of the evidence that  cannot be accepted at the summary judgment stage.  Far from merely "explor[ing]" future negotiations, the evidence shows that the parties already had a meeting of the minds.  ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████  PJ SAF 50.  And there is evidence the parties had already begun to implement the business points immediately after the September 27, 2013 meeting.  CDK began refraining from competition on the basis of openness in October 2013.  ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  *Supra* pp. 18-19.  Reynolds stopped blocking DMI and IntegraLink in the same time frame.  And both parties cooperated to block Authenticom and other independent data integrators in late 2013 and 2014.  A reasonable

jury could readily conclude from the evidence that CDK and Reynolds reached an explicit agreement in September 2013.[21]

Contrary to Defendants' argument (at 36), a jury would hardly be compelled to conclude that it is "implausible" that "negotiating and redlining the 2015 Agreements" took time "even though they had *already* entered into (with apparent ease) a never-mentioned, off-the-books agreement to stop competing on 'openness.' " The evidence that CDK and Reynolds changed their market behavior *before February 2015* shows that the two companies reached an express agreement well prior to the consummation of their written contracts – and a jury could so find.[22]

**2.** **Joint Market Messaging.** Though Defendants briefly argue (at 35-36) that the record evidence shows that the parties never agreed on "business point one" in the companies' September 2013 framework, there is, as set forth above, ample evidence that the parties reached agreement on this point. ██████████████████████████████████████████████████

██████ *See supra* p. 17.[23] ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████. *See* PJ SAF 50; PJ RSUF 104. And the parties implemented this agreement by CDK refraining from criticizing Reynolds's closed-access

---

[21] Defendants' observation (at 25) that Reynolds negotiated wind-down agreements with other independent integrators both overlooks the uniquely favorable treatment Reynolds gave DMI, *see* PJ RSUF 117; Dorris Ex. (Dkt. 977-160), Israel Reply Rep. ¶¶ 129-131, and is irrelevant: in none of those cases was that agreement a component of an agreement not to compete with a rival DMS provider.

[22] This case is unlike both *Omnicare,* 629 F.3d at 708, and *Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87, 111 (2d Cir. 2018): in both, contemporaneous documents reflected uncertainty about whether *the challenged agreement* would materialize, which undermined the inference that the agreement then existed. Not so here.

[23] PJ SAF 25; Ho Ex. 145, PX 642 at REYMDL00260942 ██████████████████████████ ████████████████████████████████████████████████████████

policy in the market and by the two firms started coordinating efforts to target independent data integrators for criticism.[24]

Defendants argue (at 37) that an agreement to adopt joint messaging would not support an inference of an agreement to coordinate underlying data access policies, but an agreement not to *compete* on the basis of openness is itself anticompetitive, even in the absence of an agreement to close the DMS. Such an agreement is not lawful "joint advertising," XII Areeda ¶ 2023c2, at 201 (3d ed. 2012): it is an agreement to "eliminat[e] advertising" with regard to "product quality," which "can harm competition just as much as agreements restraining advertising about price," *id.* ¶ 2023b4, at 195. Moreover, a reasonable jury could infer that – by adopting joint market messaging to advocate closed-access policies and to criticize the use of data integrators – Defendants had committed themselves to adopting common data access policies consistent with that message. Indeed, the evidence indicates that CDK's decision to close by mid-2014 came in the midst of its coordinated efforts with Reynolds to criticize Authenticom and DealerVault on the basis of data security – ██████████████████████████████████████████████ ████████████ *See supra* p. 20. And both companies understood the February 2015 agreements as cementing their agreement to close their systems. *See supra* p. 27.

**3. Preserving Friendly Negotiations.** Defendants suggest (at 40) that CDK's pulling of competitive punches and Reynolds's cessation of blocking after September 2013 merely reflected CDK's desire not to disrupt ongoing negotiations of the DMI wind-down. That is wishful thinking contrary to the contemporaneous evidence, *see* CDK-2683140 (Oct. 3, 2013) ████████ █████████████████████████████████████ a jury certainly would not be compelled to

---

[24] Defendants' assertion (at 36) that it is "clear" they did not agree to joint market messaging relies on emails that are inadmissible and inconclusive at best. *See* PJ RSUF 104.

accept Defendants' spin. At any rate, as a matter of law, a desire to preserve amicable negotiations provides no justification for an agreement to refrain from competition. *See infra* pp. 60-64.

    **4.**    **The February 2015 Agreements.**  As this Court held at the motion to dismiss stage, "[t]he potential impact of the 2015 Agreements, and Section 4.5 of the DEA specifically, further support the existence of the alleged agreement." *DMS*, 313 F. Supp. 3d at 951.[25]  As the Court stated, the 2015 Agreements

> effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit Defendants from assisting in the hostile access of one another's DMSs. Such a partial ceasefire and mutual forbearance between two rivals would make sense if—as the executives allegedly admitted—Defendants sought to "support" one another's integration services to the exclusion of third-party integrators from the competition.

*Id.* Thus, "it is reasonably inferable that such agreements were a part of the broader and admitted agreement to block third-party integrators." *Id.*

    The evidence adduced in discovery lends strong additional support for that inference. As set forth above, both companies' internal documents indicate that they understood the February 2015 contracts as consummating their agreement to close their respective DMSs to independent data integrators. In the words of Howard Gardner at CDK: ███████████████

████████████████ PJ SAF 55; Ho Ex. 200, PX 960 at CDK-0189718 (emphasis added).

████████████████████████████████████████

████████████████████████████████████████

████████ PJ SAF 51; Ho Ex. 10, Workman Tr. 98:14-16. Defendants' actions speak as loudly as their words: as described above, after finalizing the 2015 agreements, the two companies promptly set out to close their respective DMSs. PJ SAF 58, 60.

---

[25] The DEA was before the Court at the motion-to-dismiss stage. *See DMS*, 313 F. Supp. 3d at 942-43 & n.2.

Without even acknowledging this Court's motion-to-dismiss opinion, Defendants (at 17, 22) repeat their refrain that the February 2015 agreements were merely "vertical" in nature and "do not require . . . 'blocking.'" But, as this Court held, the fact that the agreements to block independent data integrators does not appear on the face of the agreements does not foreclose the reasonable inference that they "were a part of the broader and admitted agreement to block third-party integrators." *DMS*, 313 F. Supp. 3d at 951. "That broader agreement is, moreover, anticompetitive." *Id.*

This Court's prior ruling also forecloses Defendants' argument (at 17-18) that the anticompetitive effects of the 2015 agreements must be considered in isolation. Authenticom may "use all manner of" evidence outside those agreements "to persuade a jury that what [Defendants] *actually agreed to* was" the broader openness-and-blocking conspiracy their internal documents describe. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) (summary judgment reversed); *see also High Fructose*, 295 F.3d at 655 ("The second trap to be avoided in evaluating evidence of an antitrust conspiracy . . . is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment.").

**5.    Post-February 2015 Communications.**  Defendants argue (at 42-43) that their extensive post-2015 communications are "legitimate" because they were "self-evidently about the 2015 Agreements and nothing more."  As just discussed, this Court has already held that one can "reasonably infer[]" that the 2015 agreements were part of a "broader," "anticompetitive" agreement.  If so, Defendants' implementation of that agreement constitutes additional direct evidence of conduct that violates Section 1.  Indeed, as described above (at 29), the post-2015

communications confirm that Defendants' coordination extended to joint blocking of Authenticom and other data integrators from their DMSs and active policing of their agreement.

## C. Ample Evidence Would Allow a Reasonable Jury To Conclude That the Alleged Conspiracy Makes Economic Sense

The admissions by Defendants' executives and the other evidence of their express agreement is more than sufficient for a reasonable jury to conclude that Defendants violated Section 1. *See High Fructose*, 295 F.3d at 663. In addition, there is ample evidence that the alleged conspiracy to refrain from competition on openness made perfect economic sense.

