**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 <br> Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr. <br> Magistrate Judge Jeffrey T. Gilbert |
| ALL ACTIONS | **PUBLIC-REDACTED** |

**MDL PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS
<u>IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

MDL Plaintiffs file this Statement of Additional Facts, in support of their oppositions to the summary judgment motions of CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds"), pursuant to Local Rule 56.1.

## STATEMENT OF ADDITIONAL FACTS

1.  New entrants to the DMS market face high barriers to entry, including significant up-front software development costs and a years-long process to attempt to obtain necessary certifications with OEMs. Dorris Ex. 151, (Dkt. 977-153), Expert Report of Mark Israel ("Israel Rep.") ¶¶ 78-84 (describing substantial barriers to entry); Dorris Ex. 150, (Dkt. 977-152), Expert Report of Allan Stejskal ("Stejskal Rep.") ¶¶ 37-38 (describing substantial barriers to entry); Ho Ex. 65, PI Hearing Tr. 2-A-50:7-14 (Andreu) ("[T]he barrier to entry to get in the DMS space is difficult. . . . We wanted to buy people who knew how to do this, and we spent about $50 million trying to build another one and ended up flushing it."); *id.* at 2-A-17:3-4 (Wayne Fitkin, IT dealership director: "To build something that would run a car dealership is a monumental task."); Ho Ex. 158, PX 736, Declaration of Malcom Thorne ("Thorne Decl.") ¶ 44 ("CDK spent decades and hundreds of millions of dollars creating proprietary software platforms, valuable intellectual property, and an automotive retail data ecosystem of 9,000+ dealers."); Dorris Ex. 90, (Dkt. 977-92), Declaration of Robert Schaefer ("Schaefer Decl.") ¶ 49 ("Reynolds has invested tens of millions of dollars in developing the technologies that comprise its DMS."); Dorris Ex. 57, (Dkt. 977-58), *FTC Auto/Mate Complaint* ¶ 58 (FTC concluding that effective entry into the DMS market "would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome."); Ho Ex. 30, Battista Tr. 101:5-102:14 ████████████



Ho Ex. 143, PX 638 at 2

Ho Ex. 209, PX 1007 at SIS_DMS_0012988

Ho Ex. 55, Andreu Tr. 310:6-312:1

2.      Dealers face significant obstacles to switching DMSs, including lengthy contract terms imposed by DMS companies, substantial early termination fees if they attempt to switch DMS providers before the expiration of their contract with CDK or Reynolds, and auto-renewal provisions by which CDK and Reynolds can extend already-lengthy contracts if dealers make even minor changes such as purchasing new printers.  Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 40 ("It is usually quite difficult to break these contracts and will frequently require significant liquidated damages or that the balance of the contract commitment be paid out."); Ho Ex. 392 at KENNY_THOMAS0006655

Ho Ex. 35, Thomas (Olathe Toyota 30(b)(6)) Tr. 357:19-358:8                                                                              Ho



Ex. 12, Colson Tr. 304:7-305:8

Ho Ex. 161, PX 766 at CDK-3107885:15-886:11, Tr. 29-30

Ho Ex. 8, Jezek Tr. 182:17-184:5 (

Ho Ex. 34, Stejskal (Fact) Tr. 24:4-25:19 (in early 2000s, AutoNation paid *23-year* contract balance to switch a dealership off the UCS DMS platform).

3.      Dealers attempting to switch DMS providers risk losing valuable historical data and face an arduous process in converting their data from the old system to the new system  Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 75; Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 48; Ho Ex. 27, Johnson Tr. 177:23-178:12 (Continental Motors dealership group) ("[D]ata conversion, it's not easy.  And if – you know, you have to get the accounting departments involved, make sure things . . . are lining up, that their books are correct, that all the customers come over, notes aren't lost, service history is there.  So . . . it's not just, you know, go home one night and then it's there

the next morning. It would be . . . a long process."); Ho Ex. 65, PI Hearing Tr. 2-A-15:9-11 (Fitkin) ("I converted three UCS stores in Las Vegas to CDK without a drop of data coming over because I couldn't get it out."); Ho Ex. 22, Whitworth Tr. 44:13-14 ("The mechanics of data conversion are arduous."); Ho Ex. 454 at SLP_CDK00000346 ███████████████████████

████████████████████████████████ Ho Ex. 55, Andreu Tr. 324:16-326:1

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Ho Ex. 223, PX 1114 at CDK-0979850 ████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Ho Ex. 22,

Whitworth Tr. 301:11-14 ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████

    4.      Dealerships also face substantial out-of-pocket expenses associated with switching DMS providers – such as fees for setup, training, data conversion from the old system, and replacing physical technological equipment. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 42 ("In my experience, these 'hard' costs are typically equal to roughly six to twelve months of recurring DMS license fees."); Ho Ex. 49, Whitworth (Cox 30(b)(6)) Tr. 543:2-11 ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Dorris Ex. 58, (Dkt. 977-59), DX 405 at COX_0020335, ¶ 11

5.      When a dealership attempts to switch DMS providers, employees need extensive training on the new system before they become comfortable using the new system, which dealers and industry participants have described as being akin to undergoing a heart transplant, knee replacement, brain replacement, or a journey through the "trough of despair."  Former Reynolds President Ron Lamb described the difficulties in switching DMS providers as follows:



And then when you change to a different DMS, even though it's fundamentally

Ho Ex. 18, Lamb Tr. 98:21-102:23, 120:24-121:2; *see also* Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 44 ("Because the DMS is so integrally tied to virtually every process within the dealership, switching DMSs is hugely disruptive to a dealership's operations.  I refer to the process as having to cross the 'trough of despair.'") (footnote omitted); Dorris Ex. 151, (Dkt. 977-153),



Israel Rep. ¶¶ 78-84; Dorris Ex. 58, (Dkt. 977-59), DX 405 at COX_0020336, ¶ 16 ███████████

███████████████████████████████████████████████████████████

█████████████████████████; Ho Ex. 132, PX 527 at REYMDL00260867 – Auto/Mate

sales materials: █████████████████████████

███████████████████████████████ Ho Ex. 27, Johnson Tr. 178:7-12

(Continental Motors group) ("So it's not just, you know, go home one night and then it's there the

next morning. It would be . . . a long process. Because, you know, I could imagine it could take

a . . . 12-to-24-month period just to try to switch."); Ho Ex. 16, Brockman 1/17/19 Tr. 180:18-25

███████████████████████████████████████████████████████████

█████████████████████████████████████████████ Dorris Ex. 57, (Dkt.

977-58), *FTC Auto/Mate Complaint* ¶ 18 ("In order to change DMS suppliers, franchise dealers

need to spend a significant number of hours training their staff, while dealing with losses in

productivity that can lead to lower sales during the transition period."); *id.* ("Customers frustrated

with CDK's and Reynolds's business practices have faced significant challenges in switching

DMS suppliers and, historically, a lack of good alternatives to the two market leaders."); Ho Ex.

34, Stejskal (Fact) Tr. 106:4-108:3 ("[I]t's a big deal to switch DMSs, right, all of the employees

of the dealership are trained in that DMS product, and you have to go through a pretty rigorous

implementation process to set up [all of the old processes in the new DMS] . . . . [W]e used to talk

about the trough of despair because that day, right, your whole world [changes], you don't know

how to do your job anymore[.]"); Ho Ex. 8, Jezek Tr. 348:11-349:5 █████████████

███████████████████████████████████████████████████ Ho Ex. 19,

Rubino Tr. 117:5-118:3 ███████████████████████████████████████

███████████████████████████████ Ho Ex. 454 at SLP_CDK00000346



Ho Ex. 22, Whitworth Tr. 260:17-21

6.      Reynolds has warned dealers that switching DMS providers can take three or more years to implement and cause an average, per-store profit decline of 44%. Ho Ex. 295 at CDK-0728580                                                              Ho Ex. 149, PX 676 at REYMDL00246637

Ho Ex. 150, PX 677 at COX_0004894 (Reynolds telling dealership that "[c]hanging computer systems is always an enormous disruption, and even industry consultants will tell [you] not to change unless you have a great reason to do so. The disruption can cost a tremendous amount of time and money . . . .").

7.      A number of large dealerships – including Hendrick Automotive – have abandoned attempts to switch DMS providers in light of the high switching and conversion costs. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 43 ("In some cases, the disruption is so high that the end result is that [the] dealership abandons the switch and goes back to their old provider, such as in the case of Hendrick Automotive.") (citing Ho Ex. 138, PX 568 at CDK-0072374, in which the Hendrick CEO announced it was abandoning the switch from Reynolds to CDK: "After thoughtful consideration we determined that, given the amount of internal effort required, this was not the right time for our organization to proceed with a Dealership Management System conversion.");

Ho Ex. 151, PX 682 at REYMDL00298566 (CDK CEO Brian MacDonald stating that, "[u]nfortunately, Hendrick has decided to not move forward with the installation. . . . The reality is that, switching DMS providers can be very difficult.  It will be quite a process change and takes time, which is part of the reason that many dealers are hesitant to switch."); Ho Ex. 295 at CDK-0728580 ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ho Ex. 163, PX 772 at CDK-0117339 ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 36 (similar example for Asbury Auto Group – the nation's seventh-largest dealership group – which abandoned attempt to switch from Reynolds to Dealertrack); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 75 n.104.

8.      Because of the high costs of switching, dealers stay with CDK or Reynolds for an average of approximately 20 years; 95% to 97% of dealerships stay with their current DMS provider in a given year; and many of the switches that do occur are the result of dealership acquisitions and consolidation, rather than a dealership's decision to switch DMS providers because it is dissatisfied with the service.  Ho Ex. 229, PX 1209 at CDK-1170533 ████████████████████

████████████████████████████████████████████████████████████████████ Ho Ex. 355 at CDK-1994705.007 ██████████████████████████████████████████████

██████████████████████████████████████████████ Ho Ex. 230, PX 1211 at CDK-3111769 (CDK CEO Brian MacDonald: "You can see where we have a lot of competitive advantages that makes our customers very sticky and that we have our contracts with customers for generally a very long time, on average often 20 years."); Dorris Ex. 151, (Dkt. 977-153), Israel

Rep. ¶ 76 (Dr. Israel calculating 4.4% switching rate for 2017); Ho Ex. 460, Declaration of

Sumanth Addanki ("Addanki Decl.") ¶¶ 48-49 (Defendants' expert calculating 3% switching rate

for 2016); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 19 (noting the "increasing trend toward

consolidation" among dealerships, with the total number of distinct dealership owners expected to

shrink from 7,700 to 6,500 by 2025); Ho Ex. 161, PX 766 at CDK-3107948:14-949:15 ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████.

9.      In 2007, Microsoft attempted to enter the DMS market, but abandoned that effort

several years later due to the obstacles to entry.  Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶

37 ("The challenges of penetrating the market are so substantial that even a Microsoft supported

initiative in the mid-2000s to enter the DMS market was unsuccessful despite great interest from

the dealer community."); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 84; Brockman and

Fortier, *On the Record, Tough Questions.  Straight Answers*, at 1 (Reynolds's Brockman stating

that he would remain unconcerned about Microsoft's potential entry into the DMS market unless

Microsoft "committed a couple of billion dollars to put out a DMS product") (on file with

author); Ho Ex. 70, David Barkholz, *Data system is Brockman's latest surprise*, Automotive

News (Jan. 25, 2009), https://www.autonews.com/article/20090125/RETAIL06/301259970/data-

system-is-brockman-s-latest-surprise (Brockman:  "[w]hen you see them [Microsoft] set up a

thousand-person programming group somewhere that's dedicated to producing a dealership

management system, then it's time to sit up and pay attention.  Until then, there's not a

chance."); Ho Ex. 8, Jezek Tr. 362:19-363:3 ("[T]he environment of the CDK and Reynolds was

– their entrenched position was too strong and I think they [Microsoft] just gave up."); Ho Ex. 71, David Barkholz, *Dealers get new management system option*, Automotive News (Dec. 2, 2012), https://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option (noting Microsoft DMS "never took off" and Microsoft director for U.S. manufacturing industry stating: "We kind of got ahead of ourselves.").

10.     Switching costs impede even expansion by existing competitors: ████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ because the switching costs were too great to make the expansion effort profitable; and Dominion Enterprises abandoned an attempt to launch a new DMS product called DMX.  Ho Ex. 22, █████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████ Ho Ex. 55, Andreu Tr. 286:11-287:1 (noting Dominion's

"failed attempt" to launch the DMX product "written on a Microsoft dynamics platform. That was

an expensive lesson."); *id.* at 300:6-303:5 ("Q. Before DMX, when was the last time that a new

DMS capable of serving enterprise dealer groups came to market? A. Your question implies that

DMX made it to market. It didn't. But there were several failed attempts. Microsoft themselves

tried with an industry expert that's been around a long time, and they failed. Other companies

have failed. I can't think of one off the top of my head."); Ho Ex. 65, PI Hearing Tr. 2-A-50:13-

14 (Andreu) ("[W]e spent about $50 million trying to build [the DMX DMS] and ended up flushing

it."); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 80.

11.     Dealerships typically use 15 to 20 (or even more) software applications in addition

to the DMS. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 54; Ho Ex. 152, PX 684 at

REYMDL00016618, ¶ 28 ████████████████████████████████████████

████████████████████████████████████████████████████████████ Ho

Ex. 18, Lamb Tr. 44:3-5 █████████████████████████████████████████

███████████████████████ Dorris Ex. 3, (Dkt. 977-4), Declaration of Chris Longpre ("Longpre

Decl.") ¶ 6 ("I use roughly 20 third-party application providers at my dealership."); Dorris Ex.

151, (Dkt. 977-153), Israel Rep. ¶ 28 n.39; *id.* ¶ 56 (demonstrating relevant antitrust markets for

software applications).

12.     Although CDK and Reynolds also offer their own layered applications, which can

be purchased separately from the DMS or along with the DMS, Defendants' applications

"traditionally were not first-to-market with innovative solutions" and historically have not

"provided the most functional or most cost-effective solutions." Dorris Ex. 150, (Dkt. 977-152),



Stejskal Rep. ¶ 50; Ho Ex. 1, Ayotte Tr. 127:20-128:12 ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ Ho Ex. 453, at SIS_DMS_0014160 (with Service Edge, "ADP tried to come to market with a product that is not quite ready, too many bugs and issues for us right now"); Ho Ex. 255, PX 1539 at CVR-0314203-204 ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ho Ex. 257, PX 1548 at CVR-0071095 ███████████████████████████████████ Ho Ex. 136, PX 564 at CDK-1227767-768 ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

13.     Historically, dating back to the early 2000s, vendors had many options when choosing a data integration provider, with independent providers including Authenticom, Digital Motorworks, IntegraLink, Superior Integrated Solutions ("SIS"), Stone Eagle, Freedom Data Resources, SelectQu, ProQuotes, InDesign, Ryantech, Homenet, and more.  Dorris Ex. 5, (Dkt. 977-6), Declaration of Steve Cottrell ("Cottrell Decl.") ¶ 17 (listing data integration competitors); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 66 (in response to market demand for data integration services, "companies like Authenticom, IntegraLink, DMI, SIS and SelectQu were formed and provided a competitive set of services to the application and service providers that needed data integration.  Indeed, when I was Senior VP for E-Commerce at AutoNation in the early 2000s, I was one of the early users of DMI's data integration services."); Dorris Ex. 7, (Dkt. 977-8), PX 944, Declaration of Howard Gardner ¶¶ 37-42 (noting various data integration

- 12 -

companies); Ho Ex. 244, PX 1284 at SIS_DMS_0002391 (describing competition among data integrators as of 2009); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 26 n.37.

14.     Data integrators have typically charged vendors around $50 – and often less – on a per-dealership, per-month basis.  Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 63 (Authenticom charges $25 to $50); Ho Ex. 65, PI Hearing Tr. 2-A-30:22-25 (Andreu) (SelectQu charged $30); Ho Ex. 30, Battista Tr. 19:19-20:6 (SIS charged $39 to $49); Ho Ex. 45, Elliott Tr. 67:7-11 (StoneEagle charged $35 to $85 a month); Ho Ex. 68, Lampert Tr. 181:11-182:1 (InDesign charges $50 a month for extraction only and $100 a month for extraction plus write-back); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 179, fig. 7.

15.     By offering cost-effective and efficient access to dealer data, integrators allow startup software vendors to enter the market and offer new applications for dealerships.  Ho Ex. 19, Rubino Tr. 93:9-20 (Vince Rubino, of the vendor TotalLoop, testifying that, "[w]ithout question," Authenticom enabled his data mining application to enter the market and grow: "Without that data, we couldn't do what we did. . . . [W]e could never have done it without them."); Dkt 977-3, Declaration of Michael Korp ("Korp Decl.") ¶¶ 4-6, 8-9 (startup vendor Open Recalls describing how it used Authenticom for data integration, which enabled its app to find "early success" helping dealerships track down car owners with unresolved safety recalls; after Authenticom was blocked by Defendants, "Open Recalls' revenues went from more than $120,000 in March 2015 to virtually no revenues for the next five months.  It was a business catastrophe."); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 66 & n.85 (industry expert Stejskal noting that, "when I was Senior VP for E-Commerce at AutoNation in the early 2000s, I was one of the early users of DMI's data integration services," and citing Ho Ex. 211, PX 1034, which was a DMI news release – which quoted Stejskal – touting how its data integration services "improve the car-buying

experience of thousands of consumers every day"); Ho Ex. 467, Cottrell 7/28/2020 Decl. ¶ 1 ("By providing those vendors with affordable access to dealer data, we help them get their business off the ground and expand and grow.").

