# Exhibit 63

```
                UNITED STATES DISTRICT COURT

            FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

        Plaintiff,

-vs-                                Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC               Madison, Wisconsin
and THE REYNOLDS and                June 27, 2017
REYNOLDS COMPANY,                   1:50 p.m.

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT-SECOND DAY OF EVIDENTIARY HEARING
                    AFTERNOON SESSION
       HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
             AARON PANNER
             DAVID SCHWARZ
             DEREK HO
             JOSHUA HAFENBRACK
             KEVIN MILLER
             JOHANNA ZHANG
          1615 M Street, NW, Ste. 400
          Washington, DC  20036

Also present:  Stephen Cottrell - Authenticom president
               Steve Robb - IT technician

           Lynette Swenson   RMR, CRR, CRC
         U.S. District Court Federal Reporter
           120 North Henry Street, Rm. 520
             Madison, Wisconsin  53703
```

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 3 of 11 PageID #:81296
Case: 9:17-cv-00318-jdp Document #: 163 Filed: 07/09/19 Page 50 of 263

2-P-50

1  they bought, which vendor, is just an astronomical time
2  that we can't do.
3           THE COURT:  All right.  So just to quickly
4  paraphrase it, so you basically custom negotiate with
5  each of your vendors what their package price is going to
6  be.
7           THE WITNESS:  Yes.  And data elements.  Yes, all
8  the functionalities they use, yes, sir.
9           THE COURT:  So I don't want to stretch this too
10 far.  So you've 147 vendors and they have something like
11 50,000 individual interfaces.  You don't custom negotiate
12 each interface, but that's part of what you're looking at
13 when you negotiate the package price for the vendor.
14          THE WITNESS:  Yes.  And what you run is pretty
15 much on average about three-and-a-half to four packages
16 per vendor.  And then on top of that, they will also have
17 what we call *ala carte*, to where you have a service and
18 this guy might want parts for some reason because that's
19 what the dealer really wants.  So he can add in an
20 *ala cart* one, which would be a single interface, for
21 special ordering parts for those kind of things,
22 depending what they want.
23          THE COURT:  So when you do this, is there -- I
24 mean bottom line, is some sort of really complicated
25 price list that you have a price for each one of those

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 4 of 11 PageID #:81297
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/09/17 Page 51 of 265

2-P-51

1  very many elements?  Or you put it together and you
2  negotiate it?
3           THE WITNESS:  I put it together and I negotiate
4  it.
5           THE COURT:  Okay.  All right.  And you want to
6  keep that secret why?
7           THE WITNESS:  Because then what happens is they
8  get into a comparison.  Well, I'm paying $700 and I'm
9  paying $600.  Yeah, but you're getting five more fields
10 more and you've getting real-time.  And you're getting --
11 it gets into be way too -- I don't have time to do all
12 that and put it together and negotiate.  Because, you
13 know, car dealers and vendors, their strength is
14 negotiations, and so they want to take all of the
15 information they can get and come hit me.  And so I can't
16 get into those types of negotiations if I'm comparing
17 something.  We're not necessarily always comparing apples
18 to apples.  They get into apples to oranges and want that
19 price and we just negotiate based on --
20          THE COURT:  So part of it is just it improves
21 the strength of your negotiating position if you keep it
22 secret.
23          THE WITNESS:  Sure, it does.  Sure, it does.
24 BY MS. GULLEY:
25 Q    Are you allowed to tell one vendor what another

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 5 of 11 PageID #:81298
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/09/17 Page 52 of 263

2-P-52

```
 1  vendor's data elements are?
 2  A    Absolutely not.  In fact, even I can't --
 3  internally our organization is set up completely
 4  separate.  The actual infrastructure and all the data
 5  elements no one else can see.
 6  Q    Okay.  Looking at competition for a moment.  Exhibit
 7  -- defendants' Exhibit 161 is the declaration of Ron
 8  Lamb.  We've heard he's the former president and most
 9  immediate past president of the Reynolds and Reynolds
10  Company.  You agree with that --
11  A    Yes.
12  Q    -- general comment?
13  A    Yes.
14  Q    And did you talk to Mr. Lamb about his
15  declaration --
16  A    Yes, I did.
17  Q    -- here?  He mentions on the last page that
18  "Competition in the DMS market has heightened to a fever
19  pitch" at the very end of paragraph 30.  Do you see that?
20  A    Yes.
21  Q    Do you agree with that?
22  A    Yes, I do.
23  Q    Are you still losing customers?
24  A    Yes.
25  Q    Is this a surprise to you?
```

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 6 of 11 PageID #:81299
Case: 3:17-cv-00518-jdp Document #: 163 Filed: 07/05/17 Page 108 of 265

2-P-178

```
 1  Q    Do you know how vendor client is defined in this
 2  contract?
 3  A    That would be dealer.
 4  Q    That's the dealer; right?
 5  A    Correct.
 6  Q    Do you see that this little (ii) prohibits the
 7  vendor from getting the data from the dealer?
 8  A    Yes, it would in this case.
 9  Q    So if a vendor is part of the 3PA Program, it is
10  prohibited from getting the data from the dealer; right?
11  A    That's correct.  Well, there are cases where they
12  still can, but in general that's true.
13  Q    So it's false that dealers can just send the data to
14  the vendors, at least those who are in the 3PA Program;
15  right?
16  A    Send them directly to the dealer?
17  Q    Right.
18  A    That's correct.  Send them directly to the vendor?
19  Yes, that's correct.
20  Q    And this restriction that they have to get the data
21  from the interface, this restriction lasts forever,
22  doesn't it?
23  A    It lasts while they're in the program.
24  Q    It lasts forever, doesn't it?
25  A    While they're in the program.
```

