# Exhibit 64

```
                    UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF WISCONSIN
        _____

        AUTHENTICOM, INC.,

                   Plaintiff,

          -vs-                                 Case No.  17-CV-318-JDP

        CDK GLOBAL, LLC and                    Madison, Wisconsin
        THE REYNOLDS AND REYNOLDS COMPANY,     June 26, 2017
                                               9:03 a.m.

                   Defendants.
        _____

          STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF EVIDENTIARY HEARING
                              (MORNING SESSION)
            HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

        APPEARANCES:

        For the Plaintiff:

                    Godfrey & Kahn S.C.
                    BY:  JENNIFER L. GREGOR
                    One East Main Street, Suite 500
                    Madison, Wisconsin  53701

                    Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
                    BY:  MICHAEL N. NEMELKA
                         AARON M. PANNER
                         DAVID L. SCHWARZ
                         DEREK T. HO
                         JOANNA T. ZHANG
                         JOSHUA HAFENBRACK
                         KEVIN J. MILLER
                    1615 M Street, N.W.
                    Suite 400
                    Washington, D.C.  20036


                    Jennifer L. Dobbratz, RMR, CRR, CRC
                    U.S. District Court Federal Reporter
                       United States District Court
                    120 North Henry Street, Rm. 410
                       Madison, Wisconsin  53703
                             (608) 261-5709
```

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 3 of 12 PageID #:81307
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 113 of 180

1-A-113

1    Q    Are those -- and those are the data feeds that Authenticom
2    pulls?
3    A    Yes, those are.
4    Q    Does Authenticom have security protections and protocols?
5    A    State of the art.
6         THE COURT:  Before you move on, do all the vendors --
7    let me ask -- put it more broadly.  Is there a standard protocol
8    for transmitting data to the vendors?
9         THE WITNESS:  Yes.
10        THE COURT:  Okay.
11        THE WITNESS:  That would be a secure FTP, so basically
12   it's an FTP connection like we talked about before, but there's
13   a security and encryption on that FTP transmission.
14        THE COURT:  Okay.  But that just allows you to make a
15   connection and have the file encrypted.  Is there a standardized
16   data format that everybody is using?
17        THE WITNESS:  No.  We actually customize -- we actually
18   customize the format to the vendor's particular requirements.
19   That's part of our value proposition to the vendors.
20        THE COURT:  So they're going to tell you, "You got to
21   send us a CSV file with the fields in this order and the top of
22   the page has to have these headings on it," stuff like that.
23        THE WITNESS:  You're hired.
24        THE COURT:  Okay. All right.  I got something to fall
25   back on now.  That's good.  Okay.  I got it.

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 4 of 12 PageID #:81308
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 104 of 160

1-A-114

1   BY MR. NEMELKA:
2   Q   Does Authenticom have security protections and protocols?
3   A   State of the art.
4   Q   Please describe the security protections and protocols that
5   Authenticom has.
6   A   So, first off, Microsoft Azure. You know, everything --
7   our technology is hosted inside the Microsoft Azure cloud. As
8   far as data, we only, you know, access data based on dealer's
9   express and written permission. We only transmit the data,
10  okay, to the vendors that is expressly provided. We've got
11  state of the art technology as far as our hardware and software.
12  Q   Has Authenticom ever had a data breach?
13  A   Never once.
14  Q   Has Authenticom's firewall ever been compromised?
15  A   It has not.
16  Q   Has Authenticom ever had a reportable security incident?
17  A   It has not.
18  Q   Even if one ever did happen, what kind of provisions do you
19  have in your contracts with dealers to cover that possibility?
20  A   We've invested in a $20 million cyber liability policy in
21  the unlikely event of something happening.
22  Q   Has Authenticom ever had to draw upon its cyber insurance
23  policy?
24  A   It has not.
25  Q   Has Authenticom ever offered to explain its security

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 5 of 12 PageID #:81309
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 115 of 160

1-A-115

1   protocols to CDK and Reynolds?

2   A   Multiple times.

3   Q   Did CDK and Reynolds ever take you up on that offer?

4   A   They have not.

5   Q   Have you ever offered to host them at your facilities in

6   La Crosse?

7   A   We've invited both CDK and Reynolds and Reynolds to

8   La Crosse multiple times.  We've also suggested that we'd be

9   happy to travel to their location to have an open conversation,

10  not only about our infrastructure but, you know, data security

11  in the automotive space as a whole.

12  Q   Have you offered to open up your infrastructure to them so

13  they can evaluate your security protections?

14  A   To a degree, yes.

15  Q   Have CDK and Reynolds ever identified a specific deficiency

16  that they want you to fix about your security protocols?

17  A   Nothing comes to mind other than they wanted us to stop

18  competing with them.

19  Q   Have CDK and Reynolds ever made any misrepresentations

20  about your security protocols?

