# Exhibit IIII



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

FILED

FEB - 3 2003

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TAS DISTRIBUTING COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-*1026* |
| | ) | |
| CUMMINS ENGINE COMPANY, INC., | ) | |
| | ) | PLAINTIFF DEMANDS A TRIAL BY |
| Defendant. | ) | JURY |

## COMPLAINT

NOW COMES the Plaintiff, TAS DISTRIBUTING COMPANY, INC. ("TAS"), by and through its attorneys, Elias, Meginnes, Riffle & Seghetti, P.C., and as and for its complaint against Defendant, CUMMINS ENGINE COMPANY, INC. ("Cummins"), states as follows:

### THE PARTIES

1.    TAS is an Illinois corporation with its principal place of business and corporate headquarters located in Peoria, Illinois.  TAS is a resident and citizen of the State of Illinois.  TAS is primarily engaged in the business of inventing, developing, engineering, marketing, and licensing patented, proprietary and innovative technology which is primarily used to automatically start and stop engines (the TAS Technology). Some of the benefits of the TAS Technology include substantial fuel savings, increased engine life, and benefits to the environment.



2.     Cummins is a Delaware Corporation with its principal place of business in Columbus, Indiana.   Cummins is a resident and/or citizen of Delaware and/or Indiana.  Cummins is primarily engaged in the manufacture of engines for use in trucks and other applications.  Cummins has approximately 30% or more of the market share of the United States truck engine market.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction in this case, pursuant to 28 U.S.C.A. §1332, on the grounds that there is complete diversity of citizenship between the only Plaintiff and the only Defendant.

4.     Venue is proper in this Court because a substantial portion of the events giving rise to this case transpired in this Judicial District.  Additionally, the contracts between the parties which give rise to this action were executed in this Judicial District.

5.     Both parties have contractually consented and agreed to exclusive venue in Peoria, Illinois over any and all controversies (such as this case) arising out of their contractual agreements.  Specifically, Section 2 of the Master Agreement executed between the parties (which is discussed in greater detail below), provides as follows:

2.     Choice of Forum.

Any action brought by Licensor or Licensee against the other in any way arising out of, relating to, or under the Agreements shall be brought only in a court of competent jurisdiction in Peoria, Illinois.

## NATURE OF THE ACTION

6.     This is an action for declaratory relief, breach of contract, and damages arising out of breaches of Cummins' contractual obligations under the agreements between the parties.

## THE TAS TECHNOLOGY AND PATENTS

7.     TAS and its employees and affiliates have invented, engineered, patented, developed, and marketed extremely valuable and sophisticated technology which automatically turns an engine on (generally described as Temp-A-Start) and turns and engine off (generally described as Temp-A-Stop) (which collectively comprise the TAS Technology). TAS has incurred costs well in excess of $1,000,000 in that regard.

8.     TAS owns or is exclusive licensee of the following Patents with respect to its proprietary technology:

United States Patent Number 4,421,075
Canadian Patent Number 1,161,929
Taiwan Patent Number UM 23769

United States Patent Numbers 5,072,703,5,222,469
And 5,317,998

9.     In the early 1990's, it became apparent in the truck engine industry that the TAS Technology was extremely valuable, patented technology which would be useful and marketable, and which would enhance the sale of truck engines by a manufacturer of truck engines which had that proprietary technology.

## THE TAS/DDC LICENSE AGREEMENT AND DDC'S BREACHES

3

11.     On or about September 1, 1994, TAS entered into a License Agreement with Detroit Diesel Corporation (DDC) which allowed DDC to make, manufacture and sell products utilizing the TAS Technology.  (The TAS/DDC License Agreement).  Pursuant to that License Agreement, DDC was contingently granted certain exclusive rights with respect to the TAS Technology.  TAS and DDC also entered into a Master Agreement on that same date.

12.     DDC failed to meet the performance and/or payment criteria necessary to maintain exclusivity under the TAS/DDC License Agreement, and also failed to make payments due and owing to TAS, resulting in valid grounds for termination of the TAS/DDC License Agreement (as determined by this Court in Case No. 96 C 1516 (the TAS/DDC Lawsuit)).

## THE COMMENCEMENT OF THE TAS/DDC LAWSUIT

13.     On or about October 18, 1996, TAS filed a Complaint against DDC, which was subsequently removed to this Court as Case No. 96 C 1516.   (The TAS/DDC Lawsuit).

