**PUBLIC VERSION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This document relates to:* | Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC*, No. 1:18-cv-868 (N.D. Ill.) | |

## DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.    Authenticom's Conspiracy Claim Fails Under *Matsushita*. ............................... 2

    A.    Cottrell's "Direct" Evidence Is Fatally Flawed. ..................................... 3

        1.    Cottrell's Account of the Schaefer and McCray Conversations Is Not Direct Evidence.................................................................. 3

        2.    The Court Must Assess The Evidence As A Whole To Determine If It Rules Out Independent Action............................................. 6

    B.    Authenticom's Other "Direct" Evidence Is Remarkably Weak And Fully Consistent With Defendants' Independent Interests............................... 7

        1.    2013 Discussions About DMI Are Not Evidence Of Conspiracy. ............ 8

        2.    "Joint Market Messaging" Was Not Agreed, And Any Such Agreement Would Not Support A Conspiracy Inference Regardless. ................................................................................ 10

        3.    "Preserving Friendly Negotiations" Is Not Evidence Of Conspiracy. ................................................................................ 13

        4.    The 2015 Agreements Are Not Evidence of Conspiracy........................ 15

        5.    Post-2015 Communications Are Not Evidence Of Conspiracy.............. 17

    C.    Authenticom's Remaining Evidence Fails To Satisfy *Matsushita*. .................... 19

        1.    Generic "Motive" Evidence Is Insufficient................................. 19

        2.    There Was No Enforcement................................................... 22

        3.    Switching Data Does Not Suggest Conspiracy........................... 24

    D.    The Rule of Reason Applies As A Matter of Law................................. 24

II.    Authenticom Cannot Establish Antitrust Injury. ........................................... 28

    A.    Authenticom Agrees That It Lacks Antitrust Injury If Its Access to Defendants' DMSs Was Unauthorized................................................. 29

    B.    Defendants' Unilateral Conduct Did Not Cause Antitrust Injury....................... 30

III.    Authenticom's Unilateral Claims Fail For Multiple, Additional Reasons. .................... 31

    A.    Authenticom's Section 1 Exclusive-Dealing Claims Fail. ................................. 31

        1.    Reynolds Does Not Have Market Power in the DMS Market................. 31

        2.    Authenticom Cannot Have It Both Ways On Market Definition. .......... 33

        3.    Authenticom Cannot Show Substantial Foreclosure. ........................... 34

    B.    Authenticom's Section 2 Monopolization Claims Fail......................................... 35

**TABLE OF CONTENTS (continued)**

Page

1. *Kodak* Does Not Require Perfect Knowledge for Life-Cycle Costs..................................................................................... 35

2. Confidentiality Provisions Do Not Obscure Total Cost of Ownership. ........................................................................... 36

3. Authenticom Fails to Grapple With Substantial Evidence of Switching. ......................................................................... 37

IV. Authenticom's State Law Tortious Interference Claim Fails. ......................................... 38

V. Authenticom's Damages Claims Fail For Multiple Additional Reasons........................ 39

CONCLUSION..................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, LLC v. American Media, Inc.*,
 899 F.3d 87 (2d Cir. 2018) ........................................................................................................ 8

*Authenticom, Inc. v. CDK Global, LLC*,
 874 F.3d 1019 (7th Cir. 2017) ............................................................................................ 15, 30

*Bailey v. Allgas, Inc.*,
 284 F.3d 1237 (11th Cir. 2002) ............................................................................................... 33

*Barry Wright Corp. v. ITT Grinnell Corp.*,
 724 F.2d 227 (1st Cir. 1983) .................................................................................................... 32

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 186 F.3d 781 (7th Cir. 1999) ...................................................................................................... 5

*Brock Equities Ltd. v. Josepthal, Lyon & Ross, Inc.*,
 1995 WL 380097 (S.D.N.Y. June 27, 1995) ........................................................................... 13

*Cal. Dental Ass'n v. FTC*,
 526 U.S. 756 (1999) ................................................................................................................. 28

*Car Carriers, Inc. v. Ford Motor Co.*,
 745 F.2d 1101 (7th Cir. 1984) ................................................................................................. 25

*CDK Global LLC v. Brnovich*,
 2020 WL 255913 (D. Ariz. May 20, 2020) ......................................................................... 5, 23

*Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*,
 474 N.E.2d 1245 (Ill. App. Ct. 1984), *aff'd*, 500 N.E.2d 1 (Ill. 1986) ................................... 12

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
 961 F.2d 667 (7th Cir. 1992) ................................................................................................... 27

*In re Citric Acid Litig.*,
 191 F.3d 1090 (9th Cir. 1999) ...................................................................................... 4, 13, 24

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
 2014 WL 11516653 (S.D. Ohio Mar. 21, 2014) ...................................................................... 38

*Commercial Data Servers, Inc. v. IBM Corp.*,
 262 F. Supp. 2d 50 (S.D.N.Y. 2003) ........................................................................................ 32

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
 60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015) ................... 3, 4, 9, 16

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................................31, 35, 36, 38

*FTC v. Qualcomm Inc.*,
— F.3d —, 2020 WL 4591476 (9th Cir. Aug. 11, 2020) ........................................25

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .......................................................................... *passim*

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
910 F.3d 927 (7th Cir. 2018) ....................................................................2, 3, 19, 22

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
551 U.S. 877 (2007).............................................................................................27, 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................ *passim*

*McDaniel v. Loyola Univ. Med. Ctr.*,
2019 WL 1281969 (N.D. Ill. Mar. 20, 2019).........................................................39

*MCI Communc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ................................................................................39

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) ..................................................................................34

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ..................................................................................35

*Methodist Health Services Corp. v. OSF Healthcare Sys.*,
2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) ........................................................32

*Modrowski v. Pigatto*,
712 F.3d 1166 (7th Cir. 2013) ................................................................................31

*Monsanto v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984)....................................................................................................7

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978)..................................................................................................27

*Nitro Distributing, Inc. v. Alticor, Inc.*,
565 F.3d 417 (8th Cir. 2009) ....................................................................................7

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*North Carolina Electric Membership Corp. v. Carolina Power & Light Co.*,
    780 F. Supp. 322 (M.D.N.C. 1991) ..........................................................................7

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..........................................................................31

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985)............................................................................................26

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)........................................................................................28

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ....................................................................... *passim*

*Phoenix Mut. Life Ins. Co. v. Adams*,
    30 F.3d 554 (4th Cir. 1994) ...............................................................................13

*In re Publication Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012)...................................................................................7

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) .............................................................................34

*Republic Tobacco v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .............................................................................35

*Rock Creek Hydropower, Inc. v. Enel N. Am., Inc.*,
    2006 WL 292107 (D. Idaho Feb. 7, 2006)..........................................................13

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998).................................................................................7

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) .............................................................................28

*Serfecz v. Jewel Food Stores*,
    67 F.3d 591 (7th Cir. 1995) ...............................................................................19

*SMS Systems Maintenance Servs., Inc. v. Digital Equip't Corp.*,
    188 F.3d 11 (1st Cir. 1999).................................................................................37

*Stamatiou v. U.S. Gypsum Co.*,
    400 F. Supp. 431 (N.D. Ill. 1975) ......................................................................38

## TABLE OF AUTHORITIES (continued)

Page(s)

**Cases**

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
    903 F.2d 988 (4th Cir. 1990) ...................................................17

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs. Inc.*,
    200 F.3d 307 (5th Cir. 2000) ...................................................16

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ..................................25, 26, 27

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ................................17, 19, 24

*Thomas & Betts Corp. v. Panduit Corp.*,
    138 F.3d 277 (7th Cir. 1998) .....................................................5

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...................................................26

*Twin City Sportservice v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) .................................................32

*U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*,
    665 F.2d 781 (7th Cir. 1981) ...................................................27

*Uline, Inc. v. JIT Packaging, Inc.*,
    437 F. Supp. 2d 793 (N.D. Ill. 2006) .....................................39

*United States v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ...................................................25

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................32

*United States v. Sanchez*,
    32 F.3d 1002 (7th Cir. 1994) ...................................................13

