PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 |
| | Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr. |
| ALL ACTIONS | Magistrate Judge Jeffrey T. Gilbert |

## DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S RESPONSE TO MDL PLAINTIFFS' CORRECTED STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## RECORD CITATION FORMAT

| Abbr. | Reference | Docket Number |
|---|---|---|
| RSUF | Defendant The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment (Authenticom), October 15, 2019 | Dkt. 779 |
| MSUF | Defendant The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment (MVSC), May 20, 2020 | Dkt. 956 |
| Defs. Auth. Br. | Defendants' Memorandum in Support of Motion for Summary Judgment (*Authenticom*), May 20, 2020 | Dkt. 966 |
| Defs. JSUF | Defendants CDK Global, LLC and The Reynolds and Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of their Motion for Summary Judgment Exhibits, May 20, 2020 | Dkt. 974 |
| Defs. JSUF Ex. | Exhibits to the Declaration of Daniel T. Fenske, May 20, 2020 | Dkt. 975 |
| Defs. Resp. Auth. SOF | Response of Defendants CDK Global, LLC and The Reynolds and Reynolds Company to Plaintiff Authenticom, Inc.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on Defendants' Counterclaims, July 28, 2020 | Dkt. 1058 |
| Defs. JSOAF | Defendants CDK Global, LLC's and The Reynolds & Reynolds Company's Statement of Additional Material Facts In Opposition to MDL Plaintiffs' Motions for Summary Judgment on Defendants' Counterclaims, July 28, 2020 | Dkt. 1062 |
| Resp. Dealer SOF | CDK's Response to the Dealership Counter-Defendant's Statement of Undisputed Material Facts, July 28, 2020 | Dkt. 1060 |
| Pls. Resp. Defs. JSUF | MDL Plaintiffs' Responses to Defendants CDK Global, LLC's and the Reynolds and Reynolds Company's Joint Statement of Material Facts, July 28, 2020 | Dkt. 1070 |
| Resp. MSUF | Plaintiff Motor Vehicle Software Corporation's Responses to Defendant the Reynolds and Reynolds Company's Statement of Undisputed Material Facts | Dkt. 1079 |

| | in Support of its Motion for Summary Judgment, July 28, 2020 | |
|---|---|---|
| Defs. Add'l Ex. | Exhibits to the Declaration of Daniel T. Fenske, July 28, 2020 | Dkt. 1080 |
| Resp. RSUF | Plaintiff Authenticom, Inc.'s Reponses to Counterclaimant's The Reynolds and Reynolds Company's Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment, July 28, 2020 | Dkt. 1082 |
| Defs. Auth. Reply | Defendants' Reply Memorandum in Support of Motion for Summary Judgment (*Authenticom*), August 28, 2020 | Filed concurrently |
| Defs. Reply Ex. | Exhibits to the Declaration of Daniel T. Fenske, August 28, 2020 | Filed concurrently |
| CDK Dealer Reply | CDK Global LLC's Reply in Support of its Motion for Summary Judgment (Dealership Case), August 28, 2020 | Filed concurrently |
| Resp. Pls. SOAF | Defendants CDK Global, LLC's and The Reynolds And Reynolds Company's Response to MDL Plaintiffs' Corrected Statement of Additional Material Facts in Opposition to Defendants' Motions for Summary Judgment, August 28, 2020 | — |
| Pls. SOAF | MDL Plaintiffs' Corrected Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment, August 5, 2020 | Dkt. 1101 |
| Caseria Ex. | Exhibits to the Declaration of Leo D. Caseria in Support of Reynolds's Motion for Summary Judgment and Rule 56.1(a)(3) Statement of Undisputed Material Facts, May 20, 2020 | Dkts. 957, 958, 959 |
| Ho Ex. | Exhibits to the Declaration of Derek T. Ho in Support of MDL Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment, July 28, 2020 and August 5, 2020 | Dkts. 1069-1, 1101 |
| Wedgworth Ex. | Exhibits to the Declaration of Peggy J. Wedgworth In Support of Dealership Counter-Defendants' Motion for Summary Judgment on CDK Global, LLC's Counterclaims, July 28, 2020 | Dkt. 968 |
| Wedgworth Add'l Ex. | Exhibits to the Declaration of Peggy J. Wedgworth, submitted in support of Pls. Resp. Defs. JSUF and Dealership Class Plaintiffs' Memorandum in | Dkt. 1083 |

**PUBLIC VERSION**

| | Opposition to Defendants CDK Global, LLC's Motion for Summary Judgment, July 28, 2020 | |
|---|---|---|
| Dorris Ex. | Exhibits to the Declaration of Daniel V. Dorris in Support of Plaintiff Authenticom, Inc.'s Motion for Summary Judgment on Defendants' Counterclaims, May 20, 2020 | Dkt. 977-1 |

## DEFENDANTS' RESPONSE TO
## MDL PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1(b), Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") hereby submit this joint response to MDL Plaintiffs' Statement of Additional Material Facts In Opposition To Defendants' Motions For Summary Judgment. Dkt. 1069.

CDK and Reynolds incorporate by reference: (1) Defendants' Joint Statement of Common Undisputed Material Facts In Support of Their Motions for Summary Judgment, Dkt. 974 ("JSUF"); (2) their Joint Statement of Additional Material Facts, Dkt. 1062 ("JSOAF"); and (3) the previously filed Reynolds's October 15, 2019 Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment, Dkt. 779, 780, 782, 783 ("RSUF"). Reynolds incorporates by reference Reynolds's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, Dkt. 956 ("MSUF").

### GENERAL STATEMENT

Similar to Local Rule 56.1(a), Local Rule 56.1(b)(3)(C) calls for "short numbered paragraphs of any additional facts that require the denial of summary judgment." A host of paragraphs in MDL Plaintiffs' Statement of Additional Material Facts violate this Rule because they are argumentative, compound, purport to characterize evidence, or are statements of opinion or legal conclusions. *See Phillips v. Quality Terminal Services, LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Opinion, suggested inferences, legal arguments and conclusions are not the proper subject matter of a [Local Rule 56.1] statement."); *Hartford Fire Ins. Co. v. Taylor*, 2012 WL 5197681, at *7 (N.D. Ill. Oct. 17, 2012) ("a party's own characterization of evidence is not permitted in a Local Rule 56.1 statement"); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)

1

**PUBLIC VERSION**

("It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response.").

By way of example only, alleged facts 80, 86, 143, and 144 assert that Defendants charged "supracompetitive" prices for integration on their systems. Likewise, alleged fact 70 asserts that dealers "were harmed when Defendants changed their policies to exclude data integrators and force vendors to purchase data integration through 3PA and RCI at inflated prices." And alleged fact 72 asserts "[a]fter excluding competition from data integrators, both Reynolds and CDK raised their RCI and 3PA prices (respectively) substantially above competitive levels."

Again by way of example only, alleged fact 52 asserts that "absent agreement, CDK and Reynolds would have returned to competing against one another based on the openness of their DMSs." Likewise, alleged fact 54 asserts that "CDK agreed to stop competing with Reynolds for data integration business among Reynolds dealers."

Those are hotly contested legal conclusions or advocacy-driven characterizations, not statements of fact. Such statements are contrary to the purpose of Local Rule 56.1. *Servin v. GATX Logistics, Inc.*, 187 F.R.D. 561, 562 (N.D. Ill. 1999) ("Including legal arguments in a [56.1] statement is wholly improper, redundant, unpersuasive and irksome; in short, it advances neither the interests of the parties nor of th[e] court.").

As this Court has noted, "[i]t is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement." *Phillips*, 855 F. Supp. at 771. Given that, and this Court's disfavor of motions to strike, Defendants do not move to strike the many superfluous and inappropriate assertions and characterizations in Plaintiffs' statement. However, when CDK and Reynolds

indicate that any alleged fact asserted by MDL Plaintiffs is undisputed, it is solely with regards to the bona fide factual assertions in the corresponding paragraph. Further, such admissions are made only for purposes of Defendants' motions for summary judgment and not for any other purpose in this MDL. *See, e.g., Brown v. Navarro*, 2012 WL 3987427, at *3 (N.D. Ill. Sept. 11, 2012).

Responses to alleged facts 136-150 below relate only to the Dealership case and are offered only on behalf of CDK.

Responses to alleged facts 92-119 below relate only to the MVSC case and are offered only on behalf of Reynolds.

## RESPONSES TO ADDITIONAL FACTS

1.　New entrants to the DMS market face high barriers to entry, including significant up-front software development costs and a years-long process to attempt to obtain necessary certifications with OEMs. Dorris Ex. 151, (Dkt. 977-153), Expert Report of Mark Israel ("Israel Rep.") ¶¶ 78-84 (describing substantial barriers to entry); Dorris Ex. 150, (Dkt. 977-152), Expert Report of Allan Stejskal ("Stejskal Rep.") ¶¶ 37-38 (describing substantial barriers to entry); Ho Ex. 65, PI Hearing Tr. 2-A-50:7-14 (Andreu) ("[T]he barrier to entry to get in the DMS space is difficult. . . . We wanted to buy people who knew how to do this, and we spent about $50 million trying to build another one and ended up flushing it"); *id.* at 2-A-17:3-4 (Wayne Fitkin, IT dealership director: "To build something that would run a car dealership is a monumental task."); Ho Ex. 158, PX 736, Declaration of Malcom Thorne ("Thorne Decl.") ¶ 44 ("CDK spent decades and hundreds of millions of dollars creating proprietary software platforms, valuable intellectual property, and an automotive retail data ecosystem of 9,000+ dealers."); Dorris Ex. 90, (Dkt. 977-92), Declaration of Robert Schaefer ("Schaefer Decl.") 1149 ("Reynolds has invested tens of millions of dollars in developing the technologies that comprise its DMS."); Dorris Ex. 57, (Dkt. 977-58), *FTC Auto/Mate Complaint* ¶ 58 (FTC concluding that effective entry into the DMS market "would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome."); Ho Ex. 30, Battista Tr. 101:5-102:14 ("█████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████); Ho Ex. 143, PX 638 at 2 (█████████████████████

██████████████████████████████████████████████████████████████████████

█████████████); Ho Ex. 209, PX 1007 at SIS_DMS_0012988 (█████████████████

██████████████████████████████████████████████████████████████████████

█████████████); Ho Ex. 55, Andreu Tr. 310:6-312:1 (██████████████████

████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████.

**RESPONSE:** This alleged fact is immaterial because, as explained in Defs. JSUF 168-175, new entrants into the DMS market have been able to compete successfully, including against CDK and Reynolds.

This alleged fact is also disputed in part. It is disputed that new entrants into the DMS market face "high" or "substantial" barriers or are unable to obtain certifications from OEMs. *See* Defs. JSUF 169-171; *see also, e.g.*, Dorris Ex. 57 ¶ 46 ("For the past five years, Auto/Mate has been experiencing significant year-over-year rooftop growth."); Defs. Reply Ex. 646, Stejskal Expert Tr. 23:1-31:21 (showing that DealerTrack, Auto/Mate, Dominion, Autosoft, and DealerBuilt are certified by most, if not all, major OEMs).

It is undisputed that there are some barriers to entry into the DMS market, including development costs and OEM certifications.

2.     Dealers face significant obstacles to switching DMSs, including lengthy contract terms imposed by DMS companies, substantial early termination fees if they attempt to switch DMS providers before the expiration of their contract with CDK or Reynolds, and auto-renewal provisions by which CDK and Reynolds can extend already-lengthy contracts if dealers make even minor changes such as purchasing new printers. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 40 ("It is usually quite difficult to break these contracts and will frequently require significant liquidated damages or that the balance of the contract commitment be paid out"); Ho Ex. 392 at KENNY_THOMAS0006655 (████████████████████████████████████████████████████
████████████████████████████████████; Ho Ex. 35, Thomas (Olathe Toyota 30(b)(6)) Tr. 357:19-358:8 (t███████████████████████████████████████████████████████████); Ho Ex. 12, Colson Tr. 304:7-305:8 (████████████████████████████████████████████
██████████████████████); Ho Ex. 161, PX 766 at CDK-3107885:15-886:11, Tr. 29-30 (████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████); Ho Ex. 8, Jezek Tr. 182:17-184:5 (████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████; Ho Ex. 34, Stejskal (Fact) Tr. 24:4-25:19 █████
███████████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because, as explained in Defs. JSUF 170-73, large numbers of dealers switch DMS providers in any given year.[1]

This alleged fact is also disputed in part. It is disputed that dealers face "significant" obstacles to switching DMSs. Indeed, as explained in Defs. JSUF 170, an average of ████ of Reynolds DMS rooftops in the last year of their contract switched to a competing DMS product each year from 2008 to 2018 (███████████████████████████). *See* Defs. JSUF Ex. 71, Bresnahan Rpt. ¶ 187. *See also* Defs. JSUF Ex. 350, Stejskal Expert Tr. 172:4-6 ("There isn't anybody that says that [switching] is not a viable option."), 48:14-17 ("hundreds of dealership rooftops switch DMS providers every year"). Indeed, the evidence shows that DMS providers have become much more sophisticated and successful with the conversion process. *See*, *e.g.*, Defs. Reply Ex. 628, DX 1181 ("Auto/Mate converts over 82% of its customers from the industry's two largest DMS providers, and we retain 99.7% of them without contracts. From single-point locations to the multi-store dealer groups, we've perfected the DMS conversion process."); Defs. Reply Ex. 605, DX 1170 (COX_0112502) at -519 ("███████████ ██████████████████████████████████████).

It is undisputed that there are some costs associated with switching DMS providers.

3.      Dealers attempting to switch DMS providers risk losing valuable historical data and face an arduous process in converting their data from the old system to the new system Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 75; Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 48; Ho Ex. 27, Johnson Tr. 177:23-178:12 (Continental Motors dealership group) ("[D]ata conversion, it's not easy. And if — you know, you have to get the accounting departments involved, make sure things . . . are lining up, that their books are correct, that all the customers come over, notes aren't

---

[1] Defendants object to Plaintiffs' characterization of "significant" obstacles, "lengthy" contract terms, "substantial" early termination fees, and "already-lengthy contracts" that can be extended for "even minor changes." *See* General Statement, *supra*.

lost, service history is there. So . . . it's not just, you know, go home one night and then it's there the next morning. It would be . . . a long process."); Ho Ex. 65, PI Hearing Tr. 2-A-15:9-11 (Fitkin) ("I converted three UCS stores in Las Vegas to CDK without a drop of data coming over because I couldn't get it out"); Ho Ex. 22, Whitworth Tr. 44:13-14 ("The mechanics of data conversion are arduous."); Ho Ex. 454 at SLP_CDK00000346 (███████████████████████████████ ███████████████████████████████████████); Ho Ex. 55, Andreu Tr. 324:16-326:1 (███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████); Ho Ex. 223, PX 1114 at CDK-0979850 (████████████████████████████████████ ███████████████████████████████████████████████); Ho Ex. 22, Whitworth Tr. 301:11-14 (███████████████████████████████████████████████████████ ███████████████████████████████████).

**RESPONSE:** This alleged fact is immaterial because this modest risk does not prevent substantial numbers of dealers from switching DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.[2]

It is undisputed that, in certain circumstances, data conversion errors can occur when a dealer switches DMS providers.

4.    Dealerships also face substantial out-of-pocket expenses associated with switching DMS providers — such as fees for setup, training, data conversion from the old system, and replacing physical technological equipment. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 42 ("In my experience, these 'hard' costs are typically equal to roughly six to twelve months of recurring DMS license fees."); Ho Ex. 49, Whitworth (Cox 30(b)(6)) Tr. 543:2-11 (███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████); Dorris Ex. 58, (Dkt. 977-59), DX 405 at COX_0020335, ¶ 11 (███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████.

---

[2] Defendants object to Plaintiffs' characterization of the data conversion process as "arduous." *See* General Statement, *supra*.

**RESPONSE:** This alleged fact is immaterial because these expenses do not prevent substantial numbers of dealers from switching DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.[3]

It is undisputed that dealerships may incur some out-of-pocket expenses when switching DMS providers. As Plaintiffs' expert has acknowledged, for "many years, DMS providers have subsidized the costs of switching." Defs. JSUF Ex. 350, Stejskal Expert Tr. 50:2-9; *see also* Defs. JSUF 175.

5.      When a dealership attempts to switch DMS providers, employees need extensive training on the new system before they become comfortable using the new system, which dealers and industry participants have described as being akin to undergoing a heart transplant, knee replacement, brain replacement, or a journey through the "trough of despair." Former Reynolds President Ron Lamb described the difficulties in switching DMS providers as follows:



Ho Ex. 18, Lamb Tr. 98:21-102:23, 120:24-121:2; *see also* Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 44 ("Because the DMS is so integrally tied to virtually every process within the dealership, switching DMSs is hugely disruptive to a dealership's operations. I refer to the process as having to cross the 'trough of despair.") (footnote omitted); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶¶ 78-84; Dorris Ex. 58, (Dkt. 977-59), DX 405 at COX_0020336, ¶ 16 (███████████ ███████████████████████████████); Ho Ex. 132, PX 527 at REYMDL00260867 — Auto/Mate

---

[3] Defendants object to Plaintiffs' characterization of the data conversion process as switching costs as "substantial." *See* General Statement, *supra*.



sales materials: (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■); Ho Ex. 27, Johnson Tr. 178:7-12 (Continental Motors group) ("So it's not just, you know, go home one night and then it's there the next morning. It would be . . . a long process. Because, you know, I could imagine it could take a . . . 12-to-24-month period just to try to switch."); Ho Ex. 16, Brockman 1/17/19 Tr. 180:18-25 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■); Dorris Ex. 57, (Dkt. 977-58), *FTC Auto/Mate Complaint* ¶ 18 ("In order to change DMS suppliers, franchise dealers need to spend a significant number of hours training their staff, while dealing with losses in productivity that can lead to lower sales during the transition period."); *id.* ("Customers frustrated with CDK's and Reynolds's business practices have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders."); Ho Ex. 34, Stejskal (Fact) Tr. 106:4-108:3 ("[I]t's a big deal to switch DMSs, right, all of the employees of the dealership are trained in that DMS product, and you have to go through a pretty rigorous implementation process to set up [all of the old processes in the new DMS].... [W]e used to talk about the trough of despair because that day, right, your whole world [changes], you don't know how to do your job anymore[.]"); Ho Ex. 8, Jezek Tr. 348:11-349:5 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■); Ho Ex. 19, Rubino Tr. 117:5-118:3 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■); Ho Ex. 454 at SLP_CDK00000346 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■); Ho Ex. 22, Whitworth Tr. 260:17-21 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■).

**RESPONSE:** This alleged fact is immaterial because these expenses do not prevent substantial numbers of dealers from switching DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.

This alleged fact is also disputed in part. With respect to the excerpts from Mr. Lamb's deposition, it is undisputed that Mr. Lamb made those statements, but they do not fairly capture Mr. Lamb's deposition testimony regarding DMS switching. *See*, *e.g.*, Defs. JSUF Ex. 328, Lamb Tr. 105:1-5 (explaining the lack of disruption when a dealer switches from an inferior system to a superior system), 334:10-336:23 (explaining that, regardless of any disruptions involved in the process, "dealers switch constantly," and hundreds of dealerships switch DMS providers every year).

It is undisputed that dealership employees require some training when a dealership switches DMS providers. It is also undisputed that certain dealers have anecdotally compared switching DMS providers to medical procedures.

6.    Reynolds has warned dealers that switching DMS providers can take three or more years to implement and cause an average, per-store profit decline of 44%. Ho Ex. 295 at CDK-0728580 (█████████████████████████████████████████████████████████████████████████████████████████████████); Ho Ex. 149, PX 676 at REYMDL00246637 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████); Ho Ex. 150, PX 677 at COX_0004894 (Reynolds telling dealership that "[c]hanging computer systems is always an enormous disruption, and even industry consultants will tell [you] not to change unless you have a great reason to do so. The disruption can cost a tremendous amount of time and money . . . .").

**RESPONSE:** This alleged fact is immaterial because these expenses do not prevent substantial numbers of dealers from switching DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.

