# EXHIBIT 632

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 2 of 83 PageID #:85417
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 2 of 82

PURSUANT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AUTHENTICOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> CDK GLOBAL, LLC, and THE REYNOLDS AND REYNOLDS COMPANY, <br><br> Defendants. | No. 3:17-CV-318-JDP |

## DEFENDANTS CDK GLOBAL, LLC AND THE REYNOLDS AND REYNOLDS COMPANY'S RESPONSE TO PLAINTIFF AUTHENTICOM, INC.'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Pursuant to the Court's Procedures to Be Followed on Motions for Injunctive Relief, Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") submit this response to Plaintiff Authenticom, Inc.'s ("Authenticom") Statement of Facts in support of its Motion for a Preliminary Injunction (Dkt. 63; "SOF").[1]

### PRELIMINARY STATEMENT

For the Court's convenience, Defendants have included their respective responses to Plaintiff's SOF in this joint submission. Where one of Plaintiff's SOF is addressed to a specific Defendant (to the exclusion of the other), CDK or Reynolds have responded, as appropriate. In doing so, the Defendant to whom such an individualized statement is not directed reserves its right to object to or otherwise contest the use or admission of any such statement against it in this preliminary injunction proceeding, or any other proceedings in this matter.

---

[1] Citations designated herein as "Pl. Ex." are Exhibits attached to the Declaration of Michael N. Nemelka in Support of Authenticom's Statement of Facts in Support of its Motion for a Preliminary Injunction. Citations designated as "Defs. Ex." are Exhibits attached to the declarations of Britt M. Miller and Aundrea K. Gulley in support of Defendants' Response to Plaintiff's Statement of Facts in Support of its Motion for Preliminary Injunction and Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 1 of 83 PageID #:85418
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 296 of 82

PURSUANT TO PROTECTIVE ORDER

For the reader's convenience, Defendants have organized their responses to Plaintiff's SOF by employing the headings and subheadings used in Plaintiff's filing. In doing so, Defendants do not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, deny each and every one of them unless expressly indicated otherwise.

## RESPONSE TO AUTHENTICOM'S STATEMENT OF FACTS

## I.  Dealer Management System Software and Services

1.      Dealer Management System ("DMS") software is mission-critical software that every automobile dealership relies on to manage and direct its operations. Maas Decl. ¶ 4; Fitkin Decl. ¶ 2; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

**Response:**  Disputed in part. Undisputed that Dealer Management Systems are referred to as "DMS" and that most new vehicle franchised dealerships[2] rely on DMS enterprise software to manage and operate their dealerships. A DMS includes numerous components of hardware as well as software. In addition, a very small percentage of automobile dealerships operate without a DMS. Karp Decl. ¶ 7; Schaefer Dec. ¶ 2.

2.      The DMS is the center of a dealer's entire retail management platform and it is impossible to operate without it. Maas Decl. ¶ 4; Fitkin Decl. ¶ 2; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

**Response:**  Disputed in part. Undisputed that the majority of dealerships rely on DMS enterprise software to manage various aspects of their dealerships but a very small percentage of dealerships do not. Karp Decl. ¶ 7; Schaefer Dec. ¶ 2.

---

[2] In several instances throughout Plaintiff's filings there appears to be an embedded assumption that the only relevant automobile dealers are new vehicle franchised dealers. As detailed in Defendants' SOAF (at ¶ 7), that is not the case. Although there are some 21,000 new car franchised dealers in North America, there are over 60,000 independent car dealerships in which neither CDK nor Reynolds has a significant market presence. *Id.*

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 4 of 83 PageID #:85419
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 300 of 82

PURSUANT TO PROTECTIVE ORDER

3.     There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships. Singer Decl. ¶ 57; Maas Decl. ¶ 4; Fitkin Decl. ¶ 2.

**Response:** Disputed in part. While there are a variety of DMS providers and platforms with a variety of different methods and policies for data extraction and integration, it is undisputed that there are limited substitutes for DMS enterprise software and certain DMS services; for other DMS services there are many reasonable substitutes. Karp Decl. ¶ 8.

4.     CDK Global, LLC ("CDK") and The Reynolds and Reynolds Co. ("Reynolds") are the two dominant providers of DMS software and services to automobile dealerships in the United States. Maas Decl. ¶ 5.

**Response:** Disputed in part. Undisputed that CDK and Reynolds are the two largest providers of DMS enterprise software to new vehicle franchised dealerships in the United States.[3]  There are many competitive DMS providers across both franchised and independent dealers. No DMS provider is "dominant" or has market power in the relevant market. Addanki Decl. ¶¶ 47, 52.

5.     Combined, CDK and Reynolds control more than 70 percent of the DMS market in the United States when measured using dealership rooftops (i.e., franchised stores). Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5.

**Response:**  Disputed as to the term "control."  Dealers have many choices in DMS providers in the U.S. Based on best current estimates, Reynolds's current market share in the United States is ██████████ of new vehicle franchised dealerships. Depending on how one defines "independent dealerships," Reynolds either serves a very small portion of that market (*i.e.*, less than 1%), or does not serve it at all. Schaefer Decl. ¶ 11. Based on best current estimates, CDK's current market share in the United States is approximately ==45%== of new vehicle franchised dealerships; it is ==less than 1%== of independent dealerships. Karp Decl. ¶ 7.

---

[3] Defendants do not concede that the United States is the relevant geographic market at issue in the case. As Plaintiff has limited its motion to the United States, Defendants respond accordingly.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 5 of 83 PageID #:85420
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 4 of 82
PURSUANT TO PROTECTIVE ORDER

6.      Authenticom will show at the evidentiary hearing that CDK controls approximately 45 percent of the market and Reynolds controls approximately 30 percent. Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5.

**Response:** Disputed. Dealers have many choices in DMS providers in the U.S. Karp Decl. ¶ 9; *see also* Resp. to SOF ¶ 5, *supra*.

7.      Authenticom will show at the evidentiary hearing that when measured using the number of vehicles sold from franchised dealers, CDK's and Reynolds's market dominance is even more pronounced.

**Response:** Disputed that either Reynolds or CDK has a "dominant" share of any relevant market. Addanki Decl. ¶¶ 47, 52; Karp Decl. ¶ 10; Schaefer Decl. ¶ 11. Undisputed that CDK's and Reynolds's respective market presence may be larger if measured by the number of vehicles sold by their dealer customers.

8.      CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract. Maas Decl. ¶ 6; Korp Decl. ¶ 19; Longpre Decl. ¶ 3.

**Response:** Disputed. None of the materials cited in this Paragraph support the allegation that either CDK's or Reynolds's DMS contracts "typically" have terms between five and seven years. To the contrary, CDK's DMS contracts typically last between 3 and 5 years, depending on the customer and services involved. *See, e.g.,* Karp Decl. ¶ 18. Nor do CDK's contracts call for "automatic extensions" if new services are ordered in the middle of the contract. *Id.* Reynolds's contracts are ▮▮▮▮ by default but vary widely and are always negotiated. Reynolds contracts are not automatically extended if new services are ordered in the middle. Schaefer Decl. ¶ 15; Lamb Decl. ¶ 3.

9.      It is difficult and disruptive for a dealer to switch DMS providers. Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶ 19-20.

**Response:** Disputed. While switching DMS providers is not costless, those costs are nowhere close to prohibitive. Indeed, the DMS market is robustly competitive, and every year,

4

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 6 of 83 PageID #:85421
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 05/18/17 Page 400 of 82

PURSUANT TO PROTECTIVE ORDER

many dealerships switch DMS providers for reasons including but not limited to price, features, service, security and third-party access policies. Addanki Decl. ¶¶ 48, 49; Karp Decl. ¶ 14; Lamb Decl. ¶¶ 18-19; Schaefer Decl. ¶¶ 11-13. Several of Authenticom's own exhibits reflect this. *See, e.g.*, Pl. Ex. 3 at 1-3 (reporting that a dealer had switched DMS providers from Reynolds to Auto/Mate Dealership Systems); Pl. Ex. 6 at 1 (reporting that dealer had switched from Reynolds to ADP (now CDK)); Pl. Ex. 7 at 1 (reporting that dealer had completed transition to new DMS provider "in less than 45 days").

10.     Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate. Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶¶ 1920; Ex. 6; Ex. 7; Ex. 8.

**Response:** Disputed. Resp. to SOF ¶ 9, *supra*.

11.     For a typical dealership to change DMS providers, it can take up to a year of preparation, staff training, and testing before the new system is put into operation. Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶¶ 19-20; Ex. 6; Ex. 7; Ex. 8.

**Response:**  Disputed in part. None of the materials cited in this Paragraph state that it can take "up to a year" for a dealer to switch DMS providers; rather, one of the cited sources (Pl. Ex. 7) reports one dealer's statement that it "[i]deally … would have taken a year preparing to switch DMS vendors," but successfully did so "in less than 45 days." While the process used to take up to a year, the process of switching DMS providers now typically is much faster, and competitive DMS providers are frequently investing in new technologies and training programs to make the process easier for dealerships to switch to their DMS products. Addanki Decl. ¶¶ 48-49; Karp Decl. ¶ 14; Lamb Decl. ¶¶ 18-19; Schaefer Decl. ¶¶ 11-13. In any event, the statement is inadmissible hearsay.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 7 of 83 PageID #:85422
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 400 of 82

PURSUANT TO PROTECTIVE ORDER

12.     The financial costs of switching DMS platforms – in terms of training and implementation – are significant. Ex. 3.

**Response:** Disputed in part. While the process of switching DMS platforms can entail costs, competitive DMS providers are frequently investing in new technologies and training programs to make the process easier for dealerships to switch to their DMS products. Addanki Decl. ¶ 51; Karp Decl. ¶ 14; Lamb Decl. ¶¶ 18-19; Schaefer Decl. ¶¶ 11-13. *See also* Resp. to SOF ¶ 9, *supra*.

13.     One industry executive stated that changing DMS providers "is akin to a heart transplant." Ex. 3.

**Response:** Disputed in part. While the quoted statement appears in Pl. Ex. 3, a third-party *Automotive News* article, the statement is inadmissible hearsay. The truth of this statement is also disputed. *See* Resp. to SOF ¶ 9, *supra*.

14.     A large dealer publicly referred to changing DMS providers as "mission impossible." Ex. 7.

**Response:** Disputed in part. While the quoted statement appears in Pl. Ex. 7, a third-party *Automotive News* article, the statement is inadmissible hearsay. Indeed, the dealer quoted in Ex. 7 "switched in less than 45 days."  Pl. Ex. 7. The truth of this statement is also disputed. *See* Resp. to SOF ¶ 9, *supra*.

15.     The average DMS client tenure is over 20 years. Ex. 9, at 3.

**Response:** Undisputed by CDK. Based on information available to Reynolds, average DMS client tenures are currently less than 20 years, and DMS client tenure has been shrinking somewhat as switching costs continue to go down. Schaefer Decl. ¶ 12.

16.     Microsoft Corp. tried to enter the DMS market in 2006 to compete with CDK and Reynolds, but failed. In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded, "[w]e kind of got ahead of ourselves." Ex. 1.

PURSUANT TO PROTECTIVE ORDER

**Response:** Disputed in part. Undisputed that Microsoft introduced a competing DMS software product in 2006 and that the quoted statement appears in Pl. Ex. 1, an *Automotive News* article which is inadmissible hearsay.

Further, Microsoft has not "failed" in the DMS market. Microsoft sold, licensed, or otherwise provided Microsoft's DMS software product to DMS provider Dominion Dealer Solutions, which successfully entered the marketplace in 2012. *See id.* at 1. In addition, Microsoft recently formed a technology partnership with global DMS provider Incadea, a subsidiary of Cox Automotive, which serves more than 4,000 dealerships in 100 countries. Karp Decl. ¶ 11. *See also* http://www.incadea.com/about-us/overview/; http://www.incadea.com/about-us/technology-partnership/.

## II. Dealer Data Integration Services

17.     In the course of their operations, dealers generate important data, such as inventory, customer, sales, and service information. Maas Decl. ¶ 4; Longpre Decl. ¶ 4.

**Response:** Undisputed.

18.     Dealers store their data on their DMS, which has a database component. Maas Decl. ¶ 4; Longpre Decl. ¶ 4; Korp ¶ 21.

**Response:** Disputed in part. Undisputed that dealers store certain data on DMS platforms sold, operated, and maintained by Reynolds, CDK and others. Dealers do not own the DMS, and neither CDK's nor Reynolds's DMS has "a database component." "Database component" is overly simplistic and is only a small part of a DMS. Karp Decl. ¶ 16; Schafer Decl. ¶¶ 4-5. *See also* Defendants' SOAF ¶¶ 24, 33-37 (describing Defendants' DMS architecture and services).

19.     Dealers use software "applications" that need access to the dealers' data in order to perform value-added services for the dealers. Maas Decl. ¶¶ 9, 11-13; Longpre Decl. ¶¶ 6, 8, 9; Fitkin Decl. ¶ 5; Korp Decl. ¶¶ 6, 8, 11, 14, 22, 25-26.

**Response:** Disputed in part. Dealers use some software applications or interfaces that use dealer data in order to perform certain services for the dealers. Dealers use other applications and

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 9 of 83 PageID #:85424
Case: 3:17-cv-00318-jdp Document #: 86-4 filed: 06/19/19 Page 9 of 82

PURSUANT TO PROTECTIVE ORDER

interfaces that use third party data to provide dealers with value-added services. Gardner Decl. ¶ 3.

20.     Popular applications include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, scheduling service and repair appointments, lead generation, and many more. Maas Decl. ¶¶ 11-12; Fitkin Decl. ¶ 5; Korp Decl. ¶ 25; Longpre Decl. ¶ 6.

**Response:** Undisputed.

21.     These applications perform services in addition to (or, in some instances, in replacement of) functions provided by the DMS software. Longpre Decl. ¶ 6; Ex. 10.

**Response:** Undisputed.

22.     A single dealership rooftop typically uses ten or more separate applications. Ex. 11; Ex. 10; Ex. 8.

**Response:** Undisputed that most dealership rooftops use multiple, separate applications,

but the number of applications varies substantially by dealer. Gardner Decl. ¶ 4; Schaefer Decl.

¶ 83.

23.     Third-party application providers (called "vendors" in the industry) depend on and cannot provide their services without access to the data stored on the dealer's DMS database. Korp Decl. ¶¶ 8-9; Fitkin ¶ 5.

**Response:** Disputed in part, to the extent that this Paragraph implies a need for access to

Reynolds's or CDK's DMS. While third-party application vendors typically rely on one or more

elements of dealership data to provide their services, there are numerous ways that dealers can

provide such data to vendors without providing the vendors or "data integrators" direct access to

the DMS. Gardner Decl. ¶ 21; Schafer Decl. ¶ 84. It is also disputed that the DMS is equivalent

to a singular "database" that is owned by the dealer, or otherwise. *See* Resp. to SOF ¶ 18, *supra*.

24.     For example, vendors that provide electronic vehicle registration and titling must be able to obtain purchaser, vehicle, and financing information about the sale of a car.

**Response:** Undisputed.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 10 of 83 PageID #:85425
Case: 3:18-cv-00918-jdp Document #: 80 Filed: 06/06/17 Page 9 of 82
PURSUANT TO PROTECTIVE ORDER

25.     Some applications – customer relationship management software, for example – not only require data "pulled" from a dealer's database, but also need to "push" data back in and therefore require "bi-directional" access. Cottrell Decl. ¶ 12.

**Response:** Disputed in part. Undisputed that some customer relationship management ("CRM") applications utilize "bi-directional" access to DMS databases (also referred to as "writeback" access), and that <mark>more than thirty (30)</mark> of the eighty (80) third-party vendors who provide CRM applications utilize writeback access to the DMS. Gardner Decl. ¶ 5 (http://www.cdkglobal.com/partners/third-party-solutions/integration-products/customer-management#sm.0000p2rnnmrdlfhaqrc12q49li1qb). It is disputed that the DMS is the equivalent of a singular "database" that is owned by the dealer, or otherwise. *See* Resp. to SOF ¶ 18, *supra*. Also disputed that it is a requirement for the use of any application that it have "write-back" or "push" back access to the DMS. Gardner Decl. ¶ 5.

26.     Vendors obtain dealer data from data integrators. Maas Decl. ¶¶ 14, 16-17; Ex. 10.

**Response:** Disputed in part. Undisputed that CDK and Reynolds allow certified third-party vendors to "integrate" and thereby securely obtain data from their respective DMS platforms and that "integration" is one of a variety of ways in which vendors obtain data. Gardner Decl. ¶ 21; Schaefer Decl. ¶ 84. Authenticom, however, is not a "data integrator," as Defendants understand the term. To the contrary, Authenticom admits that "in this context, 'integration' is simply a synonym for data access." SOF ¶ 30.

27.     Data integrators extract dealer data from the dealer's DMS database, aggregate that data and put it into a standardized format, and then deliver to vendors the specific data required for their applications. Cottrell Decl. ¶ 9; Ex. 10.

**Response:**  Disputed in part. Authenticom's efforts to access the CDK and Reynolds DMS platforms, as described in this Paragraph, do not represent "integration" with either DMS, as Defendants understand the term. To the contrary, Authenticom admits that "in this context,"

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 11 of 83 PageID #:85426
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 1006192 ̃

PURSUANT TO PROTECTIVE ORDER

*i.e.*, as it describes its own business model, "'integration' is simply a synonym for data access."
SOF ¶ 30. Certain data access companies or "data integrators" like Authenticom use dealership
log-in credentials to infiltrate and extract thousands of data points from a dealer DMS (which do
not appear to be limited to the specific data required by application vendors), some of which is
data originally input by the dealer. Gardner Decl. ¶¶ 30-34; Schaefer Decl. ¶ 74; Defs. Ex. 62.
Some of that data is delivered to third party vendors for use in their applications. Gardner Decl. ¶
34. It is also disputed that the DMS is the equivalent of a singular "database" that is owned by
the dealer, or otherwise. *See* Resp. to SOF ¶ 18, *supra*.

28.    Data integrators also correct data-entry errors or anomalies in the data set. Cottrell
Decl. ¶ 9.

**Response:** Disputed. While Authenticom purports to correct data-entry errors and
anomalies in the data it extracts from DMS, it has also *created* errors and anomalies through its
unauthorized access to the CDK DMS. Thorne Decl. ¶ 41. In addition, it is not Defendants'
experience that "data integrators" correct data-entry errors, because they generally do not
know—much less follow—the business rules of the DMS. Schaefer Decl. ¶ 79.

29.    Data integrators pull and deliver data in an automated, seamless way without the
need for manual intervention by dealers. Cottrell Decl. ¶ 9.

**Response:** Disputed in part. It is undisputed that "data integrators" generally pull and
push data in an automated way. However, it is disputed that their methods are seamless or that
they never require manual intervention by dealers. Gardner Decl. ¶ 44; Schaefer Decl. ¶¶ 73, 75.
For example, Reynolds has seen evidence of Authenticom requesting certain manual steps by
dealers in an attempt to mislead the Reynolds DMS into granting the integrator access as if it
were a dealer employee. Schaefer Decl. ¶ 74.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 12 of 83 PageID #:85427
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 1196 of 42

PURSUANT TO PROTECTIVE ORDER

30. While data access providers are commonly referred to as "integrators," there is no actual "integration" with the DMS database. Instead, "integration" is simply a synonym for "data access." Cottrell Decl. ¶ 11.

**Response:** Undisputed that for "data integrators" such as Authenticom, "integration" is simply a synonym for "data access." Unlike the data access services offered by Authenticom, the Reynolds Certified Integration Program ("RCI") and CDK's Partner Program ("3PA Program"), respectively, are systems of uniquely designed custom interfaces that form an integral part of the DMS. Gardner Decl. ¶¶ 8-11; Rosenbach Decl. ¶¶ 101-102; Schneck Decl. ¶¶ 13-18; Schaefer Decl. ¶ 50.

31. CDK owns two of the largest dealer data integrators, Digital Motorworks, Inc. and IntegraLink, Inc. Through these two subsidiaries, CDK provides data integration services for dealers that use non-CDK DMS systems. Ex. 12; Ex. 13.

