# Exhibit 511

```
                    UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF WISCONSIN
_____

AUTHENTICOM, INC.,

          Plaintiff,

 -vs-                                     Case No.   17-CV-318-JDP

CDK GLOBAL, LLC and                       Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,        June 28, 2017
                                          8:02 a.m.

          Defendants.
_____

    STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF EVIDENTIARY HEARING
      HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

          Godfrey & Kahn S.C.
          BY:  JENNIFER L. GREGOR
          One East Main Street, Suite 500
          Madison, Wisconsin  53701

          Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
          BY:  MICHAEL N. NEMELKA
               AARON M. PANNER
               DAVID L. SCHWARZ
               DEREK T. HO
               JOANNA T. ZHANG
               JOSHUA HAFENBRACK
               KEVIN J. MILLER
          1615 M Street, N.W.
          Suite 400
          Washington, D.C.  20036


           Jennifer L. Dobbratz, RMR, CRR, CRC
           U.S. District Court Federal Reporter
              United States District Court
           120 North Henry Street, Rm. 410
              Madison, Wisconsin  53703
                   (608) 261-5709
```

```
APPEARANCES CONTINUED:

Also appearing:    STEPHEN COTTRELL, Authenticom
                   STEVE ROBB, IT Support

For the Defendant CDK Global, LLC:

                   Foley & Lardner
                   BY:  JEFFREY A. SIMMONS
                   150 East Gilman Street
                   Madison, Wisconsin  53701

                   Mayer Brown LLP
                   BY:  BRITT M. MILLER
                        MATTHEW D. PROVANCE
                   71 South Wacker Drive
                   Chicago, Illinois  60606

                   Mayer Brown LLP
                   BY:  MARK W. RYAN
                   1999 K Street, N.W.
                   Washington, D.C.  20006

Also appearing:    LEE BRUNZ, General Counsel, CDK Global, LLC
                   NICK HEY, IT Support

For the Defendant The Reynolds and Reynolds Company:

                   Perkins Coie LLP
                   BY:  CHARLES G. CURTIS, JR.
                   1 East Main Street, Suite 201
                   Madison, Wisconsin  53703

                   Sheppard Mullin Richter & Hampton, LLP
                   BY:  MICHAEL P. A. COHEN
                   2099 Pennsylvania Avenue, N.W.
                   Suite 100
                   Washington, D.C.  20006

                   Gibbs & Bruns LLP
                   BY:  AUNDREA K. GULLEY
                        BRIAN T. ROSS
                        BRICE A. WILKINSON
                   1100 Louisiana Street, Suite 5300
                   Houston, Texas  77002

Also appearing:    ROBERT SCHAEFER and KELLY HALL,
                   The Reynolds and Reynolds Company
```

Case: 1:18-cv-00864 Document #: 1144-2 Filed: 08/28/20 Page 4 of 6 PageID #:86012
Case: 3:17-cv-00318-jdp Document #: 186 Filed: 07/05/17 Page 45 of 118

45

1    provides that service.  It does it actually better than the
2    defendants do for a reason, and Authenticom charges 25 to $50 a
3    month for doing that service, or something on that order, and
4    other competitive providers do too and charge the same, and so
5    we know what that costs, and so that is not what the DMS
6    providers are charging for.  That is not why the DMS -- that is
7    not why vendors are willing and forced to pay these outrageous
8    fees.
9         And, you know, it's interesting actually, there's a case
10   from the Seventh Circuit called *Assessment Technologies of WI v.*
11   *WIREdata,* and the cite is 350 F.3d 640, and it's a case that we
12   cited in our reply papers, and it makes for very interesting
13   reading.  The case starts this way:  "This case is about the
14   attempt of a copyright owner to use copyright law to block
15   access to data that not only are neither copyrightable nor
16   copyrighted, but were not created or obtained by the copyright
17   owner.  The owner is trying to secrete the data in its
18   copyrighted program, a program the existence of which reduced
19   the likelihood that the data would be retained in a form in
20   which they would have -- in which they would have been readily
21   accessible.  It would be appalling if such an attempt could
22   succeed."  Now -- so if Authenticom -- and I think that that
23   analysis really applies quite well here.
24        Now, I don't want to anticipate an argument that's not going
25   to be made by the defendants, but I do know that in the opening

Case: 1:18-cv-00864 Document #: 1144-2 Filed: 08/28/20 Page 5 of 6 PageID #:86013
Case: 3:17-cv-00318-jdp Document #: 186 Filed: 07/05/17 Page 46 of 18

46

```
1     Mr. Cohen referred to the Computer Fraud and Abuse Act, and
2     there was a suggestion that somehow Authenticom was violating
3     that federal statute.  Now, we learned yesterday -- first of
4     all, CDK has never -- didn't say that in their opening, and I
5     assume they will not say it in their closing for lots of
6     reasons, not least that CDK's contract permits dealers to
7     authorize agents to access data under the contract, and the
8     dealers had done so with CDK's express approval until CDK
9     changed its mind about whether that was economical in 2015.
10          Now, Reynolds say that dealers shouldn't have granted
11    Authenticom access, but that's a matter of contract, right?  The
12    dealers did authorize Authenticom to pull the data, and the
13    federal statute is not a contract enforcement mechanism.  But
14    the more important point is this:  If Reynolds could not
15    lawfully restrict the dealers from authorizing Authenticom to
16    access their data, if that was a violation of the antitrust
17    laws, any issue about that federal statute just disappears,
18    okay?  In other words, what's important about this is that none
19    of the defendants' arguments about contract law, about the terms
20    of their agreements with the dealers, changed the calculus about
21    the likelihood of success on the merits.  If we've shown a
22    likelihood that these provisions and this conduct violated the
23    antitrust laws, then they can't enforce those provisions and --
24              THE COURT:  Help me understand that.  So let's just
25    start, I guess, with a hypothetical, but not entirely
```

Case: 1:18-cv-00864 Document #: 1144-2 Filed: 08/28/20 Page 6 of 6 PageID #:86014
Case: 3:17-cv-00318-jdp Document #: 186 Filed: 07/05/17 Page 47 of 78

47

1   hypothetical, but Reynolds on its own independently, assuming
2   that -- think of it as before February 2015.  Reynolds -- I'll
3   make it a question.  Does Reynolds commit an antitrust violation
4   by imposing a contractual restriction that prevents dealers from
5   giving the usernames to Authenticom?
6           MR. PANNER:  Yes.
7           THE COURT:  Okay.  And why is that?
8           MR. PANNER:  Because, again, there's an integration
9   services function that's being provided in the market.  We
10  learned that yesterday.  Reynolds is using its market power in
11  the DMS market to foreclose competition in the market for
12  integration services.  They're doing that in part by barring the
13  dealer -- barring dealers from providing their data in an
14  efficient way to Authenticom.  They're also entering into
15  contracts with vendors that bar those vendors from obtaining
16  that data from Authenticom, using Authenticom's data integration
17  services, and Reynolds has at that point over 30% of the market.
18  They have substantial market power because the dealers are
19  locked in --
20          THE COURT:  So at that point it's a vertical exclusive
21  dealing.
22          MR. PANNER:  Exactly.  It's also a vertical tying
23  arrangement.  Tying is actually also a per se violation of the
24  antitrust laws.  Again, these are the kinds of issues that get
25  into the interesting antitrust stuff that, you know, that