1
2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

3
4
5
6
7
8
9

IN RE:  DEALER MANAGEMENT                )
SYSTEMS ANTITRUST LITIGATION             )
                                         )
AUTHENTICOM, INC., et al.,               )
                                         ) No. 18 C 864
                Plaintiffs,              )
                                         )
        vs.                              ) Chicago, Illinois
                                         ) August 14, 2020
CDK GLOBAL, LLC, et al.,                 ) 10:41 a.m.
                                         )
                Defendants.              )

10

TRANSCRIPT OF PROCEEDINGS

11

BEFORE THE HONORABLE JEFFREY T. GILBERT

12
13

APPEARANCES:

14
15
16
17
18

For the Plaintiffs:      KELLOGG, HANSEN, TODD, FIGEL &
                         FREDERICK P.L.L.C.
                         BY:  MR. DANIEL V. DORRIS
                              MR. DEREK TAM HO
                         1615 M Street, NW
                         Suite 400
                         Washington, D.C.  20036
                         (202) 236-7900

19
20
21
22

For CDK Global, LLC:     MAYER BROWN LLP
                         BY:  MS. BRITT M. MILLER
                         71 South Wacker Drive
                         Chicago, Illinois  60606
                         (312) 782-0600

23
24
25

Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                          219 South Dearborn Street, Room 1706
                          Chicago, Illinois 60604
                          (312) 435-7626
                          nancy_bistany@ilnd.uscourts.gov

1   APPEARANCES:   (Continued)

2

3   For The Reynolds &          GIBBS & BRUNS LLP
    Reynolds Company:           BY:   MR. ROSS M. MacDONALD
4                                     MS. AUNDREA K. GULLEY
                                1100 Louisiana, Suite 5300
5                               Houston, Texas  77002
                                (713) 650-8805

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings heard telephonically and in open court:)

2               THE CLERK:  18 Civil 864, In Re: Dealer Management

3       Systems Antitrust Litigation, for telephone conference.

4               THE COURT:  Okay.  Good morning, everybody.  It's

5       Judge Gilbert.

6               We're on the record.  We have a court reporter, Nancy

7       Bistany.  And I'm going to ask counsel who want to be reflected

8       as appearing of record to state their appearances now and then

9       also to send an email to our court reporter directly with your,

10      you know, name and appearance information to Nancy,

11      Nancy_Bistany@ilnd.uscourts.gov.

12              And I'm also communicating a request from our court

13      reporter that when you speak, you speak clearly, slowly, and

14      into the microphone and also identify yourself before you speak

15      so the proper name can be associated with the person who is

16      speaking.

17              Okay.  Let's start with appearances for plaintiff or

18      plaintiffs, and then we'll move to defense counsel.

19              MR. DORRIS:  Good morning, Your Honor.

20              This is Dan Dorris for -- from Kellogg Hansen on

21      behalf of Authenticom.

22              MR. HO:  Good morning, Your Honor.

23              This is Derek Ho, also from Kellogg Hansen.

24              THE COURT:  Anybody else on the plaintiffs' side?

25              Okay.  For the defendants?

1      MR. MacDONALD:  Good morning, Your Honor.  This is --

2 good morning, Your Honor.

3      This is Ross MacDonald of Gibbs & Bruns for

4 defendant, The Reynolds & Reynolds Company.

5      And also on the line is Aundrea Gulley, also of

6 Gibbs & Bruns.

7      THE COURT:  Okay.  And just FYI, you're a little bit

8 garbled or breaking up.  I don't know if it's because you're

9 speaking on a speaker from a cell phone, or whatever, just FYI.

10      And any other appearance?

11      MS. MILLER:  Good morning, Your Honor.

12      Britt Miller of Mayer Brown on behalf of CDK Global,

13 LLC.

14      THE COURT:  Okay.  Anybody else?

15      And, Ms. Miller, we heard you fine.

16      MS. MILLER:  Thank you, Your Honor.

17      THE COURT:  Okay.  Are you all hearing me?  If you're

18 not hearing me, say so, okay, like now.

19   (No response.)

20      THE COURT:  Okay.  Good.

21      Okay.  This is the way I think we ought to proceed

22 here.  I mean, I -- as you know, I sent you pretty detailed

23 inclinations based upon the review of the documents, and I

24 wanted -- I wanted you to have those in advance of the hearing.

25 I thought it would expedite matters before the hearing,

1    frankly, and I thought it would make this a lot easier,

2    particularly by remote means.

3         As I've reviewed the letter, I think -- I mean, I

4    don't really have anything more right now to say than I said

5    there.  I thought maybe the best way to proceed is for whoever

6    the party is who came up with the short end of the stick on my

7    work product rulings to -- we can go through these one by one

8    and see -- you know, see if you -- if I missed something or

9    something that would change my mind.

10        And then as you know, for particular documents I have

11   some questions that I wanted to raise, so we can address those.

12   But I -- unless somebody feels that you'd like to proceed

13   differently, that's the way I would like to proceed.

14        Any dissents on that?

15        Okay.  So, I mean, I'm just using my letter as a

16   reference as well as the documents in front of me.  There are a

17   lot of documents here, like the first document in Tab 1, and I

18   explained why I do not think these are covered by the work

19   product privilege.  I think this is an issue that plaintiffs

20   came up short on.

21        So if Mr. Dorris or Mr. Ho want to tell me something

22   that I'm missing here, either legally or factually or

23   analytically, I'm -- I'm all ears.

24        And then FYI, just what I would think I would do is

25   after our hearing and after my rulings are finalized, I would

1    enter an order with the rulings in it in case anybody wanted to

2    appeal it and so it would be of record.  I kind of modified

3    what I've got in the letter and put that into an order.

4          So, plaintiffs, on these -- all of the documents

5    really that are variations of the same thing, the email

6    communications about the information getting to -- that needed

7    to get to the FTC, anything further you want to add?  Do you

8    think you can convince me otherwise, or should we move to the

9    next one?

10         MR. DORRIS:  Yes, Your Honor.  On this one, I take it

11   the Court's inclination --

12         THE COURT REPORTER:  Can you please state who you

13   are?  I'm sorry.  Please state your name.

14         MR. DORRIS:  My apologies.  Dan Dorris.

15         Your Honor, I believe this Court's inclination was

16   that this was not in anticipation of litigation because it was

17   a communication with the FTC.  And I submit that the -- the

18   standard here is a little different.

19         When there is an ongoing investigation of a

20   government agency, there are case -- the cases recognize that

21   that is litigation.  And documents and attorney work product

22   created in the course of that investigation are protected work

23   product.

24         And I would just give you one -- one cite, among

25   others, and that's 1992 Westlaw 281322 SR5 where a federal

1    agency had identified a specific entity that it was
2    investigating, and the court held the work product privilege
3    did apply there and that that's what occurred here.  As you can
4    tell from the Bates email that's changed, that December 2016,
5    there were ongoing meetings with the FTC where they had
6    identified Reynolds and CDK as the subject of an investigation.
7    And, indeed, several months later, the FTC -- we don't know
8    exactly for sure when they opened it, but we do know that
9    Authenticom received a formal process in that investigation in
10   August 2017.

11            So this -- this was an actual ongoing investigation,
12   and this was work product created in anticipation of that
13   litigation.  And Authenticom as an interested third party and,
14   indeed, one who was ultimately subpoenaed by the FTC could
15   force -- could concretely proceed being involved in that
16   litigation by the FTC.

17            THE COURT:  And the case that you cited -- I'm sorry.
18   Go ahead.

19            MR. DORRIS:  And second, even apart from the ongoing
20   FTC litigation, as this -- I think the Court recognized in Tab
21   12, there was considered private litigation at that time as
22   well.  That Tab 12 concerns a document from August 2016
23   demonstrating contemplated private litigation.

24            And given how closely related the FTC's investigation
25   and the private litigation was at the time, the work product

1    for one was necessarily work product for the other.  They were

2    the same attorneys working on the same case, presenting the

3    same theories, those anticompetitive conduct by CDK and

4    Reynolds.  And so work product created in the context of one is

5    necessarily work product for the other.

6            THE COURT:  And, Mr. Dorris, you cited -- you gave me

7    Westlaw cite, 1992 Westlaw, I think you said, 281322 at page 5.

8    What's the name of that case, and where is that cited in your

9    memorandum in opposition to defendants' motion to compel, which

10   is ECF 571?

11           MR. DORRIS:  That case is -- the title

12   *ChemCentral/Grand Rapids Corp. versus EPA*.  And that's --

13   that's not cited in our opposition and I think because these

14   issues were not briefed by the defendants when they filed the

15   motion.

16           THE COURT:  Well, I guess I beg to differ on that

17   last point.  That's one reason why we're here is because you

18   told me at a different status hearing that the issues had been

19   briefed, had been presented.  I didn't think they were

20   presented as well as they could have been; but nevertheless, I

21   mean, you know, in your opposition brief, for example, at page

22   12 of ECF 571, the subheading there is:  "Many of the

23   Challenged Communications Are Also Work Product."  And you make

24   some arguments there over a few pages.

25           But you didn't cite me this case in your opposition

1    brief, and you're now doing it in oral argument.  I just think

2    you're too far down the line, A, to cite me that case.  B, I

3    disagree that this series of emails would be work product for

4    the reasons I put in my inclinations.  Also, because this

5    starts with an email from AutoLoop's Tony Petruzzelli sharing

6    an article from Automotive News with a bunch of email

7    recipients, I mean, sending a -- I don't think that simply

8    sending an article to a bunch of people is going to be shielded

9    by work product under the standards that apply there.

10          In addition, I don't see a linkage between the

11   communications with the FTC responding to their request for

12   information, and the -- I don't see how that is related to

13   the -- an actual anticipated litigation that Authenticom is

14   going to be filing here or ultimately did file.

15          These were -- in my mind, there's no linkage in the

16   factual email.  It involves in some way different counsel,

17   different people involved in this.  It is certainly an effort

18   that people were engaging in to attempt to get governmental

19   intervention here, agency intervention.  I'm not sure how

20   successful it was or wasn't in terms of where it ended up

21   going, but I would stand by the inclination that I have here.

22          Further, you know, I will say with respect to

23   virtually all the documents that I reviewed, I don't think

24   they, individually or together, amount to a hill of beans in

25   this case.  I don't see how they're going to change the shape

1    of the world, the shape of the table, the shape of summary

2    judgment, the shape of the trial.  And so, you know, I don't

3    think there's a tremendous amount of prejudice here, which

4    really doesn't enter into the analysis necessarily, but I think

5    it's a backdrop here.

6         But this clearly was in my mind not in anticipation

7    of your litigation.  It was in -- it was an attempt to involve

8    the FTC and apparently was successful in some respect.  But I

9    would -- my immediate case and just my gut on this is -- this

10   is not part -- you can broadly construe everything you were

11   doing at that time as being in anticipation of litigation.  And

12   that's kind of what you're doing with these assertions of

13   privilege, and I just don't believe the work product privilege

14   is as broad as you purport to make it with your invocation.

15        So I hear what you're saying, but I'm not going to --

16   I think I'm going to stick with my inclination here.  And, you

17   know, I do -- I do -- and I don't have the transcript in front

18   of me even if we have one from the last discussion we had on

19   the record.  We may not, actually, because I remember I was at

20   home.  But, you know, I think it's a little bit poor form for

21   you to tell me that you didn't address work product at all

22   before -- you told me before I kind of overlooked it the last

23   time.  And, you know, then I went back and diligently looked in

24   your briefs, including the briefing on the litigation finance

25   firm, and then have you throw me an uncited case today and say

1    that really supports your position, I mean, that just -- it

2    doesn't work.

3          But my ruling is not necessarily on the basis of too

4    late in time.  It's on the merits.

5          Go ahead.

6          MR. DORRIS:  Completely understand, Your Honor.  And

7    I apologize, but I did not mean to suggest that you had not

8    addressed work product or that it was not briefed.

9          I was simply explaining that the reason why this

10   particular case was not cited was that the issue about the

11   government investigation had not been briefed by the other

12   side, that specific issue.

13         THE COURT:  Ah.

14         MR. DORRIS:  I didn't mean to suggest otherwise.

15         THE COURT:  Okay.  Okay.  Fair enough.

16         And I understand what you're saying; however, what I

17   would say to that last point -- and then we'll move on to the

18   next document -- is if that was a very solid basis for your

19   assertion of the privilege, I would have expected to see that,

20   whatever the heck the defendant said.

21         All right.  So let's move on to Tab -- so this really

22   applies to Tabs 1, 2, 4, 5, 6, 8, 11, 15, 21, 22, 23, 24, 26,

23   and 27.  They're all variations of this same email string.

24         Let's look at this next document, which is the

25   Gerchen Keller communication with Cooley.  And this -- this

1   actually is something that I think -- I thought the plaintiffs

2   were correct on.  You brought to my attention that this had

3   been addressed, including the cases that you had cited.

4           I was wrong in my initial inclination that

5   communications with the litigation finance firm which I viewed

6   as simply loan communications would not be covered.  The case

7   law is in these cases and others that I've read that

8   communications with a firm as part of an effort to obtain

9   financing to fund particular litigation can be considered work

10  product.  So I stand corrected on that, and I'm glad I now know

11  that.  Maybe it will come up again in some other case.

