# CORRECTED
# Exhibit 511
## To Ho Declaration (Dkt. 1144)

```
                    UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF WISCONSIN
_____

AUTHENTICOM, INC.,

          Plaintiff,

 -vs-                                  Case No.   17-CV-318-JDP

CDK GLOBAL, LLC and                    Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,     June 28, 2017
                                       8:02 a.m.

          Defendants.
_____

    STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF EVIDENTIARY HEARING
      HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

             Godfrey & Kahn S.C.
             BY:  JENNIFER L. GREGOR
             One East Main Street, Suite 500
             Madison, Wisconsin  53701

             Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
             BY:  MICHAEL N. NEMELKA
                  AARON M. PANNER
                  DAVID L. SCHWARZ
                  DEREK T. HO
                  JOANNA T. ZHANG
                  JOSHUA HAFENBRACK
                  KEVIN J. MILLER
             1615 M Street, N.W.
             Suite 400
             Washington, D.C.  20036


              Jennifer L. Dobbratz, RMR, CRR, CRC
              U.S. District Court Federal Reporter
                 United States District Court
               120 North Henry Street, Rm. 410
                  Madison, Wisconsin  53703
                        (608) 261-5709
```

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 3 of 12 PageID #:86377
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/05/17 Page 2 of 178

2

```
APPEARANCES CONTINUED:

Also appearing:    STEPHEN COTTRELL, Authenticom
                   STEVE ROBB, IT Support

For the Defendant CDK Global, LLC:

                   Foley & Lardner
                   BY:   JEFFREY A. SIMMONS
                   150 East Gilman Street
                   Madison, Wisconsin  53701

                   Mayer Brown LLP
                   BY:   BRITT M. MILLER
                         MATTHEW D. PROVANCE
                   71 South Wacker Drive
                   Chicago, Illinois  60606

                   Mayer Brown LLP
                   BY:   MARK W. RYAN
                   1999 K Street, N.W.
                   Washington, D.C.  20006

Also appearing:    LEE BRUNZ, General Counsel, CDK Global, LLC
                   NICK HEY, IT Support

For the Defendant The Reynolds and Reynolds Company:

                   Perkins Coie LLP
                   BY:   CHARLES G. CURTIS, JR.
                   1 East Main Street, Suite 201
                   Madison, Wisconsin  53703

                   Sheppard Mullin Richter & Hampton, LLP
                   BY:   MICHAEL P. A. COHEN
                   2099 Pennsylvania Avenue, N.W.
                   Suite 100
                   Washington, D.C.  20006

                   Gibbs & Bruns LLP
                   BY:   AUNDREA K. GULLEY
                         BRIAN T. ROSS
                         BRICE A. WILKINSON
                   1100 Louisiana Street, Suite 5300
                   Houston, Texas  77002

Also appearing:    ROBERT SCHAEFER and KELLY HALL,
                   The Reynolds and Reynolds Company
```

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 4 of 12 PageID #:86378
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/09/17 Page 45 of 118

45

1    provides that service.  It does it actually better than the
2    defendants do for a reason, and Authenticom charges 25 to $50 a
3    month for doing that service, or something on that order, and
4    other competitive providers do too and charge the same, and so
5    we know what that costs, and so that is not what the DMS
6    providers are charging for.  That is not why the DMS -- that is
7    not why vendors are willing and forced to pay these outrageous
8    fees.
9         And, you know, it's interesting actually, there's a case
10   from the Seventh Circuit called *Assessment Technologies of WI v.*
11   *WIREdata,* and the cite is 350 F.3d 640, and it's a case that we
12   cited in our reply papers, and it makes for very interesting
13   reading.  The case starts this way:  "This case is about the
14   attempt of a copyright owner to use copyright law to block
15   access to data that not only are neither copyrightable nor
16   copyrighted, but were not created or obtained by the copyright
17   owner.  The owner is trying to secrete the data in its
18   copyrighted program, a program the existence of which reduced
19   the likelihood that the data would be retained in a form in
20   which they would have -- in which they would have been readily
21   accessible.  It would be appalling if such an attempt could
22   succeed."  Now -- so if Authenticom -- and I think that that
23   analysis really applies quite well here.
24        Now, I don't want to anticipate an argument that's not going
25   to be made by the defendants, but I do know that in the opening

