# CORRECTED EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN
_____

AUTHENTICOM, INC.,

       Plaintiff,

 -vs-                                    Case No. 17-CV-318-JDP

CDK GLOBAL, LLC and              Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,  June 26, 2017
                                             9:03 a.m.

       Defendants.
_____

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF EVIDENTIARY HEARING
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

    Godfrey & Kahn S.C.
    BY: JENNIFER L. GREGOR
    One East Main Street, Suite 500
    Madison, Wisconsin 53701

    Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
    BY: MICHAEL N. NEMELKA
        AARON M. PANNER
        DAVID L. SCHWARZ
        DEREK T. HO
        JOANNA T. ZHANG
        JOSHUA HAFENBRACK
        KEVIN J. MILLER
    1615 M Street, N.W.
    Suite 400
    Washington, D.C. 20036


Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin 53703
(608) 261-5709

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 3 of 13 PageID #:87483
Case: 3:17-cv-00318-jdp Document #: 184 Filed: 07/05/17 Page 111 of 180

1-A-111

1  A    Never once.
2  Q    Does the user emulation software that Authenticom uses in
3  any way alter or copy the DMS software itself?
4  A    It does not.
5  Q    Ms. Miller talked about software being on the box, hostile
6  software being on the box.  Do you install any software on the
7  DMS system?
8  A    Never have and never would.
9  Q    What is the advantage for dealers to automated approach of
10 data extraction instead of having to do it manually?
11 A    Dealers like to focus on selling and servicing cars.
12 That's their core competency.  Automating the process is just
13 like, you know, robotics on an assembly line.  Essentially we do
14 what humans could do only much faster and more efficiently, and
15 we eliminate errors.
16 Q    After you've -- so what do you do after Authenticom pulls
17 the data?  What does it do next?
18 A    So again we akin that to the United Nations, and we've got
19 all these different formats and business rules from the
20 dealership, so what we do is we normalize it.  We then put it
21 into our database and we create -- we run -- actually before it
22 goes into the database, we normalize components of it.  For
23 example, we validate that a dollar amount is actually a dollar
24 amount, a phone number is a phone number, VIN numbers are VIN
25 numbers, et cetera.

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 4 of 13 PageID #:87484
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 117 of 160
1-A-117

1  not.
2  Q    What about credit card information?
3  A    I don't even know that credit card information is stored on
4  the DMS.  We do not access it if it was.
5  Q    What about OEM information?
6  A    We do not have access to any OEM information.
7  Q    What about defendants' intellectual property?
8  A    We do not have any access to the defendants' intellectual
9  property.
10 Q    Ms. Miller, I believe, talked about different levels of
11 authorization --
12 A    Exactly.
13 Q    -- that dealers have, that the dealership owner and IT
14 director have a certain level and regular employees have another
15 level.  What level do dealers grant Authenticom?
16 A    Generally the only capabilities that we have is to, you
17 know, write or edit or receive reports.
18 Q    What about levels of authorization permission though in
19 terms of accessing data.  Do you have the same access that a
20 dealership owner has or --
21 A    Absolutely not.
22 Q    Or a regular employee?
23 A    Typically a regular employee, yes.
24 Q    What about other examples of a user dealer's internal HR
25 records, payroll records, and financial records.  Does

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 5 of 13 PageID #:87485
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 134 of 160
1-A-134

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | You mentioned there are instances where dealers pay you. |
| 3 | | What is that? |
| 4 | A | Most notably would be the Lithia group. |
| 5 | Q | What is the Lithia group? |
| 6 | A | Third or fourth largest publicly traded dealership group in |
| 7 | | North America. |
| 8 | Q | And they pay you to use DealerVault? |
| 9 | A | They do. |
| 10 | | THE COURT: How do you spell Lithia? |
| 11 | | THE WITNESS: L-I-T-H-I-A. I'm the world's worst |
| 12 | | speller, so that's not guaranteed. |
| 13 | | BY MR. NEMELKA: |
| 14 | Q | Real quick, why does Lithia pay you for DealerVault? |
| 15 | A | They're ecstatic about the control, transparency, reporting |
| 16 | | and audit capabilities that it gives them over the movement of |
| 17 | | their data. |
| 18 | Q | Okay. Now let's go to Authenticom pricing. What does |
| 19 | | Authenticom charge for data polling? |
| 20 | A | So for a single file type, $25 per month. For two or more |
| 21 | | up to the seven file types that we provide, $50. |
| 22 | Q | Does Authenticom provide bidirectional access? |
| 23 | A | We do. |
| 24 | | THE COURT: What does that mean? |
| 25 | | BY MR. NEMELKA: |

