# EXHIBIT 658



Brian T. Ross
Partner
bross@gibbsbruns.com
713.751.5286

April 22, 2019

**Via Email**
Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036-3215

**Via Email**
Peggy J. Wedgworth
Milberg Tadler Phillips Grossman LLP
One Pennsylvania Plaza
New York, NY 10119

Re:   *In re: Dealer Management System Antitrust Litigation*, C.A. No. 18-C-864, MDL No. 2817 (N.D. Ill.)

Dear Counsel,

This is in response to Dan Dorris's request on Friday for the names of Reynolds's 30(b)(6) representatives.

Since Reynolds received Plaintiffs' requested 30(b)(6) topics on March 7, 2019, we have gone to great lengths in an effort to resolve the many problems with Plaintiffs' requested topics. Indeed, Reynolds served its objections to the notice on March 13, 2019, several weeks before they would be "due" under the rules. Since that time, we have worked in good faith with Plaintiffs in an effort to reach a resolution so that we can reasonably identify and prepare the appropriate representatives. When Reynolds offered May 2nd as the Reynolds 30(b)(6) deposition date, we did so expressly reserving our rights in the event the topics were not resolved.

On April 9, 2019, we sent Plaintiffs our most recent round of edits to the topics under negotiation, along with an offer to convene on a meet-and-confer call as soon as that day in order to work through any final issues. Unfortunately, 13 days later, Plaintiffs still have not responded to that proposal, which has prejudiced Reynolds's ability to prepare for a 30(b)(6) deposition on May 2nd.

Since Reynolds can no longer afford to wait on Plaintiffs to resolve the open issues, we intend to proceed as follows. If Plaintiffs are intent on proceeding with the Reynolds 30(b)(6) deposition on May 2nd, Reynolds will be presenting the individuals listed on Exhibit "A" to this letter on the topics listed under each name, and objects to any further expansion of any such topic.

Michael N. Nemelka
Peggy J. Wedgworth
April 22, 2019
Page 2 of 2

If Plaintiffs are unsatisfied with any of the topics set forth on Exhibit "A," then Reynolds is willing to further meet-and-confer, but only if the deposition is rescheduled for a mutually agreeable, later date.

      In terms of order of witnesses, Reynolds intends to present Mr. Hall first, followed by Mr. Hill, followed by Mr. Burnett.

      We note that the designations set forth on Exhibit "A" generously stand by the proposal Reynolds made on April 9, 2019, even though in the interim Plaintiffs were able to cover many of these topics in the 14-hour deposition of Robert Schaefer.

                                      Sincerely,

                                      /s/ Brian Ross

                                      Brian T. Ross

# Exhibit "A"

## Kelly Hall

**Topic 3**: Communications between CDK and Reynolds relating to Authenticom, DealerVault, and/or Steve Cottrell, concerning any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking an independent data integrator's access – including Authenticom's access – to dealer data on their respective DMS platforms.

**Topic 6:** From January 1, 2013, to the present, the type of data integration services (such as those offered directly by Reynolds or by independent integrators such as SIS, Authenticom, and DMI) used by Reynolds's add-on applications for access to dealer data on any DMS (including the Reynolds and CDK DMSs).

**Topic 7:** From January 1, 2011, to the present, the identity of all forms of data access and/or data functionality that Reynolds provided to its own add-on applications that it did not provide to vendors, such as the ability to create and edit repair orders.

**Topic 9:** CDK's (including through its subsidiaries, DMI and IntegraLink) access to data on the Reynolds DMS, including the technological means by which Reynolds has either blocked or protected CDK's access to the Reynolds DMS; and CDK's wind down of its access to data on the Reynolds DMS.

**Topic 10:** From January 1, 2011 to the present, the circumstances in which Reynolds whitelisted, protected, or authorized the use of independent data integration services to extract and/or write-back data stored in a Reynolds DMS – such as that done at the request of dealerships (such as Penske), vendors, original equipment manufacturers (such as Jaguar or BMW), agreements or arrangements with independent data integrators (such as CDK, Authenticom, or SIS) – including how whitelisting is accomplished as a technical matter.

**Topic 12:** The functions and capabilities of the Dynamic Reporting program, including the means by which dealers extract the data manually.

**Topic 14:** From 2011 to the present, the standard agreement(s) between Reynolds and its vendor customers for the provision of data integration services; the different standard versions of the agreements; and Reynolds's enforcement of any provisions in those agreements concerning the confidentiality of the prices charged by Reynolds under those agreements.

