PUBLIC VERSION

# Exhibit A

PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To: | Honorable Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| THE DEALERSHIP CLASS ACTION | |

**DEALERSHIP COUNTER-DEFENDANTS' AMENDED ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES TO COUNTERPLAINTIFF CDK GLOBAL LLC'S COUNTERCLAIMS**

Counter-Defendants ACA Motors, Inc.; Continental Classic Motors, Inc.; 5800 Countryside, LLC; HDA Motors, Inc.; H & H Continental Motors, Inc.; Continental Autos, Inc.; Naperville Zoom Cars, Inc.; NV Autos, Inc.; Baystate Ford Inc.; Cliff Harris Ford, LLC; Marshall Chrysler Jeep Dodge, L.L.C.; Warrensburg Chrysler Dodge Jeep, L.L.C.; Cherry Hill Jaguar; JCF Autos LLC; Jericho Turnpike Sales LLC; Patchogue 112 Motors LLC; and Waconia Dodge, Inc. (collectively, "Counter-Defendants" or "Dealership Counter-Defendants"), by their undersigned counsel, hereby ~~its~~submit their Answer and Affirmative and Additional Defenses in response to Defendant-Counterplaintiff CDK Global, LLC's Counterclaims Against Certain Dealership Plaintiffs, dated Feb. 22, 2019 (the "Counterclaims"). By answering, Counter-Defendants do not waive any rights or defenses, including with respect to jurisdiction.

**ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES**

*Preliminary Statement*

Except as otherwise expressly stated below, Dealership Counter-Defendants answer and respond only to those allegations contained in CDK Global LLC's ("CDK") Counterclaims that

are directed toward Dealership Counter-Defendants. Dealership Counter-Defendants are without sufficient knowledge or information to form a belief concerning the truth of the allegations of the Counterclaims that are directed towards other parties and on that basis denies them.

To the extent that an allegation in the Counterclaims relates to one (or more), but not all, of the Dealership Counter-Defendants, the answers set forth herein are made only by those Dealership Counter-Defendant(s) that are the subject(s) of that allegation, and all other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of that allegation and on that basis deny it.

For the reader's convenience, Dealership Counter-Defendants have organized their Answers to CDK's allegations by employing the headings and subheadings used within the Counterclaims. In doing so, Dealership Counter-Defendants do not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, deny each and every one of them unless they have expressly indicated otherwise. In addition, CDK's Counterclaims contain 22 footnotes that are recited herein. To the extent the contents of those footnotes are not addressed in the text of the response to the Counterclaim paragraph to which the footnote relates and/or to the extent that the content of any footnote can be read to contain factual allegations, Dealership Counter-Defendants deny each and every one of them.

## **INTRODUCTION**

1.     CDK brings these counterclaims in response to the Dealership Counter-Defendants flagrant and repeated breaches of their contracts and violations of federal law protecting access to secure computer systems. CDK licenses access and use of its dealer management system ("DMS") software to the Dealership Counter-Defendants pursuant to Master Services Agreements that expressly prohibit automated third-party access. That prohibition is designed to allow CDK to monitor and protect the sensitive data in its DMS—including highly sensitive consumer information and proprietary information owned by CDK as well as third parties—and ensure optimal system performance and data integrity in this age of ever growing cybersecurity threats.

**ANSWER:**    Paragraph 1 states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that they breached any contracts or violated any laws protecting access to secure computer systems. Dealership Counter-Defendants admit that they entered into Master Service Agreements ("MSAs") (that may include or incorporate additional documents) with CDK. Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 1 of the Counterclaims, as those MSAs speak for themselves. Dealership Counter-Defendants deny that any provisions of the MSAs between CDK and Dealership Counter-Defendants are designed to allow CDK to monitor or protect the data in the CDK DMS or to ensure optimal system performance or data integrity, but instead are designed to further CDK's anticompetitive purposes. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 1 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis denies them. Dealership Counter-Defendants deny the remaining allegations in paragraph 1 of the Counterclaims.

2.    The Dealership Counter-Plaintiffs have repeatedly breached their contracts with CDK by handing out their DMS login credentials, directly or through their software vendors, to third party data extractors, including Authenticom (another Plaintiff in this MDL), for the express purpose of enabling those third parties to use those credentials to repeatedly and relentlessly access CDK's DMS using sophisticated computer software that extracts (or "scrapes") large volumes of data from the system. Many of these data extractors—including Authenticom—then resell that data to other third party application providers, paying nothing to CDK. This unauthorized access not only threatens the security of the data in CDK's DMS, it threatens the integrity of that data because ungoverned extraction and insertion of data into the DMS may corrupt the DMS databases. Moreover, the thousands upon thousands of unauthorized extractions and the high volume of data in many of those extractions degrade the performance of the DMS, impairing its value for all of CDK's DMS customers.

**ANSWER:**    Paragraph 2 states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that they breached any contracts with CDK. Dealership Counter-Defendants further deny CDK's characterization of

their contracts with CDK discussed in paragraph 2 of the Counterclaims, as those contracts speak

for themselves. Dealership Counter-Defendants further deny that access to Dealership Counter-

Defendants' DMSs by third party data extractors threatens the security or integrity of the data in

CDK's DMS, degrades the performance of the DMS, or impairs the value of the DMS for all of

CDK's DMS customers. Dealership Counter-Defendants lack sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in paragraph 2 of the

Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and

on that basis denies them. Dealership Counter-Defendants deny the remaining allegations in

paragraph 2 of the Counterclaims.

3.      In knowingly providing login credentials to these data extractors and, actively or
passively, "authorizing" them to access CDK's DMS to extract or insert data—including data
that does not belong to the Dealership Counter-Defendants—the Dealership Counter-Defendants
have breached their contracts with CDK. This conduct also violates the CFAA, which prohibits
unauthorized access to protected computer systems. In addition, certain Dealership Counter-
Defendants—and numerous members of the putative class—have engaged in further unlawful
conduct that violates the DMCA. CDK requests that the Court enjoin the Dealership Counter-
Defendants' illegal conduct and award CDK damages.

**ANSWER:**     Paragraph 3 states legal conclusions to which no answer is required. To the extent

that an answer may be required, Dealership Counter-Defendants deny that they breached any

contracts with CDK and deny that they violated the CFAA, the DMCA or any other statute.

Dealership Counter-Defendants deny CDK's characterization of the contracts with CDK

discussed in paragraph 3 of the Counterclaims, as those contracts speak for themselves.

Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to

the truth of the remaining allegations in paragraph 3 of the Counterclaims that relate to

individuals or entities other than Dealership Counter-Defendants and on that basis denies them.

Dealership Counter-Defendants deny the remaining allegations in paragraph 3 of the

Counterclaims.

## PARTIES

4.      Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

**ANSWER:**      Dealership Counter-Defendants admit that Counter-Plaintiff CDK is a Delaware

limited liability company with its corporate headquarters and principal place of business at 1950

Hassell Road, Hoffman Estates, Illinois 60169. Dealership Counter-Defendants further admit

that CDK provides information technology and digital marketing products to the automotive

retail industry. Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the remaining allegations in paragraph 4 of the Counterclaims that

relate to individuals or entities other than Dealership Counter-Defendants and on that basis

denies them. Dealership Counter-Defendants deny the remaining allegations in paragraph 4 of

the Counterclaims.

5.      The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. CDK has made tremendous investments to build out and support its network of product and service offerings. Over the last four years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

**ANSWER:**      Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 5 of the Counterclaims that relate to

individuals or entities other than Dealership Counter-Defendants and on that basis denies them.

Dealership Counter-Defendants deny the remaining allegations in paragraph 5 of the

Counterclaims.

6.      In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National

Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[1]

**ANSWER:**  Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 6 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis denies them. Dealership Counter-Defendants deny the remaining allegations in paragraph 6 of the Counterclaims.

**The Continental Counter-Defendants**

7.    Counter-Defendant ACA Motors, Inc., d/b/a Continental Acura ("Continental Acura"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2275 Aurora Avenue, Naperville, Illinois.

**ANSWER:**  Counter-Defendant Continental Acura admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2275 Aurora Avenue, Naperville, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 7 of the Counterclaims.

8.    Counter-Defendant Continental Classic Motors, Inc., d/b/a Continental Autosports ("Continental Autosports"), is an Illinois corporation with its principal place of business located at 420 E. Ogden Avenue, Hinsdale, Illinois.

**ANSWER:**  Counter-Defendant Continental Autosports admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 420 E. Ogden Avenue, Hinsdale, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 8 of the Counterclaims.

---

[1] *See* Dep't of Homeland Security, What is Critical Infrastructure?, *available at* perma.cc/N8JR-YQ6Y.

9.     Counter-Defendant 5800 Countryside, LLC, d/b/a Continental Mitsubishi ("Continental Mitsubishi"), is an Illinois corporation with its principal place of business located at 5800 South La Grange Road, Countryside, Illinois.

**ANSWER:**     Counter-Defendant Continental Mitsubishi admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5800 South La Grange Road, Countryside, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 9 of the Counterclaims.

10.     Counter-Defendant HDA Motors, Inc., d/b/a Continental Honda ("Continental Honda"), is an Illinois corporation with its principal place of business located at 5901 South La Grange Road, Countryside, Illinois.

**ANSWER:**     Counter-Defendant Continental Honda admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5901 South La Grange Road, Countryside, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Counterclaims.

11.     Counter-Defendant H & H Continental Motors, Inc., d/b/a Continental Nissan ("Continental Nissan"), is an Illinois corporation with its principal place of business located at 5750 South La Grange Road, Hodgkins, Illinois.

**ANSWER:**     Counter-Defendant Continental Nissan admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5750 South La Grange Road, Hodgkins, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 11 of the Counterclaims.

12.     Counter-Defendant Continental Autos, Inc., d/b/a Continental Toyota ("Continental Toyota"), is an Illinois corporation with its principal place of business located at 6701 South La Grange Road, Hodgkins, Illinois.

**ANSWER:** Counter-Defendant Continental Toyota admits that it is an Illinois corporation with its principal place of business located at 6701 South La Grange Road, Hodgkins, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 12 of the Counterclaims.

13. Counter-Defendant Naperville Zoom Cars, Inc., d/b/a Continental Mazda ("Continental Mazda"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2363 Aurora Avenue, Naperville, Illinois.

**ANSWER:** Counter-Defendant Continental Mazda admits that it is an Illinois corporation with its principal place of business located at 2363 Aurora Avenue, Naperville, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 13 of the Counterclaims.

14. Counter-Defendant NV Autos, Inc., d/b/a Continental Audi ("Continental Audi"), is an Illinois corporation with its principal place of business located at 1527 Aurora Avenue, Naperville, Illinois.

**ANSWER:** Counter-Defendant Continental Audi admits that it is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 1527 Aurora Avenue, Naperville, Illinois. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the Counterclaims.

15. On information and belief, the foregoing entities (hereinafter the "Continental Counter-Defendants") share common ownership, managers, and employees and therefore operate as a single business unit. The Continental Counter-Defendants also share one DMS licensed from CDK.

**ANSWER:** The Continental Counter-Defendants deny the allegations in paragraph 15 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Counterclaims.

**Counter-Defendant Baystate Ford**

16.    Counter-Defendant Baystate Ford Inc. ("Baystate Ford") is a Massachusetts corporation with its principal place of business located at 703 Washington Street, South Easton, Massachusetts.

**ANSWER:**    Counter-Defendant Baystate Ford admits that it is a corporation organized and existing under the laws of the state of Massachusetts with its principal place of business located at 703 Washington Street, South Easton, Massachusetts. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Counterclaims.

**The Warrensburg Counter-Defendants**

17.    Counter-Defendant Cliff Harris Ford, LLC, d/b/a Warrensburg Ford ("Warrensburg Ford"), is a Missouri corporation with its principal place of business located at 330 E. Young Street, Warrensburg, Missouri.

**ANSWER:**    Counter-Defendant Warrensburg Ford admits that it is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 330 E. Young Street, Warrensburg, Missouri. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 17 of the Counterclaims.

18.    Counter-Defendant Marshall Chrysler Jeep Dodge, L.L.C. d/b/a Marshall Chrysler Jeep Dodge Ram ("Marshall Chrysler") is a Missouri corporation with its principal place of business located at 1450 W. Arrow Street, Marshall, Missouri.

