**PUBLIC VERSION**

# EXHIBIT A

**PUBLIC VERSION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 No. 1:18-CV-864 |
| This document relates to: | Hon. Robert M. Dow, Jr. |
| *Motor Vehicle Software Corp. v. CDK Global, LLC, et al.,* Case No. 1:18-cv-00865 (N.D. Ill.) | |

**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S AMENDED ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES TO PLAINTIFF MOTOR VEHICLE SOFTWARE CORPORATION'S SECOND AMENDED COMPLAINT**

Defendant The Reynolds and Reynolds Company ("Reynolds"), by and through its attorneys, hereby submits its Amended Answer and Affirmative Defenses in response to Plaintiff Motor Vehicle Software Corporation's ("MVSC") Second Amended Complaint ("SAC"). Except as expressly admitted herein, Reynolds denies each and every allegation contained in the SAC, including but not limited to any allegations contained in the introduction, headings, or subheadings of the SAC. Reynolds reserves the right to amend and/or supplement its answer and affirmative defenses.

### REYNOLDS'S ANSWER TO SECOND AMENDED COMPLAINT

Reynolds responds to the each of the paragraphs of the SAC as follows:

### INTRODUCTION

1. Plaintiff Motor Vehicle Software Corporation ("MVSC") brings this action to remedy and put a stop to ongoing federal and state antitrust violations being committed by Defendants CDK Global, Inc. ("CDK") and The Reynolds and Reynolds Company ("Reynolds"), and their joint venture Computerized Vehicle Registration, Inc. a/k/a CDK Vehicle Registration, Inc. ("CVR").

**ANSWER:** Denied.

2.      MVSC provides electronic vehicle registration and titling services ("EVR").  As an EVR provider, MVSC partners with state governments to issue the physical registration, license plates, and titles for vehicles sold at car dealerships.  Electronic registration and titling has made the process far more convenient and efficient for dealerships and consumers.  Defendant CVR is a wholly owned joint venture of CDK and Reynolds that (like Plaintiff MVSC) provides EVR services.

**ANSWER:**  Admitted that MVSC provides EVR services in certain states and that CVR is a wholly owned joint venture of CDK and Reynolds that provides EVR services in certain states. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as it relates to MVSC, and therefore denies same.

3.      In order to process the registration and title with a state, EVR providers require basic information about the car sale – namely, vehicle, buyer, and financing details.  That data is stored on a car dealer's Dealer Management System software, otherwise referred to as a dealer's "DMS."  There is no other place where the data is stored, and without access to this data, it is impossible to provide EVR services.

**ANSWER:**  Admitted that EVR services utilize basic information about the car sale.  Admitted that Dealer Management Systems are referred to as "DMS" and contain certain information relating to car sales.  As to all remaining allegations of this paragraph of the SAC, denied.

4.      In addition to storing a dealer's data, the DMS manages every function of a dealer's business from sales and inventory to service and parts.  It is the mission-critical enterprise software that a car dealership cannot operate without.  Defendants CDK and Reynolds are by far the two giants of the DMS market, controlling close to 80 percent of the United States market by number of dealers, and approximately 90 percent when measured by vehicles sold.  CDK and Reynolds have enormous leverage over dealers.  Not only is it deeply disruptive and expensive for a dealer to switch DMS providers (switching takes up to a year of preparation and training), but CDK and Reynolds also use their market power to compel dealers to submit to long-term contracts of between five and seven years in length.  As a result, CDK and Reynolds have maintained their duopoly for over two decades.

**ANSWER:**  Admitted that most new vehicle franchised dealerships and many used-car and independent dealerships rely on a DMS to manage and operate their dealerships.  In addition, a very small percentage of new vehicle franchised dealerships operate without a DMS.  Admitted that CDK and Reynolds are currently the two largest providers of DMS products to new vehicle franchised dealerships in the United States (without conceding that the United States or new

vehicle franchised dealerships are the relevant market at issue in this case). As to all remaining allegations of this paragraph of the SAC, denied.

5. CDK and Reynolds have leverage over dealers for another reason: while dealers own the data on their DMS, CDK and Reynolds have seized control over who is allowed to access the data. Many third-party vendors require access to dealer data in order to perform essential tasks – such as EVR services – for the dealer. CDK and Reynolds provide vendors access (for a fee) to the data on a dealer's DMS pursuant to formal third-party access programs. CDK's arrangement is called the Third Party Access ("3PA") program, and Reynolds's is called the Reynolds Certified Interface ("RCI") program. These programs allow third-party vendors to access – in real time – the necessary data from a dealer's DMS in order to provide services for the dealership.

**ANSWER:** Admitted that Reynolds provides the Reynolds Certified Interface ("RCI") program, which is a system of uniquely designed custom interfaces that form an integral part of the Reynolds DMS. Admitted that some of those custom interfaces provide real-time integration. Admitted that CDK has a third party access program. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as it relates to CDK, and therefore denies same. As to all remaining allegations of this paragraph of the SAC, denied.

6. This case concerns an illegal horizontal agreement between CDK and Reynolds to exclude MVSC from their third-party programs in order to prevent MVSC from obtaining the data it needs to provide EVR services. The purpose of the conspiracy is simple and obvious: by blocking MVSC's access to the data on which its services depend, CDK and Reynolds seek to eliminate a formidable competitor to CVR, their wholly owned joint venture. Money is the motive. CVR has for decades served as a reliable cash cow for CDK and Reynolds; it has long been the largest EVR provider in the United States, covering more states and processing more transactions than any other provider. Through their illegal conspiracy to insulate CVR from competition, CDK and Reynolds are seeking to protect that flow of profits into their coffers.

**ANSWER:** Admitted that CVR provides EVR services in 23 states. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC to the extent they relate to MVSC or companies other than Reynolds, and therefore denies same. As to all remaining allegations of this paragraph of the SAC, denied.

7. CDK exercises substantial control over the decisionmaking and operations of CVR, as demonstrated by numerous facts alleged below. In fact, CDK exercises more than just substantial control over CVR, but actually directs its day-to-day operations, including its marketing, dealer on-site visits, hiring and firing of employees, budgets, investments in

technology and services, and other functions normally handled internally by a corporate entity. Thus, for purposes of antitrust monopoly claims, CDK is properly considered to compete through CVR in the relevant EVR markets.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

8.    MVSC competes with CVR in two state EVR markets – Illinois and California.  In the Illinois EVR market, CVR maintains a monopoly of approximately 95 percent market share. Real-time access to dealer data is a prerequisite to competing in Illinois because the state requires that a dealership provide the registration and license plates to the car buyer at the time of sale. Participation in the 3PA and RCI programs is the only means for an EVR provider to obtain this real-time access to dealer data.  By blocking MVSC (and all other Illinois EVR providers) from their third-party programs, CDK and Reynolds have ensured that CVR will maintain its monopoly position in Illinois.

**ANSWER:** Admitted that CVR provides EVR services in California and Illinois.  Admitted that MVSC currently provides EVR services in California and Illinois.  Denied that MVSC competed with CVR in the Illinois EVR market at the time the Second Amended Complaint was filed. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC to the extent they relate to MVSC, and therefore denies same.   As to all remaining allegations of this paragraph of the SAC, denied.

9.    In the California EVR market, CVR had a monopoly until a few years ago.  But in California – unlike in Illinois – a car buyer is not required to receive the registration and license plates at the time of sale.  Real-time access to dealer data (and participation in the 3PA and RCI programs) has therefore not been necessary in California.  Instead, MVSC was able to obtain the required dealer data by other means, either through companies that provided intermediary access to a dealer's DMS or through a manual workaround whereby dealers ran a daily report with the necessary data and then transmitted the information to MVSC.  As a result, MVSC was able to compete in the California EVR market based on the quality of its products and services, which are vastly superior to CVR's and much preferred by car dealerships.  As one tangible example of the disparity in service quality, it takes CVR a minimum of 30 days to process and ship registrations and license plates to car buyers, whereas MVSC accomplishes the same in one day.

**ANSWER:** Admitted that MVSC provides EVR services in California, and has attained the largest EVR market share in California, without real-time access to Reynolds's DMS or CDK's DMS,

and without participation in RCI or 3PA. Admitted that in California, a new car buyer is not required to receive registration and license plates at the time of sale. As to all remaining allegations in this paragraph of the SAC, denied.

10. Because CVR cannot compete with MVSC on quality and service, CDK and Reynolds have engaged in a campaign to completely block MVSC's access to dealer data in California. Not only have CDK and Reynolds blocked MVSC from participating in their 3PA and RCI programs, but they have successfully cut off MVSC's access through intermediaries. Worse, they are intimidating dealers with a drumbeat of near constant threats that if dealers continue to provide MVSC with their data, then the dealers will be in breach of the DMS contract.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements, including by unilaterally blocking unauthorized access to its proprietary system; Reynolds denies that this unilateral, and longstanding conduct, resulted from a conspiracy with CDK or any third party. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same. As to all remaining allegations of this paragraph of the SAC, denied.

11. The facts of the illegal agreement to block MVSC from dealer data are straightforward. The ringleaders are Scott W. Herbers, CVR's longtime general manager who, while running CVR, simultaneously worked as a senior CDK executive; Robert N. Karp, president of CDK's North American region; and Bob Schaefer, Director of Reynolds's data services. The conspiracy has existed since at least 2014, and continues to this day. Based on information from a participant in the conversations, CDK even has a name for the illegal conspiracy – the "Closed Category." That is, EVR is a "closed category" to MVSC within the 3PA and RCI programs. A senior CDK executive even told MVSC that there are those within CDK who think the agreement is wrong and that MVSC should be able to compete with CVR on equal footing, but that Mr. Herbers and Mr. Karp have rejected any such argument. As detailed below, CVR has not been a mere bystander to the CDK and Reynolds conspiracy – CVR executives were involved in numerous conspiratorial conversations with with respect to keeping MVSC at a disadvantage with respect to data access, including at meetings of CVR's Board of Directors.

**ANSWER:** Denied. In addition, specifically as to Reynolds denied that Reynolds has had a "closed category" for EVR services and denies that it has ever agreed with anyone regarding any "closed category."

12.     CDK and Reynolds have enforced the illegal agreement with rigid discipline. Every time MVSC has applied to participate in the 3PA and RCI programs, CDK and Reynolds have said, "No." Lower-level CDK and Reynolds executives have admitted that the reason MVSC is not allowed to participate is because it is a competitor of CVR, and the decision to block MVSC was made "far above" their level – i.e., by Mr. Herbers, Mr. Karp, and Mr. Schaefer. Sometimes the rejection has been outright without explanation. Other times, CDK and Reynolds have demanded an extortive fee – at first 33 percent, and with later applications, 25 percent of MVSC's top-line revenues – to participate in the 3PA and RCI programs. CDK and Reynolds knew MVSC could never accept such terms (MVSC would lose money on every dealership and would no longer be able to operate as a going concern) and the demands were therefore an effective refusal to deal. Moreover, such demands were the opposite of what CDK and Reynolds stated publicly. For example, CDK represents in its program guide: "Our 3PA pricing philosophy is simple: standardized pricing for all customers." But privately, CDK admitted to MVSC that such "standardized pricing" does not apply to MVSC because it competes with CVR. Remarkably, a top CVR executive confirmed that the extortive price quotes were not serious and were simply designed as an effective refusal to deal. He stated to MVSC: "I wish we would have asked for 85 percent of your revenue. We don't want you in the program."

**ANSWER:** Denied as to Reynolds and as to any allegations of conspiracy involving Reynolds.

Reynolds lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore

denies same.

13.     This is not the first time that CDK and Reynolds have illegally conspired. In February 2015, CDK and Reynolds entered into an agreement to block data "integrators"— companies that specialize in pulling data from dealers' DMS, aggregating it, correcting errors, putting it into a standardized format, and delivering it to vendors— from accessing dealer data. Indeed, it is that conspiracy that makes it impossible for MVSC to access dealer data through intermediaries: CDK and Reynolds have agreed to block them. That conspiracy has therefore had a direct impact on MVSC and any other vendor in need of dealer data. Moreover, pursuant to their agreement to eliminate competition in the data integration market, CDK and Reynolds also agreed not to compete with each other, even putting that agreement in writing, with an effective date of February 18, 2015. The fact that CDK and Reynolds have colluded to control access to dealer data generally corroborates that they have colluded to block access to MVSC specifically.

**ANSWER:** To the extent this Paragraph purports to refer to the Data Exchange Agreement

between Reynolds and CDK, admitted that this agreement was entered into in February 2015, but

denied as to all characterizations of this agreement in this paragraph of the SAC. As to all

remaining allegations of this paragraph of the SAC, denied.

14.     For many dealers, the campaign to cut off MVSC and then convert dealerships to CVR has worked.  "I have really bad news," one dealer wrote in typical fashion.  "We are not going to be able to keep [MVSC] since CDK is only approving CDK Licensed approved vendors to have access to our [DMS]."  Other dealers have expressed genuine fear about the disruption caused by the blocking of MVSC.  "Help!" one dealer exclaimed.  "Where do we go from here??" The California New Car Dealers Association has even had to get involved.  Representing over 1,100 dealers, it is the country's largest state association of franchised new car dealers.  The Association has advised some of its members that CDK's and Reynolds's "conduct as it relates to the [EVR] program [is] troubling not only from a business perspective but also from the damage it could do to consumers and the DMV for the roadblocks it is creating in the vehicle registration process itself."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in this paragraph of the SAC to the extent they relate to statements

or conduct by MVSC, dealers, the California New Car Dealers Association, or entities other than

Reynolds, and therefore denies same.  As to the remaining allegations of this paragraph of the

SAC, denied.

15.     To the extent MVSC has been able to retain dealerships, it is because of MVSC's superior product and service and the dealers' belief that what CDK and Reynolds are doing is wrong.  Nevertheless, Defendants' conspiracy has had its intended effect.  By excluding MVSC from their 3PA and RCI programs, and seeking to block MVSC from obtaining dealer data through other means, Defendants' illegal conspiracy has protected CVR's monopoly in the Illinois EVR market and created a dangerous probability that CVR will regain its monopoly position in the California EVR market.  The conspiracy has caused MVSC to suffer millions of dollars in damages.  It has also harmed competition by reducing dealer choice (effectively preventing dealers from going with their preferred EVR provider), degrading the quality of EVR services, increasing the quality-adjusted price of EVR services, and eliminating competition in concentrated state EVR markets.

**ANSWER:** Denied.

16.     As described in detail herein, CDK's and Reynolds' conspiracy is a per se violation of Section 1 of the Sherman Act, *see infra* Count I; CDK and CVR are liable for monopolization of the Illinois EVR market and attempted monopolization of the California EVR market under Section 2 of the Sherman Act, *see infra* Counts II and III; and all Defendants are liable for conspiracy to monopolize under Section 2 of the Sherman Act, *see infra* Count IV.  Defendants' conduct is also prohibited by California and Illinois state antitrust and unfair competition laws.

**ANSWER:** Denied.

17.     In this action, MVSC seeks to recover the damages it has suffered as a result of Defendants' federal and state antitrust violations.  In addition, MVSC also seeks an injunction (1) enjoining Defendants from engaging in their illegal anticompetitive conduct, and (2) requiring CDK and Reynolds to permit MVSC to participate in their 3PA and RCI programs, and therefore have access to required dealer data.

**ANSWER:** Admitted that MVSC alleges federal and state claims and seeks to recover damages and an injunction; denied that Reynolds has violated any federal or state laws, that MVSC is entitled to any damages, and that MVSC is entitled to an injunction.

18.     The allegations set forth herein are based on corporate knowledge and documents and information in MVSC's possession; discussions with current and former employees of Defendants; documents and emails that were drafted in whole or in part by Defendants and their current or former employees; publicly available documents, including Defendants' press releases, public statements, and filings with the Securities and Exchange Commission ("SEC"), news articles, scholarly articles, and court documents submitted in other proceedings; and documents and information from third parties, including automotive dealerships and state regulatory authorities.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

## PARTIES

19.     Plaintiff Motor Vehicle Software Corporation ("MVSC") is a California corporation with its corporate headquarters and principal place of business at 29219 Canwood Street, Suite #205, Agoura Hills, California 91301.  Formed in 2005, MVSC provides Electronic Vehicle Registration ("EVR") services to automobile dealerships in California, Oregon, and Illinois.  MVSC is working to gain approval in the Virginia EVR program.  MVSC is privately owned.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

20.     Defendant CDK Global, Inc. ("CDK"), is a Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169.  CDK has many employees and multiple offices in California.  CDK's headquarters for the western region of the United State are located at 1100 Town and Country Road, Suite 800, Orange, California 92868.  CDK provides Dealer Management System ("DMS") software and services to automobile dealerships throughout the United States, including in California, and has more than $2 billion in annual revenues.  In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company in which ADP retains no ownership interest.  Prior

to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK").

**ANSWER:** Admitted upon information and belief that CDK is a public Delaware corporation that provides DMS services. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC, and therefore denies same.

21.    Defendant The Reynolds and Reynolds Company ("Reynolds") is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45340. As with CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in California. To service those dealerships in California, Reynolds has many employees that work in and travel to the state. Though formerly a publicly traded company, Reynolds was privately acquired in 2006.

**ANSWER:** Admitted as to Reynolds, with the clarification that Reynolds and Universal Computer Systems, Inc. merged in 2006 under the Reynolds name.

22.    Defendant CDK Vehicle Registration, Inc. a/k/a Computerized Vehicle Registration, Inc. ("CVR") is a California corporation with its corporate headquarters and principal place of business at 1100 Town and Country Road, Suite 800, Orange, California 92868, sharing an office with CDK's California headquarters. CVR was founded in 1992 and is a wholly owned joint venture of CDK and Reynolds, with CDK having an 80 percent and Reynolds a 20 percent ownership stake. CVR promotes itself as the national market leader in EVR, servicing more than 15,000 dealerships in 23 states and processing over 14 million EVR transactions a year.

**ANSWER:** Admitted that CVR is a California corporation with its corporate headquarters and principal place of business at 1100 Town and Country Road, Suite 800, Orange, California 92868. Admitted that CDK maintains an office at the same address. Admitted that CVR was founded in 1992 and is a wholly owned joint venture of CDK and Reynolds, with CDK having an 80 percent stake and Reynolds having a 20 percent stake. Admitted that CVR promotes itself as serving 15,000 clients across 23 states. As to the remaining allegations of this paragraph of the SAC, denied.

## JURISDICTION AND VENUE

23. This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and California and Illinois state law.

**ANSWER:** Admitted that MVSC purports to bring this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and California and Illinois state law. Denied that Reynolds has violated any of these laws.

24. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so closely related to the federal claims that they form part of the same case or controversy.

**ANSWER:** Admitted.

25. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). One or more of the Defendants resided, transacted business, were found, or had agents in the District; a substantial part of the events giving rise to MVSC's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District. In particular, MVSC and CVR reside and are headquartered in this District; CDK has its western region headquarters in this District; and CDK and Reynolds serve many dealerships in this District.

**ANSWER:** Admitted that venue is proper in the Central District of California.

26. The Court has personal jurisdiction over Defendants because they are engaged in ongoing and systematic business in the State of California. Defendants have also engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to MVSC in California. Defendants purposefully availed themselves of the privilege of doing business in California through the widespread promotion, sale, marketing, and distribution of their products and services in the state. This lawsuit arises from and relates to Defendants' California activities – namely, their unlawful conspiracy and attempts to deny Plaintiff access to the DMS platforms of California automobile dealerships and their attempted monopolization of the California EVR market. Through their unlawful acts, Defendants have caused substantial economic harm in California. This Court's exercise of jurisdiction over Defendants by California courts is consistent with traditional notions of fair play and substantial justice. Moreover, CVR is subject to general jurisdiction in California, because CVR's principal place of business is in California.

**ANSWER:** Answering only as to Reynolds, it is admitted that the Central District of California has personal jurisdiction over Reynolds; otherwise, denied.

