Exhibit A

In re Pork Antitrust Litigation, --- F.Supp.3d ---- (2020)
Case: 1:18-cv-00864 Document #: 1244-1 Filed: 02/10/21 Page 2 of 34 PageID #:89581

2020 WL 6149666

2020 WL 6149666
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

IN RE PORK ANTITRUST LITIGATION
This Document Relates to: All Actions.

Civil Nos. 18-1776, 19-1578, and 19-2723 (JRT/LIB)
|
Signed 10/20/2020

**Attorneys and Law Firms**

Brian D. Clark and W. Joseph Bruckner, LOCKRIDGE GRINDAL NAUEN PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401; Bobby Pouya, PEARSON SIMON & WARSHAW, LLP, 15165 Ventura Boulevard, Suite 400, Sherman Oaks, California 91403, for the Direct Purchaser Plaintiffs.

Daniel C. Hedlund, GUSTAFSON GLUEK PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402; Shana Scarlett, HAGENS BERMAN SOBOL SHAPIRO LLP, 715 Hearst Avenue, Suite 202, Berkeley, California 94710; Steve W. Berman, HAGENS BERMAN SOBOL SHAPIRO LLP, 1301 2nd Avenue, Suite 2000, Seattle, Washington 98101, for the Consumer Indirect Purchaser Plaintiffs.

Alec Blaine Finley, CUNEO GILBERT & LADUCA, LLP, 4725 Wisconsin Avenue N.W., Suite 200, Washington, District of Columbia 20016; Shawn M. Raiter, LARSON KING, LLP, 2800 Wells Fargo Place, 30 East Seventh Street, Saint Paul, Minnesota 55101; for the Commercial Indirect Plaintiffs.

Christa C. Cottrell and Christina Henk Briesacher, KIRKLAND & ELLIS LLP, 300 North LaSalle Drive, Chicago, Illinois 60654, for Defendants Clemens Food Group, LLC and The Clemens Family Corporation.

Richard A. Duncan, FAEGRE DRINKER BIDDLE & REATH LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendants Hormel Foods Corporation and Hormel Foods, LLC.

Jaime Stilson, DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, Minnesota 55402; Britt M. Miller, MAYER BROWN LLP, 71 South Wacker Drive, Chicago, Illinois 60606, for Defendant Indiana Packers Corporation.

Donald G. Heeman, SPENCER FANE LLP, 100 South Fifth Street, Suite 2500, Minneapolis, Minnesota 55402; Stephen R. Neuwirth, Sami H. Rashid, QUINN EMANUEL URQUHART & SULLIVAN LLP, 51 Madison Avenue, New York, New York 10010, for Defendant JBS USA Food Company.

William L. Greene and Peter J. Schwingler, STINSON LLP, 50 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402, for Defendants Seaboard Foods LLC and Seaboard Corporation.

Brian Edward Robison, GIBSON, DUNN & CRUTCHER, LLP, 2100 McKinney Avenue, Suite 1100, Dallas, Texas 75201; Richard G. Parker, GIBSON, DUNN & CRUTCHER, LLP, 1050 Connecticut Avenue, N.W. Washington, District of Columbia 20036, for Defendant Smithfield Foods, Inc.

Vollis Gene Summerlin Jr., HUSCH BLACKWELL LLP, 13330 California Street, Suite 200, Omaha, Nebraska 68154, for Defendant Triumph Foods, LLC.

Tiffany Rider Rohrbaugh, AXINN, VELTROP & HARKRIDER LLP, 950 F Street N.W., Washington, District of Columbia 20004, for Defendants Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc.

William Leitzsey Monts III and Justin Bernick, HOGAN LOVELLS US LLP, 555 Thirteenth Street N.W., Washington, District of Columbia 20004, for Defendant Agri Stats, Inc.

**AMENDED MEMORANDUM OPINION AND ORDER**

JOHN R. TUNHEIM, Chief Judge

**\*1** Three putative classes of Plaintiffs allege that Defendants, among America's largest pork producers and integrators, conspired to limit the supply of pork and thereby fix prices in violation of federal and state antitrust laws. Defendants move to dismiss the claims against them. Because Plaintiffs' amended complaints adequately plead parallel conduct, and because Plaintiffs adequately plead a continuing violation such that the claims are not time barred, the Court will deny Defendants' joint Motion to Dismiss. However, because Plaintiffs fail to adequately plead participation in the parallel conduct by Defendant Indiana Packers, the Court will grant Indiana Packers' individual Motion to Dismiss. In a

related case brought by two individual businesses, the Court will deny Defendants' joint Motion to Dismiss and will grant Indiana Packers' individual Motion to Dismiss, for the same reasons.

Additionally, the Court will dismiss the following state-law claims brought by the Indirect Plaintiff class: (1) the state antitrust claims arising before Rhode Island enacted its *Illinois Brick* repealer and the claims from Mississippi; (2) the consumer-protection claims from Massachusetts, Michigan, Minnesota, New Hampshire, New York, South Dakota, Utah and Virginia; and (3) the unjust enrichment claims from Arizona, Florida, North Dakota, and Utah.

Finally, the Court has determined that the Commonwealth of Puerto Rico has a statutory grant of *parens patriae* standing. However, the Court concludes that the Commonwealth has failed to adequately plead a claim for conspiracy to monopolize and will therefore grant Defendants' Motion to Dismiss the Commonwealth's claim under P.R. Laws Ann. tit. 10 § 260.

## BACKGROUND

This case represents the consolidation of thirteen separately filed putative class actions. There are three categories of class-action Plaintiffs who purchased, either directly or indirectly, pork products from one of the Defendants [1]: Direct Purchaser Plaintiffs ("DPPs"), Indirect Purchaser Plaintiffs ("IPPs"), and Commercial and Institutional Indirect Purchaser Plaintiffs ("CIPs"). All three allege that Defendants engaged in a price-fixing conspiracy to artificially constrict the supply of pork products in the domestic market of the United States, a per se violation of § 1 of the Sherman Act, 15. U.S.C. § 1.

DPPs bring a claim for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15(a); IPPs and CIPs (together, the "Indirect Plaintiffs") bring a claim for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. [2] Indirect Plaintiffs also bring claims for damages under (1) the antitrust laws of 27 jurisdictions; [3] (2) the consumer-protection laws of 24 jurisdictions; [4] and (3) the unjust-enrichment law of 32 jurisdictions. [5]

**\*2** The Court first considered a joint Motion to Dismiss brought by Defendants against the three class complaints last year. After concluding that "Plaintiffs ha[d] not adequately pleaded parallel conduct, an essential element in showing that Defendants engaged in an agreement to limit the supply of pork," the Court granted the joint Motion without prejudice and gave Plaintiffs 90 days to refile their amended complaints. *In re Pork Antitrust Cases*, No. 18-1776, 2019 WL 3752497, at \*9, 10 (D. Minn. Aug. 8, 2019). Plaintiffs timely refiled their amended complaints, [6] and Defendants now bring two joint 12(b)(6) motions—one for the federal claims in all three complaints and one for the state-law claim in Indirect Plaintiffs' Amended Complaints—as well as individual-defendant Motions to Dismiss.

Two related cases have also been subsequently combined with this action: *Winn-Dixie Stores, Inc. et al. v. Agri Stats, Inc. et al.* ("*Winn-Dixie*"), Civil No. 19-1578, and *Puerto Rico v. Agri Stats, Inc. et al.*, Civil No. 19-2723 ("*Puerto Rico*"). The former is brought by two direct-purchaser grocery chains, Winn-Dixie and Bi-Lo; the latter is brought by the Commonwealth of Puerto Rico on behalf of itself and as *parens patriae* on behalf of the people of Puerto Rico. [7]

### *The Alleged Conspiracy*

Together, the Defendants control over 80 percent of the wholesale pork integration market. (DPP Compl. ¶ 1.) Plaintiffs allege that, from at least 2009 and continuing to the present day, Defendants began to conspire to "fix, raise, maintain, and stabilize the price of pork." (*Id.* ¶ 2.) Plaintiffs allege that this was accomplished principally "by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States." (*Id.*)

Defendants were able to carry out this conspiracy in two ways. First, "Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through their co-conspirator, Defendant Agri Stats." (*Id.*) Agri Stats is a company that each of the Defendants worked with; it gathered detailed financial information from the Defendants, which it then standardized and made accessible to each Defendant. (*Id.* ¶ 3.) "Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork integrators." (*Id.*) Through the "benchmarking" reports generated by Agri Stats, Defendants were able to decipher

which data belonged to which Defendant, thereby allowing them to monitor one another's pork production "and hence control supply and price[.]" (*Id.*) The Agri Stats information was not publicly available. (*Id.* ¶ 4.)

**\*3** Second, Plaintiffs allege that Defendants were able to carry out the conspiracy through public statements, aimed at one another, regarding the need to cut production. (*Id.* ¶ 5.) These statements served a signaling purpose and emphasized to one another that solidarity existed. (*Id.*) Defendants then furthered the conspiracy by taking individual action to cut supply or limit supply increases that would have otherwise occurred in an unmanipulated market. (*Id.*)

Defendants' conspiracy was successful, and as production either declined or increased at a smaller rate than expected, pork prices increased. (*Id.* ¶ 7.) As a result, Plaintiffs allege that they paid artificially inflated prices. (*Id.*)

## DISCUSSION

### I. STANDARD OF REVIEW

When reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." 🔖 *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting 🔖 *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." 🔖 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Courts differ on how this generally permissive standard applies when reviewing antitrust claims. The Supreme Court has explicitly noted that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." 🔖 *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (cleaned up); *accord* 🔖 *Double D Spotting Serv.,*

🔖 *Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators"). However, the Supreme Court appeared to implicitly move away from that standard in 🔖 *Twombly*, which was itself a Sherman Act case. The Eighth Circuit has also recently taken a jaundiced view of the "very-sparingly" standard articulated in 🔖 *Hospital Building Co.*:

> Given the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases[,] the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage.

🔖 *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (cleaned up).

### II. THE SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 🔖 15 U.S.C. § 1. To establish a claim under 🔖 § 1 "a plaintiff must demonstrate '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.' " 🔖 *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quoting 🔖 *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 703 (D. Minn. 1998)). Because 🔖 § 1 "does not prohibit all unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decisions or

from an agreement, tacit or express." *Twombly,* 550 U.S. at 553, 127 S.Ct. 1955 (cleaned up).

**\*4** "Certain agreements, such as horizontal price fixing ... are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Thus, where—as here—plaintiffs allege horizontal price fixing or agreements between competing retailers to limit output in order to increase price, the only allegation that must be made at the motion-to-dismiss stage is that defendants acted collectively or with concerted action.

"[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate,* 797 F.3d at 543 (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1273 (8th Cir. 1983)). This may be demonstrated through the presentation of circumstantial evidence, including through a showing of parallel conduct among defendants that demonstrates that their similar behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly,* 550 U.S. at 557, n.4, 127 S.Ct. 1955 (cleaned up).

The Eighth Circuit has adopted a rule that, in addition to parallel conduct, to survive a motion to dismiss, antitrust plaintiffs must also plead "factual enhancement," often referred to as "plus factors." *See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.,* 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist."). These plus factors might include (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a substantial amount of interfirm communication in conjunction with the parallel conduct. *See, e.g., In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1194–95 (9th Cir. 2015).

Thus, in order to survive a defendant's 12(b)(6) motion, plaintiffs alleging a price-fixing conspiracy must plausibly allege both parallel conduct and at least one plus factor.

### A. Parallel Conduct

Because the Court dismissed the Complaints on the ground that Plaintiffs had not adequately pleaded parallel conduct, the critical question is whether the Amended Complaints sufficiently allege "how any of the individual Defendants acted" so that the Court can "analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork." *In re Pork,* 2019 WL 3752497, at *8.

The DPP Complaint contains new, specific allegations related to each Defendant at ¶¶ 124–32:

### 1. Smithfield

Plaintiffs allege that Smithfield first indicated that it was "reducing the number of pigs that come off sow farms" in 2008. (DPP Compl. ¶ 124.) In 2009, Smithfield announced that it had reduced the size of its domestic supply by "two million market hogs annually" and that it was immediately further reducing its herd by 3%. (*Id.*) Smithfield followed this with a 5% reduction in 2010, and a further (unspecified) downsize in 2011. (*Id.*) Although Plaintiffs allege that Smithfield also increased the share of its production directed to exports, they fail to provide specifics beyond the opening of a plant in China in 2015. (*Id.* ¶ 125.)

### 2. Tyson

Tyson cut its sows by over 25% between 2008 and 2009. (*Id.* ¶ 126.) Plaintiffs also allege that in 2010 and 2013 Tyson reported decreased sales volume of 3.3% and 3.6%, combined with unspecified decreases in its "capacity utilization rate." (*Id.*)

### 3. JBS

**\*5** Between 2009 and 2011, JBS increased its pork export volume from 15% to 20% of its total production. (*Id.* ¶ 127.) In 2015, JBS acquired Cargill's pork business, combining the third- and fourth-largest pork producers into the second-largest producer. (*Id.* ¶¶ 85–86.) In 2016, Plaintiffs allege that JBS undertook an unspecified reduction in the number of sows it produced "despite increased consumer demand." (*Id.* ¶ 127.) JBS subsequently reported that "pork prices were

18% higher year on year at the end of 2016, on the back of increased demand and output restrictions." (*Id.*)

### 4. Hormel

Plaintiffs allege that "Hormel's production statistics show that it cut its number of sows in 2008," though they do not provide specifics, and that Hormel "maintained such reduced production throughout the class period." (*Id.* ¶ 128.) They also allege that Hormel reported unspecified "tonnage reductions for its pork operations in its 2009 Annual Report." (*Id.*) The only specific reduction alleged is that "Hormel reduced its capacity at its Los Angeles plant by 500 head per day" in 2014. (*Id.*)

### 5. Seaboard

The DPP Complaint contains no specific allegations of reduced production against Seaboard, only that it "reduced supply in 2013." (*Id.* ¶ 129.) Seaboard increased its export sales in 2010 and 2011 by "23%[,] to an all-time record ...." (*Id.* ¶ 129 n.49.)

