# Exhibit 1

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

PLEASE SEE ATTACHMENT

☐ Petty
☐ Minor
☐ Misde-
meanor
☒ Felony

PENALTY:  PLEASE SEE ATTACHMENT

┌─ DEFENDANT - U.S

▶ ROBERT T. BROCKMAN

DISTRICT COURT NUMBER
3:20-cr-00371 WHA

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

INTERNAL REVENUE SERVICE

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form    DAVID L. ANDERSON

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Michael G. Pitman, AUSA

### DEFENDANT

**IS _NOT_ IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes
been filed?    ☒ No

} If "Yes" give date filed

**DATE OF ARREST**    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**    Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☒ SUMMONS ☐ NO PROCESS* ☐ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____    Before Judge: _____

Comments:

Attachment to Indictment Penalty Sheet
ROBERT T. BROCKMAN

18 U.S.C. § 371 – Conspiracy
    5 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

26 U.S.C. § 7201 – Tax Evasion
    5 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment, costs of prosecution;

31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
    10 yrs prison, $500k fine, 3 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
    30 yrs prison, $1M fine, 5 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
    20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
    $100 special assessment;

18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
    20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
    $100 special assessment;

18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
    20 yrs prison, $500k fine or twice the gross gain or loss (whichever is greater), 3 yrs sup. rel.,
    $100 special assessment;

18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
    20 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

18 U.S.C. § 1512(c)(1) – Destruction of Evidence;
    20 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment;

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

## UNITED STATES OF AMERICA,

## V.

ROBERT T. BROCKMAN

## DEFENDANT(S).

---

**INDICTMENT**

18 U.S.C. § 371 – Conspiracy
26 U.S.C. § 7201 – Tax Evasion
31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
18 U.S.C. § 1512(c)(1) – Destruction of Evidence

