# Exhibit 8

# In the Matter of:

# CDK Global & Reynolds and Reynolds

*September 19, 2019*
*Robert Brockman*
*Vol. 2*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

110

```
 1              FEDERAL TRADE COMMISSION
 2
 3   In the Matter of:          )
 4   CDK GLOBAL,                 )
 5        a corporation,         )  File No.
 6   And                        )  171-0056
 7   REYNOLDS AND REYNOLDS,      )
 8        a corporation.
 9
10
11             Thursday, September 19, 2019
12
13             Sheppard, Mullin, Richter & Hampton, LLC
14             2099 Pennsylvania Avenue, N.W.
15             Washington, D.C.  20006
16
17             The above-entitled matter came on for
18   investigational hearing, pursuant to notice, at 9:05
19   a.m., for the testimony of:
20
21             ROBERT BROCKMAN
22
23
24
25   Reported by:  Deborah Wehr, RPR
```

111

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4        DANA F. ABRAHAMSEN, ESQUIRE
 5        WILLIAM LANNING, ESQUIRE
 6        MICHAEL WILLIAMS, ECONOMIST
 7        Federal Trade Commission
 8        600 Pennsylvania Avenue, N.W.
 9        Washington, D.C.  20580
10        (202) 326-3695
11        dabrahamsen@ftc.gov
12
13   ON BEHALF OF REYNOLDS & REYNOLDS:
14        MICHAEL P.A. COHEN, ESQUIRE
15        AMAR NAIK, ESQUIRE
16        Sheppard, Mullin, Richter & Hampton, LLC
17        2099 Pennsylvania Avenue, N.W.
18        Suite 100
19        Washington, D.C.  20006
20        (202) 747-1958
21        mcohen@sheppardmullin.com
22
23   ALSO PRESENT:
24        SCOTT CHERRY
25        JON EMMANUAL
```

112

```
 1                   I N D E X
 2
 3   EXAMINATION BY:                          PAGE
 4   Mr. Abrahamsen                           113
 5
 6
 7   EXHIBIT      DESCRIPTION                  PAGE
 8   CX 1143      7/2/14 e-mail                114
 9   CX 4036      7/14/14 e-mail               125
10   CX 4037      9/11/14 e-mail               130
11   CX 4273      Settlement agreement         136
12   CX 4152      3PA agreement                144
13   CX 4153      Reynolds Interface Agreement 144
14   CX 4045      Data Exchange Agreement      144
15   CX 4176      2/26/15 e-mail               155
16   CX 4182      CDK Deal Information         167
17   CX 4038      3/19/15 e-mail               180
18   CX 4459      11/21/16 e-mail              185
19   CX 4420      11/2016 e-mail               188
20   CX 4463      8/1/17 e-mail                192
21
22
23
24
25
```

113

```
 1              P R O C E E D I N G S
 2                 -  -  -  -  -
 3        MR. ABRAHAMSEN:  We will resume today our
 4   examination of Mr. Brockman.  We have as counsel for
 5   the Federal Trade Commission, William Lanning.  And
 6   Mr. Ansaldo, who was with us yesterday, is not present
 7   today.  But otherwise the attendance in the room is the
 8   same as yesterday.  And we are back on the record.
 9   Whereupon --
10              ROBERT BROCKMAN,
11        a witness, called for examination, having been
12   previously duly sworn, was examined and testified as
13   follows:
14              EXAMINATION
15        BY MR. ABRAHAMSEN:
16   Q.  Mr. Brockman, good morning.
17   A.  Good morning.
18   Q.  I remind you, you are still under oath.
19   A.  I understand.
20   Q.  We were talking yesterday about the different
21   approaches Reynolds had when it came to its idea about
22   security and how it differed from the way the
23   laissez-faire attitude that CDK had when it came to
24   security.  And I wanted to ask whether it would have
25   been beneficial for Reynolds' business if CDK changed
```

114

1    its philosophy. You mentioned yesterday that CDK was
2    costing Reynolds millions of dollars by hacking in to
3    your system, and they were using the fact that you had
4    a closed system as a way to tell dealers that they
5    should switch DMSes over to the CDK DMS. So if CDK
6    changed its business practice and adopted a practice
7    more like Reynolds' practice of not allowing third
8    parties on its system, would that benefit Reynolds?
9       A. I really hadn't thought about that, but
10   certainly they would not be able to declare us fools
11   and idiots. And to that extent, I'm sure it would have
12   been beneficial. They would not have kept throwing the
13   way we were doing things up in our face in sales
14   situations.
15      Q. And it would have vindicated your position on
16   the importance of security for data as well?
17      A. Certainly it would. There's no question.
18      Q. Let me ask you to take a look at a document
19   we've labeled CX 1143 and ask you to take a look at it.
20   CX 1143 has Bates CDK_CID_01535307. It's a two-page
21   exhibit.
22      A. Yes, I find the next-to-the-last paragraph
23   somewhat amusing.
24      Q. I'm sorry, you are talking about the
25   next-to-the-last paragraph of the first page of the

116

1    discussed yesterday as far as which telephone call, if
2    you could refresh my recollection in that.
3       Q. I believe it's CX 4043.
4          MR. COHEN: Here we go. I have 4043 in front
5    of him as well.
6          THE WITNESS: This is my list of talking points
7    for an eventual telephone conversation.
8          BY MR. ABRAHAMSEN:
9       Q. When you said this, you are referring to
10   CX 4043?
11      A. That's right.
12      Q. Had you had any other telephone calls with
13   Mr. Anenen in this June 30th time period aside from the
14   one call you reference in your e-mail?
15      A. As best as I can recall, that was the only one.
16   Mr. Anenen was a hard person to get ahold of.
17      Q. The response from Mr. Anenen is the first page
18   of CX 1143, and I would like you to take a look at the
19   indented part of the paragraph on the first page of the
20   exhibit and the first hash mark under the sentence that
21   begins with, Based on my assumption, it starts, "For
22   ADP", do you see that sentence?
23      A. I'm sorry, I don't know if I'm looking at the
24   right thing or the right side of it.
25      Q. Yes, CX 1143.

115

1    exhibit?
2       A. Of the first page. It's the one that says, I
3    should point out, we have not been accessing R&R
4    systems for decades, as you said. Our business in
5    access R&R systems came to us through an acquisition.
6          I didn't think that acquiring something
7    automatically put them through the holy water.
8       Q. I appreciate that. His point about the number
9    of years that CDK had been accessing the Reynolds
10   system is a response to your e-mail to him; is that
11   correct?
12      A. Yes, I believe that's correct.
13      Q. So the record is clear, the Exhibit CX 1143 has
14   as the second page of the exhibit the first e-mail in
15   the e-mail and responsive e-mail. And the first e-mail
16   is from Mr. Brockman to Mr. Anenen on June 30, 2014.
17   And the first sentence of your e-mail to Mr. Anenen
18   states, "I think there is some confusion surrounding
19   the issue that I called you about last week."
20         Do you see that?
21      A. Yes.
22      Q. So is the call that you are referring to in the
23   first sentence of the second page of this exhibit the
24   telephone conversation that we discussed yesterday?
25      A. I'm not sure that I recall exactly what was

117

1       A. Dash 001?
2       Q. Yes.
3       A. Excuse me, I was on the wrong page. And your
4    question?
5       Q. I was going to direct your attention to the
6    paragraph that's indented, and it's the first paragraph
7    under, "Based on my assumption".
8       A. This is the one that starts off, "For ADP to
9    provide integration to Naked Lime"?
10      Q. Correct. What did you interpret him to mean
11   when he talked in that paragraph about providing
12   integration to Naked Lime, having to go through a set
13   of defined, documented and thoroughly tested processes?
14      A. I interpreted that to mean what he was
15   describing was a 3PA process.
16      Q. And had you talked to him about having your
17   applications go through 3PA prior to receiving this
18   e-mail?
19      A. I had not personally. I would suspect by the
20   context that my people had been talking to his people.
21      Q. But at this time, by the time you read this
22   e-mail, CX 1143, you, at that point, were aware that
23   CDK had a 3PA program?
24      A. Yes, but my people had been talking about it to
25   me.

118

1    Q.  And he talks here about not only for Reynolds
2  and Reynolds, but he also makes reference in the first
3  sentence for ADP to provide integration to Naked Lime
4  or R&R or any third party.  What did you interpret him
5  to be meaning when he said that for any third party
6  they would have go through 3PA?
7    A.  I don't know that I paid a lot of attention to
8  that particular line.  What I was more interested in is
9  that they were, as of this date, clearly getting behind
10 the process of the stand down and they were describing
11 things that they needed to have, which I considered to
12 be reasonable as part of the soft landing.
13   Q.  So you thought it was reasonable for him to
14 expect you to go through 3PA for your apps?
15   A.  Yes.
16   Q.  And with respect to his reference, and he says
17 it twice in this paragraph, in the first line he talks
18 about how this has to apply to any third party.  And
19 then the very last sentence of this paragraph says,
20 "Every third party must operate within these
21 parameters."  Did you understand that sentence to mean
22 that CDK was no longer going to adhere to its
23 laissez-faire attitude about third parties?
24   A.  Clearly this e-mail represented -- it may not
25 have been a change, but my understanding of where they

119

1  were at from a security standpoint, it was obviously
2  much different than what I had seen before.
3    Q.  And what did you take his sentence in the very
4  next indented paragraph, in other words, the one that
5  begins after the second hash mark, he's talking again
6  about ADP's third-party approval and how they have
7  developed.  And the last sentence is what I would like
8  to -- the last two sentences are what I would like to
9  point your attention to.  The second-to-last sentence
10 of the paragraph reads, "I am sure you will appreciate
11 the need to have R&R follow the same process and meet
12 the same standards.  I believe that" -- I think the
13 word "this" should be here -- that "this is the same
14 point you make publicly."
15   Did you interpret that to mean that he was
16 moving away from his position about -- his
17 laissez-faire position about allowing third parties on
18 to his system and that he was making reference to the
19 fact that this is something that you had made public
20 statements about?
21   A.  My interpretation of what this paragraph is all
22 about is that the 3PA system had been around for a
23 while but I had not known about it.  And evidently,
24 it's something that they provided to very large
25 customers, large groups, chain dealerships.  Auto

120

1  Nation, of course, is their largest customer because
2  it's the biggest chain dealer operator in the whole
3  country.
4    What we are seeing here is a well-developed
5  process, but I had not been aware of that before this.
6  And to see what all he wrote here, actually it's
7  comforting in that the worst situation would be if
8  there were no process at all and they would have to
9  build one from scratch.  Looking at this one, you can
10 say, well, this has been running for a while and it's
11 well documented.  It looks like it would be a
12 reasonable process to interface using what he's laying
13 out here.
14   Q.  And he's kind of making a point, if I'm
15 interpreting this correctly, that almost explaining why
16 maybe you haven't heard about it, that you have been
17 very public about your position when it comes to third
18 parties accessing your DMS, and he's kind of hinting
19 that you may not have known this because we haven't
20 made it public yet that we are going to take the same
21 position that you are going to take on third-party
22 access.  Did you interpret this e-mail that way?
23   A.  I don't know that I thought that deeply about
24 it.  It was mainly a sigh of relief on my part that we
25 weren't going to have to start from scratch to build up

121

1  an interface.
2    Q.  The next paragraph -- the next paragraph on the
3  first page of this paragraph that's not indented
4  begins -- and this is the one that you referenced
5  before I had even asked a question about the exhibit,
6  the "I should point out" paragraph, and I would like to
7  turn your attention to the last two sentences of that
8  paragraph.  The second-to-last sentence says, "I would
9  be remiss not pointing out that R&R is accessing the
10 ADP system through a contract with Authenticom and has
11 been doing so for quite some time without an agreement
12 from ADP.  We need to clean this up as well."
13   What did you interpret those two sentences to
14 mean?
15   A.  Well, there is no question we had been using
16 Authenticom on a very small scale to provide service
17 reminder follow-up data, addresses and names of
18 customers that own vehicles that sign up to have an oil
19 change or have a 100,000 mile checkup or whatever.
20   As far as what arrangements that Authenticom
21 had, that was beyond our vision.  We don't get to see
22 what Authenticom does or was doing at that time.  And
23 what he's saying here in so many words is that
24 Authenticom doesn't have a contract with us.
25 Authenticom is acting as a hacker into CDK's systems.

3 (Pages 118 to 121)

122

1   And he's being fairly gentle about pointing that out
2   because we truly didn't understand what Authenticom was
3   doing, what permissions they had and which ones they
4   didn't.
5       Q.  When he said "we need to clean this up as
6   well", is he suggesting that you need to stop using
7   Authenticom to access the CDK system?
8       A.  That was my interpretation.
9       Q.  And did this suggest to you that CDK was moving
10  away from its laissez-faire attitude about third
11  parties and was going to take a stricter approach in
12  terms of not allowing third parties to hack into its
13  system?
14      A.  I wouldn't say that I perceived that at this
15  point.  It wasn't until they started publicly
16  announcing 3PA that I took notice.
17      Q.  Why would he be e-mailing you that you needed
18  to clean this up as well if CDK wasn't interested in
19  stopping the use of third-party integrators on its
20  system?
21      A.  Again, I don't think I thought that deeply.
22  This was -- at this stage of this project, you know, my
23  efforts were pretty much done because I forced the
24  issue with Steve Anenen.  And after that I'm backing
25  away because I'm on to whatever the next hill is.

123

1       Q.  This notion that Reynolds had been using
2   Authenticom and that CDK was going to ask you to clean
3   that situation up, was that a topic that you and
4   Mr. Anenen had discussed on the telephone?
5       A.  I'm sorry, I don't recall whether we did or
6   didn't.  But it was absolutely clear what he was saying
7   in this letter.
8       Q.  That the third-party integration that had been
9   going on would not be allowed to continue?
10      A.  Yes.
11      Q.  Was that something you talked to Mr. Anenen
12  about, whether CDK was also, in addition to seeing to
13  it that Reynolds stopped using third-party integration
14  on its system that CDK was also going to stop being so
15  laissez-faire about other parties using third-party
16  integration on the CDK system?
17      A.  Again, I'm not perceiving that far deep into
18  this letter.  I'm -- again, I think I'm out of this
19  project and I'm on to the next one.
20      Q.  I can't remember how I started my question, so
21  I'm going to maybe ask the same question, but I don't
22  think so.
23      MR. COHEN:  You have asked the same question
24  for about 45 minutes in several different ways, and I
25  haven't objected once and I'm not going to.  But the

124

1   answer is not going to change.
2       THE WITNESS:  Can I declare a timeout?
3       (A recess was taken.)
4       BY MR. ABRAHAMSEN:
5       Q.  Before the break we were talking about CX 1143
6   and how it had followed a telephone conversation you
7   had had with Mr. Anenen.  In that telephone
8   conversation with Mr. Anenen, had he said anything that
9   led you to believe that CDK was no longer going to take
10  a laissez-faire attitude about third-party integration
11  on its DMS system and was going to be adopting a system
12  where they would no longer permit third parties to
13  integrate on its system?
14      A.  We never had any conversation about that.  When
15  I finally learned about it, I wasn't surprised because
16  I thought the way they were doing it before was really
17  stupid from a security standpoint.  And probably from a
18  general background statement, I consider really
19  everything that CDK does to be inferior.  And that's --
20  I have been competing with them now since 1975.  So
21  therefore, I don't spend any time, quote, watching what
22  CDK does.  I find it humorous that they turn over chief
23  executive officers as often as they do.  But other than
24  that, as far as operationally or technically, whatever,
25  I pay no attention to what they do.

125

1       Q.  You mentioned in a prior answer that you had
2   learned about CDK's 3PA program from people who report
3   to you.  Who would that have been?
4       A.  Probably Bob Schaefer.
5       Q.  Let me ask you to take a look at a document
6   we've marked as CX 4036.  The Exhibit CX 4036 has Bates
7   REYCID0264663, and my understanding is that these are
8   notes that you prepared for yourself to deliver remarks
9   at a sales meeting on July 14, 2014; is that correct?
10      A.  Yes, that's correct.
11      Q.  I wanted to ask you to take a look at the
12  second page of the Exhibit CX 4036-002, and at the
13  bottom of the page there is a paragraph titled
14  Security.  Do you see that?
15      A.  Yes.
16      Q.  The second bullet down talks about the early
17  stages of negotiating an agreement, and it says it's a
18  similar agreement.  When you say similar agreement, is
19  that a reference to the reference in the first bullet
20  that Reynolds had reached an agreement with
21  Mr. Batista?
22      A.  Yes, the most important part of which is that
23  Phil Batista, since lost in court, was no longer going
24  to be hacking Reynolds' sites and there was going to be
25  an orderly stand down.  And that was the way it looked

126

1  like the agreement with ADP would take place.  It would
2  be similar.
3      Q. So you had a court case going against
4  Mr. Batista, and then ultimately you settled that court
5  case?
6      A. I don't know who brought it in the first place,
7  whether it was us or whether it was Mr. Batista.  And
8  the final disposition, whether it was a settlement or
9  whether it was an agreed verdict, I'm not aware.
10     Q. And the reference in the first bullet "reached
11 an agreement where Phil is getting out of the
12 business", is that what you would call a wind down
13 agreement with Mr. Batista?
14     A. Yes.
15     Q. And were the terms basically that he would stop
16 doing integration on Reynolds but he would do so in a
17 way that allowed his clients to continue to do the
18 integration for a period of time until they could move
19 into the RCI program?
20     A. Yeah.  It was an orderly stand down would be
21 the way I would characterize it.
22     Q. And Mr. Batista, his company is SIS?
23     A. Yes.
24     Q. The third hash mark down under security on
25 CX 4036-002 states, "ADP seems to be becoming aware of

127

1  the laws and liabilities involved."  Do you see that?
2      A. This is in the last section titled Security?
3      Q. It's the third hash mark down.
4      A. Yes, I see that.
5      Q. What did you mean by ADP seems to be becoming
6  aware of the law?
7      A. The very existence, which was in relatively
8  recent news to me, was the fact that the 3PA program
9  existed at all and the fact that they were talking
10 about that.  Again, that was new news to me or
11 relatively new.
12     Q. What laws were you referring to?
13     A. The ones -- and I should know the names of
14 them, but the ones that were discussed in the document
15 produced by NADA.
16     Q. And had you talked to Mr. Anenen about the
17 applicability of those laws?
18     A. No.  I just had disagreed with the way it was
19 interacting with our systems.
20     Q. But you told your sales force that ADP seems to
21 be becoming aware of the laws.  What was your basis for
22 saying that?
23     A. The fact that I had become aware of the 3PA.
24     Q. What did 3PA have to do with laws?
25     A. Well, 3PA is, as we've seen in just prior

128

1  documents, is very organized, very structured, has
2  contracts.  The 3PA system provides for ADP to
3  understand exactly what data is being extracted from
4  systems.  And I think they probably started to become
5  aware of what was happening from a hacking standpoint
6  of their DMS system.
7      Q. You said in a prior answer that 3PA had been
8  around for a while.  It's just that you hadn't heard of
9  it.
10     A. Well, I made that statement based on the fact
11 that it was a pretty complete definition of how it
12 ought to be done.  And that's not typically something
13 you start with on day one.  So therefore, it was -- I
14 can't tell how mature it was, but it was certainly past
15 starting, for sure.
16     Q. But your comments that you are going to make to
17 your salespeople are sort of -- make it sound to me
18 that because you say ADP seems to be becoming aware of
19 the laws, that there was something recent.
20     A. It was recent knowledge to me.
21     Q. And what was it about the existence of the 3PA
22 program that gave you insight into ADP's thinking about
23 the laws?
24     A. Well, as far as compliance with the law, my
25 belief is that to do it legally, you got to have

129

1  contracts, you got to have definitions, you got to have
2  an explicit listing of what data fields are going to be
3  removed from the DMS system.  And this is -- the fact
4  that there was the existence of the 3PA at all was at
5  variance with what the status quo had been as far as my
6  knowledge is concerned.
7          And talking to the salespeople, the point I'm
8  trying to make is that, well, it kind of looks like
9  that CDK is going to have a formal process, and
10 therefore, they are not going to be able to throw rocks
11 at us for having a formal process, which the sales
12 force are the people that take the stones on this
13 particular subject.  That's why I was telling them that
14 it looked like the world is perhaps changing.
15     Q. And you talked in this same sentence about
16 liabilities, that ADP seems to be becoming aware of the
17 laws and liabilities.  What liabilities were you
18 referencing?
19     A. Well, the very fact that the 3PA agreement
20 meant to me that they were changing their previous
21 positions of laissez-faire, and that has -- if you
22 describe laissez-faire from a business standpoint, it's
23 treacherous because if there's a breach and you
24 don't -- you are operating without contracts and
25 without definitions of who is doing what, it makes for

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

130

1    a really messy situation as far as liability is
2    concerned.
3        Q. Liabilities like the ones we talked about
4    yesterday where if a third party sent data into the
5    wrong hands, the DMS is the deep pocket?
6        A. Exactly.
7        Q. And you state in the next hash mark down, "This
8    could put the security wars very much behind us." Is
9    this referencing back to the prior bullet about ADP
10   becoming aware of the laws and liabilities?
11       A. I would say that would be correct.
12       Q. Let me ask you to take a look at CX 4037.
13   CX 4037 has Bates REYCID0513201, and it appears to be
14   an e-mail from Mr. Schaefer to Mr. Brockman. It's
15   dated September 11, 2014.
16       A. The print on this one is really small. Yes.
17       Q. The exhibit has a paragraph that contains four
18   numbered paragraphs, the longest of which is number 4,
19   which starts out "CDK also wants to begin discussing
20   the tactical direction for the following." And this
21   is -- these are subjects that are being negotiated
22   between CDK and Reynolds with regard to what ultimately
23   becomes a contract that's signed in February of 2015;
24   is that correct?
25       A. Yes, that's correct.

131

1        Q. And the paragraph B starts out "RCI pricing,
2    minimums, et cetera," and has one little subparagraph
3    under it. And there's a reference in the -- well, it's
4    the first sentence, but it's a very long sentence and
5    there's some dashes, and it's talking about Menu
6    Advantage [sic], and then the sentence continues, Their
7    contract is not up with SIS until July 2015.
8        Was this a reference to CDK using SIS to
9    integrate Menu Advantage on Reynolds' DMSes?
10       A. Yes, that's correct.
11       Q. And was this integration by SIS subject to the
12   wind down agreement, as far as you know?
13       A. I'm not sure about that. What I think is
14   happening here is that Phil Batista and SIS, Phil is a
15   snake, and it looks to me like that CDK has finally
16   become aware of his true qualities and nature, and they
17   are deciding they want to move to a place where they
18   are not doing business with him anymore, which I'm not
19   surprised.
20       Q. The sentence goes on and -- I know you didn't
21   write this, but I appreciate your interpreting it for
22   us. It says that when they go with Reynolds, they'll
23   be paying Reynolds a much higher price than what SIS is
24   currently charging them. How much higher price would
25   CDK pay Reynolds compared to what it was paying SIS?

132

1        A. I don't know that. We don't have that
2    information. They don't tell us that, but they infer
3    that. But as far as what prices SIS was charging, we
4    don't know.
