# Exhibit 14

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| In the Matter of the Seizure of *(Briefly describe the property to be seized)* All funds up to $77,888,782.62 in Mirabaud Bank account #509951 in the name of Edge Capital Investments, Ltd., located in Switzerland | ) ) ) ) ) Case No.20-mc-00183-MEH |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in ___Switzerland___ _____ is subject to forfeiture to the United States of America under ___18___ U.S.C. §§ ___981(a)(1)(A) & (C), 982(a)(1),___ and 28 U.S.C. § 2461.  *(describe the property)*:

All funds up to $77,888,782.61 in Mirabaud Bank account #509951 in the name of Edge Capital Investments, Ltd., located in Switzerland

The application is based on these facts:

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are set forth in the attached affidavit which is continued on the attached sheet and made a part hereof.

☑ Continued on the attached sheet.

_____
s/ Ted Lair
*Applicant's signature*

_____
Ted Lair, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and:☐ signed in my presence. ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___10/22/2020___

_____
*Judge's signature*

City and state: ___Denver, Colorado___

_____
Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Ted K. Lair, upon being duly sworn, depose and state:

### Introduction

1.      Your Affiant is a special agent for the United States Treasury Department, Internal Revenue Service, Criminal Investigation (IRS-CI), Pacific Area, Denver, Colorado.  I have been a special agent for 20 years.  My duties and responsibilities include investigating possible criminal violations of the Internal Revenue laws under Title 26, United States Code, and related offenses, including but not limited to, violations of Title 31, Bank Secrecy Act or Currency Crimes; and Title 18, Money Laundering Statutes, based upon certain Specified Unlawful Acts (SUA), as defined under Title 18 USC § 1961 and Forfeiture.  I am a Certified Public Accountant licensed in the state of Nevada.  I was previously an auditor and tax accountant for a national public accounting firm for approximately three years and as a controller for a private real estate development company for approximately six years.  While employed as an auditor, my experience includes conducting audit engagements of dozens of companies in numerous industries adhering to Generally Accepted Accounting Principles and in accordance with Generally Accepted Auditing Standards.

2.      Your Affiant's experience includes numerous investigations of individuals, partnerships, and corporations, which he conducted or assisted in conducting while a special agent.  Many of these investigations focused on individuals deriving income from illegal activities such as bank fraud, securities fraud, real estate mortgage fraud, embezzlement, credit card fraud, mail/wire fraud, narcotics trafficking, false claims, abusive trust schemes, money laundering and filing false income tax returns.

3.      Your affiant is aware that individuals involved in this type of illegal financial fraud activity often use aliases, fictitious names, or false identification cards other than their own to avoid detection.  That these individuals very often place assets in names other than their own to avoid detection of these assets by law enforcement agencies. That even though these assets are in other person'(s) names, these individuals continue to use these assets and exercise dominion and control over them.

4.      Your affiant is aware that individuals involved in illegal financial fraud activities amass large proceeds from these activities, and that these individuals attempt to legitimize these proceeds.  I know that to accomplish these goals, these individuals utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

5.      Your affiant is aware that individuals involved in money laundering activities and other illegal financial fraud activities sometimes attempt to conceal substantial wealth from law enforcement authorities, and in particular the Internal Revenue Service, if they gained such wealth from illegal activities or are attempting to evade the proper tax liability resulting from such wealth.

6.      Your affiant is aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including but not limited to money laundering and bank and wire fraud.

7.      This Affidavit is in support of an application for a seizure warrant for the following asset:

- All funds up to $77,888,782.61 held in Mirabaud Bank Account Number – 509951 in the name of Edge Capital Investments Ltd.

8.      The statements contained in this affidavit are based, in part, on knowledge acquired by your affiant and, in part, on information provided to your affiant by other law enforcement officers, the personnel of law enforcement agencies and independent witnesses.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested seizure, I have not included all facts developed during the investigation but only those facts that I believe are necessary to establish probable cause as described.

### Statutory Provisions

9.      Pursuant to Title 18, United States Code, Section 1344 bank fraud, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice—

(1)   to defraud a financial institution; or

(2)   to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

10.     Pursuant to Title 18, United States Code, Section 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

11.    Pursuant to Title 18, United States Code, Section 1956(a)(1)(B)(i), it is a criminal violation for an individual, whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct such a financial transaction with the specified unlawful activity proceeds, knowing that the transaction is designed in whole or in part –

> To conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity.

12.    Pursuant to Title 18, United States Code, Section 1957(a), it is a criminal violation for an individual to knowingly engaging in a monetary transaction in criminally derived property that is greater than $10,000.00 and is derived from a specified unlawful activity.

13.    Title 18, United States Code, Section 1956(h) is a conspiracy to commit any offense in section 1956 or section 1957.

## Probable Cause to Seize

14.    The following facts and information have been discovered through my investigation and observations and the investigations and observations of fellow law enforcement officers as reported to me:

## I. BACKGROUND OF THE INVESTIGATION

15.     This investigation originated from information received by the Federal Bureau of Investigation.   The IRS-CI Denver Field Office is currently involved in an ongoing international investigation with the Bermuda Police Service of two U.S. billionaires, Robert Smith and Robert Brockman, who utilized a system of offshore structures to conceal income and assets from the IRS.   Through a series of investments in offshore private equity funds, it is alleged that taxes were not paid on approximately $3 billion in reportable income.

16.     During the course of the investigation, IRS-CI also began an investigation into the purchase of a debt on the secondary debt market involving a company, identified as Reynolds & Reynolds.

17.     As discussed in more detail below, the investigation revealed that Robert Brockman was involved in a fraudulent scheme in which he used a foreign company, Edge Capital Investments, which was under his control, to purchase Reynolds & Reynolds' (a domestic company) debt on the secondary debt market without disclosure of his control and through the use of a nominee.   Some of the profits realized from the scheme were used in a subsequent recapitalization of another domestic company, SumTotal Systems.   In total, $77,888,782.61 consisting of proceeds of wire fraud and bank fraud, and property involved in money laundering were transferred to Mirabaud Bank in Switzerland.

### *Overview of Individuals and Entities*

18.     Robert Smith is the Founder, Chairman and CEO of Vista Equity Partners (Vista), a large private equity firm headquartered in San Francisco, California with over $58 billion in capital commitments.

19.     Robert Brockman is CEO and founder of several businesses, including Spanish Steps Holdings, Ltd., Universal Computer Systems Holdings, Inc. ("Universal Computer Systems"), Dealer Computer Services, and Reynolds & Reynolds.  According to a source of information, Brockman lives in his Aspen, Colorado home every year from Memorial Day to Labor Day. The vacation home, known as Mountain Queen, is located just outside of downtown Aspen, Colorado.  Flight log records from Brockman's personal jet confirms he frequently travels to Aspen, Colorado.

20.     Evatt Tamine is an Australian national who currently resides in the United Kingdom, Bermuda, and Australia.  Various documents list Evatt Tamine as the trustee, director, or manager of various entities controlled by Brockman.

21.     Spanish Steps Holdings, Ltd. ("Spanish Steps") is a British Virgin Islands based entity owned by Robert Brockman.  Evatt Tamine is the Director of Spanish Steps. Universal Computer Systems Holdings, Inc. is 93% owned by Spanish Steps.  Universal Computer Systems Holdings, Inc. is headquartered in Houston, Texas.

22.     Universal Computer Systems Holding, Inc. is the parent holding company for Reynolds & Reynolds and Dealer Computer Services.  Robert Brockman is the CEO and founder of Dealer Computer Services and is the CEO of Reynolds & Reynolds. Reynolds & Reynolds is a leading provider of integrated software solutions for automotive dealerships headquartered in Kettering, Ohio.

23.     Edge Capital Investments is a Nevis corporation company. Evatt Tamine is the Director of Edge Capital Investments.  Edge Capital Investments was set-up by the Massengill Children's Trust as a cover to shield Brockman's ownership interest in Edge Capital Investments.  The Massengill Trust was originally set up by Don Jones, the former

CFO of Universal Computer Systems, and relates to his wife's side of the family. Melissa Jones, Don Jones' wife, has the maiden name Melissa Massengill.  According to Tamine, the original source of funds for Edge Capital Investments came from another Brockman owned entity named Computer Terminals, Ltd.; a defunct Cayman Islands based company that previously manufactured and sold IT equipment. Upon its liquidation in the late 1990s, there was a substantial sum of money that was donated to the offshore structure that includes present day Edge Capital Investments.

