**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Authenticom, Inc. v. CDK Global, LLC*, No. 1:18-cv-868 (N.D. Ill) | Magistrate Judge Jeffrey T. Gilbert |
|  | **PUBLIC-REDACTED VERSION** |

**REYNOLDS'S RESPONSE IN OPPOSITION TO (Dkt. 1231)**
**PLAINTIFFS' MOTION FOR SANCTIONS**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**..................................................................................................................... 1

**BACKGROUND** ...................................................................................................................... 3

    I.    Reynolds did not anticipate this or any related litigation in August 2016, when Brockman allegedly deleted emails. ...................................................................... 3

        A.    All known FTC investigations had been closed well before August 2016. 3

        B.    Reynolds did not anticipate litigation against Authenticom in August 2016.................................................................................................................. 4

    II.    Plaintiffs have known for more than two years about the so-called "gaps" in Reynolds's email production, as well as the fact that Brockman's practice was to routinely purge his emails prior to the litigation hold in this case.......................... 5

        A.    Plaintiffs knew years before this motion that Brockman deleted his emails. ...................................................................................................................... 5

        B.    Plaintiffs knew years before this motion that Schaefer lost historical emails due to a well-documented theft of his computer and phone............ 6

    III.    As soon as Reynolds learned of Brockman's impending tax indictment, its counsel undertook an extensive, additional investigation regarding Brockman's custodial documents............................................................................................. 7

**LEGAL STANDARD** ............................................................................................................... 8

**ARGUMENT** ........................................................................................................................... 9

    I.    Reynolds had no duty to preserve documents in August 2016, which defeats the entire motion. ....................................................................................................... 9

        A.    "Duty to preserve" is a threshold requirement for ESI spoliation sanctions. ...................................................................................................................... 9

        B.    Reynolds did not anticipate litigation relevant to this MDL in August 2016................................................................................................................ 10

            1.    Any duty to preserve based on Reynolds's original dispute with Authenticom terminated no later than July 2015. ......................... 11

            2.    Any duty to preserve based on the then-existing FTC investigation terminated no later than July 2015................................................ 13

            3.    Reynolds's additional dispute with Authenticom in June-July 2016 was narrow, unrelated to the claims in this MDL, and in any event resolved prior to Brockman's alleged August 26, 2016 document destruction. ................................................................................... 14

    II.    Plaintiffs cannot show Reynolds had any intent to deprive another party of the use of information for this litigation, which independently defeats the type of sanctions Plaintiffs have sought. .......................................................................... 15

    A.    Death penalty and adverse inference sanctions are only permissible under the strict requirements of Rule 37(e)(2). .................................................... 16

    B.    Plaintiffs cannot show that Reynolds acted with an intent to deprive under Rule 37(e)(2). ........................................................................................ 17

        1.    The motion is based on allegations of personal tax violations by Brockman that refute, rather than support, a finding of intent under Rule 37(e)(2). .............................................................................. 17

        2.    At the time of the alleged destruction in August 2016, no one had ever accused Reynolds of conspiring with CDK. ......................... 19

        3.    Other evidence refutes intent and any claim of prejudice. ............ 20

        4.    Plaintiffs' references to Evidence Eliminator fail to breathe life into the motion. .......................................................................... 21

**CONCLUSION** ................................................................................................... **22**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Borum v. Brentwood Vill., LLC,*
  332 F.R.D. 38 (D.D.C. 2019)..............................................................................9, 18

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
  244 F.R.D. 614 (D. Colo. 2007) ...............................................................................12

*DR Distributors, LLC v. 21 Century Smoking, Inc.,*
  2021 WL 185082 (N.D. Ill. Jan. 19, 2021) .............................................................10

*Freidig v. Target Corp.,*
  329 F.R.D. 199 (W.D. Wisc. 2018) ..........................................................................15

*Garrit v. City of Chicago,*
  2018 WL 11199008 (N.D. Ill. Mar. 06, 2018) (emphasis added, citing 2015
  Advisory Committee Notes) ....................................................................................17

*GN Netcom, Inc. v. Plantronics, Inc.,*
  2016 WL 3792833, at *7 (D. Del. July 12, 2016) ...................................................18

*Ind. Mills & Mfg., Inc. v. Dorel Indus., Inc.,*
  2006 WL 1749410 (S.D. Ind. Feb. 16, 2006) ..........................................................12

*Moody v. CSX Transportation, Inc.,*
  271 F.Supp.3d 410 (W.D.N.Y. 2017) .......................................................................16

*Packrite, LLC v. Graphic Packaging Int'l, LLC,*
  1:17CV1019, 2020 WL 7133806 (M.D.N.C. Dec. 4, 2020)....................................16

*Schmalz v. Vill. of No. Riverside,*
  2018 WL 1704109 (N.D. Ill. Mar. 23, 2018)............................................................9

*Trask-Morton v. Motel 6 Operating L.P.,*
  534 F.3d 672 (7th Cir. 2008) ..............................................................................10, 11

*United States v. Rogers Cartage Co.,*
  794 F.3d 854 (7th Cir. 2015) .....................................................................................8

*Wsol v. Fiduciary Management Associates, Inc.,*
  2000 WL 748143 (N.D. Ill. June 1, 2000) ...............................................................15

**Other Authorities**

Berman, et al., *Managing E-Discovery and ESI* 278 (2011) ........................................12

Federal Rule of Civil Procedure 11 .................................................................................8

Federal Rule of Civil Procedure 37 ................................................................9, 19

