# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | **PUBLIC-REDACTED** |
| *Motor Vehicle Software Corp. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00865 (N.D. Ill.) | |

## PLAINTIFFS AUTHENTICOM'S AND MVSC'S REPLY IN SUPPORT OF THEIR MOTION FOR SANCTIONS AGAINST DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I.      Brockman Intentionally Destroyed His Pre-August 2016 Emails ......................... 2

    II.    Reynolds Anticipated Litigation With Plaintiffs When Brockman Destroyed His Emails In August 2016 ............................................................................................ 4

    III.   Reynolds's Intentional Document Destruction Justifies Rule 37(e)(2) Sanctions.. 9

    IV.   Plaintiffs Were Prejudiced By Brockman's Document Destruction..................... 14

    V.    The Same Sanctions Should Be Imposed In The *MVSC* Action ......................... 14

    VI.   Plaintiffs Take No Position On CDK's Statement................................................. 15

CONCLUSION............................................................................................................... 15

**INTRODUCTION**

Reynolds does not dispute that Robert Brockman – its CEO, Chairman, and 98 percent beneficial owner – intentionally deleted all of his emails predating August 2016.  Reynolds's internal investigation confirmed Brockman used Evidence Eliminator – a program designed to permanently delete electronic records – on the laptop where his emails were stored.  Reynolds also does not dispute that Brockman's deliberate destruction of the emails stored solely on his laptop and Reynolds's policy of deleting any copies of his emails on the company's servers has deprived Plaintiffs of those emails.  And it does not dispute that Brockman's emails from that time period would have been highly relevant; indeed, Brockman used his email regularly in planning, negotiating, and implementing Reynolds's conspiracy with CDK between 2013 and 2015.

Reynolds's arguments for escaping *any* consequences for this flagrant discovery misconduct are unpersuasive.  *First*, Reynolds's claim that it did not objectively anticipate this litigation when Brockman destroyed his emails is belied by the record.  Reynolds aggressively used the threat of litigation against Authenticom (and others) as a tool for enforcing its data-access policies, and the push-back from those it threatened included threats of antitrust and other claims in return.  That climate of threat and counter-threat was ongoing in August 2016, as evidenced by Reynolds's own privilege log (which asserts anticipated litigation against Authenticom and others).  Reynolds cannot rewrite history to excuse its spoliation.  *Second*, Reynolds's argument that Brockman intended to hide his tax crimes rather than Reynolds's antitrust violations does not avoid sanctions under Rule 37(e)(2).  Brockman's admitted intent to conceal evidence – and Reynolds's ongoing duty to preserve documents – satisfy the Rule.  *Third*, Reynolds denies prejudice for purposes of lesser sanctions under Rule 37(e)(1), but the prejudice here is obvious: Brockman's email destruction deprived Plaintiffs of evidence that would have bolstered their

claims of antitrust conspiracy and anticompetitive conduct. That the existing record is sufficient to get to trial does not mean that being deprived of probative trial evidence is not prejudicial.

This is as egregious as spoliation gets. The Rule's most serious sanctions are reserved for just this kind of deliberate and systematic evidence destruction. The sanctions requested by Plaintiffs are proportional to the gravity of Reynolds's conduct and the severity of the prejudice to Plaintiffs' trial case. The Court should impose them.

## ARGUMENT

### I. Brockman Intentionally Destroyed His Pre-August 2016 Emails

Reynolds does not contest the factual premise that Brockman intentionally destroyed his emails in August 2016 in an effort to conceal probative evidence; on the contrary, the facts come from Reynolds itself.[1] Stunningly, rather than contest these facts, Reynolds now claims (at 21) that "there has never been a dispute that Brockman purposefully deleted his emails." That is misleading at best: when Plaintiffs made repeated inquiries in 2018 about Brockman's missing emails from prior to August 2016, Reynolds never explained that they were missing because Brockman had intentionally deleted them. Instead, Reynolds gave a non-response that it had "no specific additional information to provide." Dkt. 1234-12, at 1. Reynolds now cites testimony in Brockman's subsequent deposition that ███████████████████████████████████████

