# Exhibit 31

```
                 UNITED STATES DISTRICT COURT

             FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

        Plaintiff,

-vs-                                Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC               Madison, Wisconsin
and THE REYNOLDS and                June 27, 2017
REYNOLDS COMPANY,                   1:50 p.m.

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT-SECOND DAY OF EVIDENTIARY HEARING
                    AFTERNOON SESSION
     HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
             AARON PANNER
             DAVID SCHWARZ
             DEREK HO
             JOSHUA HAFENBRACK
             KEVIN MILLER
             JOHANNA ZHANG
          1615 M Street, NW, Ste. 400
          Washington, DC  20036

Also present:  Stephen Cottrell - Authenticom president
               Steve Robb - IT technician

           Lynette Swenson   RMR, CRR, CRC
         U.S. District Court Federal Reporter
         120 North Henry Street, Rm. 520
           Madison, Wisconsin  53703
```

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 3 of 9 PageID #:90554
Case: 3:17-cv-00518-jdp Document #: 163 Filed: 07/05/17 Page 35 of 265

2-P-35

```
 1  BY MS. GULLEY:
 2  Q    If you'll turn to Exhibit 99.  There's been earlier
 3  testimony here.  Do you agree that exhibit -- defendants'
 4  Exhibit 99 is the cease-and-desist letter -- a
 5  cease-and-desist letter that you sent to Authenticom in
 6  April 2015?
 7  A    Yes, I do.
 8           MS. GULLEY:  I would move to admit defendants'
 9  Exhibit 99.
10           THE COURT:  Any objection?
11           MR. NEMELKA:  No.
12           MS. GULLEY:  Did you send --
13           THE COURT:  It's admitted.
14           MS. GULLEY:  Thank you, Your Honor.
15  BY MS. GULLEY:
16  Q    Did you send cease-and-desist letters to other
17  unauthorized automated accessors of the dealer-facing
18  side of the DMS?
19  A    Yes.
20  Q    For example?
21  A    DMI.
22           THE COURT:  I'm sorry, what was that?  DMI?
23           THE WITNESS:  Yeah.
24  BY MS. GULLEY:
25  Q    Anyone else?  SelectQu we heard testimony --
```

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 4 of 9 PageID #:90555
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 36 of 265

2-P-36

1   A    SelectQu was another one.
2   Q    All right.  You sent this in April 2015 saying they
3   were violating your rights.  Do you still think
4   Authenticom is violating your rights?
5   A    Yes.
6   Q    Now, you've blocked unauthorized access for a number
7   of years.  I think at this point there's really no
8   dispute about that.  But you have authorized it.  So
9   you've blocked unauthorized use, but you have authorized
10  automatic processes in certain circumstances in the past;
11  correct?
12  A    That's correct.
13  Q    We've heard it called different things.  Wind down
14  is one of the things we've heard about.  Has Authenticom
15  ever been part of your wind-down monitored access program
16  as you move people to the certified interfaces?
17  A    Not exactly.  Not directly, no.
18  Q    What do you mean not directly?
19  A    Well, what we do is we actually form the
20  relationship with a vendor, and that vendor then,
21  depending on who they're using, is who we actually end up
22  allowing to get in.  We're actually having that
23  relationship with the vendor, not with that individual
24  data broker, as an example.  So we're actually white
25  listing that vendor versus the actual Authenticom or DMI

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 5 of 9 PageID #:90556
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 37 of 265

2-P-37

1  or whoever.
2  Q    The service provider to the dealer when you say
3  vendor?
4  A    That's correct.
5  Q    So in what circumstances would that come up?  Why
6  would you -- in what circumstances would you find
7  somebody that's been using Authenticom that you would be
8  doing this?
9  A    Well, there's vendors that would be using
10 Authenticom to use to get into the DMS to get the system,
11 so we would actually protect or white list that user ID
12 so Authenticom could get in to get that data for that
13 vendor.
14 Q    What if you -- what about -- we heard some testimony
15 earlier about acquisitions of companies.  Is that --
16 A    Where we've been with that is that the ones we use
17 with Authenticom today have been acquisitions; that we've
18 actually gone out and purchased those were the ones.  The
19 other ones that we've white listed, in the case of
20 Authenticom being the data broker, would be the
21 third-party vendors we've got in the RCI program or OEMs.
22 Jaguar or BMW are an example.
23         THE COURT:  So the third-party vendors that
24 you've got in the -- I didn't catch the name of the --
25         THE WITNESS:  In the RCI program.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 6 of 9 PageID #:90557
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 83 of 265

