# Exhibit 32

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| THE REYNOLDS & REYNOLDS COMPANY, | **Case No: 1:12-cv-00848** |
| Plaintiff, | District Judge Thomas M. Rose |
| vs. | |
| SUPERIOR INTEGRATED SOLUTIONS, INC., | |
| Defendant. | |

### SUPERIOR INTEGRATED SOLUTIONS, INC.'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND SECOND AMENDED COUNTERCLAIM

Defendant/Counter-Plaintiff, SUPERIOR INTEGRATED SOLUTIONS, INC. ("SIS"), by and through undersigned counsel, answers Plaintiff's First Amended Complaint and asserts its affirmative defenses as follows:

### ANSWER

1. Admit.

2. Admit.

3. Admit for jurisdictional purposes only, otherwise denied.

4. Admit for jurisdictional purposes only, otherwise denied.

5. Admit for venue purposes only, otherwise denied.

6. Admit.

7. Without knowledge and therefore denied.

8. Without knowledge and therefore denied.

9. Admit that SIS interfaces with the Reynolds DMS, otherwise denied.

Exhibit A

10.     Without knowledge and therefore denied.

11.     Without knowledge and therefore denied.

12.     Without knowledge and therefore denied.

13.     Without knowledge and therefore denied.

14.     Without knowledge and therefore denied.

15.     Without knowledge and therefore denied.

16.     Denied that SIS caused any problems with an automatic log-off process; otherwise without knowledge and therefore denied.

17.     Denied that the sysdiagx.exe program file was created or used by SIS; otherwise without knowledge and therefore denied.

17.1     Admit that SIS acknowledged the existence of the sysdiagx.exe file and denied it created or installed it; otherwise denied, and specifically denied that the sysdiagx.exe file was available for download on an SIS-hosted website.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     The First Amended Complaint does not contain a paragraph 22.

23.     Denied.

24.     SIS restates and incorporates its responses to paragraphs 1 through 23, above.

25.     Without knowledge and therefore denied.

26.     Without knowledge and therefore denied.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     SIS restates and incorporates its responses to paragraphs 1 through 32, above.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     SIS restates and incorporates its responses to paragraphs 1 through 39, above.

41.     Without knowledge and therefore denied.

42.     Without knowledge and therefore denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     SIS restates and incorporates its responses to paragraphs 1 through 49, above.

51.     Denied.

52.     Without knowledge and therefore denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     SIS restates and incorporates its responses to paragraphs 1 through 58, above.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied that Reynolds is entitled to any relief.

65.     Denied that Reynolds is entitled to any relief.

## **AFFIRMATIVE DEFENSES**

### **Affirmative Defense #1 – Res Judicata**

SIS affirmatively states that the issues raised in Reynolds' Complaint have

already been litigated and adjudicated, and therefore Reynolds' claim is barred.

### Affirmative Defense #2 – Unclean Hands

SIS affirmatively states that Reynolds is not entitled to injunctive relief, or any other relief, by virtue of the doctrine of unclean hands, based upon its engagement in unfair competition and interference as described more fully in the Counterclaim.

### Affirmative Defense #3 -- Justification

SIS affirmatively states that if SIS interfered with any of Reynolds' contractual relationships, which it denies, any interference was reasonable and justified, and therefore Reynolds' claim is barred.

### Affirmative Defense #4 – Failure to State a Cause of Action

SIS affirmatively states that the Complaint and each and every purported cause of action contained therein fail to state facts sufficient to constitute a cause of action against SIS, and therefore Reynolds' claim must be dismissed.

### Affirmative Defense #5 – Fault of Reynolds

SIS affirmatively states that if Reynolds suffered any damages at all, such damages were proximately caused by Reynolds, and therefore SIS is not liable for such damages.

### Affirmative Defense #6 – Failure to Mitigate

SIS affirmatively states that if Reynolds suffered any damages at all, Reynolds failed to properly and adequately mitigate such damages, and therefore any damages suffered are the full responsibility of Reynolds.

### Affirmative Defense #7 – Waiver and Estoppel

SIS affirmatively states that Reynolds has waived its right to bring the causes of

action contained in the Complaint, or in the alternative, is estopped from bringing the causes of action, by virtue of its own actions.

## Affirmative Defense #8 – Public Domain

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, because the material sought to be protected is found in the public domain and/or any alleged copying by SIS was of works not protectable by copyright.

## Affirmative Defense #9 – Lack of Originality

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, on the grounds that Plaintiffs' purported copyrights are invalid for lack of originality pursuant to 17 U.S.C. §102(a).

## Affirmative Defense #10 – Scenes a Faire

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the doctrine of scenes a faire.

## Affirmative Defense #11 – Merger Doctrines

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the merger doctrine.

## Affirmative Defense #12 – 17 U.S.C. §102

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by 17 U.S.C. §102 which expressly excludes from copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work."

### Affirmative Defense #13 – Registration

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, based on the fact that Reynolds was not authorized to register the works, programs, and designs of Rocket Software in the program "Wintergate" which were licensed but not assigned to Reynolds. SIS also affirmatively alleges that Reynolds' copyright claims are barred to the extent Reynolds seeks to enforce copyright registrations that contain misstatements or omission that were material to the registrations and material to the purpose for which Plaintiffs invoke the registrations in this action.

### Affirmative Defense #14– Fair Use

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the fair use doctrine, 17 U.S.C. §107.

### Affirmative Defense #15–  Copyright Misuse

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the copyright misuse doctrine.

