# Exhibit 48

NO. 01-99-00024-CV

ORIGINAL IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

99 APR 29 AM 11: 50

MARGIE THOMPSON
CLERK

*In re*: UNIVERSAL COMPUTER SYSTEMS, INC.
FORD DEALER COMPUTER SERVICES, INC.,
n/k/a DEALER COMPUTER SERVICES, INC.,
RENTAL SYSTEMS, INC., UNIVERSAL COMPUTER
CONSULTING, INC., UNIVERSAL COMPUTER GROUP, INC.,
WILSHIRE TRAVEL, INC., UNIVERSAL COMPUTER FORMS, LTD.,
UNIVERSAL COMPUTER FORMS, INC.,
UNIVERSAL COMPUTER SERVICES, INC., formerly UNIVERSAL
COMPUTER MAINTENANCE, INC., ROBERT T. BROCKMAN and
DOROTHY BROCKMAN

RELATORS,

TRIAL COURT CASE NO. 95-37973
IN THE 270TH JUDICIAL DISTRICT

**RESPONSE TO PETITION AND TO THE
SUPPLEMENTAL PETITION FOR WRIT OF MANDAMUS**

<u>ORAL ARGUMENT REQUESTED</u>

Richard Morrison, P.C.
Texas Bar No. 14528000
Karen Morris, P.C.
Texas Bar No. 00786095
401 Bradford Ave.
Kemah, TX 77565
281/535-0455 (Telephone)
281/535-0458 (Facsimile)

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

NO. 01-99-00024-CV

---

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

---

*In re*: UNIVERSAL COMPUTER SYSTEMS, INC.
FORD DEALER COMPUTER SERVICES, INC.,
n/k/a DEALER COMPUTER SERVICES, INC.,
RENTAL SYSTEMS, INC., UNIVERSAL COMPUTER
CONSULTING, INC., UNIVERSAL COMPUTER GROUP, INC.,
WILSHIRE TRAVEL, INC., UNIVERSAL COMPUTER FORMS, LTD.,
UNIVERSAL COMPUTER FORMS, INC.,
UNIVERSAL COMPUTER SERVICES, INC., formerly UNIVERSAL
COMPUTER MAINTENANCE, INC., ROBERT T. BROCKMAN and
DOROTHY BROCKMAN

RELATORS,

---

TRIAL COURT CASE NO. 95-37973
IN THE 270TH JUDICIAL DISTRICT

---

**RESPONSE TO PETITION AND TO THE
SUPPLEMENTAL PETITION FOR WRIT OF MANDAMUS**

---

ORAL ARGUMENT REQUESTED

Richard Morrison, P.C.
Texas Bar No. 14528000
Karen Morris, P.C.
Texas Bar No. 00786095
401 Bradford Ave.
Kemah, TX 77565
281/535-0455 (Telephone)
281/535-0458 (Facsimile)

AND

William J. Mays, P.c.
Texas Bar No. 13309500
62 Nassau Dr.
Rockport, TX 78382
512-790-5700 (Telephone)
512-790-5777 (Facsimile)

Attorneys for Plaintiffs and Intervenors
WEBER, FUSCO, BROWN, COKER,
MUCKLE, MORRIS, JOHNSON,
PLUMLEE AND MARSALEK

AND

Craig Estlinbaum
Attorney at Law
Texas Bar No. 00790653
2232 Avenue G
Bay City, Texas 77414
409/245-4666 (Telephone)
409/244-5342 (Facsimile)

Attorney for Intervenors, EYRE,
HUSEMAN, MENTIL, MURRAY, and
REYSA

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vi-

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vii-

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

    A. History of Ownership and Marketing of Controller Ports . . . . . . . . . . . . . . -2-

    B. Defendants' Objections Used to Thwart Legitimate Discovery . . . . . . . . . . -5-

    C. Prior History of Repeated Discovery Abuses . . . . . . . . . . . . . . . . . . -12-

        1. Earnings Forecasts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

        2. 1995 and 1996 Sales Plans . . . . . . . . . . . . . . . . . . . . . . . . . -15-

        3. Removal of Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

        4. Abusive and Hostile Depositions . . . . . . . . . . . . . . . . . . . . . . -18-

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

    A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

    B. Order Does Not Include Comtex or Jiltec . . . . . . . . . . . . . . . . . . . -21-

    C. No Attorney-Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

    D. July 10, 1998 Order Consistent With Texas Law . . . . . . . . . . . . . . . -24-

    E. Defendants' Blundering Attempt to Prepare a Record . . . . . . . . . . . . . . . -26-

        1. Ex Parte *Affidavits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

        2. Brockman's November 3, 1998 Affidavit . . . . . . . . . . . . . . . . . . -29-

F.  Defendants' Resistance to Discovery Made in Bad Faith . . . . . . . . . . . . . . -32-

G.  Brockman Failed to Comply With the July 10, 1998 Court Order . . . . . . . -34-

H.  The Sanction was Just and Appropriate Under Transamerica . . . . . . . . . . -36-

    1.  Relationship of the Conduct to the Sanction . . . . . . . . . . . . . . . . . . -37-

    2.  Defendants Participated in the Offensive Conduct and
        Deserve the Punishment of Sanctions . . . . . . . . . . . . . . . . . . . . . . . -38-

    3.  The Punishment Was Not Excessive . . . . . . . . . . . . . . . . . . . . . . . . -39-

I.  Post Transamerica Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

REAL PARTIES' APPENDIX

Exhibit 1    Reporter's Record of October 19, 1998 hearing before 270th Judicial
               District Court of Harris County, Texas

Exhibit 2    December 3, 1998 deposition of Defendant Robert T. Brockman

Exhibit 3    Plaintiffs' and Intervenors' Motion for Sanctions dated July 17, 1998
               and Plaintiffs' and Intervenors' Supplemental Motion for Sanctions and
               Reply to Defendants' Response dated July 23, 1998

Exhibit 4    Plaintiffs' and Intervenors' Motion to Compel dated September 3, 1997

Exhibit 5    Certified copy of 270th Judicial District Court Docket Sheet

Exhibit 6    Excerpts of June 11, 1998 deposition of Donna Singleton

## INDEX OF AUTHORITIES

### Cases

Allstate Texas Lloyds v. Johnson, 784 S.W.2d 100 (Tex. App.-Waco 1989, no writ)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

Altus Communications, Inc. v. Meltzer & Martin, Inc., 829 S.W.2d 878 (Tex. App.-Dallas
1992, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

Arit International Corp. v. Allen, 910 S.W.2d 166 (Tex. App.-Fort Worth 1995, no writ)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

Baird v. Koerner, 279 F.2d 623 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

Barnes v. Whittingham, 751 S.W.2d 493 (Tex. 1988) . . . . . . . . . . . . . . . -26-, -29-, -31-

Borden, Inc. v. Valdez, 773 S.W.2d 718 (Tex. App.-Corpus Christi 1989, no writ) . . -25-

Cellular Marketing v. Houston Cellular Telephone Co., 838 S.W.2d 331 (Tex. App.-Houston
[14th Dist.] 1992, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

Cole v. Huntsville Memorial Hospital, 920 S.W.2d 364 (Tex. App.-Houston [1st Dist.] 1996,
writ denied), cert. denied, 520 U.S. 1143, 117 S.Ct. 1312, 137 L.Ed. 475 (1997)-40-, -44-

Cox v. Realty Development Corp., 748 S.W.2d 492 (Tex.App.--Dallas 1988, no writ)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238 (Tex. 1985), cert. denied, 476 U.S.
1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). . . . . . . . . . . . . . . . . . . . . -21-, -41-

Duval County Ranch Co. v. Alamo Lumber Co., 663 S.W.2d 627 (Tex. App.-Amarillo 1984,
writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

Gentry v. Weaver, 909 S.W.2d 606 (Tex. App.-Fort Worth 1995, no writ) . . . . . . . . -41-

GTE Communications Sys. Corp. v. Tanner, 856 S.W.2d 725 (Tex. 1993) . . . . . . . . -40-

Gutierrez v. Walsh, 748 S.W.2d 27 (Tex.App.--Corpus Christi 1998, no writ) . . . . . -21-

Huie v. DeShazo, 922 S.W.2d 920 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

Humphreys v. Caldwell, 888 S.W.2d 469 (Tex. 1994) . . . . . . . . . . . . . . -28-, -29-, -31-

In re Grand Jury Matter 91-01386, 969 F.2d 995 (11th Cir. 1992) . . . . . . . . . . . . . . -32-

In re Grand Jury Proceedings (Jones), 517 F.2d 666 (5th Cir. 1975) . . . . . . . . . . . . . -32-

In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena, 926 F.2d 1423 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

In re Grand Jury Subpoenas, 906 F.2d 1485 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . -33-

In the Matter of Grand Jury Proceeding, Grand Jury 1988-2(Cherney), 898 F.2d 565 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

Keene Corp. v. Caldwell, 840 S.W2d 715 (Tex. App.-Houston [14th Dist.] 1992, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

Luxenberg v. Marshall, 835 S.W.2d 136 (Tex. App.-Dallas 1992, no writ) . . . . . . . . -44-

Marathon Oil Co. v. Moye, 893 S.W.2d 585 (Tex. App.-Dallas 1994, no writ) . . . . . -25-

Marshall v. Ryder, 928 S.W.2d 190 (Tex. App.-Houston [14th Dist.] 1996, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

Osborne v. Johnson, 954 S.W.2d 180 (Tex. App.-Waco 1997, orig. proceeding) . . . -29-

Remington Arms Co. v. Canales, 837 S.W.2d 624 (Tex. 1992) . . . . . . . . . . . . . . . . -26-

Sharpe v. Kilcoyne, 962 S.W.2d 697 (Tex. App.-Fort Worth 1998, orig. proceeding) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

Simpson v. Tenant, 871 S.W.2d 301 (Tex. App.-Houston [14th Dist.] 1994, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

Tornay v. United States, 840 F.2d 1424 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . -32-

Transamerica v. Powell, 811 S.W.2d 913 (Tex. 1991) . . . . . . . . . . . -36-,37-,38-,43-,44-

United States Government v. Marks, 949 S.W.2d 320 (Tex. 1996) . . . . . . . . . . . . . -26-

United States v. Liebman, 742 F.2d 807 (3rd Cir. 1984) . . . . . . . . . . . . . . . . . . . . . -33-

<u>Vingelli v. United States</u>, 992 F.2d 449 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . -32-

**Statutes**

Texas Rule of Civil Evidence 503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

Texas Rule of Civil Procedure 166b(4) . . . . . . . . . . . . . . . . . . . -7-, -25, -27-, -29-, -31-

Texas Rule of Civil Procedure 199.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-, -29-

Texas Rule of Civil Procedure 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

## STATEMENT OF THE CASE

The underlying lawsuit presents claims for breach of contract, quantum meruit, fraud and conspiracy to defraud. This mandamus proceeding arises solely out of the fraud and conspiracy claims. Because Defendants so egregiously and so repeatedly obstructed discovery so as to conceal any information that would allow proof of the fraud, the trial court sanctioned Defendants by striking their pleadings on these claims.

