# Exhibit 49

# WORD FOR WORD REPORTING
## Court Reporting Services



8121 Broadway, Suite 130
Houston, Texas 77061

TEL 713-847-8984
FAX 713-847-8987
1-800-505-WORD

JOB NO. KSD98123

NO. 95-37973

| | | |
|---|---|---|
| ROBERT VAN WEBER, ET AL. | : | IN THE DISTRICT COURT OF |
| VS. | : | HARRIS COUNTY, T E X A S |
| UNIVERSAL COMPUTER SYSTEMS, INC., ET AL. | : | 270TH JUDICIAL DISTRICT |

DEPOSITION OF ROBERT THERON BROCKMAN

AFTERNOON SESSION

December 3, 1998                                Houston, Texas



CONFIDENTIAL

CONDENSED
TRANSCRIPT

Page 207

1 yet to be paid?
2 A. I would presume that's what he's referring to.
3 Though, I didn't write this letter.
4 Q. Okay. "The fact that your earnings in '94 were
5 enormous proves that you have a continuous stream
6 of income at a substantial level"; is that not
7 correct?
8 A. Should he continue to stay employed with us.
9 Q. Well, where did you read that?
10 A. Again, as I've stated a number of times today,
11 it's custom and practice of the company that
12 salespeople are only paid while they're employed.
13   MR. MORRISON: All right. The next one.
14   (Brockman Exhibit Numbers 23 and 24 were
15   marked for identification.)
16 Q. (By Mr. Morrison) Mr. Brockman, I believe this is
17 another memorandum to Scott Johnson from you; is
18 that correct?
19 A. Yes.
20 Q. And that's Exhibit 23?
21 A. Yes.
22 Q. And it was written December 14th, '94; is that
23 correct?
24 A. Yes.
25 Q. Now, it says, "Records indicate that you also

Page 208

1 stand to earn another $140,953 in the back-end of
2 UCS re-ups"; is that correct?
3 A. That's what it says.
4 Q. All right. Was that accurate on the date as to
5 what was owed to him in UCS re-up revenues?
6 A. That was an indication of what potential
7 commissions that he would earn assuming he stayed
8 in place and stayed employed from re-up contract
9 negotiations that he was involved in.
10 Q. And the FDCS re-up's back-end potential was
11 $140,932; is that correct?
12 A. Yes. That's what it says.
13 Q. Okay. And that was accurate, those figures, just
14 the figures?
15 A. I believe those were correct, to the best of my
16 knowledge.
17   And you'll also note that they're clearly
18 shown as potential.
19 Q. Well, potential —
20 A. In other words, they're not earned. They're
21 potential.
22 Q. Well, it doesn't say that about UCS, does it?
23 "You stand to earn another 140"?
24 A. It says "potential" right there (indicating).
25 Q. Read that line right there, 140 back-end of

Page 209

1 re-ups.
2 A. Yeah.
3 Q. It doesn't say anything about potential.
4 A. That's true. "Potential" is not in the first
5 line. It is in the second.
6 Q. We had marked as Exhibit 24 a number of Brockman
7 memos under your direction and control dealing
8 with the issue of fines; is that correct? And you
9 can flip through those. I'm not going to ask you
10 about those, other than just to get you to
11 identify those as being assessments or warnings
12 about the imposition of fines or the threatened
13 imposition of fines.
14 A. I do recognize some of these. And certainly here
15 is notification that fines are going to be
16 assessed for, you know, failure to perform
17 assigned tasks and normal business functions.
18 Q. Do all of those relate to various fines that you
19 imposed?
20 A. Yes.
21 Q. Or threatened to impose; is that correct?
22 A. Yes.
23 Q. All right. Now, referred to earlier was your
24 power to transfer salesmen about district to
25 district; is that right? You had that power under

Page 210

1 the sales plans?
2 A. Yes. Under the sales plans we have the power to
3 reassign salespeople and also reassign accounts.
4 Though, I might add, that's done, you know, very,
5 very infrequently, because we value the goodwill
6 of the relationship between the customer and the
7 regional manager and their accounts, and we want
8 to maintain that intact as much as possible.
9 Q. Well, I suppose what I'm saying is: There was
10 never a client in a territory that didn't have a
11 salesman assigned to it and servicing and
12 educating and taking care of that client is what
13 your goal was; was it not?
14 A. That was my goal, yes.
15   MR. MORRISON: Would you mark that, please?
16   (Brockman Exhibit Number 25 was
17   marked for identification.)
18 Q. (By Mr. Morrison) I'm going to show you what has
19 been marked as Exhibit 25.
20 A. Yes.
21 Q. And it's a memo from you, sir?
22 A. Yes, it is.
23 Q. You know that the suit to which you are a party
24 that we're here taking your deposition on was
25 filed on August 4th, 1995?

