1
2

                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

3        IN RE:                        )  Docket No. 18 CV 00864
                                       )
4        DEALER MANAGEMENT SYSTEMS     )  Chicago, Illinois
                                       )  February 12, 2021
5        ANTITRUST LITIGATION.         )  1:30 P.M.

6                    TRANSCRIPT OF PROCEEDINGS - Hearing
                BEFORE THE HONORABLE ROBERT M. DOW, JR.
7

8        APPEARANCES:
         For the Dealership
         Class Plaintiffs:        MILBERG PHILLIPS GROSSMAN LLP
9                                 BY:  MS. PEGGY J. WEDGWORTH
                                       MR. ROBERT WALLNER
10                                     MR. MATTHEW A. KUPILLAS
                                  One Penn Plaza, Suite 4800
11                                New York, New York 10119
                                  pwedgworth@milberg.com
12

13       For the Individual
         and Vendor Class
         Plaintiffs:              KELLOGG, HANSEN, TODD,
14                                FIGEL & FREDERICK, PLLC
                                  BY:  MR. DEREK T. HO
15                                     MR. MICHAEL NEMELKA
                                       MR. AARON M. PANNER
16                                     MR. DANIEL V. DORRIS
                                       MS. BETHAN R. JONES
17                                     MS. JAYME L. WEBER
                                  1615 M Street Nw
18                                Suite 400
                                  Washington, DC 20036
19                                dho@kellogghansen.com

20       For the Defendants
         Reynolds And Reynolds
21       Company:                 GIBBS & BRUNS, LLP
                                  BY:  MS. AUNDREA K. GULLEY
22                                     MR. BRIAN T. ROSS
                                       MR. BRICE WILKINSON
23                                     MR. JUSTIN D. PATRICK
                                       MR. ROSS M. MacDONALD
24                                1100 Louisiana
                                  Suite 5300
25                                Houston, Texas 77002
                                  agulley@gibbsbruns.com

APPEARANCES (Continued)

```
For The Defendants
Reynolds and Reynolds
Company:                    SHEPPARD MULLIN RICHTER
                           & HAMPTON, LLP
                           BY:  MR. LEO D. CASERIA
                           2099 Pennsylvania Avenue NW, Suite 100
                           Washington, DC 20006
                           lcaseria@sheppardmullin.com

For the Defendants
CDK GLOBAL, LLC:           MAYER BROWN LLP
                           BY:  MS. BRITT MILLER
                                MR. MICHAEL A. SCODRO
                                MR. MATTHEW D. PROVANCE
                                MR. DANIEL T. FENSKE
                                MR. JED W. GLICKSTEIN
                                MS. MEGAN E. STRIDE
                           71 South Wacker Drive
                           Chicago, Illinois 60606
                           bmiller@mayerbrown.com
```

```
Court Reporter:            KRISTIN M. ASHENHURST, CSR, RDR, CRR
                           Official Court Reporter
                           219 S. Dearborn Street, Room 2304-A
                           Chicago, IL 60604
                           (312) 818-6549
                           kristin_ashenhurst@ilnd.uscourts.gov
```

1        (The following court proceedings were held via video.)

2        THE COURT:  This is 18 Civil 864, In Re Dealer

3   Management Systems Antitrust Litigation.  And this is the

4   tutorial that I asked you all for, so thank you all very much.

5   When I got the email the other day with the chart, it reminded

6   me of something Judge Fallon always says, which is, "Why

7   wouldn't you want an MDL if the JPML calls you, because you get

8   the best lawyers in the world and you get really interesting

9   problems to work on and they're pretty good at working well

10  together."  And this is definitely a manifestation of that.  So

11  thank you all for agreeing to this without having me or Judge

12  Gilbert or anybody else from 219 South Dearborn involved.  I

13  appreciate that.

14       All I wanted to say before we get started, because I

15  know you guys have a tight schedule here, is, first of all,

16  thank you.  Secondly, we're going to do this again.  And when

17  we do this again, I'm going to ask the questions, but I will

18  provide them in advance so you guys know what's bothering me,

19  because this is the way in really complex cases -- oh, my cat

20  is about to -- now, if any of you have a cat or dog who shows

21  up, I'll be very forgiving.  He's left now.

22       So this is what I have done with really complex cases

23  and motions, and your guys' certainly are in that category.  I

24  didn't count up the motions.  Let me see here, you guys listed

25  them all.  Oh, no, you listed them under *Daubert* and other --

18, well, that's a lot.  I was asking John, my law clerk, how

many pages he thinks we have, and it was probably somewhere

between 750 and 1,000, and that doesn't count the exhibits;

that's just the briefs.  So the purpose of today was for you

guys to give us a little tutorial.  The idea is what exhibits,

what arguments, what cases are critical -- key -- the key

things to focus on.

        The other thing that would be really helpful is any

links between these motions.  So if your argument is that, if

you exclude this expert, than this summary judgment motion

becomes easier for you to resolve in our favor, that would be a

really helpful point to make.  Other than that, I do not intend

to interrupt you all today, except for one purpose.  Somebody

has to be the bad guy today.  Those of you who know me know

that being the bad guy is a really hard thing for me to do, but

I will at least say to you, "Your time is up."  And when I say

that, if you just conclude the thought you're on.  This isn't

like the Seventh Circuit where the trap door opens and you get

dumped down to the 26th floor if you exceed your time,

depending on who is presiding.  But I do appreciate if you'll

wind up when I say your time is up, only because you guys have

worked out a very intricate schedule.

        The other thing I will say is we're going to have to

take a break about halfway through, and I'll sort of gauge that

based on how much you guys use of the time you've allocated

1   yourselves, but at some point we'll take a break because it

2   wouldn't be fair to Kris for me to ask her to type for three

3   straight hours, which I certainly will never do.

4        And then once John and I get a handle on these motions

5   and a good outline and probably start drafting, I will come up

6   with a series of questions to ask you guys, which I will put on

7   the docket.  You will then know what's really bothering me.

8   Sometimes those questions lead to another round of questions,

9   which I don't know until I start hearing your answers.  So it's

10  not as if, the next time we have the hearing, you will have all

11  of the questions in advance, but at least you will have some of

12  the questions in advance and you will know what's bothering me.

13       And the purpose of having these two arguments is so

14  that I can get this as right as I can, so you guys don't have

15  to appeal me too many times, and you don't have to go appeal

16  when you get back to your transferor courts, if you end up back

17  there, too.  So I'm just trying to get them right, and I know

18  with this many really good lawyers, you guys can help me.  In

19  many cases I look at it and I say, "You know, I would like to

20  have a hearing, but I don't think it's going to help me."  In

21  this case I know it will help me, so I thank you for that.

22       And the only other thing I want to say is there were

23  some motions that I took under advisement this week.  I set

24  briefing schedules so you guys could not waste today's time

25  trying to negotiate them.  If there's some problems with the

briefing schedules I set, rather than taking up the time today,
just send Carolyn an email saying, "We need more time, less
time," whatever it is.  On the sanctions motion related to the
spoliation, I wanted that briefing schedule to be done before
April because I want to be able to ask questions about that at
the next oral argument, too.  But if you need a week or two
extra on that, no worries, but I want to fold that also into
the next hearing.  I don't think I'll need to have a hearing on
whether to add another exhibit to the summary judgment pile,
but I would like to be able to ask you questions about the
spoliation issues after.  That is all I have.  So let me turn
it over -- it looks like Ms. Miller, Mr. Ho, and Mr. Wallner
have No. 1.  And I will just say your time is up when you run
out of time.  Okay?

          MS. MILLER:  Your Honor, thank you.  Britt Miller for
CDK.  I just wanted to -- before we start the official clock, I
wanted to give the Court one framing point, and that is,
although CDK is not a defendant in the Authenticom case
anymore, it was at the time of the filing of the motions for
summary judgment.  And as a result, and as instructed by the
court, CDK incorporated by reference the applicable arguments
from the joint motion for summary judgment as to Authenticom
into both its motion for summary judgment as to the Dealers and
it's motion for summary judgment as to the AutoLoop.  So we
will not be repeating those arguments, and Ms. Gulley will be

1    arguing summary judgment for Reynolds in the Authenticom case,

2    but those arguments will apply to CDK in the Dealers and the

3    AutoLoop case as well.

4          THE COURT:  Okay.  Perfect.  And efficiency is always

5    good.  So if you were just going to repeat what Ms. Gulley said

6    -- and I appreciate only hearing it once, and that's a great

7    way to do it.

8          Okay.  Is there anybody else who wants to put anything

9    on the record before I put you on the clock?  All right.

10   Great.  Well, again, thank you very much.  There's an immense

11   amount of legal talent assembled here on the screen, so thank

12   you.  Who's up first?  Ms. Miller, are you up first?

13         MS. MILLER:  Yes, sir.

14         THE COURT:  Awesome.  Fire away.  I'm just going to

15   say it's Docket Entry 773, just so Kris has a reference point.

16         MS. MILLER:  Your Honor, can you see my -- I shared my

17   screen.  Can you see my screen share?

18         THE COURT:  Yes, perfect.  Thank you.

19         MS. MILLER:  No problem.  Your Honor, four months

20   after the close of fact discovery, Authenticom, AutoLoop, and

21   the Dealers, as well as MVSC, collectively disclosed a dramatic

22   shift in their theories of the case.  Plaintiffs originally all

23   bought their cases based on the same basic claim, that CDK and

24   Reynolds entered into an agreement in and around January 2015

25   to exclude Authenticom from their respective DMSs and raise

1    prices for data integration.

2          As the evidence shows and will be discussed later on

3    this afternoon, the problem with this theory is that it makes

4    absolutely no sense.  Reynolds didn't need CDK's help in 2015

5    to exclude Authenticom from its DMS.  It had successfully

6    secured its system much earlier.  And CDK didn't need Reynolds'

7    help in 2015 to exclude hostile integrators from its DMS.  It

8    was more than capable of securing its own system.

9          Faced with these glaring problems as pled, and clearly

10   hoping to bolster their damages claims, plaintiffs came up with

11   a new conspiracy theory, but they failed to disclose it to

12   defendants until well after fact discovery had ended.  That

13   kind of tactic is not permissible under the federal rules.

14         The federal rules require notice pleading.  Plaintiffs

15   plead the facts behind their claim so that defendants can

16   answer and defend accordingly.  But this doesn't work if a

17   party can fundamentally alter their case after discovery is

18   already complete.  This doesn't mean, of course, that a

19   plaintiff can not change his theory as discovery proceeds.  But

20   the plaintiff has to inform the defendant of the change while

21   there is still time for the defendant to respond.  Certainly,

22   if as here, the change expands, rather than limits, the scope

23   of the case.  That's what the Seventh Circuit's decision in

24   *Chaveriat* says, "If the plaintiff in the course of pretrial

25   discovery comes up with a new claim, he will have to get his

1    complaint amended if the pleadings and the proof are to be

2    conforming." And if this isn't a new theory, why did every

3    court that addressed this case prior to the close of fact

4    discovery, your Honor -- Judge St. Eve, Magistrate Judge

5    Gilbert, and even Judge Petersen in Wisconsin -- understand

6    plaintiffs to be alleging a different conspiracy than the one

7    they now defend on summary judgment. Because that's what their

8    pleadings, briefs and discovery responses said. In response,

9    plaintiffs are relaying on boilerplate in the complaints and

10   pointing to weak and vague references in their discovery

11   responses that discovery was ongoing and may be provided in

12   expert reports. That's not enough under the federal rules.

13        So how are these theories different? Well,

14   plaintiffs' new theory is not just based on an earlier 2013

15   start date. It is also significantly broader and more vague.

16   Plaintiffs no longer limit themselves to a supposed agreement

17   between CDK and Reynolds to exclude Authenticom from the

18   marketplace. They can't, because plaintiffs' own experts state

19   that Authenticom's connection across all DMS were going up

20   during this new initial conspiracy period. Moreover, and again

21   according to plaintiffs' experts, CDK didn't raise integration

22   prices at all during the new conspiracy period and Reynolds

23   raised its prices before the start of that alleged new

24   conspiracy period. So whatever CDK was supposedly doing to

25   injure competition from 2013 to 2015 was something other than

1    raising prices.

2          Now, plaintiffs will say and have said that there is

3    no prejudice or surprise here because the parties conducted

4    discovery about the events in 2013 and 2014.  And, of course

5    they did.  That's what you do in a case about a 2015

6    conspiracy.  You take discovery regarding the clean period

7    before the alleged -- the start of the alleged conspiracy to,

8    among other things, analyze what the but-for price would have

9    been absent the conspiracy.  What's important here is that

10   discovery was not about the 2013 conspiracy plaintiffs now

11   allege.  Defendants selected deponents, sought documents and

12   conducted discovery based on the 2015 conspiracy alleged in the

13   complaints.

14         Now, none of this is to say that the new conspiracy

15   that plaintiffs are now alleging is persuasive; it's not.  And

16   as you will hear this afternoon, we don't think any of it

17   survives summary judgment.  But especially in a case of this

18   magnitude, defendants are entitled to know what plaintiffs

19   actually think defendants did wrong before discovery closes and

20   defendants have no ability to test their theory.  Plaintiffs

21   cannot survive summary judgment based on alleged conspiracy

22   they didn't even hint at until their opening expert reports.

23         The Seventh Circuit has said that "A court can and

24   should hold the plaintiff to his original theory, when at the

25   end of the discovery the plaintiff surprises the defendant with

1    an entirely new characterization of the case."  That's the

2    *Vidimos* decision.  And, your Honor, that's what we respectfully

3    request the Court to do here.

4           THE COURT:  Okay.  You're almost exactly on time.

5    Thank you, Ms. Miller.

6           So, Mr. Ho and Mr. Wallner, I don't know who's first

7    and who's second, so I'll let you guys fight it out amongst

8    yourselves.

9           MR. HO:  Thank you, Judge Dow.  Derek Ho for the

10   individual plaintiffs.  I'm going to take three and a half

11   minutes, and Mr. Wallner will follow after that.

12          Defendants; argument is based on wishful thinking that

13   they've engaged in since the beginning of this case.  And that

14   is that our claim is limited to the agreements that CDK and

15   Reynolds executed in February of 2015.  In fact, our case has

16   never been limited to those formal agreements.  From the

17   beginning, we alleged not only that those agreements were

18   unlawful, but that there was a broader conspiracy not to

19   compete and to exclude Authenticom but other data integrators

20   from the market.  Reynolds's Bob Schaefer and CDK's Dan McCray

21   bragged about that broader agreement to Steve Cottrell, and

22   Mr. Cottrell has contemporaneous notes of the McCray

23   conversation.  But because McCray and Schaefer didn't say when

24   the broader conspiracy began, our complaints consistently

25   allege that the conspiracy began no later than February 2015,

1    the date of the formal agreements.

2         In fact, this Court's motion to dismiss opinions have

3    already held that "The alleged agreements between CDK and

4    Reynolds are not limited to the 2015 agreement (inaudible) and

5    include the broader conspiracy."

6         Your Honor's Authenticom motion to dismiss opinion

7    called this very argument "a bad argument."  And as Ms. Miller

8    now acknowledges, there has been no surprise or no lack of

9    discovery in this case focused on the 2013, 2014 time frame.

10   Data discovery went back to January 2011, documents went back

11   to January 2013.  There was extensive deposition testimony

12   about what happened in 2013 and 2014.  And, in fact, Judge

13   Gilbert denied defendants' motion to quash subpoenas for

14   telephone records in this time frame because of "potentially

15   relevant conduct going back to 2013."

16        So let me just talk about what the evidence is that

17   defendants are trying to sweep under the rug.  It shows that

18   CDK and Reynolds's conspiracy started in January 2013 and then

19   culminated in the 2015 agreements.  I think of it as a

20   three-act play.

21        In Act One, starting in 2006 Brockman and Reynolds

22   begin blocking dealers' ability to use data integrators.

23   Dealers hate this and CDK bashes Reynolds in the marketplace

24   because of Reynolds's ability -- attempts to close, and that

25   act also prevents Reynolds from fully closing its system.

1    Act Two is set in August 2013 in Columbus, Ohio.

2    Reynolds has rolled out another wave of blocking, and CDK

3    initially responds in the same way, by punishing Reynolds in

4    the market.  But now Reynolds proposes a truce.  Bob Schaefer

5    of Reynolds and Howard Gardner of CDK meet in CDK's offices on

6    September 27, 2013.  And Reynolds say that if CDK will

7    coordinate its messaging on data access, Reynolds will stop

8    blocking DMI's access to its DMS.  And they also propose to

9    give each other software application (inaudible due to poor

10   audio) access to their respective DMSs.

11   CDK agreed.  Overnight CDK halts its competition

12   against Reynolds on the basis of its DMS policies.  But they

13   need time to negotiate the exact terms of the guaranteed

14   access, and it's those negotiations that culminate in the

15   February 2015 agreements.

16   Act Three is the effects of the conspiracy.  CDK

17   forces all dealers onto its own integration program.

18   Authenticom's business craters and data integration prices,

19   which were already inflated, skyrocket even further.

20   In sum, the jury should get to see the entire play,

21   not just Act Three.  The federal rules embody a strong

22   preference for merits-based termination of a claim.  This is

23   not a fundamentally different claim, contrary to what

24   Ms. Miller said, but simply evidence that the conspiracy that

25   was alleged began not in February '15, and that's not when we

1    ever said it began, but in fact in 2013.  Preclusion of

2    evidence impedes the civil justice system's truth-seeking

3    function and is not warranted here.

4              THE COURT:  Okay.  Thanks, Mr. Ho.

5              Mr.  Wallner, over to you, sir.

6              MR. WALLNER:  Good afternoon, your Honor.  Robert

7    Wallner for the Dealers.  Your Honor, the defendants' claim of

8    prejudice should be rejected by your Honor outright.  The

9    defendants in fact extensively questioned witnesses seeking to

10   show, for example, that there never was a conspiracy.  Not in

11   2015, not in 2013, not ever.  For example, Mr. Brockman, a

12   critical witness in this case and, until recently, the CEO of

13   Reynolds, was asked by his own lawyer "Have you ever discussed

14   CDK's policies about system access to their DMS with CDK?"  He

15   was asked by his counsel "Are you aware of any agreement

16   between anyone at Reynolds and CDK to eliminate third-party

17   data brokers like Authenticom?"

18             Another example, and these are just examples, your

19   Honor, is Michael Thorne, the former strategy officer of CDK.

20   He was asked by defense counsel if he was aware of "any

21   agreement" between Reynolds and CDK to drive third parties like

22   Authenticom out of business.  And, your Honor, listen to what

23   he said.  He asked his lawyer, "Time frame?"  To which defense

24   counsel said, "At any point?"  And moreover they say in their

25   brief that they are prejudiced because they need some

15

1 additional discovery about the 2013 state of the marketplace.

2 That's not correct, your Honor. Defendants were extensively

3 examining witnesses about the state of the marketplace in 2013

4 and way before. Just by way of example again, Mr. Brockman,

5 the head of CEO, was asked by defense counsel "How long have

6 you had those restrictions against the use of third-party data

7 brokers?"

8       Your Honor, that's not limited to 2015 discovery.

9 Defendants didn't focus on 2013 discovery. They focused on

10 discovery and asked questions that go back, really, to the

11 beginning of time. So, in short, your Honor, the defendants

12 have all of the discovery they possibly could need, and your

13 Honor knows they submitted not a single declaration indicating

14 they needed additional discovery because of any so-called

15 prejudice. For good reason, there is no prejudice, none

16 whatsoever. Thank you, your Honor.

17       THE COURT: Okay. Thank you, Mr. Wallner. You are

18 all doing quite well on staying close to the time.

19       Okay. So we're going to move on to the summary

20 judgment motions now. And I think 964 is the first one and it

21 looks like I have Ms. Gulley and Mr. Ho again, right?

22       MS. GULLEY: Thank you. Yes, it will be better when

23 I'm not muted.

24       THE COURT: Okay. Ms. Gulley. I just wanted to let

25 you know I can see your exhibit, so fire away.

1    MS. GULLEY:  Great.  Thank you.  Andi Gulley for

2  Reynolds.

3    While the briefing is extensive, the core principle is

4  simple.  Authenticom has not identified a conspiracy theory

5  that can survive *Matsushita*.  Namely, Authenticom has not

6  provided evidence that tends to exclude the possibility that

7  Reynolds and CDK acted independently.  Reynolds and CDK develop

8  and license complex enterprise computer systems that support

9  auto dealers and manage real-time interaction of vast

10  quantities of data.

11    Plaintiff Authenticom is not a software application

12  provider.  It's a third-party middleman whose primary complaint

13  here is it is not permitted to infiltrate the computer system

14  to take data and syndicate it to others.  We know from *Trinco*

15  and the Seventh Circuit's opinion in this case that Reynolds

16  and CDK have the right independently to refuse to allow

17  Authenticom access to their computer system.  A right

18  underscored by other laws like the Computer Fraud and Abuse

19  Act.  To skirt the clear implications of this right,

20  Authenticom twists the record to invent a conspiracy to do what

21  either DMS could and did decide to do years apart, secure their

22  systems from hostile access.

23    There are two core categories of undisputed facts that

24  compel judgment under *Matsushita*.  First, Reynolds made the

25  independent decision to prohibit computer system access years

1     before CDK's copycat decision.  Reynolds identified system

2     degradation caused by outside system access and from 2006 to

3     2013, pre any alleged conspiracy, took measures not only to

4     technologically exclude third-party access to its system but to

5     wind down hostile access industry wide through controlled

6     wind-down procedures.

7          And when plaintiffs talk about exemptions or white

8     listing, that's what they're talking about, a monitored,

9     temporary wind-down of hostile access.  These measures were

10    effective.  Authenticom called it an apocalypse for hostile

11    access to Reynolds by 2013.  This unilateral control over

12    hostile integration by 2013 makes it implausible that Reynolds

13    would conspire with CDK over such system access.  Reynolds had

14    already shut it down.

15         As to economic incentives, plaintiffs' experts don't

16    dispute that securing the system was profitable absent

17    collusion, and that integration software prices could be raised

18    profitably and unilaterally.  Indeed, they cannot dispute that

19    the core Reynolds integration price increase were put in place

20    before any alleged 2013 conspiracy.

21         Second core set of facts.  CDK had independent reasons

22    and ability to secure its system when it followed Reynolds'

23    lead into 2016.  CDK identified system infection and corruption

24    from third-party access.  CDK's own hostile integration

25    business, called DMI, was also under internal attack with CDK

18

1    employees concerned that DMI's then access methods with respect

2    to Reynolds were illegal.

3            Plaintiffs' experts concede CDK's systems measure

4    could be taken profitably and unilaterally.  But even if, as

5    Authenticom suggests, Reynolds and CDK's motives were simply

6    profit driven, not security driven, that makes no difference.

7    The point is that Reynolds and CDK had unilateral motives, not

8    what the motive was.  Critically, CDK did not need Reynolds's

9    agreement to secure its system.  In fact, the record is clear.

10   Nobody in the industry, not plaintiffs or any defendant,

11   thought there was any chance Reynolds would reverse its

12   system-access policy.

13           Under black letter anti-trust law, including

14   *Matsushita*, *Clean Products*, *Text Messaging*, and this Court's

15   *Dairy Farmers* case, no matter what spin Authenticom attempts to

16   put on any particular document, its theory cannot survive

17   *Matsushita* in light of the overwhelming evidence that CDK and

18   Reynolds acted alone years apart.

19           Now Authenticom, as Mr. Ho just mentioned, says its

20   CEO, Steve Cottrell, has direct evidence of conspiracy; that's

21   wrong.  The key evidence is Cottrell's own words.  Our Exhibits

22   32 and 306.  Reading them is the clearest evidence that they're

23   not an unambiguous admission of an agreement not to compete on

24   system-access policies.  Mr. Cottrell admits in his deposition

25   that multiple inferences are required, and that is not enough

1    under *High Fructose Corn Syrup*.

