1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3      IN RE:                        )  Docket No. 18 CV 00864
                                     )
4      DEALER MANAGEMENT SYSTEMS     )  Chicago, Illinois
                                     )  May 13, 2021
5      ANTITRUST LITIGATION.         )  10:05 A.M.

6                   TRANSCRIPT OF PROCEEDINGS - Hearing
                BEFORE THE HONORABLE ROBERT M. DOW, JR.
7
       APPEARANCES:
8      For the Dealership
       Class Plaintiffs:        MILBERG PHILLIPS GROSSMAN LLP
9                               BY:  MS. PEGGY J. WEDGWORTH
                                     MR. JOHN D. HUGHES
10                              One Penn Plaza, Suite 4800
                                New York, New York 10119
11                              pwedgworth@milberg.com

12     For the Individual
       and Vendor Class
13     Plaintiffs:             KELLOGG, HANSEN, TODD,
                               FIGEL & FREDERICK, PLLC
14                             BY:  MR. DEREK T. HO
                                    MR. MICHAEL NEMELKA
15                                  MR. AARON M. PANNER
                                    MR. DANIEL V. DORRIS
16                                  MS. BETHAN R. JONES
                                    MS. JAYME L. WEBER
17                             1615 M Street Nw
                               Suite 400
18                             Washington, DC 20036
                               dho@kellogghansen.com
19
       For the Defendants
20     Reynolds And Reynolds
       Company:                GIBBS & BRUNS, LLP
21                             BY:  MS. AUNDREA K. GULLEY
                                    MR. BRIAN T. ROSS
22                                  MR. BRICE WILKINSON
                                    MR. JUSTIN D. PATRICK
23                                  MR. ROSS M. MACDONALD
                               1100 Louisiana
24                             Suite 5300
                               Houston, Texas 77002
25                             agulley@gibbsbruns.com

```
 1    APPEARANCES (Continued)

 2    For The Defendants
      Reynolds and Reynolds
 3    Company:                    SHEPPARD MULLIN RICHTER
                                  & HAMPTON, LLP
 4                                BY:  MR. LEO D. CASERIA
                                  2099 Pennsylvania Avenue NW, Suite 100
 5                                Washington, DC 20006
                                  lcaseria@sheppardmullin.com
 6
                                  SHEPPARD MULLIN RICHTER
 7                                & HAMPTON, LLP
                                  BY:  Mr. James L. McGinnis
 8                                Four Embarcadero Center, 17th Floor
                                  San Francisco, California 94111
 9
      For the Defendants
10    CDK GLOBAL, LLC:            MAYER BROWN LLP
                                  BY:   MS. BRITT MILLER
11                                      MR. MATTHEW D. PROVANCE
                                        MR. DANIEL T. FENSKE
12                                      MR. JED W. GLICKSTEIN
                                  71 South Wacker Drive
13                                Chicago, Illinois 60606
                                  bmiller@mayerbrown.com
14

15

16

17

18

19

20

21

22

23    Court Reporter:            KRISTIN M. ASHENHURST, CSR, RDR, CRR
                                  Official Court Reporter
24                                219 S. Dearborn Street, Room 2304-A
                                  Chicago, IL 60604
25                                (312) 818-6549
                                  kristin_ashenhurst@ilnd.uscourts.gov
```

1       THE CLERK:  The case is 18 Civil 864, In Re Dealer

2  Management Systems Anti-Trust Litigation.

3       THE COURT:  Okay.  Just to make this all clear, I am

4  going to ask you from each side since I can see -- well, I can

5  tell you that Carolyn and Kris and John Moynihan are three

6  people who work in my office.  And everybody else, I'm

7  assuming, is working from one of your offices.

8       Mr. Ho, you're on the far left of my screen, so I will

9  let you go first.

10       MR. HO:  Good morning, Judge Dow.  Derek Ho from

11  Kellogg Hansen on behalf of individual and vendor class

12  plaintiffs.  For efficiency, I'll just introduce everyone from

13  the Kellogg Hansen team; that's Aaron Panner, Michael Nemelke,

14  Daniel Dorris, Jayme Weber and Bethan Jones.

15       THE COURT:  Okay.  And if I could ask --

16       THE COURT REPORTER:  Oh, you muted yourself, Judge.

17  Judge.

18       THE COURT:  Okay.  Sorry.  I'm sorry, Kris.  That was

19  for demonstration effect.  I think we're getting a little echo,

20  so if you're not the speaker, I would ask if you could mute and

21  maybe we will wipe out the echo and give Kris less of a

22  headache by the end of this proceeding as she's trying to type

23  it all down.

24       So I will go ahead -- let me turn, then, to

25  Ms. Wedgworth, if you could introduce your folks.

1      MS. WEDGWORTH:  Thank you, your Honor.  Good morning.

2 I am Peggy Wedgworth from Milberg on behalf of the dealership

3 plaintiffs.  And I am not able to determine if others in my

4 office are on the video.  John Hughes from our office is on the

5 video feed.  And others in my office, I do believe, may be on

6 the audio feed.

7      So John Hughes from Milberg also on the line at this

8 time, your Honor.

9      You're on mute, your Honor.

10      THE COURT:  Thank you.  I have -- there's two buttons

11 and only one of them seems to be working, but I've got it now.

12 Ms. Gulley, you are next at the top of my screen, so could you

13 introduce yourself and your team.

14      MS. GULLEY:  Thank you, your Honor.  For the Reynolds

15 and Reynolds Company from Gibbs and Bruns, I'm Andi Gulley.

16 I'm here with Brian Ross, Brice Wilkinson, Ross MacDonald, and

17 Justin Patrick.  And from Sheppard Mullin for Reynolds, it

18 looks like we have got Jim McGinnis and Leo Caserio.

19      THE COURT:  Okay.  Great.  Thank you.  And Ms. Miller?

20      MS. MILLER:  Good morning, your Honor.  Britt Miller,

21 Mayer Brown, on behalf of CDK Global.  And with me are my

22 colleagues Matt Provance, Daniel Fenske, and Jed Glickstein.

23      THE COURT:  Okay.  Great.  Is there anybody else who

24 hasn't been introduced yet who is representing a party in the

25 case?

1          (No verbal response.)

2          THE COURT:  Okay.  Great.  Let me tee this up for a

3    minute here.  I tee'd it up in three and a half pages, I think.

4    So let me just give you the big picture.  So I'm looking at

5    this -- the narrow picture is I got 10 *Daubert* motions with 500

6    pages of briefing.  It looks like this binder right here.

7    There's another one that looks a lot like that with 10 more

8    summary judgment motions with another 500 pages of briefing.

9    So there's about a thousand pages there for my law clerk and I

10   to digest.  He turns into a pumpkin and goes to private

11   practice in the middle of August.  And my guess is that between

12   now and the middle of August, this is pretty much what he is

13   going to be doing with me.  There's a wider picture, and that's

14   to take those two binders together.

15          But what I'm really concerned about is the even wider

16   picture, which is I'm an MDL transferee judge, and I need to

17   manage these cases in a way that makes the most sense not only

18   for myself and for any colleagues who will get these cases

19   ultimately on remand, but also for the system, because that's

20   what 1407 entrusts transferee judges to try to be as efficient

21   as we can for the entire system because, believe it or not, I

22   have 350 other civil cases and 50 criminal cases, and I can't

23   give my undivided attention 24/7/365 to this case, although a

24   judge could probably do that for months at a time and not, you

25   know, be wasting any time for the judiciary.

1    Anyhow -- and what I'm mostly interested in today is

2    the really big picture.  So, *Daubert*, I really like *Daubert*.   I

3    did *Daubert* in private practice.  That's kind of what I was.   I

4    was the *Daubert* guy.  I might have even done *Daubert* motions

5    with both sides in this case because I worked an awful lot with

6    Kellogg Huber, too.  I see Mr. Panner smiling because he knows

7    -- he and I had many, many, many, many emails and phone

8    conversations back in the day.

9          I'm not -- the *Daubert* part of this doesn't scare me

10   at all.  It's kind of what I like to do.  So is there a

11   methodology, a test?  Is there connective reasoning that links

12   the factual assumptions to the conclusions?  Do they fit the

13   case?  That's all total standard grist to the mill for judges,

14   particularly ones who like *Daubert* motions.

15         Then you've got summary judgment.  And a lot of your

16   *Daubert* motions, it's either -- it's a battle of the experts or

17   it's not.  I mean, there's multiple folks talking about the

18   same topic.  It's pretty unlikely that I will exclude one and

19   not exclude the other.  I will either exclude them both or keep

20   them both, as long as their opinions satisfy *Daubert* muster.

21   Both sides are telling me, depending on whether you are on

22   offense or defense, this is just a battle of the experts,

23   Judge, and maybe it is.  But that's not what I'm worried about.

24         I am now looking at the bigger picture.  And this is

25   taking me back to my very first antitrust case.  So sometime in

1    the late '90s, a senior partner came to my office and said,

2    "Hey, how would you like to work on an antitrust case?"

3          And I said, "Sounds interesting, but I've got to warn

4    you, I don't know anything about antitrust.  I didn't take it

5    in law school.  I've never worked on an antitrust case."

6          He said, "That's okay.  Antitrust is just a bunch of

7    expletive deleted, and you're going to be fine.  And besides, I

8    just want you to work on a *Daubert* issue."  Okay.

9          So I worked on that case, and that was *Concord Boat*.

10   You guys are both citing *Concord Boat*.  And I -- you know, it

11   all brings me back to Bob Hall and the Cournot model and trying

12   to get Judge Moody to throw the expert out, which he didn't do.

13   It went to trial.  $132 million.  Went to the Eighth Circuit.

14   Judgment entered for the defendant.  That was my introduction

15   to antitrust.

16         Now, I read all of these cases here, and I hope I

17   understand the plaintiff's theory of the case.  That's why I

18   laid it out there in a long paragraph, and I know you guys will

19   correct me if I don't understand it.  And I hope I also

20   understand where the rubber meets the road on your dispute

21   about these experts.

22         I think what I'm hearing the plaintiff say is until

23   the jury sorts these facts out, you're not in any position to

24   exclude these experts because our theory of the case might be

25   right.  The jury might agree with it.  And if our theory of the

1    case is right, the jury agrees with it, and the expert's

2    opinion lines up with the jury's findings, then our damages

3    theory is completely valid, viable, and if a jury buys it, we

4    should get the billion dollars we want out of this case.

5    That's one scenario.

6          Another scenario is exactly the opposite.  The jury

7    rejects everything.  Enters judgment for the defendant.

8          There's another scenario in the middle, and that's the

9    scenario that these cases are really teeing up in my mind, at

10   least.  It's *Concord Boat*.  It's *Story Parchment*.  It's *MCI*.

11   It's *Marshfield.*  All of those other cases where I think the

12   defendants are telling me, "Look, there is a basis for a lot of

13   what happened here as lawful conduct.  And these experts aren't

14   separating that out at all.  They're not even trying to.  And

15   if, at the end of the day, the jury comes out with a mixed

16   verdict, these expert theories may no longer fit the case, in

17   which case the verdict could be very vulnerable."

18         And I suppose the plaintiffs could come back and say,

19   "Well, it was one of those nonsegregable series of conduct and

20   so we're going to be okay anyway."

21         But what I see in these cases is not excluding the

22   expert.  I see throwing out the verdict is what happens in the

23   end.  And as an MDL transferee judge, it concerns me that maybe

24   we can do a tremendous amount of work here and I could give you

25   a couple of hundred pages of opinions on this and then you can

1    go to trial.  And maybe it will be scenario one, smashing

2    victory for the plaintiff.  Maybe it will be scenario two,

3    smashing victory for the defendants.  But if it's scenario

4    three, are we going to be redoing *Daubert* after the verdict

5    form comes in to see if the verdict is supportable by this

6    expert's testimony, which is why I raised the question for you

7    all, not having thought about it at all until about a week ago

8    when this came to my mind.  Is there a safer play here to do

9    liability and then damages, or is that just not feasible for

10   either side and not what either side wants?

11        Because I am -- I'm not sure I'm going to try any or

12   all of these cases.  I am more inclined to remand cases to the

13   original jurisdictions than to try them myself.  I know some of

14   the cases are in this jurisdiction and I'll probably end up

15   trying those if they go to trial.  But I had never planned to

16   follow a case back to Wisconsin and make myself a Western

17   District of Wisconsin judge.  That case is going back to Judge

18   Peterson.  Same with all of the other cases that come from

19   other jurisdictions.  There's definitely a split of views

20   amongst transferee judges on that, but I had not planned to do

21   that.

22        So I'm cognizant that my rulings, which will be law of

23   the case until they're not, will go back to somebody else after

24   you have this trial.  And if you get a Type C verdict, the

25   judge is going to have to redo all of this, or at least it will

1    be subject to some post-trial motions that might be pretty

2    persuasive, depending on which boxes the jury checks.

