IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| This document relates to: | Hon. Robert M. Dow, Jr. |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC* | Magistrate Judge Jeffrey T. Gilbert |
| *The Dealership Putative Class Action* | |

**CDK GLOBAL, LLC'S SUPPLEMENTAL BRIEF REGARDING
THE COURT'S JANUARY 21, 2022 MEMORANDUM OPINION AND ORDER**

**RECORD CITATION FORMAT**

| Docket Number | Reference |
|---|---|
| Dkt. 966 | Memorandum in Support of Motion for Summary Judgment (Authenticom)* |
| Dkt. 969 | Memorandum in Support of Motion for Summary Judgment (AutoLoop) |
| Dkt. 973 | Memorandum in Support of Motion for Summary Judgment (Dealers) |
| Dkt. 974 | Defendants' Joint Statement of Common Undisputed Material Facts (All Cases) |
| Dkt. 1120 | Reply in Support of Motion for Summary Judgment (Authenticom)* |
| Dkt. 1122 | Reply in Support of Motion for Summary Judgment (AutoLoop) |
| Dkt. 1123 | Reply in Support of Motion for Summary Judgment (Dealers) |

\* CDK has settled all claims and counterclaims with Authenticom. *See* Dkt. 1199. However, CDK's summary judgment motions against AutoLoop and the Dealers incorporate arguments made more fully in the Authenticom briefing.

**INTRODUCTION**

On January 21, 2022, the Court issued an omnibus ruling on the parties' *Daubert* motions. Dkt. 1321 ("Order"). As relevant here, the Court excluded the "direct" damages opinions from the Dealers' economic expert, Dr. Michael Williams, and certain opinions from AutoLoop's and the Dealers' industry expert, Alan Stejskal. The Court declined to exclude economic opinions from Dr. Williams and AutoLoop's economic expert, Dr. Mark Israel. Simultaneously, the Court asked the parties to submit supplemental briefs addressing the *Daubert* Order's effect on summary judgment as well as any other pertinent developments. Dkt. 1322, Dkt. 1326.

CDK is no longer a party to the MVSC and Authenticom actions, having settled with those plaintiffs in 2019 and 2020, respectively. Dkt. 778; Dkt. 1199. CDK's motions for summary judgment against AutoLoop and the Dealers remain pending. Dkt. 967; Dkt. 970. As explained below, the Court's Order supports CDK's contentions that it is entitled to summary judgment on all of AutoLoop's and the Dealers' claims.[1]

**I.     CDK Remains Entitled To Summary Judgment On The Conspiracy Claims.**

AutoLoop and the Dealers principally allege that CDK and Reynolds entered into a secret agreement to prohibit hostile integrators from accessing their respective DMSs in September 2013. As explained below, the Court's decision to admit Dr. Israel and Dr. Williams's economic opinions under Rule 702 does not affect CDK's grounds for summary judgment on this claim.

Under *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, an antitrust plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action" to survive summary judgment. 475 U.S. 574, 588 (1986). This is a legal, not economic,

---

[1] AutoLoop and the Dealers have filed motions for summary judgment on CDK's counterclaims. Dkt. 949; Dkt. 963. These motions are addressed in Part IV *infra*. In addition, CDK has moved to bar AutoLoop and the Dealers from pursuing a new and different legal theory than the one they disclosed in their complaints. Dkt. 773. That motion is pending and was not addressed by the Court's Order.

conclusion. As Areeda and Hovenkamp explain, "that expert testimony has been deemed admissible means that it is entitled to be included in the record, but that does not necessarily mean that it will be sufficient to create or preserve an essential factual issue." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* ¶ 309c1 (5th ed. 2021).

