**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Authenticom, Inc. v. CDK Global, LLC*, No. 1:18-cv-868 (N.D. Ill.); | Magistrate Judge Jeffrey T. Gilbert |
| *MVSC v. CDK Global, LLC*, No. 1:18-cv-865 (N.D. Ill.) | |

**THE REYNOLDS & REYNOLDS COMPANY'S
SUPPLEMENTAL BRIEF REGARDING *DAUBERT*
AND SUMMARY JUDGMENT PURSUANT TO DOCKET 1322**

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

II.     The Court's *Daubert* Analysis of Nancy Miracle's Opinions Should Lead to
        Partial Summary Judgment on Reynolds's Counterclaims against
        Authenticom .......................................................................................................... 2

III.    Reynolds Remains Entitled to Summary Judgement on Authenticom's
        Conspiracy Claims under *Matsushita* ............................................................... 4

IV.     Authenticom's Non-Conspiracy Claims Still Fail ............................................. 8

V.      Reynolds Remains Entitled to Summary Judgment on Authenticom's
        Damages ................................................................................................................. 9

VI.     Reynolds's Motion for Summary Judgment in *MVSC* Should Be Granted ........... 11

VII.    Conclusion and Prayer ....................................................................................... 14

Pursuant to the Court's January 21, 2022 request (Dkt. 1322), The Reynolds and Reynolds Company ("Reynolds") files this Supplemental Brief in support of its Partial Motion for Summary Judgement on its Counterclaims against Authenticom (Dkt. 785), Motion for Summary Judgment on Authenticom's claims (Dkt. 966), Motion for Summary Judgment on MVSC's claims (Dkt. 955), and its response (Dkt. 1061) to Authenticom's Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 976) in light of the Court's recent *Daubert* opinion (Dkt. 1321) ("Op.").

## I.    Introduction

The Court's *Daubert* rulings pave the way for the Court to grant partial summary judgment in favor of Reynolds's counterclaims against Authenticom and do nothing to save Authenticom's or MVSC's affirmative claims as a matter of law. *First*, the Court rejected Authenticom's attempt to re-draft the statutory language of Digital Millennium Copyright Act through expert testimony. That has left Authenticom exposed. As the Court noted, the meaning of the statute is a question of law and is therefore ripe for decision on summary judgment. The great weight of authority supports Reynolds's motion for partial summary judgment on its counterclaims against Authenticom for its statutory violations. Dkt. 785.

*Second*, the Court should likewise grant Reynolds's motion for summary judgment on Authenticom's affirmative claims. Dkt. 966. Nothing in Plaintiffs' expert opinions that have been allowed to proceed beyond the *Daubert* standard suffices to carry their *summary judgment burden* under substantive antitrust law: Plaintiffs have no evidence that tends to rule out the possibility that Reynolds and (years later) CDK independently decided to secure their respective DMSs,[1] as

---

[1] Recent events have only highlighted that Reynolds and CDK were justified in their independent decisions to prevent unauthorized third parties from routinely accessing and scraping data off their DMSs. *See* Dkt. 1320 (disclosing Authenticom's recent ransomware attack).

opposed to doing so pursuant to an unpleaded conspiracy.[2] To the contrary, Authenticom's liability expert Mark Israel concedes that Defendants each had the same power and incentives to secure their respective DMSs as they would under an alleged conspiracy. *See*, *e.g.*, Dkt. 966 at 21-22. Indeed, Dr. Israel opines that when CDK's and Reynolds's conduct is viewed as "unilateral" rather than "collusive," "very little of the economic analysis changes." *Id*. at 22. Dr. Israel's opinion that CDK and Reynolds had the power not only to secure their systems unilaterally, but to do so profitably, is dispositive and precludes Authenticom from satisfying *Matsushita*.

