IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*ALL CASES* | MDL No. 2817<br>Case No. 18-cv-00864<br><br>Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |

**INDIVIDUAL AND VENDOR CLASS PLAINTIFFS'**
**SUPPLEMENTAL SUMMARY JUDGMENT RESPONSE BRIEF**

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................ 1

    I.    The *Daubert* Rulings Support Denial Of Summary Judgment On Plaintiffs' Section 1 Conspiracy Claim ................................................................................. 1

        A.    Defendants Ignore The Direct Evidence Of Conspiracy, Which Alone Creates A Genuine Issue Of Material Fact For Trial .................................. 1

        B.    Dr. Israel's Expert Testimony Further Supports Denying Summary Judgment ........................................................................................................ 3

    II.    The *Daubert* Rulings Support Denial Of Summary Judgment On Plaintiffs' Exclusive Dealing And Monopolization Claims ...................................................... 8

    III.    The *Daubert* Rulings On Plaintiffs' Damages Experts Support Denial Of Summary Judgment On AutoLoop's And Authenticom's Claims ......................... 9

        A.    The *Daubert* Ruling On Dr. Israel's Damages Analysis Supports Denial Of Summary Judgment Regarding AutoLoop ............................................ 9

        B.    Reynolds Is Not Entitled To Summary Judgment On Authenticom's Damages .................................................................................................... 11

    IV.    The *Daubert* Rulings With Respect To Dr. Israel And Prof. Klein Support Denial Of Summary Judgment On MVSC's Claims ........................................... 13

    V.    The *Daubert* Rulings Have No Material Effect On The Counterclaims Against AutoLoop And Authenticom ................................................................ 15

The Individual and Vendor Class Plaintiffs respectfully submit this response to Defendants' supplemental summary judgment briefs (Dkts. 1327 and 1328) addressing the impact of this Court's *Daubert* rulings (Dkt. 1321) ("*Daubert* Opinion" or "Op."). Having failed to exclude Plaintiffs' experts – especially antitrust economist Dr. Mark Israel – Defendants parse the distinction between the summary judgment and *Daubert* standards. But that theoretical distinction makes no difference in this case. Defendants' *Daubert* motions failed because they asked the Court to take sides on a disagreement between the parties and their experts on the underlying facts and the inferences to be drawn from them. The Court's rejection of those arguments also supports denial of summary judgment. The Court should proceed to remand the cases for trial.

## ARGUMENT

I. **The *Daubert* Rulings Support Denial Of Summary Judgment On Plaintiffs' Section 1 Conspiracy Claim**

   A. **Defendants Ignore The Direct Evidence Of Conspiracy, Which Alone Creates A Genuine Issue Of Material Fact For Trial**

In their supplemental filings, Defendants omit any mention of two key pieces of evidence in this case: admissions by CDK's Dan McCray and Reynolds's Robert Schaefer that the two companies had reached an agreement to block independent data integrators such as Authenticom from their respective DMSs. *See* Dkt. 1100, at 30-33. That omission speaks volumes, because such evidence is "all the proof a plaintiff needs." Op. at 12 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002)). If the jury credits Steve Cottrell's testimony that those admissions – or even one of them – occurred, that would be sufficient evidence for the jury to find Defendants liable under Sherman Act § 1. And because Mr. Cottrell's credibility is a quintessential jury question, it cannot be resolved at summary judgment. *See, e.g., Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 2014 WL 1227311, at *7 (N.D. Ill. Mar. 25, 2014) (Dow, J.) ("credibility determinations . . . are the province of the jury"). (In the *Authenticom*

1

preliminary injunction context in which he was the factfinder, Chief Judge Peterson observed Mr. Cottrell's live testimony about these admissions, including under cross-examination, and found it "persuasive" and "credited" it as true. Dkt. 1100, at 31.)

