UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION, MDL 2817 | No. 18-cv-864 |
| This document relates to: CDK's Counterclaim against AutoLoop | Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant Loop, LLC ("AutoLoop") sells software to car dealerships to help those dealerships market, sell, and service their vehicles. In a consolidated set of cases, AutoLoop and other plaintiffs—including car dealerships and dealership management system ("DMS") data integrators—have sued two DMS providers alleging antitrust violations. Defendant/Counter-Plaintiff CDK Global, LLC ("CDK") is one of those DMS providers. CDK has responded to the complaint of anticompetitive conduct with counterclaims, including a claim that AutoLoop is in breach of a contract it signed with CDK. AutoLoop has moved for summary judgment on this claim and, for the reasons explained here, the motion [949] is granted.

## BACKGROUND

The court has detailed the facts of this MDL in multiple opinions and assumes knowledge of those opinions.[1] Here, the court summarizes only the facts material to CDK's counterclaim against AutoLoop.

AutoLoop sells software that car dealerships use to manage their inventories, customer relationships, and service and repair departments. (AutoLoop's Statement of Material Facts ("PSOF") [950] ¶ 2.) AutoLoop's software works only if AutoLoop has access to data stored on

---

[1] See, e.g., In re Dealer Mgmt. Sys. Antitrust Litig. ("Authenticom MTD Op."), 313 F. Supp. 3d 931 (N.D. Ill. 2018); In re Dealer Mgmt. Sys. Antitrust Litig. ("AutoLoop MTD Op."), 362 F. Supp. 3d 477 (2019); In re Dealer Mgmt. Sys. Antitrust Litig. ("Dealers MTD Op."), 362 F. Supp. 3d 510 (N.D. Ill. 2019); In re Dealer Mgmt. Sys. Antitrust Litig. ("Daubert Op."), 581 F. Supp. 3d 1029 (N.D. Ill. 2022). Additional facts are presented in the court's contemporaneously published opinions concerning the parties' motions for summary judgment.

dealers' DMSs, such as customer records and information about upcoming service and repair orders. (*Id.* ¶ 2.) Historically, AutoLoop used the services of a data integrator called Superior Solutions, Inc. ("SIS") to obtain access to that data, including data stored on CDK's DMS. (*Id.* ¶ 8.) But after receiving indications from dealerships that CDK's leniency toward independent data integrators was waning, AutoLoop contracted with CDK for direct access to CDK's DMS.[2] (*See id.* ¶¶ 9, 10.) Specifically, in 2016, AutoLoop entered into a Managed Interface Agreement ("MIA") with CDK in order to obtain access to data stored on CDK's DMS through CDK's own data integration program, which is called 3PA.[3] (*Id.* ¶ 10.) At issue on this motion is section 1(f) of the MIA, which by its terms prohibits AutoLoop from receiving any data sources from CDK's DMS outside the 3PA program. (Defs.' Joint Statement of Additional Material Facts ("DSOAF") [1062] ¶ 114; Pl.'s Resp. to DSOAF ("DSOAFR") [1139] ¶ 114.)

In addition to AutoLoop's software, many dealers use vAuto, an inventory analytics application that Cox Automotive sells to dealers. (*See* PSOF ¶ 17.) vAuto obtains data from many sources, including Autotrader.com and Cars.com, and, sometimes, from CDK's DMS; like AutoLoop, Cox Automotive also participates in CDK's 3PA program. (*Id.* ¶ 18; Def.'s Resp. to PSOF ("PSOFR") [1059] ¶ 18; DSOAF ¶ 122.) Dealerships use vAuto to store data including accurate pricing information and images of their vehicles for marketing materials. (*See* Dep. of Matt Rodeghero, Ex. 7 to PSOF [950-8] at 128:1–129:23.) The inventory information that dealers store on vAuto includes some information that one could obtain from CDK's DMS—such as vehicle identification numbers—but also includes data that is not available on the DMS, such as up-to-date pricing information, vehicle images, and videos. (PSOF ¶ 20 (citing testimony that vAuto "standardly store[d] information in vAuto that [dealers] do not store or maintain in CDK['s

---

[2] This switch was quite expensive: AutoLoop had been paying SIS $69 per dealer per month for data integration services, whereas CDK charged AutoLoop $672 per month per dealer for its integration suite. (PSOF ¶¶ 8, 11; PSOFR ¶ 11.)

