# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litig.*, MDL 2817<br><br>This Document Relates To:<br><br>THE VENDOR PUTATIVE CLASS ACTION<br><br>THE DEALERSHIP PUTATIVE CLASS ACTION | MDL No. 2817<br>Case No. 18-cv-00864<br><br>Hon. Rebecca R. Pallmeyer |

**CDK GLOBAL, LLC'S OPPOSITION TO MOTIONS FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

    A.    DMS Products and DIS Services ................................................. 4

    B.    Plaintiffs' Proposed Vendor And Dealer Classes ..................................... 5

    C.    Developments During The Class Period ................................................. 6

    D.    Plaintiffs' Proposed Expert Models ........................................................ 9

LEGAL STANDARD .............................................................................................. 10

ARGUMENT ........................................................................................................... 12

I.    AutoLoop's Motion for Class Certification Should Be Denied ......................................... 12

    A.    Vendors' Class Action Waivers Create Insurmountable Predominance And Adequacy Problems. ................................................................ 12

    B.    AutoLoop Does Not Show That Antitrust Injury Is A Common Question. ......... 16

        1.    Israel's Bald Assertions Cannot Establish Common Injury. .................. 17

        2.    Israel's Overcharge Model Demonstrates That A Great Many Vendors Were Uninjured .............................................................. 18

    C.    Israel's Model Cannot Assess Impact Or Damages On A Classwide Basis ......... 19

II.    Dealers' Motion for Class Certification Should Be Denied. ........................................... 23

    A.    All Dealer Classes Fail Rule 23(b)(3). ................................................. 23

        1.    Many Dealers Also Signed Class Action Waivers. ............................. 23

        2.    Dr. Williams' Models Cannot Reliably Address Injury and Damages on a Classwide Basis .................................................. 25

            a.    Dr. Williams' Overcharge Models Do Not Establish Classwide Injury To Vendors Or Damages To Dealers. .............................. 25

            b.    Dr. Williams' Pass-Through Models Cannot Be Used To Establish Classwide Injury Or Damages To Dealers. .................. 27

        c.     The "Common Impact Regressions" Also Do Not Show Classwide Injury. ........................................................................ 29

B.    Each Separate Proposed Dealer Class Fails For Additional Reasons. ................. 30

      1.    The Nationwide Class Fails Due To "Repealer" And "Non-Repealer" States' Different Treatment Of *Illinois Brick*. ........................... 30

      2.    Dealers' 26-State Class Fails Due To Other Differences In State Antitrust And Consumer Protection Laws. ................................ 34

      3.    Individual State Law Classes Fail Under Rule 23(a). ........................... 36

      4.    The Dealers Cannot Certify An Injunctive Relief Class. ......................... 37

III.    At a Minimum, All Proposed Class Periods Are Years Too Long. ............................... 37

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Adkins v. Nestle Purina PetCare Co.*,
  973 F. Supp. 2d 905 (N.D. Ill. 2013) ..............................................................31, 32

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................... *passim*

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).............................................................................................11

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)..................................................................................22

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)..............................................................................................3

*In re Auto. Parts Antitrust Litig.*,
  2019 WL 7877812 (E.D. Mich. Dec. 20, 2019) .................................................33

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  835 N.E.2d 801 (Ill. 2005)..................................................................................33

*Beach v. JPMorgan Chase Bank, Nat'l Ass'n*,
  2019 WL 2428631 (S.D.N.Y. 2019)...................................................................36

*Beaton v. SpeedyPC Software*,
  2023 WL 2711416 (N.D. Ill. Mar. 30, 2023)......................................................33

*In re Bridgestone*,
  288 F.3d 1012 (7th Cir. 2002) ...........................................................30, 32, 33, 34

*Brown v. DirecTV, LLC*,
  2022 WL 1591325 (C.D. Cal. Mar. 31, 2022).....................................................23

*In re Celexa*,
  315 F.R.D. 116 (D. Mass. 2016)..........................................................................24

*Clark v. Bumbo Int'l Tr.*,
  2017 WL 3704825 (N.D. Ill. Aug. 28, 2017) .................................................37, 38

---

[1] For brevity, all emphasis in citations has been added and all internal quotation marks and citations have been omitted, unless otherwise noted. "Ex. __" refers to exhibits to the Omnibus Declaration of Katherine R. Katz filed herewith.

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
  679 Fed. Appx. 135 (3d Cir. 2017) ................................................................19, 20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...........................................................................................11, 21

*Conde v. Open Door Mktg., LLC*,
  223 F. Supp. 3d 949 (N.D. Cal. 2017) .................................................................15

*Conde v. Sensa*, 2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ..................................14

*Copello v. Boehringer Ingelheim Pharm. Inc.*,
  812 F. Supp. 2d 886 (N.D. Ill. 2011) .............................................................16, 25

*Cunningham Charter Corp. v. Learjet, Inc.*,
  258 F.R.D. 320 (S.D. Ill. 2009) .....................................................................30, 36

*Daly v. Glanbia Performance Nutrition*,
  2023 WL 5647232 (N.D. Ill. Aug. 31, 2023) ...........................................32, 33, 34

*Dzielak v. Whirlpool Corp.*,
  2017 WL 6513347 (D.N.J. Dec. 20, 2017) ...........................................................22

*Ellsworth v. Schneider Nat'l Carriers, Inc.*,
  2021 WL 6102514 (C.D. Cal. Oct. 28, 2021) .......................................................15

*In re Evanston Nw. Corp. Antitrust Litig.*,
  2013 WL 6490152 (N.D. Ill. Dec. 10, 2013) ........................................................13

*Figueredo-Chavez v. RCI Hosp. Holding*,
  2022 WL 457848 (S.D. Fla. Jan. 6, 2022) ............................................................25

*In re Flash Memory Antitrust Litig.*,
  2010 WL 2332081 (N.D. Cal. June 9, 2010) ..................................................21, 29

*In re Flonase Antitrust Litig.*,
  815 F. Supp. 2d 867 (E.D. Pa. 2011) ....................................................................32

*In re Fluidmaster, Inc.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)..........................................34, 36, 37

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008).........................................................................20

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................................31, 34

*Hansen v. Country Mutual Insurance Co.*,
  2023 WL 6291629 (N.D. Ill. Sept. 25, 2023) ............................................. *passim*

iv

*Hooker v. Citadel Salisbury LLC*,
   2023 WL 3020967 (M.D.N.C. Apr. 20, 2023) ........................................................14

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) .............................................................................................30

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ............................................................................18

*In re Intuniv Antitrust Litig.*,
   2019 WL 3947262 (D. Mass. Aug. 21, 2019) .......................................................17

*Jensen v. Cablevision Sys. Corp.*,
   372 F. Supp. 3d 95 (E.D.N.Y. 2019) ....................................................................15

*King v. Cap. One Bank (USA), N.A.*,
   2012 WL 5570624 (W.D. Va. Nov. 15, 2012) .......................................................15

*Kleen Prods, LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ..............................................................................22

*Korea Week, Inc. v. Got Cap., LLC*,
   2016 WL 3049490 (E.D. Pa. May 27, 2016) .........................................................25

*Kotsur v. Goodman Global, Inc.*,
   2016 WL 4430609 (E.D. Pa. Aug. 22, 2016) ........................................................23

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ..........................................................................20, 23

*Lawson v. Grubhub, Inc.*,
   13 F.4th 908 (9th Cir. 2021) ............................................................................1, 14

*Lipton v. Chattem, Inc.*,
   289 F.R.D. 456 (N.D. Ill. 2013) ...........................................................................37

*Looper v. Cook Inc.*,
   20 F.4th 387 (7th Cir. 2021) ...............................................................................31

*Maher v. Int'l Bhd. Of Elec. Workers/6th Dist.*,
   1991 WL 268657 (N.D. Ill. Dec. 3, 1991) ............................................................37

*Martin v. Heinold Commodities, Inc.*,
   510 N.E.2d 840 (Ill. 1987) ...................................................................................33

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ..............................................................................36

*McGlenn v. Driveline Retail*,
2021 WL 165121 (C.D. Ill. Jan. 19, 2021) ............................................................4

*Medline Indus. Inc. v. Maersk Med. Ltd.*,
230 F. Supp. 2d 857 (N.D. Ill. 2002) ..................................................................34

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .........................................................17, 19, 23

*Montgomery v. Corinthian Colleges, Inc.*,
2011 WL 1118942 (N.D. Ill. Mar. 25, 2011).................................................16, 25

*Morrison v. YTB Int'l, Inc.*,
649 F.3d 533 (7th Cir. 2011) ..............................................................................33

*Moss v. United Airlines, Inc.*,
20 F.4th 375 (7th Cir. 2021) ...............................................................................17

*Naranjo v. Nick's Mgmt.*,
652 F. Supp. 3d 737 (N.D. Tex. 2023) ................................................................25

*Niiranen v. Carrier One, Inc.*,
2022 WL 103722 (N.D. Ill. Jan. 11, 2022) .........................................13, 16, 25

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
36 F.3d 565 (7th Cir. 1994) ...............................................................................18

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014).........................................19, 26, 28, 29

*In re Plastics Additives*,
2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ......................................................21

*Platinum Cmty. Bank v. Marshall Investments Corp.*,
2008 WL 4866343 (N.D. Ill. July 29, 2008).......................................................33

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015).........................................................................27

*R.O.W. Window Co. v. Allmetal, Inc.*,
367 Ill. App. 3d 749 (2006) ...............................................................................16

*In re Rail Freight*,
292 F. Supp. 3d 14 (D.D.C. 2017).......................................................................10

*In re Rail Freight*,
725 F.3d 244 (D.C. Cir. 2013) ............................................................................11

*Red Barn Motors, Inc. v. NextGear Cap., Inc.*,
    2020 WL 919464 (S.D. Ind. Feb. 26, 2020) ..........................................................13

*Reed v. Advoc. Health Care*,
    268 F.R.D. 573 (N.D. Ill. Sept. 28, 2009) ...................................................2, 19, 20

*In re Relafen Antitrust Litig.*,
    225 F.R.D. 14 (D. Mass. 2004) ..............................................................................34

*Matter of Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ...........................................................................3, 36

*S&S Forage & Equip. Co. v. Up N. Plastics, Inc.*,
    2002 WL 31718409 (D. Minn. Nov. 21, 2002) ......................................................37

*In re Santa Fe Nat. Tobacco Co.*,
    2023 WL 6121894 (D.N.M. Sept. 19, 2023) ..........................................................40

*Santangelo v. Comcast Corporation*,
    2017 WL 6039903 (N.D. Ill. Dec. 6, 2017) ....................................................14, 15

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008) ................................................................... *passim*

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    299 F.R.D. 555 (E.D. Tenn. 2014) ...................................................................32, 34

*Spotswood v. Hertz Corp.*,
    2019 WL 498822 (D. Md. Feb. 7, 2019) ...............................................................14

*In re Steel Antitrust Litig.*,
    2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ..........................................10, 11, 20

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) ...........................................................3, 31, 33, 34

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) .................................................................................30

*Tan v. Grubhub, Inc.*,
    2016 WL 4721439 (N.D. Cal. July 19, 2016) ........................................................14

*In re Trans Union Corp.*,
    211 F.R.D. 328 (N.D. Ill. 2002) ......................................................................32, 34

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .........................................................................................15, 17

