**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Rebecca R. Pallmeyer |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 | **PUBLIC - REDACTED** |

**AUTOLOOP'S OPPOSITION TO CDK'S MOTION TO EXCLUDE**
**DR. MARK ISRAEL'S CLASS CERTIFICATION EXPERT OPINIONS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD ........................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

I.      Dr. Israel's Deposition Testimony Regarding Antitrust Injury Is Legally Sound ............. 5

II.     CDK's Critiques of the B&D Model Are Procedurally Improper and Meritless .............. 7

        A.      CDK's Challenges To the B&D Model Are Untimely Merits Arguments ............ 7

        B.      CDK's Criticisms of the B&D Model Are Meritless ............................................. 8

III.    CDK's Criticisms of Dr. Israel's Updated DID Damages Estimates Are Moot .............. 13

IV.     Dr. Israel Reliably Estimates Damages Post-2019 ......................................................... 14

CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**CASES** Page

*Apple iPhone Antitrust Litig.*, *In re*, No. 11-6714, Dkt. 789
    (N.D. Cal. Feb. 2, 2024)................................................................................13

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)........................................7

*Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 5612340
    (N.D. Ill. Sept. 22, 2015) .........................................................................13

*Bradburn Parent/Tchr. Stores, Inc. v. 3M*, 2004 WL 1842987
    (E.D. Pa. Aug. 18, 2004).............................................................................7

*Broiler Chicken Antitrust Litig.*, *In re*, 2023 WL 7220170 (N.D. Ill. Nov. 2, 2023)....................15

*City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544
    (N.D. Ill. Mar. 29, 2024)..............................................................................3

*Elec. Books Antitrust Litig.*, *In re*, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)........................4

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 2017 WL 3592775
    (N.D. Ill. Aug. 21, 2017)............................................................................15

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010) ............................15

*Farmer v. DirectSat USA, LLC*, 2013 WL 1195651 (N.D. Ill. Mar. 22, 2013)............................12

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989)................................7

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013) ................................................9, 15

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370 (N.D. Ga. 2019) ................................13

*NorthShore Univ. HealthSystem Antitrust Litig.*, *In re*, 657 F. Supp. 3d 1077
    (N.D. Ill. 2023)...................................................................................10, 13

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014),
    *aff'd*, 638 F. App'x 43 (2d Cir. 2016).......................................................10

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565 (7th Cir. 1994) ...............7

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651
    (9th Cir. 2022), *cert. denied*, 143 S. Ct. 424 (2022) ................................10

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., In re*,
    2022 WL 14862098 (E.D.N.Y. Oct. 8, 2022) ...........................................................................10

*Republic Tobacco, L.P. v. Commonwealth Brands, Inc.*, 2010 WL 996421
    (N.D. Ill. Mar. 16, 2010) ..............................................................................................................8

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
    540 F. Supp. 3d 182 (D.R.I. 2021) ............................................................................................13

*Zhang v. Gonzales*, 434 F.3d 993 (7th Cir. 2006) ...........................................................................8

## STATUTES AND RULES

Fed. R. Civ. P. 23 .........................................................................................................................5, 8

Fed. R. Evid. 702 .............................................................................................................................5

## OTHER MATERIALS

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and
    Economic Issues* (3d ed. 2017) ....................................................................................................3

Compass Lexecon, *Compass Lexecon clients NortonLifeLock and Avast clear
    merger reviews in all global jurisdictions* (Sept. 20, 2022), https://www.compass
    lexecon.com/cases/compass-lexecon-clients-nortonlifelock-and-avast-clear-merger-
    reviews-in-all-global-jurisdictions ..............................................................................................2

**INTRODUCTION**

This Court has already held that Dr. Israel's merits opinions are both reliable and sufficient for a jury to find antitrust injury and damages for the named vendor plaintiff (AutoLoop). This Court refused to exclude *any* part of Dr. Israel's opinions, so he may offer them in full to the jury at trial. Those prior rulings are law of the case and not up for reconsideration here. The lone question left is whether vendors' claims can be adjudicated on a class-wide basis.

