**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Rebecca R. Pallmeyer |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 | **PUBLIC- REDACTED** |

**PLAINTIFF AUTOLOOP'S REPLY IN SUPPORT OF ITS MOTION
<u>FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.    AutoLoop's Amended Class Definition Moots CDK's Class-Waiver Argument ............. 5

II.   CDK's Arguments Regarding Antitrust Injury Do Not Defeat Predominance ................. 7

      A.    Antitrust Injury Is Subject To Common Proof ...................................... 7

      B.    All Vendors Incurred Antitrust Injury Whether Or Not They Paid
            Overcharges ............................................................................. 12

      C.    CDK's Critique of Dr. Israel's Regression Does Not Undermine Vendors'
            Showing That Antitrust Injury Is a Common Question ........................ 14

III.  The Conspiracy Period Is A Merits Issue That is Common to the Class and Cannot
      Be Decided at the Class Certification Stage ................................................ 22

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                   **Page**

*Adams v. Mills*, 286 U.S. 397 (1932) ...........................................................21

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................1

*Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262 (N.D. Ill. 1992) ........................................22

*Black v. Occidental Petroleum Corp.*, 69 F.4th 1161 (10th Cir. 2023) ...........................11

*Broiler Chicken Antitrust Litig., In re*, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ...................23

*Bultemeyer v. CenturyLink Inc.*, 2023 WL 1472831 (D. Ariz. Feb. 2, 2023)................................7

*Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016) ...........................................8

*Dancel v. Groupon, Inc.*, 949 F.3d 999 (7th Cir. 2019).............................................8, 9

*Disposable Contact Lens Antitrust, In re*, 329 F.R.D. 336 (M.D. Fla. 2018)..............................16

*Domestic Drywall Antitrust Litig., In re*, 2016 WL 3453147 (E.D. Pa. June 22, 2016) ..............24

*Drug Mart Pharmacy Corp. v. Am. Home Prods., Corp.*,
   288 F. Supp. 2d 325 (E.D.N.Y. 2003) .........................................22

*Feldman v. Motorola, Inc.*, 1994 WL 160117 (N.D. Ill. Jan. 31, 1994)........................................22

*Food Lion, LLC v. Dean Foods Co.*, 2016 WL 5951792 (E.D. Tenn. Jan. 19, 2016)..................23

*Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40 (D.D.C. 2006)................................22

*Gates v. Towery*, 2004 WL 2583905 (N.D. Ill. Nov. 10, 2004),
   *aff'd*, 430 F.3d 429 (7th Cir. 2005) .........................................6

*Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247 (S.D. Cal. 2023)........................................7

*Hansen v. Country Mutual Insurance Co.*, 2023 WL 6291629
   (N.D. Ill. Sept. 25, 2023) .........................................18

*Hochschuler v. G. D. Searle & Co.*, 82 F.R.D. 339 (N.D. Ill. 1978)...........................................25

*Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016) .................2, 5, 7, 8, 9, 11, 15

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009)............................................2, 7-8, 9

*Lamictal Direct Purchaser Antitrust Litigation, In re*, 957 F.3d 184 (3d Cir. 2020) ...................18

*Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331 (N.D. Ga. 2021) ...................................12

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ...............2, 5, 8, 10, 15

*Moss v. United Airlines, Inc.*, 20 F.4th 375 (7th Cir. 2021) ..........................................................10

*Mullins v. Direct Digit., LLC*, 795 F.3d 654 (7th Cir. 2015) ........................................................11

*Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ................................................14

*Nexium Antitrust Litig., In re*, 777 F.3d 9 (1st Cir. 2015) ............................................................21

*Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859 (S.D. Ohio 2000)..........................................12

*Nnebe v. Daus*, 2022 WL 1204700 (S.D.N.Y. Apr. 22, 2022) ......................................................11

*NorthShore Univ. HealthSystem Antitrust Litig., In re*,
    657 F. Supp. 3d 1077 (N.D. Ill. 2023) .......................................................................................16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651
    (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale
    Grocery Coop., Inc.*, 143 S. Ct. 424 (2022)...............................................................................17

*Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494 (E.D. Pa. 2018).....................................12

*Polyurethane Foam Antitrust Litig., In re*, 314 F.R.D. 226 (N.D. Ohio 2014) ............................24

*Pool Prods. Distrib. Mkt. Antitrust Litig., In re*, 166 F. Supp. 3d 654 (E.D. La. 2016)...............16

*Pork Antitrust Litig., In re*, 665 F. Supp. 3d 967 (D. Minn. 2023)...............................................17

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) ..................................................18

*Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., In re*,
    335 F.R.D. 1 (E.D.N.Y. 2020).....................................................................................................21

*Roofer's Pension Fund v. Papa*, 333 F.R.D. 66 (D.N.J. 2019) .....................................................22

*Santa Fe Natural Tobacco Co., In re*, 2023 WL 6121894 (D.N.M. Sept. 19, 2023),
    *appeal pending*, No. 23-83 (10th Cir. filed Nov. 2, 2023) ......................................................23

*Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010).........................................................................9

*Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748 (7th Cir. 2005) ....................................................7

*Shekar v. Accurate Background, Inc.*, 428 F. Supp. 3d 9 (E.D. Wis. 2019)................................11

*Simpson v. Dart*, 2021 WL 2254969 (N.D. Ill. June 3, 2021) ........................................................6

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
    830 F.2d 1374 (7th Cir. 1987) ...................................................................................................12

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014).......................................................7

*T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518 (N.D. Ill. 2020) ................................10

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ................................................9, 11, 16, 17

*United States v. JetBlue Airways Corp.*, 2024 WL 162876 (D. Mass. Jan. 16, 2024) .................12

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020).......................................12, 13, 14

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018).................................................................................................23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)..........................................23

**RULE**

Fed. R. Civ. P. 23 ...............................................................................................................1, 4, 8, 13, 23

**OTHER MATERIALS**

Laila Haider, John H. Johnson, and Gregory K. Leonard, *Turning Daubert
On Its Head: Efforts to Banish Hypothesis Testing in Antitrust Class
Actions*, 30 Antitrust 53 (2016)................................................................................................. 16-17

*Model Jury Instructions in Civil Antitrust Cases* 6.B.7 (Am. Bar Ass'n 2016) ...........................16

# INTRODUCTION

As this Court held in denying CDK's motion for summary judgment against AutoLoop, there is ample evidence for a jury to conclude that CDK and Reynolds, which have long dominated the market for Dealer Management Systems ("DMS"), unlawfully conspired to block independent providers of data integration services ("DIS"), eliminating consumer choice and forcing vendors to purchase DIS in monopolized markets at inflated prices. Resolution of this claim presents common questions for all vendors, and CDK does not and cannot dispute that it is more efficient for a single jury to decide them rather than to conduct myriad individual trials across the country. This case – brought by the direct purchasers of DIS from the Defendants – is a paradigm case where Rule 23 is "readily met." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-25 (1997).

