# Exhibit 18

# No. 22-80116

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE: FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INS. ET AL.
V. GILEAD, SCIENCES, INC. ET AL. (IN RE HIV ANTITRUST LITIGATION),

On Appeal from the
United States District Court for the Northern District of California,
No. 3:19-cv-02573-EMC, The Honorable Edward M. Chen

**PUBLIC VERSION OF EXHIBIT 1 TO DEFENDANTS-PETITIONERS'
PETITION PURSUANT TO RULE 23(F) OF THE FEDERAL RULES OF
CIVIL PROCEDURE FOR PERMISSION TO APPEAL FROM ORDER
GRANTING CLASS CERTIFICATION**

Jay P. Lefkowitz, P.C.
Devora W. Allon, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
lefkowitz@kirkland.com
devora.allon@kirkland.com

James F. Hurst, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2000
james.hurst@kirkland.com

Paul J. Riehle
FAEGRE DRINKER BIDDLE & REATH
LLP
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
paul.riehle@faegredrinker.com

Paul H. Saint-Antoine
Joanne C. Lewers
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103
Telephone: (215) 988-2990
paul.saint-antoine@faegredrinker.com
joanne.lewers@faegredrinker.com

*Counsel for Defendants-Petitioners
Gilead Sciences, Inc., Gilead Holdings,
LLC, Gilead Sciences, LLC, and
Gilead Sciences Ireland UC*

*Counsel for Defendants-Petitioners
Janssen R&D Ireland, Janssen Products,
LP, and Johnson & Johnson*

# Exhibit 1 to Rule 23(f) Petition

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HIV ANTITRUST LITIGATION | Case No. 19-cv-02573-EMC |
| | **FILED UNDER SEAL** |
| | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR CLASS CERTIFICATION** |
| | Docket Nos. 692, 694 |

Currently pending before the Court in this antitrust case are two motions for class certification as well as related *Daubert* motions to exclude expert testimony.  The motions for class certification have been filed by (1) the End-Payor Plaintiffs ("EPPs"), *i.e.*, the indirect purchasers, and (2) the Direct Purchaser Plaintiffs ("DPPs").  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the EPP motion for class certification and **GRANTS** in part and **DENIES** in part the DPP motion.  The Court also **DENIES** the *Daubert* motions related to Ms. Craft, Dr. Frank, and Dr. Lamb.

## I.    FACTUAL & PROCEDURAL BACKGROUND

The EPPs and DPPs allege that two pharmaceutical companies, Gilead and Janssen,[1] have engaged in anticompetitive conduct designed to stave off competition from generic manufacturers.  There are three categories of alleged anticompetitive conduct.  A fuller discussion of that conduct

---

[1] With the approval of the Court, the EPPs settled their dispute with a third pharmaceutical company, BMS.  The DPPs have also settled their dispute with BMS, but final approval on that settlement has not yet taken place.

<div style="writing-mode: vertical-lr">United States District Court
Northern District of California</div>

1   can be found in the Court's prior order of March 3, 2020.  *See Staley v. Gilead Scis., Inc.*, 446 F.

2   Supp. 3d 573 (N.D. Cal. 2020).  Below, however, is a brief summary.

3       (1)    Gilead entered into patent settlement agreements with Teva, a generic

4               manufacturer.  Under those agreements, Teva agreed to delay entry into the market

5               with generic drugs that would compete with Gilead's brand drugs Viread (TDF),

6               Truvada (TDF/FTC), and Atripla (TDF/FTC/EFV).  In exchange, Teva was given

7               most-favored-entry and most-favored-entry-plus ("MFE" and "MFEP,"

8               respectively) provisions.  "The MFE/P guaranteed Teva that no other generic

9               [manufacturer] could enter [the market] before it, even via a litigation victory

10               invalidating the patents, and that Gilead would not grant any other manufacturer a

11               license to enter the market until 180 days after Teva launched."  EPP Mot. at 2

12               (noting that the latter essentially resurrected the 180-day exclusivity that Teva once

13               had as the first ANDA filer (with respect to Truvada and Atripla) but then

14               forfeited).

15       (2)    Gilead and Janssen, as well as Gilead and BMS, entered into agreements that

16               contained No-Generics Restraints ("NGRs").[2]  The NGRs were basically

17               noncompete provisions.  Essentially, two companies – such as Gilead and Janssen –

18               would contract to produce a fixed-dose combination ("FDC") drug.  That FDC

19               would be made up of (1) the first company's brand drug that was due to lose its

20               patent protection and (2) the second company's brand drug that had a longer life in

21               terms of patent protection.  The two companies would then agree that, even after

22               the first company's brand drug *lost* its patent protection, the second company

23               would not then sell a FDC consisting of its own brand drug and a generic version of

24               the first company's brand drug.  *See* EPP Mot. at 5 (stating that the NGRs

25               "prohibit[ed] the parties from making competing (and cheaper) versions of [the]

26

27

28

---

[2] Although the EPPs and DPPs have settled their disputes with BMS, that does not bar the EPPs and DPPs from asserting as part of their cases that Gilead still bears liability for entering into allegedly anticompetitive agreements with BMS.

United States District Court
Northern District of California

1    fixed-dose combinations . . . using generic components"). This agreement

2    effectively protected the first company's brand drug from generic competition even

3    after any patent protection for that drug expired. Some of the agreements with

4    NGRs protected Gilead's drugs that were about to lose patent protection (*e.g.*, TDF,

5    FTC, and TDF/FTC), and some of the agreements protected Janssen or BMS's

6    drugs that were about to lose patent protection.

7    (3)    Gilead intentionally delayed the development of TAF (a NRTI "backbone" drug)

8         "until generic TDF was imminent" and then "us[ed] anticompetitive tactics to

9         switch its TDF franchise to TAF (including to products protected by the No-

10        Generics Restraints)." EPP Mot. at 7.

11   Based on the above, the EPPs have asserted federal antitrust claims, state antitrust claims,

12   and state consumer protection claims. The DPPs have asserted federal antitrust claims.

13                              **II.    LEGAL STANDARD**

14   A.    Class Certification

15   Federal Rule of Civil Procedure 23 governs class actions. Rule 23(a) provides as follows:

16        One or more members of a class may sue or be sued as
          representative parties on behalf of all members only if:
17

          (1) the class is so numerous that joinder of all members is
18            impracticable;

19        (2) there are questions of law or fact common to the class;

20        (3) the claims or defenses of the representative parties are typical of
             the claims or defenses of the class; and
21

22        (4) the representative parties will fairly and adequately protect the
             interests of the class.

23   Fed. R. Civ. P. 23(a).

24   Rule 23(b) goes on to provide in relevant as follows:

25        A class action may be maintained if Rule 23(a) is satisfied and if:

26        . . . .

27        (2) the party opposing the class has acted or refused to act on
             grounds that apply generally to the class, so that final injunctive
28           relief or corresponding declaratory relief is appropriate

3

respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

   (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

   (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

   (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

   (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

Essentially, for a class to be certified, the plaintiff must meet the Rule 23(a) requirements and one of the Rule 23(b) requirements.  Rule 23(b)(2) is applicable where the class seeks injunctive relief; Rule 23(b)(3) is applicable where the class seeks damages.

The Supreme Court has emphasized that a rigorous analysis is required at class certification.  *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).  The Ninth Circuit has given more precision to this standard, holding that, to prevail at class certification, "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied *by a preponderance of the evidence*." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (U.S. 9th Cir. 2022) (emphasis added); *cf. In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *38 (N.D. Cal. Feb. 21, 2017) (asking whether a case is "more appropriate for class certification than not").  "In carrying the burden of proving facts necessary for certifying a class . . . , plaintiffs may use any admissible evidence." *Olean*, 31 F. 4th at 665.

Expert opinion may be submitted in conjunction with a motion for class certification, either by the plaintiff or the defendant.  A court may have to determine whether expert opinion is admissible in the first place under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  If both sides have offered admissible expert opinions, then the court may have to weigh those opinions if they are conflicting. *See id.* at 666 ("The determination whether expert evidence

4

1   is capable of resolving a class-wide question in one stroke may include '[w]eighing conflicting

2   expert testimony' and '[r]esolving expert disputes,' where necessary to ensure that Rule 23(b)(3)'s

3   requirements are met and the 'common, aggregation-enabling' issue predominates over individual

4   issues."); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 322-24 (3d Cir. 2008)

5   (cited approvingly in *Olean*; stating that "opinion testimony should not be uncritically accepted as

6   establishing a Rule 23 requirement merely because the court holds the testimony should not be

7   excluded, under *Daubert* or for any other reason" – rather, a court must consider expert testimony

8   and give it whatever weight the court deems appropriate, although "[a] court's determination that

9   an expert's opinion is persuasive or unpersuasive on a Rule 23 requirement does not preclude a

10  different view at the merits stage of the case").

11         Certification analysis may overlap with the merits of a plaintiff's underlying claim, *see*

12  *Comcast*, 569 U.S. at 33, but "Rule 23 grants courts no license to engage in free-ranging merits

13  inquiries at the certification stage.  Merits questions may be considered to the extent – but only to

14  the extent – that they are relevant to determining whether the Rule 23 prerequisites for class

15  certification are satisfied." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

16  B.      *Daubert*

17         As indicated above, class certification proceedings may involve *Daubert* challenges to

18  expert opinions.

19             [Federal] Rule [of Evidence] 702 lays out the requirements for a
                district court to admit expert testimony.  The rule provides that a
20              witness "qualified as an expert by knowledge, skill, experience,
                training, or education," Fed. R. Evid. 702, may offer opinion
21              testimony if it "rests on a reliable foundation and is relevant to the
                task at hand,'" *Daubert*, 509 U.S. at 597.
22

23  *United States v. Nelson*, 533 F. Supp. 3d 779, 787 (N.D. Cal. 2021).  The full text of Rule 702 is

24  provided below.

25             A witness who is qualified as an expert by knowledge, skill,
                experience, training, or education may testify in the form of an
26              opinion or otherwise if:

27             (a)     the expert's scientific, technical, or other specialized
                        knowledge will help the trier of fact to understand the
28                      evidence or to determine a fact in issue;

5

(b)   the testimony is based on sufficient facts or data;
(c)   the testimony is the product of reliable principles and
      methods; and
(d)   the expert has reliably applied the principles and methods to
      the facts of the case.

Fed. R. Evid. 702.

With respect to (c) above, reliability

> requires that the expert's testimony have "a reliable basis in the
> knowledge and experience of the relevant discipline."  The district
> court must assess whether "the reasoning or methodology
> underlying the testimony is scientifically valid" and "properly can be
> applied to the facts in issue," with the goal of ensuring that the
> expert "employs in the courtroom the same level of intellectual rigor
> that characterizes the practice of an expert in the relevant field."
> "The test 'is not the correctness of the expert's conclusions but the
> soundness of his methodology,' and when an expert meets the
> threshold established by Rule 702, the expert may testify and the
> fact finder decides how much weight to give that testimony."
>
> The reliability analysis is "a malleable one tied to the facts of each
> case," and "district courts are vested with 'broad latitude' to 'decide
> how to test an expert's reliability' and 'whether or not an expert's
> relevant testimony is reliable.'"  Although *Daubert* identifies several
> factors that may be used for evaluating the reliability of an expert –
> whether the scientific theory or technique has been tested, peer
> reviewed, identified as having a particular rate of error, and
> generally accepted in the scientific community – district courts are
> not required to consider all (or even any) of these factors, nor are
> they required to hold a "*Daubert* hearing."

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188-89 (9th Cir. 2019).

Reliability is also implicated in (d) above.  With respect to (d), the 2000 Advisory

Committee Notes for Rule 702 comment as follows:

> The amendment specifically provides that the trial court must
> scrutinize not only the principles and methods used by the expert,
> but also whether those principles and methods have been properly
> applied to the facts of the case.  As the court noted in *In re Paoli
> R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994), "any step
> that renders the analysis unreliable  .  .  . renders the expert's
> testimony inadmissible.  This is true whether the step completely
> changes a reliable methodology or merely misapplies that
> methodology."

Fed. R. Evid. 702, 2000 Advisory Committee Notes (emphasis omitted); *see also* McCormick on

Evid. § 15 (stating that "[a] misapplication of the methodology can result in a flawed conclusion").

### III.   EPP MOTION FOR CLASS CERTIFICATION

As noted above, pending before the Court are two motions for class certification: one filed by the EPPs and one filed by the DPPs.  The Court addresses the EPP motion first.

A.   Class Definitions

The EPPs move for certification of three Damages Classes and three Injunctive Relief Classes.

- Damages Classes: (1) the Truvada Class; (2) the Atripla Class; and (3) the Complera Class.[3]
- Injunctive Relief Classes: (1) the Evotaz Class; (2) the Prezcobix Class; and (3) the cART Foundation Drug Class.[4]

The Damages Classes are made up of third-party payors ("TPPs") only (*i.e.*, not individual consumers); the Injunctive Relief Classes are made up of both TPPs and consumers.

With respect to the Damages Classes, the Truvada and Atripla Classes are each defined as follows: TPPs in the United States that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of (1) the brand drug and/or (2) its AB-rated generic equivalent sold by Teva in the "Specified States" during the period February 1, 2018, through the date of the order certifying the class.

The "Specified States" are the 35 states that have repealed *Illinois Brick v. Illinois*, 431

---

[3] Truvada = TDF/FTC (Gilead drug).

Atripla = TDF/FTC/EFV (Gilead/BMS drug).

Complera = TDF/FTC/RPV (Gilead/Janssen drug).

[4] Evotaz = ATV/COBI (BMS/Gilead drug).

Prezcobix = DRV/COBI (Janssen/Gilead drug).

cART Foundation drugs = TDF/FTC/EFV (Gilead/BMS drug); Biktarvy (BIC/TAF/FTC) (Gilead drug); Complera (TDF/FTC/RPV) (Gilead/Janssen drug); Descovy (TAF/FTC) (Gilead drug); Genvoya (TAF/FTC/EVG/COBI) (Gilead/Japan Tobacco drug); Odefsey (TAF/FTC/RPV) (Gilead/Janssen drug); Stribild (TDF/FTC/EVG/COBI) (Gilead/Japan Tobacco drug); Symtuza (TAF/FTC/DRV/COBI) (Gilead/Janssen drug); Truvada (TDF/FTC) (Gilead drug); and Viread (TDF) (Gilead drug).

United States District Court
Northern District of California

U.S. 720 (1977), which thus enables an indirect purchaser to seek damages.[5]  *See* EPP Mot. at 11.

15, 17 & n.11 (listing 35 states); *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1064 (9th Cir. 2021)

(noting that "the Supreme Court has long held that indirect purchasers – meaning those who

purchase the relevant product through middlemen – are barred from seeking damages for alleged

Sherman Act violations"; adding that, "[c]urrently, thirty-five states and the District of Columbia

effectively repealed *Illinois Brick* . . . in one form or another, but fifteen states have not").

February 1, 2018, is the date the EPPs contend a generic version of TDF/FTC should have been

available.  *See* EPP Mot. at 4 (arguing that Teva would have entered the market as early as

February 2018 but for the allegedly anticompetitive settlement agreement with Gilead).

The Complera Class has a similar definition (other than the generic/Teva component):

TPPs in the United States that indirectly purchased, paid, and/or provided reimbursement for some

or all of the purchase price of the brand drug in the Specified States during the period February 1,

2018, through the date of the order certifying the class.  The Complera Class makes no reference

to generic drugs or Teva because, as of yet, there is no generic version of Complera available.

As for the Injunctive Relief Classes, they are each defined as follows: Persons or entities in

the United States who indirectly purchased, paid, and/or provided reimbursement for some or all

of the purchase price of the brand drug(s) for consumption by themselves, their families, or their

members, employees, insureds, participants, or beneficiaries, other than for resale, during the

period May 14, 2015 through the date of final judgment in the case.

B.    Rule 23(a) Requirements

For both the Damages Classes and the Injunctive Relief Classes, the Rule 23(a)

requirements must be met.  As noted above, the Rule 23(a) requirements are: numerosity,

commonality, typicality, and adequacy.

1.    Numerosity and Commonality

The EPPs have easily met the numerosity and commonality requirements.  Defendants do

---

[5] Although the EPPs have identified 35 states in their motion, the Court notes that the state law claims in the operative pleading do not seem to implicate all 35 states.  *See, e.g.*, FAC (in Count 5, conspiracy to monopolize in violation of state antitrust laws, identifying the laws of 29 states, and in Count 11, violation of state consumer protection laws, identifying the laws of 23 states).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  not seriously dispute otherwise.  Even if Defendants had, that position would lack merit.  For

2  example, for the Damages Classes, the number of TPPs is significant – "in the hundreds (for

3  Complera) [and] thousands (for each of Atripla and Truvada)."  EPP Mot. at 18 (citing Craft

4  Expert Rpt. ¶ 47 & Table 11).  Therefore, joinder would not be practicable.  As for commonality,

5  there are clearly common questions of law or fact for each Damages Class and each Injunctive

6  Relief Class – *e.g.*, whether the Teva patent settlement agreement (related to Truvada and Atripla)

7  was anticompetitive, whether the NGRs in the various agreements between Gilead and either

8  Janssen or BMS were anticompetitive, and whether Gilead's development/commercialization of

9  TAF was anticompetitive.[6]

10         2.      Typicality and Adequacy

11         For typicality and adequacy, Defendants do make challenges, but, for the reasons discussed

12  below, these requirements have also been met.

13             a.      Where Purchases or Reimbursements Made

14         Because BCBSA has been dismissed from the litigation,[7] the EPPs are left with four

15  proposed class representatives for the Truvada Class (Teamsters, FOP, Local 1, and Pipe Trades)

16  and one proposed class representative for the Atripla and Complera Classes (Teamsters).  *See*

17  Docket No. 991-3 (amendment).  Defendants note that these "proposed representatives purchased

18  or reimbursed for class products in only a fraction of the 35" *Illinois Brick* repealer states.  Opp'n

19  at 3.  According to Defendants, the proposed representatives are typical/adequate (or have

20  standing) only with respect to the states where they *actually* made purchases or reimbursements.

21  *See* Opp'n at 4 ("Because the named EPPs did not reimburse for Truvada in 26 of the states,

22  Atripla in 32 states, and Complera in 34 states, EPPs' damages claims in those states must be

23  dismissed due to the named EPPs' lack of typicality and adequacy to represent class members

24  where they made no reimbursements, and/or their lack of Article III standing.").

25

26  ────────────────────
[6] Contrary to what Defendants have suggested, the EPPs have not abandoned the TAF
27  development/commercialization theory.

28  [7] Although the EPPs have filed a motion for leave to file a motion for reconsideration with respect
to BCBSA, the Court has not yet ruled on that motion.

United States District Court
Northern District of California

1    The Court is not persuaded.  As discussed below, the Court ultimately agrees with

2 Defendants that which state's law applies depends on where a purchase or reimbursement was

3 made – *e.g.*, California law applies where a purchase or reimbursement was made in California,

4 but New York law applies where a purchase or reimbursement was made in New York.  However,

5 as this Court previously held in a different case, (1) "whether a plaintiff can bring claims on behalf

6 of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was

7 injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III

8 standing," and (2) whether a named plaintiff "'can adequately represent unnamed class members

9 with claims under other states' laws *depends on how variable the laws are*'" – *e.g.*, "'[i]f the laws

10 are similar enough, or if they can be grouped into a small number of categories with named

11 plaintiffs representing each category, it may be unnecessary to have a named plaintiff from every

12 state.'"  *Sultanis v. Champion Petfoods U.S. Inc.*, No. 21-cv-00162-EMC, 2021 U.S. Dist. LEXIS

13 145293, at *21-22 (N.D. Cal. Aug. 3, 2021) (emphasis added).

14    This Court's ruling in *Sultanis* is not contrary to Ninth Circuit law.  For example, in *Mazza*

15 *v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), the Ninth Circuit indicated that a

16 nationwide class applying California law could not be certified but left open whether there could

17 be certification of a "smaller class containing only those who purchased or leased [certain

18 vehicles] in California, *or [certification of] a class with members more broadly but with*

19 *subclasses for class members in different states, with different jury instruction for materially*

20 *different bodies of state law*."  *Id.* at 594 (emphasis added).  And other district courts in the circuit

21 have also followed the same approach as this Court did in *Sultanis*.  *See, e.g.*, *Lidoderm*, 2017 U.S.

22 Dist. LEXIS 24097, at *111 (noting that "[n]umerous courts in this District have certified cases

23 involving indirect purchaser claims under different state laws"; "[t]he differences in the applicable

24 state laws identified by defendants do not appear to be material or even significant").

25    Defendants' reliance on *Hawkins v. Comparet-Cassani*, 251 F.3d 1230 (9th Cir. 2001), is

26 unavailing.  *See id.* at 1238.  There, the plaintiff was a convicted prisoner and challenged the use

27 of stun belts on prisoners appearing in Los Angeles County courts.  The district court granted him

28 class representative status over both convicted prisoners *and* nonconvicted prisoners.  On appeal,

1   the Ninth Circuit held that certification was defective because the plaintiff

2   > presents some claims that are not typical of all class members: He
3   > raises an Eighth Amendment claim, which is reserved for "those
    > convicted of crimes" and therefore would not apply to pre-trial
4   > detainees.  As a convicted prisoner, Hawkins himself cannot bring a
    > Fourth Amendment claim, which applies only to those not yet
5   > convicted.  A named plaintiff cannot represent a class alleging
    > constitutional claims that the named plaintiff does not have standing
6   > to raise.  It is not enough that the class members share other claims
    > in common.

7   *Id.* at 1238.  As indicated by the above, *Hawkins* presents a markedly different scenario from that

8   before the Court in the instant litigation.  In *Hawkins*, the plaintiff had standing to bring a specific

9   constitutional claim (based on the Fourth Amendment) but sought to represent unnamed class

10  members whose rights were governed by an entirely different constitutional provision (the Eighth

11  Amendment) that involved a different legal standard.  In contrast, in the case at bar, the proposed

12  class representatives and the unnamed class members are all bringing the same kind of claims –

13  antitrust and/or consumer protection – even if based on the laws of multiple states.  Where those

14  claims are similar, typicality and adequacy may be satisfied.

15        Accordingly, in the instant case, the Court holds that, so long as the proposed class

16  representatives' state antitrust and/or consumer protection claims are sufficiently similar to the

17  antitrust and/or consumer protections claims of the other repealer states, the typicality and

18  adequacy requirements of Rule 23(a) will be met.  Because this same issue arises as part of the

19  predominance inquiry for Rule 23(b)(3), the Court addresses it below.  *See* Part III.C, *infra*.

20              **b.**    <u>Local Government Entities</u>

21        Defendants' remaining challenge to typicality and adequacy concerns local government

22  entities.  Defendants point out that the EPPs have defined both the Damages Classes and the

23  Injunctive Relief Classes to *exclude* all federal and state government entities but to *include* "cities,

24  towns, municipalities or counties with self-funded prescription drug plans."  EPP Mot. at 12 n.37.

25  Defendants question whether it is appropriate for the proposed class representatives here – private

26  actors – to represent local government entities.

27        As an initial matter, the Court notes that there do not appear to be any Eleventh

28  Amendment/sovereign immunity concerns with respect to including local government entities in

1    the classes. *See Pittman v. Ore.*, 509 F.3d 1065, 1071 (9th Cir. 2007) ("As the Supreme Court has

2    applied the Eleventh Amendment, 'an unconsenting State is immune from suits brought in federal

3    courts by her own citizens as well as by citizens of another State.'  Municipalities, in contrast, are

4    not entitled to sovereign immunity in federal court.").  Hence, there is a basis for distinguishing

5    municipalities from states.

6          As to whether the proposed class representatives are capable of representing local

7    government entities, Defendants have suggested that prior approval must be obtained before such

8    entities can be represented by private (as opposed to government) counsel.  The problem for

9    Defendants is that it is not clear that prior approval must be obtained where a case is brought in

10   federal (as opposed to state or local) court.  As the EPPs point out, "[t]he plain language of the

11   relevant statutes [identified by Defendants] indicates only that local government counsel must

12   bring actions on behalf of the entity *in courts within their county*."  Reply at 19 (emphasis in

13   original).  The EPPs also correctly note that several district courts have certified classes that

14   include local government entities. *See, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*,

15   338 F.R.D. 527, 577 (S.D.N.Y. 2021); *In re Ranbaxy Generic Drug Application Antitrust Litig.*,

16   338 F.R.D. 294, 299, 309 (D. Mass. 2021); *In re Zetia Ezetimibe Antitrust Litig.*, No. MDL No.

17   2:18-md-2836, 2020 U.S. Dist. LEXIS 183601, at *14-15 (E.D. Va. Aug. 13, 2020).  Although

18   these cases do not contain any analysis on the specific issue before this Court, the cases suggest at

19   least that inclusion of the local government entities did not raise any red flags for these courts.

20         Defendants assert still that inclusion of the local governments presents concern because

21   local governments are unique (*e.g.*, diverse and dispersed).  Although this position is not without

22   any merit, it is not clear why the proposed class representatives could not adequately represent the

23   local government entities in the context of this case.  There does not appear to be anything to

24   suggest that the proposed class representatives' interests would not align with those of the local

25   government entities.

26         That being said, because local governments are sovereigns and may cover a wide range of

27   constituents, the Court shall – out of an abundance of caution – implement special notice

28   procedures for the local government entities that are members of the classes.  With the assurance

of proper notice to the entities, the Court leaves it to the entities to decide for themselves whether they wish to stay in or opt out of the Damages Classes.  The entities can also choose whether or not to keep track of the litigation if injunctive relief is their concern.  At the hearing, the EPPs expressly stated that they were amenable to special notice procedures.  Defendants also appeared amenable.  Accordingly, the Court orders the parties to meet and confer to determine the best means to provide notice of class certification to the local government entities.

C.   Rule 23(b)(3) Requirements – Damages Classes

For the Damages Classes, the Rule 23(a) requirements must be satisfied, plus the requirements of Rule 23(b)(3).  Whether the Rule 23(b)(3) requirements have been satisfied – particularly the requirement of predominance – is at the heart of Defendants' challenge to class certification.

