# Exhibit 3

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| **In Re:**<br><br>**DISPOSABLE CONTACT**<br>**LENS ANTITRUST LITIGATION** | | **Case No. 3:15-md-2626-HES-JRK**<br><br>**Senior Judge Harvey E. Schlesinger**<br>**Judge James R. Klindt** |
| **THIS DOCUMENT RELATES TO:**<br><br>**All Class Actions** | | |

# DEFENDANTS' MOTION TO EXCLUDE THE SUPPLEMENTAL REPORT OF DR. MICHAEL A. WILLIAMS UNDER FED. R. EVID. 702 AND *DAUBERT* AND MEMORANDUM OF LAW IN SUPPORT THEREOF

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

Preliminary Statement ............................................................................................ 1

Background ............................................................................................................ 3

Argument ............................................................................................................... 4

I.      DR. WILLIAMS'S MODEL FAILS *DAUBERT* SCRUTINY BECAUSE IT RELIES EXCLUSIVELY ON AVERAGE OVERCHARGES, WHICH DO NOT AND CANNOT ANSWER WHETHER CONSUMERS WERE IMPACTED ON A CLASS-WIDE BASIS THAT CAN BE DETERMINED USING COMMON PROOF ............................................................ 6

II.     DR. WILLIAMS'S MODEL FAILS *DAUBERT* SCRUTINY BECAUSE IT IMPROPERLY MANIPULATES DATA COLLECTED IN THIS CASE, TREATS SIMILAR DATA SETS DIFFERENTLY, AND DOES BOTH WITHOUT GOOD REASON ................................................................... 12

     A.    Dr. Williams's decision to modify the B&L class is an arbitrary decision transparently motivated to skew his results ........................................ 13

     B.    Dr. Williams's decision to include JJVCI's wholesale pricing as an independent explanatory variable is contradicted by the evidence in this case, and thus causes incorrect and unreliable results ........................... 15

     C.    Dr. Williams's failure to consistently account for product fixed effects for JJVCI products renders his regressions unreliable. ............................... 18

Conclusion ............................................................................................................ 19

Local Rule 3.01(g) Certification ........................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ................................................................4

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..................................................................12

*Burst v. Shell Oil Co.*,
    Civil Action No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015), *aff'd*, 650
    F. App'x. 170 (5th Cir. 2016) (unpublished), *cert. denied,* 137 S. Ct. 312 (2016) .....12, 14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...................................................................................5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579, 589-90 (1993). .............................................................4, 12

*Equal Emp't Opportunity Comm'n v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) ..................................................................13

*Felder's Collision Parts, Inc. v. All Star Advertising*,
    777 F.3d 756 (5th Cir. 2015) ....................................................................7

*Finestone v. Fla. Power & Light Co.*,
    03-14040-CIV, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006), *aff'd*, 272 F. App'x.
    761 (11th Cir. 2008) ................................................................................12

*Flash Memory Antitrust Litig.*, C 07-0086 SBA,
    2010 WL 2332081 (N.D. Cal. June 9, 2010) ...........................................7

*Food Lion, LLC v. Dean Foods Company*,
    312 F.R.D. 472 (E.D. Tenn. 2016) .........................................................12

*Gates v. Rohm and Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) .....................................................................7

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    No. 05-1717, 2010 WL 8591815 (D. Del. July 28, 2010) ........................7

*KW Plastics v. United States Can Co.*,
    131 F.Supp.2d 1289 (M.D. Ala. 2001) ...................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606, 629 (N.D. Cal. 2015)................................................................8

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311 (N.D. Cal. 2014).........................................................................7

*In re Pharmacy Benefit Managers Antitrust Litigation*, No.,
    06-1782, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017)..........................................6

*In re Photochromic Lens Antitrust Litigation*,
    No. 8:10-CV-00984, 2014 WL 1338605 .............................................................7

*PB Prop v. Goodman Manufac. Co.*, No. 3:12-cv-1366,
    2016 U.S. Dist. LEXIS 97520, at *30 (M.D. Fla. May 11, 2016) .......................5

