UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 |
| | Master Docket No. 18-cv-864 |
| | Judge Rebecca R. Pallmeyer |

## MOTION TO INTERVENE AND
## FOR LEAVE TO FILE OBJECTION TO DISTRIBUTION PLAN

Pursuant to Federal Rule of Civil Procedure 24, Financial Recovery Services, Inc. ("FRS, Inc.") and Financial Recovery Services, LLC ("FRS LLC," and together with FRS, Inc., "FRS") hereby move, on the grounds set forth below, to intervene and for leave to file the Objection to Distribution Plan attached as Exhibit A.

### INTRODUCTION

FRS is a third-party claim filer ("TPF") that has filed over 1,000 proofs of claim on behalf of hundreds of eligible claimants in connection with the two settlements of this MDL.[1] FRS now seeks to intervene to prevent Dealership Class Counsel and the Settlement Administrator from usurping this Court's authority and thus depriving FRS's clients ("Clients") of their rights to settlement proceeds while fatally undermining FRS's contractual rights to receive, as compensation for the valuable services it provided, direct payment of its clients' distributions.

This Court "retain[ed] and reserve[d] exclusive and continuing jurisdiction over all parties to the MDL Action, all Dealership Class Members, and the Settlement Fund to consider all further

---

[1] From July 2008 through early 2018, all claims management services were provided by FRS, Inc. Thereafter, all such services were provided by FRS, LLC. Unless defined herein, all capitalized terms shall have the same meaning as in the Settlement Agreement Between the Dealership Class and CDK, ECF No. 1528-2.

matters arising out of or connected with the [CDK Settlement] Agreement," ECF No. 1545 at ¶23, and ordered that all distributions of the Net Settlement Fund shall be "[u]pon further orders of the Court," ECF No. 1528-2 at ¶16 (CDK) and ECF No. 427-2 at ¶17 (Reynolds). Notwithstanding that directive, Dealership Class Counsel and the Settlement Administrator recently advised FRS and other TPFs that they will ignore express contractual provisions between TPFs and their Clients by sending distributions directly to the Clients and, without even notifying the Court, much less obtaining its approval, already have taken steps to do so. This punitive behavior towards TPFs undermines the vital role that TPFs serve in all class actions in which they participate. It also starkly contrasts with Dealership Class Counsel's own approach when it acts as a TPF and contractually requires direct payment to it of its share of distributions.

Dealership Class Counsel and the Settlement Administrator also are violating Rule 23(e)(2)(D), which requires settlements to treat class members equitably relative to each other, by treating Clients that entered TPF contracts delimited by timeframe less favorably than similarly situated Clients that entered otherwise identical settlement-specific contracts.

And Dealership Class Counsel and the Settlement Administrator are making the claims process more burdensome and, in many instances, impossible, for members of the respective Settlement Classes (collectively, "Settlement Class Members") by rejecting proofs of claim ("POCs") for which the corresponding client contract expressly covers all of a Client's organizational structure but that did not list by name each rooftop, or that did not include certain "required" information and documentation (the "Required Documentation") even though Dealership Class Counsel and the Settlement Administrator already have that information from CDK and may easily have obtained it—and may still do so—from Reynolds.

As a result of these extrajudicial actions, some Settlement Class Members will receive less than they should, and others nothing at all. As troubling, TPFs, which have been representing clients in this MDL for years, will be deprived of their bargained-for contractual rights and instead face substantial delay, expense, and uncertainty in connection with otherwise unnecessary collection efforts. Clients that receive direct payment of their distributions may very well attempt to renegotiate, delay payment, or refuse to pay TPFs at all.

FRS, therefore, brings this application to intervene and file the attached objection to protect the direct interests that FRS and its Clients have in the Net Settlement Fund before any distributions are made, preserve the integrity of the claim filing and administration process, and prevent the irreparable harm that will occur and dangerous precedent that will be set if Dealership Class Counsel and the Settlement Administrator are permitted to proceed as planned.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. FRS's Client Contracts

FRS uses two forms of contracts with its clients (each, a "Client Contract"). One form of Client Contract explicitly specifies the settlement or settlements to which it applies (the "Settlement Specific Client Contract"). *See* Leibell Decl., Ex. 2. The other form of Client Contract (the "Durational Client Contract") is delineated by a definitive period (*e.g.*, one or more years). *See id.*, Ex. 3. Both forms of Client Contract: (i) appoint FRS as the "exclusive recovery agent" for Clients with the authority to prepare, file, and manage the claims process; (ii) include a provision pursuant to which each Client engages FRS on behalf of "all of its subsidiaries and affiliates"; and (iii) expressly provide that all distributions are to be sent directly to FRS, and that

---

[2] A more detailed statement of facts is set forth in the accompanying Declaration of Jeffrey N. Leibell, FRS's Chief Legal & Financial Officer (the "Leibell Decl.").

