**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817<br>Case No. 18-cv-00864 |
| **This Document Relates To:** | Honorable Rebecca R. Pallmeyer |
| **THE DEALERSHIP CLASS ACTION** | |

**DEALERSHIP PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
DISTRIBUTION OF NET SETTLEMENT PROCEEDS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................................................ii

I. INTRODUCTION ................................................................................................................1

II. BACKGROUND.................................................................................................................2

    A. Claims Administration ................................................................................................2

        1. The Court-Approved Claims Process was Successfully Carried Out..............................2

        2. Epiq Verified Each Claim was Valid and Accurate...........................................................5

        3. The Audit Process was Thorough .......................................................................................6

    B. Administration Costs....................................................................................................6

    C. Calculation of Class Member Allocations...................................................................7

    D. Distribution of the Net Settlement Fund ....................................................................8

III. ARGUMENT .....................................................................................................................9

    A. The Court Should Approve the Recommendations of the Claims Administrator and Lead Counsel Concerning Acceptance or Rejection of Claims ..........................................10

    B. Late But Otherwise Valid Claims Should be Paid.....................................................11

    C. The Court Should Permit Direct Distributions to Third-Party Filers who Submitted Indemnification Agreements..............................................................................................12

    D. The Court Should Authorize Payment of Outstanding Costs .............................................14

IV. CONCLUSION ...............................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**

*Contant v. AMA Capital, LLC,*
66 F.4th 59 (2d Cir. 2023) ........................................................................................10

*In re Agent Orange Prod. Liab. Litig. MDL,*
No. 381, 818 F.2d 179 (2d Cir. 1987) ......................................................................11

*In re Broiler Chicken Antitrust Litig.,*
Case No. 1:16-cv-08637, ECF No. 5434 (N.D. Ill. Feb. 11, 2022) ........................11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
No. C 06-4333 PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013)........................10

*In re Motorola Securities Litig.,*
Case No. 1:03-cv-00287, ECF No. 557 (N.D. Ill. Mar. 16, 2009)..........................11

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.,*
2018 WL 1138541 (N.D. Ill. Mar. 2, 2018) ...........................................................11

*Lopez v. Apple Inc.,*
No. 4:19-cv-04577-JSW, ECF No. 364 (N.D. Cal. June 13, 2025) ........................13

*Sec. & Exch. Comm'n v. AR Cap., LLC,*
No. 19 CIV. 6603 (AT), 2021 WL 1988084, at 12 (S.D.N.Y. May 18, 2021) ....................14

*Waldman ex rel. Elliot Waldman Pension Tr. v. Riedinger,*
423 F.3d 145 (2d Cir. 2005) ....................................................................................10

**Statutes and Rules**

Fed. R. Civ. P. 23....................................................................................................3

28 U.S.C. § 1715(b) ................................................................................................3

**Other Authorities**

*In re Barclays PLC and Barclays Bank PLC,* Release No. 34-103625 (SEC Aug. 1, 2025)...14

*In re Impact Theory, LLC,* Release No. 101959 (SEC Dec. 18, 2024)....................14

*In re Weatherford Int'l PLC,* Release No. 100154 (SEC May 15, 2024)................13

*In re Wells Fargo & Co.,* Release No. 90898 (SEC Jan. 11, 2021) ........................13

## I. INTRODUCTION

Dealership Plaintiffs hereby seek the Court's approval of their proposed plan to distribute the $83,293,000 Net Settlement Fund[1] to qualified claimants. This Motion and the plan of distribution are pursuant to the terms and conditions of CDK and Reynolds ("Defendants") Settlement Agreements in this case.[2] Dealership Plaintiffs propose that the Net Settlement Fund be allocated and distributed according to the Allocation Plan[3] approved by the Court in its final order approving the CDK settlement. ECF 1545. The Court-approved Allocation Plan mandated a *pro rata* distribution. ECF 1528, Ex. B. As found by the Court, Class Members received notice of this Allocation Plan and were given an opportunity to object, and Dealership Plaintiffs received no objections. *See* ECF 1545 ¶ 12. As further stated by the Court, "the Allocation Plan provides a fair, reasonable and adequate method to allocate settlement funds to members of the CDK Settlement Class and the Reynolds Settlement Class." *Id.* ¶ 13. The proposed distributions provide for execution in accordance with the Allocation Plan's explicit terms.