**1.** As this Court has held, competitors have an economic motive to conspire to block lower-cost rivals – and raise prices – because that strategy is less profitable if pursued unilaterally:

> Even applying *Matsushita* [at the complaint stage], . . . the Complaint raises a reasonable inference of Defendants' motive to conspire. Specifically, the Complaint alleges facts showing that many dealers preferred open architecture; when CDK began blocking, for example, several dealers loudly complained. In light of those claims, it is inferable that—as is true of most antitrust conspiracies— Defendants (which together control the DMS market) desired the luxury of taking an action profitable for them but disadvantageous to their customers (by excluding a cheaper rival in the downstream data-integration market) without fearing that their customers would respond by, for example, turning to another provider.

*DMS*, 313 F. Supp. 3d at 953-54. As the Court further observed:

> Authenticom has asserted and submitted evidence that Reynolds's DMS market share began to decline after it implemented closed architecture. As the Seventh Circuit recognized during oral argument on the preliminary injunction, such a fact makes Defendants' repeated declarations of facial "implausibility" dubious.

*Id.* at 954 n.11.

The summary judgment record here fully supports the Court's complaint-stage holding that Defendants had a clear economic motive to conspire. There is extensive record evidence that "many dealers preferred open architecture"; that, prior to the conspiracy, CDK was taking market-share from Reynolds because of the latter's closed system; and that CDK's open system constrained Reynolds's ability to fully close its system. *See supra* pp. 8-13. Reynolds clearly

stood to gain from a commitment by CDK to stop competing on the basis that CDK's system was open to data integrators and that Reynolds's security message was a charade.

At the same time, Reynolds had shown that, by virtue of its enhanced blocking, it could cut off a highly lucrative revenue stream for CDK. The parties thus saw a clear opportunity for a mutually profitable quid pro quo: CDK would cooperate with Reynolds's effort to close its system, including by ceasing to compete on openness, and move in the direction of closing its own system; Reynolds would preserve CDK's access to Reynolds DMS while blocking CDK's rivals. Furthermore, CDK recognized that its agreement with Reynolds, once formalized in February 2015, would allow it to "lock down" its DMS. And both parties gained the ability to engage in coordinated action against Authenticom, which they did.

Defendants' own documents acknowledge that, by agreeing, they would avoid, in the words of CDK's Howard Gardner, "████████████████████████████████████████ ████ PJ SAF 52; Fenske Ex. 62 (Dkt. 975-62), PX 950 at CDK-1409655. Defendants assert (at 39) that Gardner's statement "has nothing to do with DMS competition" and that "the only reasonable interpretation of Gardner's statement is that DMI would continue 'fighting it out' with Reynolds to access the Reynolds DMS." Gardner offered no such testimony in his deposition, instead claiming he had no recollection of what he meant. PJ SAF 52. Gardner's language – "████ ████████████████████ – supports a broader inference: that the two rivals saw their agreement as superior to continued competition on openness in the DMS market that was becoming increasingly costly to both. Gardner's other statements further support that inference. As he stated in another email, ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████ PJ SAF 34; Ho Ex. 180, PX 883, at CDK-0872981; *see supra* p. 17 (explaining that the competitive environment in the DMS market left much to be desired for both sides: CDK's competition on openness was costing Reynolds market share and tens of millions of dollars in revenue, while Reynolds's sporadic closure efforts jeopardized CDK's lucrative data integration business). Once again, Defendants can try to convince a jury to accept their version, but the jury could readily interpret Gardner's statements as acknowledging that the conspiracy would benefit both CDK and Reynolds in a way that unilateral action could not.

**2.** Defendants insist (at 26) that CDK, knowing that Reynolds had tied itself to the mast of its (partially) closed system, could have closed its own DMS unilaterally, if that was the more profitable market position.[26] But that ignores clear evidence that CDK, prior to the conspiracy, had no concrete plans to close its system and a pressing need to avoid the losses that unrestrained competition with Reynolds would entail. CDK would have anticipated the same dealer and vendor backlash as Reynolds had faced in attempting to close its DMS and would have seen the benefit to "collaborating" with Reynolds, *see* PJ SAF 23, 26, and CDK needed a solution to the problem that CDK itself was the largest data integrator (a solution that only Reynolds could provide with the "soft landing" for DMI), *see* PJ SAF 38. Moreover, the jury could readily find, CDK itself recognized that its collaboration with Reynolds would permit it to close its own system with minimal blowback. *See* ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[26] Reynolds lost money when it (unsuccessfully) tried to unilaterally close its system absent agreement with and help from CDK. PJ SAF 26; Ho Ex. 460, Addanki Decl. ¶ 58 (Defendants' economic expert stating that – ██████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████████  A reasonable jury

could conclude that Defendants saw that they could both profit if they replaced competition on

openness with collusion.

As this Court held at the motion-to-dismiss stage, even if competitors may recognize that

parallel action could be mutually beneficial, that does not remove the motive to reach express

agreement.  Price-fixing illustrates the flaw in Defendants' argument:  oligopolists have a motive

to fix prices, even if they might achieve the same outcome through tacit coordination:

> Reynolds or CDK could indeed have continued or began to block integrator access independently, like any oligopolist could, say, continue or decide to raise prices independently.  But the former fact does not mean Defendants[ ] lacked a motive to conspire to do so, like the latter fact does not mean that oligopolists lack motive to fix prices.

*DMS*, 313 F. Supp. 3d at 954.  Conspiracy removes the risk that competition will constrain the

ability of even firms with market power to raise prices at the expense of consumers.  *See id.* at

953-54 (motive to obtain "the luxury of taking an action profitable for [defendants] but

disadvantageous to their customers . . . without fearing that their customers would respond by, for

example, turning to another provider").  Express collusion provided Defendants a more profitable

route to monopolistic 3PA and RCI prices than they could otherwise have achieved.

*Matsushita* does not support Defendants' argument at all.  At the outset, *Matsushita* never

held that a plaintiff must exclude the possibility that defendants could have achieved the same end-

result through tacit coordination rather than express agreement.  When it spoke of excluding "the

possibility that the alleged conspirators acted independently," 475 U.S. at 588, it was asking simply

whether Defendants would have profited from the conspiracy.  There, conspiring to set *predatory*

prices was self-defeating.  Quite the opposite with a conspiracy to block rivals, which benefits both

firms by eliminating competition and facilitating increased prices.

Furthermore, the evidence in this case shows that Defendants colluded to achieve joint profits unavailable through unilateral conduct. As detailed above (at-11), for years, CDK marketed its DMS offering as superior on the basis that CDK permitted the use of independent data integrators[27] – and CDK criticized Reynolds's closed policy as a money grab papered over by pretextual assertions of improved security – while building up DMI and Integralink into highly profitable businesses, dependent on the continued access to Reynolds's DMS that DMS-market competition had so far ensured. Reynolds's willingness, in the summer of 2013, to double down on its closed-DMS strategy – while it offered CDK the possibility of winning additional DMS business – threatened CDK's highly lucrative data integration revenues, making continued competition much more costly. It makes perfect economic sense that CDK committed to abandon its competition on openness in exchange for Reynolds's commitment to preserve CDK's data integration profits as both parties moved cooperatively to "close" their DMSs completely.

**3.**    Defendants' additional arguments create factual disputes at best.

**a.**    Defendants contend (at 27, 29) that Reynolds's price increases prior to September 2013 show that it had nothing to gain from conspiring. But ample evidence shows that (1) CDK's competition constrained Reynolds from fully blocking DMI, IntegraLink, Authenticom and other data integrators, and thus constrained its ability to raise its own data integration prices and cost it revenues it could earn from vendor customers paying lower rates to Reynolds's competitors, PJ SAF 17, 26; and (2) after eliminating CDK as a competitive constraint through the agreement, Reynolds increased its RCI revenues by $30 million a year. PJ SAF 73; Ho Ex. 474, PX 651; Ho Ex. 15, Brockman Dep. 134:20-136:8 (██████████████████████████████████

---

[27] Moreover, none of this was the "'slight – and shrinking – part of'" Reynolds's "'overall revenues'" at issue in Defendants' principal authority (at 26) (quoting *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015)). PJ SUF 25 (CDK's openness cost Reynolds $300 million-plus).