16.     Over two decades, no data integrator has ever caused a security or data breach at any automotive dealership.  Dkt. 977 ¶ 113 (Authenticom has never had a data breach); Ho Ex. 30, Battista Tr. 13:7-9 ("Q. Has SIS ever had a data breach at any time since 2003?  A. Never."); Ho Ex. 28, Gardner 3/6/19 Tr. 26:18-21 ███████████████████████████████████
████████████████████████████████ Ho Ex. 5, Distelhorst Tr. 45:2-12 ████████████████
████████████████████████████████████████ Ho Ex. 45, Elliott Tr. 85:18-21 ("Q. Has StoneEagle to your knowledge, ever caused any data breaches in connection with its data integration business?  A. No.  Not that I'm aware of."), *id.* at 134:25-135:5 (unaware of any security breaches at automotive dealerships caused by StoneEagle's integration); Ho Ex. 55, Andreu Tr. 114:3-4 ("[T]o my knowledge, Authenticom never had anything that resembled a breach."); *id.* at 352:16-18 ("Q. Has SelectQu ever been the cause of a data breach?  A. None in my knowledge."); Ho Ex. 68, Lampert Tr. 35:20-21 ("Q. Has InDesign Data ever had a data breach?  A. Not once, fortunately.").

17.     Defendants have repeatedly recognized that other data integrators – including Authenticom and SIS – compete with Defendants' "certified" data integration products and thus constrain their ability to raise prices.  Ho Ex. 338 at CDK-1313249 ██████████████████
███████████████████████████████████████████████████████████████████████████
████████████████ Ho Ex. 371 at CDK-2931056.005 ██████████████████████████████████
████████████████ Ho Ex. 190, PX 911 at CDK-2927804 (May 12, 2016) (Ron Workman) ████████████████████████████████████████████████████████████

- 14 -

██████████████████████████████████████████████████████████████

████████████ Ho Ex. 160, PX 741 at CDK-0124033, slide 6 █████████████

██████████████████████████████████████████████████████████████

████████████████ Ho Ex. 259, PX 1558 at CDK-0175309.024 & .026 █████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████ Ho Ex. 271 at CDK-0000800

(*Authenticom* Dkt. 106-26) ("Unless we secure our DMS, some 3rd parties will defect from the

CDK 3PA program. . . . CDK is unable to capture full value for our 'CDK Approved' integration

due to lack of DMS security"); Ho Ex. 158, PX 736, Thorne Decl. ¶ 77 ("If CDK enables hostile

integrators, it not only will lose critical transparency to data flows in the industry, but it likely will

lose participants in the 3PA program."); Ho Ex. 188, PX 908 at CDK-1442845 ██████████

██████████████████████████████████████████████████████████████

███████████████████████ Ho Ex. 274 at CDK-0019518 ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████; Ho Ex. 184, PX 900 at CDK-0816958

████████████████████████████████████████████████████████████ Ho Ex.

192, PX 926 ██████████████████████████████████████████████████ Dkt.

977, ¶ 45.

      18.     Unlike with Authenticom's DealerVault platform, Dkt. 977, ¶¶ 30-44, Defendants'

3PA and RCI integration services do not provide dealers with transparency and control over the

flow of their data or data-enhancement services that make the data easy for vendors to use.  Ho

Ex. 305 at CDK-0803493.015 █████████████████████████████████████

Dorris Ex. 3, (Dkt. 977-4), Longpre Decl. ¶ 5 ("CDK gives us little control or visibility into how our data is used."); Dorris Ex. 9, (Dkt. 977-10), Supplemental Declaration of Wayne Fitkin ("Fitkin Suppl. Decl.") ¶ 7 ("One major benefit of using Authenticom's DealerVault product is that it allows me to select, and thus limit, the particular types of data that I can send to a given vendor. . . . CDK does not have an equivalent product; I have never found a way to turn off a 3PA feed, let alone control what data is accessible via 3PA."); Ho Ex. 440 at REYMDL00110419 ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ ; *id.* at 420 ███████████████████████████████

███████████████████████████████████████████████████

███████ Ho Ex. 65, PI Hearing Tr. 2-A-38:4-16 (Andreu) (Authenticom's "service was, in my opinion, better. It was absolutely at least as good by any definition, but I think better, and probably for us the most significant thing is if I get data through a certified means, whether it's CDK or Reynolds and Reynolds, I still . . . have to send that data to somebody to enhance it, so when I used Authenticom or SelectQu, the data came from the DMS. It was clean, standardized, enhanced, and then sent to me, and when I got it, I was done. Now I have to write routines that bring in the data from CDK or Reynolds and Reynolds, both more complicated than getting it from Authenticom to begin with, then package that data up, send it out to be enhanced.").

19.     CDK has substantially expanded its portfolio of applications because it has determined – as former CEO Brian MacDonald put it – ███████████████████████████

███████████████████████████████████ As two examples, CDK acquired

the leading digital marketing application, called Cobalt, for $400 million (in 2010) and a leading

customer relationship management application, called ELEADS, for an estimated $550 million (in

2018). Ho Ex. 162, PX 770 at CDK-1190297 (████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ho Ex.

161, PX 766 at CDK-3107991:14-18 (████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Ho Ex. 73, https://investors.cdkglobal.com/news-releases/news-

release-details/cdk-global-acquire-elead1one (CDK announcing ELEAD acquisition in 2018).

     20.     Because CDK's layered applications historically relied on independent integrators

– including DMI, SIS, and Authenticom – for access to Reynolds's dealer data, Reynolds's

blocking of those integrators put CDK's layered application business at risk. Ho Ex. 312 at CDK-

0834881 ████████████████████████████████████████████████████████

████████████████████ Ho Ex. 314 at CDK-0835049 ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████;

Dkt. 977, ¶ 116 (noting CDK applications used Authenticom for data integration services); Ho Ex.

100, PX 255 at CDK-2286512.005 ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

21.     In 2007, Reynolds CEO and Chairman Bob Brockman unsuccessfully proposed to CDK Vice President Ron Workman that CDK and Reynolds form a joint venture to become the sole "provider of extraction/collection of data from both our DMS products to all third parties." Ho Ex. 118, PX 442 at CDK-3059253 ███████████████████████████████████

███████████████████████████████████████████████████ Ho Ex. 10, Workman Tr. 41:10-18

██████████████████████████████

22.     Through at least June 2013, in contrast to Reynolds, CDK supported dealers' right to use data integrators.  Ho Ex. 22, Whitworth Tr. 299:17-21 ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Ho Ex. 353 at CDK-1867793.020-.021 ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ Dorris Ex. 79, (Dkt. 977-81), PX 872 at CDK-1390279.030 (Jan. 16, 2013) ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Dorris Ex. 80, (Dkt. 977-82), PX 875 at CDK-0974989.002 (████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ho Ex. 1, Ayotte Tr. 34:12-23 █████████████████████████████████████████████████

█████████████████████████████████████████████████ Ho Ex. 66, *CDK v. Brnovich* PI Hearing Tr. 359:16-360:12 (Alan Andreu, of the software vendor Dominion Enterprises,

testifying that he had a conversation at the 2013 NADA convention with key CDK executive Kevin Distelhorst, where the two of them "threw stones" at Reynolds over their closed stance and increasing data integration charges); Ho Ex. 318 at CDK-0847064.002 ████████████████

████████████████████████████████████ Ho Ex. 177, PX 878 at CDK-1524404.006 ████████████████████████████

████████████████████████████████████████████

████████████████ Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 122.

23. Between 2006 and 2013, CDK's "open" strategy enabled it to overtake Reynolds as the nation's largest DMS provider, as reflected in the chart reproduced below. Dorris Ex. 70, (Dkt. 977-72), PX 443 at CDK-0244310.002; Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶¶ 124-126. During this period, "these tactics that Reynolds were using was causing so much discontent in the dealer community that it was driving large and small dealer groups in droves away from their platform and over to [CDK's]." Ho Ex. 25, Witt Tr. 179:8-12; Ho Ex. 1, Ayotte Tr. 34:6-35:8 ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ Ho Ex. 373 at CDK-3117554 ████████████

████████████████████████████████████

Ho Ex. 283 at CDK-0066958 ████████████████████████

████████████████████████████████ Ho Ex. 319 at CDK-0853633 ████████████

████████████████████████████████████

████████████████████████████████████

 Wedgworth Ex. NN, (Dkt. 968-04), PX 885 at CDK-2673485

Dorris

Ex. 153, (Dkt. 977-155), Whinston Rep. ¶ 307.



24.    From 2006 to 2013, CDK repeatedly used its relationships with OEMs and Reynolds's dealership customers to force Reynolds to stop blocking the access of data integrators. In this timeframe, "R&R has learned ***the very hard way*** that locking down the DMS is not primarily a technical issue," but rather is "primarily a BUSINESS issue" because "dealers and OEMs and the whole ecosystem of applications and services that they depend on ***LOVE*** hostile third-party integration."  Wedgworth Ex. NN, (Dkt. 968-04), PX 885 at CDK-2673485; Ho Ex. 25, Witt Tr. 231:3-7

███████████████████████████████████████████████

████████████████████████████████████████ Dorris Ex. 80, (Dkt. 977-82),

PX 875 at CDK-0974989.006 ██████████████████████████████████

███████████████████████████████████████████████

███████ Dorris Ex. 132, (Dkt. 977-134), at CDK-3122868.003 (Feb. 22, 2012) ███████

██████████████████████████████████ Ho Ex. 195, PX 946 at CDK-0832938

██████████████████████████████████ Fenske Ex. 149, (Dkt. 975-

149), at CDK-0834674 ████████████████████████████████████

█████████ Ho Ex. 288 at CDK-0223037 (Aug. 10, 2013) (Richard Nichol) ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ Ho Ex. 309 at CDK-0833700 & CDK-0832739 (Aug. 19, 2013)

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████ Ho Ex. 179,

PX 882 at CDK-2395865 █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

- 21 -

25. ███████████████████████████████████ lamented the competitive pressure put on it by CDK, complaining that CDK's criticisms of Reynolds's closed system led to large losses in dealership customers and revenue. Ho Ex. 15, ███████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ *id.* at

139:3-140:4 ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ Ho Ex. 61, Bresnahan Tr. 68:10-69:5

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ *see also* Ho Ex. 145, PX 642 at

REYMDL00260942 ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

26. As a result of competition from CDK, Reynolds was losing business and could not effectively "close" its system to data integrators. Ho Ex. 121, PX 446 at CDK-2053727 ████████

███████████████████████████████████████████

███████████████████████████████████████ Ho

Ex. 460, Addanki Decl. ¶ 58 (Defendants' economic expert stating that – "based on discussions with Reynolds's Mr. Schaefer" – Reynolds's "increase in DMS access restrictions and investment in enhanced security was, in the short run, unprofitable for Reynolds, and it lost business as a result."); Dorris Ex. 8, (Dkt. 977-9), Declaration of Ronald Lamb ¶ 10 (Reynolds's former President stating that "many major DMS providers" have used "their more 'open' computer architecture and data policies" as a "major factor" in competing against Reynolds); Ho Ex. 153, PX 691 at REYMDL00243259 ███████████████████████████████████████

███████████████████████████████████████████████████████████ Ho Ex. 119, PX 444 at CDK-2462264 ████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████ Dorris Ex. 132, (Dkt. 977-134) at CDK-3122868.005 & .008 ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Ho Ex. 60, Murphy Tr. 293:18-294:1 (CDK's expert Dr. Murphy: "[I]n a world where you're competing on openness, they [CDK] were keeping Reynolds more open."); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 130; Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶¶ 35, 77.

27.     Reynolds whitelisted the ability of its largest dealership customers (such as Penske Automotive and Hendrick Automotive Group), OEMs, and important vendors such as SiriusXM to use data integrators.  Ho Ex. 434 at PAG_0000471; Ho Ex. 432 at PAG_0000332; Ho Ex. 433 at PAG_0000350; Ho Ex. 315 at CDK-0835598 ████████████████████████████████

███████████████ Ho Ex. 365 at CDK-2685300 (█████████████████████████████████r

██████████████████████████████████████████████████████████████

████████ Ho Ex. 147, PX 672 at REYMDL00048078 █████████████████

██████████████████████████████████████████████████████████████

█████████████████ Ho Ex. 148, PX 673 at REYMDL00222238 ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ho Ex. 44,

Schaefer 4/18/19 Tr. 281:17-285:2 ████████████████████████████

████████████████████████████████████████ Ho Ex. 120, PX 445 at CDK-

0223018 (█████████████████████████████████████████████████████

█████████████████████████); Ho Ex. 110, PX 381 at REYMDL00480055

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ho Ex. 112,

PX 383 at REYMDL00534306 ██████████████████████████████████████

████████; Dorris Ex. 153, (Dkt. 977-155), Expert Report of Michael Whinston ("Whinston

Rep.") ¶ 164 ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 130 & nn.182-83.

28.     Reynolds kept a list of "major" dealer accounts whose DMS contracts were coming

up for renewal within six months and whitelisted those dealerships during the sales and renewal

period. Ho Ex. 15, Brockman 1/16/19 Tr. 149:13-151:3 ██████████████████████████

██████████████████████████████████████████████████████████████

█████████████████ Ho Ex. 111, PX 382 at REYMDL00574089 ████████



Ho Ex. 9, Hill Tr. 225:17-227:18 ████████████ Ho Ex. 443 at REYMDL00189335 ████████████ Ho Ex. 438, REYMDL00039352 ████████████ ; Ho Ex. 44, Schaefer Tr. 209:19-216:18 ████████████

████ Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 130 & n.184.

29.    Data integrators have provided real-time and write-back data functionality; and they have touted those capabilities (among other service features) to win customers.  Ho Ex. 30, Battista Tr. 219:17-19 (SIS owner Phil Battista stating that "the core of what SIS did was real-time data integration"); *id.* at 317:3-5 (SIS provides "instantaneous" real-time integration to its remaining customers); Ho Ex. 244, PX 1284 at SIS_DMS_0002391 (describing competition among data integrators in 2009 and noting SIS "specializes in bi-directional interfaces" and SIS touting its "best in class services"); Ho Ex. 190, PX 911 at CDK-2927804 ████████

██████████████████████████████████████████

██████████████████████████████████████████

████ ; Ho Ex. 45, Elliott Tr. 250:19-251:17 (Stone Eagle provided real-time data access); Ho Ex. 85, DX 1123 (marketing document for InDesign's "BART" service, which stands for Bi-directional Access Real Time); Ho Ex. 68, Lampert Tr. 24:3-24 (InDesign's service could be customized by the dealer to pull data in near real-time increments of every five minutes); Ho Ex. 55, Andreu Tr. 333:6-18 (SelectQu provided real-time, bi-directional data integration); Ho Ex. 464, Declaration of Steve Cottrell ¶¶ 3-11 (Dec. 18, 2019) ("Cottrell 12/18/19 Decl.") (noting Authenticom "has also offered bi-directional data integration for more than a decade" and listing

customers that have purchased write-back data integration services from Authenticom); Dorris Ex. 139, (Dkt. 977-141), REYMDL00015101 at 103 ███████████████████████████████

███████████████████████████████████████████████ Dorris Ex. 5, (Dkt. 977-6), Cottrell

Decl. ¶ 32 (Authenticom has $20 million cybersecurity insurance policy).

30.     Dealer-initiated downloads – in which a dealership employee manually extracts and exports data to particular vendors, typically on a daily basis – is not an adequate substitute for automated data integration.  Ho Ex. 317 at CDK-0839308 ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████; Ho Ex. 6, Gerlich Tr. 86:9-14 ██████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ Ho Ex. 326 at CDK-0917213 █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ Ho Ex. 55, Andreu Tr. 348:3-14 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ *id.* at 349:8-9 ███████████████████

█████████████████████████████████████████████████ Ho Ex. 47, Green Tr.

239:15-18 (Cox Rule 30(b)(6) witness) (████████████████████████████████████

██████████████████████████████████████████████████████████████); Ho

Ex. 65, PI Hearing Tr. 2-A-9:22-10:20 (June 27, 2017) (Wayne Fitkin, the IT Director for the Walters Automotive Group, testifying:  "Here is the thing about manual:  Manual doesn't work,"

citing an example of a vendor with 50 dealership customers: "He's got to find 50 people, one in each store, to manually run a report, grab the data, and then transmit it to Authenticom. These people can't have a day off. They can't make a mistake, can't have a vacation. It doesn't work unless you can automate the process."); Ho Ex. 167, PX 815 at TL00000181 

); Ho Ex. 19, Rubino Tr. 141:13-142:10

Ho Ex. 366 at CDK-2720210

Ho Ex. 441 at REYMDL00115805 (Aug. 23, 2013)

Ho Ex. 177, PX 878 at CDK-1524404.002

Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 64 (Plaintiffs' industry expert Mr. Stejskal opining that, based on his experience in the

industry, manual push is not a workable solution for most applications and most uses); Ho Ex. 464, Cottrell 12/18/19 Decl. ¶¶ 17-20 (describing the limitations and difficulties of using Dynamic Reporting); *id.* ¶ 21 ("Very often, dealers forget to (or choose not to) perform these daily reports. To remind dealers, Authenticom makes literally thousands of reminder requests via telephone and email every week asking dealers to run and send the reports. Despite those efforts, on a typical day at most 50% to 60% (best case) of Reynolds dealerships will be up to date with respect to exporting the necessary data to Authenticom.").