                       HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 7 of 11 PageID #:81300
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 185 of 265

2-P-179

```
 1  Q    Let's go to Section 4(I).  Are you there?  Section 4
 2  (I).  Are you there?
 3  A    Yes.
 4  Q    And then this is the section on Term and
 5  Termination.  Section 4 is.  Do you see that?  So will
 6  you read for the Court what Section 4(I) says?
 7           THE COURT:  You don't have to.  I can read it.
 8  I speed readed it.
 9  Q    "So all restrictions set forth in Section 1," that's
10  the section we just were, "of this agreement shall
11  survive the termination of this agreement" --
12           THE COURT:  You didn't have to read it either.
13  I get it.
14  BY MR. NEMELKA:
15  Q    So how can CDK possibly justify imposing this
16  exclusive dealing term forever?
17           THE COURT:  Do you know if there's any
18  justification for doing that?
19           THE WITNESS:  No, and I'm not -- I'm puzzled by
20  that.
21  BY MR. NEMELKA:
22  Q    And you're in charge -- you're in charge of the 3PA
23  Program, aren't you?
24  A    Well, I'm wondering this is a 2016 contract.  I
25  would want to see if what the current one is.
```

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 8 of 11 PageID #:81301
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 180 of 265

2-P-180

```
 1  Q    Are you aware that counsel has represented -- your
 2  counsel has represented this is the current version of
 3  the 3PA contract in their statement of facts that they
 4  submitted to the Court?
 5  A    Well, let's see.  What's the date on it?  Well, we
 6  don't -- we don't know when this contract was -- what
 7  version of the contract this is.  So --
 8  Q    All right.
 9  A    -- I'm surprised to see that in there, that that's
10  something that I would want to look at more carefully.
11  Q    Okay.  We've talked about how CDK prohibits vendors
12  from putting any access fee on their invoices to dealers;
13  right?  We've already talked about that today.
14  A    I'm sorry.  Please repeat that.
15  Q    We're talked about CDK prohibits vendors from
16  putting any data access fee on their invoices to dealers.
17  A    Yes.
18  Q    But, in fact, you do more than just -- you prohibit
19  more than just that, don't you?  You also prohibit any
20  vendor from even telling the dealers about the
21  integration of prices that CDK charges; right?
22  A    Yes.
23  Q    And let's go to Section 8.
24  A    Section 8 of the same agreement?
25  Q    Yes.  Actually what I what to focus on is the last
```

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 9 of 11 PageID #:81302
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 249 of 265

2-P-249

BY MR. PANNER:

Q   Dr. Addanki, again I think you may have misunderstood my question. In 2014, Reynolds system is closed; correct?

A   Yes.

Q   And CDK's system is open?

A   Yes.

Q   And CDK is making a decision about whether to move to closed system.

A   Yes.

Q   And in making the evaluation as to whether to do that, the fact that Reynolds system is closed was very important to it in determining the competitive consequences of going to a closed system. True or false?

A   I just don't know.

Q   You haven't looked at documents that indicate that?

A   Oh. Did they take into account the fact that it was an open system and a closed system? Yes, absolutely they did.

Q   And it was important to them in terms of evaluating the competitive consequences of closing their --

A   I just don't know how important it was. That's my point.

Q   Okay. Fair enough.

A   They absolutely took it into account.

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 10 of 11 PageID #:81303
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/09/17 Page 250 of 265

2-P-250

1  Q    It would have been a valuable thing for CDK -- I'm
2  not asking you to give me an estimate of how valuable.
3  But it would be a valuable thing for CDK to have
4  assurances from Reynolds that it does not intend to open
5  its system; correct?
6  A    If you're asking would there be some value greater
7  than zero having that assurance, possibly, yes.
8  Q    And do you think that it was of business
9  significance to Reynolds that CDK made a decision to
10 close its system?
11 A    I actually haven't seen any of Reynolds' documents
12 on it.  I would expect that Reynolds probably had mixed
13 feelings about it.
14 Q    But let me ask you -- let me try to ask you this
15 question:  There's no dispute that in a concentrated
16 market -- and you would agree with me that the DMS market
17 is highly concentrated, wouldn't you?
18 A    It's concentrated, yes.
19 Q    That in a concentrated market, rivals monitor the
20 behavior of the other competitors, other large
21 competitors in the market, and make decisions about how
22 to conduct their business based in part on what their
23 competitors are doing; correct?
24 A    Yes.  There isn't a difference in concentrated
25 markets.

Case: 1:18-cv-00864 Document #: 1094-4 Filed: 07/29/20 Page 11 of 11 PageID #:81304
Case: 9:17-cv-00518-jdp Document #: 103 Filed: 07/09/17 Page 251 of 265

2-P-251

```
 1  Q    No doubt about it; right?
 2  A    That's right.
 3  Q    So what's going on at a minimum is coordination
 4  between DMS -- excuse me.  There's coordination between
 5  CDK and Reynolds with respect to the policy of keeping a
 6  closed system.
 7  A    No, I wouldn't agree with that at all.
 8  Q    Before, a point of competitive differentiation
 9  between CDK and Reynolds was that CDK was open and
10  Reynolds was closed; correct?
11  A    That was a point of differentiation, that you
12  stressed, yes.
13  Q    And when CDK decided to close its system, that was
14  no longer a point of competitive differentiation;
15  correct?
16  A    That's correct.
17  Q    And that reduced the intensity of competition
18  between the two providers; isn't that fair?
19  A    No, I haven't seen evidence of that.
20  Q    Okay.  Do you have an -- well, I should ask you
21  this:  Many economists are very good with computers and I
22  want to know whether you consider yourself an expert in
23  computers and information technology.
24  A    I've been a software author, a published software
25  author.  I have consulted in many cases involving
```