21  A   Absolutely in the marketplace, yes.

22  Q   So let's take a few examples.  We talked about --

23              THE COURT:  Before you pass on, can I ask a question

24  about the insurance policy?

25              THE WITNESS:  Certainly.

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 6 of 12 PageID #:81310
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 137 of 160

1-A-137

```
 1    A    CDK and Reynolds and Reynolds entered into their agreement.
 2    Q    Did you hear about this?
 3    A    We did.
 4    Q    How did you hear about it?
 5    A    Initially in the marketplace the CDK salespeople,
 6    particularly DMI and IntegraLink, were out saying that they had
 7    made peace with Reynolds and Reynolds and that they would no
 8    longer be blocked.
 9    Q    What was the effect on Authenticom's business?
10    A    It was devastating.
11    Q    How?
12    A    Essentially the vendors and dealers had been living under
13    siege, the dealers essentially having to read their passwords
14    again and again and again and vendors having to answer questions
15    about why their applications, you know, weren't updated.  So
16    when the market learned of this agreement, many vendors,
17    unfortunately, migrated to DMI and IntegraLink at that point in
18    time.
19    Q    After Reynolds and CDK entered into their own wind-down
20    access agreement, did Reynolds ever talk to you about a
21    wind-down access agreement for Authenticom?
22    A    They did.
23              MR. NEMELKA:  We'd like to introduce Exhibit 47.
24    Sorry.  PX47.  PHX47.
25              MR. RYAN:  No objection, Your Honor.
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 7 of 12 PageID #:81311
Case: 3:17-cv-00518-jdp Document #: 164 Filed: 07/05/17 Page 138 of 160

1-A-138

1                THE COURT:  Okay.  Thank you.  It's admitted.
2       BY MR. NEMELKA:
3       Q    All right.  Mr. Cottrell, what -- first of all, let's look
4       at the email.  What is this email?
5       A    Essentially this is from Reynolds' counsel saying that this
6       was pursuant to the conversation that I had with Mr. Schaefer,
7       and they were presenting the wind-down access agreement for our
8       consideration.
9       Q    And what is the attachment to that email?
10      A    That's the actual agreement.
11      Q    And what did Reynolds propose you do in this agreement?
12      A    Reynolds essentially suggested that we exit the business.
13      They would protect our profiles, not block us for a period of 12
14      months.  In exchange we were required to assist them, make best
15      efforts to move everyone -- all of our customers to the Reynolds
16      Certified Interface.  At the end of that period of time, we had
17      to exit the business.  We couldn't sell our services, our IP.
18      We couldn't consult.  Basically we could never touch a Reynolds
19      and Reynolds system in any way, shape, or form.
20      Q    Did you have any conversations with anyone at Reynolds
21      about what was sent here?
22      A    I had conversations with Mr. Schaefer.
23      Q    And did you talk to Mr. Schaefer in person or on the phone?
24      A    I had conversations with Mr. Schaefer on the telephone.
25      Q    And did you talk to Mr. Schaefer after you got this?

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 8 of 12 PageID #:81312
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/09/17 Page 139 of 160

1-A-139

```
1     A    I did.
2     Q    On the telephone?
3     A    I did.
4     Q    In May 2015?
5     A    I did.
6     Q    Tell me as close as you can in his own words, as you can
7     remember, what Mr. Schaefer said on the call?
8     A    He said, "As you know, Mr. Brockman is adamant about
9     removing all third parties from our DMS system.  This is your
10    last chance.  I suggest that you consider this carefully.  We've
11    made agreements with the other major DMS providers to support
12    each other's third-party access agreements and to block
13    independent integrators such as Authenticom."
14    Q    What did you say in response to these comments by
15    Mr. Schaefer?
16    A    I said that that was not in the best interest of
17    Authenticom, wasn't in the best interest of the dealers, wasn't
18    in the best interests of the vendors or the industry as a whole
19    and that we were going to continue to compete.
20    Q    Did anyone at CDK confirm what Mr. Schaefer said about CDK
21    and Reynolds agreeing to block independent integrators like
22    Authenticom?
23    A    They did.
24    Q    Do you recall that conversation?
25    A    Vividly.
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 9 of 12 PageID #:81313
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 140 of 160