14.     In that Complaint, TAS sought a declaration that the TAS/DDC License Agreement no longer provided exclusive rights to DDC.   TAS subsequently filed a supplemental Complaint, seeking a declaration that DDC had lost its rights under the TAS/DDC License Agreement altogether.   TAS also sought substantial monetary compensation from DDC as a result of DDC's alleged payment defaults and other breaches.

4

## HISTORY OF THE RELATIONSHIP BETWEEN TAS AND CUMMINS

15.     Shortly after TAS filed the TAS/DDC Lawsuit, Cummins approached TAS, and indicated to TAS that it was losing market share in the truck engine market to DDC because DDC had the TAS Technology, and Cummins did not.

16.     Cummins urged TAS to aggressively pursue litigation against DDC to obtain a declaration either that DDC's rights under the TAS/DDC License Agreement had been validly terminated altogether, or that DDC no longer had exclusive rights to the TAS Technology.

17.     Cummins represented to TAS that it had a very strong desire to obtain rights to use the TAS Technology, that it would make the development and use of the TAS Technology a very high priority, and that it would devote substantial and sufficient resources to the development and adoption of the TAS Technology if it were granted rights to the TAS Technology.  In reliance upon those representations, and at the strong urging of Cummins, TAS began to negotiate contingent agreements with Cummins with respect to the TAS Technology.

## THE ORIGINAL AGREEMENTS BETWEEN THE PARTIES AND RELEVANT CONTRACT TERMS AND PROVISIONS

18.     On or about February 22, 1997, TAS and Cummins entered into a certain Master Agreement (the Master Agreement), a copy of which is attached hereto as Exhibit A.  The Master Agreement generally govern the relationship of the parties, and deals with such topics as defined terms, non-competition, and protection of technology.

19. On or about February 22, 1997, TAS and Cummins entered into a certain Intellectual Property License Agreement (the TAS/Cummins License Agreement), a copy of which is attached hereto as Exhibit B. The TAS/Cummins License Agreement granted Cummins a license to utilize the TAS Technology (but only upon the condition of a judicial determination that TAS had the right to do so), and sets forth the royalty and payment terms. Subject to certain limitations and retained rights of TAS, the TAS/Cummins License Agreement gave Cummins rights to the TAS Technology to the exclusion of other entities.

20. On or about February 22, 1997, TAS and Cummins entered into a certain Consulting Services Agreement (Consulting Agreement), a copy of which is attached hereto as Exhibit C.

## THE SUMMARY JUDGMENT ORDER IN THE TAS/DDC LAWSUIT

21. By Order entered in the TAS/DDC Lawsuit on or about March 31, 1998, this Court granted summary judgment in TAS' favor, declaring that DDC's rights under the License TAS/DDC Agreement were validly terminated.

22. DDC moved for reconsideration of the Summary Judgment Order.

23. DDC indicated that it intended to appeal or otherwise seeks relief from the summary judgment ruling.

## THE TAS/DDC SETTLEMENT

24. At the urging of Cummins, TAS entered into settlement negotiations with DDC with respect to the TAS/DDC Lawsuit.

25. Cummins induced TAS to forego substantial monetary compensation from DDC in the course of the settlement negotiations, and instead to negotiate for the

rights of Cummins to quickly have a "co-exclusive" right to certain of the TAS Technology, to the exclusion of other engine, truck and tractor manufacturers.

26. DDC would have paid substantial compensation to TAS to re-gain its exclusive right to the TAS Technology.

27. Because of Cummins' representations as to its strong commitment to the TAS Technology, (which were made at the time the TAS/Cummins License Agreement was negotiated and executed, and repeated throughout the course at the TAS/DDC Lawsuit) TAS decided to negotiate with DDC in a manner which would allow Cummins to immediately have "co-exclusive" rights to the TAS Technology (instead of waiting for a final decision in the TAS/DDC Lawsuit). It did so, however, under the previously negotiated express agreement set forth in Section 6(f) of the License Agreement, that Cummins would "make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement," and that it would do so on an expedited basis.

28. Upon granting Cummins "co-exclusive" rights to the TAS Technology, TAS reasonably believed that Cummins would honor its contractual obligation to fully and promptly utilize the TAS Technology so as to maximize royalties to TAS.