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)..........................................................25, 26

*Univ. Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ...............................31, 35

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) .....................................................9

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. May 2020 update) ..................................................7

## RECORD CITATION FORMAT

| Abbr. | Reference | Docket Number |
|---|---|---|
| Mot. | Defendants' CDK Global, LLC's and The Reynolds and The Reynolds and Reynolds Company's Memorandum in Support of Motion for Summary Judgment | Dkt. 966 |
| Defs. JSUF | Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of their Motions for Summary Judgment | Dkt. 974 |
| Defs. JSUF Ex. | Exhibits to the Declaration of Daniel T. Fenske, May 20, 2020 | Dkt. 975 |
| Pls. Add'l Ex. | Exhibits to the Declaration of Derek T. Ho, July 28, 2020 | Dkt. 1069-1 |
| Pls. Resp. Defs. JSUF | MDL Plaintiffs' Responses to Defendants CDK Global, LLC's and The Reynolds and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment | Dkt. 1070 |
| Opp. | Plaintiff Authenticom, Inc.'s Corrected Opposition to Defendants CDK Global, LLC's and the Reynolds and Reynolds Company's Motion for Summary Judgment | Dkt. 1100 |
| Resp. Pls. JSOAF | Defendants CDK Global, LLC's and The Reynolds and Reynolds Company's Response To MDL Plaintiffs' Corrected Statement Of Additional Material Facts in Opposition to Defendants' Motions for Summary Judgment | Filed concurrently |
| Defs. Reply Ex. | Exhibits to the Declaration of Daniel T. Fenske, August 28, 2020 | Filed concurrently |

PUBLIC VERSION

## INTRODUCTION

It is undisputed that CDK and Reynolds had the right to refuse to do business with hostile "integrators." To avoid that rule, Authenticom twists the record to invent a supposed *conspiracy*. But the undisputed facts refute that theory. The evidence shows that first Reynolds, then CDK, decided years apart to deny access to hostile data extractors. These independent decisions made perfect sense in light of each system owner's respective, unilateral interests in profitability and security. Follow-the-leader conduct like this is both expected and lawful. And after years of discovery, there is no evidence that Reynolds ever asked CDK to alter its policies as to hostile data extractors, and no evidence that CDK ever agreed with Reynolds to do so.

Authenticom's conspiracy theory continues to evolve. In its opposition, Authenticom's latest theory is a sprawling, two-phased "conspiracy" premised on three September 2013 "business points" that were no more than an embryonic framework for negotiation of written agreements reached in February 2015. Authenticom does not dispute the lawfulness of those Agreements. And none of its "points"—supposed "joint market messaging," the DMI wind-down, and reciprocal app certification—relates to the conspiracy theory Authenticom now advances. The first "point" is a mirage. Authenticom identifies *no* evidence that CDK and Reynolds ever agreed on market messaging. To the contrary, contemporaneous evidence shows they did not, and the concept is not in the contracts the parties signed in February 2015. Further, even if CDK and Reynolds agreed to jointly market "industry standards and/or recommendations"—which they did not—there *still* would be no basis to infer that they agreed on what their underlying system access policies would be. Authenticom's final two "points" (the DMI wind-down and app certification) merely describe aspects of the concededly lawful 2015 Agreements, and so get Authenticom nowhere.

To forestall summary judgment, Authenticom repeatedly mischaracterizes the undisputed facts to claim "direct" evidence of conspiracy. And it argues that, in light of that evidence, it can

1

avoid an inquiry under the *Matsushita* framework, which requires Authenticom to show that the inference of collusion is *stronger* than the inference that Defendants independently decided to secure their systems. But Authenticom is wrong on both points. Its evidence comes nowhere close to showing *unambiguous* direct evidence of an unlawful agreement and, regardless, binding case law requires that the *entire record* rule out independent action. Here, that record refutes any conspiracy. Indeed, Authenticom never argues that the 2015 Agreements did not further Defendants' independent, lawful interests in winding down DMI's hostile access to the Reynolds DMS without market disruption and in obtaining certified integration on the other's DMS. Instead, it spins Defendants' efforts to resolve their specific dispute over DMI's access as *also* consistent with a conspiracy as to DMS competition. But that fails, because evidence consistent with both independent action and conspiracy cannot withstand summary judgment as a matter of law.

This case thus calls for a straightforward application of settled antitrust law at the summary judgment stage. When a plaintiff cannot show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action," even the most "richly detailed" conspiracy claim is not entitled to trial. *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 720 (7th Cir. 2011). The Court should grant Defendants summary judgment.

## ARGUMENT

### I.     Authenticom's Conspiracy Claim Fails Under *Matsushita*.

At summary judgment, Authenticom must show that the evidence as a whole tends to rule out the possibility that CDK and Reynolds independently decided to secure their respective DMSs. Mot. 1-2, 19; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Quoting *Kleen Products*, Authenticom notes that "[a]ntitrust plaintiffs do not face a heightened burden to defeat summary judgment." Opp. 39. It leaves out what follows: "It is the substantive law, however, that establishes what the plaintiff must address. The [Plaintiffs] needed evidence

that would allow a trier of fact to nudge the ball over the 50-yard line and rationally to say that the existence of an [illegal] agreement is *more likely than not*." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018) (emphasis added).

Under *Matsushita*, Authenticom bears the burden of presenting evidence that tends to exclude independent action. *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 956 (N.D. Ill. 2014), *aff'd,* 801 F.3d 758 (7th Cir. 2015). As a matter of fact and law, Authenticom cannot, as it claims, satisfy *Matsushita* with its supposed "direct" evidence of conspiracy. Further, Authenticom's suggestion that the claimed conspiracy would make "perfect economic sense," Opp. 51-60, cannot push Authenticom's case across the 50-yard line.

**A.      Cottrell's "Direct" Evidence Is Fatally Flawed.**

**1.      Cottrell's Account of the Schaefer and McCray Conversations Is Not Direct Evidence.**

"Direct evidence" requires an unambiguous "acknowledgment of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). Authenticom claims (at 45) that *all* of the following is "direct" evidence that Defendants "expressly agreed not to compete on openness and to block independent data integrators":



- The February 2015 Agreements themselves (Opp. 49-50); and

Not only is none of this evidence arguably "direct," but when summarizing it Authenticom repeatedly asks this Court to deny summary judgment because the jury could *infer* an unlawful conspiracy from these categories of evidence.[1] By definition, direct evidence requires no such inferences. *Omnicare*, 629 F.3d at 706; *Dairy Farmers*, 60 F. Supp. 3d at 949.



If those conversations are "direct" evidence of anything, it is of the unchallenged 2015 Agreements. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Mot. 44-50; *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1104 (9th Cir. 1999) (no direct evidence where, upon "close analysis," statements "could be interpreted as evidence of a horizontal conspiracy but also . . . in a benign light"). ████████████████████████████████████████████████████

████████████████████████████████████ Opp. 41. It does not.

Defendants are not trying to "undermine Cottrell's credibility." Opp. 45. Defendants find Cottrell highly incredible. But for purposes of summary judgment, Defendants ask this Court to

---

[1] *See, e.g.*, Opp. 22 ("████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████"); Opp. 49 (arguing that evidence supports an "inference" that 2015 Agreements were part of broader conspiracy); Opp. 52 ("████████████████████████
████████████████████████████████████").

*credit* all of Cottrell's testimony. Mot. 43-44. In Authenticom's own words, "

." Pls. Resp. Defs. JSUF 187 (emphasis added).

Pls. Resp. Defs. JSUF 193

(emphasis added).[2]

These are undisputed facts—not questions of credibility—that demonstrate that those

conversations do not *unambiguously* show a conspiracy. This fails the direct evidence standard.

*High Fructose*, 295 F.3d at 661; *Omnicare*, 629 F.3d at 706; Mot. 49-50.