This alleged fact is also disputed and unsupported. None of the cited documents contain statements from Reynolds that "switching DMS providers can take three or more years to implement." The cited document merely reflects a sales representative stating that "ERP Magazine states that it takes 3.2 years to change IT process into culture." Ho. Ex. 295. The reference from the same sales representative that █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████ *Id.*

7.    A number of large dealerships – including Hendrick Automotive – have abandoned attempts to switch DMS providers in light of the high switching and conversion costs. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 43 ("In some cases, the disruption is so high that the end result is that [the] dealership abandons the switch and goes back to their old provider, such as in the case of Hendrick Automotive.") (█████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████); Ho Ex. 151, PX 682 at REYMDL00298566 (██████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████); Ho Ex. 295 at CDK-

**PUBLIC VERSION**

0728580 ( ████████████████████████████████████████████████████████
████████████████████████████████████████████████████ ); Ho Ex. 163, PX 772 at CDK-
0117339 ( ████████████████████████████████████████████████████████████████
████████████████; Dorris Ex. 150, (Dkt. 977-
152), Stejskal Rep. ¶ 36 (similar example for Asbury Auto Group — the nation's seventh-largest
dealership group — which abandoned attempt to switch from Reynolds to Dealertrack); Dorris Ex.
151, (Dkt. 977-153), Israel Rep. ¶ 75 n.104.

**RESPONSE:** This alleged fact is immaterial because the fact that some dealerships decide not to

switch DMS providers or return to former DMS providers does not prevent substantial numbers

of dealers from switching DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.

This alleged fact is also disputed in part. It is disputed that Hendrick Automotive's decision

was based exclusively on "high switching and conversion costs." *See* Defs. JSUF Ex. 328, Lamb

Tr. 321:1-334:9 ( ████████████████████████████████████████ ); *see also id*. at

336:3-7 ("dealers switch constantly for all sorts of different reasons. And it just – any assertion

that – that switching is impossible flies in the face of decades of data that shows dealers are

switching all the time"). Indeed, large dealerships routinely switch DMS providers. *See*, *e.g.*,

Dorris Ex. 57 ¶ 46 ("By adding centralized accounting to an already solid feature set at aggressive

prices, Auto/Mate has attracted the attention of multi-rooftop dealers with very sophisticated DMS

needs."); Defs. JSUF Ex. 328, Lamb Tr. 335:20-25 ( █████████████████████████████

████████████████ ); Defs. Add'l Ex. 512, a screenshot of REYMDL00017997 ( ████████

████████████████████████████ ); Defs. Add'l Ex. 519, a screenshot of

REYMDL01076539 ( █████████████████████████████████████████████████████

██████ ).

It is undisputed that Hendrick Automotive signed a contract with CDK in 2016 and

converted some of its stores to the CDK DMS before reversing course and re-signing an exclusive

contract with Reynolds.

8.      Because of the high costs of switching, dealers stay with CDK or Reynolds for an average of approximately ████████████████ of dealerships stay with their current DMS provider in a given year; and many of the switches that do occur are the result of dealership acquisitions and consolidation, rather than a dealership's decision to switch DMS providers because it is dissatisfied with the service. Ho Ex. 229, PX 1209 at CDK-1170533 (███████████████████████████████████████████); Ho Ex. 355 at CDK-1994705.007 (████████████████████████████████████████████████████████████████); Ho Ex. 230, PX 1211 at CDK-3111769 (████████████████████████████████████████████████████████████████████████████████████████); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 76 (Dr. Israel calculating 4.4% switching rate for 2017); Ho Ex. 460, Declaration of Sumanth Addanki ("Addanki Decl.") I 48-49 (Defendants' expert calculating 3% switching rate for 2016); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 19 (noting the "increasing trend toward consolidation" among dealerships, with the total number of distinct dealership owners expected to shrink from 7,700 to 6,500 by 2025); Ho Ex. 161, PX 766 at CDK-3107948:14-949:15 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

**RESPONSE:** This alleged fact is immaterial because the record shows substantial numbers of dealers switch DMS providers each year. *See* Resp. Pls. SOAF 2, *supra*.

This alleged fact is also disputed in part. It is disputed and unsupported that dealers stay with their DMS providers because of the high costs of switching. Moreover, as of 2017, average dealership tenure was ████████████ and shrinking, in light of new technologies' driving switching costs lower. Defs. JSUF Ex. 104, Schaefer Decl. [Auth. Dkt. 97] ¶ 12.

It is undisputed that some dealers switch DMSs following acquisitions or consolidations.

9.      In 2007, Microsoft attempted to enter the DMS market, but abandoned that effort several years later due to the obstacles to entry. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 37 ("The challenges of penetrating the market are so substantial that even a Microsoft supported initiative in the mid-2000s to enter the DMS market was unsuccessful despite great interest from the dealer community "); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 84; Brockman and Fortier, *On the Record, Tough Questions. Straight Answers,* at 1 (Reynolds's Brockman stating that he would remain unconcerned about Microsoft's potential entry into the DMS market unless Microsoft "committed a couple of billion dollars to put out a DMS product") (on file with author); Ho Ex. 70, David Barkholz, *Data system is Brockman's latest surprise,* Automotive News (Jan. 25, 2009), https://www.autonews.com/article/20090125/RETAIL06/301259970/data-system-is-brockman-s-latest-surnise (Brockman: "[w]hen you see them [Microsoft] set up a thousand-person programming group somewhere that's dedicated to producing a dealership management

system, then it's time to sit up and pay attention. Until then, there's not a chance."); Ho Ex. 8, Jezek Tr. 362:19-363:3 ("[T]he environment of the CDK and Reynolds was — their entrenched position was too strong and I think they [Microsoft] just gave up."); Ho Ex. 71, David Barkholz, *Dealers get new management system option,* Automotive News (Dec. 2, 2012), https ://www. autonews. com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option (noting Microsoft DMS "never took off" and Microsoft director for U.S. manufacturing industry stating: "We kind of got ahead of ourselves.").

**RESPONSE:** This alleged fact is immaterial because new entrants into the DMS market have been able to compete successfully, including against CDK and Reynolds. *See* Resp. Pls. SOAF 1, *supra*.

This alleged fact is also disputed in part. It is disputed and unsupported that Microsoft's DMS did not "enter" the U.S. DMS market, as Microsoft sold its DMS product to a third party that then successfully entered in the market. *See*, *e.g*., Ho Ex. 71 (explaining that Microsoft sold, licensed, or otherwise provided Microsoft's DMS software product to DMS provider Dominion Dealer Solutions, which successfully entered the marketplace in 2012).

It is undisputed that Microsoft abandoned its initiative to enter the U.S. DMS market directly.

      10.    Switching costs impede even expansion by existing competitors: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Dominion Enterprises abandoned an attempt to launch a new DMS product called DMX. Ho Ex. 22, Whitworth Tr. 204:14-24 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████ Ho Ex. 55, Andreu Tr. 286:11-287:1 (noting Dominion's "failed attempt" to launch the DMX product "written on a Microsoft dynamics platform. That was an expensive lesson."); *id.* at 300:6-303:5 ("Q. Before DMX, when was the last time that a new DMS capable of serving enterprise dealer groups came to market? A. Your question implies that DMX made it to market. It didn't. But there were several failed attempts. Microsoft themselves tried with an industry expert that's been around a long time, and they failed. Other companies have failed. I can't think of one off the top of my head."); Ho Ex. 65, PI Hearing Tr. 2-A-50:1314 (Andreu) ("[W]e spent about $50 million trying to build [the DMX DMS] and ended up flushing it"); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 80.

**RESPONSE:** This alleged fact is immaterial because new entrants into the DMS market have been able to compete successfully, including against CDK and Reynolds. *See* Resp. Pls. SOAF 1, *supra.*

This alleged fact is also disputed and unsupported. It is disputed and unsupported that switching costs impeded expansion by Dealertrack or Dominion. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ Similarly, although Dominion abandoned its DMX product, today it actively markets a new, cloud-based DMS called Dominion VUE. Defs. Reply Ex. 630, Dominion Vue DMS website printout (https://www.drivedominion.com/dealer-management-systems/vue-dms-software/).

11.     Dealerships typically use 15 to 20 (or even more) software applications in addition to the DMS. Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 54; Ho Ex. 152, PX 684 at REYMDL00016618, ¶ 28 (██████████████████████████████████████████████

██████████████████ ); Dorris Ex. 3, (Dkt. 977-4), Declaration of Chris Longpre ("Longpre Decl.") ¶ 6 ("I use roughly 20 third-party application providers at my dealership."); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 28 n.39; *id.* ¶ 56 (demonstrating relevant antitrust markets for software applications).

**RESPONSE:** This fact is immaterial because the number of applications dealers use is not evidence of a conspiracy or exclusive dealing.

It is undisputed that franchised dealerships typically use 15 to 20 software applications in addition to the DMS.

12. Although CDK and Reynolds also offer their own layered applications, which can be purchased separately from the DMS or along with the DMS, Defendants' applications "traditionally were not first-to-market with innovative solutions" and historically have not "provided the most functional or most cost-effective solutions." Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 50; Ho Ex. 1, Ayotte Tr. 127:20-128:12 ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether CDK's or Reynolds's applications were first-to-market, the most functional, or the most-cost-effective is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed in part. It is disputed and unsupported that CDK's and Reynolds's applications are not innovative, functional, or cost effective. Authenticom's purported expert evidence (Dorris Ex. 150, Stejskal Rpt. ¶ 50) refers to "DMS Providers" generally, not just CDK and Reynolds, and the documents it cites refer to a single CDK application and CVR.

It is undisputed that CDK and Reynolds offer applications (sometimes called "layered applications") separately or with the DMS. It is undisputed that DMS Providers █████████

████████ generally are not market leaders in most application categories. *See* Defs. Reply Ex. 604, DX 1145 (COX_0032735) at 8; Defs. Reply Ex. 606, DX 1146 (COX_0114381) at 6

14

PUBLIC VERSION

█████████████████████████████████████████████████████████

███████.

13.    Historically, dating back to the early 2000s, vendors had many options when choosing a data integration provider, with independent providers including Authenticom, Digital Motorworks, IntegraLink, Superior Integrated Solutions ("SIS"), Stone Eagle, Freedom Data Resources, SelectQu, ProQuotes, InDesign, Ryantech, Homenet, and more. Dorris Ex. 5, (Dkt. 977-6), Declaration of Steve Cottrell ("Cottrell Decl.") ¶ 17 (listing data integration competitors); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 66 (in response to market demand for data integration services, "companies like Authenticom, IntegraLink, DMI, SIS and SelectQu were formed and provided a competitive set of services to the application and service providers that needed data integration. Indeed, when I was Senior VP for E-Commerce at AutoNation in the early 2000s, I was one of the early users of DMI's data integration services."); Dorris Ex. 7, (Dkt. 977-8), PX 944, Declaration of Howard Gardner I 37-42 (noting various data integration companies); Ho Ex. 244, PX 1284 at SIS_DMS_0002391 (describing competition among data integrators as of 2009); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 26 n.37.

**RESPONSE:** This alleged fact is immaterial because the number of third-party data extractors in the early 2000s is not evidence of a conspiracy or exclusive dealing.

It is undisputed that in the early 2000s, there were a number of companies that charged vendors for the extraction of data from DMSs. However, as Authenticom has admitted, "there is no actual 'integration' with the DMS database," and in this context, "'integration' is simply a synonym for 'data access.'" Defs. Reply Ex. 632, Defs. Resp. to Auth SOF for PI [Auth. Dkt. 86] ¶ 30.

14.    Data integrators have typically charged vendors around $50 — and often less — on a per-dealership, per-month basis. Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 63 (Authenticom charges $25 to $50); Ho Ex. 65, PI Hearing Tr. 2-A-30:22-25 (Andreu) (SelectQu charged $30); Ho Ex. 30, Battista Tr. 19:19-20:6 (SIS charged $39 to $49); Ho Ex. 45, Elliott Tr. 67:7-11 (StoneEagle charged $35 to $85 a month); Ho Ex. 68, Lampert Tr. 181:11-182:1 (InDesign charges $50 a month for extraction only and $100 a month for extraction plus write-back); Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 179, fig. 7.

**RESPONSE:** This alleged fact is immaterial because the prices charged by third-party data extractors are not evidence of a conspiracy or exclusive dealing.

It is undisputed that third-party data extractors, which Authenticom inaccurately calls "data integrators," *see* Resp. Pls. SOAF 13, have charged some vendors $50 or less per dealer per month

for some data extraction services. Those same data extractors have charged other vendors higher

amounts for data extraction services. *See*, *e.g.*, Ho Exs. 45 at 67:7-11, 68 at 181:18-22; 

15.     By offering cost-effective and efficient access to dealer data, integrators allow startup software vendors to enter the market and offer new applications for dealerships. Ho Ex. 19, Rubino Tr. 93:9-20 (Vince Rubino, of the vendor TotalLoop, testifying that, "[w]ithout question," Authenticom enabled his data mining application to enter the market and grow: "Without that data, we couldn't do what we did. . . . [W]e could never have done it without them."); Dkt 977-3, Declaration of Michael Korp ("Korp Decl.") ¶¶ 4-6, 8-9 (startup vendor Open Recalls describing how it used Authenticom for data integration, which enabled its app to find "early success" helping dealerships track down car owners with unresolved safety recalls; after Authenticom was blocked by Defendants, "Open Recalls' revenues went from more than $120,000 in March 2015 to virtually no revenues for the next five months. It was a business catastrophe."); Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 66 & n.85 (industry expert Stejskal noting that, "when I was Senior VP for E-Commerce at AutoNation in the early 2000s, I was one of the early users of DMI' s data integration services," and citing Ho Ex. 211, PX 1034, which was a DMI news release — which quoted Stejskal — touting how its data integration services "improve the car-buying experience of thousands of consumers every day"); Ho Ex. 467, Cottrell 7/28/2020 Decl. ¶ 2 ("By providing those smaller vendors with affordable access to dealer data, we help them get their business off the ground and expand and grow.").

**RESPONSE:** This alleged fact is immaterial because whether third-party data extractors allow

software vendors to enter the market is not evidence of a conspiracy or exclusive dealing.[4]

This alleged fact is also disputed in part. It is disputed that hostile data extractors are the

only or the best solution for startup software vendors to enter the market and offer new applications

for dealerships. *See*, *e.g.*, Defs. Reply Ex. 609, REYMDL00015524, Defs. Reply Ex. 610,

REYMDL00015525, Defs. Reply Ex. 611, REYMDL00015526, Defs. Reply Ex. 612,

REYMDL00015527, Defs. Reply Ex. 613, REYMDL00015528, Defs. Reply Ex. 614,

---

[4] Defendants object to Plaintiffs' characterization of so-called third-party integrators as "cost-effective" and "efficient." *See* General Statement, *supra*.

REYMDL00015529, Defs. Reply Ex. 615, REYMDL00015530, Defs. Reply Ex. 616,

REYMDL00015531, Defs. Reply Ex. 617, REYMDL00015532, Defs. Reply Ex. 618,

REYMDL00015533, Defs. Reply Ex. 619, REYMDL00015534 (testimonials from RCI customers

extolling the benefits of the program to their businesses); Defs. Reply Ex. 629,

https://www.cdkglobal.com/us/media-center/rollick-outdoor-joins-cdk-global-partner-program-

through-new-innovation-catalyst (describing a CDK program for new market entrants that offers

reduced minimum monthly fees and phased development fees).

It is undisputed that some vendors, "startup" and otherwise, have chosen to use hostile data

extractors to obtain data from DMSs.

16.    Over two decades, no data integrator has ever caused a security or data breach at
any automotive dealership. Dkt. 977 ¶ 113 (Authenticom has never had a data breach); Ho Ex. 30,
Battista Tr. 13:7-9 ("Q. Has SIS ever had a data breach at any time since 2003? A. Never."); ███

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████ Ho Ex. 45, Elliott Tr. 85:18-21
("Q. Has StoneEagle to your knowledge, ever caused any data breaches in connection with its data
integration business? A. No. Not that I'm aware of"), *id.* at 134:25-135:5 (unaware of any security
breaches at automotive dealerships caused by StoneEagle's integration); Ho Ex. 55, Andreu Tr.
114:3-4 ("[T]o my knowledge, Authenticom never had anything that resembled a breach."); *id.* at
352:16-18 ("Q. Has SelectQu ever been the cause of a data breach? A. None in my knowledge.");
Ho Ex. 68, Lampert Tr. 35:20-21 ("Q. Has InDesign Data ever had a data breach? A. Not once,
fortunately.").

**RESPONSE:** This alleged fact is immaterial because whether data extractors have caused a

security or data breach at an automotive dealership is not evidence of a conspiracy or exclusive

dealing

This alleged fact is also disputed in part. It is disputed and unsupported that no data

extractors has caused a security or data breach at an automotive dealership in the last two decades.

The cited exhibits state that the relevant individuals were not aware of a data or security breach by

the specific data extractors they were discussing. Defendants' expert Scott Tenaglia identified

multiple instances in which Authenticom appears to have suffered a security or data breach

**PUBLIC VERSION**

incident. *See* Defs. Resp. Auth. SOF 113; *s*████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.

    17.    Defendants have repeatedly recognized that other data integrators — including Authenticom and SIS — compete with Defendants' "certified" data integration products and thus constrain their ability to raise prices. ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether Defendants have recognized that Authenticom and SIS "compete" with 3PA or RCI and/or whether Authenticom and SIS constrain CDK's or Reynolds's ability to raise prices is not evidence of a conspiracy or exclusive dealing.

    This alleged fact is also disputed in part. This alleged fact is unsupported and vague as to what it means for Authenticom and other data extractors to "compete" with certified integration. Certified integration allows real-time, event-driven integration, and writeback functionalities that third-party data extractors, such as Authenticom, are unable to provide. *See* Defs. JSUF 8, 22, 32-

35. ███████████████████████████████████████████████████████

███████████████████████████████████████████ Moreover, Ho Ex. 192 does not contain

the quote reflected in the parenthetical. This alleged fact is also disputed and unsupported as to

Reynolds, because it does not cite any Reynolds documents.

███████████████████████████████████████████████████████

███████████████████████████████████████████

18.     Unlike with Authenticom's DealerVault platform, Dkt. 977, ¶¶ 30-44, Defendants'
3PA and RCI integration services do not provide dealers with transparency and control over the
flow of their data or data-enhancement services that make the data easy for vendors to use. ████████
Dorris Ex. 3, (Dkt. 977-4), Longpre Decl. ¶ 5 ("CDK gives us little control or visibility into how
our data is used."); Dorris Ex. 9, (Dkt. 977-10), Supplemental Declaration of Wayne Fitkin ("Fitkin
Suppl. Decl.") ¶ 7 ("One major benefit of using Authenticom's DealerVault product is that it
allows me to select, and thus limit, the particular types of data that I can send to a given vendor. . . .
CDK does not have an equivalent product; I have never found a way to turn off a 3PA feed, let
alone control what data is accessible via 3PA."); Ho Ex. 440 at REYMDL00110419 (████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████ Ho Ex. 65, PI Hearing Tr. 2-A-38:4-16 (Andreu) (Authenticom's "service was, in my
opinion, better. It was absolutely at least as good by any definition, but I think better, and probably
for us the most significant thing is if I get data through a certified means, whether it's CDK or
Reynolds and Reynolds, I still. . . have to send that data to somebody to enhance it, so when I used
Authenticom or SelectQu, the data came from the DMS. It was clean, standardized, enhanced, and
then sent to me, and when I got it, I was done. Now I have to write routines that bring in the data
from CDK or Reynolds and Reynolds, both more complicated than getting it from Authenticom to
begin with, then package that data up, send it out to be enhanced.").

**RESPONSE:** This alleged fact is immaterial because the "transparency" and "control" provided

by DealerVault, RCI, and 3PA is not evidence of a conspiracy or exclusive dealing.[5]

---

[5] Defendants object to Plaintiffs' characterization of the DealerVault platform as "transparent" or "easy to
use." *See* General Statement, *supra*.

**PUBLIC VERSION**

This alleged fact is disputed in part. It is disputed that DealerVault provides dealers with more transparency and control over their data. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

Further, DealerVault only offers control or transparency with respect to data already copied into DealerVault. It does not offer "control" or "transparency" as to data maintained in the DMS, nor does it offer control or transparency to the DMS provider. Dorris. Ex. 159, Stroz Reply ¶ 35. Finally, both CDK and Reynolds offer tools that do provide transparency into who has access to data in the DMS. Defs. Reply Ex 648, Thorne Dep. 61:10-18, 374:14-375:5; Defs. Reply Ex. 590, CDK-0001009, at -1022-25 (describing CDK's DDX tool); Defs. Reply Ex. 645, Schaefer (Day 2) Tr. 242:10-243:7 ██████████████████████████████████████

██████████████████████████████████████████.