**Response:** Undisputed that CDK Data Services, Inc. (f/k/a Digital Motorworks, Inc. ("DMI") and formerly d/b/a DMI and IntegraLink) offers a variety of data services including obtaining certain data from CDK and non-CDK DMS platforms, which are then aggregated, cleansed, normalized, and enhanced to distribute to public and private franchised automotive retail groups, OEMs, websites, and other automotive industry participants ("Managed Data Services"). Gardner Decl. ¶ 76.

32. CDK has an integration product – called the "Third Party Access" ("3PA") program – for dealers using the CDK DMS. Maas Decl. ¶ 16.

**Response:** Disputed in part. Undisputed that CDK offers a third party partnership program, sometimes referred to as its "3PA Program" a/k/a the CDK Global Partner Program, through which vendors can establish approved integrations into CDK DMS platforms. The 3PA Program is not a "product"—it is an integral part of the CDK DMS. Addanki Decl. ¶¶ 20, 43, 44, 46; Gardner Decl. ¶ 11.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 13 of 83 PageID #:85428
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/06/17 Page 1206102-35428
PURSUANT TO PROTECTIVE ORDER

33.     Reynolds has an integration product – called the "Reynolds Certified Interface" ("RCI") program – for dealers using the Reynolds DMS. Maas Decl. ¶ 16.

**Response:** Disputed. RCI is not a "product"—it is an integral part of the Reynolds DMS. Reynolds does not provide any product that provides "data access" or "integration." Addanki Decl. ¶¶ 20, 43, 44, 46; Schaefer Decl. ¶ 50.

34.     Authenticom will show at the evidentiary hearing that Reynolds does not have an integration product that pulls data from dealers that use non-Reynolds DMS systems.

**Response:** Undisputed.

35.     Authenticom introduced its data integration product in 2004, and the current version of the product is called DealerVault. Cottrell Decl. ¶¶ 23, 29.

**Response:** Undisputed that Authenticom currently operates a product called "DealerVault" that purports to manage data obtained from various DMS providers, including CDK and Reynolds. Defendants are unable to determine what services were offered or introduced by Authenticom in 2004.

36.     Before a data integrator can pull data, it must get specific authorization from the dealer. Maas Decl. ¶¶ 9, 15; Korp Decl. ¶ 25; Fitkin Decl. ¶ 9.

**Response:** Disputed. Undisputed that dealer authorization is a necessary prerequisite to a data integrator pulling data, but disputed that it is sufficient. It is further disputed that data integrators always get such authorization. It is further disputed that dealers that are CDK or Reynolds DMS customers have the contractual right to grant unauthorized third-parties access to the DMS. Karp Decl. ¶ 19; Gardner Decl. ¶ 32; Schaefer Decl. ¶¶ 17, 19.

37.     For integrators like Authenticom, Digital Motorworks, and IntegraLink, dealers must set up separate login credentials for the integrators so that they can access the DMS database to pull the data. Korp Decl. ¶¶ 10, 14, 26; Fitkin Decl. ¶ 9; Cottrell Decl. ¶ 24; Ex. 12.

**Response:** Disputed in part. It is undisputed that some dealers set up login credentials for certain "data integrators" like Authenticom so that they can access the DMS, but it is disputed that dealers are authorized to do so with respect to the CDK or Reynolds DMS. Gardner Decl.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 14 of 83 PageID #:85429
Case: 3:17-cv-00318-jdp Document #: 86-48 Filed: 06/06/17 Page 136 of 162

PURSUANT TO PROTECTIVE ORDER

¶ 32; Schaefer Decl. ¶¶ 17, 19. *See also* Pl. Exs. 17, 49. In addition, some "data integrators" sometimes use dealers' existing usernames and passwords. Schaefer Decl. ¶ 74. With very few exceptions, DMI and IntegraLink do not use dealer-issued login credentials to perform their data extraction services; and they no longer do so with respect to CDK or Reynolds systems. Gardner Decl. ¶¶ 77, 86. *See also* Resp. to SOF ¶ 80, *infra*.

38.     Once dealers set up login credentials, the data integrator automates the pulling of data through user emulation software, which uses the database software to run and capture the reports in the same way as a user at a dealership would. Cottrell Decl. ¶ 25.

**Response:** Disputed in part. Automated data pulling and screen-scraping techniques are, by definition, different than a dealership user running manual reports. Gardner Decl. ¶ 35; Rosenbach Decl. ¶¶ 171-176; Schaefer Decl. ¶¶ 45-47. Otherwise, undisputed.

39.     Dealers authorize but typically do not pay integrators to pull their data. Instead, vendors pay integrators for their data services. Maas Decl. ¶ 18; Cottrell Decl. ¶ 61.

**Response:** Disputed in part. Dealers are not authorized to allow "integrators" to pull data from the CDK or Reynolds DMS. Gardner Decl. ¶ 32; Schaefer Decl. ¶¶ 17-19; Pl. Exs. 17, 49. Undisputed, however, that the dealers who do "authorize" Authenticom to access their DMS do not pay Authenticom for any service it provides. Upon information and belief, it is undisputed that some vendors pay Authenticom for some form of service. Gardner Decl. ¶ 31.

40.     The most sensitive data pulled by data integrators are names and contact information (such as home and email addresses). Independent data integrators like Authenticom do not have access to the more sensitive categories of data such as social security and credit card numbers. Cottrell Decl. ¶ 13.

**Response:** Disputed. When Authenticom accesses a CDK or Reynolds DMS using a dealer-issued username and password, ==depending on the security permissions associated with that log-on it== may receive access to *all* the data in the DMS, ==including highly sensitive, encrypted data such as social security, driver's license, and credit card numbers.== Crutchfield Decl. ¶ 14; Rosenbach Decl. ¶ 158; Schaefer Decl. ¶ 21. Indeed, Authenticom's own instructions to dealers

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 15 of 83 PageID #:85480
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/06/17 Page 14 of 82

PURSUANT TO PROTECTIVE ORDER

tell the dealers to grant Authenticom access to *all* data on the DMS. Schaefer Decl. ¶ 76; Defs. Ex. 62. The Cottrell declaration merely states (at ¶ 13) that it is only "industry standard practice" (which is undefined) that prevents Authenticom from viewing and pulling such highly confidential information.

### A.     Dealer Ownership and Control of Their Data

41.     The data on a dealer's DMS database belongs to the dealer. Maas Decl. ¶ 8; Fitkin Decl. ¶ 4; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

**Response:** Disputed in part. While *some* of the data stored on a DMS platform/in the DMS database—often referred to as a dealer's "business data" or "operational data"—belongs to the dealer, other confidential and proprietary data in the DMS database, including DMS provider proprietary data, OEM data, contracted third-party data, credit-reporting data, and other non-automotive third parties' data also resides there. Crutchfield Decl. ¶ 14; Schaefer Decl. ¶¶ 20-26; Rosenbach Decl. ¶¶ 42-55.   Indeed, dealers on CDK DMS platforms expressly "acknowledge[]" that all "Software," "data bases," and "related materials" are the exclusive and confidential property of CDK. *See* Pl. Ex. 18 (CDK MSA § 6.A). Dealers on Reynolds DMS platforms expressly "acknowledge that the Licensed Matter constitutes valuable proprietary property, includes confidential information and constitutes trade secrets that embody substantial creative efforts" and agree not to "disclose or otherwise permit any person, firm, or entity access to or use of the Licensed Matter."  Pl. Ex. 17 at 21. Finally, whether a dealer "owns" certain confidential customer or other information stored on a DMS does not obviate CDK's or Reynolds's obligations, contractual and otherwise, to protect that information from unapproved disclosure. Karp Decl. ¶ 26; Schaefer Decl. ¶¶ 23-24.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 16 of 83 PageID #:85481
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/08/18 Page 19 of 92
PURSUANT TO PROTECTIVE ORDER

42. Tom Schwartz, Reynolds' chief spokesperson, publicly stated: "The data belongs to the dealers. We all agree on that." Ex. 4.

**Response:** Undisputed, subject to the clarification that the quoted language goes on to say that "But we can't have people rooting around in a dealer's DMS. That creates a liability." Pl. Ex. 4.

43. On its website, Reynolds represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership." Ex. 14.

**Response:** Undisputed.

44. Howard Gardner, CDK vice president over data strategy, stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." Ex. 15.

**Response:** Disputed in part. Undisputed that the quoted statement from 2013 regarding CDK's 3PA program (f/k/a ADP Third Party Access Program), which was attributed to Mr. Gardner, appears in Pl. Ex. 15. However, Mr. Gardner's statement, which is taken out of context, was made in *support* of the 3PA vendor certification program as a way for "dealers to do business with the third party vendors of their choice without sacrificing security[.]" *Id.* He was not in any way advocating for allowing unauthorized third-party access to the DMS. Gardner Decl. ¶ 14.

45. CDK's website states: "CDK has always understood that dealerships own their data." Ex. 16.

**Response:** Undisputed that the quoted statement appears in Pl. Ex. 16, which in its entirety reads: "CDK has always understood that dealerships own their data, *so we offer an open yet secure Dealer Management System (DMS) through the CDK Third Party Access Program. We give you the flexibility to provide DMS access to third parties without sacrificing security.*" Pl. Ex. 16 (emphasis added).

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 17 of 83 PageID #:85482
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/08/17 Page 16 of 82

PURSUANT TO PROTECTIVE ORDER

46. Reynolds' DMS contract states: "Reynolds recognizes that your Business Data belongs to you." Ex. 17.

**Response:** Undisputed that the quoted statement appears in Reynolds's Customer Guide, which is incorporated into its DMS contract. Pl. Ex. 17.

47. CDK's DMS contract states: "Any Client file or other information provided by Client to CDK for use with the Services . . . shall remain the exclusive and confidential property of Client." Ex. 18, § 7.A.

**Response:** Undisputed that the quoted statement appears in § 7.A of the CDK MSA. Pl. Ex. 18.

48. Steve Anenen, CDK's recently retired CEO, publicly stated that dealers have the right to grant third parties, such as data integrators, access to their data. He told *Automotive News*: "We're not going to prohibit that or get in the way of that. I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" Ex. 19.

**Response:** Disputed in part. While the quoted statements from 2007 and attributed to Mr. Anenen appear in Pl. Ex. 19, they do not reflect CDK's policies or the state of the industry nearly a decade later, in 2017. Crutchfield Decl. ¶ 4; Gardner Decl. ¶¶ 27-29; Rosenbach ¶¶ 80-81, 159; Thorne Decl. ¶ 67.

49. Matt Parsons, CDK's vice president of sales, publicly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that." Ex. 20.

**Response:** Disputed in part. While the quoted statement from 2007 and attributed to Mr. Parsons appears in Pl. Ex. 20, it does not reflect CDK's policies or the state of the industry nearly a decade later, in 2017. Crutchfield Decl. ¶ 4; Gardner Decl. ¶¶ 27-29; Rosenbach ¶¶ 80-81, 159; Thorne Decl. ¶ 67.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 18 of 83 PageID #:85483
Case: 3:17-cv-00318-jdp Document #: 860-18 Filed: 05/08/17 Page 18 of 82 Page ID #:85483

PURSUANT TO PROTECTIVE ORDER

50.    Kevin Henahan, CDK's senior vice president of marketing, publicly stated: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." Ex. 21.

**Response:**  Disputed in part. While the quoted statement from 2006 and attributed to Mr.

Henahan appears in Pl. Ex. 21, it does not reflect CDK's policies or the state of the industry

more than a decade later, in 2017. Crutchfield Decl. ¶ 4; Gardner Decl. ¶¶ 27-29; Rosenbach ¶¶

80-81, 159; Thorne Decl. ¶ 67.

51.    On February 2, 2007, the National Auto Dealers Association and American International Automobile Dealers Association, the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility." The purpose of the statement was to "guide the use and protection of data in dealership management systems." The joint statement set forth the following principles. First, "[d]ealers should control access to the data stored in their dealership management systems." Second, "[d]ealers, not dealership management system vendors or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data." And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . [r]efrain from unreasonably impeding dealer-authorized access to dealer data." Ex. 22.

**Response:**  Disputed in part. Undisputed that the quoted statements appear in Pl. Ex. 22,

and that the National Auto Dealers Association ("NADA") and that the American International

Automobile Dealers Association ("AIADA") are two of the largest automobile dealer

associations in the U.S. However, these quoted statements read in their entirety do not reflect the

policies of these organizations today, more than a decade later. Schaefer Decl. ¶¶ 34-35; Thorne

Decl. ¶ 67

Indeed in 2013, NADA issued a watershed policy memorandum to its members,

advocating the stringent third-party access and security principles (which Reynolds had espoused

for years). The memo also explicitly states that dealers should consider implementing a strict

data "push" system—i.e., manual data distribution only. Schaefer Decl. ¶¶ 34-35; Defs. Ex. 15;

Thorne Decl. ¶ 15.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 19 of 83 PageID #:85484
Case: 3:17-cv-00318-jdp Document #: 868-48 Filed: 06/10/17 Page 1906 102

PURSUANT TO PROTECTIVE ORDER

52.     Individual dealers themselves have repeatedly made clear that they control who has access to their data. Maas Decl. ¶ 9; Longpre Decl. ¶ 4; Korp Decl. ¶ 21; Fitkin Decl. ¶ 4.

**Response:** Disputed in part. It is undisputed that individual dealers have stated that they control who has access to their data, but it is disputed that dealers are authorized to grant third-parties access to the CDK or Reynolds DMS platforms or that all dealers believe that third parties should have access to the DMS. Schaefer Decl. ¶¶ 17-19; Thorne Decl. ¶ 68; Pl. Exs. 17, 49; Defs. Ex. 61.

Plaintiff acknowledges (SOF ¶ 150) that CDK's MSA expressly provides that dealers "shall not allow access to any CDK Products by any third parties except as otherwise permitted by this Agreement," and states in all capital letters that "CLIENT IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." Pl. Ex. 18 (CDK MSA §§ 6.B, 6.D.). This contract provision, or variations thereof, have been used in CDK MSA's since at least 1994. Karp Decl. ¶ 17.

Similarly, as Plaintiff acknowledges in SOF ¶ 153, (i) Reynolds's standard DMS contract prohibits dealers from "provid[ing] access to [the DMS] . . . to any third party." Pl. Ex. 49, § 1; and (ii) The Reynolds DMS Customer Guide, which is incorporated into the contract, similarly states that the dealer is barred from "permit[ting] any person, firm or entity access to" the DMS. Pl. Ex. 17, at 21.

53.     For example, a Lexus dealership in California stated that "[a]s a dealership owner, I believe that [DMS providers have] no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security." Ex. 23.

**Response:** Disputed in part. Undisputed that the quoted statement attributed to Mr. Longpre of Lexus of Westminster, a CDK DMS customer, appears in Pl. Ex. 23. However, CDK does not in any way purport to prohibit Lexus of Westminster (or any other DMS dealer

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 20 of 83 PageID #:85485
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/06/17 Page 196 of 192

PURSUANT TO PROTECTIVE ORDER

customer) from accessing its own data, nor does CDK purport to prohibit any DMS customer from subsequently distributing its own data to vendors (or anyone else). The agreements between CDK and its DMS customers merely prohibit ==allowing unauthorized third-parties (such as Authenticom) to access the DMS *itself* without CDK's agreement or consent.== *See* Pl. Ex. 18 (CDK MSA §§ 6.B, 6.D); Gardner Decl. ¶ 22.

54.     A large coalition of dealers, application providers, data integrators, and DMS providers – including CDK and Authenticom – formed an industry group called Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." Ex. 24; Cottrell Decl. ¶ 16.

**Response:** Disputed in part. Undisputed that the quoted statement appears in Pl. Ex. 24, a press release from 2007 attributed to Open Secure Access, Inc., and that CDK's predecessor company, Automatic Data Processing, Inc. ("ADP") and Authenticom were members of Open Secure Access at the time of the press release. However, CDK was not a member of Open Secure Access, which was formed in 2006, and is now defunct. Karp Decl. ¶ 24; Defs. Exs. 72, 73.

55.     The Open Secure Access group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database." Ex. 25.

**Response:** Undisputed that the quoted statements purporting to be from an Open Secure Access webpage from 2007 (but which is not available today) appear in Pl. Ex. 25, but the statements are inadmissible hearsay. *See also* Response to SOF ¶ 54. In addition, these principles were published in 2007, well before the 2013 NADA pronouncements. Pl. Ex. 25. *See also* Resp. to SOF ¶ 51, *supra*.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 21 of 83 PageID #:85486
Case: 3:17-cv-00318-jdp Document #: 860-48 06/30/17 Page 20 of 82
PURSUANT TO PROTECTIVE ORDER

### B. Authenticom

56. Authenticom was founded in 2002 by Steve Cottrell. Cottrell Decl. ¶ 1.

**Response:** Undisputed.

57. Authenticom introduced its data integration service in 2004. Cottrell Decl. ¶ 23.

**Response:** Defendants are unable to determine what services were offered by Authenticom in 2004.

58. When Authenticom pulls dealer data, it formats the data into a consistent, usable format for third-party application providers. Fitkin Decl. ¶ 7; Korp Decl. ¶ 7.

**Response:** Undisputed that Authenticom reformats the data that it extracts from DMS systems and that it provides data to third parties. However, Defendants are unable to determine to what extent Authenticom reformats the data into a "consistent, usable format."

59. Dealers specifically authorize Authenticom to pull their data. Fitkin Decl. ¶ 9; Korp Decl. ¶ 25.

**Response:** Disputed. Neither CDK nor Reynolds dealers have the right to authorize Authenticom or any other third party to directly access or extract data from a dealer's DMS interface. Karp Decl. ¶ 19; Gardner Decl. ¶ 32; Schaefer Decl. ¶¶ 17-19; Pl. Exs. 17, 49; Defs. Ex. 61.

60. Authenticom pulled dealer data from all of the available DMS platforms – including CDK and Reynolds – using the industry standard (login credentials provided by dealers). Cottrell Decl. ¶ 25.

**Response:** Disputed in part. Undisputed that Authenticom has accessed data stored on CDK and Reynolds DMS platforms using dealer login credentials in violation of dealer agreements with CDK and Reynolds. However, it is disputed that that there is any "industry standard" that treats the usage of username-and-password access as appropriate. Rosenbach Decl. ¶ 95. Indeed, Authenticom's own contracts forbid dealers from sharing their DealerVault passwords with any third parties—precisely the same restriction that Authenticom now seeks to

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 22 of 83 PageID #:85437
Case: 3:17-cv-00318-jdp Document #: 86-8 filed: 06/06/17 Page 21 of 82
PURSUANT TO PROTECTIVE ORDER

violate and invalidate in Reynolds's and CDK's dealership agreements—thereby refuting any notion that login-sharing is valid industry practice. *Id.*; Pl. Ex. 28, at § 6.7 (Authenticom Contract).

61. Authenticom grew to serve 15,000 dealerships (out of approximately 17,000 franchised dealers nationwide) and nearly 500 application providers. Cottrell Decl. ¶ 34; Ex. 26.

**Response:** Undisputed that in October 2016, Authenticom claimed to serve more than 15,000 dealerships and more than 450 vendor partners. *See* Pl. Ex. 26.

62. As Authenticom grew, CDK and Reynolds did not interfere with Authenticom's pulling of dealer data from dealers' DMS databases. Cottrell Decl. ¶ 34.

**Response:** Disputed. Reynolds, for example, has taken active steps to prevent third-party access to its DMS since the early 2000's. Schaefer Decl. ¶¶ 29-30. Similarly, in a number of instances over the past several years, CDK disrupted Authenticom's unauthorized access to its dealers' interfaces. Conver Decl. ¶ 22.

63. From a single employee and $0 in revenue in 2002, Authenticom grew to a business with 120 employees and over $18 million in revenue in 2014. Cottrell Decl. ¶¶ 2, 73; Ex. 27.

**Response:** Undisputed that Authenticom reported more than $18 million in revenue during its fiscal year 2014. Defendants are unable to determine Authenticom's revenue in 2002 or how many employees Authenticom had in 2002 or 2014 as Authenticom has not provided documents to substantiate those claims.