12          But -- and they also include the mental impressions

13  of Authenticom's lawyer, broadly speaking.  Nothing, nothing --

14  very high-level stuff.  Nothing, again, that I think is earth

15  shattering one way or another, but it is work product.  And so

16  the defendants then, CDK and Reynolds, would have to show

17  substantial need for those documents, whether disclosure to

18  Gerchen Keller made it more likely that the information would

19  be disclosed to plaintiffs' adversaries or Authenticom's

20  adversaries, and also that the party is unable, without undue

21  hardship, to obtain the substantial equivalent of these

22  materials by another means.

23          And I will tell you, without disclosing the work

24  product, that the substantial equivalent of this -- this

25  discuss -- this communication can be gotten in six seconds in

1    a -- you know, it's not a -- it's not a 50-page litigation

2    memo.

3          So I look to the defendants to see whether or not I'm

4    missing something here and that there's something else I need

5    to consider before settling on a ruling.

6          MR. MacDONALD:  Your Honor, this is Ross MacDonald of

7    Gibbs & Bruns.  Can you hear me?

8          THE COURT:  Yes.

9          MR. MacDONALD:  Okay.  Your Honor, based on your

10   description of the documents and -- and your -- your

11   description of what you see in it, the defendants are willing

12   to concede that this is work product and will withdraw their

13   motion to compel as to Tab 3.  And we will also do it as to Tab

14   18, which I think is another communication with Gerchen Keller

15   that seems to fall in the same sort of category.

16         THE COURT:  Yeah, it's the same exact thing.  Okay.

17   Great.  Thanks, Mr. MacDonald.

18         Okay.  Next, we're at Tab 7.  And these are

19   communications from back in January through July of 2016, at

20   least within that time period -- I think maybe there's one in

21   January, one July; there's others at different times -- about

22   the situation involving CDK and Reynolds' charges for access to

23   their DMS systems.

24         And I've described the emails generally.  They don't

25   mention litigation.  They -- one of them actually involves just

1  the FTC asking for contact information for another dealer, to

2  give you the sense of how substantive these things are.  And to

3  me, they're in the regular course of business among business

4  people sharing information that is about their business and

5  about, you know, challenges they're facing in their business.

6          Sure.  Was this broadly -- you know, could you say

7  one of the reasons this was being done was people may have been

8  thinking some about litigation?  Yes.  But I -- this is not in

9  anticipation of litigation or this specific litigation at the

10 time these were made.  These are general, you know, information

11 sharing.

12         It's not just clear to me that these were in anti --

13 that they should be categorized as being in anticipation of the

14 litigation that we're talking about here.

15         So, Mr. Dorris or Mr. Ho, you came up on the short

16 end of this stick.  Is there anything I'm missing here or what

17 you want me to consider that I haven't referenced?

18         MR. DORRIS:  This is Mr. Dorris.

19         No, we understand your ruling.  There's nothing

20 further that we (inaudible, audio feedback) --

21         THE COURT:  Okay.  Yeah.  The other thing, in

22 addition to the -- you know, the previous communication was,

23 like, December 2016.  This is, you know, beginning a year --

24 more than a year before the litigation took place.

25         Okay.  Tab 9, this was communications by in-house

1    counsel at Authenticom to somebody at BMO.  I take it that BMO
2    is one of Authenticom's lenders, Mr. Dorris?
3              MR. DORRIS:  Yes, that's correct, Your Honor.
4              THE COURT:  Okay.  And, again, you know, the
5    earth-shattering nature of this escapes me.  It's mostly
6    informing the lender that Kellogg Huber had agreed to represent
7    Authenticom about four months before the lawsuit was filed.
8              It includes what I say it includes here without
9    characterizing it any more directly.  But I think you could go
10   to the Kellogg Huber at that time website and -- which
11   apparently the in-house counsel did.  He copied this stuff
12   verbatim off the website.  But it does include a couple of
13   sentences that on a very broad-based basis includes the
14   lawyers' and the law firm's sense of the case, nothing earth
15   shattering.  And you could almost -- and nothing very specific,
16   but it certainly is mental impressions.
17             So I think it's, you know, at least those two lines,
18   you know, but arguably, the whole email is work product,
19   clearly in anticipation of the litigation that happened.
20             I cannot believe that the defendants have a
21   substantial need for this communication.  So I look at the
22   defendants here, Mr. MacDonald, and then I'm -- if I need to
23   characterize this any more, I will.
24             But, you know, and I recognize, by the way, you
25   guys -- it's real tough to do these on a privilege log basis,

1    particularly with the privilege log or logs in this case where

2    the descriptions are almost 100 percent unhelpful in terms of

3    what the document actually ends up being.  So, you know, I --

4    you know, I get it.

5         But given my description, do you want to make a

6    full-court press for this or --

7         MR. MacDONALD:  Your Honor, Ross MacDonald.

8         Given your description of the documents, defendants

9    are happy to look up Mr. Ho and Mr. Dorris's firm bios on the

10   website.  We'll withdraw our claim for this document.

11        THE COURT:  Yeah.  And maybe if you look them up, now

12   there's going to be even more stuff there, because this was --

13   this was back in 2017, so hopefully they haven't been just

14   resting on their laurels with these -- with these wonderful

15   cases, but okay.

16        And I recognize there is absolutely no way that you

17   could figure out what this document is from a description that

18   says -- let's see, what does it say -- "Confidential

19   communication between the common interest parties reflecting

20   the legal advice and mental impressions of counsel regarding

21   CDK and Reynolds' data access issues for litigation strategy."

22        You know, I suppose at a high-level basis, those two

23   lines in here communicate mental impressions of lawyers at a

24   very 30,000-foot level.  But, you know, I don't blame you for

25   asking for it, but that's what it is.

1       Okay.  Tab 10, yeah, this is one that I had questions
2   about.  So, you know, this is a few months before the lawsuit
3   is filed, you know, a couple of communications here between
4   Gilbert Hale and Steve Cottrell.  And I think judging from the
5   sense of the -- the email, there were also oral communications
6   between the two.
7       They -- this appears to be part of Authenticom's
8   attempt or work in developing facts.  I don't really know who
9   Gilbert Hale is necessarily, a consultant, a dealer, a former
10  dealer, but he -- and he probably has been deposed in the
11  litigation here.
12      So, you know, I think -- I think judging by the
13  content of the email, which is long, he's reporting various
14  facts that he has learned or come into -- you know, come to
15  know and definitely is referencing anticipated litigation,
16  which really if this ends up to be this litigation, the
17  question then becomes substantial need and in particular -- and
18  I didn't put this necessarily in my letter -- but whether the
19  parties, CDK and Reynolds, are unable without undue hardship to
20  obtain the substantial equivalent of the material that is in
21  this email.
22      And, you know, if he's been deposed and he has, you
23  know, hypothetically disclosed pre-litigation conversations
24  with Cottrell, I'm not sure what the -- what the substantial
25  need is for this particular one.

1          But maybe, Mr. MacDonald, you could address this.

2          MR. MacDONALD:  Yes, Your Honor.  Ross MacDonald.

3          So I -- I think there are two questions here.  I'll,

4   first of all, answer your question.

5          Mr. -- Mr. Hale, as we understand it, operates or

6   operated kind of a competitor data or hostile integrator to

7   Authenticom, so one of Authenticom's competitors that was in

8   roughly the same line of business as Authenticom.

9          Mr. Hale was not deposed in this litigation.  Truth

10  be told, I went back and searched, and Authenticom produced

11  only eight emails with Mr. Hale, so he was not someone who was

12  really initially on our radar at all.

13         But the first key question we think is whether this

14  was Mr. Hale's work product and whether it's Authenticom's.  If

15  it's Authenticom's work product and then it's shared with

16  Mr. Hale, we agree that the relevant question then becomes was

17  there a substantial risk to include Mr. Hale, and do defendants

18  have a substantial need for it?

19         But if it was -- it's Mr. Hale's mental impression,

20  who is a third party, not a representative of Authenticom, but

21  had been given to Authenticom, we don't think under the case

22  law that's Authenticom's, quote, work product.

23         THE COURT:  Yeah, let me -- sorry, sorry.  Let me

24  interrupt you on that one, and maybe we can engage.

25         I mean, my sense of this email and the other one

is -- the reason I thought it was Authenticom's work product is

it appears to be asking on behalf of Authenticom in developing

the information that he's developing based upon -- in other

words, this is not just unsolicited information.  This is part

of a -- and I'm going to ask the Authenticom people if this is

true -- but my impression of it was that there were -- this was

part of more communications between them, not necessarily in

writing but orally, and that he was acting, you know, under

rule -- you know, the work product rule, Rule 26(b)(3), I

think, this was material by or for another party or by or for

that other party's representative, including, you know, agents.

And broadly speaking, what I was thinking is that he

was doing this work for Authenticom, which then makes it

Authenticom's work product.

You know, having said what I'm thinking, I want

Authenticom to tell me whether or not I'm wrong, because we

would have then a threshold question, but the sense of this was

that.

Mr. Dorris?

MR. DORRIS:  Yes, this is Mr. Dorris.

And, Your Honor, you're correct.  This -- this chain

of emails -- the two emails he's referenced are the result of

Authenticom seeking from its client facts to develop the

litigation and ultimately the complaint that was filed seven

months later.  And Mr. Hale was providing material in response

1    to those requests.

2            And jumping -- jumping ahead, if you'll let me,

3    because I don't believe there's any --

4            THE COURT:  Well --

5            MR. DORRIS:  Oh, go ahead.

6            THE COURT:  -- I don't think I'll -- I don't think

7    I'll let you, because I want Mr. MacDonald to finish his

8    presentation before we go there.

9            I will say, Mr. MacDonald, there's a line in here --

10   without disclosing any substance, but there is a line that

11   says, "If I can do anything" -- "Let me know if I can do

12   anything else."  So to me that's reflective of an ongoing sense

13   of communications where he's being asked questions, and he's

14   responding.  So it makes him more of an agent or representative

15   of Authenticom.  So that was my thinking on that, so that's

16   responsive to your first point.

17           So go on to your next point in terms of why it maybe

18   should be produced.

19           MR. MacDONALD:  Thank you, Your Honor.  Ross

20   MacDonald again.

21           So based on Your Honor's statements, then it does

22   become kind of whether there was a substantial risk of

23   disclosure or whether we have a substantial need for the

24   information that we can't get elsewhere.

25           As to the former, I appreciate that, you know, these

1    are just communications between two different entities, but

2    they are competitors.  We have not seen any evidence that any

3    of these materials were, you know, produced subject to a

4    nondisclosure agreement or a confidentiality agreement or

5    anything like that, which are the type of things the courts

6    typically look for to see whether, you know, the work product

7    privilege has been waived and whether there is a substantial

8    need of it or not.

9            Obviously, without kind of knowing the substance of

10   the document, it's difficult for me to say, but based on my

11   high-level understanding of the document, it is -- I think it

12   describes kind of CDK's data access policies and, perhaps,

13   Mr. Hale and Authenticom's method for accessing the CDK DMS and

14   those willing to rely on very pertinent issues in this

15   litigation about that, as Authenticom has claimed, you know, at

16   various times it didn't know its access to CDK's DMS was

17   unauthorized or didn't know or thought that its access to CDK's

18   DMS was legal when CDK claims that it was illegal.

19           So to the extent there are substantive discussions

20   about how to access CDK's DMS, CDK's blocking measures, how to

21   get around those blocking measures, that would be very relevant

22   to this case and particularly relevant to kind of the summary

23   judgment briefing that's going on now.

24           THE COURT:  Okay.  Do you want to address that second

25   point, Mr. Dorris?  Because I would say, frankly, a lot of the

1    information in this email is kind of technical.

2         MR. DORRIS:  Yes, Your Honor.  It doesn't relate --

3    of course, there's no way of knowing this instant document, but

4    what the potential relevance that Mr. Ross has mentioned

5    doesn't exist in this email.

6         What Mr. Hale is doing and the purpose of this fact

7    gathering was to determine what the data access policies of CDK

8    actually were.  And you see reference to communications with

9    CDK here and Mr. Hale reporting back what he was told.

10        So this is, one, nothing to do with what he believes

11   could be relevant; and two, that shows why there's no

12   substantial need.  It's determining what CDK's data access

13   policies are, which are necessarily within their possession.

14   They need only talk to the relevant people at their client to

15   determine those.

16        THE COURT:  Okay.  First of all, if you're on a

17   speaker, I'd really appreciate it if you would pick up the

18   phone, because you cut out on -- you know, speakers, obviously,

19   as you know, if you take a little bit of a pause or a breath or

20   something -- wait.

21        (Discussion off the record.)

22        THE COURT:  So I would ask that, because hopefully

23   our court reporter is getting it, but I'm not.  You cut in and

24   out.

25        And -- and the second -- the second point is, hearing

1     that, Mr. MacDonald, what's your response on that?

2          MR. MacDONALD:  So our response would be that I would

3     agree that CDK's data access policies are otherwise

4     discoverable.  But the relevant issue is -- is what was

5     Authenticom's and what were other, you know, integrators in the

6     industry's understanding of what CDK's data access policies

7     are?  Because CDK says our data access policies were X, and

8     Authenticom has claimed, well, we didn't know that or we

9     weren't aware of that or, you know, people weren't aware of

10    that; and therefore, we didn't know our access was

11    unauthorized.

12          And so even though, you know, the fact that the

13    policies themselves may be, you know, ascertainable from CDK,

14    Authenticom and Authenticom's competitors' awareness of them is

15    very much a live issue in this case.