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 5 of 12 PageID #:86379
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/09/17 Page 46 of 118

46

1    Mr. Cohen referred to the Computer Fraud and Abuse Act, and
2    there was a suggestion that somehow Authenticom was violating
3    that federal statute.  Now, we learned yesterday -- first of
4    all, CDK has never -- didn't say that in their opening, and I
5    assume they will not say it in their closing for lots of
6    reasons, not least that CDK's contract permits dealers to
7    authorize agents to access data under the contract, and the
8    dealers had done so with CDK's express approval until CDK
9    changed its mind about whether that was economical in 2015.
10        Now, Reynolds say that dealers shouldn't have granted
11   Authenticom access, but that's a matter of contract, right?  The
12   dealers did authorize Authenticom to pull the data, and the
13   federal statute is not a contract enforcement mechanism.  But
14   the more important point is this:  If Reynolds could not
15   lawfully restrict the dealers from authorizing Authenticom to
16   access their data, if that was a violation of the antitrust
17   laws, any issue about that federal statute just disappears,
18   okay?  In other words, what's important about this is that none
19   of the defendants' arguments about contract law, about the terms
20   of their agreements with the dealers, changed the calculus about
21   the likelihood of success on the merits.  If we've shown a
22   likelihood that these provisions and this conduct violated the
23   antitrust laws, then they can't enforce those provisions and --
24             THE COURT:  Help me understand that.  So let's just
25   start, I guess, with a hypothetical, but not entirely

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 6 of 12 PageID #:86380
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/09/17 Page 49 of 118

47

```
 1    hypothetical, but Reynolds on its own independently, assuming
 2    that -- think of it as before February 2015.  Reynolds -- I'll
 3    make it a question.  Does Reynolds commit an antitrust violation
 4    by imposing a contractual restriction that prevents dealers from
 5    giving the usernames to Authenticom?
 6            MR. PANNER:  Yes.
 7            THE COURT:  Okay.  And why is that?
 8            MR. PANNER:  Because, again, there's an integration
 9    services function that's being provided in the market.  We
10    learned that yesterday.  Reynolds is using its market power in
11    the DMS market to foreclose competition in the market for
12    integration services.  They're doing that in part by barring the
13    dealer -- barring dealers from providing their data in an
14    efficient way to Authenticom.  They're also entering into
15    contracts with vendors that bar those vendors from obtaining
16    that data from Authenticom, using Authenticom's data integration
17    services, and Reynolds has at that point over 30% of the market.
18    They have substantial market power because the dealers are
19    locked in --
20            THE COURT:  So at that point it's a vertical exclusive
21    dealing.
22            MR. PANNER:  Exactly.  It's also a vertical tying
23    arrangement.  Tying is actually also a per se violation of the
24    antitrust laws.  Again, these are the kinds of issues that get
25    into the interesting antitrust stuff that, you know, that
```

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 7 of 12 PageID #:86381
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/05/17 Page 68 of 118

68

```
 1    in opening statement about, "For the avoidance of doubt, this is
 2    not intended as a covenant not to compete," that lawyer language
 3    at the end of it, Your Honor, which I don't just see it as
 4    significant.  I think that's making it clear to the parties it's
 5    not a covenant not to compete.  But let's look at the language
 6    itself and the context, Your Honor, in which it arises.  The
 7    context is everything.
 8         They're trying to resolve a situation where Reynolds had
 9    been cutting out CDK from integrating at Reynolds dealers, and
10    Mr. Gardner testified that it was no longer viable for CDK to
11    continue to integrate over Reynolds' wishes.  Now, we're in
12    agreement on that.  Authenticom is in agreement that Reynolds
13    had become very effective at blocking.  In some of their papers,
14    they called it apocalypse, but I think we heard today it was not
15    feasible to try to overcome Reynolds' blocking anymore.  So
16    there was going to be a wind-down agreement where the vendors
17    and the dealers with whom we, CDK, had been dealing, we would be
18    weaned off of the CDK -- of the Reynolds system.
19         So let's look -- first of all, it does not say, Your
20    Honor --
21              THE COURT:  Can I take you really right to my concern
22    here?
23              MR. RYAN:  Yeah, yeah.  I would appreciate that.
24              THE COURT:  You know, I think this is -- this is a very
25    interesting, intriguing agreement really because there is a way
```