STEPHEN COTTRELL - DIRECT

```
                    UNITED STATES DISTRICT COURT

              FOR THE WESTERN DISTRICT OF WISCONSIN
_____

AUTHENTICOM, INC.,

          Plaintiff,

 -vs-                                    Case No.  17-CV-318-JDP

CDK GLOBAL, LLC and                      Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,       June 27, 2017
                                         8:04 a.m.

          Defendants.
_____

   STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF EVIDENTIARY HEARING
                       (MORNING SESSION)
     HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

          Godfrey & Kahn S.C.
          BY: JENNIFER L. GREGOR
          One East Main Street, Suite 500
          Madison, Wisconsin  53701

          Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
          BY: MICHAEL N. NEMELKA
              AARON M. PANNER
              DAVID L. SCHWARZ
              DEREK T. HO
              JOANNA T. ZHANG
              JOSHUA HAFENBRACK
              KEVIN J. MILLER
          1615 M Street, N.W.
          Suite 400
          Washington, D.C.  20036


          Jennifer L. Dobbratz, RMR, CRR, CRC
          U.S. District Court Federal Reporter
             United States District Court
          120 North Henry Street, Rm. 410
             Madison, Wisconsin  53703
                  (608) 261-5709
```

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 7 of 13 PageID #:87487
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 9 of 184

2-A-9

```
 1                THE WITNESS:  No, no, no, no.  It's a flavor originally
 2     designed for a fossil of an operating system called Pick that is
 3     still running on their systems today.
 4                THE COURT:  Okay.
 5                THE WITNESS:  And that's the query language.
 6                THE COURT:  Okay.  I get it.
 7                THE WITNESS:  It's called English.
 8                THE COURT:  I got it.
 9     BY MS. GREGOR:
10     Q    How does the level of access that Authenticom has compare
11     to your access as the IT administrator for the dealership?
12     A    I have the keys to the kingdom.  There's not a feature that
13     I can't run, full access to every single thing on every single
14     account.  Authenticom has access to limited accounts and to a
15     single function, ENG, for the purpose of retrieving the data
16     that I need them to retrieve so that they can -- I like to call
17     it feeding the children.  All the third-party vendors that need
18     the data, I call that feeding the children.  So they gather the
19     data, normalize the data, check the addresses against the NCOA
20     database, and then send the feeds to a couple dozen third-party
21     vendors that I use.
22     Q    Did you hear testimony yesterday about manual reporting?
23     A    I did hear that.  I heard that quite a bit, and I have to
24     say I understand that CDK and Reynolds offer a way for me to do
25     that manually.  Here is the thing about manual:  Manual doesn't
```

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 8 of 13 PageID #:87488
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/09/17 Page 10 of 164