**Topic 19:** Reynolds's data security policies, procedures, practices and capabilities, including without limitation: any internal or external audits or assessments of the state of Reynolds's data security policies, procedures, practices and capabilities; any data security incidents experienced by Reynolds; and Reynolds's practices to protect the security of dealer data, including where the data is stored.

**Topic 20:** Any attempts by Reynolds to document or quantify system performance or system load issues caused by third-party data integrators, including Authenticom, and any the identification and/or documentation of any dealer complaints to Reynolds about the security and system performance issues associated with the dealer's use of third-party integrators.

# Keith Hill

**Topic 4:** The "add-on" applications that Reynolds offers to dealerships, including the general functions and capabilities of those applications, any calculation or analysis performed by or on behalf of Reynolds concerning the market share of those add-on applications in their respective markets, and the prices Reynolds charges dealers per-month for the add-on applications, from January 1, 2011, to the present. For the avoidance of doubt, it shall be sufficient with respect to prices for the witness to be prepared to testify as to a range and/or the typical list and actual prices for Reynolds's products.

**Topic 13:** From 2011 to the present, the data integration services offered by Reynolds (whether through the RCI program or otherwise), including the categories of services offered; the prices charged for those services; and the vendor and OEM customers of those services. For the avoidance of doubt, it shall be sufficient with respect to prices for the witness to be prepared to testify as to a range and/or the typical list and actual prices for Reynolds's services.

**Topic 16:** The DMS hardware and software that Reynolds offers to its dealership customers, including without limitation: the general functions and capabilities of that DMS hardware and software; changes to the functions and capabilities of that DMS hardware and software; and the prices charged by Reynolds for the provision of that DMS hardware and software. For the avoidance of doubt, it shall be sufficient with respect to prices for the witness to be prepared to testify as to a range and/or the typical list and actual prices for Reynolds's products.

**Topic 17:** Reynolds's historical and current share of the DMS market (in the United States, by rooftop and cars sold), including Reynolds's market share with respect to national or enterprise dealership groups. For the avoidance of doubt, Reynolds shall not be required to compile data not maintained in the ordinary course of its business.

**Topic 18:** From 2011 to the present, the standard form DMS agreements entered into between Reynolds and its dealership customers; the circumstances in which Reynolds enforced any provision in those agreements concerning dealers' ability to provide independent data integrators access to data on the Reynolds DMS; and the extent to which any addendum, exhibit, or part thereof that authorizes or acknowledges that dealers may provide independent data integrators access to data on the Reynolds DMS.

# Robert Burnett

**Topic 1:** From January 1, 2011, the present, Reynolds's calculation of its consolidated actual and projected financial results, including without limitation, consolidated revenues, costs, and profits companywide and for its DMS business, data services business, and add-on applications. For the avoidance of doubt, it shall be sufficient for the witness to be prepared to testify as to what Reynolds'

> financial figures represent and to the authenticity, processes, and source(s) of the financial statements produced by Reynolds in this MDL.
>
> **Topic 2:** The "3PA Agreement", "Data Exchange Agreement", and "Reynolds Interface Agreement" entered into between CDK and Reynolds in or around February 2015 (the "February 2015 Agreements"), including without limitation the negotiation and drafting of the February 2015 Agreements; and Reynolds' internal projections and calculations of the benefits of the February 2015 Agreements.
>
> **Topic 5:** Reynolds' internal calculations and projections of financial information relating to Reynolds's add-on applications for each year from January 1, 2011, to the present, including Reynolds' revenues and profits arising from Reynolds' add-on applications. For the avoidance of doubt, it shall be sufficient for the witness to be prepared to testify as to what Reynolds' financial figures represent and to the authenticity, processes, and source(s) of the financial.
>
> **Topic 8:** Reynolds's ownership interest in CVR, including Reynolds's involvement in CVR's operations and board.
>
> **Topic 11:** Any "wind down," settlement, or other agreements entered into between Reynolds and any data integration provider.
>
> **Topic 15:** Reynolds' calculations and projections of financial information with respect to Reynolds's data integration services – for vendors and OEMs – including actual and projected costs, revenues, and profitability, from 2011 to present. For the avoidance of doubt, it shall be sufficient for the witness to be prepared to testify what Reynolds' financial figures represent and to as to the authenticity, processes, and source(s) of the financial statements produced by Reynolds in this MDL.