**ANSWER:**    Counter-Defendant Marshall Chrysler admits that it is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 1450 W. Arrow Street, Marshall, Missouri. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 18 of the Counterclaims.

19. Counter-Defendant Warrensburg Chrysler Dodge Jeep, L.L.C. d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat ("Warrensburg Chrysler") is a Missouri corporation with its principal place of business located at 329 E. Young Street, Warrensburg, Missouri.

**ANSWER:** Counter-Defendant Warrensburg Chrysler admits that it is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 329 E. Young Street, Warrensburg, Missouri. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 19 of the Counterclaims.

20. On information and belief, the foregoing entities (hereinafter the "Warrensburg Counter-Defendants") share common ownership, managers, and employees and therefore operate as a single business unit. The Warrensburg Counter-Defendants also share one DMS licensed from CDK.

**ANSWER:** The Warrensburg Counter-Defendants deny the allegations in paragraph 20 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 20 of the Counterclaims.

**Counter-Defendant Cherry Hill**

21. Counter-Defendant Cherry Hill Jaguar ("Cherry Hill") is a New Jersey corporation with its principal place of business located at 2000 Route 70 East, Cherry Hill, New Jersey. Cherry Hill Jaguar uses a CDK DMS.

**ANSWER:** Counter-Defendant Cherry Hill admits that it is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 2000 Route 70 East, Cherry Hill, New Jersey. Cherry Hill further admits that it uses a CDK DMS. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21 of the Counterclaims.

**The Stevens Counter-Defendants**

22.    Counter-Defendant JCF Autos LLC, d/b/a Stevens Jersey City Ford ("Stevens Jersey City Ford"), is a New Jersey corporation with its principal place of business located at 740 Route 440, Jersey City, New Jersey.

**ANSWER:**    Counter-Defendant Stevens Jersey City Ford admits that it is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 740 Route 440, Jersey City, New Jersey. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 22 of the Counterclaims.

23.    Counter-Defendant Jericho Turnpike Sales LLC, d/b/a Ford & Lincoln of Smithtown ("Smithtown Ford & Lincoln"), is a New York corporation with its principal place of business located at 440 Jericho Turnpike, Smithtown, New York.

**ANSWER:**    Counter-Defendant Smithtown Ford & Lincoln admits that it is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 440 Jericho Turnpike, Smithtown, New York. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 23 of the Counterclaims.

24.    Counter-Defendant Patchogue 112 Motors LLC, d/b/a Stevens Ford ("Stevens Ford") is a New York corporation with its principal place of business located at 507 Route 112, Patchogue, New York.

**ANSWER:**    Counter-Defendant Stevens Ford admits that it is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 507 Route 112, Patchogue, New York. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 24 of the Counterclaims.

25.    On information and belief, the foregoing entities (hereinafter the "Stevens Counter-Defendants") share common ownership, managers, and employees and therefore operate

11

as a single business unit. The Stevens Counter-Defendants also share one DMS licensed from CDK.

**ANSWER:** The Stevens Counter-Defendants deny the allegations in paragraph 25 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 25 of the Counterclaims.

**Counter-Defendant Waconia Dodge**

26. Counter-Defendant Waconia Dodge, Inc. ("Waconia Dodge") is a Minnesota corporation with its principal place of business located at 905 Strong Drive, Waconia, Minnesota. Waconia Dodge uses a CDK DMS.

**ANSWER:** Counter-Defendant Waconia Dodge admits that it is a corporation organized and existing under the laws of the state of Minnesota with its principal place of business located at 905 Strong Drive, Waconia, Minnesota. Counter-Defendant Waconia Dodge further admits that it uses a CDK DMS. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 26 of the Counterclaims.

## NATURE OF THE COUNTERCLAIMS

27. These counterclaims arise under the CFAA, the DMCA, and state common law causes of action for breach of contract.

**ANSWER:** Paragraph 27 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants admit that CDK purports to bring counterclaims arising from the CFAA, the DMCA, and state common law causes of action for breach of contract. Dealership Counter-Defendants deny, however, that CDK or any other individual or entity has suffered any injury as a result of any action or conduct of Dealership Counter-Defendants and therefore deny that CDK is entitled to the relief it seeks. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to

12

the truth of the allegations in paragraph 27 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 27 of the Counterclaims.

28.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331 and 1367(a). There is federal question jurisdiction under 28 U.S.C. § 1331, because CDK alleges violations of the CFAA and DMCA. There is supplemental jurisdiction over the state law counterclaims pursuant to 28 U.S.C. § 1367(a), because they are so related to CDK's federal law counterclaims and the Dealership Counter-Defendants' affirmative claims against CDK that they form part of the same case or controversy.

**ANSWER:**     Paragraph 28 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants admit that this Court has subject matter jurisdiction over CDK's Counterclaims. Dealership Counter-Defendants deny the remaining allegations in paragraph 28 of the Counterclaims.

29.     This Court has personal jurisdiction over the Dealership Counter-Defendants, because (a) many of the Dealership Counter-Defendants are located and do business in the District in which this action was filed; (b) many of the actions giving rise to these counterclaims occurred in, and/or were directed from, this District; and/or (c) because the Dealership Counter-Defendants filed their complaint against CDK in this District.

**ANSWER:**     Paragraph 29 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 29 of the Counterclaims.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

**ANSWER:**     Paragraph 30 of the Counterclaims states legal conclusions to which no answer is required.

PUBLIC VERSION

## FACTUAL ALLEGATIONS

### A. CDK's DMS

31.     CDK's DMS offering (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two enterprise software products—Drive and DASH—that provide dealers with proprietary software tools and resources used to manage core aspects of their business. CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

**ANSWER:**     Dealership Counter-Defendants admit that CDK provides enterprise software known as dealer management systems ("DMS"). Dealership Counter-Defendants further admit that CDK's DMS provides dealers with software tools and resources used to manage core aspects of dealers' business. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 31 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 31 of the Counterclaims.

32.     CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS. CDK's DMS also includes, and is largely comprised of, valuable pieces of intellectual property, including patented technologies, proprietary software elements and programs created by CDK (including software programs protected by the copyright laws), and proprietary data collections, which are accessible through the DMS. At all relevant times, and as CDK's contracts with the Dealership Counter-Defendants and third parties make clear, the DMS has remained the sole and exclusive property of CDK. Dealers that purchase DMS services from CDK are granted a personal, non-transferable license to *use* CDK's DMS in accordance with the terms and conditions of their agreements.

**ANSWER:**     Paragraph 32 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the contracts between CDK and Dealership Counter-Defendants and third parties discussed in paragraph 32 of the Counterclaims, as those contracts speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 32 of the Counterclaims that relate

14

to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 32 of the Counterclaims.

33.     CDK's DMS offering consists of software and hardware components residing at both the dealership ("dealership network") and at CDK's data centers ("CDK network").[2]  CDK uses state-of-the-art technology to secure the connections between the dealerships and the CDK network, including through specialized hardware at each dealership site. That hardware creates a "virtual private network" ("VPN") or "Leased-Line Multiprotocol Label Switching network" ("MPLS") between the dealership and the CDK network, which accepts direct communications only from computers on the corresponding dealership's network.

**ANSWER**:     Dealership Counter-Defendants admit that CDK's DMS offering consists of software and hardware components residing at both the dealership and at CDK's data centers. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 33 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 33 of the Counterclaims.

34.     CDK's terminal program that runs on dealer computers is an original and independent work created and licensed by CDK. It consists of original and distinct elements, including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

**ANSWER**:     Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 34 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 34 of the Counterclaims.

---

[2] In a few instances, the server side of the DMS system is located on a dealership's premises rather than offsite at a CDK data center.

35.     In addition to its core functionalities, the CDK DMS stores voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, proprietary intellectual property, and proprietary data that belongs to CDK and third parties, including the data described below. CDK encrypts sensitive data in the DMS and appropriately expunges stale data regularly.

**ANSWER:**     Dealership Counter-Defendants admit that the CDK DMS typically stores

financial and accounting information and data, which in some cases includes financial

statements, accounting data, payroll information, sales figures, inventory, parts data, warranty

information, appointment records, service and repair records, vehicle information, and/or

customer personal identifiable information. Dealership Counter-Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in

paragraph 35 of the Counterclaims that relate to individuals or entities other than Dealership

Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the

remaining allegations of paragraph 35 of the Counterclaims.

36.     Data housed in CDK's DMS belongs to several different types of entities. Some data is proprietary to original equipment manufacturers ("OEMs") (*e.g.*, General Motors, Ford, Subaru), such as prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information. Other data in CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion. Still other data in the DMS is CDK's own proprietary, copyrighted data, including forms, accounting rules, tax tables, and proprietary tools and data compilations. And some data "belongs" to the dealers that use CDK's DMS. While access to third-party and CDK proprietary information in the DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this information with other third parties absent a valid license.

**ANSWER:**     Paragraph 36 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants admit

that dealers' DMSs typically contain data that belong to the dealers. Dealership Counter-

Defendants lack sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 36 of the Counterclaims that relate to individuals or entities

other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 36 of the Counterclaims.

**B.      Security Features to Control Access to CDK's DMS**

37.      CDK's DMS is password protected. To access the DMS, each dealership employee must use his or her individual login credentials.

**ANSWER:**      Dealership Counter-Defendants admit that access to the CDK DMS typically requires the entry of valid login credentials (*i.e.*, username and password). Dealership Counter-Defendants deny that each dealership employee must use his or her individual login credentials in order to access the CDK DMS.

38.      Typically, at least one employee at each dealership using CDK's DMS has "system administrator" or "SA" level access privileges. A dealership employee who has testified in one of the cases within this MDL compared system administrator-level access to CDK's DMS to possessing "the keys to the kingdom." 06/27/2017 Tr. (*Authenticom* Dkt. 165) 2-A-9:10-11.[3] Users with system administrator-level privileges have the authority to create new accounts (and corresponding login credentials) for other dealership employees. They also have the ability to define the data and functions each employee may access within CDK's DMS by creating and assigning the employees different "roles." In other words, each user has access to the DMS that is commensurate with the access privileges assigned to his or her login credentials.

**ANSWER:**      Dealership Counter-Defendants admit that typically, at least one employee at each dealership using CDK's DMS has "system administrator" or "SA" level access privileges. Dealership Counter-Defendants also admit that users with system administrator-level privileges have the ability to create new accounts (and corresponding login credentials) for other dealership employees, and have the ability to define the data and functions that may be accessed within CDK's DMS using those login credentials. Dealership Counter-Defendants deny CDK's characterization of the testimony cited in paragraph 38 of the Counterclaims, as that testimony speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 38 of the Counterclaims

---

[3] All references to the *Authenticom* case refer to Case No. 17-cv-00318 (W.D. Wis.).

that relate to individuals or entities other than Dealership Counter-Defendants and on that basis

deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 38 of

the Counterclaims.

39.     Data maintained in CDK's DMS are used in four primary application areas: Accounting, F&I Sales, Parts, and Service. The login credentials that dealerships create for their employees can be configured to have general access to all four functions or just certain of them. Login credentials can also be configured to run reports, data queries, and writeback commands using what is known as an English Statement processor ("ENG"). Upon information and belief, the login credentials that the Dealership Counter-Defendants have provided to third-party data extractors like Authenticom to gain automated access to CDK's DMS are configured for ENG functionality and often have general access to most or all application areas.

**ANSWER:**     Dealership Counter-Defendants admit that the login credentials that dealerships

create for their employees can be configured to provide access to some or all of the functions of

the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a

belief as to the truth of the remaining allegations in paragraph 39 of the Counterclaims that relate

to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

Dealership Counter-Defendants deny the remaining allegations of paragraph 39 of the

Counterclaims.