27.    Defendants are engaged in, and their activities substantially affect, interstate commerce. CDK and Reynolds sell DMS services to automobile dealerships throughout the United States, including in California, and their third-party access programs make the data stored on their DMS platforms available on a nationwide basis. CVR sells EVR products and services to automobile dealerships throughout the United States, including in California.

**ANSWER:** As to Reynolds, and as to CDK on information and belief, admitted that Reynolds and CDK are engaged in interstate commerce and sell certain services to dealerships throughout the United States, including California. Admitted that CVR provides EVR services in 23 states, including California. As to the remaining allegations of this paragraph of the SAC, denied.

## FACTUAL ALLEGATIONS

### I.    The Relevant Product Markets

28.    The relevant product markets for MVSC's claims are: (1) the DMS Market in the United States; and (2) the Illinois and California EVR Markets.

**ANSWER:** Denied.

### A.    The DMS Market

29.    Dealer Management System software is enterprise software designed specifically for retail automotive dealerships. The software helps dealers manage every aspect of their business from sales and inventory to service and parts. The DMS has been analogized to the central nervous system of a car dealership. Specifically, DMS software handles and integrates all of the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, marketing, and more. In short, DMS software is the mission-critical software that enables dealerships to run their operations and function as a business. Industry publications describe the DMS as "the center of a dealer's entire retail management platform. It's impossible to operate without it."

**ANSWER:** Admitted that Dealer Management Systems are sometimes referred to as "DMS" and that most new vehicle franchised dealerships and many used-car and independent dealerships rely on a DMS to manage and operate their dealerships. In addition, a very small percentage of new vehicle franchised dealerships operate without a DMS. A DMS includes numerous components

of software and hardware to perform its system functions. In addition, a very small percentage of new vehicle franchise dealerships operate without a DMS. Admitted that, in the course of their operations, automobile dealerships use their licensed DMS to assist in important business functions, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more. As to all remaining allegations of this paragraph of the SAC, denied.

30. Importantly, the DMS is also the place where a dealer's data is stored, such as vehicle, customer, and sales information.

**ANSWER:** Denied that the Reynolds DMS (a proprietary enterprise computing system) is equivalent to a database that is owned by the dealer, or otherwise. Denied that the DMS is equivalent to a database where all dealer data is stored. Denied that the dealer owns all of the data within the DMS. The DMS is a licensed enterprise computer system and its functionality depends on confidential and proprietary software and data, including the DMS provider's proprietary functions and data, OEM data, contracted third-party data, credit-reporting data, and other nonautomotive third parties' data. Otherwise, admitted.

31. DMS providers license and sell their software and services pursuant to written contracts. The DMS market is comprised of those providers – including CDK and Reynolds – that sell and market DMS services to automobile dealerships in the United States. Geographically, the DMS market is the United States. There is public and industry recognition of the DMS market. There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships.

**ANSWER:** Admitted that Reynolds licenses and sells its systems, software and services pursuant to written contracts. With regard to the last sentence of this paragraph of the SAC, while there are a variety of DMS providers and platforms with a variety of different methods and policies for data extraction and integration, Reynolds does not deny that there are limited substitutes for DMS platforms and certain DMS services; for other DMS services there are many reasonable

substitutes.  Reynolds admits that the relevant DMS market for MVSC's claims includes (but is not limited to) "automotive dealerships" (including, without limitation, used-car and independent dealerships).  Reynolds denies all remaining allegations in this paragraph of the SAC.

### 1.      CDK and Reynolds Dominate the DMS Market

32.      CDK and Reynolds are by far the dominant providers in the DMS market. Combined, CDK and Reynolds control approximately 75 percent of the DMS market in the United States when measured using dealership rooftops (i.e., franchised stores), with CDK controlling approximately 45 percent of the market and Reynolds controlling 30 percent.  When measured using the number of vehicles sold from franchised dealers – which is more relevant for antitrust purposes – CDK's and Reynolds' market dominance is even more pronounced with a combined market share exceeding 90 percent.  This market dominance by CDK and Reynolds has been stable for over three decades.

**ANSWER:** Denied in part. Admitted that CDK and Reynolds are the two largest providers of DMS products to new vehicle franchised dealerships in the United States. There are many competitive DMS providers across both franchised and independent dealers. No DMS provider is "dominant" or has market power in any relevant market. Denied as to the use of the term "control". Dealers have many choices in DMS providers in the United States. Based on best current estimates, Reynolds's current market share in the United States is less than 30% of new vehicle franchised dealerships and vastly smaller when independent dealerships are included. Depending on how one defines "independent dealerships," Reynolds either serves a very small portion of that market (*i.e.*, less than 1%), or does not serve it at all. Denied to the extent that this paragraph suggests that only franchised new car dealers, as opposed to used-car and independent dealers, are relevant to the market analysis. Admitted that Reynolds's market presence may be larger if measured by the number of vehicles sold by its dealer customers. As to CDK, Reynolds lacks sufficient information to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same. As to any remaining allegations of this paragraph of the SAC, denied.

33.     Aside from CDK and Reynolds, the DMS market is diffuse, with an array of DMS providers dividing up the remaining market share.  These providers are typically small, occupy a particular niche, and serve the country's smaller car dealerships.

**ANSWER:** Admitted that there is an array of competitive DMS providers across both franchised and independent dealers.  Otherwise, denied.

34.     Based on the foregoing, it is no surprise that industry publications variously describe CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

**ANSWER:** The source of these quotes is not identified; Reynolds accordingly lacks sufficient information to form a belief about the truth of allegations in this paragraph of the SAC, and therefore denies same.  Reynolds further denies the accuracy and legal relevance of the alleged characterizations.

35.     CDK and Reynolds have enormously lucrative DMS businesses.  A single, small dealership will pay up to $150,000 per year for the DMS software license and services offered by CDK and Reynolds.  Mid-size dealership groups (5 to 10 stores) can pay $1,500,000 or more per year, and large dealerships can easily pay over $5,000,000 per year.  Given the thousands of dealerships that CDK and Reynolds serve, and with profit margins exceeding 40 percent, CDK and Reynolds are tremendously profitable.  CDK's market capitalization is $9.2 billion.

**ANSWER:** As to CDK, Reynolds lack sufficient information to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.  As to Reynolds, denied.

## 2.     CDK and Reynolds Maintain Their Market Dominance by Exercising Overwhelming Leverage over Dealerships

36.     CDK and Reynolds have powerful leverage over car dealerships, and they use that leverage to protect their dominant position and keep dealers in line.

**ANSWER:** Denied.

37.     First, CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years in length.  CDK and Reynolds therefore lock in their dealers with lengthy contracts.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as it relates to defendant CDK, and therefore denies

same. As to Reynolds, denied. Reynolds's DMS licensing agreements vary in length and are always negotiated.

38. Second, it is enormously difficult and disruptive for a dealer to switch DMS providers. One industry executive stated that changing DMS providers "is akin to a heart transplant." CDK's CEO recently acknowledged that "switching DMS providers can be very difficult. It [is] quite a process to change and takes time, which is part of the reason that many dealers are hesitant to switch." One large dealer publicly referred to changing DMS providers as "mission impossible." Both Reynolds and CDK have publicly touted that their market positions are secure because of this very fact.

**ANSWER:** Denied as to the first sentences of this paragraph of the SAC. While switching DMS providers is not costless, those costs are nowhere close to prohibitive. Indeed, the DMS market is robustly competitive, and every year, many dealerships switch DMS providers for reasons including but not limited to price, features, performance, service, security, application availability, and third-party access policies. Reynolds denies that the quoted material is in proper context (including that one of the articles purportedly demonstrating that switching is difficult is about a dealer that did switch). Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC, and therefore denies same.

39. Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate. For a typical dealership to change DMS providers, it takes at least a year of preparation, staff training, and testing before the new system is even put into operation.

**ANSWER:** Denied in part. While the process of switching DMS providers used to take longer and can entail costs, the process of switching DMS providers now typically is much faster, and competitive DMS providers are frequently investing in new technologies and training programs to make the process easier for dealerships to switch to their DMS products. All remaining allegations of this paragraph of the SAC are denied.

40.     The experience of Hendrick Automotive Group, the largest privately held dealership group in the country, is illustrative.  In May 2016, Hendrick announced that it had decided to switch from Reynolds to CDK, with the goal of completing the transition by mid-2017.  The fact that a large dealership had decided to switch DMS providers was momentous news in the automotive industry.  However, just months later, CDK disclosed that Hendrick had decided against the move after all.  The switchover to CDK had already begun but was halted because of the difficulty and disruption caused by the attempt.  Hendrick remained with Reynolds.

**ANSWER:** Admitted that Hendrick switched DMS providers for a brief period of time in 2016 and then ultimately switched back to Reynolds.  Denied that Hendrick did so due to switching costs.  As to the remaining allegations of this paragraph of the SAC, denied.

41.     Third, a dealer cannot operate without a functioning DMS.  CDK and Reynolds can paralyze a dealer's business by altering the DMS or restricting critical third-party applications from interacting with it.

**ANSWER:** Denied as to Reynolds.

42.     Fourth, the DMS houses a dealer's data, including data relating to customer, sales, inventory, marketing, accounting, financial, and other information.  Although the data is owned by the dealership, CDK and Reynolds control who is allowed to access it.  Dealerships are therefore vulnerable because many third-party vendors need to access the data stored on the DMS in order to provide services, such as EVR.  In short, DMS providers can severely disrupt a dealership's business simply by switching off third-party access to essential data.  As detailed below, that is exactly what is happening here:  CDK and Reynolds are blocking MVSC from obtaining data that is needed to provide EVR services to dealerships and ultimately to the customers of those dealerships.

**ANSWER:** Admitted that the DMS enables dealers to operate and that dealers use the DMS to, among other things, process data inputted by dealers.  Admitted that the data inputted to the DMS for processing (although not all by the dealer) includes data relating to customer, sales, inventory, marketing, accounting, financial, and other information.  Denied that dealers own all data inputted to the DMS.  The DMS is a licensed enterprise computer system and its functionality depends on confidential and proprietary software and data, including the DMS provider's proprietary functions and data, OEM data, contracted third-party data, credit-reporting data, and other nonautomotive third parties' data.  Admitted that Reynolds has unilaterally prohibited and sought

to block unauthorized third party access to its DMS. As to the remaining allegations of this

paragraph of the SAC, denied.

43. Finally, Reynolds and CDK are vindictive when spurned by dealerships that try to switch DMS providers. For dealers, that makes swapping DMS providers not only a logistic nightmare, but a risky and litigious proposition. There is a large collection of lawsuits brought by CDK and Reynolds against dealers that tried but failed to switch DMS providers. The lawsuits tell the story of how deeply damaging an unsuccessful change in DMS providers can be. One publicized case involved a dealer that had been with Reynolds for over 20 years and tried to change providers. Reynolds and the dealer ended up in court, with Reynolds refusing to release the dealer's data stored on its DMS. The lawsuit tied up the dealer's business for months, with the dealer eventually capitulating to an out-of-court settlement with Reynolds.

**ANSWER:** Denied as to Reynolds.

44. The leverage that CDK and Reynolds exert over dealers is the source of their long-standing duopoly. It also serves as a durable competitive advantage. The DMS market has been so tightly controlled for so long by CDK and Reynolds that even Microsoft Corp., the global software behemoth, could not compete with them. Microsoft tried to enter the DMS market in 2006 but failed. In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded, "We kind of got ahead of ourselves." As Mr. Brockman of Reynolds summarized, given the difficulty inherent in breaking into the DMS market, Microsoft and others "will not be an effective competitor in this marketplace."

**ANSWER:** Denied.

### B. EVR Markets

45. As noted above, the DMS houses a car dealership's most important data, including customer, vehicle, and sales information. Many third-party software vendors need to access the data in order to perform essential tasks for the dealer. One of those essential tasks is electronic vehicle registration and titling.

**ANSWER:** Admitted that the DMS enables dealers to operate and that dealers use the DMS to,

among other things, process data inputted by dealers. Admitted that the data inputted to the DMS

for processing (although not all by the dealer) includes data relating to customer, vehicle and sales

information. Admitted that vendors that provide electronic vehicle registration and titling must

be able to obtain purchaser, vehicle, and financing information about the sale of a car. Admitted

vendors providing other types of services must be able to obtain certain information in order to

provide their services, which may vary depending on the service provided. Denied to the extent

that this paragraph of the SAC implies a need for access to Reynolds's proprietary DMS. While

third-party application vendors typically rely on one or more data elements to provide their

services, there are numerous ways that dealers can provide such data to vendors without providing

the vendors or "data integrators" direct access to the DMS.

46.     Twenty years ago, states registered and titled vehicles internally through their
respective Department of Motor Vehicles ("DMV"). Now, approximately 30 states have changed
their laws to allow authorized, state-licensed firms from the private sector to electronically
register and title vehicles in partnership with the state's DMV. Only state-approved firms are
permitted to operate as an EVR provider in the state.

**ANSWER:** Admitted on information and belief.

47.     Firms that provide EVR services require three categories of information from a
dealer's DMS:  (1) car buyer identification; (2) vehicle identification; and (3) financing
information. The EVR provider processes that information with the DMV (ensuring that all
necessary information is complete and accurate); calculates and transmits the requisite fees to the
DMV; and then issues the registration stickers and license plates to the car buyer. Once the
registration is complete, the DMV issues the title to the vehicle owner, whether to the car buyer
(if the purchase was outright) or to the lender (if the purchase was financed).

**ANSWER:** Denied in part. Admitted that vendors that provide electronic vehicle registration

and titling must be able to obtain purchaser, vehicle, and financing information about the sale of

a car. Admitted that this paragraph of the SAC generally summarizes services provided by EVR

providers. Denied to the extent that this paragraph of the SAC implies a need for access to

Reynolds's proprietary DMS.

48.     EVR offers many advantages over the prior brick-and-mortar approach. Through
EVR, registration and titling of vehicles is completed electronically. It makes the process much
quicker and more efficient, eliminates the need to go to the DMV, reduces the amount of
paperwork, and minimizes errors. Car buyers benefit by receiving their registration and license
plates quicker and with a lot less hassle. Car dealerships benefit by having a third-party vendor
ensure that the critical functions of licensing and titling cars are performed accurately and
promptly for the dealer's customers as well as in compliance with specific deadlines imposed by
certain states, including California. And the government benefits from increased efficiency and
performance of an important governmental function, in addition to freeing up resources at the
DMV to perform other work.

**ANSWER:** Admitted that EVR, in general, offers certain advantages over non-electronic registration and titling. Admitted to the extent this paragraph of the SAC is describing such advantages; otherwise denied.

49. Although states regulate the EVR providers within their boundaries, states do not decide which EVR provider a dealership uses. Instead, dealerships themselves select which authorized EVR provider will electronically register and title the vehicles sold at their dealership. Once a dealership selects an EVR provider, the parties notify the DMV and enter into a written contract, which are typically month-to-month in length.

**ANSWER:** Partially denied. Admitted that states regulate EVR providers operating within their boundaries, that dealerships select the authorized EVR provider that will electronically register and title the vehicles sold at their dealership, and that the dealership provides notice to the DMV and enters into a written contract with its selected EVR provider. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning the characteristics of a "typical" EVR contract, if any, and therefore denies same.

50. An EVR market is comprised of those vendors that are authorized to provide EVR services within a given state. Each state's EVR market is a separate geographic market. EVR services in one state are not substitutes for EVR services in another state. Each state prescribes the metes and bounds of its particular EVR market. Only those providers approved in a particular state are able to offer EVR services within that state, such that an EVR provider in one state does not compete with EVR providers operating only in other states. Similarly, a dealership in one state cannot use an EVR provider licensed in another state.

**ANSWER:** Admitted.

51. There is public and industry recognition of individual state EVR markets. There is also public and industry recognition that EVR markets are geographically confined to the state level.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning "public and industry recognition," and therefore denies same.

52. Individual state EVR markets are generally highly concentrated and have high barriers to entry. For example, as described below, CVR has a monopoly as the only effective

-19-

EVR provider in several states, including Illinois, and there are just three providers in California. New entrants to an EVR market face extensive legal licensing and DMV requirements, as well as high capital and technological startup costs.

**ANSWER:** Denied.

### 1.     MVSC and CVR Are Competitors in Certain EVR Markets

53.     **CVR.** CVR, short for Computerized Vehicle Registration, was founded in 1992 and describes itself as the world's largest provider of EVR services. In the United States, it provides EVR services to over 15,000 dealerships across 23 states. It processes nearly 15 million EVR transactions annually. It is far and away the largest EVR provider in the United States, covering more states and processing more transactions than any other competitor.

**ANSWER:** Admitted that CVR was founded in 1992, provides EVR services to over 15,000 customers across 23 states, and processes nearly 900,000 vehicle transfers and DMV inquiries monthly across 23 states. Otherwise, denied.

54.     CVR is wholly owned by CDK and Reynolds. In 1992, CDK and Reynolds partnered to acquire CVR. CVR ensured that both Reynolds and CDK partnered in the acquisition so that CVR could claim to dealers that its owners controlled upwards of 90 percent of the DMS market, and that it had direct access to the data stored on their DMS platforms. According to CVR itself, its exclusive status as the only EVR provider with direct access to dealer data was a critical factor in its rapid expansion and eventual dominance of state EVR markets.

**ANSWER:** Admitted that CVR has been wholly owned by CDK and Reynolds since 1992. Otherwise, denied.

55.     Over the years, CVR has returned hundreds of millions of dollars in profits to CDK and Reynolds. For decades, CVR has been an undeniable cash cow and reliable moneymaker for its owners.

**ANSWER:** Admitted that CVR has been profitable for Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning the entities other than Reynolds, and therefore denies same. As to the remaining allegations of this paragraph of the SAC, denied.

56.     **CDK Manages and Controls CVR.** CVR is a wholly owned joint venture of CDK (80 percent) and Reynolds (20 percent). CDK in particular wields complete control over CVR's direction and management. It controls who is on CVR's board of directors, and occupies most of the board seats (Reynolds also has representatives on CVR's board). CDK executives not only

hold supervising authority over CVR's operations and personnel – CVR's general manager reports directly to CDK's Vice President of Operations, North America – but CVR executives are concurrently CDK executives. For example, for most of the past decade, Scott Herbers was simultaneously general manager at CVR and a top executive at CDK. In its public filings, CDK specifically states that it "holds a controlling financial" and a controlling "management interest" in CVR.

**ANSWER:** Admitted that CVR is a wholly owned joint venture of CDK and Reynolds. Admitted that CDK has a greater stake in CVR (80% for CDK and 20% for Reynolds). Denied to the extent this paragraph suggests that Reynolds has no control over CVR even though it has a 20% stake and one CVR board seat occupied by Jon Strawsburg. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning CDK personnel or CDK statements, and therefore denies same.

57. CVR is treated as a division of CDK, not as an independent corporate entity. For example, CDK rolls up and includes CVR's financial results in CDK's consolidated and combined financial statements. CDK likewise controls CVR's day-to-day activities. CVR employees are treated as CDK employees, with CDK email addresses and job descriptions. CDK makes hiring and firing decisions of CVR's employees. CDK posts new job listings for CVR. CDK and CVR also share physical offices – CVR's headquarters are located within CDK's California offices. CVR's operations are not even segregated to different floors, but sit side-by-side with CDK's. CDK directs CVR's marketing efforts, drafting its marketing plans and strategies for which dealers to target. CDK provides a regular list of dealerships to CVR as their "priority hit list" on which CVR must focus (those dealerships are often the ones served by MVSC and are being affected by CDK's intentional interruption of that ability of MVSC to obtain data from those dealerships). CDK account representatives also accompany CVR sales representatives on visits to current and prospective dealer customers. CDK also controls CVR's budgets and capital investments. CDK directs whether (and how much) CVR will invest in its services and technology to improve its product. CDK determines the areas of investment, and directs how CVR's budget is allocated.

**ANSWER:** Denied to the extent this paragraph suggests that Reynolds has no control over CVR. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning how CDK treats or views CVR, and therefore denies same.