### 6. Triumph

A farm member of Triumph announced it was reducing its herd by 11,000 sows in September 2008. (*Id.* ¶ 130.) In 2009, Triumph further reduced its herd by 6% (24,500 sows). (*Id.*) Plaintiffs allege that "Triumph focused its production on exports" but do not provide specifics. (*Id.*)

### 7. Clemens

A Clemens subsidiary reported a decrease in production of 1000 sows in 2011. (*Id.* ¶ 131.)

### 8. Indiana Packers

Plaintiffs allege that Indiana Packers "indicated that it expected to reduce" production in 2012 but provide no specifics. (*Id.* ¶ 132.)

The most specific allegations of herd-size reductions are against Smithfield, Tyson, and Triumph. Those reductions all took place in 2008 and 2009, with Smithfield continuing alone in 2010. There are smaller specific allegations of a herd reduction in 2011 (1000 sows, by a Clemens subsidiary) and production decreases in 2014 (500 head per day, by Hormel at its plant in Los Angeles). There are direct allegations of herd reduction—without specifics—against Hormel (2008/2009), Smithfield (2010), Seaboard (2013), and JBS (2016); there are unspecific allegations of decreased capacity utilization against Tyson in 2010 and 2013. There are specific allegations of increased exports against JBS (5% increase, 2009–2011) and Seaboard (23% increase, 2009–2011); there are unspecified allegations of export increases against Smithfield and Triumph. There are no specific allegations against Indiana Packers.

The Court concludes that these allegations, when viewed as a whole, are sufficient to plausibly plead parallel conduct against all Defendants, except Indiana Packers. The new allegations give individualized content to what the original pleading showed: after nearly a decade of sustained growth, pork supply decreased. The initial decrease comes from three specific sources—sizeable reductions by Smithfield, Tyson, and Triumph, the first, second, and sixth largest producers. (*See* DPP Compl. ¶¶ 85–86, 88, fig.4.) This comports with the industry picture as a whole.

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000–2017[8]**



[**Editor's Note:** The preceding image contains the reference for footnote [8] ].

In the same way, the specific allegations of increased exports between 2009–2011 fit the industry as a whole.

Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000–2017[9]



[**Editor's Note:** The preceding image contains the reference for footnote [9]].

**\*6** These two patterns, plausibly caused by the alleged actions of the Defendants, then allowed for a massively atypical jump in the price of pork.

Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000–2018[10]



[**Editor's Note:** The preceding image contains the reference for footnote [10]].

Given the inherent difficulty of obtaining solid information of an antitrust conspiracy—especially one involving sophisticated commercial entities—the evidence that Plaintiffs have marshalled is sufficient to survive the relatively low bar of the pleading stage.[11]
The Plaintiffs have alleged parallel conduct among the Defendants sufficient to survive a motion to dismiss.[12]

**B. Statute of Limitations**

Defendants next argue that the complaints are barred by the statute of limitations. Because the statute of limitations is "typically an affirmative defense" and a defendant "does not render a complaint defective by pleading an affirmative defense," an argument by a defendant that a claim is time barred "is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008).

Section 4b of the Clayton Act states that any claim for damages under § 4 "shall be forever barred unless commenced within four years after the cause of action accrued."[13] 15 U.S.C. § 15b. The cause of action accrues from "the date on which the wrongdoer commits an act that injures the business of another." *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004).

**\*7** Regarding the § 4 treble-damages claims brought by the DPPs, both sides acknowledge that because the DPP Complaint alleges that the antitrust conspiracy started in at least 2009, the statute of limitations has run unless exceptions apply. DPPs argue that two exceptions apply: they have alleged a continuing violation, or, in the alternative, the statute of limitations should be equitably tolled due to the Defendants' fraudulent concealment of the conspiracy.

**1. Fraudulent Concealment**

To invoke fraudulent concealment, Plaintiffs must allege facts showing: "(1) Defendants' concealment of Plaintiffs' cause of action, (2) failure by Plaintiffs to discover the existence of their cause of action, and (3) due diligence by Plaintiffs in attempting to discover the claim." *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999). To adequately allege fraudulent concealment, Plaintiffs must meet Rule 9(b)'s heightened pleading standard, such that Plaintiffs must plead "the who, what, when, where, and how." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011); *In re Milk*, 84 F. Supp. 2d at 1022 (discussing the application of Rule 9(b)).

**a. Defendant's concealment of Plaintiffs' cause of action**

Plaintiffs argue that they have adequately pleaded the first element of fraudulent concealment because (1) the conspiracy was "self-concealing" and (2) even if not self-concealing, they have otherwise pleaded the concealment.

The self-concealing doctrine essentially posits that a conspiracy may itself suffice to show fraudulent concealment where the conspiracy would not have been effective if it had been disclosed. Thus, the fact that the conspiracy was carried out at all may prove fraudulent concealment for

tolling purposes. *In re Monosodium Glutamate Antitrust Litig.*, No. CIV. 00MDL1328PAM, 2003 WL 297287, at *2 (D. Minn. Feb. 6, 2003) (explaining that the self-concealing doctrine "allows a plaintiff to proceed with a fraudulent concealment claim merely on proof of a self-concealing antitrust violation.")

The Eighth Circuit has not decided whether the self-concealing doctrine applies in cases such as this, but the Court concludes that it does not. Nearly every circuit to consider the question has held that, for tolling purposes, defendants must have in some way acted to conceal their conspiracy. *See, e.g.,* 📗 *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008); *see also In re Fasteners Antitrust Litig.*, Civil No. 08-md-1912, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011) (collecting cases and noting only the Second Circuit has adopted the self-concealing doctrine). To hold that fraudulent concealment can be met by claiming a conspiracy is self-concealing would mean allowing fraudulent concealment to apply to nearly every conspiracy. Likewise, even if the Court were to accept the self-concealing doctrine, it seems illogical to apply it to a case like this, where the Plaintiffs made public statements an essential part of their conspiracy allegations.

Of course, the Plaintiffs also argue that Defendants did indeed take affirmative actions to fraudulently conceal their antitrust violations. In the complaints, Plaintiffs claim broadly that Defendants were able to conceal the conspiracy using:

> [V]arious means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats —a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply

restraint and price discussions from non-conspirators.

**\*8** (DPP Compl. ¶ 182).

To buttress these vague allegations, Plaintiffs argue that (1) Agri Stats has described itself as a quiet company that does not advertise what it does; and (2) some defendants gave pretextual (non-conspiracy) reasons to explain why production was slowing. In further support, Plaintiffs cite a few out-of-circuit cases which state something like "[a]ttributing the anti-competitive effects of a conspiracy to some cause other than the collusive conduct can be an affirmative act of fraudulent concealment." 📗 *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1200 (N.D. Cal. 2015).

None of the alleged acts of concealment meet Rule 9(b)'s heightened pleading standard. Plaintiffs do not provide any information regarding the "who, what, when, where, and how" that could lead the Court to plausibly assume that the Defendants engaged in a fraudulent concealment campaign. Further, the heart of the complaint is that this conspiracy was agreed to and conducted in part via public statements between the Defendants. It is difficult to reconcile the Plaintiffs belief that Defendants conducted this conspiracy via public statements with its assertion that Defendants were also concealing it. Therefore, the Court concludes that Plaintiffs have failed to adequately allege Defendants' concealment of Plaintiffs' cause of action.

### b. Failure by Plaintiffs to discover the existence of their cause of action

Plaintiffs adequately allege that they failed to discover the antitrust violations until 2017. (DPP Compl. ¶¶ 187–90.)

### c. Due diligence by Plaintiffs in attempting to discover their claim

The parties dispute when Plaintiffs' duty to conduct due diligence first arose. [14] Defendants argue that the Plaintiffs were on inquiry notice as early as the start of the conspiracy because the public statements, the increased price for pork, and the slowing production were public knowledge. Plaintiffs

argue that they were not on inquiry notice until 2017, when an article on the role of Agri Stats in the broiler-chicken industry appeared in Bloomberg News and a lawsuit was filed— *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp.3d 772 (N.D. Ill. 2017)—alleging anticompetitive behavior in that industry, which the plaintiffs alleged was facilitated by Agri Stats' information sharing. (*See* DPP Compl. ¶¶ 66, 188–89.) Only then would the reasonable person have had notice by which to investigate.

When due diligence is to be exercised inherently contains a reasonableness standard. *See* *Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 897 (8th Cir. 1997) ("A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger the duty to investigate." (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1402 (8th Cir. 1992)). Although public statements made by the Defendants could have tipped off a savvy consumer to the conspiracy, that does not mean that a reasonable person must have discovered the conspiracy through the statements. The Court concludes that the most reasonable time for the duty to arise was in the wake of the *Broiler Chicken* lawsuit and the Bloomberg article.

### *2.* Continuing Violation

**\*9** Plaintiffs also argue that Defendants are liable under a continuing-violation theory. A continuing violation "restarts the statute of limitations period each time the defendant commits an overt act." *Propane I*, 860 F.3d at 1063. "An overt act has two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff." *Id.* "In the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years ... each sale to the plaintiff ... starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Id.* at 1064 (internal quotation omitted).

Therefore, to adequately allege that a continuing violation has occurred, "Plaintiffs must allege: (1) a price-fixing conspiracy; (2) that brings about a series of unlawfully high priced sales during the class period; and (3) sale[s] to the plaintiff[s] during the class period. *Id.* (internal quotations omitted) (alterations in original).

Plaintiffs have successfully pleaded the first and third elements. To successfully plead the second element, the Plaintiffs must adequately allege that the conspiracy continued into the non-time-barred class period: June 28, 2014—that is, four years before this action was filed—and beyond. The "question here is not whether the amended complaint alleges other overt acts in addition to sales to the Plaintiffs; the issue is whether the amended complaint alleges that the conspiracy continued when the sales took place." *Id.* at 1070.

It is true that many of the factual assertions regarding the conspiracy concern pre-2014 conduct. Plaintiffs, however, assert that Defendants' parallel conduct continued throughout the class period, citing factors that would not have occurred had the conspiracy disbanded.

Plaintiffs point out specific instances of behavior that indicate the Defendants were still conspiring. First, they point out that defendant Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, even though its hogs were largely unaffected by the epidemic. Plaintiffs argue that Clemens, if acting rationally, should have increased production to increase its market share for that year. Plaintiffs note that after JBS acquired Cargill's pork enterprise, it opted to decrease supply, despite increased consumer demand. And Plaintiffs cite to the decision by Defendants Seaboard and Triumph to postpone an expansion of facilities in 2017, even though it was publicly acknowledged that a growing demand and growth in the industry would have supported expansion. Finally, Plaintiffs allege that each of the plus factors were still present during the post-2013 period: high market concentration, the barriers to entry of potential competitors, and the trade association meetings that occurred each year and provided the Defendants with the continued opportunity to conspire.

Importantly, the Plaintiffs also allege that the Defendants continued to use Agri Stats beyond 2013. Given that the Plaintiffs allege that Agri Stats is the vehicle by which the Defendants were able to monitor each other's production outputs, the fact that they continued using the service makes plausible the allegation that the conspiracy continued. Therefore, the Court will deny Defendants' Motion to Dismiss on statute-of-limitations grounds.

### C. Conclusion

The Court will deny the Defendants' joint Motion to Dismiss because Plaintiffs' Amended Complaints sufficiently plead parallel conduct and a continuing violation to state plausible Sherman Act claims. The Court will, however, grant Indiana Packers' individual Motion to Dismiss because the Amended Complaints fail to adequately allege Indiana Packers' involvement in the conspiracy.

## III. STATE-LAW CLAIMS

### A. Standing

**\*10** Defendants argue that the Indirect Plaintiffs lack standing to bring most of their state-law claims because they do not have a representative plaintiff from those jurisdictions. Ordinarily, the Court would address Defendants' standing arguments before reaching the merits because "standing is a jurisdictional prerequisite[.]" *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 621 (8th Cir. 2012) (quoting *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007)). However, in the class action context, the Court may defer the standing question until class certification is " 'logically antecedent' to standing." *See Hudock v. LG Elecs. U.S.A., Inc.* ("*Hudock I*"), Civil No. 16-1222, 2017 WL 1157098, at \*2 (D. Minn. Mar. 27, 2017) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)).

Here, the Court will exercise its discretion to defer consideration of the standing issues until after class certification, which is "logically antecedent" to the question raised by Defendants: whether CIP Plaintiffs can bring claims under the laws of states in which no representative plaintiff currently resides. "If standing issues remain after class certification, Defendants are free to make a motion at that time." *Id.*

### B. State Antitrust Claims

Defendants argue that Indirect Plaintiffs' antitrust claims under the laws of Illinois, Rhode Island, and Mississippi must be dismissed for various state-specific reasons.

### 1. Illinois

Defendants argue that Illinois state law bars Indirect Plaintiffs from bringing a class action. They point to the Illinois Antitrust Act ("IAA"), which reads "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 Ill. Comp. Stat. § 10/7(2). Indirect Plaintiffs argue that they should still be permitted to bring class actions because Illinois state law is superseded by Rule 23 of the Federal Rules of Civil Procedure.

Indirect Plaintiffs rely on *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, where the Supreme Court held that a New York state law prohibiting class actions should not bar a class action in New York federal court because it conflicted with Rule 23. *Shady Grove*, 559 U.S. 393, 397–406, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010). Although the case was decided 5–4, there was disagreement among the Justices as to the reasoning. Justice Scalia authored an opinion for himself and three others; Justice Stevens authored an opinion concurring in part and concurring in the judgment for himself. *Id.* at 395, 416, 130 S.Ct. 1431.

Justice Scalia's opinion stated that the test for preemption was (1) "whether the federal and state rules can be reconciled" and (2) "if they cannot, determining whether the Federal Rule runs afoul of [28 U.S.C.] § 2072(b)," the Rules Enabling Act. [15] *Id.* at 410, 130 S.Ct. 1431. This inquiry focuses on "what the rule itself regulates: If it governs only 'the manner and the means' by which the litigants' rights are 'enforced,' it is valid; if it alters 'the rules of decision by which [the] court will adjudicate [those] rights,' it is not." *Id.* at 407, 130 S.Ct. 1431 (quoting *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 446, 66 S.Ct. 242, 90 L.Ed. 185 (1946)).