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this _____1st_____ day of

_____October 2020_____.

Clerk

Bail, $ _____ Summons

Hon. Nathanael Cousins, United States Magistrate Judge

DAVID L. ANDERSON (CABN 149604)
United States Attorney

```
┌─────────────────────────────────────┐
│             FILED                    │
│                                      │
│          Oct 01 2020                 │
│                                      │
│         SUSAN Y. SOONG               │
│     CLERK, U.S. DISTRICT COURT       │
│   NORTHERN DISTRICT OF CALIFORNIA    │
│          SAN FRANCISCO               │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:20-cr-00371 WHA |
| Plaintiff, | VIOLATIONS: |
| v. | 18 U.S.C. § 371 – Conspiracy to Defraud the United States and Commit Tax Evasion; |
| ROBERT T. BROCKMAN, | 26 U.S.C. § 7201 – Tax Evasion; |
| Defendant. | 31 U.S.C. §§ 5314 & 5322(b) – FBAR Violations; |
| | 18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution; |
| | 18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering; |
| | 18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering; |
| | 18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering; |
| | 18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering; |
| | 18 U.S.C. § 1512(c)(1) – Destruction of Evidence; and |
| | 18 U.S.C. §§ 982(a)(1), 982(a)(2)(A) & 28 U.S.C. § 2461(c) – Forfeiture Allegations |
| | |
| | SAN FRANCISCO VENUE |
| | ██████████ |

# I N D I C T M E N T

The Grand Jury charges:

INDICTMENT

**Introduction**

At all times relevant to this Indictment:

1.      Defendant ROBERT T. BROCKMAN was a United States citizen residing in Houston, Texas and Pitkin County, Colorado.

2.      Universal Computer Systems Holding, Inc. ("UCSH"), was a Delaware corporation. UCSH was the holding company for a group of companies involved in the software business. During all relevant periods, BROCKMAN was the Chief Executive Officer of UCSH.

3.      Universal Computer Systems, Inc. ("UCS"), which had offices in Houston, Texas, was a subsidiary of UCSH and was in the business of servicing the software needs of automobile dealerships. During all relevant periods, BROCKMAN was the Chief Executive Officer of UCS.

4.      Dealer Computer Services, Inc. ("DCS"), another UCSH subsidiary, was a Delaware corporation. During all relevant periods, BROCKMAN was the Chief Executive Officer of DCS.

5.      The Reynolds and Reynolds Company ("Reynolds & Reynolds") was an Ohio corporation. Reynolds & Reynolds was in the business of servicing the software needs of automobile dealerships. In or about 2006, UCS and Reynolds & Reynolds merged, retaining the name Reynolds & Reynolds. The stock of the new Reynolds & Reynolds was held by UCSH. Beginning in approximately August 2006, BROCKMAN was the Chief Executive Officer of Reynolds & Reynolds.

6.      The A. Eugene Brockman Charitable Trust ("AEBCT"), formerly the A. Eugene Brockman Children's Trust, was a trust settled on or about May 26, 1981 in Bermuda. The four named beneficiaries were BROCKMAN, BROCKMAN's wife, BROCKMAN's brother, and BROCKMAN's sister-in-law.

7.      Spanish Steps Holdings, LLC, was a Nevisian company, originally formed by BROCKMAN in or about 1997 in Nevis and wholly owned by the AEBCT. Spanish Steps Holdings, Ltd., was a British Virgin Islands ("BVI") company, originally formed by BROCKMAN in or about 1989 in the BVI, whose shares were wholly owned by Spanish Steps Holdings, LLC (collectively "Spanish Steps"). Spanish Steps owned 93% of the shares of UCSH, as well as 100% of the investment shares of Point Investments, Ltd.

8.      Point Investments, Ltd., was a Bermudian entity, originally incorporated by BROCKMAN on or about July 14, 1999 in the BVI.  On or about November 30, 2009, BROCKMAN re-incorporated Point Investments, Ltd., in Bermuda.  After that date, Point Investments, Ltd., was wholly owned by the Point Purpose Trust, a Bermudian trust (collectively "Point"), and Spanish Steps.  Point had bank accounts in Bermuda and Switzerland.  Point was created to invest in private equity funds managed by Vista Equity Partners ("Vista"), a private equity firm which was formed in or about March 2000 by Individual Two, and which maintained its principal place of business in the Northern District of California.  Vista invested primarily in United States–based software companies ("portfolio companies").  A portion of the capital that BROCKMAN invested, through Point, in various Vista funds came from UCS's retained earnings.

9.      On or about March 6, 1995, BROCKMAN created The St. John's Trust Company ("SJTC"), a Bermudian entity, to act as the Trustee for the AEBCT.  BROCKMAN caused various individuals to be appointed and serve as the Directors of SJTC.  In or about 2010, BROCKMAN caused Individual One to become a Director of SJTC.

10.      From 1995 through the date of this Indictment, BROCKMAN's foreign entities ("offshore structure"), were managed by various individuals, each of whom was appointed by, and answerable to, BROCKMAN.  In or about 2007, AEBCT, Spanish Steps, SJTC, and Point were all managed, in part or in whole, by Individual One.  Individual One was compensated on an annual basis by BROCKMAN for his management of BROCKMAN's offshore structure and had periodic performance and salary reviews.

11.      Edge Capital Investments, Ltd. ("Edge"), was a Nevisian corporation.  Edge was managed by Individual One to create the appearance that Edge was not associated with BROCKMAN in any way.  In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Edge.

12.      Cabot Global Investments, Ltd. ("Cabot"), was a Nevisian corporation.  Cabot was managed by Individual One to create the appearance that Cabot was not associated with BROCKMAN in any way.  In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Cabot.

13.     Tangarra Consultants, Ltd. ("Tangarra"), was a Bermudian corporation.  Tangarra was organized, formed, and managed by Individual One.

14.     In or about March 2000, BROCKMAN, through Point, committed $300 million to Vista's first private equity fund – Vista Equity Fund II ("VEF II").  In or about 2004, this commitment to VEF II was increased to $1 billion.

15.     BROCKMAN, through Point and Edge, was the only limited partner in VEF II.

16.     BROCKMAN, through Point, invested in numerous Vista funds in addition to VEF II. BROCKMAN only invested in Vista funds that were organized outside the United States.

17.     In the private equity fund industry, when profits are distributed to investors, the amount distributed to each investor is determined based on each investor's share of the total investment in the underlying fund, as reflected in the applicable Partnership Agreement, and is termed a "Waterfall Calculation," or simply "the Waterfall."

18.     In or about 2006, DCS borrowed $2.4 billion to finance the merger of UCS and Reynolds & Reynolds ("the Debt").

19.     Deutsche Bank Securities, Inc., together with its subsidiaries including Deutsche Bank Trust Company Americas (collectively "Deutsche Bank"), was the Administrative Agent for the Debt, and acted as a Joint Lead Arranger and Joint Book Manager for the Debt.

20.     The Debt was a syndicated loan, also known as a syndicated bank facility, meaning that the financing was offered by a group of lenders – referred to as a syndicate – who worked together to fund the loan.

21.     The Debt was issued in three different tiers, also known as tranches.  Among other things, the tiers had different rates of return and conditions for repayment in the event of default.

22.     Each of the three different tiers of the Debt was controlled by a separate contract ("Credit Agreement").

23.     All three of the Credit Agreements were dated October 26, 2006, and all three Credit Agreements were signed by BROCKMAN as Chief Executive Officer of DCS and, under a separate signature block, by BROCKMAN as Chief Executive Officer of UCSH.

24. All three Credit Agreements contemplated that the Debt would be traded on the secondary market after it had been issued, and all three Credit Agreements included restrictions on which individuals and entities would be permitted to purchase the Debt on the secondary market. Among other things, all three of the Credit Agreements contained a material provision excluding any "Affiliate" of DCS from purchasing the Debt on the secondary market.

25. All three of the Credit Agreements defined an "Affiliate" of DCS to include any individual or entity directly or indirectly under common control with DCS. Because BROCKMAN was the Chief Executive Officer of DCS, and retained full dominion and control over Edge, Edge was an "Affiliate" of DCS under all three of the Credit Agreements.

26. All three of the Credit Agreements required DCS to periodically provide Deutsche Bank with certain financial information, including audited financial statements for UCSH and its subsidiaries, and quarterly compliance certificates; the Agreements further required Deutsche Bank to promptly distribute that financial information to holders of the Debt.

27. United States citizens who had authority over certain foreign bank accounts, and/or a financial interest in such foreign bank accounts, had reporting obligations to the United States. The Bank Secrecy Act and its implementing regulations required United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeded $10,000 at any point during the year, using United States Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. This form is commonly known as a Foreign Bank Account Report, or "FBAR." The FBAR for an applicable year was due by June 30 of the following year.

COUNT ONE:      (18 U.S.C. § 371 – Conspiracy to Defraud the United States & Commit Tax Evasion)

28. The allegations set forth in paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if set forth fully herein.

29. From on or about December 1, 1999, and continuing through on or about October 15, 2019, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

with others known and unknown to the grand jury, did unlawfully, voluntarily, and willfully conspire to: (a) defraud the United States government through dishonest and deceitful means, to wit: the Department of the Treasury, Internal Revenue Service ("IRS"), in the ascertainment, assessment, computation, and collection of revenue, particularly individual federal income taxes due and owing by BROCKMAN for the tax years 2000 through and including 2018; and (b) commit tax evasion, in violation of Title 26, United States Code, Section 7201, of the individual federal income taxes due and owing by BROCKMAN for the tax years 2000 through and including 2018.