5        Q. Well, did you know what price you were paying
6    Authenticom to integrate apps on to the CDK system?
7        A. I was not personally aware of that, it was such
8    a minor piece of business. Reminder cards is not
9    really a huge deal. I think we pay more for the
10   postcard than the rest of it.
11       Q. Was it generally the case that the third-party
12   integrators were charging less than what 3PA and RCI
13   were going to be charging for integration?
14       A. I don't have direct knowledge of that, but I
15   wouldn't be surprised if that was the case.
16       Q. The next paragraph down, in other words, 4C,
17   talks about communication plan and marketing
18   announcement, and the first clause of the sentence
19   under paragraph i says, "How will the agreement be
20   announced to the market."
21       What was the issue with regard to announcing
22   the agreement to the market?
23       A. CDK was very, very sensitive -- this was their
24   issue, was very, very sensitive about how all this was
25   going to happen. We are not, you know, marketing kind

133

1    of folks. We are programmers and technical kind of
2    folks, and this was not something that we brought up.
3    It was their issue. And at this point we had not given
4    the slightest thought to that there would even be a
5    marketing program around an announcement, but that's
6    their deal. So we were not opposed to that.
7        Q. What would the announcement be if Reynolds
8    could get its -- what would Reynolds want the public
9    announcement to say?
10       A. We would not want it to say anything as far as
11   we are concerned. We would be just as happy if it
12   didn't exist.
13       Q. Is this something you discussed with
14   Mr. Schaefer? He's writing you this e-mail that
15   contains this sentence.
16       A. I would say probably we did, and probably I
17   would have communicated exactly what I have
18   communicated to you. We are not spinmeisters.
19       Q. The impression I get from having read documents
20   in this matter is that Mr. Schaefer thought that a
21   public announcement was very important to you. Do you
22   know why we would see that in the documents given what
23   you have stated about the lack of enthusiasm for a
24   public announcement that you are testifying about?
25       A. Well, I'm sure I would have talked to Bob

6 (Pages 130 to 133)

134

1  Schaefer about this issue. But again, a joint
2  marketing announcement with CDK is not something I get
3  all, you know, wet and tingly about.
4       Q. The notion that there would be an announcement
5  that CDK was no longer being agnostic about third
6  parties integrating on its platform would seem to be
7  beneficial to Reynolds in the sense that it would be
8  public acknowledgment that they were no longer going to
9  be throwing rocks at you for your stance on security.
10      A. I would think that that would be the furthest
11 thing from their mind because they are the ones that
12 want to do it, which means they are going to want it to
13 be favorable to them. And anything that's favorable to
14 them is unfavorable to us. Anything that's favorable
15 to us would be unfavorable to them.
16      Q. Well, what would be favorable to you in terms
17 of an announcement?
18      A. Nothing. No announcement. That would be our
19 preference.
20      Q. You wouldn't want an announcement that CDK was
21 going to stop coming into your system unauthorized?
22      A. I don't think that there was any way in the
23 world that CDK would admit that in a marketing
24 announcement. I mean, it would be like a public
25 confession that they were hackers and had been hackers

135

1  for years. I mean, there's no way in the world they
2  would have agreed to let that be any part of a press
3  announcement.
4       Q. I have noticed from reading the final agreement
5  that it says that both companies will agree on press
6  releases. Was that something Reynolds wanted the
7  agreement to say or was that --
8       A. Well, what it is, it's a tit for tat. They
9  would want it to say that they could agree and approve
10 it, and we would say, no, it's got to be joint which
11 means if we didn't like it, it would not happen. It's
12 one of those kind of situations where you got two
13 parties and it has to be unanimous consent or nothing
14 happens.
15      Q. Was that a provision that Reynolds felt
16 strongly about having in the agreement?
17      A. Certainly I would have thought so. I'm not
18 aware exactly how it was handled in the final
19 agreement, but I would hope that our legal department
20 would be diligent enough to not give CDK a one-sided
21 ability to approve anything.
22      Q. Is there anything that you could have said to
23 Mr. Schaefer that would have given him the impression
24 that you were strongly in favor of a public
25 announcement about the agreement with CDK?

136

1       A. I don't think so, but probably at this point
2  I'm not far enough along in thinking about how the
3  whole thing is going to wind down because again, as I
4  have said before, I was around a lot in the beginning.
5  There was a pile on my desk in the beginning, but once
6  it got past the point there wasn't a pile on my desk
7  anymore, I got other piles to work on. At this point
8  it's in the later stage of the whole situation.
9       Q. Right, but early on in the process is there
10 anything you could have said to Mr. Schaefer that would
11 have given him the impression that Reynolds wanted to
12 be having a public statement about the agreement with
13 CDK?
14      A. Well, I think that there's -- Bob Schaefer
15 feels much more strongly about that than even I do.
16 And quite possibly we might have had a conversation,
17 but when it comes down to the final thing, CDK wanted
18 so much means that automatically it's good for them and
19 it's not good for us when you really in the cold, clear
20 light of day and you think about it. But prior to the
21 cold, clear light of day, it's possible I have had
22 conversations with -- and we thought that it might have
23 been a good idea. But when you really think about it,
24 it's not.
25      Q. Let me ask you to take a look at CX 4273.

137

1  CX 4273 has Bates REYCID0675646. It's entitled
2  Settlement Agreement, and the subtitle is The Reynolds
3  & Reynolds Company versus Superior Integrated
4  Solutions, Inc., and then it gives the court that the
5  settlement is in front of.
6       A. (Reviewing document.)
7       Q. Mr. Brockman, the document, the settlement
8  agreement that I have shown you at CX 4273 on page 007
9  of the document, it indicates that it was agreed to on
10 the 5th day of March 2014. And I guess my question is,
11 is the settlement agreement the agreement you were
12 referring to in CX 4036, which was your statement to
13 the sales executives on July 14, 2014?
14      A. Yes, I believe that's the case.
15      Q. And you had mentioned in a prior answer that
16 Mr. Batista ran a company called SIS. And just for the
17 record, SIS is the acronym for Superior Integrated
18 Solutions, Inc.; is that correct?
19      A. Correct.
20      Q. What exactly was SIS doing with regard to its
21 interactions with the Reynolds system?
22      A. It was one of the Japanese manufacturers, I
23 think it was Subaru, had plans for building what I
24 would call a wrapper around the DMS system so that the
25 user interfaces would be exactly like Subaru wanted.

CDK Global & Reynolds and Reynolds                                    9/19/2019

138

1   It would be Subaru-specific. And what SIS had agreed
2   to do involved really getting into our system in much
3   greater detail than anybody else had ever attempted.
4   And this settlement basically we thought we killed the
5   snake here. Unfortunately, we've not killed the snake.
6      Next time around Phil Batista got really,
7   really clever, because he was banned from the RCI
8   system forever because -- as part of this settlement.
9   But I mean, he created an absolute fraud. He went out
10  and had another company created that achieved RCI
11  status and then he used them to collect all the data as
12  opposed to him doing it directly in contravention of
13  what he agreed to here and started selling an interface
14  for a product called Darwin, which we touched on, I
15  think, maybe perhaps the first day.
16     And what Darwin is, is a system that competes
17  in a way against DocuPad. What it does is it handles
18  presentation of products, aftersale products to the
19  consumers. And we mentioned the fact that its major
20  drawback is it can't recompute the payments based upon
21  what's either bought or decided not to buy as part of
22  the aftersale process, extended warranties, all that
23  manner of stuff.
24     And wildly enough, he had gotten some fairly
25  large Reynolds accounts to buy Darwin. And we were

139

1   then our rights -- I mean, he clearly violated
2   everything in the book, but we couldn't shut him down
3   because of the nature of the customers that he already
4   had, which were also our customers. Had to shut the
5   whole thing down. So we entered into a new stand down
6   agreement, and I think it's coming up sometime early
7   next year where he stands down once again. It's a
8   miserable deal, and I hated to settle with him, but
9   from a business standpoint, we were just compelled to.
10     Q. You didn't want to settle with him because that
11  would mean he would get the benefit of the wind down
12  period; is that correct?
13     A. Yeah.
14     Q. You said from a business standpoint, you had to
15  settle with him?
16     A. Well, because of the relationships with our --
17  his customers that's also a big customer of ours.
18     Q. Which customer was it, if you recall?
19     A. I'm sorry, I don't remember, but it was a
20  significant customer. And I think there was more than
21  one.
22     Q. Was SIS accessing the Reynolds DMS in a way
23  that was technologically different than the way, say,
24  DMI, IntegraLink and Authenticom were accessing the
25  system?

140

1      A. It was different in some respects. I can't
2   tell you specifically what they were, but Phil is much
3   smarter than the folks at CDK. And my view of the
4   situation, I was under the impression that it was a
5   more sophisticated approach.
6      Q. I have seen in the documents the phrase "code
7   on the box." Are you familiar with that phrase?
8      A. Very much so. It is very, very unpleasant as
9   far as we are concerned.
10     Q. Would that be an accurate description of how
11  SIS was accessing the Reynolds DMS?
12     A. I'm not clear as to exactly from a technical
13  standpoint how that was done. I would expect Bob
14  Schaefer to know.
15        MR. COHEN: Mr. Abrahamsen, can we take our
16  hourly break?
17        MR. ABRAHAMSEN: Yes.
18        (A recess was taken.)
19        BY MR. ABRAHAMSEN:
20     Q. So we were speaking before the break at
21  CX 4273, which is the settlement agreement with SIS.
22  Was SIS integrating other third-party apps on to the
23  Reynolds system? You mentioned the Subaru one you were
24  referring to others than the Subaru one you mentioned.
25     A. I'm not aware that they were. We had ample

141

1   evidence of Subaru. More than enough. So he could
2   have been doing other ones that we would not know
3   about. We would have no practical way to understand
4   what else he might be doing.
5      Q. Let me ask you to take a look at page 003 of
6   CX 4273, and there's a paragraph, well Roman V, so like
7   a V. And I was looking at the first sentence of that
8   long paragraph, and there's a first clause, and then
9   the sentence continues after the parenthetical "SIS and
10  Mr. Batista, on behalf of themselves and their
11  employees and affiliates, covenant and agree not to
12  integrate with, access or attempt to integrate with or
13  access any Reynolds-brand DMS."
14     A. Now we think we've got him.
15     Q. So this is a prohibition on Mr. Batista and his
16  company integrating on the Reynolds DMS?
17     A. Yes.
18     Q. And then the next sentence states, "SIS and
19  Mr. Batista further covenant and agree not to sell,
20  transfer or assign to any affiliate or third party any
21  technology or know-how regarding integration with
22  Reynolds-brand DMS." And it goes on. What is this
23  prohibition aimed at?
24     A. The same that him accessing Reynolds DMSes, DMS
25  systems in any way forever.

8 (Pages 138 to 141)

142

1    Q. And what's the reference to third parties?
2    A. He won't assist third parties with technology
3  or know-how.
4    Q. And what was the concern about technology and
5  know-how with regard to third parties that you are
6  trying to address in this paragraph?
7    A. We believed at that time and still do that Phil
8  is very smart and he is technologically the most
9  superior hacker, as far from a technology and knowledge
10  standpoint, better than DMI and IntegraLink.
11    Q. And what third parties are you trying to
12  address in this paragraph?
13    A. People that are doing the same thing or similar
14  things that Phil Batista is doing, which we would like
15  to think we were aware of all of them, but that's not
16  necessarily the case.
17    Q. Then further down after there's a reference to
18  paragraph 3.A.v, and the sentence states that the
19  covenants set forth are not intended as a covenant not
20  to compete but rather as a contractual restriction of
21  access and attempted access intended to protect the
22  operational and data security -- I'm sorry, yeah, data
23  security integrity of the DMS. What is that a
24  reference to?
25    A. I think that that is just stating further again

143

1  in a different way that he's not going to access
2  Reynolds' DMS systems. Whoever wrote this paragraph v
3  made a very serious effort to contractually lay that
4  down. And again, we thought we had killed the snake,
5  but we didn't.
6    Q. When you say "lay that down" in that answer,
7  you mean lay down the prohibition about Mr. Batista
8  accessing your DMS?
9    A. That's correct.
10    Q. And the next sentence says, "These covenants
11  are intended to extend for the life of any Reynolds DMS
12  product." And that's just what you referenced in an
13  earlier answer, that you wanted this to extend for as
14  long as Reynolds was in the DMS business?
15    A. Correct.
16    Q. You mentioned in a prior answer that
17  Mr. Batista sought access to the Reynolds DMS after
18  this settlement agreement was reached, which was in
19  2014. What was the name of the entity that later tried
20  to get access to the Reynolds DMS?
21    A. I don't remember the name of the entity which
22  essentially was a straw entity, which is how he got
23  access. Basically that straw entity did all the
24  accessing and fed him the data that he needed for the
25  application that he was building. We know what that

144

1  entity is, but I personally don't know the name of it.
2    Q. And is the entity you are referring to, is it
3  gaining access to the Reynolds DMS through the same
4  type of technique that SIS was using or is it going in
5  through RCI?
6    A. It's my understanding that this straw entity
7  had an RCI agreement and essentially used the power in
8  that RCI agreement to do what Phil Batista wanted to
9  get done. And they did it and turned everything over
10  to him on an ongoing basis the data that was required
11  for the product that he had built, which is either this
12  paragraph V is defective and the lawyer missed that
13  point or there's a case of fraud and deception. I
14  believe it's a case of fraud and deception.
15    Q. Let me show you three exhibits. These are the
16  three contracts that were executed between CDK and
17  Reynolds. We'll go through them one at a time,
18  obviously, but perhaps for the economy of time, we'll
19  just put them all on the record now and then I'll ask
20  my various questions about them as we go forward.
21    MR. COHEN: Then we'll have them all in front
22  of him, sure.
23    MR. ABRAHAMSEN: And they are CX 4045, which is
24  the Data Exchange Agreement; CX 4152, which is the 3PA
25  Agreement; and Exhibit 4153 which is the Reynolds

145

1  Interface Agreement.
2    CX 4152 has Bates REYREY0000091. CX 4153 has
3  REYREY0000025. And CX 4045 has Bates REYREY0000012.
4    BY MR. ABRAHAMSEN:
5    Q. Before we plunge into the actual words in the
6  contracts, let me ask you a broader question. Just
7  could you state for the record what your role was with
8  regard to these contracts?
9    A. Very minimal.
10    Q. Who was responsible for having these contracts
11  come into being for Reynolds?
12    A. Bob Schaefer.
13    Q. Anyone else?
14    A. I don't know to what extent our legal
15  department played in actually constructing the
16  contracts. Again --
17    Q. I meant my question to kind of exclude the
18  legal department. I'm sorry, I should have made that
19  more explicit. And I intentionally cut you off.
20    MR. COHEN: Thank you. I was listening and I
21  was comfortable with Mr. Brockman's response, but I
22  appreciate your safeguarding the privilege. And the
23  fact that he consults lawyers for legal contracts is
24  hardly earth shattering.
25    BY MR. ABRAHAMSEN:

9 (Pages 142 to 145)

146

1    Q. But were there any other businesspeople
2  involved in negotiating these contracts with CDK other
3  than Mr. Schaefer?
4    A. Not that I'm aware. Certainly all discussion I
5  had about the subject was with Bob Schaefer.
6    Q. Let me ask you to take a look at CX 4152 and
7  ask you to look at CX 4152-016. I believe my questions
8  will continue on. We'll have the same questions for
9  the next several pages.
10   In the first part of the document, Section 1:
11 List of Third Party Access Utilized, and then there's
12 several entries. Extract Inventory Vehicles - Batch,
13 what is this part of the contract referring to?
14   A. This would be they keep vehicle inventories in
15 a separate area inside their database, and the access
16 would be to -- on a batch basis. And by batch, that's
17 when you have a program that runs that copies records
18 from one file into another file, and it does it without
19 benefit of any screen interaction. That's why it's
20 called batch.
21   Q. Is this part of the contract starting with
22 CX 4152-016, are these Reynolds applications that are
23 going to be integrated into the CDK DMS through 3PA?
24   A. I'm under the impression that these are records
25 that will come out of 3PA and be used in a marketing

147

1  application in our marketing arm.
2    Q. And what is your marketing arm?
3    A. Naked Lime Marketing.
4    Q. So Naked Lime Marketing will get data from CDK
5  DMSes through 3PA?
6    A. Yes.
7    Q. And could you just go through the next couple
8  of pages and just tell us what the other applications
9  are? For instance, number 2 on CX 4152-017 appears to
10 be Naked Lime Web.
11   A. I'm sorry, I'm not following where I'm supposed
12 to be.
13   Q. CX 4152-017, there's a numbered paragraph in
14 the middle of the page, number 2, Application Served.
15   A. Yes.
16   Q. What is Naked Lime Web?
17   A. That's where we have a service which creates
18 and maintains the website for a dealership, which is a
19 very important part of their marketing.
20   Q. And that would now be getting data through 3PA;
21 is that correct?
22   A. Yeah. Vehicle inventory data, that's correct.
23   Q. And flipping over to CX 4152-018, number 3 is
24 toward the top of the page and it's talking about
25 ReminderTRAX. What is that?

148

1    A. That is the service that prepares service
2  reminder cards to be sent out to the consumers
3  encouraging them to bring their vehicles in for
4  50,000-mile service or winterizing or de-winterizing,
5  that sort of thing.
6    Q. And after the contract is signed, ReminderTRAX
7  would be getting data from CDK DMSes through 3PA; is
8  that correct?
9    A. That's correct.
10   Q. Let me ask you to flip to the first page of the
11 Exhibit CX 4152-001, and under Background in the second
12 paragraph it says, Vendor provides its application
13 programs" and then there's a parenthetical "as further
14 described in section is 2 of Exhibit 3PA-B, including
15 all subparts, the applications, close quote, to certain
16 CDK clients. So those are the Reynolds applications we
17 were starting to look at a couple of questions ago; is
18 that correct?
19   A. That's correct.
20   Q. Let me ask you to look at CX 4152-004, and
21 actually it's paragraph E on that page. And I'm going
22 to ask you whether this paragraph prohibits Reynolds
23 from using hostile integrators for its applications.
24 And I draw your attention to the first -- well, there's
25 a sentence ten lines down in subparagraph E --

149

1    MR. COHEN: I'm sorry, Dana, my assistant is
2  bringing me something.
3    (Discussion off the record.)
4  BY MR. ABRAHAMSEN:
5    Q. I'm sorry, Mr. Brockman, I'm having difficulty
6  asking you to turn your attention to the sentence I
7  want to ask you about. It's ten lines down in
8  subparagraph E, and it begins, "Vendor agrees that it
9  will not".
10   A. I'm sorry, I'm just not finding that. I'm
11 quite sure it's probably here, but this paragraph is a
12 killer.
13   Q. I'm sorry.
14   A. Typically what I do when I'm faced with having
15 to understand something like this is I get a copy in
16 Word and I go back through and wherever I think I need
17 new paragraph ought to start, I hit a return, and I end
18 up with something that's about this long, but you can
19 read it.
20   Q. It's ten lines down in subparagraph E.
21   A. Okay.
22   Q. And I'm not going to read -- it's a long
23 paragraph and this is a long sentence. I'll ask you to
24 read that sentence and then answer my question, which
25 is whether this sentence is stating that Reynolds

Brockman
CDK Global & Reynolds and Reynolds                                    9/19/2019

---

150

1     agrees not to use hostile integrators to get onto the
2     CDK system.
3         A. Yes, I see and understand that provision.
4         Q. Is my statement correct that that provision
5     prohibits Reynolds from hostilely integrating onto the
6     CDK system?
7         A. Yes, that's correct.
8         Q. Let me ask you to take a look at the second
9     exhibit in our series of three exhibits. It's CX 4153.
10    This is the Reynolds Interface Agreement. I'm going to
11    direct your attention to two provisions starting with
12    definition 1.8 on CX 4153-002, Non-Approved Access. Do
13    you see that definition?
14        A. Yes.
15        Q. And is that definition a provision that is
16    relevant to CDK getting direct or indirect access onto
17    the Reynolds system for applications?
18        A. (Reviewing document.)
19        Q. Mr. Brockman, let me ask you to take a look at
20    CX 4153-006. The very first provision on that page is
21    paragraph 2.5.3, Compliance With Certification.
22        A. I'm sorry, I'm a little bit lost. Could you
23    repeat the directions again.
24        Q. No problem. CX 4153-006, at the very top of
25    that page, the first provision, 2.5.3.

---

151

1         A. Okay, I have got 2.5.3.
2         Q. Compliance With Certification.
3         A. Yes, I see that.
4         Q. Okay. I'm looking at the second clause of the
5     first sentence, "CDK acknowledges that any non-approved
6     access and/or non-approved use is strictly prohibited
7     and is considered a material breach of this RCI
8     agreement." Is this a prohibition on CDK using hostile
9     integration to get onto the Reynolds system?
10        A. That's correct. It's an anti-hacking
11    provision.
12        Q. Let me ask you to turn to our third agreement,
13    CX 4045, the Data Exchange Agreement. I'm going to ask
14    you -- you can take a look at any part of the agreement
15    you care to. I'm going to ask you questions about
16    paragraph 4.5, which begins on the very bottom of
17    CX 4045-004.
18        A. Okay. I'm on the page 4 of 13.
19        Q. Yes.
20        A. Okay.
21        Q. It's paragraph 4.5. It begins at the very
22    bottom of that page, Prohibition on Knowledge Transfer
23    and DMS Access.
24        A. Yes, I see and understand that.
25        Q. What is this paragraph intended to apply to?

---

152

1         A. What it is, it is an anti-hacking provision.
2     And it's pointed not at CDK, but at anybody that CDK
3     might help or share information with. That's my
4     understanding.
5         Q. So when you say it's anti-hacking, what is
6     the -- what was the fear that was being covered by this
7     paragraph?
8         A. Well, what's happening in general with all
9     these agreements is that Reynolds and CDK have agreed
10    to provide RCI interfaces to each other under standard
11    terms and conditions. And what this specific provision
12    is all about is that not only do we agree not to hack
13    each other, to only use authorized interfaces, but to
14    not help or assist or teach anybody else how to hack
15    into CDK's systems or Reynolds' systems. That's the
16    whole thrust.
17        Q. So at this point does this paragraph, since it
18    applies to CDK and Reynolds, is this an indication to
19    you that CDK has moved away from its laissez-faire
20    attitude and is now concerned about hackers getting
21    into their system?
22        A. I hadn't thought about it in that light, but
23    yeah, I believe that you could see it that way.
24        Q. Let me ask you to look at paragraph
25    CX 4045-003, and I'm looking at paragraph 4.2,

---

153

1     Third-Party Communications. And my only purpose in
2     showing you this paragraph -- let me let you read the
3     paragraph. Then I'll propound my question.
4         A. 4.2 is the one being referred to?
5         Q. Yes.
6         A. Yes.
7         Q. We had spoken earlier about a provision that
8     the parties entered into where they would each have to
9     seek approval and gain approval from the other firm in
10    order to issue press releases. And I just thought I
11    would show this to you, since we hadn't had the
12    document in front of us at the time we were talking
13    about, and ask you whether this is the provision that
14    you understood me to be asking about when I asked you
15    about whether the agreement contained such a provision.
16        A. I'm afraid I'm a little lost. Could you
17    reiterate?