24.     Similar to Edge Capital Investments, Point Investments was set-up by the Massengill Grandchildren's Trust as a cover to shield Brockman's ownership interest in Edge Capital Investments.  This Massengill Trust was also set-up by Don Jones, the former CFO of Universal Computer Systems.  Per an email dated May 10, 2014, from Brockman to Tamine regarding the original source of funds for Point Investments, Brockman advised that it came from a substantial distribution in the 1990s from Universal Computer Systems prior to the 30% withholding rules that exist today.[1]

### *Cooperation by Tamine*

25.     After the Bermuda Police Service executed a search warrant at Tamine's Bermuda residence on September 5, 2018, Tamine agreed to cooperate with the United

---

[1] On December 2, 2012, Tamine recommended to Brockman in an email that they needed to change the ownership structure for both Edge Capital Investments and Point Investments.  Tamine was concerned that the pending implementation of FATCA (Foreign Account Tax Compliance Act) would necessitate having to make changes to Brockman's offshore structures in order to continue to avoid IRS detection and scrutiny. Brockman concurred with Tamine's recommendation and the ownership structure for Edge Capital Investments was subsequently changed from Massengill Children's Trust to Edge Purpose Trust on or about March 8, 2013.  Similarly, the ownership structure for Point Investments was subsequently changed from Massengill Grandchildren's Trust to Point Purpose Trust on or about October 10, 2014.

States government in its investigation of Smith and Brockman in exchange for a grant of statutory immunity, authorized by the Department of Justice – Tax Division on October 2, 2018.

26.     Tamine provided information that Brockman, over the course of 20 plus years, had created a complex web of offshore structures in order to avoid scrutiny by the IRS and other governmental authorities.

27.     Tamine assisted Brockman in evading the payment of U.S. income tax by concealing income and assets using a web or offshore trusts and entities that Tamine managed and/or help set up.  Additionally, at Brockman's direction, Tamine was involved in the destruction of records to keep these assets and income hidden from the IRS.

28.     Tamine, Brockman, and others went to extreme measures to conceal, encrypt, and otherwise safeguard their communications regarding their offshore trust structures.  Over the years, all of them used code names, encrypted email, phone and text lines when communicating about the purposes and usage of the offshore trust entities.  During this process, they referred to the IRS as "The House."

29.     Tamine has been to Brockman's Mountain Queen home in Colorado. Tamine often communicated with Brockman when Brockman was working remotely form his Mountain Queen home. When working remotely, Brockman and Tamine would use Skype, almost always utilizing the video function. Because Tamine has been to the Mountain Queen property, and had seen Brockman's office at that property, when communicating on Skype Tamine could easily recognize that Brockman was in his Mountain Queen office.

30.     Although Brockman directed Tamine to destroy inculpatory records and evidence, Tamine retained copies of records and evidence that Brockman had instructed him to destroy.

### Overview Bank and Wire Fraud Scheme

31.     Tamine provided information that he and Brockman had arranged to purchase Reynolds & Reynolds debt in the secondary debt market without disclosing Brockman's affiliation with Reynolds & Reynolds.

32.     In late 2008, Brockman developed and implemented a strategy to acquire the 2nd and 3rd lien debt of Reynolds & Reynolds, through deceptive means, thereby defrauding Deutsche Bank and other debt holders in the secondary debt market.

33.     In all, Brockman obtained over $72 million in proceeds from this bank and wire fraud scheme, and deposited these funds into a bank account at Bermuda Commercial Bank, in the name of Edge Capital Investments. Tamine, at the direction of Brockman, then laundered approximately $57 million of the $72 million in proceeds received from the debt repurchase scheme through Brockman's offshore accounts and business entities, including several of Vista Equity Partners' funds.

### The Primary and Secondary Debt Market Explained

34.     A syndicated loan, also known as a syndicated bank facility, is a loan financed by a group of lenders - referred to as a syndicate – who work together to provide funds to a single borrower.

35.     A joint lead arranger is a commercial or investment bank that arranges, with one or more other lead arrangers, to arrange the financing and management of a syndicate.

36.     In the primary debt or loan market, the money paid by the investors, or lenders, goes directly to the issuer companies or borrowers.  When the investors purchase debt, they can either hold it and receive regular interest payments and the principal at maturity date, or sell the debt on the secondary market.

37.     The secondary debt market plays a marketplace role for corporate debt issued in the primary market.  The secondary debt market handles the reselling of debt by investors.  Upon reselling of debt by an investor, the new owner of the debt now will be eligible to receive the regular interest payments and the principal at the debt's maturity date.

38.     Current interest rates, company performance, value of assets and covenants can all affect the market value of debt in the secondary market.

### The 2008 Credit Crunch

39.     According to a former Deutsche Bank analyst that covered the secondary market debt, a significant market event (i.e. the global financial crisis of 2008) caused a liquidity problem for the credit markets and depressed the pricing of debt issues, including Reynolds & Reynolds's debt, which was trading at 25 to 30 percent of par, or face value.

40.     Based on various articles, about the 2008 recession, leveraged loans began trading at a discount to par (i.e. their face value).  This was not necessarily a reflection of the underlying credit quality of this issuer, but was a function of the general "post-credit crunch" contagion and lack of liquidity affecting the loan markets.

41.     The most obvious benefit to borrowers, when their debt is trading at a substantial discount, is the ability to utilize their available cash to buy their debt at a discount to par, and then retire it.  In the normal course, the only way for a borrower to

retire its debt is for it to prepay it at par.  However, in these unusual market circumstances, a borrower could purchase its debt at a discount to par and then retire the par value of that debt, thereby achieving a significant economic advantage and reducing its overall net leverage.  This is also called a "debt buyback."

42.     In practice, however, the actual borrower was very often prevented from a debt buyback because of the pro-rata payment provisions contained in the loan agreement.   Pro-rata payment provisions in a loan agreement often state that all payments are distributed to the lenders, or syndicate, on a pro-rata basis.  Specifically, borrowers' payments on a syndicated loan would have to be apportioned among all of the outstanding loans, including 1st, 2nd, and 3rd tiers of the overall debt.  Thus, a borrower would be unable to "buyback" the 2nd and 3rd tier debt without also paying off the 1st tier loan in full as well.

43.     In order to amend the pro-rata payment provision generally requires the unanimous approval of all of the lenders, or syndicate.  Often this is difficult to obtain unless the syndicate is a small group.

44.     In addition to seeking an amendment to the pro-rata terms, the borrower would also need to obtain any necessary consents and approvals under the terms of the loan agreement to effectuate a debt buyback.

45.     The terms of the buyback would include the process by which the loans would be sold, as well as the terms of the sale.  The terms of the sale would include all of the following:

- The purchase price of the debt (a fixed price or a range).

- The length of time the offer or auction will be open.

- The amount of debt that can be bought.

- The number of offers or auctions that are permitted.

The borrower could only begin the offer, or auction process, once the terms of the amendment and the buyback itself have been agreed to by the syndicate.

## II. THE REYNOLDS & REYNOLDS DEBT BUYBACK

46.    In 2006, Reynolds & Reynolds was acquired by Universal Computer Systems, Inc. ("Universal Computer Systems"), a company founded by Brockman.  Prior to the purchase, Reynolds & Reynolds was a competitor of Universal Computer Systems.

47.    Disclosures filed with the U.S. Securities and Exchange Commission (SEC) indicated that the total purchase price for Reynolds & Reynolds in 2006 was approximately $2.4 billion. Brockman paid approximately $300 million in cash and borrowed approximately $2.1 billion for the acquisition of Reynolds & Reynolds.  The SEC disclosures further revealed that Brockman was using Spanish Steps as the entity that would own the stock in Reynolds & Reynolds.  The director of Spanish Steps is Evatt Tamine.

48.    Robert Smith, as CEO of Vista Equity Partners, also provided $50 million of the equity financing for Brockman's acquisition of Reynolds & Reynolds.  Vista Equity Partners subsequently owned approximately 3% of Reynolds & Reynolds.  Upon this acquisition, Smith also became a board member of Reynolds & Reynolds and was actively involved in the negotiations with Deutsche Bank's original financing and subsequent refinancing, including the debt buyback proposals.

49.     Deutsche Bank AG New York was the primary lender that financed Brockman's acquisition of Reynolds & Reynolds.  The purchase was financed through three Credit Agreements with Deutsche Bank as follows:

- o  First Lien Credit Agreement – Credit Facility = $1,377,000,000

- o  Second Lien Credit Agreement – Credit Facility  = $520,000,000

- o  Third Lien Credit Agreement – Credit Facility  = $250,000,000

50.     All three Credit Agreements, dated October 26, 2006, were signed by Robert Brockman as CEO of Universal Computer Systems Holding, Inc., the parent holding company for Dealer Computer Services and Reynolds & Reynolds and, under a separate signature block, by Robert Brockman as CEO of  Dealer Computer Services.

51.     The Second and Third Lien Credit Agreements include a pro rata payment provision.   According to Section C. General Provisions Regarding Payments of the Reynolds & Reynolds Credit Agreements, "paragraph (iii) **Apportionment of Payments - Aggregate principal (including prepayments), interest and prepayment premium payments in respect of Term Loans shall be apportioned among all outstanding Term Loans to which such payments relate, proportionately to Lenders' respective Pro Rata Shares**.  Administrative Agent shall promptly distribute to each Lender, at the account specified in the payment instructions delivered to Administrative Agent by such Lender, its Pro Rata Share of all such payments received by Administrative Agent when received by Administrative Agent."

52.     The Administrative Agent on all three credit agreements was Deutsche Bank AG New York.

53.      Based on the pro rata provision, the Second and Third debt of Reynolds &
Reynolds could not be purchased by the borrower (UCS or Reynolds & Reynolds) without
approval of the First Lien Debt holder, because doing so would have violated the pro-rata
apportionment of payments set forth in those agreements.