Federal Rule of Civil Procedure 37(e) ............................................. *passim*

Federal Rule of Civil Procedure 37(e)(1) ...................................................17

Federal Rule of Civil Procedure 37(e)(2) ........................................ *passim*

Jay E. Grenig & William C. Gleisner, III, *eDiscovery & Digital Evidence* § 5:37 (2020) ................................................................................................11

2 John Henry Wigmore, *Evidence in Trials at Common Law* § 278 (Chadbourn rev. 1979) ...............................................................................................19

Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process* .............................................................................................12

Tim Fisher, *33 Best Free File Shredder Software Programs*, March 2, 2021, https://www.lifewire.com/free-file-shredder-software-programs-2619149 (last accessed March 14, 2021) .............................................................................22

## INTRODUCTION

In August 2016, when Plaintiffs allege that Robert Brockman destroyed his email files, Reynolds did not anticipate litigation against Authenticom, MVSC, or any other party regarding the allegations that are the subject of this MDL. Setting aside the many other fatal flaws in Plaintiffs' motion for sanctions, that fact alone defeats any obligation to preserve documents in August 2016 and, therefore, any basis whatsoever for sanctions.

Plaintiffs have known since at least October 2018 about the absence of Brockman's pre-August 2016 emails. *See*, *e.g*., Dkt. 1234-11. And in his January 2019 deposition, Brockman testified that prior to the 2017 litigation holds for this case, he routinely purged emails older than 6-12 months. Dkt. 1234-4. In other words, for over two years before filing this motion on the eve of summary judgment hearings, Plaintiffs knew that (i) Brockman's custodial emails prior to August 2016 no longer existed; and (ii) Brockman himself deleted them.

The revelation that ostensibly led Plaintiffs to file this motion is the October 2020 indictment against Brockman for alleged income tax evasion and destruction of evidence related to those tax evasion charges. An indictment, of course, has no evidentiary value, meaning that Plaintiffs have come to this Court seeking death penalty sanctions with no evidence to carry their burden to prove actual intent to deprive under Federal Rule of Civil Procedure 37(e)(2).

But even if one were to accept the indictment as entirely admissible and true, the indictment does not even mention the antitrust claims at issue in this MDL, let alone allege any document destruction in connection with this case whatsoever. To be sure, that indictment contains serious allegations, but if anything, those allegations undermine, rather than support, the motion.

Plaintiffs can't have it both ways. By expressly relying on the indictment in bringing this motion, Plaintiffs cannot ignore the indictment's fundamental premise that Brockman destroyed

evidence in August 2016 *specifically as part a scheme to evade personal income taxes*. The indictment's allegations contradict (or on Plaintiffs' best day, do not support) Plaintiffs' theory that Brockman deleted anything with the intent to deprive Plaintiffs—or any other civil litigant— of information relevant to a supposed antitrust conspiracy that no one had ever alleged in 2016. Even assuming Reynolds had an obligation to preserve documents in August 2016, which it did not, Plaintiffs' inability to show that Brockman intended to deprive <u>Plaintiffs</u> of the use of that information <u>in this litigation</u> independently defeats their motion.

Plaintiffs try to plug these and other logical holes in their motion by casting suspicion on what they call a "purported" computer theft suffered in early February 2015 by another Reynolds employee, Robert Schaefer. Plaintiffs characterize that theft as "all-too-convenient" and falsely suggest it is supported only by "counsel's written representations." Dkt. 1233 ("Mot.") at 6, 16. To the contrary, Mr. Schaefer testified at length about the theft in his deposition, and even more importantly, it is confirmed by a lengthy police file that includes detailed eyewitness testimony, surveillance video analysis, debit card tracing in collaboration with a nearby private business, and ultimately the identification of the thief, who confessed to the crime five months later after being arrested for a subsequent theft committed to support his heroin addiction. *See infra* at 6-7. In sum, Plaintiffs' references to Mr. Schaefer add nothing to their motion.

Rule 37(e) sets forth strict standards for the kinds of sanctions that Plaintiffs have sought. Plaintiffs are not relieved of their high burden because they happened to sue a company whose former CEO has now been accused of a personal, criminal tax fraud. The Brockman criminal matter is proceeding forward in the Southern District of Texas, and if the government proves its case, the court and jury will impose whatever consequences they deem appropriate for any crimes they find he committed. So too, this case should rise or fall on its merits, not on an opportunistic

sanctions theory that is unsupported by the facts or the law. Plaintiffs' motion for sanctions should be denied in its entirety.

## BACKGROUND

I.     **Reynolds did not anticipate this or any related litigation in August 2016, when Brockman allegedly deleted emails.**

Contrary to Plaintiffs' motion, Reynolds did not anticipate litigation against Authenticom in August 2016. Nor was Reynolds facing a threat in August 2016—let alone an "intense threat"—of legal actions "challenging the legality of its DMS policies." Mot. 14.

### A.     All known FTC investigations had been closed well before August 2016.

Well before the allegations at issue in this motion, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ██ ██████████████████████ ████████████████████████████████████████████ ████████ ██ ██████████████████████████████████ ████████████████████████████

For the next two years (July 2015 – June 2017), Reynolds was not subject to any investigations or document hold instructions from the FTC or any other state or federal agency. The FTC notified Reynolds of a new investigation in June 2017, by which point Reynolds already had a broad document hold in place as a result of these civil cases that had just been filed.