████████████████████████████████████.[2] Brockman's dissembling when asked

---

[1] Contrary to Reynolds's suggestion (at 1) that Plaintiffs' sanctions motion is based on the federal indictment, all of the material facts come from Reynolds itself: Reynolds had a corporate policy of deleting Brockman's emails from company servers and storing them only on Brockman's laptop; Reynolds produced no Brockman emails pre-dating August 2016, even though the agreed start date for discovery was January 1, 2013; and Brockman ████████████████████████. *See* Opening Br. 5-6, 8-9. While the federal indictment first disclosed that Brockman used Evidence Eliminator to destroy his emails, ███████ ██████████████████████████████. *Id.* at 8-9.

[2] This is the excerpt cited by Reynolds: ████████████████████
███████████████████████████████████████████████████

directly about his email preservation is a reason to impose sanctions, not to deny them. *See Williams v. Am. Coll. of Educ., Inc.*, 2019 WL 4412801, at *14-15 (N.D. Ill. Sept. 16, 2019). Indeed, Brockman's misleading answer about his email preservation came directly after a question in which he committed perjury by answering that he ██████████████████████ when the evidence (██████████████████████) shows he used multiple secret email accounts. *See* Opening Br. 9 n.7.[3]

Brockman's document destruction was systematic, intentional, and egregious. "Any reasonable person can deduce, if not from the name of the product itself, then by reading the website, that Evidence Eliminator is a product used to circumvent discovery." *Kucala Enters., Ltd. v. Auto Wax Co.*, 2003 WL 21230605, at *5, *8 (N.D. Ill. May 27, 2003), *aff'd in part*, 2003 WL 22433095 (N.D. Ill. Oct. 27, 2003); *see* Ex. 30 (wayback machine screenshots of Evidence Eliminator website). As Reynolds's own exhibit explains, "[f]ile shredder programs are software tools that *permanently* delete files on your computer," ensuring that they "can never be un-deleted with a file recovery program." Dkt. 1268-16, at 1 (emphasis in original). Brockman used Evidence Eliminator because of this feature – to ensure that *no one* could recover his deleted emails and files. *See* Dkt. 1234-17, at -709. The use of programs like Evidence Eliminator to delete

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Dkt. 1234-4, at 161:8-25.

[3] If Reynolds is saying it knew all along that Brockman had intentionally deleted his pre-August 2016 Reynolds emails, then its statement in 2018 that it had no further information to provide was intentionally misleading, which is an independent basis for sanctions. *See, e.g.*, *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 2021 WL 185082, at *66 (N.D. Ill. Jan. 19, 2021) ("The Federal Rules of Civil Procedure place a duty of candor on parties. That duty is enforced on pain of sanctions."); *Goudy v. Cummings*, 2017 WL 1077550, at *14 (S.D. Ind. Mar. 22, 2017) (awarding sanctions based on defense counsel's "duplicitousness over many months and their lack of candor regarding the extent of their compliance with their discovery requirements").

discoverable materials has been found by numerous courts to be so egregious as to merit default sanctions. *See* Opening Br. 19-20 (citing cases). Reynolds's blasé attitude toward Brockman's use of Evidence Eliminator to delete up to 3½ years' worth of emails is an affront to the integrity of the discovery process.

## II. Reynolds Anticipated Litigation With Plaintiffs When Brockman Destroyed His Emails In August 2016

**A.** In an effort to avoid sanctions for Brockman's intentional document destruction, Reynolds offers a tortuous narrative in which it anticipated litigation with Authenticom in May 2015, but then forswore litigation in July 2015; resumed anticipating litigation with Authenticom in June 2016, but then stopped again in July 2016, just before Brockman's document purge in August 2016; and then continued to forswear litigation until Authenticom's complaint was filed in May 2017. The evidence supports a far more straightforward conclusion: Reynolds consistently wielded the threat of litigation against third parties, including Authenticom and other data integrators, as a means to force submission to its restrictive data-access policies.