2-P-83

```
 1  BY MR. NEMELKA:
 2  Q    Okay.  If you go to Section 1.9, do you see it says
 3  Nonapproved Access?
 4  A    Yes.
 5  Q    So when a vendor signs up for RCI, they can't get
 6  data after they sign up.  They are precluded from getting
 7  data from any other integrator, aren't they?
 8  A    Until they're certified.  We allow it during the --
 9  what we call the wind-down period where they aren't using
10  our stuff yet, which is what we've been through.
11  Q    But once they're fully certified or fully integrated
12  with Reynolds, you don't allow them to get data from
13  anywhere else, do you?
14  A    No.
15  Q    So this is an exclusive dealing contract, isn't it?
16            MS. GULLEY:  Objection.  Leading.
17            MR. NEMELKA:  I'll strike it.
18            THE COURT:  I'll sustain the objection.
19  BY MR. NEMELKA:
20  Q    But if a vendor signs with you, the vendor has to
21  agree that it can't use Authenticom; right?
22  A    It can't use an unauthorized access.
23  Q    If a vendor signs with you, it has to agree that it
24  can't get data from anywhere else; right?
25  A    They do get -- they can get data from other places.
```

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 7 of 9 PageID #:90558
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 84 of 265

2-P-84

1   I'll give you an example; okay?  As an example, they take
2   the data and they send it off to IHS for cleansing
3   services or other things and they give it to us to do
4   those so they can add those services for their piece.
5   But to go get other data out of our DMS, the answer no.
6   Q    The answer is no; right?
7   A    Um-hmm.  And the reason --
8   Q    Ms. Gulley can ask you further reasons.  Please
9   turn -- you enforce this exclusive provision that they
10  can only get data from you.  Reynolds enforces that,
11  doesn't it?
12  A    Yes.
13  Q    Okay.  Please turn to tab 54.  This is plaintiff's
14  hearing Exhibit 54.  This is a letter that you sent on
15  April 19 -- you personally, Mr. Schaefer, you sent this
16  on August 19, 2016, to a vendor because that vendor used
17  Authenticom for data integration; right?
18  A    That's correct.
19  Q    And you said they cannot use Authenticom for data
20  integration because they have the contract with you,
21  right?
22  A    That's correct.
23  Q    And you demanded that they pay you $100,000 for
24  slipping up and using Authenticom; right?
25  A    When I sent it, that's what we -- for using an

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 8 of 9 PageID #:90559
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 85 of 265

2-P-85

```
 1  unauthorized access, yes.
 2  Q    You demanded $100,000 from this vendor, didn't you?
 3  A    Yes.
 4  Q    Is there anything in this letter, Mr. Schaefer,
 5  about data security or system integrity?
 6  A    Going to get data from another source that isn't
 7  secure on our system we don't know about, yeah, that's a
 8  risk that we don't want to take.
 9  Q    That wasn't my question.  Is there anything in this
10  letter about data security or system integrity?  There
11  isn't, is there?
12  A    No.
13  Q    You just wanted $100,000 from the vendor for using
14  Authenticom; right?
15  A    No.
16  Q    All right.  Please turn to tab 89.  We're almost
17  done.
18          MR. NEMELKA:  I'd like to move -- excuse me, I
19  forgot.  I'd like to move that prior exhibit into
20  evidence, please.
21          THE COURT:  Any objection to 54?
22          MS. GULLEY:  Just I object that I don't know
23  where the extraneous notes come from and that I
24  previously sent Mr. Nemelka several letters regarding the
25  confidentiality of that letter.  But with that stated
```

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 1280-2 Filed: 04/13/21 Page 9 of 9 PageID #:90560
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 86 of 265

2-P-86

1  that it's confidential and that I don't know what the
2  notations are, I --
3         THE COURT:  Okay.  We'll preserve the
4  confidentiality.  And the notation is -- it looks like
5  there's highlighting and a handwritten note.
6         MS. GULLEY:  Yes, Your Honor.  Thank you.
7         THE COURT:  Okay.  With that exception, I don't
8  know what to make of the notation either, so subject to
9  that proviso about the notations, it's admitted.
10        MR. NEMELKA:  Thank you.
11 BY MR. NEMELKA:
12 Q   Exhibit 89, Mr. Schaefer, is an email from
13 Authenticom dated March 13, 2014, to among other people,
14 Chris Hellyer at Reynolds; correct?
15 A   Yes, yes.
16 Q   Okay.  And it attaches a report of Jaguar, Land
17 Rover and other dealers that -- Reynolds dealers that
18 Authenticom pulled data from; correct?
19 A   I would assume.  I don't know that specific, but I
20 would assume.
21 Q   And if you look at the attachment -- actually let's
22 look at the email, what she writes to Reynolds.  In the
23 middle -- middle paragraph, that last sentence says "We
24 will continue to send in requests to Reynolds and
25 Reynolds to protect new profiles for new Jaguar orders