### Affirmative Defense #16– 17 U.S.C. §117

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by 17 U.S.C. §117.

### Affirmative Defense #17 –First Sale

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the doctrine of first sale.

### Affirmative Defense #18 –Functional Elements of a Computer Program

SIS affirmatively states, on information and belief, that Reynolds' copyright

claims are barred, in whole or in part, by the doctrine that "functional" elements of a computer program are excluded from protection under the Copyright Act.

### Affirmative Defense #19 –De Minimus Doctrine

SIS affirmatively states, on information and belief, that Reynolds' copyright claims are barred, in whole or in part, by the de minimus doctrine.

### Affirmative Defense #20 –No Damage

SIS affirmatively states, on information and belief, that Reynolds' suffered no injury or damage as a consequence of SIS' alleged acts or omissions.

### SUPERIOR INTEGRATED SOLUTIONS, INC.'S SECOND AMENDED COUNTERCLAIM

Defendant, SUPERIOR INTEGRATED SOLUTIONS, INC. ("SIS"), by and through undersigned counsel, files its Second Amended Counterclaim as follows:

### Jurisdiction and Venue

1.     SIS is a New Jersey corporation with its principal place of business in Edison, New Jersey.

2.     Reynolds is an Ohio corporation with its principal place of business in Kettering, Ohio, and this Court has personal jurisdiction over Reynolds.

3.     This Court has original subject matter jurisdiction over the underlying action pursuant to 28 U.S.C. §§ 1331 and 1332.  Subject matter jurisdiction is conferred under 28 U.S.C. § 1331 because this is an action arising under the laws of the United States.  Subject matter jurisdiction is conferred under 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

4.     This Court has subject matter jurisdiction over SIS's state law claims

under 28 U.S.C. § 1332, as described above, and/or supplemental jurisdiction over these causes of action pursuant to 28 U.S.C. § 1367.

### Facts Applicable to All Counts

5.     On information and belief, Reynolds is the largest provider of dealer management systems ("DMS") to automobile dealerships throughout the country, occupying a relative majority of the DMS product sector, or approximately 5500 dealerships.  Virtually every new car dealership in the United States utilizes a DMS. All of the information needed to run the dealership, including sales, service, parts, parts inventory, vehicle inventory, customer relationship management, accounting, and insurance and warranties, is contained on the DMS.

6.     There are very few DMS providers in the United States.  Historically, there were three large DMS providers:  Universal Computer Systems, Inc., based in Houston, Texas ("UCS"), ADP Dealer Services, Inc., based in Hoffman Estates, Illinois ("ADP"), and Reynolds & Reynolds Company, based in Dayton, Ohio ("Reynolds & Reynolds").  In 2006, the privately owned UCS merged with the larger and publicly traded Reynolds & Reynolds, and Reynolds became a privately-owned company, owned and controlled by one man, Robert T. Brockman.  In 2006, Reynolds acquired a sixty percent (60%) share of the DMS market.  Over time, and particularly from 2009 to the present, Reynolds has used its domination over the DMS market to squeeze out independent suppliers and vendors engaging in online competition over the DMS.

7.     From the beginning, dealerships have licensed third party suppliers, manufacturers, and other vendors to access their respective DMS systems on a real time basis so that inventory, parts, customer and sales data collected daily from a dealership's

DMS can be matched with order and vendor information on a real time basis. A large competitive industry evolved over the years to provide on-line sales and services to the dealerships through third party vendor and application programs to the DMS system. The DMS was designed specifically to interface with third party providers.[1] Because the DMS contains confidential and proprietary information unique to each dealership, the dealership determines who and what access is given to third parties utilizing the system.

8.     Over the years, the automotive industry has demanded more and more integration with third party systems to manage and execute transactions in real time. SIS provides state-of-the-art technology in a Tier 1, SSAE16 certified, hosting facility which allows third party applications to submit push and pull transaction requests for batch and single record data on a near real- time basis. SIS acts solely as a secure conduit between its third party application customers and the dealerships, utilizing no internal data storage. The dealerships utilize their DMS systems and SIS to provide a bi-directional, real time API integration to their vendors, suppliers, and manufacturers to support real time transactions with these third party providers. The dealerships pay the third party vendors for both the product they sell and the integration software used to access the DMS. The third party vendors, in turn, pay software integrators, like SIS, to develop and install the code that provides access to the dealers' DMS. As Reynolds states on its website:

> To reach customers more successfully and give manufacturers increased amounts of data at the retail level, many dealers will rely on new technologies and new partners for help. Much of this activity requires

---

[1] Contrary to Reynolds' representation to the Court on October 2, 2013, no one from SIS ever testified that its software programs were a "hostile integration." This phrase was invented by Reynolds and adopted by Reynolds' attorney of record in its pleadings and hearings in this case. It has no basis in fact to the case before this Court. The integration provided by SIS requires the consent and user identification codes of the participating dealerships in order to function.

access to the Dealership Management System and, often, visibility to the consumer data within the DMS.

9.     In 2009, SIS was the largest independent provider of integration software to Reynolds-brand DMS computer systems.  As a result of Reynolds anticompetitive conduct, however, it has lost substantial business in the Reynolds-brand market.