The Respondent is the Honorable Brent Gamble, Judge of the 270th Judicial District Court, Harris County, Texas.

The original sanction order of December 11, 1998 was made by the Honorable Richard Hall. Beginning in July 1998, Judge Hall repeatedly ordered Relator Robert T. Brockman to answer specific questions so that it could be established whether any attorney-client relationship even existed. Over and over again, Brockman refused to comply. After Judge Brent Gamble took the bench at the start of 1999, Defendants requested that he reconsider the sanction order of Judge Hall. After receiving briefing on the issues and reviewing the many records of the prior hearings before Judge Hall, and after affording still another hearing on the issue, Judge Brent Gamble refused to vacate the sanctions order on February 3, 1998. Judge Gamble also refused to vacate the original order of July 10, 1998, which was the subject of a previous mandamus proceeding before this Court, Cause No. 01-98-00817-CV. On September 25, 1998, this Court denied the relief sought by Defendants and dismissed the petition seeking relief from the order of July 10, 1998, as "unripe."

## <u>ISSUES PRESENTED</u>

1.     Whether Respondent abused his discretion in denying Relators' Motion for Reconsideration of former Judge Richard Hall's orders of December 11, 1998, in light of the repeated pattern of egregious discovery abuses engaged in by Relators.

2.     Whether Respondent abused his discretion in denying Relators' Supplemental Motion for Reconsideration of July 10, 1998 Order overruling Brockman's objections and ordering him to answer clearly discoverable questions regarding the external trappings of an alleged attorney-client relationship.

NO. 01-99-00024-CV

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

*In re*:  UNIVERSAL COMPUTER SYSTEMS, INC.
FORD DEALER COMPUTER SERVICES, INC.,
n/k/a DEALER COMPUTER SERVICES, INC.,
RENTAL SYSTEMS, INC., UNIVERSAL COMPUTER
CONSULTING, INC., UNIVERSAL COMPUTER GROUP, INC.,
WILSHIRE TRAVEL, INC., UNIVERSAL COMPUTER FORMS, LTD.,
UNIVERSAL COMPUTER FORMS, INC.,
UNIVERSAL COMPUTER SERVICES, INC., formerly UNIVERSAL
COMPUTER MAINTENANCE, INC., ROBERT T. BROCKMAN and
DOROTHY BROCKMAN

RELATORS,

TRIAL COURT CASE NO. 95-37973
IN THE 270TH JUDICIAL DISTRICT

**RESPONSE TO PETITION AND TO THE
SUPPLEMENTAL PETITION FOR WRIT OF MANDAMUS**

TO THE HONORABLE FIRST COURT OF APPEALS:

Plaintiffs and Real Parties in Interest, DOUGLAS DANTE FUSCO, ROBERT VAN WEBER, MICHAEL WILLIAM BROWN, SHAWN T. COKER, JAMES F. MUCKLE, JOHN ALLEN MORRIS, DONALD SCOTT JOHNSON, MICHEAL LAINE PLUMLEE and THOMAS J. MARSALEK, MICHAEL S. HUSEMAN, MICHAEL D. EYRE, MARKUS MENTIL, JOSEPH RAY MURRAY and DAVID M. REYSA (collectively

"Plaintiffs") file their Response to Relators' Petition and Supplemental Petition for Writ of Mandamus.

## I. STATEMENT OF FACTS

*A.* *History of Ownership and Marketing of Controller Ports*

Defendants and Relators Universal Computer Systems, Inc., Ford Dealer Computer Services, Inc., now known as Dealer Computer Services, Inc., Rental Systems, Inc., Universal Computer Consulting, Inc., Universal Computer Group, Inc., Wilshire Travel, Inc., Universal Computer Forms, Ltd., Universal Computer Forms, Inc., Universal Computer Services, Inc., formerly Universal Computer Maintenance, Inc., Robert T. Brockman and Dorothy Brockman (collectively "Defendants" or "UCS") are in the business of selling hardware and licensing software for car dealerships across the country. The hardware and software comprise information systems that are utilized to manage the day to day operations of car dealerships. The Real Parties in Interest are the regional managers and salesmen who actually sold the UCS systems and who worked on a commission basis. They are referred to collectively as "Plaintiffs" or "the salesmen".

Defendant Brockman, owner and president of the UCS corporations, founded Computer Terminals, Ltd. in the Cayman Islands in 1981. *RR 12/11/98, Vol. 3, Ex. 2 at A at 44:20-45:5.*[1] Computer Terminals, Ltd. was involved in the distribution of controller ports for exclusive sale to customers of UCS. *Id. at 138:1-138:18; 156:7-157:2.* Controller ports

---

[1] References to "RR 12/11/98" refers to the Hearing on the Motion for Sanctions dated 12/11/98. Attached to Exhibit 2 of Volume 3 are exhibits A through H, to which exhibits reference is made herein.

are computer components which attach multiple CRT terminals and printers to an IBM mainframe computer. These controller ports are not compatible with any computer system other than those sold by Defendants. *Id. at 49:11-23; 156:7-157:2.* Brockman's motivation for establishing Computer Terminals, Ltd. as a Cayman Island entity was to achieve profits without having to pay income taxes. *Id. at 53:18-54:23.* Another result or benefit of owning Computer Terminals, Ltd., was not paying commissions to the salesmen that sold and marketed the controller ports as part of the UCS computer system. *Id. at 138:25-145:13.* Brockman never told the salesmen and regional managers, or anyone that asked, that he owned, managed and controlled Computer Terminals, Ltd. *Id. at 133:7-11.* In fact, when ever anyone inquired about their entitlement to commissions on the sale of controller ports, Brockman or his agents specifically told them that they would not pay them because they did not own, manage, or control the company that manufactured controller ports. *Id. at B at 122:2-134:22.* Brockman claims that in 1987, he sold all of his stock in Computer Terminals, Ltd. to Peters Investments, Ltd., a Cayman Island entity, about which he claims to know nothing. *Id. at A at 45:23-46:18.*

Brockman alleges that at the end of 1992, Jiltec, Ltd. was formed in the Cayman Islands and either bought or acquired the rights to produce controller ports, but he claims to have no direct knowledge of that either. *Id. at 47:21-48:15.* The only knowledge he claims to have of Jiltec, Ltd., is that it is a vendor that supplies Defendant Comtex with controller ports. *Id. at 121:14-17.* After 1987, when Brockman claims he sold Computer Terminals,

-3-

Ltd. to Peters Investments, he claimed to have no "part of it", and when asked if he had any control or management, he stated, "They ran it." *Id. at 175:19-176:1.*

Late in 1992, an old high school friend of Brockman named Gary Bechtol received a phone call from a lawyer in Houston named Carlos Kepke. *Id. at C at 86:12-87:6.* Bechtol had maintained his friendship with Brockman over the years, and had even worked for UCS at one point. *Id. at A at 121:23-122:9.* Bechtol did not know Kepke, who is an international tax attorney, prior to the phone call. *Id. at C at 123:5-16.* At the time of the phone call, Bechtol was working as a retail floor salesman in a computer store. *Id. at 34:1-17.* In the telephone conversation between Kepke and Bechtol, Kepke explained a plan to form a company in Dallas to import controller ports from Jiltec to be sold to UCS' customers. *Id. at 86:12-87:19.* Immediately thereafter, Bechtol received a letter from Jiltec, signed by M.F.B. Gillooly as Director of Jiltec, explaining the plan to establish a company to distribute controller ports to automobile dealerships. *Id. at D.* The controller ports were sold *only* to UCS' customers. *Id. at C at 148:1-14; see also Id. at A at 138:1-18.* In the letter, Gillooly recommended to Bechtol that he "discuss this entire matter with an attorney knowledgeable in this regard", to wit: Mr. Carlos Kepke. *Id. at D.*

Immediately, Bechtol accepted the proposition and declared his intention to hire Kepke. *Id. at E.* Bechtol retained Kepke and formed Comtex Communications, Ltd., with himself as its president. *Id. at C at 118:22-119:2.* Bechtol testified that the concept for forming Comtex Communications, Ltd. was not his "original idea", and refused to answer whose "original idea" it was. *Id. at 121:15-24.* Bechtol also testified that he had never met

-4-

Carlos Kepke prior to Kepke's phone call, did not know who he was, and did not know who Kepke represented at the time of the phone call. *Id.* *at 123:5-124:23.* Bechtol testified that he does not remember how Kepke got his name. *Id.* *at F at 28:10-13.*

Approximately two months after its formation, Comtex committed to purchase the entire 1993 production of controller ports from Jiltec in the amount of $6,000,000.00. *Id.* *at C at 143:7-11.* Comtex did not know who its customers would be, or how many controller ports were being purchased. Nor did Comtex have a line of credit or cash in the bank sufficient to purchase the controller ports. *Id.* *at 142:21-145:20.*

Plaintiffs sued Defendants for fraud because of Defendants' misrepresentation concerning their ownership, control, and/or management of the company or companies that marketed the controller ports, and because the misrepresentation resulted in the salesmen being deprived of commissions for their efforts in marketing and selling the controller ports.