### Page 211

```
 1  A.  I don't recall the exact date.
 2  Q.  When you prepared this memo about the destruction
 3      of Daytimers, was that because of the pendency of
 4      this or any other suit?
 5  A.  No, it was not. As the memo states, it was in
 6      response to an article I read in the newspaper.
 7  Q.  What all did you destroy?
 8  A.  Daytimers contain personal information, and the
 9      crux of the article that caused me to write this
10      memo had to do with personal information being
11      pulled into a discovery process.
12  Q.  It says here, "Since we document everything
13      necessary for substantiation of reporting by
14      attaching all receipts to our expense accounts and
15      describing the people/purposes of the expenses,
16      there's no legal requirement for tax purposes for
17      retention of Daytimers."
18          Does that mean that this information on
19      expense reporting with the description of people
20      and purposes of these accounts was contained in
21      the Daytimers that you wanted destroyed and
22      ultimately destroyed?
23  A.  There's a -- I don't know whether you're familiar
24      with a Daytimer or not, but there's a section in
25      which you can, if you so desire, record your
```

### Page 212

```
 1  -   expense information. And that's really not
 2      necessary since we require that information be put
 3      on expense reports that are filed for
 4      reimbursement. And, so, therefore, you know, the
 5      Daytimers are not really required to support the
 6      expense reports.
 7  Q.  Did you destroy your Daytimer?
 8          (Discussion off the record.)
 9  Q.  (By Mr. Morrison) Did you destroy your Day-Timer
10      in accordance with this memo?
11  A.  The ones that I had, I did.
12  Q.  Which ones did you have?
13  A.  I had just, you know, the last year or two worth.
14  Q.  This was in '95. So, you would have had '95
15      destroyed?
16  A.  Yeah. Probably just what I had so far in '95.
17  Q.  How about '94?
18  A.  '94 was already gone.
19  Q.  '93 already gone?
20  A.  Yeah. I didn't -- I had not made a practice of
21      keeping Daytimers.
22  Q.  Did you destroy any other evidence besides the
23      Daytimers?
24          MR. ALLEN: Objection to the form of the
25      question.
```

### Page 213

```
 1  A.  No, I did not.
 2  Q.  (By Mr. Morrison) What all was contained in your
 3      Daytimer that you recall relative to issues
 4      involved in this case?
 5  A.  None.
 6  Q.  How many other lawsuits were you involved in on
 7      the date -- "you" being the Defendants in this
 8      case -- both corporate and individually, were you
 9      involved in on the date of this memorandum,
10      November 3rd, 1995?
11  A.  I don't recall.
12  Q.  Who would know that?
13  A.  The legal department, I guess.
14  Q.  And who in the legal department would I have to
15      ask that question of?
16  A.  Scott Cherry, I would guess.
17  Q.  So, if I ask Scott Cherry of the legal department
18      for the style and number of all cases that you
19      were involved in on that date, he could tell us
20      that?
21  A.  I believe so.
22  Q.  Okay.
23  A.  You know, certainly John Allen could give us that
24      same information.
25  Q.  Well, in November of '95, was John representing
```

### Page 214

```
 1      UCS and related Defendants, including maybe
 2      yourself if you were a Defendant, in all cases
 3      that were pending?
 4  A.  Yes.
 5  Q.  Okay. So, either John or the other fellow you
 6      mentioned --
 7  A.  Yes.
 8  Q.  -- could give us the style and number of the
 9      cases?
10          Did you personally assist Gary Bechtol in
11      making a transition so that he would have or get
12      marketing rights to the ports?
13  A.  No, I did not.
14          MR. MORRISON: I'm going to pass the
15      witness.
16          (Recess.)
17
18  EXAMINATION BY MR. ESTLINBAUM:
19  Q.  Mr. Brockman, my name is Craig Estlinbaum. As you
20      know, I represent five of the Intervenors in this
21      case, Mike Eyre, Mike Huseman, Mark Mentil, Joe
22      Murray, and David Reyna. And just as the case was
23      with Mr. Morrison, you remain under oath. Do you
24      understand that?
25  A.  Yes.
```