2         A final point on *Matsushita*.  I encourage the Court to

3    listen to plaintiffs' argument carefully and ask what

4    conspiracy are they talking about.  We just heard a new one

5    with the new three points.  But following the Seventh Circuit's

6    order in this case, plaintiffs have abandoned the original

7    theory that the written agreements were the conspiracy.

8    Instead, now they have three points, like market messaging,

9    that the parties identified during the negotiation of this same

10   written agreements.  Like the written agreements, none of these

11   points relate to Authenticom's core complaint, that it is

12   blocked.  These points have nothing do with an agreement to

13   secure the system.  And plaintiffs' request that you infer a

14   broad, secret conspiracy from the negotiation of lawful written

15   agreements doesn't fly under *Matsushita*.

16        Two other key issues in the motion that I would like

17   to hit on in my remaining time.  First, Authenticom has not met

18   its burden to show that it has suffered an injury that the

19   anti-trust laws protect.  Authenticom's desired hostile system

20   access is barred because it is illegal independent of any

21   agreement between Reynolds and CDK.  It's illegal under the law

22   as cited in our counterclaims and prohibited by the dealer

23   contracts that are not challenged here.

24        Finally, Authenticom's unilateral claims fail.  Under

25   *Trinco* Reynolds has the right to refuse system access.  Also

1    Reynolds' vendor contracts are not exclusive.  They allow data

2    transfer by dealers.  Authenticom has not been foreclosed.

3    Because using dealer transfer methods, it's Reynolds' business

4    is at an all-time high.  Finally, plaintiffs admit Reynolds

5    market share is relatively small and declining, and that is not

6    market power sufficient to support these claims.

7          In conclusion, your Honor, I ask that this Court

8    exercise its critical gatekeeping function as it did in *Dairy*

9    *Farmers* and find that despite Authenticom's ever-changing

10   theories, the core undisputed facts make it clear that it has

11   not pushed this case over the 50-yard line.  Thank you.

12         THE COURT:  Sorry.  I muted myself because I was

13   getting all kinds of proposed orders, my apologies.  Thank you

14   very much, and you came in under budget.  I appreciate it.

15         Mr. Ho, back to you, sir.

16         MR. HO:  Thank you, Judge Dow.  I'm just going to

17   start by reading a few passages from *Areeda* and a couple of

18   cases that I think will make the overarching point, which is

19   that this isn't a *Matsushita* case.  And for Ms. Gulley to spend

20   all of her time on *Matsushita*, I think, indicates how weak

21   their summary judgment argument is.

22         So I will start with *Areeda*.  This is Volume 6 of

23   *Areeda*, paragraph 1413(a) at page 92.  "In the presence of

24   explicit evidence of an agreement, the presence of an

25   independent reason for acting is irrelevant."

1    *Rossi*, which is a Third Circuit case, 1998, cited in

2    Footnote 18 of our brief, "The *Matsushita* standard only applies

3    when plaintiff has failed to put forth direct evidence of

4    conspiracy." *In Re Publication Paper*, Second Circuit, same

5    thing.  And that's why the Seventh Circuit in the *High Fructose*

6    *Corn Syrup* case said two things.  One, an admission of the

7    existence of a conspiracy is all the proof that a plaintiff

8    needs.  And, two, that unlawful agreements are unlawful even if

9    the parties were "completely unrealistic in supposing they

10   could influence the market price."

11        So if there is direct evidence of conspiracy, and I

12   will explain why there is, then all the arguments about why the

13   plus factors *under Matsushita* are not met go by the wayside.

14   We think they are met, but this is a category mistake.  We have

15   direct evidence of conspiracy.  And that evidence isn't limited

16   to the testimony of Steve Cottrell that that's, of course, very

17   Important.  Those are admissions that if a jury credits them,

18   would be all of the evidence that the plaintiff needs.

19        But there is also direct communications between

20   Reynolds and CDK in the documents.  Your Honor will recall that

21   in Act One of what I called the three-act play, CDK and

22   Reynolds are in a competitive struggle in the market.  Reynolds

23   wants to close its DMS to independent integrators like

24   Authenticom, but CDK is hammering it in the market by

25   aggressively competing for dealers based on the openness of its

1    system.  Just to put a pin in it, this is not different from

2    the conspiracy we allege.  This is all about CDK and Reynolds

3    closing its systems to independent integrators like

4    Authenticom.

5        Bob Brockman testified in his deposition that CDK cost

6    Reynolds more than $300 million in lost revenues by

7    "bad-mouthing" Reynolds's data-access policies 'high and wide

8    in the market.'" That's Docket 1069-16.

9        CDK's Kevin Witt, "These tactics that Reynolds were

10   using was causing so much discontent in the dealer community

11   that it was driving large and small dealer groups in droves

12   away from their platform and over to ours."  That's 1069-26.

13       And in a colorful work document, Ron Workman of CDK

14   described Reynolds as "getting the crap kicked out of them in

15   the market because of CDK's competition."

16       Dr. Israel's expert report shows that that was the

17   case.  CDK had overtaken Reynolds in the market and Reynolds's

18   market share had dropped from 42 percent to 28 percent.  And

19   this competition critically was preventing Reynolds from

20   successfully closing its system from third-party data

21   integrators like Authenticom.  To keep major customers from

22   defecting to CDK, Reynolds had to white list log-in credentials

23   used by authorized integrators and exempt them from its

24   blocking measures.  We cite that at paragraph 69 to 70 of our

25   statement of undisputed facts, which is Docket 977.  So

1    Reynolds wants CDK, as Brockman puts it, "to stop taking

2    advantage of Reynolds in the marketplace over the issue of data

3    security."

4         Reynolds's efforts to close are also causing CDK a

5    problem, which is that CDK's integration business is being

6    disrupted by Reynolds's blocking.  And so when Reynolds

7    proposes a truce, CDK accepts it.  A key piece of evidence,

8    direct evidence of the agreement, is CDK's internal summary of

9    that September 27th, 2013, meeting.  This is Docket 1069-199.

10   Again, the meeting was between Bob Schaefer of Reynolds and

11   Howard Gardner of CDK.  And it goes through the three points of

12   the deal that I outlined earlier.  A critical part of which is

13   that CDK would agree to stop marketing its DMS as superior to

14   Reynolds's because of its openness of the third-party

15   integrators.  As Schaefer put it in the meeting to "forage a

16   common perspective with ADP" -- that's CDK -- "on the topic of

17   data-security messaging, to synchronize our security

18   perspectives and speak with similar voices to the industry."

19        CDK agreed, as I said.  As Howard Gardner later put

20   it, "CDK and Reynolds decided that cooperation was preferable

21   to the alternative," which he described as "fighting it out in

22   the DMS world for another two years or more, cooperation was

23   preferable to competition."  The effect of the agreement was

24   swift and dramatic.  Right after the September 27th meeting,

25   Howard Gardner went back and told his subordinates at CDK that

1    they were no longer to criticize Reynolds's closed-system

2    policy, because the two companies had "an agreement."  When

3    CDK's sales people continued to do so, Reynolds called CDK to

4    complain, and CDK promised to enforce the agreement.  We cite

5    all of those communications at 17 to 19 of our summary judgment

6    opposition.

7         The 2015 agreements were the culmination of CDK and

8    Reynolds's effort to implement aspects of their agreement,

9    namely Points 2 and 3 of the September 27th, 2013, meeting, and

10   that is giving each other's applications reciprocal access to

11   their DMSs and implementing the "soft landing" that Reynolds

12   had promised.

13        I want to -- I know I'm running out of time, so I want

14   to cite one more document, and that is, right before the

15   February 2015 agreements, Mr. Gardner has a marketing plan for

16   the agreement and those notes say, "We have an agreement.  We

17   are locking down our DMS."  That's Docket 1089, Plaintiffs'

18   Exhibit 960.  So there's direct evidence of agreement.  The

19   *Matsushita* factors are really beside the point.  That direct

20   evidence is more than sufficient to get to a jury and survive

21   summary judgment.  Thank you, your Honor.

22        THE COURT:  All right.  Thank you, Mr. Ho and

23   Ms. Gulley.  Thank you very much.

24        So I think the next one we are moving on to is another

25   summary judgment motion, and it's 970.  And so we have got

1  Mr. Scodro for the movant and Ms. Wedgworth for the respondent.

2  So I will turn it over to Mr. Scodro.

3      MR. SCODRO:  Thank you, your Honor, and I hope you're

4  seeing a shared screen.

5      THE COURT:  Not yet.

6      MR. SCODRO:  Okay.  It's up there now?

7      THE COURT:  Not for me.

8      There we go.  I got it.

9      MR. SCODRO:  Thank you, your Honor.

10     THE COURT:  Thank you.

11     MR. SCODRO:  Mike Scodro for Mayer Brown on behalf of

12 CDK.  Just to briefly summarize our motion for summary judgment

13 on the Dealer complaint, your Honor.

14     The Dealer plaintiffs are indirect purchasers of

15 integration services.  That is, they license the DMS from

16 companies like Reynolds and CDK and purchase apps from software

17 vendors.  To the extent those vendors then need to integrate

18 their apps with the DMS, the vendors may pass on some of the

19 associated integration cost to the dealers, but the dealers

20 don't purchase integration directly.

21     As we explain in our summary judgment motion, the fact

22 that the Dealers are indirect purchasers of integration defeats

23 their damages claim.  Meanwhile, their liability claims are

24 basically the same as the conspiracy claims that Ms. Gulley

25 just discussed.  And while the Dealers also bring several dozen

1    state-law claims, these are essentially superfluous from a
2    liability perspective and are plagued by their own
3    individualized legal problems.
4         Your Honor, I'll begin with damages.  As
5    Mr. Glickstein will discuss in connection with the Williams'
6    *Daubert* motion later, the Dealers' damages model is based
7    exclusively on alleged pass-through integration overcharges.
8    The Dealers say these damages are both direct and indirect, but
9    as this Court has already held on the motion to dismiss, such a
10   model is barred by *Illinois Brick*.  So what remains of Count
11   One of the dealer complaint following this Court's motion to
12   dismiss ruling should now be dismissed as well.
13        The Dealers' damages model also treats all of the
14   price increases after September 2013 as conspiracy damages,
15   even though first these include damages for exclusive dealing
16   claims that this Court has already dismissed.  And, second, the
17   Dealers' expert himself recognizes that CDK and Reynolds were
18   exercising unilateral market power at the time.
19        And, finally, it's alone fatal to the Dealers' damages
20   model that it simply doesn't measure named plaintiffs'
21   individual damages.  It measures damages for a putative class
22   of nationwide dealers, even though no class has been certified
23   and no nationwide damages claim is viable in light of *Illinois*
24   *Brick*.  Despite repeated requests, none of the named dealers
25   has quantified their individual damages to date.

1          Turning to liability, your Honor.  The dealers bring

2     two basic claims, one for conspiracy under Section One and

3     another for exclusive dealing.  And let me start with exclusive

4     dealing because that claim is easy to dispose of.  First, it

5     proceeds from a false factual premise.  It rests on allegations

6     that CDK added supposed exclusive dealing provisions to its

7     contracts as a result of the conspiracy, while the record shows

8     that these provisions predate 2013.

9          Second, the claim is abandoned.  The dealers don't

10    respond to CDK's factual and anti-trust injury arguments in the

11    Dealers' summary judgment opposition.

12         Okay.  Turning to the alleged Section One conspiracy,

13    your Honor.  The dealers allege the same September 2013

14    conspiracy that other MDL plaintiffs allege -- and the Dealers

15    explicitly incorporate both the background and Section One

16    argument from the Authenticom brief.  So the Dealers' case for

17    conspiracy fails at summary judgment for the same reasons that

18    Ms. Gulley just discussed.

19         But I would like to briefly address the seven

20    so-called plus factors that Mr. Williams says make conspiracy

21    more likely than unilateral action here.  As even this brief

22    summary will show, none of his opinions are based on economic

23    analysis, and all of the events he describes are equally, if

24    not more, consistent with unilateral activity.

25         First, Dr. Williams says that according to his model,

1    CDK and Reynolds' integration prices were elevated after 2013.

2    But the Seventh Circuit held in *Clean Products* that it's not a

3    Section 1 violation for a firm to raise its price unilaterally.

4    So it couldn't possibly be enough at summary judgment to

5    observe that two large suppliers merely raised their prices.

6         Dr. Williams also points to record evidence showing

7    that CDK and Reynolds were communicating, sharing information

8    between 2013 and 2015.  But of course they were.  CDK was

9    trying to wind down DMI's hostile integration business on the

10   Reynolds DMS.  And that required CDK and Reynolds to facilitate

11   the wind-down they ultimately agreed to, just as many hostile

12   integrators did during the exact same period.

13        Dr. Williams also says the February 2015 agreements

14   are themselves evidence of conspiracy.  But the Seventh Circuit

15   has held otherwise.  And, again, those agreements which mirror

16   similar agreements between app providers and hostile

17   integrators executed during that same period are consistent

18   with independent self-interest.

19        Dr. Williams next says that CDK and Reynolds' claims

20   that they were promoting security were mere pretext.  But that

21   is not even an economic opinion, and Dr. Williams isn't a

22   cybersecurity expert.  Moreover, as the Seventh Circuit has

23   held, the fact that a company supposedly acts for pretext is

24   not evidence of a conspiracy.  In essence, Dr. Williams opines

25   that CDK simply didn't want to admit to the market that it was

1    raising prices, a purely unilateral motivation.

2         Finally, your Honor, Dr. Williams claims that the

3    market here was primed for collusion.  But the Seventh Circuit

4    has repeatedly rejected this reason, recognizing that

5    concentrated markets don't just make colluding easier.  They

6    make lawful follow-the-leader elevated pricing easier as well.

7         It also bears noting that this is not the first time

8    Dr. Williams has made these kinds of basic but fundamental

9    mistakes, your Honor.  He did the same think in the *Valspar*

10   case where the Third Circuit held that his opinions weren't

11   enough for plaintiff's case to survive summary judgment.

12   There, as here, Dr. Williams' conclusions that conspiracy was

13   more likely than unilateral action were "based on predictions

14   that are insufficient under our case law in analysis that

15   'mastered the obvious.'"

16        With my remaining time, your Honor, I'll briefly touch

17   on the state law claims.  If the Court agrees that the Dealers

18   haven't joined a conspiracy, then there's no need to address

19   the state law claims the Dealers also bring.  But those claims

20   suffer from a number of independent deficiences which we set

21   out in our briefings.  We don't have time to go through each of

22   those defects, but I do want to highlight one argument.

23        The Dealers' revelation for the first time in their

24   summary judgment opposition that they aim to certify a

25   nationwide class under the Illinois Antitrust Act.  Now, of

1   course, that's not how they plead the claim, but in any event

2   the Illinois statute prohibits it.  The Illinois Antitrust Act

3   unambiguously bars class action claims by indirect purchasers

4   with the sole exception of the Illinois Attorney General

5   proceeding on behalf of Illinois residents.  And under Justice

6   Steven's concurrence in *Shady Grove* -- which, as we explain in

7   the brief, is controlling -- federal courts can't radically

8   transform the Illinois Act by disregarding these express

9   statutory limitations.  And while plaintiffs have now moved to

10  add the District of Minnesota's decision in *Pork Antitrust* as

11  supplemental authority, that decision merely adopts the holding

12  of *Broiler Chicken*, which we already addressed in our brief.

13  Judge Shah recognized the point that we're making just a couple

14  of months ago in his *Humira* decision, holding that the Illinois

15  Antitrust Act bars private class actions.

16          In short and in conclusion, your Honor, the Dealers

17  case, while widely derivative of the Authenticom and AutoLoop

18  suits, also suffers from several independent defects that doom

19  the Dealer complaint at summary judgment.

20          Thank you, your Honor.

21          THE COURT:  Okay.  You guys are fabulous.  You are

22  hitting it right on the dot, so thank you.

23          Okay.  So, Ms. Wedgworth, I think you've got the other

24  side of this one, right?

25          MS. WEDGWORTH:  I do, your Honor.  Good afternoon.

1          THE COURT:  Good afternoon.

2          MS. WEDGWORTH:  Dealerships' horizontal conspiracy

3     claim, like the Authenticom claim, is possible and supported by

4     direct evidence of defendant's anti-competitive agreement, as

5     well as strong circumstantial evidence and numerous plus

6     factors which further support the conspiracy.

7          I will briefly address three issues.  The decrease in

8     functionality of the Dealer Management Systems, DMS.  The

9     second, the damages calculation.  And, third, state law claims.

10    As to the decreased functionality in the DMS, dealers are

11    direct purchasers of DMSs and are entitled to damages under

12    federal antitrust law reflecting the DMS's reduced value and

13    functionality.  The evidence shows that due to the conspiracy

14    the DMS decreased in functionality, while the price of that

15    same DMS increased.

16         As stated in the motion to dismiss by your Honor, the

17    Court agrees that plaintiff's horizontal conspiracy claim is at

18    least to some extent based on alleged anti-competitive conduct

19    in the DMS market.  As plaintiffs allege that its DMS lost

20    functionality and is worth less as a result of CDK's agreements

21    with Reynolds.  Dealers as direct purchasers of DMSs can sue

22    under *Illinois Brick*'s bright-line rule.  As confirmed in *Apple*

23    *versus Pepper*, in 2019 the Supreme Court stated that *Illinois*

24    *Brick* establishes a bright-line rule that gives direct

25    purchasers the right to sue an antitrust violator.  In 2020 the

1    Seventh Circuit referencing *Apple* stated in *Marion Healthcare*,

2    the relevant inquiry focuses on the relationship between the

3    seller and the purchaser, not the difficulty of assessing the

4    overcharge.

5        *As Story Parchment* informs us, "It is enough if the

6    evidence shows the extent of the damages as a matter of just

7    and reasonable inference, although the result be only

8    approximate.  The risk of the uncertainty should be thrown upon

9    the wrongdoer instead of upon the injured party."  Dealers'

10   expert, Dr. Williams, determined as a result of the conspiracy

11   the directly purchased DMSs lost value and functionality.  He

12   demonstrated, and CDK fails to contradict, during this same

13   time period the price of the DMS to Dealers did not decrease

14   but, in fact, increased causing Dealers to sustain damages as

15   DMS direct purchasers.

16       As a result of the conspiracy, the functionality and

17   value of the DMS was reduced, which caused Dealers to go to

18   vendors and cover by incurring DIS, data-integration fees to

19   purchase integration services.  Dr. Williams concluded that the

20   loss is properly measured by the super-competitive increase in

21   DIS fees paid by the Dealers.  In other words the increase and

22   DIS fees paid by Dealers is a proxy for damages in the DMS

23   market.

24       There is no disagreement that the total value of the

25   DMS includes CDK's 3PA program, which is CDK's only approved

method of integration.  For example, CDK's VP of Data Services
stated in a June 2017 declaration that the 3PA program is not a
standalone product.  Rather, the 3PA program is considered to
be an integral part of the DMS itself.

CDK's own expert, Dr. Whinston, agrees that data
integration is part of the total value in using the DMS.  And
he acknowledges that Dealers' expert, Dr. Williams, holds the
same position.  And in Dealers' own words, "When we put our CDK
contract in place a couple of years ago, we agreed on no
integration or connection fees, especially in light of the fact
that this is simply an added charge with no product or service
to go along with it."  And as CDK director of sales
acknowledges, CDK's data-access policies directly affect the
Dealers' ability to use his DMS for marketing purposes by
shutting off its integration with multiple vendors.  Dealers'
expert, Dr. Michael Williams' damages model permits the jury to
make a reasonable and principled estimate of damages.  I will
address Dr. Williams' damages analysis further in the *Daubert*
discussion.

CDK argues that Dealers' expert has not disaggregated
damages between acts found to be lawful versus unlawful.  The
Seventh Circuit approaches antitrust damages differently,
stating in *MCI Communications Corp*., "There is nothing
inconsistent between requiring proof that damages were caused
by illegal acts and the rule that a plaintiff need not

1   disaggregate damages among those acts found to be lawful.

2   Here, none of the challenged conduct has been determined to be

3   lawful, and therefore no adjustment to the analysis is needed."

4        Turning to the state law claims, CDK's arguments are

5   without merit.  I will highlight four of them.  First, as to

6   the nexus argument, Dealers provide evidence that defendant's

7   conspiratorial conduct had a nexus with the six states at

8   issue.  As found in Table A of the Dealers' opposition, the

9   detailed evidence demonstrates key elements of the conspiracy

10  which took place in those states.  Hundreds of dealers,

11  including named plaintiffs, acted upon defendant's wrongful

12  acts in those jurisdictions, and yet CDK has ignored this

13  detailed evidence and substantial case law.  At the very least,

14  the detailed evidence presents genuine disputed issues of

15  material fact that are inapposite.

16       Second, with regard to the consumer protection

17  statutes, which cover antitrust behavior, this Court's decision

18  in *Dairy Farmers of America* dictates that CDK effectively

19  concedes New Mexico and Colorado.  As to South Dakota and

20  Minnesota, these states' laws extend and cover antitrust

21  violations.  As for supplemental authority, we cited

22  *Sandee's Catering versus Agristats*.

23       And third, the class action bars in Illinois, South

24  Carolina, and Colorado do not apply.  Under *Shady Grove*, state

25  class action bars have been found to be inapplicable in federal

1    class action cases because the state class action bar

2    provisions do not implicate substantive rights.  Rule 23

3    provides the procedural rules that govern class actions.

4    Substantial and recent case law support this conclusion,

5    including our supplemental authority of *In Re Pork Antitrust*

6    litigation.

7         And finally Dealers satisfied statutory notice

8    requirements.  Notice requirements are not enforceable under

9    *Shady Grove* as embraced by the Seventh Circuit in *Sawyer*.  As

10   with class action bar provisions, state notice requirements are

11   procedural and thus inapplicable to cases brought in federal

12   court, which does not require pre-filing notice.  And most

13   importantly, the states receive notice under the Class Action

14   Fairness Act.

15        In October 2018 as part of the Dealers' settlement

16   with Reynolds, and only a few months after the operative

17   complaint was filed and prior to the motion to dismiss -- well,

18   decision.  As notice was provided and no prejudice to the

19   parties exists, the remedial purpose of the notice provisions

20   has been satisfied; therefore CDK's motion for summary judgment

21   against the Dealers should be denied in its entirety.

22        THE COURT:  Okay.  Thank you very much to both counsel

23   on that one.  I really appreciate it.  It looks like we have

24   one more summary judgment motion before we turn to the

25   counterclaims.  And this one we are back to Ms. Miller and

1    Mr. Ho, right?  And this is 967.

2            MS. MILLER:  Correct, your Honor.  Can you see my

3    screen?

4            THE COURT:  I just had to unclick my mute button, so,

5    yes, I can see your screen.  Thank you.

6            MS. MILLER:  Okay.  At the outset I want to briefly

7    touch on Mr. Ho's prior statement that plaintiffs have,

8    quote/unquote, direct evidence of the alleged conspiracy.

9    Under *Omnicare*, direct evidence has to demonstrate an

10   unambiguous conscious commitment to the alleged conspiracy.

11   And the so-called evidence that Mr. Ho cited to you falls well

12   short of that standard.

13           On the AutoLoop motion, the Vendors claim hundreds of

14   millions of dollars in damages.  The vast majority of which is

15   for alleged overcharges on defendant's integration sales.