3         Anyway, maybe you all will tell me, "Judge, you're

4    worried about something that you shouldn't really worry about."

5    Or "We should just stay the course and carry on here.  Give us

6    our rulings and that's all, you know, two years from now

7    judge's problem and it may not even be yours."

8         But that's what I really wanted to tee up for you

9    guys.  And I thought what might make sense here is to give, you

10   know, Mr. Ho, Ms. Wedgworth, Ms. Gulley, Ms. Miller, and your

11   designees, whoever you want, the floor uninterrupted for, you

12   know, 10 or 15 minutes to tell me what you think about all of

13   the issues that I have raised here and how I ought to be

14   thinking about them.  Because that's my big concern.

15        I am not worried about doing *Daubert* motions or

16   summary judgment motions.  I've been doing those a long time.

17   I am worried about the end game of an antitrust case that's an

18   MDL that, you know, I have been entrusted with managing this as

19   best I can for the system.

20        So with that, I will stop talking.  I apologize for

21   talking as long as I did.  But I don't think it ever makes

22   sense for the judge not to tell the parties what's on the

23   judge's mind.  Because you have a chance to correct me from a

24   path that I may not even belong on, and if I just spring this

25   on you in a 137-page opinion, which is the last time I had an

1    issue like this in an MDL, you know, people can take shots at

2    it and it will just delay the case.  I would rather you take

3    the shots now before John and I go into our MDL bunker for the

4    next three months.

5            So, Mr. Ho, I will go in the same order I had you guys

6    do your introductions.  That's completely random, but, you

7    know, the plaintiffs have the burden so I suppose they ought to

8    go first.  Just tell me what's on your mind on what was on my

9    mind and help me out here.  That's all I'm looking for.  Thank

10   you.

11           MR. HO:  Thank you, Judge Dow.  Derek Ho, again, from

12   Kellogg Hansen for the individual and vendor class plaintiffs.

13           If I could, I'll give you my sort of headline reaction

14   to the letter and the concerns that your Honor just raised, and

15   then try to unpack that a little bit.  And the headline really

16   has two points.  One is we think that the likelihood of the

17   kind of problem that you see in *MCI* and *Concord Boat*, in other

18   words, a post -- a successful post-verdict challenge to the

19   sufficiency of the evidence on the ground that the plaintiff's

20   damages don't adequately account for lawful conduct is highly

21   unlikely here because, contrary to the premise of defendants'

22   arguments, the plaintiff's damages experts do, in fact, take

23   account of market factors that are separate from the unlawful

24   conduct.  In fact, that's the entire purpose of the damages

25   methodology that Mark Israel and Cathy Lawton use, and I can go

1    into that in more detail.

2         And, second, that even to the extent that there is

3    some residual risk that a jury could find facts that are

4    inconsistent with the assumptions that an expert makes, that

5    risk is both inherent in the admission of expert testimony and

6    not, as your Honor's *Daubert* rulings have made clear, a *Daubert*

7    issue, which goes to the admissibility of the expert's

8    testimony for trial in the first instance.

9         And, secondly, not withstanding your Honor's laudable

10   concerns about MDL administration and the potential for, you

11   know, time that might be wasted in the transfer or quarter

12   additional proceedings that might be required.  Our view is

13   that those kind of issues are appropriately handled by the

14   transferor court under Section 1407 and under *Lexicon* because

15   those were really matters for trial.

16        And so if, as your Honor says, Judge Peterson is going

17   to be trying this case, you know, it really should be within

18   his province to determine whether, for example, liability and

19   damages ought to be bifurcated or what kinds of interrogatories

20   the jury ought to receive.

21        So let me try to unpack that a little bit.  Your

22   Honor's letter invited us at the outset to react to the

23   recitation of the conspiracy that's set out there.  And on the

24   whole, we agree with the way that your Honor has sketched it

25   out, with one significant addition, which is that the damage

1    from the conspiracy was not just the loss value and

2    functionality of the DMS to the auto dealers, but also the

3    super competitive data integration prices that were suffered by

4    the vendors, which are the direct purchasers of those services

5    and the lost profits to Authenticom, which was the market

6    leading data integrator that CDK and Reynolds conspired to

7    foreclose from the market, among others.

8            Just to make sure everyone -- your Honor is oriented.

9    Mark Israel quantifies the overcharges that the vendors

10   suffered and Cathy Lawton quantifies Authenticom's lost

11   profits.  And so I guess I would like to -- I've made three

12   points about their testimony, which, hopefully, will again

13   address the Court's big-picture concerns.

14           One, as I mentioned, Israel and Lawton both used

15   well-worn, reliable methodologies that do isolate the economic

16   effects of defendant's unlawful conducts.  Israel uses the

17   differences in differences methodology, and to the extent that

18   your Honor has detailed questions about that, Mr. Panner is

19   prepared to address those.  Ms. Lawton uses a yardstick model.

20   And both of them model the but-for world using benchmarks that

21   account for exogenous market factors other than the unlawful

22   conduct.

23           There's really no dispute about that.  With respect to

24   the yardstick, for example, Professor Rubinfeld, who is the

25   rebuttal expert to Ms. Lawton, acknowledges both in his report,

1    in his writings, in his deposition, that a yardstick method is

2    a reliable methodology for doing exactly what the substantive

3    antitrust law requires, which is to isolate the effects of the

4    unlawful conduct.  Again, by using a yardstick that accounts

5    for exogenous factors, but is unaffected by the unlawful

6    conduct.  That's the whole point of the yardstick.

7         Defendants criticize the application of that yardstick

8    to the facts of this case.  But as your Honor's *Daubert*

9    opinions say over and over again, that kind of criticism goes

10   to weight and not admissibility.  And the same is true for

11   Dr. Israel, his differences in differences model uses a

12   benchmark that takes into account all market factors, other

13   than the unlawful conduct.  And, again, the rebuttal expert's

14   criticisms of his application of that methodology, the

15   selection of inputs and so on and so forth go to weight and not

16   admissibility.

17        So the fundamental premise of defendant's argument

18   that plaintiffs have not accounted for any of these lawful,

19   non-anticompetitive factors is just wrong.  And I would like to

20   address one of those arguments in particular, and that's the

21   argument that the plaintiffs' economic harm during the

22   conspiracy period could have been the product of unilateral

23   conduct.  That is a theme that animates much of the defendants'

24   arguments and there are particular sort of instances of this,

25   but the basic response to that is that that premise is hotly

1    factually disputed, and it can't be resolved without trial.

2           As both Israel and Lawton explained, consistent with

3    economic theory, CDK and Reynolds exercised their unilateral

4    market power to the fullest extent prior to the conspiracy.

5    But the result of their exercise of that unilateral market

6    power was that neither one of them could close their respective

7    DMSs.

8           Dealers preferred the ability to use independent data

9    integrators, and that preference drove CDK to compete for

10   Reynolds' dealer customers by competing on the basis of the

11   dealers' ability to use independent data integrators.  And

12   that, in turn, prevented Reynolds from closing its system.

13          There is no reason to believe, and there is no

14   evidence set out by defendants, that their unilateral market

15   power changed between the pre-conspiracy period and the

16   conspiracy period.  Nor is there any evidence that they could

17   have achieved unilaterally in the conspiracy period what they

18   were unable to achieve unilaterally in the pre-conspiracy

19   period.  And that's exactly what Israel and Lawton said as the

20   response to this assumption that the defendants make, that they

21   would have been able to do unilaterally in the conspiracy

22   period what they weren't able to do before.

23          And that, at the very least, is a factual dispute for

24   trial, and, again, if the jury accepts that, and we think the

25   economic logic of it is very powerful, then, again, there is

1    nothing to the premise that our experts have failed to account

2    for the possibility that unilateral market power accounts for a

3    change in price in the case of Dr. Israel's report, or the lost

4    profits in the context of Ms. Lawton's report.

5           And then the third and final point, I guess, that I

6    would make is to the issue of MDL administration.  There's an

7    important distinction, I think, between *Daubert*, which relates

8    to pre-testimony admissibility of our experts' testimony and

9    post-trial questions of evidentiary sufficiency.  I think your

10   Honor's opening comments reflected that.  And for the former,

11   for *Daubert*, we have no, you know, question that this Court,

12   the transferee court, is the appropriate forum for resolving

13   that.  And as your Honor says, the standards there are well

14   worn, is the experts' testimony reliable and is it relevant and

15   helpful to the jury.

16          But to the extent there becomes a problem where the

17   jury finds facts that are inconsistent with the experts'

18   opinions, and, again, we think that the scope of that potential

19   problem is greatly overstated by the defendants' briefs, there

20   are other tools that your Honor, if he is the trial judge or

21   Judge Peterson, if he is, can use to address those issues.

22   JMOL, new trial, an appeal, and there's nothing wrong or

23   inefficient or problematic from the standpoint of MDL

24   administration with leaving those kinds of issues to the

25   transferor court.  Indeed, we think that that's much more

1    efficient than the limitations of the transferee court's

2    authority under Section 1407 and more consistent with the

3    Supreme Court's decision in *Lexicon*.

4         So to take a concrete example, you know, what are the

5    interrogatories or what is the verdict form going to look like

6    when it comes to the trial.  And we would submit that that

7    really is a trial issue as opposed to a pretrial issue.  And so

8    under *Lexicon* and 1407 really is within the province of Judge

9    Peterson or the transferor court.  And bifurcation of liability

10   and damages is really in the same vein.  That's ordinarily a

11   discretionary judgment made by the trial judge, based on, you

12   know, the evidence as it is coming in in the case.  You know,

13   the relative advantages and disadvantages of having to have two

14   different trials with potentially overlapping evidence versus

15   the advantages that your Honor has pointed out of being able to

16   know exactly what the factfinder will say about liability

17   before going into damages.

18        That's, you know, -- that's a quintessential trial

19   court judgment, and we think much better dealt with at that

20   point after, you know, the issues of admissibility have been

21   addressed by this Court.  And I would say there, too, that

22   again, the prospect that bifurcation is likely to be more

23   efficient, I think, is overstated for much the same reason that

24   I alluded to before, which is I don't think that there are all

25   of these other exogenous factors that the jury is going to have

1    to be asked about.

2           In our view, the jury may have to be asked whether

3    there was a conspiracy and when it started and what the

4    conspiracy was to do, what the object of the conspiracy was.

5    But all of these other things that the defendants are saying

6    they might have to be asked, these supposed exogenous market

7    factors are addressed by the economic methodologies that

8    Dr. Israel and Ms. Lawton are using.  And so there is no need

9    to ask, for example, whether, you know, Captcha would have been

10   used in the conspiracy period and to what degree.  Those

11   arguments -- or factual findings along those lines by the jury

12   will really not respond in any meaningful way to the

13   plaintiffs' methodologies and the reasons why plaintiffs'

14   submit that unilateral conduct cannot be the rational

15   explanation for the increase in prices that you see in the

16   conspiracy period and the decline in Authenticom's connections

17   and lost profits.

18          So with that, I guess -- I'm happy to talk more about

19   why we submit that Ms. Lawton's yardstick method and the

20   difference in differences method do, in fact, account for

21   market factors other than the unlawful conduct.  But I don't

22   want to belabor that point if your Honor is already familiar

23   with those methodologies, as I suspect that your Honor is.  So

24   I would take a cue, if you're willing to give one, about

25   whether I should go into that in more detail or whether there's

1    something else that your Honor might react to.

2         THE COURT:  No.  Thank you, Mr. Ho.  That was exactly

3    what I was hoping.  And that's a good model for your fellow

4    lead counsel or their designees to follow.  Because that's the

5    kind of -- you know, I'm realizing that I have to overcome my

6    MDL management angst before I can go back into the weeds of

7    *Daubert* and then summary judgment.  I'm not actually all that

8    bothered by any of the *Daubert* issues.  The three I flagged at

9    the end are a couple.  There's one -- Williams, Halpin and

10   Miracle were just simple questions I thought you guys could

11   answer pretty fast.

12        So I don't think I need you to go into the

13   methodologies.  But I appreciate the big picture and I do, you

14   know, 1407 is -- I've been studying that for the last four

15   years at the civil rules committee as some of you know.  Some

16   of you probably have even been at some of the events that we've

17   been studying this.  And I've learned that there are hawks and

18   doves on 1407.  And I consider myself more of a dove.  I'm not

19   inclined to go lateral myself through inter-circuit transfer to

20   Mississippi to try a case, just so I can say I saw this MDL to

21   the bitter end.  I'm more inclined to remand.

22        *Lexicon*, it turns out, is also a case I worked on way

23   back in the day.  And, you know, I -- at the time I wondered

24   why you couldn't just do a lateral, but the rules are what the

25   rules are and that's what I've learned.