In *Kleen Products LLC v. Georgia-Pacific LLC*, for example, the district court "largely denied the parties' cross-motions to exclude each other's experts" but granted summary judgment to the defendants after concluding that "the record, viewed holistically in the light most favorable to the Purchasers, did not tend to rule out that the defendants had acted independently." 910 F.3d 927, 933 (7th Cir 2018). Similarly, in *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, this Court granted summary judgment despite supposed "economic evidence" that the defendants "had an agreement to manipulate the price of milk futures." 60 F. Supp. 3d 914, 962-964 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015). And in *In re Text Messaging Antitrust Litig.*, the court granted summary judgment because, as here, "the opinions of plaintiffs experts do not tend to exclude the possibility that defendants' actions were merely parallel, rather than collusive." 46 F. Supp. 3d 788, 810 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015). Courts outside the Seventh Circuit have reached similar conclusions. For instance, in *Valspar Corp. v. E.I. DuPont De Nemours & Co.*, the court granted summary judgment to the defendants despite expert testimony that economic evidence supported the existence of the claimed conspiracy. 873 F.3d 185, 197 n.9 (3d Cir. 2017). Notably, one of the plaintiff's experts in *Valspar* was Dr. Williams—the Dealers' economic expert in this case.[2]

---

[2] *See also, e.g., JDBL Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 888-890 (6th Cir. 2007) (granting summary judgment where expert failed to "account for the numerous alternative explanations" for the challenged conduct); *Blomkest Fertilizer v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037-1038 (8th Cir. 2000) (en banc) (rejecting expert's opinions "because of his heavy (if not exclusive) reliance on evidence that is not probative of conspiracy, coupled with his failure to consider significant external forces that served to raise the price of potash").

As in the foregoing cases, undisputed facts in the record show that no reasonable jury could conclude that CDK *conspired* with Reynolds to stop competing on "openness" or prevent third-parties from accessing CDK's DMS without authorization. In particular, it is undisputed that:

- Reynolds made a unilateral decision to prohibit hostile integration on its DMS in 2006, years before any purported conspiracy (Dkt. 966 at 5-6);

- After 2006, Reynolds never considered allowing hostile integration on the Reynolds DMS and CDK never believed Reynolds would do so (*id*. at 30-31);

- As early as 2010, CDK identified concerns with hostile integration on its DMS impacting system performance, data integrity, and profitability (*id*. at 11-12);

- In June 2013, Reynolds deployed technological measures that crippled numerous third parties' ability to engage in hostile access of the Reynolds DMS, causing CDK and others to conclude that legal and operational risks made it advisable to exit that business (*id*. at 7-8, 25);

- In September 2013, CDK and Reynolds began discussing ways to facilitate a controlled wind-down of CDK's hostile access to the Reynolds DMS (*id*. at 8-9);

- During these negotiations, Reynolds offered similar terms to CDK as it offered to other third parties as part of wind-down negotiations, and CDK ultimately agreed to wind-down its hostile integration activities in 2015 (*id*. at 25);

- In June 2015, CDK announced that it would begin disrupting hostile integration on its DMS, although CDK did not begin to do so until March 2016 (*id*. at 14-15);

- Throughout this period, CDK and Reynolds continued to compete on "openness," dealers continued to switch between CDK and Reynolds DMSs, and Reynolds continued to allow Authenticom to access data on the Reynolds DMS by using Reynolds' "Dynamic Reporting" functionality (*id*. at 5, 43, 67).

As to CDK, these facts demonstrate that the conduct the plaintiffs challenge (CDK's cessation of hostile integration on the Reynolds DMS, CDK's subsequent prohibition of hostile integration on its own DMS, and the price increases for CDK integration packages after CDK deployed blocking technology in 2016) was fully consistent with CDK's lawful unilateral interests (achieving a smooth wind-down of its business, furthering system security and integrity, and capturing additional value from its DMS). The same is true for Reynolds. The most significant Reynolds

blocking episode AutoLoop and the Dealers identify—the so-called June 2013 "Reynolds Apocalypse" that decimated Authenticom, CDK, and other integrators—was undertaken months before any alleged "conspiracy." Dkt. 966 at 6-8. Reynolds also unilaterally raised its prices before the start of the supposed conspiracy, and years before any increases by CDK. *Id*. at 27-28.