Finally, the Court's *Daubert* opinion also does not (a) assist Authenticom's unilateral conduct claims against Reynolds, a company without market power and whose market share has declined since the alleged conspiracy was formed and continues to decline; (b) save Authenticom or MVSC from their inability to tie the harm they allegedly suffered to any specific conduct; or (c) change the fact that MVSC has never been refused access to data on the Reynolds DMS. For all these reasons, giving all due credence to Plaintiffs' evidence, Reynolds's motions for summary judgment should be granted. Dkt. 777, 955, 966.

## II. The Court's *Daubert* Analysis of Nancy Miracle's Opinions Should Lead to Partial Summary Judgment on Reynolds's Counterclaims against Authenticom

Reynolds moved for partial summary judgment as to liability on its counterclaims against Authenticom under the Digital Millennium Copyright Act and Wisconsin Computer Crimes Act because there is no genuine dispute about Authenticom's access to the Reynolds DMS without authorization or about the means Authenticom used to gain that unauthorized access—only a legal dispute about whether those actions violate the relevant statutes that the Court can resolve as a

---

[2] Reynolds has moved to bar Authenticom and MVSC from pursuing the new and different legal theories espoused by Dr. Israel and Mr. Klein, which are different from those disclosed by Authenticom and MVSC before the close of discovery. That motion was not addressed in the Court's *Daubert* Order. Op. at 6 (citing Dkt. 773, 787).

matter of law. Dkt. 777. That motion squarely tees up the question of how to interpret the DMCA in connection with Authenticom's activities. Authenticom proffered Nancy Miracle's opinion testimony as one of its primary arguments in opposition to that motion, contending that "the jury must determine whether the capabilities of Reynolds's technological measures qualify them for DMCA protection" and pitching the issue as a "classic battle of the experts." Auth. Opp. to Rey. PMSJ (Dkt. 1081) at 17. Authenticom's own motion for summary judgment on the DMCA claim repeats its reliance on the now-excluded expert opinion. *See* Auth. MSJ (Dkt. 978) at 50-51. As this Court recognized, however, Authenticom sought to use Ms. Miracle to reinterpret the DMCA, an invasion of the Court's domain. With Ms. Miracle properly removed from the statutory-interpretation debate, this Court should resolve the issue as a matter of law on summary judgment. That interpretation should be resolved in Reynolds's favor, for all the reasons already stated. *See* Rey. Memo. ISO PMSJ (Dkt. 785) at 4-19; Rey. Opp. to Auth. MSJ (Dkt. 1061) at 20-40; Rey. Reply ISO PMSJ (Dkt. 1127) at 7-8. Assuming the Court agrees, the resulting rulings will also require the exclusion of Miracle's remaining DMCA-related opinions as irrelevant, as contemplated in the opinion. Op. at 100.

The Court also deferred ruling on Ms. Miracle's copyrightability opinion, which "is relevant solely to the issue of copyrightability of the work that Defendants allegedly protected by technological measures." *Id.* at 101. The Court allowed that this opinion might be "a factor to be weighed" in the Court's determination of copyrightability in connection with Reynolds DMCA claim, assuming that opinion satisfies the continuing requirements of *Daubert*. *Id*. As detailed in past briefing, Authenticom's reliance on Ms. Miracle's opinion on the copyrightability of Reynolds's progress bar and dialogue box suffers from multiple fatal flaws. Among other things, Authenticom's reliance on Ms. Miracle's opinions: (1) is procedurally barred, (2) is aimed at an

incorrect standard for what level of originality is required for a "copyrightable" work (especially in a case involving identical copying), (3) is refuted by an actual DMS software developer's testimony about the design choices involved, and (4) addresses only one of the four categories of copyrighted works protected by Reynolds's security measures in the first place. *See* Rey. Opp. to Auth. MSJ (Dkt. 1061) at 27-35. Accordingly, as a matter of law, nothing in Ms. Miracle's opinion saves Authenticom from its clear violations of the DMCA.

Finally, the Court's *Daubert* opinion does not affect Authenticom's clear liability under the Wisconsin Computer Crimes Act as set forth in Reynolds's motion for partial summary judgment on its counterclaims against Authenticom.