Defendants' contention (CDK at 1-5; Reynolds at 4-8) that they are entitled to summary judgment because Plaintiffs have failed to satisfy their burden under *Matsushita* falters at the starting gate. "*Matsushita* sets a summary judgment standard for cases in which an antitrust plaintiff relies *solely* on circumstantial evidence." Op. at 30 (emphasis added). Because a reasonable jury could find a conspiracy based on Defendants' admissions, Defendants cannot obtain summary judgment by debating the inferences to be drawn from other evidence. *See* VI Areeda & Hovenkamp, *Antitrust Law* ¶ 1413a, at 92 (4th ed. 2017) ("[I]n the presence of explicit evidence of an agreement the presence of an independent reason [for acting] is irrelevant.").

In its *Daubert* ruling, the Court noted that the "parties dispute" whether Plaintiffs "rely solely on circumstantial evidence or also have evidence that would qualify as 'direct' under relevant precedent." Op. at 30. But this Court has already held that CDK's and Reynolds's admissions are direct evidence of the conspiracy: "They are, for one, direct-evidence allegations of the agreement: Taken as true, the fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement." *In re DMS Antitrust Litig.*, 313 F. Supp. 3d 931, 950-51 (N.D. Ill. 2018) (St. Eve, J.). That prior ruling was correct: such "admissions . . . are textbook examples of adequate direct-evidence allegations." *Id.*; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (direct evidence "would usually take the form of an admission by an employee of one of the conspirators"). The Court should hold that Defendants' admissions – standing alone – raise a genuine issue of material fact warranting trial. *See* Dkt. 1100, at 40-45.

2

**B. Dr. Israel's Expert Testimony Further Supports Denying Summary Judgment**

The admissions of Mr. Schaefer and Mr. McCray do not stand alone. The summary judgment record contains extensive economic and non-economic evidence further supporting the existence of the alleged conspiracy. Dr. Israel "synthesizes" voluminous non-economic evidence regarding Defendants' communications, as well as the economic evidence showing that Defendants had a rational incentive to collude rather than compete, and concludes that, considered as a whole, the record is "indicative of collusion" rather than independent conduct. Op. at 17, 21.

The Court denied Defendants' *Daubert* motion because their contentions about the "sufficiency" of the evidence supporting Dr. Israel's opinions are properly made through "cross examination and argument for the benefit of the trier of fact." *Id.* at 19 (internal quotation omitted). That reasoning applies with equal force to Defendants' summary judgment motions, because Defendants' summary judgment arguments – like their *Daubert* arguments – ask the Court to take sides on genuine factual disputes that are within the jury's province to resolve.

CDK's supplemental brief (at 3) is illustrative: its contention that its actions were "fully consistent with [its] lawful unilateral interests" rests on a series of purportedly "undisputed facts" that are plainly disputed. CDK characterizes the September 27, 2013 meeting between Howard Gardner (CDK) and Bob Schaefer (Reynolds) as "discussing ways to facilitate a controlled wind-down of CDK's hostile access to the Reynolds DMS." Dkt. 1327, at 3. But that account omits a key discussion point memorialized in CDK's contemporaneous summary of the meeting: Reynolds also proposed to "forge a common perspective with ADP on the topic of 'Data Security' messaging . . . to synchronize our security perspectives and speak with similar voices to the industry." Dkt. 1100, at 16 (quoting PJ SAF 36; Fenske Ex. 61 (Dkt. 975-61), PX 948 at CDK-0802599). A reasonable jury could certainly conclude that Reynolds did not just seek to stop CDK's supposedly "hostile" access; it also asked CDK to stop competing with Reynolds on the

3

basis of openness, in return for a gradual "wind-down" of its data-integration services. At summary judgment, the Court cannot adopt CDK's version of the facts – especially when it contradicts contemporaneous documents and all inferences must be drawn in Plaintiffs' favor.

To bolster its claim of unilateral conduct, CDK asserts (at 3) that it "conclude[d]" in *June 2013* that "legal and operational risks" made it "advisable" to exit its data-integration business on Reynolds's DMS. That is contrary to the record. In an August 2013 email, the head of CDK's data-integration business vowed to "fight" Reynolds's data-access policies in the market and "do[] everything in our power to keep the data flowing." Dkt. 1069-182 (PX 882) at -864; *see* Dkt. 1100, at 13-15. Indeed, Defendants' summary judgment brief states that CDK personnel only "*began* to ask" whether CDK should wind down that business in August 2013. Dkt. 966, at 7.