[3] The 3PA program is discussed in greater detail in the court's opinion addressing Defendants' motion for summary judgment on Plaintiffs' antitrust claims.

DMS]").) vAuto allows dealers to send inventory data stored in vAuto to other applications (*see* PSOF ¶ 19; PSOFR ¶ 19), and vAuto does not track what each vendor does or does not do with the data it provides (DSOAF ¶ 130). On April 28, 2017, CDK sent an email to Cox Automotive in which CDK referred to the MIA's restrictive language and objected to vAuto's practice of sending inventory data to third parties. (*Id.* ¶ 129; *see also* Def.'s Add'l Ex. 504 [1065-36] at COX_0112623.)

At some point—the parties do not specify when—several dealerships requested that AutoLoop obtain inventory data collected by vAuto. (PSOF ¶ 20; PSOFR ¶ 20.) As early as January 2018, AutoLoop began receiving a daily feed of inventory data (or a "data pull") from vAuto to support AutoLoop's inventory-related application, which is called "Quote." (DSOAF ¶¶ 120, 124.) In or about April 2019, AutoLoop received inventory data from vAuto for approximately 40 to 50 dealers who use CDK's DMS. (PSOF ¶ 16; PSOFR ¶ 16.) AutoLoop did not pay CDK an integration package fee for "at least some" of those dealers. (*See* DSOAF ¶ 127.) The extent of AutoLoop's purported transgression appears to have been relatively minor: with the possible exception of three dealers, each of the 40 to 50 dealers that asked AutoLoop to retrieve their inventory data from vAuto had already themselves paid CDK for inventory feeds through CDK's 3PA program. (PSOF ¶ 21.)

CDK now claims that AutoLoop breached Section 1(f) of the MIA by obtaining from vAuto "a daily feed of inventory data . . . to support AutoLoop's Quote application." (Counterclaims [514] ¶¶ 2, 20–21; DSOAF ¶ 124.) CDK alleges that "the vAuto inventory data feed includes vehicle inventory data sourced from CDK's DMS." (Counterclaims ¶ 20.) CDK claims that this conduct harmed CDK by allowing AutoLoop "to avoid paying CDK the integration fees that it would otherwise owe under the 3PA Agreement" and by impeding CDK's "ability to verify that each vendor in the program is using the data that it obtains for an approved end-use and with the dealer's express, written consent." (*Id.* ¶ 24.) Under Illinois contract law, CDK seeks nominal

damages, along with declaratory and injunctive relief. (*See id.* ¶ 29; CDK's Resp. to AutoLoop's Mot. for Summ. J. ("CDK Opp.") [1056] at 8.)

AutoLoop moves for summary judgment on CDK's counterclaim on two grounds. First, AutoLoop argues that it is entitled to summary judgment because the record lacks evidence that vAuto sent AutoLoop data that vAuto retrieved from CDK's DMS. (Mem. in Supp. of AutoLoop's Mot. for Summ. J. [951] at 6–8.) Second, AutoLoop argues that summary judgment is warranted on alternative grounds because the record lacks evidence of damages or the kind of injury that would justify entry of an injunction. (*Id.* at 8–11.)

## **DISCUSSION**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court draws reasonable inferences in favor of the nonmoving party, but "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quotation omitted). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

**I.** **Breach of Contract**

AutoLoop met its initial summary judgment burden by noting the absence of any evidence that it had "materially breached" the MIA, because the record contains no evidence that vAuto obtained the data that it provided to AutoLoop from CDK's DMS. *MMG Fin. Corp. v. Midwest*

4

*Amusements Park, LLC*, 630 F.3d 651, 657 (7th Cir. 2011). Undisputed evidence shows that vAuto obtains its inventory data from multiple sources. Generally, vAuto's data comes from the CDK DMS, dealer employees manually entering inventory data directly into vAuto, original equipment manufacturers ("OEMs") who send vAuto inventory data, and vehicle listing services like Cars.com and Autotrader. (PSOF ¶ 18; DSOAF ¶ 123.) But with respect to the specific data at issue (the inventory data that vAuto sent to AutoLoop), there is no evidence in the record that vAuto drew that specific data from CDK's DMS.