*Trejo v. Adv. Am., Cash Adv. Centers of Ill., Inc.*,
  2009 WL 10713823 (N.D. Ill. June 23, 2009) ....................................................16

*Tschudy v. J.C. Penney Corp., Inc.*,
  2015 WL 8484530 (S.D. Cal. Dec. 9, 2015).......................................................15

*Tyson Foods v. Bouaphakeo*,
  577 U.S. 442 (2016) ..........................................................................................23

*United States v. Am. Airlines Grp., Inc.*,
  2023 WL 3560430 (D. Mass. May 19, 2019) ....................................................17

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018)........................................................................40

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................*passim*

*Walker v. Bankers Life*,
  2007 WL 967888 (N.D. Ill. Mar. 28, 2007).......................................................33

*Wielgus v. Ryobi Techs., Inc.*,
  2012 WL 1853090 (N.D. Ill. May 21, 2012) .....................................................35

*Yuen v. Idexx Lab'ys, Inc.*,
  2024 WL 83351 (D. Me. Jan. 8, 2024) ..............................................................17

**Statutes**

Haw. Rev. Stat. § 480-13(c)(2) .............................................................................35

MSA § 11(b) ...........................................................................................................34

Utah Code § 76-10-3109(7)-(8) .............................................................................35

**Rules**

Fed. R. Civ. P. 23 ...........................................................................................1, 2, 17

Fed. R. Civ. P. 23(a) ...................................................................................*passim*

Fed. R. Civ. P. 23(b) .......................................................................................12, 14

Fed. R. Civ. P. 23(b)(2)..........................................................................................37

Fed. R. Civ. P. 23(b)(3)................................................................................*passim*

**Other Authorities**

1 McLaughlin on Class Actions § 2:14 (20th ed.) .......................................................................13

1 McLaughlin on Class Actions § 5:36 (16th Ed.) .......................................................................17

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | February 23, 2024 Expert Report of Laila Haider |
| 2 | January 22, 2024 30(b)(6) Deposition of Stevens Group witness David Benstock |
| 3 | January 4, 2024 30(b)(6) Deposition of Waconia Dodge witness Andy Strong |
| 4 | January 26, 2023 30(b)(6) Deposition of Tony Group witness Bryan Hsu |
| 5 | April 19, 2019 30(b)(6) Deposition of StoneEagle F&I witness Thomas Elliott |
| 6 | March 29, 2019 30(b)(6) Deposition of Kenny Thomas Enterprises, Inc. witness Kelly Thomas |
| 7 | April 16, 2019 30(b)(6) Deposition of Cox Automotive/XTime witness Neal East |
| 8 | May 25, 2022 National Automobile Dealers Association (NADA) publication, "FTC Safeguards Rule: What Your Business Needs to Know." |
| 9 | CDK Webpage: "CDK Network Protect," https://www.cdkglobal.com/dealership-operations/cybersecurity/cdk-network-protect |
| 10 | January 4, 2014 30(b)(6) Deposition of Jim Marsh witness Andy Kerby |
| 11 | February 23, 2024 affidavit of Leigh Ann Conver |
| 12 | January 19, 2024 Deposition of Vendor Plaintiffs' expert Dr. Mark Israel |
| 13 | February 12, 2024 Deposition of Dealer Plaintiffs' expert Dr. Michael Williams |
| 14 | July 17, 2017 Third Party Access Agreement between CDK Data Services, Inc. and Carvana, LLC (CDK-0783279) |
| 15 | November 29, 2018 Third Party Access Agreement between CDK Data Services, Inc. and BlinkAi, Inc. (CDK-3133703) |
| 16 | October 2, 2019 Third Party Access Agreement between CDK Data Services, Inc. and Whip Mobility, Inc. (CDK-3138322) |

| Exhibit No. | Description |
|---|---|
| 17 | August 7, 2018 Third Party Access Agreement between CDK Data Services, Inc., and American Marketing & Mailing Services, Inc. (CDK-3105962) |
| 18 | January 24, 2017 Third Party Access Agreement between CDK Data Services, Inc. and Dealer Addendums (CDK-3106524) |
| 19 | July 26, 2020 Third Party Access Agreement between CDK Data Services, Inc. and Dealer Addendums (CDK-3134291) |
| 20 | June 30, 2020 Master Services Agreement between CDK Global LLC and Waconia Dodge (WACONIA_00000034) |
| 21 | February 2, 2024 30(b)(6) Deposition of GSM Auto Group witness Scott Gunderson |
| 22 | January 16, 2024 30(b)(6) Deposition of Automaster witness Nicholas Bernier |
| 23 | January 31, 2022 Invoice from Dealertrack to Gregoris Motors and February 11, 2022 check from Gregoris Motors to Dealertrack (GREGORIS_SUPPL._00000140) |
| 24 | January 17, 2024 30(b)(6) Deposition of Henry Brown Buick GMC witness Victoria Willis |
| 25 | May 8, 2020 Proposal from Dealertrack to John O'Neil Johnson Motor Co. for Dealertrack DMS services (JOHN_ONEIL-SUPPL._00000012) |
| 26 | January 25, 2024 30(b)(6) Deposition of L&S Motors witness Matthew Roop |
| 27 | February 2, 2024 30(b)(6) Deposition of Pitre Group witness Thomas Stever |
| 28 | January 9, 2024 30(b)(6) Deposition of Sandy Sansing witness Steven Henry |
| 29 | January 19, 2021 Master Services Agreement between CDK Global LLC and Audi Mission Viejo, a GSM Auto Group rooftop (CDK-3128276) |
| 30 | August 28, 2020 Master Services Agreement between CDK Global LLC and Henry Brown Automotive Group (CDK-3130110) |
| 31 | April 29, 2022 Master Services Agreement between CDK Global LLC and Henry Brown Automotive Group (CDK-3128919) |
| 32 | March 24, 2023 Master Services Agreement between CDK Global LLC and Jim Marsh Kia (CDK-3128990) |

| Exhibit No. | Description |
|---|---|
| 33 | March 7, 2022 Master Services Agreement between CDK Global LLC and Kenny Thomas Olathe Toyota (KENNY_THOMAS-SUPPL._00001114) |
| 34 | October 16, 2023 Master Services Agreement between CDK Global LLC and Landmark Ford (CDK-3129012) |
| 35 | January 12, 2024 30(b)(6) Deposition of Landmark Ford witness Laura Barrera-Moore |
| 36 | January 6, 2020 Master Services Agreement between CDK Global LLC and Stevens Ford 112 (CDK-3129144) |
| 37 | December 21, 2017 Master Services Agreement between CDK Global LLC and Tony Group (TONY_GROUP_00002883) |
| 38 | June 30, 2020 Addendum to Master Services Agreement between CDK Global LLC and Waconia Dodge (WACONIA_00000014) |
| 39 | January 27, 2022 Schedule to Master Services Agreement between CDK Global LLC and Tony Nissan (CDK-3129570) |
| 40 | September 30, 2021 Invoice from CDK Global to Waconia Dodge (WACONIA_00000716) |
| 41 | June 1, 2021 Invoice from MaxDigital to Waconia Dodge (WACONIA_00000288) |
| 42 | November 1, 2023 Invoice from MaxDigital to Waconia Dodge (WACONIA_00000408) |
| 43 | 2023 Global Insight Services (GIS) Presentation titled U.S. Dealer Management System Market: Market Forecast till 2032 |
| 44 | 2017 American Bar Association book titled Proving Antitrust Damages: Legal and Economic Issues, Third Edition. |
| 45 | January 30, 2024 30(b)(6) Deposition of DuTeau Chevrolet witness Lynn Sunderman |

## INTRODUCTION

The Court should deny both motions for class certification.  All of the proposed classes fail for the most fundamental reason—plaintiffs cannot show that key questions have "common answer[s]" for all class members across the proposed eleven-year class period.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–52 (2011).  This disqualifying fact bars class treatment altogether for both the vendors and the dealers alike.  Even if some sort of class *could* be certified, the classes here overreach.  They would need to be pared back in material ways to guard against the tactic of using the class certification device to create massive exposure and improper settlement leverage, a downside the Seventh Circuit and Supreme Court have warned against.

To start, there can be no class action here because many proposed members of both classes waived their right to bring one.  Since 2017, over 100 vendors (more than 20% of the vendor class) and many thousands of dealers in the dealer class have signed contracts with CDK that include enforceable class-action waivers, providing that any "LAWSUIT, ACTION OR OTHER LEGAL PROCEEDING, SHALL BE CONDUCTED AND RESOLVED ON AN INDIVIDUAL BASIS ONLY," rather than a "CLASS-WIDE" one.  This is a threshold obstacle to all classes: sorting out *which* class members have waivers would require individualized contractual analyses across *hundreds* of vendors and *thousands* of dealers.  Proposed class actions like this one, that "include[] [parties] who entered into agreements … to waive their right to participate in a class action," fail under Rule 23.  *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021).

All classes fail in their entirety for the additional reason that they include "a high number of uninjured class members," which "prompts serious predominance concerns."  *Hansen v. Country Mutual Insurance Co.*, 2023 WL 6291629 (N.D. Ill. Sept. 25, 2023) (Pallmeyer, J.).  To establish classwide injury, both the vendors and the dealers must show, first, that all or nearly all vendors paid an overcharge.  In addition, dealers must also show that the vendors (upstream) passed that

overcharge to all or nearly all dealers (downstream).  But plaintiffs' models do not satisfy either test—instead, they all involve "average[s]," which "by definition glide[] over what may be important differences in" individual class members.  *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. Sept. 28, 2009).  And even those models, when examined more closely, show that many proposed class members were not injured.  As much as 60% of the vendor class did not experience any overcharge at all and, in turn, could not have passed any overcharge on to dealers.  And approximately 36% of dealers associated with CDK did not experience pass-through *from any vendors*.  These results bar class certification, especially where plaintiffs "[n]owhere … explain" how the Court could separate uninjured individuals from the classes, much less "how the court could do so with common evidence."  *Hansen*, 2023 WL 6291629, at *28.

Even if the vendors and dealers could get past these fatal flaws, their proposed classes would still have to be dramatically pruned back for multiple, independent reasons:

***First***, the dealers' overbroad damages classes cannot overcome the many differences in state laws governing their claims.  "It is well-established under Seventh Circuit case law … that if the states' laws differ, class certification is improper."  *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583 (N.D. Ill. 2008) (collecting precedent).  Here, the dealers' proposed nationwide damages class fails because each dealer's claims are governed by the laws of its home state, which include both *Illinois Brick* "repealer" states (those that allow indirect purchasers like the dealers to sue) and "non-repealer" states (those that do not)—a conflict that is fatal to the nationwide class.  *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1068–69 (9th Cir. 2021) (vacating nationwide class).  Dealers' attempt to avoid this issue by framing the nationwide class under the laws of a single state, Illinois, is contrary to well-accepted choice-of-law principles and controlling caselaw.  In addition, other differences in state laws and adequacy problems bar the narrower fallback classes that dealers also seek.

***Second***, all classes overreach by seeking unjustifiable damages over indefensibly long class periods. Plaintiffs seek to certify classes not just to the date that Reynolds settled (October 2018) and thus withdrew from the alleged conspiracy, *see* ECF 1381 at 125, or the close of fact discovery (April 2019), or even the date they filed final expert reports (December 2019)—but instead all the way to the present day. But these five additional years cannot simply be lumped in with the prior, given all the significant changes to the market that occurred over those same years. Over that time, Reynolds has lost substantial market share, new competitors have entered the market, and CDK *even began waiving the data integration fees at the heart of this litigation*. Neither proposed class of plaintiffs addresses these critical issues, and therefore they do not and cannot show that key questions remain common throughout the latter portion of the class period.