Dr. Israel's opinions on that issue are twofold. *First*, he explains that his merits opinions rely on common evidence and apply class-wide. On antitrust injury and damages in particular, the two econometric models he used on the merits – a "differences-in-differences" ("DID") model and a "before-and-during" ("B&D") model – prove injury and estimate damages for every class member, not just for AutoLoop. *Second*, Dr. Israel explains that he could update his DID and B&D models for the period after his merits reports were filed in April 2019. That is all class certification requires – that vendors' claims be *capable* of class-wide adjudication. To avoid any doubt, in his opening class report, Dr. Israel re-ran his B&D model using updated CDK and Reynolds transaction data. He explained that he could re-run his DID model too once he obtained updated data from Authenticom. Those data were not available then, but Authenticom has since provided them, and Dr. Israel has now re-run his DID model as well. Both updated models show that (as was true in 2019) virtually all class members suffered positive damages.

Having no serious dispute with Dr. Israel's class-certification opinions, CDK instead seeks to relitigate the reliability of Dr. Israel's merits opinions. Those arguments – which boil down to an attack on Dr. Israel's use of an "average overcharge" – should be rejected.

**1.** CDK begins (at 5-7) by challenging as "legally flawed" Dr. Israel's deposition testimony that the "fact of monopolization establishes injury." But as he explained, that testimony

was about *this case*, where CDK and Reynolds injured *all vendors* by conspiring to eliminate *all* competitive alternatives in their data integration services ("DIS") aftermarkets. And Dr. Israel did not stop there: he also showed empirically that virtually every vendor suffered overcharges (and thus antitrust injury). CDK's point is thus academic, as well as wrong.

**2.** CDK then attacks (at 7-10) Dr. Israel's B&D model. But having chosen not to seek exclusion of that model during the merits stage, CDK does not get a second chance now. And its criticisms (most of which the Court already rejected in evaluating Dr. Israel's DID model) are wrong: Dr. Israel's "average overcharge" method is legally accepted and economically sound.

**3.** CDK argues (at 11) that Dr. Israel cannot reliably "project" damages based on his April 2019 DID model because, at the time of his opening report, he had not re-run it with refreshed Authenticom data. That overstates AutoLoop's burden: as Dr. Israel explained in his opening report, he *could* update his model once he obtained updated Authenticom data, and that is all that class certification requires. And Dr. Israel now has done exactly that – mooting CDK's challenge.

**4.** CDK argues (at 13-15) that Dr. Israel's post-2019 damages estimates should be excluded because damages ceased at some unspecified point in time. But that is a jury argument, not a basis for exclusion – and it is one that applies class-wide in any event. Further, even if properly addressed here, CDK's claim that new "market facts" cut off damages is not compelling: Dr. Israel's analysis shows that prices still remain far above pre-conspiracy levels. CDK does not show that these enduring prices are attributable to events other than the conspiracy.

### BACKGROUND

Dr. Israel is a preeminent antitrust economist.[1] He has offered two sets of expert opinions.

---

[1] CDK's own counsel retained him in connection with an $8.6 billion merger. *See* https://tinyurl.com/ec99mtau. And this District recently relied on his class-certification opinion in

**Dr. Israel's Merits Reports (2019).**  Dr. Israel opined that the economic evidence supports AutoLoop's claims regarding CDK and Reynolds's conspiracy and its effects on the relevant DMS and DIS markets.  CDK and Reynolds historically competed "on the degree of openness" of their DMSs, which "prevented them from profitably excluding independent DIS providers from their DMS systems and thus from fully monopolizing their DIS aftermarkets."  Dkt. 889-1 ("Israel Rep.") ¶ 127; *see id.* ¶¶ 128-131.  In particular, CDK's "open data-access policy . . . fostered the existence of many competitive independent DIS providers" including on "Reynolds'[s] DMS."  *Id.* ¶ 132; *see also id.* ¶¶ 133-134.  Beginning in 2013, CDK and Reynolds "cooperated to block independent DIS providers."  *Id.* ¶¶ 142-144.  That conspiracy caused vendors antitrust injury by eliminating competition from independent data integrators, which Dr. Israel empirically showed led to dramatic increases in DIS prices to the detriment of vendors.  *See id.* ¶¶ 173, 179 & fig. 7.