In opposition, CDK argues that (1) certain vendors are subject to class-action waivers that prevent them from participating in this case; and (2) vendors cannot present common proof of antitrust injury. CDK also asks this Court to resolve merits questions regarding the date when the conspiracy ended and whether it has continuing impact. None of these arguments provide a valid basis to deny the vendors' motion for class certification or to resolve jury issues prematurely.

I.      CDK first argues that certain Vendor Class members signed class-action waivers that fall outside CDK's stipulation that any such waivers are unenforceable for members who joined its 3PA program before June 5, 2018. To avoid any potential dispute over that issue, AutoLoop will amend the class definition to exclude vendors that first joined 3PA after June 5, 2018, and are therefore potentially subject to enforceable class-action waivers. Such an amendment is routine in class-action practice and moots CDK's objection.

II.     CDK's argument that the Vendor Class lacks common evidence of antitrust injury fails as a matter of law because, as the Seventh Circuit has repeatedly held, the possibility that

some class members were uninjured does not defeat predominance. Moreover, the premise of CDK's argument is incorrect because (1) CDK ignores evidence that all class members suffered antitrust injury from Defendants' elimination of competing DIS providers, which led to increased prices, reduced quality, and reduced consumer choice; and (2) in any event, Dr. Israel's analysis shows that virtually all class members suffered pecuniary harm as a result of the conspiracy.

A.     The possibility that the jury will ultimately conclude that certain class members did not suffer injury does not undermine predominance. The Seventh Circuit has long drawn a "critical" distinction "between class members who *were not* harmed and those who *could not have been* harmed." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824-25 (7th Cir. 2012) (second emphasis added). Only inclusion of the latter poses a potential class-certification obstacle. But CDK does not argue that *any* class members *could not have been* harmed. Nor could it in light of the summary judgment record. CDK's argument that the class contains some members who *were not harmed* thus does nothing to defeat class certification. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class certification"); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016) (same).

B.     The premise of CDK's argument is incorrect because, even if CDK could show that certain class members did not have measurable overcharges (and it has made no such showing), this would not contradict vendors' showing – based on common proof – that all members of the class suffered *antitrust injury*. As Dr. Israel explains, the elimination of competing DIS providers harmed all vendors that purchased DIS services, not only because they were subject to overcharges but also because they were deprived of the choice and quality benefits of competition. *See* Ex. 1,[1]

---

[1] All referenced exhibits are attached to the Omnibus Declaration of Daniel V. Dorris.

Supplemental Reply Report of Mark Israel ("Israel Suppl. Reply"), ¶¶ 15-16, 42-49.

    **C.**      CDK's argument that modifications to Dr. Israel's regression model somehow demonstrate that many class members avoided overcharges misunderstands the purpose and significance of his regression analysis, which is to quantify the market-wide price impact of the conspiracy. All members of the class can rely on that quantification to show both antitrust injury and damages. CDK's critique – which depends on the analysis of a previously undisclosed expert, Dr. Laila Haider – goes to merits issues (though Dr. Haider cannot testify at trial), not class certification, and is incorrect as a matter of statistical analysis, as Dr. Israel explains.

    **1.**      Dr. Israel's regression analysis – which this Court has already held to be reliable and admissible – calculates, on a market-wide basis, the amount by which prices were elevated as a result of the conspiracy. As Dr. Israel explains, given the economic evidence that the impact of the conspiracy was market-wide – that is, monopolization of DIS service on CDK's and Reynolds's respective DMSs – the most appropriate way to estimate overcharges incurred by members of the class is to calculate average overcharges (during two phases of the conspiracy) for CDK's 3PA service and Reynolds's RCI service. That is what he has done. Because each class member's damages depend on the difference between what the class member actually paid for DIS and what the class member would have paid in the but-for world, it is appropriate under Seventh Circuit precedent to use the average overcharge to estimate the damages incurred by each class member.

    **2.**      CDK claims that breaking the class into smaller groups indicates that certain sub-groups did not incur overcharges; CDK argues in particular that smaller vendors that purchased CDK's 3PA service did not incur statistically significant overcharges. This argument is legally incorrect because it conflates injury and damages. Moreover, far from justifying denial of class

certification, this argument underscores that the quantum of damages can be addressed on a class-wide basis through a common regression analysis. In any event, Dr. Israel explains why a claim that overcharges are not *statistically significant* is consistent with the existence of overcharges; the lack of statistical significance reflects the unsound way CDK has sliced up the data. Using a more appropriate set of vendors, which increases the statistical power of the regression, demonstrates overcharges for large and small vendors alike purchasing both RCI and 3PA services.

**3.** CDK's expert performs regression analyses on individual vendors; those analyses lack statistical power – because they involve relatively little data – but their results on the whole support, rather than undermine, a conclusion that overcharges were incurred class-wide.

**4.** The analysis of CDK's expert is legally flawed because she categorizes vendors as uninjured even where her own analysis shows they paid overcharges, if those overcharges were later offset by discounts. That approach is incorrect as a matter of law; a direct purchaser establishes antitrust injury with a single overcharge, regardless of later-in-time offsets.

**5.** The three vendor examples that CDK says had prices that remained flat or fell do not establish that any class member's overcharge is "overstate[d]" because it is possible (and consistent with economics) that their prices would have fallen or fallen more in the but-for world.

**III.** The Court should reject CDK's request to "cut back" the class period, because its arguments – which center on supposed developments since 2019 – raise common merits questions for the jury at trial. Class certification is not an opportunity to decide merits issues, especially given that CDK did not raise them as a basis for summary judgment, which it filed in 2020.