"'The predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Olean*, 31 F.4th at 664.

> The requirement that common questions be "more substantial" than individual ones naturally means that "predominance is a comparative standard."  "The mere existence of individual issues will not suffice to defeat certification.  Rather, the balance must tip such that these individual issues predominate."  This ensures that only "fatal" differences among class members, which may "make use of the class-action device inefficient or unfair," will derail certification."

*Namenda*, 338 F.R.D. at 550.

1.   Application of California Law

At the outset, Defendants contend that there is a predominance problem preventing class certification because, contrary to what the EPPs argue, California law cannot apply "across the board" – *i.e.*, to purchases/reimbursements made in all 35 repealer states.  Rather, Defendants argue, the laws of all 35 repealer states must apply: in other words, which state law applies depends on where the purchases/reimbursements of the relevant prescription drugs were made.  Defendants maintain that California law cannot apply across the board because doing so would be a violation of due process, California's presumption against extraterritorial application, and the

United States District Court
Northern District of California

13

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

1  Dormant Commerce Clause.

2      For purposes of this opinion, the Court considers only the argument that applying

3  California law to purchases/reimbursements outside of California would violate the state's

4  statutory presumption against extraterritoriality.[8]  There is no dispute that California has a

5  presumption against extraterritorial application of its laws: "However far the Legislature's power

6  may theoretically extend, [the California Supreme Court] presume[s] the Legislature did not

7  intend a statute to be operative, with respect to occurrences outside the state, . . . unless such

8  intention is clearly expressly or reasonably to be inferred from the language of the act or from its

9  purpose, subject matter or history."  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1270 (2011).

10      In *Sullivan*, the California Supreme Court addressed "questions about the applicability of

11  California law to nonresident employees who work both here and in other states for a California-

12  based employer [Oracle]."  *Id.* at 1194.  One of the issues concerned the plaintiffs' claim that

13  Oracle, based in California, failed to compensate them according to the FLSA for overtime

14  worked in states other than California.  "This claim, despite its reference to the FLSA, arises under

15  California [law, *i.e.*, California Business & Professions § 17200,] and not federal law."  *Id.* at

16  1270.  The California Supreme Court explained that "Plaintiffs' claim implicates the so-called

17  presumption against extraterritorial application" because "[n]either the language of the UCL nor

18  its legislative history provides any basis for concluding the Legislature intended the UCL to

19  operate extraterritorially.  Accordingly, the presumption against extraterritoriality applies to the

20  UCL in full force."  *Id.* (internal quotation marks omitted).

21      The California Supreme Court then considered "whether plaintiffs' proposed application of

22  the UCL would cause it to operate, impermissibly, with respect to occurrences outside the state."

23  *Id.*

24      [O]nly a single instance of relevant conduct occur[ed] in California:

25      "The decision-making process to classify Instructors as exempt from

26  _____

27  [8] The Court does so because the extraterritoriality argument appears to the strongest of
Defendants' arguments.  That being said, the Court recognizes that due process and the Dormant

28  Commerce Clause raise significant issues for the EPPs, particularly with respect to Janssen given
that Janssen, unlike Gilead, is not a California-based company and thus out-of-state sales by
Janssen have little connection with California.

United States District Court
Northern District of California

1    the requirement to be paid overtime wages under the FLSA occurred
     primarily from within the headquarters offices of Oracle
2    Corporation located in Redwood Shores, California."  But for an
     employer to adopt an erroneous classification policy is not unlawful
3    in the abstract.  What is unlawful, and what creates liability under
     the FLSA, is the failure to pay overtime when due.  Accordingly,
4    that Oracle's decision to classify its Instructors as exempt was made
     in California does not, standing alone, justify applying the UCL to
5    the nonresident plaintiffs' FLSA claims for overtime worked in
     other states.

6    *Id.* at 1208.

7         In the instant case, the EPPs have argued for application of California's Cartwright Act

8    and/or UCL to the 34 non-California repealer states.  But the EPPs have not identified anything

9    from the text of either statute, or the legislative history for each, that would support extraterritorial

10   application of either statute.  Thus, the presumption against extraterritoriality applies.

11        The Court also has doubts as to the EPPs' contention that their Cartwright Act and/or UCL

12   claims do not involve extraterritorial application with respect to purchases/reimbursements made

13   outside of California.  The Court acknowledges that liability under the Cartwright Act – and

14   thereby the UCL – can be based on the mere agreement to restrain trade, *i.e.*, not just the payment

15   of supracompetitive prices.  *See AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1110-12

16   (9th Cir. 2013) (noting that, under the Cartwright Act, "the sale of price-fixed goods in California"

17   is unlawful but so too is "the initial agreement to fix those prices – without reference to where

18   those goods will eventually be sold"; thus, "the relevant 'occurrence or transaction' in this case

19   includes not only the sale of price-fixed goods, but Defendants' alleged agreements and

20   conspiracies to fix . . . prices").  And presumably, Gilead, which is based in California, made its

21   part of the agreements to restrain trade from California.  This tie to California, however, is

22   weakened by two facts: (1) the other parties to the agreements, including Janssen, are not based in

23   California, and (2) the agreements to restrain trade concerned purchases/reimbursements in the

24   non-California repealer states.  And as noted above, regulation of actual sales out of state

25   implicates potential conflicts with other states' laws, and there is no indication that the California

26   legislature intended to invite such conflict through extraterritorial application of the Cartwright

27   Act or the UCL.

28        The Court, however, need not resolve this issue definitively because, even if the EPPs are

15

1  correct in arguing that extraterritorial application with respect to purchases/reimbursements

2  outside of California were not foreclosed, that would simply mean California law *could* apply

3  outside the state.  What law would actually apply depends on a choice-of-law analysis.  The Court

4  now turns to that analysis.  *Cf. Wash. Mut. Bank*, 24 Cal. 4th at 919 ("[E]ven where its own law

5  may be constitutionally applied, California follows a three-step 'governmental interest analysis' to

6  address conflict of laws claims and ascertain the most appropriate law applicable to the issues

7  where there is no effective choice-of-law agreement.").

8      2.   Choice of Law

9       According to Defendants, under a choice-of-law analysis, the laws of all 35 repealer states

10  should apply, which creates a predominance problem.  The EPPs disagree, contending that such an

11  analysis would lead to application of California law.  Alternatively, the EPPs contend that, even if

12  the laws of all 35 repealer states are applicable, the variations in the laws are minimal such that

13  individualized inquiries do not overwhelm common issues.

14          When state claims are brought, federal courts apply the choice of
law rules of the forum state – here, California.  Under California's
15          choice of law rules, the class action proponent bears the initial
burden to show that application of California law is constitutional
16          on the basis that California has "'significant contact or significant
aggregation of contacts' to the claims of each class member."  "Once
17          the class action proponent makes this showing, the burden shifts to
the other side to demonstrate 'that foreign law, rather than California
18          law, should apply to class claims.'"

19          California law cannot apply to the class claims if the interests of
other states outweigh California's interest.  To make this
20          determination, courts use California's three-step governmental
interest test.  "First, the court determines whether the relevant law of
21          each of the potentially affected jurisdictions with regard to the
particular issue in question is the same or different."  "Second, if
22          there is a difference, the court examines each jurisdiction's interest
in the application of its own law under the circumstances of the
23          particular case to determine whether a true conflict exists."  Finally,
"if the court finds that there is a true conflict, it carefully evaluates
24          and compares the nature and strength of the interest of each
jurisdiction in the application of its own law to determine which
25          state's interest would be more impaired if its policy were
subordinated to the policy of the other state, and then ultimately
26          applies the law of the state whose interest would be the more
impaired if its law were not applied."

27

28  *Stromberg*, 14 F.4th at 1067-68.

United States District Court
Northern District of California

a.      *Stromberg*

The Ninth Circuit's decision in *Stromberg* is instructive as it involves a recent application of the California governmental interest test by the Ninth Circuit – although, admittedly, *Stromberg* is also distinguishable since the issue there was whether a *nationwide* class could be certified under the Cartwright Act.  In contrast, here, the EPPs are not asking for certification of a nationwide class under the Cartwright Act but rather certification of (in effect) an *Illinois Brick* repealer class under the Cartwright Act.

In *Stromberg*, the plaintiffs were consumers who bought cellphones and alleged that Qualcomm maintained a monopoly by engaging in certain conduct related to chips used in cellphones.  *See id.* at 1064.  The district court certified a class action, holding, *inter alia*, that the plaintiffs could "seek damages on behalf of the *entire* nationwide class under the Cartwright Act." *Id.* at 1065 (emphasis added).  Applying the three-step governmental interest test, the district court recognized that the "non-repealer states' antitrust laws were materially different from California's Cartwright Act on the issue of damages recovery"; however, the district court concluded, "non-repealer states have no interest in applying their laws . . . because non-repealer laws disadvantage resident consumers and are not intended to protect out-of-state businesses." *Id.*

On appeal, the Ninth Circuit disagreed.  Notably, at the first step of the governmental interest, the Ninth Circuit found an error on the part of the lower court.

> There is no dispute that material differences exist between
> California's Cartwright Act and the antitrust laws of other states.
> Non-repealer states do not allow indirect purchasers to bring
> antitrust damages suits, while repealer states – like California – do.
> This difference is material because it "will spell the difference
> between the success and failure of a claim."  *But the district court
> erred in its analysis at the first step because it overlooked variations
> in the antitrust laws of Illinois Brick-repealer states.  Even among
> the repealer states, there are significant variations in the scope of
> repealer laws.*  For instance, state repealer laws vary as to the type
> of law the repeal applies to [*e.g.*, some states limit the repeal to
> consumer protection statutes]; who can sue for damages [*e.g.*,
> Illinois allows indirect purchaser recovery but precludes class
> actions brought by indirect purchasers, and other states limit indirect
> purchaser claims to suits brought by the state attorney general]; and
> the amount or type of damages indirect purchasers can recover [*e.g.*,
> Hawaii allows indirect purchaser suits for compensatory damages
> only, and other states encourage or require that courts take steps
> necessary to avoid duplicative recovery].  Thus, the district court

17

failed to "determine[] . . . the relevant law of each of the potentially
affected jurisdictions," as required under California's governmental
interest test.

*Id.* at 1068-69 (emphasis added); *see also id.* at 1074 (stating that, "[e]ven among the repealer

states, the various state laws are hardly uniform").

At step two, the Ninth Circuit also rejected the lower court's conclusion that states other

than California did not have an interest in applying their laws to the pending dispute.  Although

"California has an interest in applying its law to regulate and deter Qualcomm (a resident

California corporation) from allegedly unlawful business activities in California," "other states,

including non-repealer states, have an interest in how their markets are managed and how best to

enforce antitrust violations and regulate commerce in *their* states."  *Id.* at 1069 (emphasis added).

For example:

> Non-repealer states' *Illinois Brick* laws are designed to regulate
> antitrust enforcement by allocating recoverable antitrust damages in
> a way those states think best promotes market competition. . . .
> [T]he relevant interests are not simply about the benefit or harm to
> resident consumers or liability to resident antitrust defendants; rather
> the relevant interests are about harm to the competitive process and
> in-state business activity.
>
> . . . .
>
> Allowing non-repealer states to apply their laws to class members
> purchasing cellphones in-state furthers those states' determinations
> of how to "facilitat[e] more effective enforcement of antitrust laws."
> The decision to bar indirect purchaser damages recovery is a policy
> choice regarding how a state wants antitrust laws to be enforced
> within its borders so competition and business can be best promoted
> in the state.  Non-repealer laws reflect the state calculation that
> antitrust enforcement is best served by having indirect purchasers
> realize the benefit of antitrust enforcement outside of court
> processes.  For instance, even if barred from suing for antitrust
> damages, indirect purchasers in non-repealer states can realize the
> benefit of antitrust enforcement when direct purchasers recover
> antitrust damages and factor that recovery into their pricing and
> business activity in-state, which can then be passed through to
> consumers in the market.
>
> Applying non-repealer laws to in-state cellphone purchases would
> also further state interests in reducing the risk that transactions
> within their borders expose businesses to excessive and
> "complicated" antitrust litigation with "duplicative damages"
> recovery.  By lowering this risk, non-repealer states can attract more
> business in-state from entities like Qualcomm (and those who do
> business with Qualcomm) by creating a more favorable business

18

1      environment. Non-repealer laws can be understood as choosing to
run the risk of under-deterring antitrust violators over
2      overcompensating plaintiffs and complicating antitrust enforcement
. . . .

3    *Id.* at 1072.

4        The Ninth Circuit also pointed out that, even if it were to evaluate the case under tort

5    choice of law principles (instead of antitrust choice of law principles) – as the district court had –

6    the district court's analysis was still flawed: (1) "[t]he place of wrong, while not always

7    controlling, 'remains a relevant consideration' in California's governmental interest test"; (2)

8    "'[w]ith respect to regulating or affecting conduct within its borders, the place of the wrong has

9    the predominant interest"; (3) "[t]he place of the wrong is 'the state where the last event necessary

10   to make the actor liable occurred'"; and (4) here, "[t]he last events giving rise to liability would be

11   the consumer's purchase of the cellphone" – which, "[i]n most instances for non-California

12   residents, . . . would have occurred outside of California. *Id.* at 1073.

13        Finally, the Ninth Circuit held that, because the district court found that "only California

14   had an interest, [it] failed to determine [at step three] which states' interests would be more

15   impaired if their policies were subordinated to another state's law." *Id.* at 1074.

16        The Ninth Circuit thus remanded the case back to the district court, instructing as follows:

17   (1) "[t]he non-repealer laws should control those purchases occurring in non-repealer states and

18   class members with purchases in non-repealer states should be carved out of the 23(b)(3) class";

19   and (2) among the repealer states, the district court should "reconduct[] its choice of law analysis

20   starting at step one." *Id.* (noting that, "[e]ven among the repealer states, the various state laws are

21   hardly uniform").

22        As indicated above, *Stromberg* is not entirely dispositive of the instant case because, there,

23   the plaintiffs sought certification of a nationwide class under the Cartwright Act; here, the EPPs

24   are essentially asking for application of the Cartwright Act to an *Illinois Brick* repealer class.

25   Nevertheless, *Stromberg* is instructive: certainly as to the analysis for step two of the California

26   governmental test, but also as to step one. As noted above, at step one, the Ninth Circuit expressly

27   stated that, "[e]ven among the repealer states, there are significant variations in the scope of

28   repealer laws." *Id.* at 1068.

###### b. Step One

At step one of the governmental interest test, this Court must "'determine[] whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.'" *Mazza*, 666 F.3d at 590. "'The fact that two or more states are involved does not itself indicate that there is a conflict of law problem.' A problem only arises if differences in state law are material, that is, *if they make a difference in [the] litigation*." *Id.* (emphasis added); *see also id.* at 591 (indicating that a trivial difference is not material and that a difference is material where, *e.g.*, it will "spell the difference between the success and failure of the claim"; also providing as an example of a material difference where there are differences in the *remedies* provided by state laws).

Defendants assert that there are material differences between California's Cartwright Act and the antitrust/consumer protection laws of the 34 other *Illinois Brick* repealer states. Appendix 1 attached to Defendants' opposition brief is a chart identifying the alleged differences.

As a preliminary matter, the Court takes note that Defendants' chart suffers from a notable problem. The following is an example. In category (1) on the chart, Defendants state: "The Cartwright Act allows private indirect-purchaser class actions. Many states do not." The second item under (1) states: "[Some states'] *[a]ntitrust* laws . . . allow only the Attorney General to bring indirect-purchaser damages suits or class actions" (emphasis added). The states identified are: Arkansas, Idaho, and Illinois. The problem for Defendants is that the EPPs have not asserted any *antirust* claims based on Arkansas, Idaho, and Illinois law. Rather, the EPPs have asserted *consumer protection* claims based on Arkansas, Idaho, and Illinois law. *Compare* FAC ¶ 592 (Count 11, violation of state consumer protection laws), *with* FAC ¶ 535 (Count 5, conspiracy to monopolize in violation of state antitrust laws).

In short, the basic problem is that Defendants identify a difference between the Cartwright Act and certain states' antitrust laws, but the EPPs are not making a claim based on those states' antitrust laws but rather based on those states' consumer protection laws. Alternatively, Defendants identify a difference between the Cartwright Act and certain states' consumer protection laws, but the EPPs are not making a claim based on those states' consumer protection

20

United States District Court
Northern District of California

1    laws but rather based on those states' antitrust laws.

2          To be clear, this problem does not show up everywhere in Defendants' chart.  However, it

3    shows up often enough that it is notable – and throughout the chart (*i.e.*, not isolated to any

4    category in the chart).

5          But putting this problem aside, Defendants have identified some differences between the

6    Cartwright Act and some of the repealer states' laws – for instance, on Defendants' chart, with

7    respect to the length of the statute of limitations and the damages available (*e.g.*, whether

8    enhanced damages are available and, if so, what showing must be made).  And the Court considers

9    the differences material in that they do make a difference in this litigation.  For example, for the

10   Cartwright Act, there is a four-year limitations period, but there is a two-year period for Alabama

11   law and a three-year period for Kansas, Mississippi, and Tennessee law.  If California law were to

12   apply across the board, the limitations period would be notably longer.  *See also Mazza*, 666 F.3d

13   at 591 (providing as an example of a material difference where there are differences in the

14   *remedies* provided by state laws).

15         Thus, at step one, Defendants have met their burden of identifying some material

16   differences – *i.e.*, between the Cartwright Act and some of the repealer states' laws.

17              c.    Step Two

18         Because there are at least some material differences between the Cartwright Act and the

19   laws of some of the other repealer states (*e.g.*, on the statute of limitations and damages), the Court

20   moves on to step two of the governmental interest test.  Here, the Ninth Circuit's *Stromberg*

21   decision weighs in favor of Defendants – *i.e.*, in showing that, even though California may have

22   an interest in having its Cartwright Act apply across the board because Gilead is based in

23   California, the other repealer states still have an interest in having their own laws apply with

24   respect to purchases/reimbursements made in their own jurisdictions and the scope of antitrust

25   enforcement in their states.  For example, a repealer state may want its shorter limitations period to

26   apply as that reflects its policy decision as how best to balance consumer interests and business

27   interests.  The same would be true with respect to its assessment of what damages are appropriate.

28

United States District Court
Northern District of California

d.   Step Three

Based on step two, there is a true conflict, and therefore, at step three, the Court must

> evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately appl[y] the law of the state whose interest would be the more impaired if its law were not applied.

*Stromberg*, 14 F.4th at 1068.  Here, Defendants have the better argument that, as to purchases/reimbursements made in the non-California repealer states, those states' interests would be more impaired if their policies were subordinated to the policies of California.  Clearly, those states have a strong interest in regulating what takes place in their own borders.  Although California has an interest in having its law apply because Gilead is a California-based company, what Gilead does outside of California is of less significance.

The Court acknowledges the EPPs' citation to at least two cases where the Cartwright Act was applied across the board.  *See* EPP Mot. at 17.  But both of those cases were decided before *Stromberg*, and the analysis in those cases is not extensive.  *See In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *14 (N.D. Cal. Feb. 8, 2016) (taking note of defendants' contention that "California law should not even be applied to repealer states [because] there still exist numerous differences between the California antitrust and unfair competition laws and those in many of the other 24 jurisdictions[;] [t]he parties were specifically given the opportunity to submit additional briefing," but, "[a]part from the *Illinois Brick* issue, . . . the potential differences identified between California and some of the other jurisdictions do not appear to stand as true conflicts, or as ones that should not yield to California's interests"); *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2017 WL 235052, at *22-23 (N.D. Cal. Jan. 19, 2017) (stating that "Defendants have not identified any conflicts to applying the Cartwright Act to the 24 *Illinois Brick* repealer jurisdictions").  Accordingly, the Court declines to follow those decision.

The Court concludes that the governmental interest test does not support California law being applied across the board; rather, the Court must apply the laws of each of the repealer states

1    with respect to the purchases/reimbursements made in that state.

2              e.      Variance Among Laws of the Repealer States

3              That the laws of the 35 repealer states apply, however, is not the end of the inquiry – *i.e.*, it

4    does not mean that Rule 23(b)(3)'s predominance requirement cannot be met.  As the EPPs argue,

5    even though there may be some differences in the laws of the repealer states (*e.g.*, on the statute of

6    limitations and damages), the question is how much variance is there.  *See Namenda*, 338 F.R.D.

7    at 571 ("[A] plaintiff must demonstrate that 'any variations in relevant state laws do not

8    predominate over the similarities.'"); *cf. Stromberg*, 14 F.4th at 1067 ("'[V]ariances in state law

9    [can] overwhelm common issues and preclude predominance for a single nationwide class.'").  In

10   *Namenda*, the New York district court noted that "[m]any indirect-purchaser classes have been

11   certified even though they were brought under the laws of different states," which "follows the

12   Supreme Court's dicta that '[p]redominance is a test readily met in certain cases alleging . . .

13   violations of the antitrust laws.'"  *Namenda*, 338 F.R.D. at 571.  Defendants, of course, disagree –

14   citing once again their chart in Appendix 1 attached to the opposition brief.

15             The Court addresses variance with respect to each legal claim – antitrust and consumer

16   protection – separately.  *See Provine v. Office Depot, Inc.*, No. C 11-00903 SI, 2012 U.S. Dist.

17   LEXIS 93881, at *29 (N.D. Cal. July 6, 2012) ("Plaintiff must establish that common questions of

18   law or fact predominate for each claim in which he seeks to certify a class.").  *Namenda* is an

19   instructive case on this issue of variance.  In *Namenda*, the plaintiff asserted (1) antitrust violations

20   (monopolization and restraint of trade) arising under the laws of 25 jurisdictions and (2) consumer

21   protection violations under the laws of 14 jurisdictions.  *See Namenda*, 338 F.R.D. at 571.  The

22   court concluded that there was no significant variation such that the Rule 23(b)(3) predominance

23   requirement was met.

24              i.      Antitrust

25             On the antitrust claims, the *Namenda* court noted first that "[m]any indirect-purchaser

26   classes have been certified even though they were brought under the laws of different states,"

27   which "follow[ed] the Supreme Court's dicta that '[p]redominance is a test readily met in certain

28   cases alleging . . . violations of the antitrust laws.'"  *Id.*

                                                    23

United States District Court
Northern District of California

1        The court then went on to conclude that there was no significant variance among the

2    antitrust laws of the 25 jurisdictions because:

3        • Almost all of the state statutes had language similar to that in §§ 1 and 2 of the

4           Sherman Act (*i.e.*, restraint of trade and monopolization).  *See id.* at 572.

5        • "[E]ven the states that have statutes that do not closely track the language of the

6           Sherman Act have effectively harmonized their antitrust statutes with that of the

7           federal law such that the elements needed to sustain a monopolization or restraint-

8           of-trade claim – at the most basic level – are effectively the same under the state

9           and federal laws." *Id.*

10       • There was no other "indication that any state's antitrust laws require proof of

11          elements different from those that must be proved under the Sherman Act with

12          respect to monopolization or restraint-of-trade claims." *Id.*

13       The court acknowledged that, in the absence of any "substantive discrepancy between the

14   various state antitrust laws," the defendants invoked "procedural discrepancies." *Id.*  For example,

15   the defendants noted that there was variance among the states with respect to the applicable

16   statutes of limitations.  However, the court did not find this variance enough to create a

17   predominance problem.  "Variations in limitations periods are irrelevant to whether there exist

18   common questions of law or fact that go to the heart of Defendants' potential liability as to the

19   claims alleged." *Id.*; *see also id.* at 574 (stating that defendants failed to "explain[] why any such

20   differences [on limitations periods] would make adjudication of [plaintiff's] claims overly

21   burdensome, or why these differences would predominate the core antitrust questions that

22   underpin [plaintiff's] allegations").

23       The instant case is similar to *Namenda*.  Like the defendants in *Namenda*, Defendants here

24   have not pointed to any "substantive discrepancies" between the antitrust laws of the 35 repealer

25   states.  And in Appendix A attached to their motion, the EPPs have cited authority to support their

26   position that state antitrust laws are guided by federal antitrust law such that there is

27   "harmonization" among the various state antitrust laws.

28       In addition, like the defendants in *Namenda*, Defendants have primarily relied instead on

1  "procedural discrepancies" such as differences in limitations periods or in damages available (*e.g.*,

2  whether enhanced damages are available and, if so, what showing must be made).  But as in

3  *Namenda*, these variances are not that significant.  For the statute of limitations, even if the

4  Cartwright Act has a limitations period of four years and other states' antitrust claims are subject

5  to a shorter limitations period (two or three years), that does not create much variation and does

6  not detract from the common issues on liability, whether the theory is based on, *e.g.*, the Teva

7  patent settlements or the NGRs.  The differences in limitations periods can be managed at trial via

8  jury instructions and verdict form.  The same is true with respect to damages – *i.e.*, even if the

9  Cartwright Act provides for treble damages automatically while other states' antitrust laws limit

10  damages to actual damage or only allow for enhanced damages based on a higher showing (such

11  as flagrant or willful conduct), that is a relatively minor variation and does not overwhelm the

12  common issues on liability.  For example, Defendants have not shown that, for enhanced damages,

13  there is any practical difference between the various states' laws: while some states require, *e.g.*,

14  flagrant, intentional, malicious, or willful conduct as a condition to enhanced damages, Defendants

15  have not shown that there are meaningful differences among those states in the required showing.