*In re Rail Freight Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ........................................................................6, 8

*In re Rail Freight Surcharge Antitrust Litig.*,
    No. 1:07-mc-00489-PLF-GMH, ECF No. 843 (D.D.C. Oct. 10, 2017) ............11

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009)...........................................................................6

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ..........................7

*Sher v. Raytheon Co.*,
    419 Fed. App'x 887 (11th Cir. 2011) ...................................................................5

*Wal-Mart v. Dukes*,
    564 U.S. 338 (2011)..............................................................................................6

Defendants ABB Optical Group ("ABB"), Alcon Laboratories, Inc. ("Alcon"), Bausch & Lomb, Incorporated ("B&L"), and Johnson & Johnson Vision Care, Inc. ("JJVCI") respectfully move under Federal Rule of Evidence 702 to exclude the supplemental expert report that Plaintiffs have offered from Dr. Michael A. Williams in support of their motion for class certification.

### *Preliminary Statement*

Defendants previously filed a motion to exclude Dr. Williams's original expert report, due to the multiple and pervasive errors in the analyses detailed in that report. That motion is fully briefed and is pending. On September 8, 2017, Dr. Williams served a supplemental report, presenting substantially altered analyses. The flaws in those analyses are no less severe, and Dr. Williams's supplemental report and any related testimony should also be excluded for two reasons—(1) the fundamental methodological flaws that plagued his original report remain and (2) his latest report introduces additional problems as well.

First, as with his original report, Dr. Williams's supplemental report relies only on average "overcharges" that do nothing to answer whether contact lens purchasers really were impacted on a class-wide basis that can accurately be determined using common proof. As Defendants' original motion explained, the economic evidence in this case shows that there is no class-wide method for determining whether someone was impacted by the existence of UPPs, and averages cannot *accurately* answer that question for any member of the putative class given different types of contact lenses sold under different pricing strategies by a multitude of different retailers, compounded by different insurance policies, rebate offerings, and discounts that can impact the out-of-pocket cost to any individual consumer. Given these important differences in the marketplace, the evidence in this case unsurprisingly confirms that consumer prices varied

substantially across products, retailers, and transactions, and that there is no way to determine what someone hypothetically would have paid in the absence of UPPs without looking at the terms of his or her purchase one by one.  Indeed, the evidence in this case—including documentary and testimonial evidence from the Named Plaintiffs themselves—demonstrates that some Named Plaintiffs paid far *below* the advertised UPP prices, and thus were never actually impacted by Defendants' UPPs.  Because his model only addresses the purported average effect of Defendants' UPPs across all consumers, Dr. Williams's model concluded that even these Named Plaintiffs were "impacted"—even though the record shows they were not.  All of this shows not only that Dr. Williams's model generates demonstrably inaccurate results but also that it cannot accurately determine impact for anyone in the putative class.

Second, Dr. Williams's supplemental expert report fails to follow any serious scientific methodology because Dr. Williams manipulates both his regression models and the underlying data.  For example, Dr. Williams's supplemental report redefines the proposed class of B&L consumers based only on a cursory and untested observation of 1-800 Contacts data; but when it comes to Alcon, whose 1-800 Contacts data shows nearly identical observational patterns, Dr. Williams fails to make the same modification to his class definition for Alcon consumers.  The only apparent salient difference between the two manufacturers in this respect is that if Dr. Williams had kept his original class definition for B&L, his revised models would yield *negative* overcharges for purchases of B&L lenses through 1-800 Contacts—in other words, the model would show that those consumers actually paid *less* for their lenses upon the introduction of B&L's UPP.  Similarly, although Dr. Williams now decides to control for "product fixed effects" when measuring overcharges for Alcon and B&L lenses, he inconsistently does so for JJVCI lenses, varying his approach by model with no explanation or underlying logic.  In addition, Dr.