FRS shall then disburse "all such proceeds to its Clients less FRS' compensation." *Id.* And in 165 of the 275 Client Contracts at issue, FRS's Clients expressly assigned to FRS ownership of either a portion of the Client's recovery or of the Client's right to recover. *See id.*

It is a standard practice for TPFs to be paid directly from the proceeds of a class action settlement. In fact, Dealership Class Counsel, Milberg Coleman Bryson Phillips Grossman, PLLC ("Milberg"), when it serves as a TPF in class action litigation, uses contracts with its clients that require claim administrators to pay Milberg directly its fee for TPF services. *See* Leibell Decl., Ex. 5.

**B.     The DMS Settlements**

This matter settled for a total of $129.5 million, consisting of a $29.5 million settlement with Reynolds and a $100 million settlement with CDK. *See* ¶ 31.

In October of 2018 and August of 2024, respectively, Class Counsel filed its applications for preliminary approval of the settlements with Reynolds and CDK. Neither the applications for preliminary approval nor any of the court-approved documents—including the allocation plan, the public notice, and the POC—disclose any intention to distribute the Net Settlement Fund to the clients of TPFs rather than to TPFs, or express any of the purported concerns that were only recently raised by Dealership Class Counsel and the Settlement Administrator regarding the validity of FRS's Client Contracts. *See* Leibell Decl. ¶ 37; ECF Nos. 427, 432, 1528.

By Orders dated January 23, 2019, and February 25, 2025, respectively, the Court granted final approval of the Reynolds and CDK Settlements (the "Final Approval Orders"). *See* ECF Nos. 502, 1545. The Final Approval Orders expressly provide that the Court has retained jurisdiction over "all further matters arising out of or connected with the Agreement" and require Dealership Class Counsel "to consummate the Settlement with [the DMS Defendants] set forth in the

[Settlement] Agreement[s] in accordance with [their] terms," *id*, which, in turn, direct that distribution of the Net Settlement Fund shall be "[u]pon further orders of the Court." ECF No. 427-2 at ¶17; ECF No. 1528-2 at ¶16.

## C.   The Relevant Events Concerning the Claims Process

FRS began filing POCs on January 6, 2025, and, as of today, has filed 786 POCs on behalf of 275 Clients. *See* Leibell Decl. ¶ 49. FRS has 236 Clients for which it could not obtain the Required Documentation. *See id.* ¶ 51. For those Clients, FRS submitted a declaration from its Chief Legal & Financial Officer that detailed FRS's efforts to obtain that information and requested that the documents be provided by the DMS Defendants. *See id.* ¶ 53, Ex. 8.

By email dated January 8, 2025, CDK's General Counsel advised FRS that Dealership Class Counsel already had the information that FRS was requesting: "I would refer you to class counsel for the dealers who should have the schedule you requested." *Id.*, Ex. 9. Yet at no time did the Settlement Administrator or Dealership Class Counsel advise FRS or, to FRS's knowledge, any other TPF, that Dealership Class Counsel already had obtained from CDK—and could easily have done so from Reynolds—the information necessary to render submitting the Required Documentation irrelevant.

Since it began filing POCs, FRS has been in regular communication with the Settlement Administrator concerning the progress of the administration, including eighteen email inquiries to which the Settlement Administrator has responded. *See id.*, Ex. 10. At no time during these exchanges did either the Settlement Administrator or Dealership Class Counsel express to FRS any concern about the legitimacy of FRS's representation of its Clients. *See id.* ¶ 55.