The Court-appointed Settlement Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), in consultation with Lead Counsel, disseminated notices to a total of 24,829 potential Settlement Class Members (98.4%), administered the claims process, and evaluated each Claim Form to determine eligibility. *See Declaration of Stephanie Amin-Giwner in Support of Plaintiffs' Motion for Distribution* ¶¶ 6 ("Amin-Giwner Decl."). All Settlement Class Members who were sent an initial settlement notice (based upon Defendants' data) were assigned a unique ID and PIN,

---

[1] The term "Settlement Fund" refers to the $129,750,000 paid by the Defendants CDK and Reynolds into escrow accounts. The term "Net Settlement Fund" refers to the Settlement fund plus accrued interest and minus (i) the costs of settlement administration and escrow, and (ii) the attorneys' fees, litigation expenses, and class representative incentive awards already distributed (See ECF 1545). As more fully set forth in Section II.B below, the Net Settlement Fund equals $83,293,000.

[2] References to the settlement agreements include the Settlement with Defendant The Reynolds and Reynolds Company ("Reynolds") on November 7, 2018, and the Settlement with Defendant CDK Global, LLC ("CDK") on August 23, 2024. (ECF 432 and 1531).

[3] *See* ECF 1528, Exh B.

which enabled them to submit a Claim Form through the Settlement Website. *Id*. Potential Settlement Class Members who did not receive an initial notice were able to contact Epiq to request a lookup of their unique ID and PIN. Epiq received no fewer than 6,700 requests for a unique ID and PIN between September 2024 and the Claims Filing Deadline in January 2025. *Id*. ¶ 13. Where requests originated from Third-Party Claim Filers ("TPFs"), Epiq required documentation establishing the TPF's authority to act on behalf of the claimant prior to releasing login credentials. *Id*.

As a result of these efforts, Epiq received 10,667 Claim Forms, reflecting an overall claims rate of approximately 42%. This reflects a strong claims rate for a class action case. Of these, TPFs submitted 6,552 Claims Forms (61%), while 4,115 Claims Forms (39%) were submitted directly by purported Rooftops. *Id*. ¶ 14. Epiq has vetted the submitted claims, and eligible claims are now recommended for approval by the Court. The total claims recommended for approval to be paid are 7,373, of which 4,009 are TPF claims (54%). *Id*. ¶ 15.[4]

## II. BACKGROUND

### A. Claims Administration

The Court appointed Epiq as the Settlement Administrator for the Settlement with Reynolds on November 7, 2018, and for the Settlement with CDK on August 23, 2024. ECF Nos. 431 and 1531. As more fully detailed in the filed declaration of Stephanie Amin-Giwner on behalf of Epiq, the claims process was carried out in accordance with the approved Allocation Plan filed on August 16, 2024, and approved on August 23, 2024.[5]

### 1. The Court-Approved Claims Process was Successfully Carried Out

---

[4] The 7,373 claims approved to be paid includes 221 claims filed after the deadline but are otherwise payable. Amin-Giwner Decl. ¶ 32. *See* Argument II.B. below.
[5] *See* CDK Preliminary Approval Order ECF 1531, ¶ 12.

Following preliminary approval of the Reynolds Settlement[6] on November 7, 2018, and the CDK Settlement[7] on August 23, 2024, Epiq fully implemented each Court-approved Notice Plan in compliance with all applicable legal standards. *See Supplemental Declaration of Cameron R. Azari, Esq. Regarding Implementation and Adequacy of Settlement Notice Plan and Notices* dated January 22, 2025. ECF 1540. In its January 23, 2019 final approval order of the Reynolds Settlement, the Court found that Epiq complied with the Preliminary Approval Order and that the form and manner of notice to the Lead Class constituted the best notice practicable under the circumstances, providing due and adequate notice and satisfying Rule 23, 28 U.S.C. § 1715(b), and constitutional due process. ECF 502. The Court reached the same conclusion in approving the CDK settlement, determining that the Court-approved Notice Plan was fully implemented and satisfied all applicable legal requirements. ECF 1545.