███████████████████████████████████████████████████

████████████████████████████████████████ [28] Defendants also argue that

there could have been no agreement because Reynolds refrained from blocking CDK starting in

September 2013 even though CDK had not yet closed its system. But that ignores the immediate

benefits Reynolds gained from CDK's agreement not to market its DMS on the basis of openness.

Defendants' contention (at 29-31) that CDK lacked a motive to join the conspiracy also

raises, at best, a jury issue. As explained above, CDK benefited because, in the absence of

agreement, it had no assurance that it could maintain data integration revenues that depended on

continued access to Reynolds's system. In sum, as Dr. Israel explains in his expert opinion, in

light of "Reynolds'[s] actions in 2013, CDK determined that it would be more profitable if it

agreed to stop competing with Reynolds . . . on the basis of its more open system in exchange for

a period of continued (and exclusive) access to Reynolds' system," Dorris Ex. 151 (Dkt. 977-153),

Israel Rep. ¶ 150, together with cooperation to harm Authenticom; "assurance that Reynolds would

not 'flip' strategies to occupy the open competitor spot previously held by CDK," *id.* ¶ 170; access

to Reynolds's dealer data for CDK's DMI data-integration subsidiary and its portfolio of DMS-

agnostic applications (which CDK had cause for concern could be excluded from serving

Reynolds's dealers absent the 2015 agreement, PJ SAF 20, Dorris Ex. 151 (Dkt. 977-153), Israel

Rep. ¶ 167; and preventing *Apps* from threatening *DMSs'* market power, *id.* ¶ 108.

Defendants' assertion (at 31) that there is no "evidence that CDK sought or valued a

supposed assurance that Reynolds would remain closed" is contrary not only to Dr. Israel's

---

[28] Defendants do not meaningfully challenge Dr. Israel's showing in that respect in this Motion, save a footnoted incorporation of its *Daubert* briefing by reference (at 27 n.4). But for the reasons Plaintiffs explained in response (at 20-23) and Authenticom incorporates by reference, Defendants' critiques are incorrect.

testimony (and the concession of Defendants' expert at the preliminary injunction hearing[29]), but to the evidence that CDK monitored Reynolds's blocking of Authenticom to ensure that it was adhering to the agreement to block. *See supra* p. 29. Likewise, Defendants' claim that there is no evidence that the benefits of the agreement to CDK "offset what Dr. Israel assumes are long-term losses from CDK's supposed decision" to refrain from competition on openness ignores the record.[30] A reasonable jury could readily conclude that agreement with Reynolds's preserved CDK's data-integration-business profits while CDK joined Reynolds as a closed system while CDK raised its 3PA prices to monopoly levels that, not coincidentally, mirrored Reynolds's RCI prices. *See* PJ SAF 75 (graph of 3PA and RCI prices). CDK switched from competing to colluding *because* it was more profitable. *Cf. Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932 (7th Cir. 2000) (abandoning a previously successful means of competition "ran against" defendants' "independent economic self-interest," supporting existence of conspiracy).

    **b.** Defendants assert (at 31) that the conspiracy had no plausible enforcement mechanism, but this argument fails on its own terms: Defendants' own authority recognizes that "evidence of an enforcement mechanism is not always required." *Kleen Prods.*, 910 F.3d at 937 (stating with approval that conclusion of *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772, 796-97 (N.D. Ill. 2017)). Moreover, the factual claim is wrong: Reynolds's threat to resume blocking DMI and CDK's apps enforced CDK's promise to refrain from competing on

---

[29] PJ SAF 74; Ho Ex. 63, PI Hearing Tr. 2-P-250:1-7 ("Q: It would have been a valuable thing for CDK – I'm not asking you to give me an estimate of how valuable. But it would be a valuable thing for CDK to have assurances from Reynolds that it does not intend to open its system; correct? A: If you're asking would there be some value greater than zero having that assurance, possibly, yes.").

[30] The question is not whether such a benefit was granted to CDK by *the written agreements*, but by *the broader conspiracy* that began in September 2013. CDK's balance-of-trade document (at 30 n.6) is therefore irrelevant for at least this reason, as Defendants admit it addresses only the 2015 agreements. Further, those balance-of-trade documents indicate that they were highly dependent upon the assumptions underlying them, which could be readily changed to significantly increase the value to CDK. PJ RSUF 122; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶¶ 122-127.

openness after September 2013. PJ SAF 38; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶ 120 ("In essence, Reynolds had a powerful hammer in the DIS/app world that could be used to stop CDK from competing with it on openness, or at least make it very difficult for CDK to do so."). Reynolds threatened to deploy these measures even after the initial September 2013 agreement, including in June 2014, *see* PJ RSUF 107, immediately preceding CDK committing to closing its DMS, PJ SAF ¶ 49. That Reynolds largely elected not to deploy those measures (at 32) merely confirms that the threat was enough to cause CDK to live up to its end of the deal. CDK also had a "hammer" over Reynolds: if Reynolds withdrew from the reprieve it had granted during those agreements' negotiation, its alternative was to " █████████████████████ ." *Supra*. And by February 2015, the two companies had the obvious enforcement mechanism of a suit for breach of their February 2015 agreements.[31]

      **c.** Defendants claim that CDK did not immediately close its own system (at 28, 31), but Defendants' argument ignores the nature of the alleged conspiracy: there is extensive evidence that CDK pulled its competitive punches in the DMS market promptly after the September 2013 agreement, even as it began to plan for the transition to a closed system of its own. *See supra* pp. 17-20. Moreover, even if CDK did not fully implement the agreement immediately, it would not warrant judgment as a matter of law: "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939); *see also Broiler Chicken*, 290 F. Supp. 3d at 791 (citing numerous cases consistent with *Interstate Circuit*).

---

[31] Defendants also say (at 32) that most of DMI's business on Reynolds had been wound down by August 2016. But CDK had by then *already* spent years transitioning to a closed system; Authenticom and other data integrators had been crippled; and the companies had formal contracts in place. Reynolds had all the assurance it needed that CDK would not begin to cheat.

      **d.**     Contrary to Defendants' contention (at 32-33), DMS switching data support the existence of the conspiracy. As noted above, Defendants' September 2013 agreement was followed by a substantial reduction in switching from CDK to Reynolds. PJ SAF 39. Defendants observe (at 34) that switching did not decrease *in 2013*, but the conspiracy did not begin until September, and the share of Reynolds's competitive DMS losses going to CDK declined thereafter. Nor does it matter that Reynolds and CDK continued to win some business from each other: after 2013, the share of Reynolds's competitive losses going to CDK declined despite the fact that Reynolds's blocking angered dealers – causing the worst month of DMS losses that Reynolds had ever experienced in the month before Defendants' agreement. And Defendants' passing renewal of their *Daubert* attack on Dr. Israel's analysis of this data is incorrect for reasons Authenticom has explained in its response. Dkt. 1001, Israel *Daubert* Opp. at 14-16 (explaining that Defendants' critiques are speculative or contrary to the record).[32]

      The decline in Authenticom's connections is also consistent with the conspiracy. Defendants observe (at 33) that Authenticom's Reynolds connections today are higher than in 2013, but, as Authenticom's damages expert, Catharine Lawton, opines, the *growth* of Authenticom's connections declined dramatically after September 2013, and that decline accelerated after the February 2015 agreements. Further, Authenticom's Reynolds connections currently make use of dealers manually "pushing" data to Authenticom. *See* PJ RSUF 39. This manual method is inferior to automated integration, and dealers are willing to use it only to avoid

---

[32] Defendants' argument (at 33-34) that they had no affirmative duty to compete is irrelevant. The fact that Defendants' agreement to stop competing was followed by an actual reduction in competition is probative of their conduct's market effects. *Cf.* PJ SAF 39; Ho Ex. 57, Whinston Tr. 270:9-11 ████████

the exorbitant RCI prices that the conspiracy has enabled. *See* PJ SAF 30, 72. Authenticom's connections trends are thus consistent with the direct evidence of conspiracy set forth above.