31.     CDK's revenues and profits from its DMI data integration subsidiary nearly ███████ from 2010 to 2012, from ██████ million to ██████ million, with profit margins reaching 37.8% – with "[n]early all" of that revenue depending "to one degree or another" on DMI's ability to provide automated data integration to Reynolds dealers. Ho Ex. 173, PX 867 at CDK-2279734 at slide 4; Dorris Ex. 79, (Dkt. 977-81), PX 872 at CDK-1390279.004 ██████████████████████ ████████████████████████████ Ho Ex. 304 at CDK-0803340.003 (Oct. 9, 2013) ██████████ ███████████████████████████████ *id.* at .005 ████████████████████████████ ██████████████████████████ Ho Ex. 176, PX 877 at CDK-0771481 █████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ho Ex. 177, PX 878, CDK-1524403- 404.001 ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████

32.     In response to Reynolds's blocking of DMI in August 2013, CDK set up a "war room" and worked to apply pressure on Reynolds through OEMs and Reynolds's dealer customers, including by criticizing the blocking tactics in conversations with Reynolds dealers and encouraging them to switch to the CDK DMS.  Ho Ex. 310 at CDK-0834484 (Aug. 15, 2013)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ Dorris Ex. 114, (Dkt. 977-116), at CDK-0833797 (Aug. 14, 2013) ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Ho Ex. 324 at CDK-0904950 (Aug. 25, 2013) ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ho Ex. 267 at AUTH_00169150 (CDK sales representative telling a Reynolds dealer: "Reynolds and Reynolds loaded this user ID disabling logic into your dealership's server, and bottom line they are responsible for your frustration.  They've been telling dealerships that this is a security measure . . . but I honestly think they just want to be able to charge you (and us, and our clients, even the OEMs) for something we'd given you at no cost; the potential to turn your data into improved revenue and/or service."); Ho Ex. 437 at REYMDL00039153 █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Ho Ex. 323 at CDK-0873420 (Aug. 25, 2013) ██████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Ho Ex. 322 at CDK-0872416 ███

██████████████████████████████████████████████ Ho Ex. 324 at

CDK-0904950 ████████████████████████████████████████████

████████████████████████████████████

33.    In August 2013, Reynolds was under fire from dealers and OEMs as a result of its

blocking tactics and registered its "poorest month in a couple years" for its DMS business.  Ho Ex.

109, PX 374 at REYMDL00039156 ███████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████ Ho Ex.

444, REYMDL00200844 ██████████████████████████████████

████████████████ Ho Ex. 445 at REYMDL00200976 ████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████ Ho Ex. 441 at REYMDL00115806 ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████ Ho Ex. 448 at REYMDL00247621 ██████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

34. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

35.     In August 2013 and September 2013, there were multiple calls between high-ranking CDK and Reynolds's executives, although CDK witnesses professed a lack of memory about these conversations. Ho Ex. 178, PX 879 at CDK-1478961 ████████████████ ███████████ Ho Ex. 311 at CDK-0834717 ███████████████████████ ██████; CDK-0834881 ████████████████████████████ Ho Ex. 180, PX 883 at CDK-0872981 ███████████████████████████ Fenske Ex. 150, (Dkt. 975-150), at CDK-0872875 ████████████████████████ Ho Ex. 120, PX 445 at CDK-0223018 ██████████████████████████ Ho Ex. 89, PX 62 at CDK-0767469 ███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Ho Ex. 28, Gardner 3/6/19 Tr. 90:17-92:9 █████████████

███████████████████████████████████████████████ Ho Ex. 10, Workman Tr. 77:2-78:2 ██████████████████████████

████████████████████████████████████████████████

██████████

36.     On September 27, 2013, after several telephone communications between the two companies in August and September, CDK's Gardner and Reynolds's Schaefer met at CDK's offices in Columbus, Ohio, and agreed on a "framework" with three "business points": █

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████     Fenske Ex. 61, (Dkt. 975-61), PX 948 at CDK-0802600.

37.     Following the September 27, 2013 meeting between CDK's Howard Gardner and Reynolds's Bob Schaefer, Mr. Gardner repeatedly directed his team not to criticize Reynolds's closed-system policies, including in the following examples:







38.     After the September 27, 2013 meeting between Mr. Schaefer and Mr. Gardner, Reynolds largely stopped its blocking of DMI and "whitelisted" numerous user credentials used by DMI to access the Reynolds DMS so that they could continue to operate, as reflected in the below chart:



Ho Ex. 291, CDK-0340005; Ho Ex. 57, Whinston Tr. 214:16-215:8█████████████████

███████████████████████████████████████████████████████████

███████; Ho Ex. 98, PX 252 at CDK-0801743 (Dec. 7, 2013) ███████████████████

███████████████████████████████████████Ho Ex. 354 at CDK-1994130-131█

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ Ho Ex. 290 at CDK-0258167 ████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Ho Ex. 100, PX 255 at CDK-2286512.003

████████████████████████████████████████████████████████████

███████████████████████████████ Dorris Ex. 158, (Dkt. 977-160), Reply Expert Report of Mark Israel ("Israel Reply Rep."), ¶ 120 ("In essence, Reynolds had a powerful hammer in the DIS/app world that could be used to stop CDK from competing with it on openness, or at least make it very difficult for CDK to do so.").

39.    The DMS switching data shows that CDK stopped competing as aggressively against Reynolds in the DMS market following their September 2013 agreement. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Ho Ex. 263, PX 1708;[1] Dkt. 977-153, Israel Rep. ¶ 148 (noting that the "share of Reynolds' competitive DMS losses going to CDK declined" beginning in 2013, even though Reynolds intensified its efforts to block dealer-authorized data integrators, which caused it to suffer its worst month and fiscal quarter in years); Dkt. 977-160, Israel Reply Rep. ¶ 103 ("[T]he switching data confirms that Reynolds succeeded in cooperating with CDK to prevent a spike in losses to CDK following its 2013 lock-out initiative, with the overall trend in declining losses continuing from 2011 through the initial conspiracy period."); Ho Ex. 57, Whinston Tr. 270:9-11 ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Dkt. 977-155, Whinston Rep. ¶ 448, fig. 28 ▮▮▮▮▮▮

▮▮▮▮▮▮ *id.* at ¶ 450 (Figure 32) ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

40.     In 2014, CDK began pursuing a marketing strategy of attacking data integrators and Authenticom specifically – in coordination with Reynolds – using "security" rhetoric.   Ho Ex. 327 at CDK-0925519 (at the 2014 NADA conference (January 24-27 in New Orleans), CDK presented a "Data Security Workshop" -- marketed to the "entire [CDK] email database" – concerning the risks of "giv[ing] people access to your DMS" and the benefits of CDK's data integration service 3PA, which offered "secured, monitored access."); Ho Ex. 466, CDK-0186600 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Ho Ex. 296 at CDK-0793256 (Feb. 7, 2014) (CDK letter to dealers designed to "[c]ombat the DealerVault solution" of Authenticom); Ho Ex. 360,



CDK-2308764 (similar letter dated May 30, 2014); Ho Ex. 361, at CDK-2401122.001 (August 2014 letter from CDK to Volkswagen dealerships, stating that Authenticom was "not an approved vendor" and casting further doubt on Authenticom: "We do not have information about the methods being used by Authenticom to access your DMS data, nor do we have knowledge of what data is extracted by Authenticom, the third parties to whom Authenticom may deliver your data, or the intended use of your data by those third parties."); Ho Ex. 372 at CDK-2933245 ███

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████ Ho Ex. 368 at CDK-2856996 ███

█████████████████████████████████████████

     41.     Beginning in 2014, Reynolds held off – for more than a year – on releasing "security changes" to block data integrators, including DMI and IntegraLink, while Defendants formalized the mechanics of the "soft landing" the two companies had agreed to in September 2013; CDK understood that once those agreements were executed, Reynolds planned to "lock down their DMS" and block Authenticom and other non-DMI data integrators.  Ho Ex. 197, PX 951 at CDK-2238112 (Apr. 14, 2014) ███████████████████

███████████████████████████ Ho Ex. 336 at CDK-1210721 ███

███████████████████████████████████████████

███████████████████ Fenske Ex. 55, (Dkt. 975-55), PX 645 at CDK-0222847

███████████████████████████████████████████

███████████████████████████████ Ho Ex. 198, PX 953 at CDK-0223000 ███████████████████████████████

Ho Ex. 356 at CDK-2109583 ███████████████████████████████████

████████████████

    42.    █████████████████████████████████████ Reynolds would "support" CDK's efforts to convince the vendor Vital Insights Group ("VIG") to switch from Authenticom to DMI.  Ho Ex. 298 at CDK-0800659 █████████████████████

████████████████████████████████ Ho Ex. 246, PX 1389 at CDK-0801246; Ho Ex. 245, PX 1388 at CDK-0801423 ██████████████████████

██████████████████████ Ho Ex. 44, Schaefer 4/18/19 Tr. 47:17-54:17

█████████████████████ Later, in the spring of 2014, CDK assisted Reynolds by transitioning SiriusXM – which had been an Authenticom customer in 2013 – to the RCI program ████████████████████████ Ho Ex. 199, PX 954 at CDK-2239175-176 ███████████████████████████████████

███████

    43.    ████████████████████████ coordinated their messaging with respect to whether competing data integrators were "certified" by CDK and Reynolds.  Ho Ex. 299 at CDK-0801277 ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ Ho Ex. 297 at CDK-0800391 ████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ Ho Ex. 204, PX 967 at

CDK-0792551 

Ho Ex. 29, Gardner 3/7/19 Tr. 347:13-348:6

44.     Beginning in late August 2013, as it was engaged in daily or near-daily communications with Reynolds, CDK began internally investigating the possibility of blocking data integrators.  Dorris Ex. 150 (Dkt. 975-150), at CDK-0872875

Dorris Ex. 82, (Dkt. 977-84), PX 884 at CDK-1105564

Ho Ex. 181, PX 892 at CDK-1402528

Dorris Ex. 82, (Dkt. 977-84), PX 884 at CDK-1105564

Wedgworth Ex. NN, (Dkt. 968-04), PX 885 at CDK-2673485

Ho Ex. 187, PX 907 at CDK-0950676 to CDK-0950679

Ho Ex. 462, CDK-0767624                a

██████████████████████████████████████████████████ Ho Ex. 247, PX 1390

at CDK-2182964 (Dec. 4, 2013) ███████████████████████████████████████

███████████████████ Ho Ex. 300 at CDK-0801867 (███████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████ Ho Ex. 325 at CDK-0912660 █████████████████████████████████

████████████████████

45.     Over a multi-year period, CDK and Reynolds on many occasions explicitly discussed their approaches to competition from Authenticom.  Ho Ex. 204 PX 967 at CDK-0792551 ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████ Fenske Ex. 60, (Dkt. 975-60), PX 938 at CDK-0817806 (████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████ Ho Ex. 102, PX 257 at CDK-0905356 ██████████████████████████████

██████████████████████████████████████████████████████████████; Ho Ex.

253, PX 1504 at CDK-2270358 ██████████████████████████████████████████



Ho Ex. 50, Hall (Reynolds 30(b)(6)) Tr. 154:7-159:23

Ho Ex. 251, PX 1411 at REYMDL00221475

Ho Ex. 301 at CDK-0802267

46.      In late 2016, CDK's Steve French – who had been engaging in the "weekly synch ups" with Reynolds over "any/all overarching tactical issues" between the two companies, *see supra* paragraph 35 – told Vince Rubino, the owner of the vendor TotalLoop, that CDK was working with Reynolds on blocking the ability of independent integrators to effectively use Reynolds's Dynamic Reporting program.   Ho Ex. 168, PX 819 at AUTH 00144031 (Rubino writing in contemporaneous email in December 2013 that French "had told me that they were assisting Reynolds on disabling the functionality required of third party data aggregators in dynamic reporting."); Ho Ex. 19, Rubino Dep. Tr. 175 (Rubino testifying that PX 819 accurately reflects what French told him); Ho Ex. 468, PX 818 (showing communications between French and Rubino in the relevant time frame); *see also* Ho Ex. 91, PX 125 at REYMDL00233147

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

47.     CDK's SecurityFirst initiative was a marketing campaign designed to drive up 3PA revenues, without any substance behind the security claims.  Ho Ex. 236, PX 1247 at CDK-2666064 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Ho Ex. 469, PX 1253 at CDK-2674288

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Ho Ex. 139, PX 577 at CDK-1752981 █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Ho Ex. 172, PX 865 ███████████

- 42 -

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████  Ho Ex. 171, PX 851 at CDK-0843493  ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████  Ho Ex. 208, PX 992 at CDK-

0039289  ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

48.     Although CDK employees gave contradictory testimony on when CDK decided to

close its system to data integrators, ███████████████████  the decision was made in

July or August 2014.  Ho Ex. 158, PX 736, Thorne Decl. ¶ 48 (Malcolm Thorne, CDK's Global

Chief Strategy Officer, stating that, "in July 2014, I recommended that we take immediate action

to secure the DMS" from data integrators); Ho Ex. 182, PX 896 at CDK-2879756 ██████████

███████████████████████████████████████████████

███████  Ho Ex. 26, McCray Tr. 17:22-18:1 ████████████████████████

███████████████████████████████████████████████

███████████████████████████  *but see* Ho Ex. 29, Gardner 3/7/19 Tr. 408:7-

410:5; Ho Ex. 28, Gardner 3/6/19 Tr. 195:15-196:4 (██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

49.     CDK informed Reynolds about its decision to close its DMS before making any public announcement of that decision.  Ho Ex. 249, PX 1394 at REYMDL00243035 ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Ho Ex. 146, PX 644 at REYMDL00261632

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████

50.     Following the September 27, 2013 meeting ████████████████████████

██████ CDK and Reynolds commenced negotiations regarding a formal, written agreement to fully implement their September 27, 2013 accord.  Fenske Ex. 152, (Dkt. 975-152), at CDK-0901363 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Ho Ex. 144, PX 641 at CDK-0903802 ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

51.     Both CDK and Reynolds characterized their formal agreement as an agreement to close their respective DMSs to data integrators, including specifically Authenticom.  Ho Ex. 199, PX 954 at CDK-2239175 ████████████████████████████████████████████

████████████████████████████████████████████████ Ho Ex. 272 at CDK-0001062 (*Authenticom* Dkt. 106-38) (agreement would enable CDK to "Secure the CDK DMS

through eliminating opportunities for key enablers of hostile integration (R&R – Authenticom, Dominion, SelectQu).); Ho Ex. 185, PX 902 

Ho Ex. 10, Workman Tr. 82:2-83:2, 98:14-16

Ho Ex. 39, Anenen Tr. 158:23-161:22

Ho Ex. 159, PX 740 at CDK-1222549

Ho Ex. 202, PX 964 at CDK-0917344 (Mar. 13, 2015)

Ho Ex. 113, PX 390 at REYMDL00043745

Ho Ex. 114, PX 391 at REYMDL00574720

Ho Ex. 9, Hill Tr. 297:8-16

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

52.     Absent agreement, CDK and Reynolds would have returned to competing against one another based on the openness of their DMSs, with CDK once again "badmouthing" Reynolds's data access policies.    Ho Ex. 180, PX 883 at CDK-0872981 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████ Fenske Ex. 62, (Dkt. 975-62), PX 950 ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ (emphasis added); Ho Ex. 28, Gardner 3/6/19 Tr. 164:10-169:17 ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ Ho Ex. 470, PX 447 ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ho Ex. 471, CDK-0222940 ███████████████████████████████████████████████

████████████████████████████████████ Fenske Ex. 61, (Dkt. 975-61), PX 449 ████████

████████████████████████████████████████████████████

53. 

Ho Ex. 100, PX 255 at CDK-2286512.005.

Ho Ex. 101, PX 256 at CDK-1518883.