1-A-140

```
1    Q    Who was that conversation with?
2    A    Dan McCray.
3    Q    Who is Dan McCray?
4    A    Dan McCray was essentially Mr. Schaefer's counterpart at
5    CDK at that point in time.  He was the vice president in charge
6    of their 3PA program.
7    Q    Where did this conversation take place?
8    A    In Las Vegas, Nevada, at the National Auto Dealers
9    Association convention.
10   Q    When did it take place?
11   A    April 3rd of 2016.
12   Q    How did the conversation start?
13   A    It's not --
14            THE COURT:  What was the date?
15            THE WITNESS:  April 3rd, 2016.
16   BY MR. NEMELKA:
17   Q    How did the conversation start?
18   A    Mr. McCray approached our booth wanting to have a
19   conversation with me.  I was unavailable.  He left his business
20   card.  I called his cell phone.  He said, "I'll be right over."
21   Unfortunately, a major opportunity stepped into the booth before
22   Mr. McCray got there, so when he got there, I was tied up.  I
23   stepped out for a moment and told him I'd meet him in his booth.
24   Q    Okay.  And then as you approached the booth, what did you
25   see?
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 10 of 12 PageID #:81314
Case: 3:17-cv-00318-jdp Document #: 104 Filed: 07/09/17 Page 141 of 160

1-A-141

1    A    Mr. McCray was standing off to the side of the booth with,
2    I believe, three other individuals. Among them was Kevin
3    Distelhorst.
4    Q    As you approached the booth, what happened?
5    A    It was kind of awkward. You know, I approached them to
6    greet them, and everybody was cordial, but there was something
7    in the air. I didn't know what it was but kind of felt like I
8    was the -- part of a joke.
9    Q    Okay. And what did Mr. McCray say to you when you
10   approached?
11   A    He said, "Let's take a walk."
12   Q    I'm sorry. Go ahead.
13   A    Basically grabbed me by the arm, not forcibly but directed
14   me down a service ramp off the convention floor through a set of
15   double doors and --
16   Q    As you got to that area, what did Mr. McCray tell you?
17   A    Mr. McCray essentially confirmed the conversation that I
18   had with Mr. Schaefer previously by saying, "You may or may not
19   be aware we've entered into an agreement with Reynolds and
20   Reynolds, okay? That agreement specifically says that we're
21   going to support each other's third-party interfaces, and we're
22   working collaboratively to remove all hostile integrators from
23   our DMS system."
24   Q    Did he say anything else?
25   A    He said, quote, "I have clocked you on 2,000 of our

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 11 of 12 PageID #:81315
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/09/17 Page 142 of 160

1-A-142

```
 1    systems, and I can flip the switch at any time."
 2    Q    Did he say anything about the blocking of independent
 3    integrators?
 4    A    Yes.  He said that Reynolds and Reynolds, as I mentioned
 5    before -- or excuse me, that CDK was working with the other
 6    major DMS providers to specifically block hostile integrators.
 7    Q    How many major DMS providers are there?
 8    A    Two, CDK and Reynolds and Reynolds.
 9    Q    How did -- how did he end the conversation?
10    A    Dan looked me in the eye and he said, "I admire you.  I
11    admire your company."  He said, "I'd really like to see you get
12    something for it before I fucking destroy it."
13    Q    What did you say in response to Mr. McCray?
14    A    Again, I said that I was shocked, okay, that they would
15    collaborate in such a form and it was not in the best interests
16    of the automobile industry, wasn't in the best interests of the
17    dealers and the vendors.  It certainly was not in Authenticom's
18    employees' best interests or my best interests, and I told him
19    to pack a lunch because it was going to be a tough fight.
20    Q    You told him to pack a lunch?
21    A    I did.
22    Q    Okay.  What does that mean?
23    A    Basically means that it wasn't going to be something easy
24    that he was going to be able to handle over morning coffee.
25    That it was going to be a drawn-out process, and he was going to
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1094-5 Filed: 07/29/20 Page 12 of 12 PageID #:81316
Case: 9:17-cv-00318-jdp Document #: 164 Filed: 07/09/17 Page 143 of 160

1-A-143

```
1      need to pack a lunch.
2      Q    Did you take notes after that conversation happened?
3      A    I did.
4               MR. NEMELKA:  We'd like to introduce Plaintiff's
5      Exhibit 55A.
6               MR. RYAN:  No objection, Your Honor.
7               THE COURT:  All right.  Good.  55A is admitted.
8      BY MR. NEMELKA:
9      Q    Mr. Cottrell, what is Exhibit 55A?
10     A    55A is a copy of the Word document that I wrote the next
11     morning.
12     Q    Okay.  Why did you take notes the next morning after this
13     conversation?
14     A    Honestly, I didn't sleep that night.  It kept playing over
15     and over in my head.  I had confirmation that two multibillion
16     dollar corporations were, you know, conspiring to put me out of
17     business.  The words that Mr. McCray used were almost identical
18     to the words that Mr. Schaefer had used, and I didn't know what
19     to do, so I thought it was important to preserve that
20     conversation.
21     Q    You can take it down, Steve.
22          After your conversation did Mr. McCray, did CDK take any
23     action to destroy your business?
24     A    They did.
25     Q    What did they do?
```

STEPHEN COTTRELL - DIRECT