29. TAS reasonably believed that the TAS Technology would be fully utilized by DDC in its approximately 30% of the U.S. Truck Engine Market, and by Cummins in its approximately 30% of the U.S. Truck Engine Market.

30. But for Cummins' representations and warranties as to its firm commitment to fully and aggressively utilize the TAS Technology, so as to maximize royalties payable to TAS, TAS would not have entered into the Licensing Agreement

7

_

with Cummins, and would not have settled with DDC whereby TAS was allowed to immediately grant Cummins co-exclusive rights, but rather would have pursued its substantial monetary claims against DDC.

## THE FIRST AMENDMENT TO AGREEMENTS
## EXECUTED TO FACILITATE THE TAS/DDC SETTLEMENT

31.     On or about June 3, 1998, TAS and Cummins entered into a certain First Amendment to Agreements, ("First Amendment"), a copy of which is attached hereto as Exhibit D.  TAS also entered into an amendment of its agreement with DDC.  The main purpose of that First Amendment was to implement the terms of the TAS/DDC Settlement Agreement (the non-monetary terms of which had been approved by Cummins) and to "dovetail" the TAS/Cummins and TAS/DDC agreements to facilitate the settlement of the TAS/DDC Lawsuit.

## THE ECM (OR ONE BOX) PRODUCT AND THE RETROFIT
## (OR TWO BOX) PRODUCT

32.     The ECM Product or "One Box Product" (as defined in the TAS/Cummins License Agreement) is described in detail in Exhibit D.  In general terms, an ECM Product is a product utilizing the TAS Technology which includes programming in the engine ECM or vehicle ECM.  ECM stands for "electronic control module."

33.     The Retrofit Product or "Two Box Product" (as defined in the TAS/Cummins License Agreement) is described in detail in Exhibit D.  In general terms, a Retrofit Product is a product utilizing the TAS Technology which is not installed in either the engine or the ECM or the vehicle ECM.

8

34.     Under the TAS/Cummins License Agreement, "subject technology" is generally defined as all technology owned or licensed by TAS relating to Temp-A-Start and Temp-A-Stop.

35.     Under the TAS/Cummins License Agreement, Product is defined as follows:

> (n)     "Product" shall mean any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology.

## CUMMINS FAILURE TO DEVOTE SUFFICIENT RESOURCES TO THE TASK OF ENGINEERING AND DEVELOPING PRODUCTS UTILIZING THE TAS TECHNOLOGY

36.     Despite Cummins' representations to TAS that is had the resources and desire necessary to fully engineer and develop Products utilizing the TAS Technology, Cummins repeatedly failed and/or refused to devote sufficient resources, either in terms of experienced and capable personnel, and/or sufficient financial resources, to engineering and development of Products utilizing the TAS Technology.   In fact, despite its promise in Section 6(d) of the License Agreement to "exercise all reasonable efforts to have the manufacturing capacity to begin production of a Cummins-branded Retrofit Product by July 1, 1997", Cummins at this time does not have a marketable Retrofit Product.

37.     From at least the time of the First Amendment of its Agreement with TAS, (which was executed on June 3, 1998), through the present time, Cummins has failed to assign any engineers with any significant experience directly to the project of developing Product utilizing the TAS Technology.

38.     From at least the time of the First Amendment of its Agreement with TAS, (which was executed on June 3, 1998), through the present time, Cummins has failed to assign any marketing personnel with any significant experience directly to the project of developing Product utilizing the TAS Technology.

## DDC'S SUCCESS IN ENGINEERING, DEVELOPING AND MARKETING PRODUCTS UTILIZING THE TAS TECHNOLOGY

39.     Detroit Diesel Company (DDC) is a corporation which is generally in the same business as Cummins, and which at all relevant times has had approximately the same market shares in the "over the road" engine market as Cummins has enjoyed. DDC and Cummins are direct competitors in this market.

40.     DDC has consistently engineered, developed, marketed and sold very substantial quantities of Products utilizing the TAS Technology (from at least the time of the amendment of the TAS/DDC License Agreement in 1998 through the present time).

41.     From approximately Fall of 1998 through the present time, virtually all of the engines sold by DDC have utilized either some or all of the TAS Technology.

42.     DDC has made the development and use of the TAS Technology a significant priority in its overall engineering and marketing strategy

43.     DDC has sold an approximate annual average of 15,000 engines in each of the past four (4) years utilizing the TAS Technology:

## CUMMINS FAILURE TO MAXIMIZE ROYALTIES PAYABLE TO TAS

44.     Section 6(f) of the License Agreement provides as follows:

(f) Licensee shall make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement.