Authenticom's final contention that Defendants are making "jury" arguments, Opp. 44-45,

is wrong. The principle that "the interpretation of" even "ambiguous documentary evidence of

collusion is for the jury," Opp. 43 (quoting *In re Brand Name Prescription Drugs Antitrust Litig.*,

186 F.3d 781, 788 (7th Cir. 1999)), does not make ambiguous evidence "direct." It is black-letter

law that ambiguous evidence alone cannot get a Section 1 plaintiff past summary judgment.

---

[2] In addition to the fact that Defendants are not disputing Cottrell's credibility at summary judgment, Authenticom's reliance (Opp. 30, 38) on Judge Peterson's now-vacated preliminary injunction order is misplaced. At summary judgment, Seventh Circuit law requires this Court to assess Cottrell's testimony in light of the entire body of evidence. *High Fructose*, 295 F.3d at 661; *see also Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir. 1998) ("[a] court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment"). Authenticom's reliance (Opp. 37) on the preliminary injunction decision in *CDK Global LLC v. Brnovich*, 2020 WL 255913 (D. Ariz. May 20, 2020), is similarly inapposite. Nothing in that order, currently on appeal to the Ninth Circuit, bears on whether CDK and Reynolds conspired with respect to their DMSs.

*Matsushita*, 475 U.S. at 588 (antitrust law "limits the range of permissible inferences from ambiguous evidence in a § 1 case"). Authenticom effectively concedes the problem, stating in its response that "the rest of the [so-called] direct evidence" is necessary to put "any ambiguity" in Cottrell's testimony to rest. Opp. 44.

### 2. The Court Must Assess The Evidence As A Whole To Determine If It Rules Out Independent Action.

Plaintiffs must satisfy the *Matsushita* test regardless of how the Court views Cottrell's testimony alone. That means Authenticom must *rule out* the possibility that its relied-upon communications and alleged conversations are evidence only of the negotiation and eventual execution of the (unchallenged) 2015 Agreements. The reason is simple. *Matsushita* requires the evidence *as a whole* to tend to rule out the possibility of independent conduct. *Omnicare*, 629 F.3d at 707. Indeed, the Seventh Circuit has called the direct/indirect distinction "largely if not entirely superfluous." *High Fructose*, 295 F.3d at 661.

Authenticom trumpets *High Fructose* as setting the governing standard, Opp. 41-42, but ignores the case's holding that even when assessing "evidence of explicit agreement," the question is still "whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment." *High Fructose*, 295 F.3d at 661. *Matsushita* held the same. 475 U.S. at 587 (issue is whether evidence "as a whole" could allow reasonable jury "to find for the non-moving party"). Thus, when Authenticom asserts that other Circuits have "joined" the Seventh Circuit in "holding that the *Matsushita* framework applies only in the absence of direct evidence," Opp. 42, it mischaracterizes *High Fructose*.

An admission by a defendant could be so clear that it is enough to rule out the possibility that the defendants acted independently. That is what the Seventh Circuit meant in *High Fructose* when it stated that such an admission is "all the proof a plaintiff needs." 295 F.3d at 654. But *High*

*Fructose* also emphasized that the statements must be unambiguous in light of the *entire* record. *Id.* at 651. That is consistent with *Nitro Distributing, Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009), to which Authenticom has no answer other than to call the decision "dictum" and note that the "purported 'direct evidence' there was highly tenuous." Opp. 42-43 n.18. Nor does Authenticom address *North Carolina Electric Membership Corp. v. Carolina Power & Light Co.*'s holding that "sparse" direct evidence consisting of "isolated statements by . . . executives" is not enough to survive summary judgment. 780 F. Supp. 322, 339 (M.D.N.C. 1991).[3]

For the reasons stated above and in Defendants' opening brief, ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Mot. 50-52.

## B. Authenticom's Other "Direct" Evidence Is Remarkably Weak And Fully Consistent With Defendants' Independent Interests.

None of the other evidence Authenticom cites is even arguably "direct" evidence of a conspiracy beginning in September 2013 (or ever). Rather, Authenticom relies on many logical and inferential leaps to strain to show a conspiracy—leaps that *Matsushita* prohibits.

---

[3] Authenticom's other authority (at 42) is consistent with this approach. In *Monsanto v. Spray-Rite Service Corp.*, the Supreme Court held only that there was sufficient evidence of conspiracy after considering *both* the direct and circumstantial evidence. 465 U.S. 752, 765-67 (1984). *In re Publication Paper Antitrust Litig.* concluded that it is not "necessary to draw bright lines" between direct and other evidence, instead evaluating whether "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard for the *Matsushita* standards, could support a reasonable inference of illegal collusive behavior." 690 F.3d 51, 64 (2d Cir. 2012). *Rossi v. Standard Roofing, Inc.* held that courts "must evaluate [the evidence] as a whole to see if it supports an inference of concerted action," and the court was clear that "ambiguous" evidence does not "create a triable issue of fact." 156 F.3d 452, 466 (3d Cir. 1998). Finally, as Defendants have already explained, the Areeda & Hovenkamp treatise supports Defendants' position. Mot. 51. The statement that "explicit evidence of an agreement" makes an "independent reason [for acting] irrelevant" concerns motive, not the *Matsushita* test. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1413a (4th ed.). Elsewhere, the treatise clearly states that "the *Matsushita* principle holds that there is no genuine issue unless the whole record, including direct and circumstantial evidence, makes a necessary fact more likely than not in the mind of a reasonable juror." *Id.* ¶ 308i.

### 1. 2013 Discussions About DMI Are Not Evidence Of Conspiracy.

███████████████████████████████████████████████████████

█████████████████████████████████████████████ Opp. 46.

As Authenticom does not and cannot dispute, ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ JSUF 105. █████████

███████████████████████████████████████████████████████

██████████ Opp. 16 (emphasis added)—which is undisputed and not evidence of conspiracy.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ Defs. JSUF 105. █████████

███████████████████████████████████████████████████████

████████████████ Opp. 46. ███████████████████████████████

████████████████████████████████ Defs. JSUF 105. There is nothing "self-serving,"

Opp. 46, about ██████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ Mot. 8-9.

Thus, this case is the same as *Omnicare* and *Anderson News, LLC v. American Media, Inc.*, 899 F.3d 87 (2d Cir. 2018), where, as Authenticom notes, "contemporaneous documents reflected uncertainty about whether the challenged agreement would materialize." Opp. 47 n.22 (emphasis omitted). Here, there not only was ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ Conversely, this case is nothing like Authenticom's key authority, for there is no additional evidence that CDK and Reynolds actually agreed to coordinate their system access policies in 2013 or ever. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) (cited at Opp. 50).[4]

Authenticom's request that the Court infer a broader conspiracy from ████████████ would throw a wrench into most commercial negotiations. Arms-length parties commonly communicate agreed-upon frameworks for future discussions. Authenticom's argument—that identifying such a framework and then negotiating lawful agreements is evidence of an unlawful one—would impede the development of contracts (like those here) with unquestioned benefits. *See Matsushita*, 475 U.S. at 593 (courts may not infer conspiracy from ambiguous evidence because doing so would "often . . . deter procompetitive conduct"). Indeed, because Authenticom agrees that the 2015 Agreements alone are not illegal, evidence surrounding the negotiation and

---

[4] For instance, Authenticom claims that ████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████

implementation of those agreements cannot "rule out" independent, lawful action as a matter of law. *See Omnicare*, 629 F.3d at 711-12 (even where evidence "could support the reasonable inference that PacifiCare and United were cooperating illicitly," the evidence was insufficient because it was consistent with "legitimate business activity" too).

Attempting to create evidence of a September 2013 agreement, Authenticom twists beyond recognition the evidence surrounding CDK's and Reynolds's communications after September 2013. Opp. 18-19, 48. For example, ██████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████ Pls. Add'l Ex. 90. ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Opp. 21.

**2.    "Joint Market Messaging" Was Not Agreed, And Any Such Agreement Would Not Support A Conspiracy Inference Regardless.**

████████████████████████████████████████████████████████████ do not come close to ruling out independent action. ███████████████████████████████████████████████

███████████████████████████████████████████████████████ Mot.