It is undisputed that some dealers have stated that they prefer using Authenticom's DealerVault platform.

19.    CDK has substantially expanded its portfolio of applications ████████████████ determined — as former CEO Brian MacDonald put it — that the "value is moving outside the

20

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████        Ho Ex. 73, https://investors.cdkglobal.com/news-releases/news-release-details/cdk-global-acquire-eleadlone (CDK announcing ELEAD acquisition in 2018).

**RESPONSE:** This alleged fact is immaterial because CDK's expansion of its application portfolio

is not evidence of a conspiracy or exclusive dealing.

It is undisputed that CDK has expanded its portfolio of applications, including by acquiring

Cobalt and ELEADS, ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

20.     Because CDK's layered applications historically relied on independent integrators – including DMI, SIS, and Authenticom — for access to Reynolds's dealer data, Reynolds's blocking of those integrators put CDK's layered application business at risk. Ho Ex. 312 at CDK-0834881 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
Dkt. 977, ¶ 116 (noting CDK applications used Authenticom for data integration services); Ho Ex. 100, PX 255 at CDK-2286512.005 ████████████████████████████████
████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

**PUBLIC VERSION**

21. ███████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ████████████████

22. Through at least June 2013, in contrast to Reynolds, CDK supported dealers' right to use data integrators. Ho Ex. 22, Whitworth Tr. 299:17-21 (

Ho Ex. 66, *CDK v. Brnovich*

PI Hearing Tr. 359:16-360:12 (Alan Andreu, of the software vendor Dominion Enterprises, testifying that he had a conversation at the 2013 NADA convention with key CDK executive Kevin Distelhorst, where the two of them "threw stones" at Reynolds over their closed stance and increasing data integration charges); ███████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether CDK supported dealers' "right" to use data extractors before June 2013 is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. As discussed in Defs. JSUF 80-86, Reynolds began actively securing its DMS as early as 2006. By contrast, CDK did not deploy technical blocking measures until 2016. Defs. JSUF 159. It is disputed that CDK "supported dealers' right to use data integrators" prior to June 2013. ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████

23.    Between 2006 and 2013, CDK's "open" strategy enabled it to overtake Reynolds as the nation's largest DMS provider, as reflected in the chart reproduced below. Dorris Ex. 70, (Dkt. 977-72), PX 443 at CDK-0244310.002; Dorris Ex. 151, (Dkt. 977-153), Israel Rep. I 124126. During this period, "these tactics that Reynolds were using was causing so much discontent in the dealer community that it was driving large and small dealer groups in droves away from their platform and over to [CDK's]." Ho Ex. 25, Witt Tr. 179:8-12; ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

**PUBLIC VERSION**



**RESPONSE:** This alleged fact is disputed and unsupported in part.[6] It is disputed and unsupported that CDK's third-party access policy was the only factor contributing to CDK's growth during any period. As one of the documents cited in support of this alleged fact indicates, ███████████ ████████████████████████████████████████ Wedgworth Ex. NN, (Dkt. 968-04), PX 885 at CDK-2673485; *see also* Defs. JSUF Ex. 71, Bresnahan Rpt. ¶¶ 234-35 (discussing reasons dealers gave for switching from Reynolds to CDK from FY 2012 to FY 2015). ████████████████████████████████████████████████████████

---

[6] Defendants object to Plaintiffs' characterization of CDK's strategy as "open." *See* General Statement, *supra*.

██████ *See* Defs. JSUF 171-172. However, CDK and Reynolds continued to compete

aggressively for DMS customers, including after 2013. *See* Defs. JSUF 173.

24.     From 2006 to 2013, CDK repeatedly used its relationships with OEMs and
Reynolds's dealership customers to force Reynolds to stop blocking the access of data integrators.



**RESPONSE:** This alleged fact is immaterial because whether CDK tried to use OEM or dealer

pressure in response to Reynolds's security measures prior to September 2013 is not evidence of

a conspiracy or exclusive dealing.

This alleged fact is also disputed in part. █████████████████

███████████████████████████

25. ██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether one competitor "lamented" competitive pressure from another competitor is not evidence of a conspiracy or exclusive dealing.[7]

This alleged fact is also disputed and unsupported. ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ *See* Defs. JSUF Ex. 71, Bresnahan Rpt. ¶¶ 234-35 (discussing reasons dealers gave for switching from Reynolds to CDK from FY 2012 to FY 2015).

██████████████████████████████████████████████████

---

[7] Defendants object to Plaintiffs' characterization of Mr. Brockman's testimony as "lamenting" or "complaining" about competitive pressure. *See* General Statement, *supra*.

[REDACTED]

26.     As a result of competition from CDK, Reynolds was losing business and could not effectively "close" its system to data integrators. [REDACTED] Ho Ex. 460, Addanki Decl. ¶ 58 (Defendants' economic expert stating that — "based on discussions with Reynolds's Mr. Schaefer" — Reynolds's "increase in DMS access restrictions and investment in enhanced security was, in the short run, unprofitable for Reynolds, and it lost business as a result."); Dorris Ex. 8, (Dkt. 977-9), Declaration of Ronald Lamb ¶ 10 (Reynolds's former President stating that "many major DMS providers" have used "their more 'open' computer architecture and data policies" as a "major factor" in competing against Reynolds); [REDACTED] Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 130; Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. I 35, 77.

**RESPONSE:** This alleged fact is disputed and unsupported.[8]

It is disputed and unsupported that Reynolds could not "effectively 'close' its system" due to competition from CDK. Plaintiffs' economic expert admitted that Reynolds had "substantially closed" its DMS before September 2013, and does not dispute that [REDACTED] Defs. JSUF Ex. 322, Israel Tr. 58:7-16

---

[8] Defendants object to Plaintiffs' characterization of Reynolds as being unable to "effectively 'close' its system." *See* General Statement, *supra*.

("███████████████████████████████████████████████████

████████████████████"); *id.* at 159:15-160:16 (Reynolds "substantially closed" before

September 2013). Defs. JSUF 85-86 ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See*

Defs. JSUF Ex. 71, Bresnahan Rpt. ¶¶ 234-35 (discussing reasons dealers gave for switching from

Reynolds to CDK from FY 2012 to FY 2015).

27.　　Reynolds whitelisted the ability of its largest dealership customers (such as Penske
Automotive and Hendrick Automotive Group), OEMs, and important vendors such as SiriusXM
to use data integrators. Ho Ex. 434 at PAG_0000471; Ho Ex. 432 at PAG_0000332; Ho Ex. 433
at PAG_0000350; ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether Reynolds "whitelisted" accounts is

not evidence of a conspiracy or exclusive dealing.

**PUBLIC VERSION**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

28.     Reynolds kept a list of "major" dealer accounts whose DMS contracts were coming up for renewal within six months and whitelisted those dealerships during the sales and renewal period. Ho Ex. 15, Brockman 1/16/19 Tr. 149:13-151:3 ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether Reynolds "whitelisted" accounts during the sales and renewal period is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed in part. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Defs. JSUF Ex. 320, Hill Tr. 222:18-225:94.

29.     Data integrators have provided real-time and write-back data functionality; and they have touted those capabilities (among other service features) to win customers. Ho Ex. 30, Battista Tr. 219:17-19 (SIS owner Phil Battista stating that "the core of what SIS did was real-time data integration"); *id.* at 317:3-5 (SIS provides "instantaneous" real-time integration to its remaining customers); Ho Ex. 244, PX 1284 at SIS_DMS_0002391 (describing competition among data integrators in 2009 and noting SIS "specializes in bi-directional interfaces" and SIS touting its "best in class services"); ████████████████████████████████████████
████████████████████████████████████████████████████████████████

Ho Ex. 45, Elliott Tr. 250:19-251:17 (Stone Eagle provided real-time data access); Ho Ex. 85, DX 1123 (marketing document for InDesign's "BART" service, which stands for Bidirectional Access Real Time); Ho Ex. 68, Lampert Tr. 24:3-24 (InDesign's service could be customized by the dealer to pull data in near real-time increments of every five minutes); Ho Ex. 55, Andreu Tr. 333:6-18 (SelectQu provided real-time, bi-directional data integration); Ho Ex. 464, Declaration of Steve Cottrell In 3-11 (Dec. 18, 2019) ("Cottrell 12/18/19 Decl.") (noting Authenticom "has also offered bi-directional data integration for more than a decade" and listing customers that have purchased write-back data integration services from Authenticom); ████████████████████████
████████████████████████████████        Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 32 (Authenticom has $20 million cybersecurity insurance policy).

**RESPONSE:** This alleged fact is disputed and unsupported in part.

It is disputed and unsupported that third-party data extractors, which Authenticom inaccurately calls "data integrators," *see* Resp. Pls. SOAF 13, provide real time or write-back services. Authenticom has never offered writeback services on a real-time basis on any DMS. *See* Defs. JSUF 34; Defs. JSUF Ex. 327, Kirby Tr. 272:19-273:2; ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**PUBLIC VERSION**

It is undisputed that SIS has provided some write-back services and purportedly real-time extraction.

30.     Dealer-initiated downloads – in which a dealership employee manually extracts and exports data to particular vendors, typically on a daily basis – is not an adequate substitute for automated data integration.

Ho Ex. 65, PI Hearing Tr. 2-A-9:22-10:20 (June 27, 2017) (Wayne Fitkin, the IT Director for the Walters Automotive Group, testifying: "Here is the thing about manual: Manual doesn't work," citing an example of a vendor with 50 dealership customers: "He's got to find 50 people, one in each store, to manually run a report, grab the data, and then transmit it to Authenticom. These people can't have a day off. They can't make a mistake, can't have a vacation. It doesn't work unless you can automate the process.");

[REDACTED] Dorris Ex. 150, (Dkt. 977-152), Stejskal Rep. ¶ 64 (Plaintiffs' industry expert Mr. Stejskal opining that, based on his experience in the industry, manual push is not a workable solution for most applications and most uses); Ho Ex. 464, Cottrell 12/18/19 Decl. In 17-20 (describing the limitations and difficulties of using Dynamic Reporting); *id.* ¶ 21 ("Very often, dealers forget to (or choose not to) perform these daily reports. To remind dealers, Authenticom makes literally thousands of reminder requests via telephone and email every week asking dealers to run and send the reports. Despite those efforts, on a typical day at most 50% to 60% (best case) of Reynolds dealerships will be up to date with respect to exporting the necessary data to Authenticom.").

**RESPONSE:** This alleged fact is disputed and unsupported.

Dealer-initiated downloads are frequently an adequate solution for dealers to provide data to their vendors. [REDACTED]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ It is further disputed that Plaintiffs' citations to "manual entry" have any relevance. That concept refers to manual entry of data—not dealer-initiated downloads. Ho Ex. 47, Greene 30(b)(6) (Cox) Tr. 239:7-11.

31. ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

**RESPONSE:** This alleged fact is immaterial because whether DMI's Reynolds-related profits increased from 2010 to 2012 is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed and unsupported. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

32.

**PUBLIC VERSION**

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether ████████████████████
████████████████████████████████████████████████████

██████████████

    This alleged fact is also disputed in part. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

35

[REDACTED].

33.     In August 2013, Reynolds was under fire from dealers and OEMs as a result of its blocking tactics and registered its "poorest month in a couple years" for its DMS business. Ho Ex. 109, PX 374 at REYMDL00039156 [REDACTED]

**RESPONSE:** This fact is immaterial because whether Reynolds was "under fire" from dealers and OEMs in August 2013 is not evidence of a conspiracy or exclusive dealing.

This fact is also disputed and unsupported. It is disputed and unsupported that Reynolds was "under fire" from OEMs in August 2013. [REDACTED]

It is undisputed that, in August 2013 and other times, some dealers complained about Reynolds's third-party access policies. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ *See* Defs. Reply Ex. 620, REYMDL00133962 & Defs. JSUF Ex. 277, REYMDL00133963 (████████████████

████████████████████████████████

34. ████████████████████████████████████

RESPONSE: This alleged fact is immaterial because ████████████████████

████████████████████████████████████████████

████████████

This alleged fact is also disputed in part. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

PUBLIC VERSION

35.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████

**RESPONSE:** This alleged fact is immaterial because ████████████████████████

███████████████████████████████████████████████████████

██████████████████[9]

    This alleged fact is also disputed in part. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

    36.   ████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported in part.

    It is disputed and unsupported that ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[9] Defendants object to Plaintiffs' characterization of CDK and Reynolds employees as "high-ranking executives" and of CDK's witnesses as "profess[ing]" a lack of memory. *See* General Statement, *supra*.

███████████████████████████████████████████████████████

████████ As discussed in Defs. JSUF 102-132, CDK and Reynolds did not reach agreement on any of the issues discussed in Defs. JSUF Ex. 61 until February 2015. To the extent this alleged fact implies that Reynolds and CDK ever agreed to joint data security messaging, it is unsupported and disputed. Defs. Reply. Ex. 635, Brockman Tr. 69:25-71:4 ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

37.     ██████████████████████████████████████████████
████████████████████ Mr. Gardner repeatedly directed his team not to criticize Reynolds's closed-system policies, including in the following examples:

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ███████████████████████████████████

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████

40



███████████████████████████████████████████████

█████████████████████████████████

**RESPONSE:** This alleged fact immaterial because ████████████████████████

███████████████████████████████████████████████

████████████████████████████████

This alleged fact is also disputed and unsupported. It is disputed and unsupported that

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

- ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

█ ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

▌         ████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████

▌         ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

38.      ████████████████████████████████████████████

Reynolds largely stopped its blocking of DMI and "whitelisted" numerous user credentials used by DMI to access the Reynolds DMS so that they could continue to operate, as reflected in the below chart:

44



Dorris Ex. 158, (Dkt. 977-160), Reply Expert Report of Mark Israel ("Israel Reply Rep."), ¶ 120 ("In essence, Reynolds had a powerful hammer in the DIS/app world that could be used to stop CDK from competing with it on openness, or at least make it very difficult for CDK to do so.").

**RESPONSE:** This alleged fact is immaterial because whether Reynolds granted temporary exemptions for third parties, including DMI, is not evidence of a conspiracy or exclusive dealing.[10]

This alleged fact is also disputed in part. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Defs. JSUF

---

[10] Defendants object to Plaintiffs' expert's characterization of Reynolds's security measures as a "powerful hammer," Dorris Ex. 158, Israel Reply ¶ 120, does not address the subject of the statement of fact ("whitelisting") and is not a proper statement of fact in any event. *See* General Statement, *supra*.

**PUBLIC VERSION**

89-93. To the extent this alleged fact implies that Reynolds began providing temporary exemptions in September 2013 or that Reynolds only provided exemptions to vendors and OEMs utilizing DMI, however, it is disputed. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

39.     The DMS switching data shows that CDK stopped competing as aggressively against Reynolds in the DMS market following their September 2013 agreement. ████████

████████████████████████████████████████████████████

████████████████████



**RESPONSE:** This alleged fact is immaterial because a decline in DMS "competition" is not evidence of a conspiracy or exclusive dealing.[11]

---

[11] Defendants object to Plaintiffs' characterization of the state of DMS competition as more or less "aggressive." *See* General Statement, *supra*.

This alleged fact is also disputed and unsupported. It is disputed and unsupported that CDK "stopped competing as aggressively" against Reynolds in the DMS market after September 2013 (or at any time). As explained in Defs. JSUF 170-174, CDK and Reynolds continued to compete aggressively throughout this period. The switching data discussed in the exhibits cited in support of this alleged fact do not demonstrate any material change in competition between CDK and Reynolds in or around September 2013. *See* Defs. JSUF Ex. 78, Whinston Rpt. ¶¶ 192-203 (explaining that both switching data and documentary evidence undercut the assertion that competition between CDK, Reynolds, and other DMS providers declined after 2013). Plaintiffs' experts' contrary opinions based on switching data are inadmissible under *Daubert* for the reasons explained in Defendants' *Daubert* motion. *See* Dkt. 878 at 11-13.

40. In 2014, CDK began pursuing a marketing strategy of attacking data integrators and Authenticom specifically — in coordination with Reynolds — using "security" rhetoric.



**RESPONSE:** This alleged fact is disputed and unsupported.[12]

---

[12] Defendants object to Plaintiffs' characterization of CDK's marketing strategy as "attacking" so-called data integrators. *See* General Statement, *supra*.

It is disputed and unsupported that CDK "began" criticizing third-party data extractors in 2014. ███████████████████████████████████████████████

███████████████████████████

It is also disputed that CDK acted in "coordination" with Reynolds and that assertion is unsupported in any of the cited evidence or generally. None of the cited exhibits reflects any such coordination. Indeed, the only exhibit that mentions Reynolds is Ho Ex. 372, ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

41. ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████

**RESPONSE:** This alleged fact is immaterial because evidence that ████████████████ ████████████ is not evidence of a conspiracy or exclusive dealing.

As this alleged fact affirmatively states, Reynolds's subsequent security enhancements were not targeted specifically at Authenticom or any other particular data extractor. They were intended to further protect Reynolds's DMS from any and all hostile third parties ████████ ██████████████████████ *See* Defs. Reply Ex. 645, Schaefer Tr. (Day 2) 142:14-143:25.

This alleged fact is also disputed and unsupported in part. It is disputed and unsupported that CDK and Reynolds reached any "agreement" in September 2013. *See*, *e.g.*, Defs. JSUF 102-105. ████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See* Defs. JSUF 96, 113.

42. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ████████████████ ████████████████ is not evidence of a conspiracy or exclusive dealing.

████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

43. █████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████

**RESPONSE:** This alleged fact is immaterial because ██████████████████

████████████████████████ is not evidence of a conspiracy or exclusive dealing.

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

44. █████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ████████████████ ████████████████████████████ is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed and unsupported. ████████████

████████████ This process culminated in the

announcement of CDK's SecurityFirst initiative in June 2015. Defs. JSUF 158-159. ████████

45. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported.

None of these exhibits show that CDK and Reynolds ████████████████████ ████████████████████ (a phrase that is vague and ambiguous):

- ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

█ ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

*█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██  Authenticom had previously put ADP's logo on its website—implying that ADP certified

Authenticom, which was not true—███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

██      ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

**PUBLIC VERSION**

- ██████████████████████████████████████

████████████████████████████████████████████████

███████████

▌ ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ By this time, CDK had

already publicly announced its SecurityFirst initiative, *see* JSUF 158, ████████████████

████████████████████████████████████████████ There is

no evidence that CDK shared any marketing statements with Reynolds before they were released

publicly or that Reynolds launched a similar campaign.

- ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

- Ho Ex. 50: Consistent with their mischaracterization of Ho. Ex. 253, Plaintiffs mischaracterize testimony by Reynolds's corporate representative, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

46.    I███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████ Ho Ex. 19, Rubino Dep. Tr. 175 (Rubino testifying that PX 819 accurately reflects what French told him); Ho Ex. 468, PX 818 (showing communications between French and Rubino in the relevant time frame); *see also* Ho Ex. 91, PX 125 at REYMDL00233147
████████████████████████████████████████████████████
████████████████

**RESPONSE:** This alleged fact is disputed and unsupported.[13]

It  is  disputed  that  ████████████████████████████████████████████

████████████████████████████████████████ As Ho. Ex. 89—the email referenced in

---

[13] Defendants object to Plaintiffs' characterization of Rubino's testimony as CDK "working with Reynolds on blocking the ability of independent integrators to effectively use Reynolds's Dynamic Reporting program." *See* General Statement, *supra*.

this alleged fact, which is cited in alleged fact 35, *supra*—indicates, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████.

        █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

        Plaintiffs' citation to Ho Exhibit 91 appears to be a typo. That exhibit ███████████

████████████████████████ which has nothing to do with the stated alleged fact.

████████████████████████████████████████████

█████████████████████████

        47.    █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[REDACTED]

**RESPONSE:** This alleged fact is immaterial because [REDACTED] is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. It is disputed and unsupported that there was not "any substance" behind SecurityFirst. As Defendants' experts have observed, hostile access poses significant cybersecurity concerns. *See* Defs. Add'l Ex. 529, Stroz Rpt. ¶ 67 [REDACTED] Defs. Add'l Ex. 530, Tenaglia Reply Rpt. pp. 8-9 [REDACTED] To address those concerns, CDK made numerous investments in DMS security. In addition to CDK's security measures intended to disrupt hostile third-party access, *see* Defs. JSUF 159, 161, these included: [REDACTED]

**PUBLIC VERSION**

48.