64. The current version of Authenticom's data integration service is called DealerVault. Cottrell Decl. ¶ 29.

**Response:** Disputed in part. Undisputed that Authenticom operates a product called "DealerVault" that purports to manage the distribution and syndication of data to third party vendors. However, Authenticom admits that "in this context," *i.e.*, as it describes its own business model, "'integration' is simply a synonym for data access." SOF ¶ 30.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 23 of 83 PageID #:85438
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/18/21 Page 220 of 292

PURSUANT TO PROTECTIVE ORDER

65.     DealerVault provides a unified user interface where dealers are able to add, remove, or change the data sets that Authenticom pulls and sends to the dealers' vendors. Cottrell Decl. ¶ 29.

**Response:** Undisputed that DealerVault purports to offer dealers certain options in connection with the data Authenticom hostilely extracts from the DMS platforms and that Authenticom sends data to third party vendors. Defendants are unable to verify the remaining allegations in this paragraph as Authenticom has not provided documentation to substantiate its claim.

66.     DealerVault also provides dealers with reports detailing the data Authenticom collected and to whom it was sent, all down to the granularity of a specific data field. Cottrell Decl. ¶ 29.

**Response:** Defendants are unable verify the allegations in this paragraph and are unaware of the content or details of the reports Authenticom may provide to dealers.

67.     Many dealers prefer Authenticom's DealerVault service to the integration services of CDK and Reynolds because DealerVault allows dealers to easily manage and control how their data is used. Fitkin Decl. ¶ 6; Longpre Decl. ¶¶ 5, 10; Maas Decl. ¶ 15.

**Response:** Disputed. Authenticom cites statements from only three of the "15,000 dealerships" it claims to support. *See* SOF ¶ 61. Moreover, the "preference" between DealerVault and services provided by CDK or Reynolds is a false comparison of entirely different products (and neither Messrs. Fitkin nor Maas claim to make this comparison). Addanki Decl. ¶¶ 43, 44, 46. Further, DealerVault only purports to provide dealers with control over data already extracted by Authenticom from their DMS; DealerVault provides no visibility or control over third-party access to data in DMS itself. Gardner Decl. ¶ 36.

68.     In Authenticom's agreements with dealers, the Terms and Conditions state that (1) Authenticom extracts only that data that the dealer has specifically authorized Authenticom to pull, *see* Ex. 28, § 3.4; (2) Authenticom sends data only to those vendors selected by the dealership, *see id.* § 5.3; (3) that Authenticom will not use the dealer data for any other purpose; and (4) that dealers maintain ownership over their data, *see id.* In turn, dealers represent and agree that they have the right to grant Authenticom access to pull data from their DMS databases. *Id.* § 7.1.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 24 of 83 PageID #:85489
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/17 Page 23 of 82

PURSUANT TO PROTECTIVE ORDER

**Response:** Disputed in part. Undisputed that Authenticom's purported Terms and Conditions governing DealerVault (Pl. Ex. 28) state that "DealerVault shall only extract the Dealership Data that the Dealership permits DealerVault to extract," *id.* § 3.4, that "DealerVault may only disclose Dealership Data to third parties as authorized by Dealership or as required by law," and that "Dealership will retain all ownership of Dealership Data that Dealership submits to DealerVault …," *id.* § 5.3.

However, it is disputed that Authenticom complies with these provisions. For example, Authenticom knows that its obtaining login credentials from dealers results in a breach of the dealers' contractual agreements with CDK and Reynolds. *See* Pl. Ex. 18 (CDK MSA §§ 6.B, 6.D (CDK DMS Agreement)); Pl. Exs. 17, 49 (Reynolds DMS Contract). In addition, Authenticom, in hostilely accessing CDK's systems, fraudulently represents that it is an employee of a dealership and therefore authorized to access the system. Gardner Decl. ¶ 30. Thus, while the Terms and Conditions apparently require dealers to represent and warrant that their "entrance into these Terms and Conditions does not violate any agreement between such Party and any third party," *id.* § 7.1, Authenticom knows that not to be the case.

Further, it is disputed that Authenticom extracts only that data that the dealer has specifically authorized Authenticom to pull. Defs. Ex. 61.

69. Authenticom's standard pricing to pull data is $25 for the first data set, and then $50 for two or more (Authenticom can supply up to seven different data sets). The average price per vendor to pull data is between $30 and $40 per dealership rooftop per month. Cottrell Decl. ¶ 63.

**Response:** Disputed. CDK and Reynolds are unable to determine Authenticom's "standard" pricing or its "average price per vendor" and Mr. Cottrell's declaration does not include a copy of Authenticom's price list or any documentation of its "standard" pricing. In addition, Defendants have evidence of Authenticom charging higher amounts. Defs. Ex. 64.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 25 of 83 PageID #:85440
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/06/19 Page 25 of 82

PURSUANT TO PROTECTIVE ORDER

70.     Authenticom's contracts with vendors have one-year terms (though vendors can cancel services at any time). Cottrell Decl. ¶ 62.

**Response:** Defendants are unable to determine the term length of all of Authenticom's vendor contracts or the procedures for canceling services without access to Authenticom's vendor contracts.

71.     For bi-directional access – i.e., for data "pulled" from the dealer's DMS database as well as "pushed" back in – Authenticom has charged at most $75 per month for that bundled service, and that price included additional services such as data hygiene. Cottrell Decl. ¶ 64.

**Response:** Defendants are unable to determine Authenticom's pricing to all of its customers for "bi-directional" access to DMS or what services it includes without access to Authenticom's vendor contracts or its historical billing records.

72.     Authenticom has a setup fee of $2,500 for its services, but that works as a down payment credited against the vendor's first invoices. Cottrell Decl. ¶ 65.

**Response:** Defendants are unable to determine what setup fees are charged by Authenticom to all of its customers or how those fees are credited against future invoices without access to Authenticom's vendor contracts or its historical billing records. Moreover, Defendants have evidence of Authenticom charging per-rooftop set-up fees. Defs. Ex. 64.

73.     Authenticom's security protections and protocol are state of the art. Cottrell Decl. ¶ 30; Korp Decl. ¶ 7; Longpre Decl. ¶ 10; Fitkin Decl. ¶ 8.

**Response:** Disputed. None of the dealer statements cited in this Paragraph support the proposition that Authenticom's security protections are "state of the art." Moreover, the conclusory statement by Mr. Cottrell (at ¶ 30) that "Authenticom's security protections and protocol are state of the art" is unsupported by documents and contrary to expert evidence. Rosenbach Decl. ¶¶ 150-178.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 26 of 83 PageID #:85441
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 256 of 92
PURSUANT TO PROTECTIVE ORDER

74. Authenticom has never had a data breach and its firewall has never been compromised. Cottrell Decl. ¶ 30.

**Response:** Defendants are unable to verify whether Authenticom has ever had a data breach or whether its firewall has been compromised or how Authenticom came to these conclusions as no supporting documentation has been provided.

75. Authenticom transfers all data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions. Cottrell Decl. ¶ 30.

**Response:** Disputed. Defendants are unable to determine whether Authenticom transfers data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions and Authenticom has not made available its data transfer protocols or any documentation to support these claims. Moreover, the practices described by Mr. Cottrell do not meet or exceed these standards. Rosenbach Decl. ¶¶ 150-178.

76. Authenticom partners with Microsoft Azure cloud services and has achieved Microsoft's top-level gold security certification three years in a row. Cottrell Decl. ¶ 31.

**Response:** Disputed. Neither Authenticom nor DealerVault appears to be a current Microsoft Certified Partner. Rosenbach Decl. ¶ 157. Moreover, while Microsoft offers gold certification in various competencies, security does not currently appear to be one of them. Rosenbach Decl. ¶ 157.

77. Authenticom's information security system exceeds applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. Authenticom's contracts with dealers guarantee compliance with those regulatory requirements. Cottrell Decl. ¶ 31.

**Response:** Disputed. Authenticom's information security system fails to meet applicable consumer privacy and protection restrictions in several respects. Rosenbach Decl. ¶¶ 150-178.

Further, Authenticom's customer contracts (Pl. Ex. 28) which purport (at 1) to "constitute the entire agreement between the Dealership … and Authenticom," make no reference to either

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 27 of 83 PageID #:85442
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 26 of 82

PURSUANT TO PROTECTIVE ORDER

the Gramm-Leach-Bliley Act of 1999 or the Federal Trade Commission's Implementing Rules

standard.

78.     Authenticom agrees to indemnify dealers in the event there is any data security
event. In case such an event ever occurred, Authenticom has a $20 million cyber liability
insurance policy. Cottrell Decl. ¶ 31.

**Response:** Disputed. Authenticom's Terms and Conditions state that its duty to

indemnify dealers is limited to "event[s] concerning the security of the Dealership Data while the

Dealership Data is in the possession of DealerVault," not "any data security event." *See* Pl. Ex.

28 § 8.2.

In addition, no current cyber liability policy has been produced by Authenticom, and

therefore Mr. Cottrell's testimony about its contents are inadmissible under the best evidence

rule and Fed. R. Civ. Evid. 1007.

79.     President Barack Obama singled out Authenticom and Mr. Cottrell for praise in a
speech in La Crosse, Wisconsin, on July 2, 2015. Among other comments, the President stated:
"In 2002, Steve [Cottrell] started a small business out of his house to help manage data for car
companies and dealerships." During the recession of 2007-2009, "Steve invested in new people,
new technology, decided to double down, was absolutely confident his business model was
right." When "the auto industry came roaring back, things began booming." "Steve's revenue is
up 1000 percent. His company, Authenticom, has gone from 18 employees to more than 120. So
this business that began in Steve's son's old bedroom is now one of America's fastest growing
private companies based in a restored historic building right in downtown La Crosse." Ex. 27.

**Response:** Undisputed that the quoted statements appear in Auth. Ex. 27.

**C.     CDK's Data Integration Products**

**1.     Digital Motorworks and IntegraLink**

80.     Like Authenticom, Digital Motorworks and IntegraLink obtain authorization from
dealers to pull data (using login credentials) and provide that data to vendors. Ex. 12; Cottrell
Decl. ¶ 9.

**Response:** Disputed in part. DMI and IntegraLink (n/k/a CDK Data Services, Inc.) at one

time used login credentials provided by dealers to obtain data from non-CDK DMS. They no

longer do so except on behalf of a few dealers in accordance with contractual agreements. Defs.

PURSUANT TO PROTECTIVE ORDER

Ex. 1. Other DMS providers (*e.g.*, AutoSoft, PBS, Adam, Advent, and others) "push" data directly to DMI and IntegraLink such that DMI and IntegraLink do not directly access their DMS operations at all. Gardner Decl. ¶ 83. Another DMS provider, Auto/Mate, requires DMI to submit authorization forms executed by the dealers before it allows DMI to access the DMS and obtain data on their behalf using DMS login credentials supplied by Auto/Mate. *Id.; see also* Pl. Ex. 13 at 2 (describing this process).

None of the processes described above is hostile integration "[l]ike Authenticom," as, among other things, they occur with the DMS provider's knowledge, authorization, and often its participation. Gardner Decl. ¶ 85.

81. CDK acquired Digital Motorworks in 2002, and stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." Ex. 29.

**Response:** Undisputed that ADP (CDK's predecessor company) acquired DMI in 2002 and that the excerpted statement appears in Pl. Ex. 29.

82. CDK acquired IntegraLink in 2010. Ex. 30. IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems" using the same standard process. Ex. 31.

**Response:** Disputed in part. Undisputed that ADP (CDK's predecessor company) acquired IntegraLink in 2010 and that the excerpted statement appears in Pl. Ex. 31, but disputed that the cited document supports the proposition that IntegraLink used the "same standard process" or that such a thing even exits.

83. For over a decade before February 2015, CDK (through Digital Motorworks and IntegraLink) pulled data from Reynolds dealers' DMS databases using login credentials, instructing dealers to provide them with a "user ID, password, and store number with access to program 2213 & 6910 ([Reynolds] report generator)."). Ex. 13.

**Response:** Disputed. ADP (CDK's predecessor company) acquired DMI in 2002 but did not acquire IntegraLink until 2010. CDK was spun off from ADP as an independent company in

PURSUANT TO PROTECTIVE ORDER

2014. CDK does not dispute that there was a period of time during which it used dealer login credentials to obtain data from Reynolds's DMS. Gardner Decl. ¶ 77. *See also* Resp. to SOF ¶ 80.

84.　　For many years, Reynolds did not block CDK's access to dealer data – just as it did not block Authenticom and other dealer data integrators. Ex. 12; Cottrell Decl. ¶¶ 34-35.

**Response:** Disputed. Such access was always legally prohibited by Reynolds's DMS contracts. Pl. Ex. 21, 32. The extent to which it was technologically blocked varied over time, with increasing security measures being implemented starting at least in 2004. Schaefer Decl. ¶ 30; Pl. Exs. 21, 32.

85.　　Reynolds did not start blocking CDK and other independent integrators in earnest until 2011. Ex. 32; Ex. 12.

**Response:** Disputed. Such access was always legally prohibited by Reynolds's DMS contracts. The extent to which it was technologically blocked varied over time, with increasing security measures being implemented starting at least in 2004. Schaefer Decl. ¶ 30; Pl. Exs. 21, 32.

86.　　In 2011, Reynolds blocked and disabled CDK's usernames, disrupting Digital Motorworks' and IntegraLink's pulling of data. As described by CDK to dealers, "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, [Digital Motorworks,] and other third-party data-collection services from collecting data for programs you have enrolled in." "In short," CDK explained, "when Reynolds and Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform." Ex. 12, at 1.

**Response:** Undisputed that Reynolds disabled usernames and passwords used by DMI and IntegraLink in 2011 and that the quoted statements appear in Pl. Ex. 12. Gardner Decl. ¶ 78.

PURSUANT TO PROTECTIVE ORDER

87. To circumvent Reynolds' blocking, CDK rolled out a new solution called "SMART-R." As described by CDK, SMART-R "automates the process of running [Reynolds DMS data] reports (7601/7602), captures and encrypts the output, and then securely transfers the data to IntegraLink" or Digital Motorworks. Ex. 12, at 1.

**Response:** Disputed in part. Undisputed that IntegraLink offered a solution to dealers called SMART-R that was "intended to work within the restrictions implemented by Reynolds" on its DMS. Pl. Ex. 12 at 1. However, SMART-R was a version of a solution that was "rolled out" by IntegraLink in 2007, before IntegraLink was acquired by ADP. Gardner Decl. ¶ 79.

88. Robert Brockman, the owner and CEO of Reynolds, was asked about the fact that CDK "will not prohibit dealers from providing their vendors with a user ID and password to extract data." Mr. Brockman responded: "I don't understand [CDK's] position. Other than to be obstinate, than to be opposite, I can't imagine from a business standpoint that that's truly their position. And frankly it would be my opinion that after awhile they probably change that position." Ex. 33."

**Response:** Undisputed.

89. In February 2015, Mr. Brockman's prediction became reality when CDK entered into an agreement with Reynolds to restrict access to dealer data. Ex. 34; Ex. 35.

**Response:** Disputed. CDK and Reynolds have never entered into any agreement to restrict access to dealer data, nor is any such agreement reflected in any of the referenced exhibits. Karp Decl. ¶¶ 33-34; Schaefer Decl. ¶ 110; Defs. Exs. 1, 2, 3 (Feb 2015 Agreements).

90. After the agreement, CDK discontinued its data integration business for dealers using the Reynolds DMS. Ex. 34; Ex. 35.

**Response:** Disputed. CDK and Reynolds have never entered into any agreement to restrict access to dealer data, nor is any such agreement reflected in any of the referenced exhibits. Karp Decl. ¶¶ 33-34; Schaefer Decl. ¶ 110; Defs. Exs. 1, 2, 3 (Feb 2015 Agreements). In addition, CDK continues to offer various Managed Data Services to vendor clients certified under the Reynolds RCI program, including data cleansing, standardization, aggregation, and related support services. Gardner Decl. ¶ 82.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 31 of 83 PageID #:85446
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 30 of 82

PURSUANT TO PROTECTIVE ORDER

91.     Today, CDK – through Digital Motorworks and IntegraLink – continues to pull data from dealerships using non-Reynolds DMS systems. Cottrell Decl. ¶ 57; Ex. 36.

**Response:** Undisputed that CDK (including through DMI and IntegraLink) obtain certain data from non-Reynolds DMS platforms, with the authorization of both the participating dealers and DMS providers. *See* Resp. to SOF ¶ 80; Gardner Decl. ¶¶ 83-85.

92.     Authenticom will show at the evidentiary hearing that CDK charges vendors only $25 to $50 per connection for data pulled from dealers using non-Reynolds DMS systems.

**Response:** Disputed. CDK's 3PA pricing as to all third party vendors is now standardized across application categories. Conver Decl. ¶ 33.

### 2.     CDK's 3PA Program

93.     CDK provides access to dealer data on the CDK DMS through its data integration product called the 3PA program. Maas Decl. ¶ 16.

**Response:** Undisputed that CDK facilitates access to dealer data through its 3PA program a/k/a the CDK Global Partner Program.

94.     Before February 2015, the 3PA program provided for "basic access" by which a dealer "supplie[d] third-party vendor[s] a user ID and password to access [the] dealership's system." It also provided for "Third-Party Integration," which was data access obtained directly from CDK and included "real-time access" and a "bi-directional" interface. Ex. 19; Ex. 16.

**Response:** Disputed. For years prior to February 2015, CDK (and its predecessor ADP) did not approve third-party access to its DMS platform using dealer log-in credentials—the so-called "Third-Party Basic Access" referenced in Pl. Ex. 19, a third-party *Automotive News* article. CDK and ADP's contracts with its dealers have expressly prohibited such access since the mid 1990s. Thorne Decl. ¶ 12.

95.     CDK's prices for the third-party integration level of data access was approximately $70 per month per dealership rooftop. Ex. 10.

**Response:** Disputed. While Pl. Ex. 10, a third-party *Automotive News* article, contains a statement attributed to unidentified "vendors" that the fees under CDK's 3PA program were on

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 32 of 83 PageID #:85447
Case: 3:17-cv-00318-jdp Document #: 868-1 Filed: 06/06/18 Page 32 of 82

PURSUANT TO PROTECTIVE ORDER

"average about $70 per software product," the statement is inadmissible hearsay. Further, CDK's standard pricing under an earlier iteration of its partner program for many extraction-only DMS connections was $25 per dealership/month. For bi-directional ("writeback") access, CDK's pricing varied significantly. Some vendors paid more than $70 per dealership rooftop, while other vendors paid less. Conver Decl. ¶ 30. Among other things, the changes to CDK's 3PA pricing structure announced in 2015 were intended to standardize 3PA pricing and "level the playing field." Thorne Decl. ¶¶ 72-73.

96.     After CDK and Reynolds entered into their agreement in February 2015, CDK changed its 3PA program to match Reynolds's RCI program. Ex. 10; Ex. 37.

**Response:** Disputed. CDK began revising its 3PA program in July 2014, almost a year before entering into the Data Exchange Agreement with Reynolds. Further, CDK's revised 3PA program does not "match" the Reynolds RCI program in several material respects. Conver Decl. ¶¶ 15, 42; Gardner Decl. ¶ 18.

97.     CDK now blocks dealers from granting third-party data integrators (like Authenticom) access to dealer data. Cottrell Decl. ¶ 41.

**Response:** Disputed in part. While CDK does not allow Authenticom (or any other unauthorized third-party) to access its DMS platform outside of the CDK Global Partner program, CDK does not prevent "access to dealer data." In fact, the purpose of the 3PA program is to facilitate safe and secure third-party access to dealer data in DMS. Thorne Decl. ¶ 69.

98.     On average, CDK now charges vendors between $250 and $300 per connection, almost triple the $70 that it charged before for the same services. Ex. 10; Ex. 38.