16          THE COURT:  I need to understand what you just said

17    better.

18          The way Mr. Dorris characterized this is -- you know,

19    I think what he is saying -- Mr. Dorris, correct me if I'm

20    wrong -- it's an attempt to ascertain what CDK's data access

21    policies are.  Is that what you're saying?

22          MR. DORRIS:  Correct.  And if you look at the

23    document, I think the best thing -- and, in fact, it's the last

24    paragraph -- what the purpose of what Mr. Hale was doing was,

25    the last paragraph of the first page of the document.

1      THE COURT:  Hold on for one second.  The last

2   paragraph of the email you're referring me to?

3      MR. DORRIS:  So the email is two pages.

4      THE COURT:  Yeah.

5      MR. DORRIS:  The first page, the long page, the last

6   paragraph of that page.

7      THE COURT:  Oh, that's it.  Okay.

8      So that says, Mr. MacDonald, simply what Mr. Dorris

9   says, that it's gathering information.  I mean, I don't think

10  this is -- I mean, he's already said this, so I'm not

11  disclosing anything -- gathering information regarding CDK's

12  policy about dealers being allowed -- well, about pulling data,

13  dealers -- dealers versus third parties pulling data from CDK's

14  system.

15     And now that I'm reading the email with Mr. Dorris's

16  description, it is all about what he has learned about what

17  CDK's policies in that regard are.  Let me just review this

18  again.

19     Yes.  Okay.  So if that's the substance of the

20  email -- I know you referenced this, but I don't -- I'm not

21  looking at realtime.  Can you say again why, if it is your

22  position, that that would be relevant?  I think you said

23  something like it's relevant what the dealers or what

24  Authenticom or others knew about CDK's policies at a particular

25  point in time?

1    MR. MacDONALD:  Yes, Your Honor.  This is Ross
2  MacDonald again.

3    So, again, I don't have it in front of me, but I
4  think there are a couple of potential relevancies.  So the
5  first one is Authenticom has claimed, you know, that it wasn't
6  aware that CDK prohibited its third-party access of its DMS.
7  And this is relevant both to our antitrust defenses and to
8  CDK's counterclaims which they allege, you know, that
9  Authenticom violated the Computer Fraud and Abuse Act or the
10  copyright act or various other acts, the DMCA.  Often those
11  turn on kind of whether a third party was authorized to access
12  the system or not authorized to circumvent an access control or
13  not.

14    And so to the extent this email indicates that either
15  prior to this time or at this time Mr. Cottrell became aware
16  that Authenticom's access was unauthorized by CDK and that
17  Authenticom continued to access CDK's systems, so it has
18  relevance to those claims and defenses.

19    The other issue -- and, again, I don't know whether
20  this comes up in the letter -- but there has been a dispute
21  over aftermarket market definition in this case between kind of
22  whether a third party like Authenticom pulling data from the
23  DMS is a substitute of a dealer pushing data out of the DMS.
24  And I think there's been a dispute over what -- to what extent
25  CDK allows it or to what extent dealers are able to put data

1    out of the CDK DMS.

2              And so to the extent that this shows that dealers can

3    put data out of the CDK DMS, that is also relevant to kind of

4    how the aftermarket is defined.

5              And I'll also -- I represent Reynolds.  So to the

6    extent Ms. Miller, who represents CDK, has anything else to

7    say, I'll let her speak, too.

8              MS. MILLER:  Your Honor, this is Britt Miller.

9              Mr. MacDonald summarized it quite well.

10             THE COURT:  Well, I'm -- was -- Mr. Dorris or

11   Mr. MacDonald, was Gilbert Hale listed as a 26(a)(1) disclosed

12   witness for Authenticom when you made your 26(a)(1)

13   disclosures?

14             MR. DORRIS:  No, he has not been listed on any

15   initial disclosure.  And I think that highlights why there is

16   no need for the information, because if any -- first of all,

17   the relevant thing is whether there was authorization.

18   That's -- that's a legal relevance here.  And so what a party

19   understands or doesn't understand is not -- not really

20   addressed to that.

21             It's what are CDK's policies.  And what those

22   policies are are easily determined over why CDK is -- should

23   have access to their client (inaudible, audio feedback) --

24             THE COURT REPORTER:  I'm sorry.  I'm sorry.  Judge,

25   I'm sorry.

1        Mr. Dorris, you have to speak up because you're

2   getting garbled a little bit --

3        THE COURT:  Yeah, I can't --

4        THE COURT REPORTER:  -- on my end.

5        THE COURT:  Yeah, I can't hear him either.  I can't

6   really hear him either.

7        MR. DORRIS:  Can you hear me better now?

8        THE COURT:  Yes.

9        MR. DORRIS:  Okay.  Good.

10       So the relevant inquiry here that Mr. MacDonald is

11  referencing is whether there -- there was authorization, and

12  that's determined by the policies themselves.

13       Whether -- what a party understood about those is not

14  as directly probative of that inquiry as to what the policies

15  actually were, which is what CDK has in its possession.

16  There's no need to get that information.

17       And further, this shows what a third party, Gilbert

18  Hale, who is not listed on any initial disclosure, learned at

19  most of the policies with just -- there's no need for that

20  because he is not listed on -- (inaudible).

21       THE COURT REPORTER:  I'm sorry.  You're dropping off

22  again.

23       THE COURT:  Yeah, I get it.

24       He's not listed on what?

25       MR. DORRIS:  The initial disclosures, Authenticom's

 1    or any other parties' (inaudible).

 2                THE COURT REPORTER:  Can't hear.

 3                THE COURT:  I'm just reading this again with this

 4    information.

 5            (Brief pause.)

 6                THE COURT:  Mr. MacDonald or Ms. Miller, there has

 7    been discovery in the case, right, about just factually what

 8    Authenticom and other dealers did in terms of accessing CDK's

 9    system in terms of obtaining data from that system or pushing

10    that data to others?  There has been a tremendous amount of

11    testimony about that in this case, right?  It's central -- it's

12    been central to the case, right?

13                MR. MacDONALD:  Yes, Your Honor, there has been a

14    reasonable amount of discovery about kind of those issues.

15                Obviously, there are some disputed issues where we

16    take certain positions and Authenticom takes certain positions

17    on some of the issues.  And the Hale emails may shed light on

18    that, but I cannot say there's been no discovery on that issue.

19                THE COURT:  Okay.  Here's my call on this,

20    Mr. MacDonald and Mr. Dorris.

21                I do think it's work product for the reasons that I

22    described.  I do think that Mr. Hale was, in effect, acting --

23    doing this on behalf of Authenticom, so he becomes their agent

24    or representative in that capacity.

25                I think also, as I'm looking at this and looking at

1 the rule again, it contains what could be interpreted to be

2 mental impressions, conclusions, or opinions of a

3 representative of Authenticom concerning a matter that then is

4 in the litigation because it discusses, you know, what -- what

5 he has found and what he understands it to be and so forth.

6          I don't think, based upon the record that's been

7 developed here, I can say that Authenticom has a substantial

8 need for this information, because I think that the subject

9 matter has been discovered probably *ad nauseam* in your case.

10 And, you know, there are probably -- there's probably reams and

11 reams of transcripts and documents, even though probably

12 disputed, about what each side says about what a dealer or

13 Authenticom could or couldn't do in accessing the system but

14 they were prohibited from doing and what -- and what CDK's

15 policies were.

16          So this -- this to me is an initial piece of sand on

17 the beach with respect to that, but I don't see it being a

18 substantial need.  And it probably is the kind of work product

19 document that fits within that, you know, last sentence of the

20 rule where we talk about mental impressions, conclusions,

21 opinions.  It's analysis, too.  So it's kind of supposed to be

22 highly protected against disclosure.

23          So for all those reasons, I would say this one falls

24 within the work product, and there's no substantial need for

25 it.  But I'm glad we had the opportunity to discuss it.

1        And I think that probably is going to also -- let's

2    just do the other one, too.  That's Tab 25.

3        MR. MacDONALD:  Yeah, Your Honor, Ross MacDonald.

4        If that is Your Honor's ruling as to Tab 10, we're

5    willing to apply the same ruling to Tab 25, unless you think

6    there's a reason to treat it differently.

7        THE COURT:  Yeah, that's why I wanted to go back and

8    look at it based on what I've now heard.

9        (Brief pause.)

10       THE COURT:  Yeah, I think it's within this same vein.

11   I just want to -- yeah, and I don't think the opposite is -- I

12   mean, the article -- the publicly available article about

13   MVSC's filing a lawsuit, that's not going to be something

14   you've got substantial need for.  And because it's left in this

15   email chain, I would say I'd apply the same ruling to that.

16   Okay.

17       So that brings us to Tab 12.  And as you can see from

18   my description, this basically is an email about who might be

19   interested in -- in a lawsuit against Reynolds & Reynolds and

20   CDK, frankly.

21       And so I think, based upon identification, for

22   example, of people who they claimed were within a common

23   interest privilege and the discovery in the case, you probably

24   know all those people, but let me see how this is described on

25   the log.

1    Yeah, I don't know that I would describe it that way,

2    frankly.  But, I mean, it is a communication between --

3    involving lawyer -- or there are communications that are -- I

4    believe they start with the lawyer at Cooley, Schildkraut

5    communications with AutoLoop, Authenticom, and others about

6    people who might be interested in -- in becoming involved in

7    the litigation.

8    So, you know, it is within that -- within those

9    parameters, it's -- I would say it's work product.  I'm not

10   sure why defendants would have a substantial need for that

11   particular information.

12   They also, by the way, on the privilege log identify

13   everybody to whom the email was sent.  That doesn't necessarily

14   identify the people who they say might be interested in being

15   involved in the litigation.  But without revealing any secrets,

16   there's no names in that list that I could see that have not

17   been -- that I haven't seen as disclosed beforehand.

18   Go ahead, Mr. MacDonald.

19   MR. MacDONALD:  Thank you, Your Honor.

20   Well, I believe you identified what we think are the

21   main issues.  The first is kind of is this a document prepared

22   in anticipation of this litigation or was -- as opposed to a

23   general business document or lobbying the government or the

24   Federal Trade Commission?

25   It -- it sounds like you're ruling that you do

1    believe that this was created in anticipation of -- of this
2    particular litigation as opposed to lobbying the FTC.  But as
3    you previously kind of mentioned in the letter on the *Viamedia*
4    case and the cases it cites, to the extent communications are
5    made with respect to lobbying the government, those are not
6    work product privilege.
7              THE COURT:  Let me -- let me interrupt you there.
8    Sorry, Nancy.
9              But it specifically references a potential lawsuit.
10   It does not reference FTC stuff.
11             MR. MacDONALD:  Fair enough.
12             The second point we would raise is kind of a
13   threshold question.  It's whose work product is it, and who
14   were the lawyers representing?
15             Just to remind the Court, Authenticom has not
16   produced any evidence of who the legal representations were.
17   There are no affidavits, no engagement letters.  We're relying
18   entirely on counsel's representation of who represented who.
19   And in certain cases, those representations have changed over
20   time.  For instance, we're originally told that Davis Polk
21   represented Dominion only, who is one of the vendors on these
22   emails, and later we received a letter saying, well,
23   Authenticom was also considering retaining Davis Polk at the
24   time.
25             Similarly, Cooley, who this email seems to be about

1    or reference, you know, we know he represented Dominion.  He

2    represented Dominion's witness when that witness was deposed in

3    this litigation and has represented Dominion before the FTC.

4    We're told that he was also representing Authenticom for some

5    period of time.

6        I'm not -- I'm not casting doubt on counsel's

7    representations.  I just -- the only evidence of who

8    represented who and whose work product it is -- is it

9    Authenticom's, is it Dominion's, is it someone else's -- is the

10   documents themselves.  So we want to be clear that this is, in

11   fact, Authenticom's work product and not a different party's.

12       If it is, in fact, Authenticom's work product, I do

13   think sharing it with -- I think there are 10 different people

14   on this email who represent a variety of different businesses

15   in the automotive space, including competitors, software

16   providers.  I think Advent is on this email, who is a DMS

17   provider.  Some of them have contractual relationships with

18   defendants.  Some of them became witnesses, both at the

19   preliminary injunction hearing and in this litigation.

20       So we do think this substantially increased the

21   likelihood that CDK or Reynolds would get copies of these

22   documents.  I appreciate that there was purported common

23   interest, but the Court has overruled that.

24       We have never seen any confidentiality agreement or

25   nondisclosure agreement produced.  One of the parties on these

1    emails -- let me make sure they're on this one -- is Elead.
2    And Elead is (inaudible, audio feedback).
3            THE COURT REPORTER:  I'm sorry.  I'm sorry.  I'm
4    sorry.  You're breaking up a little bit.  Please speak louder.
5            MR. MacDONALD:  Oh, I'm sorry.
6            One of the -- one of the parties on -- and these
7    arguments really apply to both Tab 12 and Tab 14.  One of the
8    parties is, I believe, Elead, which is an entity that was about
9    a year later acquired by CDK.  And so CDK theoretically has
10   these documents now but has not reviewed them subject to the
11   privilege rulings in this case.  So as a matter of fact, by
12   disclosing these documents to all these parties did increase
13   the likelihood that CDK would get copies of those documents.
14           And so we think even if the Court were to rule that
15   this was, A, Authenticom's work product, B, for this
16   litigation, we do think that they're -- that sharing it with so
17   many different -- different -- differently situated people did
18   increase its likelihood of disclosure.
19           THE COURT:  Okay.  Hold on.  I'm making a note here.
20           MR. MacDONALD:  And, Your Honor, just to clarify
21   something I just said, it looks to me that Elead is on Tab 14
22   but not on Tab 12, but we think the arguments apply generally
23   to both.
24           THE COURT:  Okay.  Tab 14 -- I probably should have
25   said this.  I realized this when I went through the letter

1   again.