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 8 of 12 PageID #:86382
Case: 3:17-cv-00318-jdp Document #: 166 Filed: 07/05/17 Page 69 of 118

69

1  in which you could say, "Okay. Look, it's just an agreement to
2  do a couple things. One, they're going to agree to cooperate to
3  protect the security of their DMS systems. Two, it's a
4  settlement agreement. There's a nascent dispute" -- nascent
5  probably understates it. "There's a dispute between the parties
6  about CDK attempting something that Reynolds regards as
7  unlawful, and they've agreed to settle it short of litigation."
8  But there is also this idea here that there's a mutual agreement
9  that they will prevent third parties from access the DMS, and
10 when I look at what CDK had been doing to Reynolds, I can say,
11 "Yeah, you know, Reynolds is saying you are inducing our dealers
12 to breach their agreements with us, so knock it off." But the
13 agreement is mutual, and it also says CDK agrees that it's not
14 going to help anybody enter Reynolds, and Reynolds agrees that
15 it's not going to help anybody enter CDK's system, and I don't
16 read the CDK agreement to provide that same contractual barrier
17 to third-party access.
18         MR. RYAN: Okay. So --
19         THE COURT: Because CDK allows its dealers to appoint
20 agents to access its DMS, but by this agreement now, what we
21 really have here is that Reynolds -- CDK is now agreeing that
22 it's not going to allow anybody to access its own.
23         MR. RYAN: CDK is not going to allow anyone to access
24 its own?
25         THE COURT: It's own DMS now. If we look at the

```
1     agreement more broadly.
2             MR. RYAN:  This agreement, Your Honor?
3             THE COURT:  Yeah.
4             MR. RYAN:  I don't think that's right.  I just don't --
5     Let's take a look at --
6             THE COURT:  Yeah.  Walk me through it because I
7     understand here that there's a mutual agreement that both sides
8     are now going to stop allowing third-party access.
9             MR. RYAN:  So, first of all, I think we look, and we
10    see a prohibition on knowledge transfer and DMS access, so we
11    know these companies are now working together to wind down, and
12    they're going to be looking to help these dealers and vendors --
13    they're going to be looking to help these dealers and vendors
14    transfer.  So in like a lot of commercial agreements, Your
15    Honor, there's going to be confidential information and
16    technology and business knowledge that's necessarily exchanged
17    between the parties.  So this agreement clearly is saying you
18    can't take that information, you can't take the information that
19    we're going to be exchanging as we're unwinding and then use
20    it --
21            THE COURT:  I'm not concerned about the confidentiality
22    agreement with respect to the information that they're going to
23    exchange.  It's the part that says, "Or take any other steps to
24    assist any person that it reasonably believes to have plans to
25    access or integrate with the other party's DMS without the other
```