2-A-10

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | work.  Take the case of the open recall vendor that was here           |
| 2  | yesterday.  It's 50 stores.  He's got to find 50 people, one in        |
| 3  | each store, to manually run a report, grab the data, and then          |
| 4  | transmit it to Authenticom.  These people can't have a day off.        |
| 5  | They can't make a mistake, can't have a vacation.  It doesn't          |
| 6  | work unless you can automate the process.  You have to be able         |
| 7  | to automate the process.                                               |
| 8  |     In the example of -- I'll give you an example.  If I want |
| 9  | to get every repair order created every single day and I want          |
| 10 | the data of all the repair orders that were opened on that day,        |
| 11 | I have to get that data after the service department closes so         |
| 12 | they're not creating any more repair orders but before the job         |
| 13 | stack runs and rolls all the closed ones into the history file.        |
| 14 | That has to be done between 8:00 and 10:00.  You're not going to       |
| 15 | have an employee there between 8:00 and 10:00 to do that               |
| 16 | manually every single day, so manual has no value.  If you're          |
| 17 | going to do data extractions, it has to be automated.  The             |
| 18 | minute that CDK takes away the ability to automate these data          |
| 19 | extractions, they've taken away a valuable tool that I've had          |
| 20 | for almost 30 years.                                                   |
| 21 | Q   Can we have Plaintiff's Exhibit 152 on the screen, please? |
| 22 | While we're pulling it up, Mr. Fitkin, did you submit a couple         |
| 23 | of declarations in this proceeding?                                    |
| 24 | A   I did.                                              |
| 25 | Q   And when was the last time you reviewed those?      |

WAYNE FITKIN - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 9 of 13 PageID #:87489
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/09/17 Page 45 of 164

2-A-45

|    |   |
|----|---|
| 1  | their frustration of dealer-initiated downloads or, in CDK's |
| 2  | case, the price increase that we told them we were about to pass |
| 3  | through.  So, yes, it's hurt us a lot. |
| 4  | Q    Final topic, Mr. Andreu.  Can we talk about your RCI |
| 5  | agreement with Reynolds?  What limitations, if any, does |
| 6  | Reynolds place on Dominion's ability to tell dealers how much it |
| 7  | pays for integration? |
| 8  | A    It gags us completely.  We can't tell them anything, so I'm |
| 9  | expected to somehow pass through an $893 charge on an $1,152 |
| 10 | product without telling them why. |
| 11 | Q    Was Dominion ever accused of violating the price secrecy |
| 12 | provisions in its contract? |
| 13 | A    We were. |
| 14 | Q    What did Reynolds say? |
| 15 | A    We put a line item on an invoice that said "integration |
| 16 | fee," and at the time, by the way, that fee was $195 is what we |
| 17 | passed through.  I don't recall what the offsetting Reynolds |
| 18 | charge was, but since it started at $247, you can bet $195 |
| 19 | wasn't all of it. |
| 20 | Q    What was Reynolds' response to your passing through -- |
| 21 | communicating the pass-through? |
| 22 | A    They sent a nasty letter to the then-product manager of |
| 23 | Sales Center, told us that we had -- defamation I think was on |
| 24 | there.  They said that we violated the secrecy requirement. |
| 25 | They submitted -- they made us submit to an intimidating audit, |

ALAN ANDREU - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 10 of 13 PageID #:87490
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 63 of 154

2-A-63

1   A   No.  We've not been in the business of trying to get money
2   off of the transactions.  We're just trying to sell software.
3   Q   In your experience are 3PA and RCI significantly better
4   integration services than SIS?
5   A   No, not particularly.  I haven't found anything about them
6   that's any better or improved on the transactions that I would
7   get from SIS.
8   Q   Are there any ways in which RCI and 3PA are more limited
9   than SIS?
10  A   Yeah.  I did lose some functionality when I made the
11  transition to both of the different systems in different ways.
12  With the RCI system I lost the ability to make some of the
13  notifications that I do around parts, special order parts
14  orders.  I can no longer get the information indicating when I
15  can make those notifications through the RCI program.  I also
16  lost the ability to do some pushback information, and with CDK
17  there was some things I lost the ability to do as well.
18  Q   So why does AutoLoop pay these higher integration fees from
19  Reynolds and CDK?
20  A   It was a decision where we had to look at the things that
21  we were dealing with on the support basis and the constant loss
22  of business and upset dealerships saying, "Hey, you guys, you
23  got to keep your system up.  We can't keep running our business
24  with your software if your software doesn't work."
25      So at that point it was a decision.  We're like, "Okay.  We

MATTHEW RODEGHERO - DIRECT

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 11 of 13 PageID #:87491
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 64 of 154