40.     CDK has implemented security features in addition to password protection. In early 2016, CDK created a login prompt (image of screen prompt provided below) requiring users to certify that they were an "authorized dealer employee" before they could access CDK's DMS:



**ANSWER:**     Dealership Counter-Defendants admit that CDK has implemented various features

under the pretext of security, but Dealership Counter-Defendants deny that those features are

designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 40 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

41.     Further, in November 2017, CDK began introducing a CAPTCHA control for particular login credentials that CDK suspected were being used to facilitate unauthorized access to its DMS by third parties. Humans can easily pass CAPTCHA tests, but automated scripts—like the ones that Authenticom and other third party data extractors use—often encounter difficulty. Thus, CAPTCHA controls are specifically designed to prevent access to computers through automated means. CDK implemented the following CAPTCHA control:



**ANSWER:**     Dealership Counter-Defendants admit that CAPTCHA controls are typically designed to prevent access to computers through automated means. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 41 of the Counterclaims that relate to individuals or entities

other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 41 of the Counterclaims.

42.     The CAPTCHA states that "[o]nly dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services. Machine/automated access . . . or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA then requires the user to identify a word or series of letters and numbers, as shown in the example above, to "confirm you are an authorized dealer employee" before allowing the user to login to the CDK DMS.

**ANSWER**:     Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 42 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

###     C.     The MSAs Between CDK and Dealership Counter-Defendants

43.     CDK has entered into a Master Service Agreement ("MSA") with each of the Dealership Counter-Defendants (collectively, the "MSAs"). The MSAs expressly prohibit the Dealership Counter-Defendants from allowing third-parties to access CDK's DMS.

**ANSWER**:     Paragraph 43 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants admit that they each entered into an MSA (that may include or incorporate additional documents) with CDK. Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 43 of the Counterclaims, as those MSAs speak for themselves.

44.     The MSA between CDK and its dealer customers prohibits those dealers from supplying DMS login credentials to third parties or otherwise granting third parties access to CDK's DMS: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this agreement." MSA § 6(D).

**ANSWER**:     Paragraph 44 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 44 of the Counterclaims, as those MSAs speak for themselves.

45.     In addition, each CDK dealer expressly agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any of the Services or Software,[4] or any portion thereof, to any third party" (*id.* § 6(B)); and that it will "treat as confidential and will not disclose or otherwise make available any of the [CDK] Products (including, without limitation, screen displays or user documentation) or any … proprietary data, information, or documentation related thereto … in any form, to any person other than employees and agents of [the dealer]…" (*id.* § 6(D)). Each dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 6(A).

**ANSWER:**     Paragraph 45 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the MSAs entered into between CDK and Dealership Counter-Defendants discussed in paragraph 45 of the Counterclaims, as those MSAs speak for themselves.

46.     Additionally, CDK's MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK] DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." *Id.* § 6(B).

**ANSWER:**     Paragraph 46 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the MSAs entered into between CDK and Dealership Counter-Defendants discussed in paragraph 46 of the Counterclaims, as those MSAs speak for themselves.

47.     Every version of CDK's standard MSA since at least 1994 has expressly stated that dealers are prohibited from permitting unauthorized third parties to access their licensed DMS. Further, the language quoted from Section 6 has remained substantially the same in every version of the MSA since approximately 2010.[5]

**ANSWER:**     Paragraph 47 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny

---

[4] In some of the Dealership Counter-Defendants' MSAs, ███████████████████
████████████████████████████████████████████████

[5] Later MSAs with other dealers include these confidentiality restrictions in Section 4, but each MSA applicable to the Dealer Counter-Defendants contains these provisions in Section 6.

CDK's characterization of the MSAs discussed in paragraph 47 of the Counterclaims, as those MSAs speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 47 of the Counterclaims and on that basis deny them.

48. Each of the Dealership Counter-Defendants has entered into an MSA with CDK containing these provisions.

**ANSWER:** Dealership Counter-Defendants admit that each of the Dealership Counter-Defendants has entered into an MSA with CDK (that may include or incorporate additional documents). Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 48 of the Counterclaims, as those agreements speak for themselves.

49. As discussed above, CDK's MSAs prohibit the Dealership Counter-Defendants from providing access to the CDK DMS "to any person other than employees *and agents* of [the dealer] with a need-to-know." Third party hostile data extractors like Authenticom are not "agents" of the Dealership Counter-Defendants. Indeed, Authenticom's own contract with dealers makes clear that Authenticom is not the dealer's "agent," and in fact refers to "agents" of the dealer repeatedly as third parties to the agreement. Pl. P.I. Ex. 28 (*Authenticom* Dkt. 65-3) §§ 1.12, 3.2, 8.1, 10.4. Similarly, the standard End-User License Agreement ("EULA") offered by Superior Integrated Solutions, another third party data extractor, states that "[t]he parties shall be independent contractors under this Agreement, and nothing herein will constitute either party as the employer, employee, *agent* or representative of the other party, or both parties as joint ventures or partners for any purpose." EULA § 10.6 (emphasis added).[6]

**ANSWER:** Paragraph 49 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that third-party data extractors like Authenticom are not "agents" of the Dealership Counter-Defendants. Dealership Counter-Defendants deny CDK's characterization of the provisions of the MSAs discussed in paragraph 49 of the Counterclaims, as those MSAs speak for themselves. Dealership Counter-Defendants further deny CDK's characterization of the provisions of the agreements between Authenticom and dealers discussed in paragraph 49 of the Counterclaims, as

---

[6] https://superiorintegratedsolutions.com/eula_licensing-agreementnew.pdf (visited February 22, 2019).

those agreements speak for themselves. Dealership Counter-Defendants further deny CDK's characterization of the provisions of the standard End-User License Agreement ("EULA") offered by Superior Integrated Solutions discussed in paragraph 49 of the Counterclaims, as those provisions speak for themselves.

50.     Moreover, even if an "agent" exception existed (and it does not), the MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM." MSA § 6(B).

**ANSWER:** Paragraph 50 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that an "agency" exception does not exist. Dealership Counter-Defendants further deny CDK's characterization of the MSAs discussed in paragraph 50 of the Counterclaims, as those MSAs speak for themselves.

### D.     CDK's 3PA Program

51.     Introduced by CDK in 2000, the third party access program, or "3PA,"[7] is a CDK DMS interface that currently provides managed, bi-directional integration between software applications (sometimes referred to as "layered applications" or "layered apps") and CDK's DMS. By way of example, the third-party marketing website TrueCar generates sales leads on behalf of dealerships. TrueCar integrates with CDK's DMS through the 3PA program to access sales transaction data, which it uses to validate vehicle sales based on TrueCar leads. This is one example of hundreds of third-party applications that use CDK's 3PA program.

**ANSWER:** Dealership Counter-Defendants admit that the 3PA program was introduced by CDK in or around 2000, and Dealership Counter-Defendants admit that the 3PA program provides data integration between software applications and CDK dealers' DMSs. Dealership Counter-Defendants further admit that the third-party marketing website TrueCar generates sales leads on behalf of dealerships. Dealership Counter-Defendants further admit that many third-party applications use CDK's 3PA program. Dealership Counter-Defendants lack sufficient

---

[7] Today, the 3PA program is now known as the CDK Global Partner Program. For the Court's convenience, however, these counterclaims refer to CDK's third-party access program as the "3PA" program notwithstanding the name change.

knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 51 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 51 of the Counterclaims.

52. CDK has implemented technical and contractual restrictions to prevent unauthorized access to material that is protected by applicable law, including federal copyright law, within its DMS. As discussed above, CDK places access restrictions on its DMS, including secure login credentials and CAPTCHA controls. Additionally, CDK limits each third party's access to the categories of data and permissions the third party needs for the applications it provides. CDK also audits third-party integration, including which data elements in the DMS are being accessed by each 3PA program participant and how frequently they are being accessed.

**ANSWER:** Paragraph 52 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants admit that CDK has implemented restrictions to prevent access to data that is stored within CDK dealers' DMSs. Dealership Counter-Defendants deny that the restrictions implemented by CDK are designed to prevent unauthorized access to material that is protected by applicable law; instead, restrictions are designed to further CDK's anticompetitive purposes. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 52 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 52 of the Counterclaims.

53. Each vendor participating in the 3PA program enters into a written agreement with CDK, which grants the vendor a limited, non-transferrable license to use the CDK Interface System to access, send, and/or receive certain data on the DMS solely for the purpose of providing specific application services to CDK dealers. These applications are described in detailed Statements of Work ("SOWs") that accompany the vendor's 3PA contract with CDK. From the inception of the 3PA program, CDK's standard 3PA contracts have strictly prohibited the unauthorized syndication (*i.e.*, the further transfer or sale) of any data obtained through the 3PA program to third parties and have required 3PA program participants to use the data only in connection with providing the specific application services identified in their SOWs. These restrictions are designed to ensure that 3PA program participants are the end user of the data they

access and their access is limited to what is necessary to support the applications that they have certified in the 3PA program.

**ANSWER**: Paragraph 53 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the written agreements, SOWs, and "standard 3PA contracts" discussed in paragraph 53 of the Counterclaims; Dealership Counter-Defendants state that the written agreements, SOWs, and "standard 3PA contracts" discussed in paragraph 53 of the Counterclaims speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 53 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 53 of the Counterclaims.

## 1. 3PA Certification Requirements

54. The 3PA certification process consists of four phases: Orientation and Planning; Development; Certification; and finally, Deployment. During the Orientation and Planning stage, CDK works with third-party application vendors to determine their integration requirements, including the scope, workflows, frequency of access, and required data elements. CDK then proposes (and the parties agree to) an integration plan, which includes specifications for predefined integration points ("PIPs") and other details of the integration. In the Development stage, the vendor builds the components of its application that will interface with CDK's DMS. The vendor's requested integrations are then configured and rigorously tested in a special staging environment using a "test" dealer linked to a set of accounts on a server that contain sample data. Vendors are expected to implement logging into their integration framework, including the complete request and response for each data extraction, writeback command, etc. Logging is used to both troubleshoot any issues created by the interface and validate the precise data elements that are being copied from and/or written back to the CDK DMS. At the Certification stage, these results are verified and a final version of the software that the vendor plans to deploy is tested once again. Only after these steps are successfully completed does the application enter Deployment, when the application's interface is actually released into the ecosystem. Each step is designed by CDK to protect the security, integrity, and performance of its DMS.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 54 of the Counterclaims on that basis deny them.

55.    Each third party certified under 3PA enters into a written agreement with CDK, including a Statement of Work that describes the integration (including the specific "PIPs") called for by the integration plan. In addition, among other things, the agreement obligates the vendor to access CDK's DMS only through CDK's approved interface. The vendor also agrees to work with CDK on an ongoing basis to ensure that the integration remains healthy as both CDK's DMS and the third party's software evolves. The agreement imposes liability on the vendor for misuse of the system or the data and requires the vendor to obtain written consent from the dealer before accessing its licensed DMS and to refrain from re-syndicating the data to unapproved third parties. Further, the agreement indemnifies CDK for the vendor's failure to comply with data collection, privacy, and other applicable laws and regulations.

**ANSWER:**    Paragraph 55 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the written agreements discussed in paragraph 55 of the Counterclaims, as those agreements speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 55 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 55 of the Counterclaims.

56.    CDK charges third-party participants in the 3PA program fees for the integration services it provides. These fees allow CDK to recoup its investment in both the 3PA program and the DMS itself and compensate CDK for the value of its services and the intellectual property that makes secure data integration with CDK's DMS possible.

**ANSWER:**    Dealership Counter-Defendants admit that CDK charges participants in the 3PA program integration fees. Dealership Counter-Defendants deny that such fees are necessary to recoup investment costs or to compensate CDK for the value of its services and intellectual property. Dealership Counter-Defendants further deny that CDK's 3PA program provides "secure data integration".

### 2. Alternatives to 3PA

57.     While many dealers and vendors exchange data through the 3PA program, it is not the only way that data residing on CDK's DMS can be exchanged. CDK's flagship DMS product, Drive, includes several reporting tools that dealers can use to compile and export their operational data, which they can use or distribute to third parties—including third-party application providers and entities like Authenticom. Some of these are the same reporting tools that unauthorized third parties use when they access the DMS using dealer-issued login credentials—the difference being that when a dealer uses those tools, the actual dealership employee running the reports does not call them up hundreds or thousands of times throughout the day and night to constantly query data. Additional reporting tools are also available to Drive users on an add-on basis.

**ANSWER:**     Dealership Counter-Defendants admit that CDK's DMS includes multiple reporting tools. Dealership Counter-Defendants admit that some third parties use some of those tools when retrieving dealer data at the dealers' request, including using dealer-issued login credentials, and with the dealers' authorization. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 57 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 57 of the Counterclaims.