58. Given the foregoing, it is no surprise that CDK (and Reynolds) publicly refer to CVR as "our" EVR service and CVR likewise markets itself as a unit of CDK (and Reynolds).

As CVR advertises on its website, "we are backed by the leading DMS providers in the industry – CDK Global and Reynolds & Reynolds."

**ANSWER:** Admitted that CVR advertises that it is "backed" by CDK and Reynolds. Otherwise, denied.

59.    The above facts and others alleged in this complaint demonstrate that CDK exercises complete control over the affairs and policies of CVR, directs its day-to-day operations, and derives the full financial benefits (with Reynolds) from CVR's activities. Accordingly, CDK is properly considered to compete in the relevant EVR markets. To be a competitor at the level of a subsidiary, a subsidiary's parent must have substantial control over the affairs and policies of the subsidiary. If a parent in fact stands as the decisionmaking entity controlling the subsidiary – as CDK does here with respect to CVR – then the parent is properly understood to be a "competitor in the market" of the subsidiary. This is especially the case where the parent not only controls the subsidiary's activities but also reaps all the financial benefits, such as here where CVR's financials are rolled up and consolidated into CDK's. CDK therefore competes in the relevant EVR markets.

**ANSWER:** Admitted that CVR is a wholly owned joint venture of CDK and Reynolds. Admitted that CDK has a greater stake in CVR (80% for CDK and 20% for Reynolds). Denied to the extent this paragraph suggests that Reynolds has no control over CVR even though it has a 20% stake and one CVR board seat occupied by Jon Strawsburg. Otherwise, denied.

60.    While substantial control is all that is required for a parent to be considered a competitor in the market of its subsidiary for purposes of Section 2 of the Sherman Act, CDK goes beyond substantial control over CVR. The facts alleged here demonstrate that CDK directly controls the day-to-day activities of CVR, making CVR the alter-ego or agent of CDK.

**ANSWER:** Denied.

61.    **MVSC.** MVSC was formed in 2005 to compete in the California EVR market. At the time, CVR controlled approximately 90 percent of the California EVR market and therefore held a monopoly position. Market research exposed widespread dealer dissatisfaction with CVR, primarily because of its poor service to dealers and car buyers. MVSC therefore centered its business on providing top-quality and personalized service and support to dealers and car buyers. As a result of its service-oriented culture, MVSC has been able to make inroads into CVR's monopoly position in California.

**ANSWER:** Denied.

62.    MVSC's EVR product in California is called "DMVdesk." It is a web-based service for providing EVR services with sophisticated tools for workflow and inventory management.

As a web-based application, there is no need to load software onto a dealer's hard drive. DMVdesk is widely recognized as the most efficient and easy-to-use EVR application in the market today.

**ANSWER:** Admitted that MVSC has a product called "DMVdesk." Denied that DMVdesk is

"widely recognized as the most efficient and easy-to-use EVR application in the market today."

Reynolds lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph of the SAC, and therefore denies same.

63.     Building on DMVdesk's success, MVSC has created a new EVR product called Vitu (pronounced "v-two," as in "version two"). Vitu automates even more steps in the EVR process. It also allows dealers to process EVR transactions across multiple stores through a single user interface. As MVSC expands to other EVR markets, MVSC will introduce Vitu in those states and eventually California.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

64.     There are two state EVR markets at issue in this complaint: the Illinois EVR market and the California EVR market.

**ANSWER:** Admitted.

## 2.     The Illinois EVR Market

65.     Illinois began allowing EVR services in 2005. Illinois mandates the use of EVR for the registration and titling of every new vehicle sold in the state. Therefore, every franchised automotive dealership must contract with an EVR provider to perform those services. Illinois also requires that the printed registration and license plates be provided to the car buyer at the time of sale. Illinois law provides that a car buyer can be charged no more than $25 for the EVR service. EVR providers can charge up to $10 for their services, with dealers able to add an additional 1.5 times that amount, for a total of $25.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

66.     CVR has a monopoly over the Illinois EVR market. It possesses approximately 95 percent of the market, and has maintained that monopoly position since Illinois began allowing EVR services in 2005.

**ANSWER:** Denied.

67.    MVSC is an approved EVR provider in Illinois, and has maintained an office there since 2014.  But like the other three EVR providers approved in Illinois (Dealertrack, Electronic License Service, and S&S License and Title Service), MVSC cannot make any inroads into the market for a very specific and undisputed reason:  CVR is the only EVR provider that is allowed direct access to CDK's and Reynolds's DMS.  That direct access enables CVR to obtain the required data from the DMS instantaneously, which is necessary to comply with the state requirement that the registration and license plates be provided to the car buyer at the time of sale.

**ANSWER:** Admitted that MVSC is currently an approved EVR provider in Illinois, but denied that it was approved at the time the Second Amended Complaint was filed.  Reynolds has admitted EVR providers other than CVR into the RCI program.  Denied that CVR has ever had direct access to Reynolds's DMS, and denied that direct access to Reynolds's DMS is necessary in order for an EVR provider to compete in Illinois.  Otherwise denied.

68.    Because MVSC does not have direct access to the DMS – due to CDK's and Reynolds's concerted group boycott – MVSC is effectively blocked from competing with CVR in Illinois.

**ANSWER:** Denied.

69.    As discussed below, there is no alternative to obtaining the data from a dealer's DMS.  That is the only place the data is stored.  Dealers do not and would not enter the data into a separate platform just for EVR services.  No dealer does it.  Doing so would eliminate many of the primary benefits of EVR services, chief among them increased efficiency and decreased error rates.

**ANSWER:** Denied.

### 3.    The California EVR Market

70.    California began allowing EVR services in 1997.  California is by far the largest vehicle market in the United States.  Consequently, it is also the largest and most important EVR market.

**ANSWER:** Admitted that California began allowing EVR services in 1997 and is the largest new car market in the United States.  Otherwise, denied.

71.    Like Illinois, California mandates the use of EVR, and every dealership must therefore contract with an EVR provider.  Unlike Illinois, however, California does not require that the printed registration and license plates be provided to the car buyer at the time of sale.  Instead, California requires that car buyers receive their registration and license plates within 90

days of the purchase date.  It is the responsibility of the car dealership to comply with this requirement.  If car buyers do not receive their registration and license plates within 90 days of purchase, the dealer's business license from the DMV can be revoked.

**ANSWER:** Alleges a legal conclusion.  No answer required. To the extent an answer is required,

Reynolds lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph of the SAC, and therefore denies same.

72.     California law provides that a car buyer can be charged no more than $29 for the EVR service, of which $4 is paid to the DMV, and the remaining amount is paid to the EVR provider.  There is no statutory cap on what an EVR provider can charge a dealer per transaction. Therefore, while an EVR provider could charge a dealer much more than $29 per transaction, the dealer can only pass through $29 to the car buyer.  The dealer would have to bear the cost of any excess, which no dealer is willing to do.  Therefore, there is an effective cap of $29 per transaction that an EVR provider charges to dealers.

**ANSWER:** Alleges a legal conclusion.  No answer required. To the extent an answer is required,

Reynolds lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph of the SAC, and therefore denies same.

73.     CVR entered the California EVR market in 1997.  Until several years ago, CVR maintained a monopoly in California, controlling approximately 90 percent of the EVR market.

**ANSWER:** Admitted that CVR began providing EVR services in California in 1997.  Otherwise,

denied.

74.     MVSC entered the EVR market in 2005.  At first, MVSC made only small inroads into CVR's monopoly.  However, three factors have allowed MVSC to compete with CVR in California:  (1) car buyers are not required to receive their registration and license plates at the time of sale; (2) California has fostered competition in the EVR market as a matter of policy; and (3) MVSC's product and service are far superior to CVR's.

**ANSWER:** Admitted on information and belief that MVSC began providing EVR services in

California in 2005.  Otherwise, denied.

**a.      In California, Car Buyers Are Not Required To Obtain the Vehicle's Registration and License Plates at the Time of Sale**

75.     The most important factor that enabled MVSC to compete against CVR in California is that, unlike Illinois, California does not require that a car's registration and license plates be delivered to the car buyer at the time of sale.  That means instantaneous access to a

dealer's data is not required to provide EVR services in California. As a result, EVR providers that are not directly integrated with the CDK and Reynolds DMS platforms – i.e., every EVR provider other than CVR – have been able to provide EVR services by obtaining the necessary data from a dealer's DMS at a later time through different means. As described below, however, CDK and Reynolds in concert are systematically eliminating MVSC's ability to obtain the necessary data from the dealership's DMS in an effort to eliminate MVSC as a competitor in the California EVR market.

**ANSWER:** Admitted that MVSC does not need access to Reynolds's RCI program or real-time

DMS integration in order to compete in the California EVR market. Further admitted that

MVSC's claimed injuries are caused by differences in state regulations and not any conduct by

Reynolds. Otherwise, denied.

> **b.    California Has Fostered Competition in the EVR Market as a Matter of Policy**

76.    Competition between EVR providers is a central purpose of California's EVR program, and the California legislature has taken steps to ensure a competitive EVR market. The legislature recently reaffirmed that maintaining EVR competition – in which providers compete to offer the highest-quality EVR service – is the official state policy.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

77.    In 2015, the legislature noted that certain EVR providers, including CVR, were attempting to undercut the standalone EVR market by "incentivizing dealers to enter into new EVR agreements by providing other services for free or at a heavily discounted rate. These additional services include dealer management systems, digital retailing services, or Web site management." Concurrence in Sen. Amendments AB 605 (Gatto) (June 16, 2015). In other words, EVR providers were using what they charged dealers for their EVR product to subsidize the price of their other products and services. In response, the legislature enacted a new law "aim[ed] to clarify that the charge being paid by consumers for electronically filing title and registration documents with the DMV does not include costs associated with services unrelated to EVR." *Id.*; *see* Cal. Vehicle Code § 4456.5(a)(2)). The law therefore preserved a discrete EVR market in which EVR providers compete with each other to deliver EVR-specific services, without drawing on their other products and services.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same. The quoted materials

speak for themselves.

### c. MVSC's Product and Service Are Superior to CVR's

78. Finally, MVSC has been able to compete with CVR because MVSC's product and service are vastly superior. Because output and price are both regulated (i.e., EVR is mandated and the EVR fee to dealers is effectively capped, *see supra* Part 1.B.3), price is not a consideration for a dealership in selecting the EVR provider. Instead, EVR providers compete on the quality-adjusted price per registration. EVR providers differentiate themselves through customer service (to dealers and buyers), speed of processing, accuracy, and the user-friendliness of their products.

**ANSWER:** Admitted that EVR providers compete on non-price factors. Otherwise, denied.

79. Dealers much prefer MVSC's product and service to the EVR service provided by CVR. With respect to the product, MVSC's DMVdesk is a web-based program that is much more flexible than CVR's product, which must be installed on a dealer's hard drive. Dealers widely acknowledge that DMVdesk's user interface is simpler and easier to use. There is also more automation with DMVdesk, requiring fewer steps to complete the EVR process.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to MVSC, and therefore denies same.

80. With respect to service, there is no comparison. In California – where EVR providers do not issue the registration and license plates at the point of sale, but instead process them after the purchase – it takes CVR at least 30 days and sometimes as much as two months to deliver the physical registration and license plates to car buyers. MVSC accomplishes the same in one day. CVR's months-long backlog versus MVSC's same-day turnaround provides a tangible example of MVSC's superior service as compared to CVR.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to MVSC, and therefore denies same.

81. MVSC also offers 24/7 customer service – a dealership can call or message MVSC at any time of the day, and MVSC will respond almost immediately to help resolve any issues. MVSC provides extensive training for dealership employees to ensure they know how to use DMVdesk and understand the legal and technical requirements for EVR. MVSC also conducts monthly onsite visits to ensure that there are no latent issues that have not been addressed. Perhaps most illustrative of the ways MVSC provides superior service to dealers, MVSC even dispatches backup clerks to a dealership's offices when the dealership has someone out sick or is understaffed.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to MVSC, and therefore denies same.

82. In terms of quality control, MVSC's procedures exceed anything in the market. MVSC audits the paperwork and information for every EVR transaction. MVSC even videotapes

the processing of every piece of paper so that if issues arise later, there is a video record of what MVSC actually received. Due to MVSC's fastidious procedures, MVSC has the lowest error rate in the market.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to MVSC, and therefore denies same.

83.     Finally, MVSC has also brought innovation to the market in terms of dealer choice. Prior to MVSC entering the California EVR market, the standard length of an EVR provider's contract with a dealer was two years. CVR insisted that dealers agree to two-year contracts in order to make it difficult for those dealers to switch EVR providers. MVSC then entered the market and introduced the month-to-month contract in order to provide more flexibility for dealers. As a result of this innovation, the standard EVR contract in California – including from CVR – is now month-to-month, giving dealers greater flexibility to continually select the EVR provider of their choice.

**ANSWER:** Admitted that CVR used to have multi-year contracts with California dealers but now

mostly has month-to-month contracts with California dealers. Reynolds lacks knowledge or

information sufficient to form a belief about the truth of the allegations in this paragraph of the

SAC as to entities other than Reynolds, and therefore denies same. Otherwise, denied.

### d.      CVR Acquired AVRS To Try To Stop Its Market Share from Shrinking

84.     As a result of the above factors, MVSC slowly increased its market share in California, while CVR saw its market share decrease. In order to stop the slide, CVR made a major acquisition in 2015. On April 2, 2015, CVR acquired AVRS, Inc. ("AVRS") for $49.5 million. At the time, AVRS was a quickly growing EVR provider in California. CVR hoped that the combination of AVRS with CVR's "seamless end-to-end DMS integration" would reestablish CVR's monopoly in the California EVR market. The expensive ploy did not work. After the acquisition, AVRS's service to its dealerships quickly deteriorated to CVR's inferior levels. As one dealer wrote to CVR in the summer of 2016, referring to AVRS: "I have always stated that your customer services etc. were the most important reason for staying with AVRS over DMV Desk, since your products are so similar. Since the CDK [i.e., CVR] buyout, we have noticed a huge decline in service."

**ANSWER:** Admitted that MVSC's share of the California EVR market has grown while CVR's

share has decreased. Admitted that CVR acquired AVRS on April 2, 2015 for $49.5 million.

Otherwise, denied. The source of the quote is not identified; Reynolds accordingly lacks

sufficient information to form a belief about the truth of allegations in this paragraph of the SAC

concerning the quoted language, and therefore denies same.

85.     Today, due to its superior product and service, MVSC has been able to earn approximately 50 percent of the EVR market in California.  CVR still controls approximately 40 percent of the market, while Dealertrack has the remaining ten percent.

**ANSWER:** Admitted that MVSC holds the greatest share of the California EVR market, followed

by CVR and Dealertrack.  Otherwise, denied.

### 3.      Other State EVR Markets

86.     CVR maintains a monopoly or dominant position in many other state EVR markets, including Michigan, Wisconsin, West Virginia, and South Carolina.  MVSC plans to enter other EVR markets, including Wisconsin and Virginia.  But so long as CDK and Reynolds deny MVSC access to the dealer data stored in their DMS platforms, it will be very difficult, if not impossible, for MVSC to compete in those markets.

**ANSWER:** Reynolds lacks sufficient information to form a belief about the truth of allegations

in this paragraph of the SAC concerning entities other than Reynolds, and therefore denies same.

Otherwise, denied.

87.     Besides California, there is one state in which MVSC has been able to break CVR's stranglehold – Oregon.  Until last year, CVR maintained a monopoly in Oregon, controlling virtually 100 percent of the EVR market.  Due to CVR's poor service, Oregon sought to introduce competition into its EVR market and license other EVR providers.  MVSC applied, and Oregon approved MVSC as an EVR provider in the state.  After MVSC entered the market, instead of competing, CVR decided to leave the Oregon market altogether because of the market's small size.  As a result, MVSC is now the leading EVR provider in the Oregon EVR market.

**ANSWER:** Admitted that MVSC is the leading EVR provider in Oregon, and that CVR

previously provided EVR services in Oregon but no longer does so.  Otherwise, denied.

## II.      It Is Essential that EVR Providers Be Able To Obtain Data from a Dealer's DMS

88.     In order for an EVR provider to participate in an EVR market, it is necessary that the provider be able to retrieve the following specific information about the sale of a car from the dealer's DMS:  (1) identity of the car buyer; (2) car make, model, and VIN; and (3) financing information.

**ANSWER:** Denied in part. Admitted that vendors that provide electronic vehicle registration and titling must be able to obtain purchaser, vehicle, and financing information about the sale of a car. Denied to the extent that this paragraph of the SAC implies a need for access to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or more data elements to provide their services, there are numerous ways that dealers can provide such data to vendors without providing the vendors or "data integrators" direct access to the DMS.

89.     It is impossible to provide EVR services without that information, which must be provided to a state's DMV in order to complete the electronic registration and titling of a car. A dealer's DMS is the only place to obtain this information. Nobody in the industry disputes that being able to retrieve this data from a dealer's DMS is essential, necessary, and required to function as an EVR provider. As CDK describes it, the data on a dealer's DMS is "irreplaceable."

**ANSWER:** Denied in part. Admitted that vendors that provide electronic vehicle registration and titling must be able to obtain purchaser, vehicle, and financing information about the sale of a car. Denied to the extent that this paragraph of the SAC implies a need for access to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or more data elements to provide their services, there are numerous ways that dealers can provide such data to vendors without providing the vendors or "data integrators" direct access to the DMS.

### A.     Although Dealers Own the Data Stored on Their DMS, CDK and Reynolds Control Access to the Data

90.     The data on a dealer's DMS is not owned by the DMS provider. Rather, the data is owned by the dealers. CDK and Reynolds admit as much. CDK publicly states that it "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." Similarly, Reynolds has declared, "The data belongs to the dealers. We all agree on that."

**ANSWER:** Admitted that the quoted Reynolds language in the final sentence is attributable to Tom Schwartz of Reynolds, subject to the clarification that the quoted language goes on to say: "But we can't have people rooting around in a dealer's DMS. That creates a liability." Denied to the extent that this paragraph implies that dealers own all categories of data processed by the

DMS or the DMS itself. The DMS is a licensed enterprise computer system. In addition, the DMS functionality depends on confidential and proprietary software and data, including the DMS provider's proprietary functions and data, OEM data, contracted third-party data, credit-reporting data, and other nonautomotive third parties' data. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to the quote attributed to CDK, and therefore denies same.

91.     Even though dealers own the data, CDK and Reynolds have seized control over who can access it. CDK and Reynolds prohibit dealers from providing data stored on the dealer's DMS to third-party vendors through "unauthorized means" – which CDK and Reynolds interpret to mean any access not specifically approved by them. To provide "unauthorized" access, according to CDK and Reynolds, constitutes a "hostile integration" with the DMS and is a breach by the dealer of the DMS contract. Instead of dealers, therefore, CDK and Reynolds control the flow of data from a dealer's DMS to third-party vendors.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements, including by unilaterally blocking unauthorized access to its proprietary system; Reynolds denies that this unilateral, and longstanding conduct, resulted from a conspiracy with CDK or any third party. Otherwise, denied. Denied to the extent that this paragraph of the SAC implies a need for access to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or more data elements to provide their services, there are numerous ways that dealers can provide such data to vendors without providing the vendors or "data integrators" direct access to the DMS. Denied to the extent that this paragraph implies that dealers own all categories of data processed by the DMS or the DMS itself. The DMS is a licensed enterprise computer system. In addition, the DMS functionality depends on confidential and proprietary software and data, including the DMS provider's proprietary functions and data, OEM data, contracted third-party data, credit-reporting data, and other nonautomotive third parties' data.

92.     CDK and Reynolds charge third-party vendors large fees for accessing data stored on a dealer's DMS. Doing so is a major and growing revenue source for CDK and Reynolds. It

is a driving factor behind their large margins and high profitability. The fact that CDK and Reynolds – rather than the dealers themselves – profit from charging third parties for access to the dealers' own data is a prime example of the imbalance of power between the dealers and the DMS providers. Indeed, in nearly every case, the third-party vendors pass the cost of access to dealer data on to the dealers themselves in the form of higher service fees – in effect, dealers have to pay CDK and Reynolds for access to their own data.