Justice Stevens' opinion agreed with the plurality regarding the first step, but reasoned that the second could not merely be a mechanical application of the rule that "courts sitting in diversity 'apply state substantive law and federal procedural law.' " *Id.* at 417, 130 S.Ct. 1431 (quoting *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)*Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)). "A federal rule ... cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to

define the scope of the state-created right." *Id.* at 423, 130 S.Ct. 1431. The opinion went on to concur in the judgment because "it seem[ed] obvious to [him] that [the Court] should respect the plain textual reading of ... a rule in New York's procedural code about when to certify class actions brought under any source of law, and respect Congress' decision that Rule 23 governs class certification in federal courts." *Id.* at 436, 130 S.Ct. 1431.

**\*11** Given the divided reasoning of the plurality and concurrence, the Shady Grove rule is unclear. "When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]' " *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). This so-called Marks rule is "more easily stated than applied[.]" *Grutter v. Bollinger*, 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (quoting *Nichols v. United States*, 511 U.S. 738, 745–46, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994)). "In the face of this confusion, two main approaches have emerged: one focusing on the **reasoning** of the various opinions and the other on the ultimate **results**." *United States v. Davis*, 825 F.3d 1014, 1020 (9th Cir. 2016) (en banc). The Eighth Circuit has not explicitly adopted either of these approaches, but it has appeared to prefer former. *See, e.g., Jones v. Jegley*, 947 F.3d 1100, 1106 n.3 (8th Cir. 2020) ("Because Chief Justice Roberts's plurality opinion is the narrowest in support of the judgment, it is binding.") Assuming that Justice Steven's concurrence is the narrowest result because some state procedural rules might still survive when in conflict with the Federal Rules, the ultimate question here is whether the pertinent section of the IAA is strictly procedural in nature or if it is sufficiently intertwined with substantive law to the point that it would abridge, enlarge, or modify Illinois substantive law.

Defendants claim that the IAA is "sufficiently intertwined" with substantive law because it is located "in the same paragraph of the same statute that creates the underlying substantive right" and because ruling otherwise would undermine the Illinois Legislature's policy considerations for

writing the law. However, "the fact that a class action bar is included within a consumer protection statute does not make it any more substantive than if it were found instead among the state's rules of procedure." *See Smith-Brown v. Ulta Beauty, Inc.*, Civil No. 18-610, 2019 WL 932022, at \*13 (N.D. Ill. Feb. 26, 2019); *see also* 1 McLaughlin on Class Actions § 2:47 (15th ed.) ("Most courts considering the question have determined that a legislature's placement of a class action prohibition within a specific state consumer protection act (as opposed to a free-standing rule of procedure) does not necessarily mean that the prohibition is a substantive one.").

Application of the Shady Grove test to the IAA was explored in Broiler Chicken, with the court concluding that because the ability of plaintiffs to bring class actions is a purely procedural question, Rule 23 superseded the IAA. *In re Broiler Chicken*, 290 F. Supp. 3d at 818. Defendants attempt to downplay Broiler Chicken by noting that it cited few of the cases decided in the the eight years since Shady Grove. The four post–Shady Grove cases Defendants highlight generally conflict with Broiler Chicken.[16] Although these cases show some ambiguity, the Court is persuaded by Broiler Chicken and agrees that the issue is purely a procedural one. Indeed, Justice Steven's concurrence concluded that class certification is a procedural question. 559 U.S. at 436, 130 S.Ct. 1431 ("Although one can argue that class certification would enlarge New York's 'limited' damages remedy ... [i]n order to displace a federal rule, there must be more than just a possibility that the state rule is different than it appears." (citations omitted)). Because the Court concludes that the IAA rule is purely procedural, it will deny the Motion to Dismiss as to the Illinois state-law claims.[17]

### 2. Rhode Island

**\*12** As noted in footnote two above, the Supreme Court held in Illinois Brick that permitting indirect purchasers to sue for damages from over-charges "passed on" to them by middlemen "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge." 431 U.S. 720, 737, 97 S.Ct. 2061

(1977). Such "dimensions of complexity" would "seriously undermine [the] effectiveness" of lawsuits against price-fixing conspiracies. *Id.*

Although most state courts interpret their antitrust laws in accordance with federal law, in *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the Supreme Court held that "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." 490 U.S. at 103, 109 S.Ct. 1661. Therefore, whether by legislation or by state-court interpretation, states are free to reject *Illinois Brick* via so-called "repealers." *See Broiler Chicken*, 290 F. Supp. 3d at 811.

Effective July 15, 2013, Rhode Island repealed its ban on antitrust claims from indirect purchasers. 6 R.I. Gen. Laws Ann. § 6-36-7(d). Although statutes "are presumed to apply prospectively," *Hydro-Mfg., Inc. v. Kayser-Roth Corp.*, 640 A.2d 950, 954 (R.I. 1994), the General Assembly, by "strong, clear language or necessary implication[,]" may evince a desire that the law applies retroactively. *Lawrence v. Anheuser-Busch, Inc.*, 523 A.2d 864, 869 (R.I. 1987).

However, indirect Plaintiffs offer no evidence that the legislature intended for the *Illinois Brick* repealer to be applied retroactively. The Court therefore finds that Rhode Island law prohibits Indirect Plaintiffs from seeking damages from before the repealer became effective on July 15, 2013.

### 3. Mississippi

Although not found in the text of the Mississippi Antitrust Act ("MAA"), Miss. Code Ann. § 75-21-1, the Mississippi Supreme Court has held that "a material element to an MAA claim is that the illegal objective of the trust 'be accomplished in part at least by transactions lying wholly within the state.'" *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (quoting *Standard Oil Co. of Ky. v. State*, 107 Miss. 377, 65 So. 468, 471 (1914)). The question for the Court is what kind of transactions are "wholly intrastate" under the MAA?

Vague, conclusory statements of intrastate transactions are not enough. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266–67 (S.D.N.Y. 2019) (holding that plaintiffs failed to allege wholly intrastate conduct because the only allegation mentioning Mississippi alleged that Keurig had distributors "across the Southeast region," including Mississippi). The claims in *Standard Oil*, on the other hand, were sufficient because they outlined specific instances where defendants resided and conducted business in the same state where their product was delivered, though not produced. *Standard Oil Co. of Ky.*, 65 So. at 472; *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *5 (Miss. Ch. Ct. Jan. 17, 2006). Once the petroleum was brought to Mississippi, "it bec[a]me incorporated into the general mass of property therein," and "therefore constituted intrastate commerce ... governed by the state's laws." *Standard Oil*, 65 So. at 470. This implies that "wholly intrastate" does not mean that a product must literally be procured, finished, and sold all within Mississippi by the same entity. Therefore, plaintiffs must at least specifically allege that a product is distributed to, and then sold within, the Magnolia State under anticompetitive circumstances. [18]

**\*13** The claims here are closer to the vague statements of *Keurig* than to the specific transactions of *Standard Oil*. The IPPs merely allege that pork is sold indirectly via distributors throughout Mississippi and that Defendants' conduct had a substantial effect Mississippi commerce because Mississippi consumers paid artificially high prices for pork; CIP Plaintiffs fail even to do that. The wholly intrastate rule requires more than these conclusory statements. Accordingly, the Court will grant Defendants' Motion to Dismiss.

### C. State Consumer-Protection Claims

#### 1. Rule 9(b)

Under the heightened pleading standard of Federal Rule of Civil Procedure 9(b), allegations of fraud must be "stated with particularity." Fed. R. Civ. P. 9(b). This requirement extends to claims "grounded in fraud." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1010 (8th Cir. 2015). "Whether a state-law claim sounds in fraud, and so triggers Rule 9(b)'s heightened standard, is a matter of substantive state law," and "[a] claim may sound in fraud even

though it is brought under a statute that also prohibits non-fraudulent conduct." *Olin v. Dakota Access, LLC*, 910 F.3d 1072, 1075 (8th Cir. 2018) (internal quotation omitted). The Eighth Circuit uses a "a pleading-specific inquiry in which the focus is on the elements of the claims asserted[.]" *Id.* at 1076 (internal quotations omitted).

To determine whether a claim sounds in fraud, one can imagine a spectrum of how central fraud is to a claim. On one end of the spectrum are claims that do not specifically mention fraudulent behavior or specify that they are not based on fraud—such claims are not subject to Rule 9(b). *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) (holding that claims are subject to the regular pleading standard because they specifically disavowed any fraudulent behavior); *Streambend Props. II*, 781 F.3d at 1013 (holding that a claim was not sounding in fraud because it was "pleaded separately [from other fraud claims], focused on different conduct and representations, and contained no fraud averments"). On the other end are claims that center on fraud and are subject to Rule 9(b). *Olin*, 910 F.3d at 1075–76 (holding that a claim did sound in fraud because plaintiffs "repeatedly assert[ed]" that the defendant's actions were fraudulent).

The consumer-protection claims here fall somewhere in the middle. The Amended Complaints' primary allegations involve anticompetitive behavior, not fraud. Defendants point out that the Amended Complaints use the terms "deceptive," "fraudulent," "omissions," and "misrepresentations." Indirect Plaintiffs, in turn, accuse Defendants of focusing on cherry-picked terms that are not essential to their allegations of price fixing.

To determine whether a complaint sounds in fraud, courts have also looked at whether plaintiffs claim that they allege any reliance based on inducements by defendants. If not, courts have concluded that the complaint does not sound in fraud. *See id.* at 1075–76 (holding a claim to 9(b) in part because plaintiffs alleged that they were "induced" to sign misrepresented easement contracts).

Unlike *Olin*, the Amended Complaints do not allege inducement or reliance. Also, unlike *Olin*, the Amended Complaints are not intertwined any explicit claims of fraud—their allegations of anticompetitive practices stand on their own. Therefore, the Court concludes that the consumer-protection claims are not subject to Rule 9(b) and will

deny Defendants' Motion to Dismiss on the ground that the allegations are insufficiently particular. [19]

### 2. Reliance

**\*14** Defendants also argue that Indirect Plaintiffs' consumer-protection claims from nine jurisdictions—Arkansas, California, the District of Columbia, Michigan, New York, North Dakota, Rhode Island, Virginia, and Wisconsin—should be dismissed because they require either (1) deception or (2) reliance as elements of a consumer-protection claim, and Indirect Plaintiffs have failed to allege either. Indirect Plaintiffs argue that neither deception nor reliance are necessary elements of consumer-protection claims when those claims are centered around unfair business practices or antitrust conduct.

#### a. <u>Arkansas</u>

The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "[e]ngaging in any ... unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code § 4-88-107(a)(10). "[U]nconscionable acts" under the ADTPA include behavior which violates "public policy or statute." *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800, 811 (2006). That includes anticompetitive behavior. *See* Ark. Code § 4-75-302 ("A monopoly ... is declared to be unlawful and against public policy[.]"), § 4-75-309 (banning price fixing).

Defendants point to *Apex Oil Co., Inc. v. Jones Stephens Corp.*, which held that reliance was a required element because the statute "provided a cause of action for '[a]ny person who suffers actual damage or injury as a result of an offense or violation.' " 881 F.3d 658, 662 (8th Cir. 2018) (quoting Ark. Code § 4-88-113(f) (2011)). [20] However, there are factual differences between *Apex* and this case. The Eighth Circuit held that reliance was necessary to the claim in *Apex* because "as a practical matter it is not possible that the damages could be caused ... without reliance[.]" *Id.* (citing *In re St. Jude Med., Inc.*, 522 F.3d 836, 839 (8th Cir. 2008)). But in this case, Indirect Plaintiffs did not have to rely on anything to suffer damages; they had

only to pay allegedly inflated prices for pork. Therefore, the Court will deny Defendants' Motion.

### b. California

Defendants misread two cases in attempt to demonstrate that reliance is a requirement of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. *In re Tobacco II Cases* held that reliance was necessary when a complaint was brought under the fraud prong of the UCL. 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 39 (2009) ("[T]his language imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong."). It said nothing about the unlawful-business-practices prong, on which the Amended Complaints rely. Likewise, *Moore v. Apple, Inc.* concluded that reliance was a necessary element only when a complaint is predicated on misrepresentation. 73 F. Supp. 3d 1191, 1200 (N.D. Cal. 2014) ("California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation[.]"). Neither of these cases are comparable to the Amended Complaints because they are not brought under the UCL's fraud prong nor are the allegations based on misrepresentation.

The unlawful-business-practices prong of the UCL has no reliance requirement. *See Cal-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 544 (1999) ("When a plaintiff who claims to have suffered injury from ... 'unfair' act[s] or practice[s] invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws[.]"). Because reliance is not a required element under the portion of the UCL invoked in their Amended Complaints, Indirect Plaintiffs' UCL consumer-protection claims are adequately pleaded. Therefore, the Court will deny Defendants' Motion to Dismiss.

### c. District of Columbia

**\*15** Defendants argue that deception is a necessary element of the D.C. Consumer Protection Procedure Act ("CPPA"),

D.C. Code § 28-3904, citing *Williams v. Purdue Pharm. Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003). In *Williams*, however, the court concluded that plaintiffs lacked standing because they relied on a fraud-on-the-market theory to bring a false advertising claim. *Williams*, 297 F. Supp. 2d at 177–78. The allegations in this case are not about misleading advertising, they rest on anticompetitive behavior. *Williams* is therefore inapposite.

A plausible allegation that defendants violated federal antitrust law is sufficient to bring a cause of action under the CPPA. *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003) ("A main purpose of the CPPA is to assure that a just mechanism exists to remedy all improper trade practices.... Trade practices that violate other laws, including the common law, also fall within the purview of the CPPA."); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1073 (S.D. Cal. 2017) (denying motion to dismiss because "Plaintiffs have plausibility alleged a violation of federal antitrust law"). Because Indirect Plaintiffs have adequately alleged a federal antitrust claim, their CPPA claim is adequately pleaded. Therefore, the Court will deny Defendants' Motion to Dismiss.

### d. Michigan

Defendants argue that deception or reliance are required elements of a claim under the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.903, relying on *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, Plc*, 737 F. Supp. 2d 380, 413 (E.D. Pa. 2010). However, the plaintiffs in *Sheet Metal* were only required to allege reliance because their complaint was based on misrepresentation. 737 F. Supp. 2d at 412. Indeed, that same opinion noted that the MCPA is larger in scope than Defendants allege here. *Id.* (The MCPA "prohibits 'not only deceptive business practices but also those which are unfair and unconscionable' " (quoting *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178, 341 N.W.2d 268, 279 (1983))). Because the Amended Complaints are centered on anticompetitive business practices and not misrepresentation, Indirect Plaintiffs need not allege deception.