**Objective of the Conspiracy**

30.     The objective of the conspiracy was for BROCKMAN, from December 1, 1999, through October 15, 2019, to conceal from the IRS capital gain income BROCKMAN earned as a result of his investments in Vista funds through Point; deposit some of this income in unreported foreign bank accounts; and evade the payment of United States federal income tax on this income.

31.     It was further the objective of the conspiracy for BROCKMAN, using nominees, including Individual One, to create a false paper trail regarding his offshore structure, including by filing materially false United States Individual Income Tax Returns, Forms 1040, to give the appearance that BROCKMAN did not own or control AEBCT, Spanish Steps, SJTC, and Point, when, in reality, BROCKMAN had complete dominion and control over these entities, their Directors, Officers, and Trustees, and received the benefit of all the income deposited into the foreign bank accounts in these entities' names.

32.     It was further the objective of the conspiracy for BROCKMAN, using nominees, including Individual One, to create a false paper trail giving the appearance that BROCKMAN did not have any relationship with Point, Edge, or Cabot, when, in reality, BROCKMAN exercised full dominion and control over Point, Edge, and Cabot, and used them to purchase the "Frying Pan Canyon Ranch," the "Mountain Queen" vacation home, and the luxury yacht "Turmoil" (later renamed "Albula") with unreported taxable income, for his personal use, and to conceal BROCKMAN's control over Point, Edge, and Cabot from the IRS by failing to file truthful and accurate FBARs.

**Manner and Means**

The manner and means by which BROCKMAN and his co-conspirators sought to achieve these objectives included, among others, the following:

33.     It was part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal a portion of his taxable income, primarily capital gains earned as a result of his investments in Vista funds through Point, in or about 2000, BROCKMAN, with assistance from other individuals known and unknown to the Grand Jury, created a complex network of offshore companies and trusts, and appointed nominees to manage these entities for him.  These nominees were compensated and employed by BROCKMAN to act as Directors, Officers, and Trustees of BROCKMAN's offshore structure, when, in reality, BROCKMAN completely controlled these entities and made all substantive decisions in their regard.

34.     It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN created and used a proprietary, encrypted email system to communicate with the nominees he appointed and employed to manage his offshore structure and foreign entities.  Each of the users of this encrypted email system was given a code name to be used when communicating with BROCKMAN and each other.  BROCKMAN's email code name was "Permit" or "Permit1."  Individual One's code name was "Redfish."  Other code names given by BROCKMAN to nominees he appointed to manage his offshore structure included "King," "Bonefish," and "Snapper."  Individual Two was given the code name "Steelhead."  In these encrypted emails, BROCKMAN often referred to the IRS as "the house."

35.     It was further part of the conspiracy and scheme and artifice to defraud that, "on paper," Spanish Steps owned approximately 93% of the preferred stock, or investment shares, of BROCKMAN's company UCSH.  Since Spanish Steps was owned by the AEBCT, the Trustee of which was the SJTC, this arrangement created the appearance that Directors of the SJTC controlled UCSH, UCS, and Reynolds & Reynolds.  In reality, Directors of the SJTC were employed by, and served at the pleasure of, BROCKMAN.  BROCKMAN made all substantive decisions regarding UCSH, UCS, and Reynolds & Reynolds.  From 2010, and continuing through about September 2018, Individual One was a Director of SJTC.

36.     It was further part of the conspiracy and scheme and artifice to defraud that, in or about March 2000, BROCKMAN, through Point and in agreement with Individual Two, committed approximately $300 million to VEF II.  Subsequently, in or about 2004, this commitment was increased to $1 billion.  From 2000, and continuing through 2014, funds were invested by BROCKMAN, through Point, in VEF II, as needed to purchase portfolio companies.  BROCKMAN funded these investments, in part, using retained earnings from UCS.

37.     It was further part of the conspiracy and scheme and artifice to defraud that, in addition to investments in VEF II, BROCKMAN, through Point, invested in numerous other Vista funds.

38.     It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN earned approximately $2 billion in capital gains as a result of his investments in Vista funds through Point.

39.     It was further part of the conspiracy and scheme and artifice to defraud that the capital gains distributed by Vista to Point for BROCKMAN's benefit were directed by BROCKMAN and his nominees, including Individual One, to be wired from Vista's bank accounts in the Northern District of California and elsewhere, to bank accounts in Point's name in Bermuda and Switzerland.

40.     It was further part of the conspiracy and scheme and artifice to defraud that capital gains BROCKMAN earned as a result of his investments in Vista funds through Point, as directed by BROCKMAN, were not reported to the IRS by BROCKMAN on his United States Individual Income Tax Returns, Forms 1040, although BROCKMAN enjoyed complete dominion and control over these earnings.  No United States federal income tax was paid on these capital gains.

41.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Point, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

42.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Edge

and Cabot, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

## Overt Acts

In furtherance of the conspiracy, and to effect the objectives thereof, the following overt acts were committed within the Northern District of California and elsewhere:

43.     In or about September 1999, BROCKMAN directed and caused the opening of a bank account for Point at the Bermuda Commercial Bank, account number ***4132, with an initial deposit of more than $10 million.

44.     On or about July 7, 2004, BROCKMAN directed and caused a transaction to be completed, code named "Hotrod," in which approximately $635 million of UCS's retained earnings were distributed to Spanish Steps, for transfer to Point and eventual investment in Vista funds, without properly reporting the transactions to the IRS.

45.     On or about August 27, 2006, BROCKMAN, using his encrypted email system, informed his nominees, code named "Bonefish" and "Redfish," that he had read the United States Senate's Permanent Subcommittee on Investigations' report entitled "Tax Haven Abuses: The Enablers, The Tools and Secrecy" and, based on this report, BROCKMAN subsequently directed his nominees to change the name of the "A. Eugene Brockman Children's Trust" to the "A. Eugene Brockman Charitable Trust."

46.     On or about September 23, 2006, BROCKMAN instructed Individual One that BROCKMAN was to be given: 1) quarterly reports on "all portfolio companies;" 2) amendments to the VEF II partnership agreement; and 3) copies of annual audits of VEF II and another Vista fund named Vista Equity Fund III.

47.     On or about June 3, 2007, BROCKMAN, using his encrypted email system, directed Individual One to purchase a computer program called "Evidence Eliminator" for Individual One's computers.

48.     On or about July 23, 2008, BROCKMAN, using his encrypted email system, directed Individual One on the methods necessary to create more convincing backdated documents. BROCKMAN notified Individual One that "[a]s a reminder - we need to also remember that all copy machine/laser printer paper has encoded into it the manufacturer of that paper as well as the year and month of manufacture.  For that reason I always set aside some packets of copy paper with dates on them - for potential future use."

49.     On or about August 2, 2008, BROCKMAN, using his encrypted email system, directed Individual One "to eliminate direct calls to [the BVI and Cayman Islands] from landline or cell phones." He further directed Individual One to have a BVI resident establish multiple Vonage accounts for their use which "will have the effect of looking like a BVI person on the road calling back to the BVI . . . which when the house scans all of the Vonage activity will look innocent."

50.     On or about December 11, 2009, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN wanted to authorize any expenses relating to the "Mountain Queen" property that exceeded $2,000, and BROCKMAN did, in fact, subsequently review and approve such expenditures.

51.     On or about February 19, 2010, BROCKMAN, using his encrypted email system, directed Individual One to pursue the purchase of a "fishing lot" for $500,000 through an entity named "Henke Properties."

52.     On or about February 26, 2010, BROCKMAN, using his encrypted email system, instructed Individual One that he should not pay more than $500,000 for the fishing lot property through Henke Properties.

53.     On or before April 30, 2010, BROCKMAN directed Individual One, together with a second nominee, to open a bank account at Mirabaud & Cie Banquiers Prives, Geneva, Switzerland ("Mirabaud Bank") in the name of Point, account number ***463.  BROCKMAN further directed that Individual One was to be a signatory on this bank account.

54.     On or about May 20, 2010, BROCKMAN directed Individual One to move most of the remaining balance of funds on deposit in the Point account at Bermuda Commercial Bank, account ***4132, approximately $1 million, to the Point Mirabaud Bank account ***463 in Switzerland.

55. On or about May 24, 2010, BROCKMAN directed that a distribution from Vista to Point, in the amount of $799,008,883, from VEF II's sale of a portfolio company, was to be deposited in the Point account at Mirabaud Bank.

56. On or about May 26, 2010, BROCKMAN, using his encrypted email system, directed Individual One to make specific edits, changes, and amendments to the VEF II Limited Partnership Agreement on behalf of Point.