18        Q. Could you look at 4.2, the last sentence. It's
19    a sentence that runs onto the next page, and it begins
20    three lines up from the bottom of the page. And it
21    begins, "Prior to the dissemination of any written
22    press releases or market communications by either
23    party". And I'm going to skip over to the end of the
24    provision on the very top of 4045-004, "such press
25    releases or market communications shall be tendered to

---

11 (Pages 150 to 153)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

154

1  the other party for its review and approval."
2      A. Yes, I see that.
3      Q. Are you familiar with it?
4      A. Frankly, not. These documents, I was not
5  involved at all in their preparation. I authorized
6  them to be done so that the project could be finished
7  and that we could get CDK to stop hacking into our
8  systems. But as far as the content and the details
9  inside these contracts, I was not personally familiar
10  with -- I was not involved at all in the drafting, and
11  therefore, I can't claim or disclaim knowledge about
12  any particular piece. They got the job done. The
13  mission was accomplished. And I look back on it as a
14  successful effort.
15      Q. You know, just sitting back and not, you know,
16  staring at this document, did you have an
17  understanding -- this was signed in February of 2018.
18  So did you have an understanding in the February of
19  2015 time period that you had an agreement with CDK
20  whereby you would both have to review, say, a press
21  release before you put it out talking about the
22  agreements that you had entered into?
23      A. Frankly, I was not thinking very much about
24  that at all. I had moved on mentally from this project
25  at the time these documents were drafted.

155

1      Q. Were there any press releases that Reynolds
2  sent out about these agreements?
3      A. I'm sorry, I don't have any knowledge in that
4  regard. We may or may not have. I don't know.
5      Q. And the same question for CDK. Did CDK send
6  out any press releases about the agreements?
7      A. I'm sorry, I don't know.
8      Q. Did you come to have an understanding during
9  the time period leading up to these agreements whether
10  CDK had a message that they wanted to communicate to
11  the market about these agreements?
12      A. I'm sorry, I have no perception of even
13  thinking about that. I was on to the next project.
14      Q. Did you ever become aware of any exchanges of
15  documents between Reynolds and CDK exploring whether to
16  send communications to the Reynolds sales force?
17      A. I'm sorry, I'm not aware of any such thing.
18  Again, I was not active in this process. I had already
19  moved on.
20      (A recess was taken.)
21      BY MR. ABRAHAMSEN:
22      Q. I would like to show -- Mr. Brockman, I would
23  like to show you what we've marked as CX 4176 and ask
24  you to take a look at it. It's a new exhibit. CX 4176
25  has Bates REYCID0046837. I would ask you to take a

156

1  look at it. CX 4176 is an e-mail from Mr. Thornhill to
2  Mr. Schaefer and Mr. Martin dated February 26, 2015.
3  It's an e-mail with an attachment.
4      A. Yes.
5      Q. CX 4176 is entitled -- well, the subject matter
6  of the cover e-mail, I should say, is Revised
7  One-Pager - CDK. Were you familiar with the drafting
8  of this document?
9      A. Not at all.
10      Q. Have you seen this document before?
11      A. Frankly, not. I don't believe I have.
12      Q. Putting aside the actual physical document
13  itself, were you aware of any undertakings at Reynolds
14  to draft up a document to -- so people could
15  communicate to various audiences what the CDK/Reynolds
16  agreement contained?
17      A. I don't believe that I was. Again, this is now
18  substantially after the whole project got done
19  contractually, and I'm even further away from what's
20  happening in this area. All I know is that the general
21  reports are, yep, it's working; yep, CDK is doing what
22  they promised they would do. And therefore, not a
23  problem. I'm on to the next subject.
24      Q. I appreciate that, and I'm just going to use
25  the document sort of as a way to ask you questions, but

157

1  I'm appreciative of the fact that you haven't seen it.
2  You are not familiar with it. And I understand your
3  explanation and I will try not to belabor this line of
4  questioning, but I would like to ask you a couple
5  questions based on the document even though you are not
6  familiar with it.
7      A. Sure.
8      Q. I would ask you to turn to CX 4176-004. And
9  the first box on the page has in the far right-hand
10  column Scenario: Media outlets find out about the
11  CDK/Reynolds agreement.
12      A. Yes.
13      Q. To your knowledge, were the agreements ever the
14  subject of a media inquiry?
15      A. I don't recall specifically other than I think
16  that there was something. But exactly how big it was
17  and what all it contained, I don't remember if I ever
18  saw it.
19      Q. Were you asked to give a statement to the
20  media?
21      A. No.
22      Q. The response as indicated in this same box is
23  that ensure CDK and Reynolds market message align. Do
24  you know what that's a reference to?
25      A. Other than what it says in that sentence, no.

158

1  It says what it says. I agree that what it says was
2  appropriate, but I had no more specific knowledge about
3  it.
4      Q. Did you ever have any communications in this
5  February 2015 time period with anyone at CDK about
6  aligning the market messaging?
7      A. I don't believe so.
8      Q. Did you have any discussions with anyone at
9  Reynolds about ensuring that the CDK and Reynolds
10  market message aligned?
11     A. No, not that I recall. And I'm sorry, but
12  February 15th was -- February three years ago or four
13  years ago was a hundred years ago as far as I'm
14  concerned.
15     Q. The next bullet down says, "Access to DMS by
16  dealers' DMS provider only." Do you know what that's a
17  reference to?
18     A. Okay, this is the second block down?
19     Q. The first block, second bullet down under
20  Response.
21     A. Okay. Yes, I see that.
22     Q. Is that a reference to the Reynolds position
23  that only people who have an RCI agreement are allowed
24  to access the Reynolds DMS?
25     A. That's correct. That's in line with our

159

1  long-standing policy.
2      Q. Was it your understanding that the position at
3  Reynolds was that if the media were to contact you,
4  that they would ensure that CDK and Reynolds were
5  aligned on that market message?
6      A. Again, I'm not clear exactly who was doing what
7  here. I don't disagree with what was being done, but
8  it was, as far as I was concerned, it was
9  administration-type kind of issues about a project that
10  had already been done.
11     Q. This document is dated February 26, 2015. My
12  understanding is that the contracts were signed on
13  February 18, 2015. So this document is eight days
14  after the contracts were signed. But I wanted to ask
15  you, you said that you had kind of finished with this
16  project earlier. Give me your best estimation of how
17  much earlier before this February 2015 time period
18  where you would consider yourself engaged in the
19  negotiation of these contracts?
20     A. Unfortunately, I don't have a timeline of what
21  happened when, but I believe that I was detaching as
22  the final agreements were being drafted because the
23  reports I got back from principally Bob Schaefer was
24  all was in order, things were proceeding according to
25  our expectations, and that my input was not necessary

160

1  anymore.
2      Q. We looked earlier today at an e-mail exchange
3  you had with Mr. Anenen which was sort of, I believe,
4  in late June, early July of 2014. So with that as a
5  milepost and February of 2015 when the agreements were
6  signed, can you give me any idea of where in that time
7  period you became less engaged in the actual
8  negotiations of the contracts?
9      A. I would say probably -- I would have periodic,
10  not scheduled discussions with Bob Schaefer about
11  what's going on. And one of my questions would be were
12  the contract negotiations reaching final stages. So it
13  would be whenever that was happening date-wise. That
14  would be when I was beginning to detach and move on to
15  the next project.
16     Q. In terms of details about drafting the
17  contracts, what issues were you engaged on in that time
18  period after the July -- e-mails in July and the
19  signing of the contract? Were there issues that came
20  to your attention that needed to be resolved?
21     A. Not that I recall.
22     Q. Where is your office located?
23     A. I live at home.
24     Q. I live at home too.
25     A. To describe how my life works is I get up in

161

1  the morning and I have a big blue bathrobe, terrycloth.
2  I take the dog out for a walk. I get a cup of coffee
3  and some toast, I sit at my desk and the day commences.
4  Much to my wife's unhappiness, many times noontime
5  comes and I'm still in the terrycloth bathrobe.
6      Q. You'll be surprised to learn that was not
7  exactly the information I was driving at, but I
8  appreciate your answer. My next question was going to
9  be whether you worked in physical proximity with
10  Mr. Schaefer. That was the question I was going to get
11  to.
12     A. He is in Dayton, Ohio. I'm in Houston. We
13  communicate typically by Skype when necessary. But he
14  is a very experienced person, been around a long time,
15  knows the waterfront, if you will. So I don't have
16  extensive communications with him. From an
17  organizational standpoint, I have 16 direct reports,
18  which is not right, but it is.
19     Q. Is Mr. Schaefer a direct report?
20     A. Yes.
21     Q. So we obviously know from reading the documents
22  that you do use e-mail to communicate with Mr. Schaefer
23  and many other people. And you said you use Skype.
24  Any other forms of communication with Mr. Schaefer?
25     A. Occasionally there will be a telephone call

13 (Pages 158 to 161)

Case 1:21-cv-00360-DCN Document 24-7 Filed 02/11/26 Page 15 of 32
Case 1:21-cv-00360-DCN Document 126-7 Filed 02/11/26 Page 15 of 89748
Brockman
CDK Global & Reynolds and Reynolds                                      9/19/2019

162

1   when he's not in a place where he can access Skype.
2       Q. So during this time period when the contracts
3   were being negotiated and so on, give me an estimate of
4   how frequently you are in contact with Mr. Schaefer
5   with regard to these contracts. And I'm sure it
6   varied, but just give me an estimate.
7       A. Probably at that stage I would have been in
8   contact with him once a week, once every ten days, two
9   weeks.
10      Q. Let me ask you to refer back to the exhibit in
11  front of you, CX 4176, and ask you to take a look at
12  the first box on the top of CX 4176-005.
13      A. This is the top box?
14      Q. Yes, sir.
15      A. Yes.
16      Q. My first question is under Scenario, it says,
17  "New third-party vendor contacts CDK." How are
18  third-party vendors dealt with in the contracts we
19  looked at earlier?
20      A. Again, this was the orderly stand down period,
21  and as I recall, they got an announcement from CDK or
22  actually from DMI that they were no longer going to be
23  offering their Reynolds and Reynolds hacking services
24  and that they directed them on to us to talk about what
25  they needed to have done.

163

1       And I think it's important to point out that in
2   many or most cases, batch-type kind of data can be
3   handled by the dealer. They can run reports. They can
4   point those reports out to a PC and they can transmit
5   them into their third party, and they get all the data
6   and it works just fine. The issue is that somebody has
7   got to remember to do it every day. It's not one of
8   these things where you can just kind of set your watch
9   and everything is going to happen hands-off.
10      And I would think some fair number of third
11  parties were really pretty small and they really could
12  get at what they wanted as far as getting dealership
13  data by having to dealer send it to them.
14      Q. Right. My understanding is that for existing
15  DMI clients, they would have the choice -- once the
16  contracts were signed, they would have the choice of
17  either going into the RCI program if they wanted to
18  continue to get automated, the data in an automated
19  fashion. Or if they did not want to go to RCI, they
20  could manually send the data. Is my understanding
21  accurate?
22      A. That's correct.
23      Q. And my understanding is that some chose to go
24  into RCI and others chose not to go into RCI. Is that
25  your understanding?

164

1       A. That is correct.
2       Q. Do you have any idea magnitude-wise how many
3   chose to go into RCI rather than not go into RCI?
4       A. I don't have good information on that, but I do
5   know that it was some number. It was not just one or
6   two.
7       Q. I'm sorry, some number that did what?
8       A. Some number that actually elected to start
9   having their dealership customers print reports and
10  transmit them to the third party as opposed to being on
11  RCI.
12      Q. CX 4176-005 talks about a scenario where
13  there's a new third-party vendor that contacts CDK. I
14  interpreted that as a new third-party vendor being a
15  vendor that hadn't already been subject -- had not
16  already been using DMI to integrate onto the Reynolds
17  system. Do you know whether the -- how the contracts
18  dealt with the situation where a brand new vendor would
19  go to CDK and ask for them to use their services?
20      A. I don't know how the contracts addressed that
21  or if they addressed that, but I think what's stated
22  here is what actually happened in that if some new
23  third party shows up and wants to access data in
24  Reynolds' DMS systems, what happened here was that if
25  they talked to CDK, CDK forwarded them on over to us.

165

1       Q. What was your interpretation of the reference
2   in the fourth bullet which says "CDK and Reynolds agree
3   on the benefits of the dealers' DMS vendor providing
4   data"?
5       A. Well, I think it is what it says it is, that
6   there are various advantages, one of which is that
7   using an automated fashion that all the data that's
8   supposed to be collected gets collected. Again, the
9   key to the dealership actually printing reports and
10  transmitting them to the third party, it requires
11  somebody that is diligent and will do it every day like
12  they are supposed to or every week or every month. And
13  one of the benefits of an RCI-type contract is that
14  personnel failure is removed from the equation.
15      Q. The third bullet down talks about DMI
16  continuing to provide data cleansing, standardization
17  and aggregation services. Is that a reference to DMI
18  providing a subset of services that do not include
19  actually entering into the DMS, what you have referred
20  to as hacking?
21      A. Yes, that's my understanding. And what they do
22  in those services I'm not aware of. That's not a
23  business that we pursued and therefore have had no
24  occasion to come to understand what's included. I
25  think probably one of the obvious ones is a process

14 (Pages 162 to 165)

166

1  they call de-duplication. You end up with duplicate
2  pieces of data. And they have to have some software, I
3  think in some cases probably fairly sophisticated
4  software, that detect the presence of dupes and
5  actually have confidence enough where they can actually
6  combine them where all that happens automatically.
7      **Q. And does the third bullet saying that DMI will**
8  **continue to provide those services read in conjunction**
9  **with the fourth bullet that CDK and Reynolds agree on**
10 **the benefits of the dealers' DMS vendor providing data,**
11 **the recitation of the fact that CDK will be moving away**
12 **from its laissez-faire approach to third-party**
13 **integration on its DMS?**
14     A. I'm afraid I'm missing the point.
15     MR. ABRAHAMSEN: Why don't you re-read the
16 question, and then I'll probably end up rephrasing it.
17     (The record was read as requested.)
18     THE WITNESS: Sitting here reading it today
19 after the fact, I agree that it could be understood
20 that way. However, this particular document, I didn't
21 draft it. So I'm unfamiliar with it. I haven't seen
22 it. I have seen it for the first time today.
23     BY MR. ABRAHAMSEN:
24     **Q. And I appreciate you hanging with me through**
25 **these questions and letting me use that as a crutch to**

167

1  **ask you questions. Let me ask you to take a look at**
2  **CX 4182. CX 4182 bears Bates REYCID0675485.**
3  **Mr. Brockman, have you seen the document before?**
4      A. I don't recall seeing this document ever
5  before.
6      **Q. It's entitled CDK Deal Information -**
7  **February 2015.**
8      **I would like you to turn to the third page of**
9  **the exhibit, which is CX 4182-003, and ask you to take**
10 **a look at the paragraphs -- there's two numbered**
11 **paragraphs under the heading that's underlined Key**
12 **Messages.**
13     A. Yes, I see those.
14     **Q. Then the first key message, I think we've**
15 **talked about the first sentence, "Reynolds has long led**
16 **the way in the battle on DMS security." When you talk**
17 **about DMS security, aside from keeping third party,**
18 **what you refer to as, hackers off the system, what**
19 **other security measures would you say Reynolds has led**
20 **the way on?**
21     A. Well, there's, for example, establishment of
22 user ID records inside the DMS system. One of the
23 things that we did that I have not heard anybody else
24 do it, since we also in most cases have the payroll
25 information, what we do is we look at the user ID, and

168

1  before we declare it a valid employee, we go check the
2  payroll file, which is kind of simple but you know,
3  certainly a reasonable thing to do from a security
4  standpoint. And again, nobody else has done that that
5  we know of.
6      **Q. Would that help detect whether there is a**
7  **third-party integrator getting a user ID and password**
8  **from the DMS?**
9      A. It would certainly detect them being provided a
10 user ID and password. There is -- I believe that
11 software also double checks that there is not two
12 people connected to a single user ID. And again, the
13 name and user ID has to be a name in the payroll file.
14     **Q. So if somebody like Mr. Batista was given a**
15 **user ID and a password by a dealer to run an app on**
16 **their dealership's DMS, you would use that -- that**
17 **software would allow you to detect that Brown Chevrolet**
18 **does not have a Phil Batista as an employee? Is that**
19 **how it works?**
20     A. Exactly.
21     **Q. Let me ask you to look at -- and I appreciate**
22 **I'm just using this document as a crutch to ask my**
23 **questions because I know you haven't seen it and you**
24 **didn't write it. CX 4182-003 Key Messages sentence**
25 **numbered paragraph 1, second sentence, and I'll read**

169

1  **it: "In doing so, other DMS providers are finally**
2  **acknowledging that the fastest and correct way to move**
3  **data between parties is to have the DMS push the data."**
4  **Is the phrase "have the DMS push the data" a reference**
5  **to what RCI does?**
6      A. Yes. RCI is typically, and it could be in all
7  cases, set up to actually wake up and perform program
8  instructions about what data to get, where to send it
9  to, from which dealership. And I think in some cases
10 even the hour of the day is specified in the RCI
11 program.
12     **Q. The first clause in this sentence says "In**
13 **doing so, other DMS providers are finally**
14 **acknowledging". What is the reference in your**
15 **interpretation of the other DMS providers?**
16     A. Other than what it says, other DMS providers.
17     **Q. In this February 2015 time period, obviously**
18 **you had -- we have been talking about CDK and its**
19 **position on data security. Were you aware of any DMS**
20 **provider other than CDK, perhaps, that was**
21 **acknowledging the safest way to move data is to**
22 **have the DMS push the data?**
23     A. That would be the only one that I would be
24 aware of. Quite likely, some of the more minor DMS
25 providers had also adopted it, but I'm not aware of

170

1    that.
2        Q. And the second numbered paragraph, the first
3    sentence states, "CDK is finally acknowledging that
4    they need to move forward with securing their DMS."
5    And "securing their DMS" is underlined. What is your
6    interpretation of that?
7        A. That's our belief, that what they are doing is
8    that they are migrating to what we have been doing all
9    along.
10       Q. What you had been doing all along with regard
11   to securing your DMS?
12       A. Yes.
13       Q. And would that include adopting a position
14   where they would not permit third-party integrators to
15   get onto their DMS?
16       A. Yes.
17       Q. The next paragraph down is entitled Important
18   to Note. It's underlined. I would ask you to read the
19   paragraph and then I'll ask my questions.
20       A. Yes.
21       Q. Let me give you my interpretation of what the
22   paragraph is saying and then you correct me if I have
23   misinterpreted it. It seems like now that the
24   contracts have been signed, CDK is going to provide
25   Reynolds with the identification of its clients that

171

1    its integrating onto the Reynolds system. And
2    following that, once Reynolds receives those and is
3    able to protect those, Reynolds is going to put out its
4    security update, a new security update; is that
5    correct?
6        A. Yes.
7        Q. And the second-to-last sentence ends with the
8    clause "meaning a number of users will be broken."
9    What is your interpretation of that?
10       A. Well, this goes back to the peaceful stand down
11   process. Prior to that we had notified CDK that we had
12   a number of security changes that we had been holding
13   off releasing, but if they didn't finally agree to get
14   out of our boxes, quit hacking us, we were going to
15   turn loose those security changes which were going to
16   make basically all of CDK inoperative as far as
17   extracting data out of Reynolds' machines.
18       Well, once the contract was done, the agreement
19   in the stand down was that it would be an orderly stand
20   down and there would be no stand downs that would cause
21   trouble, unhappiness on the part of dealers. Well, in
22   order to do that, we have to know who because we don't
23   know who all the ADP customers are. We don't know who
24   all their third parties are. So what we are talking
25   about here is that if we don't get the names, then

172

1    what's going to happen is as we finally turn loose this
2    next security update, there's going to be some people
3    that won't work.
4        And the fact that this even has to be said is
5    kind of amazing because it is so clear that if you are
6    not on the list, if we don't know that you are a CDK
7    customer, certainly they will get the full force of the
8    security changes that are impending.
9        Q. And then there's a reference in the next
10   sentence that we will know immediately whether these
11   parties are supposed to be broken or not. And I
12   interpret that to mean that you don't intend to disrupt
13   the CDK clients but that if somebody is using an
14   integrator that you are not protecting, they are
15   supposed to be blocked. Am I interpreting it
16   correctly?
17       A. Absolutely correct.
18       Q. So --
19       A. And we have no knowledge as to how many, who,
20   because an exploit that gets past or attempts to get
21   past a security change, there's no way for us to know
22   until we apply a security change and then somebody
23   hollers. That's when we know that there's somebody new
24   that we didn't know about before. And hopefully at
25   this point there should not have been very much of

173

1    that, but we don't know.
2        Q. Well, so what happened? At this point, as I
3    understand it, you have -- you are protecting some SIS
4    customers under their stand down, and you are
5    protecting the CDK customers under their stand down,
6    and then you put in the security change, as I
7    understand it. And so what happened? Were there
8    people who were disrupted?
9        A. The answer to that is I don't know of any. I
10   just don't know whether there were, whether there were
11   not. I do know that there was -- I don't recall any
12   serious commotions. Whatever it was, I don't think
13   there were very many.
14       Q. So did there come to your attention any angry
15   phone calls or letters or other forms of communication
16   from people that were being disrupted as a result of
17   your security enhancements after this March of 2015
18   time period?
19       A. Not that I'm aware. Of course, since then
20   what's happened has been relatively quiet. Not
21   completely, but relatively. Nothing major. But as
22   security changes go on, continue to get improved, I'm
23   sure that we'll find more. Where there is one hacker
24   there, there are ten more behind them.
25       Q. Just so the record is clear, I followed your

16 (Pages 170 to 173)

174

1    answer to the question.  The question was very broad,
2    so I'm going to break it down into two questions as
3    between app providers and OEMs just so the record is
4    clear about this.
5        Following this March 2015 time period, were you
6    contacted by any OEMs because they had had applications
7    that they wanted to use that were disrupted?
8        A.  Personally, I received no such contact.
9    Whether or not someone else in the organization did,
10   I'm not aware.  But I'm quite sure that I did not.
11       Q.  And with regard to app providers in this time
12   period following March of 2015, were you contacted by
13   any app providers with regard to anger over disruption
14   of their apps?
15       A.  Not me personally.
16       Q.  You mentioned in an earlier answer that, I
17   forget the exact phrase you used, but you noted that
18   CDK had had a number of CEOs or words to that effect.
19   We have been speaking today and yesterday about
20   Mr. Anenen.  Who are the other CEOs of CDK in addition
21   to Mr. Anenen that you are aware of?
22       A.  Mr. Anenen was the last true CEO because he is
23   like a 37-year veteran of the business and probably the
24   longest serving veteran CEO.  And probably I'm the only
25   one that has got more than he.  I have got 49 years.

175

1        But I can't recite the names to you.  The most
2    recent was a gentleman that was president of Intel.
3    And he was dismissed from Intel for an inappropriate
4    relationship.  And his new job is CEO of CDK.