54.      In addition, the Second and Third Lien Credit Agreements for Reynolds &
Reynolds defined the term "Affiliate."   According to Section 1, the term "Affiliate" was
defined as "any other Person directly or indirectly controlling, controlled by, or under
common control with, that Person. For the purposes of this definition, 'control' . . . means
the possession, directly or indirectly, of the power to direct or cause the direction of the
management and policies of that Person, whether through the ownership of voting
securities or by contract or otherwise."

55.      The Second and Third Lien Credit Agreements for Reynolds & Reynolds
also defined **"Eligible Assignee," that is an individual or entity that may be assigned
the debt,** in relevant part, as **"**(i) any Lender, any Affiliate of any Lender and any
Approved Fund of any Lender; and (ii) (a) a commercial bank organized under the laws
of the United States or any state thereof; (b) a savings and loan association or savings
bank organized under the laws of the United States or any state thereof; (c) a commercial
bank . ..  (d) any other entity that is an "accredited investor" . . . ; **provided that neither
Company nor any Affiliate of Company shall be an Eligible Assignee.**

56.      Thus, based on the definitions of "Affiliate" and "Eligible Assignee," and
terms of the Credit Agreements, Brockman would be unable to purchase the Second and
Third Lien Debt through an Affiliate corporation because they would not be an "Eligible
Assignee."

***Brockman/Tamine Emails***

57.     Michael Henry, Managing Director at Deutsche Bank's Manhattan, New York office, initially emailed both Brockman and Smith as partners of Spanish Steps Holdings on October 8, 2008, informing them that there was an opportunity to buy Reynolds & Reynolds debt at market levels below par.

58.     After receiving the October 8, 2008 email from Michael Henry at Deutsche Bank about the purchasing of debt, Brockman and Evatt Tamine exchanged numerous emails regarding the purchase of the Reynolds & Reynolds debt.

59.     Brockman was aware that he could not buy Second and Third Lien debt unless he received approval from 100% of the First Lien Debt holders evidenced by the following email.

60.     On or about December 9, 2008, Brockman sent Tamine an encrypted email, which Tamine saved as a Word Doc "P20081209 re Pursuing the Possibility of Buying the Reynolds Debt.doc"  In the email, Brockman stated "We are hearing on the street that Reynolds 2nd Lien debt is trading in the 30-odd cents to the dollar range.  This is LIBOR plus 5,5% paper – which would yield 7.5% x 3 = 22.5% yield with a 3X return when paid off.  This fact plus it now looks like Reynolds to buy its own debt would be nigh on impossible due to the necessity of getting 100% agreement from the first lien holders – makes this worth a further look.  Please talk to the new tax lawyer – lay out for him the structure of it being done through a mutual fund that invests in a US partnership.  No names, just how it works... Hopefully when the loan gets repaid, it would all be long term capital gains – with no tax.  This may be the way we can recoup some of the beating from this year.  Bob."

61.    In December 2008, Brockman and Tamine exchanged emails discussing the plan to buy Reynolds & Reynolds debt on the secondary market.  Based on travel records, and Tamine's statements that Brockman spent Christmas vacations in Colorado, it appears Brockman was in Colorado when many of these email exchanges and conversations occurred.  In particular, on or about December 29, 2008, Brockman sent Tamine another encrypted email regarding his plan, which Tamine saved as a Word Doc "P20081229 re Debt Purchase Plan.doc."  In this email, Brockman wrote "Evatt, Please see the attached debt purchase plan.  Bob." The attachment to the December 29, 2008, email, laid out a proposed plan to buy the Reynolds & Reynolds 2nd and 3rd debt. Specifically, it stated that "Edge" would likely be the purchasing entity to buy the second and third lien debt at 35%. Brockman also noted that because of the total indebtedness of Reynolds & Reynolds refinancing the remaining debt would be easier to accomplish and difficult or impossible if the debt were not reduced.

62.    In January 2009, Brockman and Tamine continued to exchange emails regarding the effect of the Reynolds & Reynolds debt purchase plan.  Based on travel records and Tamine's statements that Brockman spent Christmas vacations in Colorado, it appears Brockman was in Colorado when many of these email exchanges and conversations occurred.

63.    On January 8, 2009, Brockman noted that Tamine had previously commented that buying back "Reynolds debt" would be troublesome.  Brockman also added further thoughts about the "Reynolds debt," including "I anticipate that there will be a substantial goodwill write-down at Reynolds – which while it has nothing to do with EBITDA or cash flow - will create a huge accounting loss for the year - which will further

dampen the spirits of the lienholders - and cause more debt to be available - and possibly at even deeper discounts."

64.     On or about January 10, 2009, Brockman sent Tamine an encrypted email. In this email, Brockman stated, "Evatt, I agree that you should proceed to open an account with DB and proceed to buy some 2nd and 3rd lien debt out of Edge.  Hopefully prices (discounts) and availability will eventually be good - so that all of the second and third lien debt can be purchased.  This project has the potential to recoup the losses of 2008 plus ensure the safety of Reynolds"

65.     On or about March 9, 2009, Brockman sent Tamine an encrypted email which stated, "I have no specific requests regarding the debt purchase record-keeping. My goal is simple - at the end of the day to own all the 2nd and 3rd lien debt straight out - and to have purchased it at substantial discounts.  Please do whatever you deem necessary to keep track of it all - as it will need to be set up in the books as assets.  We will also need to keep track to make sure that we get all of the interest income that we are due.  If we are fortunate enough to be successful, there will be substantial interest income that perhaps we can begin to devote to purchase of first lien debt.  At 25% - the third lien debt will yield 32%. At 30%, the second lien debt will yield 20%.  Bob"

### *Emails from Deutsche Bank to Brockman and/or Robert Smith*

66.     On March 11, 2009, Michael Henry, Managing Director at Deutsche Bank's New York office, emailed Robert Smith and Bob Brockman a 7-page presentation entitled Loan Repurchase Follow-Up Discussion Materials.

67.     The proposal indicated that Deutsche Bank believed that $125 million of face value debt was available for repurchase over the course of multiple tenders, or

rounds of purchasing.  The top 25 list of 2nd and 3rd lien debt holders indicated that Farallon Capital Management, LLC and Deutsche Bank were the two largest lien holders; holding $101 million and $49 million, respectively.  Brockman emailed Tamine on March 12 and 14, 2009, acknowledging receipt of this 7-page proposal.

68.     Brockman's knowledge that he was obligated to seek an amendment to the credit agreement is further illustrated by the Deutsch Bank lender's presentations in June and November of 2009 that were emailed to Robert Smith,  which set forth the following:

- Deutsch Bank understood that Bob Brockman and a group of investors would like to invest up to $1 billion to purchase R&R debt at the open market at a discount.

- Deutsch Bank advised them to make multiple tenders (rounds of purchases) averaging a 25% premium to the market prices in order to be successful. (The prices quoted by Deutsch Bank for the 1st, 2nd and 3rd lien debt were 82, 58, and 45 respectively, well above Brockman's plan to acquire 2nd and 3rd lien debt at 25 to 30).

- Deutsch Bank understood that Bob Brockman and a group of investors are interested in contributing new equity to Reynolds & Reynolds to de-lever the company of approximately $1.5 billion of debt.

- Deutsch Bank outlined that Spanish Steps is currently not allowed to repurchase debt as they are Affiliates of Reynolds & Reynolds.

- Deutsch Bank noted that by amending the definition of "Eligible Transferee" under the respective credit agreements, Affiliates will be permitted to buy

loans in the open market.  This would require a 51% vote under each respective credit agreement.

- Deutsch Bank noted that to prevent any violations of the pro-rata sharing and payment provisions (100% vote issues), an Affiliate would be subject to additional requirements to include the repurchase of debt through modified Dutch auctions.

### Mechanics of Buy Back

69.    No amendment to the credit agreements were obtained to permit an affiliate to purchase the Reynolds & Reynolds debt on the secondary debt market.

70.    Between March 5, 2009 to April 22, 2009, Brockman and Tamine began to purchase Reynolds & Reynolds 2nd and 3rd lien debt through Edge Capital without disclosing Edge Capital as an affiliate.  As stated *supra*, Edge Capital Investments were set-up by the Massengill Children's Trust as a cover to shield Brockman's ownership interest in Edge Capital Investments.  The Massengill Trust was originally set up by Don Jones, the former CFO of Universal Computer Systems.  According to Tamine, the original source of funds for Edge Capital Investments came from another Brockman owned entity named Computer Terminals, Ltd.  The debt buyback occurred as follows.

71.    On January 10, 2009, Brockman emailed Tamine and stated, "I agree that you should proceed to open an account with Deutsche Bank and proceed to buy some 2nd and 3rd lien debt out of Edge Capital.  Hopefully prices (discounts) and availability will eventually be good - so that all of the second and third lien debt can be purchased."

72.    On January 15, 2009, Tamine submitted to Deutsche Bank a false account opening application for Edge Capital, concealing Brockman as the true beneficial owner.