---

[1] Citations to "Ex. __" refer to exhibits to the attached Declaration of Brian T. Ross.
[2] ████████████████████████████████████████████████████

**B.** **Reynolds did not anticipate litigation against Authenticom in August 2016.**

Plaintiffs' motion implies Reynolds was pervasively and perpetually contemplating litigation against or by Authenticom, but the evidence refutes this. In the spring of 2015, while complying with ███████████████████████, Reynolds had contemplated affirmative litigation against Authenticom based on Authenticom's illegal hacking of Reynolds's DMS, and sent letters to Authenticom to that effect, ████████████████████████████████ ███████████████ *See infra* at 11-13.

Meanwhile, the only "threat" of any claim by Authenticom against Reynolds—prior to just before this lawsuit was filed in May 2017—was a single, throw-away sentence in Steve Cottrell's April 14, 2015 response to Reynolds's cease-and-desist letter to Authenticom. Dkt. 1234-26. Cottrell never followed up on that comment, and Reynolds had no reason to anticipate any affirmative claims by Authenticom at the time, let alone fourteen months later in August 2016.

For a brief period in June and July 2016, Reynolds again considered litigation against Authenticom, but as Authenticom knows, this dispute had nothing to do with Authenticom's hostile integration, Reynolds's DMS system access policies, any alleged conspiracy or other antitrust claims, or any other claim that is part of the MDL as we know it. Instead, the June-July 2016 dispute related solely and narrowly to Authenticom's breach of its contract to provide certain Reynolds applications with dealer data. Dkt. 1234-28. In any event, this additional dispute was resolved no later than July 2016. *See infra* at 14-15.

Plaintiffs cite an August 22, 2016 privilege log entry from Reynolds that refers to a ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Reynolds regrets any confusion caused by this

privilege log entry and is happy to formally amend it and/or provide the document to the Court *in camera*, but the bottom line is that Reynolds did not anticipate litigation against Authenticom in August 2016 and had not anticipated any litigation regarding its third-party access policies since at least July 2015.

## II. Plaintiffs have known for more than two years about the so-called "gaps" in Reynolds's email production, as well as the fact that Brockman's practice was to routinely purge his emails prior to the litigation hold in this case.

### A. Plaintiffs knew years before this motion that Brockman deleted his emails.

Plaintiffs admit that they have known since October 2018 about the lack of emails in Brockman's custodial (i.e., Microsoft Outlook) files prior to August 2016. Mot. 5-6. Indeed, Plaintiffs and Reynolds exchanged several letters in the fall of 2018 on this very subject. As a part of that exchange, Reynolds informed Plaintiffs that it had issued litigation hold notices (including to Brockman) for the cases that ultimately comprised this MDL in January 2017, May 2017, and July 2017. Dkt. 1234-11. Prior to this motion, Plaintiffs never argued that Reynolds should have put in place an earlier document hold. In any event, during that 2018 exchange, in a good faith effort to address any perceived unfairness caused by Brockman's lack of custodial emails, Reynolds also agreed to Plaintiffs' request that Reynolds make a complete production of several folders of electronic files from Brockman's computer that would not have otherwise been captured by the parties' agreed search terms. Dkt. 1234-12.

Though not mentioned in Plaintiffs' motion, Reynolds also pointed out during that exchange of letters that its document production included literally thousands of emails to and from Mr. Schaefer and/or Mr. Brockman prior to the respective dates that their own custodial files began—one of the benefits of Reynolds having agreed to a generous list of 27 document custodians. Dkt. 1234-11.

In addition to providing answers to Plaintiffs' various letters in the fall of 2018, Reynolds invited Plaintiffs to explore these issues in Brockman's January 2019 deposition, which they did. There, Brockman testified ███████████████████████████████████ ████████████. Dkt. 1234-4 at 161.

To summarize, Plaintiffs have known for over two years that (i) Brockman's custodial email files generally lacked emails prior to August 2016; and (ii) this was part of a purposeful personal document retention and deletion practice by Brockman. Despite being fully on notice of those facts—which Plaintiffs now contend warrant sanctions—Plaintiffs did nothing until years later, after Brockman was indicted on unrelated personal income tax charges.

### B. Plaintiffs knew years before this motion that Schaefer lost historical emails due to a well-documented theft of his computer and phone.

On February 4, 2015, a man who was addicted to heroin (and often stole to support his habit), stole Robert Schaefer's computer, iPhone, and various other personal items out of Mr. Schaefer's car while parked at his mother-in-law's Ohio home. Mr. Schaefer immediately reported the theft to the Kettering, Ohio police, who came to the scene, gathered evidence, performed impressive follow-up detective work, and ultimately identified and caught the thief, who confessed to the crime (including that he later "sold the iPhone on the street or traded it for drugs") after being arrested several months later for a different theft. *See* Ex. 5. Mr. Schaefer pressed charges, but unfortunately his property was never recovered.

The theft of Mr. Schaefer's devices was disclosed in Reynolds's document production in 2018,[3] confirmed in the same exchange of discovery letters described above,[4] and explored yet again in Mr. Schaefer's April 2019 deposition.[5] In that deposition, Mr. Schaefer answered every

---

[3] Ex. 6.
[4] Dkt. 1234-12.
[5] Dkt. 1234-13.

question asked by counsel about the theft and noted the existence of the police report.  Dkt. 1234-13 at 196.  But even then, Plaintiffs never asked for a copy of the police report.  Instead, two years later, they bring this motion, characterizing this well documented theft as a "purported" and "all-too-convenient" theft that is "suspicious in its own right," and falsely suggesting the theft was supported only by "counsel's written representations."  Mot. at 2, 3, 6, 16.