The factual chronology here is clear. After implementing its conspiracy with CDK, Reynolds acknowledges that it overtly threatened litigation against Authenticom in its April 2015 cease-and-desist letter, and it does not dispute that that letter is a classic example of when a "reasonable anticipation of litigation arises." The Sedona Conference, *Commentary on Legal Holds: The Trigger & The Process*, 11 SEDONA CONF. J. 265, 271-73 (2010); *see* Opening Br. 13 & n.9 (citing Dkt. 782-42). Reynolds instead contends (at 11) that that anticipation of litigation ended when it made a "firm decision" in July 2015 never to sue Authenticom. To begin, that *ipse dixit* lacks any evidentiary support whatsoever and thus should not be considered. Having withheld the documents regarding that supposed decision in discovery based on attorney-client privilege, Reynolds cannot legitimately ask the Court to rely on them while keeping them outside Plaintiffs'

- 4 -

view.  *See, e.g.*, *Ash v. Theros Int'l Gaming, Inc.*, 2001 WL 648632, at *4 (N.D. Ill. June 6, 2001) (no justification for *ex parte* submission); *RTC Indus., Inc. v. Fasteners for Retail, Inc.*, 2020 WL 1148813, at *5 (N.D. Ill. Mar. 9, 2020) (sword/shield principle of waiver).[4]

Reynolds's claim that it decided to *acquiesce* in Authenticom's access to its DMS as of July 2015 also should be barred as fundamentally at odds with its litigation position in this case. Reynolds's counterclaims, for example, repeatedly allege that its April 2015 cease-and-desist demand remained in force through the date of the counterclaims.[5]  Its motion for partial summary judgment on those counterclaims characterizes Authenticom's antitrust lawsuit as a "retaliatory" action in response to Reynolds's threat of litigation.  Dkt. 785, at 1.  Likewise, at the June 2017 Authenticom preliminary injunction hearing, outside counsel for Reynolds asked Schaefer about the cease-and-desist letter to Authenticom: "**Q:** All right.  You sent this in April 2015 saying they were violating your rights.  Do you still think Authenticom is violating your rights?  **A:** Yes." Ex. 31, at 36:2-5.  Reynolds cannot have it both ways.

Moreover, whether Reynolds had decided to forgo suing Authenticom in July 2015 is only half the equation.  *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 521-22 (D. Md. 2010) (duty to preserve arises "when litigation is reasonably anticipated whether the organization is the initiator or the target of litigation") (citation and internal quotations omitted).  Authenticom responded to Reynolds's cease-and-desist letter by threatening claims against Reynolds for "unfair competition, interference with . . . contractual rights . . . , and potentially even antitrust violations."

---

[4] If the Court allows Reynolds to belatedly supplement the record, it should find a subject-matter waiver and order Reynolds to produce all documents from January 1, 2015 through December 31, 2016 regarding potential litigation involving its data-access policies, including those from counsel.  *See* Fed. R. Evid. 502(a); *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 319 (N.D. Ill. 2010).

[5] *See, e.g.*, Dkt. 1210 ¶ 158 ("Authenticom's acts of trespass have not been occasional or accidental, but repeated, intentional, and in willful disregard of Reynolds's objections and demands to cease and desist."); *id.* ¶¶ 108-11 ("disregard[]" of Reynolds's cease-and-desist letter "continue[s] today").

Dkt. 1234-26, at 1. Reynolds's attempt (at 12) to dismiss Authenticom's claims as a "throwaway sentence" is belied by the record. Reynolds understood Authenticom's threat to be serious: it proposed a settlement agreement to specifically release Authenticom's threatened "unfair competition" claims, which Authenticom rejected. *See* Opening Br. 13 n.9 (citing Dkt. 979-17, at §§ 2.1-2.2); *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, 2012 WL 12294413, at *5 (D.N.M. Aug. 31, 2012) (duty to preserve triggered by rejected settlement offer). And further, at the time Reynolds received that letter, it had already been sued for antitrust violations by another data integrator (Superior Integrated Solutions ("SIS")), *see* Ex. 32 (SIS Am. Answer), at 8-34. What's past is prologue: Authenticom's threatening similar claims that others had previously brought makes that threat anything but "vague" and "indefinite."[6]

Reynolds's own privilege log confirms that it continued to anticipate litigation with Authenticom (whether offensive or defensive) well after July 2015. On September 11, 2015, not two months after Reynolds supposedly stopped anticipating litigation, Reynolds's outside counsel sent Schaefer an email with attachments "███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████" *See* Opening Br. A-4 (Entry #1158) (emphasis added). If Reynolds had made a "firm decision" in July 2015 not to sue Authenticom, what "████████████████" was Schaefer seeking outside counsel's advice for? Reynolds does not say.