10.     The relationship wasn't always so hostile.  In 1998, Reynolds contracted with SIS' predecessor, also owned by Phillip Battista, Superior Programming, to deliver all custom programming to Reynolds' customers throughout the country.  Thereafter, SIS and its predecessors worked on Reynolds' projects at Reynolds' request and received Reynolds' support in integrating third party application programs for Reynolds-brand DMS systems at thousands of dealerships across the country. On September 21, 2006, SIS entered into a Reynolds Interface Agreement ("RIA"), with Reynolds under which Reynolds licensed SIS' use of Reynolds' software, specification, data formats and other intellectual property for an initial three years with provisions for renewal of the term in order to allow SIS' software to interact with the Reynolds DMS. The agreement expressly acknowledged that the parties would share, but not release for private use, proprietary and confidential information with each other. In connection with the RIA, Reynolds tested SIS' software to ensure its integrity for the third party integration purposes intended by SIS.  SIS' software satisfied all of Reynolds' tests, and Reynolds subsequently represented on its website that the SIS software was a "Reynolds Certified Interfaced Product."

11.     In March 2009, while still under contract with SIS, Reynolds imposed a unilateral "Amendment to Reynolds Interface Agreement" containing new cost-prohibitive fee structures which were seven times higher than existing fees.  At the same

11

time, Reynolds distributed written notices to all of its dealership customers stating that it would block or remove SIS intellectual property, without the consent of SIS or the dealerships, from dealer servers beginning the week of April 2, 2009.   Reynolds' goal and intent, as stated to this Court on October 8, 2009, was to "disable this SIS integration product from working."  (Transcript at 29).

12.    SIS filed a lawsuit against Reynolds in this Court on August 18, 2009 ("SIS Case 1").  The Court ordered Reynolds to re-establish the connections it disabled from dealership servers, and the parties dismissed their claims on June 21, 2010.

13.    Since the dismissal of the SIS Case 1, Reynolds has increasingly used its control over the DMS computer servers to engage in predatory conduct designed to build market share for its own integration software and third party application products at the expense of the pre-existing competitors in this market.   Reynolds boasts on its website that it is creating new products to compete in this market and future sales are "anchored in the capability of the Reynolds dealer management system."

14.    Beginning in late 2010 and continuing to the present, Reynolds broadcast "Warnings" on its DMS systems to over 3000 dealerships across the country, stating:  "If this user id is to be used by a 3rd party entity outside the dealership, this is in direct conflict with your Reynolds agreement."  Subsequently, it engaged in the following overt acts designed to coerce a group boycott of SIS' integration services:  (1) Shutting off ERALink and other third party terminal emulators by putting in sign-on time restrictions for anything connecting to ERA; (2)  Removing over 3500 application files installed on dealer DMS systems without the consent of the dealerships; (3) Eliminating use of any inbound static IP addresses to the DMS; (4) Adding password change requirements to the

ERA login; and (5) Eliminating inbound access with removal of modems.

15. Reynolds has also threatened the dealerships with sham "breach of contract" claims. It is not a violation of the DMS contract for dealers to supply their own real time data to vendors and other third party providers engaging in commerce with the dealerships. Reynolds does not own and should not control the dealer's real time data, and therefore a contract to provide computer processing of this data cannot prevent the dealer from using its own data or authorizing third party access to the data. An information processing system is not intended to and shouldn't be construed to give control or exclusive right of access to the dealer's data by the servicer engaged to run it. Reynolds utilizes non-disclosure agreements, predatory pricing, indemnity provisions, extended five-year contracts with automatic renewal, addenda prohibiting cancellation or termination of the contract, and unilateral updates to a Customer Guide incorporated into the dealership contracts to "lock in" dealerships who balk at Reynolds' coercive tactics. The dealerships sign mandatory arbitration provisions so the competing dealerships are not apprised of the coercive tactics and varying treatment that each receives from Reynolds. Through the guise of "certification," Reynolds seeks to prohibit dealerships from providing third party access over their DMS systems without Reynolds' written approval. When a dealership or third party application provider seeks such approval, Reynolds offers to provide its own competing integration software to the dealer's third party vendor and the dealership. If the dealer requests other integration services like those offered by SIS, Reynolds notifies the dealer that it will be in breach of its contract if it does business with competing integration software providers, and shuts down access to the dealer's own system without notice or permission from the dealership where

competing integration software is found on the system.   On information and belief, the dealerships were not aware when they executed contracts with Reynolds that they would be giving up control of their third party application programs by doing business with Reynolds.

16.     SIS and Reynolds are direct competitors in the market for integration software to Reynolds-brand DMS systems nationwide. Reynolds is attempting to obtain monopoly power over this market through its unilateral insistence on  approving or disapproving the integrators doing business with DMS systems supplied by Reynolds. Reynolds competes with SIS in this market through its "Reynolds Certified Interface" or "RCI" program which "certifies" vendor compliance with its Reynolds-brand DMS by downloading Reynolds' own version of integration software to the vendor application system. Reynolds uses software updates to purge and/or disable competing integration software installed by its competitors, including SIS.  SIS and Reynolds are also direct competitors in the market for integration software to DMS systems as a whole nationwide.  Reynolds has an appreciable share of this market, occupying from 35 to 40 percent of the market. There are no substitutes for this type of integration service because of the large amount of capital required to provide a secure conduit, and the inability of vendor software programs to provide the level of technology required to integrate bi-directional systems in real time.