B. *Defendants' Objections Used to Thwart Legitimate Discovery*

Plaintiffs first requested the deposition of Robert T. Brockman in November of 1997. *RR 12/11/98, Vol. 2, Ex. 1.* After Defendants failed to respond to the request, Plaintiffs noticed Brockman's deposition, Brockman moved to quash, and the 270th Judicial District Court ordered his deposition be taken on May 19, 1998. *Id.* *at Ex. 2.* Plaintiffs did not conclude the deposition on this date and the parties agreed to continue. *RR 12/11/98, Vol. 3, Ex. 2 at A at 197:22-23.*

On July 10, 1998, the parties to this lawsuit began to take the second part of Brockman's deposition. After only a few minutes of questioning, Brockman refused to

-5-

answer questions pertaining to his relationship with Carlos Kepke. Brockman's attorney, John C. Allen, objected to the questions on attorney-client privilege grounds. The parties recessed the deposition and immediately proceeded to an oral hearing before the 270th Judicial District Court, the Honorable Richard Hall presiding. *Id. at G at 13:15-16:3.*

After hearing only argument and no evidence presented by Brockman in support of the privilege asserted, the Court overruled the objections and ordered that Brockman answer specific questions regarding how the contact with Kepke was made, the time and place of the contact, and the subject matter of the contact. *Relators' App. I, Ex. 2.*

Following the Court's order (and without first obtaining a stay order), Brockman refused to continue the deposition and filed a petition for writ of mandamus in the First Court of Appeals (No. 01-98-00817-CV). *Relators' App. IV, Ex. 24.* Because Brockman had not even established an attorney-client relationship with Kepke, the appellate court dismissed the mandamus petition as "unripe" on September 25, 1998. *Relators' App. I, Ex. 3.*

After the dismissal of this mandamus petition, John Allen agreed to produce Brockman for his oral deposition on the issue of the attorney-client privilege at 1:30 o'clock p.m., Monday, October 19, 1998, in the Jury Room of the 270th Judicial District Court. In accordance with said agreement, a notice for the deposition of Brockman and a subpoena duces tecum was served on his attorney. *RR 12/11/98, Vol. 2, Ex. 6.* Defendant filed objections to Plaintiffs' subpoena duces tecum of Brockman and filed a Motion for Protection, Motion to Quash and Motion for Reconsideration, again objecting to the deposition and to producing the documents requested. To support the motion, Brockman

-6-

filed *ex parte* affidavits of Brockman and Carlos Kepke. *Id. at Ex. 7; see also Relators' App. I, Exs. 5, 6.* Defendants did not serve these affidavits upon Plaintiffs, as required by Texas Rule of Civil Procedure 166b(4). Mr. Allen also advised, despite his prior agreement to the contrary, that he would not produce Brockman for his duly noticed deposition. *RR 12/11/98, Vol. 2, Ex.8.* Plaintiffs' counsel responded to Mr. Allen's letter as follows:

> Therefore, I expect you to abide by our agreement and have your client present for his deposition under my notice to take same. If you unilaterally refuse to produce Mr. Brockman, I will seek sanctions.

*Id. at Ex. 9.*

On October 19, 1998, at 1:30 o'clock p.m., the 270th Judicial District Court conducted a hearing on Defendants' Motion for Protection, Motion to Quash and Motion for Reconsideration. Brockman failed to present evidence at the hearing and failed to produce any of the documents responsive to the subpoena duces tecum attached to his deposition notice. The court denied Defendants' Motion for Protection, Motion to Quash and Motion for Reconsideration. *See Real Parties' App., Ex. 1.* Brockman therefore was under an obligation to appear at the deposition and answer questions, but immediately following the hearing on October 19, 1998, at 1:30 o'clock p.m.-- Brockman refused to appear. Plaintiffs took a Certificate of Non-Appearance. *RR 12/11/98, Vol. 2, Ex. 10.*

At this point, Plaintiffs filed two motions seeking sanctions on November 9, 1998 and November 13, 1998, for Brockman's non-appearance at his duly noticed deposition and for his continued refusal to answer questions as ordered by the court on July 10, 1998. *Exs. to Supp. Pet. for Writ of Mandamus, App. II, Ex. 2 at 23, 24.* The court denied the motions

seeking sanctions on November 20, 1998, but ordered Brockman to appear for his deposition by December 7, 1998. *Relators' App. 1, Ex. 11.*

Plaintiffs again noticed Brockman for deposition on November 11, 1998, and again Brockman filed a motion to quash and for protection, and filed additional objections to the subpoena duces tecum. *Id. at Ex. 10.* This time, Brockman filed a conclusory affidavit with the court and served it upon Plaintiffs. *See also Id. at Ex. 9.* On December 3, 1998, for the third time the Court denied Brockman's request for relief, overruled his objections and ordered the deposition to proceed.[2] *Id. at Ex. 12.*

Despite the fact that the court on three occasions ordered Brockman to answer the questions set forth in its July 10, 1998 order, and despite the fact that Brockman failed to successfully attack that order by mandamus, Brockman, for the third time, refused to answer questions relating to his contact with Carlos Kepke (or the "Unnamed Attorney" described in Brockman's November 3, 1998 affidavit) at his December 3, 1998 deposition. *Id. at Ex. 13.* Further, Brockman refused to answer a host of other relevant questions based on a frivolous claim of attorney-client privilege. For example, Brockman refused to answer each of the following questions based on the attorney-client privilege:

> Can you identify any person or groups of persons or entities that you ever met with, either in person or conferenced with by telephone or by letter, in connection with the sale of your Computer Terminals Limited stock to Peters Investment? *Real Parties' App., Ex. 2 at 224:17-22;*

---

[2] The parties agreed to reschedule the deposition from November 11, 1998 to December 3, 1998. Pursuant to the agreement, Plaintiffs served a Notice of Intention to Take Oral Deposition on December 3, 1998. *RR 12/11/98, Vol. 2, Ex. 11.* Defendants filed a Supplemental Motion for Protection, Motion to Quash, and Objections to Subpoena Duces Tecum on December 1, 1998, which was set for oral argument on December 3, 1998. *Id. at Ex. 12.*

When you actually consummated the sale of your stock in Computer Terminals Limited to Peters Investment, did you do so at a conference table where all parties to the sale were present? *Id. at 225:9-12;*

Do you recall the physical location, either by identifying the office building or the city where you consummated the sale of your stock from Computer Terminals Limited to Peters Investment? *Id. at 226:8-12;*

Can you identify any person who may be a custodian or in possession of records pertaining to your sale of stock in Computer Terminals Limited to Peters Investment? *Id. at 226:20-23;*

Can you identify any person who was present with you at the time that you consummated the sale of your stock in Computer Terminals Limited to Peters Investment? *Id. at 227:6-9;*

Was there a person, other than an attorney or a person who is licensed to practice law, who was present with you when you consummated the sale of your stock to Peters Investment? *Id. at 227:15-19;*

Mr. Brockman, prior to concluding the sale of your stock in Computer Terminals Limited to Peters Investment, did you make any investigation as to the creditworthiness of Peters Investment? *Id. at 242:11-15;*

Prior to consummating your sale of stock in Computer Terminals Limited to Peters Investment, did you make any investigation into the ability of the principals of Peters Investment to manage the company? *Id. at 243:1-5;*

Was either Turney Rankine or Ben Gillooly a principal of Peters Investment at the time that you sold your stock in Computer Terminals Limited to Peters Investment? *Id. at 244:2-5.*

Brockman simply has no basis in law or fact for his objections to these questions or for his failure to answer. Brockman's conduct during the December 3, 1998 deposition is the continuation of a pattern of conduct that makes a mockery of the discovery process and

-9-

shows complete disregard for the court's authority to manage discovery.[3] Therefore, Plaintiffs moved the court to sanction Defendants. Defendants were served with the Motion for Sanctions on Monday, December 7, 1998, via hand delivery, and Defendants filed their response on December 9, 1998. *Relators' App. II, Ex. 16; Relators' App. I, Ex. 7.*

On December 11, 1998, the court heard evidence and oral argument on Plaintiffs' and Intervenors' Motion for Sanctions. The court also considered Defendants' Supplemental Motion for Protection, Motion to Quash, and Objections to Subpoena Duces Tecum. At the hearing, Defendants continued to offer **only** impermissible *ex parte* testimony to establish an attorney-client privilege, despite being advised on two prior occasions that the Court would not consider *ex parte* testimony or affidavits for such purpose. The court stated on the record:

> This is the third hearing, or more, about this. And if you [Brockman] haven't established your privilege yet, I just don't see how that you will get to establish it at all.

*Exs. to Supp. Pet. for Writ of Mandamus, App. I, Ex. II at 22 at 95:7-11.* The court, after careful consideration, ordered sanctions which were just and appropriate under the circumstances and in light of Defendants' repeated history of discovery abuses in this case. The court sanctioned Defendants by ruling that (a) the facts relating to Plaintiffs' causes of action for conspiracy, fraud and quantum meruit relating to the sale of controller ports are

---

[3]  Plaintiffs refer the Court to the following pages and lines from the December 3, 1998 deposition of Brockman (*attached as Real Parties' App., Ex. 2*), all of which are additional examples of frivolous, bad faith objections to legitimate discovery: *8:4; 9:2-3; 24:21-25; 30:15-17; 30:25-31:2; 32:13-14; 34:3-4; 223:14; 223:22-25; 224:6-10.*

established as alleged by Plaintiffs; (b) Defendants are prohibited from opposing Plaintiffs'

causes of action for conspiracy, fraud and quantum meruit relating to the sale of controller

ports; and (c) Defendants' defensive pleadings to Plaintiffs' causes of action for conspiracy,

fraud and quantum meruit relating to the sale of controller ports be struck. The court also

overruled Defendants' objections to the documents sought by the subpoena duces tecum.

*Relators' App. I, Exs. 1, 12.* These documents have never been produced.

On January 7, 1999, Defendants filed their Petition for Writ of Mandamus. *Relators'*

*App. IV, Ex. 24.* This Court abated the Petition by its order of January 15, 1999, for a period

of thirty (30) days in order to afford Defendants the opportunity to seek reconsideration of

the December 11, 1998 and July 10, 1998 orders before the Honorable Brent Gamble. *Exs.*

*to Supp. Pet. for Writ of Mandamus, App. I, Ex. I.* On January 29, 1999, a hearing was held

before Judge Gamble to reconsider the orders. At the hearing, Judge Gamble stated,

"...looking at the docket sheet it doesn't show that Judge Hall reviewed those *in camera*

affidavits and anything submitted to me *in camera* is still in the sealed envelopes. I haven't

looked at them. I won't say I won't, but I haven't yet." *RR 1/29/98, Vol. I at 54:7-15.*

Later, Judge Gamble denied Brockman's tender of *in camera* testimony to establish his claim

of privilege. *Id. at 77:2-10.*

After hearing argument of counsel and reviewing the evidence, and deliberating for

five (5) days, on February 3, 1999, Judge Gamble denied Defendants' Motion for

Reconsideration of the December 11, 1998 orders, and denied Defendants' Supplemental

Motion for Reconsideration of the July 10, 1998 order. *Exs. to Supp. Pet. for Writ of Mandamus, App. II, Ex. 4.*[4]

The following summary of repeated, egregious discovery abuses was part of the record presented to the 270th Judicial District Court in support of Plaintiffs' and Intervenors' Motion for Sanctions of December 11, 1998. The 270th Court considered these (and other) discovery abuses in previous motions for sanctions filed by Plaintiffs.