16   Their damages model achieves this overblown number by

17   attributing 100 percent of defendant's price increases since

18   September 2013 to the alleged conspiracy.  But the essential

19   task of an antitrust damages model is to determine how a

20   particular market would have developed in a but-for world

21   holding every other feature of the actual world constant.  And

22   it is back letter law that a model used to measure damages

23   caused by an alleged conspiracy must separate the price effects

24   of conclusion from the price effects of the defendant's lawful

25   market power.  Vendors' damages theory fails this standard.

1        It is undisputed as the Vendors' own damages expert,

2   Dr. Israel, makes clear that CDK and Reynolds each had

3   "significant unilateral market power" to raise their prices

4   independent of any conspiracy by adopting a policy of blocking

5   hostile third parties.  It is also undisputed that a unilateral

6   decision to block third parties is lawful under the Court's

7   ruling on CDK's motion to dismiss the Vendors Section 2 claims.

8   Finally, it is undisputed that the defendant's unilateral

9   market power could explain their price increases.  Dr. Israel

10  found the same damages for AutoLoop's unilateral claims as he

11  does for its conspiracy claims.

12       In light of these undisputed facts, no rational jury

13  could agree that 100 percent of defendant's price increases

14  during the relevant period are conspiracy damages.  The Seventh

15  Circuit's opinion in *Marshfield Clinic* makes this clear.  In

16  *Marshfield Clinic*, the plaintiffs also calculated damages at

17  100 percent of the difference between the defendants' prices

18  and a set of benchmark prices.  However, they failed to account

19  for the defendant's undisputed market power to raise prices

20  relevant to the benchmark, warranting summary judgment on the

21  damages claim.  The Vendors make that exact same error here.

22       The Vendors argue that CDK and Reynold's unilateral

23  market power was baked into their pre-conspiracy prices.  So

24  it's reasonable to infer that both firms would have left their

25  prices completely flat for six-plus years once the alleged

1    conspiracy began.  Our briefs demonstrate why that argument

2    simply does not hold water.

3           But of particular note is the fact that Dr. Israel

4    claims that the source of CDK's market power is its ability to

5    profitably implement a policy of blocking independent

6    third-party DIS providers.  If that's the case, then it cannot

7    be that CDK's unilateral market power was already fully

8    realized before the alleged conspiracy began, as CDK had not

9    yet begun to block third parties from its DMS at that point.

10   CDK's other arguments on damages are fully detailed in our

11   briefs and I will not repeat them here.

12          Turning to liability, however, AutoLoop's conspiracy

13   and unilateral claims fail for the same reasons that

14   Authenticom's do.  As to its conspiracy claim, AutoLoop also

15   presses a market division Section One theory, claiming that in

16   the 2015 agreements CDK and Reynolds supposedly agreed not to

17   access each others' DMSs.  But this Court has already held in

18   the *Cox* case that this theory fails as a matter of law.  That's

19   Docket 505 at 12 and 13.  And AutoLoop did not even address in

20   its reply our demonstration that AutoLoop abandoned this claim

21   by failing to disclose any expert testimony about it.

22          As to the unilateral claims, AutoLoop cannot

23   demonstrate antitrust injury on which it bears the burden of

24   proof.  There is no antitrust injury if lawful conduct fully

25   accounts for the plaintiff's injury.  Here AutoLoop's claimed

1    injury on its unilateral claims flows from lawful conduct,

2    namely CDK's decision not to deal with hostile integrators.

3           AutoLoop's only response is to incredibly suggest that

4    if CDK did not have exclusive vendor contracts, it might not

5    have blocked hostile integration.  Of course AutoLoop supplies

6    no reason why that would be the case.  But more importantly, it

7    cites no evidence that CDK's decision not to permit hostile

8    integration hinged on its exclusive vendor contracts.  Summary

9    judgment in CDK's favor is warranted here.

10          THE COURT:  Okay.  Thank you, Ms. Miller.

11          Mr. Ho, back to you.

12          MR. HO:  Thank you, Judge Dow.  Two points about

13   liability since Ms. Miller rested and then I'll talk about the

14   damages issues as well.

15          Point No. 1 on liability.  Ms. Miller says that the

16   standard at summary judgment is that direct evidence of

17   conspiracy needs to be unambiguous, and that can't possibly be

18   right at summary judgment.  If I could quote your Honor's prior

19   decision in this case, "Even if, as defendants assert, there

20   was some ambiguity in the admissions, they're at minimum highly

21   suggestive of the existence of an agreement to block

22   Authenticom from accessing dealer data and thus out of the

23   market."  And just as you credited that at the pleading stage,

24   if a (inaudible due to poor audio) a jury, it could find that

25   "highly suggestive evidence" to be sufficient proof of the

1    conspiracy, we're entitled to try to convince the jury of that.

2    As the Seventh Circuit said in *In Re Brand Name*

3    *Prescription Drugs*, "The interpretation of ambiguous

4    documentary evidence of collusion is for the jury." So the

5    unambiguous standard is just wrong.

6    Number 2, in the AutoLoop -- in your Honor's AutoLoop

7    motion to dismiss opinion, there's a passage that I also think

8    is relevant to the question of liability. And this is Docket

9    504 at pages 17 to 18. Again, this was at the pleading stage,

10   but it applies equally at the summary judgment stage.

11   "Accepting CDK's argument that plaintiff only has alleged

12   parallel conduct would require the Court to ignore well-pleaded

13   allegations that CDK executives admitted to the agreement.

14   Such admissions are direct evidence of an illegal conspiracy.

15   The Court therefore rejects defendant's argument that plaintiff

16   has only alleged parallel conduct insufficient to establish the

17   horizontal conspiracy claim." That's our fundamental position

18   with respect to the summary judgment issue on the horizontal

19   claims as well.

20   With respect to damages, Ms. Miller's argument that

21   there is no evidence is really a *Daubert* argument in disguise,

22   because what I think Ms. Miller really means is that she wants

23   to argue that Dr. Israel's damages analysis didn't reliably

24   account for unilateral market power in a but-for world.

25   Mr. Panner is going to talk a bit more about that in the

1   context of the Israel *Daubert* motion.  But let me just say that

2   the whole point of the analysis that he did, which is known as

3   a difference in differences model led us to account for the

4   but-for world.  That is a standard econometric way of dealing

5   with it.  And the market power that Ms. Miller alludes to, and

6   that we don't deny that CDK and Reynolds had, the problem with

7   her argument is that CDK and Reynolds had that same market

8   power even before the conspiracy began.  And so Dr. Israel's

9   comparison of before and after the conspiracy takes that

10  unilateral market power into account.

11          Ms. Miller's description of what Dr. Israel said about

12  unilateral market power is also just not accurate.  He didn't

13  say that defendants had unilateral power to achieve the same

14  price absent the conspiracy.  What he said was that even if CDK

15  and Reynolds' conduct after September 2013 were found to be

16  unlawful unilateral conduct, as opposed to unlawful collusive

17  conduct, his damages opinion would remain the same because the

18  effects of the unlawful conducts would be the same regardless

19  of the legal basis for liability.  That's a very different,

20  proposition, and certainly not a concession of the kind that

21  Ms. Miller alludes to.

22          In short, Dr. Israel did account for the but-for world

23  and other factors that could have influenced integration prices

24  in a but-for world.  That's exactly what the DID method is

25  designed to do, and any criticisms of his application of that

1    method under *Daubert* and Seventh Circuit's jurisprudence are

2    really for the jury and not even for *Daubert* -- not a grounds

3    for exclusion.  I'm sorry.  Thank you, your Honor.

4          THE COURT:  Thank you to Ms. Miller and to Mr. Ho.  So

5    that looks like we have four motions on the counterclaims up

6    next.  And the first one, just so I can keep the record

7    straight, is 777.  And this is Reynolds's motion, and I've got

8    Mr. Wilkinson and Mr. Ho again.  Mr. Ho, you're busy today.

9          MR. HO:  Indeed, your Honor.

10         MR. WILKINSON:  Can everyone see my screen now?

11         THE COURT:  Yes.  Thank you.  Perfect.

12         MR. WILKINSON:  Great.  Thank you, your Honor.  So

13   I'll be addressing Reynolds' partial motion for summary

14   judgment on its counterclaims against Authenticom.  This is a

15   targeted motion asking the Court to grant an affirmative

16   finding of liability against Authenticom based on two of our

17   counterclaims.  These counterclaims are tied to Authenticom's

18   efforts to get into the Reynolds' DMS using automated computer

19   strips.  Authenticom's software would log on to the Reynolds'

20   DMS through a remote connection, input log-in credentials

21   obtained from a dealer, answer one or more CAPTCHA prompts,

22   navigate through the system, scrape or extract data, and then

23   log off.

24         To solve Reynolds CAPTCHAs, Authenticom would use --

25   excuse me.  I'm sorry.  To solve Reynolds' CAPTCHAs,

1    Authenticom used European CAPTCHA farms, such as Death by

2    CAPTCHA.  Authenticom's software would feed the Reynolds'

3    prompts to those farms and then inject their answers back into

4    the DMS.  Authenticom also used its own software tools to solve

5    Reynolds' CAPTCHA prompts, including one that used memory

6    ripping to obtain the correct answer.

7          As an additional security measure, Reynolds

8    implemented a suspicious user ID detection program, which would

9    look for and would disable accounts that appeared to be engaged

10   in unauthorized automated activity.  Authenticom engaged in an

11   elaborate cat and mouse game to avoid this detection program,

12   including using input spoofing to make it appear as if

13   Authenticom's commands to the DMS were coming from a physical

14   keyboard, and other measures designed to trick the DMS into

15   thinking that Authenticom was a human user.

16         All of this was done without Reynolds' permission.  In

17   fact, it was done over Reynolds' express objections.

18   Authenticom knew it was wrong, too, with employees expressing

19   discomfort about many of the actions it was taking, issuing

20   instructions not to discuss those actions outside the company,

21   and discussing the prison tattoos they were going to get as

22   data pullers.

23         In short, Authenticom engaged in a years-long campaign

24   of illegal self-help measures, designed to maintain its illegal

25   access to Reynolds' systems and software.  Those measures were

44

1    in place, and that campaign had been ongoing for several years

2    before the alleged antitrust conspiracy even started.

3           I'm trying to change the slide here.  Let's see if I

4    did it successfully.  Nope.  Well, apologize for the technical

5    difficulty.  There we go.

6           This motion asked the Court to measure Authenticom's

7    actions against the legal standards of two statutes, the DMCA

8    and the Wisconsin Computer Crime Act.  Our DMCA claim is for

9    circumventing technological measures that effectively control

10   access to a copyrighted work.

11          THE COURT REPORTER:  Excuse me.  Could you slow down

12   just a bit?  I'm having a little trouble keeping up with you.

13          MR. WILKINSON:  Sure.

14          THE COURT REPORTER:  Thank you.

15          MR. WILKINSON:  Our DMCA claim is for circumventing

16   technological measure that effectively control access to a

17   copyrighted work.  And our WCCA claim is for willingly,

18   knowingly, and without authorization, accessing computer

19   programs and credentials.  The attempt in this slide is to lay

20   out the key facts in exhibits, as well as the key cases.  When

21   you measure the technical facts against the law, we believe

22   summary judgment of liability is appropriate.

23          The key case, as noted at the top of the slide, is

24   actually this Court's order on the CDK's counterclaims against

25   Authenticom, where this Court joined the consensus of

1   *Ticketmaster* cases on the applicability of DMCA to CAPTCHA.

2   With respect to the suspicious-user ID evasion, the key case

3   there is the *MDY* case, which is the World of Warcraft case out

4   of the Ninth Circuit.  We believe that case is on all fours

5   with Reynolds' suspicious-user ID program and Authenticom's

6   efforts to evade it.  Determining the legality of Authenticom's

7   actions has significant ramifications for the antitrust claims

8   in this case, including our illegality defense, as Ms. Gulley

9   previously touched on, and Authenticom's damages model.

10          Authenticom has a number of defenses up to this

11  motion, many of these will be addressed by my colleague

12  Mr. Patrick as part of Authenticom's own MSJ on Reynold's

13  counterclaims.  To preview briefly, there's also what I'll call

14  an expert defense related to Ms. Miracle.  I'll address that in

15  the context of our Daubert motion against her.  We ask the

16  Court to hold as a matter of law that Authenticom's

17  infiltration of the Reynolds' system was a clear violation of

18  state and federal law.  Thank you.

19          THE COURT:  Okay.  Thank you very much.

20          And, I'm sorry that the -- Kris, that the timing is

21  definitely making people want to talk fast, and I promise I

22  won't cut anybody off if they're close and everybody has been

23  at least close.  Thank you.

24          But back to Mr. Ho again.  Okay, great.  Thank you.

25          MR. HO:  Thank you, Judge Dow.  To clarify the

1    relationship between this motion and the motion that's next up,

2    Docket 976.  This is Reynolds's partial summary judgment motion

3    on liability only for its DMCA and WCCA claims.  The next

4    motion is Authenticom's motion for summary judgment on all of

5    Reynolds's counterclaims.  So there's going to be overlap

6    between my comments on this motion and my argument on the next.

7    But for purposes of this motion, there are five reasons why we

8    think that summary judgment ought to be denied on Reynolds's

9    DMCA and WCCA counterclaims.

10           Number 1, the DMCA has an illegality defense that bars

11    enforcing conduct that the antitrust laws forbid.  That's the

12    Supreme Court decision in Kaiser Steel Corporation against

13    Mullins from 1982.  And Authenticom's antitrust claim is that

14    the technological blocking measures that Reynolds is talking

15    about were in furtherance of the unlawful conspiracy with CDK

16    to block Authenticom and other third-party integrators from the

17    market.  And so if Authenticom's antitrust claims survive and

18    proceed to trial, Reynolds cannot be entitled to summary

19    judgment.  Those counterclaims also have to proceed to trial.

20    And we think that that's the easiest way for the Court to

21    resolve Reynolds's motion for partial summary judgment.

22           Second, Authenticom's access was authorized by

23    Reynolds under both contract and copyright law.  This is an

24    argument that's really primarily an argument why we believe

25    Authenticom is entitled to summary judgment.  But even if

1    it's -- Authenticom is not entitled to summary judgment,

2    there's sufficient ambiguity in the contracts, at the very

3    least, for a jury to find that Authenticom was authorized, as

4    well as the sufficient factual basis for Authenticom to be

5    found to have been dealer's agent, which is what the contract

6    permitted.  So if we don't win on summary judgment, we're at

7    least -- it's at least sufficient to defeat Reynolds's motion

8    for summary judgment.

9         Number 3, there is no nexus to a copyright violation,

10   which is something that the DMCA requires.  The DMCA says that

11   it does not affect rights, remedies, limitations, or defenses

12   to copyright infringement, including fair use.  That's Section

13   1201(c)(1).  And as a result, if Authenticom has defenses to

14   infringement, then Reynolds cannot prevail on its DMCA claims.

15        And we think that there are two defenses that warrant

16   trial.  One is a fair use defense, under the Seventh Circuit's

17   decision in Assessment Technologies of Wisconsin against Wire

18   Data from 2004, 350 F.3d 640.  We think a jury could easily

19   find that Authenticom's use -- I'm sorry, any copyright

20   infringement -- there is no copyright infringement because of

21   fair use.  And, second, there's copyright misuse, which is also

22   provided for under the *Wire Data* decision.  Here we assert, and

23   there's evidence, that DMS providers are leveraging their DMS

24   monopoly to control data that belongs to the dealers.

25        Fourth, Reynolds' claims are barred by the statute of

1    limitations.  Acts prior to June 29th, 2015, are time barred.

2    Reynolds says that the counterclaims should relate back to

3    Authenticom's complaint.  Even then, acts prior to May 1, 2014,

4    would be time barred.  And there's no evidence that Authenticom

5    engaged in violations of the DMCA after that date.  With

6    respect to the CAPTCHA that Mr. Wilkinson was talking about,

7    that ended before May 1, 2014; that's Docket Entry 977-167.

8         The database of CAPTCHA answers that Reynolds talks

9    about, that was phased out in 2012.  Something called Menu Walk

10   was disabled by July 3rd of 2013.  So if the Court pays careful

11   attention to the dates on which the alleged DMCA violations

12   occurred, I think there's no real dispute that the claims are

13   time barred.

14        And, finally, there are three additional defenses to

15   DMCA liability that I will touch on very, very briefly.  One,

16   Authenticom didn't circumvent technological measures because it

17   actually satisfied those technological measures in their

18   ordinary operation.  I will talk more about that in my next

19   motion.  The technological measures didn't actually protect any

20   copyrighted works.  Authenticom could gain access to the

21   asserted copyrighted works without ever encountering a

22   technological measure, and those technological measures did not

23   effectively control access.  So those are three additional

24   reasons -- defenses to DMCA liability that we think foreclose

25   summary judgment.

1          THE COURT:  Okay.  Thank you, Mr. Ho.

2          So it looks like you're now going to go to the flip

3     side and go on the offensive here, and that's for 976.  And

4     just a preview of coming attraction, I think we'll do 976, 963,

5     and 949, and then take a 10-minute break just so Kris can

6     stretch her fingers and recover her sanity before she has to

7     type for another hour and a half.  So, Mr. Ho, I guess you're

8     up first on 976.

9          MR. HO:  Thank you, your Honor.  Let me just pick up

10    on two of the points that I just made in the context of our

11    opposition to Reynolds's summary judgment motion.  And those

12    are, one, that Reynolds's counterclaims failed because

13    Authenticom was authorized under Reynolds's DMS contract to use

14    the DMS.  And then No. 2 is some specific independent reasons

15    why summary judgment should be granted on Reynolds's DMCA

16    claims, which are the claims that are most significant for

17    purposes of liability.

18          With respect to authorization under the contract, that

19    question breaks down into three sub-questions.  One, did

20    Reynolds's contracts with dealers allow agents to use the DMS?

21    Two, was Authenticom an agent of the dealers?  And, three, do

22    each of Reynolds's counterclaims require lack of authorization

23    as the element?  And we submit that the answer to all three of

24    those questions is yes and that all of the counterclaims

25    therefore fail.

1            On the first of the three questions, Reynolds's

2    contracts unambiguously allow dealers and their "agents" to use

3    Reynolds's DMS.  And the agreements are at Dockets 977-20 and

4    977-22.  The license says, "You may use the licensed matter for

5    the internal data processing needs of your automotive business.

6    And then there's a list of defined terms.  And those defined

7    terms define "you" or "your" as the entity defined in the

8    authorization letter, and all of your employees, agents, and

9    representatives.  So we think it's unambiguous that the

10   contracts with the dealers authorize dealers' agents to use the

11   DMS.

12            Second, Authenticom was the dealer's agent because the

13   Authenticom acted on behalf of the dealer, and subject to the

14   dealer's control; that's classic agency law.  We cite a

15   Wisconsin Supreme Court case called *Lang* that sets out that

16   traditional test.  And the undisputed evidence here shows that

17   Authenticom was accessing data for the dealer and subject to

18   the dealer's control.  The dealer could control Authenticom's

19   credentials, which were revocable at any time.  The dealer

20   could control which data Authenticom accessed, down to the

21   field that Authenticom accessed.  The dealer could control what

22   third parties Authenticom set the data to, again, down to the

23   field level.  And the dealer could control the frequency with

24   which the data was accessed.  There's really no material

25   dispute, I don't think, that Authenticom was acting for the

1    dealers, not for itself or anybody else.

2         And, third, all of Reynolds's counterclaims require

3    lack of authorization.  The slide that Reynolds put up in the

4    last motion actually says "unauthorized" in many of them, but

5    we set out in our brief why as a matter of text and case law

6    all of the counterclaims have, as an element, that

7    Authenticom's access be unauthorized.  And because

8    Authenticom's access was, in fact, authorized by Reynolds's

9    contracts with the dealers, all of those claims fail.

10        With respect to the DMCA, let me just elaborate on

11   those three additional defenses to liability that I concluded

12   the last motion with.  One is there was no circumvention of any

13   technological measure, and because circumvention requires that

14   you go around the ordinary operation of that technological

15   measure.  So a lock works by requiring you to use a key,

16   picking the lock circumvents it, but using a copy of the key

17   doesn't.  And your Honor's decision in the *Navistar* case

18   illustrates that principle.  If your Honor recalls, the New

19   Baltimore Garage gave passwords to a third party, who used the

20   password to access Navistar's computer system without

21   Navistar's authorization.  And your Honor held that the use of

22   those passwords, even without authorization, didn't constitute

23   circumvention under the DMCA, because it didn't involve

24   descrambling, decrypting, or otherwise avoiding, bypassing,

25   removing, deactivating, or impairing the technological measure,

1    which is the statutory language.

2          Applied here, that principle requires summary judgment

3    for Authenticom.  The two key technological measures that we're

4    talking about are login prompts and CAPTCHA.  With respect to

5    login prompts, using name and password, it's undisputed that

6    Authenticom used dealer-authorized credentials, just like in

7    the *Navistar* case.  So that is not circumvention.

8          And with respect to CAPTCHA, as I'm sure your Honor

9    knows, when you go onto a site and it has a CAPTCHA prompt, the

10   only think that Authenticom is alleged to have done is provided

11   the answers that the CAPTCHA prompt required.  That's the

12   equivalent of using the key or using the password, not

13   descrambling or otherwise avoiding the technological measure.

14         THE COURT:  Mr. Ho, you're well into stoppage time.

15         MR. HO:  Okay.  Very good.  I will just cite one more

16   case on the question of whether the technological measures

17   protected any copyrighted works, and that's the *Lexmark* case.

18   If you can get to the technological work, the copyrighted work,

19   in a different way without going through the access control,

20   *Lexmark* says that the access control doesn't protect that work

21   and that the undisputed evidence shows that that was also true.

22   Thank you, your Honor.  Sorry for going over.

23         THE COURT:  No, that's okay.  Thank you, Mr. Ho.

24         Mr. Patrick, I'm going to give you an extra minute.

25   So help yourself.

1          MR. PATRICK:  Thank you, your Honor.  I'm going to

2     share my screen here.  Do you have my slide?  Screen share

3     working?

4          THE COURT:  Sorry.  My mute button doesn't work so

5     well, but I do have it.  Thank you.

6          MR. PATRICK:  Appreciate it.  Justin Patrick for

7     Reynolds and Reynolds.  Authenticom's motion for summary

8     judgment should be denied, your Honor.  The evidence of

9     Authenticom's illegal hacking into the Reynolds system is

10    simply overwhelming.  I'm going to focus on the authorization

11    defense, some key cases under the DMCA and the limitations

12    issue.  As to the rest, I will direct the Court to our

13    briefing.

14         Turning first to the authorization defense.  This

15    defense is both meritless and irrelevant.  The Reynolds's

16    license strictly prohibits Authenticom's access.  You don't

17    have to look any further on this then Authenticom's own

18    pleadings, arguments, and stipulations at every prior phase of

19    this case right up until summary judgment.  The license

20    provisions that we identified there on the slide from the

21    master agreement and the customer guide repeatedly and

22    emphatically and unambiguously state that only dealership

23    employees can access the DMS, not other third parties like

24    Authenticom.  Those provisions expressly restrict, under the

25    clear text of the license, that first sentence that

1    Authenticom's entire argument is based on.  Authenticom's

2    briefing proposes a lot of different ways to explain these

3    away.  Those are wholly unsupported and ultimately boil down to

4    asking the Court to ignore those clear prohibitions.

5         Furthermore, even if the license did allow access by

6    agents, the facts and law simply aren't there.  Authenticom is

7    not an agent.  Dealers do not have the right or ability to

8    control Authenticom's performance of its contracts.  That is

9    clear under any of the states' laws that any party has

10   proposed; that argument just fails.