1          So I appreciate all of your comments.  I hope your

2     other lead counsel will follow suit and just focusing on the

3     big picture there.  And then I only need to drill down on the

4     Williams, Halpin, and Miracle questions for now.  But I reserve

5     the right to come back to you guys, either for a quick hearing

6     or a, you know, a supplemental brief on some issue that might

7     have to do with some particular experts' methodology.  But for

8     today, I don't think that's necessary, so thank you, Mr. Ho.

9          Ms. Wedgworth, I'm going to turn the floor over to

10    you, then.  And you all should feel free to tap a designee if

11    you want.  I'm just working off my lead counsel list here.

12          MS. WEDGWORTH:  Understood.  Thank you, your Honor.

13    As to the first question of transferee/transferor and is there

14    a safer play to do liability and damages.  The class

15    dealerships at this point would anticipate requesting that this

16    case stay with your Honor for trial.  And, granted, there are

17    numerous cases that were filed by individual dealerships that

18    have been consolidated, and there are numerous cases filed in

19    front of your Honor.  Our clients filed originally, I think, in

20    New Jersey and then, of course, we've been transferred.  So we

21    anticipate asking your Honor -- making a motion at the correct

22    time for you to keep the case and try it, understanding that

23    that may not work out.  But it would be, in our minds, the best

24    plan for the class of dealerships.  You've been with the case

25    from almost the very beginning and seeing us through, and that

1    may simplify, at least for us, some of these decisions and

2    things you're addressing now.

3            As to -- I will just start up front with as to

4    bifurcation, I don't think we need that at all, certainly at

5    this point.  That's not to say later on in pretrial that

6    discussion can't be had.  But as of today, there's no need for

7    bifurcation.  As to the *Daubert* motions and liability and

8    damages, we feel you have the materials and you can address

9    them at this point.

10           I certainly appreciate your concerns about the issues

11   because all of the cases that we're all looking at, from

12   *Concord Boat* to *MCI* to *Spray-rite* to -- we've got Blue Cross

13   Blue Shield at Marshfield, all of those cases we see in the

14   context of post-trial.  And, in fact, post-trial they take the

15   trial verdict and say since some of the antitrust action was

16   considered not unlawful or lawful, as some may say, we've got

17   to determine whether or not that changes the damages

18   calculation.  And without a determination from the jury, we

19   can't make that calculation.

20           So at this point, that's an issue that's for the jury.

21   And all of the *Daubert* issues we feel like are -- any issue

22   that may come up, and I don't want to repeat all of Mr. Ho's

23   material, but any issue that may come up with regard to

24   Dr. Williams or his damages calculation is best handled on

25   cross-examination.

1          Now, I do have a couple of slides I did want to show

2     you, specifically -- and I'll get into a little bit more of the

3     weeds.  And I hope not to repeat anything that Mr. Ho has

4     covered that overlap, but I do want to at least point out with

5     regard to Dr. Williams, I wanted to specifically address your

6     questions.  And if I understand you correctly, your Honor, you

7     want to hear with regard to the Williams' questions, you want

8     me to go ahead and answer those today, is that correct?  The

9     ones you have in here or would you rather wait?

10          THE COURT:  No.  I think what I'd like to do is have

11    each of the lead counsel or their designee give me the big

12    picture.

13          MS. WEDGWORTH:  Okay.

14          THE COURT:  And then we can go to Williams, Halpin and

15    Miracle.  And, again, you all can handle those in any way you

16    wish just to answer those specific questions.  But I am trying

17    to get the big picture coherently, and I think it will work

18    better if we skip on to -- if that's what you have to say in

19    the big picture and you were ready to transition to Williams,

20    why don't we hold Williams, Halpin and Miracle for the moment,

21    just so I can get everyone's big picture thoughts, and then

22    we'll come back to the specifics.  Does that sound all right?

23          MS. WEDGWORTH:  It does.  Let me just add one point

24    since Mr. Ho brought up the fact that in your description of

25    the case you certainly addressed decreased functionality.  And

1    Mr. Ho has also pointed out that Dr. Israel has determined the
2    overcharge with regard to the vendors.  Dr. Williams has also
3    determined an overcharge that has been passed on from the
4    vendors to the dealers.  And the dealers with regard to their
5    indirect purchaser claims also have damages allegations and
6    will be pursuing -- still pursuing -- those overcharges that
7    have been passed on from the vendors to the dealers.  So that's
8    also a damages in this matter.

9         So other than that, at this point with regard to
10   Williams, I will keep the issues at hand at the moment and wait
11   until we address the other issues.

12        THE COURT:  Okay.  Thank you, Ms. Wedgworth.  As soon
13   as Mr. Ho pointed out the last sentence of my summary
14   paragraph, I realized that I had omitted a lot.  It was just a
15   note that I took down and I forgot to go back and capture all
16   of the damages of it.  So, as soon as he said it, I recognized
17   I had shorted your case a bit.  But we certainly will not short
18   it when we get to the opinion writing piece.  So thank you.
19   That's helpful, too.  Appreciate it.

20        Ms. Gulley, I'm going to turn to you next.

21        MS. GULLEY:  Thank you, your Honor.  We've divided
22   this up among a few more people, but definitely a very high
23   level and just a few minutes from each of us.  So I believe
24   Ms. Miller will address some of the overarching MDL questions.
25   I will talk a little bit about the liability points that Mr. Ho

1  made, and then some responses to Mr. Ho's statements about the

2  damages experts.

3        THE COURT:  Perfect.  Okay.  Ms. Miller, then you're

4  up.

5        MS. MILLER:  Thank you, your Honor.  Yes, as

6  Ms. Gulley points out, we divided up a little bit different.

7  So for some of these bigger picture issues, I will be referring

8  to her and to my colleague, Mr. Provance, and others to address

9  some of the statements that both Mr. Ho made and Ms. Wedgworth

10  made, which should not surprise the Court we disagree with to a

11  significant extent, both on the facts and on the law.

12        THE COURT:  Can I stop you for one second, Ms. Miller.

13  I just read 500 pages and I didn't find any agreement, so it

14  doesn't surprise me at all.

15        MS. MILLER:  Fair enough.  I will echo one thing that

16  Mr. Ho said, and that is that we appreciate the invitation to

17  comment on the Court's understanding of plaintiffs' current

18  theory or theories of the case.  And I would say I agree with

19  Mr. Ho on one thing, and that is the Court has generally

20  described the contours of plaintiffs' newest theory here.

21        Of course, we don't agree with the factual predicate

22  as your Honor has noted, as we believe some of it makes

23  absolutely no sense or is belied by the undisputed facts in the

24  record.  Plaintiffs make a lot of statements about our systems

25  being more closed or more opened, that there's some sort of

1    common messaging, but those allegations remain vague at best.

2          But we understood the Court, and take it to heart,

3    that your Honor is not asking us to comment on plaintiffs'

4    theory of the case as it relates to the motion to strike or as

5    to the motions for summary judgment, which will come later in

6    these discussions.  And so we are going to focus on the facts

7    and the law as we understand it as relevant to the *Daubert*,

8    which is a smaller subset of matters your Honor has to

9    consider.

10          At the outset, I will say we disagree that all of this

11   has to wait for trial.  We think Dr. Israel's and Dr. Lawton's

12   and Dr. Williams's opinions can be excluded as a matter of law,

13   and that the undisputed facts allow this Court to rule on their

14   exclusion.  *Marshfield Clinic*, which has been mentioned several

15   times, is not a post-trial case.  And if those -- if

16   plaintiffs' opinions are, in fact, excluded, that has

17   potentially catastrophic impact on their case going forward.

18          We will note that as Ms. Wedgworth alluded to, that

19   the Court's description of the alleged conspiracy seems for the

20   most part act as a summary -- oh, excuse me.

21       (Cell phone ringing.)

22          MS. MILLER:  Most as a summary of the theories that

23   have been offered by Dr. Israel, who is the expert for AutoLoop

24   and Authenticom.  The dealers' expert, Dr. Williams, as is

25   detailed in our papers, couldn't articulate an explanation of

1    what happened in September of 2013, only that competition

2    somehow changed as a result.

3            And, of course, the alleged conspiracy at MVSC is

4    different than the conspiracy that is alleged in the other

5    cases, and Mr. Caseria can speak to that question if the Court

6    needs him to.

7            In short, from our perspective, it remains very

8    unclear, despite the fact that this case has been going on for

9    four years, exactly what plaintiffs collectively think was

10   agreed to in September of 2013.

11           To the point Ms. Wedgworth made, and that the Court

12   included as a note at the end of its summary, the Court states

13   that the plaintiffs seek damages for the lost value and

14   functionality.  And, again, whereas that is accurate for the

15   dealers, it's, as Mr. Ho stated, not accurate to the other

16   plaintiffs who are seeking either lost profits or supposed

17   integration overcharges.

18           But regardless of merits of plaintiffs' theories,

19   which, again, is a argument for another time, defendants

20   believe it's important to keep some key aspects about their new

21   theory in mind as you assess the *Daubert* motions.  And as I

22   said, Ms. Gulley and Mr. Provance are prepared to address in

23   more detail the Court's specific questions posed in your memo.

24           But the first phase of the conspiracy from a liability

25   perspective rests primarily on a supposed reduction in DMS

switching and this so-called common messaging on data security. But we think the undisputed record shows that there is no evidence that CDK and Reynolds stopped competing for DMS customers. And as the Court's letter indicated there is evidence that fewer customers switched from Reynolds to CDK and vice versa, and that has to be viewed in the context of these new and aggressive market entrants that came into the marketplace during the period. Likewise, we think there's no evidence, and plaintiff has cited to none, that CDK and Reynolds actually worked together to craft more common messaging or any market messaging at all.

But there are a number of undisputed facts that bear directly on these *Daubert* motions and on the question of bifurcation that the Court has raised that we think are useful to note at the outset.

The first is that Reynolds secured its DMS against hostile integration 10 years before CDK did, and no one in the industry thought that Reynolds would ever reverse course. CDK observed hostile code on its system, data corruption, and system performance issues well before the alleged start of the conspiracy in 2013. CDK had a unilateral incentive to secure its DMS. Namely, to capture the additional value that was provided by certified integration. And this fundamental mechanism of the alleged conspiracy was blocking hostile integrators like Authenticom from accessing each defendant's

1    DMS without their permission.  And a number of other hostile

2    integrators wound down their operations on the Reynolds DMS at

3    the same time that CDK did.

4            As your Honor alluded to in your summary, the DMS

5    market was and is highly competitive with switching between

6    CDK, Reynolds, Dealertrack, Automate, and many other DMS

7    providers.  Indeed, Reynolds and CDK continue to add and lose

8    customers not only to each other, but to a host of existing --

9    long-existing rivals and new entrants to the marketplace.  And

10   Authenticom's connections to several of the DMSs are greater

11   than they have ever been.

12           To the bifurcation issue, which I want to make sure

13   that we address.  It may be that Mr. Ho and I agree on one

14   other thing, and that is the question of whether or not

15   bifurcation is appropriate here, insofar as we agree that it is

16   not.  I think where we disagree is what has to wait for the

17   jury and what can be resolved here before your Honor.

18           We think that bifurcation is unwarranted and

19   inadvisable for a host of reasons.  As your Honor has alluded

20   to, bifurcation, we think, risks a host of inconsistent

21   rulings.  As your Honor has acknowledged, one of the primary

22   purposes of the MDL is to yield consistent rulings across cases

23   as to common issues.  Bifurcating would risk sending damages

24   issues that turn on the same fundamental questions to three

25   different courts.  We agree with Ms. Wedgworth that the dealer

1   case stays here.  I think we disagree with Mr. Ho as to what

2   gets sent back and what doesn't, but that's an issue for

3   another day.

4        But it potentially could risk sending questions back

5   to both Wisconsin and, at least as to MVSC, to California,

6   which would risk different judges -- different judgments,

7   rather, under different circuit's laws by different juries.

8   And that's why I think all of the parties recognize, in

9   agreeing to the initial case management order back in 2018,

10  that the individual cases should not be remanded for trial, if

11  they're remanded at all, until after this Court's ruling on

12  *Daubert* and dispositive motions.

13       But from a practical matter, we don't think it's

14  feasible.  There's too much overlap here between liability and

15  damages.  We are sure the Court is very familiar with the

16  Seventh Circuit's decision in *Hydrite Chemicals* that to divide

17  a trial so that the issue of jury and the issue of damages are

18  tried in two separate trials is a recipe for confusion.  For

19  bifurcation to make sense here, the Court must be able to, I

20  think the phrase was "carve at the joint, in order to minimize

21  the overlap in evidence," but that simply isn't possible here.

22       To prove liability, the plaintiffs must show they were

23  injured.  To prove damages they must quantify that injury.  And

24  the evidence to prove damages will necessarily include the

25  evidence to establish antitrust injury.  The same is true of

1    the unilateral incentives which Mr. Ho has already spoken about

2    and which Ms. Gulley will address momentarily.  Both of those

3    -- that question of unilateral incentives and whether or not

4    plaintiffs' experts properly took account of them and whether

5    or not as a result of what we believe is their failure to take

6    account of them, whether or not their opinions can be excluded

7    as a matter of law, we clearly disagree on.