Accordingly, it is *at least* as likely that CDK and Reynolds acted unilaterally throughout relevant period as it is that the companies entered into a secret conspiracy to block hostile integrators and stop competing on "openness" in 2013. Under *Matsushita*, the plaintiffs' evidence is therefore insufficient to create a genuine issue at summary judgment.[3]

Adding the plaintiffs' expert evidence to the mix does not change this conclusion. The experts essentially observe that while CDK and Reynolds could have achieved all of their aims unilaterally, the companies also could have achieved their aims through a conspiracy, adding a degree of assurance that neither company would "defect" from their supposedly parallel course of conduct. But one could say the same thing any time one company follows another company's unilaterally profitable business strategy, particularly in concentrated markets. *See* Dkt. 966 at 19-34; Dkt. 969 at 16-17; Dkt. 973 at 17-22. In the Third Circuit's words, therefore, expert evidence describing how concentrated markets can facilitate collusion as well as lawful conscious parallelism, or noting that legitimate communications or other conduct in such markets also provides an opportunity to reach illegal agreements on other subjects, does not tend to exclude unilateral explanations. It simply "master[s] the obvious." *Valspar*, 873 F.3d at 197.

---

[3] AutoLoop has argued that because it has "direct" evidence—in the form of testimony by Authenticom's CEO—*Matsushita* does not apply. Dkt. 1075 at 15; Dkt. 1100 at 41-42. This is incorrect for two reasons. First, the evidence is not "direct." Dkt. 966 at 43-50; Dkt. 1120 at 3-6; *see also Text Messaging*, 46 F. Supp. 3d at 802-04 (email in which senior vice president referred to "collusive" price increase not direct evidence). Second, even direct evidence must be assessed under the *Matsushita* framework, and in this case would not be sufficient to defeat summary judgment. Dkt. 966 at 50-52; Dkt. 1120 at 6-7. The Court's *Daubert* ruling does not bear on this question either way. *See* Order 30 (reserving this issue for summary judgment).

Put another way, although experts may testify "as to whether certain conduct is . . . consistent with collusion," Order 19-20, such testimony cannot carry the day unless it "tend[s] to *rule out* the possibility of independent action." *Dairy Farmers*, 60 F. Supp. 3d at 963-964. The expert evidence in this case does not rule out anything. *See* Dkt. 966 at 32-33, 37-41; Dkt. 973 at 18-21. For example, both Dr. Israel and Dr. Williams opined that CDK and Reynolds had sufficient *unilateral* power to raise integration prices without a conspiracy, and both acknowledged that a controlled wind-down of CDK's hostile integration business and price increases for CDK integration were in CDK's *unilateral* interest. *See* Dkt. 975-72, Israel Rpt. ¶¶ 208-211; Dkt. 975-79, Williams Rpt. ¶ 177; Dkt. 966 at 23-24; Dkt. 973 at 17-19. Indeed, Dr. Williams could not identify any benefits to CDK during the first 17 months of the supposed "agreement." Dkt. 966 at 26-28. Likewise, while Dr. Israel opined that competition "softened" after September 2013, that is fully consistent with companies making unilateral decisions in a concentrated market. *Kleen Prods.*, 910 F.3d at 935; *Text Messaging*, 782 F.3d at 873.

In short, whether an expert "has drawn a reasonable conclusion based on his analysis and actually made a prima facie case for conspiracy" is "a matter to be examined at summary judgment." Order 31 (citing *Kleen Prods. LLC v. Int'l Paper*, 2017 WL 2362567, at *14 (N.D. Ill. May 31, 2017)). And in this case, "[w]hat still is missing is evidence that would allow a reasonable jury to find collusion, as opposed to, for example, self-interested and independent behavior." *Dairy Farmers*, 60 F. Supp. 3d at 963-64. The "opinions of experts" cannot "establish the existence of a dispute of material fact based on the same underlying evidence." *Id.*[4]

---

[4] Besides its main conspiracy claim, AutoLoop brings a Section 1 "market division" claim alleging that CDK and Reynolds agreed to divide the market for accessing each other's DMS. The Court held in another case that this claim fails as a matter of law because a competitor's product is not a "territory" for market-division purposes. Dkt. 969 at 17-18. Regardless, Dr. Israel never analyzed a "market division" theory, and AutoLoop has not pointed to any facts to support such a claim. *Id.*; Dkt. 1122 at 12. Therefore, the admission of Dr. Israel's economic opinions cannot save this claim at summary judgment.