### III. Reynolds Remains Entitled to Summary Judgement on Authenticom's Conspiracy Claims under *Matsushita*

The Court's *Daubert* rulings do not affect Reynolds's Motion for Summary Judgment on Authenticom's antitrust claims (Dkt. 966), in which Reynolds moved for summary judgment on Authenticom's claims that Reynolds conspired with CDK to close their respective systems to third-party data integrators, because Authenticom failed to carry its burden under *Matsushita* of producing evidence that tends to exclude the possibility that Reynolds and CDK made independent decisions, years apart, to secure their respective DMSs. The Court denied Defendants' motion to exclude certain opinions of Authenticom expert Dr. Israel, who generally offers the opinion that the economic facts support a finding of antitrust liability, whether by way of conspiracy or unilateral conduct. But Dr. Israel's passing through the *Daubert* gate sheds no light on whether Authenticom has carried its more substantial burden under *Matsushita* at summary judgment.

As the Court's opinion recognized, experts in antitrust cases are rarely stricken under the lenient *Daubert* standard—which requires only "basic competency of the expert [and] her methodology"—and courts instead delve into the economic facts at summary judgment, "a much

more practical vehicle in antitrust cases." Op. at 15-16 (quoting Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 309c2, at 16 (4th & 5th eds. 2015-2021)). The reason is that the *Daubert* inquiry looks "solely" to the expert's "principles and methodology, not [to] the conclusions they generate." *Schultz v. Azko Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993)). As to the underlying facts, an expert's methodology is subject to Daubert exclusion only if there is an "analytical chasm" between the facts and the conclusion. *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2004 WL 1613563, at *9 (N.D. Ill. 2004).

The *Matsushita* standard is far less lenient. It requires wading into the record and determining whether, taken as a whole, the plaintiff's conclusion is indeed the more reasonable one: Authenticom's burden as a Section 1 plaintiff is to "exclude the possibility" that Reynolds acted independently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Therefore, evidence "as consistent with permissible competition as with illegal conspiracy" avails Authenticom nothing. *Id.* That means that, unlike an expert's conclusion at the *Daubert* stage, Authenticom must show at the summary judgment stage that its conclusion of conspiracy is more reasonable than a contrary conclusion (i.e., more reasonable than a conclusion of independent action). *See Omnicare, Inc. v. United Health Group, Inc.*, 629 F.3d 697, 707 (7th Cir. 2011) (summary judgment warranted where "the inference of conspiracy is the less reasonable of the two"); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935 (7th Cir. 2018) (evidence supporting "competing inferences" does not "tend to exclude the possibility of independent action"); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc) ("[*Matsushita*] requires that if it as reasonable to infer from the evidence a price-

fixing conspiracy as it is to infer permissible activity, the plaintiff's claim, without more, fails on summary judgment.").

So, unlike at the *Daubert* stage (where a court need only assure the absence of an analytical chasm between the facts and the expert's conclusion), at the summary-judgment stage, the Court must parse the details of the evidence offered by the plaintiff. *See, e.g., In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872-73 (7th Cir. 2015) (analyzing at length the inferences that could be drawn from the language in and context of "a pair of emails"); *Miles Distribs., Inc. v. Specialty Const. Brands, Inc.*, 476 F.3d 442, 450 (7th Cir. 2007) (same as to "statements from [an] email and memo"); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 109 (2d Cir. 2018) (same, as to marketing "script" and numerous email exchanges); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121 (3d Cir. 1999) (same, as to "statements and correspondence"). The Court must also look *beyond* the expert economist's conclusions at summary judgment to decide whether the underlying facts indeed support those conclusions. In *Matsushita*, despite the plaintiff's proffer of an expert economist's opinion, the Court determined that the opinion "has little probative value" in light of the Court's own analysis of the "economic factors . . . that suggest that [the alleged conspiratorial] conduct is irrational." 475 U.S. 574, 594 n.19. Indeed, the *Matsushita* Court so held in the face of a dissenting opinion arguing that the existence of an expert opinion that survives *Daubert* is itself sufficient to survive summary judgment, regardless of whether the expert's conclusion is "persuasive." *Id*. at 606-07 (White, J., dissenting). And the majority's position—that an expert's conclusion, even if methodologically reliable for Daubert purposes, must be more exactingly reviewed at summary judgment—has been repeatedly reaffirmed. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242-43 (1993) (reaffirming that "[a]s we observed in *Matsushita*, expert opinion evidence has little probative value in comparison with