CDK also contends (at 3) that, "[t]hroughout this period," CDK and Reynolds "continued to compete on 'openness.'" But that fact is hardly "undisputed," given extensive evidence that CDK – after fiercely competing with Reynolds on the basis of openness through August 2013 – abruptly stopped after the September 2013 meeting with Reynolds. *See* Dkt. 1100, at 17-21. Dr. Israel's analysis of economic data likewise show "reduced competition from CDK." Dkt. 977-153 (Israel Rep.) ¶ 148. And contemporaneous documents show that Reynolds thought this competitive *detente* was part of the parties' "agreement"; that Schaefer complained to Gardner when CDK employees failed to abide by the companies' agreement; and that Gardner instructed those employees to hew to the parties' "more collaborative relationship." Dkt. 1100, at 19 (quoting PJ SAF 37; Ho Ex. 90 (Dkt. 1069-91), PX 63 at CDK-0802387). Reynolds's CEO, Bob Brockman, testified that as a result of Defendants coordinating their messaging, CDK's "badmouthing [of Reynolds's] data access policies" stopped, allowing Reynolds to restore "$30

4

million" per year in lost revenue that CDK's competitive efforts had caused. Dkt. 1069-16 (Brockman Tr.), at 77:9-78:10, 138:23-139:25.

Reynolds mischaracterizes (at 7) the Court's *Daubert* Opinion in arguing that the Court's description of the February 2015 written contracts was "mistaken." The Court correctly stated that the February 2015 contracts "provided that CDK and Reynolds would deny data integrators access to *each other's* DMSs." Op. at 4 (emphasis added); *see* Dkt. 1100, at 25-26 (citing Data Exchange Agreement § 4.5). Indeed, Chief Judge Peterson read the agreements the same way: "The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect. The parties agree that they will not attempt to access, or help others access, the *other*'s DMS." *Authenticom* Dkt. 172, at 12 (emphasis in original). This Court's and Chief Judge Peterson's same reading is consistent with the Seventh Circuit's statement that Defendants' 2015 agreements did not explicitly obligate either of them to deny data integrators access to "*its own* [DMS]." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). That unlawful agreement occurred prior to February 2015, as part of the coordinated market positioning on data security that began in 2013. *See* Dkt. 1100, at 22-24. That does not mean, however, as Reynolds claims (at 7), that the February 2015 agreements are "not evidence of a conspiracy." To the contrary, as Chief Judge Peterson held, the February 2015 contracts "also suggest a horizontal conspiracy" and are further evidence of the parties' joint decision to move from competition over openness to a mutual agreement to adopt closed systems. *See* Dkt. 1100, at 24-29.

In short, a reasonable jury could credit Dr. Israel's testimony – and the evidence on which he relies – to conclude that Defendants acted in concert, not independently. Both Defendants'

5

*Daubert* and summary judgment arguments suffer from the same flaw: they ask the Court to adopt their version of the facts and resolve factual disputes that are properly left to the jury.

Defendants' cases do not help them, because they involved very different factual records.

In *Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927 (7th Cir. 2018), plaintiffs' evidence consisted of little more than roughly contemporaneous "price increase attempts," many of which failed. *Id.* at 936. As the court held, similarly timed price increases are as consistent with "conscious parallelism" as with conspiracy. *See id.* at 942. What plaintiffs lacked was the evidence Plaintiffs have in this case. Plaintiffs there had "no evidence indicating that the executives discussed illicit price-fixing or output restriction deals during their calls or meetings." *Id.* at 938. Here, by contrast, Plaintiffs have not only admissions of an agreement, but also contemporaneous documents showing that CDK and Reynolds met in September 2013 and discussed a competitive *détente*. Plaintiffs there also lacked expert evidence that the price-hikes were contrary to each supplier's self-interest, whereas Dr. Israel's testimony shows that CDK's abandonment of a profitable competitive strategy only made economic sense in the context of an agreement with Reynolds. *See* Dkt. 977-153 (Israel Rep.) ¶ 150.