To overcome AutoLoop's summary judgment motion, CDK must present evidence from which a reasonable jury could find that the inventory feeds vAuto sent AutoLoop in fact included data sourced from CDK's DMS. CDK has not presented a genuine factual dispute on this point. *See Lime Crunch Inc. v. Johansen*, No. 20 C 5709, 2022 WL 4607560, at *4 (N.D. Ill. Sept. 30, 2022) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

CDK's evidence shows in a general way that some of vAuto's data comes from the CDK DMS. (DSOAF ¶ 123.) To connect that showing to the specifics of its claim, CDK largely relies on the testimony of Brian Green, the Rule 30(b)(6) witness identified by Cox Automotive, the company that owns vAuto. Mr. Green testified that vAuto does not charge application vendors for inventory data that vAuto provides to the vendors, and that there also would be no charges if that inventory data came from a DMS. (Dep. of Brian Green, Ex. 8 to PSOF [950-9] at 116:16–21.) CDK reads that testimony as evidence that the CDK DMS is the source of vAuto's data. (*See* DSOAF ¶ 128.) As the court understands Green's statement, however, it does not establish that the inventory data vAuto sent to AutoLoop came from the CDK DMS; instead, that statement merely identifies two circumstances in which vAuto would not charge application vendors for data. That vAuto does not charge vendors for certain data says nothing about the source of that data.

5

Green's other remarks similarly do not support the inference CDK urges this court to draw. For example, when asked whether the inventory data that vAuto sends to AutoLoop "includes data from CDK's DMS," Green testified, "there are approximately a dozen dealers [using AutoLoop], CDK DMS dealers, that receive the data." (Green Dep. at 122:23–123:4.) Whatever Green may have meant by this statement, it was not an affirmation that the inventory data vAuto sent AutoLoop came from CDK's DMS, and CDK did not follow up on its line of inquiry. (*See id.* at 123:2–13.) Green's response does not provide a sufficient basis for a jury to find in CDK's favor.

CDK's strongest attempt at identifying facts that preclude summary judgment is its citation to Mr. Green's testimony regarding data syndication, but that, too, is insufficient. Green testified that vAuto "syndicates" data to third parties and that he understands "syndication" to involve taking "the raw data that's extracted from the DMS" and adding "merchandising-friendly information" such as "photographs" before sending the data to third parties. (*Id.* at 117:7–22.) In his deposition testimony, Green did not specifically identify AutoLoop as a third party that receives any syndicated data. (*See id.* at 117:7–11 (listing a set of third parties that vAuto "syndicate[s]" data to and not including AutoLoop).)

CDK further contends that this court must draw the inference that vAuto sourced the data from the CDK DMS because, according to an AutoLoop document title "vAuto Inventory Integration," AutoLoop's Quote application only works if it incorporates inventory data from either a DMS or vAuto's inventory feed: "[i]t is a 'one or the other' situation." (*See* Ex. 15 to PSOF [950-16] at AL_MDL_0026553.) According to that document, vAuto inventory pulls "cannot be used in conjunction with DMS inventory pulls." (*See* DSOAF ¶ 128.) CDK takes this evidence to show that the data vAuto gives AutoLoop is duplicative of—and therefore derived from—CDK's DMS. For support, CDK cites an AutoLoop employee's testimony that he assumed the reason why AutoLoop software could not use inventory feeds from both CDK and vAuto is that the feeds "probably include the same data types." (Dep. of Alex Eckelberry, Ex. 555 to Fenske Decl. [1065-87] at 69:18–70:6.) While this court will afford "all reasonable inferences" to CDK, *Driveline Sys.,*

6

*LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579–81 (7th Cir. 2019), CDK has not clearly articulated why this testimony tends to show that the data was sourced from CDK's DMS, especially in light of a competing explanation: the fact that vAuto inventory pulls "cannot be used in conjunction with DMS inventory pulls" could simply mean that the data sets are not compatible with one another. *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (noting that "inference that are supported by only speculation or conjecture will not defeat a summary judgment motion") (internal quotation marks omitted). This testimony would not be enough for a jury verdict in CDK's favor.