If the court narrows the proposed classes just to address these issues, the impacts are massive. Eliminating the dealers' "nationwide" class while permitting their fallback 26-state-law class (which groups together only the states that allow indirect-purchaser claims) would reduce dealer damages from ███ million to ███ million. And even if the dealer nationwide class could be certified, curtailing the dealer nationwide class and the vendor class period to some more reasonable date (such as Reynolds' October 2018 settlement) would reduce dealers' requested damages from ███ million to ███ million and vendors' requested damages from ███ million to ███ million. Ex. 1 (Haider Rpt.) ¶189. Plaintiffs' extraordinary overreaches, in other words, threaten hundreds of millions of dollars of excess damages—damages that serve no purpose other than to improperly increase settlement leverage. Overbroad class actions "risk … in terrorem settlements," *AT&T Mobility v. Concepcion*, 563 U.S. 333, 350 (2011), as defendants facing immense liability "may not wish to roll th[e] dice," *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995). Thus, if a class is too broad, there is "compelling reason to require

that it be narrowed." *McGlenn v. Driveline Retail*, 2021 WL 165121, at *9 (C.D. Ill. Jan. 19, 2021). For many reasons, that point applies with particular force here.

## BACKGROUND

### A.    DMS Products and DIS Services

This case involves layers of products and services related to "dealer management system" ("DMS") software, which are "enterprise computer systems employed by car dealerships to collect, manage, and deploy data they generate." ECF 1381 at 2. CDK and Reynolds are DMS providers that "license their DMS software to dealers" across the country. *Id.* at 15. Dealers "use DMS software to manage business functions including accounting, sales, inventory, service, customer information, and human resources." *Id.* The DMS thus houses and protects data generated as part of dealers' day-to-day operations, including customers' social security numbers, driver's licenses, and other sensitive personal information. *Id.* Dealers also buy software applications that utilize DMS data from their DMS provider or third-party "vendors." *Id.* at 17.

Vendors are direct purchasers of "data integration services," or "DIS." *Id.* at 3. DIS providers extract the DMS data and ultimately make it usable for vendor apps. *See* Williams Merits Rpt. (ECF 889-07) ¶18. Apps use different types of DIS—for example, a given app may require only "basic DIS—that is, the ability to extract data from the DMS on a set schedule." *See* Haider Rpt. ¶12. Other apps require "complex DIS," which may include "the ability to extract data from the DMS more frequently or in real-time, or the ability to transmit (or writeback) certain data to the DMS." *Id.* DIS products are sold by DMS providers and by third parties (*e.g.*, Authenticom). *Id.* ¶¶13-14. For example, CDK provides a menu of DIS products at different rates through its Third Party Access ("3PA") program, which provides certified integration, and, more recently, through Fortellis, a modernized Application Programming Interface ("API") platform. Reynolds offers different DIS products, priced according to a different rubric than CDK, through

4

its Reynolds Certified Interface ("RCI") program. CDK and Reynolds do not charge DIS fees to dealers (and dealers do not purchase DIS), so dealers pay for DIS only indirectly (if at all).

**B.    Plaintiffs' Proposed Vendor And Dealer Classes**

Plaintiffs' motions propose new classes (and new class periods) based on new expert reports. Vendors seek to certify a single damages class including "[a]ll automotive software vendors … located in the United States that, at any time since October 1, 2013, have purchased data integration services from CDK or Reynolds." Vendor Mot. (ECF 1423) 1. The dealers, who cannot seek damages under federal law, move to certify many classes, including (i) a nationwide injunction class, (ii) a nationwide damages class purportedly governed by Illinois law, (iii) a fallback 26-state "State Law Damages Class" of dealers in jurisdictions that have repealed *Illinois Brick*, and (iv) as yet another fallback, "twenty-six individual state law [damages] classes." Dealer Mot. (ECF 1424) 2. Like the vendors, the dealers propose class periods from "September 1, 2013 to the present," *id.* at 1, nearly five years (and counting) after fact discovery closed in April 2019. The members within each putative class differ from each other in significant ways, many of which fundamentally undermine plaintiffs' motions for class certification.

*Vendors*: Different vendors buy different DIS. It is undisputed that there are different markets for DIS used to access the Reynolds and CDK DMS systems. Israel Class Rpt. (ECF 1422-02) ¶16; Williams Class Rpt. (ECF 1425-04) ¶¶42, 43. Vendors requiring integration with CDK's DMS ███████████████████████████████████████████████ ██████████████████████ and so there is one market for DIS relating to CDK's DMS, another for Reynolds' DMS, and others for other DMS systems. Williams Class Rpt. ¶42. DIS markets are further fractured by type of DIS: simple and complex DIS are often not substitutes for each other. Haider Rpt. ¶48 n.106. Vendors thus vary greatly in in terms of total DIS fees incurred over the putative class period and when fees were incurred. Just ██ vendors (20% of class

members) account for an outsized "94% of 3PA fees paid to CDK." *Id.* ¶138. Similarly, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Finally, at

least ▮▮ vendors (nearly a third of the proposed class) only purchased DIS from CDK or Reynolds

after April 2019. *Id.* ¶62. All of these individualized factors affect injury and damages.



**Dealers:** Each dealer's exposure to DIS fees is also highly individualized. Dealers vary

not just by the apps they purchase (and the type of DIS required by those apps), but also in terms

of the vendors whose apps they purchased over time. *See* Haider Rpt. ¶¶51-52, 130, 135. The

amount of DIS fees passed on to dealers varied by vendor, by the dealer the vendor contracted

with, and by date. Haider Rpt. ¶¶305-09. One large vendor, testified that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶305. Other witnesses agreed.[2]

Major automakers (or "OEMs") also often negotiated down or simply covered all or a portion of

the DIS fees that vendors sought to pass on to affiliated dealers. *See* Haider Rpt. ¶¶69-70; Ex. 6

(Kenny Thomas 30(b)(6) Dep.) 315:23-316:23 (an OEM covered integration fees passed on by a

vendor); Ex. 7 (N. East (Cox/Xtime 30(b)(6)) Dep.) 231:2-232:4 (OEM reimbursements ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Vendors also did not always break out integration fees in their

invoices to dealers (or even in their sales data). Haider Rpt. ¶¶65-67, 306. App'x A summarizes

key facts about, and distinctions among, the 19 proposed dealer class representatives.

## C. Developments During The Class Period

The Dealers, the only proposed class that sued Reynolds, settled those claims on October

---

[2] Ex. 2 (Stevens Grp. 30(b)(6) Dep.) 224:15-17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮; Ex. 3 (Waconia Dodge 30(b)(6) Dep.) 152:7-15 ▮▮▮▮▮▮▮▮▮▮ Ex.
4 (Tony Grp. 30(b)(6) Dep.) 196:8-197:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 5 (T. Elliot
(StoneEagle 30(b)(6)) Dep.) 44:19-45:14; 179:25-180:15 ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Haider Rpt. ¶¶64-68.

23, 2018—just before the close of fact discovery.  ECF 428.  Since then, the DMS and DIS markets have evolved significantly.  *See* App'x B (timeline of key events).

*Competition in DMS Market*:  All plaintiffs claim that CDK and Reynolds ███████████ ████████████████████████████████████████████████████████████████████ ████████████████  Israel Class Rpt. ¶8; *accord* ECF 1084 at 23.  But third-party DMS providers have grown in strength and number, and CDK/Reynolds' combined share of the DMS market has fallen.  Haider Rpt. ¶29.  One competitor, Dealertrack, matched Reynolds' DMS market share in 2020 and *overtook* Reynolds the next year, becoming the second-largest DMS provider in 2021.  *Id.* ¶¶29-30, 32; *see* App'x F.  Auto/Mate has also experienced "rapid growth," boasting "double-digit growth" from 2018-2018 before merging with DealerSocket in 2020.  *Id.* ¶33.  And Tekion, a newer entrant, took more rooftops from CDK than Reynolds did in both 2021 and 2022.  *Id.* ¶34.  Two proposed dealer representatives—Sandy Sansing and Tony Group—now use Tekion.  *See* App'x A.

*Enhanced Security Requirements*:  In 2018, the Federal Trade Commission updated the Standards for Safeguarding Customer Information under the Gramm-Leach-Bliley Act, which mandated that dealerships "designate a Qualified Individual to implement and supervise your information security program" and "implement multi-factor authentication for anyone accessing customer information on your system," among other requirements, Ex. 8.  CDK published its own IT Solutions guide for dealers, and offered built-in tools that addressed regulatory requirements "so [dealers] can stop worrying about complying with them."  Ex. 9.  Dealers testified that DMS security and protection of data is critical to their business.  *See* Haider Rpt. ¶40, FNs 81, 82; Ex. 10 (Jim Marsh 30(b)(6) Dep.) 177:6-23 ██████████████████████████.

*DIS Fee Waivers*:  CDK also transformed the market via aggressive new initiatives since 2019.  To start, CDK began waiving DIS fees (eventually waiving fees associated with over

█████ transactions).  Haider Rpt. ¶¶280-81.  The fee waiver program evolved over time.  In

2019, as part of its ███████████████████ CDK waived DIS fees charged to select dealers'

vendors.  *See* Ex. 11 (Conver Decl.) ¶¶18-19.  ████████████████████████████████

████████████████████████████████████ *Id.*  The program was

designed to █████████████████████████████████████████████ in the

hopes that this would help CDK █████████████████████████████

████████████████████████████████ *Id.* ¶¶19-20.  The

result is that, although the fee waivers were highly individualized, ████████████████

████████████████████████████████ *Id.* ¶22.

*Fortellis*:  A second major competitive change is that CDK introduced a new product:  the

Fortellis Automotive Commerce Exchange ("Fortellis").  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████ *Id.* ¶39.  In September 2022, CDK announced that it will transition 3PA customers

to Fortellis—a process that will complete in 2024.  *Id.* ¶37.  Plaintiffs' experts have not considered

the impact of Fortellis on the prices of the DIS products at issue in this case, CDK's 3PA and

Reynolds' RCI.  *See* Williams Dep. 281:2–283:5; Israel Dep. 212:9–216:21.

*Data Your Way*:  Finally, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████ Conver Decl. ¶48.  ██████████████████████████████

████████████████████████████ *Id.* ¶50.  ████████████

████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* ¶51. ████████████

███████████████████████████████████████ *Id.* ¶52.

The result of all this change over time is that class members who purchased DIS (or indirectly purchased DIS) later-in-time may differ from those who purchased earlier. Class members who did not have fee waivers face injuries different from those who did. Individuals who purchased DIS amidst competition from new competitors may not have paid the same overcharge (or any overcharge) as those who purchased earlier. As discussed below, such changes over time create individualized issues undermining predominance.

### D.     Plaintiffs' Proposed Expert Models

Both class motions rely on their experts' class certification regression models. *See* Haider Rpt. ¶¶86, 101, 107, 119, 125, 127, 288, 321-23 (overview of models). Yet even where the models aim to answer the same question, they reach varying results. *See* App'x C. All of these models are flawed, as discussed in CDK's two *Daubert* briefs (filed contemporaneously herewith).