Dr. Israel also quantified how much the conspiracy increased DIS prices.  Dr. Israel's primary model was his DID model, which compares changes in prices for DIS affected by the conspiracy (Reynolds's RCI and CDK's 3PA) and benchmark prices that were not (here, Authenticom).  *See id.* ¶¶ 194-199.[2]  This is a widely accepted methodology.  *See generally* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 123-208 (3d ed. 2017).  Dr. Israel also confirmed the robustness of the DID results using a B&D model that compared 3PA and RCI prices before and during the conspiracy period (with additional industry control variables).  *See* Israel Rep. ¶¶ 203-204.  Before-and-after models (here, before-and-during due to the ongoing effects of the conspiracy) are also "a well accepted method of measuring

---

an antitrust case to exclude another expert's analysis.  *See City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *9 (N.D. Ill. Mar. 29, 2024).

[2] Dr. Israel initially relied on SIS's prices in his benchmark as well, but he re-ran his model without them to address criticisms that Defendants made regarding the SIS data.  The results were nearly identical.  *See* Dkt. 889-2 ("Israel Reply Rep.") ¶¶ 190-191 & tbls. 4-6.

antitrust damages." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *25, *32 (S.D.N.Y. Mar. 28, 2014) (citing cases) (certifying class).

**This Court's *Daubert* and Summary Judgment Rulings.** This Court has already ruled that Dr. Israel's DID and B&D models provide reliable evidence of injury and damages, not just for AutoLoop but for the Vendor Class. As the Court noted, Dr. Israel offered both models to prove injury and damages for the entire class. *See* Dkt. 1321 ("*Daubert* Op.") at 17 (both models "quantify the impact of that alleged conduct on competition, competitors, and customers in the relevant markets, including a calculation of the damages suffered by vendors"). CDK extensively challenged the reliability of Dr. Israel's damages opinions, including on grounds that his analysis ignored differences among vendors, but the Court found them admissible. *See id.* at 22-29.

CDK's summary judgment arguments "largely mirror[ed] its earlier *Daubert* challenge to Dr. Israel's damages model, which the court rejected." Dkt. 1381 ("SJ Op.") at 68. Again, those challenges were not limited to AutoLoop; CDK challenged Dr. Israel's *class-wide* damages models and estimates. *See id.* at 68-74. The Court again rejected CDK's criticisms. *See id.* at 74.

**Dr. Israel's Opening Class Certification Report (2023).** Here, Dr. Israel's explains that his merits analysis "was entirely done on a common basis, evaluating the alleged conduct as a whole and its impact on a market-wide basis, without the need to evaluate issues particular to individual class members." Dkt. 1422-2 ("Israel Suppl. Rep.") ¶ 13. His merits opinions thus "apply equally to all class members, and do not require inquiry into issues particular to any class member." *Id.* Antitrust injury is a "common question" because Defendants conspired "to prevent competition by independent DIS providers," which created a "loss of competition" with "a market wide effect harming all buyers" (vendors). *Id.* ¶¶ 30, 31; *see also id.* ¶ 32 (vendors harmed by lack of "competitive pressure placed on CDK and Reynolds by the presence of more competitors").

His DID and B&D models show that the conspiracy caused nearly all class members to pay inflated DIS prices, a classic antitrust injury. *See id.* ¶ 33. And those models generate "a separate estimate of damages for the class as a whole and for each class member." *Id.* ¶¶ 35, 38.

Because Dr. Israel submitted his merits reports in 2019, Dr. Israel also updated his damages estimates. Dr. Israel was unable to re-run his DID model at the time of his opening class-certification report because he lacked newer data for his benchmark (Authenticom), but he explained that he could do so upon obtaining that data. *See id.* ¶ 43. Because Dr. Israel's B&D model did not rely on Authenticom data, Dr. Israel was able to re-run his B&D model through September 2023. *See id.* ¶¶ 43-44 & Ex. C. Before his class reply report, Dr. Israel obtained updated Authenticom data, which he then used to run his DID model using data through September 2023. *See* Ex. 1[3] ("Israel Suppl. Reply") ¶¶ 96-97 & tbl. 1.

## LEGAL STANDARD

Federal Rule of Evidence 702 requires that – before expert opinions can be presented to a jury – courts find that they are "based on sufficient facts or data," "the product of reliable principles and methods," and "reflect[ ] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Dr. Israel's class certification opinions reliably show that vendors' antitrust case can proceed on a class-wide basis consistent with Rule 23.