## ARGUMENT

"Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a *significant aspect of [a] case* and . . . can be resolved for all members of [a] class in a single

adjudication. . . . Put . . . another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Messner*, 669 F.3d at 815 (emphasis added). Such common questions exist here, including (among others): (1) market definition and market power; (2) whether CDK and Reynolds conspired to coordinate their data access policies and block independent integrators from their respective DMSs; (3) whether that agreement had anticompetitive effects in the relevant antitrust markets for DIS; and (4) whether CDK's purported justification for coordinating with Reynolds – *i.e.*, data security – is legitimate and outweighs the conspiracy's anticompetitive harms. *See generally* Dkt. 1381 ("SJ Op."). CDK does not and cannot dispute that it would be far more efficient for the jury to decide these common issues "in one stroke," *Kleen*, 831 F.3d at 925, rather than in scores of separate trials brought by individual vendors. Nothing more is required to satisfy predominance.

Instead of contesting the existence of these common issues, CDK asserts that the Vendor Class should not be certified because (1) some members of the class signed enforceable class-action waivers and (2) antitrust injury cannot be shown through common proof (or, alternatively, that the common proof suggests that there are too many uninjured class members). Neither argument defeats predominance, as explained below. CDK's additional arguments regarding the cut-off date for the class period raise merits issues that do not affect the propriety of class certification.

## I.    AutoLoop's Amended Class Definition Moots CDK's Class-Waiver Argument

As CDK acknowledges (at 12), in an October 1, 2019, stipulation with AutoLoop, CDK agreed that no class-waiver provision would apply to class members (like AutoLoop) that were part of CDK's 3PA program before June 5, 2018. *See* Dkt. 770, ¶¶ 1-2. By CDK's count (at 13), 259 proposed class members are covered by the stipulation. CDK asserts, however, that some vendors first joined 3PA after June 5, 2018, and that such vendors' agreements with CDK include

class-waiver provisions that are not covered by the stipulation; it further argues that the enforceability of those provisions presents individualized issues.

The Court need not address this argument because AutoLoop will voluntarily modify the class definition to include only vendors that first purchased data integration from CDK on or before June 5, 2018, by adding the following bolded and italicized language:

> All automotive software vendors (i.e., persons or entities engaged in the sale of software solutions to automotive dealerships) located in the United States that, at any time since October 1, 2013, have purchased data integration services from CDK or Reynolds.

> Excluded from the class are (1) CDK, Reynolds, and any of their officers, directors, employees, subsidiaries, and affiliates; (2) Cox Automotive, Inc. and its subsidiaries and affiliates; and *(3) automotive software vendors that first purchased data integration services from CDK after June 5, 2018*.

With this modification, the Vendor Class action can be tried without any inquiry at all into class-waiver issues, because it excludes all vendors that first purchased data integration from CDK after June 5, 2018, and thus could have 3PA agreements with enforceable class-waiver provisions. This reduces the number of class members from 439 to 244, but only decreases collective overcharges from $432 million to $399.5 million. *See* Israel Suppl. Reply ¶ 97 & n.156.

Courts routinely allow plaintiffs to modify the class definition before class certification, including, as here, in a reply brief in response to arguments from defendants. *See*, *e.g.*, *Simpson v. Dart*, 2021 WL 2254969, at *1 (N.D. Ill. June 3, 2021) (granting plaintiffs' request to modify class definitions "in their reply brief" that "responded to defendants' arguments"); *Gates v. Towery*, 2004 WL 2583905, at *1, *3-4 (N.D. Ill. Nov. 10, 2004) (granting "Plaintiffs' motion for class certification with modification" because "[i]n their reply brief, Plaintiffs revise[d] their initially proposed class definition" in response to defendants' arguments), *aff'd*, 430 F.3d 429 (7th

Cir. 2005); *see also Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) ("Litigants and judges regularly modify class definitions.").

Specifically, amending the class definition is an accepted way to prevent a defendant's insertion of class-action waivers from obstructing class certification. *See Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 274 (S.D. Cal. 2023) (modifying class definition to exclude members that joined after the date Marriott began imposing class waivers); *Bultemeyer v. CenturyLink Inc.*, 2023 WL 1472831, at *4 (D. Ariz. Feb. 2, 2023) (similar). By excluding any vendor with a potentially enforceable class-waiver provision, AutoLoop's modified class definition moots CDK's arguments regarding predominance and adequacy based on the existence of those provisions.

## II. CDK's Arguments Regarding Antitrust Injury Do Not Defeat Predominance

CDK's argument that class certification should be denied because antitrust injury is not a common issue is legally wrong and unsupported by the evidence. *First*, Seventh Circuit precedent makes clear that the possibility that a class includes uninjured members who may be unable to establish injury at trial does not defeat predominance. Here, CDK's own argument shows the question is subject to common proof. *Second*, the jury here could conclude that every member of the class suffered antitrust injury *and* quantifiable damages; the resolution of any factual dispute over how to calculate overcharges is a jury question and not a reason to deny class certification.

### A. Antitrust Injury Is Subject To Common Proof

CDK's argument that some class members may not have suffered injury and that possibility defeats predominance is legally incorrect because the Court need not find that every class member necessarily suffered injury to certify a class. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("If the court thought that no class can be certified until every member has been harmed, it was wrong."). On the contrary, the Seventh Circuit has "not insisted" on a showing at the class-certification stage that every class member is injured. *Kleen*, 831 F.3d at 927; *Kohen*,

571 F.3d at 677 ("[A] class will often include persons who have not been injured by the defendant's conduct," which "does not preclude class certification[.]"); *Messner*, 669 F.3d at 815 (same).

1.      Rule 23(b) requires predominance of common *questions* – questions that "can be resolved for all members of [a] class in a single adjudication," *Messner*, 669 F.3d at 825 – but it does not, contrary to CDK's passing assertion (at 16), require the class to prove that the trial will generate the same *answer* for all members.  Instead, "[i]f the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Id.* at 815; *see also Kleen*, 831 F.3d at 927 (The "essential" class-certification question "is whether the class can point to *common proof* that will establish antitrust injury."); *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016); *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1008 (7th Cir. 2019).

This Court has already held that the record here is sufficient to make a *prima facie* showing of antitrust injury based on common proof.  At summary judgment, the Court found that Plaintiffs have a triable case that CDK and Reynolds conspired to eliminate competition and drive up prices. CDK and Reynolds "usurped control over dealer data and thwarted dealers' ability to control who can access and use their data," leaving vendors with "no choice but to access certified data integration from CDK and Reynolds, at a price much higher than they would pay to an independent integrator." SJ Op. at 5.[2]  In addition to paying higher prices, vendors were deprived of the ability to opt for higher-quality service and greater functionality than 3PA or RCI.  *See, e.g.*, Dkt. 1101, ¶ 18 (vendor testifying that Authenticom's "service was, in my opinion, better" and "absolutely at

---

[2] Testimony from Defendants' witnesses on price impact is stark.  After conspiring to block independent integrators, both CDK and Reynolds imposed massive price increases on vendors. *See* Dkt. 1101 (MDL Pl.'s Statement of Additional Material Facts ¶¶ 72-73).  For example, CDK's Ron Workman said that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

least as good by any definition"); *id.* ¶¶ 78, 82 (vendors commonly lose functionality and data sets when forced to switched to 3PA or RCI).