16  Thus, again, this is a variable that can feasibly be managed at trial.

17          ii.    Consumer Protection

18        The *Namenda* court also found no significant variance problem to the extent the plaintiffs

19  were bringing consumer protection claims based on the laws of 14 jurisdictions.  "Like the

20  antitrust statutes, many of these statutes are worded identically in that they prohibit 'unfair

21  methods of competition,'" and other statutes used "extremely similar [language], prohibiting

22  'unconscionable' or otherwise 'deceptive' or 'fraudulent' practices." *Id.*  The court recognized the

23  defense argument that "'unfair' is not necessarily the same as 'unconscionable' or 'deceptive'" but

24  it concluded that the defendants did

25          no more than simply point out the existence of . . . slight
           discrepancies.  They do not identify how [plaintiff's] allegations

26          may "fail to satisfy the required elements under the laws of these
           jurisdictions," or whether they may be cognizable under certain

27          statutes but "not cognizable under the consumer protection
           laws of" others.  Although they cite to state court cases that

28          purportedly demonstrate different "tests" as to what constitutes an

> unfair practice, Defendants fail to show – in practice – how the statutes would be applied differently in *antitrust cases* like this one. There is no indication whatever that the serious antitrust allegations that SBA advances in this case – if proven – would not be a violation of each of these states' consumer-protection statutes.

*Id.* (emphasis in original).

The court added that,

> [u]ltimately, any substantive variations that may arise from the discrepancies within these consumer-protection statutes are eliminated by the fact that nearly all of the states in question also have statutes that harmonize state provisions with that of the Federal Trade Commission Act.  These harmonization provisions re critical because "practices that violate the Sherman Act and other antitrust laws" satisfy the standard of "unfairness" under the FTC Act.  This means that "state laws with equivalent 'unfairness' language and an FTC harmonization provision can safely be assumed to have similarly broad scope."  More precisely, any conduct that would qualify as "unfair" under the FTC Act – which violations of the antitrust laws certainly would – would also violate the state provisions at issue.  This serves to make it such that any anticompetitive conduct – if proven – would constitute an unfair trade practice such that "proof of anticompetitive conduct [will] establish[ ] a violation of each state's laws."

*Id.*

Although *Namenda* provides some guidance for the consumer protection claims here, it is less instructive compared to the analysis for the antitrust claims.  That is because, here, Defendants have claimed more than slight discrepancies among the consumer protection laws at issue – *e.g.*, they have asserted that some states' consumer protection laws bar class actions or do not cover antitrust/anticompetitive conduct.  Notably, at the hearing, the EPPs essentially acknowledged that (1) many, if not all, states' consumer protection laws covered deceptive conduct and that (2) the EPPs had pled a fraudulent concealment theory in the operative complaint, *see, e.g.*, FAC ¶ 585 (Count 11, violation of state consumer protection laws), *but* that (3) for class certification purposes, their state consumer protection claims were based on antitrust/anticompetitive conduct only.  In short, at this juncture, the EPPs are not pursuing a deception-based theory.  This simplifies the issue.

Furthermore, the Court notes that some of Defendants' criticisms are not that significant – at least from a "big picture" perspective – because, even if there is a problem with a given state

United States District Court
Northern District of California

1   law consumer protection claim, the EPPs have *also* asserted a claim under that state's antitrust

2   law.[9]  There are only a few instances in which Defendants are challenging a state's consumer

3   protection claim *and* there is no antitrust claim under that state's law to serve as an alternative or

4   backup.  In this order, the Court focuses on this specific situation only because certification with

5   respect to a given state would be problematic only if no antitrust claim is pled *and* no consumer

6   protection claim is viable either.

7   • **Arkansas.**  Arkansas's consumer protection statute prohibits "[d]eceptive and

8   unconscionable trade practices."  Ark. Code. Ann. § 4-88-107(a).  It gives

9   examples of deceptive and unconscionable trade practices but expressly notes that

10  the examples "are in addition to and do not limit the types of unfair trade practices

11  actionable at common law or under other statutes of this state."  *Id.* § 4-88-107(b).

12  In *Lidoderm*, Judge Orrick of this District noted that three judges in the District

13  have "held that price fixing allegations are sufficient to state 'unconscionable'

14  conduct under the ADTPA," but that three other judges "have found that even in

15  light of the broad definition of unconscionability adopted by the Arkansas Supreme

16  Court, in absence of authority from Arkansas courts that the ADTPA extends to

17  price fixing claims, those claims should be dismissed."  *Lidoderm*, 103 F. Supp. 3d

18  at 1166.  Judge Orrick ultimately sided with the latter group based on the "split in

19  federal authority and the absence of authority from Arkansas."  *Id.* at 1167.  The

20  Court agrees with Judge Orrick.  Furthermore, the fact that "[t]he ADTPA is not

21  patterned directly on the FTC Act and does not contain a provision harmonizing its

22  interpretation with that of the FTC Act," *In re New Motor Vehicles Canadian Exp.*

23  *Antitrust Litig.*, 350 F. Supp. 2d 160, 178 (D. Me. 2004), is instructive.  Finally, the

24

25  [9] For example, in Category 4 on Defendants' Appendix 1, Defendants contend that many state
    consumer protection laws "proscribe enumerated conduct, *excluding* antitrust conduct." Opp'n,
26  App. 1, at 2 (emphasis added).  However, the EPPs are not asserting consumer protection claims
    under Alabama, Maryland, Oregon, and South Dakota law.  *See* FAC ¶ 583 *et seq.* (Count 11,
27  violation of state consumer protection laws).  As for Michigan, Nevada, Rhode Island, Tennessee,
    and West Virginia, even if Defendants are right about these states' consumer protection laws, the
28  EPPs have also brought claims under these states' antitrust laws.

27

United States District Court
Northern District of California

1    Court takes into account that the Arkansas consumer protection statute contains the

2    following provision: "A person who suffers an actual financial loss as a result of

3    his or reliance on the use of a practice declared unlawful by this chapter may bring

4    an action to recover his or her actual financial loss proximately caused," but "[a]

5    private class action under this subsection is prohibited unless the claim is being

6    asserted for a violation of Arkansas Constitution, Amendment 89."  Ark. Code

7    Ann. § 4-88-113(f)(1)(A)-(B).  The Court concludes that this provision should be

8    given effect in federal court.  In a prior order, it has given effect to a similar

9    provision based on Justice Stevens's concurrence in *Shady Grove Orthopedic*

10   *Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010) – concluding that

11   Rule 23 does not govern if the state law prohibiting the class action is so

12   intertwined with a state right or remedy that it functions to define the scope of the

13   state-created right.  *See Staley*, 446 F. Supp. 3d at 626 (holding that "the Illinois

14   prohibition on class actions is deeply intertwined with the rights under the *Illinois*

15   *Brick* repealer"); *see also In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-

16   EMC, 2016 U.S. Dist. LEXIS 179487, at *77-78 (N.D. Cal. Sep. 14, 2016).

17   • **Idaho.**  The purpose of the Idaho consumer protection statute "is to protect . . .

18   against unfair methods of competition and unfair or deceptive acts and practices in

19   the conduct of trade or commerce."  Idaho Code § 48-601.  The statute notes that

20   "[i]t is the intention of the legislature that this chapter be remedial and be so

21   construed."  *Id.*  It further notes that "[i]t is the intent of the legislature that in

22   construing this act due consideration and great weight shall be given to the

23   interpretation of the federal trade commission and the federal courts relating to

24   section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1)) . . . ."  *Id.* §

25   48-604.  Notwithstanding such, the Idaho Supreme Court has indicated that there

26   are differences between the FTCA and the Idaho consumer protection statute that

27   cannot be "ignore[d]."  *State v. Daicel Chem. Indus., Ltd.*, 14 Idaho 102, 107

28   (2005).  While the U.S. Supreme Court has held that price-fixing violates the

United States District Court
Northern District of California

1    FTCA, the FTCA does *not* "define what constitutes unfair methods of

2    competition"; in contrast, the Idaho statute "lists nineteen types of conduct that

3    constitute either an unfair method of competition or an unfair or deceptive act or

4    practice [including unconscionable acts or practices].  There is nothing in the

5    wording of Idaho Code § 48-603 indicating that the list of conduct is merely

6    illustrative.  Price-fixing is not listed in § 48-603 as conduct that constitutes either

7    an unfair method of competition or an unfair or deceptive act or practice.  The

8    legislative intent that we give due consideration and great weight to the

9    interpretation given the FTCA by federal courts only applies when we are

10   construing a provision of the federal law that is similar to that in our Act."  *Id.* at

11   107-08; *see also id.* at 109 (also holding that the alleged conduct did not meet the

12   definition of unconscionable acts or practices).  In light of the Idaho Supreme

13   Court's holding in *Daicel*, the EPPs have no viable consumer protection claim

14   under Idaho law.  *See also In re Dynamic Random Access Memory Antitrust Litig.*,

15   516 F. Supp. 2d 1072, 1110 (N.D. Cal. 2007) (finding *Daicel* "directly on point, . . .

16   compel[ing] the conclusion here that plaintiffs' claim pursuant to the CPA, based on

17   similar allegations of price-fixing and horizontal price restraints, must fail").

18   • **Illinois.**  The Illinois Consumer Fraud and Deceptive Business Practices Act

19      prohibits "[u]nfair methods of competition and unfair or deceptive acts or

20      practices."  815 Ill. Comp. Stat. Ann. § 505/2.  It expressly states that, "[i]n

21      construing this section consideration shall be given to the interpretations of the

22      Federal Trade Commission and the federal courts relating to Section 5 (a) of the

23      Federal Trade Commission Act."  *Id.*  Nevertheless, the Illinois Supreme Court has

24      held that the Illinois Consumer Fraud Act is not intended to be "an additional

25      antitrust enforcement mechanism."  *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374,

26      390 (1990).  In light of *Laughlin*, "this Court joins the majority of other courts in

27      concluding that the EPPs do not have standing to maintain what is in essence an

28      antitrust claim by another name under the Illinois Consumer Fraud and Deceptive

United States District Court
Northern District of California

1   Business Practices Act." *In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352,

2   372-73 (D.R.I. 2019).  Notably, the Court previously dismissed the Illinois *antitrust*

3   claim because, even though Illinois is a repealer state, the state statute has a

4   provision that bars class actions by indirect purchasers.  *See Staley*, 446 F. Supp. 3d

5   at 624-26).

6   • **Missouri.**  Missouri's consumer protection statute deems an unlawful practice

7   "[t]he act, use or employment by any person of any deception, fraud, false pretense,

8   false promise, misrepresentation, unfair practice or the concealment, suppression,

9   or omission of any material fact in connection with the sale or advertisement of any

10   merchandise in trade or commerce . . . in or from the state of Missouri."  Mo. Rev.

11   Stat. § 407.020.  Regulations interpreting the statute provide that "[a]n unfair

12   practice is any practice which – (A) Either – 1. Offends any public policy as it has

13   been established by the Constitution, statutes or common law of this state, or by the

14   Federal Trade Commission, or its interpretive decisions; or 2. Is unethical,

15   oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury

16   to consumers."  15 C.S.R. § 60-8.020(1); *see also id.* § 60-8.020(2) (providing that

17   "[p]roof of deception, fraud, or misrepresentation is not required to prove unfair

18   practices as used in section 407.020.1"); *Schuchmann v. Air Servs. Heating & Air*

19   *Conditioning, Inc.*, 199 S.W.3d 228, 234 (Mo. Ct. App. 2006) ("looking at the

20   Federal Trade Commission's ('FTC') interpretation of 15 U.S.C. § 45(a) (declaring

21   'unfair or deceptive acts or practices' affecting commerce are unlawful)").  In light

22   of the regulations, the Court concludes that there is a viable consumer protection

23   claim under Missouri law based on the anticompetitive conduct alleged herein.  *See*

24   *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 571-72 (E.D.

25   La. 2013) (noting that "[a]ntitrust violations are deemed unfair methods of

26   competition under the FTC Act" and therefore "IPPs['] allegations of antitrust

27   violations are . . . sufficient to make out a claim of unfair practices under the

28   MMPA").  The Court acknowledges the authority cited by Defendants, holding that

1   "[t]he plaintiffs cannot avoid [Missouri's] antitrust prohibition on indirect

2   purchaser suits by making the same claim under Missouri's consumer protection

3   statute." *New Motor Vehicles*, 350 F. Supp. 2d at 192.  But the Court previously

4   rejected this argument in a prior order.  *See Staley*, 446 F. Supp. 3d at 633

5   (rejecting Defendants' argument that "Plaintiffs cannot try to 'end run' the *Illinois*

6   *Brick* rule by recasting the antitrust claims as consumer protection claims").

7   • **Montana.**  Montana law has the following provision in its Consumer Protection

8   Act: "Except as provided in subsection (1)(b), a consumer who suffers any

9   ascertainable loss of money or property, real or personal, as a result of the use or

10   employment by another person of a method, act, or practice declared unlawful by

11   30-14-103 may bring an individual action but not a class action under the rules of

12   civil procedure in the district court of the county in which the seller, lessor, or

13   service provider resides or has its principal place of business or is doing business to

14   recover money damages in the amount of any ascertainable loss of money or

15   property or $500, whichever is greater. . . . ."  Mont. Code Ann. § 30-14-133(1)(a).

16   Based on this provision, Defendants argue that the EPPs do not have a valid

17   consumer protection claim based on Montana law because such law bars class

18   actions.  The Court agrees with Defendants.  As the Court has noted in previous

19   decision, Rule 23 does not govern if the state law prohibiting the class action is so

20   intertwined with a state right or remedy that it functions to define the scope of the

21   state-created right.  *See, e.g.*, *MyFord Touch*, 2016 U.S. Dist. LEXIS 179487, at

22   *78-79 (concluding that "Colorado's limitation on class actions is intertwined with

23   the state right" because the limitation "appears in the substantive section of the

24   code, rather than in court rules" and "is part of the same paragraph which would

25   otherwise make it possible for Plaintiffs to sue for damages"; also noting that "the

26   limitation applies only to Colorado's Consumer Protection Act, suggesting it

27   reflects a substantive policy judgment as to the area of the law by the legislature,

28   not a rule of general procedure"); *Staley*, 446 F. Supp. 3d at 626 (concluding that

31

1    "the Illinois prohibition on class actions is deeply intertwined with the rights under

2        the *Illinois Brick* repealer").

3        For the foregoing reasons, the Court finds Defendants' arguments on the state consumer

4    protection laws of Arkansas, Idaho, Illinois, and Montana persuasive.  But the problem for

5    Defendants is that, even if this creates some "variance" among state laws on consumer protection,

6    there is a simple solution.  The consumer protection claims based on these state laws are

7    dismissed, and the EPPs cannot seek class certification based on these states because (1) the

8    consumer protection claims are not viable and (2) the EPPs have not asserted any alternative

9    antitrust claims.  *Cf. In re Solodyn Antitrust Litig.*, No. 14-md-02503, 2017 U.S. Dist. LEXIS

10   170676, at *68-69 (D. Mass. Oct. 16, 2017) (noting that some of defendants' arguments went

11   "beyond mere variations in the state statutes that could be remedied by juror forms" – *e.g.*,

12   defendants asserted that "Montana's and Utah's consumer protection statutes prohibit class

13   actions"; agreeing with defendants on Montana law and thus excluding Montana's consumer

14   protection statute from the putative class's claims).

15                iii.    Summary

16       For the foregoing reasons, the Court does not find significant variation among the laws of

17   the repealer states at issue on the antitrust claims sufficient to defeat predominance, even taking

18   into account differences based on statutes of limitations and damages.  The Court also does not

19   find significant variation among the laws of the repealer states at issue on the consumer protection

20   claims, once the claims based on the laws of Arkansas, Idaho, Illinois, and Montana are dismissed.

21       3.    Antitrust Injury or Impact

22       Defendants argue that, even if the choice-of-law issue does not present a predominance

23   problem, the EPPs still cannot meet Rule 23(b)(3)'s predominance requirement because they

24   cannot litigate "antitrust injury" without there being individualized inquiries.  In other words,

25   according to Defendants, there are a number of TPPs who were *not* injured as a result of the

26   alleged antitrust violations (only TPPs make up the Damages Classes), and to determine who those

27   TPPs are requires individualized inquiries which will swamp the common questions that do exist.

28       The Supreme Court has stated that "[c]onsidering whether 'questions of law or fact

United States District Court
Northern District of California

1    common to class members predominate' begins . . . with the elements of the underlying cause of

2    action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  As a general

3    matter, "[t]he elements of a claim for [an] antitrust action are (i) the existence of an antitrust

4    violation; (ii) 'antitrust injury' or 'impact' flowing from that violation . . . ' and (iii) measurable

5    damages." *Olean*, 31 F.4th at 665-66.

6         Because the first element "is primarily a determination that focuses on the defendants'

7    conduct – *i.e.*, whether the conduct alleged would actually violate the antitrust laws – common

8    evidence generally predominates over individualized evidence with regard to this element."

9    *Namenda*, 338 F.R.D. at 551.  But the second element – often called antitrust injury, antitrust

10   impact, or impact and causation – focuses on how the plaintiffs were harmed.  *See id.*  "When

11   individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that

12   the court determine whether individualized inquiries about such matters would predominate over

13   common questions."  *Olean*, 31 F.4th at 668.

14        As a preliminary matter, the Court notes that there is some question as to whether the

15   injury status of specific class members is of any real significance in the instant case – specifically,

16   for purposes of predominance – if the EPPs are correct that they can prove aggregate damages

17   (that is, damages on a classwide basis).  In other words, so long as the EPPs can prove aggregate

18   damages, then which specific TPPs have actually been injured and/or to what extent is simply a

19   matter of damages allocation, a matter that can be handled in a bifurcated proceeding.[10]  *See*

20   *Solodyn*, 2017 U.S. Dist. LEXIS 170676, at *40-41 ("The use of averages to develop the

21   aggregate amount of damages does not suggest Plaintiffs will be unable to ensure recovery is only

22   for injured parties.  'Apportioning damages ought wait until liability is decided upon the merits

23   . . . .'"); *cf. In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D. Pa. 2012) ("GSK's other

24   challenges to Rausser's methodology 'are concerns that relate primarily to the allocation of

25   damages among individual class members, not to the computation of aggregate damages on a

26

27   _____

     [10] As reflected in their proposed trial plan, the EPPs have suggested a two-phase trial: Phase I
28   would address liability, aggregate damages, and injunctive relief; Phase II would involve
     allocation of the aggregate damages.  *See* Huttinger Decl., Ex. 6 (EPPs' proposed trial plan).

                                                    33

United States District Court
Northern District of California

1    class-wide basis.  Assuming the jury renders an aggregate judgment, allocation will become an

2    intra-class matter accomplished pursuant to a court-approved plan of allocation, and such

3    individual damages allocation issues are insufficient to defeat class certification.'").

4         But assuming that Defendants are correct that injury status does matter, the Court bears in

5    mind the following: (1) if there is only a de minimis number of uninjured TPPs, that may not be

6    enough to prevent certification, and (2) even if there is *more* than a de minimis number of

7    uninjured TPPs, that does not automatically preclude certification.  Regarding the latter, the Ninth

8    Circuit has expressly rejected the

9                    argument that Rule 23 does not permit the certification of a class
                    that potentially includes more than a de minimis number of
10                   uninjured class members [because] [t]his position is inconsistent
                    with Rule 23(b)(3), which requires only that the district court
11                   determine after rigorous analysis whether the common question
                    predominates over any individual questions, including
12                   individualized questions about injury or entitlement to damages.[11]

13   *Olean*, 31 F. 4th at 669.

14           a.    Antitrust Injury Theories

15        In order to consider Defendants' contention that there is a sizeable number of uninjured

16   TPPs, the Court must first take into account the EPPs' theories of antitrust injury.  The EPPs have

17   an expert, Dr. Frank, who has submitted two reports (an opening reply and a reply report) that

18   address antitrust injury.

19        In his reports, Dr. Frank provides general background based on, *e.g.*, research from

20   academia, the government, and the pharmaceutical industry.  That background includes the

21   following:

22             •   When a generic drug launches, it is priced at a discount compared to the brand

23

24   ────────────────────────
     [11] Judge Lee dissented in *Olean*, asserting, *e.g.*, that "Rule 23 allows a *de minimis* number of
25   uninjured members but no more."  *Olean*, 31 F.4th at 692 (Lee, J.).  According to Judge Lee, other
     circuit courts have "endorsed a *de minimis* rule.  The D.C. Circuit, for example, suggested that
26   '5% to 6% constitutes the outer limits of a *de minimis* number,'" and "the First Circuit suggested
     that 'around 10%' of uninjured class members marks the *de minimis* border."  *Id.*  The Ninth
27   Circuit majority disagreed.  *See id.* at 669 n.13 (concluding that those circuits had not "adopted a
     per se rule[;] [r]ather, based on the particular facts of the cases before them, our sister circuits held
28   that Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured
     class members 'will predominate and render an adjudication unmanageable'").

                                        34

1    drug.  The generic price discount is usually larger where, pre-generic entry, the

2    brand drug has significant sales.  In addition, the generic price discount usually

3    increases over time as more generics enter the market (*i.e.*, there is not just one

4    generic manufacturer selling a generic drug in lieu of the brand but rather multiple

5    generic manufacturers which results in further depression of the generic price).  *See*

6    Frank Rpt. ¶¶ 73-80.

7    • "When generic drugs launch, they rapidly capture the great majority of market

8        share from the reference brand drug."  Frank Rpt. ¶ 91.  "[T]his rapid generic

9        conversion is driven partly by the generic price discounts but also by institutional

10       factors such as state automatic substitution laws and managed care policies

11       including tiered formularies (which are designed to take advantage of the low

12       prices for generics)."  Frank Rpt. ¶ 94.

13   • In response to the entry of a generic, the brand manufacturer usually lowers the

14       price of the brand drug.  *See* Frank Rpt. ¶ 104.

15   Dr. Frank then goes on to describe three types of antitrust injury in the instant case: (1)

16   brand-generic injury; (2) generic-generic injury; and (3) brand-brand injury.  Notably, "[i]f a TPP

17   paid an overcharge on a *single* transaction with respect to any *one* of these types of injury, then it

18   experienced antitrust injury."  Frank Rpt. ¶ 128 (emphasis added).  In other words, if there is just

19   one overcharge with respect to just one member of a TPP (*i.e.*, an individual consumer), then the

20   TPP is injured.

21   • **Brand-generic injury.**  "Brand-generic overcharges occur when patients who

22       would have otherwise consumed [a] generic [drug] are instead forced to consume

23       [the] branded [drug] because generic entry was delayed."  *Namenda*, 338 F.R.D. at

24       564; *see also* Frank Rpt. ¶ 128(a) ("Brand-generic injury is an overcharge on

25       purchases of the brand drug that would have been purchases of the lower-priced

26       generic equivalent in the but-for world.") (emphasis omitted).  Dr. Frank asserts

27       that most TPPs have suffered this kind of injury.  He notes, for instance, that, for

28       Atripla and Truvada, the *actual* world data shows that, "17 months after the

35

1    Truvada and Atripla generic launches, generics have captured 96.9% of the

2    Truvada molecule pills and 97.5% of the Atripla molecule pills."[12]   Frank Reply

3    Rpt. ¶ 43.  With such high generic conversion rates in the *actual* world, it can

4    reasonably be inferred that there would be similar generic conversion rates in the

5    but-for world.[13]  For Complera, there is no actual world data because no generic

6    version of Complera is available yet.  Thus, Dr. Frank had to estimate what the

7    generic conversion rate for Complera would be using a "yardstick" drug (*i.e.*, what

8    he deemed to be a comparable drug).  That yardstick drug (Trizivir) had a generic

9    conversion rate of about 80% approximately 18 months after generic entry and

10   eventually reached a conversion level of about 90%.  *See* Frank Rpt. ¶ 99 & Fig. 6

11   (chart reflecting generic conversion rate for comparable drug Trizivir).  Dr. Frank

12   took into account that there may be some consumers who still purchase brand drugs

13   after the entry of generics – *i.e.*, are brand loyal – because, *e.g.*, they are reluctant to

14   change from what works or because the cost of the brand drug is tempered or even

15   entirely eliminated as a result of cost-sharing assistance programs or patient

16   assistance programs.  However, "[g]iven conversion rates of [*e.g.*] 97% to 98%, to

17   the extent this phenomenon is occurring, it is not effectively reducing the

18   conversion of the market to the generics."  Frank Reply Rpt. ¶ 53.  Moreover, while

19   there may be *consumer* brand loyalty, the question here is whether there is *TPP*

20   brand loyalty (as only TPPs are in the Damages Classes).  Defendants' expert, Dr.

21   James Hughes, suggests that there is effectively TPP brand loyalty to the extent that

22   a number of TPPs are small and have only a few enrollees who purchase the drugs

23

24   [12] A "molecule" is the combination of a brand drug and its generic equivalents.  *See* Frank Rpt. at
     45 n. 210; *see also* Frank Rpt. ¶ 74.  The generic launch of Truvada, as well as the generic launch

25   of Atripla took place in October 2020.  *See* Frank Rpt. ¶ 50 (Truvada); Frank Rpt. ¶ 59 (Atripla).
     Multiple generics entered the market with respect to Truvada, as well as Atripla, starting in March

26   2021.  *See* Frank Rpt. ¶ 51 (Truvada); Frank Rpt. ¶ 60 (Atripla).

27   [13] In fact, Dr. Frank indicates that actual world data understates what the generic conversion rate
     would be in the but-for world because, *e.g.*, in the actual world, there was only one generic for the

28   first 6 months after generic entry, but, in the but-for world, there would have been multiple
     generics starting in the first month.  *See* Frank Reply Rpt. ¶ 71(a).

United States District Court
Northern District of California

1   at issue – *i.e.*, if a TPP has only one enrollee who purchases the drugs and that

2   enrollee is brand loyal, then the TPP is essentially brand loyal too.  *See* Frank

3   Reply Rpt. ¶ 83.  But "[a] TPP would avoid brand-generic injury only if it has

4   *exclusively* 'brand-loyal' members."  Frank Reply Rpt. ¶ 87 (emphasis added).  In

5   other words, if just one TPP member (*i.e.*, enrollee) bought a generic drug one time,

6   that would be injury to the TPP.  *See Solodyn*, 2017 U.S. Dist. LEXIS 170676, at

7   *62 (noting that "an insurer with brand-loyal members is only uninjured here if

8   everyone of its members would have been brand-loyal for all Solodyn purchases in

9   each 'but-for' scenario"); *Namenda*, 338 F.R.D. at 562 (stating that "any one TPP

10  would have suffered an antitrust injury as long as it provided reimbursement for

11  just one overcharged transaction of Namenda or a generic alternative to someone

12  who was not brand loyal").