2

Williams ignores critical record evidence explaining that JJVCI's reduction of wholesale prices was inextricably linked its UPP strategy and, instead, now includes JJVCI wholesale pricing as an independent explanatory variable in his updated regressions—which contradicts the very position that he took during his first deposition concerning his original report. *Daubert* and its progeny make clear that experts cannot selectively manipulate their models—as Dr. Williams has done here—to offer misleading conclusions based on erroneous results.

For these reasons, Dr. Williams's model fails under *Daubert*.

## *Background*

Plaintiffs' motion for class certification included an expert report from Dr. Michael A. Williams, an economist they retained from Competition Economics, LLC. Defendants filed a *Daubert* motion to exclude that report after discovery exposed fundamental economic errors in Dr. Williams's methodology. Among the host of issues they identified in their motion, Defendants focused mostly on four points: (i) Dr. Williams's regressions compared prices of non-UPP lenses to prices of UPP lenses without controlling for differences in the product features, including innovative new technology, present in UPP lenses but absent from non-UPP lenses; (ii) Dr. Williams's regressions resulted in false positives by attributing damages even in situations where none can exists, such as when a person clearly paid less than the UPP; (iii) Dr. Williams failed to run appropriate "tests" to check his regressions; and (iv) Dr. Williams used unreliable survey data instead of available transactional data. (Doc. 503 at 8-9, Defendants' Initial *Daubert* Motion to Strike Expert Report of Dr. Michael A. Williams.)

In response, Dr. Williams submitted a supplemental expert report in which he altered his models and shifted his opinions. (Doc. 612, Williams Supplemental Report.) Most notably, Dr. Williams incorporated additional transactional data and created a new set of "before during,"

"before-during-after" and "during-after" models, in which he purports to compare the prices of contact lenses subject to a UPP during the periods the various UPPs were in force to prices for those lenses prior to the implementation of the relevant UPP, after the termination of the relevant UPP, or both  (*Id.* at ¶¶ 146-55).  Dr. Williams's modifications result in substantial changes.  For one, his new overcharges are significantly lower than those originally calculated for Alcon and B&L, by an order of magnitude.  (*Compare* Doc. 398, Williams Opening Report Tables 7-9, 13-15 with Doc. 612, Williams Supplemental Report Tables 14-19).  Remarkably, despite these inconsistencies, Dr. Williams has declined to retract any of his models, and appears intent on reserving his right to use any or all of them.  (*See* Taeschler Decl., Exhibit A, Williams Supplemental Tr. at 24:14-27:13, 44:11-45:8.)  Further, even with these changes, Dr. Williams's supplemental report still contains serious flaws that, for the reasons discussed below, require his revised models to be excluded under *Daubert*.[1]

**Argument**

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, expert testimony must be excluded if it is not "relevant" or "reliable."  Fed. R. Evid. 702(c); 509 U.S. 579, 589-90 (1993).  This requires not only that an expert have the requisite qualifications but also that the proffered opinions use an established methodology and reliable data in a way that "fits" the issues in the case.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("Thus, the evidence must have a valid scientific connection to the disputed facts…[t]his connection has been appropriately denominated as 'fit.'") (citations omitted).  The

---

[1]     On October 13, 2017, Plaintiffs submitted an entirely new set of damages estimates from Dr. Williams. While the estimates for Alcon and B&L were based in part on the overcharges calculated in his supplemental report, the estimates for JJVCI depended on yet another modified regression, that continues to suffer from similar methodological flaws.  (*See* Doc. 678 ¶¶ 81-85, Snyder Sur-Reply Report Report.)  For the same reason his supplemental report should be excluded this set of estimates should be excluded as well.

4

proponent of expert testimony bears the burden of establishing that it satisfies this threshold standard. *See PB Prop Mgmt., Inc. v. Goodman Mfg. Co.*, Case No. 3:12-cv-1366-HES-JBT, 2016 WL 7666179, at *9 (M.D. Fla. May 11, 2016) (citing *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011)). These principles apply equally to experts, like Dr. Williams, who seek to testify at the class certification stage of a case, given the Supreme Court's command that Rule 23 requires "rigorous analysis" to test whether plaintiffs have *proven* that the requirements for certification have been met. *Id.* at 10, 14 (excluding class certification expert's opinions as "unscientific and unreliable"); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so.") (internal quotations omitted).