In or around January 2025, FRS was advised by another TPF, Slateshore Recovery ("Slateshore"), that Slateshore had been informed by the Settlement Administrator that Dealership

Class Counsel intended to ignore the express provisions set forth in Client Contracts and, instead, send all distributions directly to clients of TPFs. *See id.* ¶ 58, Ex. 11. On February 27, 2025, the Settlement Administrator advised FRS, for the first time, that distributions would be sent to FRS's Clients rather than to FRS. *See id.* ¶ 59, Ex. 12.

During a March 24, 2025 call between counsel for FRS and Dealership Class Counsel from Milberg, the only reason provided by Dealership Class Counsel for not sending distributions directly to TPFs was that, according to Dealership Class Counsel, there was an unusually high rate of ownership turnover among dealerships and, therefore, sending distributions to clients of TPFs rather than to TPFs would reduce the likelihood of paying ineligible claimants. *See id.* ¶ 61. During that call, Dealership Class Counsel also noted that: (i) it may reject Client Contracts that were not specific to the DMS Settlements (*i.e.*, FRS's Durational Client Contracts); and (ii) unless FRS provided a Client Contract between the current owner of each rooftop and the corresponding Defendant, the corresponding POC would be rejected. *See id.*

On June 14, 2025, FRS sent to Dealership Class Counsel a letter responding to Dealership Class Counsel's purported concerns. *See id.*, Ex. 13. Shortly thereafter, Dealership Class Counsel provided to Slateshore the same explanation for its refusal to pay TPFs directly, and further stated that, although it serves as lead class counsel in connection with many other settlements and requires direct payment of its compensation when it acts as a TPF, it never pays TPFs directly. *See* accompanying Declaration of Marc Jacobson, Esq.

By email dated June 21, 2025, the Settlement Administrator, for the very first time, challenged FRS's authority to represent its Clients and deemed 439 POCs filed by FRS on behalf of 107 Clients to be deficient because the Client Contracts did not separately identify by name each rooftop. *See* Leibell Decl., Ex. 14.

By emails dated August 29, 2025 and September 3, 2025, the Settlement Administrator (i) advised that it "will be issuing payments in the form of a check mailed directly to the approved rooftops and will not be issuing payments to any third-party filer," (ii) requested that FRS provide the correct mailing addresses and representatives names for those of FRS's Clients with approved claims, and (iii) threatened to look up Client addresses so that it could send distributions directly to clients. *Id.*, Exs. 15.

## ARGUMENT

Under Rule 24, FRS should be permitted to intervene as of right or, at a minimum, permissively. Moreover, as discussed further below, there are considerations in addition to the standard Rule 24 criteria that make intervention all the more warranted in this case.

### I.  FRS Should be Permitted to Intervene as of Right.

A party may intervene as of right if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Here, FRS satisfies all four criteria that the Seventh Circuit has established as entitling a party to intervene as of right: "(1) [its] motions to intervene were timely; (2) [it] possess[es] an interest related to the subject matter of the ... action; (3) disposition of the action threatens to impair that interest; and (4) the parties fail to represent adequately [its] interests." *S.E.C. v. Falor*, 270 F.R.D. 372, 375 (N.D. Ill. 2010) (internal citations omitted).

**First**, FRS possesses an interest inextricably related to the subject matter of the action. Apart from the Class Members themselves, there is no person or entity with a greater interest in the only remaining stage of this litigation—the distribution of the settlement proceeds—than FRS and other TPFs. As previously detailed, FRS's Client Contracts: (i) appoint FRS as the "exclusive

recovery agent" for its Clients with the authority to prepare, file, and manage the claims process in exchange for a fee in the form a designated portion of the Clients' share of the settlement proceeds; (ii) plainly state that FRS's retention and authority extend to its and "all of its affiliated businesses and subsidiaries" and "all related entities and locations"; (iii) expressly provide that the entirety of the Client's share of the settlement proceeds are to be paid directly to FRS to ensure that FRS collects its compensation; and (iv) in most instances, assign to FRS an ownership interest to a portion of the claim. Leibell Decl., Exs. 2, 3.

FRS, therefore, possesses an "interest" sufficient to permit intervention as of right. *See, e.g., Lake Investor Dev. Grp., Inc. v. Egidi Dev. Grp.*, 715 F.2d 1256, 1258 (7th Cir. 1983) (security interest in property sufficient to permit intervention in litigation concerning sale of that property); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 593 (N.D. Ill. 1998) ("An interest in a specific settlement fund likewise satisfies Rule 24(a)'s interest prong[.]"); *United States v. Thorson*, 219 F.R.D. 623, 626 (W.D. Wis. 2003) (insurance company's contractual rights sufficient to permit intervention).