In the Reynolds settlement, beginning September 23, 2024, Epiq mailed individual notice by first-class mail to approximately 15,643 Dealership Class Members after address verification, with follow-up address research and re-mailing yielding a projected final reach in excess of 90% of the class. ECF 479-2 (Azari Dec. in Support of Motion for Final Approval of Reynolds Settlement). Notice was supplemented through multiple channels, including publication in the national edition of *Automotive News* (weekly circulation of 56,684), industry-targeted internet notice campaigns (which delivered approximately 34,547 impressions), a dedicated settlement website that had received 1,385 unique visitors, and a toll-free telephone line that received 68 calls totaling 441 minutes. *Id.* ¶ 15-23. The Reynolds settlement had no objections, and 333 opt-outs. Amin-Giwner Decl ¶ 14. The number of opt-outs to the Reynolds settlement who have filed a claim to recover in both settlements is 166. *Id.*; Williams Decl. ¶ 7 n.4.

---

[6] *See generally* Reynolds Preliminary Approval Order (ECF 432).
[7] *See generally* CDK Preliminary Approval Order (ECF 1531).

3

For the CDK settlement, Epiq disseminated individual notice by email and/or first-class mail to identified Settlement Class Members using consolidated and non-duplicated defendant-produced data, with the individual notice efforts reaching 98.4% of the CDK Settlement Class Members. Amin-Giwner Decl. ¶ 6. Specifically, Epiq sent 15,996 Email Notices to 14,287 identified CDK Settlement Class Members for whom a valid email address was available. *Id*. ¶ 9. Epiq sent 10,948 postcard mail notices to all identified CDK and Reynolds Settlement Class members with an associated physical address for whom a valid email address was not available. Subsequently, 2,251 Mail Notices were sent to CDK Settlement Class Members with an associated mailing address for whom the Email Notice was returned as undeliverable after several attempts. ECF 1540. Amin-Giwner ¶ 6. These efforts were further supplemented by publication in the national edition of *Automotive News* (weekly circulation of 64,547), industry-targeted internet notice campaigns (which delivered approximately 95,021 impressions), a nationwide informational release, a settlement website, and a toll-free telephone number available 24 hours a day. The CDK settlement had no objections or opt-outs. *Id*. ¶ 26.

Each form of notice provided to Dealership Class Members directed them to the publicly available settlement website, which was continuously accessible and prominently displayed the Settlement Agreements, the proposed Allocation Plan, the Long-Form Notice, and detailed instructions regarding Class Members' rights. Amin-Giwner Decl. ¶ 7. Through these notices, Class Members were expressly advised of their right to object to the settlements and the Allocation Plan, the procedures for doing so, and the deadlines for objections. *Id.* Class Members were afforded ample time to review the settlement materials, submit written objections to the Court, or seek exclusion from the Settlement Classes, and those who raised issues concerning their claim submissions were given the opportunity to cure deficiencies with additional documentation. Amin-

Giwner Decl. ¶ 16, ECF 1540. Epiq accepted new claims forms and supporting documentation through November 14, 2025 – more than ten months after the approved submission deadline of January 10, 2025 which afforded class members ample time to supplement their claims. Amin-Giwner Decl. ¶ 19