Defendants also claim (at 32) that Authenticom's CDK connections did not decrease until 2016. But again, that is a red herring: the issue is whether Authenticom's connections in the actual world were lower than what they would have been absent the conspiracy. The evidence supports the conclusion that the growth of Authenticom's CDK connections slowed in the fall of 2013 after CDK and Reynolds began colluding, that Authenticom's CDK connections dropped immediately after the February 2015 agreements, and decreased even more sharply in 2016 after CDK began blocking. *See* PJ SAF 89; Fenske Ex. 74, (Dkt. 975-74), Lawton Rep. ¶¶ 433-448.

Finally, Defendants' reliance on Prof. Rubinfeld's belated opinion that Ms. Lawton "substantially undercount[ed] Authenticom's connections to the CDK DMS" is remarkable for what Defendants never say – that this putative data issue materially changes none of these trends. And for the reasons Authenticom has explained, the critique is untimely and should be excluded. *See* Rubinfeld Daubert, Dkt. 871.

## D. Defendants' Agreement To Stop Competing on Openness "Merit[s] *Per Se* Treatment"

**1.** The Court recognized in denying Defendants' motion to dismiss that, "[u]nder established law, 'joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle' merit per se treatment." *DMS*, 313 F. Supp. 3d at 951 (quoting *Toys "R" Us*, 221 F.3d at 936). And, the Court explained, the "essence" of Authenticom's claim is "that Defendants conspired to block integrators from accessing necessary data from the dealers – meaning, 'relationships' integrators 'need' – by (among other things) withholding authorization and disabling third-party credentials, so that Defendants, ultimately,

could charge more for their integration services." *Id.* at 952. Because the evidence confirms that that is the nature of the agreement, precedent supports *per se* treatment.

Furthermore, Defendants' agreement not to compete with respect to the openness of their systems to independent integrators is a horizontal agreement not to compete on an important quality dimension and thus subject to *per se* condemnation as the economic equivalent of price fixing or output restriction. The Supreme Court long ago held that any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (noting that "collusion" between competitors is "the supreme evil of antitrust"). Consistent with that rule, courts have treated many varieties of agreements among competitors to limit previous forms of competition as unlawful *per se*: by definition, such agreements deny consumers the price and quality benefits that competition provides. *See* 2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 13.03 (2d ed. 2020) ("Many and diverse courses of conduct, some of which do not instantly appear to affect price, have been held to constitute illegal price fixing"; citing cases).

Dr. Israel has explained why that principle applies here. *See* Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶ 116 ("Once again, the analogy to price fixing is helpful. Suppose a low-priced firm competes with a high-priced firm, and the high-priced firm attempts to offset its price disadvantage by marketing its own quality and denigrating the other firm's quality. If, as part of a conspiracy, the low-priced firm agrees to raise price and the high price firm agrees to a 'joint message on quality,' rather than denigrating the other firm's quality, this would be mutually beneficial and would surely be seen as collusive. Replace 'low-price/high-price' with

'open/blocked' and that is the situation in this case."). Defendants' principal effort to show otherwise (at 53) repackages their argument that the challenged conspiracy is vague. But Dr. Israel's deposition answers (at, e.g., 53) do not undermine his reports' consistent explanation of the conspiracy described above – or this Court's recognition that *per se* treatment is appropriate.

     **2.**    Defendants nevertheless attempt (at 53-56) to escape the *per se* rule by asserting that various aspects of their agreement or its setting are unusual. To start, the line of argument is legally improper: Defendants cannot defend their agreed imposition of their "views of the costs and benefits of competition on the entire marketplace" by reference to "the basis of the potential threat the competition poses to" various considerations Defendants think more important. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978); *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 435 (1990) ("'Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy.'") (quoting *Socony-Vacuum*, 310 U.S. at 225-26 n.59).

     Moreover, Defendants fail to identify any legitimate procompetitive benefits from the agreement. *First*, Defendants cite (at 53-54) evidence that their written agreements "expan[ded] . . . output" by creating a "more reliable and secure DMSs." But their view that a closed DMS is better cannot justify conspiring to eliminate consumer choice. Here, the record shows that many dealers preferred an open DMS, leading to a steady drip of dealers leaving Reynolds in favor CDK. This, in turn, fostered a competitive ecosystem in which CDK and Reynolds faced competition not only from each other (and others) in the DMS market, but in the data integration market from (among others) *Authenticom's* superior integration product, and, in app markets, from apps produced by a variety of firms. Nothing prevented dealers from preferring Reynolds's model; that

Reynolds and CDK jointly eliminated the alternative that CDK once offered in a way that reduced backlash from dealers and OEMs is evidence of a successful conspiracy, not consumer benefit.

The related claim (at 56) that an agreement not to compete with respect to openness stems negative externalities reflects "a frontal assault on the basic policy of the Sherman Act" – "that ultimately competition will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 695 (citation omitted). Defendants complain (at 56) that granting access to data integrators increases the risk of a data breach and of unspecified performance issues, that "[d]ealers that enable hostile third-party access do not factor in the risks they impose on the DMS provider" in that respect, and that those risks "will affect Defendants' reputations and consumer confidence in their products." But even assuming that those risks are real (neither Authenticom nor any other independent integrator has ever had a data breach, *see* PJ SAF 16), the Supreme Court ruled such defenses – *i.e.*, "that competition will cause some suppliers to market a defective product" warrants an agreement to stop competing – out-of-bounds in *Natural Society of Professional Engineers*, 435 U.S. at 694. The Sherman Act depends on consumers, not conspiring sellers, to judge what product qualities matter.

*Second*, Defendants assert (at 54) that the vertical relationships between them undermine the propriety of *per se* treatment. This puts the cart before the horse. There is sufficient evidence from which a jury could reasonably conclude there was a horizontal agreement between CDK and Reynolds *as DMS providers*. If a jury reaches that conclusion, the horizontal agreement is *per se* illegal. Of course, Defendants may try to convince the jury that the only agreements reached are the written 2015 agreements, that those agreements are vertical in nature, and that they should be

judged by a rule of reason.  This presents a factual dispute to be resolved at trial about the nature of the agreements, not a basis for a ruling on summary judgment.[33]

*Third*, Defendants suggest that *per se* treatment is unwarranted because federal statutes grant them rights "to prevent unauthorized access to their systems" (at 55) and copyrights (at 56).  But even crediting Defendants' capacious views of those statutes (which Authenticom has addressed elsewhere), Defendants cite no support for the notion that federal statutory rights can immunize them from antitrust-conspiracy law.  *Cf. United States v. The Mathworks, Inc.*, No. 02-888-A (E.D. Va. Mar. 17, 2003) (consent judgment terminating agreement between software-design competitors that the United States challenged as *per se* unlawful); *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) (affirming judgment finding antitrust conspiracy concerning (copyrighted) books).  *Moore v. Boating Industry Associations*, 819 F.2d 693 (7th Cir. 1987), is therefore wholly inapt:  the agreement here is not one of benign industry self-regulation designed, for example, to encourage DMS companies to comply with federal law, but instead an agreement not to compete with respect to activities federal law unquestionably permits.

In short, the conspiracy here uses familiar means (collusion to stop competing and to destroy rivals) to achieve their familiar, intended result (unprecedented price increases).  And even if it were true that Defendants' "scheme did not fit precisely the characterization of a prototypical *per se* practice," that "does not remove it from *per se* treatment."  *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000).  At bottom, as the Court held at the motion-to-dismiss stage, their agreement was an agreement to refrain from competition on openness and block lower-cost data integration rivals.  That agreement "merit[s] per se treatment."  *DMS*, 313 F. Supp. 3d at 951.