. Ho Ex. 5, Distelhorst Tr. 280:6-282:11.

icom. Ho Ex. 228 PX

1188 at CDK-1186832.006 █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

54.     As part of the February 2015 written agreements, CDK agreed to stop competing with Reynolds for data integration business among Reynolds dealers; and Reynolds promised that it would not – as it had considered doing in the past – launch a data integration service that would compete with CDK's DMI and Integralink subsidiaries on non-Reynolds DMSs.  Ho Ex. 248, PX 1392 at CDK-0222945-946 ██████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ *see also* Ho Ex. 44, Schaefer 4/18/19 Tr. 66:13-

19 ██████████████████████████ Ho Ex. 451 at REYMDL00936975.011 ████████

████████████████████████████████████████████████████████████

██████████████ Ho Ex. 92, PX 139 ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████

55.     On January 16, 2015, CDK executives met to discuss a "Marketing Plan" with respect to the CDK-Reynolds agreement. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ Ho Ex. 200, PX 960

at CDK-0189718; Ho Ex. 28, Gardner 3/6/19 Tr. 254:13-265:9 ███████████████

██████████████████████ *see also* Ho Ex. 201, PX 961 at CDK-2862100 ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

56.     In the February 2015 agreements, CDK and Reynolds agreed to only access each other's systems through their respective certified integration programs (i.e., 3PA and RCI). Ho Ex. 154, PX 711 at CDK-0189652 ███████████████████████████████

████████████████████████████████████████████████████████

██████████

57.     As part of the February 2015 agreements, CDK and Reynolds agreed to and did coordinate their communications to clients and the market. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Ho Ex. 370 at CDK-2919185.001; Ho Ex. 345 at CDK-1716323 ██████████████████████████████████████ Ho Ex. 346 at CDK-1716774 ███████████████████████████████████

████████████ Ho Ex. 344 at CDK-1715518 ████████████████████ Ho Ex. 439, REYMDL00062093 ██████████████████████████████ *see also* Ho Ex. 186, PX 906 at CDK-2117316 ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ho



Ex. 92, PX 139 at CDK-1424529-532

Ho Ex. 203, PX 965 at CDK-1425511.008

Ho Ex. 154, PX 711 at CDK-0189652

Ho Ex. 155, PX 714 at CDK-1693816

Ho Ex. 156, PX 717, CDK-1617197

; Ho Ex. 95, PX 186 at REYMDL00109185

Ho Ex. 203, PX 965 at CDK-1425511.002



58.    On March 16, 2015, Reynolds "locked down" its system by blocking access to non-DMI integrators, including Authenticom.   Ho Ex. 250, PX 1402 at REYMDL00064850.018

████████████████████████████████████████████████████

███████████████████████████████████); Ho Ex. 194, PX 939 at CDK-2401731 ██████████████████████████████████████ Ho Ex. 107, PX 302 at CDK-2699033 ████████████████████████████ Ho Ex. 472, CDK-0911715 (████████████████████████████████████

████████████████████████████████████████████ █████████    Reynolds then sent a cease-and-desist letter – for the first time – to Authenticom and several other data integrators.  *See* Emmanual Ex. 91 (Dkt. 782-42).

59.     In May 2015, after Reynolds had sent Authenticom a cease-and-desist letter, Reynolds's Mr. Schaefer told Authenticom's Mr. Cottrell that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and to block competitors like Authenticom from pulling dealer data.  Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 52; Ho Ex. 64, PI Hearing Tr. 1-A-138:20-139:13 (Mr. Cottrell relaying Mr. Schaefer's comments during live testimony at the *Authenticom* preliminary injunction hearing: "He said, 'As you know, Mr. Brockman is adamant about removing all third parties from our DMS system.  This is your last chance.  I suggest that you consider this carefully.  We've made agreements with the other major DMS providers to support each other's third party-access agreements and to block independent integrators such as Authenticom.'"); Dorris Ex. 90, (Dkt. 977-92), Schaefer Decl. ¶¶ 97-98 (Mr. Schaefer admitting having this phone call with Cottrell and to having a "series" of conversations with Cottrell in which he "reaffirmed to Mr. Cottrell that Reynolds's firm policy was that unauthorized third parties were not allowed to access Reynolds's DMS.  I further reaffirmed that Reynolds had and would enforce security measures to ensure that no such access could occur.").

60.     Following the execution of the February 2015 agreements, CDK immediately began to lay the groundwork to "secure" its DMS from data integrators.  Ho Ex. 103, PX 268 at CDK-0395057 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ho Ex. 261, PX 1563 at CDK-0012615 ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ Dorris Ex. 153, (Dkt. 977-155), Whinston Rep. ¶ 130 ████████████████████████

████████████████████████████████████████████████████████████████; Ho

Ex. 30, Battista Tr. 59:19-60:4 ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

Ho Ex. 55, Andreu Tr. 180:16-186:17 (Alan Andreu, of Dominion Enterprises, testifying that he had a breakfast conversation with CDK's Kevin Distelhorst during the 2015 NADA convention during which Distelhorst told him that his goal "is to put Steve out of business, referring to Steve Cottrell of Authenticom").

61.    In February 2016, CDK and Reynolds employees had a party to celebrate the one-year anniversary of the February 2015 agreements.  Ho Ex. 96, PX 187 at REYMDL00109651

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ Ho Ex. 157, PX 725 at CDK-0048439 █████████████████████████████████████ Ho Ex. 3, Martin Tr. 110:6-115:20 ███████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ Ho Ex. 97, PX 188 at REYMDL00270151 ████████████████████████████████████

███████

62. On April 3, 2016, in a conversation with Authenticom CEO Steve Cottrell at the NADA convention, CDK's Dan McCray admitted the existence of an agreement between CDK and Reynolds to block data integrators. Mr. McCray approached Mr. Cottrell at Authenticom's booth, but Mr. Cottrell was unavailable at the time. Ho Ex. 64, PI Hearing Tr. 1-A-40:17-23. Mr. Cottrell later approached Mr. McCray at CDK's booth, where Mr. McCray suggested they "take a walk." Ho Ex. 64, PI Hearing Tr. 1-A-140:18-141:15; Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶¶ 48-50. Mr. McCray then led Mr. Cottrell to a secluded area down a service ramp. *Id.* Consistent with Mr. Cottrell's testimony, the NADA floor plan of the exhibit space for the 2016 convention shows a service ramp near CDK's booth. Ho Ex. 165, PX 779 at NADA-2002484. Once they were alone, Mr. McCray said that the "major DMS providers" – of which there are only two, CDK and Reynolds – were "working collaboratively to remove all hostile integrators from our DMS system." Ho Ex. 64, PI Hearing Tr. 1-A-141:16-142:12; Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶¶ 48-50. To end the conversation, "Dan looked [Mr. Cottrell] in the eye and he said, 'I admire you. I admire your company.' He said, 'I'd really like to see you get something for it before I fucking destroy it.'" *Id.*

63. On the morning of April 4, 2016, after a restless night, Mr. Cottrell recorded detailed notes of his conversation with Mr. McCray, Fenske Ex. 32, (Dkt. 975-32), DX 744 at AUTH_00167028, which former FBI computer forensics analyst Brian Halpin analyzed to confirm they were created on April 4, 2016 and have not been modified since that date. Ho Ex. 86, DX 1237, Forensics Report of Brian Halpin.

64. Shortly after his April 3, 2016 conversation with Mr. McCray, Mr. Cottrell recounted that conversation to other Authenticom personnel, COO Brian Clements and Vice President of Product Management and Marketing Katie Wiersgalla. Ho Ex. 2, Clements Tr. 25:8-

26:12, 28:3-30:3 (testifying that Mr. Cottrell called him when Mr. Cottrell was on the way home from the 2016 NADA convention, and recounted his conversation with McCray, in substance, that "Dan McCray indicated to Steve that 'Reynolds and CDK are collaborating together and have an agreement in place to take us [Authenticom] out.'"); Ho Ex. 23, Wiersgalla Tr. 170:18-173:9 (testifying that Mr. Cottrell told her, in substance, that "Dan McCray had approached Steve [Cottrell] at a NADA conference – I believe that was in 2016 – and had said that Reynolds and Reynolds and CDK were working together to destroy the Authenticom business . . . to run Authenticom out of business"); *id.* at 173:24-175:20 (testifying she also heard Mr. Cottrell discuss the conversation with McCray at a meeting with other members of the Authenticom executive team).

65.      Immediately after the 2016 NADA convention, CDK employees recounted



 Ho Ex. 473, at CDK-0182154 Ho Ex. 369 at CDK-2862691 Ho Ex. 141, PX 595 at CDK-2827505-506

66.     Although Dan McCray did not appear in person to testify at the *Authenticom* preliminary injunction hearing, he submitted a declaration confirming that he had the conversation with Steve Cottrell on April 3, 2016 – and confirming many of the details described by Cottrell and recorded in his notes – while denying admitting to an agreement between CDK and Reynolds and making a profane threat to destroy Authenticom's business.  Ho Ex. 183, PX 897, Declaration of Daniel McCray Decl. ¶ 4 (confirming conversation with Mr. Cottrell at NADA convention); *id.* ¶ 5 (confirming Mr. McCray requested that Mr. Cottrell "take a walk" to more secluded area); *id.* ¶¶ 5-7 (confirming discussion about potential CDK acquisition of Authenticom); *id.* ¶ 9 (confirming statement that the CDK-Reynolds agreement diminished Authenticom's value, in a potential acquisition, to CDK); *id.* ¶ 10 (confirming Mr. McCray's statements regarding CDK's contracts with dealers); *id.* ¶ 12 (confirming that Mr. McCray told Mr. Cottrell he planned to retire); *id.* ¶¶ 13, 16-18 (denying statement regarding CDK-Reynolds agreement and threat to destroy Authenticom).

67.     Both CDK and Reynolds impose exclusive dealing requirements on vendors as a condition of joining the 3PA and RCI programs – which, in the case of CDK, lasts forever – that prohibits those vendors from using any other data integration providers for dealers that use their respective DMSs.  Ho Ex. 224, PX 1123 at ▮▮▮▮▮▮▮▮▮▮, § 1(e), (h) (CDK exclusive

dealing provision); Ho Ex. 225, PX 1126 at ███████████████, § 2.5.3 (Reynolds exclusive

dealing provision); Ho Ex. 224, PX 1123 at ███████████████, § 4(h); Ho Ex. 37, ███

██████████████████████████████████████████████████████████████

██████████████████████████████ Ho Ex. 63, PI Hearing Tr. 2-P-179:17-20 (The

Court: "Do you know if there's any justification for doing that?" Mr. Gardner: "No, and I'm not

– I'm puzzled by that."); Ho Ex. 286 at CDK-0164275 ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████

68.     CDK and Reynolds impose price secrecy provisions on vendor customers, which

are intended to and do prevent dealers from calculating and negotiating over the full cost of using

the CDK and Reynolds DMS (including added integration fees).  Ho Ex. 231, PX 1220 at CDK-

0263462, § 8 █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████ Ho Ex. 225, PX 1126 at

██████████████████, § 2.7 (Reynolds price secrecy provision); Ho Ex. 6, Gerlich Tr. 129:13-

131:3 ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Ho Ex. 63, PI Hearing Tr. 2-P-51:7-15 (Reynolds Bob Schaefer explaining that, if RCI fees are

disclosed to dealers, "what happens is they get into a comparison," and "I don't have time to do

all that and put it together and negotiate.  Because, you know, car dealers and vendors, their

strength is negotiations, and so they want to take all of the information they can get and come hit me."); Ho Ex. 271 at CDK-0000887 ████████████████████████

████████████████████████████████████████████████

████████████████ Ho Ex. 88, PX 24 at CDK-0569060 ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ *id.* at CDK-0569059 ████████████████████

████████████ Ex. 8, Jezek Tr. 133:17-135:7 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███ Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 188:15-189:8 (TitleTec vendor)███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Ho Ex. 65, PI Hearing Tr. 2-A-45:4-46:2 (Alan Andreu, of Dominion Enterprises, testifying that the Reynolds's secrecy provision "gags us completely. We can't tell [dealers] anything, so I'm expected to somehow pass through an $893 charge on an $1,152 product without telling [dealers] why"); Ho Ex. 277 at CDK-0041174 ████



69.     When two vendors – ████████████████████████████ – disclosed their RCI

prices on their invoices to Reynolds dealers, Reynolds forced them to pay $100,000 liquidated

damages penalties.  Ho Ex. 226, PX 1157 at ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ Ho Ex. 227, PX 1158 at REYMDL00072101 ████████████

████████████████████████████ Ho Ex. 37, Baerg ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ho Ex. 65, PI Hearing Tr. 2-A-45:11-

46:2 (Dominion Enterprises paid a $100,000 penalty to Reynolds for putting a $195 integration

fee on its invoice: "They said that we violated the secrecy requirement.  They submitted – they

---

² Ho Ex. 276 at CDK-0039610 ████████████████████████████

████████████████████████████████████████████████ Ho

Ex. 1, Ayotte Tr. 184:2-185:8 ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

made us submit to an intimidating audit, and ultimately we wrote them a check for $100,000 or they were going to cut the RCI program off from our Sales Center product.").

70.     Dealers locked into the CDK and Reynolds DMS were harmed when Defendants changed their policies to exclude data integrators and force vendors to purchase data integration through 3PA and RCI at inflated prices.  Ho Ex. 108, PX 353 at REYMDL00583139 ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ho Ex. 252, PX 1470 at CDK-0039514 ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Dorris Ex. 2, (Dkt. 977-3), Korp Decl. ¶ 22 (CDK dealer: "When we entered into our long-term DMS contract with CDK, we had no idea CDK would take this position and would begin disabling and blocking our ability to provide vendors and other third parties of our choosing with access to our own data."); Ho Ex. 457 at SUNROAD_0001840

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Ho Ex. 27, Johnson Tr. 19:12-

16 ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ *id.* at 416:19-417:5 ████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

██████████████ Ho Ex. 284 at CDK-0073775 ███████████████████████████████████

████████████████████████████████████████████ Ho Ex. 316 at CDK-0838841

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████

71.     Prior to July 2015, CDK never enforced any contractual rights it believed it had to prevent dealers from granting access to data integrators.  Ho Ex. 57, Whinston Tr. 183:11-16 ██ ████████████████████████████████████████████████████████████████ *id.* at 193:5-11 ██████████████████████████████████████████████████████████████

Ho Ex. 24,  Noser Tr. 49:3-50:16 (███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ho Ex. 21, Thorne Tr. 40:24-41:9 █████████████████████████████████████████████████████

██████████████████████████████████████████ Dorris Ex. 9, (Dkt. 977-10), Fitkin Suppl. Decl. ¶ 13 ████████████████████████████████████████████████████████

██████████████████████████████████████ Wedgworth Ex. EE, (Dkt. 968-04), PX 835 at CDK-2878952 ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Wedgworth Ex. DD, (Dkt. 968-04), at CDK-3118709 ██████████████████████████████████████████████████████████



(emphasis in original); Wedgworth Ex. FF, (Dkt. 968-04) at CDK-0847679

Dkt. 977, ¶¶ 72-77.

72.     After excluding competition from data integrators, both Reynolds and CDK raised their RCI and 3PA prices (respectively) substantially above competitive levels.  Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 214, tbl. 6 (CDK and Reynolds imposed overcharges exceeding $300 million between 2013 and 2019); Fenske Ex. 79, (Dkt. 975-79), Expert Report of Michael Williams ¶ 163, tbl. 3 (Dealership Plaintiffs' expert economist demonstrating that CDK and Reynolds imposed overcharges to vendors exceeding $360 million between September 2013 and July 2019); Ho Ex. 65, PI Hearing Tr. 2-A-57:6-9, 59:2-9, 61:13-62:21 (service lane app AutoLoop went from paying $39 to the data integrator SIS to paying $735 to CDK and $835 to Reynolds for the same service); *id.* at 2-A-30:9-15, 32:16-24, 38:24-39:3 (app vendor Dominion Enterprises went from paying $30 to $35 a month to Authenticom to paying $893 to Reynolds and $457 to CDK for the same services); Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 136:4-139:13; Ho Ex. 233, PX 1231 at CDK-0238589

Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 157:8-158:6



Ho Ex. 37, Baerg (AutoAlert 30(b)(6)) Tr. 101:11-102:13, 112:3-114:12, 127:17-129:20, 133:11-134:3

Ho Ex. 84, DX 924, COX_0005014

; Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 61:6-63:4

Ho Ex. 38, Koenig Tr. 270:2-9

Ho Ex. 46, Johnston Tr. 98:12-99:5

Ho Ex. 123, PX 465 at CDK-0175731

Ho Ex. 24, Noser Tr. 80:23-81:6

Ho Ex. 170, PX 840 at CDK-2985164 at slide 2

73.     After reaching September 2013 agreement with CDK, Reynolds substantially increased its RCI prices (as demonstrated in Figure 7 of the Israel Report, reproduced below); Reynolds's financial statements explicitly value the agreement with CDK at _____ per year just based on additional RCI revenue (not including the additional revenue from reduced DMS

competition). Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶¶ 179-183; Ho Ex. 474, PX 651 at

REYMDL00720433 

Ho Ex. 15, Brockman 1/16/19 Tr. 134:20-136:8

74. Reynolds's agreement not to open its system to data integrators was valuable to

CDK as CDK prepared to close its own system to data integrators. Ho Ex. 63, PI Hearing Tr. 2-

P-250:1-7 (Addanki) ("Q. It would have been a valuable thing for CDK – I'm not asking you to

give me an estimate of how valuable. But it would be a valuable thing for CDK to have assurances

from Reynolds that it does not intend to open its system; correct? A. If you're asking would there

be some value greater than zero having that assurance, possibly, yes."); Dkt. 977-153, Israel Rep. ¶ 170 ("Second, with the agreement, CDK could block its DMS with the assurance that Reynolds would not 'flip' strategies to occupy the open competitor spot previously held by CDK."); Dkt. 977-160, Israel Reply Rep. ¶ 113 ("First, and most basically, if CDK is going to block, there certainly is value to an assurance that Reynolds will remain blocked. Even if it [is] unlikely that Reynolds would reverse positions, the agreement provides insurance.").