45. Pursuant to Section 6(f) of the License Agreement, Cummins had an obligation to maximize the payment of royalties to TAS by making all reasonable efforts to maximize sales of both ECM Products and Retrofit Products utilizing the TAS Technology.

46. Cummins has failed and refused to honor its obligations to maximize payments of royalties to TAS by failing to make all reasonable efforts to maximize sales of both ECM Products and Retrofit Products utilizing the TAS Technology.

## CUMMINS FAILURE TO MAKE EVEN NOMINAL SALES OF PRODUCTS UTILIZING THE TAS TECHNOLOGY

47. Cummins has had virtually the same rights as DDC to develop, engineer, market and sell Products utilizing the TAS Technology since approximately June of 1998 (when the TAS/DDC Lawsuit was settled).

48. Despite having similar rights as DDC to develop, engineer, market and sell Products utilizing the TAS Technology, Cummins has failed to make any substantial sales of the Products.

49. Cummins has reported sales to TAS of an approximate annual average of only 200 Products utilizing the TAS Technology over each of the past four (4) years.

## CUMMINS CURRENT LACK OF MARKETABLE PRODUCT UTILIZING THE TAS TECHNOLOGY

50.     Cummins currently has no marketable "ECM" or "One Box Product" with respect to Temp-A-Start utilizing the TAS Technology.

51.     Cummins currently has no marketable "Retrofit" or "Two Box Product" with respect to Temp-A-Start utilizing the TAS Technology.

52.     Cummins currently does not have, and, in fact, has never had, a marketable "ECM" or "One Box Product" with respect to Temp-A-Stop utilizing the TAS Technology.

53.     Cummins currently does not have, and, in fact, has never had, a marketable "Retrofit" or "Two Box Product" with respect to Temp-A-Stop utilizing the TAS Technology.

## CUMMINS FAILURE TO INSTALL, AND/OR  DELETION OF, THE TEMP-A-START/TAS TECHNOLOGY IN THE ENGINE CONTROL MODULE (ECM) WHICH IT HAS DEVELOPED FOR ITS MAIN LINES OF ENGINES

54.     From 1997 to the present time, Cummins has spent millions of dollars upgrading and updating its engine electronics, specifically the ECM for its main lines of truck engines.

55.     At one point in time, Cummins placed TAS Technology (including the Temp-A-Start and Temp-A-Stop technology) in the ECM of at least three of its major lines of engines (specifically the "ISX" "ISM" and "Signature" lines).

56.     Subsequently, Cummins took the TAS Technology out of the ECM of its "ISX", ISM" and "Signature" lines.

57.     The reported and apparent reason for removing the TAS Technology from the ECM's of the "ISX", "ISM" and "Signature" lines was because of a limited amout of "space" in the ECM for electronic programming.  In other words, the TAS Technology was eliminated to make way for other technology which Cummins chose to include in the ECM, instead of the TAS Technology.

### THE CURRENT MARKET FOR THE TAS TECHNOLOGY

58.     DDC continues to manufacture and sell products utilizing the TAS Technology on all of its engine lines, and has experienced great success in these marketing efforts.

59.     Entities which have purchased Cummins engines have expressed dissatisfaction that no Cummins branded product utilizing the TAS Temp-A-Start Technology is available.

60.     The market for a Cummins branded Product utilizing the TAS Temp-A-Start Technology is roughly the size of the market for similar DDC branded product.

### TAS EFFORTS TO OBTAIN CONTRACTUAL COMPLIANCE

61.     TAS has made repeated efforts to encourage Cummins to honor its contractual commitments, but to no avail.

### COUNT I
### BREACH OF CONTRACT
### FAILURE TO MAXIMIZE SALES
### ECM TEMP-A-START PRODUCT (DAMAGES)

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count I.

13

62.     Cummins failed to maximize sales of ECM Products utilizing the TAS Temp-A-Start Technology.

63.     This failure on the part of Cummins to maximize sales of ECM Products utilizing the TAS Temp-A-Start Technology constitutes a breach of Section 6 (f) of the License Agreement.