35. Authenticom does not challenge those Agreements, and therefore either of these points, as anticompetitive. They thus cannot be used to rule out independent action. *See supra* pp. 9-10.

Neither does the third "point"—Authenticom's specious and irrelevant claim that CDK and Reynolds agreed to "███████████████." Opp. 47. In the first place, this is much ado about nothing. Even if there were evidence of an actual agreement on market messaging—there is not—it would not help Authenticom. Joint messaging is not illegal. Mot. 37. And it is not the conspiracy Authenticom must prove. Authenticom alleges a "classic group boycott" in which Defendants agreed to "jointly boycott other independent integrators such as Authenticom." Opp. 26, 42 n.17; *see also* Opp. 40-41 (describing supposed "conspiracy to block integrators"). Authenticom has not tried to present any evidence of damages caused by "market messaging"—instead, its purported injury arises from a supposed inability to access Defendants' DMSs in automated fashion. *See* Opp. 70 (arguing that dealer "push" extraction methods are insufficient).

Authenticom is engaged in misdirection. ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Matsushita* precludes the wild inferences Authenticom suggests. ██████████████████



████████████████ Authenticom's argument implies that all joint "messaging" proves a hidden conspiracy as to the topic of the messaging. That is not and cannot be the law.

Further, no reasonable jury could conclude that CDK and Reynolds agreed on "joint messaging" in September 2013 or ever. ████████████████

████████████████

████████████████

████████████████ *Id.* And all of the contemporaneous evidence shows that Defendants never intended to agree—and never did agree—to any "market messaging."[5]

Authenticom tries to bury this evidence, ████████████████

████████████ Opp. 48 n.24; Pls. Resp. Defs. JSUF 104. That is wrong. The evidence is not offered for its truth. ████████████████

████████████████

████████████ *Cf. Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 474 N.E.2d 1245, 1249 (Ill. App. Ct. 1984), *aff'd*, 500 N.E.2d 1 (Ill. 1986) ("The fact that the parties were still negotiating the terms and license in 1983 shows that there was no fixed long term agreement between the

---

[5] ████████████████

████████████████

████████████████

████████████ *Id.* (citing Defs. JSUF Ex. 163); *see also* Resp. Pls. JSOAF 36 (citing Defs. Reply Ex. 635, Brockman Tr. 69-71).

parties.”). ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████[6]

████████████████████████████████████████

██████████████████ *See Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 566 (4th Cir. 1994)

(statement of intent could be used “to prove subsequent conduct in conformity with [the

declarant’s] stated intention”). ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ That this was not an important deal point is obvious from the fact that it was not

included in the 2015 Agreements. *See* Defs. JSUF Exs. 49, 50, 51; *see also* Resp. Pls. JSOAF 36

(citing Defs. Reply Ex. 635, Brockman Tr. 69-71).

### 3. “Preserving Friendly Negotiations” Is Not Evidence Of Conspiracy.

None of CDK’s actions during negotiations of the 2015 Agreements suggests a conspiracy

because none is evidence of an agreement to prevent Authenticom’s DMS access. ████████████

---

[6] *See, e.g.*, *United States v. Sanchez*, 32 F.3d 1002, 1005 (7th Cir. 1994) (testimony offered to prove why person “acted as he did” is not hearsay); *Brock Equities Ltd. v. Josepthal, Lyon & Ross, Inc.*, 1995 WL 380097, at *5 n.4 (S.D.N.Y. June 27, 1995) (evidence showing what key actor “understood to be the agreement” at a “critical juncture” is not hearsay); *Rock Creek Hydropower, Inc. v. Enel N. Am., Inc.*, 2006 WL 292107, at *2 n.1 (D. Idaho Feb. 7, 2006) (similar); *cf. Citric Acid*, 191 F.3d at 1098 (where meeting minutes showed that proposed course of action was immediately rejected, it “would not be reasonable to infer that [the defendant] engaged in illegal activities merely from evidence that an illegal course of action was suggested”). Authenticom also objects that Defs. JSUF Ex. 156 and 163 are redacted, but identifies no authority for this objection and has not moved to lift the redactions. Further, the redacted material is unnecessary to understand the quoted excerpts, whose meaning is apparent on the face of the document.

███████████████████████████████████████ is perfectly lawful and consistent with trying

to negotiate an amicable resolution to a business dispute. Mot. 40. ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Opp. 14-15, 18-19. ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Mot. 8-9;

*see also* Resp. Pls. JSOAF 32, 37, 40.[7]

    Those interests have nothing to do with a supposed conspiracy on "openness." ██████

████████████████████████████████████████ Mot. 7, 10, 25. Authenticom assumes

the conclusion when it argues ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ Opp. 47 n.21. Authenticom's contention

that a wind-down does not touch on an element of DMS competition (unless accompanied by a

---

[7] Defendants have already addressed much of Authenticom's evidence on this score. For example,
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

secret separate conspiracy) is thus of no help to Authenticom under *Matsushita*.[8]

Similarly, that ████████████████████████████████████████████

████████████████████████████████████, Opp. 22, is not evidence of a conspiracy on

DMS access policies. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

### 4.     The 2015 Agreements Are Not Evidence of Conspiracy.

As the Seventh Circuit found, "nothing in any of the three [2015 Agreements] required

either CDK or Reynolds to block third-party access to its own data management system."

*Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). Authenticom admits

that "the agreement[] to block independent data integrators *does not appear* on the face of the

agreements." Opp. 50 (emphasis added).[9]

The motion to dismiss ruling is not to the contrary. Judge St. Eve concluded that the 2015

Agreements may have represented a "partial ceasefire" that "would make sense" if Defendants

were seeking to "support" each other's "integration services," so that at "this stage" of the case "it

---

[8] Authenticom claims that ████████████████████████████ Opp. 21-22. That is false.
For example, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ Resp. Pls. JSOAF 38; Defs. JSUF 137 (describing SIS wind-down agreement). And elsewhere,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Opp. 53.

[9] Authenticom ignores the Seventh Circuit and its own brief when it argues that Section 4.5 of the DEA
means that "the two companies would jointly boycott other independent integrators such as Authenticom."
Opp. 26. That section says nothing about what Defendants' policies would be as to access by third-party
integrators to their *own* DMS. Indeed, if Authenticom really believed its reading of Section 4.5, it would
be challenging the 2015 Agreements alone as embodying a *per se* unlawful agreement. Yet it is not.

[was] reasonably inferable that" they were part of a broader conspiracy. Dkt. 176 at 26-27. But *Matsushita* requires more at summary judgment. Even if the 2015 Agreements could "make sense" as part of a conspiracy, the Agreements *also* "make sense" on their own. Mot. 19-24.

Authenticom does not dispute this. How could it? ████████████████████████ ████████████████████████████████████████████████████████████████ Defs. JSUF Ex. 322, Israel Tr. 116, 452-53. Instead, Authenticom contends it can use the 2015 Agreements "to persuade a jury that what [Defendants] actually agreed to was" a "broader" conspiracy. Opp. 50 (emphasis added). *Matsushita* forbids that argument. *See Omnicare*, 629 F. 3d at 708 (summary judgment granted where actions could "just as easily be related to legitimate business matters . . . as they could be to an illicit agreement"); *Dairy Farmers*, 60 F. Supp. 3d at 951 (cannot infer conspiracy from conduct with "legitimate business reasons"); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs. Inc.*, 200 F.3d 307, 313 (5th Cir. 2000) (no broader conspiracy under *Matsushita* from "the existence of contracts between insurance companies and auto glass repair providers"). Authenticom's failure to show that the Agreements make more sense as part of a conspiracy than on their own dooms its claims under *Matsushita.*

The evidence as a whole further demonstrates there was no conspiracy. *See* Opp. 50. For example, Authenticom makes much of ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Defs. JSUF 14, 80-87.