**RESPONSE:** This alleged fact is immaterial because ███████████████████████████████

███████████ is not evidence of a conspiracy or exclusive dealing.[14]

      This alleged fact is also disputed. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████

    49.   ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████

---

[14] Defendants object to Plaintiffs' characterization of the testimony as "contradictory" and to Plaintiffs' statement that CDK decided to "close" its system to hostile third parties. *See* General Statement, *supra*.

**PUBLIC VERSION**

**RESPONSE:** This alleged fact is disputed and unsupported.

None of the exhibits cited in this alleged fact indicates that ███████████████████████████

███████████████████████████

    ▎   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

-    ███████████████████████████████████████████

███████████████████████████████████████████████████

  
**PUBLIC VERSION**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

     50.    ███████████████████████████████████
█████    CDK and Reynolds commenced negotiations regarding a formal, written agreement to fully implement their September 27, 2013 accord. Fenske Ex. 152, (Dkt. 975-152), at CDK-0901363

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported.[15]

It is disputed and unsupported that CDK and Reynolds reached any "accord" in September 2013. *See*, *e.g.*, Defs. JSUF 102-105. It is undisputed the CDK and Reynolds conducted long, hard-

---

[15] Defendants object to Plaintiffs' characterization of post-September 2013 discussions between Defendants as intended to "fully implement their September 27, 2013 accord." *See* General Statement, *supra*.

fought negotiations, *see* Defs. JSUF 106-155, towards agreements that were ultimately reached on

February 18, 2015. *See* Defs. JSUF 116-132.

51.     Both CDK and Reynolds characterized their formal agreement as an agreement to
close their respective DMSs to data integrators, including specifically Authenticom. ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

**RESPONSE:** This alleged fact is disputed and unsupported.

None of the evidence cited in this alleged fact suggests that CDK and Reynolds agreed to

"close their respective DMSs to data integrators," that CDK and Reynolds agreed to "close their

respective DMS to . . . Authenticom," or that they ever characterized their agreement as such.

- ████████████████████████████████████████████████
████████████████████████████████████████████████

**PUBLIC VERSION**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

- ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ Hill's observations about the state of the industry did not suggest that CDK

or Reynolds had agreed to coordinate their system or data access policies. In fact, Hill testified

specifically to what he understood CDK's and Reynolds's February 2015 agreement to be: ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

- ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ There is no suggestion that Reynolds agreed with CDK that Reynolds would secure its

64

**PUBLIC VERSION**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

- ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████

- ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ Again, there is no mention of any agreement as to what

CDK's or Reynolds policy would be as to access by third parties to their own DMSs.

- ████████████████████████████████████████████████

██████████████████████████████████████████████████████

**PUBLIC VERSION**

████████████████████████████████████████████████████████

████████████████████ That does not show that CDK *agreed* with Reynolds to secure its system or vice versa.

- ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

- ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

52.     Absent agreement, CDK and Reynolds would have returned to competing against one another based on the openness of their DMSs, with CDK once again "badmouthing" Reynolds's data access policies. ████████████████████████████████████
████████████████████████████████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported. [16]

It is disputed and unsupported that CDK and Reynolds reached an agreement during the time frames relevant to Ho Ex. 28, 180, 470, and 471 and Defs. JSUF Ex. 52 and 62.

It is also disputed and unsupported that these exhibits reflect a determination by either CDK or Reynolds to stop competing on what Plaintiffs call DMS "openness."

---

[16] Defendants object to Plaintiffs' characterization that CDK and Reynolds stopped or would have "returned" to competing against each other, or that CDK or Reynolds did so pursuant to (or absent an) "agreement." *See* General Statement, *supra*.

PUBLIC VERSION

███████████████████████████████████████████

███████████████████████████████████████████

████████

It is also disputed and unsupported that what Plaintiffs refer to as reduced competition on "openness" was the result of an "agreement." Reynolds decided to secure its DMS against hostile integration in 2006 and has never reconsidered that decision. Defs. JSUF 88. CDK's plan to secure its DMS developed over many years and was announced publicly in 2015. *See* Defs. JSUF 138-158. That plan was not contingent on reaching any agreement with Reynolds related to the DMI wind-down. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

53. ███████████████████████████████

███████████████████████████████████████████

██████████████████████████

ence in "ADP Strategic Benefits" to putting "greater pressure on Authenticom/DealerVault").

**RESPONSE:** This alleged fact is immaterial because

This alleged fact is also disputed and unsupported in part. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

54.     As part of the February 2015 written agreements, CDK agreed to stop competing with Reynolds for data integration business among Reynolds dealers; and Reynolds promised that it would not – as it had considered doing in the past – launch a data integration service that would compete with CDK's DMI and IntegraLink subsidiaries on non-Reynolds DMSs. ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

PUBLIC VERSION

**RESPONSE:** This alleged fact is disputed and unsupported.[17]

The February 2015 written agreements do not contain any agreement to "stop competing" for data integration business. *See* Defs. JSUF Ex. 49, 50, 51. *See also* Resp. Pls. SOAF 56. █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

   55. ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[17] Defendants object to Plaintiffs' statement that CDK "agreed to stop competing with Reynolds." *See* General Statement, *supra*.

██████████████████████████████████████████████████
████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ███████████████████████

██████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

56.     In the February 2015 agreements, CDK and Reynolds agreed to only access each other's systems through their respective certified integration programs (i.e., 3PA and RCI). ███████

██████████████████████████████████████████████████

██████████

**RESPONSE:** This alleged fact is disputed and unsupported.

It is disputed and unsupported that CDK and Reynolds "agreed to only access each other's systems" through 3PA and RCI. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

The restrictions on unauthorized system access in the 2015 Agreements were limited to the following provisions:

- ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████

- ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████

- ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████
██████████

57.     As part of the February 2015 agreements, CDK and Reynolds agreed to and did coordinate their communications to clients and the market. ████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

**PUBLIC VERSION**



**RESPONSE:** This alleged fact is immaterial because CDK's and Reynolds's agreement to review and approve market communications regarding the parties' 2015 Agreements is not evidence of a conspiracy or exclusive dealing.

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

58.     On March 16, 2015, Reynolds "locked down" its system by blocking access to non-DMI integrators, including Authenticom. Ho Ex. 250, PX 1402 at REYMDL00064850.018

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because Reynolds's deployment of additional security enhancements in March 2015 or transmission of cease-and-desist letters is not evidence of a conspiracy or exclusive dealing.[18]

This alleged fact is also disputed and unsupported in part. █████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

It is also undisputed that Reynolds sent cease-and-desist letters in 2015 to Authenticom and other hostile data extractors, but Authenticom and other data extractors were previously put on notice that their conduct violated Reynolds's DMS license agreements. ████████████████

███████████████████████████████████████████████████████

---

[18] Defendants object to Plaintiffs' characterization that Reynolds "locked down" its DMS in March 2015. *See* General Statement, *supra*.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██

59.   ██████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported.

For purposes of Defendants' motion for summary judgment, the Court can accept as true

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

60.     Following the execution of the February 2015 agreements, CDK immediately began to lay the groundwork to "secure" its DMS from data integrators. [REDACTED]

[REDACTED]

**RESPONSE:** This alleged fact is immaterial because the fact that CDK continued to take steps to secure its DMS in 2015 is not evidence of a conspiracy or exclusive dealing.[19]

This alleged fact is also disputed. It is disputed that CDK "began" to secure its DMS after February 2015. As explained in Defs. JSUF 138-155, CDK's process for securing the DMS "began" long before February 2015. [REDACTED]

---

[19] Defendants object to Plaintiffs' characterization of CDK's actions in February 2015 and thereafter as "laying the groundwork" for securing its DMS. *See* General Statement, *supra*.

61. █████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ██████████████████ ████████████████████████████████████████ is not evidence of a conspiracy or exclusive dealing.



62.

**RESPONSE**: This alleged fact is disputed and unsupported.[20]

For purposes of Defendants' motion for summary judgment, the Court can accept as true Cottrell's account of his conversation with McCray in April 2016 as recounted in Cottrell's deposition and notes. *See* Defs. JSUF 188-190. Cottrell's notes of the conversation, which Cottrell said reflect "exactly" what McCray said to him, do not indicate that McCray "admitted" to agreement between CDK and Reynolds to "block" so-called data integrators. Rather, the notes indicate that McCray "admitted" to an agreement among unnamed DMS providers to source data for their applications from other providers' certified programs: "Most of the major DMS companies have agreed to only source data from each other and effectively 'Lock you and the other third parties out.'" *See* Defs. JSUF 190 (citing Defs. JSUF Ex. 95, P.I. Hearing Tr. 1-P [Auth. Dkt. 162] at 39:12-25); Defs. JSUF Ex. 32, DX 744 (AUTH_00167028). Finally, Cottrell did not

---

[20] Defendants object to Plaintiffs' characterization of Mr. Cottrell's testimony. *See* General Statement, *supra*.



63.

**RESPONSE:** This fact is immaterial because the date that Mr. Cottrell recorded his notes is not evidence of a conspiracy or exclusive dealing.

It is undisputed that Cottrell took notes on April 4, 2016, that Defs. JSUF Ex. 32 reflects those notes, and that those notes have not been modified since that date. It is further undisputed that the Court may accept at summary judgment that those notes accurately reflect what McCray stated when resolving Defendants' motion. *See* Defs. JSUF 189. Neither of the cited exhibits describes Cottrell's restfulness at the time he recorded his notes.

64.



**RESPONSE:** This alleged fact is immaterial because ███████████████████

████████████████████████

      ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████

      65.     Immediately after the 2016 NADA convention, CDK employees recounted ████

████████████████████████████████████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because ███████████████████

████████████████████ is not evidence of a conspiracy or exclusive dealing.

      It is undisputed that the persons identified in this alleged fact made the quotes attributed to them in the cited Exhibits.

66. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

**RESPONSE:** This alleged fact is immaterial ███████████████████
███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

67.     Both CDK and Reynolds impose exclusive dealing requirements on vendors as a condition of joining the 3PA and RCI programs – which, in the case of CDK, lasts forever – that prohibits those vendors from using any other data integration providers for dealers that use their respective DMSs. Ho Ex. 224, PX 1123 at AUTOALERT0000050, § 1(e), (h) (CDK exclusive dealing provision); Ho Ex. 225, PX 1126 at AUTOALERT0000015, § 2.5.3 (Reynolds exclusive dealing provision); Ho Ex. 224, PX 1123 at AUTOALERT0000050, § 4(h); Ho Ex. 37, Baerg (AutoAlert 30(b)(6)) Tr. 106:7-108:3 ██████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

**RESPONSE:** This alleged fact is immaterial because, as explained in Defendants' summary judgment briefing, Authenticom offers no evidence of substantial foreclosure or antitrust injury from these provisions. Defs. Auth. Br. 63-64, 68-70.[21]

This alleged fact is also disputed and unsupported in part. It is disputed and unsupported that Reynolds imposes exclusive dealing requirements on vendors. As Authenticom concedes, Auth. Resp. RSUF 6-9, nothing in Ho Ex. 225 prevents the vendor from using data access features of the Reynolds DMS, such as Dynamic Reporting and AVID that enable services from other "data integration providers." ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *See* Defs. JSUF 38-39. It is undisputed that CDK's standard 3PA contracts prohibit vendors from obtaining DMS data outside the 3PA program after the vendor joins the 3PA program. As discussed in Defs. JSUF 24, these contracts have included substantially similar provisions since at least 2006.

68.     CDK and Reynolds impose price secrecy provisions on vendor customers, which are intended to and do prevent dealers from calculating and negotiating over the full cost of using the CDK and Reynolds DMS (including added integration fees). ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Ho Ex. 63, PI Hearing Tr. 2-P-51:7-15 (Reynolds Bob Schaefer explaining that, if RCI fees are disclosed to dealers, "what happens is they get into a comparison," and "I don't have time to do all that and put it together and negotiate. Because, you know, car dealers and vendors, their strength is negotiations, and so they want to take all of the information they can get and come hit me.");

---

[21] Defendants object to Plaintiffs' characterization of the effect of Defendants' vendor contracts, including that they imposed "exclusive dealing requirements" or last "forever," which are legal conclusions. *See* General Statement, *supra*.



**RESPONSE:** This alleged fact is immaterial because, as explained in Defs. JSUF 177-182, dealers can and typically do understand the "total cost of ownership" when negotiating with DMS providers to "comparison shop" among those providers.[23]

This alleged fact is also disputed and unsupported in part. It is disputed that CDK's vendor contracts include a provision that prohibits vendors from attributing an "integration fee" on their

---



[23] Defendants object to Plaintiffs' characterization of the effect of Defendants' vendor contracts, including that they imposed "price secrecy provisions," which is a legal conclusion. *See* General Statement, *supra*.

invoices to dealers. ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

It is also unsupported and disputed that these provisions "are intended to and do prevent

dealers from calculating and negotiating over the full cost of using the CDK and Reynolds DMS."

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

69.     When two vendors – ████████████████████████ – disclosed their RCI prices on their invoices to Reynolds dealers, Reynolds forced them to pay $100,000 liquidated damages penalties. Ho Ex. 226, PX 1157 at AUTOALERT0000060 ██████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████ Ho Ex. 65, PI Hearing Tr. 2-A-45:11-46:2 (Dominion Enterprises paid a $100,000 penalty to Reynolds for putting a $195 integration fee on its invoice: "They said that we violated the secrecy requirement. They submitted — they made us submit to an intimidating audit, and ultimately we wrote them a check for $100,000 or they were going to cut the RCI program off from our Sales Center product.").

**RESPONSE:** This alleged fact is immaterial because as explained in Defs. JSUF 177-182, dealers can and typically do understand the "total cost of ownership" when negotiating with DMS providers to "comparison shop" among those providers.[24]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[24] Defendants object to Plaintiffs' characterization ████████████████████████████
████████████████████████ *See* General Statement, *supra*.



70.     Dealers locked into the CDK and Reynolds DMS were harmed when Defendants changed their policies to exclude data integrators and force vendors to purchase data integration through 3PA and RCI at inflated prices.

**RESPONSE:** This alleged fact is immaterial because whether some dealers were unhappy about vendor invoices is not evidence of a conspiracy or exclusive dealing, nor evidence of named plaintiff damages in the dealership case.

This alleged fact is also disputed and unsupported. It is disputed and unsupported that dealers have ever been "locked in" to the CDK or Reynolds DMS, *see* Resp. Pls. SOAF 1-2, *supra*, or that Reynolds "changed" its policies during the relevant period. As explained in Defs. JSUF 80-88, Reynolds has prohibited unauthorized third-party access since at least 2006. Similarly, CDK's

standard DMS contracts have prohibited unauthorized third-party access since the 1990s. Defs. JSUF 67. In 2013, CDK advised dealers of the security risk of hostile integration and advised that "changes will be forthcoming" to "conduct your business more securely." Defs. JSUF 144.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ It is also disputed and unsupported that Defendants charged "inflated prices" for their services.

71. Prior to July 2015, CDK never enforced any contractual rights it believed it had to prevent dealers from granting access to data integrators. ████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████

**RESPONSE:** This alleged fact is immaterial because whether and to what extent CDK "enforced" its contractual rights prior to July 2015 is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████

72.     After excluding competition from data integrators, both Reynolds and CDK raised their RCI and 3PA prices (respectively) substantially above competitive levels. Dorris Ex. 151, (Dkt. 977-153), Israel Rep. ¶ 214, tbl. 6 (CDK and Reynolds imposed overcharges exceeding $300 million between 2013 and 2019); Fenske Ex. 79, (Dkt. 975-79), Expert Report of Michael Williams ¶ 163, tbl. 3 (Dealership Plaintiffs' expert economist demonstrating that CDK and Reynolds imposed overcharges to vendors exceeding $360 million between September 2013 and July 2019); Ho Ex. 65, PI Hearing Tr. 2-A-57:6-9, 59:2-9, 61:13-62:21 (service lane app AutoLoop went from paying $39 to the data integrator SIS to paying $735 to CDK and $835 to Reynolds for the same service); id. at 2-A-30:9-15, 32:16-24, 38:24-39:3 (app vendor Dominion Enterprises went from paying $30 to $35 a month to Authenticom to paying $893 to Reynolds and $457 to CDK for the same services); Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 136:4-139:13; Ho Ex. 233, PX 1231 at CDK-0238589 (customer relationship management app DealerSocket's annual 3PA bill tripled in a single year to $13 million, when CDK's 3PA rate increased from $180 to $694);

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████

**PUBLIC VERSION**

**RESPONSE:** This alleged fact is immaterial because whether CDK or Reynolds raised 3PA or RCI prices to different levels three years apart is not evidence of a conspiracy or exclusive dealing.[25]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that Reynolds raised its prices after September 2013 for the reasons stated in response to SOAF 73 below. It further is disputed and unsupported that Reynolds or CDK "excluded competition" from so-called data integrators, or that Reynolds or CDK raised prices above "competitive levels." █

████████████████████████████████████████████████████████████

████████████████████████████████

73.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

---

[25] Defendants object to Plaintiffs' characterization of Defendants' actions as "excluding competition" and of CDK and Reynolds raising prices "substantially above competitive levels." *See* General Statement, *supra*.

**PUBLIC VERSION**



**RESPONSE:** This alleged fact is disputed and unsupported.

It is disputed and unsupported that "Reynolds's financial statements explicitly value the

agreement with CDK ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

It is disputed and unsupported that Israel Figure 7 reports actual Reynolds prices. █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

It is disputed and unsupported that CDK and Reynolds reached any "agreement" in September 2013. *See* Defs. JSUF 102-105.

74.     Reynolds's agreement not to open its system to data integrators was valuable to CDK as CDK prepared to close its own system to data integrators. Ho Ex. 63, PI Hearing Tr. 2P-250:1-7 (Addanki) ("Q. It would have been a valuable thing for CDK – I'm not asking you to give me an estimate of how valuable. But it would be a valuable thing for CDK to have assurances from Reynolds that it does not intend to open its system; correct? A. If you're asking would there be some value greater than zero having that assurance, possibly, yes."); Dkt. 977-153, Israel Rep. ¶ 170 ("Second, with the agreement, CDK could block its DMS with the assurance that Reynolds would not 'flip' strategies to occupy the open competitor spot previously held by CDK."); Dkt. 977-160, Israel Reply Rep. ¶ 113 ("First, and most basically, if CDK is going to block, there certainly is value to an assurance that Reynolds will remain blocked. Even if it [is] unlikely that Reynolds would reverse positions, the agreement provides insurance.").

**PUBLIC VERSION**

**RESPONSE:** This alleged fact is immaterial because an expert's opinion that a hypothetical agreement to eliminate competition would be "valuable" is not a basis for opposing summary judgment. Defs. Auth. Br. 30-31.[26]

This alleged fact is also disputed and unsupported. This statement that there was an "agreement not to open [the Reynolds] system to data integrators" is unsupported and an improper argument. It is disputed that Reynolds agreed "not to open its system to data integrators." *See* Resp. Pls. SOAF 51, *supra*. It is also disputed that any assurances to that effect would have been valuable to CDK because, as explained in Defs. JSUF 88, ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

75.  ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

---

[26] Defendants object to Plaintiffs' characterization that Reynolds had an "agreement not to open its system to data integrators" and that CDK "prepared to close its own system to data integrators." *See* General Statement, *supra*.

PUBLIC VERSION

**RESPONSE:** This alleged fact is immaterial because whether CDK or Reynolds offered quality improvements is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. It is disputed that Reynolds did not offer quality improvements. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████

It is also disputed that CDK did not offer quality improvements in its certified integration program. ███████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████

[REDACTED]

[REDACTED]

76.     CDK forces many vendors in the 3PA program to purchase more data than is necessary, including by requiring vendors that purchase write-back data functionality to purchase other types of integration, regardless of whether they need them. [REDACTED]

[REDACTED]

**RESPONSE:** This alleged fact is immaterial because [REDACTED]

[REDACTED] is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. It is disputed that CDK "forces" vendors to join the 3PA Program or to "purchase more data than is necessary." The terms of the 3PA program are set forth in 3PA Agreements and related Statements of Work, which a vendor chooses to enter into if it wishes to participate in 3PA and the integration is tailored to the vendor's particular needs. *See* Defs. JSUF 25; Defs. JSUF Ex. 50, PX 34 (CDK-0000014).