**Response:** Disputed. The statements attributed to unidentified "vendors" and an unidentified "CDK" representative in Pl. Ex. 10, an *Automotive News* article, are inadmissible hearsay. And Pl. Ex. 38, another *Automotive News* article, provides no support for any statement in this Paragraph.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 33 of 83 PageID #:85448
Case: 3:37-cv-00318-jdp Document #: 868-18 Filed: 06/28/21 Page 32 of 82

PURSUANT TO PROTECTIVE ORDER

Further, under earlier iterations of its partner program, CDK's standard pricing for many extraction-only DMS connections was $25 (per connection) per month. For "writeback" access, CDK's pricing varied. Some vendors paid more than $70 per month, and others paid less. Among other things, the changes to CDK's 3PA pricing structure announced in 2015 were intended to standardize 3PA pricing and "level the playing field." Conver Decl. ¶¶ 30-31; Thorne Decl. ¶¶ 72-73.

Under the current 3PA program, pricing for *some* "writeback" packages (which include all necessary data connections) is between $220 and $275 per month, but other packages are as low as $60 per month. And pricing for extraction-only connections (such as those offered by Authenticom) is generally much lower. For example, CDK's standard extraction pricing has remained under $50 per month for many data extracts. Conver Decl. ¶¶ 37-38.

99. For "bi-directional" access – that is, for both "pulling" data from the DMS and "pushing" data back into the database – CDK charges vendors up to $700 per connection. Ex. 10; Ex. 39.

**Response:** Disputed. Both Pl. Ex. 10 and Ex. Pl. Ex. 39 reflect inadmissible hearsay statements of third-parties, and neither states that CDK now charges "up to $700 per connection" for "bi-directional" DMS access. As explained above, standard pricing under the 3PA program for "writeback" packages ranges between $60 and $275 per month. *See* Resp. to SOF ¶ 98. Conver Decl. ¶ 38.

100. CDK announced the revamped 3PA program on June 22, 2015, as part of a "SecurityFirst" initiative. Ex. 37.

**Response:** Disputed in part. Undisputed that Pl. Ex. 37 reflects a press release issued by CDK on June 22, 2015 regarding SecurityFirst. However, CDK had been working on implementing SecurityFirst for almost a year prior to the announcement and had been in

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 34 of 83 PageID #:85449
Case: 3:17-cv-00318-jdp Document #: 868-18 Filed: 06/18/21 Page 396 of 02

PURSUANT TO PROTECTIVE ORDER

discussions about it with industry stakeholders including NADA and CFO/CIO advisory boards, for months. Thorne Decl. ¶ 54.

101.    *Automotive News* reported: "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price." Ex. 10.

**Response:** Disputed. While the quoted statement attributed to unidentified "vendors" appears in Pl. Ex. 10, an *Automotive News* article, the statement is inadmissible hearsay.

Further, CDK's SecurityFirst initiative has led to several improvements to the services and integrations offered to third-party vendors through the CDK Global Partner Program. For example, CDK has expanded the program to include integrations with credit and financial information previously unavailable to vendors. In addition, data extraction integrations that were previously maintained by running multiple queries throughout the day are now being replaced with "real time" integrations that provide vendors with new data—and only new data—as it is created. These enhancements have improved the ability of third-party vendors to obtain information from the DMS and provide better service to dealers. Gardner Decl. ¶ 17; Thorne Decl. ¶ 71.

102.    *Automotive News* reported that vendors "in the CDK program . . . say the costs being charged far exceed the value of any increased data security." Ex. 10. One "vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security." *Id*.

**Response:** Disputed. While the quoted statements attributed to unidentified "vendors" appear in Pl. Ex. 10, an *Automotive News* article, the statements are inadmissible hearsay.

103.    Today, CDK declares that the 3PA program is the "only CDK-approved method [for] accessing" data on a dealer's CDK DMS. Ex. 40.

**Response:** Undisputed that CDK's 3PA program a/k/a the CDK Global Partner Program is the "only CDK-approved method for directly accessing" data on a dealer's CDK DMS. Dealers remain free to share their data with third parties without providing access to the DMS.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 35 of 83 PageID #:85450
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/10/19 Page 34 of 82
PURSUANT TO PROTECTIVE ORDER

104.    CDK labels any other method for accessing data – including through data integrators such as Authenticom – as "unauthorized." Ex. 41; Ex. 42; Ex. 43.

**Response:** Disputed in part. While third-party access to the CDK DMS outside the CDK Global Partner Program by Authenticom and others is unauthorized, CDK does not prohibit "accessing data" from dealers by any other means, including by having dealers access the DMS themselves (in accordance with their agreements) and export the requested data to any number of usable formats. Thorne Decl. ¶ 69.

### D.    Reynolds Certified Interface Program

105.    Reynolds provides integration services for dealers using the Reynolds DMS through its RCI program. Maas Decl. ¶ 16.

**Response:** Undisputed, subject to the clarification that "integration services" is a fundamental part of the Reynolds DMS. Schaefer Decl. ¶ 50.

106.    Robert Brockman acquired Reynolds in 2006.

**Response:** Disputed. The Reynolds and Reynolds Company merged a wholly owned subsidiary of with Universal Computer Systems, Inc. ("UCS") in October 2006. Robert Brockman is the founder and CEO of UCS. Defs. Ex. 70.

107.    Before Mr. Brockman acquired Reynolds, Reynolds operated like all other DMS providers in the industry, taking the position that dealers were free to have data integrators pull their data in automated ways by using login credentials. Cottrell Decl. ¶ 35; Ex. 44.

**Response:** Disputed. Schaefer Decl. ¶¶ 29-30; Pl. Ex. 21 (discussing Reynolds's security measures to prevent unauthorized third-party access prior to the merger with UCS).

108.    After Mr. Brockman acquired Reynolds, Reynolds started to gradually disable the dealer-created login credentials used by independent data integrators to pull dealer data. Cottrell Decl. ¶¶ 36.

**Response:** Disputed in part. Such access was already prohibited by Reynolds's DMS contracts prior to the merger with UCS. Such access was also prohibited in Reynolds's POWER DMS product (the DMS originated by UCS), which has never allowed third-party access and

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 36 of 83 PageID #:85451
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/30/17 Page 36 of 82

PURSUANT TO PROTECTIVE ORDER

only began to incorporate limited RCI access in recent years. It is undisputed that Reynolds's

technological abilities to prevent such unauthorized access evolved over time, with increasing

security measures being implemented starting at least in 2004, also prior to Reynolds's merger

with UCS. Schaefer Decl. ¶¶ 7, 29-30.

109.    Reynolds first started disabling Authenticom's usernames in 2009, when it
introduced "challenge questions" and "captcha" (where the user has to enter random blurred text)
to make it more difficult to automate the pulling of data. Cottrell Decl. ¶ 37.

**Response:** Undisputed.

110.    In 2011 and then again in June 2013, Reynolds intensified its tactics by disabling
Authenticom's, CDK's, and other integrators' login credentials en masse. Cottrell Decl. ¶ 38.

**Response:** Undisputed.

111.    Over a three-month period in the summer of 2013, Reynolds disabled 27,000
profiles used by Authenticom at over 3,600 dealers. Cottrell Decl. ¶ 38.

**Response:** Undisputed that Reynolds disabled a substantial number of suspicious user

IDs during the stated time frame, but ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████ Schaefer

Decl. ¶ 31.

112.    Reynolds' actions resulted in an almost complete collapse of Authenticom's
integration business for dealer data for dealers using the Reynolds DMS. Cottrell Decl. ¶ 38.

**Response:** Disputed. Authenticom's own data, relied upon by its expert Mr. Klein, shows

that there was no such collapse. *See* Klein Decl. ¶ 14.

113.    Authenticom will show at the evidentiary hearing that, by blocking independent
integrators, Reynolds transformed the RCI program into the exclusive method for automated
access to data on the Reynolds DMS.

**Response:** Disputed in part. It is undisputed that the RCI program is the only legitimate

method for authorized access to data on the Reynolds DMS. However, hostile integrators have

and continue to attempt to access the DMS. The materials relied upon by Authenticom's expert

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 37 of 83 PageID #:85452
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 36 of 82

PURSUANT TO PROTECTIVE ORDER

Mr. Klein, for example, reflect that as of November 2016 (the most recent data available), Authenticom had over 3,000 "active connections" with Reynolds customers. *See* AUTH_KLEIN_EXP_0000376.

114.    Prior to the February 2015 agreement, CDK used Reynolds' blocking of data access as a marketing tool to convince dealers to switch DMS platforms, and some dealers did switch from Reynolds to CDK. Ex. 21; Ex. 20; Ex. 19; Ex. 45.

**Response:** Undisputed subject to the clarification that the DMS market is robustly competitive, and every year, many dealerships switch DMS providers for reasons including but not limited to price, features, service, security and third-party access policies. Addanki Decl. ¶¶ 47-49, 50-52; Karp Decl. ¶ 14; Lamb Decl. ¶¶ 10, 14; Schaefer Decl. ¶¶ 12, 18-19.

115.    Reynolds charges between $300 and $800 per month (and oftentimes more) for access to dealer data. Maas Decl. ¶ 18; Ex. 11; Ex. 10.

**Response:** Disputed in part. It is disputed that Reynolds charges for "access" to dealer data. Reynolds charges for true integration by way of custom RCI interfaces. There are a variety of manual data reporting options provided by Reynolds as part of the DMS by which dealers can provide their data to third-parties at no charge. Schaefer Decl. ¶ 61; Wood Decl. ¶ 3. To the extent this Paragraph purports to refer to RCI fees, ██████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████ Schaefer Decl. ¶ 65; Wood Decl. ¶ 3.

116.    Reynolds has a tool called "Dynamic Reporting," which is a non-automated function for dealers to manually generate a data report. Cottrell Decl. ¶ 43.

**Response:** Undisputed, with the caveat that Reynolds understands that some hostile integrators, including Authenticom, have attempted to work around Reynolds limitations on automated use and attempted to use automated processes to access Dynamic Reporting. Rosenbach Decl. ¶ 158; Schaefer Decl. ¶¶ 73-75; Defs. Ex. 62; Wood Decl. ¶ 7.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 38 of 83 PageID #:85453
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/18 Page 38 of 92

PURSUANT TO PROTECTIVE ORDER

117.    To use Dynamic Reporting, Reynolds dealers must manually generate the report (or reports), and then send the necessary data to a vendor every time the vendor requires the data for its application. Cottrell Decl. ¶ 44.

**Response:** Undisputed, with the caveat that Reynolds understands that some hostile integrators, including Authenticom, have attempted to work around Reynolds limitations on automated use and attempted to use automated processes to utilize Dynamic Reporting. Rosenbach Decl. ¶ 158; Schaefer Decl. ¶¶ 73-75; Defs. Ex. 62; Wood Decl. ¶ 7.

118.    Authenticom has tried to help dealers cut down on the manual steps for using Dynamic Reporting, but the tool still requires a dealer's manual intervention. Cottrell Decl. ¶ 45.

**Response:** Undisputed.

119.    The Dynamic Reporting tool is useless for applications requiring regular data feeds or bi-directional access to dealer data, and dealers do not have the personnel available to initiate the process multiple times per day. Cottrell Decl. ¶ 46.

**Response:** Disputed in part. It is undisputed that Dynamic Reporting does not support bi-directional feeds, but it is disputed that Dynamic Reporting is useless for applications requiring regular data feeds or that dealers to not have the personnel available to utilize the Dynamic Reporting process. Schaefer Decl. ¶¶ 61, 86-87, 92; Wood Decl. ¶ 8.

### E.    Former Data Integration Providers

120.    The Dealer Data Integration Market once had numerous participants. Cottrell Decl. ¶ 17.

**Response:** Disputed that the "Dealer Data Integration Market" is a relevant and distinct economic market for any purpose in this case. It is undisputed that there have been a number of companies that have charged vendors and/or dealers to access various DMS platforms to pull and push data. Addanki Decl. ¶¶ 20, 46.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 39 of 83 PageID #:85454
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/06/19 Page 38 of 82
PURSUANT TO PROTECTIVE ORDER

121.  In this competitive market, vendors benefited from inexpensive, secure access to dealer data, and there was an explosion of innovation in applications that transformed how dealers conducted their business. Cottrell Decl. ¶ 15.

**Response:** Disputed in part. While there have been a number of innovations by application providers over the last several years, innovation has not depended on gaining unauthorized access to DMS data through an intermediary such as Authenticom. Addanki Decl. ¶ 41.

122.  Other than Authenticom, CDK and Reynolds have systematically destroyed or driven them all out of the market. Cottrell Decl. ¶ 17. Examples are provided in the below paragraphs.

**Response:** Disputed. To the extent that third party data polling functions are no longer provided by companies like Authenticom, this simply reflects the reality that the purported "data integration market" is not legitimate. In any event, there remain a number of companies that charge vendors and/or dealers to access various DMS platforms to pull and push data, and Reynolds and CDK have not "destroyed" or "systematically" done anything by agreement as the proposed finding implies. Addanki Decl. ¶¶ 20, 46; Gardner Decl. ¶ 37; Schaefer Decl. ¶¶ 110, 112; Thorne Decl. ¶ 66.

123.  Superior Integrated Solutions, Inc. ("SIS") was a leading data integration provider, but CDK and Reynolds excluded SIS from the market through blocking and litigation tactics. Cottrell Decl. ¶ 18.

**Response:** Disputed. SIS was not "excluded … from the market." It continues to provide data hygiene services in competition with other vendors and DMS providers, including CDK.

SIS also owns and operates Darwin Automotive, a successful financing and insurance ("F&I") application that is certified under CDK's 3PA program. Darwin Automotive recently partnered with CDK to offer a new F&I menu system to dealers that will be marketed and sold as CDK MenuVantage Platinum, which relies on patented "prescriptive selling" technology. Gardner Decl. ¶ 38.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 40 of 83 PageID #:85455
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/08/19 Page 396 of 92

PURSUANT TO PROTECTIVE ORDER

With respect to the alleged "litigation tactics," Reynolds invoked its legal rights under the Computer Fraud and Abuse Act; the United States Copyright Act; and common law tortious interference with contract authorities to protect its system from unauthorized access. *See* Defs. Ex. 71.

124. SelectQu, which is owned by Dominion Enterprises, is another dealer data integrator that was forced out of the market. In order to obtain approval for participation in the 3PA and RCI programs for Dominion's applications, CDK and Reynolds forced Dominion to agree that SelectQu would no longer pull data from their DMSs. Cottrell Decl. ¶ 19.

**Response:** Disputed. SelectQu was not "forced out of the market." *See* SOF ¶ 122. Rather, when it became certified under CDK's third-party access program, it contractually agreed (via its parent corporation, Dominion Enterprises) to stop accessing the CDK DMS through unauthorized means. Dominion was by no means "forced" to sign the contract and was not "required", at least by CDK, to apply to the 3PA program. Gardner Decl. ¶ 40. With respect to Reynolds, Dominion has not even signed an RCI agreement or joined the RCI program, let alone been "forced" to do so. Schaefer Decl. ¶ 107.

125. New Freedom Data Resources – founded in 1991 – was forced to shut down its data integration business in 2014 as a result of Reynolds's blocking actions. Cottrell Decl. ¶ 20.

**Response:** Disputed. Defendants are aware of no evidence that New Freedom Data was "forced to shut down its data integration business." Neither CDK nor Reynolds is familiar with a company by the name of New Freedom Data Resources. Gardner Decl. ¶ 43; Schaefer Decl. ¶ 109.

126. The StoneEagle Group recently ended its data integration business in exchange for CDK and Reynolds allowing its data analytics application into the 3PA and RCI programs. Cottrell Decl. ¶ 21.

**Response:** Disputed. The StoneEagle Group's relationship with each of CDK and Reynolds have not "destroyed' StoneEagle or driven it out of the industry. *See* SOF ¶ 122. To the contrary, StoneEagle reports that it is the 2017 Dealers' Choice Platinum Award Winner for F&I

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 41 of 83 PageID #:85456
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/26/17 Page 41 of 82

PURSUANT TO PROTECTIVE ORDER

Technology, with partnerships with more than 5,000 active dealers. Gardner Decl. ¶ 41. In addition, although Defendants understand that The StoneEagle Group is no longer attempting to hostilely access CDK's or Reynolds's systems, it "ending its data integration business" (to extent accurate) was not "in exchange" for its admission into either CDK's or Reynolds's partner programs. Gardner Decl. ¶ 42; Schaefer Decl. ¶ 108.

127. ProQuotes, Inc. was blocked by CDK from accessing dealer data stored on the CDK DMS, and as a result exited the data integration market. Cottrell Decl. ¶ 22.

**Response:** Disputed in part. Although ProQuotes, Inc. ("ProQuotes") is not authorized to access data on the CDK DMS platform, ProQuotes continues to offer "data exports" from a number of other DMS providers, including DealerTrack, Quorum, and others. Gardner Decl. ¶ 39.

### F. Dealer Data Integration Market and Brand-Specific Aftermarkets

128. Dealer data integration services is a relevant product market, as evidenced by the fact there is a demand for integration products, separate and apart from the demand for DMS and for apps. Singer Decl. ¶¶ 59-63.

**Response:** Disputed that the "Dealer Data Integration Market" is a relevant and distinct economic market for any purpose in this case. Addanki Decl. ¶¶ 20, 46.

129. The relevant geographic market for dealer data integration services is the United States. Singer Decl. ¶ 68.

**Response:** Disputed that the "Dealer Data Integration Market" is a relevant and distinct economic market for any purpose in this case. Addanki Decl. ¶¶ 20, 46.

130. There are no reasonable substitutes for services provided by dealer data integrators. Singer Decl. ¶ 57.

**Response:** Disputed. Addanki Decl. ¶¶ 12, 13, 46.

131. There are brand-specific aftermarkets for CDK's and Reynolds' respective integration services for dealers using their respective DMS platforms. Singer Decl. ¶¶ 64-67.

**Response:** Disputed. Addanki Decl. ¶¶ 12, 13, 46.

132.    CDK and Reynolds can profitably charge – and have charged – supracompetitive prices in the aftermarkets for dealer data integration on their respective systems. Singer Decl. ¶ 67.

**Response:** Disputed. Addanki Decl. ¶¶ 59-62.

133.    CDK has a nearly 100 percent market share for dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for dealers using the Reynolds DMS. Cottrell Decl. ¶ 67.

**Response:** Disputed. The "Dealer Data Integration Market" is not a relevant and distinct economic market for any purpose in this case. Addanki Decl. ¶¶ 12, 13, 46.

## III.    CDK's and Reynolds's Written Agreement Dividing the Dealer Data Integration Market and Single-Brand Aftermarkets

134.    Effective February 18, 2015, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Market. Ex. 34; Ex. 35; Ex. 46.

**Response:** Disputed. CDK and Reynolds are party to no agreement whereby they agreed that they would no longer compete, in the provision of any services. Addanki Decl. ¶¶ 22, 27; Karp Decl. ¶ 33; Schaefer Decl. ¶ 110. To the extent this Paragraph purports to refer to Defendants' Data Exchange Agreement (Defs. Ex. 1), said agreement contains no provisions restricting CDK's or Reynolds's ability to compete with one another. Addanki Decl. ¶¶ 22, 25-29; Karp Decl. ¶¶ 33, 34; Schaefer Decl. ¶¶ 110, 118.

135.    In the agreement, CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds. Ex. 34; Ex. 35; Ex. 46.

**Response:** Disputed. The Data Exchange Agreement is not an agreement with Reynolds to "no longer compete" in any respect. To the contrary, the Data Exchange Agreement expressly *does not* establish any covenant not to compete. Defs. Ex. 1 § 4.5.

136.    Reynolds already did not compete with CDK in providing access to data for dealers using the CDK DMS. Cottrell Decl. ¶ 55.

**Response:** Undisputed.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 43 of 83 PageID #:85458
Case: 3:17-cv-00318-jdp Document #: 868-48 Filed: 06/10/19 Page 44 of 102

PURSUANT TO PROTECTIVE ORDER

137.   On May 7, 2015, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement in an attempt to coerce Authenticom to exit the dealer data integration market. Ex. 47.

**Response:** Disputed in part. It is undisputed that, as instructed by Mr. Cottrell, Reynolds's lawyer sent a proposed agreement to settle disputed claims to Mr. Cottrell's lawyer at Goodwin Proctor with a cc to Mr. Cottrell. With respect to the allegation of coercion, it is expressly disputed. This settlement communication was an express attempt to settle Reynolds's legal claims against Authenticom for Authenticom's tortious interference with contract and other legal violations stemming from Authenticom's unauthorized access to Reynolds's DMS. Schaefer Decl. ¶ 100; Pl. Ex. 47.