2   Tab 14 is the predicate email. There's an email from
3   the Cooley lawyer dated August 5th to the people who you see on
4   Tab 14 and that that email without -- it looks like without all
5   the addressees for some reason is the -- is an email that is
6   also fully in Tab 12. And then there's one more email there
7   from Tony Petruzzelli, so --

8   MR. MacDONALD: Your Honor, my mistake. It is the
9   same addressees. Elead is on both. I just missed -- I missed
10  that. My apologies.

11  THE COURT: Okay. Yeah, I guess I would have --
12  yeah, I see it up there on top there, too, yeah, because
13  they're probably replying to all for all of those people.
14  Okay.

15  And -- but putting -- I get the argument that it
16  increased the likelihood of disclosure by sending it to all
17  these people. Your substantial need to know which companies,
18  including Authenticom and AutoLoop, were considering litigation
19  against -- were considering a lawsuit against R&R and CDK in
20  August 5th, 2016, what is that?

21  MR. MacDONALD: Your Honor, without kind of knowing
22  exactly the substance of the emails, if nothing else, it goes
23  to bias.

24  Authenticom has called some of these people as
25  witnesses both at the preliminary injunction hearing and later

1  during the MDL and may call some or all of these people at

2  trial.  And to the extent we have evidence that they were kind

3  of part of this grouping who had grievances against CDK and

4  Reynolds and that were helping each other, what evidence

5  against CDK and Reynolds to the FTC or otherwise is not good

6  for their reliability as witnesses.

7           THE COURT:  Okay.  I'm just pausing here for a

8  second.  I want to -- I want to look at something.

9           (Brief pause.)

10           THE COURT:  Mr. Dorris, directing your attention to

11  Tab 12, I don't think I have the necessary documents in front

12  of me, but the -- without identifying names, the Tony

13  Petruzzelli email identifies two companies.

14           Were those companies previously identified by

15  Authenticom or AutoLoop as, quote/unquote, common interest

16  parties?

17           MR. DORRIS:  Those two parties are not.  I do not

18  believe they appear on any of the communications that are

19  challenged before the Court where there's been an assertion of

20  common interest privilege.

21           So there are -- there are no communications with

22  those two parties over which we needed to assert the common

23  interest privilege.

24           THE COURT:  And who did Marc -- I don't think Marc

25  Schildkraut represented at this time the -- the representation

1       from, I think, Mr. MacDonald is that they represented Dominion

2       or did represent Dominion during depositions.

3                    But at this point, who did Cooley represent?

4                    MR. DORRIS:  My understanding is at this time he

5       represented Dominion, and that would be Rusty Friddell, the

6       general counsel at Dominion.  And the "To" line, the LCI Media

7       is Dominion.  And he also represented Authenticom at this time.

8                    THE COURT:  And you say he also represented

9       Authenticom?  What does that -- what does that mean actually?

10                   MR. DORRIS:  He -- they were both his clients.

11                   THE COURT:  So that's what you're saying,

12      Mr. MacDonald?  We have to take their word for it, right?

13                   MR. MacDONALD:  Yes, Your Honor.  All -- all we have

14      to go on is what -- is whether kind of whose work product it is

15      and who they're representing is reflected from the documents

16      themselves.  No engagement agreements or affidavits have been

17      submitted.

18                   THE COURT:  Okay.  So I need to look at this more.

19      I'm going to keep this -- I'm going to keep this under

20      advisement right now.  I've learned some information here that

21      I didn't know when I was giving you my inclinations in my

22      August 4 letter.  One is that two companies that are identified

23      in the email had not previously been identified as part of the

24      so-called common interest group.  So that has a bearing on

25      substantial need.

1          And two, I had not -- I want to think a little bit

2    more, given the breadth of distribution of this email, whether

3    defendants have shown that this kind of communication more

4    broadly among a group of, you know, eight, nine, ten people,

5    whatever, increased the likelihood of disclosure beyond

6    Authenticom.  Even if I accept at face value, that initial

7    email comes from an Authenticom lawyer.  I know it starts to

8    become difficult in what has been asserted as a common interest

9    and then -- which is what I thought.

10          So I want to -- I want to -- I want to check that.  I

11   want to think about it more, but I now at least understand the

12   issues better, and I'll put that in my ultimate ruling.

13          Okay.  Tab 13, yeah, this to me was an internal

14   attempt at developing facts that on its face the email talks

15   about that in anticipation of this particular litigation.

16          I don't think disclosing it to Ms. Zimmer made it

17   more likely that it would fall into Authenticom's adversaries'

18   hands because she was working internally at Authenticom at the

19   time.

20          So my impression is that this is a work product

21   document that would be protected.  There's no disclosure

22   outside.

23          Mr. MacDonald?

24          MR. MacDONALD:  Yes, Your Honor, Ross MacDonald.

25          Based on Your Honor's description and your ruling,

1  defendants are willing to also withdraw their request for this

2  document.

3  THE COURT:  Okay.  Tab 14, this is -- yeah, I -- this

4  gets wrapped up into 12.  It's really the same issue.

5  MR. DORRIS:  Uh-huh.  Your Honor, I did want to

6  clarify one thing.  It's --

7  THE COURT:  Identify -- identify yourself again.

8  Sorry.

9  MR. DORRIS:  Sorry.  This is Dan Dorris.

10  To clarify one thing, what I meant with those two

11  parties is we had not needed to assert that they were part of

12  the common interest group because there were no communications

13  with them.

14  I think on the face of the email in Tab 12 and 14,

15  you can see that they would be treated similarly based on their

16  willingness to -- openness to the litigation.

17  THE COURT:  Yeah, but how do you -- if you have not

18  previously identified those two companies as companies that you

19  say were part of the common interest group, which I understand

20  from prior briefing just keeps expanding -- and that was one of

21  the defendants' arguments against it, is that -- is that it was

22  a moving group.

23  But if Authenticom had not previously identified

24  those two companies as companies within the, quote/unquote,

25  common interest group, whether or not you produced any

1　communications with them or not, how can you say that the

2　defendants don't have a substantial need for this document

3　which ident -- which provides information that has never been

4　provided before potentially as, you know, going to credibility,

5　if these people end up being a witness someplace and -- or for

6　any other reason, I mean, in terms of the communication?

7　　　　　If they don't -- you know, a lot of the other stuff

8　we've been looking at here, frankly, is information that

9　defendants already have in one form or another or has been gone

10　over in discovery like we talked about with the Gilbert Hale

11　documents.

12　　　　　But this is information you haven't previously

13　disclosed. So why do you say they don't have a substantial

14　need for that information?

15　　　　　MR. DORRIS: The first of the two parties was

16　deposed. If they had a need for this information, they could

17　have asked the question of that party. And I have not read the

18　deposition recently. They may have. I don't know -- I don't

19　know one way or another.

20　　　　　The standard is not whether they need the information

21　or it would be helpful to them. It's whether they can get it

22　through alternative means. And the simple way for them to get

23　it is just to ask the third parties whether they ever

24　considered litigation against CDK and Reynolds.

25　　　　　THE COURT: Yeah. Well, contrary to what you

1 previously said on the record, I think you should stand

2 corrected, because it looks like I referenced the first company

3 listed there in my opinion dated June 8th, 2020, ECF 1011,

4 quoting from Authenticom's brief in which you identified that

5 company, along with AutoLoop, Dominion, and a bunch of others,

6 as the common interest group.

7 So now I understand your comment that this had never

8 been -- what you're saying, I guess, is they never produced any

9 documents with that person. But this is one of the companies I

10 think that you at some point added to who was part of the

11 common interest group, or else I would not have picked that up

12 in my order.

13 MR. DORRIS: I do stand corrected, Your Honor. I

14 apologize that I -- that they were -- yes, apparently my

15 recollection was wrong. There must have been a document sent

16 to them because we identified them as part of the common

17 interest group.

18 THE COURT: And then with respect to the second

19 company, at least this email does not actually identify that

20 person as part of the common interest group as much as, at

21 least arguably, potentially. But your point on substantial

22 need is? Repeat that again.

23 MR. DORRIS: It's whether they can get the

24 information through alternative means. And the simple way to

25 get this information is to -- if these parties are important in

1    this litigation and their bias is important in any way is to

2    ask them, frankly, if they'd ever considered litigation against

3    CDK or Reynolds and to ask -- to follow up on those questions.

4              THE COURT:  So was that other party deposed in this

5    case?

6              MR. DORRIS:  That other party was not -- (inaudible,

7    audio feedback).

8              THE COURT:  Pardon?

9              MR. DORRIS:  They were not deposed.

10             THE COURT:  Yeah.  Again, I don't know that this --

11   that the fate of the third world or the fate of the world

12   depends on this or not, but okay.

13             I'm going to keep it under -- I need to consider the

14   things that I've just heard.  And not deposed and I'd say

15   probably not on your Rule 26(a)(1) list either, right?

16             MR. DORRIS:  I believe those lists are co-extensive,

17   so that would be correct.

18             THE COURT:  Okay.

19             MR. MacDONALD:  Just to clarify, I think your

20   26(a)(1) list -- and this is Ross MacDonald again -- lists

21   anyone who was subpoenaed, not necessarily anyone who was

22   deposed.

23             So if they produced documents in this case, they

24   might be on your 26(a)(1) list even though they were not

25   deposed.

1           MR. DORRIS:  That is something --

2           THE COURT:  Do you have an answer, Mr. Dorris?

3           MR. DORRIS:  There -- that is something I have to

4    look into further.  I don't know whether this third party was

5    subpoenaed or not.

6           I can find that quickly, but I -- we can keep going,

7    and I will find that quickly for the Court.

8           THE COURT:  Okay.  Okay.  All right.  Document 16, I

9    don't mean to interrupt your looking, but how the heck is this

10   possibly work product privilege, Mr. Dorris?

11          MR. DORRIS:  My apologies.  Tab 13?

12          THE COURT:  16.  And I don't mean to put you on the

13   spot.  If you're okay with what I say in here, that's fine.

14   But if you're challenging it, I'd like to know why.

15          MR. DORRIS:  Yes, Your Honor.  Why it's work product

16   privilege?  I think that the first email, this communication --

17   described was commissioned -- (inaudible, audio feedback).

18          THE COURT REPORTER:  I'm sorry, Mr. Dorris.

19          I'm sorry.  Mr. Dorris, this is the court reporter.

20   I didn't hear the first part of what you said.  It's breaking

21   up a little bit.

22          MR. DORRIS:  My apologies.

23          The document was commissioned by Authenticom's

24   outside counsel identified as -- on the privilege log, I

25   believe it's Gerry Stegmaier, and this was in the anticipation

1    of litigation at this time.  This is August 2015.

2            Several months prior to that in the spring of 2015,

3    Reynolds had started to disrupt or increase its disruption of

4    Authenticom's access to Reynolds' DMS, leading to anticipated

5    litigation against Reynolds.  And also at this time in April

6    2015 to the three months before this email, Reynolds had sent a

7    cease and desist letter to Authenticom threatening litigation

8    against them.

9            So the parties, Reynolds and Authenticom, at this

10   time in August 2015 were in an adversarial position

11   contemplating litigation against one another, and this document

12   was commissioned by Authenticom's outside counsel in relation

13   to that anticipated litigation.

14           THE COURT:  I'm just looking at the document again.

15           MR. MacDONALD:  And, Your Honor, this is Ross

16   MacDonald.  I'm happy to respond briefly if you'd like.

17           THE COURT:  I'm just reading the overview of this

18   thing to see whether or not what Mr. Dorris said changes my

19   mind on this.

20           You can respond, and then I'll rule.

21           MR. MacDONALD:  Yes, Your Honor.  My only response

22   would be that it appears that this document was created two

23   years before any litigation was filed.  We think it's -- even

24   if it was -- and even if it was created in anticipation of some

25   litigation, it's not clear it's anticipated -- in anticipation

1   of this litigation.  And I don't know whether it mentions

2   additionally suing CDK or suing them for, you know, an alleged

3   conspiracy between Reynolds and CDK, which is the focus of this

4   litigation.

5          So the fact that Authenticom was obsessed or

6   grumbling that Reynolds had taken certain actions that had as a

7   dispute impacted it negatively does not make it a document

8   created in anticipation of this litigation or because of this

9   litigation, which is the standard in this district.

10          We also (inaudible, audio feedback) --

11          THE COURT REPORTER:  I'm sorry.  Mr. MacDonald -- Mr.

12   MacDonald, you're breaking up on my end.  I'm sorry.

13          MR. MacDONALD:  Yes, I'm sorry.  I'm sorry.

14          I was just going to say, in addition to it being well

15   before any litigation was instituted and presumably about a

16   different type of litigation than was ultimately filed, the

17   fact that it is a communication plan we think makes it unlikely

18   to be an attorney's work product or reflecting the mental

19   impressions of an attorney about -- about this.  We think it's

20   unlikely to be work product.

21          THE COURT:  Okay.  Yeah, I agree.  This is just not

22   attorney work product.