1      custom interface to each one of those 400 --
2               THE COURT:  They're not really asking for that now.
3               MS. GULLEY:  Right, exactly.  So that relief won't work
4      either.
5          All right.  Could you please just quickly return to slide 5.
6      Now, we have not -- we heard this *WIREdata* case.  This is not
7      minor to Reynolds.  Authenticom admits that the contracts
8      prohibit access.  They say they're vertical restraints that
9      they've known about for a decade, but they admit that they say
10     this.  They admit that we enforce it.  They admit that they work
11     around it.  They admit that they solicited usernames and
12     passwords over clear text email and just suggest, "Well, Judge,
13     you could just order us not to do that."  They admit that they
14     use those credentials to access the system and that they sold
15     the data to somebody else for cheap because they're not paying
16     for all the journaling and functions in the hub.  They don't
17     deny -- they allowed us to admit Exhibit 99, Defendants' Exhibit
18     99, which specifically said, "You must immediately cease and
19     desist from accessing Reynolds proprietary software and hardware
20     without the proper license and authorization to do so."  They
21     don't think they were any agent of ours.  They were on clear
22     notice that our dealers weren't allowed to do this.
23         This is exactly what the Computer Fraud and Abuse Act
24     prevents.  It's exactly what they did in *Facebook*.  Protected
25     computer.  Yes.  Cease and desist letter.  Yes.  Imposed IP

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 11 of 12 PageID #:86385
Case: 3:17-cv-00318-jdp Document #: 106 Filed: 07/05/17 Page 100 of 118
100

1   blocks.  Yes.  Evaded security.  Yes.  You get it.
2           THE COURT:  I think I take your point, although you put
3   it down there for Reynolds and CDK.
4           MS. GULLEY:  Sorry.
5           THE COURT:  It does seem that CDK allows the dealer to
6   designate agents.
7           MS. GULLEY:  Well, I will tell you that I am not
8   familiar with their contracts --
9           THE COURT:  I know you're not responsible --
10          MS. GULLEY:  --lawyers dispute --
11          THE COURT:  -- for them, but it's on your slide.
12  You're on your slide, so now I'm asking you about it.
13          MS. GULLEY:  Okay.  Well, I don't know what their
14  contract says, and I haven't reviewed it, but I did hear their
15  counsel say that it was not, in fact, an authorization to have
16  automated access as opposed to human agents.
17          THE COURT:  Also I'm going to ask this about the
18  Reynolds contract.
19          MS. GULLEY:  Yeah.
20          THE COURT:  The Reynolds contract doesn't say you can't
21  use machine access either, does it?
22          MS. GULLEY:  Right.  It just says you can't use
23  unauthorized access.
24          THE COURT:  So if the dealer had a machine, the dealer
25  could use their own machine.

Case: 1:18-cv-00864 Document #: 1154-3 Filed: 09/08/20 Page 12 of 12 PageID #:86386
Case: 3:17-cv-00318-jdp Document #: 106 Filed: 07/05/17 Page 101 of 118

101

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | MS. GULLEY: Well, I will say that I suppose they could                       |
| 2  | try to use their own machine, but Reynolds -- so I don't know --             |
| 3  | you had mentioned something about the PC, so just to make sure               |
| 4  | this is clear, Reynolds isn't just in the box or in the hub,                 |
| 5  | right? It starts -- the DMS starts on the PC. It's actually                  |
| 6  | copywrited software, ERAccess.exe.                                           |
| 7  | THE COURT: Is it a web interface?                                            |
| 8  | MS. GULLEY: It's not a web interface, no. It's a                             |
| 9  | terminal emulator software is I believe what Mr. Schaefer's                  |
| 10 | testimony was.                                                               |
| 11 | So, you know, could a dealer automate that process and how                   |
| 12 | would that work? Well, as far as I know, dealers --                          |
| 13 | THE COURT: You'd disable.                                                    |
| 14 | MS. GULLEY: -- aren't doing that because it would be                         |
| 15 | disabled.                                                                    |
| 16 | THE COURT: It would be disabled. My only question --                         |
| 17 | I don't think there's any doubt it would be disabled because you             |
| 18 | have key stroke monitoring that would tell this is not a human               |
| 19 | being, and you'd shut it down.                                               |
| 20 | MS. GULLEY: So the contracts are in evidence, so                             |
| 21 | actually it does have a qualified end user, and it does describe             |
| 22 | what a qualified end user is, and it is an employee of the                   |
| 23 | dealership. So I'll have to pull that cite for you, but now                  |
| 24 | that you say that, yes, it does define qualified end user, and               |
| 25 | so do the vendor contracts, by the way, define who a qualified               |