2-A-64

```
 1    have to keep the software running so we have to pay this cost."
 2    Q    If there wasn't the threat of blocking from the defendants,
 3    would you rather use SIS?
 4    A    We would be glad to go back to SIS.
 5    Q    I want to move to --
 6              THE COURT:  Just -- I mean, the cost is so clear.  Why
 7    wouldn't you rather pay $79 instead of $735.
 8              THE WITNESS:  Yeah, that's exactly --
 9              THE COURT:  That's the primary thing --
10              THE WITNESS:  That's the primary thing.  The other
11    thing we've run into from time to time with them is -- an
12    example would be is when we go back to -- when I worked with
13    SIS, if I needed additional information or I needed to develop a
14    new product that I wanted to give to the dealerships because
15    they've asked for a new functionality, I would go to them and
16    say, "Hey, can you get this additional data?"  They would work
17    it out.  They would come back and provide that data to me.
18         I make those requests with CDK and Reynolds, and if it can
19    be done, the time lines are between six months to a year with
20    additional recertification fees and paying for recertifying and
21    retesting.  With SIS it was not difficult at all.  So the
22    business relationship has changed drastically.
23              THE COURT:  Thank you.
24              MR. MILLER:  Thank you, Your Honor.
25    BY MR. MILLER:
```

MATTHEW RODEGHERO - DIRECT

```
                    UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF WISCONSIN

     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

     AUTHENTICOM, INC.

              Plaintiff,

     -vs-                                  Case No. 17-CV-318-JDP

     CDK GLOBAL, INC., LLC                 Madison, Wisconsin
     and THE REYNOLDS and                  June 27, 2017
     REYNOLDS COMPANY,                     1:50 p.m.

              Defendants.

     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

     STENOGRAPHIC TRANSCRIPT-SECOND DAY OF EVIDENTIARY HEARING
                          AFTERNOON SESSION
          HELD BEFORE THE HONORABLE JAMES D. PETERSON,

     APPEARANCES:

     For the Plaintiff:
              Godfrey & Kahn S.C.
              BY:  JENNIFER GREGOR
              One East Main Street, Ste. 500
              Madison, Wisconsin  53703

              Kellogg, Hansen, Todd, Figel & Frederick, PLLC
              BY:  MICHAEL NEMELKA
                   AARON PANNER
                   DAVID SCHWARZ
                   DEREK HO
                   JOSHUA HAFENBRACK
                   KEVIN MILLER
                   JOHANNA ZHANG
                1615 M Street, NW, Ste. 400
                Washington, DC  20036

     Also present:  Stephen Cottrell - Authenticom president
                    Steve Robb - IT technician

                   Lynette Swenson   RMR, CRR, CRC
                U.S. District Court Federal Reporter
                  120 North Henry Street, Rm. 520
                     Madison, Wisconsin  53703
```

Case: 1:18-cv-00864 Document #: 1165-1 Filed: 09/08/20 Page 13 of 13 PageID #:87493
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 77 of 265

2-P-77

1  Q    Okay.  Now, go down, and then it says "only if," and
2  then it lists three conditions.  So CDK can pull the data
3  from the Reynolds DMS only if.  Do you see the *only if*?
4  A    Yes.
5  Q    Let's go to the third.  "CDK's access to the
6  Reynolds DMS does not materially degrade or otherwise
7  materially adversely affect the operation of the
8  applicable Reynolds DMS or place Reynolds and/or a
9  Reynolds dealer at a material operational or security
10 risk - provided, however, that any such material adverse
11 risk -- effect or risk covered by this Section 4.6 must
12 be demonstrated to CDK by Reynolds with clear and direct
13 evidence and that CDK shall be given a reasonable
14 opportunity to cure any such material adverse effect or
15 risk."  Do you see that?
16 A    Yes.
17 Q    Did Reynolds ever invoke this clause?
18 A    Not that I can remember.
19 Q    Reynolds never even invoked this clause that the
20 thousands of usernames that CDK was using put any
21 material effect or risk on Reynolds' system; isn't that
22 right?
23 A    During this period of time, because we had to
24 protect it, we didn't know what they were doing, so it
25 did not put a material impact on the system.

                    ROBERT SCHAEFER - CROSS