58.     CDK dealers can and do use these reporting tools to share data with third-party vendors, often instead of having those vendors access CDK's DMS through the 3PA program. This approach is not only viable; it is specifically approved by the National Auto Dealers Association ("NADA"), which published a set of data security guidelines for dealers in 2014 suggesting that dealers should "consider implementing a strict data 'push' system for sharing data." Defs. P.I. Ex. 16 (Authenticom Dkt. 106-16).

**ANSWER:**     Dealership Counter-Defendants admit that some dealers have used the reporting tools described in paragraph 58 of the Counterclaims to share data with third-party vendors. Dealership Counter-Defendants deny that this approach is a "viable" alternative to automated data integration. Dealership Counter-Defendants deny CDK's interpretation of the NADA "data security guidelines" document cited in paragraph 58 of the Counterclaims, as it speaks for itself. DCDs deny the remaining allegations in paragraph 58 of the Counterclaims.

59.     Upon information and belief, several CDK dealers elect to "push" data to Authenticom and other third party data extractors that they obtain themselves from the CDK DMS using the reporting tools described above. Authenticom, and upon information and belief the other extractors, accept data from dealers in this manner.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 59 of the Counterclaims and on that basis

deny them.

60.     In addition, other DMS providers permit third-party access to their systems (including by Authenticom) outside of a certification program and/or without requiring those third parties to pay integration fees. If some dealers prefer that system, they are free to switch DMS providers. Some dealers have switched; many others have stayed or switched to CDK since it began taking steps to prevent unauthorized third-party access to its DMS. Indeed, Dealership MDL Plaintiff Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota terminated its contract with CDK and switched to another DMS provider, DealerBuilt, in or around August 2018.

**ANSWER:**     Paragraph 60 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants admit

that other (non-CDK) DMS providers permit third-party access to their systems, as CDK itself

did prior to colluding with Reynolds. Dealership Plaintiff Kenny Thomas Enterprises, Inc. d/b/a

Olathe Toyota admits that it terminated its contract with CDK and switched to another DMS

provider, DealerBuilt, in or around August 2018. Dealership Counter-Defendants deny that

dealers are "free" to switch DMS providers; on the contrary, dealers face significant barriers to

switching. Dealership Counter-Defendants lack sufficient knowledge or information to form a

belief as to the truth of the remaining allegations in paragraph 60 of the Counterclaims that relate

to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

Dealership Counter-Defendants deny the remaining allegations of paragraph 60 of the

Counterclaims.

### E.     Hostile Access to CDK's DMS

#### 1.     Hostile Data Extractors

61.     With Dealership Counter-Defendants' active assistance and encouragement, third parties have, without CDK's authorization and without paying any compensation to CDK, repeatedly accessed CDK's DMS using dealer-provided login credentials to extract data and then re-sell it to third party application providers.

**ANSWER:**     Paragraph 61 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 61 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 61 of the Counterclaims.

62.     Among the most egregious hostile third party data extractors is Authenticom. Authenticom refers to itself as a "dealer data integration provider," *Authenticom* Compl. ¶ 2 (*Authenticom* Dkt. 1), but that is a fiction. Authenticom admits that it offers "no *actual* 'integration'" with CDK's DMS "in the traditional sense," only "data access." *Id.* ¶ 54 n.4 (emphasis added).

**ANSWER:**     Dealership Counter-Defendants deny CDK's characterization of paragraphs 2 and 54 n.4 of Authenticom's complaint, as that document speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 62 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 62 of the Counterclaims.

63.     Authenticom is a free rider. Its business model revolves around gaining free access to DMSs (including CDK's DMS), extracting and exporting the data from those DMSs, often copying it into its own system, and then selling the data to third parties—principally vendors that provide software applications to support the dealers' operations.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 63 of the Counterclaims on that basis deny them.

64.    Authenticom does not engage in these bad acts on its own. To the contrary, it actively seeks out assistance from "████████████████████"[8] who supply Authenticom with DMS login credentials—in clear violation of the dealer's contract with CDK—and install Authenticom's software scripts and programs on the dealer's own computers. These scripts and programs not only allow Authenticom to access CDK's DMS at will, but have also been used to automatically re-enable Authenticom's dealer-provided login credentials minutes after CDK has disabled them after detecting Authenticom's unauthorized access. As detailed below, each Dealership Counter-Defendant was a "████" CDK dealer who engaged in unlawful conduct to assist Authenticom and other hostile third-party vendors.

**ANSWER:**    Paragraph 64 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of dealers' contracts with CDK discussed in paragraph 64 of the Counterclaims, as those agreements speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 64 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 64 of the Counterclaims.

65.    Once Authenticom has collected data from CDK's DMS by its unauthorized and unlawful methods, it often exports the data to its own mirrored database known as "DealerVault." From there, Authenticom sells access to the data—precisely what it takes from CDK for free—to other third-party vendors, all with the dealers' active encouragement and "authorization."

**ANSWER:**    Paragraph 65 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 65 of the Counterclaims and on that basis deny them.

66.    

---

[8] Ex. 1, AUTH_00058562.
[9] Ex. 2, AUTH_00109383.

**ANSWER:** Dealership Counter-Defendants deny CDK's characterization of AUTH_00109383 in paragraph 66 of the Counterclaims, as that document speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 66 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

67.     When Authenticom accesses CDK's DMS using dealer-issued login credentials from a computer running on the dealer's network, Authenticom's CEO Steve Cottrell admits that the intent is to "emulate" an ordinary dealership employee (whose access would be permitted under the dealer's MSA). 06/26/2017 Tr. (*Authenticom* Dkt. 164) 1-A-108:15-19.

**ANSWER:** Dealership Counter-Defendants deny CDK's characterization of the testimony of Steve Cottrell cited in paragraph 67 of the Counterclaims, as that testimony speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 67 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

68.     Despite these and other efforts to evade detection, the repetitive queries run by Authenticom's and other third parties' scripts create a distinct usage pattern. And often, the dealer-created login credentials that Authenticom or other third parties use are themselves identifying, *e.g.*, "authcom," "dlrvault," and "acom." By identifying usage patterns and login credentials linked to particular hostile third parties, CDK does its best to track, monitor, and attempt to mitigate the adverse effects of this unauthorized access to its systems.

**ANSWER:** Paragraph 68 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 68 of the Counterclaims and on that basis deny them.

69.     Other third parties besides Authenticom engage in similar illegal conduct on behalf of dealers, including the Dealership Counter-Defendants. For example, as further detailed

below, certain of the Dealership Counter-Defendants have facilitated hostile access by third party Dealertrack (another Plaintiff in this MDL) in violation of each dealer's MSA. Dealertrack provides a number of third party applications and, in connection with those applications, has used dealer-issued login credentials to gain unauthorized access to CDK's DMS. Dealertrack repeatedly accesses CDK's DMS and queries the CDK DMS in large volumes. For example, between ███████████████████████████, a login credential provided by the Continental Counter-Defendants for use by Dealertrack accessed files in CDK's DMS at least ███ times, or over ██ times per day on average.

**ANSWER:**    Paragraph 69 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants admit that Dealertrack provides a number of third party applications. Dealership Counter-Defendants deny that they have engaged in any illegal conduct, and Dealership Counter-Defendants deny that any third parties have engaged in illegal conduct "on behalf of" Dealership Counter-Defendants. Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 69 of the Counterclaims, as those MSAs speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 69 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations in paragraph 69 of the Counterclaims.

### 2.    Misappropriation of Proprietary Information

70.    Each and every time that an unauthorized or "hostile" third party like Authenticom accesses CDK's DMS using dealer-provided login credentials, that third party uses valuable pieces of CDK's intellectual property, including patented technologies and original software elements and programs. For example, as confirmed by sworn witness testimony, Authenticom has illegally obtained copies of CDK's DMS software and loaded that software onto Authenticom's own computers and servers. Former Authenticom software engineer ███████ testified ████████

**ANSWER:** Paragraph 70 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the testimony and document discussed in paragraph 70 of the Counterclaims, as that testimony and document speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 70 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

71. Further, each and every time that Authenticom accesses the CDK DMS, it creates a copy of portions of the DMS program code in the computer's Random Access Memory, as well as copies of the original and distinctive page layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience. On information and belief, other unauthorized third party data extractors accomplish the same result.

**ANSWER:** Paragraph 71 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 71 of the Counterclaims and on that basis deny them.

72. In addition, queries by third-party data extractors regularly access files containing proprietary information that belongs to neither the third-party data extractor nor the dealers it purports to serve. For example, Authenticom's queries regularly access certain files—called the "PARTS," "OP-CODES," and "WIP-HISTORY" files—that are maintained in the CDK DMS. Each of these files contains OEM proprietary data, such as part costs and pricing information and service labor rates. As noted above, under the terms of its agreements with the OEMs, CDK is contractually restricted from sharing this data with unlicensed third parties.

**ANSWER:** Paragraph 72 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the agreements between CDK and unspecified OEMs discussed in

---

[10] Ex. 3, AUTH_00153602.

paragraph 72 of the Counterclaims, as those agreements speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 72 of the Counterclaims that relate to individuals or entities other than Dealership Counter-Defendants and on that basis deny them.

73.     Authenticom's unauthorized access to these files is rampant. For example, an investigation performed by CDK in June 2017 showed that in just the preceding 30 days, Authenticom ran queries ███████████████████████████████████████████████████████

**ANSWER:**     Paragraph 73 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 73 of the Counterclaims and on that basis deny them.

74.     Even when Authenticom does not access proprietary data directly, it often accesses and copies data that were created using CDK and third-party proprietary forms and functions within the DMS. For example, dealers use CDK's proprietary programs to calculate the expected monthly payment for a financed car deal based on inputs like the sale price, the customer's down payment, and the term. All four data elements in this example—including the monthly payment calculated using CDK's proprietary dataset—are stored in the DMS files that Authenticom can, using dealer login credentials, access, scrape, and copy into its mirrored DealerVault database.

**ANSWER:**     Paragraph 74 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that a car payment calculator is proprietary. Dealership Counter-Defendants otherwise lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 74 of the Counterclaims and on that basis deny them.

75.     Access by other unauthorized third parties, including Dealertrack, poses similar risks to CDK's DMS. As noted above, Dealertrack accessed CDK's DMS over ███ times using a single login credential provided by the Continental Counter-Defendants and accessed data from the DMS. Further, between ████████████████, Dealertrack used a username provided by Waconia Dodge to run ENG queries in CDK's DMS ███ times to pull data from the DMS, or approximately ███ times per day. Further examples of Dealertrack's unauthorized access, enabled by the Dealership Counter-Defendants, are discussed below.

34

**ANSWER:**     Paragraph 75 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 75 of the Counterclaims and on that basis deny them. Dealership Counter-Defendants deny the remaining allegations of paragraph 75 of the Counterclaims.

### 3.     Burdens on System Performance

76.     Unauthorized, automated methods of accessing and extracting data like those used by Authenticom place considerably more strain on CDK's DMS than approved third-party access through the 3PA interface or the ordinary dealership employees for whom access was designed, degrading system performance and consuming valuable computing resources.

**ANSWER:**     Paragraph 76 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 76 of the Counterclaims and on that basis deny them.

77.     Third-party application providers often seek to replicate a narrow subset of data in the CDK DMS in their own databases. For example, a vendor offering a service appointment scheduling application may need to maintain up-to-date sets of service and repair order data from the DMS for each dealer it serves. This normally requires priming the vendor's database with a full dataset once, when the vendor begins providing services, and then updating the vendor's dataset with changes on an ongoing basis. In the 3PA program, vendors work with CDK to develop efficient data queries that retrieve only new data, cutting down on extraction of duplicative records and conserving computing resources. Nearly half of the third-party data extractions that occur through the 3PA interface are minimized in this manner.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 77 of the Counterclaims and on that basis deny them.