**ANSWER:** Admitted that third party vendors can access certain data stored on a Reynolds or CDK DMS by participating in the RCI or 3PA programs, respectively, and paying the corresponding fees. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC concerning fees charged by vendors to dealers, and therefore denies same. Otherwise, denied.

### B. CDK and Reynolds Have Similar Third-Party Programs for Accessing Data on Their DMS Platforms

93. CDK and Reynolds provide access to the data on a dealer's DMS through official third-party access programs. CDK's access program is called Third Party Access ("3PA"). Reynolds's is called the Reynolds Certified Interface ("RCI"). These programs supply the only means through which third-party vendors can retrieve – instantaneously and in real time – the data necessary to provide services for the dealership. Participation in these two programs is also the only way that third-party vendors become "certified" to obtain data from a dealer's DMS.

**ANSWER:** Admitted that third party vendors can access certain data stored on a Reynolds or CDK DMS by participating in the RCI or 3PA programs, respectively, and paying the corresponding fees. Denied to the extent that this paragraph of the SAC implies a need for access to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or more data elements to provide their services, there are numerous ways that dealers can provide such data to vendors without providing the vendors or "data integrators" direct access to the DMS.

94. As CDK and Reynolds repeatedly tout to dealers, the 3PA and RCI programs are the "only approved methods for accessing" data on a dealer's DMS. Any other method for accessing data from a dealer's DMS is "unauthorized."

**ANSWER:** Admitted that third party vendors can access certain data stored on a Reynolds or CDK DMS by participating in the RCI or 3PA programs, respectively, and paying the

corresponding fees. Denied to the extent that this paragraph of the SAC implies a need for access

to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or

more data elements to provide their services, there are numerous ways that dealers can provide

such data to vendors without providing the vendors or "data integrators" direct access to the DMS.

The sources of the quotes are not identified; Reynolds accordingly lacks sufficient information to

form a belief about the truth of allegations in this paragraph of the SAC concerning the quoted

language, and therefore denies same.

95.     Participation in the 3PA and RCI programs allows a third-party vendor to obtain
the needed data from a dealer's DMS, and to do so in real time. For example, when a dealership
sells a vehicle, the vendor can immediately retrieve data about that the car buyer, the vehicle, and
the financing details.

**ANSWER:** Admitted that third party vendors can access certain data stored on a Reynolds or

CDK DMS by participating in the RCI or 3PA programs, respectively, and paying the

corresponding fees. Denied to the extent that this paragraph of the SAC implies a need for access

to Reynolds's proprietary DMS. While third-party application vendors typically rely on one or

more data elements to provide their services, there are numerous ways that dealers can provide

such data to vendors without providing the vendors or "data integrators" direct access to the DMS.

96.     As for pricing, CDK publicly states that the pricing for participation in the 3PA
program is standardized and the same for all vendors. "Our 3PA pricing philosophy is simple,"
CDK states in its program guide, "standardized pricing for all customers." CDK's website makes
the same point: "Our philosophy is simple: standardized pricing for all our Third Party Access
vendors." But as detailed below, that is not true with respect to MVSC.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

97.     CDK has posted a pricing guide on its website that sets forth the standardized
charges for accessing specific types of information from the DMS. For the type of information
that EVR providers require – buyer, vehicle, and financing data – the standardized pricing is $49
per dealer per month.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

98. Reynolds's pricing for participating in the RCI program is much more secretive. According to former Reynolds executives, Reynolds has a pricing committee (chaired by owner Bob Brockman) that determines the rates on a vendor-by-vendor basis. The pricing information is not shared internally at Reynolds – let alone publicly – and even account executives within the RCI program sometimes do not know the rationale for what vendors are charged to participate.

**ANSWER:** Admitted that Reynolds's RCI pricing is not publicized and that it is determined

based on the specific scope (and burdens) of each vendor's integration needs. Otherwise, denied.

99. CDK and Reynolds pay lip service to the fact that dealerships "own their data and enjoy having choices on how best to share and utilize that data." CDK and Reynolds represent that dealers should "choose the vendors with whom [they] want to share data" through the third-party programs. But that is not how it works in reality. Even though California and Illinois dealers want MVSC to participate in the 3PA and RCI programs and despite MVSC's repeated attempts to participate, CDK and Reynolds have entered into an illegal conspiracy to block MVSC from participating in the programs.

**ANSWER:** Denied.

## III. CDK, Reynolds, and CVR Have Illegally Agreed To Block MVSC from Participating in the 3PA and RCI Programs

### A. The Facts of the Agreement Are Straightforward

100. As of January 2014, CDK and Reynolds had entered into an illegal agreement in which both DMS providers agreed to block MVSC from participating in their third-party access programs. It is likely that the agreement was formed prior to that date, but it was in place at least by January 2014. The agreement continues in effect to this day.

**ANSWER:** Denied.

101. CDK's and Reynolds's identical decisions to block MVSC from their third-party access programs were the function of an agreement between them, not unilateral decisionmaking. CDK and Reynolds – horizontal competitors in the DMS market – coordinated their actions and agreed that they both would reject MVSC from their third-party programs. CDK and Reynolds entered into the illegal agreement with CVR's encouragement.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements,

including by unilaterally blocking unauthorized access to its proprietary system; Reynolds denies

that this unilateral, and longstanding conduct, resulted from a conspiracy with CDK or any third

party. Reynolds further denies that Reynolds and CDK made "identical" or "coordinated" decisions with respect to blocking of unauthorized DMS access or with respect to MVSC's participation in RCI and 3PA. Otherwise, denied.

102. The agreement was formed and implemented by at least the following individuals: Scott W. Herbers, CVR's longtime General Manager who at the same time served in senior executive positions at CDK; Robert N. Karp, President, CDK North America, and the person with oversight of CDK's 3PA program; and Robert Schaefer, Director of Data Services at Reynolds and the person in charge of Reynolds's RCI program.

**ANSWER:** Denied.

103. Scott Herbers is at the nexus of the conspiracy. Not only was he the longtime General Manager of CVR from 2002 until 2015, but he also served as a top executive at CDK during the same period. For example, while running CVR in January 2014, Mr. Herbers was also the CDK Vice President in charge of CDK's western region. Today, Mr. Herbers serves as CDK's Vice President of Sales, North America, while retaining some oversight responsibilities for CVR. Moreover, before taking the helm at CVR, Mr. Herbers was a top executive at Reynolds, serving as Vice President of Sales from 1991 to 2002. Mr. Herbers is therefore at the center of the CDK-Reynolds-CVR triangle.

**ANSWER:** Admitted that Scott Herbers was employed at Reynolds from 1986 through 2000 and held various titles during that time. Admitted that Scott Herbers was a General Manager at CVR from 2002 to 2015. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to Scott Herbers's employment at CDK, and therefore denies same. Otherwise, denied.

104. Mr. Karp (CDK) and Mr. Schaefer (Reynolds) have played pivotal roles in implementing the agreement. MVSC has made repeated attempts to participate in the 3PA and RCI programs. On several occasions, lower-level CDK and Reynolds employees promised (or expressed confidence) that MVSC would be allowed to participate in the programs. But, inevitably, when the idea was run up the corporate ladder, those same employees would come back with news that MVSC's applications had been blocked by senior executives – Mr. Karp at CDK and Mr. Schaefer at Reynolds.

**ANSWER:** Denied.

105. Based on information from a participant in the collusive conversations, CDK even has a name for the illegal conspiracy – the "Closed Category." EVR is a "Closed Category" within the third-party programs because they are "closed" to MVSC. Instead, CDK and Reynolds agreed

to allow CVR – and only CVR – to participate in the programs in the EVR markets where CVR competes with MVSC.

**ANSWER:** Denied.  In addition, specifically as to Reynolds denied that Reynolds has had a "closed category" for EVR services and denies that it has ever agreed with anyone regarding any "closed category."  Reynolds denies that it does not allow CVR competitors to participate in the RCI program.  For instance, CVR competitor TitleTec has long been certified by Reynolds to participate in RCI. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

106.   The executives had every opportunity to coordinate and collude, and based on information from participants in those conversations, the executives took full advantage of those opportunities.  Mr. Herbers and top executives at CDK and Reynolds sat on CVR's Board of Directors together.  During board meetings, MVSC was a recurring topic of conversation.  A former CVR board member confirmed that Reynolds and CDK executives were "very involved" and "very knowledgeable about MVSC and everything CVR was doing."

**ANSWER:** Admitted that representatives of CDK and one representative of Reynolds sat on the board of CVR, which is jointly owned by CDK and Reynolds.  Further admitted that discussions occurred at CVR board meetings relating to CVR (including CVR's operations, CVR's competition, EVR market issues, etc.).  Otherwise, denied.

107.   The purpose of the conspiracy is self-evident:  (1) protect CVR's monopoly in the Illinois EVR market; (2) empower CVR to regain its monopoly position in the California EVR market; and (3) block MVSC from effectively competing with CVR in markets that MVSC may enter in the future.  For CDK and Reynolds, CVR has been a cash cow, generating hundreds of millions of dollars during their ownership.  The purpose of the conspiracy is to protect the flow of those profits into the coffers of CDK and Reynolds.

**ANSWER:** Denied.

108.    Removing all doubt as to the existence of the conspiracy, a CDK executive has even confirmed to a senior MVSC executive that CDK has agreed "for a long time" to keep EVR as a "closed category" within the 3PA program to keep MVSC out and to protect CVR. He confirmed that it was Mr. Schaefer at Reynolds who was over the consideration of MVSC for participation in the RCI program. His purpose in calling was to let MVSC know that there were some lower-level executives within CDK who believed the agreement was wrong. They believed MVSC should be allowed to participate in the third-party programs and therefore compete with CVR on a level-playing field. These CDK executives had argued that participation should be offered to everyone equally and the EVR companies should compete on the quality of the product and service. But he said that Mr. Herbers and Mr. Karp had rejected this argument. He ended the conversation by imploring the MVSC executive to contact a specific executive vice president at CDK – Malcolm W. Thorne, CDK's Chief Global Strategy Officer – in the hope that he would override Mr. Herbers and Mr. Karp and allow MVSC to participate in the 3PA program. MVSC's efforts in this regard have been to no avail.

**ANSWER:** Denied.  In addition, specifically as to Reynolds denied that Reynolds has had a

"closed category" for EVR services and denies that it has ever agreed with anyone regarding any

"closed category."  Reynolds denies that it does not allow CVR competitors to participate in the

RCI program.  For instance, CVR competitor TitleTec has long been certified by Reynolds to

participate in RCI.  ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Reynolds

lacks knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph of the SAC as to CDK or non-Reynolds employees, and therefore denies same.

###    B.    CVR Had Conspiratorial Conversations With CDK and Reynolds

109.    CVR was not a bystander to the CDK and Reynolds conspiracy to block MVSC from their respective 3PA and RCI programs.  Instead, CVR executives actively participated in conspiratorial conversations with CDK and Reynolds, specifically discussing the need to block MVSC from accessing dealer data (whether through the 3PA and RCI data integration programs or otherwise) so that MVSC could not effectively compete.

**ANSWER:** Denied.

110.    A long-time member of CVR's Board of Directors – which is compromised of representatives from CDK, Reynolds, and CVR – admitted to MVSC that the board specifically

discussed keeping MVSC at a disadvantage with respect to data access. Board members recognized that MVSC "outcompeted CVR" with respect to "technology and improved services," and so board members agreed that CVR needed a competitive advantage as compared to its competitors regarding access to dealer data. CVR board meetings therefore not only provided the opportunity for Defendants to conspire – Defendants in fact seized on that opportunity.

**ANSWER:** Admitted that discussions occurred at CVR board meetings relating to CVR (including CVR's operations, CVR's competition, EVR market issues, etc.), but denied that any conspiracy or conspiratorial conversations occurred involving Reynolds on the one hand, and CDK and/or CVR on the other hand. The sources of the quotes are not identified; Reynolds accordingly lacks sufficient information to form a belief about the truth of allegations in this paragraph of the SAC concerning the quoted language, and therefore denies same. Otherwise, denied.

111. The CVR executives who have had these conspiratorial conversations with CDK and Reynolds at board meetings and elsewhere include, but are not limited to, Scott Herbers (former CVR General Manager), Jim Quinlan (current CVR General Manager), and John Roeder (CVR Senior Executive of Sales and Operations).

**ANSWER:** Admitted that discussions occurred at CVR board meetings relating to CVR (including CVR's operations, CVR's competition, EVR market issues, etc.), but denied that any conspiracy or conspiratorial conversations occurred involving Reynolds on the one hand, and CDK and/or CVR on the other hand. Otherwise, denied.

112. Outside of board meetings, CVR executives worked with CDK to keep its integration program "closed" to MVSC so that CVR could maintain its monopoly in the Illinois EVR market and regain its monopoly in the California EVR market. In an internal CDK presentation regarding its 3PA program, there is a section entitled "Category Restrictions in Place," with a subsection dedicated to "CVR Competitors." It reads: "*Not allowed to sign, even with extract, only unless in a territory not of value to CVR.*" That is, the presentation confirms that CVR's competitors are not allowed in the 3PA program at all – even if all they need is simple extract of data, as opposed to write-back capabilities – "only unless" they operate in an EVR market that is "not of value to CVR." These rules as described in the internal CDK presentation were implemented and are enforced with the express participation, input, and approval from CVR executives.

**ANSWER:** Denied that Reynolds has had a "closed category" for EVR services and denies that it has ever agreed with anyone regarding any "closed category." Reynolds denies that it does not allow CVR competitors to participate in the RCI program. For instance, CVR competitor TitleTec has long been certified by Reynolds to participate in RCI. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK or non-Reynolds employees, and therefore denies same.

113. At times, there have been lower-level executives at both CDK and Reynolds who have urged allowing MVSC into their respective integration programs. But a CDK executive informed MVSC that internal discussions at CDK – discussions in which CVR executives have participated, including those executives identified above – devolve into "how much money CDK would make" in integration fees if MVSC were allowed into the 3PA program versus how much profit Defendants would be "giving up by allowing a competitor" to have access to dealer data through the program. Given the monopoly profits at issue, top CVR and CDK executives have prevailed in continuing to block MVSC as a way to protect and increase CVR's market positions (including in Illinois and California).

**ANSWER:** ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK or non-Reynolds employees, and therefore denies same.

114. Apart from working with CDK and Reynolds to block MVSC from the 3PA and RCI data integration programs, CVR also coordinated with CDK and Reynolds with respect to

the blocking of independent integrators. For example, Jim Quinlan (CDK's General Manager) specifically discussed with top CDK executives the blocking of independent integrators as it related to MVSC. As described below, CDK sent letters to MVSC's dealer customers regarding the blocking of independent integrators and informing dealers that only "certified" vendors such as CVR would have access to dealer data. Mr. Quinlan (of CVR) and Mr. Karp (of CDK) specifically discussed those letters and hatched plans to capitalize on the expected loss of business that MVSC would suffer. Mr. Quinlan told CVR salespeople that once CDK sent the letters to MVSC's dealer customers, CVR should "target" those dealers and "be prepared" to handle the influx of dealers leaving MVSC for CVR.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements, including by unilaterally blocking unauthorized access to its proprietary system, whether by "independent integrators" or others; Reynolds denies that this unilateral, and longstanding conduct, resulted from a conspiracy with CDK or any third party. Denied that Reynolds has ever blocked MVSC from participating in RCI. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK or non-Reynolds employees, and therefore denies same.

### C. CDK and Reynolds Have Enforced the Agreement

115. CDK and Reynolds have been disciplined in their adherence to their illegal agreement. Every time MVSC has applied to participate in the 3PA and RCI programs, MVSC has been told "No."

**ANSWER:** Denied.

### 1. CDK Has Repeatedly Refused To Allow MVSC To Participate in the 3PA Program

116. MVSC first applied to participate in CDK's 3PA program in February 2014. MVSC made clear that it needed only basic data from a dealerhip's DMS and that it would pay the standard rates for the data. On March 14, 2014, CDK rejected MVSC's application without explanation, stating: "You have not been approved for inclusion in the [CDK] Third Party Access

Program." MVSC asked the CDK representative multiple times for an explanation and received nothing other than the following statement: "The decision was far above my level."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

117. Many dealers wrote to CDK to complain. On May 15, 2014, one wrote: "DMVdesk is our chosen [EVR provider] in the State of California for electronically processing the registration and titles for all of our stores. We understand DMVdesk was denied the opportunity to participate in the program without explanation. We would strongly encourage [CDK] to reconsider this decision and to allow DMVdesk to participate in the program. We have utilized other [EVR providers] and have found DMVdesk to have a superior product and provide us with a higher level of service and support than the other approved [EVR providers]."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

118. On May 22, 2014, another dealer wrote CDK: "We currently process our DMV work electronically through our service provider, Motor Vehicle Software Corporation (DMVdesk). We are very happy with the product and service that they provide to all of our stores. It has come to my attention that they applied to participate in the [CDK] Third-Party Access Program, but were denied access. The fact that [CDK] and Motor Vehicle Software Corporation share a common client should encourage you to embrace a business relationship that will ultimately serve us, your end user. We strongly encourage [CDK] to reconsider this decision and to allow MVSC to participate in the program. We have used other Service Providers in the past and have found that DMVdesk exceeds our expectations. If they can bring additional value to us through the [CDK] Third-Party Access Program, then we would like to see it happen."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

119. On July 11, 2014, another dealer wrote CDK regarding its decision to block MVSC: "I am writing to encourage [CDK] to reconsider this decision and to allow DMVdesk to participate in the program as I believe competition in the market place is always good. When compared to the other [EVR providers] we have used in the past, we have found DMVdesk to best meet [our] needs, while providing us with a high level of service and support."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

120. In July 2014, after being prompted by multiple dealerships, MVSC again applied to participate in CDK's 3PA program. Citing the letters the dealerships had sent to CDK, MVSC

wrote that it was "hopeful that after considering the desires of your customers and the value of having DMVdesk as part of the program that CDK will approve this application." MVSC also noted the "meaningful financial value to CDK in approving DMVdesk as a vendor," given that MVSC would pay the standardized rates for the data on the DMS. Finally, MVSC noted that allowing MVSC to participate would support CDK's statement to dealers that "'[d]ealerships own their data and should have choices on how best to share it and use it. Our Third-Party Access Program lets you [the dealerships] choose the vendors with whom you want to share data, by providing participating third parties with secure application programming interfaces.'"