The MCPA prohibits " 'unfair, unconscionable, or deceptive methods, acts or practices,' including 'charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.' " *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *17 (D. Mass. Sept. 16, 2015). By the plain language of the MCPA, the anticompetitive behavior that Indirect Plaintiffs allege here state a claim under the MCPA. Therefore, the Court will deny Defendants' Motion to Dismiss.

### e. New York

The New York Deceptive Practice Act ("DCPA"), N.Y. Gen. Bus. Law § 349, does not include a prohibition on unfair competition or unfair business practices, nor does it have any other language that "bespeaks a significantly broader reach." *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 420 (E.D.N.Y. 2013) (quoting *In re Digital Music*, 812 F. Supp. 2d at 410). Because the DCPA conspicuously omits anticompetitive behavior as a cause of action, the Eastern District of New York concluded that "anticompetitive conduct that is not premised on consumer deception is not within the ambit of the statute." *Id.* at 420 (internal quotation omitted). More specifically, a DCPA claim requires "(1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 883 N.Y.S.2d 772, 911 N.E.2d 834, 838 (2009). To satisfy the narrow parameters of the DCPA, a complaint must allege that Defendants "materially misled" Indirect Plaintiffs by engaging in their price-fixing scheme for Pork.

**\*16** Courts have ruled that price-fixing complaints satisfy the "materially misleading" requirement of the DCPA if they are "imbued with a degree of subterfuge." *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 859 (E.D. Mich. 2014). Because the Court concluded that Indirect Plaintiffs did not sufficiently plead the concealment prong of fraudulent concealment, it must also conclude that the Amended Complaints fail to meet the "materially misleading" requirement of the DCPA. Therefore, the Court will grant Defendants' Motion to Dismiss as to the DCPA claim.

### f. North Dakota

North Dakota's consumer-protection statute declares unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. Code § 51-15-02.

There is very little case law interpreting whether North Dakota's consumer-protection statute requires concealment as an element. Defendants point to a decision which correctly notes that "the statute does not include the FTC Act's prohibition on unfair acts or unfair competition[.]" *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 197–98 (D. Me. 2004). That court held that complaints under this statute are limited to allegations of deception, fraud, and misrepresentation. *Id.* at 198. However, the court relied on dicta from a North Dakota Supreme Court decision that did not directly address the question of concealment as a required element of a consumer-protection claim under state law. *See State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 905 (N.D. 1986) (upholding dismissal of a consumer-protection claim only because it was not clearly erroneous). The court below had found that the defendant's conduct was not fraudulent, misleading, or deceitful, but apparently said nothing about whether those allegations were a necessary part of the complaint.

Neither Indirect Plaintiffs nor Defendants point to any other North Dakota law. Instead, Indirect Plaintiffs reference one decision in which reliance was held not to be a required element. *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98 (D. Mass. 2008). However, in that case, the parties agreed that North Dakota was among the states that "do not require the element of reliance[.]" *Id.* The court did not actually analyze the question.

Despite the thin reed of precedent, the Court will adopt the one rule announced by a North Dakota court and conclude that concealment is a required element. Therefore, the Court will grant the Defendants' Motion to Dismiss as to the North Dakota consumer-protection claim.

### g. Rhode Island

The Rhode Island Deceptive Trade Practices Act ("RIDTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices." 6 R.I. Gen. Laws §§ 6-13.1-2, 6-13.1-3. The Rhode Island General Assembly "provided interpretive guidance by declaring that 'due consideration and great weight shall be given to the interpretations of the federal trade commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act [ ("FTCA") ].' " *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (R.I. 2014) (quoting 6 R.I. Gen. Laws § 6-13.1-3). Among the factors used by the Rhode Island Supreme Court to determine whether a trade practice is unfair is whether "the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise[.]" *Ames v. Oceanside Welding & Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). Several courts have interpreted *Ames* to mean that deception is not a required element of a complaint under the RIDTPA. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008); *In re Packaged Seafood*, 242 F. Supp. 3d at 1084. The Court is persuaded by the reasoning of these cases and concludes that Indirect Plaintiffs' RIDTPA claim is adequately pleaded. [21]

### h. Virginia

**\*17** The Virginia Consumer Protection Act ("VCPA") prohibits sellers from using fraudulent or deceptive practices towards consumers. *See* Va. Code § 59.1-196. Claims brought under the VCPA do not have to allege both fraud and deception; they can be brought as distinct claims. *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 553 (E.D. Va. 2001). Furthermore, the misrepresentations necessary to a deception claim "need not be pled with the same kind of particularity as common law fraud claims." *Id.* A deception claim under the VCPA also requires an allegation that plaintiff relied on the deceptive conduct. *Curtis v. Propel Prop. Tax Funding, LLC*, 2018 WL 717006, at \*3 (E.D. Va. Feb. 5, 2018) (holding a VCPA claim insufficient because it failed to allege reliance.) In sum, misrepresentation

and reliance are both required elements of a deception claim under the VCPA, although those claims do not have to be made with heightened particularity. Because Indirect Plaintiffs have not alleged reliance, the Court will grant Defendants' Motion to Dismiss as to the VCPA claim.

### i. Wisconsin

Wisconsin's Deceptive Trade Practices Act ("WDTPA") prohibits "untrue, deceptive or misleading" statements. Wisc. Stat. § 100.18. Allegations of artificial inflation have been held to be sufficient to make a claim under the WDTPA. *State v. Abbott Labs.*, 346 Wis.2d 565, 829 N.W.2d 753, 761–62 (Wis. App. 2013).

Defendants appear to concede that the WDTPA violation is adequately pleaded on these grounds. Instead, they ask for dismissal because (1) the complaint does not satisfy the heightened pleading standard of Rule 9(b); and (2) the complaint purportedly does not identify who was injured by Defendants' misrepresentation. Both arguments fall flat. As discussed above, the heightened pleading standard of Rule 9(b) does not apply to the state claims here. As for identification, the complaint identifies multiple vendors who purchased pork at artificially inflated prices, such as the Erbert & Gerbert's located in Eau Claire, Wisconsin. The Court will deny Defendants' Motion to Dismiss the WDTPA claim.

### 3. Antitrust Claims Not Actionable

Defendants claim that antitrust allegations are not actionable under the consumer-protection statutes of eight states: Arkansas, Illinois, Michigan, Minnesota, North Dakota, Rhode Island, South Dakota, and Utah.

### a. Arkansas

The ADTPA "makes illegal any trade practice which is unconscionable, which includes conduct violative of public policy or statute." *Baptist Health*, 226 S.W.3d at 811. This includes price-fixing schemes. *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 859 (E.D. Mich. 2014). Defendants point to *State ex rel. Bryant v. R & A Investment Co.*,

336 Ark. 289, 985 S.W.2d 299, 302 (1999), arguing that high prices alone were held not enough to constitute an unconscionable act. Defendants again misread the case. The *Bryant* decision reaffirmed that the ADTPA has a "liberal construction" and is meant to "protect ... the consumer public" and that the "catch-all provision" of unconscionability "was, no doubt, included because the General Assembly could not be expected to envision every conceivable violation" of the statute. *Id.* at 302. Indirect Plaintiffs have plausibly alleged a price-fixing scheme and have therefore successfully plead an unconscionable act under the ADTPA. Therefore, the Court will deny Defendants' Motion to Dismiss.

## b. Illinois

Defendants argue that the most recent Illinois decisions hold that antitrust violations are not actionable under the Illinois Consumer Fraud Act ("ILCFA"). *See Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 798 (S.D. Ill. 2018). However, *Butler* merely concluded that a plaintiff cannot bring action under the ILCFA that would be deficient under the Illinois Antitrust Act. *Butler*, 331 F. Supp. 3d at 798 (dismissing a ILCFA claim because "the Illinois Supreme Court has instructed that plaintiffs cannot use the [ILCFA] to get around the fact that their theory does not fly under the Illinois Antitrust Act"). Illinois courts have not specifically ruled on the question of whether an ILCFA claim based on antitrust violations is permissible when the complaint would also be sufficient under the Illinois Antitrust Act. *See Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1048, n.12 (N.D. Ill. 2007). Because the Court has, at this stage, denied the Motion to Dismiss as to the Illinois Antitrust Act claim, the Court will also allow deny the Motion as to the ILCFA claim.

## c. Michigan

**\*18** As noted above, the MCPA prohibits " 'unfair, unconscionable, or deceptive methods, acts or practices,' including 'charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.' " *In re Solodyn Antitrust Litig.*, 2015 WL 5458570, at *17 (quoting *Mich. Comp. Laws Ann. § 445.903(1)*).

The MCPA is narrower than other state consumer-protection statutes because it specifically defines what constitutes unfair or unconscionable conduct. *Mich. Comp. Laws Ann. § 445.903(1)(a)–(kk)*. As other courts have noted, these definitions do not lend themselves to antitrust allegations. *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d at 1076 ("Plaintiffs do not point to a specific provision of the MCPA definitional section covering antitrust violations, and the Court is unable to find one.") Because "the only manner in which plaintiffs may assert a violation of the MCPA is through fraud," *id.*, and because Indirect Plaintiffs do not allege fraud, the Court will grant Defendants' Motion to Dismiss as to the MCPA claim.

## d. Minnesota

The Minnesota Consumer Fraud Act ("MCFA"), *Minn. Stat. § 325F.69*, prohibits "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled[.]" *Minn. Stat. § 325F.69, subd. 1*. In *State v. Minnesota School of Business*, the Minnesota Supreme Court held that " 'proof of individual reliance' is **not** needed to prevail under the MCFA," and concluded instead that plaintiffs need only "establish 'a causal nexus between the conduct alleged to violate the [MCFA] and the damages claimed.' " *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 134–35 (Minn. 2019) (emphasis in original) (quoting *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 4 (Minn. 2001)). "This is particularly true 'where a defendant's misrepresentations were directed at and affected a broad group of consumers,' and plaintiffs in such cases do not need to offer 'proof of direct individual reliance' to establish that causal nexus. *Hudock v. LG Elecs. U.S.A., Inc.* ("*Hudock IV*"), Civil No. 16-1220 (JRT/KMM), 2020 WL 1515233, at *13 (D. Minn. Mar. 30, 2020) (quoting *Minn. Sch. of Bus.*, 935 N.W.2d at 135).

Reliance is also not required to bring a claim under the Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), *Minn. Stat. § 325D.44. See Minn. Stat. § 325D.44 subd. 2* ("In order to prevail ... a complainant need not prove ... actual confusion or misunderstanding."). However, "[t]he relief provided by the [MDTPA] is limited to those persons 'likely to be damaged by a deceptive trade

practice.' " *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. App. 1999) (quoting Minn. Stat. § 325D.45, subd. 1). Therefore, the MDTPA "only provides injunctive relief 'from future damage, not past damage[.]' " *Hudock I*, 2017 WL 1157098, at *6 (quoting *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003)). An MDTPA claim will fail, then, unless the plaintiff seeks an injunction and alleges a likelihood of future harm. *Id.*

Although relaxed from the common-law fraud standard, Minnesota Supreme Court has not adopted a fraud-on-the-market standard for pleading MCFA claims. Although the IPPs need not allege individual reliance for their MCFA claim, they fail to adequately state a causal nexus because they lack any allegations of "defendants' misrepresentations [that] were directed at ... a broad group of consumers." *Minn. Sch. of Bus.*, 935 N.W.2d at 135. Likewise, CIPs fail to allege any likelihood of future harm and do not expressly seek injunctive relief. Therefore, the Court will grant Defendants' Motion to Dismiss as to the MCFA and MDTPA claims.

### e. North Dakota

Defendants, relying on *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 628 N.W.2d 707, 714–16 (N.D. 2001), argue that the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-10, does not have a private right of action. Defendants overstate the holding of *Trade 'N Post*—the North Dakota Supreme Court found only that there was no private right of action to **damages.** *Id.* at 715. Claims under section 51-10 may still be brought for injunctive relief. Indirect Plaintiffs "seek all relief available" under the N.D. Century Code. This includes injunctive relief. Therefore, the Court will deny Defendants' Motion to Dismiss as to the North Dakota consumer-protection claim in so far as it seeks injunctive relief.

### f. Rhode Island

**\*19** The RIDTPA "provides that 'unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.' " *Long*, 93 A.3d at 1000 (quoting 6 R.I. Gen. Laws § 6-13.1-2). "It is clear that in enacting the

DTPA, the Legislature intended to declare unlawful a broad variety of activities that are unfair or deceptive[.]" *Id.* (quoting *Park v. Ford Motor Co.*, 844 A.2d 687, 692 (R.I. 2004)). Thus, "a plaintiff must establish that he or she is a consumer, and that defendant is committing or has committed an unfair or deceptive act while engaged in a business of trade or commerce." *Id.* (quoting *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 431 (R.I. 2001)).

Defendants rely on *Long* to argue that "affirmative misrepresentation" is a required element of a claim under the RIDTPA. *See id.* at 1004. However, the Rhode Island Supreme Court's conclusion to which Defendants' point was made only under the deceptive-act prong. As the Court noted above when discussing whether reliance is required under the RIDTPA, Rhode Island has several factors it uses to determine whether a trade practice is unfair, including, *inter alia*, "whether it is immoral, unethical, oppressive, or unscrupulous" and "whether it causes substantial injury to consumers (or competitors or other businessmen." *Id.* at 1000. The alleged price-fixing scheme undoubtedly fits within both of those factors. *See FTC v. Cement Inst.*, 333 U.S. 683, 690, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (concluding that conduct that "constitutes a violation of the Sherman Act ... may also be an unfair method of competition and hence constitute a violation of [§] 5 of the Federal Trade Commission Act"). As such, the Court will deny Defendants' Motion to Dismiss.

### g. South Dakota

South Dakota's deceptive trade-practices act ("SDDTPA") defines what constitutes a "deceptive act or practice" under statute. S.D. Codified Laws § 37-24-6. This includes "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise[.]" *Id.* § 37-24-6(1). Because the Court concludes that Plaintiffs have not adequately pleaded fraudulent concealment, there are no allegations of false promises or misrepresentations on which to base an SDDTPA claim. Therefore, the Court will grant Defendants' Motion to Dismiss as to the SDDTPA claim.