57. On or about May 27, 2010, BROCKMAN, using his encrypted email system, instructed Individual One to pose questions to Individual Two regarding fees payable from Point to Vista in association with the sale of a portfolio company.

58. On or about June 5, 2010, at BROCKMAN's direction, Individual One provided BROCKMAN with the user identification and password to directly access the Point bank account at Mirabaud Bank, account ***463.

59. On or about July 8, 2010, BROCKMAN, using his encrypted email system, directed an additional investment, through Point, of $3,163,833 in a Vista fund named Vista Equity Partners Fund III.

60. On or about July 13, 2010, BROCKMAN, using his encrypted email system, informed Individual One that due to the "Ventyx transaction," he wished to restructure "two major structures," which "cleans up these two structures forever – yet leaves them available for charitable giving, investment management fee income, investments in real estate, investments in companies, and in the case of dire emergency – for loans to individuals or other entities."

61. On or about July 23, 2010, BROCKMAN, using his encrypted email system, instructed Individual One that Edge and Cabot should not be added under the AEBCT umbrella because, "[w]e never can tell what crazy things the house is going to do – and the AEBCT is exposed to them."

62. On or about August 30, 2010, BROCKMAN, using his encrypted email system, directed Individual One to become a Director of SJTC.

63. On or about September 27, 2010, BROCKMAN, using his encrypted email system, gave Individual One instructions regarding Point's investment in VEF II. Specifically, with regard to the purchase of a portfolio company called Sunquest, BROCKMAN told Individual One that he was not

satisfied with the proposed "management and programming structure," and that the proposed purchase was not a "reasonable thing for us to be involved [in]."

64. On or about October 30, 2010, BROCKMAN, using his encrypted email system, corresponded with Individual One about using Point to purchase a "Swiss private bank."

65. On or about November 1, 2010, BROCKMAN, using his encrypted email system, corresponded with Individual One about Point's August 24, 2004 purchase of Edge's investment in VEF II for $154,582,366, and the destruction of records at Vista reflecting the purchase.

66. On or about November 10, 2010, BROCKMAN, using his encrypted email system, directed Individual One to invest $50 million, through Point, in a Vista fund named Vista Foundation Fund.

67. On or about December 6, 2010, BROCKMAN, using his encrypted email system, notified Individual One that Point had approximately $1,414,658,673 in assets, which differed from internal reports, and directed Individual One to make several corrections to Point's financial statements.

68. On or about December 28, 2010, BROCKMAN directed Individual One to fabricate a backdated memorandum memorializing a fictitious conversation with a deceased former nominee "where he resigns and concurs with your suggestion as [a replacement nominee] – provide an original wet-ink signed copy of this memo to Bob."

69. On or about July 12, 2011, BROCKMAN, using his encrypted email system, directed Individual One to prepare for BROCKMAN a monthly "Significant Transaction Report" regarding Point, and to include any transaction exceeding $100,000.

70. On or about October 20, 2011, BROCKMAN, using his encrypted email system, directed Individual One to attend a money laundering conference "if possible under an assumed identity."

71. On or about January 7, 2012, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partners Fund IV, Vista Foundation Fund I, and Vista Equity Partners Fund III.

72. On or about February 14, 2012, BROCKMAN, using his encrypted email system, informed Individual One that he was interested in investing, through Point, $400 million in a Vista fund named Vista Equity Partners Fund IV, provided Point obtained a percentage of direct ownership in the

company purchased as part of the deal.

73.    On or about May 1, 2012, BROCKMAN, using his encrypted email system, instructed Individual One on how to structure BROCKMAN'S investment in the "debt market" in such a way to avoid IRS scrutiny of the AEBCT.

74.    On or about May 3, 2012, BROCKMAN directed Individual One to invest, through Point, $400 million in a Vista fund named Vista Equity Partners Fund IV.

75.    On or about August 12, 2012, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $16.71 million in a Vista fund named Vista Equity Partners Fund IV, to which BROCKMAN, through Point, had already committed $600 million.

76.    On or about November 25, 2012, BROCKMAN, using his encrypted email system, instructed Individual One to "register our disappointment" with a Vista employee regarding tax withholding on expected dividends from Vista.

77.    On or about December 9, 2012, BROCKMAN, using his encrypted email system, directed Individual One to change the structure in which the shares of Point were held, moving them to a "purpose trust" with a "dressed up charitable purpose" to avoid inquiries from banks and "the house" about the "ultimate beneficial owners" of Point.

78.    On or about February 17, 2013, BROCKMAN, using his encrypted email system, provided Individual One talking points regarding the negotiation of a gift from BROCKMAN to Centre College in the name of the AEBCT.

79.    On or about March 19, 2013, BROCKMAN instructed Individual One: 1) that if Point were to invest directly in a United States company, it needed to do so through a private equity manager; and 2) to secure a "wet-ink signed letter of resignation and appointment of a new trust protector" and send the document to BROCKMAN.

80.    On or about May 2, 2013, BROCKMAN, using his encrypted email system, directed Individual One to commit, through Point, $50 million to a Vista fund named Vista Foundation Fund II.

81.    On or about July 12, 2013, BROCKMAN, using his encrypted email system, directed over $7 million of additional investments, through Point, to various Vista funds.

82.    On or about July 24, 2013, BROCKMAN, using his encrypted email system, instructed Individual One on a press release for a contemplated $250 million gift from BROCKMAN to Centre College in the name of the AEBCT.

83.    On or about August 22, 2013, BROCKMAN, using his encrypted email system, sent Individual One detailed instructions regarding a gift from BROCKMAN to Centre College in the name of the AEBCT, including talking points, and directed Individual One to threaten to "pull[] the plug on the project" if BROCKMAN's demands were not met.

84.    On or about August 31, 2013, BROCKMAN, using his encrypted email system, instructed Individual One to cancel the gift to Centre College, and instructed Individual One what to tell Centre College as to why the gift was cancelled.

85.    On or about November 19, 2013, BROCKMAN, using his encrypted email system, instructed Individual One not to make a commitment, through Point, to a Vista fund named Vista Equity Partners Fund V, and that an existing investment commitment, through Point, must be "reeled back to $100 million," from $150 million.

86.    On or about December 1, 2013, BROCKMAN, using his encrypted email system, gave Individual One specific instructions to correct the record for distributions of profits from Vista to Point - "the waterfall."  Specifically, BROCKMAN directed that the return of capital in a specific distribution should be $8,489,317, and the total return should be $41,364,185.

87.    On or about January 23, 2014, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Foundation Fund I, Vista Equity Partners Fund IV, and Vista Foundation Fund II.

88.    On or about February 16, 2014, BROCKMAN directed Individual One to draft a letter to BROCKMAN on behalf of SJTC requesting that BROCKMAN negotiate a sale of Reynolds & Reynolds to Vista.

89.    On or about April 5, 2014, Individual One requested BROCKMAN purchase a house for Individual One in Australia where Individual One's family could live if Individual One were to "be subjected to proceedings."

90. On or about May 2, 2014, BROCKMAN, using his encrypted email system, sent Individual One a memorandum informing Individual One of BROCKMAN's decisions regarding Individual One's annual bonus and a loan to Individual One to purchase a home in Sydney, Australia.

91. On or about May 4, 2014, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN's annual salary from Reynolds & Reynolds must be increased to permit him to "charter" the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks per year at $150,000 per week plus fuel.

92. On or about May 10, 2014, BROCKMAN, using his encrypted email system, instructed Individual One to open a bank account in Switzerland for the AEBCT and to respond to inquiries regarding BROCKMAN's relationship to the AEBCT and the derivation of its assets. BROCKMAN also informed Individual One that his initial investment in VEF II came from a "substantial dividend" without the payment of any withholding tax.

93. On or about June 29, 2014, BROCKMAN, using his encrypted email system, agreed to provide Individual One with $3 million to purchase a home in Australia.

94. On or about July 21, 2014, BROCKMAN authorized a $75 million loan from BROCKMAN to Individual Two.

95. On or about October 3, 2014, BROCKMAN, using his encrypted email system, instructed Individual One regarding "buying out" Vista's investment in Reynolds & Reynolds.

96. On or about October 9, 2014, BROCKMAN, using his encrypted email system, requested and received from Individual One the username and password necessary to access the secure Vista website, which allowed him to download "all financials, calls and distribution notices etc."

97. On or about December 26, 2014, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $63.89 million in a Vista fund named Vista Equity Partners Fund V.

98. On or about January 2, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partnership Fund IV, Vista Foundation Fund I, and Vista Foundation Fund II.

99. On or about January 18, 2015, BROCKMAN directed Individual One to explore having BROCKMAN'S son renounce his United States citizenship and assume management of the offshore structure.

100. On or about May 9, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV.