5        And there were two others besides him prior.
6    And this is caused by the fact that CDK is controlled
7    by a group of hedge funds.  Hedge funds, it's my
8    understanding that they hold like 60 percent of the
9    stock of CDK.  And they are very impatient for
10   improvement in operations and the profits to be -- to
11   come about inside CDK.  So therefore, they appear to be
12   very quick on the trigger to turn over CEOs in seeking,
13   you know, improved stock valuations so they can
14   ultimately sell the stock that they hold today and make
15   a profit and get on to the next deal.  I'm sure it's
16   been disappointing to the hedge fund folks that it has
17   not already been able to occur.
18       And this is all a matter of public record and
19   probably is the only part of CDK that I pay attention
20   to.  I'm always curious as to who my counterpart is.
21       Q.  So we went through some -- we talked about some
22   conversations you had with Mr. Anenen.  Telephone
23   conversations, I believe.  Did you also meet with him
24   at NADA?
25       A.  Briefly.  NADA is, you shake hands with old

176

1    friends and old enemies, but there's no serious
2    conversation that takes place.  There's too much else
3    going on.
4        Q.  So you had serious conversations with
5    Mr. Anenen over the phone, the ones we spoke about?
6        A.  Yes.
7        Q.  And did you have any conversations with
8    Mr. Anenen after the contracts were signed that we
9    looked at?
10       A.  No.  As a matter of fact, the only interaction
11   I have had with him is at the big national auto dealers
12   association convention.  He was no longer with CDK, and
13   he stopped past just to say hello.  He's a nice guy.
14       Q.  To what extent have you had conversations with
15   the CEOs at CDK who have followed Mr. Anenen?
16       A.  None.
17       Q.  You have never spoken with them on the phone?
18       A.  No.  I don't exist as far as they are
19   concerned.  Yes.  And I have not -- I got other things
20   better to do than to seek out a conversation with them.
21       Q.  And just to make sure the record is clear on
22   this, have you had occasion to meet with them
23   informally at an industry conference?
24       A.  As far as I know, the answer is no.  However,
25   what happens is that at NADA people kind of travel in

177

1    packs of two, three, four, five, six, seven, eight, ten
2    people.  And they come by and I would not recognize
3    them by face.  And they don't announce themselves.
4    They don't have a sign on them that says I'm CEO of
5    CDK.  So I may possibly have seen some but not
6    understood who they were.
7        (A recess was taken.)
8        BY MR. ABRAHAMSEN:
9        Q.  Mr. Brockman, we were talking yesterday, I
10   believe it was, about how the OEMs need to certify a
11   DMS provider in order for the DMS provider to have
12   their franchise dealers as using the DMS.  Do you
13   recall that?
14       A.  Yes.
15       Q.  And we talked about decertification as
16   something that would be very, very bad for the DMS
17   provider if an OEM were to do that.
18       A.  Disastrous.
19       Q.  Short of decertification, is there other things
20   that OEMs can do to the DMS to sort of influence how a
21   DMS undertakes certain policies?
22       A.  Yes.  Probably one of the ones that we see the
23   most often is -- and we'll say that Ford Motor Company
24   has a new initiative regarding a service and how that's
25   handled from a computer standpoint.  And what they do

17 (Pages 174 to 177)

178

1   is, they kind of separate it into multiple pieces. And
2   there will be mostly old pieces but then some new
3   pieces. And let's say that the new piece is a new
4   interface where a dealership that uses the right DMS
5   with the right certifications, they can type in a
6   vehicle identification number and get an instant
7   readback of all the warranty claims that's been made on
8   that vehicle so that you can see if, say, for instance
9   another dealership fixed something under warranty, but
10  they really didn't fix it. So you have the right to
11  kick over to them and say, look, you guys fix it.
12          Well, if you are not on the good guy list as a
13  DMS provider, you may not get access to this special
14  new facility that Ford is making available, which is
15  very, very worthwhile and important to dealership
16  customers. So therefore, you are in the
17  never-neverland where you are not decertified, but
18  again you are not quite fully certified either. And
19  larger dealerships will be very, very sensitive to
20  this, which is we have a lot of customers in that
21  category.
22          And so it even comes down to dates of approval.
23  If we don't meet their schedule, their desired schedule
24  as far as the creation of the additional facilities
25  inside the factory communications, they'll say, okay,

179

1   you are late but we are still going to certify you, but
2   we are not going to give you that until next March.
3          That's dirty pool, but they are the guys. And
4   we end up having to work programmers nights and
5   weekends to meet their crazy schedule as far as when
6   something is supposed to be built, tested, implemented
7   in the field by their by-god date.
8          **Q. And I'm curious, you have mentioned several**
9   **times in the last two days that you contemplated**
10  **throwing the switch on CDK and blocking their apps,**
11  **shutting them down. Was there any concern that if,**
12  **say, you shut down CDK because you didn't have an**
13  **agreement with them and caused disruption to a lot of**
14  **dealers' use of CDK, the products that CDK was**
15  **integrating onto their DMSes, was there any fear that**
16  **OEMs would be angered by this also, the dealers would**
17  **complain to the OEMs and that the OEMs would take**
18  **actions adverse to Reynolds because of the blockage**
19  **that had taken place?**
20  A. That's always a possibility. But the hopes are
21  in any kind of situation such as we went through CDK
22  that cooler heads would prevail and a reasonable
23  situation would occur as opposed to a disastrous one.
24  And historically, that's always been the case. Now,
25  you can't say that's going to be that way on every

180

1   situation forever, but that's the opening expectation.
2          **Q. And in this particular instance, you did reach**
3   **an agreement with CDK, and the anger that would have**
4   **been directed to the OEMs was avoided, presumably?**
5   A. Correct.
6          **Q. Let me ask you to take a look at an Exhibit**
7   **CX 4038. CX 4038 has Bates REYCID0577749. It's an**
8   **e-mail with three pages of attachments. The subject**
9   **line is 6240's.**
10  A. Well, I conclude that we've got a senior vice
11  president of sales that writes pretty good.
12          **Q. What do you conclude that based on?**
13  A. Well, short paragraphs, to begin with.
14          **Q. You said vice president of sales, and you are**
15  **referring to Keith Hill; is that correct?**
16  A. Yes, that's correct.
17          **Q. Have you seen this document before?**
18  A. No, I have not.
19          **Q. With your indulgence, I'm going to still use as**
20  **an effort to ask you to interpret certain things in it.**
21  **In his cover e-mail, he talks about some of the**
22  **subjects we have been talking about in the last two**
23  **days, data security, and he uses the phrase in the**
24  **sentence "unattended automated access."**
25  A. Yes.

181

1          **Q. How do you interpret that?**
2   A. Well, there the dividing characteristic is
3   unattended. And the reason for that is and that's my
4   interpretation from a liability standpoint is that if a
5   dealer runs a report and then turns around and e-mails
6   that to a third party, that's perfectly within his
7   rights to do that, and there's nothing incorrect about
8   that. But it also means that if something goes wrong
9   from a data breach standpoint, it's his problem. It's
10  not our problem.
11          So the unattended access just crosses the line
12  to what happens over and over again, and that's an
13  unattended report will be set up and it will run, and
14  it will run faithfully every day, every week, every
15  month, and nobody knows it's running. The actual
16  running of an unattended batch job creating a data set
17  that would be used outside the dealership, there's no
18  scream of flashing lights that says we are now
19  currently extracting payroll data.
20          But the point is that if the dealer decides to
21  extract data out of his system and then put it in his
22  PC and transmit it to somebody, that's his problem.
23  When it's automatic and we allow that to occur, all of
24  a sudden we start getting our hands in the liability
25  grease.

18 (Pages 178 to 181)

182

1    Q. So firms like DMI, IntegraLink, they were doing
2  unattended automated access to Reynolds' DMSes?
3    A. Correct.
4    Q. Is there -- I'm just trying to figure out in my
5  mind whether unattended and automated are redundant.
6  Can there be automated access to a DMS that doesn't
7  inflict liability on Reynolds?
8    A. The only one that I can conceive of -- and this
9  is a theoretical answer. I don't know that it exists
10 in real life would be vehicle data used to populate
11 websites, because vehicle data we perceive to be --
12 since it's available on every dealership's website to
13 begin with, this is basically public data, and
14 therefore -- but also it changes all the time. So
15 therefore, an automated unattended process for
16 consolidating and transmitting vehicle inventory data,
17 there is no liability associated with that. But
18 anything that has name, rank, serial number, you know,
19 personal information, PII or NPPI, that has tremendous
20 liabilities associated with that, the likes of which we
21 have not begun to see.
22   Q. To your knowledge, did Reynolds send out
23 talking points to the sales staff so that they would be
24 able to address the security issues after contracts
25 were signed?

183

1    A. I think that's what this document is all about.
2    Q. Were you aware at the time -- this is sort of
3  the March 2015 time period. Were you aware that these
4  instructions were being sent out to the sales staff?
5    A. No. And I would have no occasion to be aware,
6  because Keith Hill is a senior VP of sales. He is an
7  interesting person in that he was a mathematician, a
8  math major in college, but he also was a high school
9  football coach. And so you have the personnel planning
10 capability he has because, of course, high school
11 football is all about that, deciding, you know, who can
12 start, who can play, who does what position, who gets
13 benched because of being unmannerly with a mathematics
14 background which means that he understands computer
15 systems. While he's not a software person, he
16 understands from a principle standpoint how the guts of
17 the things are supposed to work.
18   Q. Is he a direct report to you?
19   A. Yes. And I might add a very capable direct
20 report. As a result, I don't spend a lot of time with
21 him. My theory as far as personnel management is
22 concerned is when they can do as good as I can do it, I
23 need to let them do it.
24   Q. Let me ask you to flip to the second page of
25 the exhibit, CX 4038-002. And there's a series of hash

184

1  marks, and the last hash mark talks about DMI and
2  IntegraLink, and the last sentence of that hash mark
3  says, "They now see the risk inherent in facilitating
4  unattended automated data extraction." Do you
5  interpret that as the risk inherent in the data being
6  extracted and then getting into the wrong hands?
7    A. Yes.
8    Q. The bullet above that says "CDK and Reynolds
9  have partnered together to push data securely. Thus,
10 85 percent of the market is now in agreement with our
11 stance." What do you interpret that to mean?
12   A. Well, I interpret that to mean that as
13 knowledge of the availability of the 3PA program has
14 now become pretty widespread, and it's now obvious that
15 CDK has changed their feeling as far as data security
16 is concerned to no longer be laissez-faire but to
17 actually have a more secure policy.
18   Q. Do you interpret that to extend to both CDK
19 agreeing to use RCI for its apps and also to restrict
20 third-party integration on its own system?
21   A. I'm not focusing on what they do as far as
22 their own system is concerned, but the fact that they
23 understand our position and they are not going to try
24 and hack us.
25   Q. Let me ask you to take a look at Exhibit

185

1  CX 4459. CX 4459 bears Bates REYCID0186574. This is
2  an e-mail dated November 21, 2016 from Tommy Barras to
3  Mr. Schaefer and Mr. Brockman. Who is Mr. Barras?
4    A. He is an executive VP of software development.
5    Q. Is he a direct report to you?
6    A. Yes.
7    Q. Did he -- was he working at Reynolds when UCS
8  acquired Reynolds?
9    A. No. He is originally a UCSer. He and I have
10 worked together probably 48, 49 years.
11   Q. And he's been doing software development with
12 you in that whole time period?
13   A. Yes.
14   Q. In the body of his e-mail to you at the top of
15 the first page of CX 4459, the first word in the
16 sentence is S-Y-S-C-H-E-C-K. What is that?
17   A. Syscheck. I hope you'll bear with me because
18 some of the explanation of necessity has got to be a
19 little technical. The operating system that the DMS is
20 built around is what's called a multi-user operating
21 system. And what that means is that if you have a
22 system that has 100 PCs attached to it, each one of
23 those is a separate user as far as the operating system
24 is concerned. And the operating system, to the extent
25 that it is set up that way, can handle 100 different

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

186

1  users pretty much simultaneously. Well, they are not
2  exactly simultaneously. They are kind of close. Every
3  minute of computer power that's available, it's used by
4  many different users of the 100 that are out there.
5      Now, that's really pretty cool except for the
6  fact that people like in the accounting department that
7  have big end-of-month reports they have to create,
8  batch reports are very different in their usage
9  characteristics. If you have a terminal-based
10 application, somebody that uses a terminal and then
11 they won't, and that frees up computer power for all of
12 the rest of the folks. Even if you have five or six
13 people, they are not -- each one of them isn't getting
14 that big a bite of computer power.
15     But in the accounting world, we have big batch
16 programs that run at the end of the month. Think of it
17 like a machine gun. They just load in this infinite
18 supply of ammunition and they take the trigger down and
19 it just goes with no break. And what that does is you
20 can actually -- not theoretically, but it actually
21 happens in practice where the accounting department
22 with six or seven users can suck up all the computer
23 power, which means people that run terminal
24 applications like parts invoices or service repair
25 orders or service invoices, they have to wait.

187

1      And this is a logic issue that is a little hard
2  to get around, but we devised Syscheck. And what
3  happens is Syscheck is a dipstick into the computer
4  usage, and it knows -- you can dipstick and say, okay,
5  it's 85 percent consumed or 90 percent or 50 percent,
6  but when it gets up fairly high, and I would say
7  probably 85 or 90, it's smart enough that it suspends
8  the batch programs and lets the other 90 users in the
9  pile, it will get their answers quickly. Because the
10 transaction base, what you hate is when you enter a
11 bunch of data entry, hit the button and then you got to
12 wait.
13     And of course, what that then leads to is users
14 accuse the DMS provider of a defective system, you are
15 forcing us to buy a bigger computer. And our only
16 defense now, which is a pretty good defense, we turn on
17 Syscheck and people that are wanting to do something,
18 if the computer system is overloaded, they get a
19 message on their screen that says, I'm sorry, the
20 accounting department is doing you in. Anyway, that's
21 what Syscheck is all about.
22     Q.  So what is the reference in that same sentence
23 to the AUR exemption?
24     A.  That one I'm having a little difficulty with
25 what AUR is. I think it had something to do with where

188

1  we basically shut down batch reports that are consuming
2  computer time with the indication that if we want to
3  run this thing, you've got to do it at night.
4      Now, interestingly enough, all this sometimes
5  results in a power play between departments in that the
6  accounting folks will raise up and beat their chests
7  and say you guys don't let us run our reports all day
8  whenever we want to run, tough luck if payroll doesn't
9  get run on time. And everybody gets all shaky about
10 that. But that's the wrong answer.
11     The right answer is that the transaction-based
12 customers need to have as close as we can get to
13 instant response time because those people are
14 profit-producing people. The dealership, finance
15 managers, service managers, they need to have the
16 capability to get their work done. And the accounting
17 folks need to wait. And I don't publicize my feelings
18 on that widely, but I mean, that's the truth.
19     (A recess was taken.)
20     BY MR. ABRAHAMSEN:
21     Q.  Let me show you an exhibit we've marked as
22 CX 4420 and ask you to take a look at it. CX 4420 has
23 Bates REYCID0186518. The exhibit is an e-mail from
24 Mr. Schaefer to Mr. Brockman in November 2016. And the
25 subject of the document is Stone Eagle Request For

189

1  Changes. Mr. Brockman, who is Stone Eagle?
2      A.  Stone Eagle is a third party that specializes
3  in analysis of vehicle sales and more especially
4  vehicle financing and aftermarket sales. And they get
5  information on car sales, quote, deals. A deal is what
6  we -- a term we use to apply to the facts of the whole
7  transaction and the paperwork. The whole transaction,
8  which is kept in a file folder. And that's what Stone
9  Eagle wants from us in terms of interface that they
10 want all the finance deals for a month. And then they
11 go run all their analysis programs and create nice bar
12 charts and graphs and that sort of thing so that the
13 dealership will understand how well they are doing in
14 that area. And specifically, they'll understand by
15 person, by finance manager who is doing what as opposed
16 to looking at the overall department and saying, yes,
17 it's good or bad or whatever. It's specific
18 individuals.
19     Q.  In the e-mail that's in the middle of the first
20 page of this exhibit, there's an e-mail from
21 Mr. Schaefer to you dated March 15, 2016, and the first
22 sentence of the e-mail says, "Stone Eagle executes this
23 process today using their interface." What interface
24 is being referred to in that sentence?
25     A.  Stone Eagle has been a customer that's like an

190

1    RCI customer, but it predates that. They are a very
2    mature company. They have been around a long time.
3    And what's happening here is that we are saying, look,
4    you got to go forward to the RCI process. They don't
5    particularly want to do that because it involves them
6    getting involved with programming, creating a new
7    interface from the data that they want. Their old
8    stuff, as far as they are concerned, works perfectly
9    fine. But we've said that the old process is dying.
10   You got to go to the standard process. And they are
11   dragging their feet, frankly. As a matter of fact,
12   they were the worst that exhibited dragging their feet.
13   They didn't say no. They just couldn't get it done.
14   We talked to them and they would give us a new
15   anticipated deadline, and we would go away and come
16   back when they missed the deadline. And that had been
17   going on for literally a couple of years. Other than
18   that, they are nice people. They pay their bills.
19   They are not complainers.
20        And in this particular situation, they figured
21   out that the RCI interface that we had prepared for
22   them, they had left out the issue where there is a deal
23   done on paperwork and electronically, but it got
24   unwound. In other words, it never actually happened,
25   yet the data was all recorded. And as far as the data

191

1    pull that was happening here, we looked like everything
2    was just fine, but it turns out, out of the month there
3    were six deals that didn't happen, which impact the
4    numbers on the reports.
5         And so we've got to do -- this one is called
6    Deal Reversal Notification. And it was one more thing
7    we had to do before we could finally get them to move
8    forward and completely get off the old interface and
9    get onto RCI.
10   **Q. In the footnote -- or I shouldn't say in the**
11   **footnote. There's a sentence in the e-mail in the**
12   **middle of the first page of CX 4420 that says, "As a**
13   **footnote, we've received the latest enhancements for**
14   **Stone Eagle that allow us to replace the Stone Eagle**
15   **hostile interface." In what way was Stone Eagle a**
16   **hostile interface?**
17       A. That is a misnomer. It's not a hostile
18   interface. It's like a hostile interface because its
19   bandit is different, but it was not hostile in the fact
20   that we definitely knew about it and condoned it,
21   probably were even selling it as a service and charged
22   them for it. But again, it was an obsolete interface.
23   It was less secure, and we wanted to move to RCI.
24   **Q. How was it less secure?**
25       A. I don't know the details. I just know that it

192

1    was -- we were concerned that it was an oddball.
2    Whenever things are oddball, nothing good comes out of
3    that.
4    **Q. Let me ask you to take a look at CX 4463.**
5    **CX 4463 has Bates REYCID0265394. It's an e-mail dated**
6    **August 1, 2017 from Mr. Barras to Mr. Brockman on the**
7    **top. And it's a series of e-mails that follow.**
8        A. Yes.
9    **Q. Mr. Brockman, in the first e-mail in the**
10   **exhibit, the top one -- the top one on the first page**
11   **of CX 4463, the second paragraph states, "Stone Eagle**
12   **exemptions go beyond Hendrick. Third party has 100**
13   **exemptions into our ERA systems." What exemptions are**
14   **being discussed here?**
15       A. What's happening here is that the Stone Eagle
16   interface process has been around for a long time. It
17   probably dates before my time at Reynolds. And where
18   they have a bypass around the security changes, and
19   this is not desirable. It's a hangover. It's a
20   cleanup. And what's happening is Tommy Barras is
21   telling me, look, it's worse than just the current
22   Stone Eagle stuff. There's a bunch of others with
23   exceptions laying around out there.
24        At this point we are getting more focused on --
25   we actually have reports now that list every kind of

193

1    exception that's in place. And we give these
2    exceptions or are really forced to give them from major
3    customers. For instance, here they are talking about
4    Heritage is a very big customer, Crain, DARCARS is
5    right here in D.C., and evidently we have some manner
6    of exception for those folks where they are not on RCI.
7    They are on something else that predates RCI.
8         This is another example of the situation where
9    we have power to block things, but there's also a cost.
10   The cost is customer relations with major accounts.
11   **Q. Right. I mean, if you block them, they would**
12   **possibly move to a different DMS system?**
13       A. The noise would precede anything like that.
14   **Q. What noise?**
15       A. The customer just calling up and wearing
16   everybody out.
17   **Q. In the second sentence of the e-mail on the**
18   **very top of the first page of the exhibit, it says,**
19   **DSV, I think it's supposed to be "has" been talking**
20   **about moving for years now. No end in sight. What's**
21   **DSV?**
22       A. Data services, I believe, is what that stands
23   for.
24   **Q. So this is a department within Reynolds?**
25       A. Yeah, that reports to Bob Schaefer. And what's

21 (Pages 190 to 193)

194

1  happening is, and as Mr. Barras is being very pointed
2  in his needling over the situation and quite properly
3  so, the amount of things that we've had to clean up
4  inside Reynolds has been huge. And we've aggressively
5  worked at that, but it's still not done yet.
6       BY MR. LANNING:
7       Q. Mr. Brockman, talking about this idea of
8  exemptions, were you in the habit or in the practice at
9  Reynolds to give exemptions to certain customers that
10 were using what you call hackers?
11      A. Yes. And these would be large customers.
12 Frankly, in a lot of cases pretty sophisticated folks.
13      Q. Like Hendrick?
14      A. Like Hendrick and Penske, you know, very, very
15 large folks that have quite capable IT staffs on their
16 own separate from the work we do for them.
17      These are not lightly handed out. I mean,
18 particularly for an exemption for a very big customer,
19 they got to come to me and I got to weigh the sales
20 issues. In accounts like this, there's some folks that
21 are just kind of obstinate, and other folks, their
22 excuse is, well, they are really busy. And there's
23 other folks that are the delay kind of folks: Well,
24 yeah, we'll do that but we're really busy right now.
25 We'll talk about it next summer and get it done that we

195

1  constantly have to follow up on. Now we actually
2  review our lists of exemptions now, which makes it a
3  lot easier. Before we had to do a lot of legwork to
4  figure out who was doing what.
5       Q. So in essence, you're saying that for the large
6  customers that might have those types of exemptions,
7  they have to be approved by you?
8       A. Yeah. And the number is steadily falling,
9  especially now that we've got a list.
10      Q. Would Mr. Schaefer make recommendations to you
11 about whether or not an exemption for a large customer
12 should be given?
13      A. Yes. I wouldn't necessarily follow that up. I
14 would talk to Keith Hill.
15      Q. I'm going to just ask you to go back to
16 CX 4037.
17      MR. COHEN: Bill, could you just tell me what
18 that was or where it was.
19      MR. LANNING: That's the September 11, 2014
20 from Robert Schaefer to Bob. It's the one-pager.
21      MR. COHEN: Okay. Do you know how long ago you
22 guys used it?
23      MR. LANNING: It was this morning.
24      MR. COHEN: Thank you.
25      BY MR. LANNING:

196

1       Q. Mr. Brockman, I would like to direct your
2  attention to something we were talking about earlier
3  today, which is if you go down near the bottom of the
4  page where the little letter C is and it says,
5  "Communication plan and marketing announcement" under
6  number 4, do you see that?
7       A. Yes.
8       Q. And I believe when we talked about this earlier
9  today, we were talking about the sentence that says,
10 "How will the agreement be announced to the market --
11 they need to get this identified and understood quickly
12 due to the CDK global announcement."