In the account opening documents, Tamine informed Deutsche Bank that his client was a company called Edge Capital Investments Ltd., which was owned by a fully discretionary trust. Tamine further advised that the trust had a corporate Trustee, who had full discretion in relation to the trust assets and no beneficiary has any expectation, claim or right, to any of the trust assets. Contrary to Tamine's representations regarding the workings of a fully discretionary trust, the evidence shows that Brockman owned and controlled Edge Capital Investment's assets.

73.     According to Tamine, on paper the Trustee that oversaw Edge Capital Investments was an individual named Crispin Ruffel-Smith; however, he had no real authority. Crispin Ruffel-Smith resides in the British Virgin Islands, owns a tool rental shop and served purely as a nominee. Crispin Ruffel-Smith took direction from Tamine and would sign documents as instructed in order to make it appear that Brockman was not involved.

74.     On January 26, 2009, Paul Ardire, an employee of Deutsche Bank advised Tamine that the account in the name of Edge Capital was active and he could begin trading.  As discussed more fully below, Ardire believed that Tamine represented a Swiss family or Swiss endowment and that he was interested in purchasing debt of US companies; specifically Reynolds & Reynolds.

75.     On January 27, 2009, Brockman emailed Tamine and said, "We first want to focus on the third lien debt.  On February 15th all debt holders will receive un-audited year end financials which show deteriorating situation.  We will have a billion dollar write down of goodwill forced on us by the auditors causing substantial non-operating loss. From a timing standpoint, we would be best served by starting the offer before that date."

76.     On February 8, 2009, Brockman wrote in Tamine's 2008 Performance Review that the project of highest priority for 2009 is to successfully purchase all of the 2nd and 3rd lien debt at the current deep discounts.

77.     On February 11, 2009, Brockman emailed Tamine the following: "Regarding the offer for third lien debt. From what you have learned, the best guess is that there are two large holders of third lien debt on the west coast. With $250M face value outstanding, they both could have very large pieces. My further guess is that they if want to get rid of some of it, they probably want to get rid of all of their piece. Therefore an offer large enough to take them completely out is probably more attractive than one that leaves them with a remnant... Therefore I am thinking that we should offer to buy up to $100M face value at 20% of face value – making our investment $20M... For now we should focus on the 3rd lien debt only – as it sounds like the 2nd lien debt does not trade that much at the 35% numbers – however I expect that will change as our Q4 numbers, pension plan underfunding of $95M, goodwill write down of $1.2B, and 2009 plan come out."   Farallon and Ares are large investment firms that manage capital on behalf of institutions and individuals.   Brockman advised Tamine that they needed to make a large enough initial offer to induce Farallon to sell their debt.

78.     On February 11, 2009, Brockman emailed Tamine that he didn't "want to go for the whole 3rd lien debt at once.  We need to keep Deutsche Bank in the dark as much as possible."

79.     As agreed, Tamine emailed Deutsche Bank on February 17, 2009, with an offer to purchase $100 million of 3rd lien debt from Farallon at 20 cents on the dollar.

80.     On March 5, 2009, Brockman hosted a lender's earnings call to discuss the 2008 4th quarter adjustments and the 2009 Financial Plan.  Shortly thereafter, Paul Ardire with Deutsche Bank emailed Tamine and gave a recap of the earnings call, noting that that Brockman was "far from uplifting."

81.     On the same day, March 5, 2009, Brockman emailed Tamine to take the $11 million at 26.5 offered by Deutsche Bank.  Tamine then emailed Deutsche Bank that his client wished to take the $11 million at 26.5.  This led to the first contract to purchase 3rd lien debt from Farallon.

82.     On March 9, 2009, Brockman emailed Tamine, "My goal is simple - at the end of the day to own all the 2nd and 3rd lien debt straight out - and to have purchased it at substantial discounts."

83.     On March 19, 2009, Brockman emailed Tamine, "Re: Robert Smith's Ideas on Debt Purchase - Spent the day with Robert Smith - ideas to pursue massive debt repurchase, includes 1st lien debt, with a complete refinancing.  If it has legs will send you details.  Conceptually very much like DB documents I already sent you - except for all the outstanding debt.  I don't want to change anything you are doing."

84.     On March 24, 2009, Brockman emailed Tamine, "re Method of DB Trading Debt and Closing – I see no reason not to close all the debt purchase.  Helpful to get DB traders to explain their process without appearing ignorant."  As of this date, Brockman and Tamine had executed six trades, totaling $40 million in face value of 2nd & 3rd Reynolds & Reynolds lien debt.

85.     Between March 9, 2009 and April 22, 2009, Tamine entered into nine additional trades of Reynolds & Reynolds's debt.  Tamine withdrew all offers to purchase debt on or about July 6, 2009.

86.     In total, Tamine, through Edge Capital, and at the direction of Brockman, executed 10 trades in Reynolds & Reynolds 2nd and 3rd lien debt as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Reynolds & Reynolds Debt**<br>**Detailed Schedule of Debt Purchased** | | | | | | | |
| Trade No. | Trade Date | Lien Traded | Face Value | Purchase Discount | Purchase Price | Settlement Date | Upstream Seller |
| 1 | 03/05/2009 | 3rd | $ 10,228,750.00 | 26.50% | $ 2,710,618.75 | 04/06/2009 | Farallon Capital |
| 2 | 03/09/2009 | 2nd | 1,000,000.00 | 30.00% | 300,000.00 | 04/06/2009 | Future Fund Board of Guardians |
| 3 | 03/08/2009 | 3rd | 6,921,500.00 | 25.00% | 1,730,375.00 | 04/06/2009 | Farallon Capital |
| 4 | 03/16/2009 | 2nd | 7,000,000.00 | 30.00% | 2,100,000.00 | 05/14/2009 | Van Kampen |
| 5 | 03/20/2009 | 3rd | 9,500,000.00 | 26.00% | 2,470,000.00 | 04/24/2009 | Morgan Stanley<br>Ares Enhanced Credit Opportunities<br>SEI Institutional - High Yield Bond Fund |
| 6 | 03/30/2009 | 2nd | 4,500,000.00 | 33.00% | 1,485,000.00 | 06/24/2009 | UBS AG - Stamford Branch |
| 7 | 03/30/2009 | 2nd | 3,000,000.00 | 33.00% | 990,000.00 | 08/07/2009 | Alaske CBNA Loan Funding LLC |
| 8 | 03/04/2009 | 2nd | 6,000,000.00 | 35.00% | 2,100,000.00 | 08/27/2009 | Silver Lake Credit Fund LP<br>Bank of America<br>Carlyle High Yield Partners IV, Ltd. |
| 9 | 04/22/2009 | 2nd | 9,000,000.00 | 35.00% | 3,150,000.00 | 07/22/2009 | Laodiccea II, LLC |
| 10 | 04/22/2009 | 2nd | 10,427,204.92 | 35.00% | 3,649,521.72 | 07/22/2009 | Laodiccea II, LLC |
| | | | $ 67,577,454.92 | | $ 20,685,515.47 | | |

87.     Tamine, at Brockman's direction, executed and delivered fraudulent Assignment & Assumption agreements to Deutsche Bank for all 10 of the R&R debt trades listed in the above schedule.  Tamine falsely affirmed that Edge Capital was an "eligible assignee" as defined in the 2nd and 3rd lien credit agreements, when in fact Tamine was purchasing the debt on behalf of Brockman; who was not permitted to purchase the debt, since Brockman is an affiliate of R&R.

***Reynolds & Reynolds failed to disclose the affiliate purchase by Edge Capital on Ernst & Young Audited Financial Statements – 2008 and 2009***

88.    According to Reynolds & Reynolds's 2nd and 3rd lien credit agreements, the credit agreements required Reynolds & Reynolds to obtain quarterly Compliance Certificates, certifying that Reynolds & Reynolds was not aware of any condition or event that constitutes an Event of Default or Potential Event of Default.

89.    On November 15, 2009, Ken Bunney, Chief Financial Officer (CFO) of Reynolds & Reynolds, and Wayne Matteson, Treasurer of Reynolds & Reynolds, signed 2nd and 3rd Lien Compliance Certificates, falsely affirming that there had been no violations of the Credit Agreements.  The investigation has indicated that Bunney and Matteson were unaware that Brockman had acquired Reynold & Reynolds debt through his nominee, Evatt Tamine and Edge Capital.

90.    Deutsche Bank personnel distributed the Compliance Certificates to all creditors, via Intralinks.  Intralinks is a cloud-based financial technology provider for global banking, deal making, and capital markets.  Farallon, located in the Northern District of California, was a recipient of the 2nd and 3rd Lien Compliance Certificates.

91.    The credit agreements also required Reynolds & Reynolds to obtain a "clean," unqualified opinion of its annual audited financial statements from its auditor Ernst & Young and an Auditor Debt Compliance Report, stating whether any condition or event that constitutes an Event of Default or Potential Event of Default had come to Ernst & Young's attention during their audit.