### III.  As soon as Reynolds learned of Brockman's impending tax indictment, its counsel undertook an extensive, additional investigation regarding Brockman's custodial documents.

The Brockman indictment, which became public on October 15, 2020, does not make any allegation that Brockman deleted emails or any other evidence in an effort to conceal information relevant to this MDL.  Nor do any media reports about the indictment, which began to emerge earlier that month, make such an assertion.  Taking everything alleged in the indictment as true, the indictment and supporting materials allege document destruction by Brockman entirely and only in connection with an alleged scheme to hinder an investigation into tax crimes having nothing to do with Reynolds or this MDL.  *See also* Mot. 6 (describing destruction of evidence allegations as "all in connection with a scheme to evade paying federal taxes."); Dkt. 1234-1 at ¶ 47 (the indictment's sole reference to Evidence Eliminator was that Brockman directed "Individual One [Evatt Tamine] to purchase a computer program called 'Evidence Eliminator' for Individual One's computers.").

Nevertheless, in light of the serious nature of the indictment's allegations, Reynolds (through its counsel) proactively embarked on an extensive investigation to determine, inter alia,

███████████████████████████████████████████████████████████████████

███████████████████████████. This investigation included:

- ██████████████████████████████████████████████;



*See* Dkt. 1234-3 at 1-2.[6]

Reynolds provided a detailed report of the investigation to the FTC and MDL Plaintiffs on December 11, 2020.  Dkt. 1234-23, Dkt. 1234-3.  ████████████████████████████████ ████████████████████████████████████████ and submitted an additional report to the FTC and MDL Plaintiffs on January 19, 2021.  Ex. 7.

Authenticom and MVSC's counsel never asked a single question, or sought to meet and confer about, the December 11, 2020 or January 19, 2021 reports.  They just waited until the week of summary judgment hearings and filed this motion for sanctions.

## LEGAL STANDARD

This ESI spoliation dispute is properly analyzed under the carefully delineated requirements of Federal Rule of Civil Procedure 37(e).  Where, as here, the Rules adequately address alleged misconduct, requests for sanctions under the Court's inherent powers are generally improper.  *E.g., United States v. Rogers Cartage Co.*, 794 F.3d 854, 863 (7th Cir. 2015) (declining to affirm sanction on inherent-authority grounds because "Rule 11 was adequate for the court's purposes").  The Advisory Committee has noted that Rule 37(e) is expressly intended to displace inherent-authority sanctions for ESI spoliation: the Rule "authorizes and specifies measures a court

---

[6] As noted by Plaintiffs (at 8-9), ██████████████████████████████████████████ ████████████████████████████████████████ █████████ ████████████████████████ ██████████████ Even more importantly, as set forth in this brief, the motion for sanctions fails even taking every word of the indictment as true.

may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures."  2015 Advisory Cmte. Notes on Rule 37. "It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used."  *Id.*; *see also*, *e.g.*, *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 44 (D.D.C. 2019) (concluding that Rule 37(e) rather than inherent authority provides proper framework).[7]

## ARGUMENT

Plaintiffs' motion must be denied for at least the following reasons.

First, Plaintiffs do not and cannot establish Reynolds had a duty to preserve documents as of August 2016.  Reynolds had no such duty, and this threshold factor defeats the entire motion.

Second, Plaintiffs do not and cannot establish that Brockman destroyed any evidence with the intent to deprive another party in this MDL of its use in this litigation, a prerequisite for the type of sanctions sought in the motion.

Third, Plaintiffs fail to establish they have been prejudiced.

## I.  Reynolds had no duty to preserve documents in August 2016, which defeats the entire motion.

### A.  "Duty to preserve" is a threshold requirement for ESI spoliation sanctions.

It is well established under Rule 37(e) as amended in 2015 that, for a court to even consider imposing sanctions for the destruction or other loss of electronically stored information, the court "must first make a finding that . . . the ESI 'should have been preserved in the anticipation or conduct of litigation.'"  *Schmalz v. Vill. of No. Riverside*, 2018 WL 1704109, at *3 (N.D. Ill. Mar. 23, 2018) (citing Fed. R. Civ. P. 37(e)).

---

[7] Although Plaintiffs improperly rely on inherent authority, they do not suggest that inherent authority gives rise to a different standard than Rule 37(e).

As illustrated in the following flowchart from a recent decision in this District, if the movant does not establish that there was a duty to preserve ESI at the time in question, nothing else matters—no sanctions are awarded:



*DR Distributors, LLC v. 21 Century Smoking, Inc*., 2021 WL 185082, at *75 (N.D. Ill. Jan. 19, 2021) (highlight added).  A party has a duty to preserve evidence when it "knew, or should have known, that litigation was imminent."  *Trask-Morton v. Motel 6 Operating L.P*., 534 F.3d 672, 681 (7th Cir. 2008).

### B.      Reynolds did not anticipate litigation relevant to this MDL in August 2016.

Reynolds did not anticipate litigation—imminent or otherwise—related to any of the claims in this MDL in August 2016.  Full stop.  Not against Authenticom, not against MVSC, not

even some broader "threat of legal actions challenging the legality of its DMS policies" as suggested by Plaintiffs.  *See* Mot. 14.