---

[6] Reynolds's own authority (at 12) acknowledges that the "credibility" of a threat must be judged by "past experience regarding the type of threat." The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 SEDONA CONF. J. 341, 374 (2019). Courts apply this principle to trigger a duty to preserve based on prior, similar litigation. *See Resnik v. Coulson*, 2019 WL 1434051, at *8 (E.D.N.Y. Mar. 30, 2019) (duty to preserve based on "prior involvement in closely related litigation and his knowledge of the relevant facts that could lead to litigation"); *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1191 (D. Utah 2009) (litigation reasonably anticipated in light of similar past lawsuits that caused defendants to become "sensitized to the issue").

In May through July 2016, there are two dozen additional privilege log entries relating to potential "███████████████████" Opening Br. A-2 to A-7. Reynolds (at 14-15) tries to ascribe these communications to a supposedly "discrete" contract dispute that it says arose in June 2016 but ended by July 2016. We cannot see the substance of the withheld documents, but the descriptions on the log – referencing "██████████████" with "███████████████████ ██████████████████" – on their face indicate that Reynolds anticipated litigation in part because of its data-access policies. Indeed, Reynolds's entries do not refer to a contract dispute, but instead describe "██████████████████████████" *See, e.g.*, Opening Br. A-6 (Entry #870, #1803). And even assuming the dispute did center on contract issues, Reynolds has offered no evidence to support the implausible conclusion that it would have forgone its longstanding threat to sue Authenticom for providing data integration services to vendors and Reynolds dealers if litigation had in fact broken out.

Then, on August 22, 2016 – four days before Brockman's emails disappear – Reynolds sent its outside counsel an email (Schaefer was copied) referring specifically to a "██████████ ██████████████████████████████" Opening Br. A-8 (Entry #1613). Reynolds now says (at 4) that entry was "████████████████████████████████████ ████████" It is hard to see how Reynolds can use the word "unrelated" in good faith. Schaefer has already testified (twice) that the "████████████████" was about eLead *using Authenticom*:

> **Q:** This is a letter that you sent on . . . August 19, 2016, to [e-Lead] because that vendor used Authenticom for data integration; right?
> **A:** That's correct.
> **Q:** And you said they cannot use Authenticom for data integration because they have the contract with you, right?
> **A:** That's correct.
> **Q:** And you demanded that they pay you $100,000 for slipping up and using Authenticom; right?
> **A:** When I sent it, that's what we – for using an unauthorized access, yes.

Ex. 31, at 84-85; Ex. 33, Schaefer Tr. at 280-81; *see also* Ex. 34 (Schaefer letter to eLead). That is, Reynolds threatened to sue eLead for using Authenticom, which is why Reynolds withheld the August 22, 2016 document on the ground that it entailed a "██████████████████████████ ████████" As further evidence that Reynolds anticipated suing both eLead and Authenticom, a privilege log entry for June 3, 2016 (which Reynolds did not mention in its Opposition) specifically ████████████████████████████████████████. *See* Opening Br. A-4 (Entry #1601: "████████████████████████████████████████ ████████████"). Reynolds's effort (at 4-5) to recast the August 22, 2016 privilege log entry as "unrelated" to potential litigation against Authenticom is simply not accurate or credible.

And again in October 2016, two months after Brockman intentionally destroyed his emails, Reynolds's privilege log asserts that it anticipated litigation with Authenticom. *See* Ex. 35 (Entry #1638: Oct. 19, 2016 email correspondence that provided information "██████████████ ████████████████████████████████") (emphasis added). Again, Reynolds has no explanation for that entry, which cannot be squared with Reynolds's supposed "firm decision" not to sue Authenticom as of July 2015.