17.     Reynolds has instituted a "policy and practice" to prevent third-party access to its DMS, except where the third party is willing to become "Reynolds certified," which requires the third party to use Reynolds' integration software and not SIS' integration software. When asked whether SIS could ever become "Reynolds-

certified," Reynolds officers responded negatively, stating that they would never certify SIS. On August 6, 2012, Don Burlile of Reynolds wrote to Subaru of America and stated:

> The Reynolds Certified Interface program enables non-Reynolds software application providers to have supported integration with the Reynolds ERA and POWER platforms. As previously discussed, Superior Integration Solutions does not participate in that program.

18.     While third-party vendors can integrate into the Reynolds-brand DMS for prices ranging from $29-$49 per month through integration companies such as SIS, Reynolds is using the RCI program to require prices three times higher plus setup fees which are cost prohibitive.     In some cases, the fee charged by Reynolds certification exceeds the cost of the vendor's product.

19.     Knowing that it could not compete with the quality of SIS' technology, in 2011, Reynolds announced a "rolling blockade" under which it used its control over the dealer servers to block automated access to dealership DMS systems even if the access was authorized by the dealership. These service interruptions are frustrating to dealers who rely on third party data access to buy and sell products. Reynolds ignored the dealerships when they demanded that service be restored, forcing the dealerships to "go dark" for days at a time.

20.     Manufacturers also receive information directly from a dealership's DMS, including inventory and payment processing.  Recently, Reynolds has demanded a fee from the dealerships to allow interaction between the DMS and the car manufacturers. Reynolds has likewise demanded a fee from the manufacturers to gain access to the data on the dealership's DMS.

21.     SIS provides integration services for the manufacturer Subaru of America

("Subaru") at a fraction of the monthly fees charged by Reynolds. On October 12, 2012,
Subaru wrote the following to Reynolds' representative:

> As noted in my letter dated July 20, 2012 (attached), Subaru has made the
> decision that we would only partner with DMS providers that supported
> real time integration services through Superior Integrated Services (SIS).
> Since you have not given us that commitment, effective November 1,
> 2012, you will not be one of the DMS providers certified to supply
> services for all future Subaru dealerships.

On February 5, 2013, Subaru reminded Reynolds that if it wanted to be on Subaru's
approved vendor list, "you need to support real time integration utilizing SIS." If
Reynolds did not utilize SIS, existing dealerships would be told to select another DMS
provider once their existing contracts expired. On or about May 9, 2013, Robert
Schaefer, Reynolds' Vice President of Data Services, sent a letter "to the market" of
Subaru dealerships, stating:

> On May 3rd, Subaru of America, Inc. (SOA) released a memo confirming
> its Commitment to develop real time integration with its systems in
> support of the current Care Connect [an SIS product] program and future
> programs. Subaru is a valued partner as our dealership customers combine
> for over 31 percent of the Subaru new vehicle sales market...SOA's May
> 3rd memo included an updated approved DMS list that does not identify
> Reynolds as an approved provider. However, as SOA stated in the memo
> "...we are still allowing current dealerships to continue to use their existing
> DMS option, whether on the approved list or not." Therefore, at this time
> it is business as usual.

Subsequently, Reynolds agreed to a temporary integration, promising future
improvements in its own products which, on information and belief, Reynolds hopes to
achieve through discovery in this case.

22. Reynolds' own Complaint and documents produced in this case reveals
that Reynolds has been accessing SIS's directory folders on computers belonging to the
dealerships. SIS has seen evidence of Reynolds' misappropriation of its programs and

data after receiving access to SIS confidential, proprietary information. Indeed, Reynolds produced SIS proprietary and confidential information in its document production in this case. (Rey 1347-1366).

23. The unlawful design and purpose of Reynolds' conduct is clear: (1) to eliminate all competition by DMS software integrators like SIS, and (2) utilize Reynolds' control over its DMS systems to create a monopoly over third party access integration software and vendor programs currently sold by independent companies to automobile dealerships.

24. Reynolds' unlawful conspiracy requires the coerced cooperation of the dealerships who are locked into long term contracts and fear service interruptions. Fearing reprisal or interruptions, these dealerships ask their vendors to become "certified" by Reynolds. During the certification process, Reynolds requires the vendors to provide a list of the dealerships who desire integration with the vendors. Armed with confidential customer lists, Reynolds then approaches the dealerships and offers its own competing product with enhancements acquired through the vendor certification process. Reynolds targets dealerships that refuse to cooperate with Reynolds, punishing them with service interruptions, automatic logoff functions, disabling data feeds, and threatening litigation.

25. Recently, Reynolds intensified its efforts to drive SIS out of business. As of July 2013, Reynolds had "turned off" SIS software at approximately 226 auto dealerships. Another 447 dealerships were turned off on September 30, 2013.

26. SIS has ongoing business relationships, including contracts in force, with third-party application vendors who, in turn have contracts with the dealerships. Because of Reynolds' wrongful conduct, these contracts cannot be performed. The vendors pay

SIS a monthly fee based on the number of dealerships serviced by the vendors. When Reynolds "turns off" the SIS software that makes it possible for dealers to purchase or utilize the vendor's product, many vendors have no other option but to stop dealing with SIS and become "certified" by Reynolds by purchasing Reynolds integration software. In many cases, this Reynolds software is priced so high that it actually exceeds the cost of the vendor's product, making it impossible for the vendor to pass the price to the dealership and thereby making it impossible for the vendor to remain in business for Reynolds-supplied DMS systems. In that case, Reynolds steps in and offers its own vendor product directly to the dealerships at a much higher price. The dealerships, held captive to Reynolds' control over their own DMS systems, have no choice but to wait out the remainder of their contract term and buy Reynolds' products at an inflated price. In one case, a dealership lucky enough to arrive at the end of its contract term with Reynolds, paid a much higher DMS monthly fee to ADP Dealer Services, Inc. just to be free of the predatory interruptions and exclusive dealing arrangements Reynolds was doing to its business.