C. *Prior History of Repeated Discovery Abuses*

Defendants' prior history of repeated discovery abuses include (1) withholding important, discoverable documents that were requested with specificity numerous times; (2) purging files and not producing requested documents as maintained in the normal course of business; (3) questioning Plaintiffs during depositions in a hostile, abusive, needlessly argumentative and condescending manner; and (4) refusing to cooperate when deposition dates are requested. This list of abusive discovery tactics was the subject of Plaintiffs' and Intervenors' Motion for Sanctions of July 17, 1998, and Supplemental Motion for Sanctions of July 23, 1998 (*Real Parties' App., Ex. 3),* and these abuses are discussed in detail below.

---

[4] Defendants filed a Supplemental Petition for Writ of Mandamus on February 9, 1999. However, Defendants continued to seek mandamus against former Judge Richard Hall. On February 16, 1999, Plaintiffs filed a Motion to Deny Relators' Petition for Writ of Mandamus based on Defendants' repeated failure to seek mandamus against current Judge Brent Gamble.

-12-

*1. Earnings Forecasts*

Despite numerous discovery requests, Defendants withheld Plaintiffs' "UCS/FDCS Earnings Forecast" until the deposition of Donna Singleton was taken.  On November 30, 1995, at number 31, Plaintiffs requested Defendants to produce:

> The earnings forecast as maintained in the Q & A database, or other like documents which evidence the unpaid commissions due to Plaintiffs, maintained in any form, for each Plaintiff for each  year of Plaintiffs' employment.

*Real Parties' App., Ex. 3.*  Plaintiffs were so specific in their request as to even identify the database in which the records were maintained.  Defendants filed a lengthy objection based on their Motion to Compel Arbitration, and also objected that the documents were, "irrelevant, immaterial, overly broad, unduly burdensome, confidential and proprietary and assumes facts not in evidence, trade secret information." *Id.*

Again, on January 31, 1997, Plaintiffs made the following request at number 31:

> The earnings forecast for each Plaintiff and Intervenor as maintained in the Q & A data base for each year of each Plaintiffs' and Intervenors' employment.

*Id.* Defendants responded, "Objection: The Request is vague and unclear.  The reference to 'Q & A data base' is unclear.  Subject to a confidentiality order, the earnings forecasts worksheet may be contained in the personnel files." *Id.*  A thorough search of Plaintiffs' personnel files revealed that the earnings forecast documents had not been produced.  Once again, on June 9, 1997, Plaintiffs made the following request at number 10:

> The earnings forecast worksheet for each Plaintiff and Intervenor for each year of each Plaintiffs' and Intervenors' employment.

-13-

*Id.* Defendants responded as follows:

> Objection. The Request is vague and unclear. Additionally, the information is confidential and proprietary. Subject to the execution of the confidentiality order, the earnings forecast worksheet may be contained in the personnel files.

*Id.*

At this point on September 3, 1997, Plaintiffs filed a Motion to Compel production of these requested documents which relate to Plaintiffs' claims for breach of contract and quantum meruit. *Id. at Ex. 4.* On September 19, 1997, the 270th Judicial District Court granted the Motion to Compel and ordered Defendants to produce the earnings forecast worksheets. *Id. at Ex. 5.* Nevertheless, the earnings forecast worksheets were not included with any documents produced.

As previously stated, on May 19, 1998, the deposition of Brockman was taken by Court order. In the subpoena duces tecum attached to Brockman's notice of deposition, Plaintiffs requested at number 3:

> The Regional Manager ("RM") Earnings Forecast for UCS and FDCS from January 1991 to the termination date for each Plaintiff and Intervenor.

*Id. at Ex. 3.* The Earnings Forecast documents were still not produced in response to this request. Defendants responded, "To the extent that such documents exist, they are contained in Plaintiffs and Intervenors personnel files. The personnel files have been produced." *Id.* It was not until Plaintiffs noticed the deposition of Donna Singleton on July 11, 1998, that the requested documents were produced. The subpoena duces tecum for Ms. Singleton, one of Defendants' commissions clerks, requested Ms. Singleton to produce the following at number 12:

> All documents which reflect any "earnings forecast" (amount of commissions to be paid for the sale of a renewal contract to Defendants' clients) for each Plaintiff and Intervenor during their term of employment with Defendants (see Exhibit "10" attached hereto as an example).

*Id.* Finally, at Ms. Singleton's deposition on July 8, 1998, after 2 1/2 years of repeated requests, and only after Defendants learned that Plaintiffs were already in possession of an "earnings forecast" for one of the Plaintiffs, were the earnings forecast documents produced. Ms. Singleton testified that she had been employed by Defendants since 1993. *Id. at Ex. 6 at 9:12-15.* Ms. Singleton stated that since 1993, she would enter Plaintiffs' commissions into the computer in a program known as the "Q & A database". *Id. at 17:24-19:10.* Brockman knew the sales administration department was utilizing the Q & A database to document Plaintiffs' commissions. *Id. at 19:6-10.* Ms. Singleton further stated that all of Plaintiffs' records regarding "re-up" commissions were stored in the Q & A database. *Id. at 21:25-22:2.*

The above testimony, as well as the production of the earnings forecasts, proves that all along Defendants knew exactly what Plaintiffs were requesting. Nevertheless, even though the request was first made in November 1995, they refused to produce the documents until the deposition of a commissions clerk, Donna Singleton, in July of 1998.

*2. 1995 and 1996 Sales Plans*

This same scenario described above has occurred in connection with Plaintiffs' requests for the Sales Plans for each year of their employment. The specific request was first made on January 31, 1997, at number 25:

All of the annual sales plans in effect during each Plaintiff and Intervenor's employment.

*Id. at Ex. 3.* Defendants made a lengthy objection and then stated that the applicable sales plans "will be provided." *Id.* Some Plaintiffs were employed with Defendants up until 1996. However, Defendants have never produced the 1995 UCS or either the 1996 UCS or FDCS Sales Plans, despite numerous repeated requests and despite the subpoena duces tecums attached to the depositions of both Brockman (Request No. 35) and Donna Singleton (Request Nos. 8 and 9).

In response to Brockman's Subpoena Request No. 35, Defendants made an objection and then stated that, "To the extent that such documents exist, they have been produced." *Id.* In response to Donna Singleton's Request No. 8 (which requested the 1995 Sales Plans), Defendants made an objection and then stated that, "These documents will be produced." *Id.* To date, Defendants still have not produced the 1995 UCS Sales Plan.

With regard to the 1996 UCS and FDCS Sales Plans, Defendants continue to refuse to produce these documents. Defendants made a groundless objection in response to Donna Singleton's subpoena, Request No. 9, stating, "Sales Plans for the period of time after Plaintiffs left the employment of Defendants cannot possibly be relevant to this proceeding." *Id.* Plaintiff Marsalek was employed in 1996 and part of the dispute over his termination involved his refusal to sign the 1996 Sales Plan.

The 1995 UCS Sales Plan and the 1996 UCS and FDCS Sales Plans were again requested in the subpoena duces tecums attached to Brockman's October 19, 1998 and

-16-

December 3, 1998 deposition notices. The 270th Judicial District Court overruled Brockman's objections to the production of these documents by its order of December 11, 1998. *Relators' App. I, Ex. 12.* These documents have never been produced.

### 3. Removal of Documents

Every single attempt by Plaintiffs for cooperation during the discovery of this lawsuit has been met with resistance. Plaintiffs have compelled numerous items on almost every Request for Production filed in this case. A further example of Defendants' conduct occurred when Defendants agreed to produce Plaintiffs' commission statements in response to Request Nos. 32, 36, 40, 42, and 46, propounded on January 31, 1997. *Real Parties' App., Ex. 3.* Upon inspection of the documents, Plaintiffs learned that the "Calculation of Reup" worksheets had been removed from the records.[5]

It was not until after Plaintiffs produced an example of a "Calculation of Reup" worksheet in its original, stapled form (provided to a Real Party while employed with Defendants as part of the commission statement), and the court ordered production of the missing commission records on November 4, 1997, that Defendants finally produced the "Calculation of Reup" worksheets that had not been previously included in the production of Plaintiffs' commission records despite numerous requests. *Id.*

---

[5] The "Calculation of Reup" worksheet is a document which reflects the date and amount of commissions due to Plaintiffs in installments.

-17-

### 4. *Abusive and Hostile Depositions*

Counsel for Defendants has been rude, belligerent, hostile, condescending, argumentative and abusive towards all Plaintiffs during their depositions. Despite repeated requests that Mr. Allen treat the witnesses with respect, he refused to alter his behavior during depositions. This conduct should not be tolerated.

For example, during the deposition of Plaintiff Brown, Mr. Mays, one of the counsel for Plaintiffs, had to object to Mr. Allen standing over the table belligerently questioning Mr. Brown:

> Q. (By Mr. Allen) I said that's what you just said when you say "representations made during interviews prior to employment in 1985." Did somebody make a misrepresentation to you?
>
> MR. MAYS: I object to counsel's threatening approach to this witness and the hostile manner of this question.
>
> MR. ALLEN: I'm not--
>
> THE WITNESS: You can sit down, John. [Referring to John Allen, Defendants' attorney.]
>
> MR. ALLEN: I mean, this doesn't intimidate you, does it, Mr. Brown?
>
> MR. MAYS: I don't know about intimidation. But there is no need or purpose in this antagonistic, aggressive, hostile questioning of this witness.
>
> MR. ALLEN: All you're trying to do is make a record.
>
> MR. MAYS: All I'm trying to do is ask you to conduct yourself as a gentleman, Counsel.
>
> MR. ALLEN: You know, I'm entitled to ask the questions just the way I want to ask them.

> MR. MAYS: And I am entitled to respectfully request that you not be hostile to this witness, and that's what I'm doing, sir.

*Real Parties' App., Ex. 3, attached thereto as Ex. B at 105:19-106:18.* The above is only one example of the sort of dialogue that occurred at each Plaintiffs' deposition.

A second example is the deposition of Plaintiff Muckle taken June 12, 1998. Beginning on page 136, line 22, counsel for Defendants asked, "Now, what facts did Mr. Morris give you to support that statement?" *Real Parties' App., Ex. 3, attached thereto at Ex. C .* Mr. Allen repeated his question on page 137 at line 21, "My question to you is: What facts did Mr. Morris relate to you in that conversation that you discovered on that date?" Mr. Muckle responded:

> The facts that Mr. Morris related to me were the following. First, that he sold Bailey Ford. Second, that there was some issue which caused the deal to be in a state of not being resolved. It was something of a struggle for some reason. Third, that as a result of dealing with this struggle, he had discovered that Bob Brockman may, in fact, have control over the port company.