11        Finally, this entire defense is simply irrelevant.

12   For the reasons that are set out in our brief, the license is

13   not a defense to the DMCA claim.  Both the Second and Ninth

14   Circuits have so held.  They held correctly.  For purposes of

15   the CFAA and the common law claims, Reynolds revoked any

16   authorization that Authenticom had in the past through a 2015

17   cease and desist letter.  This Court has already held that that

18   revocation was legally effective.

19        Turning to the DMCA, your Honor.  You've heard about

20   the facts in some detail.  What I want to focus on are some key

21   cases.  Briefly, I want to address the illegality defense at

22   the outset.  That fails both on the facts and the law.  It

23   fails on the facts because all of these measures were in place

24   well before any alleged antitrust conspiracy.  There's no

25   relationship between them and the conspiracy.  It fails on the

1   law for the reasons set out in our reply brief in support of

2   our affirmative motion.

3           The three cases I want to focus on here are, first,

4   Docket 506 in this case.  There the Court rejected precisely

5   the arguments that Authenticom raises and relies on now

6   regarding the CAPTCHA controls.  Every single court that has

7   ever considered this issue, and there are many of them, has

8   held the same.  The consensus is unanimous in Reynolds's favor

9   here, your Honor.

10          Second, the DVD decryption cases, *Corley* and

11  *Reimerdes*.  These cases are foundational and influential.  They

12  are as close as you can come to canon in the DMCA case law, and

13  they establish that Authenticom's key arguments as to the

14  meaning of the statute are simply meritless.  First, they show

15  that there is no authorization confirmation requirement,

16  defeating Authenticom's core argument as to whether the

17  measures were effective or not.

18          Second, they show that unauthorized use of a real

19  access code or access key is actionable as circumvention,

20  contrary to Mr. Ho's argument a few minutes ago.  Indeed, what

21  we show in our brief, your Honor, is that is one of the most

22  common fact patterns from DMCA liability that you're going to

23  find in the cases.

24          Finally *MDY*, the World of Warcraft case, establishes

25  that defenses to copyright infringement, including fair use and

1    misuse, are not defenses to the DMCA because there is no

2    infringement-nexus element. Section 1201(c) of the DMCA has no

3    bearing.  It does not import a fair use defense to the DMCA.

4    Authenticom's fair use defense also fails on the merits here

5    for the reasons that are discussed in our briefing.  The most

6    notable one is *Wire Data* is wholly distinguishable.

7          Turning finally to limitations, your Honor.

8    Reynolds's counterclaims are compulsory under *Moore vs. New*

9    *York Cotton Exchange*.  Here the key facts for our counterclaims

10    are affirmatively pleaded on the face of Authenticom's

11    complaint.  This court has already adopted the majority rule

12    that compulsory counterclaims relate back to the date of the

13    complaint.  And we set out in our briefs extensive evidence of

14    post-limitations-date illegal conduct by Authenticom.

15          Your Honor, the evidence of Authenticom's illegal

16    conduct is simply overwhelming.  Authenticom's attempts to

17    excuse its behavior are legally meritless.  The motion should

18    be denied.  Thank you.

19          THE COURT:  Okay.  Thank you to both counsel on 976.

20    We'll do two more before the break.  We've got 963, which is

21    the Dealers' motion.  And so I think we have Mr. Kupillas for

22    the Dealers and Mr. Fenske for CDK; is that right?

23          MR. KUPILLAS:  Yes, your Honor.  Good afternoon.

24          THE COURT:  Okay.  Fire away.

25          MR. KUPILLAS:  CDK asserts counterclaims against

Dealers for breach of contract and violations of the DMCA.  CDK

alleges dealers breached their contracts by handing out their

DMS log-in credentials to third parties.  CDK isn't seeking

actual damages for those claims, only declarative and

injunctive relief and nominal damages.  But actual damages are

a required element of CDK's claims, as the Seventh Circuit's

decision in the TAS Distributing case makes clear.  CDK offers

no evidence of actual damages, nor that they're too difficult

to quantify, only that it wasn't worthwhile to have an expert

calculate them.  Without this required element to its claims,

CDK can't obtain any relief.

CDK also doesn't show the potential of irreparable

harm that's necessary for injunctive relief.  Since CDK claims

it's able to successfully disable third-party logins.  CDK can

prevent any harm.  Any injuries from future breaches are

compensable through money damages.  And CDK's own reports show

that third parties are not currently using dealers' logins to

access the DMS.  CDK also waived its ability to enforce the

relevant contract provisions.  CDK did not enforce them for

years, instead telling dealers they could share logins with

third parties.  And CDK did not require the specific written

notice required to retract its waiver.

CDK asserts DMCA claims against 11 dealerships.  But

as Mr. Ho explained, CDK can't establish the technological

elements of its claims.  For example, CDK can't show that its

1   DMS software and screen displays are protected by copyright.

2   The only evidence CDK offers in support are two declarations

3   from Norton Rodriguez, which should be excluded because he

4   wasn't identified in CDK's Rule 26(a) disclosures or during

5   discovery.  Under Rule 37(c)(1) and the Seventh Circuit's

6   *Tribble* decision, those declarations must be automatically

7   excluded.

8           CDK can't justify its failure to identify Rodriguez.

9   Dealers have been significantly prejudiced, as they were unable

10  to request his documents, take his deposition, or submit expert

11  testimony about his bald assertions.  And CDK can't cure the

12  prejudice it has caused by offering his deposition now.  And

13  without those declarations, CDK has no evidence that its DMS

14  software or screen displays are protected under copyright law.

15          CDK also fails to offer evidence of DMCA violations by

16  any individual dealership.  Instead, CDK lumps them together

17  into two groups, the three Warrensburg dealerships and the

18  eight Continental dealerships.  But such group evidence of

19  collective responsibility is insufficient at summary judgment.

20  And the DMCA statutory damages provision, unlike the Copyright

21  Act, does not provide for joint and several liability.

22  Additionally, your Honor, dealers join in the DMCA nexus

23  argument that Mr. Ho has already addressed.

24          CDK asserts secondary liability claims under the DMCA

25  against the eight Continental dealerships, based on

1    Authenticom's alleged circumvention of CDK's CAPTCHA prompts.

2    As to contributory liability, CDK fails to raise a genuine

3    dispute that the Continental dealers knew or should have known

4    that Authenticom would respond to CAPTCHA the way it did.  CDK

5    heavily relies on a single email exchange between Authenticom

6    and Continental.  But those emails say nothing about how

7    Authenticom would respond to CAPTCHA.  And CDK can't identify a

8    single act taken by dealers to contribute to Authenticom's

9    CAPTCHA responses, as is required for contributory liability.

10   For vicarious liability, CDK fails to show that the Continental

11   dealers supervised Authenticom's responses to CAPTCHA or had a

12   direct financial interest in those responses.

13       CDK also alleges the three Warrensburg dealerships

14   violated the DMCA by allowing Authenticom's Profile Manager

15   software program to restore disabled log-in credentials.  CDK's

16   claim that Profile Manager re-enabled 36 Warrensburg logins is

17   based on unreliable expert testimony, as I will address later

18   today.  And there were no DMCA violations where Profile Manager

19   merely ran but didn't re-enable any disabled logins, because no

20   CDK access controls were circumvented.  In fact, CDK rendered

21   Profile Manager ineffective in April 2017.  CDK's claim that a

22   completely ineffective program impaired its access controls

23   shows the absurdity of CDK's arguments.

24       As to primary liability CDK alleges that Authenticom

25   developed and implemented Profile Manager on hundreds of dealer

1  networks.  Those binding admissions negate any primary

2  liabilities of Warrensburg dealers.

3  And, finally, as to vicarious liability, CDK fails to

4  offer any evidence that any Warrensburg dealers had a direct

5  financial interest in Profile Manager during the 36 days it ran

6  before being rendered completely ineffective.  Thank you, your

7  Honor.

8  THE COURT:  Okay.  Thank you very much, Mr. Kupillas.

9  Mr. Fenske, I guess you're the closer on this one and

10  the closer on the next one, right?

11  MR. FENSKE:  That's correct, your Honor.

12  THE COURT:  Okay.

13  MR. FENSKE:  Let me share my screen.  Can you see my

14  screen, your Honor?

15  THE COURT:  I can.  Thank you.

16  MR. FENSKE:  All right.  Your Honor, on the breech of

17  contract claim, the dealers do not dispute that the jury could

18  conclude that dealers breached their contract by providing

19  log-in credentials to third parties to access the DMS and

20  screen scrape data.  Instead, Dealers assert two defenses,

21  waiver and unclean hands, which they accurately abandon in

22  their reply brief, that either fail as a matter of law or are

23  subject to factual disputes that cannot be resolved at summary

24  judgment and described in our briefing.

25  As to relief, Dealers claim that CDK is entitled to no

1    relief just because CDK is not seeking money damages on this

2    claim.  To be clear, CDK absolutely did suffer monetary harm

3    from the Dealers' conduct.  The entire point of Dealers' claims

4    in this case is that the Dealers' vendors supposedly used

5    hostile integrators to obtain data, instead of paying for that

6    data through 3PA.

7            But recovering that money is not why CDK is pursuing

8    this claim.  We simply want to make sure that this conduct

9    stops.  The Dealers claim the right to hand out log-in

10   credentials to any third party they wish, even if CDK objects.

11   CDK is entitled to relief making clear the Dealers can no

12   longer do so.  The authority I'm referring to, your Honor, is

13   on the slide.

14           As to the DMCA claim, CDK brings a DMCA claim against

15   two dealership groups, Continental and Warrensburg.  You just

16   heard in connection with Reynolds' counterclaims why

17   Authenticom violated the DMCA when invading defendant's

18   security measures.  Today I will focus on the evidence of the

19   Continental and Warrensburg dealerships' personal participation

20   in Authenticom's misconduct and will rest on our briefs as to

21   our other arguments.

22           As to Continental, the jury could easily determine

23   both that Continental had sufficient knowledge of Authenticom's

24   use of automated means to respond to CDK's CAPTCHAs and

25   materially contributed to it two grounds on which Continental

1    seeks summary judgment.  As to knowledge, CDK need only show

2    that Continental should have known or was willfully blind to

3    Authenticom's circumvention.  The evidence easily establishes

4    either requirement and is summarized in our statement of

5    additional facts, 94 through 98.

6         In summary, that evidence centers on the knowledge of

7    the Continental IT director and the person who personally

8    worked with Authenticom to help evade CDK's security measures.

9    As just one example, in September of 2017, Johnson received an

10   email -- that's the ID director, your Honor -- announcing CDK's

11   plan to roll out CAPTCHA prompts.  That email said that the

12   entire purpose of the CAPTCHA prompts was to "help prevent

13   automated systems from connecting to the CDK DMS."

14        Johnson testified that he was certain this would

15   impact Authenticom's pulling scripts and forwarded the email to

16   Authenticom's CEO, who replied, essentially, that CAPTCHA was

17   no big deal because Authenticom had figured out how to deal

18   with it on the Reynolds' DMS for years.  Mr. Johnson testified

19   that he did not ask Authenticom how it planned to work around

20   CAPTCHA because he didn't care so long as Authenticom got the

21   data.  "So long as Authenticom's program is working and

22   extracting our data," he testified, "I don't stay up at night,

23   you know, wondering how their program is getting the data."

24        That evidence easily establishes that Continental

25   should have known, because Authenticom uses automated scripts

1    to pull data and was willfully blind to the fact that

2    Authenticom would use automated means to respond to CDK's

3    CAPTCHAs.  That same evidence also shows that Continental

4    materially contributed to Authenticom's violation under the

5    test the Seventh Circuit layed down in the Flava Works

6    decision.  Put simply, Authenticom could never have

7    circumvented CDK's CAPTCHAs without Continental's active

8    efforts to supply it with user accounts over CDK's objection.

9         As to joint and several liability, Continental argues

10   that CDK's claims fail because the Continental dealerships as a

11   whole are not jointly liable.  That's wrong legally and

12   factually.  The DMCA recognizes joint and several liability.

13   That's the *Stony* decision and other decisions referenced in our

14   brief.  And here Mr. Johnson was testifying for and acting on

15   behalf of all of the Continental dealerships.

16        As to Warrensburg, Warrensburg does not dispute that

17   in March of 2017, Linda Smith, the controller for all three

18   Warrensburg dealerships worked directly with Authenticom to

19   install Authenticom's Profile Manager tool.  It does not

20   dispute Profile Manager was an automated computer script

21   designed to re-enable user accounts that CDK disabled.

22   Defendant's Exhibit 485, your Honor, is an email chain showing

23   the Warrensburg controller working with Authenticom to install

24   the Profile Manager script.

25        Warrensburg, like Authenticom, argues that it's not

1    joint and severally liable across all three of its dealerships.

2    That's wrong for the reasons laid out in Statement of Fact

3    No. 100.  But, regardless, there is evidence in the record from

4    which the jury could tie the violations to a single Warrensburg

5    dealership, Marshall Chrysler.  And, again, that's Defendant's

6    Exhibit 485, your Honor.  Thank you.

7              THE COURT:  Okay.  Thank you, Mr. Fenske.  So we have

8    one more.  It's AutoLoop's motion on the counterclaims.  It' a

9    shorty.  And we've got Mr. Panner for the movant and

10   Mr. Fenske, you're back for the respondent.  So, Mr. Panner,

11   fire away.

12             MR. PANNER:  Thank you very much, your Honor.  Sorry

13   about that confusion with the mute.  The basic claim that's at

14   issue here is CDK is claiming that AutoLoop breaches the

15   managed interface agreement between CDK and AutoLoop, which in

16   our views prohibits AutoLoop from retrieving data from CDK's

17   DMS, except through the 3PA integration-service facility.  And

18   that's -- the provision that's at issue is Section 1(f), which

19   refers to the fact that AutoLoop is not to otherwise access,

20   retrieve, license, or transfer data from CDK's DMS.  There's

21   going to be a dispute about the legal construction of that, but

22   for purposes of summary judgment, we've assumed that there's

23   legal validity to the theory that CDK is pursuing, which is

24   that AutoLoop obtains data from The Auto, which is a company

25   that obtains -- legitimately obtains data from CDK's DMS,

1   legitimately provides some data from that DMS to certain

2   applications pursuant to permissions from CDK.  The argument is

3   that in the provision that's at issue here exceeded that --

4   that permission.

5           Now, the basic defense to liability here is that

6   there's no evidence that AutoLoop, in fact, obtained data from

7   The Auto that came from the CDK DMS.  There's no dispute that

8   The Auto obtained vehicle inventory data from multiple sources,

9   and so the burden was on CDK to show that AutoLoop in fact

10  received data that originated on CDK's DMS from The Auto, and

11  they failed to do it.  They failed to present that evidence in

12  opposition to our motion.

13          Now, the key dispute is over the testimony of Cox's

14  30(b)(6) witness, Brian Green.  Now he testified squarely that

15  Cox did not share any data that pertains to data originating

16  from CDK's DMS.  That's at Docket 1069, Exhibit 48, and it's

17  cited in our reply.  And CDK simply never elicited from

18  Mr. Green testimony that supported the claimed breach.  And

19  there's -- that testimony that's at issue there is set out in

20  Exhibit 8 to our motion.  CDK essentially wants the Court to

21  accept that because The Auto had the technical ability to

22  provide data to AutoLoop, that it should assume that The Auto

23  did, at least in the absence of evidence that that data was

24  somehow excluded from the data that The Auto provided to

25  AutoLoop.  But that puts the burden of establishing the claim

1   on the wrong party.  The burden is on CDK, and speculation that

2   The Auto could have provided such data to AutoLoop is not

3   enough.  That's the *Zuppardi* case, 779 [sic] F.3d 644.

4        Now, there's also a basic failure of proof with

5   respect to damages.  There's -- at this point, if they are

6   seeking any actual damages, they don't have proof of it, and

7   they're seeking only nominal damages.  But the difficulty is

8   that they don't have any evidence of damages at all, and as

9   Mr.  Kupillas mentioned -- mentioned in his argument, the

10  *Tas Distributing* case, 491 F.3d 625, establishes or reflects

11  that the rule under Illinois law that in the absence of

12  evidence of actual damage from a breach, there's no claim.

13  It's an element of the cause of action.  So that defeats not

14  only damages, but it also defeats the -- their injunction and

15  declaratory claims as well.

16       Now, the key point here, I think, is that there is

17  simply no requirement under the contract that AutoLoop obtain

18  data from CDK.  CDK simply argues that AutoLoop wasn't allowed

19  to obtain CDK's -- data that was on CDK's DMS from CDK.

20  There's no evidence that but for the supposed breach, AutoLoop

21  would have purchased any data from CDK.  It could have gotten

22  it elsewhere.  And that's the only supposed source of damages.

23  If you look at CDK's brief at 8211, the only basis for damages

24  is supposed lost revenues from AutoLoop.  And they abandoned --

25  they had originally claimed there was (inaudible) damages

1   associated with monitoring of the system.  They've abandoned

2   that claim in response to our motion.  And so in short,

3   they're -- the motion for summary judgment should be granted.

4           THE COURT:  Okay.  Great.  Thank you, Mr. Panner.

5           Mr. Fenske, you are the last to speak before we take a

6   break, so go ahead, sir.

7           MR. FENSKE:  Wonderful.  Thank you.  I'm going to

8   share my screen again, your Honor.  Will you let me know if you

9   have got it?

10          THE COURT:  Yes.  Got it.

11          MR. FENSKE:  Your Honor, a central goal of CDK's 3PA

12  program is to ensure the accuracy, integrity, and security of

13  data maintained in the DMS.  Toward that end, CDK required

14  vendors who were certified in the 3PA program to promise not to

15  send or receive DMS data from third parties other than through

16  3PA.  That allowed CDK and dealers to understand who has the

17  data and for what purpose furthering accountability and

18  responsibility for stewardship of the data.  In this case a

19  jury could conclude that AutoLoop, whose apps are certified in

20  the 3PA program and who agreed to 3PA's terms, breached its

21  contract when it received inventory data from Cox vendor

22  The Auto outside the 3PA program that originated from the DMS.

23          It is important to note what AutoLoop does not dispute

24  at summary judgment.  It does not dispute, as you heard from

25  Mr. Panner, that its contract prohibits AutoLoop from receiving

any data from the DMS other than through 3PA.  It does not

dispute that AutoLoop received inventory data -- dealership

inventory data from The Auto.  And it does not dispute that The

Auto obtains inventory data from CDK's DMS.  The only question

before the Court, therefore, is whether a reasonable jury could

conclude that the inventory data that AutoLoop obtained from

The Auto contained at least some data originally from the CDK

DMS, and the jury plainly can.

The testimony of Cox's Rule 30(b)(6) witness, Mr.

Green, is alone enough for the jury to reach this conclusion.

Mr. Green testified that The Auto syndicates inventory data,

and he defined syndication to mean providing merchandising

friendly information, taking it and putting it "into the raw

data that's extracted from the DMS."  This is AutoLoop Exhibit

8, your Honor, transcripts pages 117 and 122.  In Other words,

The Auto takes inventory data from CDK's DMS, adds to it

information like pictures of cars, and then provides it to

third parties.  And Mr. Green testified that AutoLoop "receives

that merchandised information from The Auto."  That is enough

to deny summary judgment, your Honor, but there is additional

evidence as outlined in Statements of Additional Facts 126

through 128.

As to relief, as with the Dealers, AutoLoop claims

that even if it breached its contract, CDK is entitled to no

relief because it's not seeking monetary damage.  But there is

1   clear evidence that CDK suffered monetary harm.  AutoLoop

2   admits it receives inventory data from multiple dealers from

3   The Auto for which it does not pay CDK, depriving CDK of 3PA

4   fees to which it is entitled.  But, again, recovering that

5   money is not what CDK cares about.  AutoLoop's breach is

6   ongoing and we want it to stop.  And that's why we have brought

7   this claim.  Thank you, your Honor.

8           THE COURT:  Okay.  Thank you, everybody.  Okay.  Kris,

9   are you there?

10          THE COURT REPORTER:  I am.

11          THE COURT:  I have got 3:16.  Why don't we say 3:30.

12          THE COURT REPORTER:  Okay.  Sounds good.

13          THE COURT:  And we have the MVSC, which is two

14  motions.  And then we have ten *Daubert* motions, but many of

15  them are two minutes per side.  And I think you all can very

16  much assume that I know the *Daubert* standards really well, so

17  just stick to the application and not the law.  I know some of

18  you all I've worked on *Daubert* motions with way back in the day

19  and on both sides of the case, so if that helps you stay within

20  the lines, that would be great.  So let's start up at 3:30.

21  Thank you so much, everybody.  This has really been a huge

22  help, and I'm already thinking about what I'm going to ask you

23  next time around.  See you at 3:30.  See you then.

24          (Recess.)

25          THE COURT:  Good to see you again.  It looks like our

1    next two motions are a two-round battle between Mr. Caseria and

2    Mr. Nemelka.  So as long as those guys are ready to go.  I see

3    Mr. Caseria.  And I see Mr. Nemelka.  Okay.  Excellent.

4         All right.  So we'll start the battle with 954, and

5    then we'll go backwards to 978, and they're both Reynolds'

6    motions with MVC as the opponent, so Mr. Caseria gets the first

7    word and Mr. Nemelke the last.

8         So, Mr. Caseria, I will turn the microphone over to

9    you.

10        MR. CASERIA:  Thank you, your Honor.  And I will just

11   pull up my slides here.  Can you see those okay?

12        THE COURT:  I can.  Thank you.

13        MR. CASERIA:  Okay.  Thank you, your Honor.  Here are

14   the high points on Reynolds' motion for summary judgment in the

15   MVSC case.  MVSC is a vendor that provides electronic vehicle

16   registration or EVR services.  EVR vendors partner with the

17   state's DMV to help dealers issue registration, plates and

18   title on new cars sold at a dealership.  MVSC alleges a

19   different and unusual conspiracy.

20        According to MVSC, Reynolds and CDK and their joint

21   venture CVR, conspired to block MVSC from three different

22   methods of accessing data on Reynolds or CDK DMS.  Those three

23   methods are certified integration, manual reporting, and

24   hostile integration.  The alleged purpose of this conspiracy

25   was to destroy MVSC and make CVR a monopolist.  Now, as

1    described in our motion at pages 20 to 24, this conspiracy

2    makes no economic sense.  In particular, it makes no sense for

3    defendants to conspire to make CVR a monopolist by blocking

4    only one of its competitors, MVSC, and ignoring all others.

5    It's undisputed that at least four other EVR vendors have been

6    admitted to Reynolds' certified RCI program since 2010.

7              In addition, the undisputed facts show that MVSC

8    itself could have joined Reynolds' certified RCI program at

9    prices comparable to what other EVR vendors paid to Reynolds

10   for the one RCI interface that was actually needed to provide

11   EVR services.  That's established by the eight unequivocally

12   undisputed facts at the top of your screen.  Three times MVSC

13   asked Reynolds for quotes, and three times Reynolds provided

14   quotes.  Three times MVSC made the decision to walk away.

15             MVSC repeatedly insisted on asking for quotes for

16   interfaces that it concedes it did not need for EVR.  MVSC's

17   desire for a special lower price or a special package with more

18   interfaces that it didn't need does not state an actual

19   antitrust claim.  And I would direct your attention to the

20   *Klor's* and *De Fillipo* cases we've cited.  These unequivocally

21   undisputed facts regarding Reynolds' actions simply cannot be

22   reconciled with the conspiracy allegations by MVSC, regardless

23   of what MVSC's counsel may tell you about documents or what

24   spin they may put on various communications.