8          But these same unilateral incentives are key to

9    damages assessments, because if we had an incentive to secure

10   our system without a conspiracy, then we would have done so

11   even absent a conspiracy.  If that's the case, then any damages

12   that ultimately go to a jury would be substantially lower than

13   plaintiffs are claiming.  So as the Court is aware, and as,

14   again, we are prepared to discuss in detail, the defendant's

15   position is that plaintiffs' economic experts failed to

16   adequately account for those unilateral incentives, and as a

17   result, those opinions can be excluded as a matter of law.

18         The liability -- you know, bifurcation, and has been

19   touched on by both your Honor and plaintiffs' counsel,

20   bifurcation risks inconsistent findings.  A liability jury in

21   Wisconsin or California could find that plaintiff suffered

22   antitrust injury, whereas damages, if excluded here, there

23   could be no damages, thereby implying no antitrust injury.  And

24   so we think these issues are ripe, they're before your Honor,

25   and they should be ruled on by your Honor.

1      A separate sending just the question of liability or

2 deferring damages questions to these possible three different

3 jurisdictions makes no sense to have a liability trial if there

4 are no damages.  And we believe that several of the damages

5 opinions put forth by plaintiffs are invalid as a matter of law

6 and so it makes no sense to go to trial on liability if there

7 is no damages.

8      And as Mr. Ho has indicated, plaintiffs here make no

9 question this case is about damages.  Plaintiffs are

10 collectively seeking, like, $1 billion in collective damages.

11 Because a long period of time has passed since this supposed

12 conspiracy was formed, and the wind down agreement at issue

13 terminated back in 2017, so there's nothing to enjoin as to

14 that agreement.

15      And the Seventh Circuit made clear in this decision in

16 this case that there is very limited injunctive relief that

17 would be available to plaintiffs here.  Namely, one ordering

18 CDK and Reynolds not to implement their alleged conspiracy.

19 They are not entitled to an injunction forcing CDK and Reynolds

20 to open their systems to hostile integration.  That's what

21 Judge Petersen did and that was reversed in its entirety by the

22 Seventh Circuit.

23      Finally, as the Court might expect, a ruling on the

24 ability or inability for plaintiffs to prove their damages

25 would give the parties immeasurable guidance and allow them to

1   assess the strengths and weaknesses of their positions, and by

2   extension, the extent to which there is a viable case going

3   forward at all.  And so, again, whereas we disagree on what

4   exactly should be held for the jury, I think we are in

5   agreement that bifurcation at this point is not necessary.

6   　　　　As Ms. Gulley is going to discuss in the first

7   instance, then Mr. Provance is going to follow up, and then

8   Mr. MacDonald is specifically going to address as to

9   Ms. Lawton, we think we have a fundamental disagreement as to

10  what has to be held for the jury, and that, in fact, your Honor

11  can rule as a matter of law that a not insignificant portion of

12  plaintiffs' damages theories are out.

13  　　　　With that I will turn it over to Ms. Gulley for the

14  next phase of the big picture from our standpoint.

15  　　　　MS. GULLEY:  Thank you, your Honor.  Just in light of

16  your comments earlier and the focus of Mr. Ho's presentation,

17  ultimately the most important thing to Reynolds, I think,

18  today, based on the earlier comments, is to be heard very

19  briefly on why his comments about Mr. -- Ms. Lawton's damages

20  opinion, why we disagree with them.  So I will shorten my

21  presentation here on the answers to just focus very briefly, if

22  you'll indulge me about two minutes to talk about the liability

23  experts' failure to account for lawful explanations and your

24  questions about, you know, how does that impact the end-game

25  question, and I'll give the rest of my time over to the damages

33

1    folks, given your focus.

2          Really, I just want to focus on first principles.  You

3    know, Reynolds and CDK have a unilateral right to protect their

4    systems from hostile integration under *Trinko* and the law of

5    the case.  We all know that.  And the plaintiffs' burden, and

6    thus the role in front of their liability experts, is to bring

7    forward evidence that tends to exclude the possibility that

8    they were acting independently.  We know that even tacit

9    collusion and follow-the-leader type conduct is not enough

10   under the black letter antitrust principles like text

11   messaging.

12         Your Honor correctly identifies a fundamental flaw

13   with the plaintiffs' liability expert opinions.  Put simply,

14   they fail to account for lawful, independent obvious

15   explanations for Reynolds and CDK's decisions, years apart, to

16   secure their systems from hostile attack.  That failure cannot

17   get plaintiffs beyond the important antitrust 50-yard line on

18   this newest conspiracy theory as a matter of law.

19         Your Honor is correct that Dr. Israel, for example,

20   admits in his report, and this is at paragraphs 205 to 211,

21   that Reynolds and CDK could achieve their goals unilaterally

22   and that it was profitable for them to do so.

23         So when Mr. Ho said that the experts stated that

24   neither could close their system, that's not correct.  Recall

25   that Dr. Israel admits that Reynolds was already "substantially

1    closed" before any alleged conspiracy.  That Authenticom's

2    connections rose during the early supposed conspiracy to block

3    them.  This is a supposed conspiracy to block them during which

4    time their connections rose.

5            Dr. Israel admits that the system access decision of

6    the two firms were made years apart, and he admits that the

7    common economic principle, that it's common for one firm to

8    follow another in a market like this.  But his method ignores

9    each of these admitted facts.  These are not facts in dispute.

10           Your Honor also correctly points out that plaintiffs'

11   liability experts ignore that when CDK did ultimately begin to

12   secure its system from hostile integration in 2016, CDK still

13   faced significant competition from market mavericks like

14   Dealertrack and Automate, a fact that continues to bear out in

15   the market today.  A conspiracy with Reynolds would not help

16   CDK, given the existence of these market mavericks.  But

17   Dr. Israel ignores all other competitors in his

18   liability-and-switching analysis.

19           These are not matters for cross-examination as

20   Ms. Wedgworth suggested.  Liability opinions that ignore these

21   obvious unilateral explanations for system security decisions,

22   explanations that go to the heart of the Matsushita gatekeeping

23   function of this MDL court, are not only unhelpful to the jury,

24   but may be affirmatively misleading.  It's for this MDL court

25   to ensure that this case proceeds only if plaintiffs' theory of

1    an unlawful conspiracy is more reasonable than tacit collusion

2    or some other lawful activity.

3          Plaintiffs' liability experts' decision to ignore

4    undisputed evidence of unilateral incentives, continued

5    competition from Authenticom in the relevant market during the

6    alleged period, market mavericks impact on incentives and

7    switching rates are prime examples of why these liability

8    opinions are fundamentally unreliable and should not go to the

9    jury.  So with that, I will turn it over to folks to address

10   the bulk of your questions which relate to damages.

11         MR. PROVANCE:  Thank you and good morning, your Honor.

12   The big picture with regard to disaggregation and damages

13   issues from our perspective is in the dealer and vendor cases,

14   the plaintiffs' experts count one-hundred percent of the price

15   increases over a 68-month period as conspiracy damages.  And

16   that's a clear and immediate signal that something is very

17   wrong here under the guidance provided by the *MCI*, *Marshfield*

18   *Clinic* and *Brand Name Prescription Drugs*, and, in particular,

19   in the *Daubert* context under the guidance provided by decisions

20   like *Concord Boat*.

21         In assigning 100 percent of the price effects to the

22   alleged conspiracy, the experts assumed away other unrelated

23   factors such as changes in demand for certified integration and

24   demand for the complex type of integration that CDK and

25   Reynolds offer, but other firms do not.

1    But most important for *Daubert*, and, frankly, summary

2    judgment is the fact that the plaintiffs' experts also did not

3    account for their own affirmative opinions that both CDK and

4    Reynolds had unilateral market power to "profitably increase

5    their integration prices by controlling access to their own

6    systems."

7    It's very important to point out that that exercise of

8    unilateral market power, which both plaintiffs' experts find,

9    is not challenged as unlawful in either the dealer or the

10   vendor cases, as they were pled and as the Court's motion to

11   dismiss rulings have narrowed them.  So the need to account for

12   that unilateral market power need not await any finding by any

13   jury in either case because it's not challenged as unlawful.

14   The need to account for and separate the price effects of that

15   unilateral market power is clearly established under *MCI* and

16   *Marshfield Clinic* and *Brand Name Prescription Drugs*, and all of

17   the other cases that apply those standards.

18   Both plaintiffs' experts damages models do not account

19   for this unilateral market power because they're not designed

20   to do that.  Both models calculate damages by comparing CDKs'

21   and Reynolds' prices to the prices charged by a set of

22   benchmark firms that both experts selected as Authenticom and

23   SIS.  The problem here is that those firms do not have

24   unilateral market power and, according to the opinions offered

25   by both of the experts, CDK and Reynolds do.  So in counting

1    the difference in price between those two sets of firms, the

2    experts are necessarily capturing the impact of CDK and

3    Reynolds' alleged unilateral market power or asserted

4    unilateral market power as damages.

5           And to understand that that's happening, one need only

6    look at the result.  These models find that one hundred percent

7    of the price effects that were observed during the damages

8    period are attributable to the conspiracy.  And as we argue in

9    our *Daubert* motions and also in our summary judgment papers,

10   that methodology is simply not reliable and it doesn't provide

11   a basis for the jury to make a responsible determination of

12   damages.

13          And so we feel that these issues are absolutely

14   capable of being addressed now on *Daubert* -- excuse me, on both

15   *Daubert* and summary judgment.

16          If the Court has further questions about the specifics

17   of Dr. Israel's damages model or Dr. Williams's damages model

18   as they relate to these issues, I am, of course, prepared to

19   address that, but that is the big picture.

20          THE COURT:  Thank you very much.  Appreciate that.

21          Is there one more lateral you guys are going to do

22   here?

23          MR. MACDONALD: Yes, your Honor.  Ross MacDonald on

24   behalf of the Reynolds and Reynolds Company.  Thank you for

25   your patience.  I just want to respond to Mr. Ho's comments

1  about Authenticom's damages expert, Ms. Lawton.  I'm going to

2  start with another point of agreement between us and Mr. Ho,

3  which is that we don't dispute that the use of a benchmark or

4  the use of a yardstick in constructing the damages model can be

5  a reliable method of damages.  But it has to account for

6  salient factors, as Judge Posner wrote in *Marshfield Clinic*.

7  It has to account for exogenous conduct and it has to be

8  unaffected by the exogenous conduct, and Ms. Lawton's yardstick

9  is none of the three.

10       As Mr. Provance previewed, Ms. Lawton has the same

11  problem that was identified in *Marshfield Clinic*, where she

12  constructed a yardstick with connections to other DMSs and then

13  attributed 100 percent of the delta between the Reynolds and

14  CDK trend lines and the other line to the conspiracy.  And this

15  creates some of the disaggregation problems your judge [sic]

16  previewed in your letter.  We believe that this creates

17  disaggregation problems that do not need to wait for some sort

18  of inconsistent jury verdict.

19       Let me just give a couple of examples.  First, though

20  CDK and Reynolds' license agreements with their dealers

21  prohibit the use of third-party data brokers like Authenticom,

22  and did so before the alleged conspiracy.  Ms. Lawton in her

23  deposition admitted that some or all of Authenticom's damages

24  could be attributed to these dealer agreements.  And

25  Authenticom previously brought an exclusive dealing claim

1    challenging the legality of these provisions, and Judge St. Eve

2    dismissed that claim -- that's Docket 176 at page 36 -- but

3    Ms. Lawton has failed to disaggregate what harm was caused by

4    this now dismissed claim versus what harm was caused by other

5    allegations made by Authenticom.  This is just like *MCI* or

6    *Marshfield*, except we have this before trial where one of the

7    claims that Ms. Lawton says relates to the harm she calculated

8    has been dismissed.

9         Second, it's undisputed that Reynolds implemented many

10   of the measures complained of in this lawsuit, iterations of

11   Captcha, disabling user IDs and so on before any alleged

12   agreement with CDK.

13        Now, Mr. Ho says it's hotly contested whether Reynolds

14   would have been able to or CDK would have been able, to use

15   their terminology, "fully close their systems absent an

16   agreement."  But you don't need to decide that to decide that

17   Ms. Lawton's analysis is unreliable, because it's undisputed

18   that Reynolds was at least able to, again to use their

19   terminology, "partially close their system" using these methods

20   without any agreement with CDK.