## II. CDK Remains Entitled To Summary Judgment On The Non-Conspiracy Claims.

AutoLoop and the Dealers also bring certain non-conspiracy claims under the antitrust laws. Both bring a Section 1 claim based on alleged "exclusive-dealing" contracts between CDK and its vendors. In addition, AutoLoop brings a Section 2 claim alleging that CDK has monopolized the supposed brand-specific data integration "aftermarket" for its DMS.

A Section 1 exclusive-dealing claim fails at summary judgment for several reasons: (1) AutoLoop and Dr. Israel offer no evidence that the challenged provisions have substantially foreclosed competition in the supposed aftermarket, (2) the Dealers' claim that the provisions were the product of the supposed conspiracy is contradicted by the record; and (3) neither AutoLoop nor the Dealers suffered antitrust injury from what they call the "exclusive-dealing" provisions. Dkt. 966 at 68-69; Dkt. 969 at 3 n.2, 17; Dkt. 973 at 22-23. Neither Dr. Israel nor Dr. Williams performed a substantive analysis of "exclusive-dealing" provisions in CDK's vendor contracts, so their economic opinions cannot create genuine issues of fact on these claims. Indeed, at summary judgment, the Dealers abandoned their exclusive-dealing claim entirely. Dkt. 1122 at 4, 9.

AutoLoop's monopolization claim also fails. Section 2 does not prohibit all monopolies, only those acquired or maintained through unjustifiable means. *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991). The failure of AutoLoop's conspiracy and exclusive-dealing claims at summary judgment thus dooms the monopolization claim as well. Dkt. 966 at 71 n.14. In addition, AutoLoop has not shown the requisite aftermarket "lock-in." *See* Dkt. 966 at 70-75; Dkt. 969 at 17; Dkt. 1120 at 35-38. Here too, Dr. Israel's opinions do not create any factual issues; Dr. Israel explicitly disavowed the aftermarket theory. Dkt. 966 at 71-72. And the Court's decision to preclude AutoLoop's "industry" expert, Allan Stejskal, from opining on

the purported difficulty of switching DMS providers (Order 75) confirms that AutoLoop has not provided hard evidence of the high switching costs necessary to maintain an aftermarket claim.

### III. CDK Remains Entitled To Summary Judgment On Damages.

Because the Court should grant CDK summary judgment on liability grounds, there is no need to decide whether there is a triable issue on damages. But should the Court find it necessary to address damages, its Order highlights three separate problems with the plaintiffs' damages models at summary judgment.

#### A. The Undisputed Facts Show That No Reasonable Jury Could Award Appropriate Damages Using AutoLoop's and the Dealers' Damages Models.

This Court has recognized that "[t]o recover under the antitrust laws," a plaintiff "must prove that [its] damages were caused by the *unlawful* acts of the defendant." *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (quoted at Order 13). Expert opinions are "worthless" if they "fail[] to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining." Order 66 (quoting *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998)).

In its *Daubert* Order, the Court reserved this issue for summary judgment, when it could undertake a "comprehensive assessment of the full record," including any "lawful causes of . . . alleged damages." Order 67; *see also id*. at 16, 26, 46-47. For several reasons, it is clear at summary judgment that neither AutoLoop's nor the Dealers' damages models provide the jury with a reasonable way to separate the effects of lawful and unlawful conduct, as *Marshfield Clinic* requires. *See generally* Dkt. 969 at 10-12; Dkt. 1122 at 3-9; Dkt. 973 at 9-13; Dkt. 1123 at 4-6.