the economic factors that may dictate a particular conclusion," and holding that "the expert testimony cannot sustain the jury's verdict"); *Omnicare*, 629 F.3d at 715 (assuming that expert report was admissible and recognizing that it "supports [the plaintiff's] theory of the case," but ultimately determining that its conclusion was based on evidence supporting "competing inferences," and upholding summary judgment); *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1170 (6th Cir. 1995) (holding that where expert's "conclusions are based on nothing more than facts which … are equally consistent with independent actions," they are "not sufficient to defeat [a] motion for summary judgment").

In addition to the points set forth in its summary judgment briefing, Reynolds respectfully notes that when the Court examines the summary judgment record, it will see that certain of the background facts summarized in the *Daubert* opinion are mistaken, even giving full credit to Plaintiffs' evidence. First, in describing the allegations regarding the February 2015 written agreements, the opinion states that "[t]he agreements also provided that CDK and Reynolds would deny data integrators access to each other's DMSs." Op. at 4. However, as the Seventh Circuit has recognized: "Notably, nothing in any of the three agreements required either CDK or Reynolds to block third-party access to its own data management system." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). As a matter of law and law of the case, the written 2015 agreements are not evidence of a conspiracy. Second, the opinion mistakenly states that the wind-down period in the Data Exchange Agreement was approximately 5 years. Op. at 4. While 5 years was set as an absolute maximum for potential extensions, the actual wind down period was principally defined as lasting for the remaining term of CDK's then-extant contracts for data integration. Dkt. 974 ¶¶ 119, 121. Consistent with those terms, the wind-down process was

completed in less than 22 months, at which point the Data Exchange Agreement was terminated according to its terms. *Id*. ¶ 127. Plaintiffs offer no evidence to the contrary.

## IV.     Authenticom's Non-Conspiracy Claims Still Fail

Reynolds also moved for summary judgment (Dkt. 966) with respect to Authenticom's claims based on unilateral conduct—namely claims of exclusive dealing and "monopolization." Like its conspiracy claims, Authenticom's exclusive dealing and monopolization claims also remain ripe for summary judgment in the wake of the Court's *Daubert* opinion.

Dr. Israel's analysis does not save Authenticom's exclusive dealing claims because it cannot overcome the fact—undisputable on the summary-judgment record—that Reynolds does not have durable market power, as evidenced by its steadily declining market share over the relevant time period. *See* Dkt. 966 at 66. And Dr. Israel's evidence does not change the uncontroverted fact that the contracts challenged as exclusive dealing ***are not exclusive***, and further are terminable at will on short notice of 180 days or less. Dkt. 966 at 68; Dkt. 1120 at 34. These are matter-of-law grounds for ruling against Authenticom's exclusive dealing claim. *See, e.g.*, *Roland Mach Co. v. Dressler Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (a non-exclusive and terminable-at-will contract cannot meaningfully foreclose competition); *see also Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) ("[O]pportunities for competition remain, since the contract with Dr. King has a term of only three years and may be cancelled without cause upon six-months' notice."). Further, Dr. Israel's expert reports did not meaningfully address the exclusive dealing substantial-foreclosure analysis, *see* Dkt. 966 at 68-70, and thus his opinions should have no effect on the Court's summary judgment analysis.