Similarly, in *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697 (7th Cir. 2011), plaintiff had no admissions of the alleged conspiracy to coordinate their negotiating strategies with Omnicare. *See id.* at 706 (reaffirming that an admission is all the plaintiff needs under *High Fructose Corn Syrup*). Nor were there contemporaneous documents from which a jury could reasonably infer such an agreement. *See id.* at 707-08 (documents supposedly evidencing "agreement" were "decidedly ambiguous" because they appeared to relate to "legitimate business matters such as personnel concerns"). Especially in light of the admissions by Schaefer and McCray, the documents memorializing the September 2013 meeting amply support a reasonable

6

conclusion that the proposed agreement in fact was reached. By contrast, Omnicare's case was "constructed out of a tissue of ambiguous statements and other circumstantial evidence" from which a reasonable jury could not – without simply speculating – find the existence of a conspiracy was more likely than not. *Id.* at 706. That does not fairly describe the record in this case.

In *In re Text Messaging Antitrust Litigation*, 46 F. Supp. 3d 788 (N.D. Ill. 2014), plaintiffs, again lacking direct evidence of price-fixing,[1] relied on parallel pricing decisions that were equally consistent with independent conduct. *See id.* at 803-04. Notably, the court held the plaintiffs' expert evidence insufficient because the experts merely opined that defendants' internal pricing analyses were flawed – opinions that, even if credited, showed only independent (albeit possibly flawed) business judgments, not collusion. *Id*. Those limited expert analyses bear no resemblance to Dr. Israel's opinion that the record here is *not* equally consistent with competition as collusion.

Finally, in *In re Dairy Farmers of America, Inc., Cheese Antitrust Litigation*, 60 F. Supp. 3d 914 (N.D. Ill. 2014) (Dow, J.), plaintiffs – unlike here – "lack[ed] direct evidence [of] the alleged conspiracy." *Id.* at 950. Moreover – and, again, unlike here – the non-economic evidence did not create a factual dispute regarding conspiracy because there were "no communications between [the two defendant cheese suppliers] from which a jury could infer an agreement to fix prices." *Id.* at 957-58 (rejecting contention that two supposedly "suspect" inter-firm communications supported a reasonable inference of conspiracy). Finally, as to the economic evidence, the Court concluded that plaintiffs' expert analyses of defendants' cheese purchases relative to spot prices – even if accepted – could not support a reasonable inference, without more

---

[1] The court did not credit as direct evidence an email authored by a witness who lacked personal knowledge of pricing decisions. Here, neither Defendant has asserted that Schaefer or McCray lacked personal knowledge. Nor could they: Schaefer was Reynolds's main intermediary with CDK, *see* Dkt. 1100, at 13-25, and McCray was intimately involved in implementing the agreement with Reynolds, *see, e.g.*, Dkt. 1101, ¶¶ 40, 44, 48; Dkt. 1069-188 (PX 902); Dkt. 1069-155 (PX 711).

7

that defendants agreed to manipulate prices. *See id.* at 962-64. Here, by contrast, Dr. Israel's opinions are supported by both economic and non-economic evidence that, if credited, would show that Defendants not only had a rational motive to conspire but, in fact, did so.[2]

## II. The *Daubert* Rulings Support Denial Of Summary Judgment On Plaintiffs' Exclusive Dealing And Monopolization Claims

Defendants do not (and cannot) contend that the Court's *Daubert* rulings strengthen their summary judgment motions. Rather, Defendants' supplemental briefs merely reiterate certain arguments from their summary judgment briefs. On exclusive dealing, *first*, Reynolds contends that it lacked market power and that its RCI contracts are not exclusive. *Second*, CDK and Reynolds assert that Dr. Israel's opinions fail to address substantial foreclosure. *Third*, CDK claims that AutoLoop suffered no antitrust injury from the exclusive dealing provisions.