CDK's remaining authority is distinguishable. In *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1106 (N.D. Ill. 2012), the party opposing summary judgment presented evidence from two employees who offered specifics: they "described their work creating a database . . . by reusing data obtained from RealSource, then filling orders for data from that database." In this case, by contrast, Mr. Green did not testify that vAuto furnished data to AutoLoop by reusing data obtained from CDK.

At bottom, CDK's position improperly flips the summary judgment standard. CDK urges that AutoLoop's motion must fail because AutoLoop cannot prove that none of the data it received from vAuto was sourced from CDK's DMS. But it is CDK who bears the burden of proof on this issue. AutoLoop noted the absence of evidence regarding the source of the content vAuto sent to AutoLoop; to defeat summary judgment, CDK must present evidence that creates a genuine factual dispute on whether the data AutoLoop received from vAuto actually did include data extracted from CDK's DMS. In short, the question is not whether AutoLoop can prove that the data it received *excludes* inventory data from CDK's DMS; rather, CDK is tasked with presenting evidence that the inventory feeds in question *included* data sourced from its DMS in the first place. *See Lime Crunch Inc.*, 2022 WL 4607560, at *4 (Rule 56(c) mandates summary judgment when the non-moving party fails to make an evidentiary showing on an element that it will have the

burden to prove at trial). CDK has not met its burden, and AutoLoop is thus entitled to summary judgment on CDK's breach-of-contract counterclaim.

## II. Damages

Because AutoLoop is entitled to summary judgment on the issue of liability, the court need not address the parties' arguments concerning damages in depth. The court notes, however, that CDK's failure to support its damages theory provides an alternative basis for granting AutoLoop's summary judgment motion.

CDK claims two categories of damages. First, CDK seeks revenue lost as a result of AutoLoop "avoid[ing] paying" 3PA fees for retrieving dealerships' inventory data from vAuto rather than from one of CDK's own programs. (Counterclaims ¶ 25.) Second, CDK claims AutoLoop's actions have irreparably harmed CDK because "[t]he success of the 3PA program depends on CDK's ability to verify that each vendor in the program is using the data that it obtains for an approved end-use and with the dealer's express, written consent," and that, when AutoLoop obtains inventory data from vAuto rather than CDK directly, CDK loses its ability to "monitor" that data. (Counterclaims ¶ 24.) CDK has not attempted to quantify damages for either of these theories. CDK argues that it does not need to offer a damages model because "[d]amages are simple and straightforward to determine based on the additional fees that AutoLoop would owe CDK for the inventory data that it is unlawfully receiving from vAuto—which comes out to approximately $23 per dealer per month." (CDK Opp. at 9.) In any event, although compensatory damages are typically the most appropriate remedy for Illinois breach-of-contract-claims, CDK does not seek such relief. *See Cooper v. Durham Sch. Servs.*, No. 03 C 2431, 2003 WL 22232833, at *10 (N.D. Ill. Sept. 22, 2003) ("Illinois courts have repeatedly held that money damages are the appropriate remedy for breach of contract cases.").

CDK instead seeks nominal, declaratory, and injunctive relief for its breach-of-contract claim. In defending its pursuit of nominal and declaratory relief "in lieu of actual damages," CDK argues that it "may elect to seek an award of nominal damages instead" of compensatory

8

damages because "the practical cost of calculating damages would exceed their value." (CDK Opp. at 9.) The cases CDK cites, however, do not clearly support that proposition. CDK invokes authority stating that the court may award nominal damages when a plaintiff "fails to prove the amount of [ ] damages to a reasonable degree of certainty," *see, e.g.*, *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (2007), but such cases do not instruct that a plaintiff is excused from calculating damages at all when seeking an award of nominal damages instead. On this score, CDK incorporates arguments from its brief in opposition to the Dealership Plaintiffs' motion for summary judgment on CDK's counterclaims. (*Id.* at 11 n.8 (incorporating CDK Opp. to the Dealership Counter-Defs.' Mot. for Summ. J. [1057] at 5–15).) For reasons similar to those discussed in the court's contemporaneously-filed opinion granting the Dealership Plaintiffs' motion for summary judgment on CDK's breach-of-contract counterclaim, CDK's incorporated arguments regarding nominal and declaratory damages are unpersuasive.