***Vendor Models***:  The vendors' witness (Dr. Israel) proposes two models estimating a class-wide DIS "overcharge" to vendors. First, he offers a "difference-in-differences" ("DID") model that compares CDK/Reynolds' DIS prices to prices charged by Authenticom. But the DID model estimates an average overcharge only from September 2013 to April 2019. Israel has not updated his DID model since 2019 because, he admits, the model ████████████████████████████ ████████████████████████████ which plaintiffs did not seek. Israel Class Rpt. Ex. C ¶1. Second, Israel proposes a "before/during" model, which compares (i) each defendant's DIS prices in an eight-month period in 2013 (*i.e.*, "before" the alleged conspiracy), against (ii) that same defendant's prices over the following decade (*i.e.*, "during" the alleged conspiracy). Israel previously used this approach only as a sensitivity—having ████████████████ that his DID model was the ████████████████████ *See* Ex. 12 (Israel Dep.) 85:11-86:7.

9

***Dealer Models***:  The dealers' witness (Dr. Williams) proposes numerous regression models.  First, like Israel, Williams proposes DID and before-during models estimating an overcharge to vendors.  Unlike Israel, Williams presents two versions of each model:  one using disaggregated transaction data, and a second using Fisher Price Indices (a more aggregated price measure).  Also unlike Israel, Williams runs his DID models across years for which he lacks control data (from Authenticom and SIS)—precisely what Israel said he ██████████  *See* Ex. 13 (Williams Dep.) 151:21-152:3; Israel Class Rpt. Ex. C.  Second, Williams uses other regression models to estimate "pass-through" rates (*i.e.*, how much of any overcharge did vendors pass downstream to dealers) for ████████ vendors using data that ends, at the latest, in March 2019.  He then calculates an average "pass through" rate for each of CDK and Reynolds that he applies across all DIS transactions for the 11-year class period to calculate damages.  Williams Class Rpt. ¶146; Williams Dep. 256:16-20, 247:20-25.  Separately, he proposes three new "common impact regressions"—two of which only look at vendor data—to attempt to establish injury to "all or nearly all" dealers.  Williams Class Rpt. ¶¶113, 130.

Importantly, all of plaintiffs' models employ "averages" and do not reliably assess injury to individual vendors or dealers.  Haider Rpt. ¶¶86, 101, 107, 119, 125, 127, 288, 321-23.  As explained below and in CDK's *Daubert* briefs, they find injury where none exists and inflate damages in ways that mask distinctions among class members.[3]  None of this is consistent with class certification under governing precedent.

### LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on

---

[3] None of plaintiffs' models are reliable under *Daubert*, but even if the experts are allowed to testify, their models cannot carry plaintiffs' burdens on class certification.  *See In re Rail Freight*, 292 F. Supp. 3d 14, 91 (D.D.C. 2017) (denying certification where model satisfied *Daubert* but still failed to show predominance); *In re Steel*, 2015 WL 5304629, at *9–11 (N.D. Ill. Sept. 9, 2015) (Zagel, J.) (similar).

behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 348. Under Rule 23(a), "to justify a departure from that rule," plaintiffs must show that the litigation is driven by "common questions," which are questions likely to have "common answers" across the class. *Id.* at 348–51. Plaintiffs must also show that the class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Id.* In addition, plaintiffs must meet Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement is "even more demanding" than commonality, *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Predominance and commonality often turn on "antitrust injury," an element of liability that tests if a plaintiff has suffered "injury-in-fact," and, if so, whether that injury is "of the type the antitrust laws were intended to prevent." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 44–45 (S.D.N.Y. 2020). "Common questions of fact cannot predominate" if there is "no reliable means of proving classwide injury." *In re Rail Freight Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013). Likewise, even commonality requires that class members experience the "same injury." *Wal-Mart*, 564 U.S. at 348. Where, as here, plaintiffs claim "class-wide impact and causation" based on "an expert's model," a court "is obliged to rigorously examine the soundness of that model at the class certification stage." *In re Aluminum*, 336 F.R.D. at 46–47; *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *5 (N.D. Ill. Sept. 9, 2015) (court must "scrutinize the evidence before granting certification"). Thus, the key question is one this Court has not examined: do plaintiffs' models give a "common answer" to the question of injury across each class? They do not. For that reason and many others, the Court should deny both motions.

11

## ARGUMENT

## I.    AUTOLOOP'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED.

The Court should deny certification of AutoLoop's proposed Rule 23(b)(3) damages class. The class fails Rule 23(a) and 23(b) requirements because many putative vendor class members signed class-action waivers with CDK. It also fails to satisfy Rule 23(b)'s predominance requirement for additional reasons, including because Israel's own model, when allowed to vary based on vendor characteristics, demonstrates that many vendors were not injured at all.

### A.    Vendors' Class Action Waivers Create Insurmountable Predominance And Adequacy Problems.

Vendors' motion fails at the outset because many more than a quarter of the putative class are parties to 3PA service agreements with CDK that include enforceable class-waiver provisions. Beginning in 2017, CDK's "Third Party Access Agreement,"



See Exs. 14; 15; 16 (Example Agreements) § 13(f). Based on an October 1, 2019 stipulation between CDK and Autoloop, for purposes of this action,

See generally ECF 770 ¶¶1–2.

Id.[4]  This

---

[4] In particular, the stipulation provides that

has significant ramifications for the proposed vendor class: 

*See* Haider Rpt. ¶¶61-62.[5] The ███████

███ have enforceable waiver provisions in their contracts with CDK.[6]

The fact that ███████ putative vendor class members entered into class-waiver agreements renders it impossible for AutoLoop to satisfy Rule 23(b) predominance. Classes cannot "include[] [parties] who entered into agreements … to waive their right to participate in a class action." *Lawson*, 13 F.4th at 913 (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018), and affirming denial of class certification). In turn, courts have repeatedly held that predominance is not satisfied where "potential members of the putative class have signed arbitration and class action waiver agreements, potentially prohibiting them from joining this class action, while others have not," *Spotswood v. Hertz Corp.*, 2019 WL 498822, at *5 (D. Md. Feb. 7, 2019); that circumstance gives rise to individualized inquiries that undermine the "stringent

███████████████████████████████████████

ECF 770 ¶2.

---

[5] AutoLoop cannot argue that CDK waived its right to enforce the waivers as to these vendors. They have not been parties to the litigation, and so CDK has not had occasion to enforce the waiver (or even answer claims) as to them. "While a court may refuse to enforce an arbitration agreement on the ground that the party seeking enforcement has waived its enforcement right against its counter-party, prior to class certification the waiver is party-specific and does not extend to the separate agreements with members of a putative class." 1 McLaughlin on Class Actions § 2:14 (20th ed.); *accord In re Evanston Nw. Corp. Antitrust Litig.*, 2013 WL 6490152, at *4 (N.D. Ill. Dec. 10, 2013) ("NorthShore has [ ] not waived its right to arbitrate against the non-party [putative class members], who could not even be bound by an order to arbitrate even had NorthShore filed a motion to compel arbitration earlier.").

[6] For example, vendor American Marketing & Mailing Services, Inc. first appears in the data in January 2019, ███████████████████████. *See* Ex. 17. The class-waiver provision in that contract is enforceable. *See id.* § 13(f); *see also* Exs. 14-15 (3PA contracts with enforceable class-waiver provisions). By contrast, other vendors signed contracts with class-waivers *after* June 5, 2018, but were members of 3PA *before* that date; those class-waiver provisions are not enforceable. *See, e.g.*, Exs. 18; 19. In sum, individualized inquiry is required to identify which vendors may participate in this action.

predominance requirement in Rule 23(b)(3)," and "prevent[] [plaintiff] from establishing that the class action procedure is … superior," *Tan v. Grubhub, Inc.*, 2016 WL 4721439, at *5 (N.D. Cal. July 19, 2016).  As another court put it last year, "[w]hen certain members of a class are subject to contracts containing an arbitration clause, while other class members are not … the predominance requirement has not been met."  *Hooker v. Citadel Salisbury LLC*, 2023 WL 3020967, at *14 (M.D.N.C. Apr. 20, 2023); *see also Conde v. Sensa*, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018) (individualized issues related to arbitration and class waivers "overshadow[ed] the common issues" and defeated predominance).

Separately, federal courts regularly find that classes including putative plaintiffs with class-waiver agreements founder on Rule 23(a)'s adequacy requirement.  ███████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

AutoLoop may argue that the class waiver is unenforceable, but that argument does not save its motion. To start, ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Regardless, the waiver is enforceable. Class-waiver provisions are enforced unless they are unconscionable. "Under Illinois law, a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both, and the unconscionability of class action waivers must be determined on a case-by-case basis." *Trejo v. Adv. Am., Cash Adv. Centers of Ill., Inc.*, 2009 WL 10713823, at *2 (N.D. Ill. June 23, 2009). There is no procedural unconscionability here: even adhesion contracts (which these are not) are enforceable where the signer is "able to read the [relevant] [p]rovision," and where it is provided in conspicuous text written in all-capital-letters. *Id.*; *R.O.W. Window Co. v. Allmetal, Inc.*, 856 N.E.2d 55, 58 (Ill. 2006) (disclaimer in capital letters enforceable). ████████████████████████████

████████████████████████████ *Santangelo*, 2017 WL 6039903, at *5.

There is also nothing substantively unconscionable about these class waivers, especially where plaintiffs' purported damages are large enough to make pursuing individual claims or

15

arbitration worthwhile. *See Niiranen*, 2022 WL 103722, at *8 (class waiver enforceable where plaintiffs sought in excess of $75,000 in damages); *Copello v. Boehringer Ingelheim Pharm. Inc.*, 812 F. Supp. 2d 886, 896–97 (N.D. Ill. 2011) ("The magnitude of [plaintiff's] claimed damages, together with the attorney fee provision, leaves [plaintiff] eminently capable of attracting counsel to help vindicate her individual claims."); *Montgomery v. Corinthian Colls., Inc.*, 2011 WL 1118942, at *5 (N.D. Ill. Mar. 25, 2011) ($13,277 average claims not "cost-prohibitive" in individual arbitration). Here Israel estimates that vendors' ***individual*** damages ranged up to █████ with most vendors' damages in the ████████████████████. *See* Israel Class Rpt. Ex. C Tbl. 2. Such sizeable damages (as well as the antitrust laws' treble damages provisions) make individual claims practicable. Nor can plaintiffs argue that the antitrust laws themselves render a class-waiver provision invalid: as a federal court recently noted in rejecting that argument, "[t]he antitrust laws do not evince an intention to preclude a waiver of class-action procedure." *Yuen v. Idexx Lab'ys, Inc.*, 2024 WL 83351, at *8 (D. Me. Jan. 8, 2024).