## ARGUMENT

**I.      Dr. Israel's Deposition Testimony Regarding Antitrust Injury Is Legally Sound**

CDK argues (at 5-7) that Dr. Israel's deposition testimony that the "fact of monopolization establishes injury" is "legally flawed." But CDK mischaracterizes Dr. Israel's deposition testimony, which was based on the injury *in this case* given the evidence that Defendants'

---

[3] All referenced exhibits are attached to the Omnibus Declaration of Daniel V. Dorris.

conspiracy had allowed them to monopolize their DIS aftermarkets and dramatically raise prices as a result. *See, e.g.*, Ex. 2 (Jan. 19, 2024 Dep. Tr. of M. Israel ("Israel Tr.")) 73:3-21 ("Nothing I have seen indicates that it has not been monopolized, *including the ongoing price data that I've looked at*," "*from everything I've seen*," and "*nothing I have seen indicates that [ ] has changed*.") (emphasis added); 54:8-19 (referencing his "earlier reports" and the nature of the injury in this case). His opening report made clear that he was relying on both the "loss of competition and . . . empirical indicators of its effects – on DIS prices, DMS prices, and CDK's and Reynolds's profits." Israel Suppl. Rep. ¶ 33. And his class reply report confirms that his deposition testimony was about *this case* and the loss of price and quality competition in the relevant DIS aftermarkets. *See* Israel Suppl. Reply ¶¶ 35-50. He offers no opinion that "liability for legally-recognized conspiratorial or monopolization conduct automatically proves antitrust injury." *Id.* ¶ 35.[4]

As explained in AutoLoop's concurrently-filed class certification reply brief (at 12-14), CDK's position is also contrary to legal authority permitting an inference of class-wide impact in cases such as this one. While, as Dr. Israel notes, there may be other fact patterns where monopolization (or conspiratorial conduct) may not injure direct purchasers, that is not the fact pattern here. *See* Israel Suppl. Reply ¶ 40 (explaining possibility of discounting in certain price-fixing conspiracies). There is ample record evidence – including direct testimony regarding Defendants' massive price increases – to support Dr. Israel's opinion that the Defendants' conduct here harmed all class members. *See* Israel Suppl. Reply ¶¶ 51-56 (showing price increases).

---

[4] CDK also mischaracterizes (at 6) Dr. Israel's statement regarding the hypothetical scenario of a vendor paying "zero dollars" and still being harmed in a monopolized market. He does not "decouple injury from prices," as CDK claims (at 6). Rather, the full discussion provides an economic explanation – including being "denied the benefits of competition," such as "a lower [i.e., negative] price, of an alternative choice, of more pressure to innovate," all of which CDK does not dispute or even acknowledge – for how a vendor could be harmed in the hypothetical situation of getting free data integration in a monopolized market. *See* Israel Tr. 74:13-76:15.

None of CDK's authority (at 6-7) is on point. Its cases concern whether *competitors* (not customers like the Vendor Class) have suffered antitrust injury. *See Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 345 (1990) (holding competitors lacked antitrust injury but accepting "consumers . . . may bring suit"); *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (same); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419 (7th Cir. 1989) (addressing antitrust injury for competitor allegedly hurt by lower-priced competition). They do not gainsay that the same proof showing that anticompetitive conduct led to higher prices and reduced quality can also be *prima facie* proof of injury to the buyers in the affected market, which is the relevant point.

In any event, CDK's argument provides no basis to exclude any of Dr. Israel's opinions, given that he evaluates CDK and Reynolds DIS pricing to conclude that there has been class-wide antitrust injury.[5] As CDK concedes (at 7), if Dr. Israel establishes "the alleged conduct had a negative impact on price," he will have shown antitrust injury. As shown next, he has done so.

## II. CDK's Critiques of the B&D Model Are Procedurally Improper and Meritless

### A. CDK's Challenges To the B&D Model Are Untimely Merits Arguments

CDK contends (at 7) that Dr. Israel's B&D model (1) "improperly relies on pooled data" that masks differences among class members, and (2) "it extrapolates from an unrepresentative sample." But CDK never challenges Dr. Israel's primary model – the DID model – as unreliable. Nor could it, given this Court's prior rulings rejecting CDK's challenges to that model. CDK's

---

[5] *See Bradburn Parent/Tchr. Stores, Inc. v. 3M*, 2004 WL 1842987, at *13 (E.D. Pa. Aug. 18, 2004) ("[W]hen a monopolist unlawfully maintains its monopoly power . . . , it is logical, at least as a general rule, to presume that all class members have suffered injury as a result of the conduct, in the form of supra-competitive prices. However, Dr. Kamien relies upon far more than a mere theoretical presumption of impact in this case. To the contrary, Dr. Kamien opines that there is a method of economic analysis which can establish the existence of impact upon all potential class members.").

only complaint about the DID model – that Dr. Israel did not update it in his opening class report – misapprehends the Rule 23 standard and is at any rate moot given that Dr. Israel has now updated the model. *See infra* Part III. Because CDK does not challenge the DID model, its complaints about the B&D model – which Dr. Israel used as a robustness check – get CDK nowhere.