This summary judgment evidence "demonstrate[s] that the element of impact is capable of class-wide proof at trial, through evidence common to all class members." *Kleen*, 831 F.3d at 925. Any member of the Vendor Class – all of whom purchased DIS in markets that had been unlawfully monopolized as a result of the conspiracy – could point to this same evidence to establish antitrust impact. As the Supreme Court held in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016), the fact that any plaintiff could rely on such evidence establishes that the antitrust injury question is common. *See Dancel*, 949 F.3d at 1005 ("One way of establishing that common evidence can supply an answer to a common question is to consider whether an individual class member could have relied on that same evidence in an individual action."). The jury may find, on the merits, that some class members were injured while others were not, but "[s]uch a possibility . . . does not preclude class certification," *Kohen*, 571 F.3d at 677; *see supra* pp. 7-8. Class certification does not permit the court to predict the jury's decision – only to evaluate whether the class *can* prevail based on common evidence. *See Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) ("court may take a peek at the merits before certifying a class," but the peek must be "limited to those aspects of the merits that affect the decisions essential under Rule 23").

CDK has no valid response to *Tyson Foods*. CDK is wrong that *Tyson Foods* is limited to the FLSA context. *See Dancel*, 949 F.3d at 1004-05 (applying *Tyson* to state-law claims). And CDK's attempt to distinguish *Tyson Foods* (at 22) by arguing that class members in that case were "similarly situated" falls flat, because the members of the Vendor Class are likewise similarly situated in the relevant sense: they all purchased DIS from CDK or Reynolds in markets that had been monopolized as a result of the conspiracy, and thus can show injury through common proof.

**2.**    CDK's claim that some class members paid no overcharge – which, as explained below (Part II.B.), is properly considered a question of *damages* rather than *antitrust injury* – does not show that the class lacks common evidence to establish a *prima facie* showing of antitrust injury; rather, it is *rebuttal evidence* designed to show that "plaintiffs' proposed class contains members whose claims will fail on the merits," which is "a fact generally irrelevant to the district court's decision on class certification." *Messner*, 669 F.3d at 823-24.

As a legal matter, the "critical" "distinction for class certification purposes" is between plaintiffs that "*were not injured*" and plaintiffs that "***could not have*** suffered injury." *Moss v. United Airlines, Inc.*, 20 F.4th 375, 379 n.7 (7th Cir. 2021) (emphases added); *Messner*, 669 F.3d at 824-25. Only a class defined to include a "great number of members who for some reason *could not have been harmed* by the defendant's allegedly unlawful conduct" would pose an obstacle to certification under Rule 23. *Messner*, 669 F.3d at 824 (emphasis added).[3] Here, CDK does not even attempt to show that the Vendor Class contains members that ***could not have been*** harmed. CDK's claim that some class members will "ultimately [be] shown to have suffered no harm," *Messner*, 669 F.3d at 824, is not an argument against class certification – it is one for the jury.

Furthermore, the way that CDK purports to rebut the Vendor Class's antitrust injury showing – its expert's modification of Dr. Israel's regression analysis – simply underscores that the question of antitrust injury is common. Even if CDK's rebuttal evidence could undermine commonality – and it cannot, since common evidence need only establish a *prime facie* case – CDK's rebuttal expert uses a common methodology and common evidence to estimate damages for each class member. That CDK's rebuttal expert uses a *different* common method that purports

---

[3] Even then, such overbreadth is not "a basis to deny class certification" but rather "must be addressed by means of a narrower class definition." *T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518, 528 (N.D. Ill. 2020).

to find no overcharges for some class members does not show that the question of impact is incapable of resolution through common proof – it shows the opposite.

CDK's argument (at 22-23) that identifying uninjured members would prove difficult if the class is certified is both wrong and premature. Filtering out any class members with no damages is "generally unproblematic" because the "non-injured parties can just be sorted out at the remedies phase of the suit." *Nnebe v. Daus*, 2022 WL 1204700, at *2 n.2 (S.D.N.Y. Apr. 22, 2022) (citation omitted); *Shekar v. Accurate Background, Inc.*, 428 F. Supp. 3d 9, 18 (E.D. Wis. 2019) (similar). At the class-certification stage, plaintiffs need not identify uninjured members (although here, Dr. Israel has already generated estimates of each class member's damages using class-wide proof and methods, *see* Dkt. 1422-2 ("Israel Suppl. Rep."), ¶ 12. *See Tyson Foods*, 577 U.S. at 461 (holding it is "premature" to identify uninjured class members prior to the allocation phase, when the district court can consider methods for disbursing the awarded damages); *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1185 (10th Cir. 2023) ("The successful identification of uninjured class members is, at [the class-certification] juncture, premature.").

Similarly, CDK's suggestion (at 16-17) that certifying a class with uninjured class members could create a constitutional problem confuses the requirements for *class certification* with those for *recovering damages after trial*. The Seventh Circuit has "no quarrel with the proposition that each and every class member" would need to show injury to collect damages, but it has "not insisted on this level of proof at the class certification stage." *Kleen*, 831 F.3d at 927.

Finally, CDK's formulation – requiring all or nearly all class members to establish injury at the class-certification stage – would run afoul of the legal principle that a class cannot be designed as a so-called "fail-safe" class. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 660 (7th Cir. 2015) ("[C]lasses that are defined in terms of success on the merits – so-called 'fail-safe

classes' – . . . are not properly defined.").  CDK's approach would thus create a Catch-22:  classes would be too broad (containing potentially uninjured members) or too narrow (a fail-safe class).

### B.  All Vendors Incurred Antitrust Injury Whether Or Not They Paid Overcharges

CDK's effort to rebut the Vendor Class's showing of antitrust injury fails for a second, independent reason:  it improperly conflates the question whether a vendor incurred a measurable overcharge (damages) with the question whether the vendor suffered an antitrust injury.