- **Generic-generic injury.**  "Generic-generic injury is an overcharge on purchases of
13  the generic drug that would have been purchases of the lower-priced generic drug

15  in the but-for world."  Frank Rept. ¶ 128(b) (emphasis omitted).  This injury relates

16  to only the Truvada and Atripla Classes since there is no generic version of

17  Complera available yet.  "Both Truvada and Atripla had generics launch in October

18  2020, and every purchase of a generic from Teva in the actual world would also

19  have been a purchase of a generic in the but-for world.  In each one of those generic

20  purchases, the Class members paid an overcharge.  The primary reason is that the

21  generic price would have been lower in the but-for world than it was in the actual

22  world.  This is the case for two reasons: First, generic prices typically decline over

23  time, so a but-for generic that that would have launched would ordinarily be priced

24  lower than the actual generic that launched later.  Second, generic prices are set

25  based on the price of the brand drug when the first generic competitor launched.

26  Since brand prices almost always increase over time until an initial generic launch,

27  a generic that first launched earlier will have a lower price than one that first

28  launched later."  Frank Rpt. ¶ 134.

37

United States District Court
Northern District of California

- **Brand-brand injury.** "Brand-brand injury is an overcharge on purchases of the brand drug that would have been purchases of the lower-priced brand drug in the but-for world." Frank Rpt. ¶ 128(c) (emphasis omitted). "A small percentage of brand purchases in the actual world would also have been brand purchases in the but-for world. In those brand purchases, Class members would still have paid an overcharge. The primary reason is that the brand price would have been lower in the but-for world than it was in the actual world. This is the case because the prices of Truvada and Atripla decreased after generic entry in the actual world, indicating that they would have done the same in the but-for world. The effect of this is that the brand prices of Truvada and Atripla in the but-for world would have been lower than they were in the actual world. In the case of Complera, there is no actual generic entry to provide evidence of what would have happened to Complera brand prices after generic entry in the but-for world; however, other evidence indicates that the Complera brand price in the but-for world would indeed have decreased after generic entry. First, the yardstick for Complera – Trizivir – experienced a decrease in brand price after generic entry. In addition, other cART drugs exhibited the same pattern."[14] Frank Rpt. ¶ 135.

Defendants acknowledge the different antitrust injury theories but argue that, for each theory, individualized inquiries are necessary to determine who is not injured. As discussed below, none of Defendants' arguments is persuasive, especially since the EPPs simply have to establish that they have evidence "capable of showing that [the class members] suffered antitrust impact on a class-wide basis." *Olean*, 31 F.4th at 681.

            i.      <u>Evidence of Antitrust Injury</u>

Defendants argue first that the EPPs' economic evidence *assumes*, rather than proves, antitrust injury: "For instance, depending on the TPP, some, all or none of its members switched

---

[14] *See also* Frank Reply Rpt. ¶¶ 33, 36 (discussing factors that point to brand-brand injury – *e.g.*, "the continual increase in actual-world prices and the increase in brand consumer cost sharing for brand drugs that occurs after generic entry").

38

1   or would have switched to an AB-rated generic alternative."  Opp'n at 19.  But Defendants ignore

2   two points: (1) for a TPP to be injured, just *one* member of the TPP (*i.e.*, individual enrollee)

3   needs to have swapped a generic for a brand drug *one* time; and (2) the EPPs have presented

4   evidence that there is a high generic conversion rate – for Truvada and Atripla, over 95%.

5   Although Trizivir (the yardstick drug for Complera) had a "less rapid generic conversion"

6   compared to some other cART drugs, it eventually reached a generic conversion rate of 92%.

7   Frank Rpt. ¶ 97.

8       Defendants also argue that, "depending on the TPP, product, location, and consumer, the

9   portion of the retail price the TPP actually paid and would have paid in a 'but-for' world varies

10  from 0% to 100%."  Opp'n at 19.  But Dr. Frank has explained in his report[15] that, even though the

11  payments made by TPPs are not exactly equal to the retail price because, *e.g.*, "they are partly

12  offset by consumer cost-sharing," it is unlikely that, in the but-for world, an offset from a co-pay

13  for a generic would "eliminate the TPP's overcharge."  Frank Rpt. ¶ 132(b) (noting, *e.g.*, that,

14  "because of the high prices of these drugs, consumer cost sharing is a small fraction of the drug

15  retail price, so offsets from cost-sharing would not eliminate the overcharge in any material

16  number of transactions").  Importantly, Defendants' argument relates more to the issue of damages

17  allocation, not antitrust injury.  There is evidence of class-based injury from the challenged

18  conduct – evidence of antitrust injury.  Issues as to Phase II damages allocation do not defeat

19  predominance.  *See generally* Huttinger Decl., Ex. 6 (EPP's Prop. Trial Plan ¶ II.B) ("The

20  allocation of damages in Phase II will not involve any issues related to Defendants or their

21  liability, but instead concerns only issues that are internal to the Class.  Allocation will be decided

22  by the Court, not the jury – the jury will be dismissed after rendering a verdict on liability and

23  aggregate damages in Phase I.").

24  ///

25  ///

26

27  [15] "The determination whether expert evidence is capable of resolving a class-wide question in one stroke may include '[w]eighing conflicting expert testimony' and '[r]esolving expert disputes,'

28  where necessary to ensure that Rule 23(b)(3)'s requirements are met and the 'common, aggregation-enabling" issue predominates over individual issues."  *Olean*, 31 F.4th at 666.

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

ii.   Brand-Generic Injury

The most significant antitrust injury claimed by the EPPs is brand-generic injury. Defendants' main challenge to brand-generic injury relates to brand loyalty. According to Defendants, there are individualized inquiries with respect to brand-generic injury because some TPP members (*i.e.*, individual consumers) would have continued to purchase brand drugs even after generic launch. *Cf., e.g., Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *90-91 (noting that both parties' experts removed brand-loyal consumers from the damages calculations).

In assessing this argument, the Court bears in mind the following:

(1) There may well be legitimate reasons for a TPP member (*i.e.*, individual consumer) to be brand loyal – *e.g.*, because of "manufacturer financial assistance for persons living with HIV, the tendency of insurance companies not to restrict access to brand HIV therapies, and strong preferences to keep patients on life-saving HIV medication that is working for them." Opp'n at 22. However, the generic conversion rates for Truvada and Atripla in the actual world (97-98%) suggest that the number of brand-loyal consumers is relatively small.

(2) Brand loyalty by a TPP *member* (*i.e.*, individual consumer) does not thereby make the *TPP* brand loyal. For the TPP to be brand loyal, *all* of its members would have to be brand loyal. Defendants' expert, Dr. Hughes, essentially admits this. *See, e.g.*, Hughes Rpt. ¶ 84. Or to state the matter somewhat differently, a TPP is injured so long as *one* of its members would have, on *one* occasion, bought generic in lieu of brand.

(3) Even if there were some brand-loyal TPPs, Dr. Frank has explained why there is still brand-brand injury.

According to Defendants, the percentage of brand-loyal consumers for the relevant drugs is high. For example, "22 percent of Truvada patients, and 34 percent of Atripla patients[] continued purchasing the at-issue brand drug during the period October 2020 through August 2021, i.e., even after generic equivalents became available." Hughes Rpt. ¶ 83. In his reply report, however, Dr. Frank explains why this statement from Dr. Hughes is not accurate.

United States District Court
Northern District of California

1    First, Dr. Hughes relied primarily on IQVIA LAAD data,[16] but this specific data set "does

2 not purport to be comprehensive"; for example, "[n]ot all TPPs contribute data."  Frank Reply

3 Rpt. ¶ 71(b).

4    Second, the IQVIA LAAD data extends through August 2021 only, which is "only 11

5 months after the entry of generic Truvada and Atripla and only 5 months after the entry of

6 multiple generics."  Frank Reply Rpt. ¶ 71(c); *see also* Frank Reply Rpt. ¶ 79.  But "[t]he damage

7 period would extend many more months beyond the generic entry date" – as many as 24-40

8 months.  Frank Reply Rpt. ¶ 71(c).

9    Third, Dr. Hughes does not sufficiently address Dr. Frank's contention that, given the

10 shortcomings of the LAAD data, "[t]he best available indicator of the percentage of patients who

11 would have purchased the brand Truvada or Atripla after generic entry but never taken the generic

12 versions of these drugs is the actual generic conversion rate calculated using the [IQVIA] Xponent

13 data."[17]  Frank Reply Rpt. ¶ 80.  This data shows that, "by 17 months after generic entry, only 2%

14 of Atripla molecule pills and 3% of Truvada molecule pills were the brand version."  Frank Reply

15 Rpt. ¶ 80.  In his report, Dr. Hughes points out that "[t]he rate calculated by Dr. Frank is not a

16 calculation of the percentage of *persons* taking the brand product who switch to the generic

17 product, but instead represents only the ratio of the total *unit sales* of the generic equivalents of a

18 brand product to the total sales of the brand plus its generic equivalents."  Hughes Rpt. at 31 n.113

19 (emphasis added).  This is true, but Dr. Hughes misses the point.  The point is that, given certain

20 shortcomings in the LAAD data, the Xponent data is a better proxy for purposes of assessing the

21 likelihood of whether individual consumers would have purchased generic drugs over brand once

22

23    [16] "IQVIA . . . is a leading third-party provider of pharmaceutical sales data in the U.S. and
24 globally; IQVIA data are commonly used in academic research, litigation, and strategic analysis
conducted by firms such as Gilead, and is sometimes referred to as the 'gold standard' for
25 pharmaceutical data."  *See* Frank Rpt. at 23 n.107.

26    IQVIA offers various data products.  "IQVIA LAAD data [is] a claims database that
allows an analyst to follow the purchases of individual patients over time."  Frank Reply Rpt. ¶ 54.

27    [17] Xponent is another product of IQVIA.  Xponent "'measur[es] the retail outflow of prescriptions
28 through the front door into the hands of consumers.'"  *City of Huntington v. AmerisourceBergen
Drug Corp.*, No. 3:17-01362, 2021 U.S. Dist. LEXIS 70336, at *12 (S.D. W. Va. Apr. 12, 2021).

1   the generics are available.[18]

2          As indicated by the Xponent data, with such a high generic conversion rate, it can

3   reasonably be inferred that most TPPs would be injured because they would suffer injury from just

4   one TPP member (individual consumer) buying generic over brand one time.  Defendants try to

5   argue, nevertheless, that brand loyalty at the TPP level is not uncommon.  Dr. Hughes, the defense

6   expert, asserts that, for "TPPs with only a few enrollees purchasing the at-issue drugs . . . [,] there

7   is a higher likelihood . . . that brand loyalty at the consumer level will translate into brand loyalty

8   at the TPP level."  Hughes Rpt. ¶ 85.  For example, if a TPP has just one member who buys the

9   drugs at issue and that member is brand loyal, that essentially makes the TPP brand loyal as well.

10  Dr. Hughes then notes there are, in fact, a significant number of TPPs who had just one member,

11  or least ten or fewer members, who bought the relevant drugs.  *See, e.g.*, Hughes Rpt. ¶ 86 & Fig.

12  13 (showing that, for Truvada, 6% of the TPPs had just one enrollee and 41% had ten or fewer; for

13  Atripla, 29% of the TPPs had just one enrollee and 77% had ten or fewer); Hughes Rpt. ¶ 110 &

14  Fig. 20 (showing that, for Complera, 36% of the TPPs had just one enrollee and 78% had ten or

15  fewer).

16         Defendants' argument, however, is not well supported.  Even if one puts aside the fact that

17  Dr. Hughes was relying on a less-than-complete data set, *see* Frank Reply Rpt. ¶¶ 71, 82, Dr.

18  Hughes seems to assume that, *any* time there is a small number of enrollees in a given TPP, those

19  enrollees would *all* choose brand.  *Cf.* Frank Reply Rpt. ¶ 73.  That seems an unlikely scenario.

20  *See also* Frank Reply Rpt. ¶¶ 83-87 & Figs. 10-12 (using Dr. Hughes's figures to estimate the

21  percentage of TPPs that would have *only* brand-loyal members).  And notably, in his report, Dr.

22  Hughes points to only a handful of TPPs whose members all stayed brand loyal, *i.e.*, did not

23  switch to generic Truvada or Atripla after a generic version became available, *see* Hughes Rpt. ¶

24  85 – and even this claim is subject to criticism.  *See, e.g.*, Docket No. 1169-3 (Opp'n at 7 n.6) (in

25  opposition to *Daubert* motion related to Dr. Frank, arguing that "there is no reason to believe that

26  _____

27  [18] The Court notes that, even where Dr. Hughes does rely on Xponent data in his report, he also
    seems to use a less-than-complete data set.  *See* Frank Reply Rpt. ¶ 71(c) (noting that the Xponent

28  data set used by Dr. Hughes goes through June 2021 only; Dr. Frank relied on more updated
    Xponent data through February 2022).

United States District Court
Northern District of California

1   even these TPPs would be brand loyal in the but-for world[;] [e]ach example includes a plan

2   member that took brand Truvada in the pre-generic entry period and then had *no purchases of*

3   *either brand or generic* Truvada in the post-generic entry period," but "Dr. Hughes offers no

4   reason to think that such members would not have purchased the generic in the but for world if it

5   had been available") (emphasis added).

6          Defendants contend still that the data shows

7              10% of TPPs in the Truvada class and 20% of TPPs in the Atripla
               class *never reimbursed for a generic equivalent*; instead, these TPPs
8              reimbursed exclusively for branded products even after generic
               entry, and thus could not have suffered any 'brand-generic injury'
9              because brand loyalty by their members resulted in these TPPs being
               brand loyal as well.
10

11   Opp'n at 23 (emphasis in original); *see also* Hughes Rpt. ¶ 89.  But similar to above, Dr. Frank

12   points out that Dr. Hughes arrived at these figures using a limited data set:

13             The primary flaw in his method is that the Xponent dataset he uses
               is not well suited to this analysis.  The dataset covers only the first 9
14             months after the launches of generic Truvada and Atripla (October
               2020 through June 2021), and for the first 6 months generic
15             competition was weak because there was only one generic on the
               market.  By contrast, in the but-for world, multiple generics
16             launched in the first month, and multiple generics would have stayed
               on the market for the full duration of the damage period.  By
17             contrast, his Xponent dataset provides a very short timeframe for
               consumers to convert to the generic.
18

19   Frank Reply Rpt. ¶ 88.  Dr. Frank made new calculations using the Xponent data set through

20   February 2022: "For Truvada, it reduced the value from 10% to 6%, and for Atripla, it reduced the

21   value from 20% to 11%."  Frank Reply Rpt. ¶ 89.  Thus, the number of uninjured TPPs is de

22   minimis at best.

23          Faced with this problem, Defendants protest that there is another problem beyond the

24   alleged 10-20% uninjured TPPs: "another 25% in the Truvada class and 53% in the Atripla class

25   did not reimburse for anything – brand or generic – after generic entry, and thus there is no

26   evidence showing that these TPPs would have reimbursed for a generic had it been available

27   earlier in the but-for world."  Opp'n at 23; *see also* Hughes Rpt. ¶ 91.  Once again, Dr. Frank

28   persuasively addresses this argument in his reply report: even if there were no purchases (brand or

United States District Court
Northern District of California

43

1    generic) after generic launch, predictions about what would have happened in the but-for world

2    are still possible based on the generic conversion rate.  Furthermore, even if there were no brand-

3    generic injury, there would still be brand-brand injury.  *See* Frank Reply Rpt. ¶¶ 90-91.

4        Finally, Defendants argue that individualized inquiries are required for brand-generic

5    injury as to Complera: (1) 11% of the TPPs continued to reimburse for brand Complera only (*i.e.*,

6    after generic launch) and (2) another 13% of the TPPs actually paid less for the brand than they

7    would have paid for the generic (or rather, partial generic since only the TDF/FTC part of

8    Complera could be made generic).  *See* Opp'n at 24; *see also* Hughes Rpt. ¶¶ 110-11.  With

9    respect to (1), 11% is arguably still a de minimis number – *i.e.*, individualized inquiries would not

10   predominate over common questions.  As for (2), Dr. Frank notes that Dr. Hughes's claim "is

11   driven entirely by how [he] chose to calculate the TPPs' price per prescription rather than price per

12   pill."  Frank Reply Rpt. ¶ 93.

> To resolve this, I replicated his analysis with one modification: I used the but-for generic price from my current analysis (which is calculated in terms of price per pill, Dr. Hughes' preferred method), and I also calculated the TPPs' brand Complera prices in terms of price per pill.  After the modification, Hughes' analysis showed that only **0.7%** of TPPs in the Complera class paid a price per prescription for Complera that was lower than my estimated average price per prescription of the generic version of Complera in the same month in the but-for world.

18   Frank Reply Rpt. ¶ 93 (emphasis in original).

19                    iii.    Brand-Brand Injury

20       As noted above, the EPPs argue that, even if there were some brand loyal TPPs, they were

21   still injured as a result of Defendants' anticompetitive conduct because they suffered brand-brand

22   injury.  Defendants criticize Dr. Frank's assessment of brand-brand injury because he calculated

23   brand prices on a per-prescription basis rather than a per-pill basis.  Defendants assert that a per-

24   prescription methodology is misleading – *e.g.*, if a 90-day prescription for a brand drug costs

25   $3,000 *before* generic launch and a 30-day prescription for a brand drug costs $1,000 *after* generic

26   launch, then the per-pill price is the same, but the per-prescription approach would suggest a

27   savings of $2,000.  *See* Opp'n at 20-21.  According to Defendants, once this correction is made,

28   "the average prices of brand Atripla and Truvada . . . *do not decrease* after generic entry."  Opp'n

1    at 21 (emphasis in original); *see also* Hughes Rpt., App. F (showing that the brand prices for

2    Truvada and Atripla remained stayed roughly the same after generic launch in the real world).

3         But in his reply report, Dr. Frank explained why it was not unreasonable for him to

4    calculate on a per-prescription basis.  *See, e.g.*, Frank Reply Rpt. ¶ 25 ("[U]sing prescriptions as

5    the unit of analysis in an aggregate damage analysis is reasonable because prescription sizes are

6    fairly standardized.  In some respects, using prescriptions as the unit analysis is preferable to using

7    pills [because] co-pays are typically paid on a per-prescription basis, not a per-pill basis . . . .").

8    More important, Dr. Frank went on to make new calculations on a per-pill basis and found that

9    there was in fact a price decline for the brand drugs.  Dr. Frank explained why Dr. Hughes reached

10    a different result in his analysis: "Part of the reason Dr. Hughes did not recognize these declines in

11    price per pill is that he was using an older Xponent data set that ended in June 2021, and the price

12    declines became more evident after that date.  I conducted the analysis . . . using the updated

13    Xponent data set that goes through February 2022."  Frank Reply Rpt. ¶ 27; *see also* Frank Reply

14    Rpt., Figs. 5-7 (showing the retail prices over time for Truvada, Atripla, and Trizivir (the

15    "yardstick" drug for Complera), including after generic launch(es)).

16                 iv.    <u>Generic-Generic Injury</u>

17         Finally, with respect to generic-generic injury, Defendants' challenge consists in part of a

18    repetition of some of the arguments above (*e.g.*, there is no generic-generic injury if a TPP

19    purchased or reimbursed for a brand drug only after generic launch, and some TPPs did not buy

20    either brand or generic after generic launch).  For the reasons stated above, those arguments lack

21    merit.

22         Defendants' remaining argument is that, where a TPP did purchase or reimburse for a

23    generic,

24
25
26
27

> many (21% for Truvada, and 20% for Atripla) only did so after
> April 2021 – six months after generic entry, at a time when Teva's
> exclusivity period had expired and mass generic entry resulted in
> these generics reaching a floor price.  Because generic prices had
> bottomed out, there is no reason to believe that any of these TPPs
> would have paid any less for the generics they reimbursed even if
> generic entry had occurred earlier.

28    Opp'n at 25; *see also* Hughes Rpt. ¶ 93.

1    In response, the EPPs acknowledge that this last argument has some validity – but only in

2    part: "[G]eneric retail prices do not decline instantaneously when multiple generics enter.  It takes

3    time for prices to respond to generic competition, and generic retail prices continue to decline over

4    time even when no new generics enter the market."  Frank Reply Rpt. ¶ 96.  According to the

5    EPPs, the impact of the delayed generic entry for Truvada and Atripla "end[ed] sometime between

6    May and August 2021, . . . and [they] have ended the damage period at that point and incorporated

7    that into [the] damage calculations."  Frank Reply Rpt. ¶ 97.  It will be up to the jury to determine

8    what is the appropriate date for damages to end.  The only concern at this point is whether there

9    will be individualized inquiries for the jury to make this determination.  Defendants have made no

10   such showing.

11          b.    Medicare Part D

12   Defendants argue that, putting aside the EPPs' antitrust injury theories, individualized

13   inquiries are required to assess whether a given TPP is actually injured because about 20 percent

14   of the TPPs provided coverage to members under Medicare Part D and it is unlikely that TPPs

15   offering Part D coverage suffered injury (with respect to such coverage).  The Court is not

16   persuaded.

17          "Medicare beneficiaries, primarily people aged 65 and older (as well as individuals with

18   permanent disabilities under the age of 65), are offered prescription drug coverage through

19   Medicare Part D, a federal program . . . ."  Hughes Rpt. ¶ 41; *see al* Frank Rpt. ¶ 37(b).  "Medicare

20   Part D plans are offered through private insurers that have been contracted by the Federal

21   Government to offer such plans."  Hughes Rpt. ¶ 98.  Roughly speaking, under Part D, the plan

22   assesses the expected cost of prescription drugs for a plan member.  The government *prospectively*

23   pays the plan for the majority of the expected cost, and the plan member the remainder.  Later, if

24   the expected cost ends up being greater than the actual cost, the plan pays the government back

25   some of what the plan was paid in expected cost.  If the expected cost is less than the actual cost,

26   then the plan has to pay for part of that difference and the government covers the rest.  *See* Hughes

27   Rpt. ¶¶ 98-101; Frank Reply Rpt. ¶ 111.

28          Defendants argue that, as a result of the above structure, any payment that a TPP makes for

United States District Court
Northern District of California

1    a cART drug is typically covered through the prospective payment from the federal

2    government/plan member – *i.e.*, the TPP is not injured.  *See* Hughes Rpt. ¶ 102; *see also* Hughes

3    Rpt. ¶ 97 (asserting that a "Part D TPP may end up not bearing any financial responsibility for the

4    cost of drugs purchased by its enrollees"); Opp'n at 25-26 (arguing that "[a] Part D TTP only pays

5    part of a drug's cost if its actual costs happen to exceed the cost that the federal government

6    expects the TPP to incur").  Defendants add: "While most Part D TPPs would not pay any of their

7    members' prescription costs, assessing whether a TPP used its own funds to pay for HIV

8    medications requires individualized inquiry."  Opp'n at 26 (emphasis in original).

9         The Court rejects Defendants' argument.  As the EPPs note, "the prospective government

10   payments [from the federal government/plan member] are not made at the point of purchase" for a

11   prescription drug, Reply at 17, and thus, they are "not part of the drug purchase transaction."

12   Frank Reply Rpt. ¶ 112.  The prospective payments are, in effect, payments for insurance (*i.e.*,

13   akin to premiums).  *See* Frank Reply Rpt. ¶ 111.  That the prospective payments serve as a set off

14   against the amount the plan paid for the prescription drug does not mean that the plan was not

15   injured in the first instance; this is true even if the entire cost of the prescription drug was covered

16   by the prospective payments.  Those payments to the plan do not negate the plan's injury when it

17   paid putatively high supracompetitive prices.  *Cf. Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-

18   EMC, 2022 U.S. Dist. LEXIS 44935, at *38 (N.D. Cal. Mar. 14, 2022) (rejecting Defendants'

19   argument that "entitlement to reimbursement negates the fact of injury"; citing *In re Nexium*

20   *Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), for the principle that "'antitrust injury occurs the

21   moment the purchaser incurs an overcharge, whether or not that injury is later offset'") (emphasis

22   omitted).

23         4.   <u>Measurable Damages</u>

24         The last element of an antitrust claim is measurable damages.  *See Namenda*, 338 F.R.D. at

25   550.  If damages are capable of measurement on a classwide basis, then there is no Rule 23(b)(3)

26   predominance problem.  Here, the EPPs have offered evidence that they can establish aggregate

27   damages – hence, damages capable of measurement on a classwide basis.  *See, e.g.*, Frank Rpt. ¶¶

28   138-41.  Although Defendants do not dispute that the EPPs will be able to offer evidence on

1    aggregate damages, they argue that there is still a damages problem for the EPPs based on

2    *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  There, the Supreme Court held that

3           a model purporting to serve as evidence of damages in [a] class
            action must measure only those damages *attributable* to [the class's
4           asserted] theory [of antitrust injury].  If the model does not even
            attempt to do that, it cannot possibly establish that damages are
5           susceptible of measurement across the entire class for purposes of
            Rule 23(b)(3).
6

7    *Id.* at 35 (emphasis added); *see also Namenda*, 338 F.R.D. at 551 (stating that, in *Comcast*, the

8    Supreme Court held that "a damages estimate proffered by a plaintiff's expert must actually

9    correspond to the specific theory of liability that plaintiffs advance").

10          In particular, Defendants argue that the EPPs have violated *Comcast* in two ways: one

11   concerns pharmacy benefit managers ("PBMs") and the other concerns Janssen.