Put simply, Dr. Williams's supplemental report should be excluded under *Daubert*—both because it fails to show that impact can be proven on a class-wide basis using common proof and thus does not "fit" the question at hand, and because it uses inconsistent methodologies to generate facially unreliable results. First, Dr. Williams's supplemental report continues to rely on average overcharges without addressing the problem that the "average" does not accurately determine whether anyone in the putative class was impacted at all by the presence of UPPs. Consequently, Dr. Williams's supplemental report fails to address the fundamental problem that there is no "average" that can account for highly individualized purchasing factors and price variation in the contact lens industry, and his use of an average results in demonstrable false positives. Second, Dr. Williams's supplemental report introduces new methodological problems including facial inconsistencies and manipulation of data.

I.   **Dr. Williams's model fails *Daubert* scrutiny because it relies exclusively on average overcharges, which do not and cannot answer whether consumers were impacted on a class-wide basis that can be determined using common proof.**

Controlling law holds that, in class action cases like this one, plaintiffs must be able to prove—on a class-wide basis—that each class member suffered an antitrust injury flowing from the defendant's challenged conduct.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (stating that, for class certification purposes, plaintiffs must be able to show they are capable of proving liability "in one stroke"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (stating that plaintiffs must demonstrate "that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy").  Plaintiffs attempt to satisfy that obligation through Dr. Williams, who offers regression-based average "overcharges" to claim that every consumer who bought a contact lens subject to a UPP paid more because of UPPs.

The problem for Plaintiffs, however, is that courts have consistently recognized that models relying on average overcharges—like Dr. Williams's model here—are unreliable as a means of proving class-wide impact when the averages mask significant economic variations among class members.  *See In re Pharmacy Benefit Managers Antitrust Litig.*, Civil Action Nos. 06-1782, 03-4730, et al., 2017 WL 275398, at *20-21 (E.D. Pa. Jan. 18, 2017) (granting *Daubert* motion and excluding expert's class certification model because it relied only on national averages and thus failed to demonstrate via class-wide proof that "all or nearly all" independent pharmacies were actually injured); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 592, 594 (N.D. Ill. 2009) (rejecting expert's use of averages because it "unacceptably masks the

significant variation" in class members' wages over the relevant class period and therefore was inappropriate "when applied to the facts and data *in this case*").[2]

Moreover, class action models employing averages are particularly problematic where, as here, the models ignore industry-specific factors that drive what an individually actually pays, such as discounts, rebates, and insurance coverage. *See In re Photochromic Lens Antitrust Litig.*, Nos. 8:10-md-02173-T-27EA, 8:10-cv-02043-T-27EA, et al., 2014 WL 1338605, at *25 (M.D. Fla. Apr. 3, 2014) (holding in part that expert's regression models were legally deficient in antitrust case because expert failed to account for individualized purchasing factors like rebates and discounts); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. 05-1717 (JJF), 2010 WL 8591815, at *21-22 (D. Del. July 28, 2010) (finding regression unreliable because it failed to account for rebates); *see also Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 763 (5th Cir. 2015) (rejecting argument that price should be considered before the application of any discounts because doing so "ignores the economic realities that govern antitrust analysis"), *cert denied*, 136 S. Ct. 39 (2015).[3]

---

[2]  Numerous other courts have criticized the use of averages for purposes of proving class-wide impact. *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 265-267 (3d Cir. 2011) (upholding district court's rejection of class certification on the basis that averaged rates of exposure to toxic chemicals did not provide insight into "exposure of actual class members," did not account for "biological factors or individual activities" that would vary individual exposure, and therefore "could not constitute common proof" of class-wide impact); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (denying class certification because expert's finding "that the overcharge was about 11.48 percent in the aggregate" could not "show that all or nearly all purchasers were overcharged in that amount, or in any amount at all"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, Civil Action No. 04-5898, 2010 WL 3855552, at *26, 30 (E.D. Pa. Sept. 30, 2010) (rejecting class certification because plaintiffs' use of average prices "sai[d] nothing about the actual price paid by each purported class member" and likely ignored fact that "certain class members would have suffered no injury"); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (rejecting class certification because expert's use of average price regression analysis "obscure[d] individual variations over time among the prices that different customers pay for the same or different products that appear in the data").