***Second***, absent intervention, FRS's ability to protect its interests will be impaired. Impairment exists when, absent intervention, the proposed litigants' rights or ability to protect their interests would be materially changed or extinguished. *See, e.g., Lake Invs. Dev. Grp., Inc. v. Egidi Dev. Grp.*, 715 F.2d 1256, 1260 (7th Cir. 1983) (finding that a litigant's interest would be impaired absent intervention because its rights under the contract would be extinguished); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 593 (N.D. Ill. 1998) (allowing intervention when a class member's interest in a settlement fund could be impaired).

That is a virtual certainty here. As detailed above, Dealership Class Counsel and the Settlement Administrator have made clear that they will take certain actions that are nowhere to

be found in the court-approved settlement notices and orders, that deviate significantly from standard practice, and that will substantially interfere with and extinguish FRS's contractual rights. Further, their willingness to act without judicial authorization notwithstanding this Court's retention of jurisdiction of these matters and, as set forth in the settlement agreements that the Court has approved, the requirement that distributions shall be "[u]pon further orders of the Court," *e.g.*, ECF No. 1528-2, ¶ 16, make this urgent.

In connection with each Client Contract, FRS bargained for the right to receive distributions directly precisely to avoid the expense and delay that certainly would be occasioned by sending distributions to its Clients. FRS has been incurring costs since the settlement with Reynolds was made public. And like class counsel, FRS should not be required, given FRS's bargained-for contractual rights, to wait even longer to receive its compensation. Moreover, FRS's Clients that receive their distributions directly may attempt to negotiate a lower fee or not pay FRS at all. By refusing to (i) send distributions directly to FRS and insisting instead on paying the entirety of them to its Clients, and (ii) honor FRS's Durational Client Contracts when there is no legally significant difference between those contracts and the Settlement Specific Client Contracts, Dealership Class Counsel and the Settlement Administrator will undoubtedly interfere with, and potentially negate, FRS's ability to collect the compensation it earned for providing to its Clients valuable claims filing and management services.

Likewise, by refusing to honor POCs for a purported failure to provide the Required Documentation when they either possess or can obtain it from the DMS Defendants, Dealership Class Counsel will deprive both FRS and the Clients, on behalf of which those POCs were filed, of their shares of the Net Settlement Fund. That is more than sufficient to satisfy the impairment element. *See Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 368

(3d Cir. 1995) (holding that the disposition of the underlying dispute might impair the intervenors' interests because it could result in a reduction or complete depletion of particular insurance proceeds of which the intervenors were beneficiaries); *Citibank, N.A. v. Park-Kenilworth Indus., Inc.*, 109 B.R. 321, 324 (N.D. Ill. 1989) (permitting bankruptcy trustee to intervene where a judgment in favor of plaintiff in the litigation might result in the loss of a valuable asset of the bankruptcy estate).

***Third***, FRS's interests are not adequately represented. "[T]he Supreme Court in articulating the standard under this ... element of Rule 24(a)(2) has stated that this 'requirement of the Rule is satisfied if the applicant shows that representation of his interest may be inadequate; and the burden of making that showing should be treated as minimal.'" *Lake Investors Development Group,* 715 F.2d at 1261 (citing *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n.10 (1972)).

In this instance, none of the participants in the litigation represent FRS's interests. To the contrary, Dealership Class Counsel and the Settlement Administrator have engaged in acts that, in other litigation contexts, would undoubtedly give rise to a claim of tortious interference. *See, e.g., Tele-Port, Inc. v. Ameritech Mobile Comm'ns, Inc.*, 49 F. Supp. 2d 1089 (E.D. Wis. 1999) (holding that sales agent business sufficiently alleged claim for intentional interference with contractual relations against competing business when competitor induced mutual client to change its development payments in order to secure unfair competitive advantage); *Rodin Properties–Shore Mall, N.V. v. Cushman & Wakefield of Pennsylvania, Inc.*, 49 F. Supp. 2d 728 (D.N.J. 1999) (holding that investors in financing company intentionally interfered with contract between mall owner and financing company by causing financing company to reject expansion proposals so that the investors could gain control over mall for their own benefit).