### 2. Epiq Verified Each Claim was Valid and Accurate

Epiq implemented sufficient verification procedures to ensure each approved claim was valid and accurate. To be approved for payment, Claim Form submissions were required to be free of material defects, and accompanied by sufficient documentation substantiating the claimed dates of Dealer Management System ("DMS") usage. Amin-Giwner Decl. ¶ 16. For claims filed by a Third-Party Filer ("TPF"), a fully executed representation agreement was also required which included the signatures of the class member and the date of the agreement. *Id.* Sufficient documentation could include (but was not limited to): copies of signed exhibits to Master agreements that lay out the term or length of the contract(s) for the entire time a Rooftop was using the Reynolds and/or CDK DMS during the Class Period, invoices from Reynolds and/or CDK demonstrating DMS usage by the Rooftop during the Class Period, or other documentation provided by Reynolds and/or CDK showing DMS usage by the Rooftop during the Class Period. *Id.* Where possible, Epiq cross checked supporting documentation with the records of DMS usage supplied by Defendants CDK and Reynolds ("Defendant Data").[8]

Each claim submission that provided facially valid supporting documentation received several rounds of review by Epiq staff to ensure accuracy. *Id.* Claims submitted by TPFs without a fully executed representation agreement were denied. Claims without supporting documentation were

---

[8] *See* Amin-Giwner Decl. ¶ 18 "Defendant Data was used solely to supplement Epiq's review where a Claim Form already included supporting documentation and was not relied upon to independently substantiate Claim Form Submissions."

rejected. Claims with documentation which substantiated only a portion of the claimed dates of DMS usage, and which were otherwise free of defects, were partially awarded. All eligible and verifiable claims were approved. *Id.* In total, Epiq processed and reviewed 10,667 total claims. *Id.* ¶ 14. With the review process now complete, Epiq is recommending 7,373 Claim Form submissions be approved (69% of submissions), 2,441 Claim Form submissions be denied (23% of submissions), and 853 Claim Form submissions be removed as duplicate or withdrawn (8% of submissions). *Id.*

Of the 10,557 total claims filed, 6,552 were filed by TPFs. Of the 6,552 TPF claims, 2,543 are denied (and therefore not payable) and 4,009 are payable. *See* Amin-Giwner Decl. ¶ 26.

### 3. The Audit Process was Thorough

When addressing any deficiencies, claim modifications, or clarifying requests, Epiq provided notice to the affected Class members and Lead Counsel, and gave the claimant an opportunity to cure any deficiencies. Claim Form submissions with correctable defects were sent a Notice of Deficient Claim Form ("defect notice"). Amin-Giwner Decl. ¶ 20. Claim Form submissions that were invalid were sent a Notice of Denied Claim Form ("denial notice"). *Id.* TPF Claims without proof of representation were sent a combined defect and denial notice. All defect and denial notices listed the noted deficiencies and gave claimants 21 days from the date of the notice to respond. Despite this deadline, Epiq accepted supplemental responses through November 14, 2025 – well after the final round of notices were sent. *Id.* ¶ 19. In response to the 11 rounds of defect and denial notices sent, Epiq received and processed 5,851 responses. *Id.* ¶ 22. Epiq investigated and handled each response on an individual basis and resolved it in a timely manner. As of the filing of this Motion there are no outstanding disputes or issues that Epiq is aware of. Amin-Giwner Decl. ¶ 31.

### B. Administration Costs

Epiq has provided to Lead Counsel invoices detailing the fees and expenses it has incurred to administer the notice and claims of the Dealership Plaintiffs class members. In approving each settlement, the Court awarded the payment of up to $250,000 in claims administration costs for each respective settlement (Reynolds settlement provided to cover notice costs of the Reynolds settlement only). ECF 1528 ¶ 12; ECF 427-2 ¶ 13. As detailed further below, Epiq has incurred claims administration costs totaling $283,356, and has an additional claims administration cost of $30,000. Amin-Giwner Decl. ¶ 37, n.9. Epiq's total claims administration costs for both settlements to Epiq is $313,356, which is fair and reasonable in light of the services provided. *Id.*

## C. Calculation of Class Member Allocations

Dr. Michael A. Williams calculated Class Member settlement allocations on a *pro rata* basis in accordance with the Allocation Plan. *See generally* Declaration of Michael A. Williams, Ph.D; ECF 1358, Exh B. Dr. Williams has submitted numerous expert reports and testified as an expert in this case on merits issues (ECF 975-79 & 975-80) and class certification issues (ECF 1425, 1479-1, 1514, and 1517). Williams Decl. ¶ 2. As an expert economist, Dr. Williams has the necessary experience and expertise to calculate a *pro rata* distribution. *Id.* ¶ 1.