---

[33] Defendants' authority is inapposite.  In *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (6th Cir. 2014), the court forbid the plaintiffs from changing their theory on appeal from vertical (before the district court) to horizontal (before the appellate court).  *See id.* at 272-73.

## II.     ANTITRUST INJURY

Antitrust injury is injury "of the type the antitrust laws were intended to prevent" and that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Defendants make only two arguments on this point: (1) Authenticom lacks antitrust injury because its business was unlawful and (2) Authenticom lacks antitrust injury as to its unilateral claims because Defendants had no duty to deal. Neither is persuasive.

### A.     Defendants' Counterclaims Do Not Defeat Authenticom's Conspiracy Claim

This Court already rejected Defendants' argument (at 58) that Authenticom lacks antitrust injury because it "seek[s] to vindicate an illegal trade through an antitrust lawsuit." *DMS*, 313 F. Supp. 3d at 948 (Authenticom's business is not "illegal independent of Defendants' challenged conduct" because it depends on lack of authorization, which Defendants withheld "*because of* Defendants' anticompetitive conduct"). Defendants' brief (at 58-62) confirms that all of Authenticom's supposed legal violations – under the Copyright Act, CFAA, and DMCA – rest on the premise that Authenticom's conduct was unauthorized.[34] And, as explained in Authenticom's opposition to Reynolds's motion for partial summary judgment on two of its counterclaims, there is at least a jury question as to whether Authenticom's business practices were unauthorized.

---

[34] The Court has previously addressed most of Defendants' cases, *see DMS*, 313 F. Supp. 3d at 948, and the two additional cases they now cite are likewise distinguishable. *See Datel Holdins Ltd. v. Microsoft Corp.*, 2010 WL 3910344, at *4 (N.D. Cal. Oct. 4, 2010) (motion to bifurcate) (suggesting only that plaintiffs might not be able to collect lost profits for unlawful circumvention devices); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017) ("That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute."). Defendants misleadingly assert (at 57, 58) that *Monarch Marking Systems, Inc. v. Duncan Parking Meter Maintenance Co.*, 1988 WL 5038, at *4 (N.D. Ill. Jan. 19, 1988), was "vacated in part on other grounds," but in fact the court vacated the relevant portion of its decision. *See Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*, 1988 WL 23830, at *1 (N.D. Ill. Mar. 8, 1988) (stating that it had "erred in assuming" that the entirety of the defendant's business infringed on the plaintiff's patents).

- 65 -

Indeed, CDK, in particular, cannot be entitled to summary judgment on this ground when it did not even move for summary judgment on its counterclaims.

### B.  Authenticom Can Establish Antitrust Injury for Its Unilateral Claims

Defendants also claim (at 63) that their exclusive dealing clauses could not have harmed Authenticom because they had no duty to deal with it.  But Authenticom's harm does not stem from a mere refusal to deal; it was caused by Defendants' "affirmative[ ] interfer[ence] with [Authenticom's] business activities."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.) ("Refusal to deal doctrine . . . doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals."); *DMS*, 313 F. Supp. 3d at 956 ("*Trinko* and *Linkline* did not involve exclusive-dealing or tying claims, nor did they abrogate long-standing jurisprudence in those areas.").  Chief Judge Peterson already found it plausible that Defendants' exclusive dealing arrangements with vendors "effectively cut [Authenticom] out of the [DIS] market."  *Authenticom I*, 2017 WL 3017048, at *7.  That is clearly "the type [of injury] the antitrust laws were intended to prevent."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 481 (7th Cir. 2020); *see id.* at 482 ("[C]ompetitors suffer antitrust injury when they are forced from the market by exclusionary conduct.").

Defendants insist (at 63-64) that, "[i]f CDK and Reynolds refused to permit Authenticom to use automated methods to access their respective systems," the exclusive dealing provisions caused no harm.  But that is a *big* "if" – and the evidence casts more than enough doubt to make it a jury question.  As explained above (at 11-13), even if the law did not compel Defendants to deal with Authenticom, market demand for its services did.[35]

---

[35] *Novell* is thus inapt.  There, the court held that – even assuming Microsoft had an antitrust duty to be honest about its reasons for withdrawing access to a certain subset of its Windows APIs – the harm that Novell complained of was caused by the withdrawal of that information and not Microsoft's purported deception.  731 F.3d at 1080.  Here, by contrast, Authenticom will show that Defendants' exclusionary

### III. AUTHENTICOM IS ENTITLED TO TRIAL ON ITS EXCLUSIVE DEALING AND MONOPOLIZATION CLAIMS

#### A. Authenticom's Exclusive Dealing Claim Should Be Resolved By a Jury

A Section 1 exclusive dealing claim under the rule of reason has two elements: (1) the exclusive dealing must "foreclose competition in a substantial share of the line of commerce at issue," *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004), such that "at least one significant competitor of the defendant" is excluded "from doing business in a relevant market," *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984); and (2) "the probable (not certain) effect of the exclusion" must be to "raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition," *id.* As shown below, Authenticom has sufficient evidence on both points.

#### 1. A Reasonable Jury Could Find That Reynolds Has Market Power

Reynolds (but not CDK) denies it had *DMS* market power, but that is a "fact-bound question," *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 359-60 (7th Cir. 1990), and the record here contains both "direct evidence of anticompetitive effects" and high market share in a relevant market. *Toys "R" Us*, 221 F.3d at 937 (explaining the "two ways of proving market power").

**a.** As to the first, there is ample direct evidence that Reynolds raised prices vastly above competitive levels, in some cases tripling RCI prices in a single year without any corresponding improvements in quality. PJ SAF 72; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶ 34. Reynolds's only response to this point – that Dr. Israel's overcharge model is "fatally flawed" – is wrong for the reasons explained in Plaintiffs' opposition to Defendants' *Daubert* motion. *See* Dkt.

---

contracts are a "substantial contributing factor" or "material contributing cause" of its lost revenue, *Fishman v. Wirtz*, 1981 WL 2153, at *29 (N.D. Ill. Oct. 28, 1981), and that is enough for Authenticom to establish antitrust injury.

1001 at 18-20.  Moreover, there is ample non-expert evidence from which the jury could conclude Reynolds excluded competition and raised prices above competitive levels. PJ SAF 72.

    **b.**  As to the second form of proof, Reynolds's argument that its DMS market share is too low to support a finding of market power is wrong for three reasons.  *First*, Dr. Israel has opined that "Reynolds had sufficient unilateral market power in the DMS market" to harm competition through unilateral exclusion of independent data integrators.  PJ SAF 77; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 208; *see also id.* ¶¶ 68-87.  His testimony on that point – the admissibility of which has not been challenged – provides sufficient evidence for trial.  Moreover, Reynolds's market share is well above what courts typically require to show market power.  *See Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) (30-40%), *aff'd*, 859 F.3d 408 (7th Cir. 2017); *see also, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc) (per curiam) ("roughly 40% or 50%"); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301 (9th Cir. 1982) (24%).  Judging by dealership rooftop, Reynolds's market share was above 30% in 2013, *see* RSoF ¶ 167 – the beginning of the damages period – and is right at or just below 30% today.  ACOM SUF 7; PJ RSUF 168.  When measured by sales, Reynolds's market share is substantially higher.  ACOM SUF 7.  Even a market share below 30% is sufficient if there are "high barriers to competition," as the evidence (PJ SAF at 1-10) amply supports.  *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996).[36]

---

[36] Reynolds's market share is durable.  Although Reynolds has lost market share since it began taking a "closed" stance toward data integration 2006, CDK and Reynolds have remained the dominant DMS suppliers for decades, Dorris Ex. 150 (Dkt. 977-152), Stejskal Rep. ¶¶ 34-35, and attempts to displace them have failed, PJ SAF 9-10.  Moreover, Reynolds and CDK have a ███ market share among the largest and most lucrative dealerships.  ACOM SUF 8.