75.     When Defendants raised 3PA and RCI prices as described above, they offered no corresponding quality improvements or discounts with respect to their DMS fees. Ho Ex. 232, PX 1230 at CDK-1747633.010



(emphasis added); Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 134:23-135:7

*id.* at 158:11-16

Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶¶ 184-185 (demonstrating that, as CDK and Reynolds were dramatically raising 3PA and RCI prices, they also increased their DMS prices); Dorris Ex. 90, (Dkt. 977-92), Schaefer Decl. ¶ 67 (Reynolds's Schaefer claiming "there is no coherent way for Reynolds to give its DMS dealership customers a price break in conjunction with RCI."); Dorris Ex. 6, (Dkt. 977-7), Declaration of Leigh Ann Conver ¶ 41 ("CDK does not offer discounts to

dealers based on 3PA Program fees paid by their vendors."); Ho Ex. 60, Murphy Tr. 274:15-23

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

76.     CDK forces many vendors in the 3PA program to purchase more data than is necessary, including by requiring vendors that purchase write-back data functionality to purchase other types of integration, regardless of whether they need them.   Ho Ex. 279 at CDK-0043106

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*id.* ██████████████████████████████████████████████████

████████████████████████████████████████████████████

Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 152:10-12, 153:8-19 (the CRM DealerSocket) ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████     Fenske Ex. 80 (Dkt. 975-80), Expert Reply Report of Michael Williams ¶ 113

("CDK's DMS prices increased following the alleged reduction in functionality.") and Fig. 27 (showing increased price indexes for Defendants' DMSs).

77.    Since Defendants closed their systems to data integrators, vendors have had no choice but to purchase 3PA and RCI services at the price and terms set by Defendants.  Ho Ex. 106, PX 300 at CDK-0194969 ███████████████████████████████████

███████████████ Ho Ex. 55, Andreu Tr. 337:12-338:15 ████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████; Ho Ex. 104, PX 280 at CDK-0032707 ████████████████████

████████████████████████████████████ Ho Ex. 41, East Tr. 61:15-64:6 (explaining that, "whenever [CDK and Reynolds] wanted to increase prices, they could.  And they did."; and that CDK and Reynolds "increase[d] prices dramatically . . . for no increase in functionality); Ho Ex. 169, PX 833 at CDK-1811723 ████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████; Ho Ex. 24, Noser Tr. 33:7-13 ████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

██████████████████████████████████."); id. at 100:14-16 ██████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ see also Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶¶ 44-54 (explaining the existence of "DMS-ecosystem-specific product markets" for integration services and apps that use those integration services); id. ¶ 208 ("Reynolds had

sufficient unilateral market power in the DMS market" to harm competition through unilateral exclusion of independent data integrators).

78.     Aside from CDK and Reynolds, other DMS providers charge $25 to $75 a month for data integration services that are as good or better than the services Defendants offer through 3PA and RCI.  Ho Ex. 12, Colson Tr. 90:11-93:13, 225:18-227:20 ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████ ; Ho Ex. 47, Green (Cox 30(b)(6)) Tr. 50:24-51:9 (Cox Automotive provides "real-time API integration" through its OpenTrack program for $55 a month); Ho Ex. 37, Baerg (AutoAlert 30(b)(6)) Tr. 142:23-144:6 (AutoAlert paid Dealertrack $55 a month, with no up-front fees, for bi-directional, real-time data integration through the OpenTrack program); Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 164:20-167:3 (Brad Perry, the co-founder of the DealerSocket CRM, testifying DealerSocket pays between $50 and $75 a month for real-time, write-back data integration with the DMS providers Dealertrack, PBS, and Quorum); *id.* at 158:18-159:4, 165:3-167:4 (Mr. Perry testifying that, out of all the certified integration programs, 3PA and RCI offer the least functionality at the highest prices); Ho Ex. 46, Johnston Tr. 99:11-102:8 (the service lane vendor IFM Americas pays Dealertrack $25 for certified integration through the OpenTrack program and PBS $37.50 for certified integration); *id.* at 101:15-25 (Dealertrack and PBS allow IFM Americas to automatically create and update repair orders, whereas CDK and Reynolds do not).

79.     Aside from CDK and Reynolds, no other DMS provider blocks dealers from using data integrators if they wish.  Ho Ex. 12, Colson Tr. 169:7-10 ████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████ *id.* at 169:18-22 ████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Ho Ex. 33, Trasatti (DealerBuilt 30(b)(6)) Tr. 204:13-205:19 ("Q. . . . Does DealerBuilt allow dealers to authorize third parties to access dealer data on DealerBuilt's [DMS]? A. We allow dealers to authorize third parties to have access to data that may reside on the DMS. Q. Is it DealerBuilt's policy that . . . dealers should be able to make their own decisions about which third parties can access dealer data on DealerBuilt's DMS? . . . A. . . . [I]t has been our general understanding and our general belief that dealers have a choice on which vendors they would like to do business with. And from that perspective, we wouldn't unduly inhibit their ability to choose a vendor to do business with. I think the answer is, yes."); Ho Ex. 47, Green (Cox 30(b)(6)) Tr. 153:20-22 ("It is our belief that the dealers owned the data and they have the right to decide where that data is sent or not sent."); Ho Ex. 48, Burton (Cox 30(b)(6)) Tr. 613:12-16 ("We have an open access data policy. We believe the data is the dealer's to control, and, therefore, we make it – we try to help the dealer control the access to that data by providing them various access points."), *id.* at 616:16-20 ("We're open. We believe the . . . dealers control their data. It's their – or they own their data, and so we make it an open environment for dealers to provide access to whomever they would like."); Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 47 ("Aside from CDK and Reynolds, no other DMS company disables or blocks the login credentials that dealers create for Authenticom."); Dorris Ex. 153, (Dkt. 977-155), Whinston Rep. ¶ 59 ("By contrast [to Reynolds and CDK], other DMS providers, including Dealertrack and Auto/Mate, among others, have adopted more permissive policies for third-party access to their DMSs and/or provide third-party integration at low costs to vendors in an effort to make their overall DMS 'ecosystems' more attractive to dealers. . . . These DMS providers market the 'open' nature of their systems to dealers as a point of differentiation between themselves and other DMS

providers with more secure policies."); *id.* ¶ 75 ("Auto/Mate provides third-party integrators with login credentials to perform dealer-push type data extractions with the dealer's permission.").

80.     By blocking data integrators and raising data integration charges to supracompetitive levels, CDK and Reynolds drove out apps (and prevented entry from new apps) that cannot afford the inflated 3PA and RCI fees.  Dorris Ex. 2, (Dkt. 977-3), Korp Decl. (detailing harm to small vendor Open Recalls, which helps dealerships track down car owners with unresolved safety recalls); Ho Ex. 55, Andreu Tr. 38:9-22 ████████████████████████

████████████████████████████████████████████████████

████████████████████████ *id.* at 40:5-9 ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ ); *id.* at

167:1-5 ████████████████████████████████████████████████

████████████████████████████████████

81.     Defendants have used their control over data integration to give superior service and functionality to their own apps – a strategy CDK referred to as "tilting the table."  Ho Ex. 140, PX 578 at CDK-1228533 at slide 37 (tiling the table graphic).  For example, neither CDK nor Reynolds has allowed applications to automatically create and update service appointments – also known as "Repair Orders" – except for their own applications.  As a result, dealerships using competing applications are forced to manually re-key information into the DMS, resulting in a less efficient and lower quality experience.  Ho Ex. 1, Ayotte Tr. 50:9-23 ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *id.* at 119:17-120:22

████████████████████████████████████████████████████



Ho Ex. 234, PX 1232 at CDK-0465376

Ho Ex. 46, Johnston Tr. 33:2-19

*id.* at 105:15-106:6

Ho Ex. 87, PX 2 at CDK-0470596

Ho Ex. 41, East Tr. 166:15-19, 348:19-22 (the loss of repair order functionality would "put[ ] a huge burden on the dealership to then update their DMS," as a dealership would have to hire a full-time employee to "synchronize repair orders" and the "lack of ability to open and update [repair orders] impacted sales . . . significantly"); Ho Ex. 7, Petruzzelli Tr. 252:5-7, 309:6-16, 310:4-5 (vendor

- 71 -

AutoLoop lost business to CDK "directly because of the [repair order] functionality they could do that we could not").

82.    When vendors are forced to switch from other data integrators to Defendants' 3PA and RCI programs, they commonly lose data functionality.  Ho Ex. 260, PX 1559 at CDK-1776826 (Mar. 2016) (Leigh Ann Conver) ████████████████████████████████████████

████████████████████████████████████ Ho Ex. 54, Thorpe Tr. 102:13-104:21 (Rule 30(b)(6) witness for the vendor Impact Group) ████████████████████████████████

████████████████████████████████ Ho Ex. 38, Koenig Tr. 270:2-9 (Rule 30(b)(6) witness for CARFAX) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Ho Ex. 65, PI Hearing Tr. 2-A-63:8-17 (Rodeghero) ("I did lose some functionality when I made the transition to" RCI and 3PA.  "With the RCI system I lost the ability to make some of the notifications that I do around parts, special order parts orders.  I can no longer get the information indicating when I can make those notifications through the RCI program.  I also lost the ability to do some pushback information, and with CDK there was some things I lost the ability to do as well."); Ho Ex. 258, PX 1555 at CDK-02222761 ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████

83.     Defendants' inflated 3PA and RCI fees deprive vendors of resources for innovation

and expansion.  Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 26:7-27:17 ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *id.* at 39:8-21 ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████ *id.* at 74:12-14 ████████████████████████████████████████████████

████████████████████ Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 141:22-142:8 ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████

84.     Defendants' exclusion of data integrators and resulting control over access to dealer

data has helped them prevent software applications from taking over functions traditionally

performed by the DMS ██████████████████████████████████████████████████

Ho Ex. 328 at CDK-0948270.011 ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ho Ex. 362 at CDK-2452933.002 ████

████████████████████████████████████████████████████████████████████████

████████████████████████ Ho Ex. 313 at CDK-0834924 ███████████████████████

██████████████████████████████████████████████

████████████ Ho Ex. 335 at CDK-1076188 █████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ Ho Ex. 287 at CDK-0164405 (September 9, 2013) ████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████ Ho Ex. 137, PX 565 at CDK-1126091 ████████████

██████████████████████████████████████████████

███████████████████████████████████████

85.     Both CDK and Reynolds reject vendors they deem too small to participate in the 3PA and RCI programs, which deprives small and start-up vendors of the ability to obtain automated data integration services with respect to dealers that use Defendants' DMSs.   Ho Ex. 339 at CDK-1363611 ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ Ho Ex. 289 at CDK-0231111 █████████████

██████████████████████████████████████████████

Ho Ex. 166, PX 813 at TL00000147 █████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████ Ho Ex. 340 at

CDK-1399751 ███████████████████████████████████

███████████████████████████

86.     Defendants' data access restrictions and supracompetitive prices have harmed innovation and degraded the customer experience at dealerships across the country.  As Brad Miller of the National Automobile Dealer Association explained in a presentation at the 2018 NADA conference:

> [T]he biggest thing I hear from dealers [is] a frustration that they can't provide the customer experience that they want because they can't get the information back and forth, right? . . . [F]olks have to enter data nine and 10 times in the course of selling a car.  And that's crazy.  It increases customer frustration.  It paints dealers with this brush that we're technological dinosaurs.
>
> I was on a panel with a gentleman in fact last year at a large dealer group who made the following point.  He said look, I go get a $4 chicken sandwich and the way I buy that is different today.  I can do it online.  I get there.  They've got an iPad.  They swipe my card and my chicken sandwich is ready when I go.  They may even know what my normal order is and provide it to me.  At the same time, the way that we run customers through the service line hasn't changed in 25, 30 years and so there's an increasing frustration.  This [is] all tied to the information you have and how it gets back and forth with third parties, how it is shared, how it is stored, how do systems talk to each other.

Ho Ex. 164; PX 778 at NADA-101207 at 2; Dorris Ex. 87, (Dkt. 977-89), PX 1036 (letter from the Open Secure Access group, of which CDK was a member, stating that "progressive DMS companies" with open DMSs are "actively contributing to facilitating innovation and increasing dealer profitability"; however, "[r]estrictive data practices have the opposite effect *and* they hurt dealers.").

87.     Defendants' strategy starting no later than September 2013 was to destroy Authenticom's business.  Ho Ex. 122, PX 459 at CDK-0021983 ██████████████████

████████████████████████████████████████████████████████

█████████████████████     Ho Ex. 192, PX 926 at CDK-0214373 █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ Ho Ex. 55, Andreu Tr. 180:16-186:17 ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Ho Ex. 199, PX 954 at CDK-

2239175 ████████████████████████████

██████████████████████████████████ Ho Ex. 55, Andreu

Tr. 57:10-14 █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████ Ho Ex. 100, PX 255 at CDK-2286512.005 ███████████

███████████████████████████████████████████████████

███████████████████

88.     After Mr. Cottrell gave an industry presentation on "data taxes" and "technological

blockages" in January 2016, CDK officials derided him ██████████████████████

████████████     Ho  Ex.  105,  PX  298  at  CDK-2741409.  ████████████████

███████████████████████████████████████████████████

██████████████████████████████████████



89.    The growth of Authenticom's connections on both the CDK and Reynolds systems slowed after Defendants' September 2013 agreement; Authenticom's connections on both the CDK and Reynolds systems decreased sharply after the February 2015 agreements; and Authenticom's CDK connections decreased even more sharply in mid- to late-2016 after CDK began using technological measure to disrupt and block Authenticom's access.  Fenske Ex. 74, (Dkt. 975-74), Expert Report of Catharine Lawton ("Lawton Rep.") ¶¶ 433-448.  Authenticom's connections are reflected at paragraph 443, Figure 8.3 of the Lawton Report:



90.     Authenticom has suffered substantial financial harm resulting from Defendants'

conduct described above.  Authenticom saw consistent and rapid growth from its founding 2002

until 2013, when "Authenticom['s] financial performance experienced a marked decline";

Authenticom's annual revenue fell from ███ million in 2015 to ████ in 2018.  Fenske

Ex. 74, (Dkt. 975-74), Lawton Rep. ¶¶ 307-313, 321, 326.  Effective February 2018, Authenticom

laid off more than 60% of its staff, bringing its 120-person workforce down to 35 employees.  *Id.*

at ¶ 325.  Overall, Authenticom has suffered at least $115.8 million in lost profits as a result of

Defendants' conduct.  *Id.* ¶ 22(c).

91.    Reynolds would periodically disable Authenticom's user credentials over a period but would then stop doing so for periods of time, without any change by Authenticom in its software or process.  For example, Authenticom experienced disabling of its user credentials in mid-2013; that stopped occurring around December 2013 without any changes by Authenticom in its process.  *See* Wilkinson Ex. 79 [Dkt. 782-30] at -412 (noting "the start of another 3 month cycle R&R undergoes to antagonize their ever-shrinking dealerbase"); Dorris Ex. 80 [Dkt. 977-82] at -989.007 ("History shows us that when R&R's disruptions are more than temporary/nuisance in nature, they find themselves forced to back off and cooperate."); Dorris Ex. 98 [Dkt. 977-100] ("We have seen these lock out situations occur with Reynolds periodically – about 1X per year."); Ho Ex. 475, AUTH_00171748 (November 2013:  "It looks like lockouts are abating, so we're in that portion of the cycle again.  I believe we'll be in an R&R/dealer/vendor armistice for the next 6 weeks or so.  They typically slow down hostility before NADA as not to anger the natives all too much."); Ho Ex. 476, DX 1076, AUTH_00149741 (April 2014:  "[W]e have not seen any major lockouts since the end of 2013 on our side."); Ho Ex. 477, REYMDL00259866 ███████

████████████████████████████████████████████████████████████████████████

████████████████████

92.    Regulations in some states, such as California and Illinois, cap the fees or effectively cap the fees that EVR providers can charge.  Ho Ex. 4, Nemelka Tr. 94:11-95:4 (dealers can charge car buyers no more than $25 per EVR transaction; of that $25, EVR providers can collect up to $10 for their services, with dealers collecting the remaining $15), *id.* 96:14-98:10 (in California, EVR providers generally charge dealers, at most, $30 per EVR transaction: $5 of which goes to the DMV, the remaining $25 of which goes to the EVR provider); *see also* Ho Ex. 52, Medina (CVR 30(b)(6)) Tr. 91:11-15 ███████████████████████████████

███████████████████████████████████████████████

███████████████████████

93.     In states where EVR transactions must be initiated at the point-of-sale, such as Illinois, Virginia, and, as of January 2019, California, EVR providers require, at a minimum, near real-time access to data on DMS – which until recently could only be provided through independent integrators or DMS's certified access programs.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 8 ("In some states in which MVSC operates, including Virginia, Illinois, and now, as of January 2019, California, EVR applications must initiate the electronic vehicle registration process at the point of sale in a dealership.  That requirement in turn means that EVR providers must have, at minimum, near real-time access to data."); Ho Ex. 31, Armstrong (Individual) Tr. 264:12-265:18 (independent integrators and certified integration programs are the only means of real-time data access to the DMS); Ho Ex. 52, Medina (CVR 30(b)(6)) Tr. 101:17-102:8 ██████████████████

██████████████████████████████████████████████████████████ *see also* Ho Ex. 4, Nemelka Tr. 201:8-24 ("Q.  [W]as there something that caused MVSC to get back to Reynolds in August of 2014 after you had taken MVSC out of the process in February . . . of 2014? . . .  A. Yes.  Q.  What was the reason?  A.  We realized we wouldn't be able to do business in Illinois unless we had access – or we participated in the RCI program to be able to provide service to Reynolds dealerships in Illinois.  Q.  So it was specifically about concerns relating to the Illinois EVR market? . . .  A.  As best I recall, yes."); *see also* Ho Ex. 31, Armstrong (Individual) Tr. 263:23-264:10 ("In Illinois we really, really needed that realtime integration to be an effective competitor in that state. . . .  So without that realtime integration and not having a history of being able to do this, we're ineffective.  There is no way to compete.").