64.     TAS believes that the proper measure of damages for the breaches referenced in this Count I is the difference between the number of ECM Temp-A-Start Products sold by DDC, and the number sold by Cummins, multiplied by the per product royalty, as set forth in Section 5 of the TAS/Cummins License Agreement.

65.     TAS estimates that the amount of damages due and owing pursuant to this Count I is in excess of $3,000,000.

**COUNT II**
**BREACH OF CONTRACT FAILURE TO MAXIMIZE SALES**
**ECM TEMP-A-START PRODUCT (DECLARATORY RELIEF)**

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count II.

62.     TAS is entitled to a declaratory judgment, declaring that Cummins has breached its obligations pursuant to Section 6(f) of the License Agreement to maximize sales of ECM Products utilizing the TAS Temp-A-Start Technology.

**COUNT III**
**BREACH OF CONTRACT**
**FAILURE TO MAXIMIZE SALES**
**TEMP-A-START RETROFIT PRODUCT (DAMAGES)**

1-61.   TAS incorporates paragraphs 1-65 as and for paragraphs 1-65 of Count III.

14

62.     Cummins failed to maximize sales of Retrofit Products utilizing the TAS Temp-A-Start Technology.

63.     This failure on the part of Cummins to maximize sales of Retrofit Products utilizing the TAS Temp-A-Start Technology constitutes a breach of Section 6 (f) of the License Agreement.

## COUNT IV
## BREACH OF CONTRACT
## FAILURE TO MAXIMIZE SALES
## TEMP-A-START RETROFIT PRODUCTS (DECLARATORY RELIEF)

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count IV.

62.     TAS is entitled to a declaratory judgment, declaring that Cummins has breached its obligations pursuant to Section 6(f) of the License Agreement to maximize sales of Retrofit Products utilizing the TAS Temp-A-Start Technology.

## COUNT V
## BREACH OF CONTRACT
## FAILURE TO MAXIMIZE SALES OF
## ECM TEMP-A-STOP PRODUCT (DAMAGES)

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count V.

62.     Cummins failed to maximize sales of ECM Products utilizing the TAS Temp-A-Stop Technology.

63.     This failure on the part of Cummins to maximize sales of ECM Products utilizing the TAS Temp-A-Stop Technology constitutes a breach of Section 6 (f) of the License Agreement.

64. TAS believes that if Cummins had fulfilled its obligation under the TAS/Cummins License Agreement, it could have sold Temp-A-Stop ECM Products on all of the engines it sold. TAS believes that the proper measure of damages for the breaches referenced in this Count V is the number of engines sold by Cummins, since the execution of the First Amendment to the TAS/Cummins License Agreement, multiplied by the per product royalty, as set forth in Section 5 of the TAS/Cummins License Agreement.

## COUNT VI
### BREACH OF CONTRACT FAILURE TO MAXIMIZE SALES
### ECM TEMP-A-STOP PRODUCT (DECLARATORY RELIEF)

1-61. TAS incorporates paragraphs 1-65 as and for paragraphs 1-65 of Count VI.

62. TAS is entitled to a declaratory judgment, declaring that Cummins has breached its obligations pursuant to Section 6(f) of the License Agreement to maximize sales of ECM Products utilizing the TAS Temp-A-Stop Technology.

## COUNT VII
### BREACH OF CONTRACT
### FAILURE TO MAXIMIZE SALES
### TEMP-A-STOP RETROFIT PRODUCT (DAMAGES)

1-61. TAS incorporates paragraphs 1-61 as and for paragraphs 1-65 of Count VII.

62. Cummins failed to maximize sales of Retrofit Products utilizing the TAS Temp-A-Stop Technology.

63.     This failure on the part of Cummins to maximize sales of Retrofit Products utilizing the TAS Temp-A-Stop Technology constitutes a breach of Section 6 (f) of the License Agreement.

### COUNT VIII
### BREACH OF CONTRACT
### FAILURE TO MAXIMIZE SALES
### TEMP-A-STOP RETROFIT PRODUCTS (DECLARATORY RELIEF)

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count VIII.

62.     TAS is entitled to a declaratory judgment, declaring that Cummins has breached its obligations pursuant to Section 6(f) of the License Agreement to maximize sales of Retrofit Products utilizing the TAS Temp-A-Stop Technology.

### COUNT IX
### SPECIFIC PERFORMANCE
### TEMP-A-START ECM PRODUCT

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count IX.