The statements Authenticom cites are important not because they ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871-72 (7th Cir. 2015) (Sherman Act does not prohibit competitors from "coordinating their pricing" unless there is an "actual agreement to do so"; companies may "determine[] independently that they may be better off with a higher price"); *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 996 (4th Cir. 1990) (fact that "an employee reports a competitor's pricing policy to his home office and the two companies charge similar prices for their products, without more, cannot support an inference that the two competitors entered into an agreement to share prices"). To the contrary, ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████[10]

### 5. Post-2015 Communications Are Not Evidence Of Conspiracy.

Defendants' post-2015 conduct does not show evidence of a conspiracy. Opp. 50-51. Once again, Authenticom does not argue that this conduct was unrelated to implementing the 2015 Agreements. Instead, it claims that one can "reasonably infer" they were *also* part of a "broader" collusive scheme. Opp. 50. But if the 2015 Agreements were in Defendants' respective interests regardless of a broader conspiracy, that they "actively coordinated implementation of the February

---

[10] Later in its brief, Authenticom invokes ████████████████████████████████████ ████████████████████████████████ Opp. 52. That argument fails for two reasons. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ Pls. Add'l Ex. 180, CDK-0872981-82.

2015 agreements," Opp. 28, is both unsurprising and irrelevant.

The particular documents Authenticom relies on show only Defendants' pursuit of their independent goals. For example, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ *See supra* pp. 16-17.

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

Authenticom mischaracterizes the other post-2015 evidence. It claims, for example, that ████████████████████████████████████████

████████████████████████████ Opp. 49 (purporting to quote Pls. Add'l Ex. 200).[11]

████████████████████████████████████████

---

[11] Authenticom repeatedly ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ Resp. Pls. JSOAF 55.



The Seventh Circuit has rejected conspiracy inferences from such fragmentary statements. *See Text Messaging*, 782 F.3d at 872-73 (email that price increases were "colusive [sic] and opportunistic" did not show "express collusion"); *Kleen*, 910 F.3d at 936 (statement that "the party begins" upon observing another competitors' price increases not evidence of conspiracy).

Resp. Pls. JSOAF 55 (quoting Pls. Add'l Ex. 28, Gardner Tr. 263-64).

Opp. 27, 49, 53; *see* Resp. Pls. JSOAF 51.

## C. Authenticom's Remaining Evidence Fails To Satisfy *Matsushita*.

None of Authenticom's arguments that it made "sense" for Reynolds and CDK to conspire as to "openness," *see*, *e.g.*, Opp. 51, make it more likely than not that they did so.

### 1. Generic "Motive" Evidence Is Insufficient.

"[A]lthough a lack of motive may be evidence that parties did not conspire, the presence of an economic motive is of very little probative value." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 600 (7th Cir. 1995) (affirming grant of summary judgment on conspiracy claim). *Every* alleged antitrust conspiracy serves an economic "motive" to increase profits or reduce competition. Thus, Authenticom's suggestion that Defendants each had a motive to conspire is insufficient to show they did so. Otherwise, every case of parallel conduct would survive summary judgment.

That conflicts with legions of cases, Mot. 27, yet Authenticom ignores this issue entirely.[12]

Further, Authenticom's articulation of Defendants' motives is contradictory. Authenticom claims that Reynolds needed to conspire to ensure that CDK would "close," while asserting that CDK needed to conspire to ensure that Reynolds would not respond to CDK's closure by becoming more "open." Opp. 55-57. Authenticom does not dispute, however, that there is not a shred of evidence in the record that CDK had any expectation that Reynolds would seek to reverse course on its policy opposing hostile access. *See* Mot. 30-31. And if CDK's "closure" would *allow* Reynolds to achieve its longstanding objective of securing its DMS, why would CDK fear that "closing" its system would cause Reynolds to do the opposite?

Authenticom also ignores evidence from its own economic expert. As Defendants' opening brief observed, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Mot. 21-22. ████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[12] Thus, it is legally immaterial ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Opp. 57 & n.29.

███████████████████████████████████████████████████████████

████████ Authenticom's expert did not even attempt to make that calculation, even roughly.

Mot. 29. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ Mot. 25; Defs. JSUF 96, 133-137.[13]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████ That timing

differences do not always foreclose a conspiracy at the pleading stage, Opp. 58, says nothing about

whether the timing of *these* Defendants' actions undermine the alleged conspiracy.

Finally, Authenticom offers no reason why Reynolds would conspire to pursue a strategy

it had already implemented. Mot. 5-6. Authenticom does not dispute that Reynolds's 2013 (and

prior) security measures were implemented unilaterally. *Id.* at 6-8, 27. It was those measures that

on Authenticom's theory brought DMI and other hostile parties to the negotiating table to wind-

down access to the Reynolds DMS, and all that conduct was concededly unilateral. In short,

---

[13] As Defendants explained in their opening brief, ████████████████████████████████████
████████████████████████████ Mot. 29-31. It is notable that Authenticom
abandons this theory in its Opposition.

Authenticom's "motive" evidence does nothing to nudge the ball across the 50-yard line.

## 2. There Was No Enforcement.

Defendants demonstrated that the absence of a plausible means to enforce the conspiracy, and the lack of any actual attempts to enforce the conspiracy despite what would have been cheating, undercuts any inference of conspiracy. Mot. 31-32. Authenticom's response that an enforcement mechanism is not *required* to infer a conspiracy, Opp. 57, is a red herring. Lack of enforcement is plainly an important factor. *See, e.g.*, *Kleen Prods.*, 910 F.3d at 937 ("conspicuous[] absen[ce]" of enforcement warranted summary judgment).



Opp. 57-58. Reynolds thus gave CDK no special treatment. *See supra* p. 15 n.8.

). Given that the 2015 Agreements do not require either CDK or Reynolds to block third-party integrators, *see supra* p. 15, it is head-scratching for Authenticom to claim that Reynolds "enforced" the conspiracy by pushing forward the negotiation of contracts that do not embody that conspiracy.

Nor did CDK "enforce" the alleged conspiracy by "monitor[ing]" Reynolds's security measures. Opp. 57. As Defendants have explained, Mot. 42-43,

██████████████████████████████████████████ If this was "monitoring"

Reynolds's compliance with the conspiracy, it showed cheating, but there was no punishment.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████ Auth. Add'l Ex. 193, CDK-0817806. ████████████████

████████████████████████████████████████████████

Pls. Resp. Defs. JSUF 9, 39. ██████████████████████████████

██████████████████████████████████████████████ Pls. Resp.

Defs. JSUF 5, 38, 39. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ Opp. 29.[14]

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Dkt. 880 at 2. Regardless, the

conspiracy Authenticom claims is one to "boycott" and "destroy" Authenticom, not to limit the

rate at which its business *increased*. None of this evidence, therefore, rules out independent action.

---

[14] ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████ *See* Resp. Pls. JSOAF 45.

### 3. Switching Data Does Not Suggest Conspiracy.

Finally, Defendants have explained why the supposed "reduction" in DMS switching in 2013 (Opp. 19-20, 59) is both wrong and irrelevant. *See* Mot. 33-34. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Text Messaging*,
782 F.3d at 871; *see also Citric Acid*, 191 F.3d at 1101 ("it is not reasonable to infer that a firm is engaging in illegal activities merely from the fact that it failed to continue to increase market share"). Thus, even if competition did soften (and it did not), that says nothing about whether the switching data suggests CDK and Reynolds in fact conspired.[15]

*****

After years of discovery, including millions of documents and scores of depositions, Authenticom cannot muster any evidence of the alleged conspiracy to boycott third-party "integrators" and destroy Authenticom. Cutting through Authenticom's misdirection, this case is simple. There is no evidence that Reynolds ever asked CDK to alter its policies toward third-party data extractors, or that CDK ever agreed with Reynolds to do so. The evidence Authenticom presents is entirely consistent with unilateral, follow-the-leader behavior by two rival DMS providers. For that reason, CDK and Reynolds are entitled to summary judgment.

### D. The Rule of Reason Applies As A Matter of Law.

This is a rule of reason case. Indeed, *per se treatment* that does not consider the pro-competitive benefits of winding down hostile system access would be particularly dangerous.

---

[15] Authenticom argues (at 32) that Defendants' supposed "price secrecy" and "exclusive dealing" provisions facilitated the conspiracy, but never argues that those provisions support an inference of conspiracy.