77.     Since Defendants closed their systems to data integrators, vendors have had no choice but to purchase 3PA and RCI services at the price and terms set by Defendants. [REDACTED]

[REDACTED]

[REDACTED]

**RESPONSE:** This alleged fact is immaterial because whether vendors are "forced" to use 3PA or RCI to service CDK or Reynolds dealers is not evidence of a conspiracy or exclusive dealing.[27]

This alleged fact is also disputed. It is disputed that vendors must purchase RCI or 3PA services from Defendants. As explained in Defs. JSUF 5, Reynolds offers "push" functionality that dealers can use to provide data to vendors. S [REDACTED]

[REDACTED]

---

[27] Defendants object to Plaintiffs' characterization of Defendants as "closing their systems to data integrators," and of vendors as having "no choice" but to purchase integration. *See* General Statement, *supra*.



78.     Aside from CDK and Reynolds, other DMS providers charge $25 to $75 a month for data integration services that are as good or better than the services Defendants offer through 3PA and RCI. ████████████████████████████████████████████████████████████████ ████████████████████████ Ho Ex. 47, Green (Cox 30(b)(6)) Tr. 50:24-51:9 (Cox Automotive provides "real-time API integration" through its OpenTrack program for $55 a month); Ho Ex. 37, Baerg (AutoAlert 30(b)(6)) Tr. 142:23-144:6 (AutoAlert paid Dealertrack $55 a month, with no up-front fees, for bi-directional, real-time data integration through the OpenTrack program); Ho Ex. 40, Perry (DealerSocket 30(b)(6)) Tr. 164:20-167:3 (Brad Perry, the co-founder of the DealerSocket CRM, testifying DealerSocket pays between $50 and $75 a month for real-time, write-back data integration with the DMS providers Dealertrack, PBS, and Quorum); *id.* at 158:18-159:4, 165:3-167:4 (Mr. Perry testifying that, out of all the certified integration programs, 3PA and RCI offer the least functionality at the highest prices); Ho Ex. 46, Johnston Tr. 99:11-102:8 (the service lane vendor IFM Americas pays Dealertrack $25 for certified integration through the OpenTrack program and PBS $37.50 for certified integration); *id.* at 101:15-25 (Dealertrack and PBS allow IFM Americas to automatically create and update repair orders, whereas CDK and Reynolds do not).

**RESPONSE:** This alleged fact is immaterial because whether other DMS providers offer

integration that is cheaper than or comparable to 3PA or RCI is not evidence of a conspiracy or

exclusive dealing.[28]

This alleged fact is also disputed and unsupported in part. It is disputed and unsupported

that other DMS providers offer comparable integration as 3PA or RCI. ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[28] Defendants object to Plaintiffs' characterization of other integration services as "as good or better" than 3PA and RCI. *See* General Statement, *supra*.

79.     Aside from CDK and Reynolds, no other DMS provider blocks dealers from using data integrators if they wish. Dorris Ex. 5, (Dkt. 977-6), Cottrell Decl. ¶ 47 ("Aside from CDK and Reynolds, no other DMS company disables or blocks the login credentials that dealers create for Authenticom."); Dorris Ex. 153, (Dkt. 977-155), Whinston Rep. ¶ 59 ("By contrast [to Reynolds and CDK], other DMS providers, including Dealertrack and Auto/Mate, among others, have adopted more permissive policies for third-party access to their DMSs and/or provide third-party integration at low costs to vendors in an effort to make their overall DMS 'ecosystems' more attractive to dealers. . . . These DMS providers market the 'open' nature of their

systems to dealers as a point of differentiation between themselves and other DMS providers with more secure policies."); *id.* ¶ 75 ("Auto/Mate provides third-party integrators with login credentials to perform dealer-push type data extractions with the dealer's permission.").

**RESPONSE:** This alleged fact is immaterial because other DMS providers' policies regarding third-party access is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed. It is disputed and unsupported that CDK or Reynolds prohibits dealers from using third-party data extractors. Dealers may do so on both DMSs. Pls. Resp. Defs. JSUF 22; Defs. Resp. Auth. SOF 109. CDK and Reynolds only prohibit third parties from directly accessing Defendants' computer systems in violation of the relevant dealer's DMS license. Defs. JSUF 65-67; Resp. Pls. SOAF 30. It is undisputed that different DMS providers have different policies on third-party access. However, other known DMS providers prohibit third-party data extractors from directly accessing their DMS. *See, e.g.*, Defs. Reply Ex. 588, DX 17 (AUTH_00387593) (Talon); Defs Reply Ex. 589, DX 18 (AUTH_00388094) (Talon); Defs. Reply Ex. 586, DX 433 (AUTH_00353807) at -813; Defs. Reply Ex. 583, AUTH_00066783 at -784; Defs. Reply Ex. 584, AUTH_00242042 (NowCom).

80. By blocking data integrators and raising data integration charges to supracompetitive levels, CDK and Reynolds drove out apps (and prevented entry from new apps) that cannot afford the inflated 3PA and RCI fees. Dorris Ex. 2, (Dkt. 977-3), Korp Decl. (detailing harm to small vendor Open Recalls, which helps dealerships track down car owners with unresolved safety recalls);

PUBLIC VERSION

**RESPONSE:** This alleged fact is immaterial because whether "blocking data integrators and raising data integration charges" caused vendors to leave the market or prevented entry is not evidence of a conspiracy or exclusive dealing.[29]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that 3PA or RCI fees were supracompetitive or "inflated." *See* Resp. Pls. SOAF 72, *supra*. It is also disputed and unsupported that CDK or Reynolds "drove out" applications and prevented entry from new applications. Today there are more applications than ever, both within the RCI and/or 3PA programs and outside of those programs. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Plaintiff MVSC, for example, became the dominant market leader in the California EVR market—the largest in the nation—████████████████████████████████████ without being a part of the RCI or 3PA programs. *See* MSUF 62-63. MVSC also has (through its Vitu brand) ███████ market share in Oregon, Caseria Ex. 4, Klein Rpt. ¶ 9, and has recently expanded into Illinois (started processing EVR transactions in 2018), *id.* ¶ 104, Virginia (started processing EVR transactions in 2017), *id.* ¶ 106 and n. 110; and Indiana, Defs. Reply Ex. 631, We

---

[29] Defendants object to Plaintiffs' characterization of Defendants' actions as "blocking data integrators", "raising data integration charges to supracompetitive levels," and "driving out apps" due to "inflated" fees. *See* General Statement, *supra*.

**PUBLIC VERSION**

Are Vitu website printout (website link: https://wearevitu.com/in/). As discussed above, a significant number of app vendors utilize dealer-pushed data using Reynold's Dynamic Reporting tool (including through Authenticom). *See* Defs. JSUF 38-39. CDK provides a number of tools that dealers can use to push data to third-parties, and dealers may automate that process using software they own or operate. Defs. JSUF 22; Resp. Auth. SOF 109.

It is also disputed and unsupported that Open Recalls was "driven out" of the market. Open Recalls' founder Mr. Korp admitted on cross examination that (1) nightly batch data is entirely sufficient for his business; (2) he was not aware that dealers can provide such data for free if they so choose; and (3) he never even inquired about what the pricing would be for batch data service in the RCI or 3PA programs (if he had, he would have learned that such pricing is very modest). *See* Defs. JSUF Ex. 95, PI Hearing Tr. 1-P-201 (once-a-day batch data is all Open Recalls needs), 1-P-203-204 (unaware that dealers can push same data for free), 1-P-205 (Open Recalls has never taken the time to find out RCI prices). T██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ Any statements by Mr. Korp or Mr. Andreu to that effect are unsupported speculation outside their personal knowledge.

81. Defendants have used their control over data integration to give superior service and functionality to their own apps — ████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████ As a result, dealerships using competing applications are forced to manually re-key information into the DMS, resulting in a less efficient and lower quality experience. ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

PUBLIC VERSION

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

████ Ho Ex. 41, East Tr. 166:15-19, 348:19-22 (the loss of repair order functionality would "put[] a huge burden on the dealership to then update their DMS," as a dealership would have to hire a full-time employee to "synchronize repair orders" and the "lack of ability to open and update [repair orders] impacted sales . . . significantly"); ████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether CDK or Reynolds limit certain functionality to their own applications is not evidence of a conspiracy or exclusive dealing.[30]

This alleged fact is also disputed. It is disputed that CDK's 3PA "refresh" initiative "tilted the table" to give CDK applications superior service or functionality. H████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[30] Defendants object to Plaintiffs' characterization of Defendants as having "control over data integration." *See* General Statement, *supra*.

PUBLIC VERSION

**PUBLIC VERSION**



82.     When vendors are forced to switch from other data integrators to Defendants' 3PA and RCI programs, they commonly lose data functionality. ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ho Ex. 65, PI Hearing Tr. 2-A-63:8-17 (Rodeghero) ("I did lose some functionality when I made the transition to" RCI and 3PA. "With the RCI system I lost the ability to make some of the notifications that I do around parts, special order parts orders. I can no longer get the information indicating when I can make those notifications through the RCI program. I also lost the ability to do some pushback information, and with CDK there was some things I lost the ability to do as well."); ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether some vendors no longer have certain functionality when they join 3PA or RCI is not evidence of a conspiracy or exclusive dealing.[31]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that vendors are "forced" to switch to the 3PA or RCI programs. *See* Resp. Pls. SOAF 77, *supra*. It is undisputed that some vendors lose functionality when switching from hostile third-party data extractors to certified integration. However, most vendors gain functionality. *See* Defs. JSUF 8, 11, 22, 25-26; ████████████████████████████████████████████████████

---

[31] Defendants object to Plaintiffs' characterization of vendors as being "forced" to switch to 3PA or RCI, and to vendors as "commonly" losing data functionality. *See* General Statement, *supra*.

[REDACTED]

83.     Defendants' inflated 3PA and RCI fees deprive vendors of resources for innovation and expansion. [REDACTED]

**RESPONSE:** This alleged fact is immaterial because the extent to which certain vendors have resources for innovation and expansion is not evidence of a conspiracy or exclusive dealing.[32]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that Defendants' 3PA and RCI fees are "inflated" or that they prevent vendors from innovating and expanding. Vendors have flourished under the programs. *See*, *e.g*., Defs. Reply Ex. 609, REYMDL00015524, Defs. Reply Ex. 610, REYMDL00015525, Defs. Reply Ex. 611, REYMDL00015526, Defs. Reply Ex. 612, REYMDL00015527, Defs. Reply Ex. 613,

---

[32] Defendants object to Plaintiffs' characterization of Defendants 3PA and RCI prices as "inflated" or as "depriving" vendors of resources. *See* General Statement, *supra*.

REYMDL00015528, Defs. Reply Ex. 614, REYMDL00015529, Defs. Reply Ex. 615, REYMDL00015530, Defs. Reply Ex. 616, REYMDL00015531, Defs. Reply Ex. 617, REYMDL00015532, Defs. Reply Ex. 618, REYMDL00015533, Defs. Reply Ex. 619, REYMDL00015534 (testimonials from RCI customers extolling the benefits of the program to their businesses); ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████ It is further disputed that electronic vehicle registration (EVR) providers are hampered by the 3PA or RCI programs. For example, TitleTec has been in RCI since 2010 and provides EVR services in six states: Florida, Georgia, Virginia, Maryland, Pennsylvania, and South Carolina. TitleTec has been the leading EVR provider in Georgia, ███████████████ of Georgia's total EVR transactions, and has the exclusive endorsements of the automobile associations in Georgia and Florida. *See* MSUF 37.

TitleTec expanded into certain states, South Carolina for example, after joining RCI in 2010. █████

█████████████████████████████████████████████████████████████████████

█████████████████████ EVR provider DLRdmv has been in RCI ███████████████████ and

provides EVR services in Georgia and Florida (███████████████████████). MSUF

39. EVR provider DDI Technology (also known as Decision Dynamics, Inc.) has been in RCI

since ██████ and provides EVR services in South Carolina (where it has the exclusive endorsement

of the South Carolina dealers association), Florida, Georgia, and Indiana. *Id.* 41. Furthermore,

Plaintiff MVSC became the dominant market leader in the California EVR market – the largest in

the nation – with ███████████████████████████████████████████████████

██████████████████████ *See id.* 62-63 and Resp. MSUF 62-63 (MVSC responses thereto).

MVSC also has (through its Vitu brand) a ████ market share in Oregon, Caseria Ex. 4, Klein Rpt.

¶ 9, and has recently expanded into Illinois (started processing EVR transactions in 2018), *id.* ¶

104, Virginia (started processing EVR transactions in 2017), *id.* ¶ 106 and n. 110; and Indiana,

Defs. Reply Ex. 631, We Are Vitu webpage printout (website link: https://wearevitu.com/in/).

     84.    Defendants' exclusion of data integrators and resulting control over access to dealer data has helped them prevent software applications from taking over functions traditionally performed by the DMS





[redacted]

**RESPONSE:** This alleged fact is immaterial because whether CDK or Reynolds has sought to compete against vendor applications that offer functionality that is similar to functionality traditionally offered by the DMS is not evidence of a conspiracy or exclusive dealing.[33]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that Defendants have "excluded" so-called data integrators or taken "control over access to dealer data." It is further disputed that Defendants have "prevent[ed] software applications from taking over" functions traditionally performed by the DMS. *See* Resp. Pls. SOAF 80-83, *supra*.

85. Both CDK and Reynolds reject vendors they deem too small to participate in the 3PA and RCI programs, which deprives small and start-up vendors of the ability to obtain automated data integration services with respect to dealers that use Defendants' DMSs. [redacted]

**RESPONSE:** This alleged fact is immaterial because, even if CDK or Reynolds had "reject[ed] vendors they deem too small to participate in the 3PA and RCI programs," that would not be evidence of a conspiracy or exclusive dealing.[34]

This alleged fact is also disputed and unsupported in part. During the relevant period, CDK had a special program for vendor startups called Innovation Catalyst, which "lowers the cost of

[33] Defendants object to Plaintiffs' characterization of Defendants actions as "excluding competition" or taking "control over access to dealer data." *See* General Statement, *supra*.

[34] Defendants object to Plaintiffs' characterization of Defendants as deeming vendors "too small" to participate or as "depriving" vendors of the ability to obtain integration. *See* General Statement, *supra*.

entry into the CDK Partner Program for startups and other solution providers serving the automotive retail industry and other adjacent markets. Key features of Innovation Catalyst include reduced minimum monthly fees and a phased approach to upfront integration development fees based on the partner company's rate of growth." *See* Defs. Reply Ex. 629, https://www.cdkglobal.com/us/media-center/rollick-outdoor-joins-cdk-global-partner-program-through-new-innovation-catalyst. ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

The exhibits cited do not support the alleged fact asserted. ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████

86.     Defendants' data access restrictions and supracompetitive prices have harmed innovation and degraded the customer experience at dealerships across the country. As Brad Miller of the National Automobile Dealer Association explained in a presentation at the 2018 NADA conference:

> [T]he biggest thing I hear from dealers [is] a frustration that they can't provide the customer experience that they want because they can't get the information back and forth, right? . . . [F]olks have to enter data nine and 10 times in the course of selling a car. And that's crazy. It increases customer frustration. It paints dealers with this brush that we're technological dinosaurs.
>
> I was on a panel with a gentleman in fact last year at a large dealer group who made the following point. He said look, I go get a $4 chicken sandwich and the way I buy that is different today. I can do it online. I get there. They've got an iPad. They swipe my card and my chicken sandwich is ready when I go. They may even know

what my normal order is and provide it to me. At the same time, the way that we run customers through the service line hasn't changed in 25, 30 years and so there's an increasing frustration. This [is] all tied to the information you have and how it gets back and forth with third parties, how it is shared, how it is stored, how do systems talk to each other.

Ho Ex. 164; PX 778 at NADA-101207 at 2; Dorris Ex. 87, (Dkt. 977-89), PX 1036 (letter from the Open Secure Access group, of which CDK was a member, stating that "progressive DMS companies" with open DMSs are "actively contributing to facilitating innovation and increasing dealer profitability"; however, "[r]estrictive data practices have the opposite effect *and* they hurt dealers.").

**RESPONSE:** This alleged fact is immaterial because whether Defendants' policies have "degraded" the customer experience at dealerships is not evidence of a conspiracy or exclusive dealing.[35]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that 3PA or RCI fees were supracompetitive or that Reynolds's or CDK's data access policies have "harmed innovation and degraded the customer experience at dealerships across the country." *See* Resp. Pls. SOAF 72, 80-84, *supra*. The quotation attributed to Mr. Miller is inadmissible hearsay attributed to an unnamed dealer whose DMS provider is not even specified, and does not explain any connection between the subject matter of the quote and any action complained about in this case. *See* Ho Ex. 164. Dorris Ex. 87 does not support the stated proposition. ███████

████████████████████████████████████████████████████

█████████████████████████████████████

87.    Defendants' strategy starting no later than September 2013 was to destroy Authenticom's business. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[35] Defendants object to Plaintiffs' characterization of Defendants' prices as "supracompetitive" or of their prices or data access restrictions as having "harmed" vendors. *See* General Statement, *supra*.



**RESPONSE:** This alleged fact is immaterial because ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

is not evidence of a conspiracy or exclusive dealing.[36]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that Defendants shared any strategy regarding Authenticom in September 2013 or at any other time. Plaintiffs' characterization of isolated statements and deposition testimony by individual employees or application vendors does not show that either Reynolds or CDK wanted to "destroy" Authenticom in September 2013. Indeed, in 2015 and 2016 Reynolds worked with Authenticom to indicate that Reynolds dealers were permitted to export and push data to Authenticom using Dynamic Reporting, and to this day Authenticom does significant business on the Reynolds platform. Defs. JSUF 5, 39. ███████████████████████████████

███████████████████████████████████

88.     After Mr. Cottrell gave an industry presentation on "data taxes" and "technological blockages" in January 2016, ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

---

[36] Defendants object to Plaintiffs' characterization of Defendants' strategies as to Authenticom's access being to "destroy" Authenticom or its business. *See* General Statement, *supra*.



**RESPONSE:** This fact is immaterial because ███████████████████████ is not

evidence of a conspiracy or exclusive dealing.

It is undisputed that a CDK employee created the excerpted image and that CDK

employees made the statements that are quoted in this fact.

89.     The growth of Authenticom's connections on both the CDK and Reynolds systems
slowed after Defendants' September 2013 agreement; Authenticom's connections on both the
CDK and Reynolds systems decreased sharply after the February 2015 agreements; and
Authenticom's CDK connections decreased even more sharply in mid- to late-2016 after CDK
began using technological measure to disrupt and block Authenticom's access. Fenske Ex. 74,
(Dkt. 975-74), Expert Report of Catharine Lawton ("Lawton Rep.") ¶¶ 433-448. Authenticom's
connections are reflected at paragraph 443, Figure 8.3 of the Lawton Report:

**PUBLIC VERSION**



**RESPONSE:** This alleged fact is disputed and unsupported.

The statements in this alleged fact are disputed and unsupported because they rely entirely on Ms. Lawton's analysis which, as Defendants have explained, is inadmissible because it relies on an unreliable methodology to calculate "connections" (among other things). *See* Dkt. 880, 1029. Even taking Ms. Lawton's numbers as accurate, her analysis does not show ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Figure 8.3. Finally, it is disputed and unsupported that CDK and Reynolds reached any "agreement" in September 2013. Defs. JSUF 102-105.

90.     Authenticom has suffered substantial financial harm resulting from Defendants' conduct described above. Authenticom saw consistent and rapid growth from its founding 2002 until 2013, when "Authenticom['s] financial performance experienced a marked decline"; Authenticom's annual revenue fell from ████████████████████████ in 2018. Fenske Ex. 74, (Dkt. 975-74), Lawton Rep. ¶¶ 307-313, 321, 326. Effective February 2018, Authenticom laid off more than 60% of its staff, bringing its 120-person workforce down to 35 employees. *Id.* at ¶ 325. Overall, Authenticom has suffered at least $115.8 million in lost profits as a result of Defendants' conduct. *Id.* ¶ 22(c).

**RESPONSE:** This alleged fact is disputed and unsupported.[37]

It is disputed and unsupported that Authenticom suffered financial harm for the reasons explained in Defendants' pending *Daubert* challenge to Ms. Lawton. *See* Dkt. 880, 1029. In addition, to the extent this alleged fact implies a legal conclusion that Defendants' "conduct" was the cause of any injury, that legal conclusion is vague and improper, and incorrect as explained in Defendants' summary judgment briefs. *See* Defs. Auth. Br. 56-64; Defs. Auth. Reply 28-31.