138.   Robert Schaefer of Reynolds told Mr. Cottrell that the draft agreement Reynolds provided was word-for-word what CDK and Reynolds had agreed to a few months earlier. Cottrell Decl. ¶ 60.

**Response:** Disputed. Schaefer Decl. ¶ 102.

139.   The February 18, 2015, agreement between CDK and Reynolds states that CDK "covenants and agrees not to integrate with, access, or attempt to integrate with or access, any Reynolds-brand DMS – either [CDK] itself or through any current or future affiliated subsidiary." Ex. 46, § 4.1. CDK agreed to no longer provide any "data service that involves the polling of data from Reynolds DMS for use by" any vendor or other third-party. *Id.* at 1; *id.*, Recitals ¶ 2.

**Response:** Disputed. The statement quoted in the first sentence of this Paragraph does not appear in the Data Exchange Agreement at all. *See* Defs. Ex. 1. The statement quoted in the second sentence of this Paragraph is incomplete and therefore misleading. The Data Exchange Agreement's recitals state, among other things, that "CDK also provides DMI Third Party Clients with a data service that involves the polling of data from Reynolds DMS by CDK's Integralink and DMI affiliates (collectively 'DMI') for use by such automotive manufacturers or other third parties[.]" Defs. Ex. 1. Nowhere in the Agreement does it state that CDK will stop providing these services. *Id.*

PURSUANT TO PROTECTIVE ORDER

140.    The agreement granted CDK a "Wind Down Period" of one year to stop pulling dealer data stored on the Reynolds DMS. Ex. 46, § 3.3. During that period, Reynolds agreed that CDK could continue to pull dealer data just as it had before, using a username provided by the dealer. *Id*. But during that wind-down period, CDK agreed that it would not "add any additional data requirements, data feeds, or other services . . . without Reynolds prior written permission." *Id*.

**Response:** Disputed in part. The Data Exchange Agreement does not contain the quoted language in the last sentence of this Paragraph, or any provision to that effect. However, the Data Exchange Agreement defines a "Wind Down Period" (subject to extension by agreement of the parties) during which Reynolds agreed to, on an interim basis, "protect and facilitate current Reynolds DMS access by CDK and DMI Third Party Clients and CDK Applications," and to "not take any measures to block or otherwise disrupt DMI's normal Reynolds DMS access during such Wind Down Period." Defs. Ex. 1 § 4.3. In addition, CDK's ability to access the Reynolds's DMS during the specified wind-down period was subject to the various restrictions, protections, and requirements set forth in the Agreement. *Id.*

141.    The agreement required coordination between CDK and Reynolds in transitioning CDK's vendor clients (i.e., those vendors for whom CDK provided access to of dealers using the Reynolds DMS) into the Reynolds RCI program. Ex. 46, § 3.1. In the agreement, CDK agreed to "cooperate with Reynolds' efforts" to have integration customers "execute agreements to become part of the Reynolds RCI Program." *Id*.

**Response:** Disputed in part. During the Wind Down Period, CDK agreed "to reasonably cooperate with Reynolds's efforts, if any, to have Third Party Clients execute agreements to become part of the Reynolds RCI Program[.]"   Defs. Ex. 1 § 4.1. Such cooperation was in CDK's and Reynolds's independent best interests and in the best interests of the vendors and dealers. Karp Decl. ¶ 34 Schaefer Decl. ¶¶ 118-119.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 45 of 83 PageID #:85460
Case: 3:17-cv-00318-jdp Document #: 868-7 Filed: 06/30/175 Page 44 of 82
PURSUANT TO PROTECTIVE ORDER

142. The agreement required CDK to "assist and cooperate with Reynolds with respect to: (1) communication with [vendors, car manufacturers], their Reynolds Dealer customers and the automotive industry in general during the Wind Down Period; (2) Reynolds' development and testing of interfaces for [vendors] who choose to join the Reynolds RCI program; and (3) the transition of such customers to the Reynolds RCI Program or Reynolds OEM Solution with respect to Reynolds Dealers." Ex. 46, § 3.4.

**Response:** Disputed in part. The quoted statement does not appear in the Data Exchange Agreement, but a somewhat similar provision appears in § 4.4. Defs. Ex. 1. Such "cooperat[ion]" was in CDK's best interest and in the best interest of its vendor clients. Karp Decl. ¶ 34.

143. The agreement required CDK to give Reynolds full information about the vendors CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more. Ex. 46, § 3.3; *id.*, Ex. A.

**Response:** Disputed in part. Upon entering into the Data Exchange Agreement, CDK agreed to provide Reynolds with a list of the dealer login credentials that it planned to use during the Wind Down Period and certain information about its vendor clients. *See* Defs. Ex. 1 § 4.3 & Ex. DEA-2. CDK was not required as an absolute matter to provide the stipulated vendor information to Reynolds, but rather simply as a condition to Reynolds's ability and agreement to provide an interim solution for such connections. *Id.*

144. Consistent with their agreement, CDK stopped providing dealer data integration services with respect to Reynolds DMS dealers after the wind-down period. Ex. 34; Ex. 35.

**Response:** Disputed in part. CDK and Reynolds have never entered into any agreement to restrict access to dealer data, nor is any such agreement reflected in any of the referenced exhibits. Karp Decl. ¶ 33; Schaefer Decl. ¶ 110; Defs. Exs. 1, 2, 3 (Feb 2015 Agreements). While the Wind Down Period has concluded with respect to most of CDK's vendor clients, it has been extended by agreement of the parties as to a few vendors still served by CDK and remains in effect. Karp Decl. ¶ 34.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 46 of 83 PageID #:85461
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/06/19 Page 46 of 82

PURSUANT TO PROTECTIVE ORDER

145.   Consistent with their agreement, CDK and Reynolds coordinated the transition of vendors from CDK to Reynolds. Ex. 34; Ex. 35.

**Response:** Disputed. Pursuant to the ==Data Exchange Agreement,== CDK and Reynolds ==coordinated to facilitate the certification of certain of CDK's vendor clients under the Reynolds RCI program,== not "the transition of vendors from CDK to Reynolds." Certain vendors chose to negotiate an RCI Agreement with Reynolds; certain vendors chose not to join the RCI program and, for example, hired Authenticom. CDK's role in the process was limited to ==brief communications to make vendors aware of their option to seek a transition to the RCI program.== Reynolds conducted all such negotiations, and built and implemented all of the custom interfaces for those who signed up for the RCI program. Schaefer Decl. ¶ 119. Moreover, as reflected in Pl. Ex. 34 and Pl. Ex. 35, CDK continues to offer certain Managed Data Services to vendor clients certified under the Reynolds RCI program, including data cleansing, standardization, aggregation, and related support services. Gardner Decl. ¶ 82.

146.   CDK sent letters to its vendor clients announcing that it would no longer provide integration services for dealers using the Reynolds DMS, providing a deadline by when the vendors needed to enroll in the RCI program, and promising to assist the vendors in transitioning to the RCI program. Ex. 34; Ex. 35.

**Response:** Disputed in part. Undisputed that Pl. Ex. 34 and Pl. Ex. 35 are copies of letters that DMI sent to a vendor client on March 22, 2015 and April 1, 2015, respectively, regarding the Data Exchange Agreement, and that the second letter (Pl. Ex. 35) references an "RCI Certification Deadline." However, neither letter announces that DMI "would no longer provide integration services for dealers using the Reynolds DMS." To the contrary, the letters state that CDK's vendor clients enrolled in the RCI program "may continue to receive the benefits of DMI's data cleansing, standardization, aggregation and related support services[.]" Pl. Ex. 34. *See also* Pl. Ex. 35 ("You will continue to receive the benefits of [DMI's] data cleansing, standardization, aggregation and related support services."). Gardner Decl. ¶ 82. In

45

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 47 of 83 PageID #:85462
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/30/17 Page 46 of 82

PURSUANT TO PROTECTIVE ORDER

addition, the only "deadline" given in such letters was to avoid an interruption in service. Vendors are free to contact Reynolds to enroll in RCI at any time (or not at all). Schaefer Decl. ¶ 119.

147.    Reynolds followed up with its own letters to CDK's vendor clients as the Defendants transitioned customers from CDK to Reynolds. Ex. 48.

**Response:** Disputed in part. Undisputed that Reynolds sent letters to certain vendors with whom it was negotiating, but Plaintiff's Exhibit 48 is not evidence of that, and CDK played no role in that negotiation process. Schaefer Decl. ¶ 119.

148.    During the "wind-down" period, many vendors decided to leave Authenticom (which was being blocked) and join CDK (which was not being blocked). Cottrell Decl. ¶ 58.

**Response:** Disputed. The Data Exchange Agreement required Reynolds to provide CDK with interim access to the Reynolds DMS during the Wind Down Period on behalf of certain *existing* vendor clients identified by CDK at the *outset* of the Data Exchange Agreement. *See* Defs. Ex. 1 §§ 1.4, 4.3. In addition, CDK's ability to access the Reynolds's DMS during the specified wind-down period was subject to the various restrictions, protections, and requirements set forth in the Agreement. *Id.* CDK has not accessed the Reynolds DMS on behalf of any *new* vendor clients during the Wind Down Period; it has only continued to serve its existing clients as they transitioned into the Reynolds RCI program. Gardner Decl. ¶ 81. Moreover, Reynolds is informed and believes that many DMI vendors signed up with Authenticom during this period. Schaefer Decl. ¶ 121; AUTH_KLEIN_EXP_0000376.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 48 of 83 PageID #:85463
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/26/18 Page 48 of 82

PURSUANT TO PROTECTIVE ORDER

## IV. CDK's and Reynolds's Exclusive Dealing Arrangements with Dealers and Vendors

### A. Defendants' Exclusive Dealing Terms with Dealers

149.    In their DMS contracts with dealers, both CDK and Reynolds require dealers to agree that they will not provide anyone other than the DMS provider access to their data.

**Response:** Authenticom cites no evidence in support of this Paragraph, in violation of the Court's Procedures to Be Followed on Motions for Injunctive Relief, and therefore should be disregarded. Moreover, Dealers are not authorized to provide third parties with access to the DMS, but they can provide their data to third parties in any number of authorized ways. Gardner Decl. ¶¶ 21-23; Schaefer Decl. ¶¶ 17-19, 84; Pl. Exs. 17, 49.

150.    CDK's standard DMS contract states: "Client shall not allow access to [the CDK DMS] by any third parties." Ex. 18, § 6.D. It also states: "Client is not authorized to cause or permit any third party software to access the CDK Dealer Management System." *Id*. § 6.B.

**Response:** Undisputed.

151.    These exclusive provisions last the life of the CDK DMS contract, which is a minimum of five years. Ex. 18.

**Response:** Disputed in part. Undisputed that the third-party access restrictions in CDK's standard DMS contract remain in effect during the term of the agreement. Disputed that the agreement lasts a "minimum" of five years, and nothing in the CDK MSA suggests that it does. *See* CDK MSA § 2. Rather, CDK's DMS contracts typically last between 3 and 5 years, depending on the customer and services involved. Karp Decl. ¶ 18.

152.    While the CDK DMS contract bars dealers from granting data access to third parties, the agreement expressly provides that CDK is able to access the dealer's data. Ex. 18.

**Response:** Disputed in part. CDK's DMS agreements do not "bar[ ] dealers from granting data access to third parties." The agreements prohibit dealers from providing unauthorized data access to third-parties (such as Authenticom). *See* Pl. Ex. 18 (CDK MSA) §§ 6.B, 6.D.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 49 of 83 PageID #:85464
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/10/19 Page 49 of 82

PURSUANT TO PROTECTIVE ORDER

Authenticom does not identify which provisions in the agreement provide "that CDK is able to access the dealer's data." However, it is undisputed that CDK has access to certain dealer data as necessary to fulfill its obligations under the MSA and subject to all of the protections and restrictions set forth therein. Karp Decl. ¶ 27.

153.    Reynolds' standard DMS contract prohibits dealers from "provid[ing] access to [the DMS] . . . to any third party." Ex. 49, § 1. The Reynolds DMS Customer Guide, which is incorporated into the contract, similarly states that the dealer is barred from "permit[ting] any person, firm or entity access to" the DMS. Ex. 17, at 21.

**Response:** Undisputed.

154.    These exclusive provisions last as long as the Reynolds DMS contract, which is typically five to seven years. Ex. 49.

**Response:** Disputed in part. It is undisputed that the provisions described in the above proposed findings typically last as long as the Reynolds DMS contract, but it is disputed that these constitute "exclusive provisions." Moreover, the length of those contracts are ████

████████████████████████████████████████████████████████████

████████████████████████████████ Schaefer Decl. ¶ 15; Lamb Decl. ¶ 3.

155.    Like the CDK dealer contract, the Reynolds contract ████████████████

████████████████████████ Ex. 17, at 8-9.

**Response:** Undisputed, subject to the clarification that ████████████████

████████████████████████████████████████████████████████████

████████████████ Pl. Ex. 17.

156.    CDK and Reynolds enforce the restrictive terms in their DMS contracts. Ex. 50; Ex. 51.

**Response:** Undisputed.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 50 of 83 PageID #:85465
Case: 3:27-cv-00318-jdp Document #: 86 Filed: 06/20/17 Page 4906102

PURSUANT TO PROTECTIVE ORDER

157. Many dealers do not realize that CDK and Reynolds have inserted the exclusive dealing provisions into the DMS contracts. Ex. 51.

**Response:** Disputed. First, there are no "exclusive dealing provisions" in these contracts. Assuming Authenticom is referring to the unauthorized access prohibitions described above, these provisions are clear on the face of the (heavily negotiated) contracts. The provisions in CDK's DMS agreements restricting unauthorized third-party access have been in its agreements since at least the mid 1990s and are conspicuous. *See, e.g.*, Pl. Ex. 18 (CDK MSA) § 6.B ("CLIENT IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT.") (emphasis in original). Dealers and numerous third parties (including Authenticom) are well aware of these provisions as well as CDK's position that unauthorized third-party access to its DMS is strictly prohibited, including through the use log-in credentials issued to the dealers. *Id.* Further, dealer employees with access to the DMS are reminded of these provisions each time they log in. *See* Pl. Ex. 50.

Reynolds's policy of prohibiting unauthorized third party access to the DMS has been widely known in the market for many years, as Authenticom's own articles and allegations establish. Schaefer Decl. ¶¶ 17, 19; Pl. Exs. 20-22; Pl. SOF 153 ("Reynolds' standard DMS contract prohibits dealers from 'provid[ing] access to [the DMS] . . . to any third party.' Ex. 49, § 1. The Reynolds DMS Customer Guide, which is incorporated into the contract, similarly states that the dealer is barred from 'permit[ting] any person, firm or entity access to' the DMS. Ex. 17, at 21."). In any event, parties are also charged with knowledge of their contracts.

### B. Defendants' Exclusive Dealing and Price Secrecy Terms with Vendors

158. The CDK 3PA and the Reynolds RCI contracts contain exclusive dealing provisions that prohibit vendors from obtaining dealer data from anyone other than CDK (through the 3PA program) or Reynolds (through the RCI program).

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 51 of 83 PageID #:85466
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/19/17 Page 50 of 82

PURSUANT TO PROTECTIVE ORDER

**Response:** Authenticom cites no evidence in support of this Paragraph, in violation of the Court's Procedures to Be Followed on Motions for Injunctive Relief, and therefore should be disregarded. Moreover, there are no "exclusive dealing provisions" in these contracts. And neither Reynolds's RCI agreement nor CDK's 3PA agreement prohibits vendors from receiving data in other authorized ways, including through dealers' use of, for example, the Reynolds-provided Dynamic Reporting. Gardner Decl. ¶¶ 21-23; Schaefer Decl. ¶¶ 84-91; Pl. Ex. 17.

159.    The current CDK 3PA contract states: "Vendor agrees that it will, beginning on the date CDK certifies the use of the first Application with the CDK Interface System, access data on, and provide data to, CDK Systems exclusively through the [3PA program]." Ex. 52, § 2(e). The contract also states that the vendor cannot "contract with, or otherwise engage, any third party (including any [dealer]) to access, retrieve, license or otherwise transfer any data from or to a CDK System." *Id*. § 2(e).

**Response:** Undisputed that the quoted language appears in the 3PA contract that is attached as Pls. Ex. 52.

160.    The penalty for accessing dealer data other than through CDK is termination. Ex. 52, § 6(g).

**Response:** Undisputed that, pursuant to contract, termination is a possible penalty for dealers that allow unauthorized access to CDK DMS platforms. Karp Decl. ¶ 21.

161.    While the 3PA contract lasts three years, the exclusive terms in the contract purportedly last forever. The contract states: "All restrictions set forth in Section 2 and 3 of this Agreement shall survive the termination of this Agreement for any reason." Ex. 52, § 6(j).

**Response:** Undisputed that the restrictions set forth in § 2(e) of CDK's current third party access agreement survive termination of the Agreement. Disputed that the terms are "exclusive terms."  Karp Decl. ¶¶ 21-22.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 52 of 83 PageID #:85467
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 53 of 102

PURSUANT TO PROTECTIVE ORDER

162.    In order to police the exclusive dealing terms, the 3PA contract grants <mark>CDK audit rights to determine if the vendor has received dealer data from any other entity besides CDK.</mark> Ex. 52, § 5(d).

**Response:** Disputed. The <mark>"audit rights"</mark> granted to CDK in § 5(d) of its 3PA agreements are <mark>"for the sole purpose of verifying the amounts due with regards to the use of the CDK Interface System, regardless of Integration Method[.]"</mark> Pl. Ex. 52.

163.    The Reynolds RCI contract states that ████████████████████████████████████ ████████████████████████████████ Ex. 53, § 2.5.3. The Agreement defines ████ ███████████████████ *Id.* § 1.10. And ███████████████████████████████████████ ███████ *Id.* § 1.9.

**Response:** Disputed insofar as Plaintiff's statement misstates the definition of ████ ██████████ Pl. Ex. 53.

164.    ██████████████████████████████████████████████████████████ ████████████████████ *id.* § 5.1.

**Response:** Disputed insofar as these provisions are not correctly characterized as "exclusivity provisions."

165.    In order to police the exclusive dealing terms, the RCI contract ████████████ ██████ Ex. 53, § 6.2.

**Response:** Disputed in part. These provisions are not correctly characterized as "exclusive dealing terms."  It is undisputed that Reynolds ████████████████████████ ████████████ for legitimate business purposes, including related to data privacy and security.

166.    CDK and Reynolds impose "Price Secrecy Provisions" in their 3PA and RCI contracts.

**Response:** Authenticom cites no evidence in support of this Paragraph, in violation of the Court's Procedures to Be Followed on Motions for Injunctive Relief and therefore should be

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 53 of 83 PageID #:85468
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/08/17 Page 52 of 82

PURSUANT TO PROTECTIVE ORDER

disregarded. Moreover, there are no references to "Price Secrecy Provisions" in these contracts, but it is undisputed that the price (and other) terms of the 3PA and RCI contracts are confidential, pursuant to the terms of the respective contracts.

167. The CDK 3PA contract states that vendors "shall not include any 'interface' fee, DMS access fee or any other similar fee related to the use of the CDK Interface System in any of its invoices to its customers or otherwise include any direct or indirect indication to its customers [i.e., the dealers] (in its invoices or otherwise) of the fees charged by CDK hereunder." Ex. 52, § 10.

**Response:** Disputed in part. While the quoted provision appears in CDK's 3PA agreements, the intent of this provision is to discourage a third-party vendor from passing 3PA program fees back to the dealer as a surcharge. Gardner Decl. ¶ 25.

168. The CDK 3PA contract also bars vendors from indicating "in any way" that an increase in the price of their own services is related to an increase in the data access fees charged by CDK. The contract states: "Vendor shall never indicate in any way to any CDK Vendor Client that any increase in any price charged by Vendor to any CDK Vendor Client is in reaction to, or in any other way associated with, any modification in the price charged by CDK hereunder with respect to Vendor's use of the CDK Interface System." Ex. 52, § 10.