23          In terms of the anticipation of litigation,

24   Mr. Dorris, you know, at page .005 of the document, there's a

25   note which in my mind specifically says in so many words

1    litigation is not necessarily anticipated at this point.  It

2    could happen in the future, but this is -- this is two years

3    before anything happens and many, many -- and at least a year

4    or more before anybody has really taken any steps.

5         It's a public relations communication plan, and

6    whether or not you got a lawyer from Goodwin Proctor involved

7    or not is -- doesn't change that.  And, you know, I guess I

8    can't see how you make a description of this document on your

9    privilege log as, quote, "Confidential communications between

10   common interest parties reflecting the request for legal advice

11   of Stegmaier, Gerry regarding CDK and Reynolds' data access

12   issues."

13        Somebody has got pat little words that they put in

14   there, but when I read that, I read this document, the

15   description does not operate in the same universe as this

16   document.  So it gets produced.  It's not work product, and

17   it's not even close.

18        Tab -- you know what, I want to take -- we've been

19   going longer than I thought.  I'm going to take a five-minute

20   break here, and then we'll come back and finish the rest of the

21   documents, and we'll move on.

22        I also was going to ask the parties at the end of

23   this, by the way -- I'd like the lawyers' view on this -- I

24   know I have under advisement the motion for production of work

25   product material that's being withheld by AutoLoop.  And I'm

1    just -- and I have a box that's very large with two -- two

2    copies of the documents that are being withheld in my office,

3    which I said you should produce.

4            But I'm just wondering whether the detailed rulings

5    and inclinations that I've given you here have any effect on

6    that and whether I should now delve into all those documents

7    again.  Or are there calls that can be made based on these

8    rulings or if you're going to want to challenge them, you know,

9    you're going to reserve every right, and I've got to go through

10   all that?

11           I'm just wondering whether any of this work,

12   therefore, translates into that or whether we do the same

13   exercise again.

14           But let's just take five minutes here, and then we'll

15   come back and finish this.  Okay?  Bye.

16           MR. MacDONALD:  Thank you, Your Honor.

17           (Recess from 12:00 p.m. to 12:08 p.m.)

18           THE COURT:  Okay.  Sorry, everybody.  We had what

19   they call technical difficulties, so I'm glad you're all still

20   there.  We had to get -- we had to figure out how to get back

21   here.  Okay.  And Brenda can see on the computer that you're --

22   everybody is still there.

23           Nancy, are you there?

24           THE COURT REPORTER:  I am here, Judge.  Thank you.

25           THE COURT:  Good.  Okay.  Great.

1       Okay.  We are now at Tab 17.  I don't know -- I mean,
2   I don't know how much to belabor this.

3       I don't -- for the reasons set forth in my letter, I
4   don't think this is work product.  Unlike other emails that
5   we've looked here, the parties didn't even put on there their
6   common interest privilege protection, which I've said didn't
7   apply, but these are similar people who previously had that on
8   there, too.  So I don't know.

9       Mr. Dorris, the ruling -- my inclination was against
10  you here.  So do you have anything more you think I should
11  consider here?

12      MR. DORRIS:  Yeah, I'll try and be as brief as
13  possible.

14      The only thing to consider is that -- (inaudible).

15      THE COURT REPORTER:  I'm sorry --

16      THE COURT:  Hold on.  We just cannot hear -- we just
17  can't hear you.

18      I wonder, frankly, you know, even though we don't
19  have that many of these left, whether you should hang up and
20  dial back in, because you could -- every time you speak, you
21  break up.  I mean, we just don't -- we can't hear you.

22      MR. DORRIS:  Is this any better, Your Honor?

23      THE COURT:  It is better.  Is that because you're
24  talking into the phone?

25      MR. DORRIS:  No, I turned off the wireless

1    connection.  I switched it to cellular.

2              The only thing to -- is that Marc Schildkraut, who

3    this email was sent to, was jointly representing the two

4    parties on the email.  It was between two parties and their

5    attorneys.  There's -- there's no common interest issue.

6              THE COURT:  So even though you describe this as

7    confidential communications between common interest parties

8    requesting the request for legal advice, you're now saying this

9    is actually pure attorney-client privilege?  I mean, why do you

10   need --

11             MR. DORRIS:  I don't --

12             THE COURT:  Why is it common interest privilege if

13   each of these companies is a client of the lawyer?

14             MR. DORRIS:  Well, we're here on the work product,

15   and this is work product because they are collecting

16   information for their attorney.  They're forwarding factual

17   development of the case to their attorney.

18             THE COURT:  I'm just looking at it again given this

19   gloss on it.

20             So you would not characterize -- it says:  Client 1.

21   Client 1, Authenticom, forwarding information to its lawyer at

22   Cooley and copying Cooley's Client 2 with factual information

23   for use in potential litigation?

24             MR. DORRIS:  Correct.

25             THE COURT:  And then -- and then I guess I'm not sure

1   how that applies to the underlying emails, which are dealers

2   forwarding a letter from CDK.  But I guess that also means if

3   it's a letter from CDK, then CDK has the information.

4          Okay.  So, Mr. MacDonald, change in hypothetical

5   here, I guess, right?  This is -- I mean, they call it work

6   product because it's a communication from Client 1 to its

7   lawyer, copied to another client of that lawyer, about sending

8   a communication from CDK that was received by dealers, but

9   they're forwarding it to lawyer in anticipation of potential

10  litigation.

11         So I'm not sure why they need common interest if both

12  of them have retained a lawyer.  So it's an attorney-client

13  privileged potentially document, but they're now saying also

14  work product because they're forwarding information for use in

15  potential litigation.

16         MR. MacDONALD:  Yes, Your Honor.  Ross MacDonald --

17  Ross MacDonald again from Gibbs & Bruns for The Reynolds &

18  Reynolds Company.

19         So a few things.  First I would say that we agree

20  with Your Honor that any kind of underlying emails from the

21  dealer or from CDK or communications with the dealer would not

22  be privileged, and it would not be Authenticom's or Dominion's

23  work product.  That would be the extent of the dealer's emails,

24  the dealer's work product.

25         To the extent there are communications between

1   Authenticom and Dominion or between one and their lawyer,

2   taking kind of the assertion of representation at -- at face

3   value, it doesn't sound like there's anything on the face of

4   the email that makes clear that these emails were in

5   anticipation of litigation; I suppose, too, in anticipation of

6   lobbying the FTC, which as we've seen a number of these

7   communications are about.  And Mr. Schildkraut did represent

8   Dominion in front of the FTC.

9        But to the extent these are -- this is gathering

10  information to go to the FTC and get the FTC to investigate CDK

11  or Reynolds, that would not be work product privileged.

12       And it's also not clear to me that even -- you know,

13  I guess we're saying, well, maybe it's attorney-client

14  privileged.  You know, there is no an allegation of a joint

15  representation that we've asked -- I believe back in 2019 we

16  asked whether there's a joint representation, and we were told

17  no.  So these would be representations of two individual

18  clients, and so there would still be a waiver sharing between

19  them.

20       I would also point out that, you know, this is seven

21  months, I think, before litigation was -- was eventually filed,

22  which makes me think it might be more likely that these refer

23  to lawsuits (inaudible) rather than, you know, the instant

24  litigation.

25            MR. DORRIS:  Your Honor, this is Dan Dorris.

1          On that point, I think to clear up the timeline

2     issue, Tab 12 shows the one that was discussed at length about

3     potential plaintiff chose the contemplation of private

4     litigation by -- (inaudible, audio feedback).

5          THE COURT REPORTER:  I'm sorry --

6          THE COURT:  I didn't hear what you said at the end

7     there.

8          MR. DORRIS:  You know, this is October 2016, three

9     months after -- two months after the prior email contemplating

10    private litigation.

11         THE COURT:  Well, to answer the FTC-related issue,

12    this email doesn't reference either litigation or the FTC, but

13    I would note that all of the emails reference with respect to

14    Tab 1 and all the related emails were in December of 2016.  And

15    this document here is dated in October of 2016, two months

16    after the email that Mr. Dorris just mentioned or just alluded

17    to, taking the temperature of potential plaintiffs.

18         But focusing on this particular email, this email

19    chain consists of one, two, three, four -- five emails.  The

20    first four of those emails don't involve a lawyer.  They're

21    forwarding a letter from CDK (inaudible) that was received by

22    dealers.  Ultimately it gets to Michelle Phelps at Authenticom,

23    who forwards it to Steve Cottrell.

24         So on those, Mr. Dorris, just separating them out,

25    there's no work product there.  I mean, there's -- nothing is

1    being forwarded to any lawyer for anything, and those are

2    just -- those are just common garden variety communications

3    between business people about a letter they got -- some dealers

4    got from CDK.

5            I don't -- I mean, do you seriously have an argument

6    that any of that is work product?  I think what you're saying

7    is forwarding it to the lawyer somehow makes it work product,

8    right?

9            MR. DORRIS:  Yes, the latter.  Independently

10   forwarding it to the attorney, I completely agree, it's not

11   work product.

12           THE COURT:  So what you would say then is forwarding

13   that information to the lawyer is -- based on the timing and

14   what was going on at the time, is in anticipation of litigation

15   that Authenticom at least was discussing at that time and was

16   discussing it with Dominion, who is a common client of the

17   lawyer, right?

18           MR. DORRIS:  Correct.

19           MR. MacDONALD:  And, Your Honor, this is

20   Mr. MacDonald again.

21           We would just say that forwarding otherwise

22   unprivileged documents to a lawyer after four or five emails

23   does not retroactively make the prior email prepared in

24   anticipation of litigation and cloak them in a work product

25   privilege.

1    THE COURT:  Yeah.  Okay.  Here's -- here's where I am
2    on this.

3           I think the first four emails are not covered by the
4    work product privilege at all.  I think there's a colorable
5    claim here that forwarding the factual information to a lawyer
6    at this particular time, the lawyer who's actually representing
7    the party, copied to another client of that lawyer, arguably is
8    work product.  The timing and, you know, who the participants
9    in this are, I mean, I know that this Cooley lawyer was
10   involved to some extent with discussions between Authenticom
11   and Gerchen Keller about potential litigation, so it's in the
12   mix.

13          So I think simply forwarding the factual information
14   to a lawyer in the context of closer in time to some of these
15   other things where litigation is being contemplated arguably
16   could be work product.  If it is work product, it's hard for me
17   to see how -- it has no mental impressions of the lawyer.  It
18   just is forwarding this.

19          I don't know.  I think I'm unwilling to -- I don't
20   know -- I don't know how (inaudible) my other dealings have
21   been, but I think my -- I think probably if there are other
22   things in here where factual information is being forwarded to
23   a lawyer, the litigation conceivably is on the horizon and
24   could be considered to be work product.

25          This is -- I mean, it's pretty much disclosed.  The

1    fact is in here, I guess, because this is -- I'm going to order

2    you to produce the underlying emails and then the letter and

3    the other underlying emails and then forward it to the lawyer,

4    for whatever that's worth.

5         You know, it's clearly not clearly work product like

6    mental impressions, but it's client forwarding to lawyer

7    factual information for use in potential litigation.  I think

8    this is closer to potential litigation than the FTC-related

9    stuff, which clearly was related to the FTC and only the FTC.

10        I guess my final call on this -- and, again, the fate

11   of the Western world doesn't depend on it since we've already

12   disclosed what's in there probably -- is produce the underlying

13   emails, and you don't have to produce the final email where

14   Cottrell is sending it to Schildkraut and copying it to

15   Dominion.  I don't -- I don't know that that matters, but

16   that's my final ruling.

17        And then I'm doing that, just so you know,

18   Mr. Dorris, so you don't become emboldened, just because I

19   don't want to step across the line in saying material sent to a

20   lawyer that arguably is in anticipation of litigation can't be

21   privileged.  But this one -- this one pretty much is one end of

22   that spectrum.

23        Okay.  Let's try and wrap this up.

24        Tab 18, we dealt with this before.  This is

25   Schildkraut's communications with Gerchen Keller, the

1    litigation finance firm.  I think defendants may have withdrawn

2    this along with the other one, right, Mr. MacDonald?

3              MR. MacDONALD:  Yes, we did, Your Honor.

4              THE COURT:  And I will say to the extent that this

5    question about Cooley's representation of Authenticom versus

6    Dominion or somebody else, I mean, Schildkraut clearly is

7    involved in discussions with a firm that is being considered as

8    a potential source of funds for actual litigation at this time

9    and was communicating mental impressions -- this one clearly is

10   mental impressions of damage theory but, again, Hornbook law.

11   But I -- you know, that puts him within the mix of at least the

12   relationship that the plaintiff is saying it has with Cooley.

13             All right.  Tab 19, Mr. Dorris, how is this -- how is

14   this subject to work product privilege?

15             MR. DORRIS:  We have -- this is Dan Dorris.  We have

16   nothing further to add, so we understand the Court's -- the

17   Court's ruling.

18             THE COURT:  Okay.  I'm going to say produce it.

19             Tab 20, this is after Kellogg -- Kellogg Huber is

20   retained or is in -- maybe not clearly in the process of being

21   retained.  Maybe they've actually been retained, too.

22             MR. MacDONALD:  Your Honor, this is Ross MacDonald.

23   I'll just cut you short there.

24             Based on Your Honor's description of the document,

25   Kellogg Hansen or Kellogg Huber had been retained at that

1  point.  We'll withdraw our claim as to Tab 20.