78.     Third-party data extractors, however, do not update datasets with only the new data that they need to stay current. Instead, they often pull a complete set of data every time they access CDK's DMS, and run queries constantly in an attempt to mimic the *bona fide* integration available to vendors through the 3PA program. Authenticom repeats this process throughout the day for hundreds of dealers, adding to the cost of the computing services that CDK must provide to each of them. In one instance, CDK observed that Authenticom's scripts hit a single CDK

server with ███ large data pulls in a single day. On information and belief, other unauthorized third parties similarly pull massive datasets in a manner that overburdens CDK's system.

**ANSWER:**     Paragraph 78 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants lack

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 78 of the Counterclaims and on that basis deny them.

79.     Among the many guidelines and requirements of the 3PA program, vendors are restricted in most cases from performing bulk extraction queries between 5:00 a.m. and 10:00 p.m. The purpose of this restriction is to minimize system burden and performance degradation caused by third-party access during dealership business hours. These restrictions cannot be enforced against unauthorized third-party data extractors. Authenticom, for example, ███ ███████████████████████████████████████████████████

**ANSWER:**     Paragraph 79 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants lack

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 79 of the Counterclaims and on that basis deny them.

80.     Investigations of Authenticom's data extraction methods also show that Authenticom burdens CDK's systems with poorly-constructed, inefficient and repetitive queries that extract too much data, too frequently, and during peak dealer business hours. For example, CDK has found ████████████████████████████ In addition, CDK's analyses have shown that Authenticom is ████████████████████████████████████████████████████████████

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 80 of the Counterclaims and on that basis

deny them.

81.     One of the reasons that CDK includes a contractual restriction on dealers' enabling of third party access to CDK's system is so that CDK can control and monitor who has access to its system to ensure that access does not degrade the DMS's performance. But because Authenticom and other unauthorized third parties essentially hack into the CDK DMS outside the 3PA interface and use automated methods to extract data through decentralized interfaces that were designed for manual use by dealership employees, CDK effectively has no control over

the queries that these third parties run or how frequently those queries are run. CDK then struggles to manage the strain on system resources and mitigate any performance issues that result.

**ANSWER:**     Paragraph 81 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants deny

CDK's characterizations of the purported "contractual restrictions" discussed in paragraph 81 of

the Counterclaims, as those contractual provisions speak for themselves. Dealership Counter-

Defendants lack sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 81 of the Counterclaims – including CDK's alleged "reasons"

for the inclusion of any provisions in the contracts between CDK and dealers – and on that basis

deny them.

82.     The burdens on CDK's DMS that result from unauthorized third party access and querying are real and measurable. For example, in some instances, Authenticom accesses more than ▮ times the number of records that a vendor would access if it were to obtain a comparable dataset using CDK's managed 3PA interface. Authenticom's inefficient and poorly constructed queries ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ than comparable queries executed through the 3PA interface. At times, for at least some dealers, Authenticom's constant querying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On information and belief, querying by other unauthorized third parties has similar effects. For example, the repetitive and voluminous data queries by Dealertrack discussed above affect CDK's DMS in a similar way to such queries by Authenticom.

**ANSWER:**     Paragraph 82 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants lack

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 82 of the Counterclaims and on that basis deny them.

### 4.     Data Corruption Risks

83.     An internal report prepared in 2013 by CDK's former parent company Automatic Data Processing, Inc. ("ADP") found that *all* of the more than 2,900 CDK DMS servers examined had some level of data corruption issues, many of which were attributable to "hostile," unauthorized access to the DMS similar to Authenticom's methods of access.

**ANSWER:** Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to allegations concerning the findings and accuracy of the report discussed in paragraph 83 of the Counterclaims and on that basis deny them.

84. Moreover, in addition to extracting data from CDK's DMS, third party data extractors also attempt to write back altered data to the DMS. *See, e.g.*, *Authenticom* Compl. ¶¶ 50, 54-55 & n.4, 77-80 (Authenticom seeks not only to "pull," "extract" and "scrape" data from CDK's DMS; but also to "push data back into the database" in altered form).

**ANSWER:** Dealership Counter-Defendants deny CDK's characterization of the *Authenticom* complaint discussed in paragraph 84 of the Counterclaims, as that complaint speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 84 of the Counterclaims and on that basis deny them.

85. Unauthorized "writeback" activity creates a high risk of introducing data errors and undermining the integrity of CDK's DMS. CDK has formatting requirements called "business rules" for data fields in the DMS's various databases, which govern precisely how applications should input data. When unauthorized third-parties attempt writeback functions, they often apply business rules incorrectly (or not at all) and cause data entry errors—which CDK is then forced to fix. While a manual error by a dealership employee can be a minor annoyance, a series of errors by automated systems—such as the scripts that Authenticom and other unauthorized third parties run on CDK's DMS—can rapidly propagate across an entire dataset, causing major disruption or denial of service. CDK can effectively address these risks for third-party application providers who access writeback functionality through the 3PA program through technical evaluations of the provider's applications and extensive testing during the certification process. Pre-certification testing and evaluation also ensures that the application is not adversely affecting performance of the DMS. These sort of protections do not exist for unauthorized, automated access using dealer-issued login credentials. Accordingly, by providing login credentials to third parties like Authenticom, the Dealer Counter-Defendants knowingly enable conduct that risks the integrity of CDK's DMS.

**ANSWER:** Paragraph 85 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that they have ever knowingly enabled conduct that risks the integrity of CDK's DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 85 of the Counterclaims and on that basis deny them.

### 5. Data Security Risks

86.     Unauthorized third party access to CDK's DMS is significantly less secure than the 3PA managed interface that CDK requires third-party vendors to use.

**ANSWER:**     Paragraph 86 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants deny the

allegations in paragraph 86 of the Counterclaims.

87.     As described above, 3PA participants access the CDK DMS through PIPs, which act as an intermediary between the participant's application and the actual DMS. Before allowing any data to be transferred in or out of the DMS, the application must pass rigorous authentication protocols initiated by the PIP. The authentication token that each application uses is transmitted through a secured communication channel. By contrast, Authenticom uses dealer-issued login credentials that it often obtains through unsecured channels, including unencrypted, plain-text email. This exposes the credentials—and by extension, CDK's DMS—to the risk of interception or compromise and violates widely accepted cybersecurity practices.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 87 of the Counterclaims and on that basis

deny them.

88.     In addition, CDK's investigation to date has revealed that █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 88 of the Counterclaims and on that basis

deny them.

89.     Authenticom's use of dealer-issued login credentials is particularly concerning because Authenticom implemented a software tool called Profile Manager, as it bragged to one CDK dealer, that automatically re-enables any disabled user IDs "every hour." Defs. P.I. Ex. 41 (*Authenticom* Dkt. 106-48). This software was run by a system administrator-level account at the dealership—the highest level of user access permitted for CDK's DMS, usually limited to one or two trusted employees at each dealership. Upon information and belief, the software used an "update user profile" ("UUP") function to constantly re-enable certain dealer login credentials that CDK had disabled. Further, while the UUP function is used to create and maintain user

profiles within the DMS, it also defines the access granted to each user profile. Using the UUP function, Authenticom could do virtually anything, *e.g.*, it could create more login credentials for itself, with each granted the highest available access to restricted files and functions within the DMS.

**ANSWER:** Dealership Counter-Defendants deny CDK's characterization of *Authenticom* Dkt. 106-48 discussed in paragraph 89 of the Counterclaims, as that document speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 89 of the Counterclaims and on that basis deny them.

90.     Unauthorized access by third parties like Authenticom also violates the tenet of data minimization, i.e., that each user of a secured system should receive no greater access or privileges than necessary. The 3PA interface abides by this principle and strictly controls each participant's access at a granular level, to only the specific categories of data needed for that party's approved purposes. By contrast, Authenticom claims that "[a]s a matter of practice," it accesses and scrapes data from all primary directories in the CDK DMS for every dealer: sales, service, inventory, customers, and parts. Cottrell Reply Decl. (*Authenticom* Dkt. 143) ¶¶ 3, 13. What this means, and what CDK's investigation indicates, is that Authenticom's login credentials regularly have access to (and often, are constantly querying) all application areas in CDK's DMS, regardless of whether the purported end users—the application providers— actually need or have even asked for such access. Other hostile third-party data extractors engage in similar practices.

**ANSWER:** Paragraph 90 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the portions of the Cottrell Reply Declaration discussed in paragraph 90, as that document speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 90 of the Counterclaims and on that basis deny them.

**F.     Attempts to Evade CDK's Security Measures**

91.     In June 2015, CDK announced a multipart strategy called "SecurityFirst," one aspect of which was an initiative by the company to remove third-party code installed on its DMS and eliminate unauthorized third-party access, including through the use of dealer-issued login credentials. When SecurityFirst was announced, over 52% of CDK's DMS servers were

infected with "hostile" code and 27,000 login credentials were being used by unauthorized third parties.

**ANSWER:**  Dealership Counter-Defendants admit that, in June 2015, CDK announced a strategy that it marketed as "SecurityFirst". Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 91 of the Counterclaims and on that basis deny them.

92.  CDK's SecurityFirst announcement was well publicized within the industry. Upon information and belief, the Dealership Counter-Defendants became aware that CDK objected to unauthorized access to the CDK DMS by third parties like Authenticom no later than when CDK announced SecurityFirst in June 2015, and in all likelihood, much earlier.

**ANSWER:**  Paragraph 92 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that they became aware that CDK allegedly objected to access to the CDK DMS by third parties like Authenticom during or before June 2015. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 92 of the Counterclaims and on that basis deny them.

93.  CDK also directly notified its dealer customers that hostile third party access to its DMS was not authorized and was in violation of the MSA. For example, on August 22, 2016, CDK sent a letter to those dealers who had ███████████████████████████████████████████████████████████████████████████, and, on information and belief, so did the other Dealership Counter-Defendants who had been identified as enabling unauthorized access to the CDK's DMS at the time.[11]

**ANSWER:**  Paragraph 93 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny CDK's characterization of the MSAs discussed in paragraph 93 of the Counterclaims, as those MSAs speak for themselves. Dealership Counter-Defendants deny that any Dealership Counter-Defendant ever violated any MSA between that Dealership Counter-Defendant and CDK.

---

[11] Ex. 4, BAYSTATE0001499; Ex 5, STEVENS0005244; Ex. 6, CHERRY_HILL0000574.

Counter-Defendants Baystate Ford, the Stevens Counter-Defendants, and Cherry Hill admit that

on or around August 22, 2016, they received an email from CDK containing a letter, the contents

of which speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in paragraph 93 of the

Counterclaims and on that basis deny them.

94.     In 2016, CDK began implementing security measures to prevent unauthorized access to its DMS by Authenticom and other unauthorized third-party vendors and data extractors. These measures have included the login prompt and CAPTCHA control described above, as well as the disabling of DMS login credentials based on characteristics, including usage patterns, that strongly indicate automated (and unauthorized) third-party access. The Dealership Counter-Defendants, working in concert with Authenticom and other unapproved third parties, have actively worked to evade and circumvent these security measures, often succeeding.

**ANSWER:**     Paragraph 94 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants admit

that in or around 2016, CDK implemented measures to prevent Authenticom and other third-

party vendors and data extractors from accessing the CDK DMS under the pretext of improved

security, but Dealership Counter-Defendants deny that those measures are designed to, or serve

to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-

Defendants deny that they ever "actively worked to evade and circumvent" the purported

"security measures" discussed in paragraph 94 of the Counterclaims. Dealership Counter-

Defendants lack sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 94 of the Counterclaims and on that basis deny them.

95.     For example, in June 2016 when Authenticom encountered the CDK prompt requiring that it certify that it was a dealer employee to access CDK's DMS, ███████████

███████ ██ "[12] Within a day, Authenticom's █████████████████████████ reported

---

[12] Ex. 7, AUTH_00197197.

42

that Authenticom had ████████████████████████████████████
████████████████████████████.[13]

**ANSWER:**     Dealership Counter-Defendants deny CDK's characterization of the documents

discussed in paragraph 95 of the Counterclaims, as those documents speak for themselves.

Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to

the truth of the remaining allegations in paragraph 95 of the Counterclaims and on that basis

deny them.