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

121. The CDK representative that processed MVSC's application wrote that a "first, smaller committee agreed" to allow MVSC into the 3PA program, but that he had to send the application "up the chain." Once in the hands of Mr. Herbers and Mr. Karp, MVSC's application had no chance. They overruled the committee's decision and again rejected MVSC's application. This time, however, MVSC received an explanation for the rejection: CDK stated that MVSC was a competitor to CVR, and it was therefore unlikely that MVSC would ever be allowed to participate in the program.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

122. In March 2015, MVSC again applied to the 3PA program. MVSC emphasized that it would pay the posted standardized rates for participation. After MVSC applied and asked for a status update, a CDK representative responded that MVSC's application was "sitting at the highest level of governance that we have" – meaning, with Mr. Karp and Mr. Herbers. This time, instead of a flat rejection as with the two prior attempts, CDK demanded 33 percent of MVSC's top-line revenue to participate, an extortive demand that would make it impossible for MVSC to operate as a profitable business. CDK knew that MVSC could not charge dealerships more in order to cover the exorbitant demand. CDK knew that MVSC would lose money on every CDK dealership that it served, would cease to be able to operate as a going concern, and could never accept the proposal. MVSC made these points to CDK, and referred CDK to its public statements that "[o]ur 3PA program pricing philosophy is simple: standardized pricing for all customers." MVSC again stressed that it required only basic information from a dealer's DMS – among the cheapest information to obtain based on CDK's standardized pricing sheet. CDK responded that no matter what it had said publicly, privately MVSC was different because it competed with CVR and so would have to pay the exorbitant rate. CDK knew that no business could pay 33 percent of its top-line revenue to obtain the basic (but necessary) data from the DMS. The requested percentage was an effective refusal to deal, and CDK knew it.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

123.    In May 2016 – again at the behest of various dealerships – MVSC tried yet again to participate in the 3PA program.  On May 2, 2016, MVSC spoke with Dan McCray, Vice President of Product Management at CDK.  Mr. McCray stated that vendors "should be able to integrate with the DMS even if they have products that compete with companies owned by CDK." Mr. McCray also said that the standardized pricing posted on the 3PA website is what MVSC would pay if it wanted to participate.  MVSC stated that it had always been willing to pay the posted rates.  Therefore, with the apparent change of heart from CDK, MVSC applied the very next day to participate in the 3PA program.  After a week had passed, MVSC contacted Mr. McCray for a status update.  On May 12, 2016, Mr. McCray responded:  "I learned a lot since the last time we talked.  I see this is not going to be [an] easy decision." Mr. Herbers and Mr. Karp had intervened.  Indeed, Mr. McCray stated that CDK had "elevated your 3PA integration discussions."  Then, as it had before, CDK quoted MVSC a similarly offensive percentage of MVSC's top-line revenue as the price of participation – this time 25 percent of MVSC's gross revenues.  And as before, MVSC explained to CDK that the quoted price was an effective refusal to deal, as MVSC could not raise its rates to cover the huge fee.  MVSC would still lose money on every CDK dealership.  To break even, MVSC would have to lay off over half of its staff; cease all research and development efforts; and end multiple partnerships with car dealer associations.  Even then, such cuts would most likely not be enough.  CDK understood that, and once again, it knew that the quoted price was an effective refusal to deal.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

124.    In September 2016, MVSC applied again to participate.  This time, MVSC attached with its application CDK's "standardized" price list for all vendors in the 3PA program.  On September 13, 2016, CDK responded that the publicized pricing did not apply to MVSC, and that there would be "no change to the pricing" that CDK had presented previously.  For MVSC, "the integration pricing is still 25 percent of the revenue generated."  CDK openly admitted that MVSC's pricing was so high because CDK and Reynolds "have a competing product in the market" – namely, CVR.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

125.    With CDK's refusal to deal causing continued disruptions, dealerships again encouraged MVSC to apply to the 3PA program.  And so on October 21, 2016, MVSC wrote to CDK:  "We have tried numerous times [to participate in the 3PA program] and we have been told we can't participate and were quoted a price that far exceeds that which is published on the website and [which is] economically unfeasible."  CDK offered no substantive response.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

### 2. Reynolds Has Repeatedly Refused to Allow MVSC to Participate in the RCI Program

126. MVSC first applied to participate in Reynolds's RCI program in early 2014. In response, Reynolds refused to provide a price quote until MVSC provided detailed information about MVSC's business. Reynolds's aim was to extract as much proprietary information from MVSC as possible before providing firm pricing. Such information included details regarding MVSC's future business plans in California and Illinois, as well as technical information on how MVSC internally used and processed the data pulled from the DMS. Finally, in February 2014, Reynolds came back with a price quote that translated into a huge percentage of MVSC's top-line revenues, similar to CDK's demand. If paid, the cost of accessing the DMS would require MVSC to operate at steep losses, which would therefore make the business no longer viable. Like CDK, Reynolds knew that the quoted price was an effective refusal to deal.

**ANSWER:** Denied. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

127.   At the urging of several dealerships, MVSC applied again in August 2014.  This time, Reynolds provided a quote that was actually higher than the one provided in February.  Reynolds stated that a senior-level "pricing committee" had mandated that MVSC be quoted the even higher rate.  The rate was exorbitant, and MVSC informed Reynolds that the proposed pricing would effectively eliminate MVSC's ability to serve dealerships that use the Reynolds DMS.  Moreover, MVSC explained that the data it required from the DMS was basic information that in no way justified the inflated rate.  "To be clear," MVSC wrote to Reynolds, "our desire is to participate in the RCI program, but financially it is impossible for us." Reynolds responded that the quoted rate would not change and therefore terminated the discussions regarding MVSC becoming RCI certified.

**ANSWER:** Denied.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ Reynolds

lacks sufficient knowledge to admit or deny whether dealers "urged" MVSC to join the RCI

program, however Reynolds admits that some dealers prefer that their vendors to use certified

integration over hostile DMS access methods.

128.   In 2016, while at an industry conference, an MVSC executive complained to a CVR executive about how absurd the quoted rates were. In response, the CVR executive confirmed that the quotes were not serious and were simply designed as an effective refusal to deal. The CVR executive stated: "*I wish we would have asked for 85 percent of your revenue. We don't want you in the program.*"

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same. The alleged discussion

does not appear to relate to RCI, because RCI prices are not based on a percentage of revenue.

### D.      There is Clear Evidence of the Agreement in the Marketplace

129.   The illegal conspiracy reveals itself in obvious ways in the various state EVR markets. For example, MVSC and CVR do not compete in the Oregon EVR market. And yet, CDK and Reynolds still do not allow MVSC to participate in their third-party programs, even within the limited Oregon market.

**ANSWER:** Denied.

130.   Standing in stark contrast is the Texas EVR market, where neither CVR nor MVSC operates due to Texas's byzantine regulation of EVR services at the county (rather than the state) level. In Texas, CDK and Reynolds both allow the local EVR provider (AIB, Inc.) to participate in their third-party programs. AIB operates only in Texas and poses no competitive threat to CVR. Compare that with Oregon, where MVSC is the local EVR provider: CDK and Reynolds both bar MVSC from participating. CDK and Reynolds therefore treat AIB (a non-competitor to CVR) one way, and MVSC (the chief competitor to CVR in California) another way. As these on-the-ground facts demonstrate, CDK and Reynolds are targeting MVSC.

**ANSWER:** Reynolds admits that neither CVR nor MVSC operates in Texas, and admits that

Reynolds has several vendors in its RCI program that provide EVR services to Reynolds dealers

in Texas and other states. Reynolds does not and has never had a closed category for EVR

services. Reynolds denies that it does not allow CVR competitors to participate in the RCI program. For instance, CVR competitor TitleTec has long been certified by Reynolds to participate in RCI. Reynolds further denies that it is "targeting" MVSC. 

Otherwise, denied.

131. The California and Illinois EVR markets remove all doubt. Those are the markets where MVSC and CVR compete head-to-head. In those states, CVR is the *only* EVR provider allowed to participate in the 3PA and RCI programs. Therefore, in those markets where CVR competes with MVSC, CDK and Reynolds give CVR special protection by refusing to allow competing providers to participate.

**ANSWER:** Denied. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. Reynolds

denies that it does not allow CVR competitors to participate in the RCI program. For instance,

CVR competitor TitleTec has long been certified by Reynolds to participate in RCI.

132. Finally, other DMS providers – the ones that do not own CVR – allow MVSC to participate in their third-party programs. These DMS providers – although minor and comprising a small percentage of the dealership market – include Dealertrack and Advent. It is only CDK and Reynolds – the owners of CVR and the two dominant DMS providers – that refuse to allow MVSC to participate.

**ANSWER:** Denied that Reynolds refused to allow MVSC to participate in RCI. Reynolds lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations

in this paragraph of the SAC, which relate to practices of companies other than Reynolds, and

therefore denies same.

### E. CDK and Reynolds Have Conspired With Respect to Access to Dealer Data In Other Ways

133. CDK and Reynolds have not only agreed to block MVSC from participating in their 3PA and RCI programs, but they have conspired to control access to dealer data generally. Specifically, CDK and Reynlds have illegally agreed to eliminate competition in the market for access to dealer data. In furtherance of that conspiracy, they agreed (1) to no longer compete with each other in that market, and (2) to block competitors for data integration from accessing dealer data on their respective DMS platforms. The result is that for vendors like MVSC, there are no options for obtaining dealer data except from CDK and Reynolds.

**ANSWER:** Denied.

### 1. CDK and Reynolds Entered into a Per Se Illegal Written Agreement Dividing the Dealer Data Integration Market

134. For man [sic] years, CDK and Reynolds competed in the market data integration – i.e., the market for providing dealer data to application providers. For over a decade, CDK had provided data integration services for dealers using the Reynolds DMS, competing directly with Reynolds' own RCI integration product. Effective February 18, 2015, however, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Market. It is a classic case of illegal market division: CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds. Moreover, because Reynolds already did not compete with CDK in providing access to data for dealers using the CDK DMS, the agreement ensured that CDK and Reynolds would be the exclusive providers of data integration services for dealer data on their respective DMS platforms.

**ANSWER:** Reynolds admits that on or about February 18, 2015, it entered into three written agreements with CDK none of which, however, included any agreement "that they would no longer compete in the Dealer Data Integration market" anywhere. Reynolds denies this and all of MVSC's other characterizations of the agreements and all other allegations in this paragraph of the SAC. Claims and theories premised on a purported "market division" agreement by the same counsel and on the same allegations were previously dismissed by the Court. Dkt. 176.

135. More than that, the agreement mandated coordination between the erstwhile competitors in transitioning all of CDK's vendor clients (i.e., those vendors for whom CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. In short, the written agreement is direct and irrefutable evidence of CDK's and Reynolds's collusion to eliminate competition for data integration, and therefore be the sole providers of data integration services for dealers using their respective DMS platforms. This leaves vendors like MVSC with

no choice but to obtain data from CDK and Reynolds – except, of course, CDK and Reynolds have agreed not to allow MVSC into their data access programs.

**ANSWER:** Denied.

### a. The Agreement Contains Specific Provisions Dividing the Dealer Data Integration Market

136.    The agreement's key provision provides that CDK agreed to no longer integrate or access any Reynolds DMS.  Section 4.1.  In short, CDK agreed to no longer provide any data service that involves pulling data from a Reynolds DMS for use by any application provider.  *Id*.

**ANSWER:** Denied. Section 4.1 states no such thing as MVSC knew when it filed the SAC (its third Complaint in this case).  Nowhere does CDK agree to stop providing hostile integration services.  The core conspiracy allegations in the SAC are based upon an agreement that was never entered.  MVSC has refused to amend its SAC to correct this inaccuracy and other misstatements despite access to millions of pages of documents (including the actual agreement), the Seventh Circuit's rejection of MVSC's core theory of injunctive relief in the *Authenticom* case, and the partial dismissal of MVSC's core market division theory in the *Authenticom* case.

137.    The agreement granted CDK a "Wind Down Period" of one year to stop pulling dealer data stored on the Reynolds DMS.  During the wind-down period, Reynolds agreed that CDK could continue to pull dealer data just as it had before.

**ANSWER:** Admitted that the Data Exchange Agreement defines a "Wind Down Period" (subject to extension by agreement of the parties) during which Reynolds agreed to, on an interim basis, "protect and facilitate current Reynolds DMS access by CDK and DMI Third Party Clients and CDK Applications," and to "not take any measures to block or otherwise disrupt DMI's normal Reynolds DMS access during such Wind Down Period" subject to certain conditions. In addition, CDK's ability to access the Reynolds's DMS during the specified wind-down period was subject to the various restrictions, protections, and requirements set forth in the Agreement. All of those interim measures, along with the Wind Down Period, have now terminated. As to all remaining allegations of this paragraph of the SAC, denied.

138.   Because CDK agreed that it would no longer provide vendors with data from dealers using the Reynolds DMS, CDK and Reynolds agreed that they would work together to transition those vendors into the Reynold RCI program.  Specifically, the agreement mandated that CDK cooperate with Reynolds' efforts to convince vendors to join the RCI program.  Sections 3.1 and 3.4.

**ANSWER:** Denied in part.  During the Wind Down Period, CDK agreed "to reasonably cooperate with Reynolds's efforts, if any, to have Third Party Clients execute agreements to become part of the Reynolds RCI Program[.]"  The meaning of the Agreement speaks for itself.  As to all remaining allegations of this paragraph of the SAC, denied.

139.   It is one thing for competitors to agree not to compete and divide the market.  It is yet another for those same competitors to agree to coordinate in transitioning customers to each other.  It also lays bare a primary purpose behind the agreement:  prevent vendors from using competing data integrators and force them to become members of the RCI and 3PA programs.

**ANSWER:** Denied that Reynolds agreed with any competitor not to compete or to divide any market.  Admitted that during the Wind Down Period, CDK agreed "to reasonably cooperate with Reynolds's efforts, if any, to have Third Party Clients execute agreements to become part of the Reynolds RCI Program[.]"  The meaning of the Agreement speaks for itself.  As to all remaining allegations of this paragraph of the SAC, denied.

140.   In connection with coordinating the transition of vendors from CDK's data pulling services into the RCI program, the wind down agreement required CDK to give Reynolds full information about the vendors CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more.  Absent collusion, this type of highly confidential customer information would be treated as a trade secret carefully protected from the prying eyes of competitors.

**ANSWER:** The Data Exchange Agreement speaks for itself.  Reynolds denies that MVSC has accurately characterized the Data Exchange Agreement.  Reynolds otherwise denies the remaining allegations in this paragraph of the SAC.

141.   As the agreement mandated, after the wind-down period, CDK stopped serving Reynolds DMS dealers as a data integrator.  Also as mandated by the agreement, CDK and Reynolds coordinated the transition of vendors from CDK to Reynolds. On March 2, 2015, CDK sent a letter to its vendor clients – i.e., the ones for whom CDK had pulled data from the Reynolds

DMS – announcing that the vendors "will be provided with a roadmap to transition to the Reynolds Certified Interface (RCI) program without any further risk of interruption to existing services." A few weeks later, CDK delivered that promised roadmap, and made the sales pitch for RCI participation: "We are pleased to be working with R&R to bring you this streamlined, supported process for handling dealership data for your R&R dealers." In relation to CDK's agreement not to compete, the letter stated that if the vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data since DMI is no longer extracting data directly from Reynolds systems."

**ANSWER:** The Data Exchange Agreement speaks for itself. Reynolds denies that MVSC has accurately characterized the Data Exchange Agreement. Upon information and belief, CDK sent a letter to its vendor clients on or about March 2, 2015. That letter speaks for itself. Upon information and belief, admitted that CDK sent a letter on or about April 2, 2015 that include the language quoted in the last two sentences of this paragraph of the SAC. Reynolds denies, however, that MVSC has fairly characterized the letter, which speaks for itself. As to all remaining allegations of this paragraph of the SAC, denied.

142. The agreement had its intended effect: vendors were forced from CDK's data integration services into the Reynolds RCI program.

**ANSWER:** Denied.

### 2. CDK and Reynolds Have Agreed to Block Independent Data Integrators from Accessing Dealer Data

143. Having agreed to no longer compete with each other for data integration, CDK and Reynolds needed to get rid of the remaining competition. To that end, they agreed to block independent data integrators from accessing dealer data, and thereby destroy the competition.

**ANSWER:** Denied.

144. Senior CDK and Reynolds executives – including those who formed and implemented the agreement with respect to MVSC – have admitted that CDK and Reynolds have entered into an agreement to restrict access to dealer data on their systems and to destroy data integrators.

**ANSWER:** Denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph of the SAC, and therefore denies same.

145.    Specifically, on April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Steve Cottrell, the owner of Authenticom—one of the leading data integration firms—and said that they should "take a walk."  Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area.  Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had "agreed to only source data from each other and effectively lock you and the other third parties out." In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray confirmed the illegal agreement again, stating that the number was so low because Authenticom's "book of Reynolds business is worthless to us because of the agreement between CDK and Reynolds." Mr. McCray then grew threatening:  "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise *I will f\*\*\*ing destroy it*."

**ANSWER:** Denied as to Reynolds.  Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to unilateral conduct and statements by CDK), and therefore denies same.

146.    Top Reynolds executives have delivered the same message.  In May 2015, Mr. Schaefer told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data.  Mr. Brockman was adamant, Mr. Schaefer said, that all intermediary data integrators must be cut off.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements by unilaterally blocking unauthorized access to its proprietary system and that Reynolds executives have publicly taken this position for many years (dating back to at least 2007); it denies that this unilateral and longstanding conduct resulted from a conspiracy with CDK or anyone.  Reynolds admits that Bob Schaefer had a conversation by telephone with Steve Cottrell in or around May 2015 in which he again reiterated Reynolds's demand that Authenticom cease and desist from unauthorized access to Reynolds' system.  This conversation related to Reynolds's longstanding and unilateral efforts to block hostile integrators from unauthorized and illegal access to its system.  In all other respects, denied.

147.    CDK and Reynolds even have employees actively working together to coordinate the technical aspects of that blocking of independent data integrators such as Authenticom.  In

December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out.  Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third party data integrators like Authenticom.

**ANSWER:** Denied as to Reynolds.  Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to unilateral conduct and statements by CDK), and therefore denies same.

148.    The bottom line is that CDK and Reynolds have conspired in many ways to control access to dealer data.  Their agreement to eliminate competition in the data integration market has directly affected MVSC because it means that MVSC has no alternatives to obtain dealer data except from CDK and Reynolds.  And the fact that Defendants have conspired so explicitly to control access to dealer data generally only makes their conspiracy with respect to MVSC specifically all the more egregious and damaging.

**ANSWER:** Denied.

## IV.    CVR Is Maintaining Its Monopoly Position in the Illinois EVR Market

149.    Because CDK and Reynolds refuse to allow MVSC to participate in their third-party programs, MVSC is unable to compete with CVR in the Illinois EVR market.  Participation in the third-party programs with instantaneous access to a dealer's DMS is a pre-requisite to competing in Illinois.  Without it, an EVR provider cannot obtain the necessary information in real time in order to process the registration and tags for the car buyer at the point of sale.  CVR – as the only EVR provider in Illinois allowed to participate in the 3PA and RCI programs – is therefore guaranteed to maintain its monopoly position with over 95 percent of the market.

**ANSWER:** Denied.  Reynolds has never refused to allow MVSC to participate in RCI. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  Reynolds denies that it does

not allow CVR competitors to participate in the RCI program. For instance, CVR competitor

TitleTec has long been certified by Reynolds to participate in RCI. Reynolds admits that if

MVSC believes that access to RCI is important in the Illinois EVR market, it can obtain such

access on reasonable terms consistent with the terms that would be offered to any other EVR

provider requesting the same level of integration. Otherwise, denied as to Reynolds. Reynolds

lacks knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph of the SAC (e.g. as it relates to unilateral conduct and statements by CDK), and

therefore denies same.

150. EVR providers other than MVSC are likewise unable to break CVR's monopoly in Illinois. For example, although Dealertrack has operated in Illinois for many years, it has not been able to compete with CVR.

**ANSWER:** Denied.

151. If MVSC was allowed to participate in the 3PA and RCI programs, and therefore have real-time access to dealer data, then MVSC would be able to compete against CVR in the Illinois EVR market. And if MVSC was allowed to compete against CVR, then CVR's monopoly would no longer be secure.

**ANSWER:** Admitted that MVSC is allowed to join RCI on reasonable terms consistent with the

terms that would be offered to any other EVR provider requesting the same level of integration.

Otherwise, denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form

a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to unilateral

conduct and statements by CDK), and therefore denies same.

152. CDK and Reynolds are liable for CVR's monopolization of the Illinois EVR market because they control the management and decisionmaking of CVR. Moreover, the only reason CVR is able to maintain its monopoly in Illinois is because CDK and Reynolds have blocked MVSC and other EVR providers from participating in the 3PA and RCI programs.

**ANSWER:** Denied. MVSC's monopolization claims against Reynolds have been dismissed and

have not be repleaded. Reynolds denies that it does not allow MVSC or other CVR competitors

to participate in the RCI program. For instance, CVR competitor TitleTec has long been certified by Reynolds to participate in RCI. MVSC is allowed to join RCI on reasonable terms consistent with the terms that would be offered to any other EVR provider requesting the same level of integration, but has consistently refused to do so. Otherwise, denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to unilateral conduct and statements by CDK), and therefore denies same.