### h. Utah

The Utah Consumer Sales Practices Act ("UCSPA") prohibits deceptive and unconscionable acts. Utah Code Ann. §§ 13-11-4, 13-11-5. Although the UCSPA was modeled on the FTCA, *see* Utah Code Ann. § 13-11-2(4), it lacks an analogue to § 5, which prohibits "unfair competition." Because § 5 is the exclusive means by which the United States Supreme Court has allowed Sherman Act price-fixing claims to also fall within the ambit of the FTCA, see Cement Inst., 333 U.S. at 690, 68 S.Ct. 793, this omission is fatal to Indirect Plaintiffs' UCSPA claim and the Court will grant Defendants' Motion to Dismiss.

### 4. Intrastate Activity

Defendants argue that Indirect Plaintiffs fail to allege specific intrastate conduct as required by consumer-protection laws in six states: Florida, Massachusetts, New Hampshire, New York, North Carolina, and Wisconsin.

### a. Florida

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204. Although it does not contain any language creating a geographic limitation, some Florida courts have held that FDUTPA precludes claims by out-of-state consumers. See In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 537 (E.D. Pa. 2010) (collecting cases). The Florida Supreme Court has not addressed this intrastate case-law split. Id.

**\*20** "When there is no state supreme court case directly on point," the role of a federal court sitting in diversity jurisdiction "is to predict how the state supreme court would rule if faced with the same issue[.]" N. Oil & Gas, Inc. v. EOG Res., Inc., 970 F.3d 889, 892 (8th Cir. 2020) (quoting Blankenship v. USA Truck, Inc., 601 F.3d 852, 856 (8th Cir. 2010)). The Court is persuaded that the so-called *Erie* guess made by the court in In re Flonase is the right one. See

692 F. Supp. 2d at 537. Florida statute provides that the FDUTPA "shall be construed liberally ... [t]o protect the consuming public." Fla. Stat. § 501.202. Given this command and the generally remedial nature of the FDUTPA, "[t]here is no reason to read restrictions into the statute that the legislature has failed to include." In re Flonase, 692 F. Supp. 2d at 537.

The federal case on which Defendants rely, Five for Entm't, S.A. v. Rodriguez, 877 F. Supp. 2d 1321 (S.D. Fla. 2012), does not contradict this conclusion. In that case, the court concluded there were no allegations of any relation to Florida consumers and dismissed the claim because the "FDUTPA applies only to actions that occurred within the state of Florida." Five for Entm't, 877 F. Supp. 2d at 1330. The court did not conclude, as some have, that the statute applies to actions that occurred wholly within Florida. Here, Indirect Plaintiffs have alleged purchases within Florida. The Court predicts that this is all the Florida Supreme Court would require. Therefore, the Court will deny Defendants' Motion to Dismiss.

### b. Massachusetts

"No action shall be brought or maintained under [the Massachusetts unfair trade-practices act] unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A § 11. "Whether the actions and transactions constituting the § 11 claim occurred primarily and substantially within the commonwealth is not a determination that can be reduced to any precise formula." Kuwaiti Danish Comp. Co. v. Digital Equip. Corp., 438 Mass. 459, 781 N.E.2d 787, 798 (2003) (cleaned up). Instead, courts must "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Id. at 799.

The nature of such a center-of-gravity test means that there is a small likelihood of the Massachusetts Supreme Judicial Court deciding the precise issue before the Court and thus requiring another *Erie* guess. The Court is persuaded by the reasoning of the First Circuit on the issue of primacy: "[w]here wrongdoing is not focused on Massachusetts but

has relevant and substantial impact across the country, the 'primarily' requirement of 🚩 section 11 cannot be satisfied." 🟨 *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012). None of the CIP Plaintiffs are residents of Massachusetts. [22] *Cf.* 🟨 *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 726 (D. Md. 2001) (noting that plaintiffs rely heavily on their Massachusetts residency to make their 🚩 section 11 case). None of the Defendants are residents of Massachusetts. The allegations are of a nationwide conspiracy. Wherever the center of gravity of these claims may be located, it is far from the Bay State. Because CIP Plaintiffs fail to allege unfair or deceptive acts that occurred substantially within the Commonwealth of Massachusetts, they have not sufficiently pleaded a claim under 🚩 section 11 and the Court will grant Defendants' Motion to Dismiss.

### c. New Hampshire

**\*21** The New Hampshire Consumer Protection Act ("NHCPA") bars the use of "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." 🚩 N.H. Rev. Stat. Ann. § 358-A:2. Although the New Hampshire Supreme Court has not squarely addressed the issue of the territoriality clause, [23] "numerous federal district courts seated within and without New Hampshire have acknowledged that the [NHCPA] requires the proscribed conduct to occur within the state; merely selling a good in New Hampshire is not enough when the proscribed conduct occurs elsewhere." 🟨 *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at \*22 (N.D. Cal. Oct. 2, 2014) (collecting cases); *but see* 🟨 *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234–35 (M.D. Pa. 2010) (denying a motion to dismiss when New Hampshire allegations related only to product sale). The Court is persuaded by the weight of authority concluding that the territoriality clause requires more than mere sale of a product the price of which has been illicitly inflated by an alleged price-fixing scheme. The Court will therefore grant Defendants' Motion to Dismiss the NHCPA claim.

### d. New York

"General Business Law 🟨 § 349 provides that '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful[.]' " 🟨 *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190, 1195 (2002) (quoting 🟨 N.Y. Gen. Bus. Law § 349[a]). The New York Court of Appeals has held that the territoriality clause means that "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." 🟨 *Id.*

"The Second Circuit [has] recognized a split of authority following 🟨 *Goshen* as to whether the test asked where the plaintiff was deceived, or where the transaction following the deceptive act occurred." 🟨 *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 223 (S.D.N.Y. 2019) (citing 🟨 *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2nd Cir. 2013)). Although CIP Plaintiffs would likely fail the place-of-deception test, their Amended Complaint alleges that they purchased pork in New York, the price for which had been illicitly inflated by the alleged price-fixing scheme—meaning they satisfy the transaction-based test. *Cf. In re Fyre Fest.*, 399 F. Supp. 3d at 223–24. Therefore, the CIP Plaintiffs have sufficiently pleaded a claim under 🟨 section 349 and the Court will deny Defendants' Motion to Dismiss.

### e. North Carolina

The North Carolina Unfair Trade Practices Act ("NCUDTPA"), 🟨 N.C. Gen. Stat. § 75-1.1, provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Before 1977, the NCUDTPA was specifically limited to acts "within th[e] state." 🔶 *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 501 (M.D.N.C. 1987) (quoting 🟨 *Am. Rockwool, Inc. v. Owens-Corning Fiberglas*, 640 F. Supp. 1411, 1427 (E.D.N.C. 1986)). The North Carolina General Assembly "deleted th[e] geographical limitation in 1977, and the courts have determined that the General Assembly sought thereby to

expand the coverage" of the NCUDTPA to the limits of the North Carolina long-arm statute. 🔶 *Id.*

Defendants argue that the NCUDTPA claim must be dismissed because the 🔶 *'In' Porters* case and those that follow it require that only conduct that has a "substantial effect" on "in-state operations" is actionable—despite the absence of such a requirement in the text of the statute. *See* 🔶 *id.* at 501–02. The Court is unpersuaded. The state legislature specifically removed a geographic limitation from the NCUDTPA more than 40 years ago. The IPPs include a representative from North Carolina who alleges an in-state injury; they also allege that Defendants' products were being sold in the state. *See* 🔶 *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1173–74 (N.D. Cal. 2015) ("Here, [plaintiff] has alleged in-state injury and that defendants' products were being sold in North Carolina.... That is sufficient at this juncture to state a claim under the NCUDTPA."); *cf* 🔶 *'In' Porters*, 663 F. Supp. at 502 (dismissing NCUDTPA claim where the plaintiff "admit[ed] that its business operations are restricted to France and that it d[id] not have any business operations in North Carolina"). Therefore, the Court will deny Defendants' Motion to Dismiss.

### f. Wisconsin

**\*22** It is unlawful in Wisconsin for any person seeking to sell merchandise to the public to make "in this state ... any assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18. The statute "may be violated so long as the allegedly deceptive or misleading representation was made, published, disseminated, circulated, or placed before the public, in Wisconsin[.]" 🔶 *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1415 (N.D. Ill. 1996) (cleaned up). One of the representative plaintiffs for the CIP Plaintiffs is a Wisconsin-resident business, the Erbert & Gerbert's, Inc. sandwich shop in Eau Claire. CIP Plaintiffs have therefore sufficiently alleged an in-state violation of section 100.18 and the Court will deny Defendants' Motion to Dismiss.

### 5. Statutory Bars

As the Court discussed above when discussing the statutory bar on class actions in the Illinois Antitrust Act, application of the 🔶 *Shady Grove* test to the statutory bars on class actions found in the consumer-protection statutes of Arkansas, South Carolina, and Utah leads to the same conclusion: 🔶 Rule 23 supplants the state procedural rules. The Court will therefore deny Defendants' Motion to Dismiss.

### D. State Unjust-Enrichment Claims

Defendants argue that Indirect Plaintiffs' unjust-enrichment claims should be dismissed because they fail to plead elements required by various state statutes and because four states do not allow unjust-enrichment claims as a standalone claim.

### 1. Required Elements

Defendants argue that all Indirect Plaintiffs' unjust-enrichment claims should be dismissed because they lump their state claims together, rather than individually pleading each element for every state. Defendants rely on 🔶 *Cruz v. Lawson Software, Inc.*, which found material conflicts between the law of unjust enrichment in Minnesota and other states, specifically their statute-of-limitations rules and whether unjust enrichment can be brought as an independent cause of action. 🔶 *Cruz*, Civil No. 08-5900 (MJD/JSM), 2010 WL 890038, at \*6 (D. Minn. Jan. 5, 2010). The Court also recently concluded, when deciding a choice-of-law question in a class-certification motion, that material differences exist between the states' unjust-enrichment regimes. 🔶 *Hudock IV*, 2020 WL 1515233, at \*8. However, both 🔶 *Cruz* and 🔶 *Hudock IV* were determining whether, for the purposes of class certification under 🔶 Rule 23, common questions predominate under the various state-law claims. That is a different question than is being asked here, on a Motion to Dismiss, where the Court's inquiry is focused on whether Plaintiffs have set out a plausible claim for relief.

Unjust enrichment occurs when the defendant receives a benefit that is inequitable to retain. 🔶 *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 291 Minn. 68, 190 N.W. 2d 493, 494–95 (1971). Unjust-enrichment claims often turn on individualized facts. *Daigle v. Ford Motor Co.*, Civ.

No. 09-3214, 2012 WL 3113854, at *4 (D. Minn. July 31, 2012). Indirect Plaintiffs have successfully made a plausible claim for unjust enrichment. The Amended Complaints allege that Defendants unlawfully overcharged Plaintiffs for their pork by conducting inequitable, traceable acts that enriched themselves, and that they do not deserve to keep the benefits of their enrichment. Altogether, these are sufficient factual allegations to make a plausible case for relief. If Defendants, in the future, bring a motion for summary judgment, then the Court can consider whether Plaintiffs' case fails, as a matter of law, to meet the elements of a given state's unjust-enrichment regime.

**2. Independent Cause of Action**

Defendants argue for the dismissal of unjust-enrichment claims as they pertain to California, Mississippi, Illinois, and New Hampshire because those four states purportedly do not allow unjust enrichment as an independent cause of action.

a. California

**\*23** Unjust enrichment has been held to be an independent cause of action in California courts. *See Ghirardo v. Antonioli*, 14 Cal.4th 39, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1002–03 (1996) (holding that a vendor could recover from a debtor without statutory claims for relief because California had incorporated the common-law concept of unjust enrichment); *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1662, 15 Cal.Rptr.2d 173 (Cal. App. 1992) (affirming that, under California law, restitution is due if an individual is "unjustly enriched" by another). There is some evidence of an intrastate split on this issue. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029 (N.D. Cal. 2007). Given the California State Supreme Court's ruling in *Ghirardo*, the Court concludes that such claims are not expressly disallowed under state law and will deny Defendants' Motion to Dismiss as to the California unjust-enrichment claims.

b. Illinois

Illinois likewise recognizes unjust enrichment as an independent claim. *Cleary v. Philip Morris Inc.*, 656 F.3d

511, 516 (7th Cir. 2011) ("The Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action."). Defendants argue that if Illinois unjust-enrichment claims rest on the same improper conduct alleged in another claim, they will stand or fall with the related claim. Because the Court will deny Defendants' Motion to Dismiss as to the antitrust claims, so too will it deny the Motion as to the Illinois unjust-enrichment claim.

c. Mississippi

Unjust enrichment has also been found to be an independent cause of action in Mississippi. *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 342 (Miss. 2004) ("Mississippi law provides that, in an action for unjust enrichment, the plaintiff need only allege and show that the defendant holds money which in equity and good conscience belongs to the plaintiff." (quoting *Fordice Construction Co. v. Central States Dredging Co.*, 631 F. Supp. 1536, 1538–39 (S.D. Miss. 1986))); *but see Mosley v. GEICO Ins. Co.*, No. 3:13CV161-LG-JCG, 2014 WL 7882149 (S.D. Miss. Dec. 16, 2014), at *5 ("[T]his Court has recognized that unjust enrichment is considered to be a remedy, rather than an independent theory of recovery."). Therefore, the Court will deny Defendants' Motion to Dismiss as to the Mississippi unjust-enrichment claim.

d. New Hampshire

New Hampshire case law is friendlier to Defendants' argument that unjust enrichment is a remedy and not an independent cause of action. *See Parsons Infrastructure & Tech. Grp., Inc. v. Gilbane Bldg. Co.*, No. 05-CV-01-PB, 2005 WL 2978901, at *1 (D.N.H. Nov. 7, 2005) ("Unjust enrichment is an equitable remedy that ordinarily is unavailable if legal remedies are adequate under the circumstances."); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 240 (M.D. Pa. 2010) (concluding that an unjust-enrichment claim was sufficiently pleaded because it amounted to "simply pleading [an] alternative remed[y]" for a consumer-protection claim). However, courts have allowed indirect purchasers to bring parasitic unjust-enrichment claims based on defendants' violations of New Hampshire's consumer-protection statute. *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 767 (E.D. Pa. 2014)

Because the Court will deny Defendants' Motion to Dismiss as to the New Hampshire consumer-protection claim, it will also deny the Motion as to the New Hampshire unjust-enrichment claim.