101. On or about June 2, 2015, BROCKMAN, using his encrypted email system, instructed Individual One to determine the value of Point's investment in Vista Equity Partners Fund IV, and why it was reported as about 11% of the fund (or about $40 million), when BROCKMAN recalled that Point's investment in the fund was 17.9% (valued at approximately $70 million).

102. On or about February 13, 2016, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $33.08 million in a Vista fund named Vista Equity Partners Fund IV.

103. On or about February 24, 2016, BROCKMAN, using his encrypted email system, directed Individual One to purchase, through Cabot and Edge, $20 million of "first lien debt in a Vista software company."

104. On or about April 18, 2016, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Foundation Fund II-A.

105. On or about June 9, 2016, BROCKMAN, using his encrypted email system, instructed Individual One that before Individual One committed to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV for the purpose of purchasing a company named Misys, BROCKMAN needed a list of additional information including: 1) complete details about the current operation of Misys; 2) complete details about the sale of Misys; 3) documentation as to the valuation of Misys; and 4) a seven-year forecast of the operation proformas of Misys.

106. On or about July 3, 2017, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partners Fund III, Vista Equity Partners Fund IV, Vista Equity Partners Fund VI, Vista Foundation Fund

16

I, and Vista Foundation Fund II-A.

107.    On or about July 26, 2017, BROCKMAN, using his encrypted email system, directed Individual One how to playact an upcoming "negotiation" with BROCKMAN including which points to contest and which points to concede.  BROCKMAN directed Individual One to "continue to gripe about co-invests - but then give in."

108.    On or about December 25, 2017, BROCKMAN, using his encrypted email system, directed Individual One to position the luxury yacht "Albula" in Barcelona for BROCKMAN'S upcoming vacation so that BROCKMAN did not get billed for the costs of moving the yacht. BROCKMAN further directed Individual One "[f]or appearances sake it would probably be good for you [and your family] to take some vacation in that time frame before we get there."

109.    On or about April 20, 2018, BROCKMAN directed and caused the creation of a private equity fund named "Falcata Tech Investment Fund I, L.P.," and directed Individual One to commit, through Point, approximately $1 billion to the fund.

110.    On or about May 17, 2005, BROCKMAN directed and caused a transfer of approximately $15 million from a bank account at VP Bank in the BVI, account ***221, in the name of Edge Investment Fund, Ltd., to bank account ***690 at VP Bank in the BVI in the name of Regency Management, Ltd., for the purchase of the "Mountain Queen" property located in Pitkin County, Colorado for BROCKMAN's personal use.

111.    On or about December 16, 2010, BROCKMAN directed Individual One to transfer approximately $15 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to another bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., for the purchase of the "Frying Pan Canyon Ranch" property located in Pitkin County, Colorado for BROCKMAN's personal use.

112.    On or about March 9, 2012, BROCKMAN was informed by email that the IRS required reporting of "foreign assets" through the filing of FBARs.

113.    On or about April 16, 2013, BROCKMAN caused Individual One to transfer approximately $80 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to bank account ***951 at Mirabaud Bank in Switzerland, also in the name of Edge.

114.     On or about January 24, 2014, BROCKMAN caused Individual One to transfer $75,000 from a bank account at Bermuda Commercial Bank in Bermuda, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***891, to be used for the maintenance of "Mountain Queen" for BROCKMAN's personal use.

115.     In or about January 2014 and continuing through December 2014, BROCKMAN directed Individual One to transfer approximately $8.2 million from a bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***8029, in the name of Henke Properties, to be used primarily for the improvement of the "Frying Pan Canyon Ranch" for BROCKMAN's personal use.

116.     On or about November 8, 2016, BROCKMAN directed Individual One to transfer approximately $3.5 million from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

117.     On or about December 22, 2016, BROCKMAN directed Individual One to transfer approximately $ 29,345,705 from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

118.     On or about June 11, 2017, BROCKMAN directed Individual One to forward to him a "Significant Transaction Report," which Individual One had been maintaining for BROCKMAN since 2011, which detailed every transfer of funds involving $100,000 or more regarding the foreign bank accounts of Point, Edge, and Cabot.

119.     On or about February 26, 2011, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One, in which BROCKMAN reviewed Individual One's work during the 2010 year, and described expectations and goals for the 2011 year. Namely, BROCKMAN directed Individual One to "take over the accounting and reporting processes for Point" and "maintain the same processes as are currently in effect."

120.     On or about February 26, 2011, BROCKMAN, using his encrypted email system, increased Individual One's annual salary from $325,000 to $420,000, and granted Individual One a

bonus of $275,000.

121.    On or about April 5, 2012, BROCKMAN prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2011 year and described expectations and goals for the 2012 year.  Namely, BROCKMAN directed Individual One: "investments should be made directly by Point;" to maintain minimum bank balances in Bermuda to avoid Bermuda freezing assets; to build new banking relationships in Switzerland; and "maintain files for each Vista Fund."

122.    On or about April 5, 2012, BROCKMAN granted Individual One a bonus of $225,000.

123.    On or about April 7, 2013, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2012 year and described expectations and goals for the 2013 year.  Namely, BROCKMAN directed Individual One: to review the "Doomsday Materials" – undated letters of resignation for all nominees for BROCKMAN's offshore structure; move funds out of Bermuda Commercial Bank; and continue to monitor and keep files on Point's investments in Vista funds.

124.    On or about April 7, 2013, BROCKMAN granted Individual One a bonus of $225,000.

125.    On or about April 6, 2014, BROCKMAN granted Individual One a bonus of $325,000.

126.    On or about April 6, 2014, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2013 year and described expectations and goals for the 2014 year.  Namely, BROCKMAN directed Individual One to: maintain files for each Vista fund; provide a monthly report of business expenses; create a new computer layout including encrypted email servers; and "[o]perate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form."

127.    On or about January 18, 2015, BROCKMAN sent Individual One a "To Do List" which included: 1) begin the formation of a new Private Equity Management Company and Private Equity Fund that BROCKMAN and his son would manage; 2) notice that BROCKMAN will lease the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks a year for $150,000 per week plus fuel; and 3) "find a way that someone else runs Point in order to satisfy the auditors."

128.     On or about October 14, 2013, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2012, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2012 calendar year.

129.     On or about October 11, 2014, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2013, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2013 calendar year.

130.     On or about October 14, 2015, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2014, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2014 calendar year.

131.     On or about October 14, 2016, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2015, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2015 calendar year.

132.     On or about October 24, 2017, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2016, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2016 calendar year.

133.     On or about October 15, 2018, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2017, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain

income he earned as a result of his investments in Vista funds through Point during the 2017 calendar year.

134. On or about October 15, 2019, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2018, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2018 calendar year.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO:       (26 U.S.C. § 7201 – Tax Evasion – 2012)

135. The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

136. From on or about December 1, 1999, and continuing through on or about October 14, 2013 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2012, by committing the following affirmative acts, among others:

   a.       The acts described in paragraphs 43 through 134 of this Indictment; and

   b.       On or about October 14, 2013, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2012, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

COUNT THREE:       (26 U.S.C. § 7201 – Tax Evasion – 2013)

137. The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

138. From on or about December 1, 1999, and continuing through on or about October 11, 2014 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for

the tax year 2013, by committing the following affirmative acts, among others:

         a.     The acts described in paragraphs 43 through 134 of this Indictment; and

         b.     On or about October 11, 2014, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2013, which was submitted to the IRS.

      All in violation of Title 26, United States Code, Section 7201.

<u>COUNT FOUR</u>:       (26 U.S.C. § 7201 – Tax Evasion – 2014)

      139.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

      140.    From on or about December 1, 1999, and continuing through on or about October 14, 2015 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2014, by committing the following affirmative acts, among others:

         a.     The acts described in paragraphs 43 through 134 of this Indictment; and