13      A. Yes.
14      Q. Do you see that?
15      A. Um-hum.
16      Q. I believe it was your testimony, of course we
17 can go back and read it, but you were saying that this
18 was CDK's issue about the marketing and the
19 communication; is that correct?
20      A. Yes.
21      Q. And my question to you, then, is what was CDK's
22 concern about getting an agreement where you were going
23 to either manage jointly a communication to the
24 marketplace or that you were going to at least review
25 this?

197

1       A. Well, I think the issue is that they wanted to
2  do what they wanted to do. They would much prefer to
3  actually have us agree to what they wanted to do, but I
4  believe in the end we did not agree. In this case
5  here, they went ahead and did it or were going to do it
6  anyway.
7       Q. But was there an expression of what their
8  concern was about having this in relation to their
9  announcement of going public?
10      A. Not that I recall. There probably was, but I
11 wasn't sensitive enough to remember.
12      Q. And was it related in any way about a concern
13 that Reynolds might make an announcement about the
14 agreement that CDK didn't like?
15      A. Well, I think probably that was part of it
16 because if we made the announcement the way we would
17 like, it would be very, very damaging to them.
18 Truthful, but it would be damaging.
19      Q. What do you mean? What would this statement
20 say that might be truthful and damaging to them?
21      A. Well, the truthful statement would be that they
22 had been hacking into our systems for many years and
23 quite a large number of systems. And I'm sure that
24 would have caused telephones to ring at CDK with
25 customers calling, was I one of the ones, that sort of

22 (Pages 194 to 197)

198

1  thing.
2      Q. Was there also an element to it that Reynolds
3  might take the tack competitively that we were right
4  all along on security and now that you are joining us?
5      A. I don't know what they were thinking about, but
6  that's one of the things they could have been thinking
7  about.
8      Q. So did you discuss this with Mr. Schaefer?
9      A. Not that I recall.
10     Q. Was there any discussion that CDK did not in
11 advance of its going public want to announce that they
12 were changing their position on being open or closed?
13     A. Again, I'm not aware of anything like that.
14     Q. I have just two more questions on another
15 document, which is CX 4273.
16     MR. COHEN: Would you mind telling us what that
17 is again?
18     MR. LANNING: The SIS settlement.
19     BY MR. LANNING:
20     Q. Could you please turn to CX 4273-003 and go
21 down to V, section V or numeral 5 that starts with the
22 exception of the wind down period for SIS. Do you see
23 that?
24     A. Yes.
25     Q. I just had one question here. If you go to the

199

1  sentence that's about midway down, and it says, "For
2  the avoidance of doubt, the covenants set forth in this
3  paragraph 3(a)(v) are not intended as a covenant not to
4  compete." Do you see those?
5      A. Yes.
6      Q. I guess I'm curious, why was this put in the
7  SIS agreement?
8      A. Well, I would like to be helpful, but frankly,
9  I don't know because I wasn't part of the crafting of
10 these documents. And just looking at it today, it
11 looks to me like it was -- an attorney wanted to put in
12 some sort of blanket statement.
13     Q. Were you competing with SIS at this time?
14     A. SIS is a data extractor where they in bandit
15 mode go into a system. We don't do that. We've never
16 done that and therefore, we don't compete with them.
17 They have that market all to themselves.
18     Q. That's why I was curious about why the language
19 was in there. If you are not competing with them, why
20 are you concerned about it being construed as a
21 covenant not to compete?
22     A. I have no idea.
23     MR. LANNING: Thank you very much. That's it
24 for me.
25     MR. COHEN: Mr. Brockman, you do have a right

200

1  to clarify any testimony that you have given over the
2  past two days. Do you have any clarifications to make?
3      THE WITNESS: No.
4      MR. ABRAHAMSEN: Then we will adjourn today's
5  session. We will keep the record open. And everybody
6  can go to lunch.
7      (Whereupon, the proceedings at 1:08 p.m., were
8  adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

201

1              CERTIFICATE OF REPORTER
2
3
4      I, Deborah Wehr, do hereby certify that the
5  foregoing proceedings were taken by me in stenotype and
6  thereafter reduced to typewriting under my supervision;
7  that I am neither counsel for, related to, nor employed
8  by any of the parties to the action in which these
9  proceedings were taken; and further, that I am not a
10 relative or employee of any attorney or counsel
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of the action.
13
14
15
16
17          Deborah Wehr, RPR
18          Notary Public
19
20
21
22
23
24
25

**A**

**a.m** 110:19
**ability** 135:21
**able** 114:10 129:10
  171:3 175:17
  182:24
**above-entitled**
  110:17
**Abrahamsen** 111:4
  112:4 113:3,15
  116:8 124:4
  140:15,17,19
  144:23 145:4,25
  149:4 155:21
  166:15,23 177:8
  188:20 200:4
**absolute** 138:9
**absolutely** 123:6
  172:17
**access** 115:5 120:22
  122:7 141:12,13
  142:21,21 143:1
  143:17,20,23
  144:3 146:11,15
  150:12,16 151:6
  151:23 158:15,24
  162:1 164:23
  178:13 180:24
  181:11 182:2,6
**accessing** 115:3,9
  120:18 121:9
  139:22,24 140:11
  141:24 143:8,24
**accomplished**
  154:13
**accounting** 186:6,15
  186:21 187:20
  188:6,16
**accounts** 138:25
  193:10 194:20
**accurate** 140:10
  163:21
**accuse** 187:14
**achieved** 138:10
**acknowledges** 151:5
**acknowledging**

169:2,14,21 170:3
**acknowledgment**
  134:8
**acquired** 185:8
**acquiring** 115:6
**acquisition** 115:5
**acronym** 137:17
**acting** 121:25
**action** 201:8,12
**actions** 179:18
**active** 155:18
**actual** 145:5 156:12
  160:7 181:15
**add** 183:19
**addition** 123:12
  174:20
**additional** 178:24
**address** 142:6,12
  182:24
**addressed** 164:20
  164:21
**addresses** 121:17
**adhere** 118:22
**adjourn** 200:4
**adjourned** 200:8
**administration-ty...**
  159:9
**admit** 134:23
**adopted** 114:6
  169:25
**adopting** 124:11
  170:13
**ADP** 116:22 117:8
  118:3 121:10,12
  126:1,25 127:5,20
  128:2,18 129:16
  130:9 171:23
**ADP's** 119:6 128:22
**advance** 198:11
**Advantage** 131:6,9
**advantages** 165:6
**adverse** 179:18
**affiliate** 141:20
**affiliates** 141:11
**afraid** 153:16
  166:14
**aftermarket** 189:4

**aftersale** 138:18,22
**aggregation** 165:17
**aggressively** 194:4
**agnostic** 134:5
**ago** 148:17 158:12
  158:13,13 195:21
**agree** 135:5,9
  141:11,19 152:12
  158:1 165:2 166:9
  166:19 171:13
  197:3,4
**agreed** 126:9 135:2
  137:9 138:1,13
  152:9
**agreeing** 184:19
**agreement** 112:11
  112:12,13,14
  121:11 125:17,18
  125:18,20 126:1
  126:11,13 129:19
  131:12 132:19,22
  135:4,7,16,19,25
  136:12 137:2,8,11
  137:11 139:6
  140:21 143:18
  144:7,8,24,25
  145:1 150:10
  151:8,12,13,14
  153:15 154:19
  156:16 157:11
  158:23 171:18
  179:13 180:3
  184:10 196:10,22
  197:14 199:7
**agreements** 152:9
  154:22 155:2,6,9
  155:11 157:13
  159:22 160:5
**agrees** 149:8 150:1
**ahead** 197:5
**ahold** 116:16
**aimed** 141:23
**align** 157:23
**aligned** 158:10
  159:5
**aligning** 158:6
**allow** 168:17 181:23

191:14
**allowed** 123:9
  126:17 158:23
**allowing** 114:7
  119:17 122:12
**AMAR** 111:15
**amazing** 172:5
**ammunition** 186:18
**amount** 194:3
**ample** 140:25
**amusing** 114:23
**analysis** 189:3,11
**and/or** 151:6
**Anenen** 115:16,17
  116:13,16,17
  122:24 123:4,11
  124:7,8 127:16
  160:3 174:20,21
  174:22 175:22
  176:5,8,15
**anger** 174:13 180:3
**angered** 179:16
**angry** 173:14
**announce** 177:3
  198:11
**announced** 132:20
  196:10
**announcement**
  132:18 133:5,7,9
  133:21,24 134:2,4
  134:17,18,20,24
  135:3,25 162:21
  196:5,12 197:9,13
  197:16
**announcing** 122:16
  132:21
**Ansaldo** 113:6
**answer** 124:1 125:1
  128:7 137:15
  143:6,13,16
  149:24 161:8
  173:9 174:1,16
  176:24 182:9
  188:10,11
**answers** 187:9
**anti-hacking** 151:10
  152:1,5

**anticipated** 190:15
**anybody** 138:3
  152:2,14 167:23
**anymore** 131:18
  136:7 160:1
**anyway** 187:20
  197:6
**app** 168:15 174:3,11
  174:13
**appear** 175:11
**APPEARANCES**
  111:1
**appears** 130:13
  147:9
**applicability** 127:17
**application** 143:25
  147:1,14 148:12
  186:10
**applications** 117:17
  146:22 147:8
  148:15,16,23
  150:17 174:6
  186:24
**applies** 152:18
**apply** 118:18 151:25
  172:22 189:6
**appreciate** 115:8
  119:10 131:21
  145:22 156:24
  161:8 166:24
  168:21
**appreciative** 157:1
**approach** 122:11
  140:5 166:12
**approaches** 113:21
**appropriate** 158:2
**approval** 119:6
  153:9,9 154:1
  178:22
**approve** 135:9,21
**approved** 195:7
**apps** 118:14 132:6
  140:22 174:14
  179:10 184:19
**area** 146:15 156:20
  189:14
**arm** 147:1,2

CDK Global & Reynolds and Reynolds                    9/19/2019

[203]

**arrangements**
121:20
**aside** 116:13 156:12
167:17
**asked** 121:5 123:23
153:14 157:19
**asking** 149:6 153:14
**assign** 141:20
**assist** 142:2 152:14
**assistant** 149:1
**associated** 182:17
182:20
**association** 176:12
**assumption** 116:21
117:7
**attached** 185:22
**attachment** 156:3
**attachments** 180:8
**attempt** 141:12
**attempted** 138:3
142:21
**attempts** 172:20
**attendance** 113:7
**attention** 117:5
118:7 119:9 121:7
124:25 148:24
149:6 150:11
160:20 173:14
175:19 196:2
**attitude** 113:23
118:23 122:10
124:10 152:20
**attorney** 199:11
201:10
**audiences** 156:15
**August** 192:6
**AUR** 187:23,25
**Authenticom**
121:10,16,20,22
121:24,25 122:2,7
123:2 132:6
139:24
**authorized** 152:13
154:5
**auto** 119:25 176:11
**automated** 163:18
163:18 165:7

180:24 182:2,5,6
182:15 184:4
**automatic** 181:23
**automatically** 115:7
136:18 166:6
**availability** 184:13
**available** 178:14
182:12 186:3
**Avenue** 110:14
111:8,17
**avoidance** 199:2
**avoided** 180:4
**aware** 117:22 120:5
126:9,25 127:6,21
127:23 128:5,18
129:16 130:10
131:16 132:7
135:18 140:25
142:15 146:4
155:14,17 156:13
165:22 169:19,24
169:25 173:19
174:10,21 183:2,3
183:5 198:13

**B**

**B** 131:1
**back** 113:8 130:9
149:16 154:13,15
159:23 162:10
171:10 190:16
195:15 196:17
**background** 124:18
148:11 183:14
**backing** 122:24
**bad** 177:16 189:17
**bandit** 191:19
199:14
**banned** 138:7
**bar** 189:11
**Barras** 185:2,3
192:6,20 194:1
**base** 187:10
**based** 116:21 117:7
128:10 138:20
157:5 180:12
**basically** 126:15

138:4 143:23
171:16 182:13
188:1
**basis** 127:21 144:10
146:16
**batch** 146:12,16,16
146:20 181:16
186:8,15 187:8
188:1
**batch-type** 163:2
**Bates** 114:20 125:6
130:13 137:1
145:2,3 155:25
167:2 180:7 185:1
188:23 192:5
**bathrobe** 161:1,5
**Batista** 125:21,23
126:4,7,13,22
131:14 137:16
138:6 141:10,15
141:19 142:14
143:7,17 144:8
168:14,18
**battle** 167:16
**bear** 185:17
**bears** 167:2 185:1
**beat** 188:6
**becoming** 126:25
127:5,21 128:18
129:16 130:10
**beginning** 136:4,5
160:14
**begins** 116:21 119:5
121:4 149:8
151:16,21 153:19
153:21
**begun** 182:21
**behalf** 111:3,13
141:10
**belabor** 157:3
**belief** 128:25 170:7
**believe** 115:12 116:3
119:12 124:9
137:14 144:14
146:7 152:23
156:11,17 158:7
159:21 160:3

168:10 175:23
177:10 193:22
196:8,16 197:4
**believed** 142:7
**benched** 183:13
**beneficial** 113:25
114:12 134:7
**benefit** 114:8 139:11
146:19
**benefits** 165:3,13
166:10
**best** 116:15 159:16
**better** 142:10
176:20
**beyond** 121:21
192:12
**big** 139:17 157:16
161:1 176:11
186:7,14,15 193:4
194:18
**bigger** 187:15
**biggest** 120:2
**Bill** 195:17
**bills** 190:18
**bit** 150:22
**bite** 186:14
**blanket** 199:12
**block** 158:18,19
193:9,11
**blockage** 179:18
**blocked** 172:15
**blocking** 179:10
**blue** 161:1
**Bob** 125:4 133:25
136:14 140:13
145:12 146:5
159:23 160:10
193:25 195:20
**body** 185:14
**book** 139:2
**bottom** 125:13
151:16,22 153:20
196:3
**bought** 138:21
**box** 140:7 157:9,22
162:12,13
**boxes** 171:14

**brand** 164:18
**breach** 129:23 151:7
181:9
**break** 124:5 140:16
140:20 174:2
186:19
**Briefly** 175:25
**bring** 148:3
**bringing** 149:2
**broad** 174:1
**broader** 145:6
**Brockman** 110:21
113:4,10,16
115:16 130:14
137:7 149:5
150:19 155:22
167:3 177:9 185:3
188:24 189:1
192:6,9 194:7
196:1 199:25
**Brockman's** 145:21
**broken** 171:8
172:11
**brought** 126:6 133:2
**Brown** 168:17
**build** 120:9,25
**building** 137:23
143:25
**built** 144:11 179:6
185:20
**bullet** 125:16,19
126:10 130:9
158:15,19 165:2
165:15 166:7,9
184:8
**bunch** 187:11
192:22
**business** 113:25
114:6 115:4
126:12 129:22
131:18 132:8
139:9,14 143:14
165:23 174:23
**businesspeople**
146:1
**busy** 194:22,24
**button** 187:11

Case 1:21-cv-00306-PLM ECF No. 24-28 PageID.4760 Filed 02/11/26 Page 28 of 43
Brockman
CDK Global & Reynolds and Reynolds                                      9/19/2019

[204]

**buy** 138:21,25
  187:15
**by-god** 179:7
**bypass** 192:18

**C**

**C** 113:1 196:4
**call** 115:22 116:1,14
  126:12 137:24
  161:25 166:1
  194:10
**called** 113:11
  115:19 137:16
  138:14 146:20
  185:20 191:5
**calling** 193:15
  197:25
**calls** 116:12 173:15
**capability** 183:10
  188:16
**capable** 183:19
  194:15
**car** 189:5
**cards** 132:8 148:2
**care** 151:15
**case** 126:3,5 132:11
  132:15 137:14
  142:16 144:13,14
  179:24 197:4
**cases** 163:2 166:3
  167:24 169:7,9
  194:12
**category** 178:21
**cause** 171:20
**caused** 175:6 179:13
  197:24
**CDK** 110:4 112:16
  113:23,25 114:1,5
  114:5 115:9
  117:23 118:22
  122:7,9,18 123:2
  123:12,14,16
  124:9,19,22 129:9
  130:19,22 131:8
  131:15,25 132:6
  132:23 134:2,5,20
  134:23 135:20,25

136:13,17 140:3
  144:16 146:2,23
  147:4 148:7,16
  150:2,6,16 151:5,8
  152:2,2,9,18,19
  154:7,19 155:5,5
  155:10,15 156:7
  156:21 157:23
  158:5,9 159:4
  162:17,21 164:13
  164:19,25,25
  165:2 166:9,11
  167:6 169:18,20
  170:3,24 171:11
  171:16 172:6,13
  173:5 174:18,20
  175:4,6,9,11,19
  176:12,15 177:5
  179:10,12,14,14
  179:21 180:3
  184:8,15,18
  196:12 197:14,24
  198:10
**CDK's** 121:25 125:2
  152:15 196:18,21
**CDK/Reynolds**
  156:15 157:11
**CDK_CID_01535...**
  114:20
**CEO** 174:22,24
  175:4 177:4
**CEOs** 174:18,20
  175:12 176:15
**certain** 148:15
  177:21 180:20
  194:9
**certainly** 114:10,17
  128:14 135:17
  146:4 168:3,9
  172:7
**CERTIFICATE**
  201:1
**Certification** 150:21
  151:2
**certifications** 178:5
**certified** 178:18
**certify** 177:10 179:1

201:4
**cetera** 131:2
**chain** 119:25 120:2
**change** 118:25
  121:19 124:1
  172:21,22 173:6
**changed** 113:25
  114:6 184:15
**changes** 171:12,15
  172:8 173:22
  182:14 189:1
  192:18
**changing** 129:14,20
  198:12
**characteristic** 181:2
**characteristics**
  186:9
**characterize** 126:21
**charged** 191:21
**charging** 131:24
  132:3,12,13
**charts** 189:12
**check** 168:1
**checks** 168:11
**checkup** 121:19
**CHERRY** 111:24
**chests** 188:6
**Chevrolet** 168:17
**chief** 124:22
**choice** 163:15,16
**chose** 163:23,24
  164:3
**claim** 154:11
**claims** 178:7
**clarifications** 200:2
**clarify** 200:1
**clause** 132:18 141:8
  151:4 169:12
  171:8
**clean** 121:12 122:5
  122:18 123:2
  194:3
**cleansing** 165:16
**cleanup** 192:20
**clear** 115:13 123:6
  136:19,21 140:12
  159:6 172:5

173:25 174:4
  176:21
**clearly** 118:9,24
  139:1
**clever** 138:7
**clients** 126:17
  148:16 163:15
  170:25 172:13
**close** 148:15 186:2
  188:12
**closed** 114:4 198:12
**coach** 183:9
**code** 140:6
**coffee** 161:2
**COHEN** 111:14
  116:4 123:23
  140:15 144:21
  145:20 149:1
  195:17,21,24
  198:16 199:25
**cold** 136:19,21
**collect** 138:11
**collected** 165:8,8
**college** 183:8
**column** 157:10
**combine** 166:6
**come** 145:11 146:25
  155:8 165:24
  173:14 175:11
  177:2 190:15
  194:19
**comes** 120:17
  136:17 161:5
  178:22 192:2
**comfortable** 145:21
**comforting** 120:7
**coming** 134:21
  139:6
**commences** 161:3
**comments** 128:16
**Commission** 110:1
  111:3,7 113:5
**commotions** 173:12
**communicate**
  155:10 156:15
  161:13,22
**communicated**

133:17,18
**communication**
  132:17 161:24
  173:15 196:5,19
  196:23
**communications**
  153:1,22,25
  155:16 158:4
  161:16 178:25
**companies** 135:5
**company** 126:22
  137:3,16 138:10
  141:16 177:23
  190:2
**compared** 131:25
**compelled** 139:9
**compete** 142:20
  199:4,16,21
**competes** 138:16
**competing** 124:20
  199:13,19
**competitively** 198:3
**complain** 179:17
**complainers** 190:19
**complete** 128:11
**completely** 173:21
  191:8
**compliance** 128:24
  150:21 151:12
**computer** 177:25
  183:14 186:3,11
  186:14,22 187:3
  187:15,18 188:2
**conceive** 182:8
**concern** 142:4
  179:11 196:22
  197:8,12
**concerned** 129:6
  130:2 133:11
  140:9 152:20
  158:14 159:8
  176:19 183:22
  184:16,22 185:24
  190:8 192:1
  199:20
**conclude** 180:10,12
**conditions** 152:11

condoned 191:20
conference 176:23
confession 134:25
confidence 166:5
confusion 115:18
conjunction 166:8
connected 168:12
consent 135:13
consider 124:18
  159:18
considered 118:11
  151:7
consolidating
  182:16
constantly 195:1
constructing 145:15
construed 199:20
consults 145:23
consumed 187:5
consumers 138:19
  148:2
consuming 188:1
contact 159:3 162:4
  162:8 174:8
contacted 174:6,12
contacts 162:17
  164:13
contained 153:15
  156:16 157:17
contains 130:17
  133:15
contemplated 179:9
content 154:8
context 117:20
continue 123:9
  126:17 146:8
  163:18 166:8
  173:22
continues 131:6
  141:9
continuing 165:16
contract 121:10,24
  130:23 131:7
  146:13,21 148:6
  160:12,19 165:13
  171:18
contracts 128:2

129:1,24 144:16
  145:6,8,10,16,23
  146:2 154:9
  159:12,14,19
  160:8,17 162:2,5
  162:18 163:16
  164:17,20 170:24
  176:8 182:24
contractual 142:20
contractually 143:3
  156:19
contravention
  138:12
controlled 175:6
convention 176:12
conversation 115:24
  116:7 124:6,8,14
  136:16 176:2,20
conversations
  136:22 175:22,23
  176:4,7,14
cool 186:5
cooler 179:22
copies 146:17
copy 149:15
corporation 110:5,8
correct 115:11,12
  117:10 125:9,10
  130:11,24,25
  131:10 137:18,19
  139:12 143:9,15
  147:21,22 148:8,9
  148:18,19 150:4,7
  151:10 158:25
  163:22 164:1
  169:2 170:22
  171:5 172:17
  180:5,15,16 182:3
  196:19
correctly 120:15
  172:16
cost 193:9,10
costing 114:2
counsel 113:4 201:7
  201:10
counterpart 175:20
country 120:3

couple 147:7 148:17
  157:4 190:17
course 120:1 173:19
  183:10 187:13
  196:16
court 125:23 126:3
  126:4 137:4
covenant 141:11,19
  142:19 199:3,21
covenants 142:19
  143:10 199:2
cover 156:6 180:21
covered 152:6
crafting 199:9
Crain 193:4
crazy 179:5
create 186:7 189:11
created 138:9,10
creates 147:17
creating 181:16
  190:6
creation 178:24
crosses 181:11
crutch 166:25
  168:22
cup 161:2
curious 175:20
  179:8 199:6,18
current 192:21
currently 131:24
  181:19
customer 120:1
  139:17,18,20
  172:7 189:25
  190:1 193:4,10,15
  194:18 195:11
customers 119:25
  121:18 139:3,4,17
  164:9 171:23
  173:4,5 178:16,20
  188:12 193:3
  194:9,11 195:6
  197:25
cut 145:19
CX 112:8,9,10,11,12
  112:13,14,15,16
  112:17,18,19,20

114:19,20 115:13
  116:3,10,18,25
  117:22 124:5
  125:6,6,12 126:25
  130:12,13 136:25
  137:1,8,12 140:21
  141:6 144:23,24
  145:2,2,3 146:6,7
  146:22 147:9,13
  147:23 148:11,20
  150:9,12,20,24
  151:13,17 152:25
  155:23,24 156:1,5
  157:8 162:11,12
  164:12 167:2,2,9
  168:24 180:7,7
  183:25 185:1,1,15
  188:22,22 191:12
  192:4,5,11 195:16
  198:15,20

**D**

D 112:1 113:1
D.C 110:15 111:9,19
  193:5
dabrahamsen@ft...