92.    Ernst & Young audited Reynolds & Reynolds 2008 and 2009 annual financial statements and provided a "clean" unqualified opinion that the financial statements were presented fairly, in all material respects, the financial position and results of operations and related cash flows for the years then ended in conformity with generally

accepted accounting principles.  However, a review of the financial statements indicate that Brockman's debt buyback plan, and subsequent purchases of 2nd and 3rd lien debt, were not disclosed in the notes to the financial statements.  These transactions were "related party" transactions between Brockman (as CEO) and his company, Reynolds & Reynolds, and, therefore, should have been disclosed.  Brockman's concealment of his debt buyback scheme and intentional omission of relevant information that should have been disclosed caused the financial statements to be materially false, or misleading, and not in conformance with generally accepted accounting principles.

93.    As cited in the "Year End Financials" section of the 2nd and 3rd Lien Credit Agreements, there is also a requirement that the audited financial statements of Reynolds & Reynolds be presented in accordance with Generally Accepted Accounting Principles and that the audits were conducted in accordance with Generally Accepted Auditing Standards.

94.    Based on my qualifications as a licensed Certified Public Accountant (CPA), and prior experience as an auditor in public accounting, the financial statements as presented appear to be materially false, or misleading, and are not in conformance with generally accepted accounting principles.

95.    GAAP refers to a common set of accepted accounting principles, standards, and procedures that companies and their accountants must follow when they compile their financial statements.  GAAP is a combination of authoritative standards promulgated by the Financial Accounting Standards Board (FASB) and the commonly accepted ways of recording and reporting accounting information.

96.    The full disclosure concept is an accounting principle that requires management to report all relevant information about the company's operations to creditors and investors in the financial statements and footnotes.  In other words, GAAP requires that management tell external users material information about the company.

97.    The purpose of the full disclosure principle is to share relevant and material financial information with the outside world.  Since outsiders do not know the details of a company's business deals, contracts, and loans, it is difficult to form an opinion of the entity.  Relevant information to outsiders is anything that could change an external user's decision about the company.

98.    As part of the 2008 year-end auditing procedures, the audit team personnel from Ernst & Young interviewed Reynolds & Reynolds's management.  Brockman was aware of the on-going audit procedures performed by Ernst & Young, culminating upon his signing of a Management Representation letter as one of the final requirements for obtaining an unqualified audit opinion.

99.    The Management Representation Letter, signed by Brockman on March 25, 2009, contained the following acknowledgements and related misrepresentations:

- We recognize that obtaining representations from us concerning the information contained in this letter is a significant procedure in enabling you to form an opinion whether the consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of Reynolds & Reynolds in conformity with US generally accepted accounting principles.

- Certain representations in this letter…, **if they involve an omission** or misstatement of accounting information that, in light of surrounding circumstances,

makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the **omission** or misstatement. Accordingly, we make the following representations, which are true to the best of our knowledge and belief:

- **We have no plans** or intentions that may materially **affect the carrying value** or classification of assets and **liabilities.**

- **Related Party Transactions:** Transactions with related parties, as defined in Statement of Financial Accounting Standards No. 57, Related Party Disclosures, and related amounts receivable or payable, including sales purchases, loans, transfers, leasing arrangements and guarantees, **have been properly** recorded and/or **disclosed** in the consolidated financial statements.

- We have **no knowledge of any fraud or suspected fraud involving management** or other employees who have a significant role in the Company's internal control over financial reporting.

- We have disclosed to you all allegations of financial improprieties, including fraud or suspected fraud, coming to our attention.

- **Subsequent Events:** Subsequent to December 31, 2008, **no events or transactions have occurred or are pending** that would have a material effect on the consolidated financial statements at that date or for the period then ended, or **that are of such significance** in relation to the Company's affairs to **require mention in a note to the consolidated financial statements** in order to make them not misleading regarding the consolidated financial position, results of operations or cash flows of the Company.

100.   In his March 25, 2009 Management Representation Letter, Brockman concealed the fact that he had implemented a debt buyback plan that contemplated purchasing all of the Reynolds & Reynolds 2nd and 3rd lien debt in the secondary debt market ($770 million in total) and was acquiring it through his nominee, Evatt Tamine. These related party transactions were required to be disclosed in the notes to the financial statements.   Brockman was engaged in fraudulent financial reporting when he intentionally omitted material information that caused the financial statements to be materially false or misleading.   Deutsche Bank and other creditors relied on these financial statements to make business decisions.

101.   On March 26, 2009, Ernst Young signed audit opinion letter and issued 2008 Audit and Report on Compliance.  On March 31, 2009, this 2008 Audit and Report on Compliance letter was sent to Deutsche Bank.  On March 31, 2009, the 4th Quarter 2008 Reynolds & Reynolds Debt Compliance Certificates was sent to Deutsche Bank.

102.   The next day, April 1, 2009, Reynolds & Reynolds 2008 Financial Information was posted to Intralinks.

### *Reynolds & Reynolds Refinance*

103.   On February 17, 2010, Brockman emailed Tamine and advised that Deutsche Bank had just called him, and Brockman thinks "it was time to refinance." Brockman thought the term sheet was almost perfect. Brockman said that Robert Smith was going to engineer a bidding process between Deutsch Bank, Credit Suisse and Bank of America.

104.    On February 24, 2010, Brockman emailed Tamine and informed him that Deutsche Bank offered the best deal and that Brockman was going to discuss this with Robert Smith the following day.

105.    On February 26, 2010, Tamine emailed Brockman to congratulate him. Tamine wrote that he assumes Robert Smith does not know that they hold some of the Reynolds & Reynolds debt. Tamine informed Brockman he is having dinner with Smith and the topic may come up. Brockman responds to Tamine - "Robert does not know we hold any debt and should not be told."

106.    On March 15, 2010, Deutsche Bank was notified by Robert Smith that they were awarded the "Lead-Left" role for the underwriting of Reynolds & Reynolds new refinancing. This meant that Deutsche Bank became the lead bank within the new loan syndicate.  This term is used in the finance industry to indicate that the bank has played the most important role in the transaction and has been in the deal from an early stage.

107.    Once the terms of the new financing with Deutsche Bank were finalized, Brockman worked over the next several weeks with various representatives from Deutsche Bank to provide due diligence materials and prepare a "Bank Book" and a Lender's Presentation in order to market the debt offering. The "Bank Book" is a term used in finance to describe the Confidential Information Memorandum that is prepared containing information on the borrower, the borrower's industry, loan terms and the borrower's financial projections.

108.    On April 1, 2010, Tamine sent Brockman a copy of Deutsche Bank's announcement for the Lenders Presentation to occur in New York City on April 6, 2010.

Tamine advised Brockman that he will not participate, since Ken Bunney (Chief Financial Officer (CFO) of Reynolds & Reynold) will be in attendance.

109.   A review of the loan terms indicated that Reynolds & Reynolds was borrowing approximately $1,820,000,000 that was to be used, in portion, to pay off the existing second and third lien debt in the face amount of $520,000,000 and $250,000,000, respectively, of which approximately $67 million was purchased and held by Brockman through Edge Capital.

110.   On April 21, 2010, Tamine received a wire transfer of $67,835,129.00 to Edge Capital's Bermuda Commercial Bank.  This wire represented proceeds from the refinancing of Reynolds & Reynolds's debt in furtherance of the scheme

### *Interviews of Deutsche Bank Personnel – Reynolds & Reynolds Debt*

111.   Nikko Hayes, Managing Director of Leveraged Finance, is a Deutsche Bank employee familiar with the Reynolds & Reynolds debt.  Hayes participated as the principal financial advisor to Universal Computer Systems in their acquisition of Reynolds & Reynolds and their subsequent refinancing.   Hayes currently works for Deutsche Bank. He has been working at Deutsche Bank since 2002 in leveraged finance.  Hayes was a Vice President when he joined Deutsche Bank and is now a managing director over companies like Reynolds & Reynolds.  Hayes gave an interview on April 5, 2019, and provided the following information.

112.   Hayes was familiar with credit lien agreements, like the ones used with Reynolds & Reynolds.  Hayes explained the $2.4 billion loan to Reynolds & Reynolds was broken into three tiers; 1st, 2nd, and 3rd liens, in order of priority.  The further down you

go from 1st to 2nd to 3rd, the more leveraged the note is, and the rates are different in that the further down you go, the rates go up.

113.    Hayes stated that Universal Computer Systems, Inc. was a client of Deutsche Bank.   In September of 2006, the founder/CEO of Universal Computer Systems, Bob Brockman, wanted to buy Universal Computer System's competitor, Reynolds & Reynolds.   Reynolds & Reynolds was a public company and Universal Computer System was a private company.  Brockman needed someone to underwrite this deal, which is what Deutsche Bank's role became in that transaction.

114.    Hayes knew who Robert Smith was, and knows that he had a relationship or connection with Brockman.  Smith used to be a banker at Goldman Sachs, and he founded Vista Equity Partners.  Brockman became the initial investor in Vista Equity Partners.  Vista Equity Partners ended up investing 3% into the Reynolds & Reynolds deal.

115.    After the Reynolds & Reynolds loan closed, Deutsche Bank committed $2 billion, and then syndicated or distributed the debt to institutional investors, like Fidelity. Deutsche Bank did this to distribute risk among multiple investors.  Investors in the debt can then freely trade the debt amongst themselves or with others.  This trading takes place in the secondary debt market, explained above.