Plaintiffs' "Appendix A" of entries from Reynolds's privilege log does not establish otherwise.  Rather than reflect some ongoing anticipation of litigation "throughout 2015 and 2016," the entries highlighted in Plaintiffs' appendix concern discrete, episodic disputes that concluded well before August 2016, do not relate to the claims in this MDL, or both.

### 1.  Any duty to preserve based on Reynolds's original dispute with Authenticom terminated no later than July 2015.

On April 6, 2015, Reynolds sent a cease-and-desist letter to Authenticom, based on recently discovered evidence that Authenticom was instructing dealers how to provide Authenticom with unauthorized access to Reynolds's DMS in violation of the dealers' contracts.  Ex. 8.  This marked the beginning of a period of letter writing and negotiations regarding Authenticom's hostile access of Reynolds's system, during which there was at least the potential that Reynolds would initiate litigation against Authenticom.  Dkt. 1234-26; Dkt. 1234-27; Ex. 9.

By May 2015, those negotiations had broken down, leaving Reynolds with the decision of whether to pursue litigation against Authenticom or not.  ███████████████████████

████████████████████████████████████████████████████████████

████████████████.  The process and documents memorializing that decision are privileged, but with the Court's permission, Reynolds will submit those documents to the Court *in camera*.

Because a spoliation duty arises only where a party "knew, or should have known, that litigation was imminent," ████████████████████████████████████████

████████████████████████  *See Trask-Morton*, 534 F.3d at 681.  The leading treatises agree that the duty of a potential plaintiff to preserve electronically stored information terminates where, as here, ████████████████████████████Jay E. Grenig & William G. Gleisner,

III, *eDiscovery & Digital Evidence* § 5:37 (2020) (citing Berman, et al., *Managing E-Discovery and ESI* 278 (2011)).  In sum, any obligation Reynolds had to preserve documents related to a dispute over hostile access by Authenticom terminated in July 2015, *over a year before* Brockman's alleged document destruction.

Plaintiffs suggest in a footnote that Reynolds may nevertheless have had an ongoing duty to preserve based on potential claims *by* Authenticom *against* Reynolds, *see* Mot. 13 n.9, but that argument is groundless.  The only hint of any purported "threat" of any claim by Authenticom against Reynolds prior to 2017 was a single, throwaway sentence in Cottrell's April 14, 2015 letter responding to Reynolds's cease-and-desist letter.  Dkt. 1234-26 ("Your April 6, 2015 letter unjustifiably attempts to interfere with our contractual relationships, raising serious issues of unfair competition, interference with our contractual rights and those of the customers, and potentially even antitrust violations.").  Authenticom never followed up or elaborated on that vague reference, and never indicated to Reynolds it was actually contemplating—seriously or otherwise—asserting affirmative claims against Reynolds until just days before it filed this lawsuit in May 2017.[8]

Viewed in context, the sentence in Cottrell's April 14, 2015 letter was, at most, "a vague rumor or indefinite threat of litigation [which] does not trigger the duty [to preserve]."  The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 SEDONA CONF. J. 341, 374 (2019).  *See also*, *e.g.*, *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007) (finding no obligation to preserve despite demand letter that threatened possible litigation and referencing the defendant's potential "exposure" but in a "less-than adamant tone"); *Ind. Mills & Mfg., Inc. v. Dorel Indus., Inc.*, 2006

---

[8] The lawsuit Authenticom ultimately filed in May 2017 was, in any event, fundamentally different from any claim ever before suggested by any party.  Indeed, prior to Authenticom's counsel forwarding a draft of this lawsuit a few days before it was filed, no one had ever accused Reynolds and CDK—even informally—of entering into a conspiracy against hostile integrators.  *See also infra* at 19-20.

WL 1749410, at *4 (S.D. Ind. Feb. 16, 2006) (finding no reasonable anticipation of litigation despite a patent infringement letter because the letter opened up "the possibility to negotiate a resolution"). Cottrell's passing remark was too vague and indefinite to trigger anticipation of litigation at the time it was made in April 2015—and as of August 2016, a point in time when 16 months had passed with zero elaboration or follow-up by Authenticom, it is not even a close question. Plaintiffs' reference (at 14 n.10) to Judge Gilbert's opinion that *Authenticom* anticipated litigation against Reynolds and CDK in August 2016 for purposes of work product privilege is beside the point: those communications were all entirely secret from Defendants, who did not find out about them until well after this litigation began. On this record, any objectively reasonable anticipation of litigation had terminated in July 2015, ███████████████████████████.

> **2. Any duty to preserve based on the then-existing FTC investigation terminated no later than July 2015.**

Nor was Reynolds facing a general "threat of legal actions challenging the legality of its DMS access policies" in August 2016. *See* Mot. 14. To the contrary, ██████████████
████████████████████████████████████████████████████████████████
████████.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

Reynolds is not aware of any investigation or regulatory threat from the time the FTC closed its investigation in July 2015 until June 2017, when the FTC sent Reynolds a Civil Investigative Demand in a new investigation that mirrored the issues raised in Authenticom's May 1, 2017 complaint in this case. Ex. 10. No such investigation existed as of August 2016.

**3.** **Reynolds's additional dispute with Authenticom in June-July 2016 was narrow, unrelated to the claims in this MDL, and in any event resolved prior to Brockman's alleged August 26, 2016 document destruction.**

In June 2016, ███████████████████████████████████████

███████████████████████████████, a separate potential dispute between

Reynolds and Authenticom arose and was quickly resolved. At that time, certain Reynolds

applications had contracts to receive batch data services from Authenticom, and Reynolds learned

that Authenticom was trying to assign those services to DealerVault (then a separate entity from

Authenticom) without Reynolds's authorization. Ex. 11.