Lastly, Reynolds's privilege log shows that it was actively contemplating litigation not just against Authenticom throughout this time period but also against ████████████████████. Reynolds threatened litigation against ████████████ at least from March 2016 through September 2016 regarding various "████████" including "██████████████████████████ ████████████████" Ex. 36, at -952 (March 18, 2016 letter); *see* Ex. 37, at -325 (██████████ ████████████████████████████████████████████████████). Reynolds's privilege log also contains 25 entries in July and August 2016 for anticipated litigation against ████. Two more entries – one for July 8, 2016 (Entry #1187), and the other for July 14,

2016 (Entry #1607) – refer to anticipated litigation against an unnamed "████████ ████████" Opening Br. A-6, A-7.

Dealers were also threatening litigation based on Reynolds's data-access policies. For example, on September 8, 2016, a dealer wrote to the "████████" at Reynolds that it had "████████████████████████ ████████████████████████" Ex. 38, at -777. The dealer continued: "████████████████ ████████████████████ ████████████████████ ████████████" *Id.* This swirl of brewing litigation over Reynolds's data-access policies undermines its claim that it did not reasonably anticipate litigation in August 2016.[7] In light of the record as a whole, Reynolds's denial that it anticipated litigation should be rejected as objectively unreasonable. *See DR Distribs.*, 2021 WL 185082, at *55, *71 (standard is an objective one of reasonable foreseeability).

## III. Reynolds's Intentional Document Destruction Justifies Rule 37(e)(2) Sanctions

**A.** Reynolds's argument (at 17-22) that the Court cannot impose Rule 37(e)(2) sanctions without proof that Reynolds had a conscious objective to deprive *Plaintiffs* (rather than the United States) of evidence is wrong for two independent reasons.

*First*, as numerous courts have held, the intent to deprive requirement is satisfied where the party deliberately destroys documents when it knew or should have known it had a duty to

---

[7] Brockman's reputation as a "relentless litigant" is well documented. *See* Ex. 39, Miriam Gottfried and Mark Maremont, *The Billionaire Behind The Biggest U.S. Tax Fraud Case Ever Filed*, Wall St. J. (Mar. 3, 2021) ("a billionaire with a reputation as a relentless litigant"). He has a history of using the courts as a weapon against not only business rivals but also personal foes. *See, e.g., In re Doe*, 444 S.W.3d 603, 605 (Tex. 2014) (Brockman lawsuit to discover identity of blogger who was "critical of Brockman's character and business management").

preserve them.[8]  Contrary to Reynolds's position, intent under Rule 37 – as elsewhere in the law – can be established not only by evidence of the perpetrator's "conscious object" (on which Reynolds focuses exclusively) but also by evidence the "conduct [was] undertaken with knowledge that the proscribed effects would most likely follow" (which Reynolds ignores). *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 444-45 (1978); *id.* at 444 n.21 ("proof that the defendant's conduct was undertaken with knowledge of its probable consequences will satisfy the Government's burden"); *accord* Restatement (Second) of Torts § 8A.[9]

There is ample evidence that Brockman knew or should have known he had a duty to preserve his emails when he intentionally deleted them using Evidence Eliminator.  Brockman was not just Reynolds's Chairman and CEO; in his own words he was "██████████████" Ex. 40, Brockman Tr. at 350.  He directed the conspiracy, *see* Opening Br. 4; he █████████ ████████████, *see* Ex. 41, Schaefer Tr. 23, 75-76; and he ████████████████████████ ████████ Ex. 42, Hill Tr. 94; *see* Ex. 41, Schaefer Tr. 129; Ex. 43, Martin Tr. 164-65.  And he