27. Reynolds' coercion and baseless litigation threats to dealers who do business with SIS threatens to drive SIS out of business. SIS has sustained irreparable damage to its business reputation and the reputation of its integration software from the Reynolds' forced illegal agreement with thousands of dealerships to boycott the services of SIS.

28. Reynolds is disparaging SIS software in the marketplace. Reynolds has told all of its auto dealer customers that third-party access will compromise the security of dealership data. Such assertions are false, and merely pretense for: a) forcing

companies such as SIS and third-party vendors to become Reynolds certified; or, b) forcing the auto dealers to buy only Reynolds products.

29.     SIS's direct customers and auto dealers are already suffering interruptions of their businesses due to Reynolds' conduct, and they will continue to suffer such interruptions if Reynolds' conduct is not enjoined.

30.     Reynolds' unfair, tortious and anti-competitive actions have caused SIS to lose customers, including but not limited to: PartsEye, FirstLook (139 dealerships), Dealer Peak (55 dealerships) DealerTrack, AAX, SmartCo (174 dealerships), and Autobase.

31.     The foregoing conduct by Reynolds was intended to and did have anti-competitive effects on SIS and the market for third party integration software products. Anti-competitive effects include the elimination of price competition and price maintenance on third party integration programs, above market levels nationwide, impeding and blocking market entry by SIS and other innovative providers of third party integration software and vendor products, and impeding and blocking innovation in the Reynolds-brand DMS aftermarket.

## CAUSES OF ACTION

### Count I – Per Se Conspiracy to Restrain Trade in Violation of §1 the Sherman Act: Concerted Group Boycott

32.     SIS incorporates herein the allegations of paragraphs 1-31, above.

33.     Reynolds and ADP Dealer Services, Inc. ("ADP") equally control the nationwide DMS market with a market share of approximately 40% for each. The inventory, customer contacts, financial and insurance information that comprise the proprietary data managed by the Reynolds-brand DMS system is owned and controlled

by the dealerships. Reynolds, as a system processor, however, is attempting to control the business of competing independent dealerships by dictating who provides integration services for Reynolds-brand DMS systems.

34. Both the Reynolds-brand DMS system and the ADP DMS system are designed to allow third party access to the system so that part suppliers, car buyers, and other third party providers and participants can access and provide price quotes and other information for the data input by the dealership in real time.

35. Commencing at or around September 2009 and continuing to the present, Reynolds began to use its control over its DMS servers to require third party providers and participants to obtain "certification" from Reynolds for a fee before accessing the Reynolds' brand DMS. The fee is substantially higher than the fee charged by ADP and creates a barrier to entry to Reynolds-brand DMS systems that doesn't exist with other DMS systems. The certification requires the third party providers to use another Reynolds product, the Reynolds Certified Interface ("RCI") to integrate third party programs into the dealers' DMS.

36. Reynolds did not obtain approval or authorization from its dealership customers before implementing the RCI program. Because Reynolds is merely a service provider to a system owned and controlled by its dealership customers, it has no right, contractually or otherwise, to prevent the dealerships from sharing information contained on the DMS system so long as the dealership has agreed to provide such access. The dealerships, each constituting a direct competitor of each other, have been coerced by Reynolds to boycott SIS and any third party that hasn't been "Reynolds-approved" through the following predatory conduct:

- Service interruptions

- Baseless threats of breach of contract

- Sham litigation

- Price discrimination

- Delays in service contracts dependent on "who you are" and the types of bundled products you purchase from Reynolds.

37.     Reynolds has market power in the Reynolds-brand DMS integration market.     Reynolds and the dealership customers coerced by Reynolds (the "non-defendant co-conspirators") have illegally contracted, combined and conspired to restrain trade and boycott SIS and other independent integration software providers in violation of section 1 of the Sherman Act, 15 U.S.C. §1.  The conspiracy's unlawful objective was, and continues to be, to impose unreasonable restraints of trade, inhibit competition in the third party DMS software market,  boycott independent integrators of Reynolds-made DMS systems, and engage in price discrimination and price maintenance, and eventually drive SIS out of the third party, Reynolds- brand DMS integration market.  This horizontal agreement by competing dealerships engaging in interstate commerce, coerced by Reynolds through the predatory conduct identified above, is *per se* illegal because of its predictable and pernicious anticompetitive effect, and no showing of injury to competition in a relevant market is required.  The collective action among actual and potential competitors deprived the marketplace of independent centers of decision-making and inhibited competition in the third party Reynolds-brand DMS market.

38.     SIS has standing to bring an action under the Sherman Act pursuant to 15 U.S.C. section 15(a) which states that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws may sue therefore…and shall recover threefold the damaged by him sustained, and the cost of suit, including a reasonable attorney's fee." SIS has suffered and is continuing to suffer injury of the type the antitrust laws were intended to prevent by its unlawful exclusion from the integration software market for Reynolds-brand DMS systems within the United States. Because of Reynolds' ability to "turn off" non-compliant systems, non-Reynolds brand DMS systems are not reasonably interchangeable with the Reynolds-brand DMS system.

39. SIS has suffered substantial damages based on lost customers, lost sales, damage to reputation and product disparagement. SIS seeks treble damages for the damages proximately caused by Reynolds' unlawful conduct.