*Id. at 137:21-138:9.*

Not liking this detailed response, Mr. Allen again, for the third time, asked, "What facts did he tell you to support the statement that Bob Brockman controlled the company?" *Id. at page 138:10-12.* Mr. Allen proceeded to ask the same question **twelve** additional times (at which point an argument between counsel ensued as a result of counsel's harassment of Muckle). *Id. at 139:10-13; 139:17-20; 140:13-16; 140:22-25; 141:14-16; 142:4-8; 143:2-3; 144:2-4; 144:20-21; 144:25-145:7; 145:19-23; and 147:10-11.*

-19-

Mr. Allen simply did not like Plaintiff Muckle's answer to his question. Mr. Allen was advised to either certify the question or call the judge, but that he needed to move on. Mr. Morrison, one of the counsel for Plaintiffs, stated, "I'm not going to put up with you arguing with my witness and trying to intimidate him and trying to get him to say something when he's fully answered, on three separate occasions, your questions." *Id. at 149:17-21*.

Despite Mr. Morrison's invitation to conclude the deposition on the condition that Mr. Allen ask a different question, Mr. Allen refused to continue, knowing that Muckle traveled from California for his deposition. As stated, Mr. Allen should have certified the question or called the judge. He chose not to do so and then filed a groundless Motion for Costs and Sanctions, which Plaintiffs had to take the time to argue and defend, when it was Mr. Allen's actions that prompted the dispute.

As is evident, counsel for Defendants is needlessly argumentative in his questioning and on every occasion has stepped over the line of proper behavior during depositions.

Plaintiffs sued Defendants for multiple tort and contractual causes of action in September of 1995. Since the filing of this lawsuit, Defendants have obstructed and delayed discovery over and over. Described above is only a representative fraction of Defendants' discovery abuses.

## II. ARGUMENT AND AUTHORITIES

### A. *Standard of Review*

Mandamus relief is not available to set aside the sanction decision of the trial court unless the trial court has committed a clear abuse of discretion. The test for abuse of

discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. <u>Downer v. Aquamarine Operators, Inc.</u>, 701 S.W.2d 238, 241-242, (Tex. 1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

Absent a finding of fact and conclusion of law, the appellate court presumes the trial court found facts to support its decision on sanctions. <u>Gutierrez v. Walsh</u>, 748 S.W.2d 27 (Tex.App.--Corpus Christi 1998, no writ); <u>Cox v. Realty Development Corp.</u>, 748 S.W.2d 492 (Tex.App.--Dallas 1988, no writ). The court may consider everything that has occurred during the history of the litigation, and contemplation of sanctions is not limited to the specific violation for which sanctions are ultimately imposed. <u>Downer v. Aquamarine Operators, Inc.</u>, 701 S.W.2d at 241.

B. *Order Does Not Include Comtex or Jiltec*[6]

Defendants claim that the order of December 11, 1998, constitutes an abuse of discretion because it imposes sanctions on Defendants Comtex Communications, Ltd. ("Comtex") and Jiltec, Ltd. ("Jiltec"). The order imposes absolutely no sanctions on Comtex or Jiltec. In fact, neither the motion nor the order seeks or imposes sanctions against Comtex or Jiltec in any manner. *Relators' App. I, Ex. 1; App. II, Ex. 16; Exs. to Supp. Pet. for Writ*

---

[6] *See* Petition for Writ of Mandamus, Statement of Jurisdiction, page 4, paragraph 2.

-21-

*of Mandamus, App. II, Ex. 4.* Further, Plaintiffs stipulated on the record that the sanctions do not include Comtex Communications, Ltd. *RR 1/29/99 at 40:19-41:1.*

C. *No Attorney-Client Privilege*

Plaintiffs seek to discover facts regarding Defendants' role in the ownership, management and control of the company that had rights to manufacture and market the controller ports after 1987, when Brockman claims he sold Computer Terminals, Ltd. to Peters Investment, Ltd. There are three entities involved in the manufacture and marketing of controller ports after 1987 when Brockman claims to have sold Computer Terminals, Ltd. These entities are Peters Investments, Ltd. ("Peters"), Jiltec, Ltd. ("Jiltec") and Comtex Communications, Ltd. ("Comtex"). Brockman alleges to have sold his stock in 1987 to Peters. *RR 12/11/98, Vol. 3, Ex. 2 at A at 45:23-46:18.* Sometime in 1992, Jiltec was established in the Cayman Islands to manufacture and market the controller ports. *Id. at 47:21-48:15.* Likewise, Comtex was formed in 1992. As previously stated, Gary Bechtol was contacted by Carlos Kepke and Jiltec to establish an import company (Comtex) for the controller ports in Texas. *Id. at C at 86:12-87:6; Id. at D.*

Plaintiffs' questions and production requests have been narrowly tailored to seek information regarding Defendants' role in the formation and operation of Peters, Jiltec, and Comtex. Brockman, who testified at his first deposition that he had no relationship of any kind with Jiltec, and at his December 3, 1998 deposition that he had no relationship with Peters or Comtex, refuses to answer questions or produce documents relating to Carlos Kepke's role in the formation or operation of Peters, Jiltec, or Comtex. *Id. at A at 196:5-*

-22-

*197:3; Real Parties' App., Ex. 2 at 12:6-21:2.* His refusal is based on a clearly frivolous claim of attorney-client privilege. There can be no attorney-client relationship between Brockman and Kepke regarding these three entities if Brockman has no relationship whatsoever with Peters, Jiltec or Comtex. Even if, *arguendo*, Kepke has an attorney-client relationship with Peters, Jiltec, and/or Comtex, Brockman cannot shelter information by a claim of privilege. Texas Rule of Civil Evidence 503 requires that the privilege may be claimed by the client or the attorney on behalf of the client.

Even in their Petition for Writ of Mandamus, Defendants make the following plain statement:

> The communications in the case at hand are between Brockman and an attorney that does not represent any party to this case.

*See Petition for Writ of Mandamus at 30.* Brockman is a party, and so are Jiltec and Comtex. If the attorney Kepke does not represent any party to this case, then necessarily Brockman can have no attorney-client relationship with that attorney and there is no privilege.

Furthermore, Defendants confess there is no attorney-client relationship between Brockman and Kepke. At page 14 of their Petition for Writ of Mandamus, Defendants state, "There is simply no probative value to Plaintiffs' allegations that Brockman had an attorney client relationship with Mr. Kepke." Plaintiffs agree and have never alleged that there was an attorney-client relationship with Kepke, because none exists (and even if it did, it has been waived). Therefore, as evidenced by Defendants in their Petition, Brockman asserted

-23-

the attorney-client privilege in bad faith, and the order of sanctions was clearly not an abuse of discretion.

## D. *July 10, 1998 Order Consistent With Texas Law*

Assuming, *arguendo*, that Defendants have established the attorney-client privilege, the privilege only protects from disclosure ***confidential communications*** between a client and his or her attorney "made for the purpose of facilitating the rendition of professional legal services to the client." Huie v. DeShazo, 922 S.W.2d 920, 922 (Tex. 1995). The attorney-client relationship does not protect the attorney or client from testifying about factual matters such as the subject of the representation, date and terms of employment, persons present, and how the contact was made, because neither the client nor the attorney has been called on to "reveal confidential attorney-client communications." Id. at 923.

On July 10, 1998, this Court ordered Brockman to testify regarding (1) the subject matter for which the attorney was employed; (2) the time, place and persons present during the contact between Defendant Brockman and the attorney; and (3) how the contact was made. *Relators' App. I, Ex. 2.*

This order only mandates that Brockman testify regarding the external trappings of his relationship with Carlos Kepke, and is consistent with Texas law. Information concerning the factual circumstances surrounding the attorney-client relationship has no privilege. The attorney-client privilege does not encompass such nonconfidential matters as the terms and conditions of an attorney's employment, the purpose for which an attorney has been engaged, or any of the other external trappings of the relationship between the parties.

-24-

<u>Duval County Ranch Co. v. Alamo Lumber Co.</u>, 663 S.W.2d 627, 634 (Tex. App.-Amarillo 1984, writ ref'd n.r.e.); *see also* <u>Borden, Inc. v. Valdez</u>, 773 S.W.2d 718, 720-21 (Tex. App.-Corpus Christi 1989, no writ); <u>Allstate Texas Lloyds v. Johnson</u>, 784 S.W.2d 100, 105 (Tex. App.-Waco 1989, no writ).

The privilege only attaches to the legal advice and factual information included in the completed communications between attorney and client. <u>Marathon Oil Co. v. Moye</u>, 893 S.W.2d 585, 589 (Tex. App.-Dallas 1994, no writ). The order certainly does not require Brockman to testify regarding the legal advice or the factual information included in completed communications between Brockman and Carlos Kepke, or the "Unnamed Attorney".

In Defendants' Petition for Writ of Mandamus, they rely on <u>Keene Corp. v. Caldwell</u>, 840 S.W2d 715, 719 (Tex. App.-Houston [14th Dist.] 1992, no writ). Unlike Defendants in this case, the Relator in <u>Keene</u> established a prima facie showing of attorney-client privilege by submitting affidavits in accordance with former Rule 166(b)4 of the Texas Rules of Civil Procedure to protect documents sought in discovery. <u>Id</u>. In determining whether the judge properly applied the law of privileges to the documents sought to be discovered, the court held that the "subject matter" of the communication was of no concern in determining whether the privilege was applicable. <u>Id</u>. at 720.

Contrary to Defendants' representation on page 25 of their Petition for Writ of Mandamus, case law does not state that because the subject matter is irrelevant to a determination of whether the privilege applies, it "constitutes an invasion of the privilege."

Nowhere does <u>Keene</u>, or any Texas case, state that revealing the subject matter "constitutes an invasion of the privilege." Case law does state that the subject matter is irrelevant to **the determination** of whether the privilege applies. It is the confidential communication which is privileged, not the subject matter. Because the subject matter is irrelevant to the determination of whether the privilege applies, it is discoverable.