25             With respect to manual reporting, it's undisputed that

manual reporting was the near-exclusive method by which MVSC
actually accessed data from the Reynolds' DMS during the
relevant period; that's Fact 13.  MVSC promoted manual
reporting tools to its customers, telling them it was fast,
reliable, and secure; that's Fact 12.  MVSC also developed its
own software tool called Electro that actually works with
manual reporting and which it concedes has not been blocked by
defendants.  That's Fact 20.  Perhaps most notably, MVSC's own
experts abandoned this aspect of the conspiracy and do not
calculate any damages from it.

Now MVSC will probably tell you that manual reporting
is not as good as certified integration options such as RCI or
that they can't compete effectively with manual reporting.
Well, if MVSC wanted to join RCI, all they had to do was pay
for it as I've already described.  The manual reporting was
more than enough for MVSC to compete effectively.  In fact, it
thrived and succeeded because of manual reporting.

So let's talk about what happened to MVSC in the four
state markets at issue.  In California, it's undisputed that
MVSC went from 36 percent market share in 2014 to over
61 percent market share in 2019, while CVR's decreased; that's
Fact 62.  This was a period when MVSC was accessing data from
Reynolds almost exclusively using manual reporting.  MVSC
didn't just get by, it dominated.

This type of market-share growth and market-leading

1    position after years of alleged conspiracy to destroy it is the

2    same type of fact that *the Supreme Court in Matsushita* found to

3    be "strong evidence that the conspiracy does not in fact

4    exist."

5          In Wisconsin, it's undisputed that MVSC has not been

6    authorized by the state to provide EVR services.  In 2013, the

7    state informed MVSC that it rarely accepts new EVR vendors

8    because of massive start-up costs required from the state.

9    MVSC applied anyway, and in 2014 the state rejected its

10   application.  In 2017, the state sent a letter to MVSC

11   informing it that the state was closed to new EVR applicants

12   and had been closed and might reopen in 2019.  It's undisputed

13   that six other DVR applicants had their applications denied by

14   the state since 2005.  With these undisputed facts, 66 to 69

15   show us is that MVSC would have encountered the same

16   difficulties in Wisconsin regardless of what Reynolds did.  The

17   Court in *RSA Media* held that when a state's regulatory scheme

18   is to blame for plaintiff's inability to conduct business,

19   summary judgment should be granted to the defendant.

20         In Illinois the state imposed a lengthy two-step

21   approval process on MVSC that took years to complete.  Reynolds

22   didn't do that.  In Virginia there was no harm.  The state

23   never expressed any concerns with MVSC's level of integration

24   and it entered the market in 2017 using manual reporting.

25         I haven't mentioned hostile integration yet, but the

1    facts are similar to what you've already heard.  There was no

2    parallel conduct because there was no conspiracy.  MVSC stopped

3    using hostile integration on Reynolds by 2014, but was able to

4    continue using hostile integration on CDK until 2017, three

5    years later.

6         Your Honor, the undisputed facts I've highlighted

7    today do not tend to exclude the possibility that independent

8    conduct as required by *Matsushita*.  To the contrary, they

9    actually exclude the possibility of MVSC's alleged conspiracy.

10        Finally, even assuming the existence of this

11   conspiracy, it's not plausible that it continued past the date

12   of MVSC's October 2019 settlement with CDK, as MVSC and its

13   damages expert have asserted.  Your Honor, at a minimum,

14   dismiss any claims for damages based on an alleged conspiracy

15   continuing after the date of settlement, as the court in *Brand*

16   *Name Prescription Drugs* did.

17        And, finally, I'll just note that the settlement

18   itself has not yet been produced.  We raised this issue with

19   Judge Gilbert a year ago and he denied our request as

20   premature.  In light of the issue I just raised, and also in

21   light of this week's stipulated addition of Reynolds'

22   affirmative defense of setoff, we reiterate our request for an

23   order requiring MVSC to produce the settlement agreement.

24   Thank you, your Honor.

25        THE COURT:  Sorry.  On that last point, given the 1300

1    docket entries, if you want to reiterate the request, please do
2    it in a motion.
3              MR. CASERIA:  Understood, your Honor.  Thank you.
4              THE COURT:  Otherwise it may get lost in the thousand
5    pages.
6              MR. CASERIA:  Understood.  Thank you.
7              THE COURT:  Okay.  Mr. Nemelka, you have the back end
8    of this one and the next one, so go ahead, sir.
9              MR. NEMELKA:  Good afternoon, your Honor.  Mike
10   Nemelka here for MVSC.  Thank you for holding these hearings.
11   As a matter of how these motions fit together, the core
12   antitrust conspiracy that has been discussed already is also at
13   issue in MVSC's case.  And so MVSC's case will go forward with
14   the denial of summary judgment on that conspiracy claim common
15   to the MDL.
16             So I'll turn my attention to the conspiracy that is
17   unique to MVSC, the group boycott by CDK and Reynolds to
18   exclude MVSC from their 3PA and RCI programs.  To complete its
19   work, MVSC needs certain information from a dealer's DMS, like
20   who bought the car and the VIN number.  So in 2014, and then
21   repeatedly thereafter, MVSC applied to CDK and Reynolds to
22   participate in their data-integration programs.
23             Now, it's important to remember that CDK and Reynolds
24   jointly own MVSC -- MVSC's main competitor, CVR.  CDK owns
25   80 percent and Reynolds owns 20 percent.  It's a cash cow for

1   them.  But it is widely recognized that MVSC has the much

2   superior product and service, and that's in the record, and is

3   a threat to CVR in its main markets:  California, Illinois,

4   Virginia, and Wisconsin.  And I will just point the Court to

5   Docket 1069, Exhibit 256, where CVR says -- this is from

6   2015 -- wrote "Our biggest competitor, DMVdesk," which is

7   MVSC's product, "will be going live in mid-2015 in Illinois,

8   and we absolutely cannot allow them to get a foothold."

9           So when MVSC applied to participate in their data

10  integration programs, CDK and Reynolds conspired to boycott

11  MVSC.  There's no dispute on the legal question.  Group

12  boycotts like this are, per se, illegal.  The only question,

13  then, is a factual one.  And on that, our summary judgment

14  papers cite a host of evidence.  Today I would like to

15  highlight just one particular document, which I think

16  Mr. Caseria alluded to, and it requires no interpretation from

17  me.  So I'm going to share my screen and pull that up.

18          THE COURT:  I'm going to stop you for one second.

19  There's someone who's not muted on the phone, and it's creating

20  a little back because it keeps flipping back and forth between

21  you and that number.  There's no name, but it's someone with

22  the area code 608.  So if you could please mute, that would be

23  very helpful for our court reporter.

24          And I can see your screen, so fire away.

25          MR. NEMELKA:  Thank you, Judge Dow.  I appreciate

1    that.  This is an email from November 30, 2015, as MVSC is

2    applying to these programs from Reynolds and CDK.  And it's an

3    email from Scott Herbers -- he's at CDK, and he was the CDK

4    executive in charge of CVR for CDK -- to Jonathan Strawsburg,

5    who was the Reynolds' executive in charge of the MVSC Company.

6    And Jon Strawsburg, if you go below, had asked Herbers, "What

7    should I tell a dealer about MVSC and its competition with

8    CVR?"  And so here's what CDK tells Reynolds, and I'm reading

9    the quoted part.  "DMVdesk," which, again, is MVSC's product,

10   "does not and will not have direct DMS integration with

11   Reynolds."  Direct integration is the RCI program.  It goes on,

12   "The data that DMVdesk will never have access to through

13   Reynolds."  This is CDK telling Reynolds that MVSC will never

14   have access through the RCI program.  These are the two

15   executives at CDK and Reynolds talking about MVSC's access to

16   their programs, and saying that MVSC would never have it.

17          I am going to go back.  And Reynolds listened to CDK.

18   I point your Honor to Docket 1069, Exhibit 130.  That is a

19   document from March 2016, months, months later, and it's a

20   Reynolds marketing plan for CVR, and it says the same thing.

21   MVSC has never and would never have direct DMS integration

22   through RCI.  If there is ever evidence of a group boycott,

23   then this is it.  Both parties talking to each other about

24   never letting MVSC in.  In fact, it's CDK telling Reynolds that

25   Reynolds would never let MVSC in.

 1          Given this evidence, and of CDK's and Reynolds's broad

 2   collusion of data access generally, a reasonable jury could

 3   infer that MVSC's failure to gain access to 3PA and RCI was a

 4   product of defendant's agreement.  CDK and Reynolds carried out

 5   their boycott by denying or effectively denying MVSC's

 6   membership in their programs.  CDK, for its part, just flatly

 7   told MVC no.  "You compete with CVR, you're not getting in."

 8   Or they quoted an absurdly high percentage of MVC's top-line

 9   revenue.  CDK actually called CVR's services a "closed

10   category."  It wouldn't let any anybody in who competed with

11   CVR.

12          Reynolds, like CDK, quoted MVC a monthly integration

13   fee that would require MVC to operate at a loss on every

14   transaction in California, Illinois, and elsewhere.  There's

15   unrefuted evidence from MVSC that it could not operate as a

16   business and pay those prices.  Plus, demonstrating the charade

17   of those price quotes, they came in 2014, before the

18   communications that we just looked at, where Reynolds and CDK

19   confirmed that MVSC would never be able to participate in RCI.

20          Mr. Caserio referred to the manual workarounds that

21   MVSC developed to operate as a business.  Now they stopped MVSC

22   from joining 3PA and RCI, so it couldn't get data directly.

23   MVSC couldn't get data from integrators because they agreed to

24   block those, too.  So MVSC as a scrappy, innovative company did

25   develop some imperfect workarounds to get the data.  It

1      requires manual intervention by the dealer; it's not perfect.

2      But the MVSC needed to do that in order to operate its

3      business, and because of its superior product and services,

4      some dealers were willing to live with that.

5              A final statement on the importance of this case with

6      respect to MVSC.  It's a great example of the harm that comes

7      in a digital economy like we have now, where data is the oil

8      that powers the engine.  And CDK and Reynolds are the two

9      companies that conspired to restrict access to that data to the

10     harm of vendors and the whole industry.  Thank you.

11             THE COURT:  Okay.  Thank you, Mr. Nemelka.  I think

12     now we are on to the motion to bar.  Same two combatants, so,

13     Mr. Caseria, you get your two and a half minutes right now.

14             MR. CASERIA:  I will pull up my slides here.  Okay.

15     Thank you, your Honor.  For the first two years of this case,

16     MVC's claims were based on the California and Illinois DVR

17     markets.  In August 2019, four months after the close of fact

18     discovery, we received the damages report of MVSC's expert,

19     Gordon Klein, and discovered that MVSC had expanded its claims

20     to include Wisconsin and Virginia, more than doubling the

21     amount of the potential damages.

22             MVSC cannot amend its claims by expert report.  That's

23     established by Rule 15(a) and the *Chaveriat*, *Paramount* cases

24     that we've cited.  Now MVSC says the Wisconsin and Virginia

25     claims were always part of this case.  But MVSC's second

1    amended initial disclosures at Exhibit B, which were served in

2    April 2019 at the close of fact discovery don't mention

3    Wisconsin or Virginia at all.  They identify witnesses with

4    knowledge of the California and Illinois EVR markets but not a

5    single witness with the knowledge of Wisconsin or Virginia.

6         Similarly, MVSC never mentioned Wisconsin or Virginia

7    in its Amended Response to Defendant's Interrogatory No. 27 at

8    Exhibit C, which is served in January 2019.  That interrogatory

9    asks MVSC to describe how competition had been harmed

10   separately for each market at issue in its causes of action.

11   MVSC simply referred back to its complaint.  But if you look at

12   the complaint, particularly paragraph 64 and 206 to 263, the

13   only relevant markets at issue are California and Illinois.

14        Now all of this is highly prejudicial to Reynolds.  We

15   lost the opportunity to ask for documents from depositions from

16   key individuals, such as Don McNamara, MVSC's general manager

17   in Virginia; or Kelly Medick, MVSC's general manager in

18   Wisconsin.  Neither of whom was identified in MVSC's initial

19   disclosures.  We can't ask them fundamental questions about

20   MVSC's efforts to enter those state markets or differences in

21   competition in those states.

22        Three days after we received Klein's report, we sent

23   FOIA requests to both states asking for documents.  But FOIA is

24   not a substitute for full discovery in litigation.  Trying to

25   redo all of that discovery now to fully explore the issues in

1   Wisconsin and Virginia is not feasible due to the substantial

2   time and expense that would be required, as the courts in

3   *Oracle* and *City of New York* found.

4         Now MVSC will say this is all about the amount of

5   damages and it's not required to be specific about the amount

6   of damages early on in the case.  But this is about a lot more

7   than that.  It's about relevant markets, which are a critical

8   and unique issue in any antitrust case.  Take a look at the

9   *City of New York* case that we've cited, where the Second

10  Circuit refused to allow the plaintiff to expand its case after

11  the close of fact discovery to include two newly defined

12  relevant markets due to the delay and substantial additional

13  expense that would result.  Thank you, your Honor.

14        THE COURT:  Thank you, Mr. Caseria.  Mr. Nemelka.

15        MR. NEMELKA:  Thank you, your Honor.  And just to be

16  clear, the document that we went over previously, that's Docket

17  1069, Exhibit 130.  And then the following on Reynolds'

18  internal marketing is Exhibit 131.  I don't know if I said

19  that.  Thank you.

20        THE COURT:  Great.  Thank you.

21        MR. NEMELKA:  On this motion MVSC provided more than

22  sufficient notice of its Virginia and Wisconsin damages under

23  the "short and plain statement standard of Rule 8."  In its

24  complaint, MVSC identified the specific markets, Virginia and

25  Wisconsin, at issue. I point the Court to paragraph 86.  "MVSC

1  plans to enter other EVR markets, including Wisconsin and

2  Virginia.  But so long as CDK and Reynolds deny MVSC access to

3  the dealer data stored in their DMS platforms, it will be very

4  difficult, if not impossible, for MVSC to compete in those

5  markets."

6          The complaint also identifies the purpose of the

7  conspiracy was to harm MVSC in markets it would try to enter in

8  the future, again like Virginia and Wisconsin.  I point your

9  Honor to paragraph 107 of our complaint.  MVSC's complaint does

10 much more than what Rule 8 requires.  Given this notice during

11 discovery, CDK and Reynolds propounded a document request,

12 served interrogatories, and conducted depositions on Virginia

13 and Wisconsin.  Defendants themselves confirm in written

14 discovery correspondence that Virginia and Wisconsin EVR

15 markets were properly part of MVSC's claims.  And those

16 letters, your Honor, are marked in Appendix A of our

17 opposition.

18         And just one example that I would like to cite for the

19 Court.  Counsel for CDK wrote to us, MVSC, saying "We are

20 willing to produce non-privileged responsive documents for the

21 Wisconsin and Virginia markets in which CVR operates and MVSC,

22 according to paragraph 86 of the operative complaint, is

23 alleging to gain approval."  This admission completely

24 undermines defendant's argument that they didn't have notice or

25 that Reynolds didn't have notice now that CDK is out of the

1    case.

2         In its opening motion, Reynolds did argue that MVSC's

3    claims for damages in Virginia were a de facto request to amend

4    the complaint.  But, of course, the authorities Reynolds relies

5    on state that it has to be an entirely new claim or new factual

6    basis, which is not at issue here.  The claim remains the same,

7    group boycott.  The factual basis remains the same.  It has

8    suffered lost profits in the state markets, including Virginia

9    and Wisconsin.

10        And so on reply, Reynolds pivots, as Mr. Caseria did

11   here, to saying that it was not a damages issue, instead it's

12   about the markets.  But, again, as we've just identified, MVSC

13   actually identified those specific EVR markets in its

14   complaint, and explained how EVR markets are unique markets.

15   And there's just no prejudice here even if there was lack of

16   notice, given the discovery that Reynolds got.  Thank you, your

17   Honor.

18        THE COURT:  Thank you to both counsel.

19        Ten down, ten to go.  And we're on to *Daubert*.  So

20   with the first *Daubert* motion, I'm just going to say this for

21   the record, is 877.  And Mr. Provance and Mr. Panner are

22   dueling out this one.  Mr. Provance is representing the

23   movants, so fire away.  And I can see your screen, too, so

24   thank you.

25        MR. PROVANCE:  Excellent.  Thank you, your Honor.

1    Defendants moved to exclude several opinions offered

2    by plaintiffs' liability and damages expert, Dr. Mark Israel.

3    First, with respect to liability, Dr. Israel reframes the

4    alleged conspiracy to be about openness.  A term that he's used

5    to mean generally the ability of vendors and dealers to use

6    third-party integrators.  Dr. Israel infers a reduction in

7    defendants' openness during the so-called initial conspiracy

8    period from all sorts of things, including statements to

9    customers, pricing and competition.  But he ignores the most

10   direct evidence of defendants' openness, which is how much

11   third-party integration was actually permitted on their

12   systems.

13        By Dr. Israel's own calculations, Authenticom's

14   connections on defendants' DMSs went up during the initial

15   conspiracy period, not down.  Dr. Israel testified that

16   defendants' openness is not "tested in any way by this data."

17   His answer shows that the openness concept can't be tested or

18   disproven, even with directly contrary evidence.

19        Beyond that, Dr. Israel's conclusion that defendants'

20   comment was more consistent with conspiracy is unreliable.

21   It's undermined first by his own assessment of plaintiff's

22   unilateral conduct claims.  In that section of his report he

23   says that CDK and Reynolds have "significant unilateral market

24   power in the DMS market, which allows each of them to

25   profitably raise their integration prices by blocking

1    unauthorized third parties."  Now if there are any questions

2    about what Dr. Israel is actually saying, the Court can refer

3    and review on its own paragraphs 208 through 11 of Dr. Israel's

4    opening report, which is Exhibit 1 to our motion.  He's saying

5    that securing the DMS would be independently profitable for

6    each without a conspiracy.

7         Dr. Israel uses circular reasoning in an attempt to

8    avoid this contradiction.  He says that while it might have

9    been profitable for each defendant to do what it did

10   independently, it was more profitable for them to conspire.

11   But when pressed to explain this, he said, "Well, we know they

12   conspired, so they must have found it profitable."  He is

13   assuming the conspiracy and working backwards.  What this and

14   other evidence shows is that Dr. Israel's conspiracy opinions

15   are guided by a commitment to plaintiffs' theory, not an

16   independent analysis of the economic evidence.

17        Moving on, Dr. Israel's analysis of Reynolds' prices

18   is flawed because he used average revenue per customer, instead

19   of the prices for each product.  Those prices were available to

20   Dr. Israel, he just decided not to use them.  As a result, his

21   data observes customers shifting to more expensive integration

22   packages during the period, which is a change in product mix,

23   and calls them price increases.  In our Exhibit 104, which is

24   at Docket Entry 1034-7, you see this very clearly for AutoLoop,

25   the putative class representative.  Average revenue for

1    AutoLoop increases significantly between 2015 and 2016.  But if
2    you examine AutoLoop's actual prices, they didn't change at
3    all.
4         Next, Dr. Israel's damages model itself is unreliable.
5    On the conspiracy claims, he attributes all of defendants'
6    price increases to the alleged conspiracy.  That's explained at
7    pages 267 through -68 of his deposition, which is attached to
8    our motion at Docket 889-3.  Thus, his model assumes that
9    defendants' admitted unilateral market power would have
10   resulted in no significant price increases for the entire
11   conspiracy damages period, which is 6-plus years and counting.
12   This is both a *Daubert* and a summary judgment problem.  In
13   *Marshfield Clinic*, which is a summary judgment case, the
14   Seventh Circuit found that a conspiracy damages module with
15   similar flaws was "worthless."  That's 152 F.3d F 593.
16        Dr. Israel also contends that damages for AutoLoop's
17   nonconspiracy claims are exactly the same as the damages for
18   the conspiracy claims.  That's impossible because the specific
19   conduct at issue on the nonconspiracy claims is different.
20   It's not CDK's blocking generally, it's the alleged exclusive
21   dealing provisions in CDK's contracts.  Dr. Israel did not
22   attempt to isolate and measure price effects, if any, specific
23   to exclusive dealing.
24        Dr. Israel defined the data integration services
25   market both too broadly and too narrowly.  He defined the

1    market too broadly because he includes both simple data

2    extraction services and complex integration services.  And he

3    also defined the market too narrowly by excluding third-party

4    integration services that use dealer reporting tools, which

5    neither defendant prohibits.  Authenticom, in fact, has used

6    those tools to grow its connections on the Reynolds' DMS to an

7    all-time high.

8         These issues also impact Dr. Israel's pricing

9    analysis.  He attribute differences in pricing behavior between

10   defendants and Authenticom to the alleged conspiracy.  They are

11   offering mostly fundamentally different services, which aren't

12   good substitutes, and so there's no reason to think that the

13   price trends should be the same to begin with.

14        Finally, in the MVSC case, Reynolds also moves to

15   exclude certain of Dr. Israel's opinions that are relevant to

16   that case, and on that issue, I would simply refer the Court to

17   our briefs.  Thank you.

18        THE COURT:  Okay.  Thank you.  I appreciate it.

19        Let's see.  Mr. Panner, you've got the other side of

20   this one, right?

21        MR. PANNER:  I do.  Thank you, your Honor.

22        THE COURT:  Okay.

23        MR. PANNER:  Your Honor, as Mr. Provance indicated,

24   they've raised a number of issues with respect to Dr. Israel's

25   (inaudible due to poor audio) a number of the issues that they

1    raised in their motion.  So let me try to address in order of

2    what Mr. Provance referred to and then try to cover some other

3    issues that your Honor will see and review in the briefing.

4         Now, the first opinion, there's -- I'm not exactly

5    sure what the *Daubert* basis was.  In the original motion that

6    they filed, they argued that Dr. Israel's opinion about the

7    conspiracy was vague.  That is clearly not true and I would

8    note that Mr. Provance has misstated what the nature of the

9    conspiracy is.  He suggested the conspiracy was to reduce

10   openness.  That's not correct, and if he had read -- you can

11   see from the defendants' own experts' reports, the nature of

12   the conspiracy is not to compete on the dimension of openness.

13   It's a -- that is to say, on that product quality.

14        Now, Dr. Israel explains that DMS providers before

15   2013, before September 2013, competed on openness, and during

16   that time CDK gained substantial share.  That will sound

17   familiar from Mr. Ho's argument.  But that starting in

18   September 2013, CDK stopped competing on that basis in the DMS

19   market.  So this is a DMS-market conspiracy, which then is

20   formalized in February 2015.  They had a shared goal of

21   eliminating independent data integrators and they cooperated in

22   doing so.  And that's reflected in the common market messaging

23   that the parties agreed to in September 2013.

24        Now, as I noted, opposing experts had no difficulty

25   responding to the opinions.  For example, Dr. Bresnahan, Docket

1    889-17, referred to an agreement to cease competition in a

2    nonprice product characteristic, which is most important.

3    There's an argument that Dr. Israel somehow failed to exclude

4    unilateral conduct or didn't show that the proximate -- that

5    the conduct was a product of conspiracy, but this again goes

6    back to something else that Mr. Ho argued earlier, which is

7    this is not a case in which there's parallel conduct and we're

8    seeking an inference of conspiracy.  There's evidence of

9    agreement and Dr. Israel is providing an economic

10   interpretation of the nature of that agreement, how it affected

11   competition, how it caused harm to consumers in the markets at

12   issue here, in addition to providing necessary antitrust

13   economic expertise with regard to issues of market definition,

14   et cetera.

15          And he showed how the nature of the reduced

16   competition was analogous to -- essentially analogous to price

17   fixing.  How the parties understood that the alternative to

18   cooperation with regard to aligning market messaging, agreeing

19   to close the DMSs, was to fight it out in the DMS world.