21        It's further undisputed that as a result of this, the

22   Reynolds line and the yardstick line Lawton calculates do not

23   mirror each other before the conspiracy begins for the months

24   preceding the conspiracy.  And it's further undisputed that

25   Lawton assumes and admits that Reynolds can be expected, even

1    in but-for world, to continue to disable user IDs the way it

2    was doing immediately after the conspiracy.  Though Lawton

3    makes no adjustment for that, and makes no adjustments for this

4    lawful conduct in her yardstick, and, in fact, uses a yardstick

5    comprised entirely of systems that are not partially closed,

6    that do not have Captcha, that do not disable user IDs.  So,

7    again, this is lawful conduct that you can decide now is not

8    accounted for in her damages model.

9           And she actually has errors on both sides of the

10   equation.  Her yardstick is improperly constructed.  So to put

11   this in the context of the *Marshfield Clinic* case, not only is

12   she attributing 100 percent of the delta between the benchmark

13   and what *Marshfield Clinic* was charging to the conspiracy, but

14   she's also miscalculated the benchmark.  And that would be like

15   the expert there also getting the price the competitors were

16   charging just wrong.

17          Let me just give you two examples of that.  One of the

18   things Mr. Ho said was that a yardstick has to be unaffected by

19   unlawful conduct, and we know that's not the case here.

20   Authenticom has alleged as a result of the conspiracy, that

21   most, if not all of Authenticom competitors have left the

22   business in recent years.  Another market effect that

23   Ms. Lawton didn't account for.

24          For example, Steve Cottrell, Authenticom's CEO,

25   testified that Authenticom no longer has any competitors

1    competing for connections to Dealertrack, that's the Cox DMS,

2    the third largest, soon, I think, the second largest DMS

3    survivor, because everyone else has left the business, has

4    wound down their business.  So the yardstick's inflated because

5    Authenticom for the last years has been acting as a virtual

6    monopolist.  But, again, Lawton admits this and makes no

7    adjustment for it in her yardstick.

8         The yardstick also includes entire categories of

9    connections that don't represent Authenticom's connections to

10   other franchise DMS systems at all.  It includes connections to

11   Reynolds and CDK dealers, things that are in the impacted

12   market, not the yardstick.  It includes thousands of

13   double-counted connections.  It includes thousands of

14   connections to Authenticom's own application; in other words,

15   to itself.  That's counting as third-party connections an

16   application called CarPod, which was acquired days before the

17   damages window, which is another market event that Ms. Lawton

18   does not account for, so both the yardstick and how she

19   accounts for Reynolds' and CDK trim lines are done improperly,

20   and, therefore, she's made no attempt to isolate what

21   Authenticom's lost profits were on either side of the ledger.

22        And we're not demanding certainty here.  And we don't

23   think this is a *Story Parchment* issue.  Even *Story Parchment*

24   draws a distinction between damages that are not the certain

25   result of the wrong and those which are definitely attributable

1    to the wrong, but are only uncertain with respect to their

2    amount.  Because Lawton has not correctly calculated a

3    benchmark and has not accounted for any other nonconspiratorial

4    factors in our analysis, and it's not possible that the delta

5    she is presenting actually represents lost profits that are

6    definitely attributable to the wrongs alleged in this case.

7           And one piece of evidence, I submit, is suggestive of

8    this fact is that Ms. Lawton testified that no matter what

9    Reynolds is found liable for, her damages do not change.

10   Whether it's the dealer contracts, the vendor contracts, or

11   Captcha, or the disabling of the user IDs, or the 2015

12   agreements, Lawton testifies her damages are identical in every

13   scenario.  And it may be possible that each of these measures

14   were redundant like the assassins of Rasputin, as Judge Posner

15   colorfully wrote in *Marshfield*.  But even so, that doesn't save

16   the model, because we know there are other lawful explanations,

17   unilateral explanations, for substantial portions, if not all

18   of the disparity she calculated.  Thank you, your Honor.

19           THE COURT:  Okay.  Thank you.

20           Is that everything on the defense side for the moment?

21           MS. MILLER:  In the big picture issues, yes, your

22   Honor.

23           THE COURT:  Perfect.

24           MR. CASERIA:  Leo Caseria for Reynolds.

25           We haven't talked much about MVSC, and I don't know if

1   your Honor wants to hear about that particular case.

2   Ms. Miller alluded that -- indicated that there's a different

3   conspiracy at issue there, and I'm happy to talk about that and

4   the disaggregation issues there, but I don't know if your Honor

5   wants to hear about that, so let me know.

6           THE COURT:  Okay.  I haven't gotten there in my own

7   mind yet, although I know it's there.  I think what would be

8   useful to me -- since the plaintiffs are going to have the

9   burden on Israel, Lawton, and Williams, and Israel, Lawton, and

10  Williams have just taken some shots here in the last half hour,

11  I thought I would give plaintiffs an opportunity to respond if

12  they want on any aspects of the Israel, Lawton, and Williams

13  critique, which have been reiterated.  I hope you will only

14  take a few minutes on that.

15          And then I would like to scoop up my questions on

16  Williams, Halpin, and Miracle.  So I do want to save some time

17  for that, too.  But I did want to give the party with the

18  burden of carrying the *Daubert* threshold to respond on the

19  Israel, Lawton, and Williams points that have just been made by

20  the various people on the defense side who were assigned those

21  tasks.  So I will let Mr. Ho and Ms. Wedgworth divide that up

22  or tap a friend.

23          MR. HO:  Judge Dow, I think it makes sense to take

24  them in that order, and so I will phone a friend and ask Mr.

25  Panner to address Dr. Israel and then I will address

1    Ms. Lawton.

2         MR. PANNER:  Thank you very much, your Honor.  Let me

3    start by emphasizing an overarching point that actually relates

4    to some of the -- the question that your Honor had about trial

5    administration and bifurcation.  I think you've heard a lot of

6    agreement that bifurcation wouldn't be appropriate.  I just

7    want to provide one additional point with respect to that that

8    may help to illustrate our thinking about how this would work.

9         Of course, the defendants, presumably, are going to

10   put on evidence as well.  One of the differences -- one of the

11   disagreements we have, and I think Ms. Miller alluded to this,

12   is, you know, what does the but-for world look like?  In the

13   absence of the conspiracy, what would have happened?  And

14   there's going to be testimony about that.  And there's going to

15   be testimony about what the damages would be depending on what

16   the jury finds to be the nature of the but-for world.

17        And so, accordingly, if you -- if a jury were to find

18   there is liability for the conspiracy and then give an amount

19   of damages, that's very likely to reflect the jury's

20   understanding of what the but-for world is, and therefore the

21   extent of damages from the conspiracy, and therefore can take

22   into account, depending on the evidence that the defendants

23   choose to put in with respect to alternative damages, their own

24   beliefs about what lawful conduct could have accounted for.

25   And so as a result, it's very likely, again, you know,

1    understanding that this is going to be a decision for down the

2    road for the trial -- you know, the trial court, it's very

3    likely that the kinds of problems with respect to adequacy

4    of -- or sufficiency of evidence for the damages that are found

5    are not likely to be an issue in this case in the way that they

6    might have been in cases where there were entire categories of

7    conduct that were relied on for damages that were then found to

8    be, in fact, lawful, as happened in some of the cases that your

9    Honor's alluded to in your memo.

10          THE COURT:  Yes.  I will just stop you for one second

11   there, Mr. Panner because I -- that was a 1:00 a.m. fear that I

12   was having, and from what I've heard this morning, none of you

13   all share that fear.  And you all are the ones who have sunk

14   three or four years of your lives into this, and so I'm pretty

15   well persuaded that my fears are overblown on bifurcation, and

16   that that's a question that whoever the trial judge can face,

17   but I don't need to face it today.

18          You all seem to be very inclined to carry on the path

19   we're on.  You have different views of how that path ought to

20   be executed.  But nobody thinks I should be concerned about

21   what comes at the end, because you guys -- whatever experts

22   survive *Daubert* and whatever claims survive summary judgment

23   will be presented.  Then there will be a jury verdict.  And

24   then, maybe, there will be a problem if a scenario comes up as

25   reflected in some of the cases.  But you all are much deeper

1    into this than I am, although I feel pretty deep into it now,

2    and so I'm -- my fears of carrying on have been assuaged.  I am

3    not exactly sure how to carry on yet, but we'll get there.  But

4    I'm not going to think about -- I will not say the word

5    bifurcation again until I'm a trial judge as opposed to a

6    transferee judge, but thank you.

7            MR. PANNER:  Thank you, your Honor.  As usual, when I

8    try to persuade something as Mr. Ho and Mr. [sic] Miller have

9    already tried to persuade you of, my efforts are unnecessary.

10           So let me get to Dr. Israel and his opinion and some

11   of the points that were made, because, you know, I do think

12   they kind of go to a fundamental mischaracterization, really,

13   of his opinions, that I hope to try to address.  And one of the

14   things that consistently was articulated was that he ignored

15   something or failed to take something into account.  There was

16   reference, in particular, to the fact that he had an opinion

17   with regard to the, you know, what the damages would be if the

18   conduct were deemed to be unilateral as a matter of law.  What,

19   you know, what's to be learned from the fact that Authenticom,

20   you know, from the pattern of Authenticom connection is

21   something that your Honor alluded to in the memo.  What's to be

22   learned from the fact that there were other competitors.

23           And it's simply not the case that Dr. Israel ignored

24   these questions.  He very much addressed these questions with

25   regard to the issue of unilateral conduct.  What he made very

1   clear in his reply report is, "I just want to be really clear.

2   I think there was a conspiracy.  But if you say that as a

3   matter of law this should be treated as tacit collusion, then

4   there might be a question for what the basis for illegality is,

5   but I would not find there to be a different impact.  I still

6   appropriately measured the impact."

7           And I think the reason for that is -- one of the

8   things that helps me to think about this, was the way that

9   Dr. Israel thought about the question of damages and causation

10  is to look at the fact that there was additional closure of the

11  system.  There was additional exclusion of independent data

12  integrators and closure of the system that led to market

13  effects.  And in the case of Reynolds, what happened, and the

14  evidence backs this up, again, there can be cross-examination,

15  but what happened with Reynolds is that at the beginning of the

16  conspiracy period in September 2013, Reynolds was able more

17  effectively to close its system than it had been able to do

18  when it was acting purely unilaterally.  And that makes perfect

19  sense because they were facing competitive pressure from CDK

20  prior to September 2013 that limited their ability with regard

21  to some of their valued customers to entirely exclude

22  independent data integrators.  So they made lots of exceptions,

23  Reynolds made lots of exceptions for independent data

24  integrators in order to address the complaints of some of their

25  customers because they knew that CDK was in the wings.

1    After September 2013, the data show clearly CDK begins

2    to pull its competitive punches.  Indeed, one of CDK's

3    liability experts admitted that CDK had backed off on criticism

4    of Reynolds to try to promote an agreement with regard to other

5    matters.  And that led to reduced competitive pressure on

6    Reynolds and was able to more effectively close.  And what you

7    see with Authenticom connections is they're increasing before

8    that September 2013 period, and then they decrease, and then

9    they begin to come up a little bit.  But it is quite clear that

10   if you just eyeball the trend, Authenticom connections are much

11   lower on the Reynolds system during that period from

12   September 2013 to February 2015, than they would have been had

13   the prior trend continued.  And that's, you know, the point

14   that Dr. Israel makes.  Obviously, Ms. Lawton addresses that

15   more quantitatively, and Mr. Ho can address that.

16   So he didn't -- and, so, there's also discussion about

17   other competitors.  Again, he talks about that.  That really

18   goes to the market power and the efficacy of the conspiracy

19   given the existence of other competitors.  And he says, look,

20   for a lot of -- they have tremendous market share overall, but

21   if you look at some of the biggest dealers, they have an even

22   greater market share.  And there's a great deal of evidence in

23   the case that there really is no substitute for Reynolds and

24   CDK for certain dealer groups.  Again, you know, these may be

25   disputed issues of fact, but there is certainly an evidentiary

1    basis for him to take these matters into account, and in

2    reaching his opinion, he did take those matters into account.

3            Now, the disaggregation issue that your Honor flagged,

4    there was -- I think Mr. Provance said, "Well, look, you know

5    it can't be right because a hundred percent of the increases in

6    rates are attributed to the conspiracy, and we know there are

7    other things going on."

8            Just to be clear, the methodology that Dr. Israel used

9    was designed to ensure that other market factors that were

10   influencing prices would be taken into account, because it's a

11   difference in differences approach.  In other words, he's not

12   simply comparing the prices to the prices that Authenticom

13   charges, he's comparing the price changes over the period of

14   interest to the price changes that the benchmark competitors

15   had.  And the benchmark competitors -- so recall that if there

16   are changes during that period, you would see the impact of

17   those changes in the difference in differences analysis.