*First*, as both experts found, CDK and Reynolds each had unilateral market power to raise integration prices without a conspiracy. The Court's *Daubert* Order does not deny this. It merely notes AutoLoop's contention that its expert's "difference-in-differences" econometric model

-7-

isolated the conspiratorial price increase by comparing CDK's and Reynolds's price increases to benchmark prices. Supposedly, this model implied that "pre-collusion, [Defendants] were exercising what market power they each had, all else equal." Order 25.

There are several problems with this argument at summary judgment. The implication for CDK—which *never* raised its prices for integration before 2015, *see* Dkt. 974 ¶¶ 163-165—is irrational. By plaintiffs' theory, CDK was fully exercising its unilateral market power to raise prices for integration in 2013, but had never once raised prices in the history of its program. Additionally, the plaintiffs' experts concluded not just that CDK and Reynolds had unilateral power, but that they could have profitably exercised unilateral power to secure their DMSs and raise prices *after* 2013. *See* Dkt. 966 at 22; Dkt. 973 at 11; *supra* p. 5. This implies that CDK and Reynolds did not exercise all their unilateral market power as of 2013. Finally, if CDK in fact had no more unilateral market power to exercise after 2013—if CDK could only raise integration prices through a conspiracy—then the damages on the plaintiffs' unilateral claims should be zero. Instead, they are the same. As reflected by Dr. Israel's assertion that the damages he calculates are "empirical facts under either theory of liability" (*i.e.*, unilateral or conspiracy), the damages he estimates do not depend on the underlying conduct. The models are indifferent to whether CDK acted unilaterally, conspiratorially, or something in between. Dkt. 975-72, Israel Rpt. ¶ 206.

As explained above, at least some of the unilateral conduct AutoLoop challenges (*e.g.*, the supposed exclusive-dealing provisions) was in fact lawful. *See supra* p. 6. As such, even if Dr. Israel could testify about his difference-in-differences models, no reasonable jury could use those models to make a valid assessment of damages. The models do not allow the jury to identify what price increases are attributable to a supposed conspiracy versus lawful unilateral activity. Dkt. 966 at 63-64; Dkt. 969 at 17. The evidence is therefore insufficient under *Marshfield Clinic*.

***Second***, Dr. Williams's damages model improperly measures the purported price effects of the alleged "exclusive-dealing" provisions in CDK's contracts. The Court agreed with the Dealers that Dr. Williams was not obligated to exclude these effects from his model just because the Dealers' exclusive-dealing damages claim was barred under *Illinois Brick*. Order 47. As noted above, however, the Dealers never responded to CDK's arguments on the exclusive-dealing claim, conceding that the challenged provisions were lawful. Dkt. 973 at 21-22; Dkt. 1123 at 4, 9. Dr. Williams offers no way to separate the effects of these concededly lawful provisions from the overall price increases he calculates. Here too, it is thus clear at summary judgment that the Dealers' damages model cannot "isolate those elements of the plaintiff's damage that were caused by" unlawful conduct. Order 47 (quoting Areeda & Hovenkamp ¶ 309c2).[5]

***Third***, even setting aside the problems stemming from the plaintiffs' experts' opinions about CDK's and Reynolds's unilateral activity, a reasonable jury could not use the experts models to predict but-for prices. Neither of the benchmark firms used in the difference-in-differences models—the hostile integration vendors SIS and Authenticom—have market power, so those firms' failure to raise prices after September 2013 (as measured by Dr. Israel and Dr. Williams) does not predict how a firm *with* market power would have behaved absent the supposed conspiracy. Additionally, both experts use an exceptionally brief eight-month pre-conspiracy period to model over five years of prices in the but-for world. No reasonable jury could conclude that because CDK did not raise its prices for 8 months in 2013, CDK would not have raised prices one cent from 2014 onward, even after Reynolds raised its prices in 2013. *Marshfield Clinic*, 152 F.3d at 594; *see also Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) ("A

---

[5] For similar reasons, it does not matter whether the Dealers could have pursued an exclusive-dealing theory under one or more state laws, because the Dealers have forfeited such a claim. *See* Order 47-48 (stating that it is "unclear" how CDK's argument applies to the state antitrust claims). In any event, as explained in the next section, the Dealers have not provided evidence of damages for their state law claims.

reasonable jury could not . . . indulge in the assumption that a competitor would follow a course of behavior other than which it believed would maximize its profits.").