Authenticom's aftermarket monopolization theory likewise fails. Dr. Israel's expert opinions affirmatively, explicitly, and repeatedly reject the aftermarket monopolization theory that

Authenticom has pursued in this suit. Dkt. 966 at 71-72; Dkt. 1120 at 35. Accordingly, the survival of those expert opinions on *Daubert* is irrelevant to the matter-of-law reasons why Authenticom's *Kodak* theory fails at summary judgment. Authenticom still cannot identify a policy change by Reynolds (a blackletter requirement in this Circuit), *see* Dkt. 1120 at 35-36; cannot overcome the incontrovertible record evidence that dealers are able to ascertain the total cost they will pay to use a given DMS and constellation of applications, *see id.* at 36-37; and cannot overcome the hard record evidence that customers can and routinely do switch DMS providers, *id.* at 37-38, *see also* Dkt. 966 at 74-76. Moreover, the Court's partial exclusion of Mr. Stejskal's switching testimony, *see* Op. at 74-75, further weakens Authenticom's improper reliance on anecdotes and individual complaints in the face of hard evidence of substantial switching.

### V. Reynolds Remains Entitled to Summary Judgment on Authenticom's Damages

Authenticom's failure to disaggregate damages likewise requires summary judgment as a matter of law on both Authenticom's unilateral and conspiracy claims. In *Authenticom*, the Court held in its *Daubert* opinion that Ms. Lawton's damages opinions meet the lenient *Daubert* standard, but the Court made clear that does not resolve the deficiencies that her opinions present for Authenticom at the summary judgment stage. As the Court has noted, this is now the proper stage for a decision: the correct resolution to a damages expert's failure "to show what portion of [the] plaintiff's loss resulted from unlawful conduct . . . is not exclusion of the testimony under *Daubert* but rather a summary judgment grant because the expert's testimony has not been able to isolate those elements of the plaintiff's damage that were caused by the antitrust violation." Op. at 16 (citing Areeda & Hovenkamp ¶ 309c2, at 16); *see also* Op. at 24, 66-67. Indeed, in its discussion of *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir. 1983)

and *Blue Cross & Blue Shield of Wisconsin v. Marshfield Clinic,* 152 F.3d 588, 594 (7th Cir. 1998), the Court noted neither case "was decided in the context of a *Daubert* motion." Op. 66.

Rather, in both cases, after summary judgment or a jury verdict, the Seventh Circuit was forced to reckon with a record that established that the damages suggested by the Plaintiff included damages from harm not caused by the conduct found to be illegal. In *Marshfield Clinic*, the record established that some of the harm may have been a result of "differences in the treatment mix, rather than the defendant's unlawful division of markets" and in *MCI Communications,* the damages study did "not establish any variation in the outcome depending on which acts of [the defendant] were held to be legal and illegal." Op. at 66, 67 (quoting *MCI*, 708 F.2d at 1160 and *Marshfield Clinic*, 152 F.3d at 593-94). As the Court stated, "[w]hile *MCI* suggests reasons why Defendants could potentially be entitled to summary judgment or a directed verdict" it did not in that instance warrant *Daubert* exclusion. Op. 66.

Just so here. Ms. Lawton's calculation of Authenticom's damages does not distinguish, but instead lumps together, the alleged damages it suffered as a result of each of its claims—including conspiracy, monopolization, and exclusive dealing. Dkt. 880 at § IV, Dkt. 996 at § VI**.** It also assumes that *all* differences in growth between Authenticom's connections to so-called "Other DMSs"—however that term is defined in Ms. Lawton's parlance—and CDK or Reynolds's DMSs are *both* (a) attributable exclusively to some, indistinguishable combination of this illegal conduct and (b) that any action taken by Reynolds or CDK that caused harm to Authenticom during the damages window is similarly a product of this illegal conduct. Dkt. 880 at § IV, Dkt. 996 at § VI.