Taking each in turn: *First*, there is ample evidence, including Dr. Israel's testimony, that Reynolds had market power. *See* Dkt. 1100, at 67-69. The fact that Reynolds's RCI contracts are terminable does not, as a matter of law, establish the absence of substantial foreclosure, given the

---

[2] Defendants' out of Circuit cases are in the same vein. *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 197 (3d Cir. 2017) (no direct evidence of conspiracy, and circumstantial evidence of parallel price increases was insufficient); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000) (summary judgment where price-fixing claim was based on "a theory of conscious parallelism" and the circumstantial evidence did not support any of plaintiffs' proffered "plus factors"); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 96 (2d Cir. 2018) ("[D]espite extensive discovery, Anderson had not presented any direct evidence" of defendants' alleged boycott.); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121 (3d Cir. 1999) ("We have reviewed the documentary evidence and the testimony of Anderson and Gibbs and we conclude that they do not make out a case of direct evidence," and the circumstantial evidence was insufficient.); *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1166 (6th Cir. 1995) ("Plaintiffs admit that they do not have any direct evidence of any agreement or conspiracy among the Banks to set prices," and the circumstantial evidence of conscious parallelism was insufficient.). The remaining cases cited by Defendants are not even Section 1 cases. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (Robinson-Patman Act price-discrimination case and noting that when an expert opinion is "not supported by sufficient facts to validate it in the eyes of the law," then it "cannot support a jury's verdict"); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2004 WL 1613563, at *9 (N.D. Ill. July 19, 2004) (Robinson-Patman Act case and holding that "if the applicable data and the proffered opinion are separated by an analytical chasm, it cannot be bridged solely by the expert's say-so"); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 890 (6th Cir. 2007) (Section 2 case where evidence of causation was insufficient).

8

ample evidence that vendors lacked any alternative to RCI to obtain automated access to data on Reynolds's DMS. *See id.* at 72. Reynolds's arguments merely raise factual disputes.

*Second*, Dr. Israel did address substantial foreclosure, in opining that Reynolds and CDK had market power (separately and together). *See id.* at 67-69. Indeed, Reynolds's market share in the relevant period was between 30% and 45%, and CDK's has been even larger. *See* Dkt. 977-153 (Israel Rep.) ¶ 125. These figures are above the minimum threshold courts have adopted for substantial foreclosure. *See, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (foreclosure of 30% to 40%).

*Third*, CDK claims AutoLoop suffered no antitrust injury because CDK's decision "not to permit hostile integrators to access the DMS is lawful." Dkt. 969, at 18. But that is circular reasoning: the lawfulness of that decision – and whether CDK would have made it in a "but for" world – must be decided by the jury. *See* Dkt. 1075, at 6-7.

As for Plaintiffs' monopolization claims, Defendants' effort to find a silver lining in the Court's *Daubert* rulings rests on the Court's exclusion of certain of Allan Stejskal's DMS switching opinions. Dkt. 1327, at 7-8; Dkt. 1328, at 9. Yet as Plaintiffs explained, Mr. Stejskal's testimony was hardly the only evidence that DMS switching is both difficult and rare: there is both fact and expert evidence that supports those points. *See* Dkt. 1329, at 8. The Court's *Daubert* rulings thus do not detract from the ample evidence that "CDK and Reynolds have monopolized the data integration market on their respective DMSs." Dkt. 1100, at 72-77.

### III. The *Daubert* Rulings On Plaintiffs' Damages Experts Support Denial Of Summary Judgment On AutoLoop's And Authenticom's Claims

#### A. The *Daubert* Ruling On Dr. Israel's Damages Analysis Supports Denial Of Summary Judgment Regarding AutoLoop

The Court's *Daubert* rulings show that damages is a disputed factual issue for the jury. Defendants' arguments again improperly draw factual inferences in their own favor.

9

1.      CDK criticizes (at 8) as "irrational" the Court's statement that Dr. Israel's opinions support the reasonable conclusion that Defendants were "exercising what market power they each had" prior to September 2013.  Op. at 25.  But all of CDK's criticisms of the Court's *Daubert* Opinion at best create factual disputes and are properly raised in cross-examination of Dr. Israel or in argument to the jury.  *See id.* at 52 ("[I]t is up to the factfinder to decide which expert's 'but for' world is the more convincing one in consideration of the facts in the record.").