   CDK's arguments in support of injunctive relief fare no better. A permanent injunction may be issued if a plaintiff shows: (1) irreparable harm that cannot be adequately compensated by money damages; (2) a balance of hardships that tips in favor of the plaintiff; and (3) that injunctive relief would be consistent with the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). With respect to the first element—adequacy of money damages—CDK contends that it continues to suffer two harms that money damages will not remedy, namely harm to the 3PA brand and risk of a data breach.

   Regarding reputational harm, CDK contends that "[t]he success of the 3PA program depends on CDK's ability to verify that each vendor in the program is using the data that it obtains for an approved end-use and with the dealer's express, written consent." (Counterclaims ¶ 24.) CDK claims that, by obtaining inventory data from vAuto, AutoLoop impeded CDK's ability to "monitor how data is being transmitted, who is using and has access to the data, or verify whether AutoLoop is using the data for an approved purpose and with the dealer's knowledge or consent." (*Id.*) CDK insists that AutoLoop has harmed the 3PA brand by obtaining dealerships' inventory

9

information from vAuto (information obtained at the request of the dealerships themselves). As support for this theory, CDK cites only its own witness's vision for the 3PA brand. (*See* DSOAF ¶ 111 (citing Dep. of Howard Gardner, Ex. 556 to Fenske Decl. [1065-88] at 519:17–521:11 (testifying that monitoring data usage is "critically important to the brand of what the 3PA program stands for")).) The assertion that monitoring is "critically important" falls short of any showing that AutoLoop's actions eroded the reputation of the 3PA program. *Cf. BrightStar Franchising LLC v. N. Nevada Care, Inc.*, No. 17 C 9213, 2020 WL 635903, at *8 (N.D. Ill. Feb. 11, 2020) (granting injunctive relief where plaintiff "showed that Defendants' breaches harmed its brand"); *Luxottica Grp. S.p.A. v. Light in the Box Ltd.*, No. 16-cv-05314, 2016 WL 6092636, at *6 (N.D. Ill. Oct. 19, 2016) (passing off counterfeit goods "creates a risk of irreparable harm by devaluing Plaintiffs' brands"). In short, CDK has not presented evidence that AutoLoop's receipt of data from vAuto actually threatened or harmed CDK's brand, and CDK is not entitled to injunctive relief for harm to reputation. *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, No. 11-cv-6771, 2013 WL 1286681, at *18 (N.D. Ill. Mar. 28, 2013) (Dow, J.) (denying injunctive relief based on claimed irreparable harm to reputation because "there is no evidence that Kreg has suffered an injury to its reputation, or even that its loss of reputation is a presently existing actual threat").

Nor has CDK explained how AutoLoop's receipt of data from vAuto increases CDK's risk of a data breach. CDK argues that, because "there is no audit trail for data that vAuto obtains from CDK's DMS and syndicates to AutoLoop and others," AutoLoop's actions "increase the risk that data will fall into the wrong hands" and it would "be impossible for CDK to trace the cause of any security breach involving data distributed by vAuto." (CDK Opp. at 14.) Again, however, CDK does not link its generalized security concern with any specific facts of record. CDK does not explain why or how AutoLoop's receipt of outside data increases the risk of a data breach for CDK. And, according to record evidence, the data AutoLoop obtained from vAuto is not confidential; instead it is "publicly available inventory that is merchandised widely on behalf of . . . dealer[s]" that dealers want to publicize in "as many places as possible to help sell [the

10

inventory] faster." (Green Dep. at 105:3–16.) CDK's security concerns do not warrant injunctive relief against AutoLoop here. CDK's failure to present evidence in support of any claim for damages is an alternative ground for summary judgment in favor of AutoLoop.

## CONCLUSION

AutoLoop's motion for summary judgment on CDK's counterclaim [949] is granted.

ENTER:

Dated: June 29, 2023

_____
REBECCA R. PALLMEYER
United States District Judge