## B. AutoLoop Does Not Show That Antitrust Injury Is A Common Question.

It is well accepted that "[w]ithout common proof of injury and causation, [antitrust] plaintiffs cannot establish predominance." *In re Aluminum*, 336 F.R.D. at 45 (citing 1 McLaughlin on Class Actions § 5:36 (16th Ed.)). Indeed, if the "answer" for whether a class member is injured varies, then commonality under Rule 23(a) is not met. *Wal-Mart*, 564 U.S. at 348-52. Relatedly, as plaintiffs' own cited case makes clear, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012); *see also Hansen*, 2023 WL 6291629, at *28–29 (denying certification where 44% of class members "suffered no injury"); *In re Intuniv Antitrust Litig.*, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019) (same, where "[u]ninjured consumers likely comprise at least 8% of each putative class, and perhaps

16

considerably more"). Classes containing uninjured class members raise constitutional concerns as well: the Supreme Court has emphasized that "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC*, 141 S. Ct. at 2208; *see also Moss v. United Airlines, Inc.*, 20 F.4th 375, 379 n.7 (7th Cir. 2021) ("When the class definition sweeps within it individuals who could not have suffered injury, it is too broad …. [T]he advent of *Transunion* sets the stage for a renewed examination of the intersection of the demands of Article III and the requirements of Rule 23.").

### 1. Israel's Bald Assertions Cannot Establish Common Injury.

AutoLoop's expert (Dr. Israel) fails to meaningfully assess classwide injury. Israel asserts that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Israel Dep. 54:3–55:19. This is so, he claims, even if a vendor ███████████████████████ ███████████████████████████████████████████. *Id.* at 75:21–76:15. Thus, Israel asserts that buyers in any market subject to any conspiracy are *always* injured. If credited, his assertions would make injury a common question in nearly any antitrust case.

As discussed in the accompanying *Daubert* brief, Israel's approach is wrong as a matter of law. An antitrust *violation* is not the same as antitrust *injury*: an antitrust plaintiff must "present … evidence that, as a consumer, it paid a monopoly or above-the-market price." *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994).[7] As in prior cases where his opinions were rejected, Israel's approach reveals a basic "misunderstanding and misapplication of antitrust concepts" and his opinion regarding common injury, which is "based on false assumption[s]," does not carry plaintiffs' burden on class certification. *Compare United*

---

[7] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

*States v. Am. Airlines Grp., Inc.*, 2023 WL 3560430, at *24–25 (D. Mass. May 19, 2023) (giving "no weight" to "Dr. Israel's opinions").

### 2. Israel's Overcharge Model Demonstrates That A Great Many Vendors Were Uninjured.

Vendors cannot fall back on Israel's regressions to show common injury. *See* App'x C (summary of models). As an initial matter, Israel acknowledges that he "cannot update" his DID model—his "base model"—to use data after mid-2019 because he does not have control data after that time. Israel Class Rpt. Ex. C ¶1. As for Israel's "sensitivity" model using the before/during approach, Dr. Haider explains that the model does not test whether injury is a common question; instead, it ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Haider Rpt. ¶131.

Haider's work shows why Israel and AutoLoop have imposed this straitjacket: permitting the model to vary by class member reveals a "great many uninjured" vendors. *Messner*, 669 F.3d at 825; *Hansen*, 2023 WL 6291629, at *28–29. For example, Israel lumps together "large" and "small" vendors (in terms of total DIS fees paid). Haider Rpt. ¶141. Yet when Haider allows the estimated overcharges to vary across the two groups of vendors (*i.e.*, large vs small), for CDK, the estimated overcharge for ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████ *Id.* ¶142 (emphasis added). This result is unsurprising: in general, smaller vendors tended to purchase basic DIS with smaller price increases. *Id.* ¶146. Applying this result to the ████ vendors that purchased from CDK during the class period means that approximately ████ of those vendors were uninjured. Of those, ████—approximately 60% of the putative proposed vendor class—purchased *only* from CDK in the proposed class period and, thus, would not have sustained any injury from CDK *or* Reynolds in the proposed class period. *Id.*

¶143.

In addition, as the accompanying *Daubert* brief explains, Israel estimates an overcharge based on a small sample of vendors. Even within that sample, when Haider allows Israel's estimated overcharge to vary among vendors, she finds **no injury** to ██████████████████ ████████████████████████████████████████████. Haider Rpt. ¶165. Such a great many uninjured vendors precludes class certification. *Hansen*, 2023 WL 6291629, at *28–29. The small sample size does too: another court of appeals recently affirmed denial of class certification where a model was based "solely on a portion" of data, and "excluded data from two truck manufacturers, whose sales comprised over forty percent of the [total]." *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 679 Fed. Appx. 135, 140 (3d Cir. 2017). The expert's model was thus "insufficient to demonstrate class-wide impact." *Id.* at 141.

## C. Israel's Model Cannot Assess Impact <u>Or</u> Damages On A Classwide Basis.

It is no surprise that Israel's model masks so many uninjured class members: his "average" overcharge cannot show, one way or the other, whether antitrust injury (or damages) are subject to the same common "answer" in this case. As Haider explains, ████████████████████ ████████████████████████████████████████████ Haider Rpt. ¶132 (citing economics literature), ¶158. Thus, courts deny class certification where averages "glide[] over what may be important differences" in class members and "hide substantial variation across individual cases, which may be key to determining whether there is common impact." *Reed*, 268 F.R.D. at 591 (denying class certification); *see also In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321, 324–25 (N.D. Cal. 2014) (same where average "ma[de] no attempt to establish, but instead simply assume[d], class-wide impact"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494–95 (N.D. Cal. 2008) (similar). Although averages "may be acceptable where they do not mask individualized injury," courts "abuse[] [their] discretion" if they "assume[],

absent a rigorous analysis, that averages are acceptable" in a given case.  *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (vacating class certification).  Another court in this District put it well: where a "single, average estimated overcharge" fails to account for "[t]he realities of the [relevant] industry," then it "cannot be used, on a common basis, to measure accurately what impact, if any, each member of the class experienced as a result of the alleged conspiracy"—even where, unlike here, the expert also sought to "verify" the average by "assess[ing] impact on an individual basis."  *In re Steel*, 2015 WL 5304629, at *9, *11 (Zagel, J.).[8]



Haider Rpt. ¶¶147-52; *In re Flash Memory Antitrust*, 2010 WL 2332081, at *11 (N.D. Cal. June 9, 2010) (rejecting "one-size-fits-all construct" in light of different products).

*Id.* ¶62.

---

[8] In addition to failing to show whether injury is a common question, Israel's average model also cannot be used to measure damages.  Although a class may be certified where members sustained different *amounts* of damages, plaintiffs must still present a valid *method* for calculating those amounts—they must "establish[] that damages are capable of measurement on a classwide basis."  *Comcast*, 569 U.S. at 34; *see also Reed*, 268 F.R.D. at 593 (denying certification, where average model was not a reliable "method for proving… damages on a class-wide basis").  Israel's uniform average fails to account for material differences in (and so provides no method for calculating) vendors' damages here.

As a result, Israel attributes damages where there are none and demonstrably overstates the overcharge for many vendors. To take just a few examples:



Indeed, Israel candidly admits that ███████████████████████████████████████████
██████████████████████████████████████ Israel Dep. 117:4-6.

Instead, the only way to derive a vendor's supposed but-for price is to credit and apply Israel's average overcharge—a figure that, he asserts, ████████████████████████████
█████████████ Israel Reply Rpt. (ECF 889-8) ¶27. Yet that "expose[s] the regressions' fundamental failure: Plaintiffs must show that individual injury is capable of proof common to the class, but Dr. [Israel]'s regressions tell us nothing about individual class member experience." *In re Plastics Additives*, 2010 WL 3431837, at *15–19 (E.D. Pa. Aug. 31, 2010) (denying class certification, where aggregate result did not necessarily "represent any individual class members' pricing experiences"). AutoLoop, moreover, offers no way to litigate individualized defenses in a single class trial—there is no explanation for how CDK would be permitted to raise individualized

examples (like those above) that may not fit Israel's regression. And yet that too is fatal to class certification: "a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) (same). As this Court put it in *Hansen*, class certification must be denied where "[n]owhere do Plaintiffs explain" how they could separate uninjured vendors from the class, much less "how the court could do so with common evidence." *Hansen*, 2023 WL 6291629, at *28 (Pallmeyer, J.).[9]

Nor, finally, is AutoLoop correct that "any class member could use [its expert's averages] to establish all the elements of its claim in an individual trial." Vendor Br. (ECF 1422-1) 10 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 455 (2016)). *Tyson Foods* dealt with similarly situated workers in the same plant, and it permitted certification using "representative evidence" only "in the FLSA context, a unique labor situation in which, often due to inadequate record keeping, a representative sample [of employees] may be the only feasible way to establish liability." *Lamictal*, 957 F.3d at 191. *Tyson Foods* thus does not purport to require class certification whenever an expert puts forth a statistical average in typical non-FLSA cases. Thus if a plaintiff who did "52 washes per year" "brought an action against Whirlpool, it is unlikely that he would be permitted to use the average energy expenditures of someone who does 392 cycles per year as a proxy for his own energy use …. He would have to submit his own evidence." *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *12 (D.N.J. Dec. 20, 2017) (distinguishing *Tyson*); *see*

---

[9] For the same reason, AutoLoop's reliance on cases like *Kleen Prods, LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016), and *Messner*, 669 F.3d 802, is misplaced. *Kleen* involved a much simpler market for containerboard, "sold in standardized compositions," with prices "not tailored" to different purchasers; 96% of prices were tied to an index. 831 F.3d at 923-24, 925, 928. And *Messner* was a merger case where defendants' own expert admitted to a "price increase of nine to ten percent." 669 F.3d at 809. Neither of these cases solves AutoLoop's problem here: unpacking Israel's average shows that many vendors faced a negative overcharge, no overcharge, or no statistically significant overcharge at all.

*also Brown v. DirecTV, LLC*, 2022 WL 1591325, at *6 n.11 (C.D. Cal. Mar. 31, 2022) (distinguishing *Tyson*; "representative evidence" that "only works to show [a] percentage … in the aggregate" cannot "prove up a factual matter in an individual case"); *Kotsur v. Goodman Global, Inc.*, 2016 WL 4430609, at *7 (E.D. Pa. Aug. 22, 2016) (similar). Indeed, the expert in *Tyson* at least explained how to identify uninjured class members—he sorted out "212 employees [who] did not meet the 40-hour threshold and [so] could not recover." 577 U.S. at 450–51. But Israel's average model contains no similar safeguard. As another court put it, class certification should be denied where plaintiff makes no "showing that each [putative class member] in the proposed classes could have relied on the aggregate statistical evidence … to prove but-for causation." *In re Celexa*, 315 F.R.D. 116, 128 (D. Mass. 2016). That is exactly the case here.

## II. DEALERS' MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED.

The dealer plaintiffs' proposed classes fail for similar and additional reasons. Like vendors, many dealers signed class waivers. In addition, dealers (indirect purchasers) face the difficult burden of showing not only that an overcharge to vendors (direct purchasers) is a common question, but also that pass-through of the overcharge to dealers can be assessed classwide, which they cannot show. Separately, the dealers' nationwide and 26-state "State Law Damages" classes fail for choice-of-law reasons, and their fallback state-by-state classes are plagued by adequacy and typicality problems. In the end, certification of all requested dealer classes should be denied.