CDK's criticisms of the B&D model are misplaced for a second reason: the law of the case. Dr. Israel disclosed his B&D model in his merits reports in 2019. CDK chose not to challenge it during the merits phase, and contrary to CDK's claims (at 7), the Court relied on it in both its *Daubert* and summary judgment opinions. *See Daubert* Op. at 25 ("Israel also considered other methods of testing collusion's impact, including one that substituted CDK's and Reynolds'[s] own pre-conduct prices as the relevant baseline and one that used industry control variables."); SJ Op. at 68 ("Israel conducted robustness checks using pre-conspiracy 3PA and RCI prices as an alternative benchmark and reached a similar calculation under that approach.").

The Court did not consider any specific challenges to the B&D model because CDK never made any, and it is too late for CDK to do so now. *See Republic Tobacco, L.P. v. Commonwealth Brands, Inc.*, 2010 WL 996421, at *2 (N.D. Ill. Mar. 16, 2010) (Pallmeyer, J.) ("law-of-the-case doctrine counsels against reexamination of a previous determination in the same case 'absent exceptional circumstances such as a change in the law, new evidence, or compelling circumstances'") (quoting *Zhang v. Gonzales*, 434 F.3d 993, 998 (7th Cir. 2006)).

### B. CDK's Criticisms of the B&D Model Are Meritless

Even if the Court were to consider CDK's merits arguments at this late stage, they do not warrant exclusion of Dr. Israel's opinions. Indeed, they are just variations on the same criticisms CDK unsuccessfully leveled against Dr. Israel's DID model. *See*, *e.g.*, Israel Suppl. Reply ¶¶ 67, 111 nn.186-87, 134. And none of them bear on class certification. Because CDK does not dispute

that the B&D model is common to all vendors, its criticisms would at most call for modifications to his common B&D model, not individualized inquiries into specific vendors.

**1.** CDK contends (at 7) that Dr. Israel erred in relying on "pooled data" – that is, aggregating the DIS charges paid by all vendors rather than performing separate regressions for each vendor. But CDK admits (at 8) that it is "not unusual" to use pooled data to estimate damages in antitrust cases. That is a critical concession, because the appropriateness of adopting that commonly accepted method in this case is a question for the jury. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013) (criticisms of "the selection of data inputs" to "accepted methodology . . . should normally be left to the jury"); *Daubert* Op. at 8-9.

CDK mischaracterizes (at 9) Dr. Israel's opinion as "offer[ing] no . . . justification" for pooling. On the contrary, Dr. Israel explained that pooling was reasonable in light of the strong evidence of the conduct's market-wide effects: CDK and Reynolds's conspiracy eliminated competition from independent data integrators, thus forcing each vendor to buy DIS from CDK and Reynolds and allowing them to increase prices substantially. *See* Israel Rep. ¶ 132 (competitive pressure by independent data integrators); ¶ 180 (price increases when competitive pressure was eliminated); *see also* Israel Suppl. Reply ¶ 123 ("[G]iven that the alleged conduct is marketwide, a sensible approach is to use all data to get the best measure of that overcharge."). Indeed, ██████████████████████████████████████ – making use of a market-wide average calculation especially appropriate. *See* Dkt. 875-11 ¶ 37 n.63 (CDK's own expert noting ███████████████████████████).