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 481 (7th Cir. 2020).  Here, the anticompetitive conduct – the coordination on a chief point of competition (data access) and the exclusion of rival DIS providers – eliminated competitive pressure on CDK and Reynolds to reduce price, innovate, and increase the quality of 3PA and RCI services.  All vendors who purchased those services were deprived of choice and were forced to purchase products that were more expensive and lower quality than in a world in which those sellers faced competition.  That constitutes antitrust injury.  *See*, *e.g.*, *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1382 (7th Cir. 1987) (antitrust injury satisfied where a competitor was driven out of the market, "thereby reducing price competition in that market").[4]

---

[4] *See also, e.g., Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331, 1350-51 (N.D. Ga. 2021) (conduct that "depriv[ed] customers of choice, and thereby prevented them from accessing lower-cost, higher-quality options" establishes antitrust injury) (citing cases); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 502 (E.D. Pa. 2018) (antitrust injury present where conduct "limited competitive options for end payors, providers, and patients" in a health care market); *Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000) (conduct "resulting in higher prices, lower quality services, and less choice for consumers" are "the kind of injuries that the antitrust laws were enacted to prevent"); *United States v. JetBlue Airways Corp.*, 2024 WL 162876, at *28 (D. Mass. Jan. 16, 2024) (elimination of competition that acts "both to constrain prices and spur innovation" is cognizable harm).

*Viamedia* illustrates the point.  There, the defendant – a cable company that provided "ad rep services" to competing cable providers – was accused of having driven the plaintiff, a rival provider of ad rep services, from the market.  These actions killed the plaintiff's business and gave the defendant a monopoly of ad rep services.  The Seventh Circuit found that the elimination of the plaintiff from the market "*unquestionably harmed competition*," because when "a competitive market shift[s] to total control by a monopolist" it leads to "potentially higher prices, lower output, and reduced innovation."  951 F.3d at 475 (emphasis added).

Dr. Israel explains that vendors have suffered these expected harms.  As a result of the conspiracy, CDK and Reynolds no longer face competition from lower-priced, higher-quality DIS services provided by the likes of Authenticom.  As a result, they are free to raise prices; they have less incentive to innovate; and they have less reason to improve quality than they would if competition had been allowed to remain.  *See, e.g.*, Israel Suppl. Reply ¶¶ 42-49.[5]  As Dr. Israel explains, his damages model does not capture every way in which the conspiracy harmed the members of the Vendor Class, but that simply makes his damages estimate conservative.  *See* Israel Suppl. Reply ¶ 43.  It does not alter his opinion – consistent with bedrock antitrust principles – that all purchasers, irrespective of the amount of overcharge incurred, suffered antitrust injury.[6]

---

[5] Contrary to Dr. Haider's conclusory contention, *see* Dkt. 1460-1 ("Haider Rep."), ¶¶ 206-207, these are not "unsupported assumptions."  The plaintiffs submitted extensive evidence at summary judgment showing that Authenticom and other independent data integrators provided innovative, high-quality services that constrained CDK's prices and spurred CDK to enact competitive responses.  *See* Dkt. 1101, ¶¶ 17, 77-78, 82, 86; Dkt. 977 (Authenticom's Statement of Material Facts), ¶¶ 29-41, 45.

[6] *See, e.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) ("Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.") (citing cases); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[E]ven where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure."); 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1781 (3d ed. 2023) (where "the alleged violation can

CDK argues (at 17) that "[a]n antitrust violation is not the same as antitrust injury," but no one claims that it is. Rather, vendors rely on "[t]he general rule . . . that customers . . . in [an] affected market have antitrust standing," *Viamedia*, 951 F.3d at 482, precisely because customers suffer the consequences of a reduction in competition. *See Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."). That principle applies here, where Defendants' conspiracy eliminated all competition for DIS services.[7]

### C. CDK's Critique of Dr. Israel's Regression Does Not Undermine Vendors' Showing That Antitrust Injury Is a Common Question

CDK's reliance on Dr. Haider to argue that Dr. Israel's regression analysis obscures differences among class members that preclude class certification is legally misguided for the foregoing reasons; it is also based on a misunderstanding of his regression analysis, which courts have repeatedly validated (including in this case), and unpersuasive statistical analysis.

1.      Dr. Israel's regression is designed to determine – for 3PA and RCI services, and for two periods of the conspiracy – the average overcharge (*i.e.*, damages) incurred by purchasers of DIS. Although predominance does not require that damages be a common question, Dr. Israel's analysis makes damages a common question because *any* member of the class can rely on his average overcharge to make a *prima facie* showing of damages. As Dr. Israel explains in his report, Israel Suppl. Reply ¶¶ 42-50, his regression analysis is not the only evidence that establishes the *existence* of antitrust injury – that is also clear from the nature of the conspiracy and the common evidence of its impact on purchasers, as explained above. The regression is rather a tool

_____

be shown to arise out of a common course of conduct or have a general effect on the market," the "predominance requirement of Rule 23(b)(3) will be satisfied").

[7] In its *Daubert* opposition, *see* Dkt. 1470, AutoLoop responds to CDK's criticisms (at 17) of Dr. Israel's deposition testimony.

to *quantify* one type of harm incurred by purchasers, that is, overcharges relative to prices that would have prevailed absent the conspiracy. As Dr. Israel constructed the regression, it calculated the average, market-wide overcharge to a high degree of statistical significance: his analysis shows that 3PA and RCI prices were elevated during the conspiracy period; it allows him to calculate the overcharge as a percentage; and it demonstrates that the overcharges were extremely unlikely to be the result of random variation. *Id.* ¶¶ 51-56.

*Any* member of the class can rely on that average overcharge to establish its damages. To be sure, class members' specific circumstances – the number of apps they offer, the type of services they need, the number of dealers they serve, and so on – vary. But for all of the class members, the question is how much more they paid for DIS in the real world than they would have paid in the but-for world. *See* Dkt. 1321 ("*Daubert* Op."), at 14 ("Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation.").