12              a.       Pharmacy Benefit Managers

13          PBMs are involved in the payment process for prescription drugs.  They are "positioned"

14   in drug purchase transactions between the pharmacies and the TPPs.  Specifically, a PBM pays a

15   pharmacy for a given prescription "on behalf of the patient's TPP in an amount set by contractual

16   terms between the PBM and the pharmacy."  Happe Rpt. ¶ 26.  The TPP then pays the PBM for

17   the prescription "in an amount set by contractual terms between the TPP and the PBM."  Happe

18   Rpt. ¶ 26.  The amount that the TPP gives the PBM "may or may not match the amount the PBM

19   paid to the pharmacy."  Hughes Rpt. ¶ 32; *see also* Happe Rpt. ¶ 27.  "When the PBM charges the

20   TPP more or less than it pays the pharmacy, this is known as 'spread-pricing,' and can be a source

21   of revenue or loss to the PBM."  Happe Rpt. ¶ 27.

22          In their papers, Defendants note that the EPPs have excluded PBMs from the Damages

23   Classes.  However, Defendants argue that the EPPs have still violated *Comcast* because they

24   "offer no way to adjust claimed damages to remove any overcharges paid by the PBMs."  Opp'n at

25   31.

26          In response, the EPPs argue that, even though PBMs are involved in the payment process,

27   they are just "service providers who process, adjudicate and make payment for prescription drug

28   purchase transactions on the TPPs' behalf, using the TPPs' funds."  Craft Rpt. ¶ 72.  The PBMs

                                                    48

1    are not "parties to the retail transactions reflected in the prescription data and do not consider

2    themselves to be end-payors or to be paying for the prescription drug purchases of their TPP

3    clients." Craft Rpt. ¶ 72.  Accordingly, the EPPs assert that the PBMs do not have any

4    "overcharges that must be removed from [their] damages."  Reply at 19.  The EPPs add that "[a]ny

5    compensation arrangements negotiated between PBMs and their TPP clients, including discounts

6    and so-called 'spread pricing' do not alter the price paid for a drug at the pharmacy."  Reply at 19-

7    20.  *See, e.g.*, Craft Rpt. ¶ 76 (stating that, if spread is retained by a PBM, it is "not part of the drug

8    cost, but rather payment from the TPP for services provided to it by the PBM[;] [t]he price

9    reported in PBM claims data and data such as Symphony Health and Xponent is the actual

10   pharmacy reimbursement [and] thus represents the true drug cost regardless of whether the PBM

11   may have received slightly more from its client"); *see also* Craft Rpt. ¶ 73 (stating that,

12   "[a]lthough PBM rebate guarantees [to their clients] are common, they are not specific to any

13   particular drug or drug manufacturer; they are calculated retrospectively and they do not adjust the

14   point-of-sale purchase price paid by the TPP"); Craft Rpt. ¶ 78 (stating that PBM "[d]iscount

15   guarantees are applied across the board to brand drugs or generic drugs generally, not to specific

16   drugs").  Finally, the EPPs note that, even if it is *theoretically* possible for a PBM to be

17   overcharged as Defendants have suggested – *i.e.*, when the PBM pays more to the pharmacy for a

18   drug than what its charges to the TPP – Defendants have not shown that that is anything more than

19   speculation.  As the EPPs' expert notes: "[A]ny speculation about the occurrence of negative

20   spreads ignores the fact that PBMs are in charge of negotiating each side of the spread and would

21   obviously make efforts to assure this never happens."  Craft Rpt. ¶ 76.

22           Numerous courts have agreed with the EPPs' argument that compensation arrangements

23   between PBMs and TPPs have no real bearing on what the cost of a prescription drug is for

24   purposes of determining antitrust injury.  *See Loestrin*, 410 F. Supp. 3d at 387-88 ("Defendants

25   . . . take issue with Winkelman's opinion that PBMs do not pay any portion of the cost of the drugs

26   at issue in this case.  While Winkelman states that some PBMs contract with TPPs to provide

27   rebate guarantees and spread pricing, . . . the Court is persuaded that this arrangement does not

28   constitute payment for the drug."); *id.* at 405 ("[T]he Court is not persuaded that practices like

49

United States District Court
Northern District of California

1    spread pricing and rebate guarantees pay for specific drugs or reflect PBMs absorbing risk for

2    specific drugs.").  The Court is inclined to agree but it need not make a dispositive ruling on that

3    matter as a legal matter because, even if Defendants' legal position were accepted, they have not

4    provided any concrete evidence that, in this case, PBMs have, in fact, suffered loss by charging

5    TPPs less than what the PBMs paid the pharmacies.  As the EPPs expert indicates, it seems

6    unlikely that the PBMs would put themselves in this position and would actively take steps to

7    ensure that that situation does not happen.  *See also Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at

8    *105 ("[D]efendants criticize Singer's model for its failure to exclude damages born by the PBMs

9    that resulted from the speculated failure of the PBMs to effectively negotiate rebates and set

10   spread prices.  However, as discussed above, there is *no evidence* either of these scenarios actually

11   occurred to PBMs with respect to lidocaine patches. Defendants' speculation cannot defeat

12   certification.").  There is no evidence that the contrary happened.

13            b.    <u>Janssen</u>

14   Defendants argue next that the EPPs violated *Comcast* because their expert, Dr. Frank,

15   "has proffered only *aggregate* damages figures, and he has not even attempted to apportion those

16   amounts either by defendant or alleged misconduct."  Opp'n at 32 (emphasis in original).

17   Defendants contend that this is a particular problem with respect to the Complera Class: "[W]hile

18   the alleged Complera damages are attributable to two liability components – (1) the Gilead/Teva

19   patent settlements and (2) the non-compete provisions in the Complera agreement – Janssen was

20   not at all involved in Gilead's settlements with Teva."  Opp'n at 32.

21   Here, the problem for Defendants is that the EPPs have claimed joint and several liability

22   on the part of Gilead and Janssen.  *See* Reply at 20 (arguing that "Janssen unlawfully agreed not to

23   market a generic version of Complera *whenever* generic TDF/FTC became available, including in

24   2018 when it would have become available but-for Gilead's unlawful reverse payments to Teva")

25   (emphasis in original).  Although a jury might well reject the joint-and-several-liability theory,

26   that is a matter that the Court cannot prejudge at this stage of the proceedings.  *Cf. In re Modafinil*

27   *Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016) ("Plaintiffs' theory of liability is not that each

28   individual [reverse-payment settlement] agreement caused an individual harm, such that a new

50

1    damages model would be required under *Comcast*.  Instead, their theory of liability is that each

2    individual agreement contributed to the market-wide harm, and that all five original defendants are

3    jointly and severally liable for this harm as concurrent tortfeasors.  This theory may ultimately be

4    proven wrong, but it does match Plaintiffs' damages theory.").[19]

5             5.    Summary

6             For the foregoing reasons, the Court finds that the EPPs have satisfied the predominance

7    requirement of Rule 23(b)(3).  And given the predominance of common issues, the Court finds

8    that a class action is manageable for each Damages Class and that a class action is "superior to

9    other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

10   23(b)(3).  The Court is inclined to adopt the EPPs' proposal that trial be bifurcated into two phases

11   – in essence, resolving all issues in Phase I, including liability and aggregate damages, but leaving

12   damages allocation for Phase II – as this also enhances the manageability of the class action.

13   D.    Rule 23(b)(2) – Injunctive Relief Classes

14           In addition to the three Damages Classes, the EPPs seek certification of three Injunctive

15   Relief Classes: (1) the Evotaz Class; (2) the Prezcobix Class; and (3) the cART Foundation Drug

16   Class.  Unlike the Damages Classes, the Injunctive Relief Classes include individual consumers.

17   In fact, the proposed class representatives for the cART Foundation Drug Class are individual

18   consumers only.

19           The Evotaz Class relates to the BMS/Gilead drug Evotaz (ATV/COBI).  Allegedly, BMS

20   and Gilead entered into the Evotaz Agreement to protect BMS's drug ATV once its patent expired.

21   In terms of relief, the EPPs seek to enjoin enforcement of the NGR in the Evotaz Agreement – *i.e.*,

22   so that Gilead would not be stopped from marketing a generic version of Evotaz once the patent

23   on ATV expires.

24           The Prezcobix Class relates to the Janssen/Gilead drug Prezcobix (DRV/COBI).

25   Allegedly, Janssen and Gilead entered into the Prezcobix Agreement to protect Janssen's drug

26   DRV once its patent expired.  In terms of relief, the EPPs seek to enjoin enforcement of the NGR

27   _____

28   [19] This ruling is not determinative of the consequences to the EPPs' damages claim should they
     not prevail on the issue of joint and several liability.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    in the Prezcobix Agreement – *i.e.*, so that Gilead would not be stopped from marketing a generic

2    version of Prezcobix once the patent on DRV expires.

3           The cART Foundation Drug Class relates to ten cART drugs:

4           (1)     Atripla (a Gilead/BMS drug) (TDF/FTC/EFV);

5           (2)     Biktarvy (a Gilead drug) (BIC/TAF/FTC);

6           (3)     Complera (a Gilead/Janssen drug) (TDF/FTC/RPV);

7           (4)     Descovy (a Gilead drug) (TAF/FTC);

8           (5)     Genvoya (a Gilead/Japan Tobacco drug) (TAF/FTC/EVG/COBI);

9           (6)     Odefsey (a Gilead/Janssen drug) (TAF/FTC/RPV);

10          (7)     Stribild (a Gilead/Japan Tobacco drug) (TDF/FTC/EVG/COBI);

11          (8)     Symtuza (a Gilead/Janssen drug) (TAF/FTC/DRV/COBI);

12          (9)     Truvada (a Gilead drug) (TDF/FTC); and

13          (10)    Viread (a Gilead drug) (TDF).

14   In terms of relief for the cART Foundation Drug Class, the EPPs ask for several injunctions:

15          (a)     an injunction preventing enforcement of any NGRs that would otherwise

16                  prevent Gilead or Janssen from marketing generic versions of the cART

17                  Foundation drugs;

18          (b)     an injunction requiring (i) Gilead to issue licenses to TAF, FTC, and COBI to

19                  any willing licensee seeking to market competing versions of Evotaz and

20                  Prezcobix and requiring (ii) Janssen to issue licenses to its third agents to any

21                  willing licensee;

22          (c)     an injunction finding forfeiture of any NCE (new chemical entity) exclusivity

23                  that Defendants might have related to Vemlidy (TAF), Descovy, Odefsey,

24                  Genvoya, Symtuza, and any other FDCs that contain TAF;

25          (d)     an injunction finding forfeiture of any 30-month stay under the Hatch-Waxman

26                  Act that Defendants might have related to Vemlidy, Descovy, Odefsey,

27                  Genvoya, Symtuza, and any other FDCs that contain TAF;

28          (e)     an injunction requiring Gilead to issue licenses to TDF, TAF, and FTC to any

United States District Court
Northern District of California

1       willing licensee;

2       (f)     an injunction barring Gilead from enforcing its '791 patent (*i.e.*, one of the

3       patents related to the Gilead drug TAF).[20]

4   *See* Mot. at 32 & nn.70-71.

5       The EPPs ask for certification of each of the Injunctive Relief Classes pursuant to Rule

6   23(b)(2), which provides that a class action may be maintained if "the party opposing the class has

7   acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

8   corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

9   23(b)(2).

10       1.    <u>Standing</u>

11       Defendants argue first that there is a standing problem for the Injunctive Relief Classes.

12   For Article III standing, a plaintiff must show: (1) an injury in fact, (2) a sufficient causal

13   connection between the injury and the conduct complained of (*i.e.*, traceability), and (3) a

14   likelihood that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of*

15   *Wildlife*, 504 U.S. 555, 560-61 (1992).  In the case at bar, Defendants focus on the factors of

16   injury in fact and redressability.

17       a.    <u>Injury in Fact</u>

18       As indicated above, the Injunctive Relief Classes are made up of both TPPs and individual

19   consumers.  Some of the proposed class representatives are individual consumers.  *See generally*

20   Docket No. 991-3 (listing proposed class representatives).  According to Defendants, the proposed

21   class representatives that are individual consumers lack standing to assert any claims because they

22   are not currently suffering or likely to suffer an injury in fact.

23       As an initial matter, the Court notes that this argument has no impact at all on the Evotaz

24   Class because the EPPs have proposed TPPs only as class representatives (Teamsters and

25

26

---

27   [20] At this juncture, Defendants are not making a challenge to the propriety of the injunctive relief sought by the EPPs.  *See, e.g.*, Opp'n at 35 ("[l]eaving aside the impropriety of [a] request" that

28   Gilead be compelled to forfeit "its lawfully-obtained regulatory and patent exclusivities").

BCBSA[21]), not consumers.

The argument also has no real impact on the Prezcobix Class because the EPPs have proposed as class representatives four TPPs (Teamsters, Local 1, FOP, and BCBSA) and only one individual consumer (Brenda Emily Goodrow). In other words, even if Ms. Goodrow lacked standing to proceed, the TPPs would not be affected. In any event, Ms. Goodrow has standing with respect to Prezcobix. *See* Miranda Decl. ¶ 18 (testifying that, in 2016, Ms. Goodrow was prescribed Prezcobix and another drug and that this remains her regimen today).

The argument, however, does have potential impact on the cART Foundation Drug Class because, there, only individual consumers have been proposed as class representatives: Ivy Kwan Arce, Gregg Gonsalves, Ms. Goodrow, Joshua McDonald, Andrew Spieldenner, and Troy Vasquez-Cain. Accordingly, the focus here will be on the cART Foundation Drug Class.

As noted above, there are ten drugs that are related to this class:

(1)     Atripla. None of the six individual consumers currently takes the drug. Some did take the drug in the past: Mr. Spieldenner (2005); Mr. Vasquez-Cain (2011-2017); and Ms. Arce (2011-2016). *See* Miranda Decl. ¶¶ 24, 27, 30.

(2)     Biktarvy. Mr. McDonald currently takes the drug today. *See* Miranda Decl. ¶ 21.

(3)     Complera. None of the six individual consumers currently takes the drug. Mr. Spieldenner did take the drug in the past (2012-2016). *See* Miranda Decl. ¶ 24.

(4)     Descovy. None of the six individual consumers currently takes the drug. In addition, none took the drug in the past.

(5)     Genvoya. None of the six individual consumers currently takes the drug. Mr. McDonald did take the drug in the past (2017-2019). *See* Miranda Decl. ¶ 21.

(6)     Odefsey. Two individual consumers currently take the drug: Mr. Spieldenner and Mr. Vasquez-Cain. *See* Miranda Decl. ¶¶ 24, 27.

(7)     Stribild. None of the six individual consumers currently takes the drug. Mr.

---

[21] As noted above, BCBSA has been dismissed from the suit.

United States District Court
Northern District of California

1   McDonald did take the drug in the past (2014-2017).  *See* Miranda Decl. ¶ 21.

2   (8)   Symtuza.  None of the six individual consumers currently takes the drug.  In

3   addition, none took the drug in the past.

4   (9)   Truvada.  None of the six individual consumers currently takes the drug.  Mr.

5   Gonsalves did take the drug in the past (2015).  *See* McDonald Decl. ¶ 32.

6   (10)   Viread.  None of the six individual consumers currently takes the drug.  In

7   addition, none took the drug in the past.

8   As indicated by the above, the drugs basically fall into three categories:

9   (a)   The drug is currently being taken by some of the individual consumers.

10   (b)   The drug is not currently being taken, but in the past was taken by some of the

11   individual consumers – usually several years earlier.

12   (c)   The drug has never been taken by any of the individual consumers – either

13   currently or in the past.

14   Clearly, the drugs in categories (b) and (c) present concern with respect to standing.  *See*

15   *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 709 (9th Cir. 2020) ("A plaintiff threatened with future

16   injury has standing to sue if the threatened injury is certainly impending, or there is a substantial

17   risk that the harm will occur. And we have consistently held that a credible threat of future harm is

18   sufficient to establish an injury in fact.").  For these drugs, there is no indication that any

19   individual consumer will likely take the drug in the future, even if he or she had taken the drug in

20   the past (usually several years earlier).

21   That being said, there *are* drugs that are currently being taken by some of the individual

22   consumers: Biktarvy (Mr. McDonald) and Odefsey (Mr. Spieldenner and Mr. Vasquez-Cain).

23   These three individuals do have standing – and standing to represent the cART Foundation Drug

24   Class, notwithstanding the fact that they have taken only two out of the ten drugs defined as cART

25   Foundation Drugs.  There is nothing to indicate on this record that these individuals cannot

26   represent the broader class even if they are not currently taking or likely to take in the future most

27   of the cART foundation drugs.  For example, because Mr. McDonald takes Biktarvy (a TAF-

28   related drug), he is, absent contrary evidence, able to "represent" the other TAF-related drugs.

55

1   Similarly, because Mr. Spieldenner and Mr. Vasquez-Cain take Odefsey, they are able to

2   "represent" the other drugs involved in the NGRs.  There is no evidence of material dissimilarities

3   between the "represented" and other drugs for purposes of the relief sought.

4           b.      Redressability

5               i.      Evotaz and Prezcobix Classes

6           As noted above, for the Evotaz and Prezcobix Classes, the EPPs seek an injunction barring

7   enforcement of the NGRs in the Evotaz and Prezcobix Agreements.  In theory, this injunctive

8   relief would allow Gilead to enter the market with generic versions of Evotaz and Prezcobix.

9           Defendants contend that the EPPs lack standing to seek this injunctive relief because of a

10  redressability problem – *i.e.*, a decision favorable to the EPPs would not likely redress the injury

11  asserted.  According to Defendants, this is because there is no indication that "an injunction *would*

12  *result* in Gilead selling generic-based versions of [the drugs]," and, although the "EPPs suggest

13  that Gilead may license a generic manufacturer to sell a generic version . . . , they fail to establish

14  any likelihood that a generic-based version would come to market" – particularly for Prezcobix

15  (DRV/COBI) since Janssen's patents on DRV last until 2026.  Opp'n at 34 (emphasis added).

16  Defendants add that, even if generic drugs were manufactured, there is nothing to show that (1)

17  they would be cheaper, (2) insurance companies would cover them, or (3) patients would switch to

18  them.  *See* Opp'n at 34.

19          Defendants' position is not convincing.  First, as the EPPs point out, a plaintiff's burden to

20  show redressability "is 'relatively modest'": a plaintiff is not required to show it is guaranteed that

21  a favorable decision will redress the plaintiff's injuries; rather, the plaintiff "need only show that

22  there would be a 'change in legal status,' and that a 'practical consequence of that change would

23  amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly

24  redresses the injury suffered.'"  *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012).  Here,

25  there would be a change in legal status if the Court were to issue an injunction barring

26  enforcement of the NGRs.  And the EPPs have provided evidence – specifically, the opinion of an

27  expert, Dr. Daniel Rubinfeld – that a practical consequence of that change would amount to a

28  significant increase in the likelihood that a generic version of each drug would come to market.  In

56

1  his report, Dr. Rubinfeld explains as follows:

2        17.    *But-for the NGRs, a reasonable, profit-maximizing firm*
3                      *would have launched a competing generic version of the*
                    *FDCs created by the collaboration agreements.*  The NGRs
4                      prevented, and continue to prevent, any AB-rated
                    competition to the FDCs developed pursuant to the
5                      collaboration agreements.   There is, however, a variety of
                    evidence showing that, but for the NGRs, reasonable profit-
6                      maximizing firms in the position of the collaboration
                    partners would launch competing AB-rated versions of the
7                      FDCs. To elaborate, the collaboration partners would have
                    strong incentives to develop and launch, or partner with
8                      generic manufacturers to develop and launch, AB-rated
                    versions of the Covered Products.  The products developed
9                      under the collaboration agreements have substantial sales,
                    and the collaboration partner could earn substantially higher
10                      revenues outside the collaboration agreement.  Furthermore,
                    AB-rated versions have relatively low development,
11                      manufacturing, and marketing costs.

12        18.    There is a variety of evidence suggesting that Defendants
13                      considered the launch of an AB-rated competitor a real
                    threat, providing further support that a reasonable profit-
14                      maximizing firm would launch.  First, the NGRs themselves
                    suggest a belief on the part of Defendants that AB-rated
15                      competition was plausible.  Second, internal documents from
                    Defendants describe their concern about the prospect of
16                      competition from AB-rated versions of the products
                    developed under the agreements.  Third, both Janssen and
17                      Gilead did consider collaborating with generic manufacturers
                    to develop FDCs.

18  Rubinfeld Rpt. ¶¶ 17-18; *see also* Rubinfeld Rpt. ¶¶ 114-31 (going into further details regarding

19  the above).  The Court finds the Rubinfeld report credible.

20        To the extent Defendants point out that Gilead could not launch (or enable a launch of) a

21  generic version of Prezcobix (DRV/COBI) until Janssen's patents on DRV expire in 2026, that

22  may be true.  But that is beside the point since there is (as alleged) an illegal agreement *now*.  As

23  the EPPs note, the NGR is memorialized in the Prezcobix Agreement.  And given that there are

24  similar NGRs in other Gilead agreements that (as alleged) are already causing competitive harm, it

25  makes little sense to require the EPPs to "wait until some undefined point in the future to start

26  another lawsuit to challenge the same restraint[] on Prezcobix."  Reply at 22.

27        Second, Defendants' contention that there is nothing to show that any generics – if

28  manufactured – would be cheaper, would be covered by insurance companies, or would be

United States District Court
Northern District of California

switched to by consumers is weak.  Dr. Frank's report details how generic drugs upon launch are

priced at a discount compared to the brand drugs and that there are high generic conversion rates –

including for cART drugs in particular.  *See, e.g.*, Frank Rpt. ¶ 81 (considering six cART drugs,

including Truvada, Atripla, and Viread; noting that, "[i]n every case, the generic discounts are

significant, and a greater number of generic competitors is associated with greater generic

discounts"); Frank Rpt. ¶ 95 (stating that "[d]ata from the launches of generic versions of cART

drugs shows that rapid generic conversion occurs for these drugs").  Dr. Rubinfeld's report also

addresses how generic entry would lead to savings for TPPs and consumers alike.  *See, e.g.*, Rubin

Rpt. ¶¶ 96-111.  These reports address and provide sufficient evidence of the likelihood of

redressability of relief.

<div align="center">ii.   <u>cART Foundation Drug Class</u></div>

For the cART Foundation Drug Class, Defendants essentially make the same redressability

argument for other drugs that were involved in Gilead agreements containing NGRs (*e.g.*,

Truvada, Viread, Atripla, Complera, Odefsey, and Symtuza).  The Court does not find that

argument persuasive.

This leaves the following cART Foundation Drugs which are not implicated in any NGR:

- Biktarvy (a Gilead drug) (BIC/TAF/FTC);

- Descovy (a Gilead drug) (TAF/FTC);

- Genvoya (a Gilead/Japan Tobacco drug) (TAF/FTC/EVG/COBI);

- Stribild (a Gilead/Japan Tobacco drug) (TDF/FTC/EVG/COBI);

For these drugs, Defendants suggest that there is no basis to seek an injunction.  The Court

does not agree.  Biktarvy, Descovy, and Genvoya include TAF as a component, and thus these

drugs are relevant to the EPPs' assertion that Gilead engaged in anticompetitive conduct through

its development/commercialization of TAF.  Contrary to what Defendants suggest, the EPPs have

not abandoned this theory of anticompetitive conduct.[22]  Stribild would also be part of the mix

here because it is part of the narrative of moving consumers from TDF-based drugs to TAF-based

---

[22] The Rubinfeld report goes into the TAF development/commercialization theory.  *See* Rubinfeld
Rpt. ¶¶ 184-203, 205.

<div align="center">58</div>

1   drugs.  The Court acknowledges that Stribild and Genvoya are Gilead/Japan Tobacco drugs and

2   the Court dismissed the claims the EPPs brought against Japan Tobacco.  However, that dismissal

3   essentially concerned removing the NGR theory out of the picture for these drugs.  It did not

4   concern and hence does not preclude the EPPs from relying on these drugs as part of the TAF

5   development/commercialization theory.

6        For Biktarvy, Descovy, Genvoya, and Stribild (as well as all cART Foundation Drugs), the

7   EPPs articulate an additional theory that supports injunctive relief – *i.e.*, that supracompetitive

8   prices for a given cART drug puts upward pricing pressure on all other Gilead cART drugs (as

9   discussed in the McGuire expert report).  *See, e.g.*, McGuire Rpt. ¶ 204 ("Gilead's ordinary-

10  course-of-business documents regularly report the extent to which sales displaced from some of its

11  HIV drugs flow to its other HIV drugs.  Gilead analyses have consistently found that 70-90% of

12  switches out of Gilead drugs are recaptured by other Gilead drugs."); McGuire Rpt. ¶ 132 ("Gilead

13  will price each drug in recognition that a sale lost due to a price increase is partially recaptured by

14  sales diverted to the other product, putting upward pressure on price.").

15       2.   Primary Relief

16       Finally, Defendants argue that it is improper to include Truvada, Atripla, and Complera as

17  part of the cART Foundation Drug Injunctive Relief Class because "'Rule 23(b)(2) certification is

18  inappropriate where the primary relief sought is monetary'" – which must be the case here given

19  that the EPPs seek certification of three Damages Classes based on these drugs.  This argument

20  lacks merit because "there is a difference between seeking damages for a class certified under Rule

21  23(b)(2) and seeking to certify *separate* classes in the same action in which injunctive relief is

22  sought for classes certified under Rule 23(b)(2) and damages are sought for classes certified under

23  Rule 23(b)(3)."  *Roy v. Cty. of Los Angeles*, No. 12-CV-09012-BRO-FFMX, 2016 U.S. Dist.

24  LEXIS 186634, at *16 (C.D. Cal. Sept. 9, 2016) (emphasis added); *see also In re Qualcomm

25  Antitrust Litig.*, 328 F.R.D. 280, 319 (N.D. Cal. 2018) ("Courts have approved the practice of

26  'certify[ing] the injunctive aspects of [a] suit under Rule 23(b)(2) and the damages aspects under

27  Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an

28  opportunity for each affected person to exercise control over the damages aspects.'  Indeed, the

59

United States District Court
Northern District of California

1   Ninth Circuit has recognized that Rule 23(b)(2) and Rule 23(b)(3) 'are not mutually exclusive.'

2   Accordingly, courts in this district have certified classes under both Rule 23(b)(2) and Rule

3   23(b)(3) in antitrust suits where defendants' conduct 'was market-wide and not specific to

4   individual customers.'"); *Feller v. Transamerica Life Ins. Co.*, No. 2:16-cv-01378-CAS-AJW,

5   2017 U.S. Dist. LEXIS 206822, at *26-27 (C.D. Cal. Dec. 11, 2017) ("[T]he Ninth Circuit has

6   indicated that a district court can separately certify an injunctive relief class and, if appropriate,

7   also certify a Rule 23(b)(3) damages class."); *cf. In re Kind LLC "Healthy & All Nat. " Litig.*, 337

8   F.R.D. 581, 609 (S.D.N.Y. 2021) ("Courts in this district have certified injunctive classes for

9   consumer class actions, notwithstanding certification of additional classes seeking monetary

10  damages.").