[3]  In responding to Defendants' original *Daubert* motion, Plaintiffs cited a handful of cases to argue that models relying on averages are acceptable for class certification purposes. But Plaintiffs' reliance on those cases reveal their fundamental misunderstanding of Defendants' criticism of Dr. Williams's regression models. In fact, the cases cited by Plaintiffs show only that some courts have relied on averages when—unlike here— the case

*(cont'd)*

Here, Dr. Williams's decision to use average "overcharges" similarly masks economic variations among class members that are critical in assessing the actual prices consumers paid for UPP lenses and whether those consumers would have saved any money in the absence of the UPPs. Specifically, Dr. Williams's analysis fails because it ignores, among other things, (i) the existence of insurance coverage and rebates, which in some cases completely eliminated out-of-pocket costs for consumers, including for some of the Named Plaintiffs in this case; and (ii) economic evidence that numerous class members were not impacted at all by the UPPs because the retailers at which they purchased lenses priced *below* the corresponding UPP. (*See* Doc. 671, Cremieux Sur-Reply Report ¶¶ 6-11, 26-42.)

First, the record shows that multiple Named Plaintiffs used insurance coverage and rebates, which significantly lowered their out-of-pocket costs below UPP prices and caused some people to pay nothing for their contact lenses. ██████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

———————————————————
(cont'd from previous page)
involves either commodity products or markets with minimal price differentiation. And, critically, those cases make clear that averages would be inappropriate in cases like this one, when the record shows that different contact lenses have different features rather than being sold as a commodity, and that there is substantial pricing differentiation. For example, in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court observed that aggregates might be acceptable in a market with little pricing differentiation but expressly emphasized that aggregates would be inappropriate if, given the relevant market conditions, application of those averages led to false positives. 308 F.R.D. 606, 629 (N.D. Cal. 2015) (agreeing with *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013) and stating that a regression model is "obviously flawed" if it concludes that demonstrably unharmed class members somehow suffered injury). Here, as in *In re Rail Freight*, significant evidence shows that numerous class members were not injured by the UPPs being challenged in this case.



[REDACTED] [4] (*Id.* at ¶ 184.)

Second, in addition to evidence from the Named Plaintiffs, significant economic evidence also undermines Dr. Williams's claim that his regressions can demonstrate common impact. As Dr. Snyder explains in his Sur-Reply Report, Plaintiffs claim that consumers suffered common impact for two reasons: (i) UPPs caused "discount" internet and club retailers to increase prices, thereby creating a price floor; and (ii) non-discount retailers consequently raised their prices in response. (Doc. 678, Snyder Sur-Reply Report ¶¶ 28-30.) According to Plaintiffs, then, all consumers paid elevated prices for UPP lenses regardless of where they purchased their lenses. If this were true, the pricing data would show unanimous price increases for UPP lenses throughout all channels and all retailers. But the data sets relied on by Dr. Williams clearly show otherwise. Among other things, the pricing data in this case shows:

---

[4]       In defending his failure to analyze rebates and insurance coverage, Dr. Williams claims [REDACTED] As an initial matter, Dr. Williams is wrong. [REDACTED] [REDACTED] [REDACTED] [REDACTED] Dr. Williams ignores this testimony. And, in any event, Dr. Williams's claim—even if incorrectly taken as truth—does not change the fact that certainly some consumers [REDACTED] still would have paid zero out-of-pocket cost in such a but-for world.