***Fourth,*** Dealership Class Counsel failed to disclose in any of the settlement notices or orders that it planned to ignore the contractual rights of TPFs by sending distributions directly to class members, including Clients. Throughout the parties' many contemporaneous communications, Dealership Class Counsel and the Settlement Administrator continued to conceal their intentions concerning distributions, and failed to disclose their purported concerns regarding the validity of the Durational Client Contracts or of the contractual provisions that include retention of FRS for the entirety of the Clients' organizational structure. Then, Dealership Class Counsel and the Settlement Administrator threatened to reject POCs for failure to provide the Required Documentation (including, most notably, the DMS contracts between FRS's clients and Defendants) even though Dealership Class Counsel and/or the Settlement Administrator had possession of, or could obtain all Required Documentation directly from, the DMS Defendants. And now that distributions are imminent, Dealership Class Counsel and the Settlement Administrator have finally revealed that, absent judicial intervention, they will indeed send the entire distributions directly to the clients of TPFs.

These actions are particularly egregious considering that: (i) when Dealership Class Counsel competes with FRS and acts as TPF, its own contracts require direct payment of its fees to it; and (ii) Dealership Class Counsel's purported reason for refusing to pay TPFs—that dealership "rooftops" change ownership frequently—does not withstand any level of scrutiny.

***Fifth***, FRS's application is timely. The test for timeliness is "essentially one of reasonableness: potential interveners need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Reich v. ABC/York–Estes Corp.*, 64 F.3d 316, 321 (7th Cir.1995). Thus, a motion to intervene is timely when the intervenor acts "soon after" it becomes clear that its interests are not being adequately represented

in the action. *Alcarez v. Akorn, Inc.*, 99 F.4th 368, 375 (7th Cir.), *cert. denied,* 145 S. Ct. 377, 220 L. Ed. 2d 142 (2024) (motion was timely when intervenor moved "soon after learning of the mootness fees" that were subject of motion); *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881 (7th Cir. 2000) (motion to intervene was timely when filed shortly after class members learned of potentially inadequate settlement). In considering whether an application to intervene is timely, courts also consider several factors, including "'(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; [and] (4) any other unusual circumstances.'" *López-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 388 (7th Cir. 2019) (quoting *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000)).

Here, FRS could not have been more prompt or diligent in protecting its interests. On February 27, 2025, immediately after Dealership Class Counsel indicated its intention not to send distributions to TPFs, FRS sought to engage in discussions with Dealership Class Counsel with the hope of amicably resolving their disputes. As soon as it became apparent that no resolution would be reached, FRS sent a letter to Dealership Class Counsel formally objecting to its proposal to pay Settlement Class Members directly. And when FRS received no response, it promptly sought to intervene in this action.

## II.    Alternatively, FRS Should be Permitted to Intervene Permissively.

In the alternative, FRS should be permitted to intervene permissively. *See* Fed. R. Civ. P. 24(b)(2). To permissively intervene, a non-party must show that "(1) it shares a common question of law or fact with a party, (2) its application is timely, and (3) the court has independent jurisdiction over its claims." *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 589 (N.D. Ill. 1998). "In deciding whether to permit intervention under Rule 24(b), courts generally consider the same

factors that are relevant as of right under Rule 24(a)(2)." *Olin Corp. v. Lamorak Ins. Co.*, 325 F.R.D. 85, 87 (S.D.N.Y. 2018).

Applying the applicable principles and standards, there is also no question that FRS is entitled permissively to intervene under Rule 24(b). ***First,*** though there are no remaining common questions of law or fact with respect to the underlying claims against the DMS Defendants because the case has been settled, FRS shares a common interest with the significant number of Settlement Class Members that are FRS's Clients and on behalf of which FRS served as their "exclusive agent" in the filing and pursuit of eligible POCs. That shared interest is particularly profound with respect to the many FRS Clients that may have their claims rejected because neither FRS nor the Client could obtain the Required Documentation, all of which is in the possession, custody, and/or control of Dealership Class Counsel.

***Second,*** the Court retained jurisdiction over "all further matters arising out of or connected with the [Settlement] Agreement." ECF Nos. 502, 1545.