As described in his declaration, Dr. Williams calculated the *pro rata* distribution in "three steps": "First, I calculate(d) the total share of the settlement funds available for allocation for each month-DMS combination based on the share of damages. Second, I distribute(d) the share of the settlement funds available for allocation for each month-DMS combination equally among all qualified rooftops with approved claims in that month for that DMS. Third, for each Settlement Class Member, I sum(ed) up the share of the settlement funds available for allocation across all month-DMS combinations it has approved claims." *Id.* ¶ 7. This method conforms with the Allocation Plan's express language. *See* ECF 1528, Ex. B. Attached to Dr. Williams' Declaration are Exhibits C and D, which provide a list of each approved class member, the start-end date of its

7

substantiated DMS use, and the *pro rata* percentage and allocations that each class member will receive from each settlement. Williams Decl. ¶ 18, Ex. C and D. These class member allocations were calculated in compliance with the Allocation Plan, as approved by this Court, and as detailed by Dr. Williams. ECF 1531. Lead Counsel accordingly moves this court to approve the proposed allocations.

### D. Distribution of the Net Settlement Fund

As noted, the settled Defendants have paid a total of $129,500,000 plus settlement administrative costs into the Settlement Fund. Amin-Giwner Decl. ¶ 37. These funds have been used to pay the Court-approved Fee and Expense award (including class representative incentive awards), as well as administrative fees to Epiq in the amount of $283,356. *Id*. The remainder of the fund has been invested in U.S. Treasury Bills. As of the upcoming maturity date, February 19, 2026, the value of these funds is $83,293,000 (the Net Settlement Fund, "NSF").

| Description | Amount |
|---|---|
| Funding by CDK | + $100,000,000 |
| Funding by Reynolds | + $29,500,000 |
| CDK Admin/Notice Funding | + $250,000 |
| Earned Interest (through February 19, 2026) | + $8,743,626 |
| **Settlement Fund** | **$138,493,626** |
| Claims Administration Costs (paid) | - $283,356 |
| Attorneys' Fees (paid) | - $44,654,771 |
| Litigation Expenses (paid) | - $7,158,818 |
| Incentive Awards (paid) | - $220,000 |
| Taxes (paid) | - $2,591,065 |
| Claims Administration Costs (to be paid) | - $30,000 |
| Estimated Taxes (to be paid) | - $202,000 |
| Additional Expert Fees (to be paid) | - $50,608 |
| Incentive Awards (to be paid) | - $10,000 |
| **Net Settlement Fund** | **$83,293,000** |

Amin-Giwner Decl. ¶ 37.

Upon entry of an Order approving the distribution as set forth herein or as modified by the Court, Epiq will withdraw the NSF from the U.S. Treasury Bills and issue payments to approved Claim Form submissions ("Approved Rooftop Payments"). *Id*. ¶ 32. Each Approved Rooftop Payment will be a *pro rata* share of the NSF based on the Approved Rooftop Percentage of each approved Claim Form submission. *Id.* Such payments will be issued in the form of a traditional paper check mailed to the address of the Rooftop for all Rooftop Claims and TPF Claims where a fully executed Indemnification Agreement has not been provided.[9] Simultaneous to the check mailing, Epiq will also send an email to all recipients of such consolidated Approved Rooftop Payments with a breakdown of the payment amount as allocated to each approved Rooftop. *Id*. For all TPF Claims where a fully executed Indemnification Agreement has been provided, TPFs will receive a single payment via wire transfer or check and issued directly to the TPF along with an email with a breakdown of the payment amount as allocated to each approved Rooftop. *Id*. Lead Counsel recommends and Epiq concurs that the checks disbursed to qualified claimants bear the notation "Non-Negotiable After 90 Days" and that no check be negotiable more than 120 days after the date of the check. *Id*.