*Second*, as Dr. Israel also explains, the relevant data integration markets here are the DMS-specific integration markets in which CDK and Reynolds indisputably have market (indeed, monopoly) power. PJ SAF 77; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶¶ 48-54. Each Defendant entirely foreclosed data integrators like Authenticom from its DMS-specific markets.

*Third*, given their joint conduct , Defendants' *aggregate* market share of 70-90% is the relevant benchmark for the exclusive dealing claim in this case. *See*, *e.g.*, *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 295, 309, 314 (1949) (exclusive dealing contracts imposed by seven leading oil producers produced aggregate foreclosure of 65%); *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 395 (1953) (aggregate foreclosure of 75%).[37] Even if a jury concluded that Defendants did not enter into an unlawful horizontal agreement, it could reasonably credit the evidence, including Dr. Israel's opinion, that their joint exclusion of data integrators would warrant condemnation under unilateral principles in light of their aggregate market power. Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶¶ 205-11; Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶ 132-34.

### 2. The Evidence Supports a Relevant Market for Data Integration Services

There is ample evidence from which the jury could conclude there is a relevant product market for data integration services. Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶¶ 50-53. "A relevant market is composed of products whose use is interchangeable and for which there is a 'cross-elasticity of demand.'" *Am. Needle, Inc. v. New Orleans Louisiana Saints*, 385 F. Supp. 2d 687, 692 (N.D. Ill. 2005) (citation omitted). "Product market definition is a question of fact."

---

[37] In *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), the court distinguished *Motion Picture*, *see id.* at 46, but noted that the plaintiff there "does not contend that" the defendants "conspired . . . to bring about this state of affairs" and had conceded that "each has adopted its method of doing business independently," *id.* at 44. Here, by contrast, there is substantial evidence that CDK and Reynolds conspired to exclude Authenticom.

*Paradyne Corp. v. Wolaver*, 1986 WL 8502, at *2 (N.D. July 30, Ill. 1986); *DMS*, 313 F. Supp. 3d at 958 ("market definition is a deeply fact-intensive inquiry") (citation omitted).

Authenticom properly excluded from the relevant product market "manual push" solutions like Reynolds's Dynamic Reporting. There is substantial evidence that manual push is not interchangeable with automated data integration services like those offered through Authenticom and Defendants' 3PA and RCI programs. PJ SAF 30. CDK executive Trey Gerlich (among many others) testified at his deposition: ███████████████████████████████████

███████ *Id.*; Ho Ex. 6, Gerlich Tr. 86; *see also, e.g.*, Ho Ex. 65, PI Hearing Tr. 2-A-9:25-10:1 (Wayne Fitkin, dealership IT director, testifying: "Manual doesn't work."); Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶¶ 69-72. Defendants ignore all this evidence and instead rely on a single statement – taken out of context – by one Authenticom employee. *See* PJ RSUF 40.[38]

Nor is the data integration services product market over-inclusive. Defendants' argument that "hostile integrators like Authenticom have been unable or unwilling" to provide write-back and real-time services – and are therefore not in the same product market as 3PA and RCI – is wrong (or at least disputed) for at least three reasons, all of which were addressed by Dr. Israel in his reply report. Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep., ¶¶ 58-67, 156-168.

*First*, many data integrators – including SIS, SelectQu, Stone Eagle, and InDesign – offered real-time and write-back data integration. PJ SAF 29; PJ RSUF 34. CDK purchased those services from SIS for many years. PJ SAF 82; Ho Ex. 258, PX 1555. Authenticom, too, has provided

---

[38] Defendants' assertion that Authenticom is doing a "booming" business on the Reynolds system, through Dynamic Reporting, is a vast overstatement. Despite Authenticom's constant outreach and support, dealers are still spotty and inconsistent in sending the necessary data, which degrades the customer experience. PJ SAF 30. The fact that some dealers and vendors are willing to stick with Authenticom, despite those difficulties, is a testament to Reynolds's massive price increases and Reynolds's refusal to deal with smaller and startup vendors that lack an established client base, who have no other option but the manual workaround. PJ SAF 72, 85.

write-back and near real-time data integration for many clients and was prevented from offering those services more broadly only because of Defendants' blocking.  PJ SAF 29; PJ RSUF 33.

*Second*, regardless of the purported distinction between "simple" and "complex" integration, the evidence (including Defendants' own witnesses) shows that Authenticom constrained Defendants' data integration prices – which is the relevant question for purposes of defining the product market.  *See Microsoft*, 253 F.3d at 53-54 ("reasonable interchangeability" turns on "substitutes that constrain pricing").  It is no accident that both CDK and Reynolds massively raised 3PA and RCI prices *immediately after* excluding Authenticom and independent integrators.  PJ SAF 17; Dorris Ex. 153 (Dkt. 977-155), Whinston Rep. ¶ 216 ███████████████

███████████████████████████████████████████████████████

*Third*, even vendors that prefer real-time and write-back integration may buy so-called "simple" integration if the price for "complex" integration is too high or if it is unavailable.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'"); *McLaughlin Equip. Co. v. Servaas*, 2004 WL 1629603, at *18 (S.D. Ind. Feb. 18, 2004) ("[R]easonable interchangeability allows for some preference for one product over another."); PJ RSUF 32 (DealerSocket uses real-time and write-back integration on some DMSs, and "simple" integration on other DMSs).  Other applications (like inventory management apps) can operate with or without real-time and write-back integration.  *Id.*

### 3.      Defendants' Remaining Arguments Lack Merit

Reynolds argues (at 68) that its RCI contract is not actually exclusive because it allows vendors to use data integrators "so long as [they] do not engage in authorized access."  But that is cold comfort:  as the evidence above shows, Reynolds has refused to authorize access by independent data integrators.  As the Court previously held, that clause thus effectively foreclosed

Authenticom from competing to provide data integration on the Reynolds DMS. *See DMS*, 313 F. Supp. 3d at 957-58; *Authenticom I*, 2017 WL 3017048, at *7. The argument that the RCI contracts are terminable is also unavailing. Given that vendors have no choice but to use RCI if they want automated data integration, a reasonable jury could readily conclude that vendors' legal right to terminate their RCI contract does little to soften the anti-competitive harm to Authenticom caused by Reynolds's exclusivity requirement. PJ SAF 89-90; *Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974, 981 (7th Cir. 1969) ("short term nature of the [exclusive dealing] agreements does not lessen their anticompetitive effect" in light of the "overall market structure").

Contrary to Defendants' contention (at 68), there is plenty of evidence that the foreclosure effect on Authenticom is substantial. Authenticom is a "significant competitor," *see* ACOM SUF 45; PJ SAF 17, and the 70% (minimum) of dealers that use Defendants' DMSs is more than enough to foreclose vendors from using data integrators with respect to a "substantial share" of the market. *Roland Mach.*, 749 F.2d at 394; *see supra* p. 67-68 (discussing market power).

Finally, Defendants claim (at 69) they "could . . . have" excluded Authenticom from their DMSs even without the exclusive dealing provisions. But that is legally irrelevant, *see Lee-Moore Oil Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299, 1302 (4th Cir. 1979) ("the fact that [the defendant] might have caused the same damages by a lawful" means "is irrelevant"), and factually disputed. As explained above, a jury could reasonably find that the exclusive-dealing provisions suppressed dealer demand for data integration and thus foreclosed Authenticom from competing.

### B.     Authenticom Has a Triable Case on Section 2 Monopolization

Authenticom's evidence satisfies both elements of "[t]he offense of monopoly under § 2 of the Sherman Act": "(1) the possession of monopoly power in [a] relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Briggs & Stratton*

*Corp. v. Kohler Co.*, 405 F. Supp. 2d 986, 990 (W.D. Wis. 2005). By excluding rival integrators, CDK and Reynolds have monopolized the data integration market on their respective DMSs.

Defendants' sole argument (at 70-77) is that each lacks DMS monopoly power and that even the (limited) competition in that primary market sufficiently protects consumers from exploitation in the DMS-specific data integration markets. But, as in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), that contention raises questions of fact.