94.     Because MVSC's manual workaround tools did not historically provide MVSC with near real-time data access sufficient to process EVR transactions in point-of-sale states, it was not until MVSC developed Electron in late 2017 that it was able to access data – albeit still manually – at sufficient near-real-time speeds to operate in those states.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶ 6-11 (MVSC was not able to use manual reporting tools to access data at near real-time speeds for point-of-sale states until developing Electron in late 2017; "[d]espite our diligent efforts . . . we were unable to develop this solution any sooner because the software development process was complex and resource intensive"); Ho Ex. 4, Nemelka Tr. 202:10-203:1 (testifying that the DMS's built-in "reporting tools do not allow for real-time access and the data to be pulled immediately into our system" for purposes of processing a transaction at the point of sale); Ho Ex. 402, MVSC_MDL_0041446 at -1447 (June 2016 meeting notes observing that "[o]perational issues" are an impediment to MVSC's development of a viable EVR solution in Illinois, and, specifically that MVSC does not "yet have real-time integration"); Ho Ex. 428, MVSC_MDL_0079497 at -9498 ("We are all ready to release the latest version of Electron (for VITU) . . . This is a significant step we are making in the process of (semi) automating the report generation process for customers outside of CA and OR.  *This was the need of the hour in VA and IL*.") (emphasis added); Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 41, 44 (summarizing evidence that MVSC was not able to use manual reporting tools in Illinois and Virginia until developing Electron in late 2017).

95.     In total, CVR processes over ████████ vehicle transactions each year and generates approximately ████████ in annual revenues.  Ho Ex. 52, Medina (CVR 30(b)(6)) Tr. 13:20-22.  California is CVR's highest revenue generating state; Illinois is CVR's second highest revenue generating state, and one in which it has held a virtual monopoly since entering the state

in 2005, commanding around 90% market share. *Id.* 140:23-141:9 █████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ *id.* 140:16-20 ████████

██████████████████████████████████ Ho Ex. 255, PX 1539 at CVR-0314205

██████████████████████████████████████████████████████ *see*

*also* Ho Ex. 11, Strawsburg Tr. 53:19-23 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ho Ex. 125, PX 477 at REYMDL00117714 ████████████████████

████████████████████████████████████████████████████████

████████████████████ Ho Ex. 378, CVR-0017653 at -7653 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

    96.    CVR was the earliest entrant in most state markets, operating with little to no competition for years, and offered an older, Windows-based solution, called "Delphi," with a self-described "light" service model. Ho Ex. 125, PX 477 at REYMDL00117713 ████████

████████████████████████████████████████████████████████

██████████████████████████████████ ), *id.* at -7718 ████████████

█████████████████████████████████████ *id.* at -7713 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ; Ho Ex. 11, Strawsburg Tr. 50:24

████████████████████████████████████████████████████████



Ho Ex. 52, Medina (CVR 30(b)(6)) Tr. 147:11-24

Ho Ex. 14, Karp Tr. 236:24-237:18

; Ho Ex 216, PX 1096 at CVR-0023112.002

; Ho Ex. 255, PX 1539 at CVR-0314204

*id.* at -4207

*id.* at -4212

Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr. 98:17-25

97.     Beginning in the late 2000s, new EVR providers began to enter some of the markets in which CVR operated, differentiating their products by offering internet- or web-based solutions and heavier customer service models – both of which many dealers preferred.  Ho Ex. 125, PX 477 at REYMDL00117713

Ho Ex 216, PX 1096 at CVR-0023113.002

Ho Ex. 11, Strawsburg Tr. 64:15-65:1



98.     MVSC entered the California market with a user-friendly web-based product and a customer service model that focused on providing extensive customer support.  Ho Ex. 398, MVSC_MDL_0027566 at -7567.009 (MVSC: describing MVSC's product as a "user friendly and intuitive web based platform customized to the rules, regulations & processes of the state"); Ho Ex. 4, Nemelka Tr. 105:22-106:10 ("Q. . . . [W]hat are the . . . areas where MVSC tries to differentiate itself from other EVR providers?  A.  Our software, our product and our service.  Q. And – and when you say your software, how – how does MVSC think that its software is – is better or different from other EVR providers?  A.  It's faster.  It's more efficient.  It's more compliant. There's less data entry.  There's software validation tools to prevent errors. . . . it's more stable, software uptime, network speed."), *id.* 384:6-12 ("[W]e understand that we provide . . . a much better product.  We provide much better service.  Our dealerships have a much happier . . . they are much more satisfied using us . . . than any other competing provider."); Caseria Ex. 35 (Dkt. 957-35), DX 106 at CDK-3009135 ███████████████████████████████████ *id.* at -9136 ███████████████████████████████ *id.* at -9137 ████████████ ██████████████████████████████████████████████ ████████████████████████████████

99.     CVR suffered significant losses to MVSC as a result of MVSC's superior product and service, especially in 2013 and 2014.  Ho Ex. 220, PX 1101 at CVR- 0551757.001 ██████ █████████████████████████████████████████ ████ Ho Ex. 125, PX 477 at REYMDL00117715 ██████████████ ████████████████████████████████ Ho Ex. 219, PX 1100 at CDK-1725891.002 ████████████████████████



*id.* -5891.003

; Ho Ex 216, PX 1096 at CVR-0023113.002

Ho Ex. 456, SUNROAD_0001735 at -1735

Ho Ex. 214, PX 1094 at CVR-0017600

Ho Ex. 215, PX 1095 at CVR- 0019670

100. MVSC's successes in California and poised entry into Illinois posed a significant competitive threat to CVR. Ho Ex. 125, PX 477 at REYMDL00117714

Ho Ex. 133, PX 550 at CDK-2884307

Ho Ex. 378, CVR-0017653 at -7653

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████ Ho Ex. 256, PX 1540 at CVR-0017625

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

101.     Christopher Morris, a CDK employee and former CVR Board Member on behalf of Reynolds, admitted in a phone conversation with MVSC's COO, Joseph Nemelka, that CDK, Reynolds, and CVR strategized in Board Meetings about how to keep MVSC from being "competitive, specifically in California" and that they "would allow no vendor in the program who competed with CVR in any state that they cared about."  Ho Ex. 4, Nemelka Tr. 376:4-379:17 ("A. [H]e talked about how in board meetings they talked about us, CDK, Reynolds, and CVR.  In board meetings, they talked about us.  He talked about some of the ways that they'd discussed trying to keep us from being competitive, specifically in California. . . .  I think he actually used the word 'closed category'. . . with respect to EVR being a closed category for a period of time where they would allow no vendor in the program who competed with CVR in any state that they cared about. . . .  Q.  And what did you understand [closed category] to mean?  A.  That they would not allow us to participate in 3PA, because we competed with CVR in a state that was meaningful or material to them because CVR operated within that state.  Q.  And when you say 'they would not allow us to participate,' who is 'they'?  What was your understanding?  A.  My understanding was that it was the members that were there at that CVR board meeting: Reynolds and Reynolds, CDK and CVR."); *see also* Ho Ex. 377, CVR-0000037 █████████████████████████████

██████████████████████████████████████████████

████████████ Ho Ex. 381, CVR-0519434 at -9434 ████████████████████

████████████████████████████████████████ Ho Ex.
424, MVSC_MDL_0071899 (screenshot of text messages between Mr. Nemelka and Mr. Morris

arranging conversation), Ho Ex. 425, MVSC_MDL_0071900 (same), Ho Ex. 426,

MVSC_MDL_0071901 (same), Ho Ex. 427, MVSC_MDL_0071902 (same).

102. ████████████████████████████████████████

██████████████████████████████████████████████

████████

█████████████████████████████████████████

Ho Ex. 213, PX 1093 at CVR-0296001-02; *see also id.* at -6000-01 █████████████

██████████████████████████████████████████████

████████████████████████████████████

103. ████████████████████████████████████████

████████████████████████████████████████ Ho Ex. 217, PX
1097 at CDK-0235604. █████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ Ho Ex. 125, PX 477 at REYMDL00117707, -7714; *see
also id.* at -7712 ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



*id.* at -7713

*id.* at -7714

*id.* at -7715

104.     In correspondence between CDK, Reynolds, and CVR executives, Defendants acknowledged they had agreed to deny MVSC access to "direct DMS integration" and that MVSC would "NEVER" have access to DMS data through CDK or Reynolds.  Ho Ex. 221, PX 1105 at CVR-0018040

Ho Ex. 130, PX 498 at REYMDL00118362

Ho Ex. 131, PX 499 at REYMDL00117619

*see also* Ho Ex. 11, Strawsburg Tr. 135:1-5

Ho Ex. 36, Herbers Tr. 200:10-16

*cf.* Ho Ex. 237, PX 1259 at CVR-0068171-

72 (

105.    When MVSC applied to CDK's 3PA Program in February 2014 and July 2014, CDK flatly denied its application both times, admitting internally that MVSC was not allowed into the program because MVSC was a competitor to CVR.  Dkt 958-36, MVSC_MDL_0000669 at -0669 ▮▮▮▮▮  Dkt 958-37, MVSC_MDL_0002159 ▮▮▮▮▮ Ho Ex. 205, PX 971 at CDK-0177998-99 ▮▮▮▮▮ *id.* at -7998 ▮▮▮▮▮ Ho Ex. 26, McCray Tr. 154:20-23 ▮▮▮▮▮ Ho Ex. 133, PX 550 at CDK-2884310, -4312, -4313 ▮▮▮▮▮ *id.* at -4307 ▮▮▮▮▮ Ho Ex. 191, PX 914 at CDK-2884061 ▮▮▮▮▮ Ho Ex. 4, Nemelka Tr. 287:3-288:15 (testifying that a CDK employee told him in an "off the record" type conversation that Bob Karp, Ron Workman, and

Scott Herbers decided MVSC should not be admitted into the 3PA Program "because of the fact that [MVSC was] competing with CVR in California"); Dkt 957-35, DX 106 at -9134-9140 ██

████████████████████████████████████████; Caseria Ex. 89 (Dkt. 958-38), MVSC_MDL_0021478 at -1478 (CDK denial in October 2014), *id.* ("[T]here is pretty much no way in hell [MVSC] is getting approved to participate in the program in the foreseeable future as Scott Herbers has blocked us from being approved and until he changes his position it isn't happening.").

106.    When MVSC applied to CDK's 3PA Program in March 2015, CDK responded with a proposal the following August that MVSC pay 35% of its top line revenues excluding only mandatory state DMV fees – terms that were unreasonable and economically infeasible for MVSC. Caseria Ex. 90 (Dkt. 958-39), MVSC_MDL_0005263 at -5263 (third application in March 2015); Caseria Ex. 36 (Dkt. 957-36), DX 97 at MVSC_MDL_0007365 (35% revenue share proposal in August 2015); Ho Ex. 395, MVSC_MDL_0007415 at -7415 (MVSC: "As you would expect, my interest went right to the fees – is it right that you are asking for 35%  . . . of our revenue minus government mandated fees to get access to the data?  Is there supposed to be a decimal or something in there somewhere?  I am not sure of the end goal for CDK, but I am sure whoever made that call knows that would make it unprofitable for any company in this space to work with CDK dealerships if that is truly 35%."); Ho Ex. 4, Nemelka Tr. 310:7-15 ("Q.  . . . [W]hat was MVSC's reaction to the 35 percent number? . . .  A. Shock.  Q.  Why?  A.  Because we knew it would be impossible for us to operate as a going concern with 35 percent of our top-line revenue being paid for 3PA participation."), *id.* 314:21-315:20 (similar); Ho Ex. 94, PX 151 at 1 (MVSC: "We reapplied in March 2015 . . . and got the proposed fee schedule back, which amount would require us to shut our doors as it would be impossible to operate our business."); Ho Ex. 349, CDK-1769206 at -

9206 ███████████████████████████████████████████████████

███████████████████████████ *cf.* Ho Ex. 142, PX 602 at CDK-3015148 ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████

107.   When MVSC applied to the 3PA program twice in 2016 – once in April, and again in September – CDK responded both times with a proposal that MVSC pay 25% of its top line revenues excluding only mandatory state DMV fees – terms that were unreasonable and economically infeasible for MVSC.  Ho Ex. 399, MVSC_MDL_0039897 at -9901 (reaching out to Dan McCray); Caseria Ex. 91 (Dkt. 958-40), MVSC_MDL_0009322 at 328 (April application); Caseria Ex. 37 (Dkt. 957-37), DX 108 at MVSC_MDL_0068017 (September application and CDK response referencing 25% revenue share proposals in response to both applications); Ho Ex. 401, MVSC_MDL_0041226, at -1226-27 (stating that "this is not going to be [an] easy decision for either company as this title business is very interesting" and "elevat[ing MVSC's] 3PA integration discussions to be handled by Ron Workman"); Ho Ex. 337, CDK-1298856 at -8857 (MVSC: "We look forward to figuring out a way forward."); *id.* (CDK: ████████████████ *id.* at -8856

███████████████████████████████████████████████████████████████

████████████████████ Ho Ex. 4, Nemelka Tr. 336:6-19 (describing conversation with M. Joza regarding MVSC's 3PA application and that 25% revenue share was a "take it or leave it" offer); Ho Ex. 31, Armstrong (Individual) Tr. 287:6-9 ("[I]t was my understanding the second offer that came back was 25 percent and it was not moving."); Ho Ex. 4, Nemelka Tr. 333:4-334:8 (describing 25% revenue share proposal as "such a[n] obscene number that as we run, again, at a high level, that number through our executive discussions, that we cannot figure out how to make it work

profitably"); Ho Ex. 81, DX 109 at CDK-0116100 ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Ho Ex. 94, PX 151 at 1 (MVSC: "I was talking with a CDK/CVR

executive at an industry conference about how offensive this percentage was and he said to me, 'I

wished we would have asked for 85% of your revenue.  We don't want you in the program."); Ho

Ex. 4, Nemelka Tr. 403:21-406:2 (testifying regarding conversation with John Roeder at industry

conference).

      108.     When MVSC applied for membership in RCI, the terms Reynolds proposed in 2014

were unreasonable and economically infeasible for MVSC.  Ho Ex. 394, MVSC_MDL_0003940

at -3940 (MVSC: "We did crunch the numbers based upon the prices below and we can't figure

out how to make it profitable without passing the cost onto the dealerships, which we aren't willing

to do at this stage. . . .  To be clear, our desire is to participate in the RCI program, but financially

it is impossible for us."); Ho Ex. 4, Nemelka Tr. 210:13-211:6 ("We could not profitably figure

out how to make those prices work in many of the states that we were operating."); Ho Ex. 31,

Armstrong (Individual) Tr. 151:3-12 ("[T]he volume times the amount of money we make in some

dealerships . . . [meant] we lost money.  Meaning that the monthly cost for that connection was

more than we made in a dealership."); *see also* Ho Ex. 423, MVSC_MDL_0069963 at -9969

(Dealertrack integration agreement charging "$25 per dealer customer" per month for integration);

Ho Ex. 421, MVSC_MDL_0069938 at -9951 (Autosoft integration agreement charging monthly

dealer support fee of "$35/dealer for a certified interface with two (2) APIs"); Ho Ex. 422,

MVSC_MDL_0069961 at -9961 (Authenticom statement of work charging MVSC $35 per

rooftop per month); Ho Ex. 478, MVSC_MDL_0021778 at -1794 (SIS statement of work charging

MVSC's $71 per rooftop per month); *cf.* Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr.26:7-27:17

█████████████████████████████████████████████████████████████████

*id.* 32:15-33:7 ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████ *id.* 38:22-39:7 ███████████████████████████████████████ Dorris Ex. 158

(Dkt. 977-160), Israel Reply Report ¶ 241 ("[o]ne version of [anticompetitive collusion] can

certainly be to exclude a competitor seen to pose a particular competitive threat, rather than all

competitors."), *id.* ¶ 243 (opining that it is "flawed" reasoning to assume that prices charged to

other EVR providers cannot be exclusionary).