62.     Cummins has a contractual obligation to incorporate the Temp-A-Start Technology into its ECM (and keep that Technology in its ECM).

63.     Cummins has breached its contractual obligation to incorporate and keep the Temp-A-Start Technology in its ECM Product.

64.     Cummins' obligation to incorporate and keep the Temp-A-Start Technology in its ECM is a contractual obligation which can be, and should be, specifically enforced.

17

## COUNT X
## SPECIFIC PERFORMANCE
## TEMP-A-START RETROFIT PRODUCT

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count X.

62.   Cummins has a contractual obligation to manufacture and sell Temp-A-Start Retrofit Products so as to maximize royalties payable to TAS.

63.   Cummins has breached its contractual obligation to manufacturers and sell Temp-A-Start Retrofit Products so as to maximize royalties payable to TAS.

64.   Cummins' obligation to manufacturer and sell Temp-A-Start Retrofit Products so as to maximize royalties payable to TAS is a contractual obligation which can be, and should be, specifically enforced.

## COUNT XI
## SPECIFIC PERFORMANCE
## TEMP-A-STOP ECM PRODUCT

1-61.   TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count XI.

62.   Cummins has and had a contractual obligation to develop, manufacture and incorporate the Temp-A-Stop Technology into its ECM (and keep that Technology in its ECM).

63.   Cummins has breached its contractual obligation to incorporate and keep the Temp-A-Stop Technology in its ECM Product.

64. Cummins' obligation to incorporate and keep the Temp-A-Stop Technology in its ECM is a contractual obligation which can be, and should be, specifically enforced.

**COUNT XII**
**SPECIFIC PERFORMANCE**
**TEMP-A-STOP RETROFIT PRODUCT**

1-61. TAS incorporates paragraphs 1-61 as and for paragraphs 1-61 of Count XII.

62. Cummins has a contractual obligation to manufacture and sell Temp-A-Stop Retrofit Products so as to maximize royalties payable to TAS.

63. Cummins has breached its contractual obligation to manufacturers and sell Temp-A-Stop Retrofit Products so as to maximize royalties payable to TAS.

64. Cummins' obligation to manufacturer and sell Temp-A-Stop Products so as to maximize royalties payable to TAS is a contractual obligation which can be, and should be, specifically enforced.

**PRAYER FOR RELIEF**

WHEREFORE, TAS respectfully requests the following relief:

1. A monetary judgment with respect to Count I in an amount estimated to be in excess of $3,000,000.

2. Declaratory relief with respect to Count II consisting of a declaration that Cummins has breached its contractual obligations for failure to maximize sales and royalty payments for ECM Temp-A-Start Products.

3.      A monetary judgment with respect to Count III in an amount to be determined.

4.      Declaratory relief with respect to Count IV consisting of a declaration that Cummins has breached its contractual obligations for failure to maximize sales and royalty payments for Retrofit Temp-A-Start Products.

5.      A monetary judgment with respect to Count V in an amount to be determined.

6.      Declaratory relief with respect to Count VI consisting of a declaration that Cummins has breached its contractual obligations for failure to maximize sales and royalty payments for ECM Temp-A-Stop Products.

7.      A monetary judgment with respect to Count VII in an amount to be determined.

8.      Declaratory relief with respect to Count VIII consisting of a declaration that Cummins has breached its contractual obligations for failure to maximize sales and royalty payments for Retrofit Temp-A-Stop Products.

9.      An award of specific performance with respect to Count IX, requiring Cummins to incorporate the TAS Temp-A-Start Technology in its ECM, and to keep it in its ECM.

10.      An award of specific performance with respect to Count X, requiring Cummins to develop, manufacture and sell Temp-A-Start Retrofit Products so as to maximize royalties payable to TAS.

11.      An award of specific performance with respect to Count XI, requiring Cummins to incorporate the TAS Temp-A-Stop Technology in its ECM.

12.    An award of specific performance with respect to Count XII, requiring Cummins to develop, manufacture and sell Temp-A-Stop Retrofit Products so as to maximize royalties payable to TAS.

13.    An award of costs and attorneys' fees.

14.    Such other and further relief as is deemed appropriate in the circumstances.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully Submitted,

TAS DISTRIBUTING COMPANY, INC., Plaintiff

By: _____
     One of Its Attorneys

John S. Elias
Robert M. Riffle
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
(309) 637-6000
602-1282