Authenticom's claimed vague agreement over DMS "openness" does not fall within—and is nothing like—price-fixing and the other limited categories of *per se* restraints. The alleged conspiracy included the 2015 Agreements, which concededly had pro-competitive effects and were *vertical* in nature. It also involves two topics—cybersecurity and copyright—where Congress has enacted numerous statutes giving system owners substantial rights to control access. And the decision to secure Defendants' DMSs cured market inefficiencies. Mot. 50-56. Defendants' system-access policies are the sort of "novel business practices—*especially* in technology markets—[that] should not be conclusively presumed unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *FTC v. Qualcomm Inc.*, — F.3d —, 2020 WL 4591476, at *9 (9th Cir. Aug. 11, 2020) (quotation omitted). It would be "a bad idea to subject a novel way of doing business . . . to per se treatment under antitrust law." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012).[16]

Authenticom does not dispute that this case involves a type of "conspiracy" with which courts have no prior experience. Rather, it argues that a restraint need not "precisely" match a traditional category to be *per se* illegal. Opp. 64. But the cases Authenticom cites for this proposition involved classic *per se* illegality. In *United States v. Andreas*, the conspirators agreed to allocate sales volumes among themselves, an agreement "to limit the producers' output" by "divid[ing] the market's expected demand among the five companies." 216 F.3d 645, 667 (7th Cir. 2000). That is a prototypical *per se* offense. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984). Similarly, *United States v. Socony-Vacuum Oil Co.*, involved "buying programs" under which major oil producers allocated gasoline purchases among members of the

---

[16] Authenticom's claim notwithstanding, Opp. 64, the Court's motion-to-dismiss opinion declined to decide whether "the *per se* test will ultimately apply." Dkt. 176 at 27 n.10.

cartel for the purpose of raising prices. 310 U.S. 150, 178-190 (1940). Nothing of the sort is alleged here. Authenticom does not claim that Defendants conspired over integration (or any) prices, divided customers or territories among themselves, agreed to restrict output, or the like.

Puzzlingly, Authenticom purports to analogize an agreement "with respect to the openness of [Defendants'] systems" to a garden-variety price-fixing conspiracy. Opp. 61-62. Dr. Israel's suggestion that if you "███████████████████████████████" you have "█████████████████████" is meaningless. Opp. 61-62. Replace *any* agreement with an agreement to fix prices and you have a price-fixing agreement.

Nor can Authenticom force this case into the "group boycott" mold. ████████████ ████████████████████████████████████████████████████████████ ██████████████████████ Defs. JSUF 9, 22; RSUF 6-9. A limitation on system access is not an agreement to "wholly exclude[]" Authenticom from the market on any and all terms, and thus could be *per se* illegal only if it put Authenticom at "a severe competitive disadvantage." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295 n.6 (1985); *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (*per se* illegal boycott must "deny relationships"). █████████████████████████████████ ███████████████████████ Defs. JSUF 40. ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████. Mot. 32-33. And to the extent certain dealers prefer an "open" DMS, they may choose from other DMS providers and can use Authenticom (or any other integrator) on those DMSs. Resp. Pls. JSOAF 79.

Regardless, the *per se* rule would not apply here even if this were a price-fixing or group-boycott case. Mot. 52-56; *see Sulfuric Acid*, 703 F.3d at 1011 ("[E]ven price fixing by agreement

between competitors" can be "governed by the rule of reason."); *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981) (en banc) (rejecting "rote application of the per se rule to all conduct that can be called a 'group boycott'" in "new and unfamiliar areas"). To require application of the rule of reason it "suffices" that a restraint has plausible "procompetitive justifications." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 889 (2007); *accord Sulfuric Acid*, 703 F.3d at 1011 (rule of reason applies to "a restrictive practice that is plausibly argued to increase competition or other economic values on balance"). Authenticom claims that negotiating the 2015 Agreements—which contained reasonable provisions that "███████ ███████████" (Defs JSUF Ex. 322, Israel Tr. 116, 452-53)—was part of the alleged conspiracy. Opp. 49 ("the February 2015 contracts . . . consummate[ed] their agreement to close their respective DMSs to independent data integrators"); Defs. JSUF Ex. 73, Israel Reply ¶ 22 ("██████ █████████████"). That is enough to require rule of reason analysis.

Authenticom attacks a strawman when it contends that Defendants simply argue that "a closed DMS is better." Opp. 62. After all, the 2015 Agreements did not require either Defendant to close their DMS. Mot. 9-11. Those Agreements were procompetitive because they expanded output. █████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████ Mot. 53-54. Those are paradigmatically procompetitive because they facilitate increased competition. *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 673 (7th Cir. 1992). Defendants thus do not argue here that "competition is . . . bad." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 693 (1978). Moreover, because Authenticom theorizes that Defendants were motivated to enter into a broader conspiracy over DMS openness to obtain the benefits of the 2015 Agreements, Opp. 52-

27

53, condemning the conspiracy would condemn these output-enhancing Agreements. The Court cannot do that without a full rule of reason analysis. Mot. 54.

The same goes for the negative externality cured by prohibiting automated third-party access. The problem to be solved is not that dealers and vendors put themselves at risk by choosing an "open" option, but that they foist the reputational and cybersecurity-cost risks of that choice onto the DMS provider. Mot. 56. Resolving that market inefficiency is procompetitive, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018), or at least plausibly so, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 778 (1999).

Authenticom does not contest that the 2015 Agreements were vertical but insists that the rule of reason applies only if those Agreements were "the only [ones] reached." Opp. 63. The rule of reason, however, applies to restraints between those in "complex relationships" involving "vertical elements," *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272 (6th Cir. 2014), even if the vertical elements are intended to "facilitate" a "horizontal cartel." *Leegin* 551 U.S. at 893.[17]

Last, Authenticom protests that statutes like the CFAA, DMCA, and Copyright Act do not "immunize [Defendants] from antitrust-conspiracy law." Opp. 64. But applying the rule of reason does not "immunize" Defendants from anything. It simply requires Plaintiffs to prove that the conspiracy's alleged anticompetitive effects outweigh its benefits.

## II.  Authenticom Cannot Establish Antitrust Injury.

Authenticom cannot show antitrust injury. *First*, on all claims, its harm flows from its inability to engage in *illegal* access to Defendants' DMSs. *Second*, as to its non-conspiracy claims (all based on exclusive vendor contracts), no evidence shows that Authenticom's injury flows from

---

[17] Authenticom notes that the plaintiff in *Southeastern Milk* tried to shift to a strictly horizontal agreement "not to compete" after first pursuing a vertical one. 739 F.3d at 272. That is irrelevant. The court determined the rule of reason applied because it held the plaintiffs to a theory involving vertical elements—*i.e.*, a theory like Authenticom's.

those contract provisions rather than from Defendants' lawful refusal to deal with Authenticom.

### A. Authenticom Agrees That It Lacks Antitrust Injury If Its Access to Defendants' DMSs Was Unauthorized.

Authenticom admits that its claim of antitrust injury turns in the first place on a simple question: was Authenticom's automated polling of Defendants' DMSs authorized by Reynolds and CDK? *See* Opp. 65 (noting that the argument is based on "the premise that Authenticom's conduct was unauthorized"). If Authenticom lacked authorization to access Defendants' DMSs, then the service Authenticom claims it was foreclosed from selling was illegal, and Authenticom lacks antitrust injury. *See* Mot. 58-62. At the motion to dismiss stage, the Court was constrained by Authenticom's pleading that its conduct *only* became unauthorized pursuant to the illegal conspiracy. Dkt. 176 at 19-22. But at summary judgment, the record is clear Authenticom's conduct was illegal before and independent of any alleged conspiracy.