91.     Reynolds would periodically disable Authenticom's user credentials over a period but would then stop doing so for periods of time, without any change by Authenticom in its software or process. For example, Authenticom experienced disabling of its user credentials in mid-2013; that stopped occurring around December 2013 without any changes by Authenticom in its process. *See* Wilkinson Ex. 79 [Dkt. 782-30] at -412 (noting "the start of another 3 month cycle R&R undergoes to antagonize their ever-shrinking dealerbase"); Dorris Ex. 80 [Dkt. 977-82] at -989.007 ("History shows us that when R&R's disruptions are more than temporary/nuisance in nature, they find themselves forced to back off and cooperate."); Dorris Ex. 98 [Dkt. 977-100] ("We have seen these lock out situations occur with Reynolds periodically — about 1X per year."); Ho Ex. 475, AUTH00171748 (November 2013: "It looks like lockouts are abating, so we're in that portion of the cycle again. I believe we'll be in an R&R/dealer/vendor armistice for the next 6 weeks or so. They typically slow down hostility before NADA as not to anger the natives all too much."); Ho Ex. 476, DX 1076, AUTH_00149741 (April 2014: "[W]e have not seen any major lockouts since the end of 2013 on our side."); ████████████████████████████████████████ ████████████

---

[37] Defendants object to Plaintiffs' characterization of Authenticom's harm as "substantial" and as "resulting from Defendants' conduct," and to Authenticom as seeing "consistent and rapid growth." *See* General Statement, *supra*.

**RESPONSE:** This alleged fact is immaterial because whether or not Reynolds applied its security enhancements in a cyclical manner is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed and unsupported in part. It is undisputed that Reynolds would periodically release new security enhancements that could affect hostile data extractors,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ It is disputed and unsupported that Reynolds would "stop" ████████████

█████████████████████ "without any change by Authenticom in its software or process." *See, e.g.*, Defs. JSUF Ex. 95, PI Hearing Tr. 1-P [Auth. Dkt. 162] at 44 (Testimony of S. Cottrell) (admitting that from 2010 to 2017, Reynolds had been "actively blocking" Authenticom and Authenticom "does what it can to get around those blocks"); Authenticom Mot. for P.I. at 8 [Auth. Dkt. 61] (stating that Authenticom worked to "develop workaround solutions that circumvented Reynolds's efforts to block access"); ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

92.     Regulations in some states, such as California and Illinois, cap the fees or effectively cap the fees that EVR providers can charge. Ho Ex. 4, Nemelka Tr. 94:11-95:4 (dealers

can charge car buyers no more than $25 per EVR transaction; of that $25, EVR providers can collect up to $10 for their services, with dealers collecting the remaining $15), *id.* 96:14-98:10 (in California, EVR providers generally charge dealers, at most, $30 per EVR transaction: $5 of which goes to the DMV, the remaining $25 of which goes to the EVR provider); *see also* Ho Ex. 52, Medina (CVR 30(b)(6)) Tr. 91:11-15 ████████████████████████████

████████████████████

**RESPONSE:** This fact is undisputed.

It is undisputed that California and Illinois have regulations that cap or effectively cap fees that EVR providers can charge. For completeness, Nemelka's testimony above, Ho Ex. 4, Nemelka Tr. 94:11-95:4, that dealers can charge car buyers no more than $25 per EVR transaction (of which EVR providers can collect up to $10 for their service) was in reference to EVR fees in the State of Illinois.

93. In states where EVR transactions must be initiated at the point-of-sale, such as Illinois, Virginia, and, as of January 2019, California, EVR providers require, at a minimum, near real-time access to data on DMS — which until recently could only be provided through independent integrators or DMS's certified access programs. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 8 ("In some states in which MVSC operates, including Virginia, Illinois, and now, as of January 2019, California, EVR applications must initiate the electronic vehicle registration process at the point of sale in a dealership. That requirement in turn means that EVR providers must have, at minimum, near real-time access to data."); Ho Ex. 31, Armstrong (Individual) Tr. 264:12-265:18 (independent integrators and certified integration programs are the only means of real-time data access to the DMS); ██████████████████████████████████████████; *see also* Ho Ex. 4, Nemelka Tr. 201:8-24 ("Q. [W]as there something that caused MVSC to get back to Reynolds in August of 2014 after you had taken MVSC out of the process in February . . . of 2014? . . . A. Yes. Q. What was the reason? A. We realized we wouldn't be able to do business in Illinois unless we had access — or we participated in the RCI program to be able to provide service to Reynolds dealerships in Illinois. Q. So it was specifically about concerns relating to the Illinois EVR market? . . . A. As best I recall, yes."); *see also* Ho Ex. 31, Armstrong (Individual) Tr. 263:23-264:10 ("In Illinois we really, really needed that realtime integration to be an effective competitor in that state. . . . So without that realtime integration and not having a history of being able to do this, we're ineffective. There is no way to compete.").

**RESPONSE:** This alleged fact is disputed in part and unsupported in part.

It is undisputed that Illinois, Virginia and as of January 1, 2019, California, require EVR transactions to be initiated at the point-of-sale, *i.e.*, registration, plates, and/or title must be processed at the time of sale of a vehicle at the dealership.

It is disputed and unsupported that in states where EVR transactions must be initiated at the point of sale, *i.e.*, at some point during the long car-buying process, that EVR providers are required to have what MVSC calls "near real-time" or "real-time" access to DMS data; the fact is unsupported other than the bare, unsubstantiated assertion in Joe Nemelka's declaration which is insufficient. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 8; ███████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ Reynolds is not aware of any statutes or regulations in Illinois, Virginia, or California which require EVR providers to have so-called "near real-time access" to DMS data and MVSC has not cited any. MVSC does not define or otherwise explain what it means by "near real-time" access, including how it materially affects the process of completing EVR transactions in point-of-sale states as compared to access that is not, according to MVSC, "near real-time."

In fact, the evidence directly contradicts MVSC's statement that so-called "near real-time" access is needed in point-of-sale states. ██████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████

**PUBLIC VERSION**

████████████████████████████████████ In fact, free manual reporting tools provided by Reynolds were sufficient for MVSC to begin processing EVR transactions in Virginia ████ ████ before it developed Electron (in October 2017). Resp. Pls. SOAF 116, *infra*.

Other EVR providers have been providing EVR services in point-of-sale states without "real-time" or "near real-time" data access. █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Reynolds's MSUF 21; Defs. JSUF Ex. 71, Bresnahan Rebuttal Rpt. ¶¶ 361-63. Dealertrack RTS provides EVR services in 15 states, including point-of-sale states such as Illinois, Virginia and California. ██████████████████████████

████████████████████████████████████████

Although "near real time" is undefined, it is also disputed that hostile third parties were able to provide MVSC with "near real-time" data access. ██████████████████

████████████████████████████████████████████████████

██████████████████████████████

Although "near real-time" is undefined, it is also disputed that "near real-time" access can only be provided through certified integration. MVSC admits that it developed a software tool called Electron which, according to MVSC, works in conjunction with manual reporting tools to allow MVSC to access data in "near real-time." Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 9; Resp. MSUF 18.

94.    Because MVSC's manual workaround tools did not historically provide MVSC with near real-time data access sufficient to process EVR transactions in point-of-sale states, it was not until MVSC developed Electron in late 2017 that it was able to access data — albeit still manually — at sufficient near-real-time speeds to operate in those states. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶ 6-11 (MVSC was not able to use manual reporting tools to access data at near real-time speeds for point-of-sale states until developing Electron in late 2017; "[d]espite our

diligent efforts ... we were unable to develop this solution any sooner because the software development process was complex and resource intensive"); Ho Ex. 4, Nemelka Tr. 202:10-203:1 (testifying that the DMS's built-in "reporting tools do not allow for real-time access and the data to be pulled immediately into our system" for purposes of processing a transaction at the point of sale); Ho Ex. 402, MVSC_MDL_0041446 at -1447 (June 2016 meeting notes observing that "[o]perational issues" are an impediment to MVSC's development of a viable EVR solution in Illinois, and, specifically that MVSC does not "yet have real-time integration"); Ho Ex. 428, MVSC_MDL_0079497 at -9498 ("We are all ready to release the latest version of Electron (for VITU) . . . This is a significant step we are making in the process of (semi) automating the report generation process for customers outside of CA and OR. *This was the need of the hour in VA and IL.")* (emphasis added); Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 41, 44 (summarizing evidence that MVSC was not able to use manual reporting tools in Illinois and Virginia until developing Electron in late 2017).

**RESPONSE:** This alleged fact is disputed in part and unsupported in part.

It is undisputed that MVSC developed a software tool called Electron in October 2017. It is disputed and unsupported that EVR transactions, which must be initiated at the point of sale, *i.e.*, at some point during the long car-buying process, require so-called "near real-time" or "real-time" access to DMS data; the fact is unsupported other than the bare, unsubstantiated assertion in Joe Nemelka's declaration which is insufficient. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 8; *see also* Defs. JSUF Ex. 71, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Reynolds is not aware of any statutes or regulations in Illinois, Virginia, or California which require EVR providers to have "near real-time access" to DMS data and MVSC has not cited any. MVSC does not define or otherwise explain what it means by "near real-time" access, including how it materially affects the process of completing EVR transactions in point-of-sale states as compared to access that is not, according to MVSC, "near real-time."

In fact, the evidence directly contradicts MVSC's statement that so-called "near real-time"

access is needed in point-of-sale states. ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

It is disputed that MVSC was not able to operate in point-of-sale states until it developed

Electron. ███████████████████████████████████████████████████████

███████████████████████ MSUF 64; *see also* Resp. Pls. SOAF 116, *infra*.

It is undisputed that MVSC did not begin processing EVR transactions in Illinois until

early 2018, but disputed that the delay was caused by MVSC's inability to access data until

Electron was developed. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ MSUF 72-77; Resp. Pls. SOAF 113, 114, *infra*.

For completeness, California did not become a point-of-sale state until January 1, 2019,

after MVSC developed Electron in 2017. Resp. MSUF 6.

95.    In total, CVR processes ███████████ vehicle transactions each year and
generates approximately █████████ in annual revenues. Ho Ex. 52, Medina (CVR 30(b)(6)) Tr.
13:20-22. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because CVR's revenues are not evidence of a conspiracy, impact, or damages.

This alleged fact is also disputed in part. It is undisputed that CVR generates approximately ████████ in annual revenues; ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

It is disputed to the extent suggested that ██████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

123

████████████████████████████████████████████████████

███████████████

It is disputed to the extent suggested that MVSC entered Illinois at some point in 2015:

MVSC was not approved by the State of Illinois to provide EVR services ███████████████

████████████████████████████████████████████. MSUF 72-77; Resp.

Pls. SOAF 113, 114, *infra*.

96. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

**RESPONSE:** This fact is immaterial because CVR ████████████████████████

████████████████████████████████ is not evidence of a conspiracy, impact, or

damages.

It is undisputed that CVR ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

124

███████████████████████

97. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

**RESPONSE:** This alleged fact is immaterial because ██████████████████████

████████████████████ is not evidence of a conspiracy, impact, or damages.

This alleged fact is also disputed and unsupported in part. It is undisputed that beginning

in the 2000s, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

98.     MVSC entered the California market with a user-friendly web-based product and a customer service model that focused on providing extensive customer support. Ho Ex. 398, MVSC_MDL_0027566 at -7567.009 (MVSC: describing MVSC's product as a "user friendly and intuitive web based platform customized to the rules, regulations & processes of the state"); Ho Ex. 4, Nemelka Tr. 105:22-106:10 ("Q. . . . [W]hat are the . . . areas where MVSC tries to differentiate itself from other EVR providers? A. Our software, our product and our service. Q. And — and when you say your software, how — how does MVSC think that its software is — is better or different from other EVR providers? A. It's faster. It's more efficient. It's more compliant. There's less data entry. There's software validation tools to prevent errors. . . . it's more stable, software uptime, network speed."), *id.* 384:6-12 ("[W]e understand that we provide . . . a much better product. We provide much better service. Our dealerships have a much happier . . . they are much more satisfied using us . . . than any other competing provider."); Caseria Ex. 35 (Dkt. 957-35), ████████████████████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether MVSC had a web-based EVR solution and what level of customer support it provided is not evidence of a conspiracy, impact, or damages.

This alleged fact is also disputed and unsupported in part. It is undisputed that MVSC entered the California EVR market with a web-based EVR solution and provided customer support in California. It is disputed and unsupported that MVSC's customer service model "focused on providing extensive customer support."

99.     

other programs started hitting the market our stores couldn't move away from CVR fast enough,

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████

**RESPONSE:** ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

100.   ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

**RESPONSE:** This alleged fact is disputed as phrased.

It is undisputed that MVSC ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

It is disputed to the extent suggested that ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

101.   ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

**RESPONSE:** This alleged fact is disputed in part and unsupported.

PUBLIC VERSION

As stated in Reynolds's concurrently filed reply brief in support of summary judgment in *MVSC*, at 8 n.7, ███████████████████████████████████████ is inadmissible hearsay as to Reynolds. It is disputed that in ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ Disputed to the extent suggested that ████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

102.  ████████████████████████████████████████

██████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████
███████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

**RESPONSE:** This fact is immaterial because ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ is not evidence of a conspiracy, impact, or damages; Reynolds

owned 20% of CVR and CDK owned 80%, and communications between Reynolds, CDK, and/or

CVR concerning CVR were necessary and legitimate.

It is undisputed that ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

103.  ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████

**RESPONSE:** This fact is immaterial because ████████████████████████

█████████████████████████████ is not evidence of a conspiracy, impact, or damages;

communications between Reynolds, CDK, and/or CVR concerning CVR were necessary and

legitimate.

████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████

████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████

It is disputed to the extent suggested that ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

    104. ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

**RESPONSE:** This alleged fact is disputed and unsupported.

It is disputed and unsupported that ███████████████████████████████

PUBLIC VERSION

██████████████████████████████████████████████████

████████████████████████████████████████

It is disputed that any of the emails included in this alleged fact, Ho Ex. 221, PX 1105; Ho

Ex. 130, PX 498; Ho Ex. 131; PX 499, i███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

The individuals in this chain of communications ███████████████████████

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ MVSC's lack of certified integration with

Reynolds was a matter of public knowledge, ██████████████ because Reynolds publishes its

RCI participant list on its website. Caseria Ex. 157, RCI Third Party List (Reynolds's website

listing all RCI participants).

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

Finally, Reynolds never blocked MVSC from RCI: ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

    105.  ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████ ).

**RESPONSE:** This fact is immaterial because ████████████████████████

████████████████████████████████████████████████

████████████████████████ is not evidence of a conspiracy with Reynolds.

135

It is undisputed that w█████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

106. ███████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial ████████████████████

██████████████████████████████████████████████ is not evidence

of a conspiracy with Reynolds.

It is undisputed that ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ It is disputed and unsupported that ██████████████████

██████████████████

107. ███████████████████████████████████████
████████████████████████████████████████████████████████

136

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████

**RESPONSE:** This alleged fact is immaterial because ████████████████████

████████████████████████████████████████████████

█████████████████████ is not evidence of a conspiracy with Reynolds.

This fact is also disputed and unsupported in part. It is undisputed that ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ t is disputed and unsupported that ████

████████████████████████████████

108.     When MVSC applied for membership in RCI, the terms Reynolds proposed in 2014 were unreasonable and economically infeasible for MVSC. Ho Ex. 394, MVSC_MDL_0003940 at -3940 (MVSC: "We did crunch the numbers based upon the prices below and we can't figure out how to make it profitable without passing the cost onto the dealerships, which we aren't willing to do at this stage. . . . To be clear, our desire is to participate in the RCI program, but financially it is impossible for us."); Ho Ex. 4, Nemelka Tr. 210:13-211:6 ("We could not profitably figure out how to make those prices work in many of the states that we were operating."); Ho Ex. 31,

Armstrong (Individual) Tr. 151:3-12 ("[T]he volume times the amount of money we make in some dealerships . . . [meant] we lost money. Meaning that the monthly cost for that connection was more than we made in a dealership."); *see also* Ho Ex. 423, MVSC_MDL_0069963 at -9969 (Dealertrack integration agreement charging "$25 per dealer customer" per month for integration); Ho Ex. 421, MVSC_MDL_0069938 at -9951 (Autosoft integration agreement charging monthly dealer support fee of "$35/dealer for a certified interface with two (2) APIs"); Ho Ex. 422, MVSC_MDL_0069961 at -9961 (Authenticom statement of work charging MVSC $35 per rooftop per month); Ho Ex. 478, MVSC_MDL_0021778 at -1794 (SIS statement of work charging MVSC's $71 per rooftop per month); *cf.* Ho Ex. 20, Goroff (TitleTec 30(b)(6)) Tr.26:7-27:17 ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Dorris Ex. 158 (Dkt. 977-160), Israel Reply Report ¶ 241 ("[o]ne version of [anticompetitive collusion] can certainly be to exclude a competitor seen to pose a particular competitive threat, rather than all competitors."), *id.* ¶ 243 (opining that it is "flawed" reasoning to assume that prices charged to other EVR providers cannot be exclusionary).

**RESPONSE:** This alleged fact is immaterial for several reasons: (1) MVSC's opinions regarding whether RCI fees were "unreasonable and economically infeasibile" for MVSC is not evidence of a conspiracy involving Reynolds; (2) the prices MVSC paid to non-parties are not evidence of a conspiracy involving Reynolds; (3) ███████████████████████ are not evidence of a conspiracy involving Reynolds.

This alleged fact is also disputed and unsupported. It is disputed and unsupported that RCI terms Reynolds proposed to MVSC in 2014 were "unreasonable and economically infeasible for MVSC." ████████████████████████████████████████████████████████ ████████████████████████████ *See* MSUF 28, 29, 33 and MVSC's Resp. to same; Caseria Ex. 2, Israel Reply Rpt. ¶ 243 ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

It is undisputed that TitleTec has been in RCI

TitleTec provides EVR services in six states: Florida, Georgia, Virginia, Maryland, Pennsylvania, and South Carolina.

and has the exclusive endorsements of the automobile associations in Georgia and Florida.

.

109. CDK, CVR, and Reynolds have marketed MVSC's lack of access to certified integration to CVR's advantage; they have also sought to impugn MVSC's reliance on "non-certified" means of access (i.e., independent integrators or manual workarounds) as "insecure" and "hostile."

139



Ho Ex. 31, Armstrong (Individual) Tr. 196:7-197:9 (describing how CDK, CVR, and Reynolds "will do everything they can to communicate to [a] dealership, hey, DMVdesk is not an RCI certified provider or is not a 3PA provider"), *id.* 267:4270:9 (testifying that MVSC would hear about dealers being threatened by CDK, Reynolds, and CVR that their use of MVSC was in violation of their DMS contract).

**RESPONSE:** This alleged fact is immaterial because communications and efforts by and among Reynolds and CDK, the co-owners of CVR, to promote and market their joint venture is not evidence of an unlawful conspiracy.

It is undisputed that as a 20% owner of CVR, Reynolds did at times help promote and market CVR's EVR services to dealers that used Reynolds's DMS. Likewise, CVR at times leveraged its joint-venture relationship with Reynolds to market its EVR services.

Disputed and unsupported that Reynolds marketed MVSC as "insecure" or "hostile" based on MVSC's use of Reynolds's own manual reporting tools. It makes no sense that Reynolds would tell dealers that tools built into Reynolds's own DMS, that Reynolds developed and offered to its dealers, were "insecure" or "hostile." Also disputed and unsupported by the evidence cited that either CDK or CVR marketed MVSC's use of manual reporting tools as "insecure" or "hostile."

Disputed to the extent suggested that CDK, CVR, and Reynolds jointly marketed MVSC's lack of certified integration to CVR's advantage, which is not supported by the evidence.

110. CDK has blocked MVSC from using independent integrators, forcing MVSC to transition CDK dealers to a manual workaround.