**Response:** Disputed in part. While the quoted provision appears in CDK's 3PA agreements, the intent of this provision is to discourage a third-party vendor from passing 3PA program fees back to the dealer as a surcharge. Gardner Decl. ¶ 25.

169. The Reynolds RCI contract ███████████████████████████ ███████████████████████ Ex. 53, § 2.5.3; *id.* § 2.7.

**Response:** Undisputed.

170. CDK and Reynolds aggressively enforce the exclusive dealing provisions against vendors. They punish vendors that obtain dealer data from any other integrator, impose large fines, threaten to cancel the vendor's contract, and initiate audits. Ex. 54.

**Response:** Disputed. The letter attached as Pl. Ex. 54 provides no support for any statement in this Paragraph as to CDK. Moreover, the cited provisions are not correctly characterized as "exclusive dealing provisions," and CDK and Reynolds do not "punish"

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 54 of 83 PageID #:85469
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/18/17 Page 53 of 82
PURSUANT TO PROTECTIVE ORDER

vendors, "impose fines," or "threaten" vendors. However, it is undisputed that CDK and Reynolds enforce their respective contractual rights vis-a-vis vendors as appropriate and negotiate resolutions and/or invoke their dispute resolution rights under the contracts. Karp Decl. ¶ 20; Schaefer Decl. ¶ 70; Pl. Ex. 53.



171.

Ex. 54.

**Response:** It is not disputed that Reynolds sought to enforce its contract rights as described in Pl. Ex. 54.

172.    Authenticom will show at the evidentiary hearing that CDK and Reynolds enforce the Price Secrecy Provisions, threatening vendors with claims of material breach and liquidated damages for referencing data access fees to any third party.

**Response:** Disputed. CDK and Reynolds enforce their respective contractual rights vis-à-vis vendors as appropriate and negotiate resolutions and/or invoke their dispute resolution rights under the contracts. Karp Decl. ¶ 20; Schaefer Decl. ¶ 70.

## V.    Defendants' Agreement to Block Authenticom from Accessing Dealer Data

### A.    Admissions of CDK and Reynolds Executives

173.    Senior CDK and Reynolds executives have admitted that CDK and Reynolds have entered into an agreement to restrict access to dealer data on their systems and drive out independent integrators like Authenticom.

**Response:** Authenticom cites no evidence in support of this Paragraph, in violation of the Court's Procedures to Be Followed on Motions for Injunctive Relief and therefore should be disregarded. The unsupported statements in this Paragraph are disputed, as set forth below.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 55 of 83. PageID #:35470
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/10/19 Page 55 of 82

PURSUANT TO PROTECTIVE ORDER

174.    On April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Mr. Cottrell and said that they should "[t]ake a walk." Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. Cottrell Decl. ¶ 48; Ex. 55.

**Response:** Disputed in part. McCray Decl. ¶¶ 4, 5.

175.    Mr. McCray stated to Mr. Cottrell that CDK and Reynolds had agreed to "[l]ock you and the other third parties out." Cottrell Decl. ¶ 48 Ex. 55.

**Response:** Disputed. McCray Decl. ¶¶ 10, 11-13, 19.

176.    In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray stated that the number was so low because Authenticom's "book of [Reynolds] business is worthless to us because of the agreement between CDK and Reynolds." Cottrell Decl. ¶ 49; Ex. 55.

**Response:** Disputed. McCray Decl. ¶¶ 6-9, 19.

177.    Mr. McCray then stated: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." Cottrell Decl. ¶ 49; Ex. 55.

**Response:** Disputed. McCray Decl. ¶ 17.

178.    Referring to the exclusive dealing provisions in the dealer DMS contracts, Mr. McCray stated that "[w]e will enforce our contract with dealers and sue them if needed to keep you out of our systems." Cottrell Decl. ¶ 50; Ex. 55.

**Response:** Disputed. McCray Decl. ¶¶ 10, 19.

179.    Mr. McCray concluded by saying to Mr. Cottrell, "For god's sake, you have built a great little business, get something for it before it is destroyed otherwise *I will [f]***ing destroy it*." Cottrell Decl. ¶ 50; Ex. 55.

**Response:** Disputed. McCray Decl. ¶ 18.

180.    Mr. Cottrell did not accept Mr. McCray's offer or threats. Cottrell Decl. ¶ 51.

**Response:** Disputed that Mr. McCray made any offer or threats. McCray Decl. ¶¶ 16, 19.

181.    Instead, Mr. Cottrell insisted that Authenticom would continue to serve its dealer and vendor customers. Cottrell Decl. ¶ 51.

**Response:** Disputed. McCray Decl. ¶¶ 14, 19.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 56 of 83 PageID #:85471
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/16/17 Page 56 of 92
PURSUANT TO PROTECTIVE ORDER

182. Mr. Cottrell also took detailed notes of what Mr. McCray had said shortly after the conversation. Cottrell Decl. ¶ 50; Ex. 55.

**Response:** Disputed. Mr. Cottrell's "notes" are neither detailed nor accurate. *See generally* McCray Decl.

183. The metadata for those notes provides that the document was created on April 4, 2016, at 10:41 a.m., and last modified at 11:20 a.m. that same day. Ex. 55; Ex. 56.

**Response:** Without fully examining the metadata described in Pl. Ex. 56, Defendants are unable to determine whether it accurately describes the document submitted as Pl. Ex. 55. On its face, however, there are discrepancies, including that the metadata indicates that Pl. Ex. 55 is a two-page document, but the document itself—as submitted to the Court—is only one page. *See* Pl. Ex. 56 (under "Properties").

184. In May 2015, Mr. Schaefer – Reynolds' head of data services – told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data. Cottrell Decl. ¶ 52.

**Response:** Disputed. Schaefer Decl. ¶ 99.

185. Mr. Schaefer said that Mr. Brockman was "adamant" that all third-party data integrators must be cut off. Cottrell Decl. ¶ 52.

**Response:** Disputed as stated. However, it is undisputed that Reynolds was in fact adamant about enforcing its unauthorized third-party access policies.

186. Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators. Cottrell Decl. ¶ 52.

**Response:** Disputed. Schaefer Decl. ¶ 103.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 57 of 83 PageID #:85472
Case: 3:27-cv-00318-jdp Document #: 868 Filed: 06/30/17 Page 56 of 82

PURSUANT TO PROTECTIVE ORDER

187.    Mr. Schaefer has not been successful in convincing other DMS providers to join CDK's and Reynolds' agreement to block independent integrators: every other DMS company either provides independent integrators with an API or permits dealers to provide login credentials. Cottrell Decl. ¶ 47.

**Response:** Disputed. There is no agreement between Reynolds and CDK to "block" any "independent integrators" from accessing their respective DMS or place any other restrictions on how either party chooses to operate its own system. Karp Decl. ¶ 33; Schaefer Decl. ¶ 110. Moreover, Mr. Schaefer has not tried to convince any other DMS providers to change their policies. Schaefer Decl. ¶ 103.

Undisputed that there are other DMS providers that do not prevent third-party "intermediaries" like Authenticom from accessing their DMS. Karp Decl. ¶ 24; Schaefer Decl. ¶ 103; Lamb Decl. ¶ 23.

188.    The conversation between Mr. Schaefer and Mr. Cottrell was prompted by a threat by Reynolds to sue Authenticom for tortious interference. Cottrell Decl. ¶ 59.

**Response:** Disputed in part. Reynolds did not "threaten" Authenticom, but it is undisputed that Mr. Schaefer and Mr. Cottrell had a series of conversations in connection with Reynolds informing Authenticom that Reynolds had become aware of specific evidence of tortious interference of its contracts by Authenticom and was seeking a settlement of its valid legal claims to minimize the disruption to its customers. Schaefer Decl. ¶¶ 94-95; Pl. Ex. 57.

189.    On April 6, 2015, in a letter from Mr. Schaefer to Mr. Cottrell, Reynolds threatened to sue Authenticom for tortious interference. Ex. 57. The letter stated that because dealers were granting Authenticom authorization to pull their data, the dealers were breaching their DMS contracts and Reynolds intended to hold Authenticom liable as a result. *Id.*

**Response:** Disputed in part. It is undisputed Reynolds informed Authenticom in an April 6, 2015 letter that Reynolds had become aware of specific evidence of tortious interference of its contracts by Authenticom. Schaefer Decl. ¶¶ 94-95; Pl. Ex. 57. It is disputed that Authenticom's proposed finding captures the full context of the letter, which speaks for itself.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 58 of 83 PageID #:85473
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/19 Page 58 of 92 #35473
PURSUANT TO PROTECTIVE ORDER

190. On April 14, 2015, Mr. Cottrell sent a letter to Mr. Schaefer in response. He rejected Reynolds' threat to sue and noted that "a significant percentage of R&R's [dealer] customers also are Authenticom's customers" and, like Reynolds, Authenticom and the dealers "have contractual agreements." Ex. 58.

**Response:** Undisputed.

191. On May 7, 2015, in response to Authenticom's letter, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement pursuant to which Reynolds proposed that Authenticom would shut down its data integration business and, in exchange, Reynolds would stop blocking Authenticom's access to dealer data during the one-year wind down period. During that so-called "grace" period, Authenticom would be required to transition Authenticom's vendor clients into the RCI program. Ex. 47.

**Response:** Disputed in part. It is undisputed that, as instructed by Mr. Cottrell, Reynolds's lawyer sent a proposed agreement to settle disputed claims to Mr. Cottrell's lawyer at Goodwin Proctor with a cc to Mr. Cottrell. It is disputed that Authenticom has accurately characterized the proposed settlement agreement, which speaks for itself. Pl. Ex. 47; *see also* Schaefer Decl. ¶ 102.

192. Authenticom rejected Reynolds' Wind Down proposal. As Mr. Cottrell wrote to Mr. Schaefer earlier, instead of leaving the market, Authenticom was intent on providing "a safe and secure data movement option in a fair and competitive marketplace." Ex. 58.

**Response:** Disputed in part. It is undisputed that Authenticom ultimately did not sign any settlement agreement. It is disputed that Authenticom is intent on providing "a safe and secure data movement option in a fair and competitive marketplace." *See* Rosenbach Decl. ¶¶ 150-178; Pl. Ex. 28.

### B. Coordination Among Defendants' Employees to Block Authenticom

193. In December 2016, Steve French – CDK's senior director of client and data services – told Vince Rubino of TotalLoop that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Ex. 59; Cottrell Decl. ¶ 53.

PURSUANT TO PROTECTIVE ORDER

**Response:** Disputed. No such conversation occurred. French Decl. ¶ 8. In addition, the statement attributed to Mr. French in Pl. Ex. 59 and in Cottrell Decl. ¶ 53 is inadmissible hearsay.

194. Mr. French suggested to Mr. Rubino that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party data integrators like Authenticom. Cottrell Decl. ¶ 53.

**Response:** Disputed. No such conversation occurred. *See* French Decl. ¶ 8. In addition, the statement attributed to Mr. French in Pl. Ex. 59 and in Cottrell Decl. ¶ 53 is inadmissible hearsay. Moreover, it is expressly disputed that CDK and Reynolds "were working together to lock out third-party data integrators like Authenticom." Karp Decl. ¶ 73; Schaefer Decl. ¶ 112.

195. Mr. French previously worked for Reynolds as its data collection manager. Cottrell Decl. ¶ 53.

**Response:** Undisputed that Mr. French previously worked for Reynolds as a data collections manager until 1998, when he joined IntegraLink. French Decl. ¶ 2.

## C. Blocking by Defendants of Authenticom from Providing Dealer Data Integration Services

196. On August 1, 2016, CDK disabled Authenticom's login credentials at thousands of dealerships. Cottrell Decl. ¶ 39.

**Response:** Disputed in part. On July 8, 2016, CDK sent letters to approximately 1,500 dealers whose accounts were being used by Authenticom and other third parties to access CDK's DMS platform, advising them that CDK had detected unauthorized activity on their accounts and that CDK would be taking steps to prevent further unauthorized access to its DMS. On or about August 1, 2016, CDK then disabled approximately 1,000 usernames and passwords at those dealerships. Gardner Decl. ¶ 67.

197. During this period, Authenticom's support services were overrun with dealers and vendors calling Authenticom frantic to find a way to re-establish Authenticom's connection and resume the flow of data that dealers had authorized. Cottrell Decl. ¶ 39.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 60 of 83 PageID #:85475
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/10/19 Page 598 of 92

PURSUANT TO PROTECTIVE ORDER

**Response:** Defendants are unable to determine whether third-party vendors and dealers responded to Authenticom as described in this Paragraph as Authenticom has provided no documentation to support its claims.

198.   Over the ensuing weeks and months after August 1, 2016, CDK repeatedly disabled Authenticom's login credentials for thousands of dealerships. Cottrell Decl. ¶ 39.

**Response:** Disputed in part. On August 22, 2016, CDK sent another letter to approximately 2,500 dealer customers whose DMS accounts were being used by Authenticom and other third parties. *See* Pl. Ex. 41. Once again, CDK stressed that "[w]e want to minimize any disruption to your business that may be caused by unauthorized third-party access to your DMS and facilitate a smooth transition" for vendors to the 3PA program. *Id.* at 2. Dealers were advised that "[v]endors that wish to continue access DMS data should therefore begin the Third Party Access program application process immediately to avoid disruption." *Id.* Then, on August 29, CDK disabled approximately 630 unauthorized usernames associated with Authenticom and others. Similar actions were taken in September and October. Affected dealers were given advance notice by CDK before any usernames associated with their accounts were blocked or disabled. Gardner Decl. ¶ 61.

199.   CDK informed dealers that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016." CDK promised that in 2017 it would "further increase our security actions to prevent the use of unapproved data access methods." Ex. 41, at 2.

**Response:** Undisputed that the quoted statements appear in Pl. Ex. 41.

200.   During this time, Reynolds continued its blocking tactics as before. Cottrell Decl. ¶ 41.

**Response:** Undisputed that Reynolds undertook efforts to enforce its longstanding practice of enforcing unauthorized third-party DMS access policies throughout the entire relevant period.

PURSUANT TO PROTECTIVE ORDER

201.    Defendants constantly block – on a daily or even hourly basis – Authenticom's ability to pull dealer data by disabling the login credentials that dealers create for Authenticom. Fitkin Decl. ¶ 10; Korp Decl. ¶¶ 8, 10-11, 26-28.

**Response:** Disputed. Despite efforts by CDK and Reynolds to disable unauthorized and automated login attempts to the DMS, including by Authenticom, Authenticom has responded by developing new ways to circumvent CDK and Reynolds's security protocols and by encouraging dealers to issue new usernames and passwords to Authenticom (or provide administrator-level passwords to Authenticom so that it could re-enable passwords or create new ones), in direct violation of their dealer agreements. For example, following the security event initiated by CDK described in Paragraph 196, above, within a matter of days Authenticom had re-established access to the CDK DMS on almost 80% of the connections that had been disabled. Authenticom boasts that it has developed "multiple technology solutions" to evade and circumvent CDK and Reynolds's security protocols. Gardner Decl. ¶¶ 67-71; Defs. Ex. 44 (Cottrell Ltr. 11/18/2016).

202.    When CDK and Reynolds block Authenticom, vendors and dealers have their business operations interrupted. Korp Decl. ¶ 26.

**Response:** Disputed. While Authenticom's proposed finding is stated far too broadly, it is undisputed that to the extent that vendors and dealers choose to make their operations reliant on such unauthorized access to the DMS, those operations are by definition interrupted when such access is prevented by the DMS's processes. Gardner Decl. ¶ 62; Schaefer Decl. ¶ 32. Moreover, before any "blocking" occurs, CDK first notifies all affected dealers that unauthorized third-party activity has been detected on their accounts and that security measures will be deployed if such unauthorized activity continues. Any disruption to the business operations of vendors and dealers is completely avoidable. Gardner Decl. ¶ 61.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 62 of 83 PageID #:85477
Case: 3:17-cv-00318-jdp Document #: 868 Filed: 06/08/17 Page 62 of 83
PURSUANT TO PROTECTIVE ORDER

203.    Other DMS providers – i.e., DMS providers other than CDK and Reynolds – do not block the ability of dealers to share their data with Authenticom. Korp Decl. ¶ 13; Cottrell Decl. ¶ 47.

**Response:** Disputed in part. CDK and Reynolds do not "block the ability of dealers to share their data with Authenticom." CDK and Reynolds independently work to prevent Authenticom and other unauthorized third parties from accessing the DMS. Gardner Decl. ¶ 73; Schaefer Decl. ¶ 112. It is undisputed that dealers have the choice of at least some other DMS providers that currently have different third-party access policies and/or do not prevent Authenticom and other third parties' from accessing their DMS.

### D.    Dealer Statements to Defendants to Stop Blocking Authenticom

204.    A large number of dealers complained to CDK and Reynolds and demanded that they stop blocking Authenticom. Ex. 51; Ex. 60; Ex. 61; Ex. 23; Cottrell Decl. ¶ 79.

**Response:** Disputed that four dealers out of approximately 17,000 franchised dealerships in the United States represents a "large number of dealers." Moreover, of these four, there is no indication that one of them ever complained *to* CDK about anything. *See* Pl. Ex. 23. Another of Plaintiff's declarants complained to CDK, but his complaints ceased when CDK pointed out that his DMS Master Services Agreement expressly prohibited him from allowing Authenticom or other unauthorized third-parties to access the DMS using dealer log-in credentials. *See* Pl. Ex. 51 at 1. Many, many more dealers have *not* complained about CDK's third-party access policies and several have expressed support for them. Karp Decl. ¶ 24; Conver Decl. ¶ 18.

While Authenticom does not define "large" or provide any evidence of any complaints to Reynolds, it is undisputed that dealers sometimes complain about Defendants' third-party access policies. Lamb Decl. ¶¶ 22-23; Schaefer Decl. ¶19.

205.    In their complaints, the dealers have stated that the data is theirs, that they control access to it, and that the disabling of Authenticom has interrupted their operations and caused economic harm. Cottrell Decl. ¶ 80.

**Response:** Disputed. Mr. Cottrell's statement to this effect ("I understand that in their complaints, many dealers have stated …..") is inadmissible hearsay. Moreover, Authenticom has not provided any example complaints, and Defendants' are aware of none, that meet the description set forth here. However, it is not disputed that dealerships have made complaints of this general nature from time to time.

206.    As examples of complaints from dealers, in December 2016, a Ford dealer protested to CDK: "You do not have our authorization to disable user accounts. . . . It is my data and I decide who has access to it." After CDK stated that it would continue to block Authenticom, the dealer wrote: "We own the data, CDK doesn't." Ex. 51, at 1, 3.

**Response:** Disputed in part. Undisputed that the quoted statements appear in Pl. Ex. 51, but the statement is inadmissible hearsay.

207.    In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles? This must stop." The dealer criticized CDK's "attempt to stop all other data access [routes] thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." "When will CDK stop trying to monetize the data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most . . . can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers['] access to their own data using fully automated routines." The dealer explained: "We would like to purchase the XTime application. The CDK data access charges make that option prohibitively expensive. . . . Did CDK actually think that these exorbitant data access charges levied against our third party solution providers would not get passed directly back to us?" Ex. 60.

**Response:** Disputed in part. Undisputed that the quoted statements appear in Pl. Ex. 60, but the statement is inadmissible hearsay.

208.    On October 27, 2016, a Wisconsin dealer wrote to Authenticom that it had created a login for the owner of the dealership "to see if CDK had the nerve to deactivate it. They did!. . . I have very strongly voiced by phone to my CDK rep to STOP IT." Ex. 61.

**Response:** Disputed in part. Undisputed that the quoted statements appear in Pl. Ex. 61, but the statement is inadmissible hearsay.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 64 of 83 PageID #:85479
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/30/17 Page 63 of 82

PURSUANT TO PROTECTIVE ORDER

209.    On October 21, 2016, a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security." Ex. 23. Regarding Authenticom's integration product, the dealer wrote that "with each vendor requiring different kinds of data extraction, I feel it would be far more effective to support Authenticom and DealerVault, to build a great single point of extracted data, and plug my vendors into their ecosystem." *Id.*

**Response:** Disputed in part. Undisputed that the quoted statements appear in Pl. Ex. 23, but the statement is inadmissible hearsay.