2         THE COURT:  Okay.  Thanks.

3         Tab 25, this is -- we dealt with this before.  This

4  is the other half of the -- or the other Gilbert Hale

5  communication.  So my ruling with respect to that stands, too.

6         Tab 28, so I guess I present -- I posed a question,

7  Mr. Dorris, to Authenticom in my letter asking whether the

8  draft legal documents that outside counsel sent to Mr. Cottrell

9  here -- I guess you're also going to say they're forwarded

10  actually to a co-client of Cooley's, but were these in

11  anticipation of litigation?

12         MR. DORRIS:  Yes, Your Honor, these, well, frankly,

13  are not relevant to litigation so probably should not have been

14  on the privileged log, but they are the engagement letter and

15  agreement between Authenticom and Marc Schildkraut.  And to be

16  clear, these are the formal written engagements, but as we

17  represented, he was rep -- he was actually representing and

18  acting as Authenticom's attorney prior to this case.

19         THE COURT:  And were those -- just to put a finer

20  point on it or put you on the spot, were these written

21  engagement letters for actual -- and I didn't disclose what was

22  in the -- I don't think in the -- in my summary, so you did,

23  which is fine.  But it is -- the caption is "Draft Engagement

24  Letter and Confidentiality Agreement."  These were in

25  anticipation of court litigation as opposed to FTC

1    representation?

2          MR. DORRIS:  They would have encompassed both.  They

3    were representing Authenticom for all legal matters.

4          THE COURT:  But those legal matters, just to be

5    clear, would have anticipated potential litigation?

6          MR. DORRIS:  Would have -- would have included the

7    private litigation, yes.

8          THE COURT:  Okay.  Based on that, Mr. MacDonald?

9          MR. MacDONALD:  Yes, Your Honor.  Ross MacDonald for

10   defendants and for Reynolds.

11         If this is a discussion of Mr. Schildkraut's

12   engagement letter related to filing private litigation against

13   CDK and Reynolds, then we would concede that that is work

14   product privilege and probably did not substantially increase

15   its likelihood of disclosure to defendants.

16         To the extent the draft labeled documents related --

17   or were related to Dominion's representation or to

18   representation before the FTC, we do not think those are work

19   product privileged.  And we actually don't have the documents

20   in front of us, and so we'll just have to rely on counsel's

21   representations.

22         THE COURT:  Based on the face of them, they appear to

23   be -- because the first it's -- the first email is Schildkraut

24   to Cottrell, and the context of the second email makes clear

25   that it's Authenticom's engagement of Cooley, and then he's

1    sharing it with either -- I don't think -- for the reasons I
2    stated in my letter, I don't think sharing it with Dominion
3    under these circumstances would necessarily waive the work
4    product privilege.  And that's strengthened by some of what
5    Mr. Dorris said today.  So -- and I would say that the
6    underlying documents are not included.  It's just a cover
7    email, so all you would get is here it is.  And I'm not sure
8    it's going to make a hill of beans difference.  But I think it
9    is -- if it's as Mr. Dorris portrays, forwarding the formal
10   written letter of the engagement between Cooley and
11   Authenticom, I think it's privileged.
12              MR. DORRIS:  Thank you, Your Honor.
13              THE COURT:  The final document 29 is the same thing
14   that we looked at before, I think, right, which is this
15   strategic communication plan years before the litigation shoe
16   drops.  It's essentially the same plan, I think.
17              And for the same reasons, my ruling is the same.  It
18   has to be produced.
19              So I have one open issue.
20              MR. DORRIS:  To answer the question earlier about
21   whether the other party in that email was a -- on the
22   confidential disclosures, they were subpoena recipients.  So,
23   yes, they are on Authenticom's initial disclosures, but they
24   were not deposed.
25              THE COURT:  Okay.  You have to say this again.  All

1    right?  Because, again, you broke off, and our court reporter

2    is being too nice.  But could you say again what -- you're

3    talking about the second party in an email that I was going

4    back to, right?  The second company in the email that I was

5    going back to, right?

6            MR. DORRIS:  Correct.  The open question was whether

7    they were on the initial disclosures.  And the initial

8    disclosures include all subpoena recipients, and that party was

9    subpoenaed in the litigation.

10           THE COURT:  So you broke up again at the end.  So you

11   say that party was what?

12           MR. DORRIS:  Subpoenaed in the litigation.

13           MR. MacDONALD:  And, Your Honor, Ross MacDonald

14   again.

15           Just so that you're aware, I don't have the time to

16   do an accurate count, but I think there was something like, you

17   know, 60 or 70 or 80 subpoena recipients in this litigation.

18           So to the extent the fact that they're on the

19   disclosures is supposed to put us on notice to depose them and

20   ask them whether they're in a common interest group or

21   something like that, that would have been difficult for us to

22   be able to figure out.

23           THE COURT:  To say the least.  Okay.  Hold on for one

24   second.  I think I'd like to just resolve this right now.  So

25   I'm going back to those documents rather than taking anything

1    under advisement, and then we can talk about when the documents

2    are going to be produced.  So just hold on for one second.

3              MR. DORRIS:  Your Honor --

4              THE COURT:  We're looking at Tabs 12 and 13, right?

5    That's what we're talking about?  No, I mean -- I'm sorry, 12

6    and 14.

7              MR. DORRIS:  14.

8         (Brief pause.)

9              THE COURT:  So these Tabs 12 and 14 are

10   communications involving people who have been called the common

11   interest group.  The substance is -- and including a lawyer who

12   we know who is engaged, been engaged, representing at least

13   Authenticom, about what companies might be interested in a

14   potential lawsuit, which is a word that's used in these emails,

15   against CDK and R&R.

16             So it references potential litigation even though it

17   takes months later for it to be -- litigation to actually

18   happen.  So I have concluded in my preliminary inclinations

19   that the information was work product -- that this was a work

20   product communication.

21             And the question is whether the defendants have

22   substantial need for it or communicating the information in

23   this way substantially increased the likelihood that the

24   information could be shared with Authenticom's adversaries,

25   including CDK and R&R?

1          I think Mr. -- Mr. MacDonald reframed these issues

2     as, one, whose communication is it?  Is it Authenticom's?  In

3     which case, it could be Authenticom's work product.  Or is it

4     someone else's communication?

5          The first communication in this string which is Tab

6     14 is from a lawyer for Authenticom or a lawyer who has been

7     represented as a lawyer from Authenticom to Authenticom and

8     others -- to Authenticom, I think Dominion or what became

9     Dominion and others.  So I think Tab 14 checks the box of a

10    communication by or on behalf of Authenticom.

11         The main email in 20 -- in Tab 13 is from AutoLoop

12    and really from, I think, probably the personal email from Tony

13    Petruzzelli to Authenticom and others.

14         So if there's no common interest privilege,

15    Mr. Dorris, now that I'm dissecting this, how did the email

16    from Tony Petruzzelli to that group become Authenticom's work

17    product?

18         MR. DORRIS:  The email -- both emails are

19    Authenticom's work because they are collecting information for

20    the attorneys representing -- I mean, so the first email is the

21    actual impressions of Authenticom's attorney, and the second

22    email is providing information to that attorney.  So he's

23    representing Authenticom.

24         THE COURT:  Say that again.  You say the Petruzzelli

25    email is Authenticom's work product because he's providing

1    information to Authenticom's counsel who is using that

2    information to gather inform -- as part of what he's gathering

3    for potential litigation?

4               MR. DORRIS:  Correct.

5               THE COURT:  Can you put me on mute for a second?

6               THE CLERK:  Sure, Judge.

7         (Brief pause.)

8               THE COURT:  Okay, people, I have my final answer.

9               Tab 14 is protected as work product and does not get

10   produced.  It's communication by Schildkraut to client

11   Authenticom about a -- clearly about a potential lawsuit,

12   because that's what it says.  And so any context I think is

13   this potential lawsuit is the way to interpret that.  It

14   doesn't talk about the FTC at all.  It's talking about this --

15   it's talking about any lawsuit and trying to gather information

16   about people who might be interested in a potential lawsuit.

17   So that's work product.

18              I don't think copying it to the rest of these people

19   who were, you know, anticipated potentially to be plaintiffs

20   about this common interest group, I don't think it

21   substantially increased the likelihood that it would be

22   disclosed to Authenticom's adversaries in the way it was being

23   sent.

24              And I also don't think defendants have a substantial

25   need for it, because all the people who are identified there

1  were previously identified as common interest parties, so they

2  know who those people are.  They don't need this document to

3  say that.

4          However, Tab 12, the top part of it, which is

5  Petruzzelli's email to Schildkraut and everybody else,

6  including Authenticom, which is really in response to

7  Schildkraut's email, I don't see -- I don't buy the argument

8  that Petruzzelli's email is Authenticom's work product simply

9  because he's forwarding it to a lawyer who is representing

10 Authenticom.

11         So Petruzzelli's email in Tab 12 needs to be

12 produced, but you can redact what is under the Yahoo! email

13 address there.  Basically his signature and Yahoo! email, I

14 would redact essentially everything that's under there, which

15 is a -- a reproduction of what is Tab 14 of the Schildkraut

16 email.

17         So Tab 14 is work product, does not have to be

18 produced.  There's no substantial need for it, and it didn't

19 increase the likelihood of disclosure.  But Tab 12 -- 12, the

20 Petruzzelli email has to be produced down to where

21 Schildkraut's email begins where it says, "On Friday, August

22 5th, Schildkraut, Marc wrote."  From there on down can be

23 redacted from this, but the top part of it has to be produced.

24 Again, whether that affects the fate of this litigation, I

25 don't think so, but that's my ruling based on the law.  So

1    that's where I am.

2         Okay.  I want to get these documents -- the documents

3    that are going to be produced as soon as possible.  So I know

4    it's Friday, and now it's Friday afternoon.  I recognize that.

5    But I think the defendants are entitled to these, so you can

6    turn them around.  These have obviously been segregated because

7    they've been put in binders several different times.  So I

8    would think plaintiffs could get this -- plaintiff can get this

9    stuff produced to the defendants by Wednesday.  Am I wrong?

10        MR. DORRIS:  No, Your Honor.  In terms of producing

11   the documents, that's no problem.  We do need to consult with

12   the client to see whether they have any desire to appeal the

13   ruling.  I don't -- I hope we can resolve that quickly, but if

14   there's no appeal, the process of producing the documents

15   (inaudible, audio feedback).

16        THE COURT:  Okay.  Well, I'm going to order that they

17   be produced by --

18        THE COURT REPORTER:  I'm sorry.  Judge, Judge, I'm

19   sorry.

20        THE COURT:  I'm going to order that they --

21        THE COURT REPORTER:  Judge, I'm sorry.  I didn't hear

22   the end of what Mr. Dorris said.  He completely -- I completely

23   lost him.

24        THE COURT:  Yeah, I did, too.  I just -- I'm sorry.

25   I did, too, but I didn't think it was -- okay.

1    Okay.  Go ahead.  Mr. Dorris.

2    MR. DORRIS:  All I said was the process of producing

3    them, we can do that as quickly as the Court orders.  The only

4    issue is whether there's any desire from the client to appeal

5    the ruling.

6    THE COURT:  Okay.  So here's what I would say on

7    that.  I'm going to put in my order today that we had this

8    hearing.  The Court ruled on the record with respect to the

9    work product documents or the documents over which Authenticom

10   has asserted an attorney-client privilege.  The Court ordered

11   some of those documents to be produced.

12   A written order will follow, but you already have,

13   for purposes of discussion with your client, the substance of

14   that written order in my letter.

15   I'm going to say, the documents shall be produced by

16   Wednesday, whatever date that is.  And I'm not going to put

17   this in the order, but I'm saying to you, obviously, if you

18   are -- you know, that's a shorter period of time than you have

19   to appeal under the rules and the statute, and I'm not trying

20   to shortcut that process.  So if you need more time, you can

21   file a -- either a quick motion or get a stipulation from the

22   other side, and I would -- I would stay the production until

23   the full 14 days.

24   But if you don't need that time, then you ought to

25   get them produced sooner.  But if you do need the time or a

1      larger portion of the time than I'm giving you, I'm not going

2      to override -- I'm not going to prevent you from appealing and

3      being able to present this to Judge Dow.  But I just think if

4      you're not going to do it, then you ought to produce them.  And

5      if you need more time, we'll put it on the record, and you'll

6      get the more time.  Is that fair?

7                  MR. DORRIS:  Understood, Your Honor.  Yes, that works

8      for us.

9                  THE COURT:  And then normally what I -- you know, a

10     lot of times what I'll do is say produce them in 15 days so you

11     get the full 14 days.  But because this has been pending for so

12     long and been kicking around so long and we've kicked the heck

13     out of it so long, I just -- I'd rather do it that way.  But

14     this is by no means to preclude you from putting the issue in

15     front of Judge Dow.  And if you're going to do that, then you

16     won't have to produce them until he rules, but okay.

17                 What about --

18                 MR. MacDONALD:  Your Honor?

19                 THE COURT:  Yeah.

20                 MR. MacDONALD:  This is Ross MacDonald.  Real

21     quickly.  And I hate to prolong this any further.

22                 There is one document that appears to have slipped

23     through the cracks.  It is a document Bates labeled

24     SIS_DMS_0018107.  It was a document produced pursuant to a

25     subpoena by a third party, Superior Integrated Solutions, that

1  was at one point part of the alleged common interest group.