96.     A few months later, in August 2016, CDK implemented a security measure to
disable numerous login credentials that Authenticom was using to perpetrate its unauthorized
data scraping. In response, ████████████████████████████████████
████████████████████████████████████████████████████



**ANSWER:**     Paragraph 96 of the Counterclaims states legal conclusions to which no answer is

required. To the extent that an answer may be required, Dealership Counter-Defendants admit

that in or around 2016, CDK implemented measures to prevent Authenticom and other third-

party vendors and data extractors from accessing the CDK DMS under the pretext of improved

---

[13] Ex. 8, AUTH_00197253.

security, but Dealership Counter-Defendants deny that those measures are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ however, Dealership

Counter-Defendants ███████████████████████████████████████████████████

████████ Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 96 of the Counterclaims and on that basis deny them.

97.    Upon information and belief, Authenticom sent hundreds, if not thousands, of these emails, including to the Dealership Counter-Defendants.

**ANSWER:**    Dealership Counter-Defendants admit that at least one Dealership Counter-Defendant received an email sent by Authenticom that is similar to the email pictured in paragraph 96 of the Counterclaims. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 97 of the Counterclaims and on that basis deny them.

98.    Some CDK dealers have refused to engage in these unsafe practices.



[14]

---
[14] Ex. 9, AUTH_00200499.

**ANSWER:** Dealership Counter-Defendants deny CDK's characterization of AUTH_00200499 in paragraph 98 of the Counterclaims, as that document speaks for itself. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 98 of the Counterclaims and on that basis deny them.

99. ███████████████████████████████████████████████████████ [15] Nonetheless, Authenticom continued to solicit CDK DMS login credentials from dealers over plain-text, unencrypted email. For example, over a year later, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [16]

**ANSWER:** Dealership Counter-Defendants deny CDK's characterizations of AUTH_00200499 and CONTINENTAL0011245 in paragraph 99 of the Counterclaims, as those documents speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 99 of the Counterclaims and on that basis deny them.

100. When CDK began to disable the login credentials that Authenticom was using to access CDK's DMS, Authenticom deployed its Profile Manager tool, described above, which attempted to automatically re-enable them from a computer installed on the dealer's network. ████████████████████████████ [17] An Authenticom document ██████████████████████████████████████████████████████████████████████████████ [18]

**ANSWER:** Dealership Counter-Defendants deny CDK's characterizations of the Authenticom documents discussed in paragraph 100 of the Counterclaims, as those documents

---

[15] *Id.*

[16] Ex. 10, CONTINENTAL0011245.

[17] Ex. 11, AUTH_00206515.

[18] Ex. 12, AUTH_00146045.

speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 100 of the Counterclaims and on that basis deny them.

101. CDK's investigation to date shows that several Dealership Counter-Defendants are among the "███████" of dealers who have installed Authenticom's Profile Manager tool. For example, ███████████████████████████████████████████████████████████

**ANSWER:** Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 101 of the Counterclaims and on that basis deny them.

102. Additionally, beginning in approximately November 2017, CDK deployed the above-described CAPTCHA test to hundreds of specific login credentials associated with, among others, Authenticom in order to prevent their automated access to the CDK DMS. It worked, briefly. Authenticom was able to, and purposefully did, crack the CAPTCHA almost immediately and resumed its unauthorized access of CDK's DMS using computer-automated scripts. In doing so, Authenticom once again falsely certified to CDK that it was "an authorized dealer employee" in order to bypass a security measure specifically designed to keep it (and other unauthorized third parties) out of the system. Unauthorized third party Dealertrack has evaded CDK's CAPTCHA security controls in similar fashion. During the week of ██████ ███ alone, Dealertrack evaded CAPTCHA ████ times to successfully access CDK's system. CDK's efforts to prevent circumvention of its security measures are ongoing in the face of this kind of unauthorized third party access.

**ANSWER:** Paragraph 102 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 102 of the Counterclaims and on that basis deny them.

### G. Dealership Counter-Defendants' Repeated Breaches of their MSAs

103. Each Dealership Counter-Defendant has repeatedly violated the express contractual prohibitions in its MSA by actively facilitating hostile, unauthorized automated access to CDK's DMS by Authenticom and/or other unauthorized third parties, including Dealertrack.

**ANSWER:** Paragraph 103 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that they breached any contracts with CDK and deny that they violated the CFAA, the DMCA or any other statute.

### 1. The Continental Counter-Defendants

104. The Continental Counter-Defendants have repeatedly enabled unauthorized third-party access to CDK's DMS in violation of their MSA. For example, the Continental user ID "████" associated with Authenticom's DealerVault program, was used to successfully access files in CDK's DMS at least ████ times from ████ until CDK successfully disabled the account on or around ████

**ANSWER:** Paragraph 104 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants deny that they ever violated their MSAs with CDK. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 104 of the Counterclaims and on that basis deny them.

105. Between ████, a user ID (████) provided by the Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least ██ times. CDK successfully disabled that account on ████

**ANSWER:** Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 105 of the Counterclaims and on that basis deny them.

106. Between ████ a user ID (████) provided by the Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least ██ times. CDK successfully disabled that account on ████[19]

---

[19] The date that CDK disables an account can precede the last date of activity from that account within CDK's DMS if the account in question was signed into CDK's DMS when CDK first disabled the account but did not sign out of the account until later.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 106 of the Counterclaims and on that basis

deny them.

107.    Between ███████████████████████, a user ID (█████) provided by
the Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at
least ██████ times. CDK successfully disabled that account on ██████████████.

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 107 of the Counterclaims and on that basis

deny them.

108.    Between █████████████████, a user ID (███████) provided by the
Continental Counter-Defendants for use by Dealertrack accessed files in CDK's DMS at least
███████ times. CDK successfully disabled that account on █████████████ [20]

**ANSWER:**     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 108 of the Counterclaims and on that basis

deny them.

109.    Further, these login credentials were used to circumvent CDK's technological
security controls. Between ███████████████████████, the user ID from the
Continental Counter-Defendants called "███████" that Authenticom used to access CDK's DMS
confronted a CAPTCHA prompt at least █████ times, successfully evading CAPTCHA and
accessing CDK's DMS at least █████ times. The volume and nature of Authenticom's responses
to the CAPTCHA prompt suggest that Authenticom had enabled its automated script to respond
to the prompt in all or most of these occurrences. For instance, of the ██ times where the CDK
DMS presented a CAPTCHA prompt to the █████ user ID and the user did not successfully
respond to the CAPTCHA and obtain access to CDK's DMS, the user failed to provide any
response to the prompt ██ times. Such a pattern indicates that a computer script (as opposed to
an authorized, human employee of the Continental Counter-Defendants) was running in an
attempt to evade CDK's CAPTCHA.

**ANSWER:**     Paragraph 109 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Dealership Counter-Defendants admit

---

[20] ████████████████████████████████████████████████
██████████████████████████████████████████.

that CDK has deployed technological controls to prevent Authenticom and other third-party vendors and data extractors from accessing the CDK DMS under the pretext of improved security, but Dealership Counter-Defendants deny that CDK's technological controls are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 109 of the Counterclaims and on that basis deny them.

110. The Continental Counter-Defendants knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures. For example,

[21] Further,

[22]

**ANSWER:** Paragraph 110 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants deny that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Continental Counter-Defendants. The Continental Counter-Defendants further deny that the they knew that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Continental Counter-Defendants, and deny that they actively encouraged Authenticom to circumvent CDK's security measures. Dealership Counter-Defendants admit that CDK has deployed tactics to prevent Authenticom and other third-party vendors and data extractors from accessing the CDK DMS under the pretext of

---

[21] Ex. 13, CONTINENTAL0060014.
[22] Ex. 10, CONTINENTAL0011245.

improved security, but Dealership Counter-Defendants deny that such tactics are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. The Continental Counter-Defendants deny CDK's characterizations of CONTINENTAL0060014 and CONTINENTAL0011245, as those documents speak for themselves. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 110 of the Counterclaims and on that basis deny them.

### 2. The Warrensburg Counter-Defendants

111. The Warrensburg Counter-Defendants have repeatedly enabled unauthorized third-party access to CDK's DMS in violation of their MSA. For example,  Authenticom used at least ███ user IDs associated with the Warrensburg Counter-Defendants to access CDK's DMS. Authenticom used these login credentials to access files in CDK's DMS at least ██████ times between ████████████ ████████████.

**ANSWER:** Paragraph 111 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Warrensburg Counter-Defendants deny that they ever violated their MSAs with CDK. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 111 of the Counterclaims and on that basis deny them.

112. As soon as CDK disabled certain of these login credentials, new ones immediately popped up in their place. With one exception, the user IDs each start with ██████" which CDK has associated with Authenticom based on their usage patterns. CDK disabled the first account, "█████" on ███████████ The Warrensburg Counter-Defendants then promptly created "█████" which CDK disabled on ██████████████ The pattern continued until ██████," which CDK disabled on ███████████████.

**ANSWER:** Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 112 of the Counterclaims and on that basis deny them.

113. The Warrensburg Counter-Defendants similarly knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures. As described above, when CDK disabled

several of the login credentials that the Warrensburg Counter-Defendants had provided to Authenticom, the Warrensburg Counter-Defendants installed Authenticom's Profile Manager tool in an attempt to re-enable them, succeeding to at least some degree. ████████████

**ANSWER:** Paragraph 113 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Warrensburg Counter-Defendants deny that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Warrensburg Counter-Defendants. The Warrensburg Counter-Defendants further deny that they knew that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Warrensburg Counter-Defendants, and deny that they actively encouraged Authenticom to circumvent CDK's security measures. Dealership Counter-Defendants admit that CDK has taken measures to prevent Authenticom and other third-party vendors and data extractors from accessing the CDK DMS under the pretext of improved security, but Dealership Counter-Defendants deny that those measures are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 113 of the Counterclaims and on that basis deny them.

### 3. Cherry Hill

114. Counter-Defendant Cherry Hill has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

**ANSWER:** Paragraph 114 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Counter-Defendant Cherry Hill denies that it ever violated its MSA with CDK. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 114 of the Counterclaims and on that basis deny them.

115.    Between ███████████████████, a user ID (███████) provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ██ times. CDK successfully disabled that user ID on ███████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 115 of the Counterclaims and on that basis deny them.

116.    Between ███████████████████, a different user ID (███████) provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ██ times. CDK successfully disabled that user ID on ███████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 116 of the Counterclaims and on that basis deny them.

117.    Between █████████████, a third user ID (█████) provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on █████████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 117 of the Counterclaims and on that basis deny them.

118.    Between ██████████████, a user ID (███████) provided by Cherry Hill for use by an unauthorized third party associated with the entity "Dealer Rewards" accessed files in CDK's DMS at least ███ times. CDK successfully disabled that user ID on ████████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 118 of the Counterclaims and on that basis deny them.

119.    Cherry Hill knew that Authenticom's and Dealer Rewards' hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged them to circumvent CDK's security measures by continuing to provide them with login credentials once the credentials they were using had been disabled.

**ANSWER:**    Paragraph 119 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Cherry Hill denies that Authenticom's

and Dealer Rewards' access to the CDK DMS was unauthorized or in violation of the MSA

between CDK and Cherry Hill. Cherry Hill further denies that it knew that Authenticom's and

Dealer Rewards' access to the CDK DMS was unauthorized or in violation of the MSA between

CDK and Cherry Hill, and denies that it actively encouraged Authenticom or Dealer Rewards to

circumvent CDK's security measures. Dealership Counter-Defendants admit that CDK has taken

measures to prevent Authenticom and other third-party vendors and data extractors from

accessing the CDK DMS under the pretext of improved security, but Dealership Counter-

Defendants deny that those measures are designed to, or serve to, protect the security of CDK's

DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge

or information to form a belief as to the truth of the remaining allegations in paragraph 119 of the

Counterclaims and on that basis deny them.

### 4.    The Stevens Counter-Defendants

120.    The Stevens Counter-Defendants have repeatedly enabled unauthorized third-
party access to CDK's DMS in violation of their MSA.

**ANSWER:**    Paragraph 120 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, the Stevens Counter-Defendants deny

that they ever violated their MSA with CDK. All other Dealership Counter-Defendants lack

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 120 of the Counterclaims and on that basis deny them.

121.    Between ██████████████████████, a user ID (██████) provided by the
Stevens Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least
██████ times. CDK successfully disabled that user ID on ████████████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 121 of the Counterclaims and on that basis deny them.

122.    Between ███████████████████, a user ID (██████) provided by the Stevens Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ████████████.