153. Indeed, for purposes of MVSC's monopolization and attempted monopolization Section 2 claims, CDK and CVR are considered a single-entity based on the facts outlined in paragraphs 56 through 60 above. In such circumstances, CDK is considered a competitor through CVR in the relevant EVR markets for purposes of the monopolization of the Illinois EVR market and attempted monopolization of the California EVR market. In coordinating their conduct to achieve CVR's monopoly and attempted monopoly, CDK and CVR's conduct is treated as the unitary conduct of the single enterprise they form. The facts alleged here are a perfect illustration of why a joint venture and its controlling parent are subject to single enterprise liability for monopolization claims. Otherwise, sophisticated competitors like CDK and Reynolds could simply spread their anticompetitive scheme over multiple entities, such that no one entity met all the requirements for unlawful monopolization.

ANSWER: Denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to CDK), and therefore denies same.

154. And as described above, while substantial control is all that is required for a parent to be considered a competitor as a single-entity with its subsidiary for purposes of monopolization claims, the facts alleged here demonstrate that CDK directly controls the day-to-day activities of CVR, making CVR the alter-ego or agent of CDK.

ANSWER: Denied.

## V. CVR Is Attempting To Monopolize the California EVR Market, and There Is a Dangerous Probability that It Will Succeed

155. CVR once had a monopoly in the California EVR market, controlling virtually the entire market. But due to MVSC's dedication to quality product and services, MVSC has been able to make inroads into MVSC's dominant market position.

ANSWER: Denied.

156. CVR, CDK, and Reynolds are attempting to regain CVR's monopoly position in California through a multi-front campaign. First, CVR is leveraging its position as the only "certified" EVR provider in the state, making good on the purpose behind CDK's and Reynolds's group boycott of MVSC. Second, CDK and Reynolds are cutting off MVSC's alternative paths to obtain the necessary data from dealerships' DMS. This, more than anything, risks reinstating CVR's monopoly. And finally, CVR and Reynolds are contacting MVSC's dealerships directly, using all the leverage they possess to coerce dealerships to switch to CVR. Despite their preference for MVSC, many dealers are in fact making the switch in the face of Defendants' actions. As a result, there is a dangerous probability that CVR will succeed in regaining its monopoly position.

**ANSWER:** Denied. MVSC is the market leader with over 50% share of the California EVR market. Despite all of the allegations leveled against defendants, MVSC's California EVR market share has grown each year while CVR's has fallen each year. The only entity that has a dangerous probability of attaining a monopoly in the California EVR market is MVSC itself (assuming it does not already have one). If Reynolds is forced to provide RCI access to MVSC at special rates or terms not available to other EVR providers, which is apparently what MVSC wants (even though it has never needed such access in order to succeed), MVSC will be even more likely to obtain a monopoly in the California EVR market. Perversely, it is trying to obtain an anticompetitive edge and likely monopoly under the guise of an antitrust case.

### A. CVR Is Leveraging Its Position as the Only EVR Provider To Convince Dealerships To Switch from MVSC

157. In California (as elsewhere), CVR has leveraged its position as the only EVR provider allowed to participate in the 3PA and RCI programs. CDK and Reynolds worked in concert with CVR to capitalize on its exclusive status as the only "certified" EVR provider.

**ANSWER:** Admitted that MVSC could advertise the fact that it is RCI certified if it agrees to join RCI on reasonable terms consistent with those offered to other EVR providers for similar access. Denied that Reynolds entered into an unlawful conspiracy with CDK and/or CVR. Otherwise, denied.

158. CVR has aggressively sought to use its exclusive DMS access to its advantage. In one typical correspondence, CVR wrote to MVSC's dealers that "it's critical your dealership is utilizing a 'certified' service provider for computerized vehicle registration. Utilizing an

uncertified service provider is exposing your DMS customer data to unnecessary risk and liability. For a limited time, CVR, *the industry's only 'certified' service provider*, is offering special incentives to *drop your uncertified service provider* and instantly switch to CVR. Be prepared, be safe, switch to CVR!" (emphasis added).

**ANSWER:** Admitted that MVSC could advertise the fact that it is RCI certified if it agrees to join RCI on reasonable terms consistent with those offered to other EVR providers for similar access. The source of the quote is not identified; Reynolds accordingly lacks sufficient information to form a belief about the truth of allegations in this paragraph of the SAC concerning the quoted language, and therefore denies same. Otherwise, denied.

159. This email from CVR was immediately followed by an email from CDK, which specifically targeted MVSC's product as not being certified. "Your current DMV vendor 'DMV Desk' is not certified – please see the message below from our CVR representative about the risks from that. It's possible to have [CVR] call you and in 10 minutes [we'll] get you switched over to CVR's 'certified' system. . . . It just makes no sense to entrust the security of your DMS data to an uncertified service provider."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC (e.g. as it relates to CDK), and therefore denies same.

160. After CDK sent its email, CVR sent yet another email to MVSC's dealerships, writing: "*We are simply stating the fact that CVR is the industry's only service provider that has 'certified integration' with your [CDK] DMS. That means CVR pulls data securely and directly from your [CDK] DMS, as opposed to all our competitors, including DMV Desk, which access your [CDK] DMS via a hostile interface.*" (emphasis added).

**ANSWER:** The source of the quote is not identified; Reynolds accordingly lacks sufficient information to form a belief about the truth of allegations in this paragraph of the SAC concerning the quoted language, and therefore denies same.

161. While some dealers saw through CDK's actions for what they were – scare tactics – many other dealers switched.

**ANSWER:** Admitted that competition between MVSC and CVR is fierce and has not been restrained, and that dealers continue to switch from CVR to MVSC and vice versa. Otherwise denied.

### B. CDK and Reynolds Are Seeking To Completely Cut Off MVSC's Access to the Necessary Data on a Dealer's DMS

162. CVR's ability to market itself as the only "certified" EVR provider in California is an obvious advantage. But even worse, CDK and Reynolds are now engaged in a crusade to eliminate MVSC's last remaining ways to obtain the necessary data for a dealer's DMV. CDK and Reynolds have agreed to block MVSC from accessing the data by any means, whether through the third-party programs or otherwise.

**ANSWER:** Denied that Reynolds has agreed with CDK to block MVSC from accessing data. Admitted that MVSC could market itself as RCI certified simply by agreeing to standard RCI pricing that would be provided to any other EVR provider seeking the same level of integration, which it has refused to do. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC that relate to entities other than Reynolds, and therefore denies same. Otherwise, denied.

163. Because CDK and Reynolds can utilize their power in the DMS market to prosecute their crusade to eliminate any avenue for MVSC to obtain the necessary data, there is a dangerous probability that CVR will illegally regain its monopoly position in the California EVR market.

**ANSWER:** Denied.

### 1. CDK and Reynolds Have Cut Off MVSC's Ability To Obtain the Necessary Data from a Dealer's DMS Through Intermediaries

164. At one time, MVSC was able to obtain the required data from a dealer's DMS through intermediaries – i.e., independent data integration companies. The integrators helped dealers manage the data flow for the many third-party vendors that required access to information from the dealer's DMS in order to provide important services. The vendors, such as MVSC, would pay the integrators a fee to access the required data from the dealer's DMS. CDK and Reynolds tolerated this situation for a time. But in an effort to increase revenues, and despite loud protests from dealers, CDK and Reynolds have engaged in a campaign to destroy their competitors in the integration market and cut off intermediary access to their DMS platforms. *See supra* ¶¶ 133–148. In that way, they are forcing third-party vendors to participate in their 3PA and RCI programs. But, as described herein, CDK and Reynolds do not allow MVSC to

participate in the third-party programs. They have therefore eliminated the most viable remaining path for MVSC to obtain the required data from a dealer's DMS.

**ANSWER:** Admitted that there have been (and continue to be) a number of companies that have

charged vendors and/or dealers to access various DMS platforms to pull and push data. Denied

that Reynolds has ever "tolerated" this. Reynolds admits that it enforces the terms of its DMS

licensing agreements by unilaterally blocking unauthorized access to its proprietary system and

that Reynolds executives have publicly taken this position for many years (dating back to at least

2007); it denies that this unilateral and longstanding conduct resulted from a conspiracy with

CDK or anyone. Denied that Reynolds will not allow MVSC to join RCI at prices consistent with

prices that would be offered to other EVR providers for the same level of integration. Denied

that there is a relevant and distinct "integration market" for any purpose in this case, and especially

with regard to Reynolds's DMS. As to all remaining allegations of this paragraph of the SAC,

denied.

### a. Reynolds Eliminated Intermediary Access

165. Reynolds was the first to cut off MVSC's access through intermediaries. Until 2014, MVSC was able to obtain data from the Reynolds DMS through Authenticom. But Reynolds cut off that route. As one large dealership explained to MVSC, "Reynolds was seeking to 'choke' all 3rd party efforts to integrate directly with Reynolds to extract data. I have watched several 3rd parties literally be choked until they die and the companies are no more. Authenticom is exactly the type of company Reynolds is trying to choke off." Reynolds succeeded in cutting off MVSC's access to a dealer's DMS through Authenticom or any other data integrator, and therefore eliminated MVSC's ability to obtain the necessary data through intermediaries.

**ANSWER:** Reynolds admits that it enforces the terms of its DMS licensing agreements by

unilaterally blocking unauthorized access to its proprietary system and that Reynolds executives

have publicly taken this position for many years (dating back to at least 2007); it denies that this

unilateral and longstanding conduct resulted from a conspiracy with CDK or anyone. Denied that

Reynolds's position on this changed in 2014. Denied that MVSC had no way to obtain data in

order to provide EVR Services after 2014.

### b. CDK Eliminated Intermediary Access

166. With respect to CDK, MVSC was once able to access the CDK DMS through three data integrators – Authenticom, ProQuotes, Inc., and Superior Integrated Solutions, Inc. ("SIS"). But like Reynolds, CDK has systematically cut off that pathway.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC (e.g. as it relates to unilateral conduct by CDK),

and therefore denies same.

167. CDK first cut off Authenticom. In August 2016, Authenticom notified dealers that its access to the CDK DMS was being "disabled by CDK thus prohibiting our ability to extract data for your solution providers. This functionality is similar to the lockouts you may have heard about that we experienced with Reynolds & Reynolds in the past." Dealers immediately contacted MVSC to express their anger at CDK, complaining that their EVR service was being interrupted and they could not process the required information. For example, one large dealer wrote: "Shut down again! What the heck happened, thought you were going to access using [Authenticom]? Please advise ASAP!" When investigating the reason for the shutdown, the dealership discovered that CDK was preventing the data from being transferred to MVSC.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

168. In the fall of 2016, CDK also cut off MVSC's access through ProQuotes. As one dealer explained, "DMVDesk accesses through ProQuotes at this time and that access will cease soon, as CDK will not allow them into our [DMS]." At the time of CDK's actions, MVSC served over 100 dealerships that were impacted by the termination of access through ProQuotes.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

169. Finally, CDK cut off MVSC's access through SIS. On August 30, 2016, SIS informed MVSC by letter that it "must terminate" its "integration offerings" with the CDK DMS. "SIS will terminate the portion of the current Agreement with [MVSC] that pertains to providing integration services with the CDK DMS, effective January 1, 2017." CDK coerced SIS to take this drastic step. At the time of the letter, MVSC served 127 California dealerships that would be impacted by the termination.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

170.   Next, CDK sent a follow-up letter directly to MVSC's dealers on November 15, 2016.  The letter begins, "We are writing to inform you that Superior Integration Solutions (SIS) will no longer, as of December 31, 2016, provide DMVdesk with integration to the CDK DMS."  The letter then contains the following falsehood:  "CDK attempted to reach agreement with DMVdesk to have its product integrated through CDK's Third Party Access program – the only CDK approved method of third party integration.  However, DMVdesk recently informed us that they have declined to participate in the Third Party Access program."  CDK knew this statement was untrue.  As detailed above, it was CDK that had rejected MVSC's multiple attempts to participate.  Nonetheless, CDK deceived MVSC's dealerships, misrepresenting that it was MVSC's choice not to participate.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

171.   A CDK executive specifically warned MVSC that CDK was not "bluffing" and that CDK would "turn off" MVSC's access to the SIS dealerships.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

### 2.      CDK and Reynolds Are Trying To Eliminate MVSC's Only Remaining Route for Obtaining Data from a Dealer's DMS

172.   With CDK and Reynolds having blocked MVSC from their third-party programs and then having cut off any intermediary access, MVSC has one last option for obtaining data from a dealer's DMS:  a manual process that requires the dealer to pull the data every day.  On a daily basis, the dealer runs a script that creates a report containing the required data to process EVR transactions.  The report is placed in a folder on the dealership's local hard drive.  The report is then encrypted and transferred to MVSC using the highest security standards.  Once transferred, the report is automatically deleted from the dealership's hard drive.

**ANSWER:** Denied that Reynolds blocked MVSC from RCI.  Admitted that Reynolds authorized

dealers to use DMS reporting tools to transfer data to vendors, including MVSC.  Although

automated third party access is not allowed by either the Reynolds system or the license

agreements under which it is offered, dealers are authorized and able to use the robust reporting

functionality built into the DMS system to export operational data as needed.  Reynolds's ERA

DMS contains a functionality called Dynamic Reporting.  This reporting tool allows dealership

employees to build customized reports—i.e., data exports from the DMS—with extensive

flexibility. Dynamic Reporting reports can be scheduled to run at any time automatically, several times a day. They can also be run manually by a dealership employee at any time. Dealers can then send or push to a vendor such as MVSC, or another third party, or allow a third party access to a PC where the downloaded data is housed. (POWER contains analogous features, although there are some technical differences.) Previous versions of the Reynolds DMS also contained similar (though less advanced) reporting tools called Report Generator and Query Builder. Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

173. Because of MVSC's preferable product and service, many dealers are willing to complete the manual steps to retrieve the necessary data from their DMS. But CDK and Reynolds have conspired to put a stop to this, too.

**ANSWER:** Admitted that some dealers are willing and able to use Reynolds DMS reporting tools to transfer data to MVSC. Otherwise, denied. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

174. First, for some dealers, CDK and Reynolds are disabling the script so that the dealer cannot create the report with the dealer data.

**ANSWER:** Denied that Reynolds is disabling Dynamic Reporting, Query Builder or Report Generator for certain dealers for the purpose of preventing them from creating reports to be sent to MVSC. Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

175.   Second, and even more important, CDK and Reynolds are using the most powerful weapon in their arsenal:  the DMS contract.  CDK and Reynolds are threatening dealers by telling them that they are in breach of their DMS agreement by using the manual process to retrieve data from the DMS.  Given the importance of the DMS to the functioning of a dealer's business, and the disruption that CDK and Reynolds can cause if they pursue a claim of breach, it is hard to overstate the impact that such threats have on dealers.

**ANSWER:** Denied as to Reynolds.  Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations.  Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

176.   Moreover, this is not the first time CDK and Reynolds have used the DMS contract as a weapon to threaten MVSC's dealers.  Throughout the past year, CDK and Reynolds have repeatedly threatened MVSC's dealers that they are in breach of their DMS contract by providing data to MVSC through any means other than through the 3PA and RCI programs (from which MVSC is blocked).  It is a trump card that CDK and Reynolds repeatedly use to intimidate dealers in order to block MVSC from gaining the data required to provide EVR services.

**ANSWER:** Denied as to Reynolds.  Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations.  Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

177.   CDK and Reynolds have threatened dealers directly.  Dealerships have reported that CDK and Reynolds representatives have visited their stores and called on the phone to warn them that by using the manual process for MVSC, the dealerships have created a "hostile integration" and are therefore in breach of the DMS contract.  Notwithstanding that any such

claim of breach is baseless, and that it is undisputed that the dealers own the data stored on the DMS, the dealers have no choice but to take the threat seriously.

**ANSWER:** Denied as to Reynolds. Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

178. CDK and Reynolds have also threatened dealers indirectly, warning them that any "unauthorized" access to the DMS (i.e., any access other than through the 3PA and RCI programs) must be eliminated by the end of 2016. For example, CDK is sending emails to dealers with "non-authorized activity reports" that detail when data is retrieved from a dealer's DMS through an avenue other than the 3PA program. Dealers are contacting MVSC when they receive these reports. One dealer wrote in typical fashion: "[We] received another notice from CDK today that we are allowing unauthorized access to our data to an unapproved vendor."

**ANSWER:** Denied as to Reynolds. Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

179. Mr. Karp (CDK) – the co-conspirator with Mr. Schaefer (Reynolds) and Mr. Herbers (CVR) – has even contacted dealers directly. On August 22, 2016, Mr. Karp sent a letter to California dealers served by MVSC with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by unauthorized means." He stated that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016." Mr. Karp then wrote: "Vendors that wish to continue accessing dealer data should therefore begin the Third Party Access program application process immediately to avoid disruption." This statement is a farce: CDK refuses to allow MVSC participate in its 3PA program. Mr. Karp ended his letter with a final threat to the dealers: "In January, CDK will further increase our security actions to

prevent the use of unapproved data access methods." Beyond what CDK is already doing, therefore, CDK has threatened to tighten the vise even further in 2017.

**ANSWER:** Denied as to Reynolds. Reynolds maintains that utilizing certified interfaces is the best way to transfer data, but at the end of the day, Reynolds's dealership customers are free to take all of their operational data out of the DMS and send it to MVSC (or others) whenever they want, subject only to their own, independent legal, regulatory, and ethical obligations. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

### C. CDK and Reynolds Are Contacting Dealerships Served by MVSC To Pressure Them into Switching to CVR

180. In conjunction with their efforts to completely cut off MVSC's access to the necessary dealer data, CDK and Reynolds have contacted California dealers to convince them to switch to CVR. The pattern is now familiar: cut off MVSC, and then push dealers to switch to CVR. And as part of that push, CDK and Reynolds have spread disinformation and falsehoods about MVSC.

**ANSWER:** Denied as to Reynolds. Specifically, denied that Reynolds is contacting California dealers to convince them to switch from MVSC to CVR based on false information. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC to the extent they relate to CDK, and therefore denies same.

181. For example, throughout October 2016, CDK called dealerships served by MVSC and told them that CDK would be "turning off MVSC at the end of the year because MVSC has refused to participate in the 3PA program." The truth was the opposite: CDK denied access to MVSC. The CFO of another large dealership called MVSC to say that "an executive regional sales manager from CDK personally called me to say that DMVdesk has not renewed an agreement with CDK" – another falsehood – "and that they will no longer support the DMVdesk connection to CDK." The CDK salesperson also informed the dealership that he had contacted "about ten other CFOs from other large dealer groups to inform them" of the same.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, and therefore denies same.

182. A typical example of CDK's strongarm tactics involved a dealership from the Los Angeles area. CDK had cut off MVSC's ability to retrieve data from the dealer's DMS. The

dealer called CDK. CDK responded that MVSC was not authorized to obtain data from the DMS system and that the dealer should switch to CVR "to avoid this issue." In another representative example, a Sacramento dealer reported to MVSC that she had "received a call from her CDK rep this morning [who] said that she would no longer be able to use DMVDesk after November 30th." The CDK representative had informed the dealer that MVSC "would no longer be compliant" and that the dealer should therefore switch to CVR.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

183. Dealerships confirmed that CDK and Reynolds are using the same tactics. "Am a little surprised that CDK is beginning to sound like Reynolds," one dealer wrote to MVSC. "CDK has been in here telling me they want us to convert."

**ANSWER:** Denied that Reynolds is contacting California dealers to convince them to switch

from MVSC to CVR based on false information. Reynolds lacks knowledge or information

sufficient to form a belief about the truth of the allegations in this paragraph of the SAC about

what certain unidentified dealers may or may not have said, and therefore denies same.

184. On or around October 25, 2016, CDK sales representatives had a meeting in Denver, Colorado, where they were further instructed about the campaign to cut off MVSC and convert dealerships to CVR. In fact, while the CDK sales representatives were at the company meeting, they called dealers served by MVSC to reiterate that MVSC would be cut off. These sales representatives repeated – yet again – the false claim that MVSC had refused to participate in the 3PA program. The sales representatives emphasized that the dealers needed to switch to CVR, which they stressed was the only EVR provider with direct access to data on the DMS. They told dealers that they knew how MVSC was obtaining the data – through the manual workaround – and that CDK was going to find a way to shut off that pathway (which, as noted above, included threatening the dealers with breach of the DMS contract). On one of those phone calls, a CDK salesperson confirmed (after being asked by the dealer) that CDK sales personnel were gathered together in Denver and that the campaign against MVSC on behalf of CVR was a key part of their meeting's agenda.