### 3. Direct Benefit

Defendants further argue for the dismissal of unjust-enrichment claims for ten states—Arizona, Florida, Kansas, Maine, Massachusetts, Michigan, North Carolina, North Dakota, Utah, and West Virginia—because Indirect Plaintiffs fail to allege that they directly conferred a benefit to Defendants.

#### a. Arizona

**\*24** "Unjust enrichment is a means of restitution, which is a 'flexible, equitable remedy' that looks to 'the ties of natural justice and equity' to make compensation for the benefits received." *Span v. Maricopa Cty. Treasurer,* 246 Ariz. 222, 437 P.3d 881, 886 (Ariz. App. 2019) (quoting *State v. Ariz. Pension Planning,* 154 Ariz. 56, 739 P.2d 1373, 1375 (1987)). Under Arizona law, "[t]o make a claim for unjust enrichment, a plaintiff must show (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy at law." *Id.*

Defendants, pointing to the third element and relying on *Brown v. Pinnacle Restoration LLC,* No. 1 Ca-CV 12-0440, 2013 WL 3148654, at \*2 (Ariz. App. June 18, 2013), argue that a degree of directness is required. This overstates the holding of *Brown,* which concluded that the payment of a premium to an insurer who then paid a contractor was a sufficient connection between the enrichment and impoverishment. *Id.* The mere fact that there are necessarily intermediaries between Defendants and Indirect Plaintiffs does not therefore defeat their claim under Arizona law.

However, the Court must still dismiss the claim because Indirect Plaintiffs have failed to plead even that indirect connection. *See id.* at \*1 (describing allegations); *Yee v. Nat'l Gypsum Co.,* No. CV-09-8189-PHX-DGC, 2010 WL 2572976, at \*4 (D. Ariz. June 22, 2010) ("Plaintiff purchased the drywall from Lowe's. The complaint alleges that National Gypsum manufactured the drywall but contains no allegation that Plaintiff conferred a benefit on National Gypsum. This omission requires dismissal[.]" (cleaned up)). Because Indirect Plaintiffs have not alleged the connection between their purchases and the (admittedly mediated) transaction with Defendants, the Court will dismiss the claim.

#### b. Florida

There had previously been conflicting lines of cases in Florida regarding whether a showing of a direct benefit was required to maintain an unjust-enrichment claim. *See In re Processed Egg Prod. Antitrust Litig.,* 851 F. Supp. 2d 867, 928–29 (E.D. Pa. 2012) (describing the split and collecting cases). However, in 2017, the Florida Supreme Court adopted the rule "that to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel,* 229 So. 3d 812, 818 (Fla. 2017). Plaintiffs point only to cases decided before the *Kopel* rule. Because the Florida Supreme Court has spoken directly on the issue, the Court is bound by its decision and therefore will grant Defendants' Motion to Dismiss the claim.

#### c. Kansas

Unjust enrichment has three elements in Kansas: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.,* 259 Kan. 166, 910 P.2d 839, 847 (1996) (quoting *J.W. Thompson Co. v. Welles Prods. Corp.,* 243 Kan. 503, 758 P.2d 738, 745 (1988)). Although there are exceptions, such as between a subcontractor and the owner of a property, unjust-enrichment claims "do[ ] not depend on privity" in Kansas. *Id.* Thus, indirect purchasers could potentially recover restitution under Kansas law.

Defendants argue otherwise, pointing to an unpublished Kansas Court of Appeals case, *JA-DEL, Inc. v. Winkler,*

No. 118,441, 2019 WL 166936 (Kan. App. Jan. 11, 2019). In *Winkler*, the court concluded that a catering company could bring an unjust-enrichment claim against the groom of a wedding when his bride, who had signed the catering contract, failed to pay. *Id.* at *4. In response to the groom's argument "that a judgment against him would, by extension, allow [plaintiff] ... to sue the guests at the wedding reception," the court reasoned that such a claim would not be valid because "[t]he guests would not be receiving a benefit directly from the caterer" and "would not expect to be asked to pay later for gratuitously furnished food or beverages because the host stiffed the supplier." *Id.* at *5. Defendants' reliance on this glib response to a silly argument borders on frivolousness; nothing in *Winkler* suggests that the Kansas Supreme Court's rule in *Haz-Mat* would not apply here. Therefore, the Court will deny Defendants' Motion to Dismiss.

#### d. Maine

**\*25** "To prevail on a claim for unjust enrichment, the complaining party must show that '(1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value.' " *Knope v. Green Tree Servicing, LLC*, 161 A.3d 696, 699 (Me. 2017) (quoting *Maine Eye Care Assocs., P.A. v. Gorman*, 942 A.2d 707, 712 (Me 2008)). As in Kansas, the Supreme Judicial Court of Maine has held that "lack of privity ... do[es] not bar an action for unjust enrichment." *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1144 (Me. 1994) (internal quotation omitted).

Defendants point to an unpublished case from the Northern District of Illinois, *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 1416259, at *2 (N.D. Ill. Apr. 1, 2010), in which the court merely included in a string cite a single case from the Maine Superior Court, *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498, at *4 (Me. Super. June 22, 2001). In that case, Rivers contracted to buy beachfront property from Amato for $3,000,000; two weeks later Amato told Rivers that he was backing out of the deal, would develop the land himself, and would sell it to Rivers for $4,800,000. *Rivers*, 2001 WL 1736498, at *1. Rivers subsequently cancelled the purchase and sale agreement and his earnest money was returned. *Id.* A month later, Amato sold the property to a local developer, Hollis, for $3,000,000 and an agreement to pay a sewer lien of $41,000. *Id.* Rivers sued for breach of contract and unjust enrichment. *Id.* at *2. The Superior Court dismissed the unjust-enrichment claim because "Rivers d[id] not allege that he (at least directly), conferred a benefit on Defendants. Rather, Rivers' unjust-enrichment claim is based on an indirect (and speculative) theory that through his efforts, Hollis conferred a benefit on Amato." *Id.* at *4. The facts of *Rivers* are plainly distinguishable from this case, where Indirect Plaintiffs undoubtedly actually purchased pork, from intermediaries, processed by Defendants. Rivers never actually bought anything—he merely alleged that he was a pawn in driving up the price from another buyer.

Because nothing in *Rivers* undermines Maine's no-privity rule, the Court will deny Defendants' Motion to Dismiss.

#### e. Massachusetts

"A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust[.]" *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 984 N.E.2d 835, 850 (2013). "The injustice of the enrichment ... equates with the defeat of someone's reasonable expectations." *Id.* (internal quotation omitted). The Massachusetts Supreme Judicial Court has allowed for unjust-enrichment claims in a variety of circumstances, including " 'business torts[,]' such as unfair competition[.]" *Id.* at 851. Federal courts in Massachusetts, applying Massachusetts law, have concluded that "[u]njust enrichment does not require that a defendant receive direct payments from a plaintiff." *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 323 (D. Mass 2005) (citing *Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 81 (1st Cir. 2001)). Although the issue has not been definitely resolved by the Massachusetts Supreme Judicial Court, the statutory requirement that a plaintiff show only that "defendant received a benefit," though not from whom, persuades the Court that the District of Massachusetts got it right in *Mylan Labs.*.

**\*26** The case on which Defendants rely, *Estate of Johnson v. Melvin Rose, Inc.*, No. WOCV200400622, 2007 WL 1832029, (Mass. Super. May 9, 2007), fails to convince the Court otherwise. In the first place, the court is applying Connecticut law. *Johnson*, 2007 WL 1832029, at \*28, 35. Second, as authority for the assertion that "[i]n the absence of a measurable benefit directly conferred on the defendant, there can be no liability in restitution," *Id.* at \*39, the court points to *Zeigler v. Sony Corp. of Am.*, 48 Conn.Supp. 397, 849 A.2d 19 (2004). But *Zeigler* says just the opposite: "[some] courts have concluded that the parties must have a direct relationship (as opposed to dealing with others through an intermediary seller) and a course of dealing with each other. That, however, is to engraft a requirement not imposed by our higher courts." 849 A.2d at 25 (footnote omitted). The Court will therefore deny Defendants' Motion to Dismiss.

### f. Michigan

"A claim of unjust enrichment can arise when a party 'has and retains money or benefits which in justice and equity belong to another.' " *Wright v. Genesee Cty.*, 504 Mich. 410, 934 N.W.2d 805, 809 (2019) (quoting *McCreary v. Shields*, 333 Mich. 290, 52 N.W.2d 853, 855 (1952)). "Unjust enrichment, by contrast, doesn't seek to compensate for an injury but to correct against one party's retention of a benefit at another's expense." *Id.* at 810. The doctrine "serves a unique legal purpose: it corrects for a benefit received by the defendant rather than compensating for the defendant's wrongful behavior." *Id.* at 811. Although this does not answer the specific question of whether plaintiffs must confer a benefit directly, the language used by the Michigan Supreme Court in *Wright* suggests that the focus is on the benefit, rather than on how that benefit was transferred.

Defendants' point to *A & M Supply v. Microsoft Corp.*, Docket No. 274164, 2008 WL 540883 (Mich. App. Feb. 28, 2008). In that case, the Michigan Court of Appeals affirmed the district court's denial, on futility grounds, of a motion to amend to include an unjust-enrichment claim by indirect purchasers. *A & M Supply*, 2008 WL 540883, at \*2 (citing *Belle Isle Grill Corp. v. Detroit*, 256 Mich.App. 463, 666 N.W.2d 271, 280 (2003)). *Belle Isle* relies on a line of cases stemming from *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 473 N.W.2d 652 (1991), but that decision merely quoted the elements of unjust enrichment used by the decision below—which the Michigan Supreme Court reversed—and the elements themselves were not germane to the holding. *Dumas*, 473 N.W.2d at 663 ("[S]ince we have determined that defendant had the right to impose a new compensation plan, we find that defendant, as a matter of law, was not unjustly enriched ... [and] the statute of frauds does not bar the assertion of an unjust enrichment claim.").

The Court will rely on the Michigan Supreme Court's recent decision in *Wright*, in which the Chief Justice wrote extensively on the principles and history of unjust enrichment, to conclude that a plaintiff need not confer a benefit on a defendant directly in order to bring an unjust-enrichment claim. Therefore, the Court will deny Defendants' Motion to Dismiss.

### g. North Carolina

"The law of unjust enrichment in North Carolina proceeds from the general principle that '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.' " *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 F. App'x 916, 920 (4th Cir. 2003) (quoting *Booe v. Shadrick*, 322 N.C. 567, 369 S.E.2d 554, 555–56 (1988)). "In order to prevail on a claim for unjust enrichment, a plaintiff must prove that (1) it conferred a benefit on the defendant, (2) the benefit was not conferred officiously or gratuitously, (3) the benefit is measurable, and (4) the defendant consciously accepted the benefit." *Id.* (quoting *Booe*, 369 S.E.2d at 556).

**\*27** The line of cases on which Defendants rely are based on *Effler v. Pyles*, 94 N.C.App. 349, 380 S.E.2d 149 (1989), in which the North Carolina Court of Appeals affirmed summary judgment against a plaintiff because she had not satisfied her "burden of showing that she conferred a benefit directly on defendant[.]" *Effler*, 380 S.E.2d at 152.

"Although *Effler* has not been expressly overruled, cases decided after *Effler* have held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable,* 16 CVS 4393, 2017 WL 536361, at *5 (N.C. Super. Feb. 7, 2017); *see, e.g., New Prime, Inc. v. Harris Trans. Co.,* 2012 WL 3192718, at *4–5 (N.C. App. Aug. 12, 2012) ("Our holding ... is in line with the Restatement and other states. Many jurisdictions do not require that the plaintiff confer a direct benefit on the defendant in order to recover under a theory of unjust enrichment."); *see also Metric Constructors,* 72 F. App'x at 921; *In re Processed Egg,* 851 F. Supp. 2d at 934.

Given the silence of the North Carolina Supreme Court on the question and the trend away from the *Effler* rule, the Court concludes that North Carolina law does not require a direct benefit to maintain an unjust-enrichment claim and, therefore, will deny Defendants' Motion to Dismiss.

### h. North Dakota

Under North Dakota law, "[f]ive elements must be established to prove unjust enrichment: 1) an enrichment, 2) an impoverishment, 3) a connection between the enrichment and impoverishment, 4) absence of a justification for the enrichment and impoverishment, and 5) an absence of a remedy provided by law." *Markgraf v. Welker,* 873 N.W.2d 26, 34 (N.D. 2015) (quoting *Schroeder v. Buchholz,* 622 N.W.2d 202, 207 (N.D. 2001)). "The essential element in recovering under a theory of unjust enrichment is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value." *Zuger v. N.D. Ins. Guar. Ass'n,* 494 N.W.2d 135, 138 (N.D. 1992). These elements, like those used in Arizona, require only a "connection" between the enrichment and the loss.

The only mention of a direct benefit has been as a baseline: "[f]or a complainant to recover, it is sufficient if another 'has, without justification, obtained a benefit at the direct expense of the [complainant], who then has no legal means of retrieving it.' " *Apache Corp. v. MDU Res. Grp., Inc.,* 603 N.W.2d 891, 895 (N.D. 1999) (quoting *Midland Diesel Svc. & Engine Co. v. Sivertson,* 307 N.W.2d 555, 557 (N.D. 1981)). The quote in *Sivertson* was intended to demonstrate that "[a] complainant need not show fraud or

other misconduct on the part of the recipient to recover. It is sufficient if the latter has, without justification, obtained a benefit at the direct expense of the former, who then has no legal means of retrieving it."[24] *Sivertson,* 307 N.W.2d at 557 (citation omitted).

The Court concludes that North Dakota does not require a direct conferral of a benefit in order to bring a claim for unjust enrichment and will not, therefore, dismiss on that ground. However, as with the Arizona claim, Indirect Plaintiffs have failed to allege even the bare "connection" required under North Dakota law. Therefore, the Court will grant Defendants' Motion to Dismiss the North Dakota unjust-enrichment claim.