         b.     On or about October 14, 2015, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2014, which was submitted to the IRS.

      All in violation of Title 26, United States Code, Section 7201.

<u>COUNT FIVE</u>:       (26 U.S.C. § 7201 – Tax Evasion – 2015)

      141.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

      142.    From on or about December 1, 1999, and continuing through on or about October 14, 2016 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2015, by committing the following affirmative acts, among others:

         a.     The acts described in paragraphs 43 through 134 of this Indictment; and

b.     On or about October 14, 2016, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2015, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

COUNT SIX:     (26 U.S.C. § 7201 – Tax Evasion – 2016)

143.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

144.    From on or about December 1, 1999, and continuing through on or about October 24, 2017 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2016, by committing the following affirmative acts, among others:

a.     The acts described in paragraphs 43 through 134 of this Indictment; and

b.     On or about October 24, 2017, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar year 2016, which was submitted to the IRS.

All in violation of Title 26, United States Code, Section 7201.

COUNT SEVEN:     (26 U.S.C. § 7201 – Tax Evasion – 2017)

145.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

146.    From on or about December 1, 1999, and continuing through on or about October 15, 2018 in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

willfully attempted to evade and defeat income tax due and owing to the United States of America, for the tax year 2017, by committing the following affirmative acts, among others:

a.     The acts described in paragraphs 43 through 134 of this Indictment; and

b.     On or about October 15, 2018, preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

1  1040, for the calendar year 2017, which was submitted to the IRS.

2      All in violation of Title 26, United States Code, Section 7201.

3  <u>COUNT EIGHT</u>:    (26 U.S.C. § 7201 – Tax Evasion – 2018)

4      147.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

5  Indictment are re-alleged and incorporated as if set forth fully herein.

6      148.    From on or about December 1, 1999, and continuing through on or about October 15,

7  2019 in the Northern District of California and elsewhere, the defendant,

8                  ROBERT T. BROCKMAN,

9  willfully attempted to evade and defeat income tax due and owing to the United States of America, for

10  the tax year 2018, by committing the following affirmative acts, among others:

11          a.    The acts described in paragraphs 43 through 134 of this Indictment; and

12          b.    On or about October 15, 2019, preparing and causing to be prepared, and signing

13  and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

14  1040, for the calendar year 2018, which was submitted to the IRS.

15      All in violation of Title 26, United States Code, Section 7201.

16  <u>COUNT NINE</u>:    (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2013)

17      149.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

18  Indictment are re-alleged and incorporated as if fully set forth here.

19      150.    On or about June 30, 2014, in the Northern District of California and elsewhere, the

20  defendant,

21                  ROBERT T. BROCKMAN,

22  did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

23  an FBAR for the 2013 calendar year disclosing that he had a financial interest in, and signatory and

24  other authority over, bank, securities, and other financial accounts in foreign countries which had

25  aggregate values of more than $10,000, while violating another law of the United States and as part of a

26  pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

27  Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge and

28  Point.

INDICTMENT                24

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT TEN:       (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2014)

151.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

152.    On or about June 30, 2015, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2014 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

COUNT ELEVEN:    (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2015)

153.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

154.    On or about June 30, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

 did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2015 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had

aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland, and Bermuda Commercial Bank in Bermuda in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

<u>COUNT TWELVE</u>:   (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2016)

155.   The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

156.   On or about April 15, 2017, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2016 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

<u>COUNT THIRTEEN</u>: (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2017)

157.   The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

158.   On or about April 15, 2018, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2017 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

<u>COUNT FOURTEEN</u>:          (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2018)

159.     The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if fully set forth here.

160.     On or about April 15, 2019, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury, an FBAR for the 2018 calendar year disclosing that he had a financial interest in, and signatory and other authority over, bank, securities, and other financial accounts in foreign countries which had aggregate values of more than $10,000, while violating another law of the United States and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at Mirabaud Bank in Switzerland, in the name of Edge, Cabot and Point.

All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

\\

\\

COUNTS FIFTEEN TO THIRTY-FOUR:      (18 U.S.C. § 1343 – Wire Fraud Affecting a

Financial Institution)

161.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this Indictment are re-alleged and incorporated as if set forth fully herein.

162.    From on or about October 8, 2008, and continuing through on or about April 21, 2010, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly, and with the intent to defraud, participate in, devise, and intend to devise, a scheme and artifice to defraud purchasers and sellers of the Debt as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts with a duty to disclose, all affecting a financial institution, to wit: Deutsche Bank.

163.    On or about October 8, 2008, a Deutsche Bank employee advised BROCKMAN by email that there was an opportunity to purchase a portion of the Debt at a discount.  At the time, timely interest payments were being made by Reynolds & Reynolds, UCSH, and DCS on the Debt as required by the Credit Agreements.

164.    On or about November 24, 2008, a Reynolds & Reynolds employee emailed a Deutsche Bank employee and advised that BROCKMAN "would like to find a way to purchase the 2nd & 3rd lien debt" and was willing to invest $300 million.

165.    From on or about October 8, 2008, and continuing through on or about April 21, 2010, BROCKMAN, together with others known and unknown to the Grand Jury, engaged in a fraudulent scheme to deceive the purchasers and sellers of the Debt, through the Administrative Agent Deutsche Bank, using Edge and Tangarra to purchase Debt, and concealing the fact that Edge, Tangarra, and Individual One were controlled by BROCKMAN, and otherwise affiliated with DCS, UCSH and Reynolds & Reynolds.

**The Scheme and Artifice to Defraud**

166.    It was part of the scheme and artifice to defraud for BROCKMAN, through Individual One, to affirmatively conceal from sellers of the Debt the valuable economic information that the Debt

INDICTMENT                28

purchasers Edge and Tangarra were under common control with DCS, by BROCKMAN, by making material misrepresentations to Deutsche Bank.

167.    It was further part of the scheme and artifice to defraud for BROCKMAN to circumvent material provisions of the Credit Agreements, which prohibited any individual or entity directly or indirectly under common control with DCS and Reynolds & Reynolds from purchasing any of the Debt without prior notice, full disclosure, and amendments to the Credit Agreements.

168.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause sellers of the Debt to sell portions of the Debt without informing them that the ultimate purchasers of the Debt were affiliated with DCS, Reynolds & Reynolds, and BROCKMAN.

169.    It was further part of the scheme and artifice to defraud for BROCKMAN to use material, non-public information about Reynolds & Reynolds to make decisions about purchasing portions of the Debt through Edge and Tangarra.

170.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause and direct DCS, UCSH, and Reynolds & Reynolds to provide Deutsche Bank misleading financial information for distribution to holders of the Debt, including audited financial statements for UCSH and its subsidiaries, as well as quarterly compliance certificates, concealing the fact that an entity under common control with DCS and Reynolds & Reynolds had purchased portions of the Debt.

171.    It was further part of the scheme and artifice to defraud for BROCKMAN to expose sellers of the Debt, including Deutsche Bank, to multiple risks, including civil and regulatory liability, as well as reputational damage.

172.    It was further part of the scheme and artifice to defraud that, from on or about October 8, 2008, and continuing through on or about April 21, 2010, and thereafter, BROCKMAN used a proprietary, encrypted email system to communicate with Individual One and others.

173.    It was further part of the scheme and artifice to defraud that, on or about December 29, 2008, BROCKMAN, having noticed that the price for all three tiers of the Debt on the secondary market had dropped significantly, sent Individual One an encrypted email indicating that BROCKMAN wanted to purchase second and third tiers of the Debt using Edge as the purchasing entity.