  111:11
damaging 197:17,18
  197:20
Dana 111:4 149:1
DARCARS 193:4
Darwin 138:14,16
  138:25
Dash 117:1
dashes 131:5
data 112:14 114:16
  121:17 128:3
  129:2 130:4
  138:11 142:22,22
  143:24 144:10,24
  147:4,20,22 148:7
  151:13 163:2,5,13
  163:18,20 164:23
  165:4,7,16 166:2
  166:10 169:3,3,4,8
  169:19,21,22
  171:17 180:23

181:9,16,19,21
  182:10,11,13,16
  184:4,5,9,15
  187:11 190:7,25
  190:25 193:22
  199:14
database 146:15
date 118:9 179:7
date-wise 160:13
dated 130:15 156:2
  159:11 185:2
  189:21 192:5
dates 178:22 192:17
day 128:13 136:20
  136:21 137:10
  138:15 161:3
  163:7 165:11
  169:10 181:14
  188:7
days 159:13 162:8
  179:9 180:23
  200:2
Dayton 161:12
de-duplication
  166:1
de-winterizing
  148:4
deadline 190:15,16
deal 112:16 132:9
  133:6 139:8 167:6
  175:15 189:5
  190:22 191:6
dealer 120:2 163:3
  163:13 168:15
  181:5,20
dealers 114:4
  171:21 176:11
  177:12 179:16
dealers' 158:16
  165:3 166:10
  179:14
dealership 147:18
  163:12 164:9
  165:9 169:9 178:4
  178:9,15 181:17
  188:14 189:13
dealership's 168:16

Case 1:21-cv-00360-DAE Document 124-98 Filed 02/11/26 Page 30 of 43
Case 1:21-cv-00360-DAE Document 124-98 Filed 02/11/26 Page 30 of 43
Brockman

CDK Global & Reynolds and Reynolds                                      9/19/2019

[206]

182:12
dealerships 119:25
  178:19
deals 189:5,10 191:3
dealt 162:18 164:18
Deborah 110:25
  201:4,17
decades 115:4
deception 144:13,14
decertification
  177:15,19
decertified 178:17
decided 138:21
decides 181:20
deciding 131:17
  183:11
declare 114:10
  124:2 168:1
deep 123:17 130:5
deeply 120:23
  122:21
defective 144:12
  187:14
defense 187:16,16
defined 117:13
definitely 191:20
definition 128:11
  150:12,13,15
definitions 129:1,25
delay 194:23
deliver 125:8
department 135:19
  145:15,18 186:6
  186:21 187:20
  189:16 193:24
departments 188:5
describe 129:22
  160:25
described 148:14
describing 117:15
  118:10
description 112:7
  140:10
desirable 192:19
desired 187:13
desk 136:5,6 161:3
detach 160:14

detaching 159:21
detail 138:3
details 154:8 160:16
  191:25
detect 166:4 168:6,9
  168:17
developed 119:7
development 185:4
  185:11
devised 187:2
differed 113:22
different 113:20
  119:2 123:24
  139:23 140:1
  143:1 185:25
  186:4,8 191:19
  193:12
difficulty 149:5
  187:24
diligent 135:20
  165:11
dipstick 187:3,4
direct 117:5 132:14
  150:11,16 161:17
  161:19 183:18,19
  185:5 196:1
directed 162:24
  180:4
direction 130:20
directions 150:23
directly 138:12
dirty 179:3
disagree 159:7
disagreed 127:18
disappointing
  175:16
disastrous 177:18
  179:23
disclaim 154:11
discuss 198:8
discussed 115:24
  116:1 123:4
  127:14 133:13
  192:14
discussing 130:19
discussion 146:4
  149:3 198:10

discussions 158:8
  160:10
dismissed 175:3
disposition 126:8
disrupt 172:12
disrupted 173:8,16
  174:7
disruption 174:13
  179:13
dissemination
  153:21
dividing 181:2
DMI 139:24 142:10
  162:22 163:15
  164:16 165:15,17
  166:7 182:1 184:1
DMS 114:5 120:18
  124:11 128:6
  129:3 130:5
  137:24 139:22
  140:11 141:13,16
  141:22,24 142:23
  143:2,8,11,14,17
  143:20 144:3
  146:23 151:23
  158:15,16,24
  164:24 165:3,19
  166:10,13 167:16
  167:17,22 168:8
  168:16 169:1,3,4
  169:13,15,16,19
  169:22,24 170:4,5
  170:11,15 177:11
  177:11,12,16,20
  177:21 178:4,13
  182:6 185:19
  187:14 193:12
DMSes 114:5 131:9
  141:24 147:5
  148:7 179:15
  182:2
document 114:18
  125:5 127:14
  137:6,7,9 146:10
  150:18 153:12
  154:16 156:8,10
  156:12,14,25

157:5 159:11,13
  166:20 167:3,4
  168:22 180:17
  183:1 188:25
  198:15
documented 117:13
  120:11
documents 128:1
  133:19,22 140:6
  154:4,25 155:15
  161:21 199:10
DocuPad 138:17
dog 161:2
doing 114:13 121:11
  121:22 122:3
  124:16 126:16
  129:25 131:18
  137:20 138:12
  141:2,4 142:13,14
  156:21 159:6
  169:1,13 170:7,8
  170:10 182:1
  185:11 187:20
  189:13,15 195:4
dollars 114:2
double 168:11
doubt 199:2
downs 171:20
draft 156:14 166:21
drafted 154:25
  159:22
drafting 154:10
  156:7 160:16
dragging 190:11,12
draw 148:24
drawback 138:20
driving 161:7
DSV 193:19,21
due 196:12
duly 113:12
dupes 166:4
duplicate 166:1
dying 190:9

E

E 112:1 113:1,1
  148:21,25 149:8

149:20
e-mail 112:8,9,10,15
  112:17,18,19,20
  115:10,14,15,15
  115:15,17 116:14
  117:18,22 118:24
  120:22 130:14
  133:14 156:1,3,6
  160:2 161:22
  180:8,21 185:2,14
  188:23 189:19,20
  189:22 191:11
  192:5,9 193:17
e-mailing 122:17
e-mails 160:18
  181:5 192:7
Eagle 188:25 189:1
  189:2,9,22,25
  191:14,14,15
  192:11,15,22
earlier 143:4 153:7
  159:16,17 160:2
  162:19 174:16
  196:2,8
early 125:16 136:9
  139:6 160:4
earth 145:24
easier 195:3
ECONOMIST
  111:6
economy 144:18
effect 174:18
effort 143:3 154:14
  180:20
efforts 122:23
eight 159:13 177:1
either 138:21
  144:11 153:22
  163:17 178:18
  196:23
elected 164:8
electronically
  190:23
element 198:2
EMMANUAL
  111:25
employed 201:7,11

employee 168:1,18
  201:10
employees 141:11
encouraging 148:3
end-of-month 186:7
ends 171:7
enemies 176:1
engaged 159:18
  160:7,17
enhancements
  173:17 191:13
ensure 157:23 159:4
ensuring 158:9
enter 187:10
entered 139:5 153:8
  154:22
entering 165:19
enthusiasm 133:23
entitled 137:1 156:5
  167:6 170:17
entity 143:19,21,22
  143:23 144:1,2,6
entries 146:12
entry 187:11
equation 165:14
ERA 192:13
especially 189:3
  195:9
ESQUIRE 111:4,5
  111:14,15
essence 195:5
essentially 143:22
  144:7
establishment
  167:21
estimate 162:3,6
estimation 159:16
et 131:2
eventual 116:7
everybody 188:9
  193:16 200:5
evidence 141:1
evidently 119:23
  193:5
exact 174:17
exactly 115:25
  128:3 130:6

133:17 135:18
137:20,25 140:12
157:16 159:6
161:7 168:20
186:2
examination 112:3
  113:4,11,14
examined 113:12
example 167:21
  193:8
exception 193:1,6
  198:22
exceptions 192:23
  193:2
exchange 112:14
  144:24 151:13
  160:2
exchanges 155:14
exclude 145:17
excuse 117:3 194:22
executed 144:16
executes 189:22
executive 124:23
  185:4
executives 137:13
exemption 187:23
  194:18 195:11
exemptions 192:12
  192:13,13 194:8,9
  195:2,6
exhibit 112:7 114:21
  115:1,13,14,23
  116:20 121:5
  125:6,12 130:17
  144:25 148:11,14
  150:9 155:24
  162:10 167:9
  180:6 183:25
  184:25 188:21,23
  189:20 192:10
  193:18
exhibited 190:12
exhibits 144:15
  150:9
exist 133:12 176:18
existed 127:9
existence 127:7

128:21 129:4
existing 163:14
exists 182:9
expect 118:14
  140:13
expectation 180:1
expectations 159:25
experienced 161:14
explaining 120:15
explanation 157:3
  185:18
explicit 129:2
  145:19
exploit 172:20
exploring 155:15
expression 197:7
extend 143:11,13
  184:18
extended 138:22
extensive 161:16
extent 114:11
  145:14 176:14
  185:24
extract 146:12
  181:21
extracted 128:3
  184:6
extracting 171:17
  181:19
extraction 184:4
extractor 199:14

─────────
        F
─────────
F 111:4
face 114:13 177:3
faced 149:14
facilitating 184:3
facilities 178:24
facility 178:14
fact 114:3 119:19
  127:8,9,23 128:10
  129:3,19 138:19
  145:23 157:1
  166:11,19 172:4
  175:6 176:10
  184:22 186:6
  190:11 191:19

factory 178:25
facts 189:6
failure 165:14
fair 163:10
fairly 122:1 138:24
  166:3 187:6
faithfully 181:14
falling 195:8
familiar 140:7 154:3
  154:9 156:7 157:2
  157:6
far 116:1 121:20
  123:17 124:24
  128:24 129:5
  130:1 131:12
  132:3 133:10
  136:2 140:9 142:9
  154:8 157:9
  158:13 159:8
  163:12 171:16
  176:18,24 178:24
  179:5 183:21
  184:15,21 185:23
  190:8,25
fashion 163:19
  165:7
fastest 169:2
favor 135:24
favorable 134:13,13
  134:14,16
fear 152:6 179:15
February 130:23
  154:17,18 156:2
  158:5,12,12
  159:11,13,17
  160:5 167:7
  169:17
fed 143:24
Federal 110:1 111:3
  111:7 113:5
feeling 184:15
feelings 188:17
feels 136:15
feet 190:11,12
felt 135:15
field 179:7
fields 129:2

figure 182:4 195:4
figured 190:20
file 110:5 146:18,18
  168:2,13 189:8
final 126:8 135:4,18
  136:17 159:22
  160:12
finally 124:15
  131:15 169:1,13
  170:3 171:13
  172:1 191:7
finance 188:14
  189:10,15
financially 201:11
financing 189:4
find 114:22 124:22
  157:10 173:23
finding 149:10
fine 163:6 190:9
  191:2
finished 154:6
  159:15
firm 153:9
firms 182:1
first 114:25 115:2
  115:14,15,17,23
  116:17,19,20
  117:6 118:2,17
  121:3 125:19
  126:6,10 131:4
  132:18 138:15
  141:7,8 146:10
  148:10,24 150:20
  150:25 151:5
  157:9 158:19
  162:12,16 166:22
  167:14,15 169:12
  170:2 185:15,15
  189:19,21 191:12
  192:9,10 193:18
five 177:1 186:12
fix 178:10,11
fixed 178:9
flashing 181:18
flip 148:10 183:24
flipping 147:23
focused 192:24

Case 1:21-cv-00036-DCN Document 24-98 Filed 02/11/25 Page 32 of 43
Case 1:21-cv-00036-DCN Document 126-13 Filed 02/26/21 Page 321 of 832 PageID #: 9764
Brockman

CDK Global & Reynolds and Reynolds                                    9/19/2019

[208]

**focusing** 184:21
**folder** 189:8
**folks** 133:1,2 140:3
  175:16 186:12
  188:6,17 193:6
  194:12,15,20,21
  194:23,23
**follow** 119:11 192:7
  195:1,13
**follow-up** 121:17
**followed** 124:6
  173:25 176:15
**following** 130:20
  147:11 171:2
  174:5,12
**follows** 113:13
**fools** 114:10
**football** 183:9,11
**footnote** 191:10,11
  191:13
**force** 127:20 129:12
  155:16 172:7
**forced** 122:23 193:2
**forcing** 187:15
**Ford** 177:23 178:14
**foregoing** 201:5
**forever** 138:8
  141:25 180:1
**forget** 174:17
**formal** 129:9,11
**forms** 161:24
  173:15
**forth** 142:19 199:2
**forward** 144:20
  170:4 190:4 191:8
**forwarded** 164:25
**four** 130:17 158:12
  177:1
**fourth** 165:2 166:9
**franchise** 177:12
**frankly** 154:4,23
  156:11 190:11
  194:12 199:8
**fraud** 138:9 144:13
  144:14
**frees** 186:11
**frequently** 162:4

**friends** 176:1
**front** 116:4 137:5
  144:21 153:12
  162:11
**full** 172:7
**fully** 178:18
**fund** 175:16
**funds** 175:7,7
**further** 141:19
  142:17,25 148:13
  156:19 201:9
**furthest** 134:10

       **G**
**G** 113:1
**gain** 153:9
**gaining** 144:3
**general** 124:18
  152:8 156:20
**generally** 132:11
**gentle** 122:1
**gentleman** 175:2
**getting** 118:9 126:11
  138:2 147:20
  148:7 150:16
  152:20 163:12
  168:7 181:24
  184:6 186:13
  190:6 192:24
  196:22
**give** 135:20 157:19
  159:16 160:6
  162:3,6 170:21
  179:2 190:14
  193:1,2 194:9
**given** 133:3,22
  135:23 136:11
  168:14 195:12
  200:1
**gives** 137:4
**global** 110:4 196:12
**go** 116:4 117:12,17
  118:6,14 131:22
  144:17,20 147:7
  149:16 163:19,23
  163:24 164:3,3,19
  168:1 173:22

189:11 190:4,10
  190:15 192:12
  195:15 196:3,17
  198:20,25 199:15
  200:6
**goes** 131:20 141:22
  171:10 181:8
  186:19
**going** 117:5 118:22
  120:20,21,25
  122:11 123:2,9,14
  123:21,25 124:1,9
  124:11 125:23,24
  126:3 128:16
  129:2,9,10 132:13
  132:25 134:8,12
  134:21 136:3
  143:1 144:4
  146:23 148:21
  149:22 150:10
  151:13,15 153:23
  156:24 160:11
  161:8,10 162:22
  163:9,17 170:24
  171:3,14,15 172:1
  172:2 174:2 176:3
  179:1,2,25 180:19
  184:23 190:17
  195:15 196:22,24
  197:5,9 198:11
**good** 113:16,17
  136:18,19,23
  164:4 178:12
  180:11 183:22
  187:16 189:17
  192:2
**gotten** 138:24
**graphs** 189:12
**grease** 181:25
**greater** 138:3
**group** 175:7
**groups** 119:25
**guess** 137:10 199:6
**gun** 186:17
**guts** 183:16
**guy** 176:13 178:12
**guys** 178:11 179:3

188:7 195:22

       **H**
**habit** 194:8
**hack** 122:12 152:12
  152:14 184:24
**hacker** 121:25 142:9
  173:23
**hackers** 134:25,25
  152:20 167:18
  194:10
**hacking** 114:2
  125:24 128:5
  154:7 162:23
  165:20 171:14
  197:22
**Hampton** 110:13
  111:16
**handed** 194:17
**handle** 185:25
**handled** 135:18
  163:3 177:25
**handles** 138:17
**hands** 130:5 175:25
  181:24 184:6
**hands-off** 163:9
**hanging** 166:24
**hangover** 192:19
**happen** 132:25
  135:11 163:9
  172:1 191:3
**happened** 159:21
  164:22,24 173:2,7
  173:20 190:24
**happening** 128:5
  131:14 152:8
  156:20 160:13
  190:3 191:1
  192:15,20 194:1
**happens** 135:14
  166:6 176:25
  181:12 186:21
  187:3
**happy** 133:11
**hard** 116:16 187:1
**hash** 116:20 119:5
  126:24 127:3

130:7 183:25
  184:1,2
**hate** 187:10
**hated** 139:8
**heading** 167:11
**heads** 179:22
**heard** 120:16 128:8
  167:23
**hearing** 110:18
**hedge** 175:7,7,16
**hello** 176:13
**help** 152:3,14 168:6
**helpful** 199:8
**Hendrick** 192:12
  194:13,14
**hereto** 201:11
**Heritage** 193:4
**high** 183:8,10 187:6
**higher** 131:23,24
**hill** 122:25 180:15
  183:6 195:14
**hinting** 120:18
**historically** 179:24
**hit** 149:17 187:11
**hold** 175:8,14
**holding** 171:12
**hollers** 172:23
**holy** 115:7
**home** 160:23,24
**hope** 135:19 185:17
**hopefully** 172:24
**hopes** 179:20
**hostile** 148:23 150:1
  151:8 191:15,16
  191:17,18,19
**hostilely** 150:5
**hour** 169:10
**hourly** 140:16
**Houston** 161:12
**huge** 132:9 194:4
**humorous** 124:22
**hundred** 158:13

       **I**
**ID** 167:22,25 168:7
  168:10,12,13,15
**idea** 113:21 136:23

160:6 164:2 194:7
199:22
**identification**
170:25 178:6
**identified** 196:11
**idiots** 114:11
**immediately** 172:10
**impact** 191:3
**impatient** 175:9
**impending** 172:8
**implemented** 179:6
**importance** 114:16
**important** 125:22
133:21 147:19
163:1 170:17
178:15
**impression** 133:19
135:23 136:11
140:4 146:24
**improved** 173:22
175:13
**improvement**
175:10
**inappropriate** 175:3
**include** 165:18
170:13
**included** 165:24
**including** 148:14
**incorrect** 181:7
**indented** 116:19
117:6 119:4 121:3
**indicated** 157:22
**indicates** 137:9
**indication** 152:18
188:2
**indirect** 150:16
**individuals** 189:18
**indulgence** 180:19
**industry** 176:23
**infer** 132:2
**inferior** 124:19
**infinite** 186:17
**inflict** 182:7
**influence** 177:20
**informally** 176:23
**information** 112:16
132:2 152:3 161:7

164:4 167:6,25
182:19 189:5
**inherent** 184:3,5
**initiative** 177:24
**inoperative** 171:16
**input** 159:25
**inquiry** 157:14
**inside** 146:15 154:9
167:22 175:11
178:25 194:4
**insight** 128:22
**instance** 147:9
178:8 180:2 193:3
**instant** 178:6 188:13
**instructions** 169:8
183:4
**IntegraLink** 139:24
142:10 182:1
184:2
**integrate** 124:13
131:9 132:6
141:12,12 164:16
**integrated** 137:3,17
146:23
**integrating** 134:6
140:22 141:16
150:5 171:1
179:15
**integration** 117:9,12
118:3 123:8,13,16
124:10 126:16,18
131:11 132:13
141:21 151:9
166:13 184:20
**integrator** 168:7
172:14
**integrators** 122:19
132:12 148:23
150:1 170:14
**integrity** 142:23
**Intel** 175:2,3
**intend** 172:12
**intended** 142:19,21
143:11 151:25
199:3
**intentionally** 145:19
**interacting** 127:19

**interaction** 146:19
176:10
**interactions** 137:21
**interested** 118:8
122:18 201:12
**interesting** 183:7
**interestingly** 188:4
**interface** 112:13
120:12 121:1
138:13 145:1
150:10 178:4
189:9,23,23 190:7
190:21 191:8,15
191:16,18,18,22
192:16
**interfaces** 137:25
152:10,13
**interpret** 117:10
118:4 119:15
120:22 121:13
172:12 180:20
181:1 184:5,11,12
184:18
**interpretation**
119:21 122:8
165:1 169:15
170:6,21 171:9
181:4
**interpreted** 117:14
164:14
**interpreting** 120:15
131:21 172:15
**inventories** 146:14
**inventory** 146:12
147:22 182:16
**investigational**
110:18
**invoices** 186:24,25
**involved** 127:1
138:2 146:2 154:5
154:10 190:6
**involves** 190:5
**issue** 115:19 122:24
132:21,24 133:3
134:1 153:10
163:6 187:1
190:22 196:18

197:1
**issues** 159:9 160:17
160:19 182:24
194:20

**J**

**Japanese** 137:22
**job** 154:12 175:4
181:16
**joining** 198:4
**joint** 134:1 135:10
**jointly** 196:23
**JON** 111:25
**July** 125:9 131:7
137:13 160:4,18
160:18
**June** 115:16 116:13
160:4

**K**

**keep** 146:14 200:5
**keeping** 167:17
**Keith** 180:15 183:6
195:14
**kept** 114:12 189:8
**key** 165:9 167:11,14
168:24
**kick** 178:11
**killed** 138:4,5 143:4
**killer** 149:12
**kind** 120:14,18
129:8 132:25
133:1 135:12
145:17 159:9,15
163:2,8 168:2
172:5 176:25
178:1 179:21
186:2 192:25
194:21,23
**knew** 191:20
**know** 116:23 118:7
120:23 122:22
126:6 127:13
131:12,20 132:1,4
132:5,25 133:22
134:3 140:14
141:2 143:25

144:1 145:14
154:15,15 155:4,7
156:20 157:24
158:16 161:21
164:5,17,20 168:2
168:5,23 171:22
171:23,23 172:6
172:10,21,23,24
173:1,9,10,11
175:13 176:24
182:9,18 183:11
191:25,25 194:14
195:21 198:5
199:9
**know-how** 141:21
142:3,5
**knowledge** 128:20
129:6 132:14
142:9 151:22
154:11 155:3
157:13 158:2
172:19 182:22
184:13
**known** 119:23
120:19
**knows** 161:15
181:15 187:4

**L**

**labeled** 114:19
**lack** 133:23
**laissez-faire** 113:23
118:23 119:17
122:10 123:15
124:10 129:21,22
152:19 166:12
184:16
**landing** 118:12
**language** 199:18
**Lanning** 111:5
113:5 194:6
195:19,23,25
198:18,19 199:23
**large** 119:24,25
138:25 194:11,15
195:5,11 197:23
**larger** 178:19

Case 1:21-00800-09 Document 1 26798 Filed 02/11/26 Page 34 of 43 Page ID of #:9766
Brockman
CDK Global & Reynolds and Reynolds                                    9/19/2019

[210]

| | | | |
|---|---|---|---|
| **largest** 120:1 | 149:20 153:20 | 120:9 141:7 151:4 | 159:5 184:10 | **mentally** 154:24 |

largest 120:1
late 160:4 179:1
latest 191:13
law 128:24
laws 127:1,6,12,17
  127:21,24 128:19
  128:23 129:17
  130:10
lawyer 144:12
lawyers 145:23
lay 143:3,6,7
laying 120:12
  192:23
leading 155:9
leads 187:13
learn 161:6
learned 124:15
  125:2
led 124:9 167:15,19
left 190:22
legal 135:19 145:14
  145:18,23
legally 128:25
legwork 195:3
let's 178:3
letter 123:7,18
  196:4
letters 173:15
letting 166:25
liabilities 127:1
  129:16,17,17
  130:3,10 182:20
liability 130:1 181:4
  181:24 182:7,17
life 143:11 160:25
  182:10
light 136:20,21
  152:22
lightly 194:17
lights 181:18
likes 182:20
Lime 117:9,12 118:3
  147:3,4,10,16
line 118:8,17 157:3
  158:25 180:9
  181:11
lines 148:25 149:7

149:20 153:20
list 116:6 146:11
  172:6 178:12
  192:25 195:9
listening 145:20
listing 129:2
lists 195:2
literally 190:17
little 131:2 150:22
  153:16 185:19
  187:1,24 196:4
live 160:23,24
LLC 110:13 111:16
load 186:17
located 160:22
logic 187:1
long 131:4 141:8
  143:14 149:18,22
  149:23 161:14
  167:15 190:2
  192:16 195:21
long-standing 159:1
longer 118:22 124:9
  124:12 125:23
  134:5,8 162:22
  176:12 184:16
longest 130:18
  174:24
look 114:18,19
  116:18 125:5,11
  130:12 136:25
  141:5 146:6,7
  148:17,20 150:8
  150:19 151:14
  152:24 153:18
  154:13 155:24
  156:1 162:11
  167:1,10,25
  168:21 178:11
  180:6 184:25
  188:22 190:3
  192:4,21
looked 125:25
  129:14 160:2
  162:19 176:9
  191:1
looking 116:23

120:9 141:7 151:4
  152:25 189:16
  199:10
looks 120:11 129:8
  131:15 199:11
loose 171:15 172:1
lost 125:23 150:22
  153:16
lot 118:7 136:4
  178:20 179:13
  183:20 194:12
  195:3,3
luck 188:8
lunch 200:6

_____

**M**

machine 186:17
machines 171:17
magnitude-wise
  164:2
maintains 147:18
major 138:19
  173:21 183:8
  193:2,10
making 119:18
  120:14 178:14
manage 196:23
management 183:21
manager 189:15
managers 188:15,15
manner 138:23
  193:5
manually 163:20
manufacturers
  137:22
March 137:10
  173:17 174:5,12
  179:2 183:3
  189:21
mark 116:20 119:5
  126:24 127:3
  130:7 184:1,2
marked 125:6
  155:23 188:21
market 132:20,22
  153:22,25 155:11
  157:23 158:6,10

159:5 184:10
  196:10 199:17
marketing 132:17
  132:25 133:5
  134:2,23 146:25
  147:1,2,3,4,19
  196:5,18
marketplace 196:24
marks 184:1
Martin 156:2
material 151:7
math 183:8
mathematician
  183:7
mathematics 183:13
matter 110:3,17
  133:20 156:5
  175:18 176:10
  190:11
mature 128:14
  190:2
mcohen@sheppar...