116.    Hayes was shown the Dealer Computer Services 2nd and 3rd Credit Lien Agreements.   Dealer Computer Services is a wholly owned subsidiary of Universal Computer Systems Holding, Inc.  Hayes stated that he is familiar with this document and he would have seen this document during the time that the document was created.  On the signature page of this document, Hayes identified Brockman's signature and noted

that Brockman was signing on behalf of his company Dealer Computer Services, which was a subsidiary or affiliate of Universal Computer Systems, and a party to this transaction.

117.    Hayes advised that the term "joint lead arranger" refers to Deutsche Bank's role as the underwriter in this transaction.   Deutsche Bank and Credit Suisse were arranging the loans for Universal Computer Systems.   The term "joint book manager," also known as a "bookrunner," is similar to the term above, but it describes Deutsche Bank's role in distributing the loans.   The term "administrative agent" refers to Deutsche Bank's role of being in charge of facilitating the interest payments on the loans, complying with covenants, the posting of filings on secure websites, and conducting trades, etc.

118.    Hayes' understood that Universal Computer Systems made interest payments on their loan directly to Deutsche Bank.   Deutsche Bank would then break up and disburse those interest payments to the various debt holders of record.

119.    Hayes confirmed that these credit agreements (2nd and 3rd) provided information regarding definitions for topics like pro rata clauses, prepayments, and who is/isn't an eligible assignee.   Hayes reviewed the 2nd and 3rd lien credit agreements that discusses the term "affiliate."   Hayes also reviewed the sections discussing "eligible assignee" wherein it states that the company or its affiliate are excluded as an eligible assignee.   Hayes stated that this language in the agreement would exclude Dealer Computer Services, or its affiliate, from buying its own debt.   At the time that these agreements were put together, it had been a market standard to make this exclusion.

120.    Hayes advised that a significant global recession occurred after this Reynolds & Reynolds debt was structured.   Normally, debt like that connected to

Reynolds & Reynolds would trade right around par, but the recession dropped the trading to significant discounts wherein the debt was trading at 20 to 40 cents on the dollar.

121.    Hayes also distinguished between a performing loan and a non-performing loan.  A performing loan is one in which the borrower is current on interest payments on the loan.  A non-performing loan is one in which the borrower is not current on interest payments on the loan.  Reynolds & Reynolds loans were performing loans, and Reynolds & Reynolds did very well as a business during the recession.

122.    Hayes was not involved in the trading of Reynolds & Reynolds debt with Tamine or the company "Edge."  Because of Hayes' position at Deutsche Bank, he was privy to inside information on Reynolds & Reynolds and thus was not permitted to be involved in the trading function of Reynolds & Reynolds debt.

123.    Hayes was aware of a refinance of Reynolds & Reynolds debt that took place in 2010 after the debt buyback.  The new loan provided for $1.82 billion to be refinanced and was used to pay off the existing 1st, 2nd and 3rd liens at par.

124.    Hayes shared that anyone who purchased Reynolds & Reynolds debt at a deep discount and held the debt through the payout from the 2010 refinance stood to make a substantial profit.  Hayes gave the example of someone buying Reynolds & Reynolds debt at 25 cents on the dollar and then being paid out at par or 100 cents on the dollar once the refinance happened.  That person would make a large profit.

125.    Hayes did not have any knowledge that at the time of refinancing that Brockman was holding his own debt.  Hayes further stated that Brockman was legally not allowed to hold his own debt.  If Hayes had discovered that Brockman was holding his

own debt or had purchased his own debt, Hayes would have gone to the compliance group at Deutsche Bank and informed them of it.

126.    Hayes stated that if the company Edge Capital was an affiliate of Brockman, then Edge would have been excluded from buying Reynolds & Reynolds debt per the lien credit agreements.

### Paul Ardire Interview

127.    Paul Ardire, Financial Analyst - Senior Debt Trading, began working at Deutsche Bank in 2002 as an investment banker on the trading desk and was responsible as principal investor of the bank's capital.  His job was to provide liquidity to secondary loans that Deutsche Bank had underwritten and sold to clients.  Reynolds & Reynolds was one of the loans that the bank had underwritten and a loan that Ardire traded. Tamine and Edge Capital Investments became Ardire's client from a referral from another Deutsche Bank employee in London, who worked at the trading desk.

128.    Paul Ardire provided the following information on July 18, 2019.

129.    Ardire was familiar with the 1st, 2nd and 3rd lien credit agreements between Deutsche Bank and Reynolds & Reynolds.  Ardire was also familiar with Ken Bunney and Robert Brockman, Reynolds & Reynolds's CFO and CEO, respectively.

130.    Ardire was a consumer of Reynolds & Reynolds periodic financial reporting information.   Ardire advised that the financial information was available to all of the lenders.  Reynolds & Reynolds was required to provide quarterly financial information and conduct quarterly earnings calls with the company in which Ardire participated.

131.   Ardire explained that lenders, or potential investors in the debt, would be interested in the financial performance of the company because it affected the value of their investment.

132.   Ardire further explained that there were restrictions on which individuals or entities could purchase the debt in the secondary market.  Reynolds & Reynolds, its holding company and subsidiaries (i.e. affiliates), could not purchase the debt.  This was standard market practice at the time.

133.   A Deutsche Bank employee at the London trading desk introduced Ardire to Tamine.  It was Ardire's understanding that Tamine represented a Swiss family or Swiss endowment and that he was interested in purchasing debt of U.S. companies; specifically Reynolds & Reynolds.  Tamine would have been cleared through the KYC (Know Your Customer) process at Deutsche Bank; however, Ardire was not involved in that process.

134.   Ardire had multiple email exchanges with Tamine, wherein Tamine purchased approximately $75 to $80 million in Reynolds & Reynolds 2nd and 3rd lien debt for approximately $25 million.  Deutsche Bank would have been involved in both the purchase and sale side of these trades.  The Reynolds & Reynolds loans were then refinanced in April 2010 at full face value.  Ardire estimated that the profit exceeded $50 million and Tamine would have made between 200-300% on his investment.

135.   Ardire was not aware that Tamine was purchasing the Reynolds & Reynolds debt at the direction of Brockman.  If Ardire had known of Brockman's involvement, he could not have executed the trades due to the restrictions in the credit agreements.  Ardire explained that the prices would have been significantly higher if it were known that

Reynolds & Reynolds was actually purchasing its own debt.  At the time, other companies in similar situations obtained the required amendment to their credit agreements, and proceeded with an auction that alerted the market that the company is acquiring its own debt.  The debt would sell at a purchase price that was approximately 7 to 10 percent higher when it was known that the company was buying it back.  A company buying back its debt would be seen as a very positive sign in the market.

136.   In a prior interview in March 2019, Ardire advised that he would have held on to the Reynolds & Reynolds debt on behalf of Deutsche Bank had he known that Reynolds & Reynolds was in the process of buying it back.

137.   A review of the debt holdings for Deutsche Bank of 2nd & 3rd lien debt reflects that they sold approximately $35 million, resulting in an estimated loss of approximately $20 million.

### *Farallon-Lienholder of Reynolds and Reynolds Debt*

138.   Prior to an affiliate of Brockman's purchasing secondary market debt, Brockman would have needed to obtain the 51% majority vote of all the creditors to allow for an amendment to the 'Eligible Transferee" definition.  This would have been a de facto required disclosure to all of the creditors that Brockman was contemplating a massive debt buyback as early as March 2009, prior to Edge Capital (the affiliate) purchasing any debt.

139.   Representatives of Farallon Capital Management, LLC have indicated that such a disclosure would have put upward price pressure on the Reynolds & Reynolds debt, since this would have been viewed as positive news.  Farallon also advised that they would have held on to the debt expecting an increase in pricing if they would have

known that Brockman was acquiring the debt.  Brockman violated the creditor's rights to receive notice that he was seeking to purchase the debt through an affiliate, which would have required a creditor vote on the amendment.

### III. FINANCIAL ANALYSIS OF FRAUD PROCEEDS

140.   On or around September 16, 2008, Edge Capital Investments opened an account at Bermuda Commercial Bank in Bermuda.  A review of the account opening documentation reveals that the beneficial owner of the account was listed as the Massengill Children's Trust.  Subsequent to the account opening, Tamine was added as an authorized signor.  Tamine advised that Brockman established Edge Capital Investments in the late 1990s.  Tamine ostensibly controlled the funds but took all direction from Brockman.

141.   During 2009 and up through April 21, 2010, at least $72,335,129.00 in proceeds from the Reynolds & Reynolds debt buyback scheme were deposited into Edge Capital Investments Bermuda Commercial Bank account.  Specifically, $4,550,186.00 in interest payments from Reynolds & Reynolds were made into Edge Capital Investments' Bermuda Commercial Bank Account from April 2009 through April 2010.  On April 21, 2010, $67,835,129.00 was deposited into Edge Capital Investments' Bermuda Commercial Bank Account as the payoff of the newly re-financed debt.