Reynolds raised its concerns with Authenticom on June 21, 2016, and by June 24, 2016

Authenticom admitted it had made a mistake in attempting to transition Reynolds's services

without a new agreement. Ex. 12. Reynolds's specific complaints about Authenticom's

contractual violation were resolved shortly thereafter: (1) on July 7, 2016, Authenticom confirmed

in writing that all customer data that had been shared with "DealerVault" had been deleted (*see*

Dkt. 1234-28); and (2) on July 13, 2016, Cottrell agreed that Authenticom would acquire

DealerVault so that the services originally agreed upon could be performed without the need for

new contracts. Exs. 13, 14 (confirming that the issue had been resolved no later than July 14,

2016).

Authenticom, as a party to that entire exchange, is of course well aware of the discrete and

unrelated nature of the June-July 2016 dispute, and its attempt to twist these privilege log entries

into something broader is telling. But even putting that aside, the record is clear that the June-July

2016 dispute was resolved prior to Brockman's alleged document destruction in August 2016. Put

differently, even if the June-July 2016 dispute triggered some broader duty to preserve documents

14

for claims like those ultimately asserted in this MDL, which it did not, that duty would have terminated before August 2016.[9]

Plaintiffs' inability to establish that Reynolds had a duty to preserve documents as of August 26, 2016 ends the inquiry. Under the plain text of Rule 37(e) and the well settled case law, Plaintiffs' motion must be denied.

**II.      Plaintiffs cannot show Reynolds had any intent to deprive another party of the use of information for this litigation, which independently defeats the type of sanctions Plaintiffs have sought.**

Even putting aside the lack of a duty to preserve at the time of the alleged destruction, Plaintiffs' motion suffers from another, fundamental flaw: Brockman's destruction is expressly alleged to have been "all in connection with a scheme to evade paying federal taxes," Mot. 6, not to deprive any litigant of relevant information in this case. As an initial matter, the indictment upon which Plaintiffs rely "does not have any evidentiary value; it is merely an unproven accusation." *Wsol v. Fiduciary Management Associates, Inc.*, 2000 WL 748143, *5 (N.D. Ill. June 1, 2000). It is Plaintiffs' burden to prove intent, and their failure to adduce "actual evidence of intent" alone defeats any request for sanctions under Rule 37(e)(2). *Freidig v. Target Corp.*, 329 F.R.D. 199, 210 (W.D. Wisc. 2018).

But even assuming for the sake of argument the indictment were admissible and entirely true, Plaintiffs' refrain (*e.g.*, Mot. 2) that Reynolds cannot "offer any other explanation" for the gap in Brockman's emails has it backwards: according to the very indictment upon which Plaintiffs base their motion, the explanation literally is that Brockman was trying to hide evidence of

---

[9] The remaining privilege log entries on Plaintiffs' "Appendix A" all relate to ██████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████. Reynolds is willing to submit these privileged documents to the Court *in camera*.

personal income tax evasion. The indictment says nothing about antitrust, Authenticom, MVSC, or any other matter relating to this MDL. While shameful if true, the indictment's allegations are entirely contrary to the notion that Brockman acted "with the intent to deprive <u>another party</u> of the information's use <u>in the litigation</u>," which the rules expressly require for the type of enhanced sanctions sought by Plaintiffs. Fed. R. Civ. P. 37(e)(2) (emphasis added).[10]

### A. Death penalty and adverse inference sanctions are only permissible under the strict requirements of Rule 37(e)(2).

Even in cases where all other elements of Rule 37(e) are satisfied (*see* Flowchart, *supra* at 10), the Rule as amended in 2015 imposes one more important requirement before a court can award the type of extreme sanctions Plaintiffs seek here. Under Rule 37(e)(2), "**only** upon finding that the party acted with the intent to deprive another party of the information's use in the litigation [the court] may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2) (emphasis added). "This intent standard is 'stringent' and 'does not parallel other discovery standards.'" *Moody v. CSX Transportation, Inc*., 271 F.Supp.3d 410, 431 (W.D.N.Y. 2017). The primary sanctions sought here by Plaintiffs fit neatly into the Rule 37(e)(2) categories of extreme sanctions:

| Plaintiffs' Requested Sanction | Fed. R. Civ. P. 37(e)(2) Category(ies) |
|---|---|
| (1) Barring Reynolds from contesting the existence of a conspiracy with CDK (Mot. 17-19) | • Category "A": presume that the lost information was unfavorable to the party; and<br>• Category "C": dismiss the action or enter a default judgment. |

---

[10] The structure of the Rule makes clear that the requisite intent is to deprive another party to the litigation in which sanctions are sought of the use of the information in that litigation. *See, e.g.*, *Packrite, LLC v. Graphic Packaging Int'l, LLC*, 1:17CV1019, 2020 WL 7133806, at *10 n.17 (M.D.N.C. Dec. 4, 2020) (noting that Rule 37(e)(2) required a finding that "[Defendant] acted with the intent to deprive [Plaintiff] of the [ESI's] use in th[is] litigation" (alterations in original)).

| (2) Instructing the juries in Authenticom and MVSC that they are permitted to draw an adverse inference from Reynolds's document destruction (Mot. 20-21) | • Category "B": instruct the jury that it may or must presume the information was unfavorable to the party |
|---|---|

Absent proof that evidence was destroyed with the *intention* to prevent its use in the litigation, a movant is left to proceed under Rule 37(e)(1), where "upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice," which "should <u>not</u> have the effect of the sanctions that are permitted under subsection (e)(2)." *Garrit v. City of Chicago*, 2018 WL 11199008, at *3 (N.D. Ill. Mar. 06, 2018) (emphasis added, citing 2015 Advisory Committee Notes). In other words, even assuming for the sake of argument Plaintiffs could prove prejudice, sanctions like those sought by Plaintiffs—adverse inference instructions and prohibiting Reynolds from on putting on a defense—are not attainable through Rule 37(e)(1).