---

[8] *See, e.g., Capricorn Mgmt. Sys., Inc. v. Gov't Emps.' Ins. Co.*, 2019 WL 5694256, at *11 (E.D.N.Y. July 22, 2019) (finding "intent to deprive" due to conscious failure to preserve evidence at a time when the party "should . . . have known that it had a duty to preserve ESI" and "was in fact aware of this duty"); *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 774 (E.D. Mich. 2019) (intent to deprive where defendant "knew or should have known to save" video footage); *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d. 410, 431 (W.D.N.Y. 2017) (same where party overwrote data "[w]hile knowing they had a duty to preserve"); *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018) ("[A] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2)."); *Ottoson v. SMBC v. Leasing & Finance, Inc.*, 268 F. Supp. 3d 570, 581, 583 (S.D.N.Y. 2017) (finding intent to deprive because plaintiff intentionally "deleted emails during times when she had a duty to preserve them"); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017) (same despite "no direct evidence of an intent to deprive" because, when "Boeing anticipated (or, at a minimum should have anticipated) litigation with Pemco" evidence "was intentionally destroyed by an affirmative act which has not been credibly explained").

[9] The sole case cited by Reynolds (at 18) is inapposite.  Unlike here, no evidence was presented that the employee who destroyed emails did so with knowledge of anticipated litigation and the resulting deprivation of evidence.  *See Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 48-49 (D.D.C. 2019).  Further, unlike here, the alleged spoliator testified as to her intent, *see id.*, while Brockman has refused to cooperate with Reynolds's internal investigation.

knew that Reynolds anticipated litigation relating to its data-access policies because he was actively involved in Reynolds's litigation and settlement strategy.[10]  Moreover, Brockman is a sophisticated and experienced litigant, who has been represented by top-flight counsel throughout his life.  Allegations in Brockman's criminal indictment further evince his legal sophistication and belie any notion that Brockman would not have been aware of his duty to preserve evidence.  *See*, *e.g.*, *Colonies Partners, L.P. v. Cty. of San Bernardino*, 2020 WL 1496444, at *10 (C.D. Cal. Feb. 27, 2020) (relying on individual's sophistication).[11]

Importantly, this would not even be the first time that Brockman has been sanctioned for discovery misconduct.[12]  As a recidivist, Brockman cannot claim ignorance of his legal obligations.

---

[10] *See*, *e.g.*, Ex. 44 (May 3, 2015: ████████████████████████████ ████████████; Ex. 45 (July 6, 2015: ████████████ Opening Br. A-3); Ex. 46 (May 28, 2016: ████████████████████ ██████████; Ex. 35 (Entry #3061: May 31, 2013 ████ ████████████████████████; Opening Br. A-4 (Entry #1441: July 16, 2015 ████████████████████████).

[11] *See* Dkt. 1234-1, Indictment ¶ 33 ("created a complex network of offshore companies and trusts, and appointed nominees to manage these entities for him" but "in reality" Brockman "made all substantive decisions"), ¶ 34 ("created and used a proprietary, encrypted email system to communicate with the nominees" who also used code names), ¶ 45 (changing trust's name from "A. Eugene Brockman Children's Trust" to "A. Eugene Brockman Charitable Trust" after reviewing the Senate's tax haven investigation), ¶¶ 48, 68 (backdating documents), ¶ 49 (untraceable phones), ¶¶ 68, 88, 107 (fabricating paper trails), ¶ 70 (assumed identities), ¶ 73 (methods to "avoid IRS scrutiny"), ¶ 77 ("dressed up charitable purpose[s]"), ¶ 89 (buying a safe house for an accomplice); *see also* Opening Br. 8 (misleading outside counsel).

[12] A Texas court previously ordered "death penalty" sanctions against Brockman that deemed certain of the opposing parties' allegations to be true, prohibited Brockman from opposing certain arguments, and struck certain pleadings by Brockman. Ex. 47, Order.  Brockman's misconduct included withholding discoverable documents and purging portions of files prior to production. *See* Ex. 48, Resp. to Pet. for Writ of Mandamus at 12-17; *see*, *e.g.*, Ex. 49, Brockman Tr. 210-13 (Brockman testifying he ordered the destruction of personal calendars during litigation).  The "death penalty" sanctions were remanded to the trial court to consider whether "lesser sanctions" should be "first imposed." *In re Universal Computer Systems, Inc.*, 1999 WL 681992, at *1 (Tex. Ct. App. Aug. 31, 1999).  The case appears to have settled on remand.