### Count II – Unlawful Tying in Violation of §§1 and 2 of the Sherman Act

40. SIS incorporates herein paragraphs 1-39 of the foregoing allegations. By reason of the foregoing conduct, Reynolds has tied its DMS product to third party integration programs which access the DMS.

41. Reynolds has monopoly power in the Reynolds-brand DMS market. Alternatively, Reynolds has appreciable economic power in the DMS market as a whole, sufficient to force dealerships, the non-defendant co-conspirators to deal exclusively with Reynolds in the tied market, *i.e.,* the market for integration software which provides third party access to the Reynolds-brand DMS system.

42. Reynolds and the non-defendant co-conspirators have contracted, combined and conspired to unreasonably restrain trade by agreeing to deal exclusively with Reynolds in the market for third party access software and by boycotting integration providers like SIS, who are not "certified" by Reynolds. Reynolds has acquired 80 to

90% of the market for Reynolds-brand third party access software and therefore the tying arrangement affects a substantial volume of commerce in the tied market. On information and belief, Reynolds had less than 50% of the tied product market prior to implementing the predatory and anticompetitive conduct alleged in this counterclaim and threatens to acquire 100% of the tied product market.

43. Reynolds has a direct economic interest in the sale of the tied product because it offers for sale its own brand of third party access software known as the Reynolds Certified Interface ("RCI") program. It also offers for sale a large variety of third party vendor application products and services which directly compete against the vendors who purchase SIS' integration software.

44. SIS has suffered antitrust injury as a result of the tying arrangement. Prior to the predatory conduct alleged in this counterclaim, SIS derived approximately 40% of its revenue by integrating third party applications with Reynolds-brand DMS systems. Reynolds not only maintains substantial economic power over its DMS systems, its coercive and overreaching conduct over its customer dealerships through the lock-in of long-term contracts and the threat of baseless breach of contract litigation has the purpose and effect of effecting a horizontal group boycott of competing integration providers like SIS at the dealership level. Reynolds' coercive activity with the participating dealerships prevents the dealerships, vendors, and independent integration providers from making free choices between market alternatives and constitutes antitrust injury without regard to proof of its actual market effect, which is substantial. SIS was and is being damaged by this antitrust injury which excludes it from the relevant market and gives Reynolds monopoly power in the tied product market. In addition, and on information and belief,

Reynolds has reduced competition in the relevant market and has successfully driven smaller integrators out of the market, and is now attempting to drive SIS as its largest competitor out of the market.

45.     SIS seeks treble damages and reasonable attorney's fees for the illegal tying agreements employed by Reynolds and its non-defendant co-conspirators.

### Count III– Attempted Monopolization in Violation of § 2 of the Sherman Act

46.     SIS incorporates herein by reference paragraphs 1-45 above.

47.     Reynolds has a specific intent to achieve monopoly power in the market for third party application software for Reynolds-brand DMS systems. Reynolds' tying and bundling activities and bans on DMS software that it does not preapprove has prohibited access to alternative software, such as SIS' integration software in the Reynolds-brand online DMS market.

48.     By reason of the foregoing conduct, Reynolds has achieved a dangerous probability of monopoly power in the market for third party application software in the Reynolds-brand online DMS market.

49.     SIS has suffered antitrust injury from Reynolds' attempted monopolization in violation of section 2 of the Sherman Act, and seeks recovery of treble damages as set forth in 15 U.S.C. §15.

### Count IV– Price Discrimination in Violation of § 2 of the Clayton Act

50.     SIS incorporates herein by reference paragraphs 1-49 above.

51.     By reason of the foregoing conduct, Reynolds has engaged in price discrimination in the monthly fees it charges to integrate third party access to the

Reynolds-brand DMS systems. The effect of such price discrimination has been to lessen competition in this market and tends to produce a monopoly in this market.

52. SIS has suffered antitrust injury by virtue of Reynolds' price discrimination and is entitled to recover three times the amount of its damages pursuant to 15 U.S.C. §15.

## Count V ---Tortious Interference with Contracts

53. SIS restates and incorporates the allegations of paragraphs 1 through 52 above.

54. SIS executed contracts with the following third-party application providers throughout the country, whereby SIS provided integration software that allowed the third-party applications to work with Reynolds-brand DMS computer systems: PartsEye, FirstLook, Dealer Peak, DealerTrack, AAX, SmartCo and Autobase.

55. Reynolds had actual knowledge of these contracts, each of which contained terms requiring access and usage on the dealership personal computers through authorized user identification codes and uninterrupted service on the DMS systems.

56. Reynolds, intentionally and without justification, for the purpose of reducing competition and forcing the purchase of its own application products, interfered with SIS's contracts with PartsEye, FirstLook, Dealer Peak, DealerTrack, AAX, SmartCo and Autobase by: a) interfering with SIS's integration software, thereby preventing SIS from properly performing for its customers under the contracts; b) blocking the third-party application providers' access to the data on Reynolds-brand DMS, thereby preventing contractual performance; and, c) falsely telling its auto dealer customers that their data security would be compromised if they allowed SIS to institute and manage

automated access, thereby discouraging auto dealers from using the products of SIS's customers, and preventing SIS from performing at their dealerships. Reynolds lacked justification to interfere with these contracts because the dealership which owned the data processed by the Reynolds-brand DMS specifically authorized the above-referenced SIS customers to integrate their vendor programs with the dealership DMS systems.