### E. *Defendants' Blundering Attempt to Prepare a Record*

#### *1.* Ex Parte *Affidavits*

After receipt of the decision of the Court of Appeals on September 25, 1998, Brockman filed two *ex parte* affidavits with the Court to support his claim that the attorney-client privilege applies. *Relators' App. I, Exs. 5, 6.* Brockman did not serve these affidavits on Plaintiffs' counsel seven days before the hearing, as Rule 166(b)4 requires. Therefore, the affidavits were improper *ex parte* affidavits. <u>Barnes v. Whittingham</u>, 751 S.W.2d 493, 495 (Tex. 1988). Texas courts look upon *ex parte* communications with "extreme disfavor," and lawyers are strictly prohibited from *ex parte* communications with judges intended to influence consideration of a matter, except in rare, emergency circumstances. <u>United States Government v. Marks</u>, 949 S.W.2d 320, 325 (Tex. 1996). The Texas Supreme Court expressly disallows *ex parte* affidavits to be submitted to prove a privilege. <u>Id.</u>; *see also* <u>Barnes</u>, 751 S.W.2d at 495; <u>Remington Arms Co. v. Canales</u>, 837 S.W.2d 624, 626 (Tex. 1992). Nonetheless, despite these authorities, Brockman filed the two *ex parte* affidavits anyway. Further, Brockman continues to rely on these affidavits, as well as offers of *in camera* testimony in an attempt to establish the attorney-client privilege. His flagrant

-26-

disregard for the discovery rules, case law, and the disciplinary rules deserves severe sanction.

Defendants make the following erroneous statement at page 21 of their Petition for Writ of Mandamus that:

> The new rules make clear that Relators' burden to establish the privilege has been satisfied. First, the rule specifically recognizes that an *in camera* affidavit may be provided to the court...Second, Relators provided an affidavit establishing the elements of the privilege to opposing counsel.

First, the new rules (even if they applied) make clear that Defendants wholly failed to meet their burden. Second, Brockman's affidavit is entirely conclusory and contains nothing more than the global assertion that the attorney-client privilege applied to certain alleged communications and documents. Additionally, in his December 3 deposition, Brockman refused to testify as to his basis for concluding that the attorney-client relationship applied to alleged communications and documents. Brockman's conclusory affidavit is discussed in greater detail below.

Defendants argue that Rule 199.6 of the Texas Rules of Civil Procedure makes clear that Defendants have satisfied their burden to establish the privilege by filing the *in camera* affidavits. However, the new rules were not effective until January 1, 1999, and Defendants' attempts to establish the privilege were conducted under former Rule 166b(4) of the Texas Rule of Civil Procedure. *See Technical Corections to the Revisions to the Texas Rules of Civil Procedure, Order dated December 31, 1998, number 4.* As former Rule 166(b)4 of the Texas Rules of Civil Procedure provided, new Rule 199.6 also requires Defendants to

present evidence necessary to **establish** the claimed privilege "either by testimony at the hearing or affidavits served on opposing parties at least seven days before the hearing." Defendants failed to meet this threshold requirement and thus there was no evidence for the Court to consider demonstrating the applicability of the privilege.

In Humphreys v. Caldwell, 888 S.W.2d 469 (Tex. 1994), the relators were ordered by the trial court to produce certain privileged documents and answer interrogatories. Relators sought relief by way of mandamus. In discussing the burden on a party seeking to exclude any matter from discovery on the basis of privilege, the Court held that the party, "...must specifically plead the particular exception or immunity relied on and produce evidence supporting such claim in the form of affidavits or live testimony at a hearing." Id. at 470.

To meet its burden, relator in Humphreys proffered evidence consisting of four affidavits and submitted for *in camera* review the requested claims file. Finding the affidavits defective, the Court held that, "The affidavits constitute State Farm's only evidence for excluding the personnel files and interrogatories no. 18 and 22 from discovery. Thus, we cannot say that the trial court abused its discretion in granting Farley's motion to compel with respect to these matters." The Court then found that the claims files which had never been produced *in camera*, was not protected by the attorney-client privilege because, "Without consideration of the affidavits (which were defective), there is no evidence that the communications between Mullinax's attorney and State Farm were not intended to be disclosed to third parties." Id. at 471.

-28-

As in <u>Humphreys</u>, Defendants failed to produce any evidence supporting their claim of privilege in the form of affidavits or live testimony as required by both former Rule 166(b)4 and new Rule 199.6. Thus, there is no evidence that communications between Brockman and Kepke were not intended to be disclosed to third parties.

In <u>Osborne v. Johnson</u>, 954 S.W.2d 180, 184 (Tex. App.-Waco 1997, orig. proceeding), the court clearly states the burden of proof on one claiming the privilege:

> An organization seeking protection from discovery of documents which it contends are protected by the attorney-client privilege bears the burden to produce evidence by affidavit or testimony demonstrating the applicability of the privilege.

The court then holds that once a prima facie showing of privilege is made, the party seeking discovery must tender evidence to refute the privilege. Only after the prima facie showing and after the party seeking discovery introduces evidence which counters the claim of privilege, does the court conduct an *in camera* review to determine whether the privilege applies. <u>Id</u>.

Because Defendants never met their prima facie burden of proof showing a privilege, the second step of presenting *in camera* testimony was never reached, and Defendants' affidavits therefore constitute nothing more than improper *ex parte* communications. <u>Id</u>.; <u>Barnes</u>, 751 S.W.2d at 495.

*2. Brockman's November 3, 1998 Affidavit*

Brockman's November 3, 1998 affidavit is further evidence of Defendants' abusive conduct. *See Exs. to Supp. Pet. for Writ of Mandamus, App. 1, Ex. 2 at 13.* Brockman filed

-29-

his November 3 affidavit after filing his prior affidavit and the affidavit by Carlos Kepke, both of which prior affidavits were filed *ex parte* in violation of the discovery rules and the State Bar Rules.[7]    Brockman's November 3, 1998 affidavit states in part, "The documents requested by the subpoena duces tecum, are protected by the attorney-client privilege." In his deposition, Brockman refused to identify those allegedly privileged documents and he did not tender them for *in camera* inspection by the Court. *Real Parties' App., Ex. 2 at 39:23-40:18.*  Brockman also testified that the "Unnamed Attorney" he consulted was licensed to practice law in Texas. *Exs. to Supp. Pet. for Writ of Mandamus, App. 1, Ex. 2 at 13.*  He refused to answer how he came to know that the "Unnamed Attorney" was so licensed. *Real Parties' App., Ex. 2 at 40:19-41:4.*  Furthermore, Brockman refused to testify as to his basis for concluding that the attorney-client relationship applied to certain alleged communications and documents. *Id. at 38:10-47:13.*

First, the attorney-client privilege clearly does not apply because the applicable questions do not require Brockman to reveal the nature of a confidential communication with

---

[7] In <u>Barnes v. Whittingham</u>, 751 S.W.2d 493, 495 Justice Phillips observed:

> Because Midway Park failed to properly serve the affidavits, the sworn statements constitute improper *ex parte* communications.  This court only allows such communications in limited, extraordinary emergency situations.  *See* Tex. R. Civ. P. 592 (Writ of Attachment), Tex. R. Civ. P. 658 (Writ of Garnishment), Tex. R. Civ. P. 800 (Proof in trespass to try title action when defendant fails to appear after notice by publication).  The present situation does not provide a sufficient emergency to justify total disregard for the general rule disfavoring such *ex parte* communications.  *See Supreme Court of Texas, Rules Governing the State Bar of Texas art. X, § 9 (Code of Professional Responsibility) DR 7-110(B) (1987).*

Likewise, in this instance, Brockman has no justification for filing the *ex parte* affidavits to establish his claimed attorney-client privilege.

-30-

his attorney. However, even if such communications were protected from disclosure, Brockman <u>waived</u> the privilege by (1) failure to produce evidence to support the claim of privilege in accordance with Rule 166(b)4 and (2) refusing to answer questions regarding his knowledge of the facts to support the conclusions made in the affidavit.

More importantly, Brockman admits that despite attesting in his affidavit that the attorney-client privilege protects certain documents and communications, he could not, or would not, define the test for the privilege because such testimony would require a legal conclusion; nor would he identify the documents. Brockman has testified under oath in the case that the attorney-client privilege applies. Plaintiffs are entitled to examine Brockman regarding the basis for that conclusion, but Brockman, at his attorney's instructions, refused.

Because Brockman's affidavit is used as proof, it must positively and unqualifiedly represent that the facts as disclosed in the affidavit are both true and within the affiant's personal knowledge. Otherwise, it is legally insufficient and has no probative value. <u>Humphreys</u>, 888 S.W.2d at 469. Further, affidavits must contain more than just global allegations that the documents come within the asserted privilege and more than a global reiteration of facts that can be ascertained from the documents themselves. <u>Barnes</u>, 751 S.W.2d at 495. Brockman disclosed no facts in the affidavit to support the conclusions made therein. Also, when asked about facts in support of the conclusions during deposition, Brockman refused to answer the questions by claiming privilege and refused to produce the documents.

Under these circumstances, the 270th court was entirely justified in concluding that Brockman filed the November 3, 1998 affidavit and the *in camera* affidavits in bad faith, and for purposes of thwarting discovery in this case. This conduct justifies the sanctions imposed.

## F. *Defendants' Resistance to Discovery Made in Bad Faith*

Brockman attempts to justify his refusal to testify by claiming reliance on a narrow exception found in a few Federal cases. *Relators' Petition at 20.* The reasoning behind the holdings in the Federal cases for prohibiting disclosure of *client* identity is that the underlying facts regarding the motive for which the client sought advice from the attorney are known, and therefore, to reveal the identity of the client would destroy the privilege. These cases involve investigations of specific criminal activity or tax matters where disclosure of the client's identity by a subpoenaed attorney would also reveal the confidential purpose for which the client consulted the attorney. In discussing this narrow exception, the various Federal courts reason that because they are connected inextricably with the privileged communication--the confidential purpose for which the client sought the legal advice--the name of the client will be considered privileged. *See* In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena, 926 F.2d 1423 (5th Cir. 1991); In re Grand Jury Proceedings (Jones), 517 F.2d 666 (5th Cir. 1975); Baird v. Koerner, 279 F.2d 623 (9th Cir. 1960); Vingelli v. United States, 992 F.2d 449 (2d Cir. 1993); Tornay v. United States, 840 F.2d 1424 (9th Cir. 1988); In the Matter of Grand Jury Proceeding, Grand Jury 1988-2(Cherney), 898 F.2d 565 (7th Cir. 1990); In re Grand Jury Matter 91-

01386, 969 F.2d 995 (11th Cir. 1992); <u>In re Grand Jury Subpoenas</u>, 906 F.2d 1485 (10th Cir. 1990); <u>United States v. Liebman</u>, 742 F.2d 807 (3rd Cir. 1984).