20          Now, he also showed that there was economic evidence

21   that CDK's unilaterally optimal strategy before 2013 was to

22   compete on openness, and that they agreed to stop based on

23   Reynolds' actions.

24          And CDK's own expert, Dr. Whinston, again reflected

25   that -- the nature of the agreement quite well in his

1    testimony.  He said, "Reynolds backed off blocking DMI, and CDK

2    stopped badmouthing Reynolds."  That's Docket 875 at 45.  And

3    as Dr. Bresnahan noted, the badmouthing was really what

4    competition here was all about in the competition of the DMS

5    market.

6          And Dr. Israel also explained the additional ways in

7    which collusion was advantageous to the conspirators.

8    Reynolds -- and this is important -- Reynolds couldn't exclude

9    independent integrators successfully without CDK's help because

10   of the competitive pressure that it faced from CDK, and that's

11   discussed in Israel's reply report, paragraph 114, and in his

12   opening report at paragraphs 129 to -30 and 134.  And CDK also

13   had assurances that it would continue to have access to

14   Reynolds' dealers data for its own apps, and that Reynolds

15   would not flip strategies that it could do in the absence of an

16   agreement.

17         And -- so the notion that there's any sort of

18   circulatory here is not correct.  He was relying on the

19   evidence as an industrial organization economist -- antitrust

20   economist to explain the nature of the conspiracy and its

21   impact.

22         Now, with regard to the damages analysis, there is an

23   argument of -- you heard the argument about composition

24   effects.  This is a classic battle of the experts.  It's not

25   correct that -- essentially, what Dr. Israel did, as he

1    explained, is he tracked changes in prices at an application
2    level.  What he did is he looked at each company and saw how
3    the changes -- their changes in the amount that they paid for
4    integration services changed over time.  He used a regression
5    to isolate the change due to the conspiracy from changes that
6    were due to other factors.  That's a very common method.  The
7    difference-in-difference approach that Mr. Ho referred to
8    before.

9         Now, the argument that he lumped together, that he
10   failed to distinguish changes in product mix is not correct.
11   He has addressed that.  He did, in fact, look at
12   application-by-application prices where he could.  In some
13   cases -- and AutoLoop was an example -- he didn't have that
14   data.  But what he did is he did a check, and there was no
15   reason to think that that was necessary significant.  It was
16   challenged in the reports, and in his reply report he explained
17   it didn't make a difference.  He used a check called a
18   fixed-weight pricing index to show that the changes were
19   correlated.

20        Now, again, this is getting down in the weeds.  It's
21   not the sort of thing that can be resolved in a *Daubert* issue.
22   It's a question for the jury and cross-examination.  But,
23   although CDK argues that that method did not adequately address
24   the problem, in fact, it did, because this is about damages.
25   And, you know, under the law and a good estimate for the

1    damages is all that is required.  He confirmed the violation by

2    showing that prices increased and the fixed-weight price index

3    confirms that.

4         Very quickly, the DIS market definition, there's no

5    merit to the argument that he didn't apply appropriate

6    methodology, and they admit that there was evidence to support

7    the conclusion both that dynamic reporting and manual method is

8    not in the market because of its deficiencies.  And the

9    argument that the market is too broad because it involves both

10   read-only and more complex integration services ignores the

11   fact that he considered that problem and showed that blocking

12   of read-only services resulted in an increased price for

13   complex-integration services, which confirmed his market

14   opinion.

15        And then, as your Honor will see in reviewing the

16   briefing, the argument that -- with respect to the MVSC case,

17   is they are seeking exclusion of an opinion that Dr. Israel

18   doesn't, in fact, offer.

19        With that, your Honor, I may have gone a little bit

20   over for which I apologize, and I will yield the floor.

21        THE COURT:  Great.  Thank you so much, Mr. Panner.  I

22   appreciate it.

23        So the next motion is 881.  This is Williams, who we

24   heard about earlier today.  And I think Mr. Glickstein has the

25   affirmative case and Ms. Wedgworth has the defense, right?  So,

1    Mr. Glickstein, you're up.

2          MR. GLICKSTEIN:  That is correct, your Honor.  Just

3    give me one moment.  Is that displaying?

4          THE COURT:  Yes.  Got you.  Thank you.

5          MR. GLICKSTEIN:  Thank you, your Honor.  We challenge

6    both the liability and damages opinions that are offered by the

7    Dealers' economic expert, Dr. Michael Williams.  Dr. Williams'

8    liability opinion should be excluded because he didn't apply a

9    reliable methodology to conclude that CDK and Reynolds reached

10   an illegal agreement in 2013 or ever.  In fact, he really

11   didn't conduct an economic analysis of liability at all.  He

12   simply read documents that were given to him and asserted

13   conclusions.  The easiest way to see this is just to read Dr.

14   Williams' report.  So I won't discuss those arguments in detail

15   here.  And the Court will also see similar issues in the

16   summary judgment motion that Mr. Scodro discussed earlier

17   today.

18          Here I'm going to focus on two flaws in Dr. Williams'

19   damages opinion.  The first is his opinion on direct damages,

20   which should be excluded because it's contrary to law.  Now,

21   the Court has already held that at the motion to dismiss stage

22   that with respect to the Dealers' federal claims, the Dealers

23   cannot recover integration overcharges passed through by the

24   vendors.  That's Docket 507 at 21.

25          In paragraph 171 of his report, Dr. Williams opines

that the conspiracy has resulted in about $340 million in

pass-through overcharges.  And he calculates this number by

taking overcharges from the DMS providers to the vendors, and

then multiplying that number by an estimated pass-through rate

to the Dealers.  In the same paragraph of his report,

Dr. Williams then claims that the exact same damages,

calculated using the exact same overcharge methodology, are

direct damages.  And his justification for this is that the

overcharges can be viewed as what he says result from the

decreased functionality of defendants' DMS systems.  I think

Ms. Wedgworth earlier today said it was a proxy for damages.

But this is wordplay.  The law does not permit an

expert to take overcharged damages passed through down the

chain of distribution and call them by another name to evade

*Illinois Brick*.  That's exactly what the Seventh Circuit held

in the *Brand Name* case cited in the briefing.  We think that's

the principal and decisive authority on this point.  Plaintiffs

can prove damages however they'd like, so long as they don't

seek to use the very incidence analysis of overcharges,

indirect overcharges, that *Illinois Brick* bars.

Ms. Wedgworth responded on the summary judgment

motion, and may say again here, that the Court's motion to

dismiss allowed the Dealers to try to recover direct damages on

the federal claims were harms in the DMS market.  But the

Dealers need proof of such harms, and as I just explained,

1    Dr. Williams didn't try to measure those harms at all.  He just

2    has one model, which is an indirect overcharge model.

3         The second flaw in Dr. Williams' opinion, damages

4    opinion, is that it fails to control for CDK's and Reynolds'

5    unilateral power.  This is an issue that's come up a lot today.

6    It's in the AutoLoop brief and the Israel *Daubert* motion that

7    was just discussed.  Under the principles articulating all of

8    that briefing, a plaintiff has to separate the price effects of

9    collusion from the price effects of the defendants' lawful

10   market power.  And for two reasons, Dr. Williams failed to

11   reliably do so.

12        First, Dr. Williams' price analysis, by his own

13   admission, includes unilateral price effects.  As we explain in

14   the briefs, Dr. Williams repeatedly stated in his report that

15   CDK and Reynolds had the ability to, and did, raise integration

16   prices at least in part through unilateral exercise of market

17   power.  And having recognized that CDK and Reynolds had this

18   power and used it to raise price in the conspiracy period,

19   Dr. Williams could not simply assign all of the price increases

20   he measured to a conspiracy.

21        The second problem with Dr. Williams' opinion is that

22   he tries to rely on his difference-in-differences model to

23   control for unilateral powers, a similar move to Dr. Israel.

24   But that model is actually a reason why his opinion is

25   unreliable.  Dr. Williams admits, and you can see it on the top

96

1    of the slide, that the key assumption of a

2    difference-in-differences model is that prices in the

3    preconspiracy period move in parallel.  That parallel pads

4    assumption is what Dr. Williams uses to conclude that

5    defendants' pricing when it changes after the start of the

6    supposed conspiracy is caused by the conspiracy, as opposed to

7    nonconspiratorial factors.  But Dr. Williams has no reliable

8    basis for finding that the parallel paths' assumption holds.

9            He said at his deposition he didn't do a statistical

10   analysis.  He simply eyeballed the data to see if it looked

11   parallel.  *But Daubert* Requires more than eyeballing.  Expert

12   opinions have to have a testable scientific basis and

13   Dr. Williams admitted he didn't have one.

14           *Daubert* certainly requires more than eyeballing here

15   because if you look at the chart, you can see that the

16   pre-period is not parallel.  I have highlighted in yellow on

17   the left side of the slide, the portion of the period from

18   January to September 2013, and blown that up on the right of

19   the slide.  You can see that Reynolds' prices are going up

20   during this period.  Authenticom prices go down.  And CDK's and

21   SIS prices remain flat.  So there's no remotely reliable basis

22   for concluding that prices in the pre-conspiracy period were

23   parallel, and that means the entire model should be excluded.

24   Thank you.

25           THE COURT:  Okay.  Thank you.  Appreciate it.

1          Ms. Wedgworth, I think you're up next, right?

2          MS. WEDGWORTH:  Yes, your Honor.  Thank you.

3          THE COURT:  Thank you.

4          MS. WEDGWORTH:  Hopefully I can zero in on some of

5     this.  There is no basis, your Honor, to exclude Dr. Williams'

6     opinions.  And I'll start with Dr. Williams has two primary

7     conclusions in his liability analysis.  The first is CDK's

8     closure of its DMS to independent integration and increase of

9     3PA prices were not consistent with unilateral behavior.  They

10    were instead the result of an unlawful agreement with Reynolds

11    to stop competing on DMS openness.  Without that agreement, CDK

12    would not have closed its DMS and could not have successfully

13    raised 3PA prices.

14         Second, CDK's 3PA price increases during the damages

15    period were not unilateral but were entirely dependent on the

16    conspiracy with Reynolds.  CDK internally admitted that its

17    ability to raise 3PA prices in the 2015-16 time period was

18    dependent on successfully closing its DMS.  Otherwise, many

19    vendors would choose to move to a hostile provider rather than

20    pay CDK's price increase.  There is direct evidence of a per se

21    illegal agreement to drive Authenticom out of business, which

22    is complimented by plus factor evidence analyzed by

23    Dr. Williams.  Not only did he analyze the data of defendants

24    and vendors, he also examined plus factors, which courts,

25    including this circuit, routinely use in antitrust cases in

1   evaluating market conditions and defendant's conduct.  The

2   presence or absence of conduct constituting the conspiracy can

3   be evaluated by examining inferences that may be fairly drawn

4   from the behavior of the alleged conspirators.

5        I highlight two plus factors Dr. Williams considered,

6   which Mr. Scodro also addressed.  The first one, actual prices

7   exceed but-for prices, this is a well-recognized plus factor as

8   it is evidence of actions or conduct that could occur in the

9   presence of a collusive agreement, but that are highly unlikely

10  to occur in its absence.  Dr. Williams concluded that

11  defendant's actual integration services prices during the

12  damages period exceeded the prices that defendants would have

13  charged but for the alleged conspiracy.

14       Plus Factor 2, defendant's communications at high

15  levels.  Dr. Williams concluded CDK and Reynolds exchanged

16  certain types of information that would not be in their

17  self-interest to exchange but for the conspiracy here.  For

18  example, in 2013 a Reynolds executive told a CDK executive that

19  Reynolds would not be targeting CDK's hostile integration but

20  would be targeting other competitors.  Dr. Williams opines that

21  Reynolds had no unilateral incentive to provide that

22  information to CDK in the absence of an agreement to jointly

23  drive independent integrators from the integration services

24  markets.

25       Coke and Pepsi, who compete vigorously, would not

1   exchange this type of confidential information.  And while CDK

2   criticizes each plus factor in isolation as they have done

3   today for purposes of summary judgment, courts properly

4   consider all evidence of an antitrust conspiracy holistically.

5   Actions that might seem otherwise neutral in isolation can take

6   on a different shape when considered in conjunction with the

7   surrounding circumstances.  And Judge Posner said in the *High*

8   *Fructose* case, "No single piece of evidence that we're about to

9   summarize is sufficient in itself to prove a price-fixing

10  conspiracy.  The question is simply whether this evidence

11  considered as a whole and in combination with the economic

12  evidence is sufficient to defeat summary."  Other courts,

13  including *Broiler Chicken*, recently*, Clean Products*, and *SD3*

14  have agreed.

15          And turning to the key features of Dr. Williams'

16  difference-in-differences damages model that CDK challenges,

17  the model does control for supply and demand factors and in

18  unilateral conduct on the part of defendants.  CDK claims, and

19  you just heard they claim, that the model fails to account for

20  defendant's unilateral market power; not true.  In a

21  difference-in-difference model, any factor present in both the

22  benchmark pre-conspiracy period and damages period cancels out

23  and therefore cannot affect the estimated overcharges.

24          In order for CDK's claim to be correct, CDK and

25  Reynolds unilateral market power would have had to increase in

1    the damages period relative to the pre-conspiracy period, but

2    neither CDK, nor its experts make this contention.  In

3    addition, CDK claims that the model fails to account for

4    exclusive dealing provisions in defendant's contracts with

5    vendors.  Again not true.

6         CDK acknowledges, and Mr. Scodro stated in his earlier

7    summary judgment argument today, that the exclusive dealing

8    provisions existed in defendant's contracts with vendors prior

9    to the conspiracy.  Thus, any impact in those provisions on

10   defendant's integration services prices would already be baked

11   into the prices of the benchmark pre-conspiracy period and

12   cannot be the cause of any estimated overcharges.  Defendant's

13   motion to exclude the testimony and analysis of Dr. Williams

14   should be denied.

15        THE COURT:  Okay.  Thank you so much.  I appreciate

16   it.  It's a good thing I like *Daubert* motions.  We're up to

17   873, I believe, and this is Murphy.  And so Mr. Panner and

18   Ms. Wedgworth will be sharing this one, it looks like.  So if

19   you're still up, Ms. Wedgworth, go right ahead, and if not, you

20   can stand aside for a minute for Mr. Panner.  Thank you.

21        MS. WEDGWORTH:  I'll be brief.  I'll be brief, your

22   Honor.  So here we go.  Dr. Murphy's pass-through regression

23   analysis and his criticism of Dealers' expert's analysis should

24   be excluded.  Dr. Murphy assumes facts not present in this case

25   and his methodology is inconsistent with how all market

1    participants describe the data-integration feed to dealers.

2    Dr. Murphy argues that rather than examining data-integration

3    fees charged by vendors to dealers, the pass-through analysis

4    should examine total charges by the vendors to dealers, meaning

5    the sum of the DIS fees and the app fees and the app prices.

6         Dr. Murphy incorrectly reasons that the sum of DIS

7    fees and app prices must be considered because he claims the

8    alleged conduct could have caused dealers to have successfully

9    negotiated a different lower price to offset in the app

10   market -- to offset any increase in the data-integration fee.

11   This analysis is wrong as small unrelated changes in DIS -- I'm

12   sorry -- in app prices swamp changes in the data-integration

13   fees, preventing Dr. Murphy's regression from measuring

14   pass-through rate reliably.

15        Dr. Murphy found for two vendors a negative

16   pass-through rate and for one vendor a positive pass-through

17   rate of over 1,000 percent.  These results demonstrate the

18   fundamental unreliability of his method.

19        And, lastly, Dr. Murphy cites no evidence in support

20   of the inclusion of the app prices in his pass-through

21   regression.  Dealers and Dr. Williams have cited case law and

22   extensive evidence to the contrary.  And I'll just cite to you

23   the *Lobe* vs. *Sumitomo* case from the Seventh Circuit.

24             THE COURT:  Okay.  Great.  Lateral.

25             MR. PANNER:  Thank you, your Honor.  Professor Murphy

1    is CDK's damages expert and his principal opinion, and the one

2    at issue in our motion, is that "In the absence of conspiracy,

3    CDK would have engaged in the same conduct unilaterally, and

4    therefore there are no damages or minimal damages."  And that's

5    in his report at paragraph 45.  And that testimony should be

6    excluded because it is contrary to the legal principle that a

7    wrongdoer cannot escape liability by asserting that it could

8    have accomplished the same ends lawfully.  And that's the *Story*

9    *Parchment* case, 282 US 555.  And a number of cases from the

10   Courts of Appeals and District Courts that we cited in our

11   papers.

12        Now, CDK argued that *Story Parchment* doesn't apply

13   because damages causation was disputed.  They say that

14   plaintiffs must establish a causal link between conspiratorial

15   conduct and damages, and that's the issue.  But there is no

16   dispute here that defendant's conduct caused the harm.  The

17   dispute is over whether the conduct was pursuant to conspiracy,

18   and if it was, everyone agrees for the present purposes that it

19   was illegal.  Accordingly, CDK cannot avoid liability by

20   arguing that it would have engaged in the same harm-causing

21   conduct in a but-for world without the conspiracy.

22        CDK also argued that plaintiff somehow opened the door

23   by opining that damages would have been the same based on

24   unilateral conduct.  This is a theme that has been mentioned a

25   number of times with respect to Dr. Israel's testimony.  And I

1    should have addressed it before, so I'm glad to have the chance

2    to address it now.  There's no correspondence between

3    Dr. Israel -- Dr. Israel's opinion and Dr. Murphy's opinion.

4    Even if there was some sort of opening-the-door principle that

5    could apply here, which there is not.

6           On the contrary, Dr. Israel's testimony shows that

7    CDK's unlawful conduct caused the same harm whether it was

8    unlawful under Section one or Section two or both.

9    Mr. Provance referred to this as being an exclusive dealing

10   claim; that's not right.  It's a monopolization -- after-market

11   monopolization claim, and that's quite sensible.  Now,

12   Dr. Murphy wants to say that CDK's conduct was unlawful and

13   caused harm but that CDK could have inflicted the same harm

14   through lawful means, and that is what is not legally

15   permitted.

16          Now, we used an example in our reply brief that I

17   think illustrates the issue here and the problem with why

18   Dr. Israel's testimony is quite sensible and Dr. Murphy's

19   testimony should be excluded.  If one assumes a conspiracy

20   among makers of printers to tie ink to the printer, there is no

21   doubt that three printer manufacturers, if they entered into a

22   horizontal conspiracy to tie, would be engaged in a per se

23   violation of the antitrust laws.  And in figuring out the harm

24   inflicted by the tie, one could figure out, you know, the

25   inflation in the price of ink or what have you.

1    If -- but they might say, "Well, we didn't conspire.

2    We simply all engaged in time laterally."  In that case, one

3    might say, "Well, but your tie -- even if you acted

4    unilaterally, it's still an illegal tie, and therefore the harm

5    caused by your conduct is the same whether it was

6    conspiratorial or not."  And that would be entirely appropriate

7    testimony and it would not be a justification for saying there

8    is no harm to say, "Well, the unilateral tie would have been

9    lawful.  And I think that Manufacturer A would have engaged in

10   that tie, even in the absence of an agreement, and therefore

11   there are no damages."

12       Dr. Israel does what's entirely logical and permitted.

13   Dr. Murphy does what's legally barred.  Thank you, your Honor.

14       THE COURT:  Okay.  Thank you both.  Mr. Provance you

15   have been ganged up on.  So you have to respond to two people,

16   so you're up.  And that's good.  I've got your screen.

17       MR. PROVANCE:  Thank you, your Honor. Plaintiffs'

18   motion to exclude Dr. Murphy's testimony is narrow.  They don't

19   challenge his credentials or most of his testimony.  And on the

20   two issues where they do seek exclusion, Dr. Murphy's opinions

21   are both relevant and admissible.  And I will take them in the

22   order they were just presented.

23       Regarding pass-through, as Dr. Murphy explains, the

24   Dealers' expert, Dr. Williams, found incredible pass-through

25   rates, exceeding 100 percent of the claimed overcharges.  So

1    based on Dr. Williams' pass-through opinions, the Dealers are

2    actually claiming more in damages than the Vendors are claiming

3    in direct purchases.  But Dr. Williams only considered the

4    charges that Vendors separately list on their invoices as "DMS

5    fees or similar."  He ignored other components of the app

6    price.  That methodology is flawed.  Among other things, it

7    ignores offsetting discounts in other elements of the app

8    price, which reduce the net pass-through rate.

9          The Dealers' own expert, Dr. Williams, disputes

10   Dr. Murphy, but that isn't really surprising, and it's not a

11   reason to exclude his testimony.  First, Dr. Murphy's opinion

12   is supported by generally accepted economic theory.  You can't

13   calculate passthrough by looking only at a line item on an

14   invoice or invoices that vendors call DMS fees and ignore

15   everything else.  In fact, many vendors don't separately

16   itemize DMS fees on their invoices, and the implication of

17   Dr. Williams's logic would be then that the pass-through rate

18   for those vendors is zero.  Obviously, that is not the right

19   approach.  Dr. Murphy gave a detailed explanation of this at

20   his deposition, and we attached the relevant portions as

21   Exhibit 6 to our brief.

22         Second, Dr. Murphy's opinions are supported by the

23   record.  There is evidence of vendors offering discounts to

24   dealers on their overall app prices in order to offset DMS

25   fees, exactly what Dr. Williams ignores.  We attached that

1    evidence as Exhibit 8 to our brief and discuss it at page 20.

2    You were just told there was no evidence of that.  We attached

3    it and provided it.  And that evidence doesn't relate to some

4    small-time vendor who is not at issue in this case.  It relates

5    to AutoLoop, the putative class representative.

6          Moving to Dr. Murphy's opinions regarding plaintiffs'

7    but-for world from which they used to calculate damages.  As

8    we've explained this is a case where the plaintiffs' experts

9    say that CDK and Reynolds had market power to raise their

10   prices unilaterally, but attribute all of their price increases

11   to the alleged conspiracy.  And the evidence establishing that

12   is in the paragraphs of the reports and the pages of deposition

13   testimony from plaintiffs' experts that you now see on the

14   screen.

15         This implies a but-for world where defendants could

16   have raised their prices, but would have never done so.

17   Dr. Murphy's opinion is that such a but-for world is not

18   rational.  Dr. Murphy is not opining that the damages from any

19   alleged conspiracy are necessarily zero or that there could not

20   be any damages.  At paragraph 47 of his report, which is

21   Exhibit 1 to our opposition.  Dr. Murphy says, "Incremental

22   damages from conspiracy, given plaintiffs' expert's own

23   analysis, are either zero or, if positive, would have to be

24   measured relative to the price impacts resulting from

25   unilateral actions by CDK, which neither expert has done."  The

1    second part of that sentence is critical to understanding the

2    opinion that Dr. Murphy is actually giving in this case, as

3    opposed to the caricature of his opinion that was just

4    described.

5          The opinion is not speculative.  It's grounded first

6    and foremost in what the plaintiffs' experts say in their own

7    reports and depositions, and Dr. Murphy went beyond just what

8    the opposing experts said.  He relied on additional economic

9    evidence in the record, and that's discussed at pages 4 through

10   10 of our brief.  Dr. Murphy's opinion is also consistent with

11   the framework, which has been described by several presenters

12   thus far today.

13         As they've explained, even if plaintiffs prove a

14   conspiracy, their damages model still must account for and

15   separate price effects attributable to defendant's unilateral

16   market power.  It's fully consistent with the legal framework

17   for Dr. Murphy to explain why plaintiffs' damages models fail

18   this requirement.  Plaintiffs are overreading Story Parchment

19   to suggest it upends these principles, which have been endorsed

20   in cases like *Marshfield Clinic* and *MCI* from this Circuit, and

21   even the Supreme Court's own more recent decision in

22   *Comcast v. Behrend*.