18           And, so, for example there's discussion of unilateral

19   market power.  No one's denying that there was unilateral

20   market power.  And if you look at the prices pre-conspiracy,

21   CDK was charging more than the benchmark companies.  Reynolds

22   was charging much more than that.  But the question is -- but

23   that's already taken into account in the starting point.  And

24   so the question is how are these changing.  No one is arguing

25   that their unilateral market power increased so that that

1   accounts for the change.  And so what accounts for the change

2   over that period, the difference in differences?  And he looks

3   at that as -- he has a hypothesis as to why that's the

4   conspiracy, namely that that conspiracy allows Reynolds to

5   close more effectively, and it allows CDK to close starting

6   February 2015, to exclude independent data integrators.

7          And he would say, "Look.  If you don't agree that

8   there was a conspiracy, then you won't think there was damages

9   from a conspiracy.  But if you think that there was a

10  conspiracy that led to this closure, my analysis shows you what

11  the impact of that was."  And so it's simply not correct to say

12  that he is somehow assuming that the damages are due to a

13  conspiracy.  That's exactly what his model is designed to test

14  and establish by virtue of the difference in differences

15  approach.

16         And I also want to emphasize something that isn't

17  talked about in the defendants' presentation, which is, he does

18  a number of robustness checks to ensure that what he's seeing

19  in the data is an actual effect that can be seen by virtue of a

20  number of different analysis.  And so one that is very helpful,

21  and, again, what he's saying is that what's allowing them to

22  charge more is the fact that they're closing their system.

23         So what he does is he compares the change in Reynolds'

24  price versus the CDK price during that initial period when CDK

25  had not yet started to exclude independent integrators, and he

1    sees that Reynolds' prices are going up and CDK's are not.  And

2    then he looks at the later period, and this is interesting

3    because Reynolds already has effectively, you know, done most

4    of the closure.  So it doesn't have much more closing to do

5    post-February 2015, but CDK dramatically closes their system,

6    and he sees that CDK's prices are going up dramatically versus

7    Reynolds which are going up less.

8          So he does a great deal to establish that what is

9    causing these changes is not some exogenous question of demand

10   for certified -- certified integration.  It's the fact of

11   exclusion of competitors from the DMS, his hypothesis is based

12   on -- the damages analysis is based on the idea that that was

13   done pursuant to the conspiracy.  And if the jury so finds,

14   then his damages analysis provides them the basis to determine

15   the damages.

16         So I hope that that overview helps.

17         THE COURT:  Yes.  Thank you.  I appreciate that.

18         And if I understand this right, then, Mr. Ho, you're

19   going to go to Lawton, and then you will lateral over to

20   Ms. Wedgworth for Williams?

21         MR. HO:  I think, actually, Ms. Lawton is next, and I

22   will try to be brief.  I know I promised brevity and I will try

23   to live up to that.

24         Mr. MacDonald covered a lot of ground that's covered

25   in the briefing and I don't want to reiterate that.  I will

 1    just respond with two high-level points.  One is, at bottom,

 2    what Mr.  MacDonald is trying to do is win the battle of the

 3    experts at the gatekeeping stage.  And that, as your own --

 4    your Honor's *Daubert* opinions have said, not appropriate.

 5         His concession that the yardstick method is reliable

 6    as a way of isolating the economic effects of the unlawful

 7    conduct, puts us squarely into the category of challenges to or

 8    criticisms of the application of that methodology to a

 9    particular set of facts.  And your Honor's decisions in *Smith*

10    *against Union Pacific Railroad, Fluidmaster*, all stand for the

11    proposition that those kinds of criticisms go to weight and not

12    admissibility.  And that's for a good reason, and that is that

13    many of the facts that Mr. MacDonald states as true, are, in

14    fact, disputed and, frankly, wrong.

15         THE COURT REPORTER:  Excuse me, Mr. Ho.  Just one

16    second.  I have people in the hallway that are quite noisy, so

17    if everyone could give me one second and I could tell them to

18    quiet down.  Thank you.

19         MR. HO:  Absolutely.

20       (Brief pause.)

21         THE COURT:  Thanks, Kris.  I appreciate it.  Are you

22    good to go?

23         THE COURT REPORTER:  I am.  And I am so sorry, Mr. Ho,

24    for interrupting.

25         MR. HO:  Not a problem whatsoever.  Thank you very

1      much.

2            So let me just try to tick through quickly the points

3      that Mr. MacDonald covered again at a high level.  One point

4      was that Ms. Lawton allegedly mixed up what connections were

5      CDK and Reynolds versus other connections.  And he gives us

6      some examples, you know, that some dealers were listed as other

7      when they should have been listed as CDK.  That's just not

8      correct.  We -- Authenticom's witnesses will explain why the

9      data are classified as they are, and Ms. Lawton's economic

10     rationale for treating them differently is, again, a question

11     of the battle of the experts for trial.

12           CarPod.  Mr. MacDonald has repeatedly said that

13     there's something wrong with creating connections to CarPod as

14     other connections for purposes of the yardstick.  Again,

15     Authenticom will explain why that's entirely appropriate.  And

16     the reason is, CarPod is a separate repository of data,

17     different from the DMS.  And demand for connections to CarPod

18     is not, despite the fact that CarPod is owned by Authenticom,

19     driven by Authenticom itself.  It's driven by dealers that want

20     to have those connections made for purposes of supplying data

21     to vendors.  So as Ms. Lawton explains in her report, that

22     means it is economically an appropriate thing to include in the

23     yardstick.

24           The question of whether vendors should have been

25     included in the yardstick, again, is just a debate about

1    whether the characteristics of vendor connections are different

2    from the characteristics of DMS connections.  Authenticom and

3    Ms. Lawton will explain to a jury why they are not different,

4    and, you know, their expert is entitled to offer a contrary

5    opinion.

6              Lastly, I will just point out that with respect to

7    many of the factual assertions that are made by Mr. MacDonald

8    and the defendant's brief, you'll see that they have two

9    characteristics.  One is that the arguments that are made and

10   the facts that are used to support them were not actually

11   endorsed by their rebuttal expert, Professor Rubinfeld.  And

12   that's not simply a procedural issue, but I think a test to the

13   fact that many of these criticisms are really lawyer-driven.

14   They're not actually supported or substantiated by her own

15   reliable expert opinions, and so that is why this is really

16   fodder for cross-examination and not trial.

17             And, secondly, they have this technical appendix to

18   their *Daubert* motion with respect to Ms. Lawton.  And what you

19   will see that the technical appendix is full of citations to

20   Authenticom documents and data.  But you will not find any

21   citations to Authenticom deposition testimony.  And the reason

22   for that is because they have never tried to establish the

23   facts that support their interpretation of those documents.

24   And, in fact, their interpretation of those documents is flat

25   wrong.

1    We will introduce evidence at trial through testimony

2 of Authenticom witnesses that, for example, their assertion

3 that Ms. Lawton -- that the data simply relabeled connections

4 as CDK versus other, or other versus CDK, without any

5 substantive change, which is one of the assertions that is made

6 in the technical appendix and the brief is completely

7 unsupported by reality.  Those were not relabelings of

8 connections.  Those were substantive changes that supported the

9 change in the labeling and Ms. Lawton's use of the

10 classifications that Authenticom provided are both accurate and

11 more to the point, not, again, the fodder for a *Daubert* motion.

12    As your Honor has said, the quality of the data and

13 the soundness of the factual assumptions are matters for trial,

14 not matters for excluding.  And with that, I guess, I will pass

15 the baton to Ms. Wedgworth.

16    THE COURT:  Okay.  Great.  And, Ms. Wedgworth, I

17 assume you're going on to Williams, so you cannot only answer

18 the questions that may have been raised in your mind as

19 Mr. Williams took some incoming fire from the defendants, but

20 if you also wouldn't mind answering my two questions, that

21 would be great.

22    MS. WEDGWORTH:  Yes, your Honor.  Happy to do that.  I

23 also have some slides, so I'm going to ask that we share the

24 screen with regard to some of these issues for Dr. Williams.

25    I will start initially with the thought that any

1    concerns with regard to Dr. Williams' analysis and opinions are

2    best up for the weight of the evidence, not the admissibility.

3    Again, any concerns they may have are proper at

4    cross-examination, not at *Daubert*.

5            One of the -- and, again, some of these concerns were

6    also applicable to Dr. Israel.  I'm going to try not to

7    duplicate, so if I end up doing that, I'll hopefully speed it

8    up because there are several issues we have to cover.  As to

9    unilateral market power and disaggregation of damages, which

10   defendants brought up, I've got a slide here that has our main

11   points, which is the difference in difference model does

12   account for any unilateral market power.  In particular, a

13   factor that is present in both the benchmark and the damages

14   period cannot explain why prices for CDK and Reynolds started

15   rising faster than the controls.  And the controls here, at

16   least for Dr. Williams, are Authenticom and SIS.  Now, that is

17   explained by the conspiracy, a factor not present in the

18   benchmark period.  And Dr. Williams, at paragraph 158, goes

19   into a little bit about the controls.  What CDK has not done

20   here, and this is key, is that they do not say or allege that

21   their market power, neither Reynolds or CDK's market power

22   increased during the damages period, and CDK provides no facts

23   to support any such increase.

24           With regard to the next thought, I'll just cover

25   briefly.  We've talked *about Story Parchment*, and everybody has

1    discussed it, so I won't spend time on this one.  I want to get

2    to the meat of these arguments.  If you could go ahead.

3         The experts' choice of variables is a jury question.

4    That's something that we really haven't zoomed in on

5    particularly.  With regard to *Daubert*, it's not appropriate

6    says the Seventh Circuit, in particular, and recently I think

7    it was Judge Leinenweber in *Kleen Products* said this very

8    proposition:  "Any variables in observations in this

9    difference-in-differences model goes to the probative weight of

10   the analysis and not the admissibility."

11        The Seventh Circuit, again, in regression analysis has

12   said the selection of variables and how experts handle those

13   really are best suited for the trial.

14        And then going to the next issue, that defendants

15   addressed -- and also I am addressing any questions that you

16   had that we may not have covered at this point.  The next slide

17   is -- all of these cases, as you pointed out, are after a jury

18   verdict.

19        Now, Ms. Miller, I think, pointed out *Marshfield*

20   *Clinic* was summary judgment.  But just to be clear, this

21   opinion is after a trial and Judge Posner and the Seventh

22   Circuit had sent the verdict back down because at the trial,

23   certain antitrust allegations had been kicked out by the jury.

24   And therefore the Seventh Circuit said, "You've got to try the

25   case again to determine whether or not the damages should be

1    reduced because certain antitrust allegations did not prove to
2    be unlawful."

3          It turns out in the second round, which is this
4    opinion we have here, and granted, it is at summary judgment,
5    but Judge Posner specifically relies on the fact that the
6    experts had an additional opinion originally, and when he
7    compares the additional opinion that came out first to the
8    current opinion, he says that he just doesn't see that they've
9    accounted for it and they really haven't explained it.  And he
10   couldn't do that at a summary judgment at the first phase.  So
11   the only reason the summary judgment is even possibly
12   appropriate for this is because he has a ruling from the jury
13   that certain antitrust claims have been kicked out.

14         The only relaying claim in *Blue Cross Blue Shield* was
15   the geographic division of market.  And Posner says
16   specifically that "The geographic division of market could not
17   sustain all of the damages that had originally been calculated
18   for numerous other antitrust violations."  And I've got other
19   cases up here with similar things.

20         I will point out that in Brand Name, Judge Posner does
21   say, "Plaintiffs do not, however, as the defendants absurdly
22   argue, they do not have to exclude all possibility that the
23   defendant's price discrimination was unilateral rather than
24   collusive."

25         And going to the next slide -- and I'll just say on

1    *Concord Boat*, as your Honor knows, there was agreement in that

2    case at trial that some of the conduct which had been alleged

3    to be collusive was, in fact, not an issue. And I'm just

4    thinking, I think it was Volvo Engines had been recalled, and

5    that turned out to be something that the expert admitted he had

6    not taken into consideration.

7         So you had a question, "Did plaintiffs accept that if

8    the jury finds some lawful conduct, their damages model might

9    be vulnerable?" And my response is this. Only if three of the

10    following conditions are met: That the jury finds some alleged

11    unlawful conduct to be lawful conduct and a finding is made

12    that the model did not control for the lawful conduct. And the

13    lawful conduct can be disaggregated from the unlawful conduct.

14    If those three conditions are not met, then we do not think

15    there would be a damages revisitation. And even if those three

16    links are met, any damages analysis that may have to occur

17    would have to occur after a jury determines that some conduct

18    has been found to be not lawful.

19         Next slide. And you asked, "Can the Court conclude at

20    this stage of the case that any plaintiffs' losses were caused

21    by something other than unlawful conduct?" The short answer is

22    no, your Honor, and defendants have not shown that any lawful

23    conduct contributed to plaintiffs' losses. They point out a

24    lot of things that the experts may or may not have considered,

25    But what they don't do is set forth lawful conduct they should

1    have considered.

2            Does the Court have authority to reach that conclusion

3    at this point?  And the short answer is, again, no.  This is a

4    question for the jury.