### B. The Dealers Provide No Evidence Of Damages For Their State Law Claims.

In its *Daubert* Order, the Court excluded Dr. Williams's opinions that the putative dealer class suffered over $300 million in nationwide "direct" damages because, in fact, those were disguised pass-through overcharges. Order 36-44. The Court expressed no opinion on whether Dr. Williams could offer similar opinions "in support of a claim for damages under the antitrust laws of one or more states." *Id*. at 43. But at summary judgment, he cannot—because he calculated and disclosed only a single nationwide damages model in this case. *See* Dkt. 979-117, Williams Tr. 275 ("Q: Dr. Williams, you've not attempted to calculate damages for dealers located in any particular state, correct? A: That is correct."). An expert cannot offer state-law damages opinions that he did not disclose in his reports. Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1).

Nor can the Dealers fix this problem now. CDK pointed out in May 2020 that the Dealers had not offered evidence of damages on the state-law claims. Rather, the Dealers offered only Dr. Williams's nationwide damages model, which failed to measure "indirect" damages (individually or on behalf of a putative class) for any claims that remained in the case. Dkt. 973 at 15-16. The Dealers did not come forward with additional evidence or models in response to this argument. And it would be highly prejudicial to CDK—and extremely wasteful for the Court—to permit the Dealers to wait until after the *Daubert* ruling to decide whether to offer new evidence that purports to calculate indirect damages on a state-by-state basis. Dkt. 1123 at 7. Summary judgment is appropriate on this ground as well.[6]

---

[6] Even if the Court were to permit the Dealers to submit new damages evidence—it should not—the *Daubert* Order disposes of the Massachusetts and New Jersey consumer protection claims (Counts XXXIX and XLIV) because those states follow *Illinois Brick*. Dkt. 973 at 9; Dkt. 1123 at 3. Also, many of the remaining state claims fail for independent reasons, Dkt. 973 at 23-34, making the damages issue moot.

### IV. CDK Remains Entitled To A Trial On Its Counterclaims.

The Court's *Daubert* Order does not affect AutoLoop's or the Dealers' motions for summary judgment on CDK's counterclaims. The only pertinent issue discussed in the Order was whether CDK's cybersecurity expert, Ed Stroz, properly grouped alleged DMCA violations by dealership group rather than individual dealer. *See* Order 95 (reserving that issue for summary judgment). CDK's summary judgment briefing explains why analysis at the dealer group level is appropriate and why, even if it were not, there is sufficient evidence in the record for the jury to assign liability to an individual dealership within one of the relevant dealer groups. Dkt. 1057 at 22, 25-27, 32.

### CONCLUSION

The Court should grant CDK's pending motions for summary judgment.

Dated: February 25, 2022

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
Daniel T. Fenske
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com
dfenske@ mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

## CERTIFICATE OF SERVICE

      I, Britt M. Miller, an attorney, hereby certify that on February 25, 2022, I caused a true and correct copy of the foregoing **CDK GLOBAL, LLC'S SUPPLEMENTAL BRIEF REGARDING THE COURT'S JANUARY 21, 2022 MEMORANDUM OPINION AND ORDER** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

                                                   */s/ Britt M. Miller*
                                                   Britt M. Miller
                                                   MAYER BROWN LLP
                                                 71 South Wacker Drive
                                                 Chicago, IL 60606
                                                 (312) 782-0600
                                                 bmiller@mayebrown.com