This means that if, at the summary judgment stage, the Court were to find that any one of the multiple theories of liability Authenticom has brought against Reynolds fails as a matter of law, the Court—like the Seventh Circuit in *Marshfield Clinic* and *MCI*—would have "no rational

basis" to determine that Authenticom had established evidence of damages to the remaining claims. *Marshfield Clinic*, 152 F.3d at 593-94. Likewise, it means that if the Court were to find that any of Reynolds's actions that Authenticom *admits* contributed to its alleged harm—including Reynolds's decision to implement (a) CAPTCHA controls on its systems between 2007 and 2013 (*E.g.,* Dkt. 974, ¶ 83), (b) suspicious USER ID monitoring on its systems starting in February 2013 (Dkt. 974¶ 85), (c) dealer contracts that prohibited unauthorized third-party access as far back as 2006 (Dkt. 974, ¶ 66) (previously dismissed by Judge St. Eve (Dkt. 176 at 36)), or (d) its vendor contracts that prohibit unauthorized access to the Reynolds system (Dkt. 974 ¶ 9)—were not the product of an illegal antitrust conspiracy, the Court would be left "with no way to adjust the amount of damages to reflect [this] lawful competition." *MCI,* 708 F.2d at 1160. *See also* Dkt. 880, § IV (pp. 21-23) (describing Lawton's admissions that all these things contributed to the damages amount she calculated, but that she was unable to account for their proportions). Because Authenticom has failed to disaggregate damages as a matter of law, and because it is legally proper for this MDL Court to decide this pure legal issue at this time, summary judgment for Reynolds is required.

## VI. Reynolds's Motion for Summary Judgment in *MVSC* Should Be Granted

Reynolds moved for summary judgment on all of MVSC's claims, because there is no evidence—let alone evidence that tends to exclude the possibility of independent action—that Reynolds entered into any unlawful conspiracy to block MVSC's access to data, and to the extent MVSC suffered any harm, there are obvious alternative causes. MVSC's damages expert Mr. Klein may have survived "a close call" at the *Daubert* stage, Op. at 70, but the Court should likewise grant summary judgment against MVSC based on a straightforward analysis of undisputed material facts, none of which depend on expert analysis or are impacted by the Court's

*Daubert* rulings. Those undisputed facts are: (1) Reynolds did not conspire with CDK to block MVSC from access to DMS data; and (2) MVSC's experience in Wisconsin and other states is based on the decisions and actions of those states, not a conspiracy. In addition, as noted above with respect to Authenticom's damages expert (Section V, *supra*), Mr. Klein's admitted failure to disaggregate damages requires summary judgment.

*First*, MVSC could have accessed DMS data (and actually did so) through one or more methods throughout the relevant period, and acquired over 60% market share in California because of the availability of such methods,[3] negating any inference of an alleged conspiracy to "completely block" MVSC's access to DMS data. Notably, with respect to certified integration, Reynolds proposed RCI prices to MVSC on three occasions comparable to those offered to other EVR providers, which MVSC decided to reject. Dkt. 1079 at ¶¶ 25-36; Dkt. 1121 at 5-8. Instead, MVSC decided to leverage free manual reporting tools provided by Reynolds, such as Dynamic Reporting, to obtain data. Reynolds's free manual reporting tools became the "near-exclusive method" by which MVSC obtained Reynolds DMS data, and MVSC even developed a software tool called Electron to work in conjunction with, and to augment, manual reporting. Dkt. 1079 at ¶¶ 11, 13, 18-20; Dkt. 1121 at 3-5. The Court's *Daubert* ruling does not change or impact any of these facts. If anything, the *Daubert* process has strengthened Reynolds's arguments, because MVSC's liability expert Dr. Israel will no longer opine (based on a representation from MVSC in its opposition brief) that the RCI prices Reynolds offered to MVSC were economically infeasible for MVSC. Dkt. 1001 (*Daubert* Opp.) at 25.

*Second*, MVSC could not have obtained EVR approval in Wisconsin because the State of Wisconsin was not accepting any new EVR providers, negating any inference that an alleged

---

[3] Dkt. 955 (Mem.) at 24-26; Dkt. 1121 (Reply) at 13-14; Dkt. 1079 (Resp. MSUF) at ¶ 62.

conspiracy involving Reynolds caused harm to MVSC in Wisconsin. The Wisconsin DMV explained in writing why it rejected MVSC's application to become an EVR provider in Wisconsin: "At the time of your request the department was not accepting new vendors into [its] program." Dkt. 1079 at ¶¶ 67-70. Neither the Court's *Daubert* opinion, nor Mr. Klein's expert opinion, which the Court found presented a "close call" when it came to Wisconsin, changes these facts.