CDK also reprises its argument that Dr. Israel's difference-in-differences model fails to take account of CDK's lawful unilateral activity.  But that is wrong:  by design, his difference-in-differences model *does* take account of lawful activity by comparing Defendants' pricing with a control.  *See* Dkt. 1075, at 10-11.

Finally, CDK contends (at 8) Dr. Israel's analysis fails because "at least some of the unilateral conduct AutoLoop challenges (*e.g.*, the supposed exclusive-dealing provisions) was in fact lawful."  But Plaintiffs have sufficient evidence for a jury to find that CDK's exclusive dealing provisions were anticompetitive.  And even assuming they were lawful, that would not undermine Dr. Israel's difference-in-differences analysis, which (as the Court noted in the *Daubert* Opinion (at 25)) *does* isolate the price increases attributable to the conspiracy by comparing the prices during the conspiracy period with pre-conspiracy prices, based on the reasonable assumption that CDK's pre-conspiracy prices reflect the full exercise of its right to engage in lawful unilateral conduct.

2.      CDK makes a new argument – found nowhere in its summary judgment papers – that Dr. Israel's use of Authenticom and SIS prices to compose the benchmark for his damages estimate was erroneous for two reasons:  (i) those firms did not have market power, and so represent an improper way to predict how a firm with market power would have behaved in the

10

but-for world, and (ii) Dr. Israel's benchmark period is (CDK claims) too short. Dkt. 1327, at 9-10. The Court should reject these critiques for procedural and substantive reasons.

*First*, CDK forfeited them by not raising them in its summary judgment motion. *See* Dkt. 969, at 6-7 (criticizing the benchmarks on other grounds, but not these); *Lukis v. Whitepages Inc.*, 542 F. Supp. 3d 831, 843 (N.D. Ill. 2020) (argument raised in supplemental briefing forfeited).

*Second*, CDK distorts Dr. Israel's benchmarking analyses. As more fully explained elsewhere, Dr. Israel estimated damages using several alternative models, including some that did not use Authenticom or SIS as benchmarks; those benchmarks yielded even higher damages estimates. Dkt. 1075, at 5 & n.2. CDK's supplemental brief nowhere confronts those models, let alone explains why they would be insufficient to support a (less conservative) damages award.

*Third*, even taken on their own terms, the arguments lack merit in view of the many "more imperfect benchmarks that courts routinely hold to be sufficient." *Id.* at 8 & n.5 (citing cases). Taking the market-power objection first, Dr. Israel exhaustively considered the question whether Authenticom is a good benchmark and opined that it is, *see* Dkt. 977-160 (Israel Reply Rep.) ¶¶ 171-178; Defendants' disagreement with that opinion is for cross-examination. As for the notion that the benchmark period is too short, CDK cites nothing to prove that a longer benchmark would have made a difference, and nothing exists; this criticism, too, is one for trial.

> **B.** **Reynolds Is Not Entitled To Summary Judgment On Authenticom's Damages**

Reynolds rehashes (at 9-11) its argument that Ms. Lawton's damages model fails to "disaggregate" lawful from unlawful conduct, but that argument is not well founded, for reasons given at length in Authenticom's prior briefing. *See* Dkt. 999, at 17-22; Dkt. 1100, at 78-80. As the *Daubert* Opinion concluded, Ms. Lawton used a reliable methodology for isolating the damages caused by Defendants' unlawful conduct. *See* Op. at 55-56. To the extent Reynolds disagrees with Ms. Lawton's application of that that well-accepted method, or believes that method

11

fails to account for lawful conduct in the "but for" world, those "arguments may be explored during cross-examination." Op. at 59-60.

Reynolds's arguments fare no better on summary judgment than they did on *Daubert* because they rest on contested facts. *See id.* at 57-60. For example, Reynolds argued in its *Daubert* motion that Ms. Lawton failed "to take into account certain blocking activities that Reynolds engaged in prior to the start of the alleged conspiracy," but as the Court noted in rejecting that argument on *Daubert*, it is a disputed issue for trial "whether Reynolds' blocking activities would have continued after September 2013 in the absence of a conspiracy," especially in light of the evidence that "competition from CDK constrained Reynolds' efforts to close its DMS," and the conspiracy "eliminated this competitive constraint." *Id.* at 59; *see also* Dkt. 1100, at 55.