### A. All Dealer Classes Fail Rule 23(b)(3).

#### 1. Many Dealers Also Signed Class Action Waivers.

All dealer classes should be denied because they face numerous fatal predominance problems. First, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



*See* Ex. 20. ▮▮▮▮▮▮▮▮ proposed representatives agreed to a class waiver. *See* App'x A.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[10]  Conver Decl. ¶8.  As with vendors,

individualized questions regarding putative class members would predominate across the proposed

dealer classes.  Similar adequacy problems also prevent certification.[11]

Challenges to the class waivers' enforceability would present only more individualized

inquiries undermining predominance.  Although dealers that are bound by the waivers might

▮▮▮▮▮▮▮▮▮▮▮▮ at least have standing to bring those challenges, they would fail.  The provision

is stated in conspicuous all-caps text and is not procedurally or substantively unconscionable,

given that individual proceedings are sufficient fora for the dealers' claims.  *See* Part I.A, *supra*;

---

[10] The waiver provision also applies even retroactively: where, like here, "the class-action waiver itself provides that Plaintiffs waive their right to initiate or participate in *any* class action brought against [defendant]," class participation is barred "no matter when th[e] claims arose." *Niiranen v. Carrier One, Inc.*, 2022 WL 103722, at *8 (N.D. Ill. Jan. 11, 2022); *Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 2020 WL 919464, at *14 (S.D. Ind. Feb. 26, 2020) (applying class waiver to "disputes … that arose *before*").

[11] Representatives that *did* sign waivers cannot adequately represent the class, *Korea Week, Inc. v. Got Cap.*, 2016 WL 3049490, at *111 (E.D. Pa. May 27, 2016), while dealers that did *not* sign (and so are not bound) also cannot adequately represent dealers that *are* bound, *see* Part I.A.  CDK has not waived arbitration as to non-party putative class members, *see* n. 5, or as to the nine new dealer representatives who have not sued CDK via any amended complaint.  Even if *arbitration* were inappropriate, the *class waiver* would still be enforceable.  It specifies that even a "lawsuit" or "other legal proceeding" must proceed "on an individual basis only," not a class or "private attorney general capacity."  *See* Ex. 20.  Such language is enforceable "independent of … arbitration."  *Naranjo v. Nick's Mgmt.*, 652 F. Supp. 3d 737, 752 (N.D. Tex. 2023); *Figueredo-Chavez v. RCI Hosp.*, 2022 WL 457848, at *3–4 (S.D. Fla. Jan. 6, 2022).

*Niiranen*, 2022 WL 103722, at *8 (enforcing waiver); *Copello*, 812 F. Supp. 2d at 896–97; *Montgomery*, 2011 WL 1118942, at *5. Williams claims that ███ CDK dealers incurred over ████████ in damages, amounting to an average of over ████ per individual. Williams Class Rpt. ¶¶113, 148. Given the purported value of these claims, requiring dealers to proceed individually is not unconscionable, as courts found in in prior cases enforcing similar provisions.

### 2. Dr. Williams' Models Cannot Reliably Address Injury and Damages on a Classwide Basis.

Dealers also face predominance obstacles associated with injury and damages. Unlike vendors, dealers face a "two-fold" burden related to antitrust impact and predominance: "not only must they show that all or nearly all of the [vendors] … bought at inflated prices, they must also show those overcharges were passed through all stages of the distribution chain." *In re Optical*, 303 F.R.D. at 324.[12] To satisfy this burden, dealers rely on three sets of models that their expert says measure (a) overcharges to vendors, (b) pass through of overcharges to dealers, and (c) the percentage of vendors and dealers that suffered "common impact." But none of Dr. Williams' models establish that all or nearly all purchasers (vendor or dealer) were impacted—each employs averages that mask individualized issues, including that many individuals were not harmed at all.

#### a. Dr. Williams' Overcharge Models Do Not Establish Classwide Injury To Vendors Or Damages To Dealers.

Like Dr. Israel, Dr. Williams uses DID and before/during regression models to estimate the average overcharge to vendors purchasing DIS from CDK and Reynolds. But just like with Israel, Williams' models produce only average results and do not test whether any given vendor

---

[12] If the Court denies certification as to the vendor class because impact as to the vendors is not a common question, then class certification must be denied as to the dealers, *a fortiori*, as well. The same individual inquiries affecting the vendor class also bar the dealer classes because obstacles to the vendor class prevents dealers from establishing common injury farther down the supply chain. But even if the Court certifies a vendor damages class, "certification of an indirect purchaser class would not follow." *Id.* at 325.

actually paid an overcharge.  Haider Rpt. ¶¶101, 107, 125, 127; *see supra* Part I.C.  Just like Israel, Williams ignores the distinctions that matter for antitrust impact, including the relative amount (Haider Rpt. ¶¶222-27), type (*id.* ¶¶228-32), and timing (*id.* ¶¶233-36) of vendors' DIS purchases. Unlike Israel, Williams runs some of his models using aggregated prices, known as "Fisher Price Indices," as opposed to individual prices, which does *even more* to obscure variation among vendors. Haider Rpt. ¶¶93-94, 97-101, 122-25.  Courts have held that aggregated "Fisher indexes" like this cannot provide "common proof of class-wide impact."  *In re Optical*, 303 F.R.D. at 324.  This is for good reason:  a Fisher Price Index forecloses the kind of vendor-level testing that Dr. Haider performs to reveal that a great many vendors—up to 60%—were not injured.[13]  Haider Rpt. ¶¶222-32.

Williams' overcharge models suffer from other fundamental methodological problems that render them unreliable.  ***First***, Dr. Williams cannot reliably apply his "difference-in-differences" model to find a class-wide overcharge for the 2015 through 2023 period because he lacks the data required by that model.  *See* Williams Daubert at 9.  Williams ███████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████  Williams Dep. 158:1-14, 159:9–25.  CDK's expert and AutoLoop's expert both agree: a DID model cannot be reliably updated without control group data.  *See* Haider Rpt. ¶¶89-90, 97-99, 275-79; Israel Class Rpt., Ex. C ¶1 ████████████████████

██████████████████████████████; Israel Dep. 126:13-127:4 ██████████████████████

████████████████████  Since this is the model that dealers rely on to calculate damages, this flaw alone precludes class certification.[14]  ***Second***, Williams' overcharge analyses arbitrarily eliminate

---

[13] Williams' own analyses find no overcharge to vendors who purchased from CDK between September 2013 and February 2015, even though dealers that purchased from CDK vendors in that period are in the putative class.  *See* Haider Rpt. ¶ 312 FN 519; Williams Class Rpt. at 47 Tbl. 2.

[14] Williams' before/during model, which he uses as a "robustness check," cannot assess damages on a class-wide basis either.  This model suffers from greater reliability issues than Dr. Israel's similar model because Williams does not control for time-varying economic factors, like inflation.  *See* Williams Daubert at 10.

all DIS fee data below $20—including more than ███ zero-dollar transactions resulting from fee waivers in and after 2019, Haider Rpt. ¶¶212-18, Figure 21.

Ultimately, using the FPI version of his DID model, Williams calculates a ███ overcharge to CDK vendors for the 2015 to 2023 period, which is ██ percentage-points higher than the overcharge that Dr. Israel calculates for the exact same group using a different model. *See* App'x D. His bloated and inconsistent results expose his method for what it is: an unreliable basis for measuring overcharge and unsuitable for establishing classwide injury or damages.

### b. Dr. Williams' Pass-Through Models Cannot Be Used To Establish Classwide Injury Or Damages To Dealers.

Even if Dr. Williams could establish an overcharge to all or nearly all vendors (he cannot), his analysis fails at the next step: his "pass through analyses" do not and cannot show that an overcharge was "passed through" to all or nearly all dealers, let alone at a common rate. Williams applies his "pass through regressions" to calculate pass-through rates for ██ vendors ██████ ███ *See* Haider Rpt. ¶¶287-88; Williams Class Rpt. at 51 Tbl. 3. Using his separate vendor pass-through rates, he then calculates one weighted average pass-through rate for CDK ████ and one for Reynolds vendors ██████, that he uses to calculate damages. *Id.* In effect, Williams uses ██ vendors to calculate damages for ██████ + dealers across the dealer class. *Id.* ¶¶298-94.

To be clear, Williams' average pass-through rates do not examine whether individual dealers experienced pass through. *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 159–60 (E.D. Pa. 2015) (averages "cannot account for" pass-through at the "individual" level, including where there is "no pass-through … at all."). In fact, when Williams' assessment is broken down to the dealer level (something he does not do), his own pass-through regressions undermine his claim of class-wide impact. ***Over ████ of CDK dealers that purchased from the vendors at issue had no positive and statistically significant pass-through—that is, were not injured at all***. Haider

Rpt. ¶¶302-04. Dealers have no way to sort out these uninjured class members, precluding class certification. *Hansen*, 2023 WL 6291629, at *28.

Williams also assumes, without basis, that he can extrapolate average pass-through rates classwide. This is fatal to class certification. *See In re Optical*, 303 F.R.D. at 324 (denying certification where plaintiffs did not "persuasive[ly]" explain "why it would be reasonable to assume a uniform pass through rate"). His pass-through analyses involve ███████ of vendors from a non-random sample. Haider Rpt. ¶289. Unlike other vendors, those in his study are unique in that they broke out integration fees to dealers in their sales data. In addition, the data that he uses to arrive at his average pass-through rates **end in March 2019 (at the very latest),** and overall, the purchases account for only 20% of DIS transactions in the class period. *Id.* ¶297. Even within his small vendor sample, pass-through rates varied widely from ███████████.[15] *Id.* ¶¶287-88. Despite these limitations and indicia that the sample is unrepresentative, he pushes ahead and applies his average pass-through rates to all vendors for the entire 10+-year period.

This not enough to bear indirect purchasers' predominance burdens. In *Egg Products*, the court rejected certification where an expert "improperly assume[d], without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers nationwide shared that overcharge rate or, at least, passed along some positive overcharge." 312 F.R.D. at 159–60; *see also In re Flash Memory*, 2010 WL 2332081, at *12 (denying certification where plaintiffs' "regressions d[id] not distinguish" between different "products in any manner, but simply assume[d] that the pass through rates for all [of them] [we]re the same and [we]re equal to the average"). The same result is warranted here: Williams has not

---

[15] As noted in CDK's *Daubert* brief, Williams' attempt to estimate pass-through rates ███████ is independently impermissible. Damages cannot exceed those purportedly caused by CDK's conduct.

shown that his pass-through rates can be applied to the vendors and years he did not study.

### c. The "Common Impact Regressions" Also Do Not Show Classwide Injury.

The same reliance on averages infects Williams' last attempt at showing injury. Williams purports to show classwide injury via more regressions (his self-described "common impact regressions"). But these models manufacture only the appearance of common impact. The models fail because they take, as their starting point, the results of Williams' flawed overcharge models (described above). Haider ¶318; Williams Daubert at 15. Williams applies averages to estimate each purchaser's "but-for" price—that is, he assumes that CDK and Reynolds (1) inflated prices to all purchasers and (2) did so at the same rate for all purchasers in a given period. *Id.* Then, to "test" for supposed injury, he compares these "but-for" prices to prices actually paid. The methodology is circular: it cannot **prove** "common impact" because it **assumes** it (*i.e.*, by applying an aggregate overcharge at step one). Like the averages they depend on, the common impact models "tell us nothing about individual class member experience" and so "cannot serve as proof of impact common to the class members." *In re Plastics Additives*, 2010 WL 3431837, at *15.