Further, as Dr. Israel explains, pooling is useful because it generates more statistically robust results. *See* Israel Suppl. Reply ¶¶ 112, 123, 127 (more data generates results with greater statistical significance). That is the case here, as CDK's own expert, Dr. Haider, shows: when she

ran separate regressions for each vendor, many results were not statistically significant. *See* Dkt. 1460-1 ("Haider Rep.") ¶¶ 164-165; Israel Suppl. Reply ¶¶ 127-129 (Dr. Haider's approach "reduce[s] the statistical power of each regression by using much less data"). By reducing the regression's power, Dr. Haider's approach creates the illusion of uninjured plaintiffs and variability among vendors when those results are just artifacts of insufficient data. *See id.*[6]

Relying on Dr. Haider, CDK contends (at 8-9) that Dr. Israel erred because he pooled data without first running a so-called "Chow test." Courts routinely reject that argument – including in cases where Dr. Haider sponsored it. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 673-78, 683-84 (9th Cir. 2022) (en banc) (rejecting Dr. Haider's argument that a Chow test is required); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 14862098, at *13 (E.D.N.Y. Oct. 8, 2022) ("the case law does not support the contention that passing the Chow test is an absolute prerequisite"); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1090-92 (N.D. Ill. 2023) (rejecting argument that use of "averages" "mask[s] class members who were not in fact impacted"). CDK's sole case relying on a "Chow test" to exclude a regression based on "pooled data" is inapposite, as the expert there admitted he had no rational basis for using pooled data. *See Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 405-06 (S.D.N.Y. 2014).

Even accepting Dr. Haider's criticism, Dr. Israel re-ran his B&D model allowing control variables to vary by vendor (as the Chow test suggested may be appropriate), and it had virtually

---

[6] CDK is inaccurate in claiming (at 8-9) that Dr. Haider found ███████████████ ████████████████████████████████████████ Most of those vendors actually had *positive* damages that were not statistically significant because, without pooled data, there was insufficient data available. In reality, Dr. Haider shows ██████████████████████████ *See* Haider Rep. ¶¶ 164-165 & tbl. 16. Dr. Israel explains that, "at the 10% significance level, one would expect roughly this many apparently significant results entirely by chance." Israel Suppl. Reply ¶ 128.

no effect on the calculated overcharge (█████████████████████████, depending on control variables). *See* Israel Suppl. Reply ¶¶ 108-110 & tbl. 2. In short, it is for the jury to decide whether Dr. Israel's use of pooled data affects the weight of his testimony.

      **2.** CDK also objects (at 9-10) that vendors who purchased DIS both before and during the conspiracy are "unrepresentative" of the entire Vendor Class. CDK's argument – which, again, goes to the merits, not class certification – is misplaced.

      The B&D model estimates damages for all class members by comparing the prices paid by *all* vendors before and after the conspiracy. *See* Israel Tr. 144:10-145:4 ("They're all in the regression."). Contrary to CDK's misleading suggestion, Dr. Israel does not conduct any sampling; his B&D (and DID) models use transaction data for *all* vendors. CDK's objection (at 9-10) that Dr. Israel's sample is "non-random" or suffers from "selection bias" is thus nonsensical; Dr. Israel simply did not "select" any sample.

      What CDK is referring to as "sampling" is Dr. Israel's explanation of how B&D models work: because the idea is to compare before-and-after prices, vendors that purchased both before and during the conspiracy contribute to the overcharge estimates more than those that purchased only before or only during the conspiracy. *See* Israel Suppl. Reply ¶ 104. But as Dr. Israel explains, that "is a feature of the analysis, not a bug" because by looking at those "vendors present before and after the start of the alleged conspiracy, conspiracy effects can be isolated using an apples-to-apples comparison of prices paid to the same DIS provider by the same vendor." *Id.* (explaining the problem of "mix effects"). And tellingly, CDK's own merits expert ██████ ██████████████████████████. *See* Dkt. 875-11 ¶¶ 75-79 (only changing benchmark).

      CDK's specific arguments (at 9-10) as to why the "sample" is "unrepresentative" are unpersuasive. As Dr. Israel explains, there are good reasons to believe that the "sample" *is*

representative.  *First*, as this Court has held, Dr. Israel reliably concluded that the conspiracy affected all vendors similarly.  *See supra* pp. 7-9.  *Second*, the "sample" group of vendors accounts for approximately ▮▮ of DIS sales volume.  *See* Israel Suppl. Reply ¶ 102.[7]  Such a large sample is highly unlikely to be biased.  *See Farmer v. DirectSat USA, LLC*, 2013 WL 1195651, at *4 (N.D. Ill. Mar. 22, 2013) (sample of 30 out of 500 employees); *Daubert* Op. at 83-93 (finding admissible opinion of CDK expert that relied on sample of 98 out of 2,750 accounts).