The amount that a vendor would have paid in a competitive market is something that must be determined based on appropriate economic inference. And, as Dr. Israel explains, it is reasonable to estimate overcharges by considering what the average overcharge was – that is, there is no reason to assume that other factors accounting for differences in what individual vendors paid would have had a different effect in the but-for world than they did in the real world. That is why courts routinely allow the use of market-wide averages just like Dr. Israel's to estimate an individual purchaser's overcharges. *See, e.g.*, *Kleen*, 831 F.3d at 929 ("plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages" because "[t]he determination of aggregate classwide damages is something that can be handled most efficiently as a class action"); *Messner*, 669 F.3d at 819-20 (expert model showing average

damages capable of establishing class-wide antitrust injury); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1090-92 (N.D. Ill. 2023) (same).[8]

*Tyson Foods* is, again, instructive. In that case, plaintiffs' expert determined class-wide damages by calculating the average time it took certain employees to "don and doff" work clothes (for which they had improperly been denied compensation). *See* 577 U.S. at 449-51. Petitioner argued that because individuals' donning and doffing time varied, the class should not have been certified: using "a representative sample," petitioner argued, "assum[ed] away the very differences that make the case inappropriate for classwide resolution" and "depriv[ed] petitioner of any ability to litigate its defenses to individual claims." *Id.* at 454. The Supreme Court rejected the argument, noting that use of representative or statistical evidence does not depend on "the form a proceeding takes" – *e.g.*, whether a class or individual action – "but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Id.* at 454-55.

In the face of these well-settled principles, CDK's new expert, Dr. Haider, insists that "a finding of a positive overcharge, *on average*, across all proposed class members cannot be taken as proof that all the underlying individual overcharges are also positive." Laila Haider, *Turning*

---

[8] *See also In re Urethane Antitrust Litig.*, 768 F.3d at 1251 & n.3 (affirming antitrust verdict based on average overcharges); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 389 (M.D. Fla. 2018) ("The use of averages to prove common impact to a putative class is accepted. . . . By using averages, [the expert] presents a model that he argues follows and demonstrates the general market, averaging out the idiosyncratic outliers both high and low which tend to obscure the average trend of the market price. [The expert's] methodology identifies classwide impact that is the result of the wrong alleged."); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 683 (E.D. La. 2016) (similar); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 628 (N.D. Cal. 2015) ("[A]ttacking averaged data is a standard defense tactic in antitrust cases, so it is unsurprising that courts have often evaluated and approved the appropriate use of averages," which "is often appropriate where a small sample size may distort the statistical analysis and may render any findings not statistically probative."); *Model Jury Instructions in Civil Antitrust Cases* 6.B.7 (Am. Bar Ass'n 2016) (endorsing average overcharge, "as long as the average or estimate is based on evidence and reasonable inferences").

*Daubert On Its Head: Efforts to Banish Hypothesis Testing in Antitrust Class Actions*, 30 Antitrust 53, 56 (2016). But courts that have considered Dr. Haider's common-impact framework have rejected it.[9] Under *Tyson Foods*, if an individual class member can use an average overcharge as a reasonable estimate of its damages, then that same average overcharge is common evidence that can be used by all class members in a class action. Here, the antitrust laws permit the use of an average overcharge in cases like this one, where the facts indicate that the challenged conduct would tend to have market-wide price effects.

In this case, the Court has already determined that Dr. Israel's regression analysis is admissible and sufficient for a jury to credit as the basis for antitrust injury and damages. *Daubert* Op., at 22-27; *id.* at 23 (CDK's critiques "go to the weight rather than the admissibility of Israel's damages opinion."); *id.* at 26 ("This is a question for the factfinder"). Those decisions – which are law of the case – foreclose CDK from showing that Dr. Israel's model cannot establish injury and damages for the class. Any individual vendor, whether suing separately or in a class action, can appropriately rely on that regression – and its estimate of overcharges – to establish damages. *Tyson Foods*, 577 U.S. at 453 ("where the same evidence will suffice for each member to make a prima facie showing," that evidence is common). And in this class action, the regression undisputedly establishes the amount of *class-wide* damages; the proper allocation of those damages is a separate matter (in which CDK frankly has no interest).[10]

---

[9] *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677-78 (9th Cir. 2022) (en banc) (affirming class certification and explaining that Dr. Haider's "argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected"); *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1005-06 (D. Minn. 2023) (joining other courts that have "rejected" Dr. Haider's argument that a model "cannot show classwide impact" because it used "an averaging approach that masks individualized differences between class members").

[10] *See In re Urethane Antitrust Litig.*, 768 F.3d at 1269. For this reason, CDK's suggestion that inclusion of supposedly uninjured class members would affect the parties' incentives to settle

The cases cited by CDK (at 19-20) are off point. Dr. Israel is not asking the Court to credit "superficial reasoning" and take common impact "on faith," as occurred in *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009); he wrote detailed expert reports that this Court has already found reliable and sufficient for the jury to credit. Nor does this case bear any resemblance to *In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184 (3d Cir. 2020), where prices were "never inflated to begin with" because the defendant had pursued a preemptive discounting strategy before the conspiracy began. *Id.* at 194. Finally, *Hansen v. Country Mutual Insurance Co.*, 2023 WL 6291629 (N.D. Ill. Sept. 25, 2023), is even further afield: that was a non-antitrust case involving insurance claims after a tornado, where a class trial would have entailed locating and excluding 176,000 class members whose insurance claims were properly paid. *Id.* at *28.

**2.** CDK's criticism that Dr. Israel's before-and-during regression obscures differences among class members (and therefore a large number of uninjured class members) is legally deficient for all the reasons explained above – it is rebuttal evidence and it only rebuts vendors' common evidence of damages, not antitrust injury, which does not depend solely on measurable overcharges. At any rate, CDK's argument is incorrect as a matter of statistical inference.

CDK's principal argument is that Dr. Israel should have modified his regressions to estimate separately the overcharges incurred by (1) "large" vendors (those in the top 20% by DIS fees paid) and (2) "small" vendors (those in the bottom 80% by DIS fees). CDK argues that when Dr. Haider makes that modification, she finds: (1) "large" vendors incurred statistically significant overcharges (for both 3PA and RCI); (2) "small" vendors that purchased RCI incurred statistically significant overcharges as well (though smaller than what Dr. Israel calculates); and (3) "small"

---

– a legally irrelevant argument in any event – is incorrect. Dr. Haider does not dispute the *overall* damages amount. She merely questions how that amount should be allocated among class members, which does not affect the extent of CDK's potential monetary liability.

vendors that purchased 3PA incurred positive (but not statistically significant) overcharges prior to February 2015 but paid no overcharges after February 2015.  CDK likewise says (at 20) that slicing the data in other ways results in a finding that overcharges for some sub-groups are not positive and statistically significant.