11  E.      Class Certification Summary

12          For the foregoing reasons, the Court grants in part and denies in part the EPP motion for

13  class certification.

14          • The Court does not certify any Damages Classes based on the laws of Arkansas,

15              Idaho, Illinois, and Montana.  The EPPs have not brought any antitrust claims

16              based on the laws of these states (in the operative complaint), and the consumer

17              protection claims based on the laws of these states lack merit and therefore are

18              dismissed.

19          • The Court otherwise certifies the three Damages Classes and the three Injunctive

20              Relief Classes but notes that certification for the Damages Classes shall be with

21              respect to only those remaining repealer states that are actually identified in the

22              state antitrust and consumer protection claims (fewer than 35 total).  *See* note 5,

23              *supra*.

24          • The Court appoints the proposed class representatives, as requested by the EPPs,

25              except that, for the cART Foundation Injunctive Relief Class, the only class

26              representatives that are approved are Mr. McDonald, Mr. Spieldenner, and Mr.

27              Vasquez-Cain.

28          • The Court appoints as counsel for the Classes the current counsel representing the

EPPs.

The parties are ordered to meet and confer regarding the following: (1) new class definitions consistent with the Court's rulings above; (2) the special notice to be given to the local government entities; and (3) the content of a class notice and the timing for the notice. The parties shall report back on their meet-and-confer efforts within two weeks of the date of this order.

F.     _Daubert_ Motions

With respect to the EPP motion for class certification, Defendants challenged two of the EPP experts on _Daubert_ grounds: Ms. Craft and Dr. Frank. For the reasons discussed below, the Court concludes that the opinions of both experts are sufficiently reliable and admissible – and were properly considered in the Court's analysis above for the motion for class certification.

1.     Ms. Craft

In her report, Ms. Craft notes that she was hired by the EPPs to evaluate whether, "given the Proposed Class definitions and their various exclusions, it is possible to identify the included Class Members." Craft Rpt. ¶ 2. She concluded that it is possible.

> Doing so can be accomplished through a largely programmatic set of coding processes, employing [electronic] data legally required to be recorded and maintained in the highly regulated prescription drug industry. This electronic data is generated at the time each individual prescription is filled and identifies the payor as well as the exact price paid. The data is maintained by, and available from, multiple sources including pharmacies, Pharmacy Benefit Managers, switch operators who route the data, and TPPs themselves. The data is also collected in real time by commercial data publishers such as IQVIA and Symphony Health who sell the data to drug manufacturers (including defendant Gilead), managed care organizations and industry analysts.

Craft Rpt. ¶ 2; _see also_ Craft Rpt. ¶ 11. Ms. Craft's specific opinions start at ¶ 10 of her report.

As indicated by the above, the EPPs have relied on Ms. Craft's report to argue that they have identified _ascertainable_ classes – with ascertainability meaning "a class definition is precise enough for the court to determine membership by reference to objective criteria." EPP Mot. at 22.

According to Defendants, the Court should exclude Ms. Craft's opinions "regarding identification of EPP class members using pharmaceutical claims data" because it is unreliable. Daubert Mot. at 5. Defendants' main contention is that her opinions are unreliable because she

United States District Court
Northern District of California

1  never performed her proposed methodology to actually identify the EPP class members or make

2  the class exclusions.  *See* Daubert Mot. at 3.

3        Defendants' motion is problematic for several reasons.  First, the Ninth Circuit has

4  expressly held that it has

5        never interpreted Rule 23 to require . . . a showing [that there is an
   administratively feasible means of identifying absent class

6        members], and, like the Sixth, Seventh, and Eighth Circuits, we
   decline to do so now.  A separate administrative feasibility

7        prerequisite to class certification is not compatible with the language
   of Rule 23.  Further, Rule 23's enumerated criteria already address

8        the policy concerns that have motivated some courts to adopt a
   separate administrative feasibility requirement, and do so without

9        undermining the balance of interests struck by the Supreme Court,
   Congress, and the other contributors to the Rule.

10

11  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017); *see also id.* at 1127 (noting

12  that "Rule 23's enumerated criteria [in particular, manageability] already address the interests that

13  motivated the Third Circuit [in imposing an ascertainability requirement] and, therefore, that an

14  independent administrative feasibility requirement is unnecessary.").[23]

15        Furthermore, the Ninth Circuit also stated in *Briseno* that "requiring class proponents to

16  satisfy an administrative feasibility prerequisite 'conflicts with the well-settled presumption that

17  courts should not refuse to certify a class merely on the basis of manageability concerns.'"

18  *Briseno*, 844 F.3d at 1128 (adding that "[t]his presumption makes ample sense given the variety of

19  procedural tools courts can use to manage the administrative burdens of class litigation[;] [f]or

20  example, Rule 23(c) enables district courts to divide classes into subclasses or certify a class as to

21  only particular issues").

22        Because the Ninth Circuit does not have an administrative feasibility/ascertainability

23  requirement as a part of class certification, Ms. Craft's opinion is not necessary to the EPPs'

24  motion for class certification.  Thus, Defendants' motion to exclude Ms. Craft's opinion is moot.

25        Even if Ms. Craft's opinions on administrative feasibility were relevant, the

26  ascertainability requirement (to the extent there is one), would simply ask that a plaintiff show the

27

28  [23] In *Briseno*, the Ninth Circuit technically "refrain[ed] from referring to 'ascertainability' . . .
   because courts ascribe widely varied meanings to that term."  *Briseno*, 844 F.3d at 1124 n.3.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  following:

2     (1) the class is "defined with reference to objective criteria"; and (2)
         there is "a reliable and administratively feasible mechanism for
3         determining whether putative class members fall within the class
         definition." The ascertainability requirement consists of nothing
4         more than these two inquiries. *And it does not mean that a
         plaintiff must be able to identify all class members at class
5         certification – instead, a plaintiff need only show that "class
         members can be identified."*
6

7  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (emphasis added). Thus, Defendants'

8  criticism that Ms. Craft did not actually apply her methodology to identify class members and

9  exclusions is beside the point. Ms. Craft has a sound evidentiary basis for her methodology. *See*

10 Opp'n at 3 (noting that Ms. Craft describes "how real-time prescription pharmacy data is

11 maintained by, and available from, multiple sources including pharmacies, Pharmacy Benefit

12 Managers ('PBMs'), switch operators who route the data, and TPPs themselves[;] [t]he data is also

13 collected in real time by commercial data publishers such as IQVIA and Symphony Health who

14 sell the data to drug manufacturers *including defendant Gilead*") (emphasis added). There is no

15 requirement that she actually apply it to satisfy *Daubert*. *Cf. Carrera v. Bayer Corp.*, 727 F.3d

16 300, 306 (3d Cir. 2013) (stating that "[a] plaintiff may not merely propose a method of

17 ascertaining a class without any evidentiary support that the method will be successful");

18     Several courts have specifically rejected the argument made by Defendants. *See, e.g.*,

19 *Loestrin*, 410 F. Supp. 3d at 386 (stating that Ms. Craft's methodology to identify class members

20 and apply exclusions, "while no doubt labor and time intensive, is not so different from the sort of

21 aggregate data manipulation and analysis that businesses, researchers, and governmental agencies

22 employ regularly"; "[w]hile it is true that Craft and OnPoint have never performed the exact task

23 proposed here, Craft's Declaration, Sur-Rebuttal Report, and *Daubert* hearing testimony have

24 demonstrated that the EPPs, subpoenas in hand, are capable of securing, compiling, and analyzing

25 the requisite data to identify class members and apply the class exclusions"); *In re Namenda*

26 *Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549, 2021 WL 100489, at *12 (S.D.N.Y. Jan. 12,

27 2021) (noting that "Defendants . . . take issue with the fact that Craft has yet to use her

28 methodology to ascertain exactly who is in the class [but] [t]hat does not render her methodology

1   unreliable[;] [i]t just means that, prior to knowing whether a class would be certified, class counsel

2   has not expended the time and effort (and money) needed to identify all of its members").

3       The Court denies Defendants' motion to exclude Ms. Craft's opinions.

4       2.   Dr. Frank

5       In his expert report, Dr. Frank provided opinions regarding, *inter alia*, antitrust

6   injury/impact with respect to the EPP Classes.  Defendants make a number of *Daubert* challenges

7   to Dr. Frank's opinions, many of which replicate arguments addressed above.  At bottom,

8   Defendants have made arguments that affect the weight to be given Dr. Frank's opinions, and not

9   their admissibility.  Dr. Frank's methodology and application thereof are sufficiently reliable such

10  that his opinions may properly be considered.

11      a.   Brand-Generic Injury: "Switching"

12      Defendants argue that Dr. Frank's opinions on brand-generic injury are not reliable

13  because (1) "[b]rand-generic injury only exists when a TPP has members who switched from a

14  brand to an AB-rated generic equivalent and paid less for the generic medicine," but (2) "the

15  'generic conversion rates' presented by Dr. Frank do not measure the rate at which TPP's

16  members switch" and instead are "more akin to brand and generic drug shares at any point in

17  time."  Daubert Mot. at 3.

18      This argument is not persuasive.  First, as the EPPs point out, "[n]o case has rejected the

19  use of generic market share to model the share of prescriptions that would have been generic."

20  Opp'n at 6-7.  The data showing brand and generic drug shares provide a reasonable basis from

21  which to infer conversion.  Second, as the EPPs suggest, Defendants have failed to explain why

22  the generic conversion rate cannot be used to estimate who would have taken a generic in lieu of

23  brand in the but-for world.  In fact, Dr. Frank's report indicates that it is likely more accurate to

24  use his generic conversion rate based on, *e.g.*, IQVIA Xponent data instead of Dr. Hughes's

25  numbers based on IQVIA LAAD data (*e.g.*, with respect to LAAD, not all TPPs contribute data

26  and data extends through August 2021 only).  *See* pages 41-42, *supra*.

27      b.   Brand-Generic Injury: Individualized Assessments

28      Defendants contend that Dr. Frank's opinions on brand-generic injury are also unreliable

United States District Court
Northern District of California

because, in essence, he did not make individualized assessments.  For example:

- "Dr. Frank does not examine any individual TPP data to determine whether and to what extent some TPPs may not have any members who converted [to generics]" – especially the smaller TPPs who have a smaller number of members.  Daubert Mot. at 4.

- Even though states have different laws on the substitution of generics for brand drugs (*e.g.*, some laws make substitution mandatory while other laws make substitution permissive), "Dr. Frank simply assumes that most pharmacies and PBMs, irrespective of the type of substitution law in effect where they are located, are making substitutions."  Daubert Mot. at 5.

- Even though "physicians can instruct pharmacists to fill a prescription without generic substitution using a 'dispense as written' ('DAW') designation," Dr. Frank did not "examine the prevalence of DAW designations with HIV medications" and instead simply "speculates that, based of his generic penetration rates, the percentage of DAW designations" was low.  Daubert Mot. at 5.

- Even though a generic drug would not necessarily be "placed on a more favorable formulary tier than the brand counterpart" (*i.e.*, "there is variation with respect to prescription drug placement on formularies between commercial payors, within commercial payors, and between commercial payors and Medicare"), "Dr. Frank dd not examine actual formularies to confirm whether AB-rated generic HIV drugs, and in particular AB-rated generic versions of Atripla and Truvada, are always placed in a more favorable tier than their brand counterparts [which would encourage use of generics over brand drugs]."  Daubert Mot. at 5.

- Dr. Frank did not conduct a "robustness check" to confirm the reliability of his model and that it could be used to show class-wide injury.  Daubert Mot. at 5.

While the above is fair game for cross-examination of Dr. Frank, the question at this point is whether Dr. Frank's opinions on brand-generic injury are so unreliable that they should not even be admissible in the first place.  Given the high generic conversion rates, Dr. Frank's opinions

United States District Court
Northern District of California

1    have a sufficiently sound basis even if he did not make individualized assessments.  *See* Frank

2    Reply Rpt. ¶ 44.  As the EPPs argue, the high average generic conversion rates imply a low

3    likelihood that any TPPs will have zero prescriptions that would be converted to the generic.  Dr.

4    Frank based his opinions on conversion rates over 90% and basic probability concepts.

                    c.     Price Calculations: Retail Prices

6            Defendants next contend that Dr. Frank's price calculations (used to show antitrust

7    injury/impact) are unreliable because he used IQVIA Xponent retail price data, and retail prices

8    are not the same thing as prices paid by the TPPs.  Defendants note that many parties can be

9    involved in a pharmaceutical transaction – *e.g.*, the manufacturer, wholesaler, retail and mail-order

10   pharmacy, consumer, insurer, PBM, third-party administrator, and/or administrative services only

11   offeror.  *See* Hughes Rpt. ¶ 26.  According to Defendants, "[a]ny of these parties, or their

12   arrangements with other parties, can affect the price paid by each TPP for a given prescription

13   pharmaceutical.  PBMs, in particular, offer multiple different benefits, including contractually

14   mandated prices (which may or may not match the amount the PBM paid to the pharmacy), for the

15   TPPs."  Daubert Mot. at 8.

16           However, the EPPs have shown that using retail prices does not make Dr. Frank's price

17   calculations unreliable.  Dr. Frank explained that, "because of the high prices of these drugs,

18   consumer cost sharing is a small fraction of the drug retail price, so offsets from cost-sharing

19   would not eliminate the overcharge in any material number of transactions".  Frank Rpt. ¶ 132(b).

20   Regarding PBMs, Defendants are simply speculating that PBMs have been injured through

21   negative spread pricing.  Defendants provide no evidence of actual negative price spreading here.

22                   d.     Price Calculations: Price Per Prescription

23           Defendants also criticize Dr. Frank's price calculations as unreliable on the basis that he

24   made price-per-prescription calculations as opposed to price-per-pill calculations.  *See* Daubert

25   Mot. at 9 (arguing that "'retail price per prescription' is not an appropriate metric because it does

26   not account for differences in the number of days covered by the individual prescriptions" –

27   "under Dr. Frank's methodology, if a class member paid for a 90-day supply prescription and then

28   switched to three 30-day supply prescriptions that in total had the same cost, Dr. Frank would

United States District Court
Northern District of California

66

United States District Court
Northern District of California

1   erroneously conclude that the price had declined because he would compare the cost for the 90-

2   day prescription to the cost of a single 30-day prescription").

3          But in his reply report, Dr. Frank explained why it was not unreasonable for him to

4   calculate on a per-prescription basis.  *See* Frank Rebuttal Rpt. ¶ 25.  Moreover, Dr. Frank went on

5   to make new calculations on a per-pill basis and found that there was in fact a price decline for the

6   brand drugs.  Dr. Frank explained why Dr. Hughes reached a different result in his analysis: "Part

7   of the reason Dr. Hughes did not recognize these declines in price per pill is that he was using an

8   older Xponent data set that ended in June 2021, and the price declines became more evident after

9   that date.  I conducted the analysis . . . using the updated Xponent data set that goes through

10  February 2022."  Frank Rebuttal Rpt. ¶ 27; *see also* Frank Rebuttal Rpt., Figs. 5-7 (showing the

11  retail prices over time for Truvada, Atripla, and Trizivir (the "yardstick" drug for Complera),

12  including after generic launch(es)).  Dr. Frank had a reasonable and credible basis for his opinion.

13  For purposes of the class certification motion, his analysis is more convincing than Dr. Hughes.

14                  e.      Complera: Use of Trizivir as "Yardstick"

15         Defendants challenge next the reliability of Dr. Frank's opinions with respect to Complera.

16  According to Defendants, Dr. Frank's opinions on Complera are unreliable for two reasons:

17              (1) Dr. Frank assumes that "Janssen would have entered with a hybrid generic version

18                  of Complera – consisting of [Janssen's] branded RPV, generic TDF and generic

19                  FTC – in the absence of the [NGR]," but "does nothing to substantiate the

20                  assumption.  Absent a view on the prospect of entry by Janssen, or even an

21                  awareness of evidence about that prospect, Dr. Frank's model of Complera injury

22                  and damages is fundamentally incomplete . . . ."  Daubert Mot. at 12.

23              (2) Because there is no generic version of Complera yet available, Dr. Frank had to

24                  consider what the generic conversion rate would be using a yardstick drug.  He

25                  chose Trizivir, but Trizivir is not an appropriate analog.  While Trizivir contained

26                  *all* generic components, a generic version of Complera would be comprised of

27                  Janssen's *branded* RPV and generic TDF/FTC.  In addition, "Janssen has a direct

28                  financial stake in the sale of branded Complera" (because, even though Gilead sold

United States District Court
Northern District of California

1    Complera, it paid Janssen the equivalent of 70% of the RPV portion of the FDC),

2    and therefore any sales by Janssen of generic Complera "would cannibalize the

3    revenue from the branded product[.]  [A]t the same time, any sales by Janssen of

4    [generic Complera] in the but-for-world would presumably create the same 30%

5    royalty obligation to Gilead that Janssen owed on the RPV portion of any sales of

6    TDF/3TC/RPV in the actual world."  Mot. at 13; *see also* Mot. at 12 (noting that

7    Gilead contributed $100 million toward the development of RPV, and, "in

8    consideration of that substantial investment . . . , Janssen owed Gilead [a] 30%

9    share of RPV if the branded component was used by Janssen in a similar FDC

10    consisting of TDF/3TC/RPV").

11        Neither argument is compelling enough to warrant exclusion under *Daubert*.  On (1), the

12    EPPs fairly note that "Dr. Frank may rely on what EPPs expect to prove at trial and other expert

13    testimony that supports such proof [*i.e.*, that Janssen would make a generic version of Complera]."

14    Opp'n at 12.  *See, e.g.*, *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 477 (N.D. Cal. 2020) (in

15    response to defendants' argument that expert relied on factual assumptions and offered no

16    evidence in support of the assumptions, stating that "[e]valuating whether common issues

17    predominate antitrust impact requires us to assume class counsel will otherwise prove (by

18    common evidence) the antitrust violation at trial[;] [s]o, Dr. Leitzinger assumes (as counsel

19    directed): (i) Lupin would have entered the market (perhaps even 'at risk') in May 2012; (ii)

20    Santarus would have promptly marketed an authorized generic; and (iii) the 2015 price hikes

21    would not have occurred").  If there was no danger that Janssen would ever launch a generic

22    version of Complera once TDF/FTC lost their patent protection, then the NGR should have been

23    unnecessary.  Hence, the existence of the NGR evidences the parties' intent, an intent not

24    consistent with Dr. Frank's assumption.

25        As for (2), "'[t]he selection of comparators will seldom approach the "Utopian ideal" of

26    identifying the perfect clone,'" and "'[a]rguments about what factors an expert should have

27    controlled for in conducting a yardstick analysis generally go to the weight, rather than the

28    admissibility, of the expert's testimony.'"  *In re Suboxone*, 421 F. Supp. 3d 12, 43 (E.D. Pa.

United States District Court
Northern District of California

2019); *see also Tawfilis v. Allergan, Inc.*, No. 8:15-cv-00307-JLS-JCG, 2017 U.S. Dist. LEXIS 122974, at *19 (C.D. Cal. June 26, 2017) (stating that expert's "yardstick methodology . . . is a reliable methodology for calculating damages and is admissible under Daubert and Rule 702[;] [a]rguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony"). Defendants' argument goes to the weight, not admissibility, of this evidence. *See In re Prograf Antitrust Litig.*, No. 1:11-md-02242-RWZ, 2014 U.S. Dist. LEXIS 180899, at *10 (D. Mass. Dec. 23, 2014) (recognizing that "[a]ntitrust plaintiffs bear the 'burden of proving comparability' of their proposed yardstick to the but-for world," but evaluating factors on comparability "generally involves weighing facts, [and thus] deciding '[w]hether the plaintiff has met this burden of showing comparability ordinarily is a question for the trier of fact'"). Notably, Gilead itself used Trizivir as an analog for purposes of modeling the effects of generic entry. *See* Lamb Reply Rpt. ¶ 94.

Finally, as noted above, if there was no danger that Janssen would ever launch a generic version of Complera once TDF/FTC lost their patent protection, then the NGR should have been unnecessary. Gilead also does not provide any specifics on Janssen's potential "internal" competition – *e.g.*, even if Janssen would lose sales on brand Complera, would the pricing or volume of sales on the generic version compensate for that loss? *Cf.* Frank Reply Rpt. ¶ 18 (noting that, "because Janssen's generic Complera would be the only generic on the market, Janssen would have little incentive to apply very high discounts" to the generic price). Along those lines, Dr. Frank notes as follows in his reply report.

> [The defense expert] Dr. Hughes claims that Janssen would be making a profit on branded Complera in the but-for world and that this would amount to an opportunity cost on its sales of its generic version of Complera. He asserts that this opportunity cost would have a large impact on the generic price. He states, "The price a firm charges for a product depends on that firm's marginal cost: the higher the marginal cost, the higher the profit-maximizing price. . . . The profits lost from reduced sales of branded Complera are likely to be large and have a substantial impact on Janssen's marginal cost of selling a unit of a competing AB-rated product. Economic theory tells us that this additional and substantial component to marginal cost should result in a relatively higher price." Hughes' economic analysis of my work is flawed, since my analysis sees the market as

United States District Court
Northern District of California

a duopoly where Janssen's generic Complera would have some market power that implies the opportunity to recover their sunk costs.

Frank Reply Rpt. ¶ 19.  Dr. Frank's reasoning and the bases therefore are sufficiently reliable to pass *Daubert* muster.

For the foregoing reasons, the Court denies the motion to exclude Dr. Frank's opinions. Defendants' arguments are relevant to the weight to be given Dr. Frank's opinions but not their admissibility.  Dr. Frank's opinions are sufficiently reliable such that they may be considered on their merits, as applicable to the EPP motion for class certification.

### IV.   DPP MOTION FOR CLASS CERTIFICATION

The Court now turns to the second motion for class certification, which has been filed on behalf of the DPPs.  KPH is the putative class representative for the DPPs.  As pled in the operative complaint, KPH sought certification of the following direct purchaser class: "All persons in the United States and its territories who directly purchased cART drugs from Defendants from October 6, 2016 until the anticompetitive effect of Defendants' unlawful conduct cease."  FAC ¶ 413.

However, in the pending motion for class certification, KPH has changed its request for certification.  It now seeks to certify three Damages Classes:

(1) Truvada Class: "All persons or entities in the United States and its territories who purchased Truvada or generic Truvada directly from any of Defendants or any brand or generic drug manufacturer from February 1, 2018, until the date of the class certification order."  DPP Mot. at 1-2.

(2) Atripla Class: "All persons or entities in the United States and its territories who purchased Atripla or generic Atripla directly from any of Defendants or any brand or generic drug manufacturer from February 1, 2018, until the date of the class certification order."  DPP Mot. at 2.

(3) Complera Class: "All persons or entities in the United States and its territories who purchased Complera directly from any of Defendants from February 1, 2018, until the date of the class certification order."  DPP Mot. at 2.

70

1    Although the Damages Classes are generally narrower in scope compared to the class as

2    defined in the FAC, there is one aspect in which the Truvada and Atripla Classes are broader.  In

3    the class definition in the complaint, the class was limited to those who had purchased cART

4    drugs (brand or generic) from *Defendants*.  In the Truvada and Atripla Classes, KPH essentially

5    seeks certification of those who purchased the drugs – not just from Defendants but from *any*

6    *generic manufacturer*.

7        Because KPH settled the putative DPP class action against BMS, that now leaves Gilead as

8    the only defendant.  In opposing KPH's motion for class certification, Gilead makes two primary

9    arguments: (1) the numerosity requirement in Rule 23(a) has not been satisfied and (2) the

10   predominance requirement in Rule 23(b)(3) has not been satisfied.

11   A.    Rule 23(a) Requirements

12       With respect to the Rule 23(a) requirements, Gilead does not seriously dispute that the

13   following requirements have been met: commonality, typicality, and adequacy.  Even if Gilead

14   had disputed these elements, the Court would find these requirements met for each Class.  Clearly,

15   there are issues of fact and law in common because putative class members in each Class assert

16   that Gilead engaged in commerce anticompetitive conduct.  As for typicality and adequacy,

17   nothing suggests that KPH's claims materially differ from those of other direct purchasers.

18       Defendants contest numerosity.  Rule 23(a) provides class certification is appropriate if,

19   *inter alia*, "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P.

20   23(a)(1).  "Impracticability does not mean impossibility, but only the difficulty or inconvenience

21   of joining all members of the class."  *Solodyn*, 2017 U.S. Dist. LEXIS 170676, at *10 (internal

22   quotation marks omitted).  As one treatise has explained:

23           Three underlying concerns of the class action help explain Rule
             23(a)(1)'s requirement that joinder be impracticable.  *First*, the Rule
24           reveals the legal system's preference that litigation be conducted by
             present, joined, individual litigants rather than by class
25           representatives on behalf of absent class members. . . . The
             preference for individual joinder reflects American adjudication's
26           general theory that individuals possess a due process right to litigate
             for themselves and that representative litigation is therefore an
27           exceptional form of litigation.  The insistence that those proposing
             representative litigation show that joinder is impractical therefore
28           safeguards individual due process rights by insisting that individuals

United States District Court
Northern District of California

1     get to litigate themselves so long as it is practical for them to do so.6

2     *Second*, the requirement that joinder of individual litigants be
      impractical helps ensure that proceeding in the class form is in fact
3     an efficient means of adjudication.  Where many individuals have
      similar claims, there may be a flood of litigation.  With so many
4     litigants proceeding individually, the courts would be overrun with
      claims.  Yet the vast quantity of individual litigants makes joinder
5     impracticable.  The class action solves this problem because it
      "saves the resources of both the courts and the parties by permitting
6     an issue potentially affecting every [class member] to be litigated in
      an economical fashion under Rule 23."  Thus, where joinder is
7     impracticable, judicial economy weighs in favor of representative
      litigation of common issues for similarly situated plaintiffs.