9



Collectively, this evidence illustrates the wide variance in contact lens pricing, thereby undermining Dr. Williams's claim that his model supports Plaintiffs' theory of common impact and proving that Dr. Williams mistakenly attributes injury to uninjured consumers.

Finally, Dr. Williams's decision to provide average overcharges by data set only—as opposed to by product—further obfuscates the inherent variation in contact lens pricing.  For instance, in order to better understand Dr. Williams's alleged ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



In sum, the evidence in this case demonstrates that serious and insurmountable pricing variances exist across consumers, and that some consumers simply were not injured by Defendants' UPPs. All of this evidence—that Dr. Williams's model ignores critical individualized purchasing factors, yields demonstrable false positives, and is generally unable to prove common impact given the different pricing practices across channels, retailers, and products—demonstrates that Dr. Williams has no meaningful or reliable evidence regarding common impact in his supplemental report, and has no substantive response to Dr. Snyder's criticisms.. The models in his supplemental report are accordingly defective. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH, ECF No. 834, at *1-2 (D.D.C. Oct. 10, 2017) (denying class certification in large part because expert's model yielded

---

[5]      Six of the Named Plaintiffs—Plaintiffs Cunha, Felson, Marean, Schirf, Smith, and Watson— purchased these lenses. (*Id*. at ¶42.)

false positives by finding impact for, and thus awarding damages to, class members who were clearly uninjured by the challenged conduct). Given the methodological failures underlying Dr. Williams's model, Dr. Williams fails to offer a viable form of common proof to prove class-wide impact in this case.[6]

## II. Dr. Williams's model fails *Daubert* scrutiny because it improperly manipulates data collected in this case, treats similar data sets differently, and does both without good reason.

Multiple changes in Dr. Williams's supplemental report also reveal that he made arbitrary and inconsistent changes to his methodology in an effort to steer his results. *See Daubert,* 509 U.S. at 591-93 (stating that expert testimony may be admitted only if "the reasoning or methodology underlying the testimony is scientifically valid"); *Finestone v. Fla. Power & Light Co.*, No. 03-14040-CIV, 2006 WL 267330, at *12 (S.D. Fla. Jan. 6, 2006) (excluding report because expert considered only a portion of the collected samples, a decision that fundamentally altered his conclusions, and provided no scientifically "justified answer" for doing so), *aff'd*, 272 F. App'x 761 (11th Cir. 2008) (unpublished); *Burst v. Shell Oil Co.*, Civil Action No. 14-109,

---

[6] Also, by focusing almost exclusively on the injury aspect of antitrust impact, Dr. Williams ignores that his regressions must show, on a class-wide basis, that each class member suffered *both* (i) an antitrust violation, and (ii) actual injury flowing from that antitrust violation. *See, e.g., Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 486 (E.D. Tenn. 2016) ("In addition to proving an antitrust violation, plaintiffs must also establish 'actual' injury 'attributable to an antitrust violation…,'" commonly referred to as antitrust impact.") (citations omitted). While Dr. Williams claims that his average overcharges are evidence that consumers paid higher prices for contact lenses, he does not explain how those purported overcharges—particularly in the context of Class Plaintiffs' vertical conspiracy allegations—also establish that the allegedly higher prices were in each case caused by a cognizable antitrust violation. By contrast ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ In conceding as much, Dr. Williams implicitly admits that many class members purchased lenses from retailers who never "agreed" with manufacturers to sell lenses at the manufacturers' UPP prices, and thus never engaged in the type of concerted behavior required to sustain a Section 1 violation. Absent proof of concerted behavior between a class member's retailer and the manufacturer of her lenses, the class member cannot show that she suffered a violation of the antitrust laws, and Dr. Williams's models provide no way to do so here. *See, e.g., Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005) ("Appellants' expert did not show that other common evidence could fill the gap in proof of class wide injury that is left by appellants' evidence that appellees performed their price-fixing agreement as to some (but not all) list prices.").