***Third,*** as discussed above, FRS's motion to intervene is timely because it was filed soon after it became clear that FRS's rights were being threatened by Dealership Class Counsel and the Settlement Administrator.

***Fourth,*** given that this matter has been settled and FRS's interests pertain solely to the administration of claims and the distribution of the Net Settlement Fund, intervention will not unduly delay or prejudice the adjudication of the rights of the original parties.

## III. Additional Considerations Militate in Favor of Permitting FRS to Intervene.

While FRS easily satisfies the elements required to intervene under both sections of Rule 24, there are other compelling reasons why intervention should be granted. First and foremost, the proposed actions to be taken by Dealership Class Counsel and the Settlement Administrator pose a very real threat to the entire TPF sector, and, by extension, the essential

13

purpose of class actions—that is, to include in settlement recoveries as many class members as possible. *See In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018) ("Ultimately, '[t]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible.'") (quoting 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 12:15, *Methods for determining individual awards* (5th Ed.) (Westlaw 2018)); *Jamie S. v. Milwaukee Pub. Schs.*, No. 1-C-928, 2009 WL 2225419, at *2 (E.D. Wis. July 22, 2009) ("The aim of this litigation is to ensure that all reasonable steps are taken to ensure that as many class members as possible are provided with the remedy to which they are entitled.").

Permitting Dealership Class Counsel and the Settlement Administrator to (i) ignore the clear contractual rights of FRS and other TPFs to receive the entirety of their Clients' distributions and instead send the entirety of those distributions directly to the TPFs' Clients, (ii) disregard Client Contracts simply because they are not specific to a particular settlement, and/or (iii) deny claims based on a lack of required documentation and/or information when that documentation and/or information is in the possession of, or readily accessible to, class counsel and/or the administrator, would represent an abandonment of standard practices, completely upend TPF practice, jeopardize the substantial value that TPFs provide to their Clients and bring to the administration process, and effectively deny class members relief to which they are entitled.

In addition, given that the Final Approval Orders expressly provide that "the Court reserves and retains exclusive and continuing jurisdiction over all parties to the MDL Action, all Dealership Class Members, and the Settlement Fund to consider all further matters arising out of or connected with the Agreement," Leibell Decl. Exs. 11 & 12, FRS's objections to the proposed actions to be taken by Dealership Class Counsel and the Settlement Administrator necessarily will be presented

to, and adjudicated by, this Court regardless of whether that occurs by way of intervention in this existing action or through an entirely new and separate litigation.

That is true even with respect to any disputes that may arise between FRS and its Clients if Dealership Class Counsel and the Settlement Administrator were permitted to send distributions directly to FRS's Clients and the Clients refused to pay FRS's compensation. Indeed, in *Cascade Settlement Services LLC v. ADT LLC*, No. 25-cv-01453-JST (N.D. Cal. July 31, 2025), the United States District Court for the Northern District of California granted a motion to transfer to the United States District Court for the Eastern District of New York a dispute between two claimants concerning the ownership of certain claims filed in connection with *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-MD-1720 (E.D.N.Y.), precisely because the Eastern District had presided over that multi-district litigation and, as did this Court, retained exclusive jurisdiction over all matters related to the settlement and its distribution. *See Cascade*, No. 25-cv-01453-JST (N.D. Cal. July 31, 2025), ECF No. 41.

## CONCLUSION

For all these reasons, FRS respectfully requests that the Court authorize FRS to intervene and to file the attached objection to certain aspects of the proposed distribution plan.

Dated: September 12, 2025        Respectfully submitted,

*/s/ Dylan Smith*

Dylan Smith
COTSIRILOS, POULOS & CAMPBELL, LTD.
55 East Monroe Street
Suite 3250
Chicago, Illinois 60603
(312) 263-0345
dsmith@cotsiriloslaw.com

Eric T. Kanefsky
Kevin Musiakiewicz
(*pro hac* motions forthcoming)
CALCAGNI KANEFSKY LLP
1085 Raymond Boulevard
18th Floor
Newark, New Jersey 07102
(862) 397-1796
Eric@ck-litigation.com
Kevin@ck-litigation.com

*Attorneys for Proposed Intervenors*
*Financial Recovery Services, Inc., and*
*Financial Recovery Services, LLP*