Dealership Plaintiffs will file a report with the Court 30 days after the 120 days of negotiability advising the Court regarding the status of the distribution and propose a plan for any funds remaining in the NSF. If the Court believes a hearing on the status of distribution is appropriate at that time, Dealership Plaintiffs are available.

## III.    ARGUMENT

---

[9] Where a Rooftop and/or TPF has identified a single overarching dealership for multiple Rooftops, Approved Rooftop Payments will be consolidated into a single check for these identified Rooftops with an indication of such consolidation included with the check.

The *pro rata* distribution in this case was described in the long form class notice and claim form which have already been approved by the Court and sent to Class members. The long form notice stated, "Settlement Funds will be distributed to CDK and/or Reynolds Settlement Class Members pursuant to the Allocation Plan available at (the settlement website)."[10] Dealership Plaintiffs did not receive any objections to this Plan of Allocation and subsequently filed an Unopposed Motion for Approval of Settlement with the CDK Defendants. ECF 1545 at 5.[11]

On February 25, 2025, the Court granted Dealership Plaintiffs Unopposed Motion for Final Approval of the Settlement with CDK. *Id.* In its Order, the Court stated, "The Court further finds that the Allocation Plan provides a fair, reasonable and adequate method to allocate settlement funds to members of the CDK Settlement Class and the Reynolds Settlement Class" *Id.* ¶ 13.

### A. The Court Should Approve the Recommendations of the Claims Administrator and Lead Counsel Concerning Acceptance or Rejection of Claims

"District courts enjoy broad supervisory powers over the administration of class-action settlements to allocate proceeds among the claiming class members equitably." *Contant v. AMA Capital, LLC,* 66 F.4th 59, 65 (2d Cir. 2023) (citing *In re Agent Orange Prod. Liab. Litig. MDL No. 381,* 818 F.2d 179, 181 (2d Cir. 1987)); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013). "Disputes over the valuation of class members' shares are typically left to the district court and Claims Administrator to resolve." *Id.* (quoting *Waldman ex rel. Elliot Waldman Pension Tr. v. Riedinger,* 423 F.3d 145, 147 n.2 (2d Cir. 2005)).

Epiq has performed a diligent, thorough review of all claim forms. *See* Section II.A.1-3 *supra*; *See generally* Amin-Giwner Decl. Based on this process, Epiq has determined–and Lead Counsel

---

[10] Long Form Notice available at the settlement website:
https://www.dealershipclassdmssettlement.com/Content/Documents/Long%20Form%20Notice.pdf.
[11] There were no opt-outs or objections to the CDK settlement. ECF 1540 ¶ 26.

concurs–that 7,373 eligible claims should be paid. Amin-Giwner Decl. ¶ 15; Wedgworth Decl. ¶ 7. Each Authorized Claim and the qualifying purchase amount is identified in Exhibit C and D of Dr. Williams' Declaration. Williams Decl. ¶ 18, Ex. C and D.

Epiq reviewed and rejected 3,294 claims which includes 2,543 TPF rejected claims (77% of all rejected claims). Amin-Giwner Decl. ¶¶ 26, 32. The most common reasons for rejecting claims were (i) claimants did not provide required information; (ii) claimants did not make a qualifying purchase of a DMS; (iii) claimant was a non-Settlement Class Member; and (iv) the claim was duplicative. *Id*. Lead Counsel agrees with Epiq's determinations and proposes that the Court approve Epiq's determinations concerning the denial of ineligible claims and the payment of eligible claims. Wedgworth Decl. ¶ 8.

## B. Late But Otherwise Valid Claims Should be Paid

In its Order preliminarily approving the CDK settlement, the Court established a deadline of January 9, 2025, for the filing of claims. *See* ECF 1531 at 9-10.[12] Lead Counsel recommends that the Court approve claims submitted on behalf of 221 class members that, although filed after the deadline, are otherwise valid. Those claims represent 3% of the number of claims, and 2.88% of the total payments, proposed for distribution. Amin-Giwner Decl. ¶ 33.