At the outset, there is direct evidence – Reynolds's elevated pre-conspiracy data integration prices – from which a jury could infer that DMS competition does not constrain the exercise of monopoly power in DMS-specific data integration markets. *See Toys "R" Us*, 221 F.3d at 937. The market characteristics that allowed Reynolds to exercise monopoly power in the Reynolds-specific market for data integration services pre-conspiracy apply to the post-conspiracy data-integration markets as well. As the Supreme Court has explained, competition in a primary market cannot be counted on to protect consumers when "significant information and switching costs" impede consumers from evaluating the true costs of the primary good (here, DMS systems) and there are significant switching costs once a buyer commits to a particular system. *Eastman Kodak*, 504 U.S. at 473, 476. There is evidence that the DMS market exhibits both of those characteristics.

*First*, Authenticom has adduced substantial evidence that dealers could not reasonably determine the full life-cycle cost of a DMS system, including the cost of integration services. For one thing, CDK (dramatically) and Reynolds (more incrementally) changed their approach to authorization of independent data integrators on their systems. CDK aggressively marketed its DMS on the basis of openness until the beginning of the conspiracy period, PJ SAF 22, ACOM SUF 72-77; even thereafter, it did not implement technical measures to implement blocking until after the parties' formal agreements in February 2015. PJ SAF 71; ACOM SUF 87. A reasonable

jury could find that a dealer could not have anticipated CDK's abrupt change of policy when evaluating the likely cost of remaining on CDK's DMS. So too in the case of Reynolds, which had engaged in at most partial and ineffective blocking – with widespread whitelisting of certain dealers and applications – and only forced dealers and vendors to use RCI at steeply inflated rates with the consummation of the parties' agreement. ACOM SUF 69-70; PJ RSUF 85; PJ SAF 58

Furthermore, dealers' ability to evaluate the impact of data integration costs on the life-cycle cost of the DMS is impeded by Defendants' practice of prohibiting vendors from revealing the actual cost of 3PA and RCI services. Vendors pay for data integration. PJ RSUF 30. And Defendants' price secrecy provisions on those vendors prevent them from telling dealers how much they are paying for data integration (which is then often passed through or included in the cost of the application). PJ SAF 68; Ho Ex. 20, Goroff Tr. 188:15-189:8 ██████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Defendants' employees have acknowledged the purpose of the price secrecy provisions is to prevent dealers from knowing 3PA and RCI prices and thus negotiating over the total life-cycle cost of using the CDK or Reynolds DMS. *Id.*; Ho Ex. 6, Gerlich Tr. 129:13-131:3 ████████████████████ ████████████████████████████████████████████ Ho Ex. 63, PI Hearing Tr. 2-P-51:7-15 (Reynolds's Schaefer testifying if pricing is disclosed, "what happens is [dealers] get into a comparison" and he "doesn't have time to do all that and put it together and negotiate.")[39]

---

[39] Defendants strictly enforce the secrecy provisions. When two vendors attempted to disclose their RCI fees to dealers, Reynolds forced them to pay *$100,000* liquidated damages penalties. PJ SAF 69. And CDK has flatly rejected explicit requests from dealers for transparency on 3PA pricing. PJ SAF 68; *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1359 (S.D. Fla. 1998) (*Eastman Kodak* claim lies where "the defendants engaged in coercive practices which concealed the true cost of parts and repairs").

Defendants argue (at 73) that dealers are "sophisticated shoppers" that hire consultants to help negotiate DMS contracts. But a consultant can no better anticipate an abrupt change in data access policy than a dealer. And a jury could conclude that Defendants concealed their 3PA and RCI charges precisely so dealers cannot deploy those negotiation skills, as the comments of Gerlich and Schaefer show. PJ SAF 68; *see* Ho Ex. 271, at CDK-0000786 ███████████

██████████████████████████████████████████████████████████████████ *DMS*, 313 F. Supp. 3d at 963 (*Eastman Kodak* claim viable even as to "sophisticated purchasers"); *Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*, 2008 WL 11408997, at *7 (C.D. Cal. Oct. 10, 2008) (same).

Defendants' arguments that their contracts always prohibited data integrators is wrong for multiple reasons. *First*, Defendants' contracts permit access by dealer-authorized agents as a matter of law, *see* Dkt. 876, and the inclusion of agent language in those contracts "adds to the conclusion that CDK may have duped dealers by closing its architecture post-sale, even if CDK is correct that integrators do not actually constitute agents under state law," *DMS*, 313 F. Supp. 3d at 963; *see Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 989 (N.D. Cal. 2010) (ambiguous warranty language made it "highly unlikely that a customer purchasing an Xbox 360 console would understand the contract as prohibiting unauthorized accessories").[40] *Second*, regardless of the contract language, the record shows an abrupt change in *policy* by both CDK and Reynolds that disrupted dealers' expectations. PJ SAF 70-72; *Digital Equip.*, 73 F.3d at 763 (analysis turns on "whether the change in policy enabled Kodak to exact supra-competitive prices from customers who had already purchased its machines").[41]

---

[40] *Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227 (C.D. Cal. 2013), involved "unequivocal [contract] language" and there was no change in policy that prevented users from "discovering the restrictions at the outset." *Id.* at 1235-36.

[41] PJ SAF 70; Dorris Ex. 2 (Dkt. 977-3), Korp. Decl. ¶ 22 (CDK dealer: "When we entered into our long-term DMS contract with CDK, we had no idea CDK would take this position and would begin disabling and blocking our ability to provide vendors and other third parties of our choosing with access to

Moreover, as explained above (at 4-5), the barriers to switching between DMS providers are extremely high, resulting in *average* DMS tenure of more than 20 years and only between 3% and 5% of dealers switching DMS providers in a given year. PJ SAF 8; *Eastman Kodak*, 504 U.S. at 477 (switching costs include "heavy initial outlay" for copy machines and other brand-specific investment); *see Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516553, at *9 (S.D. Ohio Mar. 21, 2014) (plaintiff established likely *Eastman Kodak* aftermarket, where office printers had a lifespan of 10-20 years and buyers "have invested time and money into training their employees"), *aff'd*, 781 F.3d 264 (6th Cir. 2015).[42]

Defendants' argument that DMS switching "costs are not significant enough to create aftermarket lock-in" misunderstands the legal standard. The question is not whether it is *impossible* to switch DMS providers; it is whether switching costs are high enough that CDK and Reynolds "profitably could maintain supracompetitive prices in the aftermarket" without losing so much business in the primary market to make those price increases unprofitable. *Eastman Kodak*, 504 U.S. at 476. ██████████████████████████████████████ PJ SAF 75; Ho Ex. 60, Murphy Tr. 274 ████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ Evidence of a small percentage of dealers



our own data."); Ho Ex. 108, PX 353, at REYMDL00583139 ████████████████████████████

███████████████████████████████████████████████████

---

[42] Defendants' attempt to discount the ███████ switching rate because they require five-year contracts has it backwards: the long-term contracts are part and parcel of why dealers are locked in. *DMS*, 313 F. Supp. 3d at 963 (finding lock-in based on the "initial investments required, *the contract length*, and the resources required to change DMSs") (emphasis added); *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1464 (C.D. Cal. 1988) (long-term contracts with "high liquidated damages provisions" support inference of monopoly power), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

switching each year does not defeat the claim. *See Collins Inkjet*, 2014 WL 11516553, at *10 ("The fact that a select few customers have or are able to switch does not necessarily demonstrate that switching costs are not significant for the majority of the customers."); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1232 (E.D. Cal. 1999) (where there is conflicting lock-in evidence, "disputed issues for trial" preclude summary judgment).[43]