109. CDK, CVR, and Reynolds have marketed MVSC's lack of access to certified

integration to CVR's advantage; they have also sought to impugn MVSC's reliance on "non-

certified" means of access (i.e., independent integrators or manual workarounds) as "insecure" and

"hostile." Ho Ex. 254, PX 1524 at REYMDL00479400 ████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████ Ho Ex. 449, REYMDL00537499, at -7500.003, -7500.006

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████ Ho Ex. 126, PX 488 at REYMDL00238184 ████████████

█████████████████████████████████████████████████████████████████

███████████████████████████ Ho Ex. 127, PX 489 at REYMDL00333373 ████████████

███████████████████████████████████████████████████ Ho Ex. 348, CDK-1727545 at

-7545 ███████████████████████████████████; Ho Ex. 243, PX 1270 at CVR-0166090 ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ Ho Ex. 31, Armstrong (Individual) Tr. 196:7-

197:9 (describing how CDK, CVR, and Reynolds "will do everything they can to communicate to

[a] dealership, hey, DMVdesk is not an RCI certified provider or is not a 3PA provider"), *id.* 267:4-

270:9 (testifying that MVSC would hear about dealers being threatened by CDK, Reynolds, and

CVR that their use of MVSC was in violation of their DMS contract).

110.   CDK has blocked MVSC from using independent integrators, forcing MVSC to

transition CDK dealers to a manual workaround.  Ho Ex. 379, CVR-0024146 at -4146-48 ██████

███████████████████████████████████████████████████

███████████████████████████ Ho Ex. 282, CDK-0053940 at -3940 ██████████

███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Ho Ex. 222,

PX 1109 at CDK-0981583 ████████████████████████████████████████████

██████ Ho Ex. 210, PX 1008 at CDK-2194528.001 ███████████████████████████

██████████████████████ Ho Ex. 30, Battista (SIS 30(b)(6)) Tr. 115:1-10 ███████

████████████████████████████████████████ *id.* 116:2-13 ███████

██████████████████████████████████████████ Caseria Ex. 43

(Dkt. 957-43), DX 591 at MVSC_MDL_0052247 █████████████████████

██████████ Ho Ex. 238, PX 1260 at CVR-0557190 ██████████████████

███████████████████████████████████████████████████

███████████████████████████████ Ho Ex. 403, MVSC_MDL_0050251 at

-0251 (MVSC: "Yes, [CDK] [is] calling dealerships regarding how DMVdesk connects and if we

are using SIS, Authenticom, Dealervault, etc they are telling them they are disconnecting those.");

Ho Ex. 404, MVSC_MDL_0050387 at -0388 (MVSC: "Laurie Wondolowski the CFO from the

CA Car Group just called me and said that an executive regional sales manager from CDK called

to tell her personally that DMVDESK has not renewed an agreement with CDK and that they will

no longer support the DMVDESK connection to CDK."); Ho Ex. 408, MVSC_MDL_0050833 at

-0833 (Browning Automotive Group: "I know we discussed in length DMVDesk access to the

information on CDK. DMVDesk accesses through Proquote at this time and that access will cease

soon, as CDK will not allow them into our box."); Ho Ex. 418, MVSC_MDL_0068311 at -8311

(Sunroad Automotive Group: reporting that CDK has shut down MVSC's access to data through

DealerVault); Caseria Ex. 25 (Dkt. 957-25), DX 99 at MVSC_MDL_0009709 (CNCDA: "I spoke

with Dave Moeller [of the City Toyota dealership group] today and he indicated that the AVRS

crowd is misleading dealers . . . and, more importantly, is threatening to 'lock out' dealers on

DMVdesk."), *id.* at -9708 (MVSC: "[CDK and CVR] are 'locking out' the vendors we are using

to get the data from the DMS. One large dealership group was locked out yesterday . . ."); Ho Ex.

405, MVSC_MDL_0050390 (referring to effort to convert CDK dealers using SIS for integration

to manual import method); Ho Ex. 17, Bulusu Tr. 266:20-267:11 (discussing MVSC's efforts to

convert CDK dealers using SIS for integration over to the manual import method); Ho Ex. 31,

Armstrong (Individual) Tr. 185:15-186:14 ("[T]here was a big road show effort to go out and meet

with every single dealer to tell them we're not going out of business. . . . [B]ut we still lost dealers,

and we still lose dealers today."), *id.* 246:5-249:9 (testifying in part regarding the "chaos" and

"confusion" the SIS shutdown letter caused in the EVR marketplace"); Ho Ex. 407,

MVSC_MDL_0050807, at -0807 (discussing MVSC's efforts to convert CDK dealers using automated integrators to the manual import option).

111.    MVSC's manual workarounds, including Electron, are inferior to automated integration through independent integrators or "certified" access programs because they are slower and more error-prone.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 11 █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████ Ho Ex. 4, Nemelka Tr. 204:5-10 ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ *id.* 247:9-247:25 ████████████████

███████████████████████████████████████████████████

█████████ Ho Ex. 31 Armstrong (Individual) Tr. 223:11-224:24 ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████ Ho Ex. 17, Bulusu Tr. 192:21-193:16 ██████████

███████████████████████████████████████████████████

████████████████ *id.* 263:12-264 (similar), *id.* 274:25-275:12 ████

███████████████████████████████████████████████████



█████████████████████████ Ho Ex. 241, PX 1268 at CVR-0033397 █████████

██████████████████████████████████████████████████████████

██████; Ho Ex. 334, CDK-0988078 at -8078 ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Ho Ex. 239, PX 1261 at CVR-0072273 ████

████████████████████████████████████████ Ho Ex. 240, PX 1267

at CVR-0548745 ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████ Ho Ex. 242, PX 1269 at CVR-

0034171 ████████████████████████████████████████████

█████████████████████████ Ho Ex. 43, Quinlan Tr. 112:17-24 █████████

██████████████████████████████████████████████ *id.* 206:16-25

(similar); Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 28 ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ *id.* ¶ 36 ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ Dorris Ex. 147 (Dkt. 977-

149), Rubinfeld MVSC Report ¶ 112 ████████████████████████████

████████████████████████████████████████ *see also* Ho Ex. 20, Goroff

(TitleTec 30(b)(6)) Tr. 154:11-20 ████████████████████████████████████

████████████████

112. MVSC's lack of access to data through "certified" integration or independent integrators has caused it to lose dealership customers in California and has slowed its growth in the state. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 12 ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ *id.* ¶¶ 13-15 ████████████████████ Caseria Ex. 4 (Dkt. 957-

4), Klein Report ¶¶ 68-87 (████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████, *id.* ¶¶ 88-96 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ *id.* B.2

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*id.* D.9 (charting MVSC's market share over time); Ho Ex. 429, MVSC_MDL_0082956; Ho Ex. 410, MVSC_MDL_0052582; Ho Ex. 406, MVSC_MDL_0050710; Ho Ex. 78, Email from E. Partida to K. Kimball, et al., "Re: Fwd: FLSP change" (4/28/15); Ho Ex. 409, MVSC_MDL_0051377; Ho Ex. 79, Email from J. Nemelka to S. Jackley and T. Fricker, "DMVdesk – AB 516 & UCS (RCI)" (12/11/18) ("David Wilson Auto Group – Vitu Mail – DMVdesk – AB 516_UCS (RCI).pdf."); Ho Ex. 400, MVSC_MDL_0040451; Ho Ex. 479, Email

from S. Canterberry (Title Clerk) to R. Skolnick, "Fwd: Thank You For Your Time" (6/12/15) ("Barber Honda-Acura.pdf); Ho Ex. 480, Email from E. van Nieuwberg to J. Nemelka, "Fwd: Maita Automotive and CDK" (8/8/19) (see "Maita Auto Group 2nd.pdf.); Ho Ex. 481, Email from J. Capponi to L. Perine, et al., "DMV Desk Third Party Access For RPM (3/2/18) (see "Sonic Automotive - Vitu Mail - Fwd_ DMV Desk Third Party Access.pdf."); Ho Ex. 4, Nemelka Tr. 238:16-24; Ho Ex. 31, Armstrong (Individual) Tr. 229:16-17; *see also* Dorris Ex. 151 (Dkt. 977-153), Israel Report ¶ 192 ("From an economic perspective, reductions in consumer choice and reductions in product quality may result in competitive harm.").

113.    MVSC began its efforts to expand into Illinois in 2013; by early 2015, it had obtained formal authorization from the state to develop an EVR product.  Ho Ex. 411, MVSC_MDL_0058737 at -8737 (describing meeting between MVSC executives and state regulators about potential entry into the state as "very positive"); Ho Ex. 419, MVSC_MDL_0069731 at -9745 (MVSC's contract with the state of Illinois authorizing it to develop an EVR product dated January 28, 2015); Ho Ex. 80, Jamison Kingfield Offer Letter (dated June 30, 2014) and W-4 (dated July 12, 2014); Ho Ex. 397, MVSC_MDL_0016934 (referring to meetings with dealers); Ho Ex. 412, MVSC_MDL_0058926 (referring to meetings with dealers); *id.* (referring to meetings with state officials); Ho Ex. 431, MVSC_MDL_0085266 at 5266.010-5266.012 (referring to Illinois product development efforts); Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 40 (summarizing evidence).

114.    MVSC's lack of access to data through "certified" integration or independent integrators has delayed its entry into Illinois.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 20 ███████

███████████████████████████████████████████████████ *id.* ¶ 21 ███████████████

███████████████████████████████████████████████████████████████████



Ho Ex. 402, MVSC_MDL_0041446 at -1447

Ho Ex. 428, MVSC_MDL_0079497 at -9498

Ho Ex. 32, Armstrong (30(b)(6)) Tr. 59:19-21

Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 41 (                    Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶¶ 76, 80 (explaining MVSC's efforts to develop a combined renewal solution and EVR solution and summarizing evidence regarding same); *see also* Dorris Ex. 151 (Dkt. 977-153), Israel Report ¶¶ 188, 191 (CDK's and Reynolds's actions have harmed competition in Illinois by allowing CVR to maintain its dominant position there).

115. MVSC began its efforts to expand into Virginia in 2014, when it obtained a contract to enter the state. Ho Ex. 420, MVSC_MDL_0069878 (MVSC's contract with the state of Virginia dated October 29, 2014); Ho Ex. 417, MVSC_MDL_0063839 at -3868.010 (MVSC established an office in Virginia in May 2015); Ho Ex. 77, Don McNamara Offer Letter (dated August 31, 2015) and W-4 (dated September 17, 2015); Ho Ex. 417, MVSC_MDL_0063839 at -3868.009-3868.029 (MVSC hired leadership, invested resources in product development, and adapted customer contracts for Virginia); *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 43 (summarizing evidence).

116.    MVSC's lack of access to data through "certified" integration or independent integrators has delayed its entry into Virginia.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 21 ███



████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ Ho Ex. 402, MVSC_MDL_0041446 at -1447 ████████████████████

████████████████████████████████████

██████████████████████ Ho Ex. 428, MVSC_MDL_0079497 at -9498 ████████████████████████████

████████████████████████████████████

██████████████████████ Ho Ex. 32, Armstrong (30(b)(6)) Tr. 59:19-21 ██████████████████████

████████████████████ 179:14-16 ████████████████████

██████████████ *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 44 (summarizing evidence).

117.    MVSC has attempted to expand into Wisconsin since early 2014.  Ho Ex. 396, MVSC_MDL_0016208 at -6213 (MVSC developed a business plan for Wisconsin in early 2014, outlining its proposed "workflow" and product design, training initiatives, field support, and other services); Ho Ex. 413, MVSC_MDL_0059698 (MVSC submitted its business plan to regulatory authorities along with letters of support from dealers); Ho Ex. 393, MVSC_MDL_0001908 at -1934 (call summary detailing conversation with Department of Transportation); Ho Ex. 397, MVSC_MDL_0016934 at -6935 (describing "meet and great" with Wisconsin DMV and meetings

with Illinois and Wisconsin dealers); Ho Ex. 416, MVSC_MDL_0061433; Ho Ex. 414,

MVSC_MDL_0060313 (conveying reports of positive dealership visits); Ho Ex. 80, Jamison

Kingfield Offer Letter (dated June 30, 2014) and W-4 (dated July 12, 2014) (appointing MVSC

employee to assist with opening up operations in the state); *see also* Caseria Ex. 4 (Dkt. 957-4),

Klein Report ¶ 46 (summarizing evidence of MVSC's deliberate, concerted attempts to enter and

provide services in Wisconsin since at least 2014).

118.    MVSC's lack of access to data through "certified" integration or independent

integrators has impeded MVSC's entry into Wisconsin.  Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶

18-20



Ho Ex. 134, PX 555 at CDK-0236501.003

Ho Ex.

380, CVR-0313979 at -3980

*see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 29, 47-49 (summarizing

evidence); Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶ 40.

119.    MVSC has incurred millions in costs developing manual workarounds as a result of its lack of access to integration through "certified" integration and independent integrators, which constitutes evidence of harm to competition.   Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 10

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 132-135 (relying on records kept in the ordinary course of MVSC's business to quantify workaround costs, totaling conservatively at ███████████); Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶¶ 113-116; *see also* Ho Ex. 59, Israel Tr. 592:6-16 ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████ *d.* 595:5-17; *see also id.* 599:20-600:1 ("Q.  MVSC built integration, right?  A.  At a substantial time and expense.  To me, that's one of the evidences of harm to competition.").

120.    CDK internally admitted that its ability to raise 3PA prices in 2015-16 (in the "3PA Refresh" initiative) was dependent on successfully closing its DMS; otherwise, many vendors would choose to employ independent integrators to receive data from CDK dealers rather than paying CDK's increased 3PA prices. *See* Ho Ex. 169, PX 833, CDK-1811723 to 724 ███████

████████████████████████████████████████████████



Ho Ex. 24, Noser Tr. at 33:3-13 ███████████████

Ho Ex. 171, PX 851, CDK-0843479 to 499 ███████████████

Ho Ex. 482, PX 746, CDK-2868661 to 663 ███████████████

*See also* Fenske Ex. 76, (Dkt. 975-76), Murphy Report ¶ 37 ███████████████

121.    Reynolds Vice President Robert Schaefer testified that the statement in Section 4.5 of the Data Exchange Agreement that the section was intended "as a contractual restriction of access and attempted access" was not a provision that Reynolds agreed to, and "shouldn't have been in there", because "there was no agreement for CDK not to come into [Reynolds's] system." Ho Ex. 44, Schaefer Tr. at (Vol. 2) at 94:7-97:8, 98:15-99:8.  Schaefer blamed the inclusion of that statement on the attorneys who drafted the agreement; Schaefer also claimed that the title of Section 4.5 – "Prohibition on DMS Access" should have been deleted. *Id.* at 97:9-19.  Schaefer never raised these supposed "errors" with CDK or otherwise tried to correct them. *Id.* at 99:9-100:7.

122.    CDK acknowledged that its SecurityFirst program did not improve security. █

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

Ho Ex. 483, PX 1249, CDK-2665769 to 771 ███████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████ Ho Ex. 483, PX 1249, CDK-2665769 to 771. *See also* Ho Ex. 484, PX 1245, CDK-

2665746 to 751 █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████ Ho Ex. 485, PX 1248, CDK-1182331

to 332 ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████ Ho Ex. 486, PX 1250, CDK-0970696 to 697 ██████████████████████

████████████████████████████████████████████

123.    CDK acknowledged that its marketing materials about improvements to security

were false. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████ Ho Ex. 487, CDK-2665672 to 673.

124. 3PA's "SecurityFirst" was far behind industry standards. ██████████

████████████████████████████████████████████████████████

████████████████ Ho Ex. 172, PX 865, CDK-0759281 to 335 (PX 865) ████████

████████████████████████████████████ Ho Ex. 488, PX 980

███████████████████████████████ Ho Ex. 29, Gardner Tr. at (Vol. 2)

at 542:5-547:23 ████████

███████████████████████ Ho Ex. 24, Noser Tr. at 277:22-281:17

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Ho Ex. 489, PX 937, CDK-2165914 to 967, at 22-23, 25. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Id. at 23.

125. Many of CDK's vendor and dealer customers observed that CDK's decision to close its DMS had little (if anything) to do with security. *See* PJ RSUF ¶ 157 ████████

████████ *See also* Ho Ex. 490, PX 576, CDK-2719172 to 175

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Ho Ex. 491, PX 1020,

SIS_DMS_0012415 to 417 ████████████████

Ho Ex. 1, Ayotte Tr. at 49:4-14

Ho Ex. 8, Jezek Tr. at 339:1-340:2

Ho Ex. 492, PX 275, CDK-2705332 to 335

126.     Between 2006 and 2013, CDK employees stated (both internally and to the market) that Reynolds's use of "security" as a justification for blocking access to independent integrators was a pretext. Ho Ex. 493, CDK-3121097 to 099

Ho Ex. 494, PX 1180, CDK-0804056 to 0804061

Ho Ex. 495, PX 248, CDK-0853826 to 829

█████████████ Ho Ex. 176, PX 877, CDK-0771480 to 489 at CDK-0771481 █████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Ho Ex. 496, PX 1426,

REYMDL00240724 to 726 █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ see also Ho

Ex. 44, Schaefer Tr. at (Vol. 2) at 270:8-272:20 ████████████████████

█████████████████████████████

127.    CDK ██████████████████ would not have allowed CDK to engage in dealer-permissioned independent integration if they believed it caused significant security risk. Ho Ex. 5, Distelhorst Tr. at 41:14-20, 60:6-19, 68:5-11; Ho Ex. 6, Gerlich Tr. at 20:6-18.