As to Reynolds, Authenticom concedes, as it must, that if the Court grants Reynolds's Motion for Partial Summary Judgment on its DMCA or WCCA claims then Defendants would be entitled to summary judgment on any antitrust claims related to access to the Reynolds DMS. In that case, Authenticom would suffer no antitrust injury arising from automatically polling Reynolds DMSs because it had no legal right to sell and profit from that service. Opp. 65-66 (offering half-hearted defense that there "is at least a jury question" on Reynolds's DMCA and WCCA claims). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Defs. JSUF 71-79; Mot. 59-62; *see also* Dkt. 1061 at 5-19; 27-35.

████████████████████████████████████████

████████████████ RSUF 52; RSUF Ex. 83; Defs. JSOAF 45; *see generally* RSUF 49-56.

Authenticom's allegedly disputed "premise" thus cannot seriously be disputed at all. Even absent the alleged conspiracy, Authenticom would not have a right to sell its service on Reynolds's systems, so it lacks antitrust injury as to claims based on access to the Reynolds DMS.

Authenticom tries to distinguish its claims relating to access to the CDK DMS on the grounds that CDK did not move for summary judgment on its counterclaims. Opp. 65-66. But CDK *did* move for summary judgment on the issue of antitrust injury. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ Mot. 62 (citing JSUF 70, 159, 162, 189); Dkt. 506 at 15.

Further, Authenticom has no response to the point that independent of "authorization,"

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ *Id.*; *see also* Dkt. 1055 at 5-25.

## B. Defendants' Unilateral Conduct Did Not Cause Antitrust Injury.

Authenticom does not dispute that Defendants had a unilateral right to refuse to deal with Authenticom. Mot. 63-64; *Authenticom*, 874 F.3d at 1023. Framing Authenticom's allegations as "exclusive dealing," Opp. 66, makes no difference. There is no evidence that Defendants' contracts with vendors, rather than Defendants' refusal to deal with Authenticom, caused Authenticom injury. If that decision was unilateral, it was lawful. Mot. 63. And there is no antitrust injury if lawful conduct "fully accounts" for the plaintiff's injury because the "plaintiff's situation would be the same with or without the challenged restraint." Areeda & Hovenkamp ¶ 338b-c.

Authenticom suggests that, if CDK and Reynolds did not have exclusive vendor contracts, maybe they would not have barred Authenticom's access. Opp. 66. But such arguments are not

enough at this stage. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Defs. JSUF 24.[18] Thus, Authenticom's attempt

to distinguish *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) fails.

Authenticom has no evidence that Defendants' exclusive vendor contracts were a "substantial

contributing factor" or "material contributing cause" of Authenticom's injury. Opp. 67 n.35.

Authenticom bears the burden on antitrust injury, so it had to come forth with that evidence now.

*Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). It has not tried to do so.

## III. Authenticom's Unilateral Claims Fail For Multiple, Additional Reasons.

Authenticom's non-conspiracy claims—for exclusive dealing under Section 1 and

aftermarket monopolization under Section 2—fail as a matter of law.

### A. Authenticom's Section 1 Exclusive-Dealing Claims Fail.

#### 1. Reynolds Does Not Have Market Power in the DMS Market.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████[19] Nor does

---

[18] In its statement of facts response—but not its brief—█████████████████████████

█████████████████ Pls. Resp. JSUF 24. But Authenticom cites no evidence this change had any effect,
on it or anyone else, as required to survive summary judgment.

[19] Authenticom's cursory suggestion that the "DIS" market is the sole relevant market for determining
Reynolds's market power (Opp. 69) is wrong. Reynolds could not wield market power in a separate "DIS"
aftermarket unless either (1) Reynolds had market power in the primary DMS market, or (2) Authenticom
could show the *Kodak* aftermarket theory applies despite the fact that dealers knew what they were signing
on to with Reynolds (which it cannot, *see infra* § III.B). *See Univ. Avionics Sys. Corp. v. Rockwell Int'l
Corp.*, 184 F. Supp. 2d 947, 955-56 (D. Ariz. 2001). Reynolds's share of its own aftermarket is not the test.
*See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 454-55 (1992).

Authenticom dispute ████████████████████████████████████

████████████████████████████████████████████████████████

████████████ Reynolds thus lacks DMS market power as a matter of law. Mot. 65-66. Authenticom's arguments to the contrary fail.

**a.** The great weight of case law holds that "firms with market shares of less than 30% are presumptively incapable of exercising market power." *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003); *see also Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (foreclosure of "50 percent" not sufficient); Mot. 65-66 (collecting cases). Authenticom's cases are irrelevant or support Defendants.[20]

Authenticom argues that even if Reynolds has less than a 30% share by rooftop, Reynolds may have a larger percentage if calculated in some other way, such as new car sales per rooftop. Opp. at 68. This is irrelevant. ██████████████████████████████████

██████ *See* Defs. JSUF Ex. 72, Israel Rep. ¶ 209. DMS providers sell DMSs to dealers, not cars to consumers. Authenticom offers no authority supporting its attempt to change the way market share is calculated.[21]

**b.** Authenticom suggests that it has direct evidence of market power because "Reynolds

---

[20] *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001), supports Reynolds's position that 25 to 30 percent is not enough. *Id.* (acknowledging that generally a "40% or 50%" share is required). And in *Methodist Health Services Corp. v. OSF Healthcare System*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016), market power was not even litigated. *Id.* at *8 n.11 ("St. Frances has conceded for purposes of this motion that it possesses market power."). Nor was it contested on appeal in *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301 (9th Cir. 1982), where the district court relied on "artificially created barriers to effective entry into and competition within the market" unique to the inelastic market for concessions at sports stadiums.

[21] Authenticom's argument that the Court should ignore Reynolds's individual market share and instead adopt a group market share analysis—lumping CDK and Reynolds together (Opp. 69)—is unavailing. There is no evidence that Reynolds adopted its "exclusive dealing" provision as a result of any alleged conspiracy with CDK. ████████████████████████████████████████████ ██████████████ *See, e.g.*, Defs. JSUF Ex. 232 § 2.5.3 (████████████ ████████████████████); Defs. JSUF Ex. 265 § 2.5.3 (same).

raised prices vastly above competitive levels . . . without any corresponding improvements in quality." Opp. 67. This argument fails for three reasons. *First,* the "direct" evidence Authenticom cites here is fatally flawed and unreliable. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ (Defs. JSUF 33-35), so the comparison is meaningless. *See* Defs. JSUF Ex. 71, Bresnahan Rpt. ¶ 271 & fig. 17.

*Third*, even if Dr. Israel had measured price correctly, Authenticom is incorrect that there were no "corresponding improvements in quality." Opp. 67. █████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ *See* Defs. Resp. Pls. JSOAF 78.

**c.** █████████████████████████████████████████████████

████████████████████████ *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002).

### 2. Authenticom Cannot Have It Both Ways On Market Definition.

To survive summary judgment on market definition, Authenticom must resolve a paradox: that Authenticom's daily batch extraction is in the same market as Defendants' robust real-time

and write-back integration (*i.e.*, that the threshold for substitutability between these options is very *low*), while free dealer-driven data push options are not (*i.e.*, that the threshold is very *high*). If either proposition is false—and one must be—Authenticom's claims fail because it would have no economic evidence defining the relevant market. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006). Authenticom's attempt to defend Dr. Israel's market definition fails.

Authenticom's first argument is that *other* hostile third parties offer more complex integration. Opp. 70-71. But that says nothing about whether basic data extraction and complex integration are substitutes.  *See* Defs. JSUF 32-33. By definition, products *incapable* of substituting are not in the same market.

Authenticom's next contention is that dealer-driven "push" options are not a substitute for automated extraction. Opp. 70. Market realities show otherwise.

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004). Even if the Court looked to anecdotes, Resp. Pls. JSOAF 30, 77; *see also* Defs. JSUF 5, 39, 40; RSUF 6, 8.

### 3. Authenticom Cannot Show Substantial Foreclosure.

Authenticom's exclusive-dealing claim also fails because it offers no evidence that the provisions "foreclose competition in a substantial share of the line of commerce at issue." Mot. 68; *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004). Authenticom

argues that its own "exclusion" shows foreclosure, Opp. 72, but offers no evidence that its "exclusion" (or any other integrator's) was due to exclusive dealing. *See supra* § II.B; Mot. 69.