Ho Ex. 403, MVSC_MDL_0050251 at -0251 (MVSC: "Yes, [CDK] [is] calling dealerships regarding how DMVdesk connects and if we are using SIS, Authenticom, Dealervault, etc they are telling them they are disconnecting those."); Ho Ex. 404, MVSC_MDL_0050387 at -0388 (MVSC: "Laurie Wondolowski the CFO from the CA Car Group just called me and said that an executive regional sales manager from CDK called to tell her personally that DMVDESK has not renewed an agreement with CDK and that they will no longer support the DMVDESK connection to CDK."); Ho Ex. 408, MVSC_MDL_0050833 at -0833 (Browning Automotive Group: "I know we discussed in length DMVDesk access to the information on CDK. DMVDesk accesses through Proquote at this time and that access will cease soon, as CDK will not allow them into our box."); Ho Ex. 418, MVSC_MDL_0068311 at -8311 (Sunroad Automotive Group: reporting that CDK has shut down MVSC's access to data through DealerVault); Caseria Ex. 25 (Dkt. 957-25), DX 99 at MVSC_MDL_0009709 (CNCDA: "I spoke with Dave Moeller [of the City Toyota dealership group] today and he indicated that the AVRS crowd is misleading dealers . . . and, more importantly, is threatening to 'lock out' dealers on DMVdesk."), *id.* at -9708 (MVSC: "[CDK and CVR] are 'locking out' the vendors we are using to get the data from the DMS. One large dealership group was locked out yesterday . . ."); Ho Ex. 405, MVSC_MDL_0050390 (referring to effort to convert CDK dealers using SIS for integration to manual import method); Ho Ex. 17, Bulusu Tr. 266:20-267:11 (discussing MVSC's efforts to convert CDK dealers using SIS for integration over to the manual import method); Ho Ex. 31, Armstrong (Individual) Tr. 185:15-186:14 ("[T]here was a big road show effort to go out and meet with every single dealer to tell them we're not going out of business. . . . [B]ut we still lost dealers, and we still lose dealers today."), *id.* 246:5-249:9 (testifying in part regarding the "chaos" and "confusion" the SIS shutdown letter caused in the EVR marketplace"); Ho Ex. 407, MVSC_MDL_0050807, at -0807 (discussing MVSC's efforts to convert CDK dealers using automated integrators to the manual import option).

**RESPONSE:** This fact is immaterial because CDK's unilateral efforts to prevent unauthorized access to its own DMS—with no involvement by or communications with Reynolds and years apart from Reynolds—is not evidence of a conspiracy.

It is undisputed that in 2016 CDK deployed various security measures to prevent unauthorized access to its DMS. *See* Defs. JSUF 159. It is undisputed that CDK never blocked

MVSC or its dealer customers from using its free manual reporting tools to access data from a CDK DMS; also undisputed that ███████████████████████████ MSUF 16, 20.

111.    MVSC's manual workarounds, including Electron, are inferior to automated integration through independent integrators or "certified" access programs because they are slower and more error-prone. ████████████████████████████████

███████████████████████████████████████████████████ 154:11-20 (describing the "lack of accuracy" and "lack of efficiency" of manual workarounds).

**RESPONSE:** This alleged fact is immaterial because whether MVSC's own software tool Electron ██████████████████████████████████████████████████ is not evidence of antitrust injury or damages.

This alleged fact is also disputed and unsupported. It is disputed and unsupported that free manual reporting tools provided by DMS providers, either used in conjunction with Electron or not, are inferior to certified integration because it is "slower," ██████████████████████ ███████████████████ MVSC has specifically alleged at the outset of this case that manual reporting has allowed MVSC to effectively "compete in the California EVR market based on the quality of its products and services." MVSC's Second Amended Complaint, MVSC Dkt. 76 ("MVSC SAC") ¶ 9; *see also id.* ¶ 73 (every EVR provider in California besides CVR has been able to provide EVR services in California by obtaining necessary data by means other than certified integration). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**PUBLIC VERSION**

Caseria Ex. 58, MVSC_MDL_0083475 at

475. Furthermore, by 2017, MVSC had developed the latest release of its software tool, Electron,

which, according to MVSC, works in conjunction with manual reporting to enable so-called "near

real-time" access to DMS data. MSUF 18.

It is also disputed that free manual reporting tools provided by DMS providers, either used

in conjunction with Electron or not, are inferior to hostile integration.

112. MVSC's lack of access to data through "certified" integration or independent

integrators has caused it to lose dealership customers in California and has slowed its growth in

the state. ███████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ *id.* D.9 (charting
MVSC's market share over time); Ho Ex. 429, MVSC_MDL_0082956; Ho Ex. 410,
MVSCMDL_0052582; Ho Ex. 406, MVSC_MDL_0050710; Ho Ex. 78, Email from E. Partida to
K. Kimball, et al., "Re: Fwd: FLSP change" (4/28/15); Ho Ex. 409, MVSC_MDL_0051377; Ho
Ex. 79, Email from J. Nemelka to S. Jackley and T. Fricker, "DMVdesk – AB 516 & UCS (RCI)"
(12/11/18) ("David Wilson Auto Group –Vitu Mail – DMVdesk – AB 516_UCS (RCI).pdf."); Ho
Ex. 400, MVSC_MDL_0040451; Ho Ex. 479, Email from S. Canterberry (Title Clerk) to R.
Skolnick, "Fwd: Thank You For Your Time" (6/12/15) ("Barber Honda-Acura.pdf); Ho Ex. 480,
Email from E. van Nieuwberg to J. Nemelka, "Fwd: Maita Automotive and CDK" (8/8/19) (see
"Maita Auto Group 2nd.pdf.); Ho Ex. 481, Email from J. Capponi to L. Perine, et al., "DMV Desk
Third Party Access For RPM (3/2/18) (see "Sonic Automotive - Vitu Mail - Fwd_ DMV Desk
Third Party Access.pdf."); Ho Ex. 4, Nemelka Tr. 238:16-24; Ho Ex. 31, Armstrong (Individual)
Tr. 229:16-17; *see also* Dorris Ex. 151 (Dkt. 977153), Israel Report ¶ 192 ("From an economic
perspective, reductions in consumer choice and reductions in product quality may result in
competitive harm.").

**RESPONSE:** This alleged fact is disputed and unsupported.

It is disputed that MVSC's lack of access to certified integration has caused it to lose

dealership customers in California and slowed its growth in that state. From the outset, MVSC

has explicitly pled in its complaint that "[r]eal-time access to dealer data (and participation in the

3PA and RCI programs) has therefore not been necessary in California." MVSC SAC ¶ 9. MVSC

also pled that California was a competitive environment: "As a result, MVSC was able to compete

in the California EVR market based on the quality of its products and services[.]" *Id.* ████████

███████████████████████████████████████████████

███████████████████████████████████████ Pls. SOAF 99; MSUF

62-63 and MVSC's Resp. to same. California also did not have point-of-sale requirements until

145

**PUBLIC VERSION**

January 1, 2019, and by that time, MVSC had already developed Electron to be used in conjunction with manual reporting tools which, MVSC allowed it "near real-time" access to data to process EVR transactions in point-of-sale states. MSUF 18, 10 and MVSC's Resp. to the same.

████████████████████████████████████████████████████████████

████████████████████████████████ Rubinfeld Decl. Ex. A, Dkt. 956-2, Rubinfeld Rebuttal Rpt. ¶¶ 122-130 and evidence cited therein.

Disputed that MVSC's lack of access to hostile third parties has caused it to lose dealership customers in California and slowed its growth in that state. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

It is disputed and unsupported that MVSC's lack of access to data through certified integration or independent integrators has caused it to lose dealership customers in California and has slowed its growth in the state. The only "evidence" submitted in support is MVSC COO Joe Nemelka's declaration which is unsubstantiated by any facts, Ho Ex. 461, 8/26/19 Nemelka Decl. ¶¶ 12-15, and MVSC's causation and damages expert Mr. Klein ███████████████████

██████████████████████████████████████████████████████████████████,

146

████████████████████████████████ Caseria Ex. 6, Klein Tr. 246:4-20. In addition, as stated in Reynolds's concurrently filed reply brief in support of summary judgment in *MVSC*, at 14 n.11, the remainder of the evidence cited—Ho Exs. 78, 79, 406, 409, 410, 429, 479, 480, 481, and Ho Ex. 4, Nemelka Tr. 238:16-24—are all inadmissible hearsay offered for the truth of the matter asserted.

113.    MVSC began its efforts to expand into Illinois in 2013; by early 2015, it had obtained formal authorization from the state to develop an EVR product. Ho Ex. 411, MVSC_MDL_0058737 at -8737 (describing meeting between MVSC executives and state regulators about potential entry into the state as "very positive"); Ho Ex. 419, MVSC_MDL_0069731 at -9745 (MVSC's contract with the state of Illinois authorizing it to develop an EVR product dated January 28, 2015); Ho Ex. 80, Jamison Kingfield Offer Letter (dated June 30, 2014) and W-4 (dated July 12, 2014); Ho Ex. 397, MVSC_MDL_0016934 (referring to meetings with dealers); Ho Ex. 412, MVSC_MDL_0058926 (referring to meetings with dealers); *id.* (referring to meetings with state officials); Ho Ex. 431, MVSC_MDL_0085266 at 5266.010-5266.012 (referring to Illinois product development efforts); Caserta Ex. 4 (Dkt. 957-4), Klein Report ¶ 40 (summarizing evidence).

**RESPONSE:** This alleged fact is disputed in part and unsupported.

It is undisputed that MVSC began its efforts to expand into Illinois in 2013. It is disputed and unsupported that MVSC obtained formal authorization from the state to develop an EVR product by early 2015. The 2015 contract with the State of Illinois cited by MVSC ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Approval to develop a solution to process registration renewals is *not* the same as approval to develop a solution to process EVR (referred to as ERT in Illinois) transactions. MVSC admits

that ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

114.    MVSC's lack of access to data through "certified" integration or independent integrators has delayed its entry into Illinois. ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶¶ 76, 80 (explaining MVSC's efforts to develop a combined renewal solution and EVR solution and summarizing evidence regarding same); *see also* Dorris Ex. 151 (Dkt. 977-153), Israel Report ¶¶ 188, 191 (CDK's and Reynolds's actions have harmed competition in Illinois by allowing CVR to maintain its dominant position there).

**RESPONSE:** This alleged fact is disputed.

It is disputed that MVSC's lack of access to data through certified integration or hostile integrators has delayed its entry into Illinois. *See* Resp. Pls. SOAF 113, *supra*.



Lack of access to hostile integrators also did not delay MVSC's entry into Illinois because,

115.    MVSC began its efforts to expand into Virginia in 2014, when it obtained a contract to enter the state. Ho Ex. 420, MVSC_MDL_0069878 (MVSC's contract with the state of Virginia dated October 29, 2014); Ho Ex. 417, MVSC_MDL_0063839 at -3868.010 (MVSC established an office in Virginia in May 2015); Ho Ex. 77, Don McNamara Offer Letter (dated August 31, 2015) and W-4 (dated September 17, 2015); Ho Ex. 417, MVSC_MDL_0063839 at -3868.009-3868.029 (MVSC hired leadership, invested resources in product development, and adapted customer contracts for Virginia); *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 43 (summarizing evidence).

**RESPONSE:** This alleged fact is disputed in part as phrased.

It is undisputed that MVSC executed an Interface Access Agreement with the State of Virginia on October 29, 2014. Ho Ex. 420, MVSC_MDL_0069878. It is disputed to the extent suggested that MVSC had developed its EVR app for Virginia in 2014 and was ready to begin processing EVR transactions in Virginia as early as 2014. ████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████  As of March 2017, the State of Virginia had not completed testing of MVSC's EVR solution. Defs. Reply Ex. 626, at 2 (March 2017 email from Virginia DMV noting that MVSC was currently at the DMV for testing). ███████████████████████████

████████████████████████████

116.  MVSC's lack of access to data through "certified" integration or independent integrators has delayed its entry into Virginia. █████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████ *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ 44 (summarizing evidence).

**RESPONSE:** This alleged fact is disputed.

It is disputed that MVSC's lack of access to data through certified integration or independent integrators has delayed its entry into Virginia. To the extent MVSC's entry into Virginia was delayed, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ As of March 2017, the State of Virginia had not completed testing of MVSC's EVR solution, Defs. Reply Ex. 626, at 2 (March 2017 email from Virginia DMV noting that MVSC was currently at the DMV for testing). ████████████████████ ████████████████████████████████

MVSC did not need certified integration or hostile integrators to develop the Virginia solution or begin processing EVR transactions in Virginia. ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████

Free manual reporting tools provided by Reynolds and CDK were sufficient for MVSC to process EVR transactions in Virginia ██████████ before it developed Electron in October 2017. *See* MSUF 10 (undisputed that EVR providers can access data from the CDK and Reynolds DMS

through manual reporting tools), *id.* 12 ██████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████ *id.* 18 (MVSC developed Electron in October 2017); *see also* Defs. JSUF 5 ████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Using just manual

reporting, ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████ MSUF 64 and MVSC's Resp. to same ████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████

Lack of access to hostile integrators also did not delay MVSC's entry into Virginia because,

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████

117.    MVSC has attempted to expand into Wisconsin since early 2014. Ho Ex. 396, MVSC_MDL_0016208 at -6213 (MVSC developed a business plan for Wisconsin in early 2014, outlining its proposed "workflow" and product design, training initiatives, field support, and other services); Ho Ex. 413, MVSC_MDL_0059698 (MVSC submitted its business plan to regulatory authorities along with letters of support from dealers); Ho Ex. 393, MVSC_MDL_0001908 at -1934 (call summary detailing conversation with Department of Transportation); Ho Ex. 397, MVSC MDL 0016934 at -6935 (describing "meet and great" with Wisconsin DMV and meetings with Illinois and Wisconsin dealers); Ho Ex. 416, MVSC_MDL_0061433; Ho Ex. 414, MVSC MDL 0060313 (conveying reports of positive dealership visits); Ho Ex. 80, Jamison Kingfield Offer Letter (dated June 30, 2014) and W-4 (dated July 12, 2014) (appointing MVSC employee to assist with opening up operations in the state); *see also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶

46 (summarizing evidence of MVSC's deliberate, concerted attempts to enter and provide services in Wisconsin since at least 2014).

**RESPONSE:** It is undisputed that MVSC began attempts to expand into Wisconsin in or around early 2014. *See also* MSUF 66, 67.

    118. MVSC's lack of access to data through "certified" integration or independent integrators has impeded MVSC's entry into Wisconsin.



*ee also* Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶ ¶ 29, 47-49 (summarizing evidence); Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶ 40.

**RESPONSE:** This fact is immaterial in part because CVR's promotions of its EVR services to Wisconsin officials is not evidence of a conspiracy, impact, or damages.

This alleged fact is also disputed and unsupported. It is disputed that MVSC's lack of access to data through certified integration has impeded MVSC's entry into Wisconsin. MVSC admits that Wisconsin has never been a point-of-sale state, Resp. MSUF 7, hence, according to MVSC, certified integration is not necessary to compete effectively in Wisconsin. MVSC SAC ¶ 9 ("Real-time access to dealer data (and participation in the 3PA and RCI programs) has therefore not been necessary in [non-point-of-sale states].") It is disputed and unsupported that MVSC's lack of access to data through hostile integrators has impeded MVSC's entry into Wisconsin. MVSC admits that it has been able to process EVR transactions in non-point-of-sale states using manual reporting tools during the relevant period, including in Wisconsin. Resp. MSUF 11.

███████████████████████████████████████████████████████████████

████████████████████████████

MVSC has been unable to enter Wisconsin because Wisconsin "was not accepting new vendors into [its] program" when MVSC applied. Caseria Ex. 46, DX 1213. The State denied MVSC's application for the following reasons: (1) adding any new EVR provider "requires extensive resources from DMV for start-up programming and testing," and (2) "lack of program expansion to benefit DMV and the Wisconsin consumer" because adding a new EVR vendor would not increase the number of dealers that participated in the State's EVR program because the State had been mandating EVR for many years (since 2007). Caseria Ex. 45, DX 1212 at 1-2; *see also* MSUF 66-69. In fact, ████████████████████████████████████████ ████████████████████ and by 2015, six other EVR providers (in addition to MVSC) had similarly been rejected by the State. Resp. MSUF 68.

It is disputed and unsupported that defendants' alleged conduct has ████████████ ████████████ of Wisconsin authorities to partner with MVSC. ████████████████████████████

███████████████████████████████████████████████████████████████

████████████ MSUF 70 and MVSC's Resp. to same. Two out of the three EVR providers in Wisconsin, Dealertrack and Wisconsin's State-owned app, e-MV11, did not have certified integration. MSUF 71 and MVSC's Resp. to same. ████████████████████████████████████

███████████████████████████████████████ MSUF 21.

It is disputed and unsupported that lack of certified integration has ██████████████████

███████████████████████████████████████████████████████████████

████████████████████ the fact is unsupported other than the bare, unsubstantiated assertion in Joe Nemelka's declaration, which is insufficient. Ho Ex. 461, 8/26/19 Nemelka Decl. ¶ 20.

119.    MVSC has incurred millions in costs developing manual workarounds as a result of its lack of access to integration through "certified" integration and independent integrators, which constitutes evidence of harm to competition. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ Caseria Ex. 4 (Dkt. 957-4), Klein Report ¶¶ 132-135 (relying on records kept in the ordinary course of MVSC's business to quantify workaround costs, totaling conservatively at ██████████████); Caseria Ex. 5 (Dkt. 957-5), Klein Reply Report ¶¶ 113-116; *see also* ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ *id.* 595:5-17; *see also id.* 599:20-600:1 ("Q. MVSC built integration, right? A. At a substantial time and expense. To me, that's one of the evidences of harm to competition.").

**RESPONSE:** This alleged fact is disputed and unsupported.

It is disputed and unsupported that MVSC has incurred "millions" in costs developing manual workarounds as a result of its lack of access to certified integration and hostile integrators, and that this constitutes harm to competition. All the evidence cited herein are bare assertions unsubstantiated by evidence. MVSC decided to develop its own software tool, Electron, to be used in conjunction with free manual reporting tools already available to it in order to, according to MVSC, allow it to access data at so-called "near real-time" speeds. MSUF 18. ████████████

███████████████████████████████████████████████ Caseria Ex. 12, Armstrong

Tr. 122:24-123:6. *See also* MSUF 18.

MVSC has not developed a "manual workaround" or a unique, standalone method of DMS

data access. ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ *See* Defs. Reply Ex. 636, Bulusu Tr.

239:7-240:12; Defs. Reply Ex. 633, Armstrong Tr. 108:12-109:11; *see also* MSUF 18.

120. ████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████

**RESPONSE:** This alleged fact is immaterial because ████████████████████

████████████████████ is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed in part. ████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

121. ████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

██████████████████████████████████████████████████████
████

**RESPONSE:** This fact is immaterial because regardless of whether ████████████

██████████████████████████████████████████████████████

is not evidence of a conspiracy or exclusive dealing.

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

122. █████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial, because whether and the extent to which CDK's SecurityFirst program had a positive impact on cybersecurity is not evidence of a conspiracy or exclusive dealing.[38]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that SecurityFirst did not improve CDK's security. The investments CDK made in security as part of

---

[38] Defendants object to Plaintiffs' characterization of CDK as "acknowledging" facts ████████████
██████████████████, and further object to Plaintiffs' characterization of Security First as not "improving security." *See* General Statement, *supra*.

the SecurityFirst initiative are detailed in Resp. Pls. SOAF 47, *supra*. In addition, none of the exhibits cited in this alleged fact supports the proposition that SecurityFirst did not improve security. ██████████████████████████████████████████████

██████████████████████████████████████ The security risks posed by hostile third-party access to CDK's DMS are both numerous and significant. *See* Resp. Pls. SOAF 47, *supra*; Defs. JSUF 43-64.

123. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether and the extent to which ██████
████████████████████████████████ is not evidence of a conspiracy or exclusive dealing.[39]

This alleged fact is also disputed and unsupported. ████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

124. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[39] Defendants object to Plaintiffs' characterization of CDK as "acknowledging" facts based upon statements by one CDK employee, and further object to Plaintiffs' characterization ████████████████████████
████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████

**RESPONSE:** This alleged fact is immaterial because whether and the extent to which ███████ ████████████████████████████████████ is not evidence of a conspiracy or exclusive dealing.[40]

This alleged fact is also disputed and unsupported. ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████ before many of the significant aspects of the SecurityFirst initiative and Secure the DMS were fully implemented. █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

125. ████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[40] Defendants object to Plaintiffs' characterization of 3PA as being "far behind" industry standards. *See* General Statement, *supra*.