210.    After CDK and Reynolds disabled the dealer-created Authenticom credentials, dealers worked cooperatively with Authenticom to set up new credentials and reestablish access. Given the sheer scale of the mass blocking, Authenticom was forced to redirect a majority of its 120-person workforce to the effort – including at one point hiring 50 temporary employees solely to help dealers navigate around the shutdowns. Cottrell Decl. ¶ 40; Fitkin Decl. ¶¶ 10-11.

**Response:** Disputed in part. Undisputed that when CDK and Reynolds began to disable dealer usernames and passwords used by Authenticom, Authenticom responded by developing new ways to circumvent CDK and Reynolds's security protocols and by encouraging dealers to issue new usernames and passwords to Authenticom (or provide administrator-level passwords to Authenticom so that it could re-enable passwords or create new ones) in direct violation of their agreements. Gardner Decl. ¶¶ 70-71. Defendants cannot determine what resources or employees Authenticom may have devoted to these efforts to "help dealers navigate around the shutdowns" as Authenticom has not produced any documentation to substantiate its claims.

211.    As soon as dealers set up new login credentials, CDK and Reynolds disabled them. Cottrell Decl. ¶¶ 40-41; Fitkin Decl. ¶ 10.

**Response:** Undisputed that CDK and Reynolds independently employ security responses to Authenticom's efforts to gain unauthorized access to their respective DMS, which have evolved in sophistication to include scripts and protocols that constantly generate new unauthorized dealer username and password credentials or re-enable previously disabled ones. *See* Fitkin Decl. ¶ 11. *See also* Gardner Decl. ¶ 71. Moreover, while Defendants do not disable

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 65 of 83 PageID #:85480
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/26/19 Page 64 of 82

PURSUANT TO PROTECTIVE ORDER

new login credentials "as soon as dealers set [them] up," it is undisputed that Defendants independently endeavor to block unauthorized and automated login attempts to the DMS, which likely affects login credentials created by dealers for Authenticom. *Id.*; Schaefer Decl. ¶ 112.

212. As one Dodge dealer in Texas reported to Authenticom on September 9, 2016, the dealer's CDK "rep said that setting up a new profile would work for a day or two but our account is now being monitored. Basically he told me that they have control and that is the way it's going to be." Ex. 62.

**Response:** Disputed in part. While the quoted statement appears in Pl. Ex. 62, the statement is inadmissible hearsay.

### E. Defendants' False Statements About Authenticom's Security

213. In conjunction with disabling Authenticom's profiles, CDK and Reynolds have contacted dealers to convince them to have their vendors switch to the 3PA and RCI programs. Cottrell Decl. ¶ 42; Ex. 41; Ex. 42; Ex. 43.

**Response:** Disputed in part. Undisputed that CDK has contacted dealers whose accounts were being used by unauthorized third parties (including Authenticom and others) and advised them to talk to their vendors about becoming certified under CDK's partner program; disputed CDK that such discussions were "in conjunction with disabling Authenticom's profiles" specifically. *See, e.g.,* Defs. Ex. 38; Pl. Ex. 41; Defs. Ex. 39; Defs. Ex. 40. Similarly, Reynolds does not dispute that it has discussed the benefits of RCI integration with its dealership customers (and the industry generally) throughout the history of its security and technology enhancements; but it generally does not "contact dealers" to conduct any such discussions. Schaefer Decl. ¶ 33.

214. On August 22, 2016, Bob Karp – President of CDK North America and the person with oversight of CDK's 3PA program – sent a letter to all of CDK's dealers served by Authenticom with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by unauthorized means." Mr. Karp stated that CDK would no longer allow independent data integrators to access dealer data, and that vendors therefore needed to "begin the Third Party Access program application process immediately to avoid disruption." Ex. 41, at 1-2.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 66 of 83 PageID #:85481
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/10/19 Page 66 of 82

PURSUANT TO PROTECTIVE ORDER

**Response:** Disputed in part. Undisputed that CDK sent a letter (Pl. Ex. 41) dated August

22, 2016 to approximately 2,500 dealers whose accounts were being used by unauthorized third

parties (including Authenticom and others), and that the quoted statements appear in the letter.

The letter does not state that CDK "would no longer allow independent data integrators to access

dealer data," but rather that "through our SecurityFirst program, CDK is taking meaningful steps

to better secure the data ecosystem surrounding the CDK DMS. As part of this effort, CDK has

been working to migrate vendors from unauthorized access methods to approved methods

through our Third Party Access program." Pl. Ex. 41 at 1; Gardner Decl. ¶ 68.

215. In another letter – this one from September 23, 2016 – Mr. Karp told dealers to "[s]hare your list of vendors with us so that our Third Party Access program team can invite vendors who are not already part of the program to join." Ex. 42.

**Response:** Undisputed that the quoted language appears in the identified letter.

216. Reynolds also notified dealers that it was "prohibiting automated access" to independent data integrators like Authenticom, and stated that "if a third party vendor you do business with is impacted by this change, please refer them to the Reynolds Certified Interface hotline." Ex. 32.

**Response:** Undisputed that Reynolds sent the quoted communication in 2011.

217. As part of their effort to convince vendors to join the 3PA and RCI programs, CDK and Reynolds have made false statements to vendors and dealers about Authenticom's data security. Ex. 41; Ex. 42; Ex. 43; Cottrell Decl. ¶ 54.

**Response:** Disputed. All of the statements made in the cited communications are true.

Rosenbach Decl. ¶¶ 150-178. Defendants also note that Mr. Cottrell's declaration only attempts

to refute one aspect of these communications (regarding the installation of code).

218. Defendants have tried to justify their blocking of Authenticom and other independent integrators by claiming that it is necessary to protect "data security." Ex. 41; Ex. 42; Ex. 43.

**Response:** Undisputed that data security concerns are an important reason, among

several others including operational integrity and intellectual property, why Defendants do not

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 67 of 83 PageID #:85482
Case: 3:17-cv-00318-jdp Document #: 868-18 Filed: 06/10/21 Page 68 of 82

PURSUANT TO PROTECTIVE ORDER

permit unauthorized third-party access to its DMS platform. Gardner Decl. ¶ 45; Rosenbach Decl. ¶¶ 25-81; Schaefer Decl. ¶¶ 36-49; Thorne Decl. ¶ 37.

219.    In letters to dealers, CDK has falsely stated that, with Authenticom, "there are no limits on data elements that can be accessed, increasing the risk of misuse. There is also an inability for you to track and monitor where your data is going." Ex. 42; Ex. 43.

**Response:** Disputed. The quoted statement is true. Rosenbach Decl. ¶¶ 150-153; Thorne Decl. ¶ 34.

220.    Authenticom pulls only the data dealers specify, and with DealerVault, dealers have complete control and visibility over the flow of their data. Cottrell Decl. ¶¶ 24, 29.

**Response:** Disputed. *See* Resp. to SOF ¶¶ 65-67.

221.    CDK has also warned of "unauthorized software" being "installed on your CDK DMS system." Ex. 41, at 1.

**Response:** Disputed. The letter warns that "*if* unauthorized software is installed on your CDK DMS system, DMS files may be updated without following CDK protocols, resulting in data integrity issues." Pl. Ex. 41 at 1 (emphasis added).

222.    Authenticom does not install any software on the DMS system or alter the DMS software; instead, Authenticom runs data reports just as the dealer can. Cottrell Decl. ¶ 54; Swire Decl. ¶ 27.

**Response:** Disputed in part. Authenticom knowingly obtains unauthorized access to Reynolds and CDK DMS. While Authenticom claims not to "install any software on the DMS system" or "alter the DMS software," Authenticom *does* install software remotely at the *dealership* that "needs to be running continuously on a host PC attached to the network," which "allows Authenticom to extract data from the DMS" on an almost constant basis: up to 10,000 times per *month* for just a single dealer (out of the thousands of dealers using CDK DMS that Authenticom claims to serve). None of this is "just as the dealer" would access the DMS. Conver Decl. ¶¶ 19-21; Rosenbach Decl. ¶¶ 150-178; Schaefer Decl. ¶¶ 45-47. Moreover, while Defendants are unable to confirm without discovery whether or not Authenticom has installed

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 68 of 83 PageID #:85483
Case: 3:27-cv-00318-jdp Document #: 860 Filed: 06/18/19 Page 68 of 82

PURSUANT TO PROTECTIVE ORDER

software on the DMS system, it has observed third-party integrators like Authenticom attempting to do so. Schaefer Decl. ¶ 48; Defs. Ex. 71.

223.     CDK and Reynolds have also stated that sharing through "data-handling intermediar[ies]" such as Authenticom poses security risks. Ex. 41, at 1.

**Response:** Undisputed that CDK and Reynolds have separately made truthful statements to this effect and that the letter is quoted accurately.

224.     The use of "intermediaries" like Authenticom does not pose a security risk that merits blocking all independent data integrators. Swire Decl. ¶¶ 6, 33.

**Response:** Disputed. Authenticom's role as a data access "intermediary" creates unnecessary security risks, because, "[e]ach separate data transmission and stop over point increases the risk of loss, misdirection, and/or misuse of dealership data." Pl. Ex. 41 at 1; Rosenbach Decl. ¶¶ 84-85.

225.     Reynolds uses Authenticom to pull data from a handful of Reynolds' own dealerships for use in Reynolds' own applications. Cottrell Decl. ¶ 33; Swire Decl. ¶ 29.

**Response:** Disputed. Schaefer Decl. ¶ 104.

226.     Reynolds also uses Authenticom to pull data from non-CDK and non-Reynolds dealers for use in Reynolds' applications. Cottrell Decl. ¶ 33.

**Response:** Undisputed.

227.     AVRS, Inc. – a wholly owned joint venture of CDK and Reynolds that provides electronic registration and titling services for dealers in California – uses Authenticom for data integration services. Cottrell Decl. ¶ 33; Swire Decl. ¶ 30; Longpre Decl. ¶ 9. Therefore, on behalf of Defendants' own joint venture, Authenticom pulls data from CDK dealers and Reynolds dealers. *Id.*

**Response:** Disputed in part. Undisputed that AVRS, Inc. ("AVRS") is a subsidiary of Computerized Vehicle Registration ("CVR") which, in turn, is a joint venture between CDK and Reynolds that provides electronic vehicle and titling services ("EVR") in California. AVRS was using Authenticom for certain services at the time of CVR's acquisition of AVRS in 2015. Bonifay Decl. ¶ 4. As part of AVRS's integration with CVR, its use of Authenticom is being

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 69 of 83. PageID #:85484
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/19 Page 68 of 82

PURSUANT TO PROTECTIVE ORDER

==discontinued and it currently uses Authenticom for only a handful of CDK and Reynolds dealers with legacy DMS software.== Bonifay Decl. ¶ 5.

228.    Using login credentials to pull data is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers. Swire Decl. ¶¶ 15-25.

**Response:** Disputed. Gaining unauthorized access to a secure computer system using login credentials obtained from an authorized user, without the system operator's knowledge or permission, as Authenticom does, is not the "industry standard" in banking, healthcare, or any other industry where the protection of sensitive data is required. Rosenbach Decl. ¶¶ 150-178.

229.    The Consumer Financial Protection Bureau recently summarized, "Typically, consumers provide their account credentials for a particular company or financial institution where they hold an account. Those credentials are then used to obtain their account data through either: (1) A structured data feed or an application program interface (API) hosted by the company or financial institution, or (2) the company or financial institution's consumer-facing website in a process known as screen-scraping." Ex. 63.

**Response:** Disputed in part. It is disputed that the CFPB's guidance is germane to this dispute as the CFPB document is discussing "consumer-permissioned access"—*i.e.*, the situation where consumers (*e.g.*, here, *car buyers*) provide their account credentials for the express purpose of data sharing. The data being shared in the CFPB guidance is limited in scope and pertains only to the particular consumer at issue there. Moreover, while the cited CFPB document identifies "structured data feed[s]" and "screen-scraping" a "consumer-facing website" as two methods used by "account aggregators" to obtain consumer financial information, neither describes Authenticom's methods of accessing the DMS here. Moreover, CFPB itself has recognized that "screen-scraping" and other methods of data aggregation creates security risks, including "whether account aggregators … employ adequate security and privacy procedures with respect to … account data," and "unauthorized transactions that may result from a breach of

68

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 70 of 83 PageID #:85485
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/17 Page 69 of 82

PURSUANT TO PROTECTIVE ORDER

consumer credentials or consumer financial account data held by an account aggregator ….” Pl. Ex. 63 at 12-13.

230.    “[S]creen scraping is the only technology that enables all of the thousands of small financial institutions to participate in the data-sharing ecosystem.” Ex. 64.

**Response:** Disputed. The quoted statement appears in Pl. Ex. 64, but it relates to a different industry (consumer banking) and a different type of “screen scraping” than what Authenticom uses here. *See* Resp. to SOF ¶ 229, *supra*. Further, the document notes that “[m]ost seem to agree that the industry needs to move toward more secure solutions.” Pl. Ex. 64 at 1.

### F.    Authenticom’s Loss of Customers Because of Defendants’ Actions

231.    Because of Defendants’ actions, vendors have had no choice but to leave Authenticom and join the 3PA and RCI programs. Cottrell Decl. ¶ 78.

**Response:**  Disputed. Depending on the type of data access they require, vendors have options other than joining Defendants’ programs, including but not limited to receiving reports and data directly from dealers. Gardner Decl. ¶¶ 21-23; Schaefer Decl. ¶ 84; Wood Decl. ¶¶ 2-3. Indeed, Reynolds encourages some vendors to pursue alternatives to RCI. Schaefer Decl. ¶ 61. It is undisputed that some certified RCI and 3PA vendors formerly used Authenticom.

232.    The vendors could not sustain the business interruptions caused by Defendants’ blocking, and so had to terminate their connections with Authenticom. Cottrell Decl. ¶ 78.

**Response:**  Disputed. Authenticom has not shown any business interruptions to their vendors or that the purported decline in its vendor connections was caused by Defendants, much less by any coordinated activity between them; Defendants therefore cannot evaluate and or respond to this Paragraph**.**

233.    Among many examples, one large vendor wrote to Authenticom: “It is with reluctance that I write this email to confirm that we will be transitioning our CDK dealership clients from [Authenticom] to CDK.” The vendor explained that “[t]his move was solely the result of CDK’s aggressive and recurring disablement of our data access credentials . . . . Being forced to do business with CDK is distressing.” Ex. 65.

PURSUANT TO PROTECTIVE ORDER

**Response:**   Disputed in part. While the quoted statements appear in Pl. Ex. 65, Authenticom has not shown any evidence that the vendor's comments are among "many examples." The letter is also inadmissible hearsay.

234.    Another longtime vendor client wrote to Authenticom: "After being a loyal client for over six years, we are compelled to make a business decision to pursue Third Party Access from CDK Data Services." The vendor continued: "Over the past 60 days, we have averaged 100 of our dealer clients blocked from DealerVault/Authenticom polling the dealer's data. . . . The effect of these disruptions has taken a serious toll on our dealer business clients causing them to terminate or suspend marketing services with us." Ex. 66.

**Response:**   Disputed in part. While the quoted statements appear in Pl. Ex. 66, the statements are inadmissible hearsay.

235.    Another vendor explained that "[b]etween the Reynolds lockouts and the subsequent CDK lock-outs our business has contracted due to dealer cancellations." Ex. 70.

**Response:**   Disputed in part. While the quoted statement appears in Pl. Ex. 70, the. statement is inadmissible hearsay.

236.    Vendors left Authenticom even though they preferred Authenticom's data integration services to CDK's and Reynolds'. Ex. 66.

**Response:**   Disputed. The cited document (Pl. Ex. 66) reflects statements to the effect that one vendor was "compelled to make a business decision to pursue Third Party Access from CDK Data Services to access the data from our CDK Global dealer clients." Moreover, the statement is inadmissible hearsay. Authenticom does not provide services comparable to CDK or Reynolds. Addanki Decl. ¶¶ 12, 13, 46; Rosenbach Decl. ¶¶ 150-178. Moreover, the exhibit cited by Authenticom does not support the notion that venders prefer Authenticom to CDK or Reynolds.

237.    One vendor wrote: "[The] process to onboard data via [Authenticom] is streamlined and much easier for both our company and the individual dealership. Plus, the data accuracy and formatting is very consistent when it is secured . . . (this is not the case when data is pulled directly from CDK)." The vendor also wrote that "the only party that truly suffers here is the actual dealer. It takes us longer to provide them the services they are requesting and have paid for. The data is not as clean, therefore requiring additional processes and data scrubbing,

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 72 of 83 PageID #:85487
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/28/17 Page 196 of 222

PURSUANT TO PROTECTIVE ORDER

and appending tools to be applied on our side. And the costs are greatly increased – literally double – due to the egregious fees that CDK charges." Ex. 67.

**Response:** Disputed in part. While the quoted statements appear in Pl. Ex. 67, the

statements are inadmissible hearsay.

## VI. Harm to Dealers and Vendors Caused by Defendants' Conduct

### A. Defendants' Imposition of Large Price Increases in the Dealer Data Integration Market

238. Data integrators charge vendors per dealership rooftop, sometimes referred to as a "connection." Thus, if a dealer has ten rooftops (i.e., ten individual franchises), then the vendor would need ten separate connections for that dealer. Cottrell Decl. ¶ 10; Ex. 11.

**Response:** Undisputed that certain "data integrators," as Authenticom defines that term,

charge vendors per dealership rooftop.

239. To pull data, Authenticom has consistently charged vendors $25 for one data feed and $50 for two or more (up to seven). On average, Authenticom charges vendors between $30 and $40 a month per connection. Cottrell Decl. ¶ 63.

**Response:** Disputed. Authenticom has not produced any contracts or pricing information

from which Defendants can determine Authenticom's pricing structure. Moreover, Defendants

have evidence of Authenticom charging higher amounts. Schaefer Decl. ¶ 81.

240. For bi-directional access to dealer data, Authenticom has generally charged $75 per connection. Cottrell Decl. ¶ 64.

**Response:** Disputed. Authenticom has not produced any contracts or pricing information

from which Defendants can determine Authenticom's pricing structure.

241. Other independent data integrators charged similar rates to Authenticom. For example, between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market). Cottrell Decl. ¶ 66.

**Response:** Disputed that SIS has been "forced out" of the purported "data integration

market." *See* Resp. to SOF ¶ 123. Further, Authenticom has not produced any contracts or

pricing information from which Defendants can determine SIS's pricing structure.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 73 of 83 PageID #:85488
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/19/17 Page 72 of 82

PURSUANT TO PROTECTIVE ORDER

242. CDK and Reynolds now charge far higher rates than those charged by Authenticom and former data integrators. Fitkin Decl. ¶ 17; Korp Decl. ¶¶ 27, 29; Longpre Decl. ¶¶ 5, 7-8.

**Response:** Disputed in part. It is undisputed that that integration to the DMS through certified, secure custom interfaces is typically higher in cost and price than unauthorized username and password and screen scraping activities. It is disputed that such services are comparable. Addanki Decl. ¶ 60; Rosenbach Decl. ¶¶ 150-178. In addition, it is undisputed that CDK and Reynolds shoulder the costs of building, maintaining, and operating their respective DMS and Authenticom and other data access "intermediaries" do not incur such costs. Addanki Decl. ¶¶ 59-62; Rosenbach Decl. ¶ 153.

243. One prominent vendor paid Authenticom $35 per month to pull data; when it was forced to join the RCI program for data integration services, the monthly rate charged by Reynolds was $210, a 500 percent increase. Cottrell Decl. ¶ 68.

**Response:** Disputed in part. Reynolds has no information available regarding the unnamed vendor, but it is undisputed that integration to the DMS through certified, secure custom interfaces is typically higher in cost and price than unauthorized username and password and screen scraping activities. It is disputed that any vendor was "forced" to join the RCI program. Schaefer Decl. ¶ 61.

244. Another large vendor purchased data integration services from SIS for years, at a rate of $45 to $50 per month. That vendor now pays CDK and Reynolds monthly charges of between $300 and $700 (CDK) and between $300 and $866 (Reynolds). Cottrell Decl. ¶ 69.