2  Authenticom then snapped back that document. It was

3  initially submitted *in camera* to the Court under the in -- in

4  the initial tranche of challenged documents back in July of

5  2019. It appears -- it appears to have, for whatever reason,

6  not been resubmitted in the most recent binder.

7  I don't need you to make a ruling on this call, but I

8  just wanted to make you aware that there is one document in

9  which there is still a pending work product privilege fight. I

10 think the issues are going to be the same sort of issues you've

11 seen with respect to these other documents and hope -- either

12 you can let us know whether you need a new copy -- or you can

13 let Authenticom know whether you need a new copy of that

14 document or whether you still have it from July 2019.

15 THE COURT: Well, I'm wondering why that document

16 isn't in the binder of my 29 documents here. Mr. Dorris?

17 MR. DORRIS: Yes, Your Honor. The document was not

18 on the list of challenged documents in the initial motion to

19 compel, which is why it doesn't appear. It's not the subject

20 of the motion before the Court.

21 Understanding that the -- that the defendants may

22 wish to pursue the challenge, I think the most efficient way to

23 resolve that is it is currently one of the documents at issue

24 in the AutoLoop motion, so the Court will be able to address it

25 there.

1          THE COURT:  I'm not sure that satisfies.

2          Could you give me the Bates number of that again,

3     Mr. MacDonald?

4          MR. MacDONALD:  Yeah.  It is SIS_DMS_0018107.  And I

5     can provide a little bit more color on this document.

6          SIS produced this document.  It was marked at a

7     deposition of an SIS witness.  He testified about it.

8          After the initial motion to compel was filed,

9     Authenticom snapped it back.  And so then we -- we raised it

10    on -- in our reply brief that, hey, this document that wasn't

11    asserted -- there wasn't an asserted privilege on when we filed

12    our motion, now you're asserting a privilege on.  And so we

13    raised it in our reply brief.

14         And so although it wasn't mentioned in the initial

15    motion to compel, it was at issue, and Authenticom was aware it

16    was issued because they submitted it *in camera* with the initial

17    tranche of privileged documents back in July of 2019.

18         THE COURT:  And I have your -- I have your reply

19    brief in front of me.  Where in the reply brief was it

20    referenced?

21         MR. MacDONALD:  So it starts being referenced at the

22    top of page 7.  It says, "For instance, SIS produced."  And

23    this is -- I'm looking at docket 585.

24         THE COURT:  Right.  Page 7?

25         MR. MacDONALD:  Yes.

 1       (Brief pause.)

 2             THE COURT:  I just read the pages of your reply brief

 3    that relate to this.

 4             All right.  Okay.  And before I -- I don't know that

 5    there's any easy way to do this here, but Mr. Dorris says this

 6    is part of your AutoLoop work product, too.

 7             Before we broke, I asked whether I should review all

 8    the documents that have been submitted by AutoLoop in the

 9    companion exercise to this now or whether any of the rulings

10    that I've made here or the guidance I gave in my rulings,

11    including my letter, would obviate the need to review some,

12    probably not all, of those documents.

13             What -- I don't know if you've had a chance to confer

14    with your respective constituencies, but what's the -- what do

15    the parties think about that?

16             MS. MILLER:  Your Honor, this is Britt Miller on

17    behalf of CDK.

18             Since that motion was brought by us, the short answer

19    is I don't have all 123 of the AutoLoop documents at issue in

20    front of me, simply because I didn't anticipate them being

21    raised on today's call.  So I don't know how many of them

22    overlap.

23             I will say we filed our response on that -- on those

24    issues yesterday, and they broadly fall into two categories.

25    The first tranche of them relate to -- similar to the document

1    we just discussed, they relate to AutoLoop's third-party

2    communications with SIS and others from the 2000 -- from 2013

3    and 2014, so years well in advance of the instant litigation.

4         The last -- the second tranche of them comprise

5    third-party communications with various members of the common

6    interest group that Your Honor said didn't exist from 2016 and

7    2017.  And based on -- on the content of those documents, we

8    don't believe those are protected work product either.

9         So it may be that some of the guidance Your Honor has

10   provided today may be instructive.  But absent a representation

11   from Mr. Dorris that they are going to produce in response to

12   what Your Honor has said, I believe they are all still live

13   issues before Your Honor.

14        THE COURT:  Okay.  Thank you, Ms. Miller.

15        So I guess, Mr. Dorris, as the holder and party that

16   is asserting the privilege, I guess it really is more to you as

17   to whether, given these rulings, there are any documents that

18   are being withheld as part of the AutoLoop contested situation

19   there, whether any of these rulings affect that.

20        And I'm not -- and I'm not trying to put you on the

21   spot here.  This is an Authenticom hearing, not an AutoLoop

22   hearing, where you represent both.

23        I suppose in your reply -- in your -- I think you

24   have one more brief coming, right?

25        MR. DORRIS:  Yes, Your Honor.  The -- I think the

1    most I can say is there are some documents -- and I don't know

2    how many -- that I believe are complete duplicates of ones the

3    Court has ruled on here and I expect, subject to the Court's

4    ruling, would apply equally to those documents.

5            The only issue is whether a client wants to appeal

6    those rulings, but we would -- we would accept that the Court's

7    ruling on the identical documents applies in both cases.

8            THE COURT:  So maybe -- maybe -- oh, go ahead.  I'm

9    sorry.

10           MS. MILLER:  Your Honor, I'm sorry, this is Britt

11   Miller.  I was going to say -- again for CDK Global.

12           It's entirely possible -- and, again, I don't have

13   the AutoLoop one sitting in front of me -- that there are

14   duplicates.  I think we would have to look to see whether or

15   not the same documents -- because obviously the claim that is

16   being made in today's motion is whether or not it is work

17   product of Authenticom.  And the ones that are in AutoLoop are

18   whether or not they constitute work product.  These same

19   documents apparently also constitute work product for AutoLoop.

20           So we'd have to address whether or not that, in fact,

21   the rulings are dead on based on the statements Your Honor has

22   made.  I just simply can't make that determination as I sit

23   here.

24           THE COURT:  Yeah, I hear you.  And I think in the

25   first instance, what I was going to suggest -- and I think

1   we're probably stepping on Mr. Dorris's second point that he

2   was going to make -- but I suppose one thing I'd like to hear

3   from AutoLoop in their reply brief is just an inventory of

4   documents that are the same and as to which either understands

5   that the Court's ruling would apply to those, with the nuance

6   that you've just raised, which is, you know, if it's

7   Authenticom's work product, is it also AutoLoop's?  So we've

8   got to make that determination.

9          He would say it is because they still stand on the

10  common interest, I guess.  But perhaps plaintiffs can --

11  plaintiff AutoLoop can give us at least some guidance in what

12  even AutoLoop would say I've actually ruled on already, so that

13  I don't have to rule on it again, subject to AutoLoop's right

14  to appeal any of the rulings I've made, I understand that, but

15  rather than me having to go through these and figure out

16  whether or not you would agree that it's the same issue.

17         But go ahead, Mr. Dorris.  You had a second point I

18  think you were going to make?

19         MR. DORRIS:  And, first, yes, we will attempt to make

20  it as simple as possible to the Court in our reply brief.

21         The second point was, depending on when this -- when

22  or if this Court is -- or when we review the transcript, makes

23  a written ruling, I could foresee some of the written rulings

24  affecting the documents in AutoLoop.  It's just hard to know at

25  this time and probably is not going to be possible by the time

1    the reply brief is due.

2          I believe that there are some overlapping legal

3    issues that would affect the analysis for even not identical

4    documents in the AutoLoop case.

5          THE COURT:  Well, one, if you're going to order the

6    transcript, I'm sure our court reporter will get it to you as

7    soon as possible.

8          Two, I would anticipate that my written ruling is

9    going to come Monday or Tuesday-ish.  I'm not sure it's going

10   to come today-ish.  My written ruling, though, is going to, in

11   large part, parallel what you have in my letter except to the

12   point that additional reasons were given today with respect to

13   certain documents.  But you can expect that my written ruling

14   is going to look very much the same as what is in my letter

15   except instead of my saying, "The Court is inclined towards"

16   something, you know, the Court's ruling -- I'm going to rule on

17   this.  And except to the extent that I've said I've got

18   questions, I'll take that out, and I may insert things.  But I

19   think the written ruling is going to look very, very similar to

20   the 7-page letter that you already have as updated by whatever

21   we talked about here.  And I recognize you'd like to see the

22   transcript for that purpose.

23         Two, I know -- and I'm -- you know, I don't -- I take

24   responsibility for how long a lot of these issues have been

25   pending.  As we've talked about before, I think the parties

1    need to take some responsibility for how they were teed up,

2    but, nevertheless, I share in some of that.

3         If you needed more time -- if you needed more time to

4    file your reply in order to let me know where things stand, I'm

5    not -- I'm not opposed to that.  But if -- if it's not going to

6    matter because the Court is going to have to look at documents

7    in the 123 documents with a different filter -- for example,

8    I'm going to have to look at them to see whether or not it's

9    AutoLoop's privilege as opposed to someone else's -- if in the

10   end what I'm going to hear is pretty much you got to review

11   those and rule on them, then you could file your reply, and

12   I'll get you a ruling on the 123 documents when I get you a

13   ruling on them.

14        MR. DORRIS:  Understood, Your Honor.  And that's --

15   how we can simplify this is going to take some -- a day, a

16   couple days for us to go back and look at the documents in

17   light of what the Court has held.

18        If we think we can simplify the process by taking

19   several more days with our reply brief to apply the Court's

20   rulings to those documents, we will try and do that with the

21   defendants and submit a new date for the reply brief, if that

22   will be helpful to the Court.

23        THE COURT:  Okay.  Currently your reply brief is due

24   when?

25        MR. DORRIS:  I believe it is next Thursday, August

1    20th.

2         THE COURT:  Okay.  Well, I'll leave you to your

3    devices.  You'll caucus internally; you'll talk to the

4    defendants, potentially.  And if you need more time, fine.  If

5    you don't need more time, fine.  If you can shed any helpful

6    light on what I have to decide in your reply, fine.

7         If in doing so the defendants need a surreply, I

8    would consider that, too.  So let's let that process go.

9         Back to the SIS document.  I know, Mr. MacDonald,

10   you're raising it, and you're asking for a ruling on it.  And I

11   don't really think I can give you a ruling now.  I have to sort

12   through in my mind what the heck that means.

13        It sounds like it will be front and center in the

14   AutoLoop aspect of the work product wherever it sits with

15   respect to the Authenticom aspect of it.  And I, frankly, can't

16   parse through how that fits right now where the document that

17   was raised in the reply was not submitted to me.  Well, I mean,

18   I'm not -- I mean, I understand why you're raised -- raising it

19   in the reply.  It actually sounds like it hap -- it came up

20   later in the process.  So, I mean, I'm not -- I'm not being

21   critical here, but I don't think I can do anything about it

22   now.

23        If there's something you feel I can and should be

24   doing about it, you'll have to raise it to me in some way and

25   tee it up.  I mean, I see in the reply you say the reason it

1    wasn't raised in the initial motion is because the document was

2    not discovered until after you filed your motion back in 2019.

3    So I get it, but I'm not sure I can do anything here.

4              You were raising it for informational purposes and so

5    it's not a surprise later, but you're not saying I can do

6    something now, right?

7              MR. MacDONALD:  Well, Your Honor, in our reply, we

8    tried to incorporate it into the original motion.  As Your

9    Honor said, you are correct, it was not clawed back until after

10   we had already filed our original motion.

11             And Authenticom did submit a copy of that document *in*

12   *camera* to Your Honor as part of the initial tranche of

13   documents to review back in 2019 -- July of 2019.  So I think

14   Authenticom at least at one point in time agreed that it was

15   subject to an open dispute between the parties.

16             THE COURT:  Okay.

17             MR. MacDONALD:  That being said, if that identical

18   document is going to come up in the AutoLoop review and Your

19   Honor feels that that's the easiest way to evaluate whether or

20   not it's privileged, we don't have a complaint about that.

21             THE COURT:  Okay.  I'm sorry.  I had forgotten you

22   said -- so that SIS document came to me in July of 2019 in a

23   binder of documents submitted by Authenticom?

24             MR. MacDONALD:  Yes, Your Honor.  As you might

25   recall, after the initial privilege motions and response and

1    replies were submitted, you asked the parties to each identify

2    10 examples of each type of privilege and for the parties to

3    submit those documents to the Court.  And that was one of --

4    one of either defendants' or plaintiffs' 10 selections for a

5    certain kind of documents.  So at one point in time, it was

6    submitted to you.

7              THE COURT:  I got it.  I got it.  Okay.

8              Yeah, I mean, I've learned that that was not exactly

9    the best way to do this, so -- but sometimes you learn

10   things --

11             MS. MILLER:  And, Your Honor --

12             THE COURT:  -- okay.

13             MS. MILLER:  Apologies, Your Honor.  This is Britt

14   Miller again.

15             I will simply say I know there are quite a number of

16   SIS documents at issue in the AutoLoop briefing.  Again, as I

17   sit here, as I don't have that AutoLoop binder in front of me,

18   I can't say for certain that this exact one is one of those 51,

19   but perhaps Mr. Dorris can clarify.

20             MR. DORRIS:  I likewise don't have the brief in front

21   of me (inaudible, audio feedback.)