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 122 of the Counterclaims and on that basis deny them.

123.    The Stevens Counter-Defendants knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures by continuing to provide Authenticom with login credentials once the credentials that it was using had been disabled.

**ANSWER:**    Paragraph 123 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Stevens Counter-Defendants deny that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Stevens Counter-Defendants. The Stevens Counter-Defendants further deny that they knew that Authenticom's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and the Stevens Counter-Defendants, and deny that they actively encouraged Authenticom to circumvent CDK's security measures. Dealership Counter-Defendants admit that CDK has taken measures to prevent Authenticom and other third-party vendors and data extractors from accessing the CDK DMS under the pretext of improved security, but Dealership Counter-Defendants deny that those measures are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 123 of the Counterclaims and on that basis deny them.

### 5. Waconia Dodge

124. Counter-Defendant Waconia Dodge has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

**ANSWER:** Paragraph 124 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Waconia Dodge denies that it ever violated its MSA with CDK. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 124 of the Counterclaims and on that basis deny them.

125. For example, between ██████████████████, a user ID (████████) provided by Waconia Dodge for use by hostile third party Dealertrack performed queries in CDK's DMS at least ████ times. CDK successfully disabled that username on ██████████.



**ANSWER:** Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 125 of the Counterclaims and on that basis deny them.

126. Waconia Dodge knew that Dealertrack's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Dealertrack to circumvent CDK's security measures by providing Dealertrack with login credentials.

**ANSWER:** Paragraph 126 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Waconia Dodge denies that Dealertrack's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and Waconia Dodge. Waconia Dodge further denies that it knew that Dealertrack's access to the CDK DMS was unauthorized or in violation of the MSA between CDK and Waconia Dodge, and denies that it actively encouraged Dealertrack to circumvent CDK's security measures. Dealership Counter-Defendants admit that CDK has taken measures to prevent Authenticom and other third-party vendors and data extractors from accessing the CDK DMS under the pretext of improved security, but Dealership Counter-Defendants deny that those

measures are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 126 of the Counterclaims and on that basis deny them.

### 6.    Baystate Ford

127.    Counter-Defendant Baystate Ford has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

**ANSWER:**    Paragraph 127 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Baystate Ford denies that it ever violated its MSA with CDK. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 127 of the Counterclaims and on that basis deny them.

128.    Between , a user ID ( ) provided by Baystate Ford for use by Authenticom queried CDK's DMS at least  times. CDK successfully disabled that user ID on  .

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 128 of the Counterclaims and on that basis deny them.

129.    Between , a user ID ( ) provided by Baystate Ford for use by Authenticom queried CDK's DMS at least  times. CDK disabled that user ID on  .

**ANSWER:**    Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 129 of the Counterclaims and on that basis deny them.

130.    Between , a user ID ( ) provided by Baystate Ford for use by an unauthorized third party associated with the entity "Aspen Marketing" accessed files in CDK's DMS at least  times. CDK successfully disabled that username on  .

**ANSWER**:     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 130 of the Counterclaims and on that basis

deny them.

131.     Between █████████████████████, a different user ID (█████)
provided by Baystate Ford for use by an unauthorized third party associated with the entity
"Aspen Marketing" accessed files in CDK's DMS at least ██ times. CDK successfully disabled
that username on ███████████████

**ANSWER**:     Dealership Counter-Defendants lack sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 131 of the Counterclaims and on that basis

deny them.

132.     Baystate Ford knew that Authenticom's and Aspen Marketing's hostile access to
CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged them to
circumvent CDK's security measures by continuing to provide them with DMS login credentials
once the credentials they were using had been disabled.

**ANSWER**:     Paragraph 132 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Baystate Ford denies that

Authenticom's or Aspen Marketing's access to the CDK DMS was unauthorized or in violation

of the MSA between CDK and Baystate Ford. Baystate Ford further denies that it knew that

Authenticom's or Aspen Marketing's access to the CDK DMS was unauthorized or in violation

of the MSA between CDK and Baystate Ford, and denies that it actively encouraged

Authenticom or Aspen Marketing to circumvent CDK's security measures. Dealership Counter-

Defendants admit that CDK has taken measures to prevent Authenticom and other third-party

vendors and data extractors from accessing the CDK DMS under the pretext of improved

security, but Dealership Counter-Defendants deny that those measures are designed to, or serve

to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-

Defendants lack sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 132 of the Counterclaims and on that basis deny them.

57

## FIRST COUNTERCLAIM FOR RELIEF
### (All Counter-Defendants – Breach of Contract)

133.    Paragraphs 1-132 above are incorporated herein by reference.

**ANSWER:**    Dealership Counter-Defendants incorporate, as if fully set forth herein, their

answers to the preceding paragraphs of the Counterclaims.

134.    The MSAs between CDK and each Dealership Counter-Defendant are valid and
enforceable contracts and are binding on the Dealership Counter-Defendants and their affiliates.
CDK has fully performed or tendered all performance required under the MSAs.

**ANSWER:**    Paragraph 134 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Dealership Counter-Defendants deny

the allegations in paragraph 134 of the Counterclaims.

135.    The MSAs each prohibit the Dealership Counter-Defendants from (1) allowing
anyone other than a dealership employee to access CDK's DMS or (2) allowing any third party
software to access CDK's DMS.

**ANSWER:**    Paragraph 135 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Dealership Counter-Defendants deny

CDK's characterization of the MSAs discussed in paragraph 135 of the Counterclaims, as those

MSAs speak for themselves. Dealership Counter-Defendants deny the remaining allegations in

paragraph 135 of the Counterclaims.

136.    The Dealership Counter-Defendants have breached their obligations under the
MSAs by providing login credentials to Authenticom and other third parties to enable those third
parties to hostilely access CDK's DMS.

**ANSWER:**    Paragraph 136 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Dealership Counter-Defendants deny

the allegations in paragraph 136 of the Counterclaims.

137.    The Dealership Counter-Defendants' conduct has damaged CDK, including by
depriving CDK of revenue that it could otherwise earn by charging Authenticom or other
unauthorized third parties to access CDK's DMS through its 3PA program or otherwise, by
causing CDK to incur the costs and expenses associated with investigating unauthorized third

party access to its DMS and attempting to compel them to cease their unlawful conduct, and by degrading CDK's DMS system and corrupting the data thereon.

**ANSWER:** Paragraph 137 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny that CDK or any other individuals or entities have suffered any injury or damages as a result of any action or conduct of Dealership Counter-Defendants and therefore deny that CDK is entitled to the relief it seeks. Dealership Counter-Defendants deny the remaining allegations in paragraph 137 of the Counterclaims.

### SECOND COUNTERCLAIM FOR RELIEF
#### (All Counter-Defendants – Computer Fraud and Abuse Act)

138. Paragraphs 1-137 above are incorporated herein by reference.

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

139. The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer," is subject both to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief). The CFAA provides for a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

140. CDK's DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). CDK's DMS also relies on the operation of one or more computing devices in its operations. The DMS itself, and the computing devices by which it operates, are "protected computers" within the meaning of the CFAA because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

141. The Dealership Counter-Defendants have repeatedly and intentionally accessed the CDK DMS without CDK's authorization by inducing Authenticom and other third parties to access CDK's DMS without CDK's authorization. The MSAs prohibit the Dealership Counter-Defendants from granting Authenticom and other third parties access to the CDK DMS without CDK's consent. Nonetheless, the Dealership Counter-Defendants have repeatedly provided their login credentials to Authenticom and other third parties to enable those third parties to access CDK's DMS. Accordingly, by inducing those third parties to access CDK's DMS without authorization, the Dealership Counter-Defendants have accessed CDK's DMS without authorization. Further, the Dealership Counter-Defendants obtained information from the CDK DMS through that unauthorized access when, for example, the Dealership Counter-Defendants received data from a third party application vendor containing data originally extracted through unauthorized means from CDK's DMS.

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

142. Alternatively, and regardless of whether the Dealership Counter-Defendants engaged in unauthorized access to CDK's DMS themselves, the Dealership Counter-Defendants are liable for the unauthorized access of Authenticom and other third parties that the Dealership Counter-Defendants knowingly induced to engage in unauthorized access to CDK's DMS.

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

143. CDK has informed the Dealership Counter-Defendants that their conduct is unauthorized and prohibited. CDK has demanded that the Dealership Counter-Defendants cease their unlawful conduct, but they have refused to do so.

**ANSWER:** The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

144. The Dealership Counter-Defendants' violations of the CFAA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to the Dealership Counter-Defendants' unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to the Dealership Counter-Defendants' unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by the unlawful actions of the Dealership Counter-Defendants and the third parties acting in concert with the Dealership Counter-Defendants. On information and belief, these losses have exceeded $5,000 within a twelve-month period.

**ANSWER:**     The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's

Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

145.     The Dealership Counter-Defendants will continue to violate the CFAA if not enjoined by this Court, causing CDK irreparable harm. Among other things, the Dealership Counter-Defendants' unauthorized access to CDK's DMS and their deliberate enabling of Authenticom's and other third parties' unauthorized access to CDK's DMS increases the risk that CDK will suffer a serious security breach, widespread data corruption issues, and degradation of the performance of its DMS, all of which constitute irreparable harm.

**ANSWER:**     The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's

Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

146.     CDK is also entitled to equitable relief in the form of restitution for the benefits that the Dealership Counter-Defendants accrued and/or disgorgement of the unlawful profits they have received as a result of their CFAA violations.

**ANSWER:**     The Court has granted Dealership Counter-Defendants' motion to dismiss CDK's

Second Counterclaim for Relief; accordingly, no response to this paragraph is required.

**THIRD COUNTERCLAIM FOR RELIEF**
**(Continental Counter-Defendants and Warrensburg Counter-Defendants – Digital Millennium Copyright Act)**

147.     Paragraphs 1-146 above are incorporated herein by reference.

**ANSWER:**     Dealership Counter-Defendants incorporate, as if fully set forth herein, their

answers to the preceding paragraphs of the Counterclaims.

148.     The Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), prohibits, among other things, "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." *Id.* § 1201(a)(1)(A).

**ANSWER:**     Paragraph 148 of the Counterclaims states legal conclusions to which no answer

is required. To the extent that an answer may be required, Dealership Counter-Defendants deny

the allegations in paragraph 148 of the Counterclaims.

149.     CDK's DMS software is an original creative work protected under Title 17. Among its original and creative elements are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

**ANSWER:**     Paragraph 149 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, Dealership Counter-Defendants deny the allegations in paragraph 149 of the Counterclaims.

150.    CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring CDK dealer employees to log on with passwords; text prompts asking a user to certify that he or she is an authorized dealer employee; CAPTCHA controls; and disabling of dealer credentials that CDK finds have been used for automated access by third parties. In the ordinary course of their operation, these password controls, certification prompts, CAPTCHA controls, and credential disabling measures required application of information, or a process or treatment, with CDK's authority as the owner of the DMS, to gain access to the CDK DMS software or a portion of the CDK DMS software. These measures effectively control access to the DMS software program in that the program, or portions of the program, cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated. These access control measures were effective in preventing Authenticom and other third parties from accessing the CDK DMS before those third parties circumvented them.

**ANSWER:**     Dealership Counter-Defendants admit that CDK uses measures to control access to the CDK DMS, but Dealership Counter-Defendants deny that those measures are designed to, or serve to, protect the security of CDK's DMS or the data stored in the DMS. Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 150 of the Counterclaims and on that basis deny them.

151.    The Continental Counter-Defendants and Warrensburg Counter-Defendants have intentionally induced Authenticom and other third parties to repeatedly circumvent CDK's access control measures in order to access the CDK DMS, extract data from it, and push data back into it. The Continental Counter-Defendants and Warrensburg Counter-Defendants wrongfully provided dealer login credentials to Authenticom and other third parties in violation of contractual requirements that such credentials be given to and used only by authorized dealer employees.

**ANSWER:**     Paragraph 151 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants and Warrensburg Counter-Defendants deny the allegations in paragraph 151 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 151 of the Counterclaims and on that basis deny them.

152.    After CDK disabled login credentials that had been improperly used for automated DMS access by Authenticom or other third parties, the Warrensburg Counter-Defendants and Authenticom worked to evade this form of blocking by having new credentials created and/or by restoring disabled credentials—including on information and belief by automated means.