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

### D. Dealers Have Responded to CDK's and Reynolds's Tactics in Various Ways, Including by Switching to CVR

185. Unfortunately, for many dealers, the campaign by CDK and Reynolds to cut off MVSC and then convert dealerships to CVR has had its intended effect. Inevitably, after CDK

or Reynolds sent a letter or contacted a group of dealers, MVSC would receive a flood of calls and emails from concerned dealers, with many making the decision to switch to CVR.

**ANSWER:** Denied that Reynolds is contacting California dealers to convince them to switch from MVSC to CVR based on false information. Denied that Reynolds has conspired with CDK to "cut off" MVSC or that Reynolds has unilaterally "cut off" MVSC. Reynolds denies the remaining allegations in this paragraph of the SAC as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

186. "I have really bad news," one dealer wrote. "We are not going to be able to keep DMVDesk since CDK is only approving CDK Licensed approved vendors to have access to our CDK files." Another asked, "how much notice do we need to give if we go with CVR?" The decision to switch was "coming from the owner because of what CDK is telling them." Another wrote, citing CDK's communications: "This is a 30-day notice that our Company has made the decision to not continue using DMV Desk as our source of completing the DMV process for our Customers. This decision was not made lightly. We feel it is the best decision for our Company at this time." Another summed up the general response of dealers deciding to switch: "We finally received the [CDK] letter, and as per our owner we have decided to go a different direction. I apologize for the inconvenience please let us know what the next steps are to cancel our service with you. *By no means is it anything that has to do with your service, we just think it is smarter to go with a company that works closely with the DMS we use daily*." (emphasis added).

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, which relate to CDK, and therefore denies same.

187. Other dealers, while not yet having made the decision to switch, have expressed serious apprehension. "Help!" one dealer exclaimed. "Where do we go from here??" Another asked, "DMV Desk going away? Per the attached notice from CDK, they won't be allowing DMV Desk to integrate with CDK as of 12/21/16." Another wondered if there was anything MVSC could do: "Please see attached letter from CDK. They are not going to give you access to our customers' files. They want us to change registration companies. Please let me know if there is anything you can do." One industry leader summarized the general feeling: "CDK has the owner and GMs all worried. . . . CDK has really gotten in everyone else's head."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, which relate to CDK, and therefore denies same.

188.   The California New Car Dealers Association has even had to get involved. Representing over 1,100 dealers, it is the country's largest state association of franchised new car dealers.  Many car dealers contacted the Association to express their frustration with CDK and Reynolds.  Commenting on one especially sophisticated dealership, the Association's president wrote to MVSC:  "My concern is he is one of the most knowledgeable dealers we have in the state and he is concerned; I can't imagine the impact their tactics might be having on less informed dealers."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, and therefore denies same.

189.   If there is one overriding response from dealers to CDK's and Reynolds's actions, it is anger.  The dealers are up in arms.  By cutting off MVSC, Defendants are disrupting the dealers' business.  They are preventing dealers from ensuring that car buyers, as required by California law, receive their registration and license plates within 90 days of the purchase date. As reported by one industry participant, the primary dealer response to Defendants' tactics is "outrage and resentment."

**ANSWER:** Denied.

**E.     To the Extent MVSC Has Been Able To Retain Dealerships, It is Because of MVSC's Superior Product and Service**

190.   The dealers that have remained with MVSC point to MVSC's superior product and service as their reason for staying.  "CDK has been in here telling me they want us to convert," one dealer informed MVSC.  "They did not tell me how they are playing hard ball with the vendors.  Either they have a third-party access program or they don't.  They should not be selective.  As their client, I should still have the right to pick and choose.  We are happy with DMVDesk and we are getting the job done." Similarly, another dealer wrote MVSC:  "We have absolutely NO issues with your company, all I want, is to make sure our . . . service remains up to the current standard that we are used to."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth

of the allegations in this paragraph of the SAC, to the extent they purport to quote communications

from unidentified dealers to MVSC, and therefore denies same.  Otherwise, denied.

191.   Other dealers have been more direct in calling out Defendants' tactics. One dealer told CDK:  "You are turning off MVSC just because you are trying to get your inferior product from CVR back in here, aren't you?" Another dealer delivered the same message:  "You are calling me just trying to get your inferior product back in here.  Not happening." One dealer denounced CDK for its "scare tactics," writing:  "We're comfortable with DMV Desk and CVR didn't give us the service we currently experience."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, to the extent they purport to quote communications from unidentified dealers to CDK, and therefore denies same. Otherwise, denied.

192. The California New Car Dealers Association has made clear to its members that MVSC offers a far superior product and service than CVR. For example, after one dealer expressed fear about MVSC being cut off from CDK's DMS, the president of the Association responded: "In the sense that CVR is an approved vendor by DMV, yes they can replace DMVdesk, but in terms of service, product improvement and innovation . . . there is no comparison. As you'll recall, a significant reason for our switch of licensed vendors from CVR to DMVdesk in 2014 was the poor quality of service provided to our dealers." The Association told another dealer that while it "is in no position to tell dealers whom to use for any product, including DMS or electronic vehicle registration, we stand behind DMVdesk and believe their product and service to be superior to other EVR providers."

**ANSWER:** Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, to the extent they purport to quote communications from the California New Car Dealers Association to dealers, and therefore denies same. Otherwise, denied.

193. Even though many dealerships have remained with MVSC because of its superior service, other dealerships have chosen differently, deciding to switch as a result of Defendants' anticompetitive conduct. Even more serious, if CDK and Reynolds succeed in completely cutting off MVSC's access to dealers' DMS, then not even superior product and service will be able to save MVSC. In that instance, CVR's return to a monopoly position in California is assured.

**ANSWER:** Denied.

## VI.    MVSC Has Suffered Antitrust Injury

194. Defendants' anticompetitive conduct has directly and significantly damaged MVSC. As a direct result of Defendants' conspiracy to block MVSC from the 3PA and RCI programs; their conspiracy to block MVSC from accessing dealer data at all; and CVR's monopolization of the Illinois EVR market and attempted monopolization of the California EVR market, MVSC has been directly damaged. For example, MVSC has substantially fewer customers than it otherwise would have. This has had a direct, negative impact on MVSC's financial position. While the precise amount of MVSC's damages will be proven at trial, MVSC's damages exceed many millions of dollars.

**ANSWER:** Denied.

## VII.    Defendants' Actions Have Harmed Competition

195.    Defendants' anticompetitive conduct has not just harmed MVSC, it has harmed competition itself.  First, in concentrated markets, injury to a competitor harms not just that competitor, but competition generally.  In the Illinois EVR market, CVR is effectively the only EVR provider with 95 percent market share.  By eliminating the ability of MVSC to compete in that market, Defendants have harmed competition.  Similarly, in California, after CVR acquired AVRS, there are now only three EVR providers left.  Because Defendants' anticompetitive conduct is causing serious harm to MVSC in the concentrated California EVR market, competition has been harmed.

**ANSWER:** Denied.

196.    Second, Defendants' actions have harmed innovation and the quality of the products and services in the marketplace.  Because states regulate output and price of EVR services, EVR providers must compete on quality.  But by propping up an inferior product, and trying to eliminate a superior one, Defendants are hindering innovation.  By reducing the quality of the EVR product and services in the marketplace, Defendants' actions have resulted in an increase in the quality-adjusted price of those services.  That is significant harm to competition and the market.

**ANSWER:** Denied.

197.    Third, Defendants' actions have harmed car dealerships.  At a fundamental level, Defendants are restricting dealership choice.  Dealerships prefer using MVSC because of its superior product and service, but Defendants are impeding and thwarting dealerships from exercising that choice.  For example, because of Defendants' conduct, dealerships in Illinois have only one option for EVR services, and that option – CVR – offers an inferior product and service. Furthermore, in California, Defendants' actions have interrupted the provision of a critical (and legally required) service.   Indeed, by cutting off MVSC, Defendants have even put the dealerships' business licenses at risk.  California law requires that a car buyer receive the vehicle's registration and tags within 90 days of purchase.  Dealers are responsible for complying with that rule, and if they do not, their business licenses can be revoked.  By interrupting a dealer's EVR service – and forcing dealers to switch to CVR, which has months-long delays in providing registrations and license plates – Defendants have jeopardized dealerships' licenses.

**ANSWER:** Denied.

198.    Fourth, Defendants' actions have harmed car buyers.  In California, it takes CVR up to two months to provide the physical registration and license plates.  MVSC turns around the same in one day.  The difference speaks for itself.

**ANSWER:** Denied

199.    Finally, Defendants' actions have harmed the DMV and frustrated the government's purpose in fostering competition.  Defendants have eliminated competition in Illinois.  They are trying to eliminate competition in California, and there is a dangerous

probability they will succeed. Defendants are also foisting an inferior product and service on the states' dealerships and citizens, which is contrary to the very purpose the states established their EVR programs in the first place.

**ANSWER:** Denied

200. The California New Car Dealers Association summed it up best in multiple messages to its member dealers. CDK's and Reynolds's "conduct as it relates to the [EVR] program [is] troubling not only from a business perspective but also from the damage it could do to consumers and the DMV for the roadblocks it is creating in the vehicle registration process itself."

**ANSWER:** Denied that any statement from the California New Car Dealers Association has any relevance or bearing on any issue in this case. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, to the extent they purport to quote communications from the California New Car Dealers Association, and therefore denies same.

201. In another message to its members, the Association wrote: "Note that the ONLY potential advantage that CVR has over DMVdesk is integration with CDK's (and Reynolds's) DMS systems. While DMVdesk can provide the same level of service to dealers (and continues to innovate to provide more functionality) this is a short term, anticompetitive strategy by CDK to attempt to 'lock out' DMVdesk. We are researching this DMS access issue from both a legal and political standpoint because it has serious ramifications far beyond the current 'bullying' tactics of CDK to exclude DMVdesk."

**ANSWER:** Denied that any statement from the California New Car Dealers Association has any relevance or bearing on any issue in this case. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC, to the extent they purport to quote communications from the California New Car Dealers Association, and therefore denies same.

## VIII.  Defendants' Anticompetitive Conduct Has No Pro-Competitive Justification

202. There are no procompetitive justifications for Defendants' conduct. The only purpose behind their conspiracy to boycott MVSC and campaign to cut off MVSC completely from dealer data is to protect CVR's monopoly profits in Illinois and regain them in California. Defendants' conduct does not reduce price, increase output, or improve quality. On the contrary,

Defendants' conduct suppresses innovation, decreases quality in the EVR market, and increases the quality-adjusted price of EVR services.

**ANSWER:** Denied.

203. Defendants have argued to dealers that CVR is "more secure" because it has direct access to the DMS platforms. By extension, Defendants have claimed that MVSC is "unsecure" and poses a threat to the dealers' data security. Even if that were true – and it is not – that does not justify CDK and Reynolds boycotting MVSC. Instead, if they cared about security and if direct access really was more secure, then CDK and Reynolds would let MVSC participate in their third-party programs. If CDK and Reynolds are to be believed, security is a reason to let MVSC in, not keep it out.

**ANSWER:** Reynolds admits that data security concerns are an important reason, among several others including system stability, data integrity, and intellectual property, why Reynolds does not permit unauthorized third-party access to its DMS platform. Further admitted that system access intermediaries such as Authenticom create unnecessary security risks, along with other risks and costs. Denied that Reynolds has boycotted or blocked MVSC or that Reynolds has entered into any agreements with CDK with respect to MVSC. To the contrary, Reynolds has always been willing to let MVSC participate in RCI, at reasonable and fair prices that correspond with the pricing that would be offered to other EVR providers for the same level of integration. Otherwise, denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

204. In any event, the "security" argument is just a pretext. As described by industry insiders, the argument "is nothing more than a fear tactic deployed by CDK." MVSC maintains the highest-level security with respect to all sensitive, confidential data. The confidential information EVR providers require relate to a car buyer's identification information, including name, address, date of birth, and driver's license number. The state of California mandates strict protections for this data, and MVSC exceeds the state's requirements. The security levels maintained by MVSC are even higher than those used by the most secure DMS. For example, for transferring the data from the dealer's hard drive to DMVdesk, MVSC uses the highest encryption protocol available to civilian organizations – the only higher protocols are reserved for the U.S. military. Not only does MVSC have internal audits of its data security, but it has regular external audits as well. MVSC has passed every security audit without a blemish. MVSC has never had a data breach.

**ANSWER:** Denied. Data security concerns are an important reason, among several others including system stability, data integrity, and intellectual property, why Reynolds does not permit unauthorized third-party access to its DMS platform. Further admitted that system access intermediaries such as Authenticom create unnecessary security risks, along with other risks and costs. However, Reynolds has never blocked MVSC from RCI. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to MVSC's security, and therefore denies same.

205. In the end, a CDK executive has confirmed to MVSC what the industry knows: Defendants' argument with respect to "security" is a pretext in order to coerce third-party vendors into the third-party programs. The CDK executive acknowledged that the rhetoric around "security" has little credibility. The difference with respect to MVSC is that, no matter the "security" arguments, CDK and Reynolds have agreed to never allow MVSC to participate in their third-party programs.

**ANSWER:** Denied as to Reynolds. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph of the SAC as to CDK, and therefore denies same.

## FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (CDK and Reynolds)

206. MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 206 incorporates by reference the preceding allegations of the SAC; Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

207. CDK and Reynolds entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER:** Denied.

208. The conspiracy consisted of a continuing agreement, understanding, or concerted action between CDK and Reynolds – who are horizontal competitors of one another – in furtherance of which they agreed to block MVSC from their third-party DMS programs and cut

off MVSC's access to obtain the necessary dealer data by other means. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

**ANSWER:** Denied.

209. The purpose of Defendants' conspiracy was and is to drive MVSC out of the California EVR market and prevent MVSC from competing with CVR in the Illinois EVR market, thereby protecting and increasing the flow of monopoly profits from CVR to CDK and Reynolds.

**ANSWER:** Denied.

210. Defendants' conspiracy, which amounts to a group boycott, was intended to harm interstate commerce, and it has had an actual, substantial effect on interstate commerce.

**ANSWER:** Denied.

211. Through their conspiracy, Defendants have caused actual injury to competition in both the California EVR market and the Illinois EVR market.

**ANSWER:** Denied.

212. The boycott is cutting off MVSC's access to dealer data that MVSC needs in order to compete with CVR in the California and Illinois EVR markets.

**ANSWER:** Denied.

213. CDK and Reynolds possess a dominant position in the DMS market, which they have utilized to further the conspiracy.

**ANSWER:** Denied.

214. Defendants' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in the California and Illinois EVR markets. On the contrary, Defendants' conduct has produced only anticompetitive effects in these markets.

**ANSWER:** Denied.

215. As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property. MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER:** Denied.

## SECOND CAUSE OF ACTION
## MONOPOLIZATION OF THE ILLINOIS EVR MARKET IN VIOLATION OF
## SECTION 2 OF THE SHERMAN ACT
## (CDK and CVR)

216.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 216 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

217.   Defendants CDK and CVR have unlawfully monopolized the Illinois EVR market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** Denied.

218.   CDK owns 80 percent of CVR and controls its management and day-to-day operations and activities.

**ANSWER:** Denied.

219.   For purposes of Section 2, given its substantial control over CVR (let alone its direction of CVR's day-to-day operations), CDK is considered a competitor in the Illinois EVR market.

**ANSWER:** Denied.

220.   CVR possesses monopoly power in the EVR market in Illinois, where CVR has a market share exceeding 95 percent.

**ANSWER:** Denied.

221.   CDK and CVR – in conspiracy with Reynolds – have the demonstrated ability to exclude competitors from the Illinois EVR market by denying them participation in the 3PA and RCI programs.

**ANSWER:** Denied.

222.   CDK and CVR – in conspiracy with Reynolds —have willfully acquired and maintained monopoly power in the Illinois market through anticompetitive means, including by engaging in a group boycott of MVSC.

**ANSWER:** Denied.

223.   Through the monopolization of the Illinois EVR market, CDK and CVR have harmed competition.

**ANSWER:** Denied.

224.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER:** Denied.

## THIRD CAUSE OF ACTION
## ATTEMPTED MONOPOLIZATION OF THE CALIFORNIA EVR MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (CDK and CVR)

225.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 225 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

226.   Defendants CDK and CVR have unlawfully attempted to monopolize the California EVR market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** Denied.

227.   CDK owns 80 percent of CVR and controls its management and day-to-day operations and activities.

**ANSWER:** Denied.

228.   For purposes of Section 2, given its substantial control over CVR (let alone its direction of CVR's day-to-day operations), CDK is considered a competitor in the California EVR market.

**ANSWER:** Denied.

229.   CDK and CVR – in conspiracy with Reynolds – specifically intend to monopolize the California EVR market.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  They conspired to block MVSC from the 3PA and RCI third-party DMS programs and cut off MVSC's access to obtain the necessary dealer data by other means, including through intermediaries and manual workarounds.

**ANSWER:** Denied.

230.   CVR has a dangerous probability of achieving monopoly power in the California EVR market, where it once had a monopoly and currently controls 40 percent of the market.  Most importantly, CDK and CVR – in conspiracy with Reynolds – are attempting to block MVSC from obtaining the data necessary to compete in the EVR market.  Moreover, the EVR market in

California is concentrated, with a recent trend toward further consolidation; CVR benefits from nationwide economies of scale and exclusive direct access to dealer data; and potential new entrants to the California EVR market face extensive legal licensing requirements and high capital costs.

**ANSWER:** Denied.

231. Through their attempted monopolization of the California EVR market, CDK and CVR have harmed competition.

**ANSWER:** Denied.

232. As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property. MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER:** Denied.

## FOURTH CAUSE OF ACTION
## CONSPIRACY TO MONOPOLIZE THE ILLINOIS AND CALIFORNIA EVR MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (all Defendants)

233. MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 233 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

234. Defendants CDK, Reynolds, and CVR have unlawfully conspired to monopolize the Illinois and California EVR markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** Denied.

235. Defendants CDK, Reynolds, and CVR have a common purpose to monopolize the Illinois and California EVR markets and have committed multiple overt acts in furtherance of that conspiracy.

**ANSWER:** Denied.

236. Defendants CDK, Reynolds, and CVR have a specific intent to monopolize the Illinois and California EVR markets through CVR, as shown by their anticompetitive conduct that lacks any legitimate business justification.

**ANSWER:** Denied.

237.   CVR has monopoly power in the Illinois EVR market and a dangerous probability of achieving monopoly power in the California EVR market.

**ANSWER:** Denied.

238.   CDK (80 percent) and Reynolds (20 percent) own CVR.  CDK controls CVR's management and day-to-day operations and activities.

**ANSWER:** Denied.

239.   Through their conspiracy to monopolize the Illinois and California EVR markets, CDK, Reynolds, and CVR have harmed competition.

**ANSWER:** Denied.

240.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER:** Denied.

## FIFTH CAUSE OF ACTION
## VIOLATION OF ILLINOIS ANTITRUST ACT
## (CDK and CVR)

241.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 241 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

242.   Defendants CDK and CVR have monopolized the EVR market in Illinois in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(3), for all the reasons set forth in the preceding allegations.

**ANSWER:** Denied.

243.   Defendants committed this violation willfully, as that term is applied under the Illinois Antitrust Act.

**ANSWER:** Denied.

244.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Illinois Antitrust Act alleged herein.

**ANSWER:** Denied.

## SIXTH CAUSE OF ACTION
## VIOLATION OF CARTWRIGHT ACT
## (CDK and Reynolds)

245.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 245 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

246.   CDK and Reynolds entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations.  Defendants' conspiracy is a per se violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

**ANSWER:** Denied.

247.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Cartwright Act alleged herein.