### i. Utah

**\*28** "A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff." *Jones v. Mackey Price Thompson & Ostler,* 355 P.3d 1000, 1018 (Utah 2015). The Court will therefore grant the Defendants' Motion to Dismiss.

### j. West Virginia

"[I]f benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value." *Realmark Devs., Inc. v. Ranson,* 208 W.Va. 717, 542 S.E.2d 880, 884–85 (2000). "Recovery of damages based upon the theories of quasi contract or unjust enrichment does not necessitate a finding of privity of contract between the parties." *Dunlap v. Hinkle,* 173 W.Va. 423, 317 S.E.2d 508, 512 n.2 (1984). West Virginia law does not require the conferral of a direct benefit.[25] Therefore, the Court will deny Defendants' Motion to Dismiss.

### 4. Duty

According to Defendants, unjust-enrichment law in both Illinois and South Carolina require the presence of a special duty owed by defendant to plaintiff. Defendants therefore move to dismiss these unjust-enrichment claims because Indirect Plaintiffs failed to allege any such duty.

### a. Illinois

In Illinois, "there is no duty or privity requirement when bringing a claim for unjust enrichment." *Sobel v. Franks*, 261 Ill.App.3d 670, 199 Ill.Dec. 24, 633 N.E.2d 820, 829 (1994). Defendants argue otherwise. *See Phila. Indem. Ins. Co. v. Pace Suburban Bus Serv.*, 409 Ill.Dec. 344, 67 N.E.3d 556, 570 (Ill. App. 2016) ("For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty." (citing *Martis v. Grinnell Mut. Reinsur. Co.*, 388 Ill.App.3d 1017, 329 Ill.Dec. 82, 905 N.E.2d 920, 928 (2009)). The line of cases supporting this statement begins with *Board of Education of City of Chicago v. AC & S, Inc.*, in which plaintiff brought a claim of unjust enrichment against defendant manufacturers and distributors of asbestos-containing materials (ACMs) that had been installed in plaintiff's schools. *Bd. of Educ. of Chi. v. AC & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989). That claim was dismissed in part because there was no duty on defendant's part to remove the ACMs. *Id.*, 137 Ill.Dec. 635, 546 N.E.2d at 598. However, this duty requirement only pertained to a narrow subset of unjust-enrichment claims specifically dealing with dereliction of one's duty to the public. *Id.* at 597, 546 N.E.2d at 598. (noting that plaintiff's claim rests on *Restatement of Restitution § 115* "Performance of Another's Duty to the Public"). This holding was overstated by *Martis*, which has been called "not an accurate statement of the law on the equitable claim for unjust enrichment." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 393 Ill.Dec. 495, 34 N.E.3d 1023, 1042–43 (Ill. App. 2015). Because this case has nothing to do with this narrow, public-health related holding, *Philadelphia Indemnity Insurance Co.* is an unpersuasive counter to the *Sobel* rule. Therefore, the Court will deny Defendants' Motion to Dismiss as to the Illinois unjust-enrichment claim.

### b. South Carolina

**\*29** The basic requirements for an unjust-enrichment claim under South Carolina law are "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by defendant of the benefit under conditions that make it inequitable for him to retain it without paying its value." *Ellis v. Smith Grading & Paving, Inc.*, 294 S.C. 470, 366 S.E.2d 12, 15 (S.C. App. 1988).

Defendants claim that *Ellis* dismissed an unjust enrichment action because there was no breach of duty. This is inaccurate. The *Ellis* claim was dismissed because the plaintiff conferred no actual benefit and because the defendant was not actually enriched. *Id.* ("[W]e hold it was error for the Master to order restitution in this case for two reasons: (1) Smith was not unjustly enriched by its failure to pay the IRS; and (2) Ellis has conferred no benefit upon Smith for which she may demand restitution.") It is true that *Ellis* refers to a "duty" owed by defendant, but that duty is quasi-contractual, meaning it exists if the plaintiff is "substantially and personally harmed" by a defendant's failure to pay for a benefit conferred. *Id.* In other words, the duty exists whenever the basic requirements for an unjust-enrichment claim are met; it does not add another element.

The other two cases cited by Defendants hold that duty is a requirement, but they come to that conclusion by misreading the holding from *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 341 S.C. 1, 532 S.E.2d 868, 873 (2000). *See In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp.2d 461, 464–65 (D. Md. 2005); *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 574 S.E.2d 502 (S.C. App. 2002). In *Myrtle Beach Hospital*, the plaintiff hospital failed to show unjust enrichment because the defendant did not actually benefit from the medical care that plaintiffs provided to pretrial detainees. *Myrtle Beach Hosp.*, 532 S.E.2d at 873. The City could not have been unjustly enriched because it was not enriched at all. The Supreme Court of South Carolina's holding did not conclude that duty was a required element of unjust-enrichment claims, and in fact echoed the three elements listed in *Ellis*—none of which requires a duty. For this reason, the Court will deny Defendants' Motion to Dismiss as to the South Carolina unjust-enrichment claim.

### 5. Alternative Remedies

Defendants additionally argue that Plaintiffs' unjust-enrichment claims for ten states should be dismissed because unjust enrichment can only be pleaded if there is no other adequate remedy at law. According to Defendants, because Plaintiffs also make legal claims and because they fail to show why these legal remedies may be inadequate, they have failed to show that there are no other adequate remedies.

Contrary to Defendants' assertion, courts have affirmed plaintiff's right to plead unjust enrichment as an alternative to other legal remedies. *See, e.g., In re Generic Pharm. Pricing Antitrust Litig.,* 368 F. Supp. 3d 814, 851 (E.D.Pa. 2019) (refusing to dismiss plaintiff's unjust-enrichment claim because it failed to specifically allege a lack of legal remedy, citing Rule 8(d)(2)'s "permissiveness" of pleading in the alternative). Some courts emphasize that such claims should especially be allowed at the pleading stage. *See, e.g., United States v. R.J. Zavoral & Sons, Inc.,* 894 F. Supp. 2d 1118, 1127 (D. Minn. 2012) (maintaining that the government can pursue an unjust-enrichment claim in the alternative to other remedies at law).

**\*30** Indirect Plaintiffs and Defendants rely on *United States v. Bame,* 721 F.3d 1025 (8th Cir. 2013), but come to opposite conclusions. However, both fail to acknowledge that the Eighth Circuit specifically declined to resolve the question. *Id.* at 1029 ("[The existence of other legal remedies] presents a serious question that we need not resolve at this time[.]"). *Bame* is helpful in one respect, however: it suggests that the Court should be less skeptical of unjust-enrichment claims at the pleading stage. *Id.* at 1031 (noting that the courts that had allowed plaintiffs to plead both unjust-enrichment claims and legal claims did so at the pleading stage). At this stage, when it is still unclear whether Indirect Plaintiffs' other legal remedies will prevail, it is unnecessary to dismiss unjust-enrichment claims because they are pleaded in the alternative.

## IV. PUERTO RICO

### A. *Parens Patriae* Standing

The p*arens patriae,* or "parent of the country," action is rooted in the English common-law concept of royal prerogative, which included the power of the king to act "as guardian of persons under legal disabilities to act for themselves." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257, 92 S.Ct.

885, 31 L.Ed.2d 184 (1972). After the formation of the United States, the *parens patriae* power passed to the states and the scope of *parens patriae* suits has expanded beyond what existed in England. *Id.* Puerto Rico and Defendants agree that an express statutory grant of authority may confer *parens patriae* standing. A state will also have standing to sue as *parens patriae* where it can pass the so-called *Snapp* test; to do so it must "articulate an interest apart from the interests of particular private parties" and "express a quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). A state, for example, "has a quasi-sovereign interest in the health and well-being—both physical and economic— of its residents in general." *Id.* To decide whether a state's interest pertains to "its residents in general" as opposed to an "identifiable group of individual residents," a court will consider the direct and indirect effects of the alleged injury. *Id.* An "alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.* Although the American concept of *parens patriae* is broad, it "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Id.* at 600, 102 S.Ct. 3260. If that is the case, "*i.e.,* if the State is only a nominal party without a real interest of its own—then it will not have standing under the *parens patriae* doctrine." *Id.*

Puerto Rico asserts that it has an express statutory grant of *parens patriae* authority under Title 32, § 3342 of the Laws of Puerto Rico, which states: "There is recognized the right to merchants, to consumers of goods and services and to the Commonwealth of Puerto Rico to file a class suit on behalf of said merchants or consumers based on the Antitrust Act of the Commonwealth, §§ 257–274 of Title 10." P.R. Laws Ann. tit. 32, § 3342.

Defendants argue that because Puerto Rico has not brought a class action under Fed. R. Civ. P. 23, it has not brought "a class suit" within the meaning of section 3342 and therefore cannot avail itself of the statutory authority. Defendants cite no authority in support of that assertion. Puerto Rico counters by citing *In re Cardizem CD Antitrust Litigation,* which concluded, *inter alia,* that "the Commonwealth of Puerto

Rico ... ha[s] expressly conferred *parens patriae* authority upon [its] Attorney[ ] General," citing P.R. Laws Ann. tit. 32, §§ 3341–44. 218 F.R.D. 508, 521 (E.D. Mich. 2003).

**\*31** Although the language is not a model of clarity, the Court agrees with Puerto Rico and concludes that section 3342 confers *parens patriae* authority. As the Seventh Circuit noted in *LG Display Co. v. Madigan*:

> A class action must be brought by a 'representative person.' This case was brought by the [Illinois] Attorney General, not by a representative of a class. A class action must be brought as a class action. This case was brought as a *parens patriae* suit under the [Illinois Antitrust Act], which does not impose any of the familiar Rule 23 constraints.

665 F.3d 768, 772 (7th Cir. 2011). Puerto Rico, as a sovereign, cannot be a "representative person." Because the Court concludes that there is an explicit statutory grant of *parens patriae* standing under section 3342, it need not consider whether Puerto Rico's claims here satisfy the *Snapp* test.

**B. Statutory Claims**

Puerto Rico brings three statutory claims under the Puerto Rico Antitrust Act ("PRAA"), P.R. Laws. Ann. tit. 10 §§ 257–276: (1) conspiracy in restraint of trade, *id.* § 258; (2) unfair or deceptive acts in trade, *id.* § 259; and monopolization, *id.* § 260. The first claim is the PRAA analogue to § 1 of the Sherman Act; the third claim is the PRAA analogue to § 2 of the Sherman Act.

**1. Section 258**

Because section 258 is the Commonwealth's equivalent of a § 1 claim under the Sherman Act, it survives in tandem with the Court's conclusion that Plaintiffs have adequately pleaded parallel conduct. [26] *See Shell Co. (Puerto Rico) Ltd. v. Los Frailes Serv. Station, Inc.*, 551 F. Supp. 2d 127, 135 (D.P.R.

2007), *aff'd*, 605 F.3d 10 (1st Cir. 2010) ("Puerto Rico courts generally follow federal antitrust law when interpreting local antitrust laws[.]").

**\*32** Additionally, the Court agrees with the U.S. District Court for the District of Puerto Rico, which has twice concluded that the Supreme Court of Puerto Rico has rejected *Illinois Brick* and allows indirect purchasers to sue for damages under the PRAA. *Rivera-Muniz v. Horizon Lines, Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (citing *Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.*, 137 D.P.R. 497, 509–18 (1994)); *Rivera-Muniz v. Horizon Lines, Inc.*, Civil No. 09-2081 (GAG), 2010 WL 3703707, at \*2 (D.P.R. Sept. 13, 2010) (denying defendants' motion to certify a question to the Puerto Rico Supreme Court asking whether indirect purchasers may bring claims under the PRAA because, "[w]ithout citing *Illinois Brick* explicitly, the Puerto Rico Supreme Court rejected such limitations on standing for the purpose of private antitrust actions under PRAA"). Therefore, the Court will deny Defendants' Motion to Dismiss as to Puerto Rico's claims under section 258.

**2. Section 259**

Section 259 of the PRAA does not include a private right of action. *See* P.R. Laws Ann. tit. 10 § 268(a). Because it may only bring an action for violation of the PRAA "for the recovery of damages in the same manner ... as in the case of a private entity," *id.* § 268(b), the Commonwealth also cannot bring a damages claim for violation of section 259. However, section 269 does authorize the Commonwealth to seek injunctive relief for violations of the PRAA. *Id.* § 269. Therefore, this claim for injunctive relief, which is based on the same allegations as the Sherman Act claim, survives in tandem with the Court's conclusion that Plaintiffs have adequately pleaded parallel conduct. Therefore, the Court will deny Defendants' Motion to Dismiss as to Puerto Rico's claims under section 259.

**3. Section 260**

Like section 258, section 260 claims are analyzed in the same way as its federal analogue. *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petrol. Corp.*, 79 F.3d 182, 195 (1st Cir. 1996). The Amended Complaint only states a claim because

Case: 1:18-cv-00864 Document #: 1244-1 Filed: 02/10/21 Page 30 of 34 PageID #:89609

Defendants "monopolized or attempted to monopolize trade or commerce of pork." (P.R. Compl. ¶ 190.) It does not contain the conspiracy language found in section 260. *See* P.R. Laws Ann. tit. 10 § 260 ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize ... shall be guilty of a misdemeanor.") Defendants argue that because the pleadings do not make a claim for conspiring to monopolize, and because the Commonwealth fails to allege facts showing monopolization or attempt to monopolize, that the Commonwealth's claim fails. This would be a hypertechnical application of the plausibility standard; however, this is the Commonwealth's third amended complaint.

Looking past this drafting error, the Commonwealth still has failed to adequately plead a claim for conspiracy to monopolize. A "claim for conspiracy to monopolize ... generally does not require proof of a relevant market, at least not in the manner required in actual and attempted monopolization cases. This is because the essential elements of a Section 2 conspiracy claim are concerted action and specific intent to monopolize[.]" *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1181–82 (8th Cir. 1982) (citation omitted). There are no allegations that any Defendants sought to monopolize—that is, "eliminating or restraining competition." *Id.* at 1183. Indeed, the alleged price-fixing scheme would likely have benefited non-conspiring competitors. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that plaintiffs, American TV manufacturers, would not have a Sherman Act claim against a price-fixing conspiracy by Japanese TV manufactures to raise the price of TVs told in the United States, because they "stand to gain from any conspiracy to raise the market price"). Therefore, the Court will grant Defendants' Motion to Dismiss as to Puerto Rico's claims under section 260.