174.    It was further part of the scheme and artifice to defraud that, on or about January 9, 2009, BROCKMAN sent Individual One an encrypted email indicating that Reynolds & Reynolds was likely to incur an accounting loss of approximately $1 billion for the 2008 calendar year which would cause the price of the Debt to drop further.  On January 9, 2009, this fact was not available to the public

175.    It was further part of the scheme and artifice to defraud that, on or about January 10, 2009, BROCKMAN sent Individual One an encrypted email instructing Individual One to open an account with Deutsche Bank and purchase the second and third tiers of the Debt using Edge as the purchasing entity, and informed Individual One that BROCKMAN hoped to eventually purchase all of the second and third tiers of the Debt, which had a face value of $770 million.

176.    It was further part of the scheme and artifice to defraud that, in or about January 2009, Individual One falsely represented to employees of Deutsche Bank that he represented a Swiss client interested in purchasing debt of United States companies, particularly the Debt.  As part of these false representations, Individual One sent Deutsche Bank employees at least three emails purporting to describe the ownership and control of Edge and Tangarra, none of which identified BROCKMAN as the person in control of Edge and Tangarra.  Individual One never disclosed to Deutsche Bank that Individual One was employed by BROCKMAN, or that BROCKMAN retained full dominion and control over Edge and Tangarra with respect to transactions involving the Debt.

177.    It was further part of the scheme and artifice to defraud that, on or about January 26, 2009, BROCKMAN directed and caused Individual One to open an account at Deutsche Bank for Edge.

178.    It was further part of the scheme and artifice to defraud that, on or about March 5, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of the Debt with a face value of $10,228,750.  Edge purchased this portion of the Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to Edge.

179.    It was further part of the scheme and artifice to defraud that, on or about March 9, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of the Debt with a face value of $6,921,500.  Edge purchased this portion of the Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to

Edge.

180.    It was further part of the scheme and artifice to defraud that, on or about April 6, 2009, in connection with the trades on March 5, 2009, and March 9, 2009, Individual One executed an "Assignment and Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible Assignee" under the third lien Credit Agreement.

181.    It was further part of the scheme and artifice to defraud that, on or about March 9, 2009, BROCKMAN sent Individual One an encrypted email indicating that he wanted to purchase all of the second and third tiers of the Debt.

182.    It was further part of the scheme and artifice to defraud that, on or about March 11, 2009, a Deutsche Bank employee emailed BROCKMAN a seven-page presentation entitled, "Loan Repurchase Follow-Up Discussion Materials."  The presentation discussed various strategies through which Reynolds & Reynolds, or an affiliated entity, could purchase portions of the Debt in compliance with the applicable Credit Agreements, and noted that ownership of the second and third tiers of the Debt was concentrated among several investors, including an investor located in the Northern District of California.  At this time, Deutsche Bank was unaware that BROCKMAN had already purchased portions of the second and third tiers of the Debt through Individual One, Edge, and Tangarra.

183.    It was further part of the scheme and artifice to defraud that, on or about March 30, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the second tier of the Debt with a face value of $3 million.  Edge purchased this Debt from Deutsche Bank, which had purchased it from an investor in the Northern District of California specifically to sell it to Edge.

184.    It was further part of the scheme and artifice to defraud that, on or about August 7, 2009, in connection with the trade on March 30, 2009, Individual One executed an "Assignment and Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible Assignee" under the second lien Credit Agreement.

185.    It was further part of the scheme and artifice to defraud that, from on or about March 5, 2009, and continuing through on or about April 22, 2009, BROCKMAN directed and caused Individual One to use Edge to purchase portions of the second and third tiers of the Debt with an aggregate face value of more than $67 million.

186.     It was further part of the scheme and artifice to defraud that, from about April 2009, and continuing through April 2010, BROCKMAN directed and caused materially false information about Reynolds & Reynolds's financial performance to be distributed to holders of the Debt, including holders in the Northern District of California.  Specifically, each of the following documents, made available to all holders of the Debt on the dates indicated, were materially false because they did not disclose the fact that Edge, an Affiliate of DCS and Reynolds & Reynolds, and under the dominion and control of BROCKMAN, had purchased portions of the Debt, contrary to the terms of the Credit Agreements:

| Date | Description |
|---|---|
| April 1, 2009 | Reynolds & Reynolds's 2008 Audited Financial Statements |
| May 14, 2009 | Reynolds & Reynolds's March 31, 2009 Quarterly Compliance Certificate |
| August 11, 2009 | Reynolds & Reynolds's June 30, 2009 Quarterly Compliance Certificate |
| November 12, 2009 | Reynolds & Reynolds's September 30, 2009 Quarterly Compliance Certificate |
| March 24, 2010 | Reynolds & Reynolds's December 31, 2009 Quarterly Compliance Certificate |
| April 6, 2010 | Reynolds & Reynolds's 2009 Audited Financial Statements |

187.     It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, pursuant to a complete refinancing of the Debt through Deutsche Bank, the Debt was repaid in its entirety, at full face value, including a payment of approximately $67,835,129 to Edge.

188.     It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, BROCKMAN had full dominion and control over the approximately $67,835,129 paid to Edge in connection with the retirement of the portions of the Debt purchased by Edge.

**The Use of the Wires**

189.     It was further part of the scheme and artifice to defraud that, on or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme, and attempting to do so, the defendant,

ROBERT T. BROCKMAN,

did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically:

| Count | Date | Description |
|-------|------|-------------|
| FIFTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| SIXTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| SEVENTEEN | March 16, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| EIGHTEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| NINETEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-ONE | March 11, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-TWO | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-THREE | March 31, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FOUR | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FIVE | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-SIX | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |

| TWENTY-SEVEN | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
|---|---|---|
| TWENTY-EIGHT | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-NINE | April 1, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's 2008 Audited Financial Statements to Entity One in the Northern District of California |
| THIRTY | May 14, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's March 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-ONE | August 11, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's June 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-TWO | November 12, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's September 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-THREE | March 24, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's December 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-FOUR | April 6, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's 2009 Audited Financial Statements to Entity One in the Northern District of California |

All in violation of Title 18, United States Code, Section 1343.

COUNTS THIRTY-FIVE AND THIRTY-SIX:    (18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering); (18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering)

190.    The allegations set forth in paragraphs 1 through 27, 30 through 134, and 163 through 189 of this Indictment are re-alleged and incorporated as if fully set forth here.

191.    Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly conduct and attempt to conduct the financial transactions described below on the dates and the amounts indicated, affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), knowing that the property involved in these financial transaction represented the proceeds of some form of unlawful activity, with the intent to: (A) conceal and disguise the nature, source, ownership and control of the proceeds of said specified unlawful activity; and (B) to engage in conduct constituting a violation of 26 U.S.C. §§ 7201 and 7206(1).

In furtherance of his objectives, BROCKMAN, among others, intentionally and knowingly directed, caused, and engaged in the following financial transactions:

a.  BROCKMAN engaged in a scheme and artifice to defraud purchasers and sellers of the Debt, including financial institutions whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"), Deutsche Bank, and others, which included the financial transactions described in COUNTS FIFTEEN through THIRTY-FOUR, paragraphs 163 through 189, of this Indictment;

b.  On or about April 21, 2010, BROCKMAN directed and otherwise caused the Debt to be refinanced by Deutsche Bank in the approximate amount of $1.8 billion, resulting in a payment to Edge in the approximate amount of $67,835,129, which amount was deposited in Edge's account at Bermuda Commercial Bank, account number ***703-01, as more particularly described in paragraphs 187 and 188 of this Indictment ("the Proceeds");