  111:21
mean 117:10,14
  118:21 119:15
  121:14 127:5
  134:24 135:1
  138:9 139:1,11
  143:7 172:12
  184:11,12 188:18
  193:11 194:17
  197:19
meaning 118:5
  171:8
means 134:12
  135:11 136:18
  181:8 183:14
  185:21 186:23
meant 129:20
  145:17
measures 167:19
media 157:10,14,20
  159:3
meet 119:11 175:23
  176:22 178:23
  179:5
meeting 125:9

mentally 154:24
mentioned 114:1
  125:1 137:15
  138:19 140:23,24
  143:16 174:16
  179:8
Menu 131:5,9
message 155:10
  157:23 158:10
  159:5 167:14
  187:19
Messages 167:12
  168:24
messaging 158:6
messy 130:1
MICHAEL 111:6
  111:14
middle 147:14
  189:19 191:12
midway 199:1
migrating 170:8
mile 121:19
milepost 160:5
millions 114:2
mind 134:11 182:5
  198:16
minimal 145:9
minimums 131:2
minor 132:8 169:24
minute 186:3
minutes 123:24
miserable 139:8
misinterpreted
  170:23
misnomer 191:17
missed 144:12
  190:16
missing 166:14
mission 154:13
mode 199:15
month 165:12
  181:15 186:16
  189:10 191:2
morning 113:16,17
  161:1 195:23
Motor 177:23
move 126:18 131:17

160:14 169:2,21
170:4 191:7,23
193:12
**moved** 152:19
154:24 155:19
**moving** 119:16
122:9 166:11
193:20
**Mullin** 110:13
111:16
**multi-user** 185:20
**multiple** 178:1

**N**

**N** 112:1 113:1
**N.W** 110:14 111:8
111:17
**NADA** 127:15
175:24,25 176:25
**NAIK** 111:15
**Naked** 117:9,12
118:3 147:3,4,10
147:16
**name** 143:19,21
144:1 168:13,13
182:18
**names** 121:17
127:13 171:25
175:1
**Nation** 120:1
**national** 176:11
**nature** 131:16 139:3
**near** 196:3
**necessarily** 142:16
195:13
**necessary** 159:25
161:13
**necessity** 185:18
**need** 119:11 121:12
122:5,6 149:16
170:4 177:10
183:23 188:12,15
188:17 196:11
**needed** 118:11
122:17 143:24
160:20 162:25
**needling** 194:2

**negotiated** 130:21
162:3
**negotiating** 125:17
146:2
**negotiation** 159:19
**negotiations** 160:8
160:12
**neither** 201:7
**never** 124:14 176:17
190:24 199:15
**never-neverland**
178:17
**new** 127:10,11 139:5
149:17 155:24
162:17 164:13,14
164:18,22 171:4
172:23 175:4
177:24 178:2,3,3
178:14 190:6,14
**news** 127:8,10
**next-to-the-last**
114:22,25
**nice** 176:13 189:11
190:18
**night** 188:3
**nights** 179:4
**noise** 193:13,14
**non-approved**
150:12 151:5,6
**noontime** 161:4
**Notary** 201:18
**Note** 170:18
**noted** 174:17
**notes** 125:8
**notice** 110:18
122:16
**noticed** 135:4
**Notification** 191:6
**notified** 171:11
**notion** 123:1 134:4
**November** 185:2
188:24
**NPPI** 182:19
**number** 115:8
130:18 147:9,14
147:23 163:10
164:5,7,8 171:8,12

174:18 178:6
182:18 195:8
196:6 197:23
**numbered** 130:18
147:13 167:10
168:25 170:2
**numbers** 191:4
**numeral** 198:21

**O**

**O** 113:1
**oath** 113:18
**objected** 123:25
**obsolete** 191:22
**obstinate** 194:21
**obvious** 165:6,25
184:14
**obviously** 119:1
144:18 161:21
169:17
**occasion** 165:24
176:22 183:5
**Occasionally** 161:25
**occur** 175:17 179:23
181:23
**oddball** 192:1,2
**OEM** 177:17
**OEMs** 174:3,6
177:10,20 179:16
179:17,17 180:4
**offering** 162:23
**office** 160:22
**officers** 124:23
**Ohio** 161:12
**oil** 121:18
**okay** 149:21 151:1,4
151:18,20 158:18
158:21 178:25
187:4 195:21
**old** 175:25 176:1
178:2 190:7,9
191:8
**once** 123:25 136:5
139:7 162:8,8
163:15 171:2,18
**one-pager** 156:7
195:20

**one-sided** 135:20
**ones** 122:3 127:13
127:14 130:3
134:11 141:2
165:25 176:5
177:22 197:25
**ongoing** 144:10
**open** 198:12 200:5
**opening** 180:1
**operate** 118:20
**operating** 129:24
185:19,20,23,24
**operational** 142:22
**operationally**
124:24
**operations** 175:10
**operator** 120:2
**opposed** 133:6
138:12 164:10
179:23 189:15
**order** 153:10 159:24
171:22 177:11
**orderly** 125:25
126:20 162:20
171:19
**orders** 186:25
**organization** 174:9
**organizational**
161:17
**organized** 128:1
**originally** 185:9
**ought** 128:12 149:17
**outcome** 201:12
**outlets** 157:10
**outside** 181:17
**overall** 189:16
**overloaded** 187:18

**P**

**P** 113:1
**P.A** 111:14
**p.m** 200:7
**packs** 177:1
**page** 112:3,7 114:25
115:2,14,23
116:17,19 117:3
121:3 125:12,13

137:8 141:5
147:14,24 148:10
148:21 150:20,25
151:18,22 153:19
153:20 157:9
167:8 183:24
185:15 189:20
191:12 192:10
193:18 196:4
**pages** 146:9 147:8
180:8
**paid** 118:7
**paperwork** 189:7
190:23
**paragraph** 114:22
114:25 116:19
117:6,6,11 118:17
118:19 119:4,10
119:21 121:2,2,3,6
121:8 125:13
130:17 131:1
132:16,19 141:6,8
142:6,12,18 143:2
144:12 147:13
148:12,21,22
149:11,17,23
150:21 151:16,21
151:25 152:7,17
152:24,25 153:2,3
168:25 170:2,17
170:19,22 192:11
199:3
**paragraphs** 130:18
167:10,11 180:13
**parameters** 118:21
**parenthetical** 141:9
148:13
**part** 116:19 118:12
120:24 125:22
135:2 138:8,21
146:10,13,21
147:19 151:14
171:21 175:19
197:15 199:9
**particular** 118:8
129:13 154:12
166:20 180:2

190:20
**particularly** 190:5
  194:18
**parties** 114:8 118:23
  119:17 120:18
  122:11,12 123:15
  124:12 134:6
  135:13 142:1,2,5
  142:11 153:8
  163:11 169:3
  171:24 172:11
  201:8,11
**partnered** 184:9
**parts** 186:24
**party** 118:4,5,18,20
  130:4 141:20
  146:11 153:23
  154:1 163:5
  164:10,23 165:10
  167:17 181:6
  189:2 192:12
**password** 168:7,10
  168:15
**pay** 124:25 131:25
  132:9 175:19
  190:18
**paying** 131:23,25
  132:5
**payments** 138:20
**payroll** 167:24
  168:2,13 181:19
  188:8
**PC** 163:4 181:22
**PCs** 185:22
**peaceful** 171:10
**Pennsylvania**
  110:14 111:8,17
**Penske** 194:14
**people** 117:20,20,24
  125:2 129:12
  142:13 156:14
  158:23 161:23
  168:12 172:2
  173:8,16 176:25
  177:2 186:6,13,23
  187:17 188:13,14
  190:18

**perceive** 182:11
**perceived** 122:14
**perceiving** 123:17
**percent** 175:8
  184:10 187:5,5,5
**perception** 155:12
**perfectly** 181:6
  190:8
**perform** 169:7
**period** 116:13
  126:18 139:12
  154:19 155:9
  158:5 159:17
  160:7,18 162:2,20
  169:17 173:18
  174:5,12 183:3
  185:12 198:22
**periodic** 160:9
**permissions** 122:3
**permit** 124:12
  170:14
**person** 116:16
  161:14 183:7,15
  189:15
**personal** 182:19
**personally** 117:19
  132:7 144:1 154:9
  174:8,15
**personnel** 165:14
  183:9,21
**Phil** 125:23 126:11
  131:14,14 138:6
  140:2 142:7,14
  144:8 168:18
**philosophy** 114:1
**phone** 173:15 176:5
  176:17
**phrase** 140:6,7
  169:4 174:17
  180:23
**physical** 156:12
  161:9
**piece** 132:8 154:12
  178:3
**pieces** 166:2 178:1,2
  178:3
**PII** 182:19

**pile** 136:5,6 187:9
**piles** 136:7
**place** 126:1,6 131:17
  162:1 176:2
  179:19 193:1
**plan** 132:17 196:5
**planning** 183:9
**plans** 137:23
**platform** 134:6
**play** 183:12 188:5
**played** 145:15
**please** 198:20
**plunge** 145:5
**pocket** 130:5
**point** 115:3,8 117:22
  119:9,14 120:14
  121:6 122:15
  129:7 133:3 136:1
  136:6,7 144:13
  152:17 163:1,4
  166:14 172:25
  173:2 181:20
  192:24
**pointed** 152:2 194:1
**pointing** 121:9
  122:1
**points** 116:6 182:23
**policies** 177:21
**policy** 159:1 184:17
**pool** 179:3
**populate** 182:10
**position** 114:15
  119:16,17 120:17
  120:21 158:22
  159:2 169:19
  170:13 183:12
  184:23 198:12
**positions** 129:21
**possibility** 179:20
**possible** 136:21
**possibly** 136:16
  177:5 193:12
**postcard** 132:10
**power** 144:7 186:3
  186:11,14,23
  188:5 193:9
**practical** 141:3

**practice** 114:6,6,7
  186:21 194:8
**precede** 193:13
**predates** 190:1
  193:7
**prefer** 197:2
**preference** 134:19
**preparation** 154:5
**prepared** 125:8
  190:21
**prepares** 148:1
**presence** 166:4
**present** 111:23
  113:6
**presentation** 138:18
**president** 175:2
  180:11,14
**press** 135:2,5 153:10
  153:22,24 154:20
  155:1,6
**presumably** 180:4
**pretty** 122:23
  128:11 163:11
  180:11 184:14
  186:1,5 187:16
  194:12
**prevail** 179:22
**previous** 129:20
**previously** 113:12
**price** 131:23,24
  132:5
**prices** 132:3
**pricing** 131:1
**principally** 159:23
**principle** 183:16
**print** 130:16 164:9
**printing** 165:9
**prior** 117:17 125:1
  127:25 128:7
  130:9 136:20
  137:15 143:16
  153:21 171:11
  175:5
**privilege** 145:22
**probably** 124:17
  125:4 128:4
  133:16,16 136:1

149:11 160:9
162:7 165:25
166:3,16 174:23
174:24 175:19
177:22 185:10
187:7 191:21
192:17 197:10,15
**problem** 150:24
  156:23 181:9,10
  181:22
**proceeding** 159:24
**proceedings** 200:7
  201:5,9
**process** 117:15
  118:10 119:11
  120:5,8,12 129:9
  129:11 136:9
  138:22 155:18
  165:25 171:11
  182:15 189:23
  190:4,9,10 192:16
**processes** 117:13
**produced** 127:15
**product** 138:14
  143:12 144:11
**products** 138:18,18
  179:14
**profit** 175:15
**profit-producing**
  188:14
**profits** 175:10
**program** 117:23
  125:2 126:19
  127:8 128:22
  133:5 146:17
  163:17 169:7,11
  184:13
**programmers** 133:1
  179:4
**programming** 190:6
**programs** 148:13
  186:16 187:8
  189:11
**prohibited** 151:6
**prohibition** 141:15
  141:23 143:7
  151:8,22

prohibits 148:22
  150:5
project 122:22
  123:19 154:6,24
  155:13 156:18
  159:9,16 160:15
promised 156:22
properly 194:2
propound 153:3
protect 142:21
  171:3
protecting 172:14
  173:3,5
provide 117:9 118:3
  121:16 152:10
  165:16 166:8
  170:24
provided 119:24
  168:9
provider 158:16
  169:20 177:11,11
  177:17 178:13
  187:14
providers 169:1,13
  169:15,16,25
  174:3,11,13
provides 128:2
  148:12
providing 117:11
  165:3,18 166:10
provision 135:15
  150:3,4,15,20,25
  151:11 152:1,11
  153:7,13,15,24
provisions 150:11
proximity 161:9
public 119:19
  120:17,20 133:8
  133:21,24 134:8
  134:24 135:24
  136:12 175:18
  182:13 197:9
  198:11 201:18
publicize 188:17
publicly 119:14
  122:15
pull 191:1

purpose 153:1
pursuant 110:18
pursued 165:23
push 169:3,4,22
  184:9
put 115:7 130:8
  144:19 154:21
  171:3 173:6
  181:21 199:6,11
Putting 156:12

—————————
Q
—————————
qualities 131:16
question 114:17
  117:4 121:5,15
  123:20,21,23
  137:10 145:6,17
  149:24 153:3
  155:5 161:8,10
  162:16 166:16
  174:1,1 196:21
  198:25
questioning 157:4
questions 144:20
  146:7,8 148:17
  151:15 156:25
  157:5 160:11
  166:25 167:1
  168:23 170:19
  174:2 198:14
quick 175:12
quickly 187:9
  196:11
quiet 173:20
quit 171:14
quite 121:11 136:16
  149:11 169:24
  174:10 178:18
  194:2,15 197:23
quo 129:5
quote 124:21 148:15
  189:5

—————————
R
—————————
R 113:1
R&R 115:3,5 118:4
  119:11 121:9

raise 188:6
ran 137:16
rank 182:18
RCI 126:19 131:1
  132:12 138:7,10
  144:5,7,8 151:7
  152:10 158:23
  163:17,19,24,24
  164:3,3,11 169:5,6
  169:10 184:19
  190:1,4,21 191:9
  191:23 193:6,7
RCI-type 165:13
re-read 166:15
reach 180:2
reached 125:20
  126:10 143:18
reaching 160:12
read 117:21 133:19
  149:19,22,24
  153:2 166:8,17
  168:25 170:18
  196:17
readback 178:7
reading 135:4
  161:21 166:18
reads 119:10
real 182:10
really 114:9 124:16
  124:18 130:1,16
  132:9 136:19,23
  138:2,6,7 163:11
  163:11 178:10
  186:5 193:2
  194:22,24
reason 181:3
reasonable 118:12
  118:13 120:12
  168:3 179:22
recall 115:25 116:15
  123:5 139:18
  157:15 158:11
  160:21 162:21
  167:4 173:11
  177:13 197:10
  198:9
received 174:8

191:13
receives 171:2
receiving 117:17
recess 124:3 140:18
  155:20 177:7
  188:19
recitation 166:11
recite 175:1
recognize 177:2
recollection 116:2
recommendations
  195:10
recompute 138:20
record 113:8 115:13
  137:17 144:19
  145:7 149:3
  166:17 173:25
  174:3 175:18
  176:21 200:5
recorded 190:25
records 146:17,24
  167:22
reduced 201:6
redundant 182:5
refer 162:10 167:18
reference 116:14
  118:2,16 119:18
  125:19,19 126:10
  131:3,8 142:1,17
  142:24 157:24
  158:17,22 165:1
  165:17 169:4,14
  172:9 187:22
referenced 121:4
  143:12
referencing 129:18
  130:9
referred 153:4
  165:19 189:24
referring 115:22
  116:9 127:12
  137:12 140:24
  144:2 146:13
  180:15
refresh 116:2
regard 130:22
  132:21 137:20

142:5 145:8 155:4
  162:5 170:10
  174:11,13
regarding 141:21
  177:24
reiterate 153:17
related 197:12
  201:7
relation 197:8
relations 193:10
relationship 175:4
relationships 139:16
relative 201:10
relatively 127:7,11
  173:20,21
release 154:21
releases 153:6
  153:10,22,25
  155:1,6
releasing 171:13
relevant 150:16
relief 120:24
remarks 125:8
remember 123:20
  139:19 143:21
  157:17 163:7
  197:11
remind 113:14
reminder 121:17
  132:8 148:2
ReminderTRAX
  147:25 148:6
remiss 121:9
removed 129:3
  165:14
repair 186:24
repeat 150:23
rephrasing 166:16
replace 191:14
report 125:2 161:19
  181:5,13 183:18
  183:20 185:5
Reported 110:25
REPORTER 201:1
reports 156:21
  159:23 161:17
  163:3,4 164:9

165:9 186:7,8
188:1,7 191:4
192:25 193:25
**represented** 118:24
**Request** 188:25
**requested** 166:17
**required** 144:10
**requires** 165:10
**resolved** 160:20
**respect** 118:16
**respects** 140:1
**response** 115:10
116:17 145:21
157:22 158:20
188:13
**responsible** 145:10
**responsive** 115:15
**rest** 132:10 186:12
**restrict** 184:19
**restriction** 142:20
**result** 173:16 183:20
**results** 188:5
**resume** 113:3
**return** 149:17
**Reversal** 191:6
**review** 154:1,20
195:2 196:24
**Reviewing** 137:6
150:18
**Revised** 156:6
**REYCID0046837**
155:25
**REYCID0186518**
188:23
**REYCID0186574**
185:1
**REYCID0264663**
125:7
**REYCID0265394**
192:5
**REYCID0513201**
130:13
**REYCID0577749**
180:7
**REYCID0675485**
167:2
**REYCID0675646**

137:1
**Reynolds** 110:7,7
111:13,13 112:13
113:21 114:2,8
115:9 118:1,2
123:1,13 125:20
126:16 130:22
131:22,23,25
133:7,8 134:7
135:6,15 136:11
137:2,3,21 138:25
139:22 140:11,23
141:16,24 143:11
143:14,17,20
144:3,17,25
145:11 146:22
148:16,22 149:25
150:5,10,17 151:9
152:9,18 155:1,15
155:16 156:13
157:23 158:9,9,22
158:24 159:3,4
162:23,23 164:16
165:2 166:9
167:15,19 170:25
171:1,2,3 179:18
182:7,22 184:8
185:7,8 192:17
193:24 194:4,9
197:13 198:2
**Reynolds'** 113:25
114:7 125:24
131:9 143:2
152:15 164:24
171:17 182:2
**Reynolds-brand**
141:13,22
**REYREY0000012**
145:3
**REYREY0000025**
145:3
**REYREY0000091**
145:2
**Richter** 110:13
111:16
**right** 116:11,24,24
136:9 161:18

163:14 178:4,5,10
188:11 193:5,11
194:24 198:3
199:25
**right-hand** 157:9
**rights** 139:1 181:7
**ring** 197:24
**risk** 184:3,5
**Robert** 110:21
113:10 195:20
**rocks** 129:10 134:9
**role** 145:7
**Roman** 141:6
**room** 113:7
**RPR** 110:25 201:17
**run** 163:3 168:15
181:13,14 186:16
186:23 188:3,7,8,9
189:11
**running** 120:10
181:15,16
**runs** 146:17 153:19
181:5

---

### S

**S** 113:1
**S-Y-S-C-H-E-C-K**
185:16
**safeguarding**
145:22
**safest** 169:21
**sales** 114:13 125:9
127:20 129:11
137:13 155:16
180:11,14 182:23
183:4,6 189:3,4,5
194:19
**salespeople** 128:17
129:7
**saw** 157:18
**saying** 121:23 123:6
127:22 166:7
170:22 189:16
190:3 195:5
196:17
**says** 115:2 118:16
118:19 121:8

125:17 131:22
132:19 135:5
143:10 148:12
157:25 158:1,1,1
158:15 162:16
165:2,5 169:12,16
177:4 181:18
184:3,8 187:19
189:22 191:12
193:18 196:4,9
199:1
**scale** 121:16
**scenario** 157:10
162:16 164:12
**Schaefer** 125:4
130:14 133:14,20
134:1 135:23
136:10,14 140:14
145:12 146:3,5
156:2 159:23
160:10 161:10,19
161:22,24 162:4
185:3 188:24
189:21 193:25
195:10,20 198:8
**schedule** 178:23,23
179:5
**scheduled** 160:10
**school** 183:8,10
**SCOTT** 111:24
**scratch** 120:9,25
**scream** 181:18
**screen** 146:19
187:19
**second** 115:14,23
119:5 125:12,16
148:11 150:8
151:4 158:18,19
168:25 170:2
183:24 192:11
193:17
**second-to-last** 119:9
121:8 171:7
**section** 127:2 146:10
148:14 198:21
**secure** 184:17
191:23,24

**securely** 184:9
**securing** 170:4,5,11
**security** 113:22,24
114:16 119:1
124:17 125:14
126:24 127:2
130:8 134:9
142:22,23 167:16
167:17,19 168:3
169:19 171:4,4,12
171:15 172:2,8,21
172:22 173:6,17
173:22 180:23
182:24 184:15
192:18 198:4
**see** 115:20 116:22
120:6 121:21
125:14 127:1,4
133:22 150:3,13
151:3,24 152:23
154:2 158:21
167:13 177:22
178:8 182:21
184:3 196:6,14
198:22 199:4
**seeing** 120:4 123:12
167:4
**seek** 153:9 176:20
**seeking** 175:12
**seen** 119:2 127:25
140:6 156:10