142.   In July 2010, Brockman and Tamine exchanged a number of emails regarding the structure of Edge Capital Investments and how the acquired proceeds might be used.  It is clear from the exchange that Brockman controlled these funds.  In one email, Brockman noted that "[f]rom a security standpoint, I think that everything should not be rolled together this tightly. The two principal entities that we are talking about

cleaning up need to kept separate from the AEBCT structure. We can never tell what crazy things the house is going to do – and AEBCT is exposed to them. These other two structures need to be kept way in the background with separate charitable trusts, trust protectors, and underlying companies." As noted before, it is apparent that "the house" is the Internal Revenue Service and "AEBCT" is an acronym for the A. Eugene Brockman Charitable Trust, which Brockman noted was already known to the Internal Revenue Service. Based on travel records, Brockman appeared to be in Colorado when these email exchanges occurred.

143. The Reynolds & Reynolds fraud proceeds were then used in additional financial transactions, relating to other companies owned and controlled by Brockman and Tamine, which resulted in further gains. Specifically, a portion of these fraud proceeds were distributed as follows:

- $15,000,000.00 for the purchase/improvements to the Frying Pan Canyon Ranch near Aspen, CO.

- $15,000,000.00 for Edge Capital Investment's purchase of 1st & 2nd lien debt SumTotal Systems Debt Recapitalization.

- Approximately $32,563,588.04 transferred to Edge Capital Investments Mirabaud Bank account 509951 on April 16, 2013 as part of an $80 million transfer.

144. In addition, from May 2010 to December 2012, once deposited into Edge Capital Investments Bermuda Commercial Bank account, the approximately $72 million in debt buyback proceeds earned approximately $99,224.28 in interest from the bank,

145.   Further, from October 2011 to November 2012, approximately $45 million of the Reynolds & Reynolds debt buyback proceeds were also routinely invested approximately every two weeks in fixed deposit accounts with the bank, generating an additional $225,970.39 in interest.

146.   In total, $32,888,782.71 in funds traceable to the Reynolds & Reynolds buyback scheme, including directly traceable funds, bank interest, and fixed deposit interest, were wire transferred to Edge Capital Investments Mirabaud Bank account 509951 on April 16, 2013 as part of an $80 million transfer.

***Purchase & Development of Frying Pan Canyon Ranch - Colorado***

147.   On December 16, 2010, $15,000,000 of fraud proceeds was transferred from Edge Capital's Bermuda Commercial Bank account number 06-801-200703-01 to Regency Management Ltd.'s Bermuda Commercial Bank account number 06-801-200717-01.

148.   According to Tamine, the $15,000,000 in funds form the debt buyback scheme were used by Regency Management Ltd. to acquire land and develop a fishing lodge along the Frying Pan Canyon River near Basalt, Colorado.  Tamine advised that Brockman directed him on all aspects of the development, including the closing of the land purchase and subsequent funding of the improvement costs.  The property is titled in the name of Henke Property, LLC, a Colorado entity established in September 2005.

149.   Records obtained from Eagle County Title, including a Statement of Settlement dated December 28, 2010, reflect that Henke Property, LLC acquired three parcels at 9801 Frying Pan Road Basalt, CO 81621.  The contract sales price was $5,000,000.  The escrow documents further reflect wire transfers of $265,000 on

December 17, 2010 and $4,731,019 on December 23, 2010, from Regency Management Ltd., through its Bermuda Commercial Bank Account, to the seller of the Frying Pan property.

150.   Henke Property, LLC, on paper, is 100% owned by Henke Holdings, LLC. Both entities were formed in Colorado on September 7, 2005, at the direction of Brockman. Carl Linnecke, a CPA in Aspen, Colorado that works at the direction of Tamine, assisted Don Jones, the former CFO of Universal Computer Systems, and Tamine with incorporating Henke Property, LLC and Henke Holdings, LLC.  Both Jones and Tamine took direction from Brockman.

151.   Henke Holdings, LLC is 100% owned by Regency Management, Ltd., a British Virgin Islands entity incorporated on March 28, 1996, at the direction of Jones and Brockman.

152.   From May 25, 2011 through August 27, 2014, 28 wire transfers, totaling $10,550,000, were initiated from Regency Management's Bermuda Commercial Bank account # 06-801-200717-01 to Henke Property, LLC's Wells Fargo account number 9042-018029 for improvements and as lease payments for the Frying Pan Canyon Ranch property, all of which constituted proceeds from the Reynolds & Reynolds debt buyback scheme.

153.   Regency Management, Ltd. owns another Colorado entity named Mountain Queen, Inc., which in turn owns Brockman's Aspen vacation home, named Mountain Queen. According to Tamine, this structure's purpose was to hold the Colorado real properties and obscure Brockman's ownership interest.

154.   Brockman spends a significant portion of each year living in Aspen, Colorado. According to information provided by other witnesses, Brockman purchased property on the Frying Pan Canyon River where Brockman liked to go fishing. A lodge was built on that property so that Brockman and his guests did not have to drive 30 minutes from Brockman's Aspen home to the fishing hole. This property was purchased through the Regency Management structure of entities.

155.   Tamine advised that he is clear that it was Brockman's idea to buy this property and make improvements on the land. The main purpose of acquiring this property was to restore the land to facilitate good fishing for Brockman. Tamine would provide instructions on this property to Carl Linnecke, and funnel questions from Linnecke up through Brockman.  Carl Linnecke acted as a property manager for both the Frying Pan Canyon Ranch property and Brockman's Aspen vacation home, Mountain Queen.

156.   In an email from Karen White, an interior designer that performed work on Brockman's Colorado properties, wherein she asks Brockman and his wife, Dorothy, for permission to fish with her son at the Frying Pan Canyon Ranch property. She does not ask for permission from Tamine or Linnecke—individuals who on paper are made to appear as if they control this property—but she asked Brockman himself.

157.   According to Tamine, Brockman is the true owner of the Frying Pan property, but makes annual lease payments to Henke Property, LLC for use of the property.  Tamine initiated or authorized wire transfers to Henke Property, LLC.

### *Laundering the Reynolds & Reynolds Proceeds through Vista Equity Partners Fund III and Vista Equity Partners Fund IV*

158.   As described more fully below, proceeds of the Reynolds & Reynolds debt buyback scheme, totaling $15,000,000.00, were used to fund the debt recapitalization of

a company called SumTotal through Vista Equity Partners Funds III.  The funds generated from the debt recapitalization, and traceable to the Reynolds & Reynolds wire fraud, were also used to fund the purchase of ADP Taxware (Sovos Compliance) through Vista Equity Partners Fund IV.  The proceeds from the subsequent sale of ADP Taxware (Sovos Compliance) were then transferred to Mirabaud Bank in Switzerland.  These funds are traceable to wire fraud and disguised to appear as profits from this investment.

159.    In July 16, 2007, Point Investments became a limited partner in Vista Equity Partners Fund III.  As discussed supra, in 1999, Don Jones and Brockman set-up Point Investments Limited in the British Virgin Islands (it was moved to Bermuda in 2009), using the Massengill Grandchildren's Trust as a cover to shield Brockman's ownership interest in the Point Investments Ltd. structures.

160.    Included in the documents submitted by Point to become a limited partner in Vista Equity Partners Fund III was a W8-BEN, which is an IRS document for certification of status of beneficial owner for United States tax withholding and reporting for entities. This W8-BEN asserted that Point Investments was a non-US investor subscribing to the Vista Equity Partners Fund III investment.  In reality, Point Investments was a front to conceal Brockman's ownership interest.  Tamine advised that this was done so that Brockman would avoid taxation by the United States.  Tamine advised that he had completed other W8-BENs in the name of Point Investments in the same manner and for the same purpose.

161.    In July 2009, Vista Equity Partners III acquired SumTotal Systems, which became a portfolio company of Vista Equity Partners Funds III, LP.

162.   On October 24, 2012, Tamine emailed Brockman and advised him that Robert Smith, CEO of Vista Equity Partners Funds III, had proposed a refinancing of SumTotal Systems and offered Tamine $50 million of the new debt in SumTotal Systems at attractive interest rates if he were interested.   The proposed "SumTotal Debt Recapitalization" would essentially raise new and additional debt, which funds would then be used to extinguish the current debt and pay a dividend to existing shareholders.

163.   On October 25, 2012, Tamine emailed Brockman with more information about the SumTotal debt offering and recommended using cash from Edge Capital Investments to purchase the debt.   Brockman approved Tamine's recommendation on the same day.

164.   On November 16, 2012, Edge Capital Investments wired $9,900,000.00 from its Bermuda Commercial Bank to Bank of America (New York, NY) account number 1366210008929 in the name of Par Primary Trading (ref: SumTotal Systems).   These funds were comprised of Reynolds & Reynolds debt buyback proceeds.   These funds were used to purchase the first lien debt belonging to SumTotal Systems and held by Edge Capital Investments.

165.   On the same day, November 16, 2012, Edge Capital Investments wired $39,200,000.00 from its Bermuda Commercial Bank to Bank of America (New York, NY) account number 1366210008929 in the name of Par Primary Trading (ref: SumTotal Systems) to purchase the second lien debt belonging to SumTotal Systems. $5,100,000.00 of this transfer was comprised of Reynolds & Reynolds debt buyback proceeds.