**B.    Plaintiffs cannot show that Reynolds acted with an intent to deprive under Rule 37(e)(2).**

**1.    The motion is based on allegations of personal tax violations by Brockman that refute, rather than support, a finding of intent under Rule 37(e)(2).**

As discussed above, Plaintiffs knew for years prior to bringing this motion not only that Brockman lacked emails prior to August 2016 in his custodial email files, but also that Brockman admittedly deleted those historic emails himself. *See supra* at 5-6. As such, Plaintiffs rely on the Brockman tax indictment as their hook to bring this motion now, but unfortunately for Plaintiffs, the indictment doesn't suggest an intent to deprive another party in this litigation of evidence—instead it refutes any such intent.

Despite Plaintiffs' conclusory assertion that Brockman "intentionally destroyed material evidence of Reynolds's conspiracy with CDK," Mot. 1, there is zero evidence of that alleged intent

in the motion, the indictment, or anywhere else. In fact, as Plaintiffs ultimately concede, the allegations of evidence tampering and destruction of evidence on which the motion fundamentally relies were "all in connection with a scheme to evade paying federal taxes." Mot. 6. Every detail of that indictment recounted in Plaintiffs' motion relates to Brockman's alleged personal income tax evasion scheme, not some civil antitrust conspiracy involving Reynolds or CDK. *See id.* 6-8.

Trying to hide evidence of tax evasion from the government, or even being a generally bad person, simply is not the same thing as having "intent to deprive another party of the information's use in the litigation," as required by the plain language of Rule 37(e)(2) since its amendment in 2015. The *Borum* case on which Plaintiffs rely in their brief is highly instructive here. There, a key employee of a party to that case ("One DC") left the company during the pendency of litigation, and in doing so intentionally "deleted all of her emails." 332 F.R.D. at 42. The other side moved for sanctions, including the dismissal of One DC's claims. *Id.* at 44.

Despite finding actual prejudice to the movants—and even finding gross negligence on the part of One DC for not issuing a written litigation hold, which is not even alleged here—the *Borum* court rejected the requested death-penalty sanctions because the movants could not show the requisite "intent to deprive another party of the information's use in the litigation." *Id.* at 46, 48. Instead, like Brockman here, the employee in *Borum* allegedly deleted emails "for personal reasons," not to protect One DC in the litigation. *Id.* at 48. Deletion "for personal reasons" is necessarily "intentional" and may have consequences in other legal matters, but it does not satisfy the "stringent" standard of intent to deprive another party "in the litigation" for purposes Rule 37(e)(2) sanctions.[11]

---

[11] Likewise, the court in *GN Netcom, Inc. v. Plantronics, Inc.* found intent under Rule 37(e)(2) because a party's employee had deleted documents expressly "for purposes of protecting the business" but made clear that the result would have been the opposite if document deletion had been "undertaken for personal reasons." 2016 WL 3792833, at *7 (D. Del. July 12, 2016).

That result is not only correct under the plain text of Rule 37(e)(2), it is also clearly supported by the Advisory Committee Notes and relevant treatises. When Rule 37 was amended in 2015 to include the more stringent "intent to deprive" requirement (as opposed to a mere "culpable state of mind" standard), the 2015 Advisory Committee explained the logic: "Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence." 2015 Advisory Committee's Notes to Rule 37(e). *See also* 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 278 (Chadbourn rev. 1979) (explaining the logic behind adverse inferences as based on conscious falsehood or fraud "in the preparation and presentation of his cause . . . as an indication . . . that his case is a weak or unfounded one."). Adverse inferences simply are not warranted when the person in question destroys evidence for separate and unrelated personal reasons.

This is a purported multimillion-dollar antitrust case in which, incidentally, Plaintiffs contend they already have "ample evidence" to support jury verdicts in their favor. Mot. 1. Even if every other allegation in the motion were true, to impose potentially case-dispositive Rule 37(e)(2) sanctions based on Brockman's alleged efforts to destroy evidence of personal tax evasion would be an illogical windfall to Plaintiffs that is entirely unsupported by the rules. By analogy, no one would seriously argue that Reynolds would be subject to case-dispositive sanctions if an employee destroyed emails to hide information about, for example, an extramarital affair. The same should be true for Brockman's alleged personal tax crimes. Neither scenario comes close to satisfying the intent requirement under Rule 37(e)(2), or the logical principles behind enhanced sanctions under the Federal Rules.

**2.      At the time of the alleged destruction in August 2016, no one had ever accused Reynolds of conspiring with CDK.**

Plaintiffs' contention that, in August 2016, Brockman intentionally destroyed evidence of a conspiracy between Reynolds and CDK is not only refuted by the very indictment upon which the motion relies—it also makes no sense chronologically.