To the extent there is any doubt about Brockman's intent or knowledge, that doubt should be resolved against Reynolds. Brockman's email deletion likely deprived Plaintiffs of the very evidence that would have shown Brockman's knowledge of his duty to preserve evidence and his intent to conceal that evidence. Brockman's refusal to provide any information about his document destruction in Reynolds's investigation, *see* Opening Br. 8-9, likewise points to guilt, especially because he could have provided exculpatory information to Reynolds without waiving his Fifth Amendment privilege in his criminal case. *See Shakman v. Democratic Org. of Cook Cty.*, 920 F. Supp. 2d 881, 893 (N.D. Ill. 2013). The reasonable inference is that anything he said would have further implicated him and Reynolds in sanctionable misconduct. *See* Opening Br. 12.

*Second*, it has been black-letter tort and criminal law since the early Republic that the intent to harm one person – here, the federal government – transfers to victims who suffer harm of the same character from that intentional conduct. Thus, where a tortfeasor fires a gun with the intent to harm A and instead (or also) harms B, he has committed an intentional tort against B because the intent to harm A "transfers" to the injury to B. *See* Restatement (Second) of Torts §§ 16(2), 20, 32(2), 43. That doctrine applies straightforwardly here. Reynolds's (undisputed) intent to deprive federal prosecutors of probative evidence of tax crimes makes its deprivation of probative evidence from Plaintiffs intentional as well.

Since it ignores that doctrine, Reynolds offers no explanation why it should not apply under Rule 37(e)(2). As a matter of proper interpretation, there is none. Textually, use of a common-law term like "intent" presumptively comes with its settled common-law meaning. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007). Indeed, that meaning is consonant with the 2015 amendment's rationale, which was to heighten the standard for adverse inferences and other severe sanctions from mere "negligence or gross negligence" to intentional evidence destruction. Fed. R.

- 12 -

Civ. P. 37(e)(2), advisory committee's note to 2015 amendment ("Adv. Comm. Note"). Adherence to the "transferred intent" doctrine, which specifies the character of the required intent, is fully consistent with that change. None of Reynolds's cases is apposite, because they address scenarios where the party had no intent to deprive *anyone* of evidence in litigation.

Applying the transferred intent doctrine also makes sense in this context. *See S.D. Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F. Supp. 3d 891, 914 (D.S.D. 2018) (finding of intent is "highly contextual") (internal quotations omitted). To achieve his admitted objective of hiding documents from the federal government, Brockman systematically destroyed *all* of his Reynolds work emails, not just those on the secret email servers the United States alleges he used to commit his tax crimes. *See* Opening Br. 7. Why did he do that – other than because those Reynolds work emails were inculpatory as well? It is eminently reasonable to infer that his destruction of his Reynolds work emails was motivated by a desire to conceal harmful non-tax evidence.

**B.** Because sanctions are appropriate under Rule 37(e)(2), this Court need not rely on its inherent authority, which (contrary to Reynolds's contention) remains intact. *See Hsueh v. N.Y. State Dep't of Fin. Servs.*, 2017 WL 1194706, at *4 (S.D.N.Y. Mar. 31, 2017) (inherent authority sanctions remain available for *deliberate* deletion of evidence); 2015 Adv. Comm. Note to Rule 37(e)(2) ("The rule applies only if the information was lost because the party failed to take reasonable steps to preserve the information."). But if for some reason the Court believes the "intent to deprive" requirement is not technically satisfied, this is an appropriate case for inherent-authority sanctions, if there ever was one: there is no question that Brockman destroyed the documents "for the purpose of hiding adverse information," which is all bad faith requires under Seventh Circuit law. *See* Opening Br. 11-13. Reynolds cites no inherent-authority case imposing a rigid requirement of intent directed at the plaintiff specifically.