57.     Reynolds' actions caused SIS to lose the following business, when these customers terminated their contractual agreements with SIS for Reynolds-DMS dealerships: PartsEye, FirstLook, Dealer Peak, DealerTrack, AAX, SmartCo and Autobase.

58.     SIS has suffered damages as a result of Reynolds' interference, including irreparable harm to its reputation and goodwill in the marketplace.

59.     Reynolds' actions have caused actual damages to SIS, including the loss of the aforementioned customers' annual contracts, lost revenue, lost profits, costs incurred, and other special and consequential damages.

60.     Reynolds' interference continues today and will continue in the future if not enjoined by this Court. SIS has been damaged by Reynolds' conduct including the value of lost customers' annual contracts, lost revenue, lost profits, costs, other consequential and special damages.

### Count VI – Tortious Interference with Prospective Economic Advantage

61.     SIS restates and incorporates the allegations of paragraphs 1 through 60, above.

62.     SIS maintains business relationships with application providers who service over 2100 dealerships throughout the country, whereby SIS provided integration

software that allowed the third-party applications to work with Reynolds-brand DMS computer systems.

63. Reynolds had actual knowledge of these relationships.

64. Reynolds, intentionally and without justification, for the purpose of reducing competition and forcing the purchase of its own application products, interfered with and continues to interfere with SIS's business relationships by: a) interfering with SIS's integration software, thereby preventing SIS from properly performing for its customers and causing interference to their business; b) blocking the third-party application providers' access to the data on Reynolds-brand DMS, thereby preventing performance and interfering with their business; and, c) falsely telling its auto dealer customers that their data security would be compromised if they allowed SIS to institute and manage automated access, thereby discouraging auto dealers from using the products of SIS's customers, and preventing SIS from performing at their dealerships.

65. Reynolds' actions has caused and will continue to cause SIS to lose business.

66. SIS has suffered and will continue to suffer damages as a result of Reynolds' interference, including irreparable harm to its reputation and goodwill in the marketplace.

67. Reynolds' actions have caused actual damages to SIS, including lost business, lost revenue, lost profits, costs incurred, and other special and consequential damages.

68. Reynolds' interference continues today and will continue in the future if not enjoined by this Court.

## Count VII – Violations of Computer Fraud and Abuse Act

69.     SIS restates and incorporates the allegations of paragraphs 1 through 68, above.

70.     Reynolds-brand DMS computer systems are utilized on computers owned by auto dealers across the country.

71.     These computers are used in interstate commerce.

72.     Reynolds is accessing the auto dealers' computers by utilizing and employing software to interfere with the Interface between its DMS on the auto dealers' computers and integration software, blocking access to third-party application providers attempting to integrate with the Reynolds DMS, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*.

73.     Reynolds is also accessing protected computers to search and access SIS intellectual property without authorization.

74.     Reynolds' conduct is not authorized by the auto dealers.  In fact, the auto dealers want to work with the third party application providers that are attempting to access the auto dealers' own data on the Reynolds-brand DMS for the purpose of increasing the dealers' sales.

75.     While Reynolds will claim its agreements with auto dealers authorized it to access their computers, the agreements do not specifically authorize Reynolds to impair the integrity or availability of the auto dealers' data, thereby damaging their business and the business of SIS.  The auto dealers do not know when they sign up to implement Reynolds-brand DMS that the use of their own data will be restricted, and Reynolds changes the terms of their agreements after their initial execution.

76.     By blocking access by the third-party applications to the auto dealers' data, Reynolds is impairing the integrity or availability of data, programs and information on the auto dealers' computers.

77.     Reynolds actions cause damage to SIS because it provides software that allows third-party applications to integrate with the Reynolds-brand DMS on the auto dealers' computers, and Reynolds is intentionally blocking and interfering with that software.

78.     Reynolds' actions have caused over $5,000 in damage to SIS over a one-year period, and caused other damages to SIS, including the loss of customers, lost revenue, costs incurred, and other special and consequential damages.

79.     Reynolds' violations of the Computer Fraud and Abuse Act continue today and will continue in the future if not enjoined by this Court.

### Count VIII – Deceptive and Unfair Trade Practices

80.     SIS restates and incorporates the allegations of paragraphs 1 through 79, above.

81.     Reynolds is intentionally disparaging SIS in the marketplace.

82.     Reynolds is telling all of its auto dealer customers that they cannot do business with SIS or third-party application providers, and that if they do their data security will be compromised.

83.     Such assertions constitute false representations of fact regarding SIS's product.

84.     Reynolds' claims that SIS's product is unsafe are merely a pretense for: a) forcing companies such as SIS and its customers to become Reynolds certified; or, b) forcing Reynolds' auto dealer customers to buy only Reynolds products.

85.     Reynolds' false assertions of fact disparaging SIS's product violate the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A).

86.     SIS has suffered damages as a result of Reynolds' disparagement, including irreparable harm to its reputation and goodwill in the marketplace.

87.     Reynolds' actions have caused SIS to lose the following business when these customers terminated their contractual agreements with SIS for Reynolds-DMS dealerships because their auto dealer customers believed Reynolds' false assertions that third-party integration was unsafe: PartsEye, FirstLook, Dealer Peak, DealerTrack, AAX, SmartCo and Autobase.

88.     Reynolds' actions have caused actual damages to SIS, including the loss of annual contracts and lost revenue.

89.     Reynolds' interference continues today and will continue in the future if not enjoined by this Court pursuant to § 4165.03(A).