The case before the Court does not involve criminal or tax matters. Carlos Kepke has not been subpoenaed to reveal the name of his client. Plaintiffs presumably know the client, Brockman (although Defendants deny an attorney-client relationship in their Petition for Writ of Mandamus), and he has refused to answer questions about the external trappings of his relationship with Mr. Kepke (or the "Unnamed Attorney"), as well as a host of other questions which are not privileged. There are no privacy interests relating to criminal or tax matters to be protected.

Further, Plaintiffs know Brockman's motive for establishing the Cayman Island corporation, which was both to avoid taxation and to avoid payment of commissions or other compensation. Defendants attempt to apply the rule in reverse. Rather than attempting to shield the identity of a client, Defendants are attempting to shield the identity of the attorney.

During Brockman's December 3 deposition, when Plaintiffs asked questions regarding the external trappings of his relationship with the "Unidentified Attorney", he would not even answer these questions. Defendants want to shield all facts, including attorney identity and the external trappings of the relationship. The reasoning for the holdings in the Federal cases (that all facts are known other than client identity) is entirely lacking in this case. Therefore, Defendants' reliance on the narrow exception articulated in the above cited Federal cases is clearly not applicable to the claim of privilege relied on by Defendants.

Defendants shamelessly mislead the Court when they claim that the Texas case, Simpson v. Tenant, 871 S.W.2d 301 (Tex. App.-Houston [14th Dist.] 1994, no writ), "expressly adopted the rationale behind the Federal cases." *Relators' Petition at 20.* In Simpson v. Tenant, the plaintiffs attempted to compel a clergyman to reveal information concerning an accident which he learned from an unidentified source. Id. at 302. The Simpson plaintiffs analogized the relationship between a clergyman and his communicant with that between an attorney and client, and urged the Federal cases cited by Defendants in this case. The Fourteenth Court of Appeals refused to find that a communicant confiding in a clergyman is analogous to a client seeking legal assistance. Id. at 309. The Fourteenth Court of Appeals goes on to contrast the differences of a communicant seeking to unburden himself to a clergyman, and states, "We therefore find suspect the premise that communications to a clergyman are on the same plane as those to an attorney." Id. There are no Texas cases adopting the narrow exception to the attorney-client privilege as articulated in the Federal cases relied upon by Defendants.

Defendants' claimed reliance on the Federal cases is clearly an attempt to excuse and cover-up their bad faith objections to discovery, and their additional statement to this Court that the Simpson case adopts the Federal cases is a blatant attempt to mislead this Court.

G. *Brockman Failed to Comply With the July 10, 1998 Court Order*

On July 10, 1998, the court ordered Brockman to answer questions relating to the subject matter on which he consulted with the attorney, the dates and places of the consultations, the identity of parties present, and the manner in which the contacts were made.

-34-

Despite this order, which the court on three occasions declined to vacate, Brockman refused to answer.

For example, during his December 3 deposition, Brockman refused to answer questions relating to the dates Brockman consulted with Kepke or the "Unnamed Attorney" about Jiltec, Comtex or Peters *(Real Parties' App., Ex. 2 at 25:4-21),* the number of times Brockman consulted with Kepke or the "Unnamed Attorney" *(Id. at 26:1-22),* the location of those meetings or consultations *(Id. at 26:23-27:20; 29:6-15),* the persons present when Brockman met with Kepke *(Id. at 27:21-28:15, 33:23-34:12),* knowledge other persons may have regarding the subject matter for which Kepke was employed *(Id. at 28:16-29:5, 34:13-35:1),* the manner in which the contact between Brockman and Kepke was made *(Id. at 29:16-30:14),* the time and place when Brockman first met Kepke *(Id. at 32:7-33:3),* and whether Brockman has ever entered into an employment contract with Kepke, or a firm to which Kepke was employed or associated *(Id. at 35:2-13).*

Even if Defendants had not waived the attorney-client privilege, all of the foregoing areas of inquiry are proper and discoverable. In accordance with well-established Texas case law interpreting the attorney-client privilege, the court's July 10, 1998 order clearly required Brockman to answer these discoverable questions. Brockman unsuccessfully sought review of this order by mandamus, and on three occasions (unsuccessfully) urged the trial court to reconsider the order. His failure to answer constituted contempt for the discovery rules, the judicial process, and the trial court's authority. The severest sanction was warranted for this abuse.

*H. The Sanction was Just and Appropriate Under* Transamerica

In Transamerica v. Powell, 811 S.W.2d 913, 917 (Tex. 1991), the Texas Supreme Court, in determining whether a severe sanction is just or appropriate, applies a two-step analysis. First, there must be a direct relationship between the offensive conduct and the sanction imposed. In determining whether there was such a direct relationship, the trial court must make a determination that the sanction imposed was directed toward the abuse and toward remedying the prejudice caused to the innocent party. Further, the Court must visit the punishment upon the offender, whether the party alone, counsel alone, or both. Id. The second part of the analysis requires that the punishment not be excessive, meaning (a) the punishment fits the crime; (b) the punishment is no more severe than necessary; (c) consideration is given to whether lesser sanctions would promote compliance; (d) the sanctionable conduct justifies a presumption that the claim or defense was meritless; (e) there was flagrant bad faith or counsel's callous disregard for discovery under the Rules. Id. at 918.

Additionally, Justice Gonzales, in his concurring opinion, advocated standards and additional guidelines, promulgated by the Litigation Section of the American Bar Association, used to determine whether to assess sanctions under Federal Rule 11 (see concurring opinion). Id. at 920-922.

Applying all of the considerations of Transamerica to the case at bar, the sanctions imposed by Judge Hall and upheld by Judge Gamble were clearly just and appropriate. Further, the record developed at the sanctions hearing demonstrates Judge Hall's and Judge

Gamble's findings in accordance with the <u>Transamerica</u> test. A step-by-step analysis of the facts of this case in light of the <u>Transamerica</u> test follows.

*1. Relationship of the Conduct to the Sanction*

Does the offensive conduct of the Defendants bear a direct relationship to the sanctions imposed by Judge Hall in his Order of December 11, 1998, and upheld by Judge Gamble in his order of February 3, 1999? Clearly, "Yes." During a five-month period between July 10, and December 11, 1998, Plaintiffs sought to discover the fraudulent acts and practices of Defendants in the marketing of controller ports through Cayman Island companies which Plaintiffs allege were owned, managed and controlled by Defendants. Defendants never established an attorney-client relationship to shield communications directly relating to the ownership, management and control of the Cayman Island companies sought to be protected by Brockman, and Brockman consistently refused to obey the orders of the trial court to answer questions as set forth in the July 10, 1998 order and to produce documents as ordered by the court on December 11, 1999.

The questions which Plaintiffs sought to have Brockman answer were questions which were calculated to lead to and might reasonably have led to evidence showing substantial shared identity between Defendants and those secret Cayman Island companies having the rights to market controller ports.

The sanctions finally imposed by Judge Hall on December 11, 1998, and upheld by Judge Gamble on February 3, 1999, are directed toward the abuse (Brockman's refusal to answer questions touching on the creation of, acquisition of, sale of, management of, and

-37-

control of the Cayman Island corporations), all of which Defendants attempted to shield under the claim of attorney-client privilege. The sanction order remedied the prejudice to the innocent parties, Plaintiffs, because it established their claim of fraud when otherwise, they would have been severely prejudiced in developing the facts due to Brockman's long and continuous offensive conduct in refusing to answer the questions as ordered and due to the difficulty, if not impossibility, of obtaining evidence concerning the ownership of Cayman Island corporations. Once Plaintiffs were to establish Defendants' ownership, control, or management of the Cayman Island company or companies, fraud would have been inescapably shown, because Brockman and other company officers always denied commissions to the salesmen (Plaintiffs) on the representation that the UCS companies and Brockman had no relationship whatsoever with the Cayman Island company that distributed the ports.

### 2. *Defendants Participated in the Offensive Conduct and Deserve the Punishment of Sanctions*

Plaintiffs can never fully distinguish the misconduct of Brockman from that of his trial counsel. However, as <u>Transamerica</u> states at 917, "... a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules." Therefore, it can easily be presumed that Brockman was a full participant in the discovery abuses by reason of his attendance at hearings where he was ordered to answer questions; his subsequent refusal to answer the questions; his failure and refusal to attend his duly noticed deposition of October 19, 1998; his failure and refusal to

-38-

produce documents requested in a subpoena duces tecum; his participation in the signing and filing of the *in camera, ex parte* affidavits and the hearings subsequent thereto; his participation in the signing of the conclusory affidavit; his refusal to answer questions related to that last affidavit; and the continuous tender of his *ex parte, in camera* testimony.

Indeed it was Brockman who testified that he destroyed all of the records of the sale and transfer of the first such Cayman Island corporation, Computer Terminals, Ltd., his ownership of which he had always denied to his salesmen, thereby setting the stage for Plaintiffs further quest for evidence of ownership of the successor port companies.

### 3. The Punishment Was Not Excessive

Rule 215 provides three sanctions which might be considered lesser sanctions than the sanctions ordered by the court. Judge Hall, in his discussion of other available sanctions, considered the lesser sanctions of (1) attorney's fees and costs incurred since July 10, 1998 and (2) a jury instruction that the jury could presume that the testimony would support the Plaintiffs' theories of fraud and quantum meruit. *Exs. to Supp. Pet. for Writ of Mandamus, App. I, Ex. II at 1 and 22 at 92:5-94:18.* Judge Hall opted not to impose either of these sanctions, and Judge Gamble concurred. Neither of these sanctions or other imposed sanctions would have sufficed, because the jury, not hearing any other evidence of the fraud of the Defendants in the ownership of the Cayman Island corporations, might yet find for the Defendants, and Defendants' efforts in obstructing discovery would pay them a huge undeserved reward.

Any lesser sanction of (1) the payment of attorney's fees and expenses; (2) disallowing further discovery by the disobedient party; or (3) contempt of court would have been welcomed by the Defendants. First, payment of Plaintiffs' attorney's fees would have been infinitesimal compared to the potential fraud damages and punitive damages, to which Defendants are exposed by jury verdict. Second, disallowing further discovery in no way sanctions Defendants because they bear no burden of proof on the fraud issue. And finally, contempt of court carries no penalties which promote compliance with the court's July 10, 1998 order in compelling Brockman to answer the questions because it would again allow Defendants to escape disclosure of fraudulent conduct and would be much less burdensome than the payment of actual damages and punitive damages.