23         No Court has applied *Story Parchment* in the manner

24   that plaintiffs suggest here.  Most pointedly, I would refer to

25   the *RSC* decision cited in our brief, which holds that relying

1    on *Story Parchment* is "totally inappropriate when the issue

2    raised is causation of damages."  Here there's absolutely an

3    issue as to whether the alleged conspiracy is responsible for

4    causing 100 percent of the price increases in the damages

5    period.

6        In short, plaintiffs' narrow *Daubert* motion to exclude

7    Dr. Murphy should be denied.  Thank you.

8        THE COURT:  Okay.  Thank you all for that.  I think we

9    have seven left and six of them are at the speed round of two

10   minutes per side, and then there's one in here that is sneaking

11   in at five minutes.  So this next one, just to keep the record

12   clear, is 887, and it's the defendants' motion to exclude

13   Halpin, and so I think I've got Ms. Stride on one side and

14   Ms. Weber on the other; is that right?

15       MS. WEBER:  Yes, your Honor.

16       THE COURT:  So fire away.  I can see your screen, so

17   thank you.

18       MS. STRIDE:  Thank you, your Honor.  Defendants seek

19   to exclude the opinion and testimony of Brian Halpin because

20   those opinions are firmly centered in an undisputed issue.

21   Mr. Halpin's opinions set forth the creation date and last

22   modified date of a Microsoft Word document authored by

23   Authenticom's CEO, Steven Cottrell.  But those dates aren't in

24   dispute.  And Mr. Halpin offers no opinion on any disputed

25   relevant fact.  The only disputed issue that individual

1    plaintiffs can point to is whether Mr. Cottrell was accurate

2    with respect to the content of what he wrote in the document.

3         But, of course, Mr. Halpin cannot testify to whether

4    Mr. Cottrell was accurate.  And to his credit, Mr. Halpin

5    admitted at his deposition that he is not opining on that

6    topic.  The defendants have offered to stipulate to the

7    document's creation and last modified dates in order to

8    simplify the trial by removing this issue from the many that

9    actually will need to be addressed.  But individual plaintiffs

10   refused to either accept that stipulation or withdraw

11   Mr. Halpin's report, which forced defendants to move to exclude

12   testimony on an issue that no one disputes.

13        Individual plaintiffs claim in their brief that

14   defendants' offer was a "strategic stipulation," but they have

15   no basis for that conclusion.  Beyond all of that, Mr. Halpin's

16   testimony would not only be minimally probative, but unduly

17   prejudicial as well.

18        The only reason for plaintiffs to offer him at trial

19   is to confuse the issues by conflating the authenticity of the

20   document for the accuracy of its contents for the credibility

21   of Mr. Cottrell.  Mr. Cottrell is a key witness for the

22   individual plaintiffs.  And they should not be allowed to use

23   Mr. Halpin's opinion on an undisputed issue to sponsor the

24   content of what Cottrell wrote or to bolster Mr. Cottrell's

25   credibility on issues that are in dispute.  Thank you, your

1    Honor.

2          THE COURT:  Okay.  Thank you very much.  I appreciate

3    it.

4          Let's see.  Ms. Weber.  Thank you.

5          MS. WEBER:  Thank you.  Good afternoon, Judge Dow.

6    Jayme Weber for plaintiffs.

7          Defendants do not question Halpin's qualifications,

8    nor the relevance of the document, nor even the relevance of

9    its authenticity.  Instead, they argue they can make Halpin's

10   testimony irrelevant by not disputing when Cottrell authored

11   his notes.

12         But defendants confuse relevant with disputed.  The

13   Seventh Circuit recognized in *Gomez* that evidence may be

14   relevant even if not disputed.  When Cottrell authored the

15   notes is relevant regardless of defendants disputing it.  That

16   is why cases like *Old Chief* hold that a party may insist on

17   presenting evidence, even when the other sides offers to

18   stipulate.

19         The Seventh Circuit's citation to this rule in *Swiatek*

20   did not suggest, as defendants do, that it applies only to the

21   prosecution in a criminal case.  As you heard earlier, there is

22   testimony from Cottrell that if credited (inaudible due to poor

23   audio) a per se antitrust violation.  That makes Cottrell's

24   written record of an appraised admission all the more

25   significant.  And the contemporaneous nature of that record all

1  the more important.

2        Rule 401 says evidence is relevant if it has any

3  tendency to make a fact more or less probable, and that fact is

4  of consequence in determining the action.  Halpin's testimony

5  makes it more probable that Cottrell's notes were authored the

6  day after McCray's admission.  The contemporaneous nature of

7  Cottrell's notes will be of consequence to the jury in

8  assessing whose version of events to believe; thus Halpin's

9  testimony is relevant.  *LovePop* and other cases show document

10  metadata specifically may be relevant and calls for an expert.

11        Finally, Rule 403 does not bar Halpin's testimony.  To

12  start, periphery issues are better resolved in the context of

13  trial than in the abstract.  Moreover, there is no reason to

14  think jurors will mistake testimony about document metadata for

15  testimony about the document's content.  Defendants' 403 claim

16  comprises arguments that go to weight, not admissibility, plus

17  unrealistic concerns about juror confusion.  The motion should

18  be denied.  Thank you.

19        THE COURT:  Thank you very much.  I appreciate it.

20  Sorry you've been cat-bombed.

21        Okay.  We're back to the five-minute motion, which is

22  Lawton, and so we've got, let's see, Mr. MacDonald and Mr. Ho;

23  is that right?

24        MR. MACDONALD:  That is correct, your Honor.

25        THE COURT:  Mr. MacDonald, I can see your screen so

you're ready to go.

MR. MACDONALD:  Your Honor, on the eve of the alleged conspiracy, Authenticom earned an annual net profit of $3.4 million.  Authenticom's damages expert Catherine Lawton, however, calculates that as a result of defendants' conduct, Authenticom has lost up to $144 million in profits.  In other words, she assesses 42 years' worth of pre-conspiracy profits as the damages Authenticom suffered in this case.

Now, how does Lawton get there?  Lawton arrives at that conclusion through the use of what she calls yardstick analysis, visualized here in Figure 8.3 of her report, by which she claims to calculate Authenticom's connections, which she identifies as a single application paying Authenticom to scrape data from a single DMS to three different types of systems. One, CDK, which she identifies in orange; two, Reynolds, blue; and, three, what she identifies as other DMSs, gray.  And the premise of her damages model is that she assumed that post-conspiracy the blue and orange lines would grow at the same right as the gray line.  And any disparity between those growth rates, she calculates entirely as damages.

The first problem is that Lawton did not actually perform a proper yardstick analysis.  Because the gray line is not a yardstick at all.  It is not a comparison market, a comparison firm, or a comparison product.  Post-September 2013, most of the growth actually consists of connections to Reynolds

1   and CDK dealers, not other DMSs.

2          And just a couple of examples.  First, Lawton admitted

3   at her deposition that she mischaracterized a number of large

4   Reynolds and CDK dealership groups as other, rather than as

5   Reynolds or CDK at her deposition.  This includes some of the

6   largest dealership groups in the country.  The orange and blue

7   lines, as she admitted, should be much higher and the gray

8   lines should be much lower.

9          Secondly, during the damages window, Authenticom

10  acquired, via corporate acquisition, an inventory application

11  called CarPod.  CarPod is not a DMS, it's an application.  And

12  it's used by all sorts of dealers to manage inventory on their

13  lots, some of whom use the Reynolds CMS, some of whom use CDK

14  and some of whom use another DMS.

15         Lawton then counts all of these connections to CarPod,

16  Authenticom's own inventory product, as connections to other

17  DMSs in her analysis, rather than counting them as what they

18  are, which are connections on behalf of Authenticom's own

19  application to Reynolds and CDK dealers.  And the acquisition

20  of CarPod and the relabeling of CDK and Reynolds' connections

21  as CarPod connections, in fact, accounts for the majority of

22  the growth in the other DMS line in Figure 8.3, the majority of

23  damages.  If you look at the big growth in the gray line in

24  2017 and 2018, these are entirely CarPod connections that

25  Authenticom has imported into its data.  This is not actual

1    growth and paid connections to third-party DMSs on behalf of

2    third-party vendors.

3            This raises an additional issue.  The only analysis

4    that Lawton performed to justify the yardstick is a correlation

5    analysis.  She claims that the three colored lines correlated

6    before September of 2013.  But that doesn't help her

7    methodology because post-September 2013, the other DMS line

8    does not consist of the same basket of goods as it did

9    pre-September 2013.  Just for one example, it includes all of

10   these CarPod connections.

11           So Lawton did not actually perform a yardstick.  She

12   didn't isolate her variables.  But even if she had and the

13   model was what she says it is, it still fails.  For a yardstick

14   to be admissible, it has to be independent of the alleged

15   illegal conduct, it has to be comparable, and it has to exclude

16   harm caused by other factors.  Lawton's yardstick fails all

17   three.

18           First, it's not independent.  Both Authenticom's CEO

19   and Lawton testified that Authenticom's competitors,

20   particularly in the other DMS space, exited the market during

21   the damages window, allegedly as a result of defendants'

22   conduct.  Therefore, all of the post-2013 connections, the gray

23   line, even putting aside the other issues, are necessarily

24   inflated.  They do not reflect what Authenticom's trend line

25   would have looked like in a but-for world, because in such a

1    world Authenticom admits it would have substantially more

2    competition than it does today.

3        Second, the lines are not comparable.  Again, I will

4    give one example.  Lawton admits that even under her analysis

5    that Reynolds' trend line stopped correlating with the

6    yardstick prior to the conspiracy as a result of Reynolds'

7    unilateral decision to block third-party data rippers before

8    September of 2013.  In other words, she admits that the

9    yardstick is not a good proxy for at least Reynolds'

10   connections, but then proceeds to use it as proxy for damages.

11       Finally, Lawton admitted that as much as 100 percent

12   of Authenticom's damages could alternatively be explained by

13   the fact that defendants' DMS contracts with their dealers

14   prohibits hostile access.  It's undisputed that these contracts

15   pre-existed the conspiracy allegations in this case, and they

16   were actually the subject of a now dismissed exclusive dealing

17   claim.  That means that most, if not all, of the damages Lawton

18   calculated can be attributed to something other than the

19   alleged conspiracy, actually a dismissed claim.

20       Finally, cross-examination does not fix these

21   problems.  They are fundamental.  The basic components of the

22   model are not what Lawton claimed them to be, and therefore the

23   model does not and cannot measure what Lawton claims the model

24   should measure.  It cannot offer any reasonable approximation

25   of damages in this case, and it certainly does not justify how

1    a company with under $4 million in annual profits could suffer

2    $144 million in lost profits.  We request that it be excluded.

3            THE COURT:  Okay.  Thank you, Mr. MacDonald.

4            I think, Mr. Ho, you've got the response.

5            MR. HO:  I do, Judge Dow.  Thank you very much.  It's

6    telling that Mr. MacDonald starts with the conclusions that

7    Ms. Lawton offers, which, of course, are not what *Daubert*

8    trains on.  *Daubert* trains on the methodology.  And as to that,

9    there's no dispute about three points.

10           One, there's no dispute that Ms. Lawton is qualified

11   in business valuation and economic damages.  Two, there's no

12   dispute that a yardstick method is a standard damages

13   methodology for measuring lost profits caused by an antitrust

14   violation.  And, three, there's no dispute that the

15   construction of a reasonably comparable yardstick is a matter

16   of professional economic judgment.  There are no bright-line

17   rules.  And those three undisputed propositions lead to the

18   conclusion that defendants' challenges to the way Ms. Lawton

19   applied the yardstick methods, these facts go to weight and not

20   admissibility, to credibility and not reliability.

21           We cite the *Tawfilis* case, which is from the Central

22   District of California from 2017.  2017 Westlaw 3084275, which

23   is really quite on point.  Arguments about what factors and

24   experts should have controlled for in conducting a yardstick

25   analysis generally go to the weight, rather than the

1    admissibility of the expert's testimony.  That's consistent

2    with the Seventh Circuit's decision in *In Re High Fructose Corn*

3    *Syrup*, which refused to exclude a regression analysis based on

4    criticisms of what variables had been selected, included, or

5    omitted.  And it's consistent with your Honor's decision in the

6    *Fluidmaster* case, which emphasized that whether a party's model

7    is the most accurate is ultimately a merits decision.

8        Judged against that standard, Ms. Lawton's yardstick

9    is imminently reasonable.  She compared Authenticom's

10   performance with CDK and Reynolds' DMS customers, those are the

11   customers that were affected by the conspiracy, to a yardstick

12   composed of Authenticom's other transactions.  Contrary to what

13   Mr. MacDonald said, using Authenticom's own other transactions

14   starts from a far more comfortable place than most yardsticks,

15   which compare the performance of one company against the

16   performance of other companies or maybe companies in (inaudible

17   due to poor audio) together different markets.

18       We're talking here about comparing Authenticom's

19   performance with respect to other DMSs.  That's a very strong

20   and reliable starting place.  What Reynolds quarrels with is

21   whether certain Authenticom transactions should have been

22   categorized as CDK or others.  You heard Mr. MacDonald allude

23   to that.  But those arguments can't warrant exclusion for three

24   basic reasons that apply to, essentially, all of the specific

25   criticisms of her yardstick.

1          One, Reynolds is contesting her interpretation of the

2   underlying data, not her methodology, and that's a factual

3   issue, not a ground for exclusion.  The Seventh Circuit made

4   that very clear in *Manpower*, where it held that the "quality of

5   the data is not a proper consideration in assessing reliability

6   and reversed exclusion of an expert on that ground."

7          Two, as mentioned, these are judgment calls.  Again,

8   there's no right or wrong answer.  And she gave reasoned

9   explanations for all of her modeling choices.  And, finally,

10  Reynolds's own expert, Dr. Rubinfeld, had no disagreement with

11  Ms. Lawton on many of the points that defendants now raise in

12  their motion when he constructed his own alternative damages

13  calculations.  These are really lawyer arguments, and they're

14  properly suited for cross-examination at trial.

15         The only specific argument that Mr. MacDonald made

16  that I want to address is this issue about CarPod.  As we

17  explain in the brief, the fact that Authenticom owns CarPod

18  does not affect the appropriateness of its inclusion in the

19  yardstick, because it's the dealers that drive demand for

20  Authenticom services.  And so even though Authenticom owns the

21  entity that is making the connection, it cannot make that

22  connection unless the dealers ask for it.  And so as Ms. Lawton

23  explained, that's an appropriate reason to include it in the

24  other.  Thank you, your Honor.

25         THE COURT:  Okay.  Thank you, Mr. Ho.  And what you

1    said a minute ago is a good segueway because now you're about

2    to go after Rubinfeld, right?

3           MR. HO:  I am.

4           THE COURT:  I just want to say this is 867, just so I

5    can have a little break there in the record.  So that's the

6    motion we're talking about now.  Go ahead, Mr. Ho.

7           MR. HO:  Thank you, your Honor.  I'll try to make this

8    quite short.  I have no quarrel with Professor Rubinfeld's

9    credentials.  He is obviously impeccably credentialed.

10   Defendants want to use those credentials to put him in front of

11   a jury and say that plaintiffs owe them billions of dollars in

12   counterclaim damages.

13          But his deposition revealed that he was nothing more

14   than a mouthpiece for opinions that he couldn't articulate,

15   never mind give reasoned explanations for.  He was completely

16   unfamiliar with the facts of the case and the reports that were

17   submitted under his name.  He could do little more than read

18   the words on the page and then tell me that I would have to go

19   ask his staff if I wanted more of an explanation.

20          He had to correct his testimony after consulting with

21   counsel at breaks multiple times, to the point where

22   defendants' exasperated lawyers blurted out answers for him

23   twice during the deposition.  And even then he had to serve

24   substantive corrections in his deposition errata.  Your Honor

25   asked for the key evidence and the key law.

1          I would say the key evidence here is just the

2   videotaped deposition of Dr. Rubinfeld's testimony, which we

3   would encourage your Honor or your law clerk to review.  And

4   the law is straightforward.  Rule 26 doesn't permit parties to

5   put on puppets at trial.  And there are many cases that exclude

6   experts who couldn't explain their opinions.  The *Dataquill*

7   case from this Court from 2003, the *Whites* case from Southern

8   District of Iowa, and another case from this Court,

9   *Baxter International*, all of which were cited in our brief.  We

10  think that the principles of those cases apply squarely to

11  Dr. Rubinfeld's testimony, which should be excluded.

12          THE COURT:  Okay.  Thank you, Mr. Ho.

13          Mr. Ross, you've got the back half of this one in

14  speed round here.

15          MR. ROSS:  Thank you, your Honor.  First, very briefly

16  regarding the deposition, as explained in our briefing,

17  plaintiffs' characterization of this transcript is not accurate

18  and it's not fair.  The excerpts they picked for their motion

19  are at worst lapses in memory, not grounds for exclusion.  This

20  is covered beginning at the bottom of page 5 of our brief,

21  which is Docket 994.  To Mr. Ho's point, if the Court somehow

22  has time for this, we would be delighted for your Honor to read

23  or watch this deposition.  Your Honor will see the context of

24  these questions and will see counsel refusing again and again

25  and again to let Dr. Rubinfeld consult various documents that

he needed to see.

It's obviously not practical to engage in a
back-and-forth about specific questions and answers from the
deposition in the time we have here.  So for today I would just
like to make one global point about this argument, which is
that even if plaintiffs' criticisms of Dr. Rubinfeld's
testimony had merit generally, which, of course, we disagree
with, plaintiffs never connect the dots as to which of
Dr. Rubinfeld's opinions should be excluded on that basis.
Instead, they take the sweeping position that all of his
opinions should be excluded.  Respectfully, that just doesn't
make sense.

One example to illustrate the point.  Dr. Rubinfeld
has an entire report devoted to rebutting the plaintiffs'
expert in the MVSC case.  Plaintiffs' motion doesn't mention a
single deposition question or answer regarding the MVSC case.
The testimony they highlight had nothing to do with the MVSC
opinion.  That's just one obvious example, but there are
others.

In my remaining time, your Honor, I would like to turn
to just two of the specific arguments raised by plaintiffs.
First with respect to one of Dr. Rubinfeld's rebuttals to
Ms. Lawton's damage model for Authenticom.  This is the one
that Mr. MacDonald just talked about.  Plaintiffs argued that
Dr. Rubinfeld is somehow masquerading as a liability expert.

122

1    That's not accurate.  Just like Mr. Provance explained a moment

2    ago in connection with the Murphy motion, this is a causation

3    issue, not a *Story Parchment* issue.  It's discussed pages 11 to

4    12 of our brief.  But the point they're referring to is simply

5    Dr. Rubinfeld observing that based on the positions stated by

6    plaintiffs' own experts, including Ms. Lawton, there can be no

7    causation.

8            Lastly, with respect to Dr. Rubinfeld's counterclaims

9    damages model in Authenticom.  Plaintiffs criticize the data

10   that Dr. Rubinfeld relied on for the number of times

11   Authenticom accessed Reynolds' system.  But critically in

12   discovery, Authenticom's counsel described this supposedly

13   unreliable data as the data that Authenticom maintains in the

14   ordinary course regarding its DMS connections.  That's in

15   Exhibit 2.  It's Docket 994.  Thank you, your Honor.

16           THE COURT:  Okay.  Thank you both.

17           I think we're up to 859, which is motion to exclude

18   Stroz, and Mr. Kupillas is back.

19           MR. KUPILLAS:  Thank you, your Honor.  As a

20   preliminary matter before I begin, I just want to note that due

21   to the settlement between CDK and Authenticom, I will not be

22   addressing the arguments raised in this motion concerning

23   Authenticom's alleged responses to CDK's CAPTCHA and yes/no

24   prompts.

25           This motion concerns defendants' cybersecurity expert,

1    Edward Stroz.  First, Stroz's opinions concerning the Profile

2    Manager program should be excluded.  His opinion on the number

3    of times Profile Manager merely ran is irrelevant.  Because a

4    program running without effect cannot violate the DMCA.

5    Stroz's opinion on the number of times that the Warrensburg

6    dealers' logins were re-enabled by Profile Manager is

7    unreliable.  Because it's not based on any evidence of any

8    Warrensburg login accounts ever being re-enabled by Profile

9    Manager.  And by failing to respond to this argument, CDK has

10   conceded its validity.

11        Next, Mr. Stroz's failure to specifically attribute

12   alleged DMCA violations to specific dealerships renders his

13   opinions unhelpful to the jury and subject to exclusion.

14        Stroz also opines that the creation of APIs, or

15   application program interfaces, for use by third parties would

16   not adequately address defendants' security concerns from

17   third-party access.  But his opinion is wholly unsupported and

18   unreliable.  Stroz performed no analysis of the security of

19   APIs, nor did he examine the use of APIs by other DMS

20   providers.

21        Stroz also offers an opinion on the number of times

22   that Authenticom accessed purported proprietary data in CDK's

23   DMS.  But his opinion is based solely on CDK's representations

24   as to which data were proprietary.  And Stroz did nothing to

25   validate those facially inaccurate representations, as he was

1  required do as an expert.

2          And, finally, your Honor, Mr. Stroz impermissibly

3  offers his own legal opinion that dealers did not have the

4  contractual right under their contracts with defendants to give

5  DMS logins to third parties.  Experts are not permitted to

6  offer legal opinions, and Stroz is not a legal expert.  His

7  opinions on the interpretation of dealers' contracts with

8  defendants and whether Authenticom's access to the DMS was

9  contractually authorized or unauthorized should be excluded.

10 Thank you.

11         THE COURT:  Okay.  Thank you, Mr. Kupillas.  I

12 appreciate it.

13         Mr. Fenske, you've got the defense of Stroz, right.

14         MR. FENSKE:  I do, your Honor.  I'm going to share my

15 screen.  If you could just let me know if you are seeing my

16 screen, I would appreciate it.

17         THE COURT:  Sorry.  I am seeing it.  Thank you.

18         MR. FENSKE:  Great.  I will go to the next slide here.

19         Your Honor, as Mr. Kupillas mentioned, the CDK

20 settlement with Authenticom moots a large number of the issues

21 raised in the briefing.  I'm going to address a few of the

22 issues that are no longer -- that are still alive.

23         The first has to do with the DMCA calculations as to

24 the violations of the DMCA by Warrensburg.  As to that claim,

25 Mr. Stroz determined that Profile Manager actually re-enabled a

125

1    disabled Warrensburg account at least 36 times, beginning in

2    March of 2017.

3           The basis for that opinion was evidenced that

4    beginning in 2016, CDK sent instructions to disable targeted

5    accounts at least once per day, and that by February of 2017,

6    CDK had increased the frequency of those instructions as shown

7    by evidence that Profile Manager had re-enabled a disabled

8    account up to four times in one day over a two-week period.

9    I'm not sure what Mr. Kupillas was referring to when he says we

10   didn't respond to this, Your Honor.  I would just refer the

11   Court to our discussion of Exhibit O to plaintiffs' opening

12   brief and Exhibit 19 in our opposition brief, which lays out

13   this evidence.

14          In light of that evidence, Profile Manager, which

15   worked, your Honor, by scanning the system constantly to see if

16   a targeted account had been disabled and then automatically

17   re-enabling it, would necessarily work on average at least once

18   per day and likely many, many more.  So Mr. Stroz's opinions

19   are founded on record evidence and are rationally connected to

20   that evidence, which is all that is necessary for his opinion

21   to be admissible.