5            And then going on to the next slide, a different

6    question.  You also ask about plaintiffs' experts do not find

7    any "quantitatively significant lawful competition."  And I

8    think this relates somewhat to the MCI case that your Honor's

9    familiar with.  Just to follow up on the MCI case.  A case that

10   went to trial.  I think they had 22 claims of antitrust conduct

11   and claims.  And of those 22, the jury found a number of those

12   claims, and as the MCI court held, who really controlled the

13   majority of the damages, all those claims were excluded or

14   found to be not unlawful -- or found to be lawful, however you

15   care to say it.

16           So the short answer on quantitatively significant

17   lawful competition, Dr. Williams, in particular, concluded that

18   CDK and Reynolds had unilateral, lawful power in both the

19   benchmark and damages periods.  And, again, I'll just note, I

20   think it was in BMPD that Judge Posner found that kind of

21   determination to be unremarkable in that certainly market

22   participants at this level had market power.  But Dr. Williams

23   also found that any factor such as unilateral market power

24   present in both the benchmark period and the damages periods is

25   controlled in his difference in differences regression and

1    cannot affect the estimated overcharge.  Therefore,

2    Dr. Williams correctly concluded that CDK's and Reynolds' DIS

3    prices in the damages period were caused by anti-competitive,

4    unlawful conduct.

5         And continuing on, is -- we've already answered the

6    bifurcation issue.  We don't think -- and your Honor's found we

7    don't need to pursue that any further.

8         And then your question here is with regard to Williams

9    in particular.  "Do I understand the plaintiffs to be arguing

10   that the dismissal of certain claims does not affect the

11   damages model because the conduct alleged encompasses multiple

12   claims and the dismissal order does not hold that that conduct

13   is lawful?"  And that's correct.  And we, of course, have the

14   Spray-Rite case.  At this point no conduct is found to be not

15   unlawful.

16        Given that, at this point our expert does not need to

17   address and cannot address because he believes all of the

18   conduct alleged is unlawful.  He has assumed that as unlawful.

19   Until a jury finds otherwise, he would not attempt to do so.

20        In needing of disaggregation, Spray-Rite specifically

21   says, if you have all unlawful conduct, you don't have to

22   disaggregate.  Again, *Story Parchment* alludes to that as well.

23   And with regard to the exclusive dealing, an additional fact is

24   that the exclusive dealing contracts were a part of the

25   benchmark period, as well as the but-for world, and therefore a

1    DiD analysis controls for any factor present in both the

2    benchmark and the damages, period.

3            And then going to your next question that you wanted

4    to address for Dr. Williams.  You had a concern as to whether

5    the visual observation of parallel pricing is correct here.

6    And your question specifically said, "If defendants contend

7    that 'eyeballing' done by Dr. Williams cannot be squared with

8    the 'actual data,' is this a shortcoming or is this something

9    for cross-examination?"  And the fact that Dr. Williams

10   evaluated the parallel paths function, that's also known as a

11   common trend assumption, it is not a shortcoming, and any

12   concern they have about the analysis can be done with

13   cross-examination.

14           Now, I won't go into too much detail here, but I do

15   want to say and show you two examples, one reason is we did not

16   attach the full textbook as an exhibit, which we refiled last

17   night and included the entire textbook on this issue that we

18   are dealing with.  Within the textbook, there's certain pages

19   that address this issue, and at least demonstrate how visual

20   observation for a difference-in-difference model with regard to

21   parallel paths in the benchmark period are determined or

22   evaluated by visually examining the data.  So in this case

23   Dr. Williams has done that.  Defendants say it's really not

24   appropriate.

25           So if we can go to the next slide, I will show you

1    that economic literature embraces this visual analysis in

2    determining parallel path/common trend approach.  And in

3    evaluating that parallel path assumption, visual examination of

4    the trends between the treatment group, and the treatment group

5    in this case is CDK and Reynolds' DIS fees.  And the control

6    group here is Authenticom and SIS/DIS fees in the benchmark

7    period, and this is a standard methodology.  Not only in the

8    common metric literature, but in textbooks and in all

9    econometric analysis.

10          So the visual examination by Dr. Williams, CDK asserts

11   that it has been done incorrectly.  And CDK's criticism applies

12   basically only to one month, meaning that August 2013 month.

13   And as my colleagues have explained, the August 2013 price

14   increase by Reynolds, which, by the way, was a standard annual

15   price increase occurred, that is the only variation for the

16   parallel path assumption in our particular data.  CDK does not

17   disputes that its prices are parallel to the comparator prices

18   of SIS and Authenticom.

19          And specifically here, I wanted to look at the example

20   from the textbook.  And the example in the textbook -- and by

21   the way, this textbook is done by two very esteemed professors.

22   And it's a professor from MIT, Professor Angrist, and one from

23   the London School of Economics, Pischke.  And the book is

24   Mostly Harmless Econometrics: An Empiricist's Companion.  I'm

25   sure you have it on your bookshelf.  If you look at this

1    figure, here we have not necessarily prices, but they are

2    evaluating -- Dr. Pischke and Dr. Angrist -- they are

3    evaluating here two periods.  And you'll see here the top line,

4    which is the affected group, like CDK and Reynolds, tapers down

5    while the control group, like Authenticom or SIS, which is the

6    bottom line in this graph, slightly increases.  So even to the

7    eye they don't look parallel.  And if you could show the

8    benchmark period here, we've inserted a line to show where the

9    benchmark period is.

10          So analysis actually had in this case, two benchmark

11   periods with this middle section being the damages period.  And

12   in both of those benchmark periods, you will notice that this

13   is not necessarily strictly parallel.  And, yet, the authors in

14   this case concluded that the graph provides strong visual

15   evidence of treatment and control states with common underlying

16   trend and induces a sharp, but transitory deviation from the

17   trend.  And they basically make their conclusions here from

18   this parallel paths assumption that's been verified by visually

19   observing these not strictly parallel lines here.

20          And there's an additional example, I don't want to go

21   too far into it, but I've concluded it.  It's done by Professor

22   Slaughter, who is the dean of the business school at Dartmouth.

23   And if we could quickly look at it, this has to do with trade

24   liberalization.  And he looks at whether trade liberalization

25   increases income for those in the countries that are affected.

1    If you'll show the benchmark line here, the benchmark period,

2    again, you will see that these benchmark period lines deal with

3    data points that are not strictly parallel.  And, yet,

4    Professor Slaughter in a peer-review journal -- and we have

5    other articles attached to our motion -- also do the same thing

6    where that not strictly parallel line is viewed as evaluating a

7    parallel path with visual observation.

8            And I'll just conclude shortly that the standard

9    peer-review method for evaluating whether data for a control

10   group and a treatment group are parallel with the benchmark

11   period in a difference-in-differences regression analysis is to

12   visually examine the data.  And, your Honor, I'll stop there if

13   I haven't taken up too much time.

14           THE COURT:  Okay.  Wonderful.  Thank you.

15           So we have 15 minutes left.  What I propose is that we

16   give the defendants five minutes on Williams, and then each

17   side gets two and a half on Halpin and two and a half on

18   Miracle, and then I'll have covered all of my issues in two

19   hours.  And I also ask that anytime you guys agree on anything,

20   just send me an email.  That last piece is a joke, but the rest

21   of it I turn over to the defendants.  I'll give you five

22   minutes on Williams.  Anything you would like to respond to Ms.

23   Wedgworth would be most appreciated.

24           MR. GLICKSTEIN:  So thank you, your Honor.  This is

25   Jed Glickstein for CDK.

1    So let me start, I guess, at the very end of

2    Ms. Wedgworth's comments.  I think the dealers recognize that

3    they have a very serious problem when it comes to the parallel

4    path assumption. because about a year after their opposition

5    brief was filed, and about 12 hours ago before the second oral

6    argument on this motion, the dealers filed a corrected version

7    of their brief that cited a totally different chapter of this

8    econometrics treatise, because the chapter they had originally

9    cited didn't support the proposition.

10    The new chapter is 13 pages talking about the

11    differences-in-differences model.  It's not clear to me how it

12    supports the proposition either.  And I think it's telling that

13    Ms. Wedgworth's presentation was not about the data in this

14    case.  It was about studies on the effect of -- in the area

15    about school tenure and other studies that, you know, who have

16    never been the subject of any of the issues that we're talking

17    about, and that Dr. Williams didn't cite as a basis for his

18    parallel path assumption.

19    Ultimately, I think all of this is kind of besides the

20    point because the fundamental problem with what Dr. Williams

21    did is not that he used visual inspection, it's that, as he

22    admitted in his deposition, the lines, when you visually

23    inspect them for the pre-period pricing trends are not

24    parallel.  And he didn't do any further analysis to show

25    statistical significance or any other kind of reliable basis

1    for concluding that the DiD model applies.

2           So you asked in your letter whether this is the basis

3    for exclusion or just something for cross-examination, and we

4    think it's clearly a basis for exclusion because Dr. Williams

5    himself says if the past are not parallel, the DiD model does

6    not apply.  To put this in Daubert's terms, the question is

7    whether the methodology can properly be applied to the facts in

8    issue.

9           I think the *Golpalratnam* case, 877 F3d 771, from the

10   Seventh Circuit, is directly on point here.  If there's a

11   central premise of the model and the expert relies on that

12   premise, but his reliance is misplaced and doesn't do any

13   independent effort to verify that the premise is correct,

14   that's a basis for exclusion.

15          The second point I want to address is the Court's

16   other question, which is whether the dismissal of certain

17   damages claims exclusive dealing provision here doesn't, you

18   know, whether the effects of those claims can still be

19   incorporated into the damages model because the dismissal order

20   didn't hold that the exclusive dealing provision failed on the

21   merits -- the exclusive dealing claim failed on the merits.

22          I think it's important to remember why the Court

23   dismissed the exclusive dealing claim as to the vendors.  That

24   was a substantive holding about the reach of the federal

25   antitrust laws.  It was based on *Illinois Brick* and it said

1    that dealers could not recover damages for an exclusive dealing

2    claim because they were not direct purchasers in the relevant

3    market.  So to say, well, the damages claim has been dismissed,

4    but the conduct, because it wasn't declared lawful, still

5    exists and you can assume it to be unlawful and incorporate it

6    into to the damages model just runs circles around *Illinois*

7    *Brick* and this Court's holdings.

8          But even if the dealers were right that there was some

9    question as to whether this conduct was lawful or not at the

10   motion to dismiss stage, there is not a question about it now.

11   And the reason is, as we explained, and this is page 9 of our

12   summary judgment reply, the dealers have forfeited an exclusive

13   dealing claim.  We raised factual and legal arguments against

14   the exclusive dealing claim and the dealers didn't defend them.

15   So at this point I think it has been established that the

16   underlying conduct is not unlawful and that including it in the

17   model is not appropriate.

18         And then, finally, Ms. Wedgworth in her slides said,

19   "Well, you know, it doesn't really matter because CDK said that

20   the exclusive dealing provisions were in contracts before the

21   start of the supposed conspiracy, and therefore the DiD model

22   would pick up their effect."  But the fact that the model

23   apparently is insensitive to a finding of liability, that's a

24   reason to exclude Dr. Williams' thinking, not to let it in.

25   That he constructed a model where it apparently doesn't matter

1     if there's liability findings, shows that it's an unreliable

2     model, not a damages model that's attuned to the central

3     question in this case, which is whether -- what

4     unlawful -- what damages were caused by the unlawful conduct.

5     And that's established in the *Marshfield Clinic* case and the

6     *Nielsen* case that we cite in our briefs.

7              I think, ultimately, that's all we need to say on the

8     dealer motion.  You know, Ms. Wedgworth, I think, rehashed a

9     lot of the arguments that the parties have been having about

10    *Marshfield Clinic* and the DiD model in general.

11             I would just leave the Court with, I guess, this

12    concluding thought, which is that both Dr. Israel and

13    Dr. Williams found that CDK and Reynolds had unilateral power

14    and exercised that unilateral power to raise prices during the

15    conspiracy period.  Among other things, they exercised that

16    power by blocking Authenticom.  And this Court and Judge St.

17    Eve have repeatedly held that a unilateral refusal to deal with

18    Authenticom is lawful.  That's a repeated finding in this case.

19    And so, I think, this doesn't have to wait until trial or even

20    until summary judgment.

21             If there was power to unilaterally exclude Authenticom

22    and other hostile integrators, you have to assume that the

23    defendants would have exercised it to some degree.  And the

24    upshot of the experts' opinions is essentially that CDK would

25    have not exercised market power for a six-year period and

1  wouldn't have raised prices one iota, and that's just not a

2  tenable or reliable conclusion of *Daubert*.  So I'll leave it at

3  that unless your Honor has further questions.