Neither can Reynolds be held liable for MVSC's experience in Illinois, Virginia, or California, the other three states where MVSC claims injury. Delays that MVSC experienced in Illinois resulted from a lengthy state application process implemented by the State of Illinois, not Reynolds or CDK. Dkt. 955 at 28, 31-32; Dkt. 1121 at 16. In both Virginia and California, MVSC successfully entered and competed in both markets, and became the dominant EVR provider in California with over 60% market share, demonstrating the absence of the alleged conspiracy. Dkt. 955 at 24-28; Dkt. 1121 at 13-14, 17.

Finally, Klein's failure to disaggregate and isolate damages to MVSC caused by unlawful conduct calls for summary judgment. The Court declined to exclude Klein despite his failure to disaggregate because none of Defendants' conduct had yet been determined to be lawful or unlawful. Op. at 65-66. That will change once the Court rules on Reynolds's motion for summary judgment. If summary judgment is appropriate as to even one aspect of Reynolds's alleged misconduct, summary judgment will be appropriate as to MVSC's entire case due to Klein's admitted failure to disaggregate damages between different aspects of Reynolds's alleged misconduct,[4] which leaves the factfinder with no way to reasonably estimate damages. *MCI*, 708

---

[4] *See* Dkt. 957-4 (Klein Rpt.) at ¶ 26 (Klein assumed that Reynolds and CDK participated in single conspiracy to "interfere" with MVSC in three different ways: deny MVSC access to certified integration; deny MVSC assess to hostile integrators; and coordinate public messaging that MVSC's product was inferior to CVR's because MVSC was not "certified"); Dkt. 957-4 (Klein Tr.) at 45:5-46:13; 52:10-54:23;

F.2d at 1162-63; *see also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) ("We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct.").

MVSC's case, based on an alleged blocking conspiracy, has been pending against Reynolds since 2017, despite conspiracy claims that are "not robust,"[5] despite a "close call" as to the viability of its damages expert Gordon Klein, and despite a liability expert, Mark Israel, who will no longer opine that Reynolds's three RCI invitations to MVSC were economically infeasible for MVSC. The high standard at summary judgment, and the "just and efficient" management of this MDL (*see* 28 U.S.C. § 1407(a)) call for summary judgment to be granted on MVSC's claims against Reynolds.

## VII.    Conclusion and Prayer

The Court's *Daubert* rulings have clarified that Reynolds's motion for partial summary judgement on its counterclaims against Authenticom for its DMCA violations should be granted. Further, nothing in Plaintiffs' expert opinions that have been allowed to proceed tends to rule out the possibility that Reynolds's and CDK's independent decisions, years apart, to secure their respective DMSs were pursuant to an unwritten conspiracy to block either Authenticom or MVSC. Under the substantive *Matsushita* standard, Reynolds is entitled to summary judgment on Authenticom and MVSC's claims.

---

99:22-100:3 (Klein calculated damages collectively for all three categories of interference and not separately for each category).

[5] Dkt. 425 (Mem. Op. and Order) at 23.

Dated: February 25, 2022

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 650-8805
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
lcaseria@sheppardmullin.com

COUNSEL FOR DEFENDANT
THE REYNOLDS AND REYNOLDS COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I, Aundrea K. Gulley, an attorney, hereby certify that on February 25, 2022, I caused a true and correct copy of the foregoing **The Reynolds & Reynolds Company's Supplemental Brief Regarding *Daubert* and Summary Judgment Pursuant to Docket 1322** to be served electronically on all counsel of record at the following email address:

SERVICE-EXTERNAL-DMS-MDL@lists.kellogghansen.com

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com