*Blue Cross & Blue Shield of Wisconsin v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998), does not help Reynolds. As this Court observed, plaintiffs' expert reports there were "worthless" because they attributed as damages nearly all of the difference between defendant's prices and other clinics' prices, without adjusting for differences that were established by the record. Op. at 67. Had Ms. Lawton's opinions been "worthless," this Court would not have found them relevant and helpful to the trier of fact. *See id.* at 57-60. Moreover, unlike the experts in *Marshfield Clinic*, Ms. Lawton made several adjustments to account for relevant differences, and provided reasonable explanations for why she did not make others suggested by Reynolds.

Reynolds also claims (at 10-11) that Ms. Lawton failed to disaggregate damages from Authenticom's *causes of action*. That argument violates the principle that "[a] plaintiff claiming injury caused by more than one of the [defendants'] unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable. If the plaintiff shows that such proof is impracticable, the burden shifts to the

12

defendant[s] to demonstrate the contrary." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242-43 (7th Cir. 1982). Ms. Lawton testified that her damage estimates are disaggregated to the greatest degree possible given available data, *see* Dkt. 889-6 (Lawton Tr.), at 211:21-214:7, and a reasonable jury could credit her testimony.

Moreover, even "*if*, at the summary judgment stage, the Court were to find that any one of the multiple theories of liability Authenticom has brought against Reynolds fails as a matter of law," Dkt. 1328, at 10-11, Lawton's damages model would still be sufficient. For example, even if a court were to conclude that Authenticom has not succeeded in showing that Reynolds is liable for unlawful exclusive dealing, that would not undermine Ms. Lawton's conspiracy damages estimate because Ms. Lawton's yardstick model, by design, takes into account Reynolds's unilateral conduct and isolates the damages caused by the conspiratorial conduct. At any rate, as Defendants' own case (*MCI*) indicates, Plaintiffs would be entitled to submit a revised expert report on damages on the surviving claims. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1163-64 (7th Cir. 1983) (remanding for *new trial on damages* where plaintiffs' expert offered a single damages estimate for 22 anticompetitive acts, but after appeal liability was established for only seven).

**IV.    The *Daubert* Rulings With Respect To Dr. Israel And Prof. Klein Support Denial Of Summary Judgment On MVSC's Claims**

Having failed to exclude Prof. Klein's and Dr. Israel's testimony regarding MVSC, Reynolds's supplemental brief simply repeats the arguments in its motion for summary judgment.

*First*, Reynolds contends (at 12) that it is "undisputed" that "Reynolds did not conspire with CDK to block MVSC from access to DMS data." But that is a disputed factual question, and there is direct evidence that CDK and Reynolds *did* conspire to block MVSC from their certified data integration programs. *See* Dkt. 1073, at 5-8, 16-18. For example, in a string of 2015 and

13

2016 emails, CDK and Reynolds executives articulated a shared understanding that MVSC "does not and WILL NOT have direct DMS integration" and "will NEVER have access to" data through CDK or Reynolds. *Id*. at 7 (emphasis in original). This is direct proof of a per se illegal group boycott, and is "all the proof [MVSC] needs." *High Fructose Corn Syrup*, 295 F.3d at 654. But there is much more, including internal CDK presentations that its certified interface program was "closed" to MVSC and internal reports from Reynolds reiterating that MVSC would "never" be admitted into the RCI program. Dkt. 1073, at 5-8. CDK and Reynolds acted on their conspiracy by repeatedly rejecting MVSC from their certified integration programs. *Id*. at 9-12. Reynolds claims (at 12) that it quoted legitimate pricing to MVSC, but behind the scenes Reynolds executives were communicating with CDK that MVSC would "never" be admitted into RCI. Which is it? A jury must decide, especially where MVSC executives testified that Reynolds's quoted pricing was a sham and MVSC could never operate profitably with it. *See id*. at 11-12.[3]

*Second*, on MVSC's damages in the four EVR markets at issue, Reynolds raises factual questions that cannot be resolved at summary judgment. The Court found sufficient factual support for Prof. Klein's Wisconsin damages calculation and left "the resolution of the competing experts' testimony to the factfinder." Op. at 71. The same goes for MVSC's damages in the other states. *See id.* at 67-69 ("That Reynolds may be able to point to some contrary evidence does not change the Court's conclusion, as experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence."); *see also* Dkt. 1073, at 24-32 (detailing the evidence of MVSC's harm in each of the relevant EVR markets).