The models also fail to show "common impact" to dealers because, with one exception, they relate only to fees paid by vendors. Haider Rpt. ¶340. Even if these vendor models were reliable (they are not), injury to direct purchasers does not automatically show injury to indirect ones. *In re Optical*, 303 F.R.D. at 324. As the *Daubert* brief explains, the only set of "common impact regressions" that actually addresses the dealers suffers from crippling sample problems: it relies on limited data for just ███ vendors, one of which charged DIS fees to just one dealer in the benchmark period. Haider Rpt. ¶346. Notably, this model finds injury to dealers even in periods where the corresponding "vendor" model finds *no injury* to vendors. *Id.* ¶355. In sum, based on a small slice of data, the "common impact regressions" find injury to dealers whenever there is

injury to vendors—and even when there isn't. Such unreliable and circular analyses cannot show common impact. *In re Aluminum*, 336 F.R.D. at 49.

### B. Each Separate Proposed Dealer Class Fails For Additional Reasons.

Dealers' proposed classes—a nationwide class seeking damages under Illinois law, a "State Law Damages Class" seeking damages under the laws of those 26 states, 26 state-specific damages classes, and an injunctive relief class—each fail for additional class-specific reasons.

### 1. The Nationwide Class Fails Due To "Repealer" And "Non-Repealer" States' Different Treatment Of *Illinois Brick*.

Under Rules 23(a) and (b)(3), "[n]o class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone*, 288 F.3d 1012, 1015 (7th Cir. 2002). Differences in state laws "cut strongly against nationwide classes." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 674 (7th Cir. 2001); *Siegel*, 256 F.R.D. at 583 ("It is well-established under Seventh Circuit case law … that if the states' laws differ, class certification is improper."). "The burden of proof on the requirement that choice of law and conflict of law issues not present any predominance or manageability issues rests squarely with the plaintiff." *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 332 (S.D. Ill. 2009). Yet here, only 26 jurisdictions have repealed *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). "Non-repealer states do not allow indirect purchasers to bring antitrust damages suits, while repealer states—like [Illinois]—do." *Stromberg*, 14 F.4th at 1068. This material difference in state laws precludes the nationwide class. *Id.*; *In re Graphics Processing Units*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) (denying nationwide class).

The dealers cannot avoid this problem on the theory that the Court should simply apply Illinois law to the claims of class members in all fifty states. Dealer Br. (ECF 1425) 14. To the contrary, Illinois choice-of-law principles dictate that each class member's claim be governed by its home state's law. MDL courts apply "the choice-of-law rules of [a class member's] originating

jurisdiction." *Looper v. Cook Inc.*, 20 F.4th 387, 390 (7th Cir. 2021). Where a named plaintiff "direct-file[s]" into the MDL, then its claim is "treated as having originated" in the state where that plaintiff purchased the defendants' product—the "forum the individual complaint … would have been brought in," had there been no MDL. *Id.* at 392–93. The two nationwide representatives—Continental Autos, Inc. and Continental Classic Motors, Inc.—are both located in Illinois, and both direct filed as part of the dealers' consolidated complaint. ECF 184 ¶¶30, 31. Illinois choice-of-law rules apply, as dealers concede. Dealer Br. 14.

Illinois, in turn, has "adopted the most significant relationship test for deciding among conflicting laws." *Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 914 (N.D. Ill. 2013). "Under this test, the law of the place of the injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.* In consumer-products cases, courts hold that "the law of the place of purchase controls," because that is "where consumers received and relied upon … representations" and because "plaintiffs' purchases … occurred in plaintiffs' home states." *Daly v. Glanbia Performance Nutrition*, 2023 WL 5647232, at *3 (N.D. Ill. Aug. 31, 2023) (collecting cases); *In re Bridgestone*, 288 F.3d at 1017 ("the injury is decidedly where" the product was purchased, "rather than where the seller maintains its headquarters"); *Siegel*, 256 F.R.D. at 585–86 (rejecting nationwide class and applying substantive law of home states).

Antitrust cases applying the most significant relationship test similarly hold that indirect purchasers' claims are governed by the laws of the state where they purchased the product. The purpose of allowing indirect purchasers "to sue is to protect individual plaintiffs," which "weighs in favor of choosing the law of the state in which the individual plaintiffs were injured." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 587 (E.D. Tenn. 2014) (applying Tennessee's test and rejecting nationwide indirect purchaser class); *see also In re Flonase Antitrust*

*Litig.*, 815 F. Supp. 2d 867, 883 (E.D. Pa. 2011) (indirect-purchaser health-insurance companies' claims governed by laws of the states where insured plan members purchased the product). In this case, where dealers indisputably purchased DIS in their home states, those myriad state laws apply.

The dealers provide no compelling reason for departing from the law of the "place of injury"—their various respective home states. *Adkins*, 973 F. Supp. 2d at 914. At best, they argue that Illinois has an interest in applying its law to entities domiciled "within its jurisdiction," Dealer Br. 12 (citing *Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840 (Ill. 1987)), but as other courts have explained in cases addressing purportedly overpriced products or services, even where a defendant "is domiciled in Illinois," the "relationship would be centered where *plaintiffs* are domiciled, which would be in all fifty states." *In re Trans Union Corp.*, 211 F.R.D. 328, 343 (N.D. Ill. 2002). Plaintiffs' *Martin* case does not discuss the most significant relationship test at all, and federal courts including the Seventh Circuit have continued to reject purported nationwide classes brought against Illinois defendants. *See, e.g.*, *Daly*, 2023 WL 5647232, at *3 (rejecting Illinois nationwide class despite "defendant … headquartered in Illinois"); *In re Bridgestone*, 288 F.3d at 1017. And *Martin* also emphasized that there, all class members had an agency relationship with the defendant, which "became binding only upon [an agreement's] receipt and approval by defendant at its Chicago office." 510 N.E.2d at 847. Here, *vendors* (not CDK/Reynolds) charge dealers DIS fees, and many vendors—Reynolds vendors—do not have a relationship with CDK at all (let alone an agency one). Numerous dealers thus "indirectly purchased Data Integration Services" only "from … The Reynolds and Reynolds Company." Dealer Mot. 1. And Reynolds is headquartered in *Ohio*, underscoring the limited relationship Illinois has to the class members' injuries here.

*In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812 (E.D. Mich. Dec. 20, 2019), cited by dealers, proves the point. There, the court approved a settlement class allowing claimants "to

32

invoke state antitrust laws favorable to the claimant based on the laws of the state *in which the injury was sustained*." *Id.* at *2. Here, dealers do not assert they made any relevant purchase outside their home states. *Avery v. State Farm Mut. Auto. Ins.*, 835 N.E.2d 801 (Ill. 2005) is no help either—that case held that "the circuit court erred in certifying a nationwide class that included class members whose claims proceedings took place outside Illinois." *Id.* at 856.

In the end, dealers attempt to avoid Illinois choice-of-law rules entirely by arguing that "CDK's DMS contract features an Illinois choice-of-law clause," purportedly requiring the application of Illinois antitrust law across the board. Dealer Br. 14. But *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533 (7th Cir. 2011), cited by dealers, recognizes that "a choice-of-law clause is not dispositive" of statutory claims "independent of the contract." *Id.* at 537. To the contrary, it is "problematic" to use a choice-of-law clause to "frustrate some policy of…another state." *Id.* at 537–38; *see Stromberg*, 14 F.4th at 1068–69 (noting states' interests in applying own antitrust laws).

Courts applying Illinois law instead "examine the breadth and language of the choice-of-law provision to determine whether the parties intended the choice-of-law provision to govern all claims between them." *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002). Absent an "indication that the parties intended the choice of law provision to apply to issues other than contract interpretation and enforcement," the provision controls only contract claims. *Platinum Cmty. Bank v. Marshall Invs. Corp.*, 2008 WL 4866343, at *4 (N.D. Ill. July 29, 2008). Such an "indication" usually arises via language "covering all claims 'arising out of' or 'relating to' an agreement." *Beaton v. SpeedyPC Software*, 2023 WL 2711416, at *6 (N.D. Ill. Mar. 30, 2023); *Walker v. Bankers Life*, 2007 WL 967888, at *3 (N.D. Ill. Mar. 28, 2007). Yet here, the choice-of-law clause governs only ████████████████████████ ████████████████████████████████████ *See* Ex. 20 § 11(b). Notably,

33

CDK's DMS contracts also do not even govern the relevant transactions—CDK was not a party to the dealer-vendor transactions that dealers claim led to passed-on overcharges.

Because each dealer's claim is governed by the law of its home state—where it purchased and used vendors' apps, and, indirectly, DIS—dealers' nationwide class cannot be certified. *Daly*, 2023 WL 5647232, at *3; *In re Trans Union*, 211 F.R.D. at 343; *Siegel*, 256 F.R.D. at 585–86; *In re Skelaxin*, 299 F.R.D. at 587. The claims of class members in repealer and non-repealer states are not "governed by the same legal rules," so "[n]o class action is proper," and plaintiffs' request to certify a nationwide class must be denied. *In re Bridgestone*, 288 F.3d at 1015; *In re Fluidmaster, Inc.*, 2017 WL 1196990, at *52 (N.D. Ill. Mar. 31, 2017); *see also In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 24 (D. Mass. 2004); *In re Graphics*, 527 F. Supp. 2d at 1028.

### 2. Dealers' 26-State Class Fails Due To Other Differences In State Antitrust And Consumer Protection Laws.

Plaintiffs also seek to certify a 26-state class of dealers located in "repealer" states. *See* Dealer Mot. 2. This fallback class seeks relief "in accordance with the laws of twenty-six separate jurisdictions." *Id.* But "[e]ven among the repealer states, there are significant variations in the scope of repealer laws. For instance, state repealer laws vary as to the type of law the repeal applies to; who can sue for damages; and the amount or type of damages indirect purchasers can recover." *Stromberg*, 14 F.4th at 1068–69; *see also* App'x E (summarizing these and other state-law distinctions). This independently renders class certification inappropriate.

***Pass-On***: In some states, an indirect purchaser (*i.e.*, dealers) forfeits damages by passing its overcharge downstream (*i.e.*, to automobile purchasers). Utah presumes that "in the absence of proof to the contrary … each level in a product's or service's distribution chain passed on any and all increments in its cost … caused by a violation of this chapter." Utah Code § 76-10-3109(7)-(8). California and Hawaii allow a similar defense. *TFT-LCD (Flat Panel) Antitrust Litig.*, 2012

WL 6709621 (N.D. Cal. Dec. 26, 2012); Haw. Rev. Stat. § 480-13(c)(2).

***Statutes of Limitations***:  Some states follow the Sherman Act's four-year statute of limitations, while others employ 3- or 6- year periods.  *See* App'x E.

***Enhanced Damages***:  Some states permit treble or enhanced damages, others do not, and still others permit them only sometimes.  Some states make treble damages automatic, others make them discretionary (often requiring "flagrant" or "willful" conduct), and still others (like Mississippi or Nebraska) do not allow trebling at all.  Notably, educating the jury about its discretion to enhance damages in some states (Arizona, Michigan, and North Dakota) may be prejudicial in others were enhanced damages are not allowed.  *See*, *e.g.*, *Wielgus v. Ryobi Techs., Inc.*, 2012 WL 1853090, at *6 (N.D. Ill. May 21, 2012) (evidence relevant to punitive-damages may have "unfairly prejudicial impact" where "not relevant").  There is a conflict between class members whose claims *require* an enhancement instruction and others whose claims *prohibit* it.