Neither of CDK's counterarguments is persuasive.  *First*, CDK says (at 10) that the vendors that purchased before and during the conspiracy bought "more DIS, and more *expensive* DIS." But as Dr. Israel explained, CDK's claim that those differences drive varying overcharges is mistaken:  CDK's analysis "can at most show that different vendors have different price paths," but "nothing about" it "can prove that such differences are due to different overcharges as opposed to other idiosyncratic differences across vendors, which would be present in both the actual and but-for worlds, thus yielding different results for different vendors even in the face of common overcharges."  *See* Israel Suppl. Reply ¶ 19.  "And," he continues, "given that monopolization is a marketwide effect, the most reasonable economic approach is to estimate marketwide overcharges, thus recognizing that vendor specific price paths represent other idiosyncratic differences across vendors."  *Id.*; *see also id.* ¶¶ 86-90, 118-125 (elaborating); *id.* ¶ 131 (Dr. Haider's analysis "cannot refute the reasonable assumption that there is a common overcharge percentage, with the observed differences also present in but-for prices.").  More important for present purposes, evidence common to the class will resolve any debate about whether these or other vendor subdivisions bear on overcharges.  *See id.* ¶¶ 125, 131, 135.

---

[7] CDK states (at 9) that the "sample" group comprises only ▮▮ of CDK vendors and ▮▮ of Reynolds vendors, but the relevant metric is the percentage of *transaction volume*.

*Second*, CDK says (at 10) that Dr. Israel should have excluded Cox Automotive because it is not part of the class. But that makes no economic sense: although Cox Automotive (having sued separately and settled) is not a party in this class action, *see* SJ Op. at 72, its transactions were still affected by the conspiracy and should be included in the regression. *See* Israel Suppl. Reply ¶¶ 111-115; *NorthShore*, 657 F. Supp. 3d at 1089-90 (rejecting identical challenge to expert's use of data from non-class members). As noted, Dr. Israel's regression includes *all* vendors, and so it would be error and distortive to *exclude* a large vendor's transactions just because it has settled.

## III. CDK's Criticisms of Dr. Israel's Updated DID Damages Estimates Are Moot

Constrained by the Court's prior rulings, CDK makes just one argument targeting Dr. Israel's DID model. CDK argues (at 11) that the model cannot offer damages estimates *after* April 2019 because at the time of his opening class report, Dr. Israel did not have updated Authenticom data, which the DID model uses as a benchmark. CDK thus assumes that Dr. Israel must "project" damages for 2019 through 2023 based on his 2019 regression. That is wrong and moot.

It is wrong because it overstates the class's burden. As Dr. Israel explained in his opening report, he could update his DID model upon obtaining updated Authenticom data. *See* Israel Suppl. Rep. ¶ 43. That is enough "to show at this stage . . . that the class is *capable* of proving antitrust impact." *NorthShore*, 657 F. Supp. 3d at 1091. Dr. Israel did not need to run the updated model *now* to show his model reliable and common to the class, as many cases show.[8]

---

[8] *See In re Apple iPhone Antitrust Litig.*, No. 11-6714, Dkt. 789 at 13 (N.D. Cal. Feb. 2, 2024) (antitrust damages model sufficient at class certification with limited data but would be updated with "significantly more"); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019) ("sufficient for class certification" to "specif[y] a damages model that can be used to establish damages," even though "certain of the inputs to that model are not yet ascertainable"); *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 218 (D.R.I. 2021) (same). Indeed, it is routine practice in complex, long-running cases to allow supplementation of damages reports with updated data before trial. *See, e.g.*, *Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 5612340, at *14 (N.D. Ill. Sept. 22, 2015).

It is moot because Dr. Israel has now obtained the Authenticom data and re-run his DID model through September 2023, using the same method that this Court has already found to be reliable (and whose reliability CDK does not challenge). With updated data, the DID model again shows – to a high degree of statistical significance – that the conspiracy caused vendors to pay much more than they would have but for the conspiracy. *Compare* Israel Suppl. Reply ¶ 97 & tbl. 1 (with updated data, ████ overcharge), *with* Israel Suppl. Rep., Ex. C & tbl. 1 (without updated data, ████ overcharge). This moots CDK's claim (at 12) that Dr. Israel's analysis rests on a "projection" and "unsupported assumptions."