CDK's argument – and Dr. Haider's alternative models – get CDK nowhere at class certification.  Both her alternative regression models and Dr. Israel's use class-wide statistical methods to analyze large class-wide data sets to estimate damages for all class members; neither proceeds based on individualized inquiries into specific class members' circumstances.  CDK also offers no explanation on the facts why the overcharge would vary by vendor.  But ultimately, whether it is appropriate to estimate damages separately for "small" and "large" vendors (or any of the other sub-groups Dr. Haider suggests) raises a common merits question.

At any rate, even splitting vendors into "large" and "small" groups shows positive overcharges for both.  *See* Israel Suppl. Reply ¶ 132 & tbl. 3.  As Dr. Israel explains, Dr. Haider's finding of no statistically significant overcharges for "small" vendors purchasing 3PA is not the same as a showing that there were no overcharges:  all it shows is that there is insufficient data to measure those overcharges with sufficient certainty to satisfy Dr. Haider's statistical test.  *Id*.  Dr. Haider "subdivided the data to the point that the sample cannot find significant results."  *Id.* ¶ 132 (lack of statistical significance for "small" 3PA vendors was due to only 25 such vendors purchasing 3PA before-and-during the conspiracy).  Dr. Israel corrected Dr. Haider's thin slicing of the data to show there is statistically significant overcharges for all combinations of "small" *and* "large" vendors purchasing 3PA *and* RCI, once one includes sufficient data to generate statistically significant results.  *Id.* & tbl. 3.

In sum, Dr. Haider's claim that certain sub-groups of vendors did not have measurable overcharges is both legally irrelevant and unpersuasive as a matter of statistical analysis.

**3.** Dr. Haider's proposal to run separate regressions on individual vendors shows the speciousness of CDK's argument. As Dr. Israel explains, applying his regression model to individual vendors is essentially self-defeating: a regression analysis is used to calculate averages and gains statistical power by including a large number of data points. Given individual variations, running a regression model on individual buyers is less likely to generate meaningful results.

Nevertheless, even those individual regression analyses support the conclusion that all or nearly all class members incurred overcharges. Dr. Israel ran regression analyses for the 97 DMS-vendor combinations for which there was data both before and during the conspiracy period. Israel Suppl. Reply ¶ 128. Within this subset, he found that two-thirds showed positive and statistically significant overcharges. *Id.* And most of the rest showed no statistically significant result – which is consistent with overcharges. *Id.* And while 8% showed negative and statistically significant results – which would appear to reject the hypothesis that the particular vendor incurred an overcharge – "one would expect roughly this many apparently significant results entirely by chance." *Id.* In other words, "if you split out the runs enough ways and try enough times, you will find some results that go the other way purely due to the vagaries of data and statistics." *Id.*

Accordingly, Dr. Haider's analysis does nothing to establish that the class contains a meaningful number of vendors that did not incur overcharges – on the contrary, it supports the opposite conclusion. Moreover, as noted above, all of her analyses depend on the *same* regression model – underscoring that damages in this case are subject to common methods of proof.

**4.** ██████████████████████████████████████████

████████████████████████████████████████████████████████, but that is

contrary to the bedrock legal principle that payment of a single overcharge by a direct purchaser is sufficient to establish antitrust injury. This is another, independent reason Dr. Haider fails to provide a credible basis for concluding that the class contains uninjured members.

"[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (citing *Adams v. Mills*, 286 U.S. 397, 407 (1932)); *see also, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 30 (E.D.N.Y. 2020) ("payment of a single overcharge renders [a class member] injured"). Contrary to this black-letter standard, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████. It is unclear from Dr. Haider's report or work papers how many of her supposed "uninjured" class members are affected by this fundamental flaw, but as the cases cited above demonstrate, Dr. Haider's "netting" approach is contrary to law and hence provides no basis for identifying uninjured class members.

5.      Finally, CDK highlights (at 21) three vendors who, it argues, saw their DIS charges remain steady or fall slightly on net over the course of the conspiracy period, claiming that those vendors are examples of class members who incurred no overcharges. But even Dr. Haider's analysis shows overcharges for two of those three vendors – they just did not have *net* overcharges

(according to Dr. Haider) based on later-in-time offsets. *See* Haider Rep. ¶ 167 & Fig. 8; *id*. ¶ 170 & Fig. 11. Regardless, as Dr. Israel explains, "there is a very plausible but-for price path consistent with common overcharges" for each of these three vendors. Israel Suppl. Reply ¶ 144. That is, these vendors may have paid even less for DIS in the but-for world because, among other things, "the threat of going to Authenticom" at "a price of $50." *Id.* ¶¶ 146-47.

## III. The Conspiracy Period Is A Merits Issue That is Common to the Class and Cannot Be Decided at the Class Certification Stage

CDK proposes (at 37-40) alternative dates for cutting off the conspiracy period: October 2018 (when Reynolds settled with the putative dealer class) or December 2019 (when Plaintiffs submitted their merits expert reports). The Court should reject these arguments for four reasons.

*First*, the conspiracy period cannot be resolved at the class-certification stage under Rule 23, because that would require "an impermissible assessment of the merits of the action." *In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 270-71 (N.D. Ill. 1992) (rejecting challenge to class period under Rule 23). As many courts have recognized, the conspiracy period is a factual question for the jury, not a class question for the court to resolve under Rule 23. *See*, *e.g.*, *Feldman v. Motorola, Inc.*, 1994 WL 160117, at *1 (N.D. Ill. Jan. 31, 1994) (refusing to adjudicate the "length of the class period" under Rule 23 because the court "will not conduct a preliminary inquiry into the merits of plaintiffs' allegations while considering plaintiffs' motion for class certification"); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88 (D.N.J. 2019) (similar); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 44 (D.D.C. 2006) (similar).

Tellingly, CDK relies (at 38) on inapposite cases that decided the *merits* of the case – not whether class certification was appropriate. *E.g.*, SJ Op. at 125 (quoting *Drug Mart Pharmacy Corp. v. Am. Home Prods., Corp.*, 288 F. Supp. 2d 325, 332-33 (E.D.N.Y. 2003) (summary judgment)); *In re BNPD Antitrust Litig.*, No. 94-cv-897, Dkt. 3608, at 10-11 (N.D. Ill. Sept. 14,

1998) (same).[11]

Further, CDK failed to raise the end of the conspiracy period at any point during summary-judgment briefing (which occurred in 2020, after CDK's proposed cut off dates), when merits issues are properly raised. Nor did CDK supplement its summary judgment motion to raise these issues before the Court largely denied that motion in June 2023. Instead, CDK is trying to use Rule 23 to smuggle in a merits dispute through the back door, after discovery and summary judgment have concluded. But CDK cannot use Rule 23 to pursue forfeited merits arguments.