8     *Third*, even if the courts are not flooded with numerous litigants,
      other factors may indicate that joinder would be impracticable and
9     argue in favor of representative litigation.  For instance, if individual
      claims are small and/or class members are financially unable to fund
10    litigation themselves, individual joinder may be practically
      impossible.

11

12    Newberg and Rubenstein on Class Actions § 3:11 (6th ed.) (emphasis in original).

13          "Neither Rule 23 nor its accompanying Advisory Committee Notes provide a clear formula

14    for determining when joinder of all members is impracticable."  *Id.*  Likewise, the Supreme Court

15    has stated that the "'numerosity requirement requires examination of the specific facts of each case

16    and imposes no absolute limitations.'"  *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 835 (9th

17    Cir. 2022) (adding that, although the Supreme Court "thus eschew[ed] any bright-line rules, [it]

18    did go on to state that a class with only 15 members 'would be too small to meet the numerosity

19    requirement'").  That being said, the Ninth Circuit has articulated some general principles to help

20    guide lower courts.  For example, a court "must consider what the evidence shows concerning 'the

21    absolute number of class members.'"  *Id.*  "Although the absolute number of class members is not

22    the sole determining factor, where a class is large in numbers, joinder will usually be

23    impracticable."  *Jordan v. Cty. of L.A.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other*

24    *grounds by Cty. of Los Angeles v. Jordan*, 459 U.S. 810 (1982).

25          Based on pure numbers alone, 40 class members is generally sufficient to meet the

26    numerosity requirement.  *See id.*; *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466,

27    473 (C.D. Cal. 2012) (citing *Jordan* for the proposition that "[a] proposed class of at least forty

28    members presumptively satisfies the numerosity requirement").  In contrast, "'[a] class of 20 or

72

1    fewer is usually insufficiently numerous . . . . Classes with between 21 and 40 members are given

2    varying treatment." *Modafinil*, 837 F.3d at 250.

3          Importantly, the Ninth Circuit has noted that,

4          where the size of the class is more modest, "the number of class
           members does not weigh as heavily" in the analysis, and "other
5          factors" bearing upon the feasibility and convenience of joinder may
           assume more significance.  These potentially countervailing factors
6          include "the geographical diversity of class members, the ability of
           individual claimants to institute separate suits, and whether
7          injunctive or declaratory relief is sought," as well as the ability to
           identify and locate class members.
8

9    *A.B.*, 30 F.4th at 835-36.

10         In the instant case, KPH's expert, Dr. Russell Lamb, opines that there are:

11         (1) 78 members in the Truvada Class;

12         (2) 51 members in the Atripla Class; and

13         (3) 25 members of the Complera Class.

14   *See* Docket No. 1082-4 (Lamb Decl.) (revising original numbers submitted in his expert report).

15         Relying on its own expert, Dr. Bruce Strombom, Gilead argues that these numbers are

16   inflated.  Dr. Strombom asserts that Dr. Lamb should have excluded:

17         • from each of the three Damages Classes, **7-8 direct purchasers** because they filed

18           individual actions in this Court (*i.e.*, Albertsons, CVS, HEB, Humana, Rite Aid,

19           Kroger, United Health, and Walgreens);

20         • from the Truvada and Atripla Classes, 1-2 direct purchasers each because, even

21           after generic launch of Truvada and Atripla, they continued to purchase the brand

22           versions of the drugs and not generic;

23         • from the Truvada Class, **50 direct purchasers** and, from the Atripla Class, **24**

24           **direct purchasers**, because each one never purchased brand Truvada or Atripla at

25           any point in time and, after generic launch, purchased only generic versions of the

26           drugs;

27         • from each of the three Damages Classes, 2-3 direct purchasers because they were

28           acquired by other putative class members.

73

United States District Court
Northern District of California

1    Below is a chart that reflects Gilead's position regarding exclusion on who should be

2    excluded.

3

4    

Figure 5
Maximum Number of Putative Class Members after Exclusions and Consolidations

16    Strombom Rpt. ¶ 44.

17    As indicated by the bolded information above, for purposes of the pending motion, the

18    Court need only consider the first and third asserted exclusions – *i.e.*, likely opt-outs and generic-

19    only entities that never purchased from Defendants – because only those exclusions have numbers

20    of any significance.

21    1.    Individual Actions Filed by 7-8 Direct Purchasers

22    Gilead's position is that any direct purchaser who filed an individual action should

23    implicitly be counted as an opt out and therefore is not part of the class.  KPH responds, in

24    essence, that it is premature to say that a direct purchaser who has filed an individual action will

25    be an opt out – *i.e.*, the opt-out determination cannot be made until after notice goes out to the

26    class.

27    KPH has the better position.  Although the direct purchasers who filed individual actions

28    may well opt out, it is impossible to say for sure at this juncture.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Most courts have agreed with KPH's position – either explicitly or implicitly.  *See, e.g.*,

2  *Solodyn*, 2017 U.S. Dist. LEXIS 170676, at *22 ("declin[ing] to adopt Defendants' position that

3  five purchasers' filing separate complaints compels the conclusion that they would opt-out of the

4  class, if certified"); *Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 551-52 (W.D. Mo.

5  2014) (recognizing that "some class members have initiated their own lawsuits, [but defendant]

6  Morgan Keegan has not shown that the class members pursuing individual litigation will opt out

7  of any class that is certified"); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 142 (S.D.N.Y. 2011)

8  (noting that "Defendants supply no authority for the proposition that the existence of parallel

9  actions should automatically reduce the number of prospective class members for purposes of the

10  class certification inquiry[;] [u]nder Rule 23, individuals are considered class members until they

11  opt out of the suit, and 'the mere possibility that members of a potential class may choose to opt

12  out in the future is not enough to preclude a finding of numerosity'"); *see also Demint v.*

13  *Nationsbank of Fla., N.A.*, 208 F.R.D. 639, 641 (M.D. Fla. 2002) (stating that "the mere pendency

14  and continued prosecution of a separate suit, which the litigant instituted before commencement of

15  the 'opt out' period in a related class action, neither registers nor preserves a litigant's election to

16  'opt out' of the related class action"); *In re Prudential Sec. Ltd. Pshps. Litig.*, 164 F.R.D. 362, 370

17  (S.D.N.Y. 1996) (stating that "'pendency of an individual action does not excuse a class member

18  from filing a valid request for exclusion'").

19    Finally, several of the authorities that Gilead cites seem to give more support for KPH than

20  Gilead; only those class members who actually opt out are excluded.  For example, in *Bauman v.*

21  *United States District Court*, 557 F.2d 650 (9th Cir. 1977), the Ninth Circuit indicated that class

22  members who *actually* opt out might affect numerosity.  *See id.* at 656 ("The order of the district

23  court – specifically that portion permitting class members to opt out – may have the effect of

24  reducing the size of the class.  Alternatively, if sufficient people opt out, it may have the effect of

25  foreclosing class certification.  In either case, we must determine whether the damage to Bauman

26  arising from the order is correctable on appeal.").  The same was true in *Tasion Communications,*

27  *Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630 (N.D. Cal. 2015) (Chen, J.).  *See id.* at 643 ("To

28  the extent Plaintiffs argue that a putative class member can simply opt out to protect its interests,

1    that may be true, but it is then possible that a large number of putative class members would opt

2    out, which could result in a numerosity problem.").

3        Gilead's best authority is *In re Zetia Ezetimibe Antitrust Litigation*, No. 2:18md2836, 2022

4    U.S. Dist. LEXIS 69566 (E.D. Va. Apr. 13, 2022). There, the court indicated that "seven retailer

5    plaintiffs should not be considered for purposes of analyzing whether the putative class satisfies

6    the requirements of Rule 23(a)," including numerosity, because they were "'likely opt-outs.'" *Id.*

7    at *20. But notably, the court also seemed to place stock in the fact that the DPPs had conceded

8    the size of the class in appellate proceedings. *See id.* (citing to appellate decision); *see also In re*

9    *Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 238 (U.S. 4th Cir. 2021) (noting that "Plaintiffs did

10   not appeal the thirty-five-member class or argue the class should be a fifty-eight-person class that

11   included the twenty-three dismissed companies" and "[f]ailure to do so constitutes waiver").

12   Therefore, although *Zetia* does support Gilead, that support is equivocal and not persuasive in

13   view of the substantial authority supportive of KPH's position.

14        2.    No Purchases of Brand Drugs by 24-50 Direct Purchasers

15        The biggest exclusion that Gilead seeks is with respect to the Truvada and Atripla Classes.

16   As noted above, Gilead contends that, from the Truvada Class, **50 direct purchasers** should not

17   be counted and, from the Atripla Class, **24 direct purchasers**, because each one never purchased

18   brand Truvada or Atripla at any point in time and, after generic launch, purchased only generic

19   versions of the drugs.

20        KPH is essentially claiming generic-generic injury here. But the generic-generic injury it

21   claims appears different from the generic-generic injury claimed by the EPPs. The EPPs seek to

22   cover purchases/reimbursements with respect to (1) the brand drugs and (2) their generic

23   equivalents *to the extent sold by Teva only*. Here, KPH essentially seeks to cover purchases with

24   respect to (1) the brand drugs and (2) their generic equivalents *sold by any generic manufacturer*

25   (*i.e.*, Teva or otherwise). *See* DPP Mot. at 1-2 (defining, *e.g.*, Truvada Class as "[a]ll persons or

26   entities in the United States and its territories who purchased Truvada or generic Truvada directly

27   from any of Defendants or any brand or generic manufacturer from February 1, 2018, until the

28   date of the class certification order").

United States District Court
Northern District of California

1
           a.    Procedural Challenge

2
       As an initial matter, the Court notes that Gilead has launched a procedural challenge that

3
would require exclusion of the direct purchasers at issue.  Gilead notes that these direct purchasers

4
never purchased any drugs *from Defendants*.  That being the case, the direct purchasers do not

5
meet the class definition contained in KPH's operative complaint.  *See* FAC ¶ 413 ("All persons in

6
the United States and its territories who directly purchased cART drugs *from Defendants* from

7
October 6, 2016 until the anticompetitive effect of Defendants' unlawful conduct cease.")

8
(emphasis added).  Gilead concedes that the direct purchasers meet the new class definitions

9
contained in KPH's motion – *i.e.*, because those class definitions cover purchases of

10
Truvada/Atripla or their generic equivalents from Defendants or *from any generic manufacturer*.

11
But Gilead argues that it is improper for KPH to expand the class definition at this late stage.  *Cf.*

12
*Namenda*, 331 F. Supp. 3d at 210 (stating that "[i]t is well-established that a certifying court 'is

13
not bound by the class definition proposed in the complaint,'" but adding that "this principle is

14
customarily cited as support for the court's ability to *narrow* a proposed class[;] [f]ar fewer cases

15
support the converse proposition that the court may approve the expansion of the class as it was

16
defined in the complaint") (emphasis added).  Gilead points out that KPH never sought this

17
"amendment" until October 20, 2021, when it filed the pending motion for class certification –

18
which was only two months before fact discovery was due to close on December 17, 2021.  *See*

19
Docket No. 781 (order).  Gilead maintains: "Had KPH timely obtained leave to amend, the

20
targeted discovery sought from the non-party generic manufacturers earlier in the case would have

21
been more extensive and focused on KPH's new generic-only purchaser theory, including inquiry

22
into individual generic manufacturers' sales and marketing practices (e.g., pricing, rebates,

23
discounts, and formulary placement)."  Opp'n at 9.

24
       Although Gilead's position is not without merit, it is not persuasive.  "[A] plaintiff's

25
expansion of the class definition beyond that which was proposed in the complaint is not

26
categorically improper."  *Namenda*, 331 F. Supp. 3d at 211.  Rather, the court should consider

27
whether the defendant would be prejudiced as a result of the expansion.  *See id.* (noting that

28
"Plaintiffs' proposed class definition does not raise the same notice and discovery issues present in

1   [another case]").  *Compare* Fed. R. Civ. P. 15(a)(2), *with* (b)(1) and (2).  Here, it is true that KPH

2   did not bring up the new class definitions until its motion for class certification was filed in

3   October 2021, which was only two months before fact discovery closed.  But Gilead never sought

4   an extension of fact discovery because of this situation; it sought no relief from the Court.

5   Moreover, both before the filing of the class certification motion and after, Gilead took discovery

6   from a number of other generic manufacturers other than Teva.  *See generally* Schork Decl. ¶¶ 12-

7   28 (discussing discovery taken from generic manufacturers from July 2021 through December

8   2021 – with some discovery being initiated by KPH or the EPPs and some discovery being

9   initiated by Gilead).  Gilead suggests that it has been prejudiced because it would have taken more

10  extensive discovery, "inquir[ing] into individual generic manufacturers' sales and marketing

11  practices (e.g., pricing, rebates, discounts, and formulary placement)."  Opp'n at 9.  But Gilead

12  ignores the fact that much of the third-party discovery took place *after* KPH filed its motion for

13  class certification which put at issue KPH's proffered class definition.

14          b.      Substantive Challenge

15          Gilead asserts that, even if there is no procedural problem, there is still a substantive reason

16  to exclude the direct purchasers who never purchased any brand drugs (Truvada and Atripla) and

17  instead only purchased generics.  As noted above, KPH is essentially putting forth here a theory of

18  generic-generic injury.  The idea is that those direct purchasers who purchased only generics were

19  still harmed as a result of Defendants' conduct because

20          members of the proposed Truvada and Atripla Classes that
        purchased the generic during Teva's de-facto exclusivity period paid
21          more for the generics they purchased than they would have in the
        but-for world.  This is because in the actual world, these members of
22          the proposed Truvada and Atripla Classes could only purchase from
        Teva, and in the but-for world, they would have benefited from the
23          price-based competition between at least five manufacturers of
        generic Truvada and three manufacturers of generic Atripla that
24          would have entered simultaneously as early as February 2018 in the
        but-for world.
25

26  Lamb Reply Rpt. ¶ 52.

27          Gilead argues that the Court should reject the generic-generic theory because it essentially

28  espouses an "umbrella theory" – *i.e.*, Defendants' alleged anticompetitive conduct

78

United States District Court
Northern District of California

1    created a "price umbrella" under which **non-conspiring** competitors
2    of the defendants raised their . . . prices to an artificial level at or
     near the [supracompetitive] price. . . .

3    The umbrella theory is essentially a consequential damages theory.
4    It seeks to hold [defendants] liable for harm allegedly flowing from
     the illegal conduct even though the . . . defendants received none of
     the illegal gains and were uninvolved in their competitors' pricing
5    decisions.

6  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1338-

7  39 (9th Cir. 1982) (emphasis added).

8         In *Petroleum Products*, the Ninth Circuit rejected the umbrella theory in a price-fixing

9  case.  It noted that,

10   [i]n *Mid-West Paper* [*Products Co. v. Continental Group, Inc.*, 596
     F.2d 573 (3d Cir. 1979)], the Third Circuit found the umbrella claim
11   before it analogous to the pass-on issue involved in *Illinois Brick*
     because "in both situations the plaintiff seeks to recover for higher
12   prices set by, and paid by it to, parties other than the defendants."
     Given the fact that numerous factors influence a firm's pricing
13   decisions, the court concluded that an umbrella claim is necessarily
     conjectural and speculative in nature.  Moreover, ascertaining how
14   and why a competitor of the defendant charged a certain price would
     mire the court in a complex economic proceeding of the type
15   *Illinois Brick* sought to prevent.  The spectre of complicated,
     speculative proceedings combined with the potential for ruinous
16   recoveries, well in excess of defendants' illegally earned profits, led
     the court to hold that purchasers from competitors of price-fixing
17   defendants may not seek damages under an umbrella theory of
     liability.
18

19  *Id.* at 1339.

20        The Ninth Circuit went on to hold that "the limitations recognized in *Illinois Brick* bar[red]

21  the umbrella claims" being brought by the plaintiffs, particularly because of the *multi-tiered*

22  distribution at issue in the case.  *Id.* at 1340.  The court then stated that, "wholly apart from the

23  problems of pass-on and double recovery [identified in *Illinois Brick*]," the plaintiffs' claims were

24  problematic because they were "unacceptably speculative and complex."  *Id.* at 1340-41.

25   Under an umbrella theory, the result of any attempt to ascertain with
     reasonable probability whether the non-conspirators' prices resulted
26   from the defendants' purported price-fixing conspiracy or from
     numerous other pricing considerations would be speculative to some
27   degree.  *When the fact of a multi-tiered distribution system is
     imposed upon the above complex set of variables, the obstacles to
28   intelligent inquiry become nearly insurmountable.*  The causal effect

79

> of each pricing decision would have to be pursued through the chain
> of distribution.  Not only would we be required to speculate that
> plaintiffs were injured solely as the result of umbrella pricing, but
> also we would be required to sanction complex judicial inquiry into
> the pricing decisions of sellers remote from plaintiffs.  We decline to
> do either, and accordingly hold that under the facts of this case,
> application of an umbrella theory is unwarranted.

*Id.* at 1341 (emphasis added).

In response, KPH argues that Gilead's reliance on *Petroleum Products* is misplaced

because *Petroleum Products* is a price-fixing case whereas, here, the case concerns the exclusion

of competition.  KPH cites in support *Modafinil*, 837 F.3d at 238.  There, the Third Circuit noted

as follows:

> Defendants' argument that *Mid-West Paper* [the Third Circuit
> decision referenced in *Petroleum Products*] means that a **customer
> of a non-defendant** cannot have antitrust standing is an
> oversimplification.  *Mid-West Paper* reached its result because it
> wanted to ensure that only those who are most directly harmed by
> the anticompetitive conduct can sue to remedy the antitrust
> violation.  When, as in *Mid-West Paper*, the anticompetitive conduct
> is price-fixing, the only customers who will have antitrust standing
> are the **direct customers of the conspiracy members**.  The case
> before us is not about price-fixing.  It is, instead, a case about
> market exclusion, as it concerns conduct that prevents a competitive
> market from forming at all.  In such a scenario, **all market
> customers** should have antitrust standing to sue those engaged in
> the allegedly anticompetitive conduct because all suffer equally
> from the foreclosure of choice.

*Id.* at 264-65 (emphasis added).  In *In re Loestrin 24 FE Antitrust Litigation*, No. MDL No. 13-

2472-WES-PAS, 2019 U.S. Dist. LEXIS 118308 (D.R.I. July 2, 2019), the court reached a similar

conclusion: although one group of direct purchasers never purchased the brand drug from

defendants and made all their relevant purchases from a nondefendant generic manufacturer, the

court still held that "Defendants' alleged unlawful conduct is plainly the proximate cause of the

Generic-Only Purchasers' alleged antitrust injury."  *Id.* at *32.

The Areeda and Hovenkamp antitrust treatise also supports KPH's position.  The treatise

notes that, "[w]hen some competitors conspire to limit their output and bring about higher market

prices, their **nonconspiring** rivals might [*e.g.*,] maintain their previous output and thereby enjoy

higher prices [or] increase their output a bit and thus enjoy somewhat higher prices as well as

more volume."  Areeda & Hovenkamp, Antitrust Law ¶ 347 (5th ed.) (emphasis added).  In either

1    case, "the conspiracy caused market prices to rise and thereby to injure consumers, regardless of

2    whether they purchased from the conspirators or from their innocent rivals." *Id.* (emphasis in

3    original).

> May those who purchased from innocent suppliers at the inflated
> umbrella price recover from the conspirators? These purchasers'
> own suppliers are not liable, for they have violated no antitrust law,
> notwithstanding their excess profits resulting from the umbrella
> price. Because purchasers from the innocent suppliers pay a
> monopoly overcharge just as certainly as if they had bought from the
> conspirators, their injury can be compensated only by allowing them
> to sue the competitors.

9    *Id.*

10   Areeda and Hovenkamp recognized that there may be concerns here regarding causation

11   and proof of damages. For instance, "the conspirators may object to the fairness of extracting

12   from them damages based on the sales of nonconspirators – sales that profited the latter, not the

13   former"; however, the treatise did not find this argument compelling because "[s]uch liability is no

14   less just than the joint and several liability that *each* conspirator bears for *all* the damage caused

15   by all the conspirators collectively." *Id.* (emphasis in original). That being said, the treatise did

16   go on to state that there could be a point where causation and proof of damages would be too

17   speculative – *e.g.*, "the umbrella theory of standing makes a great deal of sense when a cartel and

18   its competitors sell the same product, and the competitor is able to ride its price up on the cartel's

19   price increase" but, "[a]s soon as there is significant differentiation [between products], . . . this

20   simplicity vanishes." *Id.*

21   Gilead suggests that, at the very least, the class definitions should be limited in the same

22   way as the EPPs' class definitions – *i.e.*, to purchases of (1) brand drugs or (2) generic drugs sold

23   by *Teva* specifically (and not any generic manufacturer).[24] To the extent Gilead is arguing that the

---

[24] To be clear, Gilead still argues that even generic drugs purchased from Teva should not count.
*See* Opp'n at 12 ("Even if KPH tries to argue that certain generic-only purchasers should be in the
proposed classes to the extent they purchased from generic manufacturer Teva, that argument
equally lacks merit because KPH's Amended Complaint does not name Teva as a Defendant or
even as a non-party co-conspirator. . . . And nowhere in the Amended Complaint does KPH allege
that Gilead, BMS, or Janssen conspired with Teva as to how Teva ultimately sold and priced its
generic products *after* generic entry.") (emphasis in original); *see also* Strombom Rpt. ¶ 36
(indicating the same).

81

United States District Court
Northern District of California

1   causal connection with respect to generic drugs sold by Teva is stronger, that is probably true.

2   Even if Teva is not considered a *conspiring* competitor, it is alleged to have functioned in a similar

3   manner.

4           However, just because the causal connection may be clearer with respect to generic drugs

5   sold by Teva does not mean that there is not a causal connection with respect to generic drugs sold

6   by other generic manufacturers.  As indicated above, the whole point of Gilead's actions here was

7   to *exclude* generic competition.  In contrast to the consequential but indirect conduct of

8   nonconspirator competition in a price-fixing case, the point of the exclusionary practices here was

9   to limit competition – the anticompetitive effect on the marketplace was foreseeable, indeed

10  intended.  And unlike *Petroleum Products*, damage based on higher prices paid to any generic

11  manufacturers other than Defendants does not involve the problems of a "multi-tiered distribution

12  system that compounded the calculation of damages which made the obstacles to intelligent

13  inquiry . . . nearly insurmountable."  *Petroleum Prods.*, 691 F.3d at 1341.

14          Moreover, Gilead does not provide any numbers here about how many generic-only direct

15  purchasers made purchases from Teva only as opposed to other generic manufacturers.

16  Presumably, since Teva had exclusivity for a time in the actual world (*i.e.*, upon generic launch),

17  the number who purchased from Teva is not insignificant; in other words, Gilead could not argue

18  that all 50 direct purchasers of generic Truvada should be excluded and all 24 direct purchasers of

19  generic Atripla should be excluded.

20                  c.      Complera

21          For the reasons stated above, the Court rejects Gilead's contention that the numerosity

22  requirement has not been met – at least with respect to Truvada and Atripla.  KPH has provided

23  evidence from its expert Dr. Lamb that there are 78 members in the Truvada Class and 51

24  members in the Atripla Class, and Gilead's argument that there are a number of direct purchasers

25  who should not be counted – in particular, direct purchasers who are likely opt-outs and generic-

26  only direct purchasers – is not persuasive.  There are still over 40 members in each class.  *See*

27  *Jordan*, 669 F.2d at 1319 (indicating that 40 class members is generally sufficient to meet the

28  numerosity requirement); *Tait*, 289 F.R.D. at 473 (stating that "[a] proposed class of at least forty

1   members presumptively satisfies the numerosity requirement").

2   　　This still leaves, however, the Complera Class, which has only 25 members, even under

3   Dr. Lamb's count.  Because this is a more modest class size, the Court considers "'other factors'

4   bearing upon the feasibility and convenience of joinder," such as "'the geographical diversity of

5   class members, the ability of individual claimants to institute separate suits, and whether

6   injunctive or declaratory relief is sought,' as well as the ability to identify and locate class

7   members." *A.B.*, 30 F.4th at 836.  In the instant case, the critical factors are those addressed

8   below.

9   　　• *Geographical diversity of class members.*  The 25 members of the Complera Class

10   　　　appear to be dispersed throughout the country (most of them east of the Mississippi

11   　　　River).[25]  *See* Lamb Rpt., App. C.3 (map of the United States reflecting locations of

12   　　　24 out of the 25 class members).  This weighs against the practicability of joinder.

13   　　　*See* 1 Newberg and Rubenstein on Class Actions § 3:12 (explaining that

14   　　　"geographic dispersion of class members cuts in favor of certification as joinder of

15   　　　all members of a dispersed class is likely less practicable than joinder of all

16   　　　members of a similarly sized class residing in one neighborhood or working in one

17   　　　workplace"); 5 Moore's Fed. Prac. – Civ. § 23.22[1][d] (stating that "[w]ide

18   　　　geographic dispersion of class members supports a finding of impracticability of

19   　　　joinder"; thus, "a relatively small class may be sufficiently numerous when the

20   　　　added factor of geographic dispersion contributes to making joinder

21   　　　impracticable").