2015 WL 3755953, at *10-12 (E.D. La. June 16, 2015) (disqualifying expert because he "cherry-pick[ed] data from studies" and "manipulated data," thereby "suggest[ing] a methodology driven by an attempt to achieve a particular result."), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) (unpublished), *cert. denied,* 137 S. Ct. 312 (2016); *Equal Emp't Opportunity Comm'n v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (recognizing that courts consistently exclude expert testimony that "'cherry-picks' relevant data" and collecting cases).

First, Dr. Williams modified the B&L class definition to exclude all purchases made through 1-800 Contacts after July 1, 2015. Second, Dr. Williams included JJVCI's wholesale pricing as an independent, explanatory variable in his regressions. Third, Dr. Williams refused to consistently account for product fixed effects for JJVCI products despite doing so for Alcon and B&L lenses. As explained below, none of these decisions is supported by general economic principles or the record evidence in this case.

### A. Dr. Williams's decision to modify the B&L class is an arbitrary decision transparently motivated to skew his results.

Dr. Williams modified the B&L class definition by excluding from the class all sales of B&L UPP lenses through 1-800 Contacts after July 1, 2015. (Doc. 612, Williams Supplemental Report ¶ 5.) ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ Dr. Williams's inability to describe the

---

[7]      Dr. Williams confirmed that he did not discuss this issue with 1-800 Contacts or review any ordinary course 1-800 Contacts documents on the topic.   (Taeschler Decl., Exhibit A, Williams Supplemental Tr. 114:25-115:5.)



███████████████ This is exactly the type of arbitrary manipulation of data to produce

desired results that *Daubert* prohibits.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ In the face of these similar pricing patterns, Dr. Williams has failed to offer a

legitimate reason for inconsistently defining the B&L and Alcon classes with respect to 1-800

Contacts purchases, and his regressions thus should be excluded as unreliable. *See KW Plastics*

*v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1293 (M.D. Ala. 2001) (noting that "expert testimony

should be excluded if it contains internal inconsistencies").

**B. Dr. Williams's decision to include JJVCI's wholesale pricing as an independent explanatory variable is contradicted by the evidence in this case, and thus causes incorrect and unreliable results.**

In his supplemental report, Dr. Williams takes the new step of including JJVCI's

wholesale prices into his regressions, treating them as an independent explanatory variable. As

Dr. Williams admits, including wholesale pricing would be inappropriate if those prices were

connected to a UPP.[8] (Doc. 612, Williams Supplemental Report ¶ 105.) Following this

understanding, Dr. Williams's initial regressions correctly excluded JJVCI's wholesale prices

---

[8]     Because wholesale prices are usually lower than retail prices, their inclusion in a regression analysis could artificially lower the average pre-UPP price, thereby increasing overcharges under Dr. Williams's model. Exclusion of the wholesale prices, therefore, would be necessary if they were enacted in coordination with the UPP. Otherwise, an important aspect of the UPP's pricing effect would be left unquantified, irreparably corrupting the before-during-after analysis.

because they were connected to its UPP. Now, however, Dr. Williams claims that wholesale

prices should be included in his revised regressions, but only for JJVCI.



Equally problematic, Dr. Williams's supplemental report fails to address the testimony of

Taketo Miura, Director of Pricing, Commercial Contracts, and Advocacy at JJVCI, in which Mr.

Miura explained that

16

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

Of course, Dr. Williams had a strong incentive to ignore Mr. Miura's observations. ████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████As discussed above, *Daubert* and its

17

progeny compel exclusion where an expert's methodology and findings are not reliable because they have been cherry-picked to achieve a certain predestined result. In selectively quoting and analyzing Ms. Angelini's deposition testimony and entirely ignoring Mr. Miura's declaration and other evidence in service of inflating his overcharge estimates,, Dr. Williams has done exactly that.

### C. Dr. Williams's failure to consistently account for product fixed effects for JJVCI products renders his regressions unreliable.

As discussed above, one of the most critical modifications in Dr. Williams's supplemental report is his decision to employ a new set of "before-during-after" and "during-after" models, in which he for the first time considers the prices charged *after* the UPPs were terminated. The decision to include post-UPP prices, as Dr. Williams conceded during his deposition, allowed him to consider "product fixed effects" and also resulted in dramatically reduced overcharge figures:



During his deposition, Dr. Williams conceded that

Despite these admissions, Dr. Williams still refuses to account for product fixed effects in his "before-during" model for JJVCI products, instead controlling for only four broad product

18

characteristics—toric, sphere, multifocal, and color—in running his regressions, although he includes them in his "before-during-after" models for JJVCI.  (Doc. 678, Snyder Sur-Reply Report ¶¶ 15-16.)  In defending his decision, Dr. Williams claims 

## Conclusion

For all of the foregoing reasons, Defendants respectfully request that this Court grant their motion to exclude Dr. Williams's supplemental report pursuant to Federal Rule of Evidence 702 and *Daubert*.

## Local Rule 3.01(g) Certification

Pursuant to Local Rule 3.01(g), the undersigned certifies that Defendants have conferred with Plaintiffs' counsel, and that Plaintiffs oppose the relief sought in this motion.

DATED:   November 13, 2017

*/s/ Terrence Russell*
Terrence Russell (Florida Bar No. 116057)
Jennifer L. Kifer (Florida Bar No. 77498)
HOLLAND & KNIGHT, LLP
50 N. Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: 904-353-2000
Facsimile:  904-358-1872
Email: terrence.russell@hklaw.com
          jennifer.kifer@hklaw.com


Steven C. Sunshine
Paul M. Eckles
Luke T. Taeschler
Justine M. Haimi
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: 202-371-7860
Facsimile:  202-661-0560
Email: steve.sunshine@skadden.com
          paul.eckles@skadden.com
          luke.taeschler@skadden.com
          Justine.haimi@skadden.com


*Counsel for Bausch & Lomb Incorporated*

Robert Troy Smith (Florida Bar No. 485519)
GRAYROBINSON, P.A.
50 N Laura Street, Suite 1100
Jacksonville, FL 32202-3611
Telephone: 904-632-8483
Facsimile:  904-598-9109
Email: troy.smith@gray-robinson.com

William F. Cavanaugh, Jr.
Jonathan H. Hatch
J. Taylor Kirklin
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: 212-336-2000
Facsimile:  212-336-2222
Email: wfcavanaugh@pbwt.com
          jhatch@pbwt.com
          jtkirklin@pbwt.com

*Counsel for Johnson & Johnson Vision Care, Inc.*

A. Graham Allen (Florida Bar No. 117110)
James. M. Riley (Florida Bar No. 700411)
Samuel J. Horovitz (Florida Bar No. 0059015)
ROGERS TOWERS, P.A.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, FL 32207
Telephone: 904-398-3911
Facsimile:  904-396-0663
Email: gallen@rtlaw.com
          shorovitz@rtlaw.com

David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: 212-474-1000
Facsimile:  212-474 3700
Email: dmarriott@cravath.com

*Counsel for Alcon Laboratories, Inc.*

Dennis P. Waggoner (Florida Bar No. 509426)
HILL WARD HENDERSON
101 East Kennedy Boulevard, Suite 3700
Tampa, FL 33602
Telephone: 813-227-8426
Facsimile:  813-221-2900
Email: dennis.waggoner@hwhlaw.com

Edwin John U (*pro hac vice*)
Patrick J. King (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: 202-879-5000
Facsimile:  202-8795200
Email: Edwin.u@kirkland.com
          Patrick.king@kirkland.com

*Counsel for ABB Optical Group*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2017, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to

all CM/ECF participants.

Dated: November 13, 2017

 /s/ Jennifer L. Kifer
HOLLAND & KNIGHT, LLP
50 N. Laura Street, Suite 3900
Jacksonville, FL 32202
T: 904-353-2000
jennifer.kifer@hklaw.com