Courts have discretion to allow late-filed claims. *In re Broiler Chicken Antitrust Litig*., Case No. 1:16-cv-08637, ECF 5434, ¶ 7 (N.D. Ill. Feb. 11, 2022) ("The Court hereby authorizes distribution of the Net Settlement Funds to all qualified claimants, including late claims as set forth in the Motion."); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2018 WL 1138541, at 2 (N.D. Ill. Mar. 2, 2018); *In re Motorola Securities Litig.,* Case No. 1:03-cv-00287, ECF 557, at 2 (N.D. Ill. March 16, 2009) (approving late filed claims). Additionally, pursuant to

---

[12] This date was extended to January 10, 2025, due to the death and funeral of President Jimmy Carter.

the Court's Order preliminarily approving the CDK settlement, the filing deadline may be extended "for good cause." *See* ECF 1531 ¶ 31. Lead Counsel recommends approval of those claims, as their approval will not materially affect the distributions of class members who filed timely claims, nor will it delay the distribution of the funds. Wedgworth Decl. ¶ 7. Approval of these claims, which represent 3% of the total approved claims, and 2.88% of the funds to be distributed, would have a *de minimis* impact on the distribution to the Class and will not delay the distribution plan. *Id.* Approval also will promote the goal of providing recoveries to class members damaged by Defendants' alleged conduct.

### C. The Court Should Permit Direct Distributions to Third-Party Filers who Submitted Indemnification Agreements

Numerous claims have been filed by so-called "third party filers" ("TPFs") on behalf of their class member-clients. TPFs are businesses that monitor class action proceedings, solicit class members, wait to see if class actions are resolved favorably for the class, and then file proofs of claims for their clients in return for a commission. Unlike Lead Counsel, TPFs occupy no court-approved role, and typically are non-lawyers.

Various TPFs have requested that settlement payments for their class member-clients be made directly to the TPFs themselves. By receiving direct payments, the TPFs could collect commissions presumably due under contracts with their clients, while paying the remainder of the funds to the clients. To address the requests for direct payment, Lead Counsel and the settlement administrator offered each TPF an Indemnification Agreement that, if signed by the TPF *and its class member-clients*, would permit the TPF to receive direct payments from the administrator. *See* Amin-Giwner Decl. ¶ 27, Ex. G. Importantly, the Indemnification Agreement indemnifies and holds harmless the settlement classes, as well as Lead Counsel, and the administrator, with respect to a TPF's failure to pay its client. *Id.*

12

Absent an executed Indemnification Agreement, direct payments to a TPF could undermine the integrity of the settlements[13] if, for example, the TPF failed to pay its clients the correct amount (*i.e.*, the settlement payment net of the presumably agreed-upon commission payable to the TPF) or worse, failed to pay its clients at all. Indeed, it is because of these concerns that it is the SEC's standard practice not to pay TPFs directly. *See In re Weatherford Int'l PLC*, Release No. 100154, at 4 (SEC May 15, 2024)[14] ("preclud[ing] the sending of distribution payments to Third-Party Filers … [is] appropriate as a means to protect the integrity of Commission distributions."); *See also In re Wells Fargo & Co.*, Release No. 90898, at 4 (SEC Jan. 11, 2021) ("the preferred method of payment is directly to the Eligible Claimant").[15] Courts in other jurisdictions have gone as prohibiting third-party filers from making settlement claims altogether. *See Lopez v. Apple Inc.,* No. 4:19-cv-04577-JSW, ECF 364 (N.D. Cal. June 13, 2025) (order denying TPFs motion to file settlement claims). ECF 1560, Ex. A. It is the position of Lead Counsel, as well as Epiq, that payments for TPF claims lacking an indemnification agreement should be made directly to Class Members. Wedgworth Decl. ¶ 9; Amin-Giwner Decl. ¶ 27. This additional step serves to best protect the interest of Class Members and upholds the integrity of the Settlements in this case. *Id*.

To date, Indemnification Agreements signed by 17 of 22 TPFs and their 3,315 class member-clients have been submitted to the administrator. Amin-Giwner ¶ 27, Epiq recommends that 3,066 of these claims be paid directly to the TPF as they have signed and submitted their Indemnification Agreement and otherwise submitted valid/verified claims.[16] *Id*. Such payments would address the

---

[13] *See generally United States v. Cammarata*, 145 F.4th 345, 357-59 (3d Cir. 2025) (describing fraudulent TPF scheme).

[14] Available at https://www.sec.gov/files/litigation/admin/2024/34-100154.pdf.

[15] Available at https://www.sec.gov/files/litigation/admin/2021/34-90898.pdf.

[16] Of the 4,009 TPF claims to be paid, 3,315 claims are covered by an executed Indemnification Agreement. Of the remaining 694 claims to be paid, 545 were filed by Financial Recovery Services ("FRS") who has chosen to submit no Indemnification Agreements and filed a Motion to Intervene (ECF 1552; ECF 1561). Lead Counsel has opposed (ECF 1560) which is pending before this Court. The remaining 149 TPF claims to be paid without indemnification agreements are filed by TPFs who each filed a limited number of claims. *See* Amin-Giwner Decl. ¶ 27, n.6.

preferences of those class members, while the indemnification would protect the settlement classes, Lead Counsel, and the administrator against wrongful conduct by the TPFs. Offering indemnification agreements is an attempt at compromise and is not required for approval of distribution plans limiting TPF receipts. *See In re Barclays PLC and Barclays Bank PLC*, Release No. 34-103625 (SEC Aug. 1, 2025) (approving "without modification" a proposed distribution plan which stated "A Third-Party Filer shall not be the payee of any Distribution Payment. Compensation to a Third-Party Filer for its services may not be paid or deducted from the Distribution Payment."); *Sec. & Exch. Comm'n v. AR Cap., LLC*, No. 19 CIV. 6603 (AT), 2021 WL 1988084, at 12 (S.D.N.Y. May 18, 2021); *In re Impact Theory, LLC*, Release No. 101959, at 3 (SEC Dec. 18, 2024).

### D. The Court Should Authorize Payment of Outstanding Costs

Dealership Plaintiffs respectfully request that the Court authorize the payment of any outstanding expenses associated with the Settlements. The Court-appointed administrator, Epiq has provided its services, as described in the Amin-Giwner Declaration. *See generally* Amin-Giwner Decl. The CDK Settlement Agreement authorized Lead Counsel to withdraw up to $250,000 from the CDK Settlement Fund escrow account in notice and claims costs. ECF 1528 ¶ 12. The Reynolds Settlement Agreement provided that Reynolds would pay up to $250,000 in actual notice costs of the Reynolds settlement. ECF 427-2 ¶ 13. Lead Counsel have already paid from the Settlement Fund $ 283,356 to Epiq, and if approved will pay the remaining expenses of $30,000 to Epiq; $1,750 to Seth Neilson at Crimson Vista and $48,858.87 to BRG in expert fees after review and approval of their bills. Wedgworth Decl. at ¶ 10. As described *supra*, Epiq's fees, including the anticipated cost of completing this initial distribution, are $313,356. Lead Counsel find these fees to be reasonable and recommend that the Court approve the payment.

## IV.    CONCLUSION

For the foregoing reasons, Dealership Plaintiffs respectfully request that the Court (1) authorize payment of eligible claims; (2) deny the ineligible claims; (3) order the Escrow Agent to distribute the Net Settlement Fund to Epiq and pay approved fees and costs from the Settlement Fund; and (4) order Epiq to distribute the *pro rata* settlement proceeds to qualified claimants.

Respectfully submitted,

/s/ *Peggy J. Wedgworth*
Peggy J. Wedgworth (pro hac vice)
Robert Wallner (pro hac vice)
John Hughes (pro hac vice)*
Michael Acciavatti (pro hac vice)**
MILBERG PLLC
405 E 50th Street
New York, NY 10022
Tel: (212) 594-5300
pwedgworth@milberg.com
rwallner@milberg.com
jhughes@milberg.com
macciavatti@milberg.com
*admitted in Michigan only
**admitted in Pennsylvania only

Dealership Class Lead Counsel

15