Contrary to Defendants' claim (at 71), Dr. Israel did not "disavow[ ]" Authenticom's monopolization claim. He explained that CDK and Reynolds have monopoly power in single-brand data-integration aftermarkets on their DMSs. PJ SAF 77; Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶¶ 44-54 (explaining existence of "DMS-ecosystem-specific product markets"). His observation that monopoly leveraging is the proper economic framework for understanding Defendants' motivations to conspire, *see* Dorris Ex. 158 (Dkt. 977-160), Israel Reply Rep. ¶¶ 81-84, is not at all inconsistent with the recognition that CDK and Reynolds each had the ability to exploit locked-in dealers in DMS-specific data integration services markets – as they did.[44]

## IV.  AUTHENTICOM IS ENTITLED TO TRIAL ON ITS STATE LAW CLAIMS

### A.  Authenticom Has Alleged a Valid Tortious Interference Claim

Under Wisconsin law, "[i]nterference with a present or prospective contractual relationship" requires: (1) a contract or prospective contract between plaintiff and a third party;

---

[43] Defendants' claim (at 74) that "thousands" of dealers have switched over the years is hardly surprising, because there are 17,000 dealership rooftops in the United States. Dorris Ex. 151 (Dkt. 977-153), Israel Rep. ¶ 15. Only a small fraction need to switch each year for the number to total in the "thousands" over a decade. Moreover, many of those "switches" occur when one dealership acquires another and converts the new store, rather than dealers switching because they are dissatisfied with their DMS provider. PJ SAF 8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[44] *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11 (1st Cir. 1999), was a fact-bound decision where the defendant had been transparent about the warranty policy at issue and made no "bait-and-switch" policy change to exploit locked-in customers. *Id.* at 18. As shown above, this case is the opposite on both scores. Defendants' other case is not even an *Eastman Kodak* case. *See Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987).

(2) interference with the relationship; (3) intent; (4) damages caused by the interference; and (5) lack of privilege or justification. *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006). Defendants' challenges to elements one, four, and five are unpersuasive.

### 1. Authenticom's Contracts Were (and Are) Valid

Defendants reiterate (at 77) their pleading-stage argument that there is no tortious interference because Authenticom was performing its contracts "in an illegal manner." The argument's premise raises a dispute for trial: a jury could find Authenticom's conduct to be lawful. *See generally* Dkt. 978 (Authenticom MSJ Mem.). At any rate, Wisconsin law only provides that "there can be no cause of action for the alleged breach of an *invalid* contract." *Behnke v. Hertz Corp.*, 235 N.W.2d 690, 694 (Wis. 1975) (emphasis added); *see Stamatiou v. U.S. Gypsum Co.*, 400 F. Supp. 431, 434-35 (N.D. Ill. 1975) (contract for blackmail); *see also* Restatement (Second) of Torts § 774 cmt. a (1979) ("Restatement") ("illegal agreement" is one that is "clearly illegal, as when it is forbidden by statute"). Authenticom's contracts were not legally "invalid."

### 2. Whether Defendants' Interference Was Justified Raises Questions for Trial

Defendants' contention (at 79-80) that their interference was justified also requires trial. Their claim that Authenticom violated their federal statutory rights either fails as a matter of law or raises factual issues. *See* Dkt. 978. And their claim of justification depends on their position that they did not engage in anticompetitive behavior – a question for trial. *See supra* Parts II, IV. The same is true of their invocation of the "competitor's privilege," which the Seventh Circuit has held inapplicable where a defendant commits "independent[ ] violations of federal antitrust law." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 546-47 (7th Cir. 1986) (discussing Restatement § 768). Defendants' reliance on *Metso Minerals Industries, Inc. v. FLSmidth-Excel LLC*, 2010 WL 55845 (E.D. Wis. Jan. 5, 2010), is misplaced because that court did not address whether the conduct at

issue was "an unlawful restraint of competition," Restatement § 768(1)(c), which renders the "competition privilege" inapplicable, *Metso*, 2010 WL 55845, at *4.

### 3. Authenticom Has Established Causation and Damages

Finally, Defendants assert (at 80) that Authenticom lacks evidence of causation because Authenticom's complaint purportedly limits the tortious interference claim to existing contracts, while Authenticom's damages expert calculates damages from existing and prospective contracts. But Authenticom's complaint alleged ongoing harm to contractual relations with prospective vendors. *See* Compl. ¶¶ 208-210. Authenticom's complaint did not need to plead the "legal theory" of tortious interference with prospective economic relations to recover damages associated with prospective contracts. *See Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) ("Plaintiffs need only plead facts, not legal theories, in their complaints."). Defendants' technical parsing of the complaint is especially unwarranted given that the law treats tortious interference with existing or prospective contracts as a single tort. *See Burbank Grease*, 717 N.W.2d at 796 ("Interference with a present or prospective contractual relationship requires proof of the following five elements . . . ."); *see also* Restatement, Intro. Note to Ch. 37.[45]

## V. AUTHENTICOM HAS SUFFICIENT EVIDENCE OF DAMAGES

Defendants' final argument (81-83) largely recycles positions from their *Daubert* motion to exclude the opinions of Authenticom's damages expert. *See* Dkt. 880; Dkt. 999. Those arguments fare no better as a matter of summary judgment law than they do under *Daubert*.

Defendants first argue (at 81) that an antitrust plaintiff must distinguish damages arising from the unlawful conduct "as opposed to lawful competition or other market factors." They

---

[45] Defendants contest (at 81 n.17) the sufficiency of Authenticom's allegation that they "spread[] false and disparaging information about Authenticom's security practices and protocol," Compl. ¶ 280, *Authenticom, Inc. v. CDK Global, Inc.*, Dkt. 1. But, as explained above, common market messaging – including messaging that targeted Authenticom – was part of the conspiracy. *See supra* pp. 17-21, 26-27.

criticize Ms. Lawton for not segregating damages based on Authenticom's different *theories of liability*. But their cases at most suggest that damages experts should distinguish disaggregate their models to distinguish between lawful and unlawful *conduct*.[46] Authenticom's liability theories are different ways of viewing a single course of unlawful conduct, which need not be disaggregated. *See MCI Commc'ns*, 708 F.2d at 1161 ("[S]trict proof of what damages have been caused by which acts has not been required.").

Defendants suggest that Ms. Lawton failed to take into account the effects of certain other contractual provisions and of the fact that Defendants' conspiracy ultimately drove certain other data integrators out of the market. But Defendants misunderstand how Ms. Lawton's model accounts for both phenomena. As explained in Authenticom's opposition to Defendants' *Daubert* motion (at 9-22), Ms. Lawton uses Authenticom's Other Connections as a yardstick for its CDK and Reynolds connections in the but-for world because (as the economic evidence would predict) those sets of connections were closely correlated before Defendants' conspiracy began, notwithstanding any unilaterally-imposed barriers on Authenticom's growth. And she noted, moreover, that several rivals to Authenticom continued to compete into the damages period. The yardstick amply satisfies Authenticom's modest burden to prove damages "to a reasonable degree of certainty." *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 924 (N.D. Ill. 2006).

## CONCLUSION

Defendants' summary judgment motion should be denied.

---

[46] *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593-94 (7th Cir. 1998) (no damages if the only illegal action, the division of markets, "added nothing to the price effects of the legal practices"); *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) (damages model failed to account for plaintiff's pre-antitrust-violation free riding); *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1164 (7th Cir. 1983) (pricing policies were "quantitatively significant *lawful* competition"); *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (damages model failed to account for change in market).

Dated:  July 28, 2020                    Respectfully submitted,

                                         */s/ Derek T. Ho*      __
                                         Derek T. Ho
                                         **KELLOGG, HANSEN, TODD,**
                                         **FIGEL & FREDERICK, P.L.L.C.**
                                         1615 M Street, NW, Suite 400
                                         Washington, D.C. 20036
                                         (202) 326-7900
                                         dho@kellogghansen.com

                                         *Counsel for Plaintiff Authenticom, Inc.*

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on July 28, 2020 I caused a true and correct copy of the foregoing **PLAINTIFF AUTHENTICOM, INC.'S OPPOSITION TO DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com