128.    CDK made "accommodations" for certain dealers by whitelisting DMS login credentials that those dealerships gave to independent integrators for purposes of automated DIS; that whitelisting was often done so that CDK could avoid "customer dissatisfaction" during DMS contract renewal negotiations. *See* Ho Ex. 24, Noser Tr. at 269:11-270:20 ████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ *id.* 268:2-12

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ Ho Ex. 497,

PX 864, CDK-0918981 to 983 ███████████████████████████████████

████████████████████████ Ho Ex. 14, Karp Tr. at 393:12-394:23 ████████████████

█████████████████████████████████████████████████████████████████████

████████████ Ho Ex. 498, PX 569, CDK-0753322 to 324 █████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████ Ho Ex. 500, CDK-0050564 to 565 (████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

129.    CDK did not impose additional security restrictions on those "whitelisted" logins.

Ho Ex. 24, Noser Tr. at 272:4-10 ███████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████

130.    The relevant DMS and DIS markets were highly concentrated during the alleged damages period. *See* Fenske Ex. 79, (Dkt. 975-79), Williams Report ¶¶ 96-101; Ho Ex. 501, COX_0037531 to 551 ███████████████████████████████████████████████████

███████ Ho Ex. 502, CDK-3111902 to 911 at CDK-311904 (Nov. 29, 2016 CDK conference call transcript, in which CDK Chief Financial Officer Al Nietzel stated that "In the U.S., primarily North American, there's really three players [CDK, Reynolds and Cox].") ; Ho Ex. 8, Jezek Tr. at 207:19-21 ███████████████████████████████████████████████████████████████

█████████████████████ Ho Ex. 22, Whitworth Individual Tr. at 205:3-13 █████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████ Ho Ex. 71, Barkholz, D. (Dec. 2 2012), "Dealers get new management system option," *Automotive News*, https://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option (stating that "ADP [CDK] and Reynolds each hold about a 40 percent DMS share of the nation's nearly 18,000 new-vehicle dealers."); Dorris Ex. 57, (Dkt. 977-58), U.S. Federal Trade Commission (Mar. 19, 2018), *FTC Administrative Complaint, In the Matter of CDK Global et al.* (Redacted Public Version) ¶¶ 7, 18 (discussing concerns over potential harm to competition from further DMS market consolidation and stating that while customers had been "frustrated with CDK's and Reynolds's business practices [they] have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders.").

131.    There are substantial barriers to entry into the DMS market.  *See* Fenske Ex. 79, (Dkt. 975-79), Williams Report ¶¶ 102-107; Ho Ex. 71, Barkholz, D. (Dec. 2 2012), "Dealers get new management system option," *Automotive News*, https://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option (stating that Microsoft tried and failed to enter the DMS market in 2006, and in 2012, Microsoft, in cooperation with Dominion Dealer Services, again attempted to enter the DMS market with "Dominion DMX", but the effort also failed; and discussing "other barriers to entry" in the DMS market, including "long dealer contracts of five years or more and the complexity required to integrate a vendor's software with auto manufacturers' computer systems . . . ."); Ho Ex. 8, Jezek Tr. at 361:21-362:11

████████████████████████████████████████████████████████

████████████████████████████████ Ho Ex. 501, COX_0037531 to 551 ███████

████████████████████████████████████████████████████████

Dorris Ex. 57, (Dkt. 977-58), U.S. Federal Trade Commission (Mar. 19, 2018), *FTC*

*Administrative Complaint, In the Matter of CDK Global et al.* (Redacted Public Version), ¶ 58 (in its 2018 investigation of the proposed acquisition of Auto/Mate by CDK, the FTC concluded that effective entry into the DMS market "would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome."); Ho Ex. 152, PX 684, REYMDL00016612 (Declaration of Ronald Lamb, Reynolds President, stating at ¶ 3 that "[t]he default term of a Reynolds DMS contract is five (5) years with the range being anywhere from 36 to 84 months."); Ho Ex. 16, Brockman Tr. at 198:24-200:7 ███████████████████████

██████████████████████████████████████████████); Ho Ex. 503, CDK-0983555 ████████████████████████████████████████

██████████████████████████████████████████████

████ Ho Ex. 55, Andreu Tr. at 310:6-312:1 ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ Ho Ex. 30, Battista Tr. at 100:18-102:17

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ Ho Ex. 49, Whitworth Rule 30(b)(6) Tr. at 432:15-22 ████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

132.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████.” Ho Ex. 499, PX 949, CDK-2426185 to 186.

133.   Although the DEA states that "Section 4.5 is not intended as a 'covenant not to compete,'" it admits that it was intended as a "contractual restriction on access and attempted access". Fenske Ex. 49, (Dkt. 975-49), at Section 4.5.

134.   Section 4.5 of the DEA does not terminate, but remains in effect in perpetuity. Fenske Ex. 49, (Dkt. 975-49), at Section 6.1 (carving Section 4.5 out of the termination provision).

135.   Defendants' DMS prices have increased, not decreased, since mid-2014. *See* Fenske Ex. 80, (Dkt. 975-80), Williams Reply ¶ 113 and Fig. 27 (showing increased price indexes for Defendants' DMSs); Dorris Ex. 151, (Dkt. 977-153), Israel Report ¶ 185 and Fig. 10 (same); Ho Ex. 60, Murphy Tr. at 298:8-9 ██████████████████████████████████████████ *id.* at 250:20-251:11.

136.   During the time period September 2013 through May 2019, CDK had dealership DMS customers located in all 50 states, including: Massachusetts (305); Mississippi (90); New Hampshire (85); New York (514); South Dakota (29); and West Virginia (64). Ho Ex. 459, Declaration of Wei Zhao, Ph.D. in Support of Dealership Class Plaintiffs' Memorandum in Opposition to Defendant CDK Global, LLC's Motion for Summary Judgment, dated July 27, 2020.

137.   During the time period June 2016 through June 2018, Reynolds had dealership DMS customers located in all 50 states, including: Massachusetts (145); Mississippi (61); New

Hampshire (24); New York (377); South Dakota (11); and West Virginia (45). Ho Ex. 458, Declaration of Michael A. Acciavatti in Support of Dealership Class Plaintiffs' Memorandum in Opposition to Defendant CDK Global, LLC's Motion for Summary Judgment, dated July 25, 2020.

138. Vendors accessing data on the dealerships' DMS are headquartered or principally located in the following states: **Massachusetts:** Ho Ex. 383, DOMINION-00149091 (Dominion's Dec. 11, 2017 Narrative Response to FTC Specification #3, stating that two of Dominion's principal software applications offered to dealerships - Prime Response" and Marketing Management Services (MMS) – are both principally located in Massachusetts); Ho Ex. 37, Baerg Tr. at 93:11-21 (testifying that AutoAlert has offices in Boston, Massachusetts); **New York:** https://us.dealertrack.com/content/dealertrack/en/about/locations.html (last visited July 27, 2020) (DealerTrack has its headquarters in New Hyde Park, New York); and **South Dakota:** https://9clouds.com/about/ (last visited July 27, 2020) (9 Clouds Marketing has its headquarters in Sioux Falls, South Dakota).

139. CDK has a corporate office in New York. https://www.cdkglobal.com/us/cdk-locations (last visited July 27, 2020).

140. CDK's dealership customers who complained about CDK's data access policies include those located in the following states: **Massachusetts:** Ho Ex. 329, CDK-0954976 & Ho Ex. 330, CDK-0954977 ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

████████

141.     CDK tracked and blocked dealer-created and issued login credentials, which were

given to vendors by dealerships to access dealers' data, in several states including, but not limited

to: **Massachusetts:** Ho Ex. 273, CDK-0014801 ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

142.     CDK and Reynolds imposed price-secrecy provisions on vendors located in several

states, including, but not limited to: **Massachusetts:** Ho Ex. 294,  CDK-0596624-44 ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ho Ex.

447, REYMDL00238492 ████████████████████████████████████

█████████████████████████████████████████████████████

Ho Ex. 65, PI Hearing Tr. 2-A-45:4-46:2 (Andreu Testimony) (Alan Andreu (General Manager of Equity at Dominion Dealer Solutions) testified that the Reynolds's confidentiality provision "gags us completely. We can't tell [Dealers] anything, so I'm expected to somehow pass through an $893 charge on an $1,152 product without telling [Dealers] why." The witness went on to testify that when Dominion was accused of violating Reynolds's confidentiality provision, Reynolds "sent a nasty letter to the then-product manager of Sales Center, told us that we had -- defamation I think was on there. They said that we violated the secrecy requirement. They submitted -- they made us submit to an intimidating audit, and ultimately we wrote them a check for $100,000 or they were going to cut the RCI program off from our Sales Center product."); and **New Hampshire:** Ho Ex. 385, PX 1587, IMPACT000352 ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Ho Ex. 367, PX 1588, CDK-2737639 (████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Ho Ex. 386, PX 1592, IMPACT000399 ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Ho Ex. 331, CDK-0964268

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ Ho Ex. 384, PX 1594, IMPACT000070 ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████ and **New York:** Ho Ex. 376, COX_0047149 ████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

143.    CDK and Reynolds charged supracompetitive prices to access their respective DMS's through the 3PA and RCI programs to vendors located in several states, including, but not limited to: **Massachusetts:** Ho Ex. 275, CDK-0021117 (███████████████████████████

██████████████████████████████████ Ho Ex. 37, Baerg Tr. at 52:6-53:1 ████████

██████████████████████████████████████████

████████████████████ at 43:17-44:4 ██████████████████████

- 119 -



at
67:12-68:11

at 256:25-257:4

Ho Ex. 268,
PX 1124,

**New Hampshire:** Ho Ex. 54, Thorpe Tr. at 80:5-15

at 123:19-124:9

Ho Ex. 367, PX 1588, CDK-2737639

**Mississippi:**
Ho Ex. 390, JOHN_ONEIL0005117 & Ho Ex. 391, JOHN_ONEIL0005122

and **New York:** Ho Ex. 375, COX_0006827 at 830-831

███████████████████████████████████████████████████

███████████

144.    CDK and Reynolds charged vendors located in Massachusetts, New Hampshire, and New York supracompetitive integration fees who then passed on those fees to dealership customers, some of whom are located in those same states: **Massachusetts:** Ho Ex. 382, PX 1597, DOMINION-00045801 ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Ho Ex. 55, Andreu Tr. at 236:5-8 (████████████); Ho Ex. 269 (compilation of Baystate Ford invoices from AutoAlert, including BAYSTATE0012544 ██████████████████

████████████████████████████████████    BAYSTATE0012542 (same for Dec. 2015); BAYSTATE0010548 (same for Jan. 2016); BAYSTATE0010554 (same for Feb. 2016);   BAYSTATE0010553 (same for March 2016); BAYSTATE0009975 (same for April 2016); BAYSTATE0010546 (same for May 2016); BAYSTATE0010544 (same for June 2016); BAYSTATE0010541 (same for July 2016);BAYSTATE0010556 (same for Aug. 2016); BAYSTATE0010558 (same for Sept. 2016); BAYSTATE0010539 (same for Oct. 2016); BAYSTATE0010561 (same for Nov. 2016); BAYSTATE0011471 (same for Dec. 2016); BAYSTATE0011469 (same for Jan. 2017); BAYSTATE0011467 (same for Feb. 2017); BAYSTATE0011465 (same for March 2017)); Herb Chambers dealership group questioned these fees and CDK internally acknowledged that fees charged to 3PA vendors under the new SecurityFirst initiative would in whole or in part be passed onto the dealerships. Ho Ex. 292, CDK-0567453 ████████████████████████████████████████████

███████████████████████████████████████████████████



██████████████████████████ **New Hampshire:** Ho Ex. 54, Thorpe Tr. at 67:9-16 ████████████████████████ ; Ho Ex. 54, Thorpe Tr. at 165:22-166:22 ████████████████ ██████████████ **Mississippi:** Ho Ex. 388, JOHN_ONEIL0001878 at 880 ████████ ████████████████████ Ho Ex. 389, JOHN_ONEIL0002191 at 193 ████████ ███████████████████████ Ho Ex. 389, JOHN_ONEIL0002191 at 201 ████████████ ████████████ and **New York:** Ho Ex. 374, CONTINENTAL0021501 at 502 & 504 ( ████████████

145.    CDK and Reynolds blocked vendors who do not participate in the 3PA or RCI program from accessing dealer data in several states, including: **Massachusetts:** Boch Automotive Group, a 14 rooftop dealership in Massachusetts that switched from Reynolds to CDK because of third party access issues at Reynolds, was affected and their business harmed by the conspiracy

which included CDK shutting off the use of "hostile integration" methods and requiring vendors to exclusively go through 3PA for integration to a dealers' DMS. Ho Ex. 320, CDK-0854328



**Mississippi:** Ho Ex. 387, JOHN_ONEIL0000223

**South Dakota:** Ho Ex. 266, AUTH_00036305

Ho Ex. 265, AUTH_00017254

Ho Ex. 357, CDK-2140215

; and **West Virginia:** Ho Ex. 343, CDK-1496219

146.    CDK communicated with dealership customers regarding SecurityFirst and warned them that CDK was going to disable "non-authorized" access to the CDK DMS at dealerships in

several states including, but not limited to: **Massachusetts:** Ho Ex. 270, BAYSTATE0001499

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ and **New York:** Ho Ex. 455,

STEVENS0005244 (same).

     147. CDK communicated with dealership customers regarding SecurityFirst and warned

them that CDK was going to disable "non-authorized" access to the CDK DMS at dealerships

nationwide. Ho Ex. 342, CDK-1432824 █████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Ho Ex. 285, CDK-0113318 █████████

███████████████████████████████████████████████████████

██████████████ Ho Ex. 280, CDK-0049806 & Ho Ex. 281, CDK-0049815 ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ho

Ex. 350, CDK-1836504 & Ho Ex. 351, CDK-1836506 & Ho Ex. 352, CDK-1836507 ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ho

Ex. 332, CDK-0985116 & Ho Ex. 333, CDK-0985117



148.     CDK has a data center in Sioux Falls, South Dakota. Ho Ex. 307, CDK-0804042

149.     The National Automobile Dealers Association ("NADA") keeps data on dealerships in the United States in terms of total sales dollars and total dealership locations. Ho Ex. 69, 2019 NADA Data, https://www.nada.org/nadadata/ (last visited July 27, 2020). **Massachusetts** is ranked 15th in terms of total sales by dollar amount and 15th in total dealership locations in 2019; **New Hampshire** is ranked 35th in terms of total sales by dollar amount and 37th in total dealership locations in 2019; **Mississippi** is ranked 34th in terms of total sales by dollar amount and 33rd in total dealership locations in 2019; **New York** is ranked 4th in terms of total sales by dollar amount and 5th in total dealership locations in 2019; **South Dakota** is ranked 47th in terms of total sales by dollar amount and 43rd in total dealership locations in 2019; and **West Virginia** is ranked 40th in terms of total sales by dollar amount and 36th in total dealership locations in 2019.

150.     Automotive News keeps track of the largest car dealerships, by new retail sales, in the United States. Ho Ex. 72, Charniga, J., "Here's our annual ranking of the largest U.S. dealership groups," Automotive News, March 30, 2020, https://www.autonews.com/dealers/heres-our-

annual-ranking-largest-us-dealership-groups (last visited July 27, 2020) (listing the top 150 largest dealerships in the U.S. including, five dealerships in **Massachusetts**: Prime Automotive at #11; Herb Chambers Co. at #25; Balise Motor Sales Group at #64; Colonial Automotive Group at #84; and Kelly Automotive Group at #100; and one dealership in **New Hampshire**: Autofair Automotive Group at #111; and seven dealerships in **New York**: West-Herr Auto Group at #28; Island Auto Group at #44; Lia Auto Group at #55; Rosatti / Plaza Auto Group at #68; Curry Automotive at #74; Empire Auto Group at #96; and Romano Auto Dealerships at #124).

Dated:  July 28, 2020                    Respectfully submitted,

/s/ Peggy J. Wedgworth                    /s/ Derek T. Ho
Peggy J. Wedgworth                        Derek T. Ho
**MILBERG PHILLIPS GROSSMAN LLP**         **KELLOGG, HANSEN, TODD,**
One Pennsylvania Plaza, 19th Floor          **FIGEL & FREDERICK, P.L.L.C.**
New York, NY 10119                        1615 M Street, NW, Suite 400
(212) 594-5300                            Washington, D.C. 20036
pwedgworth@milberg.com                    (202) 326-7900
                                          dho@kellogghansen.com

*MDL Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

      I, Derek T. Ho, an attorney, hereby certify that on July 28, 2020 I caused a true and correct copy of the foregoing **MDL PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

                     */s/ Derek T. Ho*

                     Derek T. Ho

                     **KELLOGG, HANSEN, TODD,**

                     **FIGEL & FREDERICK, P.L.L.C.**

                     1615 M Street, NW, Suite 400

                     Washington, D.C. 20036

                     (202) 326-7900

                     dho@kellogghansen.com