### B. Authenticom's Section 2 Monopolization Claims Fail.

Authenticom's monopolization claims fail for lack of antitrust injury, a properly defined market, and evidence that alleged exclusive dealing provisions are anticompetitive. *See supra* §§ II.B, III.A. In addition, Authenticom cannot prove that this is one of the rare cases in which single-brand aftermarkets—here, for so-called data integration services on each Defendants' DMS—are appropriate. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

To show a cognizable aftermarket, Authenticom must proffer evidence of (1) high information costs for dealers; and (2) prohibitive switching costs. Mot. 71-76. It fails as to both.

### 1. *Kodak* Does Not Require Perfect Knowledge for Life-Cycle Costs.

Authenticom cannot show substantial information costs because (a) Defendants' contracts bar dealers from enabling third-party access and (b) dealers had sufficient information on the "lifecycle" costs of using Defendants' DMSs, including integration fees. Mot. 72-74.

Authenticom's main response is that dealers did not have perfect knowledge as to either issue. Opp. 73-75. But even "'very imperfect knowledge suffices' to defeat the assertion of a *Kodak* lock-in market." *Universal. Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) (quoting Areeda & Hovenkamp ¶ 1740 (2d. ed.)). Whether all dealers could calculate exact dollars-and-cents costs, Opp. 73-74, is irrelevant.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ Defs. JSUF

83-86; 97-101; Resp. Pls. JSOAF 79. That alone defeats Authenticom's *Kodak* claim: a policy

change is a hard-and-fast prerequisite in the Seventh Circuit. Mot. 72. ███████████████

███████████████████████████████████████████ Pls. Resp. Defs. JSUF 12-13.

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ Defs. JSUF 159; Resp. Pls. JSOAF 87.

Finally, Authenticom's argument that Defendants' contracts were ambiguous or explicitly

authorized DMS access, Opp. 75, is wrong in light of Authenticom's pleadings to the contrary and

the contracts' unambiguous text. *See* Dkt. 1061 § I; Dkt. 1055 at 7-10.

## 2. Confidentiality Provisions Do Not Obscure Total Cost of Ownership.

Regardless, dealers had no problem estimating total lifecycle costs of using Defendants'

DMSs. Mot. 73-74. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ Resp. Pls. JSOAF 68; Defs. JSUF 178-79. Further, the challenged

provisions did not foreclose insight into total DMS costs. To evaluate lifecycle costs, dealers do

not need to know how much vendors pay for the various inputs to their applications. Dealers only need to know the cost of their DMS and apps. The all-in cost that dealerships pay third-party applications has never been a secret. Pls. Resp. Defs. JSUF 177. As Authenticom does not dispute, dealerships have many avenues, including specialized consultants and tools from competing DMS providers, to gather information on lifecycle costs and negotiate contractual protections. Pls. Resp. Defs. JSUF 178-182. Authenticom responds that consultants cannot anticipate "abrupt" changes. Opp. 75. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

### 3. Authenticom Fails to Grapple With Substantial Evidence of Switching.

There is extensive evidence that dealerships switch DMS providers often—evidence that Authenticom barely acknowledges. Defs. JSUF 167-171. As a matter of law, hard evidence of switching defeats a *Kodak* claim even if the plaintiff can provide anecdotes or evidence to show that switching can be difficult for some customers. *See* Mot. 74-76. As *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11 (1st Cir. 1999), and other cases cited in Defendants' opening brief hold, summary judgment is therefore appropriate. Authenticom's only retort is that *SMS* was a "fact-bound" decision. Opp. 77 n.44.

Authenticom attempts to sidestep switching evidence by arguing that CDK and Reynolds "profitably could maintain supracompetitive prices in the aftermarket without losing so much business in the primary market to make those price increases unprofitable." Opp. 76. That assumes the conclusion—that Defendants' prices were "supracompetitive." Regardless, Authenticom's conspiracy theory is predicated on the *opposite* claim: ████████████████████████

██████████████████████████████ Opp. 11, 19-20; *see also* Defs. JSUF 167-68. █

██████████████████████████████████████████

███████████████████████████████████████

Finally, Authenticom argues (at 77) that a "select few customers" switching does not undermine a *Kodak* claim. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516653, at *10 (S.D. Ohio Mar. 21, 2014). Maybe that is so in cases like *Collins*, where only "one large customer" switched. *Id.* Here, ████████████████████████████████████████

██████████████████████████████████████████

████████████████" Defs. JSUF Ex. 350, Stejskal Expert Tr. 172.

## IV.   Authenticom's State Law Tortious Interference Claim Fails.

Authenticom's tortious interference with contract claim fails for three reasons. Mot. 77-81. Authenticom's claim that summary judgment is inappropriate because there are triable questions regarding conspiracy, Opp. 78-79, fails for the reasons already discussed. *See supra* § I. Authenticom also claims that Defendants must show that Authenticom's purportedly interfered-with contracts are "invalid." Opp. 78. Defendants have done so. Contracts in which Authenticom promised vendors that it would access Defendants' DMSs were illegal if Authenticom lacked the DMS providers' authorization, and "an act forbidden by a statute cannot be the foundation of a legal contract." *Stamatiou v. U.S. Gypsum Co.*, 400 F. Supp. 431, 433 (N.D. Ill. 1975).

Nor does Authenticom show either causation or damages. Authenticom claims that Defendants are engaged in "technical parsing" in arguing that Authenticom did not bring a tort claim as to *prospective* contracts by pointing to three allegations in its complaint that Authenticom was losing customers because of Defendants' actions. Opp. 79. But even if Authenticom's failure to plead a claim for tortious interference with prospective customers could be forgiven—despite neither Authenticom's liability nor damages expert mentioning it—Authenticom does not offer the "evidence of specific customers" it would have won, as needed to withstand summary judgment. *Uline, Inc. v. JIT Packaging, Inc.*, 437 F. Supp. 2d 793, 801-802 (N.D. Ill. 2006).

Finally, Authenticom asserts in passing that "common market messaging" allegations are sufficient to show that CDK and Reynolds spread "false and disparaging" information. Opp. 79 n.45. Those allegations are unfounded and contrary to the record. *See supra* § I.B.2. In addition, "market messaging" is neither "false" nor "disparaging," and there is "no evidence" that Authenticom "suffered any damages as a result of" any such statements. *McDaniel v. Loyola Univ. Med. Ctr.*, 2019 WL 1281969, at *23 (N.D. Ill. Mar. 20, 2019). Summary judgment is proper.

## V.    Authenticom's Damages Claims Fail For Multiple Additional Reasons.

As Authenticom recognizes, Opp. 79, its damages failings have been outlined extensively in the *Daubert* context. That a damages expert does not need to "disaggregate" a "single course of unlawful conduct" (Opp. 80) does not persuade because Ms. Lawton admitted that *lawful* conduct could account for the damages she measures. Mot. 82; *MCI Communc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly attributable to *unlawful* competition.").[22]

## CONCLUSION

The Court should award summary judgment to Defendants on all claims.

---

[22] MDL Plaintiffs' Response to Defendants' Joint Statement of Facts (Dkt. 1070) contains objections to certain exhibits that Defendants submitted. This Court's rules state that "if a party contends that its opponent has included inadmissible evidence . . . in a Rule 56.1 submission," ordinarily "the party's argument that the offending material should not be considered should be included in its response or reply brief." The only objection Authenticom mentions in its brief, however, is its objection to Defs. JSUF Ex. 156 and 163, which fails for the reasons explained at pp. 12-13 *supra*. Authenticom does not contend that its other objections warrant denial of summary judgment. Because Authenticom failed to raise these other objections in its brief or a separate motion to strike, however, Defendants have had no opportunity to respond to them. Therefore, to the extent the Court deems it necessary to address these objections, Defendants concurrently have moved for leave to file a short response, limited to Plaintiffs' evidentiary objections.

Dated: August 28, 2020

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on August 28, 2020, I caused a true and correct copy of the foregoing **DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*

Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com