**PUBLIC VERSION**



**RESPONSE:** This alleged fact is immaterial because the reaction of certain market participants

to CDK's SecurityFirst initiative is not evidence of a conspiracy or exclusive dealing.

126.

**RESPONSE:** This alleged fact is immaterial because ████████████████████

████████████████████████████████ is not evidence of a conspiracy or exclusive

dealing.

████████████████████████████████████████

████████████████████████████████████

    127.    CDK executives testified that they would not have allowed CDK to engage in dealer-permissioned independent integration if they believed it caused significant security risk. Ho Ex. 5, Distelhorst Tr. at 41:14-20, 60:6-19, 68:5-11; Ho Ex. 6, Gerlich Tr. at 20:6-18.

**RESPONSE:** This alleged fact is immaterial because ████████████████████

████████████████████████████████████ is not evidence of

a conspiracy or exclusive dealing.[41]

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

    128.   ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[41] Defendants object to Plaintiffs' characterization of these statements as reflecting w████████████

████████████████████

**RESPONSE:** This alleged fact is immaterial because ██████████████████████ ████████████████████████████ is not evidence of a conspiracy or exclusive dealing.

It is undisputed that beginning in ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

129. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

**RESPONSE:** This alleged fact is immaterial because whether ████████████████████ ██████████████████████████████████ is not evidence of a conspiracy or exclusive dealing.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

130.    The relevant DMS and DIS markets were highly concentrated during the alleged damages period. *See* Fenske Ex. 79, (Dkt. 975-79), Williams Report ¶¶ 96-101;  Ho Ex. 502, CDK-3 111902 to 911 at CDK-3 11904 (Nov. 29, 2016 CDK conference call transcript, in which CDK Chief Financial Officer Al Nietzel stated that "In the U.S., primarily North American, there's really three players [CDK, Reynolds and Cox].");

Ho Ex. 71, Barkholz, D. (Dec. 2 2012), "Dealers get new management system option," *Automotive News*, https://www.autonews.com/article/ 20121202/RETAIL07/312039973/dealers-get-new-management-system-option    (stating    that "ADP [CDK] and Reynolds each hold about a 40 percent DMS share of the nation's nearly 18,000 new-vehicle dealers."); Dorris Ex. 57, (Dkt. 977-58), U.S. Federal Trade Commission (Mar. 19, 2018), *FTC Administrative Complaint, In the Matter of CDK Global et al.* (Redacted Public Version) ¶¶ 7, 18 (discussing concerns over potential harm to competition from further DMS market consolidation and stating that while customers had been "frustrated with CDK's and Reynolds's business practices [they] have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders.").

**RESPONSE:** This alleged fact is immaterial because the concentration of the market during the alleged damages period is not evidence of a conspiracy or exclusive dealing.[42]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that Plaintiffs have properly identified a relevant "DIS" market for the reasons explained in their summary judgment briefs. *See* Defs. Auth. Br. 66-67; Defs. Auth. Reply 33-34. None of the documents cited address concentration or market share in any supposed DIS market. It is undisputed that CDK and Reynolds were the two largest DMS providers during the relevant time period, ███████████████████ of the combined U.S. franchise dealership market. *See generally* Defs. JSUF Ex. 71, Bresnahan Rpt. ¶¶ 183-85, 204; JSUF Ex. 78, Whinston Rpt. ¶¶ 334-336.

131.    There are substantial barriers to entry into the DMS market. *See* Fenske Ex. 79, (Dkt. 975-79), Williams Report In 102-107; Ho Ex. 71, Barkholz, D. (Dec. 2 2012), "Dealers get new    management    system    option,"    *Automotive    News,*    https://www.autonews.com/article/

---

[42] Defendants object to Plaintiffs' characterization of DMS and DIS markets as "relevant markets," which is a question of law, and those markets as being "highly concentrated." *See* General Statement, *supra*.

20121202/RETAIL07/312039973/dealers-get-new-management-system-option (stating that Microsoft tried and failed to enter the DMS market in 2006, and in 2012, Microsoft, in cooperation with Dominion Dealer Services, again attempted to enter the DMS market with "Dominion DMX", but the effort also failed; and discussing "other barriers to entry" in the DMS market, including "long dealer contracts of five years or more and the complexity required to integrate a vendor's software with auto manufacturers' computer systems . . . ."); ████████████████████

████████████████████████████████████████████████████████

Dorris Ex. 57, (Dkt. 977-58), U.S. Federal Trade Commission (Mar. 19, 2018), *FTC Administrative Complaint, In the Matter of CDK Global et al.* (Redacted Public Version), ¶ 58 (in its 2018 investigation of the proposed acquisition of Auto/Mate by CDK, the FTC concluded that effective entry into the DMS market "would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome."); Ho Ex. 152, PX 684, REYMDL00016612 (Declaration of Ronald Lamb, Reynolds President, stating at ¶ 3 that "[t]he default term of a Reynolds DMS contract is five (5) years with the range being anywhere from 36 to 84 months.");



**RESPONSE:** This alleged fact is immaterial because new entrants into the DMS market are able to compete successfully against CDK and Reynolds. *See* Resp. Pls. SOAF 1-2, *supra*; Defs. JSUF 166-175.

It is undisputed that there are some barriers to entry into the DMS market, including development costs and OEM certifications. This alleged fact also appears to be duplicative of alleged fact 1, *supra*, and Defendants incorporate their response to that alleged fact 1 by reference.

132. 

**RESPONSE:** This alleged fact is immaterial because whether t██████████████████ ████████████████████████████████████ is not evidence of a conspiracy or exclusive dealing.

It is undisputed that Ho Ex. 499 contains the quoted statement.

133. Although the DEA states that "Section 4.5 is not intended as a 'covenant not to compete,'" it admits that it was intended as a "contractual restriction on access and attempted access". Fenske Ex. 49, (Dkt. 975-49), at Section 4.5.

**RESPONSE:** This alleged fact is immaterial because the Data Exchange Agreement is not evidence of a conspiracy or exclusive dealing.

This alleged fact is also disputed in part. It is undisputed that Section 4.5 of the Data Exchange Agreement states, in part, "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access intended to protect the operational and data security integrity of the Reynolds DMS and the CDK DMS and protection of intellectual property." Defs. JSUF Ex. 49 CDK-0000001 at -005. It is unsupported, disputed, and an improper legal conclusion that the DEA barred CDK from accessing the Reynolds DMS, or vice versa. To the contrary, the prior sentence of Section 4.5—which this alleged fact omits—only precludes either CDK or Reynolds from assisting a *third party* in accessing the other's DMS. Defs. JSUF 123; Defs. JSUF Ex. 49 § 4.5 (CDK and Reynolds agreed not to "sell, transfer or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without the other party's written consent.").

**PUBLIC VERSION**

134.    Section 4.5 of the DEA does not terminate, but remains in effect in perpetuity. Fenske Ex. 49, (Dkt. 975-49), at Section 6.1 (carving Section 4.5 out of the termination provision).

**RESPONSE:** This fact is immaterial because whether the obligations in Section 4.5 of the DEA survive expiration of the DEA is not evidence of a conspiracy or exclusive dealing.[43]

It is undisputed that, under Section 6.1 of the Data Exchange Agreement, the obligations set forth in Section 4.5 of that Agreement "do not terminate at the end of the Wind Down Period." Defs. JSUF Ex. 49, CDK-0000001 at -005. ████████████████████████████ ████████████████████████████ Def. JSUF Ex. 30.

135.    ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

**RESPONSE** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law ████████████████████ ████████████████ Moreover, no MDL Plaintiff seeks damages ████████████████

It is undisputed that ████████████████████████████
████████████████████████████████████████
████████████████████████████████

136.    During the time period September 2013 through May 2019, CDK had dealership DMS customers located in all 50 states, including: ████████████████████ ████████████████████████ Ho Ex. 459, Declaration of Wei Zhao, Ph.D. in Support of Dealership Class Plaintiffs' Memorandum in Opposition to Defendant CDK Global, LLC's Motion for Summary Judgment, dated July 27, 2020.

---

[43] Defendants object to Plaintiffs' characterization of the legal effect of the Data Exchange Agreement, and Section 4.5 in general, which are legal conclusions. *See* General Statement, *supra*.

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than the presence of customers in all 50 states to assert claims. *See* CDK Dealer Reply 10-12.

It is undisputed that between September 2013 and May 2019 CDK had dealership DMS customers located in Massachusetts, Mississippi, New Hampshire, New York, South Dakota, and West Virginia, among numerous other states.

137.    During the time period June 2016 through June 2018, Reynolds had dealership DMS customers located in all 50 states, including: ███████████████████ ████████████████████████████████████████████████ Ho Ex. 458, Declaration of Michael A. Acciavatti in Support of Dealership Class Plaintiffs' Memorandum in Opposition to Defendant CDK Global, LLC's Motion for Summary Judgment, dated July 25, 2020.

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than the presence of customers in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that Reynolds had approximately the indicated number of dealers in Massachusetts, Mississippi, New Hampshire, New York, South Dakota, and West Virginia during this time period (the methodology set out in Ho Ex. 458 appears to count dealers who were Reynolds customers at any point during this period).

138.    Vendors accessing data on the dealerships' DMS are headquartered or principally located in the following states: **Massachusetts:** Ho Ex. 383, DOMINION-00149091 (Dominion's Dec. 11, 2017 Narrative Response to FTC Specification #3, stating that two of Dominion's principal software applications offered to dealerships - Prime Response" and Marketing Management Services (MMS) — are both principally located in Massachusetts); Ho Ex. 37, Baerg Tr. at 93:11-21 (testifying that AutoAlert has offices in Boston, Massachusetts); **New York:** https://us.dealertrack.com/content/dealertrack/en/about/locations.html (last visited July 27, 2020) (DealerTrack has its headquarters in New Hyde Park, New York), *see also* PJ RSUF 166 [Dkt. 1070]; and **South Dakota:** https://9clouds.com/about/ (last visited July 27, 2020) (9 Clouds Marketing has its headquarters in Sioux Falls, South Dakota).

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than offices maintained by certain

vendors that allegedly purchased integration services from Defendants in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that certain of Dominion's product lines are conducted from offices based in Massachusetts; Dominion also conducts business from offices in four other states. Ho. Ex. 383, DOMINION-149091, at -094-95. It is undisputed that AutoAlert has an office in Boston; AutoAlert also has an office in Irvine (where it was founded) and since 2016 has been headquartered in Kansas City, Missouri. Ho. Ex. 37, Baerg 30(b)(6) (AutoAlert) Tr. at 93:11-94:7. It is undisputed that DealerTrack's USA corporate offices are in New Hyde Park, New York; Dealertrack's Dealer Management Solutions offices are in Draper, Utah. https://us.dealertrack.com/content/dealertrack/en/about/locations.html (last visited Aug. 19, 2020). It is undisputed that 9clouds is based in Sioux Falls, SD. https://9clouds.com/about/ (last visited Aug. 25, 2020). However, neither Dr. Israel nor Dr. Williams ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████.

139.    CDK has a corporate office in New York. https://www.cdkglobal.com/us/cdk-locations (last visited July 27, 2020).

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than CDK's presence in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that CDK is headquartered in Illinois and has offices in Melville, NY, among many other states.

140.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than "complaints" by one or more customers from the state. *See* CDK Dealer Reply 10-12.

This alleged fact is also disputed in part. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

141.  ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

**PUBLIC VERSION**

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than a Defendant's blocking of login credential issued by defendants located in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that CDK monitored and blocked DMS credentials issued by dealers in Massachusetts, New Hampshire, Mississippi, New York, South Dakota, and West Virginia. As reflected by Ho Ex. 273, which is 371 pages long and contains 21,771 entries, CDK also monitored and blocked DMS credentials issued by dealers in dozens of other states. This alleged fact is vague and ambiguous insofar as it asserts that CDK blocked login credentials "in" these states.

142. CDK and Reynolds imposed price-secrecy provisions on vendors located in several states, including, but not limited to: **Massachusetts: Ho** Ex. 294, CDK-0596624-44 ████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Ho Ex. 65, PI Hearing Tr. 2-A-45:4-46:2 (Andreu Testimony) (Alan Andreu (General Manager of Equity at Dominion Dealer Solutions) testified that the Reynolds's confidentiality provision "gags us completely. We can't tell [Dealers] anything, so I'm expected to somehow pass through an $893 charge on an $1,152 product without telling [Dealers] why." The witness went on to testify that when Dominion was accused of violating Reynolds's confidentiality provision, Reynolds "sent a nasty letter to the then-product manager of Sales Center, told us that we had -- defamation I think was on there. They said that we violated the secrecy requirement. They submitted -- they made us submit to an intimidating audit, and ultimately we wrote them a check for $100,000 or they were going to cut the RCI program off from our Sales Center product"); and **New Hampshire: Ho** Ex. 385, PX 1587, IMPACT000352 ████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than contracts with vendors in the state containing alleged "price-secrecy" provisions. *See* CDK Dealer Reply 10-12.[44]

This alleged fact is also disputed and unsupported in part. As explained in Resp. Pls. SOAF 68, *supra*, it is disputed that ███████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████

143.    CDK and Reynolds charged supracompetitive prices to access their respective DMS's through the 3PA and RCI programs to vendors located in several states, including, but not

---

[44] Defendants object to Plaintiffs' characterization of CDK's and Reynolds's contracts as "price secrecy" provisions that Defendants' "imposed" on vendors. *See* General Statement, *supra*.

limited to: **Massachusetts:** ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
**New Hampshire:** ██████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ **Mississippi:**
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
**New York:** ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than that some vendors in a state obtained services from Defendants and made payments for those services accordingly. *See* CDK Dealer Reply 10-12.[45]

It is disputed and unsupported that CDK or Reynolds charged "supracompetitive" prices. *See* Defs. JSUF Ex. 76, Murphy Rpt. ¶¶ 102-114. It is undisputed that vendors in these states paid fees to CDK to participate in 3PA or to Reynolds to participate in RCI, respectively.

_____

[45] Defendants object to Plaintiffs' characterization of Defendants' prices as "supracompetitive." *See* General Statement, *supra*.

144. CDK and Reynolds charged vendors supracompetitive integration fees, which vendors passed on to dealership customers in several states, including but not limited to: **Massachusetts:** ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ **New Hampshire:** ████████████████████████████████████

████████████████████████████████████████████████████████ **Mississippi:** ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ **New York:**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ).

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than that some vendors allegedly passed on overcharges to dealers located in those states. *See* CDK Dealer Reply 10-12.[46]

This alleged fact is also disputed and unsupported. It is disputed and unsupported that the prices CDK or Reynolds charged to vendors were "supracompetitive" or that vendors "passed on" those charges to the relevant dealers. *See* Defs. JSUF Ex. 76, Murphy Rpt. ¶¶ 102-114 (explaining why the Dealership Class Plaintiffs' overcharge and pass-through analysis is wrong and uninformative). This alleged fact's assertion of either proposition is improper argument. Further, none of the cited documents supports either proposition. ███████████████████

████████████████████████████████████████████████████████

145. CDK and Reynolds blocked vendors who do not participate in the 3PA or RCI program from accessing dealer data in several states, including: **Massachusetts:** █████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Mississippi:** █████████████████████████████████████
████████████████████████████████████████████████████

**South Dakota:** ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**West Virginia:** █████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[46] Defendants object to Plaintiffs' characterization of Defendants' prices as "supracompetitive." *See* General Statement, *supra*.

███████████████████████████████████████████████████
█████████████████████

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than that some vendors or dealers in a state were unable to use hostile third parties to automatically access Defendants' DMSs. *See* CDK Dealer Reply 10-12.[47]

This alleged fact is also disputed in part. It is disputed that CDK or Reynolds "blocked" vendors who do not participate in 3PA or RCI from accessing dealer data. ██████████████████

███████████████████████████████████████████████████

Defs. JSUF 5, 9, 22; Resp. Pls. SOAF 77, *supra*. It is undisputed that CDK took steps to prevent unauthorized third parties from accessing its DMS, which affected parties located in the listed states ███████████████████████████████████████████████

████████████████████████

146.    CDK communicated with dealership customers regarding SecurityFirst and warned them that CDK was going to disable "non-authorized" access to the CDK DMS at dealerships in several states including, but not limited to: **Massachusetts:** ███████████████████
███████████████████████████████████████████████████
████████████████████████████████████ **New   York:** █████████
███████████████████████

**RESPONSE:** This fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than that a defendant sent nationwide communications that were received, among other places, by customers in the state. *See* CDK Dealer Reply 10-12.

---

[47] Defendants object to Plaintiffs' characterization of Defendants' actions as "blocking" vendors who do not participate in 3PA or RCI from "accessing dealer data." *See* General Statement, *supra*.

It is undisputed that CDK communicated with its dealership customer bases in advance of its security measures, including by telling dealers that CDK was taking meaningful steps to secure its system and would deploy new security features with the goal of removing unauthorized third-party access to the CDK DMS. It is also undisputed that some of the customers CDK communicated with regarding these matters were located in Massachusetts and New York.

147. CDK communicated with dealership customers regarding SecurityFirst and warned them that CDK was going to disable "non-authorized" access to the CDK DMS at dealerships nationwide.



**RESPONSE:** This fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than that a defendant sent nationwide communications that were received, among other places, by customers in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that CDK communicated with its dealership customer bases in advance of its security measures, including by telling dealers that CDK was taking meaningful steps to secure its system and would deploy new security features with the goal of removing unauthorized third-

party access to the CDK DMS. It is undisputed that these communications were sent to dealers nationwide.

148. CDK has a data center in Sioux Falls, South Dakota. ███████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

**RESPONSE:** This alleged fact is immaterial because the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state law than a defendant having a disaster recovery site in the state under South Dakota law. *See* CDK Dealer Reply 10-12.

It is undisputed that in 2013 ADP Dealer Services had a standby disaster recovery site located in Sioux Falls, South Dakota.

149. The National Automobile Dealers Association ("NADA") keeps data on dealerships in the United States in terms of total sales dollars and total dealership locations. Ho Ex. 69, 2019 NADA Data, https://www.nada.org/nadadata/ (last visited July 27, 2020). **Massachusetts** is ranked 15th in terms of total sales by dollar amount and 15th in total dealership locations in 2019; **New Hampshire** is ranked 35th in terms of total sales by dollar amount and 37th in total dealership locations in 2019; **Mississippi** is ranked 34th in terms of total sales by dollar amount and 33rd in total dealership locations in 2019; **New York** is ranked 4th in terms of total sales by dollar amount and 5th in total dealership locations in 2019; **South Dakota** is ranked 47th in terms of total sales by dollar amount and 43rd in total dealership locations in 2019; and **West Virginia** is ranked 40th in terms of total sales by dollar amount and 36th in total dealership locations in 2019.

**RESPONSE:** This alleged fact is immaterial because law the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state than that large customers are located in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that NADA published NADA Data 2019, a copy of which is attached as Ho Ex. 69, and that the ordinal rankings of the states in the total sales (by dollars) and total dealership locations categories are as indicated above.

150. Automotive News keeps track of the largest car dealerships, by new retail sales, in the United States. Ho Ex. 72, Charniga, J., "Here's our annual ranking of the largest U.S. dealership groups," Automotive News, March 30, 2020, https://www.autonews.com/dealers/heres-our-annual-ranking-largest-us-dealership-groups (last visited July 27, 2020) (listing the top 150 largest

dealerships in the U.S. including, five dealerships in **Massachusetts:** Prime Automotive at #11; Herb Chambers Co. at #25; Balise Motor Sales Group at #64; Colonial Automotive Group at #84; and Kelly Automotive Group at #100; and one dealership in **New Hampshire:** Autofair Automotive Group at #111; and seven dealerships in **New York:** West-Herr Auto Group at #28; Island Auto Group at #44; Lia Auto Group at #55; Rosatti / Plaza Auto Group at #68; Curry Automotive at #74; Empire Auto Group at #96; and Romano Auto Dealerships at #124).

**RESPONSE:** This alleged fact is immaterial because law the Dealership Class Plaintiffs must demonstrate a more substantial nexus under applicable state than that large customers are located in the state. *See* CDK Dealer Reply 10-12.

It is undisputed that the Automotive News article attached as Ho Ex. 72 states that the Massachusetts, New Hampshire, and New York dealer groups have the rankings indicated in the paragraph above.

PUBLIC VERSION

Dated: August 28, 2020

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on August 28, 2020, I caused a true and correct copy of the foregoing **DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S RESPONSES TO MDL PLAINTIFFS' CORRECTED STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com