**Response:** Disputed. Mr. Cottrell does not identify the "large vendor" or the "services" that it purchases, nor does he provide the basis for his "understanding" of what this vendor purportedly paid SIS for the "services" or what it now pays CDK and Reynolds. It is undisputed that integration to the DMS through certified, secure custom interfaces is typically higher in cost and price than unauthorized username and password screen scraping activities. *See, e.g.,* Addanki ¶ 60.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 74 of 83 PageID #:85489
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/09/17 Page 73 of 82

PURSUANT TO PROTECTIVE ORDER

245.    After entering into their agreement, CDK and Reynolds dramatically raised their data integration fees.

**Response:** Disputed. CDK and Reynolds do not have, and have never had, an agreement with respect to the pricing of their respective services. Karp Decl. ¶ 33; Schaefer Decl. ¶ 120. Reynolds disputes the remainder of this Paragraph. Schaefer Decl. ¶ 120. To the extent this Paragraph purports to reference the Defendants' Data Exchange Agreement, the revisions to CDK's pricing structure began well prior to the consummation of that Agreement. Conver Decl. ¶ 15; Gardner Decl. ¶ 15; Defs. Ex. 24, 31.

246.    Before entering the agreement with Reynolds in February 2015, CDK charged an average of $70 per connection. Ex. 10; Ex. 38. Since 2015, the average cost per connection has risen to at least $250 to $300 (and often much more). *Id.* This constitutes, at the conservative end, an increase in the range of 250 to 325 percent in the price of data integration services. *Id.*

**Response:** Disputed. The statements attributed to unidentified "vendors" and an unidentified "CDK" representative in Pl. Ex. 10, an *Automotive News* article, are inadmissible hearsay. And Pl. Ex. 38, another *Automotive News* article, on its face provides no support for any factual statement in this Paragraph.

Further, in or about February 2015, CDK's standard pricing for many extraction-only DMS connections was $25 (per connection) per month. For bi-directional ("writeback") access, CDK's pricing varied. Some vendors paid more than $70 per month, and others paid less. Among other things, the changes to CDK's 3PA pricing structure announced in 2015 were intended to standardize 3PA pricing and "level the playing field." Conver Decl. ¶¶ 30-31.

Under the current 3PA program, pricing for *some* "writeback" packages (which include all necessary data connections) is between $220 and $275 per month, but other writeback packages are as low as $60 per month. And pricing for extraction-only connections is generally much lower. For example, CDK's standard extraction pricing has remained under $50 per month

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 75 of 83 PageID #:85490
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 74 of 82

PURSUANT TO PROTECTIVE ORDER

for many data extracts (*e.g.*, single extracts of dealer vehicle inventory data, certain customer data, and parts inventory). *Id.* at ¶ 38.

247.    CDK's prices for the 3PA program stand in contrast to the prices CDK charges for data access to non-CDK dealers. Today, CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges on average between $250 and $300 for the same services to CDK dealers. Ex. 10; Ex. 38; Cottrell Decl. ¶ 70.

**Response:** Disputed. Neither Pl. Ex. 10, an *Automotive News* article, nor Pl. Ex. 38, another *Automotive News* article, on its face provides any support for this Paragraph. Further, Authenticom misstates CDK's pricing structure in several respects. Conver Decl. ¶ 38.

248.    CDK and Reynolds are also now charging many vendors a transaction charge for every data pull, imposing an additional per-transaction fee on top of their already large monthly fees. Cottrell Decl. ¶ 71.

**Response:** Disputed.



Schaefer Decl. ¶ 66. There is no "per-transaction fee" under CDK's 3PA contracts. Conver Decl. ¶ 39.

249.    In addition to monthly fees, CDK and Reynolds also charge vendors large upfront fees to initiate services.

**Response:** Disputed. Reynolds charges vendors reasonable fees for certification and installation services. Schaefer Decl. ¶ 62. Undisputed that CDK charges certain upfront project fees under its 3PA program, which vary significantly based on the services and vendor involved. Conver Decl. ¶¶ 34-35.

250.    Authenticom will show at the evidentiary hearing that CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 (or more) per connection. Ex. 11; Cottrell Decl. ¶ 72.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 76 of 83 PageID #:85491
Case: 3:17-cv-00318-jdp Document #: 860 Filed: 06/26/17 Page 76 of 82

PURSUANT TO PROTECTIVE ORDER

**Response:** Disputed in part. CDK does not charge vendors $30,000 in upfront fees under the 3PA program for the vast majority of integration packages, and CDK's setup fees per dealer are $100. Conver Decl. ¶ 36. ██████████████████████████████████

██████████████████████████████████████████

████████████████████████████ Schaefer Decl. ¶ 63.

251. Authenticom, by contrast, collects an upfront fee of $2,500, but that fee is credited against the first invoices, and Authenticom does not charge an additional per-connection setup fee as CDK and Reynolds do. Cottrell Decl. ¶ 65.

**Response:** As Authenticom has provided no contracts or pricing information, Defendants are unable to determine what setup fees are charged by Authenticom or how those fees are credited against future invoices. Moreover, Defendants have evidence of Authenticom charging per-rooftop set-up fees. Schaefer Decl. ¶ 81.

252. The industry press has widely reported on CDK's and Reynolds' dramatic price increases for integration services. Ex. 10; Ex. 39; Ex. 38.

**Response:** Disputed in part. The industry press has reported on pricing under CDK's and Reynolds's respective programs, but its reporting has been inaccurate and largely taken out of context. Conver Decl. ¶ 25; Schaefer Decl. ¶ 68.

253. Application providers pass through to dealers all or a portion of Defendants' higher data integration fees. Fitkin Decl. ¶ 18; Korp Decl. ¶¶ 27, 29; Longpre Decl. ¶¶ 7-8; Ex. 11.

**Response:** Disputed in part. As a general matter, on information and belief, some vendors pass through some, all, or none of their integration fees. It is entirely the choice of the vendor. Conver Decl. ¶ 40; Schaefer Decl. ¶ 71. Moreover, CDK's agreements with application providers prohibit them from "includ[ing] any 'interface' fee, DMS access fee, or any other similar fee related to the use of the CDK Interface System in any of [their] invoices to … customers." Pl. Ex. 52 § 10. The intent of this provision is to discourage a third-party vendor

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 77 of 83 PageID #:85492
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/10/17 Page 76 of 82

PURSUANT TO PROTECTIVE ORDER

from passing the fees that it pays under the 3PA program back to the dealer as a surcharge.
Conver Decl. ¶ 40.

254.    As a result of the pass-through data fees, dealers pay more for third-party applications than they would otherwise. Fitkin Decl. ¶ 18; Longpre Decl. ¶ 7; Korp Decl. ¶¶ 27, 29-30; Ex. 11.

**Response:** Disputed. Addanki Decl. ¶¶ 53, 54, 56, and 59-62.

255.    As one Florida dealer wrote: "This is just a means of revenue generation for CDK." "Let me, the client, worry about my data security by using a vendor such as DealerVault. It should be my choice on how I want to secure my data, not [Defendants']." Ex. 71.

**Response:** Undisputed that quoted statements that appear in Pl. Ex. 71 and that the communication was written after a CDK DMS username "with a fictitious first and last name" provided to Authenticom had been disabled. *See id.* at 2. CDK disputes that its focus on security is "just a means of revenue generation."  Thorne Decl. ¶ 65.

### B.    Defendants' Escalating Fees for DMS

256.    CDK and Reynolds do not provide a corresponding price break to dealers in the form of lower DMS fees to make up for the higher pass-through costs for data integration.

**Response:** Undisputed, subject to the clarification that CDK believes that the costs of administering its partner program should be borne by CDK and the third-party vendors who utilize it and should not be charged back to the dealers as "pass-through costs." As such, CDK does not offer discounts to dealers based on 3PA program fees. Conver Decl. ¶ 41. Reynolds believes that it would make no sense to provide a price break "corresponding" to fees charged by a third-party application, which dealers can choose or not choose and some of which are more expensive than others (because some third-party applications choose to have more or less sophisticated integration). Schaefer Decl. ¶ 67.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 78 of 83 PageID #:85493
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/17 Page 79 of 82

PURSUANT TO PROTECTIVE ORDER

257. Instead, the DMS fees paid by dealers continue to rise every year. Fitkin Decl. ¶ 18; Korp Decl. ¶ 24; Longpre Decl. ¶ 11.

**Response:** Undisputed that generally there have been modest annual price increases for CDK's and Reynolds's respective DMS platforms, but that such increases, if any, are governed by the parties' individual contracts. Schaefer Decl. ¶ 16.

258. Authenticom will show at the evidentiary hearing that both CDK and Reynolds have fee escalation clauses in their DMS contracts with dealers.

**Response:** Generally undisputed, subject to the clarification that both CDK's and Reynolds's respective DMS fees are whatever each of them and their respective customers contractually negotiate.

259. Authenticom will show at the evidentiary hearing that the standard Reynolds contract provides that DMS fees go up every year on March 1. The price increase is measured by the Customer Price Index plus 2 percent. Ex. 17, at 5.

**Response:** ████████

260. Authenticom will show at the evidentiary hearing that the standard CDK contract gives dealers price protection for a certain period of time, but then imposes an average 4 to 6 percent automatic yearly price increase thereafter. Ex. 69, at 2.

**Response:** Disputed in part. Pl. 69 is a draft ADP contract which states that, for unknown customer, increases of the "Monthly Maintenance Charges and Monthly License and Support Fees shall not exceed 5%; there is nothing in Pl. 69 that would indicate that the contract was signed or that it is the contract currently in place. Undisputed that price increases are dictated by CDK's contracts with its dealer customers.

## C. Additional Harm to Dealers and Vendors from Defendants' Conduct

261. Smaller application providers and startups cannot afford Defendants' data integration fees and cannot operate without affordable access to dealer data. Korp Decl. ¶¶ 12, 17.

**Response:** Disputed. Addanki Decl. ¶ 45.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 79 of 83 PageID #:85494
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/06/17 Page 78 of 82

PURSUANT TO PROTECTIVE ORDER

262.    Application providers are prevented from expanding and innovating because of Defendants' blocking tactics and high data integration fees – which deprives both car dealerships and the public of the benefits of those applications. Korp Decl. ¶¶ 15-16, 28.

**Response:** Disputed. Addanki Decl. ¶ 45.

263.    Authenticom will show at the evidentiary hearing that CDK's and Reynolds' higher data integration fees reduce the quality and availability of applications from which dealers can choose. Fitkin Decl. ¶ 19; Korp Decl. ¶¶ 28, 31-32.

**Response:** Disputed. Addanki Decl. ¶ 45.

264.    Beginning in 2015 and 2016, Defendants blocked the third-party application Open Recalls from pulling dealer data, impeding its ability to service its customers and expand. Korp Decl. ¶¶ 8-11, 14-15. The blocking has prevented Open Recalls from finding and contacting automobile owners who are driving vehicles with unsafe, recalled parts. *Id.* ¶ 16.

**Response:** Disputed. While Open Recalls is not permitted to access the CDK or Reynolds DMS using dealer username and password credentials, it is eligible to apply to become part of either or both the CDK 3PA Program or the RCI Program under either program's rules. Gardner Decl. ¶ 13; Schaefer Decl. ¶ 89. If Open Recalls is unable or unwilling to join either program, it and/or its competitors could easily obtain batch data from dealers and accomplish the same direct-to-consumer marketing efforts that it conducted before. Schaefer Decl. ¶ 89.

265.    Dealers do not use some of their preferred vendors because of the large pass-through data integration fees. Korp Decl. ¶ 31.

**Response:** Disputed. One dealer purportedly electing not to use certain vendors because of fees charged to them by other vendors does not provide a basis for the conclusion set forth in this Paragraph. Addanki Decl. ¶ 45.

266.    There has also been reduced output in terms of fewer overall connections. Singer Decl. ¶¶ 6, 47.

**Response:** Disputed. Addanki Decl. ¶¶ 45, 63.

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 80 of 83 PageID #:85495
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/17 Page 79 of 82

PURSUANT TO PROTECTIVE ORDER

267.    Authenticom will show at the evidentiary hearing that because Defendants now charge some vendors an additional per-transaction fee, those vendors are economizing by reducing the output of data they receive.

**Response:** Disputed in part. ████████████████████████████████████

████████████████ CDK does not charge vendors "per-transaction fees" under the 3PA Program. CDK charges vendors a "per-extract" fee. It is undisputed that vendors are economizing the number of data extracts they receive. Conver Decl. ¶ 39; Schaefer Decl. ¶ 66.

## VII.    Irreparable Harm Suffered by Authenticom

268.    The same anticompetitive conduct that has injured competition has also directly and significantly damaged Authenticom. Singer Decl. ¶¶ 47, 55.

**Response:** Disputed. Addanki Decl. ¶¶ 56-62; Zmijewski Decl. ¶¶ 45-48.

269.    For years, Authenticom suffered customer losses and slower growth because of Reynolds's blocking. Cottrell Decl. ¶ 76.

**Response:**  Disputed in part. Undisputed that Reynolds effectively blocked hostile integrators like Authenticom for years. Disputed that Authenticom "suffered."  Klein Decl. ¶ 14.

270.    The recent action of both CDK and Reynolds has accelerated Authenticom's losses. Klein Decl. ¶ 15; Cottrell Decl. ¶ 77.

**Response:** Disputed. Zmijewski Decl. ¶¶ 30-44, 45-48.

271.    Defendants' anticompetitive conduct threatens to destroy the entirety of Authenticom's business. Klein Decl. ¶ 6; Cottrell Decl. ¶ 2.

**Response:** Disputed. Addanki Decl. ¶¶ 56-62; Zmijewski Decl. ¶¶ 7-9, 20-29, 30-44.

272.    Authenticom's profits, as measured by EBITDA, dropped by 77.22 percent from the third quarter of 2015, when Defendants intensified their blocking efforts, to the first quarter of 2017. Klein Decl. ¶ 20.

**Response:** Disputed in part. While Authenticom reports reduced earnings dating back to mid-2015, it is disputed that such reported drop in earnings was caused by any "blocking efforts" by either Defendant during this period, much less any coordinated activity between them. Addanki Decl. ¶¶ 27, 30; Zmijewski Decl. ¶¶ 45-48. In addition, Mr. Cottrell stated in a May

PURSUANT TO PROTECTIVE ORDER

2016 interview that Authenticom's "growth rate is astronomical" and that its "revenues are just crusting $20 million." Defs. Ex. 66 at 12.

273.    The number of active data feeds that Authenticom has for vendors has declined significantly. Klein Decl. ¶ 22; Cottrell Decl. ¶ 81.

**Response:** Disputed in part. Undisputed that according to the data relied upon by Authenticom and its expert Mr. Klein, Authenticom's active data feeds have declined. Disputed, however, as to the meaning of "significantly."

274.    Defendants' actions have left Authenticom cash flow insolvent, with insufficient earnings and resources to satisfy its outstanding debt obligations. Klein Decl. ¶ 28.

**Response:** Disputed in part. *See* Zmijewski Decl. ¶¶ 25-27.

275.    Authenticom was unable to pay an $11 million principal payment on a loan from BMO Harris Bank due April 16, 2017, and has received a limited 90-day forbearance from the Bank pending the outcome of the forthcoming preliminary injunction motion. Klein Decl. ¶ 29; Cottrell Decl. ¶ 83.

**Response:** Disputed in part. Undisputed that Authenticom lacked cash on hand to pay the principal payment, but Authenticom has consistently had free cash flow sufficient to make interest payments on its debt, which strongly indicates that foreclosure is unlikely. *See* Zmijewski Decl. ¶¶ 20-29.

276.    Authenticom was also unable to pay an approximately $1.17 million tax-related obligation due April 18, 2017. Klein Decl. ¶ 29; Cottrell Decl. ¶ 83.

**Response:** Disputed in part. Zmijewski Decl. ¶ 41 & n.50.

277.    Authenticom has sought additional financing from, among others, BMO Harris Bank and Citizens State Bank, but they have declined to provide this financing, citing doubts about Authenticom's continued viability because of Defendants' actions. Cottrell Decl. ¶ 83; Klein Decl. ¶ 33.

**Response:** Disputed in part. It is disputed that Defendants are responsible for any concerns regarding Authenticom's continued viability. *See* Zmijewski Decl. ¶¶ 30-44. It is also disputed that Authenticom has sought financing from a sufficient number of financial institutions

Case: 1:18-cv-00864 Document #: 1142-20 Filed: 08/28/20 Page 82 of 83 PageID #:85497
Case: 3:17-cv-00318-jdp Document #: 86 Filed: 06/16/17 Page 82 of 92
PURSUANT TO PROTECTIVE ORDER

to support the conclusion that no additional financing is available. *See* Klein Decl. ¶ 33 

████

278.    The loss of goodwill – because of Defendants' blocking, Authenticom cannot perform for its customers – is incalculable. Cottrell Decl. ¶ 85.

**Response:** Disputed. The Cottrell declaration does not claim that any loss of goodwill is "incalculable," nor does Mr. Cottrell provide any supporting basis for his assertion (at ¶ 85) that Authenticom's goodwill has been "severely damaged."

279.    Absent the emergency injunctive relief sought here, Authenticom will have no choice but to declare bankruptcy. Cottrell Decl. ¶ 2.

**Response:** Disputed. Zmijewski Decl. ¶¶ 20-29.

280.    Upon learning of Defendants' harm to Authenticom, Jenny Kuderer of the Wisconsin Economic Development Corporation wrote to the company: "[P]lease know that Authenticom is a valued contributor to the La Crosse Area and to the State of Wisconsin. We wish you all the best in moving through this difficult time and regaining focus on your core business. If there is anything that I, or our La Crosse Area Economic Development Team (cc'd here), may be able to do to assist, don't hesitate to reach out." Ex. 72.

**Response:** Undisputed that Pl. Ex. 72 shows that a representative of the Wisconsin Economic Development Corporation wrote an email to Steve Cottrell regarding Authenticom's complaint and that the quoted statement appears in the document. It is disputed that Defendants have harmed Authenticom.

281.    Similarly, the City of La Crosse wrote to Mr. Cottrell: "On behalf of the City of La Crosse and the Planning and Development department, I want to echo the message from Jenny [Kuderer]. We are grateful for the contributions you and Authenticom have made to the community, have enjoyed watching you grow, and we look forward to continued future successes. Please let us know if we can be of any assistance to you and your team." Ex. 72.

**Response:** Undisputed that the quoted statement appears in Pl. Ex. 72.

PURSUANT TO PROTECTIVE ORDER

Dated: June 16, 2017

Respectfully submitted,

/s/ *Aundrea K. Gulley*

Kathy D. Patrick (*pro hac vice to follow*)
Aundrea K. Gulley (*pro hac vice*)
Brian T. Ross (*pro hac vice*)
Brice A. Wilkinson (*pro hac vice*)
Ross M. MacDonald (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel: (713) 751-5258
Fax: (713) 750-0903
kpatrick@gibbsbruns.com
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P. A. Cohen (*pro hac vice*)
SHEPPARD MULLIN RICHTER &
HAMPTON, LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006
Tel: (202) 747-1900
Fax: (202) 637-5910
mcohen@sheppardmullin.com

John S. Skilton
Charles G. Curtis, Jr.
Michelle M. Umberger
Brandon M. Lewis
Jesse J. Bair
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, WI 53703
Tel: (608) 663-7460
Fax: (608) 663-7499
jskilton@perkinscoie.com
ccurtis@perkinscoie.com
mumberger@perkinscoie.com
blewis@perkinscoie.com
jbair@perkinscoie.com

*Attorneys for Defendant The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*

Britt M. Miller (*pro hac vice*)
Matthew D. Provance (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Tel: (202) 263-3000
Fax: (202) 263-3300
mryan@mayerbrown.com

Jeffrey Allan Simmons
Joseph S. Harper
FOLEY & LARDNER LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI 53701-1497
Tel: (608) 257-503
Fax: (608) 258-4258
jsimmons@foley.com
jharper@foley.com

*Attorneys for Defendant CDK Global, LLC*

724547613.10 17542193