22             THE COURT REPORTER:  I'm sorry.  Mr. Dorris, Mr.

23   Dorris, Mr. Dorris, I cannot hear you.  I cannot hear you at

24   all.  This is the court reporter.

25             MR. DORRIS:  I apologize.

1      THE COURT REPORTER:  I can't hear you at all.

2      MR. DORRIS:  I don't have the briefing in front of

3  me.  I believe that the document has been submitted.  I'm

4  not -- I don't believe it is in the binder of documents.  It

5  was submitted as an extra document *in camera* and identified in

6  briefing.

7      So we'll make this clear -- short story, we'll make

8  this clear in our reply brief so the Court is aware of where

9  this document is and can rule on it.

10     MS. MILLER:  And, Your Honor, one other brief note

11 for the record.  I appreciate that -- that Your Honor has --

12 has said that in light of the time we are dealing with and

13 whether or not Authenticom or AutoLoop needs additional time on

14 its reply and the possibility of CDK being given an opportunity

15 for a surreply, I will simply note for the record that, as Your

16 Honor is likely aware, we -- the parties are in the midst of

17 briefing our respective summary judgment motions.  The last of

18 those briefs is currently due on August 28th, so just a few

19 weeks from now.

20     I appreciate Your Honor has not looked at the

21 documents that are in the AutoLoop binders, but there are

22 motions for summary judgment up on issues obviously that relate

23 to the Loop case.  And so we'll simply note that the fact that

24 we don't have or won't -- likely won't have those documents

25 before the 28th, we'd like to obviously reserve our rights that

1  if those documents are ultimately produced, we would have the

2  ability to supplement the summary judgment record as

3  appropriate.

4  THE COURT:  Yes, and I hear you on this.  I'm

5  cognizant of the timing.  I'm cognizant of the summary judgment

6  briefing going on, and I'm cognizant of, you know, what impact

7  this could have -- you know, my rulings could have on that or

8  documents potentially could have.

9  I have to honestly say to you -- and, you know,

10  maybe -- maybe I'm wrong, and maybe you'll see when you get the

11  documents that I'm ordering produced here -- you know, honest

12  to God, I can't see how any of these documents have much, if

13  any, effect on the issues being briefed in summary judgment,

14  the ultimate merits of the case, the trial of the case.

15  I understand in a perfect world everybody would have

16  wanted to get all responsive documents early in the case before

17  deps and all the rest so the parties -- and I would feel the

18  same way if I was representing a party here.  You know, you

19  don't have all the information, and you don't know what you

20  don't know.

21  But, you know, honest to God, I really don't --

22  including the last document we talked about here, which

23  identifies two companies who potentially were thinking about

24  being involved in litigation, one of whom was deposed, I guess

25  one of whom wasn't, and when one was deposed, I think

1    defendants probably needed the identity of who that was as part

2    of a, quote/unquote, common interest, but I don't know that

3    that to be true because the common interest is a moving target.

4    So I get that.

5         But I hear you, Ms. Miller, and I -- I think the only

6    saving grace is I'm not sure any -- the fate of this case is

7    going to rely on the documents that are being produced or not

8    being produced as a part of this process.  But I get it, and

9    I'm sympathetic to it.  That's why I spent a lot of time today

10    and why I put what I put into writing and -- but I understand

11    it would have helped everybody if the decision came earlier.

12         Again, it would help me if these issues were teed up

13    better, too, so -- but I'm not trying to escape whatever

14    responsibility I have on it.

15         MS. MILLER:  Your Honor, I'm sorry.  I was not being

16    critical of Your Honor's efforts by any stretch of the

17    imagination.  It was simply to note for the record that, you

18    know, whatever time this takes for the Court to work through --

19    and we appreciate that Your Honor has more than one case on his

20    docket -- that we're simply noting for the record that to the

21    extent the documents that Your Honor has not had a chance to

22    look at through the AutoLoop process or these other documents

23    that they are ultimately appealed by Authenticom, that to the

24    extent some of them by some chance, in fact, are relevant to

25    the issues that we're just simply asking -- noting for Your

1     Honor that we're reserving the right to possibly introduce

2     additional information after the 28th.

3              THE COURT:  All right.  So noted on the record.  I

4     got it.  And I'm -- I'm sorry if I'm appearing offended.  I

5     didn't think you were criticizing me.  I really didn't.  It was

6     more me criticizing me, which -- you know, which I can do on a

7     regular basis.  But I get it, and I get where you're coming

8     from.

9              You know, I -- obviously I'll look at this SIS

10    document as part of the AutoLoop thing.  I really don't know

11    where I come out -- you know, I still have that stuff that was

12    submitted back in July 2019 on the, you know, 10 documents.  I

13    could go back and look at that, too.

14             It is surprising to me, I guess, that in the binder

15    of materials that were submitted to me labeled "Plaintiff

16    Authenticom, Inc.'s Documents Submitted for *In Camera* Review

17    Pursuant to June 25, 2020 Order," which was my 1026 -- ECF

18    1026, I guess it's -- I guess it's surprising to me that this

19    particular document didn't make it into this binder, given that

20    the defendants raised it in their reply, given that it was one

21    of the original documents that was submitted by someone in July

22    of 2019, and given that it would be a document over which

23    Authenticom was asserting a work product privilege.

24             What -- what the consequence is of that or what the

25    significance of it is, I don't know.  My order of June 25th

1    said -- which was after plaintiffs filed a motion to reconsider

2    in which you raised the work product issue, among others -- you

3    know, you were supposed to deliver to me on July 1st, which you

4    did, or the 2nd or whenever you did it -- that the documents

5    discussed on the record that are being withheld from production

6    based upon the work product doctrine.  And so if this is a

7    document that was being withheld from production on the work

8    product doctrine, I'm not actually -- I'm not actually sure why

9    it's not in that binder, given that I'm sure this binder also

10   contains, Mr. Dorris, other documents that were submitted on

11   July -- in July 2019 as part of the selections, or maybe that's

12   an incorrect assumption?

13        MR. DORRIS:  Your Honor, and how -- our apologies if

14   we misinterpreted the Court's order, but what we did was

15   when CDK -- when Reynolds filed its motion to compel, it

16   included two spreadsheets specifically identifying which

17   documents to challenge.

18        We went back to those spreadsheets.  We looked at the

19   ones where work product was still an outstanding issue, and

20   then we submitted the documents that CDK -- that CDK and

21   Reynolds had specifically challenged and where work product was

22   still an issue.  Because this document was raised the first

23   time in a reply brief, it was not on the initial spreadsheet

24   challenge documents.

25        There was, I believe, kind of a suggestion that

1    there's been some kind of intent to hide this document.  That

2    couldn't be further from the truth.  Authenticom voluntarily

3    submitted to this Court *in camera* because it supports our

4    assertions of privilege.  We submitted to the Court for that

5    reason two or three separate times.  There's really nothing to

6    hide here.

7              So that's -- so that's why it wasn't in the Court's

8    binder.  It's because it wasn't challenged by CDK and Reynolds.

9              THE COURT:  Okay.  I understand.  And this is the SIS

10   company that I referenced in one or more opinions that was

11   supposedly part of the asserted common interest group that

12   Authenticom or AutoLoop or both threatened to sue as being part

13   of the conspiracy, right?

14             MR. DORRIS:  Yes.  And there's some confusion on

15   that.  The defendants have said that several times in their

16   brief.  And the only commonality is the attorneys.  The party

17   that threatened to sue SIS is MVSC, which was never claimed to

18   be a party of the common interest agreement.

19             So that threatened suit is completely irrelevant to

20   the existence or anything to do with the common interest

21   agreement because the parties have threatened to sue.  MVSC was

22   not part of the common interest group.

23             THE COURT:  Okay.

24             MR. MacDONALD:  And, Your Honor, this is Ross

25   MacDonald.

1          I don't know whether you want back and forth on this.

2          THE COURT REPORTER:  I'm sorry.  I can't hear you,

3    Mr. MacDonald.

4          MR. MacDONALD:  Oh, I'm sorry.  This -- Your Honor,

5    this is Ross MacDonald on behalf of Reynolds.

6          The factual background of -- yes, that SIS is the

7    company that you reference in some of your orders.  They were a

8    threatened co-conspirator by plaintiff MVSC, who is one of the

9    other plaintiffs in this MDL.  It's the same alleged conspiracy

10   or -- but they were not alleged to be part of the common

11   interest group.  MVSC was -- (inaudible, audio feedback).

12         THE COURT REPORTER:  I'm sorry.  I'm sorry.  One more

13   time.  I didn't hear what you said after "common interest

14   group."

15         MR. MacDONALD:  Yes, I guess I'll just repeat it.

16         SIS is the company that is referenced in the Judge's

17   prior order.  Superior Integrated Solutions is their name.

18   They are a competitive data integrator or hostile integrator to

19   Authenticom.

20         SIS was at one time a threatened defendant in a

21   lawsuit -- in the lawsuit by MVSC, the Motor Vehicle Software

22   Corporation, which is one of the other plaintiffs in this MDL

23   that alleges an anticompetitive conspiracy by CDK and Reynolds.

24   In the initial draft of their complaint, they allege that SIS

25   is part of this conspiracy.

1    Mr. Dorris is correct, however, that MVSC itself is

2    not part of the common interest group.  We only point out SIS

3    as a potential defendant to show that it is unlikely that they

4    are in a -- in a common interest group to sue someone over a

5    conspiracy when someone else represented by the same lawyers

6    allege they were part of that very conspiracy.

7    And in any event, I just want to point out we were

8    not intending to accuse anyone of bad faith or of intentionally

9    hiding the SIS documents.  We just noticed that it slipped

10   through the cracks and wanted to get it on the Court's radar.

11   We're happy to -- you know, whether the Court wants

12   to look up the old -- you know, deal with it in the context of

13   AutoLoop, that's fine.  Whether the Court wants to go find it

14   from the July 2019 submissions, that's fine.  Whether the Court

15   wants Authenticom to email it today, that's fine with us, too.

16   We were just trying to raise it.

17   THE COURT:  Okay.  I hear you.  Hold on for one

18   second.

19   (Brief pause.)

20   THE COURT:  I'm inclined to deal with it as part of

21   the AutoLoop submission.  I'm not inclined to go search through

22   the piles of documents I have to find it and then to issue a

23   ruling on it without having brought everybody back together.

24   I don't view that -- I mean, I understand why you are

25   raising it as something that fell through the cracks.  I'm not

1   prepared to rule now as to whether it was or wasn't part of the

2   initial motion that was filed or it was amended back to the

3   original time with your reply or whether it should or shouldn't

4   have been included in this compendium of 29 documents.

5           And I also do not want to hold up my order -- my

6   order of today and the requirement that the documents that

7   we've dealt with for the last number of weeks be produced or

8   that an appeal should be filed as to those documents if it's

9   going to happen, because I just don't want to hold all of that

10  up with -- and have this tail wag that dog.

11          So right now, if it's part of the AutoLoop

12  submission, that's where I'm going to look at it.  I'm not

13  going to read through what I have to find it and amend what

14  we've done now, because I don't know whether I would want

15  additional argument from anybody on it having not looked at it

16  right now.  And I just don't want to delay anything.

17          So I think that's the best way not to delay

18  something, frankly.  But if after we get off somebody on the

19  defense side disagrees, file something, and I'll deal with it.

20  But I just -- I'm trying to wrestle down these documents and

21  these issues on the Authenticom thing and then move to the next

22  thing on my agenda.

23          MR. MacDONALD:  And I don't --

24          THE COURT:  Go ahead.

25          MR. MacDONALD:  Your Honor, Ross MacDonald again.

1    That is -- that is fine by us.

2         I think Mr. Dorris mentioned at one point that in

3    AutoLoop's reply they would advise the Court of where this

4    document is.  And so we would just request that just kind of

5    for everyone's knowledge, if AutoLoop in its reply would be

6    willing to drop a footnote explaining to the Court where the

7    document is or if it's in AutoLoop's group of documents just so

8    that everyone is aware, we would appreciate that.

9         MR. DORRIS:  We will do that.

10        THE COURT:  Okay.  Thanks.

11        All right.  With that, I'm prepared to recess.  Is

12   that okay with plaintiff?

13        MR. DORRIS:  Yes, Your Honor.

14        THE COURT:  And with CDK and Reynolds?

15        MS. MILLER:  Yes, Your Honor.

16        THE COURT:  All right.

17        MR. MacDONALD:  Yes, Your Honor.  Thank you for so

18   much of your time today.

19        THE COURT:  Okay.  Good.  Have a good rest of the

20   day, good weekend, be safe, and I'll see you and talk to you

21   whenever that occurs next.  Okay?

22        MS. MILLER:  Thank you, Your Honor.  You as well.

23        THE COURT:  Okay.  Thank you very much.  Bye-bye.

24        (Proceedings concluded.)

25

1          C E R T I F I C A T E

2

3

4          I, Nancy L. Bistany, certify that the foregoing is a

5     complete, true, and accurate transcript from the telephonic

6     record of proceedings on August 14, 2020, before the HON.

7     JEFFREY T. GILBERT in the above-entitled matter, to the best of

8     my ability.

9

10

11    */s/ Nancy L. Bistany, CSR, RPR, FCRR*          August 20, 2020

12         Official Court Reporter                     Date
          United States District Court
13         Northern District of Illinois
          Eastern Division
14

15

16

17

18

19

20

21

22

23

24

25