**ANSWER:**    Paragraph 152 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Warrensburg Counter-Defendants deny the allegations in paragraph 152 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 152 of the Counterclaims and on that basis deny them.

153.    Finally, when accessing CDK's DMS using login credentials provided by the Continental Counter-Defendants, Authenticom circumvented, or gave outright false answers to, multiple CAPTCHA controls through the use of automated computer scripts when accessing CDK's DMS. The Continental Counter-Defendants knew Authenticom would attempt to evade CDK's security measures when accessing CDK's DMS on their behalf. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS in violation of 17 U.S.C. § 1201(a)(1)(A).

**ANSWER:**    Paragraph 153 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 153 of the Counterclaims concerning the actions of Authenticom and on that basis deny them. The Continental Counter-Defendants deny the remaining allegations in paragraph 153 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 153 of the Counterclaims and on that basis deny them.

154.    The Continental Counter-Defendants and Warrensburg Counter-Defendants materially contributed to the ability of Authenticom and other third parties to circumvent CDK's technological measures that control access to its DMS. Without the Continental Counter-

Defendants' and Warrensburg Counter-Defendants' login credentials, Authenticom and other third parties would not have been able to access CDK's DMS.

**ANSWER**: Paragraph 154 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants and Warrensburg Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 154 of the Counterclaims concerning the actions of Authenticom and on that basis deny them. The Continental Counter-Defendants and Warrensburg Counter-Defendants deny the remaining allegations in paragraph 154 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 154 of the Counterclaims and on that basis deny them.

155. On information and belief, the Continental Counter-Defendants and Warrensburg Counter-Defendants intended Authenticom to evade, or were willfully blind to the fact that Authenticom would evade, technological measures through whatever means necessary, including automated means, to access CDK's DMS.

**ANSWER**: Paragraph 155 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants and Warrensburg Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 155 of the Counterclaims concerning the actions of Authenticom and on that basis deny them. The Continental Counter-Defendants and Warrensburg Counter-Defendants deny the remaining allegations in paragraph 155 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 155 of the Counterclaims and on that basis deny them.

156. Under 17 U.S.C. § 1203, CDK is entitled to either actual damages and any additional profits from the Continental Counter-Defendants' and Warrensburg Counter-Defendants' violations of the DMCA or statutory damages of between $200 and $2,500 "per act

of circumvention," at CDK's election. CDK is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1).

**ANSWER:**    Paragraph 156 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants deny that CDK or any other individuals or entities have suffered any injury or damages as a result of any action or conduct of the Continental Counter-Defendants, the Warrensburg Counter-Defendants deny that CDK or any other individuals or entities have suffered any injury or damages as a result of any action or conduct of the Warrensburg Counter-Defendants, and the Continental Counter-Defendants and Warrensburg Counter-Defendants deny that CDK is entitled to the relief it seeks. The Continental Counter-Defendants and Warrensburg Counter-Defendants deny the remaining allegations in paragraph 156 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 156 of the Counterclaims and on that basis deny them.

157.    The Continental Counter-Defendants and Warrensburg Counter-Defendants, in concert with Authenticom and other third parties, will continue to violate the DMCA if not enjoined by this Court.

**ANSWER:**    Paragraph 157 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants and Warrensburg Counter-Defendants deny that CDK is entitled to the relief it seeks. The Continental Counter-Defendants and Warrensburg Counter-Defendants deny the remaining allegations in paragraph 157 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 157 of the Counterclaims and on that basis deny them.

158.    Moreover, the Continental Counter-Defendants' and Warrensburg Counter-Defendants' unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute irreparable harm.

**ANSWER:**    Paragraph 158 of the Counterclaims states legal conclusions to which no answer is required. To the extent that an answer may be required, the Continental Counter-Defendants and Warrensburg Counter-Defendants deny the allegations in paragraph 158 of the Counterclaims. All other Dealership Counter-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 158 of the Counterclaims and on that basis deny them.

## **PRAYER FOR RELIEF**

WHEREFORE, CDK respectfully requests that this Court enter judgment:

A.    Declaring that the Dealership Counter-Defendants' conduct:

(1)    constitutes breach of contract;

(2)    violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and

(3)    as to the Continental Counter-Defendants and Warrensburg Counter-Defendants, violates the Digital Millennium Copyright Act, 17 U.S.C. § 1201;

B.    Permanently enjoining the Dealership Counter-Defendants from engaging in the actions that violate these laws, including providing login credentials to CDK's system to any third party;

C.    Awarding CDK its full losses, expenses, and other damages, including but not limited to statutory damages;

D.    Disgorging the Dealership Counter-Defendants of their unlawful profits and unjust enrichment;

E.    Awarding CDK costs and litigation expenses, including attorney's fees; and

F.    Awarding CDK such other and further relief that this Court deems just, proper, and equitable.

**ANSWER:**    To the extent that an answer may be required to the Prayer for Relief at the end of CDK's Counterclaims, Dealership Counter-Defendants deny each and every allegation contained therein and deny that CDK is entitled to the relief it seeks.

\* \* \*

## **DENIAL**

Dealership Counter-Defendants deny each and every allegation of the Counterclaims not specifically admitted above.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that they would not otherwise bear, Dealership Counter-Defendants also assert the following affirmative and additional defenses:

## FIRST DEFENSE

The Counterclaims fail to state a claim upon which relief may be granted.

## SECOND DEFENSE

As detailed in Dealership Class Plaintiffs' Consolidated Class Action Complaint, CDK's actions and contracts purporting to prohibit dealers from granting third parties access to their DMS data, and CDK's actions and contracts purporting to prohibit the business activities of application vendors and third-party integrators, are part of an unlawful scheme to eliminate competition. As such, the contractual and legal restrictions alleged herein are void as a matter of law. As a result, CDK has failed to state a cause of action.

## THIRD DEFENSE

CDK's Counterclaims are barred, in whole or in part, by the applicable statute of limitations. CDK filed its Counterclaims on February 22, 2019. CDK has not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of CDK's Counterclaims has passed and thus are time-barred.

## FOURTH DEFENSE

If and to the extent that CDK has been damaged, which Dealership Counter-Defendants deny, the amount of damages that CDK alleges to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

## FIFTH DEFENSE

If and to the extent that CDK has been damaged, which Dealership Counter-Defendants deny, CDK, by the exercise of reasonable diligence, could have mitigated its damages but did not, and CDK is therefore barred from recovery. Alternatively, any damages sustained by CDK, which Dealership Counter-Defendants deny, must be reduced by the amount that such damages would have been reduced had CDK exercised reasonable diligence in mitigating its damages.

## SIXTH DEFENSE

CDK's Counterclaims are barred, in whole or in part, because to the extent CDK suffered any injury or incurred any damages as alleged in the Counterclaims, which Dealership Counter-Defendants deny, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals and entities other than Dealership Counter-Defendants and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

## SEVENTH DEFENSE

CDK's Counterclaims are barred by the doctrine of unclean hands.

## EIGHTH DEFENSE

To the extent lack of authorization for access is deemed an affirmative defense rather than an element on which CDK bears the burden of proof (and Dealership Counter-Defendants contend that the latter applies), CDK is barred from claiming violations of any statute or source of law because Dealership Counter-Defendants' access, and Dealership Counter-Defendants' alleged enabling of Authenticom's and other third parties' access, were authorized.

## NINTH DEFENSE

CDK's Counterclaims are barred by the doctrine of acquiescence.

## TENTH DEFENSE

CDK's Counterclaims are barred by the doctrines of laches, waiver, and estoppel.

## ELEVENTH DEFENSE

The privilege of competition and other privileges available under state law bar CDK from pursuing its Counterclaims for relief.

## TWELFTH DEFENSE

CDK's Counterclaims are barred by the doctrine of implied license.

## THIRTEENTH DEFENSE

CDK's Counterclaims are barred by the doctrines of copyright misuse and copyright abuse.

## FOURTEENTH DEFENSE

CDK's Counterclaims are barred because Dealership Counter-Defendants' conduct constituted fair use.

## FIFTEENTH DEFENSE

CDK's Counterclaims are barred, in whole or in part, because CDK has not suffered any legally cognizable injury, including because CDK has not suffered any injury-in-fact and its alleged injuries are too speculative, indirect, and remote from the alleged conduct, and cannot be ascertained or apportioned.

## SIXTEENTH DEFENSE

CDK's Counterclaims are barred, in whole or in part, because to the extent CDK suffered any injury or incurred any damages as alleged, which Dealership Counter-Defendants deny, Dealership Counter-Defendants' conduct was not the actual or proximate cause of any such injury or damage.

## SEVENTEENTH DEFENSE

CDK's Counterclaims are barred, in whole or in part, because any recovery would result in unjust enrichment to CDK.

## EIGHTEENTH DEFENSE

CDK is barred from recovering because its acts are in violation of public policy.

## NINETEENTH DEFENSE

CDK's breach of contract Counterclaim is barred because CDK has not tendered performance under the applicable contracts.

## TWENTIETH DEFENSE

CDK's Counterclaims are barred, in whole or in part, because its alleged damages, if any, are too speculative, uncertain, and not of the nature or to the extent alleged.

## TWENTY-FIRST DEFENSE

Some or all of CDK's Counterclaims are subject to valid and enforceable contractual limitations on liability and damages.

## TWENTY-SECOND DEFENSE

CDK's Counterclaims are barred by the *in pari delicto* doctrine.

## TWENTY-THIRD DEFENSE

CDK's Counterclaims are barred, in whole or in part, because Dealership Counter-Defendants were not aware, and had no reason to believe, that their acts constituted a violation of law or breach of contract.

## TWENTY-FOURTH DEFENSE

CDK's counterclaims are barred in whole or in part to the extent they seek damages duplicative of the value of consideration CDK has received or will receive in settlements with or judgments against other parties in this MDL litigation. Dealership Counter-Defendants are entitled

to offsets and/or setoffs on account of consideration obtained by CDK through its settlements with other parties in this MDL litigation, including, without limitation (i) Authenticom, Inc., and (ii) Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Bluebook, Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc.

* * * * *

Dealership Counter-Defendants have insufficient knowledge or information upon which to form a basis as to whether they may have additional, as yet unstated, separate defenses available. Dealership Counter-Defendants reserve the right to amend this Answer to add, supplement or modify defenses based on legal theories that may be or will be divulged, through discovery, or through further factual or legal analysis of CDK's allegations, contentions and positions in this litigation.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Dealership Counter-Defendants hereby demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHERFORE, Dealership Counter-Defendants request that CDK's Counterclaims be dismissed with prejudice, that the Court find that CDK is not entitled to any judgment or relief, that the Court enter judgment in favor of Dealership Counter-Defendants, and that the Court award Dealership Counter-Defendants their attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

DATED: October 1, 2019December 9, 2020

/s/ Peggy J. Wedgworth

Peggy J. Wedgworth (*pro hac vice*)
Elizabeth McKenna (*pro hac vice*)
**MILBERG PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920

72

100 Garden City Plaza, Suite 500
New York, New York ~~10119~~11530
Tel: (212) 594-5300
Fax: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com
***Interim Lead Counsel for the Dealership
Class***


Leonard A. Bellavia (*pro hac vice*)
Steven Blatt
**BELLAVIA BLATT, PC**
200 Old Country Road, Suite 400
Mineola, New York 11501
Tel: (516) 873-3000
Fax: (516) 873-9032
lbellavia@dealerlaw.com
sblatt@dealerlaw.com
***Dealership Class Plaintiffs' Steering
Committee***


Daniel C. Hedlund (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

***Dealership Class Plaintiffs' Steering
Committee***


James E. Barz
Frank Richter
**ROBBINS GELLER RUDMAN & DOWD
LLP**
200 South Wacker Drive, 31st Floor Chicago,
Illinois 60606
Tel: (312) 674-4674
Fax: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

PUBLIC VERSION

*Dealership Class Plaintiffs' Steering Committee*

Robert A. Clifford
Shannon M. McNulty
**CLFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Tel: (312) 899-9090
Fax: (312) 251-1160
RAC@cliffordlaw.com
SNM@cliffordlaw.com

*MDL Liaison Counsel*