**ANSWER:** Denied.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
## (all Defendants)

248.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 248 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

249.   The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include any "unlawful, unfair, or fraudulent business act or practice."

**ANSWER:** Denied.

250.   Defendants have engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright

Act, Cal. Bus. & Prof. Code § 16720; and California common law, including the torts of interference with contract and prospective economic adva

**ANSWER:** Denied.

251.   Defendants' acts and practices as alleged herein have also been "unfair" under the UCL.  Defendants' conduct has threatened an incipient violation of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition in the California EVR market.  Furthermore, any utility from Defendants' conduct does not outweigh the harm it causes to competitors, car dealers, or car buyers.

**ANSWER:** Denied.

252.   A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to MVSC, car dealers, and car buyers was inflicted in California, for all the reasons set forth in the preceding allegations.

**ANSWER:** Denied.

253.   As a direct and proximate result of Defendants' unlawful and unfair conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to restitution in an amount to be proven at trial.

**ANSWER:** Denied.


## EIGHTH CAUSE OF ACTION
## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## (all Defendants)


254.   MVSC incorporates by reference the preceding allegations.

**ANSWER:** Paragraph 254 incorporates by reference the preceding allegations of the SAC;

Reynolds likewise restates and incorporates by reference its responses above to those paragraphs.

255.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."

**ANSWER:** Denied.

256.   Defendants have engaged in unfair methods of competition and unfair acts or practices in violation of the ICFA.

**ANSWER:** Denied.

257.   Defendants' group boycott of MVSC, thereby eliminating the ability of MVSC to compete in the Illinois EVR market, is contrary to Illinois public policy, as expressed in statutes such as the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1 *et seq.*, which favors free and fair competition between businesses.

**ANSWER:** Denied.

258.   Defendants' conduct as alleged herein is oppressive and unscrupulous, and as a result of Defendants' group boycott of MVSC, Illinois car dealers lack a meaningful choice in EVR provider.

**ANSWER:** Denied.

259.   By preventing competition in the EVR market, Defendants have caused substantial aggregate injury to car dealers in the form of inferior EVR services resulting from the absence of fair competition.  Defendants' actions have prevented car dealers from having a choice between EVR providers who can compete on quality-adjusted price, including products and services such as technical support, dealer training, registration auditing (which reduces the rate of errors), and computer interface design.  This injury is not outweighed by any countervailing consumer benefit resulting from Defendants' conduct.  Because Defendants operate an EVR monopoly and exclude competitors such as MVSC, car dealers cannot reasonably avoid this injury.

**ANSWER:** Denied.

260.   Defendants' violations of the ICFA implicate consumer protection concerns because Defendants' unfair practices – namely, their monopolization of the Illinois EVR market through anticompetitive acts – are directed at and effect the statewide EVR market generally.  MVSC's requested relief would serve the interests of Illinois car dealers by enabling new EVR providers, including MVSC, to compete for their business, resulting in increased consumer choice and market-driven innovation in EVR services.

**ANSWER:** Denied.

261.   As a direct and proximate cause of Defendants' violations of the ICFA, MVSC has been unable to enter into contracts with car dealers to provide EVR services.  MVSC has suffered economic injury as a result.

**ANSWER:** Denied.

262.   A substantial portion of the underlying conduct and events alleged herein occurred in Illinois, for all the reasons set forth in the preceding allegations.

**ANSWER:** Denied.

263. As a direct and proximate result of Defendants' unfair conduct, MVSC has been harmed by its inability to compete in the Illinois EVR market. MVSC is entitled under 815 Ill. Comp. Stat. 505/10a to restitution, damages – including punitive damages – in amounts to be proven at trial.

**ANSWER:** Denied.

## DENIAL

Reynolds denies all SAC allegations not specifically admitted above.

## RESPONSE TO PRAYER FOR RELIEF

MVSC is not entitled to any of the requests included in its Prayer for Relief.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Reynolds pleads the following affirmative defenses to the allegations in the Complaint:

## FIRST AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Failure to State a Claim)

1. MVSC has failed to state ultimate facts sufficient to constitute a claim for relief. Facts in support of this affirmative defense are set forth in Defendant The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the First Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 63), The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the Second Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 81), Judge Dale S. Fischer's Order dated October 2, 2017 (C.D. Cal. Case No. 17-cv-00896, Dkt. 73), and The Reynolds and Reynolds Company's Supplemental Brief Appending Seventh Circuit Precedent (Dkt. 118). Additional facts in support of this affirmative defense are set forth in other motions to dismiss, related submissions, and counterclaims by Reynolds, CDK and CVR in this MDL.

## SECOND AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Lack of Plausibility)

2.      MVSC's claims are not plausible under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and its progeny. Facts in support of this affirmative defense are set forth in Defendant The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the First Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 63), The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the Second Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 81), Judge Dale S. Fischer's Order dated October 2, 2017 (C.D. Cal. Case No. 17-cv-00896, Dkt. 73), and The Reynolds and Reynolds Company's Supplemental Brief Appending Seventh Circuit Precedent (Dkt. 118). Additional facts in support of this affirmative defense are set forth in other motions to dismiss, related submissions, and counterclaims by Reynolds, CDK and CVR in this MDL.

## THIRD AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Illegality and Lack of Antitrust Injury)

3.      The activities of hostile integrators like Authenticom are illegal independent of any Reynolds activity challenged by MVSC.  Claims based on lack of access to Reynolds DMS by hostile integrators (like Authenticom) are barred as a matter of law, whether those claims are brought by hostile integrators themselves or their customers, like MVSC.  Hostile integrators (like Authenticom) have engaged in illegal and unethical activity, and Authenticom's relentless, ongoing, unauthorized attempts to hack into Reynolds's DMS, utilize its copyrighted software, and "scrape" data for sale to third-party vendors is illegal under federal and state law as set forth in Reynolds's Counterclaims against Authenticom. Restraint of illegal trade is not an antitrust violation, and because MVSC's claims against Reynolds are based on the illegal business practices of Authenticom and other hostile integrators, MVSC lacks any valid antitrust injury. Additional

facts in support of this affirmative defense are set forth in motions to dismiss, related submissions, and counterclaims by Reynolds, CDK and CVR in this MDL.

## FOURTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Laches)

4.      MVSC's claims are barred by the doctrine of laches. The SAC's claims against Reynolds are based on actions and events dating back to at least 2007. Reynolds enforces the terms of its DMS licensing agreements by unilaterally blocking unauthorized access to its proprietary system by hostile integrators or others, and Reynolds executives have publicly taken this position for many years, dating back to at least 2007.  The doctrine of laches bars MVSC's claims given its unreasonable delay in bringing them.

## FIFTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Waiver and/or Equitable Estoppel)

5.      MVSC's claims are barred by the doctrines of waiver and/or equitable estoppel. MVSC's complaint alleges claims against Reynolds that are based on actions and events dating back to 2007. Reynolds enforces the terms of its DMS licensing agreements by unilaterally blocking unauthorized access to its proprietary system by hostile integrators or others, and Reynolds executives have publicly taken this position for many years, dating back to at least 2007. MVSC's failure to raise these claims earlier constitutes waiver. In addition, MVSC is equitably estopped from raising these claims.

6.      Furthermore, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ MVSC has therefore

waived and is equitably estopped from bringing claims against Reynolds based on purported "blocking" from RCI. MVSC blocked itself from RCI.

### SIXTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Statute of Limitations)

7.     MVSC's claims are barred by the applicable statutes of limitations. MVSC's complaint alleges claims against Reynolds that are based on actions and events dating back to 2007. Reynolds enforces the terms of its DMS licensing agreements by unilaterally blocking unauthorized access to its proprietary system by hostile integrators or others, and Reynolds executives have publicly taken this position for many years, dating back to at least 2007. The statutory time applicable to each of MVSC's claims has passed and its claims are time-barred.

### SEVENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Failure of Causation)

8.     MVSC's claims fail due to a lack of causation. Among other things, such failures include the following:

9.     ██████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ Reynolds did not cause any harm to MVSC and has always wanted MVSC to join the RCI program at prices consistent with pricing that competing EVR providers would pay for the same level of integration. MVSC's alleged harm (if any) is principally caused by MVSC's own decision to end discussions with Reynolds. MVSC blocked itself from RCI.

10.     MVSC's claimed damages with respect to Reynolds are also barred by the plain terms of Reynolds's DMS license agreements with its dealers. (MVSC admits that "DMS

providers license and sell their software and services pursuant to written contracts." SAC ¶31). Reynolds's DMS licenses are limited to dealership employee end users alone, and the licenses prohibit granting any other persons or parties access to Reynolds's proprietary DMS software and systems. Regardless of any claimed wrongdoing by Reynolds, third parties have been and continue to be barred from accessing any Reynolds DMS by the terms of the Reynolds license agreements.

11.     MVSC has never needed RCI access and has never needed the services of hostile integrators such as Authenticom in order to successfully compete with other EVR providers.  For Reynolds dealers, Reynolds authorized dealers to use DMS reporting tools to transfer data to vendors, including MVSC.  Dynamic Reporting reports can be scheduled to run at any time automatically, several times a day.  They can also be run manually by a dealership employee at any time.  Dealers can then send or push to a vendor such as MVSC, or another third party, or allow a third party access to a PC where the downloaded data is housed.  Indeed, MVSC attained the leading EVR market share position in California, and now holds over 50% market share, all without RCI access.

12.     MVSC's SAC alleges that it is has "maintained an office" in Illinois "since 2014," and that it is currently "an approved EVR provider in Illinois," (SAC ¶ 67) but it does not allege when the State of Illinois actually licensed MVSC to provide full EVR services in Illinois.  To the extent MVSC was not legally permitted to provide EVR services, Reynolds could not have caused any harm to MVSC in the Illinois EVR market during periods of time when MVSC was not actually a competitor in that market.

13.     MVSC concedes that the State of Illinois "requires that the printed registration and license plates be provided to the car buyer at the time of sale," (SAC ¶ 65) but that the State of California does not require this (SAC ¶ 9).  These differences in state laws and regulations do not

obligate or require Reynolds to change its business practices or make special exceptions on RCI pricing in order to assist MVSC in Illinois. To the extent MVSC's claimed injuries result from differences in state laws and regulations, those injuries were not caused by Reynolds.

14.     MVSC alleges that it was able to use Authenticom to access Reynolds's DMS until 2014, until Reynolds "cut off that route." To the extent Authenticom or other hostile integrators provided workarounds to MVSC and continued to access Reynolds's DMS without authorization, Reynolds did not cause harm to MVSC. Furthermore, to the extent that MVSC or dealers were already not using and preferred not to use Authenticom or other hostile integrators (whether for service, security, performance, ethical, legal, moral, or other reasons), no conduct by Reynolds caused any harm to MVSC.

15.     To the extent that MVSC could have captured more business or more profits in any EVR market through business improvements having nothing to with RCI or access to DMS, any such harm was not caused by Reynolds.

## EIGHTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Failure to Mitigate Damages)

16.     MVSC's claims should be dismissed, in whole or in part, and/or its alleged damages reduced, because MVSC failed to take all necessary, reasonable, and appropriate actions to mitigate its alleged damages. Among other things, such failures including the following:

17.     MVSC bases its asserted antitrust violations against Reynolds on alleged business practices and contract terms that it says have been evident from publicly available information throughout the alleged relevant period. Assuming arguendo the truth of these allegations, MVSC failed to mitigate its alleged damages by promptly filing suit, or by any other means.

18.     █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ Reynolds always wanted MVSC to join the RCI program at prices consistent with pricing that competing EVR providers would pay for the same level of integration. MVSC failed to mitigate damages by joining RCI at such prices, failing to negotiate, and failing to consider the possibility that it might need to readjust and reduce the level of access it wanted in order to obtain a lower price.

19.      MVSC has never needed RCI access and has never needed the services of hostile integrators such as Authenticom in order to successfully compete with other EVR providers. Reynolds authorized dealers to use DMS reporting tools such as Dynamic Reporting, Query Builder and Report Generator to transfer data to vendors, including MVSC. Dynamic Reporting reports can be scheduled to run at any time automatically, up to four times a day. They can also be run manually by a dealership employee at any time. Dealers can then send or push to a vendor such as MVSC, or another third party, or allow a third party access to a PC where the downloaded data is housed. Indeed, MVSC attained the leading EVR market share position in California, and now holds over 50% market share, all without RCI access. Any claimed harm from lack of RCI access could have been mitigated by using Dynamic Reporting, Query Builder and Report Generator to obtain the data MVSC wanted from dealers.

20.      To the extent that MVSC could have captured more business or more profits in any EVR market through business improvements having nothing to with RCI or access to DMS, MVSC failed to mitigate damages by improving other aspects of its business (for instance, sales and marketing strategies and efforts, negotiating tactics and efforts, etc.).

## NINTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Damages Are Too Speculative)

21.     MVSC has not suffered any legally cognizable injury and has not suffered an injury-in-fact.  Indeed, MVSC is the *leading provider* of EVR services in California.  If and to the extent MVSC has been damaged (which Reynolds denies), the amount of damages that MVSC alleges to have suffered is too remote, speculative, and indirect from the alleged conduct to allow recovery, and it is impossible to ascertain, apportion, and allocate such damages with reasonable certainty.

## TENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Unavailability of Injunctive Relief)

22.     MVSC's claims for equitable relief are barred for the reasons set forth in the Seventh Circuit's opinion in the *Authenticom* matter (*Authenticom, Inc. v. CDK Glob.*, LLC, 874 F.3d 1019 (7th Cir. 2017)), including *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko*, 540 U.S. 398 (2004), and *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, (2009).  In addition, MVSC has suffered no irreparable harm and otherwise fails to satisfy the criteria necessary for injunctive relief.

## ELEVENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Unjust Enrichment)

23.     MVSC's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to MVSC.  In addition, the relief sought by MVSC would put it at a competitive advantage over all EVR providers and allow it to free ride on significant investment by Reynolds.

## TWELFTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Failure to Allege Market)

24.     MVSC's claims are barred, in whole or in part, because the SAC has insufficiently alleged a relevant product market and geographic market and is so vague and ambiguous as to deny Reynolds notice of the markets alleged by MVSC.

## THIRTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Reynolds's Actions Were Procompetitive)

25.     MVSC's claims are barred, in whole or in part, because Reynolds's conduct was pro-competitive, reasonable, and permissible. Reynolds's conduct was further based on independent, legitimate, and self-interested business and economic justifications.

## FOURTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Reynolds's Actions Did Not Lessen Competition)

26.     MVSC's claims are barred, in whole or in part, because none of Reynolds's alleged actions or omissions substantially lessened competition within any properly defined market.

## FIFTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Reynolds Did Not Cause Injury)

27.     MVSC's claims are barred, in whole or in part, because to the extent MVSC suffered any injury or incurred any damages as alleged in the SAC, which Reynolds denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than Reynolds and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

## SIXTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Intervening Cause)

28.     MVSC's claims are barred, in whole or in part, because to the extent MVSC suffered any injury or incurred any damages as alleged in the SAC, which Reynolds denies, any such injury or damage was caused and brought about by intervening or superseding events, factors,

occurrences, conditions or acts of others, including forces in the marketplace and state laws and regulations, and not by the alleged wrongful conduct on the part of Reynolds.

### SEVENTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Conduct Not Unfair, Unlawful, or Fraudulent)

29.      MVSC's claims under California Business & Professions Code § 17200 et seq. are barred, in whole or in part, because Reynolds's alleged conduct is not unfair, unlawful or fraudulent within the meaning of California Business & Professions Code § 17200 et seq.

### EIGHTEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Conduct Not Unfair or Deceptive)

30.      MVSC's claims under Illinois' Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq., are barred, in whole or in part, because Reynolds's alleged conduct is not unfair or deceptive within the meaning of Illinois' Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq.

### NINETEENTH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (No Entitlement to Damages, Restitution, or Monetary Relief of Any Kind)

31.      MVSC is not entitled to recover damages, restitution, or monetary relief of any kind in connection with its claims under California Business & Professions Code § 17200 et seq. First, recovery under § 17200 is limited to injunctive relief and restitution. Accordingly, no monetary relief other than restitution, such as damages, are available under § 17200. Second, MVSC is not entitled to recover restitution because Reynolds has not taken any money or property from MVSC that MVSC previously owned. By its own choice, MVSC has never participated in the RCI program and has never purchased anything from Reynolds.

## TWENTIETH AFFIRMATIVE OR ADDITIONAL DEFENSE
### (No End-Run Around Antitrust Laws)

32.    MVSC's claims under California Business & Professions Code § 17200 et seq. and Illinois' Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq., are barred, in whole or in part, because these laws may not be used to make an end-run around antitrust laws in pursuit of claims based on the same facts and theories that fail to establish a claim under applicable antitrust laws.

## TWENTY-FIRST AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Set-Off and No Double Recovery)

~~32.~~33.  Without admitting the existence of any of the alleged conduct, Reynolds contends that it is entitled to set off or offset any amounts paid to MVSC by any Defendants or any alleged co-conspirators other than Reynolds, including CDK, that have settled MVSC's claims against them in this action.  MVSC's claims are barred in whole or in part to the extent it seeks damages duplicative of the value of consideration it has received or will receive in settlement.

## TWENTY-~~FIRST~~ SECOND AFFIRMATIVE OR ADDITIONAL DEFENSE
### (Incorporation and Reservation of Defenses)

~~33.~~34.  Reynolds incorporates by reference all affirmative defenses raised by CDK or CVR.  Reynolds also incorporates by reference all affirmative defenses raised in all prior pleadings and filings, including but not limited to Defendant The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the First Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 63), The Reynolds and Reynolds Company's Memorandum in Support of Its Motion to Dismiss the Second Amended Complaint (C.D. Cal. Case No. 17-cv-00896, Dkt. 81), Judge Dale S. Fischer's Order dated October 2, 2017 (C.D. Cal. Case No. 17-cv-00896, Dkt. 73), The Reynolds and Reynolds Company's Supplemental Brief Appending Seventh Circuit

Precedent (Dkt. 118), Reynolds's counterclaims and pleadings and submissions in this and other

cases in this MDL, and prior pleadings and filings by other defendants in this and other cases in

this MDL.  Reynolds further reserves the right to amend or supplement its affirmative defenses as

discovery or further investigation may justify.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Reynolds hereby demands trial by jury

on all issues so triable.


Dated: ~~November 7, 2018~~February 9, 2021                 ————————Respectfully submitted,

/s/ *Leo D. Caseria*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross A. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

SMRH:4835-4937-3659.1

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
agulley@gibbsbruns.com
Kathy Patrick
kpatrick@gibbsbruns.com
Brian T. Ross
bross@gibbsbruns.com
Brice A. Wilkinson
bwilkinson@gibbsbruns.com
Ross M. MacDonald
rmacdonald@gibbsbruns.com
Justin D. Patrick
jpatrick@gibbsbruns.com
**GIBBS & BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

Michael P.A. Cohen
MCohen@sheppardmullin.com
Amar S. Naik
ANaik@sheppardmullin.com
**SHEPPARD MULLIN RICHTER
& HAMPTON LLP**
Suite 100
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: 202-747-1900
Facsimile: 202-747-1901

Leo D. Caseria
**SHEPPARD MULLIN RICHTER
& HAMPTON, LLP**
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206
lcaseria@sheppardmullin.com

Dylan I. Ballard
**SHEPPARD MULLIN RICHTER
& HAMPTON, LLP**
Four Embarcadero Center., 17th Floor
San Francisco, CA 94111
(415) 434-9100
dballard@sheppardmullin.com

SMRH:4835-4937-3659.1

*Attorneys for Defendant The Reynolds and Reynolds Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this ~~7th~~ 9th day of ~~November~~February, ~~2018~~2021, I caused a true and correct copy of the foregoing Amended Answer and Affirmative Defenses to be served on all counsel of record via email.

*/s/ Leo D. Caseria*
Leo D. Caseria

SMRH:4835-4937-3659.1