## ORDER

**\*33** Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Joint Motion to Dismiss the Federal Law Claims [Civil No. 18-1776, Docket No. 433] is **DENIED**;

2. Defendants' Joint Motion to Dismiss the State Law Claims [Civil No. 18-1776, Docket No. 436] is **GRANTED IN PART**:

a. State antitrust claims:

i. Rhode Island: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 21, ¶¶ 405–10 (6 R.I. Gen. Laws § 6-36-11) is **DISMISSED with prejudice** as to claims arising before July 15, 2013; and

ii. Mississippi: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 12, ¶¶ 345–53 (Miss. Code Ann. § 75-21-1) and CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 237 (Miss. Code Ann. § 75-21-1) are **DISMISSED with prejudice**;

b. State consumer-protection claims:

i. Massachusetts: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 30, ¶¶ 478–79 (Mass. Gen. Laws ch. 93A § 1) and CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 258 (Mass. Gen. Laws ch. 93A § 1) are **DISMISSED with prejudice**;

ii. Michigan: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 31, ¶¶ 480–89 (Mich. Comp. Laws Ann. § 445.901) is **DISMISSED with prejudice**;

iii. Minnesota: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 32, ¶¶ 490–99 (Minn. Stat. § 325F.68) and CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 259 (Minn. Stat. § 325D.43) are **DISMISSED with prejudice**;

iv. New Hampshire: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 35, ¶¶ 520–30 (N.H. Rev. Stat. Ann. § 358-A:2) and CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 261 (N.H. Rev. Stat. Ann. § 358-A:2) are **DISMISSED with prejudice**;

v. New York: CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 263 (N.Y. Gen. Bus. Law § 349) is **DISMISSED with prejudice**;

vi. South Dakota: CIP Complaint [Civil No. 18-1776, Docket No. 432] Count 3, ¶ 267 (S.D. Codified Laws § 37-24-1) is **DISMISSED with prejudice**;

vii. Utah: IPP Complaint [Civil No. 18-1776, Docket No. 392] Counts 41 and 42, ¶¶ 584–603 (Utah Code Ann. §§ 13-11-1, 13-5-1) are **DISMISSED with prejudice**; and

viii. Virginia: IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 43, ¶¶ 604–611 (Va. Code Ann. § 59.1–196) is **DISMISSED with prejudice**.

c. IPP Complaint [Civil No. 18-1776, Docket No. 392] Count 44 (Unjust Enrichment), ¶ 614 is **DISMISSED with prejudice** as to the claims under the state laws of:

i. Arizona;

ii. Florida;

iii. North Dakota; and

iv. Utah

3. Defendant Indiana Packers' Motion to Dismiss [Civil No. 18-1776, Docket No. 445] is **GRANTED and the action is dismissed with prejudice**;

4. Defendants' other individual Motions to Dismiss [Civil No. 18-1776, Docket Nos. 440, 442, 448, 450, 453, 456, 458, and 460] are **DENIED**;

5. Defendants' Joint Motions to Dismiss against the Commonwealth of Puerto Rico [Civil No. 19-2723, Docket Nos. 57 and 105] are **GRANTED IN PART:**

a. Puerto Rico Complaint [Civil No. 19-2723, Docket No. 103] Count 2, ¶¶ 189–91 is **DISMISSED with prejudice** as to P.R. Laws Ann. tit. 10 § 260;

6. Defendant Indiana Packers' Motion to Dismiss [Civil No. 19-2723, Docket No. 66] is **GRANTED and the action is dismissed with prejudice**;

**\*34** 7. Defendants' other individual Motions to Dismiss [Civil No. 19-2723, Docket Nos. 60, 63, 69, 75, 76, 79, 81 and 84] are **DENIED;**

8. Defendants' Joint Motion to Dismiss against Winn-Dixie Stores, Inc. et al. [Civil No 19-1578, Docket No. 99] is **DENIED**;

9. Defendant Indiana Packers' Motion to Dismiss [Civil No. 19-1578, Docket No. 108] is **GRANTED and the action is dismissed with prejudice**;

10. Defendants' other individual Motions to Dismiss [Civil No. 19-1578, Docket Nos. 102, 105, 111, 114, 117, 120, 122, and 125] are **DENIED**.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6149666

## Footnotes

1    Agri Stats, Inc. ("Agri Stats"); Clemens Food Group, LLC and The Clemens Family Corporation (together and separately, "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (together and separately, "Hormel"); Indiana Packers Corporation ("Indiana Packers"); JBS USA Food Company ("JBS"); Seaboard Foods LLC and Seaboard Corporation (together and separately, "Seaboard"); Smithfield Foods, Inc. ("Smithfield"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, "Tyson").

2    Concluding that allowing otherwise "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge," the Supreme Court has held that only direct purchasers may sue for damages in Sherman Act price-fixing cases. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). However, "the [ *Illinois Brick*]

direct-purchaser doctrine does not foreclose equitable relief." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

3   Arizona, California, the District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

4   Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

5   Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

6   The DPP amended complaint can be found at Docket No. 431 ("DPP Compl."); the CIP amended complaint can be found at Docket No. 432 ("CIP Compl."); and the IPP amended complaint ("IPP Compl.") can be found at Docket No. 392. Due to the nearly identical allegations in the three complaints, the Court will generally discuss them interchangeably unless it is necessary to do otherwise. Because of the length of and significant details within the Complaints, the Court will provide a general background here and discuss relevant facts in each analysis section.

7   The amended complaint in *Winn-Dixie* can be found at 19-cv-1578, Docket No. 94; the amended complaint in *Puerto Rico* can be found at 19-cv-2723, Docket No. 103. The *Winn-Dixie* complaint is nearly identical to the DPP class-action complaint; the *Puerto Rico* complaint is substantially similar to the three class-action complaints. The Court will generally discuss them all interchangeably unless it is necessary to do otherwise.

8   DPP Compl. ¶ 120, fig. 7.

9   DPP Compl. ¶ 122, fig. 8.

10  DPP Compl. ¶ 165, fig. 9.

11  Indeed, even the individual-defendant allegations that lack numerical specificity are enough to overcome a 12(b)(6) motion; "Plaintiffs 'need not provide **specific facts** in support of their allegations.' Rather, they need only provide 'sufficient factual information to provide the "grounds" on which the claim rests[.]" *In re Pre-Filled Propane Tank Antitrust Litig. ("Propane I")*, 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc) (quoting *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008)).

12  Defendants argue that the alleged reductions in supply are not "proximate in time and value," a standard quoted in a see-also parenthetical of the Court's August Order. *In re Pork*, 2019 WL 3752497, at *8 (quoting *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018)). However, the Supreme Court noted more than 80 years ago that "simultaneous action is not a requirement to demonstrate parallel conduct." *In re Broiler Chicken*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Circuit v. United States*, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939)). Although the Eighth Circuit affirmed the dismissal of a Sherman Act claim for failure to plead parallel conduct where defendants' actions were separated by six months, the termination of the plaintiff from the pharmacy benefit networks of CVS and Express Scripts was also the "only allegation that hints at parallel conduct" in that case and the panel specifically noted that it was not establishing a bright-line rule. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 514–16 (8th Cir. 2018). This case, where Plaintiffs allege that Defendants took several specific actions under very similar circumstances, is distinguishable.

13  Claims for injunctive relief under § 16 of the Clayton Act are not subject to the four-year time bar under § 4b. *See* 15 U.S.C. § 15b (stating that the statute of limitations applies only to "any cause of action under *section 15, 15a*, or *15c* of this title" and not to *15 U.S.C. § 26*); *see also Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 276–77 (8th Cir. 2004) (analyzing a Clayton Act damages claim under the four-year time bar and a Clayton Act injunctive-relief claim under the equitable doctrine of laches).

Defendants do not argue that laches should bar Plaintiffs' Clayton Act claims for injunctive relief. Therefore, Plaintiffs' claims for injunctive relief under 15 U.S.C. § 26 survives, regardless of whether their damage claims under 15 U.S.C. § 15 are time barred.

14 Indeed, the Court has previously noted that plaintiffs might not be required to plead due diligence at all, given that it is an affirmative defense. *TCF Nat. Bank v. Mkt. Intelligence, Inc.*, Civ. No. 11-2717 JRT/AJB, 2013 WL 53837, at *3 (D. Minn. Jan. 3, 2013) (explaining that there is a circuit split on this issue and that the Eighth Circuit has not yet taken a position).

15 According to the Rules Enabling Act, the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

16 *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (holding that Illinois antitrust law cannot be superseded by Rule 23 because the state law is sufficiently intertwined with Illinois substantive rights and remedies); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415–16 (S.D.N.Y. 2011) (same); *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010) (same); *see also Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1092 (6th Cir. 2016) (assuming without deciding that a class-action prohibition that appears in the same statutory provision that creates the cause of action is substantive).

17 There is no doubt that Rule 23 would preempt the IAA under the reasoning of Justice Scalia's plurality opinion. Therefore, if the plurality opinion were the operative opinion under the *Marks* rule, the Court would also deny the Motion to Dismiss.

18 *Fitch* is also instructive. The state supreme court concluded that Mississippi had failed to allege wholly intrastate conduct by Japanese auto manufactures under the MAA—even though the complaint mentioned that "both Nissan and Toyota had [original-equipment manufacturers ("OEMs") ] in Mississippi"—because it "neither allege[d] [that] the defendant sold [Automotive Wire Harness Systems ("AWHS") ] in Mississippi nor that the OEMs, suppliers, or distributors that directly purchased AWHS from the defendants were in Mississippi." *State ex rel. Fitch*, 294 So. 3d at 1189–90.

19 Because the Court declines to find that the consumer-protection claims are subject to Rule 9(b), it is unnecessary to determine whether the allegations are pleaded with sufficient particularity to survive a Motion to Dismiss and the Court will decline to do so.

20 In 2017, the statute was amended to require proof of reliance. *See* Ark. Code §§ 4-88-113(f)(1)(A), (f)(2).

21 Defendants rely on *In re Aftermarket Filters Antitrust Litigation*, which concluded that complaints under the RIDTPA must allege "that defendants' conduct reasonably intended to confuse and mislead the general public into purchasing defendants' product when the actual intent was to buy someone else's product." 2009 WL 3754041, at *11 (N.D. Ill. Nov. 5, 2009). This case is unhelpful for two reasons. First, it relies on a line of decisions based on *Merlino v. Schmetz*, 66 R.I. 425, 20 A.2d 266, 267 (1941), which predates *Ames* by decades and also predates the Federal Trade Commission definition of "unfair." Second, *Aftermarket* misquotes the cases on which it relies, which required that the unfair conduct must "tend" to confuse, not "intend" to confuse. *See ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 (R.I. 1997). "Tend" in this context refers to behavior that is likely to confuse consumers; intent is irrelevant. *See Merlino*, 20 A.2d at 267 (holding that a defendant's barber-shop window sign did not constitute unfair competition because people were unlikely to be deceived into mistaking it for plaintiff's sign). Plaintiffs' allegations describe behavior that likely misled consumers into buying pork at artificially high prices.

22 The IPPs do not bring a claim under section 11.

23    Indirect Plaintiffs' reliance on 📑 *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 931 A.2d 571

(2007) is misplaced. In 📑 *LaChance*, he New Hampshire Supreme Court was answering an 📑 *Illinois Brick*

question: did the court's rule that indirect purchasers may not bring claims under the Granite State antitrust

statute, announced in 📑 *Minuteman, LLC v. Microsoft Corp.*, 147 N.H. 634, 795 A.2d 833 (2002), apply to

claims under the NHCPA as well. The court concluded that it did not. 📑 *LaChance*, 931 A.2d at 575–81.

However, the 📑 *Illinois Brick* / 📑 *Minuteman* issue has no bearing on the territoriality question.

24    Indeed, when one looks to the citation used by the court in 📑 *Sivertson* in support of the it-is-sufficient rule,

*A & A Metal Buildings v. I-S, Inc.*, 274 N.W.2d 183, 189 (N.D. 1978), one sees it is merely a recitation of the

five elements of a claim for unjust enrichment.

25    Defendants' reliance on *Johnson v. Ross*, 419 Fed. App'x 357 (4th Cir. 2011), is misplaced. The Fourth

Circuit concluded that the West Virginia Court of Appeals had not yet decided the direct-benefit question and

expressly "decline[d] [the] invitation to settle this state-law question ... because doing so [was] unnecessary

to reach [their] disposition." *Johnson*, 419 Fed. App'x at 362.

26    In its Amended Complaint, the Commonwealth alleges that it "directly and indirectly purchased pork from

Defendants[.]" (P.R. Compl. ¶ 184C.) Defendants argue that this "conclusory sentence is not enough to

establish the Commonwealth" as a direct purchaser. (Defs.' Mot. to Dismiss Memo. at 3 n.1, Jan. 28, 2020,

19-2723 Docket No. 107.) However, the allegation is similar to that used in the DPP Complaint itself. (*See*

DPP Compl. ¶¶14–19.)

The Amended Complaint also states that the Commonwealth brought this action "on behalf of itself [that is, an

allegedly direct and indirect purchaser] and as *parens patriae* on behalf of the population of Puerto Rico." (P.R.

Compl. at 1.) States, as well as the District of Columbia and Puerto Rico, are explicitly given the authority

to bring a *parens patriae* claims for violations of the Sherman Act. *See* 15 U.S.C. §§ 15c (authorizing state

attorneys general to bring parens patriae claims); 15g(2) (defining state to include the District of Columbia

and Puerto Rico). Such claims must be on behalf of direct-purchaser residents. *See* 📑 *Kansas v. UtiliCorp*

*United, Inc.*, 497 U.S. 199, 218–19, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). However, the Commonwealth

appears not to have pleaded—even with a simple "conclusory sentence" like the one in which it asserts its

own status as a direct purchaser—that any of its residents are, in fact, direct purchasers.

Therefore, the Court will consider Puerto Rico's claims on its own behalf as both direct and indirect claims

but will consider its *parens patriae* claims as only being indirect.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.