c.  On or about December 16, 2010, BROCKMAN directed and otherwise caused approximately $15 million of the Proceeds to be transferred from the Edge account at Bermuda Commercial Bank, account number ***703-01, to the Regency Management, Ltd., account at Bermuda Commercial Bank, account ***717-01, to be used for the December 28, 2010 purchase and subsequent development of the "Frying Pan Canyon Ranch" in Pitkin County, Colorado;

d.  On or about November 16, 2012, BROCKMAN directed and otherwise caused approximately $49,100,000 of the Proceeds to be transferred from Edge's account at Bermuda Commercial Bank, account ***703-01, to an account in the United States at Bank of America, for investment in a Vista Equity Partners Fund III-Parallel ("VEPF III-Parallel") portfolio company named Sumtotal;

e. On or about November 19, 2012, BROCKMAN directed and otherwise caused approximately $26,369,672 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sumtotal to be paid from the VEPF III-Parallel account at First Caribbean International Bank ("FCIB"), account ***696, to Point's account at Mirabaud Bank in Switzerland, account ***463, said amount representing a portion of the Proceeds previously invested by BROCKMAN, through Edge and VEPF III-Parallel, in Sumtotal on November 16, 2012;

f. On or about December 3, 2012, BROCKMAN directed and otherwise caused approximately $14,282,618 of the Proceeds to be transferred from Point's account at Mirabaud Bank in Switzerland, account ***463, to an account held in the name of a Vista fund named Vista Equity Partners Fund IV-Parallel ("VEPF IV-Parallel"), at FCIB, account ***960, for investment in a VEPF IV-Parallel portfolio company named Sovos;

g. On or about March 2, 2016, BROCKMAN, as more particularly described below, directed and otherwise caused approximately $47,686,187 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the VEPF IV-Parallel account at First Republic Bank in San Francisco, account ***447, to VEPF IV-Parallel's account at FCIB, account ***960, concealing BROCKMAN's dominion and control over the Proceeds, Point, and his liability to the IRS for income taxes due and owing on the capital gains realized by him through Point; and

h. On or about March 2, 2016, BROCKMAN, as more particularly described below, directed and otherwise caused approximately $41,545,359 of capital gains and profits payable on BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the VEPF IV-Parallel account at FCIB, account ***960, to Point's account at Mirabaud Bank in Switzerland, account ***463, concealing BROCKMAN's dominion and control over these proceeds, Point, and his liability to the IRS for income taxes due and owing on capital gains realized by him through Point.

\\

\\

\\

INDICTMENT                                        36

| Count | Date | Amount | Origin of Proceeds | Destination of Proceeds |
|-------|------|--------|--------------------|------------------------|
| THIRTY-FIVE | March 2, 2016 | $47,686,187 | VEPF IV-Parallel First Republic Bank, Account No ***447 | VEPF IV-Parallel FCIB, Account No. ***960 |
| THIRTY-SIX | March 2, 2016 | $41,545,359 | VEPF IV-Parallel FCIB, Account No. ***960 | Point Investment, Ltd., Mirabaud Bank, Account No. ***463 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(ii), 1956(a)(1)(B)(i), and 2.

COUNT THIRTY-SEVEN:   (18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment

Money Laundering)

The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

192.    Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly transfer and attempt to transfer funds, that is $41,545,359, from a place in the United States, namely San Francisco, California, to a place outside the United States, namely, Switzerland, in a series of financial transactions, as described in COUNTS THIRTY-FIVE and THIRTY-SIX, paragraph 191 of this Indictment, knowing that the funds involved in the transfer represented the proceeds of some form of unlawful activity, and knowing that the transfer was designed in whole and in part to conceal and disguise, the nature, ownership, and control of the proceeds of specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud).

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

COUNT THIRTY-EIGHT:            (18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering)

193.    The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

194.    In or about June 2016, BROCKMAN knew it was likely that there would be a federal grand jury investigation in the Northern District of California to determine whether violations of, among other things, Title 26, United States Code, Section 7201, had been committed involving Point. BROCKMAN further knew that his relationship to AEBCT, Spanish Steps, SJTC, and Point, and their Directors, Officers, and Trustees, would be material to that investigation.

195.    From on or about June 10, 2016, and continuing through on or about October 14, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly and corruptly persuade Individual One to alter, destroy, and mutilate documents and computer evidence with the intent to impair their integrity and availability for use in an official proceeding, to wit: a federal grand jury investigation in the Northern District of California.

196.    BROCKMAN's corrupt actions included:

a.    In or about June 2016, BROCKMAN learned that Individual Three, who was the widow of a former nominee, was in possession of materials including documents and electronic media which could reveal that BROCKMAN had complete dominion and control over AEBCT, Spanish Steps, SJTC, and Point, as well as their Directors, Officers, and Trustees, and that BROCKMAN received the benefit of all the income deposited into the bank accounts in these entities' names;

b.    Beginning in or about June 2016, and continuing until in or about October 2016, BROCKMAN engaged in a scheme to obstruct justice by destroying evidence, and causing others to destroy evidence, in an effort to prevent law enforcement authorities from learning of BROCKMAN's true relationship with AEBCT, Spanish Steps, SJTC, and Point, as well as their Directors, Officers, and Trustees;

c.    BROCKMAN engaged in multiple instances of obstructive conduct, including: causing Individual One to make several trips from places outside the United States into the United States for the purpose of destroying documents and electronic media; causing Individual One to physically destroy documents and electronic media, which Individual One did using shredders, hammers, and other means; and causing Individual One to transfer documents and electronic media from Individual Three's possession to BROCKMAN's possession.

INDICTMENT                                38

1    All in violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

2    COUNT THIRTY-NINE:          (18 U.S.C. § 1512(c)(1) – Destruction of Evidence)

3    197.    The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189,

4    191 and 196 of this Indictment are re-alleged and incorporated as if fully set forth here.

5    198.    From on or about June 10, 2016, and continuing through on or about October 14, 2016, in

6    the Northern District of California and elsewhere, the defendant

7                                ROBERT T. BROCKMAN,

8    did knowingly and corruptly alter, destroy, and mutilate documents and computer evidence, with the

9    intent to impair their integrity and availability for use in an official proceeding, to wit: a federal grand

10   jury investigation in the Northern District of California.

11   All in violation of Title 18, United States Code, Sections 1512(c)(1).

12   FORFEITURE ALLEGATION:          (18 U.S.C. 982(a)(2)(A) and 28 U.S.C. § 2461(c) (Forfeiture of

13                                Wire Fraud Proceeds))

14   199.    The allegations contained in this Indictment are re-alleged and incorporated by reference

15   for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

16   Title 28, United States Code, Section 2461(c).

17   200.    Upon conviction for any of the offenses alleged in COUNTS FIFTEEN through

18   THIRTY-FOUR, the defendant,

19                                ROBERT T. BROCKMAN,

20   shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

21   Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes, or is

22   derived from, proceeds the defendant obtained, directly or indirectly, as a result of said offenses.  Such

23   property shall include approximately $67,835,129 in United States currency.

24   201.    If any of the property described in paragraph 200 above, as a result of any act or omission

25   of the defendant:

26          a.    cannot be located upon the exercise of due diligence;

27          b.    has been transferred or sold to, or deposited with a third party;

28          c.    has been placed beyond the jurisdiction of this Court;

INDICTMENT                          39

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant's up to the value of the property described above.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

FORFEITURE ALLEGATION:     (18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c) (Forfeiture of Money Laundering Proceeds))

202.     The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c).

203.     Upon conviction for any of the offenses alleged in COUNTS THIRTY-FIVE through THIRTY-SEVEN, the defendant,

ROBERT T. BROCKMAN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), all property, real or personal, involved in such an offense, or any property traceable to such property. Such property shall include approximately $47,686,187 in United States currency.

204.     If any of the property described in paragraph 203 above, as a result of any act or omission of the defendant:

a.     cannot be located upon exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982(a)(1), Title 28, United States Code,

Section 2461(c), and Federal Rule of Criminal Procedure 32.2.


DATED: October 1, 2020                                   A TRUE BILL.


                                                              /s/
                                                     _____
                                                     FOREPERSON


DAVID L. ANDERSON
United States Attorney


Corey J. Smith by mp
COREY J. SMITH
Senior Litigation Counsel
Tax Division


MICHAEL G. PITMAN
Assistant United States Attorney


INDICTMENT                                 41