157:1 166:21,22
167:3 168:23
177:5 180:17
**sell** 141:19 175:14
**selling** 138:13
191:21
**send** 155:5,16
163:13,20 169:8
182:22
**senior** 180:10 183:6
**sense** 134:7
**sensitive** 132:23,24
178:19 197:11
**sent** 130:4 148:2
155:2 183:4
**sentence** 115:17,23

Case 1:21-cv-00064-09 Document 126798 Filed 02/11/26 Page 39 of 43 PageID #: 9771
Brockman
CDK Global & Reynolds and Reynolds                    9/19/2019

[215]

116:20,22 118:3
118:19,21 119:3,7
119:9 121:8
129:15 131:4,4,6
131:20 132:18
133:15 141:7,9,18
142:18 143:10
148:25 149:6,23
149:24,25 151:5
153:18,19 157:25
167:15 168:24,25
169:12 170:3
171:7 172:10
180:24 184:2
185:16 187:22
189:22,24 191:11
193:17 196:9
199:1
**sentences** 119:8
121:7,13
**separate** 146:15
178:1 185:23
194:16
**September** 110:11
130:15 195:19
**serial** 182:18
**series** 150:9 183:25
192:7
**serious** 143:3
173:12 176:1,4
**Served** 147:14
**service** 121:16
147:17 148:1,1,4
177:24 186:24,25
188:15 191:21
**services** 162:23
164:19 165:17,18
165:22 166:8
193:22
**serving** 174:24
**session** 200:5
**set** 117:12 142:19
163:8 169:7
181:13,16 185:25
199:2
**settle** 139:8,10,15
**settled** 126:4

**settlement** 112:11
126:8 137:2,5,7,11
138:4,8 140:21
143:18 198:18
**seven** 177:1 186:22
**shake** 175:25
**shaky** 188:9
**share** 152:3
**shattering** 145:24
**Sheppard** 110:13
111:16
**short** 177:19 180:13
**show** 144:15 153:11
155:22,23 188:21
**showing** 153:2
**shown** 137:8
**shows** 164:23
**shut** 139:2,4 179:12
188:1
**shutting** 179:11
**sic** 131:6
**side** 116:24
**sigh** 120:24
**sight** 193:20
**sign** 121:18 177:4
**signed** 130:23 148:6
154:17 159:12,14
160:6 163:16
170:24 176:8
182:25
**significant** 139:20
**signing** 160:19
**similar** 125:18,18
126:2 142:13
**simple** 168:2
**simultaneously**
186:1,2
**single** 168:12
**sir** 162:14
**SIS** 126:22 131:7,8
131:11,14,23,25
132:3 137:16,17
137:20 138:1
139:22 140:11,21
140:22 141:9,18
144:4 173:3
198:18,22 199:7

199:13,14
**sit** 161:3
**sites** 125:24
**sitting** 154:15
166:18
**situation** 120:7
123:3 130:1 136:8
140:4 164:18
179:21,23 180:1
190:20 193:8
194:2
**situations** 114:14
135:12
**six** 177:1 186:12,22
191:3
**skip** 153:23
**Skype** 161:13,23
162:1
**slightest** 133:4
**small** 121:16 130:16
163:11
**smart** 142:8 187:7
**smarter** 140:3
**snake** 131:15 138:5
138:5 143:4
**soft** 118:12
**software** 166:2,4
168:11,17 183:15
185:4,11
**Solutions** 137:4,18
**somebody** 163:6
165:11 168:14
172:13,22,23
181:22 186:10
**somewhat** 114:23
**sophisticated** 140:5
166:3 194:12
**sorry** 114:24 116:23
123:5 139:19
142:22 145:18
147:11 149:1,5,10
149:13 150:22
155:3,7,12,17
158:11 164:7
187:19
**sort** 128:17 148:5
156:25 160:3

177:20 183:2
189:12 197:25
199:12
**sought** 143:17
**sound** 128:17
**speaking** 140:20
174:19
**special** 178:13
**specializes** 189:2
**specific** 152:11
158:2 189:17
**specifically** 140:2
157:15 189:14
**specified** 169:10
**spend** 124:21
183:20
**spinmeisters** 133:18
**spoke** 176:5
**spoken** 153:7
176:17
**staff** 182:23 183:4
**staffs** 194:15
**stage** 122:22 136:8
162:7
**stages** 125:17
160:12
**stance** 134:9 184:11
**stand** 118:10 125:25
126:20 139:5
162:20 171:10,19
171:19,20 173:4,5
**standard** 152:10
190:10
**standardization**
165:16
**standards** 119:12
**standpoint** 119:1
124:17 128:5
129:22 139:9,14
140:13 142:10
161:17 168:4
177:25 181:4,9
183:16
**stands** 139:7 193:22
**staring** 154:16
**start** 120:25 128:13
149:17 164:8

181:24 183:12
**started** 122:15
123:20 128:4
138:13
**starting** 128:15
146:21 148:17
150:11
**starts** 116:21 117:8
130:19 131:1
198:21
**state** 130:7 145:7
**stated** 133:23
164:21
**statement** 124:18
128:10 136:12
137:12 150:4
157:19 197:19,21
199:12
**statements** 119:20
**states** 115:18 126:25
141:18 142:18
170:3 192:11
**stating** 142:25
149:25
**status** 129:5 138:11
**steadily** 195:8
**stenotype** 201:5
**Steve** 122:24
**stock** 175:9,13,14
**Stone** 188:25 189:1
189:2,8,22,25
191:14,14,15
192:11,15,22
**stones** 129:12
**stop** 122:6 123:14
126:15 134:21
154:7
**stopped** 123:13
176:13
**stopping** 122:19
**straw** 143:22,23
144:6
**stricter** 122:11
**strictly** 151:6
**strongly** 135:16,24
136:15
**structured** 128:1

| | | | |
|---|---|---|---|
| **stuff** 138:23 190:8 192:22 | **surrounding** 115:18 | 186:18 188:22 192:4 198:3 | 195:17 |
| **stupid** 124:17 | **suspect** 117:19 | **taken** 124:3 140:18 | **telling** 129:13 192:21 198:16 |
| **Subaru** 137:23,25 140:23,24 141:1 | **suspends** 187:7 | 155:20 177:7 | **ten** 148:25 149:7,20 162:8 173:24 |
| **Subaru-specific** 138:1 | **switch** 114:5 179:10 | 179:19 188:19 | 177:1 |
| **subject** 129:13 131:11 146:5 156:5,23 157:14 164:15 180:8 188:25 | **sworn** 113:12 | 201:5,9 | **tendered** 153:25 |
| | **Syscheck** 185:17 187:2,3,17,21 | **takes** 176:2 | **term** 189:6 |
| | **system** 114:3,4,8 115:10 119:18,22 121:10 122:7,13 122:20 123:14,16 124:11,11,13 128:2,6 129:3 132:6 134:21 137:21,24 138:2,8 138:16 139:25 140:23 150:2,6,17 151:9 152:21 164:17 167:18,22 171:1 181:21 184:20,22 185:19 185:21,22,23,24 187:14,18 193:12 199:15 | **talk** 162:24 167:16 194:25 195:14 | **terminal** 186:10,23 |
| **subjects** 130:21 180:22 | | **talked** 117:11,16 123:11 127:16 129:15 130:3 133:25 164:25 167:15 175:21 177:15 190:14 196:8 | **terminal-based** 186:9 |
| **subparagraph** 131:2 148:25 149:8,20 | | | **terms** 122:12 126:15 134:16 152:11 160:16 189:9 |
| **subparts** 148:15 | | **talking** 113:20 114:24 116:6 117:20,24 119:5 124:5 127:9 129:7 131:5 147:24 153:12 154:21 169:18 171:24 177:9 180:22 182:23 193:3,19 194:7 196:2,9 | **terrycloth** 161:1,5 |
| **subset** 165:18 | | | **tested** 117:13 179:6 |
| **substantially** 156:18 | | | **testified** 113:12 |
| **subtitle** 137:2 | | | **testifying** 133:24 |
| **successful** 154:14 | | | **testimony** 110:19 196:16 200:1 |
| **suck** 186:22 | | | **Thank** 145:20 195:24 199:23 |
| **sudden** 181:24 | | | **theoretical** 182:9 |
| **suggest** 122:9 | | **talks** 118:1,17 125:16 132:17 164:12 165:15 180:21 184:1 | **theoretically** 186:20 |
| **suggesting** 122:6 | | | **theory** 183:21 |
| **Suite** 111:18 | | | **thing** 116:24 134:11 136:3,17 139:5 142:13 148:5 155:17 168:3 188:3 189:12 191:6 198:1 |
| **summer** 194:25 | | **tat** 135:8 | |
| **superior** 137:3,17 142:9 | **systems** 115:4,5 121:25 127:19 128:4 141:25 143:2 152:15,15 154:8 164:24 183:15 192:13 197:22,23 | **teach** 152:14 | |
| **supervision** 201:6 | | **technical** 133:1 140:12 185:19 | |
| **supply** 186:18 | | **technically** 124:24 | **things** 114:13 118:11 142:14 159:24 163:8 167:23 176:19 177:19 180:20 183:17 192:2 193:9 194:3 198:6 |
| **supposed** 147:11 165:8,12 172:11 172:15 179:6 183:17 193:19 | | **technique** 144:4 | |
| | **T** | **technologically** 139:23 142:8 | |
| | **tack** 198:3 | **technology** 141:21 142:2,4,9 | |
| **sure** 114:11 115:25 119:10 128:15 131:13 133:25 144:22 149:11 157:7 162:5 173:23 174:10 175:15 176:21 197:23 | **tactical** 130:20 | | **think** 115:6,18 119:12 122:21 123:18,22 128:4 131:13 132:9 134:10,22 136:1 136:14,20,23 137:23 138:15 139:6,20 141:14 142:15,25 149:16 |
| | **take** 114:18,19 116:18 119:3 120:20,21 122:11 124:9 125:5,11 126:1 129:12 130:12 136:25 140:15 141:5 146:6 150:8,19 151:14 155:24,25 161:2 162:11 167:1,9 179:17 180:6 184:25 | **telephone** 115:24 116:1,7,12 123:4 124:6,7 161:25 175:22 | |
| | | **telephones** 197:24 | |
| **surprised** 124:15 131:19 132:15 161:6 | | **tell** 114:4 128:14 132:2 140:2 147:8 | |
| | | | 157:15 163:1,10 164:21 165:5,25 166:3 167:14 169:9 173:12 183:1 186:16 187:25 193:19 197:1,15 |
| | | | **thinking** 128:22 136:2 154:23 155:13 198:5,6 |
| | | | **third** 114:7 118:4,5 118:18,20,23 119:17 120:17 122:10,12 124:12 126:24 127:3 130:4 134:5 141:20 142:1,2,5 142:11 146:11 151:12 163:5,10 164:10,23 165:10 165:15 166:7 167:8,17 171:24 181:6 189:2 192:12 |
| | | | **third-party** 119:6 120:21 122:19 123:8,13,15 124:10 132:11 140:22 153:1 162:17,18 164:13 164:14 166:12 168:7 170:14 184:20 |
| | | | **Thornhill** 156:1 |
| | | | **thoroughly** 117:13 |
| | | | **thought** 114:9 118:13 120:23 122:21 124:16 133:4,20 135:17 136:22 138:4 143:4 152:22 153:10 |
| | | | **three** 144:15,16 150:9 153:20 158:12 177:1 180:8 |
| | | | **throw** 129:10 |

CDK Global & Reynolds and Reynolds                                    9/19/2019

[217]

throwing 114:12
  134:9 179:10
thrust 152:16
Thursday 110:11
time 116:13 117:21
  117:21 121:11,22
  124:21 126:18
  138:6 142:7
  144:17,18 153:12
  154:19,25 155:9
  158:5 159:17
  160:6,17 161:14
  162:2 166:22
  169:17 173:18
  174:5,11 182:14
  183:2,3,20 185:12
  188:2,9,13 190:2
  192:16,17 199:13
timeline 159:20
timeout 124:2
times 161:4 179:9
tingly 134:3
tit 135:8
titled 125:13 127:2
toast 161:3
today 113:3,7 160:2
  166:18,22 174:19
  175:14 189:23
  196:3,9 199:10
today's 200:4
told 127:20
Tommy 185:2
  192:20
top 147:24 150:24
  153:24 162:12,13
  185:14 192:7,10
  192:10 193:18
topic 123:3
touched 138:14
tough 188:8
Trade 110:1 111:3,7
  113:5
transaction 187:10
  189:7,7
transaction-based
  188:11
transfer 141:20

151:22
transmit 163:4
  164:10 181:22
transmitting 165:10
  182:16
travel 176:25
treacherous 129:23
tremendous 182:19
tried 143:19
trigger 175:12
  186:18
trouble 171:21
true 131:16 174:22
truly 122:2
truth 188:18
truthful 197:18,20
  197:21
try 157:3 184:23
trying 129:8 142:6
  142:11 182:4
turn 121:7 124:22
  149:6 151:12
  157:8 167:8
  171:15 172:1
  175:12 187:16
  198:20
turned 144:9
turns 181:5 191:2
twice 118:17
two 119:8 121:7,13
  135:12 150:11
  162:8 164:6
  167:10 168:11
  174:2 175:5 177:1
  179:9 180:22
  198:14 200:2
two-page 114:20
type 144:4 178:5
types 195:6
typewriting 201:6
typically 128:12
  149:14 161:13
  169:6

U

UCS 185:7
UCSer 185:9

ultimately 126:4
  130:22 175:14
Um-hum 196:15
unanimous 135:13
unattended 180:24
  181:3,11,13,16
  182:2,5,15 184:4
unauthorized
  134:21
underlined 167:11
  170:5,18
understand 113:19
  118:21 122:2
  128:3 141:3
  149:15 150:3
  151:24 157:2
  165:24 173:3,7
  184:23 189:13,14
understanding
  118:25 125:7
  144:6 152:4
  154:17,18 155:8
  159:2,12 163:14
  163:20,23,25
  165:21 175:8
understands 183:14
  183:16
understood 153:14
  166:19 177:6
  196:11
undertakes 177:21
undertakings
  156:13
unfamiliar 166:21
unfavorable 134:14
  134:15
Unfortunately
  138:5 159:20
unhappiness 161:4
  171:21
unmannerly 183:13
unpleasant 140:8
unwound 190:24
update 171:4,4
  172:2
usage 186:8 187:4
use 122:19 150:1

151:6 152:13
  156:24 161:22,23
  164:19 166:25
  168:16 174:7
  179:14 180:19
  184:19 189:6
user 137:25 167:22
  167:25 168:7,10
  168:12,13,15
  185:23
users 171:8 186:1,4
  186:22 187:8,13
uses 178:4 180:23
  186:10
Utilized 146:11

V
v 141:6,7 143:2
  144:12 198:21,21
valid 168:1
valuations 175:13
variance 129:5
varied 162:6
various 144:20
  156:15
vehicle 146:14
  147:22 178:6,8
  182:10,11,16
  189:3,4
vehicles 121:18
  146:12 148:3
vendor 148:12
  149:8 162:17
  164:13,14,15,18
  165:3 166:10
vendors 162:18
verdict 126:9
versus 137:3
veteran 174:23,24
vice 180:10,14
view 140:3
vindicated 114:15
violated 139:1
vision 121:21
VP 183:6 185:4

W

wait 186:25 187:12
  188:17
wake 169:7
walk 161:2
want 131:17 133:8
  133:10 134:12,12
  134:20 135:9
  139:10 149:7
  163:19 188:2,8
  189:10 190:5,7
  198:11
wanted 113:24
  125:11 135:6
  136:11,17 137:25
  143:13 144:8
  155:10 159:14
  163:12,17 174:7
  191:23 197:1,2,3
  199:11
wanting 187:17
wants 130:19
  164:23 189:9
warranties 138:22
warranty 178:7,9
wars 130:8
Washington 110:15
  111:9,19
wasn't 122:15,18
  124:15 136:6
  197:11 199:9
watch 163:8
watching 124:21
water 115:7
waterfront 161:15
way 113:22 114:4,13
  120:22 124:16
  125:25 126:17,21
  127:18 134:22
  135:1 138:17
  139:22,23 141:3
  141:25 143:1
  152:23 156:25
  166:20 167:16,20
  169:2,21 172:21
  179:25 185:25
  191:15 197:12,16
ways 123:24

CDK Global & Reynolds and Reynolds                                    9/19/2019

[218]

we'll 144:17,18,21
  146:8 173:23
  177:23 194:24,25
we're 194:24
we've 114:19 125:6
  127:25 138:5
  141:14 155:23
  167:14 180:10
  188:21 190:9
  191:5,13 194:3,4
  195:9 199:15
wearing 193:15
Web 147:10,16
website 147:18
  182:12
websites 182:11
week 115:19 162:8
  165:12 181:14
weekends 179:5
weeks 162:9
Wehr 110:25 201:4
  201:17
weigh 194:19
widely 188:18
widespread 184:14
wife's 161:4
wildly 138:24
William 111:5 113:5
WILLIAMS 111:6
wind 126:12 131:12
  136:3 139:11
  198:22
winterizing 148:4
witness 113:11
  116:6 124:2
  166:18 200:3
word 119:13 149:16
  185:15
words 119:4 121:23
  132:16 145:5
  174:18 190:24

work 136:7 172:3
  179:4 183:17
  188:16 194:16
worked 161:9
  185:10 194:5
working 156:21
  185:7
works 160:25 163:6
  168:19 190:8
world 129:14
  134:23 135:1
  186:15
worse 192:21
worst 120:7 190:12
worthwhile 178:15
wouldn't 122:14
  132:15 134:20
  195:13
wrapper 137:24
write 131:21 168:24
writes 180:11
writing 133:14
written 153:21
wrong 117:3 130:5
  181:8 184:6
  188:10
wrote 120:6 143:2

            X

X 112:1

            Y

yeah 126:20 139:13
  142:22 147:22
  152:23 193:25
  194:24 195:8
year 139:7
years 115:9 135:1
  158:12,13,13
  174:25 185:10
  190:17 193:20
  197:22
yep 156:21,21
yesterday 113:6,8
  113:20 114:1
  115:24 116:1
  130:4 174:19

177:9

            Z

            0

001 117:1
003 141:5
007 137:8

            1

1 146:10 168:25
  192:6
1.8 150:12
1:08 200:7
100 111:18 185:22
  185:25 186:4
  192:12
100,000 121:19
11 130:15 195:19
11/2016 112:19
11/21/16 112:18
113 112:4
114 112:8
1143 112:8 114:19
  114:20 115:13
  116:18,25 117:22
  124:5
125 112:9
13 151:18
130 112:10
136 112:11
14 125:9 137:13
144 112:12,13,14
15 189:21
155 112:15
15th 158:12
16 161:17
167 112:16
171-0056 110:6
18 159:13
180 112:17
185 112:18
188 112:19
19 110:11
192 112:20
1975 124:20

            2

2 147:9,14 148:14
2.5.3 150:21,25
  151:1
2/26/15 112:15
20006 110:15
  111:19
2014 115:16 125:9
  130:15 137:10,13
  143:19 160:4
  195:19
2015 130:23 131:7
  154:19 156:2
  158:5 159:11,13
  159:17 160:5
  167:7 169:17
  173:17 174:5,12
  183:3
2016 185:2 188:24
  189:21
2017 192:6
2018 154:17
2019 110:11
202 111:10,20
20580 111:9
2099 110:14 111:17
21 185:2
26 156:2 159:11

            3

3 147:23
3(a)(v) 199:3
3.A.v 142:18
3/19/15 112:17
30 115:16
30th 116:13
326-3695 111:10
37-year 174:23
3PA 112:12 117:15
  117:17,23 118:6
  118:14 119:22
  122:16 125:2
  127:8,23,24,25
  128:2,7,21 129:4
  129:19 132:12
  144:24 146:23,25

147:5,20 148:7
  184:13
3PA-B 148:14

            4

4 130:18 151:18
  196:6
4.2 152:25 153:4,18
4.5 151:16,21
4036 112:9 125:6,6
  137:12
4036-002 125:12
  126:25
4037 112:10 130:12
  130:13 195:16
4038 112:17 180:7,7
4038-002 183:25
4043 116:3,4,10
4045 112:14 144:23
  145:3 151:13
4045-003 152:25
4045-004 151:17
  153:24
4152 112:12 144:24
  145:2 146:6
4152-001 148:11
4152-004 148:20
4152-016 146:7,22
4152-017 147:9,13
4152-018 147:23
4153 112:13 144:25
  145:2 150:9
4153-002 150:12
4153-006 150:20,24
4176 112:15 155:23
  155:24 156:1,5
  162:11
4176-004 157:8
4176-005 162:12
  164:12
4182 112:16 167:2,2
4182-003 167:9
  168:24
4273 112:11 136:25
  137:1,8 140:21
  141:6 198:15
4273-003 198:20

**CDK Global & Reynolds and Reynolds**                    **9/19/2019**

**4420** 112:19 188:22
  188:22 191:12
**4459** 112:18 185:1,1
  185:15
**4463** 112:20 192:4,5
  192:11
**45** 123:24
**48** 185:10
**49** 174:25 185:10
**4C** 132:16

---
### 5
**5** 198:21
**50** 187:5
**50,000-mile** 148:4
**5th** 137:10

---
### 6
**60** 175:8
**600** 111:8
**6240's** 180:9

---
### 7
**7/14/14** 112:9
**7/2/14** 112:8
**747-1958** 111:20

---
### 8
**8/1/17** 112:20
**85** 184:10 187:5,7

---
### 9
**9/11/14** 112:10
**9:05** 110:18
**90** 187:5,7,8