166.   On November 16, 2012, Tamine emailed Brockman and advised that the SumTotal debt recapitalization was closing the next day and that Point Investments, as a shareholder in Vista Equity Partners Funds III, would be receiving approximately a $28.5 million distribution. Tamine indicated that the $28.5 million distribution to Point Investments was coming out of the proceeds of the $50 million debt purchase that Edge Capital made in SumTotal; so the net difference (i.e. cash outlay) had been minimized in order to put "cash to work with some good returns."

### *Edge Capital Investments Receive Returns on Proceeds from SumTotal Debt*

167.   From April of 2013 through September of 2014, Edge Capital received approximately $8 million in interest payments from the SumTotal 1st & 2nd lien debt investment. These payments were deposited into Edge Capital's account at Bermuda Commercial Bank.

168.   On October 2, 2014, Edge Capital sold the SumTotal 1st and 2nd lien debt investment and received two wire transfers, totaling approximately $49,331,649.00. This amount was deposited into Edge Capital's account at Bermuda Commercial Bank.

169.   On November 17, 2014, Tamine wire transferred $45,000,000 from Edge Capital's account at Bermuda Commercial Bank to Edge Capital's Mirabaud Bank account #509951 in Switzerland.

170.   Based on the above, through the SumTotal Debt Recapitalization, Brockman and Tamine were able to realize approximately an additional $8 million in gains from the investment of $49,100,000.00, of which $15,000,000.00 is traceable to the Reynolds & Reynolds debt buyback fraud funds.

171.    The SumTotal Debt Recapitalization deal, which included proceeds from the debt buy-back fraud, constituted money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1), (a)(2) and 1957, and all funds involved in these transactions constitute property involved in money laundering.

### *Edge Capital Investments Mirabaud Bank Account # 509951*

172.    On or around April 13, 2013, in agreement with Brockman, Tamine opened up a bank account for Edge Capital Investments at Mirabaud Bank in Switzerland.

173.    It appears a new account needed to be set up for Edge Capital Investments outside of Bermuda because another Bermuda bank, Butterfield Bank, had made a connection between Brockman and the offshore structures.  Brockman did not like this discovery and directed Tamine to "extricate" themselves from Butterfield Bank.

174.    This account was funded with an $80 million wire transfer from Edge Capital Investment's Bermuda Commercial Bank account.  A review of the account opening documentation reveals that the beneficial owner of the Mirabaud account was Edge Purpose Trust.  The Edge Purpose Trust documents appear to be have been backdated to show that the trust had been created in 2009.

175.    Tamine stated that he intentionally withheld information from Mirabaud Bank in setting up this account.  Specifically, Tamine excluded the fact that he took direction from Brockman on what would happen with the funds in this account.

176.    On April 18, 2013, Tamine emailed Brockman and informed him of the new account opening for Edge Capital Investments at Mirabaud Bank. Tamine informed Brockman that he just wired $80 million into the account from the Edge Capital's Bermuda Commercial Bank account.  Tamine advised Brockman that Mirabaud thinks that Edge

Capital was owned by a charitable trust and was comfortable with the explanations Tamine provided. On April 19, 2013, Brockman replied to Tamine that he was "surprised and happy that you were able to transfer such a large sum with so little hassle."

### *Financial Analysis of Mirabaud #509951*

177.   A review of Edge Capital Investments' Bermuda Commercial Bank account number 0680120070301 identified a wire transfer on April 16, 2013 of $80,000,000.00 in commingled funds to Edge Capital Investments' Mirabaud Bank account number 509951. Approximately $32,888,782.61 of this wire transfer is directly traceable to the wire fraud proceeds received from the Reynolds & Reynolds debt buyback scheme, or proceeds traceable thereto, including bank interest and fixed deposit interest.

178.   As described above, on November 17, 2014, Tamine wire transferred $45,000,000 from Edge Capital's account at Bermuda Commercial Bank to Edge Capital's Mirabaud account #509951 in Switzerland.  These funds represented funds from Edge Capital sale of the SumTotal 1st and 2nd lien debt investment, which included $15,000,000.00 in proceeds traceable to Reynolds & Reynolds debt buyback scheme and $30,000,000.00 of funds traceable to and involved in money laundering.

179.   According to Tamine, as of the date of his initial cooperation in this case in October of 2018, over $125 million sourced to Edge Capital Investments was sitting in the Mirabaud Bank account in Switzerland.  Tamine provided documents showing that as of June 29, 2019, there was over $129 million in the Edge Capital Investments Mirabaud Bank account.

180.   Based on a review of records, since these initial transfers from Edge Capital's account at Bermuda Commercial Bank to Edge Capital's Mirabaud, account

#509951, these funds have continued to be invested in general interest-earning investment vehicles.

181.    Accordingly, as set forth in paragraphs 177 and 178, approximately $47,888,782.61 in proceeds directly traceable to the Reynolds & Reynolds debt buyback fraud scheme was deposited into Edge Capital's Mirabaud, account #509951.

182.    Moreover, as set forth in paragraph 178, at least an additional $30,000,000.00 in funds traceable to or involved in money laundering was deposited into Edge Capital's Mirabaud, account #509951.

183.    In light of the above, there is probable cause to believe that $77,888,782.61 in Mirabaud Bank account #509951 is subject to forfeiture as property involved in money laundering and property traceable thereto.

## IV.    CRIMINAL INDICTMENT

184.    On October 1, 2020, a grand jury in the Northern District of California returned an Indictment, charging Robert T. Brockman with violations of 26 U.S.C. § 7201 (Tax Evasion), 31 U.S.C. §§ 5314 and 5322(b) (FBAR Violations), 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution), 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), 18 U.S.C. § 1956(a)(1)(A)(ii) (Tax Evasion Money Laundering), 18 U.S.C. § 1956(a)(2)(B)(i) (International Concealment Money Laundering), 18 U.S.C. § 1512(b)(2)(B) (Evidence Tampering), and 18 U.S.C. § 1512(c)(1) (Destruction of Evidence).

185.    The wire fraud counts in violation of 18 U.S.C. § 1343 as charged in the Indictment were based on the Reynolds and Reynolds debt buyback scheme described above.

186.    In addition, the money laundering counts charged in the Indictment were based, in part, on the movement of Reynolds & Reynolds debt buyback scheme proceeds to Bermuda, and subsequently to Switzerland, as set forth in the Financial Analysis of Fraud Proceeds described above.

## V.    CONCLUSION

187.    Based on the investigation described above, probable cause exists to believe that Robert Brockman and co-conspirators, committed violations of Title 18 U.S.C § 1343 (wire fraud), Title 18 U.S.C § 1344 (bank fraud), 18 U.S.C. § 1956(a)(1) (money laundering), 18 U.S.C. §  1956(a)(2) (international money laundering), and 18 U.S.C. §  1957 (spending money laundering).

188.    There is also probable cause to believe that the funds contained in the identified account up to $77,888,782.61 constitute proceeds traceable to violations of Title 18 U.S.C § 1343 (mail fraud), Title 18 U.S.C § 1344 (bank fraud) and are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), 982(a)(2), and 28 U.S.C. § 2461.    In addition, there is probable cause to believe that the funds contained in the account are property involved in 18 U.S.C. § 1956(a)(1) (money laundering), 18 U.S.C. § 1956(a)(2) (international money laundering), and 18 U.S.C. § 1957 (spending money laundering), and are, therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), and 982(a)(1).

189.    Therefore, the funds contained in the identified account are subject to seizure pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(e) and (f) as incorporated by Title 18, United States Code, Section 982(b)(1).  Specifically, because the accounts are located in Switzerland, a protective order would be insufficient to preserve the availability

of the funds for forfeiture, as they could easily be dissipated or transferred to another foreign account and a domestic restraining order would be insufficient to restrain the foreign funds.

190.    Moreover, the Court has authority to issue seizure warrants for property located outside the District of Colorado, pursuant to Title 18, United States Code, Section 981(b)(3). Section 981(b)(3) provides that a seizure warrant may be issued by a judicial officer in any district in which a forfeiture action may be filed under Title 28,United States Code, Section 1355(b), "and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement." 18 U.S.C. § 981(b)(3).

191.    In turn, Title 28, United States Code, section 1355(b) provides that a forfeiture action may be brought in any district where any of the underlying acts or omissions occurred upon which the forfeiture is based.  Based on flight log records from Brockman's personal jet, which were obtained and reviewed, many of the underlying acts and omissions, including emails and calls, relating to the wire fraud, bank fraud, and money laundering violations orchestrated by Brockman occurred within the District of Colorado as set forth herein.

<div style="margin-left: 40%;">
s/Ted Lair<br>
Ted Lair<br>
Special Agent-IRS
</div>

This affidavit has been reviewed and is submitted by AUSA Tonya S. Andrews.

Subscribed and sworn to before me
this ____22nd____ day of October, 2020

_Michael E. Hegarty_
The Honorable Michael E. Hegarty
United States Magistrate Judge