Prior to late April 2017, when counsel for Authenticom sent Reynolds a draft of its complaint that it would proceed to file on May 1, 2017, no one—formally or informally—had ever accused Reynolds of having conspired with CDK to destroy Authenticom, block hostile integrators, cease competing on "openness," or any other variation of the alleged conspiracy that has evolved throughout this MDL. Not any civil plaintiff, not the FTC, not anyone. Even the original complaint in *MVSC*, the first-filed case in this MDL, filed by the same law firm prosecuting this motion for sanctions, made no such claim. *MVSC* Dkt. 1 (Orig. Compl., asserting a narrow, MVSC-specific conspiracy between Reynolds, CDK, and CVR).

Moreover, 

. *See supra* at 3, 13. Throughout the various potential disputes between Authenticom and Reynolds in 2015 and 2016—which, in any event, concluded before August 2016—Authenticom never raised even a hint of an allegation that Reynolds had conspired in some way with CDK. In short, it simply makes no sense that Brockman deleted his emails in August 2016 based on some sudden intent to hide evidence of an antitrust conspiracy that no one had ever raised, particularly when the very indictment upon which Plaintiffs rely spells out a different, unrelated purpose.

### 3. Other evidence refutes intent and any claim of prejudice.

The notion that Brockman acted in August 2016 with the intent to deprive litigants in this case from the use of relevant evidence is rendered even more implausible by the fact that all of

Schaefer's emails subsequent to his device theft in early February 2015, including his emails to and from Brockman throughout the remainder of 2015 and 2016, were preserved and produced. Reynolds also produced (through other custodians) literally thousands of emails to and from Schaefer and Brockman prior to the respective dates that their own custodial files began. *See* Dkt. 1234-11. And CDK produced its own emails to and from Schaefer and Brockman during all allegedly relevant times. *See*, *e.g*., Ex. 16.

Accordingly, although the Court need not reach this issue to deny Plaintiffs' motion, these other sources of available documents refute any claim Plaintiffs were prejudiced, let alone that they were deprived of evidence that could not be "restored or replaced through additional discovery." *See* Fed. R. Civ. P. 37(e).

### 4. Plaintiffs' references to Evidence Eliminator fail to breathe life into the motion.

Unable to establish any "intent to deprive" under Rule 37(e)(2), Plaintiffs lean heavily on Brockman's alleged use and/or endorsement of a program called "Evidence Eliminator." *See* Mot. 1-2, 7-9, 11, 17, 19. Despite its prominence in the motion, Evidence Eliminator adds nothing to Plaintiffs' effort to meet their burden under Rule 37(e).

First, there has never been a dispute that Brockman purposefully deleted his emails. Brockman himself confirmed to Plaintiffs' counsel in his January 2019 deposition that prior to the litigation hold for this case, he routinely purged emails older than 6-12 months. Dkt. 1234-4. The October 2020 indictment alleges a specific motive for his email deletion, which has nothing to do with antitrust claims or this litigation—irrespective of who, if anyone, used Evidence Eliminator.

Second, despite its inflammatory name, Evidence Eliminator is ultimately just a "digital shredder" software application, of which there are dozens on the legitimate consumer software

21

market.  *See*, *e.g.*, *33 Best Free File Shredder Software Programs*, March 2, 2021.[12]  Such applications are widely available on the Microsoft, Apple, and Google "app stores."[13]

Like a physical paper shredder, a digital shredder can be used for perfectly legitimate purposes, nefarious purposes, or anywhere in between.  Whether Brockman used one when he deleted emails does not change the fact that (i) Reynolds had no duty to preserve documents in August 2016 or that (ii) the only "evidence" regarding Brockman's intent is that he deleted emails out of concern over personal tax matters, not to deprive Plaintiffs of evidence in a potential civil conspiracy lawsuit (that had not yet even been suggested at the time).  *See supra* at 9-21.[14]

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion should be denied.  All of the requested sanctions should be denied because Reynolds had no obligation to preserve the allegedly destroyed documents in August 2016, and the nonmonetary sanctions should be denied for the further reason that Plaintiffs fail to show intent to deprive them of evidence under Rule 37(e)(2).  In the unlikely event the Court reaches this issue, the monetary (attorneys fee) sanctions should also be denied because Plaintiffs have not established that they were prejudiced or deprived of correspondence that is both relevant and that could not be restored or replaced through additional discovery.

---

[12] Ex. 15, https://www.lifewire.com/free-file-shredder-software-programs-2619149 (last accessed March 14, 2021).

[13] See https://www.microsoft.com/en-us/p/shredder8/9wzdncrdqzzf?activetab=pivot:overviewtab ; https://apps.apple.com/us/app/secure-file-deletion-digital-file-shredder/id1055558005?mt=12 ; https://play.google.com/store/apps/details?id=com.palmtronix.shreddit.v1&hl=en_US&gl=US .

[14] ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████ █████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██ ██ ████████████████████████████████████████████████████
████████████████████████████████ .

Dated: March 23, 2021

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER &
HAMPTON, LLP
2099 Pennsylvania Avenue NW,
Suite 100
Washington, DC 20006
(202) 747-1900
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds*
*Company*

<u>**CERTIFICATE OF SERVICE**</u>

I, Brian T. Ross, an attorney, hereby certify that on March 23, 2021, I caused a true and correct copy of the foregoing **[PUBLIC – REDACTED VERSION OF] REYNOLDS'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS** to be filed and served electronically via the Court's CM/ECF system.

*/s/ Brian T. Ross*
Brian T. Ross
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713)751-5286
bross@gibbsbruns.com