We emphasize that Plaintiffs do not seek an evidentiary hearing if the Court decides that factual disputes preclude a finding of intent to deprive or bad faith, given the delay such a proceeding would create. We submit that the present record is clear and warrants the requested sanctions, but if the Court should disagree, it should deny the motion without prejudice to Plaintiffs seeking sanctions again at trial. *See* Adv. Comm. Note to Rule 37(e)(2) (court may "conclude that the intent finding should be made by a jury").[13]

## IV.    Plaintiffs Were Prejudiced By Brockman's Document Destruction

Reynolds (at 21) half-heartedly denies prejudice because it produced emails between Brockman and other custodians. This attempt fails at the starting blocks: Rule 37(e)(2) presumes prejudice for intentional destruction of evidence. *See* Opening Br. 15. It also ignores that Brockman and Schaefer were the only two individuals involved in planning, negotiating, and implementing the conspiracy with CDK. *See* Opening Br. 4. Due to Brockman's spoliation, Reynolds cannot produce *any* emails between Brockman and Schaefer from January 1, 2013 (the start date for ESI discovery) to February 2015 (when Schaefer's laptop was taken) – which includes the critical period when the conspiracy was formed. That easily constitutes prejudice. *See* Opening Br. 15-16 (citing cases).

## V.    The Same Sanctions Should Be Imposed In The *MVSC* Action

With respect to MVSC, Reynolds argues (Dkt. 1269, at 1) that the "issue preclusion sanction" should be denied because the "MVSC-alleged conspiracy is different from the conspiracy Plaintiffs seek to establish by sanction." Not so. The *MVSC* Action concerns the same conspiracy as in the *Authenticom* Action *and* a separate (but related) conspiracy to deny MVSC

---

[13] *See also Sosa v. Carnival Corp.*, 2019 WL 330865, at *3 (S.D. Fla. Jan. 25, 2019) (citing cases); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-57 (4th Cir. 1995) (affirming district court "submit[ting] the spoliation of evidence question to the jury").

entry into Reynolds's and CDK's RCI and 3PA programs. *See* Dkt. 1073, at 16-17. Indeed, Reynolds sought inclusion of the *MVSC* Action in this MDL because it included the same common conspiracy allegations. *See* JPML Dkt. 1-1 (Mot. for Transfer), at 5 (Reynolds's Brief: "All five Related Actions" – including MVSC – "allege the same underlying antitrust conspiracy."); *MVSC* Dkt. 76 (Second Am. Compl.) ¶¶ 133, 143-48. Because *MVSC* and *Authenticom* concern the same conspiracy, the same sanctions are appropriate in both cases.

Reynolds also claims (at 2-3) that "[n]othing important to the *MVSC* case was or could have been destroyed," but that is incorrect. MVSC suffered the same prejudice as Authenticom given that its case also includes the common conspiracy claims. And as to the MVSC-specific conspiracy, Brockman made *all* decisions as to who could participate in the RCI program, and at what price, with input from Schaefer. *See supra* pp. 10-11; Ex. 50 (example of Brockman-Schaefer communication regarding a vendor joining the RCI program in April 2016). MVSC has been deprived of the Brockman-Schaefer communications regarding its 2014 applications to join the RCI program that would be probative of the MVSC-specific conspiracy. Thus, although other evidence shows CDK and Reynolds coordinated on "▮▮▮▮▮" letting MVSC into the RCI program, *see* Dkt. 1069-131, at -362, there are no emails from Brockman or Schaefer about that decision.

Finally, Reynolds (at 5) reprises its "intent to deprive" argument with respect to MVSC, but as explained above, that requirement is satisfied here. *See supra* Part II.

## VI. Plaintiffs Take No Position On CDK's Statement

Plaintiffs take no position on CDK's suggestion (Dkt. 1270, at 2) that the Court decide the summary judgment motions before ruling on this sanctions motion.

## CONCLUSION

Plaintiffs' motion for sanctions should be granted.

Dated:  April 13, 2021

_/s/ Derek T. Ho_

Derek T. Ho
Michael N. Nemelka
Aaron M. Panner
Daniel V. Dorris
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com
mnemelka@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com

_Counsel for Authenticom, Inc. and
Motor Vehicle Software Corporation_

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on April 13, 2021, I caused a true and correct copy of the foregoing **PLAINTIFFS AUTHENTICOM'S AND MVSC'S REPLY IN SUPPORT OF THEIR MOTION FOR SANCTIONS AGAINST DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com