### Count IX – Product Disparagement

90.     SIS restates and incorporates the allegations of paragraphs 1 through 89, above.

91.     Reynolds is intentionally disparaging SIS in the marketplace.

92.     Reynolds is telling all of its auto dealer customers that they cannot do business with SIS or third-party application providers, and that if they do their data security will be compromised.

93.     Such assertions constitute false representations of fact regarding SIS's product.

94.     Reynolds' claims that SIS's product is unsafe are merely a pretense for: a) forcing companies such as SIS and its customers to become Reynolds certified; or, b) forcing Reynolds' auto dealer customers to buy only Reynolds products.

95.     Reynolds' false assertions of fact constitute unlawful product disparagement.

96.     SIS has suffered damages as a result of Reynolds' disparagement, including irreparable harm to its reputation and goodwill in the marketplace.

97.     Reynolds' actions have caused SIS to lose the following business when these customers terminated their contractual agreements with SIS for Reynolds-DMS dealerships because their auto dealer customers believed Reynolds' false assertions that third-party integration was unsafe: PartsEye, FirstLook, Dealer Peak, DealerTrack, AAX, SmartCo and Autobase.

98.     Reynolds' actions have caused damages to SIS, including the loss of customer contracts, lost revenue, costs incurred, and other special and consequential damages.

99.     Reynolds' interference continues today and will continue in the future if not enjoined by this Court.

### Count X – Misappropriation of Trade Secrets

100.    SIS incorporates herein paragraphs 1-99 above.

101.    Reynolds had access to confidential trade secrets and proprietary information owned by SIS.

102.     Reynolds wrongfully withheld and appropriated for itself SIS' trade secrets and proprietary information in a manner that caused and was intended to cause damage to SIS and competitive advantage to Reynolds.

103.     SIS seeks and is entitled to the return of its trade secrets and proprietary information and seeks disgorgement of all profits obtained by Reynolds in the misuse and misappropriation of SIS property.

## **Request for Temporary and Permanent Injunctive Relief for All Counts**

104.     SIS requests that the Court enter a preliminary and permanent injunction requiring Reynolds to immediately cease blocking access by third-party application providers using SIS's integration software to Reynolds-brand DMS computer systems at auto dealerships throughout the country, prohibiting Reynolds from defaming SIS' product and forcing customers to boycott SIS' services, prohibiting Reynolds from accessing and confiscating SIS intellectual property on computers owned auto dealerships, including auto dealerships that use Reynolds-brand DMS, or found on SIS websites; and requiring Reynolds to return any and all copies of SIS intellectual property it has in its possession.

105.     Unless Reynolds is enjoined, SIS will be irreparably harmed by the loss of its most valuable trade secrets and other proprietary data, loss of customers and by the loss of the goodwill associated with those customer relationships, which is difficult to compute in money damages.  SIS, therefore, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, SIS respectfully requests that this Court set this matter for trial and upon final hearing, grant the following relief:

a.      A permanent injunction in the form requested in paragraphs 104 and 105 above;

b.      Direct and consequential damages, including lost profits and treble damages as provided by applicable law;

c.      Disgorgement of profits unjustly earned with SIS trade secrets and proprietary data;

d.      Pre-judgment and post-judgment interest as permitted by applicable law

e.      Attorney's fees as provided by statute; and

f.      Such other and further relief the Court may deem proper.

Respectfully submitted,

/s/ Jeanne Crandall
Mark L. Ornstein (pro hac vice)
Frank H. Killgore, Jr. (pro hac vice)
Jeanne Crandall (pro hac vice)
KILLGORE, PEARLMAN, STAMP,
  ORNSTEIN & SQUIRES, P.A.
P. O. Box 1913
Orlando, FL 32802-1913
Tel:  (407) 425-1020
Fax:  (407) 839-3635
Attorneys for Plaintiff
Email: mlornstein@kpsos.com
Email: fhkillgore@kpsos.com
Email: jcrandall@kpsos.com
Email: mmckinnie@kpsos.com
Email: jkerce@kpsos.com
*Attorneys for Defendant Superior Integrated Solutions, Inc.*

Keven Drummond Eiber (0043746)
Anastasia Wade (0082797)
BROUSE McDOWELL, LPA
600 Superior Avenue East, Suite 1600
Cleveland, OH 44114
Tel.:  (216) 830-6830
Fax:  (216) 830-6807
Email: keiber@brouse.com
Email: awade@brouse.com
*Attorneys for Defendant Superior Integrated
Solutions, Inc.*


## CERTIFICATE OF SERVICE

The undersigned certifies that pursuant to Local Rule CV 5.2(b), the foregoing document was electronically served through the Court's CM/ECF system on all counsel who are registered users of the system as provided in Fed. R. Civ. P. 5(b)(2)(e), on October 15, 2013.   Any counsel of record not deemed to have registered for such electronic service were served with a true and correct copy of the foregoing by U.S. Mail.


Grant Harvey                                        David C. Greer
Aundrea K. Gulley                                   James H. Greer
Brian T. Ross                                       Bieser, Greer & Landis LLP
Ben Bireley                                         400 PNC Center
Gibbs & Bruns L.L.P.                                6 North Main Street
1100 Louisiana, Suite 5300                          Dayton Ohio 45402-1908
Houston, TX 77002


/s/  Jeanne Crandall
Jeanne Crandall
*Attorney for Superior Integrated Solutions,
Inc.*