In Cole v. Huntsville Memorial Hospital, 920 S.W.2d 364, 375 (Tex. App.-Houston [1st Dist.] 1996, writ denied), *cert. denied*, 520 U.S. 1143, 117 S.Ct. 1312, 137 L.Ed. 475 (1997), the court, in discussing the feasibility of lesser sanctions, stated that case determinative sanctions may be imposed in the first instance in exceptional cases (those which exhibit a pattern of discovery abuses) where it becomes apparent that no lesser sanctions would promote compliance with the rules. *Citing* GTE Communications Sys. Corp. v. Tanner, 856 S.W.2d 725, 729 (Tex. 1993); *see also* Sharpe v. Kilcoyne, 962 S.W.2d 697 (Tex. App.-Fort Worth 1998, orig. proceeding)(noting that lesser sanctions would merely postpone the inevitable and would be futile).

In fact, Defendants complain that their pleadings were struck when Defendants had never before been sanctioned and while they were attempting to prepare a record to protect

the attorney-client privilege. However, the court may consider everything that has occurred during the history of the litigation, and contemplation of sanctions is not limited to the specific violation for which sanctions are ultimately imposed. <u>Downer v. Aquamarine Operators, Inc.</u>, 701 S.W.2d at 241.

Defendants' prolonged pattern of discovery abuse was a part of the record before Judges Hall and Gamble. Therefore, with Defendants' flagrant background of repeated and unpunished delays, avoidance and obstruction of the discovery process, Judges Hall and Gamble acted well within their discretion in sanctioning Defendants. *See* <u>Arit International Corp. v. Allen</u>, 910 S.W.2d 166 (Tex. App.-Fort Worth 1995, no writ).

In <u>Gentry v. Weaver</u>, 909 S.W.2d 606, 612 (Tex. App.-Fort Worth 1995, no writ), the discovery abuse was Gentry's refusal to appear at his deposition and to produce documents as ordered by the trial court. The court stated that the only inference which could be drawn is that Gentry's discovery abuse was willful. The court then discussed that the trial court did not abuse its discretion by striking Gentry's counterclaims and defenses:

> Additionally, Gentry's testimony was essential in establishing his counterclaims and defenses. The documents and testimony that Gentry withheld prejudiced appellees' ability to defend against Gentry's counterclaims and defenses and to prepare their own case for trial. They were the only means of obtaining the information to support or challenge Gentry's counterclaims and defenses. The documents and testimony were necessary for appellees to respond to those claims.

<u>Id</u>.

This Court has judicial knowledge of the difficulty, if not impossibility, of obtaining information from Cayman Island governmental records which would reveal the identify of the

-41-

owners or beneficial owners of Cayman Island chartered corporations. The laws of the Cayman Islands are so structured as to give secrecy to and create a safe harbor for United States and other citizens wishing to hide their transactions.

Therefore, considering the impossibility of obtaining evidence from the Cayman Islands of the ownership, management and control of the Cayman Island port companies, Brockman's knowledge and any documents are vitally important to establish Plaintiffs' claims and prepare their case for trial, as Defendants exclusively possess this knowledge.

Plaintiffs have sought evidence tending to establish Defendants' ownership, management and control of the Cayman Island company or companies distributing the controller ports. Defendants have wrongfully obstructed efforts to obtain this information; therefore Defendants sanctionable conduct justifies a presumption that their defense (that they had no such ownership, control, etc.) is meritless.

The "crime" is Brockman's repeated and continuous refusal to answer questions and produce documents (as well as Defendants' numerous other discovery abuses) relating to Plaintiffs' causes of action for fraud, conspiracy and quantum meruit for commissions for the sale of controller ports.

The "punishment" assessed by the December 11, 1998 order and affirmed by the February 3, 1999 order establishes Plaintiffs' causes of action for conspiracy, fraud and quantum meruit relating to the sale of controller ports. The questions Brockman refused to answer went to the very heart of his defense, that he (Brockman) did not own, manage, or control or have any relationship with the Cayman Island port companies. Because of the

-42-

impossibility of obtaining information from Cayman Island government sources, leaving Defendants as the only other information source, no other punishment fits the crime. Defendants' crime, if unpunished, could result in the **death** of Plaintiffs' causes of action for conspiracy, fraud, and quantum meruit relating to the sale of controller ports.

The lesser punishment now suggested by Defendants (at page 16 of the Petition for Writ of Mandamus) would be welcomed, for it would allow Defendants to escape disclosure of their fraudulent conduct and perhaps avoid payment of actual and punitive damages. In effect, Defendants are asking the Court to allow them to potentially kill Plaintiffs' causes of action relating to the sale of controller ports. Therefore, the punishment rendered by the court's December 11, 1998 order and affirmed by the February 3, 1999 order is remedial and perfectly fits the crime of Defendants' discovery abuses. When Defendants sought to kill Plaintiffs' causes of action relating to the controller ports by their history of discovery abuse, the court remedied such abusive conduct by resurrecting the very causes of action Defendants sought to destroy by striking their pleadings and deeming findings in Plaintiffs' favor relating to their causes of action for conspiracy, fraud, and quantum meruit relating to the sale of controller ports. In other words, what Defendants wrongfully destroyed, the court merely resurrected. As such, the test in <u>Transamerica</u> is well met.

Add to this mix the fact of Defendants' culpability by reason of willfulness, frivolousness, and bad faith, demonstrated and discussed above, and it is clear that this punishment is not excessive.

-43-

*I. Post Transamerica Cases*

Transamerica standards were applied to uphold sanctions in Cole v. Huntsville Memorial Hospital, 920 S.W.2d at 374-- where the trial court struck a party's claim as a sanction for discovery abuse. Death penalty sanctions were properly imposed because the party had failed to comply with several discovery orders, and the discovery withheld directly affected the claims and defenses in the lawsuit. Thus, the court held there was a connection between the sanctions imposed and the party's conduct. The situation confronting the court was identical to the instant case.

The following cases all uphold imposition of death penalty sanctions for discovery abuses: Cellular Marketing v. Houston Cellular Telephone Co., 838 S.W.2d 331 (Tex. App.-Houston [14th Dist.] 1992, writ denied); Altus Communications, Inc. v. Meltzer & Martin, Inc., 829 S.W.2d 878 (Tex. App.-Dallas 1992, no writ); Marshall v. Ryder, 928 S.W.2d 190 (Tex. App.-Houston [14th Dist.] 1996, writ denied); and Luxenberg v. Marshall, 835 S.W.2d 136 (Tex. App.-Dallas 1992, no writ).

### III. CONCLUSION

Defendants' history of willful and repeated discovery abuses has been carefully weighed by two district judges. Defendants were given repeated opportunities to establish an attorney-client relationship before death penalty sanctions were finally rendered. Rather than comply with the court's orders, Defendant Brockman refused to answer clearly discoverable questions, refused to produce documents as ordered by the Court, refused to attend his deposition, signed and filed *in camera*, *ex parte* affidavits, signed, filed and then

-44-

refused to answer questions relating to his conclusory affidavit, and continued to tender his *ex parte, in camera* testimony.

Since 1995, when this case was first filed, Defendants have obstructed discovery by withholding important, discoverable documents that were requested with specificity numerous times, purging files and not producing requested documents as maintained in the normal course of business, questioning Plaintiffs during depositions in a hostile, abusive, needlessly argumentative and condescending manner, and refusing to cooperate when deposition dates were requested.

Sanctions directly related to the offensive conduct were properly imposed by both Judge Hall and Judge Gamble. Both judges carefully considered Defendants' repeated history of egregious discovery abuses, and Defendants' continued refusal to comply with the court's discovery orders, the Texas Rules of Civil Procedure, and the case law interpreting the rules. The discovery withheld by Defendants directly affects Plaintiffs' claims in this lawsuit. Thus, there is a direct connection between the sanctions imposed and Defendants' conduct.

THEREFORE, Plaintiffs and Real Parties in Interest Pray that Relators' Petition and Supplemental Petition for Writ of Mandamus be denied, that the orders of December 11, 1998 and February 3, 1999 be upheld, and for such other relief to which Plaintiffs may be entitled.

Respectfully submitted,

By:_____

RICHARD MORRISON, P.C.
Texas Bar No. 14528000
Karen Morris, P.C.
Texas Bar No. 00786095
401 Bradford Ave.
Kemah, TX 77565
281/535-0455 (Telephone)
281/535-0458 (Facsimile)

AND

WILLIAM J. MAYS, P.C.
Texas Bar No. 13309500
62 Nassau Dr.
Rockport, TX 78382
512-790-5700 (Telephone)
512-790-5777 (Facsimile)

Attorneys for Plaintiffs and Intervenors
WEBER, FUSCO, BROWN, COKER,
MUCKLE, MORRIS, JOHNSON,
PLUMLEE AND MARSALEK

AND

CRAIG ESTLINBAUM
Attorney at Law
Texas Bar No. 00790653
2232 Avenue G
Bay City, Texas 77414
409/245-4666 (Telephone)
409/244-5342 (Facsimile)

Attorney for Intervenors, EYRE,
HUSEMAN, MENTIL, MURRAY, and
REYSA

-46-

## CERTIFICATE OF SERVICE

I, KAREN MORRIS, hereby certify that on ___April 29___, 1999, a true and correct copy of the foregoing instrument was sent to the First Court of Appeals and the following attorneys of record via hand delivery:

Mr. John C. Allen
Two Houston Center
Suite 1225
Houston, Texas 77010

Mr. Robert D. Green
1200 Smith
Suite 600
Houston, TX 77002

Michael S. Hays
400 Two Allen Center
1200 Smith Street
Houston, TX 77002

Craig Estlinbaum
2232 Ave. G
Bay City, Texas 77414

Judge Brent Gamble
270th District Court
1310 Prairie, 11th floor
Houston, Texas 77002

KAREN MORRIS

<u>VERIFICATION</u>

THE STATE OF TEXAS     §

COUNTY OF GALVESTON     §

     BEFORE ME, the undersigned authority, on this day personally appeared RICHARD MORRISON, who, be me being duly sworn, states:

     "I have reviewed the Response to Petition and to the Supplemental Petition for Writ of Mandamus. I have personal knowledge that the factual statements contained in the Response to Petition and to the Supplemental Petition for Writ of Mandamus are true and correct recitations from the depositions and other exhibits on file herein with this Court. Further, I have personal knowledge of Defendants discovery abuses as documented herein and these are true and correct."


RICHARD MORRISON

     SWORN TO AND SUBSCRIBED BEFORE ME by the said RICHARD MORRISON, on this the 28th day of _April_, 1999, to certify which witness my hand and seal of office.

_____
Notary Public in and for
The State of Texas

CHARLOTTE MORRISON
MY COMMISSION EXPIRES
August 9, 2001