22          As to the DMCA claim against Continental, the only

23   argument that plaintiffs made as to Mr. Stroz's CAPTCHA

24   analysis relates to his methodology for determining if they had

25   a particular account was, in fact, used by Authenticom.  On

1      this issue, your Honor, the Continental dealerships,

2      specifically, is an easy case.  The name of the account in

3      question is "DVault," a clear reference to Authenticom's Dealer

4      Vault tool.  And the record shows that DVault used automated

5      means to respond to CDK's CAPTCHAs 1,256 times, as shown in

6      Exhibit 4 to our opposition brief.  That's all a jury would

7      need to determine that this was an Authenticom account.

8              On Mr. Stroz's cybersecurity opinions, the plaintiffs

9      do not challenge that he's imminently qualified to opine that

10     hostile third-party access poses grave risks to both the DMS

11     and the data on it, instead only challenged three narrow

12     opinions of Mr. Stroz.  Those challenges are meritless for the

13     reasons explained in our briefing.  Thank you, your Honor.

14             THE COURT:  Thank you both on that discussion.  We've

15     got three to go, and the next one is 863, which is the motion

16     to exclude Klein.  So Mr. Caseria.  And, let's see, I've got

17     your screen, too.  Thank you.

18             MR. CASERIA:  Okay.  Let me pull this up here.  Thank

19     you, your Honor.

20             Gordon Klein's opinion should be excluded for a number

21     of reasons.  First, his opinions regarding the California EVR

22     market are not even his own.  He takes the opinions of Joe

23     Nemelke, MVSC's COO, which are attached as Exhibit H, and he

24     offers them as his own.  This is the opinion of his client,

25     cloaked with expert window dressing.

1    When we asked him about this at his deposition, he

2  readily admitted.  And he said that his opinions were

3  fundamentally Joe Nemelka's opinions; his word.  When we asked

4  him if he did anything to test those opinions, he said, "No."

5  When we asked him if he was actually assuming causation in

6  California, he said, "That's fair."  When we told him there was

7  evidence contradicting what was set forth in Mr. Nemelka's

8  declaration, he told us that he could elevate the declaration

9  above contrary evidence.  The *Local Steel Products* case says,

10  "An expert cannot act as a mouthpiece for its client," and

11  that's precisely what has happened here.

12    In Wisconsin he ignores -- Klein ignores contrary

13  evidence.  As I mentioned earlier today, a 2017 letter from the

14  State of Wisconsin to MVSC informed it that the state was

15  closed to new EVR providers and had been closed and might

16  reopen in 2019.  Klein never looked at this document.  When we

17  showed it to him at his deposition, he told us that if the

18  words on the document were true, it was pretty clear that

19  Reynolds did not cause harm to MVSC.

20    Two additional reasons Klein's opinion should be

21  excluded.  Klein does not disaggregate lawful from unlawful

22  causes of harm.  To take just one example at page 45 of his

23  deposition, which is at Exhibit A, he admitted that he does not

24  disaggregate unilateral conduct from joint conduct with respect

25  to damages.  The only claims against Reynolds that are brought

1    by MVSC, and remaining in this case, are claims based on

2    conspiracy, not unilateral conduct.

3         Finally, Klein's opinions that the conspiracy was the

4    "substantial factor causing harm to MVSC should be excluded

5    because they are based on nothing more than intuition."  When

6    we asked him to describe his methodology, he couldn't describe

7    anything that could be tested or replicated and instead told us

8    that as an observer of business decisions, he was able to

9    determine when something is a substantial factor and when

10   something is a secondary and not substantial factor.  As the

11   Seventh Circuit in Zenith held, "Intuition won't do."

12        Thank you, your Honor.

13        THE COURT:  Okay.  Mr. Nemelka, you've got the defense

14   here, right?

15        MR. NEMELKA:  Yes.  Thank you, your Honor.

16        Mr. Klein calculated MVC's damages for the defendants'

17   effort to deny MVSC access to dealer data, whether through the

18   group boycott or blocking independent (inaudible due to poor

19   audio) integrators.  Klein calculated those damages caused by

20   that unlawful conduct.  There is no failure to disaggregate.

21   Klein's model was designed to measure only damages due to that

22   interference, not other causes.

23        Although Klein attributed identical damages to the

24   Section 1 and Section 2 claims, doing so was appropriate

25   because the monopolization claims were premised on the same

129

1    anti-competitive conduct and the facts of the Section 1 claims,

2    the efforts to deny MVSC access to dealer data.

3         As to Mr. Klein's reliance on Joe Nemelka's

4    declaration -- and, yes, that is my brother -- it is proper and

5    sound for experts to rely on declarations from their clients.

6    Especially where, as Mr. Klein did here, he verified the

7    accuracy of the data supplied to him by revealing other

8    documentary and testimonial evidence regarding the

9    specific-loss dealerships.  What Mr. Nemelka did was go through

10   and identify the dealerships that they lost because of the

11   (audio completely cut out), and Mr. Klein supported that by

12   reviewing the other documents and other testimony.  In any

13   event, the soundness of factual underpinnings for Mr. Klein's

14   analysis is a factual matter reserved for the trier of fact.

15        As for Wisconsin, Reynolds challenges Mr. Klein's

16   causation opinion but not his damages opinion.  And we would

17   point the Court to Mr. Klein's report at paragraphs 29 and 48

18   through 49, and then his reply report at 38 through 40, where

19   he provides the bases for that analysis.  And as Mr. Caseria

20   explained, the basic criticism that Reynolds has is that

21   Mr. Klein did not take proper account of a single letter from

22   2017 from the Wisconsin DMV.  But at his deposition, Mr. Klein

23   noted the existence of other evidence, relied on in his

24   opinion, that Wisconsin was considering around new EVR

25   providers at the time MVSC attempted to enter that market.

1    My time is up and I would just note that with respect

2    to Rubinfeld, Mr. Ho on the top side didn't get a chance to

3    respond, but Mr. Rubinfeld did -- we did cite in our brief

4    where Mr. Rubinfeld did not know the basic facts about MVSC's

5    case either, and was very confused about what that matter was

6    even about.  And we did cite those in our brief.  Thank you.

7         THE COURT:  Okay.  Thank you both.  We are down to the

8    last two, and this next one is motion to exclude Nancy Miracle.

9    Mr. Wilkinson, I see you are back on screen here, so I think

10   you've got the first shot here.

11        MR. WILKINSON:  Thank you, your Honor.  Back and ready

12   to proceed.

13        Your Honor, Nancy Miracle is a computer professional

14   offered by Authenticom to offer the core opinion that this

15   Court and numerous other federal courts have misinterpreted the

16   DMCA for years.  In her opinion, the DMCA offers zero

17   protection to CAPTCHA, because CAPTCHA is not a technological

18   measure that effectively controls access as defined by the

19   DMCA.  She reaches this opinion based solely on her own

20   experience.

21        She says essentially the same thing about all of

22   defendants' other system security measures, including Reynolds

23   Suspicious User ID Detection System and CDK's system prompts.

24   In her view, hackers are free to do whatever they want to break

25   through or get around these measures because none of these

measures are effective access controls under the DMCA.  That's

obviously intention with Authenticom's central claim in this

case that these measures were highly effective in blocking its

access to the defendants' DMSs and supposedly devastating

Authenticom's business.  She also offers the additional opinion

that Authenticom's efforts to circumvent these measures were

not actually circumvention at all.

These opinions fail the *Daubert* standard for multiple

reasons, starting with the fact that she's clearly trying to

offer opinions on a question of statutory interpretation, which

is improper.  Her proffered interpretation is also contrary to

basically every DMCA opinion ever decided by the federal courts

on circumvention claims like these.  It's contrary to the text

of the statute.  And perhaps most tellingly, her opinion is

contrary to all published standards within her own field of

computer software, including National Institute of Standards

and Technology, or NIS, which is the leading authority in the

field.

Authenticom tries to pitch this as the standard battle

of the experts.  But when an expert tries to offer opinions

contrary to the entire body of published law and a statute and

standards in their field, based solely on ipse dixit

experience, the proper course is exclusion.  Ms. Miracle also

offers some other ancillary opinions as well.  They suffer from

fatal flaws as addressed in our briefs.  And for these reasons

we ask the Court to exclude her testimony and opinions.  Thank

you.

THE COURT:  Okay.  Thanks, Mr. Wilkinson.  Mr. Dorris,

you've got the other half of this one, right?

I think you're on mute.

MR. DORRIS:  My apologies.  Good afternoon, your

Honor.

THE COURT:  How are you doing?

MR. DORRIS:  Ms. Miracle's testimony is admissible

because she is qualified as a computer security and software

expert and because her technical expertise in those areas will

be helpful to the jury.

First, on qualifications, those are unassailable.

Defendants really only challenge them in passing in their

briefing.  She has five decades of experience as a computer

programmer and she's been responsible for network security at

technology firms.  That experience qualifies her as an expert.

Second, her testimony would be helpful to the jury.

The reasons are all detailed in our brief, but I want to focus

on two of them here.  As your Honor is aware, and as

Mr. Wilkinson just mentioned, there are disputes about the

statutory construction of the DMCA.  But on at least these two

issues, Ms. Miracle's testimony will remain helpful to the

factual finder, even if this Court adopts Reynolds' statutory

construction.

1           First, did Reynolds circumvent technological measures?

2    Ms. Miracle will explain how the technological matters at issue

3    operate and how Authenticom's software responded to them.  And,

4    importantly, what Authenticom did not do:  Circumvent as

5    opposed to satisfy those measures.  On this point, your Honor,

6    it is important to note that defendants themselves proffer

7    expert testimony on the technical nature of Authenticom's

8    alleged circumvention.  Ms. Miracle should be allowed to rebut

9    that testimony as Scott Tenaglia's report at Docket 1007-1,

10   pages 7 to 12.

11          The second issue is, did the technological measures

12   protect copyrighted works?  Ms. Miracle explained the way in

13   which Reynolds's executable code could be accessed without

14   encountering any technological measures.  And so those measures

15   did not protect the code.  There is no DMCA violation as a

16   result.  Her testimony would also be helpful to the fact finder

17   on determining copyright ability of visual elements.  She will

18   explain that visual elements are dictated by functional

19   considerations.  That is permissible expert testimony on a

20   predicate fact, not expert testimony on the ultimate legal

21   issue of copyright ability.

22          At bottom, Reynolds's motion is based on the

23   assumption that Ms. Miracle will testify to legal issues

24   because the report mentions legal standards governing her

25   analysis.  And I recommend to the Court Judge Filip's decision

1    in *Amakua Development LLC v. Warner*, 2007, 2028186, where he

2    explained, "It is not exceptional at all for an expert to

3    structure his or her report so as to conform to applicable

4    law."  That's all that Ms. Miracle has done.  It will be left

5    to the trial judge to enforce appropriate boundaries on her

6    testimony about legal issues at trial.

7              Thank you, your Honor.

8              THE COURT:  Okay.  Thank you both.

9              I think we're down to the last.  I don't know.  You

10   guys will have to tell me how to pronounce that.  883 is the

11   docket number.  And Mr. Ross and Ms. Jones, I think we've got,

12   so Mr. Ross, fire away.

13             MR. ROSS:  Thank you, your Honor.  And it's Allan

14   Stejskal as I understand it.  Mr. Stejskal is a proposed

15   industry expert the plaintiffs are offering to talk about a

16   broad range of issues.  Our motion is very targeted and based

17   on two grounds.  I'm only going to focus on the most important

18   one of those grounds today, which is Mr. Stejskal proposed

19   opinions on DMS customer switching.  Now customer switching is

20   an important economic issue in the case, just like it is in a

21   lot of antitrust cases.

22             There have been huge volumes of data produced in

23   discovery, by both parties.  Both side have PhD economists that

24   have analyzed that data and reached conclusions about

25   switching.  The problem that our motion explains in short is

1   that Mr. Stejskal is trying to offer an opinion on switching

2   without looking at a single line of that data.

3          There's really no dispute about this.  Mr. Stejskal

4   candidly admits in his deposition that he looked at no data,

5   performed no analysis.  In fact, didn't even know that

6   switching data had been produced.  There is lots of testimony

7   about this, but if the Court looks at page 49 of Mr. Stejskal's

8   November 7, 2019, expert deposition, that should drive home the

9   point.

10         Now, another way I think to think about this is that

11  Mr. Stejskal is trying to offer an anecdotal subjective opinion

12  about an inherently data-intensive quantitative subject.  It's

13  actually a little bit worse than that because Mr. Stejskal

14  doesn't even point to any anecdotal examples of a dealer

15  actually deciding not to switch DMS providers.  He just says

16  it's hard, essentially.

17         Now, how did plaintiffs respond to all of this?

18  Basically, they argue that Mr. Stejskal has a lot of experience

19  in the industry, and there is case law allowing expert

20  testimony based on industry experience.  Of course that's true

21  as a general matter, but it doesn't mean you get to skip the

22  Rule 702 analysis.  In that respect, we would direct the court

23  to Chief Judge Pallmeyer's analysis in the *Crawford Supply*

24  case, where she notes "If the witness is relying solely or

25  primarily on experience, then the witness must explain how that

1    experience leads to the conclusion reached, why that experience

2    is a sufficient basis for the opinion, and how that experience

3    is reliably applied to the facts."  Plaintiffs and Mr. Stejskal

4    come nowhere close to doing that for this opinion.  That

5    opinion, by the way, is 2011 Westlaw 4840965.3.

6         Now, I don't know if Ms. Jones is going to talk about

7    specific cases in her response, but if she does, I would urge

8    the Court to focus on whether those cases are custom and

9    practice opinions cases, because I bet they are.  And this is

10   very -- we have very consciously chosen not to attack true

11   custom and practice opinions for Mr. Stejskal.  This opinion,

12   as we talked about, is an economic quantitative subject that

13   Mr. Stejskal is trying to opine on without undertaking the

14   proper analysis or any analysis.  Thank you, your Honor.

15        THE COURT:  Okay.  Thanks, Mr. Ross.  Ms. Jones, you

16   have the last word on the lawyers' side today, and my words

17   will be very brief when we're done, so we're almost there.  So

18   thank you.

19        MS. JONES:  Thank you, your Honor.  Last but not late,

20   Bethan Jones for the plaintiffs.  Mr. Stejskal is a recognized

21   industry expert.  And I would like to just begin by noting that

22   his testimony was recently credited by Judge Snow in the

23   District of Arizona, in connection with other litigation

24   involving defendants, and that's *CDK versus Brnovich*.

25        Now in forming the two opinions that defendants

1    challenge in their briefs, Mr. Stejskal reliably drew from over

2    two decades of experience, making his testimony admissible

3    under Rule 702.  I'll briefly touch on the cybersecurity point

4    that the defendants raised heavily in their brief.

5         And I think the main point there, your Honor, is that

6    Mr. Stejskal need not be a cybersecurity expert to offer

7    opinions about the use of data-integration services that are

8    grounded in his experience.  And it's important to remember

9    that Mr. Stejskal worked with data integrators many years

10   across the nation.  He created DealerTracks integration

11   program.  And he also served as the president of Open Secure

12   Access.

13        And in their briefing the defendants really tried to

14   minimize the importance of that organization, but it's

15   important to remember that that's a prominent coalition of over

16   50 industry stakeholders, including at one time CDK, then ADP,

17   studied that issue in depth.  Mr. Stejskal's opinion on that

18   front will be really helpful for the jury to evaluate

19   defendants' reported security concerns in blocking these

20   independent integrators.

21        Similarly, defendants in their briefing take issue

22   with Mr. Stejskal's opinion on data-security practices, and

23   I'll just note that Judge Snow specifically credited

24   Mr. Stejskal's testimony that dealers take data security very

25   seriously.

1        Now, counsel focused on the highly relevant topic of

2  DMS switching.  And as you've heard today, the defendants'

3  primary concern is that Mr. Stejskal did not perform an

4  empirical analysis for what they claim is a quantitative market

5  inquiry, but they notably cite nothing to explain why this is a

6  quantitative marketing group and can only be a quantitative

7  marketing group.  There is no requirement that an expert

8  perform quantitative market analysis.  The Seventh Circuit made

9  that clear in *Metavante*.

10       And Mr. Stejskal's testimony detailing both the hard

11  and soft cases that dealers face when switching DMSs shows

12  exactly why the inquiry isn't solely quantitative.

13  Mr. Stejskal's testimony will provide helpful context to the

14  jury to evaluate the parties' quantitative analyses.

15       And I'll briefly address defendants' claim that

16  Mr. Stejskal does not provide any examples.  He actually cites

17  in paragraph 43 of his report, the instance of Hendrick

18  Automotives, who faced such high switching costs that they

19  ended turning back on the process.

20       And, finally, I'll note that *Crawford* is

21  distinguishable.  I think it's very clear from Mr. Stejskal's

22  report that he really applies his experience in the industry

23  and his many years of working with dealers, large and small, in

24  analyzing the hard and soft costs that dealers face.  Thank

25  you, your Honor.

1      THE COURT:  Okay.  Well, thank you, everybody.  This

2  has been really fantastic and exactly what I was looking for.

3  I really appreciate your time and your effort and your ability

4  to stay very close to your allotted time.  I also want to

5  remind you all how much I appreciate that you all worked this

6  beautiful schedule out without my involvement.

7      I think after hearing what I've heard today, we're

8  going to have two more arguments.  One is going to be on

9  *Daubert*, and only *Daubert*, because it will be a lot easier for

10  us to just take those issues, and, you know, we may have some

11  methodology problems.  We may have some connective reasoning,

12  sort of joiner-type problems.  We may have some opining on

13  questions of law issues.  There's all kinds of fun little

14  *Daubert* projects that you all have for me.  But I think it will

15  make sense to have it one separate hearing where I give you all

16  of my *Daubert* questions and we just focus on *Daubert*.  We have

17  got 10 motions on that ground.  And then the other one we can

18  save for the summary judgments, and the counterclaims, and

19  everything else.

20      I just think *Daubert* will be so much more focused if

21  we have a single overarching topic and then specific problems

22  to explore.  And then have a second one on the summary

23  judgment.  And I probably would do them in that order because

24  some of the *Daubert* rulings may affect the summary judgment

25  rulings.

1          But I will be in touch with you guys.  I don't know

2     that I need all of you.  But, you know, you guys can -- your

3     lead counsel can decide who you want to have at the *Daubert*

4     scheduling hearing, and maybe we can do this by email.  I'm not

5     sure.  We may just do a little scheduling hearing.  And then

6     we'll have a second one on the non-*Daubert* issues.

7          The real question is going to be when -- one issue on

8     that is when can John and I figure out enough to be able to

9     formulate the questions that we're going to ask you.  The other

10    is going to be that it appears based on the general order that

11    was just entered a couple hours ago, maybe even while we were

12    on this call, that we're going to be able to resume jury trials

13    on April 5th.  I have many, many criminal defendants in custody

14    who are going to be asking me for trial dates immediately upon

15    that.

16         What I'm not sure of is whether we're going to be

17    restricted to starting one trial a day, which is where we were

18    back in the fall when we were able to do a few trials.  And

19    once that unfolds, I'll have a better sense of weeks that I may

20    be on trial and therefore unable to hang out with you all.  And

21    any weeks that I'm not on trial is probably a week I can hang

22    out with you all.  What I would have in mind is probably two

23    sessions of half a day a piece, and I'll try to focus the

24    questions for you all so that you can be responsive to the

25    things that I'm worried about and not worry about the things

1    I'm not worried about.

2           So I will be back in touch -- at least with the lead

3    counsel -- as soon as I figure this out.  I'm guessing that it

4    will be April when we have these hearings.  The only thing that

5    would push it is if I get multiple trial dates for criminal

6    cases, and unfortunately for you all, those cases take priority

7    even over an MDL, which is kind of at the top of the list for

8    civil.  And, unfortunately, we have pretty much been a year

9    without being able to take care of our criminal defendants,

10   even those in custody, so those will get immediate triage

11   whenever Judge Pallmeyer tells me I can do it.

12          Any questions on the plaintiffs' side for me today?

13          MR. HO:  Not from us, your Honor.

14          MS. WEDGWORTH:  Your Honor, would you -- go ahead.

15          MR. HO:  No.  Go ahead.

16          MS. WEDGWORTH:  Would you anticipate the experts

17   themselves possibly appearing at the *Daubert* hearings?

18          THE COURT:  I hope not, only because it would be more

19   trouble for you guys and more expensive for you as well.  But

20   if there was some issue that I needed to take a testimony on

21   and have you guys do a voir dire, essentially, before I could

22   rule on the motion, that's a possibility, but I hope not.  I

23   will try to avoid that if I can.  But if I can't, I can't.  I

24   have to keep a clean record here.  So who knows.  I don't think

25   so, Ms. Wedgworth, but it might happen.

1          MS. WEDGWORTH:  Thank you, your Honor.

2          THE COURT:  Okay.  Thank you.  And, Mr. Ho, did you

3 have anything else you wanted to add?

4          MR. HO:  Other than to thank you for your time, no.

5 Thank you very much your Honor.

6          THE COURT:  Okay.  Thank you, guys.  How about for the

7 defense side?

8          MS. MILLER:  Your Honor, two quick questions.  One,

9 would your Honor like to have copies of the slides that all of

10 the parties put on the screen today?  And if so, we're happy to

11 collect them and send them on to Carolyn.

12          And the second question relates to what we started out

13 with at the beginning of the hearing.  Namely, the motion you

14 have taken under advisement with respect to Authenticom's

15 motion against Reynolds.  There is a brief reference in that

16 motion to what AutoLoop, which is not a party to that motion,

17 intends to try to do with these allegations against CDK,

18 because, remember, CDK is not in the Authenticom case.  So we

19 would appreciate leave to file a very brief submission on the

20 same day that Reynolds submits its opposition addressing those

21 two small points as they relate to AutoLoop and CDK.

22          THE COURT:  Yes.  I think I put replies in the order.

23 If I didn't, I intended to for that very purpose.  I don't know

24 who has a dog in the fight.  Let's put it this way.  It's clear

25 who has a dog in the fight.  It's clear -- but it may be others

1    who have a dog in the fight as well.  If you have a dog in the

2    fight, I just ask that you file the same day as the response

3    brief so that the reply can take up everybody's positions.

4              MS. MILLER:  Much appreciated.

5              THE COURT:  And, then, on the other issue -- oh, the

6    slides.  Sure, absolutely.  I was thinking of pulling my phone

7    out and taking screenshots of what you guys put up because in

8    some cases they weren't up for very long.  I didn't do that.

9    But, yes, if you -- I know both sides at some point or other

10   had slides.  I couldn't even keep track of who had the slides.

11   But in the event that -- most of the slides looked to me like

12   they were kind of summaries of the brief, anyway, and then you

13   guys kind of read through it, so when I get the transcript, it

14   will be pretty close, but it couldn't hurt to give me the

15   slides, too.  So I'll be happy to take them, and if you all

16   collect them and just send them into Carolyn, that would be

17   appreciated it.

18             MS. MILLER:  Happy to do so, your Honor.

19             THE COURT:  Everybody good for today?  Anybody on the

20   Reynolds side have anything they want to add?

21             MS. GULLEY:  No.  Thanks so much for your time today.

22             THE COURT:  Okay.  You guys are the best.  Judge

23   Fallon is right.  This is why I want MDLs, so thank you.  Have

24   a good weekend.  Those of you in the polar vortex, stay warm.

25   If you're not, you're lucky.  Thank you.

1     MS. WEDGWORTH:  Have a good weekend.

2         (Proceedings concluded.)

3                 * * * * * * * * * *

4                 C E R T I F I C A T E

5     I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.

7

8

    /s/Kristin M. Ashenhurst, CSR, RDR, CRR   February 22, 2020
9   Kristin M. Ashenhurst, CSR, RDR, CRR       Date
    Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25