4         THE COURT:  Okay.  Thank you, Mr. Glickstein.

5         So speed round.  Two minutes on Halpin, each side.

6  Plaintiffs, go.

7         MS. WEBER:  Good morning, Judge Dow.  Jayme Weber for

8  plaintiffs.  The short answer to the question you asked in your

9  letter is yes.  As we led with in our brief, Halpin's testimony

10  is relevant and helpful to the jury, regardless of what other

11  evidence or stipulations are admitted at trial.

12         Defendants confuse relevant with disputed, and their

13  complaint is essentially that Halpin's testimony will be

14  cumulative.  But whether testimony is, in fact, cumulative is a

15  question to be determined in the context of trial.  That is why

16  the defendants' motion does not fit under the *Daubert* framework

17  and instead would be properly filed as a motion in limine once

18  these cases are returned to the trial courts in which they

19  originated.  This Court should therefore deny defendants'

20  motion.

21         In our brief, at pages 12 and 13, plaintiffs cited a

22  number of cases holding that a Rule 403 challenge is best

23  decided in the context of trial, where the trial court can

24  assess the testimony's probative value, meaning relevance, and

25  potential prejudice.  Those cases support denying the motion's

1    relevance, 401, argument as much as they support denying the

2    motion's 403 argument.  As the Court in *Klemis* recognized, the

3    403 inquiry encompasses 401 because the trial court must

4    determine relevance in order to weigh it against potential

5    prejudice.

6         Defendants argue at pages 7 and 8 of their reply that

7    the record on this issue is complete.  But that is not true.

8    Although the parties at this stage have a general sense of the

9    evidence available to them at trial, it will only be in the

10   months leading up to the final pretrial conference in each of

11   the cases constituting this MDL that the parties will determine

12   specifically what evidence will be presented at trial and how.

13   That is a much better context for determining the admissibility

14   of Halpin's testimony than this is.

15        Finally, the MDL context provides a particularly

16   strong reason to deny the motion at this stage.  The Court in

17   Weinberger observed that the MDL court had denied a number of

18   motions in limine as premature.  And the Court further noted

19   that it often deferred ruling on motions in limine all of the

20   way into trial because then the evidentiary context was clear.

21   The MDL court in *Cessna* likewise found that it could not

22   clearly assess the relevance of the proposed expert testimony

23   or its helpfulness to the jury in the MDL context, and

24   therefore the Court overruled a motion to exclude the expert's

25   testimony.  This Court should follow those two decisions and

1    deny defendant's motion.  Thank you.

2              THE COURT:  Okay.  Thank you, Ms. Weber.  I appreciate

3    it.

4              Defendants, two minutes.

5              MR. PATRICK:  Thank you, your Honor.  Justin Patrick

6    for Reynolds and Reynolds.

7              Very briefly.  Our challenge to Mr. Halpin's testimony

8    goes to core *Daubert* issues.  The record is complete.  The

9    motion is ripe for decision.

10             Whether an expert's proposed testimony would be

11   helpful in determining a fact in issue is a gateway 702

12   requirement.  It's properly analyzed under the *Daubert*

13   framework.  In this instance, for the reasons stated and

14   detailed in our brief, Mr. Halpin's testimony fails that

15   gateway inquiry.  The contemporaneousness of Mr. Cottrell's

16   notes is not now and never has been in issue.  We've even

17   offered to stipulate to that.  Our sole argument is and always

18   has been and always will be that the contents of the notes is

19   untruthful and inaccurate.

20             This is a clear case where they're trying to put on

21   improper expert testimony to bolster Mr. Cottrell's credibility

22   by cloaking the truthfulness of the notes with the expert's

23   credibility on the distinct undisputed issue of the timing of

24   the notes.  Given that there is no dispute on that issue, it

25   should be excluded under 702 at this time.

1          The core MDL efficiency and consistency considerations

2    that we have discussed throughout this hearing strongly favor

3    resolving this issue now, rather than kicking it to three

4    different jurisdictions in the Authenticom, MVSC and Loop

5    cases.  Sending the issue to the trial courts will do nothing

6    but create uncertainty, possibility of inconsistent results,

7    and an additional burden on the judicial system and the

8    parties.

9          But even if the Court concludes that this issue is

10   properly resolved as a motion in limine, rather than a *Daubert*,

11   and to be clear we disagree with that position, this Court

12   should be the one to rule on any reurged motion in limine on

13   Mr. Halpin across all of the cases prior to remand precisely in

14   order to achieve the MDL systems goals of efficiency and

15   consistency of results.  Thank you.

16          THE COURT:  Okay.  Very good.  Thank you.  You've done

17   very well at two minutes a piece.  So we're going to try one

18   more time with Miracle and the *Blount* case, which is the one

19   that I always use to try to assess this.  Judge Williams, I

20   thought, explained it very well in *Blount* what our job is and

21   whether there is a question of invading the province of the

22   Court to tell the jury what the law is as opposed to what the

23   facts are that you can apply the law against.  So if you guys

24   can each give me your assessment of how *Blount* applies here,

25   and I'll flip the order and let the defendants go first this

1    time.

2              MR. WILKINSON:  Thank you, your Honor.  Brice

3    Wilkinson on behalf of Reynolds.  The thrust of Ms. Miracle's

4    opinions that we're challenging, she's trying to define two

5    terms, access control and circumvention.  And if you look

6    through her report, she talks over and over again about how

7    those terms are understood in the field, the field being

8    computer software or cybersecurity.

9              Those two terms are the key DMCA terms at issue in

10   Reynolds' counterclaims in this case, and we think Ms. Miracle

11   is not supplying concrete information against which the jury

12   can measure the application of those terms, but actually

13   telling the jury what the standard is under the DMCA.  And

14   that's a legal question that we think improperly invades the

15   Court's jurisdiction.

16             In the interest of time I will actually point the

17   Court to a recent opinion out of the Northern District of

18   Illinois.  It's the *Sharp vs. Navistar* keys that just came out

19   last November, the citation for that is 2020 Westlaw 7062557,

20   and the discussion starts on Star page 9.  Judge Andrea Wood

21   excluded an expert under the *Blount* standard for offering an

22   interpretation of a term "group," which came out of a federal

23   statute.  And then further going on to opine as to whether the

24   particular facts in that case satisfied the definition of

25   "group" as the expert interpreted it, and excluded that

1    entirely under the *Daubert* and *Blount* standards.

2           We think that's the same result the Court should reach

3    to here.  The one piece I'll add is that the net effect of

4    these opinions in our view is effectively trying to add

5    extraneous requirements to the DMCA's text.  Basic principles

6    of statutory interpretation don't allow that.  And we think

7    that the plaintiffs can't do that via the back door or via an

8    expert as well.

9           They may discuss other facts that Ms. Miracle has to

10   offer.  We think they're all tied to this same standard and

11   therefore should be excluded for those reasons as well, as laid

12   out in our briefing.  We also think that the standards that she

13   is propounding are fundamentally unreliable and not actually

14   the standards held by the field.  I won't get into any of that

15   in the interests of time.

16          The other question the Court raised is on the use of

17   industry custom.  Industry custom or usage can be used in the

18   context of contract interpretation sometimes when you've got an

19   ambiguity.  But this is a question of statutory interpretation

20   which is a different animal, subject to different standards.

21   And unlike the question of contract ambiguity, which you're

22   trying to determine the subjective intent of the parties and

23   can be sometimes resolved as a fact question, here statutory

24   interpretation is always a matter for the court to resolve,

25   and, therefore, we don't think industry custom is an admissible

1    subject of expert testimony in this circumstance.

2              I've lost track of where I am on time, but I think I

3    am at my limit, so thank you, your Honor.  And we would ask

4    that Ms. Miracle's opinions be excluded for the reasons we have

5    stated.

6              THE COURT:  Wonderful.  You were right on target

7    there.

8              Last word, except I'll have about 30 seconds when

9    we're all done here.  So who's got this one for the plaintiffs?

10             MR. DORRIS:  Thank you, your Honor.  Dan Dorris for

11   the plaintiff.  Fundamentally, we disagree with the

12   characterization of Ms. Miracle's report.  And I think the

13   decision we cited in our opposition brief is on point.  That's

14   Judge Filips' decision, *Amakua Development v. Warner*, 2007

15   Westlaw 2028186.  In there Judge Filips explained that it's not

16   exceptional for an expert to state the legal standards in the

17   case in their opinion because that forms their -- what type of

18   analysis they're doing.  And that's what Ms. Miracle has done

19   in her report.  That's not the subject of her trial testimony.

20   She is not here to interpret a statute.  She merely mentions

21   those standards in her report.

22             The core of her testimony is admissible under the

23   *Blount* standard that the Court set forth in the letter.  She

24   provides concrete information on three categories that will

25   help the jury assess the abstract legal concepts for the DMCA

claims.

First, Ms. Miracle will testify on whether Reynolds's technological measures were capable of distinguishing unauthorized from authorized users.  And she will explain that based on her experience in the computer field, those measures that Reynolds put in place did not have that capability.  And that's relevant to a determination the jury will have to make of whether Reynolds' technological measures effectively controlled access.  Because if you aren't capable of distinguishing between authorized and unauthorized users, you don't effectively control access.

Second, Ms. Miracle will testify on whether Authenticom satisfied Reynolds' technological measures by supplying the expected information.  And this is important because there have been accusations that are untrue of how Authenticom accessed Reynolds' system.  And she will explain the technological functioning of Authenticom's software and that what Authenticom did was satisfy the prompts with expected information.  And that's relevant to the jury's abstract legal decision of whether Authenticom circumvented the measures as opposed to satisfied the measures.

Lastly, your Honor, Ms. Miracle will testify about which copyrighted works over which Reynolds asserts protection were accessed before or after technological measures.  And she will explain that the executable code for which Reynolds

1    asserts copyright protection could actually be accessed prior

2    technological measure, and, therefore, that's relevant to

3    whether that technological measure protected the copyrighted

4    work.

5            And, your Honor, each one of those is detailed more in

6    our opposition brief if the Court has additional questions.

7    Thank you.

8            THE COURT:  Okay.  I thank you all.  I appreciate

9    holding you over a few minutes here, but thank you.  I know how

10   much work it is to prepare for this, and this is why I love

11   MDLs.  This is why I don't always love MDLs because that's a

12   lot to chomp on for a whole case, much less one aspect of a

13   case, and it's obviously going to take us time to work through

14   this.

15           You know, 500 pages of briefing is alot.  And there

16   are important questions, and, so I will not hesitate to bother

17   you all again.  Probably for a supplemental brief rather than a

18   another hearing if I feel the need.  But John and I are going

19   to launch on this and dig in and by the -- I told John by the

20   time he goes back to private practice he'll at least be an

21   expert on this aspect of antitrust law, and I will try to get

22   there as well.

23           But thank you all for your time and for your energy

24   and for your help.  And I will be back to you as soon as I can,

25   and it may be a simple minute order saying this issue came up

1  in a week, give me five pages on it, it may be that I'm ready

2  to give you a ruling and keep moving.

3       I do appreciate having the bifurcation nightmare I had

4  laid to rest today.

5       We will all hope that we do not end up at *AT&T versus*

6  *MCI* and retrying a case years later, but that's for -- my wife

7  always says, "That's tomorrow girl's problem." That may be two

8  years from now my problem or yours, more likely yours, but

9  we'll get there. But I appreciate your coming to a common

10 ground on that and assuaging my concerns. I'm not going to

11 worry about that anymore. I have plenty of other things to

12 worry about.

13      So is there anything else that the plaintiffs wanted

14 to say for the record today?

15      MR. HO: No. Thank you, your Honor. We appreciate

16 all of the time you've devoted to this.

17      THE COURT: Okay. Ms. Wedgworth?

18      MS. WEDGWORTH: Your Honor, just a housekeeping

19 matter. As we did last time, I can forward the slides through

20 Carolyn.

21      THE COURT: Yes, that would be wonderful. I

22 appreciate that.

23      MS. WEDGWORTH: Will do. Nothing else, your Honor.

24      THE COURT: Defendants, anything else for today?

25      MS. MILLER: We're good.

1      MS. GULLEY:  Yes.  Thank you, your Honor, for your

2  time.  We appreciate it.

3      THE COURT:  Well, I thank you guys for all of your

4  time and effort and you get to bill your clients for it.  But I

5  will be in touch and have a great rest of your May.  One of

6  these days it's actually going to warm up here where we are.

7  Some of you are already probably experiencing that, so enjoy

8  the summer and we'll be back to you as soon as we can.  Thank

9  you.

10      MS. MILLER:  Thank you, your Honor.

11      MS. WEDGWORTH:  Thank you.  Bye-bye.

12      (Proceedings concluded at 12:06 p.m.)

13

14                  *  *  *  *  *  *  *  *  *  *

15                  C E R T I F I C A T E

16      I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19
   /s/Kristin M. Ashenhurst, CSR, RDR, CRR   June 1, 2021
20  Kristin M. Ashenhurst, CSR, RDR, CRR        Date
    Federal Official Court Reporter
21

22

23

24

25