---

[3] Reynolds misleadingly states (at 12) that Dr. Israel "will no longer opine" that the prices Reynolds quoted to MVSC were infeasible, but as the Court noted, "MVSC does not offer Israel to testify in that manner," Op. at 29, and never did. MVSC has a wealth of lay testimony for this point. *See* Dkt. 1073, at 11-12.

14

*Finally*, Reynolds repeats (at 13) the argument that Prof. Klein failed to "disaggregate" lawful from unlawful conduct that could have caused MVSC's damages, but the Court has already rejected that argument. As the Court noted, "Reynolds does not identify any particular lawful 'unilateral conduct' that it believes caused MVSC's damages," Op. at 65, and to the extent Reynolds tried to brainstorm some lawful conduct in its reply brief, not only were those arguments "waived," but the Court correctly noted there is not "anything in the record" to support them, *id.* at 65-66. That dearth of lawful conduct that could have caused MVSC's damages applies with equal force at summary judgment, and Reynolds's argument should be rejected once again.

## V. The *Daubert* Rulings Have No Material Effect On The Counterclaims Against AutoLoop And Authenticom

AutoLoop and CDK agree that the *Daubert* rulings have no impact on CDK's counterclaim. Reynolds overstates (at 1) the importance of this Court's partial exclusion of Authenticom's expert Nancy Miracle. Far from "pav[ing] the way" for the Court to grant Reynolds summary judgment, the *Daubert* Opinion explicitly reserved the legal interpretation of the Digital Millennium Copyright Act for summary judgment. For the reasons given in Authenticom's prior brief, *see* Dkt. 978, at 41-60, Reynolds's interpretation is unpersuasive.

Reynolds agrees (at 3-4) that this Court did not exclude Ms. Miracle's copyrightability opinion and may properly consider that opinion on summary judgment. *See* Op. at 101. This undermines one of Reynolds's principal grounds for opposing Authenticom's motion for summary judgment: that this Court could not consider Ms. Miracle's copyrightability opinion. *See* Dkt. 1061, at 32-33. This ruling is thus further ground to grant Authenticom's motion for summary judgment on Reynolds's counterclaims for Reynolds's failure to show that its technological measures protected any copyrightable work. That result is required regardless of whether this Court gives any weight to Ms. Miracle's opinion. *See* Dkt. 978, at 46-49; Dkt. 1137, at 36-47.

15

Dated: March 11, 2022	Respectfully submitted,

                */s/ Derek T. Ho*
                Derek T. Ho
                KELLOGG, HANSEN, TODD,
                 FIGEL & FREDERICK, P.L.L.C.
                1615 M Street, NW, Suite 400
                Washington, D.C. 20036
                (202) 326-7900
                dho@kellogghansen.com

                *MDL Co-Lead Counsel*

16

**CERTIFICATE OF SERVICE**

       I, Derek T. Ho, an attorney, hereby certify that on March 11, 2022 I caused a true and correct copy of the foregoing **INDIVIDUAL AND VENDOR CLASS PLAINTIFFS' SUPPLEMENTAL SUMMARY JUDGMENT RESPONSE BRIEF** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

                                                                                                    */s/ Derek T. Ho*
                                                                                           Derek T. Ho
                                                                                          KELLOGG, HANSEN, TODD,
                                                                                           FIGEL & FREDERICK, P.L.L.C.
                                                                                          1615 M Street, NW, Suite 400
                                                                                          Washington, D.C. 20036
                                                                                          (202) 326-7900
                                                                                          dho@kellogghansen.com