***Consumer Protection Laws***:  As to the 11 states where dealers bring claims under consumer protection (rather than antitrust) laws, the differences are stark.  Courts reject attempts to certify broad multistate consumer protection classes: "[S]tate consumer fraud laws differ with regard to several key issues—the type of prohibited conduct, proof of injury-in-fact, available remedies, scienter, statute of limitations, and reliance."  *Siegel*, 256 F.R.D. at 585 (collecting cases rejecting multistate or nationwide consumer-protection classes); *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012) (vacating nationwide consumer protection class, where differences are "not trivial").  West Virginia, Alaska, and Wisconsin's consumer-protection statutes also do not even reach antitrust conduct for indirect purchasers.  *See* App'x E.

"As the Seventh Circuit has explained," even "nuance in the law is important and must be respected."  *Siegel*, 256 F.R.D. at 584 (discussing *In re Rhone-Poulenc*, 51 F.3d at 1300).  And

any doubts on this issue run against class certification. Plaintiffs "make no attempt to show that predominance could be satisfied" if they applied 26 separate states' laws. *In re Fluidmaster*, 2017 WL 1196990, at *54; *Cunningham*, 258 F.R.D. at 332–33. Absent that showing, they fail to carry their burden and their 26-state class cannot be certified.

### 3. Individual State Law Classes Fail Under Rule 23(a).

As yet another fallback, dealers assert that if the Court rejects either a nationwide or multistate class, then "twenty-six individual state law classes can be certified." Dealer Mot. 2.

These classes also fail Rule 23(a) for multiple independent reasons. ***First***, nine such classes—"Alaska, Colorado, Iowa, Maine, New Hampshire, Rhode Island, South Dakota, Utah, Wisconsin do not currently have a proposed named Class Representative." *Id.* They have no representative at all, much less an adequate or typical one. *See* Fed. R. Civ. P. 23(a). Nor can plaintiffs from other states represent these nine classes. It is a basic rule that "a class representative must be part of the class." *Wal-Mart*, 564 U.S. at 348; *see also Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, 2019 WL 2428631, *6 (S.D.N.Y. 2019) (plaintiff not part of class "cannot be appointed as a class representative"). ***Second***, 14 states do not have representatives for both CDK and Reynolds purchases. *See* App'x A. (Only three states, CA, NY, and NM, have both.) That raises typicality problems, as it is undisputed that DIS services for CDK and Reynolds are different markets, and issues like Reynolds' settlement and CDK's post-2019 initiatives may affect Reynolds and CDK purchasers differently. Courts deny certification where "putative state subclass representatives … suffered" one of two types of defects, "but not both," and so "[could not] represent subclass members with a different defect." *In re Fluidmaster*, 2017 WL 1196990, at *49. So too here. ***Third***, the California representative has been dissolved and its different rooftops split up and purchased by others. Ex. 21 (GSM 30(b)(6) Dep.) 14:7–15:8, 34:8–40:3. "[T]he fact that [plaintiff] is no longer in business raises serious questions about … adequacy."

*S&S Forage & Equip. Co. v. Up N. Plastics*, 2002 WL 31718409, at *3 (D. Minn. Nov. 21, 2002).

### 4. The Dealers Cannot Certify An Injunctive Relief Class.

The dealers also cannot certify an injunctive relief class under Rule 23(b)(2), because they do not account for changed circumstances since 2019. Certifying a (b)(2) class requires that a plaintiff "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Dealer Br. 8. Such classes therefore fail where "there is no reasonable expectation that the wrong will be repeated." *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 461 (N.D. Ill. 2013). The Court must thus "decide whether the complained-of conduct may be resumed," based on more than just the "theoretical[] possib[ility] that the defendant will resume the allegedly unlawful conduct." *Clark v. Bumbo Int'l Tr.*, 2017 WL 3704825, at *4 (N.D. Ill. Aug. 28, 2017) (rejecting (b)(2) class); *see also Maher v. Int'l Bhd. Of Elec. Workers/6ᵗʰ Dist.*, 1991 WL 268657, at *3 (N.D. Ill. Dec. 3, 1991).

Here, it is not even clear what injunctive relief is sought. Regardless, dealers fail to show more than a speculative possibility that CDK and Reynolds are still conspiring or will do so in the future. Reynolds has settled all claims. CDK has revamped its DMS and DIS offerings, including by offering "Data Your Way" and Fortellis, undermining the theory that CDK is likely to restrict competition on the basis of access to data. Data Your Way is a meaningful substitute for traditional DIS. Conver ¶¶48-52. Absent a nonspeculative and imminent threat of injury, there is nothing to enjoin as to CDK, and so the (b)(2) class cannot be certified. *Clark*, 2017 WL 3704825, at *4.

## III. AT A MINIMUM, ALL PROPOSED CLASS PERIODS ARE YEARS TOO LONG.

As explained above, the proposed classes are fatally flawed for multiple independent reasons. All should be denied. Yet at the very least, any class period must be significantly cut back. All plaintiffs propose class periods that extend to the present day—more than four years past the Reynolds settlement, the close of fact discovery, and the implementation of pro-competitive initiatives

by CDK. Plaintiffs' updated expert analyses—incorporating nearly five years which the Court did not have occasion to consider at summary judgment—increase their damages claims by hundreds of millions of dollars. *See* Israel Merits Rpt. (ECF 889-1) Tbl. 8; Israel Class Rpt. Tbl. 2 ███████████ ████████████████████████████████████████████████ Williams Merits Rpt. ¶171; Williams Class Rpt. ¶148 ████████████████████████████████ ██████████████. Yet plaintiffs have not come forward with evidence entitling them to these additional damages. For several reasons, the Court should limit the class period to ***October 2018*** (the Reynolds settlement), or, at the latest, ***December 2019*** (the month when plaintiffs submitted their final merits expert reports).

***First***, the record shows that the market began to significantly change around the time Reynolds settled all putative class claims against it in October 2018. There are no allegations that Reynolds somehow violated that settlement by restraining competition after that date, which alone should end the class period. *See* ECF 1381 at 125 (agreeing that a "settlement agreement is evidence of conspirators' withdrawal from the alleged conspiracy, eliminating post-settlement damages"); *In re BNPD Antitrust Litig.*, No. 94-cv-897, ECF 3608, at 10-11 (N.D. Ill. Sept. 14, 1998) (finding that "withdrawal from the conspiracy by settlement on part of a substantial number of defendants, along with attendant notice to the remaining defendants, terminated the charged conspiracy as a matter of law," and excluding damages after the settlement date).

***Second***, new DMS competitors (like Auto/Mate, Dealertrack, and Tekion) gained significant DMS market share around this time, resulting in a more competitive market structure. *See* Background at C, *supra*. Non-Defendant Dealertrack in particular grew rapidly, matching Reynolds by 2020 and becoming the second-largest DMS provider in 2021, indicative of choice and competition in a market that had clearly shifted since the beginning of the class period. *Id.*

**Third**, CDK implemented new and pro-competitive initiatives shortly after the Reynolds settlement, including fee waivers for many dealers, and later its "Data Your Way" and Fortellis programs. *Id.* These programs have enhanced dealers' ability to access data without incurring DIS fees. *See* Background at C, *supra*. Yet plaintiffs' experts do not adequately analyze any of these changes. In particular, neither expert assesses a separate period starting at any time after the 2018 Reynolds settlement, *see* Israel Dep. 167:2-6; Williams Dep. 235:20-236:1, even though their own use of two sub-periods at the merits phase—coupled with Reynolds' settlement, CDK's fee waivers, and other post 2018 events suggest that this is required. Haider Rpt. ¶¶180-90, 256-62.

Most of plaintiffs' models are not even *capable* of addressing injury or damages after May 2019. Their difference-in-differences ("DID") models lack control data for Authenticom (after May 2019) or SIS (after December 2018). Haider Rpt. ¶¶274-79. Israel disclaims any ability to run the DID model without that data. *See* Israel Class Rpt. Ex. C ¶1. And although Williams contends he can use Authenticom and SIS as controls over a period for which he has *some* control data (2015 through 2023), that approach (which is flawed for the many reasons explained in the accompanying *Daubert* brief) also does not permit him to separately analyze the 2019 through 2023 period for which he doesn't have *any* control data. *See* Haider Rpt. ¶¶89-90, 97-99, 275-79.

Williams also does not and cannot account for fee waivers in any of his overcharge models (he eliminates all $20 and under transactions in CDK/Reynolds' data from his analysis entirely). *See supra* at 26–27. He cannot reliably assess impact or damages after fee waivers were introduced. Nor does Williams analyze pass-through for any period after March 2019—the latest date for which he has data for his pass-through regressions. Williams Dep. 250:16-251:5. At every level, his analyses cannot support a conspiracy that includes the years since Reynolds settled.

Israel's before/during overcharge model cannot establish ongoing classwide injury during

that timeframe either.  When Haider applies that model to "specifically estimate an overcharge for the period from August 2019 onwards (but otherwise keep[s] his model unchanged)," she finds that ██████████ **CDK vendors** that Israel analyzed sustained no positive and statistically significant overcharges from August 2019 onwards.  Haider Rpt. ¶¶185-89.  In other words, when the period is examined separately, a great many vendors are uninjured.[16]

Plaintiffs have created incurable predominance problems by seeking several extra years of damages.  All of this supports limiting the class period to when Reynolds settled.  In the alternative, the class period should end by December 31, 2019, after plaintiffs' experts submitted their merits reports and around the time when CDK's fee waivers, Dealertrack's rise, and other factors transformed the market.  If class allegations "can apply to only a particular period of time, the class period may be restricted to that time period." *W. Va. Pipe Trades v. Medtronic*, 325 F.R.D. 280, 293 (D. Minn. 2018); *id.* (courts can "determine the appropriate endpoints"); *In re Santa Fe Nat. Tobacco Co.*, 2023 WL 6121894, at *114 (D.N.M. Sept. 19, 2023) ("redefin[ing]" proposed class).  Plaintiffs' failure to grapple with changing market conditions requires that the Court exercise its discretion to cut the class period back to October 2018, or, at the latest, December 2019.  And it is emblematic of their failure to consider the complexity of the enormous classes they have put at issue:  because they do not carry their burdens, all plaintiffs' motions should be denied.

## CONCLUSION

Plaintiffs fail to carry their burdens and so both motions for class certification should be denied.  If any class is certified, the class period should end in October 2018 (the date of the Reynolds settlement), or, at the latest, December 31, 2019.

---

[16] Nor can Israel estimate an overcharge for any of the ██ vendors that only purchased DIS from CDK or Reynolds after mid-2019.  Israel's before-during model—his only model that estimates an overcharge based on data from after 2019—can only do so based on data from vendors that *also* purchased in the benchmark period (*i.e.*, vendors that purchased "before" and "during" the alleged conspiracy).  Haider Rpt. ¶¶155-56.

Dated:  February 23, 2024

Respectfully Submitted,

*/s/ Mark Filip, P.C.*
Craig S. Primis, P.C.
Matthew J. Reilly, P.C.
K. Winn Allen, P.C.
Katherine Katz, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, D.C. 20004
Tel: (202) 389-5000
craig.primis@kirkland.com
matt.reilly@kirkland.com
winn.allen@kirkland.com
katherine.katz@kirkland.com

Mark Filip, P.C.
Kevin M. Jonke
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
mark.filip@kirkland.com
kevin.jonke@kirkland.com

*Counsel for Defendant CDK Global, LLC*

# APPENDIX A-F
# FILED UNDER SEAL