Likewise, Dr. Israel's updated DID model moots CDK's criticism (at 12) that his projection model cannot reliably estimate damages for class members that did not purchase DIS until after April 2019 and for which the original DID model contains no data. Now that Dr. Israel has the Authenticom data (as well as CDK and Reynolds transaction data) through September 2023, his updated DID model uses transactional data from those class members.[9]

## IV. Dr. Israel Reliably Estimates Damages Post-2019

CDK argues (at 13-15) that Dr. Israel ignored market facts in concluding that Defendants' conspiracy continues to cause ongoing damages. But that does not undermine his opinion that post-2019 damages can be adjudicated on a class-wide basis; it merely raises a common defense.

At any rate, CDK's criticisms of Dr. Israel's post-2019 damages are misplaced. The economic evidence supports the existence of overcharges beyond the end of the conspiracy because the competition eliminated by the conspiracy has not been restored. *See* Israel Tr. 174:16-

---

[9] In any event, there were only a few such class members because the revised class definition excludes vendors who first purchased DIS service from CDK after June 2018, and there are only a few vendors who first purchased DIS service from only Reynolds in that later period.

175:12; *see* Israel Rep. ¶¶ 132-134, 173.  And CDK and Reynolds continue to charge persistently

higher prices than they would have but-for the conspiracy.  *See* Israel Suppl. Reply ¶ 54 & fig. 3.

CDK notes (at 15) that its prices have ████████ in recent years, but they ████████

than the competitive baseline pre-conspiracy.  *See id*.  CDK offers (at 14) a laundry list of events

that occurred in the market post-2019, but it does not even attempt to demonstrate that those events

can explain CDK's persistently high DIS prices.  And even if CDK's expert had attempted to do

so, that would merely create a battle of experts for trial.  *See In re Broiler Chicken Antitrust Litig*.,

2023 WL 7220170, at *5 (N.D. Ill. Nov. 2, 2023) ("Just because there is an alternative explanation

that is contrary to" an expert's opinion "does not mean that . . . opinion should be excluded."); *see*

*Manpower*, 732 F.3d at 808 (choice of explanatory variables "goes to the probative weight of the

analysis rather than to its admissibility").[10]

Finally, to the extent that any of CDK's new "market facts" (at 14) actually impact prices,

Dr. Israel's overcharge analysis already accounts for these "market facts" (such as new entrants

and product offerings).  His models incorporate CDK's ████ prices post-2019 to estimate a lower

– but still significant – overcharge.  *See* Israel Tr. 171:10-172:19 ("[W]hatever effect those

entrants, if they existed, had on prices [would] be determined by the regression. . . .  [I]t's all going

to be captured by what happens to prices."); Israel Suppl. Reply ¶¶ 137-142 & tbls. 7-8 (calculating

overcharge for post-July 2019 period).

## CONCLUSION

CDK's motion to exclude Dr. Israel's class-certification opinions should be denied.

---

[10] CDK's cases (at 15) are off point, as they barred opinions lacking any foundation.  *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 2017 WL 3592775, at *13-14 (N.D. Ill. Aug. 21, 2017) (excluding *ipse dixit*); *Fail-Safe, L.L.C. v. A.O. Smith Corp*., 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010) (excluding opinion due to "incredible assumptions that belie[d] basic logic").

Dated:  April 12, 2024

Respectfully submitted,

*/s/ Derek T. Ho*

Derek T. Ho
Michael N. Nemelka
Aaron M. Panner
Daniel V. Dorris
Joshua Hafenbrack
Collin R. White
Bethan R. Jones
Ana N. Paul
Daren G. Zhang
**KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
(202) 326-7900
Washington, D.C. 20036
dho@kellogghansen.com
mnemelka@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com
jhafenbrack@kellogghansen.com
cwhite@kellogghansen.com
bjones@kellogghansen.com
apaul@kellogghansen.com
dzhang@kellogghansen.com

*MDL Co-Lead Counsel and Interim Class Counsel
representing Loop, LLC, d/b/a AutoLoop on behalf
of itself and all others similarly situated*

- 16 -

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on April 12, 2024, I caused a true and correct copy of the foregoing **AUTOLOOP'S OPPOSITION TO CDK'S MOTION TO EXCLUDE DR. MARK ISRAEL'S CLASS CERTIFICATION EXPERT OPINIONS** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com