**Second**, even beyond being a merits question, the conspiracy period is a quintessential common issue: it affects the class as a whole. That the jury must determine the conspiracy period thus *supports* class certification under Rule 23(b)(3), because it is another issue that can and should be adjudicated for all class members at once rather than in hundreds of separate trials. *See*, *e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *11 (N.D. Ill. May 27, 2022) (holding that the conspiracy period is based on "evidence . . . common to each class").

**Third**, CDK's proposals confuse the end date of the conspiracy with the end date of damages flowing from the conspiracy. Even taking CDK's word that the conspiracy is over, "[i]t is black letter law that plaintiffs may recover for the continuing effects of a conspiracy that is ended." *Food Lion, LLC v. Dean Foods Co*., 2016 WL 5951792, at *4 (E.D. Tenn. Jan. 19, 2016) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 333, 343 (1971)) (similar).

---

[11] The other cases that CDK cites (at 40) were not antitrust cases and presented grounds for shortening the class period that are not present here. In *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., the court shortened the class period for a securities fraud case to the date of the corrective disclosure. 325 F.R.D. 280, 293 (D. Minn. 2018). And in *In re Santa Fe Natural Tobacco Co.*, a class action alleging that cigarette companies misrepresented their tobacco product as "additive-free," the court modified the class period to consumers who purchased cigarettes before defendants removed the challenged language from the packaging. 2023 WL 6121894, at *114 (D.N.M. Sept. 19, 2023).

Here, CDK and Reynolds have continued to exclude independent integrators and charge supra-competitive DIS prices well after CDK's arbitrary cutoff dates. *See*, *e.g.*, Dkt. 889-1 ("Israel Rep."), ¶¶ 213-216.

The jury thus could conclude (at a minimum) that the effects of the conspiracy continued after the dates CDK proposes. *See In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 268-69 (N.D. Ohio 2014) (class period included damages for the "persistence effects" of a conspiracy); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 3453147, at *4 n.5 (E.D. Pa. June 22, 2016) (noting the plaintiff "may be able to prove damages" beyond the conspiracy period); *see also* Haider Tr. 243:13-244:5 (similar).

***Fourth***, CDK's particular proposed cutoff dates are arbitrary and unsupported. CDK first proposes to end the class period in October 2018 because that is when Reynolds settled with the dealer class (but not other MDL Plaintiffs, against whom it went on to litigate for years). *See* Dkts. 427-2, 502. But CDK cites ***no*** case finding a settlement ends the conspiracy or its effects as a matter of law, much less *as a matter of class certification under Rule 23*. CDK cites (at 38) to MVSC's settlement with Reynolds, but this Court considered whether the MVSC-specific settlement mooted the conspiracy as a merits question on summary judgment. *See* SJ Op. at 125. The settlement mooted MVSC's particular group boycott claim, because MVSC was finally allowed into Reynolds's RCI program. By contrast, nothing in Reynolds's settlement with the dealers required it to stop its conspiratorial conduct or to mitigate the effects of that conduct.

CDK's December 2019 fallback date for cutting off the conspiracy period is even more arbitrary: that is when Plaintiffs submitted their merits-phase expert reply reports in this MDL. *See* Dkt. 1456 at 38. But a case-management deadline is irrelevant to whether the conspiracy was ongoing or whether CDK's and Reynolds's conduct continued to harm vendors in the marketplace.

In defense of its proposed December 2019 cutoff, CDK vaguely alludes (at 38) to a "more competitive market structure" developing "around this time," but nowhere does CDK explain why that purported development (if true) is relevant to the class certification inquiry. For example, even granting CDK's claim (at 38, 40) that Reynolds's share of the DMS market has fallen in recent years, CDK and Reynolds remain monopolists *in the DIS markets* on their respective DMSs, and they continue to exclude independent integrators. Nor does CDK explain how new entrants into the DMS market affect the prices that vendors pay CDK and Reynolds for DIS. In any event, these are common issues for trial; they are not obstacles to certification. In short, CDK's claimed "fluctuating market conditions during the proposed class period do not prevent certification of (the) class." *Hochschuler v. G. D. Searle & Co.*, 82 F.R.D. 339, 349 (N.D. Ill. 1978).

Finally, CDK's argument (at 39) that it implemented fee waivers for a limited number of dealers beginning in 2019 – and thereafter revoked them, *see* Dkt. 1460-11 (Conver Decl. ¶ 21) – does not create individualized issues or end the conspiracy period. CDK's fee waivers at most affect damage calculations during the post-2019 period, which does not raise a Rule 23 issue. And in any event, Dr. Israel accounts for CDK's temporary fee waivers in his damages model. *See*, *e.g.*, Israel Suppl. Reply ¶ 61.

At bottom, CDK's arguments for cutting off the class period present, at best, fodder for the jury, which is where this merits issue properly resides.

## CONCLUSION

AutoLoop respectfully requests that the Court grant class certification, appoint AutoLoop as class representative, and appoint Kellogg Hansen and Prof. Samuel Issacharoff as class counsel.

Dated:  April 12, 2024

Respectfully submitted,

*/s/ Derek T. Ho*

Derek T. Ho
Michael N. Nemelka
Aaron M. Panner
Daniel V. Dorris
Joshua Hafenbrack
Collin R. White
Bethan R. Jones
Ana N. Paul
Daren G. Zhang
**KELLOGG, HANSEN, TODD,**
   **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
(202) 326-7900
Washington, D.C. 20036
dho@kellogghansen.com
mnemelka@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com
jhafenbrack@kellogghansen.com
cwhite@kellogghansen.com
bjones@kellogghansen.com
apaul@kellogghansen.com
dzhang@kellogghansen.com

*MDL Co-Lead Counsel and Interim Class Counsel*
*representing Loop, LLC, d/b/a AutoLoop on behalf*
*of itself and all others similarly situated*

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
(212) 998-6580
si13@nyu.edu

*MDL Coordinating Counsel*

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on April 12, 2024, I caused a true and correct copy of the foregoing **PLAINTIFF AUTOLOOP'S REPLY IN SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
**  FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com