22   　　• *Ability of individual claimants to institute separate suits.*[26]  The members of the

23

24   [25] Because the 25 class members are identifiable and locatable, joinder is practicable.  *See* 5
Moore's Fed. Prac. – Civ. § 23.22[1][f] (2022) ("If the class members cannot be readily identified

25   or located by the parties before the court, then joinder of all class members is more likely to be
impracticable.  Conversely, joinder is more likely to be found to be practicable if the identity and

26   addresses of the class members are readily ascertainable.").

27   [26] Some circuit courts have held that the ability of a class member to bring an individual suit is not
a relevant consideration – *i.e.*, the "binary choice" is that of "a class action versus joinder of all

28   interested parties."  *Modafinil*, 837 F.2d at 253 (emphasis in original); *see also id.* at 258 (holding
that district court erred in focusing on "whether the individual plaintiffs could have brought their

United States District Court
Northern District of California

1   Complera Class, in general, appear to be companies with significant annual

2   revenues.  Although Gilead does not provide information about annual revenues for

3   each of the 25 members in the class, it appears that at least 22 of them (including

4   Albertsons, CVS, Rite Aid, Kroger, and Walgreen which have already filed

5   individual suits) have annual revenues in excess of $37 million.  *See* Strombom

6   Rpt. ¶ 48 & Fig. 6 (chart showing historical annual revenues).[27]  It also appears that

7   most – but not all – of the class members have significant damages (brand-generic

8   injury), especially when treble damages are taken into account.  *See* Strombom Rpt.

9   ¶ 50 & Fig. 7 (indicating that most class members have over $10 million in

10  damages, when treble damages are included; but also reflecting that a handful have

11  less than $300,000 in treble damages).  The bulk of the damages seem to have been

12  claimed by 3 companies: AmerisourceBergen, McKesson, and Cardinal Health.  *Cf.*

13  Strombom Rpt. ¶ 48 (indicating that, when "improper" class members are

14  excluded, these 3 companies "accounted for approximately *94 percent* of the

15  purchases of brand Complera") (emphasis added).  These circumstances suggest

16  that joinder is, in fact, practicable and/or that other putative class members could

17  institute separate suits.  *See* 5 Moore's Fed. Prac. – Civ. § 23.22[1][e] (noting that,

18  "if each individual class member has a considerable financial stake in the dispute,

19  then individual suits are more likely and joinder is not likely to be impracticable").

20  To the extent there are a few class members who do not have significant damages,

21  they could still join together to file suit or join this lawsuit.  *See Modafinil*, 837

22  _____

23  own, individual suits" because the numerosity requirement "does not envision the alternative of

24  individual suits; it considers only the alternative of joinder"); *accord In re Zetia (Ezetimibe)
    Antitrust Litig.*, 7 F.4th 227, 235 (4th Cir. 2021) (stating that, "[w]hen analyzing the judicial-
    economy factor . . . , the district court should consider whether judicial economy favors *either* a

25  class action *or* joinder[;] [o]therwise, the judicial-economy factor would always favor class
    certification, which is simpler to manage than individual lawsuits") (emphasis in original).  Gilead

26  asserts that this authority should be followed.

27  [27] It is not clear what the historical annual revenues of H.D. Smith, HEB, and Valley Wholesale
    are; they are not represented on Figure 6.  H.D. Smith and Valley Wholesale appear to have been

28  acquired by AmerisourceBergen.  *See* Opp'n at 13; Strombom Rpt. ¶ 50 & Fig. 7 (chart showing
    Dr. Lamb's estimated brand-generic overcharges).

United States District Court
Northern District of California

1   F.3d at 259 (noting that there were 6 class members with "claims below $1 million

2   each[;] [w]hile it may be uneconomical for these claims to be pursued in individual

3   litigation, there has been no showing that it would be uneconomical for these six

4   class members to be individually joined as parties in a traditional lawsuit").

5   On balance, the Court is persuaded that the relevant factors weigh against KPH on the

6   numerosity requirement.  As Gilead points out, the Third Circuit noted in *Modafinil*: "[We] have

7   never seen a class action where three class members [out of 22-25 total], each with billions of

8   dollars at stake and close to 100% of the total value of class claims between them, have been

9   allowed to sit on the sidelines as unnamed class members."  *Modafinil*, 837 F.3d at 259.

10   In response, KPH contends that it is telling that more than two-thirds of the class members,

11   including the "Big 3," have *not* filed suit – and asserts that they have not done so because of a fear

12   of retaliation.  *See* 5 Moore's Fed. Prac. – Civ. § 23.22[1][3] (noting that "courts will be more

13   likely to find impracticability of joinder if fear or retaliation or prejudice could deter individual

14   class members from bringing suit").  Retaliation, however, seems speculative and highly

15   questionable.  If most class members had significant purchases, then, if anything, Gilead would

16   have an interest in *not* retaliating because of its own interest in preserving those relationships.

17   Relying on *Solodyn*, KPH also suggests that there are

18   "formidable business realities and legal hurdles standing in the way
    of [joinder in a common suit]."  The competitive relationship among
19   some class members serves "as a significant business obstacle" to
    joinder.  To illustrate this, [the *Solodyn*] DPPs conducted an
20   empirical analysis of approximately 20,000 federal case filings from
    the last fifteen years involving one or more members of this class,
21   finding that in only five cases – were these members plaintiffs in
    pharmaceutical antitrust cases that were *not* class actions.  DPPs
22   [further] explain that such cases are so infrequent because the nature
    of the litigation makes ascertaining damages difficult at the outset
23   and many cases mirror this one, where DPPs have demonstrated that
    approximately half of the putative class members have negative
24   value claims.[28]  Such cases are the reason why the class action
    mechanism exists: there is no incentive for these parties to join in
25   light of the litigation costs as compared to the damages at stake.

26

27   ───────────────────

28   [28] "A negative value claim is a claim[] that could not be brought on an individual basis because the
    transaction costs of bringing an individual action exceed the potential relief."  *Modafinil*, 837 F.3d
    at 257 n.21.

1   *Solodyn*, 2017 U.S. Dist. LEXIS 170676, at *24-25 (emphasis added). But the analysis in *Solodyn*

2   is arguably problematic or at least not applicable to the instant case. First, it is not clear why a

3   competitive relationship among class members would be a significant obstacle to joinder. The fact

4   that there has been joinder in only a limited number of cases in the past may simply reflect a lack

5   of interest in bringing suit because of an ability to pass on overcharges downstream. Second, to

6   the extent overcharges were not passed on downstream, the asserted damages of most class

7   members is substantial enough such that there is an incentive to sue even if antitrust damages

8   might be hard to prove. Third, while there appear to be some class members here with small or

9   negative value claims, it does not seem to be a notable number. Putative class members, if the

10   class is not certified, could still be *joined* to this lawsuit which would allow them to piggyback on

11   the efforts already expended in the litigation.[29]

12        Finally, to the extent KPH relies on *Lidoderm*, that case is factually distinguishable.

13   There,

> the number of class members – 52 at a minimum – makes joinder
> impracticable, [and] other relevant factors support this conclusion.
> One is the judicial economy from proceeding as a class action,
> which is especially true since 44 DPPs [*i.e.*, the vast majority] have
> claims worth less than it would realistically cost to litigate an expert-
> and discovery-intensive case like this one. These smaller DPPs also
> may not have the market-power security to challenge defendants
> when they need to negotiate to purchase drugs from these same
> entities in the future. The wide geographic dispersion of the DPPs
> also weighs against joinder. Finally, that the "Big Three" DPP class
> members (McKesson, Cardinal Health, and AmerisourceBergen)
> account for 86% of the purchases only heightens the conclusion as
> to impracticality of joinder given the smaller-size of the other DPPs'
> claims.

22   *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *72-73. Judge Orrick went on to state that *Modafinil*

23   was not controlling in his case because "[t]here are far more DPP class members here than in that

24   case (53 versus 22) and the market concentration of the larger players [the same Big 3] is less

---

[29] To the extent KPH suggests that it is too late in the day for joinder to take place, the Third Circuit held in *Modafinil* that "the late stage of litigation is not by itself an appropriate consideration to take into account as part of the numerosity analysis." *Modafinil*, 837 F.3d at 254. In any event, it is not clear to the Court that joinder of some direct purchasers to the case would not be possible, even at this relatively late stage of the proceedings.

United States District Court
Northern District of California

1    significant (97% versus 86%)." *Id.* at *73.  To the extent judicial economy is a consideration,

2    there is no showing here that joinder would result in a greater burden on the Court than class

3    certification given the concentration of sales in three large entities.

4           Accordingly, the Court concludes that certification of the Complera Class is not warranted

5    because KPH has not shown that the Rule 23(a) numerosity requirement has been satisfied.

6    However, the numerosity requirement has been met for the Truvada and Atripla Classes, and

7    therefore, the Court continues to evaluate the Rule 23(b)(3) requirements as to those Classes.

8    B.     Rule 23(b) Requirements

9           Gilead argues that, even if the Court considers only the Truvada and Atripla Classes, there

10   is a predominance problem: specifically, KPH cannot prove antitrust injury or impact by common

11   evidence because there is a significant number of uninjured class members and thus individualized

12   inquiries will predominate.

13          Gilead does not challenge the brand-generic injury claimed by KPH but does contest the

14   generic-generic injury asserted.  The gist of Gilead's argument is as follows:

15          •   As noted above, there are 78 total members in the Truvada Class and 51 total

16              members in the Atripla Class.

17          •   Out of the 78 Truvada class members, 50 made generic-only purchases; out of the

18              51 Atripla class members, 24 made generic-only purchases.

19          •   According to Gilead, most of these generic-only purchasers ended up paying *less*

20              for the generics in the actual world compared to the average prices of the generics

21              in the but-for world.  *See* Opp'n at 25; Strombom Rpt. ¶ 74.  Specifically, Gilead

22              claims that (1) 38 out of the 50 generic-only purchasers in the Truvada Class paid

23              less than the average price in the but-for world (*i.e.*, **42%** of the 78 total members

24              in the Truvada Class), and (2) 13 out of the 24 generic-only purchasers in the

25              Atripla Class paid less than the average price in the but-for world (*i.e.*, **25%** of the

26              51 total class members).  *See* Opp'n at 25-26; Strombom Rpt. ¶ 77.  Gilead adds

27              that these purchasers (who purportedly paid less) made their purchases after March

28              2021 – *i.e.*, after *mass* generic entry ("the simultaneous entry of multiple generic

United States District Court
Northern District of California

87

United States District Court
Northern District of California

1    competitors that Dr. Lamb contends is the primary cause of average generic prices

2    declining"). Strombom Rpt. ¶ 74 (criticizing Dr. Lamb for "not fully explain[ing]

3    why the entities that exclusively purchased after mass generic injury are injured").

4        Dr. Lamb's reply report, however, sufficiently addresses this issue.[30] According to Dr.

5    Lamb, Gilead's expert, Dr. Strombom, reached this conclusion based on a flawed comparison. Dr.

6    Lamb "calculated a but-for price for each of the HIV drugs at issue using the *IQVIA NSP* data[[31]]

7    and compared those prices to the actual prices in the *IQVIA NSP* to determine the amount of

8    aggregate overcharges paid by members of the proposed Classes." Lamb Rebuttal Rpt. ¶ 45

9    (emphasis added; adding that, "[i]n using the IQVIA NSP data to measure *both* actual and but-for

10   prices, my analysis effectively washed out the effect of any differences between the IQVIA NSP

11   data and the transaction data") (emphasis added). But Dr. Strombom did not make this same

12   comparison. Rather he compared "the but-for generic Truvada and Atripla prices based on the

13   *IQVIA NSP data*" to "the actual gross prices paid by individual proposed Class members in the

14   *transaction-level* data."[32] Lamb Rebuttal Rpt. ¶ 44 (emphasis added). Accordingly, Dr.

15   Strombom failed to make an "apples-to-apples comparison. His comparisons fail to control for the

16   differences between the IQVIA NSP data and the transaction-level data." Lamb Reply Rpt. ¶ 45.

17       Dr. Lamb went on to make a comparison between (1) but-for *transaction-level* prices and

18   (2) actual net *transaction-level* prices. *See, e.g.*, Lamb Rebuttal Rpt. ¶ 47 (noting that he

19   "replace[d] the IQVIA NSP but-for price with a but-for price calculated from the transaction-level

20

21   ───────────────

22   [30] As an initial matter, Dr. Lamb criticizes this attack on the basis that he was not using the but-for price to assess whether all or nearly all class members were injured; rather, he was using the but-for price to measure class-wide aggregate overcharges only. *See* Lamb Reply Rpt. ¶ 46.

23   However, Dr. Lamb also goes on to explain why the argument is substantively incorrect.

24   [31] NSP is yet another data product offered by IQVIA.

25   [32] In his report, Dr. Strombom indicates that he purposefully chose gross prices (*i.e.*, prices before discounts to direct purchasers) in order to be conservative. *See* Strombom Rpt. ¶ 78 ("[T]he

26   IQVIA data includes some but not all discounts paid to the direct purchaser by a manufacturer. By relying on the gross price from the generic manufacturer transaction data, I am not accounting for

27   any discounts to direct purchasers. That is, I find that for many of the putative class members, their gross price before discounts is lower than Dr. Lamb's average but-for price. Adjusting

28   individual purchasers' generic prices to *include* discounts would reduce the generic prices paid by direct purchasers and likely result in additional uninjured putative class members.").

United States District Court
Northern District of California

1   data"). With this apples-to-apples comparison, Dr. Lamb reaffirmed that "generic-only purchasers

2   were injured in that they paid a higher price for the generic Truvada [or Atripla] they purchased in

3   the actual world than they would have in the but-for world."[33]  Lamb Reply Rpt. ¶ 47; *see also*

4   Lamb Reply Rpt. ¶ 48.

5        Dr. Lamb indicates that it is not surprising that generic-only purchasers have suffered

6   injury even after mass generic entry because, even after mass generic entry, it takes some time for

7   prices to "bottom out."  *See* Lamb Reply Rpt. ¶ 59 ("[S]tudies show that even following mass

8   generic entry, generic prices continue to decline gradually for some time."); Lamb Reply Rpt. ¶ 60

9   ("This finding in the academic literature is consistent with what manufacturers of generic Truvada

10  and generic Atripla expected to happen when generic Truvada and generic Atripla entered the

11  market."); Lamb Reply Rpt. ¶ 64 ("The forecast documents produced by the generic

12  manufacturers . . . are consistent with the actual experience of the markets for Truvada and Atripla

13  following generic entry, which shows that the prices of generic Truvada and Atripla in the IQVIA

14  NSP data have continued to fall even as the number of generic manufacturers remained

15  constant.").[34]

16       Gilead protests still that Dr. Lamb's analysis is flawed because "many generic-only

17  purchasers paid *flat* gross prices" after mass generic entry in the actual world – which contradicts

18  Dr. Lamb's assumption that "entities would pay decreasing prices in the but-for world."

19  Strombom Rpt. ¶ 75 (emphasis added); *see also* Opp'n at 26.  But Dr. Lamb adequately addresses

20  this criticism in his reply report.  For example:

21

22  [33] In his reply report, Dr. Lamb notes that reliance on transaction-level data is problematic because
    it is not complete.  *See* Lamb Rebuttal Rpt. ¶ 43 (stating that, "[w]ithout complete transaction-

23  level data from the generic manufacturers, including updated data on price adjustments, any but-
    for generic price calculated from the transaction-level data would be artificially high";

24  nevertheless, even making a comparison of the actual world and the but-for world with
    transaction-level data, "all or nearly all generic-only purchasers were injured").

25  [34] In his report, Dr. Lamb underscores that "analysis of the IQVIA NSP data [is] just one piece of

26  common evidence" in support of his "conclusion that all or nearly all members of the proposed
    Classes were injured."  Lamb Reply Rpt. ¶ 34.  He also relied on "(1) published research

27  concerning the effects of generic competition in pharmaceutical markets; [and] (2) Defendants'
    and Janssen's documents and forecasts regarding the effects of generic competition in the markets

28  for HIV drugs."  Lamb Reply Rpt. ¶ 34; *see also* Lamb Reply Rpt. ¶ 74 (discussing common
    evidence).

United States District Court
Northern District of California

1    (1) Dr. Strombom is relying on transaction-level data produced by generic

2        manufacturers and "many of [these] productions cover limited time periods [and]

3        with little overlap across them."  Lamb Reply Rpt. ¶ 70.

4    (2) Dr. Strombom did not consider data from three generic manufacturers.  *See* Lamb

5        Reply Rpt. ¶ 70.

6    (3) Dr. Strombom considered prices over a seven or nine-month period only, but "the

7        IQVIA NSP data demonstrate that generic prices have continued to decline through

8        early 2022 [*i.e.*, well after mass generic entry]."  Lamb Reply Rpt. ¶ 70; *see also*

9        Lamb Reply Rpt. ¶ 64 (stating that "the prices of generic Truvada and Atripla in the

10       IQVIA NSP data have continued to fall even as the number of generic

11       manufacturers remained constant").

12    (4) Even if there were flat prices for generic Truvada and Atripla in the actual world,

13       that does not mean there was no injury in the but-for world.  "[I]n the but-for world

14       with earlier generic entry, generic prices would have launched in a market with a

15       lower branded price.  The lower initial brand price at the time of but-for generic

16       entry means that the generic would have launched at a lower price than it did in the

17       actual world and that the generic price would have continued to fall over time as

18       generic manufacture[r]s continue to compete against each other."  Lamb Reply Rpt.

19       ¶ 72.

20    (5) Using the apples-to-apples comparison, there was injury.  *See* Lamb Rebuttal Rpt. ¶

21       73.

22    Dr. Lamb's analysis is credible and more complete and is entitled to greater weight for

23 purposes of this motion than that of Dr. Strombom.  Accordingly, KPH has satisfied the

24 predominance requirement of Rule 23(b)(3) for each of the Truvada and Atripla Classes.

25 Likewise, the superiority requirement of Rule 23(b)(3) has been met.

26 C.    <u>Class Certification</u>

27    For the foregoing reasons, the Court certifies two of the three Damages Classes:

28    (1) Truvada Class: "All persons or entities in the United States and its territories who

United States District Court
Northern District of California

1        purchased Truvada or generic Truvada directly from any of Defendants or any

2        brand or generic drug manufacturer from February 1, 2018, until the date of the

3        class certification order." DPP Mot. at 1-2.

4      (2) Atripla Class: "All persons or entities in the United States and its territories who

5        purchased Atripla or generic Atripla directly from any of Defendants or any brand

6        or generic drug manufacturer from February 1, 2018, until the date of the class

7        certification order." DPP Mot. at 2.

8        The Court appoints KPH as the class representative for each of the above Classes and

9 further appoints as counsel for the Classes the current counsel representing KPH.

10        The Court orders the parties to meet and confer regarding the content and timing of a class

11 notice. The parties shall report back on their efforts within two weeks of the date of this order.

12 D.    _Daubert_ Motion

13        With respect to the DPP motion for class certification, Gilead filed a _Daubert_ motion with

14 respect to only one DPP expert, Dr. Lamb. In his expert report, Dr. Lamb provided opinions

15 regarding, _inter alia_, antitrust injury/impact. In its _Daubert_ challenge, Gilead makes a number of

16 arguments, many of which replicate arguments made in the opposition to the DPP motion for class

17 certification. Similar to above, the Court concludes that Dr. Lamb's opinions are sufficiently

18 reliable such that they are admissible and may be considered for purposes of the class certification

19 motion. Gilead's challenges to Dr. Lamb go more to the weight of his opinions rather than their

20 admissibility.

21      1.    Generic-Generic Injury

22        Gilead argues that Dr. Lamb's opinions regarding generic-generic injury to the Truvada

23 and Atripla Classes are unreliable because most generic-only purchasers who purchased _after mass_

24 _generic entry_ were not injured at all.

25        Although Gilead has a basis to cross-examine Dr. Lamb on this issue, it has not shown that

26 his opinions regarding injury even after mass generic entry are not reliable. This issue has largely

27 been addressed above. In short, Dr. Lamb has cited sources to support his position that, even after

28 mass generic entry, generic prices decline, if only because it takes some time for generic prices to

1  bottom out.  His sources include academic studies, forecast documents of generic manufacturers

2  (for Truvada and Atripla specifically), and the actual data for prices of generic Truvada and

3  Atripla.  *See, e.g.*, Lamb Reply Rpt. ¶¶ 59-68.  Dr. Lamb and Dr. Strombom (the defense expert)

4  appear to disagree about whether there was a decline in the prices of generic Truvada and Atripla

5  for various reasons, including because Dr. Strombom did an apples-to-oranges comparison

6  (IQVIA data to transaction-level data) rather than an apples-to-apples comparison (IQVIA data to

7  IQVIA data, or transaction-level data to transaction-level data).  Furthermore, Dr. Strombom's

8  transaction-level data covered only a limited period of time.  Finally, even if there was no decline

9  in prices after mass generic injury, there could still be injury in the but-for world: "[I]n the but-for

10  world with earlier generic entry, generic prices would have launched in a market with a lower

11  branded price.  The lower initial brand price at the time of but-for generic entry means that the

12  generic would have launched at a lower price than it did in the actual world and that the generic

13  price would have continued to fall over time as generic manufacture[r]s continue to compete

14  against each other."  Lamb Reply Rpt. ¶ 72.  This is a rational analysis.

15        2.   <u>"Big 3" Purchasers of Generic Truvada and Atripla</u>

16        Gilead also argues that Dr. Lamb's opinions related to Truvada and Atripla are unreliable

17  because he did not "conduct a sensitivity analysis" to determine whether "the trends he observed

18  in the average prices of generic Truvada and Atripla were consistent with the price trends

19  experienced by individual generic purchasers."  Daubert Mot. at 7.  According to Gilead, had he

20  done so then he would have been that "the experience of individual purchasers significantly

21  deviates from and largely conflicts with the 'average' price trends observed by Dr. Lamb" because

22  over 90% of the purchases of brand/generic Truvada and brand/generic Atripla were made by just

23  three putative class members – *i.e.*, the "Big 3" (Cardinal Health, McKesson, and

24  AmerisourceBergen).  *See* Daubert Mot. at 7.  In other words, the average price essentially

25  represents what the Big 3 paid and "do not accurately represent the prices paid by other

26  wholesalers in the proposed classes."  Daubert Mot. at 8; *see also* Strombom Rpt. ¶ 59 ("[T]he

27  'class-wide' averages are essentially the averages for the 'Big 3' wholesalers . . . since they

28  accounted for nearly 91 percent of the class purchases of brand Truvada and the generic version or

1   Truvada, approximately 95 percent of the class purchases of brand Atripla and the generic version

2   of Atripla, and over 94 percent of the class purchases of brand Complera.").

3       But as Dr. Lamb responds in his reply report:

> Dr. Strombom confuses an analysis of class-wide damages with a methodology for allocating class-wide damages.  Whether or not the characteristics of any given proposed Class member would cause them to receive a disproportionately large amount of damages relative to the rest of the proposed Classes as a result of the alleged misconduct has no bearing was to whether all or nearly all proposed Class members were injured as a result of the alleged misconduct, whether such injury can be proven with common evidence, and whether aggregate class-wide damages can be measured using common evidence.

10  Lamb Reply Rpt. ¶ 22.  As indicated above in conjunction with the EPPs' motion, the Court is

11  inclined to have a bifurcated trial where aggregate damages would be dealt with in Phase I (along

12  with liability and injunctive relief), and allocation of damages would be dealt with in Phase II.

13      3.    <u>Price Negotiations for Generic Truvada and Generic Atripla</u>

14      Finally, Gilead criticizes Dr. Lamb's opinions on Truvada and Atripla as being unreliable

15  because he did not take into account that the generic prices paid by wholesalers are variable, *i.e.*,

16  subject to individual price negotiations between generic manufacturers and wholesalers.  *See*

17  Daubert Mot. at 8; Strombom Rpt. ¶ 31.

18      But again, Dr. Lamb sufficiently addresses this in his reply report: (1) "these discounts and

19  negotiations would be present in both the actual and but-for world," Lamb Reply Rpt. ¶ 20; and

20  (2) "the fact that there is variation in the prices paid by direct purchasers due to the differences in

21  discounts and contracting terms, or the fact that other differences exist between direct purchasers,

22  is irrelevant to assessing impact."  Lamb Reply Rpt. ¶ 20.  In other words, just because "some

23  proposed Class members were able to negotiate lower prices than other proposed Class members

24  does not mean that they were able to avoid injury.  [And] Dr. Strombom ignores the fact that the

25  discounts he identifies as contributing to pricing variation are calculated off of the same reference

26  prices."  Lamb Reply Rpt. ¶ 25.  Dr. Lamb concluded that, "[f]or all of the proposed Class

27  members that purchased branded Truvada and/or branded Atripla, the actual individual net prices

28  they paid [including the lowest] were significantly higher than the price they would have paid for

generic Truvada and/or generic Atripla in the but-for world." Lamb Reply Rpt. ¶ 27. Again, Dr. Lamb's conclusions are reasonable and rest on a sufficient basis – sufficient to survive *Daubert*.

## V.   CONCLUSION

For the reasons stated above, both the EPPs and the DPPs' motions for class certification are granted in part and denied in part. With respect to the EPPs, the Court certifies three Damages Classes (Truvada, Atripla, and Complera) and three Injunctive Relief Classes (Evotaz, Prezcobix, and cART Foundation Drugs). For the Damages Classes, certification is for fewer than the 35 repealer states identified in the EPP motion for class certification. With respect to the DPPs, the Court certifies two Damages Classes (Truvada and Atripla).

As noted above, the Court orders the parties to meet and confer regarding various issues related to class certification and to report back within two weeks of the date of this order.

Finally, the Court orders that Part III.D.1.a of this order temporarily be filed under seal. The parties shall meet and confer to determine which specific parts of this section should be filed under seal. The Court instructs the parties that, given the significance of this order, it expects any sealing request to be narrowly tailored. The parties shall file their sealing request within two weeks of the date of this order.

This order disposes of Docket Nos. 692 and 694.

**IT IS SO ORDERED**.